**CAMPAIGN LEGAL CENTER**
Danielle Lang*
Jonathan Diaz**
Molly Danahy*
Hayden Johnson*
1101 14th St. NW, Suite 400
Washington, D.C. 20005
(202) 736-2200
dlang@campaignlegalcenter.org
jdiaz@campaignlegalcenter.org
mdanahy@campaignlegalcenter.org
hjohnson@campaignlegalcenter.org

**BARTON MENDEZ SOTO PLLC**
James Barton, AZ Bar No. 023888
401 W. Baseline Road, Suite 205
Tempe, AZ 85283
480-418-0668
james@bartonmendezsoto.com

*Attorneys for Plaintiffs*
*Additional counsel listed on last page*
*admitted* pro hac vice

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| MI FAMILIA VOTA et al.,<br><br>　　　*Plaintiffs*<br><br>v.<br><br>KATIE HOBBS, in her official capacity as Secretary of State for Arizona, et al.,<br><br>　　　*Defendants*<br><br>MARK BRNOVICH, in his official capacity as Attorney General of Arizona, et al.,<br><br>　　　*Intervenor Defendants* | Case No. 2:22-cv-00509 (Lead Case)<br><br>Judge Susan R. Bolton |

1

LIVING UNITED FOR CHANGE IN
ARIZONA, LEAGUE OF UNITED LATIN
ALERICAN CITIZENS, ARIZONA
STUDENTS' ASSOCIATION; ADRC
ACTION, INTER TRIBAL COUNCIL OF
ARIZONA, INC., SAN CARLOS APACHE
TRIBE, a federally-recognized tribe,
ARIZONA COALITION FOR CHANGE,

     *Plaintiffs*,

     v.

KATIE HOBBS, in her official capacity as
Secretary of State of Arizona;

     *Defendant*,

MARK BRNOVICH, in his official capacity
as Attorney General of Arizona; STATE OF
ARIZONA,

     *Intervenor Defendants*.

Case No. 2:22-cv-00519 (Consolidated Case)

Judge Susan R. Bolton

**FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF**

### *LUCHA PLAINTIFFS'* **FIRST AMENDED COMPLAINT**

1.     In 2022, the Arizona Legislature enacted and Governor Doug Ducey of Arizona signed into law two bills, House Bill 2492 ("HB 2492") and House Bill 2243 ("HB 2243"), that impose a host of arbitrary and discriminatory burdens on eligible Arizona voters in violation of the United States Constitution, the Civil Rights Act of 1964 (CRA), the National Voter Registration Act (NVRA), and the Voting Rights Act of 1965.

2.     HB 2492 was adopted in explicit defiance of federal law and the United States Constitution. After nonpartisan legal staff advised the Arizona legislature that the bill would likely violate federal law, one of the bill's proponents expressly acknowledged that defiance is a purpose of HB 2492.

3.      Among other violative provisions, HB2492 requires that eligible Arizonans provide documentary proof of citizenship and residence in order to register to vote; requires that election officials reject the registration applications of Arizonans who do provide documentary proof of citizenship if they fail to check a box on the voter registration application, or if they fail to provide their place of birth on their application; and conditions an applicant's right to vote on the seemingly inconsequential choice of whether to use a state versus a federal voter registration form. These arbitrary, burdensome, and immaterial barriers to registering to vote are directly at odds with federal law.

4.      In addition, HB 2492 denies certain Arizonans—those who are unable to provide documentary proof of citizenship but are entitled to register and vote in federal elections—the right to vote on an equal basis with all other Arizona voters by prohibiting these "Federal-only" voters from voting by mail.

5.      In an extraordinary step that defies any conception of popular sovereignty, HB 2492 also denies eligible Federal-only voters their equal right to vote for the President of the United States.

6.      No other state in the nation has abridged the fundamental right to vote for eligible voters in a such a manner.

7.      HB 2492 discriminates against Native American voters from tribes located in Arizona by imposing a proof of residential address requirement for voter registration that will prohibit many Native voters living on reservations from registering to vote, despite an existing stipulation providing accommodations for such voters with respect to the same requirement under Arizona's voter ID law.

8.      Finally, HB 2492 and HB 2243 intentionally discriminate against naturalized U.S. citizens, Latinos, and members of language minority communities by (i) subjecting them to heightened burdens to register and vote; (ii) mandating that elected officials reject voter registration applications and purge registered voters from the registration rolls based on outdated and incorrect U.S. citizenship data derived from unreliable sources; (iii) subjecting eligible voters to harassment, criminal investigation; and (iv) prosecution by Intervenor-Defendant Mark Brnovich, and singling out naturalized U.S. citizens for harassment based on their place of birth—a fact that has no bearing on their eligibility to vote.

9.      Plaintiffs Living United for Change in Arizona ("LUCHA"), League of United Latin American Citizens ("LULAC"), Arizona Students' Association ("ASA"), ADRC Action ("ADRC"), Inter Tribal Council of Arizona, Inc. ("ITCA"), the San Carlos Apache Tribe, and the Arizona Coalition for Change ("AZC4C") bring this Complaint for Declaratory and Injunctive Relief to remedy the violations alleged herein.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, 42 U.S.C. § 1983, and 52 U.S.C. §§ 10301, *et seq.*

11.     This Court also has jurisdiction pursuant to 28 U.S.C. § 1362, which provides that "district courts shall have original jurisdiction of all civil actions, brought by any Indian tribe or band with a governing body duly recognized by the Secretary of the Interior, wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States."

12.     This Court has personal jurisdiction over Defendant Secretary of State Hobbs and Intervenor-Defendant Attorney General Mark Brnovich, elected constitutional officers for and residents of the State of Arizona.

13.     Intervenor-Defendant the State of Arizona has waived sovereign immunity and submitted to the jurisdiction of this Court by voluntarily intervening to defend this action. *Clark v. Barnard*, 108 U.S. 436, 447 (1883).

14.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

15.     This Court has authority to issue declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

## FACTUAL AND LEGAL BACKGROUND

16.     On March 30, 2022, Governor Ducey signed into law House Bill 2492 ("HB 2492").

17.     On April 22, 2022, Governor Ducey signed Senate Bill 1638, which made a technical amendment to one section of HB 2492 and delayed the effective date for all of HB 2492's provisions to December 31, 2022.

18.     On June 23, 2022, the Arizona Legislature passed House Bill 2243 ("HB 2243"), which was signed into law by Governor Ducey on July 6, 2022.

19.     HB 2243's provisions will become effective September 24, 2022.

***Documentary Proof of Residence Requirement***

20.     HB 2492 violates federal law by requiring that eligible Arizona voters, with narrow exceptions for qualified individuals temporarily absent from the State, provide documentary proof of residence ("DPOR") to register to vote in any election.

21.     DPOR is defined as "an identifying document that establishes proof of location of residence." HB 2492 § 5 (to be codified at A.R.S. § 16-123). Under HB 2492, "a valid and unexpired Arizona Driver License or nonoperating identification number that is properly verified by the county recorder satisfies the requirements of this section." *Id.*

22.     In addition, HB 2492 states that "any of the identifying documents" required for identification while voting under A.R.S. § 16-579(A)(1) "constitutes satisfactory proof of location of residence." HB 2492 § 5 (to be codified at A.R.S. § 16-123). Those documents are:

(a) A valid form of identification that bears the photograph, name and address of the elector that reasonably appear to be the same as the name and address in the precinct register, including an Arizona driver license, an Arizona nonoperating identification license, a tribal enrollment card or other form of tribal identification or a United States federal, state or local government issued identification. Identification is deemed valid unless it can be determined on its face that it has expired.

(b) Two different items that contain the name and address of the elector that reasonably appear to be the same as the name and address in the precinct register, including a utility bill, a bank or credit union statement that is dated within ninety days of the date of the election, a valid Arizona vehicle registration, an Arizona vehicle insurance card, an Indian census card, tribal enrollment card or other form of tribal identification, a property tax statement, a recorder's certificate, a voter registration card, a valid United States federal, state or local government issued identification or any mailing that is labeled as "official election material". Identification is deemed valid unless it can be determined on its face that it has expired.

(c) A valid form of identification that bears the photograph, name and address of the elector except that if the address on the identification does not reasonably appear to be the same as the address in the precinct register or the identification is a valid United States military identification card or a valid United States passport and does not bear an address, the identification must be accompanied by one of the items listed in subdivision (b) of this paragraph.

A.R.S. § 16-579(A)(1).

23.     All voters in Arizona registering to vote must attest to their legal residence under the penalty of perjury. And under existing law, the above documentation of residence is already provided at the time of voting in person (subject to a stipulation providing for voting access for Native voters).

24.     HB 2492's DPOR Requirement imposes new and duplicative burdens on voters to access or obtain, copy, print, and submit the required documents at the time they register.

25.    The DPOR Requirement will most affect Arizonans who lack a valid Arizona driver's license or nonoperating state-ID card and will have a more difficult time accessing and providing the documentation to prove their residence. These disparately burdened Arizonans include low-income voters, college and university students, enrolled members of Arizona tribes, and voters who frequently move, many of whom for circumstances largely beyond their control, such as employment, family and school demands.

26.    Further, the DPOR Requirement may effectively bar eligible voters who live in a residence without a numbered street address from registering to vote because these registrants lack any documents containing their nonexistent residential address.

27.    In recognition of the substantial number of eligible voters whose residence does not have a numbered street address, the State of Arizona permits registrants to include a description and drawing of their place of residence on their voter application form, rather than a numbered street address.[1]

28.    However, HB 2492 contains no exceptions to the DPOR Requirement for these eligible voters without a numbered street address.

29.    Because many residences on Indian reservations in Arizona lack a numbered street address or residential address, many enrolled members of tribes are likely to be prevented from voting by the DPOR Requirement.

30.    For example, on the San Carlos Apache Reservation, where Plaintiff San Carlos Apache Tribe is located, there is not a uniform residential numbering system for physical addresses that identifies residences by a street address or residence or building number.

---

[1] See Arizona Secretary of State, *Arizona Voter Registration Form* (Jan. 2022), https://azsos.gov/sites/default/files/2022_Voter_Registration_Form.pdf.

31.     For example, there are at least 100 residential or access roads that lead to residences, located on the south side of U.S. Route 70, which connects Ft. Thomas to Globe, Arizona, that have no names or route number.

32.     Accordingly, many residences are not assigned a physical numbered street address. Instead, members of the Tribe commonly describe where they live using common road names, mile markers on Route 70, Bureau of Indian Affairs' Indian Routes, or other landmarks and distances.

33.     For example, one resident of the Reservation would refer to his home as located on the south side of Route 70, just outside and several miles west the community of Peridot, near mile marker 268, and then 300 yards down that dirt road.

34.     For this reason, the Tribe's enrolled members living on the Reservation commonly receive mail at post office boxes located on or near the Reservation.

35.     Because many homes on the San Carlos Apache Reservation do not have numbered street addresses, the Tribe's members who live on the Reservation often do not have documents listing their name and residential address, and thus will be unable to satisfy the DPOR Requirement.

36.     By not satisfying that Requirement, such members would effectively be disenfranchised.

37.     In addition to the San Carlos Apache Tribe, other ITCA Member Tribes also have large and rural reservations, and their members commonly lack the type of documentation required by HB 2492. Many members of these tribes similarly lack the documentation mandated by the DPOR Requirement and will therefore be barred from voting by HB 2492.

8

38.     The experience for citizens of the San Carlos Apache is also the norm for many other Tribal citizens residing on the reservations of ITCA's other Member Tribes in Arizona.

39.     In recognition of the particular burdens Native voters would otherwise face, under a stipulation in *Gonzalez v. Arizona*, members of federally recognized Indian tribes are entitled to present Tribal identification at the polls that does not include a numbered street address. *See Gonzalez v. Arizona*, CV 06-1268-PHX-ROS, Joint Stipulation, (D. Ariz. Apr. 18, 2008). Voters needing this accommodation are given a provisional ballot that is counted without additional documentation.

40.     The new DPOR Requirement for voter registration under HB 2492 contains no accommodation for tribal identification that does not include a residential address or otherwise does not meet the requirements of Arizona Statute § 16-579.

41.     As a result, members of tribes who are eligible to vote and have identification sufficient to enable them to cast a ballot in person under the *Gonzalez* stipulation will nonetheless be prohibited from registering to vote under HB 2492.

42.     The DPOR Requirement also makes no provision for how people experiencing homelessness can comply with its mandates and register to vote.

43.     The DPOR Requirement will also burden voters who would otherwise take advantage of voter registration drives.

44.     Additional documentation requirements for registration beyond a standardized form make traditional voter registration activity nearly impossible. Potential voters often do not carry documentary proof of residence with them while out in the community. And those conducting voter registration drives cannot easily incorporate the equipment needed to copy such documentation for submission with paper voter registration forms.

45.     Arizona voters may register to vote using either the Arizona Voter Registration Form ("State Form") or the National Mail Voter Registration Form ("Federal Form"), which is promulgated by the U.S. Election Assistance Commission ("EAC") under the NVRA.

46.     Arizona voters may also register online (if they have a valid Arizona Driver's License and/or an Arizona non-operating I.D. card issued by the Motor Vehicle Division), in person at a County Recorder's office, or at a NVRA-mandated public agency.

47.     Under the NVRA, all states must "accept and use" the Federal Form, which only requires attestation of residence and does not require documentary proof of residence. 52 U.S.C. § 20505.

48.     The NVRA preempts any attempt by states to impose additional requirements to prove citizenship, residence, or any other qualification above and beyond those provided by the Federal Form.

49.     HB 2492's DPOR Requirement purports to prohibit county election officials from registering otherwise eligible voters—including those who submitted a completed Federal Form—unless they provide DPOR, in flagrant violation of federal law.

50.     The Supreme Court rejected Arizona's attempt to impose a documentary proof of citizenship requirement on registrants using the Federal Form less than a decade ago. *See Arizona v. Inter Tribal Council of Arizona*, 570 U.S. 1, 18 (2013) (holding that the NVRA's requirement that states "accept and use" the Federal Form "acts as both a ceiling and a floor" for registering to vote in federal elections).

51.     The NVRA also requires that certain mandated public assistance agencies provide voter registration services using the Federal Form or "its equivalent." 52 U.S.C. § 20506.

52.     To the extent HB 2492 seeks to impose the DPOR Requirement on applicants registering at NVRA-mandated agencies, it is preempted by the NVRA because an "equivalent" form would not require documentary proof of residence.

53.     Under the NVRA, a voter registration application provided at a state's motor vehicle authority may require only the minimum amount of information necessary to "(i) prevent duplicate voter registrations; and (ii) enable State election officials to assess the eligibility of the applicant and to administer voter registration and other parts of the election process." 52 U.S.C. § 20504.

54.     The Arizona Motor Vehicle Division implements these provisions, and the DPOR Requirement is preempted by the NVRA to the extent it is inconsistent with the Motor Vehicle Division's federal voter registration obligations.

### *Birthplace Requirement*

55.     HB 2492 mandates that eligible Arizonans provide their birthplace when registering to vote and directs county election officials not to register voters who fail to list their place of birth on the grounds that such an application is "incomplete." HB 2492 § 4 (to be codified at A.R.S. § 16-121.01).

56.     A voter's birthplace is wholly immaterial to their qualifications to vote. Arizona's voter qualifications require that a person be eighteen years old, a current U.S. citizen, and a current resident of Arizona and the specific jurisdiction in which they are registering to vote. A person's place of birth has no bearing whether they are eighteen, currently a citizen of the United States, or a resident of Arizona and the specific jurisdiction in which they are registering.

57.     Arizona's State Form already contains a field for inputting place of birth, *see* A.R.S. § 16-152(A), but until HB 2492 goes into effect, applicants who omit the field will nonetheless be

registered to vote. *See id.* § 16-121.01(A); Ariz. Sec'y of State, 2019 Elections Procedures Manual at 19 (Dec. 2019). This is because birthplace is immaterial to voter eligibility.

58.     The Birthplace Requirement, combined with HB 2492's provisions that mandate aggressive investigation and prosecution of alleged non-U.S. citizens (based on faulty data that will inevitably target naturalized citizens), is intended to, and will, intimidate eligible voters who were born outside of the United States.

59.     The Birthplace Requirement serves no purpose other than to single out naturalized U.S. citizens for harassment, including by election administrators and law enforcement officials.

60.     The Birthplace Requirement unlawfully discriminates against naturalized U.S. citizen voters based on their country of origin.

61.     The Birthplace Requirement violates the Civil Rights Act of 1964, 52 U.S.C. § 10101(a)(2)(B), by denying the right to register and to vote to eligible Arizonans who omit their place of birth from their voter registration application.

62.     To the extent HB 2492 seeks to impose the Birthplace Requirement on applicants registering at NVRA-mandated agencies or the Arizona Motor Vehicle Division, it is preempted by the NVRA because a form "equivalent" to the Federal Form would not require place of birth and that information is certainly not "necessary" to assessing eligibility.

### U.S. Citizenship Checkmark Requirement

63.     HB 2492 requires that all voter registration applicants, include "a checkmark or other appropriate mark in the 'Yes' box next to the question regarding citizenship." HB 2492 § 4 (to be codified at A.R.S. § 16-121.01). An application that omits this checkmark, regardless of the circumstances, will be rejected. *Id.*

64.     This Checkmark Requirement applies even when an applicant has already attested to their U.S. citizenship under penalty of perjury using the Federal Form.

65.     The Checkmark Requirement applies even when the applicant has supplied the type of DPOC identified in HB 2492 as "satisfactory evidence of citizenship." HB 2492 § 1 (to be codified at A.R.S. § 16-101).

66.     The Checkmark Requirement is immaterial to an applicant's eligibility to vote where the applicant has otherwise attested to their U.S. citizenship under penalty of perjury or provide DPOC under Arizona law.

67.     The immaterial Checkmark Requirement violates the Civil Rights Act of 1964, 52 U.S.C. § 10101(a)(2)(B), by denying the right to register and to vote to eligible Arizonans who accidentally omit the checkmark from their voter registration application. A person's ability to check a box is immaterial to determining whether an individual is eligible to vote in Arizona, where election officials already have adequate evidence of the applicant's citizenship.

***Documentary Proof of U.S. Citizenship Requirements***

68.     HB 2492 violates federal law by requiring Arizonans to provide documentary proof of U.S. citizenship ("DPOC") as an eligibility requirement to register and to vote. *See* HB 2492 § 1 (to be codified at A.R.S. § 16-101); § 3 (to be codified at A.R.S. § 16-121); § 4 (to be codified at A.R.S. § 16-121.01).

69.     When HB 2492 goes into effect, Arizona will be the only state in the country that enforces a DPOC requirement for voter registration and voting.

70.     HB 2492's DPOC Requirements impose additional severe, undue, and discriminatory burdens on the right to vote for eligible Arizonans who lack DPOC.

71.     Per expert estimates, as many as seven percent of United States citizens lack ready access to citizenship documents.[2] In Arizona, this means that as many as 509,342 eligible voters lack DPOC.[3]

72.     HB 2492's DPOC Requirements would deny these eligible citizens their rights to register and to vote.

73.     Arizona's attempt to impose a DPOC requirement on its voters has a substantial history in the federal courts.

74.     In 2004, Arizona enacted Proposition 200, which, among other things, imposed a DPOC requirement for voter registration.

75.     After Proposition 200's passage, the EAC denied Arizona's request to include its DPOC requirement in the state-specific instructions for voter registration in Arizona on the Federal Form.

76.     After years of litigation, the Supreme Court held that the NVRA's requirement that states "accept and use" the Federal Form preempted Arizona's DPOC requirement under Proposition 200 as applied to the Federal Form. *Arizona v. Inter Tribal Council of Arizona*, 570 U.S. 1, 18 (2013).

77.     Rather than abandoning the Proposition 200 DPOC requirement in light of the Supreme Court's decision and its unsuccessful request to the EAC (as several other states did),

---

[2] "Citizens Without Proof: A Survey of Americans' Possession of Documentary Proof of Citizenship and Photo Identification," Brennan Center for Justice (2006), https://www.brennancenter.org/sites/default/files/legacy/d/download_file_39242.pdf.
[3] The U.S. Census Bureau estimates Arizona's total population is 7,276,316 as of July 1, 2021.

14

Arizona enacted a dual voter registration system allowing it to enforce its DPOC requirement only for state and local elections. Ariz. Op. Atty. Gen. No. I13-011 (2013).

78.     From 2014 to 2018, Arizona operated this dual voter registration system in a manner that not only imposed the undue burden of the DPOC requirement on eligible voters but also arbitrarily disenfranchised tens of thousands of voters solely because they registered  using the State Form rather than the Federal Form.

79.     If the voter completed the Federal Form without DPOC, the voter was registered to vote in federal elections but not state elections and advised to submit DPOC to vote in state elections. These voters were assigned to the Federal-Only Voter List.

80.     If the voter applied using either a State Form or a Federal Form and did supply DPOC, they could vote in all eligible local, state, and federal elections. These voters were assigned to the Full-Ballot Voter List.

81.     If the voter completed the State Form without DPOC, the voter was not registered for state or federal elections and, in violation of prior court order, was not advised of the Federal Form option.

82.     In 2018, Plaintiffs LULAC and ASA sued then-Secretary of State Reagan in *LULAC v. Reagan*, No. 2:17-cv-04102-DGC (D. Ariz.), alleging that the dual-registration system violated the NVRA and the United States Constitution.

83.      The *LULAC v. Reagan* parties reached a consent decree in which the Secretary of State agreed not to condition voter registration based on the arbitrary distinction of whether a voter used the State Form or the Federal Form to apply for voter registration.

84.     The *LULAC v. Reagan* consent decree established, in relevant part, that Arizona would (a) register eligible applicants whose registration was not accompanied by DPOC and whose

citizenship could not be verified through the Motor Vehicle Division to the Federal-Only Voter List and (b) provide a ballot to vote in all available federal elections to all registered voters on the Federal-Only Voter List. *See* Consent Decree, *LULAC v. Reagan*, No. 2:17-cv-04102-DGC, ECF No. 37 (D. Ariz. June 18, 2018).

85.    The Secretary codified the consent decree framework in the Arizona Elections Procedures Manual.

86.    HB 2492 purports to abrogate the consent decree and reinstate the prior arbitrary system under which voter registration is conditioned on whether a voter submits the State Form or Federal Form.

87.    Under HB 2492, if an eligible voter provides DPOC at the time of registration and applies using a State Form or Federal Form, they can vote in all available local, state, and federal elections.

88.    If an eligible voter without DPOC submits the Federal Form, the voter will be registered to vote only in certain federal elections, as described below.

89.    But if that same voter applies using the State Form and does not provide DPOC, HB 2492 instructs that their registration be rejected outright. HB 2492, § 4.C.

90.    This arbitrary distinction is unconstitutional and requires the Secretary to violate a federal consent decree.

91.    Additionally, nothing in HB 2492 requires that rejected State Form applicants be advised of the Federal Form option, in violation of their federal rights and prior court order. *See Gonzalez v. Arizona*, No. 06-cv-1268, 2013 WL 7767705, at *1 (D. Ariz. Sept. 11, 2013).

***Severe and Disparate Restrictions on Eligible Federal-Only Voters***

92.     HB 2492 discriminates against and imposes a severe, undue, and discriminatory burden on the class of eligible Arizona voters who have exercised their right to register for federal elections without supplying DPOC.

93.     Before HB 2492, an eligible voter registered on the Federal-Only Voter List received a ballot to vote in all relevant federal elections and was treated the same in all other respects as a registered voter on the Full-Ballot Voter List.

94.     As mandated by federal law and the *LULAC v. Reagan* consent decree, registered voters on the Federal-Only Voter List are entitled to use Arizona's mail voting opportunities and to vote in presidential and congressional elections.

95.     HB 2492 arbitrarily discriminates against eligible, registered voters on the Federal-Only Voter Lists.

96.     First, HB 2492 denies this class of eligible, registered voters the right to vote by mail, even if they are not physically present in the State to cast a ballot. HB 2492 § 4 (to be codified at A.R.S. § 16-121.01); § 5 (to be codified at A.R.S. § 16-127). This discriminatory restriction denies this class of eligible voters their right to vote on an equal basis as other Arizona voters.

97.     Second, HB 2492 denies this class of eligible, registered voters the right to vote in presidential elections. HB 2492 § 4 (to be codified at A.R.S. § 16-121.01); § 5 (to be codified at A.R.S. § 16-127). This discriminatory restriction denies this class of eligible voters their right to vote on an equal basis as other Arizona voters.

98.     HB2492 singles out eligible, registered voters on the Federal-Only Voter Lists for discriminatory treatment by restricting them to voting only in-person and only in congressional elections.

99.     HB 2492's arbitrary, discriminatory, and burdensome limits on voting for registrants on the Federal-Only Voter List violate federal constitutional and statutory rights.

### Discrimination Against Naturalized U.S. Citizens

100.    HB 2492 compels election officials to reject valid voter registration applications from eligible voters based on vague criteria and using faulty inputs from databases that are known to have unreliable citizenship data. These provisions discriminate against naturalized U.S. citizens.

101.    HB 2492 mandates that election officials "use all available resources to verify the citizenship status" of a registration applicant or currently registered voter, without any requirement for the veracity of those "available resources." HB 2492 § 7 (to be codified at A.R.S. § 16-143)

102.    The specified resources that HB 2492 mandates that election officials check for U.S. citizenship information are notoriously unreliable and contain outdated and faulty data that do not accurately reflect U.S. citizenship status.

103.    Included among the "available resources" are databases from Arizona's Motor Vehicles Division, the Social Security Administration, a National Association for Public Health Statistics and Information Systems, and "any other state, city, town, county or federal database." *Id.*

104.    None of these databases are designed to contain or reflect up-to-date U.S. citizenship status.

105.    In Arizona, a person's driver's license does not expire until the licensee reaches age 65. Thus, a driver's license can be valid for nearly *fifty years*.

106.    In recent years, between 12,000 and 15,000 Arizonans have naturalized *each year*.

18

107.    Arizona Motor Vehicle Division data that indicates that a person was not a U.S. citizen at the time they were issued a driver's license or identification card—up to almost fifty years ago—is not probative of whether they are a U.S. citizen today.

108.    Nonetheless, HB 2492 requires county recorders to reject the voter registration application of an individual whose MVD record shows they were not a U.S. citizen at the time they obtained their driver's license or non-driver identification card.

109.    Any election official who fails to comply with this requirement faces potential felony prosecution.

110.    If, after receiving a notice, the voter does not provide satisfactory DPOC or attestation of residence within 35 days, the Recorder must cancel the registration. The county recorder must notify the county attorney and Attorney General of all cancelled registrations for failure to provide satisfactory DPOC for possible investigation. HB 2243 § 2 (to be codified at A.R.S. § 16-165).

111.    HB 2243 also requires the Secretary of State to compare on a monthly basis the statewide voter registration database to the driver license database maintained by the Arizona Department of Transportation (ADOT) and notify the appropriate county recorder if the ADOT database indicates that a person who is registered to vote in that county was not a U.S. citizen at the time their ADOT identification as issued. *Id.*

112.    HB 2243 further requires county recorders to complete monthly checks comparing the county's voter registration database with the Social Security Administration Database. *Id.*

113.    On a monthly basis, HB 2243 requires county recorders to identify registered voters who have not provided DPOC or "who the county Recorder has reason to believe are not United States citizens" and compare them against the Systematic Alien Verification for Entitlements

19

(SAVE) database maintained by USCIS, the electronic verification of vital events system maintained by a national association for public health statistics and information systems, and any "relevant city, town, county state and federal databases to which the county Recorder has access[.]" *Id.*

114.    HB 2243 also requires county recorders to initiate the removal process if they receive a report from the jury commissioner or jury manager, under A.R.S. § 21-314, indicating that the voter has changed residence or is not a U.S. citizen.

115.    HB 2492 and HB 2243's mandated error-prone database checks will lead to inaccuracies and result in election officials erroneously rejecting numerous voter registration applications from eligible Arizona voters.

116.    Because these databases are faulty and contain notoriously stale data, this system will fail to reliably identify non-U.S. citizens but will reliably identify and discriminate against naturalized U.S. citizens.

### *Harassing Investigations and Wrongful Prosecutions*

117.    HB 2492 and HB 2243 unlawfully subject eligible, registered voters to targeted harassment and criminal investigation and prosecution by the Intervenor-Defendant Attorney General.

118.    HB 2492 requires the Defendant Secretary of State to provide the Intervenor-Defendant Attorney General with "a list of all individuals who are registered to vote and who have not provided satisfactory evidence of citizenship" for the purpose of hunting among lawfully registered voters searching for alleged noncitizens on the rolls. HB 2492 § 7 (to be codified at A.R.S. § 16-143).

119.    HB 2243 likewise requires that county recorders refer to the county attorney or the Intervenor-Defendant Attorney General any voter whose registration is cancelled because the voter failed to supply DPOC in response to the notice letter. *Id.*

120.    HB 2492 subjects these voters to harassment and criminal investigation under a vague and overbroad mandate that the Intervenor-Defendant Attorney General "use all available resources" to investigate and prosecute registered voters based on evidence that they are not U.S. citizens, despite the fact that the identified resources do not have reliable or current data about U.S. citizenship. *Id.*

121.    The "resources" HB 2492 lists as required references for Intervenor-Defendant Attorney General to check for U.S. citizenship data are the same notoriously unreliable databases identified above known to contain outdated and faulty data that do not accurately reflect current citizenship status.

122.    Using these outdated and inaccurate inputs or any other purported "available resources," HB 2492 subjects these eligible voters to harassment and intimidation by Intervenor-Defendant Attorney General simply because they are naturalized rather than native-born U.S. citizens and they exercised their fundamental right to register and vote.

### HB 2492 and HB 2243 Impose Severe, Arbitrary, and Discriminatory Burdens

123.    HB 2492's and HB 2243's severe and undue burdens fall disproportionately on voters who have fewer resources, have less access to the tools and assistance necessary to comply with the law's many confusing and restrictive requirements, and who are more likely to have experienced past and present discrimination.

124.    Millions of Americans lack ready access to documents to prove their U.S. citizenship. For example, statistics published by the U.S. Department of State and U.S. Census Bureau indicate that approximately 56% of Americans lack a valid U.S. passport.[4]

125.    A 2006 study showed that 5-6% of Americans lacked access to both a U.S. passport and a birth certificate.[5]

126.    DPOC requirements are particularly burdensome for elderly people, including African Americans and Native Americans born during the era of *de jure* segregation, who may not have been born in hospitals, and whose births may not have been officially recorded.

127.    HB 2492 also imposes severe burdens on people who have changed their name, including through marriage. For example, the 2006 survey conducted by the Brennan Center for Justice demonstrated that as few as 48% of voting-age women with ready access to their birth certificate have a birth certificate that reflects their current name, and only 66% of voting-age women have access to any form of DPOC reflecting their current name.[6]

128.    Low-income voters are particularly likely to lack access to DPOC and DPOR. For example, citizens earning less than $25,000 per year are more than twice as likely to lack access to DPOC than other Americans, and at least 12% of voting-age citizens who earn less than $25,000

---

[4] The U.S. Census Bureau estimates U.S. population to be 331,893,745 as of July 1, 2021. US Quick Facts, US Census Bureau, https://www.census.gov/quickfacts/fact/table/US (accessed July 17, 2022). According to the U.S. State Department, 145,028,408 valid U.S. passports were in circulation in 2021. Reports and Statistics, U.S. Dep't of State Bureau of Consular Affairs, https://travel.state.gov/content/travel/en/about-us/reports-and-statistics.html (accessed July 17, 2022). The number of valid U.S. passports is approximately 44% of the estimated population of the United States.

[5] "Citizens Without Proof: A Survey of Americans' Possession of Documentary Proof of Citizenship and Photo Identification," Brennan Center for Justice (2006), https://www.brennancenter.org/sites/default/files/legacy/d/download_file_39242.pdf.

[6] *Id.*

per year do not have a readily available U.S. passport, naturalization document, or birth certificate.[7] Low-income voters are also more likely to move more frequently and have difficulty maintaining and providing DPOR.

129.    The burden imposed by DPOC requirements on low-income voters is compounded by the financial obstacles to obtaining DPOC. The cost to obtain or replace U.S. citizenship documents can be insurmountable for some Americans; a birth certificate can cost as much as $30 in fees, a first-time application for a passport card costs $55, plus the cost of photos, and a replacement naturalization certificate costs $555.

130.    In addition to those fees, applicants for passports and birth certificates may need to obtain multiple additional documents to prove their U.S. citizenship or identity, which in turn require additional costs. In some instances, individuals must also bear the cost of traveling long distances, and taking off or losing hours at work, to obtain citizenship documents.

131.    Obtaining U.S. citizenship documents also takes time. The U.S. State Department estimates a processing time of eight to eleven weeks for a routine passport request, which costs between $65 and $195 for a new applicant, and five to seven weeks for an expedited request—which requires $60 in additional costs.[8] Many states take several weeks to fulfill birth certificate requests. For example, a mailed request for a birth certificate takes ten to twelve weeks to complete in New York and eight to ten weeks in Georgia. Those timelines can be expedited but doing so

---

[7] *Id.*

[8] Processing Times for U.S. Passports, U.S. Dep't of State Bureau of Consular Affairs, https://travel.state.gov/content/travel/en/passports/how-apply/processing-times.html (accessed July 17, 2022); Passport Fees, U.S. Dep't of State Bureau of Consular Affairs, https://travel.state.gov/content/travel/en/passports/how-apply/fees.html (accessed July 17, 2022).

requires payment of an additional fee or travel to the relevant state—cost-prohibitive options that are not feasible for individuals who are struggling to afford the base fee to obtain a birth certificate.

132.    According to the U.S. Census Bureau's American Community Survey, more than 3.2 million of Arizona's approximately 7.1 million residents were born in a State other than Arizona, and more than 428,000 are foreign-born naturalized U.S. citizens.[9]

133.    HB 2492's DPOC and DPOR requirements put significant strain on voter registration work by state agencies and nonprofit civic organizations.

134.    Advocating for greater civic participation by conducting voter registration drives—activity the NVRA affirmatively encourages, *see* 52 U.S.C. § 20505(b)—is costly in time and resources, and HB 2492 makes Plaintiffs voter registration work more difficult and advocacy less effective.

135.    Even those eligible Arizonans who do have access to the specified documents establishing their U.S. citizenship or their current residence often do not carry them to locations where civic organizations conduct voter registration drives.

136.    Civic organizations likewise cannot be expected to carry expensive equipment necessary to scan those documents and attach them to completed voter registration applications in order to serve their mission participating in the voter registration process.

***Discrimination Against Eligible Native American Voters***

137.    HB 2492's DPOR requirement targets Native Americans of tribes located in Arizona, particularly enrolled members who live on Reservations, giving them less opportunity

---

[9] American Community Survey 2020 5-Year Estimates Detailed Tables, B05002 – Place of Birth by Nativity and Citizenship Status, https://data.census.gov/cedsci/table?t=Native%20Born%3ANative%20and%20Foreign%20Born%3APlace%20of%20Birth&g=0400000US04&tid=ACSDT5Y2020.B05002 (accessed July 17, 2022).

than other eligible Arizona voters to participate in the political process and elect representatives of their choice.

138.    Because HB 2492 requires that voters provide documentary proof of residence as a condition of registration, eligible voters who cannot satisfy the DPOR requirement will be unable to cast a ballot using any means of voting.

139.    The DPOR requirement will burden a substantial portion of the Native population in Arizona, and this burden will be unique when compared to other eligible Arizona voters.

140.    As described above, many enrolled members of tribes will be unable to provide DPOR because they live on Reservations or in other rural communities where homes lack numbered street addresses and therefore have no method of obtaining a document containing their name and residential address, as required by HB 2492.

141.    Even where members of tribes live in a home that has a numbered street address, many may be unable to provide documentary proof of that address due to their living circumstances.

142.    For instance, Reservation homes may house extended families and multiple generations.[10] In a 2017 study, the Department of Housing and Urban Development estimated that as many as 39 percent of Native households in Indian Country are extended family households.[11] Moreover, many homes in Indian Country belonging to enrolled members of tribes—at least 16

---

[10] *See* U.S. Dep't of Housing and Urban Development, Housing Needs of American Indians and Alaska Natives in Tribal Areas: A Report from the Assessment of American Indian, Alaska Native, and Native Hawaiian Housing Needs 77 (Jan. 2017), https://www.huduser.gov/portal/sites/default/files/pdf/HNAIHousingNeeds.pdf [hereinafter "HUD Report"].

[11] *Id.*

percent, according to one estimate—are considered "overcrowded" by the Department of Housing and Urban Development.[12]

143.    Individuals living in multi-generational, extended family, or many-member homes, may not be listed on official documentation, and as a result may lack paperwork that can be used to satisfy the DPOR Requirement. These individuals will be forced to overcome substantial hurdles in order to obtain satisfactory DPOR.

144.    Other enrolled members of tribes living on Reservations may be "near homeless," or living temporarily with family members or other Tribal members in order to avoid being without housing.[13] The Department of Housing and Urban Development estimates that on average, 16.6 percent of households in Indian Country are sheltering an individual who has no other place to live.[14] Individuals experiencing "near homelessness" are often forced to move frequently[15] and, given the short-term nature of their housing, are unlikely to be able to obtain documents that establish their place of residence. As a result, they may be prevented from registering to vote because they are unable to satisfy the DPOR Requirement.

145.    Some homes on Reservations do not have running water, electricity, telephone, or internet services, meaning that their residents may not have utility accounts and the documentation that comes with them.[16] Homes may also be in a condition that makes it difficult to maintain paper documentation.[17] These barriers are far less common in homes outside of a tribe's reservation, meaning that they are disproportionately felt by Native Americans.

---

[12] *Id.* at 74.
[13] *Id.* at 79.
[14] *Id.* at 75.
[15] *Id.* at 80-81.
[16] *See, e.g.*, HUD REPORT at 66-72.
[17] *See id.*

146.     Reservations commonly do not have residential mail services and many enrolled members of tribes either have no address or only have access to a post office box. Members commonly share these post office boxes with others or frequently change their box numbers.

147.     Together, these factors make obtaining DPOR burdensome or impossible for a substantial population of eligible Native voters and mean that the barriers to obtaining DPOR are disproportionately felt by Native Americans, when compared to other Arizona residents.

148.     HB 2492's disproportionate burden on eligible Native voters was no accident.

149.     The discriminatory DPOR requirement was enacted in the wake of widely publicized high turnout by Native voters in Arizona, which affected electoral outcomes in in the 2020 Election.[18]

150.     In response to this increased political mobilization by Native voters, the Legislature sought to suppress the Native vote.

151.     Lawmakers in Arizona have been on notice for years that conditioning voting or registering to vote on an individual's ability to provide documentary proof of their residential address, as HB 2492 does, disproportionately burdens Native American voters.

152.     In 2006, the Inter Tribal Council of Arizona, the Hopi Tribe, Navajo Nation, individual enrolled members, and others sued Arizona officials challenging the State's

---

[18] *See, e.g.*, *Native American Voters Help Biden Take the State of Arizona*, Latino Decisions (Nov. 10, 2020), https://latinodecisions.com/blog/native-american-voters-help-biden-take-the-state-of-arizona/?bbeml=tp-pck9Q6QNPEiuBt3JmyTokQ.j_A449GHrZU6gsiXEwkkqjw.rhpa3D81JCk2FHErD8XV8wQ.lr uv5nT3v40qRlHmbW6ye_A; Anna V. Smith, *How Indigenous Voters Swung the 2020 Election*, High Country News (Nov. 6, 2020), https://www.hcn.org/articles/indigenous-affairs-how-indigenous-voters-swung-the-2020-election; Shondiin Silversmith, *Navajo and Hopi Voters Turn Out in Force on Election Day, Hoping for a Clear Voice*, AZCentral (Nov. 5, 2020)L, https://www.azcentral.com/story/news/local/arizona/2020/11/05/native-american-voters-turn-out-large-numbers-election-day/6169022002/.

discriminatory practices. Amongst other issues, the Plaintiffs alleged that the State's photo identification law, A.R.S. § 16-579, which required voters to present identification that included their residential numbered street address, would disproportionately prevent Native Americans from voting.

153.    In response to the lawsuit, the Secretary of State agreed to revise the State's election procedures to permit enrolled members to vote a regular provisional ballot upon providing a form of tribal identification that does not include a residential numbered street address. *See Gonzalez v. Arizona*, CV 06-1268-PHX-ROS, Joint Stipulation, Doc. 749 (D. Ariz. Apr. 18, 2008).

154.    The DPOR requirement in HB 2492 is directly tied to the law at issue in the 2006 voter identification cases, A.R.S. § 16-579: a voter registration applicant may satisfy the DPOR requirement only by providing identification that would be sufficient under that provision, A.R.S. § 16-579, or by listing an Arizona Driver's License or Nonoperating Identification number.

155.    The 2006 lawsuit and subsequent accommodations for enrolled members put Arizona lawmakers on notice that many Native voters would be unable to satisfy HB 2492's DPOR requirement.

### *Discrimination Against Eligible Latino, Language Minority, and Other Voters of Color*

156.    HB 2492 and HB 2243 also disproportionately burden eligible Latino and language minority voters, giving them less opportunity than other eligible Arizona voters to participate in the political process and elect representatives of their choice.

157.    As described above, naturalized U.S. citizens will be disproportionately targeted by HB 2492 and HB 2243's DPOC and Birthplace Requirements as well as their reliance on faulty and stale citizenship data to cancel, remove, and target eligible voters for criminal investigation.

158.     In Arizona, the naturalized U.S. citizen population is primarily comprised of voters of color and voters who speak English as a second language. According to the 2020 5-year American Community Survey, approximately 428,788 naturalized citizens reside in Arizona. Over half of those potential voters were born in Latin America. Over 100,000 of those potential voters were born in Asia. And an estimated 19,304 of those voters were born in Africa. Over three-quarters of the naturalized U.S. citizen population in Arizona identifies as non-white and/or Hispanic or Latino.

159.     Moreover, many naturalized U.S. citizens in Arizona speak English as a second language. Over seventy-five percent of naturalized U.S. citizens in Arizona speak a language other than English at home and over one-third report speaking English less than "very well."

160.     By discriminating against naturalized citizen voters, HB 2492 and HB 2243 will disproportionately burden voters and voter registration applicants of color, particularly Latino voters, as well as voters and voter registration applicants from language minority communities.

***Totality of Circumstances***

161.     HB 2492 and HB 2243 were enacted against a background of persistent and pervasive discrimination against Native Americans, Latinos, voters of color, and language minority communities in Arizona, including in voting.

162.     The history of discrimination against Native Americans, Latinos, voters of color and members of language minority communities in Arizona is well documented.

163.     From November 1, 1972, until June 25, 2013, when the Supreme Court decided *Shelby County v. Holder*, the State of Arizona was subject to the preclearance provisions of Section 5 of the Voting Rights Act because of its use of voting practices that disproportionately burdened

members of language minority communities.[19] Apache, Navajo, and Coconino Counties were also historically covered.[20]

164.     Official barriers to Native Americans' ability to register to vote persisted in Arizona until 1948. *See Harrison v. Laveen*, 196 P.2d 456 (Ariz. 1984). Once Native Americans became United States citizens pursuant to the Indian Citizenship Act of 1924, a number of localities in Arizona continued to reject Native Americans' voter registration applications.[21] Some advanced the theory that living on a reservation made enrolled members non-residents of the state.[22] Others alleged that Supreme Court caselaw supposedly made Native Americans "wards" of the United States and therefore ineligible to vote under the Arizona constitutional provision barring persons "under guardianship" from casting a ballot.[23]

165.     The policy of rejecting Native American voter registrants living on reservations became official statewide in 1928 when the Arizona Supreme Court adopted the guardianship theory. The policy was extended in practice and later officially by the Attorney General to all Native Americans, including those living outside of Reservations.[24] Native Americans only won the right to vote in Arizona after a lawsuit filed by Native veterans who returned home after serving the United States in World War II and had their voter registrations denied.[25]

---

[19] *See Jurisdictions Previously Covered by Section 5*, U.S. DEP'T OF JUSTICE (Nov. 29, 2021), https://www.justice.gov/crt/jurisdictions-previously-covered-section-5.

[20] Patty Ferguson-Bohnee, *The History of Indian Voting Rights in Arizona: Overcoming Decades of Voter Suppression*, 47 Ariz. St. L. J. 1099, 1113-14 (2011).

[21] *See id.* at 1104-1108.

[22] *See id.*

[23] *See id.*

[24] *See* Porter v. Hall, 271 P. 411, 417 (Ariz. 1928); Ferguson-Bohnee, *supra* note 17 at 1110-11; DANIEL MCCOOL, SUSAN M. OLSON, AND JENNIFER L. ROBINSON, NATIVE VOTE: AMERICAN INDIANS, THE VOTING RIGHTS ACT, AND THE RIGHT TO VOTE 14-18 (2007).

[25] *Id.*

166.    Even after ostensibly granting the right to vote to Native Americans, the State of Arizona and its localities continued to enact laws and employ practices that had both the aim and effect of disenfranchising Native Americans.

167.    Until the 1970's, Arizona used literacy tests to block Native Americans, Latinos, and other voters of color from casting a ballot.[26]

168.    Shortly after Arizona's literacy tests were invalidated by the VRA, Apache County eliminated almost half of the polling places on lands located within tribes' reservations within the county in a bid to suppress turnout by enrolled members in an election to fund a new segregated school in the county.[27] Three counties with large populations of Native Americans entered into a consent decree with the United States after the Department of Justice sued Arizona under the Voting Rights Act for denying and abridging the voting rights of Navajo Citizens. *See United States v. Arizona*, No. 88-1989 (D. Ariz. May 22, 1989) (consent decree) (as amended Sept. 7, 1993). The consent decree was later modified due to continued noncompliance by the counties.[28] Two of those counties later attempted to hold judicial elections without obtaining preclearance, as required by the Voting Rights Act.[29]

169.    Voting discrimination against Native Americans in Arizona has persisted into this century. In 2004, Arizona enacted a voter identification law that, as noted above, failed to account for the lack of numbered street addresses on many reservations.[30] Arizona counties have also

---

[26] *See Oregon v. Mitchell*, 400 U.S. 112, 153 (1970); Ferguson-Bohnee, *supra* note 17 at 1112.

[27] *See id.* at 1117.

[28] *See* James Thomas Tucker, et al., *Voting Rights in Arizona: 1982-2006*, 17:2 Rev. of L. and Soc. Justice 283, 293 (2008).

[29] *See* Ferguson-Bohnee, *supra* note 17 at 1117-18.

[30] *See id.* at 1124-31.

31

continuously failed to provide Native language services required by the language assistance provisions of the Voting Rights Act.[31]

170.   The State and its localities have also consistently attempted to dilute Native voting power through malapportionment, failures to draw majority-minority districts that are required by federal law, and tools like at-large elections designed to quash minority voting power.[32] *See, e.g.*, *Goodluck v. Apache Cnty.*, 417 F. Supp. 13 (D. Ariz. 1975), *aff'd sub nom. Apache Cnty. v. United States*, 429 U.S. 876 (1976); *Goddard v. Babbitt*, 536 F. Supp. 538, 541 (D. Ariz. 1982) (finding that the division of the San Carlos Apache Reservation into three state legislative and three congressional districts was unnecessary to achieve traditional redistricting principles and "ha[d] the effect of diluting the San Carlos Apache Tribal voting strength and dividing the Apache community of interest" and requiring new plans).

171.   Native Americans in Arizona continue to bear the effects of discrimination in areas such as education, employment, health, and economic outcomes, further hindering their ability to participate in the democratic process.

172.   Native Americans have the highest poverty rate amongst persons of any race or ethnicity in Arizona and live in poverty at a rate more than double that of the overall population and more than three times that of white Arizonans. Specifically, 31.5 percent of Native American residents of Arizona live in a household with an income falling below the poverty line, compared to 14.1 percent in the overall population, and 9.6 percent of white residents.

---

[31]   *See* James Thomas Tucker, Jacqueline De León, and Dan McCool, Native American Rights Fund, Obstacles at Every Turn 61-62 (2020).

[32]   *See* Ferguson-Bohnee, *supra* note 17 at 1118-21.

173.    Native Americans similarly have the lowest median household income compared to any other race or ethnicity in Arizona. According to the 2020 American Community Survey, the median household income amongst Native Americans is $39,969, compared to $61,529 in the total population and $66,973 amongst white Arizonans.

174.    Native Americans in Arizona also experience the effects of discrimination in educational attainment. While 94.8 percent of white residents of Arizona aged 25 and older have attained a high school diploma, only 78.1 percent of Native Americans of the same age have completed high school or the equivalent. The disparity is even greater in postsecondary education, with only 10.9 percent of Native Americans having a bachelor's degree or higher, compared to 36.6 percent of white Arizonans.

175.    Native Americans are unemployed at a rate substantially higher than the overall population, with an unemployment rate of 12.8 percent, compared to only 5.8 percent amongst the overall population and 5.0 percent amongst white Arizonans.

176.    Enrolled members living on Reservations often do not own or have access to a reliable vehicle. Indeed, Native Americans are far more likely not to have access to a vehicle than the overall population in Arizona. While only 6.0 percent households of any race in Arizona and 5.6 percent of white households do not have a vehicle available, 19.7 percent of Native households lack access to a vehicle.

177.    Together, these factors exacerbate the barriers imposed on Native Americans by HB 2492.

178.    There is a similarly long history of official discrimination against eligible Latino voters in Arizona.

33

179.    Like Native Americans, Latinos were commonly prevented from voting through the 1970's by the State's literacy test. In enacting the pre-statehood literacy test in 1909, legislators made it clear that discriminating against Latino voters was one of the express goals of the test. One legislator even remarked that the test's purpose was to block the "ignorant Mexican vote."[33] The test was administered in a manner that allowed white applicants to easily pass or be excused altogether, while Latinos were expected to pass the test without error.[34]

180.    The obstacles faced by Arizona's Latino and Spanish-speaking communities have been exacerbated by Arizona's persistently discriminatory education policies. In 1988, the Arizona Constitution was amended by ballot initiative to require that "[t]he State and all political subdivisions of [the] State shall act in English and in no other language." *Yniguez v. Arizonans for Official English*, 69 F.3d 920, 924 (9th Cir. 1995) (en banc), *vacated sub nom. Arizonans for Official English v. Arizona*, 520 U.S. 43 (1997). The English-only requirement was invalidated by the Arizona Supreme Court as unconstitutional under the First and Fourteenth Amendments, in part because of its dramatically negative impact on political participation by language minorities. *Ruiz v. Hull*, 957 P.2d 984, 998, 1000 (Ariz. 1998).

181.    Intimidation and efforts to block Latino voters persist into this century. In 2004, Arizona enacted Proposition 200, which, in addition to establishing the DPOC requirement for voter registration at issue in *Gonzales* and *Arizona Inter Tribal Council*, also imposed similarly burdensome and discriminatory DPOC requirements for certain state and local public benefits.

---

[33] Grace Oldham, *Arizona Has Suppressed Black, Latino, and Native American Voters for More than a Century*, ARIZONA REPUBLIC (Sep. 13, 2020), https://www.azcentral.com/story/news/politics/arizona/2020/09/13/arizonas-history-suppressing-black-latino-native-american-voters/5771359002/.

[34] *Id.*

182.    Arizona jurisdictions have continued to fail to provide adequate language services to Latino voters who have limited English proficiency. In 2012, for example, Maricopa County's Spanish-language voter pamphlet listed the wrong date for the election. The English-language version did not contain the same mistake.[35] Spanish-language voting materials also frequently contain misrepresentations and mistranslations.[36]

183.    Latinos in Arizona continue to bear the effects of discrimination in areas such as education, employment, health, and economic outcomes, further hindering their ability to participate in the democratic process.

184.    Latinos in Arizona have a higher poverty rate compared to the overall population, and more than twice that of white Arizonans. Specifically, 19.2 percent of Latinos live in a household with an income falling below the poverty line, compared to only 9.6 percent of white Arizonans and 14.1 percent of the overall population.

185.    The median household income amongst Latinos in Arizona also falls below the median household income statewide. According to the 2020 American Community Survey, the median household income amongst the Latino population in Arizona is $52,399, compared to $61,529 in the total population and $66,973 amongst white Arizonans.

186.    Latinos in Arizona face greater disparities than white Arizonans in education. Only 71.7 percent of Latinos in Arizona have received a high school diploma or the equivalent, compared to 94.8 percent of the white population. The disparity is similar in postsecondary education, with only 14.3 percent of Latinos having a bachelor's degree or higher, compared to 36.6 percent of white Arizonans.

---

[35] *Id.*
[36] *Id.*

187. Latinos are unemployed at a rate higher than the overall population, with an unemployment rate of 6.2 percent, compared to only 5.8 percent amongst the overall population and 5.0 percent amongst white Arizonans.

188. Latinos are likewise far more likely not to have access to a vehicle than the overall population in Arizona. While only 6.0 percent households of any race in Arizona and 5.6 percent of white households do not have a vehicle available, 11.2 percent of Latino households lack access to a vehicle.

189. Together, these factors exacerbate the barriers imposed on Latinos and members of language minority communities by HB 2492 and HB 2243.

190. The DPOR Requirement, DPOC procedures, and Birthplace Requirement provisions enshrined in HB 2492 and HB 2243 are novel practices that were not commonly in place at the time of the passage of the Voting Rights Act of 1965 or its amendments. In particular, Arizona law did not contain any of these requirements at the time.

191. Because barriers posed by these requirements affect an eligible voter's ability to register to vote and remain registered, affected individuals will be barred from voting using any means. HB 2492 and 2243 render Arizona's entire system of voting is inaccessible to eligible voters impacted by the new laws.

***HB 2492 and 2493 Do Not Serve Any Legitimate Governmental Purpose***

192. HB 2492 and HB 2243 impose a host of severe, unnecessary, and discriminatory burdens on Arizona voters at both the registration and voting stages.

193. HB 2492 and HB 2243's burdensome, arbitrary, and discriminatory provisions serve no meaningful or legitimate governmental purpose.

194.    The intent to discriminate against Native voters, naturalized U.S. citizens, Latino voters, and members of language minority communities is not a legitimate governmental purpose.

195.    The State has not and cannot offer a rational, or much less strong, interest that is served by the DPOR requirement.

196.    Arizona's election procedures already accommodate voters who lack numbered street addresses by, for example, permitting voter registration applicants to register using a description of where they live rather than an address and permitting Native Americans to cast a ballot using tribal identification that does not include a residential address. The DPOR requirement does not offer such accommodations, and its failure to do so is not supported by any rational or strong state interest.

197.    Nor can the State identify a rational or strong interest served by the DPOC Requirement, Birthplace Requirement, Checkmark Requirement, or the mandated use of outdated and incorrect citizenship data to reject voter registration applications and purge eligible voters from the rolls.

198.    There is no evidence of widespread voter fraud or non-U.S. citizen voting in Arizona. To the extent there is a perception that Arizona suffers from widespread voting fraud or non-U.S. citizen voting in Arizona, the passage of bills like HB 2492 and HB 2243 are intended to and succeed in furthering that misperception.

199.    Despite fourteen different post-election lawsuits in Arizona state and federal courts purportedly challenging the validity of the 2020 election, courts unanimously concluded that the election conspiracists who brought these challenges failed to "establish any degree of fraud" in Arizona's elections. *Ward v. Jackson*, No. CV-20-0343-AP/EL, 2020 WL 8617817, at *2 (Ariz.

Dec. 8, 2020), *cert. denied*, 141 S. Ct. 1381 (2021); *see also Bowyer v. Ducey*, 506 F. Supp. 3d 699, 720-24 (D. Ariz. 2020) (rejecting all fraud claims and dismissing case).

200.   Since 2020, Arizona's elections have come under tremendous scrutiny in various official and unofficial audits, but none of these reviews have surfaced legitimate claims of widespread fraud or non-U.S. citizens voting in Arizona elections because no such fraud exists.[37]

201.   In sworn testimony before Congress, Arizona House Speaker Rusty Bowers has denied the widespread but false allegations that Arizona's election outcomes were affected by fraud or were otherwise illegitimate.[38]

202.   Despite the lack of any evidence to substantiate their claims, various actors—including state elected officials such as HB 2492 sponsor Representative Jake Hoffman—have continued to make allegations that Arizona's elections suffer from fraud and non-U.S. citizen voters. These allegations are intended to undermine voter confidence in the electoral process, vilify naturalized citizens and voters of color, justify restricting access to voter registration and voting, and further the misconception that the 2020 election was stolen. They are not intended to be a factual representation about the state of elections in Arizona.

203.   Instead of advancing any legitimate purpose, HB 2492 and HB 2243 were enacted to serve a political advantage and further the misconception that the 2020 election was stolen.

---

[37] *See, e.g.*, Maricopa County Elections Department, *Elections Information: Just the Facts*, https://elections.maricopa.gov/voting/just-the-facts.html.

[38] *See Here's every word from the fourth Jan. 6 committee hearing on its investigation*, NPR (June 21, 2022), https://www.npr.org/2022/06/21/1105848096/jan-6-committee-hearing-transcript.

204.    The restrictions imposed by HB 2492 and HB 2243 will not enhance electoral security. Instead, they will make voter registration rolls less reliable, and will undermine the public's confidence in Arizona's elections.

205.    Some voters will see HB 2492 and HB 2243 as legitimizing otherwise baseless claims about voter fraud and non-U.S. citizen voting—problems that Arizona does not have. Other voters will understand HB  2492 and HB 2243 as intended to discriminate against naturalized citizens and Native American voters and make it more difficult for certain eligible voters to participate in the electoral process. The end result will be that voters in Arizona will have less confidence in the electoral process.

206.    Rather than providing election officials with reliable means to identify ineligible voters, the new law will instead make it more difficult for eligible Arizonans to register and vote. The burdens will most heavily burden naturalized U.S. citizens, enrolled members of tribes, college and university students, low-income voters, elderly voters, racial and ethnic minorities, voters who move frequently, and voters who have changed their legal name such as married women.

207.    The legislature enacted HB 2492 knowing that aspects of the bill violate federal law.

208.    For example, before debating the bill in the House Rules Committee on February 22, 2022, nonpartisan legal staff for the House Rules Committee warned that the proposed documentary proof of citizenship requirement would violate federal law.[39]

---

[39]    Arizona    State    Legislature,    02/22/2022    –    House    Rules, https://www.azleg.gov/videoplayer/?eventID=2022021121&startStreamAt=451.

209.    Undeterred, the House Rules Committee voted to approve HB 2492. In explaining his vote, Chair of the House Rules Committee and House Speaker Pro Tempore Travis Grantham asserted that he "strongly reject[ed] th[e] notion" that the federal government has the authority to invalidate Arizona's past efforts to impose DPOC requirements for violating federal law and stated that rebuking that precedent by enacting HB 2492 would be "a fight worth having" in court.[40]

**PARTIES**

*Plaintiffs*

**Living United for Change in Arizona**

210.  Living United for Change in Arizona ("LUCHA") is a nonpartisan, nonprofit membership organization based in Arizona. It is led by community members fighting for social, racial, and economic justice.

211.  LUCHA advocates on behalf of approximately 2,000 dues-paying members and an additional approximately 93,000 supporters in Arizona.

212.  HB 2492 will negatively affect LUCHA's members and supporters many of whom are people of color, low income, students, and/or elderly voters, and are therefore significantly more likely to lack the required documentation under HB 2492.

213. LUCHA's membership also consists of naturalized U.S. citizens who will be targeted for specific classifications and disfavored treatment under the requirements and processes established in HB 2492 and HB 2243.

---

[40] *Id.*

214.  In advance of the 2020 election, LUCHA organized both in-person and virtual voter registration drives and educated voters about important deadlines, how voters could exercise and protect their right to vote, and issues and candidates on the ballot.

215.  LUCHA plans to conduct the same voter registration and education activities for future elections. However, as a result of the requirements imposed by HB 2492, LUCHA must divert money, personnel, time, and resources away from other activities. Specifically, LUCHA must divert its scarce resources toward efforts to ensure that voters, particularly those who are low income, can navigate the DPOC, DPOR, birthplace, and checkmark requirements mandated by HB 2492 and can obtain the necessary documentation to comply with the many changes in law.

216.  LUCHA will spend more time training volunteers to educate voters about these new restrictions, create additional digital voter education campaigns to combat misinformation about these requirements, and conduct additional outreach to Spanish-speaking, Tribal, and rural communities to ensure that these efforts are effective. These diversions will continue to occur until the 2022 election and beyond for as long as these requirements are in effect.

217.  HB 2492's disparate treatment of otherwise eligible voters based on whether they list their birthplace, check the citizenship box, and are able to provide DPOC and DPOR means that LUCHA's voter registration drive organizers must take additional time and training to inform voters of the many new changes in the law and the threats of criminal investigation and prosecution.

218.  When one of LUCHA's members or assisted voters lack DPOC or DPOR, they will be ineligible to register and/or to vote under HB 2492's eligibility requirements.

219. LUCHA expects that many of its members and the community members that it seeks to register to vote will be intimidated and discouraged from registering to vote, even though

41

they are eligible, because of the unconstitutional limits imposed on the exercise of their franchise by HB 2492 and HB 2243.

220.  Because LUCHA conducts voter registration drives at community events with the goal of completing voter registrations on-site, potential LUCHA members and voters who do not have Arizona drivers' licenses and/or do not have DPOC or DPOR with them cannot fully participate.

221.  Even if applicants happen to have DPOC or DPOR at a LUCHA voter registration drive, LUCHA must now incur costs and additional burdens to purchase and maintain mobile scanning and printing equipment to facilitate voter registration applications that comply with HB 2492.

222.  As a result of Defendant's enforcement of the unconstitutional and unlawful provisions of HB 2492, LUCHA will be overburdened and unable to conduct successful voter registration drives; LUCHA will be forced to dedicate more resources and time in order to register the same number of members and voters; LUCHA will incur costs to purchase and maintain equipment to ensure its voter registration advocacy complies with HB 2492; and fewer LUCHA members and voters LUCHA reaches will be able to successfully register to vote and then cast a ballot in all elections for which they are eligible.

223.  HB 2243's requirement that election officials purge eligible voters from the voter registration rolls based on outdated and incorrect data will disproportionately affect LUCHA's members who are naturalized U.S. citizens,

224.  LUCHA will be forced to divert additional resources to educating its naturalized U.S. citizen members about the threat of removal from the voter registration rolls under HB 2243

and assisting members who are threatened with removal in complying with notice letters and ensuring these members remain registered to vote.

**League of United Latin American Citizens**

225.  Plaintiff League of United Latin American Citizens ("LULAC") is the Arizona-based branch of the nation's oldest and largest national Latino civil rights organization. LULAC is a nonpartisan, nonprofit membership organization with a presence in most of the fifty states, including Arizona. Founded in 1929, LULAC works to advance the economic condition, educational attainment, political influence, health, and civil rights, including voting rights, of the Hispanic population of the United States.

226. LULAC members live across the State. LULAC has local councils throughout Arizona, including in Phoenix, San Luis, Tucson, Tempe, Yuma, and other smaller communities.

227. LULAC's members in Arizona include naturalized U.S. citizens, low-income voters, students, and voters who move frequently or have changed their name.

228. LULAC's members in Arizona are adversely affected by the undue burdens HB 2492's policies place on eligible Arizona citizens. Over 400,000 eligible Latino citizens in Arizona, or nearly half of eligible Latinos in Arizona, are not currently registered to vote.

229. Voter registration activity is key to LULAC's mission of increasing civic participation of its members and Arizona voters. LULAC has committed and continues to commit time and resources to voter registration drives in Arizona.

230. Due to the burdensome and confusing restrictions on voting and registration eligibility and processes imposed by HB 2492 and 2243, LULAC will be forced to divert its resources from its other programs supporting its mission. These bills will force LULAC to redirect

scarce funding to help voters comply with the new requirements. These diversions will continue to occur until the 2022 election and beyond for as long as these requirements are in effect.

231.  HB 2492's disparate treatment of otherwise eligible voters based on whether they list their birthplace, check the citizenship box, and are able to provide DPOC and DPOR means that voter registration drive organizers must inform voters of the many new changes in the law and the threats of criminal investigation and prosecution.

232.  When one of LULAC's members or assisted voters in Arizona lack DPOC or DPOR, they will be denied the right to register and the right to vote under HB 2492's eligibility requirements.

233.  LULAC expects that many of its members and the community members that it seeks to register to vote will be intimidated and discouraged from registering to vote, even though they are eligible, because of the unconstitutional limits imposed on the exercise of their franchise by HB 2492 and 2443.

234.  Since LULAC conducts voter registration drives on-site in communities with the goal of completing voter registrations on-site, potential voters who do not have Arizona drivers' licenses and/or do not have DPOC or DPOR with them cannot fully participate.

235.  Even if applicants happen to have DPOC or DPOR at a LULAC voter registration drive, LULAC must now incur costs and additional burdens to purchase and maintain mobile scanning and printing equipment to facilitate voter registration applications that comply with HB 2492.

236.  As a result of Defendant's enforcement of the unconstitutional and unlawful provisions of HB 2492, LULAC will be overburdened and unable to conduct successful voter registration drives; LULAC must dedicate and divert more resources and time in order to register

the same number of members and voters; LULAC will incur costs to purchase and maintain equipment to ensure its voter registration advocacy complies with HB 2492; and fewer LULAC members and voters LULAC reaches will be able to successfully register to vote and then cast a ballot in all elections for which they are eligible.

237. HB 2243's requirement that election officials purge eligible voters from the voter registration rolls based on outdated and incorrect data will disproportionately affect LULAC's members and community members who are naturalized U.S. citizens.

238. LULAC will be forced to divert additional resources to educating its naturalized U.S. citizen members and the communities it serves about the threat of removal from the voter registration rolls under HB 2243 and assisting those voters who are threatened with removal in complying with notice letters and ensuring these members remain registered to vote.

**Arizona Students' Association**

239. Plaintiff Arizona Students' Association ("ASA") is a nonpartisan, nonprofit membership organization based in Arizona. ASA is student led and represents the collective interest of the over 140,000 university students and over 400,000 community college students in Arizona. The organization advocates at the local, state, and national levels for the interests of students. As a part of its mission, ASA encourages students throughout Arizona to register to vote through voter registration activity. ASA has committed and continues to commit time and personnel to voter registration drives in Arizona.

240. ASA's members, students of numerous backgrounds throughout Arizona, are acutely harmed by the undue burdens HB 2492 and HB 2243 impose on eligible Arizona citizens. Many students are young adults who are just becoming eligible to vote and therefore must register for the first time. Students in Arizona living on campuses often do not have easy access to their

birth certificates or other underlying citizenship documentation. Students in Arizona move frequently and have less access to documents proving their place of residence.

241.  Many students eligible to vote in Arizona have out-of-state driver's licenses that do not meet the statutory DPOC and DPOR requirements. Many other students cannot afford to pay for state IDs or drivers' licenses.

242.  ASA has regularly conducted and will continue to conduct voter registration drives in Arizona as a core part of ASA's mission. These voter registration drives focus on registering students, many of whom are first time voters and unfamiliar with the voter registration system. ASA conducts its voter registration drives on school sites throughout Arizona.

243.  Due to HB 2492's burdensome and confusing restrictions on voting and registration eligibility and processes, ASA will be forced to divert its resources from its other programs supporting its mission. HB 2492 will force ASA to redirect scarce funding to purchase additional equipment and educational materials to help voters comply with the new voting and registration scheme, and to commit further staff and volunteer time and training to help guide voters through the additional requirements. These diversions will continue to occur until the 2022 election and beyond for as long as these requirements are in effect.

244.  HB 2492's disparate treatment of otherwise eligible voters based on whether they list their birthplace, check the citizenship box, and are able to provide DPOC and DPOR means that voter registration drive organizers must inform voters of the many new changes in the law and the threats of criminal investigation and prosecution.

245.  When one of ASA's members or assisted voters lack DPOC or DPOR, they will be ineligible to register and to vote under HB 2492's eligibility requirements.

246. Moreover, because the removal provisions set forth in HB 2243 direct county election officials to conduct monthly voter purges based on outdated information, ASA will be forced to divert resources to ensuring that its members, once registered, are not removed from the rolls.

247. ASA expects that many of its members and the community members that it seeks to register to vote will be intimidated and discouraged from registering to vote, even though they are eligible, because of the unconstitutional limits imposed on the exercise of their franchise by HB 2492 and HB 2243.

248. Because ASA conducts voter registration drives at schools with the goal of completing voter registrations on-site, potential ASA members and voters who do not have Arizona drivers' licenses and/or do not have DPOC or DPOR with them cannot fully participate.

249. Even if applicants happen to have DPOC or DPOR at an ASA voter registration drive, ASA must now incur costs and additional burdens to purchase and maintain mobile scanning and printing equipment to facilitate voter registration applications that comply with HB 2492.

250. As a result of Defendant's enforcement of the unconstitutional and unlawful provisions of HB 2492 and HB 2243, ASA will be overburdened and unable to conduct successful voter registration drives; ASA will be forced to dedicate more resources and time in order to register the same number of members and voters; ASA will incur costs to purchase and maintain equipment to ensure its voter registration advocacy complies with HB 2492; and fewer ASA members and voters ASA reaches will be able to successfully register to vote and then cast a ballot in all elections for which they are eligible.

**ADRC Action**

251. ADRC Action is a nonpartisan, nonprofit organization based in Arizona. It is dedicated to empowering community members and encouraging civic participation. ADRC Action advocates for equitable representation for all Arizonans; works closely with community leaders to protect our democracy; and is committed to dismantling structural barriers to democratic participation, supporting community self-determination, and investing in local leadership.

252. ADRC Action is the sponsor of the Arizona ballot measure committee Arizonans for Free and Fair Elections (ADRC Action). This ballot measure committee is circulating petition I-16-2022, which

> Restores permanent early voting list. Provides same-day, automatic, and online voter registration. Makes voting easier for disabled people. Reduces cancelation causes for voter registration. Ensures voters can vote in any in-county precinct Expands polling places on Indian lands, voter registration, early voting, mail voting, early voting sites, and voting rights for some under guardianship. Allows entrusting another person to return one's voted early ballot. Specifies process for correcting signature problems on early voting envelopes. Allows Clean Elections grants for election administration. Specifies sufficient requirements for voter registration, identification, and early voting. Safeguards against registering ineligible people to vote. Allows providing refreshments to waiting voters. Restricts gifts from lobbyists, reduces privately funded candidates' contribution limits, and increases funds available to Clean Elections candidates. Requires clear explanation of statewide ballot measures. Limits judicial review of initiative and referendum petitions and protects signatures from elimination based on: county of the signer; another writing signer['] name, address or date; circulator['] failure to respond to a subpoena or strictly comply with technical requirements. Enhances ballot privacy. Restricts reviews and subpoenas concerning ballots and election material. Stabilizes presidential election process. Creates voluntary tax checkoff. Increases lobbyist registration fees and corporate minimum tax for some.

Initiative, Referendum and Recall Applications, Overview I-16-2022, *available at* https://apps.arizona.vote/info/irr/2022-general-election/33/0.

253.  ADRC Action supports voter registration activities in the State of Arizona. As a result of Defendant's enforcement of the unconstitutional and unlawful provisions of HB 2492, ADRC Action will be forced to divert its resources from its other programs supporting its mission. HB 2492 will force ADRC Action to redirect scarce funding to help voters comply with the new voting and registration scheme, and to commit further staff and volunteer time and training to help guide voters through the additional requirements of both HB 2492 and HB 2243. These diversions will continue to occur until the 2022 election and beyond for as long as these requirements are in effect.

**Inter Tribal Council of Arizona, Inc.**

254.  The Inter Tribal Council of Arizona, Inc. ("ITCA") is a nonpartisan, nonprofit inter-tribal consortium of 21 federally recognized Indian Tribes with lands located across the State of Arizona, and whose lands extend into the States of California, New Mexico, and Utah.

255.  The 21 Member Tribes that comprise ITCA are the Ak-Chin Indian Community, Cocopah Tribe, Colorado River Indian Tribes, Fort McDowell Yavapai Nation, Fort Mojave Tribe, Gila River Indian Community, Havasupai Tribe, Hopi Tribe, Hualapai Tribe, Kaibab Band of Paiute Indians, Pascua Yaqui Tribe, Pueblo of Zuni, Quechan Tribe, Salt River Pima-Maricopa Indian Community, San Carlos Apache Tribe, Tohono O'odham Nation, Tonto Apache Tribe, White Mountain Apache Tribe, Yavapai-Apache Nation, and Yavapai-Prescott Indian Tribe.

256.  ITCA's representatives are the highest elected officials from each Tribal Nation, including chairpersons, governors, and presidents. Its members include citizens of the consortium of the 21 federally recognized Indian Tribes.

257.  Since 1952, ITCA's Member Tribes have worked together as the Inter Tribal Council of Arizona to advocate for regional, state, and national issues affecting Tribes.

258.  ITCA's Member Tribes have the authority to act to further their collective interests as sovereign Tribal governments. ITCA has the charge to support and represent particular Member Tribes on matters directly affecting them.

259.  ITCA works to address the historical and modern barriers members of ITCA's Member Tribes face when attempting to access the ballot and provides non-partisan support for Native American voter engagement and participation in local, state, and federal elections. ITCA's Member Tribes have consistently dedicated time and resources to protect the right to vote.

260.  Since 1975, ITCA has engaged Tribal citizens, who primarily live on Tribal reservation lands, through five key areas of civic engagement: 1) Voter Registration, 2) Voter Education, 3) Candidate Education, 4) Get-Out-the-Vote (GOTV), and 5) Election Protection. Through these five key areas, ITCA conducts voter registration drives, provides voter outreach and education specifically targeting young/new voters, produces and distributes voter guides, coordinates phone banking and other GOTV activities, and recruits and mobilizes volunteers to provide voter assistance on election day.

261.  Due to HB 2492's burdensome and confusing restrictions on voting and registration eligibility and processes, ITCA will be forced to divert its resources from its other voting-related programs supporting its mission. HB 2492 will force ITCA and ITCA Member Tribes to redirect scarce funding to purchase additional equipment and educational materials to assist Tribal citizens with compliance with the new voting and registration scheme, and to commit further staff and volunteer time and training to help Tribal citizens through the additional requirements. These diversions will continue to occur until the 2022 election and beyond for as long as these requirements are in effect.

262.    HB 2492's disparate treatment of otherwise eligible voters based on whether they are able to provide DPOC and DPOR, check the citizenship box, and attest to birthplace means that voter registration drive organizers must inform voters of the many new changes in the law and the threats of criminal investigation and prosecution.

263.    Because ITCA and Member Tribes conduct voter registration drives on reservations with the goal of completing voter registrations on-site, Tribal citizens who do not have Arizona drivers' licenses and/or do not have DPOC or DPOR with them cannot fully participate.

264.    Even if applicants happen to have DPOC or DPOR at an ITCA or Member Tribe voter registration drive, ITCA or its Member Tribes must now incur costs and additional burdens to purchase and maintain mobile scanning and printing equipment to facilitate voter registration applications that comply with HB 2492.

265.    This will be particularly burdensome on the reservations where ITCA conducts the majority of its voter registration work because many of the places where ITCA hosts voter registration activities have no electricity or broadband internet access. Consequently, ITCA's voter registration drive organizers will face the compounded barrier and expense of generating their own power for voter registration drives by running a generator or using battery-operated equipment in a manner that does not require internet services.

266.    As a result of Defendants' constitutional and statutory violations enforcing HB 2492's stringent policies, ITCA and its Member Tribes will be overburdened and unable to conduct successful voter registration drives; will be forced to dedicate more resources and time in order to register the same number of members and voters; will incur costs to purchase and maintain equipment to ensure its voter registration advocacy complies with HB 2492; and fewer Tribal

51

Members will be able to successfully register to vote and then cast a ballot in all elections for which they are eligible.

267.    Citizens of ITCA's Member Tribes will also be directly harmed by HB 2492.

268.    Many members of ITCA's Member Tribes are eligible voters in the State of Arizona. However, HB 2492's burdensome registration requirements will bar many Tribal Citizens who are eligible voters from registering to vote and casting a ballot.

269.    Many of ITCA's Member Tribes have large rural land bases that commonly lack uniform residential addressing systems to identify physical residential addresses. Consequently, it is not uncommon for homes on Reservations belonging to ITCA Member Tribes not to have a numbered street address. As a result, Tribal citizens may be unable to obtain any documentation listing their residential address.

270.    Tribal membership identification cards issued by ITCA's Member Tribes also may not list a member's residential address, instead listing a P.O. Box or no address at all.

271.    Living conditions on ITCA Member Tribes' Reservations also commonly make it more difficult for citizens to obtain official documentation listing their address. Homes within ITCA Member Tribes' Reservations may not have electricity, internet, telephone, or other utilities, meaning that residents do not have the associated documentation. Moreover, citizens of ITCA's Member Tribes may also move frequently between homes due to circumstances beyond their control, and therefore not be listed on any official documentation associated with their residence.

272.    Citizens of ITCA's Member Tribes who live on their Reservation are therefore commonly likely to be unable to obtain documentary proof of their residence, as required by HB 2492, either because their residence lacks a numbered street address entirely, or because they are not officially listed as a resident of the home where they stay.

273.    In violation of the U.S. Constitution and federal law, HB 2492 discriminates against otherwise eligible voters who are members of ITCA's Member Tribes based on whether they are able to provide DPOC and DPOR, check the citizenship box, and attest to birthplace by prohibiting voters who do not comply with these requirements from registering to vote.

**San Carlos Apache Tribe**

274.   The San Carlos Apache Tribe ("Tribe") is a federally recognized Indian Tribe organized pursuant to Section 16 of the Indian Reorganization Act of June 18, 1934 (48 Stat. 984), with approximately 17,000 enrolled members. 86 Fed. Reg. 7554. The Tribe comes from the Ndee or Western Apache Nation. The Ndee have lived and traveled throughout present-day Arizona and New Mexico for more than a thousand years. In 1871, several bands of Ndee were relocated to the San Carlos Apache Reservation ("Reservation") in southeastern Arizona. These bands, along with other Ndee who were subsequently relocated to the Reservation, make up the Tribe.

275.   The Reservation in eastern Arizona is currently the tenth largest Indian reservation in the United States, covering an area of approximately 2,855 square miles, or 1.8 million acres.

276.   The Reservation was established (and subsequently diminished) by several Executive Orders and Acts of Congress, including Executive Orders of November 9, 1871 and December 14, 1872 (establishing the White Mountain and San Carlos Reservations). *See* Executive Orders of August 5, 1873; July 21, 1874; April 27, 1876; October 30, 1876; January 26, 1877; and March 31, 1877 (diminishing the White Mountain and San Carlos Reservations); and the Act of June 7, 1897, 30 Stat. 64 (creating the Fort Apache Reservation and establishing the Fort Apache Agency "to cover and have jurisdiction" over the Reservation).

277.   The Reservation spans across Gila, Graham, and Pinal Counties and is home to approximately 11,000 members, while the remainder of the Tribe's members live off-Reservation.

278.  Many members of the Tribe are eligible voters in the State of Arizona. However, only about a quarter of the Tribe's members are registered to vote.

279.  The Tribe does not have a uniform street numbering system to identify physical residential addresses. Most streets on the Reservation do not have listed names, and not all residences on the Reservation have numbered street addresses. Consequently, many of the Tribe's members lack documents listing their residential address.

280.  Likewise, the Tribe's membership identification cards generally do not include a residential address; instead, they list the citizen's mailing address.

281.  Physical residential mail service similarly does not exist on the Reservation. Instead, most enrolled members who live on the Reservation receive mail through a Post Office Box on or near the Reservation.

282.  Although a membership identification card issued by the Tribe would be sufficient proof of identification for an enrolled member to cast a ballot under Arizona law and the *Gonzalez* consent decree, it would apparently not meet the DPOR Requirement in HB 2492 because the identification card does not include the citizen's physical residential address.

283.  The Tribe has many members who live in poverty. More than a third (36.8 percent) of households on the San Carlos Apache Reservation have incomes below the federal poverty line. As a result, some members of the Tribe move frequently from home to home and may live temporarily between homes belonging to relatives and other members of the Tribe.

284.  Members of the Tribe who live on the Reservation are likely to be unable to obtain documentary proof of their residence, as required by HB 2492, either because their residence lacks a numbered street address entirely, or because they are not officially listed as a resident of the home where they stay.

285.  In violation of the U.S. Constitution and federal law, HB 2492 discriminates against otherwise eligible voters who are members of the Tribe based on whether they are able to provide DPOC and DPOR, check the citizenship box, and attest to birthplace by prohibiting voters who do not comply with these requirements from registering to vote.

286.  The Tribe has engaged and continues to engage in voter education, registration, and engagement activities for its members to facilitate participation in nontribal elections that will be thwarted by HB 2492. For example, this year, the Office of the General Manager at the San Carlos Apache Tribe is working in collaboration with the Gila County Recorder's Office to host voter registration events on the Reservation to encourage registration by members of the Tribe. Defendants' enforcement of HB 2942 will thwart the Tribe's voter registration activities by preventing its members who cannot provide DPOR from registering to vote at the Tribe's voter registration events, and by requiring the Tribe to ramp up education efforts to teach voters what is required for registration and voting.

287.  Moreover, it will likely require the Tribe to divert limited resources from other programs into its voter registration and education activities in order to assist members of the Tribe who have no numbered street address with compliance with the DPOR Requirement.

288.  HB 2492's disparate treatment of otherwise eligible voters based on whether they are able to provide DPOC, provide DPOR, attest to birthplace, and add a citizenship checkmark means that voter registration drive organizers must inform voters of the many new changes in the law and the threats of criminal investigation and prosecution.

289.  The Tribe expects that many of its members that it seeks to register to vote will be intimidated and discouraged from registering to vote, even though they are eligible, because of the unconstitutional burdens imposed on the exercise of their franchise by HB 2492's requirements.

290.  Because the Tribe conducts voter registration drives on reservations with the goal of completing voter registrations on-site, the Tribe's members who do not have Arizona drivers' licenses and/or do not have DPOC or DPOR with them cannot fully participate.

291.  Even if applicants happen to have DPOC or DPOR at an on-Reservation voter registration drive, the San Carlos Apache Tribe must now incur costs and additional burdens to purchase and maintain mobile scanning and printing equipment to facilitate voter registration applications that comply with HB 2492.

292.  As a result of Defendants' constitutional and statutory violations enforcing HB 2492's stringent policies, the San Carlos Apache Tribe will be overly burdened and unable to conduct successful voter registration drives; will be forced to dedicate more resources and time in order to register the same number of members and voters; will incur costs to purchase and maintain equipment to ensure its voter registration advocacy complies with HB 2492; and fewer Tribal members will be able to successfully register to vote and then cast a ballot in all elections for which they are eligible.

**Arizona Coalition for Change**

293.  Arizona Coalition for Change ("AZC4C") is a non-profit organization with a mission to empower everyday people to transform their communities by building civic power, just and equitable schools, and safer neighborhoods. AZC4C's civic engagement team's primary mission is to register people to vote. AZC4C conducts get-out-the-vote campaigns, voter education programs, and trainings that teach Arizonans how to advocate for issues at the local, state, and federal levels. AZC4C also conducts in-person voter registration events. In 2020, AZC4C registered 10,141 voters.

294.    HB 2492 will negatively affect the voters that AZC4C helps to register to vote, many of whom are people of color, and are therefore significantly more likely to lack required documentation under HB 2492.

295.    As a result of HB 2492, AZC4C must divert money, personnel, time, and resources away from other programming in order to dedicate more resources toward efforts to ensure that voters, particularly those of color and those who are low income, can navigate the restrictions that HB 2492 imposes on their right to vote. AZC4C expects to divert resources in order to assist low-income Arizonans, racial and ethnic minority groups, people with disabilities, seniors, and others who disproportionately lack access to voter ID. HB 2492 will make AZC4C's voter registration campaigns more time consuming and discourage otherwise eligible voters from participating in the political process. These diversions will continue to occur until the 2022 election and beyond for as long as these requirements are in effect.

296.    AZC4C expects to spend more time assisting voters in complying with the new requirements. People of color already face obstacles to voting, including language differences and delays in receiving accurate information. AZC4C will be forced to dedicate more time and resources to inform eligible voters of the new requirements imposed by HB 2492.

297.    HB 2492's disparate treatment of otherwise eligible voters based on whether they list their birthplace, check the citizenship box, and are able to provide DPOC and DPOR means that voter registration drive organizers must inform voters of the many new changes in the law and the threats of criminal investigation and prosecution.

298.    When one of the Arizona voters AZC4C assists lacks DPOC or DPOR, they will be denied the right to register and the right to vote under HB 2492's eligibility requirements.

299.    AZC4C expects that many of its members and the community members that it seeks to register to vote will be intimidated and discouraged from registering to vote, even though they are eligible, because of the unconstitutional limits imposed on the exercise of their franchise by HB 2492's requirements.

300.    Because AZC4C conducts site-based voter registration drives with the goal of completing voter registrations on-site, potential AZC4C members and voters who do not have Arizona drivers' licenses and/or do not have DPOC or DPOR with them cannot fully participate.

301.    Even if applicants happen to have DPOC or DPOR at a AZC4C voter registration drive, AZC4C must now incur costs and additional burdens to purchase and maintain mobile scanning and printing equipment to facilitate voter registration applications that comply with HB 2492.

302.    As a result of Defendant's enforcement of the unconstitutional and unlawful provisions of HB 2492, AZC4C will be overburdened and unable to conduct successful voter registration drives; AZC4C will be forced to dedicate more resources and time in order to register the same number of voters; AZC4C will incur costs to purchase and maintain equipment to ensure its voter registration advocacy complies with HB 2492; and fewer voters AZC4C reaches will be able to successfully register to vote and then cast a ballot in all elections for which they are eligible.

### Defendant and Intervenor Defendants

303.    Defendant Katie Hobbs is the Arizona Secretary of State, a statewide elected public officer, and is named in her official capacity.

304.    The Secretary of State serves as the Chief Election Officer for Arizona. A.R.S. § 16-142. The Secretary of State is the public officer responsible for supervising voter registration throughout the state and providing binding regulations and guidelines for voter registration. *Id.*;

*see also Arizona Democratic Party v. Reagan*, No. CV-16-03618, 2016 WL 6523427, at *6 (D. Ariz. Nov. 3, 2016) ("The Secretary has the authority to promulgate rules and procedures for elections, such as voter registration, which encompasses determining voter registration deadlines. . . . Any person who does not abide by the Secretary's rules is subject to criminal penalties."). She is sued in her official capacity.

305.  Intervenor-Defendant Mark Brnovich is the Arizona Attorney General, a statewide public officer, and is named in his official capacity.

306.  The Attorney General is the State's chief legal officer, A.R.S. § 41-192, and is authorized to enforce Arizona's election laws in "any election for state office . . . through civil and criminal actions." A.R.S. § 16-1021. Attorney General Brnovich is also specifically charged with enforcing the challenged provisions of HB 2492. A.R.S. § 16-143. He is sued in his official capacity.

307.   Intervenor-Defendant State of Arizona is a sovereign State of the United States of America. The State of Arizona has waived its sovereign immunity and consented to this Court's jurisdiction through its Motion to Intervene in this action. *LUCHA v. Hobbs*, No. 2:22-cv-00519-SRB, ECF No. 12; *Clark v. Barnard*, 108 U.S. 436, 447 (1883).

## CLAIMS

### Count 1: Undue Burden on the Right to Vote, First and Fourteenth Amendment
### (42 U.S.C. § 1983)

308.  Plaintiffs restate and incorporate by reference all allegations above as though fully set forth in this paragraph.

309.  "There is no right more basic in our democracy than the right to participate in electing our political leaders." *McCutcheon v. FEC*, 572 U.S. 185, 191 (2014). The Supreme Court has recognized that "voting is of the most fundamental significance under our constitutional

structure" and the right to an effective vote is protected by the First Amendment and the Equal Protection Clause of the Fourteenth Amendment. *See Burdick v. Takushi*, 504 U.S. 428, 433-44 (1992). Indeed, the right to vote is the "fundamental political right . . . preservative of all rights." *Reynolds v. Sims*, 377 U.S. 533, 562 (1964) (quoting *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886)); *see also American Party of Texas v. White*, 415 U.S. 767, 795 (1974) ("permitting absentee voting by some classes of voters and denying the privilege to other classes of otherwise qualified voters in similar circumstances, without affording a comparable alternative means to vote, is an arbitrary discrimination violative of the Equal Protection Clause").

310.  Further, voting and participation in the electoral process is a form of speech and expression. It is the ultimate form of political speech and association and is entitled to First Amendment protection. *See Arizona Libertarian Party v. Reagan*, 798 F.3d 723, 728-29 (9th Cir. 2015) ("Restrictions on voting can burden equal protection rights as well as interwoven strands of liberty protected by the First and Fourteenth Amendments—namely, the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively.") (internal citations and quotations omitted).

311.  When analyzing the constitutionality of a restriction on voting, the Court "must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick*, 504 U.S. at 434 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)).

312. HB 2492's and HB 2243's requirements, together and individually, impose severe and undue burdens on eligible Arizonans' right to vote in violation of the First and Fourteenth Amendments.

313. HB 2492 conditions the right to register and to vote on what type of registration form—the State Form or the Federal Form—an eligible voter happens to use.

314. HB 2492 conditions the right to register on a voter's willingness to disclose her place of birth, an immaterial requirement that will intimidate naturalized citizen voters from registering to vote.

315. HB 2492 conditions the right to register on whether an applicant checks a citizenship box even where the applicant has provided documentary proof of citizenship, an immaterial requirement that will lead to erroneous rejections of registration applications from U.S. citizens.

316. HB 2492 further conditions voters' eligibility to exercise their right to register and their right to vote on whether the voter can access, copy, and submit documentary proof of residence and of citizenship during the registration and/or voting stages.

317. HB 2492 prohibits a class of eligible, registered voters on the Federal-Only Voter List from voting using any method other than in-person voting, and bars that class of voters from voting in presidential elections altogether.

318. HB 2492 also subjects voters to rejection of their voter registration applications altogether based on faulty and outdated data purporting to show U.S. citizenship status.

319. HB 2492 further subjects voters to harassing and intimidating investigation and prosecution based on incorrect and outdated data purporting to show U.S. citizenship status, disincentivizing eligible Arizonans from registering to vote.

320. HB 2243 similarly subjects eligible registered voters to removal from the registration rolls based on incorrect and outdated data purporting to show residence and/or U.S. citizenship status.

321. HB 2243 further subjects voters to harassing and intimidating investigation and prosecution based on faulty and outdated data purporting to show U.S. citizenship status.

322. HB 2492's and HB 2243's restrictions, together and individually, are severe. At numerous stages, these restrictions result in the complete denial of eligible voters' right to register and to vote. *See Dudum v. Arntz*, 640 F.3d 1098, 1108 (9th Cir. 2011) (citing *Ayers-Schaffner v. DiStefano*, 37 F.3d 726 (1st Cir. 1994)) (recognizing that a state policy in which "otherwise eligible voters were not allowed to vote in a determinative election" constitutes a "severe burden on the excluded voters' right to vote").

323. Further, HB 2492's and HB 2243's restrictive and undue requirements on registering and voting disproportionately impose more significant burdens on certain categories of voters—including naturalized U.S. citizens, Tribal Citizens, college and university students, low-income voters, elderly voters, racial and ethnic minorities, language minority voters, voters who frequently move, and voters who have changed their legal name, such as married women.

324. The challenged HB 2492 and HB 2243 provisions, together and individually, are subject to strict or heightened scrutiny because they impose severe and disparate burdens on the right to vote, in some instances requiring complete denial of the right to vote for eligible and registered Arizona voters.

325. The challenged HB 2492 and HB 2243 provisions, together and individually, do not advance any legitimate regulatory interest. They serve little purpose other than to prevent

qualified Arizona citizens from voting in eligible elections and to deter civic organizations from conducting voter registration drives.

326. The State's purported goal of enhancing election security and increasing the public's confidence in elections are at best pretextual, and the challenged restrictions are more likely to undermine than reinforce electoral security and public confidence in Arizona's elections.

327. Regardless, furthering those interests does not necessitate burdening Plaintiffs' right to vote in this severe and disparate manner.

328. HB 2492's and HB 2243's requirements cannot withstand even rational basis review, much less the strict or heightened scrutiny applied to severe and undue burdens on the right to vote.

## Count 2: National Origin Discrimination, Fourteenth Amendment
### (42 U.S.C. § 1983)

329. Plaintiffs restate and incorporate by reference all allegations above as though fully set forth in this paragraph.

330. HB 2492 and HB 2243, together and individually, discriminate between Arizona citizens based on their national origin by imposing disparate requirements and policies affecting naturalized U.S. citizens, in violation of the Equal Protection Clause. *Hernandez v. Texas*, 347 U.S. 475, 482 (1954). Such classifications based on national origin are inherently suspect and subject to strict scrutiny. *Graham v. Richardson*, 403 U.S. 365, 371-72 (1971).

331. HB 2492 classifies and subjects naturalized U.S. citizens to disfavored treatment by imposing more burdensome registration and voting requirements, requiring attestation of their place of birth to register, and subjecting them to wrongful and harassing criminal investigations and prosecutions.

332. HB 2243 likewise classifies and subjects naturalized U.S. citizens to disparate treatment by imposing more burdensome requirements to remain on the registration rolls, and subjecting them to wrongful and harassing criminal investigations and prosecutions.

333. HB 2492's and HB 2243's discriminatory classifications, together and individually, fail strict scrutiny or any lesser level of review.

334. The challenged HB 2492 and HB 2243 provisions are not narrowly tailored to serve any compelling state interest. HB 2492's and HB 2243's provisions do not advance any legitimate regulatory interest and serve little purpose other than to subject naturalized U.S. citizen voters to disfavored treatment and prevent naturalized Arizona citizens from voting.

335. The State's purported goal to enhance electoral security and increase the public's confidence in Arizona's elections is at best pretextual, and HB 2492's and HB 2243's discriminatory restrictions are more likely to undermine than reinforce electoral security and public confidence in Arizona's elections.

**Count 3: Unlawful Discrimination, Fourteenth Amendment**
**(42 U.S.C. § 1983)**

336. Plaintiffs restate and incorporate by reference all allegations above as though fully set forth in this paragraph.

337. HB 2492 intentionally and arbitrarily discriminates against eligible voter registration applicants based on whether they apply using a State Form or a Federal Form. Based on this arbitrary difference, in many cases eligible citizens seeking to register using the Federal Form will be registered while similarly situated eligible citizens seeking to register using the State Form will not be rejected.

338. HB 2492 intentionally and arbitrarily discriminates against eligible, registered voters on Arizona's Federal-Only Voter List. Under HB 2492, eligible and registered voters placed

on the Federal-Only Voter List are prohibited from using Arizona's early voting opportunities and from voting in presidential elections; they are constrained to exercise their right to vote only in-person on election day and only to cast a ballot for at most two congressional offices. Similarly situated eligible voters for federal elections are able to access Arizona's early voting opportunities and to vote for all available federal offices.

339.  HB 2492's discriminatory and arbitrary classifications fail strict scrutiny, which applies to arbitrary treatment of voters in accessing the fundamental right to vote. HB 2492's discriminatory and arbitrary classifications also fail any lesser level of scrutiny.

340.  The challenged HB 2492 provisions are not narrowly tailored to serve any compelling state interest. Indeed, HB 2492's provisions do not actually advance any legitimate regulatory interest and serve little purpose other than to subject eligible voters to disfavored treatment based on which voter registration form they use and to prevent eligible Arizona citizens from voting.

341.  The State's purported goal to enhance electoral security and thereby increase the public's confidence in elections is at best pretextual, and HB 2492's discriminatory restrictions are more likely to undermine than reinforce electoral security and public confidence in Arizona's elections.

### Count 4: Immaterial Omission on Voter Registration Form
### (42 U.S.C. § 1983; 52 U.S.C. § 10101)

342.  Plaintiffs restate and incorporate by reference all allegations above as though fully set forth in this paragraph.

343.  The Civil Rights Act of 1964 prohibits states and persons acting under color of state law from denying the right to vote to any individual "because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or

65

omission is not material in determining whether such individual is qualified under State law to vote in such election." 52 U.S.C. § 10101(a)(2)(B).

344. The Civil Rights Act of 1964 provides federal statutory rights enforceable under 42 U.S.C. § 1983.

345. HB 2492 requires state and local officials to reject voter registration applications and deny the right to vote to any individual who omits their place of birth from their state voter registration form.

346. An individual's place of birth has no bearing on any qualification for voting under Arizona state law.

347. HB 2492's Birthplace Requirement violates the Civil Rights Act of 1964.

348. HB 2492 requires state and local officials to reject voter registration applications and deny the right to vote to any individual who omits a checkmark in a box concerning U.S. citizenship status on their state or federal voter registration form.

349. An individual's ability to check a box concerning U.S. citizenship, in addition to attesting to their U.S. citizenship under penalty of perjury or providing DPOC under Arizona law, has no bearing on any qualification for voting under Arizona state law.

350. HB 2492's Checkmark Requirement violates the Civil Rights Act of 1964.

**Count 5: Preemption Under the NVRA**
**(42 U.S.C. § 1983; 52 U.S.C. §§ 20501, *et seq.*)**

351. Plaintiffs restate and incorporate by reference all allegations above as though fully set forth in this paragraph.

352. The NVRA requires states to "accept and use" the Federal Form to register eligible citizens for federal elections. 52 U.S.C. §§ 20503, 20505(a). In this way, the NVRA "acts as both a ceiling and a floor" for registering to vote in federal elections, preempting Arizona's attempt to

require registrants to provide information not required by the federal form to register to vote in federal elections. *Inter Tribal Council of Arizona*, 570 U.S. at 18.

353.  The NVRA also requires certain mandated public assistance agencies to provide voter registration services using the Federal Form or "its equivalent." 52 U.S.C. § 20506.

354.  The NVRA requires each State's motor vehicle authority to provide voter registration services and "require only the minimum amount of information necessary to-- (i) prevent duplicate voter registrations; and (ii) enable State election officials to assess the eligibility of the applicant and to administer voter registration and other parts of the election process." 52 U.S.C. § 20504.

355.  The NVRA requires that each State "ensure that any eligible applicant is registered to vote" if they register by mail, at the Motor Vehicle Division, at an NVRA-mandated agency, or by any other means if the registration is received "not later than the lesser of 30 days, or the period provided by State law, before the date of the election[.]" 52 U.S.C. § 20507(a)(1).

356.  The NVRA mandates that any registration or list maintenance program be uniform and nondiscriminatory. 52 U.S.C. § 20507(b)(1).

357.  The NVRA provides federal statutory rights enforceable under 42 U.S.C. § 1983.

358.  HB 2492 prohibits county election officials from registering otherwise eligible voters to vote in federal elections—including by the Federal Form, through the Motor Vehicle Division, or at NVRA-mandated voter registration agencies—unless they provide documentary proof of residence, in violation of the NVRA.

359.  HB 2492 prohibits county election officials from registering otherwise eligible voters to vote in federal elections through the Motor Vehicle Division, or at NVRA-mandated

voter registration agencies unless they provide documentary proof of citizenship, in violation of the NVRA.

360.  HB 2492 treats voters who register via the Federal Form as less than fully registered voters by prohibiting such voters from using all available forms of voting, including mail-in voting in violation of the NVRA.

361.  HB 2492 and HB 2243 imposes discriminatory registration and list maintenance procedures by requiring county election officials to reject or initiate the cancellation of valid voter registrations based on inaccurate and outdated data and information sources purporting to contain U.S. citizenship or residence information, in violation of the NVRA.

362.  Plaintiffs provided the Secretary with written notice of these violations of the NVRA on April 6, 2022. 52 U.S.C. § 20510(b)(1). A second written notice of these violations was sent at the time this Complaint was filed. Because the Secretary failed to remedy the violation within 90 days after receipt of Plaintiffs' notice, Plaintiffs bring this action. See *id.* § 20510(b)(2).

**Count 6: Discriminatory Effects in Violation of Section 2 of the Voting Rights Act
(42 U.S.C. § 1983; 52 U.S.C. §§ 10301)**

363.  Plaintiffs restate and incorporate by reference all allegations above as though fully set forth in this paragraph.

364.  Section 2 of the Voting Rights Act ("Section 2") prohibits states and political subdivisions from using any "voting qualification or prerequisite to voting or standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color" or because of an individual's membership in a language minority community. 52 U.S.C. § 10301(a).

365.  A violation of Section 2 is established when "based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political

subdivision are not equally open to participation by members of a [protected] class of citizens protected in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id.* § 10301(b).

366.  Section 2 permits suits by private individuals to enforce their rights and by entities, including Tribal Nations, suing on behalf of those individuals. Section 2 may also be privately enforced through 42 U.S.C. § 1983.

367.  By requiring individuals to produce DPOR in order to register to vote, implementing additional DPOC procedures, requiring voter registration applicants to list their place of birth on their voter registration form, imposing discriminatory rejection and removal procedures based on faulty and discriminatory data, and threatening naturalized citizens with criminal investigation, HB 2492 and HB 2243 will deny and abridge the voting rights of Native Americans, Latinos, voters of color, and members of language minority communities.

368.  The laws will affect a substantial portion of these populations. Likewise, the impact on these populations is unique because the law will not equally affect Arizona residents writ large.

369.  Since these provisions are barriers to registration, impacted individuals will be wholly barred from voting, meaning that the State's entire system of voting becomes inaccessible.

370.  HB 2492 and HB 2243 impose novel requirements and restrictions that go well beyond the "usual burdens of voting." Instead, they impose novel burdens using devices that were not in common use at the time of the passage of the Voting Rights Act and its amendments, especially in Arizona.

371.  The State cannot and has not offered a rational, much less compelling, justification for adopting HB 2492 and HB 2243's burdensome procedures.

## PRAYER FOR RELIEF

WHERFORE, Plaintiffs respectfully pray that this Court:

(1)     Enter judgment in favor of Plaintiffs and against Defendant and Intervenor-Defendants on the claims for relief as alleged in this Complaint;

(2)     Enter a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 declaring that the challenged HB 2492 and HB 2243 provisions, facially and as-applied, violate the Equal Protection Clause of the Fourteenth Amendment and the First Amendment;

(3)      Enter a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 declaring that the challenged HB 2492 provisions violate the Civil Rights Act of 1964, 52 U.S.C. § 10101(a)(2)(B);

(4)     Enter a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 declaring that the challenged HB 2492 and HB 2243 provisions are preempted by the National Voter Registration Act, 52 U.S.C. § 20501, *et seq.*

(5)     Enter declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 declaring that the challenged HB 2492 and HB 2243 provisions violate Section 2 of the Voting Rights Act of 1965.

(4)     Grant Plaintiffs preliminary and/or permanent injunctive relief by:

        a.      Ordering that Defendant and Intervenor-Defendants are prohibited from enforcing the challenged HB 2492 and HB 2243 provisions with respect to any election;

        b.      Ordering that Defendant and Intervenor-Defendants are prohibited from rejecting, causing to be rejected, cancelling, and/or causing to be

cancelled any voter registration or voter registration application on the grounds of the challenged HB 2492 and 2243 provisions;

c.      Ordering that Defendant and Intervenor Defendants are prohibited from transmitting or using any voter registration list for the purpose and/or effect of investigating and/or prosecuting voters on the grounds of the challenged HB 2492 and HB 2243 provisions;

(5)    Retain jurisdiction over Defendant and Intervenor-Defendants for such period of time as may be appropriate to ensure Defendant's and Intervenor-Defendants' compliance with relief ordered by this Court;

(6)    Award Plaintiffs reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988, 52 U.S.C. § 10310(e), and 52 U.S.C. § 20510(c); and

(7)    Grant Plaintiffs such other and further relief as may be just and equitable.

71

Date: July 18, 2022                                    Respectfully submitted,

/s/ James Barton
**BARTON MENDEZ SOTO**
James Barton, AZ Bar No. 023888
401 W. Baseline Road
Suite 205
Tempe, AZ 85283
480-418-0668
james@bartonmendezsoto.com

**DEPARTMENT OF JUSTICE**
**SAN CARLOS APACHE TRIBE**
Alexander B. Ritchie
AZ Bar No. 019579
Attorney General
Chase A. Velasquez[†]
NM Bar No. 019148
Assistant Attorney General
Post Office Box 40
16 San Carlos Ave.
San Carlos, AZ 85550
Alex.Ritchie@scat-nsn.gov
Chase.Velasquez@scat-nsn.gov

**FREE SPEECH FOR PEOPLE**
Courtney Hostetler[†] (MA# 683307)
John Bonifaz[†] (MA# 562478)
Ben Clements[†] (MA# 555082)
Ronald Fein[†] (MA# 657930)
1320 Centre Street, Suite 405
Newton, MA 02459
(617) 249-3015
chostetler@freespeechforpeople.org
jbonifaz@freespeechforpeople.org
bclements@freespeechforpeople.org
rfein@freespeechforpeople.org

**CAMPAIGN LEGAL CENTER**
Danielle Lang*
Jonathan Diaz*
Molly Danahy*
Hayden Johnson*
1101 14th St. NW, Suite 400
Washington, D.C. 20005
(202) 736-2200
dlang@campaignlegalcenter.org
jdiaz@campaignlegalcenter.org
mdanahy@campaignlegalcenter.org
hjohnson@campaignlegalcenter.org

**MAYER BROWN LLP**
Lee H. Rubin[†] (CA# 141331)
Two Palo Alto Square, Suite 300
3000 El Camino Real
Palo Alto, CA 94306-2112
(650) 331-2000
lrubin@mayerbrown.com

Gary A. Isaac[†] (IL# 6192407)
Daniel T. Fenske[†] (IL# 6296360)
Jed W. Glickstein[†] (IL# 6315387)
William J. McElhaney, III[†] (IL #6336357)
71 S. Wacker Drive
Chicago, IL 60606
(312) 782-0600
dfenske@mayerbrown.com
gisaac@mayerbrown.com
jglickstein@mayerbrown.com

Rachel J. Lamorte[†] (NY# 5380019)
1999 K Street NW
Washington, DC 20006
(202) 362-3000
rlamorte@mayerbrown.com

*Attorneys for Plaintiffs*

*\*admitted pro hac vice*
*[†]pro hac vice application forthcoming*