GINA M. D'ANDREA (*pro hac vice*)
CHRISTOPHER J. HAJEC (DC Bar No 492551
**IMMIGRATION REFORM LAW INSTITUTE**
25 Massachusetts Ave NW, Suite 335
Washington, DC 20001
202-232-5590
*Attorneys for amicus curiae Immigration Reform Law Institute*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Mi Familia Vota, | Case No.: 2:22-cv-00509-SRB |
| *Plaintiff*, | |
| vs. | **IMMIGRATION REFORM LAW INSTITUTE'S BRIEF OF AMICUS CURIAE IN SUPPORT OF DEFENDANTS' MOTIONS TO DISMISS** |
| Katie Hobbs, et al., | |
| *Defendants*. | |

Living United for Change in Arizona, et al.,

       *Plaintiffs*,

vs.

Katie Hobbs,

       *Defendant*,

Mark Brnovich; State of Arizona,

       *Intervenor Defendants*.

Poder Latinx,

       *Plaintiff*,

i

vs.

Katie Hobbs, et al.

*Defendants*

United States of America,

*Plaintiff,*

vs.

State of Arizona; Katie Hobbs

*Defendants.*

Democratic National Committee, et al.,

*Plaintiff,*

vs.

Hobbs, et al.,

*Defendants,*

and

Republican National Committee,

*Intervenor Defendant.*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## INTEREST OF AMICUS CURIAE

The Immigration Reform Law Institute ("IRLI") is a non-profit 501(c)(3) public interest law firm dedicated to litigating immigration-related cases on behalf of, and in the interests of, United States citizens, and also to assisting courts in understanding and accurately applying federal immigration law. For more than twenty years the Board of Immigration Appeals has solicited supplementary briefing, drafted by IRLI staff, from the Federation for American Immigration Reform, of which IRLI is a supporting organization. IRLI has litigated or filed amicus curiae briefs in a wide variety of cases, including *Trump v. Hawaii*, 138 S. Ct. 2392 (2018); *United States v. Texas*, 579 U.S. 547 (2016); *Save Jobs USA v. U.S. Dep't of Homeland Sec.*, 942 F.3d 504 (D.C. Cir. 2019); *Ariz. Dream Act Coalition v. Brewer*, 855 F.3d 957 (9th Cir. 2017); *Washington All. of Tech. Workers v. U.S. Dep't of Homeland Sec.*, 74 F. Supp. 3d 247 (D.D.C. 2014); *Matter of Silva-Trevino*, 26 I. & N. Dec. 826 (B.I.A. 2016); and *Matter of C-T-L-*, 25 I. & N. Dec. 341 (B.I.A. 2010).

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 7.1 of the FEDERAL RULES OF CIVIL PROCEDURE, *amicus curiae*

Immigration Reform Law Institute makes the following disclosures:

1) For non-governmental corporate parties please list all parent corporations: None.

2) For non-governmental corporate parties please list all publicly held companies that

   hold 10% or more of the party's stock: None.


DATED: September 22, 2022                Respectfully submitted,

                                          /s/ Gina M. D'Andrea
                                         _____

                                         Gina M. D'Andrea
                                         Immigration Reform Law Institute
                                         25 Massachusetts Ave NW, Suite 335
                                         Washington, DC 20001
                                         Telephone: (202) 232-5590

                                         Attorney for *Amicus Curiae*

# **TABLE OF CONTENTS**

INTEREST OF AMICUS CURIAE ...................................................................iii

CORPORATE DISCLOSURE STATEMENT ...................................................iv

BACKGROUND.................................................................................................. 1

ARGUMENT ...................................................................................................... 4

    I.   THE AZ LAWS DO NOT VIOLATE THE NATIONAL VOTER REGISTRATION ACT.............................................................................................................. 6

       A.  The AZ Laws do not conflict with the NVRA's requirement that states accept and use the Federal Form.............................................................................. 6

       B.  States retain the power to create and use their own mail-in voter registration forms under the NVRA. ....................................................................................... 9

       C.  The NVRA does not prevent the states from purging ineligible voters from the voter rolls...................................................................................................... 11

    II.  PLAINTIFFS CONSTITUTIONAL CLAIMS SHOULD BE DISMISSED BECAUSE THEY FAIL THE *ANDERSON-BURDICK* TEST.............................................. 11

CONCLUSION .................................................................................................. 17

# TABLE OF AUTHORITIES

**Cases**

*Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1 (2013) ............................... passim

*Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321 (2021) ............................... 14

*Buckley v. Am. Constitutional Law Found.*, 525 U.S. 182 (1999) ........................... 4

*Burdick v. Takushi*, 504 U.S. 428 (1992) ................................................. 12, 13

*Burson v. Freeman*, 504 U.S. 191 (1992) .................................................... 13

*Bush v. Gore*, 531 U.S. 98 (2000) ...................................................... 11, 12

*Crawford v. Marion County Elec. Bd.*, 553 U.S. 181 (2008) ................... 4, 12, 13, 15

*Democratic Nat'l Comm. v. Reagan*, 2018 U.S. Dist. LEXIS 77690 (D. Ariz. May 8, 2018) 15

*Dudum v. Arntz*, 640 F.3d 1098 (9th Cir. 2011 .......................................... 12

*Dunn v. Blumstein*, 405 U.S. 330 (1972) ................................................... 11

*Foley v. Connelie*, 435 U.S. 291 (1978) .................................................... 4

*Hernandez v. New York*, 500 U.S. 352 (1991) .............................................. 16

*Hunt v. Cromartie*, 526 U.S. 541 (1999) .................................................. 15

*Husted v. A. Philip Randolph Inst.*, 138 S. Ct. 1833 (2018) ............................. 6, 7

*Illinois Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173 (1979) ................ 4

*Memphis v. Greene*, 451 U.S. 100 (1981) .................................................. 15

*Obama for Am. v. Husted*, 697 F.3d 423 (6th Cir. 2012) ................................. 14

*Oregon v. Mitchell*, 400 U.S. 112 (1970) ................................................... 5

*Purcell v. Gonzalez*, 549 U.S. 1 (2006) ................................................. 9, 14

*Short v. Brown*, 893 F.3d 671 (9th Cir. 2018) ............................................ 13

*Storer v. Brown*, 415 U.S. 724 (1974) ...................................................... 4

*Timmons v. Twin Cities Area New Party*, 520 U.S. 351 (1997) ............................. 14

*Vill. of Arlington Heights v. Metro Hous. Dev. Corp.*, 429 U.S. 252 (1977) ........... 15, 16

*Washington v. Davis*, 426 U.S. 229 (1976) ................................................ 14

*Wesberry v. Sanders*, 376 U.S. 1 (1964) ................................................ 4, 11

*Yick Wo v. Hopkins*, 118 U.S. 356 (1886) .................................................. 4

*Young v. Fordice*, 520 U.S. 273 (1997) ................................................. 9, 10

**Statutes**

52 U.S.C. § 20501(b)(3) ..................................................................... 7

52 U.S.C. § 20505 ........................................................................... 7

52 U.S.C. § 20505 (a)(2) .................................................................... 9

52 U.S.C. § 20505(a)(1) ..................................................................... 7

52 U.S.C. § 20507(a)(4) .................................................................... 11

52 U.S.C. § 20507(c) ....................................................................... 11

52 U.S.C. § 20507(d) ....................................................................... 11

52 U.S.C. § 20508(b)(1) .................................................................... 10

52 U.S.C. § 20508(b)(2) .................................................................... 10

52 U.S.C. § 20508(b)(3) .................................................................... 10

A.R.S. § 16-101(A)(1) ....................................................................... 1

A.R.S. § 16-121 ............................................................................. 1

A.R.S. § 16-121.01(C) ........................................................................................... 8
A.R.S. § 16-121.01(E) .................................................................................... 2, 3, 8
A.R.S. § 16-165 ..................................................................................................... 3
A.R.S. § 16-165(A)(10) ......................................................................................... 3
A.R.S. § 16-165(K) ............................................................................................... 3
A.R.S. § 16-579(A)(1) ........................................................................................... 2
A.R.S. §16-121.01(C) ............................................................................................ 2
A.R.S. §16-166(F) ................................................................................................. 1

**Other Authorities**

News Release, Office of the Governor, Mar. 30, 2022,
    https://azgovernor.gov/governor/news/2022/03/governor-ducey-signs-legislation-
    furthering-arizonas-position-leader-election ................................................... 16
News Release, Rep. Jake Hoffman (Mar. 30, 2022),
    https://www.azleg.gov/press/house/55LEG/2R/220330HOFFMANHB2492.pdf ............... 14

**Constitutional Provisions**

U.S. Const. art. 1, § 4, cl. 1 ................................................................................... 5
U.S. Const. Art. I, § 2, cl. 1 ................................................................................... 5
U.S. Const., Art. I, § 4 .......................................................................................... 5
U.S. Const., Art. II, § 1, cl. 4 ................................................................................ 5

## **BACKGROUND**

Arizona recently enacted two laws amending several sections of the state election laws.  HB 2243 and HB 2492 (the "AZ Laws") were passed as part of Arizona's effort to improve election integrity by ensuring voter qualifications are enforced and voter rolls are accurate.  HB 2492 updates voter qualifications and the state voter registration form.  First, it expands the citizenship qualification by adding "satisfactory evidence of citizenship as prescribed in Section 16-166."  A.R.S. § 16-101(A)(1).  Such evidence must be submitted with the state application for voter registration and includes "the applicants' driver license or nonoperating identification license" number; "[a] legible photocopy" of either a birth certificate or U.S. passport; "the applicant's United States naturalization documents or the number of the certificate of naturalization;" or "[t]he applicant's bureau of Indian affairs card number, tribal treaty card number or tribal enrollment number."  A.R.S. §16-166(F).  An applicant who provides satisfactory proof is a "qualified elector" and will have their registration processed by the appropriate state election official.  A.R.S. § 16-121 (defining qualified elector as "[a] person who is qualified to register to vote . . . and who is properly registered to vote . . . is at least eighteen years of age on or before the date of the election and has provided satisfactory evidence of citizenship").

HB 2492 provides that proof of residence is also required, and can be satisfied by providing a "valid form of identification that bears the photograph, name and address of the elector," or "[t]wo different items that contain the name and address of the elector," such as "a utility bill, a bank or credit union statement…, Arizona vehicle registration, an Arizona

1

vehicle insurance card, an Indian census card, tribal enrollment card or other form of tribal identification." A.R.S. § 16-579(A)(1).

HB 2492 further provides that failure to include proof of citizenship on a state voter registration form is grounds for the application to be rejected by the county recorder. A.R.S. §16-121.01(C) ("Except for a form produced by the United States Election Assistance Commission, . . . the . . . officer in charge of elections shall reject any application for registration that is not accompanied by satisfactory evidence of citizenship."). The procedure differs, however, for applicants who use a form produced by the U.S. Election Assistance Commission ("EAC"), commonly known as the Federal Form, because that procedure is subject to the limitations of the National Voter Registration Act ("NVRA"). The NVRA's mandate that states "accept and use" the Federal Form precludes Arizona from requesting that applicants submit documentary proof of citizenship because the Federal Form does not require it. *Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1 (2013) (hereinafter "*ITAC*"). Election officials, however, are not barred from denying registration to those whose ineligibility is established based on information in the officials' possession, *id.* at 15, and nothing in *ITAC* or the NVRA makes states presume the truth of any assertion an applicant makes on the Federal Form, or bars states from verifying information provided on that form. Thus, unlike the pre-empted law in *ITAC*, HB 2492 does not order election officials to reject a Federal Form outright if it does not include documentary proof of citizenship. Instead, if after "us[ing] all available resources," a Federal Form applicant's citizenship status is confirmed, such applicant "shall be properly registered." A.R.S. § 16-121.01(E). If the state official comes to possess "information that the applicant is not a United States citizen," the

Federal Form application must be rejected and the applicant notified that he or she was rejected because he or she was not a citizen.  *Id.*  Finally, if an election official "is unable to match the applicant with appropriate citizenship information," the applicant will be notified that his or her citizenship could not be verified and that he or she "will not be qualified to vote in a presidential election or by mail with an early ballot in any election until satisfactory evidence of citizenship is provided."  *Id.*

HB 2243 provides the requirements for the state registration form discussed by HB 2492 and updates Arizona's procedures for ensuring current and accurate voter rolls.  A.R.S. § 16-165.  The provision enumerates the reasons why a voter's registration may be cancelled, including but not limited to, "when the county recorder obtains information . . . and confirms that the person registered is not a United States citizen[.]"  A.R.S. § 16-165(A)(10).  Before such person's registration can be cancelled, the election official is required to provide written notice stating "that the person's registration will be canceled in thirty five days unless the person provides satisfactory evidence of citizenship[.]"  *Id.*  The notice must "include a list of documents the person may provide" to establish his or her citizenship as well as "a postage prepaid preaddressed return envelope."  *Id.*  Registration will thus only be cancelled following written notice and an opportunity to establish eligibility.  Furthermore, once a registration is cancelled, written notice is again provided to the person explaining the cancellation and including instructions on how to register to vote if and when the person is qualified.  A.R.S. § 16-165(K).

## ARGUMENT

The right to vote has long been recognized as a fundamental right of U.S. citizens. *See, e.g., Illinois Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979) ("[V]oting is of the most fundamental significance under our constitutional structure"); *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964) (explaining that "[o]ther rights, even the most basic, are illusory if the right to vote is undermined."); *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886) (describing the right to vote as "preservative of all rights."); *see also Foley v. Connelie*, 435 U.S. 291, 296 (1978) (recognizing the "right[] of the people to be governed by their citizen peers").   The fundamental nature of the right to vote requires rules and regulations to ensure fairness and faith in elections.   *See Storer v. Brown*, 415 U.S. 724, 730 (1974) (explaining that "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes."); *Buckley v. Am. Constitutional Law Found.*, 525 U.S. 182, 206 (1999) ("States, of course, must regulate their elections to ensure that they are conducted in a fair and orderly fashion."); *Crawford v. Marion County Elec. Bd.*, 553 U.S. 181, 189 (2008) (explaining that "public confidence in the integrity of the electoral process . . . encourages citizen participation in the democratic process.").

The Constitution vests the authority to set voter qualifications and rules for the conduct of elections primarily in the states.   Article I of the Constitution contains the guidelines for congressional elections, providing that "[t]he House of Representatives[1] shall

---

[1] The election of Senators is covered by the Seventeenth Amendment, which provides that "[t]he Senate of the United States shall be composed of two Senators from each state, elected

be composed of Members chosen every second Year by the People of the several States, and the Electors in each State shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature." U.S. Const. Art. I, § 2, cl. 1 (the "Qualifications Clause").   Article I also authorizes state legislatures to determine "[t]he times, places and manner of holding elections for Senators and Representatives."   U.S. Const., Art. I, § 4. Unlike voter qualifications, Times, Places and Manner authority is not solely reserved to the states.   The Constitution grants Congress the authority to "make or alter such [state enacted] regulations." U.S. Const. art. 1, § 4, cl. 1 (the "Elections Clause").

The authority over presidential elections is also primarily delegated to the states. Article II provides that the states "shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in Congress: but no Senator or Representative . . . shall be appointed an Elector."   U.S. Const., Art. II, § 1, cl. 4 (the "Presidential Electors Clause").  Unlike Congress's "Time, Place and Manner" authority over congressional elections, the constitution only authorizes Congress to determine "the Time of chusing the Electors, and the Day on which they shall give their Votes."   *Id.*.   Congress therefore has no say in the "manner" or "qualifications" for presidential elections.   *See Oregon v. Mitchell*, 400 U.S. 112, 210 (1970) (Harlan, J., concurring in part and dissenting in part) ("It is difficult to see how words could be clearer in stating what Congress can control

by the people thereof, . . . . The electors in each state shall have the qualifications requisite for electors of the most numerous branch of the state legislatures."

and what it cannot control.  Surely nothing in these provisions lends itself to the view that voting qualifications in federal elections are to be set by Congress.").

Thus, while Congress's authority under the Elections Clause to enact "Time, Place and Manner" laws is broad, it has no authority to set voter qualifications.  *See Husted v. A. Philip Randolph Inst.*, 138 S. Ct. 1833, 1859 (2018) (explaining that Congress's authority "over the 'Times, Places and Manner' of congressional elections is paramount, and may be exercised at any time, and to any extent which it deems expedient; and so far as it is exercised . . . the regulations effected supersede" any conflicting state laws.).  *See also ITAC*, 570 U.S. at 16 (explaining that Congress has the constitutional authority "to regulate *how* federal elections are held, but not *who* may vote in them.") (emphases in original).

## I.    THE    AZ    LAWS    DO    NOT    VIOLATE    THE    NATIONAL    VOTER    REGISTRATION ACT.

Neither *ITAC* nor the NVRA should be read to infringe states' constitutional authority over voter qualifications in federal elections, nor to bar states from performing their constitutional duty to safeguard election integrity.  Nothing in these authorities makes states presume the truth of any assertion an applicant makes on the Federal Form, forbids states to verify assertions made on that form, compels states to accept assertions that cannot be verified, or precludes states from establishing their own election procedures or purging their voter rolls of ineligible voters.

### A. The AZ Laws do not conflict with the NVRA's requirement that states accept and use the Federal Form.

Congress enacted the National Voter Registration Act of 1993 ("NVRA"), 52 U.S.C. § 20501 *et seq*., based on its broad authority under the Elections Clause.  The NVRA was

6

passed to "increase the number of *eligible* citizens who register to vote for Federal office," and "protect the integrity of the electoral process."   52 U.S.C. § 20501(b)(3) (emphasis added).  *See also Husted*, 138 S. Ct. at 1838 ("The Act has two main objectives: increasing voter registration and removing ineligible persons from the States' voter registration rolls."). The NVRA accomplishes these objectives by "requir[ing] States to provide simplified systems for registering to vote in *federal* elections."  *ITAC*, 570 U.S. at 6 (quoting *Young v. Fordice*, 520 U.S. 273, 275 (1997)).

A key part of this "simplified system" is the National Mail Registration Form, also known as the "Federal Form."  52 U.S.C. § 20505.  The NVRA requires that "[e]ach State accept and use the" Federal Form for voter registration.   52 U.S.C. § 20505(a)(1). Accordingly, "a state-imposed requirement of evidence of citizenship not required by the Federal Form is inconsistent with the NVRA's mandate that States 'accept and use' the Federal Form".  *ITAC*, 570 U.S. at 15.  This requirement, however, "does not preclude States from deny[ing] registration based on information in their possession establishing the applicant's ineligibility.  The NVRA clearly contemplates that not every submitted Federal Form will result in registration."  *Id*.

The AZ Laws are in compliance with the NVRA and *ITAC* because they do not interfere with Arizona's acceptance and use of the Federal Form.  First, Arizona does not require Federal Form applicants to submit evidence of citizenship or residence with the Federal Form; such requirements are only applicable to the state registration form.  HB 2492 requires automatic rejection of applications submitted without evidence of citizenship, "[e]xcept for [applications submitted via] a form produced by the United States Election

Assistance Commission." A.R.S. § 16-121.01(C). With respect to the Federal Form, election officials are instructed to "use all available resources to verify the citizenship status of the [Federal Form] applicant." *Id*. Such resources include but are not limited to databases for the Department of Transportation, Social Security Administration, and the United States Citizenship and Immigration Service Systematic Alien Verification for Entitlements Program. *Id*. If citizenship cannot be verified based on this information, the election official must provide written notice that "the applicant will not be qualified to vote in a presidential election or by mail with an early ballot in any election until satisfactory evidence of citizenship is provided." A.R.S. § 16-121.01(E).

These verification procedures do not conflict with the mandate that states "accept and use" the Federal Form. If that mandate forbade states to verify assertions made on the Federal Form, it would require states to *presume the truth* of those assertions. Any such presumption would be nonsensical, and trench on states' powers to establish and maintain voter qualifications. And no such presumption of truth is required by the "accept and use" mandate, since states retain the ability not to register applicants who are found ineligible based on information not submitted with the Federal Form. *ITAC*, 570 U.S. at 15.

And if states may verify assertions made on the form, and not register applicants whose assertions are found false, the "accept and use" mandate also does not forbid states to act on their *inability* to verify an applicant's assertions by not registering that applicant. If states had to register voters whose qualifications could not be verified, their constitutional powers over voter qualifications would be severely compromised. *See ITAC*, 570 U.S. at 16

(explaining that states, not Congress, have the constitutional authority "to regulate . . . *who may vote in*" federal elections) (emphasis in original).

### B. States retain the power to create and use their own mail-in voter registration forms under the NVRA.

As the Supreme Court has explained, "[a] State has a compelling interest in preserving the integrity of the election process." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (quoting *Eu v. San Francisco County Democratic Central Comm.*, 489 U.S. 214, 231 (1989)).  The Court went on to state that "[c]onfidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy.  Voter fraud drives honest citizens out of the democratic process and breeds distrust of our government.  Voters who fear their legitimate votes will be outweighed by fraudulent ones will feel disenfranchised."  *Id.*  The AZ Laws serve this purpose by ensuring that only eligible voters are registered to participate in the electoral process.

While it is true that Arizona must "accept and use" the Federal Form, the NVRA permits states to "develop and use a mail voter registration form that meets all of the criteria stated in section 9(b)[.]"  52 U.S.C. § 20505 (a)(2).  As noted by the Supreme Court, while "the NVRA imposes certain mandates on states, describing those mandates in detail[,]" it "still leaves [the states] room for policy choice."  *Young v. Fordice*, 520 U.S. 273, 286 (1997).

Arizona's "policy choice" to require evidence of citizenship on its state mail voter registration form is within the bounds of the NVRA.  First, the NVRA provides what a mail registration form "*may* require . . . to assess the eligibility of the applicant."  52 U.S.C. §

9

20508(b)(1) (emphasis added). But "[t]he NVRA does not list, for example, all other information the State may—or may not—provide or request." *Young*, 520 U.S. at 286. Because Section 9(b) does not contain any prohibitions on requiring that documentary evidence be submitted in conjunction with a mail voter registration, states are free to require such information. Accordingly, the fact that the Federal Form does not require documentary proof of citizenship does not preclude states from requiring such information on their own forms.

Next the NVRA indicates what mail registration forms must contain. It provides that the registration form "*shall* include a statement that specifies each eligibility requirement (*including citizenship*); contains an attestation that the applicant meets such requirement; and requires the signature of the applicant, under penalty of perjury." 52 U.S.C. § 20508(b)(2) (emphases added). The only prohibition is found in subsection (b)(3), which provides that the registration form "*may not* include any requirement for notarization or other formal authentication." 52 U.S.C. § 20508(b)(3). The Arizona mail voter registration form does not violate any of these provisions.

Additionally, the Supreme Court was clear in *ITAC* that "state-developed forms may require information the Federal Form does not." *ITAC*, 570 U.S. at 12. Therefore, under the NVRA, "States retain the flexibility to design and use their own registration forms." *Id*. Thus, Arizona is free to require more information on and documentary evidence with its own mail registration form than is required by the Federal Form. *Id*. The purpose of the Federal Form is to provide a simple, streamlined method for voter registration, not to interfere with the states' authority to conduct elections.

### C. The NVRA does not prevent the states from purging ineligible voters from the voter rolls.

The NVRA requires that states "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of the death of the registrant; or a change in address of the registrant." 52 U.S.C. § 20507(a)(4). It further provides examples of how states may conduct these programs, including the requirement that such programs to be completed "not later than 90 days prior to the date of a primary or general election for Federal office." 52 U.S.C. § 20507(c). Finally, names are not to be removed for change of residence reasons absent written confirmation of an address change or failure to respond to written notice combined with failure to vote. 52 U.S.C. § 20507(d).

HB 2243 complies with these requirements. Because the NVRA does not prohibit the states from removing voters based on ineligibility, Arizona is free to remove persons it has determined are not U.S. citizens.

## II. PLAINTIFFS CONSTITUTIONAL CLAIMS SHOULD BE DISMISSED BECAUSE THEY FAIL THE *ANDERSON-BURDICK* TEST.

As explained above, the right of citizens to vote is fundamental. This fundamental right encompasses more than just the ability to cast one's vote; equal participation among citizens is also guaranteed. *See Dunn v. Blumstein*, 405 U.S. 330, 336 (1972) (explaining that "a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction."); *Bush v. Gore*, 531 U.S. 98, 104 (2000) ("The right to vote is protected in more than the initial allocation of the franchise. Equal protection applies as well to the manner of exercise."). *See also Wesberry*, 376 U.S. at 17 (explaining that

11

"[o]ur constitution leaves no room for classification of people in a way that unnecessarily abridges this right."). Although the States have broad constitutional authority to regulate who may vote and how they may do so, "the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush*, 531 U.S. at 104-05.

The Supreme Court applies what is known as the *Anderson-Burdick* framework when analyzing whether a state's election law violates due process or equal protection. *See Dudum v. Arntz*, 640 F.3d 1098, 1106 n.15 (9th Cir. 2011) (explaining that "[t]he Supreme Court has addressed such claims collectively using a single analytic framework."). The Ninth Circuit explained that "[w]hen the burdens on voting imposed by the government are severe, strict scrutiny applies . . . . But voting regulations are rarely subjected to strict scrutiny." *Id.* at 1106. Such "non-severe lesser burdens on voting" are subject to "less exacting review, and a State's important regulatory interest will usually be enough to justify reasonable, nondiscriminatory restrictions." *Id*.

Because "[e]lection laws will invariably impose some burden upon individual voters," the standard of review is "flexible." *Burdick v. Takushi*, 504 U.S. 428, 433-34 (1992). Accordingly, the reviewing court "must weigh the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate against the precise interests put forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights." *Id.* at 434 (citation and internal quotation marks omitted). *See also Crawford*, 553 U.S. at 190 ("We reaffirmed *Anderson's* requirement that a court evaluating a constitutional challenge to an election regulation weigh the asserted injury

12

to the right to vote against the precise interests put forward by the State as justifications for the burden imposed by this rule.") (citation omitted).

The key question is whether the burden is "severe" or "reasonable [and] nondiscriminatory." *Burdick*, 504 U.S. at 434.  Where the burden imposed by a state election law is severe, strict scrutiny applies.  *See Short v. Brown*, 893 F.3d 671, 677 (9th Cir. 2018) (explaining that "the Constitution permits states to impose some burdens on voters through election regulations, and it requires strict scrutiny of those regulations only where the burden imposed is severe.").  As the Supreme Court has explained, "because a government has such a compelling interest in securing the right to vote freely and effectively, this Court never has held a State 'to the burden of demonstrating empirically the objective effects on political stability that [are] produced' by the voting regulation in question."  *Burson v. Freeman*, 504 U.S. 191, 210 (1992) (quoting *Munro v. Socialist Workers Party*, 479 U.S. 189, 195 (1986)).

HB 2492 contains burdens for applicants that are minimal and thus do not warrant strict scrutiny.  *See Crawford*, 553 U.S. at 205 (Scalia, J., concurring) ("Ordinary and widespread burdens, such as those requiring nominal effort of everyone, are not severe.").  The *Crawford* court held that voter ID requirements for in person voting survived *Anderson-Burdick* review, explaining that the "inconvenience" of obtaining the required documents "surely does not qualify as a substantial burden."  *Id.* at 198.  HB 2492 provides applicants with several options to establish residency and citizenship, including but not limited to state identification cards, utility bills, and tribal enrollment cards.

Because the burdens imposed by the AZ Laws are not severe, the court need only determine whether the state's interest is sufficient to justify the regulation.  *Timmons v. Twin*

13

*Cities Area New Party*, 520 U.S. 351, 358 (1997) ("Lesser burdens . . . trigger less exacting review, and a State's important regulatory interest will usually be enough to justify reasonable, nondiscriminatory restrictions.").  *See also, Obama for Am. v. Husted*, 697 F.3d 423, 428-30 (6th Cir. 2012) (explaining that the "courts must weigh the burden on voters against the state's asserted justifications and make the hard judgment that our adversary system demands.") (citation omitted).  The Supreme Court has recognized that "[a] State indisputably has a compelling interest in preserving the integrity of its election process." *Purcell,* 549 U.S. at 4.  *See also Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2340 (2021) (listing "prevention of fraud" and "[e]nsuring every vote is cast freely" as important state interests).  The *Anderson-Burdick* standard is satisfied because the AZ Laws are "reasonably related" to Arizona's interests in securing free and fair elections in the state.

Additionally, the AZ Laws would survive even if the Court determined that traditional equal protection analysis should be applied instead of the *Anderson-Burdick* test.  There is no equal protection violation where a law "is neutral on its face and rationally may be said to serve a purpose the Government is constitutionally empowered to pursue." *Washington v. Davis*, 426 U.S. 229, 246 (1976).  The AZ Laws were enacted to advance the important state interest of protecting the integrity of state and federal elections.  News Release, Rep. Jake Hoffman                     (Mar.                     30,                     2022), https://www.azleg.gov/press/house/55LEG/2R/220330HOFFMANHB2492.pdf     (describing HB 2492 as "a giant step toward ensuring elections are easy, convenient, and secure in our state.").  *See also Democratic Nat'l Comm. v. Reagan*, 2018 U.S. Dist. LEXIS 77690, at *58

14

(D. Ariz. May 8, 2018) ("Fraud prevention and preserving public confidence in election integrity are facially important state regulatory interests.").  As the Supreme Court explained,

> [t]here is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters. Moreover, the interest in orderly administration and accurate recordkeeping provides a sufficient justification for carefully identifying all voters participating in the election process.  While the most effective method of preventing election fraud may well be debatable, the propriety of doing so is perfectly clear.

*Crawford*, 553 U.S. at 196.

Finally, Plaintiffs' discriminatory purpose equal protection claims also must fail. While true that "[a] facially neutral law . . . warrants strict scrutiny . . . if it can be proved that the law was motivated by a racial purpose or object[,]" *Hunt v. Cromartie*, 526 U.S. 541, 546 (1999) (internal quotation marks omitted), Plaintiffs' complaints contain no evidence of improper racial motivation.  Under the *Arlington Heights* standard, "[d]etermining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence as may be available."  *Vill. of Arlington Heights v. Metro Hous. Dev. Corp.*, 429 U.S. 252, 266) (1977).  While "[d]isproportionate impact is not irrelevant . . . it is not the sole touchstone of an invidious racial discrimination.  Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause."  *Id*. at 264-65 (internal citation and quotation marks omitted).  Here, "the absence of proof of discriminatory intent forecloses any claim that the official action challenged in this case violates the Equal Protection Clause of the Fourteenth Amendment." *Memphis v. Greene*, 451 U.S. 100, 119 (1981).

According to the Supreme Court, "[d]iscriminatory purpose . . . implies that the decisionmaker . . . selected . . . a particular course of action at least in part 'because of,' of, not merely 'in spite of,' its adverse effects upon an identifiable group.'" *Hernandez v. New York*, 500 U.S. 352, 360 (1991) (quoting *Personnel Administrator of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)).   *Arlington Heights* supplies examples of how to establish discriminatory intent, yet Plaintiffs' various complaints do not contain any such evidence. *Vill. of Arlington Heights*, 429 U.S. at 266-68 (examples include but are not limited to"[t]he impact of the official action;" "[t]he historical background of the decision;" and "[t]he legislative or administrative history").   Indeed, the bill had the opposite intent, to ensure fairness to all Arizona residents and prevent election fraud.   News Release, Office of the Governor, Mar. 30, 2022, https://azgovernor.gov/governor/news/2022/03/governor-ducey-signs-legislation-furthering-arizonas-position-leader-election (stating that "[e]lection integrity means counting every lawful vote and prohibiting any attempt to illegally cast a vote."). Plaintiffs' constitutional claims must be dismissed because they fail to provide evidence of discriminatory purpose.

## **CONCLUSION**

For the foregoing reasons, Defendants' consolidated motion to dismiss should be granted.

September 22, 2022                    /s/ Gina M. D'Andrea
                                      Gina M. D'Andrea, *pro hac vice*

                                      Christopher J. Hajec (DC Bar No 492551)
                                      Immigration Reform Law Institute
                                      25 Massachusetts Ave NW, Suite 335
                                      Washington, DC 20001
                                      Tel: 202-232-5590
                                      Email: gdandrea@irli.org

                                      *Attorneys for amicus curiae Immigration Reform Law Institute*

17

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 22nd day of September, 2022, I caused the foregoing document to be electronically transmitted to the Clerk's Office using the CM/ECF System for Filing, which will send notice of such filing to all registered CM/ECF users.

 /s/ Gina M. D'Andrea