KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

GARY M. RESTAINO
United States Attorney
District of Arizona

ELISE C. BODDIE
Principal Deputy Assistant Attorney General
Civil Rights Division

T. CHRISTIAN HERREN, JR. (AL Bar No. ASB6671R63T)
RICHARD A. DELLHEIM (NY Bar No. 2564177)
EMILY R. BRAILEY (DC Bar No. 1684650)
L. BRADY BENDER (DC Bar No. 1615749)
Attorneys, Voting Section
Civil Rights Division
U.S. Department of Justice
4CON – Room 8.1815
950 Pennsylvania Avenue, NW
Washington, DC 20530

Tel.: (202) 353-5724 / Fax: (202) 307-3961
Email: Chris.Herren@usdoj.gov
Richard.Dellheim@usdoj.gov
Emily.Brailey@usdoj.gov
Laura.Bender@usdoj.gov
*Attorneys for the United States*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Mi Familia Vota, et al.,<br>                              Plaintiffs,<br><br>        v.<br><br>Katie Hobbs, et al.,<br>                              Defendants.<br><br>Living United for Change in Arizona, et al.,<br>                              Plaintiffs,<br><br>        v. | No. 2:22-cv-00509-SRB (Lead Case)<br>No. 2:22-cv-01124-SRB (Consolidated)<br><br>United States' Response to Motion to Dismiss |

i

Katie Hobbs,

                              Defendant,

and

State of Arizona, et al.,

                              Intervenor-Defendants.

---

Poder Latinx, et al.,

                              Plaintiffs,

v.

Katie Hobbs, et al.

                              Defendants.

---

United States of America,

                              Plaintiff,

        v.

State of Arizona, et al.,

                              Defendants.

---

Democratic National Committee, et al.

                              Plaintiffs,

        v.

State of Arizona, et al.,

                              Defendants,

        and

Republican National Committee,

                              Intervenor-Defendant.

# INTRODUCTION

In 2013, the United States Supreme Court held that federal law barred Arizona from requiring voter registration applicants using a uniform federal voter registration form ("Federal Form") to submit documentary proof of citizenship ("DPOC").  *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 20 (2013) ("*ITCA*").  Soon after, the U.S. Election Administration Commission ("EAC") confirmed that DPOC was not necessary for states to determine whether someone is eligible to vote in federal elections and declined to add the requirement to the Federal Form.

Defying that precedent and bedrock authority establishing Congress's power to regulate *all* federal elections, Arizona's new election law—House Bill 2492 ("HB 2492")—again requires some Federal Form registrants to provide DPOC to be able to vote in presidential elections.  It may not do so.  The National Voter Registration Act of 1993 ("NVRA") requires Arizona to permit voters to register to vote in all federal elections, including those for president, when using the Federal Form without providing DPOC.  HB 2492 thus violates the NVRA.  HB 2492 also violates the Civil Rights Act of 1964 ("CRA") by requiring election officials to reject voter registration forms for simple errors or omissions that are not material to establishing a voter's qualifications.

The United States' Complaint sufficiently alleges these NVRA and CRA violations.  The State's motion to dismiss the United States' Complaint should be denied.

# FACTUAL BACKGROUND

Arizona HB 2492 is an omnibus election law that restricts eligible U.S. citizens' ability to register and vote.  HB 2492 goes into effect on January 1, 2023, and will impact

1    voters in the 2024 elections.

2          Section 4 of HB 2492 requires election officials to take specific steps to confirm

3    the citizenship status of applicants who use the Federal Form to register to vote in federal

4    elections, including comparing those applicants within certain databases.  *See* Compl.

5    ¶ 36, *United States v. Arizona*, No. 2:22-cv-01124 (D. Ariz.), ECF No. 1.  If officials are

6    unable to verify an applicant's citizenship status, they must notify the applicant, who

7    must then provide DPOC.  *Id.* ¶¶ 37-38.  Applicants who fail to provide DPOC are denied

8    the right to vote in presidential elections.  *Id.* ¶ 39.  These applicants also cannot vote by

9    mail in congressional elections; their votes for U.S. Senate and House contests will only

10   count if they vote in person.  *Id.*

11         Section 4 further requires applicants who have already provided DPOC in

12   registering to vote in either state or federal elections to also check "Yes" in response to a

13   question on the Arizona state registration form ("State Form") regarding their citizenship

14   status.  *Id.* ¶¶ 57-58.  Forms without this mark must be rejected, even though the

15   applicant provided DPOC.  *Id.* ¶¶ 57-58.  Finally, Section 4 requires applicants using the

16   State Form to provide their birthplace, or their application will be rejected.  *Id.* ¶¶ 49-50.

17         Section 5 of HB 2492 prohibits even those who have already registered to vote in

18   federal elections from voting in presidential elections or by mail if they have not

19   produced DPOC.  *Id.* ¶ 40.

20         Following HB 2492's enactment, the United States sued the State of Arizona and

21   its Secretary of State to enforce Section 6 of the NVRA and the "Materiality Provision"

22   codified in Section 101 of the CRA.  The United States' Complaint alleges that Sections

4 and 5 of HB 2492 violate the NVRA by requiring federal-only voter[1] registration applicants to provide DPOC, which is more than what is necessary to prove their eligibility to vote in presidential elections or by mail.  *Id.* ¶¶ 62-65.

The Complaint further alleges that Sections 4 and 5 of HB 2492 violate the Materiality Provision by requiring registration applications to be rejected on the basis of omissions or errors not material to an applicant's qualifications to vote.  *Id.* ¶¶ 66-71.  For example, the Complaint alleges that HB 2492 requires a state registration application to be rejected if the voter failed to state a birthplace or if the voter provided satisfactory DPOC but did not check the "Yes" box affirming citizenship.  *Id.* ¶¶ 67-68.  The Complaint also alleges that HB 2492 violates the Materiality Provision by requiring those seeking to vote in presidential elections or by mail, or those already registered to vote in such elections, to provide DPOC in addition to attesting to their citizenship.  *Id.* ¶¶ 69-70.

The Secretary of State admits that "the challenged provisions of HB 2492" conflict with the NVRA and that the birthplace and checkbox provisions conflict with the Materiality Provision of the CRA.  SOS Ans. ¶¶ 64, 67-68, ECF No. 122.

## STATUTORY BACKGROUND

### I.    The National Voter Registration Act

Section 6 of the NVRA requires states to "accept and use" the Federal Form to register voters for federal elections, 52 U.S.C. § 20505(a), including presidential

---

[1] Those eligible to vote in both state and federal elections are referred to as "full-ballot voters" and those eligible to vote in only federal elections are referred to as "federal-only voters."

1   elections, *id.* §§ 20502(2), 30101(3).  The Federal Form specifies that an applicant must

2   be a citizen to vote in federal elections and requires applicants to attest to their citizenship

3   under penalty of perjury.  *Id.* § 20508(b)(2).

4       The EAC develops the Federal Form and prescribes its contents in consultation

5   with the chief election officers of the states.  *Id.* § 20508(a).  The Federal Form contains

6   "only such identifying information (including the signature of the applicant) and other

7   information (including data relating to previous registration by the applicant), as is

8   necessary to enable the appropriate State election official to assess the eligibility of the

9   applicant and to administer voter registration and other parts of the election process."  *Id.*

10  § 20508(b)(1).  The NVRA thus forbids states "from requiring a Federal Form applicant

11  to submit information beyond that required by the form itself," including DPOC.  *ITCA*,

12  570 U.S. at 20 (rejecting Arizona's attempt to require Federal Form applicants to submit

13  DPOC to be registered in federal elections).

14  **II.    The Materiality Provision of the Civil Rights Act**

15      The Materiality Provision prohibits states from denying "the right of any

16  individual to vote in any election because of an error or omission on any record or paper

17  relating to any application, registration, or other act requisite to voting, if such error or

18  omission is not material in determining whether such individual is qualified under State

19  law to vote in such election."  52 U.S.C. § 10101(a)(2)(B).  The Materiality Provision

20  specifically covers registration.  *Id.* § 10101(e); *see also id.* § 10101(a)(3)(A).

21                                      **LEGAL STANDARD**

22      "To survive a motion to dismiss, a complaint must contain sufficient factual

matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up).  "[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *see also In re Alphabet, Inc. Secs. Litig.*, 1 F. 4th 687, 693-94 (9th Cir. 2021).  A motion to dismiss must be denied so long as the "plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable." *Iqbal*, 556 U.S. at 678.

## ARGUMENT

### I. The United States Has Stated a Claim That HB 2492 Violates Section 6 of the NVRA.

HB 2492's DPOC requirement conflicts with the NVRA's requirement that Arizona "accept and use" the Federal Form, and therefore Arizona's latest DPOC requirement is preempted.  HB 2492's DPOC requirement is not beyond the NVRA's scope simply because it targets voters in presidential elections rather than congressional elections:  An unbroken line of precedent confirms Congress's power to regulate *all* federal elections, including those for president.  *See infra* Part I.B.

#### A. HB 2492's DPOC Requirement for Federal-Only Voters Violates Section 6 of the NVRA.

HB 2492 violates the NVRA because it requires federal-only voter applicants to provide more than is necessary—in this case, DPOC—to prove their eligibility to vote in presidential elections.  *ITCA* bars that.  570 U.S. at 20 (holding that the NVRA

1   "precludes Arizona from requiring a Federal Form applicant to submit information

2   beyond that required by the form itself").  The Federal Form requires applicants to attest

3   under oath to their citizenship.  The EAC has determined that is all that is necessary to

4   establish a Federal Form applicant's citizenship.  *Kobach v. U.S. Election Assistance*

5   *Comm'n*, 772 F.3d 1196-98 (10th Cir. 2014), *cert. denied*, 576 U.S. 1055 (2015).  The

6   EAC alone makes that determination, which "acts as both a ceiling and a floor."  *League*

7   *of Women Voters of United States v. Newby*, 838 F.3d 1, 10 (D.C. Cir. 2016); *ITCA*, 570

8   U.S. at 18.  Thus, as long as applicants in Arizona attest under oath that they are citizens

9   and meet remaining Federal Form requirements, the NVRA requires Arizona election

10  officials to accept and use that Form.  *ITCA*, 570 U.S. at 9-13 (holding that the NVRA

11  mandates that states accept the Federal Form "*as sufficient* for the requirement it is meant

12  to satisfy"); 52 U.S.C. § 20505(a)(1).

13  　　　　Because the EAC has expressly rejected DPOC as a necessary requirement on the

14  Federal Form to prove citizenship, Arizona cannot require it of federal-only applicants.

15  *ITCA* cemented that principle in 2013; Arizona cannot flout it now.  HB 2492 therefore

16  violates the NVRA.  Federal-only voters must be permitted to vote in *all* federal

17  elections, including presidential elections, so long as those voters submit a complete and

18  valid Federal Form.

19  　　　　**B.**　　　**Congress Possesses Broad Power to Regulate Presidential Elections.**

20  　　　　The State concedes that Congress enacted the NVRA using its Elections Clause

21  power.  Mot. to Dismiss at 22, ECF No. 127; *see ITCA*, 570 U.S. at 8-9.  But it argues

22  that Congress lacks authority to regulate presidential elections.  The State is incorrect.

1          As the Supreme Court has long recognized, Congress possesses power to enact

2   laws governing presidential elections.  *Buckley v. Valeo*, 424 U.S. 1, 13 n.16 (1976) (per

3   curiam) ("The Court has also recognized broad congressional power to legislate in

4   connection with the elections of the President and Vice President."); *see also Oregon v.*

5   *Mitchell*, 400 U.S. 112, 124 (1970) (opinion of Black, J.) ("It cannot be seriously

6   contended that Congress has less power over the conduct of presidential elections than it

7   has over congressional elections."); *id*. at 124 n.7 ("[I]nherent in the very concept of a

8   supreme national government with national officers is a residual power in Congress to

9   insure that those officers represent their national constituency as responsively as possible.

10  This power arises from the nature of our constitutional system of government and from

11  the Necessary and Proper Clause."); *Burroughs v. United States*, 290 U.S. 534, 545

12  (1934) (holding that Congress "undoubtedly" possesses the "power to pass appropriate

13  legislation to safeguard [presidential elections]" because such power is "essential to

14  preserve the departments and institutions of the general government from impairment or

15  destruction").  And in the course of upholding the NVRA, courts—including the Ninth

16  Circuit Court of Appeals—have cited Congress's power to regulate presidential elections.

17  *See Voting Rights Coal. v. Wilson*, 60 F.3d 1411, 1414 (9th Cir. 1995) ("The broad power

18  given to Congress over congressional elections has been extended to presidential

19  elections"), *cert. denied*, 516 U.S. 1093 (1996); *see also Ass'n of Cmty. Orgs. for Reform*

20  *Now (ACORN) v. Miller*, 129 F.3d 833, 836 n.1 (6th Cir. 1996) (same); *ACORN v. Edgar*,

21  56 F.3d 791, 793 (7th Cir. 1995) (same); *see also, e.g.*, S. Rep. 103-6, at 4 (1993)

22  ("Congress has the power to regulate Federal elections, including the establishment of

7

national voter registration procedures for Presidential and congressional elections."). The State ignores that authority.

That the Constitution confers upon Congress the power to regulate congressional elections in the Elections Clause does not detract from Congress's power to regulate presidential elections. The omission of presidential elections from the Elections Clause reflects that the framers did not contemplate that a presidential election would be conducted by popular vote in the way it is now. *See, e.g.*, *Chiafalo v. Washington*, 140 S. Ct. 2316, 2320-21 (2020) (explaining that the framers initially approved a system of presidential electors to elect the President, but this system evolved over time, until by 1832, nearly every state introduced popular voting for presidential elections); *McPherson v. Blacker*, 146 U.S. 1, 28 (1892) (explaining that the framers voted down a proposition that the President be elected by popular vote and instead left to the states the task of appointing electors). By Reconstruction, however, Congress recognized our system of popular voting, enacting Section 2 of the Fourteenth Amendment and later Section 1 of the Twenty-Fourth Amendment, both of which refer to and operate to regulate the popular vote for presidential elections.[2] These Amendments confirm Congress's concomitant authority to regulate voting in congressional *and* presidential elections—

---

[2] Section 2 of the Fourteenth Amendment penalizes a state for denying the right to vote "for President and Vice President of the United States, Representatives in Congress, the Executive and Judicial officers of a State, or the members of the Legislature thereof." And Section 1 of the Twenty-Fourth Amendment states, "The right of citizens of the United States to vote in any primary or other election for President or Vice President, for electors for President or Vice President, or for Senator or Representative in Congress, shall not be denied or abridged by the United States or any State by reason of failure to pay any poll tax or other tax."

1    powers the Supreme Court and federal appellate courts have long recognized.

2         Moreover, it is necessary and proper for Congress to regulate voter registration for

3    presidential elections if it is to do so effectively for congressional elections.  *Cf. United*

4    *States v. Comstock*, 560 U.S. 126, 133 (2010).  Under our system of "supreme national

5    government with national officers," Congress may "insure that those officers represent

6    their national constituency as responsively as possible."  *Mitchell*, 400 U.S. at 124 n.7

7    (opinion of Black, J.).  This power must include the ability to legislate as to all elections

8    for federal office, including presidential elections.  *See id.*  A state's attempt to impose

9    dual and disparate processes for registering to vote for different federal offices

10   undermines that power.  Congress, therefore, passed the NVRA under express

11   constitutional grants to enforce the system of fair and equal elections contemplated by the

12   framers.  *ITCA*, 570 U.S. at 8, 13-14.

13       **C.    The NVRA Is a Permissible Exercise of Congress's Power to Enforce
            the Fourteenth and Fifteenth Amendments.**

14       The NVRA is also a valid exercise of Congress's authority under the Fourteenth

15   and Fifteenth Amendments.  *See Condon v. Reno*, 913 F. Supp. 946, 962 (D.S.C. 1995)

16   (holding that the NVRA's legislative history and text "are clear that Congress was

17   utilizing its power to enforce the equal protection guarantees of the Fourteenth

18   Amendment"); *id.* at 967 (Congress had a "sound basis" for concluding that the NVRA

19   was an "appropriate means" to further Fourteenth and Fifteenth Amendment protections);

20   *ACORN* v. *Edgar*, 880 F. Supp. 1215, 1221 (N.D. Ill. 1995), *aff'd in relevant part*, 56

21   F.3d at 791; *see also ACORN v. Miller*, 912 F. Supp. 976, 984 (W.D. Mich. 1995) ("Even

22

9

1   if the NVRA violated the Tenth Amendment, it would still pass Constitutional muster

2   under the Fourteenth and Fifteenth Amendments."), *aff'd* 129 F.3d at 833.

3        Those holdings are well-founded.  Congress passed the NVRA to combat

4   "discriminatory and unfair registration laws" that "disproportionately harm voter

5   participation by various groups, including racial minorities."  52 U.S.C. § 20501(a)(3).

6   The legislative record includes findings that laws, policies, and practices had imposed

7   barriers to minority applicants' ability to register to vote.  *See, e.g.*, Staff of Subcomm. on

8   Civ. & Const. Rights of the H. Comm. on the Judiciary, 98th Cong., 2d Sess., *After the*

9   *Voting Rights Act: Registration Barriers* (Comm. Print 1984) (H.R. Ser. No. 18, at 2-5);

10   S. Rep. No. 103-6, at 3, 17-18 (1993); *see also Condon*, 913 F. Supp. at 962-63; *Edgar*,

11   880 F. Supp. at 1221; *Miller*, 912 F. Supp. at 984.  The NVRA responds to these

12   problems by requiring uniform, nationwide procedures to prevent discriminatory

13   administration of registration laws and make registration easier.  S. Rep. No. 103-6, at 4

14   (1993) ("This Act seeks to remove the barriers to voter registration and participation

15   under Congress' power to enforce the equal protection guarantees of the 14th

16   Amendment to the Constitution.").

17        Such uniform rules are an effective way to enforce—and are well within

18   Congress's scope of powers under—the Fourteenth and Fifteenth Amendments.  *See*

19   *Mitchell*, 400 U.S. at 283-84 (opinion of Stewart, J.); *South Carolina v. Katzenbach*, 383

20   U.S. 301, 324 (1966); *Katzenbach v. Morgan*, 384 U.S. 641, 651 (1966).  The Fourteenth

21   and Fifteenth Amendments authorize Congress to "use any rational means to effectuate

22   the constitutional prohibition of racial discrimination in voting."  *Katzenbach*, 383 U.S. at

1    324; *accord Morgan*, 384 U.S. at 651.  Congress may thus adopt uniform, nationwide

2    rules targeting practices with a discriminatory effect.  *See Mitchell*, 400 U.S. at 132-33

3    (opinion of Black, J.) (upholding nationwide ban on literacy tests); *id.* at 216 (opinion of

4    Harlan, J.) (same); *id.* at 283-284 (opinion of Stewart, J.) (same).  The NVRA does just

5    that.  *See also* H.R. Rep. No. 103-9, at 3-4 (1993) (indicating that Congress passed the

6    NVRA in part "to reduce [the] obstacles to voting to the absolute minimum while

7    maintaining the integrity of the electoral process," as "low voter turnout in Federal

8    elections poses potential serious problems in our democratic society.").

9         The State disregards this authority.  And the cases it does cite are inapt.  *See* Mot.

10   at 23 n.7.  For instance, in *City of Boerne v. Flores*, 521 U.S. 507, 530 (1997), the

11   Supreme Court observed that the congressional record on voter suppression abundantly

12   supported legislative protection under the Fourteenth and Fifteenth Amendments in the

13   course of concluding that the record on modern religious persecution was lacking by

14   comparison.  *See id.* at 518, 525-27, 530-31, 532-33.  The State's disregard of the

15   NVRA's text and ample legislative record is telling, and renders its bare *City of Boerne*

16   citation particularly ill-founded.  The State is similarly silent on how *Shelby County v.*

17   *Holder*, 570 U.S. 529 (2013), and *Northwest Austin Municipal Utility District No. One v.*

18   *Holder*, 557 U.S. 193 (2003)—neither of which analyze the NVRA—apply here.  *See*

19   Mot. at 23 n.7.

20   **II.    The United States Has Stated a Claim That HB 2492 Violates the Materiality**
     **Provision of the Civil Rights Act.**

21

22        The Materiality Provision prohibits any state action that denies individuals the

11

1    right to vote based on errors or omissions on "any record or paper relating to any

2    application [or] registration" that are not material to the voter's qualifications.  52 U.S.C.

3    § 10101(a)(2)(B).  That a state may allow an otherwise eligible voter to cure an

4    immaterial error or omission is irrelevant.  The United States has adequately alleged that

5    HB 2492 violates the Materiality Provision by requiring prospective voters to provide

6    their birthplace and DPOC, and to attest to citizenship even if they have already provided

7    DPOC, none of which are material to establishing the voter's qualifications to vote.

8           **A.     The Materiality Provision Applies to Codified State Laws.**

9           The Materiality Provision bars a state from "deny[ing] the right of any individual

10   to vote in any election" based on errors or omissions not material to a voter's

11   qualifications.  *Id.*  The Provision applies whether a state passes or enforces a law

12   requiring such denials or takes actions that exceed state law.  Courts have regularly

13   declined to dismiss Materiality Provision challenges to existing state laws.  *See, e.g.*, *La*

14   *Unión del Pueblo Entero (LUPE) v. Abbott*, No. 5:21-cv-844, 2022 WL 1651215, at *21

15   (W.D. Tex. May 24, 2022) (declining to dismiss challenge to statute requiring provision

16   of an identification number matching voter record); *Sixth Dist. of Afr. Methodist*

17   *Episcopal Church v. Kemp*, 574 F. Supp. 3d 1260, 1282 (N.D. Ga. 2021) (declining to

18   dismiss challenge to statute requiring provision of birthdate on absentee ballots and

19   applications); *League of Women Voters of Ark. v. Thurston*, No. 5:20-cv-5174, 2021 WL

20   5312640, at *4 (W.D. Ark. Nov. 15, 2021) (declining to dismiss challenge to law

21   requiring rejection of materials based on omission of or inconsistencies in information on

22   voter statement and application); *see also Wash. Ass'n of Churches v. Reed*, 492 F. Supp.

1    2d 1264, 1270 (W.D. Wash. 2006) (finding likelihood of success on challenge to state

2    law requiring matching a voters' name to a database before registration).[3]

3          But Arizona contends that the Materiality Provision does not reach conduct

4    codified in state law, just "ad hoc" practices that "exceed" state law.  Mot. at 26-27.  The

5    State is incorrect.  Nothing in the Materiality Provision's text supports that argument.

6    Nor do the State's cited authorities hold that existing statutes are insulated from

7    Materiality Provision challenges.  *See Org. for Black Struggle v. Ashcroft*, 493 F. Supp.

8    3d 790, 802-03 (W.D. Mo. 2020); *Martin v. Crittenden*, 347 F. Supp. 3d 1302, 1308-09

9    (N.D. Ga. 2018).[4]

10          The State also wrongly suggests that Congress intended the Materiality Provision

11    to bar only discriminatory application and administration of apparently nondiscriminatory

12    laws.  Mot. at 26.  The Provision's text is clear:  it does not refer to race or

13    _____

14    [3] Contrary to the State's contention, the weight of authority recognizes a private right of
      action to enforce the Materiality Provision.  *See, e.g.*, *Schwier v. Cox*, 340 F.3d 1284,
15    1297 (11th Cir. 2003); *LUPE v. Abbott*, No. 5:21-cv-0844, 2022 WL 3045657, at *30
      (W.D. Tex. Aug. 2, 2022); *Thurston*, 2021 WL 5312640, at *4; *Brooks v. Nacrelli*, 331 F.
16    Supp. 1350, 1352 (E.D. Pa. 1971).
      [4] The court in *Organization for Black Struggle* did not reject all challenges to state laws;
17    it simply agreed that the defendants' "rejection of ballot envelopes that are unclear as to
      the voter's name, address, and attestation" of authorization to vote, pursuant to state law,
18    was not likely to violate the Materiality Provision.  493 F. Supp. 3d at 803.  *Martin*, for
      its part, held that rejecting voters' absentee ballot envelopes based on their inability "to
19    correctly recite [their] year of birth" thereon likely violated the Materiality Provision,
      because the state had already confirmed the voter's substantive qualifications through the
20    absentee ballot application process.  347 F. Supp. 3d at 1308-09.  The court said this
      conclusion "[was] only strengthened by the Georgia Supreme Court's explicit recognition
21    that Georgia law 'does not mandate the automatic rejection of any absentee ballot lacking
      the elector's place and/or date of birth'"; it did not hold that any requirement Georgia law
22    might impose would be permitted under the Materiality Provision.  *Id.* at 1309 (citation
      omitted).

1    discrimination, but broadly forbids any denial of the right to vote based on immaterial

2    errors and omissions.  And Congress addressed discriminatory application and

3    administration of laws through a different CRA provision.  *See* 52 U.S.C.

4    § 10101(a)(2)(A) (prohibiting states from "apply[ing] any standard, practice, or

5    procedure different from . . . [those] applied under such law or laws to other individuals"

6    qualified to vote).  The Materiality Provision separately forbids election officials from

7    denying the right to vote based on errors and omissions not material to voter

8    qualifications.  52 U.S.C. § 10101(a)(2)(B).

9          Congress enacted the Materiality Provision to prohibit election officials from

10   treating registration forms as tests for voters, rather than as a mechanism to gather

11   information necessary to assess voters' qualifications.  *See* 110 Cong. Rec. 1694 (1964)

12   (statement of Rep. Emanuel Celler); *id.* at 6733 (statement of Sen. Philip A. Hart);

13   *Schwier*, 340 F.3d at 1294 (explaining that Congress sought "to address the practice of

14   requiring unnecessary information for voter registration with the intent that such

15   requirements would increase the number of errors or omissions on the application forms,

16   thus providing an excuse to disqualify potential voters"); *see also United States v.

17   Cartwright*, 230 F. Supp. 873, 876 (M.D. Ala. 1964) (finding the application form to be

18   "a strict examination or test" when registration is denied "because of technical and

19   inconsequential errors and omissions").  Whether officials do so on the basis of codified

20   state laws or as the result of "ad hoc" decisionmaking "exceed[ing]" state law is

21   irrelevant.  The Materiality Provision targets *all* state conduct that denies the right to vote

22   based on immaterial errors or omissions.

To be sure, errors or omissions must be "not material in determining whether [an individual] is qualified under State law" to vote.  52 U.S.C. § 10101(a)(2)(B).  But this reference to "State law" addresses voters' substantive qualifications, which, in Arizona, include age, citizenship, residence, ability to write their name or make their mark, and criminal or incapacitated status.  *See, e.g.*, *Migliori v. Cohen*, 36 F.4th 153, 163 (3d Cir. 2022) (explaining that a "requirement is material [under Pennsylvania law] if it goes to determining age, citizenship, residency, or current imprisonment for a felony"), *vacated as moot sub nom. Ritter v. Migliori*, No. 22-30, 2022 WL 6571686 (U.S. Oct. 11, 2022) (mem.); *Martin*, 347 F. Supp. 3d at 1308 ("the only *qualifications* for voting in Georgia are U.S. [c]itizenship, Georgia residency, being at least eighteen years of age, not having been adjudged incompetent, and not having been convicted of a felony"); *Wash. Ass'n of Churches*, 492 F. Supp. 2d at 1270 (similar).

Accordingly, by its terms and history, the Materiality Provision bars state laws—such as HB 2492—that deny the right to vote based on errors or omissions in completing registration forms that do not bear on a voter's substantive qualifications.  Arizona's novel and unsupported arguments to the contrary must be rejected.

**B.**     **The Availability of a Cure Process Does Not Save HB 2492.**

Arizona argues that HB 2492 does not violate the Materiality Provision because affected voters might be able to cure the errors or omissions that required their registration materials to be rejected.  Mot. at 3, 27.  Not so.  Nothing in the Provision's text requires a state's improper rejection of registration materials to be absolute and final before a violation can occur.  *See* 52 U.S.C. § 10101(a)(2)(B).  By the statute's plain

15

1  terms, a violation occurs whenever voting materials are rejected based on errors or

2  omissions immaterial to a voter's qualifications, *id.*, regardless of the would-be voter's

3  ability to try to fix the problem.  *See LUPE*, 2022 WL 1651215, at *21 (rejecting

4  argument because the Materiality Provision "does not say that state actors may initially

5  deny the right to vote based on errors or omissions that are not material as long as they

6  institute cure processes"); *Kemp*, 574 F. Supp. 3d at 1282.[5]  As alleged, HB 2492 violates

7  the Materiality Provision because it requires the rejection of registration applications

8  based on such immaterial errors or omissions.  Compl. ¶¶ 66-71.

9  **C.    The Complaint Sufficiently Alleges That HB 2492 Violates the
          Materiality Provision.**

10     The United States has adequately alleged that HB 2492 imposes restrictions on

11

12  [5] In *Vote.Org v. Callanen*, 39 F.4th 297 (5th Cir. 2022), the Fifth Circuit stayed pending
13  appeal a district court decision permanently enjoining Texas's wet signature rule as a
    violation of the Materiality Provision.  The Fifth Circuit reasoned that a wet signature
    was likely material because Texas qualifications included whether one was "a registered
14  voter," and state law required an original, wet signature on registrations submitted by fax.
    *Id.* at 306-07.  The court further reasoned that it was "hard to conceive how [a] wet
15  signature rule deprives anyone of the right to vote" where state law "confers a right to
    cure and allows other means of registration."  *Id.* at 305-06.  The court has not yet issued
16  a decision on the merits of this appeal, and decisions on stay motions are not binding on
    the merits panel.  *See, e.g.*, *Tex. Democratic Party v. Abbott*, 978 F.3d 168, 176 (5th Cir.
17  2020).

18  In any event, the court's analysis is incorrect.  It would allow states to make any
    immaterial requirement material simply by codifying it as a part of their registration
19  process, thus subverting the very purpose of the Materiality Provision.  *Schwier*, 340 F.3d
    at 1294.  And with respect to cure processes, the court's reasoning hinged on the
20  availability of other means of registration.  In this case, HB 2492 provides *no* such
    alternatives.  In order to register to vote in state elections by any means, applicants must
21  provide their birthplace and check a box affirming their citizenship, even if they have
    provided DPOC; and to register to vote in presidential elections and by mail ballot,
22  applicants must provide DPOC.

1    eligible U.S. citizens' ability to register and vote based on errors or omissions in voter

2    registration papers that are not material to determining voter qualifications.  A voting

3    requirement is material if it goes to determining a voter's substantive qualifications to

4    vote.  *See, e.g.*, *Martin*, 347 F. Supp. 3d at 1308; *Wash. Ass'n of Churches*, 492 F. Supp.

5    2d at 1270.  In Arizona, these qualifications include age, citizenship, residency, ability to

6    write one's name or make one's mark, and lack of criminal convictions or adjudications

7    deeming one incapacitated.  Ariz. Const. art VII, § 2, cl. A; Ariz. Rev. Stat. § 16-101.

8          For a requirement to be material to voter qualifications, it must be more than

9    merely relevant.  *Cf. Cone v. Bell*, 556 U.S. 449, 469-70 (2009) (defining materiality for

10   purposes of *Brady* violations as "a reasonable probability that . . . the result of the

11   proceeding would have been different"); *Kungys v. United States*, 485 U.S. 759, 771-72

12   (1988) (defining materiality for purposes of the Immigration and Nationality Act as

13   "predictably capable of affecting" an official decision); *United States v. Uchimura*, 125

14   F.3d 1282, 1285 (9th Cir. 1997) (defining materiality for purposes of tax fraud cases as

15   "necessary to a determination of whether" tax is owed).[6]

16   _____

17   [6] Contrary to the State's claims, neither *Gonzalez v. Arizona*, No. 06-cv-1268, 2007 WL
     9724581 (D. Ariz. Aug. 28, 2007), nor *Diaz v. Cobb*, 435 F. Supp. 2d 1206 (S.D. Fla.

18   2006), defines materiality as simple relevance.  While *Gonzalez* states that *citizenship* is
     material, it does not explain why provision of DPOC, beyond an attestation, is material.

19   2007 WL 9724581, at *2.  *Diaz*, for its part, explicitly did *not* address "an applicant's
     failure to re-answer a question that is asked twice in the same way," concluding simply

20   that the "information conveyed by check-boxes and the oath" at issue there was "not the
     same" since the oath "contains a general affirmation of eligibility," while the "check-

21   boxes contain specific affirmations of specific qualifications."  435 F. Supp. 2d at 1212-
     13.  And even a case that considered whether "material" could mean "minimal

22   relevance," without deciding, treated relevance as requiring that information "ha[ve] a

1        If all requirements a state could conceive of as relevant were also considered

2    material, states could require prospective voters to prove each qualification via several

3    methods and deny their right to vote if they fail to complete just one.  But courts set a

4    higher standard than mere relevance, finding unnecessary or duplicative requirements

5    immaterial to voting qualifications.  *See LUPE*, 2022 WL 1651215, at *21 (finding

6    plaintiffs had plausibly alleged state law requiring provision of identification number

7    "may require information that is unnecessary and therefore not material to determining an

8    individual's qualifications to vote under Texas law"); *Martin*, 347 F. Supp. 3d at 1309

9    (finding provision of birth year on a ballot envelope immaterial where a voter's eligibility

10   was confirmed in earlier application process); *Thurston*, 2021 WL 5312640, at *4

11   (upholding Materiality Provision claim "where State law requires absentee voters to

12   provide some [required] information several times and . . . they have correctly provided

13   that information at least once").  Doing otherwise undercuts the Materiality Provision's

14   purpose.  *See Schwier*, 340 F.3d at 1294.

15        Under HB 2492, as alleged here, applicants' State Form registration applications

16   will be rejected if the applicants omit their birthplace, despite one's birthplace having no

17   material bearing on one's qualifications to vote.  Compl. ¶¶ 48-56, 67.  The State

18   suggests that this requirement is material to the citizenship qualification because it "helps

19   define what sort of proof can serve to demonstrate citizenship."  Mot. at 28.  But even

20   persons born in the United States—and with U.S. birth certificates—might not be citizens

21   _____

22   natural tendency to influence" the outcome of an analysis.  *Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1173 (11th Cir. 2008) (citations omitted).

1   if born to foreign diplomatic officers, *see* 8 C.F.R. § 101.3(a)(1), or if they lose

2   citizenship through expatriation.  Similarly, individuals born abroad might be U.S.

3   citizens without having naturalization papers if they were born to citizen parents.  *See*

4   Compl. ¶ 52.

5        Arizona has not previously considered birthplace necessary to demonstrate

6   citizenship.  Registration applications in Arizona have never before been rejected for

7   omitting a voter's birthplace, though birthplace has long been included on the State Form.

8   *See* Compl. ¶ 49; *cf. Ford v. Tenn. Senate*, No. 06-2031, 2006 WL 8435145, at *11

9   (W.D. Tenn. Feb. 1, 2006) (finding a requirement that voters sign ballot applications and

10  poll books immaterial because the state "ha[d] in the past treated the failure to sign" as

11  such); *see also Migliori*, 36 F.4th at 164 (holding that a date requirement was immaterial

12  in part because the State accepted materials including incorrect dates).

13       In addition, the United States' complaint also adequately alleges that HB 2492

14  violates the Materiality Provision because even voters who have *already provided* DPOC

15  will have their materials rejected based on a simple failure to *also* check a box affirming

16  their citizenship on the State Form.  The State argues that this requirement is material

17  only because it "is a minimally burdensome affirmation by the voter" that they have

18  fulfilled the citizenship qualification.  Mot. at 28.  But the relative burden a requirement

19  imposes is irrelevant in assessing its materiality.[7]  Since voters who have supplied DPOC

20  have already demonstrated their citizenship, the checkmark provision amounts to a purely

21  _____

22  [7] In any event, how weighty this burden might be is a factual question not suitable for
    consideration on a motion to dismiss. *Iqbal*, 556 U.S. at 678.

1    technical requirement that voters be able to read and precisely follow instructions on how

2    to complete their registration.  Compl. ¶ 59.  It is therefore immaterial—a conclusion

3    only bolstered by the fact that the State *already knows* the applicant is a citizen.

4          Finally, the United States has adequately alleged that HB 2492 violates the

5    Materiality Provision because both new and existing federal-only voters' registration to

6    vote in presidential elections will be rejected if they fail to provide DPOC in addition to

7    an attestation of citizenship.  Arizona says simply that "[p]roof of citizenship attests that

8    a voter is indeed eligible."  Mot. at 28.  But federal-only voters have already provided

9    that attestation on the Federal Form, which Arizona considers sufficient to demonstrate

10   citizenship for federal-only voters who vote in person for congressional elections.  There

11   are no additional substantive citizenship requirements for presidential or mail voters—

12   such as length or type of citizenship—that DPOC might be necessary to prove.  *See* Ariz.

13   Const. art VII, § 2, cl. A; Ariz. Rev. Stat. § 16-542.  Thus, if DPOC is not material to

14   establishing a voter's qualification to vote in a congressional contest, it is equally not

15   material as to that same voter seeking to vote in a presidential election or by mail.  HB

16   2492's DPOC requirement is therefore not only unnecessary and duplicative, it is

17   illogical as well.  As such, it violates the Materiality Provision.  *See LUPE*, 2022 WL

18   1651215, at *21; *Martin*, 347 F. Supp. 3d at 1309; *Thurston*, 2021 WL 5312640, at *4.

19                              **CONCLUSION**

20         For the foregoing reasons, the State's Motion to Dismiss the United States'

21   Complaint should be denied.

22

1   Date:          October 17, 2022

2                                         Respectfully submitted,

3   GARY M. RESTAINO                      KRISTEN CLARKE
    United States Attorney                Assistant Attorney General
4   District of Arizona                   Civil Rights Division

5                                         ELISE C. BODDIE
                                          Principal Deputy Assistant Attorney General
6                                         Civil Rights Division

7                                         */s/ Emily R. Brailey*
                                          T. CHRISTIAN HERREN, JR.
8                                         RICHARD A. DELLHEIM
                                          EMILY R. BRAILEY
9                                         L. BRADY BENDER
                                          Attorneys, Voting Section
10                                        Civil Rights Division
                                          U.S. Department of Justice
11                                        4CON – Room 8.1815
                                          950 Pennsylvania Avenue, NW
12                                        Washington, DC 20530

13
                            **CERTIFICATE OF SERVICE**
14
    I hereby certify that on October 17, 2022, I electronically filed the foregoing with the
15
    Clerk of the Court using the CM/ECF system, which will send notification of this filing
16
    to counsel of record.
17

18                                        */s/ Emily R. Brailey*
                                          Emily R. Brailey
19                                        Civil Rights Division
                                          U.S. Department of Justice
20                                        950 Pennsylvania Ave, NW
                                          Washington, DC 20530
21                                        (202) 353-5724
                                          Emily.Brailey@usdoj.gov
22

                                         21