1   **MARK BRNOVICH**
    **ATTORNEY GENERAL**
2   Joseph A. Kanefield (No. 015838)
     *Chief Deputy & Chief of Staff*
3   Drew C. Ensign (No. 025463)
     *Deputy Solicitor General*
4   Robert J. Makar (No. 033579)
     *Assistant Attorney General*
5   2005 N. Central Avenue
    Phoenix, Arizona 85004
6   Telephone: (602) 542-5200
7   Email: Drew.Ensign@azag.gov

8   **FENNEMORE CRAIG, P.C.**
    Douglas C. Northup (No. 013987)
9   Timothy J. Berg (No. 004170)
    Emily Ward (No. 029963)
10  2394 E. Camelback Road, Suite 600
    Phoenix, Arizona 85016
11  Telephone: (602) 916-5000
12  Email: dnorthup@fennemorelaw.com
    Email: tberg@fennemorelaw.com
13  Email: eward@fennemorelaw.com
    *Attorneys for Defendants State of Arizona*
14  *and Mark Brnovich, Attorney General*

15              **UNITED STATES DISTRICT COURT**

16                    **DISTRICT OF ARIZONA**

17
    Mi Familia Vota,
18
                    Plaintiff,          Case No: 2:22-cv-00509-SRB (Lead)
19
    v.
20                                      **STATE'S CONSOLIDATED REPLY TO**
    Katie Hobbs, in her official capacity as   **RESPONSE IN SUPPORT OF ITS**
21  Arizona Secretary of State, et al.,  **MOTIONS TO DISMISS PLAINTIFFS'**
                                         **COMPLAINTS UNDER RULES 12(B)(1)**
22                  Defendants.          **AND (B)(6)**

23  _____

24
    **AND CONSOLIDATED CASES**
25

26

27

28

# TABLE OF CONTENTS

TABLE OF AUTHORITIES............................................................................ ii

GLOSSARY ............................................................................................... viii

INTRODUCTION ........................................................................................ 1

ARGUMENT .............................................................................................. 2

I.    SOME OF PRIVATE PLAINTIFFS' CLAIMS ARE NON-JUSTICIABLE ............................................................................ 2

    A.    Private Plaintiffs Lack Article III Standing .......................... 2

        1.    No Plaintiff Has Established Representational Standing. ............................................................. 2

        2.    Private Plaintiffs Have Not Adequately Alleged Organizational Standing Either ................................... 4

        3.    San Carlos Apache Tribe Has Not Shown Parens Patriae Standing ...................................................... 6

    B.    Several Of Private Plaintiffs' Claims Are Not Ripe ............. 6

II.    PLAINTIFFS HAVE NOT PLED VIABLE CONSTITUTIONAL CLAIMS ................................................................................... 7

III.    PLAINTIFFS FAIILED TO STATE VIABLE NVRA CLAIMS .. 18

    A.    Congress does not have unbounded authority to regulate presidential elections. .......................................................... 20

    B.    The NVRA is not an exercise of Congress's authority under the Fourteenth and Fifteenth Amendments .......................... 22

    C.    HB 2492 does not apply to federal congressional elections. 24

    D.    Plaintiffs' other NVRA claims fail as a matter of law. ........ 25

IV.    PLAINTIFFS' SECTION 10101 CLAIMS FAIL ....................... 26

    A.    Private Plaintiffs Lack A Cause Of Action .......................... 26

    B.    Plaintiffs Fail To Allege Violations Of The Materiality Provision ............................................................................ 27

    C.    Plaintiffs fail to allege a violation of the discrimination provision. ........................................................................... 29

V.    LUCHA's VRA § 2 CLAIM FAILS ......................................... 29

CONCLUSION ......................................................................................... 30

1

**TABLE OF AUTHORITIES**

2

**CASES**

3

*ACORN v. Edgar,*
   56 F.3d 791 (7th Cir. 1995) ........................................................................ 21

4

*ACORN v. Edgar,*
   880 F. Supp. 1215 (N.D. Ill. 1995) ............................................................. 24

5

6

*ACORN v. Miller,*
   129 F.3d 833 (6th Cir. 1996) ...................................................................... 21

7

*ACORN v. Miller,*
   912 F. Supp. 976 (W.D. Mich. 1995) .......................................................... 24

8

9

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez,*
   458 U.S. 592 (1982) ...................................................................................... 6

10

*Am. Motorists Ins. Co. v. Starnes,*
   425 U.S. 637 (1976) .................................................................................... 15

11

12

*Ariz. Democratic Party v. Hobbs,*
   18 F.4th 1179 (9th Cir. 2021) ................................................................. 7, 11

13

*Ariz. Democratic Party v. Hobbs,*
   976 F.3d 1081 (9th Cir. 2020) .................................................................... 13

14

15

*Arizona v. Inter Tribal Council of Ariz., Inc.,*
   570 U.S. 1 (2013) ........................................................................................ 16

16

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) .............................................................................. 15, 30

17

18

*Ass'n of Cmty. Orgs. for Reform Now v. Fowler,*
   178 F.3d 350 (5th Cir. 1999) ........................................................................ 5

19

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) .................................................................................... 30

20

21

*Bell v. Marinko,*
   367 F.3d 588 (6th Cir. 2004) ...................................................................... 25

22

*Bi-Metallic Inv. Co. v. State Bd. of Equalization,*
   239 U.S. 441 (1915) .................................................................................... 12

23

24

*Brnovich v. Democratic Nat'l Comm.,*
   141 S. Ct. 2343 (2021) ................................................................................ 30

25

*Buckley v. Valeo,*
   424 U.S. 1 (1976) .................................................................................. 20, 22

26

27

*Burdick v. Takushi,*
   504 U.S. 428 (1992) .................................................................................... 11

28

*Burroughs v. United States*,
   290 U.S. 534 (1934) ............................................................. 20

*Burson v. Freeman*,
   504 U.S. 191 (1992) ............................................................. 10

*Bush v. Gore*,
   531 U.S. 98 (2000) ............................................................... 18

*Chan v. Reno*,
   113 F.3d 1068 (9th Cir. 1997) .......................................... 16, 17

*City of Boerne v. Flores*,
   521 U.S. 507 (1997) .................................................... 22, 23, 24

*Commonwealth of Northern Mariana Islands v. Zhen*,
   68 F. App'x 7 (9th Cir. 2003) ............................................. 13

*Condon v. Reno*,
   913 F. Supp. 946 (D.S.C. 1995) ......................................... 24

*Crawford v. Marion Cnty. Election Bd.*,
   553 U.S. 181 (2008) ................................................. 1, 7, 9, 10

*Dekom v. New York*,
   2013 WL 3095010 (E.D.N.Y. June 18, 2013) ..................... 26

*Dekom v. New York*,
   583 F. App'x 15 (2d Cir. 2014) ........................................... 26

*Diaz v. Cobb*,
   435 F. Supp. 2d 1206 (S.D. Fla. 2006) ......................... 28, 29

*Erotic Serv. Provider Legal Educ. & Rsch. Project v. Gascon*,
   880 F.3d 450 (9th Cir. 2018) ............................................. 17

*Erotic Serv. Provider Legal Educ. & Rsch. Project v. Gascon*,
   881 F.3d 792 (9th Cir. 2018) ............................................. 17

*Fair Elections Ohio v. Husted*,
   770 F.3d 456 (6th Cir. 2014) ............................................... 4

*Fitzgerald v. Barnstable Sch. Comm.*,
   555 U.S. 246 (2009) ........................................................... 26

*Frazier v. Callicutt*,
   383 F. Supp. 15 (N.D. Miss. 1974) ..................................... 29

*Friends of the Earth v. Sanderson Farms, Inc.*,
   992 F.3d 939 (9th Cir. 2021) ............................................... 4

*Gonzaga Univ. v. Doe*,
   536 U.S. 273 (2002) ........................................................... 26

*Gonzalez v. Arizona*,
   677 F.3d 383 (9th Cir. 2012) ................. 1, 7, 8, 10, 12, 15, 16

*Gonzalez v. Arizona*,
No. 06-CV-1268, 2007 WL 9724581 (D. Ariz. Aug. 28, 2007) ................................. 28

*Hayden v. Pataki*,
2004 WL 1335921 (S.D.N.Y. June 14, 2004) ............................................................. 27

*Ingraham v. Wright*,
430 U.S. 651 (1977) ...................................................................................................... 12

*Jones v. Governor of Fla.*,
975 F.3d 1016 (11th Cir. 2020) .................................................................................... 12

*La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*,
624 F.3d 1083 (9th Cir. 2010) ........................................................................................ 5

*Lawson v. Shelby County*,
211 F.3d 331 (6th Cir. 2000) ........................................................................................ 12

*Lee v. Los Angeles*,
250 F.3d 668 (9th Cir. 2001) ........................................................................................ 14

*Lemons v. Bradbury*,
538 F.3d 1098 (9th Cir. 2008) ............................................................................... 11, 25

*Louisiana v. United States*,
380 U.S. 145 (1965) ...................................................................................................... 17

*M'Culloch v. Maryland*,
17 U.S. (4 Wheat.) 316 (1819) ..................................................................................... 22

*Mantin v. Broadcast Music, Inc.*,
248 F.2d 530 (9th Cir. 1957) .......................................................................................... 6

*Marston v. Lewis*,
410 U.S. 679 (1973) ................................................................................................... 9, 16

*Martin v. Crittenden*,
347 F. Supp. 3d 1302 (N.D. Ga. 2018) ......................................................................... 27

*McReynolds v. Merrill Lynch & Co.*,
No. 08 C 6105, 2011 WL 1196859 (N.D. Ill. Mar. 29, 2011) ..................................... 15

*Mecinas v. Hobbs*,
30 F.4th 890 (9th Cir. 2022) ........................................................................................... 8

*Moseley v. Price*,
300 F. Supp. 2d 389 (E.D. Va. 2004) ...................................................................... 10, 13

*Nat'l Treasury Emps. Union v. United States*,
101 F.3d 1423 (D.C. Cir. 1996) ..................................................................................... 5

*National Council of La Raza v. Cegavske*,
800 F.3d 1032 (9th Cir. 2015) ........................................................................................ 2

*Navajo Nation v. Confederated Tribes and Bands of the Yakama Indian* Nation,
331 F.3d 1041 (9th Cir. 2003) ........................................................................................ 6

iv

*Navajo Nation v. Superior Ct.*,
   47 F. Supp. 2d 1233 (E.D. Wash. 1999)...................................................................... 6

*Ne. Ohio Coal. for the Homeless v. Husted*,
   837 F.3d 612 (6th Cir. 2016) ...................................................................................... 26

*New Ga. Project v. Raffensperger*,
   976 F.3d 1278 (11th Cir. 2020) .................................................................................. 11

*Nordlinger v. Hahn*,
   505 U.S. 1 (1992) ........................................................................................................ 16

*Nw. Austin Mun. Util. Dist. No. One v. Holder*,
   557 U.S. 193 (2009) .............................................................................................. 22, 23

*Oregon Advocacy Center v. Mink*,
   322 F.3d 1101 (9th Cir. 2003) ...................................................................................... 3

*Oregon v. Mitchell*,
   400 U.S. 112 (1970) .............................................................................................. 18, 20

*Pers. Adm'r of Mass. v. Feeney*,
   442 U.S. 256 (1979) .................................................................................................... 13

*Reclaim Idaho v. Little*,
   826 F. App'x 592 (9th Cir. 2020) ................................................................................ 7

*Renne v. Geary*,
   501 U.S. 312 (1991) ...................................................................................................... 7

*Richardson v. Tex. Sec'y of State*,
   978 F.3d 220 (5th Cir. 2020) ...................................................................................... 11

*Schwier v. Cox*,
   340 F.3d 1284 (11th Cir. 2003) .................................................................................. 27

*Shelby County v. Holder*,
   570 U.S. 529 (2013) .................................................................................................... 24

*Shivelhood v. Davis*,
   336 F. Supp. 1111 (D. Vt. 1971) ............................................................................... 29

*Soltysik v. Padilla*,
   910 F.3d 438 (9th Cir. 2018) .................................................................................... 8, 9

*South Carolina v. Katzenbach*,
   383 U.S. 301 (1966). ................................................................................................... 22

*Spivey v. Ohio*,
   999 F. Supp. 987 (N.D. Ohio 1998) ........................................................................... 27

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009) ...................................................................................................... 2

*Teel v. Darnell*,
   No. 1:07-CV-271, 2008 WL 474185 (E.D. Tenn. Feb. 20, 2008)............................... 12

*Trump v. New York*,
   141 S. Ct. 530 (2020)..................................................................................... 6, 7

*United States v. Comstock*,
   560 U.S. 126 (2010) ......................................................................................... 21

*United States v. Hancock*,
   231 F.3d 557 (9th Cir. 2000) ........................................................................... 17

*Vote.Org v. Callanen*,
   39 F.4th 297 (5th Cir. 2022) ............................................................................ 28

*Voting Rights Coal. v. Wilson*,
   60 F.3d 1411 (9th Cir. 1995) ........................................................................... 21

*Wash. Env't Council v. Bellon*,
   732 F.3d 1131 (9th Cir. 2013) ........................................................................... 6

*Wash. State Grange v. Wash. State Republican Party*,
   552 U.S. 442 (2008) ........................................................................... 12, 25, 29

*Washington v. Davis*,
   426 U.S. 229 (1976) ......................................................................................... 15

*Watson v. Weeks*,
   436 F.3d 1152 (9th Cir. 2006) ......................................................................... 26

*Willing v. Lake Orion Cmty. Sch. Bd. of Trustees*,
   924 F. Supp. 815 (E.D. Mich. 1996) .............................................................. 27

*Yao v. INS*,
   2 F.3d 317 (9th Cir. 1993) ............................................................................... 17

*Yazzie v. Hobbs*,
   977 F.3d 964 (9th Cir. 2020) ......................................................................... 3, 4

**STATUTES**

52 U.S.C. § 10101(a)(2)(A)................................................................................. 29

52 U.S.C. § 10101(a)(2)(B)................................................................................. 27

52 U.S.C. § 10101(c)-(g)..................................................................................... 26

52 U.S.C. § 20501(a)(3)................................................................................ 22, 23

52 U.S.C. § 20503(a)........................................................................................... 24

52 U.S.C. § 20507(c)(2)(A)................................................................................. 25

A.R.S. § 16-134(B)............................................................................................... 27

A.R.S. § 16-166................................................................................................... 17

**CONSTITUTIONAL PROVISIONS**

U.S. Const. art. I, § 4, cl. 1 ........................................................................... 18, 21

U.S. Const. art. II, § 1 ......................................................................................... 19

**OTHER AUTHORITIES**

H. Rep. 103-9 (1993)..........................................................................................23

HB 2243 § 2(A)(10) ...............................................................................12, 17

HB 2243 § 2(K)...................................................................................................12

HB 2492 § 4(C) ...................................................................................................27

HB 2492 § 4(E) ...................................................................................................24

*Material*, Black's Law Dictionary (11th ed. 2019) ............................................28

S. Rep. 103-6 (1993) .........................................................................................23

**GLOSSARY**

| **Defined Term** | **Definition** |
| --- | --- |
| 35-Day Notice | When a county recorder receives notice that a person is not a U.S. citizen, the county recorder will send the person notice that their registration will be canceled in 35 days unless the person provides satisfactory evidence of U.S. citizenship pursuant to § 16-166. The notice shall provide a list of documents the individual can provide to establish citizenship and a postage prepaid preaddressed return envelope. HB 2243 § 2(A)(10). |
| Acts | HB 2243 and HB 2492 |
| AAANHPI | Plaintiff Arizona Asian American Native Hawaiian and Pacific Islander For Equity Coalition |
| Birthplace Requirement | A person is presumed to be properly registered to vote on completion of a registration form that contains the applicant's place of birth, among other information, as prescribed by HB 2492 § 4(A). |
| Citizenship Question | A person is presumed to be properly registered to vote on completion of a registration form that contains a mark in the "yes" box next to the question regarding citizenship, among other information, as prescribed by HB 2492 § 4(A). |
| Database Allegations | Plaintiffs' various allegations that the databases contain incorrect or outdated data (Latinx alleges that "there is no database that has current, up-to-date citizenship status information" (¶ 70); LUCHA alleges that the databases "are known to have unreliable citizenship data" (¶ 93) and that "none of [the] databases are designed to contain or reflect current U.S. citizenship status" (¶ 97); DNC alleges the "databases[] contain unreliable and outdated data" (¶ 36); AAANHPI alleges the databases are "outdated and inaccurate" (¶¶ 73, 86)). |
| Federal Form | The National Mail Voter Registration Form prescribed by the U.S. Election Assistance Commission pursuant to the National Voter Registration Act of 1993. |
| HB 2243 | 2022 Ariz. Sess. Laws ch. 370; codified at A.R.S. §§ 16-153, -165, 21-314 |
| In-Person Voting Limitation | If the county recorder is unable to match the applicant with the appropriate citizenship information, the county recorder shall notify the applicant that the county recorder could not verify that the applicant is a U.S. citizen and the applicant will not be qualified to vote by mail with an early ballot. HB 2492 §§ 4(E), 5(A)(2) |
| Investigation Requirement | If the county recorder or other officer in charge of elections matches the applicant with information that |

|  |  |
|---|---|
|  | the applicant is not a U.S. citizen, the officer shall reject the application, notify the applicant that the application was rejected because the applicant is not a U.S. citizen, and forward the application to the county attorney and attorney general for investigation. HB 2492 § 4(E). |
| Monthly Check | HB 2243 requires that each month: the department of health services submit to the secretary of state the names of deceased persons to be canceled from the voter registration database; the department of transportation furnish a list of persons who have been issued a driver's license or nonoperating license in another state so that it may be confirmed whether they are resident of this state; the secretary of state compare the statewide voter registration database to the driver license database to notify the county recorder if a person has changed their residence or is not a U.S. citizen; to the extent practicable, the county recorder shall compare the county's voter registration database to the Social Security Administration database; to the extent practicable, the county recorder shall compare persons who are registered to vote in that county and whom the county recorder has reason to believe are not U.S. citizens and persons who are registered to vote without satisfactory evidence of citizenship with the Systematic Alien Verification for Entitlements ("SAVE") program. HB 2243 § 2(D)-(H). |
| POC | Proof of citizenship, as defined in A.R.S. § 16-166(F). |
| POR | Proof of residence, as defined in A.R.S. § 16-579(A)(1). |
| Presidential-Ballot Limitation | If the county recorder is unable to match the applicant with the appropriate citizenship information, the county recorder shall notify the applicant that the county recorder could not verify the applicant is a U.S. citizen and the applicant will not be qualified to vote in a presidential election. HB 2492 § 4(E) & § 5(A)(1). |
| Private Plaintiffs | All Plaintiffs with the exception of the United States |
| Removal Process | When the county recorder obtains information and confirms that a person registered to vote is not a U.S. citizen, before canceling the registration, the county recorder shall send the person notice that the person's registration will be canceling in 35 days unless the person provides satisfactory evidence of U.S. citizenship pursuant to A.R.S. § 16-166. If the person registered does not provide satisfactory notice within 35 days, the county recorder shall cancel the registration. HB 2243 § 2(A)(10). |
| State | The State of Arizona or the State and its Attorney General (as context indicates) |

| | |
|---|---|
| State Form | The state voter registration form prescribed by the Secretary of State pursuant to A.R.S. § 16-152(C). |
| Valid ID | Documentary identification required to vote in person as defined by A.R.S. § 16-579. |
| Verification Requirement | Within 10 days after receiving an application for registration to vote on a Federal Form that is not accompanied by satisfactory evidence of citizenship, the County Recorder or other officer in charge of elections shall use all available resources to verify the citizenship status of the applicant and at a minimum shall compare the information with the following, provided the county has access: (1) Department of Transportation databases; (2) Social Security Administration databases; (3) United States Citizenship and Immigration Services SAVE program; (4) a National Association for Public Health Services and Information Systems electronic verification of vital events system; and (5) any other state, city, town, county, or federal database and any other database relating to voter registration to which the county recorder or other officer in charge has access. |

**INTRODUCTION**

It is not reasonably disputed that the States can condition voting in elections on being a U.S. citizen. Indeed, the right to vote is the signature benefit of citizenship.

Plaintiffs' arguments, however, ultimately boil down to the proposition that requiring *any* actual proof of citizenship beyond a person's mere say-so violates multiple provisions of the U.S. Constitution and federal statutory law. But the only violation here is that premise's incompatibility with common sense and the governing law. The modest requirements imposed by HB 2492 and 2243 are common-sense integrity measures strikingly similar to those upheld by the Supreme Court in *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181 (2008) and the Ninth Circuit in *Gonzalez v. Arizona*, 677 F.3d 383, 409 (9th Cir. 2012) (en banc). They should be upheld here for similar reasons.

**I.** Private Plaintiffs' claims fail for lack of Article III standing. Despite the panoply of litigants, *none* have successfully established representational or organizational standing. None alleged harm to identifiable members as Supreme Court precedent demands. Further, no Private Plaintiff establishes a non-speculative diversion of resources from the operation of the challenged Acts, as opposed to their efforts to challenge them. Many of Private Plaintiffs' claims are also unripe, as the alleged harms are contingent on the speculative future events lacking any real-world implementation data.

**II.** Plaintiffs' constitutional claims fail under binding precedent. Plaintiffs' *Anderson-Burdick* claims fail because the burden imposed by the Acts is minimal and justified by the States' interest secure elections, as confirmed by the decisions in *Crawford* and *Gonzalez*. Plaintiffs' due process claims fail for similar reasons as they too are analyzed under the *Anderson-Burdick* framework. Plaintiffs' equal protection claims fail for the same reason, and further because Plaintiffs' claims do not involve a suspect class and do not establish that the relevant voters are similarly situated.

**III.** Plaintiffs' NVRA claims fail because Congress lacks the authority under the Elections Clause to regulate Presidential and state elections, and the Acts do not affect Congressional elections. Nor was the NVRA enacted under the Reconstruction

Amendments' remedial provisions, and even if it were, it would not be a constitutional exercise of them.

**IV.** Private Plaintiffs' Section 10101 claims fail because that provision lacks a private cause of action. And all Plaintiffs' §10101's claims fail to allege a violation of either the materiality or nondiscrimination provisions. The materiality provision is not violated because the challenged requirements are material to *State* law qualifications. And the nondiscrimination provision is not violated because the Acts apply uniformly to voters.

ARGUMENT

**I.**   **SOME OF PRIVATE PLAINTIFFS' CLAIMS ARE NON-JUSTICIABLE**

   **A.**   **Private Plaintiffs Lack Article III Standing**

      **1.**   **No Plaintiff Has Established Representational Standing.**

Plaintiffs DNC, Poder Latinx, and LUCHA argue that they have representational standing. However, each failed to "make specific allegations establishing that *at least one identified member* had suffered or would suffer harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009) (emphasis added).

DNC and LUCHA assert that members of their organization will suffer injury in future elections, including DNC's "competitive" injury, based on allegations that members will be removed from the voter rolls or unable to register. (Doc. 151 at 10; Doc. 153 at 8–9.) Yet there are no allegations that any of these members intend to vote in the next election, will seek to register to vote prior to the next election, or that any of their members are registered to vote without POC or lack the documents necessary to establish POC. Instead, DNC and LUCHA rely on the statistical probability that some unidentified member will be affected in some unidentified way, the exact argument that the Court rejected in *Summers*. 555 U.S. at 498. "This requirement of naming the affected members has never been dispensed with in light of statistical probabilities, but only where *all* the members of the organization are affected by the challenged activity." *Id.* at 498–99.

Thus, *National Council of La Raza v. Cegavske* is inapposite. 800 F.3d 1032 (9th Cir. 2015). There, the court concluded that it was not speculative that a member of the

plaintiff organization suffered injury. *Id.* at 1041. Specifically, the organization alleged that individual members had been harmed by the state's "failure to comply with [the NVRA] because their members have not been and will not be offered the opportunity to register to vote through DHHS Offices" based on data and field investigations. *Id.* at 1036–37 (cleaned up). Thus, the allegations established that individual members already suffered "injury as a result of Nevada's failure to comply with Section 7." *Id.* at 1041. Here, the laws are not in effect, so there is no past injury to any individual member to rely on to support standing, rendering *Cegavske* inapposite.

Poder Latinx has no members, but it asserts (at 8) it has standing because it represents a "specialized segment" of the population, citing *Oregon Advocacy Center v. Mink*, 322 F.3d 1101, 1112 (9th Cir. 2003). However, Poder Latinx distorts the court's reasoning there. In *Oregon Advocacy*, the court held that the organization had standing because it was the functional equivalent of a voluntary membership organization given that its leadership was made up mostly of a "specialized segment" of the population it represented and, significantly, that it "may be adversely affected by the outcome of this litigation." *Id.* In contrast, Poder Latinx has not cited any allegations that its leadership is mostly made up of the "specialized segment" it purportedly represents or that it will be adversely affected by the outcome of this litigation. (Doc. 154 at 8.) That certain members of this specialized segment might be adversely affected by the litigation's outcome does not speak to whether Poder Latinx will, and certainly supplies Poder Latinx license to speak for all Latino voers.

Moreover, DNC, Poder Latinx, and LUCHA have not identified any members who intend to vote in the next election. They merely assume one of their members will do so. "[T]his kind of general intent to decide, 'at some point,' to cast a ballot in a particular way that may disenfranchise them 'epitomizes speculative injury.'" *Yazzie v. Hobbs*, 977 F.3d 964, 966–67 (9th Cir. 2020); *accord Townley v. Miller*, 722 F.3d 1128, 1133 (9th Cir. 2013). "[I]t is not enough ... to simply 'speculate' that the [voting law] 'would be ... a difficult burden on'" their members, as DNC, Poder Latinx, and LUCHA do here. *See*

*Yazzie*, 977 F.3d at 966–67 (second ellipsis in original) (citation omitted).

Any injury to any individual members of DNC, Poder Latinx, or LUCHA is too speculative to support their claims. Thus, they cannot establish representational standing.

### 2. Private Plaintiffs Have Not Adequately Alleged Organizational Standing Either

Organizations have standing to challenge governmental action when they "show that the challenged conduct frustrated their organizational missions and that they diverted resources to combat that conduct." *Friends of the Earth v. Sanderson Farms, Inc.*, 992 F.3d 939, 942 (9th Cir. 2021). "[M]erely continuing ongoing activities does not" show a diversion of resources. *Id.* Thus, in *Friends of the Earth*, the court concluded that "continuation of existing advocacy" in response to certain action did not support organizational standing. *See id.* at 943–45.

Here too, Private Plaintiffs have not established that there is a diversion of resources from HB 2243 or 2492 because they assert that they will continue to engage in the *same ongoing voter registration efforts*—irrespective of HB 2243 or 2492. (Doc. 150 at 4; Doc. 151 at 10–11; Doc. 153 at 9; Doc. 154 at 7; No. 22-CV-1381, Doc. 89 at 10–11.) All of the activities Private Plaintiffs cite in their briefing as diversions from HB 2243 and 2492—including efforts to keep registered voters on the rolls—are just various forms of continued voter registration and get-out-the-vote efforts. Private Plaintiffs simply plan to "continue[] doing what they were already doing" and going about "business as usual," just like the plaintiffs in *Friends of the Earth*. *See* 992 F.3d at 943. That did not suffice in *Friends of the Earth*, and should not suffice here either. Private Plaintiffs' failure to any necessary *diversion* of resources to other activities is thus fatal here.

Indeed, an organization cannot gain standing "merely by virtue of its efforts and expense to advise others how to comport with the law, or by virtue of its efforts and expense to change the law." *Fair Elections Ohio v. Husted*, 770 F.3d 456, 460 (6th Cir. 2014). This type of injury to an "abstract social interest in maximizing voter turnout" does not confer standing. *Id.* at 461. Because Private Plaintiffs likewise assert injury to this same

interest—*i.e.*, expenses incurred in advising Arizonians how to comply with the law to get registered to vote, they too lack standing.

Nothing about HB 2243 or 2492 requires Private Plaintiffs to expend additional funds to further their mission. To start, the provisions are not even in effect yet, so it is entirely speculative whether registration efforts will be more difficult. Private Plaintiffs cannot "manufacture injury by ... simply choosing to spend money fixing a problem that otherwise would not affect the organization at all." *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010). There is no indication that the Acts will necessarily cause Private Plaintiffs to incur any additional expense in its voter registration efforts. Indeed, "the mere fact that [an organization] has spent, and continues to spend, resources registering voters" does not show that it has suffered injury as a direct result of government action. *See Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 362 (5th Cir. 1999). HB 2243 and 2492 also applies to everyone registering or registered to vote in Arizona such that "the alleged injury to the organization likely will be one that is shared by a large class of citizens and thus insufficient to establish injury in fact." *Nat'l Treasury Emps. Union v. United States ("NTEU")*, 101 F.3d 1423, 1430 (D.C. Cir. 1996). Private Plaintiffs have not sufficiently asserted that spending money on voter registration efforts is traceable to HB 2243 and 2492. Plaintiffs thus have not shown organizational standing.

Further, whether the Acts are causing injury to Private Plaintiffs is too speculative. "If a defendant's conduct does not conflict directly with an organization's stated goals, it is entirely speculative whether the defendant's conduct is impeding the organization's activities." *NTEU*, 101 F.3d at 1430. "Absent a direct conflict" between the challenged action and the organization's mission, it is speculative whether the organization's "additional expenditure of funds is truly necessary to" further the mission or "rather is unnecessary alarmism constituting a self-inflicted injury." *Id.* That is just so here.

1

2

### 3.   San Carlos Apache Tribe Has Not Shown Parens Patriae Standing

3

4

5

6

7

8

9

10

11

12

13

To establish parens patriae standing, "more must be alleged than injury to an identifiable group of individual residents, the indirect effects of the injury must be considered as well in determining whether the State has alleged injury to a sufficiently substantial segment of its population." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607 (1982). Here, San Carlos Apache Tribe alleges injury to a defined segment of its residents: those without ready access to POR. (Doc. 153 at 9–10.) But a tribe asserting parens patriae standing much show "it is acting on behalf of all of its members," not just individual members. *Navajo Nation v. Superior Ct.*, 47 F. Supp. 2d 1233, 1240 (E.D. Wash. 1999), *aff'd* 331 F.3d 1041 (9th Cir. 2003). Moreover, the Tribe has not described how many of its 11,000 residents are even affected. San Carlos Apache Tribe has not met its burden of establishing parens patriae standing.

14

Privates Plaintiffs lack standing.[1] Dismissal is therefore necessary here.

15

### B.   Several Of Private Plaintiffs' Claims Are Not Ripe

16

17

18

19

20

21

22

Private Plaintiffs' challenges to the Citizenship Question and Birthplace Requirements, claims based on the Database and Investigation Requirements, and LUCHA's VRA § 2 claim are also not ripe. A claim is not ripe when it "is riddled with contingencies and speculation that impede judicial review." *Trump v. New York*, 141 S. Ct. 530, 535 (2020). Consequently, in *Trump v. New York*, a case was not ripe because "[t]he Government's eventual action will reflect both legal and practical constraints, making any prediction about future injury just that—a prediction." *Id.* at 536.

23

24

Here too, Private Plaintiffs' claims that HB 2243 and 2492 will prevent individuals from voting relies wholly on contingencies and speculation based on future uncertain

25

26

27

28

---

[1]   AAANHPI asserts (at 9) the State lacks "standing" to seek dismissal for non-moving defendants, citing *Mantin v. Broadcast Music, Inc.*, 248 F.2d 530, 531 (9th Cir. 1957). But *Mantin* is inapposite because it dealt with a motion to dismiss for failure to state a claim, not (unwaivable) lack of jurisdiction. In any event, federal courts have "an independent duty to assure that standing exists, irrespective of whether the parties challenge it." *Wash. Env't Council v. Bellon*, 732 F.3d 1131, 1139 (9th Cir. 2013). AAANHPI's suggestion that this Court could simply ignore its lack of jurisdiction as to other parties is unserious.

action by individuals registering to vote and decisions by governmental actors that will affect *future* elections. *Reclaim Idaho v. Little*, 826 F. App'x 592, 600 n.5 (9th Cir. 2020) ("To the extent Reclaim seeks relief from impending threats they may face in *future* elections, that claim is not ripe."). Allowing the "process [to] run its course not only brings 'more manageable proportions' to the scope of the parties' dispute ... but also 'ensures that we act *as judges*, and do not engage in policymaking properly left to elected representatives." *Trump*, 141 S. Ct. at 536; *accord Renne v. Geary*, 501 U.S. 312, 323 (1991) ("Determination of the scope and constitutionality of legislation in advance of its immediate adverse effect in the context of a concrete case involves too remote and abstract an inquiry for the proper exercise of the judicial function."). Ultimately, no injury may arise. Private Plaintiffs' challenges to the Citizenship Question and Birthplace Requirements, claims based on the Database and Investigation Requirements, and LUCHA's VRA § 2 claim are too speculative, and thus, are not ripe.

## II.   PLAINTIFFS HAVE NOT PLED VIABLE CONSTITUTIONAL CLAIMS

Plaintiffs assert various constitutional claims under the *Anderson-Burdick* framework, procedural due process, and the Equal Protection Clause. However, binding precedent forecloses these claims, and thus, dismissal is necessary.

### A.   Plaintiffs' Facial Challenges Fail as a Matter of Law.

"The Supreme Court repeatedly has assessed challenges to election laws, including election-related deadlines, under the framework now described as the *Anderson/Burdick* framework." *Ariz. Democratic Party v. Hobbs ("Hobbs II")*, 18 F.4th 1179, 1195 (9th Cir. 2021). "Under [that framework], a court 'must identify and evaluate the interests put forward by the State as justifications for the burden imposed by its rule, and then make the "hard judgment" that our adversary system demands.'" *Gonzalez v. Arizona*, 677 F.3d 383, 409 (9th Cir. 2012) (en banc) (quoting *Crawford*, 553 U.S. at 190 (plurality)).

*Gonzalez* is exactly on point and forecloses Plaintiffs' constitutional claims. There, the Ninth Circuit upheld a requirement that voters show identification for in-person voting. *Gonzalez*, 677 F.3d at 404, 409-10. The court explained that "the burden imposed on

citizens who must obtain a photo identification document was not sufficiently heavy to support a facial attack on the constitutionality of the state law, in light of the state's legitimate interests in deterring and detecting voter fraud, modernizing election procedures, and safeguarding voter confidence." *Id.* The burden of obtaining identification, which included showing documents that may require a small fee to obtain, such as a birth certificate, certificate of naturalization, or passport, was minimal. *See id.* The state's weighty interests easily surpassed the *Anderson-Burdick* balancing test against a facial challenge. *See id.*

Although Plaintiffs attempt to distinguish *Gonzalez* based on the procedural posture, nothing in the court's analysis of the constitutional issues raised relied on the development of any facts. The court looked exclusively to how the statute operated and accepted that some voters would have to pay a fee to get the identification needed to vote.

Plaintiffs raise the exact same issues as burdens on voting rights here. Specifically, several Plaintiffs allege the POR and POC requirements are burdens because some will have to pay fees to meet them. The Ninth Circuit rejected that exact argument, stating that "any payment associated with obtaining the documents ... is related to the state's legitimate interest in assessing the eligibility and qualifications of voters" which outweighed the resulting minimal burdens. *Gonzalez*, 677 F.3d at 410. No factual development will make this minimal burden overcome the State's legitimate interests in detecting voter fraud, modernizing election procedures, and safeguarding voter confidence on Plaintiffs' facial challenge devoid of any factual or individualized context.[2]

---

[2] LUCHA and MFV cite *Mecinas* and *Soltysik*, (Doc. 153 at 11; Doc. 150 at 6), but those cases do not apply here. In *Mecinas*, the Ninth Circuit concluded that there were factual issues regarding whether the State could meet its interest of ballot management by a procedure other than one that allegedly led to Republicans being listed on the top position for each race, thereby precluding dismissal. *Mecinas v. Hobbs*, 30 F.4th 890, 903–04 (9th Cir. 2022). In *Soltysik*, the burden was not minimal and the statute explicitly targeted candidates who lacked party affiliation. *Soltysik v. Padilla*, 910 F.3d 438, 446 (9th Cir. 2018). Against that burden, the government's interest in avoiding voter confusion was not enough to prevail at the pleading stage. *See id. Mecinas* and *Soltysik* are both unhelpful here because *Crawford* and *Gonzalez*—binding case law—explicitly hold that a party cannot prevail on a facial challenge to an identification requirement that may include fees, such as the ones at issue here, because the State's weighty interests in voter integrity and modernization is sufficient to support the statutes. Indeed, *Mecinas* and *Soltysik* involved

Indeed, in *Crawford*, the lead opinion described that "[w]hen we consider only the statute's broad application to *all* Indiana voters we conclude that it 'imposes only a limited burden on voters' rights.'" 553 U.S. at 202–03 (emphasis added). The lead opinion refused "to perform a unique balancing analysis that look[ed] specifically at a small number of voters who may experience a special burden under the statute and weighs their burdens against the State's broad interests in protecting election integrity" despite evidence that some voters would face financial and other difficulties in obtaining the documentation necessary to obtain the identification required to vote. *See id.* at 200–01. It further rejected that invalidation of the statute was appropriate "even assuming an unjustified burden on *some* voters." *Id.* at 203 (emphasis added). "The application of the statute to the vast majority of Indiana voters is amply justified by the valid interest in protecting 'the integrity and reliability of the electoral process.'" *Id.* at 204. "The state interests identified as justifications for SEA 483 are both neutral and sufficiently strong to require ... reject[ing] petitioners' facial attack on the statute." *Id.*

Plaintiffs explicitly rely on the burden on *some* voters, (*see, e.g.*, Doc. 153 at 4–5, 11–12), but HB 2492 and 2243 are facially neutral laws that apply to *all* voters and that the Legislature enacted to advance the integrity and reliability of the electrical process.[3] Thus, as in *Crawford*, where a challenge to a neutral and generally applicable law failed because it was based exclusively on burdens that apply only to *some* voters, here too, Plaintiffs' claims fail as well for the same reason. 553 U.S. at 202–03.

Plaintiffs' contention that the State has not adequately established fraud is likewise

---

as-applied challenges with particularly injured candidates, not facial challenges like Plaintiffs' that are based on vague, contextless effects on some Arizona voters.

AAANHPI is also wrong that *Soltysik* establishes the need for further factual development here. Unlike the State's interests, which can be resolved as a matter of precedent and law, the "voter confusion" at issue in *Soltysik* was a heavily factbound issue of first impression requiring further development. 910 F.3d at 448.

[3] LUCHA Plaintiffs' insistence that some persons cannot show POR also would make residency requirements unenforceable. (*See* Doc. 153 at 12–13.) Decades of precedent support the State's authority to ensure voters are residents of the State. *See, e.g.*, *Marston v. Lewis*, 410 U.S. 679, 679 (1973) (upholding Arizona's 50-day residency requirement for voting). Again, the impact on *some* voters is not sufficient to support a facial challenge. *Crawford*, 553 U.S. at 202–03.

meritless because the State need not need present evidence of fraud before implementing voter regulations. "[B]ecause a government has such a compelling interest in securing the right to vote freely and effectively, th[e] Court never has held a State 'to the burden of demonstrating empirically the objective effects on political stability that [are] produced' by the voting regulation in question." *Burson v. Freeman*, 504 U.S. 191, 208–09 (1992) (citation omitted). "Elections vary from year to year, and place to place," rendering it "difficult to make specific findings about the effects of a voting regulation." *Id.* Further, in *Crawford*, although there was "no evidence of any such fraud actually occurring in Indiana at any time in its history," the Court concluded that voter fraud was a legitimate interest, in part, because of "flagrant examples of such fraud in other parts of the country [that] have been documented throughout this Nation's history" and "occasional examples [that] have surfaced in recent years." 553 U.S. at 194–95.

AAANHPI cites no case where a court has factored in the possibility of criminal investigation for voter registration fraud as a "burden." Because it is not. Indeed, "[t]he desire not to be investigated for voter registration fraud is not a fundamental right." *Moseley v. Price*, 300 F. Supp. 2d 389, 397 (E.D. Va. 2004). In any event, the relevant burdens are "on the voting process," *Gonzalez*, 677 F.3d at 409, and a possible voter fraud investigation is not part of the voting process.

Finally, Plaintiffs attempt to transmute HB 2492 and 2243 from a neutral and generally applicable law into a discriminatory law by crafting various classes that are created by these provisions. Comparing Federal Form users to State Form users or naturalized citizens to birthright citizens is disingenuous because HB 2492 and 2243 *apply the same rules to everyone*. In *Crawford*, the Supreme Court refused to do exactly what Plaintiffs ask this Court to do: "perform a unique balancing analysis that looks specifically at a small number of voters who may experience a special burden under the statute and weighs their burdens against the State's broad interests in protecting election integrity." 553 U.S. at 200–01. Plaintiffs cannot slice and dice Arizona voters into classes to create

special burdens to incorporate into the *Anderson-Burdick* balancing.[4]

Ultimately, HB 2492 and 2243 advance the State's legitimate interest in the integrity and reliability of the electrical process, and these provisions are a minimal burden, at most, on the voter rights of some voters. Accordingly, Plaintiffs' facial challenges fail as a matter of law under *Crawford* and *Gonzalez*.

**B.    Plaintiffs Have Not Stated a Procedural Due Process Claim.**

The Ninth Circuit has explicitly stated, after citing authority from the Fifth and Eleventh Circuits, that "the *Anderson/Burdick* approach is better suited to the context of election laws than is the more general *Eldridge* test," which applies to procedural due process claims. *Hobbs II*, 18 F.4th at 1195. Both the Fifth and Eleventh Circuit decisions cited by the Ninth Circuit rejected that there is a freestanding procedural due process claim and instead applied the *Anderson/Burdick* test. *Richardson v. Tex. Sec'y of State*, 978 F.3d 220, 233–35 (5th Cir. 2020); *New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1282 (11th Cir. 2020). And the Supreme Court itself has commanded that "[a] court considering a challenge to a state election law must weigh the character and magnitude of the asserted injury to the *rights protected by the First and Fourteenth Amendments* that the plaintiff seeks to vindicate against the precise interests put forward by the State as justifications for the burden imposed"—*i.e.*, the *Anderson/Burdick* framework. *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (cleaned up) (emphasis added).

However, even if Plaintiffs could assert a procedural due process claim that does not fall into the *Anderson-Burdick* framework, none of them has properly pleaded such a claim. To start, the Ninth Circuit has held that a procedural due process claim fails if the government's interest outweighs the burden under the *Anderson-Burdick* framework. *See Lemons v. Bradbury*, 538 F.3d 1098, 1104 (9th Cir. 2008). Moreover, HB 2243 provides sufficient notice and an opportunity to be heard to satisfy due process. Under HB 2243, the county recorder must provide notice before cancelation of registration based on

---

[4]  MFV/VL wrongly asserts that the burden on voting rights is severe because those who do not comply with the statute cannot vote. (Doc. 150 at 6–7.) But the relevant burden is that of complying with the requirement, not the "consequence of noncompliance.'" *Hobbs II*, 18 F.4th at 1188-89 (citation omitted).

"confirm[ation] that the person registered is not a United States citizen" and an opportunity to cure by providing POC, including a license number or naturalization number. HB 2243 § 2(A)(10). And after cancelation, the county recorder must send a "notice by forwardable mail informing the person that the person's registration has been cancelled, the reason for the cancelation, the qualifications of electors pursuant to section 16-101 and instructions on registering to vote if the person is qualified." HB 2243 § 2(K). When one's registration is cancelled, the individual can nevertheless register to vote prior to the election. Thus, there is no deprivation of any liberty interest in the right to vote, and presence on the voter rolls is not a liberty interest that due process protects. *See Teel v. Darnell*, No. 1:07-CV-271, 2008 WL 474185, at *8 (E.D. Tenn. Feb. 20, 2008).

HB 2492 also does not deprive anyone of a protected interest. *Ingraham v. Wright*, 430 U.S. 651, 672 (1977) (due process is only required when a "protected interest[] is implicated"). Individuals must complete voter registration before they can exercise the right to vote—including voting by mail—and thus, HB 2492 does not deprive them of protected interest in voting by adding certain eligibility requirements for registration.[5] *Gonzalez*, 677 F.3d at 409 (describing "the state's power to fix core voter qualifications"); *Lawson v. Shelby County*, 211 F.3d 331, 336 (6th Cir. 2000) ("The U.S. Constitution protects an individual's right to vote during an election, not the right to register to vote prior to an election."); *Teel*, 2008 WL 474185, at *8 (explaining party could have avoided any deprivation by showing that he met eligibility requirements to vote); *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449-50, 454-57 (2008) (refusing to strike down election law on facial challenge based on mere speculation and explaining facial challenges are disfavored because they risk "premature interpretation of statutes on

---

[5]  To the extent Plaintiffs assert a due process claim based on changing the voter eligibility requirements, including by mail, that claim fails too. Because HB 2492 is a legislative action, voters' due process "rights are protected in the only way that they can be in a complex society, by [the voters'] power, immediate or remote, over those who make the rule." *Jones v. Governor of Fla.*, 975 F.3d 1016, 1048 (11th Cir. 2020) (quoting *Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 445 (1915)) (holding that there was no due process claim where legislative action changed voter registration requirements).

1   the basis of factually barebones records"). Thus, Plaintiffs' due process claim fails because

2   there is no deprivation that requires procedural protections.[6]

3       Plaintiffs thus have not stated a due process claim, whether analyzed under the

4   *Anderson-Burdick* framework or as a freestanding procedural due process claim.[7]

5   **C.   Plaintiffs Have Not Stated an Equal Protection Claim.**

6       Preliminarily, the *Anderson-Burdick* framework is the proper analytical paradigm

7   for considering Plaintiffs' equal protection claims. *See Ariz. Democratic Party v. Hobbs*

8   *("Hobbs I")*, 976 F.3d 1081, 1086 n.1 (9th Cir. 2020) ("'[A] single analytic framework'

9   applies in voting-rights cases, rather than 'separate analyses for ... First Amendment, Due

10  Process, or Equal Protection claims'" (citations omitted)). As discussed above, Plaintiffs

11  have not stated a claim that HB 2243 and 2492 are unconstitutional under the *Anderson-*

12  *Burdick* framework because they are facially neutral laws that advance legitimate state

13  interests in voter integrity and modernization that impose minimal burdens, at most.

14      However, even setting aside the *Anderson-Burdick* framework, Plaintiffs have not

15  stated an equal protection claim. A law complies with the Equal Protection Clause if it is

16  not facially discriminatory, there is no discriminatory intent, and it has a rational basis. *See*

17  *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 271–73 (1979); *Commonwealth of Northern*

18  *Mariana Islands v. Zhen*, 68 F. App'x 7, 8 (9th Cir. 2003) ("[W]e can discern no class-

19  based claim or allegation of discriminatory application. Accordingly, no cognizable equal

20  protection claim exists for our review.").

21      *First*, Plaintiffs cannot establish facial discrimination because the challenged

22  provisions of HB 2492 apply to *all* individuals registering to vote and HB 2243's

23

24

---

25  [6]  Poder Latinx and LUCHA Plaintiffs are wrong that they have stated a procedural due
    process claim based on the voter registration process. Neither Poder Latinx nor LUCHA

26  Plaintiffs cite any case where a court found that denial of voter registration violated
    procedural due process rights. (Doc. 154 at 8–9; Doc. 150 at 7–9.)

27  [7]  Also, "[t]he desire not to be investigated for voter registration fraud is not a fundamental
    right protected by the due process clause." *Moseley*, 300 F. Supp. 2d at 397. LUCHA

28  Plaintiffs' references to possible criminal probes is therefore irrelevant because the State
    is entitled to investigate possible registration fraud. (Doc. 153 at 13.)

13

provisions apply to all registered voters.[8] To start, every registrant and registered voter, including naturalized citizens, can use a driver's license or identification card number. A.R.S. § 16-166(F). Solely because those persons can use different documents to establish POC that *might* impose slightly different burdens does not create a class based on national origin or facial discrimination, especially where everyone can use a driver's license or identification card number as POC. *Lee v. Los Angeles*, 250 F.3d 668, 687 (9th Cir. 2001) ("The mere fact that defendants' facially neutral policies had a foreseeably disproportionate impact on an identifiable group does not mean that they violated the Equal Protection Clause."). The defining characteristic is whether the person has POC, not national origin.

LUCHA and AAANHPI contort the State's explanation regarding the Birthplace Requirement. (Doc. 153 at 4 n. 5, 13; No. 22-CV-01381, Doc. 89 at 19.) The State did not say it will apply different standards to birthright citizens. Rather, it stated that providing a place of birth offers "additional information [that] facilitates ascertaining if a registrant is a U.S. citizen." (Doc. 127 at 32; *see also id.* at 19 n.6.) It simply makes it easier to identify an individual, which is why many government forms require birthplace to be specified.

*Second*, there is no disparate impact or evidence of discriminatory intent to support an equal protection claim either. All voter registration applicants must provide POC through a variety of ways, including providing a driver's license number or naturalization certificate number. Plaintiffs have not identified how there is any disparate impact based on national origin where everyone can establish POC by merely providing a number. In fact, HB 2492 and 2243 are not yet in effect, so it is impossible that they have a

---

[8] LUCHA's and AAANHPI's argument that only naturalized citizens can trigger review for U.S. citizenship is simply wrong. (Doc. 153 at 13–14 n.8; No. 22-CV-01381, Doc. 89 at 19–20.) For example, a U.S. citizen could renounce citizenship, and, if that person was registered in Arizona and the county recorder obtained information that the registered voter renounced citizenship, the cancelation process for non-citizens under HB 2243 would be applicable regardless of national origin. AAANHPI's argument that § 2(H) of HB 2243 requires use of the SAVE database to verify citizenship status shows only naturalized citizens are reviewed gets it backwards. The trigger event is when the county recorder has "reason to believe" a registered voter is not a U.S. citizen and that voter lacks POC, not use of the SAVE database. (No. 22-CV-01381, Doc. 89 at 19–20.) In short, the law is not triggered by national origin and applies the same to every registered voter in Arizona.

discriminatory effect that would support an equal protection claim. *See Am. Motorists Ins. Co. v. Starnes*, 425 U.S. 637, 645 (1976) ("There being no discriminatory effect achieved by the aspects of the Texas venue provisions calling for establishment of a cause of action, we have no difficulty in concluding that appellant's equal protection challenge to Exception 27 must be rejected."). This deficiency alone is fatal. *See id.*

In any event, that HB 2243 and 2492 affect some classes differently than others does not establish an equal protection violation. HB 2243 and 2492 were enacted to combat voter fraud and safeguard voter confidence in Arizona elections by ensuring all voters are U.S. citizens that are eligible to vote—unquestionably a legitimate government interest. *See, e.g., Gonzalez*, 677 F.3d at 410. These provisions plainly advance those interests. Facially neutral legislation that rationally furthers legitimate government purposes— without more—cannot be discriminatory. *See Washington v. Davis*, 426 U.S. 229, 246 (1976) (holding equal protection claim challenging mandated police officer test failed where test was "neutral on its face and rationally may be said to serve a purpose the Government is constitutionally empowered to pursue"). Indeed, Plaintiffs failed to adequately plead a discriminatory purpose. *McReynolds v. Merrill Lynch & Co.*, No. 08 C 6105, 2011 WL 1196859, at *4 (N.D. Ill. Mar. 29, 2011) ("In short, plaintiffs allege that the system was designed with discriminatory intent, but under *Iqbal* they must do more. They must plead sufficient factual matter to show that defendants adopted and implemented the retention system not for a neutral reason, but for the purpose of discriminating against African-American [Financial Advisors]."). That the State seeks to ensure voters are U.S. citizens by requiring POC through a variety of means is an "obvious alternative explanation" over the "invidious discrimination [Plaintiffs] ask[] us to infer." *Ashcroft v. Iqbal*, 556 U.S. 662, 681–82 (2009). Thus, as in *Iqbal*, where a more likely explanation renders invidious discrimination not plausible, Plaintiffs cannot state an equal protection claim. *See id.*

*Third*, HB 2243 and 2492 easily satisfy the rational basis test. Mi Familia and LUCHA Plaintiffs assert that a purported difference in treatment between State Form users

and Federal Form users violates equal protection. (Doc. 150 at 8–9; Doc. 153 at 14–16). As an initial matter, Federal Form users are not similarly situated to State Form users because different qualifications apply for registration. *See Chan v. Reno*, 113 F.3d 1068, 1073–74 (9th Cir. 1997) (stating that plaintiffs were not similarly situated to other applicants where they did not qualify for a visa unlike other applicants).

Even assuming the two groups are similarly situated, the equal protection claim still fails. "[T]he Equal Protection Clause is satisfied so long as there is a plausible policy reason for the classification." *Nordlinger v. Hahn*, 505 U.S. 1, 11 (1992). The State has an interest in ensuring through POC and POR that individuals registering to vote for state offices are U.S. citizens and Arizona residents. *See Gonzalez*, 677 F.3d at 404, 409–10 (citizenship); *Marston*, 410 U.S. at 679 (residency). The difference in treatment between Federal Form users and State Form users necessarily arises from the NVRA's requirement that the States register Federal Form users to vote for federal offices while also giving the States "the flexibility to design and use their own registration forms." *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 12, 16–20 (2013). The State's decision to require POC for State Form users is a rational exercise of its constitutional authority to add requirements beyond what the Federal Form requires. *See id.* Under Plaintiffs' argument, States would lack the flexibility to design their own registration forms for *state* elected offices and fully federalize voter registration and voter eligibility, a result that grates against the constitutional framework for elections and the NVRA. *Id.* at 17 ("Arizona is correct that it would raise serious constitutional doubts if a federal statute precluded a State from obtaining the information necessary to enforce its voter qualifications."). Requiring POC rationally advances the State's interest in ensuring that those registering to vote for *state* office are qualified to vote as U.S. citizens.

The State also had a rational basis to distinguish between State Form users and Federal Form users. The State's distinction supports the reliance interests of those using the Federal Form based on the Supreme Court's decision in *Inter Tribal Council* restricting the states from asking for POC for Federal Form users. *See Nordlinger*, 505 U.S. at 14.

1    And the State "'has no obligation to produce evidence to sustain the rationality of a

2    statutory classification'; rather, '[t]he burden is on the one attacking the legislative

3    arrangement to negate every conceivable basis which might support it.'" *Erotic Serv.*

4    *Provider Legal Educ. & Rsch. Project v. Gascon*, 880 F.3d 450, 457 (9th Cir. 2018),

5    *amended*, 881 F.3d 792 (9th Cir. 2018). Plaintiffs have not made that showing.[9]

6           MFV Plaintiffs' assertion that restricting Federal Form users from voting mail or in

7    presidential elections violates equal protection is also wrong. (Doc. 150 at 9 – 10.) First,

8    as discussed, Federal Form users are not similarly situated to State Form users because

9    different qualifications apply. *Chan*, 113 F.3d at 1073–74. Second, even if Federal Form

10   and State Form users are similarly situated, there is a rational basis to distinguish between

11   them based on the different eligibility requirements that apply to each form. *See Yao v.*

12   *INS*, 2 F.3d 317, 322 (9th Cir. 1993).

13          The minor differences between State Form users and Federal Form users is not

14   enough to support an equal protection violation. *United States v. Hancock* is instructive.

15   231 F.3d 557 (9th Cir. 2000). There, the Ninth Circuit held that the difference in treatment

16   between felons and misdemeants in regaining the right to possess firearms did not

17   constitute an equal protection violation because misdemeants have other adequate paths.

18   *Id.* at 567. The Ninth Circuit classified the inability to use "restoration of civil rights"

19   procedure as a "minor distinction between felons and misdemeants" that did not violate

---

20   [9]  Poder Latinx's relies on *Louisiana v. United States*, (Doc. 154 at 16), but in that case the
21   state required voters to provide "'a reasonable interpretation' of any clause of the
     Louisiana Constitution or the Constitution of the United States" without any controls on
22   official discretion, placing "arbitrary power in the hands of election officers who had used
     [the requirement] with phenomenal success to" deny the right to vote based on race at the
23   election officers' discretion. *Louisiana v. United States*, 380 U.S. 145, 148, 152 (1965).
     Here, HB 2243 has not even been implemented so there is no history of discriminatory
24   treatment, unlike in *Louisiana*. Further, there is no arbitrary power in the county recorders
     to deny any registered voter the ability to vote, unlike in *Louisiana*. If the county recorder
25   "obtains information pursuant to this section and confirms that the person registered is not
     a United States citizens," then the county recorder must first provide notice that the
26   "registration will be canceled in thirty five days unless the person provides satisfactory
     evidence of United States citizen pursuant to section 16-166," HB 2243 § 2(A)(10), which
27   includes the number from a naturalization certificate, passport, or state driver's license or
     identification card. *See* A.R.S. § 16-166. The requirement to provide a number from a
28   document or other documents does not vest arbitrary discretion in county recorders to deny
     the right to vote, unlike the "interpretation" test from *Louisiana*.

equal protection. *See id.* Similarly here, Plaintiffs only point to a minor distinction between Federal Form users and State Form users: State Form users must provide POC while Federal Form users do not. As discussed, the POC requirement is a minor burden that can be met through providing either a license number or naturalization certificate number—not even the documents themselves. As in *Hancock*, this minor distinction is not enough to constitute an equal protection violation.[10]

In short, Plaintiffs have not alleged an equal protection claim. HB 2492 and 2243 are facially neutral laws that advance plainly legitimate governmental interests in ensuring voter integrity.

## III.   PLAINTIFFS FAIILED TO STATE VIABLE NVRA CLAIMS

Congress does not have the power to alter the "Places and Manner" of state elections. The NVRA thus could not possibly apply to state elections. No party disputes that logic. Likewise, Congress does not have the power to alter the "Places and Manner" of presidential elections. By the same logic, the NVRA cannot apply to presidential elections. The Elections Clause permits Congress to regulate the "Times, Places and Manner of holding Elections for Senators and Representatives." U.S. Const. art. I, § 4, cl. 1. It does not apply to presidential elections, just as it does not apply to state elections. The Electors Clause of Article II grants state legislatures the power to appoint presidential electors, yet it notably omits any similar power for Congress. "It is difficult to see how words could be clearer in stating what Congress can control and what it cannot control." *Oregon v. Mitchell*, 400 U.S. 112, 210 (1970) (Harlan, J., concurring in part and dissenting in part). And because the NVRA does not apply to presidential or state elections, it cannot preempt the Acts in question.

The United States nevertheless urges the Court to ignore the Elections Clause's

---

[10]   Plaintiffs' citation to *Bush v. Gore* is unavailing. (Doc. 154 at 16–18). *Bush v. Gore* dealt with a voter dilution claim where there was express disparate treatment in how votes were counted in different counties across the state under an order from the state supreme court. 531 U.S. 98, 107 (2000). Here, as discussed, there is no disparate treatment—everyone registering to vote can either select the State Form or Federal Form and the same requirements apply to everyone based on the form selected.

omission of presidential elections. The United States attributes that omission to the Framers not anticipating "that a presidential election would be conducted by popular vote in the way it is now." USA Resp. 8. But presidential elections are not conducted by popular vote. Today, just as at the time of the Founding, an electoral college selects the president. And though "Congress may determine the Time" of appointing presidential electors, the States have always had exclusive authority over the "Manner" of appointing them. U.S. Const. art. II, § 1. So the United States' premise is simply wrong.

Moreover, the United States' argument proves too much. The U.S. admits that the omission of presidential elections from the Elections Clause *was* important, but it can point to no change in the Constitution undoing that important choice. The Elections Clause itself has not changed, and election-related amendments only underscore the Elections Clause's resilience. *Contra* USA Resp. 8-9. The Constitution carefully assigns election-related powers, and *nothing* in it gives Congress blanket authority to regulate the "Manner" of selecting presidential electors. That power remains with the States.[11]

The Court must apply the Constitution's text. The United States' meager attempt to deal with the text is untenable. But even that exceeds Private Plaintiffs', who don't even try. In fact, LUCHA claims that none of its claims "depend on applying the NVRA to presidential election." LUCHA Resp. 9. If that is true, the Court should dismiss the NVRA preemption claims on that ground alone, because HB 2492 applies only to state and presidential elections. Rather than deal with the text of the Elections Clause, Private Plaintiffs obscure the Constitution's plain meaning with inapplicable precedent. The words of the Constitution cut through their arguments, and the Court should reject Plaintiffs' attempts to deviate from the text.

---

[11] Congress does have limited power to regulate presidential elections to protect "the right of citizens of the United States to vote" under the Fourteenth and Fifteenth Amendments. But those amendments did not erase the States' authority to regulate the manner of choosing presidential electors. U.S. Const. art. II, § 1. In any event, Congress did not enact the NVRA under the Fourteenth and Fifteenth Amendments, as explained *infra* §III.B.

## A.   Congress does not have unbounded authority to regulate presidential elections.

Plaintiffs argue that Congress wields expansive power to regulate presidential elections. USA Resp. 6-9; DNC Resp. 5-6. But in none of the cases plaintiffs cite did the Supreme Court hold that Congress may alter the "Places and Manner" of presidential elections. In *Burroughs v. United States*, the Court held that the Federal Corrupt Practices Act did not violate the Electors Clause because "[n]either in purpose nor in effect does [the act] interfere with the power of a state to appoint electors or the manner in which their appointment shall be made." 290 U.S. 534, 544 (1934). The Court did not hold that Congress possesses power to regulate the "Places and Manner" of presidential elections. To the contrary, the quoted line assumes that a statute that *does* interfere with the States' authority over presidential elections is unconstitutional.

Plaintiffs' other cases are similarly inapplicable. Plaintiffs cite *Buckley v. Valeo* for the proposition that the Constitution gives "broad congressional power" over presidential elections. 424 U.S. 1, 14 n.16 (1976) (citing *Burroughs*, 290 U.S. 534). But the Court in *Buckley* merely addressed whether the Federal Election Campaign Act's regulations of campaign contributions and expenses violated the First Amendment and the Equal Protection Clause. *Id.* at 7-11. The Court discussed the Elections Clause only in passing. *See id.* at 131-32. Even then, the Court recognized that Congress's authority to regulate congressional elections must "not offend some other constitutional restriction," such as those "stemming from the separation of powers." *Id.* at 132. The authority of *the States* to regulate the manner of choosing presidential electors is just such a restriction. U.S. Const. art. II, § 1.

Plaintiffs' reliance on Justice Black's solo opinion in *Oregon v. Mitchell* is even less persuasive. Justice Black, "in an opinion expressing his own view of the cases," summarily dismissed any difference between Congress's power over congressional elections and its power over presidential elections. 400 U.S. at 117, 124 (op. of Black, J.). But his opinion does not reconcile the textual difference between the Elections Clause and

the Electors Clause. Justice Harlan, who actually analyzed the text, observed that "the power to control the 'Manner' of holding elections, given with respect to congressional elections by Art. I, s 4, is absent with respect to the selection of presidential electors." *Id.* 211 (Harlan, J., concurring in part and dissenting in part). Thus, "the fact that it was deemed necessary to provide separately for congressional power to regulate the time of choosing presidential electors and the President himself demonstrates that the power over 'Times, Places and Manner' given by Art. I, s 4, does not refer to presidential elections, but only to the elections for Congressmen." *Id.* at 211-12.

The circuit cases plaintiffs rely on likewise do not support their claims. *See Voting Rights Coal. v. Wilson*, 60 F.3d 1411, 1414-15 (9th Cir. 1995) (holding that the NVRA was not an unconstitutional usurpation of the State's authority to regulate *congressional* elections); *ACORN v. Miller*, 129 F.3d 833, 836-38 (6th Cir. 1996) (same); *ACORN v. Edgar*, 56 F.3d 791, 793 (7th Cir. 1995) (same). The closest plaintiffs come is some dicta misreading *Burroughs*. *See ACORN*, 129 F.3d at 836 n.1 (citing *Burroughs* for the proposition that "Congress has been granted authority to regulate presidential elections"). Plaintiffs' out-of-context invocations of "broad congressional power" over presidential elections cannot override the Constitution's plain text. Congress can regulate the "Places and Manner of holding Elections for Senators and Representatives," but not Presidents. U.S. Const. art. I, § 4, cl. 1.

In a last-ditch effort to salvage their expansive reading, Plaintiffs invoke the Necessary and Proper Clause. USA Resp. 9; *see also* DNC Resp. 7. Plaintiffs' only support for that argument is *United States v. Comstock*, 560 U.S. 126, 133 (2010), which has nothing to do with elections, and Justice Black's reasoning in *Mitchell*, which obtained no other Justice's support. Plaintiffs' weakly supported argument is also weakly explained. The United States says treating presidential elections differently than congressional elections would result in "dual and disparate processes" for federal elections. USA Resp. 9. But the Constitution explicitly *designed* dual and disparate processes for presidential and congressional elections. Moreover, no Plaintiff even

attempts to explain how proof of citizenship is remotely *related* to the "Timing" of presidential elections, let alone convenient, useful, or conducive to the "beneficial exercise" of that power. *M'Culloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 417-18 (1819). Regardless, even if the Necessary and Proper Clause were read as Plaintiffs suggest, Congress can exercise its authority over federal elections only "so long as the exercise of that authority does not offend some other constitutional restriction." *Buckley*, 424 U.S. at 132. To the extent the NVRA regulates the "Manner" of selecting presidential electors, it offends the power of the States under the Electors Clause.

### B. The NVRA is not an exercise of Congress's authority under the Fourteenth and Fifteenth Amendments

Because the Elections Clause plainly forecloses their arguments, plaintiffs retreat to the Fourteenth and Fifteenth Amendments. They claim that Congress enacted the NVRA to combat racial discrimination under its remedial authority to enforce the Fourteenth and Fifteenth Amendments, rather than under the Elections Clause. *See* U.S. Resp. 9-11; DNC Resp. 8. To show that a law is a constitutional exercise of Congress's remedial powers, plaintiffs must demonstrate "congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *City of Boerne v. Flores*, 521 U.S. 507, 520 (1997). Plaintiffs argue they need only show that Congress used "rational means" to prevent discrimination. *South Carolina v. Katzenbach*, 383 U.S. 301, 324 (1966). Regardless, the NVRA fails both tests. *See Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 204 (2009) (acknowledging, though not resolving, the two different tests).

The Court need apply either test, however, because plaintiffs have not shown that Congress enacted the NVRA under its remedial powers in the Fourteenth and Fifteenth Amendments. The only textual support that plaintiffs can muster is Congress's finding that "discriminatory and unfair registration laws and procedures can … disproportionately harm voter participation by various groups, including racial minorities." 52 U.S.C. § 20501(a)(3). And plaintiffs prop up that single line with sparse references to the

congressional record. *See* USA Resp. 10; DNC Resp. 8. But those findings are plainly insufficient under Supreme Court precedent. The NVRA's congressional record consists of nothing more than a handful of conclusory statements that "discriminatory and unfair practices still exist and deprive some citizens of their right to vote." S. Rep. 103-6, at 3, 17-18 (1993). The NVRA's "legislative record lacks examples of modern instances" of discrimination on account of proof of citizenship required for registration. *City of Boerne*, 521 U.S. at 530. The dearth of legislative history documenting racial discrimination on account of proof of citizenship is no surprise, since "many of the first generation barriers to minority voter registration and voter turnout that were in place prior to the [Voting Rights Act] have been eliminated." *Nw. Austin*, 557 U.S. at 201-02, 227 (cleaned up). Compared to the NVRA, the Religious Freedom Restoration Act contained more extensive legislative findings of past discrimination. But the Supreme Court still found a "lack of support in the legislative record" that would have justified the law as an exercise of Congress's power under the Fourteenth Amendment. *City of Boerne*, 521 U.S. at 531. The NVRA lacks findings of either past or present discrimination and thus "cannot be considered remedial, preventive legislation." *Id.* at 532

Even if Congress had passed the NVRA as an exercise of its remedial power, the NVRA is not tailored to remedying discrimination. Given the lack of legislative findings, it is difficult even to discern the NVRA's "supposed remedial or preventive object." *Id.* at 532. But assuming the NVRA's object is to combat "discriminatory and unfair registration laws," it is not tailored to achieving that object. 52 U.S.C. § 20501(a)(3). For one, the NVRA completely ignores the "dramatic improvements" to racial disparities in voter registration and summarily dismisses the "historic accomplishments of the Voting Rights Act." *Nw. Austin*, 557 U.S. at 201–02; *see* S. Rep. 103-6, at 3, 17-18; H. Rep. 103-9, at 105, 106-07 (1993). For another, the NVRA (unlike the Voting Rights Act) does not apply to state elections, demonstrating that it was not truly aimed at remedying discrimination in voter registration. An over- and under-inclusive law, the NVRA "is so out of proportion to a supposed remedial or preventive object that it cannot be understood as responsive to,

1    or designed to prevent, unconstitutional behavior." *City of Boerne*, 521 U.S. at 532.

2          The United States brushes aside those Supreme Court cases with no meaningful

3    discussion. The other plaintiffs do not even mention them. Instead, they rely on outdated,

4    nonbinding district court cases. *See Condon v. Reno*, 913 F. Supp. 946, 962 (D.S.C. 1995);

5    *ACORN v. Edgar*, 880 F. Supp. 1215, 1221 (N.D. Ill. 1995); *ACORN v. Miller*, 912 F.

6    Supp. 976, 984 (W.D. Mich. 1995). Those cases are wrong, for the reasons explained in

7    this section. And they were all decided before the Supreme Court's decisions in *City of

8    Boerne* and *Northwest Austin*, which critically undermine their analysis. In any event, the

9    NVRA "imposes current burdens and must be justified by current needs." *Shelby County

10   v. Holder*, 570 U.S. 529, 542 (2013). Plaintiffs urge the Court to follow outdated,

11   nonbinding district court opinions. Instead, the Court should apply current Supreme Court

12   doctrine to analyze the NVRA today. Under that standard, the NVRA is plainly not an

13   exercise of Congress's powers under the Fourteenth and Fifteenth Amendments.

14        **C.    HB 2492 does not apply to federal congressional elections.**

15        DNC also argues even if the NVRA applies only to federal congressional elections,

16   "H.B. 2492 would still be preempted as to congressional elections." DNC Resp. 5. But

17   DNC badly misreads HB 2492. Its plain text is clear that the act does not apply to

18   congressional elections and thus does not conflict with the NVRA. HB 2492 states that an

19   "applicant will not be qualified to vote in a presidential election or by mail with an early

20   ballot in any election until satisfactory evidence of citizenship is provided." HB 2492

21   § 4(E). DNC seizes on the words "any election" but ignores (and omits from its quotation)

22   all other words in that provision. DNC Resp. 5. The statute plainly applies to (1) voting in

23   "a presidential election," and (2) voting in any election "by mail with an early ballot." HB

24   2492 § 4(E). As to the former, the NVRA cannot constitutionally apply to presidential

25   elections, as explained above and previously. As to the latter, the NVRA covers "voter

26   registration." 52 U.S.C. § 20503(a). It sets no rules regarding mail-in ballot *applications*,

27   so there is no conflict with the NVRA in requiring mail-in voters to submit POC. HB 2492

28   thus falls outside the NVRA's boundaries, as the Arizona legislature intended.

1

**D.     Plaintiffs' other NVRA claims fail as a matter of law.**

2        The Court can dismiss plaintiffs' NVRA claims simply by construing the NVRA

3   to avoid conflict with the Elections and Electors Clauses. The NVRA applies to federal

4   congressional elections, and HB 2492 applies only to presidential and state elections. The

5   NVRA thus cannot preempt HB 2492. In addition, plaintiffs' NVRA claims suffer from

6   other infirmities that plaintiffs do not mend.

7        *First*, HB 2492 is uniform and nondiscriminatory. The statute requires proof of

8   citizenship for all voters; it does not create classes of voters or discriminate against any

9   type of voter. DNC argues that discrimination means treating applicants who attested to

10  citizenship under the federal form differently than those who offered proof of citizenship

11  under the state form. DNC Resp. 9. But that makes no sense. Nondiscrimination in the

12  election context has always meant that States must apply "uniform *statewide* rules."

13  *Lemons v. Bradbury*, 538 F.3d 1098, 1105 (9th Cir. 2008) (emphasis added). Under

14  DNC's reading, no state maintenance program could ever be "uniform" with federal law

15  because all maintenance programs necessarily require something different from or in

16  addition to federal law. But States are "free to take reasonable steps … to see that all

17  applicants for registration to vote actually fulfill" the State's qualifications. *Bell v.*

18  *Marinko*, 367 F.3d 588, 592 (6th Cir. 2004). HB 2492 applies equally to all Arizona voters.

19  It is thus uniform and nondiscriminatory.

20       *Second*, HB 2492 does not require county recorders to remove voters from the rolls

21  within "90 days" of a federal election. 52 U.S.C. § 20507(c)(2)(A). DNC argues that HB

22  2492 does not put a time limit on removing voters from the rolls, but that is irrelevant. *See*

23  DNC Resp. 10. Plaintiffs challenge HB 2492 on its face, so they must show "that the law

24  is unconstitutional in all of its applications." *Wash. State Grange v. Wash. State*

25  *Republican Party*, 552 U.S. 442, 449 (2008). But county recorders can clearly comply

26  with both HB 2492 and the NVRA: they "shall" remove ineligible voters from the rolls,

27  HB 2492 § 8, and they must "complete" that process within 90 days of a federal election,

28  52 U.S.C. § 20507(c)(2)(A). The laws do not conflict.

1    As for the remaining claims, Plaintiffs all but admit they should be dismissed. The
2  State argued that the Court should dismiss Plaintiffs' NVRA registration claims because
3  Arizona already complies with those registration provisions. *See* MTD 24. DNC responds
4  that "none of the complaints here claims that H.B. 2492 violates the NVRA because it
5  prohibits all registrations at [NVRA-mandated] agencies." DNC Resp. 17. Whatever the
6  reason Plaintiffs included those provisions in their claims, they are now disclaiming them.
7  The Court should thus dismiss them.

8  **IV.    PLAINTIFFS' SECTION 10101 CLAIMS FAIL**

9     **A.    Private Plaintiffs Lack A Cause Of Action**

10    Plaintiffs insist that Section 10101 creates a private right of action enforceable in
11  federal court. MFV argues that the U.S. Attorney General's enforcement power is
12  compatible with private enforcement. MFV Resp. 9 (citing *Gonzaga Univ. v. Doe*, 536
13  U.S. 273, 284 n.4 (2002)). But Plaintiffs overlook the *comprehensive nature* of that
14  enforcement power. Reading the statute as a whole, it is clear that "Congress created 'a
15  comprehensive enforcement scheme that is incompatible with individual enforcement.'"
16  *Watson v. Weeks*, 436 F.3d 1152, 1158-59 (9th Cir. 2006). Plaintiffs do not address the
17  comprehensive detail in the statute, which dictates who can be the defendant, creates
18  special forms of relief, sets rebuttable evidentiary presumptions, creates new federal
19  jurisdiction, eliminates exhaustion requirements, provides for the appointment and
20  compensation of private referees, specifies fast deadlines, assigns counsel to defendants,
21  and creates jurisdiction for three-judge district courts and direct appeals to the Supreme
22  Court. 52 U.S.C. § 10101(c)-(g). Plaintiffs myopically focus on the words "no person" and
23  "shall" while ignoring the six other subsections in the statute. MFV Resp. 8-10. Those
24  sections show that, unlike Title VI and Title IX, Section 10101 creates a "comprehensive
25  remedial scheme" demonstrating that Congress did not intend a private right of action.
26  *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 258 (2009). Many courts agree.[12]

27

28  ---
[12] *See, e.g.*, *Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 630 (6th Cir. 2016);
*Dekom v. New York*, 2013 WL 3095010, at *18 (E.D.N.Y. June 18, 2013), *aff'd*, 583 F.
App'x 15 (2d Cir. 2014); *Hayden v. Pataki*, 2004 WL 1335921, at *5 (S.D.N.Y. June 14,

1

**B.      Plaintiffs Fail To Allege Violations Of The Materiality Provision**

2      Plaintiffs fundamentally misunderstand the Voting Rights Act. The materiality

3   provision "was intended to address the practice of requiring unnecessary information for

4   voter registration with the intent that such requirements would increase the number of

5   errors or omissions on the application forms, thus providing an excuse to disqualify

6   potential voters." *Schwier v. Cox*, 340 F.3d 1284, 1294 (11th Cir. 2003). For example, one

7   unlawful practice was to "disqualify an applicant who failed to list the exact number of

8   months and days in his age." *Id.* (cleaned up). Plaintiffs allege no such practice. Instead,

9   plaintiffs claim that traditional, obviously relevant information such as proof of citizenship

10  and residence is immaterial under state law.

11      Plaintiffs conflate voter eligibility with voter qualifications. Arizona has

12  determined that providing birthplace, proof of citizenship, and proof of residence are

13  qualifications "under State law." 52 U.S.C. § 10101(a)(2)(B). A voter's failure to provide

14  those things is clearly an "error" or "omission" material to meeting those qualifications.

15  For example, in *Martin v. Crittenden*, a voter's failure to provide her birthyear was an

16  immaterial omission because Georgia law required birth year only when necessary to

17  confirm the identity of the voter. 347 F. Supp. 3d 1302, 1306 (N.D. Ga. 2018). Some

18  Georgia counties required a birthyear, and others did not. *Id.* The counties requiring a

19  birthyear demanded something beyond what Georgia law required, which is why

20  omissions of that information were not "material" to a voter's qualifications. *Id.* Here,

21  Arizona law *requires* birthplace, proof of citizenship, and proof of residence. Errors or

22  omissions concerning those qualifications are necessarily "material" under state law.

23      The Acts also do not automatically "[d]eny the right of any individual to vote in

24  any election." 52 U.S.C. § 10101(a)(2)(B). An application lacking satisfactory evidence

25  of citizenship triggers a notice and opportunity to cure, not an outright rejection. HB 2492

26  § 4(C); A.R.S. § 16-134(B). The only circuit to address the issue has held that an

27  individual's right to vote is not denied when there is an opportunity to cure. *Vote.Org v.*

28  2004); *Willing v. Lake Orion Cmty. Sch. Bd. of Trustees*, 924 F. Supp. 815, 820 (E.D. Mich. 1996); *Spivey v. Ohio*, 999 F. Supp. 987, 996 (N.D. Ohio 1998).

1     *Callanen*, 39 F.4th 297, 306 (5th Cir. 2022). That makes sense, because otherwise "an

2     individual's failure to comply with *any* registration requirement would deprive that person

3     of the right to vote." *Id.*

4          In any event, the errors and omissions Plaintiffs complain of are material to whether

5     an individual is qualified to vote under Arizona law. The United States says that some

6     courts have used a heightened materiality standard. *See* USA Resp. 18. But other courts

7     have not, including those in Arizona. *E.g.*, *Gonzalez v. Arizona*, No. 06-CV-1268, 2007

8     WL 9724581, at *2 (D. Ariz. Aug. 28, 2007); *Diaz v. Cobb*, 435 F. Supp. 2d 1206, 1213

9     (S.D. Fla. 2006). More importantly, plaintiffs provide no reason why the Court should

10    ignore the plain meaning of "material," which simply requires "[h]aving some logical

11    connection with the consequential facts." *Material*, Black's Law Dictionary (11th ed.

12    2019). The United States cites cases concerning whether certain evidence is material to

13    decision-making by judges, jurors, and administrators. USA Resp. 19. But those cases use

14    "material" in a different sense: "Of such a nature that knowledge of the item would *affect*

15    *a person's decision-making*." *Material*, Black's Law Dictionary (emphasis added). The

16    Acts request information to ascertain essential *facts* about the voter; the United States'

17    analogy to discretionary decision-making makes no sense.

18         The Acts require information material to a voter's qualifications. The United States

19    concedes that citizenship and residence are essential voter qualifications. *See* USA Resp.

20    15. Birthplace, proof of citizenship, and proof of residence have at least "some logical

21    connection with [those] consequential facts." *Material*, Black's Law Dictionary. The

22    United States argues that birthplace has no bearing on voter qualifications, but its

23    examples prove otherwise. The United States points to a vanishingly small category of

24    people who are born in the United States and are not citizens. *See* USA Resp. 18-19. But

25    that example proves the rule that birthplace is directly relevant to citizenship for most

26    voters. Thus, for *all voters*, listing their birthplace will help streamline the process of

27    ascertaining whether they are citizens, and what documents might demonstrate their

28    citizenship. Plaintiffs say that some voters will have unique circumstances explaining why

they may not have certain information or documents. But that is precisely why the Act gathers a variety of information with "some logical connection" to voter qualifications. That information is not duplicative and, even if it were, it would not "become[] immaterial due solely to its repetition." *Diaz*, 435 F. Supp. 2d at 1213.

**C.     Plaintiffs fail to allege a violation of the discrimination provision.**

Plaintiffs' claims that the Acts violate Section 10101's discrimination provision suffer from similar deficiencies. The requirements of the Acts are uniform—they do not apply any "standard, practice, or procedure" that is "different from the standards, practices, or procedures applied under such law or laws to other individuals within the same ... political subdivision." 52 U.S.C. § 10101(a)(2)(A). Plaintiffs incorrectly claim that the Acts are "much like the laws blocked in *Shivelhood* and *Frazier*." Poder Resp. 6. But the court in *Shivelhood* merely ruled that a city could not require students to fill out a supplemental domicile questionnaire "*unless all applicants are required to complete the same questionnaire.*" *Shivelhood v. Davis*, 336 F. Supp. 1111, 1115 (D. Vt. 1971) (emphasis added). And *Frazier* concerned blatant racial discrimination by an election registrar who was applying different registration standards to black college students compared to all other voters. *Frazier v. Callicutt*, 383 F. Supp. 15, 19 (N.D. Miss. 1974).

This case is nothing like *Shivelhood* or *Frazier*. The Acts here impose uniform requirements across all groups. Plaintiffs complain that county recorders *might* treat individuals differently. Poder Resp. 5-7. But that claim "rest[s] on speculation" that cannot support plaintiffs' facial challenge. *Wash. State Grange*, 552 U.S. at 450. To survive dismissal, plaintiffs must show "that the law is unconstitutional in all of its applications." *Id.* at 449. Plaintiffs cannot invalidate state law on its face simply because an election official *might one day* exceed his statutory authority or treat applicants differently. Those are precisely the sort of "'hypothetical' or 'imaginary' cases" inappropriate for facial challenges. *Id.* at 450. Plaintiffs thus fail to state a claim under §10101.

**V.     LUCHA's VRA § 2 CLAIM FAILS**

Most of LUCHA's VRA §2 arguments (at 9-10) consist of its contentions that the

1   burdens at issue here are substantial. Those fail for the reasons explained previously and

2   above, particularly under *Crawford*. *See* MTD at 14-16, 30; *supra* §II.A.

3       Nor does LUCHA respond to the State's argument that "*Brnovich* requires

4   consideration of 'the strength of the state interests,' which are compelling here as

5   explained above and in *Crawford* and *Gonzalez*." MTD at 29 (citation omitted). Indeed,

6   LUCHA's response ignores the State's interest entirely, thereby waiving any argument on

7   that factor.

8       More fundamentally, LUCHA fails to grapple with the central problem of its VRA

9   allegations: the complete absence of *any* detail about the magnitude of disparate impacts.

10  MTD at 29-30. LUCHA's claim literally only says that "the law *will not equally affect*

11  Arizona residents writ large." LUCHA FAC ¶369 (emphasis added). But that is a universal

12  feature of *nearly every* election law every devised by human beings: "it [is] *virtually*

13  *impossible* for a State to devise rules that do not have some disparate impact." *Brnovich v.*

14  *DNC*, 141 S. Ct. 2343 (2021) (emphasis added); MTD at 29. In essence, LUCHA has not

15  alleged anything more than that HB 2492 is just like nearly every election law that has

16  ever proceeded it. That does not suffice to allege a violation of §2.

17      The Federal Rules "do[] not unlock the doors of discovery for a plaintiff armed with

18  nothing more than conclusions." *Iqbal*, 556 U.S. at 678-79 (2009). And given the complete

19  absence of *any* detail about the magnitude of the disparate impacts, conclusions are all that

20  LUCHA offers here. LUCHA thus falls well short of crossing "the line from conceivable

21  to plausible.'" *Id.* at 683 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

22                                 *   *   *

23      LUCHA is indeed correct that it "need not 'prove their case at the pleading stage.'"

24  LUCHA Resp. 10 (citation omitted). But it was required to *allege plausibly* a violation of

25  section 2 of the VRA under *Iqbal* and *Twombly*. Its complaint failed to do so here.

## CONCLUSION

27      For the foregoing reasons, Plaintiffs' Complaints should be dismissed.

1   Respectfully submitted this 23rd day of November, 2022.

2

3                                        MARK BRNOVICH
                                         ATTORNEY GENERAL
4

5                                        By: s/ Drew C. Ensign
                                         Joseph A. Kanefield (No. 15838)
6                                         *Chief Deputy & Chief of Staff*
                                         Drew C. Ensign (No. 25463)
7                                         *Deputy Solicitor General*
                                         Robert J. Makar (No. 033579)
8                                         *Assistant Attorneys General*
                                         2005 N. Central Avenue
9                                        Phoenix, Arizona 85004
                                         Telephone: (602) 542-5200
10                                       Email: Drew.Ensign@azag.gov

11

12                                       **Fennemore Craig, P.C.**
                                         Douglas C. Northup (No. 013987)
13                                       Timothy J. Berg (No. 004170)
                                         Emily Ward (No. 029963)
14                                       2394 E. Camelback Road, Suite 600
                                         Phoenix, Arizona 85016
15                                       Telephone: (602) 916-5000
                                         Email: dnorthup@fennemorelaw.com
16                                       Email: tberg@fennemorelaw.com
                                         Email: eward@fennemorelaw.com
17                                       *Attorneys for Defendants State of Arizona*
                                         *and Mark Brnovich, Attorney General*
18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on this 23rd day of November, 2022, I caused the foregoing document to be electronically transmitted to the Clerk's Office using the CM/ECF System for Filing, which will send notice of such filing to all registered CM/ECF users.


<u>s/ Drew C. Ensign</u>
Drew C. Ensign
*Counsel for Defendants the State of Arizona*
*and Mark Brnovich, Arizona Attorney General*