# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Mi Familia Vota, et al., | No. CV-22-00509-PHX-SRB |
| Plaintiffs, | **ORDER** |
| v. | |
| Adrian Fontes, in his official capacity as Arizona Secretary of State, et al., | |
| Defendants. | |

**AND CONSOLIDATED CASES**

The Court now considers Defendants Mark Brnovich and the State of Arizona's (collectively, "Defendants") Consolidated Motion to Dismiss ("Motion") Plaintiffs' Complaints. (Doc. 127, "Mot.") For the following reasons, Defendants' Motion is denied except as to Plaintiffs' freestanding procedural due process claims.

## I.    BACKGROUND

This case arises out of two Arizona laws regulating voting registration, H.B. 2243 and H.B. 2492 ("the Voting Laws"). The Voting Laws, effective January 1, 2023, enable government officials to require heightened proof of citizenship from Arizona registrants and mandate certain consequences if a registrant does not provide such proof. (*See generally* Doc. 169, Poder Latinx Compl.) Plaintiffs, the United States of America ("United States") and a collection of nonpublic entities ("Private Plaintiffs"), allege that

the Voting Laws are both statutorily and constitutionally unsound.[1] (*See, e.g.*, *id.* at ¶¶ 86–152.)

## A. Recent History of Arizona Voting Laws

Arizona has required documentary proof of citizenship ("DPOC") from in-state voters since 2004. (Doc. 1, 22-cv-1124, USA Compl. ¶ 41.) An individual seeking to register to vote in Arizona state elections must provide one of the following forms of "evidence of citizenship":

> 1. The number of the applicant's driver license or nonoperating identification license issued after October 1, 1996 by the department of transportation or the equivalent governmental agency of another state within the United States if the agency indicates on the applicant's driver license or nonoperating identification license that the person has provided satisfactory proof of United States citizenship.
>
> 2. A legible photocopy of the applicant's birth certificate that verifies citizenship to the satisfaction of the county recorder.
>
> 3. A legible photocopy of pertinent pages of the applicant's United States passport identifying the applicant and the applicant's passport number or presentation to the county recorder of the applicant's United States passport.
>
> 4. A presentation to the county recorder of the applicant's United States naturalization documents or the number of the certificate of naturalization. If only the number of the certificate of naturalization is provided, the applicant shall not be included in the registration rolls until the number of the certificate of naturalization is verified with the United States immigration and naturalization service by the county recorder.
>
> 5. Other documents or methods of proof that are established pursuant to the Immigration Reform and Control Act of 1986.

---

[1] Plaintiff Mi Familia Vota describes itself as "a national, non-profit civic engagement organization with a mission of uniting Latino, immigrant, and allied communities to promote social and economic justice through increased civic participation by encouraging leadership development, citizenship, and issue organizing." (Doc. 65, Mi Familia Vota Compl. ¶ 16.) It "encourages non-partisan voter registration and voter participation and has challenged voter suppression around the nation." (*Id.*) Similarly, Plaintiff Voto Latino "is a 501(c)(4) nonprofit, social welfare organization that engages, educates, and empowers Latinx communities across the United States, working to ensure that Latinx voters are enfranchised and included in the democratic process. In furtherance of its mission, Voto Latino expends significant resources to register and mobilize thousands of Latinx voters each election cycle." (*Id.* ¶ 19.) "Voto Latino considers eligible Latinx voters in Arizona to be the core of its constituency." (*Id.*) Apart from the United States, the remaining Plaintiffs allege similar interests in maximizing voter turnout among certain communities, including Native Americans, Asian Americans, and Democratic voters in general. (*See, e.g.*, Doc. 1, 22-cv-1381, AZ AANHPI For Equity Coalition Compl. ("AAANHPI Compl.") ¶¶ 30–31; Doc. 67, Living United for Change in Arizona Am. Compl. ("LUCHA Compl.") ¶¶ 254–60.)

6. The applicant's Bureau of Indian affairs card number, tribal treaty card number or tribal enrollment number.

Ariz. Rev. Stat. § 16-166(F).

In addition to providing applicants a State Form to register for state and federal elections, Arizona also provides a form created by the United States Election Assistance Commission, known as the Federal Form, to register for federal elections only. *See Gonzales v. Arizona*, 677 F.3d 383, 394 (9th Cir. 2012). The Federal Form requires applicants to check a box under penalty of perjury indicating that they are citizens of the United States ("Check Box Requirement"). (AAANHPI Compl. ¶ 42.)

Arizona had previously imposed a DPOC requirement on applicants using the Federal Form. In 2004, Arizona passed a law requiring all applicants for voter registration, regardless of whether they used the Federal or State Form, to provide DPOC in order to register. (USA Compl. ¶ 41.) In 2013, the United States Supreme Court held that the National Voter Registration Act ("NVRA") preempted Arizona's requirement as applied to applicants using the Federal Form. *See Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 20 (2013). The Federal Form contains "only such identifying information (including the signature of the applicant) and other information (including data relating to previous registration by the applicant), as is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process." 52 U.S.C. § 20508(b)(1). Because the NVRA mandates that states "accept and use" the Federal Form—which does not require applicants to provide DPOC—the *Inter Tribal* Court held that Arizona could not "requir[e] a Federal Form applicant to submit information beyond that required by the form itself," including DPOC. 570 U.S. at 12, 20 ("States retain the flexibility to design and use their own registration forms, but the Federal Form provides a backstop: No matter what procedural hurdles a State's own form imposes, the Federal Form guarantees that a simple means of registering to vote in federal elections will be

available."); (AAANHPI Compl. ¶ 42.)[2]

Plaintiffs allege that ever since *Inter Tribal Council*, Arizona has attempted to disenfranchise certain voters. In 2018, the Arizona Secretary of State entered into a Consent Decree with Plaintiff League of United Latin American Citizens ("LULAC") after the nonprofit sued the state for allegedly discriminating against registrants who used the State Form without providing DPOC. (*See* Doc. 37, 2:17-cv-04102-DGC, LULAC Consent Decree; AAANHPI Compl. ¶ 46.) Plaintiffs explain that under the LULAC Consent Decree, Arizona must "(1) treat all registrants the same regardless of whether they use the state form or Federal Form, registering all voters for federal elections regardless of provided evidence of citizenship; and (2) check the motor vehicles database for citizenship documentation before limiting voters to federal-only elections." (Mi Familia Vota Compl. ¶¶ 44–45.)

### B. The Voting Laws Passed in 2022

#### 1. H.B. 2492

Former Arizona Governor Doug Ducey signed H.B. 2492 into law on March 30, 2022. (*See id.* ¶ 3.) H.B. 2492 created additional requirements for individuals using either the Federal or State Form. Specifically, the statute mandates registrants show DPOC and Documentary Proof of Residence ("DPOR") through the following provisions:

> Requirements for proper registration
> A person is presumed to be properly registered to vote on completion of a registration form . . . that contains at least the name, the residence address or the location, proof of location of residence as prescribed by Section 16-123, the date and place of birth and the signature . . . of the registrant . . . and a checkmark or other appropriate mark in the "yes" box next to the question regarding citizenship. Any application for registration, including an application on a form prescribed by the United States Election Assistance Commission, must contain a checkmark or other appropriate

---

[2] The differences between Arizona's state and federal voting registration create different voter rolls depending on when a voter registered. As described by Plaintiffs:
> Arizona has three classes of voters: (1) those who registered pre-2005 and did not have to show documentary proof of citizenship (because Arizona did not yet require it), who can vote in all elections; (2) those who registered post-2005 using the [Federal Form] . . . and did not show documentary proof of citizenship, who can vote only in federal elections; and (3) those who registered post-2005 and showed adequate proof of citizenship, who can vote in all elections.

(Mi Familia Vota Compl. ¶¶ 2, 43.)

mark in the "yes" box next to the question regarding citizenship as a condition of being properly registered to vote as either a voter who is eligible to vote a full ballot or a voter who is eligible to vote only with a ballot for federal offices. . . .

Proof of location of residence

Except for persons who register pursuant to Section 16-103, a person who registers to vote shall provide an identifying document that establishes proof of location of residence. Any of the identifying documents prescribed in Section 16-579, Subsection A, Paragraph 1 constitutes satisfactory proof of residence.

H.B. 2492 §§ 4(A), 5. The Federal Form does not require an applicant to list her place of birth ("the Birthplace Requirement"). (*See* AAANHPI Compl. ¶ 63; DNC Compl. ¶ 41.)

The documents with which an individual can show DPOR are:

(a) A valid form of identification that bears the photograph, name and address of the elector that reasonably appear to be the same as the name and address in the precinct register, including an Arizona driver license, an Arizona nonoperating identification license, a tribal enrollment card or other form of tribal identification or a United States federal, state or local government issued identification. Identification is deemed valid unless it can be determined on its face that it has expired.

(b) Two different items that contain the name and address of the elector that reasonably appear to be the same as the name and address in the precinct register, including a utility bill, a bank or credit union statement that is dated within ninety days of the date of the election, a valid Arizona vehicle registration, an Arizona vehicle insurance card, an Indian census card, tribal enrollment card or other form of tribal identification, a property tax statement, a recorder's certificate, a voter registration card, a valid United States federal, state or local government issued identification or any mailing that is labeled as "official election material". Identification is deemed valid unless it can be determined on its face that it has expired.

(c) A valid form of identification that bears the photograph, name and address of the elector except that if the address on the identification does not reasonably appear to be the same as the address in the precinct register or the identification is a valid United States military identification card or a valid United States passport and does not bear an address, the identification must be accompanied by one of the items listed in subdivision (b) of this paragraph.

Ariz. Rev. Stat. § 16-579(A)(1). Unlike preexisting Arizona law, H.B. 2492 contains no exceptions to the DPOR requirement for applicants who do not have numbered street addresses. (LUCHA Compl. ¶¶ 28, 40.)

The statute also mandates different requirements for applicants using the Federal or State Form:

Except for a form produced by the United States Election Assistance Commission, any application for registration shall be accompanied by

- 5 -

satisfactory evidence of citizenship as prescribed in Section 16-166, Subsection F, and the County Recorder . . . shall reject any application for registration that is not accompanied by satisfactory evidence of citizenship.

H.B. 2492 § 4(C).

> Federal only voters; early ballot; eligibility
> 1. A person who has registered to vote and who has not provided satisfactory evidence of citizenship as prescribed by Section 16-166, Subsection F is not eligible to vote in presidential elections.
> 2. A person who has not provided satisfactory evidence of citizenship pursuant to Section 16-166, Subsection F and who is eligible to vote only for federal offices is not eligible to receive an early ballot by mail.

*Id.* § 5(A).

The statute places the burden on County Recorders to implement the provisions of H.B. 2492. A County Recorder "shall cancel a registration" when "the County Recorder receives and confirms information that the person registered is not a United States citizen." *Id.* § 8(A)(10). Election officials also have duties to verify registrants' citizenship. "Within ten days after receiving an application for registration [through the Federal Form] that is not accompanied by [DPOC], the county recorder or other officer in charge of elections shall use all available resources to verify the citizenship status of the applicant." *Id.* § 4(D). The statute prescribes a specific verification process:

> . . . [A]t a minimum, [the election official] shall compare the information available on the application for registration with the following, provided the county has access:
> 1. The Department of Transportation databases of Arizona diver licenses or nonoperating identification licenses.
>
> 2. The Social Security Administration databases.
>
> 3. The United States Citizenship and Immigration Services Systemic Alien Verification for Entitlements program, if practicable.
>
> 4. A National Association for Public Health statistics and information systems electronic verification of vital events system.
>
> 5. Any other state, city, town, county or federal database and any other database relating to voter registration to which the County Recorder . . . has access, including an electronic registration information center database.

*Id.*

The statute provides for three different outcomes from this verification. First, if the election official "matches the applicant with information that verifies the applicant is a United States citizen . . . the applicant shall be properly registered." *Id.* § 4(E). Second, if

- 6 -

the election official "matches the applicant with information that the applicant is not a United States citizen, the County Recorder . . . shall reject the application, notify the applicant that the applicant was rejected because the applicant is not a United States citizen and forward the application to the county attorney and Attorney General for investigation." *Id.* Third, if the election official "is unable to match the applicant with appropriate citizenship information, the [official] shall notify the applicant that [her citizenship could not be verified] and that the applicant will not be qualified to vote in a presidential election or by mail with an early ballot in any election until satisfactory evidence of citizenship is provided." *Id.*

Lastly, the statute provides for prosecution of certain registrants referred for investigation. Election officials must "make available to the Attorney General a list of all individuals who are registered to vote and who have not provided satisfactory evidence of citizenship pursuant to Section 16-166." *Id.* § 7(A). The Attorney General must then use "all available resources to verify the citizenship" of the referred applicants and "at a minimum shall compare the information available on the application for registration" with the same databases listed in § 4(D) of the statute. *Id.* § 7(B). "The Attorney General shall prosecute individuals who are found to not be United States citizens pursuant to Section 16-182." *Id.* § 7(D).

Both parties detail the application and impact of H.B. 2492. Plaintiffs allege that absent such proof of citizenship as described in H.B. 2492, (1) new registrants cannot use the Federal Form to vote in presidential elections or vote by mail in elections for any office unless they provide additional documentation; (2) currently registered voters who registered using the Federal Form without proof of citizenship cannot vote in presidential elections or vote by mail for any office; and (3) approximately 200,000 Arizona voters who never had to provide proof of citizenship upon registration cannot vote in presidential elections, unless they provide additional documentation of citizenship. (*See* Mi Familia Vota Compl. ¶¶ 3, 43, 63.) In Defendants' words, "if you file the Federal Form, you will be registered for congressional elections. And if, in the course of . . .

subsequent list maintenance they discover not the absence of evidence of citizenship, but proof that you are not a citizen, you will be deregistered. [I]f you file the State Form . . . [y]ou need to provide documentary proof of citizenship or you won't be registered." (Hr'g Tr. at 30:14–21.)

Plaintiffs further describe that "[t]he law provides no details concerning how long-registered voters will be notified that they must provide new documents, or how they will be given an opportunity to do so." (Mi Familia Vota Compl. ¶¶ 3, 65.) Plaintiffs also allege that there is no cutoff date in the statute by which a registration must be cancelled, meaning "nothing prevent[s] the county recorder or other election official from removing a voter from the rolls, or otherwise blocking them from voting by mail or in presidential elections, weeks or even days before an election, when it is too late for the affected voters to correct any error." (Doc. 1, 22-cv-1369, Democratic National Committee Compl. ("DNC Compl.") ¶ 39.)

### 2. H.B. 2243

On July 6, 2022, Governor Ducey signed H.B. 2243 into law. (LUCHA Compl. ¶ 18.) According to Plaintiffs, H.B. 2243 reenforces and extends several of the requirements imposed by H.B. 2492. Like H.B. 2492, H.B. 2243 provides for cancellation of registration and investigation of registrants should they fail to meet certain requirements. (AAANHPI Compl. ¶ 84 (citing H.B. 2243 § 2).) H.B. 2243 also adds verification deadlines for registrants and mandates that election officials perform additional verification procedures. Specifically,

> When the County Recorder obtains information pursuant to this Section and confirms that the person registered is not a United States citizen . . . [b]efore the County Recorder cancels a registration pursuant to this paragraph, the County Recorder shall send the person notice by forwardable mail that the person's registration will be canceled in thirty five days unless the person provides satisfactory evidence of United States citizenship pursuant to Section 16-166. The notice shall include a list of documents that person may provide and a postage prepaid preaddressed returned envelop. If the person registered does not provide satisfactory evidence within thirty five days, the County Recorder shall cancel the registration and notify the county attorney and Attorney General for possible investigation.

H.B. 2243 § 2(A)(10).

Plaintiffs point out that not all registrants suspected of being ineligible to vote in Arizona are subject to a 35-day deadline[3] to provide documentation. (*See* AAANHPI Compl. ¶¶ 16–18, 60.) Certain registrants suspected of lacking Arizona residency are subject to a more lenient response deadline under the statute:

> Each month the Department of Transportation shall furnish to the Secretary of State . . . a list of persons who the Department has been notified have been issued a driver license . . . in another state. [After receiving this list from the Secretary of State,] [t]he County Recorder shall promptly send notice by forwardable mail to each person who has obtained a driver license . . . in another state and a postage prepaid preaddressed return form requesting the person confirm by signing under penalty of perjury that the person is a resident of this state and is not knowingly registered to vote in another state . . . . If the person returns the form within ninety days confirming that the person is a resident of this state, the County Recorder shall maintain the registration in active status. If the person fails to return the form within ninety days, the County Recorder shall place the person's registration in inactive status.

H.B. 2243 § 2(E).

H.B. 2243 also mandates monthly review and potential purging of voter rolls. Specifically,

> To the extent practicable, each month the County Recorder shall compare persons who are registered to vote in that county and who the county recorder has reason to believe are not United States citizens and persons who are registered to vote without satisfactory evidence of citizenship as prescribed by Section 16-166 with the Systemic Alien Verification for Entitlements program maintained by the United States Citizenship and Immigration Services to verify the citizenship status of the persons registered.

*Id.* § 2(H). County Recorders must conduct similar checks with the Social Security Administration Database, Verification of Vital Events System, and "relevant city, town, county, state and federal databases to which the County Recorder has access to confirm information obtained that requires cancellation of registrations pursuant to this Section." *Id.* § 2(G), (I)–(J).

Lastly, "[a]fter cancelling a registration pursuant to this Section, the County Recorder shall send a notice by forwardable mail informing the person that the person's

---

[3] Plaintiffs add that Governor Ducey vetoed a previous version of H.B. 2243, expressing his concerns that the previous bill risked "disturb[ing]" the right to vote "without sufficient due process." (*See* AAANHPI Compl. ¶¶ 57–58.) The previous bill gave individuals suspected of lacking United States citizenship 90 days to provide DPOC. (*Id.* ¶ 60.) H.B. 2243, as enacted, reduced that response period to 35 days. (*Id.*)

1  registration has been cancelled, the reason for cancellation, the qualifications of electors

2  pursuant to Section 16-101 and instructions on registering to vote . . . ." *Id.* § 2(K).

3  **C.  Legality of the Voting Laws**

4  Plaintiffs claim that the Voting Laws are illegal in multiple respects.

5  **1.  Preemption Under *Inter Tribal Council***

6  Plaintiffs allege that "[i]n essence, H.B. 2492 creates three distinct voter rolls in

7  Arizona—one for all local, state, and federal elections, one for U.S. House and Senate

8  elections, and one for Presidential elections." (AAANHPI Compl. ¶ 72.) Under *Inter*

9  *Tribal Council*, as interpreted by Plaintiffs, the NVRA preempts Arizona's requirement

10  that Federal Form users provide DPOC in order to vote for President. (*E.g.* Mi Familia

11  Vota Compl. ¶¶ 97–99.) The United States details that during legislative hearings on H.B.

12  2492, legislative counsel warned that the NVRA would preempt the statute's DPOC

13  requirement for Federal Form users. (USA Compl. ¶ 45 (referencing *Inter Tribal Council*,

14  570 U.S. at 20).) House Speaker Pro Tempore Travis Grantham responded that defending

15  H.B. 2492 would be a "fight worth having" in court. (*Id.* ¶ 46; LUCHA Compl. ¶ 209.)

16  **2.  Arbitrary & Discriminatory Verification of Citizenship**

17  Plaintiffs also contend that the citizenship verification requirements in the Voting

18  Laws threaten to illegally disenfranchise thousands of Arizonans.

19  After attempting to verify a registrant's citizenship, County Recorders must

20  "cancel a registration . . . when the [Recorder] receives and confirms information that the

21  person registered is not a United States citizen," but the statute does not define what

22  "confirms information" means in this context. (AAANHPI Compl. ¶ 82.) Plaintiffs add

23  that the databases used to "confirm" citizenship are "outdated and inaccurate," which

24  subjects naturalized citizens who might erroneously appear in those databases to

25  disproportionate scrutiny.[4] (*Id.* ¶¶ 73, 86; Poder Latinx Compl. ¶ 127.) Plaintiffs allege on

26

---

27  [4] Plaintiffs posit that the DPOC requirement "disproportionately affect[s] . . . not only
   Arizona voters who are naturalized citizens . . . but also those who are racial minorities,

28  elderly, or recently turned 18 years old, because the law singles out for disparate
   treatment 'federal only' voters, who disproportionately have these characteristics." (DNC
   Compl. ¶ 40.)

- 10 -

information and belief that the Systemic Alien Verification for Entitlements database only contains information on naturalized and derived citizens, not citizens born in the United States. (Poder Latinx Compl. ¶ 53.) Compounding the alleged risk of arbitrary and inaccurate enforcement of the verification requirements, "[certain] of these databases were [not] designed to capture or reflect current citizenship status." (DNC Compl. ¶¶ 36–37.) Plaintiffs relatedly allege that H.B. 2243's "reason to believe" investigation criterion "essentially allows anyone, without evidence, to simply give a list of names of people who are purportedly not citizens to the county recorders, thus triggering a check that can lead to improperly cancelled voter registrations and potential investigation and prosecution of eligible and registered Arizonans." (AAANHPI Compl. ¶ 86.)

Further, Plaintiffs assert that the Voting Laws intentionally target protected groups for investigation, registration cancellation, and prosecution. "AANHPIs and other ethnic groups. . . are disproportionately likely to lack the forms of identification required under H.B. 2492 and H.B. 2243 to register to vote and remain on the voter rolls." (*Id.* ¶ 90.) And because AANHPIs and Latinos "comprise a large proportion of naturalized citizens in Arizona and the population of AANHPIs and other ethnic groups in Arizona is rapidly increasing, the birthplace, DPOC, and DPOR requirements imposed by [the Voting Laws] on naturalized citizens has a disproportionate impact" on these protected groups. (*See id.* ¶ 91 (11,000 Arizona residents naturalized each year between 2014 and 2020, with the largest proportion from Mexico, followed by "Asiatic countries"); LUCHA Compl. ¶ 156 (Voting Laws burden "eligible Latino and language minority voters").) To support their claim that this disparate impact is deliberate, Plaintiffs point to the allegedly unsubstantiated statements of Representative Jake Hoffman, H.B. 2492's sponsor, that Arizona's elections are compromised by fraud and count the votes of "non-U.S. citizen voters." (LUCHA Compl. ¶¶ 201–02.) Plaintiffs also allege that H.B. 2243's criterion for enhanced scrutiny of a registrant—"reason to believe" that a registrant is not a United States citizen—invites racial and national origin discrimination. (Poder Latinx Compl. ¶¶ 7, 41; *see* AAANHPI Compl. ¶¶ 85–86, 88.)

### 3. **Discriminatory Affirmation of Citizenship**

Plaintiffs also take issue with the Check Box and Birthplace Requirements. (*E.g.* LUCHA Compl. ¶ 273; USA Compl. ¶¶ 57–61.) The United States alleges that by requiring election officials to reject a registration form without the requisite check mark when an applicant has already affirmed citizenship under penalty of perjury and provided DPOC, H.B. 2492 denies "qualified individuals the right to vote" based on an immaterial "technical[ity]." (USA Compl. ¶¶ 57–61.) Private Plaintiffs allege "on information and belief, the birthplace requirement will only be used to identify naturalized citizens for differential, unequal treatment by the state and will act to chill voter registration of AANHPIs, naturalized citizens, and other voters of color in a disproportionate manner." (AAANHPI Compl. ¶ 94.) Relatedly, Plaintiffs contend that such added complexities of properly registering to vote risk disenfranchising "language minority" groups in Arizona, including Arizona's naturalized Latino population. (LUCHA Compl. ¶¶ 186–91.)

### 4. **Discriminatory Documentary Proof of Residence**

Plaintiffs assert that "because many residences on Indian reservations in Arizona lack a numbered street address or residential address, many enrolled members of tribes are likely to be prevented from voting by the DPOR requirement." (*Id.* ¶ 29.) Indeed, Plaintiff San Carlos Apache Tribe alleges that on the San Carlos Apache Reservation, "many residences are not assigned a physical numbered street address. Instead, members of the Tribe commonly describe where they live using . . . mile markers on Route 70, Bureau of Indian Affairs' Indian Routes, or other landmarks and distances." (*Id.* ¶ 32.) The Tribe's members often lack documents bearing their name and residential address and will be unable to satisfy H.B. 2492's DPOR requirement. (*Id.* ¶ 35.) Plaintiffs add that the "experience for citizens of the San Carlos Apache is also the norm for many other Tribal citizens residing on the reservations of . . . other . . . Tribes in Arizona."[5] (*Id.* ¶ 38.)

---

[5] In addition to specific protected groups that risk disenfranchisement under the Voting Laws, Plaintiffs claim that the DPOR requirement will prevent other Arizonans from voting. For example, students living and eligible to vote in Arizona often carry out of state drivers' licenses and cannot pay to obtain an additional Arizona state identification. (LUCHA Compl. ¶ 241.) These would-be voters will be unable to meet the DPOR requirement. (*Id.*)

The DPOR requirement will consequently "burden a substantial portion of the Native population in Arizona, and this burden will be unique when compared to other eligible Arizona voters."[6] (*Id.* ¶ 139.)

### 5. The Parties' Interests

Plaintiffs claim that Arizona has no legitimate reason for the Birthplace Requirement when individuals must already provide DPOC to vote in state elections, and such unnecessary emphasis on national origin evidences the discriminatory intent behind the Birthplace Requirement. (*See* AAANHPI Compl. ¶ 94.) Relatedly, Plaintiffs argue that there is "no evidence of widespread voter fraud or non-U.S. citizen voting in Arizona." (LUCHA Compl. ¶¶ 198–99.) Arizona cannot, according to Plaintiffs, identify even a rational state interest served by "the DPOC requirement, Birthplace Requirement, Checkmark Requirement, or the mandated use of outdated and incorrect citizenship data to reject voter registration applications and purge eligible voters from the rolls." (*Id.* ¶ 197; *see* USA Compl. ¶¶ 49, 53–54.) Plaintiffs forecast that "the restrictions imposed by HB 2492 and HB 2243 will not enhance electoral security. Instead, they will make voter registration rolls less reliable, and will undermine the public's confidence in Arizona's elections." (LUCHA Compl. ¶ 204.)

All Plaintiffs have asserted interests against the enforcement of the Voting Laws. Specifically, several Private Plaintiffs allege that implementation of the Voting Laws will harm both the entities and their respective constituents. (*See, e.g.*, AAANHPI Compl. ¶¶ 101–12.) These Plaintiffs claim that the Voting Laws have forced and will force them to divert organizational resources to "train [their] staff and volunteers on the new regulations and educate potential voters, who often have limited English proficiency, on the additional documentation required to register to vote." (*Id.* ¶¶ 101–02.) Without the alleged barriers to voting imposed by the Voting Laws, "Plaintiff[s] would have the ability to use [their] limited resources in reaching out to more voters through . . . voter

---

[6] Plaintiffs also claim that H.B. 2492's disproportionate impact on Native Americans is intentional, in that the Arizona Legislature aims to repress the "increased political mobilization by Native voters" seen in the 2020 presidential election. (LUCHA Compl. ¶¶ 149–50.)

registration, mobilization, and participation efforts." (*Id.* ¶ 102.) Further, certain Private Plaintiffs assert that the Voting Laws will diminish the impact of their work, as some of their constituents will be removed from voter rolls and deterred from voting or registering. (*Id.* ¶¶ 101–05, 112.)

As for Defendants, they assert that the Voting Laws advance Arizona's interest in "reducing administrative burdens," "securing its elections," and "maintaining voter confidence." (Mot. at 16.)

### D. Procedural History

On March 31, 2022, Mi Familia Vota Plaintiffs[7] filed their Complaint in this Court. (Doc. 1, 03/31/2022 Mi Familia Vota Compl.) The United States and additional Private Plaintiffs subsequently filed lawsuits attacking the legality of the Voting Laws. These lawsuits have been consolidated into the instant case. (*E.g.* Doc. 164, 11/10/2022 Order re: Consolidation.) All Plaintiffs make at least one of the following claims: the Voting Laws (1) place an undue burden on the right to vote, violating the First and Fourteenth Amendments of the United States Constitution; (2) enable arbitrary and disparate treatment of voters, violating the Equal Protection Clause of the Fourteenth Amendment ("Equal Protection Clause"); (3) enable national origin discrimination in violation of the Fourteenth Amendment; (4) discriminate based on race, violating the Fourteenth and Fifteenth Amendments; (5) deprive procedural due process (6) violate § 10101 of the Civil Rights Act of 1964; (7) violate Sections 5, 6, and 8 of the NVRA; and (8) violate the Voting Rights Act.

On September 16, 2022, Defendants[8] filed the Motion, to which Plaintiffs filed their Oppositions on October 17, 2022. (Mot.; Doc. 150, Mi Familia Opp'n; Doc. 151, Democratic National Committee Opp'n ("DNC Opp'n"); Doc. 152, United States Opp'n; Doc. 153, Living United for Change in Arizona Opp'n ("LUCHA Opp'n"); Doc. 154,

---

[7] The Court references organizational Plaintiffs that have filed collectively under the name of one organization. "LUCHA Plaintiffs," for example, includes all additional Plaintiffs that are named on the briefing with LUCHA.

[8] Plaintiffs also sued the Arizona Secretary of State and all Arizona County Recorders in their official capacities. (*E.g.*, Mi Familia Vota Compl. ¶¶ 22, 24–39.) These Defendants did not join the Motion. (*See* Mot.)

1  Poder Latinx Opp'n; Doc. 89, 22-cv-1381, AAANHPI Opp'n.) Defendants filed their

2  Consolidated Reply on November 23, 2022. (Doc. 180, Reply.) The Court held oral

3  argument on the Motion on December 15, 2022. (Doc. 187, Min. Entry.)

4  **II.    LEGAL STANDARDS & ANALYSIS**

5      Defendants argue that Plaintiffs lack standing to sue and bring unripe claims.

6  (Mot. at 9–13.) Defendants alternatively argue that Plaintiffs have failed to state claims

7  that the Voting Laws are unlawful. (*Id.* at 14–30.) The Court addresses each argument in

8  turn.

9      **A.    Rule 12(b)(1)**

10     Rule 12(b)(1) allows parties to move to dismiss for lack of subject matter

11 jurisdiction. As courts of limited jurisdiction, federal courts may only hear cases as

12 permitted by Congress and the U.S. Constitution. *See Kokkonen v. Guardian Life Ins.*

13 *Co.*, 511 U.S. 375, 377 (1994). Federal jurisdiction is therefore presumed absent until the

14 claimant demonstrates otherwise. *Id.* "A Rule 12(b)(1) jurisdictional attack may be facial

15 or factual." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). A facial

16 attack "assert[s] that the allegations contained in a complaint are insufficient on their face

17 to invoke federal jurisdiction." *Id.* The court accepts the plaintiff's allegations as true and

18 draws all reasonable inferences in the plaintiff's favor. *Leite v. Crane Co.*, 749 F.3d 1117,

19 1121 (9th Cir. 2014). From there, the court "determines whether the allegations are

20 sufficient as a legal matter to invoke the court's jurisdiction." *Id.* A factual attack

21 challenges the underlying factual allegations by introducing evidence beyond the

22 pleadings. *Id.* In either instance, the party asserting jurisdiction bears the burden of proof.

23 *Indus. Tectonics, Inc. v. Aero Alloy*, 912 F.2d 1090, 1092 (9th Cir. 1990).

24     **1.    Standing**

25     Under Article III of the United States Constitution, a plaintiff does not have

26 standing unless it can show (1) an "injury in fact" that is concrete and particularized and

27 actual or imminent, not hypothetical; (2) that the injury is fairly traceable to the

28 challenged action of the defendant; and (3) that it is likely, as opposed to merely

speculative, that the injury will be redressed by a favorable decision. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (cleaned up). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice[.]" *Id.* at 561. In cases for prospective injunctive relief, "past wrongs do not in themselves amount to that real and immediate threat of injury necessary to make out a case or controversy." *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983). Rather, a plaintiff's "standing to seek the injunction requested depend[s] on whether he [is] likely to suffer future injury." *Id.* at 105. When addressing behavior that is alleged to increase the risk of future injury, the future injury must be "certainly impending." *Clapper v. Amnesty Int'l*, 568 U.S. 398, 409 (2013). Plaintiffs must establish standing "for each claim for relief." *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2379 n.6 (2020).

"[A]n organization has direct standing to sue where it establishes that the defendant's behavior has frustrated its mission and caused it to divert resources in response to that frustration of purpose." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 663 (9th Cir. 2021) (citing *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002)). Organizations cannot "manufacture the injury by incurring litigation costs," but they can show standing when they "would have suffered some other injury had they not diverted resources to counteracting the problem." *Id.* (internal quotations omitted). And even if the diversion-of-resources injury is "broadly alleged," such allegations are still "sufficient to establish organizational standing at the pleading stage." *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1040 (9th Cir. 2015) (citation omitted). Moreover, "[o]nly one plaintiff needs to have standing when only injunctive relief is sought." *DNC v. Reagan*, 329 F. Supp. 3d 824, 841 (D. Ariz. 2018) (citing *Crawford v. Marion Cnty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007)) (finding standing where Arizona Democratic Party and additional private plaintiffs requested injunctive and declaratory relief against Arizona election law), *aff'd sub nom. DNC v. Hobbs*, 9 F.4th 1218, 1219 (9th Cir. 2021) (Mem.); *Mecinas v. Hobbs*, 30 F.4th 890, 897 (9th Cir. 2022) ("In a suit with multiple plaintiffs, generally only one plaintiff need have standing for the

suit to proceed."); *c.f. We Are America/Somos America, Coal. of Arizona v. Maricopa Cnty. Bd. of Supervisors*, 809 F. Supp. 2d 1084, 1091 (D. Ariz. 2011) (district court is not "strictly prohibit[ed]" from considering multiple plaintiffs' standing, despite "general rule" on appeal that only one plaintiff need have standing).

Plaintiffs have standing to sue.[9] Defendants concede that the United States has standing to bring its claims. (*See* Hr'g Tr. at 6:22–7:3.) Private Plaintiffs have also established organizational standing. LUCHA Plaintiffs plausibly allege that the Voting Laws will force LUCHA, which has previously conducted voter registration and education activities and plans to continue these activities in the future, to "divert money, personnel, time, and resources away from other activities" as a result of the requirements imposed by the Voting Laws. (LUCHA Compl. ¶¶ 214–16, 223–24.) LUCHA also serves naturalized citizens, and as explained below Plaintiffs have plausibly alleged that this group will be disproportionately disenfranchised under the Voting Laws. (*Id.* ¶¶ 211–13; *infra* II(B)(1)(a), (2)(a).) LUCHA anticipates not only that some its "assisted voters" will be prevented from voting by the Voting Laws' DPOC and DPOR requirements, but also that many of the individuals it seeks to mobilize will be "intimidated and discouraged from registering to vote, even though they are eligible, because of the unconstitutional limits imposed on the exercise of their franchise by H.B. 2492 and H.B. 2243." (LUCHA Compl. ¶¶ 218–19.) LUCHA has standing to sue. *See Reagan*, 329 F. Supp. 3d at 841 (finding standing where "the new law injures the [organizational plaintiff] by compelling [it] to devote resources to getting to the polls those of its supporters who would otherwise be discouraged by the new law from bothering to vote." (citation omitted)). The Court need not assess whether additional Plaintiffs have standing.

### 2. Ripeness

Defendants also argue that Plaintiffs' claims are constitutionally and prudentially unripe. (Mot. at 12–14.) A claim is constitutionally ripe when a plaintiff's injury is

---

[9] Defendants argue that Plaintiffs' claims are not redressable through the instant suit, as Plaintiffs have not named any County Recorders as Defendants. (Mot. at 2, 11–12.) All Arizona County Recorders are now named as Defendants in this action.

"definite and concrete, not hypothetical or abstract." *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000) (en banc) (citation omitted). When evaluating the existence of a definite injury, courts consider whether "plaintiffs have articulated a concrete plan to violate the law in question, whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings, and the history of past prosecution or enforcement under the challenged statute." *Id.* (internal quotation marks and citation omitted). Under the last prong, "the government's active enforcement of a statute [may] render . . . the plaintiff's fear [of injury] . . . reasonable." *Id.* at 1140. To minimize any chilling effect from an unwarranted First Amendment restriction, the Ninth Circuit has "applied the requirements of ripeness and standing less stringently in the context of First Amendment claims." *Wolfson v. Brammer*, 616 F.3d 1045, 1058 (9th Cir. 2010).

Plaintiffs' claims are constitutionally ripe. Though Plaintiffs do not *per se* plan to violate the Voting Laws, certain Plaintiffs plausibly allege that their members risk violating the Voting Laws as an incident of inadequate access to DPOR or DPOC.[10] (LUCHA Compl. ¶¶ 274–85.) Further, as detailed in the surrounding analysis, Plaintiffs plausibly allege that enforcement of the Voting Laws will "imminently" harm their organizational missions. *C.f. Protectmarriage.com-Yes on 8 v. Bowen*, 752 F.3d 827, 839 (9th Cir. 2014) (citation omitted) (even preenforcement claim may be ripe where plaintiffs "confront a realistic danger of sustaining direct injury as a result of the statute's operation or enforcement"); (*see* Poder Latinx Opp'n at 4.) And contrary to Defendants' claims, the Court has no reason believe that the Voting Laws will not be enforced. (*See* Mot. at 12–13 ("Plaintiffs have not alleged any 'genuine threat of imminent enforcement'").) Plaintiffs' injuries are at least reasonably anticipated, not just hypothetical or "theoretically possible." *See Bowen*, 752 F.3d at 839–40.

Plaintiff's claims are also prudentially ripe. A claim is prudentially ripe when "the

---

[10] AAANHPI raises that the ripeness inquiry is limited to its prudential component when a plaintiff is not "the target of enforcement." (AAANHPI Opp'n at 4 (citing *San Luis & Delta-Mendoza Water Auth. v. Salazar*, 638 F.3d 1163, 1173 (9th Cir. 2011)).) This only underscores the Court's conclusion that Plaintiffs' claims are ripe.

fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration" both weigh toward hearing the case. *See Ass'n of Irritated Residents v. EPA*, 10 F.4th 937, 944 (9th Cir. 2021) (citing *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)). This case primarily hinges on legal issues—preemption under the NVRA, the ability of Congress to regulate presidential elections, the relative burden of Arizona's citizenship verification requirements vis-à-vis other requirements previously evaluated by the Supreme Court—and discovery will provide any factual development necessary to fully evaluate the merits of the case. *See id.* (challenge prudentially ripe where issue was "purely [a] legal question"); (Poder Latinx Opp'n at 4–6). Moreover, delaying review until after certain Plaintiffs have already been unlawfully removed from Arizona's voting rolls and prevented from voting would make any review "too late to redress the injuries suffered by [Plaintiffs'] members." *Ass'n of Irritated Residents*, 10 F.4th at 944. The Court concludes that Plaintiffs' claims are ripe for review.

## B. Rule 12(b)(6)

A Rule 12(b)(6) dismissal for failure to state a claim can be based on either (1) a lack of cognizable legal theory or (2) insufficient facts to support a cognizable legal claim. *Conservation Force v. Salazar*, 646 F.3d 1240, 1242 (9th Cir. 2011). In determining whether an asserted claim can be sustained, "[a]ll of the facts alleged in the complaint are presumed true, and the pleadings are construed in the light most favorable to the nonmoving party." *Bates v. Mortg. Elec. Registration Sys., Inc.*, 694 F.3d 1076, 1080 (9th Cir. 2012). At this early stage of the litigation, the standard does not mandate that "plaintiff's explanation . . . be true or even probable." *Starr v. Baca*, 652 F.3d 1202, 1216–17 (9th Cir. 2011). However, "for a complaint to survive a motion to dismiss, the nonconclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). In other words, the complaint must contain enough factual content "to raise a reasonable expectation that discovery will reveal evidence" of the claim. *Bell Atl. Corp. v. Twombly*,

550 U.S. 544, 556 (2007).

Defendants argue that Plaintiffs have failed to plausibly allege that the Voting Laws are unlawful under either constitutional or statutory frameworks. (Mot. at 14–30.)

### 1. *Anderson-Burdick* Claims

Under the *Anderson-Burdick* framework, courts evaluate the validity of an election law by balancing the burden the law places on the fundamental right to vote against the state interests served by the law. *See Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). Specifically, courts must "consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate"; "identify and evaluate the precise interests put forward by the [s]tate as justifications for the burden imposed by its rule"; "determine the legitimacy and strength of each of those interests"; and "consider the extent to which those interests make it necessary to burden the plaintiff's rights." *Id.*

"[T]he severity of the burden the election law imposes on the plaintiff's rights dictates the level of scrutiny applied by the court." *Nader v. Brewer*, 531 F.3d 1028, 1034 (9th Cir. 2008) (citing *Burdick v. Takushi*, 504 U.S. 428, 434 (1992)). "Regulations imposing severe burdens on plaintiffs' rights must be narrowly tailored and advance a compelling state interest. Lesser burdens, however, trigger less exacting review, and a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions." *Pierce v. Jacobsen*, 44 F.4th 853, 859–60 (9th Cir. 2022) (quoting *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997)). A restriction is "not severe" when it is "generally applicable, even-handed, politically neutral, and . . . protect[s] the reliability and integrity of the election process." *Rubin v. City of Santa Monica*, 308 F.3d 1008, 1014 (9th Cir. 2002). This balance means that voting regulations are rarely subjected to strict scrutiny. *See Lemons v. Bradbury*, 538 F.3d 1098, 1104 (9th Cir. 2008).

Plaintiffs assert that the Voting Laws place an undue burden on the right to vote in several ways. Defendants counter that Plaintiffs have failed to state claims under the

*Anderson-Burdick* doctrine because "the burdens involved [in complying with the Voting Laws] are not significant" and are "justified by the State's compelling interests." (Mot. at 14.) The Court disagrees with Defendants.

### a. Burden on Identifiable Segment of Voters

Plaintiffs make several plausible claims that the Voting Laws "place a particular burden on an identifiable segment of voters [which is] more likely to raise constitutional concerns." *Ariz. Democratic Party v. Hobbs*, 18 F.4th 1179, 1190 (9th Cir. 2021) (Mem) ("*Hobbs III*") (citing *Anderson*, 460 U.S. at 792). For example, the San Carlos Apache Tribe alleges that a significant number of its 11,000 members in Arizona "are likely to be unable to obtain [DPOR], as required by H.B. 2492, either because their residence lacks a numbered street address entirely, or because they are not officially listed as a resident of the home where they stay." (LUCHA Compl. ¶¶ 284, 312; LUCHA Opp'n at 2–4.) The alleged effect of the DPOR requirement on Tribal members "will be unique when compared to other eligible Arizona voters . . . giving [Tribal members] less opportunity than other eligible Arizona voters to participate in the political process and elect representatives of their choice." (LUCHA Compl. ¶¶ 137, 139; *see also* AAANHPI Compl. ¶¶ 117–18 (Voting Laws' DPOC requirement and verification particularly burden "AANHPIs, naturalized citizens, and other voters of color."); Mi Familia Vota Compl. ¶ 79.) Plaintiffs additionally allege that the Voting Laws undermine public confidence in Arizona's elections and draw upon legislative history to claim that the Voting Laws were intended to discriminate against certain protected groups. (*E.g.*, LUCHA Compl. ¶ 326; AAANHPI Compl. ¶¶ 53–54.) Relatedly, Plaintiffs allege that Arizona has no legitimate interest in the mandates underlying the Voting Laws. (AAANHPI Compl. ¶¶ 116–17; LUCHA Compl. ¶¶ 195–97, 325; DNC Compl. ¶ 46.) Plaintiffs have stated a claim that the Voting Laws impose a burden on the right to vote without a corresponding justification.

### b. Arbitrary State and Federal Form Distinction

Plaintiffs also plausibly allege, both within the *Anderson-Burdick* framework and

under the traditional Equal Protection framework,[11] that H.B. 2492 arbitrarily treats registrants differently depending on whether they used the Federal or State Form. (LUCHA Opp'n at 7–8; LUCHA Compl. ¶¶ 309, 313; *e.g.*, Mi Familia Vota Compl. ¶¶ 89–90.) In other words, Plaintiffs have stated a claim that the Voting Laws are not "generally applicable." *See Rubin*, 308 F.3d at 1014.

LUCHA Plaintiffs detail that the Voting Laws violate the LULAC Consent Decree and arbitrarily prevent State Form users who did not provide DPOC from voting in any election, while Federal Form users who did not provide DPOC may still vote in congressional elections. (LUCHA Opp'n. at 8.) Federal and State Form users are not suspect classes, so the State need only show that there is a rational basis for discriminating against State Form users. *See McDonald v. Bd. of Election Com'rs of Chicago*, 394 U.S. 802, 808–09 (1969) ("The [race- and wealth-neutral] distinctions drawn by a challenged statute must bear some rational relationship to a legitimate state end and will be set aside as violative of the Equal Protection Clause only if based on reasons totally unrelated to the pursuit of that goal."); *Weber v. Shelley*, 347 F.3d 1101, 1107 n.2 (9th Cir. 2003). It is undisputed that a State Form applicant who did not provide DPOC will be barred from voting at all, whereas a Federal Form registrant will be allowed to vote in certain federal elections. (LUCHA Opp'n at 7.) Both Federal and State Form users have affirmed citizenship under penalty of perjury. (*Id.* at 8.) Defendants counter that requiring DPOC and DPOR from State Form users increases "confiden[ce]" that registrants "are indeed U.S. citizens and reside in the districts in

---

[11] Poder Latinx Plaintiffs similarly claim that the Voting Laws subject registrants to "arbitrary and disparate treatment," but they rely on the Equal Protection standard articulated in *Bush v. Gore*, 531 U.S. 98, 104–09 (2000) to assert this claim. (Poder Latinx Compl. ¶¶ 120–29.) The Motion does not directly address this claim. (*See* Mot.; Poder Latinx Opp'n at 9.) Instead, Defendants generally assert that any Equal Protection challenges to the Voting Laws pled outside of the *Anderson-Burdick* framework are improperly presented to the Court. (Mot. at 17.) However, the authority Defendants cite for this assertion does not foreclose constitutional claims pled outside of the *Anderson-Burdick* framework. (*See id.* at 17–18 (citing *Dudum v. Arntz*, 640 F.3d 1098, 1106 n.15 (9th Cir. 2011) (observing that the Supreme Court "has addressed [First Amendment, Due Process, and Equal Protection claims] collectively using a single analytic framework" but noting that plaintiff did not suggest separate analyses for his claims beyond *Anderson-Burdick*)).)

- 22 -

which they intend to cast a vote." (See Mot. at 18–19.) But Defendants do not offer any basis for preventing State Form applicants from voting at all without DPOC. (*See id.*)

Plaintiffs seem to disagree regarding whether this discrimination claim is analyzed under the *Anderson-Burdick* framework. (*Compare* MFV Opp'n at 5–6 (analyzing disparate treatment of Federal and State Form users under *Anderson-Burdick*) *with* LUCHA Opp'n at 7 (separately analyzing disparate treatment claim).) The Court concludes that Plaintiffs have stated a claim that the Voting Laws arbitrarily discriminate based on use of Federal or State Forms under either framework.[12]

### c.    Fact-Sensitive Inquiry

The procedural posture of this case also weighs against granting the Motion. Plaintiffs correctly note that because *Anderson-Burdick* claims are particularly fact-sensitive, dismissal under Rule 12(b)(6) is disfavored. (LUCHA Opp'n at 4; MFV Opp'n at 2–3); *see, e.g.*, *Soltysik v. Padilla*, 910 F.3d 438, 447, 450 (9th Cir. 2018) (reversing "premature" grant of dismissal, as court could not determine "without any factual record . . . [whether the state's] justifications outweigh the constitutional burdens"); *Mecinas*, 30 F.4th at 905 ("[T]he magnitude of the asserted injury [under *Anderson-Burdick*]. . . present[s] factual questions that cannot be resolved on a motion to dismiss."). Defendants also cite *Crawford v. Marion County* to argue that requiring voter identification to vote is not an undue burden as a matter of law. (*See* Mot. at 15–16 (citing 553 U.S. 181, 185, 199 (2008)).) Plaintiffs counter not only that the law upheld in *Crawford* provided for alternative ways to vote without the requisite identification, but also that *Crawford* addressed *Anderson-Burdick* claims on summary judgment. (LUCHA Opp'n at 4 n.6; *see also* AAANHPI Opp'n at 8); 553 U.S. at 185, 187, 201. Defendants have not brought any identical state laws upheld under *Anderson-Burdick* to the Court's attention, nor is the Court aware of any. The Court will not dismiss Plaintiffs' *Anderson-Burdick* claims.

### 2.    Additional Constitutional Claims

---

[12] Applying a traditional Equal Protection analysis, Plaintiffs must plausibly allege that there is no rational basis for Arizona's distinction between Federal and State Form users voting in federal elections. (*See* LUCHA Compl. ¶¶ 86, 328.) Plaintiffs have met their burden to do so. (*See* LUCHA Opp'n at 8.)

### a. National Origin & Race Discrimination

Several Plaintiffs claim that the Voting Laws discriminate based on national origin and race, both allegedly violating the Equal Protection Clause. (*See, e.g.*, LUCHA Compl. ¶¶ 329–35; AAANHPI Compl. ¶¶ 143–50.) There are two "strands of equal protection doctrine: suspect classifications and fundamental rights. The first strand bars a state from codifying a preference for one class over another, but it prescribes heightened scrutiny only where the classification is drawn from . . . race, gender, alienage, [or] national origin. The second strand bars a state from burdening a fundamental right for some citizens but not for others. Absent some such burden, however, legislative distinctions merit no special scrutiny." *Short v. Brown*, 893 F.3d 671, 678–79 (9th Cir. 2018) (internal citations omitted). The Court addresses each alleged constitutional violation in turn.

First, Plaintiffs allege the Voting Laws facially discriminate based on national origin. (LUCHA Compl. ¶¶ 100–01, 110–16.) LUCHA details that by requiring applicants to list their place of birth and "subject[ing] voters to additional burdensome procedures to verify their eligibility to vote, as well as mandatory criminal investigation, only if they were born outside the United States," the Voting Laws unconstitutionally discriminate against naturalized citizens. (LUCHA Opp'n at 6.) Plaintiffs have plausibly alleged a scenario where a naturalized citizen who lawfully obtained state identification in Arizona before obtaining citizenship would be flagged as a noncitizen under the verification provisions of the Voting Laws. (LUCHA Compl. ¶¶ 100–33.) Considering Plaintiffs' detailed allegations regarding the unreliable "data-matching process" mandated by the Voting Laws, the Birthplace Requirement—particularly combined with the Check Box Requirement—and H.B. 2243's "reason to believe" criterion for investigating citizenship status, the Court finds that Plaintiffs have stated a claim that the Voting Laws are facially discriminatory based on national origin. (*See id.* ¶¶ 113, 116; AAANHPI Compl. ¶ 87.) Alternatively, even under *Anderson-Burdick*, total deprivation of the opportunity to vote is a severe burden and burdening voters based on foreign

national origin separately demands strict scrutiny. *Short*, 893 F.3d at 678–79 (applying *Anderson-Burdick*). Plaintiffs have stated a claim that naturalized citizens will incur such a burden solely by virtue of their birthplace.

Defendants attempt to counter Plaintiffs' claims of national origin discrimination by arguing that Plaintiffs have not adequately alleged discriminatory intent. (Mot. at 20–22.) As above explained, Plaintiffs have stated a claim that the Voting Laws are facially unconstitutional, which does not require a finding of discriminatory intent. (*See* LUCHA Opp'n at 6–7); *Mitchell v. Washington*, 818 F.3d 436, 445–46 (9th Cir. 2016) ("When the government expressly classifies persons on the bases of race or national origin . . . its action is 'immediately suspect'. . . . A plaintiff in such a lawsuit need not make an extrinsic showing of discriminatory animus or a discriminatory effect to trigger strict scrutiny.") (alterations in original) (citation omitted)); *Walker v. Gomez*, 370 F.3d 969, 974 (9th Cir. 2004) (plaintiff need not prove discriminatory intent or impact when policy is suspect on its face) (citing *Loving v. Virginia*, 388 U.S. 1, 8–9 (1967)).

In any event, the Court alternatively finds that Plaintiffs have adequately alleged discriminatory intent such that they have stated a claim that the Voting Laws were "motivated by" a discriminatory purpose. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66, 269 (1977); (AAANHPI Opp'n at 13–15). "The central inquiry in any disparate treatment claim under the Equal Protection Clause is whether an invidious discriminatory purpose was a motivating factor in some government action." *Ballou v. McElvain*, 29 F.4th 413, 424 (9th Cir. 2022) (cleaned up). "'*[A]ny* indication of discriminatory motive may suffice' to allow a disparate treatment claim to survive summary judgment." *Id.* (emphasis and alteration in original) (quoting *Arce v. Douglas*, 793 F.3d 968, 978 (9th Cir. 2015)).

> The Supreme Court articulated the following, non-exhaustive factors that a court should consider in assessing whether a defendant acted with discriminatory purpose: (1) the impact of the official action and whether it bears more heavily on one race than another; (2) the historical background of the decision; (3) the specific sequence of events leading to the challenged action; (4) the defendant's departures from normal procedures or substantive conclusions; and (5) the relevant legislative or administrative history.

*Arce*, 973 F.3d at 977.

Plaintiffs point to the reduction in response time to provide DPOC between the previous version of H.B. 2243 (90 days) and H.B. 2243 as enacted (35 days) as evidence of the legislature's intention to target naturalized citizens. (*See* AAANHPI Compl. ¶¶ 17–18, 60.) Plaintiffs also raise the comments made by H.B. 2942's sponsor regarding immigrant voters, as well as the bill's passage over advice of legislative counsel that the statute would be preempted by the NVRA, as evidence of discriminatory intent in legislation. (Poder Latinx Compl. ¶ 48 (detailing statements from bill sponsors that intention of the Voting Laws was to overrule LULAC Consent Decree and ensure noncitizens are not voting in Arizona elections).) Plaintiffs have stated a claim that the Voting Laws intentionally subject naturalized citizens to increased burdens, up to and including complete disenfranchisement, violating the Equal Protection Clause.[13]

Second, Plaintiffs allege that the Voting Laws discriminate based on race, violating both the Equal Protection Clause and the Fifteenth Amendment.[14] (*See* AAANHPI Compl. ¶¶ 143–50; Poder Latinx Compl. ¶¶ 107–18.) The Fifteenth Amendment establishes that "[t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." U.S. Const. amend XV. A plaintiff must allege "actual interference in the voting or registration processes" on account of race to state a claim for Fifteenth Amendment violation. *See Skorepa v. City of Chula* Vista, 723 F. Supp. 1384, 1393 (S.D. Cal. 1989) (citation omitted).

---

[13] Amicus curiae Immigration Reform Law Institute raises that "[d]etermining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence as may be available." (Doc. 131-1, IRLI Amicus Br. at 15 (quoting *Arlington Heights*, 429 U.S. at 266).) The fact-sensitive nature of invidious discrimination claims further weighs against granting the Motion.

[14] Poder Latinx Plaintiffs correctly note that the Motion does not address their claim that the Voting Laws violate the Fifteenth Amendment under *Louisiana v. United States*, 380 U.S. 145 (1965). (Poder Latinx Opp'n at 10.) Defendants argue in Reply that the unconstitutional action in *Louisiana* is distinguishable from the Voting Laws, in that *Louisiana* struck down a voting requirement administered "without any controls on official discretion, placing arbitrary power in the hands of election officials." (Reply at 17 n.9.) But Plaintiffs have plausibly alleged that, *inter alia*, H.B. 2243's "reason to believe" investigation criterion similarly gives election officials "arbitrary power" to purge registered voters. *See Louisiana*, 380 U.S. at 153; (Poder Latinx Compl. ¶ 111.)

Plaintiffs' claims survive the Motion. LUCHA Plaintiffs describe Arizona's extended history of denying the franchise to Native Americans and plausibly connect this history to H.B. 2492's DPOR requirement. (*See* LUCHA Compl. ¶¶ 164–69, 176–77.) AAANHPI asserts that by imposing the DPOR, DPOC, and Birthplace Requirements, "and removing voters from the rolls if such information is not provided or is questioned, Sections 1, 3, 4, 5, 7, and 8 of H.B. 2492 intentionally discriminate against AANHPIs, naturalized citizens from those communities, and other voters of color, in violation of the Fourteenth and Fifteenth Amendments." (AAANHPI Compl. ¶ 148.) AAANHPI makes similar allegations regarding H.B. 2243. (*Id.* ¶ 150.) Poder Latinx asserts that H.B. 2243 is "in essence, a redeployment of [Jim Crow-era] unconstitutional registration practices involving the unfettered discretion of officials to revoke voting rights and arbitrarily allocate the right to vote, with particular harm falling on naturalized voters and, in particular, Latinx voters throughout Arizona." (Poder Latinx Compl. ¶ 116.) The Court finds that Plaintiffs have stated a claim that the Voting Laws are racially discriminatory in violation of the Fourteenth and Fifteenth Amendments.

### b. Procedural Due Process

Multiple Private Plaintiffs claim that the Voting Laws deny procedural due process. (*See, e.g.*, AAANHPI Compl. ¶¶ 135–41; Poder Latinx Compl. ¶¶ 133–44; Poder Latinx Opp'n at 7–9.) Defendants counter that any "freestanding" procedural due process claims are "squarely foreclosed by Ninth Circuit precedent." (Mot. at 16–17 (citing *Hobbs III*, 18 F.4th at 1195).) Defendants are correct. *See Hobbs III*, 18 F.4th at 1195 (holding that the *Anderson-Burdick* framework is "better suited to the context of election laws than is the more general *Eldridge* test"); *Ariz. Democratic Party v. Hobbs*, 976 F.3d 1081, 1086 n.1 (9th Cir. 2020) (observing that district court likely erred in accepting "plaintiffs' novel procedural due process argument" when *Anderson-Burdick* should supersede any other framework). To the extent Plaintiffs assert procedural due process claims distinct from their *Anderson-Burdick* claims, the Court grants the Motion as to these "freestanding" claims. However, certain Plaintiffs' procedural due process

claims survive the Motion, as they are included in allegations that the Voting Laws impose an undue burden under *Anderson-Burdick*. (*See, e.g.*, MFV Compl. ¶¶ 3, 62–69, 79 (alleging that H.B. 2492 severely burdens the right to vote by, *inter alia*, threatening voters with registration cancellation and criminal investigation without adequate notice and time to respond); AAANHPI Compl. ¶ 136; AAANHPI Opp'n at 10 (explaining that its procedural due process claim is alleged within the *Anderson-Burdick* framework).)

### 3. National Voter Registration Act

Plaintiffs allege that the Voting Laws violate multiple sections of the NVRA. The NVRA sets parameters for the federal election process and bars states "from requiring a Federal Form applicant to submit information beyond that required by the form itself." *Inter-Tribal Council*, 570 U.S. at 20 (striking down under the NVRA Arizona's requirement that Federal Form applicants submit DPOC).

As a general argument for dismissal of all Plaintiffs' NVRA claims, Defendants assert that because the Voting Laws only regulate presidential elections rather than all federal elections, the NVRA does not apply. (*See* Mot. at 3, 23.) Citing Article I Section 4 of the United States Constitution, Defendants argue that the NVRA "can [only] apply constitutionally to 'Elections for Senators and Representatives.'" (*Id.* at 23.) But Plaintiffs point out that there is no "carve-out" in H.B. 2243 for Federal Form users—on its face, H.B. 2243 allows election officials to purge individuals lawfully registered to vote using the Federal Form. (*See* AAANHPI Opp'n at 6.) And further, contrary to Defendants' suggestions, Plaintiffs have at least plausibly alleged that the NVRA applies to presidential elections.[15] *C.f. Mattioda v. Bridenstine*, No. 20-cv-03662-SVK, 2021 WL 75665, at *18 (N.D. Cal. Jan. 8, 2021) (assuming without deciding that a claim exists, where case is on motion to dismiss and Ninth Circuit has not spoken to the issue); *see also Voting Rights Coal. v. Wilson*, 60 F.3d 1411, 1414 (9th Cir. 1995) ("The broad power given to Congress over congressional elections has been extended to presidential

---

[15] The United States details the history surrounding the Elections Clause to explain why Presidential elections may have been omitted but why the NVRA still applies to presidential elections. (USA Opp'n at 8.)

elections"); (USA Opp'n at 5 ("An unbroken line of precedent confirms Congress's power to regulate all federal elections, including those for president."); AAANHPI Opp'n at 6 (citing *Oregon v. Mitchell*, 400 U.S. 112, 124 & n.6 (1970) ("It cannot be seriously contended that Congress has less power over the conduct of presidential elections than it has over congressional elections.")), n.6 (detailing codified finding accompanying the NVRA regarding "discriminatory and unfair registration [harming] racial minorities.").)

### a. Section 5

Section 5 of the NVRA mandates that voter registration applications included with driver's license applications "may only require the minimum amount of information necessary to enable State election officials to assess eligibility of the applicant . . . ." 52 U.S.C. § 20504(c)(2)(B). This "minimum" means an "an attestation that the applicant meets each such requirement [of citizenship]," with "signature of the applicant, under penalty of perjury." *Id.* § 20504(c)(2)(C)(i)–(iii). The DNC alleges that by requiring Federal Form users to submit DPOC in order to vote in presidential elections, H.B. 2492 violates Section 5 of the NVRA. (*See* DNC Compl. ¶¶ 80–83.) The DNC argues that Defendants failed to address this specific claim in the Motion. (DNC Opp'n at 8.) The Court finds no indication otherwise. (*See* Mot.) Plaintiffs have stated a claim that the Voting Laws are preempted by Section 5 of the NVRA.

### b. Section 6

Plaintiffs allege that H.B. 2492's DPOC requirement violates the mandate of Section 6 of the NVRA that states "accept and use" the Federal Form to register individuals for all federal elections. *See* 52 U.S.C. § 20505(a); (*e.g.*, DNC Compl. ¶¶ 70–72; DNC Opp'n at 5.)

Plaintiffs have plausibly alleged that the Voting Laws are preempted by Section 6. (*See* AAANHPI Compl. ¶¶ 160, 168.) Plaintiffs argue that under *Inter Tribal Council*, "[f]ederal-only voters must be permitted to vote in *all* federal elections, including presidential elections, so long as those voters submit a complete and valid Federal Form." (USA Opp'n at 6) (emphasis in original). Like the law found preempted in *Inter Tribal*

*Council*, Plaintiffs allege that the Voting Laws require Federal Form users to provide "every additional piece of information the State requires on its state-specific form. If that is so, the Federal Form ceases to perform any meaningful function, and would be a feeble means of 'increas[ing] the number of eligible citizens who register to vote in elections for Federal office.'" *Inter Tribal Council*, 570 U.S. at 13 (alteration in original) (citing § 1973gg(b)). Plaintiffs have stated a claim that the Voting Laws are preempted by Section 6 of the NVRA.

### c.     Section 8

Section 8 of the NVRA, in relevant part, requires that any state program to "protect the integrity of the electoral process" by maintaining an accurate registration roll for federal elections "be uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965" ("Uniformity Provision"). 52 U.S.C. § 20507(b)(1). It also mandates that States "complete, not later than 90 days prior to the date of a primary or general election for Federal office, any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters" ("Purge Provision"). *Id.* § 20507(c)(2)(A).

The DNC alleges that H.B. 2492 violates the Uniformity Provision by excluding Federal Form users who did not provide DPOC from voting by mail or in Presidential elections. (*See* DNC Compl. ¶¶ 73–78.) LUCHA Plaintiffs make the same allegation regarding H.B. 2492's DPOR requirement. (LUCHA Compl. ¶¶ 356, 358; *see also* DNC Opp'n at 9.) Taking the allegations in the Complaints as true, the Court finds that Plaintiffs have stated a claim that the Voting Laws violate the Uniformity Provision. (*See* DNC Opp'n at 9–10.) And though Defendants counter that the Voting Laws have no mandate that registrants shall continue to be purged from the rolls through the 90-period preceding an election, the Voting Laws do not qualify when election officials can and cannot purge registrants from the rolls. (*See* H.B. 2492 § 8; H.B. 2243 § 2; AAANHPI Compl. ¶¶ 171–72.) At this stage of litigation, the statutes' broad directive to purge registrants, without any limit as to when this purge should cease, suffices to state a claim

for violation of the Purge Provision. (*See* DNC Opp'n at 10.)

### 4. Section 10101

The Materiality Provision of Section 10101 ("Materiality Provision") forbids states from denying "the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election." 52 U.S.C. § 10101(a)(2)(B). The United States explains that "[t]he Materiality Provision specifically covers registration." (USA Opp'n at 4 (citing §§ 10101(a)(3)(A), (e)).) In Arizona, such qualifications are age of majority, citizenship, residency, ability to write one's name or make one's mark, and lack of criminal convictions or adjudications rendering the voter incapacitated. Ariz. Rev. Stat. § 16-101.

The United States argues that multiple provisions of H.B. 2492 mandate voter purges due to immaterial omissions or errors by registrants. The Birthplace Requirement, the United States asserts, is immaterial to a voter's eligibility, as naturalized citizens are born outside of the United States and still carry the citizenship necessary to vote in Arizona. (USA Opp'n at 18–19.) Conversely, individuals born in the United States might not be American citizens, whether through foreign diplomatic parentage or expatriation. (*Id.* at 19.) Failure to comply with the Check Box Requirement would similarly disqualify applicants who have previously provided DPOC and met every other requirement for verification of citizenship. (*Id.* at 19; USA Compl. ¶ 59.)

Defendants counter that there is no private right of action under § 10101 and that, in any event, the information solicited under the Voting Laws is "material to ascertaining eligibility to vote and thus cannot run afoul of Section 10101." (Mot. at 3, 25, 28.) Specifically, Defendants assert that a cause of action under § 1983 "is not available if Congress 'did not intend that remedy' for the statutory right in question." (*Id.* at 25 (citing *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 120 (2005)).) Defendants also argue that the Materiality Provision does not "dictate the substance of state law," as

Congress's concerns in the Provision "c[a]me not from discriminatory laws," but "'from the discriminatory application and administration of apparently nondiscriminatory laws.'" (*See id.* at 26 (citing H.R. Rep. No. 88914 (Nov. 20, 1963), 1964 U.S.C. § 2391, 2491).)

As this stage of litigation, the Court disagrees with Defendants. Before the passage of the Voting Laws, the state of Arizona used other methods to verify a registrant's citizenship, suggesting that the Voting Laws' "confirmation" measures are not necessary. (*See* USA Opp'n at 19; USA Compl. ¶ 49.) And the United States points out that the Materiality Provision forbids "election officials from denying the right to vote based on errors and omissions not material to voter qualifications," "target[ing] *all* state conduct that denies the right to vote based on immaterial errors or omissions." (USA Opp'n at 14) (emphasis in original). No party disputes that citizenship itself is material to a voter's qualifications, but the United States persuasively argues that materiality may mean more than relevance in this context. (*Id.* at 17, 17 n.6.) The United States has plausibly alleged that H.B. 2492 requires duplicative information from registrants that is "unnecessary and therefore not material to determining an individual's qualifications to vote" under Arizona law.[16] *See La Union del Pueblo Entero v. Abbott*, 604 F. Supp. 3d 512, 542 (W.D. Tex. 2022). The United States has stated a claim that H.B. 2492 violates the Materiality Provision.[17] (*See* USA Opp'n at 11–20.)

The Court also finds that Private Plaintiffs have stated a claim that the Voting Laws violate § 10101. Similar to the application of the NVRA to presidential elections, the Court need not decide whether there is a private right of action under § 10101 on a motion to dismiss. While the Ninth Circuit has not spoken to this issue, Plaintiffs have cited persuasive authority from within this Circuit indicating that there is such a private

---

[16] The Court agrees with the United States that the text of the Materiality Provision does not indicate the Provision only concerns "ad hoc executive actions that exceed state law." (USA Opp'n at 13–14; *see* Mot. at 26.) Nor do the cases Defendants cite for this argument support their reading of the Materiality Provision.

[17] Defendants also argue that because Arizona voters may cure any error in their registrations before H.B. 2492 would mandate cancelling their registrations, H.B. 2492 does not run afoul of § 10101. (Mot. at 27.) Defendants cite no authority for this assertion. The Court agrees with Plaintiffs that the cure provision of H.B. 2492 does not warrant dismissing the § 10101 claim. (*See* USA Opp'n at 15–16.)

right of action, rendering their claims at least plausible. (*See* AAANHPI Opp'n at 16 n.14 (citing *Davis v. Commonwealth Election Comm'n*, No.: 1–14–CV–00002, 2014 WL 2111065, at *10 (D. N. Mar. I. May 20, 2014)).) While the United States addresses Private Plaintiffs' allegations regarding H.B. 2492, Poder Latinx additionally alleges that H.B. 2243 violates § 10101(a)(2)(A), which prohibits election officials from "apply[ing] any standard, practice, or procedure different from the standards, practices, or procedures applied under such law or laws to other individuals within the same county . . . who have been found by State officials to be qualified to vote[.]" (Poder Latinx Compl. ¶¶ 100–06.) Poder Latinx has plausibly alleged that County Recorders are "instructed" to apply a different "standard, practice, or procedure" to verify the eligibility of voters suspected of being noncitizens. (*Id.* ¶ 102.) Only suspected noncitizens, investigated under broad, potentially discriminatory criteria, will be subjected to allegedly unreliable database checks and risk erroneous cancellation of their registrations. (*Id.* ¶ 103.)

### 5. Voting Rights Act

Section 2 of the Voting Rights Act ("Section 2") prohibits states from enacting voting rules that "result[] in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a). In evaluating an alleged Section 2 violation, courts must consider "the totality of circumstances" in each case and whether "the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members" of a protected class "in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id.* § 10301(b). "The essence of a § 2 claim . . . is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities of minority and non-minority voters to elect their preferred representatives." *Brnovich v. DNC*, 141 S. Ct. 2321, 2333 (2021) (cleaned up). "[T]he judiciary provides the only meaningful review of legislation that may violate the Voting Rights Act." *Feldman v. Arizona Sec. of State's Office*, 843 F.3d 366, 369 (9th Cir.

2016).

When assessing a claim of discriminatory results under Section 2, courts consider the extent of any historical discrimination burdening the right to vote, the degree of racially polarized voting, and the severity with which discrimination restricts the class from voting. *See Thornburg v. Gingles*, 478 U.S. 30, 36–37 (1986). LUCHA Plaintiffs allege that the Voting Laws disparately burden Native American, Latino, and language-minority voters by placing "barriers to registration [causing] impacted individuals to be wholly barred from voting." (LUCHA Compl. ¶¶ 367–69.) For example, as above detailed, LUCHA Plaintiffs assert that a disproportionate number of San Carlos Apache Tribal members will be unable to provide DPOR not because obtaining adequate proof is a "mere inconvenience," but because many Tribal members do not live in a residence with one address recognized by the State. (*Id.* ¶¶ 28–40); *c.f. Brnovich*, 141 S. Ct. at 2338 ("Mere inconvenience cannot be enough to demonstrate a violation of [Section] 2.") Arizona also has a history of disenfranchising Native American citizens. (*Id.* ¶¶ 164–69, 176–77.) LUCHA Plaintiffs additionally allege that naturalized citizens, a disproportionate number of whom are members of protected racial classes, will be subject to unwarranted disenfranchisement and criminal prosecution due to the Birthplace Requirement and the State's use of faulty databases to verify citizenship. (*Id.* ¶¶ 367–70.)

Defendants respond that LUCHA's Section 2 claim does not plausibly detail any "meaningful disparate racial impacts" and "depends enormously on speculative racial disparities that may not occur as anticipated, or indeed may not occur at all." (Mot. at 4, 29 (internal quotation marks and citation omitted).) But Defendants' attacks on the Section 2 claim depend on evaluating the merits of the claim, which the Court will not do at this stage of litigation. And Plaintiffs need not plead any "specific set of factors" to state a claim of Section 2 violation. *Sixth Dist. Of African Methodist Episcopal Church v. Kemp*, 574 F. Supp. 3d 1260, 1277 (N.D. Ga. 2021) (citing *Brnovich*, 141 S. Ct. at 2336, 2340). Plaintiffs have met their burden to plausibly allege that Arizona's voting process is not "equally open to participation" from, *inter alia*, Native American voters who will not

be able to obtain DPOR. LUCHA Plaintiffs have stated a claim that the Voting Laws violate Section 2.

### III.    CONCLUSION

The Court concludes that Plaintiffs have standing to bring this action. Further, the Court finds that Plaintiffs have stated plausible claims for relief, apart from any alleged "freestanding" procedural due process violation.

**IT IS ORDERED** denying Defendants State of Arizona and the Arizona Attorney General's Motion to Dismiss except as to Plaintiffs' freestanding procedural due process claims (Doc. 127).

Dated this 16th day of February, 2023.

Susan R. Bolton
United States District Judge