John A. Freedman
Jeremy Karpatkin
Erica McCabe
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave., N.W.
Washington, D.C. 20001
(202) 942-5000
John.Freedman@arnoldporter.com
Jeremy.Karpatkin@arnoldporter.com
Erica.McCabe@arnoldporter.com
*Admitted pro hac vice

Steven L. Mayer
Arnold & Porter Kaye Scholer LLP
Three Embarcadero Center, 10th Floor
San Francisco, CA 94111
(415) 471-3100
Steve.Mayer@arnoldporter.com
*Admitted pro hac vice

Leah R. Novak
Arnold & Porter Kay Scholer LLP
250 W. 55th Street
New York, NY 10019
(212) 836-8000
Leah.Novak@arnoldporter.com
*Admitted pro hac vice

Daniel J. Adelman (011368)
Arizona Center for Law
In the Public Interest
352 E. Camelback Rd., #200
Phoenix, AZ  85012
(602) 258-8850
danny@aclpi.org

Jon Sherman
Michelle Kanter Cohen
Beauregard Patterson
Fair Elections Center
1825 K St. NW, Ste. 701
Washington, D.C. 20006
(202) 331-0114
jsherman@fairelectionscenter.org
mkantercohen@fairelectionscenter.org
bpatterson@fairelectionscenter.org
*Admitted pro hac vice

*Counsel for Poder Latinx, Chicanos
Por La Causa, and Chicanos Por La
Causa Action Fund*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA**

| | |
|---|---|
| MI FAMILIA VOTA, et al.<br><br>Plaintiffs,<br><br>v.<br><br>ADRIAN FONTES, in his official capacity as Arizona Secretary of State, et al.,<br><br>Defendants,<br><br>and | Case No. 22-00509-PHX-SRB (Lead)<br><br>**PODER LATINX, CHICANOS POR LA CAUSA, AND CHICANOS POR LA CAUSA ACTION FUND'S COMBINED CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNTS TWO AND SIX OF THEIR SECOND AMENDED COMPLAINT AND** |

1    Speaker of the House Ben Toma and
     Senate President Warren Petersen,
2
     Intervenor-Defendants.
3

4    LIVING UNITED FOR CHANGE IN
     ARIZONA, et al.,
5
     Plaintiffs,
6
     v.
7
     ADRIAN FONTES, in his official
8    capacity as Arizona Secretary of
     State, et al.,
9    Defendant,

     and
10
     STATE OF ARIZONA, et al.,
11
     Intervenor-Defendants,
12
     and
13   Speaker of the House Ben Toma and
     Senate President Warren Petersen,
14   Intervenor-Defendants.

15   PODER LATINX, et al.

16   Plaintiff,

     v.
17
     ADRIAN FONTES, in his official
18   capacity as Arizona Secretary of
     State, et al.,
19   Defendants,

20   and

21   Speaker of the House Ben Toma and
     Senate President Warren Petersen,
22   Intervenor-Defendants.

23   UNITED STATES OF AMERICA,

24   Plaintiff,

     v.
25
     STATE OF ARIZONA, et al.,
26
     Defendants,
27
     and
28

**RESPONSE TO ATTORNEY GENERAL'S AND REPUBLICAN NATIONAL COMMITTEE'S MOTIONS FOR SUMMARY JUDGMENT**

Consolidated Cases
No. CV-22-00519-PHX-SRB
No. CV-22-01003-PHX-SRB
No. CV-22-01124-PHX-SRB
No. CV-22-01369-PHX-SRB
No. CV-22-01381-PHX-SRB
No. CV-22-01602-PHX-SRB
No. CV-22-01901-PHX-SRB

Speaker of the House Ben Toma and Senate President Warren Petersen,

Intervenor-Defendants.

DEMOCRATIC NATIONAL COMMITTEE, et al.,

Plaintiffs,

v.

ADRIAN FONTES, in his official capacity as Arizona Secretary of State, et al.,

Defendants,

and

REPUBLICAN NATIONAL COMMITTEE,

Intervenor-Defendant,

and

Speaker of the House Ben Toma and Senate President Warren Petersen,

Intervenor-Defendants.

ARIZONA ASIAN AMERICAN NATIVE HAWAIIAN AND PACIFIC ISLANDER FOR EQUITY COALITION,

Plaintiff,

v.

ADRIAN FONTES, in his official capacity as Arizona Secretary of State, et al.,

Defendants,

and

Speaker of the House Ben Toma and Senate President Warren Petersen,

Intervenor-Defendants.

PROMISE ARIZONA, et al.,

Plaintiffs,

v.

ADRIAN FONTES, in his official capacity as Arizona Secretary of State, et al.,

Defendants,

1    and

2    Speaker of the House Ben Toma and
     Senate President Warren Petersen,

3    Intervenor-Defendants.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.      A.R.S. § 16-165(I) violates 52 U.S.C. § 10101(a)(2)(A) as a matter of law
        because it requires county officials to subject voters to different standards,
        practices, and procedures. ................................................................... 1

II.     Poder Latinx and CPLC may enforce 52 U.S.C. § 10101(a)(2)(A) via 42
        U.S.C. § 1983 or directly under the Civil Rights Act. ....................... 5

III.    The Attorney General and State of Arizona's Motion on NVRA Section 8(b)
        should be denied.............................................................................. 8

        A.      NVRA Section 8(b) applies to all voter registration processes,
                including the challenged provisions, not only to voter removals. ......... 9

        B.      The Challenged Provisions are neither uniform nor nondiscriminatory
                on their face........................................................................ 12

1

# **TABLE OF AUTHORITIES**

2

**Page(s)**

3

## **Cases**

4

*Am. Tobacco Co. v. Patterson*,

5

    456 U.S. 63 (1982) ............................................................................................9

6

*Arcia v. Fla. Sec'y of State*,

7

    772 F.3d 1335 (11th Cir. 2014) ......................................................................9

8

*Arizona v. Inter Tribal Council of Arizona, Inc. (ITCA)*,

    570 U.S. 1 (2013) .............................................................................................1

9

*Blessing v. Freestone*,

10

    520 U.S. 329 (1997) ...................................................................................6, 7

11

*Cannon v. Univ. of Chi.*,

12

    441 U.S. 677 (1979) ........................................................................................6

13

*Dunn v. Commodity Futures Trading Comm'n*,

14

    519 U.S. 465 (1997) ......................................................................................13

15

*Esquivel-Quintana v. Sessions*,

16

    581 U.S. 385 (2017) ........................................................................................8

17

*Frazier v. Callicutt*,

    383 F. Supp. 15 (N.D. Miss. 1974) ...........................................................3, 4

18

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*,

19

    505 U.S. 88 (1992) ..........................................................................................8

20

*Gonzaga Univ. v. Doe*,

21

    536 U.S. 273 (2002) ................................................................................6, 7, 8

22

*Gonzalez v. Ariz.*,

    No. CV 06-1268-PHX-ROS, 2008 WL 11395499 (D. Ariz. Feb. 5, 2008) ......4

23

*Greater Birmingham Ministries v. Merrill*,

24

    No. 2:22CV205-MHT, 2022 WL 5027180 (M.D. Ala. Oct. 4, 2022)...........10

25

*Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*,

26

    530 U.S. 1 (2000) ............................................................................................9

27

*Hearn v. W. Conf. of Teamsters Pension Tr. Fund*,

28

    68 F.3d 301 (9th Cir. 1995) ..........................................................................14

*Johnson v. Hous. Auth. of Jefferson Parish,*
    442 F.3d 356 (5th Cir. 2006) ........................................................................ 8

*Nat'l Council of La Raza v. Cegavske,*
    800 F.3d 1032 (9th Cir. 2015) ...................................................................... 9

*Project Vote v. Blackwell,*
    455 F. Supp. 2d 694 (N.D. Ohio 2006) ...................................................... 10

*Project Vote/Voting for Am., Inc. v. Long,*
    682 F.3d 331 (4th Cir. 2012) ................................................................ 10, 11

*Project Vote/Voting for Am., Inc. v. Long,*
    752 F. Supp. 2d 697 (E.D. Va. 2010) ................................................ 10, 11, 12

*Richards v. United States,*
    369 U.S. 1 (1962) ........................................................................................ 8

*Shivelhood v. Davis,*
    336 F. Supp. 1111 (D. Vt. 1971) ........................................................... 3, 4

*True the Vote v. Hosemann,*
    43 F. Supp. 3d 693 (S.D. Miss. 2014) ....................................................... 10

*United States v. Fla.,*
    870 F. Supp. 2d 1346 (N.D. Fla. 2012) ..................................................... 14

**Statutes**

A.R.S. § 16-165(I) ...........................................................................*passim*

42 U.S.C. § 1983 .......................................................................... 5, 6, 7, 8

52 U.S.C. § 10101 ...........................................................................*passim*

52 U.S.C. § 20501 ................................................................................. 12

52 U.S.C. § 20504 ................................................................................. 12

52 U.S.C. § 20505 ............................................................................. 1, 12

52 U.S.C. § 20506 ................................................................................. 12

52 U.S.C. § 20507 ...........................................................................*passim*

iii

## <u>Other Authorities</u>

110 CONG. REC. H 1,695 (1964) ............................................................ 2

110 CONG. REC. S 5,004 (1964) ............................................................ 3

110 CONG. REC. S 6,734 (1964) ............................................................ 3

110 CONG. REC. S 6,740 (1964) ............................................................ 2

Fed. R. Civ. P. 56(d) ........................................................................ 13

U.S. CONST. amend. XIV ...................................................................... 5

U.S. CONST. amend. XV ....................................................................... 5

Plaintiffs Poder Latinx, Chicanos Por La Causa, and Chicanos Por La Causa Action Fund ("Poder Latinx and CPLC") hereby move for entry of partial summary judgment on their Civil Rights Act claim under 52 U.S.C. § 10101(a)(2)(A) (Count II) and oppose the Intervenors' motion on the same count (ECF No. 367 at 15).

Additionally, Poder Latinx moves for partial summary judgment on Count Six, which claims that HB 2492's documentary proof of residence requirement cannot be lawfully applied to the national mail voter registration form under Section 6 of the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20505, and *Arizona v. Inter Tribal Council of Arizona, Inc. (ITCA)*, 570 U.S. 1 (2013). Poder Latinx joins and incorporates by reference Section I of the Tohono O'odham Plaintiffs' brief.

## I. A.R.S. § 16-165(I) VIOLATES 52 U.S.C. § 10101(A)(2)(A) AS A MATTER OF LAW BECAUSE IT REQUIRES COUNTY OFFICIALS TO SUBJECT VOTERS TO DIFFERENT STANDARDS, PRACTICES, AND PROCEDURES.

52 U.S.C. § 10101(a)(2)(A) prohibits election officials from subjecting voters to different standards, practices, and procedures. It provides that:

> No person acting under color of law shall--(A) in determining whether any individual is qualified under State law or laws to vote in any election, apply any standard, practice, or procedure different from the standards, practices, or procedures applied under such law or laws to other individuals within the same county, parish, or similar political subdivision who have been found by State officials to be qualified to vote[.]

52 U.S.C. § 10101(a)(2)(A). As enacted by HB 2243, however, A.R.S. § 16-165(I) requires Arizona county recorders to do what Section 10101(a)(2)(A) forbids. It directs county recorders to subject registered voters whom a recorder has "reason to believe" are not United States citizens—and only those voters—to an additional investigation using the Systematic Alien Verification for Entitlements ("SAVE") System and potential cancellation.

Subsection 16-165(I) is the only provision in HB 2492 or HB 2243 that invokes this inherently subjective and vague "reason to believe" standard. A.R.S. § 16-165(I)

1

1    commands the application of different "standard[s], practice[s], or procedure[s]" based on

2    nothing more than mere suspicion that a registered voter lacks U.S. citizenship.

3        The Secretary of State admits that A.R.S. § 16-165(I) "requires a different 'standard,

4    practice, or procedure' for determining a voter's qualifications for voters who a county

5    recorder 'has reason to believe are not United States citizens' than for voters who a county

6    recorder does not have reason to believe are not United States citizens." Non-U.S.

7    Plaintiffs' Consolidated Statement of Material Facts ("CSOMF") ECF No. 388 ¶ 44; ECF

8    No. 189 ¶ 102. The Secretary further admits that A.R.S. § 16-165(I) directs county

9    recorders to sort voters into two categories: those who will be subjected to the additional

10   SAVE System verification procedure and those who "are not suspected of lacking U.S.

11   citizenship [and] will not be subjected to the investigation and potential cancellations [*sic*]

12   provisions set forth in HB 2243." CSOMF ¶ 45; ECF No. 189 ¶¶ 102–03. Crucially, this

13   sorting will be premised on any "reason to believe" a registered voter is not a U.S. citizen,

14   whether based on a private party's accusation or someone's biased perception of that

15   voter's use of a language other than English, name, dress, or religion. Accordingly, on its

16   face, subsection 16-165(I) requires applying different standards, practices, and procedures

17   to eligible voters within the same county, because whenever recorder staff suspect a

18   registered voter is not a citizen, even without concrete or objective information, that voter

19   will be subject to a citizenship investigation and potential cancellation. This is what Section

20   10101(a)(2)(A) prohibits.

21       Congress enacted 52 U.S.C. § 10101(a)(2)(A) to prevent election officials from

22   subjecting would-be voters to different registration practices like the unequally applied

23   investigations A.R.S. § 16-165(I) requires. Congress "directed [Section 1010(a)(2)(A)]

24   primarily at discriminatory practices applied in the process of registering voters. It requires

25   the application of uniform practices in determining whether an individual is qualified to

26   vote." 110 CONG. REC. H 1,695 (Feb. 3, 1964). Congress explicitly sought to prohibit

27   "arbitrary exercises of discretion on the part of" registrars. 110 CONG. REC. S 6,740 (Apr.

28

1, 1964). Noting that by 1964 "many of the more blatant forms of discrimination" had been made "subject to judicial review and invalidation," supporters of Title I worried that registrars might "rel[y] on [their] discretionary powers" to carry out discrimination. 110 CONG. REC. S 6,734 (Apr. 1, 1964). Accordingly, Congress prohibited the "unequal application of [a] rule" or the "prejudiced application of a standard." 110 CONG. REC. S 5,004 (Mar. 11, 1964). Section 10101(a)(2)(A) prevents voters from being subjected to different or discriminatory procedures in the process of determining whether they meet voter qualification and registration requirements. The statute is explicitly intended to prevent election officials from acting on standardless suspicions or biases or unbridled discretion when deciding which voters to subject to which registration processes. By requiring Arizona county recorders to subject any voter to investigation and other additional procedures based on an undefined, arbitrary "reason to believe" the voter is not a citizen, A.R.S. § 16-165(I) requires Arizona county recorders to use the unrestrained discretion Congress barred in the voter registration process.

In line with Congress's intent, courts have applied Section 10101(a)(2)(A) to prohibit registrars from requiring particular classes of registrants to provide more proof of eligibility than other registrants. For example, in *Shivelhood v. Davis*, 336 F. Supp. 1111 (D. Vt. 1971), the court held that registrars could not require college students to provide more proof of residence than non-students merely because they suspect college students are not in fact residents of a town. *Id*. 1114–15. The court held that 52 U.S.C. § 10101(a)(2)(A) forbids registrars from forcing college students to fill out additional residence questionnaires "unless all applicants are required to complete the same questionnaire." *Id*. at 1115.

Similarly, in *Frazier v. Callicutt*, 383 F. Supp. 15 (N.D. Miss. 1974), the plaintiffs brought a Section 10101(a)(2)(A) claim against the county's registrar and the board of election commissioners, alleging "the registrar ha[d] applied one set of standards in approving or disapproving applications for registration to applicants who are students at

Rust College or Mississippi Industrial College . . . and another set of standards" for "all other applicants." *Id.* at 17–18. The court found that the registrar had violated the Civil Rights Act when he "summarily" rejected every college student's voter registration application and referred them to the board for further review but approved almost all non-student registrants' applications "on a subjective basis" without further investigation. *Id.* at 18–20. The court found Section 10101(a)(2)(A) had been violated by the application of "obviously different standard[s]" for students and non-students. *Id.* at 19.

As in *Frazier*, HB 2243 commands a wholly subjective evaluation of registered voters' eligibility. And, on its face, HB 2243 imposes differential standards, practices, and procedures based on nothing more than the subjective impressions and guesses of county recorders' staff as to registered voters' eligibility or ineligibility. A.R.S. § 16-165(I)'s vague "reason to believe" language invites county recorders to make such guesses and target voters for investigation based on race, ethnicity, dress, English proficiency, languages spoken, or other characteristics. Singling out certain voters for additional voter registration procedures based on nothing more than hunches and allegations, rather than evidence, of ineligibility is prohibited by the Civil Rights Act. And Arizona's practice of requiring some voters but not others to undergo additional procedures based on an arbitrary suspicion that they are not citizens is also forbidden by Section 10101(a)(2)(A).

It is also important to note that courts have long recognized that Section 10101(a)(2)(A)'s protections extend beyond overt discrimination. *See Gonzalez v. Ariz.*, No. CV 06-1268-PHX-ROS, 2008 WL 11395499, at *3–4 (D. Ariz. Feb. 5, 2008) (considering plaintiffs' claim of differential treatment of voters who moved within a county and voters who moved between counties); *Shivelhood*, 336 F. Supp. at 1113–15; *Frazier*, 383 F. Supp. at 20. This is consistent with the provision's text, which is not limited to discrimination based on race or other characteristics. *Cf.* 52 U.S.C. § 10101(a)(1) (limited to "race, color, or previous condition of servitude").

4

A.R.S. § 16-165(I) directs Arizona county recorders to subject some—but indisputably not *all*—registered voters to additional procedures based on a subjective "reason to believe" those voters are not citizens. On its face then, purely as a matter of law, *any* application of this statute will violate Section 10101(a)(2)(A). Unless county recorders and their staff intend to subject **all** of Arizona's millions of registered voters to a citizenship investigation and additional procedures, then **any** use of this provision will cause the application of different standards, practices, and procedures to determine the voting qualifications of only certain voters suspected of lacking U.S. citizenship.

Poder Latinx and CPLC thus respectfully request that this court find that A.R.S. § 16-165(I) violates 52 U.S.C. § 10101(a)(2)(A) and enter partial summary judgment on this claim.[1] For both this claim (Count II) and Count VI, Poder Latinx and CPLC request entry of a declaratory judgment but will not seek injunctive relief until the conclusion of this case.

## II.   PODER LATINX AND CPLC MAY ENFORCE 52 U.S.C. § 10101(A)(2)(A) VIA 42 U.S.C. § 1983 OR DIRECTLY UNDER THE CIVIL RIGHTS ACT.

The RNC argues that there is no private right of action to enforce any claims brought under 52 U.S.C. § 10101(a)(2) of the Civil Rights Act, ECF No. 367 at 11–15, but this argument fails as a matter of law. Poder Latinx and CPLC join and incorporate Section II of the Mi Familia Vota Plaintiffs' ("MFV's") brief in support of their motion for partial summary judgment, which concerns the enforceability of 52 U.S.C. § 10101(a)(2)(B) by private litigants. Because the Standards, Practices, and Procedures Provision (§ 10101(a)(2)(A)) and the Materiality Provision (§ 10101(a)(2)(B)) are part of the same provision, almost all of the arguments in MFV's brief—excluding only those specific to

---

[1] If the Court finds a violation of 52 U.S.C. § 10101(a)(2)(A) and enters summary judgment, then under the doctrine of constitutional avoidance, there is no need to adjudicate Poder Latinx and CPLC's alternative claim alleging A.R.S. § 16-165(I) violates prohibitions against racial and national origin discrimination under the Fourteenth and Fifteenth Amendments (Count Three, *see* Second Am. Compl., ECF No. 169 ¶¶ 108–18).

the text in subsection 10101(a)(2)(B)—apply to § 10101(a)(2)(A) with equal force and support a finding of private enforceability here as well. In addition to the points MFV raises, Poder Latinx and CPLC note the following additional points.[2]

Poder Latinx and CPLC may enforce 52 U.S.C. § 10101(a)(2)(A) through 42 U.S.C. § 1983. Subsection 10101(a)(2)(A) of the Civil Rights Act "confers an individual right" and is therefore "presumptively enforceable" by private plaintiffs under Section 1983. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284 (2002). Plaintiffs only need to show that these provisions create "specific, individually enforceable rights" that provide a "basis for private enforcement." *Id*. at 281. "Plaintiffs suing under § 1983 do not have the burden of showing an intent to create a private remedy because § 1983 generally supplies a remedy for the vindication of rights secured by federal statutes." *Id*. at 284.

Under *Gonzaga*, a court must determine whether the federal statute contains "explicit rights-creating" terms and "explicit 'right- or duty-creating language.'" 536 U.S. at 284 & n.3 (quoting *Cannon v. Univ. of Chi.*, 441 U.S. 677, 690 n.13 (1979)). Courts also consider the three factors set forth in *Blessing v. Freestone*, 520 U.S. 329 (1997), which were reaffirmed in *Gonzaga*, 536 U.S. at 282:

> First, Congress must have intended that the provision in question benefit the plaintiff. Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so "vague and amorphous" that its enforcement would strain judicial competence. Third, the statute must unambiguously impose a binding obligation on the States. In other words, the provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms.

*Blessing*, 520 U.S. at 340–41 (citations and quotation marks omitted). Subsection 10101(a)(2)(A) shares the prototypical rights-creating language—"No person . . . shall"— with the Materiality Provision. As explained in MFV's brief, that prefatory phrase parallels standard rights-creating language from other statutes, which courts have found confer an

---

[2] The Court cannot avoid resolving the private right of action dispute as to 52 U.S.C. § 10101(a)(2)(A), as only Poder Latinx and CPLC have asserted this particular claim.

enforceable private right via 42 U.S.C. § 1983. *Gonzaga*, 536 U.S. at 284. *Gonzaga* itself contrasted the nondisclosure provisions of the Family Educational Rights and Privacy Act with "the individually focused terminology of Titles VI and IX ('No person . . . shall . . . be subjected to discrimination')." 536 U.S. at 287.[3]

Like the Materiality Provision, subsection 10101(a)(2)(A) creates an individually enforceable right, specifically an individual right against discrimination in voter qualification standards, practices, and procedures. It provides:

> No person acting under color of law shall--(A) in determining whether any individual is qualified under State law or laws to vote in any election, apply any standard, practice, or procedure different from the standards, practices, or procedures applied under such law or laws to other individuals within the same county, parish, or similar political subdivision who have been found by State officials to be qualified to vote[.]

The text of Subsection 10101(a)(2)(A) is likewise "phrased in terms of the persons benefited," *Gonzaga*, 536 U.S. at 274, and satisfies each of the *Blessing* factors.

As to *Blessing* factor 1, Section 10101(a)(2)(A) is focused on individual voters ("any individual"). It was intended to benefit individual voters, *Blessing*, 520 U.S. at 340, and does not have "an 'aggregate' focus." *Gonzaga*, 536 U.S. at 288 (quoting *Blessing*, 520 U.S. at 343–44). Section 10101(a)(2)(A) also meets *Blessing* factor 2. Section 10101(a)(2)(A)'s prohibition of discrimination in voter qualification procedures is an objective and administrable standard, which is "not so vague and amorphous that its enforcement would strain judicial competence." *Blessing*, 520 U.S. at 340–41 (quotation marks omitted). And Section 10101(a)(2)(A) satisfies *Blessing* factor 3, as it "unambiguously impose[s] a binding obligation on" state and local election officials and is "couched in mandatory, rather than precatory, terms." 520 U.S. at 341. Section 10101(a)(2) uses the mandatory "shall."

---

[3] "No person acting under color of law shall" also echoes Section 1983 itself. *See* 42 U.S.C. § 1983 ("Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States . . .").

It would be anomalous to single out subsection 10101(a)(2)(A) as only enforceable by the federal government, given subsection 10101(a)(2), as a whole, gives individual voters concrete rights against different types of discriminatory and arbitrary conduct. It is well-established that "a section of a statute should not be read in isolation from the context of the whole Act." *Richards v. United States*, 369 U.S. 1, 11 (1962). Moreover, Intervenors have not identified any basis for concluding that Congress intended to confer an individually enforceable right for only some, but not all, subparts of subsection 10101(a)(2). *Gonzaga*, 536 U.S. at 281. The Supreme Court has frequently stated that the "[s]urrounding provisions" in a statute "guide [its] interpretation." *Esquivel-Quintana v. Sessions*, 581 U.S. 385, 393 (2017); *see also Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 99 (1992). Divergent results for intertwined or closely linked statutory provisions would be illogical. *Cf. Johnson v. Hous. Auth. of Jefferson Parish*, 442 F.3d 356, 362 (5th Cir. 2006) ("Logic prevents the conclusion that Congress could have intended to create enforceable rights for one group of Housing Act rental assistance recipients but not the other.").

Accordingly, as with the Materiality Provision in subsection 10101(a)(2)(B), this Court should find that subsection 10101(a)(2)(A) is presumptively enforceable by private plaintiffs via 42 U.S.C. § 1983. And for reasons explained in MFV's brief, the Intervenors have failed to rebut this presumption of private enforceability. Alternatively, Poder Latinx and CPLC may enforce subsection 10101(a)(2)(A) directly under the Civil Rights Act, as Congress intended to create a private remedy, as explained in MFV's brief.

## III. THE ATTORNEY GENERAL AND STATE OF ARIZONA'S MOTION ON NVRA SECTION 8(B) SHOULD BE DENIED.

Poder Latinx and several Consolidated Plaintiffs argue that because HB 2492 and HB 2243 result in disparate treatment as between naturalized citizens and U.S.-born citizens, as well as within and between Arizona counties, the Challenged Provisions are nonuniform and discriminatory in violation of Section 8(b) of the NVRA. The DNC

Plaintiffs argue HB 2492 violates Section 8(b) because it treats federal-only voters differently than other Arizona voters. *See Democratic Nat'l Comm. v. Fontes*, Case No. 2:22-cv-01369-SRB, Complaint for Declaratory and Injunctive Relief, ECF No. 1 ¶¶ 73–78.

Defendants Attorney General Kristin Mayes and the State of Arizona ("the Moving Defendants") have moved for summary judgment making two arguments. ECF No. 364 at 5–8. First, they contend that Section 8(b) applies only to voter removals, an argument that is contrary to the statutory text and explicit legislative intent. Second, the Moving Defendants argue that the remaining provisions regarding post-registration cancellations are uniform and nondiscriminatory "on the face" of the laws, ignoring the outstanding factual issues and the discrimination that will result from the Challenged Provisions. Both arguments fail.

### A.   NVRA Section 8(b) applies to all voter registration processes, including the challenged provisions, not only to voter removals.

Section 8(b)'s uniform and nondiscriminatory requirement (the "Uniformity Requirement") applies to "any State program or activity to protect the integrity of the electoral process by ensuring the maintenance of an accurate and current voter registration roll for elections for Federal office." 52 U.S.C. § 20507(b). Contrary to Defendants' position, Section 8(b)'s requirements apply to all stages of the voter registration process, as the statutory language does not limit Section 8(b)'s reach only to voter cancellations or removals. The processing of voter registration applications—including their acceptance and rejection—is certainly necessary to "the maintenance of an accurate and current voter registration roll." *Id.* The Moving Defendants provide no contrary plain text argument. The NVRA's plain language must be enforced according to the ordinary meaning of its terms. *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1045 (9th Cir. 2015) (citing *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.,* 530 U.S. 1, 6 (2000); *Am. Tobacco Co. v. Patterson,* 456 U.S. 63, 68 (1982)); *see also Arcia v. Fla. Sec'y of State,* 772 F.3d

9

1335, 1347 (11th Cir. 2014) ("Our job is to honor the broad statutory language in the [NVRA] . . .").

The Moving Defendants do not cite any case law that supports their position. Notably, at least one court has applied Section 8(b) to voter registration activities that do not concern voter removals. *Project Vote v. Blackwell*, 455 F. Supp. 2d 694, 703 (N.D. Ohio 2006) (Ohio restrictions on voter registration drives violated Section 8(b) as "neither uniform nor non-discriminatory" by creating barriers to voter registration "only for a selected class of persons"). And courts have consistently held that similar language in another subsection of Section 8, Section 8(i)—which concerns the "accuracy and currency" of the voter list[4]—applies to the entire voter registration process. Analyzing that provision, courts have noted that the process of reviewing voter registration applications is a "program" and "activity" that promotes the accuracy and currency of voter lists. *See Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 335 (4th Cir. 2012); *see also Greater Birmingham Ministries v. Merrill*, No. 2:22CV205-MHT, 2022 WL 5027180, at *3 (M.D. Ala. Oct. 4, 2022) (rejecting argument that Section 8(i)(1) should be read to pertain only to records relating to removal of voters); *True the Vote v. Hosemann*, 43 F. Supp. 3d 693, 720 (S.D. Miss. 2014) (under Section 8(i)(1), "activities geared towards ensuring that a State's official list of voters is errorless and up-to-date . . . generally relate to voter registration and removal, the processes by which a State updates its lists to ensure they reflect all eligible voters").

Courts have also noted that the statutory term "'current' refers to something that is 'occurring in or belonging to the present time' or is 'most recent,' while the term 'accurate' refers to something 'free from error . . . esp[ecially] as the result of care' or 'in exact conformity to truth or to some standard.'" *See Project Vote/Voting for Am., Inc. v. Long*,

---

[4] Section 8(i)(1) requires public disclosure of "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i)(1).

10

752 F. Supp. 2d 697, 706 (E.D. Va. 2010) (citing Webster's *Third New International Dictionary* 14, 557 (2002)); *see also Long*, 682 F.3d at 335. Maintaining a "current" voter list or roll necessarily implicates review of registration applications. As the Fourth Circuit reasoned, "[b]y registering eligible applicants and rejecting ineligible applicants, state officials 'ensure that the state is keeping a "most recent" and errorless account of which persons are qualified or entitled to vote within the state.'" *Long*, 682 F.3d at 335 (citing *Long*, 752 F. Supp. 2d at 706). Because evaluating voter registration applications is critical for "ensuring the accuracy and currency of the official lists of eligible voters," the process of determining whether a voter registration applicant is added to the official voter list falls within Section 8(b)'s plain language. *See Long*, 752 F. Supp. 2d at 705–06.

The statutory context further supports that Section 8(b) covers the entire application process, not only removals. Section 8 itself is titled "Requirements with respect to *administration of voter registration*," 52 U.S.C. § 20507 (emphasis added), and its requirements begin with the obligation to ensure that any applicant who timely submits a valid registration form is registered to vote in an election. *Id*. § 20507(a)(1); *Long*, 752 F. Supp. 2d at 708. Other Section 8 subsection headings and text expressly state that they pertain only to "removal," demonstrating that Congress was clear when it was referring only to removals. *See* 52 U.S.C. § 20507(c)(2)(A) (subsection entitled "Voter removal programs" specifically refers to programs designed to "systematically *remove* the names of ineligible voters from the official lists of eligible voters"); *id*. § 20507(d) ("Removal of names from voting rolls"). If Congress intended to limit Section 8(b) to "removals," it certainly could have referred to "removals" in Section 8(b)'s heading or text. *See also Long*, 752 F. Supp. 2d at 708–09 ("[W]here Congress wanted to draw specific attention to programs and activities designed to make lists of eligible voters accurate and current through voter removal procedures, it specifically did so."). This analysis further reflects Section 8(b)'s application to the entire voter registration process.

Additionally, the purpose of most of the NVRA's provisions is to expand opportunities to register to vote. In the NVRA, Congress found that "discriminatory and unfair registration laws can have a direct and damaging effect on voter participation in elections for Federal office and disproportionately harm voter participation by various groups, including racial minorities." 52 U.S.C. § 20501(a)(3). Two of the NVRA's specifically enumerated purposes are to "increase the number of eligible citizens who register to vote" and "to make it possible for Federal, State, and local governments to implement this chapter in a manner that enhances the participation of eligible citizens as voters in elections." 52 U.S.C. § 20501(b)(1) & (2). Some of the key provisions of the statute require states to offer registration opportunities at motor vehicle agencies, (52 U.S.C. § 20504), public assistance agencies, (52 U.S.C. § 20506), and accept and use a federal voter registration form, (52 U.S.C. § 20505). *See also Long*, 752 F. Supp. 2d at 708–09 ("[E]ach of the substantive provisions in [the NVRA], including [Section 8], discuss methods to promote increased voter registration, with some subsections providing added emphasis on voter registration programs to be conducted by the state."). This broader context further supports the conclusion that Section 8(b)'s uniformity and nondiscriminatory requirements apply to the entire voter registration process. *See id.*

The Court here should hold that Section 8(b) applies to the Challenged Provisions in their entirety because Section 8(b) covers procedures to determine which new registrants will be added to the official list of eligible voters.

**B.    The Challenged Provisions are neither uniform nor nondiscriminatory on their face.**

The Moving Defendants concede that Section 8(b) applies to post-registration removal procedures and, therefore, to at least some of the Challenged Provisions. ECF No. 364 at 6. Their motion is also premature; as they recognize, "[b]ecause discovery is ongoing, the State takes no position at this time on whether the registration cancellation provisions in the Voting Laws, *as applied*, result in a non-uniform or discriminatory

12

1  program for maintaining accurate registration lists." *Id.* at 6 n.12 (emphasis in original).

2  Under Rule 56(d), summary judgment on this claim would be improper until discovery is

3  completed. The Moving Defendants fail to explain why this Court should prejudge

4  Plaintiffs' claims under Section 8(b) based solely on the face of the Challenged Provisions.

5  Because such a premature ruling would not narrow the issues or otherwise advance the

6  case, this Court should decline Defendants' unusual invitation to do so.

7           Even if this Court were inclined to rule on Defendants' assertions that the

8  Challenged Provisions are uniform and nondiscriminatory "[a]t least on the[ir] face," ECF

9  No. 364 at 11—and it should not—Defendants' arguments have no basis in the statutory

10  text or case law.

11          First, there is no textual basis to support Moving Defendants' argument that the only

12  type of uniformity Section 8(b) requires is for a law to apply across a whole jurisdiction.

13  52 U.S.C. § 20507(b). "Uniform" means "consistent in conduct or opinion" or "having

14  always the same form, manner, or degree: not varying or variable."[5] Nor is there any textual

15  basis to support their argument that "nondiscriminatory"—the plain meaning of which is

16  simply "not discriminatory"—means solely that it does not violate the Voting Rights Act.

17  Defendants provide no basis for importing all of the requirements of the Voting Rights Act

18  into Section 8(b).[6] Moreover, such a narrow definition would make the term

19  "nondiscriminatory" surplusage because the provision goes on to also specifically require

20  "compliance with the Voting Rights Act." 52 U.S.C. § 20507(b); *see Dunn v. Commodity*

21  *Futures Trading Comm'n*, 519 U.S. 465, 472 (1997) ("[L]egislative enactments should not

22  be construed to render their provisions mere surplusage."). And Section 8(b) applies to any

23

24  ----

25  [5]   *Merriam-Webster Dictionary*, Definition of Uniform, https://www.merriam-webster.com/dictionary/uniform (last visited June 1, 2023).

26  [6] In any event, LUCHA Plaintiffs allege that these provisions violate the Voting Rights

27  Act. ECF No. 67 ¶¶ 363–71. Defendants have not moved for summary judgment on this claim and, therefore, even under Defendants' narrow construction of Section 8(b), this

28  claim is not ripe for summary judgment.

1    "program or activity," not only to "laws." Thus, Section 8(b) applies to any program or

2    activity, including implementation of the Challenged Provisions, that is inconsistent in

3    conduct or that is variable or discriminatory. The Challenged Provisions do not apply

4    uniformly across each jurisdiction and instead subject voters to differential and

5    discriminatory treatment even within counties. *See* Controverting Statement of Facts

6    ("CSOF"), ECF No. 389 at 13 ¶¶ 13–16.[7]

7              As Consolidated Plaintiffs allege, by their nature, the Challenged Provisions target

8    naturalized citizens because they require the investigation of registration applicants and

9    registered voters using databases that inevitably contain stale government data showing an

10   individual was not a U.S. citizen at some time in the past, while no database of any kind

11   would indicate a native-born voter previously lacked U.S. citizenship, resulting in

12   differential treatment of naturalized citizens. *See* Second Am. Compl., ECF No. 169 ¶¶ 91–

13   92; *see also id.* ¶¶ 89–94; Sec'y of State Ans. to Second Am. Compl., ECF No. 189 ¶¶ 5,

14   51; CSOF, ECF No. 389 at 13 ¶¶ 13–16; LUCHA Plaintiffs' Am. Compl., Doc. 67 ¶¶ 100–

15   16, 361; *cf. United States v. Fla.*, 870 F. Supp. 2d 1346, 1350-51 (N.D. Fla. 2012) (state

16   purge program "probably ran afoul of [NVRA section 8(b)]" because its methodology

17   made it likely that newly naturalized citizens were the primary individuals who would have

18   to respond and provide documentation). Defendants do not address these factual allegations

19   about the nature of the databases at issue, and the Court cannot do so either at this stage.

20   Furthermore, the Challenged Provisions also fail to inform Arizona state and local officials

21   as to how they should review and evaluate outdated citizenship status information

22   contained in government databases. As a result, different county recorders and different

23

24   _____

25   [7] The Senate Report cited by the Moving Defendants (ECF No. 364 at 6), does not justify
     their narrow reading of Section 8(b), since the report does not state that it describes the
26   provision's sole or only impact or intent. In any event, even if the report does support their
     reading, it cannot override the NVRA's statutory language. *Hearn v. W. Conf. of Teamsters*
27   *Pension Tr. Fund*, 68 F.3d 301, 304 (9th Cir. 1995) ("[L]egislative history—no matter how
     clear—can't override statutory text.").

28

staff members within a county recorder's office will inevitably apply varying rules, standards, and procedures in comparing voter registration applicants and registered voters to the enumerated databases. *See* Second Am. Compl., ECF No. 189 ¶¶ 91–92. As several Plaintiffs argue, the Challenged Provisions further divide registered voters into two groups: those who are suspected of lacking U.S. citizenship and those who are not. This openly invites county recorders to treat registered voters in a nonuniform and/or discriminatory manner based on their race, ethnicity, national origin, dress, English proficiency, and other impermissible criteria, in violation of Section 8(b). *See id.* ¶ 94. In addition, the DNC Plaintiffs argue that the Challenged Provisions are nonuniform in their treatment of federal-only voters as compared with other Arizona voters by (1) excluding them from voting early and in presidential elections and (2) singling them out for investigation and possible prosecution. *See Democratic Nat'l Comm. v. Fontes*, Case No. 2:22-cv-01369-SRB, Complaint for Declaratory and Injunctive Relief, ECF No. 1 ¶¶ 73–78.

Finally, there are disputed issues of material fact as to whether the Challenged Provisions will cause the nonuniform and discriminatory treatment of voter registration applicants and registered voters and thereby violate Section 8(b). These questions cannot be resolved while discovery is ongoing and depositions have not yet begun. Consistent with this Court's order denying the Moving Defendants' motion to dismiss this necessarily fact-intensive claim under the NVRA, ECF No. 304 at 30, Plaintiffs are entitled to complete discovery and obtain evidence to prove their claims at trial. Plaintiffs are currently awaiting outstanding document and other written discovery, including from state officials. *See, e.g.*, Notices of Service of Discovery, ECF Nos. 366, 372 & 383. In addition, following document discovery, Plaintiffs intend to depose state and county defendants to establish that the Challenged Provisions will cause nonuniform and discriminatory treatment of voter registration applicants and registered voters. Plaintiffs also intend to offer expert testimony that will elucidate the nonuniform and discriminatory nature of the Challenged Provisions.

1   As a result, it would be inappropriate to grant summary judgment on Plaintiffs' Section

2   8(b) claims.

3          For the foregoing reasons, the Moving Defendants' motion for summary judgment

4   as to Section 8(b) of the NVRA must be denied.

RESPECTFULLY SUBMITTED this 5th day of June, 2023.


*/s/ Jon Sherman*
Jon Sherman
Michelle Kanter Cohen
Beauregard Patterson
Fair Elections Center
1825 K St. NW, Ste. 701
Washington, D.C. 20006
jsherman@fairelectionscenter.org
mkantercohen@fairelectionscenter.org
bpatterson@fairelectionscenter.org
(202) 331-0114

Jeremy Karpatkin
John A. Freedman
Erica McCabe
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave., N.W.
Washington, D.C. 20001
Jeremy.Karpatkin@arnoldporter.com
John.Freedman@arnoldporter.com
Erica.McCabe@arnoldporter.com
(202) 942-5000

Steven L. Mayer
Arnold & Porter Kaye Scholer LLP
Three Embarcadero Center, 10th Floor
San Francisco, CA 94111
Steve.Mayer@arnoldporter.com
(415) 471-3100

Leah R. Novak
Arnold & Porter Kaye Scholer LLP
250 West 55th Street
New York, NY 10019
Leah.Novak@arnoldporter.com
(212) 836-8000

Daniel J. Adelman
Arizona Center for Law in the Public Interest
352 E. Camelback Rd., Suite 200
Phoenix, AZ 85012

17

danny@aclpi.org
(602) 258-8850

*Counsel for Poder Latinx and CPLC*