UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| Mi Familia Vota, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | NO. 2:22-cv-00509-SRB |
| v. | ) | |
| | ) | Phoenix, Arizona |
| Adrian Fontes, et al., | ) | July 25, 2023 |
| | ) | 10:04 a.m. |
| Defendants. | ) | |
| _____ | ) | |

**BEFORE:   THE HONORABLE SUSAN R. BOLTON, JUDGE**

**<u>REPORTER'S TRANSCRIPT OF PROCEEDINGS</u>**

**<u>MOTION HEARING and DISCOVERY DISPUTE HEARING</u>**

Official Court Reporter:
Teri Veres, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 38
Phoenix, Arizona 85003-2151
(602) 322-7251

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

UNITED STATES DISTRICT COURT

2

***A P P E A R A N C E S***

For Plaintiff United States of America:

    U.S. DEPARTMENT OF JUSTICE - VOTING - M STREET
    By:  **Jennifer Yun, Esq.**
    150 M Street NE
    Washington, D.C.  20503

    U.S. DEPARTMENT OF JUSTICE CIVIL RIGHT DIVISION VOTING
    SECTION - 950
    By:  **Richard Dellheim, Esq.**
    950 Pennsylvania Avenue NW
    Washington, D.C.  20530

For Plaintiff ADRD Action, Arizona Students' Association,
League of United Latin American Citizens Arizona, Living
United for Change in Arizona:

    CAMPAIGN LEGAL CENTER
    By:  **Danielle Marie Lang, Esq.**
         **Hayden Johnson, Esq.**
    1101 14th Street NW, Suite 400
    Washington, D.C.  20005

    SAN CARLOS APACHE TRIBE
    By:  **Alexander Bennett Ritchie, Esq.**
    Office of the Attorney General
    P.O. Box 40
    San Carlos, Arizona  85550

For Plaintiff Arizona Asian American Native Hawaiian And
Pacific Islander For Equity Coalition:

    ASIAN AMERICANS ADVANCING JUSTICE
    BY:  **Niyati Shah, Esq.**
    1620 L Street NW, Suite 1050
    Washington, D.C.  20036

    LATHAM & WATKINS
    By:  **Sadik Huseny, Esq.**
    505 Montgomery Street, Suite 2000
    San Francisco, California  94111

***A P P E A R A N C E S   C O N T ' D***

For Plaintiff Arizona Democratic Party, Democratic National Committee:

      PAPETTI SAMUELS WEISS McKIRGAN, LLP
      By:  **Bruce Edward Samuels, Esq.**
      16430 N. Scottsdale Road, Suite 290
      Scottsdale, Arizona  85254

      WILMER CUTLER PICKERING HALE & DORR, LLP
      By:  **Daniel S. Volchok, Esq.**
      2100 Pennsylvania Avenue NW
      Washington, D.C.  20037


For Plaintiff Chicanos Por La Causa, Chicanos Por La Causa Action Fund, Poder Latinx:

      ARNOLD & PORTER KAYE SCHOLER, LLP
      By:  **John A. Freedman, Esq.**
      601 Massachusetts Avenue NW, Suite 1000
      Washington, D.C.  20001

For Plaintiffs Tohono O'odham Nation and Gila River Indian Community, Keanu Stevens, Alanna Siquieros, LaDonna Jacket:

      NATIVE AMERICAN RIGHTS FUND
      By:  **Allison Neswood, Esq.**
      250 Arapahoe Avenue
      Boulder, Colorado  80302

      OSBORN MALEDON, PA
      By:  **Joshua James Messer, Esq.**
      P.O. Box 36379
      Phoenix, Arizona  85067-6379


For Plaintiff Voto Latino, Mi Familia Vota:

      ELIAS LAW GROUP, LLP
      By:  **Christopher Dodge, Esq.**
           **Elisabeth Frost, Esq.**
      250 Massachusetts Avenue NW, Suite 400
      Washington, D.C.  20001

*A P P E A R A N C E S   C O N T ' D*

For Plaintiff Promise Arizona, Southwest Voter Registration Education Project:

     MALDEF
     By:  **Ernest Israel Herrera, Esq.**
         **Erika Cervantes, Esq.**
     634 Spring Street, 11th Floor
     Los Angeles, California  90014


Defendant State of Arizona and Attorney General Kris Mays:

     Arizona Attorney General's Office - Phoenix
     By:  **Joshua Michael Whitaker, Esq.**
         **Kathryn Broughton, Esq.**
         **Joshua Bender, Esq.**
         **Timothy Horley, Esq.**
     2005 N Central Avenue
     Phoenix, Arizona 85004

For Defendant Adrian Fontes:

     SHERMAN & HOWARD, LLC
     By:  **Craig Alan Morgan, Esq.**
         **Shayna Gabrielle Stuart, Esq.**
     2555 W. Camelback Road, Suite 1050
     Phoenix, Arizona  85016

For Defendant Stephen Richer:

     MARICOPA COUNTY ATTORNEY'S OFFICE
     By:  **Anna Griffin Critz, Esq.**
     225 W. Madison Street
     Phoenix, Arizona  85003

*A P P E A R A N C E S   C O N T ' D*

For Defendant Intervenor Republican National Committee:

STATECRAFT, PLLC
By:  **Kory A. Langhofer, Esq.**
     **Thomas J. Basile, Esq.**
649 North 4th Avenue, Suite B
Phoenix, Arizona  85003

For Defendant Intervenor Warren Peterson and Ben Toma:

GALLAGHER & KENNEDY, PA
By:  **Hannah Hatch Porter, Esq.**
2575 E Camelback Rd., Suite 1100
Phoenix, Arizona  85016-9225

*P R O C E E D I N G S*

*(Proceedings begin at 10:04 a.m.)*

COURTROOM DEPUTY:  All rise.

THE COURT:  Good morning, please sit down.

COURTROOM DEPUTY:  Civil Case 22-509, Mi Familia Vota and others versus Adrian Fontes and others.  Time set for motion hearing and discovery dispute hearing.

THE COURT:  Good morning, ladies and gentlemen. Before we begin, I want to remind those individuals who are listening in on our public listening line that our local rules and the fed -- the local rules prohibit any audio taping of the court proceedings.

This is time set for argument on many motions, and the defendants' motions are a pretty manageable number.  The plaintiffs' motions are not, and I wanted to know whether or not the plaintiffs have come to any agreement or proposal on who is going to argue what?

MS. YUN:  Your Honor, the plaintiffs have --

THE COURT:  Okay, let me remind that everyone who speaks needs to announce who they are for the court reporter and for me.

MS. YUN:  Jennifer Yun on behalf of the United States.  The plaintiffs have divided up time amongst the parties to divide up -- so half of the time -- so that all of us sitting here can speak.

UNITED STATES DISTRICT COURT

THE COURT:  Do you have a proposed order as to how you want to proceed as well?  My thought was that we would start with counsel for the State parties followed by counsel for the RNC, and then we would go to the various plaintiff arguments.

MS. YUN:  That works for us, Your Honor.

THE COURT:  Okay.  Then that is how we will proceed, and who would like to begin for the State parties?

MR. WHITAKER:  Josh Whitaker for the State of Arizona and Attorney General Kris Mayes, Your Honor.

THE COURT:  You may proceed at the podium, please.

MR. WHITAKER:  Your Honor, the -- the parties on the defense side were thinking of splitting argument time between the State and the RNC with the bulk going to the State.

THE COURT:  That seems reasonable since the issues raised by the RNC are fewer and they were specifically allowed to file their motion only addressing issues that -- about which they did not have agreement with the State.

MR. WHITAKER:  Right, that -- that is why we divided it that way.  I understand that there may be a discovery dispute issue as well as the Secretary's counsel would like to discuss scheduling issues, like -- like after, you know, trial and scheduling things.

So would the Court like to reserve some time at the end of this two-hour period for that?

THE COURT:  We'll try.

MR. WHITAKER:  All right.

THE COURT:  I'm not going to limit the oral argument time so that we can discuss those issues.  If we can't discuss them this morning, we'll find another time to do so.

MR. WHITAKER:  All right.  I was thinking of speaking for about 40 minutes and then the RNC would speak for about fifteen, which I think would put us about halfway there.

THE COURT:  And would leave no room for -- no time for you to make any final argument.

MR. WHITAKER:  Oh, Your Honor, I would like to reserve -- of the 40 minutes I would like to reserve ten minutes for rebuttal with the Court's permission.  I wasn't sure whether the order suggested by the Court allows for that.

THE COURT:  Yes, but I'm not going to keep your time.  You'll have to keep your own time .

MR. WHITAKER:  All right.  (Indicating)

THE COURT:  Perfect.

MR. WHITAKER:  Your Honor, this case, as you know, involves two voting laws enacted by Arizona last year.  These laws add requirements for registering to vote in Arizona.  For example, voters must now check a box affirming they are citizens and provide proof of citizenship.  The laws also limit voting by mail in Arizona to voters who have provided proof of citizenship.

The laws also require County Recorders to check sources of citizenship information in various situations, and if a registered voter is confirmed to be a non-citizen, the Recorder must ask the voter for proof of citizenship; and if the voter doesn't provide proof, then the Recorder cancels registration after a period of time.

The plaintiffs claimed these voting laws violate various parts of the Federal Constitution and federal statutes. As this stage, as the Court knows, the State is generally not asking the Court to decide whether the voting laws violate the Constitution. That's because some constitutional claims may involve fact questions. For example, how much do the voting laws actually burden a person's right to vote?

The State is generally asking the Court to decide at this stage whether the voting laws violate federal statutes because those claims, in our view, involve questions of statutory interpretation and federal preemption, which are issues of law.

We think that the Court's decision on those issues at this time would help focus the issues for trial and help provide clarity to the parties going forward.

The two federal statutes cited most by the plaintiffs are the National Voter Registration Act of 1993 and the Civil Rights Act of 1964. I was planning to start with

the Civil Rights Act, unless the Court would like me to start somewhere else.

THE COURT:  No, go right ahead.

MR. WHITAKER:  Okay.  The Civil Rights Act of 1964 included a provision that the parties refer to as the materiality provision.  It prohibits election officials from denying a right to vote based on an error or omission that is not material in determining whether the individual is qualified to vote.

Counsel for the RNC has argued that there is no private right of action to enforce this provision or a nearby provision in the Act.  The State expresses no view at this time on whether a private action exists, but the State does agree that now would be an appropriate time for the Court to decide that issue.

That's an example of an issue that we think would provide clarity for the parties going forward.  I'll let my esteemed colleagues at the RNC take more argument on that.

Some plaintiffs argue that the citizenship checkbox requirement in Arizona's voting laws violates the materiality provision, and for context this checkbox has existed on both the state and federal registration forms --

THE COURT:  Okay, I've read all the briefs.  This issue is a really clear issue.  That is, if you provide documented proof of citizenship, isn't the omission of the

check in the box asking "Are you a citizen?" immaterial?

MR. WHITAKER:  We don't think so, Your Honor, for a few reasons.

THE COURT:  Well, you said it's duplicative, that it's not the same as immaterial, but that seems semantics.

I mean, what utility -- it seems logical to me that if somebody attaches their birth certificate or their passport to a voter registration form, that's what the County Recorder is going to look at to decide if somebody's a citizen or not, not whether or not they checked a box or omitted the check.

MR. WHITAKER:  A few responses, Your Honor.

One, directly to the question of what utility it serves.  For example, A.R.S. 16-166, I think, you're right. It allows voters to attach, for example, a photocopy of a birth certificate.

The photocopy could be messy.  There may be instances -- I'm not saying there affirmatively are in the record, but there may be instances where the birth certificate -- there's a worry that it may be somehow falsified, partially falsified.  There may be a worry that the birth certificate is genuine, but it shows the name of someone who's -- it shows the name but not the actual --

THE COURT:  How does the checkbox help?

MR. WHITAKER:  Because the checkbox asks specifically and directly "yes" or "no" to the person filling

out the form, "Are you a citizen?"  So it allows the Recorders to see that question, and that's more information that they have.  It's a clear and specific question on that point.

THE COURT:  But doesn't the statute actually require the County Recorder to verify citizenship?

MR. WHITAKER:  I believe -- I believe in A.R.S. 16-166, for example, the photocopy of the birth certificate says something to the effect of "to the Recorder's satisfaction."  It's some language along those lines.

THE COURT:  Right, because we also have that part on the federal form that -- that if you -- or it's not necessarily just for the federal form.  It says if they verify it, go ahead and vote as you will.  If they determine you're not a citizen, give you the notice and make you prove it; or, three, if they can't do it either way, all you do is get to vote with the federal form -- or in the federal elections, whatever they may be.

So it seems like there's a requirement that the County Recorders confirm citizenship?  Don't they confirm it by investigating the attached document as opposed to confirming it because you said you were one?

MR. WHITAKER:  Your Honor, I -- we agree, obviously, there is a document requirement.  We don't think that that is the entire universe of information that would be relevant to the citizenship determination and the clear "yes" or "no"

question.

THE COURT:  I don't -- how does this "yes" or "no" question confirm or refute citizenship if you fail -- if you check it "yes"?

MR. WHITAKER:  So we think, Your Honor, if someone were to leave it blank or check "no" -- checking "no" is the most obvious example; but if someone were to leave it blank and provide documentation, that's still information that would be relevant to the -- the inquiry.

THE COURT:  "Material" is the word.

MR. WHITAKER:  Right, and also material.  We think it would be both.

THE COURT:  How?  You just left it blank, but there you have attached your documented proof of citizenship, which the County Recorder has to confirm.

I just don't see where the omission of the "yes" in the checkbox can be material.

MR. WHITAKER:  Your Honor, I guess we would point to the District Court's decision in *Diaz,* which admittedly didn't involve a document -- a documentary proof requirement, but it was similar in that there was a checkbox requirement and there was a signature requirement; and there the Court said even those these are getting at the same ultimate information, they're doing it in different ways.

We would point out, also, Your Honor, that in the

federal form Congress has specifically required that the check mark box be there and has provided that -- if someone doesn't fill out that check mark box, that they be given an opportunity to correct that error.

So that's evidence that Congress, at least in the federal form context, does view the check mark box as material.

THE COURT:  There's no requirement for better proof of your citizenship than you just saying you are one for the federal form?

MR. WHITAKER:  That's -- that's right, Your Honor, the federal form does not require documentary proof of citizenship.

THE COURT:  Okay.  Let's -- let's move on.

MR. WHITAKER:  Okay, but -- and, Your Honor, I would just point out that the plaintiffs have varying theories on materiality.  So I just want to -- for example, I think Mi Familia Vota argues that even on the -- even without a documentary requirement the check mark would be immaterial, which is another thing we oppose.  So I just wanted to clarify.

THE COURT:  So let's move on to the materiality of place of birth.

MR. WHITAKER:  Yes, your Honor.

THE COURT:  And the United States says it's material

issues of fact here because the State of Arizona is just saying this is important information for County Recorders to utilize to confirm something, citizenship; but how do I know that's true?

There's no evidence before me that it's of any utility whatsoever or that it's of great utility.

MR. WHITAKER:  Your Honor, we would answer that by saying that we think the question of materiality is an objective test as the Eleventh Circuit explained in *Browning*. So we -- that's the first response, is that we think that whether birth place is material is a question of law and it is a -- birth place, at least, is a commonplace piece of information that's requested in a variety of contexts.

THE COURT:  There's no -- there's no -- nobody's saying you can't ask.  The question is:  Can you disqualify or refuse to register somebody who doesn't answer the question?

MR. WHITAKER:  And in our view it's similar -- it goes to the person's identity -- so, for example --

THE COURT:  You're telling me that, but my question is:  How do I know that?  Let's say I've attached my passport right on there.  It says city and state of birth, but I didn't write it down on the application.

MR. WHITAKER:  So I -- I take plaintiffs' claim to be even if you have documents that aren't a passport, that birth place would be immaterial.

THE COURT:  I just used that one because that's a really good proof of citizenship.

MR. WHITAKER:  And we would say that it is a data point that this Court, for example, requests when attorneys seek admission.  It's a data point --

THE COURT:  You're telling me -- I have no idea if that's material or not to seeking admission pro hac vice.  It's on the form.  They omitted it but I say, "I'm sorry, under no circumstances" -- I might ask them to tell me that information, but if they said, "I don't know where I was born.  I was adopted.  Nobody ever told me," would I say, "Well, that's really material information to whether or not you can be admitted pro hac vice despite the fact that I know you're a lawyer admitted in other jurisdictions with no disciplinary record and you have the right certification from the Court in the other jurisdiction.

MR. WHITAKER:  So -- well, a couple of responses.  One, I think that -- interesting case when someone doesn't know where they're born.  If that case were to arise in the future, maybe that would be the subject of some sort of as applied challenge, but two --

THE COURT:  But you need to tell me why, as a matter of law, it's material and I'm not sure you can.

MR. WHITAKER:  We think that as a matter of law it's material to a person's identity and --

THE COURT:  But why is that material to a person's identity?

MR. WHITAKER:  Because it's a data point that can be used to confirm a person's identity.

THE COURT:  How?

MR. WHITAKER:  So, for example -- so if say -- if birth place is required, County Recorders enter it into a database and if a question arises later whether this person --

THE COURT:  You're telling me stuff that I don't know.  This is the issue of fact question.  You're giving me factual information that I don't know.

I mean, did -- is there anyplace where you told me that that's how County Recorders use it?

MR. WHITAKER:  No, Your Honor.  In -- in part because County Recorders have not been required to use it before -- before now.

THE COURT:  So -- but it was on the form.

MR. WHITAKER:  It was on the form.

THE COURT:  So if it was on the form and they could use it, they should able to tell me how it's used and then maybe the plaintiffs couldn't dispute that.

MR. WHITAKER:  So it is true that discovery on that question is ongoing as, for example, Mi Familia Vota attached a document to its recent reply.  Some counties use it presently even though it's not required for -- they enter it

into their voter database and they will use it if a voter calls in over the phone as, like, a security question but -- but -- so -- but up until this point the counties have not been required to use birth place as -- as they would be under these laws.

THE COURT:  But if birth place is material, you would think that there would be evidence that they were using it and that it was helpful to their determination of who was qualified --

MR. WHITAKER:  Your Honor --

THE COURT:  -- and eligible to vote.

I mean, this is -- this is just -- I can't decide something on summary judgment if I have to rely on facts that I don't know, and it seems like you're telling me facts without any evidence of the existence of those facts.

MR. WHITAKER:  What -- what I would say, Your Honor, is that we agree that, in part, because the laws have not been implemented County Recorders haven't been required to do this, that it's not clear how they would use it.

THE COURT:  I don't think -- see, I can't accept that when it's been on the form for I don't know how long.  So it would seem like if it was a material thing, the County Recorders would have been using it all along.

MR. WHITAKER:  Well, so, Your Honor, as I mentioned, some of them do, as Mi Familia Vota's exhibit points out, use

UNITED STATES DISTRICT COURT

it as a security question confirmation.

THE COURT:  Ah, but is that material to the eligibility to vote?

MR. WHITAKER:  We think identity is -- by analogy, if a state were to start requiring people to enter their middle name on the form and previously they hadn't done that, that's a -- that's a fairly basic data point that goes to someone's identity that could be used later.  We think that -- and I don't want to --

THE COURT:  Let's not belabor this.  These are the concerns that I have about the issue of place of birth.  Is it a factual issue that is not -- materiality may be a question of law, but maybe only after I know the facts.

MR. WHITAKER:  Understood, Your Honor, and we would -- we would just point out that the Eleventh Circuit in *Browning* treated materiality as an issue of law.  We think it's a basic enough data point that further discovery is not needed.

We would also point out, as we pointed out in response to the cross-motion, that it's material to citizenship in a sense, which is that if -- if you are born in the United States, you are thereby a citizen.  We recognize that the inverse isn't true.  People who are not born in the United States can become citizens, but I don't want to let that point fall by the wayside as well.

That's not the basis on which we affirmatively sought summary judgment, but it is something that we -- we pointed out in response.

Your Honor, if I may turn to the NVRA?

THE COURT:  Yes.

MR. WHITAKER:  All right.  So the National Voter Registration Act governs how states register voters for federal elections.  Section 6 has to do with the Federal Mail Registration Form.  It says that states must accept and use the federal form for the registration of voters in federal elections.  I anticipate the RNC will have more to say on this.

Just briefly, we think the accept and use provision does mean that Arizona can't require federal form applicants to provide proof of citizenship as a condition of registering to vote, but we don't think that the accept and use provision regulates voting by mail.  Its text is limited to voter registration, not specific voting methods.

THE COURT:  But it's right there in the registration statute as opposed in the vote-by-mail statute.

MR. WHITAKER:  It is, Your Honor.  Most of the vote-by-mail provisions are in a different chapter of the Arizona Revised Statutes.

THE COURT:  Most?

MR. WHITAKER:  My understanding is that, in general,

the voting-by-mail provisions are in Chapter 4 of Title --

THE COURT:  Are there any voting-by-mail provisions in the registration statute, other than this one?

MR. WHITAKER:  Your Honor, I -- I don't know offhand the answer to that question.

THE COURT:  I mean, do I, like, sort of move it myself to the vote-by-mail -- I mean, theoretically, the State of Arizona -- the Legislature could have in the vote-by-mail provision put this.

The fact that they put it in registration makes it seem more likely to be controlled by the restrictions in the NVRA.

MR. WHITAKER:  We would point out, Your Honor, that historically, for example, Arizona has limited voting by mail to a subset of registered voters.  Before 1991, for example, Arizona limited voting by mail to folks with disabilities and over a certain age.  This is analogous to that.  Arizona's limiting voting by mail to a subset of registered voters.

THE COURT:  But my question is really much more to do with statutory interpretation and preemption, and we have the National Voters Registration Act to compare to a new voter registration requirement that includes a limitation on voting by mail.

MR. WHITAKER:  And, Your Honor, I guess --

THE COURT:  I accept the view of the State and all

of the plaintiffs that the statute is applicable to presidential elections as well and that the attempt to limit it to Congressional elections or Senate elections is preempted.

Then what do I do about the rest of the registration statute that has nothing to do with registration but it's in registration?

MR. WHITAKER:  Well, one thing we would point out, Your Honor, is that HB2492 Section 9 has a robust severability provision.  So insofar as this Court strikes anything in HB2492, the Court has to -- has to be careful of that provision.

THE COURT:  Do I sever a sentence or just do I sever sections?

MR. WHITAKER:  Let me look at the -- it's a very robust severability provision.  It says, "If a provision of this act or its application to any person or circumstance is held invalid, the invalidity does not affect other provisions or applications of the act that can be given effect without the invalid provision or application..."

THE COURT:  Well, see, that doesn't directly answer the question is a provision a sentence or is a provision a section?

MR. WHITAKER:  Your Honor, I -- I think a fair reading of that clause would not -- would not require it to be

a sentence that's at issue.

I would also point out that -- I believe it's HB2492 -- so, for example, in A.R.S. 16-127(a)(1) is about the -- you can't vote in presidential elections and (a)(2) is about you can't vote by mail.

So, for example, if that's the direction your court were going, I think --

THE COURT:  Okay, you're right.  It's in two separate sections.

MR. WHITAKER:  Well, and even if it weren't, I think -- you know, for example, the birth place requirement in A.R.S. 16 -- where is it?

The birth place requirement in A.R.S. 16-121.01, that's just literally two words added to the statute "and place of birth."  So if the Court were to strike that, that wouldn't strike the entirety of that sentence.

So I guess we would just point out the robust severability provision, and we do think that the NVRA Section 6 is one of the two conditions for registering, which isn't quite the same for conditions of voting by mail.

I'd like to move on, if I could, to another part of the NVRA.  This is Section 8(a)(3) and (4), which is about the grounds for canceling voter registration.

That part of the statute says that a registrant may not be removed from the rolls except at the registrant's

request or by criminal conviction or mental capacity or death or change in residence, and some plaintiffs have argued that this provision prohibits the parts of the Arizona voting laws that involve registration cancellation based on non-citizenship.

THE COURT: So -- I don't remember which one, but one of the plaintiffs have distinguished, and I think it's a valid distinction, between systematic purging regimes and individual disqualifications.

So when we're looking at this 90-day quiet period and we're looking at the obligation on the County Recorders to do this database checking every 30 days, that's a -- we'll agree that's a systematic investigation of whether or not there are people to be purged?

Can we agree that's systematic?

MR. WHITAKER: At least that's a systematic investigation.

THE COURT: Yes.

MR. WHITAKER: Yes.

THE COURT: So to me it makes sense that if the County Recorder receives information that an individual is not qualified to vote, period, or not qualified to vote in that county or not qualified to vote in that district, that they should be able, even if it's within 90 days, to say, "Hey, you moved. You can't vote here anymore. Go fix it in your new

county or your new district."

But the systematic one -- isn't the whole idea of the quiet period to get away from the systematic investigations and disqualifications of voters within 90 days of an election?

MR. WHITAKER:  So this gets a little bit to the alternative ruling that we requested, Your Honor.

I think to reach that you first have to decide whether the 90-day quiet provision applies to removals based on non-citizenship at all, and some courts have said that it doesn't.

THE COURT:  Well, but you don't figure out somebody's a non-citizen -- well, you can figure it out one of two ways.  I want to just talk about the systematic ones.

MR. WHITAKER:  Yes, your Honor, and in order to -- we do think in order to get to that question, Your Honor first would have to decide one of the issues we raised in our motion and reply response, which is the 90-day quiet provision should be interpreted in harmony with Section 8(a)(3) such that neither of them applies to removals based on non-citizenship at all.

They just -- they simply have no application to removals based on something that rendered the person ineligible from the beginning.

THE COURT:  Okay.  This isn't answering my question,

because the county -- the County Recorders have two different ways to obtain information that calls into question the eligibility of someone to vote. They have individualized information and they have systematic information.

So shouldn't the 90-day quiet period mean they don't run the systematic checks in those 90-day periods as opposed to individually disqualifying ineligible voters because of information that they have received that shows that the person is not eligible to vote?

MR. WHITAKER: We certainly agree that County Recorders can run individualized checks at any time. If the Court were to find that the 90-day quiet period does apply to systematic removals based on non-citizenship, then we would agree with that distinction that to the extent the voting laws have systematic removals -- systematic removal programs, rather, those should not be in place during the 90 days.

THE COURT: Okay, and then that raises the next question. Can I just read the 90 days into it when it's not there?

MR. WHITAKER: Well, Your Honor, the statute itself says the State must complete the program within 90 days, the NVRA that is. The NVRA doesn't envision something as sweeping as because a statute -- because a state law doesn't specifically have a 90-day carve out you have to strike the whole thing. That would be very sweeping and, I think,

contrary to the --

THE COURT: Is there case law where they have taken some kind of a systematic program and just read the 90-day quiet period into it?

MR. WHITAKER: I can't remember whether -- let me see. I don't remember whether *Arcia* addressed that specific question; but, again, the NVRA itself doesn't say that if a program happens to be in practice within the 90 days you can't run the program in the other nine months of the year. The NVRA simply says that it has to be completed by 90 days before the election.

So, for example, if this Court were to find that these monthly reviews can't be in place for the three months before the election, that wouldn't imply that the monthly reviews can't resume after an election. So we just think the text of the NVRA itself doesn't go that far.

THE COURT: Okay.

MR. WHITAKER: Your Honor, I see I've been talking for -- I've got 29 minutes and 50 seconds. May I --

THE COURT: Okay. I was just going to say you're coming up on a half hour, but you're precisely coming up on a half hour. Let's hear from the counsel for the RNC.

MR. LANGHOFER: Good morning, Your Honor. May it please the Court, Kory Langhofer for the Republican Intervenors.

I'd like to focus my time this morning on the accepted use provision and, specifically, whether it is permissible for Arizona to limit registration for presidential elections and for mail-in voting. I'm also available to answer questions on the private right of action, but given limited time I'll probably focus on accept and use, unless you direct me otherwise.

We know that the NVRA was adopted pursuant to the Elections Clause, and we know that logically -- I'll walk through that analysis in a moment -- but also perhaps doctrinally. The US Supreme Court held that in *Inter Tribal Council*, and the reason that was their holding is because it's the only conclusion that makes sense.

The -- we don't see the Fourteenth Amendment Section 5 analysis in the record for the NVRA that they would need to have in order to exercise that power under the *City of Boerne* portion -- you know, congruence of proportionality standard.

A couple of references on -- I think it's three pages in the legislative history just is not enough to meet the *City of Boerne* standard justify Section 5 exercise of power.

You can't take the necessary and proper clause and use that as a back door to expand the meaning of the Electors Clause. As we've discussed before, Your Honor, of course, there's the Elections Clause, which gives Congress power over

the time, place and manner of Congressional elections.  By contrast, the Electors Clause in Article 2 only gives Congress authority over the time of presidential elections.

You cannot use the necessary and proper clause to blow open time in Article 2 to mean time, place or manner -- or, more specifically, time and manner, I think, is the --

THE COURT:  Haven't some other appellate courts done just that?

MR. LANGHOFER:  No, Your Honor.  The case law interpreting this has never gone nearly so far as the plaintiffs asked this Court to go.

There's a couple cases and I'm happy to discuss them here.  So there's *Oregon v. Mitchell*.  Just as a matter of precedent, *Inter Tribal Council* tells us that *Oregon v. Mitchell* is of minimal precedential value because the opinion's so fractured it's difficult to analyze; but a majority of justices there, the four concurring justices plus Harlan, in partial concurrence, partial dissent, concluded that it did not -- the electors -- excuse me, that Congress lacks power to regulate the qualifications for presidential electors; but there's a difficult opinion to parse because of the fractured nature of all the, you know, concurrences and dissents. That's why *Inter Tribal Council* says it's of minimal essential value.

Then we've got *Burroughs.  Burroughs* is not an

Electors Clause case.  If you look at the analysis in *Buckley v. Valeo,* you can see that *Burroughs* is really exercising power under the general welfare clause.  This isn't an anti-corruption case.  It's not -- and *Burroughs* itself says it's not interfering with the State's prerogative to regulate the manner of appointing presidential electors.

It says you can't do that in a corrupt way, but otherwise this appears to be up to the states; and, in fact, I think it's *U.S. Term Limits v. Thornton* that interprets the Electors Clause as a delegation of power to the states.

And so you walk through the alternative clauses that may have authorized the NVRA, and the only one that fits is the Elections Clause.  Indeed, you look at the facial scope of the NVRA.  It's regulating federal elections.  It's not regulating state elections.

They, obviously, weren't trying to solve some systematic problem of bias or discrimination in voter registration.  They were really focused on the sort of finding you would need to conclude that Congress was acting pursuant to the reconstruction amendments.

So the finding in *Inter Tribal Council* that the NVRA is adopted pursuant to the Elections Clause is not only controlling, it's also the only conclusion that makes sense; and if that's correct, Congress couldn't have been acting in regulation of presidential elections.

That is why whatever the NVRA does, it cannot force the State of Arizona to use a federal form for full presidential registration.

The -- the other half of the accept and use argument goes to whether the State of Arizona can distinguish between registration for congressional election and eligibility for mail-in voting.  You've already asked some questions about that.

THE COURT:  I do and it's -- they're very technical questions that -- in my view, that has to do with whether in a registration statute if the registration statute violates the Voter Registration Act, can I put a vote-by-mail provision in the registration statute and not have the NVRA control it or should they have put the restriction that might have been a valid legislative restriction in to the voting-by-mail statute?

MR. LANGHOFER:  I -- I disagree with the idea that in Arizona registering to vote has been -- before the -- the most recent amendments has been the equivalent of qualifying to vote by mail.  That's just never been the case.

I appreciate that there is a sentence in the registration section of Title 16 that references "voting by mail."  That has never been a full implementation of the law around voting by mail in Arizona.  There's always been something more required.

So you have to -- for example, we've just never been California where it's automatic full voting by mail.  You register and the next thing you know you get a ballot in your mailbox.  That's not ever been Arizona.

THE COURT:  Well, other than that part of the statute that says you can be required to vote in person the first time, aren't we otherwise allowed to vote by mail?  Are there other restrictions?

MR. LANGHOFER:  Yes.  It has never been the case that registering in Arizona means you will be voting by mail.  There's always been other hoops to jump through.

So we used to have something called the permanent early voting list where you could say, "Not only would I like a mail-in ballot this time, I'd like one next time and every other time."  You had to register for that, though, separate.  It's an additional request -- in addition to just registering to vote.

That's now been converted -- I said "now," recently been converted to the active early voting list where you stay on the list for some period of time, but it's not permanent.  It's never necessarily followed from the active registration that you'll vote early by mail in Arizona.  It's just never been the case.

THE COURT:  Well, you -- you have to ask.

MR. LANGHOFER:  Correct.

THE COURT:  But other than the ask, isn't it automatic?

MR. LANGHOFER:  Once -- if you're registered to vote and you get yourself on the list for the next election, then, yes, in Arizona, until recently, you would be getting a mail -- a mail-in ballot for the next election.  That does not mean that that is a federal right.  It's -- it's definitely not a federal right.

When -- if you think about the base case voting, what is the federal right to vote?  The federal right to vote is historically you show up in person on election day at your local precinct and you cast a valid ballot and there's -- the decision -- I think it's the *Land* decision from the Sixth Circuit that says, essentially, when the NVRA talks about registration, that's what it means.  You're -- you're registered for NVRA purposes when you are able to show up at the local precinct and cast a valid ballot.

Now, there are many elaborations -- there are about 50 variations of that right that states have decided to extend to their citizens.  So the most restrictive states, Connecticut, New York, for example, you can vote absentee if you've got a good reason for that, you're sick or you'll be out of state, for example; and then some states go to the other extreme, like California, if you're registered to vote, they're gonna -- they're gonna mail you a ballot automatically

and everything in between.

I'll point out that even when we're talking about the mail-in voting restriction that's at issue in this case, Arizona is not in the New York and Connecticut sort of restrictive end of things.  You can still show up not just on election day, but during the early voting period, and not just at your local precinct, but anywhere in the county.

So even -- even if you say, okay, the base case of voting in person on election day at your precinct is enough to satisfy the federal right to vote, that is true.  Arizona gives much, much more than that.

If, including this one sentence in the NVRA saying if you want to require first-time voters to show up in person was actually nationalizing the standard about not just the fact of, you know, can you show up in person to vote, but the whole manner of voting, there would have been a massive exception to slip into a statute when, as we briefed, the legislative history discusses this as really authorizing states to take some steps to ensure election integrity; and for 30 years the idea that the NVRA has provided some national standard of how you vote, not just whether you can vote, it's gone undetected by courts and parties for 30 years.

It is extremely unlikely that without debate and much discussion in the statute itself the NVRA had that effect.  I think it's far easier to conclude what my learned

colleague from the AG's office said in his briefing, this is just a case unprovided for. There may someday be legislation that says the way you vote, you know, whether you mail it in or you vote in person, how long is the early voting period, maybe someday we will federalize that, but we have not yet.

I'd like to reserve some time, Your Honor.

THE COURT: Thank you.

Ms. Yun.

MS. YUN: Good morning, Your Honor, Jennifer Yun on behalf of the United States.

We ask the Court to grant the United States' Motion for Summary Judgment on the NVRA claim and deny the State's Motion for Summary Judgment on the immateriality provision claim.

Because this Court has already heard argument on the issue of the NVRA's applicability to residential elections at the Motion to Dismiss stage, I'll focus on the materiality provision claim, but I'll be happy to answer any questions you may have.

Summary judgment on the materiality provision claim is improper at this time because there are -- as Your Honor mentioned earlier this morning, there are disputed facts at issue. Whether these requirements are material to a voter's qualification is a question of fact in this case, especially in light of the State's assertions that these requirements are

material for establishing or confirming a voter's identity.

Whether certain information is necessary or material to establish or confirm identity depends on what other information these election officials have when they're processing these forms.

THE COURT:  What is the question of fact on the checkbox?

MS. YUN:  Your Honor, the -- on the checkbox point, whether officials use the checkbox in any confirmatory way as counsel for the State --

THE COURT:  I'm just trying to figure out how that could confirm anything?

MS. YUN:  We agree with you, Your Honor, but we believe that building a factual record where election officials who actually look at these forms to figure out whether the voter is qualified or not, if they could provide that testimony and build that record, we believe that would be a much more robust record for the Court to consider.

THE COURT:  But doesn't everything about the statute say that what's important is the documented proof of citizenship and the verification of citizenship, none of which can happen because you checked a box and said you were one?

MS. YUN:  We believe that is the -- that is the correct reading of the statute.  However, we believe that it -- because the State has inserted these factual disputes,

maybe they are going to look at the checkbox if the copy of the birth certificate that the voter submitted is blurry.

That sort of factual assertions in brief -- in the brief should be rebutted through factual testimony as opposed to sort of lawyers arguing about whether that actually happens in the real world.

THE COURT:  Okay.  I'm much more interested, though, in the materiality of place of birth because I do think that the things the State's saying about that are facts I don't know.

MS. YUN:  We agree, Your Honor.  So, as an example, we would say if -- the State argues that the birth place information is material for confirming someone's identity.

However, if election officials do not have access to a reliable database of all voters' birth place, having someone provide that birth place information is not going to confirm that person's identity and the question of -- if whether election officials have that kind of database, requires a factual record to answer, and these are questions that the State defendants themselves have raised; and having done so, they cannot ask the Court to rely on those assertions while also seeking to deny the plaintiffs the chance to build a record to determine the facts underlying those assertions.

So while the parties have been diligently engaging in fact and expert discovery, we are still receiving and

reviewing documented productions and just yesterday had our first deposition in the case of a County Recorder's office, which provided detailed testimony about how these fields actually work and how these officials actually use the information provided on the registration form to verify or confirm someone's identity or their qualifications; and we believe that we should be allowed to complete all fact and expert discovery to build a robust record for this Court and any reviewing courts to consider before deciding whether these requirements are material to establishing a voter's qualifications.

And if it would be helpful for the Court, we would be happy to present that factual record that we are building right now after the close of discovery in a supplemental brief or a cross motion to close the loop on this materiality provision claim; and we, of course, do not want to delay any trial in the course of doing that, but it might be an efficient way of resolving that claim as opposed to trying to decide it based on the briefing that you have -- Your Honor has in front of -- Your Honor has at this time.

I would like to turn to a couple of legal arguments that the State has now made.  On the birth place requirement the State has argued that the US State Department stated that birth place is integral to establishing identity, but context is crucial here.

The Foreign Affairs Manual drafted by the U.S. State Department states that birth place is an integral part of what constitutes -- what constitutes a passport as a form of identification under the Immigration and Nationality Act and that passport applicants cannot ask to omit that information from their passport.

Here, the State is not issuing a passport.  It is simply determining whether the person who submitted the form is a qualified voter.  So the fact that passports are required to have birth place information has no bearing on whether birth place is integral to establishing or confirming identity in the context of voter registration; and whether the State needs birth place information to confirm someone's identity, as I mentioned earlier, would depend on what kind -- what other information they already have to establish someone's identity and what data source they have to confirm the birth place information against the information that's been provided by the voter.

On the citizenship checkbox requirement, the fact that the federal form also has a checkbox, as Your Honor indicated earlier, is irrelevant here.  The United States is challenging the checkbox only to the extent that voters are also required to present documentary proof of citizenship while having to check that box, and HB2492 requires officials to reject applicants for failing to check this box even if

they provided documentary proof of citizenship.

So the attestation requirement on the federal form is fundamentally different because, as Your Honor already knows, the federal form does not require that documentary proof of citizenship; and if the checkbox is truly duplicative of the proof of citizenship requirement, then it would be material.

I'll be happy to answer any other question the Court might have.

THE COURT:  No, thank you.

MS. YUN:  Great, thank you.

MS. NESWOOD:  Good morning, Your Honor.  My name's Allison Neswood.  I am here representing the Tohono O'odham Nation, the Gila River Indian Community; Keanue Stevens and Alanna Siquieros, who are tribal members of the Tohono O'odham Nation; and LaDonna Jacket, who's a tribal member of the Hopi Indian Tribe.

The Tohono O'odham -- I'll refer to our clients collectively as the Tohono O'odham plaintiffs.  The Tohono O'odham plaintiffs are moving unopposed for summary judgment on two issues that --

THE COURT:  Then why are we having any argument about what you're -- what's unopposed?

MS. NESWOOD:  Um, I'm not going to present argument --

THE COURT:  If nobody opposed it at all, so what's -- what is the argument?

MS. NESWOOD:  I don't believe there is any argument, Your Honor.  If you want to rule on the pleadings, then I, you know, welcome --

THE COURT:  You've made -- the State made a proposal.  You made a counter proposal.  The State agreed with it.  There's -- we're arguing about things that are in disagreement, not about things that are in agreement.

MS. NESWOOD:  Agreed, Your Honor.  I'm happy to give the balance of my time to another person or we can walk through sort of what we put into the briefing, at your preference.

THE COURT:  Thank you.

MS. NESWOOD:  Okay, thanks.

MR. VOLCHOK:  Good morning, Your Honor, Daniel Volchok for the Democratic National Committee and the Arizona Democratic Party.

Your Honor, we have moved for summary judgment on two claims, both involving NVRA preemption.  One is the accept and use that's been discussed this morning, and the other is the 90-day provision that was also discussed with counsel for the State.

I'd like to address a couple of points that came up in the topside arguments, and I'd like to start with the

UNITED STATES DISTRICT COURT

accept and use claim and, specifically, the issue of voting by mail.

So counsel for the State, counsel for the RNC both spoke to the fact that Arizona over time has sometimes imposed limits on voting by mail.  Counsel for the RNC talked about what other states have done in this area.

I submit that all of that is, essentially, a red herring; and because our argument, our reading of the NVRA of the accept and use provision, does not affect any of that.  It does not say that states are required to offer this method of registration or can't put limits on that method of registration.

What the accept and use mandate, in our view, prevents states from doing is disadvantaging those who submit the federal form, a properly-completed federal form, disadvantaging those folks relative to folks who use any other method of registration that is authorized by state law.

That's what ITCA stays.  ITCA says that the accept and use mandate means that states have to treat a properly-submitted federal form -- and the federal form does not require documentary proof of citizenship.  They have to treat a properly-submitted federal form as a quote/unquote "complete and sufficient registration application."  That's the language.

Arizona is not doing that with the provisions that

we challenge.  Arizona is saying that if you submit a proper federal form but without DPOC -- so it's still proper because, again, the form doesn't require DPOC -- you do not have all of the same voting rights as people who registered with another mechanism authorized by state law.  You can't vote in presidential elections and you can't vote by mail.

That is exactly what the accept and use mandate does not allow, but it doesn't have anything to do with whether Arizona requires additional information to vote by mail once you're registered of all people, no matter what registration method you use.  It doesn't have to do with other limits that states can put in place.  It's a very focused argument, and it's exactly what ITCA held is preempted by the express language of the accept and use mandate.

Now, one other point on preemption here, Your Honor. As we said in our reply brief, the defendant's briefing doesn't even address the separate ground for preemption, which is obstacle preemption.  It's a form of conflict preemption, right.

The text of the NVRA tells us that one of Congress' objectives in enacting the statute was to enhance the participation of people as voters in federal elections. That's close to a quote.  It's not an exact quote.

The denial of voting by mail, the denial of voting in presidential elections does the exact opposite of that; and

so it stands as an obstacle to a full accomplishment of Congress' purposes, which is the doctrinal magic words for obstacle preemption; and, again, defendant's briefing didn't talk about that at all.

I want to who move to presidential elections. Your Honor, the RNC repeated a lot this morning -- a lot of the stuff that's in their briefing about what is and is not in certain cases. The Court has and can read the cases for itself; but if you just look at Page 10 of our first filing, the very bottom, we block quote language from *Burroughs v. United States,* Supreme Court case from the 1930s.

Counsel for the RNC said this morning that was not a case about the Electors Clause. I'm not exactly sure what he means. The block quoted language that we have at the bottom says -- and this is a very close paraphrase -- the only constitutional objection that we, the Court, have to consider today is the argument that the Electors Clause gives exclusive authority to the states to regulate presidential manner and the place of presidential elections and that the powers of Congress are thereby limited to time.

That is exactly the argument that the RNC is making. In the last sentence of the blocked quote that we had said such an argument is -- you know, deserves no warrant -- again, a paraphrase, but essentially rejects that argument out of hand. The Supreme Court has said that squarely.

There's also, of course, the Ninth Circuit's decision in *Wilson,* not discussed this morning, but discussed in a briefing.  The Ninth Circuit said exactly same thing.  So I understand the RNC has arguments about why as a matter of first principles Congress should not have extensive authority to regulate presidential elections.  We've laid out our responses for that, but for purposes of this argument I submit this is controlled by a pretty clear block of binding precedent.

I want to talk about the last point on the accept and use mandate before I go to the 90-day provision.  I agree with counsel for the State who said this morning that if the Court agrees with plaintiffs that the -- I apologize, Your Honor.  I got ahead of myself.  I got to the 90-day provision.  Let me give you my last point on accept and use.

There was a lot of discussion with counsel -- both counsel for the RNC and counsel for the State about where in the Arizona Revised Statutes certain language has been put.  My submission to you this morning, Your Honor, is that that doesn't matter, actually.  If a state statute is covered by a congressional preemptive provision, a state can't avoid -- excuse me, the state can avoid the force of that preemption by placing it in certain parts of the A.R.S.

So the question is just for express preemption is -- are the challenge provisions of Arizona law covered by the

express language that we've cited in the NVRA for obstacle preemption?  Again, does it -- does it prevent the full accomplishment of Congress' purposes?  So it doesn't actually matter with provision of Arizona law --

THE COURT:  So you would say if the Arizona Legislature in the voting-by-mail rules said voting by mail is prohibited for people who use the federal form without DPOC --

MR. VOLCHOK:  (Nodding of the head.)

THE COURT:  -- you would not change your argument?

That would be the obstacle preemption?

MR. VOLCHOK:  Correct, conflict preemption and obstacle preemption.  Again -- sorry, express preemption and obstacle preemption.  Again, express preemption, the Supreme Court's decision in ITCA tells us what accept and use means. Complete -- must treat it as a complete and sufficient registration application.  The State is not doing that.  So, yes, wherever that was placed in Arizona Revised Statutes.

Last point.  Your Honor mentioned briefly the part of the same section of the NVRA Section 6(c), I think, it says there are certain circumstances in which states can require people to vote in person.

If you registered by mail and if you hadn't voted in the jurisdiction before, well, that tells us those are the only circumstances, right?  When Congress says this is when you can do it, that implicitly means you can't do it in other

circumstances.  Arizona has gone beyond that.  That's why it's preempted.

Okay, on 90 days -- and I apologize again for getting ahead of myself -- but if the Court agrees with us the 90-day provision prevents Arizona from doing the removals within the 90-day period, that does not mean that the statute must be struck down in its entirety.

What we have submitted is the correct approach is for the Court to issue an injunction saying that no such removals can occur during the 90 days prior to any federal election because of the ban on doing so in the 90-day provision, and I submit that's clearly covered.

Counsel for the State said at one point that courts have held that removals for non-citizenship is not covered by the 90-day provision.  I'm not sure what courts he's referring to.  The one case they have cited is the *United States v. Florida* case from the Southern District of Florida, which rejected an argument like ours, but the Eleventh Circuit abrogated that decision in the *Arcia* case that we cite.  The *Arcia* case --

THE COURT:  Do you accept a distinction between systematic programs for purging versus individualized information that shows that a voter is no longer qualified to vote?

MR. VOLCHOK:  Right.  So what the -- the 90-day

provision, by its language, is limited to programs that systematically remove voters.  So Congress has not gone beyond that.  So all that --

THE COURT:  So you agree that if the County Recorder got information that a person was no longer qualified to vote in that county or in that district or to vote at all because they were a non-citizen, the 90-day quiet period would not prohibit them from removing that individual?

MR. VOLCHOK:  Your Honor, in all candor, I'm not a hundred percent sure what it means to systematically remove, but I am happy to accept that.

I mean, I don't think the Court needs to reach it and here's why:  The State does not actually disagree that at least portions of the challenge voting laws involve systematic removals.  In fact, all they point to as a supposed individual regime is the sending of notices, which is not what's objectionable under the 90-day provision.

So our request, DNCADP, would be for the Court to say that consistent with the plain text of the 90-day provision Arizona cannot systematically remove people from the rolls during the 90 days before any federal election.

Thank you, Your Honor.

THE COURT:  Thank you.

MS. SHAH:  Good morning, Your Honor.  My name is Niyati Shah and I represent the AZANHPI Equity Coalition

plaintiffs, and I will be addressing the State's motion on the general removal provisions and the 90-day provisions as it pertains to both 2492 and 2243 as we explained that -- in our briefs that 2243 overrules the removal provision in 2492, and I'd like to just address a few points that Your Honor was just asking my colleague right before me.

First of all, the State is essentially asking this Court that the general removal provisions of the NVRA are the entire universe of removals permissible under the NVRA; and they state in their opening brief that if the limits on grounds for cancellation does not prohibit states from canceling registrations for non-citizens, neither should the 90-day quiet period, and that is simply not true.

The general removal provisions do not need to be ruled on in order for Your Honor to rule for plaintiffs on the 90-day prohibition and certainly as --

THE COURT:  Your position is that if the -- a County Recorder 90 days prior to a general election receives conclusive information that a registered individual is not a citizen of the United States, that they still can't remove them?

MS. SHAH:  It is -- I'm sorry, I'm just gonna -- if I understand Your Honor correctly, if there is individualized inquiry and information proving that a particular voter is not a US citizen --

THE COURT:  Individualized, correct.

MS. SHAH:  -- they may remove them in the 90-day --

THE COURT:  Okay.

MS. SHAH:  -- within the 90-day period.

In fact, Arizona law already has such a provision that is not being challenged here.

THE COURT:  Okay.  Because the way you were phrasing it, you never used "systematic."  We're talking about the system that -- I believe we're talking about the system that is set up within the statute requiring County Recorders to do the first step of purging every 30 days.

MS. SHAH:  Exactly, Your Honor.  The systematic process is prohibited under the 90-day quiet provision.  Individualized is not addressed by the 90-day provision, and that is not being addressed by 2243.

The State argues that there may be some portions of 2243 that are individualized.  Plaintiff again disagrees with that, as we've stated in our papers; but, more importantly, I would like to draw the Court's attention to a provision of 2243 which tells what confirmation is and, that is, it adds 16-165(j) that requires County Recorders to confirm by doing a database match, which Your Honor has already said is systematic and is not individualized enough.

So the entirety, whether it's based on juror questionnaires or summary reports or not even the

questionnaires, or any other reason to believe perhaps based on birth place, that somebody's not a US citizen but --

THE COURT:  But you mentioned juror information.  My understanding of how that works is that the Jury Commissioner tells a County Recorder that an individual has filled out their questionnaire that they're not a citizen.  That doesn't sound systematic to me.  That sounds individual.

MS. SHAH:  So, Your Honor, the reason we say it's systematic here is because it's not the questionnaire that an individual voter provided and as case law has said --

THE COURT:  What do you mean?

MS. SHAH:  Because it's a summary report.  It's a summary report.  It's a spreadsheet.  We don't know what it is.  We don't know the timeliness, and the underlying jury questionnaire that an individual voter fills out, which could perhaps constitute a correspondence, as case law has says may be individualized, can be destroyed within 90 days; and 2243 places no time line on when a juror questionnaire summary report can be considered by the county.

THE COURT:  So which section is this of 2243?

MS. SHAH:  2243 section -- I believe it's (a)(10) which talks about the summary report.

THE COURT:  Well, it refers to a summary report about a person.

MS. SHAH:  That is correct but it's -- our

UNITED STATES DISTRICT COURT

understanding from -- the summary report is derived under A.R.S. 21-314(c) from the jury questionnaire data that is completed by the voter.

So this is a compilation of information and it says the summary report -- and I quote -- "...is derived from jury questionnaire data..." and quote "...shall only contain the information that is necessary for the County Recorder to identify the person in the voter registration database."

And so we know that what -- whether somebody's a citizen, what they said, that is just in some summary report that is perhaps a compilation of all the questionnaires that a jury manager/commissioner has collected over time.  Whether it's 90 days before the underlying documents that could verify the individualized inquiry of whether somebody's a citizen or not is destroyed potentially.

We don't know that and, certainly, there's no requirement for any accuracy or timeliness within 2243 of the summary report; but, Your Honor, more importantly, these raise issues of fact, not of whether there is a -- and even when they get this questionnaire, they're supposed to do a database match under 16-165(j), which Your Honor has just agreed is systematic and not individualized.

Particularly because this database match only gives somebody 35 days to confirm, which is -- again, goes against the balancing of the competing priorities of the NVRA and does

UNITED STATES DISTRICT COURT

not give them an opportunity to cure if there was any mistake in the summary report.

THE COURT:  Well, doesn't the 35-day notice give them the opportunity to cure?

MS. SHAH:  Well, Your Honor, but that is exactly right.  We don't know whether that in the 90 days we know that -- during the 90-day quiet period, the point is that that does not give voters sufficient time to come back and cure this, and when does this cure period end?  How would that apply?

THE COURT:  Why doesn't 30 -- you just said that 35 days isn't enough time to cure.

MS. SHAH:  Well, because they -- first of all, they have to get the notice, find the requisite --

THE COURT:  Based on what -- I mean, isn't that your opinion?  There's no evidence.  I mean, if you get a letter in the mail that says, "We have reason to believe that you're not a citizen 'cuz that's what you told the Jury Commissioner.  Please send us information within 35 days to confirm your citizenship.  Mail your birth certificate back or a copy of your passport," and there it is.  You are a citizen.  You write a letter.  "I made a mistake.  Here's my" -- why isn't 35 days enough?

MS. SHAH:  Well, Your Honor, that's exactly.  We don't know whether somebody's going to receive this in a

timely manner within the 90-day period to cure that.  That is why the systematic part of this prohibits that.

If it was an individualized inquiry that isn't prone to error, then as the North Carolina case in North -- the North Carolina State Conference of the NAACP case pointed out, that this is based on a systematic inquiry and the confirmation part comes too late perhaps to cure.

They may not know it until they get to the polls that they had received some sort of notice and there's not proof; and so but for this burden-shifting notice, the voter would have been disqualified, who was otherwise eligible, and that is the systematic part that the 90 days is seeking to prevent.

I'd also like to address the alternative ruling that the defendant has suggested and we just simply don't think it is workable here because, first of all, we can't rewrite the statute and, more importantly, what --

THE COURT:  What alternate ruling is not workable?

MS. SHAH:  That Your Honor simply decide that 2243 includes the 90-day quiet period even though it explicitly does not.

THE COURT:  So what are you asking me to do, throw out the whole systematic purge provisions of the statute?

MS. SHAH:  Your Honor, we are asking for declaratory relief here that the 90-day provision applies and HB2243 does

not comply with that as drafted.

THE COURT:  How is that an alternate to what the State of Arizona has asked?  Haven't they asked for the same thing as their alternate ruling, to declare that the 90-day quiet period is applicable to this otherwise 30-day systematic purge -- or systematic database review that could result in a purge of electors -- or individuals registered to vote?

MS. SHAH:  So, Your Honor, I think what the -- our understanding of the defendants' ruling here is simply that 2243 be read to now comply with the 90-day provision as it is drafted is how we read defendants' suggested alternative ruling.  If that's --

THE COURT:  That's not what I heard this morning. They want me to declare that the 90-day quiet period applies to any systematic review of the -- whatever these databases are.

MS. SHAH:  In which case, there's no agreement.

If there's no other questions --

THE COURT:  Okay, thank you.

MR. FREEDMAN:  Good morning, Your Honor, John Freedman from Arnold and Porter for Poder plaintiffs.  We've moved on two of our claims, our Civil Rights Act claim, which is Count 2, and our NVRA Section 6 claim, which has been addressed by my co-counsel.  I'm not going to talk about that any more.

I'm going to raise two issues.  The first is that the State defendants have sought affirmative -- have filed an affirmative motion concerning our Section 8(b)(1) of the NVRA. That's the uniformity provision, which we and a number of other plaintiffs have brought.  Counsel didn't have a chance to address it this morning so I'm just gonna cover it briefly.

Really, two reasons why we think the State's analysis why that -- why judgment is appropriate at this juncture are wrong.

The first is that -- we didn't cross move on this motion because we think -- on this count because we think it's subject to discovery, in particular, discovery from the County Recorders and how they are implementing or plan to implement the challenge provisions.  Because of that, we think that presenting the full record at trial after discovery is completed September 1 makes more sense.

THE COURT:  Okay, I'm lost as to what the issue is that you're talking about.

MR. FREEDMAN:  This is --

THE COURT:  I know you gave me a very specific section of a statute --

MR. FREEDMAN:  Sure.

THE COURT:  -- that you're much more familiar with than I am.  I don't have it memorized so I'm really not following what you're talking about.

MR. FREEDMAN:  I will take a step back.

So we filed a count and a number of other plaintiffs filed counts alleging that Section 8(b)(1) of the NVRA, the National Voter Registration Act, various challenge provisions violated.  That's the provision that says that challenge provisions have to be uniform and non-discriminatory, also commonly known as the uniformity provision.

We, for example, challenged that Sections 4, 7 and 8 of HP2492 violate that provision.  Those are the provisions that say that the County Recorders have to use all available resources to investigate whether a federal form filer is a citizen and impose similar obligations on the Attorney General.

What the County Recorders actually do -- my first point is what the County Recorders actually do to implement that provision or what they plan to do to implement that provision is a question of open discovery.  So discovery of County Recorders is going on --

THE COURT:  But what's wrong with it on its face?

MR. FREEDMAN:  Well, what's wrong with the argument on the face is their statutory interpretation is that it only applies to purges, and I think that if you look carefully at the statute -- and you should look at the statutory language provision -- the uniform and non-discriminatory provision doesn't just apply to purges or removals.

Four points in the statute that I don't think that they addressed in their brief:

The first is that Section 8(b) as a whole is entitled "Confirmation of Voter Registration."  "Voter registration," not "purges," and Section 8, more generally, is requirements with respect to the administration of voter registration.  It certainly -- Section 8 certainly has purge provisions but it's not a -- it's not a purge provision.  8(b) is not a purge provision as a whole.

Second, Section 8(b) says that it applies and covers any state program or activity, not purge programs or purge activities.

The third point is that there are other provisions of Section 8 -- Section 8(c), Section 8(d), even Section 8(b)(2) that talk specifically about removal or removal programs.  The absence of the word "removal" from the provision we're challenging under 8(b)(1) is significant.

The fourth and final point in the statutory analysis is that the uniform and non-discriminatory obligation applies to all efforts at maintenance of accurate and current registration rolls.  "Accurate and current" in Section 8 necessarily implicates registration activities because the process of registering new voters is part of what's necessary to make the voter rolls current.

So we disagree with the State that 8(b)(1) only

applies to purge activities.  I think of the cases we cited -- we cited *Project Vote v. Blackwell* where the Court in Ohio enjoined voter restrictions and voter registration under 8(b)(1).

The case that they rely on, the Supreme Court case in *Husted v. A. Philip Randolph,* concerns a purge program that was challenged under 8(b)(2), not -- not the provision we are challenging under.  So we think --

THE COURT:  Okay, so what is it that the Arizona statute does that violates 8(b)(1)?

MR. FREEDMAN:  So requiring County Recorders to use all available resources to investigate the citizenship of federal -- federal form voters is necessarily going to be -- is necessarily -- or we think discovery's going to show it's going to be implemented differently by County Recorders.  It's not a uniform program.

THE COURT:  Oh, because different County Recorders might interpret all available resources differently --

MS. YUN:  Differently, yes.

THE COURT:  -- or different County Recorders may have different resources?

MR. FREEDMAN:  I -- well, I think that it's -- calls upon them to call all available resources but I think what they -- how they -- what they think that means in context could differ from county to county, and that's exactly the

point of the discovery.

THE COURT:  Could you give me an example of how this might violate the 8(b)(1)?

MR. FREEDMAN:  Sure.  Let's say that an organization like True the Vote goes out there and sends each County Recorder a list saying, "Here are the people we believe are your federal form participants here -- federal form and you've got to use all your available resources to go investigate them," sends fifteen lists to the fifteen County Recorders.

THE COURT:  Well, before that, aren't they -- isn't there a requirement in the statute when somebody registers using the federal form and doesn't provide a proof of citizenship to do some confirmation of citizenship?

MR. FREEDMAN:  Well, on the -- on the federal -- ex-ante or -- or under the -- under the statute?

THE COURT:  Under the state statute.

MR. FREEDMAN:  Under the statute, yes, this is one of the provisions that requires that.  It requires the County Recorders to use all available resources to investigate.

THE COURT:  To confirm initially -- I mean, you started out by saying someone is sending information to the County Recorders.  I'm --

MR. FREEDMAN:  Bad hypothetical.

THE COURT:  Yeah, the County Recorder, as I understand it, if you register using the federal form and you

don't provide proof of citizenship, the County Recorder has the obligation under the State statute to confirm the citizenship.

MR. FREEDMAN:  That -- that's correct, Your Honor, and -- and anybody on their existing rolls who -- who -- who register under the federal form.

THE COURT:  Right.

MR. FREEDMAN:  So that can be implemented differently by different counties, how they conduct the investigation, what -- what available resources are they putting into there?  How -- how far do they have to go?  Do they have to hire temp employees to do that?

THE COURT:  What difference does that make?

MR. FREEDMAN:  Well, the question is if -- if they're supposed to be going about this under the NVRA in a uniform and non-discriminatory way, the statute is so broad and open ended how -- how are they going to do that?

Different counties can different -- can implement it differently and that's why we think this -- this is going to turn on discovery.

THE COURT:  So doesn't Secretary of State have some role here to provide County Recorders with guidance on how to do this?

MR. FREEDMAN:  They may.  They haven't -- they haven't yet.  What the -- what they're -- what they're

proposing -- I mean, they've got guidance in the works.  I don't think it's -- I mean, we just saw it for the first time yesterday.  I don't think it speaks to this issue, and what they ultimately do on that may speak to the issue.

At any point, our view is that this is premature.  The Court doesn't need to decide this -- this now.  We should certainly at least see what the factual record goes to show.

On -- I was going to talk a little bit about our claim under the Civil Rights Act, the -- which is our challenge that §16-165(h) -- this is the any reason to believe provision contravenes §10101(a)(2)(A) of the Civil Rights Act, that's the provision that prohibits different standards, practices or procedures for determining the qualifications of voters.  I'm gonna -- I know my colleagues are -- are chomping at the bit, so I'm going to rest on our papers on that one.

THE COURT:  Okay, thank you.

MR. FREEDMAN:  Thank you, your Honor.

MR. HERRERA:  Good morning, Your Honor.  My name is Ernest Herrera and I represent plaintiffs Promise Arizona and Southwest Voter Registration Education Project.  I will address Promise Arizona plaintiff's opposition to the Arizona Attorney General's Motion for Summary Judgment regarding our vagueness claim.

The HB2243 provisions we challenge, subsections (A)(10) and (H) or (A)(10) and (I) in the amended statute, are

unconstitutionally vague.  These provisions function together to subject registered voters in Arizona to loss of the fundamental right to vote and criminal prosecution without defining a core of prescribed conduct that allows a voter to understand what conduct to avoid.  These provisions also encourage arbitrary and discriminatory enforcement.

Plaintiffs challenge subsections (A)(10) in conjunction with (H) as vague in their functional entirety, including the undefined language, quote, "reason to believe are not United States citizens," end quote.

Once a County Recorder -- once a County Recorder forms this reason to believe, there is a lack of citizenship. The recorder must, quote, "compare" the voter to the Systematic Alien Verification for Entitlements program known as SAVE.

As a whole, this 2243 subsection does not define what a registered voter would have to do to avoid a County Recorder's scrutiny and formation of reason to believe that the voter is not a US citizen.

THE COURT:  Isn't this the kind of standard that exists throughout the law, the criminal law, things like reason to believe, reasonable suspicion, probable cause?

These are common terms that are found throughout statutes to say that there has to be some -- some kind of a good faith -- good faith belief before you go about

investigating people.

I mean, how would you draft the statute? I mean, would you have to list in the statute all of the types of information that a County Recorder could have that would give them reason to believe that someone may not be an eligible voter?

MR. HERRERA: There would have to at least be some additional guidance beside reason to believe. Reason to believe is entirely subjective as to that County Recorder.

THE COURT: Why is it entirely subjective?

MR. HERRERA: A County Recorder could -- for example, could just say, "Well, this person's place of birth I'm going to look at this -- into. I suspect this person is not a US citizen."

THE COURT: Wouldn't that be an as-applied kind of challenge to say these County Recorders don't have any good faith reason to believe, they're using discriminatory information and here's -- here's how the statute as applied is being implemented as opposed to this common standard for which we're going to assume that County Recorders are going to act within the law and in a non-discriminatory fashion?

MR. HERRERA: I don't think so because -- Your Honor, because that section -- that subsection itself implies certain kinds of considerations that may be discriminatory that a County Recorder may undertake without further guidance

because it has to do with citizenship, not with something else, not some other eligibility qualification, and it -- the tool that County Recorders must use after they form this reason to believe is SAVE.

SAVE, contrary to what the Attorney General said in the Motion for Summary Judgment, is not a database.  It's a search system that refers to a bunch of other federal data sources, and sometimes it involves secondary and territory verification.

THE COURT:  Do I know this to be a fact?

MR. HERRERA:  Your Honor, we included reference to that process in our Statement of Facts.

THE COURT:  And it's not disputed by the State?

MR. HERRERA:  The State refers to it as a database as though it's a -- we believe this raises an issue of fact -- an issue of material fact.

The Attorney General makes it seem as though SAVE is some database where you get an instant answer from a database. SAVE -- if you look on the USCIS' web pages about SAVE, and as we cited in our Statement of Facts, it's, in fact, not a point -- point of information database.  It's a search system or program, but to go back to --

THE COURT:  Are natural born citizens in there?

MR. HERRERA:  Natural born citizens would not be in there, Your Honor, and you could not possibly search them with

any documents.  So by it -- on its face, this statute encourages discriminatory enforcement.

Because it involves SAVE, which can only be used for naturalized or derived citizens or in the case if there was, in fact, someone who was not eligible, it would be an immigrant of some sort -- of some status.  They would be found in SAVE.

However, if we're talking about someone who is duly registered to vote, then you would only be talking about naturalized citizens and derived citizens.

Contrary to what the Attorney General argues, plaintiffs raised a genuine dispute of material fact in support of their opposition by providing evidence of what SAVE is and how it functions.

In Arizona that voter may swear under penalty of perjury that he or she is a US citizen or he or she may provide some form of documentary proof of citizenship, as we've discussed earlier today.  Prior to this law, County Recorder offices already conducted certain verifications of US citizenship using SAVE when a person first registers.

One such verification method for SAVE is outlined in the currently-effective 2019 Election Procedures Manual cited to by non-US plaintiffs in their Joint Statement of Facts in Exhibit 6.

However, under 2243's reason to believe language,

UNITED STATES DISTRICT COURT

whether that voter came to be registered by state or federal form and regardless of successfully making it through an initial verification process, that voter will always be subject to later scrutiny by a County Recorder.

In other words, even if a voter properly registered to vote and approved US citizenship, the voter's eligibility may again be questioned immediately or years later for unknown reasons other than the Recorder's, quote, "reason to believe."

And to give an example of this fact -- this is also referred to in the Election Procedures Manual.  So if you look in Exhibit 6, the Election Procedures Manual does say that documentary proof of citizenship, so the actual copy of the document, may be deleted by the County Recorder after two years.

Therefore, past two years after that person submitted, say, their naturalization certificate, the County Recorder can go back and say, "You know what, I have reason to believe this person is not a US citizen.  I don't see a naturalization certificate.  I'm going to run them through SAVE and make them submit it again."

A County Recorder employee could form reason to believe that a voter is not a US citizen based on someone's listed place of birth, someone's surname or even the accusation of a neighbor who claims that his neighbor is not a US citizen.  The Secretary of State admitted that 2243 does

not include any indicia or criteria that would provide a predicate for the County Recorder's reason to believe that a person is not a US citizen.

I think that's most of my time, Your Honor.  I don't know if you have any other questions, but plaintiffs also -- quickly, I would like to say that plaintiffs do have standing here.  We -- plaintiffs are organizations that will have to divert resources to address the arbitrary enforcement of these laws and assist voters with improper voter registration.

There is nothing to prevent these laws from being enforced today.  The State will, of course, claim that they're not being enforced, but they are in effect.  They are effective as of January 1st of this year.

Additionally, the same statute that the Attorney General cites to in the reply regarding vagueness, that same statute, A.R.S. §16-182(a), not only applies to someone who registers or is accused of registering knowingly falsely, but also applies to people who assist others in registering to vote.  Therefore, organizations such as Promise Arizona and Southwest Voter would be subject to that same investigation if someone was brought under this reason to believe provision.

THE COURT:  Thank you.

MR. HERRERA:  Thank you.

MR. DODGE:  Good morning, Your Honor, Christopher D. Dodge on behalf of the MFV plaintiffs.

As the plaintiff group that moved for summary judgment on our materiality provision claims, I wanted to address why summary judgment is appropriate now as to each claim; and that is because no party here disputes the material facts as to those claims and the record is clear that neither the birth place, checkbox, nor federal form DPOC requirements are material to an Arizona election official's determination on whether a person is qualified to vote; and I wanted to go straight to Your Honor's questions about the birth place requirement, in particular.

The non-US plaintiffs at Paragraphs 35 to 42 of their Statement of Fact put competent evidence into the record from Arizona's election officials, including the Secretary and County officials, explaining that the birth place requirement is not material.

In fact, the Pima County Recorder said they cannot even use that information because they lack an extrinsic source to verify it.  Those facts are undisputed.  The State does not dispute them, and so there are no outstanding issues of fact with respect to that.

The State comes back with some speculative, hypothetical theories about how, maybe, somehow a County Recorder could use this information.  I think we all here know that idle speculation on the papers is not something that gives rise to a triable issue of fact.

Further discovery on that issue will do one of two things. One, there's a snowball's chance that it will prove up the State's idle speculation; but, of course, it should not have that opportunity because it has not raised a triable issue of fact; and then the other alternative is the discovery will just confirm the undisputed facts that are already in the record at Paragraphs 35 to 42 of the Statement of Fact, which is that birth place is not material to how an Arizona election official determines a person's qualification to vote.

In fact, the only basis on which the State opposes our motion is based upon its flawed legal reading of the materiality provision, which says that if a requirement is in the abstract in some metaphysical way relevant to a requirement, then it passes muster on the materiality provision.

That is a very bad misreading of the text of the materiality provision, which focuses specifically on how state officials determine that a person is qualified to vote. You have to give some consideration to that determinative process that the County Recorders do here to determine that someone is eligible to vote, and I think a very simple example that's already been discussed with respect to birth place shows why.

If there is no evidence that a county official can look at a form and see that someone was born in a place, check it against some other extrinsic reliable source and say "okay,

check," that can't be material to their determination process. It's not information they can even use.

And the State here, as Your Honor noted, has not introduced a single piece of evidence, not a single one, to suggest the County Recorders can do that. They, nonetheless, moved for summary judgment with this pure law of materiality which badly misreads the statute; and for this reason, a lot of the discussion in the briefing about what materiality means in the securities context or whether it's material to the State Department, it's just fundamentally irrelevant.

The task before Your Honor here is to discern materiality in a single specific context, and that is an election official's determination of whether or not someone is qualified to vote under Arizona law.

There is competent evidence in the record as to each of the claims that we have moved on. There's no dispute as to those facts, and so our claims at least are ripe for adjudication now; and, you know, for that reason we just respectfully disagree with several of our fellow plaintiff groups.

As I explained, further discovery will only further confirm what we think is undisputed at this point; but further confirming a fact is not a basis to put off summary judgment or to go to trial, at least on the MFV plaintiff's claims, and so we do not think that's a sufficient basis to deny our

motion.

I'm glad to go through the individual requirements. I don't want to belabor the point. I think your questions on the checkbox provision show why that claim is also ripe for resolution at this point.

The MFV plaintiffs also addressed the private cause of action issue and the LUCHA and MFV's plaintiffs' motion on Section 8(a) of the NVRA. I'm glad to answer any questions from Your Honor on those provisions.

THE COURT: Thank you.

He left you some time.

MS. LANG: Thank you, Your Honor.

THE COURT: You must have been worried when you were going last.

MS. LANG: A tiny bit, but I have faith in my colleagues, Your Honor. So I'll pick up where my colleague --

THE COURT: Yes, announce who you are and who you represent.

MS. LANG: Thank you. My name is Danielle Lang. I represent the LUCHA plaintiffs, and I'll pick up where my colleague from the MFV plaintiff dropped off and I think I'll try to kind of sharpen what I think is the distinction between how the MFV plaintiffs are seeing this Motion for Summary Judgment on materiality and how the remaining four groups that are also bringing these claims see it.

And I think the question is really about the stage we are in this case.  So normally when your -- when the Court is adjudicating a Motion for Summary Judgment, that comes after discovery is entirely disclosed and so, therefore, you know, my colleague, Mr. Dodge, would be correct that, you know, he put forward important evidence showing that this is not material.

The State has kind of failed to come back with any meaningful evidence to the contrary, and perhaps that would be ripe for resolution; but when we were at the scheduling conference earlier this year we all kind of agreed that this round of summary judgment would be about issues of law because neither party would have had the opportunity to build the right record in order for -- to present motions for summary judgment on issues of fact at this stage; but what Mr. Dodge's presentation makes clear is that everyone, at least on the plaintiffs' side agrees and I think, quite frankly, on the AG's side as well, that materiality is a factual question.

The AG is saying that the reason why it's material is it can help confirm identity.  That's a factual question. That the citizen checkbox is useful in confirming identity, I take Your Honor's questions about that --

THE COURT:  Well, but what if I agree that Mr. Dodge, on behalf of his clients, has properly supported the Motion for Summary Judgment with admissible evidence that

a Secretary of State and at least one County Recorder says, "We can't use this information.  We don't use this information.  We don't have any databases available to us to investigate birth place," and the State in its response has failed to controvert that?

MS. LANG:  I think that the important point --

THE COURT:  Why would I not rule now --

MS. LANG:  That's fair.

THE COURT:  -- just because you want to take discovery?  Wouldn't you be happier if the State just failed to controvert and you didn't have to talk to the other fourteen County Recorders?

MS. LANG:  Your point is well taken, but no; and let me try to explain why.  So Rule 56(d), I think, comes in here. So Rule 56(d) talks about the fact that courts really should not and cannot rule on summary judgment before the party that is opposing summary judgment has had a proper opportunity to develop their record.

THE COURT:  But don't they have to provide a Rule 56(f) affidavit that says that?

MS. LANG:  Yes, Your Honor.

THE COURT:  I mean, I didn't hear the State say they can't respond yet.

MS. LANG:  I understand that because the State would like, in its view, to get a ruling on this as a matter of law;

but I do think it still is going to create a potential appellate issue that there was not a full record here, and ruling on the MFV's claim and motion here would also cut off the plaintiffs' opportunity to build a record.

And the reason I think that that's so important is that this is an area of law that is not very well developed. So there is no Ninth Circuit law figuring out what is materiality in this provision.  There is no Supreme Court law on this, and I think this case is very likely not to end in this courtroom.

THE COURT:  Really?

MS. LANG:  I know, what a surprise.

THE COURT:  Wow, I'm not used to people not just taking my orders as is and deciding not to appeal.

MS. LANG:  Exactly.  So that's my -- the crux of my concern, Your Honor, is that Your Honor might look at this record and say, "The State has failed to kind of come forward with appropriate evidence and, therefore, I rule in favor of the MFV plaintiffs."

And, of course, we don't really disagree with the MFV plaintiffs on the kind of facts or merits, but the question is whether or not we have an adequate record on appeal.  I think at least some other reasonable judges might look at this and say without more evidence rebutting the State's claim, the State gets some sort of presumption that

it, putting forward that it will use this information, should be granted some presumption; and we have seen that all too often in election law cases and other circumstances, and what I think the evidence will show at the close of discovery is beyond a shadow of a doubt this information is immaterial in every way.

I took a quite lengthy deposition yesterday of the Maricopa County Recorder's Office, and this is not before you right now but I think it would be very useful in any opinion you wrote on this issue is her emphatic descriptions of the fact that she does not have access to any of -- any data that would allow her to cross check place of birth, that this is not useful to her in any way, that the checkbox is beyond her understanding of how that could help her in the circumstances where she has documentary proof of citizenship and she lays out what that documentation is, what it looks like in the database, what she has access to.

Undoubtedly, your opinion on this issue would be much stronger and on much firmer footing after we're able to put all of that evidence into the record; and so I think it's improper for the other four plaintiffs to be unable to kind of build that record and a robust record on appeal on an issue of first impression in this circuit and potentially in the Supreme Court.

I did want to -- if Your Honor doesn't have any

other questions on that matter, I did also want to briefly address something that hasn't come up at all, which is the Section 8(a) claim, which is about what the RNC plaintiffs call the safe harbor provision of the NVRA, which states that states must ensure that any eligible applicant is registered to vote if they submit a valid voter registration form received by the deadline.

And the RNC plaintiffs have moved against both MFV plaintiffs and LUCHA plaintiffs on summary judgment on this claim, but I think what's important to recognize is that the RNC's arguments all make an assumption that all of the requirements that are challenged here, the documentary proof of residence requirement, the documentary proof of citizenship requirement, the checkbox requirement, the birth place requirement, that all of those are necessary and material to determining eligibility.

Of course, that is the key factual question underlying all of this case.  Are these requirements material and necessary to confirming eligibility or are they unnecessary obstacles that are going to cause disenfranchisement?  That's the fundamental factual question; and so under Section 8(a) if someone has turned in a state form, that state form is protected and that state form is only under the NVRA allowed to require the information that is, quote, "necessary for assessing eligibility and administering

voter registration."

Those are factual questions. You're going to have to determine whether or not a state form that lacks DPOR is valid. In order to do that, you have to determine whether or not DPOR is necessary to administering voter registration. Those are factual questions that are not ripe for decision here.

THE COURT: Residence is important to determine what ballot you get, who you get to vote for other than statewide elections.

MS. LANG: Certainly. Nobody in this case or anywhere else that I'm aware of is objecting to the requirement that voters establish their residence on their voter registration form.

The question is whether or not there can be an additional layer of requiring documentary proof of that residence and whether or not that is necessary.

So there was a great deal of testimony yesterday in the deposition about how they currently go about assessing and determining residency without any documentary proof. They have a complex GIS system that they use. They have follow-ups that they do when necessary, and so all of that evidence will go to show that this new layer of bureaucracy is not in any way necessary to the administration of voter registration.

THE COURT: Okay, thank you.

UNITED STATES DISTRICT COURT

MS. LANG:  Thank you, Your Honor.

MR. WHITAKER:  Your Honor, brief rebuttal and I understand my colleague from the RNC would like three minutes of rebuttal as well.

THE COURT:  He only has two left, unless you're giving him one of yours.

MR. WHITAKER:  How many do I have, ten?

THE COURT:  Yeah.

MR. WHITAKER:  I'll use nine.  Okay.

So quickly on --

THE COURT:  I want to go back to the last thing, this difference between the LUCHA plaintiffs and the other plaintiffs, except for MFV plaintiffs, that are saying, "Don't resolve this on summary judgment even if the State has failed to controvert the facts that are set out in that Motion for Summary Judgment because we need a fuller record."

They did provide some facts about -- from the Secretary of State and from the Pima County attorney -- or County Recorder about birth place not being useful or material or necessary.

The State hasn't provided any facts saying it is, but the LUCHA plaintiffs and all the other plaintiffs say, "Don't decide this yet until we have a full record."

What do you think?

MR. WHITAKER:  Your Honor, we see a difference

between the check mark materiality provision --

THE COURT:  I'm talking about birth place.

MR. WHITAKER:  I know and I was going to get to it.

We see a difference between the check mark and the birth place in that space.  So the check mark we think is not a lot of facts need to be developed.  You know, the Court should decide that one way or the other on materiality.

Birth place, it is different in the sense that -- so, as I recall the facts cited by plaintiffs, they were to the effect of several months ago the Secretary issued some statement in this context.  Several months ago the Arizona Association of Counties issued this statement trying to oppose the law and it's not -- the Recorders have not had an opportunity to grapple with how to deal with the law that requires them to -- requires them to have birth place -- requires them to implement birth place in a database.  It's been optional up to this point.

So I -- I do think that it's not as clear-cut legally as the materiality -- the check mark materiality issue.  We would -- here's an example:  Mi Familia Vota in its reply brief attached three interrogatory responses from Recorders.  Well, there are fifteen and that's not a very complete record.

THE COURT:  But you didn't get a declaration from any of the rest of them saying, "Oh, no, we can use this."

UNITED STATES DISTRICT COURT

MR. WHITAKER:  That's true, Your Honor.  I would point out that what we did do is respond to the specific facts they had which were simply -- and this is me trying to recall their Statement of Facts, you know, last year here is a statement made by a representative of a Recorder, and it's not a very complete record.  I think Mi Familia Vota would be extrapolating quite a bit to reach the conclusion that that is a complete picture of the Recorders.

So -- so our reaction is that it is -- it is different than the checkbox materiality issue, which is more legal.  In other words, if the Court has pause on the birth place issue, we do think discovery should proceed; but we don't feel quite the same way about the checkbox.  We think that really is a pretty pure issue of law.

I'll move quickly to a couple other points.  Back on the NVRA accept and use requirement and this difference between registration for voting by mail.  We think it all comes down to what does the accept and use provision mean when it says each state shall accept and use the federal form for the registration of voters?

And in our view registration -- although in our briefs we were candid we think it's a close question, registration doesn't quite mean the same thing as voting by mail.  So if states are prohibited from making something a condition of registering, that's not quite the same thing as

prohibiting states from making a condition for voting by mail. We do think that the --

THE COURT:  So the DNC plaintiffs say that the ITCA case says you can't disadvantage federal form users.

Doesn't this disadvantage federal form users?

MR. WHITAKER:  Your Honor, I don't recall that language in the case.  I recall that case saying it must be treated as a complete and sufficient registration form, but that really doesn't speak to whether it's a complete and sufficient -- something you need to do to vote by mail, and a similar point on the obstacle preemption point they raised.

You know, they talk about the purposes of the NVRA; but if you actually look at the NVRA, the first part of the NVRA sets out the purposes.

THE COURT:  Can we agree that disqualifying people by voting for mail disadvantages them from the vast majority of Arizonans that vote by mail?

MR. WHITAKER:  It would limit them to the traditional method of voting by mail and we also --

THE COURT:  Which is a lot harder to do.

MR. WHITAKER:  We -- we don't dispute that.  We don't dispute that it --

THE COURT:  It's disadvantage.  Voting by mail's an advantage.  I mean, can we agree with that?  We don't have to, you know, get in our cars, drive to a voting location, stand

in line.

MR. WHITAKER:  Voting by mail is certainly more convenient than showing up in person.

THE COURT:  I'll show that as an agreement, that it's an advantage.

MR. WHITAKER:  I -- I wonder what implications follow from that but I guess we -- we do think that the key -- the key distinction is there's a difference between registration and voting by mail.

On the 90-day provision, you know, hearing the colloquy here today, as suggested in our brief, the Court may wish to simply say, "I find that to the extent there are systematic removal programs in these laws, they can't be in effect in 90 days" --

THE COURT:  To the extent there are, aren't there?

MR. WHITAKER:  At a minimum, there are systematic reviews of databases.

THE COURT:  To lead to purging after --

MR. WHITAKER:  Yes.

THE COURT:  Depending on what they show.

MR. WHITAKER:  Depending on what they show, and there's a confirmation requirement, right, the --

THE COURT:  So the State doesn't have any problem with the Court saying that the 90-day quiet period applies?

MR. WHITAKER:  Again, it -- well, if the Court

follows the Eleventh Circuit majority's interpretation in *Arcia*, then we do think it applies to at least part of the voting laws.  As to which parts, it may be something best for the parties to try to discuss.  It may be something best for discovery to develop, but I guess I'll leave it at that.  It seemed like the colloquy was introducing some fact issues about how systematic is it really.

THE COURT:  What does your stopwatch say?

MR. WHITAKER:  Eight minutes.

I guess I'll very quickly say -- well, you know what, no.  I won't say anything more.

THE COURT:  Okay, thank you.

Mr. Langhofer, you still only have three minutes.

MR. LANGHOFER:  Thank you, Your Honor.  I would candidly feel guilty using the one unused minute from my colleague so I'll try to keep it to two.

I'll be blunt, hopefully not impolite about this. If the comments of counsel for DNC had been redacted so I didn't hear the names of the cases he was describing, I would not have recognized them.

I mean, I've read *Burroughs* many times.  I've read *Inter Tribal Council* many times.  I do not understand *Inter Tribal Council* to say there can be no disadvantage for anyone who files a federal form.  That's not what it means.  It can't be what it means because after *Inter Tribal Council* was

UNITED STATES DISTRICT COURT

decided, Arizona bifurcated its registration process into federal and -- federal only and then uniform federal and state registration.  If it meant what he says it means, that wouldn't have been permissible.

*Burroughs* he describes as holding -- or squarely rejecting our position.  I can't get there.  *Burroughs* acknowledges the power of the State to appoint electors and to control the manner of appointment; and, moreover, *McPherson*, which is still good law.  It's a US Supreme Court decision.

It was cited by the Supreme Court itself two years ago.  Says that the State controls this process.  They don't even have to have these electors elected by the public at large.  You could appoint them by the Legislature if you wanted or by a subcommittee even.  I -- I disagree with these characterizations of the cases very much.

On the mail-in issue, I'll point this out, too. HR1, also a piece of legislation that's advocated for by the DNC's members, has been introduced in Congress repeatedly, has repeatedly failed to gather Democratic majority so it becomes law.  It would give them the sort of regulation of the manner of vote that they're asking for here.

Failing to get that to the Legislature through the Democratic process, they seek it through the judicial process. They ask this Court to be the first in thirty years to discover this sort of regulation.  Because they can't get it

in Congress, they try to get it here.  That's just not what it means.  Thank you.

THE COURT:  Thank you.

It's ordered taking all the motions under advisement, and the parties have an issue that they need to discuss but I think we all need a 10-minute break.  I'm going to reconvene at 12:15 to discuss the schedule and the discovery dispute.  Court is in recess.

COURTROOM DEPUTY:  All rise.

(Recess taken at 12:02 p.m.)

COURTROOM DEPUTY:  All rise, court is now in session.

(Back on the record at 12:15 p.m.)

THE COURT:  Thank you, please sit down.

The record will show the presence of counsel, and I'm not really sure what we're talking about except that it's a discovery dispute and a scheduling issue.

MR. VOLCHOK:  Your Honor, Daniel Volchok for the Democratic National Committee and the Arizona Democratic Party.  I will address the discovery part of it, leave the scheduling part to others.

So there is a -- there is an outstanding discovery dispute between the plaintiffs and the intervenor legislative leaders.  The proposal that we have to submit to Your Honor is that we do a quick briefing schedule about it.  I think the

parties are in agreement there's no controlling authority, there are a number of cases and it might be just --

THE COURT:  Well, what's the dispute?

MR. VOLCHOK:  Sure.  So the dispute is essentially --

THE COURT:  Maybe I can resolve it.

MR. VOLCHOK:  Okay.  Well, the dispute is essentially twofold.  The question -- the first question is whether by intervening the legislators have essentially waived their claim of legislative privilege.

It's the plaintiffs' position that they cannot insert themselves voluntarily into the lawsuit and then, nonetheless, claim privilege while participating in the lawsuit as parties and commenting on the merits, et cetera, and, again, there's case law to that effect, which we could get into if the Court would like to hear it now; but the parties' proposal is to have a quick briefing schedule, either simultaneous briefing, if the Court prefers, or a more traditional motion, opposition, reply, and we have --

THE COURT:  So you want to inquire about their motivations for some of the provisions of these two House bills?

MR. VOLCHOK:  Exactly, Your Honor, among other things.  I mean, that bears upon some of the claims that have been raised here.

THE COURT:  Originally that would be subject to their legislative privilege.

MR. VOLCHOK:  Indeed, Your Honor, but they -- again, this get to the merits so, obviously, I'm no longer agreeing with the other side; but they have, for example, filed answers saying that there was no discriminatory intent in passing the legislation, and we want to inquire about that.

So we've propounded the deposition notice, request for production of documents and so on; but, again, our joint proposal is to brief this quickly for the Court, with the Court's indulgence.

THE COURT:  Okay.  You can do that, but not with a motion, response and reply but with simultaneous memoranda not to exceed ten pages.

MR. VOLCHOK:  Very good.  And no -- no reply memoranda?

THE COURT:  Correct.

MR. VOLCHOK:  Very good.  Does it --

THE COURT:  You get one chance to tell me what your arguments are, and then I'll decide it.

MR. VOLCHOK:  Very good.  Would Monday suit the Court, this Monday, for the simultaneous, end of the day Monday?

THE COURT:  It would be fine, but it doesn't have to be that quick because I will be at the Ninth Circuit Judicial

Conference next week.

MR. VOLCHOK:  End of the day --

MS. PORTER:  Sorry, Your Honor, Hannah Porter on behalf of the Intervener Defendant Speaker and President.

If Your Honor is amenable to more time, I would appreciate a slight extension from next Monday and I would propose next Wednesday by the end of the day.

THE COURT:  Sure.

MS. PORTER:  Or, I'm sorry, a week from tomorrow.

THE COURT:  Okay.  I'm just gonna tell you what the date is.  That's August the 2nd.  So the discovery dispute concerning the issue of legislative privilege can be briefed not to exceed ten pages and to be filed not later than Wednesday, August 2nd, 2023.

MR. VOLCHOK:  Thank you, Your Honor.

MS. PORTER:  Thank you, Your Honor.

THE COURT:  But here's my question -- well, I know that there's only going to be one brief filed -- only one brief can be filed.  So you can all use -- you plaintiffs' lawyers can give your input to whoever the designated filer is --

MR. VOLCHOK:  Yes, we'll file one brief for the plaintiffs.

THE COURT:  -- but one.

MR. VOLCHOK:  Thank you, Your Honor.

THE COURT:  Thank you.

But what's the other issue that -- as long as you're all here.

MR. MORGAN:  Good afternoon, Your Honor, Craig Morgan for the Secretary of State.

As the Court knows, this is a case that is seeking declaratory and injunctive relief and it's a case, I think, that's important to every Arizonian and discovery ends in October; and I simply just want to ask the Court to get us on its calendar for trial as soon as possible after the close of discovery, whether that's today, whether the Court wants to set a calendar hearing later.

I've polled the other parties.  My general understanding, with possibly the exception of the Attorney General, is that no one -- no one opposes that and -- you know, in fact, today, the first time in almost twenty years I've ever heard it.  I mean, at least one party doesn't even want summary judgment.  So I'd really like to just get this case moving and get it done.

THE COURT:  There was a suggestion earlier today that there be a second round of summary judgment and we have to balance here the question of more briefing, more arguments, more delay versus the parties' interest in having this case decided before important election dates in 2024.

A second round of summary judgment motions to be

filed after the close of discovery would make it impossible to decide this before certain election dates in 2024 because I've been told that there are some as early as -- am I right, March?

MR. MORGAN:  I believe that's right, Judge.

THE COURT:  So if there were -- if I set a second -- have I set a second deadline?

MR. MORGAN:  You have not, Judge.

THE COURT:  Okay.  If I were to set one, it would probably be in November.  You wouldn't fully brief it until January.  I'd hear argument in January or February and there -- that election would come and go.

MR. MORGAN:  Correct.  I unequivocally -- my client unequivocally opposes additional summary judgment briefing. We went through this the last time at our last scheduling conference and you adequately said, "I will take one round of summary judgments on the facts.  Let's try the issues that were factual issues remaining" -- I'm sorry, one round of summary judgments on the issues of law.

THE COURT:  Right.

MR. MORGAN:  "Let's try the case on the issues or let's move forward on the issues at trial," and I think we have to, Judge.

THE COURT:  Does anybody disagree with that?

I mean, I'm sure both sides has the same interest in

having this case resolved before important election dates in 2024.  So -- and I agree I said it's a bench trial.  Why would we have a second round about disputed issues of material fact, and then I'd find there were some and then I would decide them?  So what are you suggesting?

MR. MORGAN:  I'd like to set a trial date, Your Honor.

THE COURT:  No, I meant what date?

MR. MORGAN:  Oh, as soon as possible after the close of discovery.

THE COURT:  What's the close of discovery?

MR. MORGAN:  It is the end of October.  It is October 27th.

THE COURT:  And as we're present -- as we sit here, nobody's asking to change that?

MR. MORGAN:  Nobody's asked me.

THE COURT:  No one's suggesting that?

And is that the deadline for expert depositions, also?

MR. MORGAN:  That's -- that's the outside deadline for everything, Your Honor.

THE COURT:  Are you thinking November?

MR. MORGAN:  Yes, please, Your Honor.

THE COURT:  Are you thinking January?

MR. MORGAN:  I'm thinking November, as soon as

possible, absolutely.

THE COURT:  What are you thinking of -- well, this is not probably a question just for you.

MR. MORGAN:  It's not.

THE COURT:  What's the length of this bench trial?

MR. MORGAN:  My guess, Your Honor -- with the caveat I don't know how the Court's going to rule on what it has in front of it; but my guess, Your Honor, based on the number of plaintiffs there are and how things have proceeded organizationally, I would say ten days is probably what we're looking at and I think that's --

THE COURT:  November's a really short month.

MR. MORGAN:  I know.

THE COURT:  I mean, February -- technically February's our shortest month, but November and December are our really shortest months because November has three holidays in it.

MR. MORGAN:  At least.

THE COURT:  At least.  It has Veteran's Day and it has Thanksgiving.

MR. MORGAN:  My daughter was born in November, Judge.  It's a busy month for me.

THE COURT:  If you're asking for her birthday off if we set it in November, you can't take it.

MR. MORGAN:  I wouldn't dare.  This is too important

to Madeline.  She wouldn't let me take my birthday -- her birthday off.

THE COURT:  Does anybody think it's more than ten days?  Does anybody think it's less than ten days?

MR. FREEDMAN:  Your Honor, John Freedman for the plaintiffs.  Ten seems like a reasonable estimate.  We caucused yesterday, and our estimate is the plaintiffs' case -- unless the case winnows, our present plan would be about six days for the plaintiffs' direct.  That, obviously, could go down if claims are decided on summary judgment.

MR. LANGHOFER:  Can I -- may I interject, Judge?

THE COURT:  Wait, I want to -- I want to turn my calendar to the month of November.

MR. MORGAN:  If I can have the Court's permission, I think for myself and the rest of the lawyers if I can turn on my phone where my calendar is, I'd appreciate that.

THE COURT:  Well, let me just say if you have conflicts, you better get rid of them.

MR. MORGAN:  I figured as much.

THE COURT:  Mr. Langhofer, what did you want to say?

MR. LANGHOFER:  I was wondering whether the six days suggested by the plaintiffs included time for cross-examination of those witnesses?

MR. FREEDMAN:  Yes, your Honor.

MR. LANGHOFER:  In -- in that case, I do think ten

days would be enough.

THE COURT: Well, looking at my -- when I say -- I'm not looking at my calendar. I'm looking at a calendar. Monday is the 6th -- the first Monday in November is the 6th. That is a four-day week. The 10th is the date that we will observe Veteran's Day, which falls on a Saturday.

The following week is a five-day week, and the week after that is the three-day week.

MR. FREEDMAN: Your Honor, just as a potential proposal, I think that December 4th if we can --

THE COURT: Can't do that. I happen to know that I'm not available on the 4th of December.

MR. MORGAN: All of the dates in November the Court just referenced are fine by the Secretary of State in any combination whatsoever that makes it convenient for the Court.

THE COURT: Now I'm going to try to open my calendar. The only other possibility is that we not have consecutive days. So unless I give you those first full weeks in November, we would have to do some time in November and some time in December.

MR. MORGAN: I -- I would not quibble with that, Your Honor, if it's convenient for the Court and the other parties.

THE COURT: But what's wrong with the first -- I mean, we have that potential time in November.

MR. MORGAN:  I have no objection to it whatsoever.

MR. FREEDMAN:  Your Honor, can we just specify what days we're talking about when we would start?

THE COURT:  The week of the 6th and the week of the 13th and 20th.

MR. FREEDMAN:  That -- that's fine for the plaintiffs, Your Honor.

THE COURT:  Anybody have any objection?

Done.

You weren't quick enough, Mr. Langhofer.

MR. MORGAN:  Everybody's clapping.  We want to clap.

THE COURT:  Mr. Langhofer, you got to be faster than that.

MR. LANGHOFER:  I -- I can live with that, Your Honor, if I must.

THE COURT:  Okay, you must.  The problem is that, you know, 10-day bench trial and then I have to rule and we have all these holidays and then it's January and then it's February, I -- if we pushed it to December -- and then there's, heaven forbid, post-trial memoranda; but then you weren't planning to spend the holidays doing anything other than that, I guess.  So I think that we have to do those days.

MR. LANGHOFER:  My -- my one request would be that the 17th would be spared from the schedule.  I can -- look, I'm one among sixty lawyers here or so.  So I'll sacrifice my

plans if I need to.

THE COURT:  Friday the 17th?

MR. LANGHOFER:  Yes, your Honor.

THE COURT:  Can I say just maybe?

MR. LANGHOFER:  Yes.

THE COURT:  Maybe.  I personally don't mind taking Fridays off.  I actually try to do that every single week, but I think we need to see how it's going; but remind me when the trial starts that if things are going well, maybe we'll take the 17th off.

MR. FREEDMAN:  Your Honor, if you wouldn't mind, could we just go through the -- how many days each week we're talking about.

THE COURT:  Four the first week 'cuz the 10th is a holiday.  Four or five the following week and two.

MR. FREEDMAN:  Thank you, your Honor.

MR. HERRERA:  Sorry.  Your Honor, I just want to make sure that it's okay if I'm able to --

THE COURT:  The court reporter probably doesn't remember your name.

MR. HERRERA:  Of course, sorry.  Ernest Herrera for Promise Arizona.  I do have co-counsel in this case, but I'm wondering if it's okay to step out during trial?  I may have to go down the hall and do a Ninth Circuit argument the week of the 6th so if --

UNITED STATES DISTRICT COURT

THE COURT:  There's so many lawyers here --

MR. HERRERA:  Yeah, I think we'd be good.

THE COURT:  -- I won't miss you.

MR. HERRERA:  All right.

THE COURT:  In fact, you know, hopefully we'll have room for spectators.  Is that it?

MR. MORGAN:  Yes, your Honor, thank you.

THE COURT:  That was so much easier than I thought.

All right, thank you all very much.

MR. WHITAKER:  Thank you, Your Honor.

COURTROOM DEPUTY:  All rise.

*(Whereupon the proceedings concluded at 12:32 p.m.)*

***REPORTER'S CERTIFICATION***

I, TERI VERES, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 2nd of August, 2023.

　　　　　　　　　　　　s/Teri Veres
　　　　　　　　　　　　TERI VERES, RMR, CRR

UNITED STATES DISTRICT COURT