1
2
3
4
5
6

# IN THE UNITED STATES DISTRICT COURT

7

## FOR THE DISTRICT OF ARIZONA

8
9

Mi Familia Vota, et al.,

No. CV-22-00509-PHX-SRB

10

Plaintiffs,

**ORDER**

11

v.

12

Adrian Fontes, et al.,

13

Defendants.

14

15    The Court now considers the Motions for Partial Summary Judgment of

16  Defendants State of Arizona (the "State") (Doc. 364, State Mot.), Defendant Republican

17  National Committee ("RNC") (Doc. 367, RNC Mot.), and Plaintiff United States of

18  America ("United States") (Doc. 391, USA Mot.), in addition to Motions and Cross-

19  Motions for Partial Summary Judgment by several non-profit organizations ("Private

20  Plaintiffs").

21  **I.      BACKGROUND**

22    The facts of this case were summarized in the Court's prior Order regarding the

23  State's Motion to Dismiss. (*See generally* Doc. 304, 02/16/2023 Order.) This case

24  addresses the legality of two Arizona laws, H.B. 2243 and H.B. 2492 ("the Voting

25  Laws"), which amended provisions regulating voter registration under Title 16 of the

26  Arizona Revised Statutes. (Doc. 388, Non-US SOF ¶¶ 4–5.) The Voting Laws, effective

27  January 1, 2023, enable State officials to require heightened proof of citizenship and

28  residency from Arizona applicants and registrants and mandate certain consequences if a

registrant does not provide such proof. (*Id.* ¶¶ 2–5, 31, 35–50.) The Voting Laws also provide for monthly comparisons of certain registered voters to several databases and cancellation of registrations after those database comparisons. (*Id.* ¶¶ 3–4, 48–50.)

## A.    Substance of the Voting Laws

An individual seeking to register to vote in Arizona state elections must provide one of the following forms of "satisfactory evidence of citizenship," also known as documentary proof of citizenship or "DPOC":

> 1.  The number of the applicant's driver license or nonoperating identification license issued after October 1, 1996 by the department of transportation or the equivalent governmental agency of another state within the United States if the agency indicates on the applicant's driver license or nonoperating identification license that the person has provided satisfactory proof of United States citizenship.

> 2. A legible photocopy of the applicant's birth certificate that verifies citizenship to the satisfaction of the county recorder.

> 3. A legible photocopy of pertinent pages of the applicant's United States passport identifying the applicant and the applicant's passport number or presentation to the county recorder of the applicant's United States passport.

> 4. A presentation to the county recorder of the applicant's United States naturalization documents or the number of the certificate of naturalization. If only the number of the certificate of naturalization is provided, the applicant shall not be included in the registration rolls until the number of the certificate of naturalization is verified with the United States immigration and naturalization service by the county recorder.

> 5. Other documents or methods of proof that are established pursuant to the Immigration Reform and Control Act of 1986.

> 6. The applicant's Bureau of Indian affairs card number, tribal treaty card number or tribal enrollment number.

Ariz. Rev. Stat. § 16-166(F).

In addition to providing applicants a State Form to register for state and federal elections, Arizona also provides a form created by the United States Election Assistance Commission, known as the Federal Form, to register for federal elections. *See Gonzales v. Arizona*, 677 F.3d 383, 394 (9th Cir. 2012); (*see generally* Doc. 365-1, Ex. C, Federal Form at 26; *see* Doc. 365-1, Ex. D, State Form.) Subject to certain limitations, states may require additional information from applicants seeking to vote in both state and federal

elections. *See Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 12–13 (2013).

In 2018, the Arizona Secretary of State entered into a Consent Decree with Plaintiff League of United Latin American Citizens ("LULAC") after the nonprofit sued Arizona for allegedly discriminating against individuals who submitted the State Form without providing DPOC. (Non-US SOF ¶¶ 24–25.) The LULAC Consent Decree mandates that Arizona may not entirely reject an otherwise valid State Form submitted without DPOC, but rather must register that State Form applicant for federal elections. (*Id.*; Doc. 388-4, Ex. 12, LULAC Consent Decree at 8–9.) In short, the LULAC Consent Decree requires Arizona to treat Federal and State Form users the same when registering applicants for federal elections. The Federal Form and State Form both include a checkbox for applicants to indicate under penalty of perjury that they are citizens of the United States. (*See* Federal Form; State Form.)

### 1.    H.B. 2492

H.B. 2492 created additional requirements for individuals using either the Federal or State Form to show citizenship and Arizona residence. Specifically, "[a] person is presumed to be properly registered to vote," only if she, *inter alia*, provides documentary "proof of location of residence" ("DPOR"), lists her place of birth[1] ("Birthplace Requirement"), and marks "yes" in the checkbox confirming United States citizenship ("Checkbox Requirement"). A.R.S. § 16-121.01(A);  *see id.* § 16-123. Unlike preexisting Arizona law, H.B. 2492 contains no exceptions to the DPOR requirement for applicants who do not have numbered street addresses, but the Secretary of State has since provided a chart recognizing that certain voters may provide DPOR without a traditional street address or any address at all. (*See* Non-US SOF ¶¶ 27–34.)

H.B. 2492 also provides different DPOC requirements for applicants using the Federal or State Form:

> Except for a form produced by the United States Election Assistance Commission, any application for registration shall be accompanied by satisfactory evidence of citizenship as prescribed in Section 16-166,

---

[1] The Federal Form does not include a space to collect an applicant's birthplace information. (*See* Federal Form at 26.)

> Subsection F, and the county recorder . . . shall reject any application for registration that is not accompanied by satisfactory evidence of citizenship.

A.R.S. § 16-121.01(C)

> Federal only voters; early ballot; eligibility
>
> Notwithstanding any other law:
> 1. A person who has registered to vote and who has not provided satisfactory evidence of citizenship as prescribed by Section 16-166, Subsection F is not eligible to vote in presidential elections.
> 2. A person who has not provided satisfactory evidence of citizenship pursuant to Section 16-166, Subsection F and who is eligible to vote only for federal offices is not eligible to receive an early ballot by mail.

*Id.* § 16-127(A).

The statute places the burden on county recorders to enforce the standards of H.B. 2492. "Within ten days after receiving an application for registration [through the Federal Form] that is not accompanied by [DPOC], the county recorder or other officer in charge of elections shall use all available resources to verify the citizenship status of the applicant." *Id.* § 16-121.01(D). The statute prescribes a specific verification process:

> [A]t a minimum, [the election official] shall compare the information available on the application for registration with the following, provided the county has access:
> 1. The Department of Transportation databases of Arizona driver licenses or nonoperating identification licenses.
>
> 2. The Social Security Administration databases.
>
> 3. The United States Citizenship and Immigration Services Systematic Alien Verification for Entitlements program, if practicable.
>
> 4. A National Association for Public Health statistics and information systems electronic verification of vital events system.
>
> 5. Any other state, city, town, county or federal database and any other database relating to voter registration to which the County Recorder . . . has access, including an electronic registration information center database.

*Id.*

The statute provides for three different outcomes from this verification. First, if the election official "matches the applicant with information that verifies the applicant is a United States citizen . . . the applicant shall be properly registered." *Id.* § 16-121.01(E). Second, if the election official "matches the applicant with information that the applicant

is not a United States citizen, the county recorder . . . shall reject the application, notify the applicant that the applicant was rejected because the applicant is not a United States citizen and forward the application to the county attorney and attorney general for investigation." *Id.* Third, if the election official "is unable to match the applicant with appropriate citizenship information, the [official] shall notify the applicant that [her citizenship could not be verified] and that the applicant will not be qualified to vote in a presidential election or by mail with an early ballot in any election until [DPOC] is provided." *Id.*

Lastly, the statute mandates prosecution of certain registrants referred for investigation. Election officials must "make available to the attorney general a list of all individuals who are registered to vote and who have not provided satisfactory evidence of citizenship pursuant to Section 16-166." *Id.* § 16-143(A). The attorney general must then use "all available resources to verify the citizenship" of the referred applicants and "at a minimum shall compare the information available on the application for registration" with the same databases listed in § 16-121.01(D) of the statute. *Id.* § 16-143(B). "The attorney general shall prosecute individuals who are found to not be United States citizens pursuant to § 16-182." *Id.* § 16-143(D).

### 2. H.B. 2243

H.B. 2243 expands the requirements imposed by H.B. 2492 for the cancellation of registrations for persons suspected of being non-citizens. Specifically, a county recorder must cancel a voter registration:

> When the county recorder obtains information pursuant to this section and confirms that the person registered is not a United States citizen . . . . Before the county recorder cancels a registration pursuant to this paragraph, the county recorder shall send the person notice by forwardable mail that the person's registration will be canceled in thirty-five days unless the person provides satisfactory evidence of United States citizenship pursuant to § 16-166. The notice shall include a list of documents that person may provide and a postage prepaid preaddressed returned envelope. If the person registered does not provide satisfactory evidence within thirty-five days, the county recorder shall cancel the registration and notify the county attorney and attorney general for possible investigation.

*Id.* § 16-165(A)(10). H.B. 2243 also mandates monthly review of voter rolls:

1
2
3
4
5

> To the extent practicable, each month the county recorder shall compare persons who are registered to vote in that county and who the county recorder has reason to believe are not United States citizens and persons who are registered to vote without satisfactory evidence of citizenship as prescribed by § 16-166 with the systematic alien verification for entitlements program maintained by the United States citizenship and immigration services to verify the citizenship status of the persons registered.

6
7
8
9
10

*Id.* § 16-165(I). County recorders must conduct similar checks with the Social Security Administration Database, Verification of Vital Events System, and "relevant city, town, county, state and federal databases to which the county recorder has access to confirm information obtained that requires cancellation of registrations pursuant to this section." *See id.* § 16-165(G)–(K).

11

### B.   Procedural History

12
13
14
15
16
17
18
19
20
21
22

On March 31, 2022, Mi Familia Vota Plaintiffs[2] filed their Complaint in this Court. (Doc. 1, 03/31/2022 Mi Familia Vota Compl.) The United States and additional Private Plaintiffs subsequently filed lawsuits attacking the legality of the Voting Laws and these lawsuits were consolidated into the instant case. (*E.g.*, Doc. 164, 11/10/2022 Order re: Consolidation.) On March 23, 2023, the parties agreed to brief motions for summary judgment only regarding issues that could be adjudicated without discovery. (*See* Doc. 337, Sched. Min. Entry; Doc. 338, Sched. Order.) On May 8, 2023, the State filed its Motion, moving for partial summary judgment on several of Plaintiffs' claims that the Voting Laws are unlawful under the National Voter Registration Act ("NVRA") and the Materiality Provision of the Civil Rights Act of 1964, 52 U.S.C. § 10101(a)(2) (the "Materiality Provision"). (*See generally* State Mot.)

23
24
25
26

Specifically, the State asserts that Section 6 of the NVRA, 52 U.S.C. § 20505 ("Section 6"), preempts H.B. 2492's requirement that voters provide DPOC to vote in presidential elections. (*Id.* at 2–3.) The State also concedes that Section 6 precludes Arizona from requiring DPOR to register for federal elections. (*Id.* at 4, 16–17.) But the

27
28

---

[2] The Court references organizational Plaintiffs that have filed collectively under the name of one organization. "LUCHA Plaintiffs," for example, includes all additional Plaintiffs that are named on the briefing with LUCHA.

State argues that the Voting Laws' restriction on mail-in voting is "likely" lawful under Section 6. (*Id.* at 3–4.) The State further argues that it is entitled to summary judgment on Plaintiffs' claims that the Voting Laws violate Section 8 of the NVRA, 52 U.S.C. § 20507 ("Section 8") by unlawfully cancelling voter registrations and unlawfully purging voter rolls. (*Id.* at 5–10.) Regarding Plaintiffs' claims under the Materiality Provision, the State contends that the Voting Laws do not run afoul of its prohibition of denying the right to vote based on immaterial errors or omissions in a person's registration. (*Id.* at 10–14.) The State additionally moves for summary judgment on Plaintiff Promise Arizona's claim that the Voting Laws are unconstitutionally vague. (*Id.* at 15–16.)

The RNC then filed its Motion on May 15, 2023, cross-moving for summary judgment regarding Arizona's power to regulate voting in presidential elections and arguing additional issues unaddressed by the State. (*See generally* RNC Mot.) Asserting that the NVRA cannot lawfully regulate presidential elections, the RNC argues that H.B. 2492's DPOC requirement for presidential elections does not run afoul of Section 6. (*Id.* at 2–8.) The RNC also underscores that Arizona may require DPOC from mail-in voters. (*Id.* at 8–9.) Additionally, the RNC moves for summary judgment on Plaintiffs' claims that, *inter alia*, Section 8 requires Arizona to register State Form users who register without DPOC for federal elections.

On June 5, 2023, the United States and Private Plaintiffs either cross-moved for summary judgment or opposed summary judgment on all issues addressed by the State and the RNC, except that Plaintiffs agreed with the State's conclusion regarding the Voting Laws' DPOR requirement. (*E.g.*, Doc. 391, USA Mot.) Specifically, Plaintiffs cross-move for summary judgment on all Section 6 claims, arguing that the NVRA preempts H.B. 2492's limitations on presidential and mail-in voting, as well as H.B. 2492's DPOR requirement. (*E.g.*, Doc. 393, DNC Mot. at 5–15; Doc. 390, Tohono O'odham Mot. at 4–10.) Plaintiffs also argue that the Court should grant summary judgment to Plaintiffs on their claim that the Voting Laws contravene Section 8 by

enabling cancellation of registrations within 90 days of an election.[3] (Doc. 396, AAANHPI Mot. at 3–7; DNC Mot. at 16.) Mi Familia Vota cross-moves for summary judgment on its Materiality Provision claims, while the United States and LUCHA argue that issues of fact preclude summary judgment. (USA Mot. at 16–25; Doc. 394, LUCHA Mot. at 5–7; Doc. 399, Mi Familia Vota Mot. at 1–9.) Poder Latinx also moves for summary judgment on its § 10101 claim. (Doc. 397, Poder Latinx Mot. at 1–8.) But Plaintiffs contend that fact issues preclude summary judgment on their claims that the Voting Laws violate Section 8 by mandating cancellation for reasons not permitted by the NVRA; subjecting registrants to nonuniform and discriminatory voter roll maintenance programs; and failing to ensure all eligible applicants to vote are registered to vote within 30 days of an election. (LUCHA Mot. at 13–15; AAANHPI Mot. at 8–13; Poder Latinx Mot. at 8–16.) Promise Arizona also opposes summary judgment on its void-for-vagueness claim. (*See generally* Doc. 395, Promise Arizona Resp.)

The State and the RNC responded and replied to Plaintiffs' filings on July 5, 2023, to which Plaintiffs replied on July 19, 2023. (Doc. 436, State Reply; Doc. 442, RNC Reply; Doc. 473, Tohono O'odham Reply; Doc. 474, Poder Latinx Reply; Doc. 475, DNC Reply; Doc. 476, USA Reply; Doc. 477, AAANHPI Reply; Doc. 478, Mi Familia Vota Reply.) The Court heard oral argument on all Motions and Cross-Motions on July 25, 2023. (Doc. 479, Min. Entry.)

## II.   LEGAL STANDARDS & ANALYSIS

Under Federal Rule of Civil Procedure 56, summary judgment is properly granted when: (1) there is no genuine dispute as to any material fact; and (2) after viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Eisenberg v. Ins. Co. of N. Am.*, 815 F.2d 1285, 1288–89 (9th Cir. 1987). A fact is "material" when, under the governing substantive law, it could affect the outcome of

---

[3] Plaintiffs also move for summary judgment on their claim that Section 8(a) of the NVRA prevents Arizona for requiring DPOC to vote in presidential elections, but the Court will not reach this claim.

1  the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

2      **A.    NVRA**

3      For the following reasons, the Court concludes that Section 6 preempts H.B.

4  2492's (1) DPOR requirement; (2) restriction on voting in presential elections; and (3)

5  restriction on mail-in voting. The Court also concludes that Section 8(c) of the NVRA

6  forecloses enforcement of the Voting Laws' systematic purge provisions within 90 days

7  of any federal elections. However, with the exception of Plaintiffs' argument that Section

8  8(b) applies to pre-registration oversight and the parties' arguments regarding registering

9  State Form users for federal elections, the Court finds that there are genuine issues of

10 material fact precluding summary judgment regarding whether certain provisions of the

11 Voting Laws contravene Sections 8(a) and (b) of the NVRA.

12      **1.    Section 6**

13     Section 6 of the NVRA requires that states "accept and use" the Federal Form to

14 register voters in federal elections. 52 U.S.C. § 20505(a)(1); *Inter Tribal*, 570 U.S. at 9.

15 Certain Plaintiffs and the State contend that H.B. 2492 violates Section 6 by requiring

16 Federal Form users to submit DPOR. (*See* Doc. 390, Tohono O'odham Mot. at 3–5.) All

17 parties who briefed this issue agree that Section 6 preempts H.B. 2492's DPOR

18 requirement. The Court will grant summary judgment on this issue.[4] (*Id.*; State Reply at

19 14; *see* Doc. 502, Hr'g Tr. at 40:18–41:18.) The parties dispute whether H.B. 2492's

20 requirements that registrants provide DPOC to vote (1) in presidential elections and (2)

21 by mail are legal under the NVRA. (*E.g.*, DNC Mot. at 5; RNC Mot. at 2–9.)

22     A state law may be preempted if, *inter alia*, Congress makes an express statement

23 to displace state law, "it is impossible for a private party to comply with both state and

24 federal requirements," or a state law "creates an unacceptable obstacle to the

25 accomplishment and execution of the full purposes and objectives of Congress."

26 *Chamber of Commerce v. Bonta*, 62 F.4th 473, 482 (9th Cir. 2023) (internal citation and

27 quotation marks omitted). The Court finds that Section 6 preempts both H.B. 2492's

28 ────────────
[4] The State also agrees with Tohono O'odham Plaintiffs' requested clarifications about
the DPOR requirement. (State Reply at 46–50.)

1  requirement that registrants provide DPOC to vote in presidential elections and its

2  restriction on mail-in voting.[5]

3  ### a.  Presidential Elections

4  All Plaintiffs and the State contend that Section 6 preempts H.B. 2492's

5  requirement that Federal Form users provide DPOC in order to vote in presidential

6  elections. (State Mot. at 2; *e.g.*, USA Mot. at 7–10; DNC Mot. at 5–6.) The RNC counters

7  that such preemption arguments "ignore[] the constitutional constraints on Congress's

8  power to regulate presidential elections," and "applying the NVRA only to congressional

9  elections gives proper effect to Elections Clause, the Electors Clause, the NVRA, and

10 H.B. 2492." (RNC Mot. at 2–6); *see also* U.S. Const. art. II, § 1, cl. 2 ("Electors Clause")

11 ("Each State shall appoint, in such Manner as the Legislature thereof may direct,"

12 presidential electors). The Court agrees with Plaintiffs and the State that Section 6

13 preempts H.B. 2492's limitation on voting in presidential elections.

14 The plain language of the NVRA reflects an intent to regulate all elections for

15 "[f]ederal office," including for "President or Vice President." 52 U.S.C. §§ 20507(a),

16 30101(3); *California Restaurant Ass'n v. City of Berkeley*, 65 F.4th 1045, 1050 (9th Cir.

17 2023) ("As with any express preemption case, our focus is on the plain meaning of [the

18 statute]."). And binding precedent indicates that Congress has the power to control

19 registration for presidential elections. *See* 52 U.S.C. §§ 20502(a), 30101(3) (NVRA sets

20 criteria for registering for "[f]ederal office"; defining "[f]ederal office" to include office

21 of the president). In 1934, the United States Supreme Court rejected a narrow framing of

22 Congress's power over presidential elections, writing:

23     The only point of the constitutional objection necessary to be considered is
        that the power of appointment of presidential electors and the manner of
24     their appointment are expressly committed by section 1, art. 2, of the
        Constitution to the states, and that the congressional authority is thereby
25     limited to determining 'the Time of chusing the Electors, and the Day on
        which they shall give their Votes; which Day shall be the same throughout
26     the United States.' So narrow a view of the powers of Congress in respect
        of the matter is without warrant.

27

28
---
[5] The Court will not reach Mi Familia Vota Plaintiffs' related Section 8(a) claim as it
applies to Federal Form users. (*See* Mi Familia Vota Mot. at 15 n.12.)

*Burroughs v. United States*, 290 U.S. 534, 544 (1934). While *Burroughs* specifically addressed the constitutionality of a federal statute regulating campaign contributions in presidential elections, the Supreme Court later wrote that the decision more generally "recognized broad congressional power to legislate in connection with the elections of the President and Vice President." *Buckley v. Valeo*, 424 U.S. 1, 13 n.16 (1976).

Drawing on this authority, the Ninth Circuit has recognized Congress's power to regulate all federal elections under the NVRA. In *Voting Rights Coalition v. Wilson*, the Ninth Circuit rejected a challenge to the constitutionality of the NVRA, holding that because Congress has power under the Elections Clause to "alter state laws pertaining to the 'Times, Places and Manner' of electing Representatives and Senators," the NVRA may constitutionally "conscript state agencies to carry out voter registration for the election of Representatives and Senators. The exercise of that power by Congress is by its terms intended to be borne by the states without compensation." 60 F.3d 1411, 1413–15 (9th Cir. 1995) (citing U.S. Const. art. I, § 4, cl. 1 ("Elections Clause")). And acknowledging that "the Supreme Court has read the grant of power to Congress in Article I, section 4 as quite broad," the Ninth Circuit added that "the broad power given to Congress over congressional elections has been extended to presidential elections." *Id.* at 1414 (citing *Burroughs*, 290 U.S. at 545). The DNC and RNC dispute whether the latter rationale is dicta. (RNC Reply at 5; DNC Reply at 7–8.) But the DNC persuasively raises that this "broad" reading of the Elections Clause must have been essential to the Ninth Circuit's decision to deem the NVRA constitutional, as the NVRA plainly regulates congressional and presidential elections. (*See* DNC Reply at 8.)

The parties also dispute the impact of *Inter Tribal Council* on whether the NVRA constitutionally regulates presidential elections. (DNC Mot. at 5–7; RNC Mot. at 2–7; RNC Reply at 3–4.) Contrary to the RNC's arguments, *Inter Tribal Council* underscores that the Elections Clause gives Congress the power to regulate all federal elections, and that Congress intended to exercise this power through the NVRA to preempt conflicting state laws. The *Inter Tribal* Court affirmed the states' power to "establish qualifications

(such as citizenship) for voting" on the basis that "the Elections Clause empowers Congress to regulate *how* federal elections are held, but not *who* may vote in them." 570 U.S. at 16 (emphasis original).[6] And the Court described the full preemptive impact of the NVRA:

> The assumption that Congress is reluctant to pre-empt does not hold when Congress acts under that constitutional provision, which empowers Congress to "make or alter" state election regulations. Art. I, § 4, cl. 1. When Congress legislates with respect to the "Times, Places and Manner" of holding congressional elections, it necessarily displaces some element of a pre-existing legal regime erected by the States. Because the power the Elections Clause confers is none other than the power to pre-empt, the reasonable assumption is that the [NVRA's] text accurately communicates the scope of Congress's pre-emptive intent.

*Id.* at 14. The Supreme Court also foreclosed the Tenth Amendment argument offered by the RNC, reasoning that "[u]nlike the States' historic police powers, States' role in regulating congressional elections—while weighty and worthy of respect—has always existed subject to the express qualification that it terminates according to federal law." *Id.* at 15 (internal quotation marks and citations omitted); *see also* 1 Story § 627 ("It is no original prerogative of state power to appoint a representative, a senator, or president for the union"); (USA Mot. at 14 (citing *Cook v. Gralike*, 531 U.S. 510, 522 (2001)); RNC Mot. at 4.) *Inter Tribal Council* and additional controlling authority indicate that H.B. 2492's restriction on Federal Form users voting in presidential elections is expressly preempted by Section 6.[7]

### b.    Voting by Mail

Plaintiffs also contend that Section 6 preempts H.B. 2492's requirement that Federal Form users provide DPOC in order to vote by mail. (*E.g.*, DNC Mot. at 7.) The

---

[6] The RNC argues that in *Oregon v. Mitchell*, 400 U.S. 112 (1970), "[f]ive Justices took the position that the Elections Clause did not confer upon Congress the power to regulate voter qualifications in federal elections." (RNC Mot. at 5 (quoting *Inter Tribal Council*, 570 U.S. at 16 n.8).) But this assertion has no impact on any Motion, as Section 6 does not regulate voter qualifications.

[7] Contending that the Elections Clause was not the only source of congressional power behind the NVRA, the DNC argues that the Fourteenth and Fifteenth Amendments also legitimize the statute's regulation of presidential elections. (DNC Mot. at 2.) Because the Court concludes that the Elections Clause gives Congress power to regulate presidential elections under the NVRA, it need not reach any argument regarding the Fourteenth and Fifteenth Amendments.

RNC counters that the NVRA does not apply to *voting* by mail or the "mechanisms for . . . voting," but only to registering to vote. (RNC Mot. at 4, 4 n.2, 8.) The State similarly asserts that H.B. 2492's mail-in voting restriction is "likely not" preempted, as Section 6 pertains to "what states must do 'for the *registration*' of voters." (State Mot. at 3–4 (quoting § 20505(a)(1)) (emphasis in original).) But both the text and purpose of the NVRA contradict Defendants' narrow framing of the statute.

The text of the NVRA provides for circumstances where a state may limit voting by mail, implying that a state may not limit absentee voting outside of these prescribed circumstances.  52 U.S.C. § 20505(c)(1) (permitting states to require first-time voters to vote in person if those voters registered to vote by mail), (c)(2) (clarifying that paragraph (c)(1) does not apply to individuals who are otherwise entitled to an absentee ballot under federal law); (*see also* DNC Mot. at 9.) Had Congress intended to permit states that allow absentee voting to require in-person voting under additional circumstances—including when an registrant fails to provide DPOC—it could have said so in the NVRA. *See N.L.R.B. v. SW General, Inc.*, 137 S. Ct. 929, 940 (2017) (explaining that the interpretive canon *expressio unius est exclusio alterius* applies when "circumstances support a sensible inference that the term left out must have been meant to be excluded") (internal citation and quotation marks omitted). Not only does the statute exclude failure to provide DPOC among the reasons a state may require an individual to vote in person, but as explained below, the purpose of the NVRA supports an inference that Congress meant to limit the number of circumstances in which a state could prevent an individual from voting by mail.

Regarding the purpose of the NVRA, Congress recorded that it enacted the NVRA not just to "establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office," but also to "to make it possible for Federal, State, and local governments to implement this chapter in a manner that *enhances the participation of eligible citizens as voters* in elections for Federal office." 52 U.S.C. § 20501(b)(1)–(2) (emphasis added). Further, Congress found that

"discriminatory and unfair registration laws and procedures can have a direct and damaging effect on *voter participation in elections* for Federal office and disproportionately harm voter participation by various groups, including racial minorities" and it is the duty of "Federal, *State, and local governments* to promote the exercise of the [fundamental] right" to vote. *Id.* § 20501(a) (emphasis added).

Given Congress's purpose behind the NVRA, the DNC correctly raises not only that the statute's DPOC requirement to vote by mail is directly preempted by Section 6, but also that obstacle preemption bars the statute's enforcement. (DNC Reply at 2.) "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000). "If the purpose of the act cannot otherwise be accomplished—if its operation within its chosen field else must be frustrated and its provisions be refused their natural effect—the state law must yield to the regulation of Congress within the sphere of its delegated power." *Id.* (citation omitted). No party contests that Congress at least has the power to regulate congressional elections, and the findings and purposes included in the NVRA reflect an intent to increase voter turnout, largely but not exclusively through diminishing barriers to registration. Roughly 89 percent of Arizona voters cast ballots by mail in the 2020 election, indicating that most eligible Arizonans choose to vote by mail. (Non-US SOF ¶ 60.) By offering mail-in voting to registrants who provided DPOC but not to Federal Form registrants who omitted such documentation, H.B. 2492's mail-in voting restriction disadvantages Federal Form users by placing an additional burden—which is not required by the Federal Form—on federal-only voters to exercise Arizona's preferred method of casting a ballot. *See Inter Tribal*, 570 U.S. at 15 ("[A] state-imposed requirement of evidence of citizenship not required by the Federal Form is 'inconsistent with' the NVRA's mandate that States 'accept and use' the Federal Form.") H.B. 2492's limitation on voting by mail frustrates the purpose of the NVRA, as it impedes Arizona's "promot[ion] of the right" to vote. 52 U.S.C. § 20501(a). This limitation presents an

"obstacle to the accomplishment of Congress's full objectives under the" NVRA, and the Court "find[s] that the state law undermines the intended purpose and 'natural effect'" of the NVRA. *Crosby*, 530 U.S. at 373 (citation omitted).

### 2.      Section 8

Section 8 of the NVRA mandates that states respect additional requirements when administering registration and roll maintenance programs. *See generally* 52 U.S.C. § 20507. The State and the RNC move for summary judgment on Plaintiffs' claims that (1) H.B. 2243 unlawfully allows for cancellation of registration within 90 days of an election; (2) H.B. 2243 allows cancellation for reasons unsanctioned by the NVRA; (3) the Voting Laws enable nonuniform and discriminatory maintenance procedures; and (4) H.B. 2492 fails to ensure that all eligible State Form users are registered to vote in federal elections. (State Mot. at 5–10; RNC Reply at 9–12.) Plaintiffs also move for summary judgment on H.B. 2243's cancellation of registration within 90 days of an election, but oppose summary judgment on all other issues.

### a.      Cancellation Within 90 Days of Election

Section 8(c)(2) mandates that States "shall complete, not later than 90 days prior to the date of a primary or general election for Federal office, any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters" ("90-day Provision"). 52 U.S.C. § 20507(c)(2)(A). While states must pause any such systematic purge within 90 days of a federal election, States may continue to implement individualized[8] removal programs within this 90-day window. *See Arcia*, 772 F.3d at 1344–45 (discussing whether a program to remove noncitizens from the voter rolls within 90 days of an election by, *inter alia*, running registrants through the Systematic Alien Verification for Entitlements system is a systematic program contravening Section 8). The NVRA enumerates certain exceptions to the prohibition on removals before an election, which are "criminal conviction or mental incapacity," "the

---

[8] An "individualized" removal program means one in which a state determines eligibility to vote with "individualized information or investigation" rather than cancelling batches of registrations based on a set procedure. *See Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1344 (11th Cir. 2014).

1   death of a registrant," "a change in the residence of the registrant," or "correction of

2   registration records pursuant to this chapter." 52 U.S.C. § 20507(a)(3)–(4), (c)(2)(B).

3         Plaintiffs assert that the Voting Laws violate Section 8(c) because they allow

4   systematic cancellation of registrations within 90 days of federal elections. (*E.g.*,

5   AAANHPI Mot. at 8–10.) The Court agrees. The Voting Laws contain no provision

6   limiting systematic roll review and registration cancellation to at least 90 days prior to a

7   federal election.[9] (*See id.*); A.R.S. § 16-165(G)–(K). The State acknowledges that the

8   Voting Laws fail to limit systematic purges within 90 days of an election, but claims that

9   Section 8 does not prevent states from cancelling registrations of voters found to be

10  noncitizens within this 90-day window. (State Mot. at 9.) Though all parties agree that

11  citizenship is a requirement for voting, the State ignores the text and purpose of the 90-

12  day provision.

13        The 90-day Provision prohibits systematic cancellation of registrations within 90

14  days of an election. First, Section 8 plainly forbids "any program" to routinely remove

15  registrants, subject to enumerated exceptions, and "the phrase 'any program' suggests

16  that the 90 Day Provision has a broad meaning. . . . [R]ead naturally, the word 'any' has

17  an expansive meaning, that is 'one or some indiscriminately of whatever kind.'" *Arcia*,

18  772 F.3d at 1344 (quoting *United States v. Gonzales*, 520 U.S. 1, 5 (1997)). And "[w]here

19  Congress explicitly enumerates certain exceptions to a general prohibition, additional

20  exceptions are not to be implied, in the absence of evidence of a contrary legislative

21  intent." *Id.* at 1345 (quoting *Andrus v. Glover Constr. Co.*, 446 U.S. 608, 616–17 (1980)).

22  Second, the Court agrees with the Eleventh Circuit that the 90-day provision "is designed

23  to carefully balance [the] . . . purposes in the NVRA," which include protecting the

24  integrity of the electoral process and ensuring that accurate rolls are maintained, yet also

25  fostering procedures that will "enhance[] the participation of eligible citizens as voters in

---

26  [9] The DNC seeks summary judgment on its claim that H.B. 2492 violates Section 8
27  because "it places no time limit on the direction to county recorders to cancel
    registrations when they 'receive[] and confirm[] information that [a] person registered is
    not' a U.S. citizen." (DNC Mot. at 16 (quoting H.B. 2492) (alterations in original).) This
28  provision of H.B. 2492 was superseded by H.B. 2243. *Compare* H.B. 2492, § 8, *with*
    H.B. 2243, § 2.

elections for Federal office." *Id.* at 1346. It makes sense that Congress "decided to be more cautious" leading up to an election cycle, as systematic cancellation programs can cause inaccurate removal and "[e]ligible voters removed days or weeks before Election Day will likely not be able to correct the State's errors in time to vote." *Id.*; (*see* Non-US SOF ¶¶ 48–49.) But individualized removals, not expressly forbidden within the 90-day window, are based on more "rigorous" registrant-specific inquiries "leading to a smaller chance for mistakes." *Arcia*, 772 F.3d at 1346.

The State's arguments to the contrary do not persuade the Court. Relying heavily on *United States v. Florida*, 870 F. Supp. 2d 1346, 1350 (D. Fla. 2012), the State argues that the 90-day Provision does not "apply to removing noncitizens who were not properly registered in the first place." (State Mot. at 9 (quoting *Florida*, 870 F. Supp. 2d at 1350).) Yet the State ignores that the Eleventh Circuit rejected *Florida*'s reasoning in *Arcia*. *See Arcia v. Detzner*, NO. 12–22282–CIV–ZLOCH, 2015 WL 11198230, at *1 n.1 (S.D. Fla. Feb. 12, 2015) (describing conclusion reversed in *Arcia* as the same one reached in *United States v. Florida*). The State also relies on *Bell v. Marinko*, 367 F.3d 588 (6th Cir. 2004), in which the Sixth Circuit upheld a state statute enabling purges of precinct nonresidents within the 90-day window. But the *Bell* Court did not expressly consider the effect of individualized purges, the dual purposes of Section 8, or the plain meaning of "any" in Section 8(c)(2)(A). *Bell*, 367 F.3d at 591–92. Further, the facts of *Bell* are distinguishable from the Voting Laws. The statute at issue in *Bell* provided for individual "challenge hearings," which were "devoted to investigating each [registrant's] residence," before an alleged nonresident was purged from the voter roll. *Id.* at 590.

The State alternatively asks the Court to read the 90-day Provision into the Voting Laws, "harmoniz[ing]" the statutes with another Arizona law that mandates compliance with the NVRA, while Equity Coalition requests a declaration that Section 2 of H.B. 2243 violates the 90-day Provision. (State Mot. at 10; AAANHPI Mot. at 7–8, 10.) While the Court agrees with Plaintiffs that the State may still conduct individualized voter removals within the 90-day window, the systematic removal program mandated by H.B.

1    2243 violates Section 8(c)(2) of the NVRA.

2                    **b.      Grounds for Cancellation**

3              As described above, Section 8(a) lists the grounds upon which a State can cancel

4    registrations for federal elections. 52 U.S.C. § 20507(a)(3)–(4). According to Defendant

5    Fontes, "H.B. 2243 do[es] not specify what type, set, or combination of 'information'

6    establishes that a registered voter 'is not a United States citizen' or what information is

7    sufficient to match an individual in a database with the registered voter or applicant, and .

8    . . some United States citizens may be erroneously flagged as non-citizens based on

9    potentially outdated and inaccurate data." (Non-US SOF ¶ 49 (quoting Doc. 189, Sec'y of

10   State Ans. ¶ 44).) Additionally, "if a county recorder obtains information and confirms

11   that a registered voter is not a United States citizen, which may be based on potentially

12   unreliable and outdated sources, and if, after receiving a notice, the voter does not

13   provide proof of citizenship within 35 days, the recorder must cancel the registration and

14   notify the county attorney and Attorney General for possible investigation." (*Id.* ¶ 50

15   (quoting Ex. 21, Doc. 63, 22-cv-1381, Sec'y of State Ans. ¶ 12).) The State argues that

16   because "citizenship is a basic requirement for voting," the Voting Laws' cancellation

17   provision cannot violate Section 8 as a matter of law, otherwise the NVRA "would

18   effectively grant, and then protect, the franchise of persons not eligible to vote." (State

19   Mot. at 8.)

20             Plaintiffs correctly counter that "[t]he very real fact questions about voters'

21   citizenship status and how successful the removal scheme will be in identifying truly

22   ineligible voters make summary judgment inappropriate here." (AAANHPI Mot. at 12.)

23   The State admits that only registrants suspected of being noncitizens are subjected to

24   arguably unreliable database checks, which Plaintiffs may be able to prove result in

25   inaccurate identification of noncitizens, cancellation of registration for reasons not

26   permitted by the NVRA, and wrongful referral for prosecution. (Non-US SOF ¶¶ 45–50.)

27   And again, the Court is not persuaded by the State's sparsely substantiated argument that

28   Arizona may freely cancel voter registrations of those individuals suspected of being

noncitizens merely because some such individuals might actually be noncitizens, nor does this outcome raise constitutional concerns. *Supra* Section II(A)(2)(a); *Arcia*, 772 F.3d at 1347–48 (Section 8 would raise constitutional concerns if it entirely prohibited states from removing noncitizens from voter rolls, but case did not present that question). The Court concludes that there remains an issue of fact as to whether the purge procedures mandated by H.B. 2243 will likely result in unlawful cancellation of legitimate voter registrations.

### c.   Discriminatory Maintenance Procedures

The State seeks summary judgment on Plaintiffs' claim that the Voting Laws violate Section 8(b) of the NVRA, titled "Confirmation of voter registration," which mandates that "[a]ny State program or activity to protect the integrity of the electoral process by ensuring the maintenance of an accurate and current voter registration roll for elections for Federal office . . . shall be uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965." 52 U.S.C. § 20507(b). Plaintiffs claim that the Voting Laws violate Section 8(b) by treating federal-only and full-ballot voters differently and imposing "disparate treatment as between naturalized citizens and U.S.-born citizens, as well as within and between Arizona counties." (*E.g.*, Poder Latinx Mot. at 8–9.) Specifically, Plaintiffs oppose summary judgment on the grounds that there remain factual issues regarding the effects of the allegedly discriminatory verification procedures mandated by the Voting Laws. (*Id.* at 9.)

As a threshold issue, the State argues that Section 8(b) only applies to post-registration voter roll maintenance, namely purges, and the State is entitled to judgment as a matter of law on any claim that the State treats *applicants* to vote in a nonuniform or discriminatory way. (State Mot. at 5–6.) Based on the plain language of the NVRA, the Court agrees with the State only to the extent the State argues that Section 8(b) does not apply to state programs regarding individuals not yet registered to vote. Section 8(b), which expressly addresses confirming rather than soliciting voter registration, speaks to ensuring the *maintenance*, not the enlargement, of current voter registration rolls. *See* 52

U.S.C. § 20507(b); (*see also* State Mot. at 5–6 (discussing legislative history indicating that Section 8(b) was intended "to prohibit selective or discriminatory purge programs").) Binding authority supports this interpretation, and Plaintiffs cite no case or make no argument to otherwise persuade the Court. *See, e.g.*, *Husted v. A. Philip Randolph Inst.*, 138 S.Ct. 1833, 1840 (2018) (referencing § 20507(b)(1) as a "limitation applicable to state removal programs").

The Court will deny summary judgment on Plaintiffs' remaining claims that Section 8(b) forbids the State from (1) cancelling existing voter registrations of individuals identified as noncitizens after running certain individuals through (an) unreliable database(s) and (2) referring certain individuals for investigation based on such unreliable data. The Secretary of State admitted that H.B. 2243 "requires a different 'standard, practice, or procedure' for determining a voter's qualifications for voters who a county recorder 'has reason to believe are not United States citizens' than for voters who a county recorder does not have reason to believe are not United States citizens." [10] (Non-US SOF ¶ 44 (citing Sec'y of State Ans. ¶ 102)); A.R.S. § 16-165(I). And the Secretary specifically admitted that H.B. 2243 mandates that county recorders distinguish between those registrants who will be subjected to the additional Systematic Alien Verification Entitlements program screens and those who "are not suspected of lacking U.S. citizenship [and] will not be subjected to the investigation and potential cancellations [sic] provisions set forth in H.B. 2243." (*Id.* ¶ 45 (citing Sec'y of State Ans. ¶¶ 102–03).); § 16-165(I). As the Court concludes that there are outstanding issues of fact as to how this purging will be executed and whether it causes nonuniform and discriminatory registration investigation and cancellation, the Court denies summary judgment on these

---

[10] Poder Latinx seeks summary judgment on its claim that the verification procedures' "reason to believe" standard violates 52 U.S.C. § 10101(a)(2)(A), which prohibits the State from "apply[ing] any standard, practice, or procedure" to determine an individual's qualification to vote that is "different from the standards, practices, or procedures applied" to other individuals "found by State officials to be qualified to vote." Because there remain issues of fact of when and how a county recorder will have "reason to believe" that a registered voter is a non-citizen and use the Systematic Alien Verification for Entitlements program to verify citizenship, the Court denies as moot Poder Latinx Plaintiffs' Motion on its 52 U.S.C. § 10101(a)(2)(A) claim. (*See* Poder Latinx Mot. at 1–5.)

1   Section 8(b) claims.[11]

2             **d.**        **State Form Users Registering for Federal Elections**

3         Section 8(a) of the NVRA mandates that States "ensure that any eligible applicant

4   is registered to vote in an election" when an applicant submits registration materials at

5   least 30 days before an election. 52 U.S.C. § 20507(a)(1); *see also* A.R.S. § 16-120(A) (a

6   registrant "shall not vote in an election called pursuant to the laws of this state unless the .

7   . . [individual's] registration has been received by the county recorder . . . before

8   midnight of the twenty-ninth day preceding the date of the election"). Plaintiffs argue,

9   *inter alia*, that the Voting Laws contravene Section 8(a) by mandating that applicants

10   who submit a State Form by mail or at public assistance agencies must provide DPOC in

11   order to be registered for any election.[12] (LUCHA Mot. at 14.) Countering that the

12   NVRA does not require states to register applicants not actually eligible to vote under

13   state criteria, namely "known noncitizens," the RNC seeks summary judgment on

14   Plaintiffs' claim that H.B. 2492 contravenes Section 8(a)'s requirement that states ensure

15   all eligible applicants to vote are actually registered to vote. (RNC Mot. at 2, 9–11;

16   LUCHA Mot. at 13–14.)

17         This claim is resolved by the existing LULAC Consent Decree, which requires

18   Arizona "County Recorders to accept State Form applications submitted without DPOC .

19   . . [and] to immediately register the applicants for federal elections, provided the

20   applicant is otherwise qualified and the voter registration form is sufficiently complete."

---

21  [11] The State "takes no position" on whether the Voting Laws "*as applied*, result in a non-

22  uniform or discriminatory program for maintaining accurate registration lists." (State Mot. at 6 n.12 (emphasis in original).) Offering an expansive definition of the term "non-

23  uniform" as "apply[ing] to less than an entire jurisdiction," the State argues that the Voting Laws still facially pass muster under Section 8(b). (*Id.* at 6.) But the State does

24  not address that even the text of the Voting Laws mandates purges that apply to "less than an entire jurisdiction," as only those registrants whom recorders have "reason to believe"

25  are noncitizens will be subject to heightened scrutiny through, *inter alia*, the Systematic Alien Verification for Entitlements program. The Court need not endorse a specific

26  definition of uniformity or parse Plaintiffs' facial and as-applied arguments to deny summary judgment on the Section 8(b) claim.

27  [12] The Court has already explained that Section 6 precludes Arizona from requiring DPOC from Federal Form users and will grant summary judgment regarding the Voting

28  Laws' DPOR requirement, so the Court need not address the parties' arguments regarding the effect of Section 8(a) in these respects. (*See* RNC Mot. at 9–11, RNC Reply at 7–8.)

(LULAC Consent Decree at 8.) The LULAC Consent Decree, which Judge Campbell has never set aside, makes no carve-out for mail-in registrations or individuals who register at public assistance agencies. (*See* Doc. 388-4, Ex. 15, Sec'y of State Voting Laws Implementation Email ("[Q]uestions remained as to whether we could implement [the Voting Laws'] requirements that would conflict with . . . federal settlements and court cases. Having thoroughly analyzed the changes that both bills require, the Secretary of State's Office believes that there is no way to implement certain requirements without conflicting with federal law . . . including *Documentary Proof of Citizenship for federal elections*." (emphasis added)).) Rather, it reflects that Arizona agreed to refrain from precisely the conduct that the RNC would have Arizona participate in. *C.f. Taylor v. United States*, 181 F.3d 1017, 1024 (9th Cir. 1999) ("Congress may change the law and, in light of changes in the law or facts, a *court* may decide in its discretion to reopen and set aside a consent decree under [Rule] 60(b) . . . but Congress may not direct a court to do so with respect to a final judgment (whether or not based on consent) without running afoul of the separation of powers doctrine." (internal citations omitted) (emphasis added)).[13]

### B.   Section 10101 of the Civil Rights Act

Plaintiffs argue that the Checkbox Requirement and the Birthplace Requirement

---

[13] Even if the Court were to accept the parties' position that the Voting Laws "roll[ed] back" the LULAC Consent Decree, the RNC's arguments are unpersuasive in light of the Court's Section 6 analysis. (Doc. 196, MTD Hr'g Tr. at 62:3–4; *see also* Doc. 67, LUCHA Compl. ¶ 90 (requiring DPOC for State Form user to register for federal elections "requires the Secretary to violate a federal consent decree"); *but see* Doc. 388-4, Ex. 19, Veto Letter from Recorder Cazares-Kelly at 1 (automatic State form rejection "had been eliminated by the consent decree in the LULAC case so that currently all voters are treated the same"). The State Form elicits the same information for federal-only voters as the Federal Form. (*Compare* State Form (federal-only information shaded red) *with* Federal Form at 26.) The State Form informs applicants that they will only be registered for "full ballot" elections if they provide proof of citizenship, but absent DPOC and the Birthplace Requirement discussed below, the State Form's requirements are substantively indistinguishable from the Federal Form. As long as Arizona has chosen to produce a State Form that offers registration for federal elections, it must abide by the requirements outlined in Section 6, cross-referenced to Section 8. *See* § 20505(a)(2) ("In addition to accepting and using the [Federal Form], a State may develop and use a mail voter registration form that meets all of the criteria stated in section 20508(b) of this title for the registration of voters in elections for Federal office."). And as above explained, the NVRA precludes states from requiring DPOC to register applicants for federal elections.

violate the Materiality Provision, which prohibits the State from denying an individual her right to vote "because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election."[14] 52 U.S.C. § 10101(a)(2)(B). The Materiality Provision was "intended to address the practice of requiring unnecessary information for voter registration with the intent that such requirements would increase the number of errors or omissions on the application forms, thus providing an excuse to disqualify potential voters." *Schwier v. Cox*, 340 F.3d 1284, 1294 (11th Cir. 2003). To be qualified to vote in Arizona, a person must be at least eighteen years old, a current United States citizen, and a current resident of Arizona. Ariz. Const. art. VII § 2.

The State asserts that the Checkbox Requirement and Birthplace Requirement do not violate the Materiality Provision because citizenship is material in determining a person's eligibility to vote and birthplace is material in determining a person's identity. (State Mot. at 10–14.) The Court concludes that the Checkbox Requirement violates the Materiality Provision when a person provides Arizona with DPOC. But the Court finds that there are genuine issues of fact precluding summary judgment on whether the Birthplace Requirement contravenes the Materiality Provision.

### 1.    The Checkbox Requirement

The State contends that the Checkbox Requirement does not violate the Materiality Provision because "citizenship is a requirement for voting in Arizona." (*Id.* at 11–13.) The United States counters that whether the Checkbox Requirement violates the Materiality Provision is question of fact inappropriate for summary judgment. (USA Mot. at 17–20.) Specifically, the United States contends that further discovery is necessary

---

[14] Plaintiffs do not dispute that the State can require DPOC to vote in state elections, but Plaintiffs do claim that requiring federal-only voters to provide DPOC to vote in presidential elections and by mail violates the Materiality Provision. (*E.g.*, Doc. 1, 22-cv-1124, USA Compl. ¶¶ 69–70; *see generally* USA Mot.; Mi Familia Vota Mot.; LUCHA Mot.) Because requiring DPOC for federal-only voters to vote in presidential elections and by mail violates Section 6, the Court need not address the parties' arguments as they relate to the Materiality Provision. (*See* State Mot. at 13.)

because the State posits without any "record evidence supporting its assertions," that the Checkbox Requirement is "useful." (*Id.* at 19.)

No party disputes that citizenship itself is material to a voter's eligibility to vote. (*E.g.*, *id.*at 18.) And the Court finds persuasive those circumstances under which the materiality of omitted information is an issue of law. *See Chism v. Washington State*, 661 F.3d 380, 389 (9th Cir. 2011) (noting the "inquiry into whether the false statements and omissions [in an affidavit for a search warrant application] were material is a purely legal question . . . . [and] were material if 'the affidavit, once corrected and supplemented,' would not have provided a magistrate judge with a substantial basis for finding probable cause" (citation omitted)); *S.E.C. v. Reys*, 712 F. Supp. 2d 1170, 1177 (W.D. Wash. 2010) (noting that, in the shareholder context, the materiality of an omission is an issue of law "[o]nly when the disclosures or omissions are so clearly unimportant that reasonable minds could not differ" (quoting *In re Craftmatic Sec. Litig.*, 890 F.2d 628, 641 (3d Cir. 1989))). The materiality of an applicant's failure to complete the checkbox on the State Form or Federal Form is a question of law.

### a.    The Checkbox Requirement With DPOC

The United States contends that an incomplete checkbox on a voter registration form is immaterial when an applicant provides the State with DPOC. (USA Mot. at 21.) The State cites *Diaz v. Cobb*, 435 F. Supp. 2d 1206 (S.D. Fla. 2006), as "the most analogous case" to the Checkbox Requirement in asserting that it does not violate the Materiality Provision. (State Reply at 31; *see* State Mot. at 11–13.) The plaintiffs in *Diaz* argued that a voting law violated the Materiality Provision by requiring applicants to (1) check boxes affirming that they are citizens, have not been convicted of a felony, and have not been adjudicated mentally incompetent, and (2) sign an oath affirming, *inter alia*, that they are "qualified to register as an elector under the Constitution and laws of the State of Florida." 435 F. Supp. 2d at 1212–13. The *Diaz* court held that checking the boxes was not "duplicative" of signing the oath because the oath did not require an applicant to specifically affirm her citizenship, and even if it were duplicative, material

information does not "become[] immaterial due solely to its repetition." *Id.* at 1212–13.

Though an applicant registering for Arizona elections must similarly affirm her citizenship both by specifically marking "yes" in the checkbox and signing an oath, *Diaz* is inapposite, as an applicant must also provide DPOC. A.R.S. § 16-121.01(A), (C). Instead, the Court finds the reasoning in *League of Women Voters of Arkansas v. Thurston*, No. 5:20-cv-05174, 2021 WL 5312640 (W.D. Ark., Nov. 15, 2021), more persuasive. There, the court found that plaintiffs stated a claim that a voting law violated the Materiality Provision because it required absentee voters to provide information about their eligibility to vote "several times," and voters "correctly provided that information at least once," but had their ballots "rejected on the basis of a mismatch or omission in one of the multiple documents they ha[d] provided." 2021 WL 5312640, at *4. The Voting Laws similarly permit Arizona to reject an applicant's registration based on a "mismatch" between documents, specifically an incomplete checkbox on a registration form notwithstanding the applicant's accompanying documentary proof of citizenship. *See* § 16-121.01(A), (C).

The State contends that the checkbox is still "useful" in determining an applicant's citizenship.[15] Materiality "signifies different degrees of importance in different legal contexts." *Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1173 (11th Cir. 2008). The Eleventh Circuit observed in *Browning* that if "material" under the Materiality Provision "means minimal relevance," then an error is material if it "tends to make it more likely that the applicant is not a qualified voter than" in the absence of the error. *Id.* at 1174. The *Browning* court cited to the "criminal mail and wire fraud context," where "a false statement is material if it has a natural tendency to influence, or is capable of influencing, the decision of the decisionmaking body to which it was addressed." *Id.* at 1173 (quoting *United States v. Gray*, 367 F.3d 1263, 1272 n.19 (11th

---

[15] The State also argues more generally that "[t]he [checkbox] is 'material in determining' the voter's eligibility because U.S. citizenship is a requirement for voting in Arizona." (State Mot. at 12 (internal citations omitted).) But this conclusory argument conflates materiality of an applicant's citizenship with the materiality of an incomplete checkbox in *determining* an applicant's citizenship. (*See* USA Mot. at 18.)

Cir. 2004)). However, "'capable of influencing' is an objective test, which looks at 'the intrinsic capabilities of the false statement itself, rather than the possibility of the actual attainment of its end.'" *United States v. Peterson*, 538 F.3d 1064, 1072 (9th Cir. 2008). The Court does not accept that information must only meet such a low bar to be material. Because Arizona may not deny an individual the right to vote due to an error or omission that "is not material *in determining*" her eligibility to vote, the Court infers that Congress intended[16] materiality to require some probability of actually impacting an election official's eligibility determination.[17] § 10101(a)(2)(B) (emphasis added); *c.f. TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976) (explaining that under the Securities Exchange Act, an omission is material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available"); *United States v. Bagley*, 473 U.S. 667, 682 (1985) (in criminal procedure, exculpatory "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine the confidence in the outcome"); *Bruton v. Massanari*, 268 F.3d 824, 827 (9th Cir. 2001) (in social security benefits cases, "new evidence is material . . . if there is a reasonable possibility that the new evidence would have changed the outcome of the determination" (citation and internal quotation

---

[16] "Where Congress uses terms that have accumulated settled meaning under either equity or the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms." *Kungys v. United States*, 485 U.S. 759, 770 (1988) (citation omitted) (applying meaning of materiality of false statements to public officials in the denaturalization context).

[17] At least one court has interpreted "material" to mean something akin to necessary. *See La Unión del Pueblo Entero v. Abbott*, 604 F. Supp. 3d 512, 542 (W.D. Tex. 2022) (plaintiffs plausibly alleged that a voting law "may require information that is *unnecessary and therefore not material* to determining an individual's qualifications to vote under Texas law" (internal citations omitted) (emphasis added)). Whatever the appropriate definition of "material" in this context, it means something more than "useful" or "minimal[ly] relevan[t]." (*See* USA Mot. at 18); *compare Material*, Black's Law Dictionary (11th ed. 2019) ("Having some logical connection with the consequential facts" or being "[o]f such a nature that knowledge of the item would affect a person's decision-making; significant; essential"), *with Relevant*, Black's Law Dictionary ("Logically connected and tending to prove or disprove a matter in issue; having appreciable probative value—that is, rationally tending to persuade people of the probability or possibility of some alleged fact").

marks omitted) (cleaned up))).

The State asserts that "if a prospective voter is presented with a clear yes-or-no question about whether the voter is a citizen and does not mark 'Yes,' that information is material." (State Reply at 30.) The State cites *Browning*, which interpreted the Materiality Provision as "ask[ing] whether, accepting the error *as true and correct*, the information contained in the error is material to determining the eligibility of the applicant." 522 F.3d at 1175 (emphasis in original). The *Browning* court explained that with additional and accurate information:

> [an] election official will *always* be able to verify identity of the applicant. It is this additional information exclusively—and not the degree to which that new information deviates from the information on the registration application form, or the "nature of the error"—that enables the election official to ascertain the identity of the voter.

*Id.* at 1175 n.23 (emphasis in original). This suggests that no error could be material unless the erroneous information were considered in isolation from other additional information probative of an applicant's eligibility to vote. But the materiality of an error or omission is determined by the other information available to the State. So when an applicant includes DPOC, it makes little sense to accept an incomplete citizenship checkbox on her registration form as "true and correct" when it is clearly not, and that incomplete checkbox should not alter any determination of her eligibility to vote. *C.f. TSC Indus.*, 426 U.S. at 449 (focusing on "the 'total mix' of information made available"). Applying *Browning*'s interpretation of materiality would allow Arizona to disregard documentation that, under Arizona law, constitutes "*satisfactory evidence* of citizenship" and disenfranchise eligible voters. A.R.S. § 16-166(F) (emphasis added). The Checkbox Requirement violates the Materiality Provision when an applicant provides satisfactory evidence of citizenship.

### b. The Checkbox Requirement Without DPOC

As discussed above, the State must register both State Form and Federal Form users for federal elections without requiring DPOC. (*Supra* Part II.A.) The Checkbox Requirement as applied to these voters does not violate the Materiality Provision.

Specifically, the Federal Form "may require only such [information] as is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process." 52 U.S.C. § 20508(b)(1); *see id.* § 20505(a)(1). Congress further specified that the Federal Form "shall include," *inter alia*, a checkbox for the applicant to indicate whether she is a citizen and requires that an applicant who fails to check the box be given "an opportunity to complete the form" before the next federal election. *Id.* § 21083(b)(4)(A)(i), (B); (*see* State Mot. at 12; State Reply at 29.) This statutory scheme indicates that the checkbox is "necessary" to determine an applicant's eligibility, and it is doubtful "that Congress would mandate the gathering of information . . . that it also deems immaterial." *Browning*, 522 F.3d at 1174.

The Court also agrees with the State that even assuming the checkbox on the Federal Form is duplicative of the oath, an applicant's failure to complete the checkbox is not an immaterial omission. (State Reply at 29 (citing *Diaz*, 435 F. Supp. 2d at 1213); *see* Federal Form at 26 (requiring applicant to affirm "under penalty of perjury and threat of deportation" that she is a United States citizen).) Though an applicant must affirm her citizenship twice, it is effectively an applicant's only opportunity to provide this information when registering for federal elections. *See League of Women Voters of Ark.*, 2021 WL 5312640, at *4 (indicating that it would not violate the Materiality Provision to reject a ballot due to an error or omission "[w]here absentee voters have only one opportunity to provide information" about their qualifications to vote). As for State Form users, they must specifically affirm their citizenship only once, and the United States concedes that the Checkbox Requirement on the State Form is permissible in the absence of DPOC.[18] (USA Mot. at 21; State Form.) The Checkbox Requirement does not violate

---

[18] Unlike the checkbox and the signature box on the Federal Form, which both inquire specifically into whether an applicant is a citizen, the oath on the State Form requires an applicant to affirm that the information in the registration is true, that she is a resident of Arizona, and has not been convicted of a felony or adjudged incapacitated. (*See* Federal Form at 26; State Form at 51.) The checkbox on the State Form is not duplicative of this "general" oath. *See Diaz*, 435 F. Supp. 2d at 1213.

1    the Materiality Provision as applied to individuals who do not provide DPOC.[19]

2                   **2.    The Birthplace Requirement**

3          The State argues that the Birthplace Requirement does not violate the Materiality

4    Provision because an applicant's place of birth "can help confirm [a] voter's identity."

5    (State Mot. at 14 (noting that "verifying an individual's identity is a material requirement

6    of voting" (quoting *Ind. Democratic Party v. Rokita*, 458 F. Supp. 2d 775, 841 (S.D. Ind.

7    2006))).) The Court agrees with the United States that there is a dispute of material fact

8    about whether an applicant's failure to include her birthplace is material in determining

9    her eligibility to vote. (*See* USA Mot. at 21–23.) The State cites the United States

10   Department of State's Foreign Affairs Manual, which requires passport applicants to

11   provide their birthplace because birthplace is an "integral part of establishing an

12   individual's identity." (State Mot. at 14 (quoting Doc. 365-1, Ex. H, at 107).) But as the

13   State recognizes, it began offering voters the *option* to include their "state or country of

14   birth" in 1979, and there is no indication that this information—or lack thereof—has ever

15   been material in determining an applicant's eligibility to vote. (State Mot. at 13 (citing

16   Doc. 365-1, Ex. G, A.R.S § 16-152(A) (1979)).)

17         The State argues that how election officials use a person's birthplace is beside the

18   point because "[t]he question is whether a person's state or country of birth is,

19   objectively, 'material to determining the eligibility of the applicant.'" (State Reply at 33

20   (quoting *Browning*, 522 F.3d at 1175).) The State also contends that "[w]hether

21   [birthplace] is material in determining voter eligibility depends on its relevance to

22   eligibility." *Id.* But if, as the State argues, a person's state or country of birth is

23   "objectively relevant" to a person's identity, so too are her father's and mother's names,

24   or her occupation. (*See* State Form at 51 (providing applicants the *option* to include

25   occupation and parents' names).) Whether the Birthplace Requirement violates the

26   Materiality Provision is an issue of fact inappropriate for summary judgment.

27

28   _____
     [19] Mi Familia Vota's Cross-Motion on the materiality of the Checkbox Requirement is
     moot. The Court need not address the parties' arguments regarding Private Plaintiffs'
     standing. (*See, e.g.*, RNC Mot. at 11–15.)

1       **C.      Vagueness of the Purge Provisions**

The State seeks summary judgment on Promise Arizona's claims that the purge provisions of the Voting Laws, A.R.S. § 16-165(a)(10) and (I), are void for vagueness because they do "not provide an election official any guidance to determine whether a person is not a United States citizen" and allow the Attorney General to open a criminal investigation into any person whose voter registration is cancelled. (Doc. 1, 22-cv-1602, Compl. ¶ 139; State Mot. at 15–16.) Specifically, the State contends that the void-for-vagueness doctrine is inapplicable because the Voting Laws do not regulate voter conduct, and that even if the doctrine does apply, the purge provisions are not vague. (State Mot. at 15–16; State Reply at 39–42.)

"The void-for-vagueness doctrine . . . guarantees that ordinary people have 'fair notice' of the conduct a statute proscribes." *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018). Promise Arizona attempts to frame § 16-165 as a penal statute and asserts that "in order to avoid the punishment of being compared with the [Systematic Alien Verification for Entitlements] program, and subsequently, voter registration cancellation and criminal investigation, the voter is *prohibited* from giving county recorders *any* reason to believe that they are not a United States citizen." (Promise Arizona Resp. at 4–5 (emphasis in original).) A penal law must "provide a reasonable opportunity to know what conduct is prohibited," or be sufficiently definite as to not "allow arbitrary and discriminatory enforcement." *Human Life of Wash. Inc. v. Brumsickle*, 624 F.3d 990, 1019 (9th Cir. 2010) (citation omitted); *see City of Chicago v. Morales*, 527 U.S. 41, 56 (1999). As the Voting Laws are not penal in nature and do not address individual conduct, the Court will grant the State's Motion on this claim.

First, § 16-165(I) is not penal, as "[i]t does not define the elements of an offense, fix any mandatory penalty, or threaten people with punishment if they violate its terms." *United States v. Christie*, 825 F.3d 1048, 1064–65 (9th Cir. 2016); (*see* State Reply at 40). Because the provision "is not a penal statute or anything like one," it cannot be unconstitutionally vague. *Christie*, 825 F.3d at 1064 ("Justice Thomas, in his history of

the void-for-vagueness doctrine, cites one case in which the Supreme Court voided a vague statute that he classifies as non-penal." *Id.* at 1064 n.5 (citing *Johnson v. United States*, 576 U.S. 591, 612 (2015) (Thomas, J., concurring in the judgment))).

Second, § 16-165(I) regulates county recorders, not registered voters. (State Reply at 39.) If a law "imposes neither regulation of nor sanction for *conduct*," then "no necessity exists for guidance so that one may avoid the applicability of the law." *Boutilier v. INS*, 387 U.S. 118, 123 (1967) (emphasis added). The void-for-vagueness doctrine is inapplicable to the fact of whether a voter is a citizen. *See Martinez-de Ryan v. Whitaker*, 909 F.3d 247, 251 (9th Cir. 2018) (citing *Boutilier* to distinguish between conduct and a "status or condition"); *c.f. Soules v. Kauaians for Nukolii Campaign Comm.*, 849 F.2d 1176, 1184 (9th Cir. 1988) (rejecting argument that a county charter's grant of "unbounded discretion to schedule special elections in 'appropriate circumstances'" was void for vagueness because "Appellants are not at risk of being punished for engaging in ill-defined *proscribed conduct*" (emphasis added)). And a statute "is not vague because it may at times be difficult to prove [a] . . . fact but rather because it is unclear as to what fact must be proved." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (citing *United States v. Williams*, 553 U.S. 285, 306 (2008)); *c.f. Kay v. Mills*, 490 F. Supp. 844, 850–52 (E.D. Ky. 1980) (finding statute void for vagueness because it did not notify a presidential candidate of what it meant to be "generally advocated and nationally recognized" in order to be placed on the preferential primary ballot). The void-for-vagueness doctrine is inapplicable, as the Voting Laws clearly require county recorders to investigate a registered voter's citizenship status.[20]

Promise Arizona's void-for-vagueness argument about § 16-165(A) fails for similar reasons. The county recorder must cancel a voter's registration and refer the

---

[20] Even if the void-for-vagueness doctrine applies, § 16-165(I) is not unconstitutionally vague. The "reason to believe" standard in § 16-165(I) is not "so indefinite as to allow arbitrary and discriminatory enforcement," but is common in statutory drafting. *See, e.g.*, 15 U.S.C. § 56(b) ("Whenever the Commission has reason to believe that any person, partnership, or corporation is liable for a criminal penalty under this subchapter, the Commission shall certify the facts to the Attorney General . . . ."); 25 U.S.C. § 3206 (permitting examinations and interviews of children whom law enforcement officials "have reason to believe" were abused).

matter for investigation only after (1) the county recorder "confirms"[21] that the voter is not a citizen, (2) the county recorder notifies the voter that her registration will be cancelled in 35 days unless the voter provides DPOC, and (3) the voter fails to provide DPOC. § 16-165(A)(10). The first two requirements do not regulate or sanction a voter's conduct, while the third unambiguously informs voters that they must confirm their citizenship status within 35 days to avoid being de-registered and referred for criminal investigation.[22] (*See* State Reply at 39 (arguing § 16-165 regulates county recorders)); *Boutilier*, 387 U.S. at 123.

The Court grants the State's Motion on Promise Arizona's void-for-vagueness claim.

## III.   CONCLUSION

The NVRA was designed to enhance eligible voter participation in federal elections and lawfully regulates presidential elections. The Court finds Section 6 preempts H.B. 2492's restrictions on presidential elections and mail-in voting. The Court also concludes that H.B. 2243's systematic removal provisions violate the NVRA's 90-day Provision. The Court also finds that the Voting Laws' purge provisions are not unconstitutionally vague, yet there remain genuine issues of material fact as to whether the purge provisions violate the Civil Rights Act or enable Arizona to contravene Section 8. Lastly, the Court finds that the LULAC Consent Decree precludes Arizona from enforcing H.B. 2492's mandate to reject any State Form without accompanying DPOC.

The Checkbox Requirement does not violate the Materiality Provision as applied to individuals who submit a registration without DPOC. But the Court finds that Arizona

---

[21] Promise Arizona argues that § 16-165(A)(10) does not specify when a county recorder "'confirms', i.e., *believes*, that a registered voter is not a U.S. citizen." (Promise Arizona Resp. at 6.) But the provision clearly sets forth the sources of information that may confirm a registrant's non-citizenship.

[22] Promise Arizona's argument that these provisions empower county recorders to "decide" when to subject voters to "criminal liability" is unpersuasive. (Promise Arizona Resp. at 5.) County recorders only notify the attorney general of cancelled voter registrations for "*possible* investigation." § 16-165(A)(10) (emphasis added). It is the attorney general who investigates and must subsequently "prosecute individuals who are found not to be United States citizens" and who registered to vote "knowing" that they are "not entitled to such registration." *See* A.R.S. §§ 16-143(D), 16-182(A).

may not reject a voter registration that does not contain a checkmark in the box next to the question regarding citizenship when the person provides DPOC and is otherwise eligible to vote. There remain genuine issues of material fact as to the materiality of a person's place of birth in determining eligibility to vote and whether the Birthplace Requirement violates the Materiality Provision.

**IT IS ORDERED** granting Plaintiffs' Cross-Motion for Summary Judgment that Section 6 of the NVRA preempts H.B. 2492's restriction on registration for presidential elections and voting by mail (Doc. 391; Doc. 393);

**IT IS FURTHER ORDERED** granting Tohono O'odham Plaintiffs' Motion for Summary Judgment (Doc. 390) and declaring that A.R.S. § 16-123 references A.R.S. § 16-579(A)(1) for a list of documents that satisfy the documentary proof of location of residence requirement in A.R.S. § 16-123. The reference to § 16-579(a)(1) provides examples of documents, but is not an exhaustive list of the documents, that can be used to satisfy A.R.S. § 16-123.

**IT IS FURTHER ORDERED** declaring that A.R.S. § 16-123 does not require tribal members or other Arizona residents to have a standard street address for their home to satisfy A.R.S. § 16-123.

**IT IS FURTHER ORDERED** declaring that in addition to the documents listed in A.R.S. § 16-579(A)(1), the following documents satisfy the requirement in A.R.S. § 16-123:

o A valid unexpired Arizona driver license or nonoperating ID ("AZ-issued ID"), regardless of whether the address on the AZ-issued ID matches the address on the ID-holder's voter registration form and even if the AZ-issued ID lists only a P.O. Box.

o Any Tribal identification document, including but not limited to a census card, an identification card issued by a tribal government, or a tribal enrollment card, regardless of whether the Tribal identification document contains a photo, a physical address, a P.O. Box, or no address.

o Written confirmation signed by the registrant that they qualify to register

- 33 -

pursuant to A.R.S. § 16-121(B), regarding registration of persons who do not reside at a fixed, permanent, or private structure.

**IT IS FURTHER ORDERED** granting Plaintiffs' Cross-Motion for Summary Judgment that the Voting Laws violate Section 8(c) of the NVRA by allowing systematic cancellation of registrations within 90 days of an election (Doc. 393; Doc. 396);

**IT IS FURTHER ORDERED** declaring that Arizona must abide by the LULAC Consent Decree and register otherwise eligible State Form users without DPOC for federal elections;

**IT IS FURTHER ORDERED** denying the RNC's Motion for Summary Judgment as to whether Arizona can reject any State Form without accompanying DPOC (Doc. 397);

**IT IS FURTHER ORDERED** denying the State's Motion for Summary Judgment as to whether H.B. 2243 violates Section 8(a) by allowing unlawful cancellation of registrations (Doc. 364);

**IT IS FURTHER ORDERED** granting in part and denying in part the State's Motion for Summary Judgment as to whether the Voting Laws violate Section 8(b) by mandating nonuniform and discriminatory list maintenance procedures (Doc. 364);

**IT IS FURTHER ORDERED** denying as moot LUCHA's Cross-Motion for Summary Judgment under Sections 6 and 8(a) of the NVRA (Doc. 394);

**IT IS FURTHER ORDERED** granting in part and denying in part the State's Motion for Summary Judgment as to whether the Voting Laws violate the Materiality Provision of the Civil Rights Act by rejecting voter registrations that do not satisfy the Checkbox Requirement (Doc. 364);

**IT IS FURTHER ORDERED** declaring that Arizona may not reject a voter registration solely on the basis that the registration does not contain a checkmark in the box next to the question regarding citizenship, if the applicant provides DPOC and is otherwise eligible to vote;

**IT IS FURHTER ORDERED** denying the State's Motion for Summary

Judgment as to whether the Voting Laws' Birthplace Requirement violates the Materiality Provision of the Civil Rights Act (Doc. 364);

**IT IS FURTHER ORDERED** granting the State's Motion for Summary Judgment that the Voting Laws' purge provisions are not unconstitutionally vague (Doc. 364);

**IT IS FURTHER ORDERED** denying as moot Poder Latinx's Motion for Summary Judgment as to whether the Voting Laws violate § 10101(a)(2)(A) of the Civil Rights Act by applying different standards or procedures to voters that the county recorder has reason to believe are non-citizens (Doc. 397);

**IT IS FURTHER ORDERED** denying as moot the parties' Motions and Cross-Motions for Summary Judgment as to whether there is a private right of action under § 10101 of the Civil Rights Act (Doc. 367; Doc. 397; Doc. 399).

Dated this 13th day of September, 2023.

Susan R. Bolton
United States District Judge