# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

Mi Familia Vota, et al.,

                Plaintiffs,

     v.

Adrian Fontes, in his official capacity as

Arizona Secretary of State, et al.,

Defendants.

_____

AND CONSOLIDATED CASES.

_____

Case No. 2:22-cv-00509-SRB
(Lead)

**PLAINTIFFS' MOTION TO STRIKE
UNTIMELY SUPPLEMENTAL
EXPERT REPORT AND RELATED
DATA, AND TO PARTIALLY
EXCLUDE TESTIMONY OF DR.
JESSE RICHMAN**

No. CV-22-00519-PHX-SRB
No. CV-22-01003-PHX-SRB
No. CV-22-01124-PHX-SRB
No. CV-22-01369-PHX-SRB
No. CV-22-01381-PHX-SRB
No. CV-22-01602-PHX-SRB
No. CV-22-01901-PHX-SRB

# TABLE OF CONTENTS

**Page**

BACKGROUND .............................................................. **Error! Bookmark not defined.**

ARGUMENT .................................................................................................. 7

I.    THE UNTIMELY SUPPLEMENTAL REPORT AND THE
      UNTIMELY AND INCOMPLETE PRODUCTION OF DATA
      SHOULD BE EXCLUDED. ..................................................................... 7

II.   PROFESSOR RICHMAN'S UNRELIABLE ANALYSIS SHOULD BE
      EXCUDED UNDER RULE 702 AND *DAUBERT*. ................................. 11

      A.    Legal Standard........................................................................... 11

      B.    Professor Richman's Qualifications and Prior History as an
            Expert ........................................................................................ 12

      C.    Professor Richman's Supplementation Confirms His ADOT
            Methodology is Unreliable.......................................................... 15

      D.    Numerous Other Analyses Professor Richman Intends to Present
            are Unreliable. ........................................................................... 18

CONCLUSION ............................................................................................ 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Att'y Gen. of Okla. v. Tyson Foods, Inc.*,
  565 F.3d 769 (10th Cir. 2009) ................................................................. 11

*Bazemore v. Friday*,
  478 U.S. 385 (1986) .............................................................................. 21

*Bickerstaff v. Vassar College*,
  196 F.3d 435 (2d Cir. 1999) .................................................................. 21

*Bldg. Indus. Ass'n of Washington v. Washington State Bldg. Code Council*,
  683 F.3d 1144 (9th Cir. 2012) ................................................................. 11

*Brunswick Corp. v. Spirit Reel Co.*,
  832 F.2d 513 (10th Cir. 1987) ................................................................. 21

*Cooper v. Brown*,
  510 F.3d 870 (9th Cir. 2007) .................................................................. 12

*In re Countrywide Fin. Corp.*,
  984 F. Supp. 2d 1021 (C.D. Cal. 2013) ..................................................... 15

*Daubert v. Merrill Dow Pharmaceuticals, Inc.*,
  509 U.S. 579 (1993) ....................................................................... *passim*

*Fish v. Kobach*,
  309 F. Supp. 3d 1048 (D. Kansas 2018), *aff'd sub nom. Fish v. Schwab*,
  957 F.3d 1105 (10th Cir. 2020) .......................................................... *passim*

*Grodzitsky v. American Honda Motor Co.*,
  957 F.3d 979 (9th Cir. 2020) .................................................................. 12

*Jones v. United States*,
  933 F. Supp. 894 (N.D. Cal. 1996) .......................................................... 12

*Keith v. Volpe*,
  858 F.2d 467 (9th Cir. 1988) .................................................................. 21

*Krause v. Cty. Of Mohave*,
  459 F. Supp. 3d 1258 (D. Ariz. 2020) ................................................... 8, 15

*Lo v. United States*,
  No. 2:17-cv-012020TL, 2022 WL 1014902 (W.D. Wash. April 5, 2022) ................. 12

*Metavante Corp. v. Emigrant Sav. Bank*,
  619 F.3d 748 (7th Cir. 2010) .................................................................... 11

*Mukhtar v. Cal. State Univ.*,
  299 F.3d 1053 (9th Cir. 2002) .................................................................. 12

*Penk v. Oregon State Bd.*,
  816 F.2d 458 (9th Cir. 1987) .................................................................... 21

*Seaboard Lumber Co. v. United States*,
  308 F.3d 1283 (Fed. Cir. 2002) ................................................................ 11

*United States v. Valencia-Lopez*,
  971 F.3d 891 (9th Cir. 2020) .................................................................... 11

*Western Alliance Bank v. Jefferson*,
  119 F. Supp. 3d 961 (D. Ariz. 2015) .......................................................... 7

*Yeti By Molly Ltd. v. Deckers Outdoor*,
  259 F.3d 1101 (9th Cir. 2001) ............................................................... 7, 8

**Statutes**

A.R.S.
  § 16-165(G) ......................................................................................... 3
  § 16-166(F) ......................................................................................... 3
  § 16-166(G) ..................................................................................... 5, 17
  § 28-3153(D) ....................................................................................... 4

Ariz. Sess. Laws (1996), ch. 76 §§ 7, 134 ................................................... 4

**Other Authorities**

Fed. R. Civ. P.
  23(a)(3) ............................................................................................ 10
  26(a) ................................................................................................. 1
  26(a)(2) .............................................................................................. 2
  26(a)(3) ...................................................................................... 2, 7, 10
  26(e) ........................................................................................... 10, 11
  26(e)(2) ............................................................................................ 10
  37 ........................................................................................... 1, 2, 7, 9

37(c)(1) ........................................................................................................... 7

Fed. R. Evid. 702 ......................................................................... 1, 11, 12, 15

Local Rule 7.2(l) ............................................................................................. 2

David A. Freedman, *Ecological Inference and the Ecological Fallacy*, Int'l
    Encyclopedia of the Soc. & Behav. Scis. Tech. Rep. No. 549 ................................... 20

Federal Judicial Center National Research Council,
    *Reference Manual on Scientific Evidence*, 318-19 (3d ed. 2011) ................................ 19

S. Ansolabehere, et al., THE PERILS OF CHERRY PICKING LOW FREQUENCY
    EVENTS IN LARGE SAMPLE SURVEYS, 40 *Electoral Studies* 409-410
    (December 2015) ......................................................................... 13, 22

Pursuant to Federal Rules of Civil Procedure 37 and 26(a), Plaintiffs file this motion *in limine* to prevent Defendants from introducing an untimely, October 28, 2023 supplemental expert report from defense expert Professor Jesse Richman, based on an untimely October 28, 2023 supplemental production of data from Defendant Arizona Department of Transportation ("ADOT").   Although Professor Richman's untimely supplement is ostensibly a "correction" to assertions he made in his October 13, 2023 rebuttal report, it is in fact merely a last-minute effort to offer threadbare support to speculative and baseless conclusions offered in his October 13 report.   Both the supplemental report and the original flawed analysis it tries to paper over fail multiple standards of reliability and are inadmissible under Rule 702 and *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).   Beyond the "corrected" analyses in his untimely supplement, Professor Richman's original report is riddled with basic statistical and conceptual errors that warrant exclusion of significant aspects of his anticipated testimony. Professor Richman's October 30 deposition testimony confirmed the unreliability of his analysis.  Plaintiffs therefore move *in limine* to exclude the entirety of his supplemental report and the following Sections of his October 13 report: Sections 1.3, 1.3.5, 1.3.5.1, 1.5.4, 1.6, 2.1.1, 2.3.1, 2.3.2, 2.3.2.1, 2.3.2.2, 2.2.2.3, 2.3.3, and 2.3.4, including Tables 2, 2.3, 2.4, 2.5, 3-8 and 12-15.

This is not the first time Professor Richman has tried to present opinions based on flawed methodology; nor is this the first time Professor Richman has violated the rules requiring timely submission of expert opinions.  Indeed, in Professor Richman's only prior court testimony, Judge Julie Robinson of the U.S. District Court for the District of Kansas found that *every* analysis he presented (including two he is attempting to re-deploy in this case) were methodologically "flawed" and entitled to "no weight," and that Professor Richman's explanations for his untimely supplementation were "misleading" and "disingenuous."   *See Fish v. Kobach*, 309 F. Supp. 3d 1048, 1085-1089, 1115-1116 (D. Kansas 2018), *aff'd sub nom. Fish v. Schwab*, 957 F.3d 1105 (10th Cir. 2020). Professor Richman is once again impermissibly trying to belatedly amend "confusing, inconsistent,

and methodologically flawed" conclusions with "an untimely supplemental report." 309 F. Supp. 3d at 1092, 1115.

At this point in the proceeding, any effort by Defendants to have Professor Richman testify as to his untimely supplemental analysis would be prejudicial, as the supplemental report relies on incomplete data that ADOT (through the Defendant Attorney General) previously declined to produce to Plaintiffs' counsel.   Moreover, the data produced continues to be incomplete, ADOT has not supplemented with data Plaintiffs requested, and Professor Richman's supplemental analysis is unreliable due to the lack of complete data, is clearly prejudicial to Plaintiffs, and should be excluded under Rule 37.  Finally, because Professor Richman's opinions are based on unreliable methodology, he should be precluded from testifying as to the specified sections of his October 13 report.

Pursuant to Local Rule 7.2(l), Plaintiffs conferred with Defendant Attorney General and Intervenor-Defendants on November 2, 2023, and a follow up session on November 3, 2023, during which Intervenor-Defendant RNC asked to have until 4 p.m. PST to consider the relief sought.  That consideration is ongoing, but subject to that process, the Intervenor-Defendants and Defendant Attorney General oppose this motion.  Consistent with the position it has taken on other matters, Plaintiffs understand the Defendant Secretary of State takes no position on this motion.

## BACKGROUND

1.      Pursuant to the Court's scheduling orders, written discovery was required to be completed on August 14, 2023, ECF No, 472; Rule 26(a)(2) expert disclosures were due on September 14, 2023, with rebuttal reports due October 13, 2023; and the joint pre-trial order (with Rule 26(a)(3) disclosures) due October 16, 2023.   ECF Nos. 472, 485. Professor Richman served his report on October 13, a supplemental report at midnight on October 28, and was deposed on October 30.

2.      Provisions challenged in this litigation require the Defendant Secretary of State to match the statewide registered voter file (Access Voter Information Database or "AVID") against the Defendant Arizona Department of Transportation's driver's license

database for non-citizenship status.   A.R.S. § 16-165(G).   Because of this, Plaintiffs propounded discovery requests to ADOT seeking "all information that is stored in the Driver License Database . . . including but not limited to" 15 separate categories of information.   *See* Ex. 1, RFP No. 7.   In response, ADOT objected to disclosure of the database under the Driver's Privacy Protection Act.   *Id.*   *See also* Ex. 2 (objecting to providing access because it contains personally identifiable information).   Ultimately, after seven weeks of negotiations during which ADOT continued to object to production, Ex. 3, and sixteen days before expert reports were due, ADOT produced a copy of portions of the limited data in its driver's license database that it provides to the Secretary of State.   This data extract included the MVD customer number, Arizona credential number, credential issuance date, and credential expiration date, and as well as a column that is sent to the Secretary of State reflecting whether or not ADOT's information concerning authorized presence status reflects noncitizen documentation, but did not include any personally identifying information such as name, address or birthdate.

3.      With this extract, Plaintiffs' expert Dr. Michael McDonald compared the Arizona voter file against the produced ADOT drivers' license file.   Specifically, he matched AVID "full ballot voters" (who since 2005 have been required, under A.R.S. § 16-166(F) to provide county recorders with "satisfactory evidence of United States citizenship" upon registering to vote) against the ADOT records.   This analysis identified 6,084 full-ballot voters whose driver's license numbers still reflected a noncitizen status in the ADOT database.   There are a number of reasons why individuals' citizenship status could have been misclassified:

- *Matching error based on entry of wrong name, birthdate, or driver's license number*: The ADOT data in the extract was all entered manually by ADOT customer service representatives.   During testimony, ADOT provided an estimate that its review found that the data was entered accurately 85-89% of the time.   Ex. 4 (Jorgensen Tr. 190:20-191:2).

- *Data entry error in entering documentation source*: The extract ADOT produced

had a "non-citizen" field indicating citizenship status.  This, in turn, was populated through data entry from individual customer service representatives who recorded the type of identification provided at the time the credential was issued by entering a number between 1 and 6 into the database.  If the ADOT customer service representative made an error in entering the single-digit code, the individual's citizenship classification may be wrong.

- *Lag time*: Naturalizing citizens are not required to notify ADOT when they naturalize as U.S. citizens.  Accordingly, there can be a long lag time between when someone naturalizes and when their ADOT record reflects their current citizenship status. In many cases, this update will not occur until a renewal when authorized presence documentation is once again verified.  Additionally, there can also be a shorter lag time between when the customer service representative sees documentation of citizenship and when that is reflected in the driver's license database.  If ADOT data is checked during the lag, it will inaccurately reflect non-citizen status.

- *Credentials Issued Prior to October 1, 1996*: ADOT only systematically began checking DPOC or "authorized presence" to be in the United States on October 1, 1996, upon ADOT's implementation of rules to carry out a recently enacted law. *See* A.R.S. § 28-3153(D), *as enacted by* Ariz. Sess. Laws (1996), ch. 76 §§ 7, 134. This means that for driver's licenses or state IDs issued prior to October 1, 1996, there is no record of DPOC verification on file with ADOT and, therefore, no basis to assess U.S. citizenship status.  If the driver's license or state ID holder has not subsequently renewed their license or ID, they would have had no occasion to present DPOC to ADOT at a later time.  If ADOT checks one of these individual's statuses, it may inaccurately reflect their current citizenship status.

- *Licenses or state IDs issued prior to the effective date of the DPOC law in 2005*: Proposition 200 (Arizona's DPOC law) which was adopted in November 2004 and took effect in 2005, expressly exempts from its requirements all individuals who

were already registered to vote on the effective date. A.R.S. § 16-166(G). Because such individuals were not required to provide DPOC, their ADOT information may not accurately reflect their current citizenship status.

- *Credential type*: While ADOT requires individuals obtaining or renewing a license to provide proof of authorized presence, including U.S. citizenship proof, many other interactions reflected in the ADOT database do not require such a check. In particular, when a non-citizen obtains a replacement non-REAL ID license or updates their non-REAL ID license (to reflect name or address change, turning 18 or for other reasons) ADOT does not require proof of authorized presence. Exs. 5, 6, 7, & 8.

4.     On October 13, 2023, Professor Richman served a report in this case. Professor Richman's report presented approximately 20 quantitative analyses, many of which (as discussed below) have significant methodological flaws that make them unreliable. One central analysis of Professor Richman's report is an ADOT/AVID matching analysis – presented at Sections 1.3.5 and 2.3.1 and Tables 2 & 12 of his report. In these analyses, Professor Richman claimed that there were 2,331 instances when license was "established or renewed" where ADOT data indicated the license holder was a non-citizen after they registered to vote. Professor Richman concluded that this was a "reasonably strong indication" these full ballot voters were non-citizens when they registered to vote, notwithstanding Arizona's legal requirement for individuals to provide DPOC to become full-ballot voters. Notably, Professor Richman's analysis of the 2,331 likely non-citizens did not account for any of the potential errors above. Indeed, even though full-ballot voters are required to provide DPOC as a matter of Arizona law, Dr Richman assumes citizenship error in Arizona voter registration database but fails to even consider, let alone exclude, the multiple possibilities for error in the ADOT data.

5.     On October 12, 2023 – *i.e.*, two months after the written discovery cutoff and *the very day before service of his October 13 report*, Professor Richman (through Intervenor-Defendant RNC's counsel) advised the Attorney General that he needed ADOT

to provide "some additional data in order to be certain of his position."  Ex. 9.  Professor Richman asked for two things.  First, Richman asked for the extract to be re-produced to "add a column indicating the type of credential issued . . . so that we can determine whether lawful presence documentation was shown at that time."  As an alternative, Richman proposed that ADOT "return historical data" for each of the "individuals at issue"—which, as Richman recognized, "would probably result in better data."

6.     On the evening of October 26, the Attorney General notified Plaintiffs that ADOT intended to make a supplemental data production pursuant to the RNC's request, providing additional data fields reflecting the kind of credential issued.  Ex. 10.  On the morning of October 27, Plaintiffs' counsel responded by asking for more information about why this information had not been previously provided in response to their own comprehensive requests for ADOT data.  Plaintiffs further asked that, if ADOT was going to produce supplemental material, that additional points of data be included so that the data would be complete.  Specifically, Plaintiffs asked ADOT to include any other data field indicating when proof of authorized presence was provided or reviewed, any other field that indicated the credential type, when the ADOT account was first established (*i.e.,* originally issued), and the individuals' history.  Ex. 11 & 12.  That evening, ADOT made Eric Jorgensen available for a call to discuss the data that was being produced, and the additional data Plaintiffs requested; while Mr. Jorgensen advised that certain data Plaintiffs requested was not maintained in the database, he indicated that some information (including historical information) existed.

7.     On the morning of October 28, ADOT made a supplemental production of data including the two data fields the RNC requested, but without the "better data" the RNC requested, and without including the data Plaintiffs requested to ensure the data was complete.

8.     Without waiting to receive the "better data" he requested, just before midnight on October 28, Professor Richman served a supplemental report, supplementing his Tables 2 & 12.  Correcting the credential point reduced the 2,337 voters in question to

1,376; Professor Richman then added an additional 403 people who were registered as full-ballot voters on the same day they purportedly provided evidence of non-citizenship to ADOT, raising his total to 1,779.  Professor Richman's analysis failed to address other potential errors in the ADOT data match, such as data entry errors (of documentation type or matching factors), lag time or license issuance prior to 1997, or whether these 1,779 registered **full-ballot** voters had registered before or after the DPOC law's effective date in 2005, which in the latter case would be dispositive of U.S. citizenship status given the documentary proof requirement they had to fulfill to obtain full ballot voter status.

9.     At his deposition on October 30, Professor Richman confirmed that he did not address any of the other potential errors in this analysis, and that he intends to present testimony that the 1,779 people identified in his supplemental analysis are non-citizens. Ex. 13 (Richman Tr. 304-307).

## ARGUMENT

## I.     THE UNTIMELY SUPPLEMENTAL REPORT AND THE UNTIMELY AND INCOMPLETE PRODUCTION OF DATA SHOULD BE EXCLUDED.

Under Rule 37, Defendants should be precluded from introducing any expert analysis and data that was not timely disclosed.  "Supplements relating to expert disclosures must be made by the time disclosures under Rule 26(a)(3) are due."  *Western Alliance Bank v. Jefferson*, 119 F. Supp. 3d 961, 966 (D. Ariz. 2015).  Under Rule 37(c)(1) and Ninth Circuit law, the exclusion of untimely disclosed expert testimony or materials is "self-executing" and "automatic" and such should be excluded unless the untimely disclosure was substantially justified or harmless.  *See, e.g., Yeti By Molly Ltd. v. Deckers Outdoor*, 259 F.3d 1101, 1106 (9th Cir. 2001) (affirming decision to exclude expert testimony made on disclosure 28 days prior to trial).  Similarly, Rule 37(c)(1) provides that "if a party fails to provide information . . . the party is not allowed to use that information . . . at a trial, unless the failure was substantially justified or is harmless."  It is the burden of the party facing exclusion to show that the was either justified or harmless.  *Yeti by Molly*, 259 F.3d at 1107 (citing *Wilson v. Bradlees of New England, Inc.*, 250 F.3d 10, 21

7

(1st Cir. 2001).

To determine whether a failure to properly disclose evidence is "substantially justified or harmless, Courts consider the following factors, among others: (1) prejudice or surprise to the party against whom the evidence is offered; (2) the ability of that party to cure the prejudice; (3) the likelihood of disruption at trial; and (4) bad faith or willfulness involved in not timely disclosing the evidence." *Krause v. Cty. Of Mohave*, 459 F. Supp. 3d 1258, 1270 (D. Ariz. 2020).

Here, both Professor Richman's supplemental disclosure and the data production that predicated it were untimely. Late disclosure was not substantially justified, and both are highly prejudicial.

1. With regard to the data, Plaintiffs requested that ADOT provide the full driver's license database pursuant to requests for production last summer. *See* Ex. 1 RFP No. 7. After Defendant ADOT objected on the grounds of data privacy and delayed production for many weeks, on August 29, 2023, ADOT produced a limited extract containing far less data than Plaintiffs had requested. That limited data extract was what both Plaintiff and Defendants' experts had available and relied upon in preparing their expert analyses – Dr. McDonald on September 14, and Professor Richman on October 13.

On October 12, 2023, a full seven weeks after the written discovery cutoff, Intervenor-RNC requested ADOT make a supplemental production. Ex. 9. This request was made through an informal back channel, not by propounding formal discovery that would have alerted Plaintiffs that the request had been made. Ex. 9. Notwithstanding Defendant ADOT's prior objection to production of this (and other data) in response to Plaintiffs' timely discovery requests, on October 28, 2023 – eight days before trial is scheduled to start in this matter, ADOT made a supplemental production to include additional data the RNC requested. Plaintiffs had no notice that this request had been made or that ADOT was willing to produce supplemental data until October 27. Upon being notified, Plaintiffs requested ADOT provide additional data fields, consistent with their previously served discovery requests, for the sake of completeness. But ADOT produced

8

1  the supplemental data the RNC requested without producing anything else the Plaintiffs

2  requested.

3        This is a clear violation of Rule 37, and this data should be excluded.  For starters,

4  there is no justification, much less a substantial one, for the untimely production: After

5  objecting to producing data when Plaintiffs requested it within the discovery period, ADOT

6  produced a subset of that data pursuant to a request from a co-defendant well after

7  discovery had closed and after Plaintiffs' experts had submitted their reports.  Plaintiffs,

8  having assumed that discovery was closed, relied on ADOT's earlier data production to

9  prepare expert analysis, and were surprised (shocked, actually) to receive a notification

10  from the Attorney General on the evening of October 26—two weeks *after* the rebuttal

11  report deadline and on the Thursday evening before Professor Richman's Monday

12  deposition—that ADOT would be making a supplemental production.  Despite Plaintiffs'

13  request, ADOT has not produced the full database or any of the supplemental data, severely

14  prejudicing Plaintiffs' ability to respond to Professor Richman's untimely disclosures.

15  Given the timing of this violation, and ADOT's resistance to producing additional data,

16  this prejudice cannot be cured.

17        For reasons described in more detail below, this partial production of data is

18  prejudicial because has allowed Professor Richman to continue to propound misleading

19  and inaccurate analysis without providing Plaintiffs (or the Court) with the complete data

20  that would facilitate demonstrating Professor Richman is misleading.  Moreover, there is

21  no substantial justification for the untimely production of this data; ADOT objected to the

22  timely production of the data when Plaintiffs requested it, but waived that objection when

23  the data was requested by a co-Defendant, outside the time when Plaintiffs could seek

24  further discovery relief.  That is not how the Rules of Civil Procedure work.  ADOT's

25  supplemental data production should be excluded for all purposes.

26        2.     Professor Richman's supplemental report is also untimely.  Rebuttal reports

27  were due on October 13, 2023.  ECF 472.  Professor Richman did not even request the data

28  he relies upon for the supplementation until October 12 – a single day before he submitted

his report, and a full month after he had been retained by Intervenor-Defendant RNC.  His supplemental report was served late on the evening of October 28 – twelve days after Rule 26(a)(3) disclosures were due and 34 hours before his deposition was scheduled to start.

While Rule 26(e)(2) contemplates an expert may supplement their disclosure, there is a firm deadline to do so: "th[e] information must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due."  Fed. R. Civ. P. 26(e).  In this case, that deadline was October 16, 2023—twelve days before the supplement was served.  Professor Richman's supplement was clearly untimely.[1]   The late disclosure is not substantially justified: Professor Richman did not even request the data he relies upon in his supplemental report until October 12, the day before his report was due, and even without this data was able to submit an 80-page, single-spaced, 258-pararaph report.  To the extent this data was necessary to substantiate Professor Richman's conclusions, he should have (i) requested the data well before his deadline, (ii) asked for discovery to be reopened, or (iii) declined to reach conclusions he could not be "certain" were supported by the data in his possession.  He did none of these things.

The supplemental report is also highly prejudicial to Plaintiffs.  In addition to the violation of the discovery rules, as discussed below, because Professor Richman updated his report based on incomplete information (which excluded the information Plaintiffs requested be added to the production on October 27), it is highly misleading.  Moreover, there is no obvious cure to this untimely supplementation: because Professor Richman provided his supplement after Plaintiffs' expert Dr. McDonald was deposed, after the Rule 23(a)(3) deadline to supplement reports, and nine days before trial is to start, Dr. McDonald cannot serve a timely Rule 26(e) supplement to his report to identify the obvious errors in Professor Richman's supplemental analysis.  The supplemental report should be excluded

---

[1] Dr. McDonald provided a revised report and Declaration on October 11, five days before the supplementation deadline, and shortly before rebuttal reports were due.  The report updated transcript citations (to reflect final transcripts), as well as the release of the Election Procedures Manual, and addressed a document produced by the Secretary of State on October 2, 2023 explaining its matching criteria.

in its entirety.

## II.   PROFESSOR RICHMAN'S UNRELIABLE ANALYSIS SHOULD BE EXCUDED UNDER RULE 702 AND *DAUBERT*.

### A.   Legal Standard

Under Rule 702, expert testimony must meet five conditions to be admissible:

> [a] witness who is qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Both the Supreme Court and the Ninth Circuit have been clear that this standard must be rigorously enforced, and that the party seeking to admit expert testimony bears the burden of establishing its admissibility.  *Bldg. Indus. Ass'n of Washington v. Washington State Bldg. Code Council*, 683 F.3d 1144, 1154 (9th Cir. 2012); *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 n.10 (1993).

Under Rule 702, district courts play a "gatekeeping role," responsible for ensuring that any expert testimony admitted "is not only relevant, but reliable."  *Daubert*, 509 U.S. at 597, 589; *see also United States v. Valencia-Lopez*, 971 F.3d 891, 897–98 (9th Cir. 2020).  While one of the "gatekeeper" role's purposes of keeping unreliable testimony from reaching a jury is not present in a bench trial, "*Daubert*'s requirements of reliability and relevancy continue to apply in a bench trial," *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 760 (7th Cir. 2010),[2] and district courts in the Ninth Circuit have applied the *Daubert* test in bench trials and do not hesitate to exclude unreliable experts. *See, e.g., Jones v. United States*, 933 F. Supp. 894, 898 (N.D. Cal. 1996) (excluding testimony from two experts for failure to satisfy the *Daubert* standards); *Lo v. United States*, No. 2:17-cv-

---

[2] *See also Att'y Gen. of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769, 779 (10th Cir. 2009) (similar); *Seaboard Lumber Co. v. United States*, 308 F.3d 1283, 1302 (Fed. Cir. 2002) (similar).

012020TL, 2022 WL 1014902, *12 (W.D. Wash. April 5, 2022) (excluding portions of expert testimony ahead of a bench trial).

The gatekeeping function inherently requires the trial court to conduct an exacting analysis of the foundations of expert opinions to ensure they meet the standards for admissibility under Rule 702.  *Grodzitsky v. American Honda Motor Co.*, 957 F.3d 979, 984 (9th Cir. 2020) at 984 ("Under *Daubert*, the district court judge must ensure that all admitted expert testimony is both relevant and reliable." (internal quotation marks omitted)).

The Ninth Circuit has recognized that the trial court's "special obligation" to serve as the gatekeeper to "determine the relevance and reliability" is "vital to ensure accurate and unbiased decision-making by the trier of fact."  *Mukhtar v. Cal. State Univ.*, 299 F.3d 1053, 1063 (9th Cir. 2002) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999).  "The trial judge must make sure that 'junk science' plays no part in the decision." *Id.*  With respect to methodology, the *Daubert* inquiry considers "(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community."  *Mukhtar*, 299 F.3d at 1064.

As shown below, Professor Richman's testimony should be excluded for failing to meet several of the applicable requirements under these standards.

### B.   Professor Richman's Qualifications and Prior History as an Expert

Under this Court's "gatekeeper" function, the Court is charged with assessing whether Intervenor-Defendant RNC, as the party offering Professor Richman, has established the admissibility of his opinions.  *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007).  In evaluating Professor Richman's qualifications, the Court should be aware of two things:

First, while Professor Richman has published one peer-reviewed article estimating the alleged presence of non-citizens on the voter rolls, he has been widely criticized within

the field of political science for methodological errors in this work.  For example, Professor Richman's main publication on this topic, the 2014 paper "Do Non-Citizens Vote in US Elections?" which was published in the British journal *Electoral Studies*,[3] extrapolated, based on an internet public survey (the CCES) that a small number of respondents who identified themselves as non-citizens had voted in elections.  Professor Richman's analysis was the subject of extensive and withering criticism.  Dr. Stephen Ansolabehere—the creator and leader investigator of the CCES survey Professor Richman relied upon— published a peer-reviewed article in the same journal explaining the survey was not meant to measure non-citizens and that Professor Richman's conclusions were methodologically unsound.[4]  After Richman's flawed study was seized upon by President Trump in the wake of the 2016 election, over 200 political scientists signed a public letter stating that Richman's analysis "has been shown to be incorrect" and "generally rejected" by the "scholarly political science community."  *See* Ex. 14.  Among other deficiencies, Professor Richman failed to acknowledge "in a survey as large as the CCES, even a small rate of response error (where people incorrectly mark the wrong item on a survey) can lead to incorrect conclusions" and Richman based his findings "on a sample of 339 respondents . . . out of about 30,000 CCES respondents," many of whom provided inconsistent responses.  Dr. Ansolabehere also testified in the *Fish* case, where the Court found that "Richman's Electoral Studies article concluding that millions of noncitizens registered and voted was credibly dismantled by Dr. Ansolabehere, the architect of the survey upon which Dr. Richman's conclusions were based." *Fish*, 309 F. Supp. 3d at 1108; *see also id.* at 1087 (crediting testimony of Dr. Ansolabehere—the designer of the CCES survey—regarding the flaws in Professor Richman's analysis and observing "a group of approximately 200 political scientists signed an open letter criticizing Richman's work on essentially the same grounds").

---

[3] 26 *Electoral Studies* 149 (December 2014).

[4] S. Ansolabehere, et al., THE PERILS OF CHERRY PICKING LOW FREQUENCY EVENTS IN LARGE SAMPLE SURVEYS, 40 *Electoral Studies* 409-410 (December 2015).

Second, in the one matter where Professor Richman previously testified at trial, the district court, after hearing his testimony, concluded that *every* analysis he presented that estimated voter registration by non-citizens was "flawed," "not statistically valid," and entitled to "no weight." *Fish*, 309 F. Supp. 3d at 1085-1089. Professor Richman's *Fish* analyses included:

- analysis based on individuals who responded they were not citizens to the CCES survey.  The *Fish* court found that Professor Richman (i) used a sample size too small to provide "reliable or probative statistical evidence," (ii) failed to demonstrate that the [survey] respondents were in fact noncitizens, (iii) failed to account for "registration overreporting" where survey respondents respond that they are registered to vote when they are not, and (iv) failed to weight the CCES sample to reflect the population of Kansas.  *See* 309 F. Supp. 3d at 1087.  Notably, his *Fish* CCES analysis is similar to the analysis Professor Richman presents in Section 2.3.2.3 and Table 14 of his October 13 report.

- analysis from Sedgwick County of naturalized citizens who were allegedly registered to vote at the time of naturalization.  The *Fish* court found that (i) Professor Richman's reported "margin of error" was significantly understated, and when properly calculated, was not statistically distinguishable from zero, and (ii) his Sedgwick County analysis was not based on a representative sample of non-citizens and was not weighted to reflect the non-citizen population.  *Fish*, 309 F. Supp. 3d at 1088-91.  Professor Richman confirmed at deposition he presents the same Sedgwick County analysis the *Fish* court rejected in Section 2.3.2.1 and Table 13 of this October 13 report.  Ex. 13 (Richman Tr. 257-258).

In this case, what is past is prologue.  Professor Richman's recycled conclusions—already found to lack credibility in an affirmed district court decision—and history of "disingenuous" explanations for untimely disclosure of his opinions raise serious doubts about his qualification "to testify competently" and the reliability of "the methodology by which" he "reaches his conclusions." Fed R. Evid. 702.

**C.**    **Professor Richman's Supplementation Confirms His ADOT Methodology is Unreliable**

Professor Richman's analysis in this case is as unreliable as what he presented in *Fish*. In assessing reliability, a court "must scrutinize the proffered expert testimony in order to assure that the expert had sufficient data, used reliable scientific methods, and applied those methods in a reliable way . . . [and] be certain that an expert employs in the courtroom the same level of intellectual right that characterizes the practice of an expert in the relevant field." *In re Countrywide Fin. Corp.*, 984 F. Supp. 2d 1021, 1026 (C.D. Cal. 2013)  "[E]xpert opinions based on unsubstantiated generalizations or opinions not derived by the scientific method must be excluded." *Krause*, 459 F. Supp. 3d at 1264.

Professor Richman's analysis of ADOT data in Sections 1.3.5 and 2.3.1 and Tables 2 & 12 of his October 13, 2023 report fails at multiple levels – sufficiency of data, unreliable methods, and unreliable application of methods.  Professor Richman concluded that there were 2,331 instances when a license was "established or renewed" where ADOT indicated they were a non-citizen after that individual registered to vote, attributing a "confidence interval" to this estimate of "0.50% to 0.54%." But Professor Richman failed to consider and address the following reasons why the ADOT data might be wrong: data entry error regarding name, birthdate, or driver's license numbers that causes a mismatch, data entry error regarding the type of documentation provided leading to misclassification as a non-citizen, failure to consider whether these *full-ballot* voters had registered prior to or after the DPOC law's effective date in 2005 (the latter for which they were required to conclusively establish their U.S. citizenship), failure to exclude replacement and update transactions where authorized presence was not checked, and failure to account for lag time in updating ADOT's records.  Moreover, Richman's confidence interval is based on assumptions regarding the share of non-citizens in Arizona, the denominator of which is based on survey data from the ACS.  The survey data itself contains a range of error, which Richman does not account for in his Table.

Indeed, Professor Richman served his October 13 report *knowing* that his data was

insufficient and he needed "additional data in order to be certain" of the positions he was taking in Sections 1.3.5 and 2.3.1 and Tables 2 & 12   Ex. 9.  In particular, he knew that he was not certain that his characterization of 2,331 "licenses established or renewed" could "include issuance that do not require proof of authorized presence." *Id.*.   And that deficiency was only the tip of the iceberg – he knew or should have known that the 2,331 individuals issued these licenses might have been erroneously classified as "non-citizen" for a multitude of other reasons but did not even attempt, let alone exclude, these other possibilities.  These sleights of hand are nothing new for Professor Richman. In *Fish*, he offered the opinion that roughly one percent of non-citizens in Sedgwick County, Kansas were registered to vote based on records purportedly showing that a small handful of naturalizing individuals were already registered to vote. *Fish*, 309 F. Supp. 3d at 1088-89. Professor Richman offered this testimony despite *admitting* at trial that he was aware that the naturalizing individuals may not have actually been registered to vote at all, and were in Kansas's voter registration database for some other reason. *Id.*

The magnitude of Professor Richman's error here is self-evident in his October 28, 2023 supplemental report.  Of the 2,331 allegedly noncitizens "licenses established or renewed after voter registration" that he previously found, 961 (41%) turned out not, in fact, to be "licenses established or renewed" at all; rather these were updates or duplicates where ADOT does not check for authorized presence. In other words, Professor Richman has acknowledged that his original number of alleged noncitizens was inflated by over forty percent.  Another way of putting is that the ***actual error*** in Professor Richman's estimate of "licenses established or renewed after voter registration" was ***82 times larger than the 0.5% error he attributed to his estimate***.

Moreover, while Professor Richman purported to address this error in his October 28, 2023 supplement, the supplement still did not address the various potential sources for misclassification, like data entry error (keystroke errors resulting in coding the wrong documentation shown by the ADOT customer, name or birthdate errors that prevent matching), lag time, or the lack of any mandate to notify or update ADOT data if a there is

16

a citizenship status change.   Professor Richman also failed to establish that these individuals registered prior to the DPOC law's effective date in 2005—if they registered after the DPOC law took effect in 2005, their status as **_full-ballot_** voters would be a strong indication that they are U.S. citizens and had satisfied the DPOC requirement. These are all issues that could have been potentially ameliorated if ADOT had produced the "better" "historical data" that Professor Richman requested but ADOT did not provide.   Professor Richman, nonetheless, went ahead and presented what was effectively an incomplete correction, knowingly based on incomplete data without disclosing that he still did not have the full set of data necessary to conclude that these individuals had registered to vote while non-citizens.

As will be shown below, Professor Richman's analysis concluding certain _full-ballot_ voters lack U.S. citizenship failed to even consider whether these individuals registered prior to or after the DPOC law's 2005 effective date. If they registered after the DPOC law took effect, as a matter of law, their registration as **_full-ballot_** voters able to vote in all federal, state, and local elections would constitute a strong indication that they are U.S. citizens who had satisfied the DPOC requirement. By contrast, if they registered prior to the 2005 effective date, they would be expressly exempted from the DPOC law's requirements under the law's "safe harbor" provision. A.R.S. § 16-166(G). Registering _as a full-ballot voter_ after that 2005 effective date tends to demonstrate U.S. citizenship. Dr Richman merely assumes error in Arizona's voter registration database and fails to even consider, let alone exclude, the strong possibility of error in the ADOT data. This is fatal to the reliability of his analysis.

And rather than address ADOT's lag time in updating its records, Professor Richman exacerbated this error, adding in 403 people not in his October 13, 2023 report who were registered to vote as full ballot voters "_simultaneously_" (Professor Richman's word) with their providing proof of authorized presence.  Professor Richman does not seem to have grasped the absurd proposition that he is suggesting—that these individuals simultaneously presented ADOT with proof of citizenship (_i.e.,_ the requirement to be

registered as full-ballot voters) and proof they were a *non*-citizen with authorized presence. Sensible explanations for these data errors raised by ADOT itself—a delay in ADOT's processing the citizenship information, the accidental mistyping of a "3" or a "5" rather than a "4" by an ADOT customer service representative—are simply ignored by Richman. Instead, once again, Professor Richman merely assumes that the error lies in Arizona's voter registration data and fails to consider, let alone exclude, the very real possibilities for error within the ADOT data. Because Professor Richman does not account for or address any of these possibilities, his analysis is fundamentally unreliable and should be excluded.

      **D.**     **Numerous Other Analyses Professor Richman Intends to Present are Unreliable.**

Numerous other analyses Richman presents are unreliable and should be excluded under *Daubert*.

     1.    *Richman's underestimation of ADOT Errors*: Consistent with his flawed analysis in Sections 1.3.5 and 2.3.1 and Tables 2 & 12, Professor Richman significantly understates the errors in the ADOT driver's license database.  Relying on "one of the files" he was provided, in paragraphs 17 and 18 of his October 13 report, Professor Richman reports that there were only 22 instances where an error was corrected from "citizen to non-citizen" and that "this indicates a great deal of reliability in the coding of Authorized Presence Status by ADOT."  But, aside from examining this one report, Professor Richman conducted no evaluation of the ADOT database, either to conclude that these 22 instances were the *only* instances of a non-citizen as citizen classification error.  For starters, he did not conduct any analysis or evaluate why this report was either comprehensive or representative of the entire ADOT database.  Nor did he conduct any further analysis that would allow him to conclude that there are no other errors that would impact the reliability of the ADOT database to allow identification of non-citizens.  For example, he did not consider or attempt to quantify instances where a citizen is misclassified as a non-citizen, nor did he evaluate manual entry errors, typographical errors, name convention errors, or any other potential errors.  In the *Fish* case, Judge Robinson repeatedly noted that Professor

Richman failed to demonstrate his analyses were "representative" of the populations he studied, and did not adequately account for classification errors. *Fish*, 309 F. Supp. 3d at 1087, 1089, 1091, 1116. Having repeated the same types of errors here, Professor Richman's analysis of the accuracy of the ADOT database in Paragraphs 17 and 18 is unreliable and should be excluded.

2. *Professor Richman's "Geographic Distribution" Analyses*: In Sections 1.3.5.1 and 1.5.4 and Tables 3 and 4 of his October 13 Report, Professor Richman purports to show correlations between the number of non-citizens in each of Arizona's 15 counties and (i) the full ballot voters ADOT classified as non-citizens in that county (Table 3), and (ii) the number of federal-only ballot voters in that county (Table 4). In both cases, he asserts that this correlation confirms that these individuals are "in fact, non-citizens." Richman Report ¶¶ 57, 106. Richman goes so far as to assert that "for every additional 100 non-citizens in a county, an additional 3 individuals are on the federal only list." *Id.* at ¶ 105.

There are a myriad of fundamental statistical errors in these analyses. For starters, Professor Richman's analyses do not control for different types of population sizes: if there are more people, people of voting age, or registered voters in a particular county, it is reasonable to expect there will be more (i) non-citizens residing in that county, (ii) ADOT full voter matches, and (iii) federal-only voters. Professor Richman has failed to control for these potentially confounding variables.

Similarly, Professor Richman's analysis compares these metrics among Arizona's 15 counties, and accordingly his statistical analyses are fundamentally based on fifteen observations about the relationship between presence of non-citizens in a county and the various voter rolls. There is typically an inverse relationship between the data set size and the strength of statistical conclusions that can be drawn. *See, e.g.*, Federal Judicial Center National Research Council, *Reference Manual on Scientific Evidence*, 318-19 (3d ed. 2011). In both Table 3 and 4, Professor Richman attempts to mask this by ecologically inferring his 15 County-level observations to individuals within each county; by this sleight

of hand, known in social sciences as the "ecological fallacy,"[5] he has transformed his study population of 15 counties into four million Arizona residents and dramatically understates his error rates.

Other fundamental methodological errors are clear when one compares the models used to generate Tables 3 and 4.  Dr. Richman also mixes and matches different models to reach convenient conclusions.

|  | Table 3 | | Table 4 (w/o fixed effects) | | Table 4 (w/ fixed effects) | |
|---|---|---|---|---|---|---|
|  | Included in Model? | Reported on 10/13? | Included in Model? | Reported on 10/13? | Included in Model? | Reported on 10/13? |
| Proportion of population composed of non-citizens in county | Y | Y | Y | Y | Y | Y |
| Proportion of population composed of naturalized citizens in county | Y | Y | N | N | N | N |
| Constant | Y | N | Y | N | Y | N |
| County fixed effects (constant for each county) | N | N | N | N | Y | N |

These inconsistencies are telling: they reflect that Professor Richman is changing his

---

[5] *See generally* David A. Freedman, *Ecological Inference and the Ecological Fallacy*, Int'l Encyclopedia of the Soc. & Behav. Scis. Tech. Rep. No. 549.

analysis – adding and omitting variables – in the service of promoting a particular theory. While normally "failure to include variables will affect the [regression] analysis' probativeness, not its admissibility . . . some regressions [may be] so incomplete as to be inadmissible as irrelevant." *Bazemore v. Friday*, 478 U.S. 385, at 400 & n.10 (1986). *See also Penk v. Oregon State Bd.*, 816 F.2d 458, 465 (9th Cir. 1987) (affirming district court decision excluding regression analysis where important "variables were either missing or inadequately represented"); *Bickerstaff v. Vassar College*, 196 F.3d 435, 449-450 (2d Cir. 1999) (affirming trial court decision to give no weight to regression analysis that failed to account for major factors).   Given the fundamental errors with this analysis, they fail the *Daubert* standard and should be excluded.

3.      *Richman's Presentation of CCES Survey Data*: Professor Richman presents several analyses in his October 13 report based on the CCES survey.   Richman Rep. Sections 1.6, 2.1.1, 2.3.2.3, 2.3.3 & Tables 5-8 & 14.  Survey evidence is admissible as an exception to the hearsay rule "if the survey is material, more probative on the issue than other evidence and if it has guarantees of trustworthiness." *Brunswick Corp. v. Spinit Reel Co.*, 832 F.2d 513, 522 (10th Cir. 1987).   "The survey standards for reliability under *Daubert* and trustworthiness under the hearsay exception are parallel." *Fish*, 309 F. Supp. 3d at 1059.  In this Circuit, a proponent of survey evidence must show, not only that the "survey was conducted in accordance with generally accepted survey principles" but also "that the results were used in a statistically correct measure." *Keith v. Volpe*, 858 F.2d 467, 480 (9th Cir. 1988).

Here, there is substantial reason to doubt that Professor Richman will present CCES results in a statistically correct manner.  After all, his one peer-reviewed article interpreting CCES data was publicly criticized in an open letter signed by over 200 political scientists as "incorrect" and "generally rejected" by political scientists, who catalogued methodological problems with Professor Richman's analysis.  Ex. 14.  Among the most prominent critics of Professor Richman's CCES analysis are the principal investigators who designed and implemented the survey, who published a 2015 peer reviewed article

specifically called out Professor Richman for his methodology, "incorrect assum[ptions]" and misusing a survey that "was not designed to sample non-citizens." S. Ansolobehere et al., *The Perils of Cherry Picking Low Frequency Events in Large Sample Surveys*, 40 Electoral Studies 409-10 (Dec. 2015).

Judge Robinson also catalogued a myriad of problems with Richman's CCES and other survey analysis in *Fish*, 309 F. Supp. 3d at 1087-88, many of which are repeated in the analysis he intends to repeat here. Many of the surveys he presents have very small sample sizes. *Compare* Richman Rep. at 30 tbl. 6 (drawing conclusions based on 201 reported non-citizens out of 15,223 respondents) & tbl. 8 (drawing conclusions based on as few as 46 non-citizen responses) *with Fish*, 309 F. Supp. 3d at 1087 ("such small samples have large margins of error, and do not amount to reliable or probative statistical evidence"). As to the CCES analysis he intends to offer here, as in *Fish*, Professor Richman "failed to demonstrate that the [survey] respondents were in fact noncitizens" and "did not weigh the [survey] sample to accurately reflect the population of [Arizona]." *Id.*; *see also* Ex. 13 (Richman Tr. 295) (admitting he again did not confirm noncitizen of CCES respondents). And in Section 2.3.3 and Table 14, Professor Richman purports to present a new CCES methodology purportedly updated from his 2014 analysis; Professor Richman admitted in his deposition, however, that he has not submitted this new methodology to peer review. Ex. 13 (Richman Tr. 291).

Professor Richman's CCES analysis is also not probative of issues in this case. Four of his analyses concern purported differences in citizen and non-citizen voter affiliations and preferences, particularly whether there were differences in political party affiliation or approval of particular candidates. Richman Rep. tbls. 5, 6, 7 & 8. But the survey data does not address whether non-citizens are actually registering to vote.

4.    *Richman's Presentation of Sedgwick County, Kansas Data*: In Section 2.3.2.1 and Table 13 of his October 13 Report, Professor Richman presents the Sedgwick County data he presented in *Fish*. Judge Robinson found that (i) Richman had understated the margin of error in the analysis, (ii) failed to weight the sample, and (iii) did not confirm

that any of the individuals identified were, in fact, "noncitizens who had successfully registered to vote prior to naturalizing." *Fish*, 309 F. Supp. 3d at 1089.  At deposition, Professor Richman acknowledged he presented the same data, Ex. 13 (Richman Tr. 257-258), but in so doing, Professor Richman does not acknowledge the *Fish* findings, or state that or explain how he altered his analysis in light of those findings.   In other words, he has done nothing to show why Judge Robinson's conclusion was flawed and entitled to "no weight." *Fish*, 309 F. Supp. 3d at 1089.

## CONCLUSION

For the reasons stated herein, the Court should strike Professor Richman's untimely October 28 supplemental report and bar any testimony or evidence based on that or the October 28 untimely ADOT production.   Moreover, the Court should exclude any testimony from Professor Richman concerning testifying as to anything in his supplemental expert report, as well as the analyses in Sections 1.2.4, 1.3, 1.3.5, 1.3.5.1, 1.5.4, 1.6, 2.1.1, 2.3.1, 2.3.2, 2.3.2.1, 2.3.2.2, 2.2.2.3, 2.3.3, and 2.3.4, including Tables 2, 2.3, 2.4., 2.5, 3-8 and 12-15.

Respectfully submitted,

/s/ John A Freedman
**ARNOLD & PORTER**
**KAYE SCHOLER, LLP**
John A. Freedman*
Jeremy Karpatkin*
Erica McCabe*
Leah Motzkin*
601 Massachusetts Ave., N.W.
Washington, D.C. 20001
John.Freedman@arnoldporter.com
Jeremy.Karpatkin@arnoldporter.com
Erica.McCabe@arnoldporter.com
Leah.Motzkin@arnoldporter.com
(202) 942-5000

**FAIR ELECTIONS CENTER**
Jon Sherman*
Michelle Kanter Cohen*
Beauregard Patterson*
1825 K St. NW, Ste. 450
Washington, D.C. 20006
jsherman@fairelectionscenter.org
mkantercohen@fairelectionscenter.org
bpatterson@fairelectionscenter.org
(202) 331-0114

**ARIZONA CENTER FOR LAW**
**IN THE PUBLIC INTEREST**
Daniel J. Adelman (AZ Bar No. 011368)
352 E. Camelback Rd., Suite 200
Phoenix, AZ 85012
danny@aclpi.org
(602) 258-8850

**ARNOLD & PORTER**
**KAYE SCHOLER, LLP**
Leah R. Novak*
Andrew Hirschel*
250 West 55th Street
New York, NY 10019
Leah.Novak@arnoldporter.com
Andrew.Hirschel@arnoldporter.com
(212) 836-8000

*Attorneys for Poder Latinx, Chicanos Por La Causa, and Chicanos Por La Causa Action Fund*

*Admitted Pro Hac Vice*

**CERTIFICATE OF CONFERENCE**

Pursuant to Local Rule 7.2(l), I hereby certify that Plaintiffs' counsel conferred with Defendant Attorney General and Intervenor-Defendants on November 2, 2023 and November 3, 2023 regarding this motion, and understand Defendants oppose this motion. I also understand the Defendant Secretary of State takes no position on this motion.

Dated: November 3, 2023               */s/ John A. Freedman*
                                      John A. Freedman

**CERTIFICATE OF SERVICE**

I hereby certify that on November 3, 2023, I served the foregoing **PLAINTIFFS' MOTION TO STRIKE UNTIMELY SUPPLEMENTAL EXPERT REPORT, RELATED DATA, AND TO PARTIALLY EXCLUDE TESTIMONY OF DR. JESSE RICHMAN** on counsel of record for all parties by filing on ECF.

Dated: November 3, 2023               */s/ John A. Freedman*
                                      John A. Freedman