UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

Mi Familia Vota, et al.,　　　　　)
　　　　　　　　　　　　　　　　　)
　　　　　　　　　Plaintiffs,　　　) NO. 2:22-cv-00509-SRB
v.　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　) Phoenix, Arizona
Adrian Fontes, in his official　 ) November 6, 2023
capacity as Arizona Secretary　　 ) 9:04 a.m.
of State, et al.,　　　　　　　　　)
　　　　　　　　　　　　　　　　　)
　　　　　　　　　Defendants.　　　)
_____)

**BEFORE:　 THE HONORABLE SUSAN R. BOLTON, JUDGE**

**<u>REPORTER'S TRANSCRIPT OF PROCEEDINGS</u>**

**BENCH TRIAL DAY 1 - AM SESSION**

**(Pages 1-124)**

Official Court Reporter:
Teri Veres, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 38
Phoenix, Arizona 85003-2151
(602) 322-7251

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

UNITED STATES DISTRICT COURT

*A P P E A R A N C E S*

For Plaintiff United States of America:

    U.S. DEPARTMENT OF JUSTICE - VOTING - M STREET
    By:  **Jennifer J. Yun, Esq.**
    4 Constitution Square
    150 M Street NE
    Washington, D.C.  20503

    U.S. DEPARTMENT OF JUSTICE - CIVIL RIGHTS DIVISION,
    VOTING SECTION
    By:  **Richard Dellheim, Esq.**
        **Sejal Jhaveri, Esq.**
        **Margaret Turner, Esq.**
    950 Pennsylvania Avenue NW
    Washington, D.C.  20530

For Plaintiff ADRD Action, Arizona Students' Association, League of United Latin American Citizens Arizona, Living United for Change in Arizona:

    CAMPAIGN LEGAL CENTER
    By:  **Danielle Marie Lang, Esq.**
        **Molly Danahy, Esq.**
        **Robert Brent Ferguson, Esq.**
        **Hayden Johnson, Esq.**
    1101 14th Street NW, Suite 400
    Washington, D.C.  20005

    FREE SPEECH for PEOPLE
    By:  **Courtney Hostetler, Esq.**
    1320 Centre Street, Suite 405
    Newton, Massachusetts  02459

    MAYER BROWN, LLP
    By:  **Rachel J. Lamorte, Esq.**
    1999  K Street, NW
    Washington, D.C.  20006

    MAYER BROWN, LLP
    By:  **William Joseph McElhaney, III, Esq.**
    71 S. Wacker Drive
    Chicago, Illinois  60606

*A P P E A R A N C E S   C O N T ' D*

For Plaintiff Arizona Asian American Native Hawaiian and Pacific Islander for Equity Coalition:

 LATHAM & WATKINS
 By: **Sadik Huseny, Esq.**
   **Amit Makker, Esq.**
   **Evan Omi, Esq.**
   **Catherine Anne Rizzoni, Esq.**
 505 Montgomery Street, Suite 2000
 San Francisco, California  94111

 ASIAN AMERICANS ADVANCING JUSTICE
 BY: **Niyati Shah, Esq.**
 1620 L Street NW, Suite 1050
 Washington, D.C.  20036

For Plaintiff Arizona Democratic Party, Democratic National Committee:

 WILMER CUTLER PICKERING HALE & DORR, LLP
 By: **Christopher E. Babitt, Esq.**
 2100 Pennsylvania Avenue NW
 Washington, D.C.  20037

For Plaintiff Poder Latinx:

 ARNOLD & PORTER KAYE SCHOLER, LLP
 By: **John A. Freedman, Esq.**
   **Leah Motzkin, Esq.**
 601 Massachusetts Avenue NW, Suite 1000
 Washington, D.C.  20001

 FAIR ELECTIONS CENTER
 By: **Beauregard William Patterson, Esq.**
   **Jonathan Sherman, Esq.**
 1825 K Street NW, Suite 701
 Washington, D.C.  20006

For Plaintiff Tohono O'odham Nation:

 NATIVE AMERICAN RIGHTS FUND
 By: **Allison Neswood, Esq.**
 250 Arapahoe Avenue
 Boulder, Colorado  80302

*A P P E A R A N C E S   C O N T ' D*

For Plaintiff Voto Latino, Mi Familia Vota:

    HERRERA ARELLANO, LLP
    By:  **Daniel Abraham Arellano, Esq.**
    1001 N. Central Avenue, Suite 404
    Phoenix, Arizona  85004-1500

    ELIAS LAW GROUP, LLP
    By:  **Christopher Dodge, Esq.**
         **Daniela Lorenzo, Esq.**
         **Alexander Franklin Atkins, Esq.**
         **Mollie DiBrell, Esq.**
         **Elizabeth C. Frost, Esq.**
    250 Massachusetts Avenue NW, Suite 400
    Washington, D.C.  20001

For Plaintiff Promise Arizona, Southwest Voter Registration Education Project:

    MALDEF
    By:  **Ernest Israel Herrera, Esq.**
         **Erika Cervantes, Esq.**
    634 Spring Street, 11th Floor
    Los Angeles, California  90014

For Defendants State of Arizona Kris Mayes, Jennifer Toth:

    ARIZONA ATTORNEY GENERAL'S OFFICE
    By:  **Joshua Michael Whitaker, Esq.**
         **Timothy E. Horley, Esq.**
    2005 N. Central Avenue
    Phoenix, Arizona  85004

For Intervenor-Defendants State of Arizona, Kris Mayes, Ben Toma:

    ARIZONA ATTORNEY GENERAL'S OFFICE
    By:  **Kathryn E. Boughton, Esq.**
    2005 N. Central Avenue
    Phoenix, Arizona  85004

    GALLAGHER & KENNEDY, PA
    By:  **Hannah Hatch Porter, Esq.**
    2575 E. Camelback Road, Suite 810
    Phoenix, Arizona  85016-9225

*A P P E A R A N C E S   C O N T ' D*

For Defendant Stephen Richer:

    MARICOPA COUNTY ATTORNEY'S OFFICE
    By:  **Jack L. O'Connor, III, Esq.**
    225 W. Madison Street
    Phoenix, Arizona  85003


For Intervenor Republican National Committee:

    STATECRAFT, PLLC
    By:  **Kory A. Langhofer, Esq.**
    649 North 4th Avenue, Suite B
    Phoenix, Arizona  85003

## I N D E X

| PLAINTIFF WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| JANINE PETTY | | | | |
| By Ms. Lang | 22 | | | |
| By Ms. Turner | 97 | | | |
| By Mr. Whitaker | | 104 | | |

### INDEX OF EXHIBITS

| EXHIBIT NO. | DESCRIPTION | ADMITTED |
|---|---|---|
| 11 | 2023 Arizona Secretary of State Election Procedures Manual – 9/30/2023 | 76 |
| 27 | Arizona Voter Registration Form [Depo. Ex. 16] | 87 |
| 28 | U.S. Election Assistance Commission National Mail Voter Registration Form [Depo. Ex. 17] | 87 |
| 199 | 1/9/2023 Email chain from J. Petty to S. Richer, Re Election Reform blitz [MC 002742-2744] [Depo. Ex. 30] | 48 |

UNITED STATES DISTRICT COURT

*P R O C E E D I N G S*

*(Proceedings begin at 9:04 a.m.)*

COURTROOM CLERK:  On the record in Civil Docket 22-509, Mi Familia versus Katie Hobbs before the Court for bench trial day one.

THE COURT:  Good morning, Ladies and Gentlemen.

Once again, because of the numerous number of lawyers who are here, I'm not going to ask you to make your individual appearance.  Instead, we will have the record reflect your presence.  If you have not already done so, on a break -- those of you that aren't speaking, on a break if you would please be sure to let Elaine know of your presence and who you represent so that we can have that reflected on the record; and, once again, I will also request that as an attorney takes to the podium for the first time that they state their name and who they represent for the record so that we will be sure that that is accurately reflected in the transcript.

I believe that -- are there any preliminary matters that we need to discuss?

MR. DODGE:  Yes, Your Honor, there are a few matters of housekeeping.

Good morning, Your Honor, Christopher D. Dodge of Elias Law Group on behalf of the MFV plaintiffs.  I just want to go through a few matters of housekeeping this morning.

The first is that last night plaintiffs filed a motion to overrule certain global objections raised by defendants in response to our deposition designations.

As Your Honor is aware, plaintiffs have gone to quite some length to streamline trial, avoid unnecessarily calling witnesses live.  Part of that is relying significantly on deposition designations.  Defendants have lodged an objection to our use of seven transcripts in total on the basis that these parties -- these witnesses, who are Rule 30(b)(6) witnesses of various defendants, are not adverse parties under the meaning of Rule 32(a)(3) and, thus, they object to our using these transcripts altogether.

And that's very consequential for the course of trial because if those transcripts are, in fact, kept out entirely in response to their objection, it will necessitate both calling a substantial number of additional witnesses live and will also require longer live testimony from hybrid witnesses who we are going to try and have abridged live examination of and then bring in the rest of their testimony through designations.

So we filed a motion on that last night.  I can speak to it.  I mostly wanted to make the Court aware of it because it does go to the length of trial.

THE COURT:  I don't want you to speak to something that I have not had a chance to read.  I know that there have

been filings since I was last in the office on Friday, and I have had a chance to read the captions of them and that is as far as it goes.

On this point, though, I'll just ask when the defendants can respond in writing or if they would like to just respond orally and we can address it after I've had a chance to read the motion.

Mr. Langhofer -- and you can just stay right there.

MR. LANGHOFER:  Good morning, Your Honor, Kory Langhofer for the RNC.

There are four issues in the motion Mr. Dodge is describing.  On the first issue, the adversity question, I think we can respond in short order.  I would say by Wednesday.

On the other issues, I don't think there's enough detail in the motion for us to possibly respond in writing. So, for example, they say that the Court should overrule all of our objections asking the witnesses to provide legal opinions.  I thought we already litigated that issue. Apparently, they want to do it again.  They don't say which line items or objections they're -- they're pointing to.  They just say you should overrule all of our objections.  I don't think we can respond to that in writing.  It's something we should take as they come.

THE COURT:  So what you want to respond to in

writing is the question as to whether or not these depositions are the depositions of a party that then -- that can be used for any purpose?

MR. LANGHOFER:  Right.  So there are -- there are a couple of nested issues in this motion --

THE COURT:  Okay, I don't want to get into detail; but is that essentially what you want to respond to in writing?

MR. LANGHOFER:  It's whether they're adverse and whether they're more than a hundred miles from this courthouse.

THE COURT:  Oh, okay.  You can do that by Wednesday?

MR. LANGHOFER:  Yes, ma'am.

MR. DODGE:  Okay, that takes care of that.

As Mr. Langhofer said there are some other broader objections they've made to all our designations that we addressed in that motion, but I'll let Your Honor get to that in due course.

We also wanted to raise an issue with respect to resolving objections to individual designations, so specific line items, and this is consequential for a couple reasons. It also goes to the scope of trial and the course of any necessary live examination from certain witnesses.

It also goes to something the parties are working on, which is providing the Court a more streamlined set of

deposition designations rather than 8,000 pages with cross-referenced tables and whatnot.

THE COURT:  Yeah, if I have to read 8,000 pages and then have cross-references, you can expect a ruling on this trial sometime in 2025, which I don't think is satisfactory to any party.

MR. DODGE:  The parties are actively working on that.  To that end, to resolve these line item objections, what plaintiffs would like to do is submit a trial brief, maybe Wednesday, with, essentially, a chart with their objections to our line item designations saying here's our response, where appropriate cross-referencing the motion we filed last night indicating why they should be overruled; and we think it would be sensible to set a deadline this week for both parties to do that so the Court has positions on those individualized designations.

THE COURT:  And these are deposition designations for witnesses who you do not wish to call live?

MR. DODGE:  That is correct.

THE COURT:  Does this overlap with the 30(b)(6) issue or is this for --

MR. DODGE:  Does Your Honor mean 32(a)(3)?

THE COURT:  Yes -- well, both.

MR. DODGE:  As a legal matter, no, they do both go to our ability to both streamline the deposition designation

transcripts and also -- I guess it won't impact live since it's only going to be people called live except to the extent that if Your Honor were to sustain a large number of these objections, it might require us to call a witness or two live, which is why we think it's something that needs to be resolved.

THE COURT:  I ask that because we've already resolved the issue of anyone who's being called live, you're going to ask the questions rather than rely on the depositions so that I don't have to read the objections, read the answer, and then know the answer and then rule on it.

MR. DODGE:  That's the plan, Your Honor, and I think -- as I said, this goes to the course of trial because if Your Honor would sustain, you know, objections on particularly critical or a large volume of testimony, we might then have to call a witness live who we had intended to address purely through designations.

THE COURT:  So you essentially -- you said you wanted to file a trial brief.

Do you just want to file a chart?

MR. DODGE:  That's essentially what it would be, with our responses to their objections, and I guess our proposal would be for it to be mutual, in part, because it would facilitate a conferral process where I think a lot of these objections would fall by the wayside.

THE COURT:  That's fine, just -- I just don't want memoranda.  I just want the chart.

MR. DODGE:  It's a chart.

THE COURT:  Okay.

MR. DODGE:  It's a chart.

Staying on deposition designations for a moment, as I was saying, the plan is to get you streamlined transcripts.

For the hybrid witnesses who will be testifying live, what we are trying to do is get a single transcript of unobjected-to testimony highlighted to you simultaneous with that testimony so that you have it ready -- or at least close in time.

THE COURT:  Okay.

MR. DODGE:  And so that will be coming for those witnesses and, as I said, for the ones not coming live, at some point we will have final transcripts with all of the designations coming in to evidence after the objections are ruled on.

On exhibits, there are about 45 exhibits that are jointly proposed to which no party has an objection that I can read into the record now as stipulated exhibits if Your Honor would like.

THE COURT:  I would like a plaintiffs' representative and a defendants' representative to simply advise Elaine of those numbers.  She will mark them in to

UNITED STATES DISTRICT COURT

evidence, and the minutes of the day will reflect the numbers and that they are -- the defendants concede -- or have no objection to the admission.

MR. DODGE:  We will take care of that during a break.  On the same point, with respect to trial briefs, plaintiffs would like to file a trial brief to move in to evidence exhibits that won't be coming in through a witness to overruled objections from defendants just so that the Court can resolve those objections during trial.

I see you're looking skeptical, Your Honor.

THE COURT:  I'm looking skeptical.  So why can't we just address them as you offer them?

MR. DODGE:  Some of these will not be coming in through witnesses, in part, because we are choosing not to call a lot of witnesses live; and so this would be to resolve objections that defendants have indicated they intend to raise based on our exhibit list so that they're able to come in to evidence.

THE COURT:  What's the volume, the number?

MR. DODGE:  I don't know off the top of my head.  It wouldn't be everything on our exhibit list.  Obviously, everything coming in through a witness would not be included; and I think there would be a focus on, you know, our key exhibits, but I don't have a number for you.  I can have that tomorrow or later today.

THE COURT:  You said "trial brief" again.

Were you really meaning chart?

MR. DODGE:  On that I'm not sure if plaintiffs have resolved on an approach.  There might be a memo addressing points of law if it's -- if Your Honor would prefer a different approach, we -- we'll accommodate.

THE COURT:  I -- the way I address oral objections to motions I don't think would be any different.  I only ask for argument if it's not obvious to me whether it should be sustained or overruled, and so I don't think in anticipation of my allowing argument you should have argument.

If I don't know the answer based on the chart, then we could either have oral objections -- expanded objections or a trial brief, but I don't want to start off with a trial brief.  I want to start off with a chart and perhaps limit the number that we would have to actually discuss either in writing or orally to the ones that are not obvious to me.

MR. DODGE:  Understood.  We'll put together a chart, I think.  I wanted to go back to one issue briefly on -- plaintiffs are prepared to move forward in giving you a chart on deposition designations and our responses to their objections.

Would the Court set a deadline on when the parties should submit that to the Court?

THE COURT:  Well, I think you said you could do it

by Wednesday, but that doesn't mean the defendants agree that they could have theirs by Wednesday.

MR. DODGE:  Okay.

THE COURT:  I think you need to -- unless you have already, give it to them and then they can tell me how much time they need to fill out their side of the chart.

MR. DODGE:  Okay, we'll proceed with Wednesday then.

One other -- a couple other items.  County Recorder stipulations, the parties engaged in the process the Court asked them to with respect to the County Recorder stipulations.  Those were filed yesterday.  We have copies here if Your Honor would like them.

It did produce a modest number of additional stipulations in addition to those in the Joint Pretrial Order. Those are now in the docket; and, finally, I just wanted to preview for the Court also the plaintiffs --

THE COURT:  Are these the seven?

MR. DODGE:  Correct.

THE COURT:  So it's just seven?

MR. DODGE:  Yes.

THE COURT:  So that resolves the whole thing about Exhibits A, B, C and D?

MR. DODGE:  I believe so, Your Honor.  I believe Your Honor ruled A and C would not come in, and these are the ones defendant agreed to from D.

THE COURT:  Okay.  So we have now resolved all of the issues in that motion in limine and these are the -- as I -- well, the proposed stipulations of law now.  I kept referring to them as admissions.

Either way, these are going to be facts considered to the Court to be true?

MR. DODGE:  Correct, Your Honor.

THE COURT:  Is that how the defendants agree to -- that these are actually -- it says stipulations of law.

Aren't they stipulations --

MR. DODGE:  That may be a typo, Your Honor, I apologize.

THE COURT:  They're facts?

MR. DODGE:  Yeah.

MR. LANGHOFER:  I think the way we've been thinking about them is that all fifteen Recorders would agree with these things, but I guess in my mind those are interchangeable with them being true.

THE COURT:  Okay.  It's -- as I was re-reading the transcript yesterday, if called to testify, all fifteen County Recorders would say these seven things, everybody agrees, okay good.

MR. DODGE:  Final item for me --

THE COURT:  Does that mean not a single county recorder needs to be called or are you still calling a couple?

MR. DODGE:  I know we have one County Recorder testifying today.

THE COURT:  Oh, okay.

MR. DODGE:  I -- I do not anticipate a large number of County Recorders appearing live unless the Judge -- unless Your Honor sustains their objection to our use of deposition designations from an additional number of County Recorders, who we would then potentially have to call live since their deposition testimony could not come in.

THE COURT:  Okay.

MR. DODGE:  In case that informs your decision at all, Judge.

THE COURT:  Final item for me --

THE COURT:  You want me to just say now the objections are all overruled or...

MR. DODGE:  Final item, plaintiffs filed a motion to strike/*Daubert* motion with respect to a supplemental report and portions of an original report from one of defendants' experts, Professor Richman.  There's been no response on the record so I don't think we'll speak to it now, but I just wanted to highlight that for the Judge.

I think that covers housekeeping from the plaintiff side.

THE COURT:  Anything from the defense side?

MR. WHITAKER:  Good morning, Your Honor, Josh

Whitaker for the State and Attorney General.  One housekeeping matter I had is there may be some documents that were marked confidential by a party.  For example, containing voter registration information.

THE COURT:  Personally-identifiable information?

MR. WHITAKER:  It can.  So, for example, there are Excel sheets that show someone's name and address and that kind of thing.  One thought about how to handle that is if we were going to show it to a witness, we would publish it only to Your Honor.

THE COURT:  Well, let me -- this one is not a problem because if there's personally-identifiable information we can't broadcast it to -- whoever it is -- I say "broadcast."  The only broadcasting we're doing would be to show it on the video screen in the courtroom.  There's no other audio -- there's no audio line where this is being broadcast to anyone.

When it comes time for trial things that were previously marked confidential usually come in to evidence and they're public.  Personally-identifiable information is a different issue, and I guess I would have to see the exhibit to know whether it should just be -- have the PII redacted and be admitted publicly or not.

I haven't seen it.  I don't know if that's feasible, but typically that's how personally-identifiable information

is addressed in exhibits.

MR. WHITAKER:  All right.  Thank you, Your Honor.

I'm trying to think about how that would work if we were going to do it today.  Thank you for the guidance.

I think that's it from us, but I know at least another defendant had something to raise.

THE COURT:  Okay.  Thank you, Mr. Whitaker.

Mr. Langhofer.

MR. LANGHOFER:  Thank you, Your Honor.  Only one item from me and, that is, thinking about the calendar.  We have a couple -- I think three witnesses who are going to be flying in from out of town, and we want to think about when they should be here.

At the -- I guess two times ago when we were before you we set the schedule for this trial.  The plaintiffs said they need five or six days, including cross-examination.  We scheduled it for, I think, eleven days if we go into the week of Thanksgiving.

So what I would, you know, suggest is a good approach here is that the end of the sixth day of trial is next Tuesday -- would be Tuesday evening or afternoon.  So I'd like to be able to inform my out-of-town witnesses that they should be here Wednesday, Thursday and Friday of next week. Maybe they go in to Monday, but we won't have anyone out of town.

THE COURT:  I have no problem either with taking witnesses out of order.

MR. LANGHOFER:  Okay.

THE COURT:  So if -- when you have these people coming in from out of town, if they're on a schedule that requires us to take them out of order, that's fine with me.  I can keep that straight.

MR. LANGHOFER:  Thank you, your Honor.

We'll just plan on having folks here Wednesday, Thursday and Friday of next week, thanks.

THE COURT:  Okay.

MR. DODGE:  Just one small note on that, Your Honor. I just want to let the Court know that the parties have agreed to a 48-hour notice disclosure rule for witnesses.

THE COURT:  Good, good.  So are you ready to call your first witness?

Was there anything else on the defense side before we hear from the first witness?  Okay, let's go.

MS. LANG:  Good morning, Your Honor, Danielle Lang for LUCHA plaintiffs, and plaintiffs call their first witness, Ms. Janine Petty.

THE COURT:  Ms. Petty, if you'd come forward and be sworn.  Just stand right in front of Elaine.

COURTROOM DEPUTY:  Raise your right hand.

(Witness is sworn.)

COURTROOM DEPUTY:  Please state your full name for the record.

THE WITNESS:  Janine Petty.

DIRECT EXAMINATION

BY MS. LANG:

Q.   Good morning, Ms. Petty.

A.   Good morning.

Q.   And thank you very much for being here and taking some time today.  We've met before at your deposition, but my name is Danielle Lang and I represent a group of the plaintiffs in this case.

Can you tell the Court what is your current occupation?

A.   I am the Senior Director of Voter Registration for Maricopa County Recorder's Office.

Q.   And Maricopa County is Arizona's largest county, correct?

A.   Yes.

Q.   With the largest number of registered voters in the state?

A.   Yes.

Q.   And to your knowledge, approximately how many registered voters are there in Maricopa County in broad terms?

A.   2.5 million.

Q.   Okay.  Is that active?

A.   Yes.

Q.   And is there, you know, approximately 4,000,000 if you

include inactive, do you know?

A.   Approximately.

Q.   Okay.  And how long have you been in your current role?

A.   Going on three years.

Q.   Okay.  And have you had any previous roles in Arizona that relate to elections?

A.   Yes.

Q.   Can you describe those?

A.   I was the Deputy State Election Director for Arizona for almost six years.  Prior to that, I worked for Yavapai County in various roles in the election field, including Elections Warehouse Manager, Ballot Programmer, Registrar of Voters.

Q.   Okay.  Were the years that you spent at the Secretary of State's office as the Deputy State Elections Director approximately 2015 to 2021?

A.   Yes.

Q.   And then you spent approximately 2006 to 2015 with Yavapai County; is that right?

A.   In the elections realm, yes, but I actually started in 1997 with Yavapai County.

Q.   Okay.  So have you been working in Arizona elections in some capacity for over fifteen years?

A.   Yes.

Q.   Okay.  Can you describe for the Court what the role of the County Recorder is with respect to administering

elections?

A.   Yes.

Q.   All right, you can go ahead and do that.

A.   The County Recorder is responsible for voter registration and early voting as well as the recordation of documents and public records.

Q.   And what voter registration functions specifically does the Recorder's office handle?

A.   The registering of voters and list maintenance.

Q.   Okay.  And what is the size of the staff that you oversee as the Senior Director of Voter Registration?

A.   About twenty.

Q.   Okay.  And what are your personal job responsibilities in that role?

A.   I oversee the team of voter registration, make sure that we are adhering to all federal and state laws.  I also oversee the voter registration system and the interfaces with the statewide voter registration system.

Q.   Okay.  In setting voter registration policy for your office, what sources of statewide guidance do you follow?

A.   The Arizona Revived State statutes, Title 16, as well as the Elections Procedures Manual.

Q.   Okay.  And what role specifically does the Elections Procedures Manual play in Arizona elections?

A.   It does have the force of law.  There is several chapters

UNITED STATES DISTRICT COURT

related to voter registration in the Procedures Manual that we -- we follow.

Q. And does the Procedures Manual provide a gap-filling function for things that may not be spelled out in statutes?

A. Yes.

Q. Okay. And I think you already said this, but do you consider the Elections Procedures Manual to be binding on your office?

A. Yes, I do.

MR. LANGHOFER: Calls for a legal conclusion.

THE COURT: The objection is overruled. The answer will stand.

BY MS. LANG:

Q. What is the currently operative Elections Procedures Manual that you follow?

A. 2019 Manual.

Q. Okay.

MS. LANG: Can we pull up Plaintiffs' Exhibit 6, and there's no objection to this exhibit so I'll move to have it entered.

THE COURT: Is this one of the 45 that --

MS. LANG: It is.

THE COURT: -- are going to be marked in?

MS. LANG: Yes.

THE COURT: Okay.

BY MS. LANG:

Q.   So is this the 2019 Elections Procedures Manual that you were referring to?

A.   Yes.

Q.   Okay.

        MS. LANG:   And we can take that down.

BY MS. LANG:

Q.   What is the Voter Registration Advisory Committee?

A.   It is a committee that's comprised of the County Recorders as well as the Secretary of State's office.

Q.   Okay.   Is that sometimes referred to as VRAC?

A.   Yes.

Q.   Okay.  And what is the role of this committee?  What is their function?

A.   The goal of this committee is to come up with uniform practices on how to process things related to voter registration that are maybe not addressed in statute or the Elections Procedures Manual.

Q.   Okay.  And what role do you have on the committee?

A.   I'm just a participant.  I'm actually not a member.  The members are the elected County Recorders.

Q.   Okay.  Do you serve as kind of a subject matter expert on issues related to voter registration for the committee?

A.   I do and I am sometimes appointed a proxy for voting purposes.

Q.   That was my next question.  So sometimes you're designated by the Recorder to participate?

A.   Yes.

Q.   And what kind of subject matter expertise do you provide to the committee?

A.   With my longstanding experience in voter registration and my knowledge of the system programs, I offer guidance on best practices and my opinion on how to create statewide uniformity so every voter is getting treated the same way within the State.

Q.   So is the way the Voter Registration Advisory Committee kind of goes about its business is it will draft kind of papers that will advise on certain issues?

A.   Yes.

Q.   Okay.  And how does the VRAC paper get adopted?

A.   It is drafted in collaboration with the committee.  Then it voted on by the -- the members and then ultimately it's signed by the State Elections Director once it's been voted on and approved.

Q.   And does it have to be approved unanimously?

A.   Yes.

Q.   Okay.  And do you follow kind of VRAC papers after they've been adopted by the committee?

A.   Yes.

Q.   Okay.  But do you consider those papers to be legally

binding on your office?

A.   I do not.

Q.   Okay.  Do you consider in your function in the office that the Elections Procedures Manual is the only binding guidance on your office beyond the statutes themselves?

A.   Yes.

Q.   Okay.  Does Maricopa County have its own voter registration database?

A.   Yes.

Q.   And what do you call that database?

A.   VRAS.

Q.   And that's V-R-A-Z?

A.   V-R-A-S.

Q.   Oh, there you go.  And what is the statewide voter registration database called?

A.   It's called AVID.

Q.   All right.  And how do those two --

THE COURT:  Would you spell that, please.

THE WITNESS:  A-V-I-D.

BY MS. LANG:

Q.   And how do those two databases in Maricopa, VRAS and AVID, interact?

A.   They have a realtime interface that connects the two systems.

Q.   Okay.  And what is the AVID Enhancement Committee?

UNITED STATES DISTRICT COURT

A.    The AVID Enhancement Committee is a subcommittee that was created by the AVID Steering Committee.

Q.    Okay.  And what is your role on the AVID Enhancement Committee?

A.    I'm one of the co-chair of that committee.

Q.    Okay.  And what's the function of that committee?  What is its kind of goals or functions?

A.    The goal of that committee is to determine what enhancements need to be made to the statewide system and potentially the interfaces between the Pima and Maricopa systems and related to efficiency or laws that may be changed processings within the voter registration databases.

Q.    So if changes need to be made to AVID to implement a new law, would that committee be very involved in that process?

A.    Yes.

Q.    Okay.  And I see sometimes in the documents there's a reference to "super users."

      Can you tell me what that terminology means?

A.    The super users are the actual heavy data entry individuals at each County Recorder's office that do the day-to-day data entry and processing.

Q.    And are you kind of included in that group of super users?

A.    Yes.

Q.    Okay.  And do the super users have -- meet regularly as

well?

A.   Yes, they do.

Q.   Okay.  How regularly?

A.   Every week.

Q.   All right.  And during those meetings do you discuss kind of ongoing issues with the AVID system or enhancements?

A.   We do, yes.

Q.   Okay.  And when your office receives a voter registration application -- and kind of for simplicity here we can talk about kind of paper form applications -- is the first step to manually enter that data into your voter registration database?

A.   The first step would be actually date stamping so we know that they come in; but, yes, then we would start researching and manual data entry.

Q.   Okay.  And so when you put the data from the application into the database, kind of what happens next within the system?

A.   The system will do a check to see if we have an existing voter within our own county that we would just update that voter's record or if this is a brand new registration that needs to be created, a brand new record.

From there, there's a variety of different checks.  We do a check with our GIS system to see if the address is a good address that can be auto coded in the system to properly

precinct the voter.

We also do a citizenship check through the MVD system if enough information was provided to us on that form by the voter, and we also do a statewide check to see if that voter is currently registered in another county.

Q.   Okay.  Do you also check that against -- that voter against the deceased tables?

A.   Yes, there is a deceased table that's also checked against.

Q.   Okay.

THE COURT:  Let me just interrupt.  When you're doing the data input from a paper voter registration form, are you simultaneously inputting it into the county system and the State AVID system?

THE WITNESS:  We're entering it into the Maricopa County system first, and then after it's been saved it goes back out to all the counties and see do we have a voter that's now moved from that county into our county, and then it will talk to the statewide system at that point.

THE COURT:  It's doing all this automatically?

THE WITNESS:  In realtime, yes.

THE COURT:  So if I moved from Pinal County to Maricopa County, I'd submit a new voter registration form. Your system would automatically say, "Oh, this new person from Maricopa County was a Pinal County voter.  Let's cancel Pinal

County and move their registration to Maricopa"?

THE WITNESS:  At a very high level, yes.  There's a lot of potential caveats.  If we're in the middle of an election, if maybe that form wasn't in a hard match, like maybe there was certain information that was not provided in the older record that's now provided in the new record we might have to have some person to actually look at it to say, "Yes, I do agree that this is the same person," but at a high level, yes, that's what happens.

BY MS. LANG:

Q.   And so we're going to talk about that kind of check that you do for citizenship and that check against the Motor Vehicle database in some detail, and so if we could pull up the plaintiffs' demonstrative one.  There we go.

I made this chart largely perhaps for my own benefit and, hopefully, also the Court's to kind of follow along; but we're going to go through your testimony to make sure that this chart kind of accurately reflects how this all works.

So as I understand your testimony, after a voter's information is entered into the database, one of the checks that happens is that it's checked against the Motor Vehicle Division database; is that right?

A.   Yes.

Q.   Okay.  Is that check conducted through the statewide AVID system?

UNITED STATES DISTRICT COURT

A.   Yes.

Q.   Okay.  Does your office have any access to MVD data outside of the automated process within AVID?

A.   No.

Q.   Okay.  So you don't have any direct line to MVD data; is that right?

A.   Correct.

Q.   And this process where the voter's information is checked against the MVD data, is it commonly called the HAVA check?

A.   Yes.

Q.   H-A-V-A?

A.   Yes.

Q.   And does that refer to the Help America Vote Act?

A.   Yes.

Q.   Okay.  And is one purpose of the HAVA check to check to validate the voter registration applicant's identity to comply with the Help America Vote Act?

A.   Yes.

Q.   Okay.  And that means that the match between the application and the MVD data verifies that that person exists and their information matches?

A.   Yes.

Q.   Okay.  And is another use of the HAVA check in Arizona to determine whether MVD has received documentary proof of citizenship from the applicant?

A.    Yes.

Q.    All right.  And so the HAVA check is serving those two separate functions; is that right?

A.    Yes.

Q.    Okay.  When you send up through the AVID system a request for a HAVA check, what kind of match results can your office receive back from that HAVA check about a voter registrant?

A.    We will get information that it's either a hard match with data at the MVD database or a soft match with a potential person in the database.

Q.    And is a third option that there is no match with the MVD data?

A.    Yes.

Q.    Okay.  And so you'll see this kind of first option is those three options of different kind of responses you might get; is that accurate?

A.    Yes.

Q.    All right.

      THE COURT:  So would that be, for example, a situation where somebody didn't have an Arizona driver's license or an Arizona ID?

      THE WITNESS:  Yes.

      THE COURT:  So that would be a no match?

      THE WITNESS:  Yes.

      THE COURT:  So if I had just moved here from a

different state and hadn't yet gotten something from MVD either to drive or just identify me, you'd get a no match?

THE WITNESS:  Yes.

BY MS. LANG:

Q.   And just to follow up on Judge Bolton's question, is another scenario where the ID was expired?

A.   It's my understanding at this time expired driver's license do not run a result.

Q.   So at this time if I had an Arizona driver's license but it was -- or I used to have an Arizona driver's license but it was expired, you would get a no match return; is that right?

A.   Yes.

Q.   Okay.  So starting with hard match, what does a "hard match" mean?

A.   It means at least four points of data have matched between what's on the voter registration form we have entered into the system and what MVD has in their database.

Q.   And does that have to exactly match?

A.   Not exactly.  Like the first three letters of the first name, the first three letters of the last name.

Q.   Okay.

A.   Date of birth.

Q.   And I think there will be kind of additional expert testimony on the specifics of hard match so you need not go any further.

What is a soft match?

A.   A soft match is maybe where there wasn't enough information in the voter registration form to meet all of the data requirements to match hard in the MVD record.

Q.   Okay.  And so what does the person at the County Recorder's office that's looking at this soft match do when they receive a soft match?

A.   So we look at the information that does match and we look at the information that is either not there because -- so it wasn't able to have that hard match.

We look at any other information.  Does the signature that MVD has look like the signature that we have on this form?  Is it a potential that it was just a data entry typo in the date of birth and maybe that's why it didn't hard match?

So we're just doing that personal expertise in looking at the form to say is this the same person or is this not the same person?

Q.   And so is there some level of discretion in which the person is looking at the information on the application and the soft match in the computer and making a judgment call, does it appear that this person is the same person?

A.   Yes.

Q.   Okay.  And can you sometimes get multiple soft matches back from the MVD database?

A.   Sometimes.

Q.   And so in that case does the person who's kind of
reviewing the soft match have to make a judgment call about
which, if any, of those soft matches are the right person?

A.   Yes, we have procedures for this; and if they don't feel
comfortable making that call, it goes up to the next level
supervisor.

Q.   Okay.  And would you be somewhere in that chain --

A.   I would be.

Q.   Would you be the first level kind of reviewer or would
you be like an additional level reviewer?

A.   An additional lever -- level reviewer.

Q.   Okay.  And so in this middle section of the demonstrative
you'll see that after a soft match comes in there's a
procedure where the County Recorder reviews it, and they
either make a call that there's no match or that the match has
been confirmed; is that accurate?

A.   Yes.

Q.   Okay.  And then we've already discussed no match is a
little less complicated.  If there's no match, there's no
match, right?

A.   Yes.

Q.   Okay.  For purposes of verifying identity, so not
citizenship, just kind of that identity check, what happens if
there's no match with the MVD data?

A.   So we have a process where we go through MVD to the SSA

database where we try to verify the Social Security, the last four, if that was provided by the voter.

Q.   Okay.  And is that SSA check part of that Help America Vote identification process?

A.   Yes.

Q.   Okay.  And if a voter's identity cannot be verified by either MVD or SSA database, there's kind of no matches in either of those databases, what does that individual have to do to prove their identity?

A.   They would follow the statute.  They would need to come in and provide their car registration, their utility bill, something to verify their identity, ID card of some sort.

Q.   So every new registrant must prove their identity either through MVD, SSA or documentation; is that right?

A.   Before they vote.

Q.   Okay.  Can an SSA database match prove citizenship?

A.   No.

Q.   In fact, does the SSA matching that you're able to see in the system provide you with any information about citizenship?

A.   No.

Q.   Okay.  And I think you've already said this, but your access to the SSA database is through AVID and through -- it's through AVID and then by proxy through MVD, right?

A.   Yes.

Q.   Okay.  So you have no direct access to the SSA database?

A.    No.

Q.    Okay.  So backing up and going back to our hard match category here, we know that if there's a hard match with the MVD database, that's sufficient to prove identity, correct?

A.    As long as a driver's license was issued after October 1st of 1996.

Q.    Okay.  And does MVD provide information about whether the applicant provided MVD with documentary proof of citizenship?

A.    They basically give us a code and the code will be that this is citizenship or this is not citizenship.

Q.    Okay.  So you'll either get a confirmation that citizenship has been proved or that there was a license issued that doesn't indicate citizenship; is that right?

A.    Correct.

Q.    Would you call that a foreign-type license?

A.    Yes.

Q.    And that's sometimes referred to as an F-type license; is that correct?

A.    Correct.

Q.    All right.

        THE COURT:  What -- what does that mean?  "Foreign" sounds like from a different country.

        THE WITNESS:  Correct.  So it would be for a foreign national can get a driver's license.

        THE COURT:  So to get the little gold insignia on

your Arizona driver's license you have to show citizenship?

THE WITNESS:  That would be -- I think we're either calling it, like, an enhanced one.  You have to -- I think it's a little flag on it, but you'd have to provide citizen documentation in order to get that upgraded driver's license.

THE COURT:  So can you still get a plain old driver's license that isn't gonna work for going through the airport?

THE WITNESS:  Yes, but you still have to provide proof of citizenship.

THE COURT:  Thank you.

BY MS. LANG:

Q.   So regardless of whether or not you have the gold insignia or the flag, everyone who got a driver's license after 1996 has to show MVD either proof of their citizenship or proof of their lawful status in the United States; is that right?

A.   That's my understanding.

Q.   Okay.  And so when you get this information back, it's basically telling you "yes" this person showed that they were a citizen or "no" this person showed us that they were kind of lawfully in the United States, not as a citizen at the time that they got their driver's license?

A.   Correct.

Q.   All right.  And there's another option on here to make

things even more confusing that I didn't actually put on the chart, which is could there sometimes be a hard match to the driver's license database to MVD, "Yes, this person is in our database," but there is no match as to citizenship because that person received their driver's license before 1996?

A.    Yes.

Q.    Okay.  And so if a voter's information matches to an MVD record, it's a hard match, and that hard match comes back with a "yes" you've shown your citizenship indicator, does that person become what we call a full-ballot voter?

A.    Yes.

Q.    Okay.  And that means they can vote in any election within the State of Arizona that they would be eligible for based on their address?

A.    Yes.

Q.    Okay.  And if a voter's information matches to an MVD record, a hard match but MVD comes back and says this person showed lawful presence but not citizenship at the time that they got their driver's license, what happens to that application?

A.    So in that case we would register the voter as a federal-only voter -- I'm sorry.  If they came back as a type F, then we would put them in suspense and we would send them a letter saying that their driver's license information came back as a type F and we would need some type of documented

proof of citizenship in order to make them a full ballot voter and get them on the voter roles.

Q.   So these folks who have F-type licenses and -- they don't become federal-only voters; is that right?

A.   Sorry, they do not.

Q.   Exactly.  Instead, they're put into, I think you said, a suspense category?

A.   Yes.

Q.   And what does "suspense" mean?

A.   Suspense means that they were sent a letter informing the voter of the deficiency of their voter registration form, what they can do to cure it.  They have until the date of the next General Election to provide that information and cure their status and be registered as of the date they initially submitted that form.

Q.   Okay.  And if they don't provide documentary proof of citizenship and they're in the suspense status they can't vote, right?

A.   They cannot.

Q.   Okay.  Do these applicants that you send these letters to sometimes submit documentary proof of citizenship after you send them that letter?

A.   Yes.

Q.   Okay.  Does that happen frequently?

A.   Yes.

Q.   So, you know, this is not the end of the line in this chart.  You put them in a not eligible status to begin with, a suspense status, but they might actually cure that; is that right?

A.   That's right.

Q.   Okay.  And frequently they do; is that right?

A.   Yes.

Q.   And you mentioned that these applicants would have until the date of the next General Election to provide documentary proof of citizenship and cure their status; is that right?

A.   Yes.

Q.   What happens to their application after the date of the next General Election if they do not provide documentary proof of citizenship?

A.   They go into a not eligible/not registered status, and they would need to begin the process all over again with a new -- a new form.

Q.   Okay.  And we discussed that there's a third option on here -- or there's a third option that I didn't put on this demonstrative for purposes of space where there could be a match to the MVD record, but it has no citizenship information at all because it came before 1996; is that right?

A.   Yes.

Q.   All right.  What would happen to that voter?

A.   It depends if the person was already an existing voter.

They are -- they are deemed grandfathered in.  If they move from one county to another, it's in the Elections Procedures Manual that the new county if they can see that citizenship was provided prior, they could potentially make them a full-ballot voter; but if not, they would become a federal-only voter and they would be instructed on what they needed to do to become a full-ballot voter.

Q.   So federal-only voter, it's somewhat obvious in the name, but just to be super clear, they're registered to vote but they're only permitted to vote in federal elections; is that correct?

A.   Yes.

Q.   And they can't vote in state or local elections?

A.   Correct.

Q.   Or ballot referendum?

A.   Correct.

Q.   Okay.  And so if we're looking at the soft match category on the demonstrative, we discussed that sometimes you'll get a soft match back and then the County does a kind of individualized human level review to determine whether they think it's a match or not.

     If that match is confirmed, then does it follow kind of the same process for whether somebody becomes a full-ballot voter or, you know, in a suspense category depending on the citizenship information provided?

A.    Yes.

Q.    Okay.  And if there is no match to MVD, either because the County Recorder determines that the soft match was not an actual match or because there was no match to begin with, you discussed that then it would go to this SSA check if possible; is that right?

A.    Right.

Q.    And the purpose of the SSA check, I think we discussed, is purely to provide an identification purpose, right?

A.    Yes.

Q.    And so assuming that the individual is confirmed through SSA, what status do they go into?

A.    They would become federal only.

Q.    Okay.  And are there two kinds of federal-only voters depending upon whether or not an individual's identification has been confirmed?

A.    Yes.

Q.    And how do you refer to those two different statutes?

A.    There's a federal only, which means that they have provided -- or fed-I means that they have provided identification and then federal means that they have not.

Q.    Okay.  And the difference between those two would be that the person who has not provided identity would still need to provide that identification document, like a utility bill, in order to vote; is that right?

A.   Correct.

Q.   Okay.

THE COURT:  To vote or to be registered?

THE WITNESS:  To vote.

THE COURT:  So when the person would go to the polls and provide this additional identification and be allowed to vote?

THE WITNESS:  Yes, and then at that point they would be upgraded to federal ID because at that point they had provided identification, and they would be eligible to get a ballot in the mail at that point.

BY MS. LANG:

Q.   Backing up for a moment, you mentioned that frequently people with F-type licenses will receive a letter asking for DPOC and they will bring that DPOC in; is that correct?

A.   Yes, or provide -- mail us a copy back.

Q.   Okay.  Have you encountered circumstances that the reason the person -- that person could do that is because they naturalized after they received their licenses?

A.   Yes.

Q.   Okay.  Is that commonly the reason why somebody has an F-type license but is an eligible citizen to vote?

A.   That's predominantly one of the reasons.  They just never go back and tell MVD that they've naturalized.

Q.   We've talked about the fact that expired licenses do not

UNITED STATES DISTRICT COURT

show up as matches when you do this HAVA check; is that right?

A.   Yes.

Q.   Is this something that you have raised as a concern before?

A.   Yes.

THE COURT:  Excuse me a minute.  So an expired Arizona driver's license doesn't even give you a soft match?

THE WITNESS:  No, ma'am.

THE COURT:  So they're basically just out of the MVD system that you're -- that you interact with?

THE WITNESS:  Correct.

BY MS. LANG:

Q.   And why did you raise this as a concern?

A.   My personal feeling is that the person is -- if it's a valid citizenship, they've provided that and just because their license expired we shouldn't be not able to use that information from MVD.

MS. LANG:  And if we could pull up Plaintiffs' Exhibit 199.

BY MS. LANG:

Q.   Is this an e-mail from yourself to Stephen Richer on Monday, January 9th, 2023?

A.   Yes.

Q.   Okay.  And Stephen Richer is the County Recorder for Maricopa County; is that right?

A.    Yes.

Q.    Okay.  And so within this e-mail, if we can go back, I think it's the third -- it's the fourth bullet point kind of issues you were raising to Mr. Richer.  You say, "We should be able to use expired MVD credentials to confirm a voter's citizenship - we currently do not."  Do you see that?

A.    I do.

Q.    Okay.  So is this an example of one of the times where you've raised this issue for the County Recorder?

A.    Yes.

Q.    Have you also raised this issue to the Secretary of State?

A.    Yes.

Q.    Okay.

        MS. LANG:  We can take this down.  I would like to move in, though, Plaintiffs' Exhibit 199.  This is not one of the unobjected-to exhibits.

        THE COURT:  Is there an objection?

        MR. LANGHOFER:  No, Your Honor.

        MR. WHITAKER:  No, Your Honor.

        MS. BOUGHTON:  No, Your Honor.

        THE COURT:  Without objection, 199 is admitted.

        (Exhibit No. 199 admitted in to Evidence.)

        MS. LANG:  Thank you, Your Honor.

        If we could go back to the demonstrative for a

moment.

BY MS. LANG:

Q.   So voters who don't show up as a match within the MVD check -- well, let me back up here for a second to clarify.

This chart and what we've been discussing is the manner in which an individual can prove citizenship through the Motor Vehicle Division; is that correct?

A.   Citizenship or identity, yes.

Q.   But it does not address the situation where somebody provides some other form of documentary proof of citizenship when they apply to vote, right?

A.   Correct.

Q.   So this kind of assumes that no other documentary proof of citizenship was provided at the time of registration, correct?

A.   Correct.

THE COURT:   Well, that raises a question.

Does the HAVA check happen no matter what, even if the voter registration information that you're inputing had a birth certificate attached or passport?

THE WITNESS:   We still do a check to see if we can find them in the MVD system as well.

THE COURT:   So this happens no matter what is or is not included with the voter registration form?

THE WITNESS:   Yes.

BY MS. LANG:

Q.   And I just wanted to clarify that because, for example, it says if there's no match, it's going to be federal only; but, in fact, if there's no match but somebody provided their birth certificate, that person will become a full-ballot voter, correct?

A.   Yes.

Q.   All right.  I just wanted to make that clear.  This demonstrative is useful, but it has its own limitations.

     But assuming somebody becomes a federal-only voter because they didn't have a citizenship match and did not provide documentary proof of citizenship at the time of registration, so we have a federal-only voter, do those voters sometimes respond to the letter and eventually provide their documentary proof of citizenship and become full-ballot voters?

A.   Yes.

Q.   Okay.  Does that happen with some frequency?

A.   It does.

Q.   Okay.  Do you know approximately how many federal-only voters Maricopa County currently has on its rolls?

A.   A little over 11,000 active voters and a little over 9,000 inactive.

Q.   And do you know approximately how many of those voters are on the early voting list?

A.    I do not.

Q.    Okay.

MS. LANG:  Can we pull up the Maricopa County registration statistics.  And this is not a marked exhibit, but I'm wondering if it might -- if you can go to the second page.  Yeah, let's look at it first.  So this is -- so I'll just clarify this is not a marked exhibit.  I'm not planning to move it in.  I'm just wondering if it might refresh your recollection.

BY MS. LANG:

Q.    Does Maricopa County publish the totals of federal-only voter registrants on its website?

A.    Yes.

Q.    And is that regularly updated?

A.    It's live totals.

Q.    Okay.  And does this look like an accurate kind of printout of that website?

A.    Yes.

Q.    All right.  And if we look at the second page, these are totals that indicate that there's 5,943 individuals on the active early voting list; is that right?

A.    Yes.

Q.    Does that look accurate to you?

A.    Yes.

Q.    Okay.  And those other numbers align with your testimony,

correct, that there's approximately -- or there's exactly 11,143 active federal-only voters?

A.    Yes.

Q.    And 9,488 inactive federal-only voters in Maricopa County?

A.    Yes.

Q.    Okay.

        MS. LANG:    We can take that down.

BY MS. LANG:

Q.    And Judge Bolton asked you this question, I think, already; but this MVD HAVA match is conducted to determine if DPOC is available even for applicants that don't put down their driver's license number; is that right?

A.    Yes.

Q.    And do you refer to this kind of use of MVD to find DPOC even when there isn't a driver's license number as acquiring DPOC for that applicant?

A.    Yes.

Q.    And that's kind of a term of art that's used in the Elections Procedure Manual; is that right?

A.    Yes.

Q.    Okay.  And do you conduct this match for state form and federal form applicants alike?

A.    Yes.

Q.    Okay.  In fact, do you always treat kind of state form

and federal form applicants equally with respect to issues around documentary proof of citizenship?

A.   Yes.

Q.   Okay.  And this HAVA match that we've been discussing, it only happens at the point of registration, correct?

A.   Yes.

Q.   Okay.  And by that I mean there's no ongoing process, just check to see whether voter applicants that were previously denied, say because of an F-type license, have updated their status to citizenship with MVD; is that right?

A.   It would be if the voter provided either a new registration form or they provided us back the letter with the driver's license number on it for us to check.

Q.   Okay.  But, in other words, there's not some sort of constant, ongoing check happening?

A.   No.

Q.   Okay.  Is it true that most voter registration applicants satisfy the documentary proof of citizenship requirement for state and local elections through the HAVA MVD match?

A.   Yes.

Q.   Okay.  But for people without driver's licenses, they have to provide paperwork to prove their citizenship, correct?

A.   Paperwork or a number.

Q.   Okay.  And by "a number," do you mean like an immigration number like an A-number?

A.   An A-number, a driver's license number, a tribal ID number.

Q.   Okay.  So you predicted my next question, which is, what are some of the other ways that applicants can satisfy the DPOC requirement?  I heard you already say tribal ID number. We've discussed how driver's license numbers work and A-numbers or immigration numbers.

What are the other ways an applicant can satisfy the DPOC requirement?

A.   A copy of their birth certificate, copy of a passport.

Q.   Are some out-of-state IDs acceptable for that purpose?

A.   Yes, if on the face of that other state it is and enhanced with either the little American flag on it indicating citizenship was provided at that state.

Q.   Okay.  For voters who provide DPOC outside of HAVA MVD check, is the form of documentary proof of citizenship that was provided recorded in the database?

A.   It is -- the number would be data entry entered into the system.  If they provided a copy of a birth certificate or passport, it would just be notated that that's what was provided.

Q.   Okay.  And is it always notated like this was a birth certificate or will it just say, you know, DPOC provided?

A.   It usually will say BC, birth certificate, or passport.

Q.   Okay.  And how long is the physical copy of documentary

proof of citizenship maintained?

A.   We follow the retention schedule.  I believe it's two years.

Q.   And then after that two years that kind of copy of a birth certificate, for example, is destroyed?

A.   Yes.

Q.   Okay.

THE COURT:  Is the paper voter registration form also destroyed?  Is that your retention policy or is it --

THE WITNESS:  Well, the way we understand it is that it's a digital copy forever in the database.  So the physical forms are saved for about two years and then they are transferred over to state and library archives.

THE COURT:  So they're not destroyed, they're just put in an archive?

THE WITNESS:  At some point I do believe they are destroyed.

THE COURT:  But whatever the state archives, their policies are?

THE WITNESS:  Yes, the state retention schedule.

THE COURT:  But you have already digitized the application -- the registration application and any documents that accompany it?

THE WITNESS:  Not proof of citizenship documentations.  Those are not kept inside the database.

THE COURT:  Okay, thank you.

THE WITNESS:  Just the application itself.

BY MS. LANG:

Q.   So just to be crystal clear, the documentary proof of citizenship documents are not digitized?

A.   No.

Q.   So they are destroyed after two years?

A.   Yes.

Q.   Okay.  And so we started to touch on this, but one of the options for providing documentary proof of citizenship is to provide a A-number or some other unique immigration identifying number on their voter registration form; is that right?

A.   Yes.

Q.   Okay.  And when that kind of number is provided, is that when you use the Systematic Alien Verification for Entitlement system?

A.   Yes.

Q.   And do we call that the SAVE system?

A.   Yes.

Q.   All right.  And is that the only time that your office uses SAVE?

A.   Yes.

Q.   Okay.  So if you -- in order to use the SAVE system, do you have to have an A-number or some other unique

immigration-identifying number in order to be able to do a check in the SAVE system?

A.   Correct, yes.

Q.   Okay.  And just to be clear, A-number, I believe, refers to "alien number."  Is that your understanding?

A.   Yes.

Q.   Okay.  But the US Immigration system actually has a few different types of immigration numbers that they can use for people with -- not native-born citizens; is that right?

A.   That's my understanding, yes.

Q.   Okay.  So sometimes folks refer to A-numbers, but I think that they're referring to kind of any of those immigration numbers; is that right?

A.   Yes.

Q.   Okay.  And is the only way that you can get an A-number or immigration identifier, if the voter provides one on their voter registration form?

A.   Yes.

Q.   Okay.  You don't have access to kind of A-numbers through MVD, for example?

A.   No.

Q.   All right.  Or any other source?

A.   No.

Q.   All right.  And not many people provide those numbers on their voter registration forms; is that right?

A.    Not many, no.

Q.    Okay.  And so when you go into the SAVE system and you input an immigration number, what are kind of the options of the responses you can get back from the SAVE system?

A.    It's similar to MVD.  It will say citizenship or non-citizenship.

THE COURT:  Or no match?

THE WITNESS:  Or no match, correct.

THE COURT:  Do you have direct access to SAVE or is this also something that you go through some other agency?

THE WITNESS:  We -- the Secretary of State's office for the other thirteen counties, I think they hold a contract.

Maricopa County has our own contract.  So we do have direct access to SAVE, but it is still under the umbrella of the State.

BY MS. LANG:

Q.    Okay.  So you put -- you put the information into SAVE. If you get a match back, that match could potentially say, "Yes, we've matched this and this person is a citizen"; is that right?

A.    Correct.

Q.    And then would that person become a full-ballot voter?

A.    Yes.

Q.    Okay.  It's possible that you'll get a match back and it says, "This person's not a citizen.  They appear in our system

as, you know, an LPR," or something like that; is that right?

A.   Right.

Q.   Okay.  And what happens to those folks?

A.   So they would not be added to the rolls.  They would be moved to a suspense status.  They would be sent a letter letting them know the status and how they can cure the registration.

Q.   Okay.  And then if you get back no match, SAVE can't find this person based on the information you've provided, what happened to that voter?

A.   So they would become a federal-only voter and they would still be notified of their status and how they could become a full-ballot voter.

Q.   And are you aware of any time lags that can occur between a person's naturalization and updates to the SAVE system with that person's new citizenship status?

        MR. WHITAKER:  Foundation.

        THE COURT:  Sustained.

        MS. LANG:  Okay.  Can we pull up Plaintiffs' Exhibit 6 and go to Page 10.  I apologize, I was specifically instructed to have the PDF number and I didn't.  So we need Page 10 of the EPM itself.

BY MS. LANG:

Q.   Okay.  Do you see this last section labeled "c" there "Verifying Citizenship Near Voter Registration Deadlines"?

A.   Yes.

Q.   And I imagine you're pretty familiar with the Election Procedures Manual, at least the chapter on voter registration; is that right?

A.   Yes.

Q.   And so have you looked at this section about use of the SAVE system before --

THE COURT:   Excuse me.  Did you say this was stipulated into evidence?

MS. LANG:   It is, yes.

THE COURT:   So you can stop asking her for all this foundation.

MS. LANG:   Fair enough, Your Honor.

I am trying to lay some foundation for her knowledge about the delay.

THE COURT:   Why don't you just have -- isn't her knowledge about the delay what's here, and so what's here is all I need to know, here in the Elections Procedures Manual?

Is there something beyond what's in the Elections Procedures Manual that I need to know based on her knowledge?

Well, let me ask this:  Do you know anything about delays in the SAVE system other than what the Elections Procedures Manual tells you?

THE WITNESS:   I mean, we've experienced delays in the system.

THE COURT:  Okay.

BY MS. LANG:

Q.   So your office has personal experience with the potential -- with the delays between naturalization and the SAVE system updates?

A.   Yes.

Q.   Okay.

MS. LANG:  All right, we can take that down.

Thank you.

BY MS. LANG:

Q.   When you get information back from SAVE that's either a no match or says that the person is not a citizenship -- is not a citizen, are you aware of any kind of additional verification procedures that you can use through SAVE?

A.   No.

Q.   Okay.  To your knowledge, has your office ever employed the USCIS's alternative verification procedures?

A.   I don't know what that is.

Q.   Fair enough.  If your office was using those procedures, would you be aware of it?

A.   Yes.

Q.   Okay.  Maricopa has county -- I think you already said this -- has access to SAVE through a Memorandum of Agreement between the SOS and USCIS; is that correct?

A.   Yes.

Q.    Has the SOS shared that Memorandum of Agreement with County Recorder officials that use SAVE?

A.    I believe so, yes.

Q.    Have you personally reviewed that Memorandum of Agreement in your capacity at Maricopa County?

A.    I have seen an agreement, yes.

          THE COURT:  So I just had another one of these moments that I mentioned at the final pretrial conference. You said "SOS" and she's testifying, and I'm trying to think of what SOS means.

          MS. LANG:  That's fair.

          THE COURT:  SOS, you know, to me means something different to me than Secretary of State; but she was on, like, the next answer before I figured out "SOS" meant Secretary of State.

          So when possible, please don't use -- other than the ones that we're really familiar with, I think in this case we all know about DPOC so that's fine, but you're using a lot of them.  This is the first one I can think of where I'm looking and saying, "What's SOS?" and missing her actual answer.

          MS. LANG:  Thank you, Your Honor, for the reminder.

          I think we've established "SOS" means Secretary of State, but I will say Secretary of State for the future; is that fair?

          THE COURT:  Please.

BY MS. LANG:

Q.    Moving on to the laws that are at issue in this case, are you familiar with HB2492?

A.    Yes.

Q.    Okay.  And are you familiar with HB2243?

A.    Yes.

Q.    Okay.  So let's pull up Plaintiffs' Exhibit 1 --

        THE COURT:  You know what, I think before we move to this next line of questioning let's take our morning break. We'll reconvene in fifteen minutes at 10:35.

        Court is in recess.

        MS. LANG:  Thank you, Your Honor.

        COURTROOM DEPUTY:  All rise.

        (Recess taken at 10:18 a.m.)

        COURTROOM DEPUTY:  All rise, court is now in session.

        (Back on the record at 10:36 a.m.)

        THE COURT:  Thank you, please sit down.

        The record will show the presence of counsel.

        Ms. Lang, you may proceed with your questions.

        MS. LANG:  Thank you, Your Honor.

BY MS. LANG:

Q.    Just before the break I think you let us know you are familiar with the Challenged Laws in these cases HB2492 and HB2243; is that right?

A.    Yes.

MS. LANG:  And I'd like to pull up Plaintiffs' Exhibit 1, and this is one of the exhibits that has no objection and will be moved in to evidence as stipulated, and if we could go to Page 4.  Next page.  Yep.

BY MS. LANG:

Q.    There's a section here that discusses what to do with federal forms that come without documentary proof of citizenship; is that right?

A.    Yes.

Q.    Okay.  And is that Section D there where it says, "Within ten days after receiving an application for registration on a form produced by the United States Election Assistance Commission that is not accompanied by satisfactory evidence of citizenship, the County Recorder or other officer in charge of elections shall use all available resources to verify the citizenship status of the applicant and at a minimum shall compare the information available on the application for registration with the following, provided the county has access:"  Do you see that?

A.    Yes.

Q.    And have you reviewed this before?

A.    Yes.

Q.    And what follows is a list of various databases the County Recorders are instructed to review within ten days; is

that correct?

A.    Yes.

Q.    Under HB2243, if you recall, are County Recorders similarly instructed to consult a range of databases for regular checks post registration or do you want to look at it?

THE COURT:  So let me stop you a moment there.

My understanding is that at least with respect to the first two databases that are listed on Page 4, this is already your standard procedure; is that correct?

That you did the ADL, Arizona driver's license match?

THE WITNESS:  That's correct.

THE COURT:  And if that didn't produce a match, then you went to the Social Security Administration database?

THE WITNESS:  Correct.

THE COURT:  So this -- this was how you've always done it?

THE WITNESS:  Correct.

BY MS. LANG:

Q.    Just one clarification on that, Ms. Petty.  You do check the SSA database, but presently the SSA database does not provide you any citizenship information, correct?

A.    Correct.

Q.    Okay.  So you could not use the SSA database to verify the citizenship status of these individuals; is that correct?

A.    Correct.

Q.    Okay.  And so my other question -- so let's pull up PX 2 for a minute, and this is HB2243.  I believe you've testified you've looked at this bill before; is that right?

A.    Yes.

          MS. LANG:  If we could page through, I think it's Subsection 10.  I apologize, I don't have the page number.  If you could just page through for me.  Keep going.  Oh, back, sorry.  Back one more.

BY MS. LANG:

Q.    And starting with Subsection E and then continuing on, there's a variety of sections that indicate how the County Recorder should consult databases with respect to citizenship status; is that correct?

A.    Yes.

Q.    Okay.

          MS. LANG:  And so we can take those down.

BY MS. LANG:

Q.    I just want to talk a little bit about your access to those databases, and so you've already testified that you don't have any direct access to SSA.  It's only through AVID and MVD; is that right?

A.    Right.

Q.    And that data doesn't provide you any information about citizenship; is that right?

A.    Correct.

Q.    Okay.  To your knowledge, does any election official in Arizona have the ability to use SSA's database to verify citizenship status?

A.    Not to my knowledge.

Q.    Okay.  And you've testified earlier that SAVE, the Systematic Alien Verification for Entitlement system, is only useful to you if you have an A-number or other immigration number; is that right?

A.    Correct.

Q.    And that is relatively rare.  Is that also right?

A.    Yes.

Q.    Do you know if the federal voter registration form requests an A-number or any other immigration number?

A.    I believe it has a box for identification number.

Q.    Okay.

        MS. LANG:  And so can we pull up PX 28, which also has no objection, and if we could review Box 6.  So if you turn to -- I think it's Page 24.  Next page.  So right here, yeah, the last one before this, yeah.

BY MS. LANG:

Q.    So if we look at Box 6, there's an ID Number space; is that right?

A.    Yes.

Q.    And does it say, "(See item 6 in the instructions for

your state)" there?

A.    Yes.

Q.    Okay.  So I'd like to turn to the State-specific instructions for Arizona, which come right there.

      Do you see the State-specific instructions for Arizona there?

A.    Yes.

Q.    Can you read what it says for ID Number?

          THE COURT:  I can read it.

          Do you want to ask her a question about it?

          MS. LANG:  Yeah.

BY MS. LANG:

Q.    Does it mention anywhere providing an immigration or A-number?

A.    No.

Q.    Okay.

          MS. LANG:  We can take that down.

BY MS. LANG:

Q.    Do you have access to the National Association for Public Health Statistics and Information Systems Electronic Verification of Vital Event System?

A.    No.

Q.    I think it's called NAPHSIS or N-A-P-H-S-I-S.

A.    No.

Q.    Okay.  To your knowledge, does any Arizona election

UNITED STATES DISTRICT COURT

official have access to that system?

MR. LANGHOFER:  Foundation.

THE COURT:  Sustained.

Do you know what it is?

THE WITNESS:  I believe that's the Arizona Department of Vital Statistics database.  Is that what that --

MS. LANG:  I'm not quite sure either.  I think it's a national system.

THE COURT:  Do you know what it is?

THE WITNESS:  No.

THE COURT:  You thought it might be a state vital --

THE WITNESS:  I thought it might be something related to that --

THE COURT:  Okay.

THE WITNESS:  -- but we don't have access to that. I don't know what it is.

MS. LANG:  Okay.

BY MS. LANG:

Q.   You testified earlier that you are part of a variety of groups -- well, you're part of a group of voter registrars within the County Recorder's office that meet regularly?

A.   Yes.

Q.   And you also attend meetings related to the Voter Registration Advisory Committee?

A.   Yes.

Q.   And do you regularly discuss with County Recorders the various databases County Recorders rely upon to use during voter registration?

A.   We don't really discuss the databases to that extent.  We just know what they -- they are.  Usually our conversations are more about just guidance or enhancements.

Q.   And you've never heard of the National Association for Public Health Statistics Information Systems Electronic Verification of Vital Events System?

A.   I've not heard that.

Q.   You've never heard of any other election official discuss it, for example?

          MR. LANGHOFER:  Hearsay.

          THE COURT:  Overruled.  You may answer if you've heard it mentioned in any of your meetings.

          THE WITNESS:  I have not heard that.

          MS. LANG:  Okay.

BY MS. LANG:

Q.   And what is the Electronic Registration Information Center?

A.   We refer to that as ERIC and it is an organization that is made up by other states that want to participate, and we share voter registration information amongst the states and receive a variety of different reports to help in list maintenance.

Q.   Do any of those reports provide you with citizenship data?

A.   No.

Q.   Are you aware of any other databases that you have access to that could assist your office in verifying citizenship status other than the ones we've discussed here today?

A.   No.

         MS. LANG:   Can you pull up PX 1 and go to Page 5.

BY MS. LANG:

Q.   Do you see here that one of the databases -- or one of the sections discussing databases under Line 5, No. 5 direct County Recorders to rely on "Any other state, city, town, county or federal database and any other database relating to voter registration to which the County Recorder or officer in charge of elections has access, including an electronic registration information center database"?

A.   Yes.

Q.   And that last section, Electronics Registration Information Center database refers to ERIC; is that correct?

A.   Yes.

Q.   Okay.  But you've testified that ERIC does not provide you with any citizenship data; is that correct?

A.   Correct.

Q.   Okay.

         MS. LANG:   You can take that down, and I'd like to

pull up PX 196.

BY MS. LANG:

Q.   And this is an e-mail that was provided by your office from Stephen Richer.  Do you see that?

A.   I do.

Q.   Have you looked at this e-mail before, to your recollection?

A.   I --

THE COURT:  Are you a recipient listed in the "to" section?  I didn't --

THE WITNESS:  I don't think I am.

THE COURT:  I don't think you are either.

THE WITNESS:  I don't believe so.  I don't know if I've seen this document.

MS. LANG:  Okay.  Can you undo that.

THE WITNESS:  Maybe down there.

BY MS. LANG:

Q.   But do you see that Stephen Richer here is -- take it down -- is e-mailing --

THE COURT:  So is this an agreed-upon admitted exhibit?

MS. LANG:  It is not, Your Honor.

THE COURT:  Well, she's never seen it before.  She's not going to be able to testify about it.

MS. LANG:  Okay.

BY MS. LANG:

Q.   The reference in HB2492 to any other database -- let me rephrase.

Has the reference to quote "any other database" in HB2492 caused any concern within your office about how that could be interpreted?

A.   I don't think it's caused concern.

Q.   Has the Recorder ever expressed to you concern that that could require your office to rely on databases provided by private citizens?

A.   In -- in verifying proof of citizenship?  I'm sorry, I don't -- not understanding the question.

Q.   I'll move on.

MS. LANG:  If we could pull back up Plaintiffs' Exhibit 1, which is HB2492, and go to Page 4, Section C, if we could pull that up.

BY MS. LANG:

Q.   Can you read the second sentence here that starts on Line 29, "A County Recorder..."

A.   "A County Recorder or other officer in charge of elections who knowingly fails to reject an application for registration as prescribed by this subsection is guilty of a Class 6 felony."

Q.   Thank you.  And then can we also look at Page 5, Section F.  And can you also read there the section -- the second

sentence starting on Line 30, "If the County..."

A.   If the County Recorder or --

THE COURT:  Okay, she can read it to herself and you can ask questions.

MS. LANG:  Okay.

THE COURT:  I don't need her to read it to me.

MS. LANG:  Fair enough.

Can you read that to yourself and I'll have a question about it.

THE WITNESS:  Yes.

BY MS. LANG:

Q.   Have any of your staff expressed concerns about these felony provisions in the challenge laws?

A.   Yes.

Q.   Has the Secretary of --

MS. LANG:  So moving on from this, you can take this down.

BY MS. LANG:

Q.   Has the Secretary of State provided any guidance to County Recorders on how to implement HB2492?

A.   No.

Q.   How about HB2243?

A.   No.

Q.   Are you aware of any final VRAC papers on implementation of HB2492?

THE COURT:  Any final what papers?

MS. LANG:  So sorry, Your Honor.

BY MS. LANG:

Q.   Are you aware of any final Voter Registration Advisory Committee papers on implementation of HB2492?

THE COURT:  That one I couldn't even think about and figure out.

MS. LANG:  One hundred percent, Your Honor.

THE WITNESS:  No.

BY MS. LANG:

Q.   Okay.  And just to refresh everyone's recollection, that Voter Registration Advisory Committee is a committee of County Recorders that try to come together and agree on uniform policy?

A.   Correct.

Q.   Okay.  Do you know if the Secretary of State has submitted a draft of the 2023 Elections Procedures Manual?

A.   Yes.

Q.   Okay.  Have you looked that the document?

A.   Yes.

Q.   Okay.  I'd like to introduce Plaintiffs' Exhibit 11, and is this the draft of the 2023 Elections Procedures Manual that was submitted on September 30th, 2023, by the Secretary of State?

A.   It appears so, yes.

Q.   And you've looked at this document before?

A.   Yes.

Q.   Okay.

MS. LANG:  I'd like to move this exhibit in to evidence.

THE COURT:  Is there any objection?

MR. LANGHOFER:  No, Your Honor.

MR. WHITAKER:  No, Your Honor.

MS. BOUGHTON:  No, Your Honor.

THE COURT:  Without objection, No. 11 is admitted.

*(Exhibit No. 11 admitted in to Evidence.)*

MS. LANG:  Okay.

BY MS. BOUGHTON:

Q.   Apart from documentary proof of residence issues, which I'll get to in a moment, do you know if this version of the Elections Procedures Manual incorporates any of HB4292?

A.   I believe it does.

Q.   Okay.  Do you know which parts?

A.   It's my understanding it includes the new laws and they are there as a placeholder.

Q.   Okay.  You reviewed a draft of this Elections Procedures Manual earlier this summer; is that right?

A.   Yes.

Q.   Okay.  And we discussed that at some length in your deposition; is that right?

A.    Yes.

Q.    Okay.  And at that time the Elections Procedures Manual did include as a placeholder parts of these laws; is that right?

A.    Yes.

Q.    Okay.  Are you aware that the September 30th submission removed a great deal of that language?

A.    I have not in great detail looked over the new submission.

Q.    Okay, fair enough.

      MS. LANG:  I'd like to pull up Plaintiffs' Exhibit 14.

BY MS. LANG:

Q.    And this is a version of the 2023 Elections Procedures Manual Draft that's dated June 2023; is that correct?

A.    Yes.

      THE COURT:  Before you offer this, my question is why?  This is some -- we have a draft and now we have a pre-draft.  Why do I -- why should I care about what was said in June and -- if I know what the current draft says?

      MS. LANG:  Thank you, Your Honor.

      I think that this is important especially in light of the ripeness arguments that have been made by defendants.  So defendants have argued that none of this is ripe because none of it is imminent, and so there is any number of pieces

of evidence, including this manual, that show that the Secretary of State is taking active steps to prepare for the potential implementation --

THE COURT:  Isn't that all contained within the current draft?

MS. LANG:  No, Your Honor, not all of it is.

THE COURT:  But, I mean, this -- the current draft supersedes this draft.  So why would I need to know what the Secretary of State's first stab at it was and now there's this new one?  Doesn't it show the same thing you're trying to show is that the Secretary of State is doing things to implement the law?

MS. LANG:  In that sense I suppose it is somewhat cumulative, Your Honor, although I don't --

THE COURT:  Somewhat is cumulative.  I just -- I think there's much more important things for us to discuss than a superseded draft of an Elections Procedure Manual.

MS. LANG:  Okay.  The one other thing I would flag for Your Honor is key to a number of plaintiffs' claims is a discussion of the lack of any meaningful guidance beyond the statutory language in any version of the Secretary of State's manual.

So the Secretary of State has not come up with any guidance in any version of the Manual that they have put forward.

THE COURT:  I remain unconvinced.

MS. LANG:  Fair enough, Your Honor, we can move on.

BY MS. LANG:

Q.   If HB4292 is implemented, sitting here today does your office have any information about what it would need to comply -- need to do to comply with the requirement that County Recorders document all of their citizenship check efforts as the law requires?

A.   No.

Q.   And if HB2492 is implemented, sitting here today do you know if AVID, the statewide voter registration database, has the functionality to address that requirement?

A.   No.

THE COURT:  Is that "no" you don't know or "no" it doesn't?

THE WITNESS:  It does not.

BY MS. LANG:

Q.   If HB2492 is implemented, sitting here today does your office have any information about what criteria to use for matching against the various databases?

MR. WHITAKER:  Ambiguous, I think.

THE COURT:  Any of the databases other than the ones you've already been using.

THE WITNESS:  No.

MS. LANG:  Okay.

BY MS. LANG:

Q.  And if HB2443 is implemented, sitting here today does your office have any information about what criteria to use for matching against the databases other than the ones you already match against?

A.  No.

Q.  Okay.  Under these database matching provisions, do you know what your office should do if two databases provide conflicting results about citizenship status?

A.  No.

Q.  And if HB2243 was implemented, sitting here today does your office have any information about what would constitute a, quote, "reason to believe" a registrant is a non-citizen?

A.  No.

Q.  Okay.  And if HB2243 is implemented, sitting here today does your office have any plans as to how to determine if your office has, quote, "a reason to believe" someone is a non-citizen?

A.  No.

Q.  Okay.

THE COURT:  So are you waiting for the Secretary of State to give you some guidance?

THE WITNESS:  Yes, ma'am, Your Honor.

BY MS. LANG:

Q.  Switching gears, are you familiar with HB2492's

UNITED STATES DISTRICT COURT

documentary proof of residence requirement?

A.    Yes.

Q.    Okay.  And are you familiar with this Court's ruling earlier this year that outlined certain documents that can satisfy the documentary proof of residence requirement?

A.    Yes.

Q.    Okay.

        MS. LANG:  And I'd like to pull up PX 11, Plaintiffs' Exhibit 11 at Pages 12 to --

BY MS. LANG:

Q.    Well, so as a reminder, this is the September submission for the 2023 Elections Procedures Manual, correct?

A.    Yes.

Q.    Okay.

        MS. LANG:  And I'd like to turn to Page 12 to 13.

        I apologize.  If we could go to Page 12 of -- yes, I think.  There we go.

BY MS. LANG:

Q.    And do you see the subsection on Page 13 that's "C. Residency Requirements for Registration"?

A.    Yes.

Q.    Okay.  And I see here that the second paragraph discusses the documentary proof of location of residence; is that correct?

A.    Oh, yes, I'm sorry.

Q.   Fair enough.   And there are three bullet points under here that discuss certain documents that should be accepted as satisfactory documentary proof of residence; is that right?

A.   Yes.

Q.   Can you take a quick review to yourself, and then I'll have a quick question for you about it.

A.   (Witness complies.)

Q.   To your recollection, is this list similar to what the Court ordered as to what documents need to be accepted for proof of residence?

A.   Yes.

Q.   Okay.   Are you familiar with this Court's ruling earlier this year that the documentary proof of residence requirement cannot be applied to federal form applications for federal elections?

A.   Yes.

Q.   Okay.

          MS. LANG:   And I'd like to go back to that same page, if we can, on PX 11.   Next one.   Great.

BY MS. LANG:

Q.   Can you read to yourself Section C, and then I'll have a question for you about it.

A.   Okay.

Q.   Anywhere in this section is there a discussion about how documentary proof of residence should be addressed for federal

form applicants?

A.    No.

Q.    Have you received any communication from the Secretary of State about the documentary proof of residency requirement beyond this Draft EPM?

A.    No.

Q.    So just to be absolutely clear, subsequent to this Court's ruling about the documentary proof of residence you haven't received any additional guidance from the Secretary of State?

A.    No.

Q.    Is your office presently implementing the documentary proof of residence requirement?

A.    No.

Q.    Okay.  Are you awaiting guidance from the Secretary of State about that issue?

A.    Yes.

Q.    Okay.  Do you know if the state registration form has been updated to include the documentary proof of residence requirement?

A.    It has not.

Q.    Okay.  In the third bullet point about documents that could be accepted for documentary proof of residence, has a discussion of a written confirmation signed by the registrant that they qualify to register pursuant to A.R.S. 16-121(B),

regarding registration of persons who do not reside at a fixed, permanent or private structure."  Do you see that?

A.   Yes.

Q.   Are you aware of any sample version of a confirmation like that?

A.   I'm not aware.

Q.   Okay.

        MS. LANG:  We can take this down.

BY MS. LANG:

Q.   Based on your experience in voter registration over the past fifteen years, do you believe there are certain populations that might struggle more than others to comply with an additional documentation requirement, like the documentary proof of residence requirement?

        MR. LANGHOFER:  Foundation and speculation.

        THE COURT:  Overruled.

        You may answer based on your experience.

        THE WITNESS:  Yes.

BY MS. LANG:

Q.   And could you identify some of those groups of voters that you think might struggle more?

A.   Those that live in very remote, rural areas.  A lot of the tribal nations have a hard time with addressing issues and having non-standard addresses.

Q.   Might students also have a more difficult time providing

UNITED STATES DISTRICT COURT

documentary proof of residence?

THE COURT:  Well, in your experience.

MS. LANG:  In your experience.

THE COURT:  Are students -- do students have problems with residence?

THE WITNESS:  In my experience, students have lots of problems with documentary proof of residency and citizenship, actually.

MS. LANG:  Okay.

THE WITNESS:  Most of their documents are with their moms and dads.

MS. LANG:  Fair enough.

BY MS. LANG:

Q.    And additional documentation requirements, in your experience, can that be a more difficult barrier for low income folks?

A.    Potentially.

Q.    And in your experience, can additional documentations be kind of greater barriers for folks who are transient and don't have a fixed residence?

A.    Yes.

Q.    In your experience, can additional documentation requirements pose a particular barrier for folks who do not speak English as a first language?

A.    Yes.

Q.   Okay.  Are you familiar with the LULAC Consent Decree?

A.   Yes.

Q.   Okay.  And what is your understanding of what that consent decree did?

A.   It requires us to treat the federal and state forms the same, and any voter that uses any of those forms should be treated in the same manner.

Q.   Okay.  And prior to the LULAC Consent Decree, did your office actually treat state and federal form applicants differently with respect to documentary proof of citizenship?

A.   Yes.

Q.   Okay.  And did that lead to the rejection of many state form applicants instead of their registration as federal-only voters?

A.   Yes.

Q.   Okay.  In comparing -- you're familiar with the state and federal form registration applications, correct?

A.   Correct.

Q.   All right.  Does the federal form application provide your office with any additional information about residence that's not provided on the state form?

A.   No.

Q.   Okay.

          MS. LANG:  And I'd like to make sure for the record that PX 27 and PX 28 are both moved in.

We can pull up PX 27.  That's the state form.

MR. LANGHOFER:  No objection, Your Honor.

THE COURT:  And PX 28 is the federal form.

THE COURT:  Any objection to 27 or 28?

MR. WHITAKER:  No, Your Honor.

MS. BOUGHTON:  No, Your Honor.

THE COURT:  27 and 28 are admitted without objection.

(Exhibit Nos. 27 and 28 admitted in to Evidence.)

BY MS. LANG:

Q.   Sitting here today, can you think of any election administration purpose to registering federal form applicants that don't provide documentary proof of residence as -- but not state form applicants that don't provide documentary proof of residence?

MR. LANGHOFER:  To the extent this is calling for a legal conclusion about the State's justifications, we would object.

THE COURT:  I'm sorry, I -- I didn't -- let me read the question again because I didn't really follow it.

The objection is overruled.  You can answer in your experience.

THE WITNESS:  I don't think I understood the question either.

MS. LANG:  Okay, fair enough.

BY MS. LANG:

Q.   My understanding is that it's possible that -- my understanding is that the defendants believe that this Court's ruling about documentary proof of residence means that federal form applicants that don't provide documentary proof of residence will be registered as federal-only voters, but state form applicants who don't provide documentary proof of residence should be rejected altogether.

That's a system that's similar to what was happening for documentary proof of citizenship before the LULAC Consent Decree, correct?

MR. WHITAKER:  Objection to the extent counsel is testifying about defendants' understanding.

MS. LANG:  If that were the case --

THE COURT:  I'm not -- if that is their position.

I don't want her to repeat it again if you uunderstand it now.

THE WITNESS:  I understand it now.

So, yes, it would have voters being treated differently based upon the form that they use.

BY MS. LANG:

Q.   And so my question is:  Are you aware of any election administration purpose for such differential treatment?

A.   I'm not aware.

Q.   Does your office receive more state form applications

UNITED STATES DISTRICT COURT

than federal form applications?

A.   Yes.

Q.   Substantially more?

A.   Yes.

Q.   Okay.  When your office provides voter registration forms to third-party groups that are conducting drives, do you provide them with the state form?

A.   Yes.

Q.   Okay.  Does your office receive voter registration forms that come from public assistance agencies that provide voter registration services?

A.   Yes.

Q.   And when your office receives those forms, are they typically state forms or federal forms?

A.   State forms.

Q.   Okay.  Earlier today you testified a number of times about various notices that might be sent to voters about their need to provide documentary proof of citizenship, correct?

A.   Yes.

Q.   Okay.  What language are your -- what languages are your notices provided in?

A.   English and Spanish.

Q.   Any other languages?

A.   No.

Q.   Okay.  And these notices are sent by non-forwardable

mail, correct?

A.    Correct.

Q.    So if someone had a forwarding address, they wouldn't get that piece of mail; is that correct?

A.    That's correct.  However, in some cases, depending on the situation, we might send a final notice to the forwarding address that was provided to us.

THE COURT:  So your -- the way you mail it, if the person is not at that residence, you get it returned and it might have on the envelope the forwarding address?

THE WITNESS:  Yes.  It could be returned to us and it might say "undeliverable" with no address.  It might say "undeliverable" and have a forwarding address or it might just say "temporarily away."

THE COURT:  And if you have the forwarding address, the practice in your office is to send that final notice that you aren't registered to the forwarded address?

THE WITNESS:  If the person is registered and we send a piece of election official -- official election mail and it comes back undeliverable, then we'd send a final notice following the National Voter Registration Act.

However, if it's just a notice informing them that they are not fully registered and what they need to do to become registered, we would not send a notice to that forwarding address.

THE COURT:  So within whatever the time to cure was, you would just cancel their registration?

THE WITNESS:  They were never added to the rolls, so they would never be cancelled.

THE COURT:  Okay, thank you.

BY MS. LANG:

Q.   But I think the upside of your testimony is that the kind of documentary proof of citizenship notices that go out don't get sent to the forwarding addresses; is that correct?

A.   At this time, no.

Q.   Okay.

MS. LANG:  I'd like to pull up Plaintiffs' Exhibit 139.

BY MS. LANG:

Q.   Have you looked at this document before?

A.   Yes.

Q.   Is this your office's responses to interrogatories in this case?

A.   Yes.

Q.   Okay.  And did you help prepare the answers to these interrogatories?

A.   Yes.

Q.   Okay.  And I'd like to look at Interrogatory No. 9, which is at Page 12.  Can you read to yourself Interrogatory No. 9 and then also the response.

A.   Yes.

Q.   Is it accurate to say that your office -- in responding to this interrogatory, your office did not identify a single instance of non-citizen voting between 2013 and the present?

A.   I think what this is saying is that in some cases a voter might self report that they're a non-citizen.  However, we wouldn't know.

Q.   Okay.  But you haven't specifically identified any cases of non-citizen voting from 2013 to the present; is that correct?

A.   Correct.

Q.   All right.  Are you aware of any cases of alleged non-citizen voting in Maricopa County?

A.   No.

Q.   Okay.  And if we could look at Interrogatory No. 10, if you could read that to yourself and also the response.

A.   Okay.

Q.   Does it remain the Maricopa County Recorder's office's position that you are not aware of any county interest furthered by these Challenged Laws?

A.   Correct.

          MR. WHITAKER:  It calls for a legal conclusion.

          THE COURT:  Overruled, the answer will stand.

BY MS. LANG:

Q.   And the next sentence says that Maricopa County

Recorder's office believes that many of the Challenged Laws' provisions conflict with federal law which puts the County in a position of liability.  Do you see that?

A.    I do.

Q.    Okay.  And when you say that it puts the County in a position of liability, can you explain what you mean?

A.    I believe that a lot of these laws violate federal law --

MR. LANGHOFER:  Your Honor, calls for -- it's an inappropriate opinion on legal questions.

THE COURT:  Sustained.

MS. LANG:  Your Honor, what we're trying to get at here is --

THE COURT:  When I say sustained, it's not an invitation for argument.

MS. LANG:  Okay.

THE COURT:  It's only if I invite argument on the objection that I expect to hear any.

MS. LANG:  Fair enough, Your Honor.

BY MS. LANG:

Q.    Is your office concerned that if you were to implement these laws, you would be violating federal law?

MR. LANGHOFER:  Same objection.

THE COURT:  Overruled.

You may answer "yes" or "no."

THE WITNESS:  Yes.

MS. LANG:  Okay.

BY MS. LANG:

Q.   And that might lead you to be sued?

A.   Yes.

Q.   Okay.

THE COURT:  They already have been.

MS. LANG:  Even more so.

Can we pull up Plaintiffs' Exhibit 200.

BY MS. LANG:

Q.   Are you familiar with this document?

A.   Yes.

Q.   Okay.  And was this a document that was published by your office?

A.   Yes.

Q.   Okay.  And what was the purpose of this document?

A.   I think it was provide an analysis of the election.

Q.   Was one purpose to combat the misinformation that had been spread about the 2020 election in Maricopa County?

A.   Yes.

Q.   Okay.  Is it accurate to say, to your knowledge, that every legal challenge concerning election fraud or manipulation in Maricopa County's 2020 General Election failed?

A.   Yes.

Q.   Were there many such challenges?

A.    Yes.

Q.    But none of them were successful?

A.    Yes.

Q.    Okay.  I just want to back up and ask one set of questions about databases that we covered earlier, which is that Judge Bolton asked you if some of the database checks that are required by the statutes already happened.  For example, the MVD check; is that correct?

A.    Yes.

Q.    I just want to clarify, though, HB2243 is a statute about list maintenance procedures, not kind of point of registration procedures; is that correct?

A.    Yes.

Q.    Okay.  And you don't conduct any check against the Motor Vehicle database as part of your list maintenance procedures; is that right?

A.    Yes.  Data, not the actual database, but being a member of ERIC we get MVD database information.

Q.    Okay.

        THE COURT:  So ERIC is the interstate one that you --

        THE WITNESS:  Electronic registration.

        THE COURT:  -- you check to make sure that if somebody's registered in another state, that they -- you sort out which one they should be registered in?

THE WITNESS:  So every -- yes.  However, as part of our agreement, every sixty days we provide an export of our MVD database as well as our voter registration database. That's what every state does, and all that data is intermingled together.  So we would get information from our MVD database as well in some of those reports.

BY MS. LANG:

Q.   But that data that you get through ERIC is not related to citizenship status; is that correct?

A.   That's correct.

Q.   And so you don't conduct any checks against MVD related to citizenship status after the point of registration; is that correct?

A.   Correct, unless there is another voter-initiated change to the record.

Q.   Okay.  And same thing for the Social Security Administration?

A.   Correct.

Q.   Okay.

     MS. LANG:  I don't believe I have any further questions for you, Ms. Petty.

     I'm going to pass the witness over to my colleague at the Department of Justice.  She's going to focus her questions on the area of the birthplace requirement, and then we'll pass the witness to the defense.

UNITED STATES DISTRICT COURT

THE COURT:  Thank you.

MS. LANG:  Thank you very much.

MS. TURNER:  Good morning, Your Honor, Margaret Turner for the United States.

THE COURT:  Please proceed.

CONTINUED DIRECT EXAMINATION

BY MS. TURNER:

Q.   Good morning, Ms. Petty.  As Ms. Lang mentioned, I have just a few additional questions for you, and I'll be focusing in on the birthplace field on the Arizona State Voter Registration Form, which we've been referring to as the state form; is that fair?

A.   Yes.

Q.   So the Arizona State form has a field for quote "state or country of birth," right?

A.   Yes.

Q.   And to your knowledge, that field was not recently added?

A.   No.

Q.   It's been around for many years?

A.   It has.

Q.   The birthplace field has always been optional; is that right?

A.   Correct.

Q.   And I know you already spoke with my colleague a bit about HB2492 so I'll ask you more specifically.  What changes

did HB2492 make to the birthplace field on the state form?

A.   It would make it a requirement.

Q.   And a requirement in this context would be a field that the registrant must complete or they will not be registered to vote?

A.   That's my understanding.

Q.   But your office in terms of current practice is treating the birthplace field as optional; is that right?

A.   Correct.

THE COURT:  Is that, again, because you're waiting for the Secretary of State to give you some guidance?

THE WITNESS:  We're following the same practice that's in the existing Elections Procedures Manual.

THE COURT:  Ah, because it hasn't been updated since the new laws were passed?

THE WITNESS:  Correct.

THE COURT:  Does the draft change it, do you remember?

THE WITNESS:  I think that there may be a placeholder for it, but we're waiting to see how the litigation.

THE COURT:  Oh, okay, thank you.

Please continue.

BY MS. TURNER:

Q.   So just to be crystal clear in terms of current practice,

UNITED STATES DISTRICT COURT

if your office receives a state form that omits birthplace information, you will still register that voter?

A.    Correct.

Q.    I'd like to ask you just a few additional questions about data entry.  I know you mentioned earlier that Maricopa has its own internal system that interfaces with the statewide system; is that right?

A.    Correct.

Q.    And just to be clear, you also stated that data entry is done manually into Maricopa system?

A.    From paper forms, yes.

Q.    That's correct.  And your office accepts paper state form applications, right?

A.    Correct.

Q.    And so when a registrant includes birthplace on their registration form, your office would put that information into the Maricopa system exactly as written?

A.    Correct.

Q.    So you're just replicating exactly what's on the form?

A.    Correct.

Q.    And so as -- just to be very clear, as an example, if a registrant writes AZ as their birthplace, that response would be recorded exactly as written?

A.    Yes.

Q.    And the same would be true of writing CA?

A.    Correct.

Q.    In your experience, registrants might even write the name of a town, city or county in the birthplace field; is that right?

A.    In my experience, yes.

Q.    And so, for example, if a registrant were to write "Maricopa," that would be recorded as Maricopa?

A.    Correct.

Q.    And there's no guidance you're aware of on the state form that tells registrants how to write this birthplace information in a standardized way; is that right?

A.    Correct.

Q.    So, for example, no guidance that tells the voter whether to indicate birthplace as two letters versus a full word?

A.    Correct.

Q.    So I want to switch gears just for a moment and talk about voter qualifications.

      Through your experience with voter registration you're familiar with voter qualifications in Arizona; is that right?

A.    Yes.

Q.    And to your best -- to the best of your knowledge, voter qualifications in Arizona are codified in the State Constitution and statutes?

A.    Yes.

Q.    Your office does not use birthplace information to verify

someone's eligibility to vote, correct?

A.    Correct.

Q.    And would you agree with me that where someone is born does not determine whether or not they're a US citizen?

A.    Correct.

Q.    And, in fact, your office does not check birthplace information in determining whether someone is a US citizen for purposes of registration?

A.    Correct.

Q.    And in your experience, your office only uses -- is it true that your office only uses birthplace information as, say, a security question if the voter were to call that office -- call your office, excuse me?

A.    Yes.

THE COURT:   Okay, I'm just curious as to why we're proceeding with this line of questioning based on the stipulation that I received this morning that birthplace is not used by Arizona election officials, nor can it be used to establish or confirm respective registrants' current place of residence?

MS. TURNER:   Your Honor, that stipulation speaks only to whether it is useful or is used, excuse me, for purposes of a residence.   There are other eligibility requirements or voter qualifications, and so we just want to question on that.

THE COURT:  Do you use it for any purpose?

THE WITNESS:  Only if a voter was to call us and want information about their record, we'd use it as personal identifying information to make sure we're talking to the correct person.  So we'd ask them what did you provide on your --

THE COURT:  Sort of like, "What's your mother's maiden name?"

THE WITNESS:  Exactly.

THE COURT:  But for purposes of registration do you use birthplace for any reason?

THE WITNESS:  No, ma'am.

MS. TURNER:  Thank you.

BY MS. TURNER:

Q.   And so just ask one additional clarifying question on the security question that there are other pieces of identifying information that you can use for that purpose?

A.   Yes.

Q.   And that you do use, like date of birth?

A.   Yes.

Q.   And I know you just mentioned in speaking with Judge Bolton that you don't use it for any purpose related to registration, but I just want to be crystal clear that your office does not use birthplace information to verify a voter's identity to determine their eligibility; is that correct?

A.    Correct.

Q.    And then just along those same lines, you spoke with my colleague earlier about HAVA checks.  That's the Help America Vote Act checks, and you mentioned that a voter's information is checked against various databases to verify identity.

Did I get that right?

A.    Correct.

Q.    And so my question is:  You did not require birthplace information in order to verify identity through a HAVA check, right?

A.    Correct.

Q.    And finally on this line of questioning, you don't anticipate that your office's use of birthplace information would change at all if it becomes a mandatory field under HB2492?

MR. LANGHOFER:  Calls for speculation.

THE COURT:  Sustained.

MS. TURNER:  Understood.  I just have a few more questions for you.

BY MS. TURNER:

Q.    Your office does not independently confirm whether a registrant's birthplace information is accurate, correct?

A.    Correct.

Q.    And you would have no way to do so?

A.    Correct.

Q.   There's no database you're aware of against which that could be checked?

MR. LANGHOFER:  Foundation.

THE COURT:  Overruled, you may answer.

THE WITNESS:  I know of no database.

MS. TURNER:  Thank you for your testimony today, Ms. Petty.

We'll pass the witness, Your Honor.

THE COURT:  Thank you.

Have you decided an order for cross?  Mr. Whitaker?

MR. WHITAKER:  Yeah, I think I'll go first, Your Honor.

CROSS-EXAMINATION

BY MR. WHITAKER:

Q.   Good morning, Ms. Petty.

A.   Good morning.

Q.   Prior to these new laws, in the past few years has -- has your office cancelled voter registrations based on non-citizenship?

A.   Yes.

Q.   And in what context does that happen?

A.   If we get information from the voter themselves indicating they're a non-citizen.

Q.   Can that happen?

THE COURT:  Can you give me any examples, to your

recollection, of that coming up from a registered voter?

THE WITNESS:  From a jury duty questionnaire where they are self reporting that they're a non-citizen.

THE COURT:  Oh, so you're not talking about information personally coming in, somebody calling you up on the phone and saying, "I registered, but I'm a non-citizen"?

You're talking about getting that information that someone is a non-citizen typically from some other source?

THE WITNESS:  Yes, but we would verify that information with the voter and they would say, "Yes, in fact, I'm not a citizen."

THE COURT:  Do you have any other examples of getting that information other than from the jury summary?

THE WITNESS:  No, we would have most likely already caught that when they initially submitted to be a registered voter.  We would find that they were non-citizen at that point, and they would have never been added to the rolls.

BY MR. WHITAKER:

Q.   And to clarify, Arizona has required proof of citizenship for registration for a long time; is that fair?

A.   They've asked for proof of citizenship.  I don't think it's required.  They have to attest to it on their form that they're eligible.

Q.   Understood.  So the process by which the Recorder's office evaluates these -- well, let's talk about what are the

ways in which the Recorder's office gets these -- this data about how potential jurors self report?

A.   How do we get the data?

Q.   Yes.

A.   Directly from the jury duty office.

Q.   And what form does that come in?

A.   I believe it's a TXT, text file.

Q.   And upon receiving information that, for example, a current registrant has self identified as a non-citizen, does the Recorder's office check and see whether the registrant has already provided proof of citizenship?

A.   We do.

Q.   And what happens in that case?

A.   Nothing.

Q.   And what happens when you see that the registrant has not provided proof of citizenship?

A.   We would send a letter to the voter telling them that we have received information that they are a non-citizen, and we ask them to contact us and provide DPOC.

Q.   And what happens if they do provide DPOC?

A.   Then they would become a full-ballot voter.

Q.   And what happens if they do not?

A.   At this point they would need to respond within 35 days, and if they don't then they would be going to an inactive status.

Q.   And has that happened for at least some registrants over the past few years?

A.   Yes.

THE COURT:  So are the circumstances where registered voters have been put on the inactive status, have they all been because they didn't respond to your inquiry or have there been any instances, to your recollection, where you got the information from the jury office that they checked not a citizen, they're on your registration, and they respond that, "Oh, that's true, I'm not a citizen"?

THE WITNESS:  If they respond they're not a citizen, they're immediately cancelled.

THE COURT:  But has that ever happened?

THE WITNESS:  It's very, very rare.  I can think of one or two instances.

THE COURT:  So most of the time when they're put on the inactive list, it's because they just don't respond to your letter?

THE WITNESS:  Correct.

THE COURT:  Okay.  So you can think maybe once or twice somebody was registered and they told jury they weren't a citizen and they confirmed with you that they were not citizens?

THE WITNESS:  Correct.

THE COURT:  Thank you.

MR. WHITAKER:  I'd like to walk through somewhat similar to what Ms. Lang did some of the provisions in these laws.  I'd like to pull up Plaintiffs' Exhibit 1, which I think is HB2492, and let's go to Page 4.

BY MR. WHITAKER:

Q.   All right.  I'm not as high tech, but start with D here.

Ms. Lang asked you about this.  This is the provision that says that recorders upon receiving a federal form that's not accompanied by DPOC have to check databases, right?

A.   Correct.

Q.   Now, what it actually says is that they have to check databases provided the County has access, right?

A.   Correct.

Q.   So let's quickly go through these.  No. 1 is the ADOT database, right?

A.   Correct.

Q.   And you already checked that, right?

A.   Yes.

Q.   And that's generally reliable in your view?

A.   Yes.

Q.   Then No. 2 you don't have access to, right?

A.   Not direct access, no.

Q.   And to the extent you have access to it, it's through ADOT and it doesn't show citizenship information, right?

A.   Correct.

Q.   All right.  Let's go to the next page.  I don't know how to clear my red lines, but that's okay.

No. 3, this is the USCIS SAVE database, right?

A.   Yes.

Q.   And this says you check it if practicable, right?

A.   Yes.

Q.   And you can only check that if you have an A-number from the applicant or some related immigration number, right?

A.   Correct.

Q.   And that's precisely the circumstances in which you already do check it, right?

A.   Yes.

Q.   Okay.  No. 4 is this National Association for Public Health Statistics and Information Systems database, right?

A.   Yeah, yes.

Q.   Oh, go ahead.

A.   Sorry, I just said "yes."

Q.   Okay, yeah.  But you don't -- you don't have access to that, right?

A.   I don't even know what that is, so no.

Q.   All right.  No. 5 is sort of this catch-all provision that talks about the Electronic Registration Information Center database or ERIC there at the end; and I think your testimony was that you have access to ERIC, but it didn't have citizenship information, right?

A.    Correct.

Q.    And the other catch-all here is other state, city, town, county or federal databases relating to voter registration, right?

A.    Right.

Q.    And you're not aware of any such databases that would have citizenship information?

A.    I'm not aware.

Q.    So I guess my question is:  How would that part of the law change your practice if implemented, if at all?

          MS. LANG:  Objection, calls for speculation.

          THE COURT:  Have you given this any thought?

          THE WITNESS:  If we don't have access to --

          THE COURT:  No, have you given thought as to how this provision of the statute that adds these additional database requirement checks if you have access, how that would affect your practice?

          THE WITNESS:  Yes, we've given it thought.

          Most of the additional requirements we don't have access to.  So it wouldn't change our procedures that much.

          THE COURT:  Thank you.

BY MR. WHITAKER:

Q.    Is there any way in which you envision it would change your procedures?

A.    Not unless we had access to other databases.

Q.   Which you don't?

A.   Which we do not at this time.

Q.   Let's go to the next part, E.  E begins, "After complying with Subsection D..."  That's the part we just discussed about the database check.  If the County Recorder matches the applicant with information that verifies they're a citizen, then they're registered.  I'm paraphrasing.

That's what you already do, right?

A.   Correct.

Q.   All right.  This next sentence starting here, "If the County Recorder..." yada, yada, yada, matches the applicant with information that the applicant is not a citizen, then they shall reject the application, notify the applicant and forward it for investigation.

So I want to break that down a little bit.  What happens right now when, for example, the MVD database spits back information that the person wasn't a citizen at the time they interacted with the MVD?

A.   So they would be not added to the rolls.  They'd be put on suspense, and a letter would be sent out informing them that we have information that they're a non-citizen.  If they want to cure that, the ways that they could provide DPOC in order to be added to the rolls as a full-ballot voter.

Q.   So they're not allowed to vote and they're sent a notice?

A.   Correct.

Q.   Now, this part, I think, may be new, this forwarding the application for investigation.  That's not something, as I understand it, that you currently do, right?

A.   Correct.

Q.   Okay.  Have you implemented that?

A.   No.

Q.   Do you have any sense what would happen if you were to forward an application for investigation?

        MS. LANG:  Objection, speculation.

        THE COURT:  Sustained.

        So do you presently reject the application if you get information from DMV that the person's not a citizen?

        THE WITNESS:  We don't refer it as it being rejected.  It's basically put on a suspense awaiting verification from the voter.  If they never respond, then it would, again, stay in that suspense status until the next General Election; and if we still don't hear from them, at that point they would be moved to a not registered/not eligible status.

        THE COURT:  Thank you.

BY MR. WHITAKER:

Q.   Functionally someone in that status can't vote, right?

A.   Correct.

Q.   All right.

        MR. WHITAKER:  Can we zoom out a little bit.

Can we go to the next page?

THE COURT:  Can you erase the marks, Elaine.

MR. WHITAKER:  Oh, yes.

THE COURT:  Mr. Whitaker's trying, but unsuccessfully, to erase his orange.

MR. WHITAKER:  I did practice this, and I forgot how to do it.

THE COURT:  There's some corner that you touch and it goes away.

MR. WHITAKER:  Mr. Horley aided me, thank you.

Can we go on to the next page.  One more.

BY MR. WHITAKER:

Q.   All right.  So here we are looking at 16-143 and my color is different.

THE COURT:  You changed the color when you were trying to erase, apparently.

MR. WHITAKER:  I'm in the Christmas spirit, and I didn't even realize it.

BY MR. WHITAKER:

Q.   So Subsection A here directs County Recorders to make a list of folks who haven't provided DPOC available to the Attorney General, right?

A.   Correct.

Q.   Okay.  And your office, as I understand it, has not done that; is that right?

A.   Correct.

Q.   All right.

          MR. WHITAKER:  Let's go to Plaintiffs' Exhibit 2, the other statute here, HB2243.  I don't know what page it's on.  Can you go to the next page.  One more.  One more, sorry.

          Yeah, so 16-165 "Causes for Cancellation."

          Can you go one more page.

BY MR. WHITAKER:

Q.   So this is A-10 here.  It says, "When the County Recorder obtains information pursuant to this section and confirms that the person registered is not a United States citizen..." and then it has a bunch of other things.

     Is it fair to say that you need two things to trigger this section?  You need information pursuant to this section and confirming that the registrant is not a citizen?

          MS. LANG:  Objection, calls for a legal conclusion and leading.

          THE COURT:  Leading's fine -- well, actually, I forgot this is your -- this is a defendant, sorry.

          Leading's not necessarily fine, but it does call for a legal conclusion.  You can ask if they've implemented some policy as to how to do this, but I think we already know that her answer is they're waiting for the Secretary of State.

BY MR. WHITAKER:

Q.   Have you implemented this part of the law?

A.    No.

Q.    Do you know yet whether this part of the law, if implemented, would change your current practices?

A.    Yes.

Q.    And how would it change your current practices?

A.    We would need to find out how to verify that information. So we would need a new policy and procedures drafted up.

Q.    And are you basing that on the word "confirms" here?

A.    Yes.

Q.    All right.  I'll scratch that.

          MR. WHITAKER:  Let's -- let's go to Plaintiffs' Exhibit 6, the Elections Procedures Manual from 2019, and if we could go to Page 36 of the Manual.  I'm not sure it's the same as Page 36 of the document.

BY MR. WHITAKER:

Q.    All right.  So let me give you an example.  This is the part of the Manual on juror disclosure of non-citizenship, right?

A.    Yes.

Q.    And one of the steps that the Recorder's required to take is confirming that the registrant doesn't already have proof of citizenship, right?

A.    Correct.

Q.    And that's something you already do, right?

A.    Correct.

Q.   All right.

MR. WHITAKER:  Let's go back to Plaintiffs' Exhibit 2.  I think maybe it's Page 5.  One more.

BY MR. WHITAKER:

Q.   All right.  Let's go to F here.  This is the provision that says the Secretary of State needs to compare the statewide database to the driver's license database, right?

A.   Correct.

Q.   And then it says the Secretary of State shall notify the appropriate Recorder if a person who is registered to vote -- and then can we go on to the next page -- is not a United States citizen.

Has that part of the law been implemented?

A.   No.

Q.   Do you know how it would be?

A.   From some of the discussions that I've heard, the Motor Vehicle Department would be giving the Secretary of State a file.  The Secretary of State would need to make an enhancement to the statewide voter registration system.  They would need to define the matching criteria.  They would have to run that MVD file through that mechanism, and then have it disbursed appropriately to the fifteen counties the records that would potentially impact those counties to be worked by the individual Recorder's office.

Q.   Now, checking of the MVD data is already something that's

UNITED STATES DISTRICT COURT

done by your office on the front end, right?

MS. LANG:  Objection, leading.

THE COURT:  Overruled.  We already know the answer.

BY MR. WHITAKER:

Q.   Let's look at G.  G says to the extent practicable, each month the Recorder shall compare the registration database to the Social Security Administration database.

I think we discussed earlier, though, that you don't have direct access to the Social Security Administration database, right?

A.   Correct.

THE COURT:  But you can do this whenever you want through MVD; is that correct?

THE WITNESS:  It's my understanding we can only do this when a voter submits a voter registration form.

THE COURT:  Is that because you've never tried to do it on any other occasion?

THE WITNESS:  It's my understanding it's from a legal perspective that we wouldn't just randomly select voters and try to put them back through the HAVA checks without having some kind of a registration form to initiate that.

THE COURT:  Thank you.

BY MR. WHITAKER:

Q.   Let's go to H.  H says, again, to the extent practicable, each month the Recorder shall compare persons who are

registered to vote and who the Recorder has reason to believe that are not citizens and persons who are registered to vote without DPOC with the SAVE database, right?

A.   Correct.

Q.   All right.  And, again, I think we said earlier, the SAVE database is only used for folks that have an A-number or other immigration number for, right?

A.   Correct.

Q.   And that hadn't been implemented yet either, right?

A.   No.

Q.   Okay.  Do you know whether implementation of these laws would negatively affect citizens from voting?

          MS. LANG:  Objection, speculation.

          THE COURT:  Sustained.

BY MR. WHITAKER:

Q.   Let's go down to I.  I is for persons who are registered without DPOC, the Recorder shall compare the -- this is the acronym database -- National Association for Public Health Statistics and Information Systems database, if accessible, right?

A.   Correct.

Q.   And that database is not accessible to you -- at least at this time?

A.   Correct.

Q.   I'll switch gears a little bit and discuss what the

United States was discussing this birthplace requirement.

THE COURT:  Well, just a second.  So on that last screen you said "if accessible," but was that written -- you had some white lines through things and I couldn't read --

MR. WHITAKER:  I'm sorry, Your Honor.

THE COURT:  -- through some of them.

MR. WHITAKER:  Yes.  Can we pull that back up?

Yeah, "if accessible" is right here --

THE COURT:  Okay, thank you.  That's what I couldn't read.

BY MR. WHITAKER:

Q.   And, actually, now that -- now that we're back here, I hesitate to bore everyone but let's go to J.

This says to the extent practicable, the Recorder shall review relevant city, town, county, state and federal databases to which the Recorder has access to confirm information obtained that requires cancellation pursuant to this section, right?

A.   Correct.

Q.   Are you aware of any relevant database to which you currently have access that falls within that provision?

MS. LANG:  Objection, legal conclusion.

THE COURT:  Overruled.

If you're aware of any database to which you have access, other than the ones that you've already told us about.

THE WITNESS:  I -- I do not.

MR. WHITAKER:   All right.

BY MR. WHITAKER:

Q.   I think you testified earlier about the birthplace requirement that there aren't standard instructions right now about how to enter it; is that right?

A.   Correct.

Q.   But before these laws it wasn't a required field, right?

A.   Correct.

MS. LANG:  Objection, leading.

THE COURT:  Overruled.  It's helpful to expedite this.

BY MR. WHITAKER:

Q.   Is it possible that standard instructions would be introduced now that it's required?

MS. LANG:  Objection, speculation.

THE COURT:  Sustained.

BY MR. WHITAKER:

Q.   Are you familiar with the Service Arizona website?

A.   Yes.

Q.   Do you know whether that website has a standard field to enter birthplace information?

A.   I believe it does.

Q.   Do you know whether it has a drop-down menu you can select from?

A.   I actually haven't been on there in a long time.  I don't remember.

Q.   All right, that's all right.

          MR. WHITAKER:   Can we pull up Plaintiffs' Exhibit 85.

BY MR. WHITAKER:

Q.   Have you seen this document before?

A.   Yes.

Q.   What is it?

A.   It's one of the notices we would send to a voter when we're requesting additional information to cure the registration.

Q.   And down here at the bottom is place of birth listed as one of the pieces of information to help uniquely identify the information?

A.   Yes.

          MR. WHITAKER:   Can we pull up Defense Exhibit 773.

BY MR. WHITAKER:

Q.   Have you seen this document before?

A.   Yes.

Q.   What is it?

A.   Again, it's one of the notices issued from our office asking for additional information from a voter.

Q.   Down here at the bottom is place of birth listed as one of the pieces of information to help uniquely identify the

registration?

A.   Yes.

MS. LANG:  I'm sorry, could we repeat the number of that exhibit?

MR. LANGHOFER:  773.

MS. LANG:  772?

MR. LANGHOFER:  773.

MR. WHITAKER:  Yeah, 773.

MS. LANG:  Thank you.

MR. WHITAKER:  Let's go back to Plaintiffs' Exhibit 6.  Let's go to Page 34 of the Manual.

BY MR. WHITAKER:

Q.   So before I ask you a question about the text, I'll just ask could birthplace be useful if you're trying to match whether someone matches a deceased record?

A.   Yes.

Q.   And how could it be useful?

A.   It is additional information to help us verify any information that we may get from an obituary notice, a family member's affidavit of death in order to identify that we have the correct voter record.

MR. WHITAKER:  Can we go to Page 4 of the Manual.

BY MR. WHITAKER:

Q.   So as Page 4 explains, one of the -- one of the possible items of DPOC is a birth certificate, right?

A.    Yes.

Q.    But sometimes could someone submit a birth certificate that doesn't actually have their same last name?

A.    Yes.

Q.    And what are some circumstances in which that could happen?

A.    A legal name change.

Q.    Could it happen after a marriage, for example?

THE COURT:  She said a legal name change.  Let's just -- how many examples do we need?

MR. WHITAKER:  Can we go to the next page.

BY MR. WHITAKER:

Q.    Is place of birth a useful field of information to help determine that the applicant is, in fact, the same applicant on the birth certificate in that situation?

A.    It could be helpful.

MR. WHITAKER:  I think that's all the questions I have, thank you.

THE COURT:  Excellent timing, Mr. Whitaker, it's noon.  We'll reconvene at 1:00 o'clock.  Court is in recess.

Does that give everybody enough time, one hour?

MR. LANGHOFER:  Yes, your Honor.

THE COURT:  Okay, great.  Court is in recess.

COURTROOM DEPUTY:  All rise.

(Lunch recess taken at 11:59 a.m.)

### REPORTER'S CERTIFICATION

I, TERI VERES, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 6th of November, 2023.

_____s/Teri Veres_____
TERI VERES, RMR, CRR

UNITED STATES DISTRICT COURT