UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

Mi Familia Vota, et al.,        )
                                )
                Plaintiffs,     )
                                )
          vs.                   )   2:22-cv-00509-SRB
                                )
Adrian Fontes, et al.,          )
                                )   Phoenix, Arizona
                Defendants.     )   November 6, 2023
_____)      1:05 p.m.


BEFORE:   THE HONORABLE SUSAN R. BOLTON, SENIOR JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS


BENCH TRIAL - DAY 1 - P.M. SESSION

(Pages 125 through 287)


Official Court Reporter:
Elva Cruz-Lauer, RMR CRR
Sandra Day O'Connor U.S. Courthouse
401 West Washington Street
Suite 312, SPC 35
Phoenix, Arizona  85003-2150
(602) 322-7245

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

APPEARANCES


For Plaintiff United States of America:

    JENNIFER J. YUN, ESQ.
    U.S. DEPARTMENT OF JUSTICE - VOTING - M STREET
    4 Constitution Square
    150 M. Street NE
    Washington, D.C.  20503

    RICHARD DELLHEIM, ESQ.
    SEJAL JHAVERI, ESQ.
    MARGARET TURNER, ESQ.
    U.S. DEPARTMENT OF JUSTICE-CIVIL RIGHT
    DIVISION, VOTING SECTION
    950 Pennsylvania Avenue NW
    Washington, D.C.  50530


For Plaintiff ADRD Action, Arizona Students' Association, League of United Latin American Citizens Arizona, Living United for Change in Arizona:

    DANIELLE MARIE LANG, ESQ.
    HAYDEN JOHNSON, ESQ.
    MOLLY DANAHY, ESQ.
    ROBERT BRENT FERGUSON, ESQ.
    CAMPAIGN LEGAL CENTER
    1101 14th Street NW, Suite 400
    Washington, D.C.  20005

    COURTNEY HOSTETLER, ESQ.
    FREE SPEECH for PEOPLE
    1320 Centre Street, Suite 405
    Newton, Massachusetts  02459

    RACHEL J. LAMORTE, ESQ.
    MAYER BROWN, L.L.P.
    1999 K Street NW
    Washington, D.C. 20006

    WILLIAM JOSEPH MCELHANEY, III, ESQ.
    MAYER BROWN, L.L.P.
    71 S. Wacker Drive
    Chicago, Illinois 60606

127

                    APPEARANCES (Continued)

For Plaintiff Arizona Asian American Native Hawaiian And
Pacific Islander for Equity Coalition:

          NIYATI SHAH, ESQ.
          ASIAN AMERICANS ADVANCING JUSTICE
          1620 L Street NW, Suite 1050
          Washington, D.C.  20036

          SADIK HUSENY, ESQ.
          AMIT MAKKER, ESQ.
          EVAN OMI, ESQ.
          CATHERINE ANNE RIZZONI, ESQ.
          LATHAN & WATKINS
          505 Montgomery Street, Suite 2000
          San Francisco, California 94111


For Plaintiff Arizona Democratic Party, Democratic National
Committee:

          CHRISTOPHER E. BABBITT, ESQ.
          WILMER CUTLER PICKERING HALE & DORR,
          L.L.P.
          2100 Pennsylvania Avenue NW
          Washington, D.C.  20037


For Plaintiff Poder Latinx:

          JOHN A. FREEDMAN, ESQ.
          LEAH MOTZKIN, ESQ.
          ARNOLD & PORTER KAYE SCHOLER, L.L.P.
          601 Massachusetts Avenue NW, Suite 100
          Washington, D.C.  20001

          BEAUREGARD WILLIAM PATTERSON, ESQ.
          JONATHAN SHERMAN, ESQ.
          FAIR ELECTIONS CENTER
          1825 K Street NW, Suite 701
          Washington, D.C. 20006

APPEARANCES (Continued)

For Plaintiff Tohono O'odham Nation:

            ALLISON NESWOOD, ESQ.
            NATIVE AMERICAN RIGHTS FUND
            250 Arapahoe Avenue
            Boulder, Colorado 80302


For Plaintiff Voto Latino, Mi Familia Vota:

            CHRISTOPHER DODGE, ESQ.
            ELISABETH C. FROST, ESQ.
            DANIELA LORENZO, ESQ.
            ALEXANDER FRANKLIN ATKINS, ESQ.
            MOLLIE DEBRELL, ESQ.
            ELIAS LAW GROUP, L.L.P.
            250 Massachusetts Avenue NW, Suite 400
            Washington, D.C. 20001


For Plaintiff Promise Arizona, Southwest Voter Registration
Education Project:

            ERNEST ISRAEL HERRERA , ESQ.
            ERIKA CERVANTES, ESQ.
            MALDEF
            634 Spring Street, 11th Floor
            Los Angeles, California  90014



For Defendants State of Arizona, Kris Mayes, Jennifer Toth:

            JOSHUA MICHAEL WHITAKER, ESQ.
            TIMOTHY E. HORLEY, ESQ.
            ARIZONA ATTORNEY GENERAL'S OFFICE
            2005 N. Central Avenue
            Phoenix, Arizona  85004

APPEARANCES (Continued)

For Intervenor-Defendants State of Arizona, Kris Mayes, Ben Toma:

        KATHRYN E. BOUGHTON, ESQ.
        ARIZONA ATTORNEY GENERAL'S OFFICE
        2005 N. Central Avenue
        Phoenix, AZ  85004

        HANNAH HATCH PORTER, ESQ
        GALLAGHER & KENNEDY, P.A.
        2575 E. Camelback Road, Suite 810
        Phoenix, Arizona 85016-9225

For Intervenor Republican National Committee:

        KORY A. LANGHOFER, ESQ.
        STATECRAFT, P.L.L.C.
        649 North 4th Avenue, Suite B
        Phoenix, Arizona  85003

For Defendant-Intervenor Republican National Committee:

        KORY A. LANGHOFER, ESQ.
        THOMAS J. BASILE, ESQ.
        STATECRAFT, P.L.L.C.
        649 N. 4th Avenue, Suite B
        Phoenix, Arizona  85003

For Defendant-Intervenor Warren Peterson and Ben Toma:

        HANNAH HATCH PORTER, ESQ.
        Gallagher & Kennedy, P.A.
        2575 East Camelback Road, Suite 1100
        Phoenix, AZ  85016-9225

130

INDEX OF WITNESSES

| WITNESSES FOR THE PLAINTIFFS: | Direct | Cross | Redirect |
|---|---|---|---|
| Janine Petty | | 131 | 156 |
| Joseph Garcia | 175 | 197,209 | |
| Ameer Patel | 216 | 242,253 | 255 |
| Reginald Bolding, Jr. | 257 | 278,280 | |

INDEX OF EXHIBITS

| EXHIBIT NO.: | DESCRIPTION: | RECEIVED: |
|---|---|---|
| 769 | Maricopa County response to RFP 5 re statistics for suspended registrations [MC,Petty-8] | 155 |
| 773 | Maricopa County letter re missing last name [MC 002990-MC 002991] | 150 |

UNITED STATES DISTRICT COURT

P R O C E E D I N G S

THE COURT:  The record will reflect the presence of counsel.

Mr. Langhofer, you may cross-examine Ms. Petty.

MR. LANGHOFER:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. LANGHOFER:

Q.  Good afternoon, Ms. Petty.  Welcome back.

A.  Thank you.

Q.  I am Kory Langhofer.  I represent the RNC in this matter. I got a few questions for you.  Let's start with this.

If someone submits a voter registration form and you try to look them up in your system, and you find someone else with the same name and the same birth date and the same birthplace, but the other fields don't match, so address doesn't match, let's say not socials or driver's license numbers to match to, does your office conclude that that is the same person?

MS. LANG:  Objection, lack of foundation and speculation.

THE COURT:  Has that ever happened?

THE WITNESS:  Yes.

THE COURT:  Okay.  Overruled.

You may answer.

BY MR. LANGHOFER:

Q.  And if you have a three-point match, name, date of birth, and birthplace, does your office treat that as duplicate voter registration?

A.  As long as there's three data points, we would soft match and say that is a confirmed match.

Q.  And one of the three data points could be birthplace?

A.  It could be.

Q.  You mentioned earlier that there are sometimes, I think you mentioned a date of birth typo.  Does that happen in your practice, in your experience?

A.  It happens, yes.

Q.  Okay.  I want to turn now to pick up where we left off with with Mr. Whitaker showing you some provisions from DPN that relate to the use of birthplace.  And if I could share my screen, it may be helpful.  We are going to start on page 19 of Exhibit 6.

        THE CLERK:  Do you have it plugged in?  I'm sorry, it's not showing up.

        MR. LANGHOFER:  I do have it plugged in, I think that's someone else's computer.

        THE CLERK:  Yes, it was.  Let's give it a second.  It is showing no signal now.

        MR. LANGHOFER:  Perhaps if I unplug it and replug it?  Let's try that.  Tim, can you -- Mr. Horley may be able to help

out from his computer.  We will figure that out on the next break.  Exhibit number 6, page 19.  Plaintiffs' 6.

BY MR. LANGHOFER:

Q.  All right.  And I am sorry, so it is page 19 of the PDF, it is page 5 of the document.  All right.

MR. LANGHOFER:  Thank you, Mr. Horley.

BY MR. LANGHOFER

Q.  Ms. Petty, let me direct your attention to the U.S. passport section of this.  And you will notice that on the -- in the second paragraph there, why don't you read the second paragraph.

A.  Okay.

Q.  This 2019 EPM was written by the Secretary of State Katie Hobbs, correct?

A.  The 2019?

Q.  Yes.

A.  I don't believe so.

Q.  Katie Hobbs was elected in -- let's do some math here, '18, was she not?

A.  Maybe it was, I'm sorry.

Q.  In any event, the 2019 EPM predates these statues, of course?

A.  Yes.

Q.  And you have been following the EPM?

A.  Yes.

Q.   And here on page 5 of the document, it indicates a time to at least consider a place of birth or look at a page that has place of birth on it, correct?

A.   Yes.

Q.   If I were to submit a passport to show my citizenship but what I submitted was my daughter's passport, she does not have my name by the way, and you were to notice a discrepancy between what I report as my place of birth and what was on my passport as my place of birth, would your office do anything with that discrepancy?

        MS. LANG:  Objection.  Lack of foundation and speculation.

        THE COURT:  Overruled.  You may answer if that's something that has happened and your office did or didn't do anything with that information.

        THE WITNESS:  Can you restate the first part?

BY MR. LANGHOFER:

Q.   If I were to submit as my proof of citizenship a passport for someone else, it doesn't have my name, and the birthplace doesn't match up on the passport and on my voter registration form, what would your office do with that?

A.   I don't believe we would accept as DPOC.

Q.   I'm sorry.  I think you said, I just didn't hear it.

A.   We would not accept that.

Q.   Let's now look at page 61 of the PDF, page 47 of the

document, please.  And we are going to look here at the ballot by mail request form.  And I'll direct your attention to 3E.  Why don't you give that a read when you can.

A.  Okay.

Q.  Does your office also follow this guidance in how to use birthplace information?

A.  Yes.

Q.  Let's look at page 220.  It is actually page 206 of the document, but 220 of the PDF.  All right.  And where it says, provisional ballot board responsibilities, four lines up from that the line that begins with birth, why don't you read that sentence to yourself, please.

A.  Okay.

Q.  In confirming the validity of provisional ballots, does your office use birthplace information as directed here?

A.  Yes.

Q.  Okay.  You had said earlier that when someone submits a paper form, your office puts the information into the voter file exactly as it is written on the paper form.  If someone registers to through ServiceArizona, is there a handwritten paper form that goes with that?

A.  If they register in person at MVD, they will get a driver's license application which includes the opportunity to register to vote.  And then a customer service representative would enter that data into the online registration system.

136

Q.  What if a voter registers directly online through ServiceArizona, is there a handwritten form then?

A.  There is not.

Q.  So do you know how the voter then states his or her birthplace on the online form?

A.  I don't remember exactly, but I believe that there's just a text box if they wanted to include that, but I don't remember for sure.

Q.  Okay.  So you are not sure whether there's a text box or a pull-down menu?

A.  Right.

Q.  Okay.  Let's turn somewhat and talk about -- pivot somewhat and talk about voter registration drives.  You are familiar with what a voter registration drive is?

A.  Yes.

Q.  And your office receives voter registration forms gathered through drives?

A.  Yes.

Q.  Has your office noticed anything about the quality of the forms that are gathered through voter registration drives as opposed to voters showing up at MVD?

A.  Yes.

Q.  What are the differences?

A.  Sometimes there's suspicious forms or incomplete forms or forms that are illegible.

Q. When you say suspicious forms, what do you mean by that?

MS. LANG: Objection. I am not sure of the relevance of this line of inquiry.

THE COURT: Overruled. You don't have to be sure if I think it's relevant.

MS. LANG: Okay. Relevance.

BY MR. LANGHOFER:

Q. You can answer, Ms. Petty, if you know the answer.

A. On occasions we will receive registrations from large third-party voter registration drives that appear to have similar names to existing voters in the system; however, dates of birth will be different. Social Security numbers may be transposed, signatures will not match, addresses are somewhat off by either a couple of digits or entirely off.

Q. You notice anything about the handwriting consistency between those forms ostensibly for the same people?

A. It's hard to tell. Sometimes it looks like they are prefilled out by a different person and signed by another. Or the person that filled out the form doesn't match documentation of prior forms on the existing voter's record in the database.

Q. How many suspicious forms do you all get every election cycle?

A. We noticed an influx beginning in the 2022 election cycle, I would say we received thousands.

Q. I want to talk about the chart that Ms. Lang was using

earlier.  On the right-hand side of that chart, um, was talking about the Social Security Administration part of it.  As I understand it, there's a difference between confirming identity and confirming citizenship; am I getting that right?

A.  Correct.

Q.  And to confirm identity, you could have either a Social Security number or something like a utility bill?

A.  Correct.

Q.  If there was a green card holder with a Social Security number, they could use the SSN to -- the SSN4 to establish identity, right?

A.  Correct.

Q.  But you can't bootstrap that into citizenship?

A.  No.

Q.  So what kind of voter registration would they receive if they provide no other documentation -- if assuming someone actually, you know, submitted the forms and falsely stated that they were a citizen?

A.  If we do not get validated information back of noncitizen, we are going to take the voter at their signed affirmation that they are an eligible elector and they meet the requirements to register to vote.

Q.  And they would be registered as federal only?

A.  Correct.

Q.  What if someone didn't have a Social Security number, is

not a citizen, but did have a lease or utility bill, same answer?

A.   Same answer.

Q.   Okay.  Can we take a look at Exhibit 27, please?  What you are going to be seeing here is the state registration form.  And I want to talk about the mandatory fields on here, they're -- hopefully they're highlighted.  I think they're red but I am colorblind so let's just call them red for now.  It looks like the name, address, date of birth, the check boxes and the signature, those are the required parts of this field, right?

A.   It is not coming up here but, yes.

        THE CLERK:  Sorry.

        THE WITNESS:  Oh, there it is.  Yes, the item is highlighted in red required.

BY MR. LANGHOFER:

Q.   Okay.  So last four of your social, that's optional?

A.   Correct.

Q.   Driver's license number, same thing?

A.   Yes.

Q.   Tribal ID and A number or alien registration number, all optional?

A.   Yes.

Q.   If someone fills out the form with only the required fields and you run a HAVA check and you can match it with someone in

the MVD database, what happens then?  You know, if you've got a driver's license from the MVD database, what happens?

THE COURT:  Hold on a second.  Can you run it through the driver's license database without a driver's license number?

THE WITNESS:  We can run their name, date of birth, and potentially Social Security number to try to find a match.

THE COURT:  Do you have to have all three?

THE WITNESS:  It is better if have you all three, yes, but you don't have to have all three.

THE COURT:  So if we are talking about somebody who filled out only the mandatory portions of this form so that you wouldn't have their Social Security number or their driver's license, you would have their name and address, you would still run that?

THE WITNESS:  Yes, and date of birth.

THE COURT:  Oh, and date of birth because that's mandatory.

THE WITNESS:  We would still run that.

BY MR. LANGHOFER:

Q.  So if you run just the mandatory fields, because that's all they gave you, and you run it in the HAVA check through the MVD system, and you can find a match, so that there's a driver's license number in the ADOT system, what happens to that information from ADOT?

A.   So we would follow the Elections Procedures Manual and we would obtain and acquire that information on behalf of the voter for DPOC.

Q.   When you say you acquire, do you mean like importing it into your own system?

A.   Yes.

Q.   Okay.  So if there's a driver's license number in your system, do you know whether that came from the form or from MVD?

A.   Not first look.  We would have to go back to the voter registration form itself to see if it was handwritten.

Q.   Okay.  If a voter with an F type license files a form with you, and says they are a citizen, and you run that check through the -- you run the HAVA check, and it says that they are not a citizen, but the proposed registrant proves to you they are citizen, maybe they have got a naturalization certificate, do you update the information in this MVD system based on the naturalization certificate?

A.   We do not.

Q.   Okay.  The issue you mentioned earlier about expired driver's licenses being, you know, better if you use those, do you understand that to be part of this legislation or an issue that's existed for years?

A.   It is an issue that's existed.

Q.   You mentioned earlier that sometimes you've notice a delay

in the SAVE system from when someone is naturalized when it shows up in the SAVE system, what happens in those cases?

A.  We will set that registration aside and continue to within the coming days recheck the number.  It is increasingly important especially around election deadlines.

Q.  Do you do it more frequently around elections?

A.  Yes.

Q.  If -- what's happens if, let's say, shortly before an election, two days, I'm picking an arbitrary number, you are able to find proof of citizenship in the SAVE system, what do you do with that voter's registration?

A.  We would make them a full ballot voter.

Q.  For the election that's in two days in this case?

A.  Yes, because they are deemed registered as the day they submitted their form with the A number.

Q.  You had -- we talked about the criminal provisions that apply to members of staff for the county recorder's offices.  I almost feel silly asking this, but your office does not knowingly register people who are not qualified to vote, do they?

A.  We do not.

Q.  Do you knowingly refuse to check the citizenship information for people who are trying to vote?

A.  No, we do not.

Q.  I am sorry to ask.

You were also asked whether you know how these laws will be implemented.  Let's assume the laws go into effect and it is time to implement them, do you have legal counsel that advises the county recorder's office?

A.  We do.

Q.  Do you ask your legal counsel questions about how to implement statutes?

A.  We do.

Q.  The VRAC Voter Registration Advisory Committee meetings, you guys have the ability to raise issues there and get consensus on guidance and implementation?

A.  We do.

Q.  That hasn't happened yet, though?

A.  Not on these issues, no.

Q.  Okay.  You mentioned -- this is almost curiosity -- you mentioned a couple of folks who had submitted jury questionnaires saying they weren't citizens, and unlike most of the people that actually responded and said I'm not a citizen, you would cancel those, do you know whether they voted?

A.  Um, I don't know off the top of my head.

Q.  Okay.  Do you know how long they had been registered?

A.  Not specifically, no.

Q.  You'd also said that the jury questionnaires are one of the few ways that you actually get information about eligibility to vote post registration, the -- what would happen if in

processing a voter registration form or issuing a driver's license, there was an error by the clerk who was processing that for whatever reason, they are distracted, maybe something is difficult to read, they determine that someone is eligible to vote, but they are not.

Apart from the juror questionnaire, is there another process currently implemented in Arizona to go back through and identify noncitizens who were mistakenly registered to vote?

MS. LANG:  Objection.  Lack of foundation.

THE COURT:  Overruled.  You may answer.

THE WITNESS:  Um, it depends on the specific situation.  I would say if that happened, it would be identified at the MVD level and we would need to work closely with the Secretary of State's office and motor vehicle division to identify the issue and then find the impacted voters.

Q.  So you may be -- perhaps you have in mind like an error with the HAVA checks or the bad data in the system.  I am more thinking about human error.  The MVD system says they are not a citizen, and then for whatever reason, the clerk processing the voter registration form processes it unknowingly, this is accidental, in that sort of case, is there a system other than the voter questionnaires that would identify a noncitizen who is mistakenly registered?

A.  It would really need to probably come from the voter themselves if they get a voter ID card sent to them, as they

would when they get added to the rolls or an update, and if the voter receives a voter ID card and says I am not a U.S. Citizen, why did I get this, then we would be notified.

Q.  Has that ever happened?

A.  I can't recall that happening recently.

Q.  Okay.  When we were talking about documentary proof of residence, not citizenship, you had said that based on your experience, you think it would be harder for some people to provide the documentation, more for some people than others.

If one of the options for documentary proof of residence though were just a form that you fill out saying this is where I live, so you don't have to have a lease, you don't have to have a driver's license and so on, if that were an avenue, do you know of a population that would have a harder time filling out that form than another demographic?

A.  As long as the form was translated I would say into the languages that were required by each specific county, I think that would be easier.

Q.  Okay.

THE COURT:  You just raised something that is new for me, at least.  You mentioned that when you send things sometimes it can be English and Spanish.  Did different -- to your knowledge, did different counties have different languages that they use for notifications to voters?

THE WITNESS:  Yes, different counties do have

different language requirements based upon their population. I do believe that there are some Native American languages though that are not written, so -- but yes, there are different counties have different requirements.

THE COURT:  So this English Spanish is a Maricopa requirement that -- it is not a statewide -- they are the only languages requirement?

THE WITNESS:  No, so for example, Yavapai County isn't required to actually have their information translated in Spanish.

THE COURT:  Thank you.

MR. LANGHOFER:  So I view this as a legal question, so if I may, I will just put a little bit of color on this and we will come back to it in a briefing.  Section 203 of the Voting Rights Act controls this, and there's publications of the Federal Register saying which counties must do this.  And in fact, there's six counties in Arizona that must provide tribal language in translations, but it is a legal question.

THE COURT:  Interesting.  I didn't know that.

BY MR. LANGHOFER:

Q.  You had said that in order to get -- what I think is called a real ID, one of those driver's licenses with the star on it, you have got to prove citizenship.  And also to get a driver's license you need to prove citizenship after 1996.  You don't work for ADOT, right?

A.  I do not.

Q.  Have you ever been in charge of issuing these sorts of credentials?

A.  I have not.

Q.  So if someone from ADOT testified that actually you just need to prove lawful presence and not citizenship, would you have any basis for thinking that's wrong?

THE COURT:  To do what?  Do get a real ID, to get a --

MR. LANGHOFER:  A real ID or a driver's license or a state issued photo ID since 1996.  The only requirement is that you are lawfully present, not that you are a citizen.  We will prove that with someone else, Your Honor.  There's also -- I think it is primarily a question of law actually.

THE COURT:  I am just trying to remember when I got my real ID driver's license, I thought I had to show them my passport.

MR. LANGHOFER:  That would be correct for a real ID, this is a federal law, you have to prove lawful presence and passport would be that with spades.

BY MR. LANGHOFER:

Q.  All right.  I have now some tedious questions.  We have a number of exhibits for which we need foundation.  There were foundation objections that have not been waived, and so I want to show you some documents and just get through the foundational part.

Let's start with Document 751.

THE COURT:  How many are there?

MR. LANGHOFER:  I am afraid there are 10 or so, and we have tried to spare you this, Your Honor, but.

THE COURT:  Well, unless there's some -- I would really like to know what the objections are before you go through 10 documents and lay foundation for them if there's really no genuine concern about their foundation.  So what are the documents that you were just going to tediously go through with Ms. Petty?

MR. LANGHOFER:  Yes, Your Honor.  Exhibit 751, 769 through 775.  And then 932, 933, and 934 all of which were produced by Maricopa County and Bates numbered and provided to all the parties previously.

MS. LANG:  Your Honor, there's a number of objections to these exhibits beyond foundation.  And it was my understanding that the Court was interested in kind of taking exhibits one by one as they are being introduced.

THE COURT:  But not just for foundation.  I mean, that's just -- it just doesn't make any sense if you -- unless you have some genuine dispute about the foundation for the document.

MR. LANGHOFER:  I appreciate --

THE COURT:  If it is a different objection, that's fine.  But I don't want to have Mr. Langhofer, the witness, and

me spend the next 30 minutes going -- having her lay foundation for documents, and then have the plaintiffs' counsel satisfied that foundation has been laid when there really wasn't any genuine concern about it to begin with, particularly if they were documents produced by the plaintiffs.

MR. LANGHOFER:  And, Your Honor, I think you have anticipated where we are going with this.  I appreciate there's arguably hearsay objections, there's a relevance concern on their part.  We can take care of all of that later.  What I want to do with witness, so she can go home, is make sure we have got foundation, and that's it.

THE COURT:  Well, so that's going to be my question with respect to these exhibits, is there any genuine objection just to their foundation?  And if so, those are the ones we will have Ms. Petty go through before she's excused.

MS. LANG:  Can we repeat the numbers again?

THE COURT:  751, 769 through 775, 932, 933, and 934.

MS. LANG:  As to 751, no.  For 769, 775 -- let me review.  No.  I think that's the case for all of 770 to 775.

THE COURT:  And 932 through 934 apparently are three years' worth of Maricopa County juror noncitizen reports.

MS. LANG:  Yes, I don't think there are any foundation objections there either, Your Honor.  So to the extent that you're satisfied that we will handle the objections piecemeal, um, that's -- we will withdraw any foundation specific

objections to those items because we agree that those are materials that were provided by Maricopa County in this litigation.

THE COURT:  Thank you.

BY MR. LANGHOFER:

Q.  There are just two of these documents I actually want to show you.  Let's start with 769.

MR. LANGHOFER:  And, you know, the 773, she's already seen and testified about, there's apparently no foundation concern.  She testified about it with Mr. -- with Josh.

And so I would move 773 into evidence.

THE COURT:  Oh, those are the -- are they both of the form -- the two form letters that we looked at earlier that are the templates for information to send to voters?

MR. LANGHOFER:  773 was the second of the two letters that we saw.  The first one is on the plaintiffs' list, so I will let them read that.

THE COURT:  Is there an objection to 773?

MS. LANG:  No, Your Honor.

THE COURT:  773 is admitted.

(Exhibit Number 773 is admitted.)

BY MR. LANGHOFER:

Q.  All right.  Let's look at 769.  All right.  What is this document, ma'am?

A.  This is statistics about the number of records on suspense

in our system and the reason for being on suspense.

Q.   And you all prepared this in connection with this case; is that right?

A.   That's correct.

Q.   Did you participate in collecting this data?

A.   No.

Q.   Okay.  Were you familiar with it though from your previous testimony?

A.   Yes.

Q.   Let's look at this last line here, noncitizen confirmed, what does that mean?

A.   That means that we have some indication that the person that submitted the application came up as a noncitizen.

Q.   Okay.  It says confirmed.  Why does it say confirmed?

A.   I think that's just the terminology that was used.  It came back as a confirmation of noncitizen.

Q.   So for --

        THE COURT:  This number looks familiar, maybe it is just similar.  Didn't I see a document this morning?

        MR. LANGHOFER:  Perhaps Your Honor saw the federal-only list in Maricopa County portion that's about 11,000, but.

        THE COURT:  Okay.  Thank you.  The number was very similar.  Thank you very much.

BY MR. LANGHOFER:

Q.   Ma'am, the federal-only list and the suspense list, are those the same thing?

A.   No.

Q.   Okay.  Can suspense voters vote in federal or state elections?

A.   No.

Q.   Okay.  So what is the suspense list?

A.   The suspense list is for applications and voters that are on hold because of some kind of deficiency with their voter registration form or that we've received information that they are a noncitizen.

Q.   And that includes concerns about whether they are in fact U.S. nationals?

A.   I'm sorry?

Q.   It includes questions about citizenship?

A.   Yes.

Q.   So if someone with an F type license applies to register to vote, HAVA says looks like they may not be a citizen, you send them a letter, and they don't respond, what happens to that person?

A.   They stay in suspense.

Q.   And would they be captured by this last line here, the 11,730?

A.   Yes.

153

Q.  All right.

MR. LANGHOFER:  Your Honor, I move Exhibit 769 into evidence.

MR. DODGE:  We would object as hearsay, Your Honor. This is an out-of-court statement from a defendant, offered by a defendant in support of the truth of the matter asserted on the face of the document.

THE COURT:  Um, hold on a second.  Did you provide the underlying data?  Was that -- I just wanted to know if this was a summary of voluminous documents that the underlying data was available to the plaintiffs to check the compilation.

MR. LANGHOFER:  I will ask, Your Honor.

BY MR. LANGHOFER:

Q.  Ms. Petty, how did your office go about compiling these numbers?

A.  We made a query request with our IT division, who pulled the data, and then we summarized it in this document.

Q.  Okay.  How large is the database they were querying?

A.  Over four million records.

Q.  Which side of the litigation, you know, their side or our side, asked you for these numbers?

A.  I actually don't know.

Q.  Okay.

MR. LANGHOFER:  Does that answer your questions, Your Honor?

MR. DODGE:  Your Honor, we, to the best of my knowledge, did not have the underlying data.  And so this -- we haven't had the ability to review the data that underlies this out-of-court statement that Mr. Langhofer is proffering for the truth.

MR. LANGHOFER:  So this is a response -- as you will see at the top -- this is response to a request for production provided as a legal obligation.

THE COURT:  Whose request was it?

MR. LANGHOFER:  It was the plaintiffs' request.

THE COURT:  So the plaintiff made a request for production to the county recorder asking for this information.  And in response, the county recorder queried their system of 4 million names and came up with this answer for them rather than producing the documents?

MR. LANGHOFER:  That's right, Your Honor.

THE COURT:  Did you want the documents instead that -- from -- so that you could count them up?

MR. DODGE:  I admittedly don't recall at the top of my head if our request incorporated a request for these underlying materials.

MR. LANGHOFER:  If I may, I think we all have the suspense list, not just for Maricopa County but for the entire state, and in fact, I think they are marked as exhibits.

THE COURT:  What?

MR. LANGHOFER:  Well, we will not walk you through them, I promise -- actually there is -- there is a contingency, but let's just never do that.

MR. DODGE:  My understanding, Your Honor, is that we do have suspense list data for counties not including Maricopa because Maricopa is not on the state-wide database.  It has its own database, and so Maricopa is actually a county where we do not have suspense data.

THE COURT:  And are you going to present summary suspense data from the 13 counties that are on the state-wide database?  I think I said 13 because I think Ms. Petty said that there are two counties that do their own.

Let's just get some rules down here.  When there's an objection, one person is going to address it.  We are not -- I know there's lots of lawyers here with lots of information, but I am not going to hear it from multiple lawyers on a single subject.  So, let's just make this easy.  The objection is overruled.  769 is admitted.

(Exhibit Number 769 is admitted.)

MR. LANGHOFER:  May I have one moment, Your Honor?

BY MR. LANGHOFER:

Q.  You had said on direct that birthplace information is not determinative of citizenship.

MR. LANGHOFER:  You know what, Your Honor, I think this is a legal issue.  I will not take your time with this.

Thank you.

THE COURT:  Thank you.  Any other cross-examination of this witness?

MS. PORTER:  No, Your Honor.

THE COURT:  Redirect.

MS. LANG:  If the defendants would be so kind to pull back up Exhibit 769 that we just had up on the screen.  Thank you.

REDIRECT EXAMINATION

BY MS. LANG:

Q.  So we just discussed this document, Ms. Petty.  I just wanted to clarify one thing.  So there's this language below that says noncitizen confirmed.  And I think you testified that that's kind of a term of art that your office uses; is that correct?

A.  It means that we have a confirmation that -- noncitizen for that particular person.

Q.  And that confirmation would have come from MVD?

A.  Yes.

Q.  Okay.  So -- and to be quite precise, what that means is that MVD confirmed that their data indicates that the person was not a citizen at the time that they interacted with MVD; is that right?

A.  Correct.

Q.  Okay.  But you testified earlier that many of the folks who

are put in the suspense category for noncitizen confirmed in fact come in and provide their documentary proof of citizenship, correct?

A. Correct.

Q. And that happens quite frequently?

A. It does.

Q. And that's because those individuals have naturalized after they interacted with MVD; is that correct?

A. Yes.

Q. So it would not be your testimony that this category of noncitizen confirmed people means necessarily that all those individuals are not citizens?

A. Correct.

Q. Okay. Along those lines, earlier when you were speaking to Mr. Whitaker, you testified that you consider ADOT data to be reliable; do you remember that?

A. Yes.

Q. Okay. By that, do you mean that the data check is reliable in that that system of checking will reliably provide you with the data that ADOT received from the voter at the time of their transaction?

A. Yes.

Q. But you are not testifying here today as to whether that data from MVD is current as to any individual voter citizenship status, correct?

A.  Correct.

Q.  And as we have established, your experience shows that many of those voters are in fact citizens and can provide their documentary proof of citizenship, correct?

A.  Yes.

Q.  Okay.

THE COURT:  So when you do your check with MVD, do you also get nonmatches if the address on the voter application doesn't match the address on the driver's license?

THE WITNESS:  Yes, we do.

THE COURT:  What do you do then, anything?

THE WITNESS:  We take what information the voter has provided on their voter registration form to be the address they want to register at, and so we are solely using MVD data for citizenship and potentially identification through SSA.

THE COURT:  Thank you.

MS. LANG:  And if we could pull up Plaintiffs' Exhibit 1, page 5.

BY MS. LANG:

Q.  And this is HB2492.  I know you're becoming very familiar again with it.  If we could look at Subsection E.  Mr. Whitaker asked you some questions about this.  Um, and in particular he pointed you to the second sentence that starts on line 14 that says if the county recorder or other officer in charge of elections matches the applicant with information that the

applicant is not a citizen, the county recorder or other officer in charge of elections shall reject the application; do you see that here?

A.   Yes.

Q.   When you receive information from MVD, for example, that someone is not a citizen, do you reject that application?

A.   No.

Q.   And can you review for the Court again what you do with that application?

THE COURT:   You know, when you put the word "again" in the question, it automatically means that you are asking her to repeat something she already said.

MS. LANG:   Okay.   I will withdraw that.

BY MS. LANG:

Q.   Your current practice is to put someone in suspense and give them a notice and give them a period of time to cure the lack of documentary proof of citizenship, correct?

A.   Correct.

Q.   Do you see anything in Subsection E that provides for a cure period before an application is rejected?

A.   No.

Q.   Is it your current practice to reject any voter registration application outright upon receipt of it?

A.   No.

Q.   So this would be a change to your practice; is that

correct?

A.   Yes.

Q.   There's been a lot of discussion today about the fact that some provisions of these laws have not yet been implemented. Is that because the county's and the Secretary of State are waiting for the legality of those provisions to be determined by this Court?

A.   That's my understanding.

Q.   And is it your understanding that upon that determination, your office will implement all provisions that are held to be lawful?

A.   Yes.

Q.   And it is your obligation to implement all provisions that are held to be lawful; is that right?

A.   Correct.

Q.   Mr. Langhofer asked you some questions about what if a noncitizen sought to register to vote and became a federal-only voter and proved their ID through the SSA system; do you recall that?

A.   Yes.

Q.   Are you aware of any noncitizens that have successfully registered and voted on the federal-only list?

A.   No.

Q.   There was also a question about what would happen if there was some sort of human error in your office in implementing the

MVD check; do you recall that?

A.   Yes.

Q.   When the MVD check is done for citizenship status, is that automated in the system?  Let me rephrase.

So you send up an MVD HAVA check on a voter, and MVD confirms that that person has proven citizenship, does that require any kind of manual activity by your office to record this person as a citizen or is that automatically filled in the system by the computer?

A.   For hard matches it would be an automatic thing.

Q.   Okay.  And once the soft match is confirmed, would the citizenship information be automatically filled?

A.   I believe that would be a manual thing for the person to determine the match.

Q.   Mr. Langhofer also mentioned the potential for an option where someone who didn't have documentary proof of residence could sign a form declaring their residence; do you recall that?

A.   Yes.

Q.   Are you aware of any such sample declaration that currently exists?

A.   I am not.

Q.   Has there been any guidance from the Secretary of State's office that you should accept such a declaration as documentary proof of residence?

A.  No.

Q.  There was some discussion about the language requirements in Arizona.  Other than Spanish and Native languages in some counties, are you aware of any other languages that counties are required to provide notices in?

MR. LANGHOFER:  Calls for legal conclusion.

THE COURT:  Overruled.

You may answer if you are aware.

THE WITNESS:  I don't know "required," but we do provide Braille ballots in some instances.

MS. LANG:  That's a good flag.

BY MS. LANG:

Q.  Other than Braille, Native, and English and Spanish, are you aware of any requirement that Arizona -- any Arizona county provide materials in any other language?

A.  No.

Q.  There was a hypothetical discussed by Mr. Langhofer about if a passport that was submitted as documentary proof of citizenship didn't match the voter registration records, whether or not that DPOC would be accepted; do you recall that?

A.  Yes.

Q.  If the only thing that didn't match was birthplace, would that cause you to reject the DPOC?

A.  No.

Q.  Okay.  And alternatively, if the birthplace matched but

other important information like name or date of birth didn't match, would that cause you to reject the documentary proof of citizenship?

THE COURT:  Let's not use reject.  Let's put the registration in the suspension.

MS. LANG:  Yes.

THE WITNESS:  I'm sorry, what was -- if only the place of birth matched?

BY MS. LANG:

Q.  So that was my first question.  And then my second question is, if the birthplace did match but other important information like name or date of birth did not match, would that cause you to not accept that document as documentary proof of citizenship?

A.  We would not accept it as DPOC.

Q.  Okay.  So is birthplace ever going to be the determinative factor in whether or not you accept a form as documentary proof of citizenship?

A.  Not in my experience, no.

Q.  Okay.

MS. LANG:  If we could pull up Plaintiffs' Exhibit 6 which is the 2019 Elections Procedures Manual.  And I think it is page 36.  I think -- yeah, sorry.  All right.

BY MS. LANG:

Q.  This was discussed, the juror disclosure of noncitizenship

section was discussed with you with Mr. Whitaker; do you recall that?

A.  Yes.

Q.  And I just wanted to make sure the record was clear because I found it a little confusing.  Number one here means that you confirm in your own records whether or not DPOC is already in your records; is that right?

A.  Correct.

Q.  That doesn't mean that you can go out and confirm documentary proof of citizenship with that individual if they don't -- if it's not already in your possession?

A.  Correct.

        THE COURT:  So do you do anything though?  I mean, do you try to -- do you send a letter saying, you gave us documentary proof of citizenship but here you swore you weren't a citizen, can you clear this up for us?

        THE WITNESS:  We do not.  In my prior experience in Yavapai County years ago, we had tried to reach out to them and the response was, I just wanted to get out of jury duty.

        THE COURT:  Okay.  So you -- since you have been in Maricopa County, if you have this discrepancy but have satisfactory proof of citizenship, you accept that rather than what they said on their juror questionnaire?

        THE WITNESS:  That is correct.

        THE COURT:  Thank you.

JANINE PETTY - REDIRECT EXAMINATION

MS. LANG:  If we could look at Elections Procedure Manual so Plaintiffs' Exhibit 6, 47.  And we'll want to go all the way to 47, sorry.

BY MS. LANG:

Q.  Mr. Langhofer discussed this section about the ballot by mail request form; is that right?

A.  Yes.

Q.  Okay.  And there is a place here that says that the form should have place of birth on it as a field; is that correct, under 3E?

A.  Or other piece of information, yes.

Q.  Yes.  And if you could -- if we could pull down the --

This section discusses only what has to be on the request form itself, like the spaces that have to be on the request form, correct?

A.  Correct.

Q.  But nothing -- it is not a requirement that a ballot by mail request form have place of birth on it; is that correct?

A.  The -- you mean that needs to be filled out?

Q.  Needs to be filled out, yes.  It is not a requirement that a voter fill out place of birth for their ballot by mail request form; is that correct?

A.  Correct.

Q.  And there was a hypothetical from Mr. Langhofer about how you might use birthplace as a way to determine whether or not

there's a duplicate record for a voter; is that correct?

A. Yes.

Q. In that circumstance, you wouldn't be using birthplace to determine that voter's eligibility to vote; is that correct?

A. Correct.

Q. You would just be determining whether or not the records are duplicates that should be merged; is that correct?

A. Yes.

Q. Okay.

MS. LANG: And I would like to go to Elections Procedure Manual page 206, and I do apologize that I don't have the PDF numbers. 206. So one more. I see it now.

BY MS. LANG:

Q. And do you see this paragraph right before provisional ballot board responsibilities that starts with the county recorder?

A. Yes.

Q. And here, there's a discussion of using place of birth. Is this discussion similar to the use of place of birth that was discussed with Judge Bolton earlier where you would use it kind of like a security question to determine whether or not the person calling is the provisional ballot voter in question?

A. It would be -- yes, an item to help confirm it's the same voter.

Q. And even in that circumstance, there's a number of options

that could be used as that kind of security identification, correct?

A.  Correct.

MS. LANG:  If we could pull up Plaintiffs' Exhibit 85.

BY MS. LANG:

Q.  This is a sample letter that Mr. Langhofer discussed with you.  Do you recall that?

A.  Yes.

Q.  Okay.  And there's a section that says, to help us uniquely identify your registration, please complete the following information.  And one of the fields is place of birth; is that correct?

A.  Yes.

Q.  Other options here are occupation or --

THE COURT:  Okay.  Let's not read the form.  Just ask a question.

MS. LANG:  Fair enough.

BY MS. LANG:

Q.  If someone does not fill out place of birth, does that mean you can't accept this response from a voter?

A.  No.

Q.  And does any of that go to the eligibility of the voter or just to once again, kind of securely identify the voter?

A.  Just identify the voter.

Q.  Okay.

MS. LANG:  And can we look at Defendants' Exhibit 773, Mr. Horley, if you wouldn't mind.  Thank you.

BY MS. LANG:

Q.  So similarly, this is another sample notice that your office uses; is that right?

A.  Yes.

Q.  And if a voter doesn't fill out place of birth, does that mean you couldn't accept this form from that voter?

A.  No.

Q.  And is it used to determine the voter's eligibility or to identify the voter?

A.  To identify the voter.

MS. LANG:  And if we could go back to Plaintiffs' Exhibit 6, the Election Procedure Manual.  And we will go to page 34 of the manual.

BY MS. LANG:

Q.  And do you recall talking to Mr. Langhofer about the kind of deceased registrant's check that your office does following the EPM?

A.  Did we talk about deceased?  I don't remember.

Q.  Fair enough.  There's been a lot of questions.  So this section talks about how you go about kind of finding folks who are deceased; is that correct?

A.  Yes.

Q.  And there's a discussion -- so place of birth is one of the

fields that could be used in matching information; is that right?

A. Yes.

Q. It is not a required field for matching, is it?

A. No.

Q. Okay. Is your office able to identify deceased voters and remove them from the rolls even absent place of birth information?

A. Yes.

Q. Okay.

MS. LANG: If we could go to page 4 of this exhibit.

BY MS. LANG:

Q. And so I think Mr. Whitaker maybe talked to you about this page about birth certificate. And we are talking about the section that starts on page 4 and goes to page 5 about birth certificate.

And I just want to be really clear about the circumstance in which this section would apply. This second paragraph. Am I right to say that this kind of issue only arises if one, someone is relying on a birth certificate as their documentary proof of citizenship instead of saying MVD data, and two, their name has been changed and is not the same as on the birth certificate; is that right?

A. Yes.

Q. Okay. And in those circumstances, there are five criteria

that you are asked to match here; is that correct?

A.   Yes.

Q.   And not all of them have to match; is that right?

A.   Correct.

Q.   All right.  And so if you don't have place of birth information, can you still follow the directions in the Elections Procedures Manual?

A.   Yes.

Q.   All right.  Sitting here today, if the birthplace requirement becomes mandatory -- if the birthplace field becomes mandatory, does your office have any current plans to change the kind of functional way in which you use birthplace information?

        MR. LANGHOFER:  Asked and answered, Your Honor.

        THE COURT:  Overruled.  You may answer.

        THE WITNESS:  We have vaguely discussed it but we don't have specific plans yet.

BY MS. LANG:

Q.   Okay.  Have you discussed ways in which the birthplace information would become more useful to your office?

A.   No.

Q.   Okay.  Are you aware of any ways in which birthplace would become more useful to your office?

A.   If it becomes required, then we will follow the law.  I -- it would be useful to that extent that it is required.

Q.   Okay.  But in no other way to your election administration functions?

A.   Well, again, having that information is helpful.

Q.   Okay.  Mr. Langhofer mentioned to you or discussed with you that as an election approaches, you might check the SAVE system several times as an election approaches to see if a person's citizenship status has changed; is that correct?

A.   Yes.

Q.   Okay.

MS. LANG:  Let's pull up Plaintiffs' Exhibit 1, which is the HB2492.  And if we could kind of scroll forward, I am not sure -- keep going.  Stop there.

BY MS. LANG:

Q.   We discussed somewhat at length the section that requires you to look at -- let's take that down.  Sorry.

And if you look at number 3 at the top of that page that requires you to look at the SAVE system if practicable. And if maybe we could go back to the page right before this. What it is requiring you to do there is when you get a form without documentary proof of citizenship to check it against the SAVE system; is that right?

A.   Yes.

Q.   Okay.  And if we could pull down these call outs.  And then if we look at Subsection E, it says that if there's a match, then -- with the information that the applicant is not a United

States citizen, you shall reject the application; is that right?

A.   Yes.

Q.   Okay.  So this would not permit you to kind of do that kind of wait and see and then go recheck; is that right?

          MR. LANGHOFER:  Calls for legal conclusion.

          THE COURT:  Sustained.

          MS. LANG:  Okay.

BY MS. LANG:

Q.   Is there anything -- I will take it back.

          For individuals who provide an A number or an immigration number, is that inputted into the database and retained, that A number?

A.   Yes.

Q.   Okay.

          THE COURT:  So if you don't get an immigration number but you run the person through SAVE anyway and it comes back that they have been naturalized, do you then update your record with their number?

          THE WITNESS:  We can only run them through SAVE if they provide us with an A number.

          THE COURT:  Oh, okay.  Thank you.  I was thinking of running through DMV without a driver's license number.  SAVE, you can only run it if you have the number.  Thank you.

          THE WITNESS:  Correct.

MS. LANG:  I have no further questions for this witness.  Thank you.

THE COURT:  Thank you.  May this witness be excused?

MS. LANG:  I hope so.

MR. LANGHOFER:  There is something I should say just procedurally.  We had discussed with the plaintiffs the hopes of not recalling witnesses like Ms. Petty.  And so I think some of our questions were outside of their scope and so they were sort of crossing on our direct in a way taking her out of order so that we don't have to call her back, if that makes sense.

And so there may be instances where we want to sort of redirect a witness that they called.  I hope that makes sense.

THE COURT:  It does make sense what you want to do but I don't permit that to be done.  If you have such a witness that you would otherwise have called in your case in chief, I want you to cover that on your examination of the witness because I do not restrict cross-examination to the scope of direct for that very reason, and also to avoid any recross or reredirect if that makes sense.

MR. LANGHOFER:  I think I understand.

THE COURT:  So I want there to be one round of direct, one round of cross, and a very short redirect for only things that came up on cross that were new.  I don't want -- see because if you ask her questions now, then Ms. Lang gets to ask her more questions, and theoretically you get to redirect that.

MR. LANGHOFER:  I understand.  Thank you.

THE COURT:  Okay.  So I am not going to excuse her -- or I don't know if she is under subpoena or not.  She may be.

MS. LANG:  She is.

THE COURT:  She may be subject to recall, but I am going to let her go now.  You can go back to work, you can go home, you can do whatever you want to do.  Go have a drink, I mean, whatever you need to do to relax from this experience.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  Thank you.

MS. LANG:  I did want to flag one issue for Your Honor, which is that we have four more witnesses planned -- had four more witnesses planned for today, plaintiffs' representatives.  One of them fell ill and is not available.  And then the next witness is the Secretary of State who is a representative who is prepared for tomorrow.  I don't think that -- I think we will probably run through with the remaining three, but I did want to flag for you that I suppose there's some possibility that we will get to like 4:30 p.m. and be out of witnesses for the day based on Chairman Rambler's illness.

THE COURT:  No problem if we have to recess early, but don't expect to get the half hour back.

MS. LANG:  Thank you, Your Honor.  I understand.

MS. MOTZKIN:  Leah Motzkin for the plaintiffs calling Joe Garcia.

**JOSEPH GARCIA, PLAINTIFFS' WITNESS, SWORN**

THE CLERK:  State your name and spell your last name for the record.

THE WITNESS:  Joseph Garcia, G-A-R-C-I-A.

THE CLERK:  You can go ahead and have a seat right up there.

THE COURT:  You may proceed.

DIRECT EXAMINATION

BY MS. MOTZKIN:

Q.  Please state your full name.

A.  Joseph Garcia.

Q.  Where do you live, Mr. Garcia?

A.  I live in Gilbert, Arizona.

Q.  And where do you currently work?

A.  I work at Chicanos Por La Causa.

Q.  What are your current roles at Chicanos Por La Causa?

A.  I'm vice president of public policy at Chicanos Por La Causa which is a 501(c)(3) nonprofit community development organization.  And I am also executive director of Chicanos Por La Causa Action Fund, which is a 501(c)(4) advocacy nonprofit.

Q.  How long have you been in your current roles?

A.  I've worked at CPLC four years now.

Q.  Could you tell me about what led you to Chicanos Por La Causa?

A.  Yes, previously I was at Arizona State University Morrison

Institute for Public Policy.  I had an opportunity at Chicanos Por La Causa, they wanted to launch a 501(c)(4) advocacy organization to support the C3 mission.  So I had a -- since I have a master's degree in nonprofit leadership and studies, I took the job.

Q.   And what other jobs have you had?

A.   Previously to the ten years I was at ASU, I also have taught journalism at ASU Cronkite School of Journalism and previously I was at the Arizona Republic, have an extensive career, 35 years as a daily print journalist prior to joining ASU.

Q.   We are going to switch gears and talk about the organizations you have worked for.  Can you tell me about the mission of Chicanos Por La Causa?

A.   Yeah, the mission is pretty simple.  It is empowered lives. And what that means is there some very key issues that we look at.  We look at affordable housing, education, health and human services, community development, work force development.  But also advocacy, trying to get more Latinos engaged in the political process and also as an electorate.

Q.   When was Chicanos Por La Causa founded?

A.   Chicanos Por La Causa was founded in 1969.  It was part of the larger Chicano movement with Cesar Chavez and Delores Huerta.  Here in Phoenix in 1969, it was launched as part of a student protest in inequities and discrimination that was

taking place in our public schools.

At the time Latino kids were being discouraged from pursuing higher education, such as college, university. And they were pretty much being pushed towards manual labor menial jobs, trades, and so forth. And so there were walkouts. And out of that grew Chicanos Por La Causa.

Q. What is the relationship between Chicanos Por La Causa and the Action Fund?

A. Yeah, the Chicanos Por La Causa, the larger, much larger institution has about 1800 employees over five states largely delivering programs and services, everything from early childhood development all the way to senior housing.

And in between there's lots of different programs and services including helping people with domestic violence and AIDS, HIV, substance abuse. We try to build a lot of affordable housing, provide housing for others, utility assistance, the list goes on.

On the other side, the 501(c)(4), which is CPLC Action Fund, it is to support the mission of CPLC, although it is a separate entity. It is a separate board. But it is to support that mission of empowered lives but through a much more active advocacy role which is permissible under law for a 501(c)(4).

Q. Is Chicanos Por La Causa and the Action Fund commonly referred to as CPLC?

A. Yeah, I think CPLC since it is pretty much the same logo,

JOSEPH GARCIA - DIRECT EXAMINATION                178

different colors, a little bit different name, but yes, people recognize us just as CPLC.

THE COURT:  You will be relieved to hear I do too.  I know CPLC, it is a set of letters I have been hearing about for decades, so we don't have to keep saying Chicanos Por La Causa.

MS. MOTZKIN:  Thank you.

BY MS. MOTZKIN:

Q.  You have previewed some, but what other issues does CPLC focus on?

A.  Well, CPLC is very much active in building a stronger participation among Latinos and other marginalized communities in the voting process.  Presently, and historically, Latinos have not voted in the same numbers and percentages as non-Latinos have.

And we believe in order to have a voice in our democracy, you have to vote.  And so we have been very active in engaging Latinos to register to vote and then also to make sure that they do vote.

Q.  Where does CPLC operate in Arizona?

A.  CPLC operates statewide in all of the major cities and beyond, here in the Phoenix area, the Tucson area, the Yuma area.  We have offices in Flagstaff and elsewhere, so it is a pretty large footprint here in Arizona.

Q.  And who does CPLC serve?

A.  We serve marginalized communities.  And the reason I say

that is, even though our name is Chicanos Por La Causa, more than a third of our clients are non-Latinos. They are just people that need help maybe through education or assistance or workforce development. We help people in need. So we are very inclusive and not an exclusive organization.

Q. What activities does CPLC engage in related to voting?

A. In voting, we have always had our hand in registering people to vote. But in this last election or the midterm, we decided to really see if we could move the needle.

And so there was an investment by our Board of Directors for a 10 million dollar commitment for a Get Out The Vote effort. We called it Latino Loud. That was the theme.

But the idea was to target low propensity voters, those are voters who haven't voted before or they haven't voted in a very long time, missing one or two election cycles, to get them engaged, get them registered if they weren't, but get them engaged if they weren't engaged, and to vote.

And so we were looking to change voting behavior. So we were looking for generational change. We were looking for a permanent change, and not just for an election cycle, but to get more people to vote and hopefully that their kids and relatives also vote.

Q. Why does CPLC engage in this work?

A. I am sorry?

Q. Why does CPLC engage in this work?

A.  Well, as I said, the message that we have is your vote is your voice and vice versa.  And to truly have a voice in democracy, you have to participate in democracy.  And to have better public policy, you know, that voice matters at the ballot box.  So it was a matter of getting more Latinos to participate and understand that issues that are important to the Latino community and other marginalized communities are reflective in how people vote.  And so we wanted more people to be engaged and activated in our election system.

Q.  What's involved with mobilizing low propensity voters?

A.  Low propensity voters are the most difficult voters to reach for various reasons.  They either haven't been turned on to voting or they have been turned off by voting.  So they're -- we did everything from canvassing neighborhoods.  We had statewide mailers, about 3 million mailers were sent out. We did -- in addition to canvassing, we did voter registration drives at events.  We managed to register 37,000 additional new voters.

We did a lot of digital messaging because younger Latinos, and the median age for Latinos is 26, so it is a younger population, so we need to reach them digitally.  We did that.  We did billboards, we did -- you know, every way we could to engage them several times, many times because that's what it takes to get them to vote.  And we thought we were pretty successful.  More than 400,000 Latinos voted in the

midterm election.  And that was an increase of about 60,000 additional Latino voters.  Many of them were low propensity voters, so we were very pleased with the outcome and the efforts that we were able to participate in and contribute to.

Q.  You mentioned registering 37,000 voters.  How do you know the registration is attributed to CPLC?

A.  Yeah, we used vendors for many of our efforts, but these were people that we actually have them as signing up through voter registration forms and also through a dedicated URL through the Arizona Secretary of State's office where you do register with the Secretary of State office but it is recognized as it went through CPLC.  We will be doing the same in the upcoming election.

Q.  You mentioned the Latino Loud campaign.  Does that cover both your registration and mobilization effort?

A.  Yes, it covers both -- both of those, yes.

Q.  Can you describe it a little further?

A.  The mobilization?

Q.  The campaign, the Latino Loud campaign.

A.  Yeah, Latino Loud.  We called it Latino Loud because it resonated with younger voters.  As I mentioned, a very young population are Latinos.  So we had a lot of billboards and signs and T-shirts, and we even had some T-shirts for kids that had the Latino Loud logo on it, and on top of it, it said future voter.  We really are playing the long game when it

comes to registering more Latinos if we can.

Q.   Does CPLC do voter education?

A.   We do voter education in the most basic sense in that if you haven't voted before it's -- there's an intimidation factor where if you open the ballot for the first time, it looks like a tax form.  People don't know how to fill that out.  They don't realize that you don't have to answer every question on there.  They don't understand how you mail it in, that there are deadlines to mail it in, that you have to sign the envelope, you have to date the envelope, you put your phone number on there.  Why do you put your phone number on there?  It is so if there's any discrepancies between signatures, whatever for validation, they can call you to make sure that this is your vote.

It isn't way to find out information about you or your community or perhaps your family.  Many Latino families there are three generations living in the same household.  Sometimes within that household, there are people without documentation, and it's mixed status families.

It could be an older brother or sister who came here as a Dreamer, but the younger brothers and sisters were born here.  So there's a mixed status family.  And there's some doubts about giving away a lot of personal information.  So we have to explain that.  Part of it is people trust CPLC because we have been in the communities so long and we have dealt

with so many -- much of our community, so they trust us to know that the information we are trying to get and convey is legal information for voter registration purposes.

Q.   Going back to the Latino Loud campaign quickly, does that campaign currently exist in any other state?

A.   No, no, it was exclusively in Arizona in the last midterm. We are looking forward that we would like to play a part in Nevada where we also have operations, but as it stands now, it is Arizona.

Q.   What are some of your targets for the upcoming election cycle?

A.   Our targets are similar because we know that we are going to have to reengage the community and tell the importance of voting to make sure that people follow through on their votes. We know that only about 50 percent of the people that register do vote.  So we have to go after these individuals again.  So it is a matter of always, you know, reaching out to the populations.

We know some people we reached and they didn't register to vote, so we have go after them this time to register to vote.  But we had a pretty successful campaign in terms of the Latino community seeing what the difference the Latino vote can have in terms of voter turnout, so we were very pleased with that.  We just need to replicate it, but it is going to take just as much effort and expense.

Q.  And you mentioned a few examples already, but how do you identify people to vote -- I am sorry -- to register?

A.  How do we identify them?

Q.  Uh-huh.

A.  Well, we focused largely on Latino neighborhoods and we were very surprised, it was almost universally when we knocked on doors, many people -- almost everybody exclusively said that we were the first people that ever knocked on their door that told them their vote mattered or their voice mattered or their issues mattered.  So for us that just kind of shows the much more work needs to be done on voter outreach.

We also reached out to independent voters, like for the primary.  Our mailers for independent voters for instance was very much geared for the independent voter, telling them hey, did you know you can vote in the primary even though you are an independent voter.  Most independent voters didn't know this.

We were able to use the voter rolls to see who had voted and who had not so we could remind people and say hey, you didn't vote in the last election, our records show, you know, it is important to vote, here are important deadlines to know that you need to know about.

So it was educational full in that one as well, but it was somewhat customized so everybody could know that we were reaching out to them as an individual and not just with a

simple billboard that says vote.

Q.  And does CPLC engage in election protection work?

A.  Yes, we do, we do.  It is very important for us to monitor some situations.  We know that elections can be, you know, largely political, and there are people that are weary of intimidation factor.  That's the other side of intimidation factor is when they see people with guns or they feel like people are trying to trap them perhaps to find out about their community or their household, and if someone in their household maybe perhaps is here without documentation.

So it goes beyond who is eligible to vote, it goes to who should be looked upon if they are eligible to be in this country.  So there is some doubt.  But because we are Chicanos Por La Causa, they expect us to back them up.

During the COVID pandemic when there were vaccinations going on, we worked as advisory to the state and Governor Ducey's office.  And our Latino community was hit disproportionally hard with COVID.  And many of the Latino individuals were on the front lines deemed essential workers. So vaccinations were very important.

But transportation often is a challenge, so we needed to make sure these vaccination spots were done close in the Latino communities.  Many of the Latinos when we went out to witness this, there were National Guards men who were directing traffic.  And so many families that were loading everybody up,

regardless of documentation and they were coming in, and they saw people wearing fatigues, they would turn around and not go in to get the vaccination.

So we explained to the governor's office, look, you can't do it this way, here's why, so we had to explain it. So we have a certain cultural competency when it comes to the Latino community, and so we try to amplify that understanding.

Q.  And what role does CPLC's reputation play in the effectiveness of your voter mobilization and registration efforts?

A.  Yeah, very much so.  You know, we did some research on this as well.  And it was -- you know, people in our community recognize Latino Loud.  They recognize Chicanos Por La Causa.

They trust Chicanos Por La Causa as they have for generations, which has helped many people in their family or their community.  So it is a trusted name within the Latino community because we are the Latino community.  You know, we are not an outside agency coming into a community, we are part of that community so our name is gold.

Q.  And we have talked about registration and mobilization, but focusing just on mobilization here, how do you mobilize people to get out to vote?

A.  Yeah, there's various ways.  You know, we had a website, and it is still up.  But it is -- largely it's testimonials, it is young Latinos talking to young Latinos.

They didn't want to hear what I had to say too much. But it was a matter of explaining how issues are important when it comes to family or if you are building a family, a young family, or taking care of older members of your family.

You know, it was about voting for your community.  It was about having your voice heard which is a reason we did Latino Loud because a lot of younger Latinos, they don't want to hear what I have to say, but they want me to listen to what they have to say, they have something to say.

But again, your vote is your voice, and that is what we kept underlining and underscoring.  And they understood that.  But we did everything from concerts, we did special events, we did a lot of the digital media, including what's called geofencing.

So for instance, if you went to the Bad Bunny concert, everyone that went there was included in our digital fencing, and they got digital messaging about Latino Loud and voting. So we reached out in as many ways we could.

There was a lightrail car which was wrapped with Latino Loud messaging.  We were only one of four nonprofits that are accepted in that messaging.  So we had billboards across the areas that I had mentioned.

We did everything we could to get people understanding because for us it wasn't -- it wasn't about -- again, this wasn't about the midterm elections, it was about all the

elections going forward.  And it is about creating behavioral change within a community to believe in democracy, to believe in the power of the vote, and how we have to participate in democracy.

Q.  And why is CPLC able to be effective in its mobilization efforts?

A.  We were able to be effective because we listened.  We started off with focus groups, hearing from various people why you voted or why you didn't vote.

We listened to what they thought were issues, and we understood that for many people that didn't believe in the process, the more they talked about it they maybe understood is that, you know, this process that we have, while imperfect, it is a perfect vehicle to have your voice heard and that democracy requires participation.  It is not a spectator sport.

And so we wanted to amplify their voice by them expressing their voice at the ballot box, and that was the messaging.

Q.  We are going to switch gears and talk a little bit about this lawsuit.

Can you tell us your understanding of what the lawsuit is about?

A.  Well, we opposed many of the proposed legislation when it came to voter suppression laws in the legislature.  None of the laws ever say voter suppression on the title, but if that is

the intent and that is the outcome, we view that as voter suppression and oftentimes targeting the Latino community.

This one got through the legislature and was signed in to law.  But we saw it with the same harmful impact it would have on our community.  It would have harmful effect on new people who became citizens, rightfully have every right to vote, but could essentially arbitrarily on just mere suspicion be removed from the rolls due to faulty or old database or things that don't match or suspicious election officials who could be politically motivated, as we know some of those pressures, the political pressures from everything from election deniers or people that do not want the Latino community to be empowered through the electorate.

It also has a chilling effect in our community.  We know that word of mouth through our Latino community is very hard to combat.  We experienced that during -- well, during the census count whereas we know the administration at the time had said that we weren't going to count any people without citizenship, and that those information that they have anybody could use it.

It went all the way to the Supreme Court.  And the Supreme Court ruled no, no, we count everybody in this country in a census.  And no, that information cannot be used except by the census bureau.  It can't be turned over to immigration services, but by then the damage was already done, even though

we tried to correct and explain that to the community, the damage was done because through the grapevine, through the Latino community, everybody thought no, this is what they are trying to do.

The same would happen if people are removed unfairly from the voter rolls and they were naturalized or passed the citizen requirements and they're removed from there.  Because what's going to happen is --

MR. LANGHOFER:  Your Honor, I have to object on the basis of a narrative answer that is nonresponsive and far outside the bounds of his competence.

THE COURT:  Sustained.

BY MS. MOTZKIN:

Q.  Why did CPLC decide to challenge these laws?

A.  Well, one of the things that we believe in is that everybody who is eligible to vote should be allowed to vote. And we see these laws as voter suppression laws which we should challenge and we will challenge.

Q.  And you previewed a few but what aspects of these laws does CPLC take issue with?

A.  To remove people that are eligible to vote and to -- on mere suspicion and the role that politics may play from somebody who might miss a notice saying that there is an investigation and they have been removed, it could have a chilling effect on our community.

Q.  And in your experience, how do you expect the citizenship investigation procedures at issue in this case in both laws to affect the work of CPLC?

A.  Well, it would affect our work in many ways.  Obviously it would hurt our reputation because people trust us, and if they are removed from the rolls after we've registered and they've heard CPLC's name.

But also it would add added expense to us to be able to -- we would have to set up some way to monitor people who are being removed.  We would have to educate people.  Again, what is the process to do if you are removed, what do you do if you are denied at the polling place where you went to go vote.

We would have to register -- we expect perhaps 25, 30 percent more people just in order to knock on more doors in order to get people registered to vote.  So it would be an expense, not just monetarily, but also an expense to our reputation.

Q.  And what will the organization have to do in order to continue to help folks or voters who encounter problems with the registration at the poll -- registration while at the poll?

A.  Yeah, we would have to set up additional staffing, additional education, additional outreach.

Unfortunately this means that we would have to take money away from canvassing or some of the things that I had mentioned for events, for registering more people to vote.  So

it would take money away from trying to get more people to vote, and as a result, probably you know, we would expect less people would vote.

Q.  And what resources would you have to put into CPLC's registration efforts?

A.  Yes, we would have to inquire -- we would expect we would have to have additional staff, additional training.  Additional outreach, additional information, additional pamphlets.  The education would go beyond what we were talking about, basic education.  It would make what is a difficult job, it would make it even more difficult.

Q.  And based on your experience, what resources -- what additional resources would you anticipate CPLC would have to put into its canvassing efforts?

A.  Yeah, unfortunately, that would be the dilemma because we would not be able to put additional resources into canvassing because we would be putting additional resources into the education.  And they are different education, so it would be actually with limited resources, it would be -- it would be diminishing the limited resources that we have.  We don't have unlimited resources.

Q.  And what resources would you plan to put into CPLC's voter education programming?

A.  We would obviously include our attorneys to make sure the language was correct.  And the procedurals, we would have to

follow people through, guide them through the procedural process.

And then we would also have to work on damage control through the education to explain, as much as we tried to do with the census bureau, that this is not a way to remove people from the voter rolls arbitrarily, although this is how many people would assume this is -- this was the intention.

Q.  And what kind of additional resources would you plan to put into the mobilization efforts?

A.  Once again, the mobilization effort would probably be -- we would expect the mobilization would be -- would be hindered, as I have said, because we don't have additional resources to put towards this scenario.  It would take away resources from other efforts.

Q.  And what will the organizations have to do in order to continue to help voters who encounter problems with their registration or at the polls?

A.  We would have staff dedicated to answering questions.  We would have staff dedicated to visit centers.  We would have staff dedicated to speak at events.  We would have information the staff can share.

Our canvassers would be trying to explain, which is complex information, to people answering the door.  The more you have those conversations and the deeper more confusing it is, the more many voters are just saying -- or potential voters

saying well, this is too complex, I don't want to get involved. So there would be that factor.

But obviously for us, it would be the expectation we would have additional staff that instead of being used for voter registration, it would be dealing with this -- these new laws.

Q.  You previewed this, but can you explain how the laws would affect CPLC's reputation?

MR. LANGHOFER:  Asked and answered.

THE COURT:  Overruled.

BY MS. MOTZKIN:

Q.  You can proceed.

A.  Yes.  It does come to our reputation as not only a voter outreach group but a group that provides services, health services, vaccination, community development, any kind of services that people are going to need.  If it is legal and we are able to do it, we do not discriminate on people who do not have legal status.  Most cases we don't have to ask because that's largely the case that we don't have to.  So for us, if we are part of a system, we registered people to vote and they are removed from the rolls and they shouldn't have been, or many people think they should not have been, it's going to harm our reputation, the larger aspect where Chicanos Por La Causa is no longer looked at as one who is open to our community, understanding our community, but one that perhaps is also one

that could be harmful to our community or can't be trusted. And trust is everything for us and for our community who is rightfully so distrustful with a community that many members face deportation every day, still.

Q. And this goes without saying, but you don't register individuals who are not eligible to vote?

A. Absolutely not. And we, you know, people -- we register people who are eligible to vote. They affirm that they are a citizen. There are checks and balances. So no, in fact, we have found that the people will knock on the door, and many people will say, you know, I am not a U.S. Citizen, I can't vote. Very good, we move on.

Q. You mentioned a series of targets and metrics for the upcoming election cycle. How will these laws affect those targets or metrics?

A. In what respect? Can you --

Q. You mentioned previously that you have some aspirational targets for this upcoming cycle that seem to be similar to the past. How would these laws impact your ability to reach those metrics?

MR. LANGHOFER: Foundation and speculation.

THE COURT: Overruled.

You may answer.

THE WITNESS: We expect it would be an added expense, an added energy, an added focus which would make the job more

difficult to register more people to vote and to engage the population to get more people to vote and to trust our democratic system that all eligible voters should be able to vote.

BY MS. MOTZKIN:

Q.  Going back to the reputational harm you mentioned, what effect will that harm have on your work?

A.  Reputation is everything.  I think we all know that. Reputation of Chicanos Por La Causa is everything.  It's what we guard very much because people know us, they have known us since 1969.

We want to continue to be that gold standard when it comes to being recognized by the community.  The larger community may not know us as well, but the community within the Latino communities across the state and even in other states now do know us as an organization that represents them, and we want to protect that at all costs.

Q.  You testified that CPLC will have to spend additional resources if HB2492 and HB2243 are implemented.  How will you do that?

A.  Well, it would require -- I don't want to say additional resources because there are no additional resources.  It would require us reallocating resources to this individual problem and scenario, and instead of the resources being spent in other ways, which would be towards mobilization, engaging, and

getting more people registered to vote.

MS. MOTZKIN:  Your Honor, I will quickly confer with my co-counsel.

THE COURT:  You can confer at your leisure because we are going to take afternoon break and reconvene at 3:00.

(Recess taken at 2:45 p.m.; resumed at 3:02 p.m.)

THE COURT:  Are there any further questions for this witness?

MS. MOTSKIN:  No further questions, Your Honor.

THE COURT:  Anything on cross?

MR. HORLEY:  Yes, Your Honor.

CROSS-EXAMINATION

BY MR. HORLEY:

Q.  Good afternoon, Mr. Garcia.  My name is Tim Horley, and I represent the State of Arizona and the Arizona Attorney General in this case.

Is it your understanding that these laws are not being implemented?

A.  It's my understanding that these laws will be implemented unless they are stopped by the Court.

Q.  But at present, they are not being implemented?

THE COURT:  You know, I don't think he has any knowledge about that one way or the other.

MR. HORLEY:  Okay.

BY MR. HORLEY:

Q.  Is it your understanding that Arizona voters are currently required to show proof of citizenship to register?

A.  In some instances they are required, yes.  Other instances, I believe they affirm they are a citizens and some instances they can do the application on ServiceArizona and have a driver's license, and they do it while they register for Arizona driver's license.

Q.  Okay.  Can you describe your understanding of what these laws will require for newly registered voters?

           MS. MOTZKIN:  Objection, calls for a legal opinion.

           THE COURT:  Sustained.

           MR. HORLEY:  Okay.

BY MR. HORLEY:

Q.  Can you identify a way that the Challenged Laws ask voters to do something different from what they are currently required to do?

           MS. MOTZKIN:  Objection, calls for a legal opinion.

           THE COURT:  Overruled.

           You may answer.

           THE WITNESS:  I don't know the details, no.

BY MR. HORLEY:

Q.  Okay.  Is it difficult to know the answer because the laws have not been implemented?

           MS. MOTZSKIN:  Objection, asked and answered.  Calls

for legal opinion.

THE COURT:  Sustained.  But I want to ask you this question:  You have described these laws as voter suppression laws.  You must have some reason to know -- I mean, you must know something about the laws that causes you to categorize them as voter suppression laws, even though, as you said, they are not described that way.

THE WITNESS:  Yes, I believe that these laws unfairly target new citizens, especially those in the Latino community.  The suspicion can be almost anything.  It could be a last name that initiates initial suspicion.  So for new citizens, which includes the Latino community, it would be viewed as a way to keep them from voting, even though they are a new citizen.

THE COURT:  What specifically is it about these laws that cause you to come that that conclusion?

THE WITNESS:  Because it would keep a person who should be eligible to vote by every means except under suspicion, and then found for whatever reason, perhaps it's old data systems that don't agree, they'd be removed from a system and perhaps they don't get the notice through the mail or it piles up on, I don't know, the kitchen countertop and they don't respond, they are removed, they go to vote, they go to vote.  They are told they cannot vote because they are no longer on the voter rolls.

THE COURT:  So let me interrupt you.

THE WITNESS:  Sure.

THE COURT:  So would it be accurate that you're concerned about the databases that are listed in this law as things that have to be checked?

THE WITNESS:  Yeah, that's one of our concerns, yes.

THE COURT:  Okay.  And you are also concerned about this -- the notice that is sent out and has to be responded to within a certain number of days to keep you on the voting rolls?

THE WITNESS:  Yes, Your Honor.

THE COURT:  Okay.  Are those the main two things that you're concerned about?

THE WITNESS:  I would say those are the two main things, but there's also the chilling effect that we believe it will have on other voters perhaps in that family or in the community.

THE COURT:  Thank you.

BY MR. HORLEY:

Q.  And Mr. Garcia, is your understanding that those concerns you just told the Judge about are raised differently under the Challenged Laws, or are those concerns have you about current Arizona voter registration laws?

MS. MOTZSKIN:  Objection, outside of the scope of his knowledge.

THE COURT:  I am confused.  I asked him about his

concerns for these new laws and -- that have new things in them like these database checks and this notice with the 35 days to respond.  So if you want to ask him something specific about the current law, go right ahead, but I don't know how he's going to answer this comparison question that you have asked him.

MR. HORLEY:  Okay.  I will move on.

BY MR. HORLEY:

Q.  Am I right that part of the CPLC's mission is educating voters about Arizona voter registration requirements?

A.  The process of voting is largely what we do, because low-propensity voters haven't voted in a long time, or they've never voted before, so this is all a new practice for them. Oftentimes, their parents had not voted either, so it is really a brand-new practice of expressing themselves at the ballot box.

Q.  And is your organization currently engaged in those efforts?

A.  We are ramping up again for during the election cycle.  It is still on our website.  If you go to LatinoLoudAZ.org, there's information there that voters can use as far as the process of voting.

Q.  And do you provide educational services to voters about other Arizona voting laws, not just voter registration laws?

A.  Not really.  It is more the actual physical application to

register to vote and it is -- that is a huge obstacle in itself.

Q. So, for example, you do not educate voters about third-party ballot collection practices?

A. No.

Q. Okay. Do you keep track of whether your organization spends money to educate voters on one thing versus something else?

A. What thing?

Q. For example, about one set of requirements versus another set of requirements?

A. I'm sorry, I guess I don't follow.

Q. I guess -- I'm trying to understand how you know whether resources are being spent on one set of legal requirements or another set of legal requirements? Is that something you track?

A. This would be a new explanation in voter education, but we are not explaining this at this time, no.

Q. Okay. Has CPLC spent any money in response to the Challenged Laws?

A. You are talking about right now?

Q. Yes.

A. Here in court? In addition to my time, is that what you mean?

Q. Well, I guess I am asking, apart from this lawsuit, has

your organization spent any money in response to these

Challenged Laws?

A.  Not to my knowledge.

Q.  Okay.  Can you estimate how much money will be spent if the

laws are implemented?

A.  Well, the estimate is between 20 and perhaps 30 percent.

We spent $5.7 million on canvassing and registering people to

vote.  So, you know, the increase of -- result of that, so it

would be an increase cost in there, which would subtract money

from other things if we were to use it for that purpose.

       So it could be, you know, less money for advertising

or less money for digital media.  As I said, it is a limited

amount of resources, so it's not like we have extra resources

to give.

       THE COURT:  So are you saying that if you were

committed in the next election cycle to spend the same 5.7

million, you believe that 20 to 30 percent of that would have

to be diverted specifically to the issues that you see with

these laws if they are effective versus the way it was spent

before with the registration canvassing and Get Out The Vote

efforts?

       THE WITNESS:  Yes, Your Honor.

       THE COURT:  Okay.

BY MR. HORLEY:

Q.  Have you had to hire any new staff as a result of the

Challenged Laws?

A.  Not at this time.

Q.  Do you anticipate having to hire new staff as a result of the Challenged Laws?

A.  If it goes into effect and we see that it is needed, yes, we would.

Q.  Can you estimate how many staff you might need?

A.  Well, we would use existing staff as much as we could, but again, that would be that limited resource paid to this new obstacle, this new challenge, so it would depend.  So it's a sliding scale.  We are not able to hire a bunch of new people.  We don't have that budget.

Q.  Is it difficult to determine how many new staff you would need to hire because you're not sure how the laws will be implemented yet?

A.  We don't know the degree of the impact that it would have, and a lot of that would depend on -- well, everything would depend on how many people were taken off of the voter rolls and those unfairly, and those that would report they weren't allowed to vote, and we would have to have a system set up, which we don't now, to say, "Contact us if you have been kicked off the voter rolls.  Here is what you should do.  Here is who you contact.  Here is how we would follow through."  So none of that is set up right now.

Q.  And you mentioned when you were speaking with Ms. Motzkin

that you were concerned about the harm to your organization's reputation; is that correct?

A.  Yes.

Q.  And I don't -- I don't want to be repetitive, but I also didn't fully understand your testimony there, so I do want to ask a little bit about that.

You noted, I think as part of that, that currently your organization is not required to ask people about their citizenship; is that correct?

A.  I said when we provide services through programs, many of those do not require any proof of citizenship.  They are through grants and donations.

But those that do, we can't deliver services to people that aren't citizens, so it depends on each individual program.

Q.  And is voting a program that requires you to ask about citizenship?

A.  Voting -- as I mentioned before, you can register to vote on ServiceArizona.  You can register using a form through the attorney -- state -- Secretary of State's office, you can affirm your citizenship.  There are various different ways to register to vote, but, you know, we do not -- we do not ask people for proof of their citizenship, no.

Q.  But you did note that you do not register people who are noncitizens, correct?

A.  Correct.  If they -- yeah, correct.

Q. Okay. So I am trying to understand how this would be different if currently you cannot help someone register who is not a citizen, that would also be true under the Challenged Laws, correct?

A. I'm sorry, I was thinking of the last question. So can you repeat this question? I apologize.

Q. Sure. So it sounds like at present your organization cannot help someone register to vote if that person is not a citizen, correct?

A. We would not.

Q. You would not. And you also would not do that if the Challenged Laws were implemented, correct?

A. If the individual was a citizen and they were unfairly removed from the voter rolls and without their knowledge, perhaps, yes, we would, we would see what we could do. We would help them.

Q. I guess my question was: If they are not a citizen --

THE COURT: They are not going to try to register noncitizens under the old law or under the new law. I don't think you're advancing the cross-examination with this line of questioning.

MR. HORLEY: Okay. I will move on.

BY MR. HORLEY:

Q. So why would it harm your reputation to help people register to vote under the Challenged Laws?

A.  If we register people to vote and they are citizens and eligible to vote and they are removed from the voter rolls, and we were the ones that registered them, it would harm our reputation because we're the ones that registered them.

It would also harm the whole voting process that we're involved in, registering our community in larger numbers. Because people in that family or in that community, that neighborhood, would believe that somehow we were doing it either improperly, or we weren't representing them or resulted in somehow them becoming under scrutiny unnecessarily by a government entity.

And it is a somewhat suspicious community -- and rightfully so.  We understand everything from the crime sweeps of Sheriff Joe Arpaio.  You know, these are very real concerns in our community.

Q.  So is the harm to your reputation that would come from someone being erroneously removed the idea that that person would blame your organization for them being removed?

A.  I think they would think that we did not do something properly perhaps, or that it would be fruitless for them to register anyway or -- so it would hurt our campaign to get more Latinos to register, because they would say, "Look what happened to so and so, she or he got kicked off of the rolls."

Even though they deserved to be on the rolls.  They were citizens and they had to prove it, but they weren't able

to vote in the election.  So it would harm our campaign, which would harm our reputation.

Q.  But isn't it speculative to suggest that someone will be erroneously removed from these laws, given that they have not been implemented yet?

A.  I think it would be.

MS. MOTZKIN:  Objection, relevance.  Calls for speculation.

THE COURT:  That was the question, whether it is speculative.  Overruled.  You may answer if you can.

THE WITNESS:  I think it would be highly speculative to believe that that would not happen.

BY MR. HORLEY:

Q.  Okay.  Isn't it also speculative to believe that if that did happen, that someone would blame your organization for that happening?

A.  "Blame" is not the right word.  It would be somewhat of perhaps diminishing our reputation, tarnishing our reputation, bringing our reputation under somewhat suspicion that we weren't protecting our community and we weren't actually registering people to vote, or somehow we were flawed in the process.

So it would harm our reputation, the larger reputation in that.  And going beyond that, the ripple effect.  It could carry over to programs and services that we provide as well,

because it is all looked upon as CPLC, and so they may not come to us for those services because they think that, you know, it is all related.  It is our reputation on the line every day with everything that we provide, services, and Get Out The Vote efforts and programs across the board.

Q.  Are you aware of any person who has been erroneously removed from the voter rolls as a result of the Challenged Laws?

A.  No, I do not know of anyone.

Q.  Okay.

MR. HORLEY:  No further questions from me.

THE COURT:  Any other cross-examination?

CROSS-EXAMINATION

BY MR. LANGHOFER:

Q.  Good afternoon, Mr. Garcia.  I've just got a couple of questions for you.

How long have you been involved with this case?  From the beginning, right?

A.  I'm sorry, for this case?

Q.  Yeah.

A.  Yes.

Q.  About a year?

A.  Yeah, about a year, I guess.

Q.  In that period of time, have you been able to identify someone who is an adult citizen, who is a resident of the

state, who does not have a driver's license issued after 1996, a U.S. birth certificate, a U.S. passport, a tribal identity card, or an alien registration number?

A.   Were we able to identify anybody that met those criteria?

Q.   Correct.

A.   Um, that is not something that we would do.  We are not -- we -- we are not involved in that whole election process that you are describing.

Q.   You don't know of anyone?

A.   Well, we don't know of anybody, and that is part of the problem, is that at this point, people may not know they have been removed even, if that is the case, but I don't know.

Q.   So being removed isn't part of the question, right?  I am just asking whether you know of someone who is adult citizen, resident of the state, who does not have a driver's license issued after 1996, U.S. birth certificate, U.S. passport, a tribal identity card, or alien registration number?

          MS. MOTZSKIN:  Objection, asked and answered.

          THE COURT:  Overruled.

          You may answer.

          THE WITNESS:  No, I do not know anyone that you mentioned.

BY MR. LANGHOFER:

Q.   All right.  Have you and I ever met before?

A.   Not in this life.

Q.  That's a really good answer.  I didn't see that coming.

I am going to hazard three guesses about you, all right?  Let's see if I can get this right.  I bet that you have a driver's license; am I right?

A.  Yes.

Q.  I bet that driver's license was issued in Arizona after 1996; am I right?

A.  Yes.

Q.  I bet you have it with you in this room today; am I right?

A.  Yes.

Q.  Okay.  In fact, you had to show it in order to get into the courthouse?

A.  Correct.

Q.  Okay.  Let's talk about -- as I understand it, you are worried about people getting these notices in the mail and not responding.

Do you use the mail?

MS. MOTZSKIN:  Objection, relevance.

THE COURT:  Sustained.

BY MR. LANGHOFER:

Q.  Let's talk about other ways in which the mail is used for important documents.  Are you aware that jury summons arrive by the mail?

A.  Yes.

Q.  Okay.  Are you aware that Selective Service notifications

arrive by the mail?

MS. MOTZSKIN:  Objection, relevance.

THE COURT:  Overruled.

You may answer.

THE WITNESS:  I am not familiar with the whole process of Selective Service.  I have not been drafted.  I did fill out the form when I graduated from high school in Flagstaff.

BY MR. LANGHOFER:

Q.  What about ballots, they come by mail?

A.  They do.  If you -- yes, if you requested the ballot by mail, yes.

Q.  For the unfortunate few, IRS notices come by mail?

A.  Does what?

Q.  IRS notices.

A.  To my knowledge, yes.

Q.  Vehicle renewal forms?

A.  Yes, although you can register on line, which is what I do.

Q.  Water bills?

A.  Yes.

Q.  People you serve, they open their mail, right?

A.  Some do.  I could show you my kitchen countertop unfortunately, to show you the shameful unopened mail that I have.  I have had instances where mail has been lost as well, including payments to utility companies and so forth.  So there's notices I have not received before through the mail,

so -- but I do know what you are saying, yes, mail is part of my daily life, yes.

Q. Your organization actually fundraises off of your education efforts to stop voter suppression, doesn't it?

A. We -- it is one of the things that we do is voter advocacy and defending democracy, which includes antidemocratic issues, which we see as voter suppression laws, yes.

THE COURT: I think he asked if you fundraised based on those activities? You send out fundraising messages?

THE WITNESS: No, we haven't sent any fundraising related to this issue or anything on voter suppression, no.

BY MR. LANGHOFER:

Q. You all have a website, right?

A. Yes, we have a website.

Q. And there's a donate page on that website?

A. There is.

Q. The donate page talks about how if they give money to your organization, you are going to fight voter suppression?

A. Yes, we are going to be engaged with our community to register more people to vote, to fight against what we see as voter suppression laws, which I said, it's part of what we do, it's advocacy.

We do advocacy. Part of what we do is advocacy. That hasn't changed over the years. In fact, it's amplified under the Action Fund.

Q.  So I want to be as concrete as possible about this.  You guys already have voter education expenses, correct?

A.  Yes.

Q.  You have done that for years?

A.  Yes.

Q.  You are going to keep doing voter education if these laws go into effect, right?

A.  Yes, it would be additional voter education, correct.

Q.  Okay.  What exactly are you going to do with this -- with these extra dollars you think you are going to divert to voter education?

A.  Well, it would be twofold.  One would be voter education of letting the public know about this, because I -- the public does not know largely about these new laws and whether or not you would be at risk perhaps of being removed from the voter rolls.

But then also it would be what to do, what is the process if you are removed if you do show up to vote and you are not allowed to vote, what should you do.

So some of it is educating people about the law itself, and some of it would be find a process where we could help those who are denied voting who have every qualification to be able to vote and were denied.

Q.  Okay.  Do you have a document internally that says how you are going to be spending these dollars that you say are not new

dollars, just redirected dollars?

A.   No, we are hoping that the Court rule in our favor.

Q.   Okay.  If it doesn't rule in your favor and it goes into effect, you said there's not going to be new dollars, so you will have to redirect dollars, correct?

A.   Correct.

Q.   Do you have any documents internally that show how you are going to redirect those dollars and what precisely you are going to spend your money on?

A.   No.  As I said, we are hoping that the Court will see this as another extension of voter suppression laws.

            MR. LANGHOFER:  Thank you, Your Honor.

            THE COURT:  Anything on redirect?

            MS. MOTZSKIN:  No, Your Honor.

            THE COURT:  May Mr. Garcia be excused?

            THE WITNESS:  Thank you.

            MS. MOTZSKIN:  Yes.

            THE COURT:  Thank you, Mr. Garcia.  You may step down. You are excused as a witness.

            Please call the next witness.

            MR. DODGE:  Plaintiffs call Ameer Patel.

            **AMEER PATEL, PLAINTIFFS' WITNESS, SWORN**

            THE CLERK:  Please state your name and spell your last name.

            THE WITNESS:  Ameer Patel, P-A-T-E-L.

THE CLERK:  Thank you. and you can go ahead and have a seat.

MS. DIBRELL:  And, Your Honor, I am Mollie DiBrell from Elias Law Group here on behalf Mi Familia Vota and Voto Latino.

THE COURT:  Tell me your name again.

MS. DIBRELL:  Mollie DiBrell.

THE COURT:  Thank you.

DIRECT EXAMINATION

BY MS. DIBRELL:

Q.  Can you please state your full name for the record?

A.  My name is Ameer Patel.

Q.  Can you tell us why you are here today?

A.  I am here to testify on behalf of Voto Latino about the impacts of HB2492 on our constituents as well as our mission.

Q.  What is your role at Voto Latino?

A.  I am the managing director.  I have held that position since January of this year.

Q.  What were your roles at Voto Latino before you were managing director?

A.  I have been with Voto Latino for four years now, and previous to this role, I was a vice president of programs.

Q.  As managing director of Voto Latino, what are your responsibilities?

A.  I get to oversee the day-to-day operations of the

organization, including programmatic efforts and fundraising, as well as executing on the mission and goals set forth by our board and president.

Q.   What is Voto Latino?

A.   We are a 501(c)(4) nonpartisan nonprofit social welfare organization.

Q.   What is Voto Latino's mission?

A.   Our mission is to educate and empower a new generation of Latino voters here in Arizona and elsewhere, ultimately guiding the Latino community towards full realization of its political power.

Q.   What activities does Voto Latino engage in to advance that mission?

A.   At large we have three bodies of work.  First is voter registration, which is reaching out to Latinos in the state that are not yet registered to vote and making sure that they have the information they need to successfully make it onto the voter file.

        After that, it is voter turnout, also called Get Out The Vote, where we reach out to Latino voters in the state that are low-propensity voters recently registered, people navigating the voting process for the first time, first generation voters, and making sure that they have the information they need to essentially cast a ballot, whether that's early in person, early, voting by mail, or on election

day.

Last is what we call advocacy, where we inform voters across the state, Latino voters, our constituents about issues that impact them and policies and where candidates stand on those issues.

Q.  I will let you take a moment to get some water.

A.  Thank you.

Q.  Where does Voto Latino operate?

A.  We have five core states:  Arizona, here, as well as Nevada, Texas, Pennsylvania, and North Carolina.

Q.  Do you consider one of those five states to be the most important to Voto Latino?

A.  I do; Arizona.

Q.  Why is Arizona a top state for Voto Latino?

A.  Arizona is a unique state, as you all probably know where they're seeing a rapid increase in the Latino population.  We don't expect that to slow down in the foreseeable near future, however, Latinos in the state of Arizona register to vote at lower rates and actually turn out at lower rates than our counterparts in the state.

However, Arizona has increasing competitive elections, from the presidential down to local elections.  It's a state where if you engage the Latino community, it can have profound impacts on Arizona from state, federal, local levels.

And it is a state where Latino voters have an

opportunity to make advances on issues that matter to them and impact their communities.

Q.  How does Voto Latino decide where to operate?

A.  We look at multiple different factors.  First, as we got out, we look at the population.  So for here in Arizona, there's an estimated roughly 1.2 million Latinos that are eligible to vote.

In 2020, only 600,000 of them actually cast a ballot.  Then we look at those participation towards barriers our constituents face in those states.

Lastly, we also look at demographic trends.  It is estimated that in 2024 here in Arizona there will be 180,000 new Latino voters eligible to cast a ballot that were not eligible in the last presidential in 2020.  So across all of those factors we try and determine what is the best use of our limited resources.

Q.  So you spoke briefly about the voting rate of Latinos in Arizona.  Do you know how the Latino voting rate in Arizona compares to the Latino voting rate nationally?

A.  Yes.  Latino voters in the state of Arizona vote at lower rates than their non-Latino counterparts here in the state.  They also vote at lower rates than Latinos nationally overall.

Q.  I would like to briefly talk about your constituents.  So does Voto Latino consider Latino voters obviously to be their constituents?

A.   Yes.  We talk to Latino voters across our core states. Those are voters, as I mentioned, that are not yet registered but eligible.  Voters who are low-propensity voters navigating the voting process for the first time and voters seeking to learn more about candidates and issues that impact them.

Q.   And that includes Latino voters in Arizona?

A.   Correct.  It includes Latino voters in Arizona.  Latino voters in Arizona are much younger than Latino voters overall and younger than their counterparts.  So in Arizona, our core audience tends to be younger Latino voters.

Q.   When you say they're younger overall, are your constituents college-age students?

A.   Our constituents are -- we try to primarily target young Latinos 18 to 29, but we seek to provide Latinos across the board about information relating to how to vote, how to register to vote, and learn more about their ballot.

Q.   Do Voto Latinos' constituents include Latino voters for whom English is a second language?

A.   Yes, as you well know, Latinos are more likely to be bilingual.  They're more likely to have learned English as a second language.  They're more likely to be naturalized citizens, born outside the United States.

Q.   And that applies in Arizona as well?

A.   Yes, absolutely.

Q.   Can you explain for the court at a high level about Voto

Latino's voter registration work in Arizona?

A.  Yes.  Over the past decade, Voto Latino has spent millions of dollars on voter registration efforts in the state having registered over -- sorry about that.

Having registered over 60,000 voters here in Arizona since 2012.  A lot of this is done through our direct communication, where we reach out to Latino voters in the state that are not yet registered through additional programming, social media campaigns, mail, SMS, peer-to-peer SMS, in-person activation, such as voter registration drives.  And all of this is sustained by our staff and volunteers.

Q.  Does Voto Latino also utilize Spanish language ads or radio?

A.  Not for voter registration.

Q.  How many voters has Voto Latino registered nationally?

A.  A little over 1.2 million since 2012.

Q.  How many voters did Voto Latino register in 2020 in Arizona?

A.  Over 40,000 successful registrants here in Arizona in 2020.

Q.  As part of its voter registration efforts, does Voto Latino follow up with its constituents to make sure that they are able to vote?

A.  Yes.  A core part of our voter registration programming is what we call chase programming, which involves following up with individuals who perhaps not complete the voter

registration process, or completed the voter registration with us but were not able to successfully submit it with the Arizona Secretary of State, or individuals who might have been rejected and so as part of that chase programming, we reach out back to those individuals to see if they are eligible to register to vote and how to get them onto the voter file.

Q.  In your experience, what are some -- what are some reasons why people can't successfully make it onto the voter file?

A.  There's a lot of different reasons that we've learned through our chase programming.  It sometimes can be as simple as human error.  Other times it can be they don't have the right documents in front of them.

Many of the people that we try to register are college students who sometimes only have their college ID with them. So the reasons can be many and they really vary.

Q.  Through your chase programming, have you found that these individuals who didn't make it on the rolls are otherwise eligible voters?

A.  Yes, we have learned through our chase programming, by conducting it, that there are people who have made it onto the voter file after being reengaged, and that continues to be a part of our programming, and that is the reason we do chase programming.

Q.  When does Voto Latino conduct these chase programs?

A.  Um, a bulk of our registrants are near general election so

Case 2:22-cv-00509-KML  Document 647   Filed 11/07/23   Page 99 of 163

AMEER PATEL - DIRECT EXAMINATION                 223

they register to vote in August, September, October.  We conduct our programming throughout the year; however, those individuals and their information is not released from the voter files often until after the election.

So depending on, you know, which states are here, Maricopa and Pima County oftentimes don't releases voter files until February, March of the following year.  And at that point, we will reach back out to those individuals, but we are not able to reach back out to them in real time.

Q.  And so as far as you know, they couldn't vote in the previous election?

A.  Correct, yes.  As far as we know, we have no way of determining whether or not they made it onto the voter file until the voter file information is made available to us.

Q.  And once that information is available to you, that's when you do your chase program to help them successfully get on the rolls?

A.  That's correct.

Q.  Given the multitude ways there are to register in Arizona, why is it important that Voto Latino does this work?

A.  As I mentioned, our community faces nontraditional barriers when practicing to vote.  They are more likely to have language barriers, more likely to be Spanish native speakers.  They are more likely to simply be navigating the voting process for the first time.  Our community and our constituents are much

younger, so they are first generation voters.

They are also more likely to -- sorry, excuse me. They are more likely to not have individuals in the household, like I mentioned, who have navigated the voting process.  And they're more likely to have been born outside of the United States.

And so because of a multitude of those reasons, traditional outreach methods often fall short when reaching out to our community.  So as a result, we reach out to our community through platforms and channels that they already engage on using our branding to communicate to them about how to register to vote.  Give them the information they need to successfully make it onto the voter file.

Q.  Can you talk at a high level about Voto Latino's Get Out The Vote work in Arizona?

A.  Yes.  Similarly, over the past decade, we have spent millions of dollars targeting Latino voters in the state, primarily young Latino voters who have recently registered to vote, or low-propensity voters, infrequent voters, getting them the information they need to successfully cast a ballot, whether that's by mail, in person, early, or on election day.

And those tactics similarly involve direct communications, so digital programming, social media campaigns, peer-to-peer text messaging, in-person activation, such as Get Out The Vote rallies.  Spanish language radio and other forms

of direct communication.  All of this accomplished with our staff and volunteer resources.

Q.  You've mentioned a few times your digital communication advertising.  Does this include money that Voto Latino spends?  Is it paid advertising?

A.  Correct.  These are paid ads that we would run trying to communicate directly with our audience, so for Get Out The Vote, trying to identify individuals who are low-propensity voters who are Latinos who are registered and trying to match up advertises to them on platforms that they already engage on, presenting to them information about how to cast a ballot.

Q.  So you also mentioned that Voto Latino does voter advocacy work.  Could you tell me what that has consisted of in Arizona?

A.  Yes.  Voter advocacy here in Arizona over the past several cycles we've spent hundreds of thousands of dollars to using similar direct communication tactics, paid advertising, social media, mail, Spanish language radio, and other forms of direct communication run by our staff to reach out to these voters and inform them about issues that impact them, where candidates stand on those issues and larger policies.

Q.  How does Voto Latino finance all this work?

A.  As I mentioned, we are a nonprofit and so we rely on donations that we get from individuals, foundations, and our online grassroots fundraising campaigns.

Q.  Does Voto Latino have the funding to do everything it wants

to do in Arizona?

A.  No, unfortunately we do not.  As I mentioned, we have three bodies of work, and we do not have the funding to do the three fully, not here in Arizona or nationally.

Q.  Is that because Voto Latino has limited funds?

A.  Correct.  We have limited funds.  We have to decide where we can engage and what sort of audiences we can communicate with based on our limited funds and how much we can spend talking to those audiences.

A key part is we can't talk to somebody about voter turnout or advocacy if they're not yet registered to vote.

Q.  And when you have to put aside some of this other work because of your limited funds, is that work that you put aside also critical to your mission?

A.  Yes.  As I mentioned, if we have to spend more resources registering voters, registering more voters or the cost of registering a voter goes up, that means at the end of the day, based on our limited funds, we have less resources to communicate with them about turning out, getting them the information they need to cast a ballot and ultimately less resources to inform them about their ballot and the issues so they can make or cast a meaningful ballot.

Q.  Does Voto Latino -- well, you mentioned that it has staff, correct?

A.  Correct.

227

Q.   How many staff members does Voto Latino have?

A.   We have 14 full-time staff members at the moment spread across the country.

Q.   So turning now to the long question:  Are you familiar with HB2492's new provisions related to voter registration?

A.   I am.

Q.   Are you aware whether HB2492 now requires state form applicants to provide their birthplace on their application?

A.   I am aware.

Q.   Is Voto Latino concerned about the impact the birthplace provision will have on its constituents?

A.   Yes, we are.

Q.   Why is that?

A.   As I mentioned, Latino voters already engage in elections and -- elections at lower rates.  They are already registered at lower rates.  They turn out in lower rates.  We think these additional mandates and this birthplace question is just another barrier towards them actually successfully making it on to the voter file.

        Additionally, our community is more likely to be individuals who were born outside of the United States being naturalized citizens.  For them, this is just another opportunity to be disproportionately impacted and tripped up on this question, preventing them from making it onto the voter file.

Q.   And when you say it's a chance that they'll get tripped up and not end up on the voter file based on something that is not related to their eligibility to vote?

A.   Correct.  It could be simply human error, misunderstanding the question.  As I mentioned they are disproportionately impacted by virtue of being born outside of the United States, and our mission is to register and enfranchise as many Latino voters as possible.

And so by this happening, by having more individuals tripped up on the application unsuccessfully registering to vote, that frustrates our mission.

Q.   So you mentioned that it would frustrate your mission, this birthplace provision, can you tell me more about that?

A.   Yes.  Our goal is to enfranchise as many Latino voters as we can here in Arizona.  And by this birthplace provision, like I mentioned, is another opportunity for them to unsuccessfully make it onto the voter file, being tripped up on this issue.  It's an issue that disproportionally impacts them.

MR. LANGHOFER:  Foundation.

THE COURT:  I don't understand "another opportunity to trip them up."  I mean, birthplace is not a hard question to answer.  How could that trip them up?

THE WITNESS:  What I mean by that is individuals -- so our constituents are more likely to be born outside the United States.  That might mean different things to them.  It might,

you know, mean country, city, state, region.  There's a lot of different ways that our constituents can interpret that question.

THE COURT:  So you are worried that the birthplace requirement won't have any specific information as to what you have to put down, whether it's country?  City?  State?

THE WITNESS:  Yes, Your Honor.  That, in addition to it simply not being a question that was mandatory before.  It was an optional question that voters didn't have to necessarily mandate.  And now with that mandate and that question being one that disproportionally impacts our community, we worry that it's just going to be another hurdle preventing them from making it onto the voter file successfully.  We believe there's even more individuals who will then be unsuccessful making it onto the voter file.

BY MS. DIBRELL:

Q.  So how will this birthplace provision impact Voto Latino's operations?

A.  As a result of their being more individuals who are unsuccessful in making it onto the voter file, we will have to expend more resources reaching out to voters to register them.

It will cost us more to register the same amount of voters as we did in the last election cycle because a higher share of them will now be unsuccessful at registering to vote.

MR. WHITAKER:  I reraise the foundation objection, I

think.

THE COURT:  Overruled.

You may continue.

THE WITNESS:  And as a result, Voto Latino will have to expend more resources to register the same amount of voters. As I mentioned, we have limited funds.  What that will mean is that we will have less resources for voter turnout programming, or advocacy programming.

THE COURT:  So are you basically concerned that adding any more mandatory information is going to, in your words, "trip up" voters or voter registration?

THE WITNESS:  Your Honor, this one in specific just because we think it disproportionately impacts our community. We believe it's going to lead to an additional barrier just preventing them from making it onto the voter file, particularly when this wasn't a requirement check in the past.

THE COURT:  But if they're first-time registrations, they wouldn't have known that anyway.

THE WITNESS:  That is correct, but there might be individuals who are reregistering because they are college students, they moved to college campus, or they moved away from a college campus to a new address.

BY MS. DIBRELL:

Q.  So these -- excuse me.  This change to your operations, will that require you to spend more money on chase programs?

A.  Yes, as a result, if there's a larger -- when there's a larger share of individuals who are unsuccessful in making it onto the voter file, that will mean that we will have to spend more resources reaching back out to those individuals, trying to determine, you know, what went wrong and if they are eligible, how can we get them back onto the voter file.  And those will be additional resources taken away from other bodies of work.

Q.  And again, so these chase programs would occur after the election?  So after -- anyone who didn't make it on the voter file would not be able to vote?

A.  Correct.

Q.  How does the cost per registering a voter in Arizona compare to other states?

A.  Based on independent analysis that we had conducted in 2020 for our efforts, the cost was just a little over $50 per successful registrant.  That was on the higher end, much higher than many other states.

        THE COURT:  Whose cost are you referring to?

        THE WITNESS:  Our cost, like our impact of the cumulative resources we spent and how many voters we were able to register in return.

BY MS. DIBRELL:

Q.  Will the birthplace requirement increase these costs per registering a voter in Arizona?

MR. WHITAKER:  Speculation.

THE COURT:  Sustained.

BY MS. DIBRELL:

Q.  Will Voto Latino spend more moony on voter registration as a result of HB2492's birthplace requirement?

MR. WHITAKER:  Speculation.

THE COURT:  Sustained.

BY MS. DIBRELL:

Q.  Does Voto Latino expect its spending on voter registration to be as effective in Arizona because of these changes to the voter registration requirements?

MR. WHITAKER:  Speculation.

THE COURT:  I'm sorry.  I can't understand you.  You weren't speaking directly into the microphone.

MR. WHITAKER:  I apologize.  Speculation, again.

THE COURT:  Sustained.

BY MS. DIBRELL:

Q.  Mr. Patel, moving on, are you familiar with HB2492's new provision requiring applicants to check a box indicating that they're a citizen?

A.  Yes, I am.

Q.  Does Voto Latino have similar concerns about the impact of this new check-box requirement on its constituents?

MR. LANGHOFER:  Relevance.  I thought this was decided.

THE COURT:  I thought I already ruled on that.

MS. DIBRELL:  Yes, Your Honor, but defendants have made it clear that they are challenging standing with respect to the plaintiffs in this litigation and that they will -- and on appeal, we need to establish a record, that way we aren't prejudiced to prove that we have standing for each of our claims.

THE COURT:  How does the issue of checking the citizenship box show standing?

MS. DIBRELL:  Well, specifically we challenged the citizenship check-box requirement and defendants have stated in their pretrial briefs rather that we need to establish standing with respect to all of our claims.  So we are establishing a record for appeal.

THE COURT:  I'm really mystified, as if I've already ruled on this, why we should have testimony about it?  How does that relate -- how does this question relate to standing?

MS. DIBRELL:  It related to the impact of Voto Latino as a organization.

THE COURT:  Voter registration has always required some check box or avowal that you're a citizen.  I don't see how standing could be affected one way or the other by whether you leave it blank or fill it in.

MS. DIBRELL:  Yes, but it could affect Voto Latino's chase programs.  As Mr. Patel has testified, they track down

people that they have helped if they don't make it onto the voter registration rolls to help them get on.

THE COURT:  But since I ruled, that's not going to happen anymore.

MS. DIBRELL:  But standing is a jurisdictional issue.

THE COURT:  Move on, please.  This goes against my rule that we're not going to have a lot of discussion about things that have already been resolved in this case.

MS. DIBRELL:  Yes, Your Honor.

BY MS. DIBRELL:

Q.  Is Voto Latino concerned about HB2492's provision related to documenting proof of citizenship for state form registrants?

A.  Yes, we are.

Q.  Why?

A.  We primarily rely on the state form to register voters here in the state of Arizona.  In the past if somebody did not have the documentary proof of citizenship.  For example, college students, large portion of the ones we register on campus don't often have their documented proof of citizenship.  They sometimes only have their college ID.

In the past, these individuals would have been registered as a federal-only voter.  Due to these new provisions, these individuals will now be outright rejected, unable to make it onto the voter file as a state form voter or a federal-only voter, directly impacting our ability to

register them and turn them out.

THE COURT:  So you think that if they don't provide documented proof of citizenship, they won't be registered for federal elections?

THE WITNESS:  Correct.  In the past on the state form, it's my understanding that if they failed to provide documentary proof of citizenship, they would have then been registered as a federal-only voter.

THE COURT:  Right.  And what's changed?

THE WITNESS:  Underneath this new provision they will be outright rejected and not be registered as a federal-only voter.  That's my understanding.

THE COURT:  Didn't I already rule on that too?

MR. LANGHOFER:  Yes.

THE COURT:  I thought so.

MS. DIBRELL:  Yes, Your Honor, but again, we were establishing standing --

THE COURT:  So you're worried that if I'm wrong, he's going to tell us what new things they're going to have to do if on appeal this gets set aside.

MS. DIBRELL:  No, Your Honor.  I'm not worried that you'll be wrong.  I'm worried that --

THE COURT:  Oh, good.  I knew you were worried about that two weeks ago, so I'm glad you're past that.

MS. DIBRELL:  No, I am concerned about the record on

appeal since defendants have made it clear they intend to challenge plaintiffs' standing in this case.

THE COURT:  Okay.  Again, we are not -- there's resolved issues and there's issues for which we need evidence that I want to move -- not dwell on the what-ifs.  The law went into effect without the rulings that I've already made.

MS. DIBRELL:  Understood, Your Honor.

BY MS. DIBRELL:

Q.  Mr. Patel, are you -- do you know whether HB2492 will subject voters to investigation by the attorney general?

A.  I am aware it does, yes.

Q.  Is Voto Latino concerned about the impact of this provision on its constituents?

A.  Yes, we are.

Q.  Why?

A.  As I mentioned before, Latino voters in the state already engage in elections at lower rates than their counterparts register to vote at lower rates.

We believe that an added fear of criminal prosecution by failing to provide documentary proof of citizenship will only have a chilling effect going on further, dampen voter registration rates amongst Latino communities here, our constituents.

Q.  And how will this provision impact Voto Latino's operations?

A.  By having a chilling effect overall in voter registration and voter turnout.  It will lead towards Voto Latino -- making it harder for Voto Latino to conduct its mission of enfranchising Latino voters.

Increasing costs, having to reallocate resources from other parts of programming towards voter registration and voter turnout, as well as advocacy and informing those individuals about those criminal prosecutions or investigations.

Q.  Has Voto Latino done anything in response to HB2492 being passed?

A.  Yes.  As soon as we learned it was passed, our team went ahead and created content to help Arizonans understand what HB2492 is, ranging from videos, info graphics, one-pagers and such, tool kits to inform them about what HB2492 is, how it impacts them and their participation in future elections.

In addition to that, we put out a press release talking about HB2492, its impact on our constituents, offered key staff members, myself included, to reporters to talk about the issue as well.

Q.  And you've discussed this a bit, but who is Voto Latino concerned HB2492 will affect?

A.  We are concerned it will impact our constituents.  As I mentioned, our constituents are likely to be younger individuals living on college campuses, younger individuals who are navigating the process for the first time, individuals who

were born outside of the United States, naturalized citizens, elderly Latinos, disabled Latinos, and overall just our constituents.

Q.   Do you know if HB2492 is in effect?

A.   I understand it is not in effect due to this litigation.

Q.   Does that make you any less concerned about it?

A.   No.

Q.   Why not?

A.   HB2492, we believe, will continue to make it harder for Latino voters in the State of Arizona, our constituents, to successfully make it onto the voter file, to successfully cast a ballot.

It will go on to frustrate our mission of enfranchising Latino voters here in the State of Arizona, and turning them out and informing them.  We will have to reallocate resources as a response to HB2492.  Yeah.

Q.   When the law goes into effect, if it goes into effect, will Voto Latino implement the plans that you have discussed?

A.   Yes.  If it goes into effect, as I mentioned, we'll have to spend more resources registering the same amount of voters, which will be resources that we have to take away from our advocacy work, from our turnout work.  It will have an overall chilling effect on Latino voters and participation in Arizona.

Q.   But for the fact that elections officials aren't enforcing the law, would Voto Latino be already implementing these plans

that you've discussed?

A.   Sorry, can you repeat the question?

Q.   But for the fact that the law is not being enforced, would Voto Latino be implementing these plans that you've discussed?

A.   We would not be doing so otherwise, no.

Q.   I'm sorry.  Would you be doing it if the law was being enforced?

A.   If the law was being enforced, yes, we would.

Q.   Do you have any sense of what all of these plans will cost the organization?

A.   We believe they will have significant impacts on our organization and significant budgetary impacts having to reallocate resources from other bodies of work.

As I mentioned, we have limited resources, and so we will have to pull resources from voter advocacy, meaning that we will have less resources to inform Latino voters on issues and candidates because we have to spend more on voter registration.

Q.   You have mentioned pulling resources from voter advocacy. How will it affect your work in your other states?

A.   It could also go on to cause Voto Latino to have to pull resources from other states.  As I mentioned, Arizona is a top priority state for us, so in order to address the impacts that it would have on voter registration and voter turnout, we would be willing and we might have to pull resources from other

states, lower voter registration goals, voter turnouts, and voter advocacy goals in order to continue doing the work we want to do here in Arizona.

Q.   How much does Voto Latino typically spend on voter registration efforts in Arizona each year?

A.   That varies.  In 2020 in our presidential elections, we spent millions of dollars here in Arizona on our direct communication, as well as other resources.  In 2022 it was right at a million dollars.

Q.   How much does Voto Latino typically spend on Get Out The Vote efforts in Arizona?

A.   Similarly that number also really varies.  In 2020 we spent millions of dollars in Arizona on Get Out The Vote programming.  In 2022 we spent just a little over $1 million.

Q.   And how about Voto Latino's advocacy efforts in Arizona? How much did those typically cost?

A.   Over the past couple of cycles we've spent hundreds of thousands of dollars on advocacy voting efforts here in Arizona.

Q.   What types of voter engagement programs in Arizona does Voto Latino have planned for the future?

A.   All three of our major programs -- one, voter registration. We plan on registering 40,000 new voters in Arizona in time for the 2024 elections get Out The Vote programming.  We would like to target 375,000 low-propensity Latino voters here in Arizona,

as well as advocacy.  We would like to reach out to 450,000 Latino voters across the state through our advocacy programming.

Q.  Will HB2492 impact Voto Latino's, those targets you just mentioned in Arizona for 2024?

MR. LANGHOFER:  Speculation.

THE COURT:  Overruled.  You may answer.

THE WITNESS:  Yes.  As I mentioned, we believe now that as a result of HB2492, the cost part of our voter registration will increase, which will result in Voto Latino having to spend more resources reaching the same amount of voters, which will mean that we will have to decrease our advocacy audience, meaning that we'll have fewer individuals on our advocacy side of things that we would be reaching out to as a result of HB2492.

BY MS. DIBRELL:

Q.  Is that advocacy work also critical to Voto Latino's mission?

A.  Yeah.  I mean, our mission is to educate and inform and enfranchise Latino voters.  We don't stop at voter registration.  That is just a part of it.  If someone is not registered, we can't turn them out, can't engage them in democracy, and we can't inform them about their ballot if they don't have a ballot.  So voter registration is critical towards our work.  It is the first step, but is not the only step.

Q.  So you mentioned that Arizona is a top priority state.  Is that true for 2024 as well?

A.  Yes, it is.

        MS. DIBRELL:  No further questions.

        THE COURT:  Mr. Langhofer, cross-examination.

        MR. LANGHOFER:  Thank you, Your Honor.

                    CROSS-EXAMINATION

BY MR. LANGHOFER:

Q.  Sir, I've got a few questions for you.  You said a couple of times on direct examination that Latinos in Arizona vote at lower rates than elsewhere.  I want to see what you mean by that.  Do you know what the term CVAP means?

A.  I do.

Q.  What does it mean?

A.  Citizen Voting Age Population Data.

Q.  And what is VAP?

A.  Voting Age Population.

Q.  These are both different than all-Latino population, correct?

A.  Correct.

Q.  What happens when you compare just the CVAP numbers across the state, how does Arizona Latino turnout look then?

A.  Latino voters in Arizona, even based on CVAP data, turn out at lower rates than white voters in the State of Arizona.  They also turn out at lower rates than a lot of other states.

Q.   That wasn't the question though.  The question was:  What happens when you compare Latino CVAP across states?  I'm not asking for intrastate comparison to different ethnic groups.

A.   Are you asking if -- are you asking if comparing Latino CVAP data in Arizona to other states nationally?

Q.   CVAP data, say, in Iowa?

A.   I don't know the answer off the top of my head.  Also, CVAP is an estimation, as you mentioned.  It is also many times an undercount of Latino eligibility.

Q.   It's a number from the American Community Survey from the U.S. Census Bureau, right?

A.   Correct.  They say that it is an estimation of the Latino Voting Age Population, correct.

Q.   So when you say on direct that Latinos in Arizona vote at lower rates than other states, you're not only looking only at the adults who are citizens and Latino in Arizona?

A.   We're looking at Latinos based on CVAP data, as well as other data sources that we've acquired from other vendors.

          THE COURT:  So I don't want to be confused.  When you are giving the data about the lower rate of voting and voter registration, are you talking about citizens only?

          THE WITNESS:  We are looking at citizen voting age population data, correct.  So an estimation of those who are eligible, but again, like I think the last CVAP data that I understand, my team had sent me, was from 2020, so like four

years ago.

BY MR. LANGHOFER:

Q.  If I understand it correctly, your testimony was that CVAP Latino community in Arizona votes at a lower rate than CVAP white non-Hispanic community in Arizona, right?

A.  That is correct.  That is my understanding, correct.

Q.  And that's actually true in every state, right?

A.  I don't know all -- I have not looked at all those states. Again, we have five core states.  I wouldn't be able to testify to that.

Q.  All right.  So if we're looking now across states at just Latino CVAP, are you saying that the turnout rate is lower in Arizona than normal?

A.  I am saying that Latino voters in the state of Arizona looking at -- if we're looking at -- exclusively at CVAP data here, turn out less than other populations in the state, but also turn out less at -- compared towards "other states" as well.

        THE COURT:  Wait a minute.  You said other states, but are you talking about a national number?  Because you said "other states," but then when Mr. Langhofer asked you about a specific state, you didn't know the answer, which is not surprising, there's 50 of them.

        But are you comparing a national number of the Latino citizens who are eligible to vote percentage nationally against

Arizona, or are you just saying there's a lot of other states where it's higher?

THE WITNESS:  There's a lot of other states where it's higher.  Arizona doesn't rank in the top five, six states for Latino participation, based on CVAP date.

THE COURT:  Okay.  But do you know where among the 50 we rank?

THE WITNESS:  I do not, off the top of my head. Again, this is based on CVAP data, which there are other things we also look at, but for CVAP data I do not know off the top of my head.

BY MR. LANGHOFER:

Q.  Okay.  You talked about one of the reasons the Latino community is disadvantaged is because a lot of them speak English as a second language, correct?

A.  That is correct.

Q.  And I am sure what you mean is that Spanish is their primary language?

A.  Yes.

Q.  And if you work in Arizona, I am sure you know that Arizona elections officers provide Spanish translation services, correct?

A.  I am aware they do, correct.

Q.  You are not alleging that they don't do that in this case?

A.  No, I am not alleging they don't do it.

Q.  Okay.  You all don't register noncitizens to vote, do you?

A.  Sorry, can you repeat the question?

Q.  Do you -- does your organization register noncitizens to vote intentionally, perhaps it's an accident, but your goal is not to register noncitizens?

A.  Our goal is not to register noncitizens.

Q.  Okay.  And you're concerned that the requirement to providing documentary proof of citizenship will -- or checking the box will deter some people from successfully completing the process, right?

A.  Yes.  We believe that the check box and other barriers will lead towards more unsuccessful applicants who may have been eligible voters.

Q.  Let's think about some other requirements for voting.  Let's say I get the form, and I sit down at my kitchen table and I fill it out.  And I, with satisfaction, slide it across the kitchen counter and I never take it in, I never mail it in.  You wouldn't take the view that I should be registered to vote based on that form that never got submitted, would you?

A.  Um, excuse me, sorry.  I mean, if you are eligible to vote, we have no way of knowing what you did with the form once you got it.  And if you are eligible to vote, unless we hear otherwise, we would ideally keep contacting you to register to vote.

Q.  And if I just never mail it in.  I mean, you agree, I

should not be registered to vote if they never hear from me, right?

A.  If you never complete that application or -- online or other forms, yeah, you are not on the voter file.

Q.  What happens if I just sign it but I don't fill it in otherwise, mail it in?  Think I should be registered then?

A.  Sorry, can you repeat the question?

Q.  I sign the form, but I put nothing else on it.  No other information, just my signature.  Your position is not that someone like that should be registered to vote, correct?

A.  That is not my position.

Q.  Okay.  What if I fill it in but I don't sign it?  Is your position that those people should be registered to vote?

          MS. DIBRELL:  Objection, relevance.

          THE COURT:  Overruled.

          You may answer.

          THE WITNESS:  We want to enfranchise as many Latino voters as possible.  We are -- you know, if the information is correct and you do not sign the form, currently you wouldn't register to vote.

          We think that, you know, there is already a signature part on there.  We are not contesting that.

Q.  Okay.  What about a slightly different example.  Someone who really wants to vote, Dreamer, for example, been here almost his or her entire life.  Fill out the form perfectly.

Sign it.  Mail it in.  Personally, deliver it.  And they give a copy of the birth certificate, for example, one thing they don't have is DPOC, they are a Dreamer, right?  Is it your position that those people should be registered to vote?

A.  If they are not eligible to vote, my position is they should not be registered to vote.

Q.  You guys have been in this case for about a year?

A.  A little more, I believe, January 2022.

Q.  Have you yet identified a citizen of the United States who is a resident in Arizona and an adult, 18 years or older, who does not have a driver's license issued in Arizona after 1996, a U.S. birth certificate, a U.S. passport, a tribal identification card, or a naturalization number?

A.  We are not like polling or surveying our, you know, constituents --

THE COURT:  Could you just answer yes or no?

THE WITNESS:  No, we have not.

BY MR. LANGHOFER:

Q.  Let's talk about the birthplace requirement.  You do understand that the form in the statute require you to state -- to indicate your state or country of birth, right?

A.  Correct.

Q.  Do you know anyone who doesn't know the country they were born in?

A.  I think that people might -- I mean, our claim is that

people might misinterpret the question.  Not all places have states.  They might write an answer that isn't correct.  It just disproportionately impacts them because they're born outside the United States.

Q.  Disproportionately impacts people who don't answer the question correctly?  I am not trying to misconstrue this.  I am generally not trying to argue.  I want to understand.  Who do you think it impacts disproportionately?

A.  People who were born outside of the United States naturalized citizens attempting to register to vote.

Q.  Okay.  The naturalized citizens?

A.  Correct.

Q.  Okay.  So let's talk about money.  Money is important.  You already spend money on voter registration; you have for many years?

A.  That's correct.

Q.  You spend about 50 bucks per successful registration?

A.  In 2020.

Q.  Do you oversee the field observations for that registration?

A.  As part of being the managing director, I get to oversee the programs team, yes.

Q.  One of the reasons it's so expensive to do field work in Arizona is because it's so hot in the summer; am I right?

A.  A bulk of our registrants are not actually through field,

it's through other forms of direct communication, like digital

advertising, not through field.

Q.   Okay.  Interesting.  So maybe one of the reasons it's so

expensive in Arizona then is because the digital advertising

market is saturated because it's a purple state, correct?

A.   That could be.

          MS. DIBRELL:  Objection, speculation.

          THE COURT:  Overruled.

          You may answer, if you know.

          THE WITNESS:  That could be a portion of it.  I can't

isolate exactly how much of that percentage is attributed to

that.

BY MR. LANGHOFER:

Q.   Is it your position that you're entitled to a successful

registration for every $50 your organization spends?

A.   Sir, can you ask that question again?

Q.   It is your position that your organization is entitled to

one successful registration for every $50 that it spends?

A.   I would not use the term "entitled."  In 2020, based on the

resources that we spent, on average it costs $50 to register a

voter here in Arizona.

          THE COURT:  So I take it you came up with that number

because you know how much money you spent on all of the

different efforts at voter registration, and you know how many

registrations there were, and you just divided the

registrations into the total and came up with $50.

THE WITNESS:  Yes, Your Honor.  That part is correct.

BY MR. LANGHOFER:

Q.  What if the state increases its minimum wage laws, would that increase your voter registration costs?

A.  I don't think it has, off the top of my head.  We have not really looked into that or tried to connect the two.

Q.  What if a state like North Dakota goes from having no voter registration to having a voter registration system, that would increase voter registration costs certainly from zero to something above zero?

MS. DIBRELL:  Objection, calls for speculation.

THE COURT:  Sustained.

BY MR. LANGHOFER:

Q.  Is there anything in this law that requires you guys to spend money on investigations of voters who aren't citizens?

A.  No, we do not investigate noncitizens.

Q.  Okay.  I thought you testified that you were going to spend more money because of the investigations that would arise from this?

THE COURT:  No, he said they were going to spend more money because people who were registered might be the subject of investigations by the attorney general, and they would have to respond and help people.

BY MR. LANGHOFER:

Q.  Well, instead of directing the question to you, Your Honor, perhaps I'll ask him.  Are you saying that money is going to be spent on investigations or on advertising about investigations?

A.  In response to investigations, we would spend money on communications talking to our constituencies about the investigations, because we do not think that -- because we think that if -- let alone, investigations for criminal prosecutions will have a chilling effect on Latino voters overall, so we see the need to communicate with them about what is actually going on as a result of these investigations.

Q.  Do you know who is going to be investigated?

A.  I do not.

Q.  Do you know whether they are citizens?

A.  Sorry, do I know if they are citizens?

Q.  Right.  If you don't know who they are, you can't know whether they're citizens?

A.  My understanding is the investigation will -- a lot of those individuals will be those who are currently federal-only voters.  I do not know the citizenship or eligibility of all of them, no.

Q.  Why do you say that, that it's federal-only voters who are going to be investigated?

A.  That is part of the investigation, is my understanding.

Q.  What are you basing that on?

A.  I believe one of the provisions is that individuals that are currently federal-only voters will be subject to an investigation by the Attorney General's Office.

Q.  You think that's in the statute?

MS. DIBRELL:  Objection, calls for a legal conclusion.

THE COURT:  Sustained.

MR. LANGHOFER:  I think that's all I've got, Your Honor.  Thanks.

THE COURT:  Anybody else on cross?

CROSS-EXAMINATION

BY MS. PORTER:

Q.  Good afternoon.  My name is Hannah Porter, and I represent the Intervenor-Defendants, Speaker Toma and President Peterson. I just have a few questions.

You have consistently referred to members of the Latino community as "constituents."  Is Voto Latino a membership organization as in those constituents are members of your organization, or do you distinguish between members and constituents?

A.  We are not a membership organization.  We do not have members.  We --

Q.  Thank you.  And then on direct I think you testified that Voto Latino has already created content about HB2492; is that correct?

A.  That is correct.

Q.   Have you disseminated any of that, published it out to the public?

A.   I will check, but the answer is yes.  I can get back to you on exactly where it went out to.  We've shared it with partners, social media.  I also believe there's  -- available to anyone on our website.

Q.   Do you have an estimate as to how much money Voto Latino spent to create that content?

A.   I do not have that estimate currently off the top of my head, no.

Q.   Ballpark figure, more than a million?  Less than a million?

A.   Less than a million.

Q.   Has Voto Latino had to hire any additional staff because of the challenged laws?

A.   No.  I mean, we have not received additional resources to hire additional staff.  What I was referring to is mostly reallocating staff time at the moment.

Q.   Do you have an estimate, I guess, as to how much time you've spent preparing those materials in response to the challenged laws?

A.   It goes beyond myself into our social media team or content team, our comms team and other individuals.

Q.   Sorry, one second to look over my notes and then I'll be done, I promise.

There was one other thing I wanted to clear up.  I

think when you were testifying on direct you mentioned something about, and it may have been in the context of voter advocacy, but you mentioned something about Voto Latino's efforts to help constituents fill out a "meaningful ballot." Do you remember that testimony?

A.   I do.

Q.   Can you explain what you mean by a "meaningful ballot"?

A.   Yes.  What I was referring to there was part of our advocacy work where our goal is to inform the individuals that we're talking to about the candidates that are on the ballot, issues that impact them and where candidates stand on those issues.  What I mean by that is simply an informed voter.

Q.   So it doesn't have to do with the political positions that they are voting upon?

A.   No, this is through that advocacy body of work.  It's merely laying out where candidates stand on certain policies and positions that impact Latino community.

Q.   Okay.

        MS. PORTER:  Thank you, Your Honor.

        THE COURT:  Any redirect?

        MS. DIBRELL:  Yes, Your Honor.

                    REDIRECT EXAMINATION

BY MS. DIBRELL:

Q.   Mr. Patel, I just want to clarify your concerns related to -- Voto Latino's concerns related to birthplace, since you

were asked about those.

I believe you testified that in your experience often Voto Latino's constituents fail to make it onto the voter rolls because of an error?

A.   Yes.

Q.   This includes sometimes failing to fill out a required field?

A.   Correct.

Q.   Are you concerned that the birthplace requirement provides another opportunity for applicants to miss a field and be rejected for that reason?

A.   Yes.   The voter registration form is a long, complicated form.   These were not requirements that were required -- these were not requirements that existed in the past.   Just due to human error, people can not fill those fields out or have familiarity with having -- not filled that field out in the past, reregistering and not fill it out again, therefore be rejected.

Q.   So it sounds like, based on your experience, do you think that it is likely for some of the individuals that Voto Latino works to register, this would affect them?

A.   That is correct, yes.

MR. WHITAKER:   Speculation.

THE COURT:   The answer will stand.   The objection comes too late.

MS. DIBRELL:  Nothing further, Your Honor.

THE COURT:  May this witness be excused?

MS. DIBRELL:  Yes.

THE COURT:  Any objection?  Hearing none, thank you, Mr. Patel.  You may step down and you are excused.

Plaintiffs may call their next witness.

MR. DODGE:  Your Honor, before we call the next witness, I want to briefly address an issue related to discussion on standing that just occurred.

THE COURT:  No, I want you to call your next witness.

MR. DODGE:  Very well.

MS. LAMORTE:  Reginald Bolding.  My name is Rachel Lamorte of Mayer Brown on behalf of the LUCHA plaintiffs.

THE CLERK:  Come right in front of me.  Raise your right hand.

**REGINALD BOLDING, PLAINTIFFS' WITNESS, SWORN**

THE CLERK:  Can you place state your name and spell your last name for me?

THE WITNESS:  Reginald Bolding, Jr.  B-O-L-D-I-N-G.

THE CLERK:  And then you can go ahead and have a seat.

DIRECT EXAMINATION

BY MS. LAMORTE:

Q.  Good afternoon, Mr. Bolding.

A.  Good afternoon.

Q.  Can you tell the Court your current role?

REGINALD BOLDING, JR. - DIRECT EXAMINATION    258

A.    I serve as the president and former executive director of the Arizona Coalition for Change.

Q.    And what is Arizona Coalition for Change?

A.    501(c)(3) nonprofit organization.

Q.    Okay.  And when was Arizona Coalition for Change founded?

A.    In 2017.

Q.    Have you been involved with the organization since then?

A.    Yes.

Q.    In what capacity?

A.    I was the founder of the organization, so since its inception.

Q.    And does Arizona Coalition for Change have a mission?

A.    Yes.  So empower everyday people in the community to change the community around them through civic engagement, building civic power, and community collaboration.

Q.    And does Arizona Coalition for Change operate in particular communities?

A.    We do.  Primarily in three separate counties.  In Maricopa County, the primary city is in Phoenix.  In Pima County, primarily in Tucson.  And then also in Pinal County as well.

Q.    And does the organization focus on any particular communities of people?

A.    We do.  We primarily target underserved historically disadvantaged communities, black, brown, indigenous communities, young people, and then also women.

REGINALD BOLDING, JR. - DIRECT EXAMINATION          259

Q.   And why does Arizona Coalition for Change focus on those communities?

A.   Well, historically, what we know is that disadvantaged communities have had more difficult time changing the world around them.  So for us, we want to give voices to those who we believe have not always had an opportunity to have their voices heard.  So that's why our organization has been keenly targeted and focused on this group of people.

Q.   Can you describe some of your organizations activities?

A.   Yes.  So we have leadership development programs where we work with youth, college students, those who are young in their careers.

     We run civic engagement programs like voter registration, voter education programs.  We also do community organizing work, which we let people know about policies that take place and how they can be involved and interact with those policies.

Q.   Okay.  Can you tell us a bit more about the leadership development programs that Arizona Coalition for Change organizes?

A.   Yes.  So the leadership development programs, one of them we have is called Civic Scholars.  And the Civic Scholars program is designed for high school students to give them an opportunity to really change the world around them and allows them to use their voice, allows them to have the ability to see

how the political system works, and ultimately, encourage them to, you know, get involved in some way or some fashion.

Q.   Okay.  Can you tell us a bit about Arizona Coalition for Change's voter education programs?

A.   Yes.  So right now, with our voter education programs, we do a number of things, primarily informational.  So we provide information on when elections are taking place.  We allow people to know what offices are actually going to be up for election.

We tell people, you know, where they can vote.  We also let people know what particular office has -- what power they have if they wanted to make a change.

Q.   And why does Arizona Coalition for Change organize these programs?

A.   Primarily a lot of people in the communities who we serve, they are not familiar with the political system, so they may not know the same power that a school board member has is separate than the power of a congressional member.  So for us, we want to make sure that if there's any issues or problems or solutions that they want to solve, they know exactly who to talk to.

Q.   Can you tell the Court how these voter education programs are typically organized?

A.   So typically with the voter education programs we have a community organizer who works with their manager, and they plan

out what the content of the program we are going to do.  Then they bring in our communications coordinator who sets, you know, different ads and things of that nature in order to be able to communicate what the actual message is that we want to get out.

If we are going to host an event, we set that up, and if it's something that's just information only, that's set up as well.

Q.  And the organizers, the managers, the communications coordinators, are these individuals that Arizona Coalition for Change have on staff?

A.  Yes, they are.

Q.  And you testified about both events and ads.  With respect to ads, how much time does it typically take to organize -- or I apologize.

With respect to events, how much time does it typically take for Arizona Coalition for Change to put on a voter education event?

A.  So at minimum about ten hours.  So from the creation of the content of the ad or the content of the event and research for the event, that takes time.  Then there's the creation of, you know, the ad or the strategy in order to have people in the community attend the event, that takes time.  Then there's also the actual recruitment of people in the community to come to the event.  So at minimum, 10 hours.

REGINALD BOLDING, JR. - DIRECT EXAMINATION         262

Q.   And with respect to recruitment of people to come to the event, what does Arizona Coalition for Change do in order to get folks to the events?

A.   So for us, we believe, you know, the information that we are providing is essential for people in the community, so we try to use all forms of communication as possible.  So we send text messages to people who are on our list.  We send out emails.  We put ads on social media as well.  We flier in the community.  So we use as many forms of communication as possible to ensure that people understand what's happening.

Q.   Are there costs associated with any of these marketing materials you just described?

A.   Yeah, there's costs associated with each one of them.

Q.   Can you describe those costs?

A.   So if we're using a texting service, for every text message that we send, there's a cost associated with that.  If we are using email service, the platform that we're sending, there's a cost associated with that.

     With regards to social media, if we are posting an ad on social media, we're boosting that ad.  We are getting that ad out in the community, there's a cost associated with that.  And then our community organizers or canvassers out in the community have printed flyers, they are giving those out.  There's a cost associated with that as well.

Q.   Can you describe an example of a voter education event

Arizona Coalition for Change has put on?

A.   Yeah, so we've had voter education events where we're talking to the people about the changes in Arizona law.  So people know whether or not they are still on the rolls, how to get on the rolls.

We talk about changes with regards to specific policies.  So we call them, you know, voter education roundtable discussions in which we may have a guest speaker come in, and we are giving people information.

Q.   You testified as well that Arizona Coalition for Change places ads as part of their voter education program.  Do you recall that?

A.   I do recall.

Q.   Can you describe for the Court what that entails?

A.   So it entails the creation -- so of a graphic that's created, and the ad is placed on a social media platform.  And with the ad on the social media platform, we are then putting -- you know, targeting behind that and we're pushing it out into the community.

Q.   Who creates these graphics?

A.   So sometimes it's our in-house communication staff.  Other times we've used outside digital firms to create it, if we don't have the capacity in-house.

Q.   Is there a cost associated with using an outside digital firm?

A.   There is.

Q.   And are there any costs associated with the actual placing of these voter education ads?

A.   Yes.  So there's two different forms.  We have one in which we could post the ad organically, where we can, you know, try to push it out.  We also have opportunities where we can put money behind the ad, which we tend to do, and that gets out to more people in the community that actually have the message heard.

Q.   And can you describe an example of a voter registration ad Arizona Coalition for Change has placed?

A.   Yes.  So we have placed ads to tell people when early voting starts.  We've placed ads to tell people when election day is.  We've placed ads to let people know where they can drop off their early ballots.

     So we are providing people with information that they may not see, but them being part of our ecosystem, we have the ability to actually see it.

Q.   And are you familiar with HB2492?

A.   I am.

Q.   Are you familiar with HB2243?

A.   Yes.

Q.   Are those the laws that are at issue in this litigation?

A.   Yes, they are.

Q.   If those laws -- do you have an understanding as to whether

those laws have been implemented at this time?

A.  My understanding is that they have not been implemented at this time.

Q.  If those laws go into effect, does Arizona Coalition for Change intend to plan any events to educate voters about the new laws?

A.  I believe we have to, yes.

Q.  Why?

A.  Well, we believe that these laws place a significant challenge for individuals who may want to get registered to vote.  So we want to make sure that people know what information that they need in order for them to actually be registered.

        We also want to make sure that they can communicate that to other people in their community.  Make sure that they actually can have their voices heard, which is core function to our organization.

Q.  And if the Challenged Laws go into effect, does Arizona Coalition for Change intend to create any voter education ads about those laws?

A.  Yes, we are.

Q.  Why?

A.  Well, we know that alternative forms of communication like social media, text messaging, things of that nature, are forms of communication that gets to the community that we serve.  And

we know that there may be other forms and messages that this information is disseminated with, but the populations who we serve, they use us as a trusted messenger in the community.

Q.  With respect to potential events, you testified earlier about how voter education events are organized in Arizona Coalition for Change.  Do you recall that?

A.  Yes.

Q.  To the extent Arizona Coalition for Change intends to plan an event about the Challenged laws, will they be organized in a similar manner to what you described already?

A.  Yes.

Q.  And to the extent the laws go into effect and Arizona Coalition for Change creates ads, voter education ads about the laws, would they be created in a similar manner to what you described?

A.  Yes, they would.

Q.  I would like to switch topics slightly.  You testified earlier that one of the -- as part of Arizona Coalition for Change's civic engagement work, there is a voter registration program.  Do you recall that?

A.  I do recall.

Q.  Can you tell the Court about Arizona Coalition for Change's voter registration program?

A.  Yeah.  So each year what we do is we look at the voter registration rolls.  We look at census reports.  We look at the

communities that we're looking to serve, and we set, you know, goals and targets for ensuring that people in the community are registered to vote.

We create a full program based on our current capacity, based on the number of people who we believe that we'd be able to actually register, and we set up our program.

Q.  And can you tell us a bit more about what that program entails?

A.  So the program itself, we have two ways in which we register individuals.  We use what's called "hot spots," where we go to high-traffic locations, grocery stores, small business, libraries, and we register people to vote there.

We also table at different events that we go to that tend to be high-traffic events and we register people.  They come up to our table, if they are not registered, we register them to vote there.

Q.  Why register voters at "hot spots," as you call them?

A.  Well, what we do know is that people typically who have been historically disadvantaged, there's not a ton of time on their hands, meaning the people that we register, they're working multiple jobs, they have families.

So for us to try to find them in the community doing the activities that they traditionally are doing, that gives us an opportunity to register people there.  And, you know, at large community events doing tabling, it's another opportunity

for us to register people.

Q.  Let's talk about hot spots first.  At hot spots, is there a particular staffing for the voter registration program?

A.  Yes.

Q.  And who staffs those?

A.  These are typically staffed by our community organizers. We had volunteer staff at that time as well.

Q.  And how many community organizers would staff a typical hot spot registration?

A.  So typically at each location there may be one or two community organizers at multiple hot spots throughout any given day.

Q.  Okay.  And at the tabling events, is the staffing similar?

A.  It is.

Q.  At either the hot spots or the tabling events, how do those individuals help people register to vote?

A.  So traditionally, you know, there may be an at table event. There may be a sign that says, "Get registered to vote here."

We also will talk to individuals and ask them if they are registered to vote.  Some people say yes; some people say no.  If they are not registered to vote, we will ask them if they want to get registered, and we'll, you know, walk through the voter registration process with them.  They will fill out the form.  They will receive a receipt, and we'll turn in those voter registration forms.

Q.   The individuals at the hot spots or tabling locations, do they have equipment with them of any sort?

A.   They do.

Q.   What sort of equipment?

        MR. LANGHOFER:  Relevance.

        THE COURT:  Overruled.

        You may answer.

        THE WITNESS:  So the equipment they typically have is a clipboard, and they have voter registration forms.  They have pens.  It is getting a little hot out in Arizona at different times, so they may have a ice pack or something they put on their neck, something of that nature, to register people.

Q.   And prior to these individuals going to register voters, does Arizona Coalition for Change conduct any training?

A.   We do.

Q.   What does that training consist of?

A.   So before any community organizer or canvasser go out and register, typically from 30 minutes to an hour they're trained every single day just on any changes in particular that may have happened in the law, anything that's happening in the community that they need to be aware of that people may just ask them.  As they are talking to people, they are seen as an expert, just an expert registering people to vote, so we teach them that process and train them every single day.

Q.   In your experience, how many individuals does a single

staffer, for example, have to speak to in order to register a single voter?

A.  To register one voter, an organizer will probably talk to about ten people.

Q.  Why ten?

THE COURT:  Okay, and why do I care?

MS. LAMORTE:  Well, Your Honor --

THE COURT:  I mean, this is their normal -- this is what they do.  This is their regular mission.  Why don't we get to what it is that you called this witness to testify about.

MS. LAMORTE:  Certainly I will move on, Your Honor.

BY MS. LAMORTE:

Q.  You testified, Mr. Bolding, that some individuals at the hot spots or the tables say they are registered to vote.  Do you recall that?

A.  Yes.

Q.  Currently, does Arizona Coalition for Change confirm that in any manner?

A.  No, we don't.

Q.  Okay.  Now, if the Challenged laws go into effect, will Arizona Coalition for Change change its voter registration program in any manner?

A.  Yes, we would.

Q.  How?

A.  Based on my understanding of the law, in order to ensure

that people are registered, that they have a successful registration, we have to ensure that there's some type of, you know, secure cell phones that people would need to take copies of documentation.

We would have to make sure that we have the ability to, you know, train these community organizations in a different way, because they are going to need to have this information as they're turning in with the voter registration forms.

And we also are going to have to make sure that from a standpoint that we either have more community organizers out in the community registering people and more volunteers registering people, just because it would probably take a lot more attempts to register someone because of the requirements.

Q.  With respect to individuals that say at a hot spot that they're already registered, would Arizona Coalition for Change make any changes as to its interactions with those individuals?

A.  Yes.  So for people who say that they're already registered, we would check to make sure that they are registered.  We would use the, you know, the voter access -- the access to the voter database to make sure they are registered, as we, you know, believe there's going to be a highly likelihood of folks who think they are registered who aren't.

THE COURT:  Is that typically something you'd do at a

hot spot, somebody has a computer there so they can access the voter registration database and somebody says I'm registered, they check and say, oh, yes, thank you very much, or you think you are registered, but you are not?

THE WITNESS:  Currently that is not a practice that we currently do, but it's a practice that we would do if this law is implemented.

THE COURT:  So currently, if somebody says, "I'm registered."  You say, "That's great, goodbye."

THE WITNESS:  We'd give them information about, you know, when the election is coming up or any other information that would be pertinent.

THE COURT:  Why would you -- if somebody came up to you after the implementation of these laws and said -- or you called them over and said, "Would you like to register to vote?"  And they said, "I'm already registered to vote," why would you go forward and say, "Oh, well, let me double check for you"?

THE WITNESS:  Yes.  So what we want to do is we want to ensure that their registration, you know, would actually be active and valid.

THE COURT:  You don't do that now.  My question is: Why would you do that based on these laws?

THE WITNESS:  Well, based on these laws, we believe there's going to be a high number of individuals who are going

to assume that they're registered who won't be registered because they don't have documentary proof of information with them as they're turning in those forms.

BY MS. LAMORTE:

Q.   Is Arizona Coalition for Change considering any additional programming or voter registration programming as a result of the Challenged laws?

A.   Yes, we are.

Q.   Can you tell the Court about that?

A.   So we would open up office hours at our physical locations to ensure that people who we're having conversations with in the community who may not have, you know, physical documents with them, a passport or a birth certificate, if they don't have them those with them as they're in a community hot spot, we'd want to make sure that they still have an opportunity to register to vote in a complete way, so we would open up office hours at our office.

Q.   Does that have any associated cost?

A.   Yes, it would.

Q.   What would that be?

A.   We'd have to pay someone to actually staff those office hours.  We may need to hire an additional staffer in order to actually conduct the registration at site.

Q.   If Arizona -- strike that, excuse me.

          If the Challenge Laws go into effect, would Arizona

Coalition for Change have to change any of its non-civic engagement programming?

A.   Yes.

Q.   Can you tell the Court about that?

A.   Well, our civic engagement programming includes our voter registration programs.  If we now have to devote more resources to our civic engagement programs that are focused on voter registration, it would deplete resources that we have for other programs.

Q.   What sorts of programs?

A.   The civic scholars program, in particular.

Q.   Can you tell the Court a bit more about that?

A.   So this is a program in which we work with high school students, and we provide high school students with information about civic engagement, about being organizers, about how to actually have their voices heard in the community.  And this is a program that's primarily funded through our civic engagement grants.

Q.   Do you in your estimation -- strike that, excuse me.

        Would Arizona Coalition for Change have to make changes to any other programs if the Challenged Laws go into effect?

A.   We could.

Q.   Could you tell the Court a bit more about that?

A.   So we have organizing programs that we have as well, and

our organizing programs, again, that are connected to our civic engagement programs, we would have to shift resources in order to make sure that our community organizers are actually out in the field registering people to vote.

Q.  And why would your community organizers have to be out in the field registering people to vote?

A.  In order for us to make sure that we are able to, you know, meet goals and make sure that we are registering as many people as possible.  We would want to have as many people in the community who are staff or volunteers talking to as many people as possible.

Q.  And why do they have to talk to as many people as possible?

A.  Typically it takes, you know, 10 -- we have to talk to about 10 people just to register one person.  So for us, you know, in order for -- we believe if this law is going to be in place, that could be 20 to 30 people we'd have to talk to in order to have one complete registration.

Q.  At this time is Arizona Coalition for Change -- or excuse me.

        If the Challenged Laws go into effect, would Arizona Coalition for Change have to make any additional hires in order to get more people into the field as you were just describing?

A.  Yes, we would.

Q.  Do you have an estimate of how many?

A.  At this time, I don't know.

Q.   Okay.  You testified at the start of your testimony about some of the communities that Arizona Coalition for Change serves.  Do you recall that?

A.   I do.

Q.   And can you remind the Court why those are communities that your organization focuses on?

A.   Well, these communities --

THE COURT:  Excuse me.  He already talked about that at the beginning of his testimony.  I don't have a need to be reminded of what he said when he started.

MS. LAMORTE:  Understood.

BY MS. LAMORTE:

Q.   In your opinion, are the Challenged Laws going to have an effect on the communities that Arizona Coalition for Change serves?

MR. WHITAKER:  Speculation.

THE COURT:  Um, for it not to be speculative, you'd have to lay some foundation for how he knows that to be so.

MS. LAMORTE:  Certainly.

BY MS. LAMORTE:

Q.   Mr. Bolding, do you have an understanding of what HB2492 will require of voters in Arizona if it goes into effect?

A.   Yes.

Q.   And do the communities that Arizona Coalition for Change serves have any particular problems or issues obtaining certain

types of documentation?

A.  Yes.  What we find is historically a number of people who we look to register, they may not have a driver's license or a photo ID with them at that -- at the particular time we are trying to register them.

Q.  Are there other types of documentation in your experience that those particular communities may lack?

A.  Yes.  So some individuals who may be transient, they may not have birth certificates.  They may not have passports.  They may not have those documents, so at many times when we're registering people, they may not have everything that the form is asking them to have at that particular time.

Q.  And with that understanding, in your opinion, are the Challenged Laws likely to have an affect on the communities that Arizona Coalition for Change serves?

MR. WHITAKER:  Speculation as to likely.

THE COURT:  If -- do you think that this law requires more documentation than the documentation that already is a problem for your constituents?

THE WITNESS:  Could you repeat that question?

THE COURT:  Do you have some reason to believe that the laws have requirements for documents that are different from the documents that are already a problem for the people you serve.

THE WITNESS:  I believe the documents that the law has

in requiring people to submit those with their registration form is something that people typically just don't have with them.

THE COURT:  So it's no different now than if these new laws are implemented?

THE WITNESS:  No, I think the difference would be that in order to turn these forms in physically, individuals who currently don't have those forms with them physically, they won't be able -- I mean, their registration forms aren't -- may not be counted or submitted.

MS. LAMORTE:  Excuse me, one moment.  Thank you.  I don't have any further questions at this time.  I will pass the witness.

THE COURT:  Any questions on cross?

Mr. Whitaker.

MR. WHITAKER:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. WHITAKER:

Q.  Mr. Bolding, as I understood your testimony, it was basically that you think these new laws will change the status quo in a way that will impact your organization; is that right?

A.  Yeah, I believe that these laws will impact, you know, Arizona citizens on being able to have the ability to vote in different ways, yes.

Q.  What is your understanding of how these new laws will

change the status quo?

A.  My understanding is that with regards to House Bill 2492, documents that individuals would have for citizenship and residency would now be required to be turned in and submitted in order for them to register to vote.

     And with regards to House Bill 2243 that there is opportunities for purges from individuals from the rolls.

Q.  Is it your opinion that 2492 requires additional documents of citizenship that weren't required before?

A.  Could you repeat the question?

Q.  Is it your opinion that HB2492 requires additional documents for citizenship that weren't required before?

A.  For residency.

Q.  For residency, not for citizenship?

A.  For residency and citizenship with regards to the documentation that they need -- for residency, the new documents for citizenship, these documents now have to be submitted with the registration form.  That's my understanding of the bill.

Q.  What are the new documents for citizenship that you believe are now required by HB2492 that weren't under the statute?

     THE COURT:  You know, it's not really helpful to have his belief as to what the documents are.  What's important is whether there are additional citizenship documents that are required now that weren't required previously, and I don't

think that I need testimony about that.

MR. WHITAKER:  Fair, Your Honor.  That's all I have.

THE COURT:  Anyone else?  Ms. Porter?


CROSS-EXAMINATION

BY MS. PORTER:

Q.  Good afternoon.  I am Hannah Porter.  I represent Intervenor-Defendants Speaker Toma and President Peterson.

Mr. Bolding, is Arizona Coalition for Change a membership organization?

A.  So the Arizona Coalition for Change has members, and we also have individuals who volunteer with the organization.

Q.  How many members does Arizona Coalition for Change have, approximately?

A.  So it fluctuates, and we count members as someone who is attending an event, someone who may have given a distribution.  So it fluctuates from year to year.

THE COURT:  So it's not like people join formally?

THE WITNESS:  So we do have programs that people can join, and we also have programs that people don't have to be a member in order to have access to that information.

THE COURT:  Okay, thanks.

BY MS. PORTER:

Q.  Do you have an estimate as to currently how many formal members you have?

A.   I don't have the exact number with me, no.

THE COURT:  I mean, is it 100?

THE WITNESS:  Hundreds.

THE COURT:  Is it a thousand?

THE WITNESS:  Hundreds.

THE COURT:  Hundreds?  Thank you.

BY MS. PORTER:

Q.   And so how does someone become a formal member of your organization?

A.   So to become a formal member of the Arizona Coalition for Change, you can make a contribution to the organization, you can volunteer at any one of the events.

Q.   Okay.  Do formal members have any rights that others don't have, like voting in board elections, or anything like that?

A.   No.

Q.   Is Arizona Coalition for Change's position that any current member of Arizona Coalition for Change has been injured by the Challenged Laws as of today?

MS. LAMORTE:  Objection, relevance.

THE COURT:  Overruled.

You may answer.

THE WITNESS:  It's possible.

BY MS. PORTER:

Q.   Can you identify any specific member that has been injured by the Challenged Laws as of today?

REGINALD BOLDING, JR. - CROSS-EXAMINATION                282

A.  I haven't went through rolls and --

THE COURT:  Can you just answer yes or no, if you have or have not identified anyone.

THE WITNESS:  I have not identified anyone at this point in time.

BY MS. PORTER:

Q.  So Arizona Coalition for Change has been a part of this lawsuit for approximately a year, is that correct, somewhere around there?

A.  Approximately.

Q.  And have you identified any adult Arizona resident who is a citizen but does not have a U.S. birth certificate, a U.S. passport, a tribal identification number, naturalization number, or an Arizona driver's license after 1996?

A.  The question was have I?

Q.  Identified an adult Arizona resident who is a citizen but doesn't have any of those five items that I listed?

A.  I have spoken with people who have had -- who have not had some of the five items that you mentioned, absolutely.

Q.  Have you identified those individuals in this lawsuit, in connection with this lawsuit?

THE COURT:  You mean by name?

MS. PORTER:  Yes.

THE WITNESS:  To the best of my knowledge we haven't put any individual's name in the lawsuit, and it is also my

underling that neither of these laws have been implemented. So with regards to them being injured at this particular time, it hasn't occurred.

BY MS. PORTER:

Q. Okay. And of those individuals, I guess, that you've spoken to who don't have those five things but they're a citizen adult resident, was that in connection with attempting to registering them to vote?

MR. WHITAKER: Friendly objection. That may have misstated the testimony.

THE COURT: No friendly objections.

BY MS. PORTER:

Q. Sorry, I am not trying to misstate your testimony.

I think in connection with my question, I had asked if you had identified certain -- if you had identified any individuals -- sorry, I know it is a very long question.

Adult Arizona resident who is a citizen who didn't have birth certificate, passport, tribal ID number, naturalization number, Arizona driver's license after 1996.

And your answer, I believe, but please correct me if I was wrong, is that you have spoken to persons who did not have those documents, correct?

A. That's correct.

Q. Was -- were those conversations in connection with attempting to register those persons to vote?

A.   Yes.

Q.   Were you able to help those persons register to vote?

A.   No.

Q.   When were these conversations?

A.   I don't recall the exact date and time.

Q.   Within the past couple of years?

A.   I don't recall the exact date and time.

Q.   And in your testimony, you said that it was your belief that it would take more attempts to register persons to vote under the Challenged Laws; is that correct?

A.   Yes, ma'am.

Q.   Why do you think it would take more attempts to register persons to vote?

A.   Um, from my experience registering people to vote myself and then also my experience supervising people who register people to vote, there are a number of reasons why someone would not register to vote at a particular moment.

It could be that they don't have enough time.  That they are with their kids.  It could be because they said that they are already registered.

It could be because they don't have a driver's license or an ID.  It could be a number of things as to the reasons why.

THE COURT:  Okay.  But that's what happens now.  Why do you think instead of one in 10 it is going to be 1 in 20 or

1 in 30 people that you talk to?

THE WITNESS:  Now, for us, we want to make sure that people have the ability to register the whole ballot, you know, federal, state, local elections, and for us, what we want to do is make sure that we have a complete voter registration form for individuals.

So in order for that, those individuals would need to have some form of documentation that we would have in order for them to turn those in.

BY MS. PORTER:

Q.  Sorry, back to the question about those persons --

THE COURT:  Okay, how many more questions do you have?  It's after 5:00.

MS. PORTER:  My apologies, Your Honor.  I only have a few more.  I can pause here and we can start again in the morning.

THE COURT:  Are there going to be any questions on redirect?

MS. LAMORTE:  Reserving our rights, Your Honor, at this time, no.

THE COURT:  Why don't you ask two more questions and then be done.

MR. LANGHOFER:  Your Honor, I may have.

THE COURT:  Oh, you have questions too?

MR. LANGHOFER:  I think I am going to be very short.

THE COURT:  Well, it will have to be tomorrow morning. Court is in recess until 9:00.

(Proceedings conclude at 5:03 p.m.)

287

C E R T I F I C A T E

I, ELVA CRUZ-LAUER, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 7th day of November, 2023.


                                    s/Elva Cruz-Lauer
                              Elva Cruz-Lauer, RMR, CRR