2:22-cv-00509-SRB, November 7, 2023 P.M.

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

Mi Familia Vota, et al.,          )
                                  )
                Plaintiffs,       )
                                  )
        vs.                       ) 2:22-cv-00509-SRB
                                  )
Adrian Fontes, et al.,            )
                                  ) Phoenix, Arizona
                Defendants.       ) November 7, 2023
_____) 1:07 p.m.

BEFORE:  THE HONORABLE SUSAN R. BOLTON, JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

BENCH TRIAL - DAY 2 P.M.

(Pages 399 through 524)

Official Court Reporter:
**Elaine Cropper, RDR, CRR, CCP**
Sandra Day O'Connor U.S. Courthouse
401 West Washington Street
Suite 312, SPC 35
Phoenix, Arizona  85003-2150
(602) 322-7245

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

United States District Court

400

2:22-cv-00509-SRB, November 7, 2023 P.M.

**APPEARANCES**


For Plaintiff United States of America:

    **JENNIFER J. YUN, ESQ.**
    U.S. DEPARTMENT OF JUSTICE - VOTING - M STREET
    4 Constitution Square
    150 M. Street NE
    Washington, D.C.  20503

    **RICHARD DELLHEIM, ESQ.**
    **SEJAL JHAVERI, ESQ.**
    **MARGARET TURNER, ESQ.**
    U.S. DEPARTMENT OF JUSTICE-CIVIL RIGHT DIVISION, VOTING
SECTION
    950 Pennsylvania Avenue NW
    Washington, D.C.  50530


For Plaintiff ADRD Action, Arizona Students' Association,
League of United Latin American Citizens Arizona, Living
United for Change in Arizona::

    **DANIELLE MARIE LANG, ESQ.**
    **HAYDEN JOHNSON, ESQ.**
    **MOLLY DANAHY, ESQ.**
    **ROBERT BRENT FERGUSON, ESQ.**
    **JONATHAN DIAZ, ESQ.**
    CAMPAIGN LEGAL CENTER
    1101 14th Street NW, Suite 400
    Washington, D.C.  20005

    **COURTNEY HOSTETLER, ESQ.**
    FREE SPEECH for PEOPLE
    1320 Centre Street, Suite 405
    Newton, Massachusetts  02459

    **RACHEL J. LAMORTE, ESQ.**
    MAYER BROWN, L.L.P.
    1999 K Street NW
    Washington, D.C. 20006

    **WILLIAM JOSEPH MCELHANEY, III, ESQ.**
    MAYER BROWN, L.L.P.
    71 S. Wacker Drive
    Chicago, Illinois 60606


United States District Court

2:22-cv-00509-SRB, November 7, 2023 P.M.

**APPEARANCES (Continued)**

For Plaintiff Arizona Asian American Native Hawaiian And Pacific Islander for Equity Coalition:

**NIYATI SHAH, ESQ.**
ASIAN AMERICANS ADVANCING JUSTICE
1620 L Street NW, Suite 1050
Washington, D.C.  20036

**SADIK HUSENY, ESQ.**
**AMIT MAKKER, ESQ.**
**EVAN OMI, ESQ.**
**CATHERINE ANNE RIZZONI, ESQ.**
**SCOTT KANCHUGER, ESQ.**
LATHAN & WATKINS
505 Montgomery Street, Suite 2000
San Francisco, California 94111

For Plaintiff Arizona Democratic Party, Democratic National Committee:

**CHRISTOPHER E. BABBITT, ESQ.**
**BRITANY RILEY-SWANBECK, ESQ.**
WILMER CUTLER PICKERING HALE & DORR, L.L.P.
2100 Pennsylvania Avenue NW
Washington, D.C.  20037

**KELSEY QUIGLEY, ESQ.**
WILMER CUTLER PICKERING HALE & DORR, L.L.P.
2600 El Camino Real, Suite 400
Palo Alto, California  94306

For Plantiff Poder Latinx:

**JOHN A. FREEDMAN, ESQ.**
**LEAH MOTZKIN, ESQ.**
ARNOLD & PORTER KAYE SCHOLER, L.L.P.
601 Massachusetts Avenue NW, Suite 100
Washington, D.C.  20001

**BEAUREGARD WILLIAM PATTERSON, ESQ.**
**JONATHAN SHERMAN, ESQ.**
**MICHELLE KANTER COHEN, ESQ.**
FAIR ELECTIONS CENTER
1825 K Street NW, Suite 701
Washington, D.C. 20006

United States District Court

2:22-cv-00509-SRB, November 7, 2023 P.M.

**APPEARANCES (Continued)**

For Plaintiffs Tohono O'odham Nation:

    **ALLISON NESWOOD, ESQ.**
    NATIVE AMERICAN RIGHTS FUND
    250 Arapahoe Avenue
    Boulder, Colorado 80302

    **SAMANTHA BLENCKE KELTY, ESQ.**
    Hufford Horstman Mongini Parnell & Tucker, P.C.
    P.O. Box B
    Flagstaff, Arizona  86001-4547

For Plaintiff Voto Latino, Mi Familia Vota:

    **CHRISTOPHER DODGE, ESQ.**
    ELIAS LAW GROUP, L.L.P.
    250 Massachusetts Avenue NW, Suite 400
    Washington, D.C. 20001

    **JILLIAN LAURA ANDREWS, ESQ.**
    Herrera Arellano, L.L.P.
    1001 North Central Avenue, Suite 404
    Phoenix, Arizona  85004

For Plaintiff Promise Arizona, Southwest Voter Registration
Education Project:

    **ERNEST ISRAEL HERRERA , ESQ.**
    **ERIKA CERVANTES, ESQ.**
    MALDEF
    634 Spring Street, 11th Floor
    Los Angeles, California  90014

For Defendants State of Arizona, Kris Mayes, Jennifer Toth:

    **JOSHUA MICHAEL WHITAKER, ESQ.**
    **TIMOTHY E. HORLEY, ESQ.**
    ARIZONA ATTORNEY GENERAL'S OFFICE
    2005 N. Central Avenue
    Phoenix, Arizona  85004

United States District Court

2:22-cv-00509-SRB, November 7, 2023 P.M.

**APPEARANCES (Continued)**

For Defendant Adrian Fontes:

        **CRAIG ALAN MORGAN, ESQ.**
        **SHAYNA GABRIELLE STUART, ESQ.**
        Sherman & Howard, L.L.C. - Phoenix, AZ
        2525 E. Camelback Road, Suite 1050
        Phoenix, Arizona  85016

For Intervenor-Defendants State of Arizona, Kris Mayes, Ben Toma::

        **KATHRYN E. BOUGHTON, ESQ.**
        ARIZONA ATTORNEY GENERAL'S OFFICE
        2005 N. Central Avenue
        Phoenix, AZ  85004

        **HANNAH HATCH PORTER, ESQ**
        GALLAGHER & KENNEDY, P.A.
        2575 E. Camelback Road, Suite 810
        Phoenix, Arizona 85016-9225

For Defendant-Intervenor Republican National Committee:

        **KORY A. LANGHOFER, ESQ.**
        STATECRAFT, P.L.L.C.
        649 North 4th Avenue, Suite B
        Phoenix, Arizona  85003

For Defendant-Intervenors Warren Petersen and Ben Toma:

        **HANNAH HATCH PORTER, ESQ.**
        Gallagher & Kennedy, P.A.
        2575 East Camelback Road, Suite 1100
        Phoenix, AZ  85016-9225

United States District Court

2:22-cv-00509-SRB, November 7, 2023 P.M.

# I N D E X

## TESTIMONY

| WITNESS | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Plaintiffs' Witnesses | | | | |
| COLLEEN CONNOR | | 405 | 406 | |
| RAMSEY REID | 421 | 434 | 443 | |
| | | 439 | | |
| KYLE NITSCHKE | 445 | 464 | 473 | |
| | | 468 | | |
| LYDIA GUZMAN | 475 | 488 | 504 | |
| | | 492 | | |
| MORGAN DICK | 506 | 519 | 522 | |
| | | 522 | | |

## E X H I B I T S

| Number | | Ident | Rec'd |
|---|---|---|---|
| 594 | | | 420 |
| 805 | Q1 Report to Legislature under ARS 16-165.M [AZSOS-563797 -AZSOS-563798] | 414 | |

## RECESSES

| | Page | Line |
|---|---|---|
| (Recess at 2:46; resumed at 3:01.) | 474 | 18 |

United States District Court

COLLEEN CONNOR - Cross

**P R O C E E D I N G S**

(Court was called to order by the courtroom deputy.)

(Proceedings begin at 1:07.)

THE COURT:  Good afternoon.  Please sit down.

Mr. Langhofer, did you have any additional questions for this witness?

MR. LANGHOFER:  Just one, Your Honor.

(COLLEEN CONNOR, a witness herein, was duly previously sworn or affirmed.)

**CROSS - EXAMINATION** (Continued)

BY MR. LANGHOFER:

Q.   Ms. Connor, welcome back.  One question.  You had talked for a bit about sort of state of affairs with threats against elections officials and so on.  Is it fair to say that started in around late 2020?

A.   That's probably about the time.

Q.   Before these laws were passed?

THE COURT:  Well, if it was late 2020, it was before these laws were passed in 2022.

MR. LANGHOFER:  Thank you, Your Honor.

THE COURT:  Any other cross-examination of Ms. Connor?

Any redirect for Ms. Connor?

MR. PORTER:  No further cross, Your Honor.

United States District Court

**REDIRECT EXAMINATION**                                01:08:48

BY MS. LANG:

Q.    Thank you, Ms. Connor.  And I just have a brief redirect
for you.

If we could pull up PX 2, Plaintiffs' Exhibit 2.  We    01:09:11
have been looking at H.B. 2243 a lot today.  I would like to
look at it one more time.  And if we could turn to page four of
H.B. 2243.

Mr. Whitaker asked you about this Subsection 10 here
about when a County Recorder obtains information pursuant to     01:09:49
this section and confirms that the person registered is not a
United States citizen.

Do you recall that?

A.    Yes.

Q.    And he asked you whether or not one way perhaps you could  01:10:03
confirm someone is not a United States citizen is if you could
ask them; is that right?

A.    Yes.

Q.    And there was some mention of that a notice letter would
go out to these voters asking them to say whether or not they   01:10:17
are a United States citizen; is that right?

A.    Correct.

Q.    Would you consider it to be confirmation that someone is
not a United States citizen if they didn't respond to that
notice?                                                         01:10:29

United States District Court

COLLEEN CONNOR - Redirect

A.    I would need legal advice on that to make an assessment.

Q.    And can we go to Ms. Connor's deposition at page 204.

And at pages -- line 10 to 21 you were asked in your deposition if there was no response from the voter whether or not you would consider that a confirmation; is that right?

THE COURT:  I'm sorry.  That question doesn't seem to be --

MS. LANG:  205.  I apologize.  My eyesight could use some assistance I suppose.

MR. LANGHOFER:  I'll move the same objection, Your Honor.

THE COURT:  Sustained.

MS. LANG:  What's the objection?

THE COURT:  Calls for a legal conclusion.  She said she would need legal advice about -- that was her answer today.  At the deposition she had to give you an answer without regard to the objection.

BY MS. LANG:

Q.    Would you consider it reliable evidence that someone is not a citizen if they didn't respond to a notice asking them about their citizenship status?

A.    I would need legal advice on that.

Q.    Okay.  Mr. Whitaker asked you some questions about the Voter Registration Advisory Committee papers.  Do you recall that?

COLLEEN CONNOR - Redirect

A.   Yes.

Q.   And that that's one way in which the County sometimes tried to achieve uniformity; is that right?

A.   Correct.

Q.   Is it true that an issue paper can only be adopted by the Voter Registration Advisory Committee if it's unanimously agreed upon by the counties?

A.   I would have to look at the mission statement and bylaws. I don't recall if it would be unanimous.

Q.   You participate in the Voter Registration Advisory Committee; is that correct?

A.   Yes.

Q.   As the SOS representative?

A.   Correct.

Q.   Secretary of State representative?

A.   Yes.

Q.   When was the last time that the Voter Registration Advisory Committee adopted a paper?

A.   I don't know.  There has not been one adopted under this administration.

Q.   Okay.  And is there currently some stasis about who will take on the responsibility of drafting any future issue papers for the Voter Registration Advisory Committee?

A.   Could you clarify the question?

Q.   Has there been some disagreement among the members about

United States District Court

who should have the responsibility of drafting those papers?

A.    Yes.

Q.    Can you elaborate on that disagreement?

A.    In the past the prior administrations, the Secretary of State's office would draft the VRAC papers.  After attempting to draft the first three, it became apparent that not being a primary user of AVID, the Secretary of State just maintains AVID, does not cancel voters, does not enter new voter registration, that it would make more sense that the County Recorders, who have firsthand knowledge and who have these issues or bring these issues up, it would make more sense for the counties to draft it with the assistance of the Secretary of State.

Q.    And did all the County Recorders agree that that -- that they should take on that responsibility of drafting the papers?

A.    No.

Q.    Okay.

A.    They said, "Well, you're an attorney, you should."

       And I said, "But I don't know what should be included in a paper about AVID regardless of whether I'm an attorney."

       So there was disagreement about it and there continues to be.  But to the extent we can assist, getting the meeting together, of course the Secretary of State's office is going to help, but it's the County Recorders that are dealing with these day-to-day issues.

COLLEEN CONNOR - Redirect

Q.   And so presently has any County Recorder kind of taken up the responsibility of drafting any Voter Registration Advisory Committee papers?

A.   No.   There's one pending or discussed that has nothing to do with this legislation and that one is still in limbo as well.

Q.   Okay.   You were asked some questions by Mr. Langhofer about potential use of place of birth to de-duplicate voter registration records.   Do you recall that?

A.   Did Mr. Langhofer ask about that?

THE COURT:   Does it really matter who asked?   Why don't you just ask her a direct question rather than asking her if she remembers who asked her a question?

BY MS. LANG:

Q.   Is the de-duplication process for voter registration records now an automated process through AVID?

A.   Yes.   That's what I testified earlier to.

Q.   With respect to when a voter might provide place of birth as a kind of security question to identify themselves, are there other options that can be used if one doesn't have place of birth in your voter registration database?

A.   I believe that's --

THE COURT:   This is really cumulative.   We have had more than one witness testify about the various items that can be used to -- when you're on the phone with someone to verify

United States District Court

COLLEEN CONNOR - Redirect

that they are the person who is the voter you're trying to reach.

MS. LANG:  Okay.

BY MS. LANG:

Q.   Is another option for the signature-matching hypothetical that Mr. Langhofer discussed with you, would another option be for the voter to come in in person and present identification?

A.   That's not how the process works usually but -- they can provide identification but usually the intent is to update their signature.

Q.   I was just trying to understand.  So if someone has a potential signature mismatch and they are trying to resolve that in order to have their ballot count, we discussed that maybe one option would be that they would use place of birth. Would another option be that they could submit identification to say, "This is me and here's my identification," in order to prove that they are the person that voted?

THE COURT:  I think she testified this morning that particularly close to the election that that's not feasible, that it has to be done over the phone because there's simply not enough time or resources to have people -- require people to come in just before an election with a questioned signature to verify that's who they are.  I think she's testified about that already.

MS. LANG:  With the Court's indulgence, I agree that

COLLEEN CONNOR - Redirect

it might not be feasible for all people; but my question is whether or not if someone had the availability to come in, whether or not they would be permitted to do that as a manner of proving their identity.

THE COURT:  So what?  Of course they could.  Let's move on.

BY MS. LANG:

Q.   You testified that you consider the MVD data to be generally reliable.  By that did you mean that it can reliably provide the data that was presented to the motor vehicle database -- the Motor Vehicle Division at the time that someone interacted with the division?

A.   Yes.

Q.   Are you aware that voters may submit -- that voters may naturalize after they interact with the Motor Vehicle Division?

A.   Yes.

Q.   And so that data is sometimes stale or outdated for those individuals; is that right?

A.   That's possible.  I really don't know how it works with the naturalization aspect of it.

Q.   You were asked some questions about the Secretary's or -- you were asked some questions about reliance on jury summary reports versus Motor Vehicle Division's data, and I just wanted to ask you a couple of clarifying questions there.

Isn't it true that the Secretary of State and the

United States District Court

COLLEEN CONNOR - Redirect

Motor Vehicle Division have a memorandum of agreement or some sort of contract that governs how you exchange that data with the Motor Vehicle Division?

A.    Yes.

Q.    Okay.  And does your IT folks work with their IT folks to determine the appropriate matching criteria?

A.    The offices work very closely together and we have quarterly meetings.  I really don't have any knowledge exactly what they do as far as the IT perspective.

Q.    But you have a close kind of working relationship with MVD on how that data is shared?

A.    Correct.

Q.    And that data sharing is all entirely automated as well. They are AVID, right, between the MVD data systems and the Secretary's systems; is that right?

A.    That's my understanding, yes.

Q.    Okay.  Do you have similar agreements with the jury administrators about what -- you know, what matching information you need, for example?

A.    No.

Q.    Or do you have any kind of contracts with the jury administrators that govern the data that they give you and provide for its reliability?

A.    There has been contact with the jury commissioners and jury managers with prior administration, I've seen those

United States District Court

COLLEEN CONNOR - Redirect

correspondence, but more or less to apprize them of what the law requires.

Q.   I apologize, too.  I said contracts like, you know, binding agreements between yourself and the administrators about how that data is transferred?

A.   There are no contracts, no.

Q.   You just receive I think some text files from -- or election officials just receive text files from the jury administrators; is that right?

A.   I personally have not seen those reports.  I don't know what they look like.

Q.   But your office does not have, like, the similar working relationship with the jury administrators that you have with MVD?

A.   Correct.

        MS. LANG:  If we could pull up Defendants' Exhibit 805 that has been admitted into evidence.

        MR. BOGDON:  We don't have those.

        MS. LANG:  Okay.  We can't.

BY MS. LANG:

Q.   Do you recall -- let me rephrase.  Defendants Exhibit 805 that you discussed earlier was a letter that you sent with various pieces of information about the jury reports, the kind of quarterly report that you need to submit about the jury summary reports.  Do you recall discussing that?

United States District Court

415

COLLEEN CONNOR - Redirect

A.   Yes.

Q.   Okay.  And I remember that part of that said that the notices and the notice process for that is still in development; is that right?

A.   That's correct.

Q.   Okay.  Is the Secretary of State going to be the one to develop those notice -- the template for those notices?

A.   We have not discussed exactly how that's going to happen. No one has brought up that specific issue for months.

Q.   Okay.  In the past has the Secretary of State's office sometimes created template notices for the County Recorders to use for voters?

A.   Yes.  The Secretary of State would create the template and then the counties usually would modify them to fashion for their county.

Q.   And when the Secretary of State's office has created those notices, what languages are those notices put into by the Secretary of State's office?

A.   What languages?

Q.   Yes.

A.   Usually it's English and Spanish.

Q.   Okay.  Any other languages?

A.   No.  Most native languages are oral.

Q.   Okay.

A.   Most in Arizona.

United States District Court

COLLEEN CONNOR - Redirect

Q.   If we could scroll down now that we do have Exhibit 805 up.   Yes, it's Section 3.   Thank you.

I want to understand what this 373 number means to the best of your knowledge.   This first bullet point says that this is the number of persons who have stated on jury questionnaires that the person is not a United States citizen and that number is 373.   Does it say anywhere here that this -- that these people matched -- that these people are registered voters?

THE COURT:   You know, it doesn't say that so I don't know why we need her to tell us it doesn't say that.   All it says that these are the number of people who checked the box that they weren't U.S. citizens.   It doesn't say whether they are registered to vote.

BY MS. LANG:

Q.   Okay.   Ms. Connor, did you draft this letter to President Petersen and Speaker Toma?

A.   I drafted the template.   I did not provide the numbers.

Q.   Okay.   To your knowledge, is this category meant to reflect people who have stated on the jury questionnaire that the person is not a United States citizen and are on the rolls or just the total number of people who have stated on the jury questionnaire that they are not a United States citizen?

A.   The latter.   If you go back to I about the number of deaths reported, you'll notice that that number is 20,000

United States District Court

because the number of deaths reported is the total number of deaths reported, so people that are registered and not registered.

Q.   And so the same would hold true for the first bullet point of the jury notices?

A.   I did not personally complete that number but presumably it would include the total number regardless of their voter registration status.

Q.   Okay.  I have no further questions for you, Ms. Connor.  Thank you very much.

THE COURT:  May this witness be excused?

MS. LANG:  Yes.

THE COURT:  Is there any objection?

MR. LANGHOFER:  No, Your Honor.

THE COURT:  Thank you very much, Ms. Connor.  You may step down and you are excused as a witness.

THE WITNESS:  Thank you.

(Witness excused.)

THE COURT:  Please call your next witness.

MR. MORGAN:  Just asking the Court's permission to be excused.

THE COURT:  I think Mr. Morgan, I said you were welcome to be here as often and for as long as you like but you are welcome to not attend.

MR. MORGAN:  I just didn't want to walk out without

United States District Court

418

asking.  Thank you, Judge.

MS. LANG:  Your Honor, I have two small pieces of housekeeping if I could quickly resolve.  One is a matter entirely of my fault which is that yesterday I failed to move in Plaintiffs' Exhibit 200 which is a report from the Maricopa County's office entitled "Correcting the Record."  There was testimony about it.  Perhaps we can pull up Plaintiffs' Exhibit 200.  There was substantial testimony from Ms. Petty about this exhibit but I failed to move it in.

THE COURT:  Is there any objection to Plaintiffs' 200?

MR. LANGHOFER:  I think it's hearsay, Your Honor, because we do not contest its authenticity or her description of what it is, but I don't think it was public record because it's not necessarily to perform the duties of the office.  It's essentially a press release.

MS. LANG:  It's a report from the Maricopa County Recorders Office which is a defendant in this matter.

THE COURT:  Why is it admissible?  Isn't it hearsay?  Are you offering it for the truth?

MS. LANG:  A statement of a party opponent.

THE COURT:  I don't -- this is an analysis of the senate inquiry.  It's not an admission of a fact.

MS. LANG:  It has a variety of facts all put forward by the Maricopa County Recorder.

United States District Court

THE COURT: Well, that doesn't make the whole thing admissible. I mean, how many -- it's a report from -- their analysis of how the election went. I don't see how it's anything but hearsay.

MS. LANG: I understand that the objection is sustained. My understanding is that statements of party opponent are exceptions to the hearsay rule.

THE COURT: And who is the party opponent that made this --

MS. LANG: The Maricopa County Recorder.

THE COURT: The Maricopa County elections officers.

MS. LANG: Office of the Recorder is the second author.

THE COURT: I really don't think you can have an entire report be an admission. Sustained.

MS. LANG: Okay. Thank you, Your Honor.

And one last thing. Demonstrative 1 that was used yesterday, I don't know how Your Honor likes to deal with demonstratives --

THE COURT: Well, I really like Demonstrative 1 and it is demonstrative. So if you could give me a copy of it, I don't think it's evidence but it's a helpful chart to follow the evidence.

MS. LANG: And that's exactly for the reason we would want it to be in the record, so we will provide a copy to the

United States District Court

Court and have it entered into the record as a demonstrative. 01:31:59
Is that fair?  All right.

I have nothing further.  Thank you.

THE COURT:  You may call your next witness.

MR. LANGHOFER:  For the record, Your Honor, we would 01:32:11
be fine with admitting Demonstrative 1 as a full exhibit if it
helps, not just as a demonstrative.

THE COURT:  If you are happy to have it admitted as
evidence, they can mark it as whatever the next number is and
I'll admit it. 01:32:26

MS. LANG:  Fair enough, Your Honor.  We'll do that.

(Exhibit Number 594 was admitted into evidence.)

MR. BABBITT:  Good morning, Your Honor.  Christopher
Babbitt for the Democratic Arizona National Committee and the
Arizona Democratic Party.  We'll call Ramsey Reid as our next 01:32:44
witness.

COURTROOM DEPUTY:  For the record, Your Honor, 594 is
the next exhibit number.

THE COURT:  594 will be the demonstrative that
there's no objection to be admitted so 594 is admitted. 01:32:58

(Exhibit Number 594 was admitted into evidence.)

(RAMSEY REID, a witness herein, was duly sworn or
affirmed.)

COURTROOM DEPUTY:  Please state your name and spell
out your last name for the record. 01:33:21

United States District Court

THE WITNESS:  Ramsey Reid, and my last name is spelled R-E-I-D.

COURTROOM DEPUTY:  Thank you.  You can go ahead and have a seat.

THE COURT:  And you may proceed, Mr. Babbitt.

**DIRECT EXAMINATION**

BY MR. BABBITT:

Q.   Good afternoon, Mr. Reid.  Would you please introduce yourself for the Court?

A.   Yeah.  My name is Ramsey Reid.

Q.   And what do you do professionally?

A.   I'm the Director of States at the Democratic National Committee.

Q.   How long have you been in that role?

A.   Since January 2021.

Q.   What are your responsibilities as Director of States?

A.   I manage the national political and organizing staff and I oversee our state programs and strategy and resources.

Q.   Before becoming Director of States, what was your job?

A.   I was the National Coordinating Campaign Director in 2020 working with the Biden campaign.  And in 2019 -- before that, I was the Battleground States Director and before that I was a Midwest Regional Director.

Q.   How long have you been at the DNC?

A.   Since May of 2017.

Q.   What is the DNC?                                                            01:34:38

         THE COURT:  Mr. Babbitt, for some reason, the

microphone is not picking you up.  It's picking up Mr. Reid

very well.  So if you just focus yourself close to one of the

two there.                                                                       01:34:49

         MR. BABBITT:  I apologize, Your Honor.

         THE COURT:  That's much better.

         THE WITNESS:  Is my volume okay?

BY MR. BABBITT:

Q.   Mr. Reid, what is the DNC?                                                   01:34:57

A.   It's the national organizational arm of the Democratic

Party.

Q.   And what do you mean by the national organizational arm?

A.   Well, we build a sort of the Democratic Party operations

in all 50 states to make sure that, you know, we're capable of   01:35:14

helping elect Democrats up and down the ballot.

Q.   And what is the DNC's mission or purpose?

A.   It's to elect Democrats up and down the ballot in all 50

states.

Q.   And what do you mean by "up and down the ballot"?            01:35:27

         THE COURT:  I know what he means by "up and down the

ballot" so he doesn't have to explain it.

BY MR. BABBITT:

Q.   Does that include Arizona?

A.   Yes, it does.                                               01:35:39

                    United States District Court

RAMSEY REID - Direct

Q.   Does the DNC have a professional staff at the national level?

A.   Yes, we do.

Q.   And about how many people are on the staff?

A.   Right now about 300.

Q.   Does the DNC hire staff in Arizona?

A.   We do hire staff in Arizona from time to time on DNC payroll but we also fully fund staff to working at the Arizona Democratic Party.  And I think right now there are -- we're funding about 12 full-time staff at the Arizona Democratic Party.

Q.   Does the DNC also rely on volunteers in Arizona?

A.   Yes.

Q.   What's the DNC's annual budget for its Arizona operations?

A.   It changes cycle to cycle.  And as you would assume, but I think in the most recent midterm cycle, our total resources that we, you know, financial and nonfinancial direct spend from the Democratic National Committee was about three and a half million in the last cycle and in the cycle before it, 2019 and 2020, was in excess of 10 million.

Q.   And does all of that money go towards the mission of electing Democrats?

A.   Yes.

Q.   In broad terms, can you describe what the DNC does to support the election of Democrats?

United States District Court

RAMSEY REID - Direct

A.   Broadly speaking, we focus on increasing participation among democratic supporters and persuading voters to support democratic candidates and that's really the full life cycle of a voter, from someone who is not registered, getting them registered; someone who is already registered, encouraging them to vote; someone who is registered but may or may not be supporting democratic candidates, persuading them to support the democratic candidates.  And then to the extent that they have trouble actually completing the voting process, helping them cure their ballots.

Q.   Do you expect to undertake those efforts in 2024 in Arizona?

A.   Absolutely.

Q.   Let's move on to the laws that are being challenged in this litigation.  Based on your experience, if H.B. 2492 were implemented and some voters were prevented from voting in presidential elections, can you speak to how that would affect the DNC in democratic voters?

A.   For one, I think for democratic voters, in Arizona, they would -- there would be fewer overall democratic supporters casting a ballot for the democratic candidate for president. So I think just at a very high level, it would make it less likely that democratic voters and supporters in Arizona would have a candidate who they want to win, actually win the election.

01:36:54
01:37:07
01:37:24
01:37:34
01:37:56
01:38:12

United States District Court

RAMSEY REID - Direct

And then on an individual level, I think there would be people in Arizona who would -- who would otherwise want to participate and be able to participate, choose not to.

Q.   Would the bill have consequences outside of presidential elections?

A.   Yeah.  In presidential elections, you know, there tends to be the highest turnout of any given election and so other elections that are also coinciding on the same days as presidential election tend to also have high voter turnout and there's more people participating in those elections, too.

Q.   And what would the DNC need to do to respond to that development?

A.   Well, I think that we would have to obviously put more resources and time and effort into either finding additional voters to register who -- to replace the voters who are no longer participating or we would need to put additional resources and time into getting new voters to participate to replace the people who are no longer participating because of this law or we would need to persuade new voters to support democratic candidates to replace the voters who would no longer be participating.

Q.   Would putting resources into those efforts divert resources from other endeavors of the DNC?

A.   Definitely.  I mean, as much as I would like to have an unlimited budget for programs and campaigns, we don't and so

United States District Court

RAMSEY REID - Direct

everything that we do is a choice.  And when we put resources into voter registration programs in Arizona, that generally means fewer resources for voter research station programs in other states.

Q.    Shifting gears here, did the DNC encourage Democrats in Arizona to vote by mail?

A.    Yes, we do.

Q.    Why is that?

A.    Well, there's a really long history and sort of cultural voting preference for voting by mail in Arizona.  And, you know, one of our primary goals is to increase participation among democratic supporters.  So we want to do that in whatever way is easiest for democratic supporters to actually vote.

So, you know, one very common way of voting is voting by mail and so we will talk to voters and encourage them to vote by mail and help them through that process.

Q.    Do you track the number of voters who vote by mail?

A.    Yeah, we do.

Q.    What percentage of voters voted by mail for Democrats in any past election that comes to mind?

THE COURT:  Excuse me.  Are you asking nationally or just Arizona?

MR. BABBITT:  I apologize.

BY MR. BABBITT:

Q.    In Arizona.

United States District Court

RAMSEY REID - Direct

MR. LANGHOFER:  Object on the grounds of vagueness if it's a question about who voted for Democrats.

MR. BABBITT:  I'll rephrase.

BY MR. BABBITT:

Q.   Mr. Reid, can you tell us what percentage of voters voted for President Biden by mail, to your knowledge?

A.   I think of total Biden supporters in 2020, more than nine out of every ten voted by mail.

Q.   If -- based on your experience at the DNC, if H.B. 2492 were implemented in a manner that prevented certain voters from voting by mail, how would that affect the DNC and democratic voters in Arizona?

A.   Well, I think, you know, for one, again, just thinking about voters.  Generally in Arizona, democratic supporters, democratic voters, people who would want to participate and can't vote by mail and aren't able to vote in person wouldn't vote.  That would mean fewer votes for democratic candidates in Arizona and that would mean that democratic supporters and democratic voters in Arizona would be less likely to have their preferred candidate win.

Q.   What would the DNC need to do to respond to that eventuality?

A.   We would need to put more resources into enrolling additional voters to vote by mail, encouraging additional supporters to vote by mail.  We would need to potentially

United States District Court

RAMSEY REID - Direct

implement new GOTV programs that are focused specifically on

01:42:05

in-person programs and in-person voting for a certain segment

of voters.  It would add layers of complexity and cost into our

Arizona GOTV programs.

Q.   So the record is clear, What is GOTV?

01:42:21

A.   Getting Out The Vote.

Q.   Thank you.

Would the efforts that you just described require the DNC to divert resources from other programs to support those efforts?

01:42:31

A.   Yeah.  For the same reasons I mentioned earlier, yes.

Q.   Mr. Reid, are you familiar with H.B. 2492's requirement that voters provide their place of birth when registering in Arizona?

A.   I am, yeah.

01:42:42

Q.   Based on your experience at the DNC, how would that requirement affect the DNC and Arizona voters if implemented?

MR. LANGHOFER:  Foundation.  Speculation.

THE COURT:  Sustained.

BY MR. BABBITT:

01:42:54

Q.   Mr. Reid, are you concerned about the requirement stated in H.B. 2492 that voters provide their place of birth when registering to vote?

A.   Yes.

Q.   Why?

01:43:08

RAMSEY REID - Direct

A.   Well, I think there's a couple of reasons.  One, just practically speaking, when democratic volunteers or staff are out registering voters, this is an additional piece of information that voters need to fill out on their voter registration form.  At large scale, large volume, over the course of the campaign, this will inevitably lead to fewer, you know, fully completed and accurate voter registration forms. So it would be fewer people actually following through with the voter registration process.

It would mean viewer available -- it would mean longer voter registration form -- the process of actually completing the voter registration form would take longer, not a long time, but we're talking about thousands and thousands and thousands of volunteers doing thousands and thousands and thousands of voter registration forms.  So over the course of time, it will make the voter registration programs slightly less productive and it will ultimately net fewer democratic votes.

Q.   And would the DNC have to divert resources to that eventuality if it comes to pass?

A.   Yes.  Yeah.  We would.  We would have to put additional resources into more voter registration staff, more voter registration training, more voter registration form quality control.  It would just increase the level of work that we have to do for each individual form.

United States District Court

RAMSEY REID - Direct

Q.   Shifting gears, Mr. Reid, if H.B. 2492 were implemented and certain voters were subject to investigation and prosecution as a result of their registration, would that be of concern to the DNC?

A.   Yes.

Q.   Why?

A.   Well, I think, for one, it would -- the idea of registering to vote and being worried about increased risk of law enforcement oversight from just doing something that is natural for the democratic process I think would have a chilling effect on people who are new to the voting process who are maybe the first-time voters in their family, maybe people who haven't grown up with a culture of voting in their household who, you know, aren't familiar with all of the ins and outs of voting.

I think that, you know, generally, it would probably concern and discourage some people from registering.  I think that more than that, I imagine it could create some confusion.  Imagine you're the only person in your family who is a citizen and you have maybe the same name as someone in your household and you're then bringing law enforcement scrutiny on someone in your family who you share the same name with for no reason and that would be a scary thing for people.

Q.   Would the DNC do anything to address that chilling effect?  And if so, what?

United States District Court

RAMSEY REID - Direct

A.   Yeah.  Again we would have to make sure that all of our volunteers and all of our staff who are registering voters are able to talk about this with people.  You know, if someone is ready and prepared to be registering to vote and filling out the form and then they choose to walk away, it's going to require those volunteers to, you know, dig into that and try and persuade them and try and mitigate their -- you know, the likelihood that they actually don't complete the process.

And again, you know, like I mentioned earlier, ultimately it's probably going to mean fewer registrations which means that we're going to have to invest more resources into actually finding new voters to register.

Q.   And would the investment of those resources divert resources from endeavors that the DNC would otherwise pursue?

A.   Yes, it would.

Q.   Mr. Reid, has the DNC already started doing anything in response to the enactment of H.B. 2492?

A.   Yeah.  This is a law that we think has a real risk on reducing the total number of votes for democratic candidates if it were enacted.  And in a state like Arizona where the margins statewide are incredibly narrow, we fight tooth and nail for every supporter, every voter.  Something like this, this law in particular, has a real chance to change the outcome of the election.

And so, you know, for this law and for anything that

RAMSEY REID - Direct

has real risk in changing the outcome of the election, we think really long and hard about what are the mitigation strategies, what are the additional resources we need to have, what do we need to do to try and overcome that potential down side?  And that means everything from contingency budgets to additional planning to withholding spending in other places and other programs, knowing that we may have to put additional resources into finding new voters to register and new voters to turn out.

THE COURT:  I think the question was, has the DNC actually done anything?  And your answer seemed to be you're thinking about doing things and if you do the things you're thinking about, it could cause you to divert resources.  But the question was, have you actually done anything?

THE WITNESS:  Yeah.  We are actively going through the planning and budgeting process for state programs in Arizona and in other states right now and we are factoring in things like this law in terms of what we think it's going to take to get to the number of votes that we think it's going to take to win.  And so that means that we are planning for additional resources that we'll have to allocate into Arizona to overcome the hurdles that this law might impose.

Obviously, there's uncertainty around whether or not that's going to happen, but we only get one shot at winning an election and so uncertainty and -- is an opportunity cost for us.

United States District Court

RAMSEY REID - Direct

BY MR. BABBITT:

Q.   Mr. Reid, would implementing H.B. 2492 affect the ability of democratic candidates to compete in Arizona?

            MR. LANGHOFER:  Speculation.

            THE COURT:  I'm sorry.  I couldn't hear you.

            MR. LANGHOFER:  Speculation.

            THE COURT:  Sustained.

BY MR. BABBITT:

Q.   Mr. Reid, can you speak to the competitive effect of 2492 sitting here today and your assessment as States Director of the DNC?

A.   Yeah.  I think just last election cycle there was a statewide campaign that won by not thousands of votes, hundreds of votes.  The last presidential election, President Biden won Arizona by fewer than 12,000 votes.  So, again, everything, any possible factor, including this law, that could reduce the number of democratic supporters that would be registering and participating in the election has a very real opportunity of reversing the outcome of the election.  And if the outcome of the election was reversed in Arizona, that would meaningfully reduce the chances of the presidential candidate winning the Electoral College.  It would meaningfully reduce the chances of statewide candidates winning in their statewide elections.

Q.   In your judgment, as the States Director of DNC sitting here today, would preventing H.B. 2492 from taking effect

434

RAMSEY REID - Cross

address those concerns?

A.   Yes, it would.

MR. BABBITT:  No further questions.  I'll pass the witness.

THE COURT:  Any cross?  Mr. Whitaker?  Ms. Porter?

**CROSS - EXAMINATION**

BY MR. PORTER:

Q.   Good afternoon.  I'm Hannah Porter and I represent the intervenor-defendants Speaker Toma and President Petersen.

Is it the DNC's position that any member of its organization has been injured by H.B. 2492 as of today?

A.   I think there's a couple of ways that I would think about what a member of our organization is.  On the one hand, there is sort of the everyday way of what a member of being the Democratic party is, people who are voters who consistently support democratic candidates, people who vote in democratic primaries, people who register as Democrats, people who chip in five bucks a month to support the DNC or their favorite Democratic candidate.  And then there's sort of the term of art member of a voting member within the Democratic National Committee for the purposes of our party affairs, so I'm not sure which one you're speaking to.

Q.   Well, let's talk about both.  We'll go to the first category which is I believe more broadly Democrat voters or persons who have voted for Democrat candidates.

United States District Court

A.   Yes.   I think there's voters who are rank and file grassroots democratic supporters and voters have a real interest in democratic candidates winning, and this law I think would meaningfully impact the likelihood that democratic candidates could win.

Q.   My question, though, was about injury as of today.   Have any of those rank and file members been injured as of today by H.B. 2492?

A.   I believe it's -- it hasn't been implemented for injunctive relief; is that right?   Has it been implemented?

Q.   No, it has not.

A.   So then no.   No.

Q.   And then the same question for -- I'm sorry.   What did you call the other group of members?

A.   Of voting members of the DNC, of the Democratic National Committee.

Q.   Right.   And is it your position that any of the voting members of the DNC have been injured as of today?

A.   I think so there's I think eight voting members from Arizona and I don't think any of them have had -- are going to be impacted directly in terms of being able to cast their ballot, but they represent the grassroots interests in Arizona at the DNC.   And I think that, you know, the people that they represent and that they serve would be injured.

Q.   Just to clarify, those eight voting members, is it your

RAMSEY REID - Cross

position they personally will not be impacted even if H.B. 2492 is implemented?

A.   Yes.   I seriously doubt that any of the eight would be impacted.

Q.   You expressed a concern about the birthplace information on the voter registration form being mandatory; correct?

A.   Yes.

Q.   And your concern was that it was an additional piece of information that would have to be filled out on the form; is that correct?

A.   Yes.

Q.   Would that concern be the same for any additional piece of information that was required on the registration form?

A.   Generally speaking, I think the more information that you have to fill out on a form, the longer it takes to do will, over time, reduce the total completion and likelihood of actually filling it out correctly.   So I think, yes, any additional information generally is a marginal increase in the barrier of completing it correctly.

Q.   And are you aware that the state form already includes a place for state or country of birth?

A.   Yes.   It's not required is my understanding right now.

Q.   When you're doing staff or training for volunteers or staff who are helping persons register, are they typically using the state form?

United States District Court

RAMSEY REID - Cross

A.   I think generally, yes.

Q.   Is part of that training?  Do the volunteers advise not to fill in the birthplace?

A.   I think, you know, the volunteers are trained on completing all of the required information and that is the first and foremost priority.  And then, you know, we train them on, you know, sort of the typical frequently asked questions around what else and what does this mean and what is the next step and that sort of thing.

Q.   So you're already training your volunteers about whether or not to fill in the birthplace portion of the state form?

A.   We're training on all of the required pieces of information.

        THE COURT:  What about the optional ones?  Do you give them any advice about fill them in?

        THE WITNESS:  We say it's optional.  It's up to them.

BY MR. PORTER:

Q.   So the difference, in terms of training, would just be you tell the volunteers that it's mandatory now?

        MR. BABBITT:  Objection.  Misstates testimony.

        THE COURT:  Overruled.

        You may answer.

        THE WITNESS:  Yes, would it require additional training, yes.

\\\

                    United States District Court

RAMSEY REID - Cross

BY MR. PORTER:

Q.   But would the additional training be --

A.   It would be training both on the front end of all of the forms that are -- all of the fields that are required.  And then also the sort of back end, once a voter has filled it out, sort of the quality control review and what you need to check and look at.

Q.   But to be clear, would the difference be now you're just looking to make sure that field is filled in?

A.   Yeah.

        MR. PORTER:  I don't have any further questions, Your Honor.

        THE WITNESS:  I'm sorry.  Can I add one more thing?

        Filled in and accurate.  It says county so someone might write country, you know, people could do it incorrectly.

        MS. PORTER:  Okay.  So sorry.  Now I do have one follow-up on that.

Q.   But when you're saying "accurately," you're -- can you explain what you mean by "accurately"?

        THE COURT:  I don't think he has to explain what he means by "accurately."

        MR. PORTER:  I just want to make sure --

        THE COURT:  I understood what he said.

BY MR. PORTER:

Q.   Are you meaning -- are you checking any information that

United States District Court

RAMSEY REID - Cross

the voter provides to you to make sure that it's accurately reflected on -- in terms of what they have in terms of documents matches what's on the form?  That was all?

A.   No.  Not comparing documents.  But I think when you're looking at, like, a tiny size six font and it says "Country," people will often write the county that they live in and that's incorrect.  And so you're -- it's a quality control check with the best of your ability knowing that you don't work at the Recorder's office.  You're helping them complete the form to the best of their ability.

Q.   I appreciate that.

        MR. PORTER:  Thank you, Your Honor.  No further questions.

**CROSS - EXAMINATION**

BY MR. LANGHOFER:

Q.   Good afternoon, sir.  Kory Langhofer for the RNC.  I believe you said that 90 percent of Biden voters voted for him by mail.  Did I hear that correctly?

A.   Yes.

Q.   What is the empirical basis for saying that?

A.   We have a really sophisticated assessment of individual voter support and so we have modeling that gives us a pretty substantial -- a pretty -- a very good view of the overall likelihood of Biden supporters and whether they are voting by mail, whether they are voting in person, all of that.

United States District Court

RAMSEY REID - Cross

Q.   Okay.  So it's based on, partially, polling?

A.   Polling is probably the -- an incorrect term.  I would say, you know, extensive survey data and other inputs.

Q.   Okay.  And the other thing is, you have to combine your survey inputs with how people actually vote in order to get to this answer; right?

A.   Right.

Q.   The Arizona results are not reported based on whether someone votes by mail or some other form of early ballot, are they?

A.   We know if people vote early or on election day or if they requested a ballot and if they have completed their ballot.

Q.   Right.  That -- I think we agree those are both reported.  But early ballots include in-person early ballots and they include and emergency voting that's in person.  These are all under the Early Ballot category.  They are not all mail ballots; right?

A.   Right.

Q.   But for purposes of your answer, you are treating them all as mail-in ballots; right?

A.   I think that the vast majority of people who are voting absentee are voting by mail and not emergency.

Q.   Right.  But for the purposes of your testimony to this Court that 90 percent voted by mail, you're treating all early ballots as though they were voted by mail; right?

United States District Court

A.   No.   I think, you know, I would need more like information around exactly what goes into the analytics inputs.  But I can just say that an extraordinarily overwhelming number of Biden supporters in 2020, we estimate more than 90 percent we believe voted by mail.

Q.   Okay.  You seem very confident that the implementation of this laws will hurt Democrats politically.  What is the empirical basis for that prediction?

A.   We think that people who are younger, people who are Hispanic are most likely to be impacted by this.  And we also have substantial and a very detailed view of the likelihood of support of younger voters and Hispanic voters.  And we think that those groups are disproportionately likely to support democratic candidates and they are disproportionately likely to be impacted by this law.

Q.   Sounds like you've got some modeling; is that right?

A.   Yes.

Q.   It's not based on any data because it hasn't been implemented?

A.   It hasn't been implemented.

Q.   Are you familiar with the quantitative reviews of the implementation of a DPOC requirement in the Medicaid context showing that had no significant impact on citizen enrollment?

A.   I don't work on Medicaid --

      MR. BABBITT:  Objection. foundation.

RAMSEY REID - Cross

THE COURT:  Excuse me.  It's very difficult to know you're objecting when I can't hear you over your witness.  Perhaps it would be easier if you stood and said, "Objection," and then your witness would think, "Maybe I shouldn't answer until my lawyer speaks."

MR. BABBITT:  I apologize, Your Honor.  Objection.  Foundation.

THE COURT:  Overruled.

You may answer if you know anything about the Medicare enrollment with requirements for documented proof of citizenship.

THE WITNESS:  I am not an expert in Medicaid enrollment.

BY MR. LANGHOFER:

Q.   So you're not familiar with this study?

A.   No.

Q.   One last question.  You have been on this case for about a year.  In that time, have you identified any adult citizen who resides in Arizona who does not have an Arizona driver's license issued after 1996, a U.S. birth certificate, a U.S. passport, a tribal identity card, or a naturalization number?

A.   We don't track that sort of information when we run our voter registration and our GOTV programs; but what we do know is that we think that the voters who are very likely to be impacted by this are also very likely to be democratic

United States District Court

RAMSEY REID - Redirect

supporters.

Q.   So you've identified no one?

A.   Yeah.  We don't track at that level, that's correct.

Q.   Thanks.

THE COURT:  Anything else for this witness?
Mr. Babbitt?

**REDIRECT EXAMINATION**

BY MR. BABBITT:

Q.   Mr. Reid, will your members who support democratic
candidates be injured if the law is permitted to go into
effect?

MR. LANGHOFER:  Speculation.  Vague.

THE COURT:  Gee, what kind of members are you talking
about?  Because he gave all of these different categories like
there's eight actual Board members and then just people that
are registered Democrat and there's people that give money.

BY MR. BABBITT:

Q.   Mr. Reid, would any category of DNC member be injured in
your judgment if the law is permitted to go into effect?

MR. LANGHOFER:  Speculation.

THE WITNESS:  Yes, I think so.

THE COURT:  So that was another objection but I'm
going to overrule it.  So say "Yes" but explain why you think
that.

THE WITNESS:  I think so because I think that if

United States District Court

RAMSEY REID - Redirect

fewer democratic supporters were participating in the election
and actually casting a vote for a democratic candidate, that it
is less likely that the democratic candidate would win.  And I
think that that would be something that our democratic
supporters and members would not want.

BY MR. BABBITT:

Q.   Mr. Reid, Ms. Porter asked you about the burden imposed by
adding additional fields to the registration form.  Is there
anything specific about the birthplace requirement itself
beyond just being another field on the form?

A.   I think it brings about a general concern around just your
status as a citizen and other people you know in your family.
And I think it sort of is sort of a triggering question to ask
for people who are already dealing with law enforcement
scrutiny or have family members who might be.

Q.   Based on your experience at the DNC, is that concern more
likely to be -- to arise with particular demographic groups?

A.   I think it's more likely to apprize with Hispanic voters
in Arizona.

MR. BABBITT:  Nothing further, Your Honor.

THE COURT:  May this witness be excused?

MR. BABBITT:  Yes.

THE COURT:  Is there any objection?

MR. LANGHOFER:  No.

THE COURT:  Thank you very much, Mr. Reid.  You may

KYLE NITSCHKE - Direct

step down and you are excused as a witness.

(Witness excused.)

THE COURT:  Plaintiffs may call their next witness.

MR. FERGUSON:  Brent Ferguson of the Campaign Legal Center representing plaintiffs.

(KYLE NITSCHKE, a witness herein, was duly sworn or affirmed.)

COURTROOM DEPUTY:  Thank you.  Can you please state your name and spell your last name for the record?

THE WITNESS:  Kyle Nitschke.  Nitschke is N-I-T-S-C-H-K-E.

THE COURT:  You may proceed.

MR. FERGUSON:  Thank you, Your Honor.

**DIRECT EXAMINATION**

BY MR. FERGUSON:

Q.   Good afternoon, Mr. Nitschke.  Thanks for being here today.

THE COURT:  And you are?

MR. FERGUSON:  My name is Brent Ferguson of the Campaign Legal Center representing plaintiffs.

THE WITNESS:  Good morning.  Good afternoon.

BY MR. FERGUSON:

Q.   Thanks very much.  Could you tell us where you work?

A.   I'm the co-Executive Director for the Arizona Students Association, ASA.

United States District Court

Q.   Okay.  Excellent.  And can you tell us a little bit about what you do in your role as co-Executive Director?

A.   I oversee our regional organizers, help create our yearly plan and budget and do hands-on voter registration as well, too, and on-the-ground work, but then also working with partners and funders.

Q.   Excellent.  And how long have you worked at ASA?

A.   Since January of 2020.

Q.   Okay.  And have you served as co-Executive Director that whole time or did you have a previous position there?

A.   I was just up covering the NAU campus for a year and then was Organizing Director and I have been the co-Executive Director since January of this year --

Q.   Okay.  So about 10 or 11 months?

A.   M'hum.

Q.   Okay.  Thank you.

          Who are ASA's members?

A.   Our members are the students of our public universities -- ASU, U of A, and NAU -- as well as GCU and our community colleges here in the state.  We represent half a thousand students -- or half a million students.

Q.   And are some of those members Latino?

A.   Yes.

Q.   And are some of them other members of color?

A.   Yes.  And NAU recently is a Hispanic-serving institute

now.

Q.   Okay.  Thanks.

I would like to talk a lit bit more about staff and volunteers that work for ASA.  So can you tell us how many staff members ASA has?

A.   Yeah.  We have about seven full-time staff and then we have part-time campus organizers and fellows on our campuses.

Q.   Okay.  And when you say fellows, are those paid staff?

A.   Those are paid a stipend and sometimes we can get them internship credit as well depending on their major.  We have -- like for the fall semester, the spring semester, and the summer semester when our fellowship programs run.

Q.   Excellent.  So it's some permanent staff plus those fellows and do you have any other volunteers that do work on your behalf?

A.   Our volunteers will come out for our welcome week voter registration pushes generally.

Q.   Okay.  Great.  And can you tell me a little bit more about ASA, basically what it does, what is its position?

A.   Yeah.  We advocate for more affordable and accessible higher education for all of our members and students here in Arizona.  So we do that by growing and developing and training student leaders, by registering students to vote and getting more involved in the political process.  And then by doing direct advocacy as well as at the state legislature but also at

KYLE NITSCHKE - Direct

our local Board of Regents and through our universities' administrations as well.

Q.   Okay.  And you mentioned voter registration.  Is that a core part of ASA's mission?

A.   Absolutely.  It's the most important thing.  It's so important that we get our students registered to vote before we can start plugging them into all of the other work that we do.

Q.   About what percentage of ASA staff time is devoted to voter registration?

A.   During our welcome week voter registration push, it feels like 100 percent.  I would say throughout the year roughly, on average, we're about 40 percent of staff time is put towards voter registration efforts.

Q.   Okay.  And you mentioned -- I think you said welcome week. Can you tell me about how voter registration is set up?  Is it focused on that welcome week period?

A.   So we do voter registration throughout the year.  We have our on-line voter registration systems where you go through Turbo Vote and have been able to implement that into a few of the different university systems.  For our welcome week specifically, that's our big push and it's during the first couple of weeks of the fall semester.

        And we'll generally set up tables or booths across from where students are moving in or at the student union and draw students in to register that way.  And then we'll also go

United States District Court

KYLE NITSCHKE - Direct

into classrooms during the first two weeks of the school year as well and do just pitches about getting involved locally and registering to vote and being more than just a student at the school but a citizen in their community.

Q.    Sure.  So you mentioned setting up registration tables. Is that one per campus?

A.    Roughly speaking.

Q.    Okay.  And about how many campuses is that?

A.    For our public universities and then our community colleges, you know, we're not generally doing that -- we just want capacity to be all of them for all of the welcome week, so it's a little more of all of the place but one campus at our four public universities.

Q.    Sure.  And as part of your role as ASA, you've personally registered voters?

A.    Yes.  And I've registered voters from 2016 as well, too, with different groups.  And even now as an Executive Director, still going in in the fall to go do that hands-on voter registration work directly with students.  It's all hands on deck.

Q.    Okay.  Could you just briefly walk me through a typical interaction when you are registering a voter at one of those tables during welcome week?

A.    I'll walk you through an NAU welcome week, because those students are my favorite.  Generally, we're set up as they're

United States District Court

moving in so it's, you know, "Hi, well -- thanks for coming to campus.  Have you had the opportunity to update your voter registration yet to your new NAU address?"  I will walk them through the active early voting list, generally answer questions about federal-only voters.

At NAU they can register at their dorm addresses by just writing the name of the dorms.  We're always talking about that.  Just generally making surely they get everything filled out.  They will miss the boxes at the bottom.  They will miss the date, home state or country of birth.

So generally making sure they have everything filled out properly and then we will take the form from them, give them their receipt back and then we look over the form one last time and then we directly turn in for them to the County Recorders.

Q.   Okay.  And when you're talking about the form, do you use the state voter registration form or the federal form?

A.   We use the state form.

Q.   And can you tell me why that is?

A.   For one, the County Recorders will give us those state forms for free and some counties even have paid postage on those forms so it's really easy for our students to complete their voter registration.  And then, secondly, is that the state form will still get students registered as federal-only voters, even if they don't have that proof of citizenship.  So

United States District Court

KYLE NITSCHKE - Direct

this gives them that opportunity to do additional follow-up to   02:13:32

become in-state voters, but they are still registered to vote

day of with that in-state form.

Q.   Okay.  And can you give a rough estimate of how many

people ASA registers to vote every year?   02:13:44

A.   Around a thousand this last fall but we'll do more in the

even-numbered election years.  You can kind of double or triple

that serial number.

Q.   So in 2022, for example, it might have been two or 3,000

people?   02:13:59

A.   Yeah, three or 4,000 maybe.

Q.   Let's move on and talk about some of the laws that are

being challenged in this lawsuit.  Can you give your general

understanding of the two laws that are being challenged here

today, H.B. 2492 and 2243?   02:14:14

A.   My general understanding is that they really just impact

the documents and stuff needed when folks are registering to

vote, so documentary proof of residence, documentary proof of

citizenship, state or country of birth, making that required on

the form.  And I know there's also provisions or stuff that   02:14:30

could potentially lead to evaluations if registered voters

don't pop up as citizens on the database.

Q.   Okay.  Thank you.

       And do you know if the laws are being fully

implemented at this time?   02:14:44

A.   I know that it's in limbo.  And I know that, you know, we have been doing stuff since the state law was passed but I know it's not all -- it's not all happening.

Q.   Okay.  You mentioned doing stuff so let's talk a little bit about what ASA has done or whether it will do anything in the future in response to the two laws.  First of all, has ASA changed its training practices at all in response to passage of the laws?

A.   Yes.  We've updated all of our training slides and updated our tips and tricks sheet to specifically address the state or country of birth, and then as well as we're now doing kind of additional follow-up to make sure that our federal-only voters are getting fully registered here in states.

Q.   Okay.  Excellent.  So we'll go through that in a little bit more detail.

You mentioned a few things that are being included in that training.  Who is -- who is doing that training and about how many people need to be trained?

A.   Yeah.  Generally, our regional organizers or executive staff will do those trainings or teach those trainings and then we have all of our fellows volunteers and we do paid hourly staff as well for the welcome come week push.  They all have to go through that training before they are registering voters.

Q.   Those are the fellows that you mentioned that are being paid hourly.  Is that correct?

KYLE NITSCHKE - Direct

A.   Our fellows are on a stipend but we'll take some of them and also pay them hourly for those two weeks that they are doing the extra hard work.

Q.   So all of those categories together who are taking the training, about how many people is that per year?

A.   About 100.

Q.   Okay.  And the training will happen once per year?

A.   Sometimes we have to do like individual one-on-one training if we're needing canvass or prepped, but we'll try to do five or six students at a time and in the classroom setting if we can.

Q.   Okay.  And can you estimate the amount of time that ASA has spent on additional training those various things that you mentioned, additional training because of the new laws?

A.   I could just say, I guess roughly saying, an hour per training per student, roughly 100 hours, but knowing a little less because we're able to train some in groups.

Q.   Okay.  Sure.  And you mentioned before one of the elements of these new laws is a requirement for proof of residency or I'll call that DPOR.  If that requirement were fully implemented and every registration required DPOR, how would that change ASAs training process that you've been talking about that?

A.   That would specifically really affect us in how we're training to fully register our federal-only voters and get them

United States District Court

registered in state.  Many times those traditional federal-only voters are college students coming from out of state and don't have in-state ID.  That's the problem.  They don't have that proof of residency.  They don't have an in-state driver's license.  They don't have a utility bill that matches with their dorm address.  They are paying that dorm as a lump sum as well, too.  So they really don't have proof that they are living at the dorm they are living at a lot of the time.

Q.   Okay.  Okay.  So we have been talking about training. Let's talk about specific interactions with registrants at the registration table and how the laws might affect that.  So you've said you've done -- I think you said you've done thousands of these.  Again, if DPOR were required for every registration, then how would it affect those individual interactions with the registrant at the table?

A.   It would really slow down the registration process and it might even cause us to just initially turn down those students and ask them to go get that in-state ID first before coming back and registering with us.  So we would have to spend much more time making sure we have that full proof of residence citizenship, et cetera, and checking the documents and getting everything done there.  Or we'll turn those voters away and ask them to come back when they have additional identification if these new laws go into place.

Q.   And you mentioned proof of citizenship just then, too.  So

similar question to that.  If DPOC were required, would that have the same effect on your interaction at the registration table?

A.    Yeah.  Currently we're giving students either a little Vote Rider card.  And so Vote Riders is just a group that will pay for students' state ID or driver's license, give them that $12 if they are using it to register to vote.

Alternatively, we give them a little slip that says, "Please email your birth certificate or passport to this email address," as follow-up.  If these laws go into place, we would want to ensure that we're getting all of the proof of citizenship then and there and not having them do that additional follow-up step.

Q.    Okay.  And you also mentioned the requirement to list a place of birth on the form.  How would that affect your interactions with registrants at the table?

A.    Mostly just the time it takes, one, to fill it out; but then, two, the conversation about, "Why do I have to put state or country of birth?"  Sometimes -- or, actually, really the thing most they commonly run into is, they will put, like, United States.  Well, you need to put the state if you were born in the state.  It's just a long conversation -- longer conversation to have.

Q.    Okay.  And putting those three requirements together that we've just been talking about, if those three requirements were

United States District Court

implemented, what effect do you think it would have on the overall voters that ASA is able to register?

A.   For us I think we would definitely be able to register less voters.  I think we would be seeing more students registering to vote at their parents' address where they are not actually living during the election.  That's what I would say.

Q.   Okay.  We've talked some about the documents that would be required.  So if you were -- if the laws were implemented and required, DPOR and DPOC, you mentioned that you would want to try to get those documents at the registration table.  How would you go about copying or saving images of those documents?

A.   There's an app that we use for some scanning, CamScanner. We pay for the upgraded versions so students are able to scan and redact important information and immediately upload those documents.

Q.   And you said an upgraded app.  That's something that you would need to pay for?

A.   Yeah.  It's $10 per month for the CamScanner Premium.

Q.   And how many ASA --

THE COURT:  Excuse me a minute.

Do you already do that?

THE WITNESS:  We have the CamScanner but just the free trial version.

THE COURT:  Okay.

BY MR. FERGUSON:

Q.   And about how many people do you think would need to pay that cost and get the upgrade?

A.   We wouldn't do it for every volunteer.  It would be too much.  We would kind of have a lead at each table, probably or three or four campus organizers, and then our three regional organizers and executive staff so 10 or 11 folks.

Q.   And relating to Judge Bolton's question, you're aware that Arizona law already requires proof of citizenship; is that correct?

A.   Yes.

Q.   Okay.  And why are you not already using that upgraded app and taking DPOC at every interaction before the laws are implemented?

A.   One, for time and then, two, we know that those students are already being registered federally.  And so they will have the opportunity to -- sorry.  No, because citizenship, not the residency.  They are not registered when they are registering -- no.  Excuse me.  Can we start over?

Q.   Yes. Of course.  Of course.

So we talked about upgrading that app and so you say that if the laws were implemented, it would be important to get both proof of residency and proof of citizenship during that initial contact.  And I asked because DPOC is already required to be registered for state elections in particular, why are you

United States District Court

KYLE NITSCHKE - Direct

not already using that upgraded app and requiring DPOC every time someone tries to register?

A.   One, because of the time that it takes, and currently we're expecting the County Recorder to do a little bit more of that work now.  We fear when this law gets passed, it will be uploaded without the citizenship and then, like, kicked off the thing and there's nobody to do that follow-up.  That's the fear.

Q.   Okay.  And if the laws are fully implemented, will ASA staff devote time or resources to trying to make sure that student members have that required documentation already before they get to the registration table?

A.   Yeah.  I think we probably put more work in with our partner Vote Riders to make sure that more of our students who are voting here in Arizona have in-state ID or drivers' licenses.

Q.   Okay.  One thing you mentioned at the beginning was the training process that you have already started doing with staff and volunteers.  And you mentioned tips and tricks document that is used for staff.  Is something that you've -- is it something that you've printed and distributed to staff and volunteers?

A.   Yes.

Q.   And have you incurred costs doing that?

A.   Just print paper and ink.

United States District Court

KYLE NITSCHKE - Direct

Q.   Okay.  You also mentioned an element of the laws that required investigation of various databases to see whether an already registered voter is a citizen and the possibility that people would be removed from the rolls.  If that law is fully implemented, would ASA spend time determining whether the students that it has registered are remaining on the rolls?

A.   Yes.  I think we would look through our database and compare with what students are actually going to register to deduce what effects this new law is having and the impact on our students.

Q.   And if you -- so we've talked about several things that you've done in terms of training and that you might need to buy that upgraded app and a few other similar things.  If the laws were to go into effect and you didn't take any of those steps, what effect do you think it would have on ASA's registration efforts?

A.   I think we would see less students getting registered to vote in the state and see more students registering out of state or staying at addresses where they are not currently living, registering at their parents' address.  For us we know it would for sure take more time to register students.  So with first-time voters, so many of them really love the help and need to be guided through the process to get registered.

So if we're not taking the time to register them and it's being left up to them, again, like, if there's less

United States District Court

KYLE NITSCHKE - Direct

students that we're actively registering, there will be less students registered to vote.

Q. And we talked some about the cost that you will likely have to incur and that you have incurred to some extent. If you weren't spending that money on reacting to the challenged laws, what would ASA be spending that money on?

A. After last election survey, we found another reason that students don't vote is that they don't know what's on the ballot, so we really want to identify and we want to do more about is work around voter education and helping students learn what's on their ballot and get educated around those issues.

Q. And do you know yet what form that voter education will take? Is it seminars or is it printing materials, things like that?

A. Door-to-door canvassing, printing materials, in-person town hall trainings. We have to do a town hall, for example, in Flagstaff and NAU this last election cycle, but we weren't able to hit any of our other campuses or do any of the local school bond or overrides.

Q. Okay. And, similarly, if you aren't spending the extra time training staff, if you are aren't spending the extra time explaining the requirements at the registration table, what would ASA be using that staff and volunteer time doing?

A. Yeah. Voter education is a huge one. We have a big youth empowerment summit where we bring our students to the State

Capitol for a couple of days of training and then meeting directly with their state senators and representatives. And so any time and money that we're not using on actually registering students to vote, we can spend that money on that next step of actually getting them to share their voice and meet -- yeah.

Q. And we talked about the effect the laws might have on ASA if you were not to implement any of these changes you've discussed. Even with all of the changes we've just talked about over the last few minutes, do you think that the laws will affect ASA's voter registration efforts?

A. Yes.

Q. And can you explain in a little more detail about why that might be?

A. Just in general just slows down the registration process and I think that is the biggest thing and then, you know, I think there's smaller things that we could potentially talk about. It's just so time-consuming to register voters as it is. We already kind of have students walking away halfway through the process sometimes. So I think that's the key thing I would speak to.

Q. Sure. And we talked a little bit about the element of the laws that would require investigation into certain people who try to register to vote. Would that element of it have that effect that you're talking about?

A. I fear for that and specifically if a case really does go

through and students start hearing case of that.  We're already kind of like the crazy fake elector state.  And a lot of students are, like, maybe it's easier to stay registered to vote where my parents are or in other states.

So I think just in general, all the craziness around Arizona elections, we have -- we have more of a fear on registering, and I think this law wouldn't help.

Q.   Okay.  And so when members come to the tables to register to vote, it's true that sometimes they lack DPOR?

A.   Yes.

Q.   And why is that?

A.   I touched on it a little bit but, for one -- for one, the dorm that they are living at, they don't get utility bills so they don't have, like, regular mail for that.  They don't have an in-state ID if they are from out of state necessarily and they don't want to incur that cost to get an in-state ID.

The other residency bits, alien registration or if you're indigenous, you know, Native American, that doesn't apply a lot to our out-of-state students.  Student IDs don't count as proof of residency, which is ridiculous.  So I -- I mean, really, just students don't have that proof of residency.

And I can even speak when I was a freshman.  I grew up in Gilbert but I was going to school up at NAU in Flagstaff. I didn't have any proof of residency that I lived at the dorm that I lived at, even though I was -- I registered to vote

KYLE NITSCHKE - Direct

there and the ballots and all of that jazz, but I didn't have any proof that I lived where I lived.

Q.    Sure.  And similarly for proof of citizenship, can you tell me some about the reasons that students lack that?

A.    So for proof of citizenship, that's going to be our birth certificate.  A lot of times students just aren't bringing their birth certificates with them to college.  They can sometimes reach out and get that information but it just takes more time and they will have to come back to us.  Arizona doesn't accept a lot of other states' drivers' licenses as proof of citizenship.  Our California voters state IDs don't count as proof of citizenship.  Yeah.

Q.    And are some ASA members naturalized citizens who are born outside the United States?

A.    Absolutely.  I was just speaking to one of our student Government folks on ASU who is a naturalized citizen and was kind of speaking to how can we get more naturalized citizens registered to vote and involved in politics in process.

Q.    And have you reviewed completed registration forms and seen that some people who list place of birth as outside the United States as well?

A.    Yes.

Q.    Okay.  And do some members who try to register completely leave the birthplace form blank?

A.    Blank, yeah.

464

KYLE NITSCHKE - Cross

Q.   And have you implemented any efforts to try to ensure that that form is -- that part of the form is filled out?     02:31:11

A.   Since these laws passed, we highlight a lot of the required things and so we started highlighting "state or country of birth" since summer of '22 I believe.     02:31:25

Q.   Okay.  And in general, the laws that we've talked about today, how do they affect your members' confidence in Arizona elections?

A.   Just generally speaking, I think it -- generally speaking, I think our members aren't super aware of a lot of these laws, to be honest.     02:31:50

Q.   If the laws are fully implemented and, for example, every student, you know, you inform students at registration table s that they will have to give proof of residency, also inform them about the parts of the law that require investigation that we touched on a little bit before, how do you think that awareness will affect the students' confidence in elections?     02:32:07

A.   I think that could decrease registration, could potentially decrease some confidence.

Q.   Okay.  No further questions.  Thank you.     02:32:25

          THE COURT:  Any other questions on direct?

          Cross?  Ms. Porter?

**CROSS - EXAMINATION**

BY MR. PORTER:

Q.   Good afternoon.  I'm Hannah Porter.  I represent the     02:32:43

United States District Court

465

KYLE NITSCHKE - Cross

intervenor-defendant Speaker Toma and President Petersen.  I do have a few questions for you.    02:32:46

You spoke about ASA's members.  How does someone become a member of ASA?  And if I use ASA, is that okay and you know I'm referring to Arizona Student Association?    02:33:07

A.    Absolutely.

Q.    How does one become a member of ASA?

A.    So all students who are enrolled in our public universities, GCU, and community colleges are members of ASA.

Q.    So they don't have to affirmatively do anything other than enroll at one of those universities?    02:33:22

A.    Correct.

Q.    Do members have certain rights in your organization?

A.    Yeah.  Members are always open to any of our educational events that are going on and then have the ability to get more involved by joining the fellowship, and anyone is open to our youth and empowerment summit and lobbying at the Capitol or all of our members.    02:33:41

Q.    Is it your position that any current member of ASA has been injured by the Challenged Laws as of today?    02:33:57

A.    Only by the time that ASA has taken to have to respond to some of the laws and taking it away from doing voter education. They are being able to do lobbying for them.

Q.    Is that an injury to the member or to your organization?

A.    I don't really know what "injury" means.  I think in the,    02:34:19

United States District Court

KYLE NITSCHKE - Cross

like, legal terms so I don't know.

Q.    Well, let's use it -- has any member of your organization been affected by the Challenged Laws as of today?

A.    I think not directly, only kind of taking away time from us to educate and do work.

Q.    Only to the extent that your organization has had to spend more time?

A.    Yeah.

Q.    Apart from litigation expenses, can you break down for me what money ASA has spent in response to the Challenged Laws as of today?

A.    I would say our updated trainings and the tips and tricks check sheet list for our volunteers and staff.

Q.    And so am I correct that you've updated your tips and trainings to reflect portions of the Challenged Laws?

A.    The state or country of birth bit and then just general stuff about the work that we're doing to fully register our original federal or state to get them in-state registration and in-state status.

Q.    The tips and trick sheet is something you had before these Challenged Laws were passed; correct?

A.    Yes.  We had a bunch printed out and laminated and had to reprint all of those.

Q.    Do you have an estimate as to generally how much that reprinting costed?

United States District Court

KYLE NITSCHKE - Cross

A.    I can say that I bought the paper and ink for NAU and it was, like, between 50 and 70 bucks, so I did that for each region.  And we've three regions, central, southern, and northern for ASA is how we are structured.    `02:36:35`

Q.    So less than $300 total approximately?    `02:36:49`

A.    Yeah.

Q.    Do you have any internal documents that outline what measures you would take in response to the laws if they were implemented?

A.    Just rough staff notes from executive calls.    `02:37:15`

Q.    I believe you noted that in your experience, people have not always filled in the state or country of birth portion of the state form?

A.    M'hum.

Q.    Is that correct?    `02:37:47`

In the training -- sorry.  Before these laws, now taking these laws into account, in that training of your staff and volunteers, would they tell people to fill in that portion of the form that they had the information?

A.    No.  We would just direct them to do all of the highlighted bits.  And so prior to this, state or country wouldn't have been one of our highlighted bits, so it's not something that we covered in the training previously.    `02:38:08`

Q.    Okay.  Understood.

On direct you expressed -- I'm not trying put words    `02:38:25`

United States District Court

in your mouth so please correct me if I'm misstating what you said.  But I think you expressed some concern about whether or not the Secretary of State would take actions with respect to documentary proof of citizenship.  Could you please explain that?  I am not sure I followed what you said.

A.    I think I might have misspoke if I did say Secretary of State.  My understanding is, it's the Attorney General that would do any investigations for -- if they tried to register to vote and a database pops up and they are not a citizen, that the investigation would be directed to the Attorney General.

Q.    So your concern was with the Attorney General investigation?

A.    Yes.

Q.    Sorry.  Let me just check my notes real quick.

        MR. PORTER:  I have no further questions.

        THE COURT:  Mr. Langhofer?

        MR. LANGHOFER:  Thank you, Your Honor.

**CROSS - EXAMINATION**

BY MR. LANGHOFER:

Q.    Good afternoon, sir.  I think you and I may be going to the same barber these days, or not going.  So I've got a couple of questions for you.  The first is, how many of the students you have registered are non-citizens?

A.    We haven't registered any non-citizens to vote.

Q.    Okay.  And how can you be sure about that?

KYLE NITSCHKE - Cross

A.   We can as sure as I guess the County Recorder -- as sure as their word because of the check box at the bottom of the form.

Q.   I see.  Okay.  And in order to really know for sure, you would need to have access to documents to proof their citizenship; right?

A.   Sure.

Q.   Okay.  In the time that you've been doing -- involved in this case, about a year, have you identified any U.S. citizen who is an adult, 18 or older, residing in Arizona, but does not have any of the following:  An Arizona driver's license issued after 1996, a birth certificate from the United States, a U.S. passport, a tribal identity card, or a naturalization number?

A.   I can say for sure that I've identified those people that don't have any of those documents with them in the State of Arizona.  I can't say for sure about the birth certificate. That would be the one piece that likely the students do have the birth certificate and it's just in another state.  I also can say for sure that some of our substitutes have lost birth certificates in the past and there's a potential that I've bumped into someone.  I can't say for sure.

Q.   Okay.  So let me make sure I've got this right.  If we take out birth certificate, you say yes, I know the answer to that?

A.   Yes.

United States District Court

470

KYLE NITSCHKE - Cross

Q.    But you think for the others they probably have a birth certificate, just somewhere else?

A.    Likely, most of them, yes.

Q.    Can you think of anyone who does not have any of those but is still an adult citizen residing in Arizona?

A.    I couldn't name someone for you.

Q.    Okay.  You know that in order to get federal student aid at any of these universities that you mentioned, you also have to be lawfully present in the United States?

A.    But we have many undocumented students who attend our universities and community colleges.

Q.    Just not getting federal student aid apparently?

A.    Yes.

Q.    And you're not trying to register them anyway?

A.    Generally, no.  Well, no.  Not generally, no.  And why I said generally is because when we bump into these students, we actively go, "Hey, you're not a citizen.  Don't register to vote."  I don't know why I said generally.

Q.    No.  I understand.  It's not a gotcha moment.

         All right.  Let's talk about proof of residence.  If you're living in a dorm, you've got a lease with that dorm, don't you?

A.    Not necessarily -- it's just very weird.  It is not like a traditional lease.  It is, like, through the housing portal that these students go through.

United States District Court

471

KYLE NITSCHKE - Cross

Q.   Okay.  Which university let's you move into a dorm without signing a lease and terms and conditions and you won't destroy it and so on?

A.   I'm sure they do sign a lease through the housing portal, you're right.

Q.   College students, they are above average education; right?

A.   Our students here in Arizona are the greatest, very highly educated.  Our Arizona public schools need more funding but they produce great students.

Q.   They can fill out a form that says where they live, can't they?

A.   Absolutely.

Q.   Okay.  Great.

You mentioned the CamScanner.  I'm genuinely confused about what you meant by this.  I don't even want to try to characterize it.  I'm sure would get it wrong.  What were you saying about the CamScanner and the $10 a month and the County changing something?

A.   The CamScanner is the app that we generally use.  We'll use to it upload all sorts of documents.  The premium version of CamScanner costs $10 a month and allows to us redact information when we scan those documents.

Q.   Okay.  But you use the CamScanner now to take pictures of documents?

A.   Yes.

United States District Court

472

KYLE NITSCHKE - Cross

Q.   You just don't do the redaction?                                    02:43:36

A.   We don't do the reaction directly on the phone.  We use a
different device blocks to then do the redaction.

Q.   Oh.  Why don't you just keep doing that?

A.   Just the time it takes and also the redaction is used for   02:43:45
our internal purposes for using voter registration forms and
like keeping them in our database, they need to be redacted
before we send them to partners.

     So we would want to be able to redact any important
information before sending files over the Internet, just to      02:44:03
protect ourselves because there's -- yeah.  There's stuff
around sending a lot of these files digitally.

Q.   For sure.  But are you currently sending documents over
the Internet?  You are just redacting them first?

A.   Not to the County Recorders though.  Generally, the         02:44:19
students are the ones doing that follow-up step.  We would take
on that follow-up step and send it in the documents with the
paper voter registration form.

Q.   So you're going to take on new responsibilities that were
previously being done by the students; right?                    02:44:31

A.   Yes, because we're worried about the laws and how they --
how the -- you know, how that would go into effect.

          MR. LANGHOFER:  Thank you, Your Honor.

KYLE NITSCHKE - Redirect

**REDIRECT EXAMINATION**

BY MR. FERGUSON:

Q.   Just a brief redirect.  Mr. Nitschke, Miss Porter asked you a question or two about your membership and how you define that.  And you testified that members of ASA are all public university higher education students in the state; is that correct?

A.   Yes.

Q.   And does the organization as a whole refer to all of those students as members?

A.   Yes.

Q.   And is ASA's purpose to advocate on behalf of those students that he call members?

A.   Yes.

Q.   And who are the primary beneficiaries of ASA's work?

A.   Our members.

Q.   And you mean --

A.   The students of all higher education, community colleges, public universities.

Q.   And how do those students influence what ASA does?

A.   Both through their general sentiment on issues.  There's a lot of polls that are around young people and their feelings. When we get more direct inputs through the students or fellowship or club meetings or tables on campus to pick what ideas we're working on, yeah, lots of different ways.

United States District Court

Q.    Okay.  And Mr. Langhofer just asked the question about the CamScanner app and you talked about some of the things you currently use it for.  Is it correct that in the process of voter registration at the table, you rarely or never use the CamScanner app?

A.    Yes.  It's usually done afterwards but before we turn the voter registrations in to the County Recorder.

Q.    Okay.  No further questions.

THE COURT:  May this witness be excused?

MR. FERGUSON:  Yes.  Thank you.

THE COURT:  Any objection?

MR. LANGHOFER:  No.  Thank you.

THE COURT:  Mr. Nitschke, thank you.  You may step down.  You are excused as a witness.

We'll take a recess for 15 minutes.

(Witness excused.)

COURTROOM DEPUTY:  All rise.

(Recess at 2:46; resumed at 3:01.)

(Court was called to order by the courtroom deputy.)

THE COURT:  Thank you.  Please sit down.

Plaintiffs may call their next witness.

MS. MOTZKIN:  I'm Leah Motzkin for the plaintiffs calling Lydia Guzman as our next plaintiff witness.

(LYDIA GUZMAN, a witness herein, was duly sworn or affirmed.)

United States District Court

COURTROOM DEPUTY:  Can you please state your name and spell your last name for the record.    03:02:35

THE WITNESS:  Sure.  Lydia Guzman.  G-U-Z-M-A-N.

**DIRECT EXAMINATION**

BY MS. MOTZKIN:    03:03:05

Q.   Hi, Lydia.  Please state your name.

A.   My name is Lydia Guzman.

Q.   And where do you live?

A.   I live in Tempe, Arizona.

Q.   And where do you currently work?    03:03:12

A.   I work at Chicanos Por La Causa.

Q.   And what is your role at CPLC?

A.   My role is I work with the community, community coalitions, grassroots, grasstops, community leaders.

Q.   And what's your title?    03:03:30

A.   I do advocacy, civic engagement.

Q.   Could you tell me about what led you to Chicanos Por La Causa?

A.   Chicanos Por La Causa is an organization that I've always known of -- working in the community, I've always seen all the    03:03:45
work they do.  And to meet Chicanos Por La Causa was an organization that I've always thrived to be a part of because of the voice and the political empowerment that they do in the community.

Q.   And what previous jobs have you held?    03:04:02

United States District Court

LYDIA GUZMAN - Direct

A.   I've worked for the Arizona Secretary of State as the Director of Voter Outreach and Voter Engagement.  I've worked for Southwest Voter Registration Education Project as the Arizona State Director.  I've worked for the Clean Elections Institute as Voter Engagement/Voter Education and I'm the State Director for LULAC so . . .

Q.   And what led you to voting advocacy?

A.   I've been involved in voter registration projects since the mid-'80s as a young -- advocated in southern California, I was recruited by a couple of organizers and we talked about doing a lot of communities' empowerment and we started knocking on doors and registering voters and that is where I got the bug.

Q.   And could you share an example of when you saw that this was an effective strategy?

A.   Yes.  Actually, one of the first examples that I saw was as a young advocate, we did a social experiment, a group of folks and I.  We registered a bunch of homeless folks, you know, folks that weren't housed.  We registered them to vote using soup kitchens and shelters as addresses but knowing that they live like underneath the bridge of where the freeway is or whatever and there was some local elections taking place.

     What we did is we went to that candidate form and showed the stack of voter registration cards and said, "We registered all of those homeless folks to vote," and we saw

that these candidates started turning their attention and focus to issues like housing, jobs, you know, care for mental health illness.  Those are the issues that were important to this new voter block.  And at that moment I thought, well, the power of the vote has this impact.

Q.   How long have you been doing grassroots advocacy and community organizing?

A.   Probably since like the mid-'80s, you know, just knocking on doors, talking to folks.  I have been doing this for quite a long time.

Q.   Is it fair to say you have a lot of experience in this space then?

A.   I have a lot of experiences in this space, yes.

Q.   And has your work always included the voter registration empowerment?

A.   Yes.  Everything at the end revolves around political empowerment.  Voter registration, civic engagement on all of the different areas that I work in, even to this day, you know, at the end of the day, we know that in order for the community to have a strong collective vote, they have to register to vote and participate.

Q.   We're now going to talk about the organization that you work for.  Do you know Joe Garcia?

A.   Yes.  I do.  He's my boss.

Q.   Okay.  So Joe already testified to a lot about the

LYDIA GUZMAN - Direct

background on CPLC and I'm going to spare the Court and you that discussion.  We'll jump into talking about who makes up the community that CPCL serves?

A.    The communities that CPLC serves are communities who they look to us for assistance about -- our mission statement is we drive economic and political empowerment.  So that means that sometimes you they are looking to us so they can do things, whether they are going to buy a house, whether they want to start a business, whether they want scholarships or things like that; but also the political empowerment piece is every person that we touch, whether we're doing work within our organization or with our allies in the community with community coalitions. It all revolves around political empowerment and that our communities have a voice. Those are the communities that we serve.

Q.    And based on your decades of experience and service, what it does it takes to politically empower this community?

A.    Well, that takes a lot of voter registration, making sure that we mobilize the voters by, you know, talking to them and educating them about just the issues on election so that they know to participate so that they can be engaged.

Q.    What kind of problems do you help people related to voting?

A.    Well, you know, sometimes there's a lot of questions that come up.  We assist them with how to make sure that the form is

United States District Court

LYDIA GUZMAN - Direct

accurately filled out.  A lot of times they have questions.  I know, like, for example where we educate them about the early voting process, we tell them about, you know, how the importance to make sure that they sign their envelope, that they seal it, that they send it and, you know, so those are just a lot of the technical questions.  When the polling places are open, when they close, if they still have a ballot in their hands and so just that kind of information.

Q.   And how do you mobilize people to get out the vote?

A.   So what we do is -- there are several ways.  We send them mailers but same time we also do a lot of community events to make sure that the community is well informed that there is an election that's coming up.  We have town halls.  We have panel discussions, you know, to talk about just a lot of the issues that are important.  We also, you know, do a lot of radio.  We have billboards.  You know, so that they know, oh, there's an election coming up.  I better participate.

Q.   Can you tell me about your understanding of this lawsuit?

A.   So I'm not a lawyer.  But my understanding of this lawsuit is when a person is registering to vote and they submit their voter registration, if the Elections Department see that is there is not enough sufficient proof of citizenship, they will receive a notice saying that they are not -- that they need to submit additional information.  That's at the front end.

And then the other piece is when they are already

United States District Court

registered.  Let's say that they have been registered for a while.  Let's say the County -- the Elections Department, they deal with, like, the sweep through the rolls and they are going to identify certain people, they are going to say, "We feel that you might not be a citizen," and then they second them a letter, submit proof and so they question their citizenship.  So it's an investigation on the citizenship and on both the front end and the back end.

Q.   And why did CPLC decide to challenge these laws?

A.   We decided to challenge these laws because the laws we feel are detrimental to the folks that we're trying to register and the folks that we're trying to mobilize.  Because I understand it, these laws, when you start questioning and investigating a registrant's citizenship, it creates a fear factor like a chill effect, a chilling effect.

You know, folks -- the community that we work with, many of the communities, they might be mixed families and they don't want to draw attention to themselves.  So when they start getting these letters saying we need to investigate your citizenship, that could have a chilling factor and word spreads quickly in our community.

We do a lot of work in the community and we feel that this is going to have this impact, this negative impact on the people that we're trying to mobilize.

Q.   And you've answered a version of this.  Based on your

LYDIA GUZMAN - Direct

decades of experience working in voter empowerment, how do you expect the implementation of these laws to affect the community you serve?

A.   If these laws are implemented with what's likely to happen and based on my experience, because I worked in these communities for over 40 years, you know, people are just not going to register to vote.  Word spreads fast in our Latino community whether someone -- if someone gets a letter in the mail saying, "Hey, we're going to remove you off the rolls unless you can provide proof of citizenship," and, you know, and then at some point if people will give up and say, "I'm not going to submit this," and then because they don't respond to this letter down the line, they either get rejected.  And then on election day they are going to show up to the polls and be turned away.  Or if they get referred to the Attorney General, this will spread in the community and they will send the message of I don't want to register to vote because I don't want to be subject to this type of investigation.

Q.   And based on your experience, how do you expect the implementation of these laws to affect the work of CPLC?

A.   So because of the communities that we serve, you know, we have different programs and I'll just give you an example. Let's say that a family is being assisted by Chicanos Por La Causa because you're attending our home ownership program, okay, and so they are attending, constantly learning about

United States District Court

cleaning up their credit and all of that stuff.

And our staff is offering and inviting them to register to vote and they register to vote. If they are turned away and they say, you know, the Election Department says we need additional proof or we need this information, these folks are probably going to be embarrassed: Our community, they are very shy and very humble but very proud. They may not tell our staff that they received this letter. They may not even finish the course out of embarrassment. They may not buy their house, so this is going to have a ripple effect on some of the programs and the work that we do.

Q.   So how will this hurt your other areas of your work?

A.   There's so many different areas. What it's going to do is not only within the community that we serve and the clients but also in community. Our reputation is on the line. I mean, we're the ones that told them in the community, "Register to Vote." We have that credibility in the community because we're always there. We've been around for over 50 years in the community and as we invite folks to register to vote, now they are going to come to us and say, "Well, you told me to register to vote and look what I got in the mail."

Q.   So if the laws go into effect, will the organization have to make changes in order to carry out its goals of empowering voters?

A.   Oh. Yes. Yes. See, the changes that we're going to have

United States District Court

LYDIA GUZMAN - Direct

to make is we already spend a lot of time on trying to entice people to register them to vote, to tell them about the importance of civic participation.  This is all about political empowerment and why it's important for them, for their communities, for their families.  And so if this law, you know -- if it starts taking effect, what's going to happen is we're going to have to gear a lot of our efforts into addressing and trying to find out who these people are that were turned away, that were -- that received this letter that's being removed from the voter registration rolls.  So it's going to be a lot of work.  And many of these folks may be our folks that we've already worked hard to register them and now we have to reregister them and do extra work to find out who they are so we can touch them again.

Q.   What kind of additional resources will it take to address these laws?

A.   Well, it already costs us money to do the mailers, to do the ads, to buy, you know -- when we buy the ads like in the Spanish publications or Telemundo, Univision or media, when we do all of that, that takes a lot of resources, money, time, manpower, okay?

And so if we're going to start shifting a lot of that to do the voter protection piece where we have to start trying to protect people from being kicked off of the rolls, then that is going to take a lot more resources than -- that we probably

United States District Court

LYDIA GUZMAN - Direct

don't even have right now.

Q.   And to clarify, do you already do voter protection work?

A.   We do.  We do.  But it's very simple.  It's just basically, you know, what I mentioned before.  Know when you get your ballot, you know, it's very simple, in Spanish it sounds better but it's -- you stuff it, sign it, seal it, send it.  Oh, that sounds good.  I think I'll write that one down.  But that kind of work.  Just to educate and that's, you know, if something happens, just, you know, there's some hotlines to call and that's pretty much it.

Q.   So under the laws if they were implemented, how would it change?

A.   Wow, okay.  So we're probably going to get a lot of folks are going to show up to the polls and they are going to say, "Hey, I was -- I'm not on the rolls any more.  I'm not on the voter registration rolls.  I was kicked off," or, "I received this letter."  So that's going to take a lot of manpower so now we're going to have to have them come in and convince them, first of all, because, you know, they probably are disillusioned with -- "I just don't want to deal with this," but we're going to have to have them come in and encourage them to reregister to vote.  We're going to have to also work with more folks because one person alone to do this is probably not going to be enough.  We're probably going to need to hire more people, to be honest with you.

LYDIA GUZMAN - Direct

Q.    And what kind of national resources -- let me scratch that.    03:18:37

What kind of resources would you have to put into your voter education work?

A.    So the resources is going to be a lot of time to do those    03:18:49
things, to do additional panel discussions, additional town
halls to talk about this because word spreads fast in the
community.  We're going to have to spend resources to talk
to -- to try to earn media.  That takes a lot of manpower and
also we're probably together to need to put some resources into    03:19:13
buying, you know, in Spanish publications or whatever, ads, you
know, "Hey if you've been affected like this," and manpower,
more manpower.

Q.    Would you have to revamp your education materials?

A.    Oh.  Yes.  Yes.  Absolutely.  Because right now it's just    03:19:32
register to vote.  It's important, it's part of community
empowerment.  The part of your civic duty as a citizen.

So the message will have to change.  It's going to be
an entirely new message.

Q.    And what role does reputation play in the work CPLC does?    03:19:52

A.    We have a really good reputation in the community.  This
is why the community comes to us for all of those issues, like
everything -- I need assistance to buy a home or development,
even from domestic violence, but -- so we are there in the
community all the time.  So when they come to us and they come    03:20:15

United States District Court

LYDIA GUZMAN - Direct

to us because they need assistance, we also -- we pride

ourselves in saying, "Register to vote," and then they trust us

and they do register because they trust us.

Q.   And can you explain how these laws would affect CPLC's

reputation?

A.   So our reputation would be damaged.  It will be damaged

because the work that we do in the community is everything when

we strive for political empowerment.  When we strive to make

sure that the communities that we serve are succeeding, their

success also is dependent on their participation, their civic

participation; and if we can't assist them, our reputation will

be damaged in that way.

Q.   And you may have reviewed this but just so the record is

clear, what effect would the harm to CPLC's reputation have on

other aspects of your programming?

A.   So like the example that I shared, let's say the family

that might be going through a home ownership class, if -- if

the folks that we register to vote become disillusioned and

they lose interest in registering to vote, they may not finish

their -- you know, their course.  They may not buy their home.

And, you know, when -- our mission statement is we -- we drive

political and economical empowerment.  We know -- even the

simplest things, like buying a home, this is how they build

wealth.  This is how they get empowered economically but

politically.  So if we fail that one side and they don't

LYDIA GUZMAN - Direct

continue to trust us because of that, then we failed altogether  03:22:05
It has this ripple effect.

Q.   If, as you say, based upon your decades of experience, these laws will cause CPLC to have to spend additional time, effort and money to address the harm done, how will the  03:22:24 organization do that?

A.   So can you please rephrase that?

Q.   Yeah.  Absolutely.

     Where will CPLC divert resources from if these laws go into effect to address the harms that you mentioned?  03:22:47

A.   So our -- I don't know a number of budget, because my boss knows this.  I can tell you that we're going to -- we're a nonprofit.  It's very slim, the budget that we have, to get out the vote to register voters.  So if we have to spend additional resources, I guess would this take away from our programs, some  03:23:08 of the programs that we do in the community, would this take away from some of the other things that we like to do in the community.

     I mean, we do -- like everything from during school, like backpack give-aways.  Will resources from that be taken  03:23:28 away so that we can do this just other programming stuff?

Q.   Thank you.  I need one moment to confer with my co-counsel.

     No more questions.

     THE COURT:  Thank you.  03:23:44

**CROSS - EXAMINATION**                                              03:23:44

BY MS. BOUGHTON:

Q.    Kathryn Boughton for the State Attorney General.

You testified on direct that CPLC's activities include voter mobilization and voter registration; right?    03:24:16

A.    Correct.

Q.    And that part of your work is answering what I think you called some of the more technical questions that voters might have, kind of the nitty-gritty of the process; is that right?

A.    Correct.                                                       03:24:29

Q.    Is it CPLC's practice then to provide the most current information about voter registration requirements and the voting process to its constituents?

A.    Yes.

Q.    So would it be fair to say that there's always some degree    03:24:45
of updating educational materials in advance of an educational cycle?

A.    Yes.

Q.    Regardless of these bills?

A.    Yes.  So -- yes.                                               03:25:00

Q.    Apart from this litigation, has CPLC spent any money as a result of the Challenged Laws as of today?

MS. MOTZKIN:  Objection.  Outside of the scope of the direct.  She's not a witness who spokes to that.

THE COURT:  I've already indicated that that is not    03:25:25

United States District Court

LYDIA GUZMAN - Cross

an objection that I will entertain so it's overruled.

THE WITNESS:  Repeat the question.

THE COURT:  I'm not saying that she knows the answer but it's outside the scope of direct.  I'm not limiting cross because I want all witnesses to be fully examined the one time they are here so that they are not recalled.

MS. MOTZKIN:  Thank you, Your Honor.

BY MS. BOUGHTON:

Q.   Ms. Guzman, the question was, apart from any money spent on this litigation has CPLC yet spent any money in response to the Challenged Laws?

A.   I am not aware of that.

Q.   Okay.

THE COURT:  Are you not aware of that because that's outside of your -- the scope of what you do there or because you don't think they have?

THE WITNESS:  I would not be involved in any of that discussion.  Maybe my boss knows this.

THE COURT:  Thank you.

BY MS. BOUGHTON:

Q.   But I understand your testimony on direct to be that you expect that if these laws were implemented, as you understand them or as you believe they will operate, you expect that CPLC will have to divert resources and spend additional funds; is that right?

490

LYDIA GUZMAN - Cross

A.   Yes.

Q.   Okay.  Do you have an estimate for how much money the organization expects to spend?

A.   That is also a Joe question.  I'm sorry.

Q.   So to your knowledge, has the organization kind of started this budgeting process or started planning on how it might change operations or kind of reassign staff work?

A.   So what I can tell you is, we know that it's going to take a lot of resources and a lot more manpower but as far as budgeting, that also would be a Joe question.

Q.   Would it be fair to say that at this point, it's difficult to make those planning decisions and operations when it's not clear exactly how the law might be implemented?

A.   Can you rephrase that?

Q.   I can certainly try.  So as of today, would you agree with me that the laws have not been implemented?

A.   The laws have not been implemented as I'm aware of.

Q.   So because they have not been implemented, there's some degree of uncertainty as to how these laws will be applied.  Is that fair to say?

A.   So how the laws will be applied is something that I don't know how because that would be something with the Elections Departments.  I mean --

Q.   Sure.  That makes sense.

     I guess my kind of larger point is, because we don't

United States District Court

exactly know the specifics of how these laws might play out, it's difficult for CPLC today to say we're going to change -- divert 30 percent of our staff to this and we need to do this in paid advertising.  That's not something that you can testify here today that you have concrete plans?

A.   So we don't have -- that I'm aware of, I don't know what the plans are, okay, because that is a technical question for Joe.  But what I can tell you is if word gets out of how the laws would be implemented, just like with the census.  The census when we were doing mobilization around, you know, participating in the census and the question around citizenship just came up, even though it was never implemented, the community became afraid and we had to convince them to participate in the census regardless of what they heard and that took a lot of extra effort.

Q.   So your testimony is that CPLC expects that it will have to spend resources and divert staff or potentially hire more staff and that's based on your understanding that the law will wrongfully turn away eligible voters?

A.   Yes, it would.

Q.   A somewhat similar question but you discussed your voter education materials I believe.

        THE COURT:  Let's ask a question.

BY MS. BROUGHTON:

Q.   Does CPLC have voter education materials?

03:28:12
03:28:29
03:28:54
03:29:15
03:29:34
03:29:56

LYDIA GUZMAN - Cross

A.   We send out mailers and in the mailers they have information.

Q.   And you indicated that you expect the organization would have to redraft these materials if the laws were implemented?

A.   Yes, they will have to redraft them.

Q.   Has CPLC begun that redrafting process?  Or are you waiting?

A.   Yes.  We are waiting we because we don't know.

Q.   And just to confirm, you have not yet hired any new staff in response to these bills?

A.   Oh, gosh.  No.  No.  Because we're still waiting.  Everything is in limbo.

Q.   That is all I have for you, Ms. Guzman.  Thank you.

**CROSS - EXAMINATION**

BY MR. LANGHOFER:

Q.   Good afternoon, Ms. Guzman.  My name is Kory Langhofer.  It's nice to meet you.

What is the relationship between LULAC and CPLC?

A.   LULAC and CPLC.  They are two different organizations.  One is a membership organization where the members of LULAC, they pay to be a member and but they don't have, you know, the programming.  They don't do, like, the social services.  They do a lot of efficacy work and Chicanos Por La Causa is social services organization.

Q.   And you work for both of them?

493

LYDIA GUZMAN - Cross

A.   I am the State Director because, remember, everybody in LULAC is a volunteer.

Q.   I see.  So you are an employee of CPLC but you're the volunteer State Director of LULAC?

A.   Correct.

Q.   Thank you.  I'm sorry to make you perhaps repeat yourself. You were talking about fears around the investigations that may come out of this.  Have you been able to identify anyone who is a citizen but believes they are not a citizen?

A.   Rephrase that because I don't understand your question.

Q.   Yeah.  I guess what I'm -- I don't want to hide the ball here.  I'll sort of tell you what I'm getting at.  If they are going to investigate people for citizenship and it comes to nothing if they are citizens but it may come to more than nothing if they are not citizens, it seems to me like the people who would be worried about that investigation would be non-citizens.  So do you know of anyone who is a citizen but thinks they are not a citizen so they would have this fear?

A.   We have -- the communities that we work with, many of them are mixed-status families and so many of them are new citizens naturalized and so, you know, there's always that fear factor. This community, in decades of experience working with community, they don't like to draw attention to themselves, okay?  So it's not that they are not citizens that is the fear. It's drawing this attention to themselves and having to prove

United States District Court

and now they are being subject to an investigation as if they did something criminal when they are registering to vote.

Q.   So you're not saying that someone is a citizen but thinks they are a non-citizen.  You're saying it's sort of general aversion to much interaction with the Government.  I don't want to mischaracterize or talk you into it but am I capturing the gist?

A.   I guess I need more of where you are going because I don't know what the question is.

Q.   I'm trying to pin down what you're worried will make people afraid about the investigations.  You're not worried that people will think they will be successfully prosecuted because you don't think that citizens believe they are non-citizens; right so far?

        MS. MOTZKIN:  Objection.  Confusing question.

        THE COURT:  I'm confused.

        MR. LANGHOFER:  So am I.  I'm trying to understand the fear.

BY MR. LANGHOFER:

Q.   So what are people going to be afraid of exactly?

A.   This is a community who is very humble.  This is a community who maybe they have, you know, mixed status families. Let's say that some of the -- maybe the parents or the older kids might be DACA recipients they are not citizens so maybe the younger ones that are 18 and 19 years old, those are the

ones that we're registering.  But if they think that in their    03:34:56

registration they are going to be drawing attention to their

family, this is what that fear is.

Q.    Okay.  So fear for someone else, not for themselves?

So let's use your example.  If I understand your    03:35:20

example right, it's that a younger member of a family is a

citizen and older member is DACA status, using the word

"status" loosely.  The -- your concern is that the younger

member of the family who is in fact a citizen would be afraid

that they would get their sibling who has DACA status in    03:35:40

trouble.  So not worried about their own prosecution but that

it may have spillover effects to their family?

A.    Bringing that kind of attention to your family where now

if you receive a letter saying that you're going to be

investigated and this letter is almost accusatory of like --    03:35:55

Q.    Have you seen this letter?

A.    No, I haven't.  No, I haven't but, you know, if they get a

notice, a letter or I don't know how the Elections Department

is going to notify them of this investigation --

Q.    Do you believe people will be notified of investigations?    03:36:14

A.    Will they?

Q.    You don't know then?

MS. MOTZKIN:  Objection.  Calls for legal conclusion.

THE COURT:  Overruled.

THE WITNESS:  As I understand it in this law, they    03:36:33

United States District Court

are going to be subject to an investigation into their citizenship, okay.  When, you know, everybody else that fills out a form, they sign their name, they check everybody, okay, checks under penalty of perjury that they are a U.S. citizen.  They check the box.  Okay.  But when the Anglo family from Scottsdale is probably never going to receive that type of investigation, yet if in my family I have people that are -- that are -- if somebody challenges my citizenship because my surname maybe or maybe because, you know, I check the box there that says that I was born in another country, I became naturalized, right, and because of that, I suddenly drew the attention of the Elections Department and they are going to investigate me, that has a chilling effect.  That -- I don't want that type of attention to my family.

BY MR. LANGHOFER:

Q.    Okay.  So naturalized citizens let's stick with for an example.  Naturalized citizens definitely know they are citizens, right?  They went through the whole ceremony.

A.    Yes.

Q.    Okay.  So in the example that naturalized citizens are worried about scrutiny on their family, not them?

A.    Naturalized citizens are worried about what?

Q.    Scrutiny on their family but not themselves?

A.    Attention to their family.

\\\

Q.   Okay.  What if the letter they received just said, "We can't find evidence in our database that you're a citizen. Could you please send us something?"  Doesn't say they are under investigation.  They have got 35 days to respond.

Is that the sort of thing that would make you worried about your family members?  Is this the concern you are articulating?

MS. MOTZKIN:  Objection.  This is speculative, a hypothetical.

MR. LANGHOFER:  We do agree it's speculative.

THE COURT:  Hardly hypothetical.  It's what the statute says.

You know the statute has a thing where you can -- the County Recorder can send you a letter saying we don't have satisfactory proof of citizenship.  Send it in 35 days or else your registration will be canceled.  Are you concerned about that portion of the statute on your communities or just the Attorneys General investigation?

THE WITNESS:  So the Attorney General investigation, our community -- news travels fast through our community.

THE COURT:  Okay.  I know you're concerned about the Attorney General investigation.  But I think Mr. Langhofer is asking if you are also concerned about members of the community receiving the -- I'll call it the 35-day letter.

THE WITNESS:  So if a new registrant received a

United States District Court

498

LYDIA GUZMAN - Cross

35-day letter and they failed to respond to that because, "Oh, gosh, I worked so hard to -- you know, to register to vote and now I have to," you know, find whatever maybe they put it away and then they give up and if they don't respond to it, then they may be turned over to the Attorney General's office for that investigation for failure to respond is a concern.

BY MR. LANGHOFER:

Q.   Okay.   Is your concern that they will be investigated for failing to respond or for not being citizens?

THE COURT:   Well, I think it's not too far of a leap to think that a failure to respond may be reason to believe they're already doubting the citizenship.   Under the statute you're already doubting the citizenship, the documentary proof of citizenship.   Letter goes out.   You don't respond.   It's not farfetched to think that might be reason to believe you're not a citizen.

MR. LANGHOFER:   So I don't want to veer into closing argument.   There is no right not to be investigated.   Let me just save that for later.

THE COURT:   I'm just suggesting that her putting the two together is not an illogical thing to do.

MR. LANGHOFER:   I understand.

BY MR. LANGHOFER:

Q.   Ma'am, would your position on this fear -- I'm sort of dwelling on this.   We never had questions before.   I'm trying

United States District Court

499

LYDIA GUZMAN - Cross

to wrap my mind about this.  Would your position on this fear change if the primary investigation were done without notice to the voters?  It was a database check done internally at the County Recorders office and they come back.  It's the same sort of database checks they are already doing when they register people.  It's not a new investigation.  Sort of rerunning the checks to make sure nothing has changed.  And in most cases, the voters would hear nothing.  Would that change your concern about fear in the community?

A.   So right now if a naturalized citizen becomes naturalized and they failed to notify the MVD and they try to register to vote, that -- what you explained happens, you know.  They just -- the -- they won't be on the rolls.  They wouldn't be registered until they complete that satisfactory information.  But the additional piece of not responding to the request for more information that can lead them to an Attorney General investigation is very troubling.

Q.   So in your experience, is there fear in the community arising out of the citizenship checks that were already in place before this law?

A.   Say that again?

Q.   In your experience, was there fear in the Latino community about the citizenship checks that were in place before this law?

A.   The citizenship checks have always been, you know,

United States District Court

500

LYDIA GUZMAN - Cross

problematic for us.  We know that when a person registers to vote, they swear under penalty of perjury and they submit, you know, now they submit the evidence, but this is something that affects a lot of folks.                                                    03:43:00

The problem is that the people that are questioned about their citizenship are people that look like me, people that have my surname.                                                         03:43:13

Q.   You do appreciate that in Arizona we do not -- with the exceptions that have been dealt with in courts already, we do not pull people over or question them based on the color of their skin or their surnames; right?                                  03:43:33

A.   I testified in a court just in this building not long ago about racial profiling.

Q.   With Sheriff Joe.  Okay.  Sheriff Joe lost and was actually convicted.  Okay?                                            03:43:50

A.   Yes.

Q.   So there's that.  My question was, is there fear in the community from just the citizenship status checks that were done -- that were in place before these laws?

A.   Is there fear in the community?                               03:44:08

Q.   Correct.

A.   Fear from an Attorney General investigation under the false accusation that maybe they did something wrong.  Okay.  There's that fear.

Q.   I'm asking about something else.  I'm not talking about          03:44:22

501

LYDIA GUZMAN - Cross

the new laws.  I'm talking about the processes that were in

place before the laws, did that cause fear in community?

A.    There's a lot of disappointment over disenfranchisement.

Okay.  So when people register to vote and they thought had

they registered because -- and then the information didn't

match with the MVD, then they show up and we have to, you

know -- we would have to educate them.

Q.    Do you know what the LULAC Consent Decree is?  You work

for LULAC.

A.    I don't work for LULAC.

Q.    You might experience it as work, but you volunteer for

LULAC.  Do you what the LULAC Consent Decree is?

        MS. MOTZKIN:  Objection.  Calls for a illegal

opinion.

        THE COURT:  He didn't ask for an opinion.  He just

asked if she knew about it.

        Do you know about the LULAC Consent Decree?

        THE WITNESS:  So I'm not a lawyer.  The work that we

do with LULAC has to do with, you know, just doing work in the

community.  We don't -- the volunteers and the members of

LULAC, we don't step in the courtroom very often.

        THE COURT:  Okay.  Ms. Guzman, the only question was,

do you know that there's a LULAC Consent Decree?

        THE WITNESS:  Yes, I do know.  I do know.

\\\

                United States District Court

502

LYDIA GUZMAN - Cross

BY MR. LANGHOFER:                                                      03:45:39

Q.   So is it your understanding of that that the citizenship
checks that were in place before these laws actually originated
out of litigation that your group initiated and entered into
this agreement over?                                                  03:45:50

A.   Yes.

Q.   So is it your position that the procedures that you all
help put in place are causing fear in community?

A.   No, I didn't say fear.   There's --

Q.   Okay.   I think we've got that.                                  03:46:04

     Next, hopefully last question or line of questions.
How many people will be removed from the rolls because of these
laws?

A.   You're asking me to give you a number.

Q.   Earlier you said a lot of people.   I'm wondering if you        03:46:19
can give us a number.

A.   How many people will be removed?

Q.   That's what I'm asking.

A.   Well, it depends on how they -- for example, the people
that are registered.   Let's say that somebody does a check on      03:46:29
the people that --

          THE COURT:   Excuse me.   Do you have an estimate?
He's just asking for a number.

          THE WITNESS:   Oh.   No.   No.   I don't know.

\\\

                    United States District Court

LYDIA GUZMAN - Cross

BY MR. LANGHOFER:

Q.   Do you know -- is it more than 100?

A.   Oh, yes.

Q.   Oh.   Why do you say that?

A.   Because if they do those checks, someone can just pick a big random number of people whether they look for your Hispanic surnames or because of place of birth or things like that. What if somebody just says, "I want all of these people investigated"?

Q.   Okay.   Let's assume it's more than 100.   What percentage of them would actually be not qualified to vote?   Do you know that number?

A.   When I worked at the Secretary of State's office, it was my job to report to the Department of Justice any inaccuracies of voter registration or any voter fraud because they submitted a quarterly report to me that I submitted and forwarded to the Department of Justice.   And in my years of working for the Secretary of State's office we found very -- like almost zero, you know --

Q.   Yes, ma'am.   I'm asking you a different question.   I'm asking you -- we're going to go with your assumption it's more than 100 people and I'm asking if you know what percentage of that number over 100 would actually be not qualified to vote?

A.   Oh, how many would be not qualified to vote?

Q.   That's right.

United States District Court

504

LYDIA GUZMAN - Redirect

A.   Oh, I see.  So, you know, I don't know that people that are registering to vote are not citizens.  I'm afraid of the people that are going to be removed from those rolls that are qualified to vote.

Q.   You said that in direct.  What I'm asking you is, do you know how many of them will not be qualified to vote?

A.   No, I don't.  Very little to none.

Q.   Would it be fair to say on the number of people who would be removed and the number who are not qualified within that removal number, you are guessing?

A.   No.  Based on experience.  Based on my work at the Secretary of State's office and what I saw.

Q.   Secretary of State's office before these laws were ever implemented; right?

A.   Yes.

Q.   Okay.

        MR. LANGHOFER:  Thank you, Your Honor.

        THE COURT:  Any redirect?

**REDIRECT EXAMINATION**

BY MS. MOTZKIN:

Q.   Hi, Ms. Guzman.  Mr. Langhofer in his questioning about investigation suggested that if people are investigated and they are citizens, it is nothing to them.  Is that correct?  Do you remember that?

A.   Yes.

United States District Court

LYDIA GUZMAN - Redirect

Q.   If they are investigated, it's not nothing to them; right?     03:49:16

A.   That's right.

Q.   Even if their citizenship is confirmed, it is not nothing to them; right?

A.   Correct.     03:49:25

Q.   Why?

A.   Because it's like being falsely accused of a crime that they did not commit.  It's like, you know, questioning -- it's like questioning someone for their right to participate in this and they do have the right based on perhaps, you know, the fact     03:49:43 that they were foreign born; okay?  I mean, they have the right to participate in our voting and election system.

Q.   And what effect would that have on CPLC?

A.   That will have a very big impact.  Even with our mission statement, we drive political and economic environment.  And     03:50:07 when we work so hard to empower those communities, those communities trust us to lead them so that they can have a voice in -- when engage civically and if we lead them down a path where they are going to be investigated now and they did nothing wrong but register to vote.     03:50:34

Q.   And just so the record is clear, are you additionally concerned about individuals being removed from the rolls?

A.   Yes.  Yes.  My concern is that U.S. citizens are going to be removed from the rolls, people that perhaps either -- you know, that look like me, that have Hispanic surnames, have been     03:50:58

United States District Court

naturalized.  They have been registered for a long time and suddenly now they are going to be the subject of the attention of someone who says, "I need to report these folks."

Q.   Thank you.  I have no further questions.

THE COURT:  May this witness be excused?

MS. MOTZKIN:  Yes.

THE COURT:  Any objection?

MR. LANGHOFER:  No.

THE COURT:  Thank you very much, Ms. Guzman.  You may step down and you are excused as a witness.

(Witness excused.)

THE COURT:  Plaintiffs may call their next witness.

MR. BABBITT:  Hello again, Your Honor.  Plaintiffs will call Morgan Dick as our next witness.

COURTROOM DEPUTY:  Please raise your right hand.

(MORGAN DICK, a witness herein, was duly sworn or affirmed.)

COURTROOM DEPUTY:  Can you please state your full name and spell your last name?

THE WITNESS:  Morgan Dick. D-I-C-K.

COURTROOM DEPUTY:  Okay.  You can go ahead and have a seat.

**DIRECT EXAMINATION**

BY MR. BABBITT:

Q.   Ms. Dick, could you please introduce yourself to the

United States District Court

Court?

A.   Yes.  Good afternoon, everybody.  My name is Morgan Dick and I am the Executive Director of the Arizona Democratic Party.

Q.   How long have you been in that role?

A.   I have been the Executive Director since April 1 of this year.

Q.   What are your responsibilities as Executive Director?

A.   I have many responsibilities as the Executive Director of a state political party.

I like to think about them in three buckets.  I have internal responsibilities.  I manage staff, I oversee our budget, day-to-day office operations.  I also have external responsibilities, maintaining good partnerships in key relationships with our elected officials, our nominees, our key partner organizations like the Democratic National Committee. I also have strategic responsibilities that are to advance the mission of the Arizona Democratic Party, which is to elect more Democrats in Arizona.

Q.   Before becoming Executive Director, what was your job?

A.   I was the Communications Director at the Arizona Democratic Party.

Q.   And how long in total have you worked at the Arizona Democratic Party?

A.   I have been at ADP since February of 2022.

MORGAN DICK - Direct

Q.   And what is the Arizona Democratic Party?

A.   Well, at its core, we are a recognized political party in Arizona seeking to elect Democrats up and down the ticket.

Q.   And so what does that mean in terms of your day-to-day operations?

A.   Well, I like to think of us as we are the day-to-day operating arm of the democratic infrastructure in Arizona.  You know, we work to support our candidates and support our voters.

Q.   How many registered Democrats are there in Arizona?

A.   About 1.26 million registered Democrats in Arizona.

Q.   Does the Arizona Democratic Party have a professional staff?

A.   Yes, we do.

Q.   How many people are on staff?

A.   Currently we have 46.

Q.   Does that staff increase in presidential years?

A.   Absolutely.  For some context, there at the peak of our staffing tin 2020, we had just over 400 folks on staff.

Q.   Do you expect a similar increase in 2024?

A.   Very much so.

Q.   Does the Arizona Democratic Party also rely on volunteers?

A.   Yes.  They are the core of our work.

Q.   And can you give me a sense of the scale?  What's the volunteer force?

A.   Well, similarly to our staff, it also fluctuates.  Today

United States District Court

509

MORGAN DICK - Direct

is election day in Arizona after all and we have recruited a        03:54:44
couple hundred volunteers to support our efforts for this
election day but similarly in a presidential cycle, that effort
is ballooned.  At our peak in 2020, we had about 25,000
volunteers actively engaging with us.        03:54:59

Q.    What's the annual budget of the ADP?

A.    Again, it also fluctuates.  In an off year, like 2023, we
are looking at a couple of million dollars; but in an on year,
we are looking at upwards of $60 million.

Q.    And does all of that money go towards electing Democrats        03:55:24
in Arizona?

A.    Absolutely.

Q.    In broad terms, what does the Arizona Democratic Party do
to support the election of Democrats?

A.    Well, to elect Democrats, you must have voters.  So I        03:55:33
think it starts with -- the starting point is registering folks
to vote.  We then persuade them that a Democrat is the best,
you know, choice on their ballot so on issues, on the who our
candidates are.

        We then mobilize them to go out to the polls and        03:55:50
then, you know, obviously intertwined with that is educating
them on the mechanics of voting, how to receive a mail-in
ballot, where to go to find your in-person voting location, who
to call if you have questions, things like that.

Q.    Are you familiar with the term federal-only voters?        03:56:09

United States District Court

510
MORGAN DICK - Direct

A.   Yes.

Q.   What do you understand that to mean?

A.   I understand federal-only voters to mean that folks who register to vote but when they register, they are unable to provide documentary proof of citizenship.  Therefore, when they cast a ballot, they are only allowed to vote in federal races. So, for example, they could not vote for a statewide race like a governor or a state legislative race.

Q.   Do you know how many federal-only voters are registered Democrats in Arizona?

A.   It's my understanding that it's about 9,000.

Q.   Do you know how many federal-only voters are registered as Republicans?

A.   Likewise, it's my understanding that there are about 4500.

Q.   And beyond that numerical discrepancy, in the Arizona Democratic Party's experience, are federal-only voters more likely to vote for Democrats than Republicans?

A.   I think we just talked about it.  There's a two-to-one margin into how many of those voters are registered Democrats versus registered Republicans; but beyond that, you know, folks who are unable to provide documentary proof of citizenship, we know they are likely younger, they likely have a lower socioeconomic standing, therefore, they have a harder time providing that DPOC or documentary proof of citizenship.

Q.   I would like to move to a different aspect of H.B. 2492.

United States District Court

MORGAN DICK - Direct

Based on your experience at the ADP, if H.B. 2492 were implemented and some voters could not vote in presidential elections, how would that affect Arizona democratic voters in the ADP itself?

A.   I mean, I think we just said it.  They could not vote in presidential elections.  Our votes would not have the opportunity to cast a ballot for the office of the United States Presidency, the top of the ticket, the most powerful elected office in this nation.

And it would, therefore, impact the Arizona Democratic Party's ability to execute on our mission which is to elect more Democrats.  You know, we know that margins are razor, razor thin in Arizona with elections most recently being decided by just 280 votes.  You know, every vote is critically important to our ability to win elections.

Q.   So would the inability to vote in a presidential election have effects on races beyond the presidential election itself?

A.   Yeah.  Absolutely.  If you're not eligible to vote in a presidential election, you know, we know that presidential elections are incredibly high turnout years, so what we mean by that is, there's a lot of energy and excitement around presidential election years.  You know, it's a whole new cycle for an entire year, right, and folks are very motivated to turn out and vote in those years as compared to midterm years.

Therefore, we see a down-ballot effect with the

United States District Court

MORGAN DICK - Direct

number of folks casting a ballot for a U.S. Senate race, a U.S. House race, all the way down to state legislative races in presidential years.

Q.   If it were to come to pass that certain voters could not vote in presidential elections, what would the ADP need to do to respond?

MR. LANGHOFER:  Relevance.  This issue has already been resolved, Your Honor.

THE COURT:  Sustained.

BY MR. BABBITT:

Q.   Would the ADP have to reallocate resources to address the effect on its operations if voters were unable to vote in presidential elections?

MR. LANGHOFER:  Same objection.

THE COURT:  Overruled.

You may answer.

THE WITNESS:  Yes.  If some voters were ineligible to vote in presidential elections, we would certainly need to reallocate resources to educate voters on why and, you know, how they could continue to participate in the process beyond presidential elections.  Again, as I mentioned, elections are won on razor thin margins in Arizona and we would need to do a great deal of work to make up any lost ground from voters we would have otherwise been counting on to turn out and cast their ballot.

MORGAN DICK - Direct

BY MR. BABBITT:                                                    04:00:28

Q.   Does the ADP encourage Democrats in Arizona to vote by mail?

A.   Very much so, yes.

Q.   Why is that?                                                 04:00:35

A.   We know that nearly 90 percent of Arizonans prefer to vote by mail.  We know that Democratic voters is our experience that they enjoy violating by mail.  We understand voting by mail to be critical for some of our key constituencies that we work with.  Younger folks, for example, they might not have time to  04:00:51 get to a polling location between classes so we encourage them to vote by mail.  We encourage folks who live in rural Arizona or on tribal lands who may live upwards of 10, 20, maybe even 50 miles from their polling place to vote by mail as a convenience factor for them.                                     04:01:09

        I know people in my own life who prefer to sit around a kitchen table and vote next to their computer so they can look up candidates and issues and cast an incredibly well-educated ballot.  And even most recently, right, folks who don't want to go to a physical polling location for fear of  04:01:25 COVID, exposure to the flu, other things like that.

Q.   Would an inability of certain voters to vote by mail affect the Democratic Party's operations in Arizona?

A.   Yes.

        MR. LANGHOFER:  Same objection.                          04:01:40

514

MORGAN DICK - Direct

THE COURT:  Overruled.  The answer "Yes" will stand.    04:01:41

BY MR. BABBITT:

Q.   How so?

A.   I mean, if folks were ineligible to vote by mail, we would    04:01:49
need to seriously rethink our strategy for folks to be able to
go to vote in person and educate them as to, you know, why they
can no longer vote by mail.  And, you know, we would need to
think about things like how do we get folks to those polls?
Are we having more volunteers drives folks to polls on election    04:02:10
day?  Are we partnering with civic engagement organizations to
be able to bring their ballots from their kitchen table into
the ballot box?  That is, our ultimate goal is, you know, folks
who have a ballot, how can they turn it in?

Q.   And would doing these things that you just described force
the ADP to divert resources from other endeavors?    04:02:26

A.   Yes.

Q.   Are you aware of 2492's requirement that voters provide
their place of birth on the state form when registering?

A.   Yes, absolutely.

Q.   And are you concerned about that requirement?    04:02:41

A.   Yes.

Q.   Why?

A.   I think when you take a step back and what does the voter
registration experience look like for a lot of people.  Very
recently we did voter registration drive on college campuses.    04:02:53

515

MORGAN DICK - Direct

This is like a really exciting time in young folks' life.  They have just started college.  They are eligible to vote.  They see us at our table.  We often have music going and it's a fun experience.  It's a very exciting time.

And it's a very official form.  It can be a little, like, intimidating to a young person to think, "Okay.  What is my driver's license number?  What is all of this information?"  And then you start asking what can be like very sensitive questions to a number of people about, you know, what country were they born in and I think that -- when we talk about those kinds of things, particularly in Arizona, that can be a point where a lot of people would just say, "No, like I don't want to open myself up to this, my family up to this. I'll just like -- I'll move on."

THE COURT:  I want to interrupt for a minute, because this question, it has been optional -- or this blank has been on the form, state or country of birth, for many, many years as I understand it.  Have you ever experienced during a voter registration drive someone who expressed what you were just I think speculating about?

THE WITNESS:  I haven't personally experienced that but, you know, if we're talking about, you know, under 2492 this becoming a mandatory question to fill out rather than be, you know, optional, I think that is a fear we would have.

THE COURT:  It's a fear that you have?

United States District Court

516

MORGAN DICK - Direct

THE WITNESS:  Yes.

THE COURT:  But in all the years that these optional questions have been on the form, do you have any personal knowledge of people not wanting to fill it out?  I mean, there are several optional questions.

THE WITNESS:  Yes, of course.  No, I don't have any personal knowledge of that.

BY MR. BABBITT:

Q.   Do you have specific concerns -- with the Court's indulgence, do you have specific concerns about making that question mandatory with respect to the Birthplace Requirement?

A.   Yes.  I would.  I think when we're tabling at these college campuses, for example, we want to be supportive and folks filling out those forms, we want to be able to walk it through with them.  We want to be able to review it with them when they are done to ensure all of those mandatory lines and boxes have been filled out.

And I think, you know, when we get to that, you know, that what would be newly mandatory question of country of birth, then I think that would open up a very, like to some people, sensitive conversation.

Q.   Shifting gears here to another aspect of H.B. 2492, based on your experience, would implementing the law in a way that exposed certain voters to the possibility of investigation and prosecution have an effect on the ADP or its members?

United States District Court

517

MORGAN DICK - Direct

A.   Yes, it would.  Again, kind of going with this, like, tabling example, something we see quite often.  If we're having this conversation with folks at the table saying, "Hey, if you, like, have concerns about this, this is what it potentially, like, opens you up to."  Again, I think many people would say like, "Oh, you know, like I am good.  I do not want to open myself up to this, my family, other members of my household up to this."

And those folks would just be lost voters that we could have otherwise registered and turned out as democratic voters.

Q.   And would addressing that concern require the organization to divert resources from other endeavors?

A.   Yes.

Q.   How so?

A.   I mean, again, thinking about can we make up that lost ground of voters that we could have otherwise registered and done the work to persuade, mobilize, educate them out to the polls on election day.  We need to talk about, like, where there are new different groups of voters that we can make up for that lost ground.

Q.   And sitting here today, has the ADP done anything in response to the enactment of H.B. 2492 last year?

A.   Other than participating in this litigation, we have been paying very close attention to the review and comment process

United States District Court

MORGAN DICK - Direct

on the Elections Procedures Manual which, you know, is our hope and understanding that the Elections Procedures Manual will be implemented early next year.  And additionally, we're having very serious and in-depth conversations about budget, planning for next year and strategic planning for voter registration, turnout, those kinds of things.  And this pending litigation is a part of that that we'll be forced to adjust pending the outcome of this litigation.

Q.   Can you elaborate on that based on where we are in the election cycle and your budget cycle?

A.   Sure.  We're election day.  2024 starts tomorrow.  As soon as we get through the election day today, we are strongly planning on having an increase in our budget, a very strong strategy to win in 2024 and we're building those things out right now.  And I think 2024 is the -- this litigation around 2492 is a major contingency plan that is a part of our budget and strategy pending the outcome.

Q.   And based on your experience at the ADP, would implementing H.B. 24 as written affect the ability of democratic candidates to compete in Arizona?

A.   Yes.

        MR. LANGHOFER:  Speculation.

        THE COURT:  Overruled.  The answer "Yes" will stand.

BY MR. BABBITT:

Q.   And would preventing H.B. 2492 from being implemented as

United States District Court

MORGAN DICK - Cross

written address that disadvantage?

A.   Yes.

Q.   No further questions.  I'll pass the witness.

THE COURT:  Thank you.

Anything else on direct of this witness?

All right.  Who wants to cross?

**CROSS - EXAMINATION**

BY MR. PORTER:

Q.   Good afternoon, Ms. Dick.  I am Hannah Porter.  I represent the intervenor-defendants Speaker Toma and President Petersen.

I wanted to make sure I understood how ADP is organized in terms of members.  Is ADP a membership organization?

A.   I think we think of our members as democratic voters as folks who are registered to vote democratic and certainly folks who open up their wallets to contribute to our organization.

Q.   Do you have normal members of ADP?

A.   We don't distribute formal membership cards or anything like that.

Q.   So you define members by persons who vote in favor of democratic candidates or I think you said contribute money?

THE COURT:  Or registered Democrats.

BY MR. PORTER:

Q.   Or registered Democrats.

United States District Court

MORGAN DICK - Cross

MS. PORTER:  Sorry.  Thank you.

THE WITNESS:  Yes.  Registered Democrats, folks who support democratic candidates, contribute money, volunteer.  I think it could be an expansive definition.  Folks who are engaged with the Arizona Democratic Party.

BY MR. PORTER:

Q.   Okay.  Using that expansive definition of a membership, is it your position that any of ADP's members have been injured by the current -- by the Challenged Laws as of today?

A.   No.

Q.   And in your testimony you talked about a contingency plan related to H.B. 2492.  Is that a written plan?  Do you have an internal written document?

A.   Planning out our budget right now and I think that is a part of those kinds of discussions and, you know -- plans are being put on paper right now.

Q.   Still in the planning stages?

A.   Very much, yes.

Q.   No definite decisions made yet?

A.   No.  No definite decisions made yet, again pending the outcome of this litigation and how the implementation is handled in the Elections Procedures Manual.

Q.   Is it correct to say that aside from this litigation, ADP has not yet expended resources because of the Challenged Laws?

A.   I mean, I think I would say that because we have been

United States District Court

leaned on the Elections Procedure Manual comment and review period with things like that partner organizations, of course, our staff time has been devoted to that.  And I view our staff time as the best expense we can make of the party so . . .

Q.   I just want to make sure I'm understanding your testimony. So your testimony is that ADP staff time has been spent on the EPM process?

A.   Yes.

Q.   In your personal experience, helping persons to register to vote, has anyone expressed to you a fear that registering to vote would open themselves up to wrongful investigation for lack of citizenship?

A.   No.  I think the way that happens -- the table, right, for example, is oftentimes we'll get folks come up and say, "I know I'm not eligible to register to vote.  I'll move on with my day," and then folks who check the box and fill out the form and we're moving on.

Q.   The persons who are willing to check the box, though, have never expressed to you a fear that they could be wrongfully investigated?

A.   No.  That has never been expressed to me.

Q.   Okay.  I don't think I have any further questions.

         THE COURT:  Thank you.

         Any questions, Mr. Langhofer?

         MR. LANGHOFER:  Just the one about the unicorn, Your

Honor.

**CROSS - EXAMINATION**

BY MR. LANGHOFER:

Q.   Ma'am, I have actually been looking forward to talking to you because the ADP has so many members, using it the loosest sense of the word in Arizona, as far as I can tell, more than anyone else on the plaintiffs' side.  And you have such an extensive network.

What I want to ask is, over the last year that your organization has been involved, with all of its resources and members, have you been able to identify a person who is an adult, 18 years or older, a citizen who resides in Arizona, who doesn't have an Arizona driver's license issued after 1996, U.S. birth certificate, a U.S. passport, a tribal identity card, or a naturalization number?

A.   It's not something we like proactively and go out and look for these folks, right.  So no.

Q.   Thanks.

THE COURT:  Redirect?

**REDIRECT EXAMINATION**

BY MR. BABBITT:

Q.   Ms. Dick, will your members, expansively defined who support democratic candidates, be injured if the laws are permitted to go into effect?

MR. LANGHOFER:  Speculation.

United States District Court

THE COURT:  Overruled.

You may answer.

THE WITNESS:  Yes.

MR. BABBITT:  No further questions, Your Honor.

THE COURT:  May this witness be excused?

MR. BABBITT:  Yes.

THE COURT:  Any objection?

MR. LANGHOFER:  No, Your Honor.

THE COURT:  All right.  Thank you very much. Ms. Dick.  You may step down and are you excused as a witness.

(Witness excused.)

THE COURT:  Plaintiffs may call their next witness.

MR. BABBITT:  Your Honor, I don't believe we have any further witnesses today.

THE COURT:  Is that correct?  Nobody else for today? Okay.

MR. FREEDMAN:  That's correct, Your Honor.  We've made it through nine witnesses so far.  We're definitely on track.  We are trying to figure out when we can reschedule Chairman Rambler who was not able to attend yesterday.

For the record, this is John Freedman for the Poder plaintiffs.

THE COURT:  All right.  Then court is in recess until 9 o'clock tomorrow morning.

(Whereupon, these proceedings recessed at 4:15 p.m.)

United States District Court

524

C E R T I F I C A T E

04:15:03

I, ELAINE M. CROPPER, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

04:15:03

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control, and to the best of my ability.

04:15:03

DATED at Phoenix, Arizona, this 8th day of November, 2023.

04:15:03

s/Elaine M. Cropper

04:15:03

_____
Elaine M. Cropper, RDR, CRR, CCP

04:15:03

United States District Court