2:22-cv-00509-SRB - November 8, 2023 A.M.

## UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF ARIZONA

_____

| | |
|---|---|
| Mi Familia Vota, et al., | ) |
|  | ) |
| Plaintiffs, | ) |
|  | ) |
| vs. | ) 2:22-cv-00509-SRB |
|  | ) |
| Adrian Fontes, et al., | ) |
|  | ) Phoenix, Arizona |
| Defendants. | ) November 8, 2023 |
| _____ | ) 9:01 a.m. |

BEFORE:   THE HONORABLE SUSAN R. BOLTON, JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

BENCH TRIAL - DAY 3 A.M.

(Pages 525 through 635)

Official Court Reporter:
**Elaine Cropper, RDR, CRR, CCP**
Sandra Day O'Connor U.S. Courthouse
401 West Washington Street
Suite 312, SPC 35
Phoenix, Arizona  85003-2150
(602) 322-7245

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

United States District Court

2:22-cv-00509-SRB - November 8, 2023 A.M.

**APPEARANCES**


For Plaintiff United States of America:

    **JENNIFER J. YUN, ESQ.**
    U.S. DEPARTMENT OF JUSTICE - VOTING - M STREET
    4 Constitution Square
    150 M. Street NE
    Washington, D.C.  20503

    **RICHARD DELLHEIM, ESQ.**
    **SEJAL JHAVERI, ESQ.**
    **MARGARET TURNER, ESQ.**
    U.S. DEPARTMENT OF JUSTICE-CIVIL RIGHT DIVISION, VOTING
SECTION
    950 Pennsylvania Avenue NW
    Washington, D.C.  50530


For Plaintiff ADRD Action, Arizona Students' Association,
League of United Latin American Citizens Arizona, Living
United for Change in Arizona::

    **WILLIAM JOSEPH MCELHANEY, III, ESQ.**
    MAYER BROWN, L.L.P.
    71 S. Wacker Drive
    Chicago, Illinois 60606

For Plaintiff Arizona Asian American Native Hawaiian And
Pacific Islander for Equity Coalition:

    **NIYATI SHAH, ESQ.**
    ASIAN AMERICANS ADVANCING JUSTICE
    1620 L Street NW, Suite 1050
    Washington, D.C.  20036

    **SADIK HUSENY, ESQ.**
    **AMIT MAKKER, ESQ.**
    **EVAN OMI, ESQ.**
    **CATHERINE ANNE RIZZONI, ESQ.**
    **SCOTT KANCHUGER, ESQ.**
    LATHAN & WATKINS
    505 Montgomery Street, Suite 2000
    San Francisco, California 94111


United States District Court

2:22-cv-00509-SRB - November 8, 2023 A.M.

*APPEARANCES' (Continued)*

For Plaintiff Arizona Democratic Party, Democratic National Committee:

        **DANIEL S. VOLCHOK, ESQ.**
        WILMER CUTLER PICKERING HALE & DORR, L.L.P.
        2100 Pennsylvania Avenue NW
        Washington, D.C.  20037

        **KELSEY QUIGLEY, ESQ.**
        WILMER CUTLER PICKERING HALE & DORR, L.L.P.
        2600 El Camino Real, Suite 400
        Palo Alto, California  94306

For Plantiff Poder Latinx:

        **JOHN A. FREEDMAN, ESQ.**
        **LEAH MOTZKIN, ESQ.**
        ARNOLD & PORTER KAYE SCHOLER, L.L.P.
        601 Massachusetts Avenue NW, Suite 100
        Washington, D.C.  20001

        **BEAUREGARD WILLIAM PATTERSON, ESQ.**
        **JONATHAN SHERMAN, ESQ.**
        **MICHELLE KANTER COHEN, ESQ.**
        FAIR ELECTIONS CENTER
        1825 K Street NW, Suite 701
        Washington, D.C. 20006

For Plaintiffs Tohono O'odham Nation and Gila River Community:

        **ALLISON NESWOOD, ESQ.**
        NATIVE AMERICAN RIGHTS FUND
        250 Arapahoe Avenue
        Boulder, Colorado 80302

        **SAMANTHA BLENCKE KELTY, ESQ.**
        Hufford Horstman Mongini Parnell & Tucker, P.C.
        P.O. Box B
        Flagstaff, Arizona  86001-4547

United States District Court

528

2:22-cv-00509-SRB - November 8, 2023 A.M.

**APPEARANCES (Continued)**

For Plaintiff Voto Latino, Mi Familia Vota:

**ELISABETH C. FROST, ESQ.**
ELIAS LAW GROUP, L.L.P.
250 Massachusetts Avenue NW, Suite 400
Washington, D.C. 20001

**JILLIAN LAURA ANDREWS, ESQ.**
Herrera Arellano, L.L.P.
1001 North Central Avenue, Suite 404
Phoenix, Arizona   85004

For Plaintiff Promise Arizona, Southwest Voter Registration
Education Project:

**ERNEST ISRAEL HERRERA , ESQ.**
**ERIKA CERVANTES, ESQ.**
MALDEF
634 Spring Street, 11th Floor
Los Angeles, California   90014

**DANIEL R. ORTEGA, JR., ESQ.**
Ortega Law Firm, P.C>
361 E. Coronado Road, Suite 101
Phoenix, Arizona   85004

For Defendants State of Arizona, Kris Mayes, Jennifer Toth:

**JOSHUA MICHAEL WHITAKER, ESQ.**
**TIMOTHY E. HORLEY, ESQ.**
ARIZONA ATTORNEY GENERAL'S OFFICE
2005 N. Central Avenue
Phoenix, Arizona   85004

For Defendant Adrian Fontes:

**CRAIG ALAN MORGAN, ESQ.**
**SHAYNA GABRIELLE STUART, ESQ.**
Sherman & Howard, L.L.C. - Phoenix, AZ
2525 E. Camelback Road, Suite 1050
Phoenix, Arizona   85016

United States District Court

2:22-cv-00509-SRB - November 8, 2023 A.M.

**APPEARANCES (Continued)**

For Intervenor-Defendants State of Arizona, Kris Mayes, Ben Toma::

      **KATHRYN E. BOUGHTON, ESQ.**
      ARIZONA ATTORNEY GENERAL'S OFFICE
      2005 N. Central Avenue
      Phoenix, AZ  85004

      **HANNAH HATCH PORTER, ESQ**
      GALLAGHER & KENNEDY, P.A.
      2575 E. Camelback Road, Suite 810
      Phoenix, Arizona 85016-9225

For Defendant-Intervenor Republican National Committee:

      **KORY A. LANGHOFER, ESQ.**
      STATECRAFT, P.L.L.C.
      649 North 4th Avenue, Suite B
      Phoenix, Arizona  85003

United States District Court

530

2:22-cv-00509-SRB - November 8, 2023 A.M.

**I N D E X**

**TESTIMONY**

| WITNESS | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Plaintiffs' Witnesses | | | | |
| ERIC JORGENSEN | 536 | 583 | 597 | |
| YOLANDA MORALES | 605 | 621 | 634 | |
| | | 632 | | |
| | | 633 | | |

**E X H I B I T S**

| Number | | Ident | Rec'd |
|---|---|---|---|
| 6 | 2019 Arizona Elections Procedures Manual | 627 | |
| 231 | AZ MVD One Source: Acceptable Documentation for | 546 | 547 |
| 234 | ADOT - Customer Extract Data Layout information [ADOT001400-10][Depo Ex. 111]ADOT - Customer Extract Data Layout information [ADOT001400-10][Depo Ex. 111] | 568 | |
| 235 | 11/15/2022 Email chain from A. Previte to B. Briggs, CC'ng J. Byrd, Re: New data exports for HB2243 Compliance (No attachment) [ADOT001464-67][Depo Ex. 112] | 574 | |
| 242 | 3/30/2022 Email from Y. Morales to T. Robinson, et al. re: Yolanda/Russ/Tyler/Jasmine FW: Voter registration and changes [AZSOS-017979-AZSOS-017982][Depo. Ex. 119] | 618 | |
| 428 | ADOT - Establishing Authorized Presence, Effective date: January 04, 2022; Review Due :January 04, 2024 | 578 | 579 |

United States District Court

2:22-cv-00509-SRB - November 8, 2023 A.M.

**E X H I B I T S (Continued)**

| Number | | Ident | Rec'd |
|---|---|---|---|
| 767 | Screenshots of voter registration webpages at servicearizona.com [AG136665 -AG136699, Hersh 287] | 594 | 596 |
| 935 | Matching Criteria Sheet [AZSOS-564547-AZSOS-564548, McDonald 307] | 628 | 631 |

**RECESSES**

| | Page | Line |
|---|---|---|
| (Recess at 10:25; resumed at 10:41.) | 583 | 2 |

United States District Court

532

2:22-cv-00509-SRB - November 8, 2023 A.M.

**P R O C E E D I N G S**

(Court was called to order by the courtroom deputy.)

(Proceedings begin at 9:01.)

THE COURT:  Good morning.  Please sit down.                    09:01:25

I assume you've all seen the email from Ms. Lang that indicates that another member of one of plaintiffs' trial team has tested positive for COVID.  It's apparently somebody who was in the courtroom yesterday.

I understand that no one from that trial team is               09:01:47 present today so I would -- I see more masks.  I think that seems like a good idea.  So anyway, everybody else, please monitor your health and try to stay healthy.

Plaintiffs may call their next witness.

MR. FREEDMAN:  John Freedman for the plaintiffs.              09:02:07

Before we start, just a few housekeeping matters. The first is -- it's very loud -- I wanted to just flag for the Court that we have a pending motion to strike part of the defendants' expert's supplemental reports as well as some related *Daubert* motions.  It was filed last Friday.  621.       09:02:27

ADOT has responded but we would like, if at all possible, to get a resolution on that motion.

THE COURT:  Who has responded?

MR. FREEDMAN:  The State and ADOT have responded.

THE COURT:  ADOT?                                            09:02:43

United States District Court

2:22-cv-00509-SRB - November 8, 2023 A.M.

MR. FREEDMAN:  I'm sorry, Arizona Department of Transportation.

THE COURT:  Arizona Department of Transportation?

MR. FREEDMAN:  Yes.  That is this morning's first witness so it would be clearer who ADOT is very quickly.

I just wanted to flag for the Court that we're expecting resolution of that motion is going to bear directly on length and scope of Dr. McDonald's testimony.  We're expecting to call him Monday.

THE COURT:  Has there been a response filed by everybody that wants to file a response, Mr. Langhofer?

MR. LANGHOFER:  We discussed this on Monday morning. We said we would file today.  You wanted us to file today.  We will file today.

THE COURT:  That's what I thought; that we decided that the responses would be due today and I can't discuss the motion with you until -- if I even need to discuss it with you but we need to -- but I haven't read it because I typically don't read it until I have both motion and the responses.

MR. FREEDMAN:  Thank you, Your Honor.

THE COURT:  So I don't think there's anything new on that.

MR. FREEDMAN:  Thank you, Your Honor.  The second thing is, on Monday we discussed various charts to address the defendants' objections to plaintiffs' deposition designations

United States District Court

2:22-cv-00509-SRB - November 8, 2023 A.M.

and plaintiffs' proposed exhibits.  Plaintiffs expect to get both of those charts in to Your Honor today.

The third thing that we wanted to raise was the adverse party global objection, our filing at 624.  The defendants have filed a blanket objection to any County Recorder testimony coming in as an adverse party.  I understand we're getting a response today.  I just wanted to flag for the Court that depending on how that's resolved, we may need to be calling County Recorders next week.

THE COURT:  I'm sorry.  Has that motion been responded to?

MR. FREEDMAN:  Again, we're expecting the response today.

THE COURT:  Then why are we talking about it now?

MR. FREEDMAN:  Thank you, Your Honor.

MR. LANGHOFER:  There is one new development on the motion to strike.  This morning, I think not more than 20 minutes ago, they filed a supplement apparently to exclude -- as Your Honor will hear soon, there has been a very recent, in the last five days or so, supplemental disclosure from ADOT, which required one of our experts to update his reports.  When we disclosed his update --

THE COURT:  Oh.  ADOT.  I'm thinking road construction.  We're talking the Department of Motor Vehicles within -- they are within -- under the -- okay.

United States District Court

MR. LANGHOFER:  So there's -- when we disclosed the most recent supplemental report, we said we're not going to introduce this in our case-in-chief.  If you all open the door, of course maybe, but this -- we're obligated to update the report.  Here it is.

Twenty minutes ago there was a supplemental -- their supplement to the motion to strike trying to exclude our most recent supplemental report.  I don't think we're going to be able to brief that by today because they just filed it 20 minutes ago.

THE COURT:  But I don't have to worry about that until you call your witnesses next week; right?

MR. LANGHOFER:  Sounds right to me.

THE COURT:  Okay.

And we'll see what the representative from the Department of Motor Vehicles has to say which will inform the Court about the subject matter that is sought to be -- the supplemental report that the plaintiffs want to strike.

MR. HERRERA:  Good morning, Your Honor.  Plaintiffs call to the stand Eric Jorgensen.

(ERIC JORGENSEN, a witness herein, was duly sworn or affirmed.)

COURTROOM DEPUTY:  Thank you.  Can you please state your full name and spell your last name?

THE WITNESS:  Eric Russell Jorgensen.

United States District Court

ERIC JORGENSEN - Direct

J-O-R-G-E-N-S-E-N.                                                09:06:42

COURTROOM DEPUTY:  Thank you and you can go ahead and have a seat on the witness stand.

MR. HERRERA:  Good morning again, Your Honor.  I failed to introduce myself.  Ernest Herrera from the Mexican   09:07:03 American Legal Defense and Educational Fund representing the Promise Arizona plaintiffs.

THE COURT:  You may proceed.

**DIRECT EXAMINATION**

BY MR. HERRERA:                                                   09:07:13

Q.   Good morning, Mr. Jorgensen.  Would you please state and spell your name for the record?

A.   Eric Russell Jorgensen.  J-O-R-G-E-N-S-E-N.

Q.   And Mr. Jorgensen, what is your occupation?

A.   I am the Motor Vehicle Division Director at the Arizona   09:07:28 Department of Transportation.

Q.   And you kind of implied it there but under which state agency is the Motor Vehicle Division?

A.   The Arizona Department of Transportation.

Q.   And how long have you held that position?                 09:07:45

A.   A little bit more than eight years now.

Q.   And is the Motor Vehicle Division sometimes referred to as MVD?

A.   Yes, it is.

Q.   And who is the Executive of the Arizona Department of     09:07:57

ERIC JORGENSEN - Direct

Transportation?

A.    That would be director Jennifer Toth.

Q.    Do you recall that you were designated as a person from ADOT or Arizona Department of Transportation most knowledgeable about certain topics for the purposes of a deposition in this case?

A.    Yes.

Q.    Do you recall your deposition in this case in that capacity?

A.    Yes.

MR. HERRERA:    Your Honor, Mr. Jorgensen currently serves as the MVD director, a component agency of the Arizona Department of Transportation.  Because Promise Arizona plaintiffs sued the director of ADOT in her official capacity, Mr. Jorgensen is a witness identified with an adverse party.  I request permission to ask leading questions of the witness at this time.

MR. LANGHOFER:    Your Honor, I don't think we're adjourned -- we should make this as efficient as possible and to the extent leading questions do that, I don't think it's a problem.  We do just uniformly resist the idea that by suing someone who in many cases lobbied against the laws that they are trying to stop, it automatic makes them adverse.  And I think you'll see he's not, in fact, adverse to them.

THE COURT:    I'm with Mr. Langhofer on this.  I would

United States District Court

ERIC JORGENSEN - Direct

prefer to hear the witness's testimony rather than his agreement or disagreements with questions that purport to be testimony and if he appears hostile, which I sincerely doubt, then I will reconsider the issue of leading questions.

MR. HERRERA:  Your Honor, my response would be to --

THE COURT:  I didn't ask for a response.  That's my ruling.

MR. HERRERA:  I would just like to note for the record that they are --

THE COURT:  Excuse me.

MR. HERRERA:  Yes, Your Honor.

THE COURT:  I did not ask for you to respond.  I want you to begin your direct examination of the witness.

MR. HERRERA:  Of course, Your Honor.

BY MR. HERRERA:

Q.    What are the two main types of credentials that the Motor Vehicle Division manages?

A.    We issue both drivers' licenses and state-issued IDS which don't have a driving privilege associated with them.

Q.    And broadly -- can United States citizens obtain drivers' licenses and state-issued identifications from MVD?

A.    If they meet all the other requirements, yes.

Q.    And, quickly, what would be those requirements?

A.    It would depend on the credential that we're issuing but for a driver's license, you have to pass a drivers's test, have

United States District Court

539

ERIC JORGENSEN - Direct

a certain driving record, no infractions on the driving record or things along those lines.  You have to be able to prove your residence, your identity, your citizenship status or your authorized present status with us.  Those are some of the things that you would have to prove.

THE COURT:  Do you have to be a certain age?

THE WITNESS:  For a driver's license, correct, yes.

BY MR. HERRERA:

Q.    And you mentioned authorized presence.  Who would have to prove authorized presence?

A.    So every applicant for either driver's license or for an ID card has to at some point prove authorized presence.

Q.    And do United States citizens have to prove authorized presence?

A.    Yes, they do.  Their citizenship is the authorized presence.

Q.    Okay.  And what is the -- well, I'll get back to that in a minute.

But for the -- as I think your answer just implied, people who are not U.S. citizens can also obtain drivers' licenses and state-issued identifications from MVD; right?

A.    That is correct as long as they meet the other requirements, yes.

Q.    For the MVD, a customer could be someone who requests a driver's license or state-issued identification; right?

United States District Court

ERIC JORGENSEN - Direct

A.    That is correct.                                                09:12:05

Q.    Would it be fair to say then that in the MVD system, there are both citizens and non-U.S. citizens?

A.    That is correct.

Q.    What is the MAX system?                                        09:12:27

A.    The MAX system is -- it's a conglomeration of different applications, programs, databases, pieces of information but it is -- it's the system -- it's what we call the overall system that we use to issue drivers' licenses, credentials, title vehicles, keep a customer driving record, a vehicle record, all  09:12:48 of that would be considered our MAX system.

Q.    And MAX is M-A-X in capital letters?

A.    Yes.

Q.    What is the ADOT or MVD system that is behind the portal for self-service by customers?                                      09:13:15

A.    That is the MAX system.

Q.    And you may have mentioned this but what is the system at MVD that broadly manages MVD records?

A.    That is also the MAX system.

Q.    And to clarify, MAX manages the customer records for MVD;  09:13:36 right?

A.    MAX manages all the records so customer records, vehicle records, yes.

Q.    What system does MVD use for front-end services for MVD customers?                                                         09:13:55

United States District Court

ERIC JORGENSEN - Direct

A.   I'm not sure I understand what you mean by front end.

THE COURT:  Do you want to know what Service Arizona is?  Is that where we're going with this?

MR. HERRERA:  That will be one of my questions, Your Honor.

BY MR. HERRERA:

Q.   MAX also serves as a front-end system that MVD customer service representatives would use to issue a credential to a customer; right?

A.   Correct.  When we are in the office, we would call this the system that they are working on MAX.

Q.   And what is the azmvdnow.gov?

A.   Azmvdnow.gov is the customer portal.  So if the customer is logging in to do work with us, they can log in through azmvdnow.  Its back end is also MAX.

Q.   And I think you made this fairly clear by now but MAX's management of MVD records includes records for both drivers' licenses and state-issued identifications; right?

A.   Correct.

Q.   Therefore, MAX does include ADOT's data related to drivers' licenses; right?

A.   Yes, it does.

Q.   What does the term "customer service representative" mean for MVD?

A.   Our customer service representatives are the front-line

United States District Court

542

ERIC JORGENSEN - Direct

people at the counter who would be serving the customer, whether that is in one of our offices or one of our third-party providers.

Q.   Are customer service representatives responsible for inputting data regarding the various transactions that occur in ADOT's MAX system?

A.   Yes, they are.

Q.   And I should probably -- I should have asked this already but what is a transaction for a customer service representative?

A.   So when we are talking about transactions, we're talking about anything that the customer service representative or CSR is doing in the system, anytime we complete something on behalf of the customer for the customer.  So issuing a driver's license, titling a vehicle, all of those would be transactions.

Q.   So do customer service -- do customer service representatives enter data into MAX from transactions presented to MVD credentials?

A.   Yes, they do.

Q.   And could one example of transaction be when a customer service representative enters data into MAX regarding the issuance of an original driver's license, that is a Real ID?

A.   Yes, that would be a transaction where the customer service representative would enter data.

Q.   And I will back up again one minute because I think the

United States District Court

543

ERIC JORGENSEN - Direct

Court wanted some clarity on this.  What is a Real ID?                09:17:00

A.   In 2005 the federal government passed the Real ID Act and it had certain requirements to be -- for a credential to be labeled a Real ID compliant credential.

THE COURT:  I know this.  I have one right in my                       09:17:19
pocket but maybe he could explain what the Motor Vehicle Division's responsibilities are with respect to the Real ID Act.

MR. HERRERA:  Okay.

BY MR. HERRERA:                                                        09:17:36

Q.   What are MVD's responsibilities regarding the Real ID Act?

A.   So because state law said that we had to offer both compliant and noncompliant credentials, we have to assess what the customer is coming in for, making sure we understand whether they are wanting a Real ID compliant or a noncompliant   09:17:57
credential and then there are different -- the requirements are largely the same for both credentials but there are some differences that apply for it -- that apply to one credential but not the other.

Overall, the Real ID credentials are a little bit                     09:18:15
more stringent than the non-Real ID compliant credentials.

Q.   And by more stringent, what do you mean?

A.   There's usually additional requirements.  So, for example, we use -- Real ID requires two forms of verification of address for residency.  Our noncompliant one only requires one, so that   09:18:39

United States District Court

ERIC JORGENSEN - Direct

would be an example of the difference.

09:18:43

As we have discussed earlier in deposition, one of the differences that is in between these two is when you have to prove authorized presence again.  In the case of a non-Real ID compliant credential, we don't require you to prove authorized presence if all you're doing is requesting a duplicate, for example.  But under Real ID, it has to be proven every single time a credential is issued.

09:18:58

THE COURT:  Do you have to show authorized presence to renew your driver's license if it's not a Real ID?

09:19:19

THE WITNESS:  And to be clear, if you have shown proof of authorized presence that makes you a citizen, no. Once we have proof that you're a citizen, we don't require you to reprove that you're a citizen.  But anything that has an expiration of that, yes.  Every time you come in to do a renewal or reinstatement or even a duplicate in the case of a Real ID compliant credential, you do have to reverify, reprove your authorized presence.

09:19:37

BY MR. HERRERA:

Q.   And putting aside citizenship proof, are there types of authorized presence proof that do not expire to your knowledge?

09:19:56

A.    It's my understanding that previously there was no expiration on permanent residents but that was changed so now they have a ten-year expiration on the document.  So prior to some date, and I'm sorry I don't remember what the date was,

09:20:25

United States District Court

ERIC JORGENSEN - Direct

there was not an expiration is my understanding.

Q.   And I will now get back to these questions about that in a minute but I wanted to ask a little bit more about the MAX system more broadly.  Another example of a transaction for which a customer service representative enters data into MAX is a renewal of a driver's license, that is a Real ID; right?

A.   Is that a transaction?

Q.   Yes.

A.   Yes.  I'm sorry.  Yes.  Yes.  That is a transaction.

Q.   And would it also be a a example of a transaction if a customer service representative enters data into MAX regarding a renewal of a foreign-type driver's license which could mean a driver's license issued to a customer who has proven he or she is a lawful permanent resident?

A.   So a renewal of any driver's license, regardless of type, would be a transaction.

Q.   And you stated in one of your answers that there are some types of transactions that do not require the customer to provide proof of authorized presence; right?

A.   Correct.

Q.   And what would those be?

A.   Those would be transactions where the customer has already proved that they are a citizen, so either natural born or naturalized citizen, or in the case of a non-Real ID compliant, a non-Real ID compliant credential, they don't have to prove

United States District Court

ERIC JORGENSEN - Direct

authorized presence for a duplicate that has not expired.                    09:22:18

Q.   Now, we have been talking about the MAX system.   What is -- what is MVD One Source?

A.   MVD One Source -- its name kind of implies.   It's the One Source that CSRs go to get information about MAX and how to         09:22:39 process transactions.   It contains user guides.   It contains our policies, other resources and charts that might help them in their processing of a transaction.

Q.   And you're familiar with the contents of One Source; right?                                                             09:22:59

A.   Yes.

Q.   Did ADOT produce, in response to plaintiffs' discovery requests in this case, some excerpts from one source?

A.   Yes, we did.

MR. HERRERA:   Your Honor, I would like to show         09:23:12 Exhibit-- Plaintiffs' Exhibit 231.

BY MR. HERRERA:

Q.   Now, looking at the first page of this exhibit at the top, does this appear to be from MVD One Source?

A.   Yes.                                                       09:23:29

MR. HERRERA:   Your Honor, there is no objection from the defendants to this exhibit.   Plaintiffs respectfully move it into evidence.

THE COURT:   Is it 108 -- No.   It's 231.

MR. HERRERA:   231.                                     09:23:45

United States District Court

ERIC JORGENSEN - Direct

THE COURT:  Is there any objection to 231?                    09:23:47

MR. WHITAKER:  No, Your Honor.

THE COURT:  Without objection, 231 is admitted.

(Exhibit Number 231 was admitted into evidence.)

BY MR. HERRERA:                                               09:23:55

Q.   Mr. Jorgensen, this exhibit contains pages that come from -- let me back up.

MVD One Source contains policies, procedures, additional information, and help files for customer service representatives; correct?                                      09:24:16

A.   Correct.

Q.   Is there anyone else besides customer service representatives who can access one source?

A.   Yes.

Q.   Who would that be?                                       09:24:28

A.   Other employees of the division.  So I have access to it, for example, and other employees that are associated with third parties would -- even if they are not a front-line processor may have access to One Source.  People who would use the system and need access to it and then it is possible -- I'm not sure     09:24:55 if we've authorized access it for parts for other people.  I'm not sure.

Q.   When you say third parties, what do you mean by that?

A.   Arizona has a system of authorized third parties that we approve and are available to customer -- to customers in the     09:25:15

state to visit them for an additional fee as opposed to coming to one of our offices.

Q.    Would it be fair to say this would be sort of a private company providing MVD services?

A.    Yes.

Q.    And do third-party representatives from those companies also enter data from MVD transactions into MAX?

A.    They do.

Q.    Now, what is the rate of -- does ADOT do any kind of sampling of MAX records to check for errors?

A.    Yes, we do.

Q.    And what is the rate typically of -- what is the rate of records in the MAX system when you do the sampling that are error-free?

A.    So the way that we do the sampling isn't of the records; it's of the transactions that are conducted.  The error rate on the transactions, we tend to be about an accuracy rate with no error anywhere on the transaction of about 85, 90.  It's actually getting better.  We're 90 to 95 probably more recently in that.  But it's on the transaction, not on the record itself.

Q.    And when there's an error in the transaction, what are the kinds of errors that exist there?

A.    Typically, some of our most common things that we'll run into is an improper scan, so you might have something that was

United States District Court

ERIC JORGENSEN - Direct

scanned in backwards so you end up with a blank sheet, because you're looking at the back of the paper, or they may have forgotten to scan it in altogether or maybe something on the application wasn't properly filled out.  A common one would be at the top of the application it says what kind of credential are you here for and they should check that so that we have a record that that was what they were asking for.  But sometimes if they get up there and the customer hasn't checked that, they will say, "Oh, what are you here for?"  And we'll just do the data entry and forget to put that on.  Those would be very common examples of errors that we would run into.

THE COURT:  So when I go in to get my new driver's license, Real ID, they are supposed to -- in addition to the application scan the supporting documents that I brought to show my citizenship and to show my address?

THE WITNESS:  Correct.

THE COURT:  So if they make a mistake and put it on the scanner upside down or backwards, they might just get blank pages?

THE WITNESS:  Well, upside down would probably get them the pass on.  If we can't read it, that's probably where it would be a problem.

BY MR. HERRERA:

Q.   And would transactions include data entry?

A.   There is a data-entry component of a transaction, yes.

United States District Court

ERIC JORGENSEN - Direct

Q.   And if -- would the data-entry component of a transaction where there has been an error be reflected in MAX's data?

A.   So if we entered something in error, if the public said I have brown hair and we put I had blonde hair, yes, that would be counted as an error.

Q.   And when you do this sampling and you discover errors, what does ADOT do with that?

A.   So we use it as tracking and as a teaching tool but we also do require that they be corrected if it's possible to correct the error.

Q.   And until errors in MAX records are discovered by MVD, they are not corrected; right?

A.   Right.   We couldn't correct what we didn't know about.

Q.   Now, I want to go back to what we were talking about a minute ago regarding people who are not U.S. citizens but who can still get an MVD credential.   Can someone who has different or can people who have different types of visas receive a driver's license or state-issued identification in Arizona?

A.   There are many visa types that are eligible for it, yes.

Q.   And to go back to clarifying some of these terms, the different characteristics of credential, what is an original credential?

A.   So an original credential would be the first time we issue a credential of that type or class.   So, for example, first time you come to the state, that's purely an original

United States District Court

ERIC JORGENSEN - Direct

credential.  It's the first license you have.  But also if you change from a non-Real ID compliant credential to a Real ID credential.  Your Real ID, because it's the first of its type, would also be considered an original credential.  It's something you don't renew or -- it's the first time that you've done that particular type of license.

Even the case of I turned 21 and I go from a G license to a D license, that would be considered an original issuance of the D license.

Q.   And that last example you gave about someone going from one class of license to another, that could be the same actual human getting that; right?

A.   Correct.  Yes.  Same customer.

Q.   But those would be two separate original credentials that they are getting; right?

A.   Correct.

Q.   Now, what happens if someone gets -- to go to one of your examples, someone gets their first Real ID and then it expires, what happens next?

A.   If it expires?  If a credential expires, a Real ID credential?

Q.   Right.

A.   Then it's no longer valid for them to use as a permission to drive or -- yeah.

Q.   And that person who has a Real ID, what would they have to

do to keep it valid before it expires?

A.   So you can renew your credential before it -- or after it expires.  You can come in and renew that credential.

Q.   And that would be called a renewal?

A.   Correct.

        THE COURT:  You're making me want to go and look at my driver's license to see when it expires.

        MR. HERRERA:  To check the date?  Always good to check.

BY MR. HERRERA:

Q.   Is a U.S. Certificate of Naturalization an acceptable primary document that would establish authorized presence for an original or renewal?

A.   Yes, it is.

Q.   And for the purposes of getting a driver's license, a U.S. Certificate of Citizenship is an acceptable primary document that would establish authorized presence; correct?

A.   That is an acceptable document, yes.

Q.   For the purposes of getting a driver's license, an I-94 form with an unexpired foreign passport and an unexpired U.S. visa is an acceptable primary document that would establish authorized presence; right?

A.   Correct.

Q.   And for the purposes of getting a driver's license, a permanent resident card or resident alien card is an acceptable

primary document that would establish authorized presence; correct?

A.   Correct.

Q.   Now, if we can bring up the exhibit we forgot about long ago but bring up Exhibit 231 again.  Can we go to the second page or third page I should say, yes.

And if we look at this page, it says "Acceptable Primary Documents;" right?

A.   Correct.

Q.   Does showing a valid unexpired document from this list of acceptable primary documents allow someone to get a non-driving state-issued identification?

A.   If they -- if it's unexpired and everything is proper with it, yes.  These would be -- these would be sufficient to establish authorized presence and fulfill that requirement of getting an identification card.

Q.   And on this page you see the term travel DL/ID.  What does travel mean?

A.   So if it's Real ID compliant, we call it a travel ID; and if it's not Real ID compliant, then we would say it's a non-travel ID.  It's just a term that has been used over the years.

Q.   And for non-travel IDs, which would be a non-Real ID, do citizens get those sometimes?

A.   Do citizens get --

ERIC JORGENSEN - Direct

Q.   Let me ask that again.  Do U.S. citizens obtain non-Real IDs?

A.   Yes.  They can.

Q.   And do non-U.S. citizens obtain non-Real IDs?

A.   Yes.

Q.   Do non-U.S. citizens also obtain Real IDs?

A.   Yes.

        MR. HERRERA:  Could we move to the previous page?

BY MR. HERRERA:

Q.   This is the second page of Plaintiffs' Exhibit 231.  And do you see the table here in the middle?

A.   Yes.

Q.   Okay.  And what is this table?

A.   It looks like a list of scenarios showing what the requirements would be for each to issue credentials.

Q.   And in this table we've discussed some of these terms and there are a lot of different acronyms.  But let's start at the top here.  Non-TID, ID/DL, what does mean?

A.   Non-Real ID compliant or DL, identification card or driver's license.

Q.   So to be issued one of these, you would have to show primary authorized presence; right?

A.   Correct.

Q.   Or you would have to show some primary document that is proof of authorized presence; right?

United States District Court

ERIC JORGENSEN - Direct

A.   You would have to show a primary document and so if you already have -- again, if you already have another proof of authorized presence with us, it doesn't necessarily have to be a proof of authorized presence.  But most -- I mean, the most common are birth certificates and passports.  So generally they accomplish both functions for a citizen.  For a non-citizen, it would -- and because it's not -- doesn't say "foreign" on it, it says foreign down below, these would be citizen ones there.

Q.   So in the sixth row you start to see the word "foreign"; right?

A.   Correct.

Q.   And the ones for foreign, those are IDs issued to non-U.S. citizens; right?

A.   Correct.

Q.   And those non-U.S. citizens can be people of varying immigration status or varying immigration authorizations; right?

A.   Correct.

Q.   And what is -- TID is an acronym for travel ID in this chart?

A.   Yes, it is.

Q.   Now, what does the term "duplicate" mean in terms of a credential as we're looking at PX 231?

A.   So a duplicate is where your credential is not expired, revoked.  There's no -- there's nothing that would require you

United States District Court

ERIC JORGENSEN - Direct

to go and get a new version of it.  But you are asking for a new version of it and that could be whether you lost it or you changed your address and want one that has the current address on it.  That's what a duplicate is.

Q.   If someone moves and needs to update their address, is that an example of when a duplicate credential would be issued?

A.   It can be.  They don't have to get a duplicate credential. They can just update their address with us.  But if they want a credential with the address on it, yes.

Q.   Right.  I want -- sometimes I want that reflected.  People ask me if I go to a hotel or something, they will say, "Is that your address?"  I'll say, "No that's my old address."  So I had to get a new one; right?  So would that be an example of why someone might get a duplicate after a change of address?

A.   Correct, yes.

Q.   If someone gets married and changes their name, is that another example of when a duplicate credential would be issued?

A.   Yes, with a little bit of a caveat on it.  It's considered a duplicate issuance but they have to prove the name change for us to do it.  So they couldn't do it without proving the name change.

Q.   So they would just have to -- what would you need to prove a name change?

A.   Most common is marriage license.  You would bring that in.

Q.   Would that person in that instance who brings their

United States District Court

ERIC JORGENSEN - Direct

marriage license in order to get a duplicate credential with a name change have to also show authorized presence proof?

A.   In this case because it's non-TID and in this case because it's already assumed to be a citizen because it's not foreign, no.

Q.   Well, when you said this instance, what -- which row are you pointing at?

A.   So if we're still looking at this top row with the non-TID ID/DL, in that case, no.  As long as it's a non-TID they wouldn't have -- because it's just a -- because it's just a duplicate, they wouldn't need to reprove their authorized presence status.

Q.   Okay.  Well, let's go down to the row that says foreign non-TID, duplicates, do you see that?

A.   Yes.

Q.   And what does that row mean there?

A.   Is not Real ID compliant.  It is someone whose status is -- whose authorized presence status is non-citizen and they are coming in for a duplicate license.

Q.   So if someone's foreign-type driver's license is still valid in terms of expiration date but that person wants a duplicate to reflect a name change, do they have to establish authorized presence again or just the name change?

A.   As long as it's non-TID like it says right here, just the name change.

United States District Court

ERIC JORGENSEN - Direct

Q.    Now, if someone losses their credential and needs a replacement, is that another example of when a duplicate credential would be issued?

A.    Yes.

Q.    If someone just needs to update the information reflected on the face of their license, ADOT issued a duplicate; correct?

A.    As long as what they are updating isn't affecting class of license or something along those lines.  There's a lot that's on that face.  So your type of license is on that face and that would be an instance where it wouldn't be -- yes.  I mean if we're talking about address or height and weight or even just the photo, those would just be duplicates.

Q.    For a Real ID credential, if someone gets a duplicate, they are required to show proof of citizenship or if not a U.S. citizen, proof of authorized presence; correct?

A.    So if it is travel ID, they have to -- and we're talking about duplicates?

Q.    Right.

A.    For travel ID, if they are -- if they are citizens was the question?

Q.    Right.  Well, if they are -- we'll take them one by one.  So if there is a U.S. citizen who has a Real ID and loses it, to get a duplicate, do they have to show proof of citizenship or authorized presence?

A.    No.

United States District Court

ERIC JORGENSEN - Direct

Q.   Now, if someone is not a U.S. citizen and they have a Real ID credential, does that person have to show proof of authorized presence?

A.   Yes.

THE COURT:  Is that because as you mentioned earlier, there's expiration dates now on many of them?

THE WITNESS:  So these are rules established by the federal government and a lot of it has to do with -- you don't have equal -- are you far less likely to go from being a citizen to a non-citizen than from a non-citizen to being a citizen or remaining a non-citizen.  So there's no requirement for us to continually check.  Once you've proved citizen, it's assumed to just continue to always be that.  But because there's expiration dates, because there are changes in status, that has to be proved every time.

BY MR. HERRERA:

Q.   Now, if someone gets a duplicate that is not a Real ID credential, that person is not required to provide proof of citizenship or authorized presence; right?

A.   To get a duplicate?

Q.   Right.

A.   No, they are not.

Q.   So even a non-U.S. citizen who wants a duplicate of a non-Real ID does not have to show authorized presence again as long as it's not expired; right?

A.    Correct.

Q.    And to reiterate, if a non-U.S. citizen who has a credential naturalizes, they are not required to update MVD on their naturalization; right?

A.    They are not.

Q.    So such a person could go a long time with their old credential and ADOT records would not reflect that they are a U.S. citizen; correct?

A.    That is possible.

Q.    When you say "that is possible," what do you mean?

A.    You said is it possible that they go a long time?

THE COURT:  You asked if it was possible.  He said it was.

MR. HERRERA:  Okay.

BY MR. HERRERA:

Q.    Now, to that point, stick with that for a minute, for customers who are currently categorized under a foreign authorized presence sub category, Arizona law does not require that person to do anything with regard to his or her MVD credential to update their citizenship information if he or she naturalizes as a U.S. citizen; is that right?

THE COURT:  I think that's the exact same question you already asked him and he already answered it so we don't need to have it asked a second time.

\\\

United States District Court

ERIC JORGENSEN - Direct

BY MR. HERRERA:

Q.   So MVD does not know when someone has naturalized if they still have an unexpired valid credential based on foreign authorized presence; correct?

A.   Correct.

Q.   Now, to move to a different topic, what is an API for ADOT?

A.   An API stands for Application Program Interface.  And it is a technical specification that allows two programs to talk to each other over a network.  So two programs.  And when we've provided -- the example is Secretary of State has a program, we have MAX.  They can talk to each other using the specification which is called an API.

Q.   And how many APIs does MVD offer to other agencies?

A.   Many.  I wouldn't know exactly how many.

Q.   So what are the -- what are some examples of APIs?

A.   So ones pertinent to this one would be there are two customer lookup APIs that Secretary of State can use to look up customers in the MVD system.  We have other APIs to all sorts of other partners, ways that we connect to the courts to receive information from them or to law enforcement to receive information to connect to us.

Q.   And when you said the two that are relevant to this case, what are those two that are relevant to this case?

A.   So those are the -- they are called -- they were the ones

09:46:04

09:46:14

09:46:55

09:47:31

09:47:58

09:48:13

United States District Court

that we provided in the information -- the Request for
Production or -- I think that's what it's called.  But it's two
APIs that are customer lookup APIs and I don't remember off the
top of my head what the names of them are in the production.

Q.    Is one of those referred to as a single customer or
returns a single customer?

A.    One of them is, yes, returns a single customer and the
other returns a list of customers.

Q.    So the one that returns a single customer, what does that
mean?

A.    So that is a service that we offer to the Secretary of
State to say, "Hey, if you give us some information and it
matches to one and only one customer, we'll return the
information for that one, for that one customer."

Q.    And what would you need on the requesting side to be able
to get that single customer?

A.    So there are a few fields that we offer to the Secretary
of State to request that information.  It includes our internal
customer number which they have in cases where we've
registered -- where we've submitted an application for
registration to vote.  But it would also include the driver
license number, the credential number that we have, whether
it's a driver's license or an ID, first and last name, date of
birth, last four of the Social Security number I believe are
the fields that are available for them to use.

563

ERIC JORGENSEN - Direct

Q.    And the other API that returns a list of customers, what is needed to get that list of customers?    09:49:56

A.    So that same list of potential criteria issues for the one that returns a list of customers as well.

Q.    And the API that returns a list of customers, how many matches can it return as a maximum?    09:50:19

A.    It will return up to 50.

Q.    Does the API that returns a list of customers give the user information on how to narrow the query to get fewer results?    09:50:33

A.    The API itself does not.  The API if it -- if it doesn't find a customer -- if it finds between zero and 50, it will return that list of customers.  If it is more than that and needs to be narrowed, it just returns an error message saying too many results or something to that effect.    09:50:56

Q.    However, does the -- does the Secretary of State -- is it correct that the Secretary of State has the ability to send a request to ADOT system via one of these two APIs in order to get back data about certain people?

A.    Yes.    09:51:46

Q.    Now, to your knowledge, are these two APIs used by the Secretary of State and County Recorders for what they call HAVA checks, H-A-V-A?

A.    So I'm not intimately aware of how they use it on their side.  I know that, you know, we collaborated in setting these    09:52:11

United States District Court

ERIC JORGENSEN - Direct

up so they have it for a use.  That sounds correct to me, the HAVA check is what I've -- I've heard it referred to as.  So that sounds correct.  But I don't have knowledge of how they actually use it on their side.

Q.   Okay.  And are you familiar with the laws that are the subject of this litigation, H.B. 2492 and H.B. 2243?

A.   Yes.

Q.   And did these two APIs exist before those two laws?

A.   Yes, they did.

Q.   Does MVD provide any birthplace data to the voter registration database or the Secretary of State through one of these APIs?

A.   I would have to look the at the specification which we provided but I -- well, I'll put it this way:  We don't store that data so I don't see how we can.

Q.   And when you say you don't store the data, do you mean that sometimes data is received regarding birthplace at MVD?

A.   So for someone who registers on Service Arizona, and we didn't talk about what Service Arizona is, but it's a separate portal that has been decreasing in utilization.  The one thing that's still there for the customer is voter registration. That voter registration application that is on Service Arizona, which is operated by Motor Vehicle Division, has a bunch of optional questions around voter registration at the request of the Secretary of State and is required by statute.

United States District Court

565

ERIC JORGENSEN - Direct

Therein there is an optional question about where were you born and it is collected as part of a voter registration application and that is transmitted to the Secretary of State if it is provided.  Again, it's an optional question.  So if it's provided, we do transmit it but that's not data that we store.  MVD doesn't have a use for that data.  That's voter registration data so we just pass it on.

Q.   So MVD does not store voter registration data?

A.   We do not store any of the --

Q.   I'm sorry.  Strike that.

MVD does not store birthplace data?

THE COURT:  He said that at least two times.

MR. HERRERA:  Okay.

BY MR. HERRERA:

Q.   What is a soft match in an API?

A.   So that's probably somebody's term of art that they are using.

THE COURT:  It's not yours?

THE WITNESS:  Usually when we talk about it, we talk about it as what -- is it a dead on we've got it.  It's an exact match to the credential number.  Great.  That would be kind of what we call a hard match.  And a soft match might be, well, I got a last name and birth date and so that's not for sure a match but it could be.

\\\

United States District Court

ERIC JORGENSEN - Direct

BY MR. HERRERA:                                                          09:55:44

Q.   So because MVD does not store birthplace data, there's no situation where a soft match during the HAVA check would be based on name, date of birth, and a birthplace; correct?

A.   So, again, if this is a term of art that the Secretary of   09:55:58
State is using, I don't know what they mean by soft check.  But since we don't store the data, it couldn't be based on that data.

Q.   Does MVD offer or ADOT more broadly offer any assistance to the Secretary of State's office upon request for   09:56:23
clarification of any of the data returned through either of these two APIs?

A.   Yes.

Q.   Okay.  And what is that assistance?

A.   It's -- it would be very informal.  It was if they have a   09:56:37
question, they can call us.  Usually it would be a technical team reaching out to somebody else on the technical team and having a conversation to make sure that they understand what the data is, that it was done correctly.

Q.   And in offering that technical assistance to the Secretary   09:56:55
of State's office regarding data return through the API, would ADOT go and look at the record that that data is based on?

A.   We could, yes.

Q.   Now, I mentioned a minute ago the two laws that are the subject of this lawsuit.  What has ADOT or Arizona Department   09:57:16

United States District Court

ERIC JORGENSEN - Direct

of Transportation done to implement either House Bill 2492 or 2243?

A.   So we met with the Secretary of State to see what they would need, what they might want for it because the requirement is really on the Secretary of State.  They have to compare to our database.  And so we asked what can we do to facilitate your comparing to our database?  This is in the second of the two laws, not 2492 but the other one.  I think it's the one with the comparison to the database if I'm not mistaken.  They kind of bleed together for me.

But when they did the comparison to the database, they needed to a way to, like, match everything up, so we created what we call an extract file from our customer database and said, "Here is a file that you can use to do your comparison."  There was also a requirement in that bill -- and this one might have been on us to provide I think.  There was a list of everything that we've received, every -- a list of credentials that we've received notification from another jurisdiction that they have done a credential in another state so we have canceled our credential.  So we created a list of all of those credentials and we give that to the Secretary of State on a monthly basis.

Q.   And those are two separate extracts of data that you send to the Secretary of State; right?

A.   They are, yes.

ERIC JORGENSEN - Direct

Q.   One is citizenship related, one is out-of-state license related; right?

A.   Correct.

Q.   Now, we're going to go into the one regarding citizenship in a minute but can we bring up -- well, before that, did Arizona Department of Transportation produce anything related to these extracts to the plaintiffs in this case?

A.   Yes, we did.

Q.   And what did you produce?

A.   We produced a description of the file.  So we call it a file layout, told what the fields were that were in it and what format they would be in.

          MR. HERRERA:  Can we bring up Exhibit PX 234?

          And can we kind of click through the page here, please.  Thank you.

          MR. WHITAKER:  We had designated this confidential.

          MR. HERRERA:  Oh, can we take that down?  Sorry.

          MR. WHITAKER:  Can we maybe publish it to a more limited audience?  Is there a way to not show it on the screen?

          THE COURT:  You might have some agreements.  But if you want something offered into evidence in a public trial, it's a whole different analysis.  It's not -- you have an agreement that this isn't public.  That doesn't make it not public when it's offered in evidence at a public trial.

          MR. HERRERA:  Your Honor, I think this was already

admitted into evidence on Monday, this exhibit.                    10:00:41

THE COURT:  I don't know.  Maybe it was.

COURTROOM DEPUTY:  Yes, Your Honor.

THE COURT:  It's already admitted?

COURTROOM DEPUTY:  Yes, Your Honor.                    10:00:50

THE COURT:  Thank you.  Elaine says it's already admitted.

MR. HERRERA:  May I confer with Mr. Whitaker very quickly?

THE COURT:  Yes.                    10:00:57

(Counsel confer.)

BY MR. HERRERA:

Q.    Okay.  And Mr. Jorgensen, let's look at the first page of the exhibit.  Is this the layout that you were talking about?

A.    Yes, it is.                    10:01:37

Q.    And it when says file, colon, customer extract, what is that?

A.    It's just a description of what we were providing.  This is our customer extract file.

Q.    And does the data that ADOT sends to the Secretary of State via this customer extract include both valid and expired credentials?                    10:01:56

A.    It does.

Q.    To go back to one question on credentials for a minute, I know it's a little off track, but what is a reinstatement                    10:02:17

United States District Court

ERIC JORGENSEN - Direct

credential?

A.   If for some reason your driving privileges were suspended or especially if they were revoked and you need to go and reinstate those driving privileges, that would be a reinstatement.

Q.   Would that include something like following a DUI?

A.   It could, yes.

Q.   Okay.  And would someone with a reinstatement be included in this customer extract?

A.   Yes.

Q.   And I'm sorry if you said this earlier but how often does ADOT now send this customer extract to the Secretary of State?

A.   We produce this monthly.

Q.   And when it is sent monthly, in terms of how current the data is, what data is reflected when it is sent?

A.   So it is -- the process is that we will run the extract of this -- of this data, build the file and we will put it on our secure FTP server, which is a location for the Secretary of State to come and pick it up.  As soon as it's produced, it is put on that server for them to come up.  So the data is as of the time of production.

Q.   Okay.  And if we zoom in to the last field in the layout of the customer extract, can we look at that, what is NonCitizen, all one word?

A.   That is -- that's one of the fields that we produce for

United States District Court

ERIC JORGENSEN - Direct

this report.

Q.   So how is the NonCitizen field as reflected in Plaintiffs' Exhibit 234, how is that field populated with a value?

A.   Okay.  It is -- it's actually derived from values that are in the -- in our database.  So there are five authorized presence types and two of them are citizen, so natural born citizen or naturalized.  If it's not one of those two, then this would be set to yes.

Q.   So it would be fair to say the value in that NonCitizen field as reflected in PX 234 in the customer extract is generated only based on whether there is a foreign or non-foreign credential shown for that customer in MAX?

A.   It is based entirely on the authorized presence type which is an indication of what type of authorized presence they have demonstrated.  It's just trying to be technically correct on that answer.

Q.   And as a part of this extract, customer extract shown in PX 234 that ADOT sends to the Secretary of State, are there any documents that go along with these -- the NonCitizen field?

A.   Do we transmit documents?  No, we do not.

Q.   And to be more specific, if you get a NonCitizen and a Y in that field, you're not actually getting the underlying proof of authorized presence that produced that Y?

A.   Correct.  All you're getting is what -- at the point which have we last issued a credential, what proof did they use for

United States District Court

ERIC JORGENSEN - Direct

authorized presence and what classification did they give them. And so at that point in time we set the flag to this is a permanent resident or temporary INS or Canadian citizen or whatever. And if it's one of those, that's all we're saying, is that Y means the last time they were issued a credential, they did not prove citizenship.

Q. So if someone had shown a birth certificate from within the United States as their authorized presence, their NonCitizen field would be blank; correct?

A. Correct.

Q. Now, if someone who had a foreign type credential that was not expired in MAX but had recently naturalized, that person would show up as a Y in the NonCitizen field in the customer extract?

A. If they had not come in and presented, yes, correct.

THE COURT: So, Mr. Jorgensen, I missed something. You may have already said this but you're producing these customer extracts monthly. Are they based on requests of specific customer names from Secretary of State? I mean how do you know what customer extracts to produce?

THE WITNESS: So we produce anybody who has an active credential record with us. So there's about 7.3 million every time we do this.

THE COURT: So every month you are sending them the entire customer extracts for all seven million licensed drivers

United States District Court

573

ERIC JORGENSEN - Direct

or with state ID?                                                    10:08:17

THE WITNESS:  Right.  And so it would include -- it could definitely include people who are no longer with the State and have moved but haven't canceled their credential and that's why it's 7.3 million.  But, yes, it's every active record.          10:08:27

BY MR. HERRERA:

Q.   And when did ADOT start sending these customer extracts to the Secretary of State?

A.   My recollection is that we first produced it in November of 2022, put it on the FTP site and then their first download was December or like the next week, December 2022.          10:08:39

Q.   And what is an FTP site?

A.   It's a file transfer protocol is what it stands for.  It's a site where we exchange very large files back and forth.          10:09:04

Q.   And when you said you put it on FTP in November of 2022 but it wasn't downloaded until December, that means the Secretary didn't grab it until December; right?

A.   That's correct.

Q.   Okay.  You explained this a little bit earlier but because the Court had a question about it just now, why is it -- or what part of the law, as far as you understand, is having ADOT send these two customer extracts to the Secretary of State?          10:09:23

A.   So there was a requirement that the Secretary of State make a comparison of its database to what it termed the          10:09:53

United States District Court

ERIC JORGENSEN - Direct

Department of Transportation database and there wasn't a simple way to do that comparison. And so this was our way of providing them a simple way of making that comparison.

Q. And what does MVD or ADOT have to do with Secretary actually performing that comparison of MVD data to voter registration data?

A. Nothing other than providing the data.

Q. Now, as part of the document productions that were sent to plaintiffs in response to requests in this case, there were a number of emails and communications from within ADOT that were provided; right?

A. Correct.

Q. Okay.

        MR. HERRERA: And can we show PX 235, please. And can we look at the --

Q. I'll spoil the surprise here. But you're not on this email thread. But who is Anthony Previte?

A. He's a contractor that works on the MAX system.

Q. And who is Bronco Briggs?

A. He's another contractor that works on the MAX system.

Q. And who is Jessica Byrd?

A. She is an MVD employee who is what we call a product owner, a businessperson that works with the technical team.

Q. And what is the date of this -- the sent date of this email at the top of this document?

ERIC JORGENSEN - Direct

A.    November 15, 2022.

Q.    And what is the subject of --

THE COURT:  Okay.  I don't really need to have him read it to me.  I can see it.

BY MR. HERRERA:

Q.    Does the subject have H.B. 2243 compliance in it?

A.    Yes, it does.

Q.    And is this one of the --

MR. HERRERA:  Can we zoom out, please and click through the pages.  And can we go back to the first page?

BY MR. HERRERA:

Q.    So I just want to -- is this one of the documents that ADOT produced to plaintiffs in response to requests?

A.    Yes, it is.

Q.    Okay.

MR. HERRERA:  And plaintiffs move to admit this exhibit, Your Honor.

THE COURT:  Why?

MR. HERRERA:  Your Honor, there are issues in this case regarding ripeness and whether or not the laws have been implemented --

THE COURT:  He's already testified -- I mean does this show me anything other than what he testified to, which is they made their first extract available to the Secretary of State on this file-sharing platform in November of '22?

United States District Court

576

ERIC JORGENSEN - Direct

MR. HERRERA:  I could resolve it by just asking a question and seeing if he answers it before I --

THE COURT:  Excellent idea.

MR. HERRERA:  Okay.

BY MR. HERRERA:

Q.   So if you know, when did ADOT begin to work with the Secretary of State's office on implementing what would become the customer extracts in response to House Bill 2243?

A.   So it would have start in the summer once the bill was passed.  We would have started reaching out to the Secretary of State to have those discussions.

Q.   And by summer you mean summer of 2022?

A.   Correct.

MR. HERRERA:  Okay.  We can take that one down.

BY MR. HERRERA:

Q.   Now, has ADOT discussed with the Secretary of State's office any safeguards to prevent any data mismatches regarding the identity of customers in the customer extract that ADOT sends?

A.   We haven't provided -- we haven't gone to them and say, hey, watch out for X, Y, and Z.  We've sent data back and forth for a long time.  If they asked us questions about what does this mean or what could this return, we would have answered those; but I don't have any specific knowledge of how that would have happened.

United States District Court

577

ERIC JORGENSEN - Direct

Q.   Now, Mr. Jorgensen, is it true that plaintiffs in this case at some point requested access to all of the customer records and data in the MAX system?

A.   That is correct, yes.

THE COURT:  I assume you said, "No"?

THE WITNESS:  Correct.

BY MR. HERRERA:

Q.   Why is it that ADOT said no?

THE COURT:  That's pretty obvious, that you can't have all of that personal information of 7.5 million people.

BY MR. HERRERA:

Q.   Mr. Jorgensen, what is the -- to your knowledge, as the director of MVD, what was the law that prevented you from producing all of that data?

MR. LANGHOFER:  Legal conclusion.

THE COURT:  Sustained.

BY MR. HERRERA:

Q.   Do you know what the driver Privacy Protection Act is?

A.   Yes, I do.

MR. WHITAKER:  Same objection.

THE COURT:  It's not an objection to his knowledge about it but he's not going to explain it to us.

BY MR. HERRERA:

Q.   As far as you understand, is the Driver Protection Act part of why or the reason why ADOT did not produce the MAX

United States District Court

records and data to plaintiffs in this case?                                    10:16:20

MR. LANGHOFER:  Same objection.

THE COURT:  Sustained.  If he's legally prohibited
from doing so, the lawyers know that and you can tell me he
doesn't have to.                                                                 10:16:34

MR. HERRERA:  Okay.  Plaintiffs would represent that
that is why --

THE COURT:  Obviously.

MR. HERRERA:  Okay.  I would like to show
Mr. Jorgensen another document and just so the first page,                       10:16:57
please, and it is PX 428.

BY MR. HERRERA:

Q.   Now, I just want to you look at the top of this document.
Have you ever seen a document like this, Mr. Jorgensen?

A.   Yes.                                                                        10:17:12

Q.   And what type of document is this?

A.   This would be an ADOT Motor Vehicle Division policy
document?

Q.   And what is an ADOT Motor Vehicle Division policy
document?                                                                        10:17:26

A.   It's a description of a policy established by the division
for implementing our duties.

Q.   And what is the title of this policy document?

THE COURT:  Once again, he doesn't have to read that
to all of us.  We're all looking at it.                                          10:17:43

ERIC JORGENSEN - Direct

BY MR. HERRERA:

Q.    Okay.   Is the purpose of this policy document to provide guidelines for the processor to use when establishing an -- when establishing authorized presence and, when applicable, issuing of foreign authorized presence limited credential?

A.    Yes.

        MR. HERRERA:   Your Honor, moves move to admit PX 428.

        MR. WHITAKER:   No objection, Your Honor.

        THE COURT:   Without objection, Plaintiffs' Exhibit 428 is admitted.

        (Exhibit Number 428 was admitted into evidence.)

BY MR. HERRERA:

Q.    Now, can we go down to Section D, so it's on this first page and section D of Plaintiffs' Exhibit 428.   And in section D of PX 428, the establishing authorized presence policy document, is it true that authorized presence requirements do not apply to a certain set of transactions?

A.    Correct.

Q.    And the transactions that authorized presence proof requirements would not apply to would be requests for a duplicate or update of any license; right?

        MR. LANGHOFER:   Asked and answered.

        THE COURT:   Sustained.

BY MR. HERRERA:

Q.    What is an extended license?

United States District Court

ERIC JORGENSEN - Direct

A.   To be honest, I'm not sure exactly what we're referring to as an extended license.

Q.   What is an instruction permit?

A.   So that would be what a -- at 15 and a half you're able to begin to learn to drive, but there are limitations on when you can drive.  So it's -- it would be the permit that would allow you to drive with supervision.

Q.   And can a non-U.S. citizen get an instruction permit?

A.   If they meet all of the other requirements, yes.

Q.   Now, when it says in this part D, "A database record of an extended Arizona driver license, commercial driver license, instruction permit, or identification card is acceptable proof of authorized presence," what does that mean?

A.   So because we already have on file information regarding authorized presence if you've received one of these, that's -- that's for an Arizona driver's license, we're not going to require you to re-show it in these cases or it just doesn't apply in these cases.

Q.   So in other words if someone already had been issued that before -- well, I'll withdraw that questions.

Does that mean if someone previously had one of the credentials listed in Section D of PX 428 such as an instruction permit, then they would not actually have to present any document as authorized presence proof?

A.   That could serve as the proof of authorized presence in

United States District Court

ERIC JORGENSEN - Direct

specific cases.

Q.   And when you say that, do you mean the --

A.   The instructional permit.

Q.   The what, sorry?

A.   The instructional permit.

Q.   Okay.  Mr. Jorgensen, are you aware that ADOT produced additional data to the parties on this past Sunday?

A.   Yes.

Q.   And this supplemental production contains data on about 50,000 MVD customers; right?

A.   It does.

Q.   And ADOT has about 7.3 million customer records; right?

A.   Active customer records, correct.

Q.   And the data in the supplemental production represents a subset of the customers who have received duplicate licenses; right?

A.   It does.

Q.   And to prepare this production, ADOT had to pull and convert data from ADOT's prior system, that is the system preceding MAX; right?

A.   The production of this report, all the data came from MAX. To get the data -- that we used in MAX required us to have converted it about three years ago.

Q.   And were these data in the supplemental production ever intended to be retrieved in this manner that you just

United States District Court

ERIC JORGENSEN - Direct

described?

A.    The data is -- they are historical records and, no, they weren't -- we've never designed the system to link -- to provide kind of this record of what the authorized presence was.

The purpose of those was for audits so that we could always go back and say, "Did you check?"

"Yes.    This is what we check and this is what we did."

Q.    And when ADOT transmitted these data, you wrote that it was possible that dates were not available, able to be connected, or are missing; correct?

A.    Correct.

MR. HERRERA:    Your Honor, may I have one moment to confer with counsel?

THE COURT:    You may.

MR. HERRERA:    Thank you.

(Counsel confer.)

MR. HERRERA:    Thank you, Your Honor.    Excuse me. Plaintiffs pass the witness.

THE COURT:    No other questions on direct?

MR. HERRERA:    No other questions, Your Honor.

THE COURT:    All right.    We'll take our morning break. We'll reconvene at 20 minutes to 11.

Court is in recess.

United States District Court

COURTROOM DEPUTY:  All rise.                              10:25:25

(Recess at 10:25; resumed at 10:41.)

(Court was called to order by the courtroom deputy.)

THE COURT:  Thank you.  Please sit down.

You're going first, Mr. Langhofer?                        10:42:06

MR. LANGHOFER:  I'm afraid so, Your Honor.

**CROSS - EXAMINATION**

BY MR. LANGHOFER:

Q.   Good morning, Mr. Jorgensen.  The -- I've got a few questions for you mostly on the orders of clarification,   10:42:14 mercifully.  First of all, we've talked about renewals, original issuances, duplicates.  What is a reapplication in your system?  What does that mean that?

A.   Would be a reinstatement, putting a license back in from a revoked status.                                            10:42:36

Q.   All right.  One thing that we've not discussed I think in this case at all is when someone is checking the documentary proof of citizenship records at the MVD, how manual is it? Like how much opportunity is there for just human error in that process?  But rather -- let me ask the question this way:   10:42:59

Imagine someone shows up to get a driver's license and they provide their green card.  What would you see if you're watching the customer service rep walk through that process of checking the documentation?

A.   Okay.  So's they start their documentation, they would   10:43:15

United States District Court

584

ERIC JORGENSEN - Cross

first choose in the system what type of authorized presence are you going to have.  So in this case it would be permanent resident and then it would say can you provide -- please choose the INS code that applies from the document and so they would have to insert the INS code and then they would have to say which document are you using to prove the status and then they would choose, you know, the right document for it.

And the list is limited to what would be available to prove that status type and then they would be asked to upload that document type to match the document that they said they were going to provide.

Q.  By the way, this explains why sitting to get my driver's license takes so long.  Now I understand.

So has there ever been a point in time in your systems where the customer service rep would just have, you know, a keystroke to indicate whether someone is a citizen or not?

MR. HERRERA:  Objection.  Foundation.

THE COURT:  I'm sorry.  What was the objection?

MR. HERRERA:  Foundation, Your Honor.

THE COURT:  Overruled.

You may answer.

THE WITNESS:  So that's the way the current system works and, no, there's nothing that you could do to just -- it's not a one-click type thing.  You would have to make

United States District Court

multiple errors.

In the Legacy system it was a little different.  You would have to start a transaction to make it a foreign type, you actually had to add something to it to say hey, I'm going to make this a foreign-type transaction.

So would it be possible in that scenario to leave off the foreign type and have it be a citizen?  Yes, but you would also have to have a Social Security number and you would also still have to upload documents to say this is why I chose the foreign or non-foreign type that I did.

BY MR. LANGHOFER:

Q.   Well, when did the Legacy system leave us?

A.   So the cut-over date between Legacy and the current MAX system was April 20 of 2020.

Q.   Okay.  And so the Legacy system, then the assumption was that everyone was a citizen?

A.   The default setting as you went in to start it was you're a citizen.  To make it foreign, you would have to add a foreign characteristic to it.

Q.   When we were talking about duplicates for which there's not proof of authorized presence required, does that include just a last name change?

A.   Yes.

Q.   The extracts that you've described, the monthly extracts that you're sending to the Secretary of State, are you aware of

United States District Court

whether those have been used for any purpose yet?

MR. HERRERA:  Objection.  Foundation.

THE COURT:  Are you aware?

THE WITNESS:  I am not.

BY MR. LANGHOFER:

Q.   Okay.  You described the monthly extracts and then some delay apparently when the Secretary downloaded those.  But the extracts aren't what your API uses or the Secretary of State uses or accesses when they use the API.  Am I right?

A.   Correct.

Q.   Okay.  When you run a HAVA check through the API, how current is the data that the -- that is returned from ADOT?

A.   It's realtime.  It's whatever is currently in the system.

Q.   Okay.  So if someone had left the MVD five minutes earlier, would the data reflect what happened at that transaction?

A.   Yeah.  It's automatic update, yes.

Q.   Are you aware of whether the API allows the County Recorders to import driver's license numbers and Social Security -- you know, the four digits of a Social Security number into the voter file?

MR. HERRERA:  Objection.  Compound.

THE COURT:  Are you aware whether that's possible?

THE WITNESS:  I don't understand the question.

THE COURT:  Okay.

BY MR. LANGHOFER:

Q.   That's fair.  Let's take this in two parts.  Let's say that the County Recorders are looking up through your API someone based on name and birth date, nothing more.  Through the API they can find a record, conclude it's the -- in fact the correct person and your records show the SSN four data.  Are you aware of whether your API allows the County Recorders then to import that into the voter file?

A.   So all the API does is return the data.  How it's displayed and how it can be used after that, I have no knowledge of how that happens on that.  That's a Secretary of State side of the API.

Q.   You mentioned testing for error rates.  I think you said roughly 85 percent for the whole transaction.  Have you tested for error rates specifically in lawful presence -- or the citizenship field?

A.   No.  We don't test specifically for that.

Q.   If someone naturalizes and -- well, let me zoom out for a moment.  Green cards expire; right?

A.   They do.

      MR. HERRERA:  Objection.  Misstates testimony.

      THE COURT:  I'm sorry.  I cannot discern that you're trying to object because I'm not hearing it.  I'm not seeing you do anything.

      MR. HERRERA:  Yeah.  Oh.  Misstates the testimony,

United States District Court

588

ERIC JORGENSEN - Cross

Your Honor.

THE COURT:  Overruled.

BY MR. LANGHOFER:

Q.   If there's an expiration date on a green card that is after what that person's naturalization date ends up seeing. You get a green card.  It's going to be valid for eight years. Two years later you naturalize but you presumptively had six years left on the green card.  If someone comes in to the MVD and wants to renew their license so they need to show, establish lawful presence of this transaction -- are you following me so far?

A.   Yeah.

Q.   -- can the renewal be based on their green card rather than their citizenship?

A.   So it would be based on whatever the customer provides us and then of course we run it through SAVE, which is the federal verification system for all of immigration documents, and then it would be based on whatever response we get from SAVE to say if that was correct.  So it would just depend on what they presented and what was returned through SAVE.

Q.   Does SAVE notify you when a green card is no longer valid?

MR. HERRERA:  Objection.  Foundation.

THE COURT:  Overruled.

You may answer.

THE WITNESS:  I don't know.  I'm not sure.  I don't

ERIC JORGENSEN - Cross

use the SAVE program myself.

BY MR. LANGHOFER:

Q.    Okay.  Now, this is a little bit esoteric but I think it ends up being important later so please bear with me on this point.

What is -- you've talked a little bit about the voter registration application through Service Arizona; right?  And is it possible for someone to register to vote through Service Arizona if your database does not indicate that they are a citizen?

A.    So there are edits in Service Arizona or filters, restrictions that keep somebody from being able to use it to submit an application and that's kind of a nuance that we don't register.  We submit an application but, yes, if you don't have the right citizenship status, then it will not allow you to submit an application.

THE COURT:  So somehow Service Arizona, if I'm an there trying to register -- trying to submit my voter registration application, it somehow is interfacing with the MAX system and says, oh, this person has a foreign-type driver's license and will not allow the application to be completed?

THE WITNESS:  Correct.

THE COURT:  Okay.  Thank you.

\\\

United States District Court

590

ERIC JORGENSEN - Cross

BY MR. LANGHOFER:                                                    10:51:58

Q.    And the sort of esoteric that I wanted to nail down here is, sometimes a database will have, you know, multiple fields that relate to a similar thing.  So what I'm getting at is, when Service Arizona queries citizenship status in order to let a voter registration application through or not, is it the exact same field that you were discussing earlier with Mr. Herrera, the Y for non-citizenship category?    10:52:15

A.    Well, so to clarify, that Y was created only for the report.  So what is it querying?  We only store your authorized presence type which is one of five numbers in one place.  There's not one that's for voter, one that's for driver's license.  So there's only one place where that data is stored.  Whether Service Arizona is actually going back and checking to see if that is one -- if it's a one or four versus a two, three, or five, I don't know or if it's going to check a flag that says hey, there's a flag but the flag is based on whether the one, two, three, four, or five; right?  So there's not two data sources for it.  I can't speak to exactly how it's doing its filtering.    10:52:42    10:53:02    10:53:21

Q.    There may be an intermediate calculation but it's all based ultimately on the same data set?

A.    Correct.

Q.    I want to talk just a little bit about the document productions.  There's been a brief filed on this but it's not    10:53:35

United States District Court

evidence so let's hear it from you.  Before you produced to the plaintiffs the data concerning the lawful presence values for Arizona, you know, ID holders, had you ever made a production of that scale before?  When I say "you," I mean of course ADOT.

MR. WHITAKER:  Lack of foundation.

THE COURT:  Overruled.  You may answer.

(Reporter seeks clarification on speaker identification.)

THE COURT:  That's all right.  We want to be sure that we have the record and the lawyers aren't making it easy that they just kind of sit and speak without letting us know who is speaking.

THE WITNESS:  Thinking back, have we ever done a full production of data?  Yes.  I know of at least one instance where we did a production that was to law enforcement for the purpose of a law enforcement system upgrade.  So I know that we have done a large-scale production of data before, not necessarily an entire open the database.  And if you're talking about what was the request, the request was access to everything.  Never to a public -- it's very security unconscious to do that.

BY MR. LANGHOFER:

Q.   Has a production of records for everyone in the system, has it ever been done in connection with civil litigation before?

United States District Court

ERIC JORGENSEN - Cross

A.    Not to my knowledge, no.

Q.    After the initial production, you received a request for a supplement, did you not?

A.    Yes.

Q.    Do you remember who that came from?

A.    I was not aware of who it came from.  I have since been made aware that it came from defense.

Q.    Yes.  And how long -- what did you guys do in that request for a supplement?

THE COURT:  Are we talking about the one that came on Sunday?

MR. LANGHOFER:  There's actually three rounds, Your Honor.  Two supplements.  Right now I'm asking about the first supplement.

THE COURT:  Okay.

BY MR. LANGHOFER:

Q.    So for the first supplement, what did you do when you received the request for that supplement?

A.    So it was -- we tried to figure out if there was a way that we could answer it and what it would entail to answer it. We did a little bit of analysis of how the databases were organized and what might be available.

Q.    How long did it take for you to prepare the supplement?

A.    A couple days.

Q.    After the first supplement was made, you received a

United States District Court

ERIC JORGENSEN - Cross

request for yet another supplement; correct?  `10:56:44`

A.   Correct.

Q.   Who did that come from?

A.   My understanding is it came from plaintiffs' counsel.

Q.   And did you agree to participate in a sort of emergency  `10:56:51`
conference call about all of this data?

A.   Yes.

Q.   Do you remember when that was roughly?

A.   I think it was Friday.  I think.  I could be wrong.

Q.   And did you participate in that call personally?  `10:57:09`

A.   I did.

Q.   Did you answer all the questions on that call?

A.   I did.

Q.   Were you asked to do anything after that call?

A.   We were asked if we can make that production.  I think  `10:57:26`
there was one clarifying question but I can't remember what the
clarifying question was.

Q.   Did you -- you said you were asked to make another
supplement.  Did you end up doing that?

A.   Yes, we did.  `10:57:37`

Q.   And that was just a couple of days ago?

A.   Correct.

Q.   You had said earlier with Mr. Herrera when you were
discussing this most recent production, the second supplement,
that because of the Legacy system, some dates may be missing.  `10:57:52`

594

ERIC JORGENSEN - Cross

Did I hear that right?

A.   So the Legacy system didn't have all of the same -- it was built on a mainframe.  It didn't have what we called relational databases behind it so it was possible to have things that were missing and all of that data had to be converted.  And if it was -- if there were errors in the way that it was input and it wasn't exactly what it was expected, there were opportunities for data not to be properly converted when it came over and we put it into the new system.

Q.   Does that issue apply to all three of your productions or just the third one?

A.   That would apply to all.

Q.   Okay.

        MR. LANGHOFER:  Your Honor, I've got some good news for you.  We are going to skip the foundation authenticity questions for these exhibits, for 945, 946 and 971.  The parties have agreed that that at least is not the objection that will be raised to those exhibits.

Q.   There is, though, sir, one document I need to show you and that is Exhibit 767.

        MR. LANGHOFER:  Can I share the screen, please.

BY MR. LANGHOFER:

Q.   Okay.  It looks like it's up.  How familiar are you with Service Arizona, sir?

A.   MVD operates it.  I'm very familiar with it.

United States District Court

ERIC JORGENSEN - Cross

Q.    Okay.  I'm going to go back to the first page and ask you -- first of all, have you seen this document before?

A.    Yes.

Q.    What are we looking at?

A.    These are screen shots from the voter registration process on Service Arizona.

Q.    And as we tab through these pages one by one, what's the sort of progression as we walk through the document?

A.    So it's going through the voter registration process making sure that you have what you need to do it.  It asks you what your address is and if you need to update it.  Do you want access to the publicity pamphlet via email, fill out basically the application for voter registration.

So -- and actually this part right here is how we would look you up in MAX so that we have your proper information so that gives us enough information to look you up.

Q.    You're saying "right here."  We're looking at page six.

A.    So first, middle, last names, date of birth, last four of Social and the driver's license will give us an exact match on a customer.

Q.    Okay.  And, sir, this is a fair and accurate representation then of the user interface on Service Arizona?

A.    It is.

MR. LANGHOFER:  Your Honor, I would move into evidence Exhibit 767.

United States District Court

ERIC JORGENSEN - Cross

MR. HERRERA:  No objection, Your Honor.

THE COURT:  Without objection, 767 is admitted.

(Exhibit Number 767 was admitted into evidence.)

BY MR. LANGHOFER:

Q.   Before I sit down, one more question here and that is page 21 of this same exhibit.  I'm showing you the pull-down menu from the state or country of birth line.  How does this part actually work on Service Arizona?

A.   So this is part of the optional questions.  So you don't have to answer them to register but they are there and available for you to register.  There's -- there is a list of states and countries, territories that is prepopulated and you would just select which one pertained to you if you wanted to answer the questions.

Q.   All right.  So there's a lot of screens with this drop-down menu but the one I've pulled up specifically -- I said screens.  I mean pages.  The one I've pulled up specifically is where we transition from Wyoming from Afghanistan.  We're rolling over from states to countries here. Is there an option to just say born in the United States without specifying which state?

A.   No.

Q.   Okay.

MR. LANGHOFER:  Your Honor, no more questions for this witness, thank you.

United States District Court

ERIC JORGENSEN - Redirect

THE COURT:  Any other cross-examination of Mr. Jorgensen?

MS. PORTER:  No.  Your Honor.

MS. BROUGHTON:  No, Your Honor.

THE COURT:  Any redirect?

MR. HERRERA:  Yes, Your Honor.  Brief redirect, Your Honor.

**REDIRECT EXAMINATION**

BY MR. HERRERA:

Q.   Mr. Jorgensen, I think you were talking a little bit about the extract again and there was a question or there was a question about the coding in it, right?  Can you tell me about code for authorized presence values rather what code six means or value six?

A.   So I've said that there's five.

THE COURT:  I heard that.  Now we're up to six.

THE WITNESS:  Technically there was a sixth one.  It was used for a very short amount of time.  It was for U.S. territories, Pacific Islands, which have a mixed status.  So it depends on when you were born on in the Islands as to whether or not you would be a citizen.  We found the code was not useful.  It actually caused more problems than we would hope to solve with it and so we said no.  Just code them either if they were before, code them non-citizen.  If they were after, code them as citizen and discontinue using six.  And all of the

United States District Court

ERIC JORGENSEN - Redirect

sixes were supposed to have been converted into one or the other.

BY MR. HERRERA:

Q.   There was also a question about Service Arizona.  Does the Service Arizona drop-down menu for state or country of birth include an option for no place -- does it include anything that has the word "undetermined" in it?

A.   Yeah.  I believe the last option on there was it's something other than what's in this list.

Q.   Okay.  So it could be --

THE COURT:  Like other or unknown or something like that?

THE WITNESS:  It would be in the screen shots but I don't remember offhand exactly what it says.

MR. LANGHOFER:  Page 35.

THE COURT:  Does it really matter what the word is?  Can we just move on?

MR. HERRERA:  I guess it's in the exhibit so.

BY MR. HERRERA:

Q.   Is it no place unknown or undetermined?

A.   Yeah.  That's the one I was thinking of.

Q.   And you discussed with Mr. Langhofer a bit about the supplemental productions that have all happened in the last couple of weeks.  Do you recall when the first supplement came in?

United States District Court

ERIC JORGENSEN - Redirect

A.   The date of the request?

Q.   Right.

A.   I do not offhand.  I'm sorry.

THE COURT:  I mean, was it been within the month?
Was it within the year?

THE WITNESS:  So it was --

THE COURT:  We know the second one was Sunday.

THE WITNESS:  It was pretty recent.  Within the last
few weeks.

THE COURT:  Thanks.

BY MR. HERRERA:

Q.   And the first of those three, what makes you think that
that request for that supplement came from plaintiffs?

THE COURT:  The second supplement?

MR. HERRERA:  Or the first of the three.

THE COURT:  I think he said the first supplement came
from the defense.

MR. HERRERA:  Okay.

THE WITNESS:  I think if I understand Mr. Langhofer's
question correctly when I was answering it, that was a
supplement that was -- there was an original production that
was done at the request of the plaintiffs which was the 7.3
million de-identified records that we produced or somewhat
de-identified and then the -- then through the first request
for a supplemental request of data and that was the

11:04:49

11:04:57

11:05:05

11:05:14

11:05:29

11:05:55

United States District Court

ERIC JORGENSEN - Redirect

plaintiffs' -- the defense's request was to add some information about Real ID status and what type of issuance it was so that we could tell whether authorized presence had been checked.  And then there was a subsequent one that was from the plaintiffs to say if you couldn't tell when it was checked -- if it wasn't checked, when was the last time it was checked.  So those are the three that I'm understanding that I'm thinking of.

BY MR. HERRERA:

Q.   So it would be the first one was defendants', the second was plaintiffs', and the third was defendants?

THE COURT:  No.  He said the opposite.

THE WITNESS:  I think when we're talking about the first one --

THE COURT:  Hold on a second.  You know what, why does he have to remember?  You all know which -- who made which request.

MR. HERRERA:  Okay.  All right.

BY MR. HERRERA:

Q.   You also discussed with Mr. Langhofer the error sampling.

A.   M'hum.

Q.   So when you checked for errors, can you tell me what a sampling is?

A.   So we would look at what transactions had been produced in the last week, what had customer service representatives done

United States District Court

ERIC JORGENSEN - Redirect

in that last week.  We would pull a random sample for each    11:07:36
region.  There's four regions and so we would pull a random
sample from each region and go through was the transaction
processed according to our standards?  And we would check to
see if there was anything that was outside of the -- outside of    11:07:53
the standard.

Q.    And when you say four regions, how are those regions
determined?

A.    Pretty much geographically.

Q.    And you mentioned that it was errors that are found get    11:08:10
corrected; right?

A.    If they are found in the process and they can be
corrected, then they are corrected.

Q.    And so I think you said this earlier but you don't correct
errors that you haven't found through the sampling; right?    11:08:25

A.    We wouldn't know to correct them, correct.

Q.    And are there -- in data entry by customer service
representatives and third-party representatives, are there
actual manual data entry elements to that?

A.    You mean do people type things into it free hand?    11:09:06

Q.    Right.  Right.

A.    It depends on the field that it's being typed into but it
can be or it can be a drop-down menu or it can be a selection
box or something along those lines.

Q.    And thinking about those transactions, when someone needs    11:09:24

United States District Court

602

ERIC JORGENSEN - Redirect

to update that they are -- say someone who had a foreign type license naturalizes, do they have to come update their -- if they wanted to show that they are now a citizen, a U.S. citizen, how would they go about doing that?

A.   So they would need to come in and get a new driver's license because we only check it at issuance so they would come in and say, "Hey, I've naturalized," so they would bring in their naturalization documents, apply for a new driver's license using their new status showing that they are naturalized and then we would issue that and that would update it in the system.

Q.   And when they bring in that certificate or proof of naturalization, can they do so online?

A.   No.

Q.   It has to be in person?

A.   Yes.

Q.   And thinking about transactions with customer service representatives and third-party representatives more broadly, are the name fields typed in by those representatives?

A.   Yes.  They are typed in unless they are prepopulated.  If we already have the information, then it's not typed in.  It's generated from what we have in the past and then it's validated.

Q.   One more thing.  I think there were some objections about -- well, the Attorney General represents ADOT in this

United States District Court

ERIC JORGENSEN - Redirect

case; right?

A.   Yes.

Q.   Does the RNC, Republican National Committee, represent you in this case?

A.   No.

Q.   Did you have any conversations with Mr. Langhofer today?

A.   Yes.

Q.   What did you talk about with him?

A.   The testimony that I have given.

Q.   Okay.  And when you say the testimony you've given, is that the testimony given in response to his questions?

A.   Correct, yes.

Q.   Anything else?

A.   No.

       MR. HERRERA:  Your Honor, I have no questions at this time.  However, because there are issues with the admissibility of the depositions designations and Mr. Jorgensen is one of the hybrid witness, we are not excusing him yet until we resolve those designation issues.

       THE COURT:  I thought that we came to an agreement that if there were objections on a hybrid witness, that those would be live testimony and that the only thing for a hybrid witness that would be deposition testimony would be designations to when there's no objection because, as I mentioned before, then I don't have -- I have not read the

United States District Court

604

portions of the deposition to which objections might be sustained, not to mention the fact it's very cumbersome to do that.  So I'm only going to read the testimony that no one has any objection to for hybrid witness.

MR. HERRERA:  Okay.  I see, Your Honor.  May I confer one moment, Your Honor?

THE COURT:  You may.

(Counsel confer.)

MR. HERRERA:  Mr. Jorgensen, thank you for your time.  We excuse this witness, Your Honor.

THE COURT:  Is there any objection to Mr. Jorgensen being excused as a witness?

MR. WHITAKER:  No, Your Honor.

THE COURT:  Mr. Jorgensen, thank you very much.  You may step down and you are excused as a witness.

(Witness excused.)

THE COURT:  Plaintiffs may call their next witness.

I don't see anybody sitting in the chair -- oh.  Your next witness, please.

MS. SHAH:  Your Honor, we're calling Ms. Morales but I think I just would like to confer briefly with Mr. Whitaker because there's some evidentiary issues that we're trying to resolve very quickly, hopefully without taking up the Court's time.

THE COURT:  Well, it's going to take up my time

United States District Court

either way because here I am.

THE REPORTER:  And I'm sorry.  You are?

MS. SHAH:  Your Honor, my name is Niyati Shah and I represent the AZ and HPI Equity plaintiffs.

COURTROOM DEPUTY:  Do you want to stand in front of me and raise your right hand?

(YOLANDA MORALES, a witness herein, was duly sworn or affirmed.)

COURTROOM DEPUTY:  Thank you.  Can you please state your name and spell your last name for the record.

THE WITNESS:  My name is Yolanda Morales and my last name is M-O-R-A-L-E-S.

COURTROOM DEPUTY:  Thank you.  You can go ahead and have a seat.

THE COURT:  You may proceed.

### DIRECT EXAMINATION

BY MS. SHAH:

Q.    Good morning.  Please state your title.

A.    I'm Senior Elections Policy Manager.

Q.    And how long have you been in that position?

THE COURT:  Senior Elections Policy from -- working for who?

THE WITNESS:  Secretary of State office.

THE COURT:  Thank you.

THE WITNESS:  Thank you.

United States District Court

YOLANDA MORALES - Direct

BY MS. SHAH:

Q.   And how long have you been in that position with the Secretary of State's office?

A.   September, October, 2021, one of those two months.

Q.   And how long have you been overall with the Secretary of State's office?

A.   Since 2008, June of 2008.

Q.   Could you briefly tell the Court what you have been doing since then?

A.   I started in Business Services.  I was a Notary Complaint Coordinator there for about three years and then I moved to the Elections Division in 2011, May.  I was a Campaign Finance Coordinator there until 2014-15.  That year is kind of muddy for me.  And then I moved into a HAVA Specialist Position. That HAVA Specialist Position was then was renamed to Elections Data Specialist and I remained in that position as an Elections Data Specialist until my promotion in 2021 to Senior Elections Policy Manager.

Q.   And you recall that you were deposed in this case as one of the Secretary of State's representatives to speak about the Arizona Voter Information database, or AVID, as well as the Systemic Alien Verification for Entitlement System or SAVE; is that correct?

A.   Yes.

\\\

United States District Court

YOLANDA MORALES - Direct

MS. SHAH:  And if Your Honor agrees, I'm going to use the acronyms AVID and SAVE as we talk about them today.  Is that all right with everybody?

THE COURT:  As long as they are the only two.

MS. SHAH:  I will be careful about acronyms.

THE COURT:  I bet HAVA will try to sneak in, though.

MS. SHAH:  Would Your Honor like the HAVA acronym de-acronymized?

THE COURT:  No.  I can deal with three.  That's my limit.

MS. SHAH:  Okay.

BY MS. SHAH:

Q.   And Ms. Morales, earlier this week the Court heard from the Maricopa County Recorder about their voter registration database.  Is AVID the same database as Maricopa County's?

A.   No, it's not.

Q.   So what is AVID?

A.   AVID is a database, statewide database used by the 13 counties that are not Maricopa County and Pima.  Maricopa County and Pima have their own respective systems.  Their data is transferred into AVID through an API on a daily basis.

Q.   And so to be clear --

THE COURT:  In a statewide database for what of what?

THE WITNESS:  For voter registration.

THE COURT:  Thank you.

United States District Court

608

YOLANDA MORALES - Direct

THE WITNESS:  But it's more than just voter registration.  There's also early voting modules.  There's election management modules.  Do you need more details than that?

THE COURT:  So all of the registered voters are in there but it also tells you which ones are early voters and --

THE WITNESS:  The counties that use AVID also have an early voting module that are used for those voters.

THE COURT:  And is this a situation where Maricopa and Pima don't use AVID for early voting?

THE WITNESS:  Right.

THE COURT:  They use their own system?

THE WITNESS:  Correct.

THE COURT:  But their voter registration information automatically populates AVID as well?

THE WITNESS:  Yes.  It also does give us some limited early voting information.  But they run early voting module in their own systems.

THE COURT:  Thank you.

BY MS. SHAH:

Q.   So 13 counties use AVID; correct?

A.   Yes.

Q.   And it is also correct that the Secretary of State's office maintains AVID through a vendor; is that correct?

A.   Yes.

609

YOLANDA MORALES - Direct

Q.   And when we talk about voter registration, is it accurate to say that there's a voter registration record in AVID?    11:19:55

A.   For every voter, yes.

Q.   And a voter registration record can initially be created in AVID in two ways.  One, by County Recorders entering    11:20:12
information provided on a physical voter registration form or through an electronic or online application through Service Arizona; is that correct?

A.   Yes.

Q.   And upon receiving a voter registration application,    11:20:28
County Recorders enter the information on the application as it is provided into AVID by going to what is called an add registrant module?

A.   Yes.

          THE COURT:  So is the only way to electronically    11:20:42
register to vote through Service Arizona?

          THE WITNESS:  Yes.

          THE COURT:  So everything else is input by hand?

          THE WITNESS:  Yes.

BY MS. SHAH:    11:20:53

Q.   And do you know if each voter registration record in AVID contains a status?

A.   Yes.

Q.   What is a status?

A.   A status, well, there's different statuses.  It could be    11:21:03

United States District Court

active, inactive, suspend, merged, archived.  I don't have them all committed to memory but it basically let's you know the status of the voter record in the system.

Q.   To clarify that, it's fair to say that a voter registration record in AVID shows information about the current status of an individual's voter registration?

A.   Yes, that would be accurate.

Q.   So once a County Recorder enters whatever information is provided in a voter registration application into AVID, is the next step to conduct a HAVA check?

A.   Can you repeat the beginning?

Q.   Sure.  So once the County Recorder enters whatever information is provided in a voter registration application form into AVID, the next step is to run a HAVA check?

A.   Yes.

Q.   And this HAVA check is a function in AVID whereby County Recorders are able to compare that entered information in AVID with current MVD data?

A.   That's correct.

Q.   And once the information from AVID is compared with MVD data, County Recorders will get what is a soft or hard match --

A.   Yes.  That produces a soft or hard match.

Q.   -- with the MVD records.  I just want to clarify that.

A.   Based on the information sent from AVID to MVD and the information that is received back from MVD.

611

YOLANDA MORALES - Direct

Q.   And is it your understanding that a hard match, that there is only one match with an MVD record?

A.   There should only be one match unless MVD has duplicate records.

Q.   Okay.  And I want to break that down a little bit with you when you said about the duplicate record.  So stepping back for a minute, a voter registration application, that only has the name of the registrant or the applicant rather, their address, date of birth, affirmation of citizenship and a signature is considered to be a complete voter registration; is that right?

A.   Did I hear you mention date of birth?

Q.   Yes.

A.   Yes.

Q.   And if I didn't say it, I meant to say that.

A.   Okay.

Q.   And so even without a driver's license or state ID number or a Social Security number, a HAVA check can be conducted and will be conducted for that type of application?

A.   Correct.

Q.   So when you are saying that there is the possibility of a duplicate within MVD, it is possible that with just this limited information you will potentially get a duplicate from MVD even though it's a hard match?

A.   Right.

Q.   And a soft match means that there is more than one

United States District Court

612

YOLANDA MORALES - Direct

possible MVD record that could match with the information
entered in the AVID by the County Recorder; correct?

A.   I wouldn't put it that way.

Q.   Okay.  How would you put it?

A.   So a hard match is whatever criteria we have in the system
for a hard match, if all the information matches the MVD system
based on the matching criteria, then that would be a hard
match.  If not everything match, then it would be a soft match.

Q.   Correct.  So you could have more than one soft match?

A.   Potentially, yes.

Q.   Okay.  Great.  Thank you.

A.   Yes.

Q.   And Ms. Morales, can you confirm that birthplace is a
field in AVID that can be completed by County Recorders if a
voter registration application includes that information?

A.   Yes.

Q.   But currently the birthplace field in AVID is not matched
with the corresponding field in an MVD record; correct?

A.   Right.  That is not transmitted for a HAVA check.

Q.   And the MVD database does not have birthplace information;
correct?

A.   No.

Q.   And I know you were here for Mr. Jorgensen's testimony so
I just want to clarify for the record from you, on behalf of
the Secretary of State's office, upon selecting an MVD record,

United States District Court

613

YOLANDA MORALES - Direct

County Recorders also get their authorized presence value from that MVD record; correct?

A.   It's part of the HAVA check, correct.

Q.   And we won't go into the various authorized presence values since we've just covered that.  But I want to just clarify that these authorized presence values, those that don't show United States citizenship, those are known as the F type licenses; correct?

A.   They used to be call F type licenses.

Q.   Okay.  And am I also correct that an AVID record that is being entered and matched with an MVD record won't then include the underlying immigration documents that were part of that MVD record; correct?

A.   Documents are not exchanged through that API call, no.

Q.   And depending upon the authorized value presence and the matched MVD record, the registrant's record in AVID will automatically reflect whether their citizenship is verified or not; correct?

A.   Yes.

Q.   And so if the authorized presence is one or four, one being for U.S. citizen -- I'm sorry, one for naturalized and four for U.S. citizens, AVID record would automatically mark "yes" in that citizenship verified field; correct?

A.   Yes.  It would default to that.

Q.   In it would default to marking "no" in the citizenship

United States District Court

614

YOLANDA MORALES - Direct

verified field if there's any other authorized presence value; correct?

A.   Correct.

Q.   And if a voter registration record isn't matched to a record with MVD during the HAVA check process, only then will it be compared to the Social Security administration database; correct?

A.   That's my understanding, yes.

Q.   And is it your understanding that the Social Security administration database cannot provide information about an individual's citizenship?

MR. LANGHOFER:   This is cumulative of yesterday's testimony, Your Honor.

THE COURT:   Sustained.

MS. SHAH:   Okay.

BY MS. SHAH:

Q.   And so is my understanding correct that the HAVA check process is whereby County Recorders obtain DPOC, that is, if it's not provided with the voter registration application, and confirms the identity or personhood of the applicant?

A.   The HAVA check is also ran whether the voter registration form came with DPOC as well.  You cannot bypass it.  It will still run.

Q.   But if it's not provided, the DPOC, the HAVA check is whereby the DPOC will be --

United States District Court

YOLANDA MORALES - Direct

A.   Acquired.

Q.   -- acquired?

A.   Yes.

Q.   Thank you.  And just to clarify, and it's also the HAVA check where an applicant's identity is confirmed; correct?

A.   Yes.

Q.   And outside of the HAVA check process, there is no other way for a County Recorder to obtain the authorized presence of a registrant from MVD; correct?

A.   Right.  It's through the API that's built in.

Q.   And the HAVA check has to be run for both a new voter registrant applicant or one that is updating an existing voter registration record?

A.   Yes.  Every time, m'hum.

Q.   I want to go back again to the citizenship verified defaults in AVID, that field -- before we move on, does AVID when a County Recorder is entering information into AVID for the first time, does it -- does AVID run a search to check for existing or a duplicate record within AVID?

A.   Yes.  That is the first thing that it does.

Q.   And that is before the HAVA check process; correct?

A.   Yes, that's correct.

Q.   So is a birthplace a field to match for duplicates?

A.   No, it's not.

Q.   But are date of birth and name used?

616

YOLANDA MORALES - Direct

A.   Yes.

Q.   So going back to the citizenship verified field and the defaults based on the authorized presence value, even when you're updating an existing record, if when you run the HAVA check process and the MVD record indicates a non-citizenship presence value, it defaults to "no"; correct?  And so then if the voter registration application for a new voter registration application, let me clarify, actually was accompanied by a physical DPOC, do you know whether a County Recorder can override that default?

A.   They can.

Q.   And so this is done after the HAVA check function is complete; correct?

A.   Yes.

Q.   And if a voter registration application doesn't actually -- is not accompanied by a DPOC but instead has the A number or citizenship or naturalization certificate number, County Recorders are then supposed to verify that with the SAVE system; correct?

A.   Correct.

Q.   And am I correct that the SAVE system is not a part of AVID but it's a separate Web-based platform?

A.   Correct.  It's not built into AVID at all.  It's a separate system, immigration system.

Q.   So like the HAVA check is actually built into AVID?

United States District Court

YOLANDA MORALES - Direct

A.   Yes, that is the difference.

Q.   So if the voter registration application in addition to the acceptable DPOC included at least their name, date of birth, residence, signature, this voter would be able to vote in state, local, and federal elections; correct?

A.   If they prove citizenship, yes, they could.  They would be considered a full-ballot voter.

Q.   And if a voter registration applicant didn't have acceptable documentary proof of citizenship with their application, either acquired or otherwise, but was otherwise eligible, this would be a voter who could only vote in federal elections; correct?

A.   Yes.

Q.   In that case, how would AVID show that a voter registration -- voter registrant could only vote in federal elections?

A.   There are flags in system that indicate that the voter is either fed or fed I?

Q.   And this fed only or fed I, are these fields in AVID?

A.   They are fields.  It's a flag.  But, yeah, essentially yes.

Q.   Okay.

        MS. SHAH:  Can we pull up Plaintiffs' Exhibit 242, please.  And I will confirm that this document has been redacted for personally identifying information.

United States District Court

YOLANDA MORALES - Direct

BY MS. SHAH:

Q.   But Ms. Morales, if you can just quickly go through this email chain before we discuss it.

A.   Okay.

Q.   And if you need to move and scroll down, let us know.

A.   Okay.

THE COURT:   Are there more pages?

MS. SHAH:   There are, yes.

THE WITNESS:   Where is the bottom of the email?  I got confused.

MS. SHAH:   Can we pull up the last?

THE WITNESS:   Okay.  This is the bottom of the email?

BY MS. SHAH:

Q.   Correct.

A.   Go to the next page.

Q.   If we can go just back to the top of the email, earlier --

A.   I didn't get to read the top of the email.

Q.   Let's go back and give you time to do that.

A.   I don't think this is the top of the email.  Okay.  Here we go.  Okay.  I think I recall now.

Q.   Okay. Wonderful.  So you recall this email and earlier, you know, there was a conversation with Mr. Jorgensen about Service Arizona and checking.  So is it correct that you cannot register to vote in Service Arizona if there is no authorized presence value indicating citizenship with MVD records;

United States District Court

619

YOLANDA MORALES - Direct

correct?

MR. LANGHOFER:  Objection, Your Honor.  You've already had testimony on this and she wouldn't know the answer anyway.  Service Arizona is an ADOT thing.

THE COURT:  I thought Mr. Jorgensen told us that.

BY MS. SHAH:

Q.   And so in this situation, the individual was somebody who had citizenship but couldn't use it because MVD didn't show that he was a citizen; correct?

A.   Right.  What I recall is the customer knew that he was --

THE COURT:  Is this document in evidence?

MS. SHAH:  I was just about to enter it.

THE COURT:  Because you're asking about the contents of a document not admitted in evidence.  You referred to "this situation" and I didn't know what "this situation" was although I speculated it had something to do with the contents of this document.

MS. SHAH:  I apologize, Your Honor.  I skipped ahead. May I enter this exhibit into evidence.

MR. LANGHOFER:  We don't object, Your Honor.

THE COURT:  What utility is this if all of it's going to tell me is that a person failed because of an error or perhaps a date problem within Service Arizona?  Someone wasn't able to register through Service Arizona.

MS. SHAH:  Your Honor, it's showing how the MVD data

United States District Court

620

YOLANDA MORALES - Direct

is not -- is not accurate or an accurate reflection necessarily 11:37:10

of an individual's citizenship status presently.

MR. LANGHOFER:  Your Honor, I think we already have

stipulations on this and there's already been testimony.

There's no question of that. 11:37:28

THE COURT:  Yes.  I already know that.  If someone

naturalizes, they are not required to notify the Department of

Motor Vehicles.  Therefore, Motor Vehicle will still have them

as a foreign type and it won't be accurate because nobody told

Motor Vehicle.  I don't know how putting more pages in the 11:37:45

record to say the same thing is going to be helpful.

MS. SHAH:  That's fine, Your Honor.

At this time --

THE COURT:  Do you want to withdraw 242?

There was no objection but I think it's cumulative so 11:38:10

I'm not going to admit it.  Then you don't have to withdraw it.

I'm already concerned with the volume of exhibits

that may be offered and I want to be sure that I only have to

look at exhibits that actually tell me something that is new

that I don't already know from prior testimony. 11:38:37

MS. SHAH:  Fair enough, Your Honor.  The only other

point in this document is it's going to talk about the

frequency of this occurrence happening of an outdated record in

MVD and the ability to register to vote.

In that case, we will withdraw it and I will pass the 11:38:57

United States District Court

621
YOLANDA MORALES - Cross

witness.                                                                    11:39:01

            THE COURT:  Mr. Whitaker?

            MR. WHITAKER:  Yes, Your Honor.

                    **CROSS - EXAMINATION**

BY MR. WHITAKER:                                                           11:39:14

Q.    Good morning, Ms. Morales.

A.    Good morning.

Q.    Josh Whitaker representing the State and Attorney General.

I would like to show you a redacted document, Plaintiffs'

Exhibit 314.  While that's pulling up, I guess I'll ask, were      11:39:27

you here for Eric Jorgensen's testimony earlier this morning?

A.    Yes, I have been here.

Q.    And did you hear him talk about MVD has been giving on a

monthly basis a CSV customer extract to the Secretary of State?

A.    Yes.                                                                 11:39:56

Q.    Do you know whether the Secretary of State has done

anything with that file?

A.    So he testified to two sets of data.  Can you clarify

which one you're --

Q.    Yes.  One had to do with citizenship.  One had to do with    11:40:11

I think out of county or out of state.  Something or other.

I'm talking about the citizenship-related one.

A.    I don't know what you mean by the citizenship one.  Can I

explain to you what I understand the two data sets to be or --

Q.    Sure.                                                                11:40:28

                    United States District Court

YOLANDA MORALES - Cross

A.   So there's a data set that we do receive currently monthly and it lists those individuals who MVD has been advised they have moved out of state.

Q.   Understood.  That not the one I'm talking about.

A.   Okay.  And then the second one that he mentioned is a request that was made at one point to receive the entire MVD data set for comparison against our voter registration system.

Q.   Right.

A.   I don't categorize them as citizenship the way you --

Q.   Right.

THE COURT:  It was 7.3 million records that were --

MR. WHITAKER:  It's a large file.

THE COURT:  -- that were summarized.

BY MR. WHITAKER:

Q.   Yes.  On that one, I'm just wanting to know does the Secretary's office -- has the Secretary's office done anything with that?

A.   My understanding is that we're not receiving the data set.

THE COURT:  Did you hear him say he sent you one in November and you downloaded it in December?  And they have sent it every month since.

THE WITNESS:  My understanding is that we have not been receiving it.  There were discussions about it but we were not able to utilize the large data set at that time for the comparison so that was put aside pending the trial.

United States District Court

YOLANDA MORALES - Cross

THE COURT: So it might be coming but you're not taking it?

THE WITNESS: We're not working with it right now. The data set was very complex and large and we needed to continue discussions internally on how to use the data to be able to do that high-level data set or comparison.

BY MR. WHITAKER:

Q. Okay. Here we go. Thank you very much. So this is a redacted document here and I wanted to just try to make concrete some things that we've been discussing a little bit about. So are we looking at -- can you explain what we're looking at in this document?

A. This is what the County user would see when they are -- let me finish looking at it. It's a little fuzzy on the screen so bear with me.

THE COURT: It doesn't appear to be a whole page and then it has this block in the middle that is blocking other things from being seen.

MR. WHITAKER: Yes. This is -- there probably would be a much more ideal version of this but this is the only one I'm aware of among the parties' exhibit lists.

THE WITNESS: Okay. I got familiar with everything that I'm seeing.

BY MR. WHITAKER:

Q. Okay.

United States District Court

YOLANDA MORALES - Cross

A.   So there's a popup blocking what Judge Bolton just mentioned.  Do you want me to just focus on that popup or the entire screen?

Q.   Let's back up from the popup.  I think first just generally what the screen is showing and then we'll talk about the popup.

A.   Okay.  So behind the popup is the add registrant module that is used by County users to do the data entry from a voter registration form to enter the voter into the system.

Q.   All right.  And so --

THE COURT:  If I understand it, this, when somebody from the Elections Department at the County gets a paper voter registration form and they begin to enter the information, this is the screen they start on.

THE WITNESS:  Well, there's a previous screen to this one.  You can --

THE COURT:  This is one of the screens they have to fill out?

THE WITNESS:  It's the main screen that they work on to do all of the data entry, correct.

BY MR. WHITAKER:

Q.   All right.  And you can see it's redacted here but you can see blanks for name, address, SSN four, DL/ID; right?

A.   Yes.

Q.   And SSN four I assume is the last four of a Social?

United States District Court

YOLANDA MORALES - Cross

A.    Yes.

Q.    All right.  And DL, slash, ID is either a license number or, as Mr. Jorgensen explained earlier today, a non-driving identification number?

A.    Yes.

Q.    Okay.  Now in this form, state or country of birth is blank; right?

A.    Yes.

Q.    Okay.  Now, the popup -- I actually didn't have questions of my popup in the outline but why don't you just go ahead and explain what the popup is, just so we have a sense?

A.    It's a popup that the system will present to the County user to let them know that they found a hard match with an existing record.

Q.    Okay.  So let's -- let me see here.  So you've got some start-up on the top here and I hesitate to do this because it didn't work so well last time.  Nope, okay.  My touchscreen skills are failing me, but do you see the horizontal ribbons, there are about four of them at the top below where it says "Add registrant driver's license update"?

A.    Right below the "Run HAVA checks"?

Q.    Yes.

A.    Yes.

Q.    So the second of those ribbons says "Check MVD"?

A.    Yes.

United States District Court

YOLANDA MORALES - Cross

Q.    And what does that refer to?

A.    That is -- so when the County user selects "Run HAVA checks," you are going to see each of those boxes that have the check marks start being filled because it's letting you know what it's doing in the background.  So when it moves to "Check MVD," it means that it's making the API call from AVID to MVD.

Q.    Got it.

The next ribbon, it's not -- it's kind of blocky but I believe it says "Duplicate record match"; is that right?

A.    Yes.

Q.    And what does that refer to?

A.    It's checking to see if the voter already exists in the system.

Q.    Not the MVD system, the AVID system?

A.    Correct.

Q.    All right.  And then the third ribbon after that I think says "Deceased checks."

A.    Yes.

Q.    I think that's self-explanatory but can you go ahead and explain what that is.

A.    It just makes another check to see if the voter was marked as deceased already.

Q.    Okay.  Now, you mentioned the concept of soft and hard matches with respect to the MVD election.  Does a similar concept exist with respect to the duplicate record check within

United States District Court

627

YOLANDA MORALES - Cross

AVID?

A.   It does.

Q.   Okay.   Do I roughly have it right that a hard match is more exact and a soft match is more questionable?

A.   Yes, in summary.

Q.   Okay.   Do you recall what guidance the Elections Procedures Manual gives Recorders as to what to do when they are presented with this soft match within AVID?

A.   I don't believe it goes that granular in the EPM, to my recollection.

Q.   I'm asking on the spot.   Why don't we pull up -- I think it's Plaintiffs' Exhibit 6, page 36 of the document.   No.   You had it right the first time.

Can you take just a quick moment to review section F here?

A.   Sure.

THE COURT:   Maybe you can make it bigger.

THE WITNESS:   That would be super nice.   Okay.   Thank you.

Okay.

BY MR. WHITAKER:

Q.   I'm focused on that second sentence in the first paragraph.   That refresh your memory that Recorder may use any information in the voter's record to identify potential matches?

United States District Court

YOLANDA MORALES - Cross

A.    Yes.

Q.    Okay.  Thanks.

        MR. WHITAKER:  Can we go back to the redacted document that I had?

Q.    And while we're going back to it, I'll ask you some questions.  Do you know offhand --

        MR. WHITAKER:  You know what, actually, don't go back to it.  Let's go Defense Exhibit 935.

BY MR. WHITAKER:

Q.    While we're doing that, do you know offhand the current criteria that AVID uses for a hard match?

A.    I don't have it committed to memory but if I ever have to reference it in AVID, we have a section called Master Values that has it all outlined.

Q.    Okay.  I'm on your screen -- on your screen is a document that I believe is relevant to this.  So do you recognize this is document?

A.    It's a screen from AVID.

Q.    Okay.  And does the first table duplicate registrations hard match, explain the criteria that are used to determine whether two records are a hard match?

A.    It does.

Q.    Okay.  And does the second table identify the criteria used to identify whether two records are a soft match?

A.    It does.

United States District Court

11:49:05

11:49:14

11:49:26

11:49:41

11:50:00

11:50:16

YOLANDA MORALES - Cross

Q.    Okay.  So, for example, County Recorder gets a record Sam Smith born in January 1, 1980, and there's already a record in AVID with a Sam Smith born in January 1, 1980, would that be a soft match given the first three lines under the soft match criteria there in the second table?

A.    Yes, it would be.

Q.    So in that case, County Recorder gets a form, looks like there's another form in the system that may or may not be the same person.  Suppose the County Recorder looks at both forms and one of them says Samuel and one of them says Samantha.  Would that be helpful for the County Recorder in determining whether these are a genuine match?

A.    I don't do their function so I don't know how they proceed with the soft matches.

Q.    Okay.  All right.

      The second set of criteria there under the soft match duplicate registrations, five, six, seven, it says first name, date of birth, SNN four, do you see that?

A.    On line five, six, seven?

Q.    Yes.

A.    Yes, okay.

Q.    So does that mean that if there is an existing record so, you know, County Recorder gets a form in, there's an existing record where the first name is the same, a date of birth is the same and the last four of the Social are the same, that would

United States District Court

YOLANDA MORALES - Cross

result in the soft match situation?

A.   It does.

Q.   Okay.  Line nine kind of confused me a little bit because it looks like if there's an exact match in the system with a driver's license number, that still is considered a soft match by AVID; is that right?

A.   Yes.

Q.   Why is that?

A.   People may change their names with MVD.  I imagine.  It's a guess.

Q.   And part of what confused me is that I would have assumed that if there's an exact match, I get a registration form with a driver's license that's the same nine digits as the nine digits and a form already in the system, I would assume those are the same people.  Does AVID not make that assumption?

A.   If it's not matching the first name and last name and only the driver's license match, it's going to consider it a soft match.

Q.   I see.

A.   People do change their names and keep their same ID and driver's license.

Q.   Understood.  Understood.  Okay.

        MS. SHAH:  Sorry, Your Honor.  Did we enter this exhibit?

        MR. WHITAKER:  I move to enter this exhibit into

United States District Court

YOLANDA MORALES - Cross

evidence.

MS. SHAH:  No objection.

THE COURT:  What's its number?  When you say "this exhibit"?

MR. WHITAKER:  Sorry.  Yes.

MR. LANGHOFER:  935.

THE COURT:  Elaine and me enough information.

MR. WHITAKER:  It's not a very good match one might say.  Exhibit 935.

THE COURT:  Without objection, 935 is admitted.

(Exhibit Number 935 was admitted into evidence.)

MR. WHITAKER:  And while we're at it, did I -- can I also move in the redacted Exhibit 314, the screenshot?

MS. SHAH:  I think that's already in.

THE COURT:  Oh, it is?  Okay.  Great.  Sorry about that.

BY MR. WHITAKER:

Q.   Okay.  I'll switch gears a little bit.  I don't think we need to refer to this document any more.

As part of your role within the Secretary of State's office, have you been receiving, since these new laws, summary reports of juror statements?

A.   Yes.

Q.   Okay.  And you've personally seen those in your role?

A.   I have, yes.

United States District Court

YOLANDA MORALES - Cross

Q.   I don't want to go through a bunch of them right now but have you had an opportunity to review what has been marked as Defense Exhibits 807 through 821?

A.   Yes.

Q.   Okay.  Are those the summary reports of the jury statements that the Secretary of State's office has been receiving this year?

A.   From the Courts, yes.

Q.   Okay.

MR. WHITAKER:  That's all the questions I have for you.

THE WITNESS:  Thank you.

THE COURT:  Mr. Langhofer?

**CROSS - EXAMINATION**

BY MR. LANGHOFER:

Q.   Good morning, barely.

A.   Still morning.  Good morning.

Q.   I think I've only got two quick ones for you.  The first is, if the County Recorders receive a paper registration form that only has required fields, so no Social Security number and no driver's license number, how do those two fields of data make their way into the voter file?

A.   Once they run the HAVA check, if they can find -- if they can acquire the driver's license or ID and SSN through the HAVA check, then that will be part of the voter registration field

United States District Court

633

YOLANDA MORALES - Cross

once the County is presented with the hard and soft match of that MVD call and then it gets committed into the record.

Q.   Second question is, is your office using the monthly data extracts from ADOT for any purpose?

THE COURT:  The big one, not the one that you mentioned that --

THE WITNESS:  The monthly out-of-state --

THE COURT:  That was out-of-state people.

THE WITNESS:  No.  Not at this time.

MR. LANGHOFER:  Thank you, Your Honor.  Nothing further.

MS. PORTER:  No questions, Your Honor.

MR. MORGAN:  Craig Morgan.  I represent the Secretary of State.

**CROSS - EXAMINATION**

BY MR. MORGAN:

Q.   Ms. Morales, earlier you testified you're not receiving the big million, seven million record.  The Secretary of State's receiving it.  They are just not using it because they don't know how to; correct?

A.   I'm not aware that we're receiving it.

Q.   So you don't know either way whether it's being received?

A.   Correct.  Yeah.

Q.   Okay.  Thank you.

THE COURT:  Redirect?

United States District Court

634

**REDIRECT EXAMINATION**

BY MS. SHAH:

Q.   Can we pull up Defense Exhibit 935 that was just admitted and on the second page, Miss Morales, these are the criteria that are used to determine whether there's a hard or soft match between AVID and MVD records; is that correct?

A.   Correct.

MS. SHAH:   That's all I have.   Thank you.

THE COURT:   May this witness be excused?

MS. SHAH:   Yes.

THE COURT:   Is there any objection?

MR. WHITAKER:   No objection.

THE COURT:   Thank you very much, Ms. Morales.   You may step down and you are excused for a witness.

We'll break for lunch.

(Witness excused.)

THE COURT:   We'll reconvene at 1 o'clock.   Court is in recess.

COURTROOM DEPUTY:   All rise.

(Whereupon, these proceedings recessed at 11:58 a.m.)

* * * * *

United States District Court

C E R T I F I C A T E

I, ELAINE M. CROPPER, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control, and to the best of my ability.

DATED at Phoenix, Arizona, this 8th day of November, 2023.


s/Elaine M. Cropper

_____
Elaine M. Cropper, RDR, CRR, CCP


United States District Court