UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

Mi Familia Vota, et al.,            )
                                    )
            Plaintiffs,             )
                                    )
        vs.                         )  2:22-cv-00509-SRB
                                    )
Adrian Fontes, et al.,              )
                                    )  Phoenix, Arizona
            Defendants.             )  November 8, 2023
_____)  1:00 p.m.


        BEFORE:  THE HONORABLE SUSAN R. BOLTON, SENIOR JUDGE

                REPORTER'S TRANSCRIPT OF PROCEEDINGS

                BENCH TRIAL - DAY 3 - P.M. SESSION

                    (Pages 636 through 769)


Official Court Reporter:
Elva Cruz-Lauer, RMR CRR
Sandra Day O'Connor U.S. Courthouse
401 West Washington Street
Suite 312, SPC 35
Phoenix, Arizona  85003-2150
(602) 322-7245

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

637

APPEARANCES


For Plaintiff United States of America:

      JENNIFER J. YUN, ESQ.
      U.S. DEPARTMENT OF JUSTICE - VOTING - M STREET
      4 Constitution Square
      150 M. Street NE
      Washington, D.C.  20503

      RICHARD DELLHEIM, ESQ.
      SEJAL JHAVERI, ESQ.
      MARGARET TURNER, ESQ.
      U.S. DEPARTMENT OF JUSTICE-CIVIL RIGHT  DIVISION, VOTING SECTION
      950 Pennsylvania Avenue NW
      Washington, D.C.  50530


For Plaintiff ADRD Action, Arizona Students' Association,
League of United Latin American Citizens Arizona, Living
United for Change in Arizona:

      WILLIAM JOSEPH MCELHANEY, III, ESQ.
      MAYER BROWN, ESQ.
      71 S. Wacker Drive
      Chicago, Illinois 60606




For Plaintiff Arizona Asian American Native Hawaiian And
Pacific Islander for Equity Coalition:

            NIYATI SHAH, ESQ.
            ASIAN AMERICANS ADVANCING JUSTICE
            1620 L Street NW, Suite 1050
            Washington, D.C.  20036

            SADIK HUSENY, ESQ.
            AMIT MAKKER, ESQ.
            EVAN OMI, ESQ.
            CATHERINE ANNE RIZZONI, ESQ.
            SCOTT KANCHUGER, ESQ.
            LATHAN & WATKINS
            505 Montgomery Street, Suite 2000
            San Francisco, California 94111

UNITED STATES DISTRICT COURT

638

For Plaintiff Arizona Democratic Party, Democratic National Committee:

            DANIEL S. VOLCHOK, ESQ.
            WILMER CUTLER PICKERING HALE & DORR, L.L.P.
            2100 Pennsylvania Avenue NW
            Washington, D.C.  20037


            KELSEY QUIGLEY, ESQ.
            WILMER CUTLER PICKERING HALE & DORR.
            2600 El Camino Real, Suite 400.
            Palo Alto, California 94306

For Plantiff Poder Latinx:

            JOHN A. FREEDMAN, ESQ.
            LEAH MOTZKIN, ESQ.
            ARNOLD & PORTER KAYE SCHOLER, L.L.P.
            601 Massachusetts Avenue NW, Suite 100
            Washington, D.C.  20001

            BEAUREGARD WILLIAM PATTERSON, ESQ.
            JONATHAN SHERMAN, ESQ.
            MICHELLE KANTER COHEN, ESQ.
            FAIR ELECTIONS CENTER
            1825 K Street NW, Suite 701
            Washington, D.C. 20006


For Plaintiff Tohono O'odham Nation and Gila River Community:

            ALLISON NESWOOD, ESQ.
            NATIVE AMERICAN RIGHTS FUND
            250 Arapahoe Avenue
            Boulder, Colorado 80302


            SAMANTHA BLENCKE KELTY, ESQ.
            HUFFORD HORTSMAN MONGINI PARNELL & TUCKER.
            P.O. Box B.
            Flagstaff, Arizona  86001-4547.

639

For Plaintiff Voto Latino, Mi Familia Vota:

        CHRISTOPHER DODGE, ESQ.
        ELISABETH C. FROST, ESQ.
        250 Massachusetts Avenue NW, Suite 400
        Washington, D.C. 20001

        JULIAN LAURA ANDREWS, ESQ.
        HERRERA ARELLANO, L.L.P.
        1001 North Central Avenue, Suite 404.
        Phoenix, Arizona  85004


For Plaintiff Promise Arizona, Southwest Voter Registration
Education Project:

        ERNEST ISRAEL HERRERA , ESQ.
        ERIKA CERVANTES, ESQ.
        MALDEF
        634 Spring Street, 11th Floor
        Los Angeles, California  90014

        DANIEL R. ORTEGA, JR., ESQ.
        Ortega Law Firm, P.C.
        361 E. Coronado Road, Suite 101.
        Phoenix, Arizona 85004.


For Defendants State of Arizona, Kris Mayes, Jennifer Toth:

        JOSHUA MICHAEL WHITAKER, ESQ.
        TIMOTHY E. HORLEY, ESQ.
        ARIZONA ATTORNEY GENERAL'S OFFICE
        2005 N. Central Avenue
        Phoenix, Arizona  85004


For Defendant Adrian Fontes:

        CRAIG ALAN MORGAN, ESQ.
        SHAYNA GABRIELLE STUART, ESQ.
        SHERMAN & HOWARD, L.L.C. - Phoenix
        2525 E. Camelback Road, Suite 1050
        phoenix, Arizona  85016

640

For Intervenor-Defendants State of Arizona, Kris Mayes, Ben Toma:

        KATHRYN E. BOUGHTON, ESQ.
        ARIZONA ATTORNEY GENERAL'S OFFICE
        2005 N. Central Avenue
        Phoenix, AZ  85004

        HANNAH HATCH PORTER, ESQ
        GALLAGHER & KENNEDY, P.A.
        2575 E. Camelback Road, Suite 810
        Phoenix, Arizona 85016-9225


For Defendant-Intervenor Republican National Committee:

        KORY A. LANGHOFER, ESQ.
        STATECRAFT, P.L.L.C.
        649 N. 4th Avenue, Suite B
        Phoenix, Arizona  85003

UNITED STATES DISTRICT COURT

641

INDEX OF WITNESSES

| WITNESSES FOR THE PLAINTIFFS: | Direct | Cross | Redirect |
|---|---|---|---|
| Eitan Hersh, Ph.D | 642 | 676,716 | 725 |
| Lydia Camarillo | 727 | 746,755 | 764 |

INDEX OF EXHIBITS

| EXHIBIT NO.: | DESCRIPTION: | RECEIVED: |
|---|---|---|
| 595 | (Plaintiffs' Demonstrative Exhibit 2) | 726 |
| 972 | (Defendants' Demonstrative Exhibit) | 683 |

UNITED STATES DISTRICT COURT

P R O C E E D I N G S

THE COURT:  Plaintiffs may call their next witness.

MS. YUN:  Good afternoon.  Jennifer Yun on behalf of the United States.  Plaintiffs next call Dr. Eitan Hersh.

THE CLERK:  You can stand right here and raise your right hand for me please.

**EITAN HERSH, PH.D., PLAINTIFFS' WITNESS, SWORN**

THE WITNESS:  My name is Eitan Hersh.  My last name is H-E-R-S-H.

THE COURT:  You may proceed, Ms. Yun.

MS. YUN:  Thank you.

DIRECT EXAMINATION

BY MS. YUN:

Q.  Good afternoon.  Could you please state your full name for the record?

A.  Eitan Hersh.

Q.  And could you briefly walk us through your educational history?

A.  Sure. I received a BA from Tufts University and master's and Ph.D. from Harvard University in political science.

Q.  And what was your dissertation on?

A.  My dissertation was about the role of administrative data like voter registration records and campaign politics.

Q.  Where are you currently employed?

A.  At Tufts University.

EITAN HERSH, PH.D., - DIRECT EXAMINATION            643

Q.   How long have you been employed at Tufts University?

A.   Since 2017.

Q.   And what is your title?

A.   Professor of political science.

Q.   Where were you employed before that time?

A.   For the first six years of my career, I was a professor at Yale University, New Haven.

Q.   What are your research interests as a political scientist?

A.   I study American politics with a focus on elections, election administration, civic engagements, a few other topics.

Q.   Could you explain what kind of research you have done related to elections in particular?

A.   Sure.  So I have done a bunch of studies on the quality of voter registration lists, about the effects of voter ID laws on participation.  What else have I done?  Studies about the relationship between age and voter registration and voting, the relationship between geography and race and participation and other topics.

        THE COURT:  Could I ask if you would speak a little closer to the microphone, please?

        THE WITNESS:  Sure.

BY MS. YUN:

Q.   What courses have you taught related to voting in U.S. elections?

A.   So I teach courses on U.S. elections.  Undergrad at Yale I

taught a grad class on U.S. elections.  I teach classes on information technology in politics and of course on American political conservatism.

Q.  Have you had any articles published?

A.  Yes.

Q.  And are those -- were those in peer-reviewed journals?

A.  Yes.

Q.  Could you give us some examples related to elections?

A.  Sure.  So, I've written a methodological piece about how to link voter registration data to other sources of data to study voter ID laws, I've done a study about, again, what the relationship between partisanship is on voter registration records and geography.  Those are some examples.

Q.  Have you been awarded for your research?

A.  Yes.

Q.  Could you give us some examples of those?

A.  Sure.  So my dissertation book on campaign politics won an award from the Political Science Association.  I've won an Emerging Scholar Award for some research related to the race and geography piece.  I recently won an award for some studies related to antisemitism.

Q.  Have you ever served as an expert witness before?

A.  Yes.

Q.  How many times?

A.  I think about 12 or so cases, I have been deposed ten

times.

Q.   What kind of cases have they been?

A.   They have nearly all been about something to do with voter registration like a voter ID law or something about -- I have done a case about accusations about people voting more than one time or noncitizens voting, things like that.

Q.   Have you been retained by both plaintiffs and defendants in voting cases?

A.   Yes.

Q.   You mentioned that you have been involved in more than 10 cases, I don't want to go through all of them, so let's go through a couple of them just some illustrative examples. Could you tell us what was your -- what your most recent case was before this case that you were served as an expert witness?

A.   Sure.  So there was a case in Texas.  Texas made a law that when you submit a mail ballot you have to put in the ID number, and then the State was going to confirm that ID number.

     But I did an analysis showing that for a variety of reasons related to the quality of data stored by Texas, that a lot of people could correctly fill out that ballot application but it would be rejected because of a typo in a number or an incorrect or an incomplete collection of data.

Q.   Let's do one more case where you served as an expert witness.

A.   Okay.  So I was on a case in North Carolina in a state

court.  I was a rebuttal witness.  There was a question raised by -- or evidence raised by a witness that a lot of people were voting twice both in North Carolina and in another state.

And my rebuttals showed why the analysis was actually just invalid so they -- the person essentially counted people like a John Smith who voted in North Carolina and a John Smith who voted in West Virginia who had the same birth year as the same people, but they were actually different people.

Q.  Have you ever been found by any court to be unqualified to serve as an expert?

A.  No.

MS. YUN:  Your Honor, at this time the United States offers Dr. Hersh as an expert on voter registration data analysis and usage of voter registration data in election administration.

MR. LANGHOFER:  I didn't think we did this in these matters, Your Honor.

THE COURT:  I don't do it.  I am going to wait and see if anybody objects when he tries to offer an opinion.

MR. LANGHOFER:  We have also already stipulated that he's qualified to present his opinions and so I think we are happy to get to the merits.

THE COURT:  Thank you.

MS. YUN:  May I proceed, Your Honor?

THE COURT:  Please do.

BY MS. YUN:

Q.  Dr. Hersh, what were you asked to do in this case?

A.  Sure.  So there's a new law in Arizona that requires individuals to list their place of birth when they register to vote.

There was a claim about why this data was collected that it helps identify a voter.  And I was asked to conduct analysis of whether the data on place of birth helps identify voters.

Q.  And that is within Arizona's voter registration database?

A.  That's right, the collection of the data in voter registration records.

Q.  And did you reach an opinion on the usefulness of birthplace in establishing a voter's identity within Arizona's voter registration database?

A.  Yes, I did.  I found that there was -- that the data is not useful for the purpose of identifying voters.  For a number of reasons, you can't use the data to identify voters.

Q.  Okay.  Let's go -- briefly, let's go through those reasons. What is your first reason?

A.  Sure.  So the first reason is that the data on place of birth that is currently collected by Arizona, current Arizona records has place of birth information for about two-thirds of registrants because it has been a voluntary field that one could use.

And the data is kind of a mess.  There's typos everywhere, there's no organized way that the data is stored.  And because of that, it's basically impossible to use it to understand what country or state a person is from.

Q.  What is your next reason?

A.  The next reason is that the State collects other identification numbers or forms of identification like Social Security number and driver's license numbers, and those numbers give you all that you need in order to identify a voter, so there's no added value for collecting place of birth for that purpose.

Q.  And what is your next reason?

A.  The third reason is that if you needed another piece of data to confirm someone's identity, place of birth is a really bad one.  And that's because when you think about people registering to vote in Arizona, most of them were born in the same country, and a huge number of them, millions, are born in the same place which is Arizona.  And so place of birth doesn't differentiate between people very well in the way that an identification number would.

Q.  Did you do any analysis matching records from the voter registration database to another database?

A.  No.

Q.  Why not?

A.  So what I took to be my task here was to see whether the

data is useful on the voter registration database for identifying voters.  And I didn't need any other database in order to do that analysis.

Q.  Did you have access to any data from Arizona's Motor Vehicle Division?

A.  Yeah, I had -- I saw the data from motor vehicles, and I checked to see whether there was a field that showed place of birth on the Department of Transportation data.

If it did I might have done an analysis comparing how place of birth is stored by Department of Transportation versus voter registration records.  But at least the data that was provided to me doesn't have place of birth on the transportation data so I didn't use that.

Q.  Did you look into any other provision in the laws that are being challenged in this case?

A.  No.

Q.  Were you asked to do any analysis on how to verify someone's citizenship status?

A.  No.

Q.  Did you do any analysis regarding voter turnout in this case?

A.  No.

Q.  I would like to briefly turn to your methodology in forming these opinions.  What data did you use to conduct your analysis?

A.   Sure.  So the main analysis is just focused on the voter registration records for all registered voters in the State. There's a bunch of fields that I use like their names and addresses and this birthplace field, ID numbers.

And then I looked to the Arizona's Elections Procedure Manual to understand how they might use this data for the purpose of identifying voters.  So for example, if a new voter comes in -- or a new application for registration comes in and an election official wants to check oh, is this person new to this system or are they a duplicate record for an existing person, that's the situation where an identification number or method of identification is useful.  So I took that as a use case from the manual and then looked at the data and saw how it might help inform that role.

Q.   In your experience as an expert analyzing voter registration databases, are there any standard tools and methods that experts use to do their analysis?

A.   Sure.  So I took all of the data from the -- that was provided to me for active and inactive registered voters.  And the first thing I do is -- which I think is common in the field -- is to understand the variables, you know, how the data are stored, are they stored in a standardized way, are they stored completely.  And so I did a bunch of diagnostics on the fields that I was looking at before doing my analysis.

Q.   And what did you find when you did that with Arizona's

voter registration database?

A.   So name and birthdate are stored comprehensively, almost every person is listed with them.  Birthdate is stored in a very clean way, so not like one person with January 1st, another person with 1-1, it is stored in a routinized way.

Arizona also has for almost all voters, for 99.6 percent of voters, either a last four digits of a Social Security number or a driver's license number or both.  So nearly every voter has an ID number like that.

And so for those fields, they are kind of clean and complete.  The birthdate field looked very good.  In some states there's errors in the storage of birthdate, and the Arizona one my diagnostic test showed that it looks pretty good.  But those stand in stark contrast to the place of birth data, which doesn't look anything like the other fields.

Q.   Okay.  Before we move on to that, I just wanted to briefly step back and table that.  How many registered voters did you look at in this voter file that you received?

A.   Sure.  So the voter file I received had active voters, inactive voters, and then a couple of other designations like people who were removed from the list.  So my analysis was just focused on the active and inactive which we would call the current registered voters, and it amounts to 4.7 million records.

Q.   So you mentioned that you looked at the quality of the

birthplace field.  So could you tell us a little bit about what you found out in terms of the quality of the birthplace data?

A.  Yeah, so the birthplace data is not stored in any particular way, like a two-digit state code or country code. It can be stored however a registrant put it in.  And so for a number of reasons, it's very hard to use it for identifying a voter.

So just to give you some examples, like one of the big problems is that there's no way to distinguish state names from country names sometimes.  So for example, if you write Georgia, there's no way you can tell on the database that that's the state of Georgia or the country of Georgia.

A lot of people use just two character codes like MX for Mexico or U.S. for United States.  But then if you think about a code like CA, that could be Canada but it also could be California.

And so the codes, even these two character codes, are kind of impossible to use to validate even the country of birth in many cases.

Q.  Do you have any other examples of ambiguous entries for the birthplace field that you saw in the data?

A.  Yeah, there are lots.  So a lot of people just put like a county name or a city name.  So you could think of something like San Luis, S-A-N, L-U-I-S, which is a city in Arizona, but it is also a city in 12 other countries.  Or like Sonora which

is a city in California, but it's also a state in Mexico.

So people -- a lot of people just put like city or county names that are ambiguous. Colombia is another good one, it is a country but it's also a county in 12 different states.

There's also a number of people, hundreds who put countries that don't exist anymore, so they put U.S.S.R, they put Yugoslavia, they put Czechoslovakia, Rhodesia, Zaire. And so those present interesting cases, you know, it could be that someone who was born in what is now Lithuania, they could have put U.S.S.R. or they could put Lithuania, or any number of different variants. And so that's another issue.

And then the last issue, just in terms of ambiguity, is that obviously in Arizona there are voters who are born on Indian lands, and like the Navajo lands transcend state boundaries, so you could put the name of a town like Chinle, that's in Indian territory, and it could be ambiguous about exactly like what state you were born in depending on how you put that data in.

Q. After you looked at the quality of the data in the voter registration database, what did you do next in your analysis?

A. So kind of the main part of my analysis is thinking through this problem. Like when would you potentially use this data to identify voters. And so I imagined a scenario, like okay, suppose any one of these 4.7 million voters was not yet a voter and they were just registering for the first time. And the

State or the county official wants to know is this a new registrant or is this someone who is already on the voter file perhaps at an old address.

And so my exercise through a lot of the report is imagining that scenario, I am trying to figure out whether this is a new voter or an existing voter, which is something that Arizona election officials have to grapple with, and seeing under what circumstances could place of birth information be helpful in making that judgment.

Q.   And did you run an analysis to find out the answer?

A.   Yes.

Q.   Could you tell us more about it?

A.   Sure.  So the first step is here's 4.7 million records, and I want to know how many of them have the same name and birthplace -- sorry, have the same name and birthdate as another record.  All right.

Most people like 99 point something percent are unique on their name and birthdate.  Which is not surprising because there's like 30,000 birthdates for, you know, voters age 18 to 100, and there's lots of different names, and so nearly everyone is actually unique just on their name and birthdate.

So if you are trying to identify someone, you are not going to see very many cases where there's even a question that this might be a duplicate record.  In the circumstances where there are, it's going to be in situations where there's like a

very common name like a John Smith type name.

Q.  So did you look into some of these very common names where that -- where there are many, many records with that same name within the Arizona voter registration database?

A.  Yeah, so I like put a table together that showed the most common names on the voter file, and then using that to think through, okay, would birthplace information be useful for differentiating between again, two John Smiths who look the same versus two people who are named John Smith who are different people.

MS. YUN:  I would like to show on the screen what's been marked as Plaintiff's demonstrative number 2, table three, please.

BY MS. YUN:

Q.  Do you see the slide on your screen?

A.  Yeah, I can see it.

Q.  Could you tell us a little bit about what this table shows?

A.  Sure.  So if you look at the 4.7 million registered voters, the four most common first name last name combinations are on the screen, so it's Michael Smith, Maria Garcia, Maria Lopez, and Robert Smith.

So for each of these names, there's 4 to 500 people in Arizona who are registered voters with that name.  So the count column shows you how many.

I mentioned before that about two-thirds of

registrants have listed their birthplace, so the next column is just a count of how many of them listed a birthplace. And then the last four columns are just counts of people who listed specific birth places, Arizona, Mexico, all U.S. states combined and all non-U.S.

Q. You mentioned earlier that there's some ambiguities as to what some birthplace entries might be referring to. So how did you go about separating out all United States birthplace entries versus all non-U.S.?

A. Great question. I used my best judgment. So for the purpose of this illustrative table, for example, if there was a CA, I called that -- I treated it as a U.S. -- as California and not as Canada. So it might be wrong in some cases, but I just wanted to kind of combine as best I could at first glance how these people differ based on their state or country.

THE COURT: So to come up with the 115 Arizona, did you use all of the birthplaces that were listed that were likely in Arizona that weren't just AZ or Arizona?

THE WITNESS: Right. So if it was AZ, if it was a city or a county, if it was Maricopa, I would count that as AZ. And, you know, like AZ could be Azerbaijan, but I assumed it was Arizona for the purpose of the table.

THE COURT: But I think you said earlier that a lot of people had put down cities or counties. If it was a city or a county in Arizona, you counted it as Arizona?

THE WITNESS:  That's right, yes.

BY MS. YUN:

Q.  Could you tell us what conclusions you drew -- you drew from this -- the table that we are looking at?

A.  Sure.  So the real insight from this table is that these are the situations where you actually most need other pieces of information to make the assessment of whether these are say, two Michael Smiths or the same Michael Smith who's registered twice.

But it is in exactly these situations where something like birthplace is not very helpful.  I mean, in the case of Michael and Robert Smith, for example, nearly all of them, like 97 percent have the same country of birth, which is the United States.  And a huge number of them have the same state of birth, Arizona.  And so if I knew that there was two Michael Smiths and that's all I knew about them, maybe they have the same birthdate, and they both say they were born in Arizona, which is quite likely since a lot of people in Arizona were born in Arizona, I still don't know the answer to the key question I'm looking for, which is is this same person or are these two different people?

In the other two cases, Maria Garcia and Maria Lopez, you have a little bit more information because some of the Maria Lopezes were born in -- they are born predominantly in two places, Arizona or Mexico, the country.

And again, for similar reasons, it is actually not that helpful because there is a very good chance if there are two Maria Garcias they might both be born in Mexico or might both be born in Arizona. So it's not -- the place of birth data is not allowing us to distinguish between two people the way that a birthdate or a Social Security number would.

MS. YUN: We can take down table 3. Thank you.

BY MS. YUN:

Q. What was the next step in your analysis?

A. Okay. So now I wanted to do kind of a complete analysis of the whole voter file. So this is where I started with every record, 4.7 million, and I said, okay, who is not unique based on their name and birthdate. How many people are we talking about here where you need information beyond name and birthdate to determine whether it's a new person or someone who is already registered.

Q. I am going to pull up the next slide on the -- of the demonstrative. Could you tell us a little bit about this graph?

A. Sure. So this graph is just starting with the full set of registered voters, 4.7 million. And here's the number that are not uniquely identified based on their name -- first name, last name, and birthdate.

So out of everyone that registered in Arizona, only 2700 are not uniquely identified based on name and birthdate.

And so again, these are the cases in which we have this question, is this the same person listed twice, like at an old and new address or is it two people who have just the same name and birthdate.

THE COURT:  So this would be two Michael Smiths listing -- the record showing two Michael Smiths both have the same birthdate?

THE WITNESS:  That's exactly right.

THE COURT:  And you want to know is that one person or two people?

THE WITNESS:  Exactly, that's it.

BY MS. YUN:

Q.  So I am going to zoom in to the 2700 here.  And what did you do to study these 2700 records that you found in the voter registration database?

A.  Sure.  So I next looked at I think the next piece of useful data here, which is -- again, I said before that 99.6 percent of Arizonan registrants have a Social Security number, last four digits or a driver's license number.  Some -- there's very few, but some don't have either of those numbers.  And then we have this birthplace data for about two-thirds of the people.

And so the next question is, okay, of these 2700, how do we use these other pieces of data to navigate between this question, are they one person or are they two.  And I came up with like six scenarios that comprehensively characterize all

of the possibilities.

Q.  Let's start looking at those scenarios starting with scenarios 1 and 2.  Could you tell us a little bit about what is on the screen here?

A.  Sure.  So these are -- again, we are imagining we are trying to decide, is this John Smith already registered or is it a new person who happens to be named John Smith.  So we have -- excuse me.

We have a new registrant and an existing record.  They both have the same name and birthdate, John Smith -- I just made this up -- the birthdate July 4th, 1976.  And what you will notice in both scenario 1 and 2, is that the new registrant and the existing registrant have different ID numbers.

And so these are what we would call like doppelgangers, they're two Michael Smiths with the same birthdate, but they're different people.  And the way you know they are different people is that they have different identification numbers.

And so then my question is, well, could birthplace information be useful in these scenarios.  And the answer is no because in scenario 1, these doppelgangers, the two Michael Smiths have same birthday, they happen to both be born in Arizona, that's not shocking, a lot of people who are registered to vote in Arizona were born in Arizona.  So it is

not like you suddenly think they are the same people. It's the ID numbers that help you say that they are different people.

Similarly in scenario 2, it's also not shocking once you've learned that these two Michael Smiths are different people, based on their identification numbers, that one might be born in Arizona and the other in California. So the data in these scenarios suggests that place of birth would not be necessary or useful in identifying voters here.

Q. And how many records fit into these two scenarios?

A. Right. So of the 2700 that we started with, where there's ambiguity, most of them, actually, 2014 fit into one of these two categories.

Q. To clarify we started with 4.7 million records, right?

A. Yes, sorry. We started with 4.7 million. 4.7 minus 2700 were unique based on their name and birthdate, and now these 20 -- 2014 are unique once we have accounted for their birthdate and their ID numbers.

MR. LANGHOFER: Your Honor, I just want the record to be clear. He said 20 -- 2,000 -- I think -- can we just get that number again on the record so it is accurate?

THE COURT: Go ahead. 2014.

THE WITNESS: Right. So 2014 is the subset of the 2700 where there's an ambiguity. And we resolved that ambiguity in the cases of these 2014 because we see that these two individuals have different ID numbers.

BY MS. YUN:

Q.   Could you tell us a little bit about what's reflected on the screen?

A.   Right.  So now we've just shown that of these 2700, 2014 are in this scenario of 1 and 2 bar.  And that leaves 720 records left that are going to fall into these other scenarios.

Q.   Can you tell us a little bit about scenarios 3 and 4?

A.   Sure.  So in these scenarios, again we are dealing with our illustrative case of John Smith.  The new registrant and the new registrant -- or the new registration application and the existing record both show the same name and birthdate.  And they also show the same ID numbers.

So this is like a situation where someone is a registered voter at one address, they move and they reregister, but for whatever reason they are still left on the voter registration records at their old address, and now I see two records of the same person.  And I know that they are the same person because they have the same name, birthdate, and ID numbers.

In scenario 3, we see that -- these would be the situations where they also show consistent birthplaces.  They were born in the same place, which is again not surprising because we are treating these as the same people who has reregistered, and then appears as a duplicate on the voter roll.

Scenario 4 is like an unusual case.  'Cause in scenario 4 --

BY MS. YUN:

Q.  Before you move on to scenario 4, could you tell us how many records you found in the voter registration database that fit into scenario 3?

A.  Sure.  So out of those now 720, left there's I think 660 that are in scenario 3.

Q.  Okay.  And could you tell us about scenario 4?

A.  Right.  So just to be clear, those 660, these are the people that are like -- they are a duplicate because they maybe reregistered at a new address.

Okay.  Scenario 4 presents a puzzle because these people have the same name and birthdate and ID numbers which all suggest they are the same person, but they have a different birthplace listed.  That is one birthplace says Arizona, and one says California.

Now, that strikes us as sort of like an impossibility, how can two people who have the same ID numbers have different -- and names -- have different birthplaces?  And the answer is, you know, these are the records, there must be an error somewhere.  And these account for 24 records out of the 4.7 million.  So just to be clear, it is actually 12 pairs like 12 John Smiths which amount to 24 records out of the 4.7 million.

EITAN HERSH, PH.D., - DIRECT EXAMINATION          664

Q.  And just to put this into some perspective, how does that number compare to the total number of records that you looked at?

A.  Right.  Again, so out of 4.7 million, almost everyone is identifiable uniquely by name and birthdate.  And then there's a bunch of these cases in scenarios 1 and 2 of the doppelgangers, and scenario 3 of just a duplicate, and now we are down to just 24 out of the full 4.7 million.

Q.  Could you tell us a little bit about -- you mentioned that these are records that there may have been some errors, could you tell us a little bit about what you saw in the data that suggested that to you?

A.  Sure.  Like as a mentioned before, the data on place of birth is not kept very well or in a uniform kind of way.  And so there are errors in it.  We know there are errors in it, typos and things like that.

        But just to give you a couple of examples like one of the records, the two John Smiths -- obviously their names are not John Smith in the real data, or not necessarily named John Smith -- one says a birthplace of New Mexico and one says a birthplace of Chinle, which is in Arizona.  That's likely someone who was born on Indian land and at one point may have registered and thought put their birthplace as one and then one is the other.  So that would be one out of these 12 cases of pairs.

There's another one where the data is kind of incomprehensible, like it says the state or country of birth is GW, which I don't know. I don't know -- it's certainly not a state abbreviation, I don't know what country it might be or city or county it might be an abbreviation for. And then there are some where it says, you know, CA and AZ, which seem like they are inconsistent states.

My sense is again, because the data is not kept very well, these are likely cases that are similar to scenario 3, that's a duplicate record. And we wouldn't think that because of the same name, birthdate, and ID numbers, and there's some error in the tracking of the birthplace data.

Q. Okay. So we have now talked about additional 684 records out of the 720 that was remaining. Could you tell us now about the next two scenarios that would address the remaining -- the remainder of the records that you were studying?

A. Sure. So the only thing left to consider are cases where we don't have ID numbers like a Social Security or a driver's license number. I said before that 99.6 percent of Arizona registrants have one or the other of those identification numbers. But there are still .4 percent that don't. So if there's two John Smiths and one of them we don't have any ID number, then that presents an opportunity where another piece of information like birthplace could theoretically be useful.

Q. And what did you conclude about these -- the usefulness of

birthplace for those scenarios?

A.   Right.   So scenario 5, again, these are -- we are comparing two records, they both have the name and birthdate, and one of them we don't have an ID number.  But we do have birthplace information.  And that birthplace information is not inconsistent.  Which again is not surprising because a lot of people who are registered to vote in Arizona were born in the U.S -- or were born in Arizona.  And so the data on birthplace doesn't help us actually resolve the question we want here.  If these two records -- again, we don't know if they have the same ID numbers or not because we don't have their ID numbers in these cases -- if they were born in the same place, again they might just be two John Smith who were born in Arizona.  If they are born in different places, then -- well, that is what scenario 6 is.  So anyway -- I will talk about that in a second.

        But in scenario 5, it just doesn't help us resolve this question of whether they're the same person or different people.  And there are 36 total records out of the 4.7 million who are in this scenario 5.

Q.   Okay.  And lastly scenario 6, could you tell us about that?

A.   Sure.  So scenario 6 would be this instance where you don't have ID numbers, so you can't confirm whether this person is the same or different based on the ID numbers.  And then you look at the birthplace data, and the birthplaces are

inconsistent.

And so here, if we had a situation like this, you would say, ah-hah, well, at least I know these people are different people.  It turns out that scenario doesn't exist in the data, there are actually zero cases in all of the 4.7 million where you would have the same name and birthdate, you can't use the ID numbers, and the birthplace data differentiates people.

Q.   Let's suppose that actually under scenario 6, tomorrow we have two records that fall into scenario 6, what would you conclude about the usefulness of birthplace for those two records that fall into scenario 6?

A.   Right.  So I would I think form two conclusions.  One is that this is just an exceedingly rare event, like it happened zero times in the current data.  If it happened one time tomorrow, that would be like one time out of 4.7 million, that's a very rare account.

And the second thing I would say is like again we've seen that there are a lot of errors in how Arizona is storing birthplace data right now.  And so because of those errors, I would not be confident that the data is actually differentiating people.  That is, if I don't have an ID number like a Social Security or a driver's license number, and I have these two Michael Smiths or John Smiths, I would need more information to make the judgment of whether these people are

different or the same.

Q.  Could you briefly summarize these six scenarios and your conclusions based on those scenarios?

MR. LANGHOFER:  Cumulative.

THE COURT:  Overruled.

You may answer.

THE WITNESS:  Sure.  Again, so we just have 4.7 million, most -- almost all -- all but 2700 the name and birthdate are sufficient.  And then of these other cases, we either have cases that are clearly kind of the doppelgangers because we know they have different ID numbers but they happen to have the same name and birthdate.

And then we have a sum number of cases, 660 where there's a duplicate maybe because someone moved.  And then essentially you have a few little odd cases at the end, but it amounts to just an infinitesimally small fraction of the voter file.

BY MS. YUN:

Q.  I want to talk briefly about what these scenarios accounted for and did not account for.  Did you consider the possibility that some of these ID numbers that you were looking at may have been erroneous?

A.  I treated the data coming from the -- on ID numbers as correct.  So I assumed, for example, that if two John Smiths have different ID numbers, that's because they are different

people, not because the data was erroneously collected.

Q. And if you were to consider that possibility that there may be some data entry errors, would that change your conclusion about the usefulness of birthplace as a way to identify a voter in the voter file?

A. No. Because for one reason, like we already know that regardless -- even if the ID number data is not accurate, we know that we are only talking about a tiny number of records because there's only 2700 out of 4.7 million that are even duplicative on name and birthdate.

And then if you were looking for another piece of data to help differentiate these voters, you know, state or country of birth would be very low on your list because, as we talked about before, it just doesn't differentiate people.

If I have two people and I want to know if they are the same person or different people, that they were both born in the U.S. or that they were both born in Arizona just doesn't differentiate them.

Q. In constructing your scenarios, did you consider whether one person might have two records in the voter file because one of them has their full name as Robert Siegal and the other one has their nickname Bobby Siegal?

A. So I thought about that. I didn't use -- put it into the analysis for a very specific reason, which is that it wouldn't change the results. So there are a couple of reasons, typical

reasons why there might be name variants.  One is surnames change oftentimes with marriage or nicknames.

And so if we had someone who is Robert Smith, and then they register later as Bobby Smith, right?  That would be like scenario 3.  That is a duplicate record.  And I know from my analysis how likely that is to happen.  And the way I know it is by looking at the driver's license numbers, which are collected for nearly everyone.

The driver's license numbers on the Arizona registration records are unique for almost everyone.  But they are not unique for 1400 people.  Now, what does that mean?  That means in 1400 cases there are -- there's someone else on the voter registration record who shares that driver's license number.

About half of those cases I have already accounted for.  Those are the people who are -- they have exactly the same name in two records and they have the same ID numbers.  There's about 700 cases left where you might have a situation where it is like a Robert and a Bobby.  They both have the same driver's license number or -- sorry, or you have someone who changed their last name and they both have the same driver's license number.  And so they are a duplicate for that reason.  So at a maximum it would account for something like 700 more records than what I've articulated.  And they would all be in that scenario 3, or potentially scenario 4 situation where this

is a duplicate. It is a duplicate for a different reason than I was explaining before. The way that I was thinking about it was about someone who moved addresses. This would be a duplicate because they have changed their name, maybe they change their name and moved their address, but they would fall into that category.

And again, in those situations, birthplace information would not be helpful at all. So if you just think about it, like suppose we have a record for someone named Jen and at a particular birthdate. And we want to look at all the other Jens with that same birthdate.

Under the question of whether a Jen changed her name, her last name. And so anyone with any birthdate who is Jen on this birthdate could be that same person.

Again, if we're -- if we are now have only to go on is the birthplace information, it just is not going to differentiate among the Jens, because a huge number of the Jens will be born in the United States and be born in Arizona. And so it is just not a useful differentiator between people who are otherwise similar on the records.

Q. Have you formed any opinions on the utility of birthplace as a security question? For example, for voters who call their county Recorder's Office to inquire about their voter registration record and the Recorder's Office would like to confirm their identity?

A.   Yeah, I think the analysis I have already done speaks to that.  You know, if you call your election office and you want to request a mail ballot, and they want to validate you on the administrative end, they could ask for --

MR. LANGHOFER:  Your Honor, we have to object on scope and timely disclosure.  There's been -- whatever he is about to say is not in his report.

THE COURT:  Overruled.

You may continue.

THE WITNESS:  So if the scenario that I think you are asking about is a scenario where someone is trying to validate your identity through calling -- they are asking you questions so, you know, like you might ask what's your mother's maiden name or what's your birthdate or what's your Social Security number.  And those pieces of information, which are commonly asked about in the world, as far as I can tell, are useful because they differentiate people.  That is not that many people have my mother's maiden name.

For the reasons that are exactly discussed in my report, birthplace doesn't do that because again, most people were born -- most people who are registered voters are born in the same country and many in Arizona are born in the same state.  So if you just took a random guess, you know, if you were somehow a bad person posing as someone else and they said, where were you born, and you said Arizona, you would be right a

lot of the time, because, again, the data is not a good differentiator between people.

BY MS. YUN:

Q. You spoke a little bit earlier about the lack of standardization in Arizona's birthplace data in the voter file. If the State were to collect this data in a standardized manner starting tomorrow, would that make birthplace a useful field for identifying voters in your opinion?

A. No.

Q. Why is that?

A. So first of all, I'd like the caveat, is I wouldn't know what they were doing with all of the people who already have the sort of incorrectly or inadequately collected data going back in time.

But let's suppose everyone -- suppose Arizona went to every single person who is a registered voter already and every future person who's going to be a registered voter, and went through this great effort to collect the data, we know that there's almost no circumstance in which it would be useful because again, once you already have name, birthdate, ID numbers, we are talking about 99 point something percent of the, you know, 99.6 have one of the ID numbers, there's almost no circumstance where the data would be necessary.

And as we have talked about before now, it wouldn't be useful because it just doesn't differentiate people in the same

way that an ID number or a birthdate does.

Q.   Dr. Hersh, did you write a report that details the findings that you just discussed in court today?

A.   Yes.

Q.   I am going to pull up what's been previously marked as Plaintiff's Exhibit 327.

        Dr. Hersh, do you recognize this document?

A.   Yes.

Q.   And what is it?

A.   This is the report I filed.

Q.   And let's scroll to page 32.  Is that your signature?

A.   Yes.

Q.   Does this report accurately reflect your opinion and methods that you presented in court today?

A.   Yes.

        MS. YUN:  Your Honor, the United States would like to move Plaintiff's Exhibit 327 into evidence for the limited purpose of serving as a reference point for Dr. Hersh's live testimony today and assisting the Court in weighing his opinions and bases for those opinions.

        MR. LANGHOFER:  Your Honor, we actually reached an agreement I think with all the parties on this issue which is going to come up a lot, which is to admit all of the expert reports but not for the truth of the matter, just sort of as an anchor for conversations and if someone needs to reference it

later on.

THE COURT:  Well, I was just going to say, they either all come in or none come in.

MR. LANGHOFER:  The agreement between us is all as long as it is acceptable to the Court.

THE COURT:  How many are there going to be?

MR. LANGHOFER:  There are eight -- nine.

MS. YUN:  Your Honor, just to clarify, I don't think there's a global agreement in terms of the reports that are being challenged in the motion in limine that was filed last week.

THE COURT:  Because expert reports typically are not admitted.  They are hearsay.  It is the testimony -=

MS. YUN:  Yes.

THE COURT:  -- that is important, and --

MR. LANGHOFER:  We certainly.

THE COURT:  I am going to reserve -- it is his report. He's authenticated it.  I am going reserve ruling on whether I admit all, none, or some.

MS. YUN:  Thank you, Your Honor.  I pass the witness.

MR. LANGHOFER:  Can we try to get the laptop here to display?  There we go.

THE COURT:  I was wondering when the defense was going to get one of these really nice demonstratives.  Finally, finally, after three days.

MR. LANGHOFER:  I will tell you, I don't mind confessing, Ms. Yun shared her demonstrative last night and it was so pretty, we had to add colors to ours because it was just this ugly black and white thing before.

THE COURT:  I liked how hers moved across the page and everything.

It is really nice, Ms. Yun, I liked it.

MS. YUN:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. LANGHOFER:

Q.  Mr. Hersh, it's nice to see you again.

A.  It's nice to see you.

Q.  And I promise that our exchange today will be much shorter than when we spoke several weeks ago.  What I want to do is let's start with the scope of what you're looking at.  And then I want to spend some time talking about your methodology, primarily that's what I'm interested in mostly.

So number one, you described your use case.  And that was sort of mimicking the job of a county recorder who has got a new form, and they are figuring out whether this person is already registered to vote and need their birthplace information to answer that question, right?

A.  They might want their birthplace information to answer that question.

Q.  I suppose what you were asking was would you need their

birthplace information in order to answer this question?

A.  Correct.

Q.  Okay.  And you were conducting this, you know, review using only the data that currently exists, not extrapolating out to what may exist in the future?

A.  Well, as I mentioned in the report, I have done this kind of analysis in other states too.  And what's -- it is commonly true that name and birthdate are uniquely identifying.

So for example, in Texas, which is obviously a much bigger state in terms of population, you get to the same basic fact, which is that nearly everyone, 99 point something percent of people are uniquely identified just based on their name and their birthdate.

Q.  Of course.  That makes sense, it's not surprising.  But when you are conducting the analysis that led to the calculations you were talking about with Ms. Yun that you and I are going to talk about in a moment, you were only working with the data that currently exists in the voter file?

A.  Yes.

Q.  Okay.  And as you point out, that data is not kept in a uniform manner, right?

A.  With respect to birthplace, correct.

Q.  Right.  And only about two-thirds of the voters actually have their birthplace in the data that you were looking at?

A.  Correct.

Q.   Okay.  So if going forward 100 percent of the new registrants had an answer in there, and it was kept in systematic way, your results would naturally be somewhat different as time goes on, right?

A.   Well, not quite.  I mean, as I just mentioned to Ms. Yun, there's almost no circumstance, even if you had perfect data, where the data would be useful.

Q.   The -- I appreciate your point that scenario 6 is exceedingly uncommon, and I think you are saying it would continue to be uncommon.  What I am saying is the results of your analysis would be different if the data was uniformly kept and gathered on 100 percent of the people, right?

A.   So if I was in a classroom, we'd would have to talk about the difference between like substantive difference and, you know statistical difference.  So substantively I don't think it would be different, or a few cases here, a few cases there.  It might be different in the numbers, but I would not opine today that that would be a substantive difference.

Q.   Okay.  It sounds like you would conclude that it's useless even if you have 100 percent collection and it is all systematically stored in an organized way, a uniform way?

A.   Yes, it's not going to serve the purpose of helping to identify voters.

Q.   Okay.  But you do appreciate your calculations would be different if it was uniformly gathered and stored in a

systematic way?

A.   Yes.

Q.   Okay.  All right.  In -- you -- one of your criticisms is that the birthplace information is not a very good distinguisher because so many people are born in, for example, Arizona?

A.   Correct.

Q.   The first image you showed the Court though -- we are going to go back to the DOJ's exhibit here -- this is table 3 from your slide deck.  The top row there, Michael Smith, apparently the most common name that's repeated in the file, 115 are in Arizona.  There are 169 total.

     So even if you were to guess by these numbers if someone were to be a very sophisticated impersonator of voter -- right, you called the County Recorder on the phone, and you know this birthplace question is going to come up as a security question, you are playing the odds to guessing the most likely answer Arizona, you are most likely going to get it wrong, right?

A.   Sorry.  Could you put it up on my screen?

Q.   I believe it is.

A.   Thank you.  So you are saying that 115 divided by 369 is less than .5; is that -- am I understanding the claim?

Q.   That is correct.

A.   Um, yeah, you would get it right, you know, about half the

time, a little less than half the time just by guessing Arizona.

Q. Okay. And that is for the most common name with the most common state, and in fact, the widest disparity between Arizona and Mexico on the chart, right? It is still right less than half the time?

A. That's right.

Q. Okay. When I was -- I think the first time I ever got a credit card, it asked me what my first car was -- and it was a Honda Accord, if you must know, it was terrible. But it asked me what was the first car I ever owned? I said Honda Accord. I imagine there were a lot of people who answered that question with Honda Accord; wouldn't you think that's right?

A. If they said what's your first car, and you said Honda Accord?

Q. Right.

A. I have no basis for knowing what the rate of that would be.

Q. No, I'm not asking you to quantify. But you understand, Honda Accord is not a unique answer for a security question, right?

A. Right. It is not a unique answer, right.

Q. The pin number you use for your debit card is not a unique number because there's only 10,000 combinations, right?

A. Right. And we could quantify the difference between like 1 in 10,000, and in this case, it would be like almost 1 in 2.

Q.  Right.  So if we were to use something that was actually unique like a Social Security number, wouldn't that be more burdensome than asking someone where they were born because many people don't know their Social Security number by heart?

MS. YUN:  Objection, out of scope.

THE COURT:  Overruled.

You may answer.

THE WITNESS:  Right.  So I think what you are saying is that there's some balance between asking a specific question and a general question.  If you ask a general question, like what country were you born in, and a reasonable answer is United States, that's an easy question to answer but doesn't differentiate people.

And if you ask someone, you know, what were the last two digits on your AGI in your last tax form, it's going to be hard to make that up.

BY MR. LANGHOFER:

Q.  Okay.  We can go through it if we need to, but the Court has already seen it many times, and you have seen it many times.  There are five provisions in the Election Procedures Manual -- which I think you were describing as just the manual during your direct -- that talked about when birthplace could be used; do you remember when we went through those in your deposition?

A.  Yes.

Q.  Okay.  We started with the using birthplace to confirm that a birth certificate for someone whose name has changed is really their birth certificate for the right person.  You did not look at the provision of the EPM when forming the opinions in your report, did you?

A.  No.

Q.  Okay.  We looked at the part about passport pages.  I appreciate that you don't really think it applies, but you also didn't look at the passport portion of the EPM when writing your opinion, right?

A.  Right.  As we talked about in the deposition, I think all these --

Q.  That's enough.  We have got a lot to get through here.

A.  Okay.

Q.  We looked at the portion about deceased voters, making sure the person you're taking off the roll is in fact the one who died; you didn't look at that provision?

A.  Right.

Q.  Okay.  Ballot by mail request forms; you didn't look at that one?

A.  Right.

Q.  And let's see, the last one is confirming provisional ballot signatures; you didn't look at that one either?

A.  Correct.

Q.  Okay.  So let's look at this chart.

MR. LANGHOFER:  We are going to go back to -- I should ask Elaine, is there a numbering convention for demonstratives?

THE COURT:  Pardon?

MR. LANGHOFER:  Is there a numbering convention for demonstratives?  How would we mark this?

THE COURT:  No, I think that first one, the plaintiffs marked it as an exhibit and we admitted it.

MR. LANGHOFER:  The very first one.  I am happy to do that here, but it is really for clarity purposes.

THE COURT:  Whether they are admitted or not admitted, I am going to keep copies of them and --

MR. LANGHOFER:  In that case, Your Honor, I would move into evidence this exhibit.  And I think the next exhibit number is 792.

THE COURT:  792?

MR. LANGHOFER:  972.

THE COURT:  972.  Any objection?

MS. YUN:  No objection, Your Honor.

THE COURT:  972 is admitted.

(Exhibit Number 972 is admitted.)

BY MR. LANGHOFER:

Q.  Mr. Hersh, I am a little bit more visual than Ms. Yun, whose presentation was I think more narrative.  This is the way I think of it in my mind.  So I want to walk through this and make sure we are on the same page.

So we started this off with 4.7 million.  And almost all of the dropoff is at this first level where you are distinguishing between people with a unique name and date of birth combo and people whose name and date of birth combo is not unique.  That's almost everyone?

A.   Correct.

Q.   Okay.  And let's slow down then and think about what is involved exactly in that dropoff.  You said that you were looking for name and date of birth matches, but you weren't looking at nicknames, right?

A.   Correct.

Q.   So let's be more specific.  You were actually looking for exact matches between first names and last names and dates of birth, right?

A.   That's right.

Q.   Okay.  You had -- as I understand it, there were a couple of nuances there like if there was an apostrophe in the last name, a dash or a space, you would ignore the differences between those things; am I getting it right?

A.   That's right.  There's a bunch of characters like hyphens or apostrophes that if there was two records and one had an apostrophe and a hyphenated name and one did not, those would have counted as an exact match.

Q.   Okay.  You ignore middle names?

A.   I ignore middle names, yes.

Q.  Okay.  So was it -- did you use a common list of nicknames as substitutes for each other or did you just ignore any nickname?

A.  No, if someone -- if there was a case of say John Smith and Jonathan Smith who were duplicates but they were actually the same person, I would have counted them as different people. And as I just testified previously, we know roughly how many cases those would be, which is a few hundred.

Q.  We'll get to that.

THE COURT:  So if there were Mike Smiths with the same date of birth as Michael Smith, they aren't in the 2734?

THE WITNESS:  That's right.  But we know how many more they could possibly be, which is like roughly 600 more.  There would be people like that.

BY MR. LANGHOFER:

Q.  So spelling variations, like if Jen with two Ns, Jen with one N, that would be lost in your calculation?

A.  Yeah, not lost.  We just know how many duplicates there are in ID number, so we know how many there could be.  So it's not lost.

Q.  We will get the ID numbers.  Right now we're talking about the first step, the dropoff between 4.7 million and 2700.  So the difference -- at this step, the difference between Jen with two Ns and Jen with one N is lost, right?

A.  Yes.

Q.   You treat them as different people?

A.   Correct.

Q.   You don't use the first three letters of the first name, you use the entire first name as it appears in the file?

A.   Right.

Q.   Okay.  Someone goes by initials like JP or TJ, that would be different from Jonathan Price, for example?

A.   Yes.

Q.   Okay.  What about people who have, you know, in the Latino community, it is common to hyphenate last names like Alvarez-Morales for example.  Sometimes it's in the database as like a middle name and last name.  If it is stored that way as a middle name and last name, you would treat those as different people?

A.   Yeah, again, we are talking about a total of a few hundred records that might be like that, but yeah, that's right.

Q.   Again, we are going to get back to that, the number that this might actually be.  All right.  We had talked in your deposition about Sam Bankman-Fried.  It's a good one because it's in the news, and also there's a lot of variations of that name, right?

A.   There could be.

Q.   Why don't you give us some of the examples of variations of his name?

A.   So, I don't know him personally and what he goes by, but

Samuel -- I assume his name is Samuel, I don't know if that is true or not.  But there could be Sam, Sammy.  And then --

Q.   S?

A.   Just the letter S?  I guess that could be true, yeah, I don't know.  And what else?  Bankman-Fried, I don't know if he sometimes just uses one of those names.  I assume that's a hyphenated from his parents, I don't really know.  So there could be a bunch of last name variants and first name variants.

Q.   It could just be Bankman?

A.   Yeah, I don't know, I guess so, yeah.

Q.   And if every one of those variations appeared in the file at the same time with the same birthday, you would treat them as all the same persons and not duplicates?

A.   Again -- yes.

Q.   Okay.  Did you know -- I am going to show you here what's been already admitted as Exhibit 935.  Have you ever seen this document before, sir?

A.   No.

Q.   This is the actual matching criteria that the elections officials use here in comparing names across databases.  And you are going to see at the top that they don't use the full first name, they treat as a hard match the first three letters of the first name.  So Sam and Samuel would in fact be treated as a duplicate in the government's process, got that?

A.   Okay.

Q.  Okay.  And if you look a little bit lower at the -- here we go.  The soft match criteria, they still use the first three letters of the first name.  You can use the last name.  Date of birth, right?  There's any numbers of variations that would result in a soft match, according to the actual matching procedures of the county?

MS. YUN:  Objection, Your Honor.  The witness has not seen this document, and he did not look at the MVD database.

THE COURT:  The fact that he never saw it before doesn't necessarily mean he won't be able to follow this on cross-examination, wherever it's going.

BY MR. LANGHOFER:

Q.  This is not the process you used?

A.  No, but it's exactly relevant to what we have been talking about.  So I mean, just looking at -- and I am looking at this for the first time.  But if you just scroll back down.  So line 9 here says it would be a match based on driver's license number alone.

And as I said, there's only 1400 duplicates on driver's license in the whole 4.7 million.  And so it's almost never the case except in those 1400 cases, otherwise it doesn't occur of people who are Sam, and Sammy, Samuel Bankman-Fried multiple times, I would have picked up on that by seeing the duplicates on the driver's license number.

Q.  Okay.  So again, it was not the process that you used,

that's I think where we started this question?

A.  What's not the process?

Q.  The process that's here in document 935, the one you are looking at.

A.  Right.  I looked at -- my first step was first name, last name, and birthdate.

Q.  Great.  Did you know that another expert from the plaintiffs in this case actually ran this matching criteria and has a completely different result than you?

MS. YUN:  Objection.  Scope.

THE COURT:  Overruled.

THE WITNESS:  I don't know what the other experts have done.

BY MR. LANGHOFER:

Q.  You did review at least some of Michael McDonald's work in preparing your report, right?

A.  I skimmed it to make sure that it wasn't on the same topic as mine, as I mentioned to you in the deposition, and once I quickly saw that it was on a different topic, I did not read it.

Q.  Okay.  Then let me show you what's been marked for identification as Plaintiffs' Exhibit 331.  We are going to look at page 5, this highlighted scenario.  And he is talking about four different match types here from document 935 we were just talking about.

Do you see how in paragraph E he says if you run the county's own system, you actually get more than 12,000 matches; did you see this when --

THE COURT:  I see that sentence, but it doesn't mean anything to me because I don't know what the four match types are.

MR. LANGHOFER:  Well, I think that -- what I was going to ask him was whether he had considered this approach in forming his opinion.  I am confident on Monday Mr. McDonald will give you the full debrief on this, Your Honor.  Or we can go through it now.

THE COURT:  But I don't know how from this sentence the witness can say whether this is the four match types were different.  It's just a random sentence.

MR. LANGHOFER:  Perhaps this then.

BY MR. LANGHOFER:

Q.  Did you review this report and the conclusions of Michael McDonald in settling on the process you used in your report?

A.  No.

Q.  Okay.  Did you consider that Professor McDonald says if you use this criteria to match, not just within the AVID database, but across to AVID, you would actually have 30 to 40,000 matches?

THE COURT:  You said "this criteria," but there's no this --

MR. LANGHOFER:  The criteria in 935, Your Honor.

THE COURT:  -- that has been defined.

MR. LANGHOFER:  The criteria in Exhibit 935.

THE COURT:  But he hasn't reviewed 935.  Isn't this 935?

MR. LANGHOFER:  No, this is 331.  935, I will pull it up on screen here.  This is the matching criteria from the --

MS. YUN:  Objection, Your Honor.  This expert has not seen this before and he cannot be asked to opine on some other expert's conclusions based on documents that he has never seen.

THE COURT:  Well, that may be so, but let's see if he can or can't.  So the four criteria that you are talking about in connection with the question that you want to ask Dr. Hersh is first name, last name, date of birth, and Arizona driver's license or ID number?

MR. LANGHOFER:  No, Your Honor, it's somewhat different than that.  And I have in fact moved on from there.

MS. YUN:  Your Honor --

THE COURT:  I'm -- there's nothing to object to, I am talking to Mr. Langhofer.

MS. YUN:  Understood. I thought your question was directed at Dr. Hersh.

MR. LANGHOFER:  The Exhibit 331, which is the one with the highlighting on it, I can bring it up if you would like to see it again, Your Honor, where you were uncomfortable with

this because you weren't sure what the four match types are.

The question I asked there was whether he had reviewed

Mr. McDonald's process in reaching his conclusion and forming

his own opinion.  He said no.  And so now I have moved on.

We're done and gone to the next one.

THE COURT:  Terrific.

BY MR. LANGHOFER:

Q.  The next thing I want to ask whether you considered was

Michael McDonald's testimony that if you used these same four

criteria which come from Exhibit 935, and you applied them --

you used them to find duplicates within the Arizona voter file

and the ADOT file, you would actually have 30 to 40,000

duplicates?

THE COURT:  So is your question has he considered

Michael McDonald's testimony about his opinions?

MR. LANGHOFER:  That's --

THE COURT:  Without all the rest of the detail?

Because we could get a yes or no if he --

MR. LANGHOFER:  That's right.

THE COURT:  -- considered his testimony.  And if it is

a no, then.

MR. LANGHOFER:  That's right.  Then we move on.

THE WITNESS:  Yeah, I have not considered Michael

McDonald's testimony.

MR. LANGHOFER:  Okay.  There we go.  And that was

always the point, three no answers.

BY MR. LANGHOFER:

Q.  When you decided to do it your way with only hard matches on full first and last names, why did you believe that would give you a more accurate answer than using the criteria that are actually employed by the County Recorders?

THE COURT:  Well, could you just ask him with respect to just using the first three letters of the first name?

MR. LANGHOFER:  We can do that, Your Honor.

BY MR. LANGHOFER:

Q.  Why did you decide -- why did you believe that using a hard match on the full first name rather than just the first three letters would you lead to a more accurate conclusion?

A.  Yeah, so I tried to be efficient and do something that I thought was the right way to do it.  I have done this many times.  I have matched in other circumstances across databases. I thought that this would be very clear.

And the circumstances that would differentiate this method from another method, like using just the first three letters or accounting for nicknames, it just amounts to a trivial number of people.  And so, because it wouldn't change my conclusions, because it amounts to a trivial number of people, it just didn't seem to me to be necessary.

Q.  The different between 2700 and 40,000 is not trivial, though, agreed?

MS. YUN:  Objection.  Assumes facts not in evidence.

THE COURT:  Sustained.

BY MR. LANGHOFER:

Q.  All right.  So you weren't just doing a hard match on the birthdays -- excuse me, on the names, you were also doing a hard match on the full birthday, right?

A.  Correct.

Q.  So if someone's handwriting a form, and their 9 looks like a 4, for example, so it is entered in wrong, and eventually they register again and it's entered in correctly, same name, birthday is off by one digit, your process would treat it as not a match, right?

A.  If there's two people on the voter registration records, they have the same name but they have a different birthdate from one another on account of a typo, I would treat those as two different people.

Q.  Okay.  So in this very first step when you're going from 4.7 million to 2700, they end up in the left box?

A.  That's right.

Q.  Okay.  Let's think now about the next sort of tier in this waterfall, as we are working our way down.  At this next tier, what you're doing as I understand it is comparing the Social Security -- the SSN4s and the ADOT ID numbers, but only amongst the people who have same name and same birthday as someone else, we are together?

A.   Correct.

Q.   Okay.  And in doing that step, you have already testified you assume that all the SSN4s and ADOT ID numbers were correct?

A.   That's right.

Q.   Okay.  And you are aware though that in the Arizona voter file some unknown percentage of those data fields, SSN4 and ADOT ID numbers are derived really from the name and date of birth, not independently presented by the voter?

A.   So you are saying that some of the people -- like there's a John Smith and if John Smith misentered his birthdate.

Q.   No.  Different.

     THE COURT:  I think -- so I know what the question is.  Are you asking about how when they do the match with the DMV records, the DMV record of the driver's license number and the last four numbers of the Social Security number are put into the voter registration file even if they weren't on the application for registration?

     MR. LANGHOFER:  Yes, Your Honor, that's where we are going.

     THE COURT:  You understand?

     THE WITNESS:  Yes.  So some of the ID numbers are coming -- are imported and some of them are written by the voter themselves.

     THE COURT:  Okay.  So we understand that.

BY MR. LANGHOFER:

Q.   What percentage of the SSN4s are imported versus provided by the voter directly?

A.   The data provided to me didn't distinguish that.

Q.   What about the ADOT ID numbers?

A.   The data provided didn't distinguish that.

Q.   Okay.  So in the second step of the waterfall, you are treating the ADOT ID numbers and the SSNs as an additional -- an independent way of differentiating voters independent from name and date of birth.  But we don't know the extent to which those identifying numbers are actually independent of just the name and date of birth, right?

A.   I am just trying to imagine the scenario.  So you are saying there's a John Smith with a particular birthdate.  And let's suppose that their data about Social Security number or driver's license number is imported, so they didn't fill it out themselves, and so that -- those ID numbers are coming from an external database?

Q.   That's right.

A.   And then I think your question is, do I know whether those numbers are correct or incorrect?

Q.   No.  You are treating the SSN4 and the ADOT ID number as though they are independent of the name and birthday.  But for some unknown percentage of the people that you were looking at, they are not independent at all, they were just derived from

the name and date of birth, right?

A.   Yeah, I think this gets back to the same question and answer.  Which is that I am assuming in the analysis -- and we can talk about whether that is a good or bad assumption -- that the data on the ID number is correct, that in other words, when you are looking at the Arizona voter registration records and you look at someone's last four digits of their Social or driver's license number, that the data is correct.  I mean, if it wasn't correct then you -- if you are saying what if there's a situation where you can't trust any of the ID numbers in the database, we are in like a very different world with this kind of analysis.

Q.   Let me give you an example.  I don't think anyone is saying you can't trust any of the numbers in the database.  We are just talking about whether this is the right method to get to the answer.

Let me give you an example.  You said John Smith.  So let's assume John Smith, born January 1st, 1980 gets a driver's license.

As fate would have it, a different John Smith, born on the same day, doesn't have a driver's license, he goes to register to vote.  They run the HAVA check, ah, look at that, there's another John Smith with the same birthday.  They match it.  And his information -- the second John Smith's information -- excuse me, the first John Smith's information is

imported in as though it is the second John Smith's information because they import the data when they lack it.  Following me so far?

A.  I think I'm following you.

Q.  Okay.  If then the first John Smith goes and registers to vote and he actually provides all of his information or he doesn't, either way they are going to end up with it in the file through the HAVA checks or directly through the form, and you would say, ah, look at this, doppelgangers, it is scenario 1 and scenario 2 with this green box in the middle.  Same person, same name, same date of birth, same ID numbers.

         But the problem is that the ID numbers aren't independent of the name and date of birth, it is just derived from that, right?

A.  Again, the scale here is very important to notice.  So, as I have told you, there are 1400 cases, that's 700 pairs.

Q.  I understand your argument.  And that is something for your lawyer to do later.  I'm asking --

         THE COURT:  Let him finish, please.  Go ahead.

         THE WITNESS:  So there's 700 pairs of people who have the same ID number.  And I had said before that those seem to be duplicates.  And -- so in other words -- and they could have the same ID number and they have different last names because someone changed their name when they got married or they used a nickname.  Or I have shown you that some portion of them, like

half of them, are exactly the same, they are just listed twice, and that's why they have the same driver's license number.

Now, I think the comment you are making is that it could be that those 700 pairs are not all duplicative but maybe they are two different John Smiths who -- where one was erroneously assigned the ID number of another.

And what I am saying is -- and the reason I keep bringing it up is because, you know, we are talking about a maximum of 700 people of all of these kinds of scenarios that you are talking about.  And so yeah, it is possible that instead of it being two of the same person, there could be this mismatch.  Again, I didn't study in this case the relationship between the voter file and the driver's license database.  I assumed for my purposes that the driver's license importing of ID numbers was correct.

Q.  And your analysis does treat it as though it is independent of name and date of birth because it is a separate step in your analysis?

A.  Sure.

Q.  Okay.  So let's look at this 684 box on the left-hand side here, we are talking about these folks.  So these are people -- these are matches that have the same name, same birthday, and then a matching Social or ADOT ID number, right?

A.  Right.

Q.  In your report you were actually somewhat unclear about

whether it was both social and the ADOT ID number matching, but it turns out it was just one of those, right?

A.   Right.   99.6 percent have one or the other or both.   And so if either of them were matching, I treated it as a match.

Q.   And there are actually some though where the Social Security numbers match but the ADOT ID numbers conflict, right?

A.   Yeah, after our deposition, I found nine cases where someone has the same last four digits of the Social as someone else but a different driver's license number.   So, you know, we would have to look into that.   It seems like -- I know in other states that -- some states will issue different ID numbers on driver's license depending if it's like a commercial or -- for a variety of reasons, someone might have more than one driver's license number, and there were nine cases that looked like that.

Q.   Okay.   It's nine pairs, it's not a large number, I think we have spent enough time on it.

So the thing with this box though -- let's just put aside those nine.   Actually those nine you ended up putting in a different box, I think, right?   I think you put those in scenarios 1 and 2; does that sound right?

A.   That's right.   They were in 1 and 2, if -- depending on how we interpret them, they might be in scenario 3.   It is sort of a question of how you interpret whether there's -- some people have two driver's license numbers or whether it was an

accidental importation or an error in the Social Security number. Yeah, but there are essentially nine cases that might be in one of these two bins.

Q. It's nine, I think let's -- we both have other things to do instead of talking about these nine. I do want to talk about these 684 though. What's going on here? So it's -- it seems -- it feels like a duplicate, right? Same name, same birthday, same SSN or ADOT ID, right?

A. Yeah, as I said before, that was a kind of case where I think where someone maybe have moved and they are on the file more than once.

Q. Yeah, so -- but you said they moved because your process didn't analyze the duplication of addresses at all, right?

A. Correct.

Q. Okay. So in order to know whether these are really, what is that, 342 pairs, wouldn't our level of confidence be higher if their birthplaces matched?

A. So I think you are just pointing to the fact that there is this 660 where they are the same birthplace.

Q. You said the same. We are going to come back to that, they are not really the same. But for now I'm saying, if we're looking at just the 684, and we are saying is this 342 pairs or is it just like a, you know, data import error, just like a -- extreme coincidence that 1 in 10,000 people had the same SSN4 and some percentage of that had the same name, some percentage

of that had the same birthday, right?  Is this an extreme coincidence or are they duplicates?  In order to know, you could look at whether they had the same birthplace in theory, right?

A.  Yeah, so you just said a few things that I don't think are quite right.  But I mean, it is not a 1 in 10,000 chance that two people with the same name and birthdate have the same Social Security number for us.

It's like -- I mean, like a grain of sand on the beach kind of rare, right, because we are talking about 1 in 10,000 times, 1 in 30,000 times, 1 in -- excuse me -- like 100,000 times, 300,000, which is how many first names, how many last names, how many dates of birth, and how many Social Security combinations there are, so it's very, very unlikely that that's the situation.

Q.  You --

THE COURT:  I think the question is, when you are trying to decide if this is a duplicate and you see that the -- they are compatible birthplaces, does that raise your confidence level that they are duplicates rather than different people?

THE WITNESS:  So the way I think about it is once I have their same ID numbers, I now assume they are the same person.  And in almost all of the cases, the birthdays are not incompatible, the birthplaces are not incompatible.

But again, because the birthplace -- I mean, sometimes -- you know, in almost I think almost 200,000 cases, the birthplace just says U.S. or, you know -- and millions it just says Arizona.  So it's just not helping us really separate people.

So, in other words, I have confidence -- once I know there's two records of the same name and birthdate and an ID number, now I say okay, they are the same person.  And if -- and almost all of the cases their birthplaces are not incompatible, but if they were incompatible, which is what happens in the 24 cases, I would say well, there has got to be an error in the birthplace data because that's the only way that would explain it.

In other words, the birthplace data is obviously not trustworthy as it's currently collected.  And so I would just not put any weight on it, I would put weight on the ID numbers.

BY MR. LANGHOFER:

Q.  Okay.  So when someone has the same name, date of birth, and what's supposed to be a unique identifying number, and your level of confidence is unaffected by the question of whether their birthplace is also the same -- level of confidence on the question of whether it's a genuine duplicate?

A.  So again, when I am looking at this data, I see -- what you are talking about I think is the difference between scenario 3 and scenario 4.

Q.   That's right.

A.   And so when I look at these 12 pairs in scenario 4 and I see like weird entries like GW, I see basically like anomalies, and so I guess it doesn't strike me that this gives us information that these are different people who happen to have been assigned the same ID numbers.  I mean, that's what it would mean.  Let's suppose there's a case in these 24 -- there is a case.

Q.   Sir, I understand that you have got a point to make.  The question I am asking is, is your level of confidence that these are duplicates lower for scenario 3 than for scenario 4?

A.   No.

Q.   Okay.  Because you disregard the birthplace as long as there's a unique identifying number match?  That's what you said to the judge a moment ago.

A.   Given the quality of the birthplace data, as it is currently collected, which is what I've studied, I would not take that in consideration in making this judgment here.

Q.   Okay.  Let's talk about how you distinguished between whether to put something in scenario 3 or scenario 4, or for that matter, scenario 5 or scenario 6.  Same question.  It's like, are these birthplaces compatible, right?

     What you did was treat blank birthplaces as being compatible with all other birthplaces, right?

A.   In the data that I had about a third of the people don't

have birthplace --

Q. I think this is a simple question. Is that what you did?

A. Yes, they would not be incompatible, right.

Q. Okay. And so isn't the standard methodology to treat a null field as incomparable, like you can't decide whether the furniture in an empty room is compatible with a rug in the next room, there's nothing to compare, right?

A. I guess that's one way to do it. I was very transparent about how I did the analysis in the report. I said that if they are not incompatible, then I treated them in scenario 3.

So if one person wrote U.S. and one person wrote Arizona, I would say those are not incompatible, so they would be in scenario 3. If one person wrote CA and one person wrote AZ, I would say those are incompatible, so they would be in scenario 4.

Q. Okay. And if someone wrote absolutely nothing, and the next person wrote Azerbaijan, you would say it's compatible?

A. They are not incompatible, right, yeah.

Q. Okay. So, I guess, let's think about the decisions that are made on the methodology. First, on all three levels, right, when we are going from the top level 4.7 million to the 2700, you choose to use only exact matches on full first names, last names, and DOBs. That has the effect of -- doing it that way instead of the way that we looked at in Exhibit 935, that has the effect of keeping voters out of scenarios 3, 4, 5, and

6, doesn't it?

THE COURT:  Do I understand you're asking wouldn't there be more people -- more records in 3, 4, 5, and 6, if you had only used the first three letters of the first name instead of the whole name?

MR. LANGHOFER:  That's close to what I'm asking.  I think it works for our purposes, Your Honor.

THE WITNESS:  Yeah, as I said, I think there could be up to a few hundred more people in scenario 3, 4, 5, or 6 if I did a name variant model.

BY MR. LANGHOFER:

Q.  You say a few hundred.  Why do you say a few hundreds?

A.  Because again, those people, if they were -- those are people who would be duplicative records of the same person. What's distinguishing scenarios 1 and 2 from all of the other scenarios is scenarios 1 and 2 are the doppelgangers, right?

And so there might be -- the kind of scenario you are talking about is something different than doppelgangers.  It's some people who -- it's two people who are the same person, but they have duplicative records on the voter file on account of something like a nickname or a surname shift.  And so they would not be in scenario 1 and 2 because they're the same person listed twice, they would be in another scenario.

And what I said is that we can use the number of duplicates on driver's license numbers to give us an upper

bound of how many people could possibly fall into that category.

Q. That upper bound doesn't work though because you are assuming that everyone has a driver's license number, and that's just not the case in the data, is it?

THE COURT: I thought he said that 99 point some percentage had --

MR. LANGHOFER: Either.

THE COURT: 99.6 percent had a driver's license or state ID?

THE WITNESS: Have one or the other. Yeah, I think -- it's in the report. I think it's 98.5 who have a driver's license number. So the 1400 is out of the 98.5 percent. So that's where that number is coming from.

BY MR. LANGHOFER:

Q. If those numbers had all been taken from the voter registration files, as opposed to just someone in the system with the same name and date of birth -- I understand your point.

All right. The question we were getting at was, if you had not used an exact match requirement, on the first level, you would have more people in scenarios 3 through 6, I think we have agreed on that by now, right?

A. Yes.

Q. Okay. If the next level -- and we are going from 2700 to

the next three boxes there, in the middle, you had not treated the unique identifying numbers SSN4 and ADOT ID numbers as independent of name and date of birth but just, you know, derivative of them --

MS. YUN:  Objection, asked and answered.

THE COURT:  He hasn't finished the question, so I really don't know what it is going to be.

BY MR. LANGHOFER:

Q.  If you had not treated the information derived from name and date of birth from ADOT as independent of name and date of birth, you again would have -- well, you don't know how many more people would end up in scenarios 3 through 6?

A.  Yeah, I mean, I think what you are saying is that if we don't trust the ID numbers coming from ADOT, then we don't know -- then -- right, the analysis assumes that that data is accurate, right.

Q.  Okay.  And at the final level, if you weren't assuming that everything in a blank room is compatible with everything in another blank room, you would have more people in scenarios 4 and 6 than you did under your methodology, right?

A.  So, I think what you are saying is, there were some people who have clear incompatible birthplaces and some people have clear compatible ones, and then there are some people who have like one of the records of John Smith says Arizona and one is blank.  I treated those as not incompatible.

Q.   Correct.

A.   And if you wanted to switch those to -- if you wanted to create a new category that says neither compatible nor incompatible and we would need more data, then we would need more data.

Q.   Okay.  But you chose to call them compatible and that had the effect of moving people from scenarios -- well, making sure they didn't end up in scenarios 4 and 6, right?

A.   Yeah, in fact, I think I, in my report, enumerated every one of the cases in scenario 5.  So I think -- I am pretty sure -- you can just look right at my report and see how many of them would be in the category that you are describing.

Q.   Can you identify any methodological choices like the ones we have been talking about that you made that had the effect of increasing the numbers that flow through this chart into the bottom row?

A.   I think what you are saying is like something which we already talked about, like, you know, I standardized with respect to hyphens as an example or apostrophes, things like that.  That's an example.

Q.   Okay.  Is that it?

A.   Off the top of my head, that's an example.  I would have to think more about it for other examples.

Q.   All right.  Standardization of data, if Arizona were to implement the statutes, you do agree they could standardize the

intake of data in this field, right?

A.   As I wrote in my report, when I was writing my report there was no evidence that Arizona was in the process of such standardization.  If they standardized, it would have to -- we would have to learn how they were standardizing.

Q.   Okay.  But you agree it's possible like the State Department does it, you write?

A.   The State Department does it in a standardized way.  But you could do it in a standardized way that makes it hard to assess, for example, treating CA as both an abbreviation for Canada and California.

Q.   And there are some of the data that already exists in the system that I think the judge mentioned, zip codes.  There are some things you could do that would take an unambiguous statement of location that is not a state or a country, and sort of convert it to, at least the unambiguous ones, to a standardized answer like 85003, this zip code could be transformed to Arizona, if -- you know, assuming there's a proper process, notice, comment, review, et cetera?

        THE COURT:  Are you suggesting somebody could put their zip code for their place of birth?

        MR. LANGHOFER:  Oh yes, Your Honor, I'm afraid that's true.  I don't know how they know the hospital's zip code, but maybe they were born at home.

        THE COURT:  How about if people are so old that they

didn't have zip codes?  They used to have postal codes that were like two digits.

MR. LANGHOFER:  Wow.

THE COURT:  Yeah.

BY MR. LANGHOFER:

Q.  Do you have any two digit numbers?

A.  There are two digit -- I don't know.

Q.  Anyway, you do agree there's some sort of retroactive sort of disambiguation or standardization of data that could be done, although there's obviously problems in that process that you would have to work out?

A.  Yeah, there are problems that would affect like hundreds and hundreds and hundreds of records where there are ambiguities right now.

Q.  Okay.  You said that, you know, if folks were allowed to just answer United States as their birthplace or U.S., it wouldn't be very useful as a differentiating factor.  If the United States generically were not permissible, if you had to choose one of the States, that would help us address this concern of yours, would it not?

A.  Again, I have to learn.  So what you would do to the retroactive ones, because there's again almost 200,000 people, it's like the third most common entry is U.S.  So you would have to know what to do with those people who have already put U.S. in.

Q.   Right.  No, I am not talking about retroactive anymore, I am just talking about you could, going forward, if this is implemented, require people to state a specific state, not generally the United States.  And if that were done, it would help address your concerns, would it not?

A.   Not really.  Again, even if you imagine that the United States wasn't a permissible entry, and so you collected data similar to how passport data is collected, you would still have a very persistent problem which is that for the voter registration system of Arizona, a huge percent of the public is born in Arizona.  And so on cases where you most want to differentiate between two people, you are left with the fact that a lot of people are born in the same place.

Q.   You said a huge percentage.  It's about two-thirds, right?  Excuse me, about one-third born in Arizona in the entire file?

A.   I don't know.  I didn't check.

Q.   Okay.  Did you do a -- did you do an analysis of the relative confidentiality or the extent to which birthdate is publicly known relative to say -- excuse me.

Did you do an analysis to the extent to which birthplace is commonly known relative to other possible security questions like your birthday or your mother's maiden name?

A.   Commonly known to the --

Q.   To someone who is not the proposed voter?

A.  I see.  I did not do an analysis like that.

Q.  Okay.  And you are aware that other sorts of security questions the answers to those can just be bought online through public records requests, correct?

A.  Sorry.  Can you be more specific?

Q.  Yeah, I think you have previously testified that you could use birthday as a security question, but also that you can buy files with all of the birthdates in a voter registration record, for example, from other states, right?

A.  Yes, in many states birthdate is public record, right.

Q.  Okay.  Did you do a comparison about how easy it is to find someone else's birthplace relative to their birthdate?

A.  I did not do that analysis.

Q.  Okay.  How about mother's maiden name?

A.  I did not do that analysis.

Q.  Father's middle name?

A.  No.

Q.  Okay.  Did you look at how burdensome it would be to get people to provide truly unique numbers like Social Security numbers relative to their birthplace?

A.  I did not analyze that, no.

Q.  Okay.  Did you think about the security concerns it would be if we were collecting from every voter a truly unique number like their SSN as opposed to just their birthplace?

A.  What's the question?

Q.   You know, I will say it another way.  I don't like that my data exists on like Facebook servers, right?  I don't like people knowing all these things about me.  Did you do any analysis of what added risks there would be if we had in one file, the Secretary of State's office, all of the names, dates of birth, those are necessary fields, addresses, that's a necessary field, and now Social Security numbers and signatures for all of the voters in the State?  It seems like one step away from like massive credit card fraud?

A.   I don't understand the question.

Q.   You appreciate that if one agency were to gather all the information about you, including a truly unique number like your Social Security number, the risks of that data being misused are greater than if they only have some of it, right?

A.   I suppose.  That seems like a very general question that -- I don't know how to answer that question.

Q.   Okay.  And you haven't thought about whether asking for a birthplace, which is easily given, you don't have to memorize it, and also not that useful for purposes of stealing someone's identity, you didn't do an analysis whether that was striking the correct balance?

A.   Well, what I did an analysis about, you know, where you have some trouble using that data because it doesn't differentiate people or because people are born in countries that don't exist anymore, you know, there's all sorts of

issues. So I answered -- it sounds like part of the question that you are talking about, but not exactly in the way that you were just talking about it right now.

MR. LANGHOFER: Your Honor, I think that's all the questions we have -- or I have at least. Thank you.

THE COURT: I think we will take our afternoon break. We will reconvene in 15 minutes.

(Recess taken at 2:40 p.m.; resumes at 2:55 p.m.)

THE COURT: So I know that you are all amazed to learn that the Zip Code has not always existed. July 1, 1963. So let's not disenfranchise our 60-and-older voters, because we vote at very high percentages.

Mr. Whitaker, did you have any questions for this witness?

MR. WHITAKER: I did, Your Honor.

CROSS-EXAMINATION

BY MR. WHITAKER:

Q. Good afternoon, Professor Hersh.

A. Good afternoon.

Q. I'd like to ask you an overall question about your reliance on percentages, and I will ask it in the context of the security question situation you brought up on direct.

Okay, so imagine the county recorders need to verify signatures on the ballots they get in the mail. So they call the voter, and they begin the call by asking a security

question, to make sure the person on the other end is the person who matches their rolls.  Okay, with me so far?

A.  I think so.

Q.  Suppose that they have a two-question system, the first question is always, what's your mother's maiden name?  Okay. And the vast majority of voters answer this correctly, over 99 percent they answer it correctly.

But in some cases, the voters -- maybe they don't know, maybe they give an answer that doesn't match what's on the file.  So the county recorders have a process where they ask a second question, which is, what's your state or country of birth?

In that process, would you agree that the second question is useful, even though it is not necessary in the vast majority of cases?

MS. YUN:  Objection, Your Honor, I just want the record to be clear that this is a hypothetical question that is being asked.

THE COURT:  I think that's not an objection since it has no evidentiary basis.

Please answer the question.

THE WITNESS:  Okay, so if -- I'm just trying to consider this hypothetical.  Just to be clear, I did not study this particular scenario, but I am just taking your hypothetical.

So a voter calls, and they say, I can't remember my mother's maiden name.  That's one of the scenarios -- that's one of the options you said, they didn't know it.

BY MR. WHITAKER:

Q.  Sure.

A.  And then they say, okay, well what country and state were you born in?  They say the United States.

Q.  But they have to be more specific than United States. Let's imagine that they have to --

THE COURT:  So you are changing the hypothetical?

MR. WHITAKER:  I am.

THE COURT:  From state or country to something --

MR. WHITAKER:  Yes.

BY MR. WHITAKER:

Q.  Let's pretend that it's like what exists on the ServiceArizona website, where you have to list a specific state or a specific country.  Is that a useful question even though it is not necessary in the vast majority of cases?

A.  So again, it's hard to answer the question because I have to assume a whole bunch of other stuff.  So for example, there are 200,000 Arizonans who just have their place of residence listed -- their place of birth listed as United States.  So I think you are imagining a situation where the state's data is accurate to the state level, and then they don't remember the mother's maiden name and they do know what

state they are in.

I mean, I guess, yeah, it's possible for me to imagine a kind of an odd scenario like the one you're describing in which another piece of information could be useful. Again, as I testified before, if I were to come up with 10 security questions, this would not be on the list.

And that's why when you, you know, verify your identity at a bank presumably, or something like that, they don't ask what country you are born in, as far as I can tell, because there's a lot more pieces of information that we have that differentiate between people.

And so, again, just trying to encounter your hypothetical here, it seems to me that this scenario would almost never occur. And if it did, I wouldn't want this piece of information as my method of verification.

Q. Why did you use the bank as an analogy and not the United States State Department passport system?

THE COURT: Do you think they use that as a security question?

MR. WHITAKER: No.

THE COURT: Or are you going to change the hypothetical again?

MR. WHITAKER: No, no, no.

BY MR. WHITAKER:

Q. I notice that you said that banks don't ask for it. I also

noticed in your report you cite the federal government's State Department's policy on place of birth for passports, right?

A.  I do mention that in the report, yeah

Q.  And the federal government does require place of birth to be given on the passport -- for a passport application, right?

A.  It is a required field for passports, yes.

Q.  Okay.  So let's assume that the Court accepts all of your assumptions.  Let's assume that the Court rejects everything that my colleague Mr. Langhofer has said and arrives at the number that you've identified.

        And can we pull up Mr. Langhofer's demonstrative?  I did not prepare a demonstrative.

BY MR. WHITAKER:

Q.  So I am looking at scenario 4 there.  Even under all of your assumptions, there are 24 cases where there is the same name, the same date of birth, and the same either last four of Social or driver's license number, and there's no conflict between those.  And the birthplaces between the two records are not the same, right?

A.  Correct.

Q.  Okay.  Doesn't the place of birth add value in those cases?

A.  No, actually, I think quite the opposite.  I think that because, as I've said, the birthplace data is not collected very well.  You know, if I -- again, one of these 12 --

Q.  Well --

THE COURT:  Let him answer the question, please.

THE WITNESS:  One of these 12 pairs is someone who has corresponding information and one place of birth says Chinle and one says New Mexico.  Chinle we know is an Arizona city in Indian territory.

Now, if I said let's make a big -- I am not an election administrator, as I said, but we have to figure out what's going on here, and, you know, that might use government resources and maybe take time from this person.

And it seems to me just like an erroneous piece of data that because maybe there is confusion about where the person is born, or similarly, as I mention in the report, there are places in Arizona near Nevada where the closest hospital might be in Nevada.

And so someone might be although they grew up in Arizona -- the house that they were born in was in Arizona but the hospital is in Nevada, and they have some ambiguity about how to put this -- so these are the kinds of weird scenarios that emerge, again in 12 cases in the voter file.

And so I guess my intuition is that the date is not helpful.  It's actually just causing an issue in those kind of cases.

BY MR. WHITAKER:

Q.  Let's be really clear, Professor Hersh, in eight of the 12 cases you agree that the different birthplaces are

unambiguously different states, right?

A. Right. Just like the situation I told you, someone was born in the hospital in one state but was -- but their home was in this state. You know, we don't know the exact circumstances, but that would be the kind of thing we're talking about here.

Q. Can you list for me the different states in those eight examples?

THE COURT: He might be able to, but I don't really want to hear them.

MR. WHITAKER: Okay.

BY MR. WHITAKER:

Q. Is one of them Arizona and California?

A. I think so. You'd have to give me my report. I mean, they're all listed in my report.

Q. I am not sure that's -- I know the Arizona-California example is listed?

A. No, I'm almost certain I've enumerated all the cases.

Q. All right. In the Arizona-California example, you don't think that that provides value? You don't think that that's an indication that those may be different people?

A. So what you'd have to believe is that these two people with the same name and birthdate and corresponding identification numbers are truly different people, and maybe one of them had their ID number data was exported incorrectly and that's why --

and the birthplace data is correct.  So that's one possibility.

It's a possibility.

My intuition, which I discuss in the report, is that given how many inaccuracies there are on the place of birth data, I think it's more likely to be the opposite.  But we would have to explore.  We'd have to look into these 12 cases if we want to use resources to do so and figure out well, why has this happened?

Q.  I just want there to be no confusion.  The SSN four numbers aren't the full Social Security number that would clearly distinguish someone, they're just the last four digits of the Social Security.

THE COURT:  Okay.  Let's move to things that we don't already know, Mr. Whitaker.

BY MR. WHITAKER:

Q.  We've heard testimony in this trial, I believe, that when a paper registration form is given to a county recorder, they have to manually input the information into the voter system. Were you aware of that when you wrote your report?

A.  I think in my footnote where I discuss the use case, looking someone up, that would reflect that experience.

Q.  Okay.  Would you agree that in that process, errors could occur with someone's name?

A.  Sure.  There are typos that could emerge, yeah.

Q.  You found over 69,000 instances where the driver's license

or identification number was blank, right?

A.   Off the top of my head I can't remember, but it's 1.6 percent of 4.7 million, so something like that.

Q.   All right.  You found over 47,000 instances where the last four of the Social was blank?

A.   Again, I don't remember the details, but -- I mean, I know it's something like one percent.  So if you did the calculation and you are stipulating to that -- I am not sure.

Q.   You found about 18,000 instances where both the driver's license number and the last four of the Social were blank?

A.   Okay.  That's four percent of 4.7 million.

Q.   All right.  Mr. Langhofer raised a question with you about what on his demonstrative is scenario 3, the compatible birthplaces.  I understand that those include situations where either there's no birthplace in either spot, or one spot, one form has a specific birthplace and the other form doesn't have anything in birthplace; is that right?

A.   Scenario 3 would mean they're not incompatible in the pair, right?

Q.   Did you list in your report how many of those scenarios exist where you say they're not incompatible because of a blank in the birthplace?

A.   For scenario 5 I did that.  For scenario 3 I did not do that in the report.

Q.   Could you tell us now how many of those 660 cases are not

incompatible because they have a blank?

THE COURT:  I think he just said he didn't do that in his report.

MR. WHITAKER:  Okay.  All right.

I think that's all the questions I have.  Thank you.

THE COURT:  Thank you.

Any other cross-examination?

MS. PORTER:  No, Your Honor.

THE COURT:  Redirect, Ms. Yun?

MS. YUN:  Thank you, Your Honor.

REDIRECT EXAMINATION

BY MS. YUN:

Q.  Dr. Hersh, you discussed some uses of birthplace in the Elections Procedures Manual with Mr. Langhofer; do you recall that?

A.  Yes.

Q.  When you discuss those use cases of birthplace in the Elections Procedures Manual that you did not consider in your report but during your deposition it was brought up, did those use cases change your opinion about the usefulness of birthplace?

A.  No, they all seem to fall into one or two categories where it's either an exact analogy to the analysis I did.  So we are either dealing with -- you know, we're trying to essentially find/distinguish the doppelgangers from the duplicates or we

are presented with a problem which I talked a lot about, which is that when push comes to shove, the fact that two people were born in the same state or the same country doesn't differentiate people when you most want it to. And so all of the scenarios we talked about that I didn't focus my report on but we talked about in deposition fit into one of those two categories.

Q. You spoke about first name variations with Mr. Langhofer. The fact that you could have run your analysis with just three letters of the first name instead of the whole first name; do you recall that?

A. Yes.

Q. Would imploring that different methodology, just using the first three letters, would that have changed your conclusion here?

A. No. It would -- there would be a tiny additional number of people who look like they could be duplicates; I mean, really tiny, couple of hundred. And then we would use the ID numbers and say, okay, these are duplicates or not. So it would be exactly the same analysis. And we're just talking about a few hundred records moving around.

MS. YUN: I have no further questions.

THE COURT: May this witness be excused?

MS. YUN: Actually, one moment, Your Honor. We'd like to move in Plaintiffs' Demonstrative Number 2 as -- into

evidence.  I believe the next number is 595.

THE COURT:  Without objection?

MR. LANGHOFER:  Yes.

THE COURT:  595 is admitted.

(Exhibit Number 595 is admitted.)

MS. YUN:  Thank you, Your Honor.

THE COURT:  May this witness be excused?

MS. YUN:  Yes, Your Honor.

THE COURT:  Is there any objection?

MR. LANGHOFER:  I had an objection to his last answer, Your Honor.  It was --

THE COURT:  It's a little late.

MR. LANGHOFER:  Because the answer was nonresponsive.  You can't object to --

THE COURT:  It's still too late.  It's like after we discussed an exhibit and everything.

Thank you.  Dr. Hersh, you may step down and you're excused as a witness.

Plaintiffs may call their next witness.

MS. CERVANTES:  Good afternoon, Your Honor.  Erica Cervantes from the Mexican America Legal Defense and Educational Fund representing Promise Arizona plaintiffs.

Your Honor, plaintiffs call up Lydia Camarillo to the stand.

THE CLERK:  Can you please come up here?  Stand here

and raise your right hand for me.

**LYDIA CAMARILLO, PLAINTIFF'S WITNESS, SWORN**

THE CLERK:  Please state your name, spell your last name for the record.

THE WITNESS:  Lydia Camarillo, L-Y-D-I-A, Camarillo, C-A-M-A-R-I-L-L-O.

THE CLERK:  Thank you very much.  You can have a seat up there.

DIRECT EXAMINATION

BY MS. CERVANTES:

Q.  Hi, Ms. Camarillo.  Thank you for taking the time to speak to us today.

A.  Thank you.

Q.  Ms. Camarillo, what do you do for a living?

A.  I am the president of Southwest Voter Registration Education Project.  And moving forward, I will likely call it SVREP or Southwest Voter.

Q.  And Ms. Camarillo, when did you first join SVREP?

THE COURT:  Okay, I really can't understand what that is, so could you call it by its name?

MS. CERVANTES:  Oh, I'm so sorry.

THE WITNESS:  Southwest Voter Registration Education Project.  It's very long.

BY MS. CERVANTES:

Q.  Yes.  And how do people normally refer to Southwest Voter

Education Project?

A.   Southwest Voter Registration Project is referred to as SVRP or SVREP, the initials.

MS. CERVANTES:  I think we have cleared the confusion.

BY MS. CERVANTES:

Q.   So how long have you been the president of SVREP?

A.   I became president on December 13th, 2018, after the untimely passing of the former president Antonio Gonzales.

Q.   What are your duties as the president of SVREP?

A.   As president of Southwest Voter Registration Education Project, I have similar duties that any leader of a nonprofit does; raising money, make sure we reach the budget, relationship with the Board of Directors, developing a strategy on the work you are going to do this year, next year, and other years, training staff.

Q.   Okay.  And Ms. Camarillo, have you taken on any other roles during your time in SVREP?

A.   Yes.  From December of 1995 to September of 1999, I was the executive director.  And then from 2003 to 2018, just before I became president, I was the vice president of Southwest Voter Registration Education Project.

Q.   How long were you vice president of SVREP?

A.   From '03 to December 12th, 2018.

Q.   And what were your duties as vice president?

A.   My duties as vice president are similar to those as

president, except that as president, the buck stops here.
Otherwise, I worked on developing strategies for registering
voters, turning out voters, working with community leaders,
training leaders, and of course fundraising.

Q.   And how long were you the executive director for SVREP?

A.   From December 1994 to September 1999.

Q.   What were your duties there?

A.   Same as vice president, except my title was executive
director.

Q.   So now I'd like to get into what -- regarding what is
SVREP.  So Ms. Camarillo, can you describe to the Court what is
SVREP?

A.   SVREP is a national nonprofit that works to empower Latinos
through their vote.

Q.   And when was SVREP founded?

A.   SVREP was started and founded in San Antonio, Texas in 1974
by the late William C. Velasquez.

Q.   And can you describe to the Court some of SVREP's history
with the state of Arizona?

A.   Southwest Voter has a long history working in Arizona.  It
was -- Southwest Voter was founded in 1974, and effective
January of 1975, SVRP began working to register Latino voters
in Latino neighborhoods in Arizona, as well as conducting
trainings for organizers and candidates wanting to run for
local offices, nonpartisan offices.

And of course we also engaged in changing systems that were at large to single-member districts in other states, including Arizona.

Q.  Ms. Camarillo, what is the mission of SVREP?

A.  SVREP's mission is to work with community leaders and communities that are Latino to empower them through their vote.

Q.  And in what ways does SVREP accomplish that mission?

A.  We accomplish the mission by conducting voter registration projects, voter education efforts, as well as turning out the vote and training organizers and candidates running for nonpartisan offices.

Q.  How does SVREP receive its funding?

A.  SVREP is a 501(c)(3) so our funding comes from donations.

Q.  And Ms. Camarillo, how are the donations allocated within the nonprofit?

A.  The donations are allocated according to the work we are going to do that year, and Arizona is an important state for us, so we always make sure we have the resources and the time to do the work that we need to do in Arizona.

Q.  For this year, Ms. Camarillo, how many employees does SVREP have?

A.  At this point we have five full-time employees, including myself, and five part-time employees.

THE COURT:  Is that nationally or in Arizona?

THE WITNESS:  They're stationed in Los Angeles and San

Antonio, and we work in Arizona.

THE COURT:  Do you have any employees here?

THE WITNESS:  Not at this time, but we have had.

BY MS. CERVANTES:

Q.  How are these employees paid?

A.  They're paid through the donations that we raise.

Q.  And what do the employees of SVREP work on?

A.  All of the employees, with the exemption of myself and the director of operations, work on voter registration, voter education, Get Out The Vote for Latinos, as well as the trainings.

Q.  And does SVREP have volunteers?

A.  Yes.

Q.  How many volunteers does SVREP have this year?

A.  25 this year.

Q.  And what do SVREP volunteers work on?

A.  They work on the similar activities depending on the cycle with paid staff, voter registration, voter education, turnout, and they help in the trainings.

Q.  Ms. Camarillo, do you anticipate that the number of SVREP employees and volunteers will increase next year?

A.  Yes.  We expect that next year our staff -- full-time staff and part-time staff and volunteers will increase.

Q.  Why is that?

A.  Because it is a presidential cycle, and we are -- our

cycles are sort of work -- in presidential we have more work, more activities.  In a midterm we have less, and in off-cycles it is even less.

So for instance, in 2022, we had 45 full-time staff, including myself, and 200 volunteers.

Q.  And where is SVREP's office physically located?

A.  In San Antonio, Texas.

Q.  And has SVREP worked outside of San Antonio, Texas?

A.  Since we opened our doors in 1974, quickly we organized ourselves where we needed to work in at least five states, and Arizona has been one of those states since 1975 that we do the work, in addition to other states in the Southwest.

Q.  And which elections is SVREP usually involved in?

A.  We work on all of the elections every year to make sure that Latinos have a voice and participate in America's democracy through their vote.

Q.  Thank you, Ms. Camarillo.  So I just want to get a little bit more into SVREPs work in voter registration.  So when it comes to your nonprofits voter registration efforts, what is SVREP's targeted demographic?

A.  Latino, and we work in Latino neighborhoods.

Q.  How many Latino voters has SVREP registered since its founding?

A.  Since we opened our doors, Southwest Voter has registered 3.2 million Latino voters, and we believe that by the end of --

by January, 2024 we will be at 3.3 million registered Latino voters.

Q.  And is SVREP registering Latino voters in Arizona this year?

A.  Yes, we are registering high school students and community college students.  We have identified 250 high schools and 25 community colleges in Arizona for voter registration.

Q.  Okay.  And with that effort, can you describe a little bit more on how you engage the 25 community colleges and 250?

A.  So before the pandemic, we organized what are called community-based projects, and it means that we would be meeting with community leaders, and they would become volunteers.

And then we would hire individuals from the communities we work with, whether it be Arizona or Flagstaff or wherever we worked within Arizona or the other states that we work with to do the voter registration.

Because of the pandemic, more and more high schools and community colleges, and even the churches, when we do voter registration at the churches, there use to be Masses where the church at the 12:00 Mass might be 200 people; now it is only 10 people.

And the schools and the community colleges basically closed their doors because of the pandemic.  And so we had to think about how do we continue to fulfill our mission, which is to expand and register Latino voters, since we decided one of

the best ways to do it is to contact high schools and community colleges and register them online with the permission of the principal, and usually it's a third party, someone who we work with, and we register the voters for the high schools.

At the community college, we have -- we ask permission of the community colleges, and then we go discipline by discipline.  That is to say, the English department, we would talk to all the people that are the principal -- I'm sorry, the instructors, professors of that discipline for permission to let us register online or let us come in and do it in person.

Q.  And just to clarify, you are trying to register the students that are in those schools?

A.  That's correct.  Yes, thank you.

Q.  And apart from engaging with the community colleges and high schools in Arizona, how else does SVREP register voters in the state?

A.  So before the pandemic we were --

THE COURT:  I was hoping we could talk about something more current.  What is your -- what have been your plans since the pandemic ended?

THE WITNESS:  Well, we are still registering the voters in those 250 high schools and community colleges.  At this point in time, we are contacting the community colleges.

THE COURT:  So all of your current voter registration efforts in Arizona are in the high schools and the community

colleges?

THE WITNESS:  At this point, yes, ma'am.

THE COURT:  Thank you.

THE WITNESS:  Or I guess I should say "Your Honor."
Yes, Your Honor.

BY MS. CERVANTES:

Q.  Sorry, let me just repeat the question then.  You were saying how else -- apart from engaging with these schools, how else do you -- does SVREP register voters in Arizona?

A.  We register voters what we call the community-based projects, that includes volunteers and community leaders.  We do the -- conduct the voter registration door to door or through sites, what we call sites, which is the churches, the football games, places where Latinos gather.

THE COURT:  Are you doing that in Arizona?

THE WITNESS:  We have done it.  We are not doing it this year.

THE COURT:  You are not doing it this year?

THE WITNESS:  No, but we intend to do it next year.

BY MS. CERVANTES:

Q.  Yes, I was actually going to go into that.  So you just mentioned, Ms. Camarillo, that you intend to be involved in Arizona next year.  How will SVREPs -- how --

THE COURT:  What are your plans for voter registration in Arizona in 2024?

THE WITNESS: Our plans are to register voters in Arizona by conducting the three strategies: The high schools, the community colleges online; the door-to-door; and the site voter registrations.

And more than likely we will identify several counties in addition to Pima and Mariposa, which is what we have done in the past.

BY MS. CERVANTES:

Q. Ms. Camarillo, for this year, how many Latino voters has SVREP registered?

A. In Arizona?

Q. Yes.

A. 5,000.

Q. What about last year?

A. It was -- I believe it was 10,000.

Q. What about in 2020?

A. In 2020 it was 25,000.

Q. Ms. Camarillo, earlier you mentioned that SVREP engages in voter turnout. How long has SVREP helped turn out the vote in Arizona?

A. Since 1975.

Q. Can you describe all the ways in which SVREP has helped turn out the vote in Arizona?

THE COURT: I don't want to go back to 1974. I really want to know what they are doing currently and what their plans

are.

MS. CERVANTES:  Okay.  Then I will move on.

BY MS. CERVANTES:

Q.   Does SVREP plan to do any turnout in Arizona next year?

A.   Yes.

Q.   And how do you anticipate that those efforts will look like next year?

A.   We will be using the strategies that we've been doing for 49 years, which is door-to-door, phone banking, and we usually contact both the voters through the door-to-door and the phone banking, complementing.  So we contact them three to four times with live contacts, and lots and lots of messages, whether it is by the door, through the door, or on the phone.

And then we complement that with emails and texting, and then of course we also use social media strategies.

Q.   You mentioned that SVREP engages in voter education. Has -- what type of voter education has SVREP provided Arizona in the past?

A.   We have provided education that is either with the -- directly with the voter by explaining to the voters what the rules are for Arizona to register to vote or to turn out to vote.

What do they need when they show up to vote, as well as where do they go to vote, and what's at stake for them to vote, and we do this through the door-to-door, through the

phone bank, and then through the emails.

With the emails, we are able to do a series of, I would say, pieces, where you walk them through different information so there are as informed as possible.

Q.  And do you also plan to do voter education in Arizona next year?

A.  Absolutely.  Voter education is a key component of what we do.  We believe that when a citizen is informed and educated about the elections and its impact and how it affects their neighborhoods, it is more likely that they will participate and vote.

Q.  And how do you think SVREP's voter education plans will look like for next year in Arizona?

A.  They will look very similar, but understanding the different communities, we might do it in Spanish.  We might do it in English.  We might do it bilingually.

And of course we are nonpartisan so it's a nonpartisan voter education effort.  And more importantly, it's to voters who are registered to vote, voters who are citizens, voters who are ready to turn out to vote in the elections.

Q.  Ms. Camarillo, earlier you testified that SVREP works on all elections.  Does that include Arizona's state elections?

A.  Yes.

Q.  And does SVREP work on Arizona local elections in odd-numbered years?

A.   Yes.

Q.   Okay.  Thank you, Ms. Camarillo.  So I am actually going to shift gears now towards why we are here in the first place.

So are you familiar with HB 2243?

A.   I am familiar with HB 2243.

Q.   Ms. Camarillo, what's your understanding of HB 2243?

A.   It's my understanding that if enacted, HB 2243 would be purging Latino voters and other voters that are -- were targeted or flagged as a result of databases not matching their name or some information.  And if someone, which I call right now an accuser, an informant, somebody who claims that the person who they are saying is not a voter because -- they shouldn't be a voter because they are not citizens is part of that process.

I also understand that it will take 35 days for each voter to demonstrate that in fact they're citizens and provide proof of citizenship in order to vote.  I also understand that if this law is enacted, they will be purged if they don't do that.

Q.   Now, for the purposes of this question, let's assume that HB 2243 is implemented.  How do you think -- if implemented, how will the challenged -- how do you think the Challenged Laws will affect Latino voters in Arizona?

MR. LANGHOFER:  Speculation.

THE COURT:  Sustained.

BY MS. CERVANTES:

Q.  Based on your experience, how do you think the Challenged Laws -- the Challenged Law will affect Latino voters in Arizona?

MR. LANGHOFER:  Same objection.

THE COURT:  Sustained.

MS. CERVANTES:  I will move on.

BY MS. CERVANTES:

Q.  Ms. Camarillo, if HB 2243 was implemented next year, let's assume for this hypothetical, how would SVREP respond if they were informed that Arizona voters are receiving notices stating that their voter registration will be canceled in 35 days if they don't provide documentary proof of citizenship?

A.  Southwest Voter Registration Education Project will have an obligation to work with the voters who received a notice, help them understand that they only have a limited time to prove that they're citizens, work with them so that they in fact prove that they are citizens so they are not purged from the voting polls.

But it would have a chilling effect on current voters, which at this point, by 2024 we believe there will be about a million Latino voters who will be  -- could be impacted in a negative way that sends a chilling effect for years to come.

Q.  Ms. Camarillo, what's your understanding of HB 2243 on what happens to an Arizona voter if they don't provide documentary

proof of citizenship within 35 days?

MR. LANGHOFER:  The law speaks for itself, Your Honor.

THE COURT:  Sustained.

MS. CERVANTES:  I will move on.

BY MS. CERVANTES:

Q.  Ms. Camarillo, if HB 2243 was implemented, how would SVREP respond if the organization was approached by an Arizona voter that they themselves were purged under the law?

A.  Southwest Voter Registration Education Project would have to help the voter that informed us that they are in the list -- they are possibly -- they would possibly be purged from the voting rolls if they don't prove that they are in fact citizens.

But it also means that we would have to shift our projected goals for 2024 at all levels; voter registration, voter education, Get Out The Vote.  Because it would be a tragedy if the one million or so Latinos that are expected to be ready to vote by 2024 would be purged from the voting polls, whether it's one or 50 percent or 100 percent, that's a tragedy, and that means that the State of Arizona has failed these voters.

Q.  And just to clarify, you would -- your nonprofit would address the voter that was purged and help them, correct?

A.  Yes, ma'am.

Q.  And let's say if implemented -- if HB 2243 was implemented,

how would the nonprofit respond if that same voter that we were just talking about was purged again under the law?

A.  Well, we would be disappointed, but once again, we would help the voter and encourage the voter to follow the requirements to submit the paperwork, the documentation, to demonstrate that he or she is in fact a United States citizen.

My concern is that when a voter registers to vote, they're signing an affidavit that clearly states and is asked, are they a citizen.  And so all these voters that are being purged, whether because databases do not work or do not match their names or the information that they have been placed on that list, or someone accuses them of not being citizens is in fact a problem.

Because it is going to be -- from my understanding, the database will be done every month, and this voter who was already -- who already proved once that he or she is a citizen is now being called into question again, and that is a problem because they will be suppressed from the opportunity of exercising their right to vote because they are American citizens.

Q.  So earlier in our conversation you testified that SVREP has plans to work in Arizona next year.  And so if HB 2243 was implemented, how would the law affect HB -- how would the law affect SVREP's original plans for voter registration in Arizona?

A.  We would have to shift our goals of registering voters or conducting voter education or the turnout because we would have to work on providing ongoing education to the registered voters who could be at risk of being purged, because it's an ongoing process, it's not just a one-time thing.  And as we already established in this discussion, a voter may be called twice, three times, to prove they are in fact citizens.

Q.  If implemented, how would SVREP's original plan for voter education be affected next year if this law was enforced?

A.  It means that we would have to shift the work that we would normally be preparing to do for 2024 to specifically deal with the consequences of HB 2243.

Q.  Is it safe to say that if the law was implemented, it would also affect SVREP's voter turnout efforts for next year?

A.  That is correct.  It is safe to say that it would have consequences in our work to turn out voters.

Q.  In Arizona?

A.  In Arizona.  I believe Arizona is the only state that might have this law enacted.

Q.  So based -- sorry.  Let me strike that.

        Just to clarify, if -- you mentioned earlier in our conversation that volunteers and employees work on voter education, voter turnout, and voter registration.  So if HB 2243 was implemented, how would it affect those employees and volunteers?

A.   It would have a major effect, because instead of during the phase of voter registration, the voter registration, or during the phase of voter education, voter education, or in the phase of GOTV, GOTV, we would now have to work on providing the education to existing registered voters, which we already worked on registering these voters, to make sure they were not purged from the list and they would continue to have the opportunity to exercise their right to vote.

Q.   Ms. Camarillo, based on your testimony today, it would also be fair to say that if implemented next year, SVREP would need to divert its time to address HB 2243?

A.   HB 2243 would force us, compel us to divert our time, resources, staff, to making sure that the -- whether it is the one million that I'm projecting or the 850,000 that are registered to vote that are Latino, that they stay in the rolls and they have the right as American citizens, as U.S. citizens, whether by birth or naturalization, to in fact exercise their right to vote should they choose to vote.

Q.   If HB 2243 is implemented and remains in effect, will SVREP continue to divert its time, money, and resources past 2024 to address this law?

A.   I have a concern that if the law is in fact implemented, enacted, and every month databases will be checked, given the voter's name, that we are going to have this happen in 2024, in 2025, in 2026, and beyond, and therefore, we would have to take

away from what we normally do from our goals of expanding the electorate, educating the electorate and turning out voters to keeping on the rolls the existing registered voters, which in fact is a tragedy, but it's voter suppression at its best.

Q.   Thank you, Ms. Camarillo.

MS. CERVANTES:  Your Honor, I would like to pass the witness.

THE WITNESS:  Thank you.

CROSS-EXAMINATION

BY MR. HORLEY:

Q.   Good afternoon, Ms. Camarillo.

A.   Good afternoon.

Q.   My name is Tim Horley, and I represent the State and Attorney General in this case.  You testified on direct that SVREP helps people register to vote, correct?

A.   Yes.

Q.   When SVREP helps people register, your staff explain voter registration requirements as they currently exist in Arizona, right?

A.   That is correct.

Q.   Through your voter education programs?

A.   Through the voter education program, and when we ask a voter if we can register them to vote, we lay out that they must be U.S. citizens, the age requirement, the residency requirement, as well as if they are felons that they cannot be

felons, or they must have completed those requirements before they can register to vote, absolutely.

Q.   So fair to say that your staff is trained on any updates to voter registration laws or practices in Arizona?

A.   Fair to say, yes.

Q.   And that training would happen regardless of whether these laws go into effect, correct?

A.   I am not sure I understand your question.

Q.   When you train your staff to help people register to vote, you will have to train them on any updates to Arizona laws to help them register people to vote, correct?

A.   Except if HB 2243 is not in effect, we wouldn't go into that.  That's what you are asking, correct?

Q.   Yes.  I am asking something slightly different.

So you noted that you might need to have more staff in 2024 than you currently do because it's a presidential election year, correct?

A.   What I noted is that in a presidential cycle, we increase the number of people that we register to vote, which also means we have more staff working on that effort.

Q.   And you would have to train those staff about how to teach people to register to vote?

A.   We always train our staff and volunteers on how to register to vote, but I still don't think I understand your question. Because if your question says that it's not yet enacted, then

we wouldn't go there to train folks about HB 2243.

Is what what you're asking?  I am not sure I understand your question.

Q.  No, I understand that you're saying that if that law were not enacted, that would not be part of your training?

A.  Correct.

Q.  But regardless, when you have this new staff come on, you would have to train them about Arizona voter registration laws generally, correct?

MS. CERVANTES:  Objection, asked and answered.

THE COURT:  Overruled.

You may answer.

THE WITNESS:  Yes.

BY MR. HORLEY:

Q.  Apart from any monies spent in connection with this litigation, has SVREP spent any money in response to the Challenged Laws?

A.  To this law?

Q.  Yes.

A.  Ask again.

Q.  Apart from any money spent on this litigation, this lawsuit, has your organization spend any money responding to HB 2243?

A.  Not at this point.

Q.  Okay.  Does SVREP plan to spend more money in 2024 than it

did in 2023?

A.   Yes.

Q.   And that is because 2024 is a presidential election year?

A.   That's correct.

Q.   And SVREP typically spends more in a presidential election year than in a non-presidential election year?

A.   There is usually more interest of donors to give -- to make donations during a presidential cycle.

Q.   And then more money is also spent?

A.   So that means you have more money and therefore you can do more work and therefore you spend more money.

Q.   Understood.  Do you know how much money SVREP spent in Arizona in the 2020 election cycle?

A.   I actually prepared for that, but I forgot it this minute.

Q.   Could you give an estimate, ballpark?

A.   I believe it was 100,000.

Q.   Okay.  Do you recall how much you spent in the 2022 election cycle?

A.   I believe it was about 60,000.

Q.   Okay.

A.   But I may be wrong.

Q.   That's fine.

A.   I forgot.

Q.   Can you estimate how much you will spend in 2024?

A.   Um, we will likely spend equal to 2020 or more.

Q.   Okay.  And will that spending be regardless of whether these laws are implemented?

A.   Well, to your question, the money that we would be spending is for voter registration, voter education, turnout.  And I didn't have a good sense yet how much money is required, which I would argue that it's more because we would be contacting more than the hundred thousand voters that we contacted in 2020 or 2022, and now we are talking about -- like I said, if we are correct with our projections, we are expecting about a million voters that are Latino that would be registered and ready to vote at the November 2024 elections.

Therefore, we would be talking about a million voters, and that's a lot more money than I'm prepared to spend, but would work on figuring out how we educate and inform those voters.

Q.   Okay.  I understand that your testimony on direct was that you will likely have to shift resources in response to the Challenged Laws; is that right?

A.   That's correct.

Q.   Do you have an estimate for how much money will be spent in response to the Challenged Laws if implemented?

A.   I do not, but as I said, I'm assuming it's going to impact those that are registered.  And at this time, it is about 850,000.  By November of 2024 it will be about a million.  That's a lot of people that we have to talk to, and I don't

believe that the law has any money allocated -- the state, to educate the voters about A, how they are going to be purged because of the databases.  And there's no monies to fix the different machines -- the different databases, because all of them are wrong, and second, if we are going to have accusers accusing us of not being citizens, how are we going to fix that?  It's just haters.

Q.  Does your organization have an internal budget document laying out plans for how to spend money in response to the Challenged Laws?

A.  No.

Q.  Would the amount of money to be spent depend on how the laws are enforced?

A.  Correct.

Q.  Would it be useful to know how the laws will be enforced to determine how much money you will spend?

A.  I wouldn't be able to answer that question right now, but first of all, the law has to be implemented.  And as you know, we're suing so we don't implement it.  So I am hoping we win and it doesn't take into effect, because it has chilling effect on those that already registered and those that might register and just not bother because of this law.

Q.  So fair to say that it's very difficult to determine how much money your organization would spend right now, because you don't know how the laws will be implemented?

LYDIA CAMARILLO - CROSS-EXAMINATION

A.  Fair to say at this point, yes.

Q.  Okay.  Given that you expect to spend more money in 2024 anyway, because there's a big presidential election coming up, does that also make it difficult to determine how much money would be spent in response to these Challenged Laws?

A.  I think we're not talking to each other the way we should, which is -- I'm suggesting there's going to be a million voters that are going to potentially be on the list to be purged because the databases, all of them, whether it is city, state -- city, county, state, and federal, none of them are perfect.

I don't believe any of them are fixing them, and they are going to be checked monthly?  And then we've got the haters, which as we know, right now they're in abundance.

So I don't believe that I have an absolute understanding yet of what the budget is, but contacting a million voters is very expensive, and it takes a lot of time, a lot of resources.

And frankly, even if we were able to get an incredible grant from somebody and we contact them all, having them go through the process once or twice doesn't mean that they are doing it again, because they're being compromised.

They're being questioned about whether or not they are citizens after all when they signed the voter registration card, they were signing an affidavit that clearly asked, "Are

you the citizen?  Are you the person that you say you are?"  And if you are already an American citizen by birth or naturalization, why are we questioning them now?

Q.  Understood.  So I take it from this testimony and your earlier testimony on direct, your understanding is that some number of Latino voters will be purged under the Challenged Laws, correct?

A.  Correct.  And I don't know if it is one percent or a hundred percent.

Q.  Right.  So you anticipated my question.  Hard to say how many would be, right, because the laws have not been implemented?

A.  Hard to say, but because we don't understand how the law is going to be implemented, because databases are all messed up, and there's lots of haters that are there, we've got a problem.

Q.  Do you know that any people will be purged if the laws are implemented?

A.  I would assume that those that became naturalized citizens -- I will give you something that I know from my experience.

When I go vote, and I vote in a district that's very conservative, I swear I'm always asked, "Are you" -- "You don't live here.  You are not registered to vote."

And on a good day, I ask them again, please find my name because I am a registered to vote.  On a bad day I ask

them, "Do you want me to call the press?"  Because I vote, and

they are trying to cancel and dilute my vote.  That's the kind

of chilling effect it will have in the state of Arizona.

Q.  Okay.  But my question was, if you know whether any voters

will be purged under this law.

A.  I am confident that we will have voters that will be

purged, given how the law is written.

Q.  Okay.  But fair to say you don't know for sure?

        MS. CERVANTES:  Asked and answered, objection.

        THE COURT:  Sustained.

BY MR. HORLEY:

Q.  Have you had to hire any new staff as a result of the

Challenged Laws?

A.  As I said earlier, we are not doing anything on this yet.

Q.  Do you anticipate having to hire new staff?

A.  The staff that we would be hiring to do the voter

registration, the voter education, the Get Out The Vote would

now be shifting their work to educate voters about their

likelihood that more than likely, 100 percent, 90 percent, they

are going to be called to question, their citizenship, even

though they signed an affidavit that clearly says -- and asked

the question if they're citizens, and they understand it.

        By the way, the experience that I have registering

voters over the last 26 years, when we speak to a voter and you

ask them, are you registered to vote?   Before even going into

what the rules are, the voter -- the person will say either, I'm not a citizen, therefore you don't need to talk to me, or I am a felon, therefore you don't need to talk to me.

Latinos understand.  They don't want to get into trouble.  They don't want to be deported.  They want to make sure that they follow the letter of the law, and therefore, they will not register to vote.

MR. LANGHOFER:  Nonresponsive.  Sorry, Your Honor, the objection was nonresponsiveness.

THE COURT:  The answer will stand.  The objection is overruled.

BY MR. HORLEY:

Q.  Is SVREP a membership organization?

A.  No.

Q.  Okay.

MR. HORLEY:  No further questions.

THE WITNESS:  Thank you.

CROSS-EXAMINATION

BY MR. LANGHOFER:

Q.  You have been involved in this case for more than a year?

A.  I'm sorry?

Q.  You've been involved in this case for more than a year?

A.  Yes.

Q.  I would like to know whether in that time you've identified anyone in this state who is an adult citizen residing here who

does not have a U.S. birth certificate, a U.S. passport, a naturalization number, a Arizona driver's license issued after 1996, or a tribal identity card; do you know anyone like that?

A.   I am not sure that I do at this point.

Q.   You have been talking about the "haters."  I think you said that?

A.   Yes, I did use the word "haters."

Q.   If someone is registered to vote and at the -- you know, the beginning of every month the county recorder checks their entire voter roll, things off of the ADOT database -- the driver's license database and confirms that everyone who previously had proven their citizenship still has proof of citizenship in the system, and you know virtually everyone will, just assume for purposes of the conversation that virtually everyone will still have that, where is the hater in that part of the process?

        MS. CERVANTES:  Objection, relevance.

        THE COURT:  I'm sorry I didn't understand what you said.

        MS. CERVANTES:  Relevance to the term "hater."

        THE COURT:  Overruled.  The witness is the one that introduced the term.

        THE WITNESS:  Do I have to answer?

        THE COURT:  Yes.

        THE WITNESS:  I didn't say that the database was a

hater, nor that the county elections office were a hater.  I said that the law, if enacted, allows for anyone who's not involved or employed by any government entity who can say, Lydia Camarillo is not a citizen, if I were the voter that they're accusing of not being a voter.  That's what I was talking about.

BY MR. LANGHOFER:

Q.  Okay.

A.  And the databases, as you know, no matter what database --

Q.  Ma'am, ma'am, ma'am.

A.  -- is not perfect.

Q.  Here is the way this works.  I ask questions and you answer them.  And my question for you was, when they run a voter through the driver's license databases and they see they still have proof of citizenship on file, where is the hater in that process?  So that is the question.

         MS. CERVANTES:  Asked and answered.

         THE COURT:  Overruled.

         You may answer.

         THE WITNESS:  Again, I wasn't talking about the database.

BY MR. LANGHOFER:

Q.  Okay.  So if for some reason there's a problem with that process I just described, and the person appears to not have that proof of citizenship in the databases, and they send a

letter to a voter, say, hey, there appears to be an issue, could you please respond?

Where is the hater in that part of the process?

A.   Again, I didn't say that the database was the hater.

MS. CERVANTES:  Objection.

THE WITNESS:  I said if they end up in the list that are being flagged as not citizens because someone just decides that they don't like Lydia, and she is not a citizen, that's what I was referring to.

But ask your question again, because I am not sure I understood it.

BY MR. LANGHOFER:

Q.   If the county recorder sends a letter to a voter because it turns out something has happened in the database, there's no longer evidence available that shows this person is a citizen, so they send the voter a letter at the beginning of the month and say, hey, it looks like there's a -- we are not sure whether you are a citizen, could you please respond with, you know, the correct information.

I was asking when that letter is sent, where's the hater in that part of the process?

MS. CERVANTES:  Objection, misstates prior testimony. He's only referring to one part of HB.

THE COURT:  Excuse me.  No speaking objections, please.

MS. CERVANTES:  Sorry.

THE COURT:  Overruled.

You may answer.

THE WITNESS:  I got caught up with the "hater" 'cause I don't think that's what I said, but can you ask it again?  I'm sorry.

BY MR. LANGHOFER:

Q.  Yeah, I will.  County recorder runs their checks, they find some citizens, we don't know how many, who there's not documentary proof of citizenship in the database anymore for some reason.  They send a letter to those citizens and say, hey, we don't see your proof in the database, could you please respond with the proof, you've got 35 days?

A.  As --

Q.  And my question for you was, for the third time, where is the hater in that part of the process?

A.  Let me respond this way, 'cause I think we're confusing what I meant by a "hater," but nonetheless.

Q.  Please clarify.

A.  Arizona database from the driver's license doesn't let us know, as far as I know, and you may correct me if I'm wrong, similar to what happened in Texas, a voter got their driver's license, they were a permanent legal resident at the time.  They were not citizens.

Moving forward, they registered.  They became

naturalized citizens through the whole process that they have to follow, the ceremony. Moving forward, they registered to vote and they voted, and they received a letter saying -- very nice letter by the way, but still a letter saying they didn't have the right to vote because they were not citizens.

That's basically what you are suggesting is that the database is going to call them out because they are not citizens. How do we know that when they got their driver's license they were in fact Green Card holders, permanent residents and not yet naturalized United States citizens? That's part of the problem with this law.

Q. I understand that concern. For purposes of this next question, please assume this, the county recorders have a process where if the driver's license records say you are not a citizen, because they predate naturalization, but the person shows up to register and they show their naturalization number or their certificate, the county recorders have a process that indicates notwithstanding whatever there is in the driver's license database, this person is in fact a citizen, and that will be used to make sure they're not sending letters to people who naturalized after getting their driver's license. So assume that. And they run their process, the people you described aren't going to get the letters, where is the hater there?

A. Again, I didn't say that that was a hater. I said that the

law has flaws with the databases.  And if that's how they end up on the list, that's a problem.

And then there's also -- the law says that someone, anyone, can claim they're not citizens.  That's what I was referring to the "hater."

But let me finish to your question.  Let me try to respond to your question.  If they receive the letter, as I indicated earlier when the attorney asked me about how we would handle it, we said we would work with the voter to make sure that they provided the information necessary in order so that they would not be called into question and so that they would not be purged.

I also said that there's a risk that it would happen again.  And if it happens again, at what point does the voter get tired?  Wouldn't you feel upset if you were -- your citizenship would be questioned?  Of course you would.

So they would -- so would they.  And as a result, they may decide not to bother voting, and that is violation of the voting rights.  They have a right to vote if they are citizens.

Q.  Can you name someone that that's going to happen to?

A.  Pardon?

Q.  Please name someone that is going to happen to.

A.  I don't have any answer yet.

MS. CERVANTES:  Objection, speculation.

THE WITNESS:  It's not a law yet.

BY MR. LANGHOFER:

Q.  Okay.  You said also three times that one million Latinos would be -- I think it's slightly different descriptions, but at risk of removal from the list?

A.  I'm sorry, I said there is going to be likely a million registered Latino voters by 2024, November in order to vote for the presidential election, for the general presidential elections, which means that these voters are all potentially at risk, given that the databases are flawed and given that there's haters, since I am going to use that word from now on.

Q.  All right.  One million Latinos is every registered Latino in the state?

A.  That's correct.

Q.  Okay.

A.  And I'm suggesting that each and every one of them, including native born and certainly naturalized citizens, are at risk of being purged, given the way that the law is written.

Q.  Do you have any reason to believe that the people who work at ADOT and process driver's licenses are biased against Latinos?

        MS. CERVANTES:  Objection, speculation.

        THE COURT:  Overruled.

        You may answer.

        THE WITNESS:  Again, I didn't say that the persons that are processing are haters.  I said that somebody out

there, it's the second part to the piece unrelated to the databases.

BY MR. LANGHOFER:

Q.  Okay.

A.  I already answered this question.

Q.  Do you have any reason to believe that the people who are going to run the database searches at the county recorder's office are hateful towards Latinos?

A.  Again, I am not talking about them being haters.  I am saying that the databases are flawed.  There's never enough money to fix them.  Because people move all the time, things change.  People change their names because they got married.  They got divorced.  They have three or four husbands.  Who knows?

Q.  If they're not the DMV, and they're not the county recorder's office, do you believe the Secretary of State's office staff is hateful towards Latinos?

        THE COURT:  I don't think we're -- this is a productive line of questioning.  It's very clear that she is talking about what she perceives to be outside third persons making complaints, not things happening within the governmental office.  That's how I understand it.

        THE WITNESS:  Thank you, Your Honor, for helping me clarify the situation here.

BY MR. LANGHOFER:

Q.  How do you expect outside third persons to get voters purged from the rolls under these laws?

A.  Lydia Camarillo is not a citizen.  Do they know that?  Do they know where I was born?  No, they throw my name out and I'm suddenly being purged, or at least asking to prove -- again, because I already signed the voter registration that clearly says, are you a citizen?  And I sign yes, and I sign under perjury of law, I signed it saying I am a citizen, I am being questioned.

And more than likely I probably had to give you a birth certificate, because guess what, Arizona requires that you have a birth certificate.

MR. LANGHOFER:  Thank you, Your Honor.

THE COURT:  Anything else for this witness on cross?

MS. PORTER:  No, Your Honor.

THE COURT:  Anything on redirect, Ms. Cervantes?

MS. CERVANTES:  Yes, Your Honor.

REDIRECT EXAMINATION

BY MS. CERVANTES:

Q.  Ms. Camarillo, again, thank you for taking the time to testify today.

A.  No thank you.

Q.  Ms. Camarillo, Mr. Horley asked you about the diversion of money if the law is implemented.  Do staff cost money?

A.   Yes.

Q.   And does staff time cost money?

A.   Staff time cost money, staff costs money, even volunteers cost money, because "La aqua cuesta."  You have to give volunteers water, food.  You have to train them.  All of those things "cuesta."  It costs.  I'm sorry, ma'am, I'm saying it costs.

          MS. CERVANTES:  Your Honor, I am done with my questioning.  This witness may be excused.

          THE COURT:  May this witness be excused?

          MS. CERVANTES:  Yes.

          THE COURT:  Any objection?

          MR. LANGHOFER:  No.

          THE COURT:  Thank you very much.

          Ms. Camarillo, you may step down.  And you are excused.

          THE WITNESS:  Have a beautiful day.

          THE COURT:  Plaintiffs may call their next witness.

          MR. DODGE:  Good afternoon, Your Honor.  Christopher D. Dodge of the MFV plaintiffs.  Plaintiffs don't have another witness today.  A witness originally scheduled to go today will no longer be testifying.

          But I did want to update the Court on --

          THE COURT:  Who is that?  Who is no longer testifying?

          MR. DODGE:  I believe it's Ms. Alejandra Gomez.

I just wanted to update the Court that plaintiffs still believe we're on track with our case.  We have made it through 13 witnesses to date.  We have four witnesses scheduled to go tomorrow.  And at that point, the remainder of our case will largely be expert testimony, along with two or three more plaintiff representative witnesses.

THE COURT:  So when do you expect to rest your case?

MR. DODGE:  I would guess during the first half of the day Wednesday or early Wednesday afternoon.

THE COURT:  I thought you only had till Tuesday?

MR. DODGE:  Well, we reached an agreement with the other side that they would -- well, there was an agreement between the parties that defendants would put on their directs for certain witnesses during our case in chief.  That has added some time to certain witnesses.  So --

THE COURT:  When is that happening?

MR. LANGHOFER:  Your Honor, I don't think so.

MR. WHITAKER:  Your Honor, the parties did discuss -- I apologize.  The parties did discuss -- before Your Honor expressed a preference to have each party put their examinations on at the same time, the possibility that the defense would ask direct-style questions during the -- when plaintiffs call their witnesses to sort of streamline things, and we recognize that doing so could elongate plaintiffs case.

So we have been trying to ask questions during the

time that plaintiffs are calling their witnesses that we may otherwise have asked in our case in chief.

THE COURT:  So is that happening on Monday or Tuesday when experts are coming that are -- presumably are yours?

MR. DODGE:  No, Your Honor, but I believe --

THE COURT:  I just want this to be expedited.  This is the second day that there haven't been enough witnesses to complete the day, which means you're extending the time it's going to take, and I would still like to get this case done before the week of Thanksgiving, and you're not making that look likely.

MR. DODGE:  I appreciate that, Your Honor.  We did attempt to get another witness here to use the rest of the Court's time today.  Unfortunately, you know, given that there's only one day left in this week for trial, that was a limited number of witnesses who were even potentially available, and many of them had preexisting obligations, so we did endeavor to do that.  And I apologize that we weren't able to use the time today more efficiently.

With respect to what Mr. Whitaker was saying, I believe they've been asking these direct-style questions specifically of witnesses like --

THE COURT:  No, no.  I am not asking about up until now.  You were suggesting that it's going to take you until midday Wednesday because the defendants were going to take up

time that would otherwise be in their case in chief.

MR. DODGE:  Let me clarify, Your Honor.  We still anticipate that the time we are using for our case in chief will be approximately six days.  The time to date has involved some questions that I would attribute to defendants' case in chief, because they have been asking direct-style questions of various public officer witnesses.

So when that time is taken into account, if we are finishing up our case the morning of Wednesday, we will have still effectively used, for our case in chief, roughly six days.

THE COURT:  Oh, I find your logic to be quite faulty in that here we are on our second day with plaintiffs not taking up all the time, and then claiming they're going to need an extra half day because of time defendants already used does not make sense to me.

Just we are going to recess, and as I said before, you don't get the time back.

MR. DODGE:  I appreciate that, Your Honor.  I guess just for our planning purposes and for discussions between the parties, if plaintiffs were to require a few hours Wednesday morning, would the Court permit that, just so we can --

THE COURT:  I want to know how much time the defendants need, because it seems to me what you are doing is invading their time, not my time.

768

MR. LANGHOFER:  I can tell you what we know about our plan so far.  We expect Professor Hoekstra to come on Wednesday, Professor Richmond to speak on Thursday, Professor Stein has asked to testify the following week -- although we appreciate that Your Honor wants to not do anything the following week.

THE COURT:  I wouldn't say "not do anything," I would say not be in trial.

MR. LANGHOFER:  I think we are on the same page there.  So we also were talking at lunch about calling perhaps four county recorders for very short testimony.  And Mr. Dodge and I may be able to avoid that, but it may be like a three-question direct, which is hopefully not necessary.

And then we are going to have a couple of folks from the AG's office, and so it is conceivable that we won't need Wednesday, Thursday and Friday.  I am hopeful this is academic, but as we stand here, I think that's what our case looks like.

THE COURT:  All right.  Well, you know how limited your time is.

Anything else before we recess?  Okay.  Court is in recess.

(Proceedings conclude at 4:12 p.m.)

C E R T I F I C A T E


I, ELVA CRUZ-LAUER, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 9th day of November, 2023.


                              s/Elva Cruz-Lauer
                         Elva Cruz-Lauer, RMR, CRR