UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

Mi Familia Vota, et al.,              )
                                      )
                 Plaintiffs,          )
                                      )
          vs.                         )   2:22-cv-00509-SRB
                                      )
Adrian Fontes, et al.,                )
                                      )   Phoenix, Arizona
                 Defendants.          )   November 9, 2023
 _____)   8:59 a.m.


        BEFORE:   THE HONORABLE SUSAN R. BOLTON, SENIOR JUDGE

                REPORTER'S TRANSCRIPT OF PROCEEDINGS

                BENCH TRIAL - DAY 4 - A.M. SESSION

                   (Pages 770 through 883)


Official Court Reporter:
Elva Cruz-Lauer, RMR CRR
Sandra Day O'Connor U.S. Courthouse
401 West Washington Street
Suite 312, SPC 35
Phoenix, Arizona  85003-2150
(602) 322-7245

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

UNITED STATES DISTRICT COURT

771

APPEARANCES


For Plaintiff United States of America:

    RICHARD DELLHEIM, ESQ.
    SEJAL JHAVERI, ESQ.
    MARGARET TURNER, ESQ.
    U.S. DEPARTMENT OF JUSTICE-CIVIL RIGHT  DIVISION, VOTING SECTION
    950 Pennsylvania Avenue NW
    Washington, D.C.  50530


For Plaintiff ADRD Action, Arizona Students' Association,
League of United Latin American Citizens Arizona, Living
United for Change in Arizona:

    HAYDEN JOHNSON, ESQ.
    DANIELLE MARIE LANG, ESQ.
    CAMPAIGN LEGAL CENTER.
    1101 14th Street NW, Suite 400
    Washington, D.C. 20005

For Plaintiff Arizona Asian American Native Hawaiian And
Pacific Islander for Equity Coalition:

        NIYATI SHAH, ESQ.
        ASIAN AMERICANS ADVANCING JUSTICE
        1620 L Street NW, Suite 1050
        Washington, D.C.  20036

        SADIK HUSENY, ESQ.
        AMIT MAKKER, ESQ.
        EVAN OMI, ESQ.
        CATHERINE ANNE RIZZONI, ESQ.
        SCOTT KANCHUGER, ESQ.
        LATHAN & WATKINS
        505 Montgomery Street, Suite 2000
        San Francisco, California 94111

        ANDREW MARK FEDERHAR
        SPENCER FANE LLP - Phoenix, AZ
        2415 E Camelback Rd., Ste. 600
        Phoenix, Arizona  85016-4251

772

For Plaintiff Arizona Democratic Party, Democratic National Committee:

>           DANIEL S. VOLCHOK, ESQ.
>           WILMER CUTLER PICKERING HALE & DORR, L.L.P.
>           2100 Pennsylvania Avenue NW
>           Washington, D.C.  20037

For Plantiff Poder Latinx:

>           JOHN A. FREEDMAN, ESQ.
>           LEAH MOTZKIN, ESQ.
>           ARNOLD & PORTER KAYE SCHOLER, L.L.P.
>           601 Massachusetts Avenue NW, Suite 100
>           Washington, D.C.  20001
>
>           BEAUREGARD WILLIAM PATTERSON, ESQ.
>           JONATHAN SHERMAN, ESQ.
>           FAIR ELECTIONS CENTER
>           1825 K Street NW, Suite 701
>           Washington, D.C. 20006

For Plaintiff Tohono O'odham Nation and Gila River Community:

>           ALLISON NESWOOD, ESQ.
>           NATIVE AMERICAN RIGHTS FUND
>           250 Arapahoe Avenue
>           Boulder, Colorado 80302

For Plaintiff Voto Latino, Mi Familia Vota:

>           CHRISTOPHER DODGE, ESQ.
>           ELISABETH C. FROST, ESQ.
>           ALEXANDER ABRAHAM ARELLANO, ESQ.
>           MOLLIE DIBRELL, ESQ.
>           ELIAS LAW GROUP
>           250 Massachusetts Avenue NW, Suite 400
>           Washington, D.C. 20001
>
>           DANIEL ABRAHAM ARELLANO, ESQ.
>           HERRERA ARELLANO, L.L.P.
>           1001 North Central Avenue, Suite 404.
>           Phoenix, Arizona  85004

773

For Plaintiff Promise Arizona, Southwest Voter Registration Education Project:

      ERNEST ISRAEL HERRERA , ESQ.
      ERIKA CERVANTES, ESQ.
      MALDEF
      634 Spring Street, 11th Floor
      Los Angeles, California  90014

      DANIEL R. ORTEGA, JR., ESQ.
      ORTEGA LAW FIRM, P.C.
      361 E. Coronado Road, Suite 101.
      Phoenix, Arizona 85004.


For Defendants State of Arizona, Kris Mayes, Jennifer Toth:

      JOSHUA MICHAEL WHITAKER, ESQ.
      TIMOTHY E. HORLEY, ESQ.
      ARIZONA ATTORNEY GENERAL'S OFFICE
      2005 N. Central Avenue
      Phoenix, Arizona  85004


For Intervenor-Defendants State of Arizona, Kris Mayes, Ben Toma:

      KATHRYN E. BOUGHTON, ESQ.
      ARIZONA ATTORNEY GENERAL'S OFFICE
      2005 N. Central Avenue
      Phoenix, AZ  85004

      HANNAH HATCH PORTER, ESQ
      GALLAGHER & KENNEDY, P.A.
      2575 E. Camelback Road, Suite 810
      Phoenix, Arizona 85016-9225


For Defendant-Intervenor Republican National Committee:

      KORY A. LANGHOFER, ESQ.
      STATECRAFT, P.L.L.C.
      649 N. 4th Avenue, Suite B
      Phoenix, Arizona  85003

774

INDEX OF WITNESSES

| WITNESSES FOR THE PLAINTIFFS: | Direct | Cross | Redirect |
|---|---|---|---|
| Carolina Rodriguez-Greer | 780 | 794,796,808 | 809 |
| Martin Quezada | 811 | 877,878 | |

INDEX OF EXHIBITS

| EXHIbIT NO.: | DESCRIPTION: | RECEIVED: |
|---|---|---|
| 61 | (Arizona State Judiciary Committee Hearing March 10, 2022 Transcript and Video | 828 |
| 62 | (Arizona Senate Floor Session March 23, 2023 Transcript and Video | 835 |
| 67 | (HB 2617 Bill History Overview) | 837 |
| 495 | (3/14/2022 Senate Government Committee Hearing on HB 2617 - Certifed Audio Transcript | 865 |
| 499 | (6/22/2022 Senate Committee of the Whole Hearing on HB 2243 - Certifed Audio Transcript | 857 |
| 500 | (6/22/2022 Senate Floor Session (Third Reading) Hearing on HB 2243 Certified Audio Transcript | 857 |

UNITED STATES DISTRICT COURT

775

P R O C E E D I N G S

THE COURT:  Plaintiffs may call their next witness.

MR. MAKKER:  Your Honor, Amit Makker for Arizona Asian American Native Hawaiian Pacific Islander for Equity Plaintiff.

We had just a couple of matters to raise ahead of time.  I know that the RNC's opposition to our motion regarding party opponents and adverse parties came in last night.  I don't know if you had a chance to look at it.  We did want to try resolve that today, but we don't have to do it now.

THE COURT:  No.  It came in last name.  I learned about it within the last 10 minutes.

MR. MAKKER:  Correct.  So I just wanted to raise --

THE COURT:  I think we may still be waiting for courtesy copies.

MR. MAKKER:  And I just still want to raise that we did want to raise it today if it's possible, obviously not now, but perhaps after lunch or towards the end of the day, just wanted to raise that with you.

THE COURT:  So could I leave and spend an hour looking at all of those things while the witnesses testify?  I think you are asking me to do things that are entirely unrealistic.

I want to read it before we talk about it, and I don't really know exactly when I'm supposed to read it while we are in trial.

MR. MAKKER:  Understood.  Do we have another --

UNITED STATES DISTRICT COURT

MR. DODGE:  Courtesy copies will be delivered shortly, Your Honor.  I just wanted to make that clear.  Courtesy copies of last night's filing.

MR. LANGHOFER:  On both sides.

THE COURT:  I'm assuming that's the defendants' courtesy copy.

MR. MAKKER:  There were other filings from plaintiffs last night as well is what Mr. Dodge is referring to.

THE COURT:  Oh, I don't know anything about that.

MR. MAKKER:  And then I believe Kory you said you had a housekeeping matter.

MR. LANGHOFER:  Yes.  Good morning, Your Honor.  Two things for your attention.  First, the defense side conferred last night for a while and -- about trial schedule, and we are pretty confident we can wrap this up by next Friday.

THE COURT:  Good news.

MR. LANGHOFER:  Yes.  And so there's still some discussion internally of course about who exactly we'll call and which issue, but the -- that's assuming we start on Wednesday.  We go Wednesday, Thursday, Friday and celebrate Thanksgiving.

One of the issues that I'm worried about, I am just going to flag it now, I don't think it requires a ruling from you is -- good thing we're going to call a handful of county recorders for -- what we don't want to do is rehash things that

777

have already been discussed.

Our perspective is that Maricopa County is a very good representation of the rest of the state, primarily because a majority of the residents are here, but also because their systems of course track the rest of the state. There's some exceptions which we can, you know, litigate if we need to. But -- so our intention is to call these county recorders for I think one or two narrow issues.

Because there's some deposition testimony about this that are objected to and so let's just do it live is our view. The reason I want to flag this though is that I am somewhat concerned if the plaintiffs are having scheduling problems on their end, we have someone on the stand for five, witness to answer a very limited question, and then the scope -- if the scope objection isn't valid, we have three hours of cross really to present things that should have been in the case in chief, our scheduling is going to become a problem.

I don't think it requires ruling from you now, but I want to say, you know, that that is the one thing that frustrate our plans to finish this on time.

Second thing, we drafted a motion on an issue. It's so discrete that it may not be worth the back-and-forth, and I'll just describe now. If you want us to file, we'll file.

There's an upcoming expert who has disclosed a redacted copy of her engagement letter pursuant to a subpoena.

We would like to know what's behind those redactions so we can really figure out whether it's worth cross-examining.

And I don't want to speak for the defense on their perspectives on this issue, we can file a motion or if you think this is clear cut, we could --

THE COURT:  Why doesn't somebody just give me the unredacted and the redacted and I can see what was redacted and may make it obvious that whatever was redacted was appropriately redacted, and if it's some redaction of something that makes no sense, then maybe I'll ask a question or two about it.

MR. LANGHOFER:  Perfect.  Thank you.

THE COURT:  So plaintiffs, give me the unredacted and the redacted.  I will look at them, and I don't think we need paper filings with respect to something like that.

MR. LANGHOFER:  Thank you.

MR. DODGE:  Agreed, Your Honor, and we'll have that to the Court today.

THE COURT:  Thank you.

Mr. Whitaker.

MR. WHITAKER:  Yes, Your Honor.  I have two housekeeping items, if you don't mind.  One is that a defense side expert, Dr. Stein, who previously bought tickets to come out -- not next Monday but the following Monday, which would push this past week, I believe Your Honor mentioned a

possibility of doing a Zoom testimony during the pretrial conference.  Is that something that the Court would be willing to entertain for that expert?

THE COURT:  Sure.

MR. WHITAKER:  Okay.  The second item is I heard from Mr. Jorgensen yesterday evening.  He wanted to correct part of his testimony yesterday.  It is just about on the ServiceArizona website, he had testified the option "United States" was not there.  But upon looking at the website after he left the courtroom, he saw that it was there, it was just among the countries alphabetically listed.

I just wanted to bring that to the Court's attention, and if the Court would like us to file something to that effect, we are happy to do that.

THE COURT:  I think that everybody could independently verify that correction, so unless somebody comes up and disputes that, I will assume the record has been corrected.

MR. WHITAKER:  Thank you, Your Honor.

MR. MAKKER:  I think we are ready to proceed, Judge. And plaintiffs call Carolina Rodriguez-Greer.

THE CLERK:  Good morning.  If you want to step up here.  Stand right there and raise your right hand for me.

**CAROLINA RODRIGUEZ-GREER, PLAINTIFFS' WITNESS, SWORN**

THE CLERK:  State your name and spell your last name.

THE WITNESS:  Yes.  My name is Carolina

Rodriguez-Greer.  Last name, R-O-D-R-I-G-U-E-Z.  Greer, G-R-E-E-R.

THE CLERK:  Thank you.  You can go ahead and have a seat on the witness stand.

MR. ATKINS:  Good morning, Your Honor.  Alexander Atkins for Elias Law Group representing plaintiffs Mi Familia Vota and Voto Latino.

THE COURT:  You may proceed.

DIRECT EXAMINATION

BY MR. ATKINS:

Q.  Good morning.  Can you please state your full name for the Court.

A.  Carolina Rodriguez-Greer.

Q.  Where are you employed?

A.  I work at Mi Familia Vota.

Q.  And what is your position at Mi Familia Vota?

A.  I serve as a state director for the State of Arizona.

Q.  How long have you held that position?

A.  I have been in this role a little over two years.

Q.  What is Mi Familia Vota?

A.  Mi Familia Vota is a nonprofit organization in the state of Arizona that aims to increase civic participation amongst the Latino community.

Q.  And where is Mi Familia Vota headquartered?

A.  We're headquartered in Phoenix, Arizona.

Q.   What are your responsibilities as state director?

A.   As state director for the organization, I am responsible for general oversight, leadership of the staff, creating the overall strategy, managing the budget and fundraising efforts, to name a few of my responsibilities.

Q.   What is the size of Mi Familia Vota staff?

A.   Currently in Arizona, I want to say we're at 10 full-time employees.

Q.   How does Mi Familia Vota finance its work?

A.   We do year-round fundraising, looking at different grants, opportunities through various foundations, as well as independent donors.

Q.   Do you have an approximation of Mi Familia Vota's operating budget for Arizona for this year?

A.   I want to say approximately it was close to 1.5 million.

Q.   Does Mi Familia Vota have the funding it needs to do everything it wishes to accomplish in Arizona?

A.   Unfortunately, you know, we have to be very creative with the budget that we do have, and so unfortunately we are not able to do all of the things that we wish we could do to advance our mission, but we do our best.

Q.   Why does Mi Familia Vota engage in civic engagement with the Latino community?

A.   So our organization really focuses on ensuring that as many people participate in our democratic process, and that includes

the Latino community, which is a very large segment of the population in Arizona.

And so we focus on providing voter education efforts. We see that the Latino community is eager to participate, but, you know, our democratic process sometimes can be a little convoluted and so we make every effort to lean into a language equity lens so that we provide a lot of our resources are activities in Spanish and break things down so that it can be understood for just an average Arizonan.

And so we do that work because we want to see the participation numbers increase, especially for such a large group of our population. And so yeah, in general terms that's why we do our work.

Q. What types of programming does Mi Familia Vota engage in to accomplish this mission?

A. Yeah, so, you know, we really aim to be a trusted community resource. And so what that means is that we do year-round engagement work. Everything from offering voter education opportunities such as workshops, community learning events.

We do a lot of work with young people, so our youth engagement summits, our youth fellowships to aim to empower and excite the next generation of potential voters so that when they become of age, right, they understand their responsibility in our democracy.

We also do work to expand the electorate by helping

eligible legal permanent residents with their citizenship process, and, you know, be a trusted resource in the community year round so, you know, you might see us out at the farmers market tabling asking, hey, are you registered to vote?

You might also see us speaking at different events around the importance of civic engagement. And so that's a little bit about the work that we do.

Q. So you mentioned voter registration. Could you talk just a bit more about Mi Familia Vota approach to voter registration?

A. Yeah, absolutely. So our voter registration efforts range, depending of course on what we have going on at the organization, as well as in, you know, funding.

So our voter registration efforts range from, you know, that tabling at the farmers market, at the community resource fair, as well as sending canvassers to high-traffic areas where there might be events going on or perhaps a busy transit center so that folks -- so we are meeting folks where they're at.

Because we find that a lot of people are like, I don't know where to register to vote, or they are very grateful for our efforts and they tell us, you know, I recently moved and I completely forgot that I needed to update my voter registration. I am glad I ran into you. So that's a little bit about our voter registration efforts.

Q. How does Mi Familia Vota train its canvassers?

A.  So we have an extensive training for our canvassers in the organization.  Everything from, you know, how -- what a complete form looks like, different ways to approach individuals out on -- in the community.  And so our goal is that we have the most informed canvassers out there reaching out to the community.  So we have some extensive training efforts.

Q.  Do you have an estimate of how much it costs on average for Mi Familia Vota to register a single voter?

A.  You know last time I checked, I want to say that number is above the $50 range, if I had to put a number to it.

Q.  Do you know how many voters Mi Familia Vota has registered in Arizona?

A.  Since my tenure, it been over 30,000.

Q.  Do you know approximately how much Mi Familia Vota's voter engagement efforts cost in 2022?

A.  I think an approximate number is over one and a half million dollars.

Q.  And do you know how much Mi Familia Vota has budgeted for voter engagement during the 2024 election cycle?

A.  Gosh, we don't have those numbers yet, but I anticipate it is going to be significantly higher than last year.

Q.  Understood.  Could you please tell the Court more about the communities that Mi Familia Vota serves?

A.  Yeah, so it's a broad range of folks from the Latin

American countries and folks coming from different backgrounds and -- or folks who identify as Latino, and of course the Spanish-speaking audience.

Q. Are there particular issues that these communities face that Mi Familia Vota is seeking to address?

A. Yeah, I think for us, you know, we really look at this -- I am a former educator, and so for us it's really important that we are meeting people where they're at.

We are filling in the gaps of knowledge, especially for folks who may not have grown up or gone to school, formal education in the K through 12 system. So we want to make sure that people understand how government works.

That we're bringing this information in their language. That we are taking into account what are the issues that are important to them in helping them understand how through civic participation we can address those issues. And so -- I hope that answers the question.

Q. It does. Thank you. Are some of the community members served by Mi Familia Vota people who were born outside of the United States?

A. Yes.

Q. And are some of those people newly naturalized citizens?

A. Yes.

Q. Are you yourself a naturalized citizen?

A. I am.

Q.   How old were you when you moved to the United States?

A.   Eight years old.

Q.   Could you tell the Court just a little bit about what it was like growing up in the United States as someone who wasn't born here?

MR. LANGHOFER:  Relevance.

THE COURT:  Sustained.

THE WITNESS:  Does that mean I answer the question?

THE COURT:  Oh, I am sorry, no.

THE WITNESS:  Sorry.

BY MR. ATKINS:

Q.   In your experience, are the communities that Mi Familia Vota serves ever hesitant about sharing information with the government?

A.   In what I have observed, yes.  You know, I myself am a naturalized citizen, and growing up in a space like Arizona, particularly in Tucson, that's within 100 miles of an international border, our streets were patrolled by Border Patrol.

And growing up, my mother, for my own safety, right, always reiterated the importance that I'm not to share with people that I was born outside of the country.  That that's not information that needed to be disclosed.

And now, right, having a greater understanding, I understand why she would train me to protect me.  And I can

only speak of my experience and what I have heard from other folks who are hesitant because of the experiences faced by Arizonans.

I mean, we are in Maricopa County today.  This is the place that was terrorized by --

MR. LANGHOFER:  Nonresponsive.  Narrative.

THE COURT:  This has become a narrative.  I think you need to interject another question.

MR. ATKINS:  Certainly, Your Honor.

BY MR. ATKINS:

Q.  Are you familiar with the requirement under HB 2492 that voter registration applications must include the voter's place of birth?

A.  Yes.

Q.  Based on your experience at Mi Familia Vota, does this birthplace requirement raise any concerns for the communities that you serve?

A.  Yes.  It's very concerning because the communities that we work with have experienced some things and there's a hesitancy to share information that, you know, sometimes that relevancy to, well, why would you need to know that?

If I could share an example?  Like I shared, I am a prior educator and spent over a decade doing college access work, and I saw hundreds of students decline to fill out the FAFSA, which is a Free application for Federal Student Aid,

because there was a question in these, these are citizen U.S. born children of undocumented parents and they would say, I'm not going to fill out this information because I don't want to disclose my parents' birthplace.  I don't know what's going to happen with that information, and I don't feel safe.

And so based on the experiences and what I have seen, I can say that there is a hesitancy to provide this information.

THE COURT:  Have you done voter registration work personally in your capacity as state director?

THE WITNESS:  I don't get to do it as much as I would like to, but I have gone out with the team to different events and done some voter registration.

THE COURT:  And when you have been at voter registration events, were you using the state form for registering rather than the federal form?

THE WITNESS:  Correct, yes.

THE COURT:  And there is a question on there about birthplace, along with a few other questions, I think they may already all be in a section that's optional.

Did you have an opportunity to personally observe whether or not those optional fields were typically filled in by the people that you were helping to register?

THE WITNESS:  So we -- when we do the voter registration, folks are typically on their way to do something

else or in a hurry, and so from my recollection, I've never seen anybody actually fill out that section, because it is -- it's always been there, but because it's optional, they feel free that, okay, like I don't need to provide that information.

THE COURT:  So when you do voter registration events, do you keep the forms and then send them in yourself after they have been filled out typically?

THE WITNESS:  Correct, yes.

THE COURT:  Thank you.

BY MR. ATKINS:

Q.  Do you know if HB 2492 changes whether some individuals can vote by mail?

A.  Yes.

Q.  Based on your experience is limiting the ability to vote by mail likely to affect the communities that Mi Familia Vota serves?

MR. LANGHOFER:  Relevance.  It's already resolved, Your Honor.

THE WITNESS:  Yes.

THE COURT:  Overruled.

You may answer.

THE WITNESS:  Yes.

BY MR. ATKINS:

Q.  And how do you expect it to impact the communities that you serve?

A.  When we are out engaging with folks, there is a level of excitement and relief when they know that they can vote by mail.  That they have time to research the different things that are on the ballot.

It has actually been one of the things -- voting by mail has been one of the things that has allowed us to motivate and encourage and excite people about voting in Arizona, because they have that convenience.  Because they don't have to take time off of work and they can just mail it in.  And so we've seen it be extremely successful in helping increase participation.

Q.  So what impact would you expect if some of the individuals that you serve were no longer able to vote by mail?

A.  Gosh, it's very concerning because of the confusion and also folks feeling like, you know, if we take that convenience away -- I am concerned that it would just discourage folks from participating.

Q.  Do you know if HB 2492 also changes whether some individuals can vote in presidential elections?

A.  Yes.

THE COURT:  Or it used to?

MR. ATKINS:  Fair enough, Your Honor.

BY MR. ATKINS:

Q.  Can you -- are presidential elections important to Mi Familia Vota's outreach and voter engagement efforts?

MR. LANGHOFER:  Same objection.

THE COURT:  Overruled.

You may answer.  I am sure the answer is yes.

THE WITNESS:  Yeah, it's one of the things they get really excited about.

BY MR. ATKINS:

Q.  Do you know if HB 2492 is currently being enforced?

A.  Yes.

Q.  Is it being enforced currently?

A.  Oh, sorry, it is not currently being enforced.

Q.  Does the lack of enforcement make you any less concerned about the law?

A.  No, I am extremely concerned about what this might do for voters in Arizona, as well as our organization and the mission that we try to accomplish.

Q.  What are your concerns about the communities that you serve?

A.  If this law goes into effect, it would have a very disruptive impact because, you know, I do this for a living, yet I'm extremely confused about this law and now I can imagine just an average Arizonan.

And so what I would do for our organization, we'd have to reshift our entire focus go into crisis mode to try to address and help folks understand what is actually happening.

I think the -- our budget would surely be impacted.

We would have to reallocate our limited resources to try and fill in the gaps of knowledge, but also to help convince folks, right, that they should still participate in spite of the changes.

Q.   Are there specific programs that Mi Familia Vota would need to dedicate additional resources to should the law be implemented?

A.   Can you repeat the question?

Q.   Are there specific programs that Mi Familia Vota would need to dedicate additional resources to if the law is implemented?

A.   Yeah, I think -- not necessarily additional resources because I don't see that we would get any additional resources, but I would have to reallocate funding and stop doing some of the more proactive efforts.

Such as our youth engagement work, which has been really successful with young people, our efforts to help legal permanent residents through their citizenship application process.

I can see something like our ambassadors program be shifted to now just make an effort to help the community understand what this change means, and so it -- in short it would be very disruptive to what we aim to do today.  We'd have to change a lot.

Q.   Do you anticipate that you would need to make changes to your voter registration program?

A.   Yeah, I think that program in particular, right, the resources that this would take to train, to create a new training, because now I can see the role of our canvassers and our staff of now having to convince folks, you know, without being able to provide them any sort of certainty, right, like we'd have to convince them that like, please put this information on there because you won't get registered to vote without it, and then knowing, right, that I don't know what's going to happen with that information once it's turned in.

So the training resources as well as now training our staff would take a significant amount of time, effort, and limited resources.

Q.   And finally, I think you mentioned something about community ambassadors as something that you would need to allocate additional resources to.  Can you explain what that is and how that work contribute to this effort?

A.   Yeah, so currently we are building out an ambassadors program where folks are -- it's kind of like train the trainer. So folks are going out into the community and they are helping family members, neighbors, create a plan to vote.

Help them understand the difference between a midterm, a general election, those basic concepts that sometimes for folks is like, oh, it's too complicated, I am not going to vote, right.

Instead of doing that proactive effort, we would have

to reshift the focus of that program and now just running, I call it crisis response, right, like this is the new law, this is what's happening, and helping clear up that confusion that, you know, I think would be distracting from the proactive work of increasing participation and getting folks excited about participating in our democratic process.

MR. ATKINS:  Thank you.  No further questions.

THE COURT:  Thank you.

Any other questions from any plaintiff's side?

Ms. Porter.

CROSS-EXAMINATION

BY MS. PORTER:

Q.  Good morning.  I'm Hannah Porter.  I represent the Intervenor-Defendant Speaker Toma and President Petersen.

Mi Familia is not a membership organization, correct?

A.  That is correct.

Q.  And has -- aside from this litigation, sorry, has Mi Familia Vota devoted any financial resources as of today in response to the Challenged Laws?

A.  No, I mean, we've had conversations but no significant effort.

Q.  No expenditure of financial resources?

A.  Not that I am aware of.

Q.  Do you have a written plan for how you will expend financial resources if the laws were to be implemented?

A.  Not at the moment.

Q.  In your testimony, you estimated approximately that Mi Familia Vota spends approximately $50 a voter to get a voter registered; is that correct?

A.  Right, that's my approximation.

Q.  Did you arrive at that number by dividing your total expenditure on voter registration activities by the number of persons that Mi Familia Vota has registered?

A.  Can you repeat the question?

Q.  Sorry.  To get at that number, did you divide your total voter registration costs by the number of successful registrations?

A.  I can't recall exactly, but I believe we looked at some averages and said, you know what, this is an average cost, yeah.

Q.  Is it fair to say that you don't know how much Mi Familia Vota would spend in response to the Challenged Laws if they were implemented?

A.  Yeah, it's hard for me to predict what the financial impact would be at this moment.

Q.  Sorry, just looking at my -- one second.

        Do you anticipate having to hire any new staff if the Challenged Laws are implemented?

A.  Gosh, that's a good question.  At this moment I think I would have to reallocate staff.  So I would have staff stop

doing the responsibilities that they have right now to reshift to address this effort.  I don't know that I could afford to hire any new staff.

MS. PORTER:  I don't have any further questions. Thank you.

CROSS-EXAMINATION

BY MR. LANGHOFER:

Q.  Good morning, ma'am.  Kory Langhofer for the RNC.

Do you think it would be fair to say that Mi Familia Vota is not a nonpartisan organization?

A.  Can you repeat the question?

Q.  You are not a nonpartisan organization, are you?

A.  Mi Familia Vota is a nonpartisan organization.

Q.  You have a Twitter account, right?

A.  The organization does have a Twitter account.

Q.  It is @MiFamiliaVota?

A.  I believe so.

Q.  Okay.  And you tweet political messages a lot, right?

A.  I don't oversee the social media accounts, but I know there's a lot of information that is shared.

Q.  Your social media feed of course opposes Donald Trump, right?

MR. ATKINS:  Objection, relevance.

THE COURT:  Overruled.

You may answer.

THE WITNESS:  What was the question?

BY MR. LANGHOFER:

Q.  Your social media feeds oppose Donald Trump, right?

A.  I believe there are messages sharing with the community what political candidates are saying about the community.

Q.  Do you not oppose Donald Trump on your social media feeds?

MR. ATKINS:  Objection, asked and answered.

THE COURT:  Overruled.

THE WITNESS:  So can you repeat?

BY MR. LANGHOFER:

Q.  Would it help to see it?

A.  Or if you could repeat the question?

Q.  Does your social media feed oppose Donald Trump, for example?

A.  Yes.

Q.  Okay.  Does it denounce Republicans for their policies?

A.  I believe so.

Q.  Okay.  Quite a bit, right?

A.  I haven't checked.

Q.  Can you think of any social media posts from your organization that denounced Democrats?

A.  I am not familiar with the messaging.

Q.  Your organization called the Republicans' position on the 2019 budget, "a hateful agenda"; is that right?

MR. ATKINS:  Objection, relevance.

THE COURT:  Overruled.

You may answer.

THE WITNESS:  Sorry, I am not familiar with all the social media accounts.

BY MR. LANGHOFER:

Q.  Does it sound like something you guys would post?

MR. ATKINS:  Objection, foundation.

THE COURT:  Sustained.

BY MR. LANGHOFER:

Q.  Has your organization accused Republicans of doing everything possible to dehumanize immigrants?

A.  I am not aware of specific messaging.

Q.  Would it help if you saw it?

A.  Sure.

Q.  Okay.

MR. LANGHOFER:  Elaine, can we have the laptop here connected, please?

BY MR. LANGHOFER:

Q.  Ma'am, you see this?  What I'm showing you is marked for identification as Impeachment Exhibit 184.  This is a Mi Familia Vota Twitter account, isn't it?

MR. ATKINS:  Objection, Ms. Rodriguez-Greer was not employed by the organization at the time this tweet was made. she has no foundation to --

THE COURT:  Excuse me.  I believe that I've mentioned

several times, no speaking objections.

MR. ATKINS:  Apologies.

THE COURT:  When did you go to work originally for the organization?

THE WITNESS:  August 2021.

THE COURT:  So whatever happened before then, she is not competent to testify about.

BY MR. LANGHOFER:

Q.  Has your organization argued that tax cuts are also racist?

A.  I don't recall being a part of those conversations.

Q.  Okay.  Do you agree that there is voter registration fraud in Arizona?

A.  I am not aware of such things happening in Arizona.

Q.  Are you aware of organizations turning in voter registration forms in large numbers that are found to contain false information or not be signed by the person who's ostensibly submitted it?

A.  I am not aware of those things.

Q.  Do you know whether your organization has turned in voter registration forms like that?

A.  Our organization makes every effort to turn in as complete forms as possible.

Q.  Okay.  I was asking whether you knew whether your organization has turned in forms like that.

A.  I am not a part of the efforts that run the field

operations for those voter registration efforts.

Q.  Is that a no, that you are unaware of that?

A.  I am unaware.

Q.  Do you agree it would be important to stop things like that?

A.  To stop things like what?

Q.  Fraudulent voter registration forms.

A.  I believe everybody should do every effort to avoid any level of fraud.

Q.  Okay.  The 30,000 voters that your organization has registered, are those registrations that have been successfully completed or forms that were submitted before some of them are rejected?

A.  Those are forms submitted.

Q.  Okay. All right.  You said you were unaware of your organization submitting voter registration forms that are later found to be -- I am just going to say "unlawful."  I don't want to say "fraudulent," because I am not suggesting it was your organization doing something intentionally wrong.  Would it help if you saw some documents about that?

A.  Sure.

Q.  Okay.

        MR. LANGHOFER:  Elaine, could we have the laptop here, please?

BY MR. LANGHOFER:

Q.  Ma'am, I am showing you a document that has been marked as Impeachment exhibit 746, and I'd like to -- well, let's start with who it's from.  Do you see it's from StephanieHomewytewa@recorder.pima.gov?

Do you know Ms. Homewytewa?

MR. ATKINS:  Objection; hearsay, foundation, relevance.

THE COURT:  It hasn't been offered yet.  He is trying to lay foundation for it.  The question, which you may answer because the objection is premature, is, do you know who Stephanie Homewytewa is.

THE WITNESS:  I am aware of Stephanie.  I believe she's provided training for our field staff in Pima County.

BY MR. LANGHOFER:

Q.  She oversees the voter registration forms that are turned in by voter registration organizations, correct?

MR. ATKINS:  Objection, foundation.

THE COURT:  Overruled.

You may answer, if you know.

THE WITNESS:  I am not familiar with her title.

BY MR. LANGHOFER:

Q.  This email was sent after you were working for Mi Familia Vota, was it not?

A.  That's correct.

Q. Okay. Why don't you read that first paragraph to yourself please.

THE COURT: First, have you ever seen this email before?

THE WITNESS: Yes.

THE COURT: Was it in connection with this litigation, or was it in connection with seeing it because of somebody shared it with you who was a recipient?

THE WITNESS: No, I recently was made aware of it through our legal team.

THE COURT: Through your legal team. So you saw it in connection with this litigation?

THE WITNESS: Correct, I had never seen it before.

THE COURT: Next question, please.

BY MR. LANGHOFER:

Q. I asked her to read the first paragraph, Your Honor. And my intention is to have her read one more document, and then I'm going to ask whether she recalls then more about the original question.

Have you finished reading that, ma'am?

A. Correct.

Q. I would like to now show you the transcript from the Pima County Recorder's deposition. And we are going to start on page 289 of that. There's a couple of pages here, so what I am going to do is put them on the screen, let you read through it,

at the end of that, I am going to ask you some questions about what we've read.  Let me know when you get to the bottom of this page.  I'll scroll.

THE COURT:  So you want her to start at line 11?

MR. LANGHOFER:  Yes, Your Honor, page -- 289, line 11.

THE WITNESS:  Okay.

BY MR. LANGHOFER:

Q.  Scrolling to the top of page 290.  Let me know when you get to the top of this.

A.  Okay.

Q.  Please let me know when you are done with this section.

A.  Okay.

Q.  Now at the top of 291, let me know when you finish with this.

A.  Okay.

Q.  All right.  Let me know when you are finished here, please.

A.  Okay.

Q.  All right.  Almost done.  Top of page 292, let me know when you finish with this section ending at line 16 on page 292.

A.  Okay.

Q.  Okay.  A little while ago I'd asked whether it would help if you reviewed some documents.  We have reviewed these.

Without any suggestion that your organization is engaging in fraud, please don't take it that way.  Do these documents help you remember?

MR. ATKINS:  Objection, Your Honor.

THE COURT:  Please allow Mr. Langhofer to finish the question, because I can't rule on the objection to a half of a question.

MR. ATKINS:  Apologies.

BY MR. LANGHOFER:

Q.  Do these documents help you recall whether your organization has turned in voter registration forms that are fraudulent?

THE COURT:  You said you weren't going to use that word.

MR. LANGHOFER:  I did.  I'm sorry, I've misspoken.

BY MR. LANGHOFER:

Q.  The word "fraudulent" here is, I will be very clear, not directed at MFV.  They're turning them in, and I have no reason to believe MFV filled out these -- MFV, as such, filled out these forms.  I hope that's clear.

MR. ATKINS:  Objection, speculation and completeness. The witness hasn't been permitted to read all of the --

THE COURT:  Excuse me, remember the speaking objection part?  You are making another speaking objection.

The objection is overruled.

Have you ever been made aware of a discussion that your organization may have turned in voter registration forms that did not have true and accurate information in them?

THE WITNESS:  We have had conversations with -- we try to have a very close working relationship with the election offices, such as they help train our teams, and we regularly want to have a clear line of communication.

And when we have had conversation around -- because remember, we have to turn in every form.  And we are not filling out the form for anybody, so I -- you know, there's only so much you can control or demand folks to fill out in a form, and so we have had conversations about training opportunities.

And at those moments, the election officials have been very kind to engage in conversations with us and even come out and train our staff.

BY MR. LANGHOFER:

Q.  You have though turned in forms that were later found to be inauthentic; am I right?

A.  We have to turn in every form we collect.

Q.  Including the ones that were later found to be inauthentic?

MR. ATKINS:  Objection, speculation.

THE COURT:  Overruled.

You may answer.

THE WITNESS:  I cannot speak to authenticity.  We try to make every effort to turn in as complete form as possible.

BY MR. LANGHOFER:

Q.  Okay.  Look, voter registration in the field is hard,

right?

A.   Correct.

Q.   And do you pay the people who gather the voter registration forms per registration?

A.   Absolutely not.

Q.   Okay.  And if you are going to do something in large numbers with humans, there are going to be problems in what you collect, almost inevitably; do you agree with that?

A.   Mistakes are definitely made.

Q.   You guys try to identify inauthentic voter registration forms that are turned in to you?

A.   Can you repeat the question, please?

Q.   Do you attempt to identify the inauthentic voter registration forms that are turned into you?

A.   I don't have a way to check authenticity of forms.

Q.   What about if someone turns in, I think it was 14 or 15 voter registration forms for the same person.  Do you check for that sort of thing?

A.   We don't have the resources to track that level of information.

Q.   Do you have a process in place to -- let me just move on.

     So you had said that folks in the Latino community are hesitant to share information about citizenship with the government, and you talked about the FAFSA form in particular.

     If I understand you correctly, you are saying that

hesitation to share information about citizenship goes far beyond the FAFSA form; it's like a generalized concern in the Latino community about discussing citizenship with the government, right?

A.   Specifically birthplace.

Q.   The FAFSA form doesn't require your birthplace, though, it just required whether you are a citizen, right?

A.   It does ask questions of both biological parents for the student requesting the application.

Q.   Your position is that in order to apply for Federal Student Aid, you need to say where your parents were born?

A.   Correct, from my last recollection.  I haven't filled one out since I joined this organization.

Q.   Okay.  If it doesn't require that, are you still saying that students would be -- are hesitating to fill out that form because it's asking about a student's citizenship?

A.   The student's hesitancy was providing information about their parents' birthplace.

Q.   Okay.  You all have been involved in this case for about a year.  During that time, have you been able to identify anyone who is an adult resident of this state, who is a citizen, and does not have an Arizona driver's license issued after 1996, a U.S. passport, a U.S. birth certificate, a tribal identity card, or a naturalization number?

A.   Since I am not the one conducting the voter registration

efforts, I cannot identify someone at the moment.

MR. LANGHOFER:  Thank you, Your Honor.  No further questions.

THE COURT:  Mr. Whitaker, do you have any questions?

MR. WHITAKER:  Maybe one clarification.

CROSS-EXAMINATION

BY MR. WHITAKER:

Q.  Good morning, ma'am.  I just want to make sure I understand the FAFSA thing.

THE COURT:  That's Mr. Whitaker from the Attorney General's Office.

MR. WHITAKER:  I am sorry.  I'm Mr. Whitaker representing the State and Attorney General.

THE WITNESS:  Good morning.

BY MR. WHITAKER:

Q.  On the FAFSA, so as I understand your testimony, there may be students who are citizens who are concerned with filling out the FAFSA form because the FAFSA form requires them to list their parents' place of birth and their parents may not be citizens; is that the concern?

A.  That is the concern from the students.

MR. WHITAKER:  Understood.  Thank you.

THE COURT:  Anything on redirect?

MR. ATKINS:  Yes, Your Honor.  Just few questions.  Mr. Atkins.

REDIRECT EXAMINATION

BY MR. ATKINS:

Q.   Is Mi Familia Vota obligated -- legally obligated to turn in all of the voter registration forms that it collects?

A.   Absolutely.

Q.   Does Mi Familia Vota have any databases to verify the information that people put on their voter registration forms?

A.   No, we do not.

Q.   Do you have access to a database to check driver's license numbers?

A.   We do not.

Q.   Are county recorders responsible for verifying the information that's provided on voter registration forms?

A.   That is my understanding.

Q.   Do you expect that Mi Familia Vota will have to spend or reallocate significant resources if HB 2492 goes into effect?

MR. LANGHOFER:  Scope.

THE COURT:  Overruled.  Ms. Porter asked questions along this line.

Go ahead.

THE WITNESS:  What was the question again?  I'm sorry.

BY MR. ATKINS:

Q.   Do you expect that Mi Familia Vota will have to spend or reallocate significant resources if HB 2492 goes into effect?

A.   Yes, definitely.

MR. ATKINS:  No further questions.  Thank you.

THE COURT:  May this witness be excused?

MR. ATKINS:  She may.

THE COURT:  Is there any objection?

MR. WHITAKER:  No.

THE COURT:  Ms. Rodriguez Greer, thank you very much. You may step down.  You are excused as a witness.  And plaintiffs may call their next witness.

MR. HERRERA:  Excuse me, Your Honor.  Excuse us while we do our musical chairs here.

Your Honor, plaintiffs call Martin Quezada to the stand.  My name is Ernest Herrera from the Mexican American Legal Defense and Educational Fund for Promise Arizona plaintiffs.

THE CLERK:  Stand right here and raise your right hand.

**MARTIN QUEZADA, PLAINTIFFS' WITNESS, SWORN**

THE CLERK: And could you please state your name and spell your last name for the record?

THE WITNESS:  Martin Quezada.  Q-U-E-Z-A-D-A.

THE CLERK:  You can go ahead and have a seat on the witness stand.

DIRECT EXAMINATION

BY MR. HERRERA:

Q.   Good morning, Mr. Quezada.  Can you please state and spell your full name for the record?

A.   Sure.  My name is Martin Quezada.  M-A-R-T-I-N. Q-U-E-Z-A-D-A.

Q.   And where do you reside?

A.   I reside in Glendale, Arizona.

Q.   And what is your occupation?

A.   I am an attorney.

Q.   And aside from your work as an attorney, what other jobs have you held in the last couple of years?

A.   I have also served as a state legislator.  I did that for the majority of the time for the past 10 years.  The last eight years of which I was in the state senate.

Q.   And were you -- before serving in the Senate, did you serve in the legislature in any other capacity?

A.   Before the Senate I also served for almost three years in the state House of Representatives, and then I ran for the Senate in 2014 and served there for a full four terms.

Q.   And are you in the Senate now?

A.   I am no longer in the Senate as of January of this year.

Q.   And why is that?

A.   I was termed out after the end of my eighth year, fourth term.

Q.  And what District did you serve when you were in the Senate?

A.  In the Senate I represented District 29, and that was in the West Valley.  It covered large parts of west Phoenix and Maryvale, and south and west Glendale.

Q.  And how did you first come to serve in the Arizona Legislature?

A.  I first came to serve in the year 2012.  I was appointed to fill a vacancy in the House of Representatives.  It was in March of 2012, the Maricopa County Board of Supervisors voted to appoint me to fill that vacancy.

        And then 2012 was an election year as well.  So later that year I ran for full term and then served that term then.  But I got appointed.

Q.  Have you ever -- after being appointed, did you ever have to run for election?

        THE COURT:  I think he just said he ran for a full term in the end of 2012.

BY MR. HERRERA:

Q.  When what was that election like?

A.  Well, I ran for elections in every other year since then, so 2012, '14, '16, '18, '20, and I did run in '22 as well.  So I have run in multiple elections and so they were all interesting to say the least.  Some were more interesting than others for sure, but I could tell you about any one of those if

you would like.

Q.  Sure.  Tell us about the more interesting ones.

A.  I would certainly say, you know, the year of the presidential elections were the most interesting.  That was when you had much greater -- or a higher voter turnout and much more attention to races here in Arizona because of the presidential elections, and because of Arizona's nature as a swing state.

And so I would say particularly the last two presidential elections were the most interesting and the most -- the ones that I remember the most in terms of all that happened in those elections.

Q.  And since your first time running in an election to the last time you had to run in an election, did you notice any changes in your District at that time?

A.  There were consistent changes in my District, and they took any number of forms.  So you have to be a little more specific on what kind of changes you're looking for, but there were consistent certain changes.

Q.  What were the demographics of legislative District 29 like when you first ran as a House member?

A.  Yes, so my District had always been a majority minority district.  And in fact District 29 was the highest -- had the highest percentage of Latino population in the entire state of Arizona.  It had one of the highest percentages of lower income

communities.

The highest percentage of refugees.  The highest percentage of monolingual Spanish-speaking members of the population.  So it was a majority minority district for sure.

Q.  And did you notice any changes over the years in terms of turnout of Latino voters?

A.  Certainly.  There was certainly an increase over the years.  As my district was also one of the youngest districts as well, I think the youngest districts in the state, and so as more Latinos came of age to vote and there was more issues that were of interest to my community and my district, you saw higher voter turnout.  And so that number did increase pretty steadily I think through the years.

Q.  And I am going to turn to a different topic now, but what was the last legislative session that happened during your tenure in the Arizona Senate?

A.  The last session was in 2022, so that was last calendar year from January until, I think that one lasted pretty long into the year, but 2022 was the last one.

Q.  Would that be the second regular session of the 55th Legislature?

A.  I believe so, yes.

Q.  On which committees did you serve during the second session of the 55th Legislature?

A.  I served on the Judiciary Committee.  I was the ranking

member on that committee.  I served on the Government Committee for a long period of time during that session.  And I served on the Rules Committee as well.

There may have been a couple of other interim committees or not permanent committees, but those were the standing committees I served on.

Q.  And when did the second regular session of the 55th Legislature begin?

A.  It would have been the second Monday of January.  Not sure the exact date, but early January.

Q.  And how long do the legislative sessions go, usually?

A.  They're supposed to last --

THE COURT:  Do you live in Arizona?

MR. HERRERA:  I do not.

THE COURT:  Because the answer to that question changes every single year.

THE WITNESS:  It does.  They are supposed to last 100 days, but they last anywhere from 100 to 200 to 300.  I think this last session this year was the longest in history, and I don't even know how long it was.  But I think in 2022 it was a long one, so it lasted pretty long, well over 100 days.

BY MR. HERRERA:

Q.  Thank you for educating an out-of-stater.  But that was kind of -- my question is, was the second regular session longer than 100 days?

A.   It was one of the longest sessions that I had ever been a part of in my nearly 11 years on the legislature.

Q.   Do you know why the second session of the 55th Legislature ran that long?

A.   There were a number of reasons.  I think some of them were just kind of political in nature, in terms of infighting among the Majority Caucus and the ninth floor, the governor's office.

But I think a lot of it came down to the impacts of the pandemic that had just occurred, and just some of the issues that we were dealing with in the session as well.

A lot of those issues kind of took the forefront that weren't normal in that sense, that had happened in past sessions.  And I think with those issues kind of driving a lot of the discussion and a lot of the focus, we as a body were not able to focus on things that we probably should have been focusing on, or that we normally would have focused on in a legislative session.

Q.   And what were some of the issues you think that came up that might have prolonged it?

A.   I think the voting issues is the number one issue I think that came up that was of -- the prime focus I think of that year in the legislature.  A lot of talk about voting legislation, about what the County Board of Supervisors was doing and who should and should not be voting in general I think was -- became a heavy focus, and trying to deal with a

perceived or a -- I believe a made-up idea of voter fraud that needed to be dealt with.

Q.  And you're aware that in this lawsuit there are a couple of bills that have been challenged, right?

A.  I am, yes.

Q.  So besides those bills that you know of, were there other laws that had to do with voting in elections in 2022 in the legislature?

A.  There were a number.  There were several bills.  In fact, I think the Committee on Government that I sat on that was almost the prime topic of conversation in that committee every single week was voting or elections issues, and a few other issues, but there was always several bills or pieces of legislation that dealt with voting or elections issues.

Q.  And when you mentioned a problem that was made-up, and that being voter fraud, why did -- what made you think -- have that opinion about that supposed problem?

A.  Through the years that I had served in the legislature, that had always been like a quote, unquote, problem that was proposed to be dealt with by certain members of the legislature.  And in every committee, you know, we would invite testimony to come up and tell us the nature of this problem, like is this actually a problem.

And after several years, there just -- there was no evidence whatsoever that was ever brought forward to show that

this was actually a real problem that needed to be dealt with in the ways that they were proposing, in terms of these proposed pieces of legislation.

So it seemed as if there were multiple solutions that were being proposed, but they were in search of problems that those solutions were married to.

Q. What were the -- as part of this supposed voter fraud problem, what were the types of supposed voter fraud or illegal voting that were supposed to be happening?

MS. PORTER:  Hearsay.

THE COURT:  Overruled.

You may answer.  It's not offered for the truth, only for a subject matter.

MR. LANGHOFER:  Also competency.  He can't speak to the concerns of the legislature as a body.

THE COURT:  Well, the concerns that you heard raised in your committees and discussions on the floor of the legislature.

THE WITNESS:  Sure.  I am sorry, would you repeat the question, again?

BY MR. HERRERA:

Q.  Sure.  So you mentioned that -- well, of this supposed voter fraud problem, what were the types of fraud or illegal voting that were suppose to be happening as a part of that concern?

A.  Oh, yes.  And I think that it was quite obvious what the intent of the body was.  Because they would --

THE COURT:  No, no, no, no, no.  You weren't asked what the intent of the body was.  That's a whole other issue.

You were asked what the specific claims that you heard discussed of fraudulent voting were.  You know, was it people that were 16 years old that were trying to vote.  People that weren't citizens that were trying to vote.

THE WITNESS:  Yes.  And in that sense, that was a -- was common in conversations I had with legislators.  It was common in the debates and in the introductions to those bills by the sponsors.

They would say that there were people who should not be voting who were voting.  And in that, most of the, time, the implication was that it was people who are not citizens who are voting, or people who are registered in other states who are also voting here, or people who are underage, or just people who were not within the guidelines of who should be voting -- actually voting.

BY MR. HERRERA:

Q.  Now, to get back to kind of some questions about the legislative order of things.  I am going to ask you to help us out with -- maybe it's more help me out since I am not from here.

Because help us out with kind of an Arizona version of

Schoolhouse Rock.  So do bills start in a committee such as a Government Committee?

A.  A simplified answer is yes.  That's usually the first airing of that bill, the first kind of presentation and public opportunity to debate that bill and get voted on it, yes.

Q.  And do they get assigned to a standing committee like that?

A.  Yes.  So -- and that's really the first process is, you know, the Presiding Officer, the President or the Speaker would first read the bill, and then assign it to one of those committees.  And then it's up to that committee chairman whether or not to give that bill a hearing.

Q.  And what typically happens to a bill once it is passed out of committee, such as the Government Committee or the Judiciary Committee?

A.  Well, it depends on whether that bill was assigned to multiple committees or just one committee.

THE COURT:  Why don't we just have a simple example where you only have to go through one committee.

THE WITNESS:  Okay.

THE COURT:  One committee passes it, then what?

THE WITNESS:  If it's assigned to one committee, the Government Committee, the next step is it would have to go to the Rules Committee.  And then every bill, no matter which committee they are assigned to, goes to that Rules Committee.

BY MR. HERRERA:

Q.   After the Rules Committee, let's say -- well, what's in the Rules Committee?

A.   In the Rules Committee, the idea is that it's supposed to be evaluated for technical reasons to make sure that it's technically correct in terms of grammar, punctuation, formatting, and to review it for legality and constitutionality.

     So we have our Rules attorneys who review each of those bills and give us a report on whether the bill might have issues in terms of its legality or conflicting with other statutes or it violates the Constitution.

Q.   As far as you know, does a Rules Committee check to see if bills might conflict with state law?

A.   Yes, they do.

Q.   And does the Rules Committee check to see if a bill might conflict with federal law?

A.   Yes.

Q.   Now, what is -- how does a bill get out of the Rules Committee?

A.   It is a -- it's a vote like any other committee.  So after that report is given by the Rules attorneys, we may have short debate, and then the chairman takes a vote and we vote on it.

Q.   And then after that, where does the bill go?

A.   The bill then goes to a caucus where each -- Democrats and

Republicans will review the bill and get a summary of it, and then it goes to the floor, either to Committee of the Whole or directly to a third read if there are no amendments involved.

Q.   Why would a bill go to the Committee of the Whole before the floor?

A.   For -- really for two reasons.  One is because there are further amendments that are needed to the bill, either that were adopted in the committee or that have come up post committee that need to be added or that want to be added, or just for the sake of debate another step in the process to add a step to debate the bill.

Q.   And in the Committee of the Whole, what happens to a bill that has amendments that were made?

A.   Um, we debate those amendments.  The amendment is proposed. We vote on the amendment to that bill, and then we vote on the bill as a whole as it is amended.  And then it moves on to the final vote, the third read.

Q.   And when you vote on a bill's amend -- with amendments in the Committee Of the Whole, how is that vote conducted?

A.   It's usually just a voice vote.

Q.   And what is the, I guess procedural term for when that voice vote say succeeds or passes?

A.   Sorry, could you say that again?

Q.   In the Committee of the Whole, if a bill gets voted in favor with amendments, what is it called?  What is the term for

that?

A.  I think you are looking for, it's like a "do pass" amended bill.

Q.  Yeah, okay.  After the Committee of the Whole gives a "do pass" recommendation on a bill, then I imagine it goes to the floor?

A.  Well, the Committee of the Whole is on the floor, but it goes to a third read, which is the recorded vote where the names are up on the screen and we all vote in that sense there.

Q.  And do people get to -- or do members get to debate at that point further?

A.  There's not debate during the third read, but there is vote explanation, which kind of turns into a debate sometimes via vote explanations.

Q.  Now, you mentioned a little bit about this, about the 2022 election and some of the issues around purported voter fraud or illegal voting.  At that point, in 2022, was the 2020 general election still a topic of discussion?

A.  Absolutely.  I think it was a heavy topic of discussion.

Q.  What would be the general discussion among members of the Senate about the 2020 election?

        MR. LANGHOFER:  Same objection as to competence, Your Honor.

        THE COURT:  I just want your personal knowledge; that is, you were there.  What were the issues that were being

discussed about the 2020 election -- not what you heard -- like other people said, I heard this discussion, things that you were part of.

THE WITNESS:  Yeah, I heard -- it was mostly about combating voter fraud.  I mean, that was the big -- that kind of summarizes the sentiment, I guess, about the 2020 election.

BY MR. HERRERA:

Q.  And in the previous year, in 2021, was there a legislative session?

A.  Yes.

Q.  And in that legislative session in 2021, was there similar discussion of supposed voter fraud?

A.  Yes, certainly.

Q.  And did the Senate convene any committees other than standing committees to look at that issue?

A.  Yes, absolutely.  I wasn't personally a part of those committees, but I know that they did create those and that again, involved the County Board of Supervisors and looking at how they had handled the election and whether or not they had complied with the law as well.

Q.  What were those committees called?

A.  I don't remember the exact name of what it's called.  They had a name, but it was something to the effect of, you know, an interim committee looking at the -- examining the voter fraud issues in Maricopa County or something to that effect.

Q.  Did you ever see any findings or documents that came out of those 2021 election fraud related committees that gave you evidence that there was voter fraud occurring?

THE COURT:  Well, let's find out if there were any reports or findings published by this interim -- these interim committees.

THE WITNESS:  I believe they published a report, but there was -- I mean, the report in and of itself had nothing that --

MR. LANGHOFER:  Nonresponsive.  The question was -- I don't want to do a speaking objection.

BY MR. HERRERA:

Q.  And were -- had you ever seen a committee like that formed in the Senate in your time in the legislature before 2021?

A.  No, that was the first time I had seen something like that for sure.

Q.  Are you aware whether any of those committees in 2021 dealing with election fraud issued subpoenas to election officials?

A.  I know for a fact they did, yes.

Q.  And did you get to witness any of that testimony by election officials at all?

A.  I believe one of the committees did issue those subpoenas that I sat on, and I am trying to remember, I don't think the subpoenaed individuals actually showed up to testify.

But I believe they sent, you know, representatives from the County instead to speak on their behalf. But that's kind of going back a little bit. I have to remember.

Q. Now, I'd like to turn to one of the specific bills that is the subject of this case here. What is your familiarity with House Bill 2492 from the Second Regular Session of the 55th Legislature?

A. I am aware of that bill. It's obviously one of many that we dealt with, but that bill did go through the committees that I sat on. So it was one of the ones that I was more familiar with during my time there.

Q. And that was -- did that bill go to the Judiciary Committee?

A. That I am not sure -- it was either the Judiciary Committee or the Government Committee. It was one of those, and I am on both of them.

Q. You were serving in the Judiciary -- you said both of them?

A. Yes.

Q. Do you recall a Judiciary Committee hearing about HB 2492 on March 10th, 2022?

A. Yes, I do remember that one, yes.

Q. Okay. And -- sorry, to go back to the voter fraud Senate Committees in 2021 for a moment, did those reports that came out of the committee contain any evidence of voter fraud?

MR. LANGHOFER: Relevance, Your Honor. There's --

THE COURT:  The relevance objection is overruled.

You may answer.

THE WITNESS:  No, I don't believe so, no.

BY MR. HERRERA:

Q.  And to go back to -- so on the March 10th, 2022 Judiciary Committee hearing on HB 2492, were you in attendance in that meeting?

A.  Yes.

Q.  Okay.  Do you recall -- did the committee vote on HB 2492 on March 10th, 2022?

A.  I believe so, yes.

MR. HERRERA:  Could we pull up Exhibit 61, Plaintiffs' Exhibit 61?

BY MR. HERRERA:

Q.  Can you -- Mr. Quezada, could you read the first -- well, do you see that there on this exhibit, it says Arizona House of Representative Senate Judiciary Committee -- well, it would be probably not the House of Representatives.

But it says, Senate Judiciary Committee March 10th, 2022?

A.  Yes.

Q.  And then do you see at the top it says, Senate Judiciary Committee again, March 10th, 2022?

A.  Yes.

MR. HERRERA:  Can we go to the last page of this

exhibit?  Or go up a few pages to the signature?

BY MR. HERRERA:

Q.  And do you see that there's a certification signature there?  And if we zoom out, please, do you see that this is a certification by someone who is authorized to transcribe the foregoing recorded proceedings?

A.  Yes.

        MR. HERRERA:  Your Honor, I would like to move into evidence transcript of the Senate Judiciary Committee from March 10th, 2022, which is --

        THE COURT:  Is there any objection?

        MS. PORTER:  No, Your Honor.

        THE COURT:  Without objection, Plaintiffs' 61 is admitted.

        (Exhibit Number 61 is admitted.)

BY MR. HERRERA:

Q.  Now, could we turn to page 36?  And do you see that there was a vote, as you said, happened on that day?

A.  Yes, I see that.

Q.  And how did you vote on HB 2492 in this hearing?

A.  I voted no.

Q.  Now, let's go -- can we go back to page 33?  Do you see towards the bottom it says that you requested to the chairman explaining your vote?

A.  Yes.

Q.   And who was the chairman of the committee at that time?

A.   I believe that was Senator Warren Petersen, at the time.

Q.   And can you tell me what you recall about your explanation of your vote on HB 2492 in this hearing on March 10th, 2022?

MS. PORTER:   Best evidence.  We have the transcript.

THE COURT:   Just -- sustained.  Why would -- if this is the transcript of what was said, why do we have to rely on his recollection?

MR. HERRERA:   That's fine.

BY MR. HERRERA:

Q.   So we have your comments here.  So I have a couple of questions about your explanation.

Do you recall noting that the bill was unnecessary?

MS. PORTER:   Relevance.

MR. HERRERA:   Your Honor, this goes to --

THE COURT:   I did not ask for a response to the objection.  Ask a different question about whether he recalls something that he said?  We all know what he, because we just admitted it in evidence.  So -- it's obviously relevant because it is admitted, but whether he recalls what he said or not is -- doesn't advance the case.  If you want to ask him a question --

MR. HERRERA:   Sure.

THE COURT:   -- about something that's not in here, that's fine.

MR. HERRERA:  Okay.  Could we go to page 35 of the transcript, please?

BY MR. HERRERA:

Q.  Do you see at the top of the page your comments there?

A.  Yes.

Q.  And do you see where it says, "Take a look around.  Look at the room.  Look at the people you are sitting next to in the room"?

A.  Yes, I see it now.

Q.  Now, why did you say that?

A.  The committee hearing room that day was a packed committee, it was a packed house.  There was every seat, I believe was filled, and there was lots of people who were there to testify in opposition to this bill.

It was a crowd of people of color.  And so I was pointing out to the crowd like this is -- letting them know, this is who is out there, this is the make up of the crowd.

Q.  And why did you point that out in relation to this bill?

MS. PORTER:  Relevance.

THE COURT:  Overruled.

You may answer.

THE WITNESS:  Because I believed that the impacts of that bill, that particular legislation, would have a disproportionate impact on those very people who are sitting in that room.

BY MR. HERRERA:

Q.  And do you recall what you were trying to convey about that bill?

MS. PORTER:  Relevance.

THE COURT:  Sustained.  Not what he was trying to convey, it is what he did convey, which we know.

MR. HERRERA:  Yep.

BY MR. HERRERA:

Q.  Now after that -- after you -- well, what -- were you -- did you get to finish your explanation of your bill?

A.  I did not.  In the middle of my vote explanation.

Q.  I'm sorry, I said bill.  I meant, did you get to finish your explanation of your position on the bill?

A.  I did not.  And right in the middle of my explanation of that vote, the chairman interrupted and he eventually recessed the committee.

Q.  And what happened when -- right after he recessed the committee?

A.  The -- I got up to leave the dais out into the hallway.  I know that the sergeant of arms -- the Sergeant at Arms was removing somebody from the crowd that the chairman had ordered.

And the chairman came out to me in the hallway and kind of got if my face at that point and was telling me, "Like why are you riling up to crowd?"  And "This is your fault that we have to recess," and kind of stuff like that.

And so the Sergeant at Arms had to actually separate us at that time and put me in another hearing room, just said, "Wait here for a little while."

Q.   What did you say to Senator Petersen then?

MR. LANGHOFER:  Relevance.

THE COURT:  Sustained.

BY MR. HERRERA:

Q.   What was your reaction in the moment to --

THE COURT:  Excuse me.  I take it one of the things the transcript of the audio doesn't show is that there was a reaction from the audience to the things that you were saying?

THE WITNESS:  Yeah, that was definitely the case.

BY MR. HERRERA:

Q.   And what was the reaction of the audience to what you were saying?

A.   They were reacting in agreement.  I think, you know, some of them were -- I think some of them got vocal about that, and I think that's what upset the chairman.  I don't know if they clapped or if they snapped their fingers or something to that effect, but they were -- they started to make some noise.

And so that -- he stopped that immediately, and that's when he interrupted my vote explanation and ultimately recessed the committee.

Q.   Had you ever seen a committee chairperson recess a meeting like that?

MR. LANGHOFER:  Relevance.

THE COURT:  Sustained.

MR. HERRERA:  Goes, Your Honor, to the --

THE COURT:  Sustained.

MR. HERRERA:  It does go to Arlington Heights, Your Honor --

THE COURT:  I did not ask for further explanation.

MR. HERRERA:  I feel like I have to make my record here, Your Honor, about our claim under the 14th Amendment. And this is proper Arlington Heights evidence, statements of the legislators at the time and the procedure, also whether the procedure was normal.

THE COURT:  Didn't ask him about any statement.

Ask a new question.

BY MR. HERRERA:

Q.  Mr. Quezada, besides what you just said about what Mr. Petersen -- or Senator Petersen, I'm sorry, told you about riling people you?  What else did he say to you?

A.  He said, and I am having to go back and remember this, but it was something to the effect of, you know, "It's your fault that, you know, when you do that that these people get out of hand and they start making noise and disrupting our committee," something to that effect.

Q.  And how did you feel when he said "these people"?

MS. PORTER:  Relevance.

THE COURT:  Sustained.

BY MR. HERRERA:

Q.  And later after this committee hearing, how did you vote on House Bill 2492 when it went to the Senate floor?

A.  I voted no on that bill throughout the process.

Q.  Okay.

MR. HERRERA:  Could we go to Exhibit 62, please?

BY MR. HERRERA:

Q.  I assume if you were -- if you voted no on HB 2492 you were there when that bill went to the Senate floor?

A.  Yes, I would assume so.

Q.  Okay.  And do you recall if that was March 23rd, 2022?

A.  That sounds about right, yes.

MR. HERRERA:  And, Your Honor, I would like to move into -- first, let's look at this document here we have in front of you, Mr. Quezada.

MS. PORTER:  Your Honor, we don't have any objection to this exhibit, so we don't need to lay the foundation?

THE COURT:  Thank you, Ms. Porter.

MR. HERRERA:  Thank you.

THE COURT:  Did you wish to offer 62?

MR. HERRERA:  Yes, Your Honor.  I wish to offer into evidence Plaintiffs' Exhibit 62.

THE COURT:  Without objection, Plaintiffs' 62 is admitted.

(Exhibit Number 62 is admitted.)

BY MR. HERRERA:

Q.   Earlier we talked about the March 10th, 2022 Judiciary Committee Meeting.  Would House Bill 2492 have had to have gone through the Rules Committee after that?

A.   Yes.

Q.   And would that have happened before this floor session?

A.   Yes.

Q.   And did you sit on the Rules Committee in the Senate in 2022?

A.   I did, yes.

Q.   Could we go to page 7 of the transcript, please?  And here you refer to the Rules Committee in this transcript.  What did you say about what the Rules Committee did with this bill?

          MS. PORTER:  Relevance.

          MR. LANGHOFER:  Best evidence.

          THE COURT:  What he said is -- are you asking him to read what he said?  Because --

          MR. HERRERA:  Essentially, yes, Your Honor.

          THE COURT:  Well, I just admitted the exhibit.

          MR. HERRERA:  Okay.

          THE COURT:  So what he said is right here in front of us.

          MR. HERRERA:  Okay.

BY MR. HERRERA:

Q.  Does what's on page 7 accurately reflect what you said?

A.  Yes.

Q.  Okay.  Now, I want to talk about another bill.  What is your familiarity with HB 2617 from the second regular session of the 55th Legislature?

A.  I have the same level of familiarity with that bill as well.  It went through the committees that I sat on, and it was obviously one of many that I voted on during that year.

MR. HERRERA:  Could we show Exhibit PX67, or plaintiffs' Exhibit 67?

BY MR. HERRERA:

Q.  Now, the text is a little garbled down below, but before I ask you more questions about it, do you recall what committee HB 2617 was assigned to in 2022?

A.  If I remember correctly, this one was a Government Committee.

MR. HERRERA:  Your Honor, I don't know if -- I would like to move into evidence Plaintiffs' Exhibit 67.

MS. PORTER:  No objection.

THE COURT:  I have no idea what this is, so admitting it into evidence is not going to be particularly helpful to me.

MR. HERRERA:  Sure.

BY MR. HERRERA:

Q.  Are you familiar with this type of document, Mr. Quezada?

A.   Yes.

Q.   It looks like a printout.  What is it?

A.   So this is a -- it is a description of the path that the bill took throughout its journey from the start to the finish. And so at the top is the, you know, the bill title, the bill sponsor.  The date that it started its journey, the committees it was assigned to in the House of Representatives, the first two sections, and then some more kind of technical dates that things happened.

Committee of the Whole is where it says, Show House COW, and the action that happened there.  And then the House Third Read vote totals.  And then below that is when it was transmitted to the Senate.

And then the document kind of continues on.  I don't know if there's a second page.  Yeah, there is, and it tells what happens in the Senate in the same way.

Q.   Okay.  And so this would reflect sort of the history of the bill as it went through the legislature?

A.   Correct, correct.

MR. HERRERA:  Your Honor, I would like to move this exhibit into evidence.

THE COURT:  Without objection, 67 is admitted.

(Exhibit Number 67 is admitted.)

BY MR. HERRERA:

Q.   Now, were you a member of the government committee when HB

2617 was assigned to it?

A.  Yes, I believe so.

THE COURT:  Do you know that I have no idea what HB 2617 is.

MR. HERRERA:  Yes, Your Honor, and that's why we are looking at it.

THE COURT:  I mean, it would -- before we talk too much about it, could you tell me if you recall what the general subject matter of HB 2617 is?

THE WITNESS:  Yes.  Yes, Your Honor.  And at the very top of the first page the short title usually gives a good summary of it, but voter registration cancelations and causes.  So that -- without going back and looking at the actual details of it, it had something to do with reasons to cancel people's voter registrations.

THE COURT:  Is this the one that ultimately was vetoed by the governor, or is that a different one?  Different number?  Would it show?

THE WITNESS:  It would if there's a third page.  I am not sure if there is.

MR. LANGHOFER:  As a legal matter, Your Honor, it was vetoed.

THE COURT:  Oh, vetoed, there it is.

THE WITNESS:  Yes, Your Honor.

BY MR. HERRERA:

Q.  All right.  And do you recall how you voted on this bill?

A.  I believe I voted no on this bill throughout the process as well.

Q.  Okay.  Could we look at -- well, I want to --

MR. HERRERA:  Sorry to backtrack a little bit before we get into this bill, but could we take down this exhibit, please?

BY MR. HERRERA:

Q.  Going back a little bit to HB 2492, do you recall what the Rules Committee Rules attorney said about HB 2492?

MR. LANGHOFER:  This is inadmissible for the truth of the matter, Your Honor.

THE COURT:  Sustained.

BY MR. HERRERA:

Q.  What was your understanding of what the Rules Committee Rules attorney said about HB 2492?

MR. LANGHOFER:  Same objection.

THE COURT:  Still sustained.  Plus you just admitted an exhibit where he told the legislature what the Rules attorney said.

MR. HERRERA:  Okay.

THE COURT:  So that was admitted without objection because it was actually his statement that he made.  So I don't know why we have to try to get in the hearsay statement of the

Rules Committee lawyer.

MR. HERRERA:  Well, I will get us back to HB 2617 then, Your Honor.

THE COURT:  Great, I think.

MR. HERRERA:  Could we look at Plaintiffs' Exhibit 4, please?

BY MR. HERRERA:

Q.  And this one I don't know if it's -- Mr. Quezada, have you ever seen this document based just on the first page before?

A.  Yes.

THE COURT:  Okay, if there's not going to be a foundation objection, let's not go through the tedium of laying the foundation.  There might be objections to this, but I'm guessing none of them have to do with whether or not this is an accurate copy of House Bill 2617.

MS. PORTER:  Your Honor, I believe this was already admitted.

THE COURT:  And it's already admitted.  Even better.

MR. HERRERA:  Sorry.  I was mistaken -- we were mistaken about whether it was admitted.  Sorry about that. Thank you, Ms. Porter.

BY MR. HERRERA:

Q.  All right.  So what does Senate Engrossed mean?

A.  That is the version of the bill that the Senate voted on and passed out.  So the final step in the Senate this was the

version that the Senate approved.

MR. HERRERA:  Okay.  Can we go to section 1 of this bill?  It should be on the second page?

BY MR. HERRERA:

Q.  Do you see where it appears to amend A.R.S. 16-165, causes for cancelation?

A.  Yes.

Q.  Okay.  And do you see what the bill says further down under -- right under that:  The County Recorder shall cancel a registration?

A.  Yes.

Q.  Okay.  And then do you -- let's go down to A10, so a little bit further down the page.  And do you see where it says:  When the County Recorder receives and confirms information that the person registered is not a United States citizen?

A.  Yes.

Q.  Okay.

THE COURT:  So do I interpret these correctly that when it's red and it's struck through that's the existing statute, and then the blue is the amendment to the statute?

THE WITNESS:  Yes, Your Honor.  The black text, normal text is existing language.  Red is -- red and stricken is text that's being proposed to be deleted.  And then capitalized blue is proposed additions to the law.

THE COURT:  Thank you.

BY MR. HERRERA:

Q.  And so would it be fair to say that this provision in this bill was about sending a notice to someone, and you can take a minute to review it.  It was about sending a notice to someone that their registration -- that their registration might be canceled for supposed lack of U.S. citizenship?

THE COURT:  I think that might be on the next page.

MR. HERRERA:  Yes, that is Your Honor -- well the notice part, yes.

BY MR. HERRERA:

Q.  And then if we look again at 10B, do you see that it says: When the recorder receives and confirms information that the person registered has been issued a driver's license or the equivalent of Arizona nonoperating identification license from another state?

A.  Yes.

Q.  So on the next page, if we go to capital C, subsection C, and then under that there's a one and a two, right?  Is it true that -- do you see that HB 2617 gives the voter 90 days to respond to a notice pursuant to the section A10(a), asking for evidence that the person is citizen?

A.  Yes.  It will be canceled in 90 days.

Q.  Okay.  And then do you see under C2 that if a person might have an out-of-state license, they also have 90 days to respond to a notice, right?

A.  Yes.

MR. HERRERA:  Okay.  Now, can we go to page 4 of this exhibit?

BY MR. HERRERA:

Q.  And do you see section F?

A.  Yes.

Q.  And do you see that there's a provision about requiring the Secretary of State to do a comparison of the voter registration database to the driver's license database?

A.  Yes.

Q.  And then do you see a little further down on this page section H which talks about:  If a County Recorder has reason to believe someone is not a U.S. Citizen running them through SAVE?

A.  Yes.

MR. HERRERA:  Okay.  And can we take this down, please?

BY MR. HERRERA:

Q.  Now, we went over -- we obviously already covered what happens to 2617.  Do you remember how you voted on it?

THE COURT:  He already said he voted no.

MR. HERRERA:  Okay.

BY MR. HERRERA:

Q.  And now let's move to to another bill here.

THE COURT:  Let's take our morning break before we go to another bill.

Court is in recess for 15 minutes.

(Recess taken at 10:41 a.m.; resumes at 10:57 a.m.)

THE COURT:  Thank you.  Please sit down.

You may continue your questioning, Mr. Quezada.

BY MR. HERRERA:

Q.  I know I said I was moving on to another bill, but just a couple more questions.

MR. HERRERA:  Can we bring up Exhibit 4 again?  And then could we please go to page 4?  Then the next page, sorry. Could we go to page 2?

BY MR. HERRERA:

Q.  And under -- because both of these issues having to do with -- well one, if someone does not have citizenship, and another if someone has a license or an ID from a different state.

In both of those cases, if the person doesn't provide the notice under HB 2617, their registration would be canceled, right?

A.  Yes.

Q.  Let's move on to House Bill 2243.  Now, what is your familiarity with HB 2243 from the second regular session of the 55th Legislature?

A.  Yeah, it was a bill that went through the same committees I

sat on again.  So it was one of the bills -- one of the many that I voted on that year, but I would have more familiarity with this one, only because it went through my committees.

Q.  And is it your understanding that there's a relationship between HB 2243 and HB 2617 that we were just discussing?

A.  I am not sure I am following.

MR. HERRERA:  So could we show Exhibit 63, please? And Your Honor, I would like to move this into evidence.

THE COURT:  It is not in already?

MR. HERRERA:  I do not think so, Your Honor.

MS. PORTER:  No objection.

THE COURT:  63 is admitted.

(Exhibit Number 63 is admitted.)

BY MR. HERRERA:

Q.  And do you see that at the top it says, HB 2243 in large letters, and then underneath it says introduced?

A.  Yes.

Q.  And would this be the introduced version of the HB 2243?

A.  Yes, in this format here this is the bill as it first starts its journey in the legislative process.

Q.  And do you see where it says it's amending section 16-152?

A.  Yes.

Q.  Okay.  And then can we go to the next page?  And do you see that this bill deals with that same title I just read, that same statute, and it says:  Registration form?

A.  Yes.

MR. HERRERA:  Now, could we go to the next page, please?

THE COURT:  Can I just clarify with you, is this the passed version  of the bill?  The bill that got eventually signed into law?

MR. HERRERA:  This is the introduced version of the 2243 that would eventually get signed into law.

THE COURT:  That's not my question.  I know this is the introduced version.  I want to be sure this is the actual one that was signed into law so that I don't have multiple versions of 2243 and don't know which is which.

MR. HERRERA:  You know, Your Honor, actually that's kind of why I wanted to show this to clarify.

THE COURT:  Just answer my question.  Is this the bill that was enacted?

MR. HERRERA:  No, Your Honor.

THE COURT:  It's not?  So somehow I am going to have to keep straight which -- this is why I thought it was already in evidence.  So this is --

MR. HERRERA:  That's probably --

THE COURT:  This is a different version of 2243.  So I am going to have two of them in evidence, and I am going to have to figure out which is which.

MR. HERRERA:  Yes, Your Honor.  So the one that was

signed enacted, that was Exhibit 2, and that's been admitted.

THE COURT:  Great.

MR. HERRERA:  And this is Exhibit 63, and this is introduced.

THE COURT:  Well, I might have to not admit it, unless I think it's important.  Because this is going to be very confusing.  And looking at exhibits -- and I have two that look virtually the same except for some fine points of difference.

MR. HERRERA:  That's kind of our point, Your Honor, that's why we're bringing it up.  So if we look --

THE COURT:  I am concerned about deciding the case not whatever point you are trying to make that might not be significant enough to have this in evidence.

MR. HERRERA:  Since it's already in evidence, I can just say this, but the section -- the statute that is amended by -- that is the subject of Plaintiffs' claims on HB 2243, it amends A.R.S. Section 16-165, and those are mainly the provisions we're challenging, the ones as amended.

This introduced version does not amend 16-165 at all.

THE COURT:  And why am I going to care about that?

MR. HERRERA:  Because of how this bill comes to be the bill that is later signed into law.

THE COURT:  And how is this going to show me that?

MR. HERRERA:  This shows you what we started with, or what the legislature started with.

THE COURT:  Why do I care what they started with?  Why don't I only care what they ended up with?

MR. HERRERA:  How they ended up with that is I think what's relevant, Your Honor.

THE COURT:  Well, I think you can ask him about that without me having to have a confusingly similar bill in evidence.  So at the present time I am going to reverse my admission of this one.

MR. HERRERA:  Your Honor --

THE COURT:  And you can ask him about how the things got changed.

MR. HERRERA:  Okay.  Your Honor --

THE COURT:  If he needs this to refresh his recollection about that, that's fine.

MR. HERRERA:  Right.  Well, I think this would go to procedural history, Your Honor, under Arlington Heights, that's why it's relevant.  And we would want to be able to cite to it in our case, Your Honor, this introduced version.

MR. LANGHOFER:  If I may, Your Honor, our position is that none of these actually need to be admitted because they are legal authorities and don't -- it's not really an evidentiary issue, it's a legal matter.

So I think -- our position is they can cite to anything that is in the legislative record.

THE COURT:  That's in the legislative record?

MR. LANGHOFER:  That's correct.  If it's publicly available on the legislative record, it's fair game.  Like you don't have to admit into evidence the discussion of a Senate debate in Washington D.C., it's  part of the legislative record.

THE COURT:  Okay.

MR. HERRERA:  I don't know that that's the case, Your Honor, for a bill that wasn't passed, a version of a bill that wasn't passed.

THE COURT:  You don't think it's in the legislative record?

MR. HERRERA:  No, it is in the legislative record.

THE COURT:  Okay.  Let's put it this way, I am going to let you cite to it rather than me having two exhibits that look exactly the same, except I have to figure out where it's different.

MR. HERRERA:  Well --

THE COURT:  But continue with your examination.

MR. HERRERA:  One is missing an entire statute, Your Honor, amendments to an entire statute.  The beginning one, but I see what you are saying.

BY MR. HERRERA:

Q.  So --

THE COURT:  So do you remember that there were some last minute floor amendments before HB 2243 was passed?

THE WITNESS:  Yes, Your Honor.

THE COURT:  See, he remembers.

BY MR. HERRERA:

Q.  Well, what do you remember about those last minute amendments, Your Honor -- or Mr. Quezada?

A.  Yes.  Your Honor, so the bill as it was introduced was a lot simpler than it was on the one that we voted on before it was finally passed and sent to the governor.

On the last day of session, I believe, is the one that this bill is, a pretty significant floor amendment was added during the Committee of the Whole portion of that process.

THE COURT:  And as I recall from things that I have read about in connection with this lawsuit, one of the things that happened was that 2617, which had amendments to 16-165.

MR. HERRERA:  That one did not -- yes, Your Honor, I am sorry.

THE COURT:  Was vetoed by the governor, and so those provisions with some changes were then at the last minute on the floor put into 2243.

THE WITNESS:  Yes, I think that's pretty accurate.

THE COURT:  Okay.

BY MR. HERRERA:

Q.  And do you understand what were the provisions that -- what were the changes that were made to the provisions that were taken from the vetoed 2617 and into HB 2243?

THE COURT:  Other than 90 going down to 35 days?

MR. HERRERA:  Yes.  Yes, Your Honor.

THE COURT:  Are there any others that happened?

THE WITNESS:  Your Honor, there may have been others but that was the significant one for sure.

BY MR. HERRERA:

Q.  All right.  Do you also recall that there's a difference in -- that in the bill that passed, that the amendment that was introduced for HB 2243, that it had a different consequences for someone who was suspected of -- who did not provide proof of citizenship versus someone who did not provide proof that they were indeed a resident of their county in Arizona?

A.  I believe so, yes.

Q.  And what do you recall about that?

A.  I would -- to be honest from my recollection, I don't know exactly what those differences were.

MR. LANGHOFER:  Best evidence.

THE COURT:  I'm sorry, I didn't --

MR. LANGHOFER:  Best evidence.

THE COURT:  Sustained.

MR. HERRERA:  Okay.  Could we go to Exhibit 2, please? And could we go to the next page?  And sorry, the next page. And let's go on to the next one.  All right.  And sorry, keep going, one more.

BY MR. HERRERA:

Q.   And do you see under A10 that it says:  When the County Recorder obtains information pursuant to this section and confirms that the person registered is not a United States citizen.

And then there's more text, and then there's a notice that's sent, right?

A.   Yes, I see that.

Q.   And at the end, do you see the last three lines, 17 through 19:  If the person registered does not provide satisfactory evidence within 35 days, the County Recorder shall cancel the registration and notify the County Recorder and Attorney General for possible investigation?

A.   Yes.

Q.   Do you recall if that's the same for someone who doesn't prove that they are indeed a resident of Arizona or rather who has a -- strike that.

Do you recall if that's the same consequence in 2243 for someone who has an out-of-state license or ID?

A.   I believe those were different provisions in those two separate versions of the bill.

MR. HERRERA:  Okay.  Let's go to the next page, please.  And the next page.  Could we go back one page, please?

BY MR. HERRERA:

Q.   And do you see section E?

A.  Yes.

Q.  And do you see that each month the Department of Transportation shall furnish to the Secretary of State without charge a list of persons who the department has been notified have been issued a driver's license or the equivalent of an Arizona nonoperating identification license in another state?

A.  Yes.

Q.  And then a notice is sent to that person, correct?

A.  Correct.

Q.  Okay.  And what happens, if you can recall, or -- from reading this, what happens to that person if they don't respond to that notice?

        MR. LANGHOFER:  Legal conclusion.

        THE COURT:  Sustained.  He and I can both read it at the same time.

BY MR. HERRERA:

Q.  So would it be fair to say that there's a different consequence for this -- for someone under these circumstances and they are put in inactive status versus canceled?

        MR. LANGHOFER:  Same objection.

        THE COURT:  Sustained.

BY MR. HERRERA:

Q.  So Mr. Quezada, do you understand there are different consequences under HB 2243 for someone who is suspected of not being a citizen and someone who is suspected of having an

out-of-state license?

MR. LANGHOFER:  Same objection.

THE COURT:  I understand that so whether he does or not is -- really doesn't matter, but you could ask him more questions about that.

BY MR. HERRERA:

Q.  So was that part of why you spoke against the bill in your reason for your vote on June 22nd, 2022, on the floor?

A.  Yes.  Those differentiations I thought were of critical importance and I thought should have been part of the record and part of that debate, and so that was one of the reasons why I voted no.

MR. HERRERA:  Could we bring up Exhibit 65, please?  No, sorry, 64.

BY MR. HERRERA:

Q.  Okay.  Can we -- do you see that this is a -- well, it's not playing right now.  You see an image.  Do you see that this is a video?

A.  Yes.

Q.  And are you familiar with this type of video?

A.  Yes.

Q.  Okay.  Well, before I go further --

THE COURT:  My screen is totally blank, so what are we asking about?

MR. HERRERA:  It is an exhibit that's a video, Your

Honor, Plaintiffs' Exhibit 64.  We would like to move it into evidence.

THE COURT:  What is it a video of?

MR. HERRERA:  It is a video of the Committee of the Whole in floor session of the Senate on June 22nd, 2022.

THE COURT:  Is this the one we were talking about earlier where while he was explaining his vote, there was noise and the meeting was adjourned, or is this a different meeting?

MR. HERRERA:  This is the Senate floor, Your Honor, where he is speaking.

THE COURT:  Okay.  And is there some reason why it has to be a video rather than an audio transcript?

MR. HERRERA:  If it's admitted there's -- I mean, I can ask him about it, but I would like to have it admitted because of the remarks made by Mr. Petersen -- by Senator Petersen and Mr. Quezada.

THE COURT:  Oh, I'm not doubting the -- what is said but the last one was an audio recording that you had put into a transcript so that I didn't have to listen to it over and over to make sure that I understood what was being said.  So I just wondered if there was a reason why --

MR. HERRERA:  Sure.

THE COURT:  -- you want this audio as opposed to transcript, which then I can read and I don't have to --

MR. HERRERA:  Sure.

THE COURT:  Unless you have closed captioning on here like they do on video depositions.

MR. HERRERA:  You know in school they'd roll in the TV as a substitute.  You don't want to watch a video, Your Honor, of that?  Okay.  Well, there is a transcript, I think it's 495.

THE COURT:  So is there something that makes the transcript not sufficient?  It just takes -- presumably both sides have had a chance to review the transcript and I don't have to interpret what's being said on the video, which is often not clear.

MR. HERRERA:  Sure.  I have -- it will be -- well, they would be transcripts 499 and 500.  And those would have the relevant segments that I wanted to have admitted but also be able to refresh the witness's memory if he does not recall what his comments are or what the comments of others were.

MR. LANGHOFER:  We like transcripts, Your Honor.  It's a lot easier, particularly on appeal.

THE COURT:  Oh, I forgot about that.  I bet you that the Court of Appeals likes video even less than I do as an evidentiary item.  Can we just do the transcripts instead?

MR. HERRERA:  I think -- the transcripts, yes, we can definitely do, Your Honor.  As far as the video --

THE COURT:  So there's no objection to the admission of the transcripts.

MR. HERRERA:  Right, it's just that I would have to

make sure -- could we go to 499?  Go to the first page, please?
And then 500 and go to the first page of actual transcription?

I think that would be fine, Your Honor.  We prefer to have the video just to capture the -- I think fully what happened, but the transcriptions we'll move into evidence now.

THE COURT:  Okay.  And they are number?

MR. HERRERA:  499 and 500.

THE COURT:  Without objection, 499 and 500 are admitted.

(Exhibit Numbers 499 and 500 are admitted.)

BY MR. HERRERA:

Q.  Now, do you recall -- and let's go to 499, please?

Do you recall on -- during the Committee of the Whole on June 22nd, 2022, Senator Petersen's floor amendment?

MS. PORTER:  Best evidence.

THE COURT:  Overruled.

Just yes or no, please.

THE WITNESS:  I do, yes.

BY MR. HERRERA:

Q.  Do you recall that Senator Petersen made remarks about his amendment?

A.  Yes.

Q.  And what do you recall about the accuracy of his comments?

MS. PORTER:  Best evidence.

THE COURT:  No, he didn't ask him what he said.  He is

asking him about the accuracy of what he said, which is a little vague.

MR. HERRERA:  Sure.

BY MR. HERRERA:

Q.  Do you recall that Senator Petersen made comments about --

THE COURT:  Why don't we look at his comments and you can ask him the question.

MR. HERRERA:  Right.  That was my intention, Your Honor, originally to show the video so we could do that, but I think we can just show the transcript.  So let's go to page 3.

BY MR. HERRERA:

Q.  Okay.  And do you see that Senator Petersen said:  This amendment is basically what was House 2617 passed out of here.

Do you see that.

A.  Yes.

Q.  And then it was vetoed by the governor and Senator Petersen notes that, right?

A.  Yes.

Q.  And then Senator Petersen said:  And that's one --

THE COURT:  Let's have him -- we'll all read it together silently.

MR. HERRERA:  Okay.

THE COURT:  And then you can ask him the question.  So you want him to read through what line?

MR. HERRERA:  So this page, 9 through 25.

THE COURT:  Okay.

We are done reading.

MR. HERRERA:  Okay.

BY MR. HERRERA:

Q.  And do you see where you read the last part where it said:

It adds additional notice requirements.

Was that an accurate statement?

A.  I believe so, yes.

Q.  Okay.  And then he says:  But besides that, it's identical.

Was that accurate?

A.  Oh, I'm sorry.  Going back to your last question, it

changed the notification requirements, so I think that was more

accurate than adding notification requirements.  And so and --

I forgot what your second question was.

Q.  Sure.  And then the next question was, if it was identical

to the prior bill being HB 2617?

A.  Oh, yeah, I think that the two bills, if you look at them

as a whole, were significantly different after the amendment

that was offered.

Q.  Okay.  And what did you say when you explained your --

well, when you spoke up against or about the amendment on HB

2243 on June 22nd, during the Committee of the Whole?

A.  I pointed out that what -- that Senator Petersen's

explanation of his amendment wasn't entirely accurate.  I think

that was the point of my comments, was that there was some

significant differences that he left out of that explanation.

Q.  Okay.  And what were those significant differences?

A.  I think that, number one, the -- the notice requirement was one.  The fact that they were different from the original version was something that was more than a minor cleanup, which I took his comments to imply that these were minor changes, cleaning up some things.  But the changes were actually much more significant than that.

Q.  And when did you first learn about this amendment?

A.  On that day, this was the last few days of session, we probably got that amendment within minutes of actually voting on it on the floor, and that was common in those types of situations.

Q.  To get the amendment minutes before the vote?

A.  Yeah, without having a chance to really read through it thoroughly, like the time we're taking here, we didn't have that opportunity, or to check in with stakeholders to review it with staff.  There was very minimal time to do any of that.

Q.  You said that was common though.  So it would be common to get significant amendments just before you vote on it?

THE COURT:  At the end of the legislative session I think is part of the reason; is that right?

THE WITNESS:  Well, it was common that we would get amendments without much notice, for them to be that significant though was certainly not as common.  I mean, that was

definitely a differentiation and something that was, in my opinion, I never liked that practice and so we tried to avoid that at all costs.

If there was going to be a significant type of an amendment like that, we would usually ask for time, say, let's do this one tomorrow, so we can at least go home and look at it overnight.

In this instance, we didn't get that opportunity to review it or review the significance of it.

THE COURT: So why is that? Isn't there some procedure that you can use to delay a vote so that you have a chance to review an amendment?

THE WITNESS: We can try, but it comes down to kind of the partisan nature. Oftentimes the minority -- if the majority wishes to move forward, they are going to move forward.

BY MR. HERRERA:

Q. Did you have the votes to call a special vote to block it?

MR. LANGHOFER: Legislative record speaks for itself, Your Honor.

THE WITNESS: I'm sorry, say it again.

THE COURT: He obviously didn't because it didn't happen.

MR. HERRERA: Well, yeah.

THE COURT: I mean, I think it's obvious that's what

he wanted to do but he couldn't do it because they wouldn't have had the votes to do it.

BY MR. HERRERA:

Q.  Is that right, Mr. Quezada?

MR. LANGHOFER:  Foundation.  I think we need to know whether there was ever such a motion.

THE COURT:  Well, I think the transcript --

MR. HERRERA:  Well, I think you're objecting to the Judge.  Sorry.

BY MR. HERRERA:

Q.  Was that the case -- what Judge Bolton just described?

MR. LANGHOFER:  Same objection.

THE COURT:  Overruled.

THE WITNESS:  We did not have an opportunity to delay that vote at all.  And in those situations, most of the times there's not a formal motion that is made but it's usually a conversation with the presiding officer, hey, can we do this one tomorrow or can we delay this?  And it's like, nope, we're moving forward.

Q.  And later that day, when it went to a final vote, you spoke up against the bill again, right?

A.  Yes, during the third read, which is the final recorded vote, yes.

Q.  Okay.  Now, did you -- how did you vote on HB 2243?

A.  I voted no.

Q.  And why did you vote against it?

A.  For a lot of -- really the same reasons I had voted no against it throughout, but for this one especially, it was because of the significance of that last amendment that we had just adopted.

It was probably within the last couple of hours during Committee of the Whole, and then we turned around and flipped it and did a final read vote on it -- or a third read vote on it right after that.

Again, with so little time to even check in with stakeholders or to talk with staff about it or to get feedback from the community.  I wasn't comfortable voting yes on it.

Q.  And besides the short time that you had to review the amendment and the procedure, were there other substantive reasons about the bill that made you vote against it?

MS. PORTER:  Relevance.

THE COURT:  I'm sorry, couldn't understand what you said.

MS. PORTER:  Sorry.  Objection, relevance.

THE COURT:  Sustained.

MR. HERRERA:  Your Honor, it goes to Arlington Heights and intent of the bill.  I think he can explain his intent behind voting against the bill.

THE COURT:  I said sustained.

MR. HERRERA:  I think Your Honor this is -- we need --

there is certain evidence that we want to get in about the intent of this bill under --

THE COURT:  His intent in voting no doesn't say anything about what the intent of the bill was.

MR. HERRERA:  Right, but we -- it does explain the intent of other -- it reflects on the intent of those who did pass the bill, choose to pass the bill, Your Honor.

THE COURT:  Sustained.

BY MR. HERRERA:

Q.  Why do you think that this bill was passed?

MS. PORTER:  Personal knowledge.

THE COURT:  Do you have any personal knowledge from the individual who introduced this bill or its amendments as to what the intent was?

THE WITNESS:  Your Honor, I think the personal knowledge would only come from what that sponsor or the supporters of the bill testified to throughout the legislative process.

THE COURT:  Okay.  That's fair.

BY MR. HERRERA:

Q.  Did you -- I am going to go back a little bit in time to a different house bill, the one we discussed HB 2617.

MR. HERRERA:  Okay.  Could we go to Exhibit 495, please?

And I would like to move this transcript into

evidence, Your Honor.

THE COURT:  Any objection to 495?

MS. PORTER:  No, Your Honor.

THE COURT:  Without objection, 495 is admitted.

(Exhibit Number 495 is admitted.)

MR. HERRERA:  Okay.  Could we go to page 9?

BY MR. HERRERA:

Q.  And do you see on lines 3 through 5 the introduction of someone -- someone introducing himself to the committee?

A.  Yes.

Q.  Okay.  And this is a Senate Government Committee on HB 2617 on March 14th, 2022, right?

A.  Yes.

Q.  Were you present at that committee hearing?

A.  I was.

Q.  Okay.  And do you know who Greg Blackie is?

A.  I didn't know who he was before but he introduced himself at that committee.

Q.  Do you know what the Arizona Free Enterprise Club is?

A.  I do, yes.

Q.  Okay.  And what do you know about what the Arizona Free Enterprise Club had to do with HB 2617?

A.  Well, he was the -- Mr. Blackie was the main, I guess you could call it expert witness in the committee.  He was the one that testified about all of the detailed aspects of the bill.

And so the implication was through his testimony that he was involved in helping create that bill and putting it forward before the legislature.

Q.  And before this hearing, were you familiar with the kind of work that Arizona Free Enterprise Club does?

A.  I was familiar with them, yes.

Q.  Okay.  Have you ever read any blog entries or articles written by the Arizona Free Enterprise Club?

A.  I am sure I have read a few of them.  I -- it wasn't my chosen reading a lot of times, but I know I was familiar with them.

MR. HERRERA:  Okay.  Could we go to Exhibit 66, please?

THE COURT:  I have already read this.  I think it was submitted in connection with motion papers.

MR. HERRERA:  Okay.

BY MR. HERRERA:

Q.  So have you ever read this article, Mr. Quezada?

A.  Yeah, I think I did read this one when it first came out, yes.

Q.  I want you to look at the title there.  Now, this is not about 2617, but it is by the Arizona Free Enterprise Club, right?

A.  Yes.

Q.  And it's about House Bill 2492?

A.  Yes.

Q.  And it says, How More Illegals Started Voting in Arizona Elections, right?

A.  Yes.

Q.  And How House Bill 2492 is Going to Fix That is part of the title, right?

A.  Yes.

Q.  What do you take to mean by the term "illegals"?

A.  Well --

MR. LANGHOFER:  Relevance.

THE COURT:  I'm sorry, there's like a stray word that doesn't signal any of us as to what's going on.

MR. LANGHOFER:  Relevance.

THE COURT:  Relevance?  Overruled.

You may answer.

THE WITNESS:  I'm sorry, the question again was?

BY MR. HERRERA:

Q.  Sure.  So what do you understand the term "illegals" to mean in the context of this article title about 2492?

A.  Well, I mean, here given our demographic, given our geographic location on the planet in Arizona, "illegals" technically -- or typically refers to people of Latin descent. People from -- typically from south of the border, most often Mexico who lack citizenship in this country.

Q.  And --

THE COURT: You said lack citizenship, but doesn't it imply that they're also not in the country legally? I mean, just this is me, but I've been seeing this for many years, and I thought it referred to individuals who are here without legal authorization, undocumented people as opposed to a distinction between citizens and noncitizens.

THE WITNESS: Your Honor, I would agree. I think I was speaking more to the context in terms of voting, and only because citizens can vote. But yes.

BY MR. HERRERA:

Q. And -- now, may I ask what is your ethnicity, Mr. Quezada?

A. I am Latino. My parents were Mexican -- are Mexican.

Q. In your experience, is the term "illegals" offensive or nonoffensive?

A. It is very much offensive.

Q. Why is that?

A. Well, that could be a long conversation, but it's taking away the humanity of people who are really victims of a broken legal system and describing them as illegal really kind of paints them as -- it takes away their humanity as human beings first.

And so my family has members who were born here in the United States, who are born in Mexico, and their documentation status covers a wide range of factors from, like myself who is born as a citizen to people who crossed the border without

authorization.  And so -- yet we are all human beings and we're all family.

So I think that this was a term that is used to scare people and to imply criminality when these people are more often simply victims of a broken immigration system.

Q.  And is there another way to refer to someone who doesn't have what we might call legal immigration status besides the word illegal?

A.  Yes, there's a number of terms.

MR. LANGHOFER:  I don't believe Mr. Quezada is a linguistics expert, Your Honor.

THE COURT:  Overruled.

You may answer.  He's not being offered as a linguistics expert.

THE WITNESS:  Oh, yes, I think typically, like the Judge just mentioned earlier, undocumented is a much more preferable term to describe people who do not have documents, rather than describing them as a person as being "illegal."

BY MR. HERRERA:

Q.  Would it be offensive to call someone who is actually a U.S. Citizen an illegal?

A.  I believe it's offensive to call anybody illegal, but yes.

Q.  Now, I want to go back to -- earlier we were talking a little bit about the atmosphere in 2021, or rather the proceedings of the Arizona Senate in 2021.  And for the

concerns some raised about voter fraud after the 2020 election,

were the concerns about fraud in the abstract, or were they

questioning the results of the 2020 election?

MR. LANGHOFER:  Best evidence.

THE COURT:  Overruled.

You may answer.

THE WITNESS:  Your question was were they abstract or?

BY MR. HERRERA:

Q.  I will ask it again.  For the concerns some raised about

voter fraud in the 2021 legislative session, after the 2020

election, were those concerns about fraud questioning the

results of the 2020 election?

A.  Yes, they were.

Q.  Did the unusual Senate committee you mentioned from 2021

audit the results of the 2020 election?

A.  Yes, they attempted to conduct an audit of that election,

yes.

Q.  Why did you say "attempted to"?

A.  Whether it was a legitimate audit I think is debatable.

Q.  And did the results of the Senate audit of the results

and -- well, did the results of the Senate audit and the effort

to subpoena election materials inform the consideration of

election bills in the 2022 legislative session?

MR. LANGHOFER:  Your Honor, he's not competent to

speak to this.  It's also --

THE COURT:  Let me look at the question again.

The objection is overruled.

You may answer.

We are not asking him to tell us what the results were.  We are asking if in his view as a legislator those results and the processes that went through during that audit informed the --

THE WITNESS:  Yes.  Yes and no.  I believe that the audit was used as a justification to propose bills like the ones we were just discussing in evidence earlier.

I think that there was a large segment of the -- of the legislative body from both sides of the aisle who saw that those questions about the legitimacy of the 2020 election as not having much credibility at all.

But -- and so in that sense, that audit didn't inform their actions moving forward, but for some few, it did.  And those bills are the ones that I think we were talking about earlier.

BY MR. HERRERA:

Q.  In your view, are HB 2492 and 2243 from 2022 an outgrowth of the 2021 Senate efforts to investigate the 2020 election results?

MS. PORTER:  Personal knowledge.

THE COURT:  Sustained.

BY MR. HERRERA:

Q.  In your experience, do some legislators say one thing publicly for why they support a piece of legislation but also have other nonpublic reasons?

MR. LANGHOFER:  Personal knowledge, speculation.

THE COURT:  Overruled.

You may answer.

MR. LANGHOFER:  I would like to just make sure the reporter caught my speculation objection, Your Honor.  Thank you.

THE WITNESS:  I would say absolutely, 100 percent.

BY MR. HERRERA:

Q.  And do you believe that was the case for supporters of HB 2492?

MS. PORTER:  Same objections, personal knowledge, speculation.

THE COURT:  Sustained.

BY MR. HERRERA:

Q.  Do you believe that was the case for supporters of HB 2243?

MS. PORTER:  Same objection.

THE COURT:  Sustained.

BY MR. HERRERA:

Q.  Now I want to go back to just thinking about who served on the committee with you for HB 2243, the Government Committee in 2022.  There were other senators involved or serving on that

committee at the time, right?

Did you ever have off the record or nonrecord conversations with those members of the committee regarding House Bill 2243 or any other election bills?

A.  Certainly.  I think those conversations actually happened quite often with all of the members of the committee.

Q.  And what can you tell me about those conversations?

MS. PORTER:  Your Honor, I think this gets into an area of legislative privilege, and I don't know if these legislators are represented by counsel and have had the opportunity to raise an objection to their own privilege being waived.

THE COURT:  Is that an objection?

MS. PORTER:  Yes.

MR. HERRERA:  May I --

THE COURT:  I am still speaking to Ms. Porter.

MS. PORTER:  Yes, the objection is this --

THE COURT:  Give me an evidentiary basis, please.

MS. PORTER:  Privilege.  Legislative privilege, Your Honor.

THE COURT:  Is this a common occurrence, you talk about things with your fellow legislators outside of the formal hearings?

THE WITNESS:  It is a very common occurrence actually.

THE COURT:  Okay.  The objection is overruled.

BY MR. HERRERA:

Q. Okay. And can you tell me about some of those conversations you had about House Bill 2243 or other election bills in 2022 from those members who served with you on the Government Committee?

MS. PORTER: Same objection, Your Honor.

THE COURT: Overruled.

You may answer.

THE WITNESS: Yes, I mean certainly. I know I sat next to one of the members on the committee who was quite a talkative one, actually. And he would often mute his mic and lean over and have commentary about all of those bills. And he was one who I sat very close to on the floor of the Senate, so like I said, he was a talker. So he was having conversations with me about these particular bills quite consistently.

Other members of the committee, wasn't as often. But members of my own caucus, we had conversations in terms of when we were being briefed by our staff or prior to the committee about how we were -- how we perceived the bill or how we intended to vote.

But members of the other caucus, it was more often in passing or in breaks between the committee hearings when those bills were being heard.

BY MR. HERRERA:

Q. And you mentioned -- the first senator you mentioned who

sat next to you in committee, who is that?

A.   That was Senator Sonny Borrelli.  He sat next to me.

Q.   And what were some of the comments Senator Borrelli would make about voting related bills?

MS. PORTER:  Same objection, Your Honor.

THE COURT:  Overruled.

You may answer.

THE WITNESS:  He was quite vocal about his beliefs in the fact that people who were not -- who should not be voting were voting.  And he believed they came from communities like mine.

And so he would say that often.  Like, "It's your people over there in your neighborhood that are doing this and that's why why we are bringing these bills forward," or when someone made comment in public testimony that he agreed with he would say, "That's exactly what's happening."

Mostly justifying his -- or confirming his belief that -- his belief that people from my area of the state were voting when they should not be voting.

BY MR. HERRERA:

Q.   And what did you take to -- what do you mean by "your area of the state"?

A.   I would describe -- he would often refer -- like refer to, "That's your district."  "The people in your district."

Q.   Compared to his district?

A.  Yeah, and I am not sure where his district is, but he would say "your district" for sure.

Q.  And what do you think he meant by "your district"?

MS. PORTER:  Same objection, and personal knowledge.

MR. LANGHOFER:  Speculation.

THE COURT:  Sustained.  It's one thing for what he said, it's another thing for him to tell me what he thinks the other person was thinking.

MR. HERRERA:  Okay.

BY MR. HERRERA:

Q.  Do you know how Senator Borrelli voted on House Bill 2617?

MS. PORTER:  Objection, best evidence.

MR. HERRERA:  I don't think that's in the record so far.

THE COURT:  I am going to overrule it because I don't want to see an exhibit of the roll call of everybody if you remember on this one person how he voted.

THE WITNESS:  I believe he voted yes on the bills.

BY MR. HERRERA:

Q.  And do you know how he voted ultimately on House Bill 2243 in 2022?

A.  I believe he was a yes on that one as well.

MR. HERRERA:  Your Honor, we pass the witness.

THE COURT:  Which of the three of you would like to begin?

MR. WHITAKER: Your Honor, Josh Whitaker for the State and Attorney General.

THE COURT: You may proceed.

CROSS-EXAMINATION

BY MR. WHITAKER:

Q. Good morning, Senator Quezada.

A. Good morning.

Q. In your time in the legislature, were there times when members of the public would come in and express their views?

A. Yes.

Q. And after the 2020 Election, did some members of the public express their views on the issue of voter fraud?

A. Yes.

Q. Did some members of the public express concern about voter fraud?

A. Some did, yes.

Q. What were the nature of those concerns, if you recall?

A. Most of the time when those concerns were relayed by members of the public they were speaking in generalities, basically saying there are people who are voting that shouldn't be voting.

Or I've heard that this is happening, or this happened in South Carolina somewhere -- but there was never rarely any specifics about this is exactly what's happening, here is where it's happening, here's why it's happening and here's how to

solve it.

So it was just in general, like we don't want people who shouldn't be voting voting and please support whatever bill it was.

Q.  Is it fair to say that some members of the public expressed concern about voter fraud but didn't give a lot of specifics?

MR. HERRERA:  Objection, foundation.

THE COURT:  Sustained.

You may answer.

THE WITNESS:  I think that's fair.

THE COURT:  I meant to say overruled.  Sorry.

BY MR. WHITAKER:

Q.  Did any members of the public express concern about noncitizens voting?

A.  Yes, I think that was -- I mean, that was in the -- in the kind of theme of the general kind of commentary was that people who shouldn't be voting are voting and they are noncitizens.

Q.  Okay.

MR. WHITAKER:  Thank you.  No further questions.

CROSS-EXAMINATION

BY MS. PORTER:

Q.  Good morning, Senator Quezada.  My name is Hannah Porter. I represent the Intervenor-Defendants Speaker Toma and President Petersen.  Nice to meet you.

A few minutes ago you discussed a conversation that

you had with Senator Borrelli off the record during the consideration of the bills.  What was your response to Senator Borrelli?

A.  Usually in my interactions with Senator Borrelli, I would just kind of laugh at his comments and like not really justify them by engaging in a debate with it.  I just tried to dismiss them without starting a conversation -- without starting like an argument.  That was usually how I handled that situation.  I don't know if that helps.

Q.  Well, I just want to be clear because you're saying "usually" and I was trying to ask I think about the specific conversation that you had testified about earlier.

THE COURT:  Well, he didn't testify about the conversation.  He testified about a comment being made.  And I'm not sure he said they've ever had a conversation along those lines, more comments being made in hearings or out in the hallway or between hearings.

MS. PORTER:  Yes, Your Honor.  I appreciate the distinction, and I will clarify then.

BY MS. PORTER:

Q.  Have you ever had conversation, in terms of a back and forth, with Senator Borrelli about that topic?

A.  I am sure we did, but if we did they were very brief conversations.  Him saying something to the effect, like I mentioned earlier.  And I would say, you know that's not the

case, or something to that effect.  That's usually the extent of those conversations.

Q.  You -- did you attempt to put Senator Borrelli's comments on the -- into the record as part of the legislative proceedings?

A.  No, there was too many of them for that to ever be logistically possible.

MS. PORTER:  Sorry, Your Honor, I'm just --

BY MS. PORTER:

Q.  Did you ever understand Senator Borrelli to be speaking on behalf of any other legislators when he made those comments?

A.  I think that one is hard to answer.  Senator Borrelli served in a leadership role in his caucus, and so in that sense, by the nature of his title he was a representative of his entire caucus.  When -- to distinguish when he was speaking with that hat on versus not is hard to differentiate.

Q.  You were also a leader in your party when you were a senator, correct?

A.  Yes, that's correct.

Q.  And just to be clear, I don't know if we have it on the record, you were -- you are a member of the Democratic Party?

A.  That's correct.

Q.  And were when you were a senator?

A.  Yes, that's correct.

Q.  And when you were a leader, did you consider your comments

to other legislators to be made on behalf of everyone in your caucus?

A.  I would answer that almost the same way as I answered the other one, it's hard to differentiate that a lot of times.  But I will say that whenever I had a conversation, whenever I made a public comment, I had that in consideration, that I wasn't just speaking for myself, but I was speaking as a member of the leadership team of the entire caucus.  So that certainly colored all of my comments that I made.

Q.  And sorry if I missed this.  What position did Senator Borrelli hold at that time?

A.  I believe he had -- I believe he was the whip, and so I was the whip as well, so I believe we had the same role.

Q.  In your direct testimony, you talked a little bit about the amendment process for bills.  Is there something that's called -- and please correct me, terminology as strike everything or strike all amendment?  Can you please explain what those are?

A.  Yes.  So a strike everything amendment is an amendment that strikes, using the red stricken language the entire body of that bill and replaces it with entirely new language.  And oftentimes it can be a completely different subject.  So a strike everything amendment is really kind of swapping one bill idea for an entirely new one.

Q.  Is it relatively common to have a strike everything bill?

A.   The practice is common, yes.  It's used quite often.

Q.   So it's not uncommon to have an amendment that may change everything that was in a prior version of a bill?

A.   It's not not uncommon for that practice to be used.  It is much much less common for it to happen at that stage in the legislative process, so that late in the game switching out all new language for old language is not as common at all.

           MS. PORTER:  I have no further questions, Your Honor.

           Thank you, Senator.

           THE COURT:  Do you have more than five minutes of questions, Mr. Langhofer?

           MR. LANGHOFER:  I certainly do.

           THE COURT:  Then we'll take a recess until 1:00.

           (Proceedings concluded at 11:56 a.m.)

C E R T I F I C A T E


I, ELVA CRUZ-LAUER, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 9th day of November, 2023.


s/Elva Cruz-Lauer
Elva Cruz-Lauer, RMR, CRR

UNITED STATES DISTRICT COURT