UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

Mi Familia Vota, et al.,        )
                                )
                Plaintiffs,     )  No. 2:22-cv-00509-SRB
v.                              )
                                )  Phoenix, Arizona
Adrian Fontes, et al.,          )  November 13, 2023
                                )  8:58 a.m.
                Defendants.     )
_____)


*BEFORE:  THE HONORABLE SUSAN R. BOLTON, JUDGE*

*REPORTER'S TRANSCRIPT OF PROCEEDINGS*

**BENCH TRIAL DAY 5 - AM SESSION**
(Page 1017-1142)


Official Court Reporter:
Teri Veres, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 38
Phoenix, Arizona 85003-2151
(602) 322-7251


Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

UNITED STATES DISTRICT COURT

```
 1                      A P P E A R A N C E S

 2   For Plaintiff United States of America:

 3        U.S. DEPARTMENT OF JUSTICE - VOTING - M STREET
          By:  Emily Brailey, Esq.
 4        150 M Street NE
          Washington, D.C.  20503
 5
          U.S. DEPARTMENT OF JUSTICE CIVIL RIGHT DIVISION VOTING
 6        SECTION - 950
          By:  Richard Dellheim, Esq.
 7             Sejal Jhaveri, Esq.
               Margaret Turner, Esq.
 8        950 Pennsylvania Avenue NW
          Washington, D.C.  20530
 9
     For Plaintiff Arizona Asian American Native Hawaiian and
10   Pacific Islander for Equity Coalition:

11        LATHAM & WATKINS
          By:  Amit Makker, Esq.
12             Evan Omi, Esq.
          505 Montgomery Street, Suite 2000
13        San Francisco, California  94111

14        ASIAN AMERICANS ADVANCING JUSTICE
          BY:  Niyati Shah, Esq.
15        1620 L Street NW, Suite 1050
          Washington, D.C.  20036
16
          LATHAM & WATKINS, LLP - Avenue of the Americas
17        By:  Neethu Putta, Esq.
          1271 Avenue of the Americas
18        New York, NY 10020

19
     For Plaintiff Arizona Democratic Party, Democratic National
20   Committee:

21        WILMER CUTLER PICKERING HALE & DORR, LLP
          By:  Kelsey Quigley, Esq.
22        2600 El Camino Real
          Suite 400
23        Palo Alto  94306

24

25
```

```
 1              A P P E A R A N C E S   C O N T ' D

 2   For Plaintiff Chicanos Por La Causa, Chicanos Por La Causa
     Action Fund, Poder Latinx:
 3
         ARNOLD & PORTER KAYE SCHOLER, LLP
 4       By:  John A. Freedman, Esq.
              Jeremy Karpatkin, Esq.
 5            Leah Motzkin, Esq.
         601 Massachusetts Avenue NW, Suite 1000
 6       Washington, D.C.  20001

 7       FAIR ELECTIONS CENTER
         By:  Michelle Kanter Cohen, Esq.
 8            Jonathan Sherman, Esq.
         1825 K St. NW, Ste. 701
 9       Washington, DC 20006

10   For Plaintiff Voto Latino, Mi Familia Vota:

11       HERRERA ARELLANO, LLP
         By:  Daniel Abraham Arellano, Esq.
12       1001 N. Central Avenue, Suite 404
         Phoenix, Arizona  85004-1500
13
         ELIAS LAW GROUP, LLP
14       By:  Christopher Dodge, Esq.
              Elisabeth C. Frost, Esq.
15       250 Massachusetts Avenue NW, Suite 400
         Washington, D.C.  20001
16

17   For Plaintiff Promise Arizona, Southwest Voter Registration
     Education Project:
18
         MALDEF
19       By:  Ernest Israel Herrera, Esq.
         634 Spring Street, 11th Floor
20       Los Angeles, California  90014

21   For Defendant State of Arizona Kris Mayes, Jennifer Toth:

22       Arizona Attorney General's Office - Phoenix
         By:  Joshua Michael Whitaker, Esq.
23            Kathryn E. Boughton, Esq.
              Timothy E. Horley, Esq
24       2005 N. Central Ave.
         Phoenix, AZ 85004
25
```

1           *A P P E A R A N C E S   C O N T ' D*

2    For the Intervenor-Defendants State of Arizona, Kris Mayes,
     Ben Toma:

3

4           GALLAGHER & KENNEDY, PA
            By:  **Hannah Hatch Porter, Esq.**

5           2575 E. Camelback Road
            Suite 810
            Phoenix, Arizona   85016-9225

6

7    For Counter Plaintiff Republican National Committee:

8           STATECRAFT, P.L.L.C.
            By:  **Kory A. Langhofer, Esq.**

9           649 North 4th Avenue, Suite B
            Phoenix, Arizona   85003

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED  STATES  DISTRICT  COURT

1        *I N D E X*

2   **PLAINTIFF WITNESS:**                                    **PAGE**

3   MICHAEL P. McDONALD, Ph.D.
    Direct Examination by Mr. Karpatkin......................1058
4

5                        *INDEX OF EXHIBITS*

6   **EXHIBIT**                                          **ADMITTED**
7
    NO.    DESCRIPTION
8

9   334      Table 1 from report                              1106

10  335      Table 2 from report                              1111

11  336      Table 3 from report                              1114

12  337      Table 4 from report                              1125

13  338      Table 5 from report                              1128

14  339      Table 6 from report                              1130

15  340      Table 7 from report                              1133

16

17

18

19

20

21

22

23

24

25

*P R O C E E D I N G S*

1

2 *(Proceedings begin at 8:58 a.m.)*

3          COURTROOM DEPUTY:  All rise, court is now in

4 session.

5          THE COURT:  Please sit down.  Before we begin with

6 witness testimony this morning, there were a couple of matters

7 that parties wish to address with the Court.

8          I believe there are at least three of them, and I

9 wanted to first ask counsel for any or all of the defendants

10 there was a Request for Judicial Notice that was filed on

11 November 3rd.

12          To my knowledge, there has not been any opposition

13 filed.  Is there any objection to the Court -- this is the

14 request for Judicial Notice of Certain Census Records.

15          MR. LANGHOFER:  Good morning, Your Honor.  We have a

16 draft.  There are two parts of it.  One part is about their

17 proposal for judicial notice.  I think we're in principle okay

18 with it, but maybe have some concerns around the margins; and

19 the second part is saying since we're taking judicial notice

20 of these public records, we have some as well.  I think it --

21          THE COURT:  Nobody's going to dispute that census

22 records are the type of records that the Court can take

23 judicial notice of.

24          MR. LANGHOFER:  Ms. -- Kathryn has drafted part of

25 it so I don't want to speak for her, but our impression is

UNITED STATES DISTRICT COURT

1    it's not going to be the subject of much dispute.

2              THE COURT:  Okay.  So we can worry about this later?

3              MR. LANGHOFER:  Yes, your Honor.

4              THE COURT:  Okay.  And let me just ask whichever

5    plaintiffs' counsel wishes to address this, there were a total

6    of 486 pages attached to this Request for Judicial Notice,

7    none of which I have lacked at.

8         What I have looked at is your Request for Judicial

9    Notice which contains -- and I didn't count them up -- several

10   specific data items that the census records show, and then

11   there's several of them that just refer to the census records.

12        Am I correct in concluding that -- for example,

13   No. 3 says, "Data tabulated in the U.S. Census Bureau's  2021

14   1-Year American Community Survey B05003 series of tables," and

15   then it goes on and on listing various tables.

16        Am I correct in my conclusion that what you want me

17   to take judicial notice of are the specific facts shown by the

18   census records as an example that there are 5,541,976

19   Arizonans at voting age population?

20        I ask that because I don't want to look at the 486

21   pages, and I want to be sure that I'm interpreting this

22   correctly that the ones where you are specific about what the

23   records show are the actual facts that you want me to take

24   judicial notice of from the data from the Census Bureau.

25             MR. MAKKER:  Amit Makker for the Asian American --

1   Arizona Asian American Native Hawaiian and Pacific Islander

2   for Equity Coalition.

3            As I understand it, Your Honor, there are -- within

4   the Request for Judicial Notice certain specific facts have

5   been pulled out for some of the paragraphs, but in some

6   instances the request is to take notice of sort of the set of

7   numbers in a complete table.

8            THE COURT:  And how am I supposed to do that and how

9   am I supposed to know what numbers you think are important?

10           MR. MAKKER:  Yeah, so at this point I think the

11  exhibits should include the tables themselves.  That's what

12  the pages that were attached include.  So those values are

13  there.  Separately, what will actually be -- you know, what

14  are you to then look at later, I think, would be cleared up by

15  the proposed findings of fact, statements of law, as well as

16  various expert testimony throughout the trial.

17           THE COURT:  So why is it structured this way?

18           I mean, I understand with the citation to various

19  tables that the 2017 to 2021 ACS estimate of the voting age

20  population of Arizona is 5,000,102.

21           Why aren't the other tables summarized in that way?

22           MR. MAKKER:  Because I think in the instances where

23  it is not summarized that way, the whole of the table is

24  either sort of part of an expert's opinion or is used by an

25  expert; and so the idea was to not sort of exclude and instead

1  of trying to tabulate multiple sort of entries per table in

2  the way that in some instances we were able to, like you said,

3  some of them call out a specific value, the approach was then

4  to attach the table as the exhibit and have the Court take

5  judicial notice of the census' records in that table.

6          But as you said, there are certain instances where

7  specific numbers, like the total population, or specific

8  pieces of the table have been pulled out in specific

9  paragraphs.  In other instances the ask is that the table be

10 judicially noticed.

11         THE COURT:  I'm not sure that's going to work well.

12 I would like the plaintiffs to try to do what they did for

13 each table, what they did for the very specific statements as

14 to what the records show, unless it somehow becomes obvious

15 when you have your expert testify; but there's numerous,

16 numerous exhibits that it isn't clear to the Court what --

17 what they are or what they mean, and I'm not sure I should be

18 the one to decipher them if there's no dispute as to what

19 they're attempting to show.

20         MR. MAKKER:  Understood, Your Honor.  We'll take a

21 look at if it's feasible to do it that way or if there's a

22 reason why it needs to be done specifically the way that it's

23 already been done.

24         MR. LANGHOFER:  We may be able to help on that, Your

25 Honor.  I believe that Kathryn has already identified the

1   facts that they're trying to prove that we think are not quite

2   right, and so we may be able to resolve this by way of

3   stipulation.

4            THE COURT:  I hope so.

5            MR. LANGHOFER:  We'll work with the plaintiffs.

6            THE COURT:  Okay, thank you very much.

7            I'm not sure what the status is of the motion filed

8   on November 8th regarding resolution of exhibit objections,

9   and then there's a motion to overrule the defendants'

10  objections.

11           Is this still a work in progress, because I noticed,

12  in particular, that there's references here to a witness who's

13  actually testified, and my understanding -- or understanding's

14  the wrong word.  My direction at the beginning of trial was

15  that if the witness testified, you could only supplement that

16  testimony from the deposition if it's deposition testimony to

17  which there's no objection.

18           So I wasn't sure if this is really a current motion

19  or it's one that is still being refined.

20           MR. MAKKER:  Amit Makker again, Your Honor.  So if

21  this is for the deposition designations, I believe that the

22  table that was attached to that would have taken out any of

23  the objections to any of the hybrid witnesses.  I think the

24  only instance where there may have been reference to that was

25  to provide notice, essentially, where we understood that an

```
 1   objection was withdrawn because the defendants had counter
 2   designated, basically, the same testimony and had told us in
 3   correspondence that that objection was withdrawn.
 4        So I believe the only instance where a hybrid
 5   witnesses' testimony would have appeared in that table would
 6   have been where we were just saying we understand this
 7   objection's withdrawn to sort of provide them that notice;
 8   but, otherwise, we followed Your Honor's direction from the
 9   pretrial conference that for hybrid witnesses, specifically
10   objected-to deposition testimony should have been handled live
11   and then the unobjected-to testimony would have been coming
12   in, but that shouldn't have been in those tables.  They were
13   removed, from my recollection.
14        THE COURT:  Is it still the plaintiffs' intention to
15   provide those specific portions of the deposition or is the
16   entire deposition being provided?
17        MR. MAKKER:  You mean subsequent to trial like what
18   would come in?  Yeah, so what we would do, as I understand it,
19   is then for hybrid witnesses, for example, the designations
20   that would come to Your Honor would be a combination of
21   plaintiffs' designations, defendants' designations that just
22   deal with what was not specifically objected to ahead of time.
23        THE COURT:  Do I have all the depositions?
24        MR. MAKKER:  I believe they were filed with the
25   JPTO.  Someone correct me.  Yes, I'm seeing nods of "yes."
```

UNITED STATES DISTRICT COURT

```
 1              So currently they are with you.  I don't think those
 2    designations are, like, finalized in that sense, right?  Those
 3    designations were with the objections before we knew kind of
 4    what the trial list was, who the witnesses were.  So I believe
 5    the parties would endeavor to provide you, "Here are the final
 6    designations that are, you know, for hybrid witnesses, just
 7    the stuff that was unobjected to that sort of supplements the
 8    live testimony, both for plaintiffs and defendants," and then
 9    there would be, obviously, the non-hybrid witnesses.
10              THE COURT:  I -- I guess I'm still a little
11    confused.  Are the original depositions, the books produced by
12    the court reporter, have they been filed with the Court?
13              MR. MAKKER:  I believe they are exhibits to the JPTO
14    filing.
15              THE COURT:  Okay, that's now how depositions usually
16    work.  The depositions themselves are provided -- the original
17    are provided to the Court.
18              MR. DODGE:  I've been told that the Court --
19    apologies.  Christopher D. Dodge on behalf of the MFV
20    plaintiffs.
21              I've been told that there actually is a box labeled
22    "depos" right up here --
23              THE COURT:  Okay.
24              MR. DODGE:  -- with hard copies of all the
25    deposition transcripts.
```

UNITED STATES DISTRICT COURT

```
 1              THE COURT:  Okay.

 2              MR. DODGE:  In addition to what was filed with the

 3    JPTO, and the parties are continuing to work on a final

 4    transcript of testimony that will come into evidence.  That's

 5    just an on-going process between the parties of understanding

 6    the scope of one another's objections so that only

 7    unobjected-to testimony is coming in for those witnesses who

 8    have appeared live.

 9              THE COURT:  Okay.  And for these witnesses for whom

10    there is a table of plaintiffs' responses to defendants'

11    objections, your thought is that I'll rule on these before you

12    submit proposed findings and conclusions?

13              MR. MAKKER:  So that -- that is part of the

14    question, Your Honor.  I think part of this is we've tried to

15    work a little bit with defendants to see, "Can we narrow these

16    objections?"  We have not been able to do that with them yet.

17    For whatever reason, there hasn't been time to really try and

18    narrow those.

19              I think where we're at right now is -- I don't know

20    that you would do it before or that you could do it even

21    after, but that is where we are right now.  I think --

22              THE COURT:  Because I can tell you right now --

23              MR. MAKKER:  Yeah.

24              THE COURT:  -- that I can't.  I mean, I -- I don't

25    know when I would have the time to go through each of the
```

```
 1   depositions, the objections, and the response to the
 2   objections and make a specific ruling by the end of this
 3   trial -- well, I guarantee you I can't do it by the end of the
 4   trial or probably even next week, which is a very shortened
 5   week.
 6            MR. MAKKER:  Understood, Your Honor.  That's part of
 7   the reason why, I think, when we filed the first motion, which
 8   sort of that table refers back to, was that there are certain
 9   objections that we think potentially could be overruled
10   categorically, which would remove a number of those, which my
11   colleague, Mr. Sherman, is also prepared to address today.
12   Some of these are --
13            THE COURT:  Are you address -- are you talking about
14   that general objection that -- as it relates to the County
15   Recorders that they aren't adverse parties and, therefore,
16   their depositions cannot be used for any purpose and, also,
17   that some of them aren't more than a hundred miles away?
18            MR. MAKKER:  Relatedly.  So that is part of the
19   motion that we filed.  Included in that motion were some other
20   -- they're not phrased general, but they're more -- you know,
21   similar objection is made throughout the various witnesses.
22            So they should be, for example, legal conclusion
23   objections; and so we see those repeatedly throughout.  As I
24   said, my colleague, Mr. Sherman can address this more
25   directly; but, you know, what we're talking about here is
```

 1   these witnesses, just like you heard from Ms. Petty or from

 2   Ms. Conner, yeah, they might talk about the statute; but we're

 3   not offering these for the Court to accept their legal

 4   conclusions.

 5          It's to understand what are these County Recorders

 6   going to be doing under these laws, and so we think that that

 7   potentially could be handled categorically to certainly remove

 8   a number of objections throughout these tables and so

 9   that's -- you know, that's what we were trying to do is try

10   and clear a lot of the objections perhaps categorically; but

11   if that cannot be done, then I think that leaves us with

12   one-by-one, and then maybe what that means is when we get to

13   the end and we try and figure out what we're citing, that's

14   how we do it.

15          But that was our attempt was first to see if we

16   could narrow objections with defendants; and, if not, we

17   thought there was some that could potentially categorically be

18   overruled.

19          THE COURT:  From your perspective, is this a final

20   table?

21          MR. MAKKER:  From your perspective, absent

22   additional movement from the defendants, that's where the

23   table is now.

24          Now, what I would say is ultimately we may not need

25   to cite to every single thing there, and so that's where there

 1   could be additional narrowing as well in terms of the

 2   objections lodged.

 3           THE COURT:  Let me just ask, Mr. Langhofer, if you

 4   want to speak, and then we'll see if anybody wants to add

 5   anything.

 6           From your perspective, is this a final table since

 7   you've seen their responses to the defendants' objections?

 8           MR. LANGHOFER:  The table is overwhelming, Your

 9   Honor.  It would take, you know, days with a team of lawyers

10   going through it to digest it and explain it to the Court.

11           My concern with the table with the objections -- we

12   had a meet and confer about this on Saturday.  You know, of

13   course, we didn't have a real three-day weekend, and the

14   concern that I expressed was that so much -- we took fifteen

15   -- we've took the same deposition fifteen times with fifteen

16   counties.

17           So much of this is redundant and cumulative.  We've

18   already heard from Ms. Petty, who is extremely capable and I

19   think, as I've already said, represents the State with some

20   exceptions that we can get into.

21           I said, "Can the plaintiffs please identify which of

22   these portions are not cumulative?"  Like if you're getting to

23   a real difference in a particular county, show us and we can

24   review those, but reviewing -- re-reviewing all these

25   transcripts and line-by-line objections are not productive or

```
 1    necessary.  The plaintiffs so far have not been able to do
 2    that.  So there is a big cumulative concern here.
 3             The second thing I'll say, which I think simplifies
 4    the hybrid situation significantly is none of the Government
 5    witness that you have heard from will have any portion of
 6    their transcripts that are unobjected to.
 7             There, essentially, are no hybrid witnesses so far
 8    because the ones you've heard from, our position is, they're
 9    not adverse and they're all within a hundred-mile radius and,
10    therefore, we have a global objection to their depositions.
11    If they had somebody to present with them, they need to do it
12    on the stand.  So I think the hybrid issue you don't need to
13    reach.
14             THE COURT:  How many of these designations are
15    County Recorders?
16             MR. MAKKER:  From that table?
17             THE COURT:  How many different County Recorders?
18             MR. MAKKER:  So we -- I mean, we deposed all
19    fifteen, right, so --
20             THE COURT:  No, that's not my question.
21             How many of their depositions do you think have to
22    be evidence in this case?
23             MR. MAKKER:  So currently they're all in that table,
24    and I'll give the reason why, right, is there are claims that
25    are still left in this case about how is this -- these laws
```

```
 1    going to be implemented across the State, right?
 2              There's equal protection claims that go to is it
 3    going to be done in an inconsistent manner?  The people that
 4    implement these laws are the County Recorders, right?  And so
 5    if they are telling us, "Over here in this county it's going
 6    to be done this way.  Over here in this county it's going to
 7    be done this way" --
 8              THE COURT:  Are they telling you that?
 9              MR. MAKKER:  Indeed, they are.  So that's what we're
10    trying -- I mean, I'm not saying every single county is doing
11    something different but there are --
12              THE COURT:  That's what I'm asking you, because I've
13    discussed this issue with fifteen County Recorders.  We have
14    seven stipulations of things that they would all say if called
15    to testify.
16              MR. MAKKER:  Sure.
17              THE COURT:  But, for example, if seven County
18    Recorders said, "We'll do it this way," and six said, "We'll
19    do it this way," and two said, "I don't know how we're going
20    to do it" --
21              MR. MAKKER:  Right.
22              THE COURT:  -- why would I want to read seven people
23    saying the same thing and then six people saying the same
24    thing?
25              MR. MAKKER:  As opposed to, for example, one
```

1  representative, one representative, one representative?

2           THE COURT:  Exactly.  If it would take the defense

3  weeks to figure this out, how long is it going to take me?

4           And I am trying to be sensitive to all of the

5  parties' desire that this case be resolved before the Primary

6  Election in March of 2024; and when I'm given something like

7  this or this census data for which I have to look at hundreds

8  of pages and try to decipher it or read more than a dozen

9  depositions and try to rule on objections and find that the

10 information is largely cumulative and there's not a lot of

11 differentiation between what the County Recorders had to say,

12 I can guarantee you that it won't be decided before the March

13 2024 election.

14          The more you put into evidence, the more that you

15 give me that I have to work through with my two law clerks --

16 and I'm looking out here at, you know, more than a dozen

17 lawyers -- clearly, more than a dozen on the plaintiffs' side,

18 a more camp packet group of only five to six or eight -- I

19 don't know how many are not here that are working on this --

20 if their estimate is it would take them days and days and days

21 to figure this out, how long is it going to take me?

22          And so ultimately, you can put into evidence

23 whatever is admissible that you think is important; but the

24 volume of what you put into evidence will be directly related

25 to the time within which it takes the Court to make a

```
 1   decision, and at the rate you're going I see the decision
 2   coming beyond March of 2024 with just the two examples that
 3   we've used today, and that doesn't even begin to have me
 4   thinking about an exhibit that I heard you call about that has
 5   like 80,000 pages so I -- that's some Excel spreadsheet.  I
 6   think I have a hint to what that is, but you see where I'm
 7   going.
 8           I want to decide this case based on the things that
 9   I have to see, not based on everything that you've collected,
10   much of which is not essential for the statistician.
11           MR. MAKKER:  I understand, Your Honor, and I would
12   say this, right.  We have been trying in various ways to try
13   and streamline the County Recorder piece.  We had a discussion
14   the very first day of trial about, you know, County Recorder
15   stipulations that came in.  That was objected to as well.
16           We're trying to figure out a way to streamline this
17   with the County Recorders.  There hasn't been a lot of help
18   from the other side in terms of being able to do that, right.
19           We had a list of numerous things that various County
20   Recorders would have agreed to.  You've ended up with seven, I
21   think, is all that we could -- we've moved with it.  So, yes,
22   there's only seven things that, I guess, they agree that
23   fifteen County Recorders would say.
24           As I mentioned, part of these claims are not what's
25   everyone gonna say?  It's specifically, what is everyone not
```

```
 1   saying?  And so is there opportunity to potentially get that
 2   down to sort of what other representatives?  Potentially.
 3           There are still various issues to clear even to do
 4   that, right.  So one is the adverse party issue and the
 5   100-mile issue, right.  I mean, I don't -- I don't think it's
 6   credible to say that these are --
 7           THE COURT:  I'll just tell you --
 8           MR. MAKKER:  Sorry.
 9           THE COURT:  -- I think the 100 mile has to be
10   driving distance, not as the crow flies, because the County
11   Recorders can't fly like a crow.  Just so you know.
12           MR. MAKKER:  Fair enough, and I think that may
13   affect just one of them and maybe not at all.  It just
14   depends.
15           THE COURT:  Yavapai.
16           MR. MAKKER:  Yes, exactly.
17           THE COURT:  Under no circumstances, Pinal County a
18   hundred miles away.
19           MR. MAKKER:  I don't think anyone is saying that
20   they are, but the issue here is really, like you said, you
21   directed the hybrid testimony at the pretrial conference.
22           We had four witness come up and testify to a
23   slightly limited scope here with the understanding that the
24   testimony that was not specifically objected to would be
25   coming in under that hybrid approach.
```

1    As you just heard from Mr. Langhofer, his belief is

2  there's no such thing because, "No, we've said they're not

3  adverse" and what -- I mean, we have here is "yes" they're on

4  the other side of the "V," but it's more than that.

5    We have sued these County Recorders because they are

6  going to take actions under these laws that we don't want them

7  to take.  We're asking you to enjoin them from doing that, and

8  in some instances these County Recorders are guilty of a

9  felony, I believe, if they do what we want them to do.

10    There are clearly adverse interests here and that

11  shows they're adverse; but, also, we identified the sort of

12  catch-all unavailability rule that allows in the interest of

13  justice for Your Honor to also allow this deposition testimony

14  in.

15    We've tried numerous ways to keep these -- you know,

16  to stop burdening these County Recorders from coming in and

17  testifying live.  We think that's also a completely reasonable

18  application of that rule.  As they said in their opposition,

19  it's to accommodate the witnesses.  That's exactly what this

20  is for.

21    THE COURT:  Okay, you're straying way beyond the

22  issue of the volume of information that you're trying to get

23  me to look at; and Mr. Langhofer talks about cumulativeness,

24  which has been my concern as it relates to the County

25  Recorders since we first discussed this at the final pretrial

1   conference.

2          I'm not sure that when I look at this table I see

3   much of an attempt to limit cumulativeness.

4          MR. MAKKER:  Understood, Your Honor.  I think

5   Mr. Sherman would like to address that specific point.

6          THE COURT:  The cumulativeness?

7          MR. MAKKER:  I believe so.

8          MR. SHERMAN:  Yes, your Honor, if I may be heard on

9   this.  John Sherman for the Poder Latinx plaintiffs.  Some of

10  the volume here, not even 25 percent, but some of the volume

11  is in -- we took deposition testimony that directly went to

12  the Court's instruction or ruling in the order on the partial

13  motions for partial summary judgment that said there were

14  outstanding issues of fact with respect to, first, the NVRA

15  Section 8(b) claim, *Bush v. Gore* equal protection claim, and

16  the Civil Rights Act claim that we have in our case around

17  differential practices, standards and procedures.

18         In anticipation that, we asked questions of all

19  fifteen County Recorders about their varying understandings

20  not for legal conclusions, but to understand how they'll be

21  implementing the law; and that is the best evidence in the

22  record, but hearing what Your Honor has said this morning --

23         THE COURT:  And they all gave different answers?

24         MR. SHERMAN:  There are different varying answers

25  for -- across many of the questions that we asked, yes, Your

Honor; and for -- and for that reason, Your Honor -- I think

what would be cumulative, as Your Honor has indicated, is to

give you all seven who have responded "yes" to one question

and then all five who have responded "no" and then, you know,

give you all of the, you know, remaining that said it's a

judgment call.

What we'll endeavor to do on our end, at least

specifically with these arbitrariness claims, is to narrow

down to the greatest hits, the best of, and give you only one

the one or two examples for each category that establish that

there's arbitrary inconsistent understandings of these laws

that will lead to arbitrary and inconsistent implementation.

I think the defendants will still maintain their

legal conclusions objections to those specific designations,

but there will be fewer designations for the Court to

consider; and we tried to tee up the legal conclusion dispute

for Your Honor in this motion to overrule, but I think that

might be a way forward in limiting what your -- the Court

views as -- and the defendants see as cumulative.  It won't

resolve, though, the dispute that we have --

THE COURT:  No, I don't mind that.  I'm happy to

resolve the objection.  I just don't want to resolve the

objection fifteen times -- well, fourteen 'cuz we had

Ms. Petty testify and she, apparently, gave all the testimony

-- well, I'm not sure if she did.  I don't know -- she was

1    mentioned again in this motion, and I don't think she should
2    have been but...
3            MR. SHERMAN:  Understood, Your Honor.
4            You know, we can -- we can narrow it.  I do want to
5    be clear, though, that, you know, all fifteen County
6    Recorders' depositions will still be implicated because the
7    questions that were asked for these different results for
8    different, you know, combinations of County Recorders; but for
9    each one of those questions that produced varying results that
10   we think are material to the claims that I identified before,
11   we will narrow it to only, you know, the one or two for each
12   category of response that we think will establish the -- you
13   know, resolve the issues of fact that the Court pointed to in
14   the Motion for Summary Judgment order.
15           THE COURT:  I'll await an amended shortened table.
16           MR. SHERMAN:  Understood, Your Honor.
17           THE COURT:  Okay.
18           MR. SHERMAN:  For what it's worth, if I could just
19   add one point, Your Honor.  I don't think this is a very
20   substantial portion of that table.  So we will work again with
21   defendants on the balance of questions.
22           Just to be clear, the arbitrariness-related
23   designations are not an overwhelming portion of that -- of
24   that table.
25           THE COURT:  Okay.  I want to move to --

1    MR. MAKKER:  Just one last piece on that, right.

2    So as to the adverse party 100-mile issue, that does

3 leave, I guess, three County Recorders that under this sort

4 of, hey, they're not adverse, there would be no opportunity, I

5 guess, for their depositions to come in at all is how I

6 understand the objection, and so we subpoenaed them to appear.

7    THE COURT: Which are those?

8    MR. MAKKER:  It is Pinal, Gila and Yavapai.

9    Well, I guess, yeah, Yavapai's right on that border

10 there but, as I understand it, that's the position they have.

11    THE COURT:  So I did a Google maps of Courthouse

12 Square in Prescott to 401 West Washington.  It came to a

13 hundred miles.  Now, I don't know what side of Courthouse

14 Square the Yavapai County Recorder's office is, but if it's

15 close to Cortez Street, it's 100 miles -- it said on Google

16 Maps 100.0 miles.

17    Presumably, if he or she parks on the other side of

18 Cortez Street, it's over a hundred miles; and I just don't

19 think I should have to resolve if it's a hundred miles and,

20 you know, a hundred yards or --

21    MR. LANGHOFER:  Helpfully, your Honor, there --

22 there is a bright line of rule in this.  In the Federal Rules

23 of Evidence it's 100 miles exactly, and we have attached to

24 our response a route from the County Recorder's office -- it's

25 a 30(b)(6) deposition -- to this courthouse that's 99.8 miles

```
 1   if you take the most direct route.
 2           THE COURT:  Oh, is the County Recorder not in --
 3   their office is not right there --
 4           MR. LANGHOFER:  I don't believe --
 5           THE COURT:  I didn't know where their office was.
 6           MR. LANGHOFER:  Yeah, I had to Google it myself; but
 7   I think it's attached to our motion.  It's 99.8 miles if
 8   you -- if you go up Grand Avenue.
 9           THE COURT:  What if the County Recorder has to leave
10   from his or her house?
11           MR. LANGHOFER:  Well, maybe they're closer then.
12           THE COURT:  Might be farther.
13           MR. MAKKER:  At any rate, Your Honor, you know,
14   there is the separate provision 32(a)(4)(E) under availability
15   that I think, you know, it's -- as they've said, it's to
16   accommodate the witnesses.  I think that's another way to deal
17   with the Yavapai issue.
18           Additionally, I don't think there's any
19   disagreement, but the counsel for the Secretary of State,
20   there's another witness here, Russell Smith, that was not
21   called live.  Their counsel has said he's in Nevada.  So I
22   believe he would be in that 100-mile --
23           THE COURT:  Who, I'm sorry?
24           MR. MAKKER:  Russell Smith was another 30(b)(6)
25   deponent of the Secretary of State.
```

```
 1            THE COURT:  Oh, is it somebody that used to work
 2    there and now lives in --
 3            MR. MAKKER:  No, he just works remotely is my
 4    understanding.
 5            THE COURT:  Oh.
 6            MR. MAKKER:  And so he's in Nevada.  I believe that
 7    would put him in the 100-mile bucket as well.
 8            MR. LANGHOFER:  I don't think it's worth spending
 9    time disputing this.
10            MR. MAKKER:  I'm just trying to resolve the
11    different issues that we have on the various witness that they
12    have under these global objections.
13            So I believe that deals with Russell Smith.  I
14    believe that deals with Yavapai.  That leaves Pinal and Gila
15    and then the hybrid witnesses and their unobjected-to
16    testimony and whether that comes, which we would then, of
17    course, try to narrow if possible to what we actually cite
18    later on; but, as I said, our understanding was that the un --
19    specifically unobjected-to questions would be coming in and we
20    dealt with what was specifically objected to in their live
21    testimony.
22            THE COURT:  That's exactly how it's supposed to be.
23            MR. MAKKER:  Okay.  And so then the question, I
24    guess, is for things that were not specifically objected to,
25    would that be coming in as narrowed by whatever we cite to or
```

 1   -- I guess how are we dealing with the objection of

 2   non-adversity for those witnesses?

 3          THE COURT:  Well, my understanding with hybrid

 4   witnesses was that there was no -- if there was no objection

 5   to the designations that -- for purposes of streamlining the

 6   trial, that we weren't concerned about the issue of adversity

 7   or how far away they were.

 8          MR. MAKKER:  That is what --

 9          THE COURT:  I guess adversity's the only thing.

10          MR. MAKKER:  I think that's what we understood as

11   well, but as you heard Mr. Langhofer say, he believes there is

12   no hybrid deposition testimony because they're not adverse.

13          MR. LANGHOFER:  Yeah, I -- as I recall your

14   instruction, Your Honor, it was only unobjected-to portions of

15   transcript could come in --

16          THE COURT:  Correct.

17          MR. LANGHOFER:  -- and there are objections -- at

18   least to the witness you've heard from so far there are

19   objections to everything in their transcripts because they're

20   not adverse and they're within a hundred miles.

21          THE COURT:  All right.  That is not how I understood

22   our agreement with hybrid testimony.

23          My understanding was it was an evidentiary objection

24   as opposed to an issue of adversity, which is not a rule of

25   evidence objection.  It's a federal rule objection.

1    MR. LANGHOFER:  Your Honor is the leading expert in

2  this courtroom on its orders so...

3    THE COURT:  That's my understanding, that that --

4  the objection had not been raised before me, that their

5  depositions could not be used because they weren't adverse

6  parties; but that their depositions -- but for a hybrid

7  witness for purposes of trying to avoid prolonging the

8  testimony that unobjected-to designations would be read -- I

9  would be allowed to read those as opposed to having the

10  witness testify to that and only rule of evidence objections

11  would be handled with live testimony.

12    MR. LANGHOFER:  I think the case law gives Your

13  Honor discretion in this matter.

14    THE COURT:  Okay, so that's -- that's the ruling.

15    MR. MAKKER:  Okay, and so I believe all that leaves

16  is Pinal and Gila as, you know, they're not adverse.  We have

17  designations that are also objected to and because they're

18  inside the 100 miles and so just -- so that Your Honor is

19  aware, we did subpoena these -- I guess we can take Yavapai

20  out if that's where Your Honor lands on Yavapai being more

21  than a hundred, but we did subpoena them to appear at trial.

22  I don't know exactly how it will impact schedule yet, but I

23  just wanted to make you aware of that --

24    THE COURT:  Okay.

25    MR. MAKKER:  -- to try and resolve that issue.

```
 1              THE COURT:  Thank you.
 2              MR. MAKKER:  Thank you, your Honor.
 3              THE COURT:  Now I want to talk about the Motor
 4   Vehicle Department second disclosure.
 5              MR. FREEDMAN:  Good morning, Your Honor, John
 6   Freedman for the Poder plaintiffs.
 7              THE COURT:  And the first thing I want to have
 8   straight is the chronology.
 9              MR. FREEDMAN:  Okay.
10              THE COURT:  My understanding -- and you can tell me
11   if this is correct or only partially correct.
12              My understanding is that after plaintiffs made their
13   request to produce to the Arizona Department of Transportation
14   Motor Vehicle Division they got back a note there's a statute
15   that says that you can't have what you asked for because of
16   privacy concerns, and then a whole lot of work was done and
17   eventually the Motor Vehicle Division produced a very large
18   document with certain fields in it that included things that
19   are not precluded by -- because of privacy.  Driver's license
20   number, ID number -- I don't remember how many fields.
21              Then -- and everybody got that and everybody gave
22   that to their experts and their experts gave opinions, and
23   here's where I'm not sure of the chronology.
24              MR. FRIED MAN:  Okay.
25              THE COURT:  At some point the defendants' counsel
```

1    got in touch again with the Motor Vehicle Division,

2    Mr. Jorgensen specifically, and said, "Can you add a couple

3    more fields to this Excel spreadsheet?" specifically whether

4    it's a real ID driver's license or not and that put -- and the

5    plaintiffs were not involved in those discussions.

6              MR. FREEDMAN:  That's right, Your Honor.  That

7    request came in on October --

8              THE COURT:  Can I finish?

9              MR. FREEDMAN:  Sorry, ma'am.

10             THE COURT:  And that data was provided to the

11   defendants -- "yes" or "no" was it provided to you

12   simultaneously?

13             MR. FREEDMAN:  Yes, Your Honor.

14             THE COURT:  And here's where I'm not positive:  Did

15   you get it before you deposed Dr. Richman?

16             MR. FREEDMAN:  The first installment we got two days

17   before Dr. Richman's --

18             THE COURT:  What installment?

19             MR. FREEDMAN:  There are two supplements at issue.

20   So can I just take a step back and walk Your Honor through the

21   chronology?

22             Everybody got -- in response to plaintiffs' RFPs

23   there was data production, exactly as Your Honor described,

24   August 29th.  Everybody got that.  Our expert prepared an

25   analysis of that.  Their expert prepared an analysis of that.

 1          Their expert made a supplemental request to

 2   Mr. Jorgensen on October 12th.

 3          THE COURT:  Were you -- when I say "you," I mean the

 4   plaintiffs.  Were you aware of that?

 5          MR. FREEDMAN:  Not until October 25th.

 6          THE COURT:  So Dr. Richman through whoever, counsel,

 7   said, "Could we get something more?" and that request was made

 8   October 12th?

 9          MR. FREEDMAN:  Yes, ma'am.

10          THE COURT:  So something more was produced when?

11          MR. FREEDMAN:  October 26th.

12          THE COURT:  And did you get it on October 26th.

13          MR. FREEDMAN:  We got it at the same time as

14   defendants on October 26th.

15          THE COURT:  When did you depose Dr. Richman?

16          MR. FREEDMAN:  October 28th.

17          THE COURT:  October 28th.  And when was the second

18   supplemental production made?

19          MR. FREEDMAN:  Second supplemental production was

20   November 5th.

21          THE COURT:  November 5th?

22          MR. FREEDMAN:  Yes.

23          THE COURT:  And what did that add?

24          MR. FREEDMAN:  It's very confusing what it added.

25   It was for approximately 50,000 records.  Mr. Jorgensen went

1    back to the Legacy pre-max database to provide additional

2    information on 50,000 individuals.

3              THE COURT:  So when you -- and then when did you get

4    the supplemental report from Dr. Richman?

5              MR. FREEDMAN:  So the first supplemental we got at

6    midnight October 26th, so just before his deposition.

7              THE COURT:  Okay.

8              MR. FREEDMAN:  And I did have a chance to depose him

9    on -- on that.

10             THE COURT:  All right.

11             MR. FREEDMAN:  The second supplemental was served

12   November 6th after the first day of trial.

13             THE COURT:  Okay.  Well -- and what are you asking?

14   Obviously, you're asking that the second supplemental

15   production and report not be considered by the Court --

16             MR. FREEDMAN:  Yes.

17             THE COURT:  -- or not allow any testimony on it.

18             What's your view on the first supplemental, the one

19   that you had a chance, although with short notice, to depose

20   Dr. Richman about?

21             MR. FREEDMAN:  We also believe that should be out

22   under Rule 32(e).

23             THE COURT:  And when did he give you his original

24   report?

25             MR. FREEDMAN:  October 13th, the day after he made

1  his request for more data.

2          THE COURT:  Did his report reveal the deficiency

3  that he thought there was in the data and the additional

4  information that he wanted to get from the Motor Vehicle

5  Division to make his analysis better?

6          MR. FREEDMAN:  There is a disclosure.  It's not

7  particularly clear.  There's a footnote in the report

8  indicating that he had requested more information from ADOT.

9          We promptly asked the defendants, "What's this

10 about?"  We didn't hear back until October 25th.

11         THE COURT:  October 25th, the day before you got the

12 new production?

13         MR. FREEDMAN:  That's right, ma'am.

14         THE COURT:  So you want to limit Dr. Richman to his

15 October 13th report?

16         MR. FREEDMAN:  That's right, ma'am, and we believe

17 that that's consistent with Rule 26(e)'s limitation on

18 supplementing expert.

19         THE COURT:  Did you depose him about the

20 supplemental report?

21         MR. FREEDMAN:  The first one was within scope of the

22 deposition.  The second one was served after the deposition.

23         THE COURT:  So that's "yes"?

24         MR. FREEDMAN:  "Yes" as to the first supplement.

25         THE COURT:  Okay.  Mr. Langhofer.

```
 1              MR. LANGHOFER:  So second one should be easier, Your
 2    Honor --
 3              THE COURT:  Second one is out.
 4              MR. LANGHOFER:  And we've -- we've never even said
 5    that we wanted to offer this --
 6              THE COURT:  Okay.
 7              MR. LANGHOFER:  -- in our testimony.
 8              When we disclosed this up in our report, he's got a
 9    duty to update.  He updated it, and when I transmitted his
10    second supplement I said, "We do not intend to introduce this
11    in our case in chief."
12              Conceivably they could open the door and we can have
13    a discussion about cross -- or redirect but that's -- that's a
14    problem for another day, maybe never.
15              On the disclosures that they received, there's
16    Footnote 3 in Paragraph 46 of Richman's report, talk about how
17    there's an outstanding request -- he actually has several
18    paragraphs where he talks about the interpretation of the
19    original production and how there's some limits to it, and he
20    reserves the right to update if his request for additional
21    information is, you know, fulfilled.
22              Mr. Freedman said that he asked us for clarification
23    as to what those meant.  I don't -- like, maybe I missed an
24    e-mail, but I do not recall getting any requests for
25    clarification.
```

```
 1              Look, if I missed an e-mail, I apologize to
 2    everyone; but I just don't think I ever saw that.
 3              THE COURT:  But you got -- you, the defendants, got
 4    the information from ADOT at the same exact time that it was
 5    provided to the plaintiffs?
 6              MR. LANGHOFER:  That's right, and less than twelve
 7    hours later we disclosed Mr. Richman's analysis of that first
 8    supplement.
 9              THE COURT:  Okay.  Have you provided the first
10    supplement to your expert?
11              MR. FREEDMAN:  We have, Your Honor.
12              THE COURT:  And he's had a chance to see whether
13    that affects his opinions in any way.
14              MR. FREEDMAN:  He has, Your Honor.
15              THE COURT:  Have you provided anything in writing?
16              MR. FREEDMAN:  We've not supplemented his report in
17    part because the Rule 26(e) provides that you're not supposed
18    to supplement after final pretrial disclosures are made.
19              THE COURT:  Right, all right.  Here's -- I'm not
20    going to hear any more argument.  Here's what I'm going to
21    allow:  I'm going to allow Dr. Richman to testify about his
22    supplemental report, including the information that was
23    received on October 26th, despite the lateness of it because
24    this case did not proceed in the ordinary way that cases
25    usually did, and I -- despite there being no written
```

```
 1   supplement, I will allow plaintiffs' expert to orally testify,
 2   even though it will be the first time defendants ever hear it,
 3   to what, if anything, his opinions are with this additional
 4   information.  So that's my ruling.
 5            MR. FREEDMAN:  Very good, Your Honor.
 6            THE COURT:  With respect to the other aspect of this
 7   motion, by the way, that far exceeds -- I've felt like
 8   something I've done in the past but decided I wouldn't, which
 9   is like to -- oh, it actually is the perfect place for me to
10   do this because page -- it's not the real Page 17, sorry --
11            MR. FREEDMAN:  It's okay.
12            THE COURT:  -- but it was an overlength brief
13   without anybody asking permission to do that; but even so, the
14   issues that really relate to the question of qualifications
15   and admissibility of his opinions under Daubert can only be
16   resolved through his testimony in any event, which because
17   this is a bench trial the Court would not convene a separate
18   hearing to have that.
19            So I can't discuss that yet.  We'll hear what
20   Dr. Richman has to say, and the Court then will determine
21   whether or not he -- if he is qualified, whether his opinions
22   are admissible under Daubert and that's how it will go.
23            MR. FREEDMAN:  Understood, Your Honor.  If I could
24   just point out one thing that's important for our experts'
25   response, as well as Professor Richman's, which is that in the
```

1    RNC's option to the brief, ECF 637, Footnote 1 makes

2    representations that Professor Richman will not be introducing

3    in his testimony certain of the things that were -- certain of

4    the items that were subject to the *Daubert* motion.

5            So I just want -- I want the record to be clear that

6    they wrote defendant does not intend to offer during their

7    direct examination Tables 3 through 8, Paragraphs 52 to 58,

8    Paragraphs 102 to 107, 116 and 117 and 154 to 160 and we're

9    planning to proceed with our expert on the relevant issues

10   with that understanding.

11           THE COURT:  And that is still accurate,

12   Mr. Langhofer?

13           MR. LANGHOFER:  Yes, ma'am.

14           THE COURT:  Thank you.

15           MR. FREEDMAN:  Thank you, ma'am.

16           MR. MAKKER:  One last bit of housekeeping, Amit

17   Makker again.

18           Your Honor, we learned -- I think it was after court

19   on Thursday -- that defendants are now also planning to

20   call -- I believe it's four County Recorders, at least that's

21   what we heard last.  These are Yuma, Pima, Apache and

22   Coconino, all that, I believe, were on their unlikely to call

23   list beforehand.

24           We've talked about the pretrial conference and the

25   hybrid testimony.  We did have a point of clarification.  We

1   wanted to understand what would happen now that defendants are

2   moving them up to being called because, right, we have

3   objected to testimony that we've elicited from them in

4   deposition and then, of course, whatever they elicited in

5   deposition.

6          If they bring these witnesses to trial, our

7   expectation would be that that doesn't require us to then

8   question them about everything that we've already asked them

9   about at deposition; but if that would be the understanding,

10  that does change how those examinations would go when they're

11  called.

12          THE COURT:  My hybrid ruling goes both ways.

13          MR. MAKKER:  Right.

14          THE COURT:  So if those individuals are called to

15  testify and there are designations to which there's an

16  evidentiary objection, I want it covered live in person so I

17  can rule on it; and the only thing that will be left in the

18  designations are the questions and answers to which no

19  evidentiary objection has been made.

20          MR. MAKKER:  Okay, I think that is clear then.

21  That's the point of clarification we wanted.

22          Defendants may ask this with respect to these County

23  Recorders, and we discussed this on Thursday as well, the

24  potential of maybe the County Recorders appearing by zoom or

25  some other video conferencing.

```
 1          I think the earliest that any one County Recorder
 2   may go would be tomorrow.  So I just wanted to put that on the
 3   record because I think you mentioned there's a certain amount
 4   of time to prepare for that that may be necessary.
 5          THE COURT:  Well, we have to have some equipment
 6   brought in and we have to give them whatever the link is, none
 7   of which I'm in charge of.
 8          Elaine -- I take it there's no objection to these
 9   witnesses appearing by zoom rather than coming all the way
10   from wherever they are?  They're all -- those are mostly more
11   than a hundred miles away.
12          MR. WHITAKER:  Josh Whitaker for the State and
13   Attorney General.  No objection.  We think that would be great
14   for everyone.
15          THE COURT:  Okay.  So if that is the case, then when
16   they're scheduled to testify -- before they're scheduled to
17   testify -- so if it's tomorrow, tell -- talk to Elaine so
18   Elaine can talk to Systems and we can have the system set up
19   so that we can take that testimony.
20          MR. MAKKER:  Thank you, your Honor.  We will figure
21   that out.
22          THE COURT:  And plaintiffs next witness, please.
23          MR. KARPATKIN:  Your Honor, Jeremy Karpatkin for
24   Poder Latinx plaintiffs.  Plaintiffs call Dr. Michael P.
25   McDonald.
```

 1          COURTROOM DEPUTY:  Raise your right hand.

 2          *(Witness is sworn.)*

 3          COURTROOM DEPUTY:  Thank you.  Could you just state

 4   your name and spell your name for the record.

 5          THE WITNESS:  Michael McDonald, M-i-c-h-a-e-l,

 6   M-c-capital-D-o-n-a-l-d.

 7          COURTROOM DEPUTY:  Thank you.  You can go ahead and

 8   have a seat up there.

 9          THE WITNESS:  Good morning, Your Honor.

10          THE COURT:  Good morning.  Please proceed.

11                    DIRECT EXAMINATION

12   BY MR. KARPATKIN:

13   Q.   Dr. McDonald, can you please state your full name for the

14   record.

15   A.   Michael McDonald.

16   Q.   And, Dr. McDonald, did you prepare a slide to use as a

17   demonstrative to assist in your testimony today?

18   A.   I did.

19          MR. KARPATKIN:  We will be referring to that

20   demonstrative shortly; but, Stephen, can you put

21   Dr. McDonald's CV up.

22   BY MR. KARPATKIN:

23   Q.   Dr. McDonald, is this your curriculum vitae?

24   A.   Yes, it is.

25   Q.   Was this submitted on September 14th with your expert

 1   report?

 2   A.   Yes, it was.

 3   Q.   And was this CV up to date at the time you submitted it?

 4   A.   Yes.

 5   Q.   And have there been any changes or updates to this CV

 6   since then?

 7   A.   No.

 8           MR. KARPATKIN:  Your Honor, we move to admit

 9   Dr. McDonald's CV, which is Plaintiff's Exhibit 333.

10           THE COURT:  So this is one of those all or

11   nothing's.  We've had other experts testify.  Their CVs

12   weren't offered, and then they testified about it because it

13   wasn't offered.

14           If you want to offer it, I'll admit it if there's no

15   objection; and then I'll admit all the other ones if they're

16   identified and offered, but if you offer it and admit it, I'm

17   not going to have him tell me what it says.  Your choice.

18           MR. KARPATKIN:  Your Honor, we will then waive

19   admission of the CV so that --

20           THE COURT:  Okay.  You're going to withdraw your

21   offer and have him testify to his qualifications, thank you.

22           MR. KARPATKIN:  Yes, Your Honor.

23           THE COURT:  Go right ahead.

24   BY MR. KARPATKIN:

25   Q.   Dr. McDonald, what is your current position?

 1  A.   I'm a Professor of Political Science at the University of

 2  Florida.

 3  Q.   And for how long have you held that position?

 4  A.   About ten years.

 5  Q.   And what classes do you presently teach?

 6  A.   I teach classes in elections, specifically election law,

 7  something we call election data science, political parties and

 8  campaigns.

 9  Q.   Dr. McDonald, what are your main fields of academic

10  expertise?

11  A.   Elections, voting, election administration, methodology,

12  public opinion.  Those are some of the areas I cover.  I do

13  more than that.

14  Q.   Have you also published in -- published articles in the

15  area of voter registration?

16  A.   Yes, I have.

17  Q.   Does that include published articles on the accuracy and

18  reliability on voter registration information?

19  A.   Yes, I have.

20  Q.   And did that include a publication related to match and

21  voter registration data?

22  A.   Yes, I have.

23  Q.   Do you have expertise in election administration?

24  A.   Yes, I have.

25  Q.   And can you cite some of your relevant experience related

1  to voter registration?

2  A.   So I've been involved with consulting with election

3  officials across the country on improving the accuracy of the

4  information on the voter registration databases, and that

5  springs from work that I did on -- some academic work that I

6  did that developed a methodology of using geocoding to place

7  correctly individuals within their districts.

8       And so I consulted with the Virginia Division of

9  Elections, with the Colorado Secretary of State, worked with a

10  national organization to help other state organizations to

11  develop similar methodologies as proposed in that research.

12  Q.   Can you also summarize some of your relevant experience

13  related to election administration?

14  A.   Yes, I've worked with the US Elections Assistance

15  Commission on their biennial election administration survey

16  early in the 2000s.

17       I've consulted with the Federal Voting Assistance

18  Program.  They're the Department of Defense's organization

19  that assists with overseas and military voters and looking at

20  how localities manage that -- the data regarding military and

21  overseas civilian voters' experiences.

22  Q.   And has your professional work included review and

23  analysis of census data?

24  A.   Yes, it has.

25  Q.   Can you summarize some of that experience?

Michael McDonald, Ph.D - Direct Exam by Mr. Karpatkin    1062

1   A.   Well, I've published on using census data; but I've also

2   served as a -- on a liaison group that was appointed by the

3   National Academy of Sciences to the Census Bureau over issues

4   regarding the 2020 census.

5   Q.   And, Dr. McDonald, has your professional work included

6   work with quantitative methodologies?

7   A.   Yes, it has.

8   Q.   Can you summarize some of that published work?

9   A.   Most noteworthy is a book that I published with

10  co-authors, published by Wiley and Sons, which is the premier

11  publishers of scientific and methods-type related work

12  generally, not just within political science; and that work

13  generally involves replication, particularly with attention to

14  some of the issues that come up with computers when you're

15  attempting to do replication.

16       I've done other derivative work from that among other

17  things and developed methodologies that have been published in

18  -- again, the top journal and political science for

19  methodology to political analysis.

20  Q.   Dr. McDonald, do you serve as a peer reviewer on academic

21  journals?

22  A.   Yes, I do.

23  Q.   Can you identify some of the journals which you provide

24  peer review?

25  A.   Yes, the *American Political Science Review*, which is the

Michael McDonald, Ph.D - Direct Exam by Mr. Karpatkin     1063

1  top overall journal in the field of political science.

2      Others that are very top level, *American Journal of*

3  *Political Science*, *Journal of Politics*, *Political Analysis,*

4  *Public Opinion Quarterly,* and the list goes on.

5      I've been a reviewer somewhere around 50 to 75 times.

6  I've lost count.

7  Q.   Dr. McDonald, I think you might have mentioned this, but

8  have you done consulting work for state governments related to

9  voter registration?

10  A.   Yes, I did.  I mentioned that previously.

11  Q.   Are there any specific examples you failed to mention

12  before?

13  A.   I think we covered the major ones, yes.

14  Q.   Dr. McDonald, have you previously testified as an expert

15  in State or Federal Court?

16  A.   Yes, I have.

17  Q.   Can you list some of the more recent cases on which

18  you've testified?

19  A.   Yeah, I've done this about fifteen times where I actually

20  testified in court.  Most recently, I testified in Georgia

21  regarding exact match procedures with the voter registration

22  database to the -- their Department of Motor Vehicles

23  database.

24      I testified in litigation in Maryland challenging the

25  Maryland Congressional Districts as a Democratic gerrymander.

1    That went to the Supreme Court as a companion case to the

2    *Benisek* case that the Supreme Court ruled on.

3        I testified as an expert witness in -- a lot of this is

4    redirecting as well as election administration -- in a

5    redistricting case in Virginia that also went to the US

6    Supreme Court where the congressional districts are overturned

7    on racial gerrymandering grounds.

8        Here in Arizona -- this is a little ways further back --

9    I did testify for the Arizona Independent Redistricting

10   Commission in the 2000s as a consultant to the Commission, and

11   I was working for the Commission as a defending claims from

12   Democratic-aligned groups against the Commission.

13   Q.   Dr. McDonald, on each occasion when you testified as an

14   expert witness, did the Court find you to be qualified?

15   A.   Yes.

16   Q.   Dr. McDonald, have you received any professional awards

17   or recognition for your work?

18   A.   Yes, I've received several.  Most of them are related to

19   redistricting and these are coming from professional

20   organizations, some from media organizations.  Some are

21   outside of political science, and then there's another class

22   of awards that more recently I've been awarded from various

23   organizations for freedom of speech issues that I'm -- I've

24   been involved with at the University of Florida.

25   Q.   Dr. McDonald, did you prepare an expert report in this

 1  case?

 2  A.   I did.

 3  Q.   And did you later provide a revised report and

 4  declaration?

 5  A.   I did.

 6           MR. KARPATKIN:   And, Stephen, can we put up PX 332.

 7           Next page, please.

 8  BY MR. KARPATKIN:

 9  Q.   Is this your revised report, Dr. McDonald?

10  A.   Looking at the first page, I believe it is.

11           MR. KARPATKIN:   And can we have PX 331, Stephen.

12  BY MR. KARPATKIN:

13  Q.   And is this the declaration you submitted with your

14  revised report?

15  A.   Yes, it is.

16  Q.   Can you explain what revisions or additional information

17  the revised report and declaration addressed?

18  A.   Yeah.  After I wrote my original report and after the

19  Secretary of State's office was deposed, the Secretary of

20  State's office referred to a technical document about -- that

21  regarded matching procedures for the AVID database and we were

22  provided a -- this technical document about, as I recall,

23  three or four days after that deposition; and it did

24  illuminate some of the issues that I raised in my report

25  regarding matching.

1    So I thought it was prudent to write a supplemental -- or

2  this declaration to evaluate that new criteria that was

3  provided by the Secretary of State's office.

4  Q.   Were there any other changes made to your revised report?

5  A.   Those were just mainly to clean up citations and -- the

6  deposition citations 'cuz we had the original raw ones and

7  then we had the finalized ones.

8    So I don't think there was any other issue other than

9  that that we revised in the revised report.

10  Q.   And, Dr. McDonald, does the revised report and

11  declarations contain the opinions you intend to offer in this

12  case?

13  A.   Yes, it does.

14    MR. KARPATKIN:  Your Honor, I'm aware that you are

15  withholding ruling on the admission of expert reports, but I

16  just want to go through the formality of offering the revised

17  report and declaration for your consideration for such time as

18  you rule on the global admissibility of reports.

19    THE COURT:  Thank you.  And I take it the revised

20  report is a complete report, and so that's the only one that's

21  being offered?

22    MR. KARPATKIN:  That, along with the declaration --

23    THE COURT:  Correct.

24    MR. KARPATKIN:  -- which has one additional issue

25  that expands upon something in the report.

UNITED STATES DISTRICT COURT

 1              THE COURT:   Thank you.

 2   BY MR. KARPATKIN:

 3   Q.   Dr. McDonald, can you briefly explain what you were asked

 4   to do in this case?

 5   A.   I was asked to evaluate the effects of HB2243 and HB2492

 6   on the burdens that they may place upon registrants and

 7   particular -- through the course of my work most of the focus

 8   is on naturalized citizens.

 9              MR. KARPATKIN:   Your Honor, I move to admit

10   Professor Michael McDonald as an export on political science,

11   voter registration, election registration and quantitative

12   methodologies.

13              THE COURT:   Unless there's any objection to

14   proceeding with the testimony, you may proceed.

15              MR. KARPATKIN:   Thank you, Your Honor.

16              Stephen, can we please put up Slide 2.

17   BY MR. KARPATKIN:

18   Q.   Dr. McDonald, can you briefly describe the materials you

19   reduced in preparing your report.

20   A.   Generally we're looking at data files and deposition

21   testimony and documents that were provided, either through

22   discovery or accessed publicly.

23       So there's the Arizona Active Voter Registration file.

24   There are other lists that are similar to these that are

25   adjacent to them on lists of individuals who have been

1    cancelled, suspended; and from the Active Voter Registration

2    file it's possible to get a subset of federal-only voters.

3         There are limited extracts, as you mentioned before, from

4    the Arizona Department of Transportation that I've reviewed;

5    deposition transcripts from various entities in the case;

6    documents, again, that were produced in discovery from county,

7    state and federal agencies; publicly-accessible reports and

8    some of these -- beyond these reports about the effectiveness

9    of the databases.

10        Also information specifically on naturalizations within

11   the State of Arizona from the Department of Homeland Security

12   and information about the character of naturalized citizens

13   from the American Community Survey.  That's a survey that's

14   from the Census Bureau.  I think you were probably looking at

15   a very long document on that.

16        And then just for the final opinions that I draw in my

17   report, those are scholarly articles on the cost of voting and

18   the impacts of obstacles to voting.

19   Q.   Dr. McDonald, did you also review the rebuttal reports

20   provided by defendants?

21   A.   I did.

22   Q.   Let's now turn to Slide 3.  I want to turn to the

23   substance of your opinions.

24        Can you please briefly summarize your principle opinions

25   in this case?

1   A.   Yes, sir.  Highlighted in this slide -- and there are six

2   of them listed.  The first is there are multiple failure

3   points in database matching, and we'll go into detail about

4   what these failure points are and that these -- these failures

5   or these difficulties for matching and the timeliness of the

6   information found in databases is disproportionately going to

7   impact naturalized citizens, that there are non-uniform

8   documentary proof of citizenship or DPOC requirements or

9   implementation now currently that I can observe; and then

10  through deposition testimony there's indications that this

11  discretion that will be afforded by these new laws will

12  exacerbate the existing trends that we see right now in

13  non-uniform implementation of DPOC requirements.

14       Examining the people who are likely to be impacted by

15  these laws are mostly federal-only voters, although that's not

16  the only group of individuals, and these federal-only voters

17  tend to be younger, more diverse and less partisan than active

18  registered voters in the State of Arizona.

19       These -- the burdens that are going to be placed upon

20  individuals will have, of course, immediate impacts on

21  burdens, but they will also have long-term impacts on their

22  voting behavior.

23  Q.   Dr. McDonald, we're going to dive into each of these in

24  more detail.  Let's start with your first opinion about

25  database matching.

```
 1            MR. KARPATKIN:  Can we go to Slide 5.
 2   BY MR. KARPATKIN:
 3   Q.   Dr. McDonald, you reviewed several databases.  Can you
 4   briefly describe what these databases are?
 5   A.   So there's the statewide voter registration system that's
 6   contained with the AVID system, which is a larger election
 7   management system thirteen of the fifteen counties use
 8   directly; and then Pima and Maricopa have their own systems
 9   which interface with the AVID system as well.
10        Then there's the Arizona Department of Transportation
11   database for licensed credential holders.  There's the Social
12   Security Administration database, which is used for something
13   that we'll call the HAVA check or Help America Vote Act check.
14        There's the SAVE database, which is a database that's
15   maintained by the US Citizenship and Immigration Services that
16   is -- allows groups, agencies, to look up information on
17   citizenship status for use of potential benefits.
18        There's a database -- and I cannot remember the name of
19   the organization fully -- but it's a National Association of
20   Public Health and Statistics and Information Systems, I
21   believe, is that NAPHSIS and this is a database of birth
22   certificates.
23        And then there's -- those are the ones that I could
24   evaluate.  I'd also make note that the new laws have another
25   category of unspecified databases, and so some of the issues
```

1    that we're going to be talking about -- or I will be talking

2    about with respect to these other databases will also apply to

3    these unspecified databases and the law.

4    Q.   Dr. McDonald, why did you choose these databases to

5    analyze?

6    A.   Well, as I said, these are the ones that are specified in

7    HB2243 and HB2492.

8    Q.   And can -- we're going to turn to the individual

9    databases, and let's start with the Arizona Department of

10   Transportation database.

11             MR. KARPATKIN:   Can we have Slide 6, please,

12   Stephen.

13   BY MR. KARPATKIN:

14   Q.   Can you briefly summarize the issues you identified in

15   your evaluation of the ADOT database?

16   A.   Yeah.  We're going to go into more detail about this, but

17   there's -- something that's going to be consistent across all

18   the databases and deposition testimony documents that I

19   reviewed is the timeliness of the citizenship information

20   that's contained with those databases.

21        This is going to be true for ADOT's databases.  It's

22   going to be true for other databases.  Citizenship information

23   does not get automatically updated.

24        There's also -- because of that phenomenon, that the

25   information does not get updated, there's a particular

 1  situation that's going to occur where if individuals do not

 2  provide updated citizenship information to ADOT, even though

 3  they have provided documentary proof of citizenship to County

 4  Recorders, they're going to find themselves a monthly loop

 5  where they're constantly being requested to have DPOC.

 6  There are data entry errors that are going to plague all of

 7  these databases.  It's going to lead to matching issues.

 8      And then, finally, just because -- there's going to be

 9  the situation where in some cases that County Recorders are

10  faced with indeterminate matches, and there are going to be

11  multiple matches that they're going to have to review and

12  decide which of these records in these other databases is the

13  individual that they're looking at.

14      There's going to have to be some resolution and some

15  discretion that the County Recorders are implementing to

16  resolve those indeterminate matches.

17  Q.   Dr. McDonald, let's address each of these individually in

18  a little bit more detail.

19          MR. KARPATKIN:   Slide 7, Stephen.

20  BY MR. KARPATKIN:

21  Q.   What did you conclude with the respect to the timeliness

22  of citizenship status in the ADOT database?

23  A.   Well, individuals are only required to provide

24  citizenship when they're issued an original credential or if

25  they're issued a renewal credential.

1    Those renewals can take up to ten years between those two

2   time periods.  So if you're changing your address, for

3   example, you don't need to renew and provide this citizenship

4   information.

5    This is something that it's incumbent upon the individual

6   to update that information with ADOT.  It's not required by

7   the law, and even when someone dutifully does this task, a new

8   naturalized citizen provides their new citizenship

9   information, that information has to go through a SAVE --

10  what's called a SAVE check through the federal government, and

11  there can be delays in that process up to weeks; and this has

12  to be done in person by the individual.

13    So as a consequence of that, the citizenship record that

14  exists in ADOT is at a point in time -- this, again, is

15  discussed not in just ADOT, but in other databases as well --

16  and, thus, the accuracy of that citizenship information that's

17  contained within the ADOT database can be out of date.

18  Q.   Dr. McDonald, why is this timing issue of particular

19  significance with respect to the Challenge Laws?

20  A.   So there's really two scenarios that we have to consider

21  here.  Currently, if a new registrant is a naturalized

22  citizen, they've exited the naturalization ceremony -- County

23  Recorders have provided deposition testimony about how they

24  attend these ceremonies and they register individuals to vote.

25    They know that these people are citizens and they're very

1   happen.  It's a -- I've been to these naturalization

2   ceremonies myself to register individuals, and it's a joyous

3   occasion.  People are very excited.  They want to be good

4   citizens, and one of the first things they want to do is

5   register to vote.

6        Currently, election officials understand that there's

7   some timeliness issues with the information when they need to

8   do citizenship verification under current policies and

9   procedures within Arizona.

10        The law will change, though, and for these new

11   registrants, if there's conflicting citizenship information --

12   if there's any information, actually, that says that

13   individual is not a citizen, even though we know there are

14   issues of timeliness with that information being updated

15   within databases, or any other factor that may not allow a

16   County Recorder to find the correct record, then that person's

17   registration is immediately cancelled.

18        So there's no opportunity for them to receive a notice

19   letter, which is what currently happens under the law.

20   Instead, their registration will be immediately cancelled.

21   They will be mailed notice that they've been cancelled, and

22   they will be referred for criminal investigation.

23        So here is a process that is known to have flaws, that

24   County Recorders know this, it's in the Elections Procedures

25   Manual about the timeliness of the citizenship information;

Michael McDonald, Ph.D - Direct Exam by Mr. Karpatkin   1075

1  and, yet, it's going to penalize individuals and penalize

2  their rights.

3      There's also this issue, as I discussed and we'll discuss

4  in more detail, about this loop where current registrants

5  will -- who have not updated their ADOT record will find

6  themselves repeatedly requesting -- County Recorders

7  requesting county -- citizenship information from them until

8  they can resolve the citizenship information status that's

9  found in the ADOT database.

10 Q.   Dr. McDonald, let's dive a little bit deeper into that

11 loop you just mentioned with respect to currently-registered

12 voters.

13      MR. KARPATKIN:  Can we have Slide 8, please.

14 BY MR. KARPATKIN:

15 Q.   You referred to this earlier with the DPOC loop.

16      Can you explain what this chart demonstrates?

17 A.   Yes.  So HB2243 applies to current registrants, and for

18 somebody who's a full-ballot voter, who has provided DPOC to

19 County Recorders in accordance to Arizona law, if there's a

20 record of them not being a citizen in the ADOT database, on a

21 monthly basis the law requires the Secretary of State's office

22 to look up their information in the ADOT database; and if they

23 see that there's a non-citizen flag, they're supposed to

24 report that to the County Recorders.

25      County Recorders are then to issue a notice to the voter

1    that they are not -- they have not provided acceptable -- or

2    there's a question of their citizenship status.  So they're

3    required to provide DPOC.

4        If they respond affirmatively with the DPOC, then they

5    retain their full ballot status, but this is gonna happen on a

6    monthly basis until they -- this is the arrow that goes off to

7    the left and down to the lower left -- until they go to MVD

8    and update their citizenship status.

9        In the event that for some reason they don't respond to

10   that notice -- and there could be a number of reasons why an

11   individual may not respond.  It may have to do with problems

12   with the mail, delivery.  I myself experienced this during the

13   pandemic where I did not receive mail for more than a month

14   and -- but that's not uncommon to happen to individuals.

15       There may be individuals who are traveling for some

16   reason and don't receive that information within the allotted

17   35 days that are permitted under the law, or there could be

18   other reasons why individuals are not responsive to that

19   mailer; but if they do not respond within the 35 days, their

20   registration is cancelled.

21   Q.  Dr. McDonald, I want to zero in on one element of the

22   loop in the center of this graphic where it shows that there's

23   notice to the voter.  The voter responds and provides DPOC.

24       To whom do they provide that DPOC?

25   A.  County Recorders.

 1  Q.   And so the County Recorder is then able to register the

 2  voter as a full-ballot voter?

 3  A.   Yes, they are.

 4  Q.   Is the County Recorder able to change the information in

 5  the Arizona Department of Transportation database?

 6  A.   No, they are not.

 7  Q.   And is that why the voter could be subject to the monthly

 8  check again?

 9  A.   Yes.

10  Q.   I want to turn to the next issue that you identified.

11          MR. KARPATKIN:  Can we have Slide 9, please.

12  BY MR. KARPATKIN:

13  Q.   What did you find with respect to data entry errors with

14  the ADOT database?

15  A.   I first want to make clear that there's a certain class

16  of voters, these naturalized citizens, who are most likely

17  going to be affected by these laws but there is just --

18  because of random chance and other elements that just happens

19  with very large databases, that there's going to be an element

20  of chance to individuals being incorrectly identified as

21  non-citizens or their information be in indeterminate status

22  because you cannot find the right record through database

23  matching.

24          And so one of the barriers that will exist and currently

25  exists for any large-scale database is simply database entry

1    errors.  Individual at the -- say at the County Recorder's

2    office or ADOT -- since we're talking about ADOT at this

3    point -- they have to do ingest procedures when they're

4    entering people's identification.

5        So there's a clerk there who's entering information, and

6    we all make typos; and so just those typographical errors and

7    data entry errors can lead to incorrect position.

8        That information is important to have correct because

9    we're talking about doing matching, and computers need to have

10   the exact information as presented to them in order to do a

11   successful match.

12       And so in deposition Mr. Jorgensen discussed that there

13   are inaccuracies in their auditing procedures that they do

14   about data entry.  They find that 10 to 15 percent of the time

15   that there are inaccuracies in some portion of the ADOT

16   record.

17   Q.   And, Dr. McDonald, to clarify, is that 10 to 15 percent

18   inaccuracy rate related specifically to the citizenship

19   information in the ADOT database?

20   A.   It is not.

21   Q.   So what does that refer to?

22   A.   It refers to all of the potential errors for any of the

23   data elements that are entered into the ADOT database.

24   Q.   Dr. McDonald, is this level of inaccuracy generally

25   consistent with your understanding of inaccuracies in large

1    administrative databases?

2    A.   Yes, there are other documents that are provided with

3    respect to the Social Security Administration, for example,

4    where they have a six percent error rate.

5        So it seems relatively similar in auditing procedures at

6    other large organizations who manage these very large

7    databases.  This sort of error rate that they typically find.

8    Q.   I want to now turn to the process where county official

9    -- election officials have to try to match registrants to the

10   ADOT database.

11            MR. KARPATKIN:  Can we have Slide 10, Stephen.

12   BY MR. KARPATKIN:

13   Q.   As an initial matter, can you explain the different types

14   of matches that can be made between a registrant and an ADOT

15   record?

16   A.   Yeah, so this is part of this HAVA match procedure.  So

17   when a County Recorder enters information into AVID, that

18   information is transmitted to ADOT, and then ADOT transmits

19   information to the Social Security Administration database for

20   limited verification of some of the information on names and

21   birthdates and last four digits of Social Security number.

22       That information from the Social Security Administration

23   is then transmitted back to ADOT.  ADOT appends some

24   information to those records, and that information is then

25   transmitted back to the County Recorders through the AVID

UNITED STATES DISTRICT COURT

Michael McDonald, Ph.D - Direct Exam by Mr. Karpatkin    1080

1    system, all right.

2        So what we're discussing here is the stage in which

3    information has been returned by the Social Security

4    Administration and that they're gonna -- in some cases, as

5    described by Mr. Jorgensen in deposition, they're not gonna

6    find the exact record that they're -- they're hoping to find,

7    and the exact record would be a hard match.

8        This is where we have a good identification.  We've done

9    additional matching.  There's a high level of confidence.

10   It's always possible that you found the wrong record, but

11   there's a very remote chance that you found the wrong record

12   when you're doing this database matching.

13       So if you have a hard match, the ADOT system is gonna

14   send back a single record and you would hope that it's the

15   correct record; and in most cases it will be, but if there's

16   an indeterminate match, if the AVID -- or the ADOT system

17   can't automatically find this hard match record that its

18   looking for, it's going to revert to a soft match.

19       And these soft matches are ones where there's not enough

20   information to identify uniquely the record.  In deposition,

21   Mr. Jorgensen described one of the soft matches that ADOT

22   does, which is simply last name and birth date and that's it,

23   and that's going to have a large number of matches because

24   there's Smiths in the world and millions of people, you're

25   gonna find that there are going to be upwards to fifty or more

1  people who have exactly the last name and same birthdate.

2  This is a phenomenon called the birthdate problem that I've

3  published research on.

4      So Mr. Jorgensen says that they know that this is gonna

5  be a problem so they actually truncate the number of returned

6  records through the ADOT system to 50 records.  So we know

7  there are going to be at times up to 50 records that are going

8  to be transmitted back to the AVID system for adjudication.

9  Q.   Dr. McDonald, did you have an opportunity to analyze the

10 specific criteria that AVID uses to evaluate matches?

11 A.   Yes, this was that technical document that came in after

12 the Secretary of State's tran -- deposition.

13          MR. KARPATKIN:   Stephen, can we put on DX 935.

14          And, Your Honor, this has already been an admitted

15 exhibit.  It is defendants' Exhibit 935.

16 BY MR. KARPATKIN:

17 Q.   Dr. McDonald, is this the document that you're talking

18 about?

19 A.   Yes, but it's not the page where the soft matches for MVD

20 is found.

21          MR. KARPATKIN:   Stephen, can we go to Page 2.

22 BY MR. KARPATKIN:

23 Q.   Is this the basis for your analysis?

24 A.   Yes, it's the -- at the bottom of that page -- it's cut

25 in half.  These are the MVD verification soft matches.  So

1  these are the four types of soft matches that MVD -- that AVID

2  uses to winnow down that information that's being transmitted

3  back from ADOT to AVID.

4          MR. KARPATKIN:  Can we go to Slide 11, Stephen.

5  BY MR. KARPATKIN:

6  Q.   Does this slide reflect the information that was on the

7  document we just reviewed?

8  A.   Yes.

9  Q.   And can you briefly explain what the different soft match

10 types are here?

11 A.   Yes, so we have a Soft Match Type 1.  It's -- to take it

12 out of the technical document, it's related to exact match on

13 the last name, the first three characters of the first name,

14 and the last four digits of the Social Security number.

15     Soft Match 2 and Soft Match Type 3 are similar.  They're

16 varying some of the information, maybe birthdate, but

17 generally the information is generally the same about

18 birthday, names or Social Security numbers.

19     The last one is a different character, which I found

20 interesting, and it's not something that I contemplated in my

21 original report.  It's that the Arizona driver's license

22 number is considered to be a soft match, and under reflection

23 from this document and from some of the expert report that was

24 produced by Mr. Richman, which discusses duplicates, I

25 realized that AVID does not treat driver's license number as a

1    unique number.

2          And in some of the hard matches, additional criteria such

3    as names, birthdates or Social Security numbers are used to

4    help identify records that would be under the hard match.

5    It's not -- but a driver's license number itself is not a hard

6    match, which means that the AVID system recognizes that you

7    can have duplicates and that you may not be matching the

8    correct record when you are doing record matching with

9    driver's license numbers alone.

10   Q.   Dr. McDonald, the right column of this table identifies

11   the number of duplicate pairs.

12         Did you calculate those duplicate pairs?

13   A.   Yeah, I applied these criteria to the AVID database, so

14   the database of active registered voters.  Understand that

15   that's roughly four million records.  The ADOT database is

16   roughly seven million records.  So these are the numbers that

17   we can see within the AVID system.

18         I didn't have the personal identifying information that I

19   could do a similar sort of check on the ADOT system.  So I'm

20   trying to approximate what's going to happen here.  I would

21   guess that there's gonna be more matches when we're talking

22   about a roughly two-thirds size more size of a database with

23   millions of records talking about ADOT.

24         But these number of duplicate pairs are -- for example,

25   with Soft Match Type 1, there are 3,428.  So there's -- it

 1   means that there are 3,000 -- excuse me, 3,428 instances where

 2   there are two records that satisfy this soft match criteria.

 3   Q.   And, Dr. McDonald, how many duplicate pairs are there for

 4   Soft Match Type 2?

 5   A.   2412.

 6   Q.   And that's 2412 duplicates?

 7   A.   Duplicates of this character, yes.

 8   Q.   And how many duplicates are there for Soft Match Type 3?

 9   A.   438.

10   Q.   And how many duplicates are there for Soft Match Type 4?

11   A.   480.

12   Q.   Dr. McDonald, on this table you prepare a total.  Can you

13   explain what that total represents?

14   A.   Yeah.  So as I was doing this analysis, I realized that

15   it's possible that one record could be matched under Soft Type

16   Match 1 with another record, but in Soft Match Type 2 it could

17   be matched with yet a different record, and so it wouldn't be

18   right, really, just to tally these up and come up to a total

19   number of duplicates.

20       So instead, I changed the unit of analysis to the

21   individuals that were not uniquely identified by any of these

22   four soft match types, and that total number is 12,051.

23   Q.   And just to be clear, what does that 12,051 number

24   represent?

25   A.   That represents -- as far as we can see within the AVID

 1   system -- but, again, ADOT's gonna have a greater number of

 2   records that are transmitting to it.  The number of instances

 3   where using the soft match criteria there's gonna be an

 4   indeterminate match that the County Recorder's going to have

 5   to exercise some form of discretion to determine whether or

 6   not the -- which record is the correct individual to match

 7   information to and with the new AVID record that they're

 8   entering into the system.

 9   Q.   Professor McDonald, I would like to give you a chance to

10   walk us through an illustrative example of this soft match

11   process.

12          MR. KARPATKIN:  Can we have Slide 12, please.

13   BY MR. KARPATKIN:

14   Q.   What does this example show?

15   A.   So this is replicating, essentially, the Soft Match Type

16   1 and showing an issue where it can fail.  So now we're --

17   here's where we would have two records, but they're actually

18   not the same person.

19         So recall that the Soft Match Type 1 involves last name,

20   first three characters of first name and the last four digits

21   of the Social Security number, and the real blocker here is

22   with first name.

23         If an individual is named Mari, for example, and there's

24   another individual who's named Maria, the soft match will fail

25   because it only looks at the first three characters of the

 1   first name.

 2   Q.   So this is an instance where two individuals who were

 3   potentially the same individual failed to match?

 4   A.   Yeah, and I -- sorry.  I don't really mean to say fail.

 5   I mean that there will be an indeterminate match and there

 6   will have to be some adjudication by the County Recorder as to

 7   which of these two is the correct record.

 8   Q.   I want to now move to an illustration of a different

 9   kind, of a match failure.

10        MR. KARPATKIN:  Can we go dough to the next slide,

11   please.

12   BY MR. KARPATKIN:

13   Q.   Dr. McDonald, what does the -- this slide provides two

14   examples of match failure.  Can you explain the example on the

15   left?

16   A.   Yeah.  So here again, these are just illustrative

17   examples to be somewhat repetitive so I apologize for that;

18   but, again, we've got the first name issue not matching

19   correctly on the left-hand side and what's more frequent --

20   and this comes up in deposition and it comes up in documents

21   that are reviewed for this case repeatedly across multiple

22   databases is what happens when a woman takes a hyphenated last

23   name for the husband through a marriage or a child is adopted

24   and they take the last name as a hyphenated name with their

25   parents, and so this happens quite frequently.

1    It's described in documents from various sources.  I've

2   also seen instances when I've been working with voter

3   registration databases around the country that people will

4   take those dual first names, like a Lopez Garcia that has a

5   space between them and they'll put the Lopez into the middle

6   name and not put the Lopez and Garcia on the same line as

7   well.

8    So there are various things that can go wrong here when

9   it comes to these -- you know, particularly with these last

10  names and given life events that people have and that can

11  alter that last name.  That can challenge how that

12  information's entered into a database.

13   On the right-hand side is an example where we have an

14  individual who maybe at one stage in their life they went by

15  Joseph, but over time they decided to start calling themself

16  Joe.  So they adopted a nickname and that's become their legal

17  name, and that's the name that they're using for their forms.

18   So this really speaks to the point in time that this

19  information's entered into the database and whether or not

20  those life event changes or those discretionary changes that

21  people may have are accurately reflected in the names that are

22  contained within the databases.

23   At the bottom is more of a typical sort of matching -- a

24  transcription error that can occur.  So we have a Social

25  Security number of 1234 on the left-hand side and a Social

1   Security number last four of 1239 -- and, again, this is

2   pretty common that people have -- will write onto a paper form

3   a number, like a "4," and it may be hard to distinguish from a

4   "9" whoever's doing the data entry; and so here would be a

5   good example of that of sort of phenomenon.

6   Q.   Dr. McDonald, what is the consequence to the voter if

7   they find themselves in a situation like described here where

8   there isn't a match between their AVID registration and their

9   ADOT record?

10  A.    In terms of their ADOT record is that they may be denied

11  some benefit of being able to cast a full ballot.  As

12  contemplated currently under the laws, if there's an

13  indeterminate match, you just simply can't look up the record,

14  that person would be given a limited federal ballot status in

15  the AVID database.

16  Q.   Dr. McDonald, were you able to estimate the total number

17  of individuals with ADOT records that may inaccurately

18  identify them as non-citizens?

19  A.   Yes.

20        MR. KARPATKIN:  Can we have Slide 14.

21  BY MR. KARPATKIN:

22  Q.   What did you conclude about that number?

23  A.   So I took the driver's license number as it was found

24  within the AVID system, and I matched that exactly with the

25  driver's license number in the ADOT system in that extract

1   that was provided by ADOT; and there's a citizenship flag in

2   there as well, and I found 6,084 cases where there were

3   full-ballot voters who had provided DPOC satisfactory to

4   County Recorders and were registered as full-ballot voters,

5   but the ADOT system had a record of them being a non-citizen.

6   Q.   Dr. McDonald, so summing up your analysis of the use of

7   the ADOT database, what, in your opinion, will be the result

8   if the new laws expand the use of ADOT matches to confirm

9   citizenship?

10  A.   As I mentioned in the very beginning, there are two real

11  problems here; but globally, what we're looking at, is

12  naturalized citizens are gonna have some difficulties here.

13       The information is not going to be current necessarily

14  within the ADOT database, and there are going to be certain

15  things that are going to happen to them as a consequence to

16  that.

17       The other major thing that's going to happen here is

18  registering to vote is going to become like a lottery and, you

19  know, very few people win the jackpot; but in this case the

20  jackpot's going to be that you may be found to be a

21  non-citizen through -- just simply through database entry

22  errors or matching issues.

23       And anyone, it could be a full naturally-born citizen

24  within the United States, they could be erroneously matched

25  with an ADOT record, and if they're a new registrant, they're

 1   going to find themselves -- their registration cancelled and

 2   they'll be referred for criminal investigation.

 3            THE COURT:  So would this 6,084 be the number of

 4   people that would be in what you described as the loop?

 5            THE WITNESS:  That's correct.  It's a -- I'm not

 6   including any other registrants like the full -- the

 7   federal-only voters that could also be caught in this loop as

 8   well.

 9            MR. KARPATKIN:  Dr. McDonald, I want to now turn to

10   the next database of the Social Security Administration.

11            Can we have Slide 15.

12   BY MR. KARPATKIN:

13   Q.   What did you conclude about the usefulness of this

14   database for verification of citizenship?

15   A.   Well, the Social Security Administration under the Help

16   America Vote Act of 2002 makes an application available to

17   election officials across the country to permit look-ups of

18   information found in the Social Security Administration

19   database.  It's called the HAVV system or Help America Vote

20   Verification system.

21        That system only returns certain information.  It returns

22   names and last four of the Social Security number and

23   birthdates.  So it only verifies that.  Although the Social

24   Security Administration does have citizenship information for

25   some of their credential holders, that information is not

1  externally available outside the federal government through
2  this HAVV system.
3       So it cannot be used, currently configured, to verify
4  citizenship and the State of Arizona would not have access to
5  the citizenship information found within the Social Security
6  Administration database.
7       If somehow there was a change of law at the federal level
8  that would permit this access or policy, then there's other
9  challenges, just like we were discussing with ADOT.  There's
10 gonna be latency issues with the citizenship, and there's
11 going to be another global issue that, according to the Social
12 Security Administration, about a quarter of their records
13 don't even have citizenship information.
14 Q.   Dr. McDonald, you referenced "latency issues."  Can you
15 elaborate a little bit?  What do you mean by a "latency
16 issue"?
17 A.   Well, it's the same thing we were discussing earlier with
18 ADOT where that citizenship information is only good at the
19 point in time in which it was acquired by the organization, be
20 it the Arizona Department of Transportation, be it the Social
21 Security Administration, and so unless individuals have
22 contact in which there was an opportunity to update that
23 citizenship status, naturalized citizens will have inaccurate
24 and old citizenship information contained with any of these
25 databases.

1          MR. KARPATKIN:  Stephen, can we go to Slide 16,

2    please.

3    BY MR. KARPATKIN:

4    Q.   Did you also review the accuracy and reliability of the

5    SSA database?

6    A.   Yes, so I -- I didn't have the data in the same way as we

7    have with AVID and with the ADOT records.  So there are some

8    reports that have been produced by the Social Security

9    Administration, the Office Inspector General.  These were

10   reports back in the 2000s so they are a little dated, but I

11   don't think that there's anything that would have changed the

12   circumstances within the Social Security Administration since

13   then because these are issues that are pernicious and they're

14   present in all large databases, and there really would not

15   have been fixes to these over time to any large degree.

16        So what that -- those Inspector General reports describe

17   is that the Social Security database really does not

18   necessarily provide reliable matching.  Part of it's because

19   the ID number that you're looking up is just the last four

20   digits.

21        It's not the full Social Security number, and so what's

22   happening here with the Social Security Administration

23   database is they're doing soft matching, too, and they're

24   going to have multiple records; and there's possibility

25   described in the documentation that you're going -- if you put

Michael McDonald, Ph.D - Direct Exam by Mr. Karpatkin    1093

 1   the same information in twice into this HAVV system that they

 2   have, you can actually get two different records back when

 3   you're doing this; and for this reason the Inspector General

 4   warns against using the HAVV system as a means to verify

 5   eligibility for voting.

 6   Q.    Dr. McDonald, did the reports you reviewed estimate what

 7   the error rate might be in the SSA database?

 8   A.    Yeah, I referenced that earlier.  It's about six percent.

 9   Q.    And, Dr. McDonald, you referenced Inspector General

10   reports from SSA.  Did you also review record requests from

11   SSA?

12   A.    Yes, there was a record request as well that was made.

13   Q.    And was that in a piece of correspondence provided from

14   the SSA addressing these issues?

15   A.    Yes.

16   Q.    And is that the kind of information generally relied upon

17   by scholars in your field in assessing databases?

18   A.    Yes, I do it all the time.  We do data collection on

19   precinct boundaries and election results that have been used,

20   for example, the most recent case out of Alabama that went to

21   the Supreme Court, the data that was produced by the team that

22   I lead at the University of Florida.

23        So we're constantly doing records requests of local

24   election officials across the country to obtain information

25   that we use in courtroom.

1          MR. KARPATKIN:  Dr. McDonald, I want to now turn to

2     the SAVE system.  Can we have Slide 17.

3     BY MR. KARPATKIN:

4     Q.   This Court has already heard some about the SAVE system,

5     but can you briefly describe the key features of this system

6     that are most critical to your analysis?

7     A.   Yeah, so SAVE is gonna have some of the same issues that

8     we've just been discussing with other databases; but there's

9     also some issues that are really endemic to the SAVE system as

10    well.

11         One of those is that it's a system.  It's actually not a

12    single database, and there's a system of other databases

13    within the federal government that the SAVE system is

14    accessing to get information about citizenship status of

15    individuals; and the information is only for non-native born

16    citizens and you have to have some identification number in

17    order to conduct the query into the system.

18          MR. KARPATKIN:  Dr. McDonald, I now want to turn to

19    the specific issues you identify with respect to the SAVE

20    system.  Can we have Slide 18, Stephen.

21    BY MR. KARPATKIN:

22    Q.   Can you explain your findings from your review of the

23    SAVE system?

24    A.   Yeah, again, this is very common; but in some respects

25    the data issues are magnified in SAVE because it's got

1    multiple databases that it's accessing, and so there's a

2    description in the documentation about how the different

3    databases that the SAVE system's accessing can have variations

4    on last name, like we were describing earlier with respect to

5    the ADOT system; and there they're gonna be indeterminate

6    matches as to whether or not this individual is the correct

7    individual that you're supposed to be finding and providing

8    verification that that individual should receive a benefit.

9        It's known from -- from the side of Arizona within the

10   County Recorder depositions and within the Secretary of

11   State's deposition and within the Elections Procedures Manual

12   that there's a lag time of how SAVE gets updated.

13       So if someone naturalizes, the SAVE system, that doesn't

14   immediately propagate through the bureaucracy that's the

15   federal government; and so some of these databases could have

16   conflicting information with citizenship status because it's

17   not being updated at the same time and it may be points of

18   contact updates, but at the very least you're gonna have flags

19   of how that information gets updated.

20       The Elections Procedures Manual describes that lag time

21   to be -- some caution is to be exercised if a person -- a

22   naturalized person registers within two weeks of an election

23   date.

24       I think that that -- there's no documentation why the two

25   weeks should be the cutoff point.  It's just what the

 1   Elections Procedures Manual says.  In my review of the
 2   documentation from SAVE, there are reasons why we might
 3   suspect that the time might be longer in some cases.
 4        For example, there was a discussion that there could be a
 5   database down for days or -- hours or days and that the
 6   information would not be able to be accessed within the SAVE
 7   database, and so this whole system is known to have issues
 8   with it.  It's known to have inability to find the correct
 9   record; and in that situation where the SAVE does not provide
10   a record back, the USCIS requests that the user, the agency
11   that's using the SAVE database -- could be County Recorders,
12   could be Secretary of State's office, could be ADOT 'cuz they
13   also use the SAVE database -- they're requested to send some
14   information back to SAVE so that they can do a manual search
15   and find the information and see if they can find it within
16   their database so they can provide the benefit to the
17   individual who's seeking it.
18   Q.   Dr. McDonald, were you able to review information about
19   how this manual verification is actually implemented in
20   Arizona?
21   A.   Yes.
22        MR. KARPATKIN:  Can we put up PX 266.
23        Your Honor, I believe this is an admitted exhibit --
24   I'm sorry, that was the wrong exhibit.  Let's take that down.
25   My apologies.  Can we have Slide 19, please.

1    BY MR. KARPATKIN:

2    Q.   Dr. McDonald, does this slide include the information you

3    reviewed with respect to the implementation of the manual

4    verification?

5    A.   Yes.

6    Q.   Can you please explain what this slide represents?

7    A.   It's a spreadsheet.  Fortunately, it's only one page, and

8    it has dates going from 2016 to 2023 on the left-hand side

9    year.  There's agency ID and agency name.  The agencies that

10   are being described within each of these years are County

11   Recorders and the Secretary of State's office -- County

12   Recorders that have access to the SAVE system.

13       Of note are these two columns that are highlighted in

14   yellow.  The first column represents the number of times that

15   SAVE requested information from Arizona -- additional

16   information to perform one of these manual checks.

17       The column next to it is the number of instances where

18   Arizona affirmatively responded with that additional

19   information.  I've totaled these up.  Just simple.  That was

20   not in the document, but I just did a simple sum; and there

21   were 2,892 instances where SAVE requested a manual

22   verification check and the State agencies, either the County

23   Recorders or the Secretary of State's office, responded 162

24   times from that request.

25              THE COURT:  So would this potentially be the

 1    situation where someone walked out of the naturalization

 2    ceremony, went and registered to vote at the table outside the

 3    ceremony, run through SAVE, SAVE hadn't updated their records

 4    and they say, "Well, can you send us more information?"

 5                THE WITNESS:  Yeah, but it's the scenario where it's

 9    not that the information hasn't updated in SAVE yet.  It's the

10    scenario where whatever information was entered into the

11    system is not matching with a record within the SAVE system.

12                THE COURT:  So this isn't an update situation?  This

13    is just a failure to match?

14                THE WITNESS:  It could be an update situation

15    because these HAVA checks are happening whenever anyone

16    updates their voter registration, and it could be that there's

17    a non-citizenship information coming back from ADOT through

18    the update that's happening within the HAVA check; and that

19    might trigger a SAVE check, a request for documentary proof of

20    citizenship that would then result in a SAVE check.

21                MR. KARPATKIN:  And I just want to note for the

22    record that the data on this table is derived from Plaintiffs'

23    Exhibit 269-2, which has been admitted.

24    BY MR. KARPATKIN:

25    Q.   Dr. McDonald, can you just sum up on this issue.  Why is

1  this -- the totals that you derived here, the 2,892 requests

2  and the 162 responses significant in your overall evaluation

3  of the SAVE system?

4  A.   Yeah, this is a scenario where under this Memorandum of

5  Agreement that if there is a failure to find information

6  because there's just no record match, there's a duty to the

7  County Recorders and the Secretary of State's office to

8  request this manual information.

9      You can envision a scenario like we just discussed where

10  someone had previously provided information to the ADOT that

11  they are not a citizen, they've naturalized, but that new

12  information's not being matched within the SAVE system; and so

13  they will still be considered to be a non-citizen even though

14  they provided DPOC, but SAVE just can't verify that because

15  they can't find the record.

16          MR. KARPATKIN:  Dr. McDonald, I want to now turn to

17  the NAPHSIS Electronic Verification Vital Events database.

18          Slide 20, please.

19  BY MR. KARPATKIN:

20  Q.   As an initial matter, can you summarize what this

21  database is?

22  A.   So this is a -- as I understand it -- and there's not as

23  much documentation on this system as other systems, but it's

24  a -- as I understand it to be, a database of a collection of

25  birth certificates across the country.

Michael McDonald, Ph.D - Direct Exam by Mr. Karpatkin    1100

1   Q.    And what issues did you identify in --

2           THE COURT:   Could I interrupt?   Is this the database

3   that the County Recorders said they had no access to?

4           MR. KARPATKIN:   Yes, your Honor.

5           THE COURT:   Okay.   So why do we need to talk about

6   it if they can't even -- I mean, they have plenty of errors,

7   but they're not using it 'cuz they have no access.

8           Is the idea maybe they'll have access and it will

9   still be bad?

10          MR. KARPATKIN:   That contention has been made by

11  some of defendants' experts.

12          THE COURT:   What, that access might be granted to

13  this?

14          MR. KARPATKIN:   At some point in the future.

15          THE COURT:   "Yes"?

16          MR. KARPATKIN:   Yes.   Yes, your Honor.

17          THE COURT:   Okay.

18          MR. KARPATKIN:   We will not spend much time on this,

19  Your Honor.   We'll be very brief.

20          THE COURT:   I don't know what EVVE is.

21          THE WITNESS:   It's Electronic Verification of Vital

22  Events.   That's the database system that they provide the

23  product they provide.   This is not a government entity.   This

24  is a nonprofit organization that collects this information,

25  and so they have this product EVVE that allows people to look

1    up information within their system.

2                THE COURT:  Who are the people it allows to look up?

3                THE WITNESS:  Anyone who has a contract with them

4    that they've granted access to their system.

5                THE COURT:  Thank you.

6    BY MR. KARPATKIN:

7    Q.   Let's move on, Dr. McDonald.  Is it possible for two

8    databases to provide inconsistent information?

9    A.   Yes, it is.

10   Q.   And what happens if there's an inconsistency?

11   A.   So we have a situation where we know that there's latency

12   in how citizenship gets updated within the databases, and so

13   County Recorders are going to be confronted at times with

14   conflicting citizenship information.

15       One database will say that they're a citizen, another

16   database will say that they are not.  In that scenario, the

17   County Recorder needs to exercise their discretion as to which

18   information they're going to accept as being the definitive

19   proof of citizenship.

20       Now, there's conflicting information of how this is being

21   implemented right now in the deposition testimony, and I think

22   we'll cover that so -- but it will also be, though, the

23   situation where County Recorders are under threat of

24   committing a felony if they knowingly register an individual

25   who is not a citizen.

1    And so a risk adverse person, I think is reasonable to

2    assume, would look at the conflicting information of

3    citizenship status and they would not want to be committing a

4    felony so they're gonna go with the citizenship -- the

5    information that says that person is not a citizen so that

6    they are guaranteed that they're not committing a felony in

7    that case.

8         THE COURT:  Can we take our morning break, Ladies

9    and Gentlemen.  We'll reconvene at five minutes after 11:00.

10        Court is in recess.

11        COURTROOM DEPUTY:  All rise.

12        (Recess taken at 10:48 a.m.)

13        (Back on the record at 11:05 a.m.)

14        THE COURT:  Thank you, please sit down.

15        Please continue with your questions.

16   BY MR. KARPATKIN:

17   Q.   Dr. McDonald, I want to ask one last question about your

18   databases analysis.  We've been discussing your analysis of

19   these databases for purposes of citizenship verification.

20        Is it your opinion that these databases are not reliable

21   generally?

22   A.   No.

23   Q.   So for what particular purposes are these databases not

24   reliable?

25   A.   They're unreliable for the purposes of determining

1  citizenship verification.

2  Q.   Dr. McDonald, thank you.  I want to now focus on your

3  second opinion, which is the disproportionate impacts on

4  naturalized citizens.

5       Did you have an opportunity to evaluate which groups in

6  the population are most likely to be impacted by the further

7  application of these databases for citizenship verification?

8  A.   Yes, it's been discussed throughout that naturalized

9  citizens are going to be the ones mostly impacted by these new

10 laws.

11       MR. KARPATKIN:  Can we have Slide 23, Stephen.

12 BY MR. KARPATKIN:

13 Q.   Did you have an opportunity to analyze the demographic

14 composition of naturalized citizens of voting age in Arizona?

15 A.   Yes, I did.

16 Q.   And what did you conclude?

17 A.   So from the Department of Homeland Security, there are

18 statistics on the number of individuals who have naturalized

19 within Arizona since 2015; and they report that there are

20 111,513 individuals of voting age who have naturalized.

21       In addition, the American Community Survey, it's a

22 large-scale survey that the Census Bureau runs every year, it

23 finds some information on the demographic characteristics of

24 these individuals who have been naturalized compared with the

25 voting age population within Arizona.

Michael McDonald, Ph.D - Direct Exam by Mr. Karpatkin    1104

1  Q.   And can you explain in a little bit more detail how you

2  use the American Community Survey data to identify the numbers

3  in this table?

4  A.   Yes.  So, for example, on the first two columns there,

5  the blue is the voting age population, and 66.0 percent of the

6  voting age population within the State of Arizona is

7  non-Hispanic white.  Among naturalized citizens, 32.6 percent

8  are non-Hispanic white.  So they're more diverse.  Naturalized

9  citizens are more diverse, as we might expect.

10      Predominantly they're going to be more diverse because of

11  the Hispanics and Asian American Pacific Islanders.  So for

12  the Hispanic, 34.0 percent of Arizona's voting age population

13  is Hispanic, while 67.4 percent of naturalized citizens are

14  Hispanic; and, again, going to the most prevalent group, 4.8

15  percent of the voting age population is Asian or Pacific

16  Islander, while among naturalized citizens 35.8 percent are

17  Asian or Pacific Islander.

18      The numbers aren't so big for the smaller groups within

19  the State of Arizona.  So 61. -- 6.1, excuse me, percent are

20  African-American among the voting age population and 7.9

21  percent among the naturalized citizens and 4.8 percent among

22  Native Americans of voting age statewide compared with 2.4

23  percent naturalized.

24  Q.   So, Dr. McDonald, what conclusion do you draw from the

25  data in this table?

UNITED STATES DISTRICT COURT

 1  A.   That the naturalized population's more diverse than the

 2  voting age population of Arizona.

 3  Q.   I want to now turn to your next opinion, Dr. McDonald.

 4           MR. KARPATKIN:  Can we go to Slide 24.

 5  BY MR. KARPATKIN:

 6  Q.   I'm sorry, one -- one last question on the last slide.

 7       Dr. McDonald, do you know the number of voting age

 8  citizens in Arizona since 2015?

 9  A.   Yes, that's the first graphic in the top there.

10  Q.   I'm sorry.  Thank you very much, Dr. McDonald.

11           MR. KARPATKIN:  Let's go to the next slide, please.

12  BY MR. KARPATKIN:

13  Q.   Dr. McDonald, what is the third opinion that's

14  highlighted here?

15  A.   Non-uniform documentary proof of citizenship

16  implementation current.

17  Q.   And what analyses did you conduct in coming to this

18  opinion?

19  A.   I analyzed the -- some of the databases that I described

20  earlier with respect to suspended voters, cancelled voters and

21  federal-only voters, and I also looked at deposition testimony

22  and also considered the rebuttal experts' reports.

23           MR. KARPATKIN:  And I want to review the data one

24  category at a time.  Let's go to Slide 25, cancelled voters.

25  BY MR. KARPATKIN:

1    Q.   Dr. McDonald, what is this table?

2    A.   This is Table 1 from my report, and it's the active

3    registered voters by county.  So we've got the counties

4    identified on the left --

5              MR. KARPATKIN:  Dr. McDonald, let me just pause you

6    for a moment there.

7              Your Honor, this is Table 1 from Dr. McDonald's

8    expert report.  In this table and several other tables that

9    Dr. McDonald will discuss are separately-identified as

10   exhibits.

11             Since the Court has not yet determined whether the

12   report in its entirety will come in and since this exhibit

13   will assist in Dr. McDonald's testimony, we would like to move

14   to enter this table as a separate exhibit.

15             It's Plaintiffs' Exhibit 334.

16             THE COURT:  334?

17             MR. KARPATKIN:  Correct.

18             THE COURT:  Is there any objection to 334?

19             MR. LANGHOFER:  Subject to cross-exam on accuracy,

20   of course, Your Honor, no objection.

21             THE COURT:  With that objection, Exhibit 334 is

22   admitted.

23             *(Exhibit No. 334 admitted into Evidence.)*

24   BY MR. KARPATKIN:

25   Q.   I'm sorry, Dr. McDonald, can you briefly explain what is

1   a "cancelled voter"?

2   A.   A cancelled voter is an individual whose registration has

3   been cancelled effectively so that they are no longer active

4   or in a suspense status.

5   Q.   And how did you determine invalid citizenship proof on

6   this table?

7   A.   There is a status reason field within the database, and

8   among the status reasons indicated there's "Invalid

9   Citizenship Proof."  So that's in the quotations there.

10      So these are all of the individuals by county that have a

11   flag of invalid citizenship proof.

12   Q.   Dr. McDonald, looking at the individual counties, what

13   pattern do you observe from this table?

14   A.   There's some anomalies here.  I draw your attention to

15   Pima, in particular.  There are zero invalid citizenship proof

16   in Pima.  It's the second largest county in Arizona, at least

17   in terms of active registered voters, and I believe that's

18   also total population and, yet, it has zero.

19      Maricopa has 232, Pinal has 825.  It seems reasonable

20   that Pima should have some more and it's -- it's suggestive,

21   then, that there's uneven implementation of current DPOC

22   procedures among County Recorders in Arizona.

23   Q.   Dr. McDonald, did you consider any explanations for that

24   pattern that you observed?

25   A.   Yes, and the defendants' experts questioned whether or

1   not there could be some other explanation for this zero number

2   in Pima; and this goes, also, with the next slide that we're

3   going to see with suspended voters, because we will find in

4   the next slide as well that Pima has zero suspended voters for

5   invalid citizenship proof as well.

6       So it looks to be an anomaly and when I -- one of the

7   suggestions by Dr. Hoekstra was that there's some other code

8   here that's identifying the invalid citizenship proof.

9       Well, if there was a different code, that would also

10  speak to different policies and procedures that are being

11  implemented across the counties; but I did look with respect

12  to the suspended voters and there were, if I recall correctly,

13  114 records of suspended voters in Pima County, and all but

14  one of them was for not of voting age.  So it doesn't seem

15  reasonable that that's some other code for invalid citizenship

16  proof.

17      There was one record with missing code.  So if I were to

18  be most generous, there could be one; but even if there was

19  one, as we'll se in the next slide, it would be very unusual

20  for Pima, being the second largest county, to have only one

21  individual in a suspended status for invalid citizenship

22  proof.  So I looked a little further.

23      I looked at -- I took recommendations from the

24  defendants' experts, looked at the data further, but then I

25  also looked back at the Pima deposition; and Pima says in

 1    their deposition that they don't put people into a suspended
 2    status or cancelled status if they do not provide DPOC.  They
 3    simply register them as federal-only voters.
 4        So, clearly, it's a matter of record in the deposition
 5    testimony that Pima is definitely doing something different
 6    from the other counties.
 7    Q.   Dr. McDonald, did you consider whether the numbers
 8    reflected in this table could reflect the possibility that
 9    non-citizens are distributed in a manner consistent with the
10    invalid citizen paragraph?
11    A.   That was something that Richman did in his report.
12        Non-citizens tend to be located in larger counties and
13    they tend to be in most populous counties across the country.
14    I look at this data all the time for purposes of calculating
15    turnout rate for those who are eligible to vote, and so when I
16    calculate those things I know that the patterns are gonna be
17    that the larger counties are going to have concentrations of
18    non-citizens.
19        So, again, if it was an explanation somehow that there
20    were zero non-citizens in Pima and that's why Pima has zero
21    non-citizens who are registered for insufficient -- or in
22    suspended or cancelled status for invalid citizenship proof,
23    that just doesn't bear any reasonable explanation from what I
24    know about how the data work.
25    Q.   Dr. McDonald, you've already talked a little bit about

1  suspended voters, but let's turn to the table in your report

2  that addresses suspended voters.

3        MR. KARPATKIN:  Can we have Slide 26, please.

4  BY MR. KARPATKIN:

5  Q.  Is this Table 2 from your report, Dr. McDonald?

6        THE COURT:  I'm not sure that I know what a

7  "suspended voter" is.  I've heard about inactive list.

8        THE WITNESS:  Yeah, so -- so there's a process that

9  happens here, and this just generally discusses the process

10 not with respect to citizenship.

11       So if a County Recorder receives an application and

12 for whatever reason they don't think that that application is

13 valid and they need to go out and gather more information from

14 the registrant, could be like the address doesn't seem

15 correct, it's not in their records as an example this sort of

16 thing that could be just mundanely that they're worried about,

17 it could also be for citizenship, DPOC, they will put those

18 voters in a suspended status while they do further

19 investigation.

20       At the point in time when that investigation ends,

21 and under Arizona law this is supposed to -- you can only keep

22 a person in suspended status up to the next general federal --

23 General Election -- Arizona Regular General Election, I

24 believe is the correct wording in the law.  Then they're

25 supposed to be moved into a cancelled status and so,

 1   basically, time is up.  You're not going to get registered to

 2   vote.

 3          There are scenarios, also, where you could

 4   immediately cancel a registrant, skip the suspended status and

 5   go directly to a cancelled status.

 6          MR. KARPATKIN:  Your Honor, similar to Table 1, this

 7   is Table 2 from Dr. McDonald's expert report.

 8          We would like to admit it as plaintiffs' Exhibit

 9   335.

10          THE COURT:  Is there any objection?

11          MR. LANGHOFER:  The same reservation of rights on

12   cross-examination.  Otherwise, no, Your Honor.

13          THE COURT:  Without objection, Exhibit 335 is

14   admitted.

15          *(Exhibit No. 335 admitted into Evidence.)*

16   BY MR. KARPATKIN:

17   Q.   Dr. McDonald, in developing this table did you use the

18   same methodology that you used for Table 1?

19   A.   Almost.  I mean, I looked at suspended voters, which is a

20   separate list from cancelled voters; but besides that, same

21   methodology.

22   Q.   Did you see a similar pattern in this data?

23   A.   Yes, Pima stands out as an anomaly.  Maricopa appears to

24   stand out as well as an anomaly.  This was an issue that was

25   brought up by defendants' experts, and although they were not

1  able to find additional data file for Maricopa suspended

2  voters, I was able to locate one.  It just wasn't provided in

3  the overall data dump that I got for all of the voter

4  registration data.

5      I missed it.  It was may fault, but I did review that one

6  and there were fifteen records that had some indication of

7  invalid citizenship proof.  It wasn't the same exact wording

8  for the Maricopa system.  Recall that Maricopa has a separate

9  system from AVID.  So it's slightly different wording, but it

10  had citizenship as part of the reason why individuals were in

11  suspended status.

12      So even if I were to look at these fifteen, it doesn't

13  really change my opinion that there's something different

14  going on in Maricopa where they would only have fifteen

15  suspended voters; and you compare that with counties that

16  have, you know, significantly smaller populations having over

17  a thousand.

18      So we know something's going on in Pima that's different,

19  and it looks like as well in Maricopa that something is having

20  differently there as well.

21          THE COURT:  My understanding from prior testimony is

22  that both Maricopa County and Pima County have their own

23  registration system and don't -- and all of the other thirteen

24  counties use the State system?

25          THE WITNESS:  Yes.

1          THE COURT:  Would that be an explanation for why the

2    data doesn't work for them?

3          THE WITNESS:  These are data that were compiled by

4    the Secretary of State's office that included suspended

5    registrations and cancelled registrations for Pima, and for

6    Maricopa there were cancelled registration but there were no

7    suspended; and so I looked for that additional suspended data

8    and that was in a separate database.

9          So for whatever reason, it wasn't compiled into that

10   statewide file that was provided in discovery for suspended

11   voters, and the data file itself that was provided by the

12   Secretary of State's office misleadingly says all counties.

13         Again, it was my fault for not looking further; but

14   I did find the records and I would amend this table to say

15   there should be fifteen there for Maricopa.

16   BY MR. KARPATKIN:

17   Q.   So, Dr. McDonald, just to give you a chance to say it

18   explicitly, what pattern do you observe looking at this table

19   of suspended voters?

20   A.   There's just some anomalies, and these anomalies suggest

21   that there's some uneven implementation of current DPOC

22   requirements in Arizona; and this is most certainly true, it's

23   not just the data table when we look at Pima, that there's

24   additional deposition testimony that confirms that Pima's

25   doing something different from the other counties.

1    MR. KARPATKIN:  I want to now turn to federal-only

2    registrants.  Can we have Slide 27.

3    BY MR. KARPATKIN:

4    Q.   Dr. McDonald, is this Table 3 from your expert report?

5    A.   Yes, it is.

6    MR. KARPATKIN:  Your Honor, similar to the other

7    exhibits, I move admission of this table that is plaintiffs'

8    Exhibit 336.

9    THE COURT:  Any objection?

10   MR. LANGHOFER:  Same reservation; but otherwise no,

11   Your Honor.

12   THE COURT:  Exhibit 336 is admitted.

13   *(Exhibit No. 336 admitted into Evidence.)*

14   BY MR. KARPATKIN:

15   Q.   Dr. McDonald, why did you evaluate federal-only

16   registrants?

17   A.   Well, these are individuals who have not provided DPOC

18   and have been registered to vote for only federal-only

19   elections pursuant to prior court action here in the State of

20   Arizona.

21   Q.   And what methodology did you use to develop this table?

22   A.   Similar as before, except instead of looking at the

23   status reason, there are two codes within the Arizona Voter

24   Registration File that indicate what sort of federal ID that

25   you have to provide; and those two codes together, looking at

1  the documentation, is -- they're indicative of individuals who

2  are federal-only voters.

3  Q.   And, Dr. McDonald, do you find a pattern in this data

4  similar to what you found in Tables 1 and 2?

5  A.   No.  I mean, we don't see zeros here.  So the patterns

6  are not as stark in Maricopa as the largest county and it has

7  the most federal-only voters.

8      So some of these patterns make sense, although, I mean,

9  there's still some peculiarities.  Coconino appears to be

10 somewhat of an outlier with 636 federal-only voters; but you;

11 look at a similar-sized county, say like right next to it

12 above in the alphabetical list, Cochise, there's only 118

13 (sic).

14     So, again, not as stark difference as we saw with

15 suspended and cancelled voters.  There's still some suggestion

16 there that there's uneven implementation of these policies on

17 DPOC policies.

18 Q.   And Dr. McDonald, for these three tables, did you

19 calculate the degree of statistical significance?

20 A.   No, I did not.

21 Q.   And why did you not do that?

22 A.   Well, statistical significance is only used when you're

23 sampling from a population.  So if I were randomly selecting

24 people from all of the registered voters within the State of

25 Arizona, that would be a survey like -- and there would be a

1    margin of error associated with that survey, and that might be

2    what we would use to do statistical significance.

3        We don't apply -- and I've never applied it in any other

4    prior court case or work that I've done when I'm working with

5    the universe of all individuals who are in these different

6    statuses.  There is no margin of error.  That's the number,

7    and so it's inappropriate to calculate margins of errors for

8    numbers when they're just the absolute number that's known as

9    truth.

10   Q.   So Dr. McDonald, to sum up the discussion of the data in

11   these tables, what conclusions do you draw from your analyses

12   in Tables 1, 2 and 3?

13   A.    It appears that County Recorders are unevenly

14   implementing current DPOC procedures within the State of

15   Arizona.

16   Q.   I want to now turn to the next opinion, your opinion for

17   County Recorder discretion.

18             MR. KARPATKIN:  Give me Slide 28.

19   BY MR. KARPATKIN:

20   Q.   And before we dive into the details, can you explain why

21   you think county discretion is particularly important to

22   implementation of the Challenge Laws.

23             MR. KARPATKIN:  Give me Slide 29, please.

24             THE WITNESS:  Well, there's deposition testimony

25   currently that there are counties are interpreting current

1  policies differently and implementing current policies

2  differently.  The new laws will create more opportunities for

3  discretion from local election -- among local County

4  Recorders, and so likely they're just going to continue doing

5  what they're doing now and they're going to have that

6  discretion.

7              They might have some guidance, but none is going to

8  be coming from the Secretary of State's office.  The new 2023

9  Elections Procedures Manual does not address any of the

10  discretion that is present in the law, at least as I

11  understand that's being challenged in this case; and so the

12  Secretary of State themselves, I believe, at least in

13  deposition testimony that I reviewed, 'cuz I don't know what

14  they testified to in the Court, said that it's really up to

15  the County Recorders to decide what they will do.

16  BY MR. KARPATKIN:

17  Q.   Dr. McDonald, what information did you rely on in

18  conducting your evaluation for this opinion?

19  A.   Primarily -- well, I actually think exclusively I was

20  looking at deposition testimony.

21  Q.   And is that the kind of information experts in your field

22  generally use to analyze issues in election administration?

23  A.   Yes, I've used it in prior cases.

24  Q.   In your opinion as an expert in election administration,

25  is it similar to relying on interviews with local election

Michael McDonald, Ph.D - Direct Exam by Mr. Karpatkin     1118

 1  officials?

 2  A.   Yes, I've done that sort of activity where I've

 3  interviewed election officials about their election practices,

 4  yes.

 5  Q.   And, in your opinion, are statements by local officials

 6  useful in understanding how voter registration will be

 7  implemented?

 8  A.   Yes.

 9  Q.   Okay.  You evaluated several areas where you saw evidence

10  of diverse practices by County Recorders with respect to these

11  laws.  Let's take them one at a time.

12       MR. KARPATKIN:  Can we have slide 30, please.

13  BY MR. KARPATKIN:

14  Q.   What provision of the Challenged Laws does this slide

15  represent?

16  A.   There's a provision "reason to believe," and in

17  deposition County Recorders were confronted with various

18  scenarios of what may constitute reason to believe; and we've

19  taken some excerpts here of the various responses that County

20  Recorders are providing to these reasons to believe.

21  Q.   And can you walk us through what -- well, let me first

22  ask you, Dr. McDonald, can you explain in a little more detail

23  what the reason to believe provision is and how it works?

24  A.   Yes.  So for a current registrant, if the county recorder

25  obtains some reason to believe that the individual is not a

 1    citizen, then they can institute a SAVE check.

 2    Q.   And on the left-side column there's some information that

 3    could be a reason to believe.  Is that how I am to interpret

 4    this slide?

 5    A.   Yes.

 6    Q.   And can you explain what you found with respect to how

 7    counties construe that information?

 8    A.   Yes.

 9              MR. LANGHOFER:  Your Honor --

10              THE COURT:  I'm sorry, I couldn't understand what

11    you said.

12              MR. LANGHOFER:  We have pending objections to all of

13    the testimony that he's about to rely upon.

14              THE COURT:  Oh, overruled.  You may answer.

15              I have to allow the answer because I can't rule on

16    the objections that I haven't had an opportunity to read yet.

17              So we'll go ahead with this.

18              THE WITNESS:  Okay.  So to proceed, on the left-hand

19    side the County Recorders were confronted with the scenario if

20    they received information from a neighbor, anonymous call or

21    by mail, it was posed in different ways in different forms in

22    deposition, but that's summarizing the scenario that was

23    posted; and, for example, Santa Cruz County Recorder said it's

24    something they would have to act upon.

25              Maricopa elicits that they would need guidance on

1  what it makes credible to make them believe the information,

2  and Cochise County Recorder says it's not a reason to believe.

3          So there's varying interpretation of this

4  information.  The quality of that information determines

5  citizenship status to reason to believe that they need to

6  conduct a SAVE check.

7  BY MR. KARPATKIN:

8  Q.   And can you explain what the right column of this table

9  shows?

10 A.   So this would be with lists of non-citizens provided by

11 third parties.  This is currently happening, by the way, in

12 places like Virginia, where I used to live, among others.

13         So there are organizations that are compiling lists of

14 non-citizens and providing them to -- suspected non-citizens

15 and providing them to election officials.

16         It's also happened with respect to Texas and Florida

17 where state officials did a similar sort of HAVA check against

18 voter registration database versus a driver's license database

19 finding hundreds of thousands of individuals who were not

20 citizens, but later turned out to be just this latency issue

21 with citizenship information.

22         So this is a reality.  It's happening right now.  It's

23 not so much of a hypothetical, though I don't think that it's

24 -- to my knowledge, it's not actually occurred within Arizona

25 to date.

1    But Santa Cruz says in this situation they would need to

2    consult their legal counsel.  Cochise says, no, they would not

3    accept that information.  La Paz said they would need to look

4    into or need to research, but would not change a registration

5    based solely on that information.

6              MR. KARPATKIN:  Dr. McDonald, I want to move on to

7    another issue.  Can you pull Slide 31.

8    BY MR. KARPATKIN:

9    Q.   What issue does this slide represent?

10   A.   So this -- for example, in that loop that we were talking

11   about earlier, a person was registered as a full-ballot voter.

12   They provided DPOC.  They've been flagged as having to provide

13   DPOC because there's this record in the ADOT database, but

14   they really are a citizen and they provide the okay; and so

15   what would happen in that case if this was close to an

16   election deadline, would that voter's rights be restored so

17   they can participate in election?

18        So that's basically the scenario that's being posed here.

19   So we get differing responses again from County Recorders.

20   One from Cochise saying the voter could not be added back to

21   the rolls if the registration deadline has passed.  Pinal says

22   so it might vary from circumstance to circumstances the

23   questions posed to Pinal and the County Recorder says that is

24   correct; and in Coconino if it's their mistake they would

25   restore that voter so they can participate in the election.

 1           MR. KARPATKIN:  Can we have Slide 32.

 2   BY MR. KARPATKIN:

 3   Q.   Dr. McDonald, what is this slide?  What issue does this

 4   slide represent?

 5   A.   So County Recorders were posed the question how reliable

 6   did they view the HAVA check information that's coming back.

 7           So if they're getting citizenship information through

 8   that HAVA check that's being appended by ADOT, whether they

 9   determine -- like how reliable is that information; and a

10   number of County Recorders, the five that are on the left-hand

11   side, they're expressing the view that that HAVA check

12   information may be inaccurate.

13           Some of them were describing, again, actually going to

14   naturalization ceremonies as part of the response to this

15   question; and so they know that these individuals' information

16   is gonna be inaccurate and out of date until everything can be

17   worked through the system.

18           The two on the right-hand side, Navajo and Graham,

19   believe that the -- whatever they get back from the HAVA check

20   is the accurate, definitive citizenship status for that

21   individual.  So there's uneven County Recorder understanding

22   of the limitations of the HAVA check right now in Arizona.

23           MR. LANGHOFER:  We'd note the same situation with

24   pending objections, Your Honor.

25           THE COURT:  Understood.  Please continue.

1   BY MR. KARPATKIN:

2   Q.   Dr. McDonald, why is the difference in the two columns in

3   this slide particularly important?

4   A.   Well, under the new law we can think about this loop.

5        Whenever anyone is a new registrant or they're updating

6   information, like their address or something of that, a HAVA

7   check is performed.  So anyone who is having a HAVA check

8   performed can have their citizenship questioned; and

9   particularly for the new registrants, we're going to be in a

10  situation where the new laws say that if that HAVA check comes

11  back as a negative on citizenship, they will -- their

12  registration will be cancelled immediately and that their

13  registration -- they will be referred to law enforcement for a

14  criminal investigation.

15  Q.   So, Dr. McDonald, looking at the evidence you reviewed

16  with respect to County discretion, what do you conclude?

17  A.   There's uneven implementation right now in the State of

18  Arizona of current DPOC procedures.

19  Q.   And what do you conclude from the statements of the

20  County Recorders?

21  A.   That when the new laws are put into effect, that the

22  current discretion is present in the system will only continue

23  to exist in the new system.

24  Q.   Dr. McDonald, I want to turn to your next opinion

25  regarding current federal-only voters and their composition.

1    What analysis did you perform related to this opinion?

2   A.   Well, I -- I looked at this federal-only list, and the

3   reason why I thought that would be important to look at is

4   that these are people who have not provided DPOC and there's

5   going to be investigations.  There are going to be database

6   matching -- not really investigations, but there's going to be

7   database matching that's going on with respect to these

8   particular class of voters, and I wanted to understand who

9   they are.

10          MR. KARPATKIN:  And can we have Slide 34.

11   BY MR. KARPATKIN:

12   Q.   Dr. McDonald, is this slide based on Table 4 from your

13   report?

14   A.   Yes, it is.

15          MR. KARPATKIN:  Your Honor, this slide is not

16   identical to Table 4 from Dr. McDonald's report.  It is

17   derived from data from that report.  We would like to move for

18   the admission of Table 4 from Dr. McDonald's report as

19   Plaintiffs' Exhibit 337.

20          MR. LANGHOFER:  So this implicates a problem because

21   Exhibit 337 is not what we're seeing on screen, and as we're

22   sitting here I've discovered that the last three exhibits

23   we've admitted also were not what we saw on the screen because

24   they included a lot of narrative from the witness, not just

25   the chart.

1    So we've got no objection to just the table portions

2  of those four exhibits coming in, but I think we should work

3  with opposing counsel to strike the narrative portions.

4         THE COURT:  Okay, thank you.

5         What was this number again?

6         MR. KARPATKIN:  337.

7         THE COURT:  With the limitations that, I believe,

8  the parties agree with, 337 is admitted; and my understanding

9  when the other documents were admitted, that all we were

10  admitting were the tables and if the exhibit that's been

11  admitted in evidence has more than that on it, it needs to be

12  removed.

13         MR. KARPATKIN:  Your Honor, we have prepared

14  versions of those exhibits that remove anything other than the

15  data itself.  We'll work with the clerk to make sure that is

16  what is admitted as evidence of those exhibits.

17         THE COURT:  Thank you.

18         (Exhibit No. 337 admitted in to Evidence.)

19  BY MR. KARPATKIN:

20  Q.   Dr. McDonald, can you explain how you calculated race and

21  ethnicity in this table?

22  A.   Yes.  So this is actually race and ethnicity of the

23  community in which the registered voters live in.  So it's --

24  it's not actually the race or ethnicity of the -- the Spanish

25  ethnicity, I should say, of the registrant.  It's the nature

1    and character of the community that they live in, and how I

2    determined that was I took the resident address of the

3    individual and geocoded it just like you would look up on a

4    map, like an app map, and you get a point as to where a

5    location a restaurant or something else that you're trying to

6    find.

7        It's the same methodology, and so putting those dots down

8    on a map I can overlay census data and from the census data it

9    has aggregate statistics on the nature of the community in

10   which the individuals live in.

11       And so from that I can look at the average of the

12   different characteristics that we're looking at here on this

13   screen on race and ethnicity and average across all of the

14   registrants who are in the different classifications of voters

15   across the entire state.

16   Q.   Dr. McDonald --

17             THE COURT:  This one isn't where you knew exactly

18   what the race and ethnicity was.  You made certain assumptions

19   based on all of the different data that you had?

20             THE WITNESS:  That is absolutely, correct.

21   BY MR. KARPATKIN:

22   Q.   Dr. McDonald, what conclusion do you draw from this

23   table?

24   A.   So in terms of the communities in which these individuals

25   live in, according to the Census Bureau -- this is the 2022

1   Census -- they -- among all active registered voters 62 -- the

2   average community that they reside in is 62.9 percent

3   non-Hispanic white.  Among federal-only voters, their

4   communities are 47.3 percent Hispanic white, and from that we

5   can deduce that those communities among federal-only voters

6   are more diverse than all active registered voters.

7   Q.   Dr. McDonald, did you conduct any analyses to try to

8   confirm or verify the aggregate patterns you've shown here?

9   A.   Yeah, so this is where you're absolutely right, Your

10  Honor, to worry about trying to infer individual behavior from

11  aggregate data.  It's something that's called the Ecological

12  Inference Problem, and so in order to take that possibility

13  into account that the patterns that we're seeing here really

14  do not apply to the individuals, I did a procedure called

15  "surname matching."

16       Surname matching -- the Census Bureau when it conducts

17  its census, it takes all of the last names that individuals

18  have provided to the census and it comes up with frequency

19  counts of the different race and Hispanic ethnicities of that

20  particular surname, and so from that you could look at the

21  surname and what may be that individual's race or ethnicity

22  from the surname.

23       But you can do a little better.  You can take the

24  geocodes and you know something about the community that the

25  individual lives in and you can deduce from that something

UNITED STATES DISTRICT COURT

 1  about the characteristic of the individual.

 2       For example, I know a Martinez who's a Latino and I know

 3  a Martinez who's a Hispanic male -- I mean, excuse me, a white

 4  male; and so the Latino lives in a dense Hispanic neighborhood

 5  and so we can deduce from the fact that she lives in that

 6  neighborhood and has the last name Martinez that she's more

 7  likely to be a Hispanic; but for Martinez he lives in a

 8  predominantly white neighborhood, and so we would say he's

 9  more likely to be a white even though he has that last name of

10  Martinez.

11            MR. KARPATKIN:  Can we have Slide 35, Stephen.

12  BY MR. KARPATKIN:

13  Q.   Dr. McDonald, does this table depict the information that

14  you developed from surname matching --

15  A.   Yes, it does.

16  Q.   -- from Table 5 of your report?

17            MR. KARPATKIN:  Your Honor, similar to the other

18  tables, I'd like to admit Table 5 from Dr. McDonald's report,

19  plaintiffs' Exhibit 338.

20            MR. LANGHOFER:  Same situation, Your Honor.  We'll

21  need to clean up the exhibit that's been deposited with the

22  clerk.

23            THE COURT:  338 is admitted.

24            (Exhibit No. 338 admitted in to Evidence.)

25  BY MR. KARPATKIN:

1  Q.   Dr. McDonald, what conclusions do you draw from this

2  table?

3  A.   This largely confirms the patterns that we just saw with

4  respect to the communities in which the individuals live in.

5  This would be expected.  In order for the ecological fallacy

6  to really have had an effect, it would have had to have been,

7  for example, that whites in dense Hispanic neighborhoods were

8  more likely to be federal-only voters and that doesn't --

9  there's no real theory or explanation I could come up with

10 that would explain something like that, especially given what

11 we know about the other potential characteristics of these

12 individuals.

13      So this is just confirming information.  We had the

14 ecological inference fallacy that may be at play.  This

15 surname information seems to be confirming that.  It's not the

16 end all.  I mean, there's lots of sources of error and,

17 unfortunately, a lot of these errors can't be even quantified.

18 There's errors with surname matching.  There's errors with the

19 surname matching process.  So they're -- they're just

20 suggestive that the federal-only voters tend to be more

21 diverse, but there's going to be other evidence to suggest

22 that they're more diverse as well, as we're about to see.

23           MR. KARPATKIN:  Can we have Slide 36.

24 BY MR. KARPATKIN:

25 Q.   Dr. McDonald, did you also consider age differences among

1  these categories of voters?

2  A.   Yes, I did.

3  Q.   And does this slide show your analysis of age differences

4  from Table 6 of your report?

5  A.   Yes, it does.

6          MR. KARPATKIN:   Your Honor, we move to admit

7  Dr. McDonald's Table 6, Plaintiff's Exhibit 339.

8          MR. LANGHOFER:   Same response, Your Honor.

9          THE COURT:   339 is admitted.

10          (Exhibit No. 339 admitted into Evidence.)

11  BY MR. KARPATKIN:

12  Q.   Dr. McDonald, why did you analyze these age differences?

13  A.   Well, this is really gonna come in play for the last

14  section of my report, and we're going to get to at the end of

15  my testimony about my report, which is younger people are

16  going to be disproportionately impacted by these laws and

17  they're most at risk of having burdens placed upon them and

18  their voting behavior not only immediately but over their

19  lifetimes.

20  Q.   And what did you find with respect to age differences

21  among federal-only voters and all active registered voters?

22  A.   Yeah, so here I don't have to rely on any inference or

23  estimation procedures.  We can go directly to the voter

24  registration file.  There is a birthdate on that file as we

25  well know through what we've been discussing.

1    So here it's just taken directly there and there's no
2  problem with the ecological inference or anything of that
3  nature, and the federal-only voters are remarkably younger
4  than all active registered voters.

5    You know, for example, in the 18 to 29 classification --
6  I just chose these because they're commonly used with surveys,
7  these age ranges.  49.9 percent of them are -- of federal-only
8  voters are between the age range of 18 and 29 with only 16.4
9  percent of all active registered voters, and this pattern, you
10  can see, increasingly through the ranges as you get over 60
11  plus, 38.0 percent of active registered voters are over age 60
12  and only 14.8 percent of federal-only voters are over age 60.

13    This makes sense because these laws only went into effect
14  about ten years ago, and so the people who are being impacted
15  by these laws or at least are being put on to the federal-only
16  status would only be people who are recently registering and
17  those are most likely -- you know, predominantly they're going
18  to be younger people.

19    So the patterns here are what one would expect if you
20  were thinking about who are these federal-only voters and who
21  may be registering through these procedures and the timing of
22  those procedures.

23    We also know that younger voters tend to be more diverse.
24  There's just greater diversity.  We know that the younger
25  population is much more diverse than the older population in

1   the United States.

2       So this, again, is just building up a body of evidence to

3   say these are who these people are and what may be the

4   potential impacts for these individuals.

5   Q.   Dr. McDonald, for this table and for the last two tables,

6   you compared federal-only voters to active registered voters.

7       Why did you choose not to compare federal-only voters to

8   the total Arizona population?

9   A.   Well, we know that people who register to vote and

10  participate in elections are markedly different from people of

11  the general population, and so for whatever federal-only

12  voters for active registered voters, we know that they're

13  going to be different in some fundamental ways from just the

14  general population because they wanted to participate.

15  They're interested in politics, and so I thought that the

16  proper comparison point -- it's what I've done in previous

17  litigation as well.

18      I think it's firmly in academic, scholarly work on voter

19  turnout, which I'm one of the leading experts in the country

20  on.  I thought that this was the appropriate way to go about

21  doing this is to compare active registered voters to -- as the

22  comparison point rather than just the general population.

23          MR. KARPATKIN:  Stephen, can we have Slide 37.

24  BY MR. KARPATKIN:

25  Q.   Dr. McDonald, did you also consider party registration

1   among active registered voters and federal-only voters?

2   A.   Yes, I did.

3   Q.   And is this slide derived from Table 7 of your report?

4   A.   Yes, it is.

5           MR. KARPATKIN:  Your Honor, similar to the other

6   tables, we move to admit Dr. McDonald's Table 7.  It would be

7   plaintiffs' Exhibit 340.

8           MR. LANGHOFER:  Same response, Your Honor.

9           THE COURT:  Exhibit 340 is admitted.

10          (Exhibit No. 340 admitted into Evidence.)

11  BY MR. KARPATKIN:

12  Q.   Dr. McDonald, why did you analyze registration by party?

13  A.   One, it was just available and I wanted to be complete,

14  but it also -- again, it's confirming evidence of what I've

15  been telling you about the characteristics of these

16  individuals; and of most note, if you look at the third

17  classification of non or no party affiliation is provided by

18  the voters.

19      We know that younger people tend to not affiliate with a

20  political party or less frequently than older people.  So it

21  would not be surprising at all then to see that among all

22  registered voters, active registered voters 28.7 percent of

23  them are -- have no party affiliation -- or no party

24  registration, I should say, but among all those who are

25  federal-only voters who are younger, more diverse, 52.5

 1   percent have no party affiliation.

 2        So, again, that's very consistent with the other

 3   information that we've been seeing here, yeah.

 4   Q.   So, Dr. McDonald, what is your overall conclusion from

 5   these tables about the characteristics of federal-only voters?

 6   A.   Yeah, these are individuals who are younger, they're more

 7   diverse, they're less tied to a political party.

 8   Q.   Dr. McDonald, I want to turn to your sixth opinion with

 9   respect to long-term impacts.

10        Can we -- let's start with the immediate effects.

11             MR. KARPATKIN:  Can we have Slide 39, please.

12   BY MR. KARPATKIN:

13   Q.   Can you briefly describe your opinion on the short-term

14   effects on impacted voters from the Challenge Laws?

15   A.   Yes.  For the sake of brevity and discussing this all

16   along in the deposition, so just to say that an individual may

17   be barred or delayed from registering to vote because they're

18   having to provide additional DPOC.

19        Those DPOC burdens are going to be unique to these

20   individuals on their -- you know, particularly with

21   naturalized citizens, they're -- they have to go through a

22   different process and procedure of providing a DPOC and

23   repeatedly in some cases providing it; and, lastly, that in

24   certain circumstances they may be referred for criminal

25   investigation.

1    Q.    And, Dr. McDonald, when you describe impacts, are you

2    talking about impacts to voters generally?

3    A.    No, I'm not.

4    Q.    So who were the group whose impacts you're particularly

5    focused on?

6    A.    Yeah, it's -- it's primarily naturalized citizens, and

7    then there's this sort of unlucky lottery that's going to be

8    happening where people are going to be randomly picked out of

9    the population and matched and have to provide additional DPOC

10   or be at risk for referral for criminal investigation through

11   just bad luck of database matching.

12   Q.    Do the impacts that you are describing include an overall

13   impact on voter turnout among the electorate?

14   A.    No, I'm not.

15   Q.    Okay.  Now, let's turn to long-term effects.

16         MR. KARPATKIN:  Can we have Slide 40, please.

17   BY MR. KARPATKIN:

18   Q.    Dr. McDonald, can you briefly describe what you believe

19   to be the long-term effects of these laws on the impacted

20   voters?

21   A.    Well, obviously, they have immediate effects; but then

22   the question is if those individuals are not able to

23   participate or if there's additional barriers in the way of

24   participating, will that reduce their voting propensities?

25         And there's a large body of literature, some of it I've

1  written myself, that says you add registration cost to

2  individuals and they're going to be less likely to vote or,

3  conversely, you make registration easier for individuals and

4  you're going to have higher turnout.

5      So on these increasing costs are going to -- for the

6  individuals who are at risk are going to decrease their vote

7  propensity.

8      Voters with the negative interactions with the legal

9  system, in the last decade or so there's been research on what

10 the effect of low level interactions with police have on

11 turnout, and so just a traffic stop can result in an

12 individual having a lower turnout rate than those people who

13 aren't stopped for traffic stops; and that's trying to control

14 for lots of other factors about who those individuals are.

15     And so here we could be in a situation where people are

16 having negative interactions with government.  It's not a

17 police officer, but in some cases they could be put under

18 criminal investigation; and that interaction could have a

19 negative effect then on people's willingness to participate in

20 the system, and it could harm their long-term propensities to

21 vote because once you vote you're more likely to vote again.

22     The literature talks about this in terms of habit

23 forming, and you empower yourself by voting and you are --

24 it's more easier for you to navigate the system once you voted

25 once; and so what could happen here are individuals who are

1   seeking to register but they're deterred through whatever

2   reasons, but they do -- they don't vote in the first election,

3   but they do manage to vote in a subsequent election.

4        It's just that that habit forming will happen at a later

5   point -- stage in they're life.  So they're likely going to

6   have lower voting propensities over the entire life span, and

7   we know that these impacts are going to disproportionately

8   affect low propensity voters.

9        I mean, we're looking at younger voters who are going to

10  be more at risk of these sorts of burdens that are going to be

11  placed upon them.

12  Q.   Dr. McDonald, is your analysis of long-term effects based

13  on a body of political science literature?

14  A.   Yes, it is.

15  Q.   And does that literature generally reflect the accepted

16  consensus among political scientists?

17  A.   Yes.

18  Q.   And is this literature published in peer review journals?

19  A.   Yes.

20        MR. KARPATKIN:  Could we go to Slide 41.

21  BY MR. KARPATKIN:

22  Q.   I want to give you a chance to walk through in a little

23  more detail the basis for the conclusions you describe in the

24  last paragraph -- in the last slide.

25        So let's start with burdens on voting.  What are some of

1   the principal sources you've relied on?

2   A.    Well, I cite myself.   I can I can self cite in a

3   courtroom and -- but, really, this is building on a large body

4   of literature.   The two pieces that I cite to regarding a

5   phenomenon called "portable registration" where some states

6   allow people to re-register if they've moved and -- they're

7   currently registered voters and they move to a new locality

8   they can register on election day.   So that was investigation

9   of that.

10        I was also investigating a phenomenon called "same day

11   registration."   Again, there's widespread consensus within

12   academia that -- and scholarship that election day

13   registration increases turnout, that lowering those barriers

14   of cost of registering increases turnout.

15        The other one I'm citing here is a policy that certain

16   states have of allowing 16-year-olds to register so that

17   they'll be available to vote and already registered when they

18   turn eighteen.   Florida is one of these states.   Hawaii is

19   another.   Since I've produced this report, other states have

20   adopted these laws and, you know, I publish on this.

21        There is another publication on this in the *American*

22   *Journal of Political Science* that confirms what I find here,

23   which is, that you're gonna end up -- there's a boost on

24   turnout for people who have already been registered through

25   this pre-registration system.

1      In terms of interactions with the law enforcement, the

2   first one I cite is the most recent piece.  It's in the

3   *American Political Science Review*.  That's the top journal in

4   political science, and this particular piece is as close to

5   what Hoekstra mentions in his expert report is the gold

6   standard for randomized controlled experiments.

7      It's a very clever study.  You know, I reviewed it.  It

8   looks at traffic stops, matches this with the voter file in

9   Hillsborough County where Tampa's located in Florida and is

10  able to deduce, like, the effect of traffic stops because they

11  look not just at one point in time at the traffic stop, but

12  they also look at an earlier traffic stop; and they're

13  matching people not only on whether or not they were stopped,

14  but also in the character of the stop that had happened to

15  them.

16     So it's a pretty clever study and gets as close as we can

17  to get to randomized controlled experiments, in my opinion.

18  The earlier one is based -- you know, is cited in that one,

19  too, and it's in the *American Political Science Review* and --

20          THE COURT:  I don't know what that word means, the

21  "carceral" state.

22          THE WITNESS:  Prison, being in the judicial system

23  as, you know, a felon or something of that nature.

24          In terms of long-term harms, this goes back to this

25  consuetude or habit forming.  It's in the first title and

1  that's coming from the *British Journal of Political Science*.

2  It's a well-respected journal.  It's like the Top 10 journal

3  in the profession.

4          It's an early study.  It's doing randomized control

5  experiments to a degree and looking at other survey data, and

6  they find that voting is habit forming.

7          Another study by Eric Plutzer in the *American*

8  *Political Science Review*, again, top journal, is -- really

9  focuses on this efficacy, this empowering way in which people

10  once they vote they feel empowered and they feel like they can

11  effect change in the future.

12          So -- and the last one as well is in the *American*

13  *Journal of Political Science* building upon the prior research

14  here, and that's like the No. 2 or No. 3 journal in political

15  science, depending on who you ask; and so it's in a

16  well-respected journal and it's, again, doing a randomized

17  controlled experiment and finding in a field experiment that

18  voting can be habit forming.

19  BY MR. KARPATKIN:

20  Q.   Dr. McDonald, is there a particular or specific study

21  that you relied on related to your conclusion about the voting

22  habits of younger people?

23  A.   Yes, there is an additional one that's not on this list,

24  although all of these long-term harms are talking about when

25  people establish their voting behavior when they're young.

UNITED STATES DISTRICT COURT

1    So in one respect we're looking at young people here in

2    this last group of scholarly work.  There's also another piece

3    that I referred to.  It has to do with -- it's from Brady and

4    McNulty.  It appears in the *American Political Science Review,*

5    and it looks at the effect of moving polling places and how

6    that's going to have a disproportionate effect on younger

7    voters.

8    Q.   Dr. McDonald, I now want to turn to the defendants'

9    expert reports.  You mentioned earlier that you had an

10   opportunity to review them?

11   A.   Yes, I did.

12              THE COURT:  I think it might actually be a good time

13   for to us break for lunch.  We'll reconvene at 1:00 o'clock.

14              MR. KARPATKIN:  Yes, your Honor.

15              THE COURT:  Court is in recess.

16              COURTROOM DEPUTY:  All rise.

17   *(Whereupon the proceedings adjourned at 11:57 a.m.)*

18

19

20

21

22

23

24

25

1    *REPORTER'S CERTIFICATION*

2

3          I, TERI VERES, do hereby certify that I am duly

4    appointed and qualified to act as Official Court Reporter for

5    the United States District Court for the District of Arizona.

6          I FURTHER CERTIFY that the foregoing pages

7    constitute a full, true, and accurate transcript of all of

8    that portion of the proceedings contained herein, had in the

9    above-entitled cause on the date specified therein, and that

10   said transcript was prepared under my direction and control.

11          DATED at Phoenix, Arizona, this 14th of

12   November, 2023.

13                                      s/Teri Veres
14                               TERI VERES, RMR, CRR

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT