2:22-cv-00509-SRB - November 13, 2023 P.M.

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| | |
|---|---|
| **Mi Familia Vota, et al.**, | ) |
| Plaintiffs, | ) |
| vs. | ) 2:22-cv-00509-SRB |
| **Adrian Fontes, et al.**, | ) |
| | ) Phoenix, Arizona |
| Defendants. | ) November 13, 2023 |
| | ) 12:59 P.M. |

**BEFORE:  THE HONORABLE SUSAN R. BOLTON, JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**BENCH TRIAL - DAY 5 P.M.**

(Pages 1143 through 1293)

Official Court Reporter:
**Elaine Cropper, RDR, CRR, CCP**
Sandra Day O'Connor U.S. Courthouse
401 West Washington Street
Suite 312, SPC 35
Phoenix, Arizona  85003-2150
(602) 322-7245

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

United States District Court

2:22-cv-00509-SRB - November 13, 2023 P.M.

### ?APPEARANCES

For Plaintiff United States of America:

      **RICHARD DELLHEIM, ESQ.**
      **SEJAL JHAVERI, ESQ.**
      **MARGARET TURNER, ESQ.**
      **EMILY BRAILEY, ESQ.**
      U.S. DEPARTMENT OF JUSTICE-CIVIL RIGHT DIVISION, VOTING SECTION
      950 Pennsylvania Avenue NW
      Washington, D.C.  50530

For Plaintiff Arizona Asian American Native Hawaiian and Pacific Islander for Equity Coalition:

      **NIYATI SHAH, ESQ.**
      ASIAN AMERICANS ADVANCING JUSTICE
      1620 L Street NW, Suite 1050
      Washington, D.C.  20036

      **AMIT MAKKER, ESQ.**
      **EVAN OMI, ESQ.**
      **SCOTT KANCHUGER, ESQ.**
      LATHAM & WATKINS,
      505 Montgomery Street, Suite 2000
      San Francisco, California 94111

      **NEETHU PUTTA, ESQ.**
      LATHAM & WATKINS, L.L.P.
      1271 Avenue of the Americas
      New York, New York  10020

For Plaintiff Arizona Democratic Party, Democratic National Committee:

      **KELSEY QUIGLEY, ESQ.**
      WILMER CUTLER PICKERING HALE & DORR, L.L.P.
      2600 El Camino Real, Ste. 400.
      Palo Alto, CA  94306

United States District Court

2:22-cv-00509-SRB - November 13, 2023 P.M.

**APPEARANCES (Continued)**

For Plantiff Poder Latinx:

> **JOHN A. FREEDMAN, ESQ.**
> **LEAH MOTZKIN, ESQ.**
> **JEREMY KARPATKIN, ESQ.**
> ARNOLD & PORTER KAYE SCHOLER, L.L.P.
> 601 Massachusetts Avenue NW, Suite 100
> Washington, D.C.  20001
>
> **JONATHAN SHERMAN, ESQ.**
> **MICHELLE KANTER COHEN, ESQ.**
> FAIR ELECTIONS CENTER
> 1825 K Street NW, Suite 701
> Washington, D.C. 20006

For Plaintiff Voto Latino, Mi Familia Vota:

> **CHRISTOPHER DODGE, ESQ.**
> **ELISABETH C. FROST, ESQ.**
> ELIAS LAW GROUP, L.L.P.
> 250 Massachusetts Avenue NW, Suite 400
> Washington, D.C. 20001
>
> **DANIEL ABRAHAM ARELLANO, ESQ.**
> Herrera Arellano, L.L.P.
> 1001 North Central Avenue, Suite 404
> Phoenix, Arizona  85004

For Plaintiff Promise Arizona, Southwest Voter Registration
Education Project:

> **ERNEST ISRAEL HERRERA , ESQ.**
> MALDEF
> 634 Spring Street, 11th Floor
> Los Angeles, California  90014
>
> **DANIEL R. ORTEGA, JR., ESQ.**
> Ortega Law Firm, P.C.
> 361 E. Coronado Road, Suite 101
> Phoenix, Arizona  85004

United States District Court

2:22-cv-00509-SRB - November 13, 2023 P.M.

**APPEARANCES (Continued)**

For Intervenor-Defendants State of Arizona, Kris Mayes, Jennifer Toth:

        **JOSHUA MICHAEL WHITAKER, ESQ.**
        **TIMOTHY E. HORLEY, ESQ.**
        **KATHRYN E. BOUGHTON, ESQ.**
        ARIZONA ATTORNEY GENERAL'S OFFICE
        2005 N. Central Avenue
        Phoenix, Arizona  85004
        Phoenix, AZ  85004

For Intervenor-Defendant Ben Toma:

        **HANNAH HATCH PORTER, ESQ**
        GALLAGHER & KENNEDY, P.A.
        2575 E. Camelback Road, Suite 810
        Phoenix, Arizona 85016-9225

For Defendant-Intervenor Republican National Committee:

        **KORY A. LANGHOFER, ESQ.**
        STATECRAFT, P.L.L.C.
        649 North 4th Avenue, Suite B
        Phoenix, Arizona  85003

United States District Court

2:22-cv-00509-SRB - November 13, 2023 P.M.

## I N D E X

### TESTIMONY

| WITNESS | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Plaintiffs' Witnesses | | | | |
| MICHAEL P. MCDONALD, PH.D. | 1149 | 1165 1194 | 1254 | |
| MATINE TIWAMANGKALA | 1264 | 1277 1282 | | |
| NANCY HERRERA | 1284 | | | |

## E X H I B I T S

| Number | | Ident | Rec'd |
|---|---|---|---|
| 6 | 2019 Arizona Elections Procedures Manual | | 1167 |
| Imp 108 | (Not identified) | | 1203 |
| 118 | 2/2/2023 Defendant Gila County Recorder Sadie Jo Bingham's Response to Plaintiff Arizona Asian American Native Hawaiian and Pacific Islander for Equity Coalition's First Set of Interrogatories | | 1199 |
| 334 | Table 1. Active Registered Voters and Voters Canceled for Status Reason of "Invalid Citizenship Proof" by County | | 1228 |
| 335 | Table 2. Arizona Secretary of State Voter Registration Statistics by County: Active Registered Voters and Voters Suspended for Status Reason of "Invalid | | 1228 |

United States District Court

2:22-cv-00509-SRB - November 13, 2023 P.M.

**E X H I B I T S (Continued)**

| Number | | Ident | Rec'd |
|---|---|---|---|
| 337 | Table 4. Statewide Voting-Age Population Race and Ethnicity Statistics for Select Populations | 1237 | |
| 338 | Table 5. Statewide Surname Matched Race and Ethnicity Statistics for Select Populations | 1242 | |
| 406 | 7/27/2022 Poder Latinx NVRA Letter re HB 2243's Noncompliance | 1289 | 1290 |
| 407 | 6/3/2022 Poder Latinx NVRA Letter re HB 2492's Noncompliance | 1288 | 1289 |

**R E C E S S E S**

| | Page | Line |
|---|---|---|
| (Recess at 2:52; resumed at 3:07.) | 1220 | 8 |

United States District Court

MICHAEL P. MCDONALD, PH.D - Direct

**P R O C E E D I N G S**

(Court was called to order by the courtroom deputy.)

(Proceedings begin at 12:59.)

THE COURT:  Good afternoon.  Please sit down.

You can continue your questions of Dr. McDonald direct.

(MICHAEL P. MCDONALD, PH.D., a witness herein, was duly sworn or affirmed.)

**DIRECT EXAMINATION**

BY MR. KARPATKIN:

Q.   Dr. McDonald, we left off before talking about the rebuttal reports that had been submitted that addressed your report and you had indicated earlier that you had a chance to review the rebuttal reports; is that correct?

A.   Yes.

Q.   And did these reports cause you to change your opinions in this case?

A.   No.

MR. KARPATKIN:  Can we have slide 42?

BY MR. KARPATKIN:

Q.   I wanted to offer you an opportunity to respond to some of the opinions that were offered specifically with respect to your report.  But as an initial matter, can you provide your general response to the themes underlying some of the arguments made in response to your report?

United States District Court

MICHAEL P. MCDONALD, PH.D - Direct

A.   Yes.  So one of the global issues that I have with the defendants' experts reports, rebuttal reports, is that they don't really challenge portions of my report specifically with respect to the burdens and difficulties that naturalized citizens are going to have to be faced with under the new laws.

And why that's important is, well, one, apparently, they are in agreement with me that these burdens exist. There's no rebuttal from them about that.  But the other part of it is that some of the assumptions that they make in their analyses are -- assume away that naturalized citizens will have any burdens whatsoever.

So they are nonresponsive but it also colors the analyses that they are doing.

In addition, on -- they are simply nonresponsive and making new claims that are not about information found in my report.

Q.   Dr. McDonald, I want to now go through the opinions individually and when we walk through these slides, some of the individual arguments are arguments that I now understand are not going to be raised by defendants based on Mr. Langhofer's statement this morning.  So I will direct you to particular arguments that I believe are still present.

Let's go to the next slide, please.

So this slide addresses defendants' arguments with respect to your database comparisons and let's start with the

United States District Court

MICHAEL P. MCDONALD, PH.D - Direct

first argument.  Dr. Richman opined that multiple databases will cure incorrect citizenship information.  What's your response to that argument?

A.    So Dr. Richman leads his report by saying this is going to be great.  We're going to have multiple databases to look into to find evidence of citizenship and he discusses -- he creates a Table 1 where he talks about the probabilities if there was an error in the citizenship information that having the multiple databases is going to reduce our uncertainty about because the elected County Recorders are going to be able to look in and find the evidence.

And, again, this goes back to the very first global problem I have with this because he comes up with a very small probability that there will be errors based on his calculations; but there's a certain class of voters, naturalized citizens, particularly newly naturalized citizens, where we know there's going to be outdated citizenship information in these databases.  And so the probability is going to be infinitesimal about of the status of their citizenship being incorrect in those databases.  There probably will only be one was because the information hasn't been updated in the databases yet.

So, again, he assumes away the problem that the bulk of my report is about to come up with a table that really misrepresents the burdens that are placed upon naturalized

United States District Court

1152

MICHAEL P. MCDONALD, PH.D - Direct

citizens.

Q.    And Dr. McDonald, Dr. Richman also asserted that you had overstated the number of full-ballot voters that ADOT identifies as non-citizens.  What's your response to that issue?

A.    Well, I did not fully respond.  There's a second bullet point there on the first row that I also want to raise because it's going to come into play later.

So Mr. Richman in the initial table opines that having these multiple databases and when there's conflicts on citizenship information, County Recorders can err in favor of the voter and provide the citizenship and then register them accordingly.

And this gets to the question that you're raising here about these full-ballot voters.  This is that 6,084 that I discussed earlier.  Dr. Richman wants to say that a certain portion of these -- and this is revised in his supplemental report, but a certain proportion of these are actually people who were non-citizens, were registered but provided evidence that they were non-citizens to ADOT after they registered to vote so, therefore, they must be non-citizens.

And, again, the procedures in Arizona are that if an individual provides DPOC to the County Recorders, then they are registered as full-ballot voters.  So here we have conflicting information from the two databases.  We have the AVID database

United States District Court

1153

MICHAEL P. MCDONALD, PH.D - Direct

saying that these individuals have gone through their citizenship checks that the County Recorders have verified and they are citizens and they are entitled to the full rights of being full-ballot voters.  But then over in the ADOT database we have individuals who are flagged as non-citizens and instead of doing what he said in Table 1, which is to say we should err in favor of the voter and we would have definitive information of citizenship from AVID, instead he's going to say for these particular class of voter, he identifies there's very strong evidence and he's very -- he's very strong language to this effect to say that they are not citizens because of the timing issues that he identifies in the different databases.

The problem with this approach in addition is that he's, again, assuming away all of these issues about citizenship timing and just the fact that some of these individuals are registering -- it's actually in the database. You can see the timing.  They are registering and getting a driver's license on the same date and so we know that ADOT is going to have to do some process of doing citizenship verification for these individuals.  And although he tries to claim that, well, they are going to be issued documents sufficient to provide to citizenship, again, there's really no discussion.  And then there's no evidence that he really puts forward to say there's not going to be these issues because the individuals still need to be verified through the same system

United States District Court

MICHAEL P. MCDONALD, PH.D - Direct

if they are providing naturalized documents.

So he assumes this away. It's also important to understand in his original report when individuals were registering at the same time as they were establishing a credential in the ADOT database, he excluded those individuals in his original report. His supplemental report, because of new data that was available, had reduced the numbers on -- he said that were these non-citizens that were identified through this database matching that he did.

And so in order to -- effectively, what he did was increase the number again. He included all of the people who were registered on the same day that they were getting their driver's license in a supplemental report. He doesn't provide an explanation for why he thought that was important to do. He just asserts that he had done it.

I have a lot of problem with an expert to changed their methodology within their report or series of reports and doesn't explain why it is that they are doing it, especially when those changes are in support of the opinions that he finds.

Q. Dr. McDonald, the third issue on this chart appears to relate to Tables 3 and 4 from the Richman report which we understand are not going to be introduced.

So on that basis, let's go to slide 44.

So the first issue in this slide is that Dr. Richman

United States District Court

MICHAEL P. MCDONALD, PH.D - Direct

and Dr. Hoekstra assert that DPOC is not impacting turnout and could increase turnout.  What's your response to that?

A.    Well, many of the studies that both Richman and Hoekstra are identifying are about aggregate turnout rates so there are lots of things that are going in on elections:  Candidates, campaigns, other factors that are happening, other laws for that matter and so it's hard -- it's very difficult to do changes in laws that are affecting a smaller segment of the population relative to the overall population within a state. And here we're talking about naturalized voters and individuals who are having difficulty with timing on DPOC, teasing that out from aggregate data.  It's really difficult to do it.

And so there are a number of studies have that have looked at, say, photo identification laws, for example, and they don't find an effect of those photo identification laws on turnout but that's aggregate turnout.  It's not really people that are burdened by it.  So my task was really to look at the individuals who are being subjected to these new procedures and laws.  It wasn't about overall turnout rates.  So I simply didn't look at that literature because I didn't think it was dispositive to my opinions.

Q.    Dr. Hoekstra in this context cites to a study by Biggers and Smith regarding the impact of citizenship requirements on voter registration.  Dr. McDonald, do you agree with Dr. Hoekstra's summary of that study?

United States District Court

MICHAEL P. MCDONALD, PH.D - Direct

A.    Yes.  So this particular study is about what happened in Florida where individuals were identified through a database match of the driver's license database as being non-citizens. They were sent a letters to that they were going to be removed from the voter registration laws.  There was litigation.  No one was actually removed.  And the individuals then were sent an additional letter saying that our bad, you're reinstated. So it's unlike our situation here.

Dr. Smith is a colleague of mine, he's my chair of my department.  I know him very well.  We've talked about this report or this particular piece many times and he describes the scenario or at least the theory that he developed about this scenario is reactance theory, that people got mad because they were told that they were not citizens and then they were reinstated without having to do any additional burdens that were placed upon them.

And from that reactance to the situation, turnout rates increased for the people who had been subjected to this list that had been devised and people had been, unfortunately, removed but replaced without any real impact on the voters.  So it's really a psychological effect of reacting to it.  It's not about the burdens that were placed by anyone because no one was actually burdened because everyone was reinstated.

So, again, I don't cite that particular piece because it's really not dispositive to my opinions.  It's not really

United States District Court

MICHAEL P. MCDONALD, PH.D - Direct

explaining the situation.

Richman does something similar with voter ID laws and he cites a study that says Democrats reacted.  There were campaign effects.  So there can be backlash effects to these laws and some campaigns can do effective messaging.

But what's also interesting about the particular study is that effect decayed really quickly.  So, yeah, you can run the campaign, you can message on it in respect to the laws. But that's not really talking about the burdens that people have.  And when that you think how the long-term burdens, are you going to be able to continue to messaging for a long period of time, you start seeing the decaying effects of these laws.

Q.   Dr. McDonald, defense experts in their reports use comparisons to studies about mail voting to disagree with your assessment about long-term events.  What's your response to that?

A.   Well, this is an area I studied and this is an issue that's raised by Hoekstra.  He didn't even look at my CV to see that I had actually published on this particular issue.  But that said, so I actually know the issue pretty well.

It doesn't -- it's not relevant to this case.  It's not about burdens of registering.  It's about burdens of people voting, which mode they are voting in.

So I didn't really look at it because I just didn't think it was relative to the registration issues that are at

MICHAEL P. MCDONALD, PH.D - Direct

stake in this case.

Q.   Dr. McDonald, Dr. Hoekstra also asserts that laws requiring DPOC could have the benefit of increasing trust and confidence in Government.  Do you agree?

A.   There's been a number of pieces of research that have been done on this on -- again, this is not in my report.  This is not something that I even bothered to look at because it wasn't concerning the burdens that individuals were being imposed upon them.  But in this trust literature on -- if I could sum it up, it's basically that the trust doesn't really have much.  You can't do much to change the trust.  People understand or they have beliefs I should say not really understanding but they have beliefs about fraud and other things in the system.  And a lot of that is coming from rhetoric from politicians.  So when you adopt one of these laws, you don't really see a change in that.

There's, for example, a survey that Charles Stewart, who is a professor at MIT, has been doing for some time.  It's called the Survey Performance of American Elections and they ask these trust questions and people have published on this survey and they will correlate changes in the laws with the trust.  And they don't finding anything, and that's a pretty common thing.  I was just at a conference last weekend where people were presenting papers on this and, again, the cutting edge ones -- they are not published yet.  The ones that publish

MICHAEL P. MCDONALD, PH.D - Direct

don't find this correlation.  But the ones that I was seeing at this conference, we still don't see -- we can't figure it out. What can we do to restore trust by adopting these laws?

Q.   Dr. McDonald, there's one issue I want to go back to.

MR. KARPATKIN:  Can we go back to the last slide please.

Q.   Going back to the issue of the number of full-ballot voters that ADOT identifies as non-citizens, is there an area where you and Dr. Richman agree with respect to this issue?

A.   Yes, there is.  There are some that he and I agree with are people who are full-ballot voters who after -- before they registered, they were identified as non-citizens.  And so for these individuals can think about the timing issues and the latency issues that naturalized citizens have.  It's perfectly reasonable to know that they could have provided DPOC to the County Recorders and there's just out of date DPOC information within the ADOT database.

Q.   And do you have an understanding about approximately how many voters would be in that category?

A.   Unfortunately, I mean, I'm having to remember his first supplemental versus his second supplemental.

As I recall, this would be roughly 4500, something like that.

Q.   4,000 of the 6,084?

A.   Yes.  Correct.

MICHAEL P. MCDONALD, PH.D - Direct

MR. KARPATKIN:  Can we go to the next slide, please.

Q.   Dr. McDonald, I'm going to skip the second issue because I believe you covered that in your direct testimony already. Let's go to the third issue on this list.  And that is that Dr. Hoekstra asserts that the evidence that you cite does not show causation between burdens on registration and impacts on voting.  What is your response?

A.   Well, Hoekstra wants to basically have the Scope's Monkey Trial for evolution because social sciences over the last hundred years have used all sorts of observational studies, the ones that he criticizes for various purposes.  So he's really a blanket attack on thousands and thousands of published research and top journals.

And so, you know, what's the real thing that we go -- what's going on here is that, look, we can't do the ideal randomized controlled experiment that he called for where we have some people assigned to a control group and we randomly assign people to a treatment.  We give an intervention and then we can observe the effect of that intervention on their behavior or whatever.

We can't, for example, randomly assign countries to having wars.  That's not something that's possible.  So instead, knowing that limitation, everything that we do, we develop hypotheses.  We go test those hypotheses.  We look at different situations, different data, different points in time.

United States District Court

MICHAEL P. MCDONALD, PH.D - Direct

And try our doing our best to the data, you reach a consensus looking across all of the data and the studies that you're looking at.  Do we build a consensus that we see?  We see correlation that there's probably causation there, too, because we have some thought about what we would expect for the relationships to be.

So, yes, there are some situations where we can do these randomized controlled experiments.  Some of the studies that I cite are trying to get that as best as they can.  But there's always going to be a -- when we're working with observational data, which is election administration data, it's not something we can randomly assign people to.  We're always going to have this problem and we're just trying to do the best as we can as academics and scientists to come to an agreement.

Q.   Dr. McDonald, the final issue is that Dr. Hoekstra and Dr. Stein assert that your opinions are premature and speculative.  How do you respond?

A.   So, yes, I say this very clearly and plainly in the last section of my report that when I'm thinking about what the intermediate long-term harms are going to be to individuals, I'm having to infer from other studies -- no one has done a study of the system that's contemplated here in Arizona so we simply can't do it yet.  So I'm having to infer from other studies what's happening here.  I'm pretty clear about that in my report.  In fact, Robert Stein says, to his credit,

United States District Court

MICHAEL P. MCDONALD, PH.D - Direct

Dr. McDonald says that this is speculative.

So -- and that's all of his critique of me, by the way, too.  And out of the three experts, I would say Robert Stein, I've known him for quite a while.  He does a lot of election administration work with election officials.  He's researched it quite a bit.  I think it's quite telling that he only has that one line as critique for me compared with the others.

But that said, we can look at some of the procedures and policies that are in place right now.  And we can see unimplemented limitation.  We can look at people who are in different situations like this circle that I discussed earlier and we can see, like, this is likely what's going to happen to these individuals because of the new laws.  And we can say that likely because of the new laws that we're going to have outdated ADOT information for people.  And when there's a matched record for that out-of-date data, we know what's going to happen there.  They are going to be canceled.  Their registration is going to be canceled and they're going to be referred on for investigation.

So there are aspects of this which are speculative thinking about how we would look generally at social science research and try to apply it to this situation.  But others that are based on my analysis of the data and the deposition testimony and other documents in this case which aren't as

United States District Court

MICHAEL P. MCDONALD, PH.D - Direct

speculative as those findings at the end of my report.

MR. KARPATKIN:  Stephen, can we go to slide 45?

BY MR. KARPATKIN:

Q.   Dr. McDonald, some of the reports and rebuttal opinions relate to your opinion regarding the population most likely to be impacted.  But based on the understanding that defendants are not going to be raising or introducing the evidence that was cited in footnote one of the response to the motion to strike Dr. Richman's testimony, I don't think we need to address the first two issues on this slide.  And the third issue I believe you've already addressed in your direct testimony.  But with that understanding, is there any other issue that was raised by defense experts that you would like to address?

A.   No.  I believe we covered them all.

Q.   Thank you.

MR. KARPATKIN:  Your Honor, I'm close to the end of my examination.  May I have just a moment to confer with my colleagues to see if there are any other questions?

THE COURT:  You may.

(Counsel confer.)

MR. KARPATKIN:  Can we see slide 46?

BY MR. KARPATKIN:

Q.   Dr. McDonald, in summing up, can you recap the opinions that you've offered in this matter?

MICHAEL P. MCDONALD, PH.D - Direct

A.    Well, for brevity sake, we know that there are going to be out-of-date citizenship information in the databases.  It's going to disproportionately affect naturalized citizens. Because of that, there are going to be certain harms that are being borne by these individuals.  We know that they are going to be younger.  They are going to be more diverse.  They are going to be less partisan, less partisan affiliation.  And because of those sorts of things that are going to be happening here, those burdens are going to be borne and people who -- they are just naturalized.  They are eager.  They are excited to be citizens of the United States and they are going to get the disappointment if some of the County Recorders take that HAVA check as what it is and without questioning it.  They are going to be told that their registration is canceled and tough luck and, by the way, we're also referring you for criminal investigation.

            And I can't just imagine the disappointment that someone would have in that situation.  And so I think it's reasonable to think that that is going to be a disappointment and that there's other literature in other situations to say that people are going to have a negative effect on their willingness to participate as a consequence of that negative interaction, even if they manage to get registered at a later point in time.  And even if they do get registered later, they may have missed that first opportunity to vote and participate

MICHAEL P. MCDONALD, PH.D - Cross

and that is going to retard their overall life span of
participation.  So I think that in a nutshell is my opinions.

Q.   Dr. McDonald, are these opinions based on method and data
generally relied upon by scholars in your field?

A.   Yes, they are.

Q.   And do you believe these opinions are presented with a
reasonable degree of certainty?

A.   Yes, they are.

Q.   I have no further questions.

        THE COURT:  Are there any other questions for
Dr. McDonald from the plaintiffs?

        All right.  Who is likely to go first?  Mr. Whitaker?

        MR. WHITAKER:  Yes.  Thank you, Your Honor.

                    **CROSS - EXAMINATION**

BY MR. WHITAKER:

Q.   Good afternoon, Dr. McDonald.  Let's start by --

        MR. WHITAKER:  Can we pull up the demonstrative page
seven?

Q.   All right.  I would like to talk about your opinions on
the timeliness of the citizenship information and the MVD
records.  First, you're aware that before these laws, County
Recorders were already checking MVD records as part of the
registration process; right?

A.   Yes.

Q.   And you're aware that before these laws, for applicants

                    United States District Court

MICHAEL P. MCDONALD, PH.D - Cross

who didn't provide proof of citizenship with their registration form, County Recorders would check the MVD records and if they saw an indication of non-citizenship, they would send the applicant a request for proof of citizenship; right?

A.    In some cases.  I mean, there's deposition testimony talking about delays of SAVE because they can also do a SAVE check.  And so there's some discussion in the Election Procedures Manual discussing those sort of situations.  And in deposition testimony from the County Recorders, that some of them are aware that whatever DPOC they are getting back from ADOT may be inaccurate and out of date, and they are also going to reserve doing their own SAVE check for at least two weeks and there's some care that's going to be taken for people who are being registered at these naturalization services.

Q.    All right.  We'll get to the SAVE system in a bit. Setting aside the SAVE system, is it your understanding that the current practice of County Recorders is that for applicants who don't provide proof of citizenship with their application, they check MVD records and if they see from MVD an indication of non-citizenship, they send a request for proof of citizenship to the applicant?

A.    Yeah.  My review of the deposition testimony would say that that is not what's happening.  If there's, like, a number that's provided, that they can do a SAVE check locally.  So if they do get the information back from ADOT that's out of date,

United States District Court

MICHAEL P. MCDONALD, PH.D - Cross

County Recorders, we know they have access -- at least four of them have I believe access to the SAVE system so that they can do their own SAVE check and search for documentary proof of citizenship from another source other than ADOT.

Q.   Okay.  Have you reviewed the Elections Procedures Manual on this point?

A.   I have reviewed the Election Procedures Manual.

Q.   Okay.

          MR. WHITAKER:  Let's go to Plaintiffs' Exhibit 6, PDF page 21.

BY MR. WHITAKER:

Q.   Dr. McDonald, can you take a moment to read to yourself the section titled 3, Procedures for Registrant With F-type License?

A.   Yes, and I'm just going to point out we're not looking at the section of the Elections Procedures Manual that I'm describing where there's discussion about care being taken when a newly naturalized citizen registers to vote.

Q.   All right.  According to this part of the Elections Procedures Manual, if the registrant provides -- sorry.  If the only form of proof of citizenship provided -- no.  No.  No. Let me back up.

          If a resident has not provided proof of citizenship other than a license number, and MVD records show that they have this F-type license, then the County Recorder is supposed

United States District Court

MICHAEL P. MCDONALD, PH.D - Cross

to send a letter to the registrant and ask for proof of citizenship.  Is that fair?

A.   So I think this is resolving our disagreement.  So if that is the only information they provided, which is the driver's license number or really the information that can be gleaned from a HAVA check, because you can imagine that you're not always identifying somebody who has a driver's license correctly in the ADOT database through this HAVA check.

But in that case, then, yes, the procedures are if that's the only piece of information that has been provided for DPOC, then a letter will be generated.

Q.   And under the Elections Procedures Manual in that circumstance, under current practice, if the applicant doesn't respond to that letter within a certain amount of time, the County Recorders don't allow that person to vote.  Is that your understanding?

A.   Yes.

Q.   So under current practice -- and I think we can go back to the demonstrative, page seven.

Under current practice, this issue with the timeliness of MVD data, is that already an issue under current procedures?

A.   It's a different type of burden than what's contemplated under the new laws.

Q.   Can you explain?

United States District Court

1169

MICHAEL P. MCDONALD, PH.D - Cross

A.   Yes, it is an issue currently with the system of the HAVA check or this -- only providing a driver's license.

Q.   So, for example, under the current system, County Recorder could check MVD records, see an indication of non-citizenship from MVD and then send this request for proof of citizenship to the applicant but it turns out the applicant has become naturalized since the last interaction with MVD.  Is that fair?

A.   Yes.  That is a possible scenario, yes.

Q.   All right.  Under the preexisting process, do you know how many registration applicants were citizens but were flagged with MVD as non-citizens and, therefore, got a request for proof of citizenship?

A.   I do not.  I can only look at the information that's within the databases, so I've not done an independent investigation as to the correct citizenship status of any individual.

Q.   Do you know how many applicants under the existing process were citizens, were flagged as non-citizens by MVD, got this request for proof of citizenship and responded by providing proof?

A.   Again, I can't answer that question because you're asking me about the individual status which I did not look at in my report.

Q.   I think I know the answer but for sake of completeness, do you know how many applicants were citizens under the

United States District Court

MICHAEL P. MCDONALD, PH.D - Cross

preexisting process, were flagged as non-citizens by MVD, got request for proof of citizenship and didn't provide proof?

A.    Yeah, it's the same answer as before.

Q.    All right.  And then under the preexisting process, do you know how many registration applicants were non-citizens and MVD's indication of non-citizenship was correct and up to date?

A.    Yes.  That -- again, I did not investigate in individual status their citizenship.

Q.    Well, okay.  Let's talk about the 6,084 number you've presented.  As I understand it, that's the number of full-ballot voters so voters who were required to provide proof of citizenship who MVD has indicated -- MVD records indicate are not citizens.  Is that right?

A.    It's roughly correct because, again, we're matching the driver's license number which may have some -- as I learned subsequent to my report by looking at that technical documentation that was provided by the Secretary of State's office, that that's actually a soft match so there could be some error with matching those driver's license numbers but, yes, generally that's that number.

Q.    All right.  And I want to think about the types of situations that could lead to that situation.  So is one situation folks provide proof of citizenship at the time they submit their registration form?

A.    Well, that's the current law is that they have to provide

United States District Court

MICHAEL P. MCDONALD, PH.D - Cross

DPOC to the County Recorders in order to be registered as a full-ballot voter.

Q.   Do you know how many of these roughly 6,000 provided DPOC at the time they registered?

A.   I'm assuming that the County Recorders did their due diligence.  They either provided it immediately or they provided it if there was a follow-up letter that was generated, they provided it through that mechanism.  But I don't know. It's not in data to really tell us how many may be of one category and how many may be of another.

Q.   We've heard testimony I think from you and others in this case about possibility of human error being introduced in these processes, sort of making typos when you enter data.  Is it possible that some of the people of the 6,000 you've identified were actually non-citizens but, for whatever reason, were mistakenly entered as full-ballot voters by whoever was doing the data entry at the County Recorder level?

A.   Yes.  I don't know the status of the individuals so I don't -- it might be possible that they were non-citizens.  It was a data entry error.

Q.   Is it possible that -- well, let me back up.  Rarely but sometimes someone can renounce their citizenship.  Is that fair?

A.   Yes.  I discuss that in my report some, yes.

Q.   Is it possible that some of these 6,000 full-ballot voters

United States District Court

MICHAEL P. MCDONALD, PH.D - Cross

who are being indicated as non-citizens by MVD were citizens at the time they registered but renounced their citizenship before they transacted with the MVD?

A.    I think that would be a rare situation but, yes, I think that is a possibility.

Q.    Backing up a little bit, imagine today a County Recorder gets a registration form that doesn't have proof of citizenship and they run an MVD check and they get back an indication of non-citizenship.  First of all, do you know what the MVD notification actually says in that situation?

A.    What the MVD notification says?  I'm not really sure what you mean by MVD notification.

Q.    For example, does it say Josh Whitaker is not a citizen or does it say something like the last time MVD interacted with Josh Whitaker, he provided information indicating that he was not a citizen?

        THE COURT:  I don't think that anybody is saying anything.  I think it's a data transfer.

        MR. WHITAKER:  Yes, Your Honor.

BY MR. WHITAKER:

Q.    So do you know what the specific data is that the County Recorders look at that they get back from MVD?

A.    Yes.  So this is that HAVA check as described by the County Recorders and during that HAVA check, it's either when you originate a new registration or you update a registration,

MICHAEL P. MCDONALD, PH.D - Cross

a HAVA check is completed.  It's described in deposition and that information is transferred back to AVID and then it's presented to the County Recorders.  There's -- I don't know what that screen looks like precisely but there is deposition testimony to say that when that information is transferred back to the County Recorder for review, whatever citizenship information is found in AVID -- excuse me, in ADOT automatically overwrites the citizenship status that is in the AVID system.

And at that point there's deposition testimony about how the County Recorders need to be vigilant because that citizenship information is being overwritten in the system and they need to make note of it in case citizenship status is changed.  But the County Recorder has previously provided DPOC and just is my opinion, that's not a very good system where you are requiring people to be vigilant on a data issue like that. It seems to me that that is an invitation for error.

Q.   Do you know whether the information that County Recorders see specify when the date of transaction was from which this MVD indication is arising?

THE COURT:  I'm sorry.  I don't understand your question.

Are you asking does the -- does it show when they indicated F-type license?

MR. WHITAKER:  Yes.  Yes.

United States District Court

MICHAEL P. MCDONALD, PH.D - Cross

THE COURT: So whether it was eight days ago or eight years ago?

MR. WHITAKER: Yes. That's a much more articulate question.

BY MR. WHITAKER:

Q. Do you know whether County Recorders get that information?

A. There are two pieces of information I need to look at to answer your question and so I would need to review it. There's a document that ADOT prepared on the interface that happens between AVID and ADOT and it does describe what data elements are transferred from ADOT back to AVID and so that will at least clear up one part of it, is whether or not the AVID system ever got that information.

And then what I would not know, because I have not seen any documentation on this or deposition testimony, is that what information is being presented to the County Recorder if indeed it is being transferred from ADOT to AVID.

So if you want me to look at that piece of it, because it is -- there was that document and it was produced, I can look at that and at least tell you whether or not the AVID system is receiving that information from ADOT.

Q. In your opinion, is this MVD indication of non-citizenship information that the person at issue is not a citizen currently or is it information that the person at issue was not a citizen at the time they last transacted with MVD?

1175
MICHAEL P. MCDONALD, PH.D - Cross

A.   I'm not really sure I understand that question.

Q.   So knowing what you know about the MVD data, suppose a County Recorder gets one of these MVD indications of non-citizenship and you were trying to explain to the County Recorder what that means, would you say this is information that the person trying to register is currently not a citizen or would you say this is information that indicates that the last time the person transacted with MVD they weren't a citizen at that time?

A.   Well, I think some County Recorders in their depositions were taking the other -- the view that you just -- the latter view that you just described while other County Recorders were taking the position that that information was fully dispositive about the citizenship status of the individual.  So I think the County Recorder's practice is what I would refer to at this point that some do not see it as being a firm indication of non-citizenship and others do see it as a firm indication of non-citizenship.

Q.   And what's your view?

A.   What's my view?

Q.   Yes.

A.   In certain circumstances, as I've described in my direct testimony, that would be out-of-date information and I would recommend that the County Recorders take care in interpreting that information that is coming from ADOT.

United States District Court

Q.   And similarly, imagine a County Recorder thinks their registrant may not be a citizen and they want to confirm this. In your view, would an indication of non-citizenship from MVD constitute confirmation that the registrant is not a citizen currently?

A.   So, again, I would point to current practices.  Some County Recorders do find that that information is sufficient to say the individual is not a citizen.  Other County Recorders do not view it that way.  Again, through my testimony, I would say I would err with the County Recorders.  I think there were five of them, that I referenced in my direct testimony that have this more equivocal position about the validity of that information.

Q.   Let's go to the next page of the demonstrative, the DPOC loop as you call it.  I take it that here you're envisioning a full-ballot voter who, for whatever reason, MVD information says last time they transacted with MVD, it looks like they weren't a citizen and then they became a naturalized citizen and didn't notify MVD.  Is that the prototypical case for this DPOC loop?

A.   Yes.  This would be like the 6,084 full-ballot voters.  It could be other federal-only voters, too, who may have a driver's license that election officials, through the HAVA check, has found a matching record in ADOT.  Either one of those cases.

MICHAEL P. MCDONALD, PH.D - Cross

Q.   Now, I want to ask a little bit about the link between the purple box there which mentions H.B. 2243 monthly citizenship MVD comparison in the yellow box that says:  Notice to voter. Do you think that H.B. 2243 requires a notice to be sent to someone who previously did provide proof of citizenship just because they are flagged in this monthly MVD check?

A.   Again, you're asking my opinion and I'm going to draw a legal conclusion here so there will be objections maybe.  But my reading of the law is that, yes, they are required to do this and some County Recorders would view this HAVA check of citizenship information that's being sent to them by the Secretary of State's office as confirmation that the individual is not a citizen.  Others may not.  And I think we're going to get varying implementation of the procedures across the state with respect to this.

     But my reading of the law is that those County Recorders who are at this point exercising some discretion in the information that they are getting from an ADOT check will no longer have that discretion.

Q.   And do you understand that the current Elections Procedures Manual is being reviewed as we speak?

A.   I thought the new one was out and it was no longer under review but -- if there's another one that's being reviewed, I was not aware of that.

Q.   Also in this DPOC loop, flowing from the box that says

United States District Court

MICHAEL P. MCDONALD, PH.D - Cross

Notice to Voter are a few boxes in brown.  So, for example, mail problems.  Are you aware of anyone in Arizona who was sent a request for proof of citizenship under the existing procedures but never got it?

A.   No, I didn't do that sort of analysis, no.

Q.   On language barrier, are you aware of anyone in Arizona who was sent a request for proof of citizenship under the existing procedures but couldn't read it?

A.   Same answer.

Q.   For the inaccessible DPOC box, are you aware of anyone in Arizona who was sent a request for proof of citizenship under the existing procedures but didn't have access to proof of citizenship?

A.   Same answer as before.

Q.   And how about the box Time Barriers, are you aware of anyone in Arizona who was sent a request for proof of citizenship under the existing procedures but didn't have time to respond within the time allotted?

A.   Same answer.

Q.   Let's go to the next page of the demonstrative, page nine. Here you quote Mr. Jorgensen from his deposition and you say that there are inaccuracies in the MVD data 10 to 15 percent of the time; is that right?

A.   Yes, that's his deposition testimony, yes.

Q.   And he went on to testify, though, that the errors he was

United States District Court

1179

MICHAEL P. MCDONALD, PH.D - Cross

talking about are typically not something that would invalidate the data in the system; right?

A.    Well, again, as I testified during my direct testimony, these databases are generally valid for the purposes they are put to.  So it may be a name issue or something like that that doesn't really affect the integrity of the data in a business way.

So I think as my interpretation of what he was saying with respect to that is that there's generally integrity of the database.  There may be some errors in it but, generally, the database has integrity to it.

Q.    He specifically said the errors he was talking about are typically not something that would invalidate the data in the system; right?

A.    Yes.  He says typically.  And typical means most often. That's my understanding of that definition.  10 to 15 percent is atypical in that definition of typical and so he could say and assert that typically whatever errors are in the system are not really affecting the integrity of the entire database.

Q.    As an example he gave, an improperly scanned document; right?

A.    Yeah.  Scanning and doing optical character recognition turns out to be a thorny problem especially when people are writing on forms and so, yes, those can lead to errors.

Q.    Let's go to the next page in the demonstrative.  One more

United States District Court

MICHAEL P. MCDONALD, PH.D - Cross

actually.  So this soft match part of your opinion, I take it that the duplicates here on page 11, you're referring to duplicates within the AVID system among voter registration records within AVID?

A.    That's correct.  I could not do an analysis of the ADOT system because we didn't get the personal identifying information that would have permitted me to do an analysis there.

Q.    And do you know what County Recorders do when they are presented with this soft match after receiving MVD data?

A.    There is some deposition testimony to this effect on that they may be confronted by that information.  They may try to enter new information and reinitiate a HAVA check to try to resolve the discrepancies, but ultimately they are going to have to have some resolution to these discrepancies.

Q.    Are you aware of any instance -- let me back up.  The soft match thing is something that's part of current procedures before these new laws; right?

A.    Yes.  This is part of the HAVA check process, yes.

Q.    Are you aware of any instance where a County Recorder, upon being presented with one of these soft matches, reached a decision about that voter incorrectly?

A.    That's a good question.  In Richman's report he discusses five duplicates that I did not account for in some of my calculations, so I looked at those duplicates and I could see

United States District Court

MICHAEL P. MCDONALD, PH.D - Cross

that there was -- three of the duplicates were on the third digit at the birth year for the individual.  Twice they had provided a driver's license number and once they had provided the last four digits of their Social Security number, if I recall correctly.  But it was really interesting, it was that third digit, it was a four, a five, and a nine in the third digit of the birth year.  Otherwise they appeared to be very similar records.

And so they had -- so that -- I think that would be an example of the question you're asking me where the soft match had somehow failed or that there was an indeterminate, match somehow these people got through the system and got -- a duplicate record was created within system because of the inaccuracies that you get with the soft match.

Q.   In your reports, did you cite any examples of County Recorder proceeding after receiving the soft match a way you thought was improper?

A.   No, I did not explore this.  This was only after I had reviewed Richman's report.

Q.   Do you know of any voter in Arizona that was negatively affected by the existence of this soft match procedure?

A.   No, I do not.

Q.   I think let's skip the Social Security database issues and go to the SAVE database issues on page 18 of the demonstrative.

Are you aware of any Arizona voter whose registration

MICHAEL P. MCDONALD, PH.D - Cross

was affected by these reliability issues you've identified in the SAVE system?

A.    No, I'm not.

Q.    And SAVE is a system that County Recorders currently consult under preexisting procedures; right?

A.    Some County Recorders have access to the SAVE system, yes.

Q.    One of the boxes you mention here is lag time.  What is a typical lag time in your view for the SAVE system?

A.    That's a good question.  I mean, there's some discussion in there about how the various databases can have out-of-date citizenship information because of the last contact the individual had with the particular agency, but there's really not a good -- at least to my satisfaction, a real discussion about what would that exact lag time be for that point of contact because we are talking primarily about naturalized citizens.  And I don't know what these other databases are if they are not part of that direct data input or process and just station process that would happen with naturalization.  So there can be some other databases in the federal government that would only have citizenship information at the point in time of a contact and it would be something other than naturalization.

      So I really can't answer that question.

Q.    I think there's a difference in kind.  I'll ask you a question on this -- I want to ask you whether my thinking is

MICHAEL P. MCDONALD, PH.D - Cross

right.  I think there's a difference in kind between the MVD records as to naturalized citizens and the SAVE system as to naturalized citizens in that for MVD, someone could become naturalized after they transact with MVD and not tell MVD whereas for SAVE if someone becomes naturalized, the federal government knows about it so eventually the SAVE system will get updated.

Is that a fair distinction between the systems when it comes to naturalized citizens?

A.   See, I'm not entirely clear if that's true or not because, again, there's some point-of-contact discussion but I don't really know the nature of those databases.  And I don't know if they are talking about point of contact when they are naturalized and I don't know what's going to happen when there's conflicting information in these databases.  Recall there's other issues that are here present in these databases that there is documentation on where there's discussions about how these databases don't really work very well with one another and this is why there's this whole manual verification process.

And so it could be that for whatever reason, you've gotten indeterminate citizenship information that's coming through SAVE and then SAVE is requesting more information to do one of those manual verification checks.

But, again, this is speculation because the

United States District Court

MICHAEL P. MCDONALD, PH.D - Cross

information here within the SAVE documentation doesn't really go into the sort of granular detail that I would have liked to understand what's really happening within the SAVE database or the SAVE system.

Q.   Let's go to the next page in the demonstrative.  So as I understand your testimony on the two yellow columns here, you're saying on the column on the left, SAVE requested -- asked someone in Arizona to provide additional information and then in the column on the right, those are the number of times -- well, maybe could you again describe what your understanding of those two yellow columns are.

A.   I think you were going there.  So my understanding is the first column, summed up, there were 2,892 requests by SAVE for additional information so that a manual verification check could be initiated by a caseworker at the federal government and then the next column is that 160 -- my eyesight is going, I think it's 162, Arizona officials provided that requested information to SAVE so they could institute a manual verification check.

Q.   Okay.  So this is SAVE telling Arizona officials we needed more information to run your inquiry and the second column is the instance of times where Arizona officials said okay, here's more information?

A.   Correct.  That's my understanding of this.

Q.   All right.  Is it possible that in the times when SAVE

United States District Court

MICHAEL P. MCDONALD, PH.D - Cross

said we need more information from you, Arizona officials, to run our inquiry, that the election officials got more information some other way such as by asking the voter for proof of citizenship?

THE COURT:  I'm sorry.  I think -- I'm not following that.  I thought that the point of this chart was just to show that SAVE asks for help and I'm going to characterize it as yes, updating their database if they should, and that the Secretary of State and the County Recorders are particularly unresponsive to those requests.

MR. WHITAKER:  So maybe I'll back up and ask the question.

THE COURT:  Is that what this was trying to show?

THE WITNESS:  Well, it's that SAVE could not find the record.  So for whatever reason, there wasn't enough information that was provided by Arizona to the federal government and so then SAVE is saying, well, for the purposes of providing a benefit, we really want to err on the side of the individual.

So in that situation, we want to do our due diligence and look through these databases, which don't really work together very well, and so they are going a caseworker to go through and troubleshoot the problem and see if they can find the information, the record that was requested.

THE COURT:  But doesn't it also show that the

United States District Court

MICHAEL P. MCDONALD, PH.D - Cross

Secretary of State and the County Recorders have not responded to those requests by SAVE?

THE WITNESS:  Yes.  That's the second yellowed column, yes.

BY MR. WHITAKER:

Q.   And is it possible that in those situations, the Secretary of State and County Recorders got information about the applicant's citizenship in some other way?

A.   I mean, there are -- I'm just trying to imagine what the scenario is.  So there's some alien identification number or other, you know, lawful presence number, naturalization number that has been provided by the voter and it comes back negative through the SAVE system.  And I'm just -- it's escaping me what this other information is about their citizenship that naturalized citizens would be providing to establish their citizenship.

Q.   Could one example be a Certificate of Naturalization?

A.   Then you would go through the SAVE system.  I mean, that was probably provided in the first place and the record wasn't found and so SAVE is requesting more information.

Q.   Maybe I'll ask it this way:  Do you know in those cases in the left-hand column whether the election officials, upon getting that response from SAVE, asked the voter directly for more information?

A.   I do not know what happened at that stage of the process.

United States District Court

If they had provided that naturalization number, the scenario that's being contemplated here is that I don't know.  Maybe they misentered the number or something and so SAVE is just saying, hey, can you send us the document itself, send a scanned copy of it so that we can put a caseworker on this and see if we can identify that record.

So I suppose someone could provide a different document but it doesn't seem like it's part of really the normal process that's envisioned by this SAVE system.

Q.   Are you aware of any citizen in Arizona that does not have one of the documents that count as proof of citizenship under the statute?

A.   Can you say that again?  I missed the first part of that question.  I apologize.

Q.   Yeah.  Are you aware of any citizen in Arizona that does not have one of the documents that count as proof of citizenship under the statute?

A.   I did not investigate the status of any individual so if you ask me one of those questions, I'll just respond that I did not investigate that.

Q.   Let's go to page 25 of the demonstrative.  In your testimony you talked about -- you described Pima as an outlier here; right?

A.   That's correct.

Q.   And I believe you said that in their deposition, they said

1188
MICHAEL P. MCDONALD, PH.D - Cross

that they don't put voters who don't provide proof of citizenship in a suspended or canceled category.  They just put them as federal-only voters; is that right?

A.    That was my interpretation of the deposition testimony, yes.

Q.    Did you analyze whether that stance is consistent with the Elections Procedures Manual's guidance on what to do in those situations?

A.    I did not analyze that but I believe that would be a variance from the Elections Procedures Manual.

Q.    Let's go to page 29.  Actually I already asked you about the Elections Procedures Manual.  Let's go to page 30.

On the reason to believe part of these new laws, were the County Recorders posed hypotheticals in depositions?

A.    Yes.  They were.

Q.    Do you know of any actual instance where a County Recorder has had to apply in practice this reason-to-believe standard?

A.    No, I am not aware of any instance of this.

Q.    Let's go to page 31.  Here, too, you're talking about restoration of voters removed erroneously.  Were these -- was the testimony that you're citing here coming from hypotheticals posed to County Recorder representatives at their depositions?

A.    Yes, it was.

Q.    Are you aware of any actual cases where the Recorder representatives were talking about their own.

1189

MICHAEL P. MCDONALD, PH.D - Cross

experience here?

A.    Not that I'm aware of, no.

Q.    Let's go to the next page, page 32.  So here, as I understand your testimony, you list five Recorders who say that the MVD portion of the HAVA check may be inaccurate and two who say that the MVD portion is accurate; is that right?

A.    That's correct.

Q.    What's your view?

A.    Well, you asked me this before.

Q.    Right.

A.    And to be repetitive, I would err with the -- or I would side with the five counties I cite here to say that that HAVA check may be inaccurate.

Q.    Did you try to quantify how often the MVD indications of non-citizenship are inaccurate?

A.    Yes.  That was that 6,084 number that we discussed earlier.  So there would be an instance where someone has provided DPOC but there's a record in the ADOT database that says that they are not a citizen.

Q.    Let's assume for the sake of argument we're adopting that 6,000 number.  What percentage of the overall instances of MVD flags of non-citizenship does that 6,000 represent?

A.    I have not done that calculation.

Q.    And I believe you testified earlier that the MVD system is generally reliable.

United States District Court

MICHAEL P. MCDONALD, PH.D - Cross

A.    Yes, for the -- yes.

Q.    Let's go to page 34 of the demonstrative.  So as I understand your analysis here, this is about race and ethnicity.  And to set the stage here, the voter files have specific dates of birth and party registration so you have direct information from the voter files about fed-only voters' age and party preferences; right?

A.    That is correct, yes, and all active registered voters, too.

Q.    Right.  You don't have that same information about race and ethnicity because that's not something that's part of the voter file; right?

A.    That's correct.  Some states have that information.  They request it from the registrants but not Arizona.

Q.    And so as I understand it, you attempted to approximate this information using two methods; is that right?

A.    Correct.

Q.    Okay.  And on page 34 here, as I understand it, you were comparing the address that is on file with a voter with census information about the race and ethnicity of the neighborhood within which that voter resided; is that right?

A.    That's correct.  Be more specific.  It's a census block.  It's roughly the size of a city block in an urban area.

Q.    But the voter data you looked at was from 2023; right?

A.    That's correct.

United States District Court

MICHAEL P. MCDONALD, PH.D - Cross

Q.   And the census data you looked at was from 2020?

A.   That's correct.

Q.   And even 2020 is not quite right because the 2020 information is actually using older -- or information gathered before 2020?

A.   No.  That would be the decennial 2020 census.  It would be for the 2020 census.

Q.   So you're comparing 2023 voter information with 2020 census data?

A.   Correct.

Q.   Let's go to the next page, page 35.

So the surname matching, you gave an example of Martinez in your testimony?

A.   That's correct, yes.

Q.   And the idea here is to -- you know the last names of all of the voters so you can estimate their race or ethnicity based on how people with that same last name responded to census questions?

A.   That's one step of the process, yes.

Q.   Okay.  And what are the other steps?

A.   The other step is we can also know something about the neighborhood that they reside in from the geocoding exercise we did on the previous slide.  And so we can take some information about the neighborhood they live in to make another guess as to what the individual's race and ethnicity is.

United States District Court

MICHAEL P. MCDONALD, PH.D - Cross

Q.   And not to belabor an obvious point but is it fair to say that someone's surname is not necessarily indicative of their race or ethnicity?

A.   Yes.  I mean, I gave that example when I was describing the surname matching, yes.

THE COURT:  I just wanted to be clear because the last -- question before last wasn't.  This surname, this use of surname is not something you came up with that's part of what the census does?

THE WITNESS:  So I'm using an algorithm that is cited in my report that was developed by some Princeton professors and so I'm applying that algorithm that they have developed to do the surname matching and so that is what I am doing for the report.

THE COURT:  So who came up with the categorization of surnames?

THE WITNESS:  Oh, that's the Census Bureau.  It's the Census Bureau.

THE COURT:  That's what I was trying to clarify.  The Census Bureau is the one that did the surname categorization, not you or some other social science researchers?

THE WITNESS:  Yeah.  The Census Bureau publishes this big list of all of the surnames and all of the frequencies of the different race and ethnicity associated with these surnames.

United States District Court

MICHAEL P. MCDONALD, PH.D - Cross

BY MR. WHITAKER:

Q.   Let's go to page 39 of the demonstrative.  You spoke a little bit on direct about the effects on impacted voters of these laws.  We may have already covered this but you're not aware of any specific voter who has been affected by these new laws; right?

A.   No, I have not.

Q.   And you're not aware of any specific voter who will be affected by these new laws; right?

A.   I definitely don't know about the future.  If I did, I would bet on the stock market, you know.

Q.   And on the subject of criminal investigations, to your knowledge, no investigation has happened under these new laws; right?

A.   I am not aware of any criminal investigation, no.

Q.   And you're not aware of what such an investigation would involve?

A.   No, I'm not an expert in law enforcement and what sort procedures they would do.

Q.   And you haven't spoken to any Arizona voter about how they might feel about this possibility of investigation?

A.   No, I've not.

Q.   And you have not spoken to any Arizona voter at all about these laws?

A.   Well, I think there are some people who are lawyers so,

United States District Court

yes, I have spoken with some people.

Q.    Setting aside counsel.

A.    No, I have not.

Q.    That's all the questions I have.  Thank you.

A.    Thank you.

**CROSS - EXAMINATION**

BY MR. LANGHOFER:

Q.    Good afternoon, sir.

A.    Good afternoon.

Q.    Isn't it fair to say that you have demonstrated a profound bias against the Republican party?

A.    No, that's not true.

Q.    I'm going to read you a quote.  I would like you to tell me who said it:  How will Republicans poop their pants today and then blame Democrats?

      Who said that?

A.    I would imagine it's something I said on social media.

Q.    How about:  Republicans are, quote, totally cool with a violent insurrection, end quote.

      Who said that?

A.    I would imagine it's something I said on social media.

Q.    How about, quote, Republican politicians just flat out say they favor White nationalism?

A.    I imagine that's something I said on social media.

Q.    Steve Scalise is the majority leader of the United States

United States District Court

1195

MICHAEL P. MCDONALD, PH.D.- Cross

House of Representatives?

A.    That is correct.

Q.    Who said in reference to Steve Scalise:  He's David Duke?

A.    I imagine I said that on social media because you're asking me these quotes.

Q.    David Duke is the -- apparently, the Grand Wizard in the Ku Klux Klan.

A.    I believe he was.  And the particular quote you're asking about is with reference to Scalise identifying himself as David Duke without the baggage.

Q.    So you said this one month ago; right?  Steve Scalise is David Duke.

A.    Without the baggage, yes.

Q.    And let's see.  You said:  It's cute when you think Republicans believe the law applies to them?

A.    I imagine you did if you are providing me these quotes, yes.

Q.    Okay.  George Santos is currently indicted and accused of being a serial con man, swindler, and notorious liar.  Is that fair?

A.    I believe that's fair.  Those are allegations that have been made against him in federal court, yes.

Q.    Are you the one who said that George Santos is, quote, just the type of representative Republicans love?

A.    I imagine I said that on social media.

United States District Court

1196

MICHAEL P. MCDONALD, PH.D.- Cross

Q.   About a month ago?

A.   I imagine I said that on social media a month ago.

Q.   When apparently Natzis marched outside of Disney World, you blamed Ron DeSantis?

A.   I imagine I said that on social media since you're asking me the question.

Q.   You've scorned DeSantis for concluding that religion is an essential service?

A.   That religion is an essential service?  I don't remember that one but I will agree to you that I've said lots of things on social media that you're going to continue to provide quotes to me.  But I provided an oath to this Court that I would tell the truth.  And so when I work for plaintiffs, I tell the truth and I've worked with Republicans in many cases across the country because I thought the system was unfairly stacked against them by Democrats.  I believe --

Q.   Sir --

A.   I believe very strongly --

Q.   -- the way works is I ask questions and you answer them.

A.   -- I believe very strongly --

Q.   There are no sermons in this court.

A.   I'm being responsive to your questions about --

          THE COURT:  Dr. McDonald, you're not being responsive to his questions.  Counsel for the plaintiffs will have an opportunity on redirect if they wish to get further explanation

United States District Court

MICHAEL P. MCDONALD, PH.D.- Cross

from you.

THE WITNESS:  Thank you, Your Honor.

BY MR. LANGHOFER:

Q.   Is it fair to say that you do not attribute fringe views to the Democratic Party on social media?

A.   That I do not attribute fringe views.  I could probably go look through my social media and find instances where I have attributed fringe views to the Democratic Party but I would have to review all of my social media posts.  Would you like me to do that now?

Q.   Perhaps on the break.  I think you will have time.

Would it be fair to say that you have demonstrated a profound bias against the Republican party's election integrity policy platform?

A.   I think the answer to that is no.  I work with Republicans in a number of instances to create fair elections.  I believe that democracy shows party when it comes to pluralism and how it should work in a democracy like the United States.

Q.   Didn't you say Republicans just can't get enough vote suppression?

A.   I imagine I said that on social media.

Q.   When Texas -- and you said that when Texas considered penalties for illegal voting.  That's when you said it.  Is that right?

A.   Was that a question?  I didn't realize that was a

United States District Court

1198

MICHAEL P. MCDONALD, PH.D.- Cross

question.

Q.   It's a question.

A.   Again I would have to go look and look through my social media.  I'll assume that's accurate.

Q.   Okay.  During COVID Kentucky considered a plan to expand absentee voting to accommodate health concerns and you described that as a way to suppress voting, expanding absentee voting?

A.   I would have to look at the context of that one.  There were some aspects of the expansion of absentee voting that worked to disfavor larger jurisdictions within the state of Kentucky.

Q.   Okay.  You do recall the situation in Kentucky?

A.   Yes, I do.

Q.   Okay.  And what was proposed and eventually adopted was an expansion of absentee voting; correct?

A.   In a manner, yes.

Q.   Okay.  Well, let's talk about it.  It was an expansion from the law that existed before the proposed amendment.  Am I right?

A.   Well, again, what -- you are going to have to review the situation in Kentucky.

Q.   Okay.

A.   So if you would like, I would like an opportunity to review the change of the law in Kentucky and what I've written

United States District Court

MICHAEL P. MCDONALD, PH.D.- Cross

about it.

Q.    Sure.

          MR. LANGHOFER:  Elaine, can we have the podium laptop connected, please.

BY MR. LANGHOFER:

Q.    And what I will show you first is what's been marked for identification as impeachment Exhibit 118 and see if this helps you refresh your recollection.  Give that a read to yourself, please?

          THE COURT:  Could you maybe make it bigger because it's really small?

          THE WITNESS:  I appreciate that, too.

BY MR. LANGHOFER:

Q.    I'm sorry.  I've moved.  I'm trying to move the text so we can all see this together.

A.    I believe, you know, the issue for Kentucky is that the Governor of Kentucky is Andy Beshear who is a Democrat who is issuing this order.

Q.    Why does that make it vote suppression?

A.    You're asking me about bias against Republicans and here I am -- you asked me earlier whether or not I've ever said anything derogatory or fringe views for Democrats.  And so here is an example of me apparently saying a fringe view as it applies to a Democrat.

Q.    You're correct that Beshear is a Democrat.  You will see

United States District Court

1200

MICHAEL P. MCDONALD, PH.D.- Cross

in the last paragraph the proposal was actually from Secretary of State Adams who is a Republican.  Am I right?

A.    I recall in that situation that Andy Beshear wanted to do more than what Secretary of State did.  There was a compromise between the two of them.  The Governor issued this order in consultation with the Secretary of State who was a Republican.

Q.    And ultimately you called this expansion of absentee voting vote suppression?

A.    Right, because the Democrats, and I think reasonably there was -- again, I would have to review all of the policies that were at play in Kentucky, but they could have done more.

Q.    Okay.  When the -- when a Republican Attorney General of Texas sued to stop an unlawful mail voting program and the Court agreed that it was unlawful and stopped it, you said that that was vote suppression; right?

A.    Again, I would have to look at the context of that.  Are you talking about the 2020 emergency COVID procedures?

Q.    That's right.

A.    All right.  So in Texas, the situation was that Democrats had sued -- again, I'm just trying to answer your question for you; that Democrats had sued -- excuse me.  That's an incorrect -- they had won at lower court level and this went up to the state Supreme Court I think is the issue that you're talking about and the state Supreme Court reversed the lower court on some of the emergency procedures that some of the

MICHAEL P. MCDONALD, PH.D.- Cross

counties had implemented within the state of Texas.

In that ruling, interestingly, the state Supreme Court gave a wink and a nod to exceptions for health reasons to vote and the Attorney General then in Texas said he would go after anyone who -- and investigate anyone who provided one of those health reasons.  And so that I felt was vote suppression.

Q.    Your comment about vote suppression was about the litigation, was it not?

A.    I think that's tied up into that litigation as I was describing it.  That's my recollection of the situation that was in Texas.

Q.    All right.  Let's take a look.

Your description of this as bragging how vote suppression helps Republicans, this is not about enforcement of people who have transgressed the law.  It's about the outcome of the litigation, is it not?

A.    Well, he's saying here in this video that is -- this is an excerpt here that Ken Paxton, if he hadn't been successful with lawsuits to block mail-in ballots, Trump definitely would have lost the election in Texas.  And so it appears then that he believed that the lawsuit favored a particular candidate.  And I was pointing out this, that he believes that he managed to suppress some votes that had the net effect of giving Trump a larger margin of victory in Texas than what would have existed without those current laws or without those laws that had been

United States District Court

MICHAEL P. MCDONALD, PH.D.- Cross

challenged.

Q.   You're saying it's vote suppression but the Supreme Court said that he was correct about the application of the law, didn't it?

A.   The Texas Supreme Court?

Q.   That is the one.

A.   All right.  Just making sure because there are different Supreme Courts.  I suppose the Texas Supreme Court said yes.

Q.   Okay.  More broadly, stepping away from Republicans and what you think of them, your view is that any requirement that you register to vote is vote suppression, isn't it?

A.   No.

Q.   Well, didn't --

A.   However, but if you want, I've actually wrote an op ed in *USA Today* that agreed with Donald Trump.

Q.   We will get there.  Didn't you say voter registration is a vote separation tool?

A.   Yes, I said that.  That's the history of voter registration.

Q.   And you said you --

A.   Can I --

Q.   -- said you despise voter registration.

A.   Can I answer the question, please.

Q.   Sure.

A.   So the history of the voter registration was, it was first

United States District Court

MICHAEL P. MCDONALD, PH.D.- Cross

adopted in northeastern states.  And so states like New York, Connecticut, Rhode Island and others adopted voter registration but they only applied it to larger cities.  So they exempted the rural areas of those states and they applied it to the larger cities and they did because they were concerned about votes that were coming out of those larger jurisdictions.  That's the historical record about how these laws were adopted.

And then later in the south these registration laws were adopted and applied in a discriminatory manner.  So, again, they were used historically for voter suppression.  And so when I say that, I'm saying, yes, voter registration laws historically definitely were used for voter-suppression measures.

Q.   I appreciate that's what you're saying today.  But publicly you don't talk about in a different context in a different age voter registration was expressive.  You say voter registration is vote suppression, don't you?

A.   Within that context, yes, absolutely.

Q.   Okay.  So let's take a look at what's been marked for identification as impeachment exhibit 108.  The first tweet you say:  It's Voter Registration day.  I despise this day.  It's one of the most effective voter suppression tools in history.

Right?

A.   Yes.  So right there I'm telling you the context of the comments I just made and, in fact, the organization that runs

United States District Court

1204

MICHAEL P. MCDONALD, PH.D.- Cross

National Voter Registration Day, I'm on the board of the organization that runs that particular event.

Q.    You say that real solutions to problems with voter registration will not be implemented since we know this is really about vote suppression; right?

A.    Yes.  And really I'm trying to refer to what I believe is the best solution here which is that -- and I've also said -- you've asked me before do I say derogatory things about Democrats, yes, in this case I have.  So, again, if I could refer to that op ed that I wrote in USA today, is it okay if I do that?

Q.    We will get there.

A.    That's really what I'm referring to.

Q.    How many states require voter registration right now?

A.    All but North Dakota.

Q.    You talked earlier about how your accusations under oath are different than your accusations on Twitter.  While you're under oath in this case, you accused Professor Hoekstra of concluding that everyone on the federal-only list is a non-citizen, haven't you?

A.    And I said in deposition, I believe I corrected that to say I probably overspoke.  The language that is used by Richman and Dr.-- Dr. Richman and Dr. Hoekstra is strong but they do allow some possibility so they are a little bit more equivocal than what I originally said.

United States District Court

MICHAEL P. MCDONALD, PH.D.- Cross

Q.   You corrected it at your deposition after about two hours and being unable to find anywhere in the reports that supported your conclusions; right?

A.   I don't recall two hours looking in my reports for that particular piece of information.  We did not stop my deposition for two hours to look for that information.

Q.   No.  Certainly that's not what happened and I'm not trying to say that it is.  But it's not like you said it, caught yourself and corrected it.  A separation of time, you were pressed to defend your answer.  You conceded you could not defend it; right?

A.   I corrected the record in my deposition, yes.

Q.   All right.  Let's talk about your *USA Today* article.  Now is the time.  Your position has been and, as I understand it, continues to be that voter ID is okay.  It's actually good policy as long as everyone has one of the IDs; right?

A.   That's correct.  Yes.

Q.   Okay.  You also have said that you agree that there is unlawful voting but you just are not sure that it's on a scale that affects the outcome of elections.

A.   All right.  So am I now allowed to talk more about -- are we moving on today from the USA op ed?  Can I provide some context on that?

Q.   You will have a chance later.

A.   Okay.  So I will have a chance.

United States District Court

MICHAEL P. MCDONALD, PH.D.- Cross

Q.   Haven't you said that you agree unlawful voting occurs. You're just not sure that it's on a scale that affects the outcome of elections?

A.   Yes.   There's lots of evidence to that effect.   Even your own Governor certified the 2020 election and said that there's no substantial fraud to overturn the election.

Q.   Yeah.   But the first half of that, the unlawful vote does exist.   You agree with that part of it as well?

A.   Yes.   There's evidence of it, yes, it happens.

Q.   Okay.   And are you in a position to say whether unlawful votes in Arizona have ever exceeded 17 in a Congressional district?

A.   Sorry.   I didn't understand that.

Q.   Are you in a position to say whether the number of unlawful votes in Arizona has not exceeded 17 in one Congressional district?

A.   Has not exceeded 17 in one Congressional district.   I have not looked at that issue so I can't provide you an opinion on that.

Q.   Okay.   What about 280 in a statewide election?   Are you in a position to say whether the number of unlawful votes in Arizona is smaller or greater?

A.   I have not looked at that hypothetical so I can't respond to that question.

Q.   All right.   I want to talk about these -- well, and I have

United States District Court

MICHAEL P. MCDONALD, PH.D.- Cross

a lot of details about the HAVA checks and the database matching to talk through; but before we get into the nuance of it, I want to sort of zoom out and think about at a system-eye level what we're talking about.  You do appreciate, don't you, that the HAVA checks and the SAVE checks are a system put in place after one of the plaintiffs' groups sued to secure that system?  Do you recognize that?

A.   Yes.  I recognize that there was litigation earlier in the decade.  I actually was not aware fully of the parties to case so I will take your word that one of the plaintiffs was a party to that case.

Q.   Okay.  And the process of using these databases was arrived at as a shortcut or a bypass to asking every citizen to provide copies of their documents.

        Do you understand that?

A.   I do not understand the intent behind that.  I have not looked at that particular portion of the litigation.  I wouldn't be able to answer those questions.

Q.   The database checks, when they succeed in confirming proof of citizenship, are an alternative to asking the voter to provide their documents; right?

A.   Again, you're asking me an intent question as to why the -- and I don't know the reason for that but, functionally, there are certain number of documents that are accepted for DPOC under Arizona law.  And so the current system is availing

United States District Court

1208

MICHAEL P. MCDONALD, PH.D.- Cross

itself of that to look up information in these disparate database to obtain citizenship information, yes.

Q.   So my question isn't about intent.  It's functionality. If I apply to register to vote and I don't attach any documents.  They run my name through the system.  They can find that I've already provided my passport to the ADOT.  I don't have to give a copy of my passport in that case because they confirm it through the database checks; right?

A.   I'm not exactly sure about that particular scenario.  So you have not provided any DPOC?

Q.   I did provide it but it was to ADOT before I applied to register to vote.

A.   I don't think that -- again, I would have to look back at the Elections Procedures Manual to verify this.  Depending on which form that you're using, if it's the state form, I think you have to provide a form of DPOC, as I recall.  Certainly under the new law you do.  I'm just trying to recall correctly my memory from the report and studying those laws.

I think, yeah, if you do not provide DPOC by your state or federal form, then can they look up that information? And the twist here is that you're saying that they are not providing their driver's license number which is a form of DPOC and so --

THE COURT:  I think he's saying they are providing the driver's license number, just not any document that proves

United States District Court

1209

MICHAEL P. MCDONALD, PH.D.- Cross

your citizenship.

THE WITNESS:  But my understanding is that's a form of DPOC under the Elections Procedures Manual.

THE COURT:  To write down your driver's license number?

THE WITNESS:  Yeah.

THE COURT:  So I think we have a term definition problem.  When I think of documented proof of citizenship, I think of a birth certificate or a passport or a naturalization certificate.  I don't think of driver's license number as a document.  A driver's license is a document that may, under some circumstances, be documented proof of citizenship but this is just the number we're talking about.

You understand that if you put in the number, it goes to MVD and if they have received documented proof of citizenship, that's good enough?

THE WITNESS:  Oh, I see what you're saying is like where is the source of the citizenship information?

THE COURT:  Yes.

THE WITNESS:  And my understanding was that the Elections Procedures Manual says that the driver's license number is DPOC but that's okay.  Is that the scenario?  Because I just want to make clear in my head the scenario that you're talking about.  So they provided a driver's license number.  You're not really thinking of that as DPOC so that you can look

United States District Court

1210

MICHAEL P. MCDONALD, PH.D.- Cross

up the record in MVD.

BY MR. LANGHOFER:

Q.   I don't want to turn myself into a witness here but I'll explain our view of the law and it may help clarify it.   Our view, if you provide a driver's license number or a naturalization number, for example, that is, under the new laws, DPOC because it allows them to check the system.

So let me -- I hope that helps clarify this question somewhat.

I take my passport to MVD.  I get a driver's license. Sometime later I go to the County Recorder and I submit a form with my driver's license number on it, no copy of my passport, nothing identifying me as a citizen except this driver's license number.

A.   Okay.

Q.   I think --

A.   Now I'm following along correctly because I thought we were going to do some sort of soft match lookup into the ADOT database.  Okay.  Thank you.

Q.   So in this scenario, the database checks, if they work, spare me from having to track down a copy of my DPOC and provide it to -- when I say DPOC, I mean in this case the actual document that proves my citizenship, the original document, I don't have to track it down because the database check bypasses that process; right?

United States District Court

1211

MICHAEL P. MCDONALD, PH.D.- Cross

A.    Yes; that you can look up that DPOC that has been provided to ADOT, yes.

Q.    So whatever warts there may be in this database check process, it only reduces the burden on the voter who now does not have to provide their original document.  Am I right?

A.    No.  That's incorrect.

Q.    Okay.  Please explain to me how someone is more burdened because the County Recorders will run the databases checks.

A.    As I was discussing in my direct testimony, we have two scenarios really we have to consider where an individual is a naturalized citizen and the DPOC is out of date with ADOT.  And so even if they provide that driver's license number that you're describing, that's not going to be sufficient for them. So they are going to have to go and update that record with ADOT before ADOT's records square.

So that's one scenario.  And under the new laws, it's not that there's even an opportunity for the registrant to -- there's no curing process, curing when you are trying to fix the process in terms of election restriction lingo.  There's no curing process with a letter being sent to the voter saying, hey, you need to provide DPOC.

Instead, the letter says you're canceled.  Sorry. And then there's the individual is referred for criminal investigation.  So that's a different process.

And then there's the individuals who have provided

United States District Court

1212

MICHAEL P. MCDONALD, PH.D.- Cross

DPOC but if they don't update their driver's license database, they can get caught into this loop where they continually have to provide DPOC until they rectify that record that's in ADOT.

Q.   We will get to the monthly loop but let's start with that. So let's say someone is newly naturalized.  You may know there's naturalization ceremonies just outside this courtroom. And so someone walks out of the naturalization ceremony.  They are enthusiastic.  They register.  For some reason they don't give a copy of their -- they don't check a copy of the naturalization certificate at the time; right?  We'll come back to whether that's probable.  Let's just bracket that for a moment.

You're saying that under the new laws, this person will not get a letter asking them for their DPOC?

A.   So, first of all, in that scenario, I'm filling out the form.  There's a space for driver's license number.  I may fill that out.  So, you know, it's information that may be volunteered.

But that aside, the letter that is generated under the law is if ADOT record is looked up, then through the HAVA check, as will happen when you're doing the ingest procedures for the registration form, and that comes back as a negative for their citizenship, as it likely would be in is this scenario that you're describing, then the letter that's generated isn't asking for their DPOC.  It's saying that they

United States District Court

MICHAEL P. MCDONALD, PH.D.- Cross

are going to be canceled.

Q.   So your answer assumes a certain construction of the statute.   Let's say it's not interpreted that way because none of the parties are asking the Court to interpret it that way. So instead the person gets a letter saying we couldn't find it in the system.   Could you please provide us a copy of your original document showing citizenship?

In that case in that scenario, these database checks have not increased the burden on the voter.   They tried to spare the burden of tracking down a copy of their original documents.   It didn't work so now they just have to actually provide the documents.   Am I right?

A.   So you're representing a legal opinion to me that I'm not aware of.   I looked at the law and I've come to my interpretations.   In the scenario where you're saying that the County Recorders will disregard the law and in my view, in my interpretation of it.   So again I'm providing a legal opinion, which I apologize for, that would burden the voter.   But in your scenario, you're saying that there would be no additional burden on the voter in the scenario that you're describing where they would have had to provide DPOC except for the instance where they would have been registered as federal-only voters.

Q.   Okay.   So you also have said that if they provide their naturalization certificate and the SAVE doesn't update

United States District Court

MICHAEL P. MCDONALD, PH.D.- Cross

immediately, they won't be registered; right?

A.    Some County Recorders take precautions at that stage because they know that the SAVE system doesn't update immediately.

Q.    So what I want to show you here is page 19 of the EPM and I want you to --

MR. LANGHOFER:  Elaine, if I could have the podium laptop again, please.

BY MR. LANGHOFER:

Q.    I would like you to read to yourself this subsection D, Citizenship and Immigration Documents, please.  Let me know when you're done.

A.    Yes.

Q.    Okay.  So that in fact, as long as you have a copy of your naturalization certificate, SAVE doesn't matter; right?

A.    If you provided a copy of your naturalization certificate, then that would be the first case that's in this paragraph -- in these two paragraphs, yes.

Q.    And when the County Recorders do registration right outside of naturalization ceremonies, isn't it your understanding that they are aware that there is a naturalization ceremony and it may be a couple of days until SAVE is updated?

A.    Well, up to two weeks according to the Elections Procedures Manual but I don't think that -- I think that's just

1215

MICHAEL P. MCDONALD, PH.D.- Cross

a number that people have come to from their experience.

Q.   You keep saying a relatively large number but you did review the transcript with USCIS, didn't you?

A.   I did and other documents that were provided by them, yes.

Q.   And didn't USCIS say the customary time to process this is two days?

A.   I think there were some other documents that are reviewed that said it could be a longer period of time.  So you're talking about the average time versus what are the more extreme periods.

Q.   Let's take a look at the USCIS transcript, page 40.  Why don't you read that highlighted section and let me know when you're done?

A.   I'm done with that.  That's consistent with what I've been saying, that -- you were talking about typical and I'm talking about atypical cases.  And so there was other documents or deposition testimony that I reviewed, or maybe it was the -- whatever documents that I reviewed that suggested that it would be longer and that's confirmed within the Elections Procedures Manual.  It's confirmed with the County Recorders' deposition testimony that this could be longer than two days.

Q.   Okay.  So -- it can be but it's atypical.  We agree on that.

A.   According to that deposition testimony, they are saying typical so I'm going to use the reverse of typical and say

United States District Court

1216

MICHAEL P. MCDONALD, PH.D.- Cross

atypical.  I'm going to use this definition of typical that says that 50 percent or more is typical.

Q.    All right.  So let's try to get back to where we started on this.  Someone submits a voter registration form to the County Recorder.  They do not attach to it their original document proving citizenship or a copy of their original document.  They just give a number that hopefully matches the database.

If the database works, great.  They never have to attach the documents.  Do we agree on that?

A.    Never -- are they just never requested more documents?  Is that what you mean by "attach"?

Q.    Correct.  If all you submit is the form with your driver's license or naturalization number on it, they are able to match you in ADOT.  ADOT --

A.    Yes.  If you can confirm the citizenship status, then that ends the search and you will be registered as a full-ballot voter.

Q.    If the database matching does not work for some reason, even though are you a citizen, they can't prove it in the database, the consequence of that then is that you just have to provide the documents that they tried to spare you providing with the database check, but now they can't spare it to you so you have to provide them; right?

A.    Well, I will contest the issue that they just have to

United States District Court

MICHAEL P. MCDONALD, PH.D.- Cross

provide them, that they are burdened.  But there's this whole manual verification check that's also supposed to take place, so it may be that the reason why that you're not successfully being able look up that information is that the SAVE verification check failed and SAVE is requesting more information and it could be in the form of that document, that photocopy that's then transmitted to SAVE so they can do -- have a caseworker investigate why that information is not showing up in their database.

Q.   I'm not sure -- I am genuinely not sure I understand your point there.  Are you saying that one of the reasons it may fail is this failure to pass information back and forth between the counties and the USCIS?

A.   Yes.  I mean, this is like they have done data entry or maybe there was an illegible number on the form or the photocopy didn't come through for whatever reason, whatever that reason is, is that the automated SAVE check failed, then SAVE requires this manual verification check.  So I was just pointing out -- you were giving a scenario and you did not -- I was trying to explain all of the scenarios that are exceptions to the scenario that you were providing.

Q.   Okay.  I think we understand each other.  Let's not spend more time on this.  I want to talk about the monthly loop though.

As I understand your testimony, it's that once a

MICHAEL P. MCDONALD, PH.D.- Cross

month when they run the list maintenance, everyone who still has an F-type license but has proven their citizenship will get a letter saying we're no longer sure you're a citizen.  You have to reup your registration.

Is that a fair characterization of what you're saying?

A.   That is my understanding of the law and that is the interpretation of the HAVA check for the two counties that I mentioned in my direct testimony.

Q.   Whether that's what they were really saying is a disputed matter but I understand your characterization of it.  You reviewed the transcripts for the Secretary of State's deposition as well, didn't you?

A.   I did, yes.

Q.   And in the Secretary of State -- let me put it this way: Then isn't it your understanding that when the counties check HAVA and it says there's no evidence this person is a citizen, but the proposed registrant actually has provided the documents that in the voter registration system the County Recorders indicate that notwithstanding what ADOT says, they have confirmed this person is a citizen.  Isn't that the process?

A.   That's the current process as it's supposed to happen and I provided testimony with this as well about how the County Recorders need to be vigilant in this situation because that HAVA check can overwrite the citizenship status that's in the

MICHAEL P. MCDONALD, PH.D.- Cross

database.

Q.   And you've not seen any entries where that actually happened, have you?

A.   No.  It's just described in the deposition testimony.

Q.   And if they were to have a human error and overwrite the citizenship indication from their own review with ADOT data, then there is a history for that voter in the voter registration system indicating that they had previously provided DPOC, isn't there?

A.   I would hope that the system does have transactions that are recorded within it.  But with respect to the DPOC issue, the law as I understand it only requires the County Recorders to retain the DPOC for two years.  And so you could have a situation where the DPOC is no longer retained by the County Recorders and so they are going to be faced with a situation of trying to adjudicate.  They do not have the DPOC on hand.  They are getting the HAVA check that tells them that person is not a citizen and they are going to have to make some adjudication at that point as to what they are going to do.

Q.   My question is simpler.  There will be an indication -- even if they have a human error and they overwrite their own observation of DPOC with the ADOT data saying that person is not necessarily a citizen, there is history in the voter file showing that that person has previously provided DPOC, isn't there?

1220

MICHAEL P. MCDONALD, PH.D.- Cross

A.   I would hope.  I did not review any --

Q.   Would you like to see the transcript on this?  Would it help?

THE COURT:  You can find that and we'll take it up in 15 minutes.

Court is in recess.

COURTROOM DEPUTY:  All rise.

(Recess at 2:52; resumed at 3:07.)

(Court was called to order by the courtroom deputy.)

THE COURT:  Thank you.  Please sit down.

Mr. Langhofer, you may continue your cross-examination of Dr. McDonald.

MR. LANGHOFER:  Thank you, Your Honor.

BY MR. LANGHOFER:

Q.   Professor McDonald, when we left off we were about to look at a transcript from the Secretary of State's office about whether the voter registration system keeps histories of whether the voter has provided DPOC notwithstanding the absence of DPOC in the ADOT system.

Have you had a chance to review that transcript on the break?

A.   Yes, I did.  Thank you for providing it to me.

Q.   And isn't it your understanding that, in fact, the voter registration system does have that sort of history?

A.   It does and also described in that passage is, consistent

United States District Court

MICHAEL P. MCDONALD, PH.D.- Cross

with my earlier testimony, that County Recorders need to be -- need to pay attention if the record is overwritten by ADOT.

Q.   And if it is overwritten, they can look at the history?

A.   They have to be vigilant and have to identify that the record has been overwritten; but in that scenario, yes, it can go back and correct the record.

Q.   So this monthly DPOC loop assumes that County Recorders will not look at their own transaction histories and just send letters to the same people who have already proven DPOC?

A.   Again, I'm relying on this deposition testimony from two of the County Recorders that find that that DPOC from -- or the citizenship information from Arizona Department of Transportation is dispositive about the status -- the citizenship status of individuals.  So my interpretation is that at least those two will continue their procedures currently and cancel those voters or put them in a suspended status while they are issuing the letter.

What I also interpret from the law is the counties that currently are exercising the discretion of what you're talking about would be in violation of the law and so that they would have -- their discretion would no longer be available to them.

Q.   Okay.  We'll take up those objections and the illegal question with the judge later.

Let's shift gears somewhat and I want to talk to you

United States District Court

1222
MICHAEL P. MCDONALD, PH.D.- Cross

about the birth date problem.  You said you've published on this issue?

A.    Yes, I have.

Q.    Can you summarize the -- why is it called the birth date problem?

A.    So it might actually work in this room.  So surprisingly with a very small number of people, you can have two people who have the exact same birth day, not birth date, which is the year thing.  And so we have about 40 people I think in this room so the probability, surprisingly, isn't 40 divided by 365.  It's actually close to 90 percent and it has to do with some quirks in the way in which statistics work that you get this phenomenon.

What I did in that *Election Law Journal* article that was also cited by the National Academy of Sciences in a report about database matching is that the frequency, when you're talking about millions of records, to have two people with the same name and birth date actually become surprisingly more often than you would expect.  You would think that I'm an individual.  Someone shouldn't have my same name of birth date.  I've actually personally encountered this.  Really my wife did when we were getting a mortgage in Virginia.  She had the same name and birth date as a felon in prison.

So in order for us to get our mortgage, they had to get a document that said that she was not a felon even though

United States District Court

MICHAEL P. MCDONALD, PH.D.- Cross

that felon was in prison.

Q.   Your family has a lot of doppelgangers because it turns out there's another political science professor named Michael McDonald, isn't there?

A.   That's correct.  There's actually three or four of them. But there's one that really works in my field, yes.

Q.   So if that's correct, is it your view that it's important to -- well, strike that.

Let me come at this from a different way.

When looking for matches in a large data set like this, a voter file of driver's license databases, et cetera, is it more common for governments to use a hard match system or a soft match system to identify potential duplicates?

A.   To identify potential duplicates?

Q.   Correct.

A.   Well, I would have to refer back to that hard match document or technical document.  As I recall from it, there is hard match and it's trying to use unique identifier numbers like the driver's license number in addition to other pieces of information to really drill down and be certain that you're finding that record.  I don't know the frequency of those particular matches.  I didn't do that for my particular report.

I was more interested in the -- and, admittedly, I tried to frame it this way.  It's like unfortunate role of the lottery.  Some people are just randomly going to be subjected

United States District Court

MICHAEL P. MCDONALD, PH.D.- Cross

to this.  But it's not going to be with very high frequency that they are going to be subjected to this.  It's just that because randomness will happen with data entry or records being mismatched.  There are going to be some people likely that, you know, just a handful that are going to be citizens but yet they are going to have their record associated with a non-citizen and then they will be into the situation where they are potentially facing some criminal liabilities for doing something that is just purely a matter of data entry and database matching.

Q.   So the inverse is also true, though.  If you're a non-citizen, you can be matched to a citizen?

A.   That is correct, yes.

Q.   You had testified that -- we don't need to rehash it here -- there's about 12,000 individuals who would have soft matches using the criteria in Exhibit 935; right?

A.   Yeah.  I think 12,051 or something like that, something close to that number.

Q.   You've also offered an estimate of how many matches you would have if you were looking not just across the voter file but from the voter file to the ADOT database.  Do you remember this?

A.   The number of matches, soft matches?

Q.   Correct.

A.   Well, that analysis that was in that supplemental

United States District Court

MICHAEL P. MCDONALD, PH.D.- Cross

declaration that I did was trying to mimic what happens with -- what AVID does, AVID or AVID does when it's receiving the ADOT record.  So is that what you're discussing or is it what ADOT does internal with its database matching?

Q.   Here's I guess the question.  We'll jump right to the point.  Haven't you offered the opinion that if you were to apply the soft-matching criteria that the Arizona voter file uses when it queries ADOT, that you would have 30 to 40,000 names matching under the soft-match criteria?

A.   I don't know the exact number but based on what I -- the properties of this birthday problem, going from four to seven million, you wouldn't -- you might think, well, roughly I could double the number.  But because of the properties of -- the statistical properties of this problem, it's going to be more than that and that's the same reason why out of this room, probably there's a good chance that two people share the same birthday.

Q.   On the 6,084 voters who ADOT says have not established citizenship but are, nevertheless, active voters, your --

A.   Full-ballot voters.

Q.   Yes, thank you.  Active full-ballot voter, not federal-only voters; right?

A.   That's correct, yes.

Q.   Your interpretation of that is that there is likely an error in the ADOT system; right?

United States District Court

MICHAEL P. MCDONALD, PH.D.- Cross

A.   There's an error in the ADOT system.  I mean there can be errors anywhere.  There could be data entry errors on a driver's license number.  I don't think that would exist within the ADOT system because I think that there's testimony that says that that is a unique identifier.  So if there was the error with respect to that 6,084, it would really come on the side of the County Recorders misentering a driver's license number to get that match on the driver's license number.

Q.   Okay.  But what I'm trying to tease out is, there's another explanation which is that they were incorrectly registered notwithstanding the absence of DPOC.  That would also explain the data that you've been presented, wouldn't it?

A.   Well, my assumption was that they had followed the procedures and the law in Arizona and had provided DPOC to the County Recorders and that there was information that was different in the ADOT database regarding their citizenship status. so my position that these individuals were registered correctly because they provided DPOC.

Q.   Although you've not seen any database notation indicating that they provided DPOC?

A.   No, I don't believe, if I think through the data that was provided to us, it was something I could look at.  Sorry.

Q.   I was trying to cut you off.  Sorry for that.

If we could look now back to your demonstrative, slide 23.  I may be missing something here but just on its

United States District Court

MICHAEL P. MCDONALD, PH.D.- Cross

face, it seems to me like these numbers are wrong because the blue numbers in the first two sets, non-Hispanic White and Hispanic sum up to 100 percent?

A.   Yes.

Q.   So these all exceed 100 percent and am I missing something?

A.   Yeah.  We had this discussion in deposition and it's in my report.

So what I'm using here is the OMB recommendation for how you define race for voting rights issues.  So back in 2000, the Census Bureau allowed individuals to record their race to being one race or more races.  And so the question that was posed to OMB from the Department of Justice was that what to do with these people who are in multiple categories.  And so I decided to follow that OMB recommendation here.  And so if someone is indeed like a Black and Hispanic like a Dominican, they would appear both -- in both of the numbers here consistent with the OMB recommendation.

Q.   But if someone were Black and non-Hispanic White, you put them only in the Black column here, didn't you?

A.   Correct, that's the OMB recommendation.  If they are White and another race, you would put them into that race category and not put them in the White category.

Q.   And that method overstates the numbers for everyone except non-Hispanic Whites?

United States District Court

1228

MICHAEL P. MCDONALD, PH.D.- Cross

A.    Yeah.  It's about like maybe two to three percent.  It really depends on the particular category.  Some of these with African-American Native American there's not going to be as much overlap on this.  So, yes, these numbers are slightly overstated.  I tried to be transparent about that in my report and I tried to describe it correctly to you during deposition.

THE COURT:  So that's why it adds up to more than 100 percent, because some people of voting age population are counted twice because they put down two races?

THE WITNESS:  Two, three, four, five, yeah.

BY MR. LANGHOFER:

Q.    We're going to pivot and talk about County Recorder discretion and what you believe are the variations between the different counties.  So for Exhibits 334 and 335, I've pulled up on the screen 335, at least -- this is after pulling out the commentary parts.

What you're looking at here are voters who are in suspended status and then of those, only the subtype that has this code invalid citizenship proof; right?

A.    That's correct, yes.

Q.    This is not all suspended voters; just the ones with the subtype.  Do you know that each of the counties uses those same coding standard when entering their data?

A.    I would not know if they are using disparate standards.  I would assume and hope that they have a consistent coding

United States District Court

MICHAEL P. MCDONALD, PH.D.- Cross

standard.  And what I don't know and how the AVID system works. I do know in other states when you would enter something like an invalid citizenship proof, then that would flag the generation for a DPOC letter and so it may be required that you enter that information so that County Recorders will issue the letter to the voter.

Q.   But these variations that you've identified between the counties' numbers with this particular code does not necessarily trace back to how they are processing applications but could be just how they are coding after following the same procedure in each county?

A.   So, Your Honor, you had earlier, as I was sitting out in the audience at the very beginning, you had said it was sufficient to just show a single situation where one county would be disparate from the other counties to show that there's disparate application of policies and procedures.  So that's why I primarily focused on Pima.  And Pima is -- I know something more about Pima because in this case we're looking at the suspended voters and I did look at the suspended voter codes that are for Pima.  And as I testified earlier, as I recall correctly, there were 114 suspended voters in Pima and all but one of them was for age.  And so there was one record that had a missing no information entered.

So we have that and we have the deposition testimony from Pima that suggests and has been stated that they would

1230

MICHAEL P. MCDONALD, PH.D.- Cross

register these people as federal-only voters.  So we know that Pima is doing something different from the other counties.

Q.   So you're a step ahead of me.  I think Pima is a good exception to talk through.  Let's finish the thought then.  I'm going to come back to the question before.  What Pima is doing departs from the EPM in a way that registers people, doesn't deny them registration; right?

A.   No.  They would be registered as federal-only voters rather than having a chance to provide DPOC and be full-ballot voter, yes.

Q.   And what the EPM tells them they are supposed to do is if the only indication of citizenship is your signature on a voter registration form and the F-type license, what they are supposed to do is not register them at all until they get DPOC; right?

A.   Sorry.  I did not follow that all the way.  I really apologize for that.

Q.   It has been a long day for you.  I just got up and you have been there for a while.  So I'll say that again.

What the EPM says is that if someone submits a form. You run the HAVA check, you run the SAVE check, and the only indication of citizenship that you find is that they have an F-type license.  Nothing else.

A.   Okay.

Q.   In that case, the EPM says don't register them.  Ask them

United States District Court

MICHAEL P. MCDONALD, PH.D.- Cross

for DPOC; right?

A.    That is my understanding of what the EPM requires, yes.

Q.    But what they do in Pima is they register them as federal-only voters?

A.    That is my understanding of the deposition testimony.

Q.    So Pima registers them.  They are not burdening the voter. They are giving them something more than the EPM would entitle them to; right?

A.    Well, again the request for DPOC is to give them full-ballot status besides just registering to vote so it's not quite as you're describing it because there is a benefit that is being withheld from them potentially.

        THE COURT:  So is it your understanding from what you've reviewed in Pima that they register them as federal-only and that is the end?  They don't send them a letter and say I know you submitted for full ballot but we registered you for federal.  Please provide DPOC and we'll give you what you originally asked for?

        THE WITNESS:  Well, hopefully you can get the County Recorder on the stand and ask that question.  But that was my interpretation, was that they don't send out the letter at this point.  They just register them as federal-only voters.

        THE COURT:  So that person might go to the polls and get a really short ballot instead of --

        THE WITNESS:  Yeah.  And the real purpose here wasn't

United States District Court

MICHAEL P. MCDONALD, PH.D.- Cross

to say like -- what the procedure Pima is doing and what benefits are being given; it's just to establish that there's discretion currently within the system.  And so we can see that Pima is doing something different than the other counties and that is showing up in other facets of deposition testimony, for example, that I reviewed for the case.

MR. LANGHOFER:  Your Honor, if I could have just one moment while I track down, I think we can get on the same page here.  I think my co-counsel is tracking that down.

Q.   Let's move on.  I want to go back then.  So we were talking earlier about whether the discrepancy you are pointing to to say there's disparate treatment in the counties could be attributable to coding errors and you point out that Pima has a different process.  We'll get back to that.  Do you know of any other county that the discrepancies in the data arise from the way they are processing the applications as opposed to disparate coding practices?

A.   Yeah, I think so.  So if you can put that table back up. I did not testify to this because I thought it was one would be enough.

So, for example, some of these counties that have large numbers here, when I looked at the dates on when they were put into suspend status, this is the moment where there's been a HAVA check and the individual, it's either for their original registration or there's been a HAVA check because of

United States District Court

MICHAEL P. MCDONALD, PH.D.- Cross

an address change, they have been moved into suspended data so it's in the database.

At that point in time, Arizona law says that that suspended status should only exist through the next general -- next regular general election I think is the language that's in the statute.  And so I could see here the effective date of change on some of these counties with the particularly large numbers, there are suspended voters there who persist beyond the prior effective date of change.

THE COURT:  So the number's big because they didn't cancel them; they just left them suspended.

THE WITNESS:  They just left them suspended, that's correct.  So that's another example of how some of these counties are not following the procedures.

THE COURT:  Did you look into Maricopa because their zero stands out as being wrong?

THE WITNESS:  Yeah.  And I provided the deposition testimony -- excuse me, my direct testimony on this in response to the opposing experts.  They were pointing out that that looks odd.  And Mr. Richman, Dr. Richman in particular said, well, they have a different database system.  So that sparked me to look into the discovery that had been provided in the lawsuit and I did find a file that was for Maricopa and it was actually 15 there instead of zero that had some sort of citizenship issue code.  It wasn't exactly the same code and I

United States District Court

1234

MICHAEL P. MCDONALD, PH.D.- Cross

can't remember exactly what that code was.  But there were 15 records that had it.

THE COURT:  That doesn't seem like very many either for 2.3 million.

THE WITNESS:  I agree.  It seems like there's something going on in Maricopa that might be different from the other counties as well.  But at least one explanation could be when you look at those big numbers in some of those counties, just they are simply not following the procedures to move them off of suspended status and cancel them or whatever they are going to do with the final disposition of those records.  They might actually be federal-only.  I don't know what would be the proper disposition of those particular records.

BY MR. LANGHOFER:

Q.   I'm showing you here the transcript from Pima County at page 192.  Why don't you read that paragraph to yourself, please.

A.   Yes, I've read it.

Q.   Okay.  And does this help you remember whether -- when Pima County registers one of these F-type license applicants as a federal-only voter whether they also ask that voter for DPOC so they can upgrade them to full ballot status?

A.   It doesn't say anything to that effect.  It says that they register them as federal-only voters so that's where I was --

THE COURT:  Then we let them know they need to

United States District Court

MICHAEL P. MCDONALD, PH.D.- Cross

provide us with proof of citizenship and when we have that, we move their status to a full-ballot voter.

THE WITNESS:  Thank you.

BY MR. LANGHOFER:

Q.    So then these other counties that leave someone in suspense status beyond the next general election, is the voter prejudiced by being downgraded from suspended to canceled?

A.    No, but what I was saying earlier just a couple minutes ago, I don't know if any of these individuals when they are requesting DPOC whether or not they should be registered as federal-only voters in the scenario we were just looking at, Pima.  And, again, I don't know what the disposition of those records should be.  So maybe they have not provided any DPOC whatsoever.  The County Recorder is reaching out to them and put them in a suspended status to obtain it.  They should have been registered as federal-only but instead they have put them into a suspended status.  That's a possible outcome here.

Q.    If I understand what you're saying correctly, it's that you're not sure they shouldn't have gone to federal-only instead of suspense?

A.    One reasonable interpretation is that they could be moved to canceled status.  That's where they should go generally. But there could be situations where those individuals have not provided any DPOC and they should be registered as federal-only voters.  I only know that they are in this status for

United States District Court

MICHAEL P. MCDONALD, PH.D.- Cross

insufficient citizenship proof.  So I don't know what the scenarios are for the County Recorders as to what the proper disposition of the -- of that particular registrant should be.

Q.   So you're not offering the opinion that they are denying federal-only status to someone who -- for whom there is --

A.   Yeah.  I don't know.  I'm just providing some scenarios which could reasonably be true.

Q.   Okay.  Let's talk about the Postal Service.  You agree that the Postal Service is generally reliable, do you not?

A.   Well, generally, typically, yes, it's reliable using the sort of definitions that we've used before.

Q.   It's one of the reasons why in Kentucky you said it was vote suppression when they failed to further expand mail-in voting?

A.   I said that.  Again, we would have to rehash that whole scenario there about what was actually going on within Kentucky.  But, yes, I said that.

Q.   You're an enthusiastic supporter of mail-in voting.

A.   There are some things that you can do with mail ballots which I think are best practices absolutely.  I think when you are using best practices, it can assist voters but it's still not going to work in all cases.

You know, I've noted this in my own writings how mail will not be delivered on time in such a way that the voter will be able to return that ballot in a sufficient time for election

United States District Court

MICHAEL P. MCDONALD, PH.D.- Cross

officials to properly accept that ballot within deadlines that are -- that specify within state law and there are tens of thousands of ballots that are rejected every election cycle because voters return them too late.  So there's timing issues with the mail.

And as I said earlier -- I mean I have direct experience with this during the pandemic.  My parents came to live with us and they did a household -- filed household change of address to our home and then when they moved back, when they felt safe to move back, they filed another household change of address.  And when they did that, it took all of our mail and our mail -- we live in Florida, all of our mail because my parents, McDonald, all of our mail went to Colorado for the period of about a month and a half until we could get the situation rectified.

So it's things like that can happen with mail.  So it generally works.  But it's going to fail in some circumstances and I would caution about criminal liabilities for mail that isn't delivered to an individual.

Q.    Okay.  I want to talk about Exhibit 337.  This is Table 4 from your report.

And what you're showing here is a comparison of ethnicity by voter type relative to 2020 census; right?

A.    Correct.  This is what we pulled out for the slide deck that I presented earlier, yes.

United States District Court

1238

MICHAEL P. MCDONALD, PH.D.- Cross

Q.   But the census numbers that you have on the top line here are not limited to citizens, are they?

A.   No.   This is the voting age population of the State of Arizona as that top row.

Q.   Okay.

A.   Which I did not testify about.

Q.   So it includes non-citizens?

A.   It would include non-citizens, yes.

Q.   And if you were comparing this to just the ethnic makeup of citizens in each of these categories, the numbers would be different?

A.   Yes, they would be, yes.

Q.   Okay.   And in fact, you've testified some today but much more in your deposition about all of the accumulated error that is ultimately baked into a calculation like you see in this table; right?

A.   Yes.   There are many sources of error here.

Q.   And those errors actually prevent you from giving margin of error or sort of confidence interval for any of the numbers in this table, don't they?

A.   Yes.   And this particular error is the geocoding error so sometimes when you identify a point as an address, the geocoding algorithm actually doesn't know where that point is and so it could place that individual at another point that is outside of the census block that they actually reside in.   And

United States District Court

1239

MICHAEL P. MCDONALD, PH.D.- Cross

there's really no way to come up with margins of errors on that sort of error, because it's not really statistical in nature. You would have to know something about frequency of the error in the geocoding guys in order to calculate as sort of margin of error for that.

Q. Relative to the adult population of Arizona, the citizen adult population of Arizona is more non-Hispanic White, isn't it?

A. Well, just to understand why I use this particular --

Q. That's a different question.

THE COURT: Before we find out why you used this, could you answer Mr. Langhofer's question?

THE WITNESS: Sure. I can do that.

So please go ahead and again.

BY MR. LANGHOFER:

Q. Citizen voting age population in Arizona is more non-Hispanic White than just the voting age population of Arizona, isn't it?

A. I would generally think that's true. I've not reviewed those statistics but I've reviewed similar statistics across the country. So, yes, I think I would agree with that statement without looking at the statistics themselves.

Q. It's also older than the vote being age population, isn't it?

A. Yes, that would be true as well I believe.

United States District Court

1240
MICHAEL P. MCDONALD, PH.D.- Cross

Q.    And the people -- the non-citizens who express a -- let me think about how to say this.  The self-identified party affiliation is less democratic for citizen voting age population than for just voting age population, isn't it?

A.    Well, that I think is deeply contested within political science.  I know your expert has produced a published piece on this which was widely criticized from survey data and he provides some of those numbers in his report.  But he's using extremely small numbers and there are other data errors in that survey data for matching and other sources, how people even respond to surveys, so that's what he's been widely criticized for.

Q.    We'll get to that.

A.    Just a second.  So I would say in answer to your question, I don't know the answer to what your question is.

Q.    So you've produced a series of tables, Exhibit 337 through I want to say 340, attempting to show that the people you believe will be affected by these laws are older, more Hispanic, and more democratic than an average, but the average you're using is voting age population instead of citizen voting age population?

A.    No.  In the report that I use here, and the purpose for this is that we're geocoding the 2020 census which the finest granular level of data is at the census block level.  For the estimates and statistics you're talking about, those come from

United States District Court

the American Community Survey.  And so the American Community Survey has a much larger geography that you would be able to use than what I'm using here for this purpose.  And there's other inaccuracies for that as well.  Some of it is because this is -- it's a very large survey.

The Census Bureau typically has a million respondents every year to the American Community Survey but that's across the entire country.  And so when you start getting into small populations, the margin of error gets rather high on some of those American Community Survey numbers.

So you can look at this statewide.  But the purposes I was putting this to was to geocode to census blocks and the available data there is the 2020 decennial census.

Q.   You had available to you the citizen voting age population demographics, did you not?

A.   Yes, it's available through American Community Survey again but not for the purposes of producing this table because I'm geocoding down in the census block.  That doesn't exist at the census block.  The census doesn't provide that information.

Q.   Let me make sure I got that.  So you're saying if you want to use census block level data, you can't use ACS?

A.   That's correct.  You can't.

Q.   But you could have effectively used this not using census block and use as your benchmark citizen violating age population instead of just voting age population?

United States District Court

MICHAEL P. MCDONALD, PH.D.- Cross

A.    I mean, I could.  The purpose of this exercise was really a validity check.  I wasn't trying any inferences about citizen or voting age population.  It's just that we know that people who register to vote tend to be people who are engaged in elections as I discussed earlier.  And so they tend to be older.  They tend to be more often non-Hispanic White.  They tend to be more frequently registering with a political party.

And so the purpose of having that number in that particular table was just I had a benchmark to verify that the geocoding had worked properly.

Q.    Let's talk about Exhibit 338.  This is Table 5 in your report.

And you would agree for this table as well, can you not calculate the accumulated error or confidence intervals for these numbers; correct?

A.    Yes.

Q.    For the federal-only voters who are identified in this table.  One thing we have been talking about, not just today but throughout the trial, is problems that may -- trouble that maintenance might cause someone who is currently registered.  Isn't it also possible, though, that if you're doing monthly list maintenance -- actually, let me give you a timeline.

Let's say someone with a green card goes and gets a driver's license and they get an F-type license because they only have a green card.  They then naturalize and they register

United States District Court

MICHAEL P. MCDONALD, PH.D.- Cross

to vote.  But they don't provide DPOC for whatever reason so they only are registered as a federal-only voter.  Tracking me so far?

A.    I think so.

Q.    Okay.

A.    Please continue.

Q.    Yes.  So here it is.  So then the laws are implemented. There's a monthly list maintenance, they check this person's registration against ADOT.  And by this time the person has gone back to ADOT and got a citizen license, not an F-type license.

In this scenario, wouldn't that have the effect -- wouldn't it very likely have the effect of causing them to upgrade their status from federal-only to full ballot?

A.    I don't think that's contemplated in the law as far as I could read it.  I mean, there's -- this monthly check is supposed to be done by the Secretary of State's office and then the non-citizens are supposed to be transmitted back to the County Recorders.

Q.    Can you point to anything in the law that says that's not allowed once they actually acquire through ADOT proof that this person is, in fact, a citizen?

A.    So I suppose at a later point in time they could update their address and then that would initiate a HAVA check and if their citizenship status -- they are federal-only voter and

United States District Court

1244

MICHAEL P. MCDONALD, PH.D.- Cross

their citizenship status changes in ADOT, then the County Recorder, if they are noting that that has happened, could upgrade them to full-ballot voter.

Q.   All right.  Let's talk about causation.  Is it your position that if enough people conclude that there's correlation, that that is causation?

A.   Generally, that's what we do in the social sciences is that we don't have the luxury of doing randomized controlled experiments and most of what we do.  It's only in a very limited number of cases with, say, surveys, there's some randomized experiments where people put out a message about voting and see whether or not that message has an effect on people's participation.

So there are some purposes that you can manipulate survey wording or you can do these other voter mobilization studies where we do randomize controlled experiments.  But that's about it.  I mean, I may be missing some other situations in the social sciences but at least within political science, that all of our other studies are basically observational data and that's something that we all struggle with to try to come to a consensus when we're doing our studies of observational data.

Q.   Haven't you previously testified under oath in this case that any study without randomized treatment group is going to be suspect to causation arguments?

United States District Court

1245

MICHAEL P. MCDONALD, PH.D.- Cross

A.    Yes.   That's why I said this was putting the entire social sciences on trial for causation.   There's always going to be a degree of some suspicion about it and we're going to continue to investigate and try to confirm the patterns that we do see in various contexts.

Q.    Let's talk about turnout.   You have compiled a very large data set on turnout nationally haven't you?

A.    Yes, I have.

Q.    And I think you described it as what many consider to be the most reliable turnout rates that you can calculate; is that right?

A.    That's correct, yes.

Q.    And you have turnout data in Arizona going all the way back to 1980?

A.    Yes.   That would be correct, yes.

Q.    So you could test, from the data that you have in your possession, whether the first DPOC requirement implemented around 2005 reduced turnout in Arizona, couldn't you have?

A.    Again, that wasn't what I did in my report.   So you're asking me to do an analysis that is outside my report.   I was looking at the effects of these laws and the burdens that they would impose on voters in Arizona, not about overall turnout rates.   I think I testified earlier with this respect what I would expect to find because I've seen a number of these sorts of studies that have been done in other contexts, is that you

United States District Court

1246

MICHAEL P. MCDONALD, PH.D.- Cross

would find no effect on turnout.  And the reason for that is we've only got a limited number of people who are affected by these.  They are particular class of individuals who are naturalized citizens.  Again, there's going to be randomness for some number but it's a relatively -- especially relative to the naturalized citizens.

And since we're talking about a very small number, there are so many other variable things that happen in elections with candidates and other contexts of what's happening that, basically, the noise in the elections outweighs the effect that we might be able to estimate from the effect of a particular law that is affecting a fairly narrow set of people.

Q.   But you can test across election cycles for changes on turnout using a differences-in-differences method, can't you?

A.   Yes.  Some people do that.  And, again, my expectation is if I were to do the analysis that you were suggesting is that I would find it had no effect.

Q.   All right.  Since you read Professor Richman's rebuttal report, you have acknowledged some of the calculation corrections that he suggests as valid; right?

A.   Yes, I have in my deposition.

Q.   For example, you had initially said that there were 79 people who had proven to ADOT their citizenship as of the date of their cancelation and you've acknowledged it's actually

United States District Court

1247

MICHAEL P. MCDONALD, PH.D.- Cross

closer to 39, about half of that?

A.    Just to be clear, I did not provide that in testimony earlier.  So now you're asking me to put into evidence some of the -- this other analysis.  So if you want me to explain it, I'm happy to do that at this stage.

Q.    The question was, you acknowledge that your calculation was about twice as high as it should be?

A.    I acknowledge in deposition that my calculation was incorrect but it didn't change my opinion that I derived from the calculation because my opinion was carefully worded to offer the possibility that the calculation maybe in error so I don't actually reference the number in my opinion which I did not provide earlier in my testimony.

Q.    With that correction, that's about one in 125,000 voters in the state; right?

A.    Yeah.  The purpose of this was just to point out that there are these anomalies in the databases and that there's just going to be a random roll of the dice for some people, that they are going to be required to provide DPOC when they may not otherwise be required to.

Q.    Even this error doesn't show that there was a flaw in the process, does it -- excuse me, even this number, 39, does not show there was a flaw in the County Recorder's processing, does it?

A.    I say again in my report I'm pretty clear about this.  I

United States District Court

MICHAEL P. MCDONALD, PH.D.- Cross

don't know what the source of the error is.  It could be data entry error.  It could be that in this case we're talking about here is that, if I recall correctly, that there are individuals who are either suspended, canceled or federal-only status who, when you do this match with the driver's license number, you see that they have a record of being a citizen in the get database and you can look at the timing of when some of these actions occurred within -- when licenses were issued and when the registration occurred or when people were moved into a suspended or canceled status.  And that information should have been available at the time that they were a citizen at the time they were put into one of these categories but they weren't given the full-ballot status.

And, again, it's a very small number.  And the point of it was just to say I don't know why that happened.  The individual -- the County Recorder could have decided that that individual didn't actually provide DPOC.  And as I mentioned earlier, only after I wrote the report and later when the Secretary of State's office provided a technical document after their deposition did I realize that this driver's license number was actually a soft match.  And so there's some possibility then that what we're really looking at here is data entry error on a driver's license, as an example, as sort of the thing that could be happening here.

So it was just really to establish that there's some

issues with the data.  It wasn't -- and that's really the opinion that I draw from in the report which I didn't testify to earlier.

Q.    Even that, though, wouldn't have to be an error by -- you said data entry error.  It wouldn't have to be an error with the County Recorders, would it?

A.    Again, as I said, it could be that the County Recorder had other evidence, that they didn't have DPOC; and so in that situation, I think that's the scenario that you're suggesting, is that the record came back as matched.  They were citizenship.  And for whatever reason, the County Recorder determined that that must be an error and so they rejected or took some action other than providing them full-ballot status.

Q.    Let me give you another example and see if this would explain the data.  Someone registers to vote.  They are new to the state.  They have no DPOC in the data sets.  So they are put in suspense status, sent a letter and said, "Please send us your DPOC."

They then go to MVD and get a driver's license.  They provide DPOC and so now the ADOT data says that they are a citizen.  Then they decide they don't like their new job or they miss their girlfriend or whatever it is.  They move away and they never respond to the County Recorder's request for DPOC.

When the response time expires, they move away, the

United States District Court

1250

MICHAEL P. MCDONALD, PH.D.- Cross

County Recorder will then move them to canceled status and the date of the cancelation, because it's after the date of the ADOT interaction, post-dates the date that they provided DPOC. That scenario would also explain this 1 in 125,000 instances, wouldn't it?

A.    I don't think the number is that large but, yeah, I think that's a possibility that the canceled status could be the moment that the individual moved into a canceled status where their effective date of change had updated from suspended status to canceled status.  That's where they are getting moved into that status.  There are far more people in suspended status than canceled status so it's a possibility, yes.

Q.    Okay.  I don't want to belabor this but let's give it a shot on the math.  If there's 39 people to whom this happened in Arizona and there's 4.7 million active and inactive voters, 39 divided by 4.7 is about 125,000, isn't it?

It's unfair to ask you to do the math.

A.    I don't know where that last number really came from but I think this is making the point I said earlier, like 39 people is not going to change the overall turnout rate in the State of Arizona.  So whatever is happening here, if it is an error somehow, it's not going to affect the overall turnout rate.  I think the number that you are providing is a very large number. That's why I'm, like, sort of -- I don't know how you made this leap to this much larger number.

United States District Court

1251

MICHAEL P. MCDONALD, PH.D.- Cross

Q.   Let's not take the Court's time with this.  I think we've said what we need to on that.

You said that there were 108 federal-only voters who provided DPOC to ADOT as of their date of registration and you subsequently agreed the number is closer to 36; right?

A.   Yeah.  I tried to replicate Richman's analysis and I followed his code to do this but I couldn't get to it.  I tried to do it externally in my own software and data, couldn't get to it.  So I get a slightly higher number.  The main issue here is that I did not take into account drivers' licenses that were issued before 1996.  So in the original report I didn't do that.

But, again, it doesn't change my opinion as expressed in the report.  I could accept Dr. Richman's number and it doesn't change the opinions that I'm expressing in my report which I did not provide in direct testimony.

Q.   And that number, though, again, we can do hypotheticals if you want, but can we just agree that there are explanations for how that could happen 36 times more or less that do not involve some error on part of the County Recorders?

A.   Yes.  Again, I say that in the report itself so you're just -- I mean, we could quote the sentence outside of my report that says I don't know why these errors are occurring and it could be data entry; it could be that County Recorder had some other information that the individual did not have

United States District Court

MICHAEL P. MCDONALD, PH.D.- Cross

DPOC.

Q.   All right.  I think two more questions here.  First is the Court has not yet heard -- but we'll tie this up later Your Honor -- testimony that there are 1,779 voters who are registered to vote as full-ballot voters and then subsequently provided to ADOT proof of lawful presence but as a non-citizen.  You're familiar with calculation?

A.   Yes.  This is this Table 2 and Table 12 in Dr. Richman's report.

THE COURT:  No question yet except are you familiar with that data?

THE WITNESS:  That's correct.

THE COURT:  Yes?

THE WITNESS:  Yes.

BY MR. LANGHOFER:

Q.   Do you agree that the calculations from those data sets are correct?

A.   I agree that he changed his methodology from the one report to the other.  I was able to verify independently that the numbers that he provided using his changing definition is -- I was able to identify those numbers, yes.

Q.   Okay.  Let's be precise about what the change in methodology is.  Initially, Professor Richman was looking at people who said to ADOT they were non-citizen but lawfully present after they had registered to vote.  His methodology in

MICHAEL P. MCDONALD, PH.D.- Cross

the second report, the first supplement, was on or after the day that they registered to vote; right?

A.    That's correct.

Q.    Okay.  And you agree that with that process, his calculations are accurate?

A.    With his definitions as they have changed, yes, they are accurate.

Q.    Okay.  Well, the change only affected, what, I want to say it was 400 people; is that right?

A.    I think it was about 450 as I recall.  Unfortunately, I prepared for both the second supplemental and the first supplemental.  So I can't recall with certainty what that number was.

Q.    All right.  Last one and then I'll sit down.  Let's assume that Arizona has made a policy decision to restrict the disenfranchised citizens only and that it wants to enforce that policy somehow.  Do you know of a better way of confirming citizenship than using these databases as they currently are?

A.    Do I know a better way of confirming citizenship?

Q.    Correct.

A.    So on the narrow question about confirming citizenship, there are certain issues with the system that is going to cause some real headaches for some individuals.  So I think the system could at least be perfect to some greater degree than what it is now.  So when you are saying effective, I would

United States District Court

1254

MICHAEL P. MCDONALD, PH.D - Redirect

question that because there are going to be people who are these naturalized citizens and because the SAVE database isn't updated or ADOT isn't updated, they are going to be having their registrations canceled and then referred for criminal investigation.

The system where -- for comparison purposes, where a letter is issued for DPOC and those sorts of penalties would not be imposed would be a better system than the system that is contemplated under these laws.

Q.    Is there any database of all of the United States citizens that you know of?

A.    No.

MR. LANGHOFER:  No more questions, Your Honor.  Thank you.

THE COURT:  Thank you.

Any other cross-examination?

MS. PORTER:  No, Your Honor.

THE COURT:  Mr. Karpatkin, redirect?

MR. KARPATKIN:  Thank you, Your Honor.

**REDIRECT EXAMINATION**

BY MR. KARPATKIN:

Q.    Dr. McDonald, just a few questions.  I want to come back to the questions Mr. Langhofer was asking you about Mr. Richman's number of 1779 voters.  Do you recall that conversation?

United States District Court

1255

MICHAEL P. MCDONALD, PH.D - Redirect

A.   Yes, I do.

Q.   I wanted to ask you if you have any -- I believe you just said in response to Mr. Langhofer's question that you believe that Dr. Richman's calculation of that number within the definitions he used was an accurate calculation; is that correct?

A.   That's correct.

Q.   I wanted to ask you if you had any other observations about what that number reflects?

A.   Yes.  So this is one of the criticisms I had about that supplemental report compared to his original report and as Mr. Langhofer and I were just discussing.  There are roughly -- I think the 450.  Maybe it's 400.  But it's -- they are the -- it's the number -- the number of people who registered to vote and on the same day, they were either issued -- they were issued a driver's license so there was a change on the issue date of the driver's license.

So in original report he did not include any of those.  From the original report to the supplemental, when he was applying additional criteria, the number reduced on the number that he had identified that are these individuals who registered and provided ADOT record after the -- after they registered to vote that indicates that they are not a citizen.

And so it went down a considerable amount and then on behalf of the defendant, the number back up.  Apparently he

United States District Court

MICHAEL P. MCDONALD, PH.D - Redirect

changed his methodology so that the number wouldn't go down as much as it did, as it would have otherwise if he had used consistent methodology between his original report and his supplemental report.

I looked further at this because we know that SAVE doesn't update immediately. We know that at least from the County Recorders and from the Secretary of State's office that there may not be manual verification. There's really no testimony that I could identify -- I could be wrong on this -- as to what ADOT does with manual verification requests from SAVE.

So I did look at the two-week that number that is in the Elections Procedures Manual and there are hundreds more that are occurring within the two weeks that are in the Elections Procedures Manual. So I've used that as a very conservative number because I think it may be more under certain circumstances. But let's just use that one.

We're adding hundreds more back to the -- they are included in the numbers that Richman is providing. So I think that number is inflated. He clearly inflated it from his original report to a supplemental by way of changing his methodology. And, again, if we're talking about small numbers, there could be other reasonable explanations that Richman doesn't consider as to what the source of that discrepancy is. It could be data entry errors or other things.

United States District Court

1257

MICHAEL P. MCDONALD, PH.D - Redirect

And we also have to remember we're assuming that that driver's license number is a good match and so we know it doesn't match all the time.  It's probably not very many but there could be some of those in there as well, mismatches.

Q.   Dr. McDonald, I want to turn to another issue that I believe you discussed with Mr. Langhofer.  This also relates to the DPOC loop.  And I wanted to make sure your testimony was clear about one of the issues involved in the DPOC loop.  Could the DPOC loop start with an inaccurate citizenship record with ADOT?

A.   Yes, it could.  I mean, that's -- my assumption is that these 6,084 individuals who are full-ballot voters have provided DPOC to County Recorders, although Richman doesn't believe that that is the case for his small number with respect to timing issues, but that's I believe -- I believe that's what's going on here.

Q.   So if the Arizona Department of Transportation database has an inaccurate record of citizenship, under the monthly citizenship comparison, would that generate a record to the County Recorder?

A.   Yes, it would.

Q.   And can the County Recorder do anything to modify the incorrect information in the MVD database?

A.   Again, you're asking me a legal opinion but my reading of the law is that they can not.

United States District Court

MICHAEL P. MCDONALD, PH.D - Redirect

Q.    So does that mean that at the next monthly check, the same cycle would take place again?

A.    Well, I thought you were just talking about the transfer of information to the County Recorders and what actions are going to take next.  So in this scenario we're talking about a letter will be issued to the voter and if they provide the DPOC, then they can be reinstated as full-ballot voter at that point.

It's the next iteration and the next month where if they have -- if that voter has not gone to the Motor Vehicles Department, then they are going to find themselves in the same situation again.  That's why I describe it as a loop.

THE COURT:  But how do we know the County Recorder isn't going to say, well, we got this one month.  The voter provided us with DPOC.  Obviously it's this problem of you don't have to notify ADOT so next month when it happens, we're not going to -- we're going to disregard ADOT's record because we've already verified that it's not updated.

THE WITNESS:  I think it would be wonderful if there's clarification about that, yes.

THE COURT:  But isn't that something that the Secretary of State could provide to the County Recorders and say if you do it once, you know there's this problem because ADOT doesn't -- nobody has the obligation to tell ADOT about citizenship.  And so if you verify it once, that's it.  You

United States District Court

1259
MICHAEL P. MCDONALD, PH.D - Redirect

don't have to do it again.

THE WITNESS:  Again, the strict reading of the law -- again, I'm drawing a legal conclusion, you're going to be ultimate leader opinion of course; but the strict reading of the law, as I see it, is that this loop will occur until the registrant goes to the DMV and fixes.

THE COURT:  Well, the loop will keep occurring because there's a monthly requirement to do the database check. But that doesn't mean the letter goes out and the person has to respond in 35 days.

THE WITNESS:  The law is very specific that this happens on a monthly basis.  The information is transmitted from ADOT to the Secretary of State's office and it gets transmitted to the County Recorders.  So if they are strictly following the law, yeah, this is going to happen.

Again, I would hope that we can get some clarification to say that really should not be happening.

BY MR. KARPATKIN:

Q.   Dr. McDonald, I wanted to turn to a different issue now. Have you represented Republicans in litigation matters?

A.   Yes, I have.

Q.   Which ones?

A.   Well, not represented.  But I was an expert witness for Republicans.  So here in Arizona, I mentioned earlier that I -- although it was the Arizona Independent Redistricting

United States District Court

1260

MICHAEL P. MCDONALD, PH.D - Redirect

Commission, Republicans were intervenors in that suit and so in defense of the Commission's work.  So I was working for the Commission with the Republicans as intervenors.

Another case that I was involved with here in Arizona, I was -- the Attorney General's office Republican, when there was a Republican administration, retained me as an expert on a ballot access case that was brought against the State of Arizona.

So there are two cases here in Arizona that I worked with Republicans either directly consulting with them as an expert or through intervenors.

There have been other situations where -- like in the *Benisek* case that I mentioned earlier where their Democrats had gerrymandered the Congressional districts in Maryland and, fortunately, I think in the state court came in and rectified what the Supreme Court was unwilling to do in this last round of redistricting and it involved the district that's on the panhandle of Maryland that Democrats had manipulated to disfavor Republicans.  And so I worked with the plaintiffs in that case, the Republican plaintiffs in that case to make that claim.

I work with a former Republican gubernatorial candidate for the state of Virginia on litigation in Virginia to challenge both the state legislative, state house, state assembly, and state senate districts is violation of

United States District Court

MICHAEL P. MCDONALD, PH.D - Redirect

compactness requirements in the state constitution.

I'm just trying to think.

So I think that's the breadth of all of the times that I've worked with Republicans on litigation matters.  I think that's true.

I take that back.  There's one more time, very early in my career where I was involved in a case with San Gabriel Water Valley Authority on a racial gerrymandering case where I worked for the Authority and it was Republican lawyers who were representing the District and it was democratic-aligned candidates who were working for the plaintiffs in that case.

Q.   Dr. McDonald, turning away from litigation matters, have you worked with Republican Secretaries of State?

A.   Yes, I have.

Q.   And can you explain what some of those were?

A.   So, for example, with the work that I did in Colorado was with the Republican Secretary of State's office.  It wasn't with the current democratic Secretary of State's office.  There was that work that I was doing on trying to improve election integrity.  I've worked with election officials across the country who are Republicans.  That particular organization I was involved with was bipartisan and I worked with Republican members of that task force that had been put together to try to develop procedures and methods to improve registration, the integrity of the district assignments and precinct assignments

United States District Court

MICHAEL P. MCDONALD, PH.D - Redirect

that we had in voter registration data.

So yeah, I've worked with them in that scenario. I'm just trying to scrub my memory on other instances where I was working with Republicans on this sort of consulting work that I do. I think that's all of them but there could be others that I just don't recall.

Q.   Dr. McDonald, you had a conversation earlier today with Mr. Langhofer about a piece you wrote for *USA Today*. Was that the piece you authored on January 15, 2018?

A.   Yes, it is. I believe it is, yeah.

MR. KARPATKIN: Stephen, can you pull that piece up?

BY MR. KARPATKIN:

Q.   Is this the article that you were discussing?

A.   Yes.

Q.   Dr. McDonald, I wanted to give you an opportunity to provide the additional context for this article and to explain it to the Court.

A.   Yeah. I mean the title, you know, is here I'm saying complimentary things about a Republican. President Trump. And I agree with his statement that we should have voter ID in this country.

I'm really drawing upon the Baker-Carter Commission that was convened after the 2000 election and they also recommended this; that we adopt a national identity card, make that card widely available and free to individuals. And that

United States District Court

1263

could serve as a voter registration.  It's what most European countries do.

So we could, again, in this sort of discussion about what I think about voter registration being a suppressive tool, that's the history of it.  If we really wanted to deal with this -- and I have been critical of Democrats on this, I have been critical of Republicans on this issue -- that we should have a national identity card and it's going to -- honestly, I think that Donald Trump would like that because some of these issues about citizenship could be managed through a national identity card.

MR. KARPATKIN:  Your Honor, I just want to consult with my colleagues to see if there's any other questions on redirect.

(Counsel confer.)

MR. KARPATKIN:  No further questions.

THE COURT:  All right.  May Dr. McDonald be excused?

MR. KARPATKIN:  He may be excused.

THE COURT:  Is there any objection?

MR. LANGHOFER:  No.

THE COURT:  Thank you very much, sir.  You may step down and you are excused as a witness.

(Witness excused.)

THE COURT:  Plaintiffs may call their next witness.

MS. SHAH:  Good afternoon, Your Honor.  Niyati Shah

United States District Court

on behalf of the Arizona Asian Americans, Native Hawaiian, and Pacific Islander plaintiff calling Matine Tiwamangkala.

(MATINE TIWAMANGKALA, a witness herein, was duly sworn or affirmed.)

COURTROOM DEPUTY:  Thank you.  Can you please state your name and spell your last name for the record, please.

THE WITNESS:  Matine Tiwamangkala, T-I-W-A-M-A-N-G-K-A-L-A.

COURTROOM DEPUTY:  Thank you.  You can go ahead and have a seat.

THE COURT:  You may proceed, Ms. Shah.

**DIRECT EXAMINATION**

BY MS. SHAH:

Q.   Ms. Tiwamangkala, where do you live?

A.   I live in Tempe, Arizona.

Q.   And how long have you lived there?

A.   I lived at my address for four months but I have been in Arizona for 15 years.

Q.   Are you currently employed?

A.   Yes, I am.

Q.   Where?

A.   I am employed at the Arizona Asian American Native Hawaiian And Pacific Islander For Equity.

Q.   And is it okay if I just refer to them as Equity today?

A.   Yes, you may.

United States District Court

MATINE TIWAMANGKALA - Direct

Q.   What is your title at Equity?

A.   I am the Advocacy Director.

Q.   And when did you start at Equity?

A.   I started January of 2022.

Q.   And since you started at Equity, have you held any other titles?

A.   Yes.  I was hired on as the Democracy Defender Director.

Q.   And does your new title include the responsibilities of your prior title?

A.   Yes, it does.

Q.   And let's talk more about Equity the organization.  What kind of entity is Equity?

A.   We are a statewide nonpartisan, nonprofit organization.

Q.   And when was it founded?

A.   We were founded in 2019.

Q.   And where is Equity located?

A.   We're located in Tempe and Tucson.

Q.   And does Equity have a mission?

A.   Yes, we do.

Q.   What is it?

A.   Our mission is to strive for Equity and justice on behalf of AANHPI constituents through direct community organizing, increasing civic engagement, and developing young leaders.

Q.   And what are your responsibilities at Equity?

A.   I oversee the advocacy and the civic engagement programs.

United States District Court

1266

MATINE TIWAMANGKALA - Direct

Q.   So you mentioned programs.  Are there any other programs or program areas at Equity?

A.   Yes, there are.

Q.   Can you tell me what they are?

A.   Yeah.  So we have the AANHPI representation, we have Youth Leadership, Climate Justice, COVID Vaccine Outreach, We Imagine Safety, Don't Get Pucked Out of Tempe and I believe I listed them all.

Q.   Just now you have used an acronym.  This Court has heard a lot.  So AANHPI.  Is that Asian American Native Hawaiian Pacific Islanders?

A.   Yes, it is.

          MS. SHAH:  And with Your Honor's permission, we will continue to use that acronym.

Q.   And you mentioned the COVID Vaccine Outreach Program.  Can you tell us what you learned from that program?

A.   Yeah.  So with the COVID Vaccine Outreach Program, we learned that with giving resources about COVID in language as well as going to Asian businesses, we did vaccine pop-ups at the Asian grocery store, we were able to, you know, achieve health equity and get people access to vaccines.

          We also conducted a community needs survey at the same time and with the survey, we found out that 90 percent of our survey respondents and those were AANHPI folks who were the respondents, we found out that 90 percent of the respondents

United States District Court

1267

MATINE TIWAMANGKALA - Direct

felt that discrimination was the top issue for our community.

Q.   And why have all of these different types of program areas?

A.   It's to achieve our mission.

Q.   And I know we're using shorthand for Equity and we're using acronyms, but the full name again is Arizona Asian Americans Native Hawaiian Pacific Islander For Equity Coalition.  How broad, really, are communities that you serve?

A.   It's very broad with AANHPI people, they come from 50 different countries, over 50 different countries, and as well as they speak over 100 different languages.  And they also come from different backgrounds.  The reason why they migrate to America is fairly vast.  They could move here because of natural disasters that happen.  We see that a lot happening in the Pacific Islands.  People seek refuge here because of war, escaping genocide, and escaping political terror.

Q.   And does Equity serve only AANHPI communities?

A.   We do not.  We emphasize on the AANHPI community, but we do believe -- we do believe that multicultural, multiracial collaboration will help us advance our mission.

Q.   And you mentioned you oversee the Civic Engagement Program.  Can you please tell us briefly what that program means?

A.   Yes.  So the Civic Engagement Program has three parts.  One is voter education and second is voter registration and

United States District Court

MATINE TIWAMANGKALA - Direct

then lastly is voter mobilization to the polls.

Q.   Okay.  And you mentioned voter education.  Can you explain to the Court a little bit what that means?

A.   There's a lot to voter education.  We do have to educate on the democratic process happens in America with our community not everyone is familiar on what democracy is or has experienced democracy.

We also educate on how to register to vote, when to vote, you know, key dates for the elections, and then we educate on top issues that we find concern our community through our community needs survey.

Q.   And why have this education about the democratic process?  Actually, you mentioned that so I'm not going to do that.  But do you find that voter education helps you register voters?

A.   Oh, yes, it does.

Q.   And who conducts Equity's voter registration work?

A.   Well, I oversee the program and then we have a field director.  We have paid canvassers who go out.  We also have our youth fellows that are part of the Pacific Engagement Fellowship Program.  We also have our subgrant partners who are other AANHPI organizations that typically don't do civic engagement work, but we subgrant to them to do it and then, lastly, we have our volunteers.

Q.   And have you trained the field director and the paid canvassers?

1269

MATINE TIWAMANGKALA - Direct

A.    Yes, I have.

Q.    And I meant to say have you trained them on how to conduct voter registration activities?

A.    Yes.

Q.    And what about the volunteers and the subgrantee organizations, have they also been trained to conduct voter registration activities?

A.    Everyone who does voter registration with our organization is required to go through voter registration training.

Q.    And where does Equity conduct its voter registration activities?

A.    For in-person activities, we focus on East Valley because that's where the highest AANHPI concentration is.  We also do other areas in Maricopa County targeting Asian cultural festivals, Asian businesses, temples, mosques in those areas as well as college campuses.  And then we're also in Tucson doing in-person canvassing.

Q.    So what I heard you say is you focus on the AANHPI communities and where they are, but is this the only place where you would find AANHPI communities in America?

A.    No.  AANHPIs are statewide so that's why we do have online voter registration, so we're able to reach everyone statewide or help us reach.  And we do that through digital ads where there's a link for voter registration.  We also have ads in ethnic media as well as text banking and phone banking.

United States District Court

1270

MATINE TIWAMANGKALA - Direct

Q.   And does link in your digital ads that is unique to your organization?

A.   Yes, it is.  We can track who fills out that link.

Q.   Okay.  Understood.  And so in what language does Equity conduct its voter registration activities?

A.   So our website is translated into six AANHPI languages that has instructions on how to register to vote.  But we also have canvassers who may be bilingual.  We do offer higher pay for bilingual canvassers.  Our youth fellows also can help translate as well as our subgrantee partners who speak other AANHPI languages and then, yes, volunteers.

Q.   You said six languages.  What are those?

A.   Those are Chinese traditional, Chinese simplified, Vietnamese, Lao, Korean, and Tagalog.

Q.   And are these the only languages that are faced by the AANHPI community in Arizona?

A.   Definitely not.

Q.   So why not translate in all of those languages?

A.   It would be very costly.  Translation services can vary.  Usually it's around 25 cents per word to translate any materials.

Q.   And when conducting these in-person voter registration activities, does Equity encounter people who don't speak English very well?

A.   Yes, we do.

United States District Court

1271

MATINE TIWAMANGKALA - Direct

Q.   And can you give the Court an example of how Equity has handled this type of situation when they encounter somebody who doesn't speak English very well?

A.   So we do a table at the Lao Buddhist temple for their New Year's celebration and we do voter registration.  And the first time we went, we weren't able to register anyone because everyone who was there did not speak English very well or didn't speak English at all.  So we were able to recruit a volunteer who spoke Lao and she was able to register folks at the temple.

Q.   And what happens in other situations where you are unable to recruit bilingual or multilingual staff or volunteers?

A.   Yeah.  So, I mean, we could always provide them with our website that has translated materials in the six languages; but if they don't speak or read those languages, then they really don't have any instructions that they understand to fill out a voter registration form.

Q.   And what kind of form does -- voter registration form does Equity use to conduct its voter registration activities?

A.   We use the state form.

Q.   And do you know if the state form is available in any AANHPI languages?

A.   No, it's not.

Q.   Do you know if the federal voter registration form is?

A.   Yes, it's translated.

United States District Court

MATINE TIWAMANGKALA - Direct

Q.   So why not use the federal form?

A.   With the federal form, it is unclear on how to provide DPOC in order to get a full ballot as a registered voter, and our organization wants to build political power with local and state elections.

Q.   And despite these challenges when it comes to voters who don't speak English very well, you have been managing to register some of them; right?

A.   Yeah, with the help of our volunteers, partners, yeah.

Q.   So but that begs the question for me, right.  Like if these individuals don't speak English very well, based on your experience, do you know if they are able to cast a ballot?

A.   They are able to cast a ballot.  It is legal in Arizona to bring in a sister to help translate the ballot during election day.  We also promote a -- it's the API hotline where there's translators readily available to answer any questions in languages that people speak.  And then we also try to recruit volunteers to stand around the polling locations to help with translations, answer any questions, so, yeah.

Q.   Okay.  Let's talk about the laws that are at issue here today.  Do you have a general understanding of what H.B. 2492 and H.B. 2243 are?

A.   Yes, I do.

Q.   And do you recall roughly when they were passed?

A.   Yes, I do.

United States District Court

MATINE TIWAMANGKALA - Direct

Q.   So in the immediate aftermath of when these laws passed, did you know exactly when they were going to be implemented?

A.   No, we didn't know when it was going to be implemented. It was pretty unclear.

Q.   Okay.  But did they raise any concerns -- the substance of these laws, did they raise any concerns with Equity about their voter registration work and about registered voters?

A.   Yeah, it definitely raised concerns.  We were concerned that the requirements for voter registration were going to change, like the birthplace box was required where now it's optional.  We also were unsure of the changes of the DPOC and the state forms.  We also knew that the County Recorder could find a reason to believe to -- a reason to believe someone is a non-citizen and then subject them to a match on the SAVE database and if they didn't match, they would have to respond to a 35-day notice to provide DPOC.

And with my experience, that notice would be in English, just seeing the election documents and notices beforehand.  And then, lastly, if they are not able to respond within 35 days with a physical copy of DPOC, then they would be subject to a criminal investigation.

Q.   Thank you.  That makes me ask you a question.  Do you know any naturalized voters or voter registrants that may not have a physical copy of their naturalization paperwork?

A.   Yes, I do.  One of our subgrantees, Island Liaison, they

United States District Court

1274

MATINE TIWAMANGKALA - Direct

use our office two days a week to help community members get documentation for citizenship in order for them to apply for Government benefits and services.

Q.   And based on your experience, do you know how long it takes to get these types of documents?

A.   So to get a copy of your naturalization certificate, the website does state that it takes six to eight months to get that.

Q.   Yeah.  So in the immediate aftermath of these laws passing, what did Equity do with its voter registration work?

A.   I'm sorry.  Could you repeat that?

Q.   Sure.  Right after these laws passed, what did Equity do with its voter registration work?

A.   So we had to take a pause.  We had to figure out how the laws were going to impact voter registration because we wanted to make sure we were doing it correctly.  And then I had to inform our canvassers, our volunteers, our subgrantees and our fellows about these two laws.

Q.   And when you told your canvassers and volunteers and subgrantees about these laws, what was their reaction?

A.   Well, they expressed concern knowing that naturalized voters would only have 35 days to provide DPOC or else they would get, you know, kicked off with the voter roll or a criminal investigation.

There's also a fear from the community because of

United States District Court

MATINE TIWAMANGKALA - Direct

Government prosecution and, you know, where they have came from, you know, may be escaping from Government prosecution or targeting, things like that.

Q.   So in light of Equity's own concerns and the feedback that they got from people out in the field, what did you do about your voter registration goals?

A.   So we did have to reduce our goals which meant a reduction of our funding because our funding is tied to the goals.

Q.   But now sitting here today, do you know if these two laws were actually ever implemented?

A.   I do know that they are not being implemented right now based off of what the County Recorder has told us.

Q.   So did you go back and increase your rolls and get back your funding?

A.   No.  We don't do that.

Q.   So what will Equity do if these laws do get implemented?

A.   Well, we would have to retrain our canvassers, our volunteers, subgrantees, fellows on how to do voter registration with these laws in place.  We also would have to train them on how to address the concerns and fears from the community because of these two laws.  We would expand these services of Island Liaison to assist more people with getting their DPOC to respond from the 35-day notice.  And, yeah, we would update our voter registration instructions on our websites and get them translated which would take some

United States District Court

1276

MATINE TIWAMANGKALA - Direct

resources and time.

Q.   Do you have those resources?

A.   No, we don't.

Q.   So will you continue to do voter registration?  What will happen?

A.   Well, we'll still continue to do voter registration.  It is part of our mission.  We would just have to shift our priorities into responding to the laws with getting DPOC, educating our community, educating our volunteers and, you know, that might -- that's going to impact other programs.  But we would have to raise our voter registration goals because our focus will be on that and not on the actual collection of the voter registration.

Q.   You also mentioned in your answer I think that it would impact the other programs as well?

A.   Yes.

Q.   So what would this mean for your mission?

A.   This would hurt our mission.  We're not reaching our --

Q.   All right.

        MS. SHAH:  With that, I'll pass the witnesses.

        THE COURT:  Are there any other plaintiffs' attorneys that have questions for this witness?

        Okay.  Who wants to cross?

United States District Court

MATINE TIWAMANGKALA - Cross

**CROSS - EXAMINATION**

BY MS. BOUGHTON:

Q.   Kathryn Boughton for the State Attorney General.

Good afternoon.

A.   Good afternoon.

Q.   So you said the organization was founded in 2019?

A.   Yes, it was.

Q.   So this upcoming 2024 cycle will be your second big presidential election cycle?

A.   For the organization, yes.

Q.   Yes.  Has -- pardon me.  Do you mind if I refer to it as Equity as well?

A.   Yes.

Q.   Great.  Okay.  Has that Equity started planning its 2024 voter mobilization goals yet?

A.   Yeah.  We are going through planning.

Q.   Do you have specific targets on how many voter registration drives the organization will conduct?

A.   No.

Q.   Not yet?  Okay.  But it sounds like as a part of that, your 2024 registration efforts, you would train any volunteers or existing canvassers regarding current registration requirements.  Is that fair to say?  I can rephrase.

A.   Oh, yeah, please do.

Q.   So when people for your organization go out and conduct

United States District Court

MATINE TIWAMANGKALA - Cross

voter registration drives, you indicated that you train them in advance.

A.    Yes, we do.

Q.    Okay.  So looking ahead to the 2024 election, do you guys have any trainings planned in connection with 2024 voter registration drives?

A.    Oh, yeah.  We would have to train anyone new who comes on but we do have the same canvassers.  We have the same partner organizations who do voter registration, and then the fellows are already trained on voter registration.

Q.    So you have plans for some training with respect to 2024 Get Out The Vote activities.  Is that fair to say?

A.    Oh, for GOTV?

Q.    Oh, I'm sorry.  I misspoke.  I swapped an imprecise term. I don't operate in this field.

You have trainings planned for those who will be conducting voter registration activities?

A.    Oh.  Yeah.  They are already created.

Q.    Okay.  Great.

So I want to confirm, apart from his lawsuit, has Equity spent any money in response to the Challenged Laws up to today?

A.    We have haven't spent any money but we've lost money.

Q.    I want to -- we can talk about that as well then.  That's the grant funning you mentioned?

MATINE TIWAMANGKALA - Cross

A.   Yes.

Q.   So my understanding is that when the laws were passed, your organization made a determination to reduce its voter registration goal target.  Is that correct?

A.   Yes.

Q.   And as a result, you received a lower amount of funding?

A.   Yes, that's correct.

Q.   Okay.  But the laws were not implemented -- and this was for 2022, just for the record?

A.   Correct.

Q.   But the laws were not implemented in 2022?

A.   They weren't but we didn't know at the time how they were going to be implemented as well as like when.

Q.   Okay.  Did you end up registering more individuals than your -- than you had set your goal for in 2022?

A.   Could you ask that again?

Q.   I can.  Yes.  So just to recap, you reduced your goal target in 2022 because it wasn't clear if the laws were going to be implemented or how they might be but then the laws were not implemented.  So did you end up registering more than your goal target because the laws were not implemented?

A.   No, we didn't.  It is already -- there was the concerns and the fear within our community as well as our canvassers and volunteers not really knowing if it was safe to register voters with the new laws that could possibly be implemented.

1280

MATINE TIWAMANGKALA - Cross

Q.    So is your testimony that you didn't attempt to register people because of the new laws in 2022?

A.    No.  We did attempt to register voters.

Q.    Okay.  On direct you talked about some of the ways you think your organization would respond if the laws were implemented.  I'm curious.  Has Equity put together any internal planning documents estimating how much money would be spent in response to the laws?

A.    No, we haven't.

Q.    Would it be fair to say that the amount of money that Equity ultimately spends will depend on how the laws are enforced?

A.    I mean, I'm not too sure.  I don't know -- I don't really do the budgeting.  So I wouldn't be -- I guess I am not the person to answer that.

Q.    Okay.  Well, so, for example, you understand that the laws would require birthplace to be a mandatory field and that's part of what's being challenged in this lawsuit?  Yes?

A.    Yes.

Q.    So you would agree with me that the ultimate ruling on birthplace would affect what Equity puts in its voter education materials.  Is that fair to say?

A.    I wouldn't say that's the only thing that we update.

Q.    Just as an example?

A.    Okay.  Yeah, like the 35 notice, that would have to be

United States District Court

explained, translated, because that -- it's a pretty big deal.

Q.    Has Equity hired any new staff in response to the Challenged Laws as of today?

A.    Yes, we did.

Q.    You did?  How many staff members?

A.    We hired a Political Director to help me with my responsibilities so I can focus on the voting rights because I was hired on as Democracy Defender Director to focus on voting rights and democracy.

Q.    So the Political Director that was hired on, did they take over some of what was in your existing portfolio and you shift focus?

A.    No.  Our programs are growing so they just took on other program areas.

Q.    Okay.  That are not -- that do not involve --

A.    Right.  More of the advocacy programs.

Q.    Okay.  Thank you.

      Just to confirm, Equity is not a membership organization?

A.    We're not right now but we're building a membership program.

Q.    But as of today, it's not a membership organization?

A.    No.

Q.    And to your knowledge, Equity has not identified a specific individual who will be affected by the Challenged

MATINE TIWAMANGKALA - Cross

Laws?

A.   No.

Q.   That's all I have for you.   Thank you so much.

A.   Okay.   Thanks.

THE COURT:   Mr. Langhofer?

**CROSS - EXAMINATION**

BY MR. LANGHOFER:

Q.   Have you been able to identify anyone who is an adult citizen who resides in this state and does not have a U.S. passport, a U.S. birth certificate, an Arizona driver's license issued after 1996, a tribal identity cashed, or a naturalization number?

A.   No.

Q.   Are you alleging in this case that Arizona is not meeting its language assistance obligations under the Voting Rights Act?

A.   I'm not too sure.   Could you --

THE COURT:   If she doesn't know what the requirements are, I don't think that's a productive line of questions.

MR. LANGHOFER:   Thank you, Your Honor.

MS. PORTER:   No further questions.

MS. SHAH:   Nothing further.

THE COURT:   May this witness be excused?   Is that a yes?

MS. SHAH:   Yes.

United States District Court

THE COURT:  Any objection?

MR. LANGHOFER:  No.

THE COURT:  Thank you very much.  You may step down and you are excused as a witness.

(Witness excused.)

MR. MAKKER:  Your Honor, Amit Makker on behalf the Arizona Asian American Native Hawaiian and Pacific Islander For Equity Coalition plaintiff.

As we're getting the next witness ready, my folks on my team wanted to confirm, because we're discussing with the various County Recorders about tomorrow, that Your Honor this morning did say that Yavapai fits into the 100-mile or unavailable?

THE COURT:  I did say that.

MR. MAKKER:  Thank you very much.

MS. MOTZKIN:  I am Leah Motzkin for the plaintiffs and I call Nancy Herrera.

COURTROOM DEPUTY:  Please raise your right hand for me.

(NANCY HERRERA, a witness herein, was duly sworn or affirmed.)

COURTROOM DEPUTY:  Okay.  Please state your name and spell your last name four the record, please.

THE WITNESS:  Nancy Evelyn Herrera.  H-E-R-R-E-R-A.

THE COURT:  You may proceed.  And as you do so, I

United States District Court

note that it's about 13 minutes to five and I have a meeting at 5 o'clock.  So we will be recessing not even 30 seconds after five.

MS. MOTZKIN:  Okay.

**DIRECT EXAMINATION**

BY MS. MOTZKIN:

Q.    Please state your full name.

A.    Nancy Evelyn Herrera.

Q.    Where do you live, Ms. Herrera?

A.    Glendale, Arizona.

Q.    And where do you work?

A.    I work for Poder Latinx as their Arizona State Program Director.

Q.    And how long have you been in that role?

A.    I have been the State Director since January of 2023 but I was employed in April of 2022 as their Voter Engagement Coordinator.

Q.    Why did you begin working for Poder Latinx?

A.    I began working for Poder Latinx because I aligned with their mission and also because I want to be that catalyst that brings that information to our community that is much needed for voter engagement, voter education, and voter participation.

As a naturalized U.S. citizen, I went through many hurdles to be able to become a citizen and I didn't even have any resources available to me.  My lawyer was scrupulous and

United States District Court

NANCY HERRERA - Direct

they took away her license.  And for that, I made it a mission to be a part of my community and empower them and provide them the resources, and working through Poder Latinx has allowed me to do that and I am very honored so.

Q.    And what is the mission of Poder Latinx?

A.    The mission of Poder Latinx is to engage the Latinx community to be civil participants through their vote.  Voter engagement, voter participation, voter protection.  We want to be able to bring on leadership within our community and be -- notes that their vote is their voice.

Q.    And what would you describe as Poder Latinx's areas of focus?

A.    Our areas of focus are divided in through three different buckets.  We do environmental work, economic justice, and immigration justice.  But our big bucket of work is the voter engagement, voter education, voter electoral work.

Q.    And what are the campaigns that Poder Latinx runs in Arizona related to these areas?

A.    So for a voter engagement portion, we run various campaigns.  We do Drag y Vota, Drag and Vote; Vota Es Poder, Vote is Power; National Civic -- National Latina Civic Engagement Day; National Voter Registration Day; Early Day are some of the campaigns that we do.

Q.    And who makes up the community that Poder Latinx serves?

A.    Our community is made up of marginalized disenfranchised

United States District Court

NANCY HERRERA - Direct

communities, communities who are BIPOC, Black indigenous people of color, who don't have accessibility to documents in their language so we provide that accessibility by translating documents, providing the information up front to our community, being on the ground.

Q.    And in terms of resources, what is involved with Poder Latinx mobilizing and registering this community?

A.    There are so many things involved in -- to mobilizing our community.  A lot of it has to do with funding, being able to have enough canvassers on the ground to educate, bring the information to them directly.  Language accessibility is a big one, having to translate information in their native tongue and also in the language that they can understand, right.  If it's legal, we want to break it down for them and that's what we do.

Q.    And how does Poder Latinx measure the success of its voter engagement programs?

A.    We measure our success through metrics and goals that we set forward earlier on within the year.

Q.    And can you provide any examples of goals that Poder Latinx has set for its voter engagement programs in Arizona?

A.    Yes.  So for 2023 this year, our goal is to register 4600 new registered voters.  For 2024, the election year, going to be 9,000 new registered voters.

Q.    And so how do you reach those goals?

A.    Oh, we reach those goals by doing a lot of outreach, being

United States District Court

NANCY HERRERA - Direct

out in the community, making sure we have sufficient canvassers on the ground, making sure that we utilize our campaigns for voter engagement, a lot of social media, a lot of television, radio, all of that requires funding and time to do so.

Q.   And when someone interacts with Poder Latinx in one of these capacities, how do they know to Poder is involved?

A.   They know that we are Poder Latinx because part of our uniform, we have to wear our T-shirt.  Our logo is stated clearly on there.  It's large enough.  Also when we communicate with our community, we introduce ourselves who we are, what we're doing there, what our role is.  And also in our clipboards, we have a QR code that they can scan and it will direct them directly to our Poder Latinx website.

Q.   And why is it important that someone knows Poder is involved?

A.   It's important that our community knows who they are interacting with so if there are any questions along the way of, for example, their voter registration process, you know, they know who they can contact.  They know who they can reach out to.  So it's very important that we build that trust within our community as well so they can feel comfortable and confident enough to come visit us at the office, send us an email and have contact with us.

Q.   Can you describe the resources that you put in to a voter registration campaign?

United States District Court

NANCY HERRERA - Direct

A.    Absolutely.  So it goes without saying funding is a big one; right?  We also have to do a lot of outreach, a lot of time that has to be put into our voter engagement program.  We have to knock on doors to connect with our community.  So all of that is integral to the part that we do.

Q.    And how much does registering one individual cost?

A.    Right now to register one individual, roughly around $50 per registered voter.

Q.    Does Poder engage in election protection work?

A.    Yes, we do.

Q.    Does Poder programming include voter education?

A.    Yes, it does.

Q.    And why is Poder able to be so effective in its election-related efforts?

A.    We're able to be effective because for our voter protection we have a 1-800 hotline where they can call.  We have individuals working at the polls where they see anything suspicious or anything out of line, you know, they have a plan in place that they can work with the constituents to be able to make them feel comfortable and know what the next steps are in order to be participants.

        MS. MOTZKIN:  Stephen, would you please pull up PX407?

BY MS. MOTZKIN:

Q.    Do you recognize this document?

NANCY HERRERA - Direct

A.    Yes.

Q.    What is it?

A.    This document is the letter to initiate the lawsuit, the first lawsuit.

      MS. MOTZKIN:  Your Honor, for the purpose of demonstrating plaintiffs' compliance with the NVRA statutory notice requirements as to the violations of H.B. 2492, we would like to move PX 407, Plaintiffs' Exhibit 407, into evidence.

      THE COURT:  Is there any objection?

      MR. LANGHOFER:  No, Your Honor.

      THE COURT:  407 is admitted without objection.

      (Exhibit Number 407 was admitted into evidence.)

      MS. MOTZKIN:  Please pull up 406.

BY MS. MOTZKIN:

Q.    And do you recognize this document?

A.    Yes.

Q.    And is it the same -- I'm sorry.  What is it?

A.    The second letter that was submitted for the second lawsuit.

      MS. MOTZKIN:  Your Honor, for the same purpose, related to violations of H.B. 2243, we would like to move PX 406 into evidence.

      MR. LANGHOFER:  No objection.

      THE COURT:  Without objection, Exhibit 406 is admitted.

                  United States District Court

NANCY HERRERA - Direct

(Exhibit Number 406 was admitted into evidence.)

MS. MOTZKIN:  Thank you.

BY MS. MOTZKIN:

Q.   Why did Poder Latinx decide to challenge these laws?

A.   We are challenging these laws today because they are going to be removing lawful registered voters from the rolls as well as denying new applicants because of the citizenship checks which is detrimental to our community because many of our community are naturalized citizens.  And that is going to have many effects on our organization.

Q.   And based on your experience, what aspects of the laws are problematic?

A.   The laws are problematic because we have new citizenship checks.  Also, denying new applicants and looking at the old databases essentially from the County Recorder's office.

Q.   Based on your experience, what effects will these laws have on your community?

A.   Based on my experience and being a naturalized U.S. citizen, I know that my community is going to be fearful.  They are not going to want to be participants or even remove themselves overall from wanting to be registered voters.  Why? Because we go through a harsh process just to become naturalized U.S. citizens, to then be able to cast our vote and make our voices heard, to then now being questioned are you truly a U.S. citizen.  And a lot of our elderly folks are going

NANCY HERRERA - Direct

to not want to go anywhere else related where they have to now prove themselves that they are U.S. citizens because they don't know what the repercussions might be for that.

So this is why Poder Latinx will now have to restructure our entire program and identify, you know, best ways to how to combat misinformation and provide, you know, the best practices moving forward.

Q.   And what will that organization have to do in order to continue to help voters who encounter problems with registration or at the polls?

A.   Well, we're definitely going to have to allocate a lot of time and money into our Voter Engagement Program, additional canvassers on the ground to try to identify those who have been removed.  If we are even able to identify or have to -- we're going to have to put in another program, quality control measure to call already registered voters to identify, you know, and speak to them about the new law and if they know if they have been removed, have they gotten a notice, what the next steps might be.

So allocating all of this time and additional effort to the process that we're doing now is essentially going to be a waste of money for us because we could be out there registering new voters instead of, you know, having to reregister these voters that have been essentially pulled from the rolls or being denied to be participants.

United States District Court

NANCY HERRERA - Direct

THE COURT:  Ms. Motzkin, we'll have to leave it there.

Court is in recess until 9 o'clock.

COURTROOM DEPUTY:  All rise.

(Whereupon, these proceedings recessed at 5:00 p.m.)

* * * * *

United States District Court

1293

C E R T I F I C A T E

I, ELAINE M. CROPPER, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control, and to the best of my ability.

DATED at Phoenix, Arizona, this 14th day of November, 2023.

s/Elaine M. Cropper

_____

Elaine M. Cropper, RDR, CRR, CCP

United States District Court