UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

Mi Familia Vota, et al.,                )
                                        )
              Plaintiffs,               )
                                        )
        vs.                             )  2:22-cv-00509-SRB
                                        )
Adrian Fontes, et al.,                  )
                                        )  Phoenix, Arizona
              Defendants.               )  November 14, 2023
_____)  1:02 p.m.

BEFORE:   THE HONORABLE SUSAN R. BOLTON, SENIOR JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

BENCH TRIAL - DAY 6 - P.M. SESSION

(Pages 1406 through 1548)

Official Court Reporter:
Elva Cruz-Lauer, RMR CRR
Sandra Day O'Connor U.S. Courthouse
401 West Washington Street
Suite 312, SPC 32
Phoenix, Arizona  85003-2150
(602) 322-7261

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

UNITED STATES DISTRICT COURT

1407

APPEARANCES


For Plaintiff United States of America:
     EMILY BRAILEY, ESQ.
     U.S. DEPARTMENT OF JUSTICE-VOTING - M STREET
     150 M. Street NE
     Washington, D.C.  20503


     RICHARD DELLHEIM, ESQ.
     SEJAL JHAVERI, ESQ.
     MARGARET TURNER, ESQ.
     U.S. DEPARTMENT OF JUSTICE-CIVIL RIGHT  DIVISION, VOTING SECTION
     950 Pennsylvania Avenue NW
     Washington, D.C.  50530


For Plaintiff ADRD Action, Arizona Students' Association,
League of United Latin American Citizens Arizona, Living
United for Change in Arizona:

     HAYDEN JOHNSON, ESQ.
     DANIELLE MARIE LANG, ESQ.
     ROBERT BRENT FERGUSON, ESQ.
     JONATHAN DIAZ, ESQ.
     CAMPAIGN LEGAL CENTER.
     1101 14th Street NW, Suite 400
     Washington, D.C. 20005

For Plaintiff Arizona Asian American Native Hawaiian And
Pacific Islander for Equity Coalition:

          NIYATI SHAH, ESQ.
          ASIAN AMERICANS ADVANCING JUSTICE
          1620 L Street NW, Suite 1050
          Washington, D.C.  20036

          AMIT MAKKER, ESQ.
          EVAN OMI, ESQ.
          LATHAM & WATKINS
          505 Montgomery Street, Suite 2000
          San Francisco, California 94111

          NEETHU PUTTA, ESQ.
          LATHAM & WATKINS, LLP - Avenue of the Americas
          2415 E Camelback Rd., Ste. 600
          Phoenix, Arizona  85016-4251

1408

For Plaintiff Arizona Democratic Party, Democratic National Committee:

      DANIEL S. VOLCHOK, ESQ.
      WILMER CUTLER PICKERING HALE & DORR, LLP
      2100 Pennsylvania Avenue NW
      Washington, D.C.  20037

      KELSEY QUIGLEY, ESQ.
      WILMER CUTLER PICKERING HALE & DOOR, LLP
      2600 El Camino Real, Suite 400
      Palo Alto, CA  94306

For Plantiff Chicanos Por La Causa, Chicanos Por La Causa Action Fund, Poder Latinx:

      JOHN A. FREEDMAN, ESQ.
      LEAH MOTZKIN, ESQ.
      ERICA ELAINE MCCABE, ESQ.
      ARNOLD & PORTER KAYE SCHOLER, L.L.P.
      601 Massachusetts Avenue NW, Suite 100
      Washington, D.C.  20001

      MICHELLE KANTER KOHEN, ESQ.
      JONATHAN SHERMAN, ESQ.
      FAIR ELECTIONS CENTER
      1825 K Street NW, Suite 701
      Washington, D.C. 20006

For Plaintiff Voto Latino, Mi Familia Vota:

      CHRISTOPHER DODGE, ESQ.
      ELISABETH C. FROST, ESQ.
      ELIAS LAW GROUP
      250 Massachusetts Avenue NW, Suite 400
      Washington, D.C. 20001

      DANIEL ABRAHAM ARELLANO, ESQ.
      HERRERA ARELLANO, L.L.P.
      1001 North Central Avenue, Suite 404.
      Phoenix, Arizona  85004

UNITED STATES DISTRICT COURT

1409

For Plaintiff Promise Arizona, Southwest Voter Registration Education Project:

      ERNEST ISRAEL HERRERA , ESQ.
      ERIKA CERVANTES, ESQ.
      MALDEF
      634 Spring Street, 11th Floor
      Los Angeles, California  90014

      DANIEL R. ORTEGA, JR., ESQ.
      ORTEGA LAW FIRM, P.C.
      361 E. Coronado Road, Suite 101.
      Phoenix, Arizona 85004.


For Defendants State of Arizona, Kris Mayes, Jennifer Toth:

      JOSHUA MICHAEL WHITAKER, ESQ.
      TIMOTHY E. HORLEY, ESQ.
      KATHRYN E. BOUGHTON, ESQ.
      ARIZONA ATTORNEY GENERAL'S OFFICE
      2005 N. Central Avenue
      Phoenix, Arizona  85004


For Intervenor-Defendant Ben Toma:


      HANNAH HATCH PORTER, ESQ
      GALLAGHER & KENNEDY, P.A.
      2575 E. Camelback Road, Suite 810
      Phoenix, Arizona 85016-9225


For Defendant-Intervenor Republican National Committee:

      KORY A. LANGHOFER, ESQ.
      STATECRAFT, P.L.L.C.
      649 N. 4th Avenue, Suite B
      Phoenix, Arizona  85003

UNITED STATES DISTRICT COURT

1410

INDEX OF WITNESSES

WITNESSES FOR THE         Direct     Cross     Redirect
PLAINTIFFS:
Orville V. Burton, Ph.D.  1411   1461,1543    1544


INDEX OF EXHIBITS

EXHIbIT NO.:         DESCRIPTION:                        RECEIVED:
                       (NONE)

UNITED STATES DISTRICT COURT

P R O C E E D I N G S

MR. LANGHOFER:  If I may?

THE COURT:  Mr. Langhofer, was there something you wanted to address?

MR. LANGHOFER:  I think we need to make a record on something.

Mr. Burton has been asked a question about legislative intent, and his report does not disclose any opinions on legislative intent.  In his deposition he confirmed that as the rules require, he is offering no opinion of legislative intent. We've got, by my account, the third evidence is being offered without disclosure to us, and I think the appropriate time to take this up --

THE COURT:  Hold on.  Are you going to ask him about the legislative intent?

MR. JOHNSON:  Your Honor, his report and his testimony does cover discriminatory intent.

THE COURT:  So let's -- tell Mr. Langhofer where it is so that he can look at it and be ready to object or not object when you get to that question.

MR. JOHNSON:  Okay.  That works.  Thank you.

MR. LANGHOFER:  Thank you.

DIRECT EXAMINATION

BY MR. JOHNSON:

Q.  Dr. Burton, I will just reframe where we are after the

lunch break here.

You mentioned that you're offering your expertise concerning history of discrimination in Arizona, conditions of inequality and racial appeals in the electoral environment.

Let's start with the history.  So turning first again we have the demonstrative 329 and it's section V of your report, which starts on page 11.  But let's skip some of the older history that goes back a ways in your report, and go to page 13.  And here you talk about some of the U.S. Civil War history related to Arizona.  Do you see that?

A.  Yes.

Q.  And you quote a passage saying that Arizona was considered the twelfth star of the Confederacy on that page.  What do you mean by that?

A.  Well, a number of former Confederates had settled into it -- at that time I guess they weren't former Confederates, people from what became the Confederacy, had settled into Arizona and particularly when Colonel Baylor raised a regiment for fighting for the Confederacy.  People claimed to be the twelfth star of the Confederacy or 11 star.

Q.  That's Colonel Baylor; is that right?

A.  I believe that quote is from the newspapers, and I don't remember if it was Colonel Baylor's or not, but it was commonly cited.

Q.  Okay.  And so did residents of Arizona join up with the

Confederacy during the U.S. Civil War?

A.  Yes, with Colonel Baylor's regiment.

Q.  And also on page 13 you began to discuss this historical concept of manifest destiny.  Can you explain that concept as it relates to Arizona?

A.  Well, yes, this idea that Anglo and particularly U.S. civilization would be spread from coast to coast, sort of the idea now scholars talk about like an empire, but it was bringing, quote, civilization.  And with Arizona, that meant displacing indigenous people.  It meant the Mexican war as usually seen as part of this manifest destiny as we take part of what had been Mexico.

Q.  Okay.  And so you mentioned Anglo.  That means there was racial overtones in manifest destiny?

A.  Lots of racial overtones, sort of a hierarchy of civilization and Anglo-Saxon United States, the idea of the republic all was tied in the idea of manifest destiny.

Q.  So turning ahead to page 23 of your report.  You note that post Civil War migration to Arizona.  How did that affect Arizona's development?

A.  Well, I point out that the territorial governor says that so much of the early settlers came from what had become the states that were part of the Confederacy and that they were very influential.

Q.  So how did these two concepts, this manifest destiny ethos

and this post Confederacy migration, how did that affect the development of racial and ethnic relations in Arizona?

A.   I'm sorry, could you repeat the question?  I didn't --

Q.   Sure.  So we talked about this manifest destiny ethos and this post Civil War migration from the Confederacy.  How did that affect the development of racial and ethnic relations in Arizona?

A.   Well, I think everyone would agree that the racism that is there, and particularly so much of the laws later, reflect and are similar to those out of the former Confederate states regulating the races with segregation, voting, things like that.

Q.   So that affected Native Americans living in Arizona?

A.   Yes.  Certainly manifest destiny you have several quotes here about how people feel about Native Americans as totally uncivilized.

Q.   And you mentioned, just to clarify, Latinos as well?

A.   Yes.

Q.   And did this materialize in discriminatory laws against these groups?

A.   Yes.

Q.   So let's turn back to page 16, and your discussion goes on to page 17, where you talk about the history of laws prohibiting interracial marriage.  Approximately when did that begin in Arizona?

ORVILLE VERNON BURTON, PH.D - DIRECT EXAMINATION    1415

A.  Well, immediately.  But particularly when it becomes a state after the territorial legislation, that all marriages are white persons, particularly lists a group of people, Negroes added some later, becomes a law, but miscegenation is the law of the land and there's not to be interracial marriages.

Q.  And those anti-interracial marriage laws, were they further expanded in 1931?

A.  Yes.

Q.  And then turning to page 17, towards the end of that partial paragraph, when did interracial marriage laws end in Arizona?

A.  Well, it's a court case in 1962, which is five years before *Loving*, the Virginia case that makes it an -- outlawed or unconstitutional to bar people from different -- what is considered races from intermarrying.

Q.  Okay.  So there was a court case that ruled on interracial marriage?

A.  Yes, yes.

Q.  Was Arizona in the minority of states that still had an anti-interracial marriage law by the 1960s?

A.  Yes, I think there were 22 and then 18.  And there are scholars that have argued that's one of the reasons that often Arizona is linked regionally with the South with that identification.

Q.  Let's turn to page 21 where you discuss some other

historical instances of formal discrimination, this time in the workplace.  At statehood, did Arizona --

MR. LANGHOFER:  Your Honor, I would prefer if we follow the custom of not reading from the report.

THE COURT:  I would prefer that as well.

THE WITNESS:  I'm sorry.  I didn't realize I was reading from the report.  I was looking at it before I answered.

THE COURT:  Well, it appears that counsel is the one reading from the report.

THE WITNESS:  Oh, sorry, I thought you were --

MR. JOHNSON:  Your Honor, I am just sort of framing the question from the page, using it as a demonstrative.

THE COURT:  Why don't we talk to him about his opinions, and if he needs to use his report to refresh his recollection, he may do so.

But I agree with Mr. Langhofer that this should proceed as expert testimony and not as you reading to him things and directing him to certain sentences in his report.

MR. JOHNSON:  My apologies.  I am not trying to direct his sentences.  I was just aiding the document manager to pull up the right passage.  My apologies.

BY MR. JOHNSON:

Q.  Did you discuss discrimination in terms of workplace limitations?

A.   I did.

Q.   At statehood, was there a ban on certain minority population being employed in any industries?

A.   Yes.

Q.   What were those?

A.   Well, mining was certainly one where it was banned to have English -- only English-language-speaking populations to work in mining, which of course singled out in particular Native Americans and people of Mexican descent, as well as later those of Asian descent.

     But they also had a citizenship requirement of at least 80 percent in certain manufacturing needed to be citizens to be employed.

Q.   Was there any legislation that was focused on businesses that were owned by non-U.S. citizen residents?

A.   Yes.

Q.   Like what's an example of that?

A.   I'm blanking.  Can I ask for you to point to it, if it's in my report.

     Is that okay to ask?

     THE COURT:  That's okay.

     THE WITNESS:  I'm just blanking suddenly.

BY MR. JOHNSON:

Q.   If you turn back to page 17.

A.   Okay.

Q.  Apologies, page 15.  Do you see where you discuss Chinese laundries?

A.  Oh, yes.

Q.  What are you getting at there?

A.  Well, there was particularly legislation against Chinese laundries, gambling dens, opium places.  There was an anti-Chinese League that was very active there as well.

Q.  So let's turn next back to page 22.  Apologies for flipping around here.  And you talk a little bit about school segregation.  Racial school segregation laws in Arizona.  What was the origin of school segregation in the state?

A.  Well, it's in the territory, in 1909, which is the -- I believe it's called the Hampton Education Qualifications Measure, without looking down.  But close to it, which was passed that was really a literacy test but also school segregation mandated.

Q.  And when Arizona became a state in 1912, what happened with school segregation?

A.  Well, particularly there was an act beforehand that was led by the famous Indiana senator, an American historian, quite renowned, Andrew [sic] Beveridge explained that would be disqualifying some of the finest citizens.

So before it became a state, there was a law that said, I say a law, it was ruled that that would be discriminatory.  So it was not -- when it became a state, the

literacy test and the school law became null.  There was a particular act.

Q.  Okay.  I guess -- my apologies.  My question was imprecise. I am asking about when school segregation -- did the legislature in 1912 pass a school segregation law?

A.  So you are now -- when it's a territory?  Yes.

Q.  But in the state legislature in 1912 after statehood?

A.  Yes, even though they had to get rid of it before they became a state.

Q.  And then renewed it is what you are saying?

A.  Yes.

Q.  Was that a mandatory school segregation statewide?

A.  The way it was framed was that it was amended supposedly so that it was the discretion of each school board, if they wanted to segregate or not.

Q.  And then school boards with that discretion, did they enact mandatory policies segregating schools?

A.  Yes.

Q.  Was that widespread?

A.  Yes.

Q.  Did you find that supporters of the 1912, the school code bill, supporters in the legislature, were they trying to ensure that such segregation would be mandatory?

A.  Yeah.  In fact, the person who I quote here, Leon Jacobs, who was a friend of Carl Hayden's who was in Congress wrote a

letter in which he explained that he believed -- if you read the letter, it says that he has in fact been successful against some people fighting against it to make school segregation compulsory.

He even uses -- and I left this out of the quote sort of inadvertent -- he uses racist language in fact.  When he talks about who is being left out at the time, he says, I am making sure that this group of people are not going to be able to go to school with white people.

Q.  And by "this group of people," do you mean minority residents?

A.  I do mean minority residents, though it spoke to black people.  He doesn't use the word "black people."  And it was used even though it was not there to in fact segregate other groups as well.

Q.  Does that include Latino, Native Americans?

A.  It did.

Q.  Okay.  So in this letter that you're quoting, you highlight this term "Hoorah for Dixie."  And I wondered, what was the significance of you including that quote from the letter?

A.  Well, he is saying to Congressman Hayden that we are buying into the white supremacy and the segregation laws of the former Confederacy, which is what "Dixie" generally refers to.

Q.  Okay.  And so does --

A.  Saying, "Hoorah for Dixie," in this case for himself and

his belief that his amendment, which he says has ensured segregation of the schools.

Q.   So as a historical matter, when -- there's a difference between mandatory and permissive for school segregation.  Did that -- was that as a practical matter meaningful, that difference?

A.   In Arizona?

Q.   In Arizona.

A.   No.

Q.   So was this de jure segregation, meaning done explicitly based on -- discrimination based on race?

A.   Yes.

Q.   And then on page 26 you talk about this system of official segregation lasting into the 1950s.  What happened then?

A.   I am not getting the document here.  I am using this, but it doesn't seem to be projecting.

Q.   Apologies.  Page 26, if you don't mind pulling that up.

A.   And the question was?

Q.   The system of official school segregation, what happened in the 1950s to it?

A.   Well, in 1952 with a court case, I believe it was '53, at least the decision was in '53, a court case ruled that segregated schools were illegal.  That's the year before the *Briggs v. Elliott,* which is really what *Brown* should be called, was argued or was decided.  So the year before *Brown v. Board,*

Briggs v. Elliott, Arizona ruled as a state court that segregating schools were unconstitutional.

Q.  Did school discrimination continue after that state court decision?

A.  Yes.

Q.  Was that a de facto discrimination, meaning not explicitly based on race but in effect?

THE WITNESS:  Can you repeat the question?

THE COURT:  Excuse me.  There's going to be an objection before he repeats the question.

MR. LANGHOFER:  This question is outside of the scope of the report.

MR. JOHNSON:  May I respond, Your Honor?

THE COURT:  Is it in the report?

MR. JOHNSON:  Yes.

THE COURT:  Where?

MR. JOHNSON:  The page we are discussing here, page 26.

THE COURT:  So I am looking at page 26, Mr. Langhofer. It says:  Even after school segregation officially ended, English-only classes denied access.

MR. LANGHOFER:  I withdraw the objection, Your Honor. Thank you.

THE COURT:  Thank you.

BY MR. JOHNSON:

Q.  So I guess, Dr. Burton, can you explain what the English-only access had to do with school discrimination segregation?

A.  Yes.  In 1913, Arizona passed a law that all school instruction had to be in English, and that meant particularly there were English-learning classes that those who did not speak English had to be in.

It was not just minorities, but it was mainly minorities, I believe, particularly Mexican Americans and others, Native American who did not speak -- and of course the problem is, the courses were not age-appropriate.

They were like looking at the shapes and colors and phrases like, I brush my teeth.  And you'd have older children there in those classes, so they're segregated from the regular classes, and therefore, they -- many of them just drop out instead of going through this embarrassing course having to repeat it again and again like that.  So that was another way of segregating.

Q.  We'll cover this more in a moment, but noting for now, do English language instruction requirements and inequalities continue in Arizona today?

A.  Yes.

Q.  So the report talks about other types of discrimination.  What about in housing in Arizona?

A.  Well, yes, you had particularly racial covenants and red lining.  You had situations where people had to live primarily in areas of -- that were mixed manufacturing and residential and therefore exposed more to the toxins and environmental problems that you have with manufacturing industry.

And, you know, you even have later on in the more modern period in the 1940s, funds that ended up removing groups of people as you built highways that were -- particularly hurt minority communities and had them removed.

You had Native American, the indigenous peoples, encouraging them to buy housing but not the places to go and also not enough money that was given by the bureau for them to buy homes in places.

Q.  So just two specific points on that.  What are the -- you said "covenants."  What are the covenants?

A.  Well, covenants laid out that if you bought a home in a certain area, you could not sell it to certain groups of people.  In other words, it restricted who could be there.

I have an illustration of one in fact in my co-authored book Justice Deferred:  Race and the Supreme Court. It included almost all minorities, Jewish people often, and well, that's it, it restricted so people couldn't buy in places where usually those would be the best places for the equity in your home to increase, but you are excluded from them.

Q.  You have an illustration in your report, the Palmcroft

District.  What is that?

A.  Well, that is where -- not at that time, but Justice Rehnquist is living.  He bought a place and discovered later, I think during the first hearing when President Nixon appoints him, he is actually living in a -- or his house is covered by one of these restrictive covenants in that area.

Q.  You said the term "redlining."  Can you just briefly describe what is that term?

A.  That is federal government and state government and that is about loans and where people can get federal loans or even other loans, and it's called redlining because of the lines there, in those red lines are those restricted areas, usually not the better places, often maybe closer to dumps and trash and places or land that's not as good.

But once again, it was used as a way to restrict minorities as to where they could live.

THE COURT:  Dr. Burton, let me interrupt you a moment, because I've heard about banks and mortgage companies redlining.  Are you saying that in the State of Arizona there were actual state laws or local laws that redlined areas?

THE WITNESS:  The federal government itself provided these as federal funds often and the banks as well, so it is state -- and some states do -- did.  I am not sure about Arizona and the banks, but since it was particular, say for veterans, then we think that -- well, and African American or

Hispanic, or in Arizona you have the Native American heroes of World War II, then they are eligible for the veterans home loan.

But when they go to get their loans, they cannot buy them in the same areas as white veterans can.  I can give you a great example.  My father-in-law, you know, was able to use the veterans loan.  He was white, although he claimed Irish identity.  He was able to buy where his house increased in equity and was able to send his four children to college, so it contributes to generational wealth that I sort of outline in Justice Deferred.

THE COURT:  So are you saying that redlining though was a federal policy for -- for example, VA loans or FHA loans?

THE WITNESS:  Yes, ma'am.  Yes, ma'am, it was.

THE COURT:  Thank you.

THE WITNESS:  And it's explained in some detail in the book I was talking about that I did if you are interested.

MR. JOHNSON:  Thank you, Dr. Burton.

BY MR. JOHNSON:

Q.  And did you discuss segregation in other public spaces in Arizona --

A.  Yes.

Q.  -- history?

What were those?

A.  Particularly black people not allowed into certain

restaurants or be in certain places.  One of the classic example, very similar to the former Confederacy, was swimming pools, where white people were able to swim after it was cleaned.

And then the last day before it was cleaned, then the minorities could use the pool and it would be cleaned, and whites again.  But it was common practice in terms of segregation.

Q.  So at a conceptual level, how does this history of discrimination in education, housing, other areas, how does that relate to voting in current conditions of discrimination?

A.  Well, they grow out of that in the current area of discrimination.  This has been the pattern.  You talked about patterns earlier.  They continue.  And of course they interact with each other, these different Senate factors as well, and then put a disparate burden upon minorities when they deal with voting and issues of voting, particularly minorities in Arizona where voting instructions and things are mailed out in English only.

Q.  So we talked a little bit about your comparative history methodology approach earlier.  Do you consider Arizona to be akin to the South?

A.  What do you mean by "akin"?

Q.  Do you see historical connections in your comparative approach between Arizona and what we think of as the Deep

South?

A.   Yes, in terms of the laws, the segregation laws and the voting laws of restriction.

Q.   Have you conducted -- I think you said you conducted some research about this topic; is that right?

A.   Yes.

Q.   Let's turn to page 24 -- well, I guess did you discuss instances of the Klan, the KKK having presence in Arizona?

A.   Yes, there was an active Klan in Arizona in the 1920s, actually earlier than the 1920s.  They were successful, I think, in getting someone recalled.  They were unsuccessful in defeating Governor Hunt, but they were very active in Arizona in the 1920s.

Q.   You have this phrase that stuck out to me, that academics use the phrase, "Jim Crow Southwest."  What is Jim Crow Southwest?

A.   This is referring to Arizona being Jim Crow states, or the segregation states of the South, usually referring to it about the 1890s through -- well, it depends, *Brown v. Board* or *Briggs v. Elliott*, sometime even in the voting rights, that it was the Jim Crow of the Southwest, Arizona.

Q.   Okay.  So we have covered some history of discrimination in other social areas.  Let's talk specifically about in the voting system.  You brought up the literacy test earlier.  We can start there.

And let's turn back to page 18. And you talk about the Hampton Educational Qualifications Measure. Again, I think you mentioned this, but that was the first literacy test, right?

A. That's right, when Arizona was a territory.

Q. And on page 19, you have this quote from the Arizona Attorney General referring to "ignorant Mexican vote." What do you mean by that? What's the connection of that quote to the literacy test?

A. Well, the idea that Mexican Americans are ignorant or even purchasable, that they are ignorant and poor and should not be voting, sort of a trope that's going on at that time, and you can see it continuing, some echoes of it unfortunately even today about groups of people by ethnicity.

Q. And I will skip this because you mention that Senator Beveridge, Congress intervened with this Hampton Measure?

A. Yes.

Q. So let's go back -- we'll skip that one and go back to page 28. Did Arizona renew the literacy test when it became a state?

A. Yes.

Q. And what year was that?

A. 1912.

Q. And then in the interest of time, let's go to page 31. How long did the literacy test last until?

A.  Until 1972 when Justice Hugo Black did a rather famous ruling when Arizona joined Oregon, a couple of other states, in *Oregon v. Mitchell,* and he ruled against the literacy test in 1972.

Q.  And that case you are referencing, is that *Oregon v. Mitchell*?  That's the case?

A.  Yes.

Q.  And about halfway down this page, in this highlighted passage, you mention the literacy test not surviving as a fossil.  What do you mean by that?

A.  Well, it was used.  It was used to stop people from registering, to stop them particularly at the polls from voting, and it was used as -- I think the best way to describe, an intimidation tactic.

I have examples that lay out that people were -- felt intimidated by the challenges at the polls.

Q.  Was that on a discriminatory basis?

A.  Yes.

Q.  So on page 32, you have an example from the 1960s called Operation Eagle Eye.  What is Operation Eagle Eye?

A.  Well, it really came out of -- can I just take a moment to put background?  Is that okay?

THE COURT:  Yes.

THE WITNESS:  Just very briefly.  After Richard Nixon lost a very close election to President Kennedy, a lot of

ORVILLE VERNON BURTON, PH.D - DIRECT EXAMINATION   1431

people were upset.  And a group of Arizona attorneys with the 1964 election started challenging people at the polls.  And that actually becomes the basis or the framework of what becomes known as Operation Eagle Eye, which has been talked about as sort of a caging process to identify certain voters.

In this case it was primarily of ethnicity and challenge them to stop them or to make sure that they were -- both would have passed the literacy test or were citizens or whatever else.  But it was really sort of racially, at least people -- scholars looked at it as a racial profiling.

BY MR. JOHNSON:

Q.  Okay.  So how did the literacy test intersect there?

A.  Well, you had to be able to read or understand the Constitution and write your name in English.  So that was how the literacy test was used.

Example, we have in the literature Judge Rehnquist sometimes used the Pledge of Allegiance that I have in the report, as I remember.  But it was to challenge people on -- if they were literate or not.

Q.  Okay.  And even apart from these challenges, did you find that literacy test was applied in a discriminatory manner?

A.  Yes.

Q.  Okay.  What happened to the literacy test in -- or scratch that.

So you talked about -- before the literacy test, about

UNITED STATES DISTRICT COURT

the educational discrimination and school segregation in Arizona. What is the interplay between those things and the adverse effects of the literacy test?

A. Well, if you are not having the same educational opportunities, it's more difficult then to pass the literacy test. Did you just ask about the literacy test or were you talking about -- did you ask about other things?

Q. Yeah, my question is, this history that you laid out about discrimination and segregation in education, how does that interplay with the literacy test?

A. Well, there's been a long pattern of using the literacy test in 1972, and you can argue that in some ways language is still an issue in voting. I guess I still don't quite understand what you are asking. One more time. I apologize.

Q. I think you answered it.

Your report covers some other historical voting discrimination that we can just quickly walk through. Let's briefly start with Native voters. Were Native Americans allowed to vote when they gained citizenship?

A. No. It was 1924. That was the Dawes Act.

Q. That was the citizenship grant?

A. Yes.

Q. Did they gain the right to vote in 1948?

A. Yes, with a court case. That -- Justice Udall, state court, as I remember.

Q.  And just turning back one page to 31, you reference this 1947 report of the President's Committee on Civil Rights.  What are you getting at there?

A.  Well, that's President Truman's Secure These Rights report of the Committee on Civil Rights.  And I mean, it's part of what sparked off the Dixiecrats with Strom Thurmond, the state rights party, along with the integration of the armed services.

        But in that, particularly at that time, it was said or scholars have said that Justice Udall was affected by this as it talked about how Native Americans in particular had been treated just as badly as black people in the South.

        And I think it mentions black people in Arizona also had been treated just as badly as they were in the American South, the old Dixie.  Goes back to the "Hoorah for Dixie" sort of idea, and it particularly singled out, and this was important to Truman, the contribution of Native Americans and the black people fighting for democracy abroad in World War II.

Q.  And so once Native Americans formally had the right to vote in 1948 was that -- everything is equal and fine at that point?

A.  No.

Q.  And why not?

A.  Well, I believe, if I remember correctly, it was about only 20 percent of the Native American population were proficient in English, and, you know, others were using their native languages.  So once again, you have the literacy test as a way

to stop Native Americans.

And really until the Voting Rights Act, I believe it was '72 and then the '75 amendments, it says if you have five percent of the population in a particular area, then the voting, at least the ballots and things, have to be provided in the language of that group of minorities that make up five percent of the population.

But more than that as well, still the number of post offices, the voting centers, all of those things, the huge area there, the roads, the bad paved roads. And when I was doing this report, I found an article in The Atlantic that said, it's hard to believe that you would think that in Arizona there would be conditions of the Third World, and it pointed to Native American reservations as an example of that.

And so all of those socioeconomic factors you asked me about earlier came into play there very much on putting extra burdens on a group of people that actually need help instead of more burdens.

Q.  So I want to discuss some other prior voting-related practices and discrimination more generally that you have in your report. Still on page 33, going over to page 34.

You have this discussion of historical registration -- sorry -- registration list maintenance practices and statutes.

Did you find that in the '70s and '80s Arizona had discriminatory list maintenance practices?

A.   Yes.

Q.   What were those?

A.   Well, first of all, re-registration, sort of a total purge in 1970 and 1980, and all the social science literature points out when there are purges, and this was also common, or tried to be common, in the former Confederate states in particular, then with the re-registration the burden was harder and fewer minorities would register -- re-register as opposed to white.

As well as, I believe, if you missed one election cycle, you could be purged as well.  But I give an example, particularly here in Maricopa County of a registrar who insists on seeing citizenship as part of the re-registration, sort of an outcry.

It was very interesting, in 1970 people say this is not Arizona.  We don't need to have citizenship.  We never have as an example.

Q.   I will break that down just a little bit.  So in the 1970s you found this practice of election official asking for citizenship when people registered or sought re-registration?

A.   Yes.

Q.   And that was sort of after they have been removed from the rolls?

A.   It was a re-register -- yes, but also everybody has to re-register.

Q.   And I guess I should ask first, when people are removed

from the rolls, they get a notice or something in the mail?

A.   They are supposed to.

Q.   And do -- how does that -- how does that affect voters who are English-language learners like we just talked about?

A.   Well, it's only in English, and as we pointed out too, particularly, minorities tend much more not to own their own home but be renters, so those addresses can change and they change more quickly.

But particularly for Native Americans there are a group of addresses that aren't standard, and so reaching them is a problem as well.

Q.   So -- and this instance in the 1970s that you mentioned, I think you're talking about what you have on page 51 going to page 52?  Am I getting that right?  Am I tracking you?

A.   On page 51 and 52?

Q.   Yeah, making sure we are talking about the same thing.

A.   Let me see here.  Yes.

Q.   And was there a law at that time that required showing proof of citizenship?

A.   I did not see one.

Q.   Okay.  So this was a practice in -- being done in Maricopa County?

A.   That is correct.

Q.   And you said there was some outrage about this.  What did you find in researching this?

A.   There were people who said, this is sort of not American. And there was one person that said, thank goodness in our county we don't have someone who wants to do this kind of thing, going beyond what has been required before.

There was a -- I believe it was either a county councilman or a legislator who made some statements along those lines.  It got sort of personal actually between the recorder and others.

Q.   Is this -- what you are referring to, is it this, "Mr. Marston's practicing the worst kind of discrimination"? Is that the line you're referencing?

A.   Yes.  I don't see where it is, but I'll find it if you want me to.  Yes, I see it.  Yes.  That is Harold Giss, and he was a state senator.

Q.   Also on these pages, extending to page 53, your report talks about the state of voting laws generally in 1982.  As a historical matter, what's the significance of 1982 to voting laws?

A.   Well, 1982 was the major 25-year extension of the Voting Rights Act and my co-author was one of the people in charge of getting that through Congress of Justice Deferred.  And so that is like the major renewal of the Voting Rights Act in 1982.

Q.   Okay.  And as of that major renewal in 1982, did you look to see if there was any directly analogous laws to the provisions being challenged here in -- did you find any

instances of that?

A.  No, I did not.

Q.  Okay.  What was involved in your search?

A.  Well, I read the newspapers which I rely on a lot, usually tells you about these things.  I looked at bills, and I also tried and also charged research assistants to help me to search for these laws.  And I used Westlaw with the keyword trying to find these and I did not.

Q.  So turning back to page 46, you talk about more recent years of voting conditions access in Arizona.  You reference on 46 this "five voting rights issues" about halfway down.  What is that?

A.  This was the U.S. Commission on Civil Rights report, and it lists the five most common practices that have been used since the *Shelby v. Holder*, which ruled that Section 4 of the voting rights that was unconstitutional, basically gutted section 5, the areas that was covered in Arizona was covered.  So they went through these five ones and looked at each state that had been covered under section 5 and which ones -- which states had used which of the -- what would be called either enhancement or disfranchising devices or putting a heavier burden on minorities.

It would have been covered, you know, under Section 5, so they would have had to have been precleared or gone to a, you know, federal court to do that.

Q.  Okay.  So are you looking at these five areas to provide some context about how to evaluate the difficulties in the voting system?

A.  Yeah, yes.  And they did that by ranking the state -- or looking at each state that was covered.  So I was able to use what they had done.

Q.  Okay.  And what did the Commissions report find with respect to Arizona?

A.  It had -- they said it had done three of these devices.

Q.  Did you agree with that, upon looking -- I guess this report was 2018 so --

A.  Yeah, initially I did until I got -- and I had used this before in other court cases, until I got into studying the record itself in Arizona.  So I thought it also -- Arizona either since 2018 or they had missed, had done all five.  The only state that was listed to have used all five was Georgia.

And Arizona, three was one of the top.  But not -- but I decided that in fact in my analysis that Arizona had used the other two as well, at least since 2018.

Q.  Okay.  So the first issue was voter ID law.  You found that Arizona has a voter ID law?

A.  Yes.

Q.  How about proof of citizenship.  You understand that that's an issue in this case?

A.  I do.  And yes, it was there in 2004.  It was the first

state to require proof of citizenship as I remember.

Q.  And number 3, voter purges.  Same question?

A.  It's interesting.  They -- the report had not listed voter purges, but, you know, later reports that come up by Demos and the Brennan Center, you know, do list voter purges.

Q.  And how did those reports think that Arizona, you know, compared to other states on voter purges?

A.  Arizona did not compare well to the other states, particularly on voter purges.

Q.  And how about number 4, cutbacks to early voting opportunities?

A.  Yes.  As I looked at particularly these laws, it dawned on me that it's more of a -- maybe you'd call it mode than days, but with the new law that says federal -- if you are using the federal form you can vote, with some other provisions, you can vote in the Congressional election if you haven't done the state, but you have to do it in person so that Arizona is sort of famous for its absentee voting and how widespread it is and by mail and mail-in voting.

But now the person would have to show up in person to vote.  So I see that as a way of limiting early voting.

Q.  And how about how voters are on the early voting list?

A.  Yeah, well, now it's made it much easier to take people off the early voting list.  I think if you miss two elections, then you can be taken off --

Q.  Okay.

A.  -- of the early voting list.  So that again is a way of shortening early voting.  It's more a question of mode, I think, than the temporal that you would think of, but I see it fitting under that category.

Q.  The number 5, widespread polling place closures.  Did you find that one too?

A.  Yes.  And I believe it's the Leadership Conference's report which said that only Texas had had more.  It was 300-something polling place closes listed in that report.

Q.  So you noted that many people in Arizona vote by mail.  I guess I am wondering, how does that affect your conclusions about the openness of the voting system here?

A.  I think it's great; however, you got to get registered first to vote.  But I think it's wonderful that Arizona allows people to vote by mail.

Q.  So restrictions on registration that prevents you from voting by mail in the first place, is that what you're saying?

A.  Yes, that you have to be registered before you can vote, and if you're putting restrictions and heavier burdens on a certain group of people, then you are putting, it seems to me, discriminatory burden and perhaps discriminatory intent, I would argue.

Q.  Let's turn to Section VI now where you -- titled Modern Continuing Discrimination.

ORVILLE VERNON BURTON, PH.D - DIRECT EXAMINATION   1442

A.   Can you help me with the page?

Q.   Yes, that's page 36.

A.   Okay.

Q.   And it's the -- what I am asking about is really the second paragraph under Section VI where you have the phrase that says, "led to."  Arizona's history led to significant disparities. What do you mean by that?

A.   Can you point me to where -- oh, is it highlighted here?

Q.   I was just asking about that first sentence.

A.   I'm sorry, I don't see the "led to."

Q.   Oh, apologies.  I took -- "has resulted in."  My apologies.

A.   Oh, okay.  Okay.

Q.   Yeah, so I am asking --

A.   Can you give me a moment to read it?

Q.   Sure.

A.   Okay.

Q.   What do you mean by that?

A.   Well, I think "led to" is a fine word of it that you have a history, an official history of discrimination in Arizona, and that's been documented by courts before, that I have done this. And that has had the effect, particularly on the socioeconomic factors like health, education, literacy, housing, things like that, to sort of interplay with each other to have an effect on minorities and naturalized citizen who are attempting to vote. And it puts extra burdens on them.

Is that your question?

Q.  That is my question.  I guess I'm trying to figure out, seems like you are describing a relationship.  Is that -- are you saying that's the only explanation?

A.  No, it's one of several, but it's very significant.  And it's one of the things that doing a totality of the circumstances, Senate 5 factor, you know, I'm trying to present information to help the Court and the attorneys to come to the legal conclusions.

I am not trying to do a legal conclusion but presenting the evidence is what I am trying to do.

Q.  And on page 37 you discuss some academic literature on this point.  What are the findings in academic literature?

A.  Well, it goes back.  Sort of famous one that has been updated a lot now is Who Votes by Steven Rosenstone and Wolfinger, and there's been a lot more literature to that as well.

But it basically says that there's a correlation, particularly between education and voting, but also with employment and wealth, all of these things make it -- they even talk about a "regional memory" for the South there in terms of the problems with voting.

I'm not sure I cite it here, but I have used before, even things like moving a polling place just a little bit has a disparate impact on poor and minority voters than it does

others, and there are other examples like that.

And most of that is covered in the literature in the footnotes that I have summarized here.

Q.  Footnote 104 on page 38, is that some of the other literature?

A.  Yes, 103 and 104.

Q.  Okay.  And again, apologies for taking things a little out of order here.  Can we turn back to page 8 where you discuss some demographic trends?

A.  Yes.

Q.  And I'll just go over this quickly to get your high-level view on things.  So according to the data reviewed, what did you find were some of the relevant demographic trends in Arizona over the last decade?

A.  Last decade or the last two?

Q.  Last two, yeah.

A.  Well, basically it's the same.  The recognition that the non-Hispanic white population is decreasing and at the same time, the minority population, particularly Mexican American or Hispanic, Asian, Pacific Islanders, those populations are increasing.

And the rate of increasing -- that they are increasing is pretty significant and gives a perception of what in several states like Arizona, Arizona is not there yet, but it looks as if Arizona is moving towards a majority minority state in that

direction, so I give both numbers and try to give a rate of change as well.

Q. So just to clarify one thing. So when you say "increase and decrease," that's increase rate compared to the total population, not net increase and decrease?

A. That's right. That's right. How they compare within -- what percentage of the population is non-Hispanic white. What percentage of the population is Hispanic and --

Q. Turning to page 9, you discuss immigration trends as well?

A. Yes.

Q. At a high level, what did you find concerning the census data about Arizona's foreign-born population and naturalized citizens?

A. It has really increased, and the rate of increase is pretty extraordinary.

Q. And so what's the rate of -- what was the rate of increase since 2000, for example?

A. All right. Well, if I am reading right here, 39.6 percent increase since 2000, and about 136 percent increase from 1990 to 2000. That's the rate of increase.

Q. That's the foreign-born population?

A. That's right.

Q. And then further down you talk about naturalized citizens. What percentage of that foreign-born population in Arizona was naturalized as of 2021?

A.   It's right at 50, I think.  I'm looking -- if I look down, I see it as 48.7 percent.

Q.   And is that an increase over the preceding decades as well?

A.   Yes, more than 25 percent increase, almost a third, about 30 percent as I remember.

Q.   And then last question on this subject.  You talk about some trends concerning, you know, urbanization and rural living trends.  What did you find there?

A.   You know, I was president of the Agricultural History Society and it's just amazing how not that long ago Arizona was -- its residents were considered rural, and now 90 percent are considered urban.  And then minorities, in particular, are sort of intercity.  Minorities at a high rate.  And I give examples there of black and other populations and where they live.

Q.   Okay.  Let's turn back to section VI.  We will go to page 39.  And you discussed some conditions of inequality in Arizona on that page about education?

A.   Yes.

Q.   What did you find?

A.   Well, minorities score not as well as non-Hispanic whites almost every measurement, whether it's reading, whether it's math.  Those levels that are standard to see how students are performing and doing, and also naturalized citizens, which are overlapping somewhat in terms of minorities.

Q.  And when you say "not as well," can you give us a sense of -- was that significant?  What's the magnitude?

A.  It was very significant.  Let's just take the first one, fourth grade level in mathematics was 32 points less than white students.  Hispanics were about a quarter less than white students.  That's the first one that I see just glancing down without trying to read through it first.

Q.  Yeah, and 32, just to clarify, you are referring to black students?

A.  32, sorry.

Q.  So did you find -- as that one illustration, did you find that these conditions of education inequality in Arizona, was that persistent and large?

A.  Yes.

Q.  And you mentioned school discipline -- scratch that.

Before we go there, you reviewed some education disparities for Native American students as well.  What did you find there?

A.  Yeah, that was pretty bad.  The graduation rate for African [sic] Americans was close to the lowest of any ethnicity or group.  It was 72 percent.

Q.  And you said African Americans, but did you mean Native Americans?

A.  I meant Native Americans.

MR. LANGHOFER:  Your Honor, may the record reflect the

witness is reading from his report?

THE WITNESS:  Well, I was looking down to get the number.  I'm sorry.  I'm sorry.

THE COURT:  I think -- the objection is overruled, but, again, you have reverted back to basically having the witness read his report to us because you are reading it partially to him rather than my hearing what his opinions are.

MR. JOHNSON:  My sincere apologies, Your Honor.

BY MR. JOHNSON:

Q.  Dr. Burton, is your opinion that there's significant educational disparities in Arizona on the basis of race and ethnicity?

A.  Yes.

Q.  And you talk about school discipline.  Does school discipline support -- disparities in school discipline support that opinion as well?

A.  Yes.

Q.  A few moments ago we talked about the historical interplay between educational disparities, school segregation, and the literacy test.  Do these continuing educational disparities now have interplay with voting restrictions in the present day?

A.  Yes.

Q.  How so?

A.  Well, as we said, the voting materials are in fact sent out only in English and notices, things of that nature make a

difference.  And plus particularly some of the complications, particularly under these bills that are being challenged, those sections, they can be rather complex.

So to be able to understand -- I'm sorry, to be able to understand those particular factors of education and literacy in Native language -- is going to be more difficult to interpret.  What you have to do, when you have to do it, even to a little point like reading -- I looked at one of the forms, and you know, if you don't check a box, these things can be a little intimidating, I think at least for me sometimes, filling out forms and things, understanding what we need to be done to be registered, particularly reregistered after you have been taken off of a voting --

Q.  Dr. Burton, you talked about the notices in English.  Do you understand that sometimes they're sent out in other languages, election notices?

A.  Sometimes.

Q.  But they are sometimes not?

A.  That's right.  Particularly there are areas where minorities live where there aren't five percent, and they are not covered there.

Q.  By "covered," are you saying covered by the Voting Rights Act?

A.  Yes.

Q.  Your report next discusses conditions of inequality in

terms of poverty and economic success. In broad terms, what did you find?

A. That minorities are less well off. That they are more -- compared to white non-Hispanics, they are more in the level of have a greater proportion of their population in poverty.

As I said earlier, they are less likely to own homes, health disparities, which are all related in some way there with minorities, as part of being a minority and the statistical measurements that are there from the census and Kaiser data and other records that you can get this kind of information for.

Q. So I think in that answer you talked about, you know, economic success, housing, health, before we were talking about education, how do these -- why do these conditions of inequality matter when it comes to understanding the effects of the laws that are being challenged in this case?

A. Well, as I said earlier, if you are -- don't have an equal education opportunity or equal education, it's harder to understand what you have to do.

But secondly, wealth comes in and employment related to wealth too, even to -- if you have to get off work to prove these things or to go about getting these material -- it can be like a poll tax, to say it takes more -- it's more of a burden to do it.

Not having cars or transportation, if you need to do

that, all related to wealth.  And we've talked about the health issues.  And, you know, there are examples there that we went back to covenants, redlining.

But also a great example is the extraordinary COVID infection among Native Americans on the reservation compared to other groups of people, so that would affect one's ability to do things.

Q.  Okay.  Somewhat unrelated to this, on page 41, bottom of 41 going over to 43, you talk about racial profiling.  What is that recent environment of racial profiling in Arizona that you discuss?

A.  Well, Arizona has been -- I mean, people point to Arizona. Particularly I gave two examples of course.  The first was a 1977 Chandler roundup, and then a decade later the Maricopa County with -- particularly Sheriff Joe Arpaio.  And I talk about both of them there where it's basically racial profiling where people are singled out.

Q.  Okay.  And I think you said '77, but --

A.  Did I say '77?

Q.  Is it '97?

A.  Yes, sorry.

Q.  And then further down on that page you discuss some legislation, SB 1070, you quote as the "show me your papers" law, is that also sort of an instance of racial profiling from your historical view?

A.   Yes.

Q.   So how do you evaluate this environment of racial profiling in Arizona when it comes to -- how do you think these Challenged Laws will affect minority voters?

A.   Well, it is intimidation factor.  People have been targeted.  People have been targeted just for their color or their ethnicity.  And so do you want to risk being singled out and having to prove these things is very important, I think in understanding how these laws will have a disparate effect to different groups of people.

Q.   So let's turn next to your last topic.  The racial appeals in the electoral environment.  It's section VII of your report. It starts on page 53, but let's go ahead and skip ahead to page 59.

     Here you talk about this difference of overt versus subtle racial appeals.  Can you describe for us what is that?

A.   Yes.  There's a long literature that -- you know, before the Voting Rights Act, it was not uncommon to use the kind of language that was in the letter in 1912 that I quoted, but left out the offensive language, to rally people, to sort of motivate their racial fears or ethnic fears to get them to vote.

     And that has changed, and I go through the literature in the report explaining how now scholars talk about coded racial appeals, that it has the same effect without using the

offensive words.  So using terms like "welfare queen," "young strapping buck," things like that.  And then it gets more and more subtle.

And there's a big scholarly literature on this now.  I cite two people who talk about it and give these kind of examples of how these coded words develop over time.

Q.  And on that literature, a phrase you use is "coded language to activate racial thinking."  So can you explain, how does it activate racial thinking?

A.  Well, instead of saying you're talking about black people or immigrants or people of Hispanic origin, the words trigger that in the mind of particular voters or particular citizens to associate with that.

And I give the example of someone sort of who was confessing -- one of the leaders of it in there, that I think explains it better than anything.

Q.  Okay.  So I'm curious particularly about "voter fraud" as a coded word.  Can "voter fraud" be a racial code word?

A.  Yes.

Q.  Is any reference to voter fraud considered a racial appeal?

A.  No, it has to depend on the context, of course.

Q.  What kind of context matters?

A.  Well, particularly after the -- what many people see as a hanging chad debate in the election of 2000.  Voter fraud has become used more and more and more, and it really accentuated

in 2016 with the campaign of Donald Trump, who became President.

And then particularly, using that trope again and again and again and referring to groups of people as -- that he did not lose the election, but the election was stolen because of voter fraud. And that's been picked up by -- that banner has been picked up by a lot of other people, including significantly people in Arizona.

And that idea of voter fraud is pretty straight in line, kicks off illegal -- people voting who are not citizens, inner city people, minorities who are not trustworthy or don't know what they're doing or being bought off by groups.

Q. So does some of that context -- like references to, quote, "illegals," is that, you know, sort of the context that would make it seem like racially coded use?

A. That's right. In the context in which it is used, yes.

Q. And how about talking about migration from certain countries and voter fraud, is that also the type of context?

A. Yes, it has been used that way.

Q. What about talking about voters in urban areas?

A. Particularly became that way with the 2016 election and then 2020, and since then pointing out particularly former President Trump and even before he was -- even when he was running, pointed to inner city places as places where voter fraud was rampant and has become a particular code word.

ORVILLE VERNON BURTON, PH.D - DIRECT EXAMINATION    1455

Q.  Has voter fraud been used historically to justify voting laws?

A.  Yes.  It really begins in 1967 [sic] when black men are first enfranchised during Reconstruction, and every time, at least in my study, the reason given when things like the poll tax, the white primary, the -- any of these disfranchising -- the literacy, the excuse always given is voting fraud.

But court cases have instead, when they have turned them over, says those were tenuous arguments and instead that it was the desire to disfranchise people for political advantage is the real reason when they have been found unconstitutional, almost all of those laws were found unconstitutional.

Q.  You said 1967, then you said Reconstruction.  Do you mean --

A.  I meant 1867.  I'm sorry.

Q.  Great.  No worries.  Slip of the tongue.

So on page 63 of your report, you talk about this quote from Donald Trump about voter fraud in cities.  Can you -- is that a racial appeal in campaigning?

A.  Yes.

Q.  Can you explain why?

A.  Well, he's talking about where minorities are -- I believe this one -- I didn't really look down at.  I use Philadelphia, Chicago.  I mean, I put those in there.  And he tells them,

you've got to be very careful of these people.  These people and these voters in particular.  Where -- in this case it was known to be minorities in particular, whether they're black people.

Q.  And on page 67 of your report you talked about this Republican Congressional candidate in Arizona, Candidate Mercer.  Do you find that was a racial appeal?

A.  Can you point me to where this is?

Q.  65.

A.  Is it 67?

Q.  The beginning of the last paragraph?

A.  65 instead of 67?

Q.  I may have misspoke.  65.

A.  Okay.  Yes.

Q.  And what was that racial appeal, in your view?

A.  Well, it was Middle Easterners are only there to hurt people of color, to hurt Americans.

Q.  And you are paraphrasing the candidate?

A.  You want me to read it?

Q.  No, that's okay.

A.  Says it's the only goal in life, is to do harm to United States citizens.

Q.  You also have this quote from -- on page 66 from an Arizona Representative David Stringer at the top, in the carry-over paragraph?  Do you see that?

A.   It's not highlighted.  I will find it.  It's page 66?

Q.   66.

A.   Who am I looking for?  David -- yes, I see it.

Q.   And what was that instance?

A.   Well, he had made the statement that there's not enough white children, making a comparison to minority children, saying that minority children were a burden.

Q.   Are you sort of paraphrasing again?

A.   I am.  "Enough white kids to go around," is what he said.

Q.   Page 67, you have this --

A.   And let me correct.  He said there's not -- that the non-native English speaking were a burden, not minorities.  But those non-- which is, I think, means the same thing pretty much.

Q.   Okay.

        MR. LANGHOFER:  Your Honor, I hate to be a stickler about reading from the exhibits.  If we want to refresh his recollection, obviously we'd have no objection to that.

        MR. JOHNSON:  I will rephrase the question.

        THE COURT:  Thank you for reminding counsel, Mr. Langhofer, that this is supposed to be testimony, not reading to me from a report that will not be admitted into evidence.

        MR. JOHNSON:  Yes, Your Honor.

BY MR. JOHNSON:

Q.  Do you recall looking into a Trump campaign rally in Mesa, Arizona?

A.  I do.

Q.  And what did you find in terms of racial appeals in the electoral environment from that campaign rally?

A.  Well, Marjorie Greene Taylor [sic] was there and gave a speech and she went straight to sort of what is called White Christian Nationalism, but particularly replacement theory. That these minorities, particularly immigrants, are coming in to take your place, take your jobs.

It actually sort of reminded me of going back to one of the earlier campaigns when my friend Harvey Gantt was running for Senate against Jesse Helms, and you had a black hand coming to take away the job from a white person.

But it's that kind of mentality sort of brought down that is a clear racial appeal and demonizing or what many scholars would say othering a different group of people.

Q.  Do you recall discussing a July 2021 Phoenix Trump campaign rally here in town?

A.  Can I ask what page?  I do remember that, but --

Q.  Yes.  To refresh your recollection, it is on page 68.

A.  So this is Phoenix, correct?

Q.  Yes.  And if you look -- the second full paragraph about halfway down.

A.   Yes.

Q.   And you said it, "replacement theory," is that sort of the same?

A.   It very much is, except here he's talking about different countries, Venezuela, Haiti, sort of singles out the countries that would be, but it fits into the replacement theory idea.

Q.   Those are sort of non-Hispanic white countries?

A.   That's correct.

Q.   Okay.  And you understand that voter fraud was a justification for passing the bills that we're talking about today?

A.   I do think that that was the reason given.

Q.   And sort of viewing those references in context, as you do in your report, did you view that some of those were racially coded appeals?

A.   Yes.

Q.   And again, it's sort of -- there's a difference between subtle and overt racial appeals, right?

A.   That's correct.

Q.   And would those be sort of along the subtle lines?

A.   Some of these are getting pretty --

        THE COURT:  I was going to say, which ones are subtle? The last couple you have asked him to testify about weren't even remotely subtle.

        MR. JOHNSON:  Understood, Your Honor.

BY MR. JOHNSON:

Q.   Are some?

THE WITNESS:   That's what I was going to say, basically.  Same.

Q.   My apologies for that question.

A.   And -- well, I shouldn't opine unless you ask a question, but for me it's sad as a student of democracy and American history that we are sort of reverting back to something that we thought was in the past.

MR. JOHNSON:   I will pass the witness then, Your Honor.  Thank you.

THE COURT:   Thank you.

MR. JOHNSON:   Oh, Your Honor, I just wanted to note one thing for the record in response to counsel's objection earlier about notice.

Dr. Burton's report on page 1 discusses the 14th and 15th Amendment, intentional discrimination.  Numerous parts of his deposition talk about --

THE COURT:   I am not sure why you are putting this on the record when I didn't hear an objection during the testimony of Dr. Burton.

MR. JOHNSON:   Yes, Your Honor.  Thanks.

THE WITNESS:   Would it be inappropriate, Your Honor, if I asked for a quick restroom break?  Is this a bad time?

THE COURT:   Not at all.  We can take our 15-minute

break right now.  Court is in recess until 2:35.

(Recess taken at 2:20 p.m.; resumes at 2:37 p.m.)

THE COURT:  Thank you.  Please sit down.

Mr. Langhofer, you may proceed.

MR. LANGHOFER:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. LANGHOFER:

Q.  Good afternoon, Professor.  It's nice to see you again.

You and I have quite a bit of ground to cover today, but let's pick up with dog whistles.

A.  Sorry, I can't hear you very well.

Q.  I am going to move this microphone a little bit closer to me.

I said you and I have a lot of ground to cover this afternoon, but I want to start with dog whistles.  One of the people who was using a dog whistle, or maybe that's too charitable, Gabriela Saucedo Mercer, who -- she had the reference to Middle Easterners.  Do you remember that?

A.  I remember that.

Q.  That was 11 years ago, wasn't it?

A.  I would need to look at my report to get the time.  Can you tell me what page it is?

Q.  Yes.

MR. LANGHOFER:  Elaine, can we have the laptop at the podium, please?

BY MR. LANGHOFER:

Q.  We are looking at page 65 of your report.

Do you see that?

A.  Yes.

Q.  Okay.  So the incident that you are referring to was 11 years ago?

A.  Yes.

Q.  And do you know whether Ms. Mercer lost her election?

A.  I believe that she did.  When you say "know," my memory is.

Q.  I understand.  You also talk about Andy Thomas, who made racially charged comments in 2014, right?

A.  Can you show me where?

Q.  Yes, sir.  Same page on the screen.

A.  Yes.

Q.  And Mr. Thomas also lost his election?

A.  Yes.

Q.  In fact, he was disbarred, wasn't he?

A.  I knew there were issues.  I did not remember he was disbarred.  I know there were some issues.

Q.  On the next page, sir, we're going to look at page 66, if you need to refresh your recollection.  You talked about David Stringer.  In 2018 he made this white replacement theory comment, right?

A.  Yes, if you want to -- I did not characterize a white replacement theory, but I would agree with you.

Q. Mr. Stringer resigned from the state legislature in disgrace because of incidents like this, didn't he?

A. I do not know if it was in disgrace or not, but he resigned.

Q. All right. Let's see. You talked about Wendy Rogers, I believe, on page 67. Let's pull that up.

Do you recall that, sir?

A. I see it here. Give me a moment to recall it.

Q. Yes. Take your time.

A. Yes.

Q. And -- partially as a result of her comments that were racially insensitive, she was censored by the Arizona State Senate, was she not?

A. Yes.

Q. You talk about Blake Masters; do you remember that?

A. Yes.

Q. Blake Masters lost his election, didn't he?

A. Yes. Can you give me the page number where that is?

Q. Yes, sir. That's the next page, page 68.

A. Yes. Go ahead.

Q. He did lose his election, didn't he?

A. Yes. He's running again, though, I understand, for Congress.

Q. Well -- okay. He hasn't won? He has not won an election, has he?

A.  I thought he had won an election.  Let me look at this again.  No, according to this, I didn't get into -- I thought he had been elected to something maybe in the state house earlier, but I don't remember.

Q.  Okay.  Let's see, you mentioned Joe Arpaio, of course.  His racially targeted round-ups were enjoined by the courts here, weren't they?

A.  Again, you would have to give me the page, but that's my memory.  If we are going to talk about it, I would like to have the page.

Q.  And he was eventually criminally convicted for disregarding this Court's orders, wasn't he?

A.  I believe that's the case.

Q.  And he subsequently ran for election to a different office and he lost, didn't he?

A.  Yes.

Q.  Donald Trump took no electoral votes from Arizona in 2020, did he?

A.  Since it's a winner take all, he did not.  But it was a very close election.  Very close.

Q.  Doug Ducey, who signed these bills, did you find any instances of him using dog whistles?

A.  I don't remember if I did or didn't.  I thought I had plenty of evidence of the use of dog whistles as examples, so I just didn't keep searching everything.  But I do not remember

seeing Doug Ducey using a dog whistle.  But that's memory, again.

Q.  What about Ben Toma, the Speaker of the House?  Any dog whistles by Mr. Toma?

A.  I don't remember him at all, seeing dog whistles.  But I -- go ahead.

Q.  Warren Petersen, President of the Senate.  Dog whistles?

A.  You know, I can't answer honestly, because I don't remember looking.  I found these that I have in the report that I thought were illustrative, but I assume not.  But I don't know if you are telling me not.

Q.  You also talk about -- I will pull it up on the screen so that you can look at it.  I am not trying to pull a memory test on you.  You talk about Evan Mecham -- well, do you remember Evan Mecham, sir, from your report?

        THE COURT:  I saw Evan Mecham at the top of the page.

        MR. LANGHOFER:  Thank you, Your Honor.  I am glad you have a keener eye than me.

        THE WITNESS:  Yes.

BY MR. LANGHOFER:

Q.  Governor Mecham was impeached, wasn't he?

A.  Yes.

Q.  Also he left public office in disgrace, did he not?

A.  I don't say anything there about him leaving in disgrace, but if you say he did, I wouldn't doubt it.

Q.   I guess what I am trying to get at here is, surely -- I think we agree people say inappropriate and offensive things about race, unfortunately, all too common.  But what I am looking for as an example, perhaps you can give us one, of someone who uses it as a political strategy in Arizona with success?

A.   I was not necessarily looking for success, but some of these races were extremely close.  And even though he's not in Arizona, very much influencing is the former President who was President when he was campaigning.

     And he certainly used these, and the election was razor thin close.  So that if you can keep out just a few votes of people that you assume might be voting a certain way, then it can make a difference in Arizona elections.

Q.   Let's talk about your experience in Arizona history.

     During your deposition, you and I had a long exchange about what publications you might have authored that were about really Arizona history.  Do you remember that?

A.   I thought you said that mentioned Arizona history, but how did you characterize it before I answer?

Q.   Well, let me put it this way, you and I have had a conversation about your publication record concerning Arizona, right?

A.   Yes.

Q.   And I asked you which publications you had authored that

were really about Arizona.  Maybe I'm not getting the wording right, but this was the gist of our conversation?

A.  Authored or edited as I remember.

Q.  Okay.  And you pointed to several sources that I just want to work through with you.  The first one was your book Justice Deferred?

A.  Yes.

Q.  And that's a book about the history of race decisions at the United States Supreme Court?

A.  I think it's more than that.  I would characterize it as a history of race through the lens of the Supreme Court from before there is a United States through the 2021 and the confirmation of Amy Coney Barrett on to the Supreme Court.

Q.  And you had offered that as an example of your publications about Arizona because some of those cases at the U.S. Supreme Court originated here, right?

A.  That's right, but also you have a number of people who are part of Arizona history who is listed, like Judge Rehnquist, Justice Sandra Day O'Connor, the one in Texas.  We hear they were both in the same class of course at Stanford and Law Review.  Yes, but it is more than just court cases.

Q.  The book is primarily though about the Supreme Court's national perspective on race; is that fair?

A.  With examples from the cases, and one of the things I like about the book, and that's been well reviewed by someone like

Randall Kennedy, is it gives the specifics about the people and how this all came about in the context over time.  So I -- yes, certainly, U.S. Supreme Court, but these come from all over the country.

Q.  The next example you gave was your book Age of Lincoln, right?

A.  Yes.

Q.  And that's a book about, as the name applies, Lincoln and the events around him and the Civil War, fair?

A.  No.

Q.  Please give us your characterization.

A.  It goes well beyond Lincoln.  It's -- Lincoln is assassinated of course in 1865.  It literally starts with sort of the millennial age in the about 1820s, and it really doesn't end till sort of Teddy Roosevelt's Armageddon speech.  Because I talk about the millennial influences on America and so it's about how Lincoln was influenced by his time period.

Lincoln in the Civil War and early Reconstruction after the Civil War, and then the influence of Lincoln and his ideas like the 13th and 14th and 15th Amendment in the United States afterwards.

Q.  I meant no disrespect.  I am not trying to minimize the scope of your work.  I hope you don't take it wrong.

A.  I didn't take it as offensive.  I just wanted to correct what you said.

Q.  That's best.

Your book Age of Lincoln mentions Arizona one time, doesn't it?

A.  I don't know the number of times.  There's a lot of things that are there though, like Native Americans, things like that.  I can't remember if Glorieta Pass is in there or not, but certainly, you know, it could have been.  And I don't remember the number of times.

But it certainly includes Arizona, even the Gadsden Purchase, I would imagine is in there, which is 1854.  And it is about how you get southern Arizona in this because of the transcontinental railroad and was it going to have a southern route or was it going to have a northern one.

And there's a lot on railroads.  And railroads are central to Arizona, including the railroad that goes -- not just the one that was finally built through the Gadsden Purchase, but the one that goes to the Grand Canyon and even the Santa Fe, Topeka the song where it comes into Kansas as well with the cattle industry and all that, how important the railroads are here.

So, you know, I am not -- I don't know how many times it's mentioned.  I would have to search the page.  The page proves you may be talking about the number of times and the index is quite a different thing.

Q.  No, I am talking about the word "Arizona" appears any time

in the book, excluding the index.  If you include the index, two times, is that -- do you dispute that it would appear twice, once in the pages and once in the index?

A.  I do not know.

Q.  Okay.  Well, let me show you what's been marked for identification as -- what we are looking at page 763 of your book.  Here is a reference to Arizona.  This is the Age of Lincoln.  You would agree that at least this reference to Arizona in Age of Lincoln has nothing to do with race relations, does it?

A.  I would not say it doesn't have anything to do with race relations.  Federal troops are here, you know, to deal with Native Americans, and that is race relations.  Federal Bureau of Investigation.  I would have to look at the time period, but no, I would not say that it has nothing to do with race relations.

Q.  Okay.  This passage we can see here doesn't mention race or Indians, does it?

A.  It doesn't say race, but even land grants are taking people off their land and moving Native Americans.  I mean -- I think anyone knows American history would agree with that, so I don't want to say that it's not there.  The word's not there, if you want me to say that.

Q.  The next publication that you and I have discussed previously was what you called your presidential address; is

that right?

A.   That's right.

Q.   What was that?

A.   It is the south and other -- that's just one presidential address.  Which presidential address did you mean?

Q.   I -- well, I think that you have described it right, you gave -- as I understand it, you gave some sort of acceptance speech to a historical society and in it you gave -- you reference Arizona and eventually it was published.  But I don't want to misdescribe your track record.

A.   You know, if you're going to be going through the deposition, should I have a copy?

Q.   To the extent you need to see it to refresh your recollection, please tell me and I will show you the pages.

A.   Okay.

Q.   Um --

A.   But I want to say, I was president of the Agricultural History Society as well, and certainly Kansas has a lot to do with agricultural history.

Q.   Which state?

A.   Excuse me.  We are going to have our meeting in Kansas together next year, so I apologize on that.

      Arizona, I misspoke, has a lot to do with cattle, with citrus, all of this agricultural usage and things so -- and there I was talking about community and community studies and

that's not even -- some of the South, but that's all of the rural and agricultural history.

Environmental History Association grew out of the Agricultural History Society, and of course environment is really big right now in Arizona.  So I don't know where you are going with this, but I am happy to talk about either presidential addresses as best I remember.

Q.  Okay.  The presidential address that I have in mind is the one that is "The South as 'Other' Southerner as 'Stranger'" I believe that's the one you and I have discussed before, right?

A.  Yes.

Q.  And you have offered that as a prior publication about Arizona -- part of your qualifications in this case, right?

A.  I don't think I offered it.  You asked had I written about Arizona, and I answered I remember researching and writing about it, and I assumed it was in the presidential address.

But what I found after the deposition is that the arguments that were there was actually cut out by the editor, including the reference.  But I didn't mention in the introduction to Justice Deferred:  Race in the Supreme Court, I had the same argument.  Unfortunately, they cut again where I actually talked about Arizona, as often editors do, but the reference is there to the three political scientists, if I can get Justice Deferred, I can get it for you, that makes the argument that Arizona was part of the South, particularly

pointing out the miscegenation laws as one of the ways that people define what was the South and the South that's not.

But I misspoke when I thought -- well, I didn't misspeak.  I had forgot Arizona indeed was in my Southern history address because I was doing some digital quantitative work and I had these auto fields that anyone can do, and when I asked Google what were the three most racist states, three Southern states, and the fourth one was Arizona.

So Arizona is in that southern history association presidential address, which is, I think, pretty good evidence that you could argue that there are at least some similarities between the South and Arizona.

Q.  All right.  I am showing you here on the screen a paragraph from page 22 of the presidential address that you were just describing, right?

A.  Yes.

Q.  And "Arizona," the word appears twice in this paragraph but nowhere else in this article; do you dispute that?

A.  I don't dispute it, but I have not read to see if that's the case.  But that probably is --

Q.  Okay.

A.  -- in terms of the word.  That does not mean that Arizona is not considered in this definition of the South and an article on the South, as I tried to explain that -- the difference between antiquarianism, and you can find where I've

written about it in history, as history is comparative, particularly when you are looking at regions or states.

So when I am talking about the South, you know, I have to consider would Arizona be part of the South or not. Since there are scholarly literature, I am sorry you won't be reading the report I just found out because I try to lay out how scholars debate, whether Arizona is the South or not.

Q.  This paragraph says that when you Google why is blank state so, Google will prompt you to finish that sentence, right?

A.  Yes.

Q.  And your position was that when you type, why is Arizona so, one of the results is "racist"?

A.  The day that I did this study. The day that I typed this in, that is what happened, and that is the result, which would have been probably 2012.

Q.  Okay. Do you appreciate that Google search results are based on your search history?

A.  It can be. There's algorithms.

Q.  So if I search for bike parts, the next time I search, I'm more likely to see results or prompts about bike parts; do you agree with this in principle?

A.  I don't think I would go that far. I think it depends on how you frame the question, what you do. This is a common thing that people do. The algorithms, as you know, and artificial intelligence are changing everything and quickly

these algorithms can change.

Q. All right. The next thing that you and I discussed, the last thing that we discussed also mentioned in your report are two law review articles that you say relate to the topic of your testimony, right?

A. Did I say two? There's three -- at least three law review articles, but two are -- four now. But two are -- one on the 14th Amendment, one on the 15th Amendment, Louisiana State University Press, is that what you are referring to?

Q. I am looking at page 4 of your report here on the screen where you said there were at least two law review articles that address these issues directly, right?

A. Yes.

Q. And the two Louisiana law review articles that you are referring to there were called Tempering Society's Looking Glass and Creation and Destruction of the 14th Amendment During the Long Civil War, right?

A. That sounds correct.

Q. Neither of those mention Arizona, do they?

A. I don't know. I certainly would have -- that's the 14th Amendment, right?

Q. Yes.

A. Well, Arizona was not a state with the 14 Amendment when it came on. I am surprised if it does not over time, but if you say it's not there, I will -- at least I have not searched it.

I certainly was looking at Arizona when I was doing it, and particularly with the Supreme Court's use of the 14th Amendment I guess affirmative action and other things, I would have thought there would have been at least two Arizonians on the Supreme Court during the period I was writing.

But the word "Arizona" might not show up.  And I thought the question was -- that we were discussing in the deposition was Arizona history, not the word "Arizona."

Q.  Your research for this case was conducted remotely, not in Arizona, right?

A.  You are saying that I did not physically come to Arizona to do it, that's correct.

Q.  Okay.  You have never been to the state archives?

A.  As far as I remember.  I have been to Arizona before and -- but I don't remember going to the Arizona archives.

Q.  You have never been to ASU's library?

A.  As far as I remember.  You know, I've been to Arizona before COVID several times and did do some research but don't remember going to archives specifically.

Q.  Ever been to University of Arizona's archives?

A.  I don't think so.

Q.  Northern Arizona University?

A.  No -- I mean, not physically.

Q.  Never been to Grand Canyon University physically?

A.  Been to the Grand Canyon but not Grand Canyon University.

Q.  Glad to hear it.  You have never been to the Arizona State Historical Society?

A.  Not that I remember.

Q.  You do not subscribe to their journal?

A.  Arizona History?

Q.  Arizona State Historical Society's journal?

A.  Arizona History, right?

Q.  Is that the name?  That was my next question for you.

A.  I think so, and I have read it.  No, I don't subscribe.  I don't subscribe to a lot of journals I read.  But particularly when I was at the University of Illinois and sat on Clark Spence's dissertations for his students.

There were a lot of -- in fact Bob Spude, who is -- now sort of heads up a lot of the National Park Service, lives in New Mexico but was from here and did his MA on Arizona.  And I remember reading the Arizona Journal when I was reading and learning about Arizona from his dissertation -- from his MA thesis and dissertation.  So no, I don't subscribe, but I have read it when I needed to or found occasion to.  Is that being clear?

Q.  Yes.

A.  And that's the way I do most things.  I subscribe to some things, like agricultural history, but -- social science history.  But most journals that I read or articles now you use online.  When I was at the University of Illinois, that was one

of the great libraries of all times.  Then I had everything there in hard copy.

Q.  You mentioned Kingman in your report?

A.  Sorry?

Q.  You mentioned the city Kingman in your report?

A.  Yes.

Q.  But you have been unable to say where it actually is?

A.  Is that the one that is Route 66?  And I have Kingman in here at the end of Route 66 -- it's where the 66 museum is?  I don't pretend to be a master of trivia as you seem to be, but I am a master of history and historical methods and tools, and I am able to use those as I have done in every other state where I have applied the methodology that has been credited by the state.

Q.  Sir.

A.  But I have not gotten down -- I mean, I don't see how that's relevant to my report or my opinions.  But, you know, after that I looked up all these things that you had sort of thrown at me.

And so my memory is Kingman, besides being in the report, is where Route 66 museum is and one end of Route 17 and the other being -- maybe that's Flagstaff.  I don't know.  But no, I don't remember specifically, but I can find it very quickly.

Q.  You said all those things I "threw" at you.  What you were

referring to is an exchange that you and I had before?

A.   Yes.   How to pronounce names, um, which I don't even pronounce English names, some Southern names very well, having grown up in the country and having a country accent.   And I hope, ma'am, that you can understand this Boston accent.   I apologize.

But no, you are right, it was very interesting.   I never had anything like that before.   Just sort of -- anyway.

Your question?

Q.   One of the things I asked you was about the names of legislators who voted for the Challenged Laws, and you knew none of them, right?

A.   Well, I knew Hoffman, didn't I?   I mean, he's the sponsor of the Challenged Laws, right?   You are talking about the two bills that are being challenged here; is that correct?   When you say the "Challenged Laws"?

Q.   Yes, sir.

A.   Yes, I think I have in the report Hoffman.   And I tried to go through and make a list.   I don't have it with me, but I can go get it.   Who's head of the House and the House Speaker and the Senate and others.

But, you know, I don't see that as essential to what I am doing as a historical and an expert, but it is your question.

Q.   When asked about whether you knew individuals who had

actually voted for these Challenged Laws, is it fair to say you were generally unfamiliar with the people who are involved in passing this legislation?

A.  I certainly did not recall names at that time in that deposition the day that it was given, and I did not have notes in front of me or anything like that.

Q.  Okay.  You have been unable to recall a case in which you were asked to consider whether the jurisdiction had a history of racism, and you concluded that it did not, right?

A.  I think I said that I had been asked -- an expert in cases not even deal with whether there was racism or not, such as these socioeconomic factors, Senate factor 5, which says it doesn't matter, is my understanding.  I don't pretend to be a lawyer, but that -- those are, if there's a disparity, then that satisfies Senate factor 5, but --

Q.  Sir, I don't want to cut you off if what you are going to say is important.  We have a lot of ground to cover and not so much time.  So if you feel like you have got something important to say and I start asking the next question, pause me; otherwise, I am going to try to keep moving.

A.  Well, your question was, and I was trying to respond to it. And again, I am taking you at your word.  This is what happens is -- I don't have the deposition, but my memory is, is that I have been asked to do things that had nothing to do with whether a law -- I can't even remember if you said was intended

or was discriminatory, but anyway.

Q.   The question is -- right now my question is, can you recall a case in which you were asked to consider whether the jurisdiction has a history of racism, and you concluded that it did not?

A.   No, but again, you are talking about comparative history. When I looked at a Massachusetts case, though like most places, there are discriminatory laws, you put it in the context of say, Georgia, or Texas, or Arizona, it has less.  I mean, I'm not -- wasn't asked to do that here.  I was asked to look at these laws, and that's what I concentrated on.

Q.   And you cannot identify any United States -- member of the United States that does not have a history of racism, can you?

A.   I cannot identify -- did you say a state or what?

Q.   Any state.

A.   Any state?  Well, I would have to be careful of what I say, but I think you can probably find, particularly early on, laws that -- I mean, women could not vote.  That's discrimination.

Q.   Can you identify any state that does not have a history of racial discrimination?

A.   Well, it sort of asks an unfair question.  I would have to be careful to look at the same kind of records I did here.  But off the top of my head, I assume that there's a long history of racism in the United States, and how it's dealt with is -- differently in different states.

Q.  You talked on direct examination about Operation Eagle Eye. And you said in your report that Justice Rehnquist was one of the people organizing that project, right?

A.  I don't think I said he was organizing.  I think I said he -- that as a Republican attorney for the '64 campaign, he was involved in the challenges, and that those challenges, what was done in Arizona sort of became the -- oh, what's the word? The framework, the prototype of what developed into what people called Operation Eagle Eye.

Q.  All right.  So let's take a look at page 32 of your report at the top.  You can see the highlighted words there.

Didn't you accuse Chief Justice William Rehnquist of organizing campaign largely targeted at minority voters?

A.  I don't think I accused anyone.  I said it included him of organized campaign, largely targeted at minority voters to combat the supposed voter fraud they believed that it cost Nixon the presidency.

Q.  And in the footnote, footnote 88, you note that he strenuously denied challenging voters, right?

A.  Yes.

Q.  But the truth is that while he was an Associate Justice of the United States Supreme Court, he made this denial under oath before the United States Senate, didn't he?

A.  Yes.

Q.  And after that he was confirmed with a bipartisan vote,

wasn't he?

A.  Yes.

Q.  I want to talk about your analysis of Arizona history more broadly.  One of the things you rely on in your report is the opinion from Judge Fletcher on the Ninth Circuit in *DNC versus Hobbs*; do you remember that?

A.  I do.  He found that long history of discrimination in Arizona as part of the decision.

Q.  You are familiar with legal research?

A.  I am a historian, but I do research.  I do it as a historian, not as a lawyer.

Q.  You have published a book about the United States Supreme Court's jurisprudence, right?

A.  Yes.

Q.  You have published multiple law review articles?

A.  Yes.

Q.  You already testified previously that you understand what it means when a case is reversed?

A.  Yes.

Q.  You had access to Westlaw throughout your research for this case?

A.  Yes.

Q.  You had access to the KeyCite function in Westlaw as well, didn't you?

A.  Yes.

ORVILLE VERNON BURTON, PH.D. - CROSS-EXAMINATION    1484

Q.  And the case that you rely on to open your report -- in your report to open your discussion of Arizona's history was in fact reversed by the United States Supreme Court, wasn't it?

A.  Yes.

MR. JOHNSON:  Objection, Your Honor, calls for a legal conclusion.

THE COURT:  Overruled.

You may answer.

THE WITNESS:  Well, Judge Alito, yes, but he did not --

THE COURT:  Wait.  Dr. Burton, just do you know that it was reversed?

THE WITNESS:  I know it was reversed.

THE COURT:  All right.  Next question, Mr. Langhofer.

THE WITNESS:  But can I say that --

THE COURT:  See what Mr. Langhofer has to say, whether he wants you to or not.  It is his cross-examination.

BY MR. LANGHOFER:

Q.  You've commented on what you think of that opinion, the Alito opinion, in *Brnovich versus DNC,* haven't you?

A.  Here in court or in my report?

Q.  Previously.  I'm talking about in your deposition, but I think you have done it on many occasions, right?

A.  I have certainly talked about it.  I am often on, you know, NPR and various C-Span, other things.  I am sure I have been

UNITED STATES DISTRICT COURT

asked about it and talked about it, yes.

Q.  In your deposition, didn't you analogize Justice Alito because of the *Brnovich* decision, Justice Roberts because of the *Shelby County* decision, to Justice Taney in *Dred Scott*?

A.  I was pointing out -- I would not use those words.  I was pointing out that the words they used each time are so similar that you have to see a pattern.

That is, in Dred Scott, considered the single -- by most scholars and I would think legal scholars as well, the most heinous Supreme Court decision that the lower court there, if they had followed the precedents that had been, even someone from Mississippi, or South Carolina, Georgia, who had been enslaved would have been freed, as Harriet and Dred Scott would have been.

But that judge then said, things are not as they were, and that's exactly what Judge Roberts -- almost to the word, I shouldn't say exactly, said when he ruled against the Section 4 of the Voting Rights Act.  Things are not as they were.

And I might say I show also that the ellipsed words in *South Carolina v. Katzenbach* that he, quotes, changes the meaning created in an earlier case that sovereign doctrine thing.

And then when Judge Alito, it couldn't help but strike me when he did the *Brnovich* decision, he said, things were not like they were in 1982.  Thus referring again to the renewal of

the Voting Rights Act and the need for it to be renewed.

So I have seen that pattern, and it just strikes me that when things are being ruled against minorities, it's always, "things are not as they were."

Q.  And you've traced -- you were tracing that pattern back to the *Dred Scott* decision by Justice Taney?

A.  That's right.

Q.  We need to talk about the idea of Arizona as a Confederate state, and you have discussed that concept as it being the twelfth star of the Confederacy, right?

A.  I quoted newspaper articles, but it has often been called the twelfth state.  I don't think I said it was a Confederate state.  If I did, I would like for you to show me where I said it was a Confederate state.

Q.  Do you think it was not a Confederate state?

A.  I think that it has similarities, particularly in the laws of discrimination, the laws of voting, the laws of Jim Crow that are very similar and would group it as these political scientists that I cite in the footnote in Justice Deferred have grouped it as a Southern state or a part of the sort of Dixie states.  And one of the things they cited were the miscegenation laws.

Q.  What you cited in your report you have previously said were the complete bases for your opinion, right?

A.  I'm sorry, I didn't understand the question.

Q.  Your report set forth all of the bases for your opinions, didn't it?

MR. JOHNSON:  Objection, Your Honor.  Misstates testimony.

THE COURT:  Overruled.

You may answer.

THE WITNESS:  One more time.

BY MR. LANGHOFER:

Q.  Your report set forth all of the bases for your opinion, didn't it?

A.  My opinion in this report?

Q.  Yes.

A.  Yes.

Q.  Okay.  And what you actually cite in your report is newspapers from Virginia and Kentucky to say that Arizona was the twelfth star of the Confederacy, right?

A.  Those newspapers are cited, yes.

Q.  Okay.  And can you point to anyone in Arizona who actually referred to the state as the twelfth star in the Confederacy?

A.  Well, we have the Jacobs -- Leon Jacobs letter says, Hoorah for Dixie and you go on -- I have a whole literature of social scientists like Daniel Elazar who says it is.

I think it's the same thing, he's pointing out that there has been an identity from literally the Civil War until today that there are relationships or similarities with the

Deep South and with the former Confederacy that would sort of signify why people would see it as the twelfth star of the Confederacy.

And I do not have it -- if you tell me I do not have it cited from someone in Arizona, but I think that's even more evidence that people outside are saying it. It's my remembrance of the articles they are saying that people in Arizona claim that it was the twelfth star, but maybe I am wrong, but that's my memory.

Q. One of the reasons you said that you believe Arizona was the twelfth star of the Confederacy is because Lieutenant General John Baylor said that? Do you remember asserting that as a basis for your opinion?

A. I don't remember. You want to show me that in the report.

Q. We are going to get to a slightly different point. It's on the way to -- I'm going to try to bypass that part of this detour.

A. I don't remember saying that in the report. I thought that it was after you raised the regiment that people called it the twelfth star of the Confederacy. I don't remember him per se saying it.

Q. In your deposition, I asked you whether anyone in Arizona had said that this was the twelfth star of the Confederacy, and you said Lieutenant General John Baylor, correct?

A. I don't remember. If I did, I may have been wrong at the

time, and again, had no notes with me.

Q. All right.

A. So you know if I did, I don't remember it.

Q. Lieutenant General John Baylor was a Confederate soldier, right?

A. Yes.

Q. From Texas?

A. I believe that's right, but, you know, that border.

Q. You said previously though you think he's an Arizonian?

A. Well, I think he did come to Arizona. He was there. It's like Justice Sandra Day O'Connor is from Texas but people identify her with Arizona.

Q. Okay. So you -- let's start with this. You agree he's not from Arizona, right?

A. Yes.

Q. So now you are asserting he made it to Arizona. Let's talk about that.

    You talk about this in your report. Is one of the bases for saying it was a Confederate adjacent, if not a Confederate state, Lieutenant General John Baylor left Texas and started marching towards the Arizona territory, right?

A. I believe that's right. I don't remember the specifics.

Q. Okay. He never actually made it to Arizona, did he?

A. Well, it's New Mexico, Arizona together, right? I thought he did, but I don't remember.

Q.  Okay.  At the time there was the Arizona territory and the New Mexico territory, right?

THE COURT:  Well, that's a good question, because they used to be one territory, and then at some point in time they were split into two territories and eventually New Mexico became a state and then sometime --

MR. LANGHOFER:  I feel like we don't need to recount this history.

THE WITNESS:  I believe it's 1863 that it becomes a territory right after this, and it's after the defeat.  And there's this whole argument about -- in fact, in one of the books that I edited, Dixie Redux, Steve Hahn, Pulitzer Prize winning historian, writes that -- when you're talking about things that I have done, that the reason they kept New Mexico and Arizona from becoming states until 1912 for Arizona, is that they wanted to ensure that Anglo-Saxons controlled the political processes.  There were so many Mexican Americans and others there, so I am not sure -- at the Glorieta Pass in 1862, if it was not the same territory.

BY MR. LANGHOFER:

Q.  Let's walk through this progressively, because part of your argument is that the Confederate troops made it to Arizona and that's part of christening Arizona as the twelfth star?

A.  I think -- now maybe -- I don't mean to interrupt you if you want to finish, but I am thinking that people from Arizona

joined his regiment. So maybe we are just talking past each other. It wasn't just Texans, but people from Arizona were part of his regiment, and that's why people said Arizona was the twelfth start of the Confederacy, and I thought he was in --

Q. You say in your report, the Confederate troops were prevalent in Arizona, don't you?

A. Can you point me to the page and where I say that?

Q. Yes, sir. Exhibit 329, page 13.

A. Is this my report you are talking about?

Q. Yes, sir. Exhibit 329, page 13. That's your report.

A. Yes.

Q. And you did say, didn't you, that Confederate forces were then prevalent in Arizona, didn't you?

A. Yes.

Q. What really happened though was that Lieutenant General John Baylor marched from Texas, roughly El Paso, north about 30 miles into New Mexico and captured a territory there. It was not what we currently identify as Arizona, was it?

A. It's not in southern -- I mean, it's in New Mexico, but I thought he was in Arizona, and I am pretty sure. I mean, we are getting very technical here. I am pretty sure that Arizonians joined his regiment.

Q. Okay. I am not talking about whether Arizonans joined. What we are trying to get to is the idea that this troop,

confederal forces were prevalent in Arizona and dubbed us the twelfth star. So you agree he captured a fort in what is currently New Mexico, right?

A. Yes.

Q. And then later he lost a battle at Glorieta Pass?

A. Right.

Q. Also in New Mexico?

A. Yes.

Q. About 200 miles from Arizona's border actually, right?

A. I think that's correct.

Q. And then had to go back to Texas because there was no path forward, right?

A. Yeah, sort of ended the desire of those there. And you know, later on I point out how people say how many people -- well, I testified earlier, how many people were here from the former Confederacy that were in the state at the time. And that was by the territorial governor who reported that, and how they were so influential to Arizona.

Q. There was a period of time, actually during the Civil War, when there was a space called the Arizona territory, which covered the southern half of Arizona and New Mexico; do you agree?

A. The Arizona territory covering --

THE COURT: You are saying what's now Arizona plus the southern part of what's now New Mexico?

MR. LANGHOFER:  Right.

BY MR. LANGHOFER:

Q.  So currently the border between Arizona and New Mexico runs north-south.

A.  Right.

Q.  At one point in the past it ran east-west.  So the Arizona territory was the southern half of both current states, right?

A.  Which was the southern half?

Q.  Arizona.

THE COURT:  So did New Mexico have the top half of Arizona?

MR. LANGHOFER:  I think so.

THE COURT:  Hum.

THE WITNESS:  I really thought -- well, I do not remember.

BY MR. LANGHOFER:

Q.  Here is the point, I guess.  The Confederate troops never actually made it to Arizona and were prevalent here, were they?

A.  I do not know.  I thought that the Confederate -- you know, I think as most people did look at the two as the same pretty much at the time.  And seeing that New Mexico had more Mexican Americans or more people of Mexican descent, but otherwise were sort of lumped together, and that maybe where that comes from.

Q.  You may have just offended two entire states of people.

A.  I am sorry about that.

Q.  Let's move on from that.

A.  I don't mean to be offensive.  I am just trying to do the history.  I promise you, I left out that Leon Jacobs called the people he was segregating "skunks."  Should I put that in print?  That was the word he called them.  I don't mean to be offensive to people.

Q.  Sir, the way this is going to work is I am going to ask questions and you will answer them.  We are not going to have asides that are unprompted.

A.  I didn't hear the last few things you said.

THE COURT:  He says he doesn't want any asides.

MR. LANGHOFER:  That are unprompted.

BY MR. LANGHOFER:

Q.  All right.  Still staying with the territorial days of Arizona, you quote in your report a speech from Governor John Goodwin; do you remember that?

A.  I don't remember, but if you'll show me the page.

Q.  Yes, sir.  Page 14 of your report.

A.  Yes.

Q.  All right.  And you testified during your deposition that you read the entire speech, right?

A.  I did.

Q.  Okay.

A.  When I say "read," that's different than studying.  I just want to make sure that's clear.

Q. Understood. Let's -- bear with me. I need to find one document.

You did not in your report though quote the final paragraph of that speech, did you?

A. I don't remember, but if you tell me I did not, then --

Q. All right. I am going to show you a document. Then we are going to -- start at page 1 so you can see we are looking at the journals of the first legislative assembly of the territory of Arizona, right?

A. Yes.

Q. This is obviously materials you have looked at because you have quoted from it, right?

A. Yes.

Q. I would like you to look now at the final paragraph. This is on the screen for your review?

A. Okay.

Q. That's not supposed to happen.

A. Could you give me a hard copy?

Q. I could, but let's try this again. All right.

THE COURT: It's back.

MR. LANGHOFER: Yes.

BY MR. LANGHOFER:

Q. Let me know when you are done.

A. I was on the last two lines.

Q. I'm sorry. If you would give me one moment. I think I can

fix this.

A.  While you are doing that, can you remind me where I have quoted this?

Q.  Yes, I can.

A.  Page what?

Q.  How about this, we will finish your review of the document on the screen and then we'll go back to your quote from it.

Your quote of it is on page 14 of your report.

A.  Yes, I found it.

Q.  Okay.  Let me know when you are done reading.

A.  Okay.  Done reading.

Q.  So you did read the speech in its entirety or not?

A.  Yes.

Q.  Okay.  In this final paragraph of the speech that you read, the first governor of Arizona is expressing fealty to the United States Constitution of the Union, isn't he?

A.  Yes.

Q.  And he's expressing his desire for the Union to win the Civil War?

A.  Yes.

Q.  Do these sound like the words of a Confederate governor?

A.  No, sounds like a Unionist.  I could show you people in South Carolina and North Carolina who would say the same thing at that time, too.

Q.  Let's look at another document now from the First

Legislative Session or the Territorial Assembly.  And so what I am going to do is show you the first page.  So we are talking here about the acts, resolutions, and memorials adopted by the First Legislative Assembly, correct?

A.  What year is this?

Q.  This is -- 1865 is the publication date.  Looks like 1864 is when the session ended.  With me?

A.  I'm looking at it here.

Q.  Okay.

A.  Is this in my report?

Q.  Well, you did look at the acts of the assembly, did you not?

A.  I did.

Q.  So I don't believe it's in your report, but that's kind of my point.  I am going to turn now to this page listing the members of the First Legislative Assembly.  Do you see that -- the counsel sort of the predecessor to the Senate includes Francisco Leon, right?

A.  Yes.

Q.  Jose Redondo was born in Mexico?

A.  Yes.

Q.  Jesus Elias in the House of Representatives?

A.  Yes.

Q.  Do those sound like Confederate names to you, sir?

A.  Well, there were Hispanics who fought like Gonzales for the

Confederacy so it could be, but, you know, I don't see how you can go by the name. You know, I would suggest that they were of Hispanic origin, but I am not sure how that has to do anything with the Confederacy. You had -- not only that you had a lot of Confederates who after the war went to Mexico and Brazil and other -- but I guess I don't understand your question.

I don't see how that compares to whether they sound like Confederates or not. There were Confederates who had those kind of names that fought, but I suspect you are asking me if they weren't here, but I don't know.

Q. Fair enough.

A. We say that it was short lived when the regiment lost the Battle of Glorieta Pass.

Q. Fair enough. Let's look at another document from the territorial founding the area you're talking about.

We are looking now at what's been marked as Impeachment Exhibit 25. The Howell Code adopted by the First Legislative Assembly of the territory of Arizona in 1864, right?

A. Yes, did I cite this in my --

Q. No, sir. That's part of where we are going with this.

I would like you to look now at the Bill of Rights, Article 2 of the Bill of Rights in the territory. Why don't you give that a read.

A.   Out loud or to myself?

Q.   To yourself, please.

A.   I'm finished.

Q.   So sir, this is not just a speech by one man.  This is actually adopted laws of the territorial legislature, isn't it?

A.   I believe that's correct.  Again, you know, it's hard for me to make pronouncements and judgments without studying in entire context a document that I may have read.  I read a lot of documents for this report, so -- but it looks to me, yes, is your answer.

Q.   Is it fair to say this is in no way the work product of a Confederate legislature?

A.   What was the year of this again?

Q.   1864.

A.   Right, except, you know, the Confederate legislature went one beyond the Confederates.  They actually made it so that you could not secede in the Confederacy so -- except for using the word "union," it could have been.  But, no, it's not.

It's -- you know, it's clearly commitment to the union, but I just want you to know that the constitution of the Confederacy is very similar to that of the union except for including slavery and enslavement and that it says that you cannot dissolve the Confederacy.

Q.   I am glad you mentioned slavery, because that's next.  What we're showing on the screen here is from the same document,

section 54 and 55 of the same 1864 code.  Please read these. When you are done, I will flip to the next page and you can finish.

A.  It ends with "with."

Q.  Yes.  Let's go to the next page and you can finish it off there.  Let me know when you are done.

A.  Okay.  I'm a little confused.  Can you go back up to the one before?  I'd like to find out if this is saying you can only take them out or if you cannot do it within the territory. I am sorry, I can take your word on it.

Q.  No, I think it's important to get this right.  Let's do it. 25.  Here we go.

A.  Okay.

Q.  Taking -- using their words, negroes, mulattos, or colored people into slavery or involuntary -- taking them with the intent to sell them into slavery was illegal in Arizona as of 1864, wasn't it?

A.  It says to take them out of the territory, right?  As I read it, it is a little unclear in the second one, but it looks like to me that you are going to take them out of the territory to put them into enslavement.  It's a little confusing language in the second one.  I would have to have whole context to study it.

Q.  Anything like this in the Confederate codes?

A.  I don't believe so.  You are talking about codes, not the

Constitution.  Trying to remember if there were Confederate codes.  You mean state codes in the former Confederacy, yeah.

Q.  That's right.  All right.  Sir, let me just put it to you directly; Arizona was not a Confederate state, was it?

A.  It was not part of the Confederacy.  They had that brief time when -- before Glorieta Pass that some Arizonians, people from Arizona, fought for the Confederacy and identified with the Confederacy.

And the reason I am laying this established framework is how later on Arizona continues to identify with former Confederate, what we think of as Southern states.  So I don't really see the relevance.

So what was your question?

Q.  My question was, Arizona was not a Confederate state, was it?

A.  It's not usually considered a Confederate state at the time of the Civil War, like Missouri and Kentucky.  People like to say Kentucky became a Confederate state after the Civil War.  I think you might -- could make a similar argument, I am not, about Arizona.

Q.  All right.  Would you -- do you agree with me that if certain people from Arizona chose to fight for the Confederacy, that is totally different than the governor and a majority of the legislature supporting slavery and the Confederacy?

A.  Yes.  I don't think I ever said what you are saying or what

you are implying.  I just said that people had called at that time -- well, it's all right.

Q.  Okay.  You say in your report that -- sort of still latter half of the territorial period you said that Latinos faced severe discrimination in Arizona, right?

A.  Would you point me to where I say that?

Q.  Yes, sir.

A.  I am not saying that I didn't.  I just want to read in context what I said.

Q.  Yep.  Let's see, severe discrimination.  We're at the last paragraph on page 15 of your report.

A.  Uh-huh, okay.

Q.  You said that, did you not?

A.  Yes.

Q.  Okay.  And then in literally the same paragraph you also point out that in 1875 a Mexican American merchant was elected mayor of Tucson, right?

A.  Yes.

Q.  Okay.  Let's look at what's been marked as Impeachment Exhibit 26.  I think we looked at this one before.  Some of the territorial laws from 1864.  And we are going to look now on page 3.  All right.  And why don't you read that joint resolution at the bottom of the page that's on the screen.  Read that to yourself, please.

A.  You went so fast.  First I want to know, did I cite this

report?

Q. No, sir. You said that you read the laws of the assembly, right?

A. I am just wondering if I cited this particular one?

Q. No, sir, you do not.

A. Okay. Just wanted to see what -- okay. And this is again, the date and everything is gone now so --

Q. It is from 18 -- if you want, we can go through all that. I am not trying to trick you into anything.

A. No, I just want to know so I can -- the fact is, I don't actually like to opine or give an opinion on something that has been taken out of context that even though I have read, I might not have studied, to help me understand what you're saying. So I want to give that caveat, please.

Q. That is wise.

A. And I'm just trying to find out -- oh, November 9th, 18 -- okay. Now, where are we?

Q. Bottom of the page here of the joint resolution. Read that to yourself, please.

A. It is not highlighted. Just read it?

Q. Correct.

A. Okay. Okay.

Q. So even in 1864, there was mandatory translation of legal materials into Spanish in Arizona, wasn't there?

A. To produce not less than 100 copies of this -- let's see,

what is he doing?  Shall make a companion and translate in Spanish the language the following laws and parts of the law. Yes.

Q.  I am sorry, that was a yes?

A.  Yes.

Q.  Okay.  You talked about miscegenation laws in the 1860s. And look, no one in this room and I imagine no one reading the transcript would defend that, but isn't it true that anti-miscegenation laws were common in the United States in the 1860s?

A.  It's interesting, you know, you don't even have an anti-miscegenation law in South Carolina in 1860.

Q.  Sir, that was not the question.

A.  So I would have to say that I have not looked to see how common it was.  My opinion is I was sort of surprised that because of enslavement that there were Southern states that did not have anti-miscegenation laws and in free states that did, so I don't think it's sort of an either/or question.  And I am certainly not comfortable quoting at this time.

I can tell you at the time that Arizona ended its miscegenation laws in 1963 about how many there were and --

Q.  1963 is before *Loving versus Virginia,* isn't it?

A.  That's right.  It is.  About four years before, there's 18 or 22 it varied.  I would have to look at which year.

Q.  I want to go back to this idea of whether

anti-miscegenation laws were common in the 1860s.  You are a professor of history focused on race, aren't you?

A.  Right.

Q.  And you have testified as an expert in I think 30 states or so?

A.  I don't know the exact number.

Q.  Roughly, 30?

A.  30 cases, maybe.  I wouldn't say 30 states.

Q.  You are not able to say whether in the 1860s it was not unusual at all in the United States to have a law like this?

A.  I can say it was not unusual -- you were asking me sort of a different question, as I understand it.  And we actually talk about it in Justice Deferred, and if I had known you wanted to talk about it, I could have refreshed my memory about the general miscegenation laws.

THE COURT:  Now that he has rephrased the question to "it was not unusual for states to have these laws," would you agree with that?

THE WITNESS:  I would say that other states had these laws, yes, but it just -- when it triggered off that I was shocked when I was doing research early in my --

THE COURT:  Excuse me, Dr. Burton.  I think you are going to have to just focus on answering Mr. Langhofer's question.  So we have an answer to the question.

New question now.

MR. LANGHOFER:  Thank you, Your Honor.

BY MR. LANGHOFER:

Q.  Let's talk about the state foundings.  We are leaving the territory.  We're entering the statehood, roughly 1910, 1912, okay?

A.  Yes.

Q.  Okay.  And you said in your report you reviewed the records of the Constitutional Convention?

A.  Yes.

Q.  And there were a couple of resolutions from the Constitutional Convention, I think they called them propositions, that you had focused on; do you remember that?

A.  I don't specifically, but you can point me to them and show me.

Q.  Okay.  Do you remember talking about the -- there was a proposition that would have banned noncitizens from the mining industry, right?

A.  Yes.

Q.  Okay.  And that was --

A.  Can you give me the page number for that, please?

THE COURT:  I think on direct he mentioned that.

MR. LANGHOFER:  Yes.

BY MR. LANGHOFER:

Q.  But the final version that was adopted only had to do with requiring the English language in the mining industry, right?

A.   Yes.

Q.   Okay.  And the ban on noncitizens was actually rejected six to one by the committee at the Constitutional Convention, wasn't it?

A.   I don't remember the vote.

Q.   Sounds roughly right though?

A.   I believe that's correct.

Q.   And the reason the language requirement was kept in was because mining and several other industries at the time were regarded as particularly dangerous in 1910 or so, and they thought facility with a common language would help?

        MR. JOHNSON:  Objection, Your Honor, lack of foundation.

        THE COURT:  Overruled.

        You may answer if that's what your research showed was the reason.

        THE WITNESS:  Yeah, well, I think that was a reason given, but I think there were other reasons as well.  That was one of the sort of tenuous reasons.  It could be legitimate, but it targeted a group of people, minorities.

BY MR. LANGHOFER:

Q.   Look, no one is defending the requirement now in hindsight, right, but I think it's important, if we're going to talk about this, to have the full context.

        We don't need to rehash all the segregation material

that you've already covered on direct, but I do want to add something. Isn't it true that in 1925, so, 28 years before there was full desegregation, the Arizona courts ordered Latino students admitted into the schools for non-Hispanic whites?

A. I believe that is the case -- can you point to me in my report where I say that?

Q. I can. It is on page 25.

A. I believe there were more issues with it though is why I'm asking, my memory. Yes, that's the court case where -- in 1925 Adolfo Romo, Sr.

Q. Okay. So in 1925 there was a partial desegregation of Arizona schools that came before the full desegregation in 1953, correct?

A. That's correct.

Q. And both of these desegregation orders came from the Arizona system, not the federal courts, right?

A. Yes.

Q. You talk about the Klan quite a bit -- well, I don't want to characterize it as "quite a bit." You talk about the Klan, you did on direct, it is also in your report, right?

A. Yes.

Q. There were alarmingly a lot of members of the Ku Klux Klan in the United States in 1925, weren't there?

A. Yes.

Q. You've written about this separately?

A.   Yes.

Q.   Massive march in Washington, D.C., I think 40,000 people?

A.   Yeah, it was huge.  I have an illustration of it in Justice Deferred.

Q.   Yes.  But one year before that, Arizona banned acts of intimidation by the Klan, didn't they?

A.   Is that in my report?

Q.   No, sir, it's not.

A.   I don't remember then.

Q.   Okay.  Then let's take a look -- we are going to look at Exhibit -- Impeachment Exhibit 29.  And we will start with cover page so you know what we are talking about.  We are looking at the Acts Memorials of the Sixth Session of the Regular Session of the Sixth Legislature from 19 -- adjourned in 1923.

On this document we are going to look at -- why don't you start with chapter 78.  Let me know when you are done.

A.   First again, tell me where I am talking about the Klan?

Q.   You talk about the Klan on page 24 of your report.

A.   Okay.  It runs on I guess to the next page.

Q.   Yes, sir.

A.   Okay.

Q.   All right.  Isn't it true then that even before they had this astonishingly well-attended rally in Washington, D.C. in 1925, Arizona had banned acts of intimidation by the Klan in

the state?

A.   It also did not ban the Klan, but it said if they were -- and there were a number of states that did this, but the Klan was still active.  They failed in Illinois to in fact --

THE COURT:  Okay.  I don't want to know about Illinois.  Stick with Arizona.

THE WITNESS:  I meant Arizona.  I'm sorry.  In Arizona they were trying to, you know, get recalled Governor Hunt and they failed with that.

BY MR. LANGHOFER:

Q.   So they apparently lacked political power here?

A.   Well, they were successful in other areas.

Q.   Not so successful that they could lobby against this bill successfully, right?

A.   No, but the Klan still exists.  They are not supposed to wear hoods.  And we know they were there as an intimidating factor.

Q.   Okay.  All right.  Let's move into the "20s and 80s," mercifully less material here.  Restrictive covenants.  Those ended nationally in 1948, didn't they?

A.   They were supposed to with the -- yes, they were supposed to have but, you know, they continued.

Q.   According to the United States Supreme Court, no court in the country could enforce restrictive covenants after 1948, right?

A.  They should not have been able to.

Q.  Okay.  Did you find any evidence that they were enforced in Arizona after 1948?

A.  No, I did not.

Q.  Okay.

A.  I mean, I didn't look for that, but I just know that they were still there.

Q.  Yes.

A.  We know from the --

Q.  Did you note in your report, just rewinding for a moment, did you note in your report that Arizona had taken steps to end Klan intimidation?

A.  To end intimidation?

Q.  Right.

            THE COURT:  You mean by the Ku Klux Klan?

            MR. LANGHOFER:  Yes, ma'am.

            THE WITNESS:  I don't believe so.

BY MR. LANGHOFER:

Q.  Okay. All right.  Let's talk about the public facilities, public accommodations.  Unfortunately, again, denial of access to places of public accommodation, swimming pools, restaurants was all too common throughout the United States before the Civil Rights Act, wasn't it?

A.  Not just before the Civil Rights Act, but yes.

Q.  Okay.  And that was 1964, 59 years ago?

A.   Yes.

Q.   Okay.  Nothing in your report about Arizona violating the Civil Rights Act after it was adopted, is there?

A.   I don't remember.

Q.   Okay.  When Native Americans were belatedly given the right to vote in this state, 1948, right?

A.   Let me -- can I modify the --

Q.   Yes, sir.

A.   When I was looking at those laws, it seemed to me that there was a law -- and I am not a legal scholar; I promise, I'm not trying to say a legal opinion.

But it reminded me of Louisiana case that Judge Black had founded about -- like requiring residence and things, that a law -- an amendment was particularly added to the 1964 Civil Rights Act, and I am trying to think of what they called it in general that you couldn't add things -- freezing.

I believe that was the term, a "freezing."  That you couldn't add more restrictions on voters if it hadn't been there for other people before.

So this is not a legal opinion, but it did remind me that this was happening with the current laws, which of course haven't been enacted yet but are being challenged.  It just reminded me that that would be a -- it seems similar kind of situation of violating the Civil Rights Act.

But again, that's just from a historical perspective

in what I have done and researched an earlier case.

Q.   Let's talk about Native Americans belatedly getting the right to vote in Arizona, that was in 1948, right?

A.   Yes.

Q.   That right was recognized by the Arizona courts and not the federal courts, wasn't it?

A.   I believe I said that in testimony.  Judge Udall.  Can you, again, tell me which page we are referring to?

Q.   Page 30.

A.   Page?  Sorry?

Q.   3-0.

A.   3-0.  Okay.

Q.   All right.  I think we've got what we need on that.  In 1957 there was a black newspaper in Phoenix called the Arizona Sun, right?

A.   Again, can you tell me where it is in my report?

Q.   Yes.  Now we are on page 55 of your report.  I will bring it up to save some time.

     And according to that newspaper, Arizona is not a Jim Crow state or at the time was not a Jim Crow state, right?

A.   Yes, but it's used -- if you'll see the context in how that is used, that is, they are saying it's not a Jim Crow state but they are doing it because the fight against a drive-in restaurant that did not allow the serving of customers at the time.

So it is there trying to remind Arizona that they're not necessarily a Jim Crow law.  So I will just put that in the context of how that is being used.

Q.  Yes, I think it's important to have the context.  All right.  You -- literacy tests ended in 1972, right?

A.  Right.

Q.  Okay.  And 1972, 1973 a Navajo candidate won election to the County Board of Supervisors, right?

A.  That's my memory.  Could you again tell me where in my report?

Q.  Yes, sir.  Page 34.  I will bring it up to hasten things.

A.  All right.  Go ahead.  I will read it quickly here.  Does it go on to the next page or is that a period?

Q.  I believe that is it.  Let's just be sure.  That is it for the paragraph.

A.  Okay.

Q.  So in 1972 and '73, a member of the Navajo tribe won election, didn't he?

A.  Yes.

Q.  And then he had a lawsuit about whether he would be seated, right?

A.  Yes.

Q.  And he won the case?

A.  Right.

Q.  And the Arizona state court system, not the federal courts,

right?

A.   Yes.

Q.   So he was seated?

A.   Yes.

Q.   Okay.  In 1974, a Mexican American won the governorship in Arizona?

A.   And I follow-up what happened after that to show the difficulties there.  I don't want to just leave it out of context.

        THE COURT:  Why don't we wait and see if on redirect the attorney who is questioning you wants to give more context, because Mr. Langhofer probably still has a lot of questions.

        MR. LANGHOFER:  I am afraid I do.  Probably about half done, maybe more.

BY MR. LANGHOFER:

Q.   1974 the governor-elect was a Mexican American, wasn't he?

A.   Yes.  Can you point me to which page?

Q.   Page 63.  You talked about the purging.  We are going in a bit talk in more detail about purging.  But you said it was -- well, let me just ask this as directly as possible.  The 1970 purge practice in Arizona was wiping everyone off the voter rolls, right?  It was not targeted to minorities at all, was it?

A.   That's right, but people know, and they certainly did in other states, talked about it, that when you purge, that is,

and have a re-registration, that minorities register at a lower rate than whites, and we also have talked about in the socioeconomic factors some of the reasons.

Q.   And for better or worse, when that -- worse, I think, when that statute was challenged in this District Court, obviously different judicial officer, it was upheld by the District Court and affirmed by the United States Supreme Court, wasn't it?

A.   I believe that's right, but do I have that in my report?

Q.   No, that's --

A.   Okay.

MR. LANGHOFER:  Your Honor, if you need the citation for that, it's *Stillman versus Marston.*

BY MR. LANGHOFER:

Q.   All right.  You talked about educational disparities a bit. Are you aware that the Arizona state courts have and continue to consider to this day, legal challenges about the adequacy and equity of student funding in the state?

A.   Am I aware that they are continuing to consider the issue?

Q.   Well, we will take this in two halves.  Are you aware that the Arizona Supreme Court has looked at this issue and previously ordered additional funding to take care of equity concerns in the state system?

A.   I am not sure.  I probably was aware, but I don't remember specifically out of context following up on that, but --

Q.   You --

A.   I do think I remember.

Q.   You rely on some data showing that there are educational disparities that correlate to race.  As I understand it, you are not offering the opinion that race is the cause of these educational disparities, are you?

A.   I don't believe that I am required to.  Again, it is a legal decision.  But I am showing that it is clearly one of the factors, I believe.  But I am not saying that it is the only cause.

Q.   Well, my question is a little more nuanced.  It is about whether you are maintaining that race causes educational disparities or that it is a correlate of educational disparities.

A.   Well, I think it is more complicated than that.  There's no doubt that there is a correlation, but all these things don't work in isolation; they work together.  And so that's what I am saying here.

Q.   All right.  On page 40 of your report, let's just pull that up.  Still on the topic of education.  You say research also shows that minority students are often overrepresented amongst students who are suspended for attendance violations, right?

A.   Yes.

Q.   And you are citing there an Arizona Center for Investigative Reporting article?

A.   Which note is it?

Q.  108.

A.  108?

Q.  Correct?

A.  Yes.

Q.  The article you are citing, we can look at it if we need to, is not a peer-reviewed study at all, is it?

A.  I'm sorry?

Q.  It's not a peer-reviewed study at all?

A.  A peer-reviewed study?

Q.  Correct, it is not?

A.  I don't remember.  I suspect not as an investigative report.

Q.  So I will pull it up here.  Same article you were citing, right?

A.  Yes.

Q.  In this article, are there any footnotes?

A.  No.

Q.  Okay.  Are there any citations to underlying data?

A.  I don't remember.  I thought there were.  I thought there were links but -- you know, I don't remember just looking at -- I can't tell, but I thought there were links that would lead you to some of those -- like if you hit the links, it would take you to another field and you would hit there.  And I thought -- my memory is -- but, again, without studying the document and having it, doing it, I don't remember.

Q.   Perhaps I can save us some time by getting to the a nub of it.  You are relying on a study that controls for nothing other than punishment and race, right?

A.   I don't think I characterize it that way.  I think it's an investigative reporter looking at -- and looking at it in context and it comes out that there is a correlation or that overrepresented in this group are these minorities.

Q.   The question was whether you are relying on a study that controls for anything other than race and punishment in an academic setting?

A.   Well, I thought they gave us context and other things is what I'm saying.

Q.   Sir, the question is, whether you are relying on a study that controls for nothing except race and punishment?

A.   Been a while since I read the article, but I thought they gave us a context for all of this in that article.

Q.   You said on direct and in your report that there's not enough post offices on tribal lands for voting, right?

A.   Yeah, I have cited where others have said that as well.

Q.   Does the State of Arizona control where post offices are located?

A.   No.

Q.   Okay.  And isn't it true that there are -- in a document you considered from Dr. McCool -- do you remember this?

A.   No, can you show me where it is on my report?

Q.  Yes, sir.  We are going to look at page 53 of the McCool report.  And this is -- do you remember we discussed in your deposition the McCool report about voting at tribal lands, and you said you consulted it in preparing your report?

MR. JOHNSON:  Objection, Your Honor, scope.

THE COURT:  Overruled.

You may answer.

THE WITNESS:  I did not hear the question.  I think the blockage thing here is making it difficult to hear.  If you could speak into the microphone.

BY MR. LANGHOFER:

Q.  Yes, sir, my apologies.  The question was, did you rely on Professor McCool's report called Obstacles at Every Turn in preparing your report.  I put it on the screen for you to see?

A.  I did.

Q.  And Professor McCool was going to be but ultimately isn't going to be presenting testimony as an expert for the plaintiffs in this case, right?

MR. JOHNSON:  Objection, foundation.

THE WITNESS:  I have no idea.  I have no idea.  Again, where is this?  I didn't see it on the page you told me, 53?

MR. JOHNSON:  Sorry, Dr. Burton.

Objection, foundation.

THE COURT:  So too late.  He already answered the question.

THE WITNESS:  Can you show me what page this is on?

BY MR. LANGHOFER:

Q.  So --

A.  Or tell me what page it is on in my report.

Q.  So that is part of the point.  It's, I believe, not in your report.  And we are trying to get context for the facts that you are relating to the Court.

This McCool report you did consider, correct?

A.  Yes.

Q.  And doesn't the McCool report say that there are examples of Arizona elections officials agreeing to continue to provide assistance to American Indian languages even when the language is no longer covered by Section 203 of the Voting Rights Act?

A.  I do remember that.

Q.  Okay.  But you didn't mention that in your report?

A.  No.

Q.  All right.

A.  At least I don't remember mentioning it in my report.  I still haven't seen where it is.

Q.  Understand.

A.  Or what page.

Q.  All right.  Opposing counsel showed you page 46 of your report while you were on direct examination.  I am going to pull that up here.

A.  Page 46?

Q.  Yes, sir.  And so we are looking at the paragraph that begins, "in 2018."  And you testified to this during direct, right?

A.  Yes.

Q.  All right.  And your testimony was that the U.S. Commission on Civil Rights found that Arizona had done something in three of the five categories, but you believe in fact Arizona has done something in all five categories, right?

A.  Yes.

Q.  Okay.  And you said that these acts make Arizona one of the most egregious states, right?

A.  Yeah, with the -- three of them made it -- perhaps we should say that it was ranked as one of those that had used more than others, as I said, Georgia was listed on all five.  So that is in reference to --

Q.  So you said Arizona's conduct in just three of these categories is actually what made it one of the most egregious states?

A.  Yes, I believe that's what the report said, as I --

THE COURT:  That was my confusion.  I can't tell from -- as I read this, I thought he was saying that the report said Arizona was one of the most egregious states.  That's how I read it.

BY MR. LANGHOFER:

Q.  So we will take a look at it.

A.   I was going at the report that -- maybe those are my words. I don't remember.  But that since -- what I was trying to say, the number three is more.  Georgia had five.  There might have been one other state that had three as well or four.

But most of them in that report had less than Arizona did.  That's of the states covered.  That's what I was trying to say.

Q.   All right.  So I am showing you now Appendix E from the U.S. Commission on Civil Rights report that you cited.  This is the document you had in mind, isn't it?

A.   Yes.

Q.   And I want to slow down and talk through these.  If we are going to say that this is what makes Arizona egregious, let's make sure we are understanding each other.

This report predates the laws at issue here, doesn't it?

A.   Yes.

Q.   And in your report, you were also saying Arizona is egregious, even without the laws that are at issue here, right?

A.   I am saying that Georgia had five of these.  Alabama and Arizona have the next highest number, three.  So to me that says that they are more egregious in terms of using these than other states.

Q.   I understand.  Let's walk through these five things.  If this is what makes Arizona egregious, let's talk them through.

Let's start with -- well, I think my question to you was, your point was that Arizona's egregious even before you look at the laws that are at issue in this case, right?

MR. JOHNSON:  Objection, asked and answered.

THE COURT:  Overruled.

You may answer.

THE WITNESS:  My testimony is that according to the study by the U.S. Commission on Civil Rights, Arizona had the second largest number of these ways in which issues that have been covered by jurisdiction had been used by states since that time.

Is that clear?  And I am using their data, the Civil Rights Commission ranking those that have been used at that time, I believe in 2018, if I remember right.

BY MR. LANGHOFER:

Q.  Okay.  So the question though was when you're criticizing Arizona in these five categories, your report was limiting it to the voting regulations that existed before these laws were passed, right?

A.  At this point you are talking about, where I make this statement?

Q.  Correct, in your report.

A.  Yes, at 2018, what I'm saying is that only Georgia had more or was using more of these in effect that would have been covered under Section 5.

ORVILLE VERNON BURTON, PH.D. - CROSS-EXAMINATION    1525

Q.  All right.  So let's walk through them one by one.  We are going to start with the voter ID requirement.  Your argument in the report is that now that *Shelby County* is gone and there's no longer preclearance, states are adopting laws that restrict minority voting, right?

A.  I would not characterize it that at all.  I am saying these are ones that are used like voter ID law was before *Shelby County.*  So I am not characterizing -- these are the ones that were used it says.  If I can read the title:  Chart of voting rights and issues by state comparing formerly covered jurisdiction.

And then it lists these, voter ID -- so that's what I'm saying.  I'm trying to summarize what I found in their report.

Q.  Okay.  Let's make sure -- I want to slow down and talk about something you just mentioned.  Arizona's voter ID requirement was approved -- it was precleared by the Department of Justice while Section 5 was still in place, wasn't it?

A.  Yes.

Q.  Okay.  The proof of citizenship requirement also predates *Shelby County,* doesn't it?

A.  Yes, same year.

Q.  So although it was limited by intertribal council, it did also receive Department of Justice preclearance, didn't it?

A.  In 2004?

Q.  Yes.

A.  Yes.  Intertribal county is later, 2012 or '13, as I remember.

Q.  Are you aware that this court, different judicial officer, but this court also upheld the documentary proof of citizenship requirement in this state when it was challenged in District Court?

A.  No, I was not aware.

Q.  Okay.  Voter purges, you have a relatively long narrative about voter purges in your report; do you recall that?

A.  I do.

Q.  Okay.  And this is one area where the Department of Justice -- excuse me -- the U.S. Commission on Civil Rights did not say that Arizona had, you know, met their criteria on this chart, right?

A.  That's correct.

Q.  Okay.  You say that because Arizona was using a software system called Crosscheck, it suggested there was a violation of minority voting rights, fair?

A.  Should have said minority of voter rights, but it had issues -- you would have to show me exactly what I said before I say I had said it.  But it had a lot of issues and there was an agreement to quit using it.  I've often wondered if that's why, because they were going to correct it and maybe it did not.

Q.  All right.  Let's look at page 49 of your report where you talk about Crosscheck.  Give that a read and we'll discuss it.

A.  Okay.

Q.  Done, sir?

A.  Yes.

Q.  So the Crosscheck program was voluntarily abandoned by the state, wasn't it?

A.  It appears the way I wrote it that's what happened.  I don't remember.  I know there were issues about Crosscheck in several states, but Arizona said they were not using it anymore.

Q.  Okay.  You nevertheless for other reasons attribute -- you express concerns about Arizona's list maintenance practices.  You call them list purge.  I will call them list maintenance.

Let's look now at page 50 of your report.  Why don't you refresh your recollection with that, please?

A.  Page 50?

Q.  Yes, sir, 5-0.  Let me know when you are done.  Oh, I'm sorry, I've --

A.  Shall I read on it my version?

Q.  I'm sorry.  I have taken you way from it.  This is my fault.  I will get it right back.

A.  I can get it on my copy if you tell me what page.

Q.  Here we go.  Page 50.  Do you have that?

A.  Yes.

Q.  Okay.  You are not actually familiar with the list maintenance procedures that you are describing here -- that you are describing in order to reach your opinion that Arizona has egregious practices, are you?

A.  I am relying on the work of others.

Q.  Okay.

A.  And this was their assessment.

Q.  So, for example, when you say that voters who were removed for citizenship status don't receive notification -- bear with me one second.

When you say voters who are removed for citizenship status are not notified, you are just basing that on a Demos report and not the actual law in Arizona, right?

A.  That's correct.  At this time from the Demos report.

Q.  Would you be surprised to hear there's a legal requirement that people who are canceled for citizenship status receive a written notice before they are canceled?

A.  I believe I say that when I'm dealing with the issue later. Maybe I'm wrong.  Are we looking at the report?

Q.  Where do you think you say that?

A.  When we are talking about these bills that are being contested.

Q.  Okay.  When --

A.  I'm sorry.

Q.  The Demos report that you are relying on, it's not about

these laws though, it's about Arizona's preexisting laws, right?

A.   Yes.

Q.   And even before these laws were passed -- would you be surprised to hear that even before these laws were passed, there was a notification requirement if someone was going to be removed due to their citizenship status?

        MR. JOHNSON:   Objection, foundation.

        THE COURT:   Overruled.

        You may answer if you know.

        THE WITNESS:   Would I be surprised?

BY MR. LANGHOFER:

Q.   Yes.

A.   No, not -- you are saying there was a law?   Would I be surprised if there was a law is what you are saying?

Q.   That's right.

A.   I don't think I would be surprised.   It's how the laws are enforced that would be interesting to me, but I don't think I was aware of that law.   In reading these new laws, I saw that they were supposed to be notified.

Q.   Let's look at Exhibit 50, which is the Elections Procedures Manual.   And we are going to look at -- let's see, page 36 of the EPM, page 50 of the PDF.

A.   Can you tell me what source I am looking at?

        THE COURT:   This is called the Elections Procedures

Manual.  Are you familiar with the fact that there is one of those in Arizona that is updated periodically?

THE WITNESS:  Yes, ma'am.

THE COURT:  Okay.  That's what this is.

THE WITNESS:  Okay.  What year is this we are looking at?

BY MR. LANGHOFER:

Q.  This is 2019, sir.

A.  Okay.

Q.  And why don't we look at paragraph 2.  Let me know when you have had a chance to read that?

A.  Yes.

Q.  All right.  And that does require notification to be sent to voters before they are canceled for non-citizenship, does it not?

A.  Yes.

Q.  Now we are going to look at page 372 from the Elections Procedures Manual.  Let me know when you have had a chance to read this.

A.  Do you want to highlight it or just read the whole thing there at the top?

Q.  How about this, I will tell you the question, you can decide how much you want to read.  The question is, isn't this a letter that notifies the voter that they will not be registered because of lack of citizenship and gives them a

chance to respond and, you know, correct the record if necessary?

MR. JOHNSON:  Objection, cumulative.

THE COURT:  Overruled.

You may answer.

THE WITNESS:  Now can I read it?

BY MR. LANGHOFER:

Q.  Yes, sir.

A.  I note that it is in English.  Okay.

Q.  Okay.  Is this not a form letter for notifying people that they won't be registered due to their citizenship?

A.  Yes, in English.

Q.  Next -- in English.  Are you aware that the state and certain counties provide these letters in different languages as well?

A.  In certain counties.

Q.  Okay.  Let's look at the next page, exhibit -- excuse me, page 373 from the same document.  Take the time you feel necessary to familiarize yourself with this form letter, please.

A.  This is from the same manual?

THE COURT:  Yes.  This is from the same manual.

MR. JOHNSON:  Objection, cumulative.

THE COURT:  Sustained.

BY MR. LANGHOFER:

Q.  All right.  We are going to go back now to your report, page 50.  You say that when people are removed for felony conviction they don't receive a notice, right?

A.  And you --

        MR. JOHNSON:  Objection, misstates testimony.

        THE COURT:  Overruled.

        I am not sure if you completed your question -- yes, you did.

        You can answer, Dr. Burton.

        THE WITNESS:  Okay.  Now your question?

BY MR. LANGHOFER:

Q.  All right.  You say here that when a felony conviction makes someone ineligible to vote, they don't receive a notice, don't you?

        MR. JOHNSON:  Objection, misstates testimony.

        THE COURT:  Overruled.

        MR. JOHNSON:  Misstates the document, I apologize.

        THE WITNESS:  I am -- you know, I am citing what the Demos report said here.

BY MR. LANGHOFER:

Q.  Okay.  The Demos report is wrong, isn't it?

A.  Well, I am not willing to say that.  They are usually pretty accurate on these things.  I would have to go back and see the whole context before I am willing to say that it's

wrong.

Q.  Well, all right.  We will -- tell you what, let's take a look at page 384 from the Elections Procedures Manual.  And bear with me please.  All right.  It is actually page -- yes, 384 of the Elections Procedures Manual.

A.  This is the same year?

Q.  Yes.

A.  Okay.

Q.  All right.  Sir, this is a notification that someone's registration will be canceled due to information received about a felony conviction, isn't it?

A.  Yes.

Q.  Okay.  You also said that people would not receive notification if they -- back to your report page 50 -- if they are ineligible because of mental incapacity, right?

MR. JOHNSON:  Objection, Your Honor.  Again, mischaracterizes testimony.

THE COURT:  Overruled.

Your report that's highlighted, does it say what Mr. Langhofer just summarized?

THE WITNESS:  I don't mean to be difficult, Your Honor, but it's different to say that this has happened but not telling you when it has changed, so --

THE COURT:  The only question was, does your report say that when someone with a mental capacity was ineligible and

their status changes they don't receive notice?

That was the only question.

THE WITNESS:  Yes.

BY MR. LANGHOFER:

Q.  Okay.  And let's look now at page 49 of the EPM and doesn't this require a notification to the voter if they are going to be canceled due to mental incapacitation?

A.  That's not the same thing I said in my report, but, yes, it says what is going to happen.  But what I say is -- or rather what the Demos report -- what I report from the Demos report is that when that condition changes, then they are not notified.

Q.  I see you are correct, actually.  Point taken.  Enough on list maintenance issues.  Let's talk about early voting hours. So now we are back in the U.S. Commission on Civil Rights report.

Cuts to early voting is not one of the findings of the U.S. Commission on Civil Rights, is it?

A.  No.

Q.  In Arizona --

A.  I think I answered correctly.  I think we agree, but I forgot how you phrased it.  The report -- the Civil Rights Commission did not cite cuts to early voting as a problem for Arizona.

Q.  Okay.  In Arizona, during the early voting period, anyone can vote in person, right?

A.  I believe that's correct.

Q.  Okay.  And anyone who has established their identity can vote by mail, correct?

A.  Yes.

Q.  Okay.  And there's an emergency voting period, the last couple of days before the election while they are tidying up the voter rolls, right?

A.  I need to look at it, but I believe that's correct.  This is my memory.

Q.  Okay.  You ever heard about special election boards in Arizona?

A.  I believe that I have.

Q.  So --

A.  You can recall it for me.

Q.  And that's when if you are ill or if you are in a retirement home and you can't leave, the county recorders will actually come to you and take your vote, won't they?

            MR. JOHNSON:  Objection; foundation, scope.

            THE COURT:  Overruled.

            You may answer if you know from your research.

            THE WITNESS:  I really don't remember, but I think that is the case.  I believe as of this time, yes.  Certainly the mail-in ballot voting is wonderful.

BY MR. LANGHOFER:

Q.  On your direct examination though, you said that the

necessity to take time off of work was tantamount to a poll tax in Arizona, didn't you?

A.   Yes.

Q.   If you have 27 days to vote in person or most people by mail, do you know anyone who would not have time off in 27 days in Arizona?

A.   I am not saying time off.  But it works to disadvantage people who are working 9:00 to 5:00 jobs or where they are to a poll place or to a post office to mail things.  All of that factors in.  To me I think it is analogous to a modern-day poll tax.

Q.   Are you aware that the early voting centers in Arizona are open after 5:00?

A.   How late after 5:00?

Q.   I am asking if you are aware.

A.   I don't remember.

Q.   Okay.  The last category here, moving or eliminating polling places.  That's actually different than the way you described it in your analysis, wasn't it?

A.   I don't remember.  I used the report that looked at, I think it's the Brennan report that looked -- no, it was the Leadership Conference report that listed the number of voting polling locations that were closed.

Q.   All right.  In your report, we are on page 46 here, you talked about --

A.  What page?

Q.  46.  You called it "widespread polling place closures," didn't you?

A.  I don't know.  I have to look.  Where are we?  Page 46?

Q.  Yes, sir.

A.  Can you sort of guide me on that page?

Q.  It is the middle paragraph, sub point 5.

A.  I said in 2018 the commission on -- widespread -- this is what they listed, "widespread polling place closures."

Q.  Your description is that the U.S. Commission on Civil Rights found that there was widespread polling place closures in Arizona, but if you look at the report itself, on page 375 of the U.S. Commission on Civil Rights report, they just said, "moving or eliminating polling locations" no requirement that it be widespread, right?

A.  I believe in that report they use that term, but I don't remember.  I believe that's where it comes from.

Q.  Let's talk about what's behind this idea of polling places closing.  What is a vote center?

A.  Where you can vote whether you are in that precinct or not to enable people to be able to vote, voting centers.

Q.  Okay.  So if you have precinct-based voting, you have to go to the correct location in order to vote, right?

A.  Yes, that's what Judge Alito said.

Q.  But if you have voting center voting, you can go to any of

the voting centers in your county, right?

A.  Is it in your county, or just any of the voting centers?

Q.  I will represent to you that it is any voting center in your county.

A.  Then, yes.

Q.  Okay.  And in fact, the move from precinct-based voting to vote centers was something that the challengers, the plaintiffs were trying to get the Supreme Court of the United States to give them in *Brnovich versus DNC,* isn't it?

A.  Yes.

Q.  Because it's generally perceived as making voting easier?

A.  When you say "generally perceived" -- generally perceived as yes, but I always have to put that into context of where you worked, where you lived, that sort of thing, and which precinct was closer.

Q.  Sure.  And when counties move from precinct-based voting to voting centers, they generally reduce the number of locations because they are easier to staff and you can go to any one of them, right?

        MR. JOHNSON:  Objection, foundation.

        THE COURT:  Overruled.

        You may answer if you know.

        THE WITNESS:  I don't know if they generally reduce or not.

BY MR. LANGHOFER:

Q.   Okay.  Isn't it true that much of what could be doing the work here, the moving or eliminating polling locations column, is the shifts in Arizona from precinct-based voting to vote centers?

        MR. JOHNSON:  Objection, foundation.

        THE COURT:  Overruled.

        You may answer if you know.

        THE WITNESS:  I am going to have to ask you to ask the question again.

BY MR. LANGHOFER:

Q.   Yes, sir.  If there's a finding that Arizona has been moving or eliminating polling locations, that could be caused by Arizona counties moving from precinct-based voting to vote centers, right?

A.   It is possible.  I don't know if that's what's going on.  I have to have to context and where these are placed.

Q.   It is not your position that moving from precinct-based voting to vote centers is a disenfranchising change, is it?

A.   No, it possibly could make it more difficult for some people, but in general I think it is a good thing.  But it really depends from the perspective of the voter who is being affected.

Q.   All right.  You had testified about your view of what the laws were in the United States in 1982, right?

A.  Which laws?

Q.  You testified that there were no laws in effect like the ones that are challenged in this case in 1982.

A.  Show me where.  I think I qualified that, because I was researching, and in my research I did not find -- show me the page so I can make sure what I said.

Q.  Yes, sir.  We are going to look at page 53 of your report.

A.  Yes.  I said any laws analogous, that my research didn't uncover those.

Q.  Okay.  You said on direct examination you base this partly on searching newspapers?

A.  Yes.

Q.  Okay.  You have access to Westlaw?

A.  Yes.

Q.  Okay.  Were you doing Westlaw research to reach this conclusion?

A.  I used it and also supervised others using it, and it did come into my conclusions from the research I did, key words.

Q.  Is the person who conducted this research the same person who came up with the -- or decided to include the quote from Judge Fletcher on the Ninth Circuit?

A.  I included the Ninth Circuit quote, and I supervised and did a lot of this research.  But I asked other people to look, too, because when I wasn't finding it, I wanted to see if others might -- could find analogous laws.

Q.  Did you also make the decision to include the Demos summary of Arizona's list maintenance laws?

A.  I did.

Q.  Okay.

A.  In fact, I had used the Demos report in another case, couple of other cases at least, yes, in my reports before.  So I was familiar with it before I used it here.

Q.  You say on page 72 of your report that -- you reference 192,000 voters who used a license issued prior to 1996 as proof of citizenship?

A.  Yes.  I said that, approximately 192,000 voters have used a license issued prior to 1996 as proof of citizenship where, you know, it's not required.

Q.  Are you also the one that decided -- well, strike that.

What do you mean by using a driver's license that predates 1996 as proof of citizenship?

A.  Well, driver's license can last a long time in Arizona, and you can get a driver's license when you are not a citizen; Arizona allows that.  And so it is -- if you then register to vote, become a naturalized citizen, your driver's license will not reflect that unless you have changed your driver's license.

That is, unless you have updated your driver's license where it has the citizenship on it.  So it in fact seems to me this is sort of targeting a group of people by using this method to search that we know that there are people who have

these licenses.

And then you are sort of putting an undue burden on them, targeting particularly minorities and immigrants and people who hope will be naturalized citizens but may not be if you are using the driver's license as citizenship.

Q.   Fair enough.  I think I understand your point.  Thank you.  You have helped me understand it.

Sir, did you look at the legislative history for these bills in forming your opinions?

A.   I couldn't hear your question.  I think you had your hand over your mouth.

Q.   Did you look at the legislative history for these bills in forming your opinions?

A.   I looked mainly at these challenged bills, right?  I looked mainly at the bills and a little bit of legislative history.  I don't think you have to look at the legislative history.  I was looking at the history of discrimination and putting them in that context, so it was sort of the final product, and I'm looking over the years how Arizona has used discriminatory laws and the impact it has had.

And then comparing these laws in that context and how that history might affect people, particularly minorities and naturalized citizens, with these new laws when and if they are implemented.

Q.   Did you conduct any interviews with legislators or governor

who supported these bills?

A.   No.

MR. LANGHOFER:  Your Honor, I think I am about done. Can I have just a moment to read through my notes?

THE COURT:  You may.

MR. LANGHOFER:  Your Honor, thank you for the time. No more questions for this witness.

THE COURT:  Thank you.

MR. HORLEY:  Very briefly, Your Honor.

CROSS-EXAMINATION

BY MR. HORLEY:

Q.   Good afternoon, Professor.  Good to see you again.  My name is Tim Horley, and I represent the state and the attorney general in this case.

Is it fair to say that you have extensive experience testifying as an expert witness in voting rights cases?

A.   It depends on how you would define extensive.  I started with *Mobile versus Bolden* in 1980 and have done a lot of testimony.

Q.   And yes, I believe on direct you said somewhere between 10 and 20 cases you have testified?

A.   Where I have actually been in court and testified, yes. But again, I am not certain the numbers.

Q.   And you have never testified as an expert on behalf of a state in such lawsuits, correct?

ORVILLE VERNON BURTON, PH.D. - REDIRECT EXAMINATION 1544

A.  No.

Q.  And to the best of your recollection, you have always served as an expert on behalf of a party that is challenging the voting laws, correct?

A.  As I remember -- let me just say, you know, with that white primary, the whole idea of a -- and I am not trying to be trouble.  I just want to be honest here.  That the party is sort of part of the state kind of thing with that, you know, in redistricting where I have testified.  But I believe the correct answer is no, I have never testified for the state.

Q.  Okay.  And always for the party that is challenging the voting laws, correct?

THE COURT:  Well, that kind of goes without saying when the state has passed them and he hasn't represented the state.

MR. HORLEY:  Sure.  Okay.  That's all I have.  Thank you.

MR. JOHNSON:  Just briefly, Your Honor.

THE COURT:  You have 12 minutes or we will be back in the morning.

REDIRECT EXAMINATION

BY MR. JOHNSON:

Q.  Dr. Burton, you were asked about the *DNC v. Brnovich* decision and whether it was reversed.  Did the Supreme Court question the conclusions concerning history and conditions of

discrimination in Arizona?

A.   No.

Q.   On page 34, you discussed on cross this instance with Mr. Shirley, a Navajo man who won an election in Apache County. He was prevented from holding a seat on that county commission for a year until the courts intervened; is that right?

A.   Yes.

Q.   And then you referenced some context about that situation. On page 35, you note that white officials responded by gerrymandering Mr. Shirley's seat; is that right?

A.   Yes.

Q.   On page 25 and 26, about desegregation, you were asked about this case in 1925 that concerned the plaintiff's children, Mr. Romo, you talked about the court's decision --

A.   Yes.

Q.   -- requiring integration for those children; do you remember that?

A.   Yes.

Q.   But on page 26, the next page, you conclude that the school board continued to segregate Mexican American students in general until the 1950's; is that right?

A.   Yes.

Q.   On page 50 you were asked some questions about notices concerning voters who have a felony conviction or are incapacitated.  But your report says that people do not receive

notice that their voting rights have been restored; is that right?

A.   That's right.   That's what the Demos report said.

MR. LANGHOFER:   Same objection about reading from the report, Your Honor.

THE COURT:   Sustained.

BY MR. JOHNSON:

Q.   You were asked on cross about racial appeals in some instances.  And we talked earlier on direct about Mr. Trump and his racial appeals in 2016.  Did Donald Trump win Arizona's electors in the 2016 election?

A.   2016, yes.

Q.   We also talked about some racial appeals in 2021 and 2022 on direct.  Is it your understanding that Mr. Trump is the leading candidate in the current presidential election, including in Arizona?

A.   Yes.

Q.   And then you were asked is there any instance of a candidate winning reelection after making a comment along these lines.  You reference this --

MR. LANGHOFER:   Misstates the record.

MR. JOHNSON:   I will rephrase.

THE COURT:   Go ahead.

BY MR. JOHNSON:

Q.   Do you recall an instance of racially -- racial appeals in

ORVILLE VERNON BURTON, PH.D. - REDIRECT EXAMINATION    1547

campaigning involving Eli Crane in Arizona?

MR. LANGHOFER:  Scope.  Not in the report.

THE COURT:  Yes, it is.

MR. JOHNSON:  Yes.

THE COURT:  I saw his name.

MR. JOHNSON:  Page 68 of your report, Dr. Burton.

THE WITNESS:  Yes.

BY MR. JOHNSON:

Q.  And there did he use the term "colored people."

A.  Yes.

Q.  Is Mr. Crane now a Congressional representative of Arizona?

A.  Yes.

MR. JOHNSON:  No further questions, Your Honor.

THE COURT:  Thank you.

May this witness be excused?

MR. JOHNSON:  Yes.

THE COURT:  Is there any objection?

MR. LANGHOFER:  No.

THE COURT:  Was there something -- anything else before we recess that can't wait until 9:00 tomorrow morning?

MR. DODGE:  No.

THE COURT:  Okay.  Court is in recess until 9:00 tomorrow morning.

(Proceedings conclude at 4:51 p.m.)

UNITED STATES DISTRICT COURT

1548

C E R T I F I C A T E


I, ELVA CRUZ-LAUER, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 15th day of November, 2023.


s/Elva Cruz-Lauer
Elva Cruz-Lauer, RMR, CRR

UNITED STATES DISTRICT COURT