1                    UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF ARIZONA

3                    _____

4

5   Mi Familia Vota, et al.,      )
                                   )
6               Plaintiffs,        )  No. 2:22-cv-00509-SRB
    v.                             )
7                                  )  Phoenix, Arizona
    Adrian Fontes, et al.,         )  November 15, 2023
8                                  )  9:00 a.m.
                Defendants.        )
9   _____)

10

11          *BEFORE:  THE HONORABLE SUSAN R. BOLTON, JUDGE*

12            *REPORTER'S TRANSCRIPT OF PROCEEDINGS*

13

14             *BENCH TRIAL DAY 7 - AM SESSION*
                   (Page 1549-1676)

15

16

17

18

19

20
    Official Court Reporter:
21  Teri Veres, RMR, CRR
    Sandra Day O'Connor U.S. Courthouse, Suite 312
22  401 West Washington Street, Spc. 38
    Phoenix, Arizona 85003-2151
23  (602) 322-7251

24
    Proceedings Reported by Stenographic Court Reporter
25  Transcript Prepared by Computer-Aided Transcription

                    UNITED STATES DISTRICT COURT

1        *A P P E A R A N C E S*

2    For Plaintiff United States of America:

3        U.S. DEPARTMENT OF JUSTICE CIVIL RIGHT DIVISION VOTING
         SECTION - 950
4        By:  **Richard Dellheim, Esq.**
         950 Pennsylvania Avenue NW
5        Washington, D.C.  20530

6    For Plaintiff ADRD Action, Arizona Students' Association,
     League of United Latin American Citizens Arizona, Living
7    United for Change in Arizona:

8        CAMPAIGN LEGAL CENTER
         By:  **Danielle Marie Lang, Esq.**
9             **Robert Brent Ferguson, Esq.**
              **Hayden Johnson, Esq.**
10            **Jonathan Diaz, Esq.**
         1101 14th Street NW, Suite 400
11       Washington, D.C.  20005

12   For Plaintiff Arizona Asian American Native Hawaiian and
     Pacific Islander for Equity Coalition:
13
         LATHAM & WATKINS
14       By:  **Amit Makker, Esq.**
              **Evan Omi, Esq.**
15            **Sadik Huseny, Esq.**
         505 Montgomery Street, Suite 2000
16       San Francisco, California  94111

17       ASIAN AMERICANS ADVANCING JUSTICE
         BY:  **Niyati Shah, Esq.**
18       1620 L Street NW, Suite 1050
         Washington, D.C.  20036
19
         LATHAM & WATKINS, LLP - Avenue of the Americas
20       By:  **Neethu Putta, Esq.**
         1271 Avenue of the Americas
21       New York, NY 10020

22

23

24

25

UNITED STATES DISTRICT COURT

```
 1              A P P E A R A N C E S   C O N T ' D

 2   For Plaintiff Arizona Democratic Party, Democratic National
     Committee:
 3
         WILMER CUTLER PICKERING HALE & DORR LLP
 4       By:  Daniel S. Volchok, Esq.
              Christopher E. Babbitt, Esq.
 5            Britany Riley-Swanbeck, Esq.
         2100 Pennsylvania Ave. NW
 6       Washington, DC 20037

 7   For Plaintiff Chicanos Por La Causa, Chicanos Por La Causa
     Action Fund, Poder Latinx:
 8
         ARNOLD & PORTER KAYE SCHOLER, LLP
 9       By:  John A. Freedman, Esq.
              Erica Elaine McCabe, Esq.
10       601 Massachusetts Avenue NW, Suite 1000
         Washington, D.C.  20001
11
         FAIR ELECTIONS CENTER
12       By:  Michelle Kanter Cohen, Esq.
              Jonathan Sherman, Esq.
13       1825 K St. NW, Ste. 701
         Washington, DC 20006
14
     For Plaintiff Voto Latino, Mi Familia Vota:
15
         HERRERA ARELLANO, LLP
16       By:  Daniel Abraham Arellano, Esq.
         1001 N. Central Avenue, Suite 404
17       Phoenix, Arizona  85004-1500

18       ELIAS LAW GROUP, LLP
         By:  Christopher Dodge, Esq.
19            Elisabeth C. Frost, Esq.
         250 Massachusetts Avenue NW, Suite 400
20       Washington, D.C.  20001

21

22

23

24

25
```

1            *A P P E A R A N C E S   C O N T ' D*

2    For Plaintiff Promise Arizona, Southwest Voter Registration
     Education Project:
3
          MALDEF
4         By:  **Ernest Israel Herrera, Esq.**
               **Erika Cervantes, Esq.**
5         634 Spring Street, 11th Floor
          Los Angeles, California  90014
6

7    For Defendant State of Arizona Kris Mayes, Jennifer Toth:

8         ARIZONA ATTORNEY GENERAL'S OFFICE - PHOENIX
          By:  **Joshua Michael Whitaker, Esq.**
9              **Kathryn E. Boughton, Esq.**
               **Timothy E. Horley, Esq**
10        2005 N. Central Ave.
          Phoenix, AZ 85004
11

12   For the Intervenor-Defendants State of Arizona, Kris Mayes,
     Ben Toma, Warren Peterson:
13
          GALLAGHER & KENNEDY, PA
14        By:  **Hannah Hatch Porter, Esq.**
          2575 E. Camelback Road
15        Suite 810
          Phoenix, Arizona  85016-9225
16

17   For Counter Plaintiff Republican National Committee:

18        STATECRAFT, P.L.L.C.
          By:  **Kory A. Langhofer, Esq.**
19        649 North 4th Avenue, Suite B
          Phoenix, Arizona  85003
20

21

22

23

24

25

1          **I N D E X**

2

3    **PLAINTIFF WITNESS:**          **DIRECT**    **CROSS**    **REDIRECT**    **RECROSS**

4    LORRAINE MINNITE,Ph.D.
     By Mr. Dodge               1555                    1633
5    By Mr. Langhofer                       1615
     By Mr. Horley                          1625
6

7    MARK HOEKSTRA, Ph.D.
     By Mr. Langhofer           1640
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

1554

```
 1              P R O C E E D I N G S

 2   (Proceedings begin at 9:00 a.m.)

 3          COURTROOM DEPUTY:  All rise, court is now in

 4   session.

 5          THE COURT:  Morning, please sit down.

 6          Plaintiffs may call their next witness.

 7          MR. DODGE:  Your Honor, plaintiffs call Dr. Lori

 8   Minnite to the stand.

 9          COURTROOM DEPUTY:  Ma'am, if you want to come step

10   up here, please.

11          Raise your right hand for me.

12          (Witness is sworn.)

13          COURTROOM DEPUTY:  Can you state your name and spell

14   your name for the record, please.

15          THE WITNESS:  Lorraine Carol Minnite,

16   L-o-r-r-a-i-n-e, C-a-r-o-l, M-i-n-n-i-t-e.

17          MR. DODGE:  Christopher D. Dodge on behalf of the Mi

18   Familia Vota plaintiffs.

19          We intend to use a demonstrative for Dr. Minnite's

20   testimony.  I have a hard copy if Your Honor would like it.  I

21   understand that you haven't been taking them, but I wanted to

22   make the offer.

23          THE COURT:  I'd prefer to look at it on the screen

24   with everyone else.

25          MR. DODGE:  Understood, Your Honor.
```

1                    DIRECT EXAMINATION

2   BY MR. DODGE:

3   Q.   Good morning, Dr. Minnite.  I think everyone will be

4   happy to hear, perhaps you most of all, that you will be the

5   last witness plaintiffs will be calling this week.

6        With that, could you please state your full name for the

7   record.

8   A.   Lorraine Carol Minnite.

9   Q.   And could you please describe --

10            MR. DODGE:  Can we pull up the demonstrative,

11   please, and if we could go to Slide 2.  Thank you.

12   BY MR. DODGE:

13   Q.   Could you please describe your educational background for

14   the Court?

15   A.   I have a Bachelor of Arts degree in History and Master's

16   and a Ph.D. in Political Science.

17   Q.   And can you tell the Court where you're currently

18   employed?

19   A.   Rutgers University in Camden, New Jersey.

20   Q.   And what's your position there?

21   A.   I'm Associate Professor.

22   Q.   In what department?

23   A.   Department of Public Policy and Administration.

24   Q.   And how long have you taught at Rutgers?

25   A.   Twelve years.

 1   Q.   And are you a tenured professor at Rutgers?

 2   A.   Yes.

 3   Q.   Can you describe for the Court at a general level the

 4   research you do on elections?

 5   A.   I focus on the incidence of voter fraud in American

 6   elections.

 7   Q.   And for how long have you studied the incidence of voter

 8   fraud in US elections?

 9   A.   Over twenty years.

10   Q.   And why did you first begin to study this issue?

11   A.   I was a new professor and I was approached by Miles

12   Rapoport, who had been the Secretary of State for the State of

13   Connecticut, about research on the question of voter fraud and

14   what political scientists knew about it.

15        He had become the president of a new policy organization

16   in New York City called Demos, and he just said, "You know,

17   we've tried in Connecticut to pass election day registration,

18   and every time we try to make it easier to vote, we get the

19   argument that that will make it easier to commit fraud.  So

20   how much fraud is there?" and that -- you know, I thought I'd

21   spend about three months on that, and it's been a lot longer

22   than that.

23   Q.   Here we are twenty years later?

24   A.   Yeah.

25   Q.   Are you familiar with the academic literature regarding

1   the incidence and effects of fraud in US elections?

2   A.   Yes.

3   Q.   And are you familiar with that literature through your

4   own academic work and research?

5   A.   Yes.

6   Q.   Can you describe some of the highlights of your research

7   into the incidence of voter fraud for the Court?

8   A.   Yeah, so I mentioned the early reports that I did, a

9   couple of them, for organizations but then I did -- all of

10  that built into a book that I published in 2010, and then

11  other publications and edited books as well on various aspects

12  of the question of voter fraud.

13  Q.   I'd like to ask you a bit more about your book of voter

14  fraud.  Can you tell me the principal conclusion you draw in

15  that book?

16  A.   Yes, the principal conclusion was that the incidence of

17  voter fraud in American elections was exceedingly rare and did

18  not pose a threat to electoral integrity.

19  Q.   And how long did you research and work on the myth of

20  voter fraud?

21  A.   It was, you know, eight or nine years.

22  Q.   What types of sources and data and information did you

23  evaluate when writing the book?

24  A.   So a very wide range of material because, like I said, I

25  thought I would spend three months looking up the statistics

 1  and getting the answers, and it turns out, you know, there's

 2  no national databases or things like that that are easily

 3  accessed.

 4      And so I ended up looking everywhere for it, and that

 5  included then, you know, mining the academic literature of

 6  which there was very little.  I looked at news sources,

 7  thousands and thousands of newspaper articles.  I looked at

 8  government reports of all kinds, all agencies.  I looked at

 9  contested elections, Congressional reports.

10      I ended up doing case studies in four places that

11  involved interviewing 25 or 30 people including, you know,

12  prosecutors, defense witnesses, voters.  I looked at the range

13  of advocacy groups on both sides, what they were saying about

14  it, what information they had and just -- you know, anything

15  anywhere I could find.

16  Q.   And after you completed your work on the book -- that

17  book was peer reviewed, right?

18  A.   Yes, as a -- university press books are peer reviewed.

19  Q.   Are you aware of any other peer-reviewed books on the

20  incidence of voter fraud in US elections?

21  A.   No.

22  Q.   Not to be glib, but is it fair to say that you wrote the

23  book on voter fraud?

24  A.   I think so.

25  Q.   Has the myth of voter fraud been recognized by any

Lorraine Minnite, Ph.D. - Direct Exam by Mr. Dodge        1559

 1  government agencies as a significant authority on the question

 2  of voter fraud?

 3  A.    Yes.

 4  Q.    Can you tell the Court an example of that?

 5  A.    An example is in 2014 the Government Accountability

 6  Office was asked by Congressional members to look at the

 7  extant literature and any evidence for the issue of in-person

 8  voter fraud and voter impersonation, and they collected about,

 9  you know, 300 studies that they then subjected to an

10  assessment, an evaluation for their methodology, whether these

11  studies use systematic scientific methodologies; and of all of

12  those studies they identified five that they thought met their

13  standards, and my book was one of the five.

14  Q.    We'll talk about your book a bit more later, but for now

15  I'd like to move on to your prior work as an expert witness.

16        Have you ever testified before as an expert witness on

17  the topic of voter fraud?

18  A.    Yes.

19  Q.    About how many times?

20  A.    About a dozen.

21  Q.    In state and federal courts?

22  A.    Yes.

23  Q.    And have those courts recognized you as an expert in the

24  subject of voter fraud and its effects on US elections?

25  A.    Yes.

1  Q.   Has your testimony on the frequency of voter fraud been

2  found credible by courts?

3  A.   Yes.

4  Q.   Repeatedly?

5  A.   Yes.

6  Q.   Has any court ever found you unqualified as an expert on

7  the issue of voter fraud?

8  A.   No.

9  Q.   Has any court found your testimony to not be credible on

10 this issue?

11 A.   No.

12 Q.   Has any court ever found your testimony to be biased?

13 A.   No.

14 Q.   In your work as an expert witness, do you ever assume

15 what you will find with respect to the incidence of voter

16 fraud in a particular jurisdiction?

17 A.   No, all of this work -- mostly -- most of this work in

18 terms of the expert witness testimony came after the

19 publication of my book and usually involved a question about

20 fraud in a particular state.

21     So each time that I was asked to provide an opinion about

22 voter fraud in a particular state, I would start anew; and it

23 was good experience because as a social scientist you train to

24 be skeptical and to, you know, continuously question your

25 findings; and so I've, in a sense, put the test to my thesis

1  in my book, you know, put it to the test with the subsequent

2  work that I've been asked to do.

3      So I -- you know, I'm always saying maybe -- "Did I miss

4  something?"  "What don't I know about this particular state?"

5  and that has given me the opportunity, then, to dig into the

6  sources deeper in a particular state and see what -- you know,

7  what I might find there.

8  Q.  Beyond your work as an expert witness, have you ever

9  testified before other government bodies about the issue of

10 voter fraud?

11 A.  Yes.

12 Q.  Can you just give a couple examples to the Court?

13 A.  I testified about a House subcommittee.  I also submitted

14 -- was asked to submit written testimony to a Senate

15 subcommittee, and I also testified before the US Commission on

16 Civil Rights.

17 Q.  You prepared a report in this case?

18 A.  Yes.

19 Q.  Do you have a copy of that in front of you?

20 A.  Yes.

21 Q.  And is your CV included in your report as Appendix A?

22 A.  Yes.

23 Q.  All right.  I'd now like to turn to the conclusions you

24 reached in your report in this case.

25          MR. DODGE:  Can we pull you up plaintiffs' Exhibit

1    325.

2    BY MR. DODGE:

3    Q.   Can you tell us what this document is, Professor Minnite?

4    A.   It's the first -- looks like the first page of my report.

5            MR. DODGE:  And if we could go to Slide 6 of the

6    demonstrative now.

7    BY MR. DODGE:

8    Q.   Can you tell the Court what issues you analyzed in your

9    report?

10   A.   Yes, I was asked questions to answer; and so the opinions

11   that follow are based on these issues, which were the

12   incidence of voter fraud in the United States in Arizona,

13   whether the Challenged Laws in this litigation were likely to

14   reduce voter fraud in Arizona, and then the impact of

15   misinformation about voter fraud on voter confidence.

16   Q.   And on that first question, you looked, in particular, at

17   the issue of whether non-citizens vote in Arizona's elections;

18   is that fair to say?

19   A.   Yes, I was asked to focus on -- on that type of fraud.

20   Q.   Okay.  Let's briefly go through your conclusions on those

21   three issues.

22           MR. DODGE:  If we could go to the next slide,

23   please.

24   BY MR. DODGE:

25   Q.   What did you conclude about the incidence of voter fraud

1   both in the US and in Arizona and particularly with respect to

2   non-citizen voting?

3   A.   I concluded that the incidence of voter fraud nationally,

4   and again in Arizona, is exceedingly rare.  That includes

5   non-citizen voter fraud, and that popular claims about voter

6   fraud have been repeatedly shown to be false.

7   Q.   And what did you conclude about whether the laws at issue

8   in this case will reduce voter fraud and not citizen voting in

9   Arizona?

10  A.   The way I thought about that question was, you know, what

11  was to reduce?  And because I had found very little voter

12  fraud in Arizona, the laws are not going to reduce it really

13  further.  I didn't see anything in the -- you know, in the way

14  that would work.

15  Q.   And finally, what did you conclude about the impact that

16  false allegations about voter fraud have on public confidence

17  in elections?

18  A.   I found there were no reason to -- or no persuasive

19  reasons to believe that the Challenged Laws would improve

20  confidence and that, you know, misinformation probably is

21  lowering confidence in elections.

22  Q.   Great.  I'd like to get into your first conclusion, but

23  before that I just want to talk a little bit more about how

24  you look for voter fraud and how you define voter fraud in

25  your work.

1    How do you look for voter fraud in your work?

2  A.   So as I mentioned, my naivety twenty years ago thinking I

3  could just find the statistics led me down this long path of

4  trying to answer the question about the incidence of voter

5  fraud.

6       So what is appropriate for a kind of question like that

7  when you're trying to measure something empirically and the

8  sources are incomplete and scattered is what we call, in

9  social science, a kind of mixed methods or multi methods

10  approach.

11      And the idea is that you -- you look at all kinds of

12  sources, anything you can think of, and we might put them in

13  buckets of qualitative sources and quantitative sources and

14  you look for patterns in the findings understanding that no

15  one source is maybe complete; and so you -- you look for those

16  patterns and if you find -- you know, one source is telling

17  you, for example, there's a lot of fraud and another source is

18  telling you there's not a lot of fraud, you have to resolve

19  those conflicts until you have a kind of convergence on an

20  answer, and then you make inferences from that information.

21  So that's the methodical approach.

22  Q.   And is it fair to say with a mixed methods approach, you

23  don't draw a conclusion until you see that kind of convergence

24  in the sources you're looking at?

25  A.    Exactly.  It's a problem where you can't rely on one

 1  source because -- for whatever reason, it's not a complete or,

 2  you know, accurate -- or not accurate, but it may not be a

 3  complete source; and so you keep looking and you keep, you

 4  know, comparing what you're finding using different sources.

 5      And, again, so, for example, if, you know, every person I

 6  interviewed said, "Oh, there's a tremendous amount of fraud.

 7  We just know there's a tremendous amount" -- or if I just

 8  followed the public allegations that seem to suggest there's a

 9  lot of fraud and I drew a conclusion from that, that would not

10  be good social science.

11      So I needed to figure out, you know, where it would show

12  up when it showed up and look across a range of sources until

13  I came to the conclusion that it was rare.  Not non-existent,

14  but rare.

15  Q.   And mixed methods is the approach you used in your book?

16  A.   That's correct.

17  Q.   Does mixed methods rely upon conviction data to analyze

18  the incidence of voter fraud?

19  A.   Well, conviction data certainly is part of it.

20  Conviction data is, you know, showing you where there's been a

21  violation of the law.  The person's been prosecuted,

22  convicted, but it's not the only source.

23  Q.   Do you believe that voter fraud is sometimes difficult to

24  detect?

25  A.   Yes, I think my journey in this research tells me that

 1   it's difficult -- it can be difficult to detect, although I

 2   point out that the Justice Department has a training manual

 3   for US Attorneys on election crimes and how to detect them and

 4   how to investigate them and how to prosecute them and what all

 5   the legal statutes are and all the legal requirements, and

 6   they say in there it's not that hard to detect.

 7        So, you know, I think under different conditions it may

 8   be difficult, others conditions it may be obvious.

 9   Q.   You acknowledged --

10             THE COURT:  Excuse me.  I wanted to ask a couple of

11   questions.

12             What is your definition of "voter fraud"?  I mean,

13   there could be -- like I could vote in the wrong precinct.  Is

14   that voter fraud?

15             Non-citizen voting, that's voter fraud; but where on

16   the spectrum do you draw the line between somebody made a

17   mistake and voted the wrong ballot versus voter fraud?

18             THE WITNESS:  So that question I take a whole

19   chapter in my book to discuss, but I can give you the short

20   answer which is that --

21             THE COURT:  The short answer is what I'm looking

22   for.

23             THE WITNESS:  I define it as the intentional

24   corruption of the voting process by voters.  So it has the --

25   the element of intent is part of the definition, and very

1   importantly, for me, was to think about the perpetrator

2   because in the electoral process there are many actors who

3   have different access to different parts of the process; and

4   the best example I give, I think, is, for example, voters

5   can't corrupt the count because they don't count the ballots.

6          So I think it makes a lot of sense to distinguish

7   the different -- you know, people who have different access to

8   that process where they could corrupt the process.  That's why

9   I focus on voters and, also, because the public policy

10  discussions around election integrity have very much focused

11  on voters.  This hasn't been about corrupt election officials

12  or politicians, you know, running vote buying schemes.  This

13  has been about access to the ballot.

14         So it's the intentional corruption of the electoral

15  process by voters is how I define voter fraud.

16                THE COURT:  Thank you.

17                MR. DODGE:  Your Honor anticipated some of my next

18  questions.

19  BY MR. DODGE:

20  Q.   Returning to the challenges of detecting voter fraud, you

21  acknowledge some of these research challenges in your book?

22  A.   Oh, yes.

23  Q.   But in your view, mixed methods -- the mixed methods

24  approach permits researchers, such as yourself, to make

25  intelligent inferences about the incidence of voter fraud?

1   A.   Yes, it's -- it's sort of something like, you know, the

2   preponderance of the evidence.  It's across all kinds --

3   different kinds of sources that -- looking for how they line

4   up.

5   Q.   You just described your definition of voter fraud to Her

6   Honor.  Would you say that your definition of voter fraud is

7   generally consistent with Arizona's criminal statutes

8   regarding illegal voting?

9          MR. LANGHOFER:  Legal conclusion.

10         THE COURT:  Sustained.

11  BY MR. DODGE:

12  Q.   Your academic definition of voter fraud would not include

13  instances of unlawful registration due to mistake or human

14  error; is that right?

15  A.   That's correct.

16  Q.   And why -- why don't you include those?

17  A.   Well, because we have a lot of human error in election

18  administration.  We have a lot of voter confusion from the

19  constant changing of the laws in recent years and, also, just

20  new people coming into the system and needing to, you know,

21  figure out how to get registered and vote and so forth and

22  follow all the rules.

23       Judge Bolton mentioned, "Hey, what if I voted in the

24  wrong precinct?"  That happens, because people are confused.

25  So I -- when I -- when I'm looking at this, I often find those

 1  kinds of mistakes that people are making, and that's why I
 2  think it's important to try to distinguish between mistakes
 3  and intentional deceit, which, by the way, is the meaning of
 4  the word "fraud."
 5       The Latin root of the word "fraud" is deceit.  So there
 6  has to be an intent to commit the fraud.
 7  Q.   You just mentioned that you find instances of human error
 8  in your research.  Is it fair to say that you don't ignore
 9  this phenomenon of accidents and mistakes in the process by
10  voters in your own research?
11  A.   No, in part because the method is, in a sense,
12  overinclusive.  The methodology of looking at, you know,
13  everything means that I'm finding things that initially may
14  look like or be alleged to be fraud and that later through
15  investigation turn out to be mistakes.
16  Q.   Are you aware of any instances of non-citizens
17  accidentally being registered to vote in Arizona?
18  A.   Yes, I've seen that.  I included a couple cases in my
19  book and I've seen that since -- excuse me, not in Arizona.
20       Forgive me, not in Arizona.  Outside of Arizona.
21  Q.   And you point to a few examples of that in other states
22  in your report?
23  A.   Yes.
24  Q.   So is it fair to say, just to put a pin a this, that your
25  mixed methods approach leads you to identify these instances

 1  of mistaken non-citizen registration if and when they occur?

 2  A.   Yes.

 3  Q.   Okay.  Let's get into your first opinion.

 4       Is this slide a fair representation of your first

 5  opinion?

 6  A.   Yes.

 7  Q.   I'd like to get into the sources you used, particularly

 8  in this case, to reach this conclusion.

 9       You've already talked about your sources a little bit,

10  but can you just briefly summarize the sources you used for

11  your mixed methods approach in this case for the Court?

12  A.   Yes.  So in this case I looked at -- again, looking for

13  peer-reviewed academic research, looking at government

14  studies.  I included, actually, research from my book that

15  detailed a federal government initiative to try to find voter

16  fraud some years ago.

17       And then with respect to Arizona, as I mentioned, the

18  opportunity to do a case in another state means I'm gonna dig

19  into the state sources themselves; and here, in Arizona, I

20  looked at a range of issues, including materials that were

21  produced -- voluminous materials that were produced through

22  discovery, which included reports by the Attorney General's

23  office, including their complaints that came in from the

24  public through the website on the Attorney General's website

25  about, you know, inviting the public to make complaints.

 1      I looked at -- you have here third-party databases

 2   meaning data collected by nonprofit organizations, and I also

 3   looked at lawsuits, which can be useful as well, lawsuits in

 4   this case challenging the outcome of the 2020 Election.

 5   Q.    So let's get into the social scientific research you

 6   looked at a bit and try and move through it quickly since it

 7   can be a little dry, I think.

 8      Can you tell the Court about the US Government

 9   Accountability Office?  You actually mentioned the 2014 GAO

10   audit --

11   A.    Yes.

12   Q.    -- is that right?

13   A.    Yes.

14   Q.    And you mentioned that the GAO audit identified five

15   scientifically valid studies on the incidence of voter fraud?

16   A.    That's correct.

17   Q.    And your book was one of them?

18   A.    Yes.

19   Q.    Can you describe the remaining four studies the GAO audit

20   identified for the Court?

21   A.    Yes, three of them were academic articles that used

22   different quantitative method approaches; and then the fourth

23   one was a graduate journalism project at the Cronkite School

24   here at the Arizona State University in which students are

25   trained in investigative reporting and investigative

1  journalism techniques, and they take on a project for the

2  year.

3       And so about ten years ago they focused on the question

4  of voter fraud, and I know about that project because they

5  asked me to give a seminar to their students early in the

6  project about my methodology and then they -- they adopted

7  some of what I did, which had to do with Public Records

8  Request that they sent to thousands of election jurisdictions

9  in the United States.

10 Q.   And what do these five GAO-approved studies, including

11 your own book, find with respect to the incidence of voter

12 fraud?

13 A.   They found that the incidence of voter fraud was rare.

14 Q.   Do you also rely on studies in your report that post date

15 the 2014 GAO audit?

16 A.   Yes.

17 Q.   And about how many of those studies do you rely on?

18 A.   There are -- there were three more peer-reviewed journal

19 articles on this specific question of the incidence of voter

20 fraud.

21 Q.   And what methodical approach do those studies use?

22 A.   They also use quantitative research or analysis.

23 Q.   And what do these three more recent peer-reviewed

24 quantitative studies conclude or find with respect to voter

25 fraud?

1  A.   They also confirmed the earlier findings, mine and the

2  work of others.

3  Q.   Do any of those studies conclude anything other than

4  voter fraud is isolated and rare?

5  A.   No.

6  Q.   And that's consistent with the conclusion in your report?

7  A.   Yes.

8  Q.   Are you aware of any peer-reviewed studies that

9  contradict the findings of these other materials you've been

10  describing?

11  A.   I'm aware of one.

12  Q.   And can you tell me about that study?

13  A.   Yes, this was a peer-reviewed journal article that

14  appeared in 2014 that focused on the question of non-citizen

15  votings nationally in the United States.

16  Q.   And specifically in the 2008 election, if I recall?

17  A.   Yes.

18  Q.   Do you discuss that article in your report?

19  A.   Yes.

20  Q.   At some length?

21  A.   Yes.

22  Q.   Can you briefly describe what that article concluded and

23  what methodology it used to reach that conclusion?

24  A.   Yes.  That paper relied on something called the

25  Congressional Election Study, which is an on-line survey

1    that's been done either every year, every other year since

2    about 2006 and it -- so it used that study because that study

3    included some people in it who had identified themselves as

4    non-citizens, and then there was various questions about their

5    voting behavior and so forth; and it made this sort of wild

6    claim that between 38,000 and 2.8 million non-citizens had

7    voted in the 2008 election.

8    Q.   So do you find -- who's the author of that study?

9    A.   The author was Jesse Richman and two colleagues, Guishan

10   Chattha and David Earnest.

11   Q.   Do you find Professor Richman's study persuasive?

12   A.   No.

13   Q.   Can you just briefly explain what you think are the flaws

14   in his approach in that article?

15   A.   Yes.  I looked at that article very carefully, and I

16   looked at the survey data that they relied on; and I had some

17   problems with the way the questions had been asked that made

18   me think that people answering it could have made mistakes

19   about how they answered the questions, and I also was

20   persuaded by the critiques about measurement error and sort of

21   misreading and misunderstanding what that -- how to look at

22   that with respect to the tiny number of non-citizens that were

23   then extrapolated out to the large range that you see there.

24   Q.   You just mentioned that large range of 38,000 to 2.8

25   million.  What do you make of a range like that when you see

1  it reported in a study?

2  A.   I mean, that's just a red flag.  There's something wrong.

3  Q.   Is Professor Richman's study considered reliable within

4  the field of political science?

5  A.   No.

6  Q.   And what do you base that opinion on?

7  A.   I base it on this -- a letter that almost 200 political

8  scientists felt moved to write on their own rebuking the

9  findings.

10  Q.   Have you ever seen a response to a published article in

11  your field like that before?

12  A.   No.

13  Q.   You mentioned some other critiques of Professor Richman's

14  article.  Did his article trigger any sort of a published

15  rebuttal from others in the field?

16  A.   Yes.

17  Q.   And who wrote that rebuttal?

18  A.   That rebuttal was written by Stephen Ansolabehere,

19  Samantha Luks and Brian Shaffner, and Stephen Ansolabehere is

20  the creator of the data.  He is the one who created the data

21  and maintained the survey and worked with others, and Brian

22  Shaffner was one of the people managing it.  I believe they

23  still -- Ansolabehere and Shaffner continue to oversee that

24  project.  So he's kind of the political scientist who created

25  that data.

1    Q.   Is Dr. Ansolabehere respected within your field?

2    A.   Very respected.

3    Q.   And he actually created the survey that Professor Richman

4    relied on?

5    A.   Yes.

6    Q.   What did Dr. Ansolabehere's paper conclude about the

7    prevalence of non-citizens voters based on the CES data he

8    helped to create?

9    A.   This article was published in the same journal that

10   Professor Richman's article was published like about a year

11   later, and they concluded that, in fact, there were all kinds

12   of mistakes in the analysis and that the likely percent of

13   non-citizen voters in recent US elections was zero.

14   Q.   Did Professor Richman's 2014 study generate any attention

15   during the 2016 Election?

16   A.   Yes.

17   Q.   And can you just briefly describe what that attention was

18   for the Court?

19   A.   Well, after the election President Trump claimed that

20   three to five million, what he called illegals, had voted for

21   him in the election -- sorry, excuse me, voted for Hillary

22   Clinton, his opponent; and people associated with him cited

23   this study because Professor Richman had also written a

24   *Washington Post* Monkey Cage column in which he had discussed

25   this research.

1  Q.   And just maybe to educate everyone here, what's Monkey

2  Cage?

3            THE COURT:   I heard you ask that.

4            MR. DODGE:   I don't know the answer, Your Honor.

5            THE COURT:   I got it right.

6            THE WITNESS:   In the *Washington Post* they've had a

7  column for experts to write about sort of data-based studies

8  that they've done.  So it's a -- like a wonky kind of column,

9  and so I guess they were -- Professor Richman was invited or

10  maybe offered to write this column and it was about this

11  question of non-citizen voting based on his research.

12            I say that just because it had a wider audience

13  outside of the academic circles when it appeared in *The*

14  *Washington Post*.

15  BY MR. DODGE:

16  Q.   And it was relied upon by supporters of the former

17  President with respect to some of his claims in the 2016

18  election?

19  A.   I think so.

20  Q.   Is it fair to say, then, your report sets out at some

21  length why you do not rely upon Professor Richman's study in

22  your survey of the peer-reviewed literature on the incidence

23  of voter fraud?

24  A.   Yes.

25  Q.   Besides Professor Richman's article, are you aware of any

1  other peer-reviewed literature suggesting voter fraud is

2  anything other than isolated and rare?

3  A.   No.

4  Q.   And so just to close out this discussion of the scholarly

5  literature, what do you conclude in your report based on the

6  scientifically-valid and peer-reviewed literature you reviewed

7  with respect to the incidence of voter fraud?

8  A.   I conclude that it is exceedingly rare.

9  Q.   Okay.  Let's move on to some of the other sources you

10 relied upon here.

11      Did you look at any federal prosecution data?

12 A.   Yes.

13 Q.   Can you tell the Court about the Ballot Access and Voting

14 Integrity Initiative?

15 A.   Yes, this was a project of former Attorney General

16 Ashcroft in the George W. Bush administration following the

17 2000 -- controversial 2000 presidential election, you know, to

18 sort of respond to concerns; and it was an initiative that

19 brought together attorneys from the civil rights side and the

20 criminal side to train them on recognizing both voter

21 intimidation and voter fraud, and so they had a series of

22 trainings for those attorneys and produced materials.

23      And the US Attorneys put out press releases at election

24 time to let the public know they're there if they have any

25 concerns, how to reach them and so forth.

1   Q.   And did you have some access to some data about the

2   results of this initiative?

3   A.   Yes.

4   Q.   And what time period was covered by the data you had

5   access to?

6   A.   2002 to 2005, so the first three years of that

7   initiative.

8   Q.   And that would have covered the 2002 and 2004 federal

9   elections?

10  A.   Yes.

11  Q.   Roughly ballpark, how many ballots would have been cast

12  between just those two elections?

13  A.   About two hundred million.

14  Q.   What did, in that time period, the Ballot Access and

15  Voting Integrity Initiative produce by way of indictments for

16  voter fraud?

17  A.   It produced 95 total indictments.

18  Q.   How many of those indictments actually concerned

19  individual voters?

20  A.   Just 40.

21  Q.   And of those 40 indictments of individual voters, how

22  many actually resulted in a conviction or a guilty plea?

23  A.   Twenty-six.

24  Q.   And of those 26 out of two hundred million ballots cast,

25  how many concerned allegations of voting by non-citizens?

```
 1   A.    Fifteen.
 2   Q.    Was the Ballot Access and Voting Integrity Initiative a
 3   major priority at the Department of Justice at the time?
 4   A.    Yes.
 5   Q.    How do you know that?
 6   A.    I know that from interviews given by the person who was
 7   the long-time head of the Elections Crimes branch, which is
 8   within the Public Integrity section of the criminal division;
 9   and he said that at the time that it was a priority second
10   only to terrorism and espionage for the department.
11   Q.    Why is the Ballot Access and Voting Integrity Initiative
12   relevant to your analysis in this case?
13   A.    Well, some people argue that the reason you're not
14   finding fraud is because prosecutors aren't prosecuting it and
15   they don't really care about it.  It's low level crime,
16   they're not going to pursue it; and this was an example of the
17   federal government putting considerable resources and effort
18   to find it in federal elections nationwide.
19   Q.    Did you also review a more recent GAO audit of the
20   federal government's election-related prosecutions?
21   A.    Yes.
22   Q.    And roughly what time period was covered by that audit?
23   A.    That audit came out in 2019, and it covered the period
24   about 2000 to 2017.
25   Q.    And what did that audit reflect with respect to the
```

1   number of election-related prosecutions the federal government

2   initiated in that time period?

3   A.   That audit found -- they looked at data from the public

4   integrity section and they looked at data from the US

5   Attorneys' offices and they found very few election-related

6   prosecutions.

7        I think it was altogether -- these weren't even all

8   prosecutions.  These were cases brought, and it was under 200

9   election related; but I point out in my report that there

10  isn't a way for me with that kind of data to drill down on who

11  the perpetrators were -- or at least very easily.

12       So their classification was election related, and it

13  included people who were not just voters.

14  Q.   But roughly 200 or so initiated cases over that time

15  period by the federal government, both at the Public Integrity

16  section and US Attorneys' offices across the country?

17  A.   That's correct.

18  Q.   And again ballpark, about how many ballots would have

19  been cast in just federal elections over that time period of

20  that audit?

21  A.   It was close to a billion.

22  Q.   Is there any reason to think election-related crimes were

23  just not a priority for the federal government over that

24  18-year period or so?

25  A.   No, and the GAO investigators asked that in people that

 1   they interviewed about how did they approach the problem and
 2   they -- they all said that it was, you know, something that
 3   was important that they pursued.
 4   Q.   So we've discussed this federal data.  What conclusion do
 5   you draw in your report based on the federal prosecution data?
 6   A.   That voter fraud is exceedingly rare in contemporary US
 7   elections.
 8   Q.   So we've now discussed academic literature and federal
 9   prosecution data.  Do you also look at state government
10   reports and data when assessing the incidence of voter fraud
11   in your work?
12   A.   Yes, I try to.
13   Q.   Can you give the Court just a brief sample of what kinds
14   of sources you might look at from state governments?
15   A.   Certainly.  So I've looked at legislative debates when
16   there have been bills to implement voter ID or things like
17   that.  I've looked at reports that have been produced by
18   Attorneys Generals' offices.  I've looked at all kinds of
19   investigations that may have occurred for one election here or
20   there in a state and, as I've said, I've had -- in
21   participating in this litigation I've had the opportunity to
22   have materials that -- have access to materials I might not
23   otherwise have that relate to state government agencies.
24   Q.   So let's get into some of these state-level sources you
25   just mentioned.  Did you review any press investigations into

 1  reports of voter fraud at the county level in Arizona?

 2  A.   Yes.

 3  Q.   And can you describe what investigation you reviewed?

 4  A.   Yes, so after the 2020 presidential election, the

 5  Associated Press conducted an investigation in six

 6  battleground states which included Arizona, and they sent

 7  Public Records requests to something like 340 election

 8  jurisdictions asking for any potential cases of voter fraud

 9  and, you know, what cases.  Did you send any to county

10  prosecutors, and those sorts of numbers and wrote -- it took

11  them months to do and they published the report in 2021, I

12  think.

13  Q.   And focusing on Arizona, how many cases did the counties

14  report referring on to prosecutors?

15  A.   So the AP reported that only four counties of the fifteen

16  had told them that they had forwarded any cases to county

17  prosecutors.

18  Q.   And what was the rough volume of those cases?

19  A.   Roughly just under 200.

20  Q.   And did any of those cases referred for further

21  investigation or prosecution concern allegations of voting by

22  non-citizens?

23  A.   I don't -- no, I don't think so.

24  Q.   Did you review the deposition transcripts of County

25  Recorders in this case?

1  A.    Yes.

2  Q.    And are those transcripts similar to the kinds of sources

3  you would rely upon in your academic work?

4  A.    Well, they're better because they're sworn testimony.

5        So if I had interviewed all of those County Recorders, I

6  probably would have gotten less information; but, yes, I would

7  rely on that.

8  Q.    And what did you conclude based on your review of those

9  transcripts with respect to the incidence of non-citizen

10 voting in Arizona?

11 A.    I don't recall the County Recorders having seen

12 non-citizen voting in Arizona in recent years.

13 Q.    Did any of the County Recorders identify instances of

14 non-citizen voting in their jurisdictions?

15 A.    No.

16 Q.    Did you review a list of election-related prosecutions

17 maintained by the Attorney General's office in your work in

18 this case?

19 A.    Yes.

20 Q.    And do you recall generally the time period covered by

21 that list of prosecutions?

22 A.    Yes, that was 2010 'til April 2023.

23 Q.    And do you know if that list is considered an

24 authoritative list of prosecutions within the Attorney

25 General's office?

1   A.    That's my understanding.

2   Q.    And what do you base that on?

3   A.    I base that on the deposition testimony of the lead

4   election prosecutor in the Attorney General's office,

5   Mr. Lawson.

6            MR. DODGE:  Can we just briefly pull up Plaintiffs'

7   Exhibit 292.

8   BY MR. DODGE:

9   Q.    Is this the first page of the list of prosecutions you

10  reviewed?

11  A.    Yes.

12  Q.    Can you tell us what this table we're looking at shows,

13  Dr. Minnite?

14  A.    Yes.  So I took the Attorney General's list and I broke

15  it down in the way that I had been breaking things down in

16  terms of type of fraud and also by election year.  So this was

17  the year that the fraud was -- occurred; and I should say,

18  also, these cases I also looked at what I could look at in

19  terms of court records that are publicly available.

20       So it's divided by -- or separated by the types of fraud

21  and then election year.

22  Q.    And how many overall prosecutions does the AG's list

23  show?

24  A.    It shows here 39, but it was 35 people because four of

25  them had been charged in two elections.

 1   Q.   How many convictions did the Attorney General obtain for

 2   illegal non-citizen voting over that time period?

 3   A.   Zero.

 4   Q.   Do you know if the Attorney General has obtained any

 5   convictions for non-citizen voting or registration in Arizona

 6   since 2010?

 7   A.   I don't believe so.

 8   Q.   And what do you -- beyond this list, what do you base

 9   that conclusion on?

10   A.   I'm trying to get this fly away from me, but I base that

11   on the deposition testimony that I reviewed of the Attorney

12   General's office.

13   Q.   And any particular individuals within that office?

14   A.   Mr. Lawson.

15   Q.   Do you know whether the Attorney General's office has any

16   pending charges that allege a non-citizen voted?

17   A.   Yes, he testified to that in his deposition.

18   Q.   How many did he testify to currently being pending?

19   A.   He said there were two pending cases.

20   Q.   Have either of those resulted in a conviction yet?

21   A.   Not that I'm aware.

22   Q.   Do you know if information regarding those cases is

23   public?

24   A.   My understanding is it is not public.

25   Q.   The list of prosecutions you reviewed, did that reflect

 1   cases brought by other prosecuting authorities in Arizona,

 2   like County Attorneys?

 3   A.   I don't think so.  I think these are within the Attorney

 4   General's office.

 5   Q.   And do you know if other prosecutors within Arizona have

 6   obtained any convictions for non-citizen registration or

 7   voting since 2010?

 8   A.   I'm not aware of any.

 9   Q.   Did you review news coverage going back to 2010 to

10   investigate that issue?

11   A.   Yes, about 3,000 articles.

12   Q.   Do you base that conclusion on anything else that you saw

13   in this case?

14   A.   Well --

15   Q.   Do you recall if any witnesses in this case testified to

16   their awareness that no prosecuting authority in Arizona had

17   obtained a conviction for non-citizen voting since 2010?

18   A.   This is the Attorney General's office, yes.

19   Q.   Well, you're aware that there's a report in this case

20   issued by a Professor Hoekstra?

21   A.   Yes.

22   Q.   Does Professor Hoekstra identify any successful

23   convictions of non-citizens for registering or voting in his

24   report in Arizona since 2010?

25   A.   No.

1   Q.   Does Professor Richman?

2   A.   No.

3   Q.   Are you aware of whether there were any convictions in

4   Arizona for non-citizen voting prior to 2009?

5   A.   Yes.  Yeah, I am aware of a handful of cases.

6   Q.   How did you become aware of those handful of cases?

7   A.   So shortly before my report had to be filed, as part of

8   the deposition of Mr. Lawson, I -- counsel shared with me a

9   document that, I guess, had been part of that deposition,

10  which was material produced by one of the people that the

11  Attorney General's office was prosecuting for having voted her

12  deceased -- recently deceased mother's ballot.

13       She was on the list -- their list and she was somebody

14  they were prosecuting, and I guess her attorney was trying to

15  get a leniency in the sentencing and had hired a private

16  investigator to look at how other people who have been charged

17  like her had been sentenced.

18       And in doing that this private investigator produced a

19  list of cases that went past 2010 -- or before 2010, and on

20  that list there were thirteen non-citizens who had been

21  prosecuted in 2007/2008.

22  Q.   Do you recall who prosecuted those cases?

23  A.   Yes, I think they were all in Maricopa County.

24  Q.   The Attorney General's Office didn't create that document

25  you looked at?

 1  A.   No, it's my understanding it came from this other party.

 2  Q.   And the case that generated that report, it didn't

 3  concern an instance of non-citizen voting?

 4  A.   That's correct.

 5  Q.   Does that document you reviewed impact your conclusions

 6  at all in this case?

 7  A.   No.

 8  Q.   Why not?

 9  A.   It's just too few of a number of people who were

10  prosecuted.  I believe some of them had come from a jury list

11  -- matching of a jury list to a registration list, but there

12  were no other cases after that.

13  Q.   Does Dr. Hoekstra cite that document in his report?

14  A.   No.

15  Q.   Does Dr. Richman cite that document in his report?

16  A.   No.

17  Q.   Did you review a database of election complaints produced

18  by the Attorney General in this case?

19  A.   Yes.

20  Q.   And can you just generally tell us what that database

21  was?

22  A.   Yes, so this was -- these were two spreadsheets that

23  downloaded data from the portal that had been on the Attorney

24  General's website for people to make complaints or, you know,

25  put in their concerns about fraud and other problems in the

 1  elections.

 2       So the data covered right around the time of the 2020

 3  election through early of this year, 2023, and there were

 4  about 4,300 complaints in those two spreadsheets.

 5  Q.   And who could submit complaints to that portal?

 6  A.   I believe anyone could have done that because they had

 7  people who submitted complaints who didn't live in Arizona and

 8  didn't vote in Arizona who would say, you know, "I live in

 9  Iowa and I'm watching what you're doing in Arizona and I'm

10  upset."

11  Q.   Could people submit anonymous complaints into that

12  portal?

13  A.   Yes.

14  Q.   Did any of those complaints allege that non-citizens had

15  registered or voted in Arizona?

16  A.   Yes.

17  Q.   Do you know if those allegations were acted upon by the

18  Attorney General's office?

19  A.   It's my understanding that all of those complaints

20  received some level of review -- some initial level of review,

21  and if they merited further investigation that they were

22  further investigated.

23  Q.   Do you know if any of those allegations in the portal

24  resulted in a prosecution or conviction?

25  A.   For non-citizens?

1  Q.   Yes.

2  A.   No.  I mean, I'm aware that there were none.

3  Q.   And then just very briefly, can you tell the Court what

4  the Election Integrity Unit is?

5  A.   My understanding of it is that it was a special unit

6  created in 2019 by the previous Attorney General who went to

7  the Legislature to get an annual funding for it and that

8  initially hired three or four people, but then relied, also,

9  on other special agents in the criminal division of the

10  Attorney General's office.

11  Q.   And so that unit was provided some dedicated resources by

12  the Legislature?

13  A.   That's my understanding.  I reviewed documents again

14  produced through discovery regarding the funding of that

15  agency or that office.

16  Q.   And in particular, in the wake of the 2020 Election and

17  the audit that was performed in Arizona of that election, in

18  Maricopa County in particular, do you know if that unit was

19  provided extra resources to investigate the issue of fraud?

20  A.   Yes, my understanding is that after the State Senate's

21  forensic audit of the Maricopa County election, which

22  concluded, like, in August of 2021, that the Election

23  Integrity Unit then expanded to include all 72 agents in the

24  Attorney General's office to follow up on both those

25  complaints, but also what had been produced through this Cyber

1  Ninja Company's audit.

2  Q.   And what did those efforts uncover with respect to

3  non-citizen voting in the 2020 election?

4  A.   No non-citizen voting.

5  Q.   Is it fair to say based on the materials you reviewed

6  that the Election Integrity Unit was highly motivated to

7  uncover instances of non-citizen voting?

8  A.   Yes, the current Attorney General put out a press release

9  saying that this effort -- those dates, by the way, are off.

10 It should be October of 2021 to March/April 2022.

11       Through that period about 10,000 person hours had been

12 spent following up on every kind of allegation and every

13 alleged instance of fraud that came through the -- either the

14 portal or the Cyber Ninja's audit.

15 Q.   And you just actually alluded to this, but for clarity

16 the dates on this slide are slightly off?

17 A.   Yes.

18 Q.   October 2021 to April 2022 would be more accurate?

19 A.   That's correct.

20 Q.   Okay, thank you.

21       Based on these state and county level materials you

22 reviewed, what did that suggest with respect to the first

23 conclusion you reached in your report?

24 A.   Well, it, again, was an example of a concerted effort to

25 find fraud by people who have the power to find it and they --

 1  there was a memorandum written by a special agent to his

 2  supervisor in the Attorney General's office, Ronald Grigsby,

 3  explaining what they did in this investigation that was also

 4  released to the public; and in that memo Special Agent Grigsby

 5  talked about how they issued subpoenas, they traveled the

 6  state, they went to other states, they interviewed everybody

 7  that they could where they had the information and they found

 8  that these allegations were all false, that they were not --

 9  they had no substance to them, no basis and no evidence.

10  Q.   Did you look at any third-party databases compiling

11  alleged instances of voter fraud in reaching your first

12  opinion here?

13  A.   Yes.

14  Q.   And can you briefly tell the Court what databases you

15  looked at?

16  A.   Yes.  So the Heritage Foundation, which is, you know, a

17  major, national, nonprofit organization -- policy organization

18  which, by the way, has been a strong supporter of things like

19  proof of citizenship and photo ID and so forth, they took it

20  upon themselves to create a database -- it's available to the

21  public.  It's on their website -- where they collect these

22  cases of what they call are proven fraud, and you can look at

23  that database.  You can sort it by state.  So I could pull out

24  all of the cases that they coded for Arizona.

25  Q.   Does the Heritage Foundation disclose its methodology for

1   compiling these cases?

2   A.   No, that's one of the, I guess, frustrations with it.

3   It's not exactly clear how they -- what methods they've used

4   to collect the information, but all of the cases in their

5   database are cases that have gone all the way through the end

6   of the process.  So they're either guilty pleas or

7   convictions, things like that.

8   Q.   So why do you rely on the Heritage Foundation database if

9   you're not sure of its methodology?

10  A.   I include it because, again, of the public policy issues

11  of the position of the Heritage Foundation who -- who was --

12  for many years put out policy memos saying there's a lot of

13  voter fraud.  It's a problem in American elections and, yet,

14  their own data that they pulled together does not support

15  that.

16  Q.   And you think they'd be motivated to disclose these cases

17  if they were aware of them?

18  A.   I -- I would think so.  If they keep saying there's a lot

19  of fraud, then I would hope that they would be able to show

20  the evidence of that.

21  Q.   With respect to Arizona, what does the Heritage

22  Foundation database show as far as voter fraud cases?

23  A.   So they have mostly double voting cases.  They -- they

24  have 28 cases in their database.

25  Q.   And did any of the cases in the Heritage Foundation

 1   database for Arizona concern instances of non-citizens

 2   registering or voting?

 3   A.   None of them.

 4   Q.   And you also looked at a second database, right?

 5   A.   Yes.

 6   Q.   And that was the News 21 database at ASU that you've

 7   already mentioned?

 8   A.   Yes, and this database only goes to 2012.  Their database

 9   goes from 2000 to 2012.  Heritage Foundation, it's a little

10   hard to figure out when they started looking for cases, but

11   they only have cases from 2009 to the present.

12        So there's not a perfect alignment there, but the News 21

13   also is this different methodology that I happen to know a lot

14   about, which involved the Public Records Request as the sort

15   of foundation of their data collection effort.

16   Q.   So what does the News 21 database further show with

17   respect to allegations of voter fraud in Arizona?

18   A.   So the only cases that they have come from -- or overlap

19   with cases that are also in the Heritage Foundation, and they

20   only had four cases of double voting in their database.

21   Q.   Did they report any additional instances or allegations

22   of alleged non-citizen voting in Arizona?

23   A.   No.

24   Q.   So just looking at Table 4 here, can you very briefly

25   summarize your conclusion from these two databases?

1   A.   My conclusion from these two databases is that voter

2   fraud is still exceedingly rare.

3   Q.   Shifting gears.  In reaching your first opinion, did you

4   look at the results of any lawsuits making allegations of

5   fraud in Arizona's elections?

6   A.   Yes.

7   Q.   And without spending too much time on it, can you just

8   tell the Court sort of the upshot of what you found when

9   reviewing that -- those lawsuits?

10  A.   Yes.  So I looked at eight lawsuits that followed the

11  2020 Election.  Only one of them was in Federal Court, and

12  only four of them actually made something like claims around

13  fraud 'cuz there were a lot of allegations about things having

14  to do with, you know, voting machines and ballot box stuffing

15  and so forth; but with respect to illegal voting, only four of

16  them made kind of discernible claims.

17  Q.   Did any of those lawsuits present evidence of non-citizen

18  voting in Arizona?

19  A.   No, none.

20  Q.   Were any of those lawsuits successful?

21  A.   No.

22  Q.   And again, I don't want to go down any rabbit holes; but

23  did you also review public claims made by elected officials

24  claiming that there was widespread non-citizen voting in

25  recent Arizona elections?

1  A.    Yes.

2  Q.    Did you review any claims made by former President Trump

3  to that effect?

4  A.    Yes.

5  Q.    And what did President Trump claim specifically with

6  respect to non-citizen voting in Arizona in the 2020 Election?

7  A.    He said that there were 36,000 non-citizen votes in

8  Arizona in 2020.

9  Q.    When did he make that claim?

10  A.    He made that claim in his speech on the Ellipse in

11  Washington on January 6th.

12  Q.    Did that claim he made have any basis in the facts you

13  reviewed in this case?

14  A.    No.

15  Q.    Based on your review of the facts in this case, what do

16  you believe that former President Trump was referring to when

17  he alleged that 36,000 non-citizens voted in Arizona's

18  elections?

19  A.    I think that number came from the number of federal-only

20  voters in Arizona, which at the time was being said was the

21  same number.  Some people said 32,000, but 36,000 was a number

22  that a state senator told Rudolph Giuliani in a meeting in

23  late November of 2020.

24  Q.    So the gist of his claim was that all these federal-only

25  voters had cast ballots and they were all non-citizens?

```
1   A.   Correct.

2   Q.   Do you know if members of the Arizona Legislature made

3   similar claims of non-citizen voting in the 2020 Election at

4   that time?

5   A.   Yes.

6   Q.   Was there any basis for those claims based on the

7   evidence you reviewed in this case?

8   A.   No.

9   Q.   Okay.  So let's sort of step back for a second and just

10  sort of summarize what we've discussed here with respect to

11  your first opinion.

12       You see these sources we discussed earlier.  You reviewed

13  each of these in reaching your first opinion, right?

14  A.   Correct.

15  Q.   And after reviewing all these different qualitative and

16  quantitative sources, this is the approach you would use in

17  your mixed methods approach in your book, right?

18  A.   That's correct.

19  Q.   And having reviewed all these sources here, can you just

20  again briefly summarize for the Court how they lead you to

21  reach your first conclusion?

22  A.   Could you say that again?  I didn't hear you.

23  Q.   I apologize.  Having reviewed these various sources in

24  this case, can you explain for the Court how these sources

25  lead you to reach your first opinion that voter fraud is rare
```

1    in the United States and in Arizona?

2              MR. LANGHOFER:  Cumulative.

3              THE COURT:  Sustained.

4    BY MR. DODGE:

5    Q.   Let's move on to your final two conclusions.

6         This is your second conclusion, right?

7    A.   Yes, and it builds on the first.  It's deduced from the

8    first conclusion.

9    Q.   And, basically, you're concluding that because there's so

10   little evidence of non-citizen voting in Arizona, the

11   Challenged Laws are not going to materially reduce it?

12   A.   That's correct.

13   Q.   And how did you reach this conclusion?

14   A.   I reached the conclusion, again, by assessing the

15   evidence of non-citizen voting in Arizona and reading laws,

16   looking at the laws, looking at all of the legislative

17   debates.

18        I think I looked at, like, twelve State Senate and

19   Assembly various hearings and meetings looking to see if

20   evidence was being introduced in those legislative sessions

21   that would support the idea that the proof of citizenship was

22   needed to reduce fraud.

23   Q.   Did anything in the legislative record that you reviewed

24   suggest non-citizen voting as a problem in Arizona?

25   A.   No.

1   Q.    Did supporter -- did any of the supporters of the bill

2   identify instances of non-citizen voting in Arizona?

3   A.    No.

4   Q.    Did supporters of the law express concern at the number

5   of federal-only voters in Arizona?

6   A.    That was a big theme across a lot of the legislative

7   meetings and hearings.  There was a lot of discussion or

8   reference to the concern that the federal-only voters were the

9   people who had not produced documentary proof of citizenship,

10  but were duly registered to vote in at least federal

11  elections.

12  Q.    Does the legislative record contain any evidence that

13  federal-only voters are likely to be non-citizens?

14  A.    No.

15  Q.    Have you seen any evidence in this case that federal-only

16  voters are non-citizens?

17  A.    No.

18  Q.    Did either Dr. Hoekstra or Dr. Richman identify any

19  federal-only voters who are non-citizens in their reports?

20  A.    No.

21  Q.    Do you know if the Secretary of State's office has a view

22  with respect to whether federal-only voters are non-citizens?

23            MR. LANGHOFER:  Relevance.

24            THE COURT:  Pardon me?

25            MR. LANGHOFER:  Relevance.

1          THE COURT:  Overruled, you may answer.

2          THE WITNESS:  The Secretary of State's spokesperson

3    publicly stated that it was just wrong to assume that

4    federal-only voters were non-citizens and that they were legal

5    voters.

6    BY MR. DODGE:

7    Q.   Did Arizona have federal-only voters prior to the 2020

8    election?

9    A.   Yes.

10   Q.   Based on your review of the legislative record, why do

11   you think the Arizona Legislature acted on this issue in the

12   wake of the 2020 Election?

13          MR. LANGHOFER:  This is an improper opinion, Your

14   Honor.

15          THE COURT:  Sustained.

16   BY MR. DODGE:

17   Q.   So just to recap, why do you conclude that HB2492 and

18   HB2243 will not reduce voting by non-citizens in Arizona?

19   A.   Because the existing evidence suggests that it's

20   practically non-existent in Arizona with the current -- with

21   the rules that were in place prior to the enactment of those

22   two pieces of legislation.

23   Q.   Okay.  Let's briefly discuss your final opinion in this

24   case.  What did you conclude with respect to your -- the third

25   issue you looked at in this case?

1   A.   This is based on the academic research broadly on the

2   question of voter confidence and what boosts it or increases

3   it or what diminishes it, and misinformation about fraud could

4   diminish it because it suggests that the electoral outcomes

5   cannot be trusted.

6   Q.   Do you reach a conclusion with respect to whether the

7   laws at issue in this litigation -- whether there's good

8   evidence to believe they'll improve voter confidence?

9   A.   No, there's no research that I find that looked at

10  whether adopting proof of citizenship requirements would

11  increase voter confidence.

12  Q.   Very briefly.  I believe Dr. Hoekstra cites an article in

13  his report by Endres and Panagopoulos.  I can spell that if

14  the reporter would like.

15       Did that report -- or study give you any pause in

16  concluding that these Challenged Laws are not -- there's no

17  good evidence to believe they'll improve voter confidence?

18  A.   No.

19  Q.   And very briefly can you say why?

20  A.   This was a kind of an experiment done in Virginia

21  recently where the researchers worked with the League of Women

22  Voters, and they adopted a kind of experimental design where

23  they had some people in their population who received

24  postcards from League of Women Voters informing people that a

25  new photo ID requirement had been put in place, and some

 1   people didn't receive that.

 2       And after the election and the mailing out of these

 3   postcards, they did a survey of people and they -- and this

 4   survey was very problematic, but they did the survey and they

 5   reported that the people who got the postcards were slightly

 6   more likely to say that they didn't think any fraudulent votes

 7   had been cast in that election.

 8       And so it's not exactly voter confidence because voter

 9   confidence is a complicated somewhat black box at the moment

10   for researchers, but it spoke to the issue of "Do you think

11   fraud is happening in the election?"

12   Q.   Do the laws at issue in this case require the State to

13   mail voters postcards with information about the contents of

14   the bills?

15   A.   It's not my understanding that that's a requirement.

16   Q.   Do you think researchers have a perfect understanding of

17   what drives the lack of public confidence in elections?

18   A.   No.

19   Q.   Are you aware of any peer-reviewed papers, though, that

20   are beginning to reach conclusions about potential sources of

21   public distrust in elections?

22   A.   Yes.

23   Q.   Can you just briefly just tell us about those at high

24   level?

25   A.   Well, there was one recently just, you know, a few months

 1    ago published by a number of authors.  The lead author's name
 2    is Berlinsky that did actually try to look specifically at the
 3    impact of misinformation about election integrity on voter
 4    confidence; and they found, in fact, that it depressed voter
 5    confidence.
 6    Q.   So before we finish up here, Dr. Minnite, I just wanted
 7    to briefly give you an opportunity to respond to a couple of
 8    the criticisms of your report.
 9         Did you read the rebuttal reports filed in this case by
10    Professor Hoekstra and Professor Richman?
11    A.   Yes.
12    Q.   We've already discussed Dr. Richman a bit so let's focus
13    on Dr. Hoekstra.  Have you ever encountered Dr. Hoekstra in
14    your twenty years of work on voter fraud?
15    A.   No.
16    Q.   Are you aware of any work he's published on voter fraud?
17    A.   No.
18    Q.   Have you ever encountered him at a political science
19    conference?
20    A.   He's an economist, no.
21    Q.   Did you know who he was before this litigation?
22    A.   No.
23    Q.   Dr. Hoekstra criticizes your report for not acknowledging
24    the difficulty of detecting voter fraud.
25         What do you make of that criticism?

1   A.   I think that's completely wrong.

2   Q.   In fact, your book acknowledges some of these challenges;

3   is that fair to say?

4   A.   That's correct.

5   Q.   Do you know if Dr. Hoekstra responded to your book at all

6   in his report?

7   A.   He did not.

8   Q.   Dr. Hoekstra and Dr. Richman also criticize your

9   definition of voter fraud for not counting for non-citizens

10  who accidentally get registered.

11       Do you think that's a fair criticism of the approach you

12  used to detect voter fraud?

13  A.   No, I've tried to explain why I adopted the definition

14  that I did and why, I will also say, it's important in social

15  science to clearly define the concepts you're going to

16  measure.  You have to be precise about it.

17       You have to know what you're actually looking for; and if

18  I'm looking for fraud, I'm not looking in the same way for

19  errors to be part of the measurement of fraud, although, as we

20  talked about, I see the errors.  I see that as a phenomenon as

21  part of my research.

22  Q.   Does Dr. Hoekstra identify any persons in his report who

23  mistakenly registered to vote as a non-citizen in Arizona?

24  A.   No.

25  Q.   Does Dr. Richman?

1  A.   No.

2  Q.   In your you review of news stories about Arizona

3  elections, do you see any indication that non-citizens are

4  accidentally being registered to vote in the state?

5  A.   No.

6  Q.   Are you aware of any evidence suggesting there's a

7  systematic problem of non-citizens being inadvertently

8  registered to vote in Arizona?

9  A.   I'm not aware of that, and I also refer to the

10 depositions of the County Recorders who didn't talk about that

11 being a problem.

12 Q.   Is it fair to say that between you, Professor Richman and

13 Professor Hoekstra you were actually the only one to identify

14 any examples in other states of non-citizens accidentally

15 being registered to vote?

16 A.   Yes, that's correct.

17 Q.   And finally, Dr. Richman and Dr. Hoekstra allege that you

18 rely exclusively on conviction data in reaching your

19 conclusion.

20     After all we've reviewed today, do you think that's a

21 fair criticism?

22 A.   No.

23 Q.   And could you just briefly say why?

24 A.   It's -- it's just a complete misreading of my work, and I

25 wouldn't expect Dr. Hoekstra to recognize that as easily

1  because, as an economist, he's not going to be trained in the

2  same methods; but it just ignores, you know, twenty years of

3  work that I've done on this subject to say that I only look at

4  convictions.

5          MR. DODGE:  Your Honor, I will pass the witness.

6          May I bring her a bottle water before doing so?

7          THE COURT:  You can hand it to Elaine and Elaine

8  will provide it to the witness.

9          MR. DODGE:  That works just as well, and I do pass

10  the witness.

11          THE COURT:  I have a question about your third

12  opinion, which I understand, essentially, to be that there's a

13  problem with voter confidence because of various things and

14  that these voting -- new voting laws aren't going to do

15  anything to improve voter confidence.

16          THE WITNESS:  Correct.

17          THE COURT:  But is the basis for your opinion that

18  the two laws won't improve voter confidence the fact that

19  there's no social science research to show that?

20          THE WITNESS:  That's the foundation, because this

21  area of research on voter confidence has begun to gather a lot

22  -- or garner a lot of attention on the part of social

23  scientists and they're studying it in all different kinds of

24  ways.  So there's -- we're not -- there's nowhere yet to kind

25  of bring it all together to have definitive sort of research

 1  findings on it but -- but specifically, you know, I could talk

 2  about many of the myriad of findings that don't quite yet add

 3  up to a sort of convergence on a theory about voter confidence

 4  but when people -- what some of the research shows is that

 5  when people think that their vote doesn't matter, they maybe

 6  have less confidence.

 7          It doesn't necessarily mean that it changes their

 8  behavior.  They may or may not vote.  Some people, for

 9  example, in the research in the case of African-Americans,

10  when they have been told that their vote's being suppressed,

11  they may vote more.  They may respond because of the long

12  history of voter suppression in the United States with respect

13  to African-Americans.

14          So the causal chain about what do you know, what do

15  you think, what do you do for attitudes and behavior is very

16  complicated right now; but one thing that is general -- seems

17  to be generally supported in the research is that if people

18  think that their vote is being undermined, they're gonna have

19  less confidence and they're gonna be -- they're gonna believe

20  that the elections are not producing the outcome.

21          And so the issue here, though, is -- or the

22  secondary issue is if the information people are given is not

23  true.  So untrue information about fraud functions as if fraud

24  actually happened.

25          THE COURT:  But that's the situation that we have

UNITED STATES DISTRICT COURT

```
 1   based on your research and your opinion, that we have all of
 2   this information in the public that there's lots of voter
 3   fraud, even though your research shows that there's hardly any
 4   at all and with respect to non-citizens even less.
 5             THE WITNESS:  That's correct.
 6             THE COURT:  But the voter perception appears to be
 7   different?
 8             THE WITNESS:  That's right, and --
 9             THE COURT:  And would you agree with me that when
10   state legislators pass laws to try to fix perceived problems,
11   they don't go to the social science research to figure out if
12   what they're doing is going to help or not help?
13             THE WITNESS:  I was going to say that, you know,
14   I've never been asked to testify at one of these hearings
15   adopting a proof of citizenship or photo ID law, but what I
16   say in my report is there's an easier solution, which is that
17   people should stop lying about fraud.
18             Politicians could take the data that the Attorney
19   General's office has produced and promote that and help the
20   public understand.
21             For a long time I've called for much more
22   transparency about this issue in an effort to get it out to
23   the public to counter what happens in the political arena and
24   the manipulation of people around the idea there's fraud; and
25   I can say having studied this for twenty years, it's just
```

1  gotten worse and worse.

2          When I first studied -- began studying this people

3  said to me, "What are you doing?"  You know, "This is not an

4  issue.  You'll never get tenure.  I mean, what are you

5  focusing on this for?"

6          There was no attention to it twenty years ago and it

7  has -- it expanded when Barrack Obama was elected president in

8  2008, and then it exploded after 2016.  When I say "it," I

9  mean this wild perception that there's all this fraud and

10 elections are being rigged in the United States and we can't

11 trust anything.

12         So we do have that problem that you've identified,

13 that we have this perception, but it is a misperception and I

14 -- I don't know that making it harder for some portion of the

15 population to comply with the rules when they're eligible

16 voters to vote is the best way to handle it, because we still

17 have the problem of promoting misinformation about voting.

18         And politicians could -- could do this very easily

19 without passing a law.  They could -- you know, any politician

20 could take it upon themselves to try to put out to the public

21 what they know, and I think that happened here in Arizona

22 after the 2020 Election with Maricopa County doing its various

23 audits and putting out reports and trying to assure the public

24 that the election in Maricopa County was run well.

25         So it's not going to be easy to give people the

 1    right information but there's -- there's -- politicians have a
 2    lot of sway with people.  They're authoritative figures in the
 3    society and when the President of the United States says this,
 4    people are going to believe it.  A lot of people.
 5            We've never had a situation like this before.  It's
 6    a deep, deep problem in terms of perception.  I don't -- I
 7    don't see the evidence of the laws, although I'm following,
 8    your -- you know, your logic that if politicians say, "Well,
 9    we're doing this because we want to make it -- we want to make
10    sure there's more accuracy in the election and you can be
11    assured this will do that," that that's going to have any kind
12    of an impact on voter confidence because the problem has
13    gotten so big and it is continuously happening.
14            THE COURT:  But it doesn't -- I mean, the
15    legislature may have done things that aren't going to help,
16    but that doesn't mean their motives weren't to try to help
17    with voter confidence.
18            THE WITNESS:  Yeah, I'm not speaking to their
19    motives 'cuz I -- I think that's hard to discern what their
20    motives are but when -- you know, when they don't use
21    information that they have from their own Attorney General's
22    office, for example, in thinking about how they should craft
23    these kinds of laws and whether changes are actually needed --
24    for example, they have no evidence that the people on the
25    federal-only list are non-citizens, so what is the problem

1   that they're fixing with the law?

2          And if they're going on the misinformation

3   themselves, then we have, you know, kind of an even bigger

4   problem; but they're certainly in a position to do the fact

5   finding before they enact -- you know, takes an action that

6   they hint at is -- is a problem.

7          Because even if they say, "We're just trying to make

8   things more accurate," there's still the impression that this

9   is illegal behavior that's going on that we have to address

10  even if they don't accuse, you know, people of that.

11         It's a question of what was the rationale?  And I

12  know we can't get in people's heads and discern their true

13  motives, but I think that the information is just so

14  overwhelming that it's not a problem -- that the non-citizen

15  voting is not a problem in Arizona, and then it goes to the

16  question of have how the rules -- what those new laws may do

17  with respect to people who are eligible citizens, making it

18  harder for them to vote.

19         THE COURT:  Any other questions in light of the

20  Court's questions?

21         MR. DODGE:  Just a couple, I think.

22  BY MR. DODGE:

23  Q.   Is the public's -- amongst those members of the public

24  who believe there is widespread or systematic voter fraud in

25  Arizona, is that belief rooted in anything empirical?

1              MR. LANGHOFER:  Foundation.

2              THE COURT:  Overruled, you may answer.

3     BY MR. DODGE:

4     Q.   Is that belief that there's widespread fraud rooted in

5     anything empirical?

6     A.   I mean, the allegations are kind of an empirical thing,

7     but in terms of actual facts with respect to behavior, no.

8     Q.   Is it fair to say, then, that belief is somewhat

9     irrational?

10    A.   It's misplaced.  It's misplaced.

11    Q.   And so that belief is misplaced due to public claims of

12    voter fraud.  Are laws like these likely to move or alter

13    those opinions that there is, in fact, widespread voter fraud?

14    A.   Well, again, you know, we don't know.  This would be a

15    field for research later, but it's not likely because it's

16    probably pretty unlikely that the public knows much about this

17    at all.

18         This is very in the weeds with respect to public policy,

19    and it's just not likely to have much of an impact on what

20    people think; and, again, another study that I looked at

21    recently that was also an experimental design put information

22    in front of people.

23         A lot of these kinds of studies are happening now around

24    misinformation.  There's, like, new journals about

25    misinformation.  Universities are creating offices -- are

1  creating initiatives to study misinformation.  So they put the

2  facts in front of people and there are studies that show that

3  people actually sort of agree to the facts.  They say, "Yes, I

4  recognize that's a fact, but I'm not changing my mind."

5        So -- I'm not a psychologist.  I can't really get into

6  why that is working that way, those commitments either to a

7  set of ideas or a particular politician or, you know,

8  community that believes that could be playing on why people

9  say that; but, again, I want to stress this is a very

10  complicated research problem because there's the issues of

11  what do people know, how do they receive information, how does

12  that affect their attitudes, and then what's the relationship

13  between their attitudes and their behavior?

14        Those are all points at which there's research that's

15  done to try to understand, "Why can't you just give people the

16  facts and have them change their behavior?"  And I would say

17  this drum beat of fraud -- and I'm in a position to know -- is

18  the drum beat of fraud that has been building for the last

19  twenty years has gone, you know, so far that it does become a

20  kind of irrational commitment, if you will.

21            MR. DODGE:  I'll save any additional questions for

22  redirect.

23            THE COURT:  We'll take our morning break.

24            We'll reconvene in fifteen minutes.  Court is in

25  recess.

 1           COURTROOM DEPUTY:  All rise.

 2           (Recess taken at 10:21 a.m.)

 3           COURTROOM DEPUTY:  All rise, court is now in

 4   session.

 5           (Back on the record at 10:35 a.m.)

 6           THE COURT:  Thank you, please sit down.

 7           Mr. Langhofer, you may cross-examine Dr. Minnite.

 8           MR. LANGHOFER:  Thank you, Your Honor.

 9                    CROSS-EXAMINATION

10   BY MR. LANGHOFER:

11   Q.   And good morning, Professor.  I actually don't have too

12   many questions for you this morning, four or five issues I'd

13   like to explore; and I'd like to start with the definitional

14   issue of "voter fraud."

15       You've already talked about how your analysis -- to the

16   extent you're talking about voter fraud, which I appreciate is

17   distinct, to some degree, from unlawful non-citizen voting.

18   You're limiting it only to intentional unlawful voting, right?

19   A.   Yes.

20           THE WITNESS:  I'm sorry, could you perhaps speak up

21   just a little bit.

22           MR. LANGHOFER:  Yes, I'll -- what I'm going to do is

23   move the microphone closer.

24   BY MR. LANGHOFER:

25   Q.   So you -- you have written previously.  In 2003 you did a

 1   study for the Demos Group about what you were calling election

 2   fraud back then, right?

 3   A.   Yes, I tend to distinguish voter fraud by perpetrator

 4   component and all other forms of fraud we may see as broadly

 5   election fraud.

 6   Q.   Yeah.   In 2003 you were considering election fraud

 7   defined more broadly than you're defining voter fraud today,

 8   right?

 9   A.   Could you say again which study you're pointing to?

10   Q.   Yeah.   I can show it to you if you'd like, but I think

11   the Court's preference is that we start with the question and,

12   if necessary, move to the documents.

13        So in 2003 you wrote about what you were describing as

14   election fraud, right?

15   A.   Yeah.   Again, if you could tell me where I did that

16   because I'm -- my research evolved a little bit in the

17   beginning.

18   Q.   Yes.

19           MR. LANGHOFER:   Perhaps it's easier at this point if

20   we move to the exhibit.   Elaine, can we have the laptop here,

21   please.

22   BY MR. LANGHOFER:

23   Q.   Can you see that on your screen, ma'am?

24   A.   Yes.

25   Q.   Okay, great.   In 2023 you were, I think, the lead author

1    for *Securing the Vote* for Demos?

2    A.    Yes.

3    Q.    What I'd like to do is take a look at -- we're going to

4    start with Page 10, and we're really just getting to the

5    definitional issue here.

6        So in the top left-hand corner here you wrote something

7    about election fraud.  Please read that to yourself, and then

8    I'll ask you about it.

9    A.    Pardon me?

10   Q.    Read it to yourself, and then I'll ask you about it.

11   A.    Yes.

12   Q.    Okay.  So in 2003 when you started writing on this topic,

13   then describing it as election fraud rather than voter fraud,

14   you did not have the "intentional wrongdoing" part of the

15   definition in your analysis, right?

16   A.    It may not have been as well formed at that point.

17   Q.    Yeah.  And you -- the Court had previously noted that

18   when a non-citizen votes unlawfully, that would be election

19   fraud; but that's actually not consistent with your previous

20   discussions or your view now, right?

21   A.    If you're asking me about the very first thing I wrote,

22   which is this report, I -- I can say as I learned, I refined

23   my definition and one of the ways in which I -- one of the

24   things I thought about was the way fraud is actually defined

25   in state law.

1          So I read every state's election code to try to figure it

2    out, and I found that almost no state has sort -- has a voter

3    fraud statute where they say, "This is what voter fraud is."

4          They define "illegal behavior," and almost all of them --

5    I can think of one exception, but almost all of them have an

6    intent requirement.  They will say knowingly voted when

7    ineligible, something like that.  So I think -- that research

8    probably came after this report.

9    Q.   Yes, I don't disagree with what you're saying or I

10   understand your definition now to be what it is.  I just want

11   to get clear that you have -- you do agree that non-citizens

12   can vote without doing it -- without doing intentional

13   wrongdoing, right?

14   A.   That has happened, yes.

15   Q.   Yes.  And you agree that there is some level of fraud

16   that is likely to exist in any electoral system?

17   A.   Some form of voter fraud?

18   Q.   Some level of fraud is likely to exist within any

19   electoral system?

20   A.   I wouldn't say it's likely.  I would say it's possible.

21   Q.   In 2003 in the Demos report, you did say those words,

22   though, right?  "Some level of fraud is likely to exist within

23   any electoral system"?

24   A.   If you're reading something I wrote twenty years ago when

25   I first started this research, which actually was not a

1  peer-reviewed document either, I'll attest to whatever I

2  wrote; but I think we're -- you know, I would say after twenty

3  years of studying it, I would say it's possible because I've

4  found cases of fraud, you know, since then.  So it's possible,

5  but I would not say it's likely now.

6  Q.   Well, I didn't mean it as a gotcha question.  I'm sorry

7  if it came across that way, more in the way of clarification.

8      I understand the opinion you're offering is not that

9  voter fraud, even as you define it now, is non-existent, but

10  that it's rare; is that fair?

11  A.   That's correct.

12  Q.   Okay.  And when you began writing about this, your view

13  was that the most common perpetrator of -- the party most

14  commonly responsible for unlawful voting actually wasn't

15  voters.  It would be campaigns or political parties, right?

16  A.   When I first started on this work, I had no opinion

17  whatsoever on whether there was a lot of any kind of fraud, to

18  be honest with you.

19      So I think -- I don't really try to measure other forms

20  of fraud with the precision that I've tried to measure fraud

21  committed by voters; but, as I stated earlier, given the

22  methods that I use I see almost everything.

23      So I will see, you know, a so-called rigged election or

24  an election where campaign operatives have stolen absentee

25  ballots or something like that.  So I'll see all of that, but

1    I don't have a good -- I can't give a precise sort of

2    measurement of how much fraud is committed by other parties.

3    Q.   I take your point but you -- as I understand your current

4    definition of "voter fraud," it does not include such

5    wrongdoing by political parties or campaigns, right?

6    A.   Correct, it's focused on voter behavior.

7    Q.   Yes.  You'd mentioned the AP investigation into voter

8    fraud in Arizona, which I think you said 4 of the 15 counties

9    had referred something for investigation, right?

10   A.   The Associated Press --

11   Q.   Yes, ma'am.

12   A.   -- investigation.  That's what they reported.

13   Q.   And you've subsequently become aware of at least one

14   county that had evidence that they didn't report back to the

15   AP, right?

16   A.   In the deposition Mr. Worley shared with me some e-mail

17   for a county that had one case that they found out about after

18   they had, I guess, already -- I assume.  I couldn't really

19   look at the e-mails, but I assume they had already talked to

20   the AP and said they had none.

21   Q.   Okay.  Let's talk about the number of prosecutions

22   briefly.  You'd agree, of course, that the number of

23   prosecutions does not capture crimes that go undetected?

24   A.   Correct.

25            THE COURT:  We'd all agree on that.

 1              MR. LANGHOFER:  Thank you.

 2    BY MR. LANGHOFER:

 3    Q.   And it would also include crimes that cannot be traced

 4    back to a particular person, right?

 5    A.   Correct.

 6    Q.   And convictions, at least, don't include crimes for which

 7    the mental state cannot be proven, mens rea?

 8              MR. DODGE:  Objection, calls for a legal conclusion.

 9              THE COURT:  Sustained.

10    BY MR. LANGHOFER:

11    Q.   You considered prosecutions by the DOJ.  It is true,

12    though, that the DOJ has a policy of not bringing prosecutions

13    when the federal interest isn't weighty enough to justify

14    their involvement, right?

15    A.   My understanding is that they only bring prosecutions in

16    federal elections unless state elections somehow implicate

17    federal candidates on the ballot.

18        I know that in the Ballot Access and Voting Integrity

19    Initiative what we learned from Mr. Donsanto, who was the

20    Election Crimes Branch Director for many years that I

21    mentioned before, that what they were trying to do was to see

22    "what works with juries," were his words, in pursuing

23    individual voters, which hadn't really been the way they had

24    operated in the past.

25        They had gone after mostly vote buying conspiracies where

 1  voters essentially were the victims of efforts to purchase

 2  votes, and they didn't have -- they didn't have a record of

 3  going after individual voters, for example, a person who had a

 4  felony conviction who had not had their rights restored who

 5  had voted in an election.

 6       And so they were focused on that kind of fraud, felon --

 7  we call it felon fraud, non-citizen fraud in Florida, felon

 8  fraud in Wisconsin, double voting in Kansas and Missouri, and

 9  they were trying to bring prosecutions to see if juries would

10  -- if they could convict people.

11       So they felt there was a federal interest at that time

12  with the data that I present.

13  Q.   In federal elections?

14  A.   In federal elections.

15  Q.   Okay.  You -- you did not review any deposition

16  transcripts for the County Attorneys in this case, did you?

17  A.   I'm sorry, I'm having trouble hearing you, Mr. Langhofer.

18  Q.   I'll do my best to speak up.

19       You did not review any deposition transcripts with the

20  County Attorneys in Arizona in this case, did you?

21  A.   That's correct.

22  Q.   You had testified that when you -- when you've previously

23  testified, your testimony's been found credible; and I don't

24  mean this disrespectfully.  I hope you don't take it that way.

25       It is not true, though, in each of the cases which you've

 1    testified previously, the Judge has found that you had offered
 2    evidence that proved there was no justification for the laws
 3    being challenged, right?
 4              MR. DODGE:  Objection, calls for a legal conclusion.
 5              THE COURT:  Overruled, you may answer.
 6              THE WITNESS:  Yeah, I'm not sure I fully understand
 7    your question.
 8              THE COURT:  I think he's saying that the Judge might
 9    have found you credible, but that doesn't mean that the party
10    for whom you were testifying won.
11              THE WITNESS:  Well, all I know is from the final
12    opinions sometimes in those cases where occasionally -- there
13    may be a North Carolina case where the Judge said it, I guess,
14    essentially it was credible; but it didn't bear on his
15    decision, something like that.
16              I don't know, you know, the legal definitions of
17    "credible" and things like that, but I'm trying to understand.
18              MR. LANGHOFER:  I guess just a couple more thoughts
19    about Professor Richman.
20    BY MR. LANGHOFER:
21    Q.   When you talked about his article on electoral studies,
22    giving that range of 38,000 to 2.8 million, I want to say, he
23    wasn't actually asserting that 2.8 million had cast -- 2
24    million non-citizens had cast votes in America, was he?
25    A.   He asserted that 1.2 million non-citizens voted in 2008,

1    the likely probability 1.2 million, which was in that range;

2    and the range was calculated by looking at it like a lower

3    bound and an upper bound and a confidence interval around the

4    upper and lower bounds.

5    Q.   And Professor Richman, to your knowledge, has disavowed

6    the use of his research to make extraordinary claims about the

7    existence of election fraud in the country, hasn't he?

8    A.   Who?

9    Q.   Professor Richman.

10   A.   Professor Richman has disavowed his research?

11   Q.   No, he's disavowed people's attempt to turn his research

12   -- use his research as proof that there is pervasive election

13   fraud in the country?

14   A.   I remember reading a blog on his website where he seemed

15   to be distancing himself from people he thought were misusing

16   or misreading his research.

17   Q.   Okay.

18         MR. LANGHOFER:  All the questions we have -- that

19   RNC at least has for this witness on cross, Your Honor.

20         THE COURT:  Thank you.

21         Any other questions?  Mr. Horley.

22         MR. HORLEY:  Good morning, Your Honor, and good

23   to see you again Professor Minnite.  My name is Tim Horley,

24   and  I represent the State and the Attorney General in this

25   case.

 1                    CROSS-EXAMINATION

 2   BY MR. HORLEY:

 3   Q.   As we discussed on direct, Professor Minnite, you

 4   identify in your report certain instances where non-citizens

 5   mistakenly voted, correct?

 6   A.   Correct.

 7   Q.   Or to put it differently, where non-citizens voted but

 8   without an intention to corrupt the political process?

 9   A.   Correct.

10   Q.   I'd like to look more closely at some of those instances,

11   and we could try to do it from memory; but if you need me to

12   pull up the report, we can do that.

13        So in your report you discussed a 1996 election in

14   California where hundreds of non-citizens were alleged to have

15   voted illegally, correct?

16   A.   Correct.

17   Q.   And then you note that an investigation ensued and

18   ultimately the California Secretary of State determined that

19   these voters would not be prosecuted for voter fraud because

20   there was no criminal intent, correct?

21   A.   Could you give me the page number you're reading from?

22   Q.   Yes, ma'am.  It's at Pages 60 and 61 of your report, and

23   that's at PDF Pages 63 and 64.

24   A.   Okay.

25   Q.   Yeah, so PDF Pages 63 and 64.

1   A.   Okay.

2   Q.   Would you like me to repeat the question?

3   A.   Yes, please.

4   Q.   Okay.  So you note that an investigation ensued from this

5   incident and ultimately the California Secretary of State

6   determined that these voters would not be prosecuted for voter

7   fraud because there was no criminal intent, correct?

8   A.   Correct.

9   Q.   Okay.  And then looking at another incident in your

10  report, which is at PDF Page 69, or Page 66 in your hard copy,

11  you discuss an incident with a Ms. Keathley, correct?

12  A.   Correct.

13  Q.   And she was a citizen of the Philippines who

14  inadvertently registered to vote and voted after immigrating

15  to the United States while still a non-citizen, correct?

16  A.   Yes, she had her Philippines passport with her when she

17  registered -- when she went to the DMV and somehow got

18  registered to vote.

19  Q.   Okay.  And this is an incident where a non-citizen

20  registered to vote by mistake, correct?

21  A.   Well, she was registered by the DMV; and my

22  understanding, she wasn't seeking to register, but they asked

23  her -- under the National Voter Registration Act they asked

24  her, "Would you like to register to vote?" and apparently

25  didn't acknowledge that she had a Philippines passport and she

 1  wasn't a US citizen.  So that was a mistake on the part of the

 2  DMV.

 3  Q.   And then she subsequently voted?

 4  A.   That's correct.

 5  Q.   And is your understanding that she thought she was

 6  eligible because that DMV official told her that she was?

 7  A.   Yes, and I've seen a few cases like that before where

 8  people were told by officials that they had the opportunity to

 9  register to vote, got registered, and then found out later

10  that they were not eligible to do that.

11         THE COURT:  So, apparently, you have the explanation

12  from what happened with this person.  Did you get an

13  explanation for what happened to the several hundred people in

14  California?  What was that?

15         THE WITNESS:  Yes, I spent a lot of time studying

16  that because that was a contested Congressional election and

17  there was actually a task force in Congress that investigated

18  that election and then California officials investigated it,

19  and the bottom line was that these people -- most of them had

20  been working with an immigrant rights group who were helping

21  them become citizens, and a lot of them had taken the exams

22  and they'd gotten a notification from the federal government

23  that they were -- you know, "Congratulations, you're a

24  citizen.  Now schedule your ceremony."

25         And it was in between the time that they had passed

```
 1  their exam and they had actually sworn the oath that the
 2  immigrant rights group was helping them get prepared to be
 3  citizens and filled out voter registration forms, and those
 4  forms mistakenly got sent in.  They were not supposed to be
 5  sent in until after people took the oath, and that was how the
 6  bulk of those people ended up getting registered.
 7            So they were -- you know, technically it was not
 8  correct that -- it was not legal that they had been registered
 9  before they took the oath itself, and that was why they didn't
10  find a criminal intent.
11            THE COURT:  Mr. Horley.
12  BY MR. HORLEY:
13  Q.   Yes.  Just to close the loop on Ms. Keathley, voting by
14  mistake in this way caused her nearly to face deportation,
15  correct?
16  A.   That's correct, and I also report a case in my book of a
17  person, similar circumstance, got registered at a DMV and
18  actually was deported to Pakistan with his American wife and
19  American-born daughter.
20  Q.   And I'll try to avoid the tedium of recounting every
21  instance like this that you analyze in the report, but fair to
22  say that you describe other similar incidents in your report
23  as well?
24  A.   I think just one other with a man in Alaska who similarly
25  was sent a voter registration form before he became a citizen,
```

 1  thought that meant he could register and he voted.

 2  Q.   Okay.

 3  A.   And I would say in the Keathley case she was put in

 4  deportation proceedings and was going to be deported and

 5  appealed her case to the Seventh Circuit, and the Seventh

 6  Circuit said that she -- they hoped that she would not be

 7  deported.  They found, in a sense, in her favor that this was

 8  a mistake.

 9  Q.   Yes, understood.  And just to recap your definition of

10  "voter fraud" that you testified to on direct is the

11  intentional corruption of the voting process by voters,

12  correct?

13  A.   That's correct.

14  Q.   And you stated on direct that this does not include

15  voting based on mistake, right?

16  A.   That's correct.  Mistakes are separate from deceit.

17  Q.   So in your testimony when you use the phrase "voter

18  fraud," you are not referring to those instances like those we

19  just discussed a few minutes ago where a non-citizen votes

20  without any attention to corrupt the process?

21            MR. DODGE:  Objection, cumulative.

22            THE COURT:  Sustained.

23            THE REPORTER:  I'm sorry, who was that?

24            MR. DODGE:  Mr. Dodge.

25            MR. HORLEY:  Could we look at demonstrative Page 9.

 1  BY MR. HORLEY:

 2  Q.   So if you would take just a moment to review this.

 3       And so in that second sentence when you say "the

 4  incidence of voter fraud attributable to non-citizens," you're

 5  referring to the incidence of intentional corruption of the

 6  voting process by non-citizens, correct?

 7  A.   Correct.

 8  Q.   Okay.  So not inadvertent voting?

 9  A.   Correct.

10  Q.   Okay.  And your report does not tell us the rate of

11  inadvertent non-citizen voting, correct?

12  A.   Correct.

13  Q.   Okay.  And it was discussed a bit on direct, and I know

14  it was quoted in your report, some statements of supporters of

15  the Challenged Laws in this case, including Representative

16  Jake Hoffman, Senator Warren Peterson, Greg Blackie and former

17  Governor Ducey, correct?

18  A.   In my report, yes.

19  Q.   Yes.  And is it fair to say that all those statements

20  raised concerns about non-citizens voting?

21  A.   Could you help me point to where you're referring to?

22  Q.   Yes, so it's Pages 53 through 55 of your report and those

23  are Pages 56 to 58.

24  A.   Okay.

25  Q.   Okay.  And none of those statements say anything about

 1  what non-citizens' intent might be when voting, correct?

 2  A.   They don't use the word "intent."

 3  Q.   And none of those statements use the word "fraud,"

 4  correct?

 5  A.   One says, "We want to ensure that only legal citizens are

 6  casting ballots."

 7  Q.   Okay.  And you agree that it is reasonable for a state to

 8  try to ensure that only citizens vote in that state's

 9  elections, correct?

10          MR. DODGE:  Objection, calls for a legal conclusion.

11          THE COURT:  Overruled, you may answer.

12          THE WITNESS:  Could you state the question again.

13          MR. HORLEY:  Sure.

14  BY MR. HORLEY:

15  Q.   You agree that it is reasonable for a state to try to

16  ensure that only citizens vote in that state's elections,

17  correct?

18  A.   Yes.

19  Q.   And do you agree that it is reasonable for a state to try

20  to prevent non-citizens from voting by mistake?

21  A.   Yes.

22  Q.   And you agree that it's reasonable for a state to try to

23  prevent voting by a non-citizen even when that non-citizen

24  does not intend to corrupt the electoral process?

25  A.   Yes.

 1  Q.   And you would agree that the Challenged Laws in this case

 2  could prevent non-citizens from voting, whether it is by

 3  mistake or whether the voting is fraudulent under your

 4  definition, correct?

 5          MR. DODGE:  Objection, speculation.

 6          THE COURT:  Overruled, you may answer.

 7          THE WITNESS:  It's possible.

 8  BY MR. HORLEY:

 9  Q.   Okay.  I want to go back quickly to the case of

10  Ms. Keathley that we discussed.

11       Suppose Ms. Keathley had been required to provide proof

12  of citizenship to register.  Would she have been able to

13  register?

14          MR. DODGE:  Objection, speculation.

15          THE COURT:  Sustained.

16          MR. HORLEY:  Okay.

17  BY MR. HORLEY:

18  Q.   And one final question:  You discussed on direct some

19  Arizonans' belief that voter fraud is widespread, and I

20  understand that you believe that those beliefs are inaccurate;

21  is that fair?

22  A.   Yes.

23  Q.   Are you opining that those beliefs are insincere?

24  A.   No.

25  Q.   Okay.

 1          MR. HORLEY:  No further questions.

 2          THE COURT:  Any additional cross-examination for

 3   this witness?

 4          MS. PORTER:  No, Your Honor.

 5          THE COURT:  Mr. Dodge, redirect?

 6          MR. DODGE:  Very few.

 7                      REDIRECT EXAMINATION

 8   BY MR. DODGE:

 9   Q.   Dr. Minnite, you were just discussing some of the

10   examples in your report of mistaken registration by

11   non-citizens.  Do you recall that?

12   A.   Yes.

13   Q.   None of those occurred in Arizona?

14   A.   They did not occur in Arizona.

15   Q.   In those cases, was the mistake attributable to the voter

16   or to the Government or some sort of third-party organization?

17   A.   It was not attributable to the voter in those cases.

18   Q.   And in your report you give these, I think, three

19   examples you discussed with Mr. Horley.

20          Any other examples in your report, to the best of your

21   recollection?

22   A.   No.

23   Q.   Are you aware of a significant number of other similar

24   types of examples of these sorts of mistaken registrations?

25   A.   I'm aware of other -- some other examples, but not a huge

 1  number of them.

 2  Q.   And that's based on twenty years of looking for those

 3  examples?

 4  A.   Yes.

 5  Q.   So you'd agree these sorts of instances are not common or

 6  widespread?

 7  A.   I would agree.

 8           MR. DODGE:  Nothing further, your Honor.

 9           THE COURT:  May this witness be excused?

10           MR. DODGE:  Yes.

11           THE COURT:  Is there any objection?

12           MR. LANGHOFER:  No.

13           THE COURT:  Dr. Minnite, thank you very much.  You

14  may step down, and you are excused as a witness.

15           I heard you say this was plaintiffs' final witness,

16  Mr. Dodge; is that right?

17           MR. DODGE:  Your Honor, yes, this is the final

18  witness we intend to call at trial.

19           With respect to whether plaintiffs rest their case,

20  there are a couple logistical issues I would flag, but we're

21  getting there.  One -- I think there's sort of three buckets.

22           One, the parties are continuing to confer on things

23  like designations and exhibits.  So I ask the record be left

24  open to permit admission of those.

25           Another, Your Honor's aware that you issued a

1   discovery order with respect to discovery from the legislators

2   and the legislators have filed a Petition for Mandamus that is

3   actually being heard by a panel of the Ninth Circuit this

4   week.  I think plaintiffs would also ask that the record be

5   left open specifically with respect to any future discovery

6   generated as a result of that appeal specifically on claims

7   that happen speak to the intent of the Legislature.

8        THE COURT:  Go to No. 3, and then I'll tell you what

9   my thoughts are on No. 2.

10        MR. DODGE:  You know what, I'm not sure what No. 3

11   is.

12        THE COURT:  Oh, good, then we'll talk about No. 2.

13        Your request would not be unreasonable if the Ninth

14   Circuit issued a ruling tomorrow or Friday or even next

15   Monday; but based on my knowledge of a typical ruling by the

16   Ninth Circuit, this case is -- I can't leave the record open

17   indefinitely, again, expressing the concern that you all have

18   that I'm trying to accommodate that I decide this case before

19   the March primary election; and so, no, I can't leave the

20   record open indefinitely.  I suppose it's possible to leave it

21   open for a few days, but I can't -- I don't see how we could

22   do something else.

23        No, we're not going to have multiple people

24   discussing the same issue.

25        MR. DODGE:  What I can say, Your Honor -- and I -- I

 1   represent clients who don't have intentional discrimination

 2   claims and don't have much of a stake in this discovery.

 3            Your concern is a valid one, and I think maybe the

 4   parties should come up with an appropriate proposal given the

 5   time frame you've raised to see the best way to address that

 6   issue and allow the Court to move forward on the remaining

 7   claims that don't turn on that evidence.

 8            THE COURT:  Yeah, I think you need to give it more

 9   thought.

10            MR. DODGE:  Agreed, as we so often do.

11            And I think with respect to that, we're -- we have

12   no further witnesses to call at this time.

13            THE COURT:  Okay.  So we're leaving the record open

14   so that the -- I think there's two outstanding items.  One is,

15   obviously, the definition -- the deposition designations and

16   objections, which I'm hoping continue to shrink, and the

17   request for judicial notice.

18            MR. DODGE:  That was the third, Your Honor.

19            THE COURT:  Well, that's okay.  I'm glad I thought

20   of it.  The request for judicial notice that the defendants

21   may wish to supplement with, as I understand it, additional

22   requests for judicial notice of census data; but the other

23   reason that the record will remain open on that is because I

24   have asked you to try to treat the request for judicial notice

25   consistently and, that is, tell me what it is that the

1  documents say that you want me to look at rather than have me

2  try to figure out what those 400 and some pages mean, which I

3  anticipate would cause significant delay in any ruling by the

4  Court.

5         MR. DODGE:  Heard loud and clear, Your Honor.

6         THE COURT:  Okay.  So with that, the defendants may

7  call their first witness.

8         MR. LANGHOFER:  Thank you, your Honor.

9         So that we're clear, are those the only reason for

10  which the record is being held open on the plaintiffs' case?

11         THE COURT:  I believe so.  There's no, like, witness

12  that's unavailable until tomorrow.  Those are the only things

13  that -- only evidentiary things that remain open are the

14  request for judicial notice, the deposition designations and

15  objections and the possibility that there might be something

16  from the Court of Appeals that would change how we close --

17  plaintiffs' close their evidence.

18         MR. DODGE:  If I may raise one more, Your Honor.

19         Exhibits.  There --

20         THE COURT:  Oh, I always want you to -- that remains

21  -- goes without saying is that one of the things that I

22  request that the parties do in every case is to get together

23  with Elaine, who has the official list of what's admitted and

24  what's not admitted, and make sure that both sides agree that

25  what she shows as admitted you agree was admitted, what she

 1    shows was not admitted was not admitted; and if there's any

 2    concern about that, I can address it despite the plaintiff

 3    having otherwise rested by either taking one out that I didn't

 4    admit or you offering something that you forgot to offer.

 5            MR. DODGE:  Agreed, Your Honor, and if I can -- may

 6    just add two pieces of gloss on the exhibit issue.

 7            One, there are some outstanding plaintiff exhibits

 8    to which defendants have no objection.  We are working with

 9    defendants to get those admitted, but also to streamline them.

10    That's an ongoing process.

11            I just want to confirm there's no prejudice to

12    plaintiffs submitting those before the end of trial, even if

13    we're no longer calling witnesses?

14            THE COURT:  Again, I would -- there is no problem

15    with that; but, again, I would ask that you be conservative in

16    what you admit, despite the fact that there's no objection.

17            I've got so much stuff up here and the more of it

18    that's admitted -- I might sound like a broken record at this

19    point -- the longer it's going to take for me to issue any

20    final ruling in this case.

21            MR. DODGE:  Plaintiffs appreciate that, and we

22    appreciate the Court's cognizance of the time frame here.

23            One other thing on exhibits.  We submitted a notice

24    of exhibits we intended to move to which there are objections

25    from defendants.  This was a notice.  It was not a motion.  It

1   was filed, I believe, Wednesday night of last week.

2            We're trying to continue to meet and confer with

3   defendants on that to see where objections can be dropped and

4   same sort of thing.  We will be judicious, cognizant of what

5   is already being asked by the Court.  I don't know if the

6   Court has any further guidance on how we may resolve -- where

7   there are, in fact, continuing disputes over important

8   exhibits, if the Court has guidance on how we resolve those

9   issues.

10           THE COURT:  At some point you offer them, the

11  objection's made, and I rule on it.

12           MR. DODGE:  Okay.  Thank you, Judge.

13           THE COURT:  And I mean that here in open court, not

14  in memoranda filed that I look at without having an

15  opportunity to talk to you.

16           MR. DODGE:  Appreciate that, Judge.

17           THE COURT:  Okay.

18           Mr. Langhofer, would you like to call a witness.

19           MR. LANGHOFER:  Yes, your Honor, the defense calls

20  professor Mark Hoekstra, and I'll note that the -- not like

21  the plaintiffs, the defense isn't planning to call witnesses

22  -- you know, all RNC witnesses and all the State witnesses,

23  we'll call them in the order that they're available, as long

24  as that's acceptable to the Court.

25           And later today we may have to interrupt Professor

 1   Hoekstra's testimony after lunch in order for get a relatively
 2   quick witness in and out for scheduling purposes if it suits
 3   the Court.
 4              COURTROOM DEPUTY:  Come here over and raise your
 5   right hand for me.
 6              *(Witness is sworn.)*
 7              COURTROOM DEPUTY:  Thank you.
 8              Can you please state your name and spell your last
 9   name for the record.
10              THE WITNESS:  Mark Hoekstra, and the last name is
11   H-o-e-k-s-t-r-a.
12              COURTROOM DEPUTY:  Thank you, and you can go ahead
13   and have a seat.
14              THE COURT:  You may proceed, Mr. Langhofer.
15              MR. LANGHOFER:  Thank you, your Honor.
16                        DIRECT EXAMINATION
17   BY MR. LANGHOFER:
18   Q.   Good morning, Professor Hoekstra.  Please take a moment
19   and introduce yourself to the Court.
20   A.   Yeah, my name is Mark Hoekstra.  I'm a Professor of
21   Economics at Baylor University.
22   Q.   And, Professor Hoekstra, please tell us about your
23   educational background.
24   A.   Yeah, so I did a Bachelor's degree in Economics, minor in
25   Math at Hope College in Michigan.  I did my Ph.D. in 2006 at

1    the University of Florida; and from there on my first job, it

2    was an assistant professor and we can go from there.

3    Q.   Where were you assistant professor first?

4    A.   Yeah, my first job was at the University of Pittsburgh.

5    Q.   How long were you there?

6    A.   I was there five years.

7    Q.   And were you on a tenure track position?

8    A.   I was.

9    Q.   What'd you do after leaving the University of Pittsburgh?

10   A.   Yeah, so at the time I left I was offered tenure at both

11   University of Pittsburgh and Texas A&M.  I moved to Texas A&M

12   where I was an associate professor with tenure, eventually

13   promoted to full professor for the twelve years I was there.

14   Q.   Where are you now?

15   A.   As of August 1st, I'm at Baylor University.

16   Q.   What position do you hold there?

17   A.   I'm the George J. Boden Professor of Economics, which is

18   an endowed professorship from the business school at Baylor.

19   Q.   All right.  Have you authored any peer-reviewed scholarly

20   articles?

21   A.   Yeah, so I've published roughly 20 peer-reviewed articles

22   over the years in various journals; but including, you know,

23   the very top journals in economics.

24   Q.   Which -- which journals are you referencing are the top

25   journals?

1    A.   Yeah, so the top journal is the American Economic

2    Association.  It's called the *American Economic Review* and --

3    and that's one of, you know, what's called the top five

4    journals in economics.  In general, if you're kind of a young

5    researcher and you publish in a journal like that, it more or

6    less makes your career.

7         I've published there twice.  From there, there's also we

8    consider A-minus journals like *American Economic Journal,*

9    *Applied Economics*, *American Economic Journal*, *Economic Policy,*

10   which are also AEA journals and -- and others.

11   Q.   All right.  I'm not asking you at this point to discuss

12   the details of your publications, but on what sort of topics

13   have you been publishing?

14   A.   Yeah, so I started out doing research in education first,

15   looking at various questions within education.  I've done a

16   few things, you know, here and there on other topics.

17        Most recently I've been working more on crime and things

18   like the role of race in police use of force and testing for

19   gender bias among -- among juries and so on.

20   Q.   Have you published on voter ID issues?

21   A.   I have.  So I've published one paper on, essentially,

22   what is the maximum -- the maximum potential impact of

23   transitioning from a non-strict identification law to a -- to

24   a strict identification law.

25   Q.   Do you hold any research appointments?

1  A.   I do.  So I hold one research appointment.  I'm a

2  research associate at what's called the National Bureau of

3  Economic Research, which is based out of Cambridge.  It has

4  big ties to Harvard and MIT.

5       It's -- the best way to describe it is it's basically

6  like a club for economists, and so in order to get into the

7  club you need to have powerful people in your field advocate

8  for you and say, "We think this person is good and they ought

9  to be an NBER."  Then you get invited to the conferences.

10  Your papers get disseminated by NBER to media outlets and

11  everybody else and so on.

12            THE COURT:  Could I interrupt a minute?

13            MR. LANGHOFER:  Of course.

14            THE COURT:  I have this idea of what an economist

15  is, and my idea didn't include things like when you were

16  talking about working on educational issues, working on things

17  doing with crime, things doing with gender, things doing with

18  voting.

19            THE WITNESS:  Sure.

20            THE COURT:  Could you maybe broaden my understanding

21  of what an economist does?

22            THE WITNESS:  Sure.  I mean --

23            THE COURT:  Or a professor of economy, I guess I

24  should say.

25            THE WITNESS:  That's right, sure.  So I think one

1  way to think about it is, you know, we have, I think, a pretty

2  advanced tool set for trying to get at causal questions; and

3  while there are lots of typical economics questions,

4  economists also take those sometimes, you know, outside of

5  what you might consider to be economics and answer those as

6  well.

7              And I think, essentially, we just have a -- I think

8  it's fair to say we have a more rigorous way of assessing

9  causality and trying to figure out, you know, is A causing B

10  as opposed to some other interpretation.

11             Within -- with respect to some of these other

12  things, for example, the voting question, right, at the end of

13  the day, you know, a lot of these things are about marginal

14  benefits and marginal costs; and so you say if I increase the

15  marginal cost, the additional cost facing a prospective voter,

16  does that matter?

17             And that's -- I mean, fundamentally that's Econ 101,

18  right, is you compare -- we think people compare marginal

19  benefits and marginal costs, and that's how they make

20  decisions; and here we're just trying to quantify that in the

21  context of voting.

22             Within education, obviously, education -- one of the

23  reasons for getting educated is you learn more, you acquire

24  human capital and, therefore, you can earn more later on; and

25  so then there's the question of, well, what are those returns

1  and what are the returns to going to school for longer or

2  going to a better school?  And those questions, like many in

3  social science, are hard to answer; and, again, we have this

4  tool set for trying to answer those in a careful way.

5  BY MR. LANGHOFER:

6  Q.   Let me -- since Your Honor's asking, let me jump around

7  somewhat in my outline.  I want to sort of ask you to explain

8  the methods you would use in one of these publications you've

9  been talking about.

10     Why don't we do the gender bias in juries.  I don't think

11  we need detailed explanation, but talk through the methods so

12  we have a better sense of what economic research like that

13  does.

14  A.   Yeah, so -- so we have a project on testing for gender

15  bias by juries.  One of the difficulties is that if you were

16  to just compare across, say, male defendants and female

17  defendants, those individuals, those cases might be different

18  in all kinds of ways, including ways that I don't see in the

19  data, right.

20     And so what we do instead, then, is we say, "Well, let's

21  also use the fact that some juries are -- are more male and

22  some juries are more female and let's see whether the more

23  male juries tend to favor the male defendants; and, of course,

24  the problem with that is, well, there's a jury selection

25  process, right.

1    And so the composition of that seated jury is the result

2    of all these attorneys and people like you having say over who

3    gets struck and who doesn't, and so the way we go about trying

4    to solve that problem is we say, "It's true that the seated

5    jury isn't random, but the panel from which those people were

6    selected is random."

7    And so I don't know how it works in Arizona, but in

8    Florida, essentially, you get numbered from, say, 1 to 30 and

9    you're gonna take the first six jurors if they don't get

10   struck.  Sometimes, maybe, four or five of those six will be

11   women.  Sometimes, maybe, four or five of the six will be men,

12   and that's going to end up having an impact on the final jury

13   composition; and so that's the coin flip, like that's the

14   randomization that we're going to use to identify, you know,

15   the interaction between defendant gender and jury

16   composition -- the gender composition of the jury.

17   Q.   You had described a research appointment with the

18   National Bureau of Economic Research.

19   Do you have any other research appointments?

20   A.   I do.  So I have an appointment with what's called the --

21   I believe it's called the Institute for Labor Studies.  It's

22   IZA in German.  So, essentially, it's -- it's more or less the

23   European NBER is the simplest way to describe it.

24   Q.   Do you hold any editorial positions?

25   A.   I do.  I'm an Associate Editor at the *Journal of Labor*

1    *Economics* and the *Journal of Human Resources*, which are

2    essentially the top two field journals in my field, which is

3    labor economics.

4    Q.   Have you won any awards?

5    A.   I have.  So I won a Young Labor Economist award from IZA,

6    which, again, is this European NBER, this club, right; and I

7    also won a Graduate Mentoring Award, a university-level award

8    from Texas A&M.

9    Q.   What is a Graduate Mentoring Award based on?

10   A.   It's based on, essentially, excellence in advising

11   students.  You know, I think a little bit as human beings, but

12   also preparing them to be, you know, successful researchers;

13   and my students have gone on to good research universities.

14   Q.   You mean your Ph.D. level --

15   A.   My Ph.D. students have gone on to have good -- yeah, good

16   jobs.

17   Q.   I want to talk about the classes that you teach and the

18   research that you've advised and supervised.

19        Have you ever taught a class on econometrics?

20   A.   Yeah, so my -- so last spring I taught part of the first

21   year sequence in econometrics, which is a fancy word for the

22   application of statistics to economic problems, and

23   specifically the part of the course that I taught was on

24   causal inference, which is, again, you know, suppose two

25   factors are correlated.  What makes us -- you know, how can we

 1    try to figure out whether A is causing B or some other

 2    explanation is driving things?

 3        And there are various methods that economists use,

 4    occasionally randomization, sometimes randomized control

 5    trials, and we talk about how that solves, you know, basically

 6    the math or how that solves the problems; but also other

 7    strategies that get used, which we'll probably talk about

 8    today, things like difference-in-differences, regression

 9    discontinuity and so on.

10    Q.   Yes, we'll get there, I'm afraid.

11             THE COURT:  I can't wait for regression

12    discontinuity.

13             THE WITNESS:  Oh, it's pretty pictures.  You're

14    gonna love it.  It's great.

15    BY MR. LANGHOFER:

16    Q.   The econometrics course that you taught, is that an

17    undergraduate or graduate level course?

18    A.   Yeah, that was a first year Ph.D course.  So this is the

19    year that anyone who wants to -- or this is a course where

20    anyone who wants to get a Ph.D. in economics, they need to

21    take this; and then there's a -- they need to pass the class,

22    but they also need to pass an exam at the end of the -- the

23    first year and that's typically kind of a big weed-out exam.

24        It's called the qualifying exam, and so I had to write a

25    question, you know, for that that determines whether they get

 1  to stay on track to get a Ph.D. or not.

 2  Q.   Have you taught Ph.D. level courses in public economics?

 3  A.   I have.  So I've -- I've taught mostly every year a

 4  course, which is a second year course.  So once students focus

 5  on some areas, they'll take that course; and mostly what I do

 6  there is we focus on how economists have applied these various

 7  methodologies, mostly not randomized control trials, mostly

 8  things with observational data to get at causality and a range

 9  of questions:  education, health, crime, occasionally some

10  voting-related stuff, occasionally some industrial

11  organization-type stuff and so on.

12  Q.   What about bias?

13  A.   Yeah, interracial bias is a big part.  So I'm a labor

14  economist, and one of the big questions in labor for decades,

15  right, is is there racial discrimination in different

16  contexts?  And so we -- we have to think carefully about how

17  do we test for that.  How do we rule out alternative

18  explanations, and how do we measure it and so on.

19  Q.   Have you taught a course in research methods?

20  A.   I have.  So at the undergraduate level I've taught a

21  course on research methods, which is, you know, a simplified

22  version of what I'm doing at the graduate level.

23  Q.   Let's talk about the Ph.D. research that you've

24  supervised.  Can you talk us through the topics that you've

25  supervised?

1   A.   Yeah, so in general I -- you know, I think, as you can

2   see from my CV, which struck you as somewhat -- you know,

3   somewhat unusual, like I'm -- I'm interested in a wide range

4   of questions and I -- I think many of us in economics view the

5   world as we have a tool set and we can go use that to answer a

6   variety of questions.

7        So, you know, most recently my students have been working

8   on crime, racial bias-type stuff; but perhaps most relevantly

9   and this just occurred to me the other day is, you know, one

10  of the -- one of the best studies I think one of my students

11  did was on looking at what happened when you -- when the

12  Philippines implemented safeguards to reduce election fraud.

13       So they had -- I think anyone would agree they had big

14  problems with election fraud.  They introduced some systems to

15  reduce that.  She went and documented that it reduced fraud,

16  and there's various ways of doing that, and then looked at

17  whether this changed, you know, how government operated,

18  measure of corruption, that sort of thing.

19  Q.   It wasn't your research, though, you were just

20  supervising?

21  A.   That's right.  I supervised her dissertation.  That was

22  one of her papers.

23  Q.   Do you serve as a referee for the publications of other

24  scholars?

25  A.   Yeah, so roughly twenty a year probably I'm reviewing

 1  papers.  So you submit a paper for publication.  It goes out

 2  for peer review.  I'm a peer reviewer roughly twenty times a

 3  year.

 4  Q.   What topics?

 5  A.   Again, it would be primarily the topics that I write on,

 6  but sometimes it would be -- it would be other topics; and,

 7  again, like yesterday, I have a hard time remembering these

 8  things because I do twenty of them a year and, you know,

 9  they're in and out.  You forget about them, right, but I --

10  you know, I did a review for the *Journal of Political Economy*,

11  which is one of these top five publications, a really big deal

12  for anybody, but especially for a young scholar to publish

13  there.

14      I reviewed a paper looking at the impact of income shocks

15  on the incumbency advantage and whether -- and, essentially,

16  why there's an incumbency advantage when the economy is good,

17  and I reviewed that.  That paper was ultimately published in

18  the JPE, and I cite it in one of my reports.

19  Q.   The articles that you review for -- that you referee for

20  publication, do they include racial bias?

21  A.   They do, for sure.

22  Q.   Have you previously served as an expert witness?

23  A.   I have.

24  Q.   Where?

25  A.   So I -- I've served in -- the first case I ever took was

1   this Texas case on S(b)(1).

2   Q.   What's S(b)(1)?

3   A.   So S(b)(1) was an election restriction that essentially

4   made it -- it introduced some safeguards to the absentee

5   voting process, right.  So, among other things, people had to

6   write down an ID number when they voted.  That ID number had

7   to match in order for their vote to count, et cetera.

8        So that was the first case I took.  That was, I guess,

9   just concluded; and then I've also served as an expert witness

10  actually here in Phoenix for the Attorney General's office on

11  a criminal case.  It was a death penalty case about racial

12  disparities and whether those racial disparities were due to,

13  you know, racial bias or something else.

14       And then I've served as either an expert witness or a

15  consulting expert on a variety of criminal cases in

16  California, most of which, again, are about the absence or

17  presence of racial bias.

18  Q.   And how many of those cases have you actually testified

19  in?

20  A.   So I testified in the death penalty case here in Arizona.

21  I testified in the case in Texas on elections on S(b)(1).  I

22  have not testified in these cases in California.  I don't know

23  if I will or not.  They're at various stages.  To be honest,

24  I'm not sure where they're at.

25  Q.   And was your testimony accepted as expert opinion in

1   those cases -- the two cases?

2   A.   Yeah, it was definitely accepted in Texas and I believe

3   they tried to -- they tried to have me excluded in Arizona.

4   The Judge said she took it under advisement, but I believe she

5   accepted it.

6   Q.   Okay.  So zooming out somewhat, what are the

7   qualifications -- like what are the key skills for success in

8   daily economics, as you've described?

9   A.   Yeah, so one of the things that -- essentially, what

10  you're trying to do as an academic is you're trying to answer

11  questions better than anybody else has ever answered them,

12  right, and you're competing against a lot of smart people.

13       And so one of the things that you've got to do is you've

14  typically got to assemble really good data sets.  So that

15  might mean -- in the context of policing it means you're

16  pulling really large, sometimes messy administrative data sets

17  from police departments.  You're often linking them together.

18  So you're linking things like officer race to use of force to

19  a 911 call, for example.

20       Then you're gonna think, you know, really carefully about

21  what is it that you're measuring?  You know, if you're looking

22  at the impact of -- or at whether race matters, you want to

23  think about what could be driving these differences and so on.

24  You're gonna think really carefully about research designs

25  that get you at causality, like what is the best way to answer

1    this question?  How would I go about doing it?  What kind of

2    data would I need to do it?

3         And again, our success is determined by how well you do

4    those things; and if you don't do them very well, you either

5    don't have a very good job or you have to find a new job; and

6    if you do them well, then life is better.

7    Q.   What were you asked to do in this case?

8    A.   I was asked to read, analyze and respond to the reports

9    of Professor Burch, Professor McDonald and Professor Minnite.

10   I was also asked to respond -- to analyze and respond to

11   another expert, although my understanding is that expert is

12   not here, Professor McCool.

13   Q.   And let's talk through your process as you were preparing

14   your opinions in this case.

15        What did you do?  How did you begin?

16   A.   Yeah, so you'd begin, you know, roughly the same way

17   you'd begin thinking about, you know, reviewing a paper or

18   anything else or even doing -- doing your own research.

19        So first I'm reading the reports.  I'm trying to

20   understand -- as I read them, I'm trying to understand what

21   are the research questions that they're trying to answer.  As

22   they -- you know, throughout their report; and then I'm trying

23   to assess the credibility of the evidence and -- and, you

24   know, what kind of research designs are these studies using?

25   What kind of approaches are they using to get at causality,

1  and what are the assumptions that underlie those and what can

2  we say about the likelihood that those assumptions are -- are

3  going to hold versus not.

4  Q.   Did you look at the sources that were relied upon by the

5  plaintiffs' experts?

6  A.   Yeah, so that's -- that's certainly a big part of it is

7  assessing -- you know, looking at those studies that they're

8  citing and figuring out what is it that they were doing, what

9  question were they trying to answer, which in some cases was

10 different than how they were being cited by the experts; and

11 then how do they go about trying to answer that and is that a

12 credible approach or -- or not.

13 Q.   I don't want to repeat what we've already trowed, but is

14 this process you've just described a process with which you

15 have experience?

16 A.   Certainly.  So when you advise a student and they're

17 thinking about ideas, you're gonna say, "Okay, what's the best

18 study?  What are the studies that are out there on that

19 topic?"  And in that context you're gonna say, "Okay, what are

20 the problems with those studies and what can you do better?"

21 and that's going to involve evaluating, you know, how good

22 that other research is, as well as evaluating the proposal of

23 what the student is proposing to do.

24      When I review papers, you know, either as an editor or as

25 -- as a -- just a reviewer for a journal, you're gonna do the

 1  same thing.  You're gonna say, "How good is the evidence out
 2  there generally on this question?" in order to figure out what
 3  is the value added of this study and -- and how -- you know,
 4  how credible do I believe the results -- will the readers of
 5  this journal believe the results of this -- of this study; and
 6  then, of course, I'm gonna do it in my own research as well
 7  where you say, "Okay, I want to answer this question better
 8  than anybody else.  What's the best evidence out there?  How
 9  good is it?  What are the problems with it?  And can I do
10  better than that?"
11  Q.   We're going to talk in a bit about
12  difference-in-differences and regressions; but at a high
13  level, this process you've described of going through reports
14  and analyzing them, is that common in your field?
15       Is that accepted method in your field?
16  A.   Yes, it is.
17  Q.   Professor, let's talk about causation.  What is the
18  difference between -- is there a difference between
19  correlation and causation?
20  A.   Certainly, and, you know, distinguishing between those is
21  more or less how people like me have made our livings for a
22  couple decades.
23       In general, if two things are correlated, it could be
24  that -- if A and B are correlated, it could be that A causes
25  B.  You know, it could be that B causes A.  Could be there's

1   reverse causation.  It could be that there's some other factor

2   that's perhaps driving both of these things and, you know --

3   and good research, reliable research is proposing, you know,

4   good strategies for distinguishing between those various

5   interpretations, and that's a simplification in any context.

6   We -- we can say more, but that's what we're doing.

7   Q.   What's the gold standard in academic studies attempting

8   to prove causation?

9   A.   Yeah, the gold standard is going to be randomization,

10  right.  So this is -- this is why the FDA is -- before a drug

11  comes to market they're going to require that that drug

12  company, you know, do a randomized control trial because

13  that's the best way to get at causation.

14       Now, you can't always do randomized control trials but

15  that's -- that's the model that we have in our head of, you

16  know, what can I do that comes as close as possible to this

17  first best approach.

18  Q.   Is it possible to establish a causal connection without a

19  randomized control experiment?

20  A.   It certainly is.  You know, depending on what we're

21  talking about, it requires some assumptions.  Obviously, some

22  assumptions are more reasonable than others, but in some cases

23  we'll find something that's exactly equivalent to a randomized

24  control trial out in the wild.

25  Q.   So I'd like to, you know, give an illustrative example.

1    You and I have previously discussed Air Force Academy

2    assignments.  So just -- I don't think we want something

3    extraordinarily lengthy on this, but talk the Court through

4    that study and how you may be able to prove causation without

5    randomized control experiment.

6    A.    Yeah, so in one of those studies we're looking at whether

7    -- whether you're impacted by the fitness of your peers; and

8    so if you hang out with people who are, you know, physically

9    fit, does that cause you to become more physically fit?

10    The reason that's a hard question to answer is, well, you

11    probably choose who you hang out with; and so maybe you hang

12    out with other fit people because you like to exercise.  Well,

13    that doesn't mean they're causing you to be fit, right?  And

14    there's other -- there's other things that can go wrong with

15    that as well.

16    The way that we got around that is we looked in a context

17    where people actually didn't have so much choice in who they

18    hung out with.  So at the United States Air Force Academy, in

19    the first year you get what's called stratified randomly

20    assigned to different squadrons and so, essentially, those --

21    some people are going to happen to land in a squadron that has

22    lot of fit cadets and some people are going to land in a

23    squadron that has less fit cadets and then we can -- we can

24    examine how -- you know, does that impact your fitness levels

25    while you're at the academy, and it gets around all those

Mark Hoekstra, Ph.D. - Direct Exam by Mr. Langhofer      1659

1    problems of people choosing who they hang out with.

2    Q.   Have you also applied that method at the Air Force

3    Academy to looking at issues of race?

4    A.   Yeah, we have.  So we've looked to see -- there's this

5    hypothesis that goes back to, I think, 1953 with somebody

6    named Allport that says under some conditions if you have

7    people from different groups interact with other people, you

8    can cause them to have more positive impressions of each

9    other, right, and -- and it's hard to test that because mostly

10   people choose who they hang out with again; and so, again, we

11   use the Air Force Academy context to do it.

12        It turns out some cadets are randomly assigned to

13   squadrons with more black cadets or with higher ability, like

14   higher academic ability, black cadet versus lower; and then we

15   look at does that impact your behavior toward new and

16   different black cadets in the second year, and the measure

17   that we're using is do you pair up with a black roommate or

18   not; which is a measure of, like, you know, trying to get at

19   how comfortable are you with that group, how much do you like

20   that group and so on.

21   Q.   All right.  I want to just present squarely an idea and

22   let you respond to it if you haven't already.

23        The idea is political science does not allow researchers

24   to prove causation because you can't conduct

25   randomly-controlled experiments.  Do you agree with that?

1    A.    No.

2    Q.    Okay.  Let's talk a bit about the cost of voting theory.

3    You're familiar with this by now?

4    A.    Sure.

5    Q.    And documented proof of citizenship, which I will

6    probably call DPOC sometimes, and in your -- in preparing your

7    opinions in this case, were you able to find any situations

8    that are identical to the laws that are being challenged here?

9    A.    So there's no -- there's no context where -- where both

10   the treatment and the outcome are exactly the same, so where

11   the laws are the same and we're looking at, say, voting

12   outcomes.

13         The study that I think is most relevant with respect to

14   the citizenship requirement is a study on what happened when

15   Medicaid -- when Medicaid required proof of citizenship

16   starting, I believe, in 2006 and looking at the impact of that

17   requirement on -- on participation in Medicaid among both

18   citizens and non-citizens.

19   Q.    And you became aware of this issue in reviewing Professor

20   Burch's report?

21   A.    That's right.

22   Q.    And what was your reaction upon reading the GAO study

23   that Professor Burch relied on?

24   A.    Yeah, so Professor Burch made a big deal out of this --

25   this GAO -- I mean, "study" is like an optimistic

1    characterization of it, but this GAO report; and this GAO

2    report essentially consisted of the government going and

3    asking these state Medicaid officials like, "Hey, what was

4    your impression of the impact of this requirement on

5    enrollment?  And what's your impression -- did these people

6    who you think maybe are no longer being enrolled, did they

7    appear to be citizens or not, whatever that means, right.

8         And so I read that, and I thought to myself, like, this

9    policy happened in 2006.  There are lots of ambitious people

10   trying to write papers on, you know, topics like this.  I find

11   it hard to believe that nobody's actually studied it, and so I

12   did a search and like a minute later you find a paper that's

13   published been by a Harvard professor in *Journal of Public*

14   *Economics,* which is like a top field journal in economics.

15        It'd count for tenure, basically, at every university in

16   the country; and he used one of the common designs that

17   economists use to look at -- to look at this question.

18   Q.   We're gonna take a look at some of the studies that you

19   reviewed.

20            MR. LANGHOFER:  Elaine, would it be possible to

21   share the -- thank you.

22   BY MR. LANGHOFER:

23   Q.   So we're talking about -- you're talking about targeting

24   in Medicaid, that article by Professors Sommers?

25   A.   That's correct.

1  Q.   Okay.  What is the -- I think you've already described

2  the GAO method.  The Court's already heard a bit about that.

3       What is the method that Professor Sommers used to

4  evaluate the DPOC requirement?

5  A.   Yeah, so one of -- one of the common methods, one of the

6  things, for example, that I taught in that first year

7  econometrics course is what's called

8  difference-in-differences.

9       What it does is it says, "Well, we have some states in

10 here" -- I believe it was 40-some states -- "where from before

11 this policy to after the policy the policy changed things,"

12 right.

13      So you went from a world where you didn't have to provide

14 documentation of citizenship to now you do, but then we

15 have -- and those states you can think of as the treatment

16 group, but then we have four states in this case where they

17 already had that requirement in place even before this federal

18 requirement happened, and so those states nothing changed,

19 right.

20      Like, other things changed, obviously, but the policy

21 about citizenship documentation didn't change; and so what you

22 do is essentially you look to see, okay, how much did Medicaid

23 enrollment change in the treatment group?  And what you --

24 what you pick up when you do that is, well, you probably pick

25 up the impact of the policy; but, of course, other things can

1    change over time as well.  And so then what you say is, "Well,
2    I really only want the impact of the policy.  Not the impact
3    of, you know, just other things that change over time."
4         And so then what you do is you say -- you take that
5    difference and subtract off what happened in the control
6    states from before versus after the policy, because in those
7    states things changed over time but the policy didn't; and so
8    when you take the difference of these two differences, under
9    some assumptions you pick up the -- you pick up the causal
10   effect of the policy itself, and that's a pretty common design
11   in economics.
12        It's considered to be reliable if you executive it well,
13   and if the assumptions, you know, seem like they're likely to
14   hold, which in that paper they do and we can talk about that.
15   Q.   All right.  I'd like to show you a chart from the paper
16   you're talking about -- a table rather, and here we go.
17        I've called out this -- these tables on the left.  Can
18   you start by talking about the top of these two charts,
19   please.
20   A.   Yeah.  So, essentially, what it's -- what it's showing is
21   it's showing the -- I believe this is the Medicaid enrollment
22   rate on the vertical axis, on the Y-axis, and showing that
23   both for the treatment states -- and these are the states that
24   went from a world where there was no citizenship
25   requirement -- or no citizenship documentation requirement to

1   a world where you had to prove documentation with -- you had

2   to prove citizenship with documentation.

3        And then we have the control states, which are those

4   states where that policy just didn't change over that time

5   period, and the first thing that you want to look at on a

6   diff-in-diff to see whether it's a good study is you want to

7   look at what's going on in the pre-period, and there's an

8   assumption in difference-in-differences that's called parallel

9   trends.

10       And what that means is we'd really like those two lines

11  to be parallel in the pre, because what we're assuming is that

12  that difference would have been the same in the post period as

13  it was in the pre period; and to the extent that that's not

14  even true in the pre period, then we worry about whether

15  that's going to be true.

16       And so the way that we teach people to do research is

17  before you even look at what's happening after the policy,

18  look at what's happening before and does it look like, you

19  know, you have -- like your assumption is holding, and here it

20  does.

21       And then if you look in the post period, what you'd be

22  worried about is a drop in the treatment group relative to the

23  control group.  You'd be worried about, you know, now all of a

24  sudden citizens have this requirement and they drop off of

25  Medicaid in these states that now -- you know, that now forced

 1   them to provide documentation, and you don't see that.

 2        Instead, it looks like they just continued to cruise

 3   along the way that they were doing.  The difference is

 4   basically constant from the post to the pre.

 5   Q.   Okay.  The differences that Professor Sommers published,

 6   were those statistically significant between the treatment

 7   state and the control state?

 8   A.   For citizens they found no effect.  So they found that

 9   this requirement had no effect on Medicaid enrollment of

10   citizens.

11   Q.   And what about for non-citizens?

12   A.   Yeah, so if you look at the bottom again, if you look at

13   the left-hand side, it looks like the design is performing

14   pretty well because those -- those two groups seem to track

15   each other pretty well in the pre period.  When one goes up,

16   the other goes up by about the same amount and so on; but then

17   if you look in the post period, what you see is, well, maybe

18   there's not such a big difference right away in 2007, but in

19   2008 it does look like there is this divergence.

20        And so, essentially, you know, in these states where

21   there was no requirement, they saw an increase in enrollment

22   rates among non-citizens; but in the states where there a

23   requirement, they didn't see that.

24        And so when they estimate this, which you can do with,

25   you know, typical statistical tools, they're gonna estimate

1   roughly a two to three percentage point reduction in the

2   Medicaid enrollment rates of non-citizens.  So it reduced

3   enrollment by non-citizens, had no affect on the enrollment

4   rates of citizens.

5   Q.   All right, and here we go.  Bear with me one moment,

6   please.  All right, and we're back.

7        So the -- did you find a -- any other studies that you

8   thought were more analogous to the situation in Arizona than

9   this one?

10  A.   So I think this one is probably the most -- the most

11  analogous in the sense that it's literally about a citizenship

12  documentation requirement and about participation by citizens

13  and non-citizens, you know, as a result of that.

14  Q.   The study does -- I think the Court has -- perhaps the

15  Court hasn't actually heard this yet, but the study does find

16  that there were, within the non-citizen group, some eligible

17  and some ineligible populations.

18       Were you looking at that part of the study?

19  A.   Yeah, so -- so that's true.  So there -- you know,

20  apparently -- I don't know all the rules on Medicaid, but

21  according to the study apparently there is some non-citizens

22  who can become -- who are eligible for -- for Medicaid.

23       And, you know, the -- the limit -- you know, the

24  limitation is if you care about the impacts on those groups,

25  you can't -- they can't tell.  So, essentially, in the data

1    they only see whether you're a citizen or not a citizen.  They

2    don't see whether you're a non-citizen eligible for Medicaid

3    versus a non-citizen that's not eligible for Medicaid; and so

4    they can show aggregate affects on non-citizens but,

5    obviously, they can't break it down beyond that.

6    Q.   So Professor Sommers' study, is this a randomized

7    controlled experiment?

8    A.   It is not.

9    Q.   Okay.  Do you, nevertheless, believe that he can speak to

10   causation?

11   A.   Can you ask that one more time, Kory?

12   Q.   Do you, nevertheless, believe that he can speak as to

13   causation?

14   A.   Yes, it speaks to causation, again, under what's called

15   this parallel trends assumption, which is, again -- the best

16   way of assessing it is, essentially, are those lines parallel

17   in the pre?  So it's not free.  It requires an assumption, but

18   it's a common -- it's a common approach and it's -- frankly,

19   it's a well-executed study on this.

20   Q.   All right.  I'd like to turn away from Medicaid and focus

21   on voter ID and turnout.

22        You've looked at studies on this question?

23   A.   Yes.

24   Q.   Why don't we start with Cantoni and Pons.

25        What is -- I'll put it on the screen here.  What is a

1   Cantoni and Pons study?

2   A.   Yeah, so essentially what they're trying to do is put

3   together the biggest panel of data on voting outcomes and --

4   and, again, the -- you know, the intuition is how do you

5   assess whether, you know, these types of laws have a burden on

6   voters?  Well, if -- one way is do they have such a large

7   burden on voters that they cause people not to vote?

8        And so they assembled this individual level data set on

9   all -- you know, across all these states for whatever it was,

10  a 10-year time period, and then they're using that same

11  approach, that same difference-in-differences approach.

12       So looking at what happens before versus after state,

13  goes from a non-strict to a strict law, compared to states

14  where there was no change over time; and they're asking does

15  that impact turnout overall or does that impact turnout among

16  these groups that people might be most worried about?  You

17  know, for example, blacks, Hispanics, et cetera, and then they

18  find -- they fined no effects.

19  Q.   What was the size of the data set they used?

20  A.   Yeah, it's 1.6 billion observation.  So that's 1.6

21  billion individual by election year, I believe, on

22  observations.

23  Q.   How does the size of that data set compare to the other

24  studies in this area?

25  A.   I mean, so -- so that's huge, obviously.  I mean,

1  that's -- that's like -- it's the best data set you could put

2  together to study this question, you know, using variation in

3  those state laws.  Like it's -- there's a reason -- it

4  published in the *Quarterly Journal of Economics,* which we've

5  now hit No. 3 of those top five journals in economics.

6       Like -- again, if you're young, this makes your career.

7  Even if you're old, it's a really big deal and it published

8  there.  It was published very well.

9  Q.  All right.  I want to show Page 28 of that study, the

10  Table 3.  This is a little bit overwhelming for me as a mere

11  lawyer.  Can you explain what we're looking at here, please?

12  A.  Yeah, so we're what we're looking at here is essentially

13  the -- the estimates of what is the -- again, under the

14  identifying assumption of diff-in-diff, what is the causal

15  impact of these strict voter identification laws on turnout?

16       If you look at Panel A, what Panel A is picking up is

17  they're showing you differential effects by -- by whether

18  you're white or non-white.  And so what you see in the

19  highlighted -- in the highlighted row is that there's a

20  negative estimate.  So that's literally minus .6 percentage

21  points is how you would interpret that, but that's nowhere

22  close to being statistically significant.

23       In other words, we'd expect to see effects, you know,

24  even with data of this size due to chance; and then if you

25  look at non-whites, which is that second row, you actually see

1    a positive estimate; and, again, literally in that second row

2    it would be, you know, .6 percentage points but this time it's

3    positive.  Again, not statistically different from zero.

4         The other thing I'd point out is that, you know, this

5    study actually finds positive effects on Hispanics.  And so,

6    again, to the extent you're worried about whether certain

7    disadvantaged groups are, you know, more negatively affected

8    by these types of laws that arguably increase the cost of

9    voting, if you look at -- I guess that second row highlighted

10   there, the times Hispanic row, what they're seeing is evidence

11   of about a 2.2 to 2.5 percentage point increase in turnout

12   among Hispanics after these laws are introduced relative to

13   before, compared to what's going on in states where there is

14   no change in policy.

15   Q.   Was that finding on the effect on Latino turnout

16   statistically significant?

17   A.   It is.  It certainly is.  It's going to be significant at

18   the one percent level in that second column.  I believe it

19   would be significant at the 10 percent level in that first

20   column.

21   Q.   All right.  Let's go back to Page 1.  Did they find any

22   -- did they also evaluate the effect of these strict voter ID

23   laws based on age and party?

24   A.   They did and they report finding no -- you know, no

25   effects overrule.

1  Q.   The Court's heard some testimony previously about the

2  confidence interval for this study.

3  A.   Yeah.

4  Q.   What does that mean?

5  A.   Yeah, so any time -- any time you're doing a study

6  there's some -- there's some statistical uncertainty about the

7  resulting estimate that you get and, you know, it's called the

8  standard error.  It gives you a measure of, like, how much

9  uncertainty do I have about that sometime?  Like how sure am I

10 that that's the right thing?  And you can use that standard

11 error to construct what's called a 95 percent confidence

12 interval.

13      In this case they report that confidence interval in the

14 abstract and it's a roughly, I think, plus or minus three

15 percentage points or two and a half percentage points in this

16 study; and, again, what that -- the literal interpretation of

17 that is if you could imagine -- you know, we have lots of

18 alternative worlds and we run this study in lots of

19 alternative worlds and we do the same thing.  That confidence

20 interval says we'd expect that our estimates would land within

21 that interval 95 percent of the time, and it's a bell curve,

22 right.

23      So, like, it's sort of centered around where your

24 estimate is; but what that means is there's some chance, you

25 know, that we'd get -- if we could do this again that we'd get

1  a positive effect or, essentially, there's some chance that

2  there was a positive impact, but there's also some chance

3  there was a small negative impact.  Overall, it's not

4  statistically different from zero.  It's not -- it's

5  consistent with what we'd expect to see, you know, by chance.

6  Q.   Am I correct in recalling that the confidence interval

7  interest ranges from minus 2.6 percent effect on turnout to

8  plus 2.4 percent effect on turnout?

9  A.   I think with turnout it goes from minus 3 to 2.8

10  percentage points.

11  Q.   Okay.

12  A.   Yeah, and registration a little bit tighter than that.

13  Q.   And are each of the points on that spectrum equally

14  likely according --

15  A.   No, so they're gonna be centered around the actual

16  estimate, which, again, the overall estimate is this minus .1

17  percentage points.  If you go and you break it down by race,

18  of course, it's -- you know, if we look at non-whites, it's

19  going to be centered around -- I think it was -- what was it,

20  .6 or .3 percentage points, the table that we just looked at.

21       And so, essentially, you know, the farther away you get

22  from that, the less likely it is that you think that's the

23  true answer.

24  Q.   Okay.  So we've talked so far about a couple slides, both

25  are which diff-in-diff.  Is there a -- are you aware of other

 1  studies that do not -- on this question of voter turnout and

 2  voter ID that do not rely on diff-in-diff?

 3  A.   Yes.

 4  Q.   And there's some -- Panagopoulos is what I'm thinking

 5  first.  Do you recall that study?

 6  A.   Yes.

 7  Q.   Can you tell us about it?

 8  A.   Yeah, so one of the -- you know -- well, let's back up.

 9       So, again, if we think about what's the ideal setting,

10  what's the ideal design to try to get at causality?  Well, if

11  you gave me all the power in the world and I used it to, like,

12  try to do really good studies, I would randomly assign these

13  laws across states, right?  And if you let me do that, I could

14  do a really great job.

15       Now, I don't think states will let me do that.  I'm not

16  quite that powerful so -- but they can do things that are kind

17  of like this, and so there are these survey experiments and

18  Endres and Panagopoulos, I think, right?  So they do -- they

19  essentially take advantage of the fact that not everybody in a

20  state is super well informed about what the law is; and so

21  some people might know that there's a voter identification law

22  in place, but a lot of people -- like, maybe they knew and

23  they forgot or they're just not thinking about it very often,

24  right?

25       And so what they do is they send out notifications, and

1    so you might get a card that just says -- that just says,

2    "Hey, there's an election.  You should vote," right?  But then

3    a randomly-assigned person that's like you is gonna get a card

4    that says, "Hey, there's an election.  You should vote; and,

5    by the way, there's a voter identification law in place," and

6    they might tell you varying -- there's differing ways of doing

7    that.

8         And then what they do is they compare across these groups

9    and they say, "Did the people who I told about the voter

10   identification law, were those people more or less likely to

11   vote than the other people?"

12        And that speaks, again, directly to the impact of these

13   things on turnout because -- and, again, the only reason it

14   works is because not everybody is super well informed and so

15   they do this and if you -- yeah, if you put it up there.

16        I mean, essentially what they found is that Democrats

17   were -- were mobilized, right.  So when you sent Democrats a

18   note that said, "Hey, there's this voter identification law,"

19   versus just sending them a note about, "Hey, there's an

20   election," they were more likely to subsequently vote.

21        And, which, again, is, like, maybe the opposite of what

22   you would think with respect to this voter cost theory, right?

23   You're finding positive effects, and it turns out this is not

24   all that uncommon in this type of literature.

25   Q.   Is this an example of a randomized control experiment?

1    A.    Yes.

2    Q.    Do you think this speaks to causality?

3    A.    Yes.

4    Q.    All right, one more in this genre.  The Citrin study

5    from -- Citron study from 2014.  You're familiar with that

6    study, sir?

7    A.    Yes.

8    Q.    Can you tell us about the study design there?

9              THE COURT:  Why don't we do that one after lunch.

10             We'll take our lunch break.  We'll reconvene at 1:00

11   o'clock.  Court is in recess.

12              COURTROOM DEPUTY:  All rise.

13   (Whereupon the proceedings adjourned at 11:57 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1                    ***REPORTER'S CERTIFICATION***

2

3              I, TERI VERES, do hereby certify that I am duly

4    appointed and qualified to act as Official Court Reporter for

5    the United States District Court for the District of Arizona.

6              I FURTHER CERTIFY that the foregoing pages

7    constitute a full, true, and accurate transcript of all of

8    that portion of the proceedings contained herein, had in the

9    above-entitled cause on the date specified therein, and that

10   said transcript was prepared under my direction and control.

11             DATED at Phoenix, Arizona, this 16th of

12   November, 2023.

13

                                               _____s/Teri Veres_____

14                                         TERI VERES, RMR, CRR

15

16

17

18

19

20

21

22

23

24

25

                    UNITED STATES DISTRICT COURT