2:22-cv-00509-SRB - November 15, 2023 P.M.

1            UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF ARIZONA

3            _____

4
    Mi Familia Vota, et al.,          )
5                                      )
                         Plaintiffs,   )
6                                      )
                  vs.                  )  2:22-cv-00509-SRB
7                                      )
    Adrian Fontes, et al.,             )
8                                      )  Phoenix, Arizona
                     Defendants.       )  November 15, 2023
9    _____)  1:05 P.M.

10

11

12        BEFORE:  THE HONORABLE SUSAN R. BOLTON, JUDGE

13        REPORTER'S TRANSCRIPT OF PROCEEDINGS

14            BENCH TRIAL - DAY 7 P.M.

15            (Pages 1677 through 1842)

16

17

18

19

20
    Official Court Reporter:
21   Elaine Cropper, RDR, CRR, CCP
    Sandra Day O'Connor U.S. Courthouse
22   401 West Washington Street
    Suite 312, SPC 35
23   Phoenix, Arizona  85003-2150
    (602) 322-7245
24
    Proceedings Reported by Stenographic Court Reporter
25   Transcript Prepared by Computer-Aided Transcription

            United States District Court

2:22-cv-00509-SRB - November 15, 2023 P.M.

1              **?APPEARANCES**

2

3    For Plaintiff United States of America:

4         **RICHARD DELLHEIM, ESQ.**
          U.S. DEPARTMENT OF JUSTICE-CIVIL RIGHT DIVISION,
     VOTING SECTION
5         950 Pennsylvania Avenue NW
          Washington, D.C.  50530

6

7    For Plaintiff ADRD Action, Arizona Students' Association,
     League of United Latin American Citizens Arizona, Living
8    United for Change in Arizona::

9         **DANIELLE MARIE LANG, ESQ.**
          **HAYDEN JOHNSON, ESQ.**
10        **ROBERT BRENT FERGUSON, ESQ.**
          **JONATHAN DIAZ, ESQ.**
11        CAMPAIGN LEGAL CENTER
          1101 14th Street NW, Suite 400
12        Washington, D.C.  20005

13

14   For Plaintiff Arizona Asian American Native Hawaiian and
     Pacific Islander for Equity Coalition:

15        **NIYATI SHAH, ESQ.**
          ASIAN AMERICANS ADVANCING JUSTICE
16        1620 L Street NW, Suite 1050
          Washington, D.C.  20036

17

18        **AMIT MAKKER, ESQ.**
          **EVAN OMI, ESQ.**
          **SADIK HUSENY, ESQ.**
19        LATHAM & WATKINS,
          505 Montgomery Street, Suite 2000
20        San Francisco, California 94111

21        **NEETHU PUTTA, ESQ.**
          LATHAM & WATKINS, L.L.P.
22        1271 Avenue of the Americas
          New York, New York  10020

23

24

25

               United States District Court

2:22-cv-00509-SRB - November 15, 2023 P.M.

1                    **APPEARANCES (Continued)**

2    For Plaintiff Arizona Democratic Party, Democratic National
     Committee:
3
                **DANIEL S. VOLCHOK, ESQ.**
4               **CHRISTOPHER E.BABBITT, ESQ.**
                **BRITANY RILEY-SWANBECK, ESQ.**
5               WILMER CUTLER PICKERING HALE & DORR, L.L.P.
                2100 Pennsylvania Avenue NW
6               Washington, D.C.  20037

7

8    For Plantiff Poder Latinx:

9               **JOHN A. FREEDMAN, ESQ.**
                **ERICA ELAINE MCCABE, ESQ.**
10              ARNOLD & PORTER KAYE SCHOLER, L.L.P.
                601 Massachusetts Avenue NW, Suite 100
11              Washington, D.C.  20001

12              **JONATHAN SHERMAN, ESQ.**
                **MICHELLE KANTER COHEN, ESQ.**
13              FAIR ELECTIONS CENTER
                1825 K Street NW, Suite 701
14              Washington, D.C. 20006

15

16   For Plaintiff Voto Latino, Mi Familia Vota:

17              **CHRISTOPHER DODGE, ESQ.**
                **ELISABETH C. FROST, ESQ.**
18              ELIAS LAW GROUP, L.L.P.
                250 Massachusetts Avenue NW, Suite 400
19              Washington, D.C. 20001

20              **DANIEL ABRAHAM ARELLANO, ESQ.**
                Herrera Arellano, L.L.P.
21              1001 North Central Avenue, Suite 404
                Phoenix, Arizona  85004

22   For Plaintiff Promise Arizona, Southwest Voter Registration
     Education Project:
23
                **ERNEST ISRAEL HERRERA , ESQ.**
24              **ERIKA CERVANTES, ESQ.**
                MALDEF
25              634 Spring Street, 11th Floor
                Los Angeles, California  90014

                   United States District Court

2:22-cv-00509-SRB - November 15, 2023 P.M.

1           **<u>APPEARANCES (Continued)</u>**

2   For Intervenor-Defendants State of Arizona, Kris Mayes,
    Jennifer Toth:
3
            **JOSHUA MICHAEL WHITAKER, ESQ.**
4           **TIMOTHY E. HORLEY, ESQ.**
            **KATHRYN E. BOUGHTON, ESQ.**
5           ARIZONA ATTORNEY GENERAL'S OFFICE
            2005 N. Central Avenue
6           Phoenix, Arizona  85004
            Phoenix, AZ  85004
7

8   For Intervenor-Defendant Ben Toma:

9           **HANNAH HATCH PORTER, ESQ**
            GALLAGHER & KENNEDY, P.A.
10          2575 E. Camelback Road, Suite 810
            Phoenix, Arizona 85016-9225
11

12  For Defendant-Intervenor Republican National Committee:

13          **KORY A. LANGHOFER, ESQ.**
            **THOMAS J. BASILE, ESQ.**
14          STATECRAFT, P.L.L.C.
            649 North 4th Avenue, Suite B
15          Phoenix, Arizona  85003

16

17

18

19

20

21

22

23

24

25


                   United States District Court

2:22-cv-00509-SRB - November 15, 2023 P.M.

1                              <u>I N D E X</u>

2                              TESTIMONY

3     WITNESS                  Direct   Cross   Redirect   Recross

4     Defense Witnesses

5       TODD LAWSON            1684     1698
                               1697

6       MARK HOEKSTRA, PH.D.   1713     1767

7                                       1804
                                        1827

8

9

10                          <u>E X H I B I T S</u>

11    Number                                   Ident   Rec'd

12    105    6/19/2023 Defendant Attorney General    1703
             Kristin K. Mayes' Response to

13           Consolidated Plaintiffs' First Set of
             Interrogatories [Depo Ex. 212]

14
      106    8/24/2023 Defendant Attorney General    1705

15           Kristin K.

16    292    4/4/2023 Arizona Attorney General's     1688
             Office Criminal Division - Fraud &

17           Special Prosecutions Section list of
             cases prosecuted by the Attorney

18           General's Office since 2010 [AG000349
             - 56][Depo Ex. 224]

19
      328    Expert Report of T. Burch               1827

20
      332    Exhibit A to 10/11/2023 Declaration of  1825

21           M. McDonald

22    338    Table 5. Statewide Surname Matched      1808
             Race and Ethnicity Statistics for

23           Select Populations

24    526    Weaver, Vesla M., and Amy E. Lerman.    1823
             2010.

25

                     United States District Court

2:22-cv-00509-SRB - November 15, 2023 P.M.

1                    **E X H I B I T S** (Continued)

2    Number                                      Ident  Rec'd

3    548     Mark Hoekstra, Strict Voter          1838
             Identification Laws, Turnout, and
4            Election Outcomes. Cato Institute.
             Research Briefs in Economic Policy.
5
     900     Hoekstra Report in Response to Burch  1827
6
     901     Hoekstra Report in Response to        1804
7            McDonald

8    902     Hoekstra Report in Response to Minnite 1774

9    907     Hoekstra Report in Response to       1756 1760
             McDonald Table 1
10
     908     Hoekstra Report in Response to       1757 1760
11           McDonald Table 2

12   909     Hoekstra Report in Response to       1759 1760
             McDonald Table 3
13
     944     Targeting in Medicaid: The costs and 1821
14           enrollment effects of Medicaid's
             citizenship documentation requirement,
15           Benjamin D. Sommers [Hoekstra 394]

16   948     Photo identification laws and        1797
             perceptions of electoral fraud, Endres
17           & Panagopoulos [Hoekstra 388]

18   950     Grimmer, Justin and Jesse Yoder. 2022. 1811
             "The Durable Differential Deterrent
19           Effects of Strict Photo Identification
             Laws." Political Science Research and
20           Methods 10.

21   951     The Effects of Voter ID Notification  1815
             on Voter Turnout, Citrin et al.
22           [Hoekstra 392]

23   952     Strict ID Laws Don't Stop Voters:     1812
             Evidence From A
24

25

                  United States District Court

2:22-cv-00509-SRB - November 15, 2023 P.M.

1    **E X H I B I T S** (Continued)

2    Number                                    Ident  Rec'd

3    973    American Community Survey           1761  1762

4

5

6    **RECESSES**

7                                               Page   Line

8    (Recess at 2:49; resumed at 3:06.)         1760    17

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

United States District Court

TODD LAWSON - Direct

|  | |
|---|---|
| 1 | P R O C E E D I N G S |
| 2 | (Court was called to order by the courtroom deputy.) |
| 3 | (Proceedings begin at 1:04.) |
| 4 | THE COURT:  Good afternoon.  Please sit down. |
| 5 | I understand that defendants want to interrupt |
| 6 | Dr. Hoekstra's testimony with another witness. |
| 7 | MR. WHITAKER:  Josh Whitaker for the State and |
| 8 | Attorney General, Your Honor.  Yes.  Todd Lawson, a prosecutor |
| 9 | with the Attorney General's Office, has some limited |
| 10 | availability today and we would like to try to squeeze him in |
| 11 | to keep things expedited. |
| 12 | THE COURT:  You may call him. |
| 13 | MR. WHITAKER:  The defense calls Todd Lawson. |
| 14 | COURTROOM DEPUTY:  Raise your right hand for me. |
| 15 | (TODD LAWSON, a witness herein, was duly sworn or |
| 16 | affirmed.) |
| 17 | COURTROOM DEPUTY:  Thank you.  And could you state |
| 18 | your name and spell your last name for the record? |
| 19 | THE WITNESS:  Todd Lawson.  L-A-W-S-O-N. |
| 20 | COURTROOM DEPUTY:  Thank you.  And you can go ahead |
| 21 | and have a seat. |
| 22 | THE COURT:  Please proceed, Mr. Whitaker. |
| 23 | **DIRECT EXAMINATION** |
| 24 | BY MR. WHITAKER: |
| 25 | Q.   Good afternoon, Mr. Lawson. |

01:04:04

01:04:24

01:04:46

01:04:59

01:05:20

TODD LAWSON - Direct

1    A.   Good afternoon.                                              01:05:21

2    Q.   Where are you employed?

3    A.   I work for the Arizona Attorney General's Office.

4    Q.   And what your position?

5    A.   I am a senior litigation counsel assigned to the Criminal   01:05:25

6    Division.

7    Q.   Do you prosecute cases for the office?

8    A.   I do.

9    Q.   How long have you prosecuted cases for the office?

10   A.   I became a Special Assistant Attorney General assigned to   01:05:35

11   prosecute cases in May of 2000.

12           THE COURT:  Could I ask you to speak more directly

13   into the microphone, please.

14           THE WITNESS:  Yes, Your Honor.  Is that better?

15           THE COURT:  Yes.  It is.                                  01:05:47

16           MR. WHITAKER:  Your Honor, would you like the witness

17   to repeat that last answer?

18           THE COURT:  No.  I could hear him.  I was concerned

19   about the people in the back of the courtroom.

20           MR. WHITAKER:  All right.                                 01:05:59

21   BY MR. WHITAKER:

22   Q.   Mr. Lawson, have you prosecuted crimes related to voting

23   laws?

24   A.   Yes, sir.

25   Q.   Is that a major focus of your work?                         01:06:05

United States District Court

TODD LAWSON - Direct

1   A.   For a couple of years it was the primary thing I was paid          01:06:07

2   to do were election-related offenses, yes.

3   Q.   And what years were those?

4   A.   Those began in October of 2019 through the end of this

5   current fiscal year so June 30 of this year.                           01:06:22

6   Q.   Had you prosecuted crimes related to voting laws before

7   that time?

8   A.   I had.

9   Q.   Can you explain a little bit about your experience there?

10  A.   So I became a prosecutor with the agency in 2000.  There          01:06:33

11  are a number of various case loads and expertise that people

12  build up over the years.  In 2010 there became a need for

13  people to investigate offenses under Title XVI and I started

14  doing those cases around that time.

15  Q.   Is there any other prosecutor in the office, to your              01:06:54

16  knowledge, who focuses on voting law prosecutions?

17  A.   No.

18  Q.   Are you familiar with the offices Election Integrity Unit?

19  A.   Yes.  I was assigned to that unit for, again, just over

20  three years.                                                           01:07:11

21  Q.   And were you the only prosecutor assigned to that unit?

22  A.   I was, yes.

23  Q.   Can you generally describe your understanding of why that

24  unit was created?

25  A.   The legislature created the unit to investigate offenses          01:07:24

United States District Court

TODD LAWSON - Direct

1  related to -- actually, not just offenses but any sorts of                     01:07:32

2  questions or allegations related to conduct of elections.

3  Q.   And have there been investigators in that unit?

4  A.   Yes.  The unit as it was constituted included myself as a

5  prosecutor and an assigned investigator.                                       01:07:48

6  Q.   We heard testimony earlier today from an expert witness

7  that voter fraud in Arizona is rare.  Would you agree with that

8  characterization?

9  A.   Yes.

10 Q.   We heard testimony from that same expert that voter fraud              01:08:04

11 with non-citizens in Arizona is extremely rare.  Would you

12 agree with that assessment?

13 A.   Yes.

14 Q.   Has the Attorney General's Office, to your knowledge,

15 published online a list of voting related prosecutions in the              01:08:18

16 past several years?

17 A.   Yes, they have.

18 Q.   Do you recall roughly when that list first started to

19 become published?

20 A.   I began preparing a list which is for some points in this            01:08:30

21 time frame was the list and other times it was a version of

22 that list.  I began compiling that document in earliest 2013 --

23 excuse me latest 2013, perhaps as early as 2011.

24 Q.   And that was -- you anticipated my next question.  Are you

25 the primary drafter of that document?                                        01:08:53

United States District Court

TODD LAWSON - Direct

1  A.    Yes.   I have been the person to maintain it over the                    01:08:55

2  years, yes.

3          MR. WHITAKER:   All right.   Can we pull up Plaintiffs'

4  Exhibit 292?

5  BY MR. WHITAKER:                                                               01:09:12

6  Q.    Is this the document you were referring to?

7  A.    I believe it is.   I would know by the last page where

8  there's a number on it, a tracking number.   That looks like my

9  document, yes.

10 Q.    Can we turn to page eight of the document?                              01:09:26

11 A.    Yes.   That is a version -- so the way our office works is

12 there's a unique number assigned to every document.   Here

13 that's the number begins 499.   The version number in this case

14 is 23 and there's a date after it which shows the date of this

15 version.   I prepared this one, yes.                                          01:09:42

16 Q.    Okay.   And is this, to your knowledge, the version of the

17 document that's currently on the office's website?

18 A.    That's correct.   I haven't had the opportunity to update

19 it since April.

20 Q.    All right.                                                              01:09:53

21          MR. WHITAKER:   Can we go back to page one?

22 BY MR. WHITAKER:

23 Q.    The top of this page there's a disclaimer that says these

24 are only cases prosecuted by the Arizona Attorney General's

25 Office.   Are there other agencies in Arizona with authority to             01:10:04

United States District Court

TODD LAWSON - Direct

1   prosecute voting-related crimes?                                01:10:09

2   A.   Yes.

3   Q.   And what are those agencies, to your knowledge?

4   A.   The U.S. Attorney's Office could pursue voting-related

5   crimes as well any County Attorney who had an offense in their   01:10:18

6   jurisdiction.

7   Q.   Part A of this document says prosecutions related to

8   illegal voting by individuals since 2010 and I'll represent to

9   you that a few pages later part B says prosecutions related to

10  elections since 2010.  Can you briefly explain that             01:10:37

11  distinction?

12  A.   There were some iterations of this document where those

13  two things were commingled and people were counting

14  prosecutions of candidates for things like petition fraud under

15  the umbrella of saying we had prosecuted those people for       01:10:53

16  voting legally when we hadn't.  And so, again, my case load

17  included anything related to Title XVI, which included other

18  offenses that aren't specifically involving voting, and so I

19  divided this list to make it a little more clear.

20  Q.   Let's go to page five of the document.  So page five       01:11:17

21  indicates that the numbers of prosecutions related to illegal

22  voting go up to number 38; right?

23  A.   That's correct.  That was accurate as of the date of the

24  document.

25  Q.   All right.  And I'm not going to go through all 38          01:11:31

United States District Court

TODD LAWSON - Direct

1  definitely but what's the most common type of illegal voting          01:11:36
2  case that you have prosecuted?
3  A.    Double voting.   People voting in more than one
4  jurisdiction on the same date.
5  Q.    Is it fair to say that none of the numbered entries one          01:11:51
6  through 38 involve a charge of a non-citizen voting?
7  A.    That's accurate.   That's correct.
8  Q.    Now, also on that page there's a bullet under Additional
9  Notes that says, "Four additional cases have been charged and
10 are sealed pending the arrest of the defendants."                      01:12:10
11        What does that mean?
12 A.    By way of background, there are cases that are charged in
13 public, meaning the individual has been served with either a
14 summons or has been served with an arrest warrant so then they
15 know the charges pending against them.   An Arizona criminal           01:12:29
16 procedure when that hasn't occurred, the charges against that
17 person are sealed.
18        I know those cases exist and so I am disclosing that
19 here that there are four cases that exist but I'm not at
20 liberty to provide case numbers, defendant names, jurisdictions        01:12:45
21 and the charges that are involved and so that's what that point
22 means.
23        THE COURT:  Since you last made the report, have any
24 of these four become public?
25        THE WITNESS:  One has but it is not a non-citizen               01:13:02

United States District Court

TODD LAWSON - Direct

1   case.                                                          01:13:05

2   BY MR. WHITAKER:

3   Q.   And that was going to be one of my questions.  Is any of

4   these four cases a case involving a charge of a non-citizen

5   voting?                                                        01:13:13

6   A.   One is and then in addition, while we were preparing for

7   this case, for the deposition in this case, I learned of

8   another case that involved a non-citizen that was charged by

9   another attorney, so it's not a case that appeared on this

10  tracking chart.                                                01:13:28

11          So as I sit here today, I'm aware of two cases that

12  our agency has involving non-citizens who are alleged to have

13  voted.

14          THE COURT:  Are either of them public?

15          THE WITNESS:  Neither of them are and, Your Honor,     01:13:42

16  what we did prior to the deposition is, we reviewed E.R. 3.8,

17  the state grand jury secrecy statute, which is 13-2812, and

18  determined that we were prepared to provide some limited

19  background information about those cases such that doesn't

20  identify the person targeted and charged with any specificity  01:14:03

21  so we're not holding them up to public scorn without them

22  having been served, and also that we're not going to be able to

23  identify them such that a person could go and find that person

24  and say, "You were charged.  They were testifying about your

25  case in court today."                                          01:14:22

United States District Court

1692

TODD LAWSON - Direct

1      So we did, during the course of the deposition,          01:14:23

2  provide some limited information about that -- them and I'm

3  prepared to provide that as well here today.

4  BY MR. WHITAKER:

5  Q.   With the Court's permission, could you provide general   01:14:35

6  information about those two cases?

7  A.   Sure.  The one that actually is among those four, the one

8  that I charged was an individual who, to start the time line

9  back at the beginning, the individual appeared to have entered

10  the country with the permission of friends or distant relatives  01:14:53

11  who had had a child die and that child had died in Mexico.  The

12  child had been born in the U.S. and had valid claim to U.S.

13  citizenship.  But because they had died outside the United

14  States, their death hadn't been recorded.  So there was nothing

15  that indicated that that person was no longer alive in the U.S.  01:15:16

16  database.

17      Our target presented themselves at the U.S. border

18  identifying themselves as this deceased child and was allowed

19  essentially to enter and assume that person's the identity and

20  they did so with the permission of the family member whose       01:15:37

21  child it was.  They then proceeded to live in the United States

22  for a number of years and while they lived here, they did vote

23  in I believe it's at least five different General Elections.

24  Then at some point they became cross-wise with the family that

25  had sponsored them -- sponsored him into the United States.      01:15:57

United States District Court

TODD LAWSON - Direct

1  That family then reported him for a criminal violation and he          01:16:03

2  became a fugitive.

3          At some point during his time being a fugitive he was

4  caught by a local police department in southern Arizona and

5  asked to be removed and identified himself with his real name        01:16:17

6  and real information and said he was a Mexican national and

7  instead of being here, he wanted to be removed back to Mexico,

8  please.

9          In the course of the search incident to that arrest,

10 they found his voter registration card and other information       01:16:36

11 relevant to his use of the other identity.  That was then

12 reported to us and we conducted an investigation which was

13 primarily focused on Title XVI violations.

14         That case was presented and is currently on warrant

15 status.                                                             01:16:58

16 Q.  All right.  And then you mentioned two cases.  Can you

17 give just a general -- without violating any ethical

18 obligations you have, a general summary of the second case

19 you're aware of?

20 A.  The second case involves an individual who was                 01:17:10

21 investigated for fraud in the AHCCCS, Arizona Health Care Cost

22 Containment System, providing medical benefits.  There was an

23 allegation that a person who had obtained those benefits had

24 done that fraudulently because they were not a U.S. citizen.

25         In the course of that investigation, they did contact       01:17:32

United States District Court

TODD LAWSON - Direct

1   the person and learn that that person was registered to vote.        01:17:36
2   And when that case was filed, it was filed primarily as a fraud
3   and benefits case but they also added a charge that related to
4   the illegal registration by that person.  That case is also in
5   warrant status.                                                       01:17:54
6   Q.   And to your knowledge, neither of those cases has resulted
7   in a conviction?
8   A.   That's correct.
9        THE COURT:  In the second case, was there further
10  investigation as to whether or not the person had actually          01:18:07
11  voted or was just registered to vote?
12       THE WITNESS:  I cannot speak to that specifically,
13  Your Honor.  I just know that the primary focus of the case was
14  the benefits fraud and the Title XVI offense was essentially an
15  additional charge that was added later in the process.              01:18:21
16  BY MR. WHITAKER:
17  Q.   I want to switch gears just a little bit.  Are you aware
18  of a statute that criminalizes what is called false
19  registration in Arizona?
20  A.   Yes.  I believe you're referring to 16-182.  I'm familiar      01:18:40
21  with it.
22  Q.   Yes.  Does that statute require a level of intent on the
23  part of the alleged perpetrator?
24  A.   The language in it is that the person not knowing that
25  they are -- or knowing that they are able to vote -- or able to     01:18:58

United States District Court

TODD LAWSON - Direct

1  register.  So there's a subjective element to it.  I think I'm          01:19:03
2  quoting it correctly.

3          I don't like to quote the law without it in front of
4  me and I'm here on the stand so I'm at a loss.

5  Q.  Do you know whether the statute requires that a person          01:19:16
6  convicted under that law must have known that they are not
7  eligible to register?

8          THE COURT:  You know what, rather than asking him to
9  tell us what the statute says, if it's of any importance, you
10  can just put it in your findings and conclusions and I'll make          01:19:35
11  sure that that is what the statute says.

12          MR. WHITAKER:  That makes sense, Your Honor.  Thank
13  you.

14  BY MR. WHITAKER:

15  Q.  More generally, what is the standard you use when deciding          01:19:48
16  whether to charge a case?

17  A.  The prosecuting standard used by our agency is reasonable
18  likelihood of conviction.  It means based on the evaluation of
19  our agency, that if the matter was presented to a trial jury,
20  that it is likely that that jury would return a guilty verdict          01:20:09
21  on the charges to the beyond a reasonable doubt standard.

22  Q.  Have there been times where there was an allegation that
23  someone voted while ineligible but you didn't think there was
24  enough evidence to prosecute that case?

25  A.  Yes.          01:20:26

United States District Court

TODD LAWSON - Direct

1        THE COURT:  Did any of those instances involve                    01:20:33

2   non-citizen voting as opposed to other ineligibility?

3        THE WITNESS:  The one example that came readily to

4   mind while I was preparing here today is, we did have an

5   allegation that involved a person who voted from Israel.  And    01:20:47

6   the allegation was that that was a non-citizen voting in the

7   election.

8        When we did the research, the Investigation Section

9   did their research, the person was a U.S. citizen who was

10  simply residing in Israel temporarily.  They voted through the   01:21:03

11  UOCAVA provisions of federal law and they are allowed to do

12  that and so they legally cast a vote.

13       THE COURT:  So your conclusion wasn't that there

14  wasn't a substantial likelihood conviction; your conclusion was

15  there was no crime?                                              01:21:20

16       THE WITNESS:  There was no crime, that's correct.

17  BY MR. WHITAKER:

18  Q.   To your knowledge, have there been not specific

19  allegations of crimes but general complaints from members of

20  the public expressing concern that a lack of a proof of          01:21:34

21  citizenship requirement could allow non-citizens to vote?

22  A.   Yes.

23  Q.   Those are not things you would prosecute; right?

24  A.   That's correct.  In terms of -- I would need a specific

25  else allegation in order to pursue something like that.          01:21:55

TODD LAWSON - Direct

| | | |
|---|---|---|
| 1 | Q.   You mentioned earlier that the most common type of case | 01:22:04 |
| 2 | you've prosecuted is double voting.  Compared with that kind of | |
| 3 | a case, would a non-citizen voting case be, in your opinion, | |
| 4 | easier to detect, harder to detect, or about the same? | |
| 5 |          MR. DODGE:  Objection.  Speculation.  Legal | 01:22:22 |
| 6 | conclusion. | |
| 7 |          THE COURT:  Sustained. | |
| 8 | BY MR. WHITAKER: | |
| 9 | Q.   Then that's all the questions I have for you.  Thank you. | |
| 10 | A.   Thank you. | 01:22:29 |
| 11 |          THE COURT:  Any other direct questions for this | |
| 12 | witness. | |
| 13 |          **DIRECT EXAMINATION** | |
| 14 | BY MR. LANGHOFER: | |
| 15 | Q.   Just one.  Good afternoon, Mr. Lawson.  You said that the | 01:22:40 |
| 16 | table -- well, while I'm here, I suppose we should move the | |
| 17 | exhibit into evidence.  I think it was 292. | |
| 18 |          MR. DODGE:  I believe it's already been admitted. | |
| 19 | BY MR. LANGHOFER: | |
| 20 | Q.   Sir, you said the table was current as of April 4 of this | 01:22:57 |
| 21 | year.  Are there any updates to that table that concern | |
| 22 | non-citizen voting at that time that you just haven't entered? | |
| 23 | A.   No, sir. | |
| 24 | Q.   Thank you. | |
| 25 |          THE COURT:  Mr. Dodge, cross? | 01:23:13 |

TODD LAWSON - Cross

1      MR. DODGE:  Thank you, Your Honor.                          01:23:15

2                    **CROSS - EXAMINATION**

3  BY MR. DODGE:

4  Q.    Good to see you again.  I need to re-create some of the

5  questions from our deposition but Mr. Whitaker got to a fair     01:23:22

6  number of them so I'm hoping we can make it quick?

7      MR. DODGE:  Can we pull up PX 292?

8  BY MR. DODGE:

9  Q.    You created this list around 2011; is that right?

10 A.    Sometime back that far.  It was a long time ago.  There    01:23:38

11 have been many versions of it.

12 Q.    And you're the individual responsible for maintaining this

13 list in your office?

14 A.    That's correct.

15 Q.    And it covers prosecutions going back to the 2010 election  01:23:47

16 cycle?

17 A.    I believe actually the first cases there may be 2008

18 election cycle cases that just took us some time to investigate

19 and prosecute.

20 Q.    I appreciate the clarification.  At least with respect to   01:23:59

21 public information, this list is comprehensive with respect to

22 your office's prosecutions going back to that time?

23 A.    I hate to say comprehensive.  It is what I'm aware of and

24 this is what I'm assigned; but as I discovered in the prep for

25 this, if other attorneys are filing those and they are not the   01:24:15

United States District Court

TODD LAWSON - Cross

1   top charge, some of those may happen without my knowledge.    01:24:19

2   Q.   Attorneys within your office at the Attorney General's

3   office here in Phoenix typically know that if there's an

4   election case, they should bring to it your attention as the

5   lead prosecutor in the office?    01:24:31

6   A.   I have a reputation, so yes.

7   Q.   I won't ask about your reputation.

8        To the best of your knowledge, this is the

9   authoritative list of election prosecutions that your agency

10  produced?    01:24:43

11  A.   To the best of my knowledge, yes.

12  Q.   And whenever an election-related case within your office

13  became public, you would add it to this list?

14  A.   Yes.  If there was another case filed by another attorney,

15  I would certainly add it if I was aware of it, yes.    01:24:56

16  Q.   And it's personally important to you that this list be

17  accurate?

18  A.   I would say yes.  I do want to provide enough

19  information -- the genus of this list was the idea that we were

20  getting a number of media complaints -- not complaints but    01:25:08

21  requests for information and I wanted to make sure this was all

22  accurate.

23  Q.   And this is just for the record, but none of these

24  prosecutions concern non-citizen voting?

25  A.   None.    01:25:22

United States District Court

TODD LAWSON - Cross

1  Q.   And if you were aware of any successful prosecutions by        01:25:23

2  your office for non-citizen registration or voting since 2008,

3  2010, you would add them to this list?

4  A.   Correct.

5  Q.   And you can't think any reason why your office would have      01:25:34

6  chosen not to include a successful prosecution of a non-citizen

7  on this list?

8  A.   I cannot.

9  Q.   You would agree with me there have been dozens of

10 elections in Arizona since 2020?                                   01:25:46

11 A.   Counting primaries and generals, yes.

12 Q.   And you would agree there were millions of ballots cast in

13 Arizona since 2010.

14 A.   Yes.

15 Q.   You mentioned that most of these cases involved double        01:25:58

16 voting.  To your knowledge, do the laws at issue in this

17 litigation address the issue of double voting?

18 A.   I don't pretend to have command of all of the statutes

19 that were passed but to my knowledge, no, these are not

20 statutes about double voting.                                      01:26:17

21 Q.   So setting aside this list for a moment, since 2010 you

22 would agree with me your office has received thousands of

23 complaints alleging violations of the election laws?

24 A.   Yes.

25 Q.   You would agree your office received thousands of election    01:26:32

United States District Court

TODD LAWSON - Cross

1  complaints related to 2020 alone?                                    01:26:35

2  A.   That's correct.

3  Q.   And your office has conducted, ballpark, 300 or so formal

4  investigations into election-related offenses since 2010?

5  A.   Yeah.  The number I believe I gave you previously was          01:26:46

6  somewhere between 2 to 300 and I would be hard pressed to pin

7  it down to an exact number.

8  Q.   I appreciate your clarification.

9        THE COURT:  Would the discrepancy thousands of

10  complaints, 300 investigations have largely to do with             01:26:59

11  non-specificity of complaints?

12        THE WITNESS:  For example, the complaint I referenced

13  by Israel would be counted in the larger number but not the

14  smaller number because we did the opening work, looked at it,

15  said this doesn't -- this is not something that we would pursue    01:27:20

16  and it would not get into the smaller number.  Does that make

17  sense, Your Honor.

18        THE COURT:  Oh, his question said something about

19  formal investigation.  I was just thinking about investigation.

20  Obviously you investigated the person who voted from Israel but    01:27:36

21  did not put any process in motion for possible charges?

22        THE WITNESS:  I doubt the person knows there was even

23  a complaint made about them.

24        THE COURT:  I was trying to get the magnitude of

25  thousands of complaints, a very small percentage of               01:27:58

United States District Court

TODD LAWSON - Cross

1   investigations.  Is it because many of the complaints are just          01:28:05

2   a generic I think your office should be investigating all of

3   this voter fraud as opposed to somebody from Israel voted?

4           THE WITNESS:  So let me answer your question with the

5   best statistic I can.  When we started taking complaints in 202        01:28:26

6   we began trying to classify them best we could by time.  The

7   single largest type of complaint we had in 2020 were Sharpie

8   complaints which arose from a myth that was perpetrated on

9   election day that if you marked your ballot with a Sharpie, it

10  wouldn't count.                                                         01:28:47

11          THE COURT:  Sharpie gate.

12          THE WITNESS:  Yes.  And we had hundreds of Sharpie

13  complaints that came in.  Those come in to the count of

14  thousands of complaints includes all the Sharpie complaints.

15          THE COURT:  Okay.  Because it's all election related          01:29:04

16  as opposed to fraud related.

17          THE WITNESS:  The people who were alleging that their

18  vote wasn't counted because of a Sharpie were technically

19  alleging fraud but they were doing so based on incorrect

20  information.                                                            01:29:19

21  BY MR. DODGE:

22  Q.   I promise I don't have any questions about markers.

23          THE COURT:  It was the issue of the moment for a

24  couple of days until I think the Attorney General said we can

25  read -- maybe all the County Recorders said we can read             01:29:35

United States District Court

TODD LAWSON - Cross

1   Sharpies.                                                          01:29:39

2           MR. DODGE:   I recall it well, Your Honor.   I've seen

3   the complaints in the database.

4           Could we pull up Plaintiffs' Exhibit 105?

5   BY MR. DODGE:                                                      01:29:48

6   Q.   We discussed these at your deposition.   These are

7   interrogatory responses provided by your office in response in

8   this litigation?

9   A.   Yes.

10          MR. DODGE:   Could we go to PDF 16 and look at           01:29:58

11  interrogatory number three?

12  BY MR. DODGE:

13  Q.   Just take a moment to review the interrogatory itself.

14  A.   Yes, I'm familiar with this.

15  Q.   Great.   Thank you.   This interrogatory asked your office   01:30:16

16  to identify any instances in which it was established by any

17  prosecuting authority in Arizona that a non-citizen registered

18  to vote or cast a ballot since January 1, 2016.   Is that fair?

19  A.   I can only speak to what we would have knowledge of within

20  our agency.   And anything that would be public from another     01:30:37

21  agency that I would have been aware of which at that time was a

22  select few U.S. Attorney cases.   But I'm aware of the

23  parameters of the question.

24  Q.   Thank you.   And that's what I was looking for.

25  A.   I saw the look on your face as I was answering.             01:30:52

United States District Court

TODD LAWSON - Cross

1  Q.   Okay.  I'm trying to get you out of here quickly, sir.          01:30:54

2  A.   Of course.

3  Q.   So this interrogatory on its face was not limited to

4  prosecutions by your office?

5  A.   No.  And that is part of the reason we made sure to          01:31:02

6  provide you the information about the two sealed cases, so that

7  we wouldn't -- we wanted to make sure you had a full picture.

8  Q.   I appreciate that.  Just so it's clear on the record, this

9  interrogatory asked about political subdivisions within the

10 State of Arizona?                                                 01:31:19

11 A.   Yes.  And to the extent during the deposition I indicated

12 we had a chart that I was aware of that had some other

13 jurisdictions on it, we provided that to you.

14 Q.   And take a moment to review your office's response to the

15 interrogatory.                                                    01:31:32

16 A.   Okay.

17 Q.   You see a citation there to a Bates number; right?  I know

18 you're a criminal attorney but I suspect you know what a Bates

19 number is.

20 A.   I see the 349.                                               01:32:07

21 Q.   Right.  And that's the list of prosecutions we've sort of

22 been discussing.

23 A.   Yes.  I think that's the same one, yes.

24 Q.   And it notes the existence of one pending case where a

25 charge involved a non-citizen; correct?                          01:32:17

TODD LAWSON - Cross

| | |
|---|---|
| 1 | A.   Yes.  And that was the one we talked about, the four, one | 01:32:21 |
| 2 | of those, and then in the course of preparing, we found the |
| 3 | sector one. |
| 4 | Q.   And we'll get to that.  I'm just building the record here. |
| 5 | We agreed that this response, with the exception of that sealed | 01:32:29 |
| 6 | case, doesn't contain any instances of non-citizen voting? |
| 7 | A.   I'm sorry.  I don't understand your question. |
| 8 | Q.   Let me ask a little more precisely.  The interrogatory |
| 9 | response incorporates the AG's prosecution list; right? |
| 10 | A.   Yes. | 01:32:49 |
| 11 | Q.   And that list doesn't have any instances of non-citizen |
| 12 | voting? |
| 13 |          MR. LANGHOFER:  Cumulative. |
| 14 |          THE COURT:  Sustained. |
| 15 | BY MR. DODGE: | 01:32:58 |
| 16 | Q.   This interrogatory response, with the exception of the |
| 17 | sealed case, does not identify any non-citizen voters? |
| 18 | A.   Correct.  And then I believe this was amended and it was |
| 19 | an amended response. |
| 20 | Q.   Could we pull up Plaintiffs' Exhibit 106 and can we go to | 01:33:12 |
| 21 | PDF page three? |
| 22 |          This is the supplemental response? |
| 23 | A.   Yes.  And this was after we discovered the second case |
| 24 | that wasn't one that I was responsible for. |
| 25 | Q.   Final question on this:  Your interrogatory responses | 01:33:29 |

United States District Court

TODD LAWSON - Cross

1  beyond these two sealed cases does not identify any instances                01:33:32

2  of non-citizen voting in Arizona?

3  A.   That's correct.

4        MR. DODGE:  So let's go to Plaintiffs' Exhibit 292

5  and go to PDF page six and zoom in at the top there.  Yes.             01:33:49

6  That's right.

7  Q.   Do you see that second bullet that says approximately two

8  involve ballots cast with individuals who were not eligible to

9  vote?

10 A.   Yes, sir.                                                          01:34:05

11 Q.   That's different than the two sealed cases we were just

12 talking about; right?

13 A.   That's correct.

14 Q.   And to the best of your recollection, those cases involved

15 instances of a felon without restored rights voting?           01:34:11

16 A.   That's correct.

17 Q.   You talked to Mr. Whitaker a little bit about why -- or

18 that this document is divided into illegal voting cases and

19 election cases?

20 A.   Correct.                                                          01:34:30

21 Q.   Can you see as to why the two are different?

22 A.   Again, the original point of preparing this document was

23 in response to media requests.  We used to get a lot of media

24 requests and the requests would sometimes be ill-formed.  They

25 would say tell us about your election cases or tell us about         01:34:46

United States District Court

TODD LAWSON - Cross

1  your vote voting cases and then we would have people take one          01:34:49

2  answer and conflate the two.

3          So I felt it was necessary to divide cases about

4  candidates and things like that from cases about individuals.

5  Q.   They are different phenomenon?                                     01:35:03

6  A.   Different sections, different criminal violations and they

7  were being conflated.

8  Q.   I now want to ask about those two sealed cases and I want

9  to be very clear none of my questions are asking you to violate

10 your ethical obligations.  And if you feel that they are,              01:35:17

11 please say as much.

12         Is it fair to say that those two cases both involved

13 individuals who engaged in systematic identity theft over a

14 number of years?

15 A.   I believe that's an accurate description, yes.                    01:35:32

16 Q.   You mentioned the one instance of the individual who

17 assumed the identity of the deceased child.  Do you remember

18 that?

19 A.   Yes.

20 Q.   In your experience as a prosecutor with the Attorney             01:35:50

21 General's Office, you're not aware of another case within

22 Arizona with a similar specific set of facts like that one?

23 A.   Involving a voting allegation, no, I'm not.

24 Q.   And that case was referred to you in 2017?

25 A.   Yes.                                                              01:36:07

United States District Court

TODD LAWSON - Cross

1  Q.   And it was filed in 2019?                                01:36:08

2  A.   That's correct and remained sealed.

3  Q.   The second case involved benefits fraud?

4  A.   That's correct.

5  Q.   Neither of those cases involved voting in connection with  01:36:19

6  the 2020 or 2022 elections?

7  A.   I don't believe either of those people were alleged to

8  have voted in either of those elections; but, honestly, if we

9  filed them in 2019, I'm not sure we looked.

10 Q.   Both of those prosecutions predate the creation of the     01:36:33

11 Election Integrity Unit in your office?

12 A.   Correct.

13 Q.   The details of those cases are not public?

14 A.   Correct.

15 Q.   The members of the Arizona legislature who debated and      01:36:47

16 voted on the laws of this case could not have known about those

17 cases?

18 A.   I believe the first time we decided as an agency that we

19 were prepared to discuss them even in the abstract was during

20 the deposition to prepare for this case because they are        01:37:00

21 confidential.

22 Q.   So fair to say the answer to my question is yes?

23 A.   Yes.

24 Q.   Do you recall during your deposition we discussed an email

25 from a democratic Senate staffer requesting information from     01:37:12

TODD LAWSON - Cross

1  your agency about its voter fraud prosecutions?                    01:37:15

2  A.   I do remember that, yes.

3  Q.   Good memory.  Do you recall that your office was not able

4  to ultimately provide her with any examples of non-citizen

5  non-citizens voting in Arizona?                                    01:37:26

6  A.   I remember our discussion.  I can't remember the outcome

7  of it but that wouldn't surprise me, your summary.

8  Q.   Okay.

9           MR. DODGE:  If we could pull back in Plaintiffs'

10  Exhibit 105 and go to PDF page four and look at interrogatory      01:37:41

11  number one.

12  BY MR. DODGE:

13  Q.   And please take a moment to review that.

14  A.   Could I continue on to the next page?

15  Q.   Of course.  Read the whole thing.  You only need to read      01:38:00

16  through subpart one.

17  A.   Okay.  Thank you.

18  Q.   Fair to say in response to subpart one, your office

19  identifies two interests that are promoted by the laws here?

20  A.   Yes.                                                          01:38:30

21  Q.   The first is that the laws serve the state's interest in

22  ensuring that voter registration is limited to individuals who

23  are eligible to vote.  Did I get that right?

24  A.   That's correct.

25  Q.   And can you explain to the Court how the Challenged Laws       01:38:40

United States District Court

TODD LAWSON - Cross

1   do that?                                                    01:38:43

2   A.   I cannot --

3              MR. LANGHOFER:  Foundation.

4              THE COURT:  Excuse me.  Overruled.

5              Continue with your answer.                       01:38:50

6              THE WITNESS:  I can only speak to the general

7   interest there in terms of as I pursue cases, for example, in

8   the arena of convicted felons, that there is a general interest

9   in making sure that only those eligible to vote are doing their

10  voting -- or voting.                                        01:39:05

11  BY MR. DODGE:

12  Q.   It was a felony in Arizona prior to the enactment of these

13  laws to register or cast a ballot when ineligible to do so?

14  A.   Correct.

15  Q.   Going back to the two sealed cases we were discussing, can 01:39:20

16  you explain how the laws in this litigation would have

17  prevented those individuals from registering to vote?

18             MR. LANGHOFER:  Speculation.

19             THE COURT:  Excuse me.  I missed the question.

20             MR. DODGE:  I can repeat it.                      01:39:32

21             THE COURT:  No.  I can read it right here.

22             Sustained.

23  BY MR. DODGE:

24  Q.   Based on your experience as the lead prosecutor in the

25  Election Integrity Unit, would the Challenged Laws in this case 01:39:51

United States District Court

TODD LAWSON - Cross

| | | |
|---|---|---|
| 1 | have made it more difficult for the two individuals in those | 01:39:54 |

1   have made it more difficult for the two individuals in those

2   cases to register to vote or cast ballots?

3            MR. LANGHOFER:  Same objection.

4            THE COURT:  Sustained.

5   BY MR. DODGE:                                                01:40:02

6   Q.   Going back to Plaintiffs' Exhibit 105 at PDF page five.

7   You see that your office also indicated that the Challenged

8   Laws search the state's interest in ensuring that members of

9   the public trust elections?

10  A.   Yes, I'm familiar with that.                           01:40:16

11  Q.   And the response states that, quote, some members of the

12  public may feel bad about election results, rightly or wrongly.

13            Do you see that?

14  A.   Yes, I'm aware of that.

15  Q.   You're not able to explain how the Challenged Laws promote 01:40:27

16  public trust in elections?  Is that fair to say?

17            MR. LANGHOFER:  Foundation.

18            THE COURT:  Overruled.

19            You may answer.

20            THE WITNESS:  I will say that one of the motivations 01:40:37

21  in both setting up and then the operation of the Election

22  Integrity Unit was to address people who had concerns about

23  elections and either debunked their concerns or if, to the

24  extent their concerns pointed to valid cases that could be

25  filed, we pursued those cases.                              01:40:51

United States District Court

TODD LAWSON - Cross

BY MR. DODGE:                                                      01:41:00

Q.   The next sentence in the response is that the Challenged

Laws may help alleviate such doubt.  Do you see that?

A.   I believe in the deposition I said the word "may" does a

lot of work in that sentence.                                     01:41:12

Q.   And that's because it's a speculative statement?

A.   Yes.

Q.   And I actually skipped a sentence.  The sentence before

that says:  Some members of the public -- well, the use of term

"may" in that sentence:  Some members of the public may feel     01:41:29

doubt about election results, rightly or wrongly, you agree

with me that's a speculative statement as well?

A.   Correct.

Q.   And you agree that your office's response does not

categorically state that the Challenged Laws will help           01:41:44

alleviate such doubt?

A.   Not categorically we did not respond that way.

Q.   Final question.  To the best of your knowledge, the

Attorney General's office has not identified any additional

state interests that it believes the Challenged Laws promote     01:42:02

beyond the two we were just discussing?

A.   No, I don't believe we have.

         MR. DODGE:  No further questions.

         THE COURT:  Any other questions on cross-examination

of this witness?                                                 01:42:17

United States District Court

MARK HOEKSTRA, PH.D. - Direct

1        Mr. Whitaker, questions on redirect?                        01:42:20

2        MR. WHITAKER:  We have no redirect for this witness,

3   Your Honor.

4        THE COURT:  May Mr. Lawson be excused as a witness?

5        MR. WHITAKER:  Yes.                                         01:42:43

6        THE COURT:  Any objection?

7        MR. DODGE:  No objection.

8        THE COURT:  Thank you, sir.  You may step down and

9   you are excused as a witness.

10       THE WITNESS:  Thank you, Your Honor.                        01:42:49

11       (Witness excused.)

12       MR. LANGHOFER:  Your Honor, may Professor Hoekstra be

13  reseated?

14       THE WITNESS:  Yes, please.

15       (MARK HOEKSTRA, PH.D., a witness herein, was duly           01:43:24

16  sworn or affirmed.)

17       MR. LANGHOFER:  May I proceed, Your Honor?

18       THE COURT:   You may.

19                   **DIRECT EXAMINATION**

20  BY MR. LANGHOFER:                                                01:43:31

21  Q.   Professor Hoekstra, welcome back.  One cleanup question

22  before we go on to the next study.  In the Cantoni and Pons

23  study with 1.6 billion observations you described before, are

24  both of those authors political scientists?

25  A.   I know for Vincent Pons is a trained economist in the      01:43:57

MARK HOEKSTRA, PH.D. - Direct

1    Harvard Business School.  Off the top of my head, I don't                  01:44:01

2    remember about Cantoni but I suspect Cantoni is also an

3    economist.

4    Q.   All right.  We left off discussing the Endres and

5    Panagopoulos study.  There's another one we may not need to                01:44:11

6    cover in as much detail by Citrin.  Do you remember that?

7    A.   Yes.

8    Q.   What's the method in that study?

9    A.   So Citrin and co-authors doing something similar to what

10   the Endres and Panagopoulos paper were doing, which is                     01:44:25

11   explaining the fact that not everyone is super aware of what

12   the rules are in their state.  And so they are doing this

13   experiment where they are informing a random set of voters,

14   hey, there's an election and also there's a voter

15   identification law and sometimes they will queue other things.             01:44:42

16        And then other people will just get the notice that,

17   hey, there's an election and they will compare across those

18   groups with the intent of learning about what the likely impact

19   of these laws can be.

20   Q.   All right.                                                            01:44:59

21        MR. LANGHOFER:  Elaine, can I have the podium laptop,

22   please.

23   BY MR. LANGHOFER:

24   Q.   I'm showing you on the screen here, sir, the abstract from

25   the Citrin study.  What did they find with their process?                  01:45:07

United States District Court

MARK HOEKSTRA, PH.D. - Direct

1    A.    Yeah.   They find that there's -- for low-propensity voters    01:45:13

2    there's evidence that when you inform them about this, about

3    voter identification laws, they are actually more likely to

4    vote to the tune of about one percentage point.

5    Q.    All right.   Was this a randomized controlled experiment?    01:45:27

6    A.    It was.

7    Q.    You believe this can address the issue of causality?

8    A.    Yes, I do.

9    Q.    Let's talk now about the --

10          THE COURT:   So was this another two postcards, one    01:45:41

11   that just said go vote and the other one said go vote and, by

12   the way, bring ID?

13          THE WITNESS:   Yeah.   Let me look at it and make sure

14   I don't mischaracterize it.   You know, the way most of these

15   studies work, and I have to look in more detail to see what the    01:45:58

16   different treatments are, but sometimes the control is always,

17   you know, a notice that says there's an election; right?   And

18   then there might be a treatment arm that says there's an

19   election and, by the way, there's a voter identification law.

20   And then the third one, and I think in this one they actually    01:46:14

21   have some evidence that says here's how you might go about

22   getting an acceptable ID; right?   So they are also telling them

23   something about how to potentially solve a problem.

24          And in other cases I don't remember here, I think in

25   the previous paper they had one treatment arm that said are you    01:46:33

United States District Court

MARK HOEKSTRA, PH.D. - Direct

1   aware that, you know, a lot of people believe that these things       01:46:36

2   are likely to have a disproportionate impact on minorities?  So

3   they will queue different aspects of the law.  And, again, this

4   one seems to mostly be about the notification that the law is

5   there and then also the fact that there's help in certain --        01:46:52

6   you can go find help to get an ID.

7   BY MR. LANGHOFER:

8   Q.   Okay.  So one more we should talk about and this is the

9   Komisarchik and White paper.  And you're familiar with this

10  paper, sir?                                                           01:47:13

11  A.   I am.

12  Q.   What was the process they used in this case?

13  A.   Yeah.  So one of the big -- one of the big fights, which

14  I'm sure everyone in this room is aware of, is this fight over

15  preclearance, right; and so whether states would have to go get       01:47:26

16  preclearance from the federal government in order to change

17  voting rules and that came out of like all this bad stuff that

18  happened in the sixties and so on.

19       And so what happened is in the *Shelby* decision, which

20  again everybody knows, but in 2013 they said no more                 01:47:42

21  preclearance, right, so you don't need to go get the feds'

22  approval to do these thing.

23       What this paper does is, it says, well, first they

24  show that the end of preclearance led states to do the types of

25  things that the experts on the other side would say increased       01:47:57

United States District Court

MARK HOEKSTRA, PH.D. - Direct

1   voting casts, so they will do things like -- the two main                01:48:01

2   things that they show is they show that these states responded

3   by passing strict voter identification laws and also by

4   attempting to sort of purge ineligible voters off of the

5   registration list.  Those are the two main things that they               01:48:19

6   did.

7           And so they show using a difference-in-differences

8   approach, which we've talked about, same approach as Pons used,

9   and they show what is the impact of this.  The end of

10  preclearance and the associated increase in expected voter               01:48:32

11  costs, right, on turnout of groups that we might subpoena worry

12  about and specifically they are looking at turnout of Hispanics

13  and Blacks.

14  Q.   I would like to show you page 12 of that study in Figure

15  2.  Can you explain the charts that were presented?  Before we           01:48:49

16  go on, I should make something clear.  Has this study been

17  published yet?

18  A.   No.  This is a working paper with -- Ariel White is a

19  professor of political science at MIT and I believe her

20  co-author is I think at Rochester.  And so it's not published.           01:49:05

21  It is -- according to the author's website, it's under revision

22  for the journal.  The way a publication works is you send it to

23  a journal.  Most of the time they say, "This is not good enough

24  for us, take your study elsewhere."  Sometimes they say, "Oh,

25  this is good but we want you to fix a few things."And then you           01:49:25

United States District Court

MARK HOEKSTRA, PH.D. - Direct

1   get a chance to respond to those comments.                          01:49:28

2           My guess is like 90, 95 percent of the time when you

3   get that offer to revise the paper, it ultimately gets

4   published.

5           This paper is in that revision visions process            01:49:39

6   according to the author's website.

7   Q.   The other studies that we've discussed so far that have

8   been published in peer-reviewed journals?

9   A.   Yes.  Everything else.

10  Q.   Back to page 12.  Can you tell me what's going on on page    01:49:52

11  12?

12          THE COURT:  Was this available to you because the

13  author's website says:  Here's my report.  It's not final yet.

14  It's under revision?

15          THE WITNESS:  When you say "this" available, the          01:50:07

16  paper or the information about --

17          THE COURT:  The paper.

18          THE WITNESS:  Yeah.  So the paper is available on

19  their website.  Anybody with an Internet connection can go find

20  it and that's -- the end of preclearance is a pretty big deal.    01:50:17

21  So it's kind of like an obvious thing to study and so that's

22  how I found it.

23          And then on their website they also indicated the

24  under revision for -- I forgot the name of the journal.

25  \\\

United States District Court

MARK HOEKSTRA, PH.D. - Direct

1    BY MR. LANGHOFER:                                           01:50:35

2    Q.   Can you explain the table, Figure 2 on the screen?

3    A.   Yeah.  So, for example, if you look at -- you know, if you

4    look at the lower right corner, that is showing Hispanic voters

5    turnout.  So, again, what we have is we have treatment and      01:50:48

6    control groups and what we're going to do is we're going to

7    look to see how turnout changes over time in both the treatment

8    and control group.  The treatment group in this case is going

9    to be the dotted line.  And those are the states where they

10   were under preclearance so they were restricted from doing      01:51:04

11   stuff.

12        And then preclearance got ended so their world

13   changed a little bit and they responded by passing strict voter

14   ID laws and, you know, doing these purges of registration

15   lists.                                                          01:51:20

16        And then the control group are all the other states

17   so not every state was under preclearance.  So those states

18   were not impacted at all by the *Shelby* decision.

19        And so just gives you an idea of, like, how are

20   things going to change over time anyway because things can      01:51:32

21   change over time.  We want to have a control group that.  Gives

22   us an idea of what that change would be.

23        So, again, if you want to assess the validity of

24   diff-in-diff, you want to look at the left-hand side of that

25   figure on the lower right.  And, ideally, what you want to see   01:51:49

United States District Court

MARK HOEKSTRA, PH.D. - Direct

1   is that those two lines are the same distance apart the whole          01:51:51
2   time, to the left of that vertical line.  And so when one goes
3   up, the other goes up.  When one goes down, the other goes
4   down.

5          And if that's true, it gives us some degree of               01:52:02
6   confidence that the assumption that we need for causality is
7   likely to hold.  And if you look at especially the lower right,
8   that looks true.  It also looks true if you look directly above
9   it for Black turnout.  They are tracking each other quite
10  nicely and that's, again, called the parallel trends            01:52:19
11  assumption.

12         And then what you see in the post period is this is
13  what they are going to -- what they are going to estimate, the
14  treatment effect is, do we see that gap close or not?  If we
15  look at the upper right, in general, what you see is, yeah,     01:52:35
16  there was this little gap between but actually the preclearance
17  Black voters were a little bit more likely to vote.  So that
18  gap, they closed that gap a little bit.

19         And so ultimately, you know, if you look at that
20  upper right corner, the authors are going to estimate that      01:52:49
21  there was this I think it's roughly a two percentage point
22  increase in Black turnout in the states that passed these
23  additional burdens, right, in the states that passed these
24  other additional laws compared to the other states.

25         The same thing is true if you look at Hispanic            01:53:06

United States District Court

MARK HOEKSTRA, PH.D. - Direct

1   voters, lower right, you have a much smaller gap on these lines          01:53:10
2   on the right than you have on the left.  In other words, the
3   voters that were subject to preclearance or that were no longer
4   subject to preclearance, voters in those states, they close
5   some of the gap.                                                          01:53:23

6           And so, again, the experts on the other side would
7   have you believe that every time you have this thing that
8   increases voting casts, you're going to reduce voting.  We've
9   now seen a few examples where, like, the reality of it is when
10  you study this thing and you use good designs, you're actually          01:53:37
11  finding in some cases zero like the Pons paper.

12          In this case you are finding a positive effect and I
13  think that is because in the real world, these things come with
14  lots of things.  They -- maybe they make people upset.  Maybe
15  they make people feel better about election integrity.  There's         01:53:56
16  a lot of potential mechanisms why people may be more likely to
17  turn out as a result of this sort of thing but they are finding
18  that and here they are finding it for minority groups.
19  Q.  So one more image on this.  We're going to look at page 16
20  of the same study.  Is this showing confidence intervals?                01:54:14
21  A.  Yes.  So this is showing the resulting estimates.  So,
22  again, as long as you believe that parallel trends assumption,
23  which seems reasonable given that the difference seemed
24  constant before the law was changed.  This is estimating the
25  impact impacting the end of that preclearance on turnout and so          01:54:36

United States District Court

MARK HOEKSTRA, PH.D. - Direct

1    for Hispanics, what you see is they are estimating a                          01:54:41

2    statistically significant increase in turnout among Hispanic

3    voters.

4              If you look at Black voters, you see also a positive

5    increase and that confidence interval sort of barely overlaps    01:54:51

6    zero, so it's probably marginally significant we would say,

7    between the five and ten percent level.

8    Q.   Is it your view that this study can speak to the question

9    of causation?

10   A.   Yes.  So again, you know, this difference-in-differences    01:55:07

11   method, this is one of the three methods that we teach in the

12   first year econometrics course when we teach people how to do

13   good research for the observational data.  And, again, in this

14   case, it was executed well because they -- they are looking at

15   pre-trends.  They are showing that pre-trends seemed to be       01:55:24

16   parallel before the law was changed.  And then the outcome is

17   the outcome.

18             If we're doing research right, we shouldn't care

19   about the outcome.  In this case the outcome is in the interest

20   for this lawsuit but the outcome is Hispanic and Black voters    01:55:38

21   were more likely to vote when they were in these states that

22   had previously been subject to preclearance.

23   Q.   I want to be precise about what action may be causing this

24   effect.

25             Is it your view that it's fair to say that these       01:55:57

United States District Court

MARK HOEKSTRA, PH.D. - Direct

1    prove that just the passage of the law standing alone causes          01:55:59
2    this effect or that it's more complicated?
3    A.   What they are going to pick up is the net effect of the
4    law and everything that comes with the law and so to the extent
5    when you pass a law, it makes voters upset, Black and Hispanic      01:56:12
6    voters upset, maybe because you have people out there yelling
7    voter suppression, that might be one reason why they are more
8    likely to vote.

9         Another reason might be when you pass these laws,
10   people feel better about election integrity and, therefore,        01:56:30
11   they are more likely to vote.  That would be another
12   explanation.

13        It could be that there's, you know, these
14   mobilization responses from campaigns.  You know, they respond
15   either just saying, oh, by the way, there's a law and we are        01:56:44
16   wondering if you are more likely to vote, so maybe now you're
17   more likely to vote than you would have been or maybe part of
18   it is to shout about voter suppression and maybe it does and
19   there can be a bunch of other things but those are some
20   examples.                                                           01:57:00
21   Q.   So far we've talked about randomized control experiments.
22   We've talked about and diff-in-diff.  I want to return to
23   regression discontinuity.  What does that mean?
24   A.   So regression discontinuity is, again, another way of
25   trying to get at causal relationships.  So for regression           01:57:16

United States District Court

MARK HOEKSTRA, PH.D. - Direct

1    discontinuity method, the idea is that there's some variable.    01:57:21

2    There's some metric that determines what we would call

3    treatment.  And so -- would you like me to discuss it in the

4    context of voting or something else?

5    Q.   Certainly we need to get to voting in a moment.  But I    01:57:38

6    believe you've got a study about the economic benefits of

7    education.  Maybe describe it just briefly to illustrate the

8    concept of regression discontinuity.

9    A.   So first project I ever published was on the returns to

10   going to a more selective school.  So if you go to, you know,    01:57:51

11   University of X versus X State University, do you earn more as

12   a result of that?  Does it cause you to earn more?

13          And that question is hard to answer because you

14   have -- different people get into those schools; right?  And

15   even conditional on getting in, maybe the really ambitious    01:58:07

16   people go to the more selective school or there's -- there

17   could be lots of differences between the types of people who go

18   to more versus less selective universities.

19          And so the approach that I took was to use this

20   regression discontinuity and I got administrative data from a    01:58:23

21   large flagship state university and I identified the people who

22   were just above the admission threshold, so you applied and you

23   barely got in, right, and so you now have the option of going

24   there.

25          I applied, I just fell short and so you and I have    01:58:38

United States District Court

MARK HOEKSTRA, PH.D. - Direct

1    otherwise maybe similar abilities.  I'll compliment myself,          01:58:43

2    right.  So you and I have otherwise similar abilities.  But you

3    happened to get lucky.  You landed on the right side of the

4    cutoff.  I landed on the wrong side of the cutoff.  And of

5    course we do this with lots of people.  And the idea is, you          01:58:56

6    know, that, essentially, it's random within that small area

7    around that threshold, it's random whether you got in or not.

8          And then we look at your earnings years later and it

9    turns out that people who barely got across earn about 20

10   percent more than people who just fall short.                        01:59:13

11         And that's the idea of a regression discontinuity.

12   You're comparing you think otherwise similar people.  Some of

13   them happen to land on one side of the threshold.  Some happen

14   to land on the other side of the threshold but otherwise we

15   expect these guys would have been similar and we compare their      01:59:29

16   outcomes.

17   Q.   Has anyone applied this sort of method to the question of

18   whether voting costs reduce turnout?

19   A.   Yeah.  There's a paper in *Science Advances* that looks at

20   this and specifically they are looking at data in Texas and         01:59:43

21   Arizona -- not Arizona, Texas and Indiana.  And one thing that

22   is unique about Texas and Indiana is that once you turn 65

23   years old, you don't have to have an excuse to vote absentee.

24         So it's basically automatic if you ask for it, they

25   give it to you.  Before you're 65, I'm going to forget the          02:00:04

United States District Court

MARK HOEKSTRA, PH.D. - Direct

1    rules in Indiana but, for example, in Texas you have to prove                    02:00:07
2    that you're not going to be in the state during any of the
3    times that the polls are open.  I think if you give birth
4    within a certain time which isn't applying to old people
5    probably.  And there's a few other -- if you're out of the                      02:00:21
6    country.  There's a few exceptions but mostly it's pretty hard
7    to get an absentee ballot in Texas when you're 64 whereas once
8    you turn 65, it's pretty easy.

9            And so the idea of the paper is to compare both
10   methods of voting across that threshold and say, hey, do people                 02:00:37
11   take advantage that, hey, now you can vote by mail.  You don't
12   even have to go to the polls?

13           And they look at this, including in 2020 when you
14   might think that's a really big deal, right, to not to have to
15   go into a public place in the middle of a pandemic to vote.                     02:00:54
16   That's a pretty big deal.

17   Q.   And what did they find when they applied that method?
18   A.   Yeah.  So what they find is you reduce voting costs a lot
19   to age 65.  It changed how people vote.  You did see this spike
20   in absentee voting but it didn't change overrule turnout.  And                  02:01:09
21   you can this, the nice thing -- I promised you pretty pictures.
22   So the nice thing about regression discontinuity is you can
23   assess it visually.  Honestly, I think anyone in this room can
24   assess it visually and basically see where the result's coming
25   from.                                                                           02:01:27

United States District Court

MARK HOEKSTRA, PH.D. - Direct

1  Q.    Okay.  So we've pulled up on page three of the study      02:01:28

2  Figure 2.  Talk us through the images here, please.

3  A.    Yeah.  So if you look at the left-hand side, either the

4  upper left or the lower left which shows Texas and Indiana.

5  You know, this shows the share of votes cast that are cast      02:01:43

6  absentee and what you see is, sure enough, at age 65 when the

7  states make it much easier for you to vote absentee, you see

8  people take up the state on that.  Like people are -- people

9  are choosing this method; right?

10        And then the question for assessing the empirical        02:02:01

11 impacts of changes in voting costs on turnout, or another way

12 to think about it would be does the inability to vote absentee,

13 is that such a burden that it keeps some people from voting at

14 all?  And the way they do that is by then testing do I see a

15 discontinuity in turnout that is the likelihood that you vote   02:02:23

16 with any method at age 65?

17        And if voting costs matter a lot, if voting costs of

18 going to the polls including in the middle of a pandemic are,

19 like, such a large cost that they prevent people from voting,

20 we should see a jump, we should see a discontinuity; right?  I  02:02:42

21 know the transcript can't pick up the hands but you want to see

22 a jump much like you do on the left-hand side.

23        And if you look at the right-hand side, all of you

24 visually can see -- I mean, you would have to squint really

25 hard to try to argue that there's a jump there at age 65.  It   02:02:58

United States District Court

MARK HOEKSTRA, PH.D. - Direct

1   looks pretty smooth.  And so the authors conclude there's no                    02:03:02

2   evidence that this change in voting costs changes turnout.

3   Q.   Have any of the experts in this case on the plaintiffs'

4   side authored studies on whether voter ID has a discernible

5   effect on voter turnout?                                                        02:03:21

6   A.   Yes.  So Professor Minnite wrote a study on this on voter

7   identification laws.  She criticized another paper that claimed

8   to find effects on turnout and, broadly speaking, I think it's

9   fair to say Professor Minnite concluded that the literature on

10  that was inconclusive, that she didn't think that there was                     02:03:41

11  evidence that these voter ID laws impacted things one way or

12  the other.

13  Q.   Are you familiar with Professor Hersh?

14  A.   I am familiar with Professor Hersh.

15  Q.   Does he have a publication on the same question?                           02:03:55

16  A.   So I'm not -- so it's been a while since I've looked at

17  that paper but, in general, he has a paper with I think someone

18  from Stanford where they are arguing that they think that most

19  of these voting laws seem to have not much of an effect.

20  Q.   Let's think about -- we've talked about ethnic groups and                  02:04:16

21  how it may affect them.  Let's think about income disparities,

22  though, whether increasing the costs of voting has a

23  disproportionate effect on low-income voters.  Did you consider

24  whether they may be more vulnerable to proof of citizenship

25  requirement than others?                                                        02:04:37

United States District Court

MARK HOEKSTRA, PH.D. - Direct

1   A.   Yeah.  So I both looked through the evidence.  Now I    02:04:38

2   believe it's mostly Professor Burch who is making this argument

3   in her report.  I both looked at the papers that Professor

4   Burch cited in support and evaluated those and I also found two

5   I believe credible papers on this topic.    02:04:54

6   Q.   Okay.  You've -- we've already talked about the Medicaid

7   paper.  Let's not rehash that in detail, but what does that

8   suggest about income effects to DPOC requirements?

9   A.   Certainly the thing about Medicaid is you're only eligible

10   for Medicaid if you're poor.  So the only people who are in    02:05:11

11   that study, the only people who could be impacted are people

12   who are eligible for Medicaid and that means you're really low

13   income.  You're not just low income, you're really low income.

14   And, obviously, there they found no evidence that requiring

15   people on Medicaid to prove citizenship had any impact on    02:05:26

16   enrollment or staying on Medicaid.

17   Q.   Did you look at a study that concerned local economic

18   shocks?

19   A.   Yeah.  So there's another study.  And so, again, the

20   question would be, you know, if Professor Burch were right,    02:05:46

21   then when we, you know, impose, say, a negative economic shock

22   on an area, the voting cost theory would say, well, maybe those

23   people would be -- are now less likely to be able to vote.

24   Maybe you would see turnout go down; right?

25          So the way that they study this is they look -- for    02:06:05

United States District Court

MARK HOEKSTRA, PH.D. - Direct

1    example, you have some regions that might have a big furniture                    02:06:07
2    industry and maybe you have some regions that might have a big
3    automotive industry and so suppose that what happened around
4    2000, right, so all of a sudden a lot of furniture started
5    getting built, manufactured in Asia and it became pretty hard         02:06:22
6    for these U.S. furniture firms to compete with that.

7            And so there's this big negative shock but it's
8    focused on these areas where there's a big furniture industry.

9            And so what they do is they compare changes in
10   turnout in those areas to changes in turnout in other areas           02:06:38
11   that have other industries and they say, well, if income really
12   matters, if resources really matter to overcome the cost of
13   voting, we should see this place with a negative shock.  We
14   should see them become less likely to vote.

15           And the same -- the inverse would be true for the              02:06:56
16   positive shocks.

17   Q.   And what do they find?

18   A.   Yeah.  So they found the opposite.  So they found when you
19   had a positive shock, you were actually less likely to shock.
20   When you had a negative economic shock, when things got worse,        02:07:10
21   people became more likely to vote.  And, again, like it's not
22   explicitly randomization but the point is that you have these
23   international trends, like all of a sudden China starts
24   producing furniture so it's going to have this bigger impact in
25   one group, one area than another.  And it's an accepted              02:07:28

United States District Court

MARK HOEKSTRA, PH.D. - Direct

1   research design to get at causality and, again, they are                  02:07:31

2   finding literally exactly the opposite of what Professor Burch

3   would have you believe.

4   Q.   One more study that you relied on regarding economic --

5   effect on low-income voters something about a Spanish lottery;             02:07:51

6   is that right?

7   A.   Right.

8   Q.   What is that study?

9   A.   Yeah.  So one way, you know, one way social scientists

10  have gotten at the impact of income, the impact of resources on            02:08:00

11  outcomes, including voting, is by exploiting lottery shocks.

12  There's -- I'm going to forget the details about the Spanish

13  lottery but there's sort of oddities of the Spanish lottery

14  that make it so that everybody in the village kind of

15  collectively buys tickets so everybody in a town.  They are all            02:08:19

16  in on the same lottery ticket which is, like, different, right.

17  It's individual here.

18        In Spain I think it's because they made the price of

19  the tickets really expensive.  The way it works is they are

20  basically all in and they call it like the Christmas lottery so            02:08:34

21  people who will buy these tickets.

22        But the impact of that is when you win, and I think

23  my recollection is they might win two or three percent of the

24  GDP.  It's, like, quite a lot.  And so what these authors do is

25  they look at, okay, what happens when places -- what happens to            02:08:52

United States District Court

MARK HOEKSTRA, PH.D. - Direct

1  voting in places where they win where they get this money                    02:08:56

2  showered upon them which in theory could help them overcome the

3  costs of voting versus another village that played but didn't

4  win.  And of course the nice thing about the lottery is it's

5  random, right, so some win by chance, some don't win by chance.             02:09:09

6        And they found no effect of these really big local

7  economic shocks which, again, is like inconsistent with what

8  Professor Burch would have you believe.

9  Q.  The Spanish lottery so it's really a foreign election

10  system, though; right?                                                      02:09:26

11  A.  Yeah.  So, I mean, they are people and they have elections

12  but it is in Spain.  It's not in the U.S.

13  Q.  Right.  Okay, so in comparison to those studies that you

14  were looking at in forming your opinion, what did you -- what

15  did you -- let me put it is this way:  Did you review the                   02:09:42

16  studies on which Professor Burch relied for the idea of

17  low-income disparities?

18  A.  I did.

19  Q.  And did you look at her study from Brodkin?

20  A.  I did.                                                                   02:09:55

21  Q.  And let's pull that up and have you discuss this.  What

22  was going on in the study from Professor Burch?

23  A.  Yes.  So what they are trying to say is essentially do

24  these -- does the red tape around -- I guess this is claiming

25  welfare.  Does the red tape associated with claiming welfare               02:10:20

United States District Court

MARK HOEKSTRA, PH.D. - Direct

1    the fact that you have to fill out forms and this sort of          02:10:21
2    thing, does that have a bigger effect on low-income people
3    versus on higher-income people?  And that is -- it's a
4    reasonable question, right.  It would be directly relevant for
5    this.                                                              02:10:36

6         The problem is, like, the paper is done really badly
7    and what they did is, they had a data set where they only
8    looked at people who left welfare and then they classified the
9    reasons into one of two groups.  They said either you leave
10   welfare for procedural reasons, which is that you didn't file     02:10:53
11   the right form or you didn't do something that you were
12   supposed to do, or nonprocedural reasons, which is basically
13   you made too much money; right?

14        And then what they did is they compared conditional
15   on leaving, they compared across income levels and they said     02:11:08
16   aha, the low-income people conditional on leaving were more
17   likely to leave for a procedural reason.  That's mechanical.
18   They are not going to leave because they got too much money
19   because you -- they are literally low income.

20        So the only answer that study ever could have gotten        02:11:25
21   is the answer they came to which is, like, not how do you
22   research.  There's a right way to do this study, which would
23   be, okay, we have some costs that get imposed on some people
24   and not on other people.  And then let's see what the effect is
25   on higher-income and lower-income people and do they leave?       02:11:45

MARK HOEKSTRA, PH.D. - Direct

1   That's the way you would do that study.  But they don't do that    02:11:48
2   because they are only looking at leavers.
3   Q.   So help me understand that.  Among the people who are
4   leaving, some leave for procedural reasons.  I'll call it
5   paperwork -- that may be inaccurate shorthand -- and others       02:12:02
6   leave for substantive reasons.  Why is it that -- why is this a
7   mechanical result within that group?
8   A.   Yeah.  The reason is because if you're low income, by
9   definition, you're not going to leave for nonprocedural reasons
10  because you're low income.  You didn't earn too much for         02:12:20
11  welfare.  You're low income.
12       On the other hand, if you're higher income, there's
13  two ways for you to have left; right?  One is you didn't do the
14  paperwork, and the other is you made too much money.  So it is
15  always going to be true that the fraction of higher income       02:12:34
16  people who left, conditional on leaving, it's always going to
17  be true that they were more likely to leave for income-related
18  reasons than this other group, than the low-income people.
19       It's not a test of whether -- I mean, it's --
20  literally it's -- I don't know -- it's bizarre.                  02:12:52
21  Q.   Let's -- in thinking about the economic disparities of
22  voter ID, did you consider the economics, the socioeconomic
23  status of naturalized citizens?
24  A.   Yeah.  So one of the things that had to be pointed out is
25  obviously these federal-only voters, they are going to be the    02:13:16

United States District Court

MARK HOEKSTRA, PH.D. - Direct

1    ones who have to prove -- prove citizenship, right.  And so if          02:13:19
2    you were to believe -- and I don't think there's good evidence
3    for it but if you were to believe, well, maybe those people are
4    low income and they are not going to be able to do this as
5    well.  Well, it turns out like naturalized citizens do pretty          02:13:33
6    well.

7            And so -- I have a table in my report where I
8    compare, you know, citizens by birth in Arizona to naturalized
9    citizens and they are not crazy different.  But basically on
10   almost every measure, the naturalized citizens are higher SES.         02:13:52
11   They are higher income, better educated.  They look different
12   on race.  That's not surprising.  But they are, in general,
13   they are more advantaged than citizens by birth.
14   Q.   And the citizens by birth column in your table, is that
15   just low-income citizens by birth or all citizens in Arizona?          02:14:14
16   A.   That's all citizens in Arizona.
17   Q.   Let's talk now about the idea that negative interactions
18   with the Government through maintenance processes may
19   discourage voters from participating.  You're familiar with the
20   arguments made by the plaintiffs on that issue?                        02:14:48
21   A.   Yes.
22   Q.   And you looked at several studies on this issue as well?
23   A.   I did.  I certainly looked at those studies and I think
24   there's one in particular that they failed to mention that is
25   especially related.                                                    02:15:02

United States District Court

MARK HOEKSTRA, PH.D. - Direct

1   Q.   Biggers and Smith?                                          02:15:04

2   A.   Correct.

3   Q.   All right.  Tell us the method that Biggers and Smith used

4   in their research.

5   A.   Yeah.  So Biggers and Smith, again, are going to use this   02:15:11

6   difference-in-differences so they are going to look at changes

7   in voting over time and they are going to take seriously this

8   assumption that you need to hold, this common trends, and they

9   do it a little bit differently here but they do it well.  They

10  are doing smart things.                                          02:15:27

11        The question they are attempting to answer is when

12  Florida announced that they were going to go and essentially

13  try to ensure that people were citizens, they went and had a

14  target list of people and then some subset of those, they

15  actually sent them letters saying you're going to need to prove 02:15:47

16  citizenship and if you don't, you might lose the right to vote

17  and so on and so forth; right?  So they got this kind of

18  threatening letter.

19        So then a big chunk of those people actually can go

20  through and prove citizenship so they incurred that voting      02:16:03

21  cost; right?  And then later on the state, because there are

22  lawsuits over all of these things forever; right?  Due to the

23  lawsuit, the state retracted that and they sent them another

24  letter and said, more or less, just kidding.  You guys can all

25  vote.                                                            02:16:23

United States District Court

MARK HOEKSTRA, PH.D. - Direct

1   Q.   Did everyone get the letter or just the ones who had          02:16:24

2   responded with the proof?

3   A.   Everyone got the letter I believe, yeah.

4   Q.   Proceed.

5   A.   And so then what they do is they say, well, you know, you     02:16:32

6   made these people incur a cost and they might have viewed this

7   as a negative interaction.  I wasn't here for McDonald's

8   testimony but in his report he would have you believe that when

9   you have this negative interaction with law enforcement, that's

10  going to deter you from voting.  You will be less likely to       02:16:51

11  vote.  So they test that.  Right.  So in theory that could be

12  true.  Let's test it.

13       It turns out to be the case that those people were

14  more likely to vote.  And so, again, it suggests that

15  there's -- there are these other things that happen when you      02:17:04

16  pass these policies, when you do those things, and they tend to

17  have kind of the opposite effect that -- sometimes zero but

18  sometimes the opposite effect of what the experts on the other

19  side would have you believe.

20       And then they go through again and they worry about,         02:17:19

21  well, maybe, you know, essentially they worry about that

22  assumption for difference-in-differences and it looks good.  I

23  mean, that's the short version.

24  Q.   Let's think now about those studies on which Professor

25  McDonald relies.  That negative interaction will discourage       02:17:40

United States District Court

MARK HOEKSTRA, PH.D. - Direct

1    relationship.  I believe he relied on three studies.  The first   02:17:44
2    one was by Professor Burch as it happens?
3    A.   Correct.  I remember.
4    Q.   And what was -- do you believe that Professor Burch's
5    study supports Professor McDonald's assertion?                     02:17:54
6    A.   The short answer is no, it did not and I don't think it
7    should be controversial that it does not.  Professor McDonald's
8    assertion is that if you have this negative interaction with
9    law enforcement types, it causes you to be less likely to vote.
10   That's the assertion.                                              02:18:17

11        Professor Burch doesn't attempt to answer that causal
12   question at all.  So she has a paper where she's basically
13   saying how often do felons vote compared to other people.  It's
14   a descriptive question.  There are lots of differences between
15   felons and other people, right, and so you wouldn't want to       02:18:31
16   attribute whatever the difference is only to the fact that they
17   had this negative interaction with law enforcement.

18        Different people commit crimes and don't commit
19   crimes.  So they didn't make any causal claims in that paper.
20   She didn't have a design to get at causality in that paper and    02:18:49
21   yet Professor McDonald is citing that as evidence of this
22   causal assertion which is wrong.  It's bad.  He shouldn't do
23   it.
24   Q.   Professor McDonald also looked at a paper written by a
25   Weaver and Lerman, L-U-H-R-M-A-N I think.                         02:19:04

United States District Court

MARK HOEKSTRA, PH.D. - Direct

1        Did he look at such a paper, sir?                    02:19:10

2   A.   He did.  So that paper, you know, again, struggles with

3   this issue and if you read it carefully, like, they acknowledge

4   the people -- they are looking at people I believe who were

5   arrested, charged, and perhaps convicted I believe were the     02:19:22

6   three different groups and then they are looking at voting

7   outcomes of those people compared to others.

8        And those authors are obviously aware of the problem

9   that these two groups can be different in lots of ways.  We

10  have a correlation that that is now a causation issue and they   02:19:37

11  try to do some things but they don't -- I mean, they don't have

12  a good design.  They don't have -- you know, they don't have

13  the equivalent of a regression discontinuity.  They don't have

14  something that comes close to a randomized control trial.  And

15  ultimately, and I think even the authors acknowledge if you      02:19:54

16  read the paper they will say yeah, there are things here that

17  we can't control for that could be problems for us and we can't

18  do it.

19  Q.   The third paper that Professor McDonald relied on

20  Ben-Menecham.  I think it's B-E-N, hyphen, M-E-N-E-C-H-A-M.      02:20:09

21  Are you familiar with this study, sir?

22  A.   I am.

23  Q.   And what was the design of the study?

24  A.   So in that study they are looking at the impact of traffic

25  citations from police on voting.  And I believe as near as I     02:20:21

United States District Court

MARK HOEKSTRA, PH.D. - Direct

1    can tell, that study is better.  That study is pretty good.                02:20:25

2    And so, you know, I think a fair characterization of it is for

3    whatever reason, when you give people traffic tickets, they are

4    a little bit less likely to turn out as a result of that.

5    Notably they are not looking at a voting-related thing at all.              02:20:42

6    It's a traffic citation.  It has nothing to do with voting.

7    And the other thing is, like most of us who get traffic

8    citations, we actually did something wrong.  We were speeding,

9    went through a red light or whatever it is.

10        If you think about those federal-only voters that                     02:20:57

11   you're worried about, we're talking about people who are maybe

12   citizens who just have to prove documentation.  It's not

13   getting at that question because those people are just, you

14   know -- it's much closer to the Biggers and Smith article than

15   it is to this one.                                                          02:21:12

16        THE COURT:  So is it just kind of a curiosity that

17   people who have gotten traffic citations are less likely to

18   vote?

19        THE WITNESS:  So --

20        THE COURT:  Is there some conclusion as to why or is                   02:21:24

21   it just isn't this interesting that these things appear to be

22   totally unrelated?

23        THE WITNESS:  Welcome to academia.  I think what the

24   authors would say is they would say, well, we know that some

25   groups have much more interaction with law enforcement than                 02:21:41

United States District Court

MARK HOEKSTRA, PH.D. - Direct

1  others and so, for example, Black people are more likely in                    02:21:43

2  general to be arrested, convicted, all of these things.  And so

3  they are asking, well, does that impact, you know -- could that

4  have this impact on turnout?

5         And they don't -- their clean issue method of getting       02:21:55

6  at it is in the traffic citations thing, which is maybe not --

7  really not what you would want but I'm defending their paper

8  now so I think that's what they would say, though.

9  BY MR. LANGHOFER:

10  Q.   Did any of the studies that Professor McDonald relied on     02:22:10

11  consider a challenge to someone's voter registration as opposed

12  to some other unlawful act?

13  A.   No.

14  Q.   Biggers and Smith, though?

15  A.   Biggers and Smith did exactly that.                          02:22:22

16  Q.   All right.  Professor Burch relied on a study Reny,

17  R-E-N-Y.  Am I right?

18  A.   Yes.

19  Q.   Let's talk about this.

20         MR. LANGHOFER:  And why don't we go to page 17 of          02:22:41

21  that study?

22  BY MR. LANGHOFER:

23  Q.   Let's start with what is the question that Reny was trying

24  to answer?

25  A.   We're going to have to go back.  I'm remembering many of     02:22:51

MARK HOEKSTRA, PH.D. - Direct

1    these papers.  I'm having a hard time remembering this          02:22:54
2    particular one.  I apologize for that.
3    Q.    Don't apologize.  I'm taking you back to the first page,
4    the abstract.  Let me know if you need more time to read that.
5    A.    I remember now.                                           02:23:23
6    Q.    We're going to flip forward to page 17.  I would like you
7    to describe the research model that they were using in this
8    paper.
9    A.    Yes.  So the way -- you know, the way that Professor -- it
10   just has background.  The way that Professor Burch is citing    02:23:37
11   this paper is she's saying that this paper is finding evidence
12   on the impact of threat of immigration crackdowns I believe is
13   the language that Professor Burch used which is characterizing
14   this paper.
15         And specifically the effect of that on voting and you     02:23:53
16   think broadly, okay, you could have a study on the impact of
17   the threat of immigration crackdowns or the impact of
18   immigration crackdowns on voting.  You might imagine, well,
19   over here you have crackdowns, over there you don't and now we
20   compare and maybe a difference-in-differences framework and we  02:24:13
21   see what the effect is.  That's actually not what the paper
22   does.  It doesn't do anything close to that.
23         So instead, what the paper does is -- what do they
24   call it?  This is like academic speak.  Let me get the term
25   right.  Essentially they don't have variation in immigration    02:24:33

United States District Court

MARK HOEKSTRA, PH.D. - Direct

1    crackdowns.  So what they have is what's highlighted.          02:24:41

2          So, you know, in the first model they say, well, we

3    think there's a bigger threat to Hispanics later as we get

4    closer to the election versus farther away which is, like, kind

5    of wild, like, why is there a bigger threat closer to the       02:24:57

6    election versus, like, farther away from the election?  That's

7    not what I would think of when I think of the threat of an

8    immigration crackdown, is proximity to the election.  That's

9    the first way they define it.

10          The second way they define it is whether the state       02:25:13

11   has a competitive Senate race in 2018 and, again, that is not

12   what I would think of when I think of the threat of an

13   immigration crackdown, is my Senate race competitive or is it

14   not?  But that is exactly how they are doing it.

15          The third thing is, they have a visit for whether        02:25:29

16   Trump came because I don't know.  Like whether Trump visited

17   the state is a threat of an immigration crackdown?  That

18   doesn't make sense either.

19          The fourth thing, they operationalize threat as

20   whether the state had unified Republican control of Government.  02:25:47

21   Again, like that's -- I mean, to interpret that as the threat

22   of immigration crackdown is like a little wild.

23          And then the last thing, they have one more where

24   they are actually classifying some immigration laws.  But

25   that's broadly what the paper actually does that Professor       02:26:08

United States District Court

MARK HOEKSTRA, PH.D. - Direct

1   Burch is citing as support for his hypothesis, that threat of          02:26:11

2   immigration crackdowns is going to, you know, scare off

3   Hispanic voters.  Yeah, go ahead.

4   Q.   In your mind, does the Reny study support the idea that

5   negative interactions with the Government deter voting?          02:26:24

6   A.   No.

7   Q.   Professor Burch had one more study on this negative

8   interaction problem and that was by Terry (phonetic) concerning

9   a fear of responding to the census.  Are you familiar with that

10  study?          02:26:43

11  A.   Yes.

12  Q.   Can you tell us about what was going on in that research?

13  A.   Yeah.  So in that research there, you know, they are

14  basically just asking -- they're asking people questions and

15  trying to figure out, you know, what are they worried about.          02:26:54

16       And Professor Burch sort of incorrectly says that

17  both Black and Hispanic people are failing to respond because

18  they are scared about deportation, like the article doesn't say

19  anything about Black people worrying about deportation.  That

20  would be kind of odd.  It's only about Hispanics.          02:27:15

21       And the other issue is that Burch is trying to make

22  this argument that even -- even people who are citizens might

23  be intimidated by this and might have this fear that causes

24  them to be less likely to vote out.  But in the article they

25  are actually not splitting -- they are not splitting up          02:27:36

United States District Court

MARK HOEKSTRA, PH.D. - Direct

1    Hispanics by citizens versus not.                          02:27:39

2            So when the article talks about yeah, there's

3    Hispanics who are a little bit scared to answer some questions

4    because of fear of deportation, it's not -- they are not

5    talking about Hispanic citizens.  They are talking about of    02:27:50

6    Hispanics period.  And, of course, undocumented Hispanics might

7    well be worried about being deported because they are

8    undocumented.

9    Q.   All right.  Let's turn our attention to really a new topic

10   and that's unlawful voting.  Also sometimes called voter fraud.  02:28:06

11   You're familiar with Professor Minnite's report on this issue?

12   A.   Yes.

13   Q.   And you have a couple of criticisms of her report I think.

14   Let's start with the definitional concern.

15   A.   Yeah.                                                 02:28:23

16   Q.   What is your view there?

17   A.   Yes.  So, I mean, as I see it, and, frankly, as some

18   others see it, there's two problems with her definition.  One

19   is that -- and perhaps the most important problem is that it

20   requires criminal intent.  So if somebody you know votes as a    02:28:37

21   non-citizen but they did it without criminal intent, she won't

22   count it.

23           And that might well be true, that in order to charge

24   something, that you need to have evidence of criminal intent.

25   But if -- in her own report, she cites these quotes from      02:28:58

United States District Court

MARK HOEKSTRA, PH.D. - Direct

1   legislators who don't specifically talk about that in the   02:29:03

2   quotes.  They just say, well, we have these people who are

3   voting and we have never verified that they are citizens and we

4   would like to verify that they are citizens before they vote.

5         So the state can have an interest in keeping people   02:29:15

6   from voting as non-citizens even if those people didn't have

7   the intent to, you know, corrupt the system, for example.

8   That's the first issue.

9   Q.   Her definition she also makes a distinction between

10   unlawful voting by an individual or third parties being   02:29:32

11   responsible for this.  Do you have a view on that part of her

12   definition?

13   A.   Yeah.  And again my view here is echoed by -- like,

14   frankly, by some of the same authors that she cites in her

15   report which is that -- I don't know why we are only interested   02:29:46

16   in measures of fraud that happened from voters as opposed to,

17   like, third parties, like political parties or, you know, or

18   these different campaign organizations.

19         And if any fraud had been perpetrated by those

20   groups, like, she's not going to count it in her definition.   02:30:06

21   And so it's an unnecessarily narrow definition of voter fraud

22   in my view.

23   Q.   Sir, you are not opining about the incidence of voter

24   fraud in the state, are you?

25   A.   No.  I don't know what it is.   02:30:22

United States District Court

MARK HOEKSTRA, PH.D. - Direct

1  Q.   You do have some views, though, on the ease or not of          02:30:25
2  measuring the incidence, don't you?
3  A.   Sure.   So one of the issues -- and it's not recognized at
4  all.   I wasn't here for her testimony but it wasn't recognized
5  at all in her report, which is that when you are trying to        02:30:40
6  measure cheating or corruption, like, the people a cheating and
7  being corrupt don't usually like to be caught.   And so it's a
8  little bit hard sometimes to figure out how much is going on
9  because those people don't like to be caught.
10         And that is a -- I mean, it's acknowledged maybe not        02:30:54
11 universally in the literature but in most of these studies that
12 test for it, they acknowledge it, like, hey, that's hard.
13         And Professor Minnite doesn't acknowledge that at all
14 and yet, I mean, you study corruption, like, this is a big
15 issue.   Are you sure you can measure it?   And are you sure that  02:31:14
16 you can measure the type that's -- that you want to measure.
17 Q.   There are some ways of measuring corruption, right?
18 A.   So certainly these authors of some of these studies that
19 she cites, they are going to propose a test and, you know, I
20 think the way I would think about it is it's, like, you know,      02:31:34
21 the test is going to capture what it can capture and maybe you
22 find evidence of it.   Maybe you don't.   But I think when you
23 report the results of that or in her case, when you interpret
24 this, it ought to be interpreted with humility that I have a
25 particular test for a particular form of fraud and not take        02:31:54

United States District Court

MARK HOEKSTRA, PH.D. - Direct

1    that and say, therefore, I know for sure there's no fraud.     02:32:00

2    It's just not a principled stand to take on this type of issue

3    given the known difficulty of measuring it.

4    Q.   Have you looked into whether other academic reviews of the

5    incidents at which fraud is -- excuse me, not fraud, crime is     02:32:17

6    detected?

7    A.   Yeah.  So, you know, one of the -- arguably the primary

8    source of evidence that Professor Minnite is citing in her

9    report is that there are relatively view prosecutions and

10   convictions for voter fraud.  And obviously the first thing is,     02:32:35

11   we have this -- you know, she's using this unnecessarily narrow

12   definition in the two ways that I talked about.

13        But then the other issue is that it can be hard to

14   detect these things and it can be hard to -- especially for

15   fraud, you have to prove intent.  It has been hard to prosecute     02:32:53

16   these things.  It can be hard to put together everything.

17        I don't know what fraction of fraud incidents get

18   prosecuted because I don't know how much fraud there is; but

19   when you look at other crimes, for example, if you look at

20   property crimes, it turns out that only seven percent of     02:33:07

21   reported property crimes are reported and prosecuted by police.

22        And so that's a case where we have a known victim and

23   where there's usually some incentive to report the crime.  Like

24   if I want my stuff back, I've got to report it.

25        And even in those cases, like, it's only 6.7 percent     02:33:27

United States District Court

MARK HOEKSTRA, PH.D. - Direct

1    of those things are actually being prosecuted criminally and        02:33:31

2    presumably the number is much, much more, the fraction is much,

3    much lower for voter fraud.  But I don't claim to know what

4    that is because I don't know how common voter fraud is or is

5    not.                                                                  02:33:50

6    Q.   Do you have any experience with the prosecution of

7    academic cheating?

8    A.   I do.  So I think one illustration that I used in my

9    report is, you know, I've been responsible directly for the

10   grading of around 10,000 undergraduates and a big chunk of          02:34:10

11   those when I was at TA in graduate school for these big

12   principal sections.  And if you were to look and say every

13   university that I have been at has a process where you can

14   prosecute cheating.

15        So a faculty member can say I know this student               02:34:28

16   cheated.  They go through this judicial process within the

17   university and there are penalties and the penalties can

18   include suspension and expulsion from the university; right?

19        And if you were to go look see what Professor Minnite

20   does, out of these 10,000 students there are exactly zero          02:34:47

21   prosecutions in the university system.  There are none of those

22   10,000 students were ever prosecuted, you know, much less

23   convicted or penalized for cheating.

24        And I think it would be a really bad mistake to look

25   at it and say, well, therefore, there must not have been any        02:35:06

United States District Court

MARK HOEKSTRA, PH.D. - Direct

1  cheating by any of those 10,000 students on any of those exams    02:35:09
2  or any of those assignments.  Like I was there.  Like I sit
3  there and I watch kids.  I'm sure some of them cheat.  I'm just
4  not sure I can prove it and I'm not sure it's worth the hassle
5  of prosecuting it.  And so as a result, nobody does that.    02:35:23
6        And so, again, this idea is like just because you
7  don't have prosecutions doesn't mean the underlying behavior
8  doesn't exist.  Maybe it doesn't exist or maybe it exists and
9  you don't detect it.
10        And I think that's the prudent view on this thing.    02:35:43
11        MR. LANGHOFER:  Just one more topic Your Honor, voter
12  confidence.  I would like to keep powering on.  So I know you
13  like a 2:30 break.
14        THE COURT:  We'll go ten more minutes and then we'll
15  break.    02:35:59
16        MR. LANGHOFER:  Thank you, Your Honor.
17  BY MR. LANGHOFER:
18  Q.  So, Professor, you're familiar with the ideas presented by
19  the plaintiffs on the potential effect on voter confidence of
20  these laws?    02:36:10
21  A.  Yes.  Professor Minnite in particular I think made strong
22  statements about this.
23  Q.  And have you reviewed surveys on public confidence in the
24  electoral process?
25  A.  I have.    02:36:27

United States District Court

MARK HOEKSTRA, PH.D. - Direct

1  Q.   And what have you found?                                    02:36:28

2  A.   Yeah.  So in general, to my knowledge, there's no survey

3  specific to Arizona.  But there are a couple of different

4  national surveys that ask people essentially how much fraud do

5  you think there is and fraud of different types.                 02:36:39

6        And, for example, if we take those numbers and impose

7  those numbers on Arizona, which I think is arguably

8  conservative for reasons we can talk about, you know, what you

9  get is you get I think 700,000 registered voters in Arizona

10 believe that -- believe that non-citizen voting is very common, 02:36:58

11 so that's 700,000 people out of roughly 4.2 million registered

12 voters in Arizona.

13       If you look at how many think there's a great deal of

14 election fraud, that number is about 1.5 million out of the 4.2

15 million registered voters.  So it's clear there's -- I mean for 02:37:20

16 better or worse, there's a lot of people in Arizona who think

17 there's a problem.

18       And one potential benefit of these laws could be to

19 help persuade them that the State is taking, you know,

20 precautions to make it harder to do those things and hopefully  02:37:35

21 improve perceptions.

22 Q.   These numbers you just gave, those do assume that the rate

23 of voter confidence or lack of confidence in Arizona tracks the

24 national survey; right?

25 A.   That's right.  And so the reason I said I think that's     02:37:53

United States District Court

MARK HOEKSTRA, PH.D. - Direct

1    conservative, because clearly there was political support for        02:37:56
2    passing these laws in Arizona and, you know, in general, I
3    think the way -- politicians don't tend to do things that their
4    constituents don't like.

5            And so what that tells you is there is some popular        02:38:10
6    support for these sorts of things which, if anything, I think
7    suggest -- means that Arizonans are probably more worried about
8    this than the average voter in U.S. but that's -- you know, I
9    think that's why I would view it as conservative.

10   Q.    Have you looked at any academic research on whether          02:38:30
11   election integrity measures have an effect on voter confidence?
12   A.    Yeah.  I have.  So, for example, the Pons paper that we
13   studied earlier didn't find any effects on voter confidence of
14   these voter ID laws and we can talk about that.

15           The best evidence that these things could possibly         02:38:51
16   matter would be this study by Endres and co-author and, again,
17   this is using that same experiment so it's sending out fliers
18   to a random set of people and the fliers will flag that, by the
19   way, there's a voter identification law in your state and the
20   control group will just get a flier that says, oh, by the way   02:39:12
21   there's an election; right.

22           And what they did is they followed up with a survey
23   and asked how much faith do you have in election integrity.
24   So, again, the idea is not all these people were aware of what
25   the law was or at least it wasn't in the top of their minds.      02:39:26

United States District Court

MARK HOEKSTRA, PH.D. - Direct

1  By sending them this flier, they moved it to the top of their          02:39:30

2  minds.  They made people aware that there's this safeguard in

3  place against -- in this case it's really voter impersonation

4  and they looked at -- they look at these measures of confidence

5  in election integrity and they find evidence, you know, here          02:39:47

6  that essentially those -- knowledge of those restrictions

7  improved perceptions of integrity.

8  Q.   I see that -- I put on the screen the Endres and

9  Panagopoulas study.  Do they find a very strong effect on voter

10 confidence?                                                           02:40:12

11 A.   My recollection is I know there was a couple percentage

12 points but I'm not sure I'm going to remember exactly.  So I

13 don't know if you characterize one, two, three, percentage

14 points as big or not.

15 Q.   It's not double digits?                                         02:40:24

16 A.   It's not double digits, yeah.

17 Q.   I see that I have missed a section of my outline so I said

18 one more topic but there's actually now one more.  I want to

19 talk about administrative data.  And there's been some concern

20 expressed about whether databases used by the Government to           02:40:39

21 perform their duties is sufficiently reliable.  In the academic

22 community, what is the view of the reliability of

23 administrative data?

24 A.   The view is it's the best you're ever going to get.  And

25 it's really good.  So typically the -- you know, the              02:40:56

United States District Court

MARK HOEKSTRA, PH.D. - Direct

1   alternative is to use surveys where you're asking people          02:41:00
2   questions and you're relying on them to tell you the truth.
3   And in certain contexts, we might worry about that or we might
4   worry about whether people can remember.  In some cases, that's
5   the best you're ever going to do.  For example, voter           02:41:13
6   confidence, that's probably the best you're going to do.

7           But in general, like, years ago all of these famous
8   economists, including David Card, who won a Noble Prize a
9   couple years ago, wrote this open letter to the federal
10  government saying please make administrative data available to   02:41:27
11  more researchers because this is so much better than everything
12  else that you can do with data sets out there that we can
13  answer questions that you wouldn't be able to answer.  Like
14  this is literally, like, it sets the bar for data quality.

15          And that is -- and I think that's true also in           02:41:42
16  McDonald's work, for example, and we can talk about that if you
17  would like.
18  Q.   Has Professor McDonald relied on administrative data in
19  his own written publications?
20  A.   Yeah.  He has.  He cites I think seven papers in these top   02:41:55
21  two political science journals.  I think four or five of them,
22  five of them I think use administrative data on voting.  It's
23  clear it's obviously good enough to publish in the very best
24  political science journals.  He has a project on comparing
25  voter turnout from administrative data to these post-election    02:42:13

MARK HOEKSTRA, PH.D. - Direct

1    surveys on turnout.  And so they ask you after the election,    02:42:18

2    like, "Did you vote?"  And it turns out, it seems like people

3    lie.  They overestimate.  They overstate how often they voted.

4            And when you look at Professor McDonald's paper on

5    that, he doesn't say, oh, the administrative data must be    02:42:31

6    wrong.  Like because people are saying they voted and yet it

7    looks like we don't have enough votes cast.  He's saying, no.

8    No.  No.  The administrative data are actual turnout.  He

9    actually calls it actual voting or actual turnout and yet what

10   people are saying doesn't track that.    02:42:48

11           And so what is explaining that?  What is explaining

12   the problem is the point of the paper.  But implicit in that is

13   this acknowledgment that administrative data are, you know --

14   you know, set the bar for data quality for social science

15   research.    02:43:03

16   Q.   And while we're talking about data, Professor McDonald

17   prepared a couple of tables, Tables 4 and 5 in his report, that

18   talk about the demographics of voters who were -- well,

19   statewide residence and then different categories of voters.

20   Do you recall those tables?    02:43:21

21   A.   Yes.

22   Q.   And you expressed some concern about the way those tables

23   were organized?

24   A.   Yes.

25   Q.   Can you explain to us your view there?    02:43:28

United States District Court

MARK HOEKSTRA, PH.D. - Direct

1    A.    Yeah.  So there's two things.  One is on inferring                    02:43:31

2    discrimination, which I assume we'll get to that in a minute;

3    and the other on -- you know, there's some ambiguity.  So the

4    trouble is, when you look at these groups, federal-only voters,

5    suspended, those voters whose citizenship has been suspended or  02:43:44

6    canceled, what Professor McDonald is doing is comparing those

7    to active registered voters in Arizona.

8          And that is going to be the right comparison if you

9    believe that everybody in each of those three groups is a

10   citizen.  That's arguably the right benchmark.  The problem is,  02:44:02

11   like, we don't know -- like he doesn't know, I don't know

12   whether all of these people in those three groups are actually

13   U.S. citizens.

14         And so, you know, on the other extreme, if all of

15   those people were non-citizens, then it would be inappropriate   02:44:20

16   to be comparing them to actively registered voters.  Instead,

17   it would be appropriate to compare them to the Arizona

18   population.

19         And so I show what would happen if you were to do

20   that.                                                            02:44:32

21   Q.    You prepared some tables to that effect?

22   A.    I did.

23   Q.    I'm going to show you on the screen what's been marked as

24   Exhibit 907.  What are we looking at here, sir?

25   A.    So we might be mixed up in the order of what we're talking 02:44:45

United States District Court

MARK HOEKSTRA, PH.D. - Direct

1  about.                                                                02:44:47

2  Q.   I think we are.  You say we.  Charitably, I think 908 is

3  where we should begin.

4  A.   Yeah.  So the sort of grayed out is what Professor

5  McDonald is showing the actively registered.  And so           02:45:00

6  essentially, you know, if you were to do it the way he's doing

7  it, which is right, if you believe all of these people in those

8  three groups are citizens, then what you get is, well, you get

9  there's some evidence of the people who are likely to be

10 disproportionately impacted are more likely to be Hispanic,    02:45:18

11 more likely to be Black and so on.

12        But of course we don't know whether all of those

13 people are citizens or not.  And to the extent they are not, we

14 want to move toward looking at Arizona population.  And if you

15 look at the population of Arizona, which is in that first row,  02:45:33

16 what you see is that things like roughly proportionate, that

17 we're seeing essentially, you know, a similar proportion of

18 Black people, Hispanics, non-Hispanic Whites in these three

19 categories, the federal-only voters, suspended citizenship,

20 canceled citizenship.  You're seeing it roughly tracks the     02:45:56

21 Arizona population.

22        And, essentially, there's a choice of benchmark that

23 he's making that is going to, you know, make it look like

24 there's this disproportional effect, but implicit in that is an

25 assumption that all of these people are citizens and that's --  02:46:13

United States District Court

MARK HOEKSTRA, PH.D. - Direct

1  you don't know that that's true.                                     02:46:16

2  Q.   All right.  Let's go back now to Exhibit 907.  I think

3  it's now ripe to discuss this one.

4  A.   Yeah.  So the other issue is, you know, he's making this

5  argument that when -- you know that because -- well, let me      02:46:29

6  back up.

7        My understanding is one of the claims in this case is

8  that -- is whether or not there was discriminatory intent on

9  the part of the legislature; right?  Did they intend to

10 discriminate against minority voters?  And so then one relevant  02:46:46

11 question is, well, let's look at the people who are arguably

12 impacted by this.  And so what I'm pointing out in this table

13 is essential.  It's a reproduction of his table but I'm also

14 computing the number of non-Hispanic Whites and the number of

15 minorities which is in columns three and five.                   02:47:07

16        And so what you see is that you actually have, you

17 know, more White people, 10,361, than you have minorities who

18 are going to be impacted by this.

19        And so if you want to believe that there's

20 discriminatory intent and that's, like, I guess your call,       02:47:25

21 right; but if you want to believe that, you would have to

22 believe that that discriminatory legislature is willing to sort

23 of harm or disenfranchise more White people than non-White

24 people.  And that's an odd model of discrimination to have in

25 the context of voting but that's what you would have to          02:47:43

United States District Court

MARK HOEKSTRA, PH.D. - Direct

1    believe.                                                                    02:47:47

2    Q.   All right.  One more.  We're going to look at Exhibit 909.

3         What is this, sir?

4         THE COURT:  This is still 907.

5    BY MR. LANGHOFER:                                                           02:48:01

6    Q.   I'm sorry.  I need to press one more button on my iPad.

7    There we go.

8    A.   Yeah.  So this shows what the difference is.  You know if

9    you were to use the alternative benchmark of Arizona population

10   instead of registered voters which, again, is appropriate to     02:48:16

11   the extent that you think some of these -- so, well,

12   potentially all of those people on these lists or all of the

13   people on some of those categories are not citizens.  What

14   essentially I'm doing is saying, well, how similar are the

15   numbers to what you would expect if the numbers were           02:48:33

16   proportionate to the Arizona population?

17        And so in column -- in column two we have the actual

18   numbers and in column three what we have is, well, what would

19   we expect if things were proportionate to the Arizona

20   population?  And what that shows is those two numbers are       02:48:52

21   really similar to each other.

22        So his choice of benchmark is, like, super meaningful

23   and it's based on this assumption that all of those people in

24   those groups are citizens.

25   \\\

United States District Court

MARK HOEKSTRA, PH.D. - Direct

1    Q.   You said Arizona population.  I just want to be clear.          02:49:09

2    You mean, all -- including non-citizens in the population;

3    correct?

4    A.   Correct.

5              MR. LANGHOFER:  Your Honor, we would move 907 through     02:49:19

6    909 into evidence.

7              THE COURT:  Is there any objection?

8              MS. KANTOR COHEN:  Assuming the narrative is not part

9    of it, no objection to the table.

10             THE COURT:  With that objection, 907, 908, and 909        02:49:33

11   are entered into evidence.

12             We'll take our break and reconvene at five minutes

13   after three.

14             (Exhibit Numbers 907, 908, and 909 were admitted into

15   evidence.)                                                          02:49:45

16             COURTROOM DEPUTY:  All rise.

17             (Recess at 2:49; resumed at 3:06.)

18             THE COURT:  Thank you.  Please sit down.

19             And Mr. Langhofer, you may continue with your

20   questions.                                                          03:06:22

21             MR. LANGHOFER:  Thank you, Your Honor.

22   BY MR. LANGHOFER:

23   Q.   Three hopefully short things.  First is --

24             MR. LANGHOFER:  Elaine, if I could have the laptop

25   one more time.                                                      03:06:30

United States District Court

MARK HOEKSTRA, PH.D. - Direct

1   BY MR. LANGHOFER:                                                      03:06:30

2   Q.   We have previously talked about the appendix to

3   Dr. Hoekstra's report.  Does this data come from the United

4   States Census?

5   A.   Yes.                                                             03:06:39

6   Q.   Census Bureau.  It's actually the ACS.

7   A.   Yes.  Specifically, the survey is called the American

8   Community Survey.

9        MR. LANGHOFER:  Your Honor, we would move into

10  evidence this appendix as Exhibit 973.                                03:06:47

11       THE COURT:  Any objection?

12       MR. BABBITT:  No, Your Honor.

13       THE COURT:  Okay.

14       MR. BABBITT:  973.

15       THE COURT:  Okay.  I know that it's 973.  I'm just              03:06:58

16  wondering why a different lawyer responded to the question than

17  one that did before because we only have one lawyer per

18  witness.

19       MR. DODGE:  Your Honor, no objection, to be clear.

20  The reason there are multiple counsel here is that Dr. Hoekstra      03:07:15

21  addresses three different experts in his --

22       THE COURT:  That doesn't mean that three different

23  people are going to object and cross and --

24       MR. LANGHOFER:  I think this is probably academic

25  because I think I have perhaps two minutes left.                      03:07:36

United States District Court

MARK HOEKSTRA, PH.D. - Direct

 1          THE COURT:  Anyway.  973 is admitted without                        03:07:39

 2   objection.

 3          (Exhibit Number 973 was admitted into evidence.)

 4   BY MR. LANGHOFER:

 5   Q.   Professor Hoekstra, have you looked into this idea that              03:07:43

 6   voting causes voting?

 7   A.   Yes.

 8   Q.   And have you reviewed the academic literature on that?

 9   A.   I reviewed the literature that I believe it was Professor

10   McDonald cited in support of that assertion.                              03:08:01

11   Q.   Okay.  And the argument that he's making, to refresh the

12   Court's recollection, is that any short-term deprivation of

13   voting rights would have long-term consequences because voting

14   causes voting.  What is your view or criticism of the

15   literature on which Professor McDonald relied?                            03:08:24

16   A.   Yeah.  So, again, he's making this causal claim, right,

17   that if by -- you know, by not voting, I randomly didn't let

18   you vote this year, that you are now less likely to vote in the

19   next election.

20          And so one of the papers that he cites it as the                  03:08:42

21   seminal paper on this topic.  And if you read the title -- I'm

22   not going to remember exactly the title but the title would

23   have you believe that there is this causal relationship.  And

24   so I looked and I opened up the paper and literally in the

25   abstract it says, you know, that we speculate -- something to             03:08:59

United States District Court

MARK HOEKSTRA, PH.D. - Direct

1  the effect of we speculate that voting causes voting.  And so          03:09:04

2  literally the conclusion the causal claim in the seminal paper

3  is, according to the authors in their own abstract, like

4  speculation.  There were additional papers as well.

5          So, for example, there are a couple of papers cited          03:09:22

6  in support of that assertion by Professor McDonald, again, that

7  voting causes voting and it matters for the reasons Kory laid

8  out where they don't actually make that causal claim at all.

9          So, you know, they are not claiming that voting

10  causes voting.  They are documenting a correlation between          03:09:39

11  voting in the last election and voting in this election.  But

12  they don't have a strategy for assessing whether that's a

13  causal relationship or whether, you know, something else drives

14  that correlation.

15          And then to my recollection, there was one other          03:09:52

16  paper that was, frankly, the best design of the studies that he

17  cited and this one -- I want to say it's by Gerber and some

18  other co-authors.  So what they did is they did an experiment

19  and they looked and they had two elections one year.  They had

20  an experiment where in August they sent out people to canvass          03:10:13

21  and they encouraged people to vote.  And then they looked,

22  okay, those people who we -- who had the interaction were more

23  likely to vote in the fall election and then they looked in the

24  following election one year later and found, again, that those

25  people were more likely to vote.          03:10:32

United States District Court

MARK HOEKSTRA, PH.D. - Direct

1        And so, you know, then what the authors do is they --    03:10:34

2   in order to interpret that as voting causes voting, they impose

3   what econometricians call an exclusion restriction which is,

4   again, one of those big things that we teach in the very first

5   year of an econometrics course.    03:10:51

6        And specifically what you need to believe to give

7   that interpretation to that study is that the only effect that

8   this canvassing had on voting 16 months later was through

9   whether or not you voted in this election.  So they are not

10  allowing there to be, like, a persistent effect of, oh, I    03:11:08

11  talked to you and I got you interested in politics and it's

12  that interest in politics that caused you to vote this year and

13  vote next year.  They are assuming that away.

14       And that is like -- to be fair, authors -- it's an

15  older paper.  It's 2005.  They might not have known all of the    03:11:25

16  pitfalls of imposing exclusion restrictions like hopefully they

17  do now.  But they shouldn't be making that assumption because

18  obviously something today can impact voting a year and a half

19  from now for reasons other than just whether it makes you vote

20  this year.    03:11:43

21       And yet that's what -- that's what they need to

22  assume to get to this conclusion that voting causes voting and

23  of course that's -- that's the best evidence that they cite.

24       The authors in that same paper will also say, you

25  know, it's an open question about the long-run effects because    03:11:59

United States District Court

MARK HOEKSTRA, PH.D. - Direct

1  they are only looking 16 months out.  And it's an open question    03:12:02
2  as to whether this would extend to other settings.  And so they
3  are properly sort of cautious.  Professor McDonald is obviously
4  not so cautious when he cites that as support for that
5  hypothesis.                                                        03:12:17
6  Q.  Professor, what is your opinion on the net effect that
7  these laws will have on turnout in Arizona?
8  A.  Yeah.  I'm basing my opinion on these papers that we've
9  gone through and looking at what the evidence is and I think
10 overall, it's most likely you're probably going to see zero       03:12:31
11 effect on turnout.  And I think there's some chance that you
12 might see an increase in turnout because after all, I think
13 there's some credible papers out there that find evidence of an
14 increase.
15 Q.  But the most likely outcome would be --                       03:12:46
16 A.  Would be zero effect would be my bet.
17 Q.  All right.  Final thought.  You've reviewed a paper from
18 Pippa Norris at Harvard --
19 A.  That's right.
20 Q.  -- about voter confidence?                                    03:12:59
21 A.  That's right.
22 Q.  And you have a thought on her analysis?
23 A.  Yeah.  So I think as you sit and you watch these types of
24 cases and these types of things and you watch politicians, one
25 of the things that she points out is coming from the people,      03:13:15

United States District Court

MARK HOEKSTRA, PH.D. - Direct

1    coming from people like President Trump, you have these                03:13:20
2    unsubstantiated claims of massive voter fraud.  And she points
3    out, rightly, as does Professor Minnite, that these things are
4    damaging to I think democracy, to perceptions of electoral
5    integrity and, again, Minnite points that out and I think she's        03:13:37
6    right to point that out.  You ought not be making
7    unsubstantiated claims about fraud.

8              And on the other hand, Pippa Norris also would say
9    the other challenge is on the other side, you have -- you know,
10   you have people who use every opportunity, like every one of          03:13:56
11   these laws that gets passed, they use it as an opportunity to
12   accuse that side of being racist, discriminatory, you know, of
13   attempting to suppress votes and so on.

14             And I think Pippa Norris is correct in pointing out
15   that, like, collectively, both of these things are damaging,          03:14:12
16   like this is -- this is a bad world like we would -- we should
17   get out of this world somehow.  Like where you've got crazy
18   claims on the right about, you know, unsubstantiated election
19   fraud and on the left you've got mostly unsubstantiated claims
20   of, you know, of racism and intent to suppress votes and so on.       03:14:33
21   And I think she's right to point out that both of these things
22   are bad.  They are both damaging.

23             MR. LANGHOFER:  No more questions on direct, Your
24   Honor.  Thank you.

25             THE COURT:  And I misspoke.  Yes, multiple                   03:14:46

United States District Court

MARK HOEKSTRA, PH.D. - Cross

1  cross-examination is permitted.                              03:14:49

2      Nothing else from your side, I assume?

3      MR. DODGE:  We appreciate that clarification, Your

4  Honor.  We were getting nervous over there.

5      THE COURT:  I saw that you were getting nervous.  I    03:14:59

6  thought I would correct my misstatement.

7      MR. DODGE:  As always, you are very perceptive, Your

8  Honor.

9                    **CROSS - EXAMINATION**

10 BY MR. DODGE:                                                03:15:12

11 Q.   Christopher D. Dodge on behalf of the Mi Familia Vota

12 Plaintiffs.

13     Professor Hoekstra, as Yogi Berra would say, it's

14 deja vu all over again.  We keep finding ourself in this

15 situation but it's good to be speaking with you again.       03:15:20

16     I'm going to ask you some questions mostly about your

17 response to Dr. Minnite's report but also a little bit about

18 your background and then my colleagues will address your other

19 reports here.

20     Your training is as an economist?                        03:15:35

21 A.   That's right.

22 Q.   And you don't have any degrees in political science?

23 A.   I do not have degrees in political science.

24 Q.   And you don't consider yourself to be a political

25 scientist?                                                   03:15:48

MARK HOEKSTRA, PH.D. - Cross

1    A.    True.                                                    03:15:49

2    Q.    You don't consider yourself to be a historian?

3    A.    That's true.

4    Q.    Have you ever taught a course focused on political

5    science?                                                      03:15:56

6    A.    Not where that was the main focus, no.

7    Q.    Have you ever taught any courses on election

8    administration?

9    A.    No.  Certainly not a course on that.  At most I would have

10   a paper or two on the syllabus.                               03:16:08

11   Q.    Do you hold yourself out as an expert on the mechanics of

12   election administration?

13   A.    I believe I'm an expert in evaluating evidence on what the

14   impacts of -- what the impacts of changes in election

15   administration and so on.                                     03:16:29

16   Q.    So you would say you're an expert in analyzing the impacts

17   of changes in election laws but not necessarily the

18   nitty-gritty of election administration itself?

19   A.    I mean, I don't know exactly what you mean by

20   nitty-gritty.                                                 03:16:41

21   Q.    I think that may be a term that you used in your

22   deposition if I recall.

23   A.    I don't recall that.

24          Certainly there are going to be aspects that people

25   involved in elections are going to know a lot about and I'm    03:16:54

United States District Court

MARK HOEKSTRA, PH.D. - Cross

| | | |
|---|---|---|
| 1 | going to know less about.  But obviously there are also data | 03:16:56 |
| 2 | issues that are involved in how do you interpret data.  And I | |
| 3 | have been working with data for a long time and doing it | |
| 4 | successfully and I do believe I'm an expert there. | |
| 5 | Q.   You never taught any courses on American elections? | 03:17:11 |
| 6 | A.   Correct. | |
| 7 | Q.   Have you ever worked with or advised election officials in | |
| 8 | your professional capacity? | |
| 9 | A.   No. | |
| 10 | Q.   Have you ever interviewed an election official as part of | 03:17:20 |
| 11 | your scholarship as an economics researcher? | |
| 12 | A.   No. | |
| 13 | Q.   Have you ever reviewed legislative committee hearings or | |
| 14 | debates in your scholarship? | |
| 15 | A.   Not as part of my scholarship. | 03:17:36 |
| 16 | Q.   You mentioned that you've written one paper on the subject | |
| 17 | of elections.  Is that fair? | |
| 18 | A.   That's correct. | |
| 19 | Q.   That was published in an economic journal? | |
| 20 | A.   That's right. | 03:17:44 |
| 21 | Q.   That journal is called *Economic Letters?* | |
| 22 | A.   That's correct. | |
| 23 | Q.   And that journal specializes in short-form papers? | |
| 24 | A.   That's right.  You have to make the point very concisely | |
| 25 | for that journal. | 03:17:54 |

United States District Court

MARK HOEKSTRA, PH.D. - Cross

1   Q.   Judge Bolton likes concise points.   So -- the paper there        03:17:55
2   was just three pages long?
3   A.   Yeah.   The final paper was three pages long.   It was
4   originally a full-length paper that we cut down for the
5   purposes of submitting it to that journal.                             03:18:08
6   Q.   Do you know if that paper has been cited at all by
7   political scientists?
8   A.   I don't know.   I know it's been cited by the -- by the
9   Vincent Pons paper.   I noticed that when I was reading that
10  paper the other day but, again, he's an economist who published 03:18:25
11  on voting.   I don't know who the other citations are from.
12  Q.   Do you know if there are other citations?
13  A.   I think my Google color page said there are more than one,
14  yeah.   Some of them are of the working paper, so there's a
15  working paper that was published in NBER and so there are        03:18:41
16  citations to that and also to the published version.
17  Q.   That paper did not analyze a proof of citizenship law.
18  Fair?
19  A.   That's correct.
20  Q.   And it didn't analyze the effects of laws governing the     03:18:56
21  voter registration process?
22  A.   That's correct.
23  Q.   You mentioned that you testified recently in another
24  election law case in Texas.   Did I get that right?
25  A.   You did.                                                     03:19:12

United States District Court

MARK HOEKSTRA, PH.D. - Cross

1  Q.   And the name of that case was something like *Lupe v.*                    03:19:13

2  *Abbott*?

3  A.   That sounds right.

4  Q.   Have you ever served as an expert in any other election

5  law cases besides this one and the *Lupe* case in Texas?              03:19:22

6  A.   No.

7  Q.   You mentioned in your testimony that the court there

8  recognized you as an expert; right?

9  A.   That's right.  I mean, the reports were accepted into

10 evidence, for example, and we can talk about the one objection        03:19:39

11 that was sustained which I'm sure you're going to bring up.

12 Q.   The Court didn't recognize you as an expert in voter fraud

13 in that case.  Do you recall that?

14 A.   Yeah.  I don't know exactly what the characterization was,

15 Chris, but it was something about -- the discussion about             03:19:56

16 whether evidence of absence is -- or whether absence of

17 evidence is evidence of absence.  That part of my testimony was

18 cut off.

19 Q.   To your knowledge, that court has not yet issued a final

20 ruling in that case?                                                  03:20:11

21 A.   Yeah.  I don't know.  So I'm guessing not.  It was just

22 ended recently.

23 Q.   So it hasn't expressed any opinion yet on the credibility

24 of your testimony there?

25 A.   Not to my knowledge.                                             03:20:22

United States District Court

MARK HOEKSTRA, PH.D. - Cross

1  Q.   So fair to say no court as recognized you as an expert on          03:20:27

2  voter fraud?

3  A.   I don't know what we mean by recognized as an expert.  So,

4  literally, they accepted my reports into evidence and I was

5  allowed to testify all day long so I would have thought that         03:20:37

6  that contradicts your question.  But maybe it's some term of

7  art that I'm not familiar with.

8  Q.   That's fair enough.

9        You don't consider yourself a scholar within the

10  field of those scholars attempting to assess the incidents of         03:20:53

11  voter fraud.  Is that fair to say?

12  A.   Am I a scholar within a field of scholars attempting to --

13  I don't know how to characterize it.  I've written one paper

14  that I think speaks directly to the maximum amount of one

15  particular voter fraud that could be occurring and it's one          03:21:15

16  paper.  I haven't written ten but I have written one.  I don't

17  know if that means I'm a scholar among scholars in your words

18  or not but that's the precise answer.

19  Q.   Did you know who Dr. Minnite was prior to being engaged in

20  this lawsuit?                                                         03:21:36

21  A.   No.

22  Q.   You don't know what her reputation is within her field

23  when it comes to the issue of voter fraud?

24  A.   No, I don't.  I haven't surveyed people about how do you

25  feel about this professor.  I've looked at her CV and her short      03:21:50

United States District Court

MARK HOEKSTRA, PH.D. - Cross

1    publication record and that's about it.                          03:21:54

2    Q.   Had you reviewed any of her work prior to your engagement

3    in this case?

4    A.   No.

5    Q.   Were you aware of her book <u>The Myth of Voter Fraud</u> prior   03:22:00

6    to your work in this case?

7    A.   No.

8    Q.   Did you read <u>The Myth of Voter Fraud</u> in preparing your

9    response to her report?

10   A.   No.                                                         03:22:11

11   Q.   Can you identify for the Court the parties here who are

12   have retained you in this litigation?

13   A.   Yes.  So the RNC and the State Senate and the State House.

14   Q.   So fair to say you have not been retained by the Attorney

15   General and the State in this case?                              03:22:31

16   A.   That's correct.

17   Q.   You testified on direct that the Arizona Attorney General

18   actually had retained you as an expert in a different matter

19   regarding criminal issues, though; is that right?

20   A.   Yeah.  So if I said -- if I said the State Attorney         03:22:41

21   General, I would have misspoken.  I believe it's Maricopa

22   Prosecutor's Office.  So if I misspoke about that, I apologize

23   but it's a criminal case so it's -- and I believe they were

24   Maricopa.

25   Q.   I appreciate that clarification.                            03:22:59

United States District Court

MARK HOEKSTRA, PH.D. - Cross

1      Do you know if there was any discussion in this case         03:23:02
2   about whether the Attorney General and State would retain you?
3   A.   I suspect there was.  I know who won the last election and
4   it was a Democrat and not a Republican and these things are
5   political, so I can only imagine that there were conversations   03:23:15
6   about this case.
7   Q.   I would like to pull up Defense Exhibit 902, please.  This
8   is your rebuttal to Dr. Minnite; correct?
9   A.   Yes.
10      MR. DODGE:  Could we go to paragraph one.  Zoom in on        03:23:36
11   that.
12   BY MR. DODGE:
13   Q.   You say in the last sentence here:  My analysis is based
14   on my knowledge and experience as an active research economist
15   who is well versed in the frontier empirical methods used in    03:23:48
16   causal analyses.
17      Did I mostly get that right?
18   A.   I think so.
19   Q.   So it's fair to say you hold yourself out as an expert on
20   evaluating the impact of things?                                03:24:00
21   A.   But also, you know, doing research more generally,
22   including working with data, linking data sets, all of the
23   things that you have to do to be, you know, an active research
24   economist which we've talked about before.
25   Q.   I think it's fair to say you would agree that you don't    03:24:12

United States District Court

1775

MARK HOEKSTRA, PH.D. - Cross

1  hold yourself out as someone with specialized knowledge about     03:24:15
2  how elections work?
3  A.   Yeah.  I think that's true.  My knowledge comes from
4  reading the literature on these things and so on.
5          MR. DODGE:  Could we please go to paragraph 16 of     03:24:42
6  professor Hoekstra's report here?
7  BY MR. DODGE:
8  Q.   You criticized Dr. Minnite here.  You, Dr. Hoekstra, in
9  your report here in paragraph 16 criticize Dr. Minnite for not
10  accounting for the difficulty in detecting and observing fraud.     03:25:05
11  Is that fair?
12  A.   Yeah.  That's fair.
13  Q.   And in making this criticism, you cite I think three
14  political science papers that use various language say it can
15  be hard to detect fraud.  Is that fair?     03:25:20
16  A.   Yeah, I think that's fair.
17  Q.   And you don't cite anything else in your report to support
18  that criticism beyond these three papers?
19  A.   Yeah.  I didn't attempt to find the universe of papers
20  that say documenting cheating or fraud or corruption is hard.     03:25:36
21  I mean I think it's pretty much universally acknowledged but I
22  cited those because they were literally cited by Minnite.
23  Presumably she finds them reliable and I'm pointing out they
24  acknowledge this.
25  Q.   Did you review those studies prior to reviewing     03:25:56

United States District Court

MARK HOEKSTRA, PH.D. - Cross

1    Dr. Minnite's report?                                          03:26:00

2    A.   I had some familiarity with the Ahlquist paper from the

3    previous case.  I don't think I was familiar with these other

4    two before this case.  And certainly I read them.  I'm more

5    careful now.                                                   03:26:18

6    Q.   The one paper that you read, that was in connection with

7    prior work as an expert witness?

8    A.   Yes.

9    Q.   It wasn't from your own scholarship?

10   A.   I believe that's correct.  I mean don't honest I wrote   03:26:29

11   that paper that we talked about probably three years before we

12   publish it and so that's some time ago, and I'm not going to

13   remember all of the papers that I read while we were working on

14   that project.

15   Q.   Is it fair to say that most of the literature you've read 03:26:44

16   with respect to the extent of voter fraud has been in

17   connection with this case?

18   A.   So that would be true for the most recent literature.

19   Again, when we worked on this project on the impact of voter

20   identification, I would have looked through the literature then 03:27:05

21   as well writing that paper.  A lot of that probably got cut in

22   the final version because we had to make it really short.  But

23   I would have familiarized myself with the literature then as

24   well.

25   Q.   So just a couple of questions about those three papers you 03:27:17

MARK HOEKSTRA, PH.D. - Cross

1   cite there in paragraph 16.                                        03:27:21

2   A.   To be fair, I can't see the screen any more.

3        MR. DODGE:   Can we actually bring that back up?

4   BY MR. DODGE:

5   Q.   Sorry.  Not asking gotcha questions.                         03:27:30

6        Is it fair to say that for each of these papers that

7   you cite, they propose a method for measuring fraud or some

8   kind of fraud?

9   A.   Yeah.  I think it's fair to say they propose, you know, a

10  certain method to detect a certain type of fraud in a certain   03:27:43

11  context.  I think that's fair.

12  Q.   Is it also fair to say that those papers apply their

13  methods for measuring fraud or a specific kind of fraud and

14  then find little evidence of that fraud?

15  A.   That is what they report, yes.                              03:27:59

16  Q.   Your report does not propose any kind of methodology for

17  detecting or measuring voter fraud.  Fair to say?

18  A.   Yeah.  That's correct.

19  Q.   Do you know who Professor Robert Stein is?

20  A.   I've heard the name.                                        03:28:24

21  Q.   Have you heard the name in connection with this case?

22  A.   I want to say perhaps that professor is another witness,

23  another expert on the defense's side.

24  Q.   If Professor Stein had written that past evidence of voter

25  fraud has been scant, would you have any reason to disagree      03:28:37

United States District Court

1778

MARK HOEKSTRA, PH.D. - Cross

1    with him?                                                            03:28:41

2    A.   I mean, as with all of these things, I would want to

3    evaluate on what basis he's saying that and I didn't evaluate

4    that.  I didn't talk to him.  I didn't read his report.

5    Q.   You wouldn't disagree with me that there are already          03:28:58

6    existing systems and processes in place in U.S. elections for

7    preventing election fraud?

8    A.   Certainly there are some and, you know, arguably this --

9    these bills introduce one more.

10   Q.   You don't dispute that here in Arizona there are systems       03:29:15

11   and processes already in place that help detect voter fraud?

12   A.   Yeah.  Again, you know, I'm aware that there are things to

13   try to catch this to some extent.

14   Q.   In your report you note that according to the U.S. census

15   there are 450,000 non-citizen adults in Arizona.                     03:29:35

16   A.   Yes.

17   Q.   And you criticize Dr. Minnite for not asking how difficult

18   it would be for any of those 450,000 non-citizens to be able to

19   vote.  Is that fair to say?

20   A.   That's correct.                                                 03:29:53

21   Q.   Your report doesn't make an opinion on how many of those

22   people are in fact -- strike that question.  It makes no

23   census.

24        You don't do any analysis in your report suggesting

25   there's currently a problem of non-citizens in Arizona              03:30:07

United States District Court

MARK HOEKSTRA, PH.D. - Cross

1  registering to vote as federal-only voters?                    03:30:10

2  A.   I don't know how many of the federal-only voters are

3  citizens or not citizens.  To my knowledge, none of us know.

4  People can guess but none of us know.

5          I'm pointing out with the 450,000 number that you      03:30:22

6  might be more worried about non-citizen voting in a world where

7  you have lots of non-citizens living there rather than in a

8  world where you didn't have many non-citizens living there.

9  And in Arizona, there's a lot of non-citizens.

10  Q.   I think you said this on direct with Mr. Langhofer.  You   03:30:38

11  don't make any claim in your report about the current

12  prevalence of voting by non-citizens in Arizona.  Is that fair?

13  A.   That's fair.  I don't know the prevalence.  I don't think

14  anyone knows the prevalence really.

15  Q.   You would agree with me you don't identify any specific    03:30:58

16  instances of a non-citizen voting in Arizona in your report?

17  A.   I didn't attempt to do that.

18  Q.   And you don't offer any opinion in your report about how

19  frequently non-citizens might vote in future elections

20  depending on whether these laws are put into effect?           03:31:10

21  A.   So I do offer opinions on that.  Can you ask your question

22  one more time?  I want to make sure I get it right.

23  Q.   Sure.  You don't offer any opinion in your report about

24  the frequency of non-citizen voting in future elections in

25  Arizona based on whether the laws here are upheld?             03:31:30

United States District Court

MARK HOEKSTRA, PH.D. - Cross

1   A.   I mean, my view of that is in a world where you take one          03:31:34
2   more step to make it more difficult, you know, you'll probably
3   have less.  How much less, I don't know.  I'm not going to
4   claim to know any magnitude; but I know if there's scope for an
5   issue and you take a step that makes it harder, if anything,        03:31:51
6   you would have less.  I don't claim magnitude.
7   Q.   My question is maybe a little narrower.  You make no claim
8   with respect to frequency of non-citizen voting in the future
9   one way or the other based on the outcome of this case.  Is
10  that fair?                                                           03:32:06
11  A.   I mean, I thought I answered that.  So now I'm -- I think
12  when you take an additional step to prevent something from
13  happening, if anything, we would expect less of it to happen in
14  terms of lower frequency.
15       I'm just not making a claim on whether that goes from          03:32:33
16  one so zero or a lot to zero or what because I don't know.
17  Q.   You'll agree with me that you don't have any opinion on
18  whether non-citizen reporting is common, rare, or nonexistent
19  in Arizona?
20  A.   That's true.                                                   03:32:57
21       MR. DODGE:  Can we pull up paragraph 18 of
22  Dr. Hoekstra's report responding to Dr. Minnite?
23  Q.   You write here that to the best of your knowledge, any one
24  of the 450,000 individuals could vote in federal-only elections
25  if they would sign the federal voter registration form and          03:33:19

United States District Court

MARK HOEKSTRA, PH.D. - Cross

1    falsely claim U.S. citizenship.                                    03:33:22

2             Did I get that write?

3             THE WITNESS:  That's right and I think I would add         03:33:33

4    the additional caveat that they not be in the ADOT system as

5    being a non-citizen.

6    BY MR. DODGE:

7    Q.   To do that they would have to commit a felony; right?

8    A.   Yes.

9    Q.   They would also have to commit perjury.

10   A.   Yes.                                                          03:33:43

11   Q.   And if they were detected by the authorities, they would

12   potentially face deportation?

13   A.   Again, I don't know how the deportation stuff works but it

14   wouldn't be good for them if they got detected.  And it might

15   lead to that.  It might well be true.                             03:33:58

16   Q.   You agree there are already penalties in place for

17   unlawfully registering to vote in Arizona?

18   A.   Yes.  And as we've talked about of course, you know,

19   whether we know people respond to that depends not just on the

20   penalty but also on the probability that they be caught.  And    03:34:11

21   penalties are known; probabilities are much harder to assess.

22   Q.   You reviewed some deposition testimony from County

23   Recorders in preparing your report.  Is that fair?

24   A.   Yes.

25   Q.   Do you recall any of them indicating one way or the other   03:34:24

United States District Court

MARK HOEKSTRA, PH.D. - Cross

1    whether they believed the Federal-Form is susceptible to abuse      03:34:27

2    by non-citizens?

3    A.   I don't recall anything specifically about the

4    non-citizens.  It was clear that some of them believe that

5    there were bad registration forms that were false and           03:34:38

6    problematic but I don't recall them saying if it was about

7    non-citizens or other things.  It may well have been other

8    things.

9    Q.   Do you know if those claims were with respect to the

10   federal form or the state form?                                  03:34:51

11   A.   I don't recall as we sit here.

12          MR. DODGE:  Staying on the topic of County Recorders,

13   if we could pull up paragraph 20 to 26 or so of Dr. Hoekstra's

14   report.

15   Q.   You quote a few County Recorders, as you just indicated,    03:35:08

16   expressing some concerns with inaccurate voter registration

17   forms.  Fair to say?

18   A.   Yes.

19   Q.   You didn't speak with any of these election officials in

20   preparing your report; right?                                    03:35:17

21   A.   That's correct.  I only reviewed the transcripts.

22   Q.   And you don't know whether any of these county officials

23   testified to being aware of non-citizens registering to vote in

24   their counties?

25   A.   As in -- yes.  So I don't remember if it was in the         03:35:30

United States District Court

MARK HOEKSTRA, PH.D. - Cross

1    deposition and if you're talking about what they did at trial,     03:35:33

2    I definitely don't know what they said.

3    Q.    I'll represent to you that none of the three you quote

4    testified at this trial so their testimony is in their

5    deposition transcript.  So focusing just on the deposition     03:35:44

6    transcripts, you cite in your report you're not sure whether

7    any of them spoke to the issue of their awareness of

8    non-citizens registering to vote within their jurisdictions?

9    A.    Yeah.  I don't recall.  Those were really long transcripts

10   and I'm not going to claim to recall what they said everywhere.    03:35:59

11   Q.    You're not making any claim about the extent or frequency

12   with which inaccurate registration forms are submitted to

13   counties in Arizona.  Is that fair to say?

14   A.    I'm not attempting to put a number on it.  I am merely

15   pointing out that there are people on the front lines who     03:36:25

16   clearly think there are some problems.

17   Q.    Do you know how many County Recorders were deposed in this

18   case?

19   A.    If I know, it would have come from the deposition when

20   someone told me and I don't remember.     03:36:37

21   Q.    Do you know how many counties are in Arizona?

22   A.    It was around 15.  I forgot the exact number.

23   Q.    You got it right.

24   A.    All right.

25   Q.    Did you review County Recorder deposition transcripts     03:36:44

United States District Court

MARK HOEKSTRA, PH.D. - Cross

1  besides the three you quote here?                           03:36:47

2  A.   I think I reviewed a fourth one and I didn't use anything

3  from that one so I -- I would have to go look at my records to

4  figure out what it was but I think there was one that I

5  reviewed that I didn't end up quoting.                      03:37:01

6  Q.   So it's fair to say you're not aware of whether other

7  County Recorders testified with respect to awareness of

8  non-citizens voting in their jurisdictions?

9  A.   That's correct.

10 Q.   In paragraph 24 of your report you refer to an email from  03:37:16

11 Ms. Stephanie Homewytewa in Pima County.  Do you see that?

12 A.   Yes.

13 Q.   Did you speak with Ms. Homewytewa about this email?

14 A.   I did not.

15        MR. DODGE:  Let's go to paragraph 28 of             03:37:30

16 Dr. Hoekstra's report now.

17 Q.   You criticized Dr. Minnite for being overly reliant on

18 conviction data.  Is fair to say?

19 A.   I think it's more than just convictions.  It's also

20 prosecutions and convictions.  Yes.                         03:37:43

21 Q.   You write in this paragraph that even if counties in

22 Arizona believe there's voter fraud, they don't need to report

23 it for prosecution.

24        Do you see that?

25 A.   Yes.                                                   03:38:13

United States District Court

MARK HOEKSTRA, PH.D. - Cross

1  Q.   And you base that conclusion on a letter sent by the Chief          03:38:13

2  of Staff at the Arizona State Senate?

3  A.   I believe that's right.

4  Q.   The Arizona State Senate isn't responsible for prosecuting

5  election crimes in Arizona.  We can agree?                                03:38:22

6  A.   Yes.

7  Q.   Did you revie any County Recorder testimony in this case

8  to assess their practices for referring allegations of voter

9  fraud to prosecutorial authorities?

10  A.   No.                                                                 03:38:34

11  Q.   Did you directly review any policies from County Recorder

12  offices for referring allegations of voter fraud to

13  prosecutors?

14  A.   No.

15  Q.   Is it fair to say you didn't review any records in this            03:38:50

16  case from the Arizona Attorney General's Election Integrity

17  Unit?

18  A.   I believe that's correct, not that I recall.

19  Q.   Very briefly today you spoke about the incidence of

20  property crime.  Do you remember that?                                   03:39:09

21  A.   Yes.

22  Q.   Is it fair to say that's the portion of your testimony in

23  the Texas case where an objection was sustained and you weren't

24  permitted to speak to it on the stand?

25           MR. LANGHOFER:  Relevance.                                      03:39:18

United States District Court

MARK HOEKSTRA, PH.D. - Cross

1    THE WITNESS:  Yes.                                          03:39:19

2    THE COURT:  Overruled.

3    The answer "Yes" will stand.

4  BY MR. DODGE:

5  Q.    You would agree with me that election crimes and property    03:39:26

6  crimes are different in meaningful ways?

7  A.    Yes.

8  Q.    They have different incentives to commit them?

9  A.    Presumably different incentives.  You know, if they are

10 different in terms of whether there's a victim, whether the        03:39:39

11 victim knows about the crime.  They are different in many ways,

12 no doubt.

13 Q.    You spoke a little bit with Mr. Langhofer about

14 Dr. Minnite's definition of voter fraud.  Do you recall that?

15 A.    Yes.                                                         03:40:00

16 Q.    Prior to this litigation, you hadn't read any scholarship

17 about the definition of voter fraud.  Is that fair to say?

18 A.    No, that's not fair to say.  Because I wrote a paper on

19 this topic and I would have read a lot of things as part of,

20 you know, writing that paper and evaluating the evidence on       03:40:18

21 voter fraud.

22 Q.    You recall you were deposed in this matter?

23 A.    Yes.

24 Q.    You had Mr. Langhofer by your side when you were deposed.

25 A.    Yes.  Well, on Zoom I guess.                                 03:40:31

United States District Court

MARK HOEKSTRA, PH.D. - Cross

| | | |
|---|---|---|
| 1 | Q.   Metaphysically by your side.  Do you recall if you were | 03:40:33 |
| 2 | asked that question in your deposition? | |
| 3 | A.   No. | |
| 4 | Q.   Could we pull up Dr. Hoekstra's November 1, 2023, | |
| 5 | deposition transcript and go to page 113, lines 11 to 13. | 03:40:46 |
| 6 | You were asked:  "Prior to being engaged in this | |
| 7 | matter, had you read any scholarship on the definition of voter | |
| 8 | fraud? | |
| 9 | "No, I don't think so." | |
| 10 | Are you amending your answer today? | 03:41:02 |
| 11 | A.   Yes.  So certainly it would have been when I wrote that | |
| 12 | paper, which is probably six years ago, and so, you know, it | |
| 13 | wasn't at the front of my mind when you asked me that then but, | |
| 14 | you know, as I sit here today, like, did I read scholarship on | |
| 15 | voter fraud, yeah, because we were trying to speak to the | 03:41:19 |
| 16 | prevalence of one form of voter fraud with that paper. | |
| 17 | Q.   I guess my question is a little narrower specifically | |
| 18 | about debates in the scholarly literature about how a person | |
| 19 | would define voter fraud.  Had you read anything on that prior | |
| 20 | to being engaged in this matter? | 03:41:35 |
| 21 | A.   Not that I recall.  Yeah, probably not. | |
| 22 | Q.   And you don't offer any competing definition of voter | |
| 23 | fraud in your report responding to Dr. Minnite? | |
| 24 | A.   Well, I think a more inclusive better measure of voter | |
| 25 | fraud would be one -- well, let me rephrase. | 03:41:51 |

United States District Court

MARK HOEKSTRA, PH.D. - Cross

1          I think a more useful measure for this case would not      03:41:55
2   require criminal intent because that's not the only thing that
3   legislators were attempting to prevent.  I also think it would
4   include fraud committed by -- you know, by third parties and
5   those would be meaningful differences to -- so I'm essentially   03:42:13
6   proposing an amended definition that -- I don't know that I
7   would call it voter fraud but I would call it a measure of
8   unlawful voting that is relevant for this case.
9          MR. DODGE:  Can we pull up paragraph 47 of
10  Dr. Hoekstra's report?                                           03:42:32
11  BY MR. DODGE:
12  Q.   You write here that Dr. Minnite's definition of voter
13  fraud, quote, improperly excludes any other form of election
14  corruption committed by nonvoters.
15          Can you explain why election corruption committed by     03:42:51
16  nonvoters should be included within the scope of voter fraud?
17  A.   Well, the point is, you know, that she's limiting things
18  to voter fraud so she's excluding things that come from third
19  parties, things that would come from campaigns, things that
20  would come from these registration drives organized by, you      03:43:10
21  know, by third parties.  Those are not voters.  They are third
22  parties that are, you know, may be registering people to vote
23  and she's excluding that.
24  Q.   You mentioned campaigns.  Can you explain to the Court how
25  H.B. 2492 or H.B. 2243 regulate what campaigns can do?           03:43:27

MARK HOEKSTRA, PH.D. - Cross

1    A.    I mean, we all know what the statutes say.  I've not           03:43:36

2    thought about if I were going to be a third party how exactly

3    would I engage in fraud.  I'm not going to claim to know

4    exactly how they would do that.  But I don't know if you're

5    trying to figure out is there election fraud on the system, I    03:43:53

6    don't know why you limit it only to voters and not third

7    parties.

8    Q.    I mean, the gist of my question is this:  You've

9    criticized Dr. Minnite for only looking at voters and my

10   question is, do you know if the laws in this case regulate       03:44:06

11   anything beyond voters?

12   A.    So there's a couple of different issues.  There's the laws

13   in this case and what they are doing.  What her report is about

14   is not just non-citizen voting.  It's about fraud much more

15   generally and in doing that, she's excluding this stuff and I    03:44:33

16   think she ought not.

17          And it may very well be true, and I'm trying to see

18   her thinking about that when they think about non-citizen

19   voting in particular, maybe that's all by voters and maybe it's

20   not by third parties.  I'm not sure as I sit here would --        03:44:49

21   could third parties be involved in this in some way.  I don't

22   know.

23          But her evidence is not just about non-citizen

24   voting.  It's about fraud more generally than that.

25   Q.    Yeah.  That's fair enough.  I guess I mean even just        03:45:09

United States District Court

MARK HOEKSTRA, PH.D. - Cross

1   setting aside Dr. Minnite's report I'm curious if you do think        03:45:12
2   these laws regulate nonvoter actors in the electoral process?
3   A.   It could potentially impact what, you know, what third
4   parties can do with respect to registering, say, non-citizens
5   to vote.                                                               03:45:28
6   Q.   You don't offer any examples in your report of a
7   non-citizen in Arizona who registered to vote without
8   fraudulent intent.  Fair to say?
9   A.   I didn't discuss any one-off examples at all in my report.
10          MR. DODGE:  Could we pull up paragraphs 52 through 54          03:45:44
11  of Dr. Hoekstra's report?
12  BY MR. DODGE:
13  Q.   And I'm glad to zoom in if you like.
14  A.   Zooming in would be great.
15  Q.   You quote a couple of legislators here who testified in          03:45:57
16  the hearings regarding the bills at issue here.  Fair?
17  A.   Yes.
18  Q.   But you would agree with me that you didn't
19  comprehensively review the legislative history of the
20  Challenged Laws?                                                       03:46:16
21  A.   So that's true.  I attempted to find the transcript that
22  Professor Minnite referred to when she cited these same things.
23  I wasn't able to find them.  I'm quoting them and presumably
24  she thought -- I mean my understanding is she didn't testify to
25  this part of her report.  But she was making some accusations         03:46:31

United States District Court

MARK HOEKSTRA, PH.D. - Cross

1    about the people who supported this and I'm pointing out that          03:46:36
2    she has no evidence of that.
3    Q.    I'm just trying to understand the scope of what you looked
4    at for your report and I think you answered my question which
5    is that you didn't comprehensively look at the record it when     03:46:48
6    came to the legislative debates over this bill?
7    A.    That's correct.  I looked at the things that she cited as
8    evidence of essentially discriminatory intent by the supporters
9    and I pointed out that it doesn't actually have any evidence of
10   that.                                                              03:47:05
11   Q.    A moment ago you said something I think very closely to
12   the effect of the kind of fraud -- the kind of behavior
13   legislators were intending to prevent with this law.  Do you
14   recall that?
15   A.    Sure.  I think so.                                          03:47:17
16   Q.    But you're not offering an opinion on what the legislators
17   who voted for these laws, what their actual legislative intent
18   was in enacting them?
19   A.    I'm pointing out that if you take them at their word as
20   quoted in Professor Minnite's report, they seem to be            03:47:33
21   interested in preventing voting by non-citizens and they didn't
22   seem to make any claim in what she quoted at least that they
23   were only interested in stopping this if there was criminal
24   intent or intent to corrupt the process.
25   Q.    Fair to say, though, that your opinion is limited to your   03:47:55

United States District Court

MARK HOEKSTRA, PH.D. - Cross

1   review of those particular quotes cited in your report?          03:47:59

2   A.   Yeah.  I was responding to, again, these accusations by

3   Professor Minnite about essentially the discriminatory intent

4   of those legislators and that's -- yeah.  So that's the

5   evidence that I evaluated and I didn't see any evidence of       03:48:16

6   discriminatory intent in there.

7   Q.   You make no claim in your report that County Recorders in

8   Arizona are themselves participating in any kind of electoral

9   fraud.  Fair?

10  A.   I certainly hope not.  I didn't make any accusations        03:48:30

11  there.  I didn't say anything about that.  I hope they are not

12  doing that.

13  Q.   Let's briefly hopefully talk about some of the

14  peer-reviewed literature that Dr. Minnite discusses in her

15  report and that you respond to.  You're aware of an article on  03:48:44

16  the prevalence of voter fraud by Professor Jesse Richman.  Is

17  that fair to say?

18  A.   I'm aware of it in the sense that I -- yeah, I looked

19  through it briefly.  I didn't spend lots of time thinking about

20  it.                                                              03:48:59

21  Q.   And as a general matter, you're aware that it purported to

22  find fairly substantial evidence of non-citizen voting in the

23  2008 presidential election?

24  A.   That's right.

25  Q.   And you're aware that there was a fair amount of criticism 03:49:12

United States District Court

MARK HOEKSTRA, PH.D. - Cross

1    in the political science field of Professor Richman's article?    03:49:15

2    A.    I'm only aware of that from counsel to some extent about

3    the criticism about how, you know, wide it was or whatever.  So

4    the only thing I'm -- I have real good knowledge about is that

5    the paper that critiqued it where, again, I didn't read it    03:49:33

6    carefully but I am aware of it.

7    Q.    Do you have any view of the critique offered in that

8    rebuttal article you just alluded to?

9    A.    No.

10   Q.    You don't discuss Professor Richman's article in your    03:49:47

11   report.  Is that fair to say?

12   A.    That's right.

13   Q.    Are you aware of any other peer-reviewed article finding

14   substantial levels of non-citizen voting in the United States?

15   A.    Yeah, I'm not aware.  To be clear, I'm not aware one way    03:50:02

16   or the other.  I don't know if there are things that say it's

17   zero or things that says it's a lot.

18   Q.    Fair enough.

19         Is there a reason you didn't discuss Professor

20   Richman's paper in your report?    03:50:14

21   A.    Yeah.  We talked about this before and I was trying to

22   figure out why you asked me so many questions about this in the

23   deposition and then it occurred to me that this guy Richman is

24   another expert for the defense.

25         I didn't have -- I didn't think of that as I was    03:50:28

United States District Court

MARK HOEKSTRA, PH.D. - Cross

1   reading it.  Like I knew he was another expert but I didn't        03:50:30
2   recognize the name as I saw it.  I literally was responding to
3   four reports in a short period of time.  I was focusing on the
4   stuff that Minnite was emphasizing and I was simply pointing
5   out that she had a 330 plus word footnote where she talked       03:50:46
6   about things she excluded.  But I didn't have time to go dig
7   into it.
8   Q.   We agreed in your deposition that she actually spent
9   some time above the line in her report discussing Professor
10  Richman's paper at some length.  Is that fair?                    03:51:00
11  A.   So at the very end of her report she talked a bit about
12  that, yeah.
13  Q.   Here's the gist of my question:  In your report you look
14  at I think a half-dozen or so papers that Professor Minnite
15  relies upon in reaching her conclusion but here you have          03:51:14
16  another article that reaches a contrary finding but you don't
17  consider it at all in your report in evaluating the other
18  papers she relies on.
19       And so I'm just curious why you chose not to discuss
20  it in your report.                                                03:51:30
21  A.   I mean, she didn't feature it heavily.  It's like
22  literally a thing -- again, so we made clear in the deposition
23  the discussion.  We can go pull up the discussion at the end of
24  her report and exactly the context in which she's discussing
25  about discussing that paper.                                      03:51:45

United States District Court

MARK HOEKSTRA, PH.D. - Cross

1      But as I read it, like I thought, well, here we have          03:51:48

2  something that she's excluding that's not helpful.  I'm going

3  to point out that she's excluding this paper that's not helpful

4  and I didn't have time to go dig into the weeds of, you know,

5  can this thing be explained by measurement error or can it not.  03:52:02

6      And honestly I think we already -- well, I think

7  tomorrow you're going to have this person testify and he can

8  testify directly about this stuff presumably.

9  Q.   Let's move on from Professor Richman and get to the papers

10 you did discuss in your report.                                  03:52:18

11      MR. DODGE:  Can we pull in section six at paragraph

12 55 of professor Hoekstra's report?

13 Q.   You offer some criticisms of how she relies on these

14 papers.  Fair to say?

15 A.   Yes.                                                        03:52:45

16 Q.   But it's fair to say that in this section of your report,

17 you only discuss two of those six papers; right?  We can

18 maybe --

19 A.   Yeah.  I'm trying to remember to make sure you're not

20 misstating things.                                               03:52:59

21 Q.   So let's look at -- well, let's look at 57 and 58.  So

22 here you're looking at one of the papers, the Goel paper, is

23 that fair to say?

24 A.   Right.

25 \\\

United States District Court

MARK HOEKSTRA, PH.D. - Cross

1    MR. DODGE:  And can we go to the next page?          03:53:16

2  Q.   And look at 60 and 61.  And so here you're talking about

3  the Ahlquist, Mayer paper?

4  A.   Yes.

5  Q.   Did you discuss any of the other four papers Dr. Minnite    03:53:28

6  relied upon in this section of your report?

7  A.   I don't discuss their findings.  I -- I think I quote from

8  those studies in different parts of my report.  I believe two

9  of them were essentially about the accusations like the kind of

10  wild accusations made by President Trump.  I didn't spend time    03:53:47

11  looking at those or I didn't spend much time.

12  Q.   I'm going to skip ahead a bit.  Let's talk about the voter

13  confidence issue.  You don't offer any report in your opinion

14  about whether the laws here will positively or negatively

15  impact voter confidence in Arizona.  Is that fair to say?    03:54:24

16  A.   Yeah.  I don't know for sure what's going to happen on

17  that.  I'm not going to claim that voter confidence is going to

18  get a lot better.  The best I've done is introduced the one

19  study which finds some evidence that when you made people aware

20  of the safeguard, there were improvements in perceptions of    03:54:39

21  election integrity.

22  Q.   You didn't measure public awareness in Arizona of the

23  provisions of law at issue in this litigation?

24  A.   I did not.

25  Q.   And you're not claiming to measure any change in voter    03:54:54

MARK HOEKSTRA, PH.D. - Cross

1    confidence from before and after the enactment of these laws?                03:54:57

2    A.    That's correct.  I'm not attempting to get at the causal

3    impact of these laws on voter perceptions in Arizona.

4    Q.    Just a few questions on that paper you discussed, the

5    Endres and his co-author paper as you put it.                                03:55:09

6    A.    Right.

7    Q.    You described that paper as --

8              MR. DODGE:  Let's actually pull it is up.  Can we

9    pull up Defense Exhibit 948?

10   BY MR. DODGE:                                                                03:55:31

11   Q.    This is that study, fair?

12   A.    Yes.

13             MR. DODGE:  Can we just zoom in on abstract a bit and

14   just take a quick moment to review it?

15   BY MR. DODGE:                                                                03:56:00

16   Q.    Good with the abstract?

17   A.    Yes.

18   Q.    According to the abstract, the researchers in this paper

19   partner with an advocacy group to send postcards to voters in

20   Virginia about the state's voter ID law.  And then afterwards,              03:56:12

21   they surveyed those voters to compare their attitudes relative

22   to a control group.

23             Did I get that about right?

24   A.    That's right.  Yeah.

25   Q.    And their conclusion is that the voters who received those            03:56:23

United States District Court

MARK HOEKSTRA, PH.D. - Cross

1   postcards received -- reported, rather, slightly higher degrees      03:56:26
2   of voter confidence than the control group?
3   A.   I think that's fair.
4   Q.   It's fair to say then that the voters who did not get
5   postcards had slightly lower confidence in the electoral system      03:56:38
6   than the treatment group?
7   A.   So it's going to be true the control group although I
8   believe -- I'm trying to remember now exactly how they set it
9   up, if the control group just got a postcard indicating there's
10  an election.  If we went to the results, I would remember that      03:56:54
11  better.  I don't want to misstate how they are defining
12  control.
13  Q.   That's fair.  The Challenged Laws in this case, to your
14  knowledge, don't require the State of Arizona to send postcards
15  to voters describing the provisions of these laws?                   03:57:08
16  A.   Can you ask that one more time?
17  Q.   Sure.  So the laws at issue in this case, they don't have
18  any provision telling the State of Arizona you have to send
19  postcards to people across the state educating them on what's
20  in this law?                                                          03:57:24
21  A.   Yeah.  I don't know what the informational requirements
22  are and how that information gets disseminated.  Obviously this
23  study is getting at the impact of information generally and
24  that information could come from things other than postcards.
25  Q.   Well, in the abstract it says they partnered with an            03:57:39

United States District Court

MARK HOEKSTRA, PH.D. - Cross

1  advocacy organization.  Do you see that?                          03:57:43

2  A.    Yes.

3  Q.    Do you know what advocacy organization was involved?

4  A.    I want to say it was the Women's League of Voters.

5  Q.    League of Women Voters sounds right to you?                 03:57:53

6  A.    League of Women Voters, that sounds better.

7  Q.    Do you know anything about their reputation when it comes

8  to working at elections?

9  A.    Not that I'm willing to say under oath as I stand here.

10  Q.    So you wouldn't know if perhaps they are a highly          03:58:03

11  respected relatively nonpartisan organization when it comes to

12  elections?

13  A.    I suspect -- I suspect that's true because I don't know

14  them to be partisan but I'm not -- I don't have a lot of

15  knowledge about the organization.                                03:58:14

16  Q.    Are you aware of any similar advocacy organization in

17  Arizona that's undertaken a public outreach campaign to educate

18  voters in this state about the laws at issue here?

19  A.    I don't know one way or the other.

20  Q.    Let's assume for a moment the control group here didn't    03:58:34

21  get postcards.  In that case your average Arizona voter would

22  be much more like the control group, right, as a person who

23  didn't receive a postcard?

24  A.    Yeah.  I'm not sure that assumption is true.  You know,

25  again, we can look at the main results and I think we can        03:58:52

United States District Court

MARK HOEKSTRA, PH.D. - Cross

1    figure out exactly what the control group was.                    03:58:55

2           But, you know -- but again it's -- if Arizona voters

3    didn't get a postcard, they didn't get a postcard; but again,

4    the point of this paper is to get at what is the impact of

5    information.  They are using postcards not because postcards    03:59:07

6    are magical but it's because they can do an experiment with

7    postcards that they can't do with TV or radio or other forms of

8    disseminating information.

9    Q.   You don't know what level of awareness the public in

10   Arizona has with respect to these laws.  Fair?                  03:59:22

11   A.   I don't know.  I wouldn't be surprised if there's some

12   confusion over them in part just because of the lawsuits and so

13   on.

14   Q.   Is it fair to say that perhaps most people in Arizona have

15   never heard of these laws to begin with?                        03:59:33

16   A.   I don't know.  I haven't studied that.  I don't know.

17          MR. DODGE:  Could we just Zoom in on PDF page two of

18   this article, specifically the paragraph under Experimental

19   Design.  Could we highlight the sentence beginning "We obtained

20   a random sample" ending in "voter per household"?               03:59:51

21   BY MR. DODGE:

22   Q.   Just based on this excerpt, it's fair to say this study

23   relied exclusively on people with land line telephones?

24   A.   That's right.

25   \\\

United States District Court

1801

MARK HOEKSTRA, PH.D. - Cross

```
 1          MR. DODGE:  If we can pull up the next paragraph now.   04:00:09
 2   And can you highlight the portions beginning with "All 28,000
 3   subjects" through the end of the paragraph about the bottom
 4   two-thirds?
 5   BY MR. DODGE:                                                  04:00:22
 6   Q.   Based on this excerpt, it's fair to say that only 1.54
 7   percent of the 28,000 subjects ultimately responded and were
 8   included within the survey?
 9   A.   That's right.  So as with many surveys, response rates are
10   incomplete.  They are low in general.  This is, you know, maybe  04:00:37
11   especially low and so the authors do things to try to deal with
12   that.
13   Q.   It's fair to say the authors acknowledge that the
14   individuals who they did count tended to be older and tended to
15   vote at higher rates than the full sample?                     04:00:49
16   A.   I don't recall but that may well be true.
17   Q.   Just a couple stray questions and I'll finish up.  You
18   gave some testimony on direct about the differences between
19   naturalized citizens and citizens.  Do you recall that?
20   A.   Yes.                                                      04:01:06
21   Q.   And, I mean, you said that naturalized citizens do well.
22   They are successful.  Is that fair?
23   A.   Yeah.  They are more advantaged on average compared to,
24   you know, citizens by birth.
25   Q.   Naturalized citizens start in this country as            04:01:18
```

United States District Court

MARK HOEKSTRA, PH.D. - Cross

1   non-citizens.  Fair?                                          04:01:23

2   A.    Yes.

3   Q.    Would you say it's fair to -- strike that.

4          It's fair to say that a naturalized citizen in this

5   country would also be very different from a non-citizen who   04:01:30

6   never naturalizes; right?

7   A.    I mean, they may well be.  So you're asking me can

8   naturalized citizens be different from non-citizens?

9   Q.    Yeah.  Is it possible they would be different in important

10  ways in terms of their age, socioeconomic level, their races,  04:01:51

11  these other key characteristics?

12  A.    Certainly that's possible for them to be different in lots

13  of ways.

14  Q.    Would you say it's likely they are different in important

15  ways?                                                         04:02:01

16  A.    I mean, I would want -- you could look at the data and you

17  would know for sure.  I mean, they may well be different.  I'll

18  say that.

19  Q.    It was just striking to me that you noted that naturalized

20  citizens are appreciably different from citizens and I was    04:02:13

21  wondering if the same was true relative to non-citizens.

22  A.    Yeah, the reason I'm focused on citizens here is because,

23  you know, citizens are the ones who can vote legally.  And so

24  if we're thinking about the people who are impacted, like these

25  are the people we want to be comparing.                       04:02:30

United States District Court

MARK HOEKSTRA, PH.D. - Cross

```
1   Q.   That's fair.  That's fair.  I was curious about that.         04:02:32
2          Final questions.  You mentioned a couple of polls
3   nationally about public concern about the integrity of the
4   electoral system.
5   A.   Yes.                                                          04:02:44
6   Q.   Those were national polls?
7   A.   Yes.
8   Q.   They were conducted prior to the enactment of these laws?
9   A.   Yes.  I think 2016 and 2020 I believe were the dates of
10  those.                                                             04:02:55
11  Q.   And you don't cite any polls specific to Arizona?
12  A.   Yeah.  I mean, if there were, I didn't find it.  To my
13  knowledge, most of these polls are doing things nationally but
14  if there's one that is specific to Arizona, I missed it.
15  Q.   You mentioned in direct that you thought there were          04:03:10
16  700,000 people in Arizona who would be concerned or have doubts
17  about the integrity of the electoral system.  Do you recall
18  that?
19  A.   I believe the 700,000 number was the number, the estimated
20  number of registered voters in Arizona who believe there is      04:03:25
21  a -- that non-citizen voting is very common.  I believe that's
22  the correct characterization of that.
23  Q.   Correct me if I'm wrong.  You got that number by taking
24  those national survey results and just applying them to the
25  population of Arizona; right?                                     04:03:44
```

United States District Court

1804
MARK HOEKSTRA, PH.D. - Cross

1    A.    Correct.  So it's the fraction of people in that survey     04:03:46
2    who said they believe there was a great deal of non-citizen
3    voting and I think -- I can probably back this out.  I think it
4    was 17 percent.  You multiply 17 percent by 4.2 million I
5    believe registered voters in Arizona and you come up with that   04:04:03
6    number.
7    Q.    But it's fair to say you didn't do any analysis -- focus
8    specifically on the attitudes of Arizonans with respect to
9    public faith in the electoral system?
10   A.    That's correct.  Again, I think, you know, given that      04:04:19
11   there was clearly support for these laws politically, I think
12   in general, it's reasonable to believe that those numbers are
13   probably conservative, but obviously I don't know the true
14   numbers because we didn't do the survey.
15              MR. DODGE:  I pass the witness.                        04:04:34
16              MS. KANTOR COHEN:  Michelle Kantor Cohen for Poder
17   Latinx plaintiffs.
18                    **CROSS - EXAMINATION**
19   BY MS. KANTOR COHEN:
20   Q.    Dr. Hoekstra, in these questions I'll refer to your report 04:05:14
21   in response to Dr. McDonald which has been marked as DX 901.
22              In this report, similar to your rebuttal to
23   Dr. Minnite, you say that your analysis in the case is based on
24   my knowledge and experience as an active research economist who
25   is well versed in the frontier empirical methods used in causal  04:05:36

1805

MARK HOEKSTRA, PH.D. - Cross

1   analyses; correct?                                            04:05:41

2   A.   Yes.

3   Q.   You testified on direct we're trying to calculate marginal

4   costs in the context of voting.

5            Do you remember that?                                04:05:48

6   A.   I remember talking about marginal costs in the context of

7   voting, yes.

8   Q.   You didn't attempt to calculate costs of voting in your

9   rebuttal here; correct?

10  A.   Not directly.  I'm speaking -- I am commenting on evidence  04:05:59

11  and the impact of these increases in expected marginal costs on

12  voting which are relevant for assessing the magnitude of that

13  but I'm not directly trying to put a number on that.

14  Q.   You're not presenting any quantitative analysis of the

15  cost of voting as part of your response to Dr. McDonald;       04:06:16

16  correct?

17  A.   I did not do my own independent analysis of that.  I'm

18  relying on the literature.

19  Q.   Let's talk about costs a little bit.  If the law changes

20  things for some people because they will have to show          04:06:32

21  documentation and it doesn't change things for others, there's

22  an additional voting cost on the group required to show

23  documents; right?

24  A.   Arguably, yes.

25  Q.   If someone had to go update their citizenship status in   04:06:49

United States District Court

MARK HOEKSTRA, PH.D. - Cross

1   person versus someone who did not have to do that, there would          04:06:53

2   also be an additional voting cost that that person would have

3   to undertake versus someone who did not have to go in person to

4   do that; right?

5   A.   Yeah.   That's true and certainly what I think the authors     04:07:06

6   of many of these studies would say is these laws could have

7   indirect effects on other people as well.   And not just on

8   positive population you're talking about but what you said is

9   true.

10  Q.   If a citizen was not able to vote in an election while          04:07:20

11  their documentary proof of citizenship was being sorted out,

12  you agree that would be a cost of voting; right?

13  A.   Yeah.   That would be a cost of voting that were

14  sufficiently high to prevent voting from happening.

15  Q.   You're aware that the voter registration form is signed        04:07:48

16  under penalty of perjury; right?

17  A.   Yes.

18  Q.   And when you wrote your report, you didn't know the

19  specific penalties for intentionally registering to vote as a

20  non-citizen in Arizona; correct?                                     04:08:02

21  A.   Yeah, I did not look into that, like either what's in the

22  statute or in practice what the penalties are that get laid

23  out.

24  Q.   And when you wrote your report, you were not aware of what

25  the immigration-related consequences for registering to vote as     04:08:13

United States District Court

MARK HOEKSTRA, PH.D. - Cross

1  a non-citizen would be; right?                                    04:08:18

2  A.   That's true.  Well, let me rephrase.  So it's true I

3  didn't know exactly what the consequences are.  I can imagine

4  if you commit a felony and you're convicted of a felony, it's

5  not surprising to me that that could have implications for      04:08:34

6  whether you can remain in the country.

7  Q.   Let's take a moment to talk about the sources you

8  consulted in preparing your report.

9  A.   Okay.

10 Q.   In writing your report, you did not review the testimony   04:08:54

11 of any representatives of the Secretary of State's office in

12 this case; correct?

13 A.   That's correct I think.

14 Q.   And in writing your report, other than a few transcripts

15 cited in your response to Dr. Minnite's report, you did not     04:09:12

16 review the testimony of additional County Recorders in this

17 case; right?

18 A.   Yeah.  I believe I cited three and I think from memory, I

19 think I looked over a fourth and I think that was the extent of

20 it.                                                              04:09:27

21 Q.   You did not review testimony of the Arizona Department of

22 Transportation in this case; correct?

23 A.   That's correct.

24 Q.   You did not review testimony of United States Citizenship

25 and Immigration Services representatives in this case; right?   04:09:38

United States District Court

MARK HOEKSTRA, PH.D. - Cross

1    A.   That's correct.                                          04:09:41

2    Q.   And you didn't review the Arizona Election Procedures

3    Manual in drafting your reports; correct?

4    A.   That's correct.

5    Q.   I believe you stated earlier that Professor McDonald's  04:09:57

6    analysis suggests that the Challenged Laws would reduce voting

7    more for White people than it would for minorities?

8    A.   In terms of -- well, yeah.  So I would like to rephrase.

9    So if we're thinking about federal-only voters, the people that

10   are most directly by this, they are -- per his analysis, there  04:10:18

11   are more White people in that group than non-White people in

12   that group.

13   Q.   Let's look at Dr. McDonald's Table 5 which is PX 338,

14   which is already in evidence.

15           So you would agree that according to Table 5 Hispanic  04:10:36

16   individuals comprise a higher percentage of federal-only voters

17   than they do active registered voters; right?

18   A.   Can you ask that one more time?

19   Q.   Sure.  You would agree that Hispanic individuals,

20   according to this table, comprise a higher percentage of        04:10:49

21   federal-only voters than the percentage of active registered

22   voters; right?

23   A.   That's correct.

24   Q.   And you would agree that Asian American Pacific Islander

25   individuals, according to this table, comprise a higher          04:11:02

United States District Court

MARK HOEKSTRA, PH.D. - Cross

1    percentage of federal-only voters than they do active          04:11:06

2    registered voters; right?

3    A.    Yeah.  It's 2.5 versus 2.2 percent so it's a small

4    difference and I don't know how much to make of that.  But that

5    number 2.5 is greater than 2.2.                                04:11:17

6    Q.    You criticize Dr. McDonald's use of active registered

7    voters as an appropriate benchmark for federal-only voters;

8    right?

9    A.    So it's true I criticize it for it.  I also criticize it

10   for these other two groups, the groups with suspended or       04:11:35

11   canceled registrations.

12   Q.    And you offer the Arizona population as your benchmark;

13   correct?

14   A.    I wouldn't call it my benchmark.  I would say I offered up

15   as a benchmark that would be more appropriate to the extent    04:11:49

16   that you believe that the -- that the people in those three

17   groups are non-citizens rather than citizens.

18   Q.    Including federal-only voters; right?

19   A.    Yes, for all three of those groups.

20   Q.    The Arizona State population includes children; correct?  04:12:05

21   A.    Correct, and you could do the -- and I'm sure on rebuttal

22   you could have done the same thing excluding children.

23   Q.    But in your report you included children?

24   A.    I included children in the report, yeah, whole population.

25   Q.    You're aware children under 18 make up more than 20       04:12:21

United States District Court

MARK HOEKSTRA, PH.D. - Cross

1   percent of Arizona's population according to the census?                04:12:24

2   A.    Sure.  And to the extent this matters, it's determined by,

3   you know, which people have more kids and so on.

4   Q.    So your benchmark includes at least 20 percent of the

5   population who can't vote; right?                                       04:12:36

6   A.    Population includes lots of people who can't vote

7   including non-citizens as well.

8   Q.    If the federal-only voters were all citizens, you would

9   agree that the appropriate benchmark for them would be active

10  registered voters; right?                                              04:12:54

11  A.    I would agree that would be the way to assess whether

12  things are proportional or disproportional.  Again, I would

13  emphasize that if you want to believe that this law was passed

14  with discriminatory intent, you would have to believe that the

15  legislature was willing to disenfranchise or inconvenience more        04:13:12

16  White people than non-White people.  And maybe -- you can

17  believe.  Anyone can believe that if you want to but that's --

18  you would have to believe.

19  Q.    But again, if the federal-only voters were all citizens,

20  you would agree that the appropriate benchmark would be active         04:13:24

21  registered voters?

22  A.    I agree it's the appropriate benchmark for assessing

23  proportional/disproportional effects.  What I'm disputing is

24  whether or not that's the right way to think about evidence of

25  discriminatory intent.                                                 04:13:41

MARK HOEKSTRA, PH.D. - Cross

1   Q.   You haven't conducted any analysis in your report as to          04:13:45
2   whether non-citizens are equally likely to apply to register to
3   vote as citizens, have you?
4   A.   Can you ask that again?
5   Q.   Sure.  You haven't conducted any analysis as to whether          04:13:55
6   non-citizens are equally likely to register to vote as
7   citizens, have you?
8   A.   I have not.
9   Q.   Let's turn to another article you relied on in your
10  testimony.                                                            04:14:14
11            MS. KANTOR COHEN:   Can we please pull back up DX 950?
12  BY MS. KANTOR COHEN:
13  Q.   And you relied on this article to support your conclusions
14  regarding negative interactions with law enforcement?
15  A.   Yes.                                                             04:14:28
16  Q.   When you wrote your report, you had not read this article
17  in its entirety; correct?
18  A.   I had not read it super carefully, that's true.
19  Q.   Let's look at page 934, the first full paragraph.
20            The pertinent issue here was actually abandoned            04:14:54
21  before the election, wasn't it?
22  A.   Yes.  I pointed that out earlier when I testified about
23  this.
24  Q.   And the challenged voters got a letter from election
25  officials that their rights were restored and they could vote        04:15:06

United States District Court

MARK HOEKSTRA, PH.D. - Cross

1  even if they hadn't responded to the challenge; right?                04:15:08

2  A.    That's correct, as we talked about earlier.

3  Q.    So all of these challenged citizens were, in fact, allowed

4  to vote, even those who did not respond to the challenge or

5  provide DPOC; right?                                                  04:15:20

6  A.    Correct, as we talked about earlier.

7         MS. KANTOR COHEN:  Let's look at page 952, please.

8  BY MS. KANTOR COHEN:

9  Q.    The authors realize that the fact the purge was halted

10  before the election had significant implications for              04:15:42

11  interpreting the study; right?

12  A.    Yes.  They talk about that.  If you can highlight in --

13  blow up the particular reference that you're referring to, that

14  would be helpful.

15  Q.    Sure.  It's the sentence beginning, "More importantly,       04:15:57

16  unlike other systemic purges."  It says:  More importantly,

17  unlike other systematic purges, the targeting of potential

18  non-citizens in Florida was halted before the election.  This

19  has significant implications for interpreting our estimated

20  treatment effect."                                                  04:16:28

21         Do you see that?

22  A.    Yes.

23  Q.    So the authors are conveying that this treatment effect

24  has to be interpreted in light of the fact that the purge

25  itself was halted; right?                                           04:16:34

United States District Court

MARK HOEKSTRA, PH.D. - Cross

1  A.   Yes.  They are picking up the impact of both of these          04:16:36

2  letters, both the one that says we're challenging your

3  registration and I think roughly half of the people then went

4  through with proving citizenship and then obviously the second

5  letter as well that said just kidding.  Everybody here can vote   04:16:50

6  regardless of whether or not you did that.

7          MS. KANTOR COHEN:  Can we look at the next two

8  sentences, please.

9  BY MS. KANTOR COHEN:

10 Q.   And the authors write, "As it is unlikely that the aborted   04:17:05

11 purge demobilized any potential voters, our estimates only

12 capture the positive changes in vote propensity we would expect

13 to observe for some had the purge been conducted.  In the

14 absence of a halt to the process" --

15         THE COURT:  Are you trying to test the speed of the        04:17:22

16 court reporter?

17         MS. KANTOR COHEN:  I apologize.

18         THE COURT:  I think she's probably passing the test

19 but really at 4:20 in the afternoon, it's not really fair to

20 talk as fast as you possibly can.                                 04:17:30

21 BY MS. KANTOR COHEN:

22 Q.   The second sentence there, "In the absence of a halt to

23 the process, the increased costs would have undoubtedly kept

24 some previously registered individuals from voting."

25         You didn't actually --                                    04:17:43

MARK HOEKSTRA, PH.D. - Cross

1    A.   I'm trying to find where you're reading.                04:17:45

2    Q.   I'm sorry.  It's the next two sentences after the first

3    one we looked at.  So it's the third and fourth sentences at

4    the top of the page.

5    A.   Okay.  Beginning with "In the absence of"?              04:17:57

6    Q.   "As it is unlikely."

7    A.   Got it.

8    Q.   Got it.  You didn't --

9             THE COURT:  Hold on.  Let him read it.

10            Let us know when you're finished.                   04:18:11

11            THE WITNESS:  Just give me a second.

12            Okay.  I've read it.

13   BY MS. KANTOR COHEN:

14   Q.   You didn't actually discuss this language in your report,

15   did you?                                                     04:18:28

16   A.   So that's correct.  I also disagree with part of what they

17   are saying here.  Part of what they are saying is not true.  So

18   it's not going to be true that they are only capturing, you

19   know, positive changes in voting propensity.

20            To the extent that Professor McDonald was right there  04:18:41

21   and that this interaction with law enforcement, you know, has

22   this, like, negative impact on you, which is what he's

23   asserting in his report, if that were true, then you would

24   expect a lot of these people to perhaps become less likely to

25   vote and you don't see that.  In fact, you see the opposite.   04:18:58

United States District Court

MARK HOEKSTRA, PH.D. - Cross

1   Q.   All right.   Let's move to another study that you discussed          04:19:09

2   which was DX 951, Citrin and Green.   And you talked about this

3   earlier in your testimony for the point about voter ID measures

4   that increased turnout in your view; right?

5   A.   Yes.                                                                  04:19:29

6   Q.   And before you read -- sorry.   Excuse me.

7            Before you wrote your report, you didn't read this in

8   its entirety; correct?

9   A.   I mean, again, I looked through things to try to figure

10  out whether they were good.   Did I read every paragraph, every           04:19:41

11  word?   Probably not.

12  Q.   This was a controlled experiment; correct?

13  A.   Yes.

14  Q.   This treatment was providing information about the voter

15  ID requirement; right?                                                    04:19:52

16  A.   Yes.

17  Q.   Both the treatment and the control groups were subject to

18  the voter ID requirement in the study; right?

19  A.   Yes, although they might not have been aware of it and

20  that's why this study is useful.                                          04:20:04

21  Q.   But they both had to show -- both the control group and

22  the treatment group had to show their ID; right?

23  A.   That's true.

24  Q.   So the study didn't observe the impact of the voter ID

25  requirement on the treatment group; right?                               04:20:19

United States District Court

MARK HOEKSTRA, PH.D. - Cross

1   A.   They are looking at the impact of, essentially, knowledge          04:20:23
2   about that ID requirement as well as whatever it is that they
3   were queuing up in the messages that they sent out.
4   Q.   But the given here is that all voters have the ID
5   requirement applied to them in the study; right?                        04:20:36
6   A.   That's -- so that's true.  All voters have the ID
7   requirement.  Some of them, you know, the voting requirement
8   was made salient to them and some of them it wasn't.  And
9   that's relevant especially when we start thinking about all of
10  those other studies that we look at, like, why are you seeing          04:20:53
11  positive effects sometimes?
12        Well, for whatever reason, it seems like being made
13  aware of these things can sometimes cause increases in turnout.
14  Q.   And in your deposition you guessed that H.B. 2492 or 2243
15  came with a voter education requirement.  Do you remember that?        04:21:08
16  A.   Yeah.  My -- sure.  Most of the time these things come
17  with some educational requirement.  I didn't claim particular
18  knowledge I don't think about Arizona.
19  Q.   So let's pull up DX 952, please.  It's entitled "Strict ID
20  Laws Don't Stop Voters" and you discussed this on your direct          04:21:28
21  testimony; right?
22  A.   Yes.
23  Q.   And this is not a controlled experiment; right?
24  A.   That's correct.  It's difference-in-differences which
25  we've talked about.                                                     04:21:39

United States District Court

MARK HOEKSTRA, PH.D. - Cross

1   Q.   And let's look at the abstract.  It says at the end:          04:21:41

2   Strict ID requirements have no effect on fraud, actual or

3   perceived.  Overall, our findings suggest that efforts to

4   improve elections may be better directed at other reforms.

5            You don't -- do you see where it says that?            04:21:59

6   A.   Yes.  Yes.

7   Q.   You don't discuss this language in your report; right?

8   A.   That's correct.

9   Q.   Isn't this directly contrary to your point?

10  A.   In what way is it directly contrary to my point?          04:22:12

11  Q.   It does not -- it states that strict ID requirements have

12  no effect on fraud, actual our perceived; correct?

13  A.   Correct.  And I'm not asserting that as a result of these

14  laws that voter perception will definitely be improved.  And as

15  we've talked about in the deposition, I think one challenge in  04:22:32

16  a paper like this is to overcome the fact that not everyone is

17  aware of the laws.

18           And so if you want to look at the impacts on voting,

19  well, like you're subject to the law regardless of whether you

20  know it or not.  When you want to look at the impact on          04:22:45

21  perceptions, you really want to look -- you really want people

22  to know about the law, because if they are not aware the law is

23  in place, then you're not going to -- you're not going to find

24  any difference in perceptions even if, you know, knowledge of

25  the law would impact perceptions.  And I think that's a          04:23:00

United States District Court

MARK HOEKSTRA, PH.D. - Cross

1    challenge in this context.                                      04:23:03

2            The other challenge is when you look at the estimates

3    for actual fraud here, I mean, those --

4    Q.   I didn't ask you a question about that.

5    A.   You asked me a question about the sentence and why I       04:23:14

6    didn't include it and I'm telling you now why I'm not including

7    it.

8            If you look at the estimates on actual fraud, what

9    you'll see is, like, they can't reject the actual fraud went to

10   zero.  Like their estimates are so imprecise on actual fraud    04:23:27

11   and, again, it's actual measured fraud.  I think on one measure

12   they can't reject, like, a 50 percent reduction.  The other

13   one, literally, they can't reject if it went to zero.

14           And so it's, like -- I don't blame them for doing it

15   but it's not a very useful result.                              04:23:43

16   Q.   So it's indeterminate?

17   A.   I think their evidence on actual fraud is so imprecise

18   that's not very useful.

19   Q.   So let's look at -- it's page 2618 in this document which

20   is PDF page four I believe.                                     04:24:06

21           Can you please read the last two sentences to

22   yourself beginning -- of the first full paragraph beginning

23   "However, the laws increase."

24           So we were talking about --

25           THE COURT:  Well, could you let him read it first?      04:24:27

United States District Court

MARK HOEKSTRA, PH.D. - Cross

1       MS. KANTOR COHEN:  Excuse me.                                    04:24:30

2           THE WITNESS:  Okay.  'ready.

3   BY MS. KANTOR COHEN:

4   Q.   You've said that one of the things that come with the law

5   is the mobilization efforts that come with campaigns; right?       04:24:38

6   A.   Yeah.  Lots of things can come with the laws.

7   Mobilization efforts could be one of those things.  Obviously,

8   knowledge about the laws comes with those things.  Potentially

9   changes in perceptions of election integrity, possibly anger

10  from claims of voter suppression, lots of things.  This is one     04:24:53

11  of them.

12  Q.   So you agree that this article finds that these laws

13  increase the likelihood that campaigns contact non-White

14  voters; right?

15  A.   So that's literally what it says right there.  I would        04:25:12

16  like to look at the table as well if I can just to make sure

17  that they are determining that the right way.

18  Q.   Tell us when you get to the table that you want to look

19  at.

20  A.   I think it's going to be after this I believe.  Okay,         04:26:33

21  maybe before.  There it is.

22          Yeah, that's right.  Okay.  I see the estimate.

23  Q.   So just to --

24  A.   And their characterization of it is fair.  I just wanted

25  to check that their characterization of it was fair and that       04:26:56

United States District Court

MARK HOEKSTRA, PH.D. - Cross

1  you weren't talking about some suggestive result.                    04:27:00

2  Q.   Sure.   Just to go back to my question, you agree that this

3  article finds that these laws increase the likelihood that

4  campaigns contact non-White voters; right?

5  A.   That's right.                                                   04:27:09

6  Q.   And these efforts might have offset -- they conclude these

7  efforts might have offset direct negative effects of the laws'

8  requirements itself; right?

9  A.   That's right.   And the language they use is I think

10 appropriately cautious when they talk about this because they       04:27:22

11 don't know, for example, were those people who were contacted?

12 Are those the additional people who voted or not?   And really

13 they are trying to explain this result, especially for

14 Hispanics, that Hispanics, after these laws, were more likely

15 to vote and they are trying to figure out what are the             04:27:42

16 potential explanations for that.

17 Q.   So talking about the mobilization campaigns, groups or

18 campaigns responding to these laws have to spend money to do

19 that mobilization; right?   You're an economist.

20 A.   So I presume they are spending money to do that.               04:27:56

21          I want to say one more thing on that.   I think

22 there's two interpretations for those mobilization campaigns.

23 One is that maybe they are trying to offset this stuff and they

24 are -- legitimately think there's negative effects and they are

25 going to try to offset it.   The other is that they see an          04:28:26

United States District Court

MARK HOEKSTRA, PH.D. - Cross

1   opportunity to get people -- to get their base motivated by          04:28:29

2   making voter suppression arguments and all of those things.

3   And I don't claim to know which of those is true but I think

4   they are both possible.  And for someone trying to win an

5   election, you know, both would be rational, including the          04:28:43

6   second thing.

7   Q.   But the authors of this study that you cited in your

8   testimony are concluding that the mobilization efforts might

9   have upset small direct negative effects on the participation

10  of ethnic minorities; right?  That's their conclusion?          04:28:58

11  A.   Yeah.  And I think "might have" is the appropriate

12  language for that.

13  Q.   Okay.  So let's pull up DX 944, please.  And this was the

14  article you discussed about the Medicaid documentation

15  requirement; right?          04:29:15

16  A.   Yes.

17  Q.   This constitution noted that about 30 percent of

18  non-citizens were actually eligible for Medicaid; right?

19  A.   I don't remember the number offhand but there was a chunk.

20  That's true.          04:29:31

21  Q.   We can look at it.  Does that refresh your recollection?

22  A.   Yes.

23  Q.   And I think we agreed that the study, the authors don't

24  know what the impact was on non-citizens who were not eligible

25  for Medicaid versus citizens who were, in fact, eligible for          04:29:46

United States District Court

MARK HOEKSTRA, PH.D. - Cross

1    Medicaid because they can't distinguish between those two sets          04:29:50
2    of people in their data; right?
3    A.    I don't think you said that right.  I think it's true that
4    they can't distinguish between the affects on non-citizens
5    eligible for Medicaid and effects on non-citizens not eligible          04:30:06
6    for Medicaid.  They distinguish between non-citizens generally
7    and citizens.
8    Q.    Right.  But in terms of looking at non-citizens on one
9    hand who are eligible versus non-citizens who are not
10   eligible --                                                             04:30:23
11   A.    They don't observe that and so they can speak to the
12   difference between citizens and non-citizens, which is arguably
13   most relevant for voting, because non-citizens are not eligible
14   to vote even though some of them apparently are eligible for
15   Medicaid.                                                               04:30:38
16   Q.    But we agree that -- and I believe we agreed in your
17   deposition that this study can't really tell us anything at all
18   about the impacts of the DPOC policy on the specific population
19   of non-citizens who, in fact, remained eligible for Medicaid;
20   right?                                                                  04:30:55
21   A.    I don't think -- I don't think what you said is true and
22   it was a long question so you might need to ask it again.
23   Q.    So since there's no information on eligible for the
24   benefit non-citizens versus ineligible for the benefit
25   non-citizens, the study doesn't really tell us anything about          04:31:14

United States District Court

1823
MARK HOEKSTRA, PH.D. - Cross

1    the impacts of the policy on non-citizens who remained eligible    04:31:19

2    for the benefit; right?

3             THE COURT:  I am completely and totally confused.

4             MS. KANTOR COHEN:  I'll move on Your Honor.

5    BY MS. KANTOR COHEN:    04:31:38

6    Q.   For a Medicaid applicant, there's some kind of clear

7    financial or health benefit of obtaining Medicaid coverage;

8    right?

9    A.   Yes.

10   Q.   That coverage could have the benefit of thousands of    04:31:49

11   dollars in health care coverage for a beneficiary; right?

12   A.   I don't know what the number is.  I'm not going to claim

13   to know what the number is but clearly there's a benefit.

14   Insurance is a helpful good thing that people value.

15   Q.   In your response to Dr. McDonald's opinion about the    04:32:10

16   impacts of negative interactions with Government, you opine

17   that Dr. McDonald only considered studies that discussed voting

18   behavior of people who have actually done something wrong.  Is

19   that a fair characterization of your opinion?

20   A.   I think it's fair.  Certainly most of them have done    04:32:28

21   something wrong and it certainly includes a lot people if not

22   the vast majority have done something wrong.

23            MS. KANTOR COHEN:  Can we pull up Exhibit 526,

24   please.

25   \\\

United States District Court

MARK HOEKSTRA, PH.D. - Cross

BY MS. KANTOR COHEN:                                          04:32:49

Q.   And this is one of the articles cited by Dr. McDonald that

you referenced in your report in your testimony; right?

A.   That's right.

Q.   Even if people were not arrested, this study found the    04:32:58

probability of voting declined; right?

A.   I don't recall what all of this paper found but this is

the paper where I think there were serious issues with making

causal statements where they, frankly, don't have a great

design for assessing causality here and they are doing a few    04:33:16

different things.  But I don't know that it's fair to give it a

causal interpretation.

          MS. KANTOR COHEN:  Can we look at page 11.  It's the

second column about ten or so lines down.

BY MS. KANTOR COHEN:                                          04:33:38

Q.   So the finding of this study is that the probability of

voting declined eight percent for those who had been stopped

and questioned by the police; right?

A.   Yeah.  That's a descriptive, in fact, and the question, of

course, is whether it's appropriate to say that that decline   04:33:50

happened because of that interaction and that's where I think

there's problems.

Q.   This afternoon with Mr. Langhofer you discussed three

articles that Dr. McDonald cited and you stated that none of

the articles he cited had to do with changes to voter          04:34:05

MARK HOEKSTRA, PH.D. - Cross

1    registration rules.  Do you remember that?                    04:34:08

2    A.    Not really, no.

3    Q.    It was about 2:20.

4    A.    Yeah.  What was this about?

5    Q.    With respect to impact on voting propensity, that       04:34:20

6    Dr. McDonald cited that you discussed three articles only and

7    you said none of them were about voter registration?

8    A.    What was his hypothesis that he was using these as support

9    for?  If you tell me that, I think I'll remember.  But he cited

10   a lot of stuff.                                               04:34:42

11   Q.    So this was in reference to the long-term impacts of the

12   cost -- sorry.  That there's a body of research that increasing

13   the cost of voter registration decreases voter turnout rates.

14          Do you recall that?

15   A.    No, but we can talk about the papers and you can ask your  04:35:06

16   question and maybe I can answer it.

17   Q.    Let's look at Dr. McDonald's report, which is PX 332.

18   Let's look at footnote 67, please.

19          Dr. McDonald identified seven articles in footnote 67

20   of his report.  So I wanted to look at those and ask you about  04:35:38

21   what you were discussing in your testimony.

22          You didn't discuss the book by Rosenstone and

23   Wolfinger by Yale University Press; right?

24   A.    That's correct.

25   Q.    And you didn't discuss the Staci Rhine article in        04:35:57

United States District Court

MARK HOEKSTRA, PH.D. - Cross

1    *Political Behavior*; correct?                                    04:36:00

2    A.   So this is footnote 68.  Can I see what they were citing?

3    Q.   I'm sorry.  It should be 67, please.

4    A.   Yeah, but there's --

5    Q.   I'm sorry.  It is 68 of the report.  Sorry about that.     04:36:16

6    Just to be clear, we're looking at footnote 68 of PX 332.

7              So in your report, you did not discuss the Staci

8    Rhine article in *Political Behavior*; right?

9    A.   Before we look -- let me see what he said before he cited

10   footnote 68 because he's backing -- he's trying to support     04:36:38

11   something.

12   Q.   I'm talking about the body of scholarly research that

13   Dr. McDonald discussed in his testimony.

14   A.   I got it.  I got it.  I understand.

15   Q.   Thank you.                                                  04:36:51

16             I don't think you answered yet.  Just to make sure,

17   you did not discuss the Staci Rhine article in *Political

18   Behavior* in your testimony; correct?

19   A.   Correct.

20   Q.   You did not discuss the Mitchell and Wlezien article in    04:37:04

21   *Political Behavior*; right?

22   A.   That's correct.

23   Q.   You didn't discuss Highton's article on voter registration

24   even though you did cite Highton on voter ID; correct?

25   A.   I mean, I believe it's a different paper but that is        04:37:19

United States District Court

1827

MARK HOEKSTRA, PH.D. - Cross

1  correct.   I don't believe I cited this particular paper by that          04:37:22
2  author.
3  Q.   And you didn't cite Leighley and Nagler's book published
4  by Princeton University Press; correct?
5  A.   That's correct.                                                       04:37:32
6  Q.   And you did not cite either of Dr. McDonald's two articles
7  on the impact of improved access to voter registration on
8  turnout; correct?
9  A.   That's correct.
10         MS. KANTOR COHEN:   I'm going to take a moment to                  04:37:42
11  confer with counsel, Your Honor.
12         (Counsel confer.)
13         MS. KANTOR COHEN:   I'm going to pass the witness.
14         THE COURT:   Thank you.
15                  **CROSS - EXAMINATION**                                   04:37:48
16  BY MR. BABBITT:
17  Q.   Good afternoon, Professor Hoekstra.   Chris Babbitt for the
18  DNC and the Arizona Democratic Party.
19         I'll be asking you about your rebuttal to Professor
20  Burch this afternoon.                                                     04:38:21
21         And I would like to pull up both your -- the
22  conclusion of your report and Professor Burch's report which I
23  believe are PX 328 and DX 900.
24         And if we could go to page 26 of Professor Burch's
25  report and page 23 of Professor Hoekstra's report.   Maybe 22.           04:38:47

United States District Court

MARK HOEKSTRA, PH.D. - Cross

1   We can start there.                                                       04:38:56

2           So Professor Hoekstra, I just want to orient you on

3   Professor Burch's ultimate conclusion which is stated in the

4   final two sentences of -- rather final sentence of her report

5   on the left side of the screen.  If you could read that?         04:39:11

6           THE COURT:  Can you make it bigger?

7   BY MR. BABBITT:

8   Q.   The sentence beginning, "For these reasons, based on my

9   analysis of the scholarly literature, it is my opinion that the

10  changes to Arizona's voter registration laws will impose a       04:39:30

11  significant burden on voting in the state and prevent some

12  eligible voters from participating in elections"?

13  A.   Okay.

14  Q.   And you disagree with that; correct?

15  A.   Yes.                                                         04:39:51

16  Q.   And in contrast, you conclude at the end of your report

17  over on the right, "For these reasons, based on my analysis of

18  the evidence presented in Professor Burch's report as well as

19  the evidence presented here, I believe that H.B. 2243 and H.B.

20  2492 will not reduce voter turnout by Arizona citizens.          04:40:11

21  Rather, I believe these laws will most likely have no effect on

22  voting by Arizona citizens, and may increase it."

23          And you continue to stand by that opinion; correct?

24  A.   Yes.

25  Q.   So let's focus on your report.  When you say that you       04:40:28

United States District Court

MARK HOEKSTRA, PH.D. - Cross

1   believe these laws will have no effect, you mean no net effect     04:40:34
2   on voting; correct?
3   A.    No net effect on -- I'm basing this on the studies.  And,
4   again, as we've talked about in the deposition, these studies
5   are using different baseline groups and so -- and mostly those    04:40:53
6   studies are finding zeros and in some cases they are finding
7   positives and that's what I'm basing it on.
8          So those studies are all looking at different
9   populations?
10  Q.    You remember we discussed this in your deposition two       04:41:06
11  weeks ago; correct?
12  A.    Yes.
13         MR. BABBITT:  Stephen, if we could pull up page 246,
14  beginning at lines 23 of Professor Hoekstra's deposition.
15  BY MR. BABBITT:                                                    04:41:23
16  Q.    And I asked you:  "What do you mean by 'no effect'?"
17         And you said:  "Zero effect."
18         And I asked you:  "Meaning that you don't believe
19  these laws will affect the ability of a single Arizona citizen
20  to vote?"                                                          04:41:36
21         And you gave what I refer to as -- or I think of as a
22  version of no.  You said, "It is possible that some people
23  would have -- would be less likely to vote and some people
24  more."
25  A.    Hold on.  What line are on?                                  04:41:49

United States District Court

MARK HOEKSTRA, PH.D. - Cross

1    Q.    Six, seven.  I'll let you read this.                    04:41:52

2    A.    I just want to read along as you're reading it.   Okay.

3          That's right.

4    Q.    "These studies are all looking at the net impact of these

5    things.  That's what I'm referring to.  I believe the net      04:42:08

6    effect is likely to be zero."

7          That's your opinion in this case, correct, the net

8    effect?

9    A.    The net effective assistance of counsel although the

10   interpretation of that is different in different studies        04:42:19

11   because they are looking at different populations.

12   Q.    But in this case your opinion is not that there will be no

13   voters who are adversely affected.  Your opinion is that on net

14   any number of adversely affected voters will be

15   counter-balanced by voters who come into the system; correct?   04:42:35

16   That's what -- that's what you mean by net effect; right?

17   A.    I believe that's right.

18   Q.    Hypothetically, just to take it out of the context of this

19   case but if we had a thousand left-handed people who were

20   excluded from voting but a thousand right-handed people, new    04:42:56

21   voters, came in and fill the voids, there would be no net

22   effect on turnout?

23   A.    That's right although -- I mean in that hypothetical, for

24   the real world, presumably if there are policies that impacted

25   handedness, people would look at subgroups by handedness and    04:43:14

United States District Court

MARK HOEKSTRA, PH.D. - Cross

1    they would identify effects.  And people have done that here.          04:43:20

2    If you think that Black people are more likely to be affected

3    or Hispanics, they focus on those subgroups.

4    Q.    Okay.  But just in terms -- I want to be clear on the

5    point of net effect.  We can take it out of left-handed and          04:43:31

6    right-handed.  If all of the Hoekstras were excluded but all

7    the Babbitts were brought in and there were more Babbitts than

8    Hoekstras, that would be positive; right?  That's what we mean

9    by net.

10   A.    Yes.  Although, again, it's possible for a study to have        04:43:44

11   looked at let's look only at the impact of voting on Babbitts

12   and let's look only at the impact of voting by Hoekstras and

13   that's more or less what these studies have done.  They don't

14   do it by name but they are doing it by racial group, they are

15   doing it by political party and other things and they are           04:43:59

16   generally finding zeros and some positives.

17   Q.    Okay.  And so having surveyed all of that, your conclusion

18   is that there is most likely to be no net effect on voting in

19   Arizona?

20   A.    For the relevant subgroups that have been studied, yes.         04:44:12

21           THE COURT:  So to be more specific, is it your

22   opinion that on naturalized citizens, the net effect would be

23   zero, but some might be less likely, but some may be more

24   likely and so it's a subgroup issue as opposed all of the

25   voters?                                                              04:44:35

United States District Court

MARK HOEKSTRA, PH.D. - Cross

1      THE WITNESS:  Yeah.  I think -- I think that's right.      04:44:35

2  So if you look at it -- if you were to do the study and, you

3  know, if you made this really easy on us, we could randomize or

4  something and we would know for sure what answer was.  But I

5  think that's right.  Like you look at the Biggers and Smith      04:44:47

6  thing and you say, well, there's some evidence that these

7  people who get targeted are more likely to vote.  Is it

8  possible, you know, is it possible that there's something the

9  other way.  Like maybe.  But there's not much evidence on that

10  out there.  Most of this stuff is either zeros or it's      04:45:02

11  positives.

12      MR. BABBITT:  Okay.

13  BY MR. BABBITT:

14  Q.   Okay.  And when you say in your opinion here that you

15  think it is most likely these laws will have no net effect or      04:45:11

16  may increase voting, you're not assigning any particular

17  probability.  You just mean -- by most likely, you just mean

18  more than 50 percent?

19  A.   Yeah, I believe that's fair.  I believe if I put a

20  probability on it, it would be with some false degree of      04:45:27

21  certainty because obviously we don't know the probabilities.

22  Q.   And you didn't conduct any sort of quantitative analysis

23  that would allow you to say whether it's 50.1, closer to 100,

24  nothing like that?

25  A.   I did not.      04:45:41

United States District Court

MARK HOEKSTRA, PH.D. - Cross

1  Q.   Okay.  And when you say that the laws may increase voting,   04:45:42

2  do you mean that the laws themselves may increase voting by

3  citizens in Arizona or do you mean that these other effects,

4  like the mobilization by civic organizations, like the voter

5  outreach by political campaigns, that that is what will need to   04:46:00

6  increase the voting?

7  A.   It will be the laws in those things and potentially those

8  things that come along with the laws.  And so if of those

9  things could be the outreach stuff that you mentioned.  But it

10 need not.  I mean, it could be just the fact that we passed   04:46:16

11 this law and I feel like you're trying to suppress votes and it

12 makes me mad and I'm more likely to vote; or we passed these

13 laws and now I feel better about elections because you're

14 actually trying to do something about what I think is a problem

15 and now I'm more likely to vote.  Those things don't involve   04:46:30

16 outreach but potentially it would include the effects of the

17 outreach that come as a direct impact of this.

18 Q.   And I think when you were asked about this by

19 Mr. Langhofer this morning, you said something like these

20 things come with lots of things.  And the studies are going to   04:46:46

21 pick up the net effect of these laws and everything that comes

22 with them.  It's that other stuff that you're talking about

23 there?

24 A.   That's right.  And, you know, the best they are going to

25 do -- and I think the Pons paper is people on this where they   04:47:00

United States District Court

MARK HOEKSTRA, PH.D. - Cross

1    say, yeah, we've got this increase in voting by Hispanics and    04:47:03

2    we've got some evidence of maybe additional outreach and could

3    that explain part of it?  Maybe.  But it's hard to know for

4    sure because you don't know if they are the same people even.

5            So they are appropriately cautious when they try to    04:47:20

6    tease out what is that mechanism for why voting went up.

7    Q.   And you're not offering an opinion to the effect that

8    these laws have already had a positive impact on registration

9    or turnout; correct?

10   A.   That's correct.  I haven't done the study and to my    04:47:36

11   knowledge, none of the experts have either so I haven't

12   responded to anything like that.

13   Q.   And you're not offering an opinion on when we might expect

14   that positive uptick to occur; right?

15   A.   I'm offering up these studies.  We could certainly look at    04:47:50

16   those one by one and look at the timing of when did the effect

17   show up and that would be the best evidence of what we would

18   expect when it comes to the timing.

19   Q.   But your report in this case does not offer a prediction

20   about when we might expect to see this uptick; correct?  That    04:48:03

21   is the question I'm asking.

22   A.   I'm not explicitly mentioning that.  I'm citing the

23   papers.  In those papers they obviously talk about what's their

24   sample and where are the effects and so on.

25   Q.   But you're not doing that here; correct?    04:48:18

United States District Court

MARK HOEKSTRA, PH.D. - Cross

1    A.    I'm citing the papers.                                    04:48:20

2    Q.    But not offering an opinion on when?

3    A.    I'm citing the papers which, if you read the papers, you

4    can see when they found effects.

5    Q.    The papers aren't coming into evidence.  So the question   04:48:31

6    is, you're not offering an opinion on when; correct?

7    A.    Yeah.  I would have to -- I mean -- I have not so far

8    offered an opinion on when.  If I were to think about the

9    timing of these papers, I could try to come up with an answer.

10   It would take me a minute to do that.                           04:48:56

11   Q.    And you haven't quantified any potential increase;

12   correct?

13   A.    When you say -- I haven't studied the actual impact of the

14   laws so I haven't quantified that.  Is that what you're asking

15   me?                                                             04:49:11

16   Q.    Yes.

17   A.    Are you asking me about did I quantify a prediction or

18   something?

19   Q.    You're not offering a quantified judgment or opinion here

20   that says I would expect, as an economist, to see an uptick in  04:49:18

21   voting by 10,000 voters.  There's nothing to that effect in

22   your reports; correct?

23   A.    That is correct.  Again, in my report I'm talking about

24   the magnitudes that we see elsewhere which I think are

25   informative of what you might expect to see here and most of    04:49:33

United States District Court

MARK HOEKSTRA, PH.D. - Cross

1  those are in the range of -- you know, the positives are in the    04:49:36

2  range of one, two, three, percentage points.

3          But I'm not going to claim to know exactly what is

4  the right weighted average of those estimates to apply in this

5  situation.                                                          04:49:47

6  Q.   And beyond the studies that you reviewed, the academic

7  articles, you didn't conduct any empirical analysis specific to

8  this case; correct?

9  A.   So I certainly look at the naturalized voters versus the

10 born citizens.  I don't know if that qualifies as, you know, an    04:50:10

11 analysis in your question but I've done that for this case.

12 Q.   So can we go back to your deposition transcript.

13          MR. BABBITT:  Stephen, see if we can pull up page

14 250, lines 15 through 20.

15 BY MR. BABBITT:                                                     04:50:29

16 Q.   So I asked:  "Just to be super clear here, you didn't

17 conduct any empirical analysis specific to this case to support

18 the opinion you're offering in the final two sentences of your

19 report; correct?"

20 A.   Okay.  So that's a different question than what you just      04:50:40

21 asked me now.

22 Q.   How?

23 A.   My answer there is -- I mean, is correct.

24 Q.   So you did not conduct a separate empirical analysis

25 specific to this case to support the conclusions in the last       04:50:51

MARK HOEKSTRA, PH.D. - Cross

1  two sentences of your opinion correct?                                    04:50:54

2  A.   That's correct.

3  Q.   Did you conduct any surveys specific to this case?

4  A.   I did not.

5  Q.   Did you conduct any interviews specific to this case?            04:51:02

6  A.   I did not.

7  Q.   Did you speak to any Arizona voters in connection with

8  this case aside from counsel?

9  A.   I did not.

10 Q.   Did you speak with any Arizona officials in connection            04:51:11

11 with this case?

12 A.   No.

13 Q.   Did you contact anybody at the Arizona Department of Vital

14 Records in connection with this case?

15 A.   No.                                                               04:51:23

16 Q.   Did you review the Arizona Election Procedures Manual

17 before drafting your report?

18 A.   I was asked that before and my answer was no.

19 Q.   Okay.

20      So let's go to your prior work on voting and we had             04:51:38

21 talked about the economics letters piece that Mr. Dodge asked

22 you about.  That article was also published or rather the

23 research underlying it was also published by the Cato

24 Institute; is that correct?

25 A.   Yeah.  They put out a brief summary of that article as          04:51:55

United States District Court

MARK HOEKSTRA, PH.D. - Cross

1   well.  That's right.                                          04:51:59

2   Q.   And when you say they put it out, I mean, it's under your

3   name and you signed off on it correct?

4   A.   That's correct.  Yeah.

5        MR. BABBITT:  Stephen, if we could pull up Exhibit PX     04:52:07

6   548 and go to page one.

7   BY MR. BABBITT:

8   Q.   Professor Hoekstra, this is that article; correct?

9   A.   That's correct.

10  Q.   And you signed off on this summary before it was         04:52:17

11  published.

12  A.   That's correct.

13  Q.   I would like to turn to page two of this, the right-hand

14  column.

15       MR. BABBITT:  And I'll ask Stephen to highlight the       04:52:26

16  sentence beginning "A national survey."  It's halfway down the

17  paragraph on the right.  There you go.

18  BY MR. BABBITT:

19  Q.   And you state -- this is a February 2020 analysis that you

20  published; correct?                                           04:52:45

21  A.   If you say so, I'll take your word for it.

22  Q.   Shall we go back to the prior page?

23  A.   No.  I'm not worried about it.

24  Q.   And you state here, "A national survey reports that nearly

25  7 percent of U.S. citizens did not have ready access to        04:52:56

United States District Court

MARK HOEKSTRA, PH.D. - Cross

1   documents providing proof of citizenship and that as many as 11    04:53:01

2   percent of citizens lacked government-issued photo

3   identification."

4            Did I read that correctly?

5   A.   Yes.                                                          04:53:10

6   Q.   And you're not questioning those figures for the purposes

7   of your opinion in this case; correct?

8   A.   I'm not attempting to assess whether those figures were

9   right or wrong.  I'm just simply reporting there was a survey.

10  This is what they reported to find.                               04:53:22

11  Q.   But you had enough confidence in these figures in 2020 to

12  allow the Cato Institute to put out this publication over your

13  name; correct?

14  A.   I'm not -- that survey is not attributable to me.  I'm

15  pointing out there was a survey that reported to find           04:53:37

16  something.  That's it.  I'm not vouching for it.

17  Q.   Do you typically cite sources that you're not prepared to

18  vouch for?

19  A.   Sure.  I mean, I'm not citing it in support of what I'm

20  finding.  I'm citing a number.  There's a number out there.      04:53:49

21  They are claiming this.  Do people cite papers where you might

22  disagree with the paper?  Of course.  All the time.

23  Q.   Okay.  But you have no reason -- did you have any reason

24  to doubt had figure at the time?

25  A.   I didn't look into it one way or the other.  I didn't       04:54:05

United States District Court

1840

MARK HOEKSTRA, PH.D. - Cross

1  attempt to -- I didn't attempt to validate the survey one way          04:54:07
2  or the other.
3  Q.   You just threw it into your paper?
4  A.   I cited it in my paper.
5  Q.   All right.  But you're not walking away from those figures        04:54:16
6  now.  Let me ask a more precise question.
7        Do you have any reason to believe that these numbers
8  would not apply in Arizona in 2023?
9  A.   I don't know one way or the other.  And from this I don't
10 remember what survey it was.                                           04:54:32
11 Q.   But you're not offering an opinion that it's incorrect,
12 these figures are incorrect?
13 A.   I never attempted to assess the validity of this survey or
14 vouch for the survey or criticize the survey.  I simply
15 reported what the survey reported to find.                             04:54:48
16 Q.   Okay.  Which is that 7 percent of U.S. citizens did not
17 have ready access to documentary proof of citizenship.
18        Let's move on to the Medicaid literature.
19        MR. BABBITT:  Your Honor, I appreciate we're running
20 up against the clock.  This is a new topic.  I'm happy to keep         04:55:07
21 going or stop here and pick up in the morning.
22        THE COURT:  I'm happy to stop here and pick up in the
23 morning.
24        MR. BABBITT:  Okay.
25        THE COURT:  You can step down, sir.                             04:55:17

United States District Court

1841

MARK HOEKSTRA, PH.D. - Cross

1       You really want to go on?                                    04:55:20

2              THE WITNESS:  I wanted to finish.  I was hoping to go

3    home morning.  I have a ticket tomorrow morning.

4              THE COURT:  Well, the thing is that I'm just guessing

5    Mr. Langhofer also has a few questions and so either way we did  04:55:30

6    it, we have to pick up in the morning because there's more than

7    five minutes left.

8              Unless there's something that can't wait until 9

9    o'clock tomorrow morning.  Nobody seems to be offering

10   anything.                                                        04:55:48

11             We'll recess until tomorrow morning at 9 a.m.

12             COURTROOM DEPUTY:  All rise.

13             (Whereupon, these proceedings recessed at 4:55 p.m.)

14                       * * * * *

15

16

17

18

19

20

21

22

23

24

25

United States District Court

1842

1       C E R T I F I C A T E                                    04:55:53

2

3           I, ELAINE M. CROPPER, do hereby certify that I am

4   duly appointed and qualified to act as Official Court Reporter

5   for the United States District Court for the District of      04:55:53

6   Arizona.

7

8           I FURTHER CERTIFY that the foregoing pages constitute

9   a full, true, and accurate transcript of all of that portion of

10  the proceedings contained herein, had in the above-entitled    04:55:53

11  cause on the date specified therein, and that said transcript

12  was prepared under my direction and control, and to the best of

13  my ability.

14

15          DATED at Phoenix, Arizona, this 16th day of November,  04:55:53

16  2023.

17

18

19

20                          s/Elaine M. Cropper                   04:55:53

21                          _____

22                          Elaine M. Cropper, RDR, CRR, CCP

23

24

25

                    United States District Court