UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

Mi Familia Vota, et al.,          )
                                  )
              Plaintiffs,         )
                                  )
         vs.                      )   2:22-cv-00509-SRB
                                  )
Adrian Fontes, et al.,            )
                                  )   Phoenix, Arizona
              Defendants.         )   November 16, 2023
_____  )   9:00 a.m.


     BEFORE:  THE HONORABLE SUSAN R. BOLTON, SENIOR JUDGE

              REPORTER'S TRANSCRIPT OF PROCEEDINGS

              BENCH TRIAL - DAY 8 - A.M. SESSION

                  (Pages 1843 through 1959)


Official Court Reporter:
Elva Cruz-Lauer, RMR CRR
Sandra Day O'Connor U.S. Courthouse
401 West Washington Street
Suite 312, SPC 35
Phoenix, Arizona  85003-2150
(602) 322-7245

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

UNITED STATES DISTRICT COURT

```
 1                        APPEARANCES

 2

 3    For Plaintiff United States of America:

 4        EMILY BRAILEY, ESQ.
          U.S. DEPARTMENT OF JUSTICE-VOTING - M STREET
 5        150 M. Street NE
          Washington, D.C.  20503.

 6

 7        RICHARD DELLHEIM, ESQ.
          U.S. DEPARTMENT OF JUSTICE-CIVIL RIGHT  DIVISION, VOTING
 8   SECTION
          950 Pennsylvania Avenue NW
 9        Washington, D.C.  50530

10

     For Plaintiff ADRD Action, Arizona Students' Association,
11   League of United Latin American Citizens Arizona, Living
     United for Change in Arizona:
12
          HAYDEN JOHNSON, ESQ.
13        DANIELLE MARIE LANG, ESQ.
          CAMPAIGN LEGAL CENTER.
14        1101 14th Street NW, Suite 400
          Washington, D.C. 20005
15
     For Plaintiff Arizona Asian American Native Hawaiian And
16   Pacific Islander for Equity Coalition:

17            NIYATI SHAH, ESQ.
              ASIAN AMERICANS ADVANCING JUSTICE
18            1620 L Street NW, Suite 1050
              Washington, D.C.  20036
19
              AMIT MAKKER, ESQ.
20            SADIK HUSENY, ESQ.
              NEETHU PUTTA, ESQ.
21            EVAN OMI, ESQ.
              LATHAM & WATKINS
22            505 Montgomery Street, Suite 2000
              San Francisco, California 94111
23

24

25
```

```
1   For Plaintiff Arizona Democratic Party, Democratic National
    Committee:
2
            CHRISTOPHER E. BABBITT, ESQ.
3           BRITANY RILEY-SWANBACK, ESQ.
            WILMER CUTLER PICKERING HALE & DORR,
4           L.L.P.
            2100 Pennsylvania Avenue NW
5           Washington, D.C.  20037

6           KELSEY QUIGLEY, ESQ.
            WILMER CUTLER PICKERING HALE & DORR, LLP.
7           2600 El Camino Rael.
            Suite 400
8           Palo Alto, CA  94306

9

10
    For Plantiff Chicanos Por La Causa, Chicanos Por La Causa
11  Action Fund, Poder Latinx:

12          JOHN A. FREEDMAN, ESQ.
            LEAH MOTZKIN, ESQ.
13          ERICA ELAINE MCCABE, ESQ.
            ARNOLD & PORTER KAYE SCHOLER, L.L.P.
14          601 Massachusetts Avenue NW, Suite 100
            Washington, D.C.  20001
15
            MICHELLE KANTER COHEN, ESQ.
16          JONATHAN SHERMAN, ESQ.
            FAIR ELECTIONS CENTER
17          1825 K Street NW, Suite 701
            Washington, D.C. 20006
18

19
    For Plaintiff Voto Latino, Mi Familia Vota:
20
            CHRISTOPHER DODGE, ESQ.
21          ELIAS LAW GROUP
            250 Massachusetts Avenue NW, Suite 400
22          Washington, D.C. 20001

23          DANIEL ABRAHAM ARELLANO, ESQ.
            HERRERA ARELLANO, L.L.P.
24          1001 North Central Avenue, Suite 404.
            Phoenix, Arizona  85004.
25
```

```
 1

 2     For Plaintiff Promise Arizona, Southwest Voter Registration
       Education Project:
 3
               ERNEST ISRAEL HERRERA , ESQ.
 4             ERIKA CERVANTES, ESQ.
               MALDEF
 5             634 Spring Street, 11th Floor
               Los Angeles, California  90014
 6

 7     For Defendants State of Arizona, Kris Mayes, Jennifer Toth:

 8             JOSHUA MICHAEL WHITAKER, ESQ.
               TIMOTHY E. HORLEY, ESQ.
 9             KATHRYN E. BOUGHTON, ESQ.
               ARIZONA ATTORNEY GENERAL'S OFFICE
10             2005 N. Central Avenue
               Phoenix, Arizona  85004
11

12     For Intervenor-Defendant Ben Toma:

13
               HANNAH HATCH PORTER, ESQ
14             GALLAGHER & KENNEDY, P.A.
               2575 E. Camelback Road, Suite 810
15             Phoenix, Arizona 85016-9225

16

17     For Defendant-Intervenor Republican National Committee:

18             KORY A. LANGHOFER, ESQ.
               THOMAS J. BASILE, ESQ.
19             STATECRAFT, P.L.L.C.
               649 N. 4th Avenue, Suite B
20             Phoenix, Arizona  85003

21

22

23

24

25
```

1847

```
 1
 2
 3                        INDEX OF WITNESSES

 4   WITNESSES FOR THE      Direct    Cross    Redirect
     DEFENDANTS:
 5   MARK HOEKSTRA, PH.D.             1848     1883
     JESSE RICHMAN, PH.D.   1902      1938
 6
 7
 8
 9
10
11                        INDEX OF EXHIBITS

12   EXHIBIT NO.:        DESCRIPTION:                RECEIVED:

13       974                (Table)                     1932
14
15
16
17
18
19
20
21
22
23
24
25
```

UNITED STATES DISTRICT COURT

MARK HOEKSTRA, PH.D. - CROSS-EXAMINATION                1848

8:49:40AM 1                    P R O C E E D I N G S

2              THE COURT:  Good morning, please sit down.

3              And Mr. Babbitt, I believe you were cross-examining.

4              MR. BABBITT:  Yes, Your Honor, I want to make sure

9:01:02AM 5   there aren't any housekeeping items to attend to.

6              MR. DODGE:  We have a few brief matters of

7    housekeeping just to land this plane as smoothly as possible,

8    but we can do it after.

9              THE COURT:  Dr. Hoekstra has indicated a desire to be

9:01:13AM10   finished as soon as possible, so I think that can wait.

11             MR. DODGE:  We agree.

12                         CROSS-EXAMINATION

13   BY MR. BABBITT:

14   Q.  Good morning, Dr. Hoekstra.  I would like to start where we

9:01:31AM15   were going to pick up at the end of the day yesterday, which is

16   everybody's favorite topic, Medicaid.  And based on your back

17   and forth with Mr. Langhofer yesterday, I want to see if we can

18   frame the disagreement you have with Dr. Burch fairly.

19             So in essence, if I understand it, Dr. Burch relies on

9:01:52AM20   a 2007 study by the Government Accountability Office, which she

21   uses to support her conclusion that DPOC requirements can have

22   an adverse effect on Medicaid participation.

23             In contrast, you view that article as unreliable and

24   think that the Sommers article from 2010 is more reliable and

9:02:14AM25   you use that to support your conclusions in this case.  Is that

MARK HOEKSTRA, PH.D. - CROSS-EXAMINATION                1849

9:02:17AM 1    a fair framing of the issue for this morning?

2    A.  I think in terms of her characterization of that report,

3    that report was about citizens versus non-citizens, and I think

4    you phrased it somewhat differently than that.  So that's one

9:02:35AM 5    slight difference.

6              Otherwise, I think that's right.  The first thing was

7    a report written by a government agency.  The second thing is a

8    peer-reviewed article written by a Harvard researcher.

9    Q.  Okay.  So let's pull up the first page of the GAO report.

9:02:51AM10   Let's pull up the first page of the GAO report, so we can go to

11   that government agency document.

12             MR. BABBITT:  So Stephen, this is PX554.  If we can go

13   to page 2.

14   BY MR. BABBITT:

9:03:02AM15   Q.  So Professor Hoekstra, can you see that on your screen

16   there?  And I'd like you to read that highlight.

17             THE COURT:  We can see it, but it is not easy to read

18   it.  That's much better.  Thank you.

19             THE WITNESS:  I agree with that.

9:03:15AM20   BY MR. BABBITT:

21   Q.  So I would like to focus on the highlighted section which

22   says that:  Not all of the 22 states reporting declines could

23   quantify enrollment declines due specifically to the

24   requirement, that's the DPOC requirement, but a state that had

9:03:29AM25   begun tracking the effect identified 18,000 individuals in the

9:03:33AM  1    seven months after implementation whose applications were

        2    denied or coverage was terminated for inability to provide the

        3    necessary documentation, though the State believed most of them

        4    to be eligible citizens.

9:03:46AM  5            And you don't have any reason to think the State was

        6    wrong with respect to those 18,000 individuals, do you?

        7    A.  So the State may very well have been right about 18,000

        8    people having their applications denied.  I think the, you

        9    know, key part of that sentence is this thing about where the

9:04:05AM 10   State believed most of them were eligible citizens.  That's,

       11    you know, that's a big problem throughout this report, is they

       12    are asking for these subjective beliefs about whether the

       13    people who were no longer getting covered were citizens or not

       14    citizens.

9:04:20AM 15   Q.  And do you recall what the GAO said about why they were

       16    comfortable relying on the State's assessment of the apparent

       17    citizenship status of the individuals?

       18    A.  I believe they said something like, well states were making

       19    this determination, you know, in the past based on people

9:04:35AM 20   attesting or not attesting to be citizens.

       21    Q.  Right.  So let's actually turn to footnote 12 of the GAO

       22    report where they address this directly.  And your recollection

       23    is very good.  It says:  We asked states whether they thought

       24    enrollment declines were due to, in part, individuals who

9:04:59AM 25   appeared to be eligible citizens experiencing delays or losses.

9:05:02AM 1    We believe that the States' assessment of individual

2    citizenship were appropriate, given their reliance on prudent

3    person policies to make such determinations under their prior

4    self-attestation policies.

9:05:13AM 5              And you understand what that means?

6              THE COURT:  I have no idea what a "prudent person"

7    policy is.

8              THE WITNESS:  I don't either actually.

9    BY MR. BABBITT:

9:05:23AM10   Q.  In essence, the regime is that individuals would

11   self-attest to their citizenship status, and then if the

12   government official had reason to doubt that, then they would

13   sort of -- then they would look behind it.

14              Sort of like if you go to a bar and you look like you

9:05:36AM15   are under 21 or might be close, they would ask you for ID.  But

16   once you get to a certain age, they stop asking you for ID,

17   right?  That's how this policy worked in practice?

18   A.  Yeah, I am not so sure I think -- I am not so sure that's a

19   fair analogy, because it's much harder to figure out whether

9:05:52AM20   someone, you know, appears to be a citizen or not.  It's not

21   like age where we can do a decent assessment of that.

22   Q.  But your view is that it's inappropriate for the GAO to

23   draw -- or by extension, Dr. Burch, to draw any conclusions

24   based on someone's self-attestation of their citizenship

9:06:10AM25   status?

MARK HOEKSTRA, PH.D. - CROSS-EXAMINATION          1852

9:06:12AM  1    A.  The whole point of these laws, of this policy change was

           2    to -- was to require documentation rather than simple

           3    attestation of citizenship.  And so if people were attesting to

           4    be citizens in order to get Medicaid, the point was to figure

9:06:30AM  5    out who those people were and to get them so that they were no

           6    longer eligible for Medicaid.

           7            And it's -- there are much better ways to assess

           8    effects on citizens versus non-citizen rather than rely on this

           9    subjective assessment by state officials who don't really know

9:06:46AM 10    whether those people are citizens or not.

          11    Q.  And you believe that the Sommers report is not subject to

          12    that same vulnerability?

          13    A.  That's correct.

          14    Q.  So let's turn to --

9:06:58AM 15            MR. BABBITT:  Stephen, DX944, which is the Sommers

          16    report.

          17    BY MR. BABBITT:

          18    Q.  And you understand that Professor Sommers was relying on

          19    the current population survey conducted by the Census Bureau

9:07:12AM 20    for his data set, correct?

          21    A.  Yes.

          22    Q.  And you understand that there's no citizenship question

          23    in -- the census does not track citizenship, right?

          24    A.  The census does track citizenship.

9:07:25AM 25    Q.  So -- I should say, it doesn't validate citizenship

UNITED STATES DISTRICT COURT

MARK HOEKSTRA, PH.D. - CROSS-EXAMINATION          1853

9:07:29AM 1    independently; rather it asks individuals whether they were

2    citizens in this survey?

3    A.  That's correct, yeah.  That's tracking, yeah.  But I take

4    your point.

9:07:41AM 5    Q.  So let's --

6              MR. BABBITT:  Stephen, let's go to the top of page 3

7    of this study, so 176.

8    BY MR. BABBITT:

9    Q.  It says -- and CPS is the Current Population Survey.  So it

9:07:55AM10   says:  Given that these measures are self-reported, one concern

11   is that immigrants will misrepresent their legal status.

12             Right?  And so -- and it says:  The limited nature of

13   the CPS items mitigates this problem.

14             The survey does not ask respondents if they are in the

9:08:12AM15   U.S. legally; it only asks if they are citizens.  So this too

16   is relying on a self-attestation of citizenship to determine

17   whether people are citizens or not, you are not overcoming the

18   problem?

19   A.  I disagree with that.  So this is asking -- it's true, they

9:08:28AM20   are asking about citizenship, but they are asking about it in

21   the context of a census survey, which is meaningfully different

22   than asking about citizenship in the context of, do you want

23   this benefit or do you not?  And the census is very careful

24   about -- I mean, they're very worried about people not

9:08:45AM25   answering questions and not answering questions correctly.

UNITED STATES DISTRICT COURT

9:08:48AM 1          And so there's no cross-link from census data to other

2      state databases or anything like that where it says, hey, in

3      census, this person said they're not a citizen and over here it

4      said they are a citizen.

9:08:59AM 5          Census doesn't do that because they want people to

6      tell the truth.  And obviously when you go to Medicaid and

7      you're trying to become eligible for Medicaid, there's an

8      incentive there to not tell the truth about citizenship if you

9      want to get -- if you want to get Medicaid.  There's no

9:09:14AM10      incentive here.

11   Q.  And you don't think that the the same individuals who would

12      be attesting to those citizenship for purposes of Medicaid are

13      not also attesting to their citizenship for purposes of the CPS

14      data?

9:09:26AM15   A.  I think the incentives are meaningfully different in, you

16      know, those two contexts.  Here you have a survey where you

17      have no reason to lie.  In Medicaid there is, you know, an

18      incentive to lie.  It's an open question whether people did,

19      but there is certainly a pretty strong incentive there.

9:09:42AM20   Q.  An open question, we can leave it at that; is that fair?

21   A.  The important thing is the incentives are meaningfully

22      different across these two data sets, and I think that matters

23      a lot for assessing the reliability of these two approaches.

24   Q.  Okay.  Well, let's move on to other aspects of the Sommers

9:09:59AM25      analysis.

9:09:59AM 1         So what is your understanding of how strictly the DPOC

2       requirement was being enforced in the -- under Medicaid in the

3       analysis that the GAO performed?

4       A.   So you are talking about as a result of the policy.

9:10:17AM 5   Q.   Exactly.

6       A.   Do I -- so my sense is that they were requiring

7       documentation, and I don't know the, you know, the nuts and

8       bolts of exactly how they were doing that, but that's what they

9       were required to do under law.

9:10:29AM10  Q.   Okay.  And your understanding is that that requirement took

11      effect in July of 2006?

12      A.   I believe that's right.  It's listed in one of the figures

13      in the paper.

14      Q.   Yeah, we can get to that in a moment.

9:10:39AM15         MR. BABBITT:  Stephen, let's pull up 554, page 21.

16   BY MR. BABBITT:

17      Q.   And so what we see here is this is an explanation of how

18      the states were implementing the different requirement, the

19      DPOC requirement.  And it says:  In total 33 states reported

9:10:56AM20  the number of days --

21      A.   Can I have you pause?  What are we reading from again?

22      Q.   This is the GAO report.

23      A.   Got it.

24      Q.   And this is an explanation of how states implemented the

9:11:10AM25  DPOC requirement beginning in July of 2006.

MARK HOEKSTRA, PH.D. - CROSS-EXAMINATION                    1856

9:11:14AM 1        And so what we see is in total 33 states reported the

       2   number of days they allowed applicants and beneficiaries to

       3   meet the requirement, and the limits ranged from 10 days to up

       4   to a year.  And only nine of those states reported -- requiring

9:11:30AM 5   individuals to allow DPOC within 30 days or less.  In some

       6   states, if we go down further in the highlighted section,

       7   reported allowed applicants an "indefinite" amount of time to

       8   obtain necessary documentation, provided they were deemed as

       9   making a good-faith effort.

9:11:54AM10        Let me know when you are done reading that.

      11   A.  Okay.

      12   Q.  And so since some states were allowing that July 2006 date

      13   to slip, even as late as July 2007, and some states extended it

      14   indefinitely for people who making a DPOC requirement -- who

9:12:15AM15   were making a good-faith effort to supply DPOC.  Doesn't that

      16   call into question the ability to rely on snapping the line in

      17   July of 2006 to draw conclusions, because you don't even know

      18   when this requirement was implemented?

      19   A.  Well, you know it was implemented for some.  I mean, they

9:12:31AM20   are not very -- I mean, this report in general isn't very

      21   precise.  And so there -- you know clearly there are nine

      22   states where they gave them 30 days or less.  I don't know what

      23   the full -- they don't spell out the full distribution.

      24        But it is clear there's a meaningful number of states

9:12:45AM25   where this thing became binding, you know, soon.  And I believe

MARK HOEKSTRA, PH.D. - CROSS-EXAMINATION                    1857

9:12:49AM  1    from recollection the authors look through 2007, 2008 for

           2    effects, which would capture most, if not all, of these states.

           3    Q.  Well, you say "meaningful," but we don't actually know,

           4    right?  I mean, in the Sommers report we don't know which --

9:13:04AM  5    right?  If nine states -- if only nine states required DPOC to

           6    be provided within 30 days, at least a lot of states where --

           7    you know, you're well past certainly August of 2006, we don't

           8    really know when those states were doing it?

           9    A.  Again, I mean, it would be -- yeah, I agree it would be

9:13:22AM 10    great to know exactly when they are doing it.  We're talking

          11    about the maximum is a year, and a few indefinite.  And I don't

          12    know if that means the others are 60 days or if they're 90 days

          13    or 180 days, but again, the authors are looking at effects all

          14    the way through 2007, 2008.

9:13:38AM 15    Q.  Yeah, but we don't actually know that the maximum is a

          16    year, right, indefinite is indefinite?

          17    A.  Yeah.  Again, the language here is not very precise.  I

          18    mean, 33 states ranging from 10 to a year and a few were

          19    indefinite.

9:13:57AM 20    Q.  Well, let's see what that looks like on the chart that you

          21    provided in your report.

          22            MR. BABBITT:  Stephen, if we could go to DX900, page

          23    9?

          24    BY MR. BABBITT:

9:14:06AM 25    Q.   And I understand, Professor Hoekstra, that you've

9:14:08AM  1    basically just either cut and pasted or replicated these charts

        2    from Professor Sommers' report, right?

        3    A.  Yes, cut and pasted.  Don't give me too much credit.

        4    Q.  All right.  So then -- what I was trying to describe

9:14:21AM  5    verbally but I think we can now see visually, is, right, you

        6    got this, you know, vertical black line in here, Professor

        7    Sommers says:  The documentation rule was implemented in July

        8    of 2006.

        9         But once we slip that to the right, for some number of

9:14:37AM 10    states, right, only 30 was implementing this requirement --

       11    excuse me -- only nine states were implementing this

       12    requirement by August of 2006.

       13         And slip it to the right for a year, and we slip it

       14    further to the right indefinitely, this starts to look like

9:14:54AM 15    this study -- I recognize it was conducted in a top economics

       16    journal in the field, but it seems like it was done a little

       17    early to draw the conclusions that you're imputing to it?

       18    A.  So one way to test your hypothesis here would be to say,

       19    you know, were they reducing enrollments by non-citizens over

9:15:13AM 20    this same time period, because of the factors that you just

       21    laid out are going to impact citizens and non-citizens, right?

       22         And so if you look at those graphs, and as we talked

       23    about earlier under direct, the authors are finding, you know,

       24    evidence of meaningful reductions in enrollments by

9:15:29AM 25    non-citizens from these same policies.  Yes, some of them were

MARK HOEKSTRA, PH.D. - CROSS-EXAMINATION          1859

9:15:33AM 1  lagged, but enough of them were obviously implemented quickly

2  enough that they had an impact on non-citizens, and yet you

3  don't see it on citizens.

4  Q.  But non-citizens -- there are non-citizens who can

9:15:47AM 5  participate in Medicaid, right?

6  A.  Sure, and that would -- I mean, to the extent you think

7  that those people were -- you know, were not among those who

8  were being dropped from Medicaid, that means our estimates on

9  non-citizens are a little bit conservative, that you would even

9:16:04AM10  bigger declines among non-citizens.

11  Q.  All right.  I think we can move on from these charts, and I

12  would like to talk about just sort of how Professor Sommers

13  thinks about the DPOC requirement.  He thinks of it as a

14  compliance cost, right, or he describes it as a compliance

9:16:24AM15  cost?

16  A.  I believe so.  I don't remember the terms, but I think it

17  would have been fair for him to do that, and I am sure he

18  probably did.

19  Q.  Okay.  So let's just make sure that we're not -- there's no

9:16:35AM20  question mark about that.

21      MR. BABBITT:  Stephen, if we could pull up 944, pages

22  7 and 8, I believe.

23  BY MR. BABBITT:

24  Q.  Right there at the bottom we see Professor Sommers stating:

9:16:46AM25  Private compliance costs are more difficult to estimate.  A

MARK HOEKSTRA, PH.D. - CROSS-EXAMINATION                    1860

9:16:48AM 1     minority of applicants have already demonstrated citizenship

2     for other programs so they wouldn't have to reproduce it.  But

3     others, the DRA could have a significant burden -- could be a

4     significant burden, because getting DPOC costs, you know, $5 to

9:17:05AM 5     $23 for birth certificates, 87 to 97 for a passport -- again,

6     these are 2010 figures, so those would have increased -- but he

7     understands those to be compliance costs, and you don't dispute

8     that, right?

9     A.  Yeah, that's right.  I mean, I think assessing the

9:17:19AM10     magnitude of those things, you know, as he says, is pretty

11     hard.  But I agree there could be compliance costs for some of

12     those people.

13          THE COURT:  Could I interrupt for a second?  There's a

14     reference to the DRA, is that the law?

9:17:33AM15          MR. BABBITT:  That's the Deficit Reduction Act of

16     2005, which is what implemented this requirement in the

17     Medicaid context.

18     BY MR. BABBITT:

19     Q.  So Professor Hoekstra, we are almost ready to move on from

9:17:46AM20     Medicaid, but I wanted to ask one more thing about Professor

21     Sommers' conclusion, which is --

22          MR. BABBITT:  Stephen, if we go back to page 1 of

23     this?

24     BY MR. BABBITT:

9:17:56AM25     Q.  And we see at the end of his abstract, which -- where he

MARK HOEKSTRA, PH.D. - CROSS-EXAMINATION           1861

9:18:00AM 1    says:  Nonetheless -- after going through his assessment.  He

        2    says:  A cost-benefit analysis indicates that the policy was a

        3    net loss to society of $600 million through increased

        4    administrative -- state administrative spending and compliance

9:18:14AM 5    costs imposed on U.S. citizens applying for Medicaid.

        6            So you're not -- you didn't perform any sort of

        7    cost-benefit analysis in this case to say whether there would

        8    be a net benefit or net loss to society from HB 2492 or

        9    HB 2243, did you?

9:18:34AM10    A.  That's right.

       11    Q.  So let's move on to the Cantoni and Pons article, which

       12    Mr. Langhofer asked you about yesterday, and in your report you

       13    refer to this as by far the most thorough assessment of the

       14    impact of strict voter identification laws.  And as I

9:18:59AM15    understand it from your discussion with Mr. Langhofer

       16    yesterday, you continue to believe that to be true?

       17    A.  Yes.

       18    Q.  Okay.  And let's pull up that article.

       19            MR. BABBITT:  Stephen, it's PX547, page 1.

9:19:13AM20    BY MR. BABBITT:

       21    Q.  This is the article that we're are talking about, right?

       22    A.  Yes.

       23    Q.  And so -- I know that we spent some time on this yesterday

       24    in the abstract, and we have also spent some time on this in

9:19:26AM25    the deposition, but just to make sure I understand what the

MARK HOEKSTRA, PH.D. - CROSS-EXAMINATION                1862

9:19:30AM 1    statistics are here, the net result of this is that they

2    conducted a survey of 1.6 billion voter events over a ten-year

3    period, 2008 to 2018.  And they ultimately concluded that

4    within a 95 percent confidence interval, the overall effect on

9:19:54AM 5    registration and turnout was between negative 2.3 percent for

6    registration and positive 2.1 percent.  And then with respect

7    to turnout, it was negative 3.0 percent and 2.8 percent.  And

8    so those are sort of -- it's a bracket around zero.  And their

9    best estimate is that the effect was minus 0.1 percent, and I

9:20:21AM10    think you said that was statistically indistinguishable from

11    zero; is that fair?

12    A.  That's correct.  And it's also -- you know, we talked about

13    when we split it up by race the estimate is actually positive

14    for non-whites and negative for whites, but both of those are

9:20:35AM15    indistinguishable from zero.

16    Q.  Okay.  So setting aside this sort of any racial disparities

17    or lack of disparities that you think this study shows, let's

18    just talk about what even minus .1 percent looks like over a

19    data set of 1.6 billion.  I mean, you are the math whiz here,

9:20:55AM20    but that's 1.6 million voter events, right?  That's their best

21    estimate, right?

22    A.  So it's 1.6 million, I believe it's individuals by election

23    is the level of observation.  If you were to apply that number

24    to a, you know, particular election, say to an Arizona

9:21:13AM25    election, you would take .001 times 2 million, 2.2 million

UNITED STATES DISTRICT COURT

MARK HOEKSTRA, PH.D. - CROSS-EXAMINATION          1863

9:21:23AM  1    votes were casts, I believe, in the 2022 election, so you would

        2    be talking about --

        3    Q.  2200?

        4    A.  2200, right.

9:21:29AM  5    Q.  Okay.  And so if -- so that's 2200.  That's their best

        6    estimate.  But then if you were to take 3 percent of that -- or

        7    I guess it was just a negative 3 percent effect on turnout,

        8    right, would be 3 times 2.2, so you are talking about 66,000,

        9    right?

9:21:46AM 10    A.  It would be .03 times 2.2 million and -- I am not going to

       11    do that in my head on the stand, but I trust that you did that

       12    right.

       13    Q.  I am doing it on the fly here, too.  But okay.  I think

       14    that's right.  Right?  If we just move the decimals?

9:22:04AM 15    A.  And if you were going to do the upper bound, it also means

       16    they can't rule out, you know, .021 times 2.2 million

       17    additional votes as a result of this.

       18    Q.  Okay.  The reason I am belaboring this is because I just

       19    think it's important for those of us, like me, who don't work

9:22:18AM 20    with statistics every day, to understand what this all means.

       21    So, you know, minus .1 percent can still be 2200 votes in an

       22    election with 2.2 million voters.  If you take a larger

       23    presidential election, say, I think there were 3.4 million

       24    voters in the 2020 election, you are looking at 3400 voters.

9:22:38AM 25    So we're still talking about thousands of voters under this

UNITED STATES DISTRICT COURT

9:22:42AM 1   specification with a potential -- within bounds that could go

2   up to, you know, tens of thousands, twenty of thousands of

3   voters?

4   A.   In either direction.

9:22:50AM 5   Q.   Yeah, okay.  So then let's go to the end -- glad we are

6   done with statistics now, I think.  So let's go to the end of

7   their article and what they conclude sort of based on this

8   assessment.

9           MR. BABBITT:  Stephen, this is going to be 547-39 and

9:23:10AM10   -40.

11   BY MR. BABBITT:

12   Q.   And so at the end they say in their conclusion:  Contrary

13   to the argument used by the Supreme Court in the 2000 case

14   *Crawford versus Marion County* to uphold the constitutionality

9:23:25AM15   of the early strict ID laws, we find no significant effect on

16   fraud or public confidence in election integrity.  This result

17   weakens the case for adopting such laws in the first place.

18           You disagree with that, right?

19   A.   I certainly disagree with at least part of it.  So if you

9:23:44AM20   look at the estimates on -- you know, they are measuring

21   effects on detected fraud, I think is the right way from these

22   two different databases, and, you know, the precision we just

23   talked about on the main estimates, like a couple of percentage

24   points on either side, that's reasonably precise in this world.

9:24:07AM25           They, you know, when they start looking at -- when

9:24:10AM 1    they start looking at effects on detected fraud, I mean, they

2    can't reject that detected fraud went to zero, and they

3    can't -- for one measure.  And I think for the other measure

4    they can't rule out the possibility that it went down by 50

9:24:23AM 5    percent.

6            So the bottom line is, it's just not -- there aren't

7    very many incidents of detected fraud.  Whether or not that

8    means there's little fraud, open question.  But I think the

9    estimates there are really uninformative, and so that's why I

9:24:36AM10    think they are overstating their case a bit right here.

11    Q.  Okay.  So just to sort put a stamp on this, so the first

12    half of the analysis you believe -- kind of gets the Mark

13    Hoekstra seal of approval, but the second half of the analysis

14    you just feel like the empirical methods aren't sensitive

9:24:53AM15    enough to allow them to reach their conclusions and so it

16    doesn't get the seal of approval?

17    A.  They are using the same method, and so I don't have a

18    problem with the method.  It's just that sometimes a method

19    gives you an estimate that's like so imprecise, it has so much

9:25:06AM20    statistical uncertainty, that it's really not useful.  And when

21    you can't rule out that detected fraud goes to zero as a result

22    of this, like that's a problem.

23            I think the second thing, which we've talked about

24    before, is that when you are looking at the impact of laws like

9:25:21AM25    voter identification on turnout, on actual voting, you don't

9:25:24AM 1    have to be aware of that law to be impacted by it.

2              So if you don't have ID, it doesn't matter if you are

3        not aware, you still going to have to show ID, and you are

4        going to detect an effect on turnout.  When you start talking

9:25:37AM 5    about perceptions, now we really want people to know what the

6        law is.

7              Because if people in states with laws don't realize

8        that the law is in place, then you wouldn't expect to see

9        effects on perceptions, and there is some evidence that that's

9:25:51AM10    true because we've looked through those survey experiments

11       where, yeah, everybody was subject to the same law but clearly

12       not everybody knew that, because when you made that law salient

13       to some people, they responded by being sometimes more likely

14       to vote and also sometimes having, you know, more positive

9:26:10AM15    perceptions about election integrity.  So I think that's the

16       other limitation of that result in this study.

17             THE COURT:  I want to ask you a question about public

18       confidence, because you also disagree that you can draw this

19       conclusion from the data that they looked at.

9:26:29AM20            THE WITNESS:  On the public confidence?

21             THE COURT:  That there was no significant effect on

22       public confidence.

23             THE WITNESS:  So that's a true fact.  So they found no

24       effect on, you know, self-reports of public confidence.  I

9:26:40AM25    think the main limitation with that result is what I just said,

MARK HOEKSTRA, PH.D. - CROSS-EXAMINATION                    1867

9:26:44AM 1   which is, that's only a meaningful result if you believe people

2   are really well informed about the fact that the law changed in

3   their state.

4          THE COURT:  But wouldn't -- based on this article,

9:26:57AM 5   wouldn't all of the people that voted know there was an ID law

6   because everybody that voted had to show it?

7          THE WITNESS:  Yeah, the issue is most of these states

8   had non-strict ID laws anyway, right?  So even in the

9   pre-period, this study is looking at the impact of strict voter

9:27:18AM10   identification, and the difference between strict and

11   non-strict if you vote in the non-strict, they are going to ask

12   me for my ID, and most people are going to show it to them

13   because you have it, right?

14          The issue is if you don't have that ID and it is a

9:27:29AM15   non-strict law, then they'll still count your vote under some

16   circumstance -- like basically if you sign an affidavit, you

17   know, they will count your vote.  In other places they'll do

18   it, so the only people who would be aware that it's like a

19   non-strict law would be those people who -- those people who

9:27:47AM20   didn't show ID.

21          And in the post period, the only people who would

22   really be aware that it was a strict law and not a non-strict

23   law, would be the people who didn't have ID and then they were

24   told, by the way, in order for your vote to count, you need to

9:28:01AM25   show ID somewhere soon, like in the next couple of days.

MARK HOEKSTRA, PH.D. - CROSS-EXAMINATION          1868

9:28:05AM 1          THE COURT:  So your research shows that before strict

2      ID laws were passed, when people went to the polls to vote,

3      they had -- they were asked to show ID?

4          THE WITNESS:  Most states -- I am not going to have

9:28:17AM 5      the number off the top of my head, but most of these states had

6      non-strict laws in place.  And so the treatment here is mostly

7      states going from non-strict laws to strict laws.

8          So they all had -- they all asked you for

9      identification, the question is, was that -- did you literally

9:28:34AM10      have to show identification as the only way for your vote to

11      count?  And that's true under a strict law.  But that wasn't

12      true under non-strict law.  You could sign an affidavit or they

13      would match your signature to your voter registration.  Those

14      are two that I am aware of.  There may have been other systems

9:28:50AM15      for doing that.

16          THE COURT:  Let me go back to fraud.  You said their

17      definition was detected fraud.

18          THE WITNESS:  That's right.

19          THE COURT:  Which is hard to find.

9:29:05AM20          THE WITNESS:  Presumably, yeah.

21          THE COURT:  What other measure could there be?

22          THE WITNESS:  Fair enough.

23          THE COURT:  Assumed fraud?  Imaginary fraud?

24          THE WITNESS:  Yeah, I don't blame the authors for

9:29:14AM25      looking at that to be clear.  Like they're looking at the best

UNITED STATES DISTRICT COURT

MARK HOEKSTRA, PH.D. - CROSS-EXAMINATION                    1869

9:29:17AM 1    measure of fraud that they could find, and there's two

        2    databases and they use them as an outcome.

        3            I'm not -- you know, I don't mean to be criticizing

        4    the authors for doing the exercise.  I think the problem is

9:29:29AM 5    that when you look at their corresponding estimates from that,

        6    those confidence intervals that we talked about, they are so

        7    wide.  There is so much statistical uncertainty about their

        8    resulting zero estimate that they wouldn't be able to rule out

        9    that detected fraud went to zero as a result of these laws.

9:29:48AM10    And that's like -- it's an imprecise zero.  It is an

        11    uninformative answer.

        12            And again, I don't blame them for doing it.  Like it's

        13    perfectly reasonable to do it.  In fact I won't be surprised if

        14    reviewers were like, hey, I want you to do this, this is an

9:30:03AM15    important question, and so they do it.

        16            I do think they are overstating their case a bit right

        17    there because the bottom line is they don't have enough

        18    precision to detect the magnitude of reductions and detected

        19    fraud that you might expect from a policy like this.

9:30:18AM20            THE COURT:  Mr. Babbitt.

        21    BY MR. BABBITT:

        22    Q.  So focusing on that point right there, in your report --

        23            MR. BABBITT:  And Stephen, if we could pull up DX900

        24    at page 6?  Let's go to paragraph 14.

        25

MARK HOEKSTRA, PH.D. - CROSS-EXAMINATION                    1870

9:30:30AM  1    BY MR. BABBITT:

          2    Q.  So you say, right, about two-thirds of the way down in

          3    paragraph you say:  Clearly one potential benefit of HB 2243

          4    and HB 2492 is to reduce perceptions of fraud, which would, in

9:30:44AM  5    the view of another plaintiffs' expert, cause individuals to be

          6    more likely to vote.

          7         But based on your colloquy with Judge Bolton just now,

          8    it seems the emphasis here should not be on "clearly," but

          9    rather "potential."  Because the only way this could reduce

9:30:59AM 10    perceptions of fraud is, one, if people knew about the laws,

         11    and two, those people were persuadable these laws would in fact

         12    put their concerns to rest; is that right?

         13    A.  So I mean, I think the sentence as I -- I'm making it clear

         14    there was a potential benefit.  I think that's a fair

9:31:15AM 15    characterization.  I agree it's potential benefit.  It's not a

         16    certainty.

         17    Q.  Great.  And so let's move to to the final --

         18         THE COURT:  Why would this be any different than

         19    strict voter ID laws to not affect public confidence because

9:31:35AM 20    there's no evidence that people knew about them?

         21         THE WITNESS:  Yeah, I think this is -- I think one

         22    question is, you know, in part because of the lawsuits and so

         23    on, people probably don't know about them right away.  Overtime

         24    perhaps people learn and so you might expect bigger effects

9:31:52AM 25    overtime as people learn.

MARK HOEKSTRA, PH.D. - CROSS-EXAMINATION                1871

9:31:54AM 1           It also depends on how that information gets

         2    disseminated in a rational world, you know, both parties would

         3    be interested in trying to, you know, convince people that

         4    there are safeguards in place, you know, to prevent these sorts

9:32:05AM 5    of things that in Arizona roughly 700,000 people think that,

         6    you know, it's very common for non-citizen voting.

         7           And, you know, it's true if people don't learn about

         8    it it's not going to change perceptions, but -- you know, but

         9    overtime presumably there's some chance that can happen.

9:32:23AM10    Q.  Potential, some chance, requires people to learn about it

        11    and be persuadable, those are all variables that would need to

        12    be, you know, turning the right way for this to have an effect?

        13    A.  I think that's right.

        14    Q.  Okay.  So at the very end of the Cantoni and Pons article,

9:32:40AM15    they -- their big conclusion is that for now there's a real

        16    need to improve the administration of U.S. elections, including

        17    voting technology and increase faith in elections, but strict

        18    ID laws are unlikely to do that.  At the same time, low and

        19    unequal participation represent real threats to democracy, but

9:32:59AM20    these may be more effectively addressed by reducing other

        21    barriers to voting such as registration costs.

        22           So my question is, do you agree with their conclusion?

        23    Do you disagree with their conclusion?  Or as an economist, do

        24    you simply have no opinion one way or the other?

9:33:22AM25    A.  Yeah, I think that first sentence that they write there,

UNITED STATES DISTRICT COURT

MARK HOEKSTRA, PH.D. - CROSS-EXAMINATION                    1872

9:33:25AM 1    they're basing it on those results on both, you know, what is

        2    the effect of these laws on detected election fraud and on

        3    perceptions.

        4            And as I said, when you think about actual, the

9:33:37AM 5    problem is, they don't have a precise answer for that, so we

        6    don't learn much from the study.  So I don't think that should

        7    be a basis for making an assessment on this question one way or

        8    another because it's just not informative.

        9            The other thing that's relevant for both of them is

9:33:53AM10    obviously, if you think -- you know, I think in a world where

       11    there's less ambiguity about whether these laws were in effect,

       12    which is hard given there's all the lawsuits.  I mean, the

       13    lawsuits and the -- you know, the Court does this, and then it

       14    gets overturned.  That makes it hard for people to learn.

9:34:09AM15            You know, if that were -- in the long run, I suspect

       16    people can learn with -- at least with education interventions

       17    and so on, and I presented evidence on that from these audit

       18    studies.

       19            But I think those are the two limitations of that, and

9:34:24AM20    so again, I think on that first part, I mean, they are saying

       21    it's unlikely.  I don't know exactly what they mean by

       22    unlikely, but in general I think they're overstating their case

       23    because it's based on those results.

       24    Q.  And so you're essentially passing on this issue?  You are

9:34:36AM25    not offering an opinion that -- one way or the other on this?

UNITED STATES DISTRICT COURT

MARK HOEKSTRA, PH.D. - CROSS-EXAMINATION                1873

9:34:39AM 1    You think -- I'll leave it at that.

2    A.  I think they don't have good evidence to say it one way or

3    the other on the basis of their paper.

4    Q.  And you're not pretending -- excuse me.  You are not

9:34:52AM 5    purporting to provide better evidence one way or the other?

6    A.  I mean, I've certainly reported some evidence to suggest

7    that.  For example, the Florida study, these people were

8    obviously aware of this attempt to crack down on registrations.

9    They were more likely to vote.  I presented evidence on the

9:35:10AM10    audit studies that when people are made more aware of these

11    things, they can be more likely to vote and sometimes, you

12    know, improved perceptions.  So I have presented that evidence,

13    and I think that's informative for this.

14    Q.  Okay.  I think we can leave Cantoni and Pons from my

9:35:25AM15    perspective and move on to Komisarchik and White, which is

16    another article that you discussed with Mr. Langhofer

17    yesterday.

18         So as you may recall and the Court may recall, this

19    was an article assessing the effects of the elimination of the

9:35:40AM20    preclearance requirement on voting.  Does that ring a bell?

21    A.  Yes.

22    Q.  And you in -- basically, as I understand it, you criticized

23    Dr. Burch for not relying on this article or not acknowledging

24    this article, which as I understand it, is in working paper

9:35:58AM25    form but has been accepted for publication, according to the

MARK HOEKSTRA, PH.D. - CROSS-EXAMINATION                 1874

9:36:01AM 1    authors; is that right?

2    A.  It's under revision for publication but it has -- to my

3    knowledge, it hasn't been formally accepted, but I haven't

4    looked in the last week or two.

9:36:11AM 5    Q.  And you agree that what Komisarchik and White are focused

6    on there are the net effects on voter turnout with respect to

7    the restrictive laws that were introduced after the elimination

8    of free clearance, right?

9    A.  In general, it's going to be true for any of these studies,

9:36:31AM10    that they're going to pick up the net effects on the population

11    that they study, and that's of course going to be true here as

12    well.

13    Q.  Okay.  And so let's turn to -- actually, I think that's

14    probably enough there.

9:36:56AM15         And so I would like to move on for -- move on to the

16    psychological costs of the -- these laws at issue in this case

17    impose on voters.

18         In your report, and I believe in your discussion with

19    Mr. Langhofer yesterday, you said that -- you questioned the

9:37:15AM20    research that Professor Burch relies on because you didn't

21    think that it either was reliable or that it didn't actually

22    speak to the question of whether psychological costs affected

23    participation in government programs by the individuals studied

24    or the group study; is that fair?

9:37:33AM25    A.  I think that's right.  I don't recall the studies offhand,

UNITED STATES DISTRICT COURT

MARK HOEKSTRA, PH.D. - CROSS-EXAMINATION                    1875

9:37:35AM 1    off the top of my head.  I know we have been talking about a

2    lot of different ones, and it would be helpful if we could get

3    a refresher on what that was.

4    Q.  Well -- so I think this can be pretty quick because you may

9:37:45AM 5    remember in your deposition, I asked you whether you reviewed

6    any of the studies cited in footnotes 34, 35, and 36 of

7    Professor Burch's report.  Do you recall that discussion two

8    weeks ago?

9    A.  No.

9:38:02AM10    Q.  All right.  Let's see if we can pull that up.

11           MR. BABBITT:  And Stephen, it's Professor Hoekstra's

12    deposition transcript at 291, lines 6 through 17.

13           Professor Hoekstra's deposition transcript, 291, lines

14    6 through 17.

9:38:39AM15    BY MR. BABBITT:

16    Q.  So I asked you whether -- well, whatever.  This speaks for

17    itself, but I am happy to read it.

18    A.  Okay.

19    Q.  So I asked you whether you had read the articles that she

9:38:53AM20    cites in footnotes 34, 35, 36.  And you said:  Yeah, I

21    believe -- yeah, if I didn't write it, I didn't write about

22    them, then I'm certainly not planning on making a -- not having

23    an opinion about those articles in this case.

24           And so I just want to make clear that you are not

9:39:09AM25    addressing the articles that she cites in those footnotes?

MARK HOEKSTRA, PH.D. - CROSS-EXAMINATION                1876

9:39:15AM  1    A.  Can you show me the footnotes?

           2    Q.  Sure.

           3         MR. BABBITT:  Stephen, this will be the Burch report.

           4    Can we go do footnotes 34, let's see where those come up.  It's

9:39:26AM  5    going to be page 8 of her report -- 7 and 8.  Those are really

           6    small.  Sorry, 7 and 8 of the report, so yeah, there we go.

           7    Pedraza.

           8    BY MR. BABBITT:

           9    Q.  Alsan, Watson, Becerra.  I don't see any of those cited in

9:40:08AM 10    your report.  I don't recall you discussing those with

          11    Mr. Langhofer yesterday.  Fair to say you have no response to

          12    them?

          13    A.  That's correct.

          14    Q.  While we are in this neighborhood, let's move on to

9:40:24AM 15    Professor Burch's reliance on the Census Bureau's report here,

          16    which comes up?

          17         MR. BABBITT:  Stephen, this will be 328, page 9.

          18    BY MR. BABBITT:

          19    Q.  Top paragraph, the sentence on the left that begins:

9:40:42AM 20    Research also shows that both black and Latino householders

          21    resist responding to the census because of, quote, concerns

          22    about confidentiality, deportation, and their general trust in

          23    government.

          24         I believe you do address this one, right?

9:41:04AM 25    A.  That's right.

UNITED STATES DISTRICT COURT

MARK HOEKSTRA, PH.D. - CROSS-EXAMINATION                1877

9:41:05AM 1    Q.  And so that article seeks to identify factors.  It was

2    produced -- it was written by individuals working at the Census

3    Bureau, correct?

4    A.  I don't recall where they were employed.  I think -- is the

9:41:21AM 5    Terry paper?

6    Q.  Exactly.

7    A.  Yeah, I just don't remember where.

8    Q.  We can get to that in a moment, but they were -- I do

9    believe they were employed by the Census Bureau and this was

9:41:29AM 10   their work.

11         So the article seeks to identify factors affecting

12   census participation, what they refer to as "enumeration" among

13   different racial and ethnic groups; is that right?

14   A.  I think that's right.

9:41:41AM 15   Q.  Okay.

16         MR. BABBITT:  Stephen, let's pull up PX566-1.

17   BY MR. BABBITT:

18   Q.  So this is that article?  This is the Terry article?

19   A.  Yes.

9:41:57AM 20   Q.  And you see that they are working at the U.S. Census

21   Bureau.  And in -- the first paragraph is in French because

22   this was published in Europe, but at the bottom in the English

23   version of the abstract it says:  This article presents

24   findings from a 2010 census ethnographic evaluation with a

9:42:18AM 25   record check conducted to identify factors affecting

UNITED STATES DISTRICT COURT

MARK HOEKSTRA, PH.D. - CROSS-EXAMINATION                    1878

9:42:21AM 1    enumeration, meaning being counted in the census, among racial

       2    and ethnic groups.

       3           Does that refresh your recollection or is at least

       4    consistent with your recollection?

9:42:30AM 5    A.  Yes.

       6    Q.  And yesterday in your discussion with Mr. Langhofer, you

       7    said that the article was cited -- that Dr. Burch cited it to

       8    support the proposition that black and Hispanic voters  -- or

       9    people's fears of immigration-related consequences affected

9:42:46AM10    their census response.

       11          Is that -- do you recall that?

       12   A.  Yes.

       13   Q.  But it's actually looking at something much broader, right?

       14   It's not just about their fear of immigration consequences.

9:42:59AM15   It's about the consequences of engaging with the government and

       16   law enforcement generally, right?

       17   A.  Well, if we read the sentence that Professor Burch wrote,

       18   she wrote "fear of deportation" in that sentence in reference

       19   to both black and Latino households.

9:43:14AM20   Q.  So let's go to Professor Burch's report, which is --

       21          MR. BABBITT:  Stephen, this will be PX328-9.  And it's

       22   the top paragraph, eight lines down.

       23   BY MR. BABBITT:

       24   Q.  Research also shows that black and Latino householders

9:43:33AM25   resist responding to the census because of concerns about

UNITED STATES DISTRICT COURT

MARK HOEKSTRA, PH.D. - CROSS-EXAMINATION                    1879

9:43:35AM 1    confidentiality, deportation, and their general trust in

2    government.

3              This isn't just about deportation or

4    immigration-related consequences, right?  She is quoting the

9:43:44AM 5    study.

6    A.  Well, she's quoting the study with respect to Latino

7    householders, but the study didn't claim that, you know, that

8    black householders resisted due to fears -- due to concerns

9    about deportation.  And, you know, those are concerns.  It's

9:44:00AM10    not about concerns about confidentiality or deportation or

11    general trust, it's "and."

12    Q.  But -- I mean, she's -- both black and Latino householders

13    resist responding to the census because of a set of concerns,

14    concerns about confidentiality, deportation, and their general

9:44:18AM15    trust in government, right?  This is two groups with three sets

16    of concerns, right?

17    A.  Sure.  I mean, if you want to say -- you know, perhaps you

18    want to -- you'd acknowledge that that's misleading in the

19    sense that there's no in evidence in that paper that black

9:44:34AM20    householders resisted responding because of fears of

21    deportation.

22    Q.  But they would have resisted -- they could have resisted

23    for fears of confidentiality in their general distrust in

24    government, or deportation, right?  I mean, there's no reason

9:44:49AM25    to think that black householders wouldn't be just as concerned

UNITED STATES DISTRICT COURT

9:44:51AM 1    about deportation-related consequences based on their own

2    family history and circumstances, right?

3    A.  No, the article never said that.  Like, that's the problem.

4    Like, she is citing something as though the article said

9:45:03AM 5    something, and it didn't.

6    Q.  So let's go to that section of the article.

7         MR. BABBITT:  So Stephen, this is going to be PX566,

8    11.  Bottom paragraph here.  Another cultural issue was

9    respondent resistance to participating in the census due to

9:45:27AM10    concerns about confidentiality, deportation, and their general

11    distrust in government.

12         That's the part that Professor Burch is quoting,

13    right?

14    A.  Correct, and then she goes on talking about Hispanics, not

9:45:39AM15    black people.

16    Q.  Well, let's go down halfway through the paragraph.

17         As in the Hispanic side, respondent concealment and

18    distrust of the government were found in some cases of

19    inconsistency in the African American side too.  These examples

9:45:54AM20    of respondent resistance and concealment, highlight the impact

21    of social and cultural motivations that can be independent of

22    questionnaire wording, right?

23         So these are two groups where the Census Bureau found

24    that the concern about -- whether it's deportation,

9:46:08AM25    confidentiality, or general trust in government, they were

9:46:10AM 1   affecting these groups' decision to participate in the census.

2   That's what this is finding, right?

3   A.  I mean, I think a literal interpretation of the sentence

4   that she wrote is that black people were -- had fears of

9:46:25AM 5   deportation, and she is attributing that to the study, and the

6   study isn't saying that.  That's all I am pointing out in that

7   part of my report.

8   Q.  That's -- all you are doing is thinking --

9   A.  With respect to the black, Hispanic issue, yes.

9:46:39AM10   Q.  And your view is that that concern might not arise or

11   wouldn't arise in the black community?

12   A.  I mean, I think you should only cite things that you have

13   evidence for, and she's attributing that assertion to this

14   article, and there's no support for that assertion in this

9:46:54AM15   article, as shown in the paragraph you have on the screen.

16   Q.  All right.  I think we're just -- at this point we're just

17   sort of debating how to apply the topic sentence of this

18   paragraph, you know, to the different groups that are covered

19   by it.  I am not sure it's worth belaboring this point.

9:47:16AM20          And -- let's talk about some of the sources of

21   concerns.

22          MR. BABBITT:  Stephen, we can leave that exhibit up --

23   BY MR. BABBITT:

24   Q.  And talk about where those concerns about the psychological

9:47:30AM25   effects came from.

9:47:31AM 1        And if we go to -- carry over on -- if you go to the

2    very bottom of this page, the paragraph says:  The wider social

3    context also has an important role in enumeration, meaning

4    being counted in the census, right, just before the NRFU

9:47:50AM 5    enumeration program started in 2010, a very strong

6    anti-immigration law passed in Arizona that coincided with

7    legal ordinances in two Dallas area studies.  These ordinances

8    were aimed at identifying illegal immigrants through police

9    stops or the reporting of immigration status of applicants

9:48:09AM10    wishing to rent apartments.  The new law provoked heightened

11    tensions around the country.  Right?

12        So the census' finding is that these anti-immigrant

13    policies can sort of spill over into the census context and in

14    effect the ability of certain demographic groups to participate

9:48:26AM15    in something as benign as the census, right?  That's what the

16    Census Bureau is finding?

17    A.   The Census Bureau is particularly worried about that in the

18    context of non-citizens.  And I think one of the problems I

19    have with Professor Burch's report is she doesn't make clear

9:48:39AM20    that these concerns -- I mean, it's fair for the census to

21    worry about whether non-citizen are going to be -- have this

22    psychological cost, right, but if you are thinking about a

23    psychological cost on voters in Arizona, well, non-citizens

24    shouldn't be voting in Arizona.  So that distinction is a

9:48:57AM25    really important distinction.

MARK HOEKSTRA, PH.D. - REDIRECT EXAMINATION                1883

9:48:59AM 1    Q.  But this isn't limiting the findings.  This is saying,
        2    these are concerns among the black and Latino community, not
        3    just among non-citizens within that community?
        4    A.  Yes, but there are non-citizens is that community who are
9:49:12AM 5    rationally to be more concerned, whereas citizens ought
        6    rationally be much less concerned about things like
        7    deportation.
        8    Q.  Well, look, I think we heard last week -- I realized you
        9    weren't here -- from fact witnesses who are much more sensitive
9:49:25AM10    to these issues than certainly I could be.  And so I think I
       11    will leave it at that and turn you over to Mr. Langhofer for
       12    any redirect that he has.
       13            Thank you for your time.
       14            MR. LANGHOFER:  Good morning, Your Honor.
9:49:51AM15                     REDIRECT EXAMINATION
       16    BY MR. LANGHOFER:
       17    Q.  And good morning again, Professor.  I have just a few
       18    questions for you.  Let's pick up where we left off with
       19    Mr. Babbitt.
9:50:01AM20            The Terry study, who apparently was working for the
       21    census, did that study conclude that the fears of deportation
       22    were -- in concluding that there were fears of deportation, was
       23    that limited to citizens or non-citizens?  Was it
       24    distinguishing between those groups when saying there was this
9:50:23AM25    fear?

UNITED STATES DISTRICT COURT

MARK HOEKSTRA, PH.D. - REDIRECT EXAMINATION          1884

9:50:26AM  1   A.  It didn't attempt to distinguish between those groups.  And

        2   obviously we'd expect those fears to be greater among

        3   non-citizens than citizens and arguably nonexistent among

        4   citizens.

9:50:36AM  5   Q.  Sticking with the census, is the -- the census data

        6   regarding citizenship, how is that regarded in the academic

        7   community?

        8   A.  I mean, it's regarded as reasonable.  And again, the big

        9   key there is that census won't ask you whether you're

9:50:53AM 10   undocumented or not.  And I mean, we had a census data research

       11   center on campus at A&M, and if you proposed anything where you

       12   wanted to look at undocumented immigrants, they were like, no,

       13   it's a no-go, because they were super worried about people

       14   answering questions correctly on the census.  And so they don't

9:51:13AM 15   have -- you know, they ask about citizenship.  And the reason

       16   why we think people likely tell the truth there is because

       17   they're so protective of that, and they are so protective of

       18   making sure that undocumented immigrants feel comfortable, you

       19   know, responding and responding honestly to census surveys.

9:51:32AM 20   Q.  Do you recall whether Professor McDonald relied on census

       21   data regarding citizenship?  If it helps, I can --

       22   A.  Yeah, you might want to pull it up, because I'm having a

       23   hard time recalling everything.

       24           MR. LANGHOFER:  Elaine, can I have the laptop?

       25

MARK HOEKSTRA, PH.D. - REDIRECT EXAMINATION          1885

9:51:51AM 1    BY MR. LANGHOFER:

2    Q.  We are going to look at the McDonald report, page 16.  Does

3    that help you recall?

4    A.  That's right.  So he's using data in particular on

9:52:13AM 5    naturalized citizens in the U.S., and that comes from the

6    census.  That comes from the census asking people about their

7    citizenship status.

8    Q.  Do you recall whether Professor Burch relied on the U.S.

9    Census data regarding citizenship?  And I can see your eyes

9:52:27AM10    going to the corner of the room, so I'll point you to the Burch

11    report on page 23.

12    A.  Yeah.  So again there it is from the same survey as that

13    Medicaid study used.  It's American -- it's the American

14    Community Survey from the census, and she is using it to look

9:52:50AM15    at naturalized citizens, which again comes from asking people

16    about their citizenship status.  And again, I think there's

17    every reason researchers believe that's a reliable source of

18    data on that.

19    Q.  So you said the Medicaid study.  I want to be clear about

9:53:05AM20    this.  So when Professor Sommers from Harvard Medical School

21    conducted his study on DPOC implementation in the Medicaid

22    context, was he drawing his citizenship information also from

23    the census?

24    A.  Yes, the same survey as you see here.

9:53:22AM25    Q.  I want to talk to you about this idea -- sticking with

MARK HOEKSTRA, PH.D. - REDIRECT EXAMINATION        1886

9:53:26AM 1    Professor Sommers' study, this idea of delayed implementation.

2    It could be few months to up to a year.  I want to pull that up

3    on screen, Exhibit 944 marked but not identified.

4              And we're going to look at -- on cross-examination

9:53:42AM 5    with Mr. Babbitt, you looked at the top two charts.  I want to

6    point your attention to the bottom left-hand chart, the

7    non-citizens.

8              How long was it from the implementation of the policy

9    until you start seeing significant increases -- or excuse me,

9:53:57AM10    decreases in non-citizen enrollment?

11    A.  So most of that is happening in the second year.

12    Q.  You were asked also by Mr. Babbitt about the Cato sort of

13    publication summarizing your previous publication on election

14    laws, and you cited a survey in that study.  I would like to

9:54:26AM15    pull it up, let you read it, and then ask you the purpose that

16    citation to the survey was serving in your article.  So this is

17    Exhibit 548.  We are on page 2.

18              If you could read that, and then let me know when you

19    are done, I'll scroll a little bit so you can finish.

9:55:30AM20    A.  I have read it.

21    Q.  Okay.  For what purpose were you citing the survey

22    indicating that nearly 7 percent of citizens may not have ready

23    access to DPOC?

24    A.  Yeah, these surveys typically would be cited by critics of

9:55:44AM25    these strict voter identification laws.  And they would say,

MARK HOEKSTRA, PH.D. - REDIRECT EXAMINATION                1887

9:55:48AM  1    well, you know, look -- there's some survey evidence to suggest

         2    that a lot of people don't have IDs.  And as a result, there

         3    were concerns that there would be a large number of people then

         4    who might not be able to vote if they weren't able to get an ID

9:56:00AM  5    in time.

         6             And, you know, that's -- again, it's a concern

         7    expressed by critics.  You often, you know, lay out concerns

         8    expressed by different sides of an issue when you write a

         9    paper.

9:56:15AM 10             Ultimately here, we find estimates that are much, much

        11    smaller, and so essentially there's two different

        12    interpretations for why -- you know, why do we find that at

        13    most, roughly .1 percent of voters, and that's an upper bound,

        14    at most .1 percent of voters could have been -- could have not

9:56:34AM 15    cast a vote if one of these laws were passed.

        16             THE COURT:  Excuse me, a minute.  You said "we," and

        17    I'm not sure I know who "we" found are.

        18             THE WITNESS:  I'm sorry.  My co-author and I in our

        19    publication on, you know, strict voter identification laws.

9:56:50AM 20    BY MR. LANGHOFER:

        21    Q.  This is the one we discussed yesterday, it was Texas and

        22    another state?

        23    A.  It was Florida and Michigan.

        24             THE COURT:  Did you -- I want to focus a moment on

9:57:02AM 25    this survey report that said that 7 percent of U.S. citizens

MARK HOEKSTRA, PH.D. - REDIRECT EXAMINATION          1888

9:57:08AM 1  did not have ready access to documentary proof of citizenship.

2            Did you do anything to find out if that was so or not?

3            THE WITNESS:  I -- can you say the last -- I missed

4  the last word or two.

9:57:21AM 5            THE COURT:  When you wrote your paper.

6            THE WITNESS:  Yes.

7            THE COURT:  Did you find some different number for

8  lack of ready access to proof of citizenship?

9            THE WITNESS:  We didn't attempt to do that directly.

9:57:36AM10 Instead -- sorry, go ahead.

11           THE COURT:  What you found had to do with whether you

12 had sufficient ID to satisfy a strict voter ID law, and you

13 found those estimates from this survey to be much higher than

14 your findings.

9:57:54AM15           THE WITNESS:  Correct.  We found in practice in two

16 different states there were very few voters who did not show a

17 valid ID to vote, even though it was possible to do so in those

18 states because they had non-strict laws.  Like the fraction of

19 voters doing that and the numbers were just really tiny.

9:58:12AM20           And so there's two explanations to sort of reconcile

21 our finding with those surveys.  One is, it's possible those

22 surveys are wrong.  That's a possibility.  And the other

23 possibility is that perhaps there are people who don't have

24 access to IDs, but maybe those people in practice just never

9:58:31AM25 choose to vote, even when they can.

UNITED STATES DISTRICT COURT

MARK HOEKSTRA, PH.D. - REDIRECT EXAMINATION      1889

9:58:33AM  1          And so as a practical issue, it's a nonissue.  I don't

        2    know which of those -- we are not making claims about which of

        3    those two potential explanations are correct, but we're

        4    obviously very confident in our numbers because they're

9:58:46AM  5    literally just counts of people who cast these ballots, you

        6    know, without ID.  They cast provisional ballots in Michigan

        7    and Florida.  And there's just not very many of them.  And

        8    that's the set of people who could potentially be impacted by

        9    these laws, much smaller than what these surveys would lead you

9:59:05AM 10    to believe.

       11    BY MR. LANGHOFER:

       12    Q.  When the survey concluded that up to seven people -- or 7

       13    percent of people -- approximately 7 percent of people didn't

       14    have ready access to these documents, do you know whether they

9:59:15AM 15    were including driver's licenses among the documents?

       16          THE COURT:  I'm sorry.  You are asking the question

       17    but what I read was -- a sentence that talked about 7 percent

       18    of people without ready access to documentary proof of

       19    citizenship, which is -- I don't think is the same as having

9:59:35AM 20    identification to vote.

       21          MR. LANGHOFER:  I agree with you in theory, Your

       22    Honor.  I am trying to get to the bottom of that issue.

       23          THE COURT:  Okay.  Go ahead.

       24    BY MR. LANGHOFER:

9:59:44AM 25    Q.  So when the survey was concluding that nearly 7 percent of

MARK HOEKSTRA, PH.D. - REDIRECT EXAMINATION                    1890

9:59:49AM 1    U.S. citizens did not have ready access to DPOC, Documentary

       2       Proof of Citizenship, was the survey contacting as DPOC a

       3       driver's license?

       4       A.  I don't recall, to be honest.  I haven't gone back and

10:00:03AM 5   looked at that survey.  And we wrote the paper several years

       6       ago, and I think ultimately that got cut out of the published

       7       paper to shorten it down.

       8       Q.  Okay.  You talk --

       9       A.  Let me say one more thing.  I believe this would have been

10:00:21AM10   pulled from the full-length paper.  And so the place to go for

      11       the full citations as opposed to this research brief which is

      12       meant for a more, you know, lay audience, the NBER version of

      13       the paper would have had those citations, and that's where I

      14       would go back to look if I were to look.

10:00:41AM15   Q.  You talked with Mr. Babbitt a bit about Cantoni and Pons'

      16       conclusions such as they were about informational effect on

      17       voter confidence.

      18               In the Biggers and Smith study, looking at the Florida

      19       voters who were notified that their registration may be

10:01:03AM20   challenged, were the voters in that study made aware of the

      21       laws and its potential effects on them?

      22       A.  When you say, were they made -- were they made aware of

      23       what laws, the laws regarding citizenship?

      24       Q.  The laws that may have invalidated their registration based

10:01:23AM25   on citizenship?

MARK HOEKSTRA, PH.D. - REDIRECT EXAMINATION          1891

10:01:24AM 1    A.  I believe they would have become aware if they weren't

2    directly aware of that letter.

3    Q.  Because they received two letters in fact?

4    A.  Exactly.

10:01:31AM 5    Q.  What happened to the voters who became aware of it in that

6    study?  What happened to their turnout rates?

7    A.  So their turnout rates increased relative to others.

8    Q.  Was it statistically significant?

9    A.  It was, and it was relatively large.  I think it's several

10:01:45AM10    percentage points.

11    Q.  Last question.

12            MR. LANGHOFER:  Elaine, if I could have the podium

13    laptop one more time, please?

14    BY MR. LANGHOFER:

10:01:51AM15    Q.  We are going to look now to Exhibit 952.  This is Cantoni

16    and Pons.  Oh, let's ignore the overhead for a moment.

17            Cantoni and Pons, the 1.6 billion observation study.

18    Was there any -- for how many ethnic groups was there a

19    statistically significant change in turnout when the voter ID

10:02:25AM20    laws were implemented?

21    A.  Just one, it was Hispanics.

22    Q.  And was that change positive or negative?

23    A.  It was positive.  Hispanics were more likely to vote after

24    states moved from non-strict to strict voter identification

10:02:38AM25    laws.

10:02:39AM 1    Q.  Any other subgroups with a statistically distinguishable

2    from zero effect on turnout?

3    A.  No, none.

4            MR. LANGHOFER:  No more questions, Your Honor.  Thank

10:02:50AM 5    you.

6            THE COURT:  May this witness be excused?

7            MR. LANGHOFER:  Yes.

8            THE COURT:  Is there any objection?

9            MR. BABBITT:  No objection.

10:02:55AM10            THE COURT:  Thank you, sir.  You may step down, and

11    you are excused as a witness.

12            Defendants may call their next witness.

13            MR. DODGE:  Was the Court interested at all in hearing

14    a few matters of housekeeping or would the Court like to wait?

10:03:14AM15            THE COURT:  Is it -- does it have any time

16    sensitivity?

17            MR. DODGE:  Not particularly.  It is in the interest

18    of making sure we get this all wrapped up tomorrow.

19            THE COURT:  Let's have our next witness.

10:03:24AM20            MR. DODGE:  Okay.

21            MR. HERRERA:  Well, Your Honor, there may be one

22    matter that's time-sensitive, only because it involves another

23    witness to be called -- expected to be called tomorrow;

24    therefore, I think, out of fairness to that witness, I think

10:03:41AM25    this issue might be best raised now earlier in the day, if

10:03:45AM 1    that's okay?

2              THE COURT:  Go ahead.

3              MR. HERRERA:  Thank you, Your Honor.  Good morning,

4    Your Honor.  Ernest Herrera for the Promise Arizona plaintiffs.

10:03:55AM 5    We wanted to raise one important issue about a witness dispute

6    that crystallized yesterday.

7              Last night at 11:00, RNC's counsel sent us transcripts

8    and videos that they want to use in a second cross-examination

9    of Senator Quezada, who was on the stand last week -- former

10:04:11AM10    Senator.

11             RNC counsel had informed plaintiffs at the conclusion

12    of trial yesterday that these materials might be used.  These

13    are legislative hearing videos regarding the Challenged Laws

14    and the 2023 hearing regarding Mr. Quezada's nomination to a

10:04:27AM15    position by Governor Hobbs.

16             We have two issues with this.  Defendants' second shot

17    at cross is improper as a general matter, given the rules of

18    this trial, and the anticipated topics of examination are

19    cumulative, given that they examined Mr. Quezada about those

10:04:44AM20    exact same topics last Thursday.

21             Your Honor will recall that after Mr. Quezada's

22    testimony last week, defendants noted that they would, quote,

23    think about an objection to Mr. Quezada's testimony as

24    improperly disclosed.  But over one week later they have not

10:04:58AM25    done so, because they cannot.  The witness and the subject of

UNITED STATES DISTRICT COURT

10:05:02AM 1    the testimony was clearly disclosed to them in August, or were

2    clearly disclosed.

3            Defendants' failure to file an objection should not

4    give them a second crack at a witness on the same topics when

10:05:12AM 5    the Court has admonished the parties that no witness will have

6    to appear twice during trial.  And the RNC retreading the same

7    topics with Mr. Quezada, they already asked him about at length

8    will inevitably lead to argumentative and cumulative

9    questioning.  We ask that you not allow the RNC to do this.

10:05:29AM10            They haven't even tried to provide any grounds for

11   this special treatment, but plaintiffs nevertheless stand ready

12   to reexamine or to examine Mr. Quezada again as well tomorrow

13   with our own transcripts and videos if the Court uniquely

14   allows the RNC another bite at cross-examination for this

10:05:45AM15   witness.

16            THE COURT:  Does defense counsel intend to re-call

17   Mr. Quezada?

18            MR. LANGHOFER:  We do, Your Honor.  And the reason

19   it's not cumulative is because there are things that are not

10:05:56AM20   yet in the record.  We have transcripts of two committee

21   hearings.

22            Mr. Quezada testified that, as you will recall,

23   Senator Borrelli leaned over muted a microphone and made

24   comments that -- the wording is now -- I don't think there's

10:06:16AM25   precise testimony of what exactly the wording is.

10:06:19AM 1          The only thing we have on the record so far are

2     transcripts.  We need to introduce videos because they also

3     fail to show that Senator Borrelli leaned over and muted a

4     microphone and spoke to Senator Quezada.

10:06:34AM 5          There's also --

6          THE COURT:  Now, I assume these videos would not have

7     audio if something were said.  It would -- you just want to

8     show the videos to show whether or not, as Mr. Quezada

9     testified, the other legislator leaned over and appeared to

10:06:58AM10   speak to him during the hearing?

11          MR. LANGHOFER:  That's right, Your Honor.  I think the

12     audio in these videos is immaterial.  It's to establish

13     that there was no -- there appears to have been no conversation

14     --

10:07:09AM15          THE COURT:  Couldn't the two of you -- since the

16     videos don't show what's said, will only show if it appears

17     that something was said, couldn't you both just look at the

18     videos and tell me, yes, there's situations where -- is it

19     Borrelli?

10:07:29AM20          MR. LANGHOFER:  Borrelli.

21          THE COURT:  Borrelli leaned over and appeared to say

22     something versus the video doesn't show that.  I mean, why

23     would I watch a silent video of -- and then see if he leaned

24     over and spoke or didn't?

10:07:45AM25          MR. LANGHOFER:  That works for us.  I think that's a

10:07:47AM 1   lot more efficient use of the Court's time, and I don't think

2   the appellate courts want to watch, you know three, 45-minute

3   hearings from the legislature, maybe longer.

4          THE COURT:  Three 45-minute hearings?  Definitely

10:07:59AM 5   don't want to watch silent video of three, 45-minute hearings.

6          MR. HERRERA:  And, Your Honor, this is Mr. Herrera

7   again.  The confirmation hearing video is two and a half hours

8   long.

9          THE COURT:  Oh, I really am not going to watch that.

10:08:11AM10          MR. LANGHOFER:  For that we have a transcript, because

11   I don't think the video is more helpful than the transcript on

12   that issue.

13          THE COURT:  But why do we need to call Mr. Quezada

14   back?

10:08:22AM15          MR. LANGHOFER:  Well, he's the best person to

16   authenticate these things.

17          THE COURT:  We don't authenticate things unless

18   there's a dispute about the authenticity.

19          MR. LANGHOFER:  We have not received confirmation from

10:08:35AM20   the plaintiffs that they will not dispute authenticity and

21   foundation.

22          MR. HERRERA:  Your Honor, plaintiffs can stipulate to

23   videos without the testimony, and we will not object to

24   authenticity.

10:08:46AM25          THE COURT:  There we have it.

10:08:48AM 1     MR. LANGHOFER:  So I think -- that works.

2     THE COURT:  That doesn't make them admitted, but it

3  saves the witness from saying, oh, yeah, that's the hearing I

4  was talking about.

10:09:00AM 5     MR. LANGHOFER:  So -- right.  So I think -- then we

6  will have the transcript from the confirmation hearing,

7  which -- did I miss whether there's an authenticity or

8  foundation objection to that?

9     THE COURT:  I didn't hear one.

10:09:18AM10     MR. HERRERA:  Yeah, I think on the transcript, no

11  objection there either, as long as it's not also the video.

12     THE COURT:  No.  The video -- I am not watching two

13  and a half hours of video.  If it's admitted, I could read a

14  transcript in a much shorter period of time than that.

10:09:39AM15     MR. LANGHOFER:  Even then there's only so many

16  sections of the transcript that would be helpful and obviously

17  that's what we'll cite to when we need it.

18     There's additionally -- on the videos, I think we

19  don't even need to have those admitted, as long as we agree

10:09:53AM20  that there was no communication where Senator Borrelli leans

21  over, mutes his microphone and says something to Senator

22  Quezada, and certainly no appearance that Senator Quezada was

23  upset by, you know, some remark that he's heard.

24     THE COURT:  Well, okay.  The only thing I want to

10:10:09AM25  resolve right now is whether or not there's any need to re-call

10:10:12AM 1   Mr. Quezada?

2          MR. LANGHOFER:  So the only other thing I can consider

3   here -- contemplate wanting to ask him is we have more -- as an

4   offer of proof, Senator Quezada said he didn't know Quan

10:10:29AM 5   Nguyen, the Vietnamese refugee who introduced -- who voted for

6   the Challenged Laws in this case.  It turns out he has at a

7   minimum referred to the actions of Quan Nguyen as white

8   supremacy.

9          THE COURT:  I think you asked him about that.

10:10:49AM10          MR. LANGHOFER:  I asked whether he knew him, and he

11   said he did not.  But then he's got tweets saying, this is

12   white supremacy, in regard to Quan Nguyen.

13          THE COURT:  Did they serve at the same time in the

14   same house?

10:11:04AM15          MR. LANGHOFER:  Different house, same time.

16          THE COURT:  Different house.

17          MR. LANGHOFER:  And then they've got these Twitter

18   exchanges or Quan Nguyen posts something.  And then Senator

19   Quezada says, this is white supremacy.

10:11:14AM20          We've got more tweets like that.  I think we've gone

21   down this road.  I don't know if it's adding a lot of value to

22   the Court, but that's the only other thing we would want to get

23   from him on recross tomorrow.

24          MR. HERRERA:  Your Honor, I think that that

10:11:31AM25   opportunity, if these were Twitter exchanges that happened

UNITED STATES DISTRICT COURT

10:11:35AM  1    before this past week, then I think that is something that

2    could have been asked last week.

3         THE COURT:  I agree.

4         MR. HERRERA:  And --

10:11:42AM  5         THE COURT:  I agree.  Mr. Langhofer, you asked him

6    about Mr. Lee?

7         MR. LANGHOFER:  Nguyen

8         THE COURT:  Nguyen.  I'm sorry.  Mr. Nguyen.  I

9    thought you asked him the thing about white supremacy, but I

10:11:56AM 10    could be wrong.

11         MR. LANGHOFER:  There were several of those.  We

12    didn't ask about this one.

13         THE COURT:  But why didn't you ask him these questions

14    last week?

10:12:06AM 15         MR. LANGHOFER:  Because -- if you would like, I can

16    show you the disclosures we received about Mr. Quezada before

17    he took the stand.

18         THE COURT:  Oh, so you're saying 'cause you were

19    surprised about the scope of his testimony?

10:12:19AM 20         MR. LANGHOFER:  Yes, Your Honor.  Now -- and to that

21    point, I received last night for the first time a draft motion

22    to strike the portion of his testimony that was undisclosed in

23    advance.  You know, I --

24         THE COURT:  I'm sorry, who's moving to strike?

10:12:36AM 25         MR. LANGHOFER:  We haven't filed it yet, but I expect

10:12:38AM 1    that we will, so I don't want there to be a suggestion that

2    we've been sitting on this and doing nothing.  Immediately we

3    pulled the videos, ordered transcripts, started drafting a

4    motion to strike based on disclosure issues.

10:12:51AM 5         If we -- Your Honor hasn't seen the motion yet, and I

6    don't think you want us to sort of orally summarize it here.

7         THE COURT:  That's correct.

8         MR. LANGHOFER:  But the -- if he -- we don't know what

9    the disposition of that motion will be.  Vigorous

10:13:05AM10   cross-examination on a surprise testimony at trial is not

11   unusual.

12        THE COURT:  So are you trying to call him back just to

13   talk to him about these tweets that he sent?

14        MR. LANGHOFER:  If the foundation authenticity issues

10:13:27AM15   are resolved, it sounds like they are, that would be the only

16   purpose for re-calling them.

17        THE COURT:  Again, this doesn't say they're

18   admissible, but if Mr. Langhofer has obtained the Twitter

19   account that shows him tweeting about whoever this -- senator?

10:13:45AM20        MR. LANGHOFER:  Yes, Your Honor.

21        THE COURT:  Senator Nguyen?

22        MR. LANGHOFER:  I'm sorry.  I thought you were

23   referring to Borrelli.  Nguyen is a representative.  I

24   apologize.

10:13:53AM25        THE COURT:  Oh, it's the other way around okay.  Okay.

10:13:59AM 1    We don't need Quezada and we can argue about its admissibility.

2                      MR. HERRERA:  About admissibility of the tweets, Your

3              Honor?

4                      THE COURT:  Yes.

10:14:10AM 5           MR. HERRERA:  I think we can sort that out.

6                      THE COURT:  Good.

7                      MR. HERRERA:  On the videos, I would just note for the

8              matter of showing Senator Borrelli leaning over or not, I think

9              as long as we're able to also review the videos and --

10:14:25AM10           THE COURT:  Of course, I want you to review the videos

11             and either agree or disagree.  If you disagree, I will address

12             that.  If you agree, it's over.

13                     MR. HERRERA:  Okay.

14                     THE COURT:  As to what they show.  Okay.

10:14:38AM15           MR. LANGHOFER:  I think that's a resolution.

16                     THE COURT:  All right.  Excellent.

17                     MR. LANGHOFER:  With that the defense calls Jesse

18             Richman.

19                     THE CLERK:  Stand here and raise your right hand.

10:14:58AM20           **JESSE RICHMAN, PH.D. - DEFENDANTS' WITNESS, SWORN**

21                     THE CLERK:  Can you please state your name and spell

22             last name for the record?

23                     THE WITNESS:  Jesse Richman.  Last name spelled

24             R-I-C-H-M-A-N.

10:15:34AM25           THE COURT:  You may proceed, Mr. Langhofer.

JESSE RICHMAN, PH.D. - DIRECT EXAMINATION                1902

10:15:35AM 1         MR. LANGHOFER:  Thank you, Your Honor.

2                    DIRECT EXAMINATION

3    BY MR. LANGHOFER:

4    Q.  Good morning, Mr. Richman.  Please take a moment and

10:15:43AM 5   introduce yourself to the Court.

6    A.  My name is Jesse Richman.  I am an associate professor of

7    political science and international studies at Old Dominion

8    University.

9    Q.  And can you please tell us about your educational

10:15:57AM10   background, sir?

11   A.  Yes.  I completed a BPhil in history and political science

12   at the University of Pittsburgh summa cum laude, and then I

13   completed my master's and Ph.D. in political science at

14   Carnegie Mellon University.

10:16:15AM15   Q.  When did you graduate from Carnegie Mellon with your Ph.D.?

16   A.  I graduated in 2005.

17   Q.  And what was your first job out of Carnegie Mellon?

18   A.  I took a job as a visiting assistant professor at

19   Vanderbilt University, and after one year at Vanderbilt, I

10:16:34AM20   moved on to Old Dominion.

21   Q.  At Old Dominion, were you in a tenure track position when

22   you joined faculty there?

23   A.  Yes, I was in a tenure track position and received tenure

24   in 2012.

10:16:46AM25   Q.  What's your current position?

UNITED STATES DISTRICT COURT

JESSE RICHMAN, PH.D. - DIRECT EXAMINATION          1903

10:16:48AM 1    A.   I'm associate professor of political science and

2    international studies.

3    Q.   What are your research interests there?

4    A.   My research interests are in American politics and research

10:16:59AM 5    methodology and modeling and simulation.  I have published 25

6    papers.  I study legislatures, elections, legislative

7    elections, state politics, national politics, election rules,

8    and variety of other topics.

9    Q.   You just mentioned 25 publications.  Are those in

10:17:28AM10    peer-reviewed journals?

11    A.   Yes, those are all in peer-reviewed journals.

12    Q.   Have you published in the American Political Science

13    Review?

14    A.   Yes, I have.

10:17:36AM15    Q.   Why is that significant?

16    A.   The American Political Science Review is generally seen as

17    top-ranked journal in the field of political science.

18    Q.   How about the Journal of Politics?

19    A.   Another top ranked journal, typically seen as the

10:17:50AM20    third-ranked journal in American politics.  I've also published

21    in that journal.

22    Q.   Have you published on election administration rules?

23    A.   Yes, I have.

24    Q.   Have you authored any books?

10:18:02AM25    A.   I have authored two books.

JESSE RICHMAN, PH.D. - DIRECT EXAMINATION                    1904

10:18:04AM 1    Q.  Co-authored?

2    A.  Co-authored, yes.

3    Q.  What courses do you teach?

4    A.  I teach courses in American politics, including American

10:18:14AM 5    politics, Congress, elections, public opinion, and American

6    political thought.

7           I teach courses in research methods, statistics and

8    modeling simulation including research design, research

9    methods, quantitative methods and advanced statistical

10:18:35AM10    techniques, and game theory.  I teach courses at both the

11    undergraduate and graduate level in that area.

12    Q.  Do you teach Ph.D.-level courses in advance statistics?

13    A.  Yes.  The course in advanced statistics is a Ph.D. level

14    course, and I teach that every year.

10:18:54AM15    Q.  Does that course include topics -- the use of large data

16    sets?

17    A.  It does.

18    Q.  Does it include matching procedures when you are using

19    large data sets?

10:19:06AM20    A.  Yes.

21    Q.  Can you tell us about some of the research that you have

22    supervised?

23    A.  I have supervised the work of many students, undergraduate

24    and graduate level.  I have won awards for my research

10:19:24AM25    mentoring at both the undergraduate and graduate level.

JESSE RICHMAN, PH.D. - DIRECT EXAMINATION          1905

10:19:28AM 1    Students have completed projects in a wide range of areas,

2    including projects on American politics but also projects

3    applying research methods to a wide range of different problems

4    around the world.

10:19:44AM 5    Q.  When you are asked to serve on dissertation committees,

6    what expertise are you customarily asked to provide as part of

7    that service?

8    A.  I am typically asked to provide expertise in research

9    methods.

10:19:59AM10    Q.  What type of research methods?

11    A.  So this would include statistical models and methods, also

12    game theoretic modeling.

13    Q.  Have you won any awards for your academic work?

14    A.  Yes.  So I have won awards including an American Political

10:20:18AM15    Science Association Congressional Fellowship and a Fulbright

16    award.  I am currently on the Fulbright specialist roster and

17    have completed an assignment on that roster as well.

18    Q.  Dr. Richman, what have you been asked to do in this case?

19    A.  I was asked to evaluate and assess two expert reports.  The

10:20:45AM20    report of Michael McDonald and the report of Lorraine Minnite.

21    Q.  And what process did you follow in undertaking this task?

22    A.  I began by reading each report carefully and taking notes.

23    I then used the data sets which were used by Professor McDonald

24    in his report to evaluate the reducibility of the analysis

10:21:13AM25    which he had conducted, and I conducted a variety of other

10:21:18AM 1   analyses aimed at evaluating the robustness and accuracy of the

2   claims and conclusions in those reports.

3   Q.  You said data sets.  What data sets are you talking about?

4   A.  So Professor McDonald primarily examined data sets provided

10:21:36AM 5   by the state of Arizona, both data from the Secretary of

6   State's office voter file records, several types and data from

7   the Department of Motor Vehicles.

8   Q.  Did you consider the narrative portions of both Professor

9   McDonald and Professor Minnite's reports?

10:21:59AM10   A.  Yes, I did.

11   Q.  Did you prepare a report of your own in this case?

12   A.  Yes, I did.

13   Q.  Okay.  I would like to talk to you about database matching

14   procedures as the first of I think four topics we are going to

10:22:09AM15   cover today.

16        Have you given some thought to the strengths of

17   Arizona's current practice of database matching to confirm

18   citizenship?

19   A.  I think the current practice is quite robust.  It involves

10:22:29AM20   using multiple data sets to obtain proof of citizenship.

21   Q.  Have you run any tests to determine -- to identify errors

22   or inaccuracies in the ADOT data that's used as part of the

23   HAVA check process?

24   A.  Yes.  So one of the data sets that is used under current

10:22:50AM25   practice is data from ADOT, and this data involves information,

JESSE RICHMAN, PH.D. - DIRECT EXAMINATION          1907

10:22:56AM 1    among other things, on the citizenship status of individuals.

        2            One of the files that Professor McDonald and I were

        3    provided with is a file which discusses the changes that have

        4    occurred in the citizenship status records held by ADOT.

10:23:22AM 5    Q.  Did you evaluate that file for apparent errors?

        6    A.  Yes, I did.

        7    Q.  What did you find?

        8    A.  What I found was that there were 22 cases out of 40,000

        9    records in that file, and out of about 7 million overall

10:23:38AM10    records in the ADOT database for which there was a change in

       11    status from a citizenship status code to a non-citizenship

       12    status code.

       13    Q.  And what was your -- do you have an opinion then about what

       14    that suggests about the reliability of the ADOT date?

10:23:59AM15    A.  It suggests to me that there are very few clear errors in

       16    the citizenship status measure in the ADOT data.

       17    Q.  We are going to get back to this potential staleness of the

       18    ADOT data in a bit.  But have you thought about Arizona's

       19    current practice of using not just one database but multiple

10:24:23AM20    databases at the same time?

       21    A.  Yes.  I think that using multiple databases is a clear

       22    strength of the current practice and that this will be improved

       23    further with additional databases.

       24    Q.  Have you thought specifically about the use of SAVE in

10:24:43AM25    addition to the ADOT database and whether that has an effect on

UNITED STATES DISTRICT COURT

JESSE RICHMAN, PH.D. - DIRECT EXAMINATION                    1908

10:24:46AM 1    the reliability of the current process?

2    A.  Certainly.  One of the key issues with the ADOT data is

3    that that data is only updated at most when someone interacts

4    with ADOT.  And so a significant portion of the time somebody

10:25:02AM 5    who is, you know, interacted with ADOT several years ago may

6    have had some change in their citizenship status and the ADOT

7    data may be missing that change in status.

8           So this -- we could refer to this as staleness in the

9    ADOT data.  Sometimes ADOT is out of date.  And so the SAVE

10:25:25AM10    data set is potentially very useful in addressing that

11    limitation because SAVE data is updated continually by U.S.

12    immigration authorities, so one possible pattern that one could

13    see is someone receives a driver's license by the -- with the

14    State of Arizona, they are not a citizen at that point, they

10:25:47AM15    provide proof of legal presence, maybe their Green Card or more

16    temporary status document, and then they are able to

17    naturalize.  They become a U.S. citizen.

18           The ADOT data set may not have updated yet to include

19    that; however, the SAVE data set will typically have updated.

10:26:08AM20    The deposition testimony from the immigration authorities, it's

21    typically a day or two -- federal working day or two for that

22    update.  So typically when ADOT is stale in the place where

23    that matters, which is with someone who told ADOT they were not

24    a citizen, the SAVE data set can back stop that and help assure

10:26:32AM25    that that person gets a right to vote in all elections.

JESSE RICHMAN, PH.D. - DIRECT EXAMINATION          1909

10:26:40AM 1    Q.  Are you familiar with a data system named the National

         2    Association for Public Health Statistics and Information

         3    Systems?

         4    A.  Yes, I am.

10:26:51AM 5    Q.  I would -- is it okay if we just talk about this as the

         6    "vital records database" going forward?

         7    A.  That sounds fine to me.

         8    Q.  Good.  What is the vital records database?

         9    A.  So this has developed across time from collaboration

10:27:05AM10    between the vital records administrators in different states

        11    and also U.S. territories, and it's a database that has matured

        12    significantly over time.  That database, in collaboration with

        13    the Social Security Administration, is used by Social Security

        14    to verify for example when Social Security receives a birth

10:27:28AM15    certificate.

        16              THE COURT:  Hold on a second.  I thought you were

        17    going to tell me what it was first before you tell me --

        18              THE WITNESS:  I'm very sorry.

        19              THE COURT:  -- before you tell me who they talked to

10:27:35AM20    about it.  I mean, when I say "talk to" I mean the computers

        21    talk to each other.

        22              THE WITNESS:  Okay.

        23    BY MR. LANGHOFER:

        24    Q.  I'll break this up with questions so that we are directed.

10:27:45AM25    A.  Thanks.

JESSE RICHMAN, PH.D. - DIRECT EXAMINATION                    1910

10:27:46AM 1    Q.  So the vital records database is not currently used in

2    Arizona's voter registration process, correct?

3    A.  That's correct.

4    Q.  What information does the vital records database gather?

10:27:59AM 5    A.  It gathers information on vital records.  So births,

6    deaths, marriages, divorces, some other information as well has

7    been collected at various points by various states.

8    Q.  Does it -- is the information collected uniform across all

9    of the states?  For example, if there's a particular data point

10:28:20AM10   from one state, is it necessarily there for all of the states?

11   A.  It is not completely uniform.  So, for example, some states

12   have -- put into an electronic form their vital records going

13   back further in time than other states.  So some states it's

14   1920, other states it's 1860-something and so forth, so there's

10:28:45AM15   some variability.

16   Q.  The information that it contains on births, does that

17   include date of birth?

18   A.  Yes.

19   Q.  Does it include birthplace?

10:28:56AM20   A.  Yes.

21   Q.  Do you have an opinion --

22        THE COURT:  Wait a second.  Whose database is it?  You

23   said they collect information from state vital records, but who

24   actually owns this database?

10:29:14AM25        THE WITNESS:  So it's a collaboration of the various

UNITED STATES DISTRICT COURT

JESSE RICHMAN, PH.D. - DIRECT EXAMINATION          1911

10:29:16AM  1   state organizations that collect that information to assist in
        2   sharing that information.
        3           THE COURT:  So the state organizations are the ones
        4   that contribute the money to keep the database maintained?
10:29:27AM  5           THE WITNESS:  I'm not sure of the details of how it's
        6   funded.  It's possible that some of the funding also comes from
        7   users of the database.
        8           THE COURT:  But it's not owned by some company that
        9   has entered into contracts with every state to get this
10:29:43AM 10   information.
       11           THE WITNESS:  My understanding is that it is a
       12   organization that involves collaboration between the various
       13   state organizations that collect the records.
       14   BY MR. LANGHOFER:
10:29:57AM 15   Q.  Do you know whether it's for profit or nonprofit?
       16   A.  I don't know.  I would assume it's nonprofit, but I don't
       17   know.
       18   Q.  Okay.  Do you have a view on whether incorporating the
       19   vital records database into Arizona's voter registration
10:30:15AM 20   process would increase the efficiency of the current
       21   citizenship verification system in Arizona?
       22   A.  I think it would improve the efficiency.
       23   Q.  In what ways might it be able to help if added?
       24   A.  So currently Arizona's process includes the Department of
10:30:36AM 25   Motor Vehicle's data, which is excellent data where that can be

JESSE RICHMAN, PH.D. - DIRECT EXAMINATION          1912

10:30:41AM 1     obtained, or if somebody demonstrated to ADOT that they are a

        2     citizen, then ADOT can use that information to let the

        3     Secretary of State and the county recorders know that this

        4     person is a citizen.

10:30:57AM 5             However -- and then furthermore there's the SAVE

        6     database which is useful for people who have naturalized and

        7     become a citizen.  The potential gap is somebody who is a U.S.

        8     citizen and doesn't have an ADOT credential.  And the vital

        9     records can fill an important gap there.

10:31:22AM10             Because if you were born in any of the U.S. states or

        11    territories, for the most part, with some exceptions, if your,

        12    you know, state has a 1920 end of the window, right, so

        13    somebody born -- one of the oldest people alive would maybe not

        14    be in that database, things like that.  But for the most -- so

10:31:46AM15    you have to be cognizant of those limitations when analyzing

        16    that data.

        17             In many instances this would allow the state to

        18    identify proof of citizenship for that person through a match

        19    with the vital records database.

10:32:07AM20    Q.  For about what percentage of Arizona voters does the ADOT

        21    data not provide an answer on the citizenship question?

        22    A.  It is about 250,000 people on the active voter roll for

        23    whom there isn't a match with the ADOT date that would provide

        24    DPOC.

10:32:30AM25    Q.  Okay.  About 5 percent of active and inactive voters then?

JESSE RICHMAN, PH.D. - DIRECT EXAMINATION                1913

10:32:35AM 1    A.  That's right.

          2    Q.  If the vital records database were an alternative means for

          3    confirming citizenship, do you have an opinion about whether

          4    that would reduce the frequency with which voters are asked to

10:32:51AM 5    mail in copies of their birth certificates, for example?

          6    A.  I think it would reduce by a very substantial margin the

          7    extent to which that happens.  Especially given that the laws

          8    in question in this case will increase the degree to which

          9    people are providing information on their state of birth, that

10:33:14AM10    will facilitate matching.  Even without that you might still be

         11    able to match, but that will facilitate accuracy of matching.

         12         For many of those individuals it becomes a costless

         13    process as it is with ADOT, where you simply -- the state works

         14    in the background using databases to identify DPOC, and this

10:33:34AM15    eliminates any need for the individual to find or provide DPOC.

         16    So it reduces costs for those registrants who aren't being

         17    captured already by the other databases in use.

         18    Q.  In your mind, would adding the vital records database to

         19    the citizenship checks in Arizona significantly increase the

10:33:59AM20    odds of a false positive on citizenship, essentially

         21    identifying a non-citizen incorrectly as someone who was born

         22    in the United States?

         23    A.  I think it would have a minimal effect on false positive

         24    rate.  It could happen because somebody could get incredibly

10:34:18AM25    lucky as a non-citizen, and if they are claiming that they were

JESSE RICHMAN, PH.D. - DIRECT EXAMINATION                1914

10:34:24AM 1    born in a U.S. state, they happen to claim that they were born

        2    in a U.S. state on the same day with the same father or

        3    mother's name, if they filled in that field, as somebody else

        4    who is a U.S. citizen, same birthdate, that could happen.  I

10:34:45AM 5    think it's unlikely to be a substantial problem, however.

        6    Q.  Have you developed a view on weaknesses in the current

        7    database checking system used by Arizona?

        8         THE COURT:  Before we hear that answer, we'll take our

        9    morning break.  We will reconvene at 10 minutes to 11:00.

10:35:05AM10    Court is in recess.

        11        (Recess taken at 10:35 a.m.; resumed at 10:50 a.m.)

        12        THE COURT:  You may continue, Mr. Langhofer.

        13        MR. LANGHOFER:  Thank you.

        14   BY MR. LANGHOFER:

10:50:11AM15   Q.  Dr. Richman, before we leave vital records, I should ask

        16   you, do any other states currently use the vital records

        17   database for purposes of voter registration?

        18   A.  Yes.  For example, the state of Missouri uses the vital

        19   records database, EVVE, which is the database produced by

10:50:32AM20   NAPHSIS to establish voter identification.

        21   Q.  NAPHSIS again is the vital records database?

        22   A.  That's right.

        23   Q.  Has the Elections Systems Commission, U.S. Election Systems

        24   Commission given any guidance on the appropriateness of using

10:50:47AM25   the vital records database?

JESSE RICHMAN, PH.D. - DIRECT EXAMINATION                1915

10:50:48AM 1    A.   Yes.   In fact it's one of the tools that they recommend

        2    that states adopt to improve their election practices.

        3    Q.   Have you considered whether there are any weaknesses in

        4    Arizona's current database checking procedures?

10:51:05AM 5    A.   So related to what we were just talking about, one of the

        6    weaknesses is the lack of use of EVVE, the vital records

        7    database.

        8    Q.   Have you thought about whether the -- Arizona's use of the

        9    database checks only at the time of registration and not on an

10:51:29AM10    ongoing basis is a strength or a weakness?

       11    A.   That's another weakness of the current system.   So, for

       12    example, let's say that somebody registers to vote, and at the

       13    time they register, ADOT is not able to provide DPOC.   And so

       14    perhaps they end up getting put on the federal-only list.

10:51:57AM15         At some point, however, they may have returned to ADOT

       16    and provided proof of legal presence, or they may have gone for

       17    the first time to ADOT and provided proof of legal presence.

       18    And so ADOT may now have evidence that they are a U.S. citizen

       19    and they should be on full voter list.

10:52:17AM20         But under current practice, that's not going to be

       21    rechecked, and so they may stay on that list when the State in

       22    fact does know that they have DPOC and, you know, they should

       23    be, I would argue, on the full voter list as soon as possible.

       24    Q.   Have you and Professor McDonald looked at whether those

10:52:38AM25    sorts of voters exist?   Currently registered federal-only but

JESSE RICHMAN, PH.D. - DIRECT EXAMINATION          1916

10:52:41AM 1    have since registration provided DPOC to ADOT?

2    A.  Yes.  We both looked at that.  My calculation is that there

3    are currently 112 such voters on the federal-only list for whom

4    ADOT now appears to have a record demonstrating that they are a

10:53:00AM 5    citizen and nonetheless they are still in the fed-only list.

6    This law would, as those checks proceed, take those voters, I

7    believe, off of the fed-only list and get them onto the full

8    list where they belong.

9    Q.  All right.  I'd like to turn now to the second of four

10:53:21AM10    topics.  And that's the even or uneven implementation of voter

11    registration procedures across the counties.  You have

12    considered Professor McDonald's report on this issue?

13    A.  Yes, I have.

14    Q.  And let's start with his concerns about the number of

10:53:42AM15    individuals who appear on the suspended and canceled lists

16    across the various counties.

17           MR. LANGHOFER:  If possible, Elaine, can I have the

18    laptop available as well.

19    BY MR. LANGHOFER:

10:53:58AM20    Q.  Here we go.  I am showing you, sir -- yeah, it's doing that

21    thing again.

22           Sir, you've previously seen exhibits -- what's

23    previously been marked and admitted as Exhibit 334.  I will

24    describe it to you as a table of the counties in Arizona, and

10:54:21AM25    it indicated in one column the number of canceled, or for

JESSE RICHMAN, PH.D. - DIRECT EXAMINATION        1917

10:54:26AM 1    Exhibit 335, suspended voters in each of those counties; do you

       2    recall this table?

       3    A.  I do.

       4    Q.  And Professor Richman argued that the table showed uneven

10:54:36AM 5    implementation across the counties.  Have you considered

       6    whether the data underlying those tables support the argument?

       7    A.  I think you may have misstated.  You said Professor Richman

       8    argued.  Could you restate the question?

       9    Q.  I'm sorry.  I meant Professor McDonald.  Thank you for the

10:54:50AM10    correction.

       11    A.  So Professor McDonald argued that there was uneven

       12    implementation.  I noted several limitations of his argument.

       13    One of the limitations was that there are a variety of

       14    different cancelation codes and these overlapped with each

10:55:07AM15    other.

       16          And ideally when one is constructing a coding system

       17    for a database, one should not have overlapping codes, but in

       18    this case they could very well overlap.  There is a broader

       19    category of involuntary cancellation that could easily include

10:55:22AM20    cancellation because of lack of DPOC.  It's -- these are nested

       21    inside each other, and so that could happen.

       22    Q.  So let's slow down and think about this in a little bit

       23    more detail.  When a county cancels a voter, how do they -- are

       24    they required to enter a code indicating the reason for

10:55:45AM25    cancellation?

JESSE RICHMAN, PH.D. - DIRECT EXAMINATION          1918

10:55:46AM 1    A.  Yes, so they enter a code for reason of cancelation.

         2    Q.  About how many reasons are there?

         3    A.  There are about -- I can't remember exactly, about 39 I

         4    believe.

10:55:54AM 5    Q.  And --

         6          THE COURT:  Are we talking here about the 13 counties

         7    that use the Secretary of State and that's where the 39 reasons

         8    are?  I understand that Pima and Maricopa have their own

         9    database.

10:56:11AM10          MR. LANGHOFER:  That's a good question, Your Honor.  I

        11    think this is best directed to the witness.

        12    BY MR. LANGHOFER:

        13    Q.  Professor Richman, can you answer the Judge's questions?

        14    A.  I would be happy to.  Yes, so those codes are counties with

10:56:23AM15    the Secretary of State.  A further source of potential

        16    complication in the data is that the codes used by the counties

        17    that maintain their own databases may be distinct, and so

        18    again, focusing just on that code from the set of codes used by

        19    the counties that are on the Secretary of State's data system

10:56:44AM20    might further be problematic when looking at those counties.

        21    Q.  The Court has previously received evidence about how

        22    Professor McDonald was looking at people who were canceled for

        23    the invalid citizenship proof reason.  Is there another code of

        24    the available codes that might cover someone who is canceled

10:57:05AM25    for lack of DPOC?

UNITED STATES DISTRICT COURT

JESSE RICHMAN, PH.D. - DIRECT EXAMINATION                1919

10:57:08AM 1    A.  So there's another code for cancelation for citizenship
         2    status.  There are also codes for voluntary cancelation, code
         3    for involuntary cancelation.  Either one of those could apply.
         4         Somebody might ask to be canceled.  In some other
10:57:26AM 5    states one of the main ways that non-citizens on the voter roll
         6    get detected is when those people realize that they
         7    accidentally got on the voter roll and asked to be canceled.
         8    So, you know, potentially those people could be entered in the
         9    code cancelation for citizenship or they could be a broader
10:57:48AM10    category of voluntary cancellation.  It could go a variety of
        11    ways.  So there again, they are overlapping codes.
        12    Q.  Were there any issues with -- you know, I think Your Honor
        13    has already received evidence on that.  Let's cut that.
        14         Professor McDonald has also testified that the county
10:58:11AM15    recorders have given answers that are at a minimum in tension
        16    with each other about their interpretation of the laws.  Have
        17    you had a chance to review the county recorder deposition
        18    transcript in this case?
        19    A.  I have.
10:58:26AM20    Q.  It's my understanding you didn't review all of them, but do
        21    you remember how many you did have access to and reviewed?
        22    A.  I can't remember precisely, but I believe it was nearly all
        23    at least.
        24    Q.  Okay.  What was -- what is your opinion about whether the
10:58:42AM25    conclusion that the answers from the county recorders -- excuse

JESSE RICHMAN, PH.D. - DIRECT EXAMINATION          1920

10:58:45AM 1    me.

2              What is your opinion about whether the answers of the

3    county recorders in those depositions support the conclusion

4    that they're implementing the laws unevenly?

10:58:55AM 5    A.   I think that that conclusion would be premature, given the

6    transcript.  They were presented with a set of very vague

7    hypotheticals to which they were asked to reply in rapid

8    succession.

9              And I think that a reasonable person approaching such

10:59:11AM10   vague hypotheticals could answer a variety of ways depending on

11   how they specifically envision what the specific facts of a

12   case would look like.

13             A reasonable person given specific facts could

14   reasonably go variety of ways.  The hypotheticals were so vague

10:59:29AM15   that I don't think much can be concluded from them except that

16   if you ask a really vague question, you're likely to get a

17   confused and perhaps confusing set of answers.

18   Q.   When the witnesses were asked these questions, did the

19   depositions recess to consult with counsel, for example?

10:59:48AM20   A.   I can't recall across all of them.  I think in many cases

21   there were objections that were issued, but I couldn't see

22   necessarily on all of the deposition transcripts that there was

23   a recess.

24   Q.   Let's turn now to the third or fourth issues.  That is the

11:00:06AM25   voters with -- registered voters who have F-type licenses.  Are

JESSE RICHMAN, PH.D. - DIRECT EXAMINATION          1921

11:00:12AM 1    you familiar with the term "F-type license"?

2    A.  By "F-type license" you're referring to people who have a

3    record with ADOT indicating that they are not a citizen, at

4    least on the basis of the data that was last provided to ADOT

11:00:30AM 5    providing proof of authorized presence.

6    Q.  Professor McDonald testified that there are 6084 voters

7    who -- in the ADOT records that apparently have F-type

8    licenses.  Did you attempt to replicate that number with your

9    own analyses?

11:00:47AM10    A.  Yes, I was able to replicate that number.

11    Q.  And did Professor McDonald analyze, when discussing these

12    6084 voters, the sequence of voter registration and issuance of

13    the ADOT license at issue?

14    A.  I thought that was somewhat puzzling because when he

11:01:10AM15    analyzed the federal-only voters, the suspends, and the citizen

16    canceled voters, he did do further analysis, but in this case

17    he did not.

18         He simply asserted that this was evidence of the

19    inaccuracies in the ADOT data such as staleness of the data.

11:01:33AM20    But he did not do the same kinds of analyses that he had

21    performed for the other groups, which would allow for more

22    assessment of whether in fact there was evidence of staleness

23    or not in that data.

24    Q.  The Court is already familiar with the sequence of data

11:01:49AM25    productions in this case, so let's not rehash that.

JESSE RICHMAN, PH.D. - DIRECT EXAMINATION                    1922

11:01:52AM 1            But with the first ADOT production, did you attempt to

        2    assess the sequencing of voter registration and ADOT issuance

        3    state?

        4    A.   Yes.  So in that production Professor McDonald and myself

11:02:11AM 5    were provided with the issuance states of the ADOT credentials,

        6    and we also had in the voter file the registration dates for

        7    voters.

        8            And so I compared those, in terms of whether somebody

        9    had registered to vote prior to contact providing -- or

11:02:32AM 10   updating their records with ADOT or whether they had registered

        11   to vote after providing those records to ADOT.

        12           The second category registration to vote after

        13   providing records to ADOT would be the one that would be

        14   consistent with potentially an argument that the ADOT data was

11:02:53AM 15   stale.

        16   Q.   Assumed naturalization, for example, right?

        17   A.   Exactly.  It could be that somebody received their driver's

        18   license and then they naturalized and then they registered to

        19   vote but their driver's license had not expired yet and they

11:03:13AM 20   hadn't returned to provide any updated information to ADOT.

        21   Q.   Let's talk about the other category there, the people

        22   who -- were there people in the category of registering to vote

        23   before receiving an ADOT license that is an F-type license?

        24   A.   Yes, there were.

11:03:32AM 25   Q.   Okay.  Before we get to what that number is, can you

JESSE RICHMAN, PH.D. - DIRECT EXAMINATION                1923

11:03:37AM 1    explain the ambiguities that existed in the first data set
         2    produced to you by ADOT?
         3    A.  Certainly.  So there are a variety of ways in which one can
         4    get an issuance number, and my understanding is that there are
11:03:52AM 5    basically four of them.  It could be that it's a duplicate
         6    credential.  It could be that it is a replacement, or a
         7    renewal, or it could be an original credential.
         8           Furthermore, there's a second category which is, is
         9    this a real ID or a non-real ID variable?  And that's crucial
11:04:13AM10    in terms of thinking about the duplicate credentials.  Because
        11    the testimony from ADOT was that for the duplicate credentials,
        12    if someone had a real ID, they would be asked to provide proof
        13    of authorized presence when they got the duplicate credential.
        14           However, if it was not a real ID, then the person
11:04:31AM15    receiving a duplicate credential might not be required to
        16    provide that evidence of authorized presence.  So basically
        17    that was the one category in which someone might have had a new
        18    issuance number, but that issuance number might not reflect
        19    provision of proof of authorized presence to ADOT at the time
11:04:53AM20    that they applied for that issuance.
        21    Q.  Did the first data production by ADOT allow you to see the
        22    type of issuance and the type of ID issued?
        23    A.  The first production did not have the information about the
        24    type of issuance, and it did not have information about whether
11:05:14AM25    the individual was receiving a real ID credential or not.  So

JESSE RICHMAN, PH.D. - DIRECT EXAMINATION          1924

11:05:18AM 1   that was an open question.  I flagged that in my analysis as an

2   issue that I did not have the data at that point to resolve.

3   Q.  You said you flagged it in your analysis.  Do you mean in

4   your initial report?

11:05:32AM 5   A.  In my initial report I discuss that issue.

6   Q.  Okay.  After you issued your initial report, did you

7   receive a supplemental production from ADOT?

8   A.  Yes.  I did receive a supplemental production from ADOT,

9   and I immediately worked on evaluating that issue.  So I was

11:05:49AM10  able to, with the supplemental production, identify whether it

11  was a real ID credential or not, and identify the type of

12  issuance.

13      And so then I could create a table that laid out the

14  various categories of whether somebody had a duplicate,

11:06:05AM15  non-real ID or something else, and that allows us to adjudicate

16  whether when they got a new credential issued, ADOT would have

17  required them to provide proof of authorized presence or not.

18  Q.  Did you supplement your initial report after you received

19  that supplement from ADOT?

11:06:27AM20  A.  Yes, I did.

21  Q.  In preparing your supplemental report, you changed

22  something about your calculations regarding dates.  Can you

23  please explain that?

24  A.  Yes.  So initially I had done the calculations involving

11:06:42AM25  dates in Excel.  For the supplemental report I moved to

UNITED STATES DISTRICT COURT

JESSE RICHMAN, PH.D. - DIRECT EXAMINATION                1925

11:06:46AM 1     calculating everything in Stata, which is a statistical

2     analysis package, the leading commercial statistical analysis

3     program used in the field of political science.

4          And when I did that, I realized that there was an

11:07:04AM 5     ambiguity in the way that I had treated individuals who had a

6     credential issuance on the same day that they had registered to

7     vote.  I hadn't looked at those individuals, and, you know, I

8     had greater than or less than, but I realized when I did the

9     further coding in Stata that there were in fact individuals in

11:07:29AM10     that category as well, so then I needed to put them in one or

11     another of the categories of the analysis.

12     Q.  All right.  Did you prepare a table that summarized your

13     findings of the voters that fit into these categories, you

14     know, receiving driver's license issued with proof of lawful

11:07:54AM15     presence before and after their voter registration date?

16     A.  Yes, I did.

17     Q.  And does that table compare the type of voter registration

18     for each of those individuals, and by that I mean active,

19     inactive, federal-only, et cetera?

11:08:12AM20     A.  Yes, it does.

21          MR. LANGHOFER:  Elaine, we are going to try this

22     overhead one more time, please.

23          THE CLERK:  It is still showing no signal.  Did you

24     unplug and plug back in?

11:08:28AM25          MR. LANGHOFER:  Let's give that a shot.  There is

UNITED STATES DISTRICT COURT

JESSE RICHMAN, PH.D. - DIRECT EXAMINATION                1926

11:08:29AM 1    another way of doing this.  The old-fashioned way.

2              THE COURT:  That used to be state of the art.

3              MR. LANGHOFER:  I actually prefer it, but I don't know

4       that anyone else does.

11:08:48AM 5    BY MR. LANGHOFER:

6       Q.  From iPad through ELMO I am showing you, sir, a table that

7       appears as Table 2.5 in your supplemental report.  Is this the

8       table you were just describing you prepared?

9       A.  Yes, it is.

11:09:03AM10    Q.  Let's start with the center column that has a 6084 number

11      at the top.  Is this the same number that you and Professor

12      McDonald agreed on?

13      A.  Yes, it is.

14             THE COURT:  So basically that's all of the F-type

11:09:18AM15    licenses or IDs?

16             THE WITNESS:  So the central column is all of the

17      people who we could match between the voter files, and there

18      are various different voter files you can see listed going down

19      the different rows, who had an F-type license in the ADOT

11:09:40AM20    database.  So we matched the two databases, and these are the

21      people with an F-type license.

22             THE COURT:  Okay.  I'm still confused.  Are these

23      people with F-type licenses who are registered to vote?

24             THE WITNESS:  That would be in the first row, so

11:09:56AM25    active voter files.  These are F-type licenses and registered

UNITED STATES DISTRICT COURT

JESSE RICHMAN, PH.D. - DIRECT EXAMINATION                1927

11:10:00AM 1   to vote.

2              THE COURT:  So there's many, many more F-type licenses

3       than 6084, it's just there's only 6084 that show F and they are

4       on the voter registration list?

11:10:15AM 5              THE WITNESS:  That's right.  They are about 330,000 or

6       so people with F-type licenses.

7       BY MR. LANGHOFER:

8       Q.  And let's clarify that.  6084 is not everyone with an

9       F-type license who's registered to vote, correct, because there

11:10:30AM10     are some additional rows in this table?

11      A.  That's right.  So this is people -- the first row is people

12      who are on the active voter file non-federal only.  Then there

13      are also some individuals who are on the federal-only list who

14      have an F-type license.  So that would be the column -- the row

11:10:51AM15     here with 65 indicated in it.

16              There are also people on the canceled and suspended

17      list who have F-type licenses.  That's the 77 for canceled and

18      253 for suspended.  Then there's finally another canceled

19      category of canceled because on a jury survey somebody said

11:11:15AM20     they were not a citizen, and there's one person who falls into

21      that category also.

22      Q.  All right, Professor, let's talk a bit about the first

23      column.  Is the first column a subset of the second column?

24      A.  Yes, it is.

11:11:32AM25     Q.  Okay.  This first number 1,779, what does that represent?

JESSE RICHMAN, PH.D. - DIRECT EXAMINATION          1928

11:11:37AM 1   A.  That represents the result of the analysis I was able to do

        2   examining the timing of the issuance of the ADOT credential and

        3   the voter registration.  So the people in the 1779 cell are

        4   individuals who registered to vote and either on that day or

11:12:03AM 5   after that day they had a credential issued by ADOT based upon

        6   ADOT receiving proof of authorized presence that indicated they

        7   were not a citizen.

        8   Q.  This number --

        9        THE COURT:  Let me just ask if your understanding is

11:12:24AM10   the same as mine.  That if someone registered to vote at the

        11   same time that ADOT issued them a driver's license or a state

        12   ID, it's in all likelihood because they registered to vote at

        13   ADOT at that very time.

        14        THE WITNESS:  I have no way to demonstrate that.  The

11:12:51AM15   state election laws require that the place of registration be

        16   kept confidential, and that was not part of the files I

        17   received.  So I don't know.

        18        It seems like a logical deduction, but it's possible

        19   that someone may have gone from office to office.  Maybe they

11:13:12AM20   went to the Department of Motor Vehicles and dealt with the

        21   driver's license and subsequently they went to a different

        22   office and registered to vote.  There's no way to conclusively

        23   demonstrate that given the confidentiality issues in state law

        24   around --

11:13:28AM25        THE COURT:  But do you understand that ADOT asks

UNITED STATES DISTRICT COURT

JESSE RICHMAN, PH.D. - DIRECT EXAMINATION          1929

```
11:13:31AM  1   people --
            2             THE WITNESS:  Yes, of course.
            3             THE COURT:  -- would you like to register to vote
            4   today with your new driver's license -- now that you are
11:13:37AM  5   getting a driver's license?
            6             THE WITNESS:  It's possible that these happened at the
            7   same time.
            8             THE COURT:  You use "possible"; I use "likely."
            9             THE WITNESS:  It seems -- I would agree.  It's quite
11:13:46AM 10   likely.
           11   BY MR. LANGHOFER:
           12   Q.  Let's focus on quantifying that.  How many of the people
           13   out of the 1779 have registered and received an F-type license
           14   on the same day?
11:13:58AM 15   A.  My memory is it's about 400.
           16             MR. LANGHOFER:  And, Your Honor, I'll note on the
           17   record I believe Professor McDonald said he thought it was 450,
           18   just previous testimony.
           19   BY MR. LANGHOFER:
11:14:09AM 20   Q.  Of these 1779, how many received driver's licenses before
           21   -- or registered to vote before 2005?
           22   A.  There are about 100 of those.
           23   Q.  Okay.  I understand that this number changed from your
           24   first report to your supplemental report.  What changed and
11:14:31AM 25   why?
```

JESSE RICHMAN, PH.D. - DIRECT EXAMINATION                    1930

11:14:32AM 1    A.  So as I discussed previously, in the first report I

        2    couldn't rule out the possibility that these were duplicate

        3    issuances for non-real ID.  So in the second report I got

        4    better data that allowed me to deal with that issue.  And so

11:14:50AM 5    I'm excluding from this number anybody who had a duplicate

        6    issuance for a non-real ID.  It's possible of course that some

        7    of those people may have had multiple interactions with ADOT

        8    after registering to vote, so it could -- there are further

        9    possibilities that further data might allow one to adjudicate.

11:15:11AM10    I received that data later, but I believe that that's been

        11    excluded, so I can't talk about that.

        12    Q.  You are not offering the opinion that these 1,779 votes --

        13    that this is proof that these individuals are not citizens, are

        14    you?

11:15:31AM15    A.  No, not at all, and there are several reasons to be

        16    cautious about that conclusion.  I think that's a likely

        17    conclusion about many of these, but let's keep in mind first,

        18    both of these interactions may have happened years ago, and so

        19    these people may have naturalized at this point, even if

11:15:51AM20    perhaps when they registered to vote they were not a citizen,

        21    they very well might be a citizen now.

        22          Second, it's possible that there's a matching error

        23    that is leading us to think that the person who told ADOT they

        24    are not a citizen is the same person who registered to vote,

11:16:12AM25    but perhaps in some cases that's not what happened.

11:16:16AM 1    Q.  When you say "matching error," what do you mean by that?

2    A.  Well, so these databases are being matched on the driver's

3    license identification number.  It's possible that someone may

4    have provided the wrong driver's license identification number

11:16:33AM 5    when they registered to vote, for instance, and so that could

6    have accidentally gotten matched then with a different record

7    than they intended to match with.

8    Q.  What about data entry errors?  Is that a possible

9    explanation?

11:16:47AM10    A.  Yes, that's another possible explanation.  There could be

11    data entry.

12    Q.  If you're not testifying that this is proof of

13    non-citizenship, what is your view of the significance of this

14    number?

11:16:56AM15    A.  I think this number speaks to the wisdom of following up

16    with these people.  It's quite possible that these are simply

17    data entry errors, but it's also possible that in a significant

18    number of cases these are people who in fact told ADOT they

19    were not a citizen on the day that they registered to vote or

11:17:18AM20    after the day they registered on vote.

21         And in that case, that's an action which is contrary

22    to the Arizona Constitution and to federal law, and it would be

23    good to remove those people from the voter rolls.  It could

24    also be helpful for them potentially because voting while a

11:17:42AM25    non-citizen can be an issue in naturalization.  So getting --

JESSE RICHMAN, PH.D. - DIRECT EXAMINATION                    1932

11:17:48AM  1    if they are non-citizens, getting then off the voter rolls as

          2    soon as possible would probably be in their interest as well.

          3    Q.  All right, Your Honor, we would offer into evidence

          4    Exhibit 974, this table on the screen currently.

11:18:05AM  5              THE COURT:  Is there any objection?

          6              MR. FREEDMAN:  Your Honor, I believe --

          7              THE COURT:  Would you speak into a microphone if you

          8    are going to object?

          9              MR. FREEDMAN:  Sorry, ma'am.  I believe, just for sake

11:18:14AM 10    of clarity of the record, it's been marked as a different

         11    exhibit, and I'm looking for the number for you.  But subject

         12    to the constraints that this is coming up to challenge, we have

         13    no objection to it coming in.

         14              THE COURT:  I have no idea what you are talking about.

11:18:29AM 15              MR. FREEDMAN:  So I'm --

         16              THE COURT:  My question was, is there any objection?

         17              MR. FREEDMAN:  Subject to the same conditions that

         18    Mr. Langhofer consented to Mr. McDonald's tables coming in,

         19    that we can challenge the validity of the numbers, no

11:18:43AM 20    objection.

         21              MR. LANGHOFER:  I think he wants to cross-examine on

         22    it, Your Honor.

         23              THE COURT:  I still have no idea what he's talking

         24    about, but I heard the "no objection."  So 974 is admitted.

11:18:53AM 25              (Exhibit Number 974 is admitted.)

JESSE RICHMAN, PH.D. - DIRECT EXAMINATION                1933

11:18:53AM 1          MR. LANGHOFER:  And we certainly do expect

2     cross-examination, so -- okay.

3   BY MR. LANGHOFER:

4   Q.  Let's talk about now our fourth and final topic.  That's

11:19:12AM 5   voter confidence.

6          Have you formed an opinion about whether the

7   Challenged Laws may have an effect on voter confidence in

8   Arizona?

9   A.  I have.

11:19:26AM10   Q.  What is your opinion about the effect the law may have on

11   the confidence of people who are concerned about

12   disenfranchisement in this state?

13   A.  I think that these laws should increase confidence.  As we

14   discussed a little bit ago, with the vital records data coming

11:19:45AM15   now from across the country being used to establish DPOC, this

16   should reduce substantially the extent to which the state is

17   not able to automatically identify DPOC for people who are

18   registering to vote.

19          THE COURT:  Are you aware that there's been evidence

11:20:05AM20   in this trial that the people that are supposed to do this

21   check with the vital records don't have any access to it?

22          THE WITNESS:  I am.

23          THE COURT:  So how can the comparison increase voter

24   confidence if they don't have access?  Are you assuming they

11:20:23AM25   are going to get access?

UNITED STATES DISTRICT COURT

JESSE RICHMAN, PH.D. - DIRECT EXAMINATION          1934

11:20:25AM 1          THE WITNESS:  I would assume they would get access.

2    The NAPHSIS website lists election processes as one of the uses

3    of the data.  There are other states that are using this data

4    for election processes.  My understanding is it's not being

11:20:42AM 5    used currently because the laws in question are being litigated

6    and that the state should be able to get access because other

7    states do have access for use on voter file issues.

8          THE COURT:  So you don't know why the state doesn't

9    have access?

11:21:04AM10          THE WITNESS:  I do not.  My assumption is that that's

11   partly because the access here for use with voter files is part

12   of laws that are currently being litigated, and my

13   understanding is the state has not implemented those laws

14   because of this litigation.

11:21:22AM15  BY MR. LANGHOFER:

16   Q.  Do you have a view on -- assuming -- well, do you -- do you

17   have a view on whether the law may affect the confidence of

18   people who are currently on the federal-only voter list?

19   A.  I think that it should improve their ability to get off of

11:21:44AM20   the federal-only list.  As we've discussed, there are

21   additional databases being brought to bear, and this evaluation

22   happens on a rolling basis after someone has registered to vote

23   and been put on the federal-only list.

24          So we discussed there were 112 people who have a ADOT

11:22:06AM25  match indicating they are a citizen.  Those people will

JESSE RICHMAN, PH.D. - DIRECT EXAMINATION     1935

11:22:09AM 1  hopefully very quickly get into the full active voter list

        2  where it would appear they belong.  And I think that's a good

        3  thing.

        4         Furthermore, as the vital records data comes in, that

11:22:24AM 5  should likely bring many additional people who are currently on

        6  the federal-only list into full participation.

        7         I think it's important that this should require no

        8  effort on their part.  They don't have to re-register to vote

        9  or take some other action to get off the federal-only list.

11:22:40AM10  This is going to happen automatically through these periodic

       11  checks, and so that should reduce the number of people who are

       12  restricted in terms of the range of elections they can take

       13  part in.

       14  Q.  Finally, do you have a view on how this law, if

11:22:56AM15  implemented, might affect the confidence of people who are

       16  concerned about non-citizen voting in Arizona?

       17  A.  I think it should address many of those concerns.  The

       18  state is deploying more databases, more checking.  It should

       19  make it harder for people to engage in the kind of heated

11:23:19AM20  propaganda shtick, political rhetoric that we saw as part of

       21  the great -- the big lie over the last few years by reducing

       22  the number of people on the federal-only list, which has often

       23  been a lightning rod for criticism, and also by making clear

       24  for anybody who wants to pay attention, that the State is

11:23:40AM25  making an extensive effort to identify the citizenship status

JESSE RICHMAN, PH.D. - DIRECT EXAMINATION                1936

11:23:44AM 1    of people on voter lists.

2              THE COURT:  You just talked about people who might be

3         paying attention.  I think one of the issues with expressing

4         that this will improve voter confidence is that there --

11:24:02AM 5    doesn't that have an assumption in it that somehow the citizens

6         of Arizona will know about this, and there's nothing in the law

7         that says that it's got to be publicized in some way to

8         increase voter confidence.

9              You know, generally speaking, I would think that laws

11:24:22AM10   like this would not be the type that the average citizen of

11        Arizona would even know about.  They go to the polls.  They

12        vote.  They have been doing that for years.  They already gave

13        their documented proof of citizenship.  How do they know the

14        rules have been tightened up?

11:24:42AM15   THE WITNESS:  I think that's a fair point.  At the

16        same time, as I just mentioned, one of the aspects that was

17        deployed for propaganda purposes in the last few years in

18        Arizona were the number of people on the federal-only list.

19             As that shrinks because of vital records and using the

11:25:00AM20   ADOT database, that diminishes the capacity to use that list as

21        a kind of propaganda point by people.

22             And furthermore, although surely not everybody will be

23        aware, it gives another point of argument for those trying to

24        disabuse people who hold unrealistic views about the level of

11:25:24AM25   of say, non-citizen registration and voting in the state of

JESSE RICHMAN, PH.D. - DIRECT EXAMINATION                    1937

11:25:27AM 1   Arizona of those views.  Look, the State is really working hard

2   on this issue.

3          Conversely, I fear that if these laws are struck down

4   in their entirety, that's bad for voter confidence because it

11:25:45AM 5   means that those who are looking for propaganda points to score

6   could say, look, we tried to protect you from these problems

7   and we weren't able to, so the problems are still, you know,

8   looming out there in some scary, huge level that, you know, is

9   completely unrealistic.  But, you know, we have seen those

11:26:10AM10   kinds of claims unfortunately here in recent years.

11   Q.  Professor, just a couple of clean-up points.  You published

12   an article in 2014 concerning non-citizen voting, correct?

13   A.  That's right.

14   Q.  And you presented testimony in the *Fish versus Kobach* case,

11:26:25AM15   right?

16   A.  Yes, I did.

17   Q.  The methodology you used in *Fish versus Kobach* was based on

18   the article you published in 2014?

19   A.  Yes.

11:26:35AM20   Q.  Is any of the data that you used in preparing your opinions

21   in this case drawn from your 2014 article or the *Fish* case?

22   A.  None of the date that we've talked about so far is drawn

23   from either of those.

24   Q.  What about the calculation methods that you used -- that

11:26:53AM25   you have presented in this case?  Are any of those methods

UNITED STATES DISTRICT COURT

JESSE RICHMAN, PH.D. - CROSS-EXAMINATION                1938

11:26:56AM 1    drawn from your 2014 article or the *Fish versus Kobach* case?

2    A.  No, none of them are.

3            MR. LANGHOFER:  No more questions on direct, Your

4    Honor.  Thank you.

11:27:03AM 5            THE COURT:  Thank you.  Cross-examination.

6            MR. FREEDMAN:  Thank you, Your Honor.

7                        CROSS-EXAMINATION

8    BY MR. FREEDMAN:

9    Q.  John Freedman for the Poder plaintiffs.

11:27:19AM10            So let's start with databases.  As I understood your

11    testimony when you started about 10:20 this morning, your view

12    is that Arizona's practice of using multiple databases will be

13    improved by adding additional databases, right?

14    A.  That is my view.

11:27:37AM15            THE COURT:  Can I just amend your question to say "the

16    proposal to use," or "the law that dictates using it," which

17    has not gone into effect," as opposed to -- the way your

18    question was worded, it sounded like it was a current practice.

19            MR. FREEDMAN:  Your Honor, you can amend my questions

11:27:54AM20    any time you want.

21            THE COURT:  Thank you.

22            THE WITNESS:  Should I answer again?

23    BY MR. FREEDMAN:

24    Q.  Yes, please.

11:28:00AM25    A.  Okay.  I would agree, that is my testimony.

JESSE RICHMAN, PH.D. - CROSS-EXAMINATION                1939

11:28:05AM 1   Q.  And is it fair to say that you recognize that each of the
        2   databases we're talking about, the four that are in the law,
        3   specified law, three of which you talked about today, each of
        4   them has, I think the word you used was, a "weakness."
11:28:23AM 5   A.  All databases have limitations.
        6   Q.  That's probably a better word.  That's the one you actually
        7   used in your report.
        8       Let me just walk through the four databases and we'll
        9   spend a little bit of time on them.  I want to start with the
11:28:38AM10   Social Security Administration database, which you did not
       11   testify about in your direct, correct?
       12   A.  That's correct.
       13   Q.  You recognize the Social Security Administration database
       14   does not provide information on citizenship?
11:28:52AM15   A.  That's right, but it's useful for establishing identity.
       16   Q.  Okay.  I want to spend some time now on the NAPHSIS
       17   database which you spent actually probably most of your time
       18   earlier this morning talking about.  This is the National
       19   Association for Public Health Statistics and Information
11:29:12AM20   Systems electronic verification of vital events.
       21       And I want to just recap with Judge Bolton's question
       22   at 11:20.  You're aware that there's been testimony in this
       23   case that the county recorders don't have access to this?
       24   A.  Yes.
11:29:26AM25   Q.  And you are aware that there's been testimony actually at

UNITED STATES DISTRICT COURT

JESSE RICHMAN, PH.D. - CROSS-EXAMINATION                    1940

11:29:28AM  1   this trial that the one county recorder who has testified live

         2   had no idea what this database was?

         3   A.  I am not aware of what testimony has happened in this

         4   trial.  I arrived by air yesterday afternoon.

11:29:44AM  5   Q.  So I have a couple of questions about your testimony.  You

         6   mentioned, notwithstanding the fact that county recorders don't

         7   currently have access, that other states have used NAPHSIS,

         8   right?

         9   A.  Yes.

11:30:00AM 10   Q.  Where is that disclosed in your report?

        11   A.  That is not disclosed in my report, but I do discuss the

        12   usefulness of the database.

        13   Q.  Just so we're clear -- and I don't have a lot more

        14   questions about NAPHSIS.  NAPHSIS can't be used to confirm the

11:30:22AM 15   citizenship status for people born outside of the United

        16   States, right?

        17   A.  Excuse me, could you please restate the question?

        18   Q.  I can repeat the question.  Did you not understand it or

        19   did you --

11:30:32AM 20   A.  Well, I would like you to clarify what you mean by "born

        21   outside of the United States."

        22   Q.  Sure.  For people -- you would agree for people born -- not

        23   born in the United States, NAPHSIS is not going to be helpful

        24   in terms of determining their citizenship?

11:30:49AM 25   A.  What do you mean by "United States"?  Let me -- I don't

UNITED STATES DISTRICT COURT

JESSE RICHMAN, PH.D. - CROSS-EXAMINATION                    1941

11:30:55AM 1    mean to be tendentious.  It's merely that NAPHSIS includes data

2    from various U.S. territories, and so are you including those

3    or not?  If you consider people from the U.S. territories as

4    having been born in the United States, then I would agree.  On

11:31:12AM 5    the other hand, if you don't, then I would disagree.

6    Q.  Let me see if I can refresh your recollection.  At your

7    deposition --

8         MR. FREEDMAN:  Stephen, can you call up Professor

9    Richman's deposition, page 60, lines 7 through 16?

11:31:26AM10    BY MR. FREEDMAN:

11    Q.  And you see that I asked you the question:  Is there a

12    group of individuals for which NAPHSIS is less likely to be

13    able to provide information about citizenship?

14         And your answer was:  Well, as I just said, it's going

11:31:38AM15    to help with providing information about people born in the

16    United States.  For people not born in the United States, it's

17    not going to be as helpful in that instance.

18    A.  Exactly.  And so except in these edge cases of someone born

19    in one of the U.S. territories that is part of this database,

11:31:54AM20    it's not going to be particularly useful, and so that's one of

21    the key limitations of the data set.

22         As I talked about earlier, that's complemented by the

23    limitations of the SAVE data set.  So when put them together,

24    then you have a much stronger capacity.

11:32:13AM25    Q.  I'll get to the SAVE database.

JESSE RICHMAN, PH.D. - CROSS-EXAMINATION                    1942

11:32:15AM 1    A.  Okay.

2    Q.  One final question on NAPHSIS.  Are you aware of any

3    national unique identifier that allows somebody in the United

4    States to -- somebody in one state to identify people in

11:32:27AM 5    another state that NAPHSIS uses?

6    A.  I'm sorry, could you rephrase the question?

7    Q.  Yeah.  I mean, we'll talk about -- with some of the other

8    databases their unique identifiers identified.  For SAVE it's

9    what's called the A number or the alien registration number.

11:32:43AM10    Are you aware of NAPHSIS having a similar national unique

11    identifier?

12    A.  I am not aware that it has a national unique identifier.  I

13    believe the identification is typically based on various

14    aspects of the vital records.  So Social Security

11:32:59AM15    Administration, for example, uses NAPHSIS to verify people's

16    statements about their birth certificates.  And, you know,

17    they're looking at matches on names and dates of birth and so

18    forth in part.

19    Q.  Let's turn to SAVE, the Systematic Alien Verification for

11:33:18AM20    Entitlement system.  You understand that's run by the U.S.

21    Citizenship and Immigration Services, USCIS?

22    A.  I believe it is.

23    Q.  The SAVE system -- you would agree, the SAVE system has

24    imperfect coverage for people born in the United States, right?

11:33:34AM25    A.  Yes, very, very limited.  There are few edge cases where

UNITED STATES DISTRICT COURT

JESSE RICHMAN, PH.D. - CROSS-EXAMINATION                1943

11:33:38AM 1    somebody might be included because they sponsored someone for

2    migration into the U.S. or things like that, but typically they

3    are not included.

4    Q.  And in order to -- you are aware that in order to -- I

11:33:49AM 5    alluded to this earlier.  In order to query the SAVE system, a

6    user needs the subject's A number, the alien registration

7    number, right?

8    A.  I am not sure of the details in terms of ability to search

9    more specifically, but typically, yes, I believe you need the A

11:34:07AM10    number.

11    Q.  Is the A number maintained in the Arizona voter file?

12    A.  I don't believe so, but the State may well have that in

13    other files.

14    Q.  If an election official, county recorder, doesn't have a

11:34:25AM15    registrant's A number, how is SAVE going to help them verify

16    the citizenship?

17    A.  I think that is an important limitation which can be

18    addressed by possession of the A number by other state agencies

19    potentially.

11:34:43AM20    Q.  Okay.

21            THE COURT:  Do you know if other state agencies

22    require the A number?

23            THE WITNESS:  So the system is used extensively by

24    ADOT.  And so everybody who registers -- who is issued a

11:35:00AM25    credential by ADOT, with the exception we talked about in terms

UNITED STATES DISTRICT COURT

JESSE RICHMAN, PH.D. - CROSS-EXAMINATION                    1944

11:35:03AM 1    of duplicate credentials, and tells ADOT that they're not a

2    citizen or -- they're going to get run through the SAVE system

3    by ADOT and the credential doesn't issue until ADOT receives

4    confirmation about their status through the SAVE system.  So

11:35:23AM 5    ADOT is using that number.

6           THE COURT:  So your understanding is that when ADOT

7    requires proof of lawful presence, if it is a non-citizen, they

8    require the A number and then run the A number through SAVE.

9           THE WITNESS:  The testimony in the deposition by

11:35:40AM10    Mr. Jorgensen for ADOT was quite clear about that, that they

11    run that check each time.

12           MR. FREEDMAN:  You are the fact finder, so I was

13    waiting.

14           May I proceed?

11:36:20AM15           THE COURT:  Yes, please.

16    BY MR. FREEDMAN:

17    Q.  Professor Richman, you are aware that Arizona's Memorandum

18    of Agreement with USCIS does not allow use of the SAVE system

19    to check the status of persons who have already been registered

11:36:36AM20    to vote, correct?

21    A.  I have been told that.  I think it was in one of the

22    reports I read.

23    Q.  Now, when a county recorder uses the SAVE system, USCIS may

24    need a county recorder to follow-up and verify information,

11:36:59AM25    right?

JESSE RICHMAN, PH.D. - CROSS-EXAMINATION                1945

11:37:02AM 1    A.  I'm sorry.  Could you restate the question?

2    Q.  Sure.  I'm asking a question about the county recorder

3    process for checking SAVE.  And my question is whether you're

4    aware that sometimes when the county recorder puts in a request

11:37:17AM 5    to SAVE, USCIS comes back and makes a request back to the

6    county recorder asking them to verify certain information?

7    A.  I believe that happens.  In fact, I believe every time a

8    SAVE request is run, SAVE provides an option for the user, if

9    they received a result that was maybe unexpected or not

11:37:39AM10   consistent with what they thought, to request further follow-up

11   by SAVE in a manual process.

12          THE COURT:  So I want to go back to what you and

13   Mr. Freedman were just talking about.  ADOT has an agreement

14   with USCIS that they can run an alien number through the SAVE

11:38:05AM15   system to verify lawful presence when they issue a driver's

16   license -- an F-type driver's license or state ID?

17   A.  That's right.  My understanding is that every time they are

18   asking for -- they ask someone for proof of authorized

19   presence, they run that evidence that they receive if this

11:38:24AM20   person is providing information that would be relevant for

21   SAVE, such as, you know, a Green Card, legal permanent resident

22   and so forth.  They're running that through the SAVE system to

23   verify the information.

24          THE COURT:  But I think you just agreed with

11:38:40AM25   Mr. Freedman that the Memorandum of Understanding -- or

UNITED STATES DISTRICT COURT

JESSE RICHMAN, PH.D. - CROSS-EXAMINATION        1946

11:38:46AM 1    Agreement with SAVE -- with USCIS does not allow county

         2    recorders through ADOT to run people through the SAVE system

         3    for purposes of confirming citizenship for voter registration.

         4            THE WITNESS:  I think the difference is you added

11:39:10AM 5    "through ADOT."  I think the testimony -- my impression is that

         6    the limitation is the agreement between the Secretary of

         7    State's office and USCIS.  So there are different agencies

         8    which have Memorandums of Understanding.

         9            THE COURT:  Let's go back to the Secretary of State.

11:39:33AM10    The Secretary of State's office has a Memorandum of

        11    Understanding with USCIS that prohibits it from periodically

        12    running registered voters through the SAVE system?

        13            THE WITNESS:  I do not know.  That was in I think one

        14    of the expert reports that was provided to me.  I did not get

11:40:00AM15    access to the specific Memorandum of Understanding so I can't

        16    speak to it, other than to say that one of the experts from the

        17    plaintiffs' side asserted that that was the case.  I don't have

        18    specific information that would allow me to verify that.

        19            THE COURT:  But if it's true that the Secretary of

11:40:20AM20    State can't use the SAVE system periodically, and that ADOT can

        21    only use it at the time of issuance of a F-type license to

        22    verify legal presence, then the periodic database check that's

        23    in the law for SAVE can't be executed?

        24            THE WITNESS:  I think this is in the same category of

11:40:51AM25    issue as what we were talking about a little bit ago with the

JESSE RICHMAN, PH.D. - CROSS-EXAMINATION          1947

11:40:55AM 1    vital records database.  Currently the State isn't doing that

2    and their agreement doesn't contemplate doing that, but

3    Memorandums of Understanding are not set in stone.  I would

4    expect that that could potentially be renegotiated.

11:41:09AM 5          THE COURT:  So your assumption that there will be

6    these multiple database checks, specifically with SAVE and with

7    the vital records, assumes that the Secretary of State and/or

8    the county recorders are going to renegotiate an existing

9    agreement with SAVE or enter into an agreement with the

11:41:36AM10    organization that maintains the vital records so that they can

11    do that?

12          THE WITNESS:  Essentially that they will implement the

13    law.  If they don't implement the law, then my discussion of

14    what the advantages of implementing the law would be

11:41:52AM15    potentially doesn't apply.

16          MR. FREEDMAN:  Thank you.

17    BY MR. FREEDMAN:

18    Q.  Just a few more questions about SAVE.  You are aware that

19    the information in SAVE about citizenship status is not always

11:42:07AM20    instant and there could be a delay or lag time, right?

21    A.  Yes.  I looked over the transcript from the deposition for

22    USCIS and there's discussion that sometimes there's a day

23    delay.  The people in the deposition seemed to think that it

24    was usually very quick, one federal working day, that sort of

11:42:28AM25    thing, but potentially that could be an issue in some

JESSE RICHMAN, PH.D. - CROSS-EXAMINATION                1948

11:42:34AM 1    instances.

          2            I think this is why it is particularly important to go

          3    back, because it's possible someone could fall through the

          4    cracks.  I naturalized and registered to vote and my

11:42:47AM 5    information is run immediately and SAVE hasn't updated yet, and

          6    I get put on the federal-only list.  And then the next day SAVE

          7    is updated.  If there's a monthly check, then the next month I

          8    am going to be off the list.

          9    Q.  My question --

11:43:07AM10            THE COURT:  Let's --

         11            THE WITNESS:  Sorry.

         12            THE COURT:  -- try to answer Mr. Freedman's question

         13    and then stop.  And if there's another question, you can answer

         14    that one, and if your answer isn't sufficient, Mr. Langhofer

11:43:23AM15    will have an opportunity on redirect to ask you.

         16            THE WITNESS:  I'm very sorry, Your Honor.  I got a

         17    little bit carried away.

         18            THE COURT:  Yes.  Are you aware that the -- are you

         19    familiar with any of the parts of the election procedures

11:43:35AM20    manual.

         21            THE WITNESS:  I have examined parts of the 2019 and

         22    then the draft updated 2023 manual.

         23            THE COURT:  There apparently is a caution in there

         24    about SAVE that suggests that there should be at least a

11:43:58AM25    two-week wait between naturalization and checking SAVE.

UNITED STATES DISTRICT COURT

JESSE RICHMAN, PH.D. - CROSS-EXAMINATION          1949

11:44:06AM 1          THE WITNESS:  Yes.  So in the USCIS deposition, the --

           2          THE COURT:  He said one to two days.

           3          THE WITNESS:  They said one to two days.  They said

           4     they thought users sometimes thought there was more of a delay.

11:44:18AM 5     So I don't know.  Maybe sometimes there's a longer delay.  I am

           6     not sure.

           7     BY MR. FREEDMAN:

           8     Q.  Professor Richman, I got sort of two follow-ups on this.

           9     One, had you actually reviewed the USCIS deposition before you

11:44:32AM10     prepared your report?

          11     A.  That was one of the documents that was provided to me.

          12     Q.  Okay.  But when I asked you at your deposition, do you

          13     remember what you said when I asked you if you --

          14     A.  Wait, wait.  No, let me correct.  That was a document -- I

11:44:48AM15     think that was not a document I got originally, and I got that

          16     later.  So I'm sorry.  I'm very sorry.  I was getting confused.

          17     That was not part of the original set of documents I was

          18     provided with.

          19     Q.  Since I deposed you, you've gone back and reviewed the

11:45:04AM20     USCIS testimony?

          21     A.  I got access to that report after you deposed me, yes.

          22          MR. FREEDMAN:  Let's pull up -- since I was going to

          23     ask about it anyway.  Can we pull up PX6, the Elections

          24     Procedures Manual at PDF page 24, at the bottom, part C?

          25

JESSE RICHMAN, PH.D. - CROSS-EXAMINATION                1950

11:45:19AM 1    BY MR. FREEDMAN:

2    Q.  You reviewed the Elections Procedures Manual before you

3    prepared your report, right?

4    A.  Yes, I did.

11:45:31AM 5    Q.  And the language here is exactly what Judge Bolton referred

6    to:  Often there's a delay between when a registrant becomes a

7    U.S. citizen and when that registrant's citizenship status has

8    been updated in SAVE.  Therefore, certain precaution must be

9    taken if a county recorder receives a voter registration form

11:45:51AM10    within two weeks of a registration deadline that contains a

11    citizenship naturalization or alien registration number.

12              You are aware of that, right?

13    A.  Absolutely.

14              MR. FREEDMAN:  We can pull that down, Stephen.

11:46:08AM15    BY MR. FREEDMAN:

16    Q.  Let's turn to the Motor Vehicle Division database.  You

17    discussed on direct some of the limitations of the MVD

18    database, right?

19    A.  I suppose.

11:46:25AM20    Q.  Well, let's just walk through some of them so the record is

21    nice and clear.  One of the limitations is when MVD began

22    asking for documentation of citizenship, right?

23    A.  That's right.

24    Q.  Licenses in the MVD database before 1997 don't indicate

11:46:47AM25    citizenship, right?

UNITED STATES DISTRICT COURT

JESSE RICHMAN, PH.D. - CROSS-EXAMINATION        1951

11:46:49AM 1    A.  More or less.

2    Q.  And you talked a little bit about this in your direct.  You

3    agree that the MVD -- in the MVD database there's some

4    probability of data entry error that could lead to matching

11:47:06AM 5    failures, right?

6    A.  Yes, there's that possibility.

7    Q.  And another limitation is that the MVD database isn't

8    necessarily updated at the time an individual becomes a U.S.

9    citizen?

11:47:21AM10    A.  Correct.

11    Q.  You certainly talked about that on your direct?

12    A.  I did.

13    Q.  Is another limitation that the ADOT Max legal presence

14    information isn't always up to date?

11:47:32AM15    A.  The ADOT match to --

16    Q.  -- Max.

17    A.  The ADOT match to Max?  I'm sorry, could you repeat the

18    question?

19    Q.  I will repeat.  I stumbled on the word.  I meant Max,

11:47:43AM20    M-A-X.  So the question is -- I'll ask it this way.  The DMV

21    Max, M-A-X, legal presence information is not always up to

22    date?

23    A.  Exactly, staleness issue, yes.

24    Q.  And you also talked about this on your direct.  Another

11:48:06AM25    limitation is that not every interaction with ADOT requires

11:48:10AM 1    someone to provide proof of citizenship or authorized presence,

2    right?

3    A.  Yes, exactly.

4    Q.  Just because I want to make sure that we are clear on this.

11:48:18AM 5    If an MVD customer is not getting a real ID and is just

6    updating their name, they are not required to provide proof of

7    citizenship or authorized presence, right?

8    A.  Wel, so if they are getting a duplicate issuance, so it

9    would depend on, you know, updating a name could happen in the

11:48:38AM10    context of an action that would lead to it or not.  But if the

11    credential issuance is a duplicate issuance and it's not a real

12    ID, then they wouldn't.

13    Q.  And the same question with regard to updating an address.

14    A.  Again, it's going to be a matter of whether -- what kind of

11:48:56AM15    action they're taking, but if it's merely a duplicate issuance,

16    then for a non-real ID it would not require it.

17    Q.  And if somebody -- same question, somebody -- their ID is

18    lost or stolen and they want to replace it, same answer?

19    A.  Again, if it's a duplicate issuance, then that's not going

11:49:15AM20    to be required for a non-real ID.

21    Q.  Okay.  I want to turn to some of your discussion.  I

22    believe this was just after the break about 10:55 about

23    Professor McDonald's observations about county to county.  And

24    you talked about his analysis of canceled voters, right?

11:49:48AM25    A.  Yes.

JESSE RICHMAN, PH.D. - CROSS-EXAMINATION          1953

11:49:51AM 1           MR. FREEDMAN:  Stephen, can you pull up PX334, which

2     is Professor McDonald's analysis on canceled voters?  Okay.

3     Can we do a side-by-side between that and exhibit -- Defense

4     Exhibit 930, which is Professor Richman's Table 2.5 that we'll

11:50:17AM 5     be spending some more time on?  Stephen, can you highlight the

6     total for the -- on professor -- Dr. Richman's -- I'm sorry,

7     Dr. McDonald's report for canceled?  It's 1290.  Do you see

8     that?  And professor -- Dr. Richman's canceled lack of DPOC,

9     the right most column is 858.  You see that, Stephen, second

11:50:46AM10     line?  If you could highlight?

11     BY MR. FREEDMAN:

12     Q.  So there's about a 430-person difference, right?

13     A.  I don't think it's quite that large, but yeah -- yeah,

14     that's about right, yep.

11:51:09AM15     Q.  432?

16     A.  Yeah, sorry.  Doing math on the stand is -- yeah, I agree.

17     Q.  I promise I won't make you do the things I make my kids do.

18     Math on their feet.

19           So the question I have about this, on direct you said

11:51:25AM20     that you were concerned about the under-inclusiveness of

21     Dr. McDonald's citizenship because he was only looking at one

22     cancelation code for -- based on citizenship; do you recall

23     that testimony?

24     A.  This was in relation to the -- his argument about uneven

11:51:48AM25     implementation across counties.

11:51:50AM 1    Q.  That's right, but you had a question about whether he was

2    including enough cancelation codes in this chart, his table 1,

3    right?

4    A.  That's a potential source of cross-county variation.

11:52:06AM 5    Q.  But when you calculated the canceled voter on your chart,

6    canceled lack of DPOC, you came up with a smaller number than

7    he did?  Did you not include the codes that you said that he

8    should have included?

9    A.  Could you restate where in my report did I make this

11:52:25AM10    calculation you are referring to?  I would like to be able to

11    look at that.

12    Q.  I am just referring to your Table 2.5, canceled lack of

13    DPOC.  You have got an 858 number.

14    A.  Oh.  Well, so the difference is because the 858 is, as we

11:52:45AM15    discussed, not inclusive of the people with any match with the

16    ADOT file, whether that's indicating they're a citizen or a

17    non-citizen.

18          The 858 are the individuals who are on the canceled

19    file that McDonald examined who did not have a match of any

11:53:08AM20    type with the -- with the files or they had a match which would

21    not allow one to identify their citizenship status.

22          THE COURT:  I'm sorry.  I still don't understand the

23    difference, why Dr. McDonald has 430 more canceled than you do.

24          THE WITNESS:  So mine -- the total on the right is not

11:53:34AM25    a total for the total number of individuals on the canceled

JESSE RICHMAN, PH.D. - CROSS-EXAMINATION                1955

11:53:38AM 1    file.  I was able to replicate Dr. McDonald's number of 1290,

2    and I have no issues with that in terms of the total number of

3    people with that status code in the database.  The number on

4    Table 2.5 is a different number because it's looking at a

11:53:55AM 5    subset of the 1290.

6           THE COURT:  Okay.  I understand it's a subset, but I

7    don't understand what --

8           THE WITNESS:  What kind of subset?

9           THE COURT:  What kind of subset?  Who are the other

11:54:10AM10    432 canceled voters that are not included in your analysis of

11    the ADOT numbers?

12           THE WITNESS:  Well, so I believe the others are people

13    for whom we have some kind of ADOT information.  So if we turn

14    to the -- with your permission, I would like to consult my

11:54:38AM15    report to clarify --

16           THE COURT:  Go right ahead.

17           THE WITNESS:  -- the numbers. thank you.

18           So there are a variety of other groups that could be

19    in the 858, including people for whom ADOT has some kind of

11:55:24AM20    information.  The 858 is a set of individuals for whom my

21    analysis of the match between the ADOT data and the voter file

22    did not provide a match.

23           So these are people -- some of them have a driver's

24    license number that's clearly not matchable like CO, maybe for

11:55:53AM25    Colorado, I don't know, as their driver's license number.

UNITED STATES DISTRICT COURT

11:55:57AM 1    Couldn't match that between the databases.  So these are people

2    for whom we don't have information from ADOT about their

3    citizenship status.

4    BY MR. FREEDMAN:

11:56:11AM 5    Q.  Professor Richman, where's this discussed in your report?

6    A.  This is discussed in the discussion of Table 12, and it's

7    also discussed in the paragraphs related to my critique of

8    McDonald's analysis starting I think around paragraph 66.

9        MR. FREEDMAN:  Stephen, could you pull down 334 but

11:56:38AM10    replace it with 336?  I would like a side by side with Table

11    2.5.

12    BY MR. FREEDMAN:

13    Q.  So I have a similar question for you, Dr. Richman, about --

14    this is Professor McDonald's federal-only table, and he

11:56:57AM15    calculates -- he's not calculating, he's just adding up, there

16    are 19,439 federal-only voters, and on your chart you have

17    19,262.  That's a difference of about 170?

18    A.  Yes.  Thank you.  Again, this is the same issue as I've

19    discussed previously.  The far right column in Table 2.5 is a

11:57:28AM20    column only as it's labeled -- these are only individuals

21    without a match with the ADOT file that would allow one to

22    identify citizenship status.  And so it's a subset.

23        I have no disagreement with Professor McDonald's

24    number.  For example, the 31 and the 65 individuals on the two

11:57:49AM25    left columns are not included in the 19,262 number because

JESSE RICHMAN, PH.D. - CROSS-EXAMINATION                    1957

11:57:53AM 1    those are individuals -- they're part of the 19,439 number, but

2    these are people for whom there was an ADOT match that allows

3    us to, you know, get some indication of citizenship status.

4              There's also, as I discussed in my analysis of

11:58:09AM 5    McDonald's report, individuals for whom and we -- people for

6    whom there's evidence that they are U.S. citizen and they are

7    on the federal-only list, and so that's another group that's

8    not part of the 19,262 because that's only -- 19,262 are only

9    the people for whom ADOT records aren't providing evidence one

11:58:31AM10   way or another about their citizenship status.

11   Q.  So I'm sorry, the part I didn't follow there is why you

12   think there are federal-only voters where ADOT has information

13   that they're U.S. citizens?

14   A.  McDonald discussed that in his report.  He claimed one

11:58:49AM15   number which was in error because it excluded consideration,

16   one of the issues we just talked about, people who have a

17   license issued before 1997 roughly, are not going to have proof

18   of legal -- of authorized presence provided to ADOT.

19             So I ended up with a slightly different number once

11:59:11AM20   correcting for some of the issues in his analysis, but we both

21   agreed that there are a number of people -- I talked about this

22   number before, there are 112 people that I was able to identify

23   for whom I believe ADOT has evidence that they're a citizen and

24   they're on the federal-only list.

11:59:33AM25   Q.  And where is the that 112 number in your report?

UNITED STATES DISTRICT COURT

11:59:35AM 1    A.   It's listed on paragraph 96 and paragraph 100.

       2              THE COURT:  Mr. Freedman, we are going to break for

       3    lunch.  We will reconvene at 1:00.  Court is in recess.

       4              (Proceedings conclude at 11:59 a.m.)

1959

11:59:48AM 1

2

3

4

11:59:48AM 5

6

7

8

9

11:59:48AM10

11

12

13

14

11:59:48AM15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

        I, ELVA CRUZ-LAUER, do hereby certify that I am duly

appointed and qualified to act as Official Court Reporter for

the United States District Court for the District of Arizona.

        I FURTHER CERTIFY that the foregoing pages constitute

a full, true, and accurate transcript of all of that portion of

the proceedings contained herein, had in the above-entitled

cause on the date specified therein, and that said transcript

was prepared under my direction and control.

        DATED at Phoenix, Arizona, this 16th day of November,

2023.


                                    s/Elva Cruz-Lauer
                          Elva Cruz-Lauer, RMR, CRR

UNITED STATES DISTRICT COURT