UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

Mi Familia Vota, et al.,      )
                              )
            Plaintiffs,       )   No. 2:22-cv-00509-SRB
v.                            )
                              )   Phoenix, Arizona
Adrian Fontes, et al.,        )   November 16, 2023
                              )   1:01 p.m.
            Defendants.       )
_____)


*BEFORE:  THE HONORABLE SUSAN R. BOLTON, JUDGE*

*REPORTER'S TRANSCRIPT OF PROCEEDINGS*


*BENCH TRIAL DAY 8 - PM SESSION*
(Page 1960-2097)


Official Court Reporter:
Teri Veres, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 38
Phoenix, Arizona 85003-2151
(602) 322-7251


Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1    *A P P E A R A N C E S*

2    For Plaintiff United States of America:

3         DEPARTMENT OF JUSTICE - VOTING - M STREET
          By:  **Emily Brailey, Esq.**
4         150 M Street NE
          Washington, D.C.  20503

5
          U.S. DEPARTMENT OF JUSTICE CIVIL RIGHT DIVISION VOTING
6         SECTION - 950
          By:  **Richard Dellheim, Esq.**
7         950 Pennsylvania Avenue NW
          Washington, D.C.  20530

8

9    For Plaintiff ADRD Action, Arizona Students' Association,
     League of United Latin American Citizens Arizona, Living
10   United for Change in Arizona:

11        CAMPAIGN LEGAL CENTER
          By:  **Danielle Marie Lang, Esq.**
12             **Hayden Johnson, Esq.**
          1101 14th Street NW, Suite 400
13        Washington, D.C.  20005

14   For Plaintiff Arizona Asian American Native Hawaiian and
     Pacific Islander for Equity Coalition:
15
          LATHAM & WATKINS
16        By:  **Amit Makker, Esq.**
               **Evan Omi, Esq.**
17             **Sadik Huseny, Esq.**
          505 Montgomery Street, Suite 2000
18        San Francisco, California  94111

19        ASIAN AMERICANS ADVANCING JUSTICE
          BY:  **Niyati Shah, Esq.**
20        1620 L Street NW, Suite 1050
          Washington, D.C.  20036
21
          LATHAM & WATKINS, LLP - Avenue of the Americas
22        By:  **Neethu Putta, Esq.**
          1271 Avenue of the Americas
23        New York, NY 10020

24

25

UNITED STATES DISTRICT COURT

```
 1                 A P P E A R A N C E S   C O N T ' D

 2   For Plaintiff Arizona Democratic Party, Democratic National
     Committee:
 3
          WILMER CUTLER PICKERING HALE & DORR LLP
 4        By:  Christopher E. Babbitt, Esq.
               Britany Riley-Swanbeck, Esq.
 5        2100 Pennsylvania Ave. NW
          Washington, DC 20037
 6

 7        WILMER CUTLER PICKERING HALE & DORR, LLP
          By:  Kelsey Quigley, Esq.
 8        2600 El Camino Real
          Suite 400
 9        Palo Alto, California  94306

10   For Plaintiff Chicanos Por La Causa, Chicanos Por La Causa
     Action Fund, Poder Latinx:
11
          ARNOLD & PORTER KAYE SCHOLER, LLP
12        By:  John A. Freedman, Esq.
               Erica Elaine McCabe, Esq.
13             Leah Motzkin, Esq.
          601 Massachusetts Avenue NW, Suite 1000
14        Washington, D.C.  20001

15        FAIR ELECTIONS CENTER
          By:  Michelle Kanter Cohen, Esq.
16             Jonathan Sherman, Esq.
          1825 K St. NW, Ste. 701
17        Washington, DC 20006

18   For Plaintiff Voto Latino, Mi Familia Vota:

19        HERRERA ARELLANO, LLP
          By:  Daniel Abraham Arellano, Esq.
20        1001 N. Central Avenue, Suite 404
          Phoenix, Arizona  85004-1500
21
          ELIAS LAW GROUP, LLP
22        By:  Christopher Dodge, Esq.
          250 Massachusetts Avenue NW, Suite 400
23        Washington, D.C.  20001

24

25
```

1    *A P P E A R A N C E S   C O N T ' D*

2    For Plaintiff Promise Arizona, Southwest Voter Registration
     Education Project:

3

         MALDEF
4        By:  **Ernest Israel Herrera, Esq.**
              **Erika Cervantes, Esq.**
5        634 Spring Street, 11th Floor
         Los Angeles, California  90014

6

7    For Defendant State of Arizona Kris Mayes, Jennifer Toth:

8        ARIZONA ATTORNEY GENERAL'S OFFICE - PHOENIX
         By:  **Joshua Michael Whitaker, Esq.**
9             **Kathryn E. Boughton, Esq.**
              **Timothy E. Horley, Esq**
10       2005 N. Central Ave.
         Phoenix, AZ 85004

11

12   For the Intervenor-Defendants State of Arizona, Kris Mayes,
     Ben Toma, Warren Peterson:

13

         GALLAGHER & KENNEDY, PA
14       By:  **Hannah Hatch Porter, Esq.**
         2575 E. Camelback Road
15       Suite 810
         Phoenix, Arizona  85016-9225

16

17   For Counter Plaintiff Republican National Committee:

18       STATECRAFT, P.L.L.C.
         By:  **Kory A. Langhofer, Esq.**
19            **Thomas J. Basile, Esq.**
         649 North 4th Avenue, Suite B
20       Phoenix, Arizona  85003

21

22

23

24

25

UNITED STATES DISTRICT COURT

1

<u>**I N D E X**</u>

2

3   **PLAINTIFF WITNESS:**          **DIRECT**   **CROSS**   **REDIRECT**   **RECROSS**

4   <u>JESSE RICHMON, Ph.D.</u>
     By Mr. Freedman (Cont.)                 1965
5   By Mr. Dodge                            1982
     By Mr. Langhofer                                     1989
6

7   <u>HAILEY HISER</u>
     By Mr. Whitaker              1994              2059
8   By Mr. Langhofer             2008              2059
     By Mr. Sherman                       2009
9   By Ms. Lang                          2039
     By Ms. Brailey                       2053
10

11  <u>ANALEE SHREEVE</u>
     By Mr. Horley                2065
12  By Mr. Sherman                       2071
     By Ms. Lang                          2078
13  By Mr. Langhofer                                     2079

14  <u>SARA JOHNSTON</u>
     By Mr. Horley                2081
15  By Mr. Langhofer             2087              2095
     By Mr. Sherman                       2087
16  By Ms. Lang                          2094

17

18                   ***INDEX OF EXHIBITS***

19  <u>**EXHIBITS**</u>                                        <u>**RECEIVED**</u>

20  <u>NO.</u>      <u>DESCRIPTION</u>

21  220      10-17-22 Email from AVID Help                    2024

22

23

24

25

                    UNITED STATES DISTRICT COURT

1                    *P R O C E E D I N G S*

2    *(Proceedings begin at 1:01 p.m.)*

3              COURTROOM DEPUTY:  All rise, court is now in

4    session.

5              THE COURT:  Good afternoon.  Mr. Freedman, you may

6    continue with your cross-examination of Dr. Richman.

7              MR. FREEDMAN:  Thank you, Your Honor.

8                    CONTINUED CROSS-EXAMINATION

9    BY MR. FREEDMAN:

10   Q.   Good afternoon, Dr. Richman.

11   A.   Good afternoon.

12   Q.   I want to start on the analysis of the 6,084 full-ballot

13   voters in AVID that you were talking about with Mr. Langhofer

14   about two hours ago, at just about 11:00.  I'd just like to

15   put this in context.  I want to just, like, level set on

16   something.

17             So, one, I want to make sure you're aware that since

18   2004 a registrant in Arizona is required to provide

19   documentary proof of citizenship?

20   A.   Yes.

21   Q.   Okay.  And individuals who provide documentary proof of

22   citizenship are called or referred to as full-ballot voters,

23   meaning that they can vote in all federal, state, and local

24   elections, right?

25   A.   Yes.

1   Q.   So just a couple of basic points.  When Mr. -- when

2   Professor McDonald compared the full-ballot voters to the MVD

3   databases, he found that there were 6,084 full-ballot voters

4   who the ADOT credential database indicates are non-citizens,

5   right?

6   A.   Yes.

7   Q.   And you confirmed in your direct testimony that you were

8   able to replicate that number?

9   A.   I was.

10   Q.   Okay.  So why don't -- I want to spend a little time just

11   walking through the iterations of your analysis at this point,

12   starting with your original report and then -- and then we'll

13   get to the supplemental.

14          MR. FREEDMAN:   Stephen, can you pull up Defense

15   Exhibit 912, which is --

16   BY MR. FREEDMAN:

17   Q.   Professor Richman, this is going to be your Table 2 from

18   your original -- your October 13th report.

19   A.   Yes.

20   Q.   Okay.  And we see at the bottom you've got the 6,084

21   numbers under "Frequency."  Do you see that?

22   A.   Yes.

23   Q.   Okay.  And looking at the first substantive line, the

24   licenses established or renewed after voter registration, you

25   concluded in our October 13th report that 2,331 of the 6,084

 1  had a license established or renewed after voter registration,

 2  right?

 3  A.  Well, with the caveat that in the text I discuss as well

 4  the issue of duplicate credentials.

 5  Q.  Okay.  I'm just trying to level set and kind of make

 6  clear.  Your October 13th report you reported 2,331 instances

 7  where the timing of voter registration versus the ADOT license

 8  date was that the license was established or renewed after

 9  voter registration, right?

10  A.  Well, established, renewed or duplicate or replacement as

11  it became clear once I got additional data.

12  Q.  Okay.  But when you filed this report on October 13th,

13  you didn't include the words "duplicate" or "replacement."

14  You just said license established or renewed, right?

15  A.  And in the text of the report I also discussed the issue

16  of duplicates.

17  Q.  Okay.  So on the day before you signed this October 13th

18  report with this analysis, you requested -- you put in a

19  request through counsel to ADOT to provide additional data

20  because you were not certain of your position, right?

21  A.  That's correct.

22  Q.  Okay.

23        MR. FREEDMAN:  Why don't we pull up what's been

24  marked for identification Impeachment Exhibit 5.  And why

25  don't we just blow up the bottom e-mail, if we could, Stephen.

 1   Just magnify it.

 2   BY MR. FREEDMAN:

 3   Q.   And, Professor Richman, have you seen this before?

 4   A.   Let me -- let me just review it briefly.  Yes, I believe

 5   I have.

 6   Q.   Okay.  What is this?

 7   A.   This is a message from Kory Langhofer to Joshua Whitaker.

 8   Q.   And you see it's sent October 12th, 2023, the day before

 9   you submitted your report, right?

10   A.   Yes, I see that.

11   Q.   And you see Mr. Langhofer's writing and he says -- well,

12   we can read it ourselves.  The point I want to focus on is in

13   the -- in the second paragraph.  He writes, "If so, our large

14   data set matching expert will need some additional data in

15   order to be certain of his position," right?

16        That's what he says?

17             THE COURT:  Okay --

18             MR. FREEDMAN:  I'm sorry.

19             THE COURT:  Just ask your question as opposed to ask

20   if you've read it correctly.

21             MR. FREEDMAN:  Okay.  Thank you, ma'am.

22   BY MR. FREEDMAN:

23   Q.   Just tell us, what position were you not certain of when

24   this was sent?

25   A.   As I said in the report, it involved the question of

 1  duplicate licenses for non-Real ID issuance.

 2  Q.   Okay.  And so we understand your analysis --

 3        MR. FREEDMAN:   Stephen, can you put 912 back up.

 4  BY MR. FREEDMAN:

 5  Q.   Just to be clear, one of the positions that you could not

 6  be certain about when you submitted your October 13th report

 7  was that the 2,331 number identified in Table 2 were

 8  individuals who may have registered to vote -- you cannot be

 9  sure that those were all instances where licenses were

10  established or renewed after voter registration, right?

11  A.   Exactly.

12  Q.   Okay.  Now, you went ahead and submitted your report on

13  October 13th?

14  A.   That's when it was due.

15  Q.   Okay.  I want to talk about some of the other limitations

16  in the ADOT data, the MVD data that we talked about earlier,

17  and just understand how they -- how they factor into this

18  analysis.

19  A.   Okay.

20  Q.   So one of the limitations we discussed this morning was

21  that the ADOT MAX, M-A-X, legal presence information is not

22  always up to date, right?

23  A.   That's correct.

24  Q.   And --

25        MR. FREEDMAN:   If we can keep 910 on.

1   BY MR. FREEDMAN:

2   Q.   And that limitation is also reflected in your 2,003 --

3   2,331 number, right?

4   A.   So that's the crucial distinction between the first and

5   second rows here, in part.  So it's because of the uncertainty

6   around duplicates, it's reflected in both, but it's especially

7   reflected for the second row where the license was established

8   or renewed prior to voter registration.

9   Q.   Okay.  Just so we're clear and so we understand, your

10  2,331 number only includes people who ADOT said that they were

11  non-citizens after they had registered to vote, right?

12  A.   So what this number includes are people who ADOT says in

13  its file are non-citizens and who had a credential issuance

14  date after their date of registration.

15  Q.   So the question Judge Bolton asked earlier about the

16  treatment of people who registered to vote on the same day as

17  ADOT said they were non-citizen, those individuals are not in

18  your 2,331 number, right?

19  A.   That's correct.

20  Q.   Okay.  But the 2,331 number includes people who's voter

21  registration was a couple weeks before the ADOT event date

22  where ADOT says they were non-citizen, right?

23  A.   It would include people -- it includes all issue dates

24  after the voter registration date.  So it could be two weeks.

25  It could be longer.

1  Q.    Okay.

2  A.    It could be one day.

3  Q.    Okay.  Now, another limitation of the ADOT data we

4  discussed earlier is that there's some probability of data

5  entry errors that could lead to matching failures, right?

6  A.    Yes.

7  Q.    And the 2,331 number could reflect some data entry or

8  matching errors, right?

9  A.    That's a possibility, as we've already discussed, yes.

10 Q.    Okay.  And another limitation, which I think gets to your

11 information request, the October 12th request, is that not

12 every interaction with ADOT requires somebody to provide

13 proof of citizenship or authorized presence, right?

14 A.    Right.

15 Q.    And the 2,331 number could include people who are just

16 updating their name or address or requesting a replacement for

17 a lost or stolen license, never provided proof of authorized

18 presence to ADOT, right?

19 A.    As we discussed, duplicative issuance for non-Real ID

20 would not necessarily require proof of authorized presence.

21 Q.    And as we now know, based on the additional data you got,

22 the 2,331 number actually includes 961 individuals who are not

23 establishing or renewing a license, right?

24 A.    I don't think that's quite correct.  It's -- it's roughly

25 but the -- there -- also, there's that same-day issue.  So

 1  some of the duplicate issuances were same day.

 2  Q.    Okay.  But it's about -- the order of magnitude I'm

 3  talking about, it's about 900-some people?

 4  A.    Probably.  I'd have to sort that out in terms of exactly

 5  how many, but approximately.

 6  Q.    Sitting here today, you don't -- you don't know the --

 7  A.    I don't remember the exact number.

 8  Q.    Okay.

 9        MR. FREEMAN:  And this may be confusing for the

10  Court, so I just want to see if I've got this straight.

11        Stephen, can you pull up what we've marked as

12  Impeachment Exhibit 6.

13  BY MR. FREEDMAN:

14  Q.    So I prepared something just to see if I've got this

15  right.  So this is your calculation of your 2,331.  And what I

16  think we've -- what I would like you to confirm is that this

17  excludes the people who registered the same day as the ADOT

18  credential was checked.

19        The people who -- the same-day people are not in your

20  2,331 number, right?  That's the second line here.

21  A.    That -- yes, that is -- the second row is excluded.

22  Q.    And some of the other limitations we've talked about,

23  people who registered before 2000 -- registered to vote before

24  2005, data entry, mismatch errors, people who were not

25  establishing or renewing credentials, as opposed to a

1  duplicate, people who registered not the same day, but a

2  couple weeks, like within a month, before the ADOT credential

3  was checked, those are all included in your 2,331 number?

4  A.   The term "credential checked" by which you -- you mean --

5  you mean the issuance date?

6  Q.   When ADOT is saying that non-citizenship was -- proof of

7  non-citizenship was shown.

8  A.   Yes, this looks consistent with my analysis.

9  Q.   Okay.  Now, I want to roll forward a little bit to your

10  revised analysis.  This is the analysis in your supplemental

11  report that was served around midnight on October 22nd -- I'm

12  sorry, October 28th.

13       That's -- to put it in perspective for you, that's

14  about a day and a half before -- well, it's a day and a night

15  before we deposed you, right?

16  A.   It's also the same day I got the data.  So I turned it

17  around as fast as I could.  I appreciate that the timing was

18  unfortunate.

19  Q.   Right.  I mean, you testified on direct you did it

20  immediately.  I don't think there's any dispute you turned to

21  your analysis immediately, right?

22  A.   Yep.

23  Q.   So in that supplemental report you acknowledge that it's

24  clear that the issuance of a duplicate non-Real ID credential

25  does not require proof of legal presence provided that the

 1   proof of authorized presence previously had not expired,

 2   right?

 3   A.    For non-Real ID.

 4   Q.    Non-Real ID, okay.

 5          MR. FREEDMAN:  And, Stephen, can we pull up 929,

 6   which is Professor Richman's supplemental -- Table 2.4 from

 7   his supplemental report.

 8   BY MR. FREEDMAN:

 9   Q.    And this is -- this is the -- this is the table you

10   discussed on -- this table has the 1,779 number that you

11   discussed on direct, right?

12   A.    It does, yes.

13   Q.    Okay.  Just to help understand some of -- some of the

14   changes between this and the Table 2 that we looked at

15   before --

16          MR. FREEDMAN:  Stephen, can you pull up what's been

17   marked for identification Impeachment Exhibit 6, No. 2.

18   BY MR. FREEDMAN:

19   Q.    Okay.  So what -- what this does is -- this is just

20   designed to show your row headers as if you compare your

21   original analysis October 13th against your revised analysis,

22   Table 2.4, October 28th.  Do you see that?

23   A.    Yes.  If you'll give me just a moment to review it, I'd

24   appreciate it.

25   Q.    Sure.

1  A.    Okay.

2  Q.    Okay.  So if you look at the second row, in your original

3  table you were looking at license established or renewed

4  after voter registration, and in your revised analysis you're

5  looking at evidence of non-citizenship provided to ADOT on day

6  of or after voter registration.  Do you see that?

7  A.    Yes, I do.

8  Q.    Okay.  And is it fair to say -- and I think you testified

9  to this on direct, but I just want to make sure we're clear.

10        This reflects that you had the people who went to

11  ADOT and showed their proof of non-citizenship and registered

12  on the same day were excluded from your original analysis, but

13  are in your revised analysis, right?

14  A.    That's right.  I identified that that was a error or

15  limitation in my previous analysis and I corrected it.

16  Q.    Okay.  Just to help the Court understand --

17        MR. FREEDMAN:  Stephen, can we look at the third in

18  this series, Impeachment 6.

19  BY MR. FREEDMAN:

20  Q.    This is just a comparison of your two analyses, what's

21  in, what's out, and proximate magnitude.

22        I just want to take this line by line.  The pre-2005

23  registrations were included both in your original calculation

24  of 2,331, but excluded -- but also included in your -- in your

25  calculation of the 1,779, right?

1    A.    That's correct.

2    Q.    And on direct, at about -- about 11:14 this morning, you

3    said that you thought that was about a hundred, right?

4    A.    Yes.

5    Q.    Okay.  And then the second line, which we've talked about

6    a little bit is the same-day issue.  It was excluded from your

7    original analysis, but it's included in your revised analysis,

8    correct?

9    A.    That's correct.

10   Q.    And you had -- you didn't agree with my number earlier of

11   409, but that's about the right order of magnitude, right?

12   A.    I -- I said before I wasn't sure of the exact number.

13   I'm still not, but that looks like the right order of

14   magnitude to me.

15   Q.    Okay.  And then if we look at the people looking at, you

16   know, potential time lag issues, delay issues on -- on ADOT

17   processing, looking at people who within a month their

18   credentials checked, they registered to vote within a month

19   before ADOT checked their credential, that's in both your

20   first and your second calculation, right?

21   A.    I'm a little confused about your discussion of time lag.

22   Maybe we can go into that further, but that seems about right.

23   Q.    Okay.  Had you attempted to quantify this?

24   A.    I had looked principally actually in the other direction,

25   so people who -- it was quite proximate the other way you had

1  a -- but, you know, you had -- they registered to vote only

2  shortly before a credential is issued, because you could get a

3  time lag that way as well, but I didn't include that in my

4  analysis.  I did look at it.

5  Q.   But it's not -- it's not in your analysis?

6  A.   No, I decided to be conservative about the numbers in

7  terms of not -- trying to argue that someone who registered to

8  vote the day before their -- their credential issued is --

9  arguably, they're less likely to have a stale record at that

10  point, but I left those in that category of potentially stale.

11  Q.   Okay.  And then the next line, the

12  "non-establishment/renewal credentials," this is the principal

13  change that you made, the one that you -- going from licenses

14  renewed and issued to a truer definition of licenses renewed

15  and issued, right?

16  A.   This is the ability to identify who the duplicate

17  non-Real ID license holders are.

18  Q.   And those were in your first calculation, but excluded

19  from your second calculation, right?

20  A.   Most of them.  As I discussed previously, there is the

21  duplicate issue.

22  Q.   And then the final -- final limitation we talked about

23  earlier, the ADOT data entry and mismatches, those are going

24  to be reflected in both numbers, right?

25  A.   Yes, potentially in both numbers.

1  Q.   And can you quantify that?

2  A.   Well, so in terms of data entry on the ADOT side, as I

3  discussed this morning, I was able to identify 22 cases in

4  which someone was at one point identified in the ADOT database

5  as being a non-citizen, and then -- I'm sorry, a citizen, and

6  then later updated to be identified as a non-citizen.

7         So that's one data point in terms of quantifying the

8  degree of error in that database.

9  Q.   And did you look at errors going the other way, people

10  who were classified as non-citizens in the ADOT database who

11  were actually citizens?

12  A.   So to identify those errors would be -- would be

13  difficult in -- there wasn't data available to do that,

14  because most of the time when someone is a non-citizen and

15  becomes classified as a citizen, it's because they

16  naturalized.

17  Q.   Okay.  I want to take a look at your Table 2.5.  I

18  believe this is the one that was moved -- well, I want to do

19  another comparison to what your original report and your

20  revised report.

21         MR. FREEDMAN:  Stephen, can you pull up Defense

22  Exhibit 921.

23  BY MR. FREEDMAN:

24  Q.   This is Table 12 from your original report.  And then I

25  want to --

1        MR. FREEDMAN:  Stephen, can you do a side by side

2  with Defense Exhibit 930, what was pre-marked -- this was the

3  exhibit that was actually moved into evidence as Defense

4  Exhibit 974.  This was my unintelligible objection earlier to

5  the -- to the exhibit numbering.  But this is -- Table 2.5 is

6  in evidence as Exhibit 974, so I just want the record to be

7  clear on that.

8        MR. LANGHOFER:  Your Honor, we agree with that.

9  What we previously described as Exhibit 274 is actually marked

10  as 930.  The error was mine.

11        THE COURT:  Thank you.

12        MR. FREEDMAN:  And I apologize, it was completely

13  unintelligible when I was trying to explain this earlier.

14  BY MR. FREEDMAN:

15  Q.  Professor Richman, I just want to walk through this --

16  these charts and just understand sort of the relationship

17  between them.

18        So the top line, the active voter file in --

19        MR. FREEDMAN:  The line above, Stephen, sorry.

20  What's 335?  So I want to see -- Stephen, if you could pull up

21  921 and 930 side by side.

22  BY MR. FREEDMAN:

23  Q.  And we see that in the active voter file, the top line,

24  we see the 2,331 number we've been talking about.  And then

25  the -- in the top line of Table 2.5 we see the 1,779 number

 1    we've been talking about.

 2            Now, the next three lines you're cancelled, you're

 3    suspended, you're federal-only registered voters.  All those

 4    numbers dropped between your original analysis and your

 5    revised analysis, right?

 6    A.    Yes, that's right.  Well, except for the cancelled jury

 7    stated one.

 8    Q.    Okay.  Just so we're clear, so the -- the initial -- your

 9    cancelled lack of DPOC dropped from 56 to 51, right?

10    A.    That's correct.

11    Q.    And your suspended invalid citizen proof dropped from 97

12    to 72, right?

13    A.    Yes.

14    Q.    And your federal-only registered voters dropped from 41

15    to 31, right?

16    A.    Correct.

17    Q.    Now, on the last line, I just want to be clear what

18    the Cancelled - Juror Survey Non-Citizen means.  In your

19    original report you identified one individual who was

20    cancelled because their juror survey indicated they were

21    non-citizen whose ADOT record -- ADOT records indicated

22    non-citizenship as well?

23    A.    That's correct.

24    Q.    And they -- and that individual also had a ADOT document

25    issued date, meaning their credential was checked after they

 1  registered to vote, right?

 2  A.   I believe so.

 3  Q.   And October 28th, your revised analysis, that number

 4  remained the same.  It was still one --

 5  A.   There was still the one.

 6  Q.   Still one juror non-citizen, right?

 7  A.   There was still that one individual who -- yeah, so

 8  that -- that number didn't change for that one, yeah.

 9  Q.   So, to be clear, you've identified one non-citizen from

10  the Jury Surveys whose ADOT record reflects they were

11  non-citizen after they registered to vote?

12  A.   This is from -- this isn't from the Jury Surveys.  This

13  is from the -- the cancelled voter file.  This is a code in

14  the file.

15  Q.   I see.  So it's a different -- it's within the cancelled

16  file.  It's not from the jury -- it says Jury Survey, but it's

17  not --

18  A.   It's based on the Jury Survey.  This is the -- I

19  replicated the name of the code.  So this is Cancelled - Jury

20  Survey Non-Citizen is the code in the voter file.

21  Q.   Thank you.

22       MR. FREEDMAN:  Let me confer with my colleagues, but

23  I may be able to pass this to Mr. Dodge, with the Court's

24  indulgence.

25       Thank you, Professor Richman.  I will turn it over

UNITED STATES DISTRICT COURT

 1   to Mr. Dodge.

 2                         CROSS-EXAMINATION

 3   BY MR. DODGE:

 4   Q.   Christpher D. Dodge on behalf of the Mi Familia Vota

 5   plaintiffs.

 6        Good afternoon, Dr. Richman.

 7   A.   Good afternoon.

 8   Q.   I spent last night putting together a very lengthy

 9   outline to go over with you, and I'm very pleased to say I

10   think I only need a few pages of it.  So I'll keep this very

11   brief.

12             I'd like to first go over a little about your prior

13   work as an expert and then talk about the voter confidence

14   issue you spoke about with Mr. Langhofer.

15   A.   Okay.

16   Q.   You've served as an expert witness in a total of four

17   cases, including this one, correct?

18   A.   That's correct.

19   Q.   One of them was a case called *Lee vs. Virginia State*

20   *Board of Elections* where you were retained as an expert and

21   deposed; is that right?

22   A.   That's correct.

23   Q.   But you didn't ultimately testify at trial in that case,

24   correct?

25   A.   Correct.

 1   Q.   There was another case, *Priorities USA vs. Missouri*,

 2   where you were also deposed, but then, again, not called to

 3   testify at trial; is that correct?

 4   A.   That's correct.

 5   Q.   There was a third case, which has been mentioned already,

 6   *Fish v. Kobach*.  You remember that case?

 7   A.   Yes.

 8   Q.   You did testify there?

 9   A.   Yes.

10   Q.   And with the exception of today, that's the only case in

11   which you were retained as an expert witness in which you

12   testified live, correct?

13   A.   That's correct.

14   Q.   The *Fish v. Kobach* decision also concerned a challenge to

15   a law involving documentary proof of citizenship?

16   A.   Yes.

17   Q.   The Court in that case did not ultimately credit your

18   testimony with respect to the prevalence of non-citizens

19   registered within Kansas; fair to say?

20   A.   The Court said it was confused.

21   Q.   And it ultimately did not rely on your testimony?

22   A.   As far as I know.

23   Q.   The Court also expressed generally some concerns with

24   your candor with respect to the reasons why you supplemented

25   some of your testimony; is that fair to say?

1   A.   I don't recall that.

2   Q.   You're aware there's a federal published court decision

3   addressing this issue, correct?

4   A.   Yes.

5   Q.   All right.  I'll turn to the better confidence issue.

6        You acknowledge in your report that insufficient research

7   has been done at this stage to investigate the relationship

8   between voter confidence and election legislation; is that

9   fair to say?

10  A.   Yes, that's fair to say.  I'd be happy to explain more if

11  you'd like.

12  Q.   It's also the case that you haven't published any

13  peer-reviewed work on the topic of voter confidence?

14       Is that fair to say?

15  A.   On the whole, yes.

16  Q.   And based generally on your experience as an academic,

17  you're not familiar with any peer-reviewed literature

18  concluding that enacting a documentary proof of citizenship

19  law improves public confidence in elections.

20       Also fair to say?

21  A.   I am not familiar with any literature specifically on

22  that topic.  I'd be happy to discuss related literatures,

23  though.

24  Q.   You haven't published any work on public awareness of

25  voter ID or proof of citizenship laws; is that also the case?

1   A.   Yes.

2   Q.   And you haven't done any research in this case into

3   public awareness within the State of Arizona of HB2492 or

4   HB2243?

5   A.   If you can give me half a second, I just -- my previous

6   answer, I need to correct that slightly.  Is that okay?

7            THE COURT:  Yes, go ahead.

8            THE WITNESS:  Okay.  So I did publish a paper on

9   identification requirements for college students in college

10  towns a number of years ago, and that did address some of

11  these issues.

12           Thank you.  If you could restate your subsequent

13  question.  I'm so sorry.

14  BY MR. DODGE:

15  Q.   The work you just mentioned, that concerned specifically

16  public awareness of voter ID or documentary proof of

17  citizenship issues?

18  A.   Requirements for identification of college students in

19  college towns.

20  Q.   You haven't done any research in this case into public

21  awareness within Arizona of HB2492 or HB2243, correct?

22  A.   Correct.

23  Q.   And you would agree with me that a voter needs to be

24  aware of the law for that law to contribute to their

25  confidence or lack of confidence in the electoral system,

1    right?

2    A.    Yes.  Well, let me -- let me correct.  I would say that

3    that is one way that it could have an effect, but there are

4    other ways.  I'd be happy to explain.

5    Q.    I'm not sure I follow your answer.  That what could have

6    an effect?

7    A.    So you said awareness is -- of the law is a prerequisite

8    for an effect on voter confidence.  I believe that was your

9    question.  Am I -- am I right about that?

10   Q.    Let me -- let me step back a little bit.

11   A.    Sorry about that.

12   Q.    Can a person's perception of something be impacted by

13   something they have no knowledge of?

14   A.    Yes.

15   Q.    Could you say how?

16   A.    So, for example, as we discussed earlier, one of the

17   effects on voter confidence in Arizona, based on some of the

18   rhetoric that has happened, is the number of people on the

19   federal-only list.  And so one might not be aware of how this

20   law is reducing the number on the federal-only list, but the

21   reduction that would likely happen through bringing in

22   additional databases, especially by the records, to identify

23   that a lot of -- that perhaps many of those people are

24   citizens would thereby reduce the ability to make that claim

25   even if people are not aware of how that reduction happened.

Jesse Richmon, Ph.D. - Cross-Exam by Mr. Dodge                1987

1   Q.   Let me -- let me restate my original question a little

2   differently, then.   A member of the public would have to be

3   aware of the effects of a law, then, for it to impact their

4   confidence or lack of confidence in the electoral system,

5   fair?

6   A.   That -- that's another way that they could -- it could

7   have an effect.

8   Q.   But if a person was oblivious to the law or the effects

9   of the law, it would presumably not impact their views of the

10  electoral system, as a matter of common sense, fair?

11  A.   That seems -- that seems sensible.

12  Q.   You discussed what you refer to as "the big lie" with

13  Mr. Langhofer a little bit.   Could you just tell us what you

14  consider that to be?

15  A.   So this is it a term that's been used in a variety of

16  papers.   I was just reading a paper published in a political

17  science journal the other day analyzing voter confidence and

18  the effects of the rhetoric of the Trump campaign and some of

19  Trump's surrogates and they used that term.

20          So it's a term that's used to refer sometimes to

21  these seemingly baseless claims of giant voter fraud that were

22  made by Trump and some of his allies.

23  Q.   And those baseless claims of giant voter fraud were very

24  widely propagated around the time of recent presidential

25  elections; fair to say?

1    A.   I would agree.

2    Q.   And a lot of people in the country, and in Arizona,

3    believed those baseless lies because they were widely

4    propagated by an authority figure, fair?

5    A.   That certainly seems like a plausible explanation.

6    Q.   And you mentioned that the lies were --

7    A.   But I would add that there -- there were other factors as

8    well.

9    Q.   You mentioned that the lies were baseless, right?

10   A.   None of -- as far as I know, the Trump team never

11   prevailed in court, for example, in their claims.

12   Q.   The fact of their baselessness was also widely propagated

13   to the public, right?

14   A.   It certainly would seem that way.

15   Q.   In fact, you, yourself, undertook your own efforts to

16   explain why these lies were not rooted in fact, right?

17   A.   Yes, I did.

18   Q.   And so it's fair to say that it was also widely

19   disseminated amongst the public that these claims were wrong

20   and why they were wrong, right?

21   A.   I would hope so.

22   Q.   But you would agree with me that there's still a lot of

23   people who believe them, despite the fact that that knowledge

24   has been disseminated, right?

25   A.   Yes, I would.

1  Q.   And so those people continue to believe in an irrational,

2  baseless claim about our electoral system, correct?

3  A.   They continue to -- they continue to believe the claim,

4  it certainly would appear, at least a significant number of

5  them do, and you can look at what's happened in some

6  subsequent elections to Republicans who objected to Trump's

7  claims and so forth.

8           MR. DODGE:  I have nothing further.

9           THE COURT:  Any other cross-examination of this

10  witness?

11           Mr. Langhofer, redirect?

12           MR. LANGHOFER:  Yes, Your Honor, briefly, please.

13           All right.  Elaine, could we have the Elmo again.

14  We're going to do that -- the fixed methods here.

15                   REDIRECT EXAMINATION

16  BY MR. LANGHOFER:

17  Q.   All right.  Professor Richman, I'd like to do some math

18  with you, some second-grade math, lawyer level math, in a

19  moment.  But I want to talk about the, you know, discrepancies

20  or mismatched numbers in a minute and try to make sense of it.

21           So in the far right-hand column of Exhibit 930,

22  which I previously described as 974 improvidently, what is

23  included in that column?

24  A.   These -- what's included in this column are a variety of

25  different kinds of instances in which the ADOT data does not

1    provide evidence of citizenship or non-citizenship.  So it

2    includes several different categories of those.

3    Q.   So if someone has an F-type license, would they be

4    included in the right column of Exhibit 930?

5    A.   They would not if we have a match on the ADOT number.

6    Q.   Okay.  Would they instead be in the middle or left-hand

7    columns?

8    A.   Yes.

9    Q.   Okay.  So let's do my, you know, lawyer level math.  I'm

10   going to try to write this out.  You've got 1,972 -- excuse

11   me, 19,262 is the number there in the right-hand column.  In

12   the middle column, you've got 65.  What does that number

13   represent?

14   A.   That represents the set of records who are federal-only

15   registered voters for whom the ADOT file match indicates that

16   they're not a citizen.

17   Q.   Okay.  And you previously have testified to the number of

18   federal-only voters that at this point ADOT indicates are

19   citizens, and if I recall correctly, your testimony was 112,

20   right?

21   A.   There are 112.  I think that's a -- that's a subset of

22   the total number, though.  That's -- wait.  No.  Yes, that's

23   the total.  Yeah.

24   Q.   Okay.

25   A.   I'm pretty sure.

Jesse Richmon, Ph.D. - Redirect Exam by Mr. Langhofer    1991

1   Q.   So I'm just going to do this math by hand.  I apologize

2   for my handwriting, which is my worst grade in second grade,

3   Ms. Fuggit, and why don't you check this as being our, you

4   know, resident math expert for the moment.

5        Did I do those numbers correctly?

6   A.   Looks like you did it correctly to me.

7   Q.   Okay.  So those sum up to 19,439?

8   A.   Yes.

9   Q.   I want to look now at Exhibit 332, which is Professor

10  McDonald's report, and we're going to look at Page 63 there,

11  which you were asked about on cross-examination.

12        This is Professor McDonald's calculation of all the

13  federal-only voters -- federal-only voters in the state.

14  What's the number that he has there?

15  A.   19,439.

16  Q.   It's the same number?

17  A.   It is.

18  Q.   Okay.  So this -- the fact that the right column of your

19  exhibit excludes F-type licenses that match to a voter and

20  voters that match to some who's provided DPOC to ADOT, does

21  that explain this sort of mathematical discrepancies that you

22  were questioned about before?

23  A.   Absolutely.

24  Q.   But I'm not trying to be -- I actually have a little bit

25  of difficulty hearing what was your answer?

1    A.    My answer is "yes."

2    Q.    Thank you.

3          On the juror survey issue where you identified only one

4    voter who was cancelled for that, are you aware of any

5    testimony from the County Recorders that when they invalidate

6    a voter registration for jury questionnaire reasons how they

7    code that?

8    A.    I can't recall at the moment.

9    Q.    Okay.  Well, then we will not pursue that one.

10         Her Honor had some questions for you earlier about how

11   some of the supplementation of the new law would require new

12   MOUs with, for example, USCIS or the federal records

13   administrators.

14         For the 112 apparent citizens who are currently

15   registered as federal only, is it your understanding -- do you

16   have an understanding of whether there would have to be a new

17   MOU negotiated between ADOT and the Secretary of State to

18   update their records?

19   A.    I'm not certain, as I said before, of the details of the

20   MOU.  However, that seems likely to me that if they're not

21   currently allowed to do it, then they would need a new MOU in

22   order to be able to -- to accomplish that goal.

23              MR. LANGHOFER:  Thank you, Your Honor.

24              No more questions on redirect.

25              THE COURT:  May this witness be excused?

1            MR. LANGHOFER:  Yes.

2            THE COURT:  Any objection?

3            MR. DODGE:  No objection.

4            THE COURT:  Dr. Richman, thank you very much.  You

5    may step down and you are excused as a witness.

6            And defendants may call their next witness.

7            MR. WHITAKER:  Thank you, Your Honor.  Josh Whitaker

8    for the State and Attorney General.

9            The defense calls Hilary Hiser by Zoom.

10           COURTROOM DEPUTY:  Mr. Whitaker, I see a Laura Bauer

11   in there.  What was the name?

12           MR. WHITAKER:  That may be her.

13           COURTROOM DEPUTY:  It was Hilary Hiser, you said?

14           MR. WHITAKER:  Yes.

15           COURTROOM DEPUTY:  If it's her, I'll let her in, but

16   if you would ask her to change her name.

17           MR. WHITAKER:  I believe the person there is Hilary

18   Hiser.  Can I just tell her to -- ask here to change her user

19   name?

20           COURTROOM DEPUTY:  Yes, but let me swear her in

21   first.

22           Ms. Hiser, can you please raise your right hand.

23           *(Witness is sworn.)*

24           COURTROOM DEPUTY:  I didn't get that.

25           Okay, hold on a second.

UNITED STATES DISTRICT COURT

 1          Can you try saying something for me again?

 2          Try it one more time.

 3          THE WITNESS:  Hello.

 4          COURTROOM DEPUTY:  Okay, that's perfect.

 5          Let me swear you in one more time just so the record

 6  is clear

 7          (Witness is sworn.)

 8          COURTROOM DEPUTY:  Thank you.

 9                      DIRECT EXAMINATION

10  BY MR. WHITAKER:

11  Q.   Good afternoon, Ms. Hiser.

12  A.   Hello.

13  Q.   I understand that until recently you worked for the Pima

14  County Recorder's office; is that right?

15  A.   That is correct.

16  Q.   Okay.  When -- when did you begin working for the

17  Recorder's office?

18  A.   I retired from the Pima County Recorder's Office in

19  September of 2001 (sic).

20  Q.   And what was your most recent position in the office?

21  A.   My most recent position at Pima County Recorder was the

22  Chief Deputy Recorder of Pima County.

23  Q.   And how long did you hold that position?

24  A.   I held that position for a year and couple of months.

25  Q.   And what were you before then?

1  A.   I was the Assistant Chief Deputy Recorder.

2  Q.   Were you working for the Pima County Recorder's office at

3  the time of your deposition in this case?

4  A.   I was.

5  Q.   And do you remember roughly what day you left the office?

6  A.   I left Pima County August -- I think it was the 18th.

7  Q.   All right.  In your experience at the office, were you

8  ever aware of the office receiving registration forms that

9  appeared to contain inaccurate information?

10  A.   We did have some experiences with registration forms with

11  inaccurate information during the '22 cycle.

12  Q.   Can you explain a little bit more about what that -- what

13  happened?

14  A.   So during the '22 election cycle, during Congressional

15  elections and Presidential elections, various voters

16  registration groups will ramp up operations, and they will do

17  voter registration drives and they will turn in large

18  quantities of voter registration forms to County Recorders,

19  Pima County, Maricopa County.  We get quite a lot of those

20  forms during the 2022 cycle.

21        We would be receiving sometimes hundreds of forms a

22  day from these groups and be processing through the voter

23  registration forms.  And, for the most part, we would have

24  forms that were good, and we would update people's voter

25  registrations.  And we'll have forms of -- for new voters and

 1  we would put new voter registrations in the system, but then

 2  there would be -- we would encounter forms where it would be

 3  the same voter.  So you'd have -- say, on Monday you'd get a

 4  voter for -- for Joe Smith and we would get a registration

 5  form for him and then, you know, on Wednesday, we'd get

 6  another voter registration form for Joe Smith, but something

 7  else -- something would be slightly different on the form.

 8          So you'd get maybe a different -- it would be Joe

 9  L. Smith or it would be Joe Smith with a slightly different

10  Social Security -- last four digits of a Social Security

11  number or would be a date off on the date of birth or a change

12  of party.  It could be any number of things.

13          So we would encounter times where we would have

14  forms that would be on the face a valid registration form, but

15  as we continued to work through them, we would have questions

16  as to whether or not that was a valid registration form.  So

17  we would put those off to the side in our troubles and -- and

18  kind of put them in a suspended status and then come back to

19  them and try to work through them.

20  Q.   And did that sort of thing happen only in 2022?

21  A.   Well, I was not with the Recorder's Office during the

22  2020 cycle, but from staff who were in that cycle they said

23  that they experienced some of the same issues.

24          During the '23 cycle, because it was not a Congressional

25  election, the voter registration -- the volume of voter

1  registration forms that we got during the '23 cycle were

2  significantly less because those were elections -- local

3  elections, cities, towns, county-only elections.

4  Q.   And I realize I may have misheard your testimony at the

5  beginning.  I thought you said you were there since 2001, but

6  did you say 2021?

7  A.   2021, yes.

8  Q.   I see, okay.  Can you think of any other examples of

9  questionable forms that the Recorder's office has received,

10  such as forms of people who -- forms for applicants who are no

11  longer alive?

12  A.   During the '22 cycle we did have several voter

13  registration forms that staff processed that we had determined

14  that that voter had been deceased for quite some time.  Their

15  voter registration -- so in Pima County, just as in Maricopa

16  County, we have our own voter registration database, and

17  within the voter registration database the voter registration

18  doesn't actually go away.  It will be archived.  So we always

19  have the ability to find a voter registration of a citizen.

20      So when we process voter registration forms and we input

21  them in, the old record may sometimes come up because that's

22  the way the system is designed.  It's designed to look for

23  similar names and things like that.

24      So on several occasions we had some records that showed

25  deceased individuals mand we would then have a voter

1  registration form that had just been turned in for an

2  individual who had passed away, like, two or three years ago.

3  Q.   Were there specific -- well, let me ask a preliminary

4  question.  Were questionable -- questionable forms, in your

5  experience, usually turned in by an individual purporting to

6  be the person on the form, or were questionable forms more

7  often turned in by a group, like a third-party group?

8  A.   So in the instances that I just described, those were

9  instances of forms being turned in by voter registration

10 groups during that -- the congressional election year.

11      As I stated earlier, during a congressional election or a

12 presidential election year, voter registration groups do voter

13 registration drives and we get a lot of forms returned by

14 them.  So -- that was the 2022 cycle, so it would have been

15 from those groups.

16 Q.   You mentioned just now that the Pima County Recorder's

17 Office has a way to look at existing forms when new forms come

18 in to compare information.  Did I get that right?

19 A.   Correct.

20 Q.   Okay.  Can you talk a little bit about the process that

21 was used when it looked like a form comes in and it may -- it

22 may be at least a partial match with an existing form?

23 A.   So the -- the basic process of registering someone to

24 vote, once the voter registration form comes into the office,

25 it is a two-step process.  It is a first check, second check.

1          So staff will be assigned forms to input into the

2   system as a first check, and as they're putting information

3   into the system, the system is able to kind of populate as to

4   whether or not this person already exists.

5          So things like if you have a really common name, you

6   can start to put that in and you'll look for that common name

7   to see if this might be one of -- if this is an existing voter

8   registration record that just needs to be updated or if this

9   is a brand-new voter registration record that needs to be

10  input into the system.

11         The reason that you would do that is is that you

12  don't want to make an unnecessary -- unnecessary duplicate

13  into the system.  When you do that, then you have two records

14  for the same person and then we would have to go back in and

15  we would have to merge the records.

16         So you look for -- you put the voter -- you look for

17  the voter, if they're still matched, then we're putting the

18  registration in as a brand-new registration.  So they're going

19  in like never been there before.

20         And then there is a second check.  So every

21  registration that goes into the system, a second staff member

22  will go in and check all of the information that was input

23  into the system, and that's a quality control feature to

24  ensure that we don't transpose any names or letters or

25  numbers, that the information on the form is accurately put

Haley Hiser - Direct Exam by Mr. Whitaker

1    into the fields of the database.

2            And every voter registration form that comes in or

3    any -- any mail that is official election mail that is

4    correspondence between the office and the voter, that's all

5    scanned into the voter's record.

6            So, in my instance, as a voter here in Pima County,

7    if we were to look at my voter registration record, we would

8    see that there are nine different voter registration forms

9    that are attached to me as the voter because I've changed

10   something on my record nine times.  I've either changed a

11   party affiliation or an address, you know, something along

12   those lines.  So that we track those and those digital images

13   of all those voter registration forms are part of the voter's

14   record.

15   Q.   Would there be situations where the office gets a form

16   and it looks like it could be the same person who has

17   previously submitted information, but you're not sure?

18   A.   Yes, that happens a lot.

19   Q.   Can you give an example of that kind of situation where

20   you got a new form, but you're not -- you're not sure that

21   it's the same as the person currently in the database?

22   A.   So, in those instances, if you got a record and it's

23   similar to the form that you have and you think it might be

24   the same person, or you think it might be a different person,

25   the staff member will contact the voter.  So the first contact

1  will be the person on the form, right.

2       So the physical form in hand will contact the voter and

3  say, "Hey, I see that there's a voter registration record for

4  you," you know, and -- and we've received it.  We think we

5  might -- "is this an update or is it a new record?"  And then

6  we ask a series of security questions to verify the voter, and

7  if those security questions are verified by the voter and they

8  match the information in the system, then we know that that's

9  the same person and we're just going to update their voter

10  registration form.

11       Sometimes that happens where people will say -- you know,

12  they'll look at your first name, a middle initial, and a last

13  name, and then they do a voter registration where it just has

14  a first name and a last name, and so it's a little bit of a

15  difference.  That would kind of cause people to say, "Is this

16  the same person?"  Let's double-check.

17       People who are juniors, seniors, you know, get a lot of

18  times fathers and sons who don't put the senior or the junior

19  and they have the same names, but they have different dates of

20  birth.  That would be a cause for us to call and say, is this

21  -- "Is this you or is this your family member?"

22            Even people who have very similar names, so there

23  are -- there are a couple voters in Pima County who have the

24  exact same first name and last name, and whose dates of birth

25  are very close to each other, but they're not the same people.

Haley Hiser - Direct Exam by Mr. Whitaker                2002

1    So that would be a cause for us to contact the voter and

2    determine, you know, are you this person or are you the other

3    person, things like that.  But it's always a cause for staff

4    to do follow-up.

5    Q.   If there were an example of a name matching and the date

6    of birth matching, but the place of birth listed in the form

7    -- and I understand this has not been a required field

8    historically, but imagine that there's a -- you get a form

9    where someone says they're born in one state, in the existing

10   file you've got someone with the same name, date of birth, but

11   says they were born in another state.  Would that be a cause

12   for follow-up?

13   A.   It would.  We would call that a soft match.  So a soft

14   match is there are some things that match within the names,

15   dates of birth, things like that, and then there are some

16   things that do not match.  It could be a place of birth.  It

17   could be the last four digits of a sosc.  So those soft

18   matches require additional follow up.  If it is a hard match

19   from the form to the database and there are -- there's --

20   there's no question, that would not cause a follow-up.

21   Q.   And earlier you mentioned that when you follow up with

22   voters you ask security questions?

23   A.   Correct.

24   Q.   What security questions would be asked?

25   A.   So the security questions for a voter are determined

Haley Hiser - Direct Exam by Mr. Whitaker                    2003

1    based off of the information provided on the voter

2    registration form.  So Arizona's voter registration form has

3    certain required fields that every voter has to fill out and

4    we have to input that information into the voter registration

5    database and that's consistent across the State.

6         The other fields that are on the voter registration form

7    -- in Pima County, we will capture that information in our

8    database as well, and we will use those as security questions.

9    So if you were to send in your -- let's say you voted an early

10   ballot and it was mailed back to us and the affidavit envelope

11   had something on it that looked a little like the signature

12   didn't quite match, the signature that's on file, right, that

13   would go to our ballot resolution team, and then one of our

14   ballot resolution team members would call the voter with the

15   information that's on the affidavit envelope.  Hopefully, it's

16   the correct phone number.  Or they would contact the voter

17   based off of the information that's in the voter database,

18   whether it's an e-mail, sending out a letter, using a phone

19   number on file.

20        And once we were able to actually contact the voter

21   and speak to that voter on the phone, we would ask any one of

22   those supplementary field questions as a security question.

23   So what are the last four digits of your Social Security

24   number?  What's the year that you were born?  What is your

25   father's name or your mother's maiden name?  What is the place

Haley Hiser - Direct Exam by Mr. Whitaker                    2004

1  of birth?

2       Any one of those additional fields we would consider as a

3  security field to confirm the voter when speaking to them.

4  Q.    Thank you.  Switching topics a little bit, would the

5  Recorder's office, in your experience, sometimes get

6  information from a jury office stating that a particular

7  individual said that they weren't a citizen?

8  A.    Yes.  Yes, that does happen.

9  Q.    Do you have a sense for how often it happens?

10 A.    So the Jury Commissioner sends the County Recorder's

11 office a report of the responses of people who have been

12 called for jury and who have said that they aren't citizens

13 and so we get that list and the -- the standard is is that we

14 input that information into the system that says that these

15 individuals are not citizens, and then we send notification

16 out to those individuals, a letter saying we've been notified

17 by the Jury Commissioner that you stated you're not a citizen

18 and you're registered to vote.  Your registration is going to

19 be cancelled.  If this is in error, please contact us.

20      I don't know if that's what the letter says now, but

21 that's the gist of what the letter used to say.  And then

22 citizens would call us back and say, "I got this letter in the

23 mail that says you're going to cancel my voter registration

24 because I said I'm not a citizen, when, in reality, I am a

25 citizen.  I just said this so I didn't have to serve on a

Haley Hiser - Direct Exam by Mr. Whitaker                2005

1   jury."  So we've had that happen, yes.

2        And then people who do not respond back to the letter, we

3   go forward and cancel the registration.  And then, you know,

4   we have had people come that says I tried to vote and it shows

5   up that they have a cancelled voter registration, and then

6   they contact our office, and then we sort them out in that

7   respect.

8        So we have also had people when we've gotten the

9   notification -- a jury notification where the voter will tell

10  us that no -- at the time -- the Commissioner's jury

11  notification report isn't always timely.  So the voter could

12  say yes, no, at the time I wasn't a citizen, so I couldn't

13  serve on a jury, but I've since been naturalized and we'll

14  have their naturalization information in the system and they

15  are a citizen.

16  Q.   Do you have a sense for how many people would get one of

17  these letters and wouldn't respond?

18  A.   No, not off the top of my head.

19  Q.   Okay.  Do you know how that situation -- so they get the

20  notice.  They don't respond.  Do you know how that would be

21  coded in -- in the registration system, what the status reason

22  would be for a cancellation?

23  A.   Yes.  So every time anything in the database for a voter

24  registration record, any change that's made to it is tracked

25  and it's called a note code.  So if a voter registration is

 1   cancelled, there are corresponding note codes to why the voter

 2   registration is cancelled.

 3        So it could have been felony conviction.  It could have

 4   been moved out of jurisdiction, voter request.  It could also

 5   be Jury Commissioner.  Any number -- it's a -- it's a field

 6   that's a dropdown field and the developer is able to add

 7   additional note codes to customize it specifically for the

 8   Pima County Recorder.

 9        Oftentimes the note codes that the Recorder's office --

10   that Pima County uses do try to track -- and they're -- they

11   have parody to the note codes that are used by the other 13

12   counties for the AVID system.

13   Q.   And do you have a sense for whether within the office

14   those note codes are applied consistently?

15   A.   Yes, that's part of the first check, second check

16   process.

17   Q.   Okay.  I want to ask a general question.  Are there

18   instances where -- well, let me ask it this way:  Are there

19   ways that the various County Recorders can come to a consensus

20   on how to implement a given procedure?  Are there -- are there

21   ways in which the County Recorders can communicate about that

22   kind of thing?

23   A.   Yes.  So the -- there are two -- two methods that County

24   Recorders use to do that.  The first method is, obviously,

25   what is in the current Elections Procedures Manual, the 2019

 1    version.  So that's the one that's currently in effect until

 2    they have adopted a new one.  And those first chapters --

 3    first two chapters, I believe -- it's been a while since I've

 4    looked at the manual.  Those first two chapters talk about

 5    voter registration specifically and the contacting voters.

 6         The other aspect of how County Recorders deal with voter

 7    registration issues is through best practices called VRAC

 8    papers.  So the VRAC papers are advisory papers of procedures

 9    as it relates to voter registration procedures throughout the

10    State.  The VRAC papers are drafted and dispensed and then

11    ultimately adopted by the recorders and that's the -- the

12    elected recorders, not their staffs or their chiefs, but it's

13    ultimately once a VRAC paper is approved, that has kind of

14    like the force of best practice.

15         So how people encounter certain aspects of voter

16    registration we reference the VRAC paper to be able to make

17    sure that we are doing the same or similar process as other

18    counties.

19         For the most part, that's very helpful, except that for

20    Pima County and Maricopa County we have our own voter

21    registration databases that do operate differently in some

22    technical aspects than the AVID system.  So those are -- VRAC

23    papers are written in such a way as to provide us enough

24    detail and guidance for procedures, but they're not written in

25    such a way to narrowly focus that this is what you'll do in

Haley Hiser - Direct Exam by Mr. Langhofer

1    AVID versus Maricopa County or Pima.

2         Does that answer your question?

3    Q.   It does, thank you.

4         MR. WHITAKER:  I actually don't think I have any

5    further questions.  Others may.  Thank you very much.

6         THE WITNESS:  You're welcome.

7         THE COURT:  Mr. Langhofer.

8         MR. LANGHOFER:  Thank you, Your Honor.

9                      DIRECT EXAMINATION

10   BY MR. LANGHOFER:

11   Q.   Ms. Hiser, good afternoon.  I just have one question for

12   you -- well, one topic, I suppose.

13        Do you know the difference between forwardable mail and

14   non-forwardable mail?

15   A.   Yes.

16   Q.   What is that difference?

17   A.   So for forwardable mail, it is any mail that the office

18   can mail out to a voter that can then be forwarded on to

19   another address.  That could be an address change on file from

20   the post office.  It could be a temporary holding address.  It

21   could be any of those.  Non-forwardable mail would be any of

22   the mail that would be official election mail.  So any mail

23   like an early ballot, a 90-day notice, an update, sometimes we

24   send kind of like just updates to voters talking about

25   upcoming elections.  That's all considered non-forwardable.

1    And if it comes back to us, then we would start the NVRA

2    process, which is just -- starting the process that the voter

3    has either moved and needs to contact us and we kind of put

4    them in a suspended status.

5    Q.   And you said NVRA, that's the National Voting Rights Act,

6    correct?

7    A.   Correct.

8    Q.   What about notices when there's a defect in the voter

9    registration form?  Like, for example, if there's a question

10   about citizenship status and you send the notification letter,

11   do those go out customarily by forwardable mail or

12   non-forwardable mail?

13       If you don't know, I don't want you to guess.

14   A.   Yeah, I don't -- I can't -- I can't recall exactly.  We

15   have two types of -- we have a blue envelope and a black

16   envelope.  And so the black envelope is the election official

17   envelope and the blue envelope is the forwardable envelope,

18   and I just cannot recall as to which one we use for those

19   letters of correspondence.

20           MR. LANGHOFER:  Thank you, ma'am.

21           No further questions.

22           THE COURT:  Cross?

23                   CROSS-EXAMINATION

24   BY MR. SHERMAN:

25   Q.   Good afternoon, Ms. Hiser.  My name is John Sherman.  I

 1   represent Poder Latinx and Chicanos Por La Causa in this

 2   action.  It's good to see you again.

 3        I just wanted to revisit your experience, your testimony

 4   about your experience.  You were -- you had a different role

 5   with the Pima County Recorder's office prior to being the

 6   deputy -- Chief Deputy Recorder, correct?

 7   A.   Correct.

 8   Q.   And what was that role?

 9   A.   The Assistant Chief Deputy.

10   Q.   Could you describe your responsibilities and the scope of

11   work related to voter registration and maintaining the voter

12   rolls across these two positions?

13   A.   As the Assistant Chief Deputy, I was responsible for the

14   operations of the voter registration unit and the recording

15   unit.  So I was the person in charge of our voter registration

16   unit making sure that supervisors and staff were responsible

17   for processing voter registration forms, preparing for early

18   voting and preparing for elections.

19        And then as the Chief Deputy, I was responsible for the

20   full operations of the department on both the voter and early

21   voting side, as well as the recording, and as well as the

22   budget and IT for the department.

23   Q.   And prior to joining the Pima County Recorder's office,

24   you had experience in election administration as well,

25   correct?

1    A.   Yes, I did.

2    Q.   And what was that?

3    A.   I was the Deputy Town Clerk for the Town of Marana in

4    Arizona.

5    Q.   And for how long?

6    A.   I was in that position for -- I was with the Town of

7    Marana for nine years.

8    Q.   And you worked on voter registration procedures there as

9    well, correct?

10   A.   Not voter registration procedures, but voting and

11   candidate filings, campaign finance report, ballot

12   propositions.

13   Q.   Understood.

14        Have you met with any plaintiffs' counsel outside of your

15   deposition?

16   A.   No, I have not.

17   Q.   Okay.  Your office was responsible for enforcing Arizona

18   election laws, correct?

19   A.   Yes.

20   Q.   And when I say "your office," can we stipulate I'm

21   talking about your former office, Pima County Recorder's

22   office?

23   A.   Yes.

24   Q.   Are you familiar with the Pima County Recorder's office's

25   voter registration policies and procedures?

1    A.    I am.

2    Q.    Are you familiar with the Challenged Laws in this case,

3    HB2492 and HB2243?

4    A.    Yes, I am.

5    Q.    Have you participated in internal discussions at your

6    office about these laws?

7    A.    We did, yes.

8    Q.    Are you familiar with your office's thinking on when to

9    implement these laws absent an injunction?

10   A.    Yes.

11   Q.    Are you familiar with the office's thinking on how to

12   implement these laws?

13   A.    I am, yes.

14   Q.    Is it your understanding that the EPM, the Elections

15   Procedures Manual, is binding on County Recorders?

16            MR. LANGHOFER:   Legal conclusion.

17            THE COURT:   Overruled.

18            You may answer.

19            THE WITNESS:   Yes, it's my understanding that the

20   EPM is our guiding document for elections operations and

21   procedures.

22   BY MR. SHERMAN:

23   Q.    And is it your understanding that Voter Registration

24   Advisory Committee or VRAC papers are just advisory and not

25   binding on County Recorders?

1  A.   Yes, that is my understanding.  We consider those to be
2  best practice.
3  Q.   And as best practices, these are just recommendations,
4  but not something that any particular County Recorder's office
5  has to follow, correct?
6  A.   Yes, that is the intent of a best practice, but it is
7  also the intent of the County Recorders as a whole to try to
8  do the same -- try to do the same processes to make consistent
9  -- to make it consistent across the State regardless of where
10  a voter is.  So if we're all doing similar things, there's
11  less chance of us doing something outside the scope of another
12  county.
13  Q.   Is it also your understanding that the VRAC papers don't
14  contradict, but supplement the EPM?
15  A.   Yes, that is my understanding.
16  Q.   Is it your understanding that outside of the EPM and
17  VRAC, no other documents originating from the Secretary of
18  State's office are binding on County Recorders' offices, such
19  as e-mails and memos?
20  A.   We take the information from the Secretary of State's
21  office as advisory and any additional supplemental documents
22  or guides that they provide us we would use to help guide our
23  policies and our practices.
24       But an example of that would be that we have a guide
25  telling us how to review signatures for petitions that are

1  being challenged.  So that is a guide from the Secretary of

2  State's office that we all use.

3  Q.   Absent an injunction, are you required to enforce these

4  new statutes that are challenged in this litigation,

5  regardless of what makes it into the EPM, that the Secretary

6  of State, Attorney General and Governor sign off on?

7  A.   Yes, that is correct.  We are required to uphold the

8  Arizona State statute laws as written.  That's our

9  responsibility as election officials.

10 Q.   If there's no guidance in the EPM on a particular

11 election statute, for instance, in the two-year period between

12 revisions of the EPM, how does the County Recorder's office go

13 about enforcing that new law?

14 A.   Well, we look towards the Secretary of State's office for

15 guidance.  As the chief election official for the State of

16 Arizona, we look to the Secretary to provide all of us

17 guidance on how to do certain activities.  And then with any

18 guidance that is provided by the Secretary's office, we would

19 work with our attorney to determine if that -- that guidance

20 is within the scope of our duties and within the law.

21       For laws that are particularly vague or

22 contradictory, it can make enforcing them very difficult for

23 us and so we would rely heavily on the Secretary's office to

24 give us some -- some guidelines that we can all use; but,

25 again, we would constantly refer back to our own counsel.

1   Q.   And just so the record's clear, any guidance that the

2   Secretary -- or guidelines that the Secretary of State

3   promulgated or issued between EPM revisions, that would be

4   advisory, but not binding on the County Recorders, correct?

5   A.   That would be correct.

6   Q.   Has the office -- has the Pima County Recorder's Office

7   been enforcing HB2492 and HB2243?

8   A.   We are still waiting on guidance on how to do that.  At

9   the time of my tenure, we were still waiting on guidance on

10  how to do that.  We -- I can't speak for what the office is

11  doing now.

12  Q.   Okay.  So the absence of guidance on how to implement the

13  laws was the main reason for not enforcing HB2492 and HB2243?

14  A.   I would say that that is an accurate description, yes.

15  So without guidance, the ability for us to know -- there's

16  contradictory parts to those laws with federal law.  So --

17             MR. LANGHOFER:  Legal conclusion.

18             THE COURT:  Overruled.

19             You may complete your answer.

20             THE WITNESS:  So our understanding's from -- through

21  our attorney is is that we're either breaking federal law or

22  we're breaking state law, and so it kind of puts you in the

23  ability of, well, which -- what do we do?

24             So in the absence of guidance, we continued to

25  operate the same way we did prior to the passage of the bills.

1   BY MR. SHERMAN:

2   Q.   Does the County Recorder's office work with its attorneys

3   to interpret and implement new election laws such as those

4   challenged in this lawsuit?

5   A.   We do.

6   Q.   Where is the County Recorder's office in that process for

7   HB2492 and HB2243, if you know?

8   A.   At the time of my tenure, we were still waiting on a

9   decision from the Court.  I do not know where the office

10  stands on that today.

11  Q.   Understood.  I want to shift gears a bit and ask you a

12  bit about the databases that are enumerated in both HB2492 and

13  HB2243, and just starting with ADOT or the MVD database.

14       When a HAVA check shows that a voter registration

15  applicant still has an F-type or foreign-type license in MVD's

16  data, does your office understand that to be information that

17  the applicant is not a US citizen?

18  A.   It can be understood that the -- that the applicant is

19  not a US citizen absent any additional information on the

20  voter registration record, such as a naturalization number.

21            So if a -- some voters when they are naturalized

22  will register to vote at their naturalization ceremony.  And

23  so we will register them, we will get their voter registration

24  information, and we will take those registration forms back to

25  the office, upload them into the system.  So there's -- their

 1   voter application can still have an F-type license and a

 2   naturalization number and they are -- so the F-type license

 3   doesn't play an impact to whether or not they are a citizen.

 4   Q.   Understood.  Maybe I'll ask this a different way.

 5        When you run a HAVA check and it turns up information

 6   that someone's -- that registration applicant has an F-type

 7   license in MVD's records, that's not conclusive as to their

 8   citizenship status, correct?

 9   A.   Correct.

10   Q.   Okay.  And just stating it another way, can your office

11   use this MVD data to confirm a lack of US citizenship --

12             MR. LANGHOFER:  Vague.

13             MR. SHERMAN: -- or do you have to take other steps?

14             MR. LANGHOFER:  Vague.

15             THE COURT:  Overruled.

16             You may answer.

17             THE WITNESS:  I -- I would say that we would take

18   additional steps.  The -- if it's a new registration that we

19   are inputting into the system, we would do follow-up steps.

20   It is -- the question that you've asked is a very technical

21   question on procedure, and I think that it really would be --

22   it depends on who's doing -- who's inputting the information

23   and who their supervisor is as to how many additional extra

24   steps they would take.

25             As I previously stated, we have a first check,

1   second check procedure, but for things like that, that would

2   probably -- a supervisor would most likely get involved and

3   provide additional guidance.

4   BY MR. SHERMAN:

5   Q.   When you -- when a HAVA check turns up MVD data showing

6   an F-type license, your office sends that person a notice

7   asking them for DPOCs, correct?

8   A.   Correct.

9   Q.   Okay.  Do you know whether an expired Arizona driver's

10  license or a de-issued after October 1st, 1996, that is

11  associated with DPOC, can be used to verify an individual's

12  citizenship?

13  A.   The use of an expired license on a form?

14  Q.   An expired Arizona driver's license or ID, the number or

15  the ID itself.

16  A.   I think that our procedure stated it has to be an active

17  driver's license.

18  Q.   Okay.  Putting citizenship aside just for a moment, if

19  you had evidence that two years ago a person was enrolled in a

20  college in another state, would that be information that they

21  weren't an Arizona resident today?

22           MR. LANGHOFER:  Foundation, speculation.

23           THE COURT:  Sustained.

24  BY MR. SHERMAN:

25  Q.   So back on citizenship.  Because this MVD data showing

Haley Hiser - Cross-Exam by Mr. Sherman                2019

 1  F-type licenses issued in the past is not conclusive as to

 2  citizenship status, what's your understanding as to whether it

 3  constitutes information that someone isn't a citizen?

 4          MR. LANGHOFER:  Legal opinion.

 5          THE COURT:  I'm sorry, I couldn't hear what you

 6  said.

 7          MR. LANGHOFER:  Legal opinion.

 8          THE COURT:  Overruled.

 9          You may answer concerning the practices at the Pima

10  County Recorder's office.

11          THE WITNESS:  I'm not sure that I quite understand

12  your question.

13  BY MR. SHERMAN:

14  Q.   Sure.  I can repeat it.  Because this MVD data showing

15  F-type licenses issued in the past is not conclusive as to

16  citizenship status, what's your office's understanding as to

17  whether it constitutes information that someone isn't a

18  citizen?

19  A.   I don't think that we would say that that constitutes

20  information that they're not a citizen.  It would just require

21  us to do additional follow-up.

22  Q.   Understood.

23          THE COURT:  Let -- let me ask Ms. Hiser a question.

24          Ms. Hiser, have you ever run across a situation

25  where you were given with the voter registration form a copy

1  of a naturalization certificate for the applicant and then you

2  ran the check through Motor Vehicles and showed F-type

3  license?

4              THE WITNESS:  Yes, we've had that happen.

5              THE COURT:  And if you have the actual

6  naturalization certificate, do you then just assume that the

7  F-type -- the F-type of the license is stale information and

8  register the voter without any other procedures?

9              THE WITNESS:  Yes, we would go ahead and register

10  the voter because the naturalization certificate is the

11  documentary proof of citizenship.  So people who come in and

12  provide us a birth certificate for a birth in the United

13  States or a US territory or on a US military base, we would

14  accept that.  We would accept the naturalization form

15  certificate that's issued to a citizen.

16              A newly-naturalized citizen, we accept the -- copies

17  of a valid, non-expired US passport.  So the documentary proof

18  of citizenship is the controlling factor as to determine

19  whether or not that person is a citizen on the form.

20              So, as I stated, if you -- you could have an F-type

21  license and then be naturalized and your license has not yet

22  changed with the DMV; but that certificate, that would be --

23  we would follow the certificate.  We would disregard the

24  F-type license as an indicator that the person is not a

25  citizen.

1          Did that answer your question, Your Honor?

2          THE COURT:  Yes, it did.  Thank you.

3   BY MR. SHERMAN:

4   Q.   Is there a separate field in AVID that indicates whether

5   a registrant has previously provided DPOC?

6   A.   In AVID or in the Pima County voter registration

7   database?

8   Q.   Excuse me, sorry.  Is there a separate field in Pima

9   County's voter registration database that indicates whether a

10  registrant has previously provided DPOC?

11  A.   Yes, there is.

12  Q.   And that separate voter registration database is called

13  Voter, correct?

14  A.   Correct.

15  Q.   If your office were checking a registration, are you able

16  to tell if that registered voter ever previously provided DPOC

17  without doing some extra step?

18  A.   Are you -- are you asking would we -- if the field in

19  Voter was not checked, would we do additional research through

20  another database?

21  Q.   I'll -- I'll retract the -- I'll retract the question and

22  ask it a different way.

23       Is that -- is that field that you just mentioned before

24  that would show previously provided DPOC, is that readily

25  viewable or do you have to perform some extra step, click on

 1    somewhere else to bring it up?

 2    A.    The field itself is viewable for a voter alert.  So when

 3    you're in the system and you bring up the voter registration

 4    record, we can see that information in the voter's record.

 5    For the information you can -- the Pima County Recorder's

 6    office has public terminals in our lobby where people can look

 7    up voter registration, information about Pima County voters,

 8    and it will show only certain aspects of the voter

 9    registration record for the public.  That is not one of the

10    fields that's viewable by the public.

11    Q.    Understood.  If the HAVA check turns up an F-type license

12    in MVD's records, that MVD data will override the authorized

13    presence value in Voter that shows the person is a US citizen;

14    is that correct?

15    A.    It's really a development question.  My understanding of

16    the way the system works is, no, it won't.  We'd have to

17    import the information.  So the import of the information then

18    has to be mapped to the system.

19         So think of it like this:  Voter talks to AVID and can

20    download information into AVID and can upload information into

21    AVID, and then voter is able to get information from the --

22    the -- the DMV information, I believe, goes through AVID,

23    which then comes through us.

24         And so we would map the files in the system.  So there's

25    a download from the system and then the system does an

 1  automatic mapping and updates, and then there's a quality

 2  control check that is done on the development side.  So if the

 3  field has "citizen" checked, and it is checked even if the

 4  field from DMV comes back as F, the way our -- my

 5  understanding of the way that we've developed the Voter system

 6  is is that our internal field controls.

 7      If there's nothing within that internal field, then the

 8  information that's downloaded will update, but, again, that's

 9  a really -- that's a technical question related to the

10  development of the system.

11  Q.   Might this turn on some of the technical differences

12  between Pima County's system Voter and the statewide voter

13  registration database AVID, such that the MVD data might

14  override that authorized presence value in AVID, but not in

15  voter?

16          MR. LANGHOFER:  Foundation.

17          THE COURT:  Sustained.

18          MR. SHERMAN:  Understood.  I'll move on.

19  BY MR. SHERMAN:

20  Q.   Before moving away from MVD data, I want to ask you about

21  one document.

22          MR. SHERMAN:  Stephen, could we pull up Plaintiffs'

23  Exhibit 220.

24  BY MR. SHERMAN:

25  Q.   Ms. Hiser, can you see this document on your screen?

1   A.    Yeah.  It's kind of blurry, but yes.

2   Q.    Are you able to read this document now that it's zoomed

3   in?

4   A.    Yes.

5   Q.    Okay.  Ms. Hiser, what is this document?

6   A.    This is an AVID -- looks like it's an AVID ticket and a

7   follow-up with an issue that we encountered with the voter and

8   AVID information.

9   Q.    And you were in the "To" line for this e-mail, correct?

10  A.    Yes.

11  Q.    And do you remember receiving this e-mail?

12  A.    I received a lot of e-mails in my tenure, but I do recall

13  this one, yes.

14          MR. SHERMAN:  Your Honor, I'd like to move that

15  Plaintiffs' Exhibit 220 be admitted.

16          THE COURT:  Is there any objection?

17          MR. LANGHOFER:  No, Your Honor.

18          THE COURT:  Without objection, Exhibit 220 is

19  admitted.

20          (Exhibit No. 220 admitted into Evidence.)

21  BY MR. SHERMAN:

22  Q.    Ms. Hiser, if I could ask you to take a minute to review

23  this e-mail, and then I just have a few questions about it.

24        Just let us know when you're finished.

25        I think the first page is sufficient, so whenever you're

 1    done with the first page, we can...

 2    A.    I'm done with that email.

 3    Q.    Thank you.  Do you recall the circumstances of this

 4    incident from last year?

 5    A.    Yes, I do.

 6    Q.    And what happened?

 7    A.    We had a -- there was an issue among several states.

 8    Pima County was impacted where some of our voters -- when we

 9    downloaded some information from AVID through -- I don't -- to

10    this day, I still don't quite understand the technical issues

11    that this caused; but the bottom line was, is that some of our

12    voters who were registered were registered as non-citizens and

13    so got a fed-only ballot, rather than citizens and got a full

14    Arizona ballot.

15    Q.    So this was a database matching error, in your

16    recollection?

17    A.    Yes.

18              MR. SHERMAN:  And, Stephen, if you could just

19    highlight -- or scroll down to the third paragraph here and

20    just highlight that.

21    BY MR. SHERMAN:

22    Q.    And these were Pima County voters who were, in fact,

23    full-ballot voters, correct?

24    A.    They were.

25    Q.    And they were erroneously flagged as --

1           MR. SHERMAN:  Sorry, Stephen, I meant the paragraph

2   above.

3   BY MR. SHERMAN:

4   Q.   And these were -- these were full-ballot voters who had

5   been erroneously identified as federal-only voters, correct?

6   A.   That is correct.

7   Q.   And the last line of this paragraph that's highlighted,

8   what does that reflect, the last sentence?

9   A.   That indicates that at the time it appeared that we had

10  mailed out 558 records, 58 early ballots from this group, and

11  so we were assuming that 558 voters were -- had a federal-only

12  ballot when they should have had a full ballot.

13  Q.   And what did your office have to do after those voters

14  were erroneously mailed federal-only ballots?

15  A.   We did two things.  We updated their records immediately

16  and then we mailed them -- if they hadn't returned a ballot

17  yet, we mailed them a full ballot and contacted them with the

18  explanation as to why they were getting a -- a new ballot.

19           And for voters who had returned an early ballot

20  already, if it had not gone in a batch over to tabulation, we

21  isolated and held those ballots, contacting those voters

22  letting them know that they were entitled to get a full

23  ballot.  We would have given the option of having another

24  ballot mailed to them or having them come to an early voting

25  location and casting a full ballot.

1  Q.   Just a minute ago you had referred to these individuals

2  as non-citizens.  Did you mean that they were registered as

3  federal-only voters?

4  A.   I misspoke, yes.  Federal -- registrants who do not

5  provide proof of citizenship are considered federal-only

6  voters.  They -- because they lacked documentary proof of

7  citizen, so they're just fed-only voters.  They most -- you

8  know, they could be a citizen, but without -- until further

9  proof we treat them as a fed-only voter.

10 Q.   And, in reality -- just to clear up the record, in

11 reality, these were, in fact, full-ballot voters not

12 federal-only voters, correct?

13 A.   That is correct.

14 Q.   Okay.  Did any of them call the office or complain or ask

15 questions as to why this had occurred?

16 A.   I think we might have gotten one or two people, but it

17 turned out to be a much smaller number than even this

18 indicates, if I recall.

19 Q.   Okay.  Just one other question on MVD.  Is the field that

20 shows DPOC was provided in the past, is that sent up to AVID

21 so it can be seen if the voter later moves to another county?

22 A.   We don't scan the DPOC, so it's -- the DPOC doesn't stay

23 as a digital record.  It doesn't -- a scanned digital copy

24 doesn't stay with their record.

25 Q.   Sorry.  Not -- yeah, not a scanned copy of the DPOC

 1   itself, but the indication, the data in Voter indicates --

 2   A.   Yes.

 3   Q.   Okay.  So that's --

 4   A.   Yes, the field --

 5   Q.   -- uploaded to AVID?

 6   A.   Yes.

 7   Q.   Okay.  So I want to shift and ask you about the SAVE

 8   system.  If you send a notice -- a notice letter out asking

 9   for DPOC and the registrant responds with an alien

10   registration number or a naturalization certificate number,

11   what does your office do with that number?

12   A.   We would run it in SAVE just for new registrants.

13   Q.   And if SAVE returns a match to a record of a natural --

14   of naturalized or derived citizenship, that person is

15   registered as a full-ballot voter, correct?

16   A.   Correct.

17   Q.   And that's conclusive information that the person is a US

18   citizen, right?

19   A.   Yes.

20   Q.   But if the initial search turns up a status other than --

21   other than, you know, confirmed naturalized or derived

22   citizenship, is that conclusive information that the person is

23   not a US citizen?

24   A.   I think we would treat it at the time as conclusive

25   information because it's coming from the federal government.

Haley Hiser - Cross-Exam by Mr. Sherman                    2029

1   Q.   Can you use SAVE to confirm a lack of US citizenship?

2   A.   I think in that instance --

3            (Zoom connection lost.)

4            COURTROOM DEPUTY:  Uh-oh.  She's still there.  Hold

5   on.  Let me tell her to stop talking.

6            I'm sure she's still there.

7            Can you ask her if she can hear us?

8            MR. SHERMAN:  Can you hear us, Ms. Hiser?

9            THE WITNESS:  I can.

10           MR. SHERMAN:  Okay, great.

11           COURTROOM DEPUTY:  She's still talking.  Hold on,

12  let me tell her to stop talking.  I'm sure she's still there.

13           (Discussion off the record with Systems.)

14           COURTROOM DEPUTY:  Can you hear us, Ms. Hiser?

15           THE WITNESS:  I can.

16           MR. SHERMAN:  Okay, great.

17  BY MR. SHERMAN:

18  Q.   So when the line dropped off we were talking about SAVE.

19  I'll ask the question that's pending again.

20       So can you use save verification to confirm a lack of US

21  citizenship?

22  A.   What I was saying when we dropped off was in that

23  instance we would send out a letter.  So we would send out

24  notice that you've registered to -- we received your  voter

25  registration form, we're processing your voter registration.

UNITED STATES DISTRICT COURT

1  You'll get a -- you'll be registered as a federal-only voter

2  until we receive documentary proof of citizenship.

3       So we would put back on the onus of the voter -- the

4  registrant to provide the information.

5  Q.   And your office follows this procedure both when

6  information is turned up in SAVE, other than naturalized or

7  derived citizenship, or when there's no match whatsoever,

8  correct?

9  A.   I think so, unless they've changed it.

10 Q.   Is your office familiar with USCIS's additional

11 verification procedures?

12 A.   In what respect?

13 Q.   So you said if initial verification in SAVE fails, you

14 send out a notice letter.  Do you do anything -- does your

15 office do anything else with USCIS to try to verify the

16 nationalized or derived citizenship of that applicant?

17 A.   No, not to my knowledge.

18 Q.   Are there other individuals in the Pima County Recorder's

19 office who are responsible for SAVE verification?

20 A.   Yes, so that would be the voter manager and the voter

21 supervisors.  They would be the individuals and the voter

22 specialist so. . .

23 Q.   And so it may be that --

24 A.   The structure -- so the structure would be the chief

25 deputy, the assistant chief deputy, the voter manager, voter

1  supervisor, voter specialist, voter clerk.

2  Q.   Understood.  So those individuals may be engaging in

3  additional verification procedures, initiating additional

4  verification procedures with USCIS even if you're not plugged

5  into that process, correct?

6  A.   Very possible, yes.

7  Q.   Okay, understood.  Are there any other sources of

8  information beyond MVD and SAVE that your office can use to

9  confirm US citizenship?

10 A.   Other than provided by the voter registrant, we don't use

11 any other additional databases that I'm aware of.

12 Q.   Are there any other sources of information that your

13 office can use to confirm a lack of US citizenship?

14 A.   Not that I'm aware of, no.

15 Q.   Are you aware of any databases beyond MVD and SAVE that

16 have information on US citizenship or lack thereof?

17 A.   I don't know about citizenship.  The Social Security

18 database provides information to the Secretary of State, which

19 is then funneled down to us regarding death of individuals.

20 Q.   But not information on citizenship, correct?

21 A.   Not that I'm aware of, no.

22 Q.   Okay.  Do you know if it's possible to confirm that a

23 person is not a US citizen?

24 A.   Through the use of one of those databases?

25 Q.   In any -- for the purposes of this question, in any

```
 1  method.
 2  A.    No, we have no way to confirm unless we're given
 3  documentary proof.
 4  Q.    Would your office consider a phone call, e-mail or letter
 5  announcing a lack of US citizenship to be information that the
 6  person calling, e-mailing oro writing is not a US citizen?
 7              MR. LANGHOFER:  Objection, lack of foundation.
 8              THE COURT:  Sustained.
 9              I've sustained the objection, Ms. Hiser.
10  BY MR. SHERMAN:
11  Q.    Would your office consider --
12              MR. SHERMAN:  May be heard on these questions?
13              THE COURT:  No.
14              MR. SHERMAN:  All right.  Why don't we show
15  Connor -- why don't we bring up Day 2 of the trial testimony.
16              THE COURT:  Okay, we're going to take a break.
17  We're going to reconvene in fifteen minutes.  Court is in
18  recess until five minutes after 3:00.
19              COURTROOM DEPUTY:  All rise.
20              (Recess taken at 2:51 p.m.)
21              COURTROOM DEPUTY:  All rise, court is now in
22  session.
23              (Back on the record at 3:06 p.m.)
24              THE COURT:  Thank you, please sit down.
25              Mr. Sherman, you may continue your cross-examination
```

1   of Ms. Hiser.

2           MR. SHERMAN:  Thank you, your Honor.

3   BY MR. SHERMAN:

4   Q.   Ms. Hiser, while you were in the Pima County Recorder's

5   office, was there any policy or practice on what to do if you

6   received information from law enforcement, private groups,

7   private citizens regarding the citizenship status of

8   applicants or registered voters?

9   A.   There was no defined policy.  If we had received

10  information from law enforcement, which we did not during my

11  tenure, but that's not to say it hasn't happened, we would

12  take the information from law enforcement and speak with legal

13  counsel regarding next steps.

14       During my tenure we did have private groups and

15  individuals provide us information about the registration of

16  people.  Not specifically citizens, but people that they

17  believed had moved out of the jurisdiction and in those

18  instances we discussed with our counsel as to whether or not

19  we do additional research to verify that information based off

20  of our resources and if we had the time.

21  Q.   And so there were multiple instances when this occurred?

22  A.   After the 2020 Election, there was an increase in the

23  number of groups who considered themselves citizen election

24  integrity investigators, and so we would get correspondence

25  from those groups or individuals regarding -- based on the

1    voter rolls and would provide us things like screenshots of

2    files that would update or Facebook showing that somebody had

3    moved or something like that or links to recorder -- recorder

4    documents and other states or counties showing that somebody

5    had moved as reasons as to why to remove someone from our

6    voter rolls.

7           The first couple of times it happened it was just they

8    were small numbers so, you know, spend time kind of looking at

9    those individuals and see that those voters -- the

10   registrations had been updated, as was necessary based off the

11   information we were provided from the updates to addresses

12   from the post office, things like that.

13          So a lot of these people that they were looking at we'd

14   already had a updated registration on them, and then on some

15   of the other ones it was questionable, at best.

16          Towards the end of 2021 and starting in 2022 they would

17   be more frequent.  There's one particular group that's their

18   goal is to identify voters who are -- should not be on the

19   voter rolls in states.

20   Q.   And you dealt with these situations on a case-by-case

21   basis with your counsel?

22   A.   Correct.

23   Q.   Did you issue any kind of written, memorialized guidance

24   for all staff on how to deal with these occasions?

25   A.   No.

Haley Hiser - Cross-Exam by Mr. Sherman                    2035

 1  Q.   Understood.
 2              MR. SHERMAN:  Stephen, if we can pull up the Day 2
 3  AM trial testimony.  I just want to for just a quick minute
 4  have you look at PDF Page 85 of this.  This was Judge --
 5  excuse me, this was Colleen Connor's testimony on Day 2.  If
 6  you could look at Lines 2 through 23 and just let me know when
 7  you're finished.
 8              THE WITNESS:  Okay.
 9  BY MR. SHERMAN:
10  Q.   So Ms. Connor's testimony reflects the County Recorder's
11  offices must use their discretion to decide what is a reason
12  to believe a registered voter is not a US citizen, correct?
13  A.   That is correct.
14  Q.   And in practice, that might mean not just the discretion
15  of the County Recorder or him or herself, but the discretion
16  of their staff, correct?
17  A.    In an office the size of Pima County, yes, it would be
18  the discretion of the staff.
19  Q.   How many different people in the Pima County Recorder's
20  Office do you think would be responsible for enforcing a
21  provision like the "reason to believe" provision in HB2243?
22  A.    To enforce it?  Well, as I stated earlier, there's a
23  structure, right.  So there's the chief deputy, the assistant
24  chief deputy, the voter manager, voter supervisors, voter
25  specialists and voter clerks.

Haley Hiser - Cross-Exam by Mr. Sherman                    2036

1       So the clerks would do the information.  The specialists

2   would resolve any sort of outside-of-the-box issues or

3   concerns.  If they weren't able to resolve it, it would go to

4   a supervisor.  The supervisor would then make a decision.  If

5   they weren't able to make a decision, it would go to the

6   manager, and then up the chain of command.

7   Q.   And how many people are in the each of these roles? I

8   know you've left the office, but at the time you were in the

9   office how many people were in each of these roles?

10  A.   One chief, one assistant chief, one manager, three

11  supervisors, three specialists and then there were many more

12  clerks.  So maybe six or seven clerks.

13  Q.   Understood, thank you.  If a registered voter is removed

14  from the rolls based upon an erroneous determination that they

15  are not a US citizen, what is your understanding as to whether

16  that voter can be added back to the rolls if the registration

17  deadline has already passed?

18          MR. LANGHOFER:  Legal conclusion.

19          THE COURT:  Overruled.

20          You can tell me if -- what the practice or procedure

21  was in your office.

22          THE WITNESS:  In the County Recorder's office, if we

23  had determined that we had made the mistake and incorrectly

24  removed someone based off of information we received, we would

25  reinstate the person.

1    BY MR. SHERMAN:

2    Q.   Are you aware of any law, regulation, EPM guidance or

3    anything else that tells County Recorder offices what to do if

4    they learn after the registration deadline that a registered

5    voter has been removed from the rolls based upon an erroneous

6    determination?

7    A.   There's here's nothing in the guides that I am aware of

8    that would certainly -- in instances like that, that would

9    definitely be a call the Recorder would make in conjunction

10   with advice from counsel.

11   Q.   Did your office have an established policy or practice on

12   this?

13   A.   Not an established one, no.

14   Q.   One last question on DPOC and citizenship verification.

15        What is the language -- what languages are the DPOC

16   notice letters available in?

17   A.   English and Spanish.

18   Q.   Okay.  So you send out English and Spanish notice

19   letters.  Any other languages?

20   A.   Not at this time, no.

21   Q.   Okay.  Just a few more questions, then I'll be done.

22        Prior to the passage of HB2492 and HB2243, was it already

23   illegal in Arizona for a non-citizen to register to vote?

24             MR. LANGHOFER:  Legal decision --

25             THE WITNESS:  Yes.

UNITED STATES DISTRICT COURT

1                 MR. LANGHOFER:  -- cumulative.

2                 THE COURT:  Overruled.  The answer "yes" will stand.

3     BY MR. SHERMAN:

4     Q.   And prior to the passage of HB2492 and 2243 did Arizona

5     already have policies, laws or procedures in place to prevent

6     non-citizens from registering to vote?

7     A.   Yes.

8     Q.   Based on your experience in the County Recorder's office,

9     do the Pima County Recorder's offices' protocols for

10    registering voters effectively mitigate the risk of his

11    non-citizens voting in Pima County?

12                MR. LANGHOFER:  Improper legal opinion, testimony,

13    Your Honor.

14                THE COURT:  Overruled.  You may answer.

15                THE WITNESS:  Yes, I believe the Pima County

16    Recorder's office procedures did a very good job of

17    registering people who were supposed to be -- who were legally

18    allowed to be registered and not registering people who were

19    not allowed to be legally registered, including people who

20    were not citizens.

21    BY MR. SHERMAN:

22    Q.   Do the Pima County Recorder's office's protocols also

23    effectively mitigate the risk of non-residents voting in Pima

24    County?

25    A.   Yes.

 1   Q.   Based on your experience, do you think it is plausible

 2   that tens of thousands of non-citizens are voting in Arizona

 3   elections?

 4            MR. LANGHOFER:  Improper opinion.

 5            THE COURT:  Sustained.

 6   BY MR. SHERMAN:

 7   Q.   At least as of the time you left the Pima County

 8   Recorder's office, did the office have any information or

 9   documents regarding even a single instance of a non-citizen

10   registering or voting in Pima County in the past decade?

11   A.   Not that I'm aware of, no.

12            MR. SHERMAN:  I'll pass the witness to my -- I think

13   my colleagues just have a few questions, and then we'll pass

14   the witness.

15                        CROSS-EXAMINATION

16   BY MS. LANG:

17   Q.   Good afternoon, Ms. Hiser.  My name's Danielle Lang, and

18   I represent the LUCHA plaintiffs in this matter.  It's nice to

19   meet you.  I just have a few questions for you so I won't take

20   up too much of your time.

21        Mr. Langhofer asked you about a term you used.  You said

22   something about the NVRA process, and he asked you if you that

23   was referring to the National Voting Rights Act.

24        Do you know if that term is actually the National Voter

25   Registration Act that you were referring to?

1   A.   Yes, that's the actual term.  I misspoke.

2   Q.   No problem, I just wanted to make sure the record was

3   clear on that question.

4        I think you mentioned that you -- you spoke with

5   Mr. Whitaker a little bit about issues with voter registration

6   forms during the 2022 cycle, and then he asked you about other

7   voter -- or other election cycles.

8        You have no personal knowledge of any issues related to

9   voter registration forms during the 2020 Election; isn't that

10  correct?

11  A.   That's correct, I wasn't with the office during that

12  election.

13  Q.   Okay.  And in the 2022 cycle you were able to identify

14  these problematic forms that had been -- that had been turned

15  in by voter registration groups; is that correct?

16  A.   Yes.  So any form that was determined to be problematic

17  or have an issue with it, we internally designated it as a

18  "trouble," which just simply means that there is something on

19  it that requires additional investigation, additional support,

20  any number of reasons a form can be considered a trouble, and

21  it just basically requires follow-up.

22       The trouble forms are kept through the full election

23  cycle, and they're logged in the system kind of like a --

24  they're not -- it's not like a register -- they're not

25  registering the individual.  They're logging the form as a

1    trouble so it's kind of like a suspended status, and during

2    the ballot cure period of an election once -- so on election

3    day anybody who goes to a vote center in Pima County or a

4    polling location in another county and they do not show up on

5    the roll for whatever reason, they're issued a provisional

6    ballot or a conditional provisional ballot depending on what

7    they've provided to the poll.

8        And during that period of time after the election all of

9    the provisionals, the provisional ballots and conditional

10   provisional ballots, are given to the Recorder's office and

11   then the Recorder's office goes through a process to find --

12   basically, find the voter to see whether or not the person was

13   able to vote in the election.

14       So one of the things that we do when we've -- are

15   processing the provisional ballot envelopes is to go through

16   the trouble file and see if we can actually find a voter

17   registration form for the person who has cast a provisional

18   ballot.  If we are able to find the voter registration form

19   and see that it was received by our office before their

20   cut-off date, then that provisional ballot will then be

21   processed because they did register to vote; and then we would

22   do the necessary follow-up with the voter and things that

23   like.  So that -- that's how we used the troubles and say, you

24   know, here's -- this provisional is good to go.

25       Once the election has closed and the cycle has closed,

 1  then all of those trouble forms would then be archived and

 2  they would go into archivings.

 3      I'm not sure if that actually answered your question.

 4  Q.  Somewhat.  So that was all very helpful background,

 5  Ms. Hiser, but I think my question is a little narrower and

 6  hopefully easier for you to answer, which is, Mr. Whitaker was

 7  talking to you specifically about some identified problems

 8  with voter registration groups turning in plainly incorrect

 9  voter registration forms, correct?

10  A.  Correct.

11  Q.  And I just wanted to verify with you that your office had

12  procedures in place that you were able to identify those

13  plainly incorrect voter registration forms from groups,

14  correct?

15  A.  Yes.

16  Q.  And those voter registration forms didn't turn in to

17  active voter registrations because they'd been identified by

18  your office?

19  A.  That is correct.

20  Q.  And that's even without having these laws be -- that are

21  challenged here today, HB2492 and 2243 in effect, correct?

22  A.  That is correct.

23  Q.  Okay.  Mr. Whitaker also talked to you about the Voter

24  Registration Advisory Committee as an opportunity to create

25  uniformity across the County Recorders.

Haley Hiser - Cross-Exam by Ms. Lang

1    As of when you left the office, do you recall the last
2  time that committee had actually issued a paper?
3  A.  They had not issued a -- they had not approved a paper
4  for quite some time.  We had had some draft VRAC papers that
5  had been circulating, but nothing the Recorders had formally
6  adopted as a committee.
7    I think that the last full VRAC paper that had been
8  adopted was maybe the tail end of 2020, maybe early 2021, but
9  it had been quite a while since we had a full VRAC paper
10  adopted.
11  Q.  Thank you.  You also mentioned kind of this uptick in
12  what you termed kind of citizen election integrity
13  investigators.
14    In your experience with those communications, were they
15  often providing reliable information about voter registration
16  status?
17  A.  Hit and miss, I guess.  It would just cover the -- it
18  would just cover like a variety of different information, and
19  they would get information from, you know, social media
20  sometimes.  Sometimes they would get information from, like I
21  said, recorded documents in other jurisdictions.
22    We -- information that we would have taken -- given a
23  little bit more weight to and done further investigation would
24  have been information like copies of voter registration
25  records from other jurisdictions and, you know, perhaps copies

1    of records showing that voters had voted in other

2    jurisdictions while still registered in our own jurisdiction.

3        The thing about these election integrity groups is they

4    would focus on voters who were -- who wouldn't -- who wouldn't

5    show up on an ERIC cross state match.  So the ERIC databases

6    -- it's kind of an electronic clearinghouse for many states to

7    upload their voter registration information so other states

8    can see it and see -- it's how we use -- that's how we figure

9    out if he's double voted in other states after elections.

10       Not every state participates in ERIC, and the voters

11   from -- from my recollection that they would call out would be

12   from states that weren't ERIC participants.  So some of the

13   information might have been good and some of the information

14   might have been bad, and then some of the information was just

15   a misunderstanding of what it -- of registration laws here in

16   Arizona.

17       I think one that came to mind was we got a list of -- it

18   was like 30 voters who the request was that we remove the

19   voters from the roll because the voters were incorrectly

20   registered to commercial addresses and in Arizona you -- you

21   have some voters who are registered at commercial addresses

22   because they -- that's where they park their -- their RV and

23   so that's the parking lot that they park in or their houseless

24   and that's the area that they -- they live in so the cross

25   streets are the places that they -- so we would have people

 1   like that asking to remove people because the address itself

 2   was a commercial address and it's not eligible.

 3        So it's things like that of not understanding the nuances

 4   of voter registration in Arizona.

 5   Q.   And would following up on every piece of information

 6   provided by these investigators be a drain on the County

 7   Recorder's resources?

 8   A.   Yeah.  I mean, there's 630,000 registered voters in Pima

 9   County, and sometimes we would get, you know -- I think one

10   time we got, like, a list of 4,000 voters that they said

11   needed to be removed.

12   Q.   Right.

13   A.   But I -- so. . .

14   Q.   Thank you.  I'm going to move on to a different topic,

15   which is to is ask you briefly about HB2492 documentary proof

16   of residence requirement.

17        Are you familiar with that residence documentation

18   requirement?

19   A.   Yes.

20   Q.   Okay.  Based on your experience in voter registration,

21   are there certain populations that might struggle more than

22   others to comply with that requirement?

23   A.   Absolutely.

24   Q.   And could you identify some of those groups of voters

25   that would struggle more than others?

1   A.   Well, the people who are transient and that's not -- that

2   could be people who have an RV and they -- they do camping.

3   That could be people who are houseless and they don't have a

4   fixed residence that they go to.  It could be -- there's a

5   variety.  Those are the two that come to mind immediately, but

6   yes.

7        Particularly for houseless voters, if they don't live in

8   a fixed residential, you know, domicile or they're not going

9   to a shelter consistently and they just have an area that they

10  -- a lot of people in Pima County who are houseless, they pick

11  a particular area of the county and that's kind of where they

12  stay and they camp there.

13       So we would register -- we'd get registrations of where

14  they would have the major cross streets of where their camp

15  was, and then we would help them find the closest post office

16  that would have general delivery to those major cross streets,

17  and that's how we would get them their registration.

18       Or often times, a lot of people would register them at

19  the Justice Court, so 240 N. Stone is Pima County Justice

20  Court.  It's also the location of the Recorder's office.  So

21  they would use the Justice Court as the registration, which is

22  totally acceptable under state law.

23  Q.   Right.  Are you familiar with the LULAC Consent Decree?

24  A.   I -- I am familiar with it.  I am not familiar with its

25  details.

1    Q.    Okay.  Is your general understanding of the consent

2    decree that it required County Recorders to treat state form

3    and federal forms equally as to documentary proof of

4    citizenship?

5    A.    Yes.

6    Q.    Okay.  So I'll kind of submit to you as some foundation

7    here that there's a question about whether or not state and

8    federal forms might be treated differently as to documentary

9    proof of residence in this case.

10        So a circumstance where someone who turns in a federal

11   form without documentary proof of residence could become a

12   federal-only voter, and a person who turns in a state form

13   without documentary proof of citizenship would be rejected

14   altogether.

15        So with that background, based on your experience with

16   voter registration, is there -- is there a -- does the federal

17   form application provide the Recorder with any additional

18   information about residence that's not provided on the State

19   form?

20   A.    No, the information on the federal form hits all of the

21   required boxes on the state form.

22   Q.    And sitting here today, can you think of any election

23   administration reason to register federal form applicants that

24   do not provide that documentation of residence, but not state

25   form applicants that do not provide residence documentation?

1   A.    I'm sorry, I don't quite understand your question.

2         Are you asking me is there -- would I think it's okay to

3   register someone with a federal form without documentary proof

4   of residence --

5   Q.    No.

6   A.    -- but not register?

7   Q.    Yeah, let me rephrase because this is a hard thing to

8   kind of get at.

9         Basically, can you think of any kind of election

10  administration reason why you would treat state and federal

11  forms differently when it comes to documenting proof of

12  residence?

13  A.    No.

14  Q.    And what impact do you think treating state form and

15  federal form voters differently would have on voters?

16              MR. LANGHOFER:  Speculation.

17              THE COURT:  Sustained.

18  BY MS. LANG:

19  Q.    Based on your experience with the documentary proof of

20  citizenship issue, what concerns would you have about treating

21  state form and federal form applicants differently?

22              MR. LANGHOFER:  Improper opinion.

23              THE COURT:  Whatever you said, Mr. Langhofer,

24  neither the court reporter nor I could understand it.

25              MR. LANGHOFER:  Improper opinion, Your Honor.

 1              THE COURT:  Still didn't get it.

 2              MS. LANG:  Improper opinion, I believe.

 3              Improper opinion, I think is what Mr. Langhofer

 4   said.

 5              THE COURT:  Oh, okay, thank you.  Overruled.

 6              THE WITNESS:  Could you repeat the question?

 7              MS. LANG:  Yes, I will try.

 8   BY MS. LANG:

 9   Q.   Based on your experience in voter registration and the

10   documentary proof of citizenship issue, what concerns would

11   you have about treating state and federal form voters

12   differently with respect to documentary proof of residence?

13   A.   Well, so we already have kind of a bifurcated process

14   between the two forms as it is, and it would create another

15   layer for us to have to -- if there's this -- it would just

16   make it really difficult.

17        I mean, it would just be very time-consuming because you

18   have to keep track of the type of form that's being registered

19   and then the specific regulations as it relates to that form,

20   and then if there were different regulations as it relates to

21   a state form and so you're making these -- there's a lot of

22   room for error to be made at the point of entry, and then

23   there's a lot of confusion that can happen from staff trying

24   to reach out to voters to get the appropriate information to

25   ensure that the voter can vote a full ballot versus not a full

 1  ballot or if their registration has been, you know, rejected

 2  outright; and then we give them another voter registration

 3  form to be able to do this and then more clear -- it's just --

 4  it's time-consuming is really what it is.

 5      It's time-consuming and it adds a lot more on top of what

 6  it takes to register -- when you use the first check and

 7  second check procedure, so you do the whole process the first

 8  time and then you do the whole same process the second time to

 9  ensure that you're doing everything correctly.

10      So it's a -- it doesn't make operational sense from the

11  terms of effective use of resources.

12  Q.   Thank you.  You previously testified that such

13  differential treatment in the documentary proof of citizenship

14  context would erect a quote "unnecessary obstacle to

15  registration."

16      Do you recall that testimony?

17  A.   Was that during my deposition?

18  Q.   Yes.  I can pull it up.

19  A.   It was a very long deposition so. . .

20  Q.   I know.  Here, let's just pull it up really quickly.

21      So if we could go to Ms. Hiser's deposition, the Pima

22  County deposition Page 257.

23          MR. LANGHOFER:  Improper impeachment.  We should

24  just ask the witness the question.

25          MS. LANG:  I thought I just did and she couldn't

1    recall.

2                THE COURT:  Well, she can read this to refresh her

3    recollection.  She didn't remember if she said this or not.

4    So just ask what she wants to read.  She can read it to

5    herself, and then you can ask a question.

6                MS. LANG:  Great.  If you could read from Line 6 to

7    the end of the page, and then we'll go and read just a little

8    bit of the following page as well.

9                So just let us know when you need us to change the

10   page for you.

11               THE WITNESS:  You can change the page.

12               MS. LANG:  So the next page, great.

13               And just through Line 10 there.

14   BY MS. LANG:

15   Q.   So based on this review, I'll amend my question a little

16   bit to say do you recall saying that a differential treatment

17   system like this would create an unnecessary barrier to

18   registration?

19   A.   Yes.

20   Q.   And would your view be the same if it was applied to

21   documentary proof of residence as opposed to documentary proof

22   of citizenship?

23   A.   Yes.

24   Q.   And that it would kind of require re-registration that is

25   kind of unnecessary red tape and bureaucracy?

1  A.   Yes, it would.

2  Q.   I just have one more topic for you, Ms. Hiser, which is:

3  Do you recall that the laws at issue in this case include some

4  provisions that include potential criminal sanctions on

5  election officials?

6  A.   Yes, I'm very familiar with that section.

7  Q.   Okay.  Why do you say that you're very familiar with that

8  section?

9  A.   When the laws were being discussed and the Recorder's

10  Association was providing feedback on it to the Legislature

11  through our lobbying, we emphasized that putting criminal

12  penalties on election workers would make our job more

13  difficult.  It would also make our job -- it would make it

14  difficult for us to retain election officials, election poll

15  workers if they thought that a mistake could get them a

16  criminal penalty.

17       So we interpreted the language to be that a mistake would

18  always be considered criminal even if was an unintentional

19  mistake.  So there were no protections for us.

20  Q.   And was this an area of concern for staff within the

21  County Recorder's office?

22  A.   Yes, this is a constant area of concern for staff and

23  election officials.

24  Q.   And would you say that right now is already a

25  particularly difficult time for election officials in Arizona

1    in the current climate?

2    A.    Yes, it is.

3    Q.    And that it's been quite difficult for offices like the

4    Pima County Recorder's office to retain election officials

5    because of the current climate?

6    A.    Yes, it is.

7    Q.    And is it your view that felony provisions like the ones

8    in these laws only made those challenges harder?

9    A.    That is my personal view, yes.

10            MS. LANG:  I have no further questions.  I believe

11   my colleague from the Department of Justice has a few more,

12   and then we will let you -- we will pass the witness.

13        Thank you.

14                      CROSS-EXAMINATION

15   BY MS. BRAILEY:

16   Q.    Good afternoon, Ms. Hiser.  My name is Emily Brailey.  I

17   represent the United States.  I'm going to ask you just a few

18   very quick questions that you might remember from your

19   deposition about HB2492's birthplace requirement.

20        Is it fair to say that in your experience if a person

21   provides their birthplace on a state voter registration form,

22   Pima County does not use that information to determine whether

23   the person is eligible to vote in Arizona?

24   A.    That is correct, we wouldn't use that information to

25   determine eligibility.  That would be a security question.

1  Q.   And I'll talk a little bit about the security questions

2  in one minute, but based on your experience you aren't aware

3  of any county that uses birthplace information to determine

4  voter eligibility, are you?

5            MR. LANGHOFER:  Foundation.

6            THE COURT:  Sustained.

7  BY MS. BRAILEY:

8  Q.   Pima County does not have a way to verify birthplace

9  information, does it?

10  A.   No, it does not.

11  Q.   And, in fact, there's no database available to Pima

12  County that collects or aggregates birthplace information for

13  US citizens, is there?

14  A.   Not that I'm aware of.

15  Q.   Okay.  So you mentioned earlier that the office -- and by

16  that I mean the Pima County Recorder's office -- uses

17  information from voter records as security questions to verify

18  a voter when they call.  Do I have that correct?

19  A.   That's correct.

20  Q.   And so even when a person does not provide their

21  birthplace on a state form, your office was still able to use

22  information from the voter record to verify that caller if

23  they called; is that correct?

24  A.   Yes.

25  Q.   And based on your experience, when a Pima County official

```
 1   is verifying a caller using a security question, would they
 2   first prefer to use the last four digits of the caller's
 3   Social Security number over other information in the voter
 4   record?
 5   A.   It's kind of the discretion of the employee that's
 6   contacting.  So each -- each staff member that talks directly
 7   with voters who either contact voters or who receive incoming
 8   calls from voters, they each have their own particular
 9   security questions that they like to ask.
10        Some people refer the last four digits of the sosc.  Some
11   people will ask about mother's maiden name or father's name.
12   Some people will ask year of birth.  It just depends on the
13   staff member.
14   Q.   Did you know any staff members that preferred to use
15   place of birth as the first security question that they used
16   to verify a caller?
17   A.   Not to my knowledge, no.
18   Q.   And outside of security questions, does Pima County use a
19   person's birthplace for any other reason related to voter
20   registration?
21   A.   No.
22             MR. LANGHOFER:  Foundation.
23             THE COURT:  The answer "no" will stand.
24   BY MS. BRAILEY:
25   Q.   How about for any other reason related to identifying a
```

1   voter for purposes of determining whether they are eligible to

2   vote?

3   A.    Not for determining eligibility.

4   Q.    So based on your understanding of HB2492's birthplace

5   requirement, does a registrant's birthplace -- does that

6   information now provide the County with new information

7   regarding whether a person is eligible to vote?

8   A.    No.

9   Q.    And similarly, based on your understanding of the

10  requirement to provide birthplace in HB2492, a registrant's

11  birthplace information does not now provide the County with

12  new information that would allow the official to identify a

13  voter; is that correct?

14  A.    That's correct, 'cuz it's already on the form.

15  Q.    Okay.

16          MS. BRAILEY:  No further questions.

17          Thank you so much.

18          THE COURT:  So, Ms. Hiser, let me ask you a

19  question.  If someone from the Pima County Recorder's office

20  called a voter -- or a voter called in and there was an

21  attempt to verify that they were speaking to the person who

22  was -- they were trying to speak to or the person who

23  identified themselves and the person's name was Joe Smith and

24  they were going to ask a security question and the question

25  asked was, "What state were you born in?" and the answer was

 1    "Arizona," and the registration said "Arizona," would that

 2    under the practices and policies of the Pima County Recorder's

 3    office be sufficient to satisfy the security questioning?

 4              THE WITNESS:  No, we would ask a follow-up with

 5    that.

 6              THE COURT:  Is that because the State of Arizona

 7    would be such a common birthplace for Arizona registered

 8    voters that it would not distinguish them for security

 9    purposes?

10              THE WITNESS:  That would be correct.

11              THE COURT:  Is there a requirement that -- for

12    example, if the preferred question by one of the staff members

13    was, "What is the last four digits of your Social Security

14    number?" for Joe Smith and they were given and they were --

15    matched what was on the form, would that be sufficient to

16    identify that you were speaking to the correct Joe Smith?

17              THE WITNESS:  It would.  With a common name like Joe

18    Smith, this isn't -- this isn't, like, a written rule.  It's

19    more like a -- it's more like a habit that people have

20    developed is that for very common names, you usually would ask

21    two questions, because names can be very common and you can

22    have -- so you'd ask the -- you'd ask the last four digits of

23    the Social Security number; and then if you had another field,

24    usually like a maiden name or a father's name, you would ask

25    that was well, and between those two pieces of information you

Haley Hiser - Cross-Exam by Ms. Brailey                    2058

1    would be able to verify.

2             I -- the more experienced clerks usually ask two

3    pieces of information as verification, and they're usually two

4    pieces of information of -- pieces of information that people

5    wouldn't normally want to give out.  So like your last four

6    digits of a Social Security number or your mother's made name,

7    pieces of information that would be considered a little bit

8    more private to the voter.

9        So we would -- I guess a good rule of thumb,

10   Your Honor, would be if someone requested my voter

11   registration application, the fields that were redacted on

12   that request, those would be the fields that we would ask

13   security  questions on; and the fields are Social Security

14   number,  phone number, mother's maiden name, father's name,

15   country date -- country state of birth.  Those are redacted

16   fields.

17            THE COURT:  Even for somebody who doesn't have a

18   very common name, would the answer "Arizona" to state of birth

19   be a sufficient security answer to identify that the person in

20   your office was speaking to the correct voter?

21            THE WITNESS:  No, it wouldn't.

22            THE COURT:  Mr. Whitaker, did you have any questions

23   on redirect?

24            MR. WHITAKER:  Briefly, Your Honor.

25            THE COURT:  You may proceed.

```
 1                        REDIRECT EXAMINATION
 2   BY MR. WHITAKER:
 3   Q.   Ms. Hiser, you mentioned in your testimony that the
 4   letter that is sent out requesting proof of citizenship is in
 5   English and Spanish I believe you said; is that right?
 6   A.   Yes.
 7   Q.   Okay.  If someone were to ask the office to translate it
 8   into another language, would the office do that?
 9   A.   Yes, we would.
10   Q.   Okay.  Is the last four digits of someone's Social Social
11   Security number a required field on the registration form?
12   A.   It is not.
13   Q.   How about the mother's maiden name?
14   A.   It is not.
15   Q.   How about the father's --
16            THE COURT:  Okay, this is cumulative.  We've been
17   through this with other witnesses.  I already know the answers
18   to these questions, and I don't expect Ms. Hiser to give any
19   different answers.
20            MR. WHITAKER:  Fair enough, Your Honor.
21            That's all I have.
22            THE COURT:  Mr. Langhofer.
23                        REDIRECT EXAMINATION
24   BY MR. LANGHOFER:
25   Q.   Good afternoon again, ma'am.  Just a couple cleanup
```

 1   questions here.  Pima County, if it receives a voter

 2   registration form and after running the HAVA check sees the

 3   voter has an F-type license, but apart from the information on

 4   the voter registration form and the HAVA return showing an

 5   F-type license has no other information about whether this

 6   person's a citizen, is Pima County's practice to register that

 7   voter as a fed-only voter while you wait for them to provide

 8   DPOC?

 9   A.    For a new registrant?

10   Q.    Correct.

11   A.    Yes, we would register them as a fed-only.

12   Q.    You had been shown by -- I think it was Mr. Sherman --

13   the e-mail about late last year there being some trouble with

14   a HAVA system that caused some full-ballot voters to receive

15   federal-only ballots.

16         Is that the first time you're aware of a problem like

17   that coming up with the HAVA system?

18   A.    I don't think that's the -- in my tenure, that was the

19   first problem that I had encountered that we had to deal with.

20   I don't know for sure if they've had other issues.

21         Yeah, I -- that's the first time I encountered that

22   particular problem.

23   Q.    Okay.  And did your office follow the Secretary of

24   State's recommendations in how to address the problem?

25   A.    We did.

1   Q.   Okay.  Since you were deposed in this case, the Court has

2   interpreted the DPOR requirement narrowly -- or broadly

3   probably is a better way of saying it.

4        Rather than being required to provide a driver's license

5   or utility bill, for example, the voter could also provide a

6   declaration saying that they live at the address they claim.

7        You testified to Mr. Sherman -- again, I believe it was

8   Mr. Sherman -- that certain populations in your experience

9   would have more difficulty complying with a DPOR requirement

10  than others?

11            MS. LANG:   Objection, misstates the record.

12            THE COURT:   Overruled, please complete your

13  question.

14  BY MR. LANGHOFER:

15  Q.   If the DPOR requirement has been narrowed or interpreted

16  so that you can just provide a declaration instead of an

17  official paperwork or utility bill, does that address your

18  concerns about certain populations having a more difficult

19  time providing DPOR?

20  A.   Well, the declaration would be -- would come from the

21  Recorder's office.  So it goes back to what would be the

22  responsibility of the Recorder's office to determine the

23  necessary information to provide a declaration; and the EPM as

24  written currently, there's no clear guidance and instruction

25  on how to provide a declaration.

 1       They give us a template and say, "You can do this and

 2  then you can stamp it and this is a declaration."  So we're --

 3  as a -- I guess how does the declaration help us if we are the

 4  entity that is giving the declaration and then we're going

 5  ahead and registering the people?

 6  Q.  So, yeah, there are a couple of issues mixed in together

 7  here.  So I'm going to try to tease them out so we're speaking

 8  clearly.

 9       One issue is whether there's a template declaration.

10  Let's just assume that the Secretary of State issued the

11  template that you could use.  Of course, that may -- you know,

12  whether or not that will happen is something we can discuss,

13  but let's just assume that they do.

14  A.  There is a template in the current EPM.

15  Q.  Okay, thank you for that.  The second -- another issue is

16  whether this should be required for state form applicants if

17  it's not required for federal form applicants.  Let's sort of

18  put that aside as, I think, a separate issue.

19       What I'm really wondering about is you had expressed

20  concern that certain populations wouldn't be able to meet the

21  DPOR requirement, but if they can satisfy it by just filling

22  out a form -- a declaration form that's -- there's a template

23  available for everyone, does that address your concerns about

24  the difficulties of some populations relative to others in

25  satisfying the requirement?

 1              MS. LANG:  Objection, misstates the record and the

 2     Court's prior ruling.

 3              THE COURT:  Overruled, you may answer.

 4              THE WITNESS:  So -- I mean, yes.  If there were a

 5     way to prove residency in a way that was easy, then yeah.  Any

 6     additional supplemental information we can get with a voter

 7     registration record to firm a record and make sure that that

 8     voter can be registered to vote the full ballot, we will use

 9     to ensure that every eligible voter is able to vote the full

10     ballot that they're entitled to.

11     BY MR. LANGHOFER:

12     Q.   The next question I apologize for asking, but we just

13     need a complete record.  It's certainly fair to say that Pima

14     County does not knowingly register anyone who's unqualified to

15     vote, does it?

16     A.   I would say that's correct.  We do not unknowingly

17     register people.

18     Q.   Yeah, thank you.  I don't mean to suggest otherwise.

19     It's just for the record.

20              Last one.  You talked to the United States Government

21     about whether your former employer uses birthplace for

22     purposes of registration, determining eligibility, and your

23     office follows the EPM to the extent it governs voter

24     registration, right?

25     A.   Correct.  The 2019 EPM, yes.

1  Q.   And so if that EPM said that in certain circumstances

2  consideration of birthplace were appropriate, you would follow

3  that, right?

4  A.   If it were clearly laid out in the EPM, yes.

5  Q.   Okay.  And one example that we've discussed before, I

6  believe, is if there were two people with the same name and

7  same birthday but different birthplaces, your office would

8  look at the birthplace, in part, to determine whether this is

9  the same person or two different people who happen to have the

10 same name and birthday, right?

11 A.   Correct, we would follow up with the voter.  We would

12 make contact.  We would want to speak with the voter.

13          MR. LANGHOFER:  Thank you, Your Honor.

14          No further questions.

15          THE COURT:  Thank you.

16          Ms. Hiser, thank you very much.  We are going to

17 leave the meeting.

18          THE WITNESS:  Okay, thank you.

19          THE COURT:  Defendants may call their next witness.

20          MR. HORLEY:  Defendants call Analee Shreeve also

21 over Zoom.

22          COURTROOM DEPUTY:  Ms. Shreeve, are you able to hear

23 me okay?  This is the courtroom deputy.

24          THE WITNESS:  Yes, I can hear you.

25          COURTROOM DEPUTY:  Will you please raise your right

1    hand.

2              *(Witness is sworn.)*

3              THE COURT:  You may proceed, Mr. Horley.

4              MR. HORLEY:  Thank you, Your Honor.

5                       DIRECT EXAMINATION

6    BY MR. HORLEY:

7    Q.   Good afternoon and hello, Ms. Shreeve.  I don't believe

8    we've met before so nice to see you and thank you for being

9    here.

10   A.   Thank you for having me.

11   Q.   Could you please state your first and last name for the

12   record?

13   A.   Analee Shreeve.

14   Q.   And where are you employed, Ms. Shreeve?

15   A.   I am employed in the Apache County Recorder's office as

16   the voter registration supervisor.

17   Q.   And how long have you been at the Apache County

18   Recorder's office?

19   A.   It's been about one year.

20   Q.   Okay.  Had you worked as an elections official before

21   joining the Recorder's office?

22   A.   No, I had not.

23   Q.   And what are your primary responsibilities as the voter

24   registration supervisor?

25   A.   To look over -- you know, oversee my other employees,

1    make sure that the voter registration is -- runs smoothly,

2    everything from all of the early voting and all of that stuff.

3    So there's only two employees in Apache County in voter

4    registration so. . .

5    Q.    Understood.  Do you personally handle the intake of voter

6    registration applications?

7    A.    I do.

8    Q.    And do you personally enter the data from voter

9    registration applications into Apache County's voter

10   registration files?

11   A.    I do.

12   Q.    How many voter registration applications per day does

13   your office typically receive?

14   A.    On a daily basis maybe four or five, and then we also

15   have our easy voters that come in through the MVD.  There's

16   probably about the same amount there, so total of about ten.

17   Q.    Okay.  And can you recall an incident in your time at the

18   Recorder's office where you received a batch of applications

19   that appeared to have false information on them?

20   A.    We did receive some, yes.  It was shortly after last

21   year's election.  There was some that were given to us through

22   the Secretary of State's office.  They -- some were -- could

23   be fraudulent.  Some -- they were all filled out the same way

24   and were handed out or gathered by a voter group that was

25   trying to get voter registrations in.  So they all came from

1   the same source; and, yes, they were suspect.

2   Q.   Okay.  And how many such forms did you receive in that

3   incident?

4   A.   I don't know the exact number.  It was probably around

5   20, 20 or 25, something like that.

6   Q.   Okay.  And how could you tell that these were submitted

7   by a third-party registration organization?

8   A.   There's a source code on the top right of the forms that

9   identifies where they were sourced from.

10  Q.   Okay.  And how could you tell there were problems with

11  these forms when you received them?

12  A.   For the most part, they were all filled out the same.

13  They would put the name, the date of birth, like the very,

14  very -- like the things that we have to have on the form in

15  order to process it, but not like any of the other parts of

16  the forms were filled out.

17      Sometimes there was not an address from physical or

18  mailing or otherwise.  So they all were filled out similarly

19  and some of -- I believe that we did have a few that were

20  filled out by the same person but days apart, so they seemed

21  suspect to us.

22  Q.   Okay.  How did you confirm that the information on them

23  was false?

24  A.   So it's not necessarily that they were false, but some of

25  the registrants were already registered somewhere in Arizona.

 1   So we could look them up in the AVID system and see if they're

 2   there.  They just seemed suspect because they were all filled

 3   out similarly and we knew that the group that was handling the

 4   forms, that was gathering the forms, had changed their name

 5   several times.  We knew the source that they were coming from.

 6   We can't prove it or otherwise, but there was suspicion that

 7   they were being paid to fill out the form.  So some were

 8   correct, some were not.  I don't know.

 9   Q.   Yeah, thank you.  And so what did your office do to

10   resolve this issue?

11   A.   So they're currently in the hands of our new Chief

12   Deputy.  We did have some turnover this year, and I had

13   personally gone through each of them.  If there were some that

14   I was able to process because there was enough information, we

15   did go ahead and process those, you know, updated the voter's

16   file, that sort of thing.

17        We are in the works of getting them to our County

18   Attorney so she can review them.  So some of them we weren't

19   able to verify at all just because there was nothing -- we

20   couldn't find their name.  There's no driver's license or

21   anything on there.  We can't verify who the person was that

22   filled out the form so. . .

23   Q.   Okay.  And in your deposition you testified that you

24   assumed that these forms were being collected fraudulently,

25   right?

Analee Shreeve - Direct Exam by Mr. Horley                    2069

1   A.   That is the suspicion.  I don't -- I haven't heard

2   anything more than that, but at the time I was brand new to my

3   position and there was a suspicion that the people that were

4   disseminating the voter registration forms were being paid to

5   do so and buy a form, and so they were giving the person

6   selling it out part of that is the suspicion.  I can't prove

7   that, though.

8   Q.   Okay, understood.  And was this the only incident like

9   this that you have seen in your time at the Recorder's office?

10  A.   In my time, yes, that's the only time that I've seen

11  that.

12  Q.   Okay.  Just a few more questions for you, ma'am.

13       In your experience with the Recorder's office, have you

14  found that Arizona's voting statutes can be difficult to

15  understand?

16  A.   Sometimes, yes.  The legal jargon, you know, is difficult

17  for the lay person to understand; but for the most part, if I

18  have any questions on them, I always reach out either to our

19  County Attorney or to someone at the Secretary of State's

20  office for direction so, you know, we don't just leave it

21  uninterpreted, I guess.

22  Q.   And in those situations is it helpful to look at the

23  guidance in the Elections Procedures Manual?

24  A.   It is.  The elections -- the current Elections Procedures

25  Manual is helpful.  Obviously, the information is there.  It's

1    just a little bit hard to navigate that -- the book.  So it's

2    hard to find the specific thing that you're looking for easily

3    and quickly so. . .

4    Q.   Okay.  And to your knowledge, have the laws at issue in

5    this case been implemented yet?

6    A.   No, they have not.

7    Q.   And could an updated EPM help clarify how to implement

8    these laws?

9    A.   Yes, that would be very helpful.

10   Q.   I wanted to ask one more question, Ms. Shreeve, about

11   that incident that we were talking about involving the false

12   registration forms.

13   A.   Uh-huh.

14   Q.   Was one of those forms that you received, did it have the

15   name of someone in your family, I believe, was on one of the

16   forms; is that right?

17   A.   Yes.  Yes, it did.  As I was going through them, I

18   recognized one of the addresses and it was actually my

19   parents' address, and the person turned out to be my adopted

20   brother, who I knew was living on the streets and had just

21   gotten out of prison.  So I knew that he's a felon, and he had

22   actually filled out one of those forms.

23   Q.   Okay.

24        MR. HORLEY:  I have no further questions, thank you.

25        THE COURT:  Any other questions of this witness on

 1   direct?

 2              MR. LANGHOFER:  No, Your Honor.

 3              THE COURT:  Cross, Mr. Sherman?

 4                        CROSS-EXAMINATION

 5   BY MR. SHERMAN:

 6   Q.   Good afternoon, Ms. Shreeve.  Just a few questions for

 7   you.  How long have you worked in the County Recorder's

 8   office?

 9   A.   It has been almost exactly a year.  I started there

10   November 4th of last year.

11   Q.   And do you have prior background in election

12   administration before this position?

13   A.   No, I do not.

14   Q.   Have you met with plaintiff's counsel outside of your

15   deposition?

16   A.   No, I have not.

17   Q.   As a County Recorder -- as an employee of the County

18   Recorder's office, your office is responsible for enforcing

19   Arizona election laws, correct?

20   A.   That is correct, but we're not enforcing them.  We're

21   supposed to adhere to them, yes.

22              THE COURT:  Maybe complying with them would be a

23   better question.

24              THE WITNESS:  And complying, yes.

25              MR. SHERMAN:  I'll reask it.  Are you --

```
 1              THE COURT:  Well, I think she's already answered it.
 2              MR. SHERMAN:  All right.  Understood, Your Honor.
 3   BY MR. SHERMAN:
 4   Q.   You are familiar with the Apache County Recorder's
 5   office's voter registration policies and procedures, correct?
 6   A.   I am.
 7   Q.   And you're familiar with the Challenged Laws in this
 8   case, HB2492 and HB2243?
 9   A.   I am.
10   Q.   Have you participated in internal discussions about how
11   to enforce these laws?
12   A.   For now we're not -- we're not discussing that because
13   we're not enforcing those at this time.
14   Q.   Are you familiar with the office's thinking on when to
15   enforce these laws absent an injunction?
16   A.   We will enforce those laws when we are told that it is
17   okay to go ahead and do that.
18   Q.   So you're waiting for direction from the Secretary of
19   State's office or your counsel or some --
20   A.   Yes, that's correct.
21   Q.   From which?  Who are you waiting for direction from?
22   A.   From either/or, yeah.
23   Q.   Absent an injunction, are you required to enforce these
24   new statutes regardless of what makes it into the EPM that the
25   Secretary of State, Attorney General and Governor sign off on?
```

```
 1              MR. LANGHOFER:  Legal conclusion.

 2              THE COURT:  Sustained.

 3              THE WITNESS:  I'm not exactly sure --

 4              THE COURT:  Ms. Shreeve, you don't have to answer

 5   the question.  Thank you.

 6              THE WITNESS:  Okay, thank you.

 7   BY MR. SHERMAN:

 8   Q.   If there's no guidance in the EPM on a particular

 9   election statute, for instance, when the Legislature enacts a

10   new election law in the two-year period between EPM revisions,

11   how does your office go about enforcing that new law?

12   A.   We do wait for direction from the Secretary of State's

13   office in those cases.

14   Q.   Do you do anything else?

15   A.   Refer to our County Attorney in those cases as well.

16   Q.   Where is the County Recorder's office in that process for

17   HB2492 and HB2243?

18   A.   As of right now, we don't have any plans.

19   Q.   Okay, understood.

20   A.   Either/or, yeah.

21   Q.   Is the office waiting for this litigation to conclude?

22   A.   That's correct, yes.

23   Q.   The DPOC notice letters that your office sends out, are

24   they only in English and Apache?

25   A.   I believe that right now they are in English and we have
```

 1    Spanish.  We also have translators that we can put them out in
 2    Navajo as well.
 3    Q.   Understood.  I want to ask you just a few questions about
 4    the SAVE system.  If you send out one of these DPOC notice
 5    letters and the person -- the recipient responds with an alien
 6    registration number or a naturalization certificate number,
 7    what does your office do with that number?
 8              MR. LANGHOFER:  Cumulative.
 9              THE COURT:  Overruled.  You may answer -- well, let
10    me ask you:  Since you've been there, has that happened, that
11    you've sent out a letter to someone who was trying to register
12    saying, "You need to provide us with documentary proof of
13    citizenship," and they returned the letter with an alien
14    number or a naturalization number?
15              Has that happened since you've been there?
16              THE WITNESS:  Only one time and the -- the woman had
17    come to our office.  So we didn't have to send out a letter.
18    She came to our office with her documents.
19              THE COURT:  So she actually brought the certificate?
20              THE WITNESS:  Yeah, she brought the proof of
21    citizenship and everything to the office, uh-huh.
22              But, no, as far as letters going out, no, we have
23    not had to do that.
24    BY MR. SHERMAN:
25    Q.   Do some registration applicants -- do some registration

Analee Shreeve - Cross-Exam by Mr. Sherman                    2075

1    forms that you've received already have the alien number or

2    naturalization certificate number on it?

3    A.    I actually personally have not come across any that have

4    that alien number or naturalization number.  Most of the

5    applicants either provide their tribal ID or their Arizona

6    driver's license.

7    Q.    Are you responsible in your office for conducting SAVE

8    verification?

9    A.    I am, yes, but I have yet to go through the training for

10   that.

11   Q.    Understood.  So you have no familiarity with any

12   additional verification procedures that USCIS may have; is

13   that correct?

14   A.    That's correct, yeah.  We don't have the occasion to have

15   to utilize anything more than what we've got right now, at

16   least not yet, not that I've come cross.

17   Q.    Are the DPOC notice letters that your office sends out,

18   are they translated into any other languages beyond the ones

19   that you listed before?

20   A.    No, not that I know of, no.

21   Q.    Okay.  Are there any other sources of information beyond

22   MVD databases and SAVE that your office can use to confirm US

23   citizenship?

24   A.    Personally, I'm not -- I'm not aware of any others just

25   because we haven't had to use them.  Like I haven't had to go

 1   outside of what we have available.

 2   Q.   Are there any sources of information that your office can

 3   use to confirm lack of US citizenship, as far as you know?

 4   A.   As far as I know, no, there's not.

 5   Q.   Does your office -- I know you've only been there for

 6   about a year, but as far as you know is there an established

 7   policy or practice for what to do if your office receives a

 8   list of alleged non-citizens from a private citizen, a private

 9   group or law enforcement officer?

10   A.   There isn't right now anything in place, but if I were to

11   receive a list like that, I would definitely take it to our

12   County Attorney first to get direction on where to go from

13   there.

14   Q.   You'd deal with that situation on sort of a case-by-case

15   basis?

16   A.   Yes.

17   Q.   Okay.  This hasn't happened in your tenure as of yet,

18   correct?

19   A.   No.  It has not, no.

20   Q.   All right.  Just a few more questions.

21        If a registered voter is removed from the rolls based

22   upon an erroneous determination that they're not a US citizen,

23   what is your understanding as to whether that voter can be

24   added back to the rolls if the registration deadline has

25   already passed?

1  A.   I am not sure in that case.  I would have to -- I know

2  that they do have the ability to update their information.  I

3  would definitely consult with my -- my County Attorney before

4  I did that but I do -- I believe that they do still have the

5  right if there's an update to be made, that we can make that.

6  Q.   Understand, but you're not --

7  A.   But, like I said, before -- before I would do that, I

8  would definitely consult with my attorney.

9           THE COURT:  And I take it that situation has not

10 occurred in the year that you've been in the office; is that

11 right.

12          THE WITNESS:  That's correct, we haven't come up

13 with that.  I know that we've discussed it in some of the --

14 like the Recorder's meetings and that sort of thing.  That's

15 where my knowledge of that situation comes from so. . .

16 BY MR. SHERMAN:

17 Q.   Is it fair to say your office doesn't have an established

18 policy or practice on this?

19 A.   No, we do not, no.

20 Q.   Okay, understood.

21          MR. SHERMAN:  I have no further questions, but my

22 colleagues may have a few.  Thank you.

23          THE COURT:  Are there any additional questions for

24 this witness on cross-examination?

25          MS. LANG:  Yes, your Honor, just a few.

1                        CROSS-EXAMINATION

2   BY MS. LANG:

3   Q.   Good afternoon, Ms. Shreeve.  Just a few questions for

4   you.  My name's Danielle Lang.  I represent the LUCHA

5   plaintiffs in this matter.  It's nice to meet you.

6        There are a number of voters in your county that live in

7   very rural areas; is that correct?

8   A.   That is correct.

9   Q.   And in your time and experience at the County Recorder's

10  office, is it your experience that many of those rural voters

11  do not have standard addresses?

12  A.   That is correct.

13  Q.   And is the current practice that those voters often

14  provide their residency to your office by drawing the location

15  of where they live, for example?

16  A.   Yes, that's correct.

17  Q.   You were asked a question by Mr. Horley that -- along the

18  lines of the laws in question here, HB2492 and HB2243, have

19  not been implemented yet.  Do you remember that?

20  A.   That's correct, yeah.

21  Q.   And you testified that the laws have not been

22  implemented.  I just want to clarify.  Your testimony is that

23  your county has not implemented those laws yet, correct?

24  A.   That is correct.

25  Q.   And it would be correct to say that you can't speak to

1   every county in the state?

2   A.   No, I cannot speak to the other counties.

3   Q.   So, for example, you wouldn't have any knowledge about

4   whether or not Cochise County has testified that they have

5   begun implementation in this case?

6   A.   That's correct, I wouldn't have any idea.

7            MS. LANG:  I don't have any further questions.

8            I will pass the witness to my colleague, if she has

9   if any.

10           MS. BRAILEY:  No questions, your Honor.

11           THE COURT:  Thank you.

12           Anything on redirect?

13           MR. HORLEY:  Not from the State, thank you.

14                      REDIRECT EXAMINATION

15   BY MR. LANGHOFER:

16   Q.   Good afternoon, ma'am.  I promise we're near the end.

17        You'd mentioned the non-standard -- drawing the

18   non-standard addresses in the rural parts of your county?

19   A.   Uh-huh.

20   Q.   Has your county been accepting address and residence

21   information provided in that way for some time?

22   A.   Yes, we have.  Our county is majority Navajo Nation and

23   then -- and, also, the southern part of our county also has a

24   lot of rural addressing as well; but, yes, we have been doing

25   that for quite some time.

1  Q.   If the only description that someone can give of their

2  residence is something like two miles north of Milepost 391,

3  do you accept that sort of description?

4  A.   Yes, we do.

5          MR. LANGHOFER:  No more questions, your Honor.

6          THE COURT:  Does that complete this witness'

7  testimony?

8          MR. HORLEY:  Yes, your Honor.

9          THE COURT:  Ms. Shreeve, thank you very much for

10 participating in the trial today.  We are going to leave the

11 meeting.

12          THE WITNESS:  Thank you.

13          THE COURT:  Do plaintiffs have another witness?

14          MR. HORLEY:  The defendants would like to call --

15          THE COURT:  Sorry, I meant defendants.

16          MR. HORLEY:  Yes, no problem.

17          I would like to call Ms. Sara Johnston.

18          THE COURT:  Is she here live and in person?

19          MR. HORLEY:  Over Zoom, Your Honor.

20          COURTROOM DEPUTY:  Hi, good afternoon.  This is the

21 courtroom deputy.  Can I please have you raise your right hand

22 for me.

23          *(Witness is sworn.)*

24          THE COURT:  And could the gentleman who's present in

25 the conference room with Ms. Johnston please identify himself.

```
 1              MR. KEREKES:  Good afternoon, Your Honor, Bill
 2   Kerekes, Deputy County Attorney representing Richard Colwell,
 3   Yuma County Recorder.
 4              THE COURT:  Mr. Horley.
 5                        DIRECT EXAMINATION
 6   BY MR. HORLEY:
 7   Q.   Okay.  Good afternoon, Ms. Johnston.  Nice to see you
 8   again.  My name is Tim Horley, and I represent the State and
 9   Attorney General in this case.  Thank you for taking your time
10   out of the your busy schedule today to join us.
11        Could you please state your first and last name for the
12   record?
13   A.   Sara Johnston.
14   Q.   And where are you currently employed, Ms. Johnston?
15   A.   I am currently employed with Yuma County Conflict
16   Administration.
17   Q.   Did you previously work at the Yuma County Recorder's
18   office?
19   A.   Yes.
20   Q.   How long did you work at the Recorder's office?
21   A.   About five years.
22   Q.   And what was your job title at the Recorder's office?
23   A.   I was the voter -- or voter services coordinator.
24   Q.   And when did you leave the Recorder's office for your
25   current role?
```

1   A.    January of 2023.

2   Q.    And what is your title at your current job?

3   A.    I am a legal secretary.

4   Q.    And what were your primary responsibilities as the voter

5   services coordinator?

6   A.    To administrate early voting and to supervise the voter

7   registration staff.

8   Q.    And did you ever personally handle the intake of voter

9   registration applications?

10   A.    Yes.

11   Q.    And did you supervise those who handled that personal

12   intake as well?

13   A.    Yes.

14   Q.    And do you have experience personally entering the data

15   from voter registration applications into Yuma County's voter

16   registration files?

17   A.    Yes.

18   Q.    And do you still consult for the Recorder's office?

19   A.    I do.

20   Q.    What kind of consulting do you provide?

21   A.    Such as the deposition we recently did.  Again, here

22   today.  If they have any questions about how I did things at

23   the time I was there or just everyday administrative tasks, I

24   can assist them with those things.

25   Q.    And how often do you interact with folks at the

 1  Recorder's office in your current role?

 2  A.   In my current job role or as a consultant?

 3  Q.   As a consultant.

 4  A.   Maybe a handful of times since I've left in the last ten

 5  months.

 6  Q.   Okay, thank you.  In your time at the Recorder's office,

 7  did you ever receive registration applications that appeared

 8  to contain false information?

 9  A.   Yes.

10  Q.   Could you explain a little bit about what you received?

11  A.   Sure.  Typically during right before an election cycle we

12  would get hundreds to upwards of thousands of registration

13  forms from third-party registration groups, and some of those

14  times we would get those registration forms and because of

15  where we live, it's a small town, we were able to identify

16  specific people with date of births that are not theirs; or

17  even as far as to having a co-worker have somebody register

18  her parents' house that she obviously knew they don't live

19  there.

20       Some of the forms will have names of registered voters in

21  Yuma County at another date of birth of another person here in

22  Yuma County, almost as if it was combined information of

23  different people.

24  Q.   And have you seen forms where it appears that voter

25  registration applicants are lying on their applications?

 1  A.   I don't think it was the applicants.  I think it was the

 2  circulators filling those out, but that's just a personal

 3  opinion.

 4  Q.   Okay.  So in those instances that you --

 5            THE COURT:  Excuse me.  In these circumstances that

 6  you're talking about, would the voter registration forms be

 7  brought in by the group that was doing the registration rather

 8  than being brought in individually by the registrant?

 9            THE WITNESS:  Yes, it was almost always brought in

10  by the third-party groups.  I would say -- I don't think I

11  ever witnessed somebody bringing in a form that they filled

12  out with a third-party group that they decided to bring in

13  themselves.

14  BY MR. HORLEY:

15  Q.   And you -- you talked about this a little bit, but I'm

16  wondering if you could elaborate on some of the common issues

17  that you saw when you received these -- these false forms?

18  A.   Sure.  Let's say I got a registration form theoretically

19  for Sara Johnston.  When I would put the information into the

20  database, the registration form would have maybe the same

21  first and last name but the date of birth would be transposed.

22  Maybe the birthday would be -- instead of October 2nd of '87,

23  it would be February 10th of '87 or the social would be

24  switched around, slight differences from the voter's actual

25  voter registration record.

1     That's just an example of some of the things that we

2   would see or we would get from the third-party groups maybe

3   four forms filled out for the same person but in different

4   handwriting, different signatures, different than the

5   information that was provided through the DMV as well.

6   Q.    Okay.   And do you have any understanding of why

7   third-party groups would submit these falsified applications?

8              MS. LANG:   Objection, foundation.

9              THE COURT:   Sustained.

10             THE WITNESS:   Other than --

11             THE COURT:   Excuse me, you don't have to answer when

12   I say "sustained."   I'm sorry, I should have mentioned that.

13             Mr. Horley's going to ask a different question.

14             MR. HORLEY:   Yes, your Honor.

15   BY MR. HORLEY:

16   Q.    Could you walk us through how your office handles such

17   forms?

18   A.    Well, legally we are required to enter a registration

19   form that we receive.   So once we enter the data with the

20   information, HAVA checks were ran against the voter's record

21   to compare it to the MVD interface.   The voter would either be

22   deemed as a real person with matching information or it

23   wouldn't.

24        By law we are required to follow up with the voter within

25   10 business days of filling out -- or putting in the data into

1    the registry -- into the system, excuse me.  So we would send

2    a letter and majority of the time not get any response.

3    Q.   And did you ever refer these incidents to the Attorney

4    General's office?

5    A.   Yes.

6    Q.   Okay.  Could you describe a little bit that process?

7    A.   Sure.  I don't recall exactly how they got involved or

8    how I started communicating with them.  I'm assuming it was

9    discussion between the previous recorder and the Attorney

10   General's office, but I would send him or the Attorney

11   General's office a list of an Excel spreadsheet with the voter

12   ID number, the information that we had on record for that

13   voter that was already confirmed real information and in

14   another column put the information that we were receiving on

15   the registration form, which we found to be false or fake

16   information.

17   Q.   Okay.  And after sharing that information, do you have

18   any knowledge of what happened next?

19   A.   I do remember them tracking down one of the special

20   agents, a circulator who was filling out those registration

21   forms; but what happened with that person, I don't know.

22   Q.   Okay.

23            MR. HORLEY:  One moment, please.

24            No further questions for me, thank you.

25            THE COURT:  Mr. Langhofer.

1          MR. LANGHOFER:  Thank you.

2                    DIRECT EXAMINATION

3    BY MR. LANGHOFER:

4    Q.   Good afternoon, Ms. Johnston, Mr. Kerekes.  I'm

5    wondering -- it sounds like when these forms that weren't --

6    the information wasn't authenticate on them, it sounds like

7    when those came in your office was able to identify a number

8    of them.  If I understand your testimony, most of them didn't

9    register to vote.

10        Were any of them registered as fed-only no identification

11   voters?

12   A.   Yes.

13   Q.   Do you have any sense of how many?

14   A.   I don't off the top of my head.

15   Q.   Okay.

16          MR. LANGHOFER:  Thank you, your Honor.

17          No other questions.

18          THE COURT:  Any cross-examination?

19          MR. SHERMAN:  Yes, your Honor.

20                    CROSS-EXAMINATION

21   BY MR. SHERMAN:

22   Q.   Good afternoon, Ms. Johnston.  My name is John Sherman.

23   I represent Poder Latinx and Chicanos Por La Causa in this

24   action.  I just a few questions for you.

25        Have you met with any plaintiffs' counsel outside of your

Sara Johnston - Cross-Exam by Mr. Sherman

 1  deposition in this case.

 2  A.    No.

 3  Q.    And as an employee at a County Recorder's office, your

 4  office must comply with Arizona election laws, correct?

 5  A.    Correct.

 6  Q.    And you're familiar with Yuma County Recorder's office's

 7  voter registration policies and procedures?

 8  A.    Correct.

 9  Q.    Are you familiar with the Challenged Laws in this case,

10  HB2492 and 2243?

11  A.    A little bit, yes.

12  Q.    Have you participated in internal discussions about these

13  laws?

14  A.    Minimal, but yes.

15  Q.    Are you familiar with the office's thinking on when to

16  implement these laws absent an injunction?

17  A.    Because I no longer work there I'm not quite sure, but

18  I'm assuming whenever they get proper guidance from the State.

19  Q.    Are you familiar with the office's thinking on how to

20  implement these laws?

21  A.    I'm not.

22  Q.    If there's no guidance in the EPM on a particular

23  election statute, say, for instance, a law that's passed

24  between two EPM revisions in that two-year period, how does

25  the County Recorder's office go about enforcing that new law?

Sara Johnston - Cross-Exam by Mr. Sherman

1   A.   I'm not sure.  I haven't been in that situation.

2   Q.   Understood.  What has your office been doing, as far as

3   you know before you left, to start the process, if anything,

4   on HB2492 and 2243?

5   A.   I'm not sure.  I no longer work there as a full-time

6   employee so I don't know what they're doing.

7   Q.   Let me -- let me just clarify the question.

8        Before you left the office --

9   A.   Okay.

10  Q.   -- did the County Recorder's office take any steps to

11  enforce HB2492 and 2243?

12  A.   Those laws were not in effect before I left -- or just

13  got into effect as I was leaving.  So I'm not sure what their

14  strategy is to implement those laws.

15  Q.   I apologize if you mentioned this before.  When did you

16  leave the office?

17  A.   Early January of 2023.

18  Q.   Understood.

19  A.   Right when the laws came into effect.

20  Q.   Understood.  How many different staff members in your

21  office would be responsible for applying and enforcing voter

22  registration statutes like HB2492 and 2243?

23  A.   All of them.

24  Q.   How many -- how many staff members are there?

25  A.   I believe there's four in voter registration currently

Sara Johnston - Cross-Exam by Mr. Sherman

1   and four -- or three or four in elections.

2   Q.   Any supervisors who oversee their decision making?

3   A.   Recorder Colwell.

4   Q.   Okay.  For the DPOC notice letters that your office sends

5   out, are they in any -- what languages are they available in?

6   A.   English and maybe Spanish or we offer them in Spanish if

7   needed.

8   Q.   Any other languages beyond that?

9   A.   No.

10  Q.   Okay.  I just want to ask you a few questions regarding

11  the SAVE database.  Are you familiar with SAVE?

12  A.   Yes.

13  Q.   During your time in the office, were you responsible for

14  conducting SAVE verification checks?

15  A.   Yes.

16  Q.   All right.  So if you sent out a notice letter asking a

17  voter registration applicant for DPOC and the person responds

18  with an alien registration number or a naturalization

19  certificate number, what did your office do with that number?

20  A.   We would enter it into the SAVE program and wait for

21  verification, which was pretty immediate.

22  Q.   If SAVE returns a match to a record of naturalized or

23  derived citizenship, that person's registered as a full-ballot

24  voter, correct?

25  A.   Correct.

Sara Johnston - Cross-Exam by Mr. Sherman

1  Q.   And that constitutes conclusive information that they're

2  a United States citizen, correct?

3  A.   Correct.

4  Q.   But if that initial verification or initial search turns

5  up a status other than confirmed naturalized or derived

6  citizenship, that information is not conclusive as to their

7  citizenship status; is that right?

8  A.   Can you repeat that again, I'm sorry.

9  Q.   Yeah, let me rephrase this a different way.

10      So if you get a status, you put in their A-number or

11  their naturalization certificate number and it doesn't turn up

12  information that they're a naturalized or derived citizen, it

13  shows that they're a legal permanent resident, is that the --

14  is that the end of the road for that voter registration

15  applicant or does your office take other steps?

16  A.   We would send them out a notice letting them know that

17  they are not eligible to be a registered voter due to lack of

18  citizenship and they still would have another opportunity, of

19  course, to bring in some form of proof of citizenship.

20  Q.   Understood.  So you can't use SAVE -- the SAVE results to

21  confirm a lack of US citizenship; is that correct?

22  A.   Sure, yes.

23  Q.   Does your office take any other steps beyond sending out

24  that additional notice letter to try to verify that person's

25  citizenship after that failed initial verification?

Sara Johnston - Cross-Exam by Mr. Sherman                    2092

1   A.   I'm not aware of any other way to obtain citizenship

2   other than the voter providing it or using the resources that

3   we had.

4   Q.   And does your office follow the same procedure, sending

5   out the notice letter if there's no match whatsoever in the

6   SAVE system?

7   A.   Correct.

8   Q.   Is your office familiar at all with USCIS's additional

9   verification procedures?

10  A.   I was not aware of it, and I'm not sure if they are.

11  Q.   Okay.  Are there any other sources of information that

12  your office consulted beyond MVD or SAVE that your offices

13  used to confirm US citizenship?

14  A.   No.

15  Q.   Are there any sources of information that your office

16  knows of and uses to confirm a lack of US citizenship?

17  A.   No.

18  Q.   If a registered voter is removed from the rolls based

19  upon an erroneous determination that they are not a US

20  citizen, what is your understanding as to whether they can be

21  added back to the rolls if the registration deadline has

22  already passed?

23  A.   Well, I've never had that happen to me where somebody was

24  put into the system and -- and then -- well, not that I can

25  recall, at least, that they were put into the system with

Sara Johnston - Cross-Exam by Mr. Sherman

1  verified citizenship and then later down the road found that

2  they weren't a citizen and taken off the voter rolls.

3      I would assume that if a voter brought in proper

4  documentation to prove their citizenship, they would be able

5  to get added back into the system and just like any other

6  database probably could override the -- the dates that they

7  were previously in there as a registered voter.

8  Q.   Is there any established policy or practice on this in

9  the office?  For instance, if there were an erroneous

10  determination that someone had been convicted of a felony and

11  that error came to light only after the registration deadline

12  had passed, is there any policy?

13  A.   No, not that I'm aware of.

14  Q.   Have you testified previously in your deposition that

15  HB2243 makes the personnel in the Yuma County Recorder's

16  office constant investigators unnecessarily?

17  A.   I don't remember, but I can imagine that if we were

18  having to constantly follow up on something like that,

19  yeah.

20  Q.   I could ask just so the record's clear.  I'll ask it

21  directly to you.  Do you believe that HB2243 makes the

22  personnel in your office constant investigators unnecessarily?

23  A.   Yes.

24      MR. SHERMAN:  No further questions for me, thank

25  you.  My colleagues may have some.

```
 1                        CROSS-EXAMINATION
 2   BY MS. LANG:
 3   Q.   Just very briefly, Ms. Johnston.  My name is Danielle
 4   Lang.  I represent the LUCHA plaintiffs in this matter.
 5        You were asked some questions about the 2022 cycle and
 6   your identification of some potentially false and fraudulent
 7   voter registration forms, and so I just want to follow up on
 8   that.
 9        Mr. Langhofer asked you whether or not a few of those may
10   have ended up on the rolls as federal-only no ID; is that
11   right?
12   A.   Correct.
13   Q.   In order for those individuals to actually vote, they
14   would have to provide identification to the Recorder's office,
15   correct?
16   A.   Correct.
17   Q.   Okay.  And so, to your knowledge, no one voted based on
18   these potentially false or fraudulent forms, correct?
19   A.   Not without bringing proof of identification.
20   Q.   And at that point you would be satisfied that that was
21   not a false application but, in fact, you know, a verified
22   application, correct?
23   A.   Correct.  And as a safeguard, I would probably require
24   them to fill out another registration form just to have an
25   accurate clipping of their signature.
```

Sara Johnston - Redirect Exam by Mr. Langhofer                    2095

 1          MS. LANG:  I don't have any other further questions
 2   for this witness, and the plaintiffs do not have any further
 3   questions for this witness.  Thank you.
 4          THE COURT:  Any questions on redirect?
 5                      REDIRECT EXAMINATION
 6   BY MR. LANGHOFER:
 7   Q.   Good afternoon, Ms. Johnston.  On this fed-only no ID
 8   category, the types of identification that they can show in
 9   order to move into the fed ID category and start casting
10   ballots, doesn't that include things like a utility bill?
11   A.   No.
12   Q.   What kind of ID does it have to be?
13   A.   A state-issued ID or a passport, birth certificate.
14   Q.   Thank you.
15          THE COURT:  Is this witness' testimony complete?
16          MR. HORLEY:  Yes, your Honor.
17          THE COURT:  Okay.  Ms. Johnston, thank you very much
18   for participating this afternoon, and we're going to leave the
19   meeting.
20          THE WITNESS:  Thank you.
21          THE COURT:  Do the defendants have another witness
22   or are we done for the day?
23          MR. WHITAKER:  We're done for the day, Your Honor.
24          THE COURT:  Okay, then -- Mr. Dodge.
25          MR. DODGE:  I wanted to make the offer, Your Honor,

1    but if you'd like to wait until tomorrow, I think that's fine.

2              THE COURT:  Court is in recess.

3    *(Whereupon the proceedings adjourned at 4:45 p.m.)*

1                    *REPORTER'S CERTIFICATION*

2

3              I, TERI VERES, do hereby certify that I am duly

4    appointed and qualified to act as Official Court Reporter for

5    the United States District Court for the District of Arizona.

6              I FURTHER CERTIFY that the foregoing pages

7    constitute a full, true, and accurate transcript of all of

8    that portion of the proceedings contained herein, had in the

9    above-entitled cause on the date specified therein, and that

10   said transcript was prepared under my direction and control.

11             DATED at Phoenix, Arizona, this 16th of

12   November, 2023.

13
                                      ____s/Teri Veres____
14                                     TERI VERES, RMR, CRR

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT