UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | |
|---|---|
| Mi Familia Vota, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | 2:22-cv-00509-SRB |
| ) | |
| Adrian Fontes, et al., ) | |
| ) | Phoenix, Arizona |
| Defendants. ) | November 7, 2023 |
| _____) | 8:57 a.m. |

AMENDED AS TO PAGE 293 AND PAGE 350 RE: EXHIBIT 266

BEFORE:  THE HONORABLE SUSAN R. BOLTON, SENIOR JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

BENCH TRIAL - DAY 2 - A.M. SESSION

(Pages 288 through 398)

Official Court Reporter:
Elva Cruz-Lauer, RMR CRR
Sandra Day O'Connor U.S. Courthouse
401 West Washington Street
Suite 312, SPC 35
Phoenix, Arizona  85003-2150
(602) 322-7245

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

289

APPEARANCES


For Plaintiff United States of America:

      JENNIFER J. YUN, ESQ.
      U.S. DEPARTMENT OF JUSTICE - VOTING - M STREET
      4 Constitution Square
      150 M. Street NE
      Washington, D.C.  20503

      RICHARD DELLHEIM, ESQ.
      SEJAL JHAVERI, ESQ.
      MARGARET TURNER, ESQ.
      U.S. DEPARTMENT OF JUSTICE-CIVIL RIGHT DIVISION, VOTING
SECTION
      950 Pennsylvania Avenue NW
      Washington, D.C.  50530


 For Plaintiff ADRD Action, Arizona Students' Association,
 League of United Latin American Citizens Arizona, Living
 United for Change in Arizona:

      DANIELLE MARIE LANG, ESQ.
      HAYDEN JOHNSON, ESQ.
      MOLLY DANAHY, ESQ.
      ROBERT BRENT FERGUSON, ESQ.
      CAMPAIGN LEGAL CENTER
      1101 14th Street NW, Suite 400
      Washington, D.C.  20005

      COURTNEY HOSTETLER, ESQ.
      FREE SPEECH for PEOPLE
      1320 Centre Street, Suite 405
      Newton, Massachusetts  02459

      RACHEL J. LAMORTE, ESQ.
      MAYER BROWN, L.L.P.
      1999 K Street NW
      Washington, D.C. 20006

      WILLIAM JOSEPH MCELHANEY, III, ESQ.
      MAYER BROWN, L.L.P.
      71 S. Wacker Drive
      Chicago, Illinois 60606

UNITED STATES DISTRICT COURT

290

APPEARANCES (Continued)

For Plaintiff Arizona Asian American Native Hawaiian And
Pacific Islander for Equity Coalition:

        NIYATI SHAH, ESQ.
        ASIAN AMERICANS ADVANCING JUSTICE
        1620 L Street NW, Suite 1050
        Washington, D.C.  20036

        SADIK HUSENY, ESQ.
        AMIT MAKKER, ESQ.
        EVAN OMI, ESQ.
        CATHERINE ANNE RIZZONI, ESQ.
        LATHAN & WATKINS
        505 Montgomery Street, Suite 2000
        San Francisco, California 94111


For Plaintiff Arizona Democratic Party, Democratic National
Committee:

        CHRISTOPHER E. BABBITT, ESQ.
        WILMER CUTLER PICKERING HALE & DORR,
        L.L.P.
        2100 Pennsylvania Avenue NW
        Washington, D.C.  20037


For Plantiff Poder Latinx:

        JOHN A. FREEDMAN, ESQ.
        LEAH MOTZKIN, ESQ.
        ARNOLD & PORTER KAYE SCHOLER, L.L.P.
        601 Massachusetts Avenue NW, Suite 100
        Washington, D.C.  20001

        BEAUREGARD WILLIAM PATTERSON, ESQ.
        JONATHAN SHERMAN, ESQ.
        FAIR ELECTIONS CENTER
        1825 K Street NW, Suite 701
        Washington, D.C. 20006

291

APPEARANCES (Continued)

For Plaintiff Tohono O'odham Nation:

        ALLISON NESWOOD, ESQ.
        NATIVE AMERICAN RIGHTS FUND
        250 Arapahoe Avenue
        Boulder, Colorado 80302


For Plaintiff Voto Latino, Mi Familia Vota:

        CHRISTOPHER DODGE, ESQ.
        ELISABETH C. FROST, ESQ.
        DANIELA LORENZO, ESQ.
        ALEXANDER FRANKLIN ATKINS, ESQ.
        MOLLIE DEBRELL, ESQ.
        ELIAS LAW GROUP, L.L.P.
        250 Massachusetts Avenue NW, Suite 400
        Washington, D.C. 20001


For Plaintiff Promise Arizona, Southwest Voter Registration Education Project:

        ERNEST ISRAEL HERRERA , ESQ.
        ERIKA CERVANTES, ESQ.
        MALDEF
        634 Spring Street, 11th Floor
        Los Angeles, California  90014



For Defendants State of Arizona, Kris Mayes, Jennifer Toth:

        JOSHUA MICHAEL WHITAKER, ESQ.
        TIMOTHY E. HORLEY, ESQ.
        ARIZONA ATTORNEY GENERAL'S OFFICE
        2005 N. Central Avenue
        Phoenix, Arizona  85004

UNITED STATES DISTRICT COURT

292

APPEARANCES (Continued)

For Intervenor-Defendants State of Arizona, Kris Mayes, Ben
Toma:

            KATHRYN E. BOUGHTON, ESQ.
            ARIZONA ATTORNEY GENERAL'S OFFICE
            2005 N. Central Avenue
            Phoenix, AZ   85004

            HANNAH HATCH PORTER, ESQ
            GALLAGHER & KENNEDY, P.A.
            2575 E. Camelback Road, Suite 810
            Phoenix, Arizona 85016-9225


For Intervenor Republican National Committee:

            KORY A. LANGHOFER, ESQ.
            STATECRAFT, P.L.L.C.
            649 North 4th Avenue, Suite B
            Phoenix, Arizona  85003


For Defendant-Intervenor Republican National Committee:

            KORY A. LANGHOFER, ESQ.
            THOMAS J. BASILE, ESQ.
            STATECRAFT, P.L.L.C.
            649 N. 4th Avenue, Suite B
            Phoenix, Arizona  85003


For Defendant-Intervenor Warren Peterson and Ben Toma:

            HANNAH HATCH PORTER, ESQ.
            Gallagher & Kennedy, P.A.
            2575 East Camelback Road, Suite 1100
            Phoenix, AZ  85016-9225

293

INDEX OF WITNESSES

| WITNESSES FOR THE PLAINTIFFS: | Direct | Cross | Redirect |
|---|---|---|---|
| Reginald Bolding, Jr. | | 298,299 | |
| Mary Colleen Connor | 305,331,373 | 375,388 | |

INDEX OF EXHIBITS

| EXHIBIT NO.: | DESCRIPTION: | RECEIVED: |
|---|---|---|
| 13 | Key Changes to the 2023 Election Procedures Manual (EPM) Submissions | 337 |
| 23 | 12/5/22 State of Arizona Official Canvass, 2022 General Election | 395 |
| 196 | 6/15/22 Email chain from S. Richer to J. J. Marson, G. Jackson, and others re ASAP - Need feedback on revised 2617 [Depo. Ex. 20] | 365 |
| 266 | 10/31/18 Memorandum of Agreement Between the Dept. of Homeland Security and USCIS and Office of the Arizona Secretary of State (USCIS SAVE 000001-12][Depo Ex. 184 "SAVE" Program Usage [YC000172-79] | 350 |
| 805 | Q1 Report to Legislature under ARS 16-165.M [AZSOS-563797-AZSOS-563798] | 379 |
| 806 | Q2 Report to Legislature under ARS 16-165.M [AZSOS-563799-AZSOS-563800] | 381 |
| 896 | 2014 General Election Canvass [Minnite 316] | 395 |
| 897 | 2016 Primary Election Canvass [Minnite 317] | 395 |

8:57:30AM

UNITED STATES DISTRICT COURT

294

P R O C E E D I N G S

THE COURT:  The record will show the presence of counsel.  Last night Mr. Dodge appears to have sent an ex parte email to the courtroom deputy clerk and the court reporter indicating that two members of the trial team tested positive for COVID yesterday.

I don't know if Mr. Dodge has advised anyone besides the other members of his trial team and my courtroom deputy clerk and the court reporter.

Does anybody else know about this?

MR. DODGE:  Your Honor, I believe the parties do know. Certainly our side advised --

THE COURT:  We can't hear you.

MR. DODGE:  Shall I come closer?

THE COURT:  Yes, please.

MR. LANGHOFER:  Not too close though.

THE COURT:  Not too close, you're right.

MR. DODGE:  Morning, Your Honor, Chris --

THE COURT:  Why don't you put your mask on.  There's a few questions that I have.

MR. DODGE:  Sure.

THE COURT:  First of all,  have you advised all of the other counsel of this?

MR. DODGE:  I believe so, Your Honor.  There are a lot of counsel here, but it hasn't been a secret.

UNITED STATES DISTRICT COURT

THE COURT:  Because this is ex parte, you didn't copy anybody --

MR. DODGE:  I appreciate that.

THE COURT:  -- but people on your firm on this.

MR. DODGE:  I appreciate that, Your Honor, and that was my mistake.

THE COURT:  I also can't tell from what you wrote here, because you say that they were two nonlawyer members of your team that tested positive, but it doesn't say whether those two individuals were present in the courtroom yesterday.

MR. DODGE:  I don't believe that they were.

THE COURT:  You don't believe they were?  You can't be more definitive than that?

MR. DODGE:  They were not in court yesterday, to the best of my recollection.

THE COURT:  They were not in the courtroom yesterday?

MR. DODGE:  Right.

THE COURT:  So did all members of your trial team have face-to-face contact with them yesterday?

MR. DODGE:  In the morning.

THE COURT:  In the morning?

MR. DODGE:  Yes.

THE COURT:  Okay.  And have all of those individuals tested today?

MR. DODGE:  Every other member of our trial team has

tested twice yesterday evening and this morning.  All have been negative.  All have been asymptomatic.  I am the only member of my trial team present here today.

THE COURT:  And how would you propose we proceed?

MR. DODGE:  We are amenable to the Court's guidance. I guess what our internal thinking is, is that today I alone would be present, sitting in the corner with a mask on, for my team.  If we continue to test negative today and tomorrow, we would resume in-person attendance of our fuller team of three or four lawyers beginning Thursday morning, when our next witness is anticipated to be on the stand.  So that would be two days of ---

THE COURT:  Of you sitting in the corner.

MR. DODGE:  Correct.

THE COURT:  Does anybody have any objection to us proceeding as Mr. Dodge has suggested?

Nobody appears to have a concern about proceeding that way, so -- you did mention here that you were hopeful that your trial team could listen in.

My understanding of the new rules of the judicial conference is that no part of any trial proceeding can be publicly broadcast, and a listen-only line essentially would be a public broadcast of the trial.

I know that daily transcripts are being prepared. They will have to rely on those, because I can't open up either

UNITED STATES DISTRICT COURT

a video link or an audio link to the courtroom.

MR. DODGE:  I understand, Your Honor, given that I'll be present.  I have another member of my team that's arriving this morning from Washington, D.C. that's counsel of record in the case already, was obviously not exposed.  They will also be here.

I think given that, there's less concern about us having access to some kind of telephonic link.  Obviously, it would still be convenient for the other members of our team, but I take the Court's --

THE COURT:  And for future reference, not just to Mr. Dodge, but to everyone else, emailing the deputy -- the courtroom deputy and the court reporter doesn't get it to me.

We have chambers mailbox.  You are used to sending things to chambers mailbox.  My judicial assistant checks chambers mailbox first thing in the morning.

If there are any -- if there's any need to communicate with the Court other than through a court filing, that's where the email should be sent.  And it shouldn't be ex parte.

MR. DODGE:  I appreciate that, Your Honor.  That was my mistake.  I take full responsibility for it.

THE COURT:  Thank you.  You can resume your seat as far as away from everyone else.

MR. DODGE:  Unless Your Honor would like to have a couple of items of housekeeping first, which I think --

THE COURT:  I would like to finish with Mr. Bolding's testimony.  I think we were almost there, and I think it would be best if he was able to conclude and go on about his business.

Mr. Bolding, you can retake the stand.  You are still under oath.

Ms. Porter, you may continue your cross-examination.

MS. PORTER:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MS. PORTER:

Q.  Mr. Bolding, if you may recall, I'm Hannah Porter.  I just have a couple of remaining questions, and then I will pass you off to counsel for the RNC.

In terms of funds that you plan to spend if the laws are implemented, do you have any written document that shows your plans for spending funds in response to the Challenged Laws?

A.  Could you clarify?

THE COURT:  Have you prepared any internal documents that reflect an alternate budget for how you're going to spend funds if the law is implemented versus how you were going to spend your funds without this law?

THE WITNESS:  No, I have not.

MS. PORTER:  Thank you.  That was it, Your Honor.

THE COURT:  Okay.  Mr. Langhofer.

MR. LANGHOFER: Good morning, Your Honor. May it please the Court.

CROSS-EXAMINATION

BY MR. LANGHOFER:

Q. Mr. Bolding, I want to talk about unicorns. And I think the words you said were, "I know some people who don't have some of those things." That's what I remember your answer when Ms. Porter asked if you knew someone without those five documents.

Do you remember that exchange yesterday?

A. I don't remember using those words exactly.

Q. Okay. Let me try to make sure we are on the same page there. We are talking about adult citizens who are residents in Arizona, who don't have any of the following five things, an Arizona driver's license issued after 1996, a U.S. birth certificate, a U.S. passport, a tribal identity card, or a naturalization number.

So adult citizen who resides in Arizona who doesn't have any of those five things. Do you know someone like that?

A. I've tried to register someone who has not had any of those things.

Q. And what happened?

A. We couldn't register them.

Q. Was that person a citizen?

A. I am assuming that they were a citizen.

Q.  Why do you assume that?

A.  Just from the conversations that we've had.  I mean, I just assumed that they were a citizen.

Q.  Okay.  So did they tell you they were a citizen?

A.  I didn't ask if they were a citizen.

Q.  I see.  And you submitted a voter registration form for them?

A.  No.

Q.  Oh, why not?

A.  They didn't have the information that they needed to complete the voter registration form.

Q.  Oh.  You know you can submit a voter registration with just your name, address, and birthday?

A.  Yes.

Q.  They didn't have that information?

A.  So part of the process that we have when we're registering people, we let them look at the form.  We let them know exactly what they need.  If someone doesn't have, per se, a driver's license, they may say, I don't have a driver's license number so I am not going to fill out the form.

    If you are talking to someone who may be younger, a youth who doesn't know the last four of their Social Security, they may say, I don't want to register because I don't have -- I don't know the last four of my Social.

    So people who we are registering, they have the

opportunity to look at a voter registration form, make a determination if they have the documents that they need, or if they know that information that they need, and then they assume -- then they fill out to form or they don't.

THE COURT:  Let me interrupt a second.

I think you testified yesterday that you try to fully register people and so that you use the state form and you don't use the federal-only form; is that correct?

A.  That's correct, we only use the state form.

MR. LANGHOFER:  Your Honor, the under the LULAC decree, if you have just your name address and --

THE COURT:  Well, I know that, but he's using the state form, he calls for all this information, people say they don't have it.

MR. LANGHOFER:  Understood.

BY MR. LANGHOFER:

Q.  So Mr. Bolding, they look at the form, decide they don't want to apply, one of the other things on that form is a requirement that they swear under penalty of perjury that they are citizens, right?

A.  Correct.

Q.  So going back to this person that you apparently met who doesn't have any of those five documents, do you need me to say them again or do you have them in mind?

THE COURT:  Let's not repeat them again.

BY MR. LANGHOFER:

Q.  The person who doesn't have these five documents, you didn't actually submit a voter registration form for the person that you're thinking of?

A.  Correct.

Q.  Okay.

MR. LANGHOFER:  Your Honor, I'll keep hunting for unicorns next time.

THE COURT:  Anything on redirect?

MS. LAMORTE:  No, Your Honor.

THE COURT:  May Mr. Bolding be excused?

MS. LAMORTE:  Yes, Your Honor.

THE COURT:  Mr. Bolding, thank you very much.  You may step down, and you are excused as a witness.

THE WITNESS:  Thank you.

THE COURT:  So Mr. Dodge mentioned that there were housekeeping matters that he wanted to discuss before we swore in the next witness.

MR. DODGE:  Just a couple of quick advisories for the Court, Your Honor.

THE COURT:  Okay.  Would you try -- I want you to keep your mask on, so I want you to speak into one microphone.

MR. DODGE:  Understood.  How is this for Your Honor and the reporter?

THE COURT:  It's good for me.  Hopefully everyone else

can hear you as well.

MR. DODGE:  Perfect.  First of all, I wanted to advise that the RNC intervenors served a second supplemental report from one of their experts yesterday evening.  This goes to the relief requested in our motion to strike filed Friday or over the weekend.

We intend to supplement our motion to account for this new supplemental report in the relief we are asking for.  Just wanted to advise the Court on that.

Second, wanted to advise the Court that yesterday around midnight we filed a trial brief addressing some of the evidentiary rulings to date so far, specifically with respect to questions that go to the standing of the non U.S. plaintiffs' ability to obtain relief on the claims resolved in the Court's partial summary judgment order.

Very briefly --

THE COURT:  No, I am not -- I don't want to hear any argument on something that I haven't read.  I am aware that it was filed, but I have -- I know nothing beyond the title.

MR. DODGE:  That's fine, Your Honor.  Then we will be prepared to address it when it's convenient for the Court.

THE COURT:  Okay.

Plaintiffs may call their next witness.

MS. JHAVERI:  Good morning, Your Honor.  My name is Sejal Jhaveri, and I represent the United States in this

matter.  The plaintiffs next call Colleen Connor.

THE COURT:  By the way, I kept looking for my plaintiffs' witness list yesterday and Elaine advises that you haven't given her one.  This -- on the form she told you about, the one defendants did.  It looks like like this.

MS. JHAVERI:  We will remedy that, Your Honor.

THE COURT:  Any time soon?

THE CLERK:  He has it.

THE COURT:  Your witness list can't possibly be that many pages.

MS. JHAVERI:  It has exhibits -- includes both witness list and exhibit.

THE COURT:  Microphone, please, because there's a lot of people in the back of the courtroom that can't hear what you are are saying.

MS. JHAVERI:  Apologies.  I believe the first page is the witness list.

THE COURT:  Okay.  It's the witness list that -- I mean, I'll take them both, but I really want the witness list.  I don't see a witness list.

MS. JHAVERI:  Apologies, Your Honor.  We will have it at the break.

THE COURT:  Okay.  Is it --

THE CLERK:  Ms. Connor, step on up.  Raise your right hand.

**MARY COLLEEN CONNOR, PLAINTIFFS' WITNESS, SWORN**

THE CLERK:  Can you please state your name for the record and spell your last name.

THE WITNESS:  My full name is Mary Colleen Connor. Connor is spelled C-O-N-N-O-R.

THE COURT:  You may proceed, Ms. Jhaveri.

MS. JHAVERI:  Thank you.

DIRECT EXAMINATION

BY MS. JHAVERI:

Q.  Good morning, Ms. Connor.

A.  Good morning.

Q.  My name is Sejal Jhaveri, and I represent the plaintiffs in in matter.  It's nice to see you again.

A.  Nice to see you.

Q.  Ms. Connor, can you start by telling us what is your current occupation?

A.  I am the State Elections Director.

Q.  And how long have you been in that role?

A.  Since January 4th of 2023.

Q.  Have you had any previous roles in Arizona that relate to elections?

A.  Yes.  In the late '90's I worked at the Attorney General's Office representing the Secretary of State's Office.  And in 2000 after the Citizens Clean Elections Act was passed by a voter-approved initiative, I became the first executive

director and held that position through July or -- I believe it was July of 2005.

In August of 2005 I began working at the Maricopa County Attorney's Office, where I was the lead attorney for the County Recorder, County Elections Department, and the Board of Supervisors pursuant to their duties in elections.

In 2011, after Bill Montgomery was elected County Attorney, I was promoted to be the practice group leader for the government advice practice group, but I continued to be the lead attorney in elections.

In -- I am trying to think.  In 2020, January 2020 I began working in Pinal County briefly.  I represented the Recorder Elections Department, many other departments too, because it was a smaller county.

But I worked there, I believe seven months, and then started working for the Yavapai County Attorney's Office, where I also represented the Elections Department, County Recorder and Board of Supervisors in election matters.

Q.   Would it be fair to say that you have experience working in elections from both the state level and the county level?

A.   Yes.

Q.   And can you describe your general responsibilities -- strike that.

What are the general responsibilities of the Secretary of State related to elections?

THE COURT:  Why does she need to tell me that?  Isn't that all a matter of law?

MS. JHAVERI:  I can move on.

THE COURT:  Plus, the Secretary of State does a lot of things that have nothing to do with elections that we really don't have to concern ourselves with.

MS. JHAVERI:  I will ask a different question.

BY MS. JHAVERI:

Q.  Ms. Connor, can you describe your responsibilities as State Elections Director?

A.  I oversee the elections division, which includes voter registration, election filing, compliance of lobbyist registration, campaign finance, and candidate filings.

I am also responsible for overseeing the production of the Elections Procedures Manual, as well as developing other manuals and handbooks related to elections.

Q.  So you just mentioned the Elections Procedures Manual.  Can you tell us a little bit more about what that is?

A.  The Elections Procedures Manual is required to be produced by the Secretary of State pursuant to A.R.S. 16-452 in consultation with the County's Boards of Supervisors.  And the intent of the Elections Procedures Manual is to provide, to the highest degree possible, a manual that is impartial, provides uniformity, correctness in the implementation of elections laws.

The statute also provides a range of subject matters that must be included in the procedures manual starting from voting, early voting through collecting ballots, tabulation, and canvassing or certifying the elections results.

In addition, it requires, the procedures manual provide guidance related to the -- well, UOCAVA, the military and overseas voting.

There are other subjects included in the procedures manual that are required in other statutes, but that's the general nature of the procedures manual.

It shall be produced every two years, and the deadline for the Secretary of State to have that first draft completed, or the submission completed to provide to the Attorney General and the Governor was October 1st of 2023, which we complied with.  And the Attorney General and Governor have until December 31st to approve the procedures manual.

Q.  Okay.  And the Elections Procedures Manual includes a chapter on voter registration, correct?

A.  Correct.

Q.  And as you just noted, there is an updated draft of the Elections Procedures Manual, correct?

A.  That's correct.

Q.  And did you personally work on updating that Elections Procedures Manual?

A.  I did.

Q.   Based on your experience, how would you describe your familiarity with the voter registration process in Arizona?

A.   I am very familiar with voter registration.  In fact, the voter registration chapter in the EPM, as it's called, has been included since 1998, to the best of my knowledge, when I started doing elections work.  And I tried to stay up to date on all new legislative changes related to voter registration.

Q.   And so when you are referring to your work in the '90s and 2000s, that was largely from a county level, correct?

A.   That's correct.

Q.   I want to shift topics and talk about one of the statutes at issue in this litigation, HB2492.

      Are you aware that Arizona passed HB2492 in 2022?

A.   Yes.

Q.   And among other things, HB2492 makes the birthplace field on the Arizona state form mandatory, correct?

A.   Correct.

Q.   So under HB2492, county recorders cannot register a voter who fails to complete a place of birth field on the state form, correct?

A.   Pursuant to the new legislation, correct.

Q.   And the Arizona state voter registration form, which I think you refer to as the "state form," has contained a field for inputting state or country of birth for decades, correct?

A.   Yes.

Q.  And for most of those decades, prior to the passage of HB2492, the plate of birth field on that form was optional, correct?

A.  Yes.

MS. JHAVERI:  Mr. Bagdon, can we put Exhibit 6 up?

BY MS. JHAVERI:

Q.  Ms. Connor, I am going to turn your attention to what has been marked as Exhibit 6 in this litigation and entered into evidence.  Do you recognize this document?

A.  Yes, this is the current Elections Procedures Manual that's in effect.  It was produced in 2019 under then-Secretary of State Katie Hobbs.

MS. JHAVERI:  Mr. Bagdon, can we look pages 2 and 3 of the manual, which is PDF pages 16 and 17?

BY MS. JHAVERI:

Q.  Ms. Connor, I will turn your attention to part two where it says, Voter Registration Requirements.  Do you see that?

A.  Yes.

Q.  Um, and these sections that are pulled out, these are the requirements for a voter to be registered to vote in Arizona, correct?

A.  Correct.

THE COURT:  I'd call them the qualifications.

MS. JHAVERI:  I will use "qualifications."

BY MS. JHAVERI:

Q.  And these are all of the qualifications to vote in Arizona, correct?

MR. LANGHOFER:  Calls for a legal conclusion.

THE COURT:  Sustained.

BY MS. JHAVERI:

Q.  Does the -- are these all of the qualifications to vote listed in the Elections Procedures Manual, to the best of your knowledge?

A.  You're referring to the 2019 Elections Procedures Manual?

Q.  Yes.

A.  Yes.

Q.  And based on your experience applying Arizona election laws, providing one's birthplace information is not a qualification to vote in Arizona, correct?

MR. WHITAKER:  Calls for a legal conclusion.

THE COURT:  Sustained.

BY MS. JHAVERI:

Q.  In your experience with the voter registration process, does a -- does the place of birth field -- strike that.

Let me move on.

So let's look at the qualifications on this page. Birthplace is not used to determine someone's citizenship status, correct?

A.  Correct.

Q.   And birthplace does not determine whether a voter would be 18 at the time of the next elections, correct?

A.   Correct.

Q.   Nor would birthplace determine whether voter registration applicant has been an Arizona resident for at least 29 days, correct?

A.   Correct.

Q.   Place of birth also does not determine whether the applicant can write their name, correct?

A.   Yes.

Q.   And place of birth does not determine whether an applicant has committed a particular felony that would make them ineligible to vote, correct?

A.   Correct.

Q.   And place of birth is not listed in the qualifications to vote that you see here today, correct?

A.   Correct.

        MS. JHAVERI:  Um, you can take this down please, Mr. Bagdon.

BY MS. LANG:

Q.   Previously you testified that prior to HB2492 applicants who filled out the state form had the option to provide place of birth, correct?

A.   Yes.

Q.   And that means during that time, the decades in which it

was optional, county recorders have been processing voter registration forms where the person did not include place of birth, correct?

A. Correct.

Q. And they've also been processing these forms where someone included information in the place of birth field that was not in fact their place of birth, correct?

MR. LANGHOFER: Foundation.

THE COURT: Sustained.

BY MS. JHAVERI:

Q. Currently -- excuse me.

Prior to the passage of HB2492, in your experience, how did -- how do county election officials input the place of birth field?

A. For clarification, are you -- is your question assuming the place of birth is the same field as the state or country of birth.

Q. Yes, and I apologize for that. That is exactly what I mean.

A. Okay. Could you repeat your question?

Q. Prior to the passage of HB2492, how do county election officials process the place of birth field, or the state or country of birth field on the state form?

A. It's a data entry issue. If someone does provide the state or country of birth, it's added to the person's voter

registration record.

Q.   And they enter it exactly as written on the form, correct?

A.   Yes.

Q.   So even though the field says place or country of birth, if a person put "Tucson," the county recorder -- the county election official would enter "Tucson," correct?

A.   Could you repeat that?

Q.   Sure.  So the field, as we discussed, says state or country of birth, correct?

A.   Yes.

Q.   But county recorder -- county election officials enter exactly what's written in that field, correct?

A.   Yes.  And if I could clarify too, in addition to data entry, the voter registration database provides a scanned copy of a physical form.

Q.   So you're not aware of any difficulties that counties encountered during the time in which the place of birth field was optional in determining whether an applicant was qualified to vote in Arizona if they chose not to include place of birth?

A.   No.

Q.   And to the best of your knowledge, no county officials have told you that they needed birthplace information in order to determine whether an applicant was qualified to vote in Arizona?

A.   Not that I can recall.

Q.  So we are going to talk a little bit more about voter registration.  Based on your experience as a state elections director, do county recorders generally need to confirm identity when they process a voter registration form?

A.  Yes.

Q.  And the majority of voters who register to vote in Arizona register via the Motor Vehicle's Department, correct?

A.  Correct.

Q.  So in that case, confirming the identity of the voter occurs during an automated process through the Motor Vehicle's Department, correct?

A.  Yes.

Q.  If a person completes a paper registration form, county recorders must also confirm identity, correct?

A.  Correct.

Q.  And the Elections Procedures Manual does not direct county recorders to use birthplace to determine identity when registering new voters, correct?

A.  Correct.

Q.  And to the best of your knowledge, the Secretary of State has not directed county recorders to use birthplace information to determine the identity of a voter, correct?

A.  Correct.

Q.  And no county has informed the Secretary of State's office that it needs place of birth information in order to identify a

voter, correct?

A.  To the best of my knowledge.

Q.  And to the best of your knowledge, it is not possible for county election officials to confirm a registrant's birthplace information, correct?

A.  That's correct.

Q.  Based on your experience, the Secretary of State's office does not currently use birthplace information for any purpose, correct?

A.  To the extent that the registrant is seeking to be registered to vote, there's no use for that information. However, that information can be used when there needs to be an identification or certainty as to who someone might be talking to on the phone by verifying certain personal information.  For example, post-election signature curing.

Q.  So if I understand that correctly --

THE COURT:  Can you give me an example about how you would use birthplace when you had a questioned signature on a mail-in ballot?

THE WITNESS:  Yes, Your Honor.  So the elections department is charged with contacting voters who might have inconsistent signatures and -- especially as someone -- as you get closer to election day, there's more urgency to verify the signature or verify that the signature is consistent or is the signature of the voter.

So if it's a verification done over the telephone and there's no time for the voter to come in to the tabulation center and provide a new sample signature, the election department will ask a number of questions that presumably only the voter would know, such as place of birth.

BY MS. JHAVERI:

Q.   And in that example, place of birth is not the only question that a county election official could ask, correct?

A.   Correct.

Q.   And they could use information like the last four of a Social Security number, correct?

A.   Yes.

Q.   And in your previous answer you noted that the Secretary of State's office does not use place of birth to register voters, correct?

A.   Yes.

Q.   So as a practical matter, has the passage of HB2492 changed the utility of the birthplace information?

A.   Not that I am aware of.

Q.   And there's no reason why birthplace information would be necessary for the state form applicants but not for federal form applicants, correct?

        MR. LANGHOFER:  Calls for a legal conclusion.

        THE COURT:  Sorry, I couldn't understand what you said.

MR. LANGHOFER:  Legal conclusion.

THE COURT:  Do you know practically -- well, do you deal with the federal registrants only in terms of signature verification, for example and mail-in ballots?

THE WITNESS:  Yes.  Federal-only voters could possibly be contacted for inconsistent signatures.

THE COURT:  And that form, if they registered using that form, it doesn't call for birthplace, to your knowledge, does it?

THE WITNESS:  Correct.  The federal form does not have that field.

THE COURT:  So if you called them on the -- someone to verify their signature, what points of identity would you have since birthplace wouldn't be one of the options?

THE WITNESS:  Well, it would depend on what the registrant had provided in the registration form.  Sometimes people only provide the bare minimum.  But if, as counsel had offered, such as the last four digits of a Social Security number or father's middle name, mother's maiden name, that sort of information could be useful in confirming the identity of a person.

BY MS. JHAVERI:

Q.  And --

A.  I wasn't sure if there was still a question from you, counsel.

Q.  Yes.

MS. JHAVERI:  Your Honor, I assume the objection has not been sustained on the --

THE COURT:  Ask the question that you want her to answer in light of my clarifying question.

MS. JHAVERI:  Sure.  Sure.

BY MS. JHAVERI:

Q.  And as a practical matter, there's no reason why birthplace information would be necessary for state form applicants but not for federal form applicants?

A.  Correct.

Q.  And just in talking about sort of the use of birthplace -- as -- would it be fair to call like a security question or security piece of information?

A.  I think that would be a fair assessment.

Q.  Okay.  And in your experience, counties have been able to confirm voter's identity over the phone while birthplace was an optional field, correct?

A.  Yes.

Q.  And so some of those voters had not completed the birthplace field on the form, correct?

A.  Correct.

Q.  And in the examples we are talking about where someone -- we -- counties are using it a security question, those are typically individuals who are already registered to vote,

correct?

A.   Yes.

Q.   So we talked about this a few minutes ago -- I am going to change topics a little bit.

We talked about this a few minutes ago, but I want to confirm you submitted a 2023 draft of the Elections Procedures Manual to the Attorney General and the Governor for review in September, correct?

A.   Correct.

Q.   And that Elections Procedures Manual is binding on counties, correct?

A.   It is, yes.

Q.   In that draft that you submitted in September, does that include any direction on how county election officials should process the birthplace field after HB2492?

A.   I don't recall.  I would have to look at the manual.

Q.   Sure.

MS. JHAVERI:  Mr. Bagdon, could we pull up what has been entered into evidence as Plaintiffs' Exhibit 11?

THE COURT:  Do you know, based on your knowledge of this draft, whether there have been attempts to include in this manual the changes in the voting laws from the two bills that were passed in 2022?

THE WITNESS:  Your Honor, that's an excellent question.  I really struggled with the voter registration

chapter for that very reason, and in fact, even though it's chapter 1, I waited until the very last meeting with the counties to present it to the counties in the event that there was a ruling from the Court.

Nevertheless, in the very last draft, I included everything from the two bills at issue in the litigation, and there was quite a strong reaction, a negative reaction that I had done so.

In addition, the public comment period, which started August 1st, so post -- after the meeting with the counties, August 1st there was a public comment period that lasted two weeks.

In those public comments, many requested that anything related to this litigation be stripped from the EPM. So in reviewing the EPM draft that was actually submitted, the voter registration chapter admittedly is not consistent with what is or is not included.

And there are footnotes included when -- well, for any litigation, but for this specific litigation, footnotes that are intended to inform the reader that there is pending litigation.

Q. So the September 30 submission to the Attorney General and the Governor's Office does not incorporate the two House Bills in the voter registration section, the new requirements?

THE WITNESS: You know, I believe I took everything

out, but with a deadline approaching rapidly, it's possible that I might have left some content in there -- the voter registration chapter is about 50 pages long.

THE COURT:  Please continue.

BY MS. JHAVERI:

Q.  Ms. Connor, you will see on the screen what's been marked Plaintiffs' Exhibit 11.  Is this the 2023 elections procedure manual that you submitted on September 30th, 2023?

A.  Yes.

MS. JHAVERI:  So Mr. Bagdon, can we look at what is PDF page 28?

BY MS. JHAVERI:

Q.  Ms. Connor, do you see the part C at the bottom where it says, minimum required -- now it has been pulled out -- minimum required information on state forms?

A.  Yes.

Q.  And you have included place of birth in this version of the EPM, correct?

A.  I have, yes.

MS. JHAVERI:  And Mr. Bagdon, can we also pull up footnote 12?

BY MS. JHAVERI:

Q.  I think footnote 12 is what you referenced earlier about, footnotes regarding the litigation; is that correct?

A.  That's correct.

Q.  Okay.  And so to the best of your knowledge, is this the entirety of the direction included about place of birth in the draft EPM submitted on September 30th, 2023?

A.  Yes.

MS. JHAVERI:  You can take that down, Mr. Bagdon.

BY MS. JHAVERI:

Q.  So this draft EPM Elections Procedures Manual does not include any guidance on how county recorders should enter the birthplace information into the voter registration system, correct?

A.  Correct.

Q.  And then nothing about standardizing those entries, correct?

A.  Correct.

Q.  And the draft 2023 Elections Procedures Manual does not include new guidance on what counties should do with the birthplace information once they've entered it into the voter registration system, correct?

A.  I am not sure I know what you mean by "do with" it.

Q.  If there is any use for it that has changed in this version of the Elections Procedures Manual.

A.  No, there is nothing that would refer to that.

Q.  And the Elections Procedures Manual also doesn't include any information on how voters should complete the place of birth field, correct?

A.   Correct.  The procedures manual is not intended for voters, it's intended for administrators of elections.

Q.   We discussed earlier that this field had been optional for many years, so there are a whole host of Arizona registrants who have not completed this field, correct?

A.   I would assume, but I don't have any personal knowledge, frankly.

Q.   Are there any plans in the Elections Procedures Manual on how to have those who have not filled out this form go back and complete it now?

A.   Candidly, the plan is for the attorney general to review the procedures manual, and we will be meeting with the Attorney General's Office and the Governor's Office on at least two occasions to discuss whatever issues throughout the entirety of the procedures manual.

But it is my hope, desire, that we are provided with feedback from the Attorney General on how best to include or not include that information.

Q.   And to make sure I understood, I think you said there were plans to have meetings; is that correct?

A.   That's correct.

Q.   And so no such meeting has occurred to date, correct?

A.   Well, we did have one meeting, so two representatives from the Solicitor General's Office, including Josh Bendor, Bo Dul, the general counsel from the Governor's Office.

I believe there was someone else from the Governor's Office, and I can't recall.  And then myself, my deputy elections director, and Assistant Secretary of State Keely Varvel, we were on a phone call in which I just gave kind of a summary of what was included.  And Ms. Dul expressed her desire to have those meetings, and so essentially the meeting was about scheduling meetings.

Q.  And do you have an upcoming meeting scheduled?

A.  We do have two meetings -- actually, we do have two meetings that are definitely going to happen and scheduled.  We have a third date scheduled for a possible third meeting.  I forgot about that possible third meeting.

Q.  I want to return for a moment to those voters who have not -- who have registered to vote in Arizona but had not completed the place of birth field when they registered.

I think you noted in your answer that you agree that those people exist in Arizona?

THE COURT:  I think she said she thinks they do; she doesn't have personal knowledge.

BY MS. JHAVERI:

Q.  Based on your experience, if the -- based on your experience in elections administration, would you agree with me that it would be very hard to get those folks to complete that information now?

A.  Um, I don't know.  I don't know how hard it would be.

Q.  If the evidence in this case showed that there were close to one million people who had not completed the birthplace information in this field, would you agree with me that it would be very hard to get those million people to complete that birthplace information?

MR. LANGHOFER:  Relevance, Your Honor.  The statute is not retroactive.

THE COURT:  Overruled.

You may answer.

THE WITNESS:  Yes, it would be challenging to gather that information.

BY MS. JHAVERI:

Q.  And to the best of your knowledge, there's no database that the state can use to automatically acquire that information, correct?

A.  Not that I am aware of, correct.

Q.  Okay.  Just a few more questions for you about the current Elections Procedures Manual.

MS. JHAVERI:  So Mr. Bagdon, can we please pull up Exhibit 6 again?

BY MS. JHAVERI:

Q.  So as we discussed, this is Plaintiffs' Exhibit 6, which is the 2019 Elections Procedures Manual.

MS. JHAVERI:  Mr. Bagdon, can we move to PDF pages 18 to 19, which are 4 and 5 of the manual.

BY MS. JHAVERI:

Q.  Ms. Connor, I am going to draw your attention to the birth certificate section that starts at the bottom of page 4 and continues on to page 5, and it has been called out on your screen.  Do you see that?

A.  Yes.

Q.  Okay.  This situation described in this birth certificate section would only come up if a person needed to provide documentary proof of citizenship because a Motor Vehicle Department match did not confirm citizenship, correct?

A.  Not necessarily.  If someone went to the recorder's office with a physical registration form and had a birth certificate, they would not necessarily be run through the Motor Vehicle Department system, that I am aware of, perhaps, but -- this -- someone could prove documentary proof of citizenship just by providing a birth certificate.

Q.  Okay.  Fair enough.  So either in the situation where someone brought in a birth certificate to the County Recorder's Office, or they needed to provide documentary proof of citizenship with a birth certificate because the MVD match did not confirm citizenship; is that correct?

A.  Yes.

Q.  Okay.  And again, there are variety of options for documents that can be used to provide documentary proof of citizenship, correct?

A.   Yes.

Q.   And birth certificate is just one of those options, correct?

A.   Correct.

Q.   And this particular section also only applies when a birth certificate is being used for documentary proof of citizenship and the person currently does not use the same name, correct?

THE COURT:   Okay, why are you having -- that's what it says, so let's ask a question that I don't know the answer to by reading this.

MS. JHAVERI:   Fair enough.

BY MS. JHAVERI:

Q.   So in this scenario, place of birth information is not being used to determine whether this voter is eligible to vote, correct?

A.   Correct.

MS. JHAVERI:   Mr. Bagdon, can we move on to page 5, which is PDF page 19.

BY MS. JHAVERI:

Q.   I will call your attention to middle section, part C, that says U.S. Passport.

And here the U.S. passport is not being used -- excuse me, strike that.

Place of birth in this section about the U.S. passport is not -- is being used to confirm that the document is a U.S.

passport, correct?

A.   Yes.

          MS. JHAVERI:  Then Mr. Bagdon, let's look at page 34,

please -- 34 in the Elections Procedures Manual, I apologize.

BY MS. JHAVERI:

Q.   Ms. Connor, can you look at section C that says, Other

Sources of Information on Deceased Registrants.

          Do you see that?

A.   I do see that, yes.

Q.   In this portion of the Elections Procedures Manual is

describing how to match death notices with those who are

already on the voter roll, correct?

A.   Correct.

Q.   And therefore this process would only apply to those who

are already registered to vote, correct?

A.   Yes.

Q.   And birthplace is just one of several pieces of optional

information that could be used for such matches, correct?

A.   That's correct.

Q.   And none of the three examples --

          MS. JHAVERI:  Mr. Bagdon, you can take this down.

BY MS. JHAVERI:

Q.   None of the three examples we just looked at indicate that

birthplace is necessary to determining a voter's qualifications

to vote, correct?

A.  Correct.

Q.  And as we discussed earlier, you do not believe that birthplace, even if required, provides any information that could determine a voter's qualifications to vote, correct?

A.  Correct.

MS. JHAVERI:  Thank you, Ms. Connor.  That's all my questions.  Ms. Lang for the plaintiffs has some additional questions.

May I approach?  I do have copies of the witness list.

THE COURT:  Yes.

THE CLERK:  Thank you.

THE COURT:  So I don't understand the witness list.  It doesn't include the names of the people that have already testified.  It just has five names on it.

MS. JHAVERI:  Your Honor, I believe --

THE COURT:  Which would be great, because we would be done.

MS. JHAVERI:  I think we understood this to be today's witness list.

THE COURT:  No, it is not -- you are required, and I know that Elaine has explained this to one or more of you, to give us your final complete witness list.  It is not about who is testifying today.  It is about what witnesses are testifying at the trial.

MS. LANG:  I am advised this will be provided to you

no later than after lunch today, Your Honor.  And my deepest apologies.

THE COURT:  Thank you.

MS. LANG:  Thank you.

DIRECT EXAMINATION

BY MS. LANG:

Q.  Good morning, Ms. Connor.

A.  Good morning.

Q.  I am Danielle Lang.  We've met before.

A.  Yes.

Q.  I represent the LUCHA plaintiffs in this matter, and I am going to ask you some additional questions.  And thank you very much for your time.  I would like to start by introducing Plaintiffs' Exhibit 45.

Do you recognize this document?

A.  Yes.

Q.  Can you tell me what it is?  And what is it?

A.  It is a letter from then Secretary of State Katie Hobbs to Governor then-Governor Ducey requesting that he veto HB2492.

Q.  And you have said this, but this was submitted by the prior Secretary of State, not Secretary Fontes, correct?

A.  Correct.

Q.  But you have reviewed this veto letter before; is that correct?

A.  Yes.

Q.  I want to review some of the language in here to understand what the current Secretary's position is as to HB2492.

THE COURT:  Is this in evidence?

MS. LANG:  I was going to move it in, Your Honor.  I'd like move in Plaintiffs' Exhibit 45.

MR. LANGHOFER:  No objection, to the extent it's not for the truth of the matter asserted.  If it is for the truth then it's offering legal opinions.

THE COURT:  What is the purpose for the admission of this bit of hearsay?

MS. LANG:  Several purposes, Your Honor.  One is to understand any continuity in the positions of the Secretary of State from Secretary Hobbs to Secretary Fontes and so --

THE COURT:  Of what relevance is it that the former Secretary, now-governor and the current Secretary agree or disagree about what issues, including costly litigation, which apparently was correct, the signing of HB2492 will have?

I don't see the utility of this document for any purpose here.

MS. LANG:  The Secretary of State's letter not only goes to kind of Secretary Hobbs' kind of personal opposition to the bill, but her view on the problems that this will create for election administration.

And I would like to discuss Secretary Fontes' agreement or disagreement with those statements about the

difficulties for election administration posed by these bills.

THE COURT:  The objection is sustained.

MS. LANG:  I will move on, Your Honor.

BY MS. LANG:

Q.  Does the Secretary of State maintain the statewide voter registration database.

A.  Yes.

Q.  And what is that database called?

A.  It is called the Access Voter Information Database or AVID.

Q.  And you work with a third-party vendor to maintain that database; is that right?

A.  Correct.

Q.  What's the name of that vendor?

A.  INEXL, I-N-E-X-L.

Q.  Okay.  And AVID is currently used by 13 of the counties for their voter registration databases directly, correct?

A.  Correct.

Q.  Is it also the case that Pima and Maricopa County maintain their own database systems?

A.  Yes, they maintain their own databases with interfaces with AVID.

Q.  Okay.  And I think I understand that last part of your answer to be that Pima, Maricopa County systems sync regularly with the AVID system, correct?

A.  Correct.  It's essentially a bottom-up system.

Q.  Yes.  And we heard testimony yesterday that the Maricopa County database kind of syncs in real time with AVID; is that your understanding?

A.  You know, I really don't know.

Q.  Fair enough.  You testified earlier that the Secretary has submitted a draft of the 2023 EPM to the Attorney General and the Governor; is that correct?

A.  Yes.

Q.  And that was on September 30th?

THE COURT:  Okay.  This -- you get to continue the direct, but you don't get to ask the same questions.

MS. LANG:  Yes, Your Honor.

BY MS. LANG:

Q.  Did you submit that on September 30th?

THE COURT:  That's the same question that we already covered when she was testifying previously on direct.

MS. LANG:  I'm sorry, I did not recall that she had testified as to the date, but I apologize.

THE COURT:  And it's right on the admitted exhibit.

MS. LANG:  Okay.

BY MS. LANG:

Q.  And you testified earlier that you had an involvement.  Did you primarily write this draft of the EPM?

A.  Yes.

Q.  Okay.  And you testified that there are scheduled meetings

with the AG and Governor's Office.  When are those scheduled meetings?

A.  I don't recall the exact dates.  I have a busy calendar.

Q.  Fair enough.  You have to submit -- or the Governor and AG only have until December 1st to approve; is that right?

A.  December 31st, I believe.

Q.  31st.  My apologies.  Is the first meeting in the month of November, to your knowledge?

A.  Yes.

Q.  Okay.  And are all of those meetings before December 31st?

THE COURT:  Okay, let's -- this is a little tedious. It is pretty obvious, so let's ask something substantive and important.

MS. LANG:  Okay.  Thank you, Your Honor.

BY MS. LANG:

Q.  You testified that you aim to take out most of the components of HB2492 and HB2243 from the submission that you gave to the Attorney General and the Secretary of State, but I want to drill down on that just a little bit more.

Are there portions of the draft that seek to incorporate some of this Court's rulings already on portions of the Challenged Bills?

A.  Yes, the draft submitted to the Attorney General and Governor did attempt to incorporate Judge Bolton's September ruling.

Q.   Okay.  And so I would like to pull up Plaintiffs' Exhibit 13.  Are you familiar with this document?

A.   Yes.

Q.   And what is it?

A.   I created a summary of key changes to the procedures manual, and I believe these were key changes since the August 1st draft that was submitted for public comment.

Q.   Understood.  And who was the intended audience for this document?

A.   Anyone interested in knowing what the changes would be.

Q.   Is it posted online, or how have you kind of provided this document to folks who are interested?

A.   I don't know if it's posted online.  You know, we do have challenges with our website, so I wouldn't be surprised if it was not.

Q.   Fair enough.  It is an evergreen problem.

     Was this provided to the Attorney General and the Governor's Office, to your knowledge?

A.   I believe I did submit it to them with a copy of the final EPM draft.

Q.   Okay.

     MS. LANG:  I would like to move Plaintiffs' Exhibit 13 into evidence.

     THE COURT:  Is there any objection?

     MR. WHITAKER:  No objection, Your Honor.

THE COURT:  Okay.  Exhibit 13 is admitted without objection.

(Exhibit Number 13 is admitted.)

BY MS. LANG:

Q.  So I would like to look at section 2A2, and do you see here that there's a citation to this very case there?

A.  Yes.

Q.  Okay.  And this notation about section 2A2 indicates that -- that section has language related to the LULAC consent decree consistent with this Court's order; is that correct?

A.  Correct.

Q.  Okay.  In looking at section 2C -- there's a number of items listed section 2C I now see.  The last one at the end here is labeled section 2C, and it relates to the documentary proof of residence requirement; is that right?  The last section 2C at the very bottom of the page.  I apologize.

MS. LANG:  If we could take this one down?

THE WITNESS:  Yes, it does.  But the full section is not included on this page.

MS. LANG:  Yes.  So can we look at the next page, Mr. Bagdon.  Thank you.

BY MS. LANG:

Q.  And so this is a continuation here, and there's a list of documents that are acceptable forms of proof of documentary proof of residence; is that correct?

A.   Yes.

Q.   Okay.  And a citation to this case; is that correct?

A.   Correct.

Q.   And so was this added to the EPM in order to reflect this Court's order about what should be accepted as documentary proof of residence?

A.   Yes.

Q.   Okay.  And section 4C?

A.   You know what, I will add though, it just coincidentally, when Judge Bolton's ruling came out, we were -- we, meaning representatives from the Secretary of State's office, were at a tribal summit and representatives from the various tribes that were in attendance requested -- specifically requested this section be included.

Q.   Thank you for that addition.

     And section 4C about minimum information required includes instructions about the citizenship check mark; is that correct?

A.   Yes.

Q.   And was that added also to be consistent with this Court's order that the citizenship check mark is not material if a person has provided documentary proof of citizenship?

A.   Yes.

Q.   Okay.  And I see here also that you note that litigation is still pending on the place of birth issue, correct?

A.   Correct.

Q.   And we reviewed earlier that you also have a footnote in the EPM to that effect?

A.   Yes.

Q.   So to your knowledge, are there any other places where you changed the Elections Procedures Manual to reflect this Court's order?

A.   I can't recall.

Q.   Okay.  I would like to pull up Plaintiffs' Exhibit 11, which is the 2023 submission of the Elections Procedures Manual, and I can't -- if someone could let me know, has this been moved into evidence?  Yes.  Okay.  Thank you.

         And if we could go to PDF page 21 to 22, which is Elections Procedures Manual page 12, I believe.

         I think we can just look at 22, actually.  And this discusses the residency requirements for registration; is that correct?

A.   Yes.

Q.   And looking at that second paragraph, the first sentence of the second paragraph indicates that a person who registers to vote "shall" provide an identifying document that establishes proof of location of residence; is that right?

A.   Yes.

Q.   And I note there that there's an exception for UOCAVA registrants, correct?

A.   Yes.

Q.   Is there any exception there for federal form applicants?

A.   No, but in drafting the voter registration section, my attempt was to divide what was going to be required on the federal form versus the state form.  So perhaps I added a sentence in the federal form section but I -- no, you are correct, there's nothing in here about the federal form.

THE COURT:  What's a UOCAVA registrant?

THE WITNESS:  It is a military and overseas voter.

THE COURT:  Thank you.

BY MS. LANG:

Q.   I will confess, that I'm not sure I can recite the acronym.  It's Uniformed and Overseas.

A.   -- Citizens Absentee Voting Act, I believe.

Q.   Yes.  Okay.

MS. LANG:  And then if you take that down -- I apologize.  I just meant the call-out.  That's my fault.  So Plaintiffs' Exhibit 22 -- or Plaintiffs' Exhibit 11 at 22.

BY MS. LANG:

Q.   And then this is where that list of acceptable documents appears that we just discussed a moment ago; is that right?

A.   Correct.

Q.   Okay.  And to your knowledge, do these -- does this list of documents mirror exactly the Court's order in this case?

THE COURT:  Again, the question doesn't really have a

lot of utility.  Either it does or it doesn't mirror what the Court's order says.

MS. LANG:  Okay.

BY MS. LANG:

Q.  The last bullet point indicates that one option would be written confirmation by the registrant.  Do you know if there's any kind of template for an individual to use for written confirmation, if they want to use this option?

A.  This is an issue we will be seeking legal advice on.  We only recently were able to be represented by the Attorney General's Office due to the legislature prohibiting the Attorney General from providing advice to the Secretary of State.

Also, the Secretary of State was -- is prohibited from hiring counsel, so due to very limited legal resources, this has not been -- nothing related to this written confirmation has been drafted.

Q.  Okay.  You may not be able to answer this question, given what you just said, but do you know if there's a plan to create a declaration option that would satisfy the written confirmation?

A.  That's the plan, yes.

Q.  Okay.  To your knowledge, does anything in the EPM submission address this Court's ruling that the documentary proof of residence requirement cannot be applied against

federal form applicants for federal elections?

A.   Um --

THE COURT:  I think she's already said that she thinks that in the section related to the federal form, she might have included something; is that right?

THE WITNESS:  That's correct, Your Honor, yes.  I just don't recall how I ultimately reconciled those two.

MS. LANG:  Okay.  I am going to find the page so we can look at that.

BY MS. LANG:

Q.   But in the meantime, I do have a kind of a process question there, which is, if we could assume for a moment that that is not yet part of this draft submission, you have talked about how there's going to be meetings with the AG and the Governor's Office.

Will there be an opportunity for revision of the Election Procedures Manual through that consultation process with the Attorney General and the Governor's Office?

A.   Well, of course.  The Attorney General's review is essential.  It's critical to make sure all of the legal requirements are met.  So in the event I did not address something regarding the federal form, I certainly hope the Attorney General will raise that as an issue.

So I did find some comfort in the fact that the Attorney General who, as I noted, was not prohibited from

providing us legal advice, would be able to do a full

assessment.  Because I know, I'm humble, I could not take on

all of these legal issues, as hard wanted -- as hard as I

tried.

Q.  You are just one lawyer?

A.  Yes.

Q.  Understood.  Just to get on the same page as a foundational

matter, it is your understanding that the Court has held that

the documentary proof of residence requirement can't be held

against federal form applicants for federal-only voters -- for

federal-only elections, correct?

A.  Correct.

Q.  And is it presently the Secretary's view that that means

that state form applications without documentary proof of

residence must be rejected or placed in suspense while federal

form applicants who do not submit documentary proof of

residence can be registered as federal-only voters?

A.  So to rephrase your question, if I may?

Q.  Please.

A.  Are you asking if the LULAC consent decree essentially

applies in the same way?

Q.  I think the principle at least of the LULAC consent decree

applies to the documentary proof of residence issue?

A.  That's an issue I would not make an assumption either way

and would seek legal advice.

Q.  So presently that's an unresolved issue within the Secretary of State's Office?

A.  That's an issue that I need legal advice on, yes.

Q.  Okay.  And the reason I phrased it that way is of course the documentary proof of residence requirement didn't exist at the time the LULAC consent decree was drafted, correct?

A.  Well, I will say factually that did not exist at the time of the LULAC consent decree.

Q.  Okay.  I think we've addressed that.

     If the LULAC consent decree, you know, did not extend to the documentary proof of residency issue, would that create a situation where state and federal form applicants are going to be treated differently depending on which form they submit?

A.  That's a potential issue, yes.

Q.  Okay.  And you have testified about your extensive experience and knowledge about the voter registration process in Arizona, does the federal form application provide any additional information about residence that is not provided by the state form?

A.  Well, candidly, I have not looked at the instructions related to the federal form in quite a while, but part of the process, if anything, was added regarding state-specific instructions such as documentary proof of citizenship, or documentary proof of residence.

     There would be a request to the Elections Assistance

Commission to add instructions to the federal form.  So I don't think we can answer that question necessarily before that step is taken of requesting certain instructions be included.

Q.  To date, has any such request been made to the Election Assistance Commission to add documentary proof of residence to the federal form and state-specific instructions?

A.  No.

Q.  Okay.  Are you aware of any current plans to make such a request?

A.  Yes, I think my last question answered that.  I fully intend to do so.  We are seeking legal advice on the broader issues, but part of the process is to request from the EAC instructions be included with the federal form.

Q.  Okay.  Right now, if someone turned in a federal form application rather than a state form application, would their application include any additional information about residence that would not be included on the state form?

A.  Well, right now all of the procedures that are necessary to make the changes in AVID are being undertaken.  I am not aware of any county enforcing either accepting a form or not accepting a form based on the DPOR.

Q.  I think I am doing a poor job of asking my question, so I apologize.  Let me try it a different way.

Can you identify any election administration purpose that would be served by registering federal form applicants

that do not provide documentary proof of residence but not state form applicants that do not provide documentary proof of residence?

MR. LANGHOFER: Objection, to the extent she's being asked --

THE COURT: Excuse me. Do you mean to be registered as a federal-only registrant?

MS. LANG: Yes, Your Honor. You know is there any -- perhaps just put it in a simpler way. Can you think of any election administration purpose to not extending the principals of the LULAC consent decree to the documentary proof of residence issue?

MR. LANGHOFER: Objection to the extent that she's being asked to testify for the state as opposed to her perspective as an election official.

THE COURT: Overruled. You may answer.

THE WITNESS: It is not anything that I've really put any thought into.

BY MS. LANG:

Q. Okay. To your knowledge, does the Election Procedures Manual right now include any information about HB2243's list maintenance provisions?

A. I believe it does.

Q. And what do you believe is included?

A. I don't know. You would have to refresh my memory. I

would need to see it.

Q.   Okay.   I recall you saying that you attempted to remove most of the challenged provisions from the Elections Procedures Manual; is that correct?

A.   Yes.   I -- you know, I think also with HB2243 and 2492 they are used interchangeably so much, I really would need more specificity exactly what you're talking about.

Q.   Absolutely.   And I am happy to pull up the bill if we need to, but perhaps I can try to clarify.

     HB2243's provisions focus on the various database matching that would happen on the back end after voter registration during this maintenance?

A.   Okay.

Q.   Does that refresh your recollection?

A.   So the section that every 30 days the information is run through MVD or Social Security or SAVE or something like that?

Q.   That's correct.   And let's put up Plaintiffs' Exhibit 2, just so you can look at it.   And I believe the relevant pages are page 4 and 5.

     And maybe you can just take a moment to refresh your recollection about HB2243's provisions.

     THE COURT:   Well, what do you want to ask her about? Because there's a lot of text here that you may not be going to ask her about.   So before she has to read too many pages, maybe you could focus her on the section you want to ask her about,

for example, the one that puts responsibilities on the Secretary of State.

THE WITNESS:  Thank you, Your Honor.  Because this page -- or the two pages refer to the jury commissioner, jury manager.

THE COURT:  County Recorder.

THE WITNESS:  County Recorder.

THE COURT:  Attorney General.  But I know there's a Secretary of State.

MS. LANG:  Can we look at the next page?  And the following page after that?  Page 6.  And if we could pull the the split screen for page 5 and 6, which is PDF page 6 and 7.

And I think, you know section F refers to -- I think what you were just referring to, which is the Secretary of State's comparison of the driver's license database against the MVD data; is that right?

A.  Yes, it does.

Q.  Okay.  Do you recall if there's anything in the Elections Procedures Manual about that process?

A.  I don't recall including this part.

MS. LANG:  We can take that down.

BY MS. LANG:

Q.  And do you recall that there is language in HB2243 that instructs recorders to conduct a check against the SAVE system if they have, quote, reason to believe someone is not a U.S.

citizen?

A.  Yes, and the SAVE system, it's not permissible under the agreement with the USCIS to do so, so the county recorders would not be permitted to do so.

Q.  So that's not in the Elections Procedures Manual?

A.  I likely would not have included that.

Q.  Okay.

THE COURT:  What do you mean by that?  Does that mean that you're prohibited access to the SAVE database?

THE WITNESS:  There's a Memorandum of Agreement between the Secretary of State and USCIS, and there are certain permissible uses.  The permissible use for using the SAVE system is for new applicants to register to vote, but there's no permissive use for an ongoing check of someone's citizenship status.

THE COURT:  Because I did hear testimony yesterday about, if someone provides their A number or their naturalization number, there's an ability to run it through the SAVE system through your office?

THE WITNESS:  That's correct.

THE COURT:  And that's for a new registrant that will confirm their new -- presumably their new citizenship?

THE WITNESS:  That's correct, yes.

THE COURT:  But with respect to the statute saying, every 30 days or whenever you think maybe somebody isn't a

citizen, run it through SAVE that's prohibited?

THE WITNESS:  Under the agreement that we have with the federal government, that's correct.  And I think the language in the statute is to the extent practicable.

THE COURT:  Yes.  It is not practicable at the moment because it's prohibited under the memorandum of understanding.

THE WITNESS:  That's correct.

THE COURT:  Okay.

BY MS. LANG:

Q.  And just to follow-up on that line of questioning.  Can we pull up Plaintiffs' Exhibit 266.  Is this a copy of the Memorandum of Agreement that you were just referring to between the Secretary of State and the USCIS?

A.  Yes.

MS. LANG:  I would like to move 266 into evidence.

THE COURT:  Is there any objection to Exhibit 266?

MR. WHITAKER:  None from the State, Your Honor.

MR. LANGHOFER:  No objection, Your Honor.

MS. PORTER:  No objection, Your Honor.

THE COURT:  Without objection, Exhibit 266 is admitted.

(Exhibit Number 266 is admitted.)

BY MS. LANG:

Q.  And looking at page 2 of this document, there's a purple section here; do you see that?

A.   Yes.

Q.   Okay.  And was this section of the Memorandum of Agreement what you were referring to as kind of the restrictions on what users -- what Arizona election officials can do with the SAVE system?

A.   This section.  And I do believe the more specific terms articulate that as well.

Q.   Okay.  And that language at the end that says that it can be used for registrants when they register to vote?

A.   Correct.

Q.   Okay.  Do you know what would happen if a county right now attempted to use -- did use the SAVE system for list maintenance process that did not occur at the time of registration?

A.   I don't know.  I just don't know.

THE COURT:  Excuse me.  Could that happen?  Isn't this access from the Secretary of State only; the county recorders don't have any direct access?

THE WITNESS:  Your Honor, actually the Secretary of State has access and certain counties have access, such as Maricopa County, being such a large county.

And I know Maricopa County as a service to other counties, the smaller counties, does run numbers, A numbers through the SAVE system.

THE COURT:  So Maricopa County can do it directly; the

smaller counties have to make the request through the Secretary

of State's Office?

THE WITNESS:  You know, I can't say with certainty

whether other counties have an agreement -- have access to

SAVE.  I am just more familiar with Maricopa County's system.

BY MS. LANG:

Q.  Is it possible that county election officials have logins

they can use themselves through the access that's been granted

by the Secretary of State?

A.  That's probably how it works, correct.

Q.  I think there will be testimony -- or there has been

deposition testimony to that effect submitted in this case.  So

hypothetically --

THE COURT:  Excuse me, if that's the case, that the

various county recorders have access to SAVE, how will this MOA

be enforced to make sure county recorders don't do something

that's beyond the scope of the access that the MOA allows?

THE WITNESS:  I don't know.  I am not sure how they

would enforce that.

MS. LANG:  That was my question, Your Honor.

BY MS. LANG:

Q.  Is there any kind of monitoring that the Secretary of State

is currently doing to try to ensure compliance with this

Memorandum of Agreement?

A.  Okay.  As far as monitoring, usually these type of systems,

such as like an applicant for AHCCCS or Medicaid, there are safeguards built in to ensure that people don't stray from the parameters of what they can and can't access.

Also like with databases accessible to law enforcement, they don't want people to look up, you know, their girlfriend or boyfriend or, you know, something like that.

So my assumption is something with this much sensitive information, the federal government would build in a safeguard to prevent anyone that has access to SAVE from deviating. But I don't know well enough, but certainly our office doesn't do any sort of audit or check.

Q.  Okay.

A.  The county recorders are duly elected constitutional officers.  They are the custodians of their own voter registration database.  So the Secretary of State's Office does not really play a role in monitoring what they're doing.

BY MS. LANG:

Q.  But the county recorders do have access to the SAVE system through the Secretary's Memorandum of Agreement with the USCIS, correct?

A.  Yes.

Q.  Okay.  And does the Secretary's office have any safeguards in place to ensure that users provided access through this agreement are complying with the agreement?

A.  I don't know.  I'd have read the whole agreement.  I just

don't know, or someone else -- it sounds like you have a witness that will testify that has more expertise related to this subject.

Q.   Who in your office would have more expertise about how the Secretary ensures compliance with the Memorandum of Agreement?

A.   Well, I've recently hired -- well, I have a deputy elections director, and then I have hired a voter registration director.  So I have two directors that report to me.

The new director would be familiar with this because he formerly worked for Secretary of State -- former Secretary of State Brewer and I believe former Secretary Bennett.  He likely would have knowledge about this, as well as Mr. Russ Smith.  I don't know.

One reason I hired Craig Stender, the individual that's overseeing voter registration, is because it is such a massive, massive amount of work.

I made a determination early on when I started, I can either be the voter registration manager, the deputy elections director, or the elections director.  I was hired to be the elections director, so I certainly don't have the level of granular knowledge that you are seeking.

Q.   Okay.  Do you know if the Secretary of State provides any training to county recorders on use of SAVE in compliance with the Memorandum of Agreement?

A.   I am not familiar with training.

Q.  Okay.  And I will move on in just a moment, I promise.

THE COURT:  Well, we are going to take a break.  We will reconvene in 15 minutes.  Court is in recess.

MS. LANG:  Thank you.

(Recess taken at 10:34 a.m.; resumes at 10:51 a.m.)

THE COURT:  Please sit down.

Ms. Lang, you may continue your questions.

BY MS. LANG:

Q.  Thank you, Ms. Connor.  Earlier today we talked in great length about the Elections Procedures Manual.  My understanding is that the Secretary of State plans to publish some guidance documents to elections officials outside of the Elections Procedures Manual context; is that correct?

A.  Yes.

Q.  Okay.  Unlike the Elections Procedures Manual, my understanding is that those guidance documents will be just that, guidance, and not legally binding on the county recorders; is that also correct?

A.  Well, I would say it is a combination of both.  They would be legally binding because they're going to be based on statutes, but they're guidance because statutorily the Arizona Supreme Court has told us that the EPM is restricted in what shall be included in the EPM.

So, for example, a new political party recognition, there's a whole chapter in the former EPM.  That was taken out

because nowhere in Title 16 does -- is there a statute that provides for a new political party recognition procedure be developed.

Nevertheless, in Title 16 there are statutes that apply, and that chapter is very helpful because this year we've -- we are now on our second new political party recognition process underway, and we will have a third by the end of the month.  So, yes, we are producing guidance documents to that effect.

Q.   Thank you.  And I understand that clarification to mean that the guidance documents are legally binding insofar as they reflect state law, but they wouldn't have any independent force of law beyond that; is that correct?

A.   No, but they could be updated as the legislature updates the statutes.

Q.   Correct.  I think you just answered this, but is one of the benefits of issuing these guidance documents outside of the EPM is that you will have more flexibility in being able to update those documents than you do with the Elections Procedures Manual?

A.   Yes.  Okay.  And you can provide maybe more fulsome guidance that than you think is appropriate for the Elections Procedures Manual?

A.   Absolutely.

Q.   Okay.  And does -- the 2023 Draft Elections Procedures

Manual actually trims down a good bit from the 2019 Elections Procedures Manual; is that accurate?

A.   It does.  I don't know the exact page number from 2019 to 2023, but given the numerous statutory changes, the main content of the EPM, it's pretty close to the number of pages.

What we did take out were the sample letters in the appendix, sample letters that would be used, for example, if DPOC or DPOR was not provided.  Those are going to be sample letters that we can provide on our website.  We did not need to include all of that information.

Q.   And when we talked about this during your deposition in September, I know you were still in the process of kind of planning for some of these guidance documents; have any of those been issued since the time we last talked?

A.   No, but they're in their final form, and we're going through the checks and balances and double-checking, so they should be issued shortly.

Q.   And you say "they," can you identify the guidance documents that you currently have near-final drafts for?

A.   Yes.  New political party recognition, candidate nomination petition challenges.  And that chapter was specifically taken out under the case -- Arizona Supreme Court case McKenna v. Soto.

We're also providing guidance on voter -- how to determine voter intent.  So, for example, if someone fills in

the oval when they're marking the ballot and there's a stray mark, perhaps someone rested their pen on another oval, that's just one example of -- I think there are 30 different types of cases of guidance on how to determine voter intent, if it was just a stray mark or the voter intended to overvote a ballot.

And we're doing signature verification guide and -- signature verification guide and that references actually two separate guides.

There is a signature verification section from the 2019 EPM that dealt with when a signature on an initiative petition shall be acceptable or not -- or rejected.

So for example, if a date of the signature on an initiative petition is omitted, the signature should be rejected. So it's not a signature analysis guide, simply approve the signature or don't approve. There will be that guide.

Separate from that will be a signature verification guide to the effect of when or how to spot forgeries, how to know consistencies with signatures. There are certain markers, certain training materials that we can provide.

Q. Okay.

A. Those are just the manuals that I can think of off the top of my head.

Q. Any related to the issues presented in this case that are currently planned?

A.   Not that I can think of.

Q.   Okay.  I would like to turn to Plaintiffs' Exhibit 2, which we've talked about a little bit already today.  That's HB2243, and look at page 4, which as we referenced earlier, is about the jury summary reports.

Are you familiar with the jury summary reports that go to the county recorders related to issues of non-citizenship?

A.   I am familiar with the existence of the reports, but I've never personally seen one.

Q.   Okay.  Is it your understanding that they are just summary reports though?

THE COURT:  Okay.  She's never seen one.  She knows that they exist, so I don't know how she can be very helpful in telling us what's in them.

MS. LANG:  I have some deposition testimony from Ms. Connor on this precise topic, so I am happy to turn to that if that would be most helpful.

THE COURT:  Is there really something important for her to tell us about the jury summary reports that somebody that's actually seen one isn't going to tell us?

MS. LANG:  Ms. Connor testified to her own concerns about the problems with using summary reports.

THE COURT:  Maybe you could ask her about that.

MS. LANG:  Okay.  Yeah, this is a fun -- okay.

BY MS. LANG:

Q.  Do you have any concern about county recorders acting on a voter registration based on a jury summary report that a county recorder receives?

A.  Yes.  So the legislation requires cancelation perhaps within 35 days of a juror or respondent to a jury questionnaire who indicates that he or she is not a citizen or not a resident.

          With that said, the concern is that it is a summary report.  We never see the jury questionnaire or the response from the individual.  We never have that source document, and we never will.  They're confidential, for obvious reasons.

          And I believe -- under Arizona Revised Statutes they can be destroyed as early as 90 days after the questionnaire is received.  So I am concerned about acting on information without the source documents.

          Second, to remove someone or to cancel a voter registration under the National Voter Registration Act, there have to be two letters sent to the voter via first class mail.

          The first letter is non-forwardable, and it's non-forwardable so the letter is returned back to the elections department or county recorder to note that that person no longer lives at a certain address.

          Then there's a second forwardable mailing.  This section just jumped to the second mailing, and I am not -- we

don't have enough information about the initial mailing from

the jury commissioner or jury manager for every county, every

municipality.  So I am not sure if it would satisfy the

mailings in this situation would satisfy the National Voter

Registration Act.  Again, that's an area where we need legal

advice.

Q.  Thank you, Ms. Connor.  And just to return to your first

concern about summary reports, is one of your concerns that

elections officials just can't verify independently that this

person did in fact report themselves as a noncitizen just by

looking at the report?

A.  Correct.

Q.  Okay.  And is one of your concerns that errors could be

introduced in a summary report by the jury administrator that

an elections official couldn't catch?

A.  Yes.

Q.  Going back to PX2, and it's page 6 of HB2243, the PDF

number might be different, but we're looking for page 6.

And among -- we have talked a few times now about this

area of HB2243 that requires county recorders to look at a

variety of databases.  Can you look at section J.  And I will

give you a moment to review it, and then I will have a

question.

A.  Okay.

Q.  Beyond any of the databases that are otherwise listed in

HB2243, has the Secretary's office identified any databases as either ones that should or should not be used for comparison under this catchall provision?

A.  No.

Q.  Okay.  Is one of the concerns that your office has about HB2243 that this section could invite third parties to submit lists of voters suspected not to be U.S. citizens, and then the County would be obligated to investigate?

MR. WHITAKER:  I think it calls for speculation.

THE COURT:  Overruled.  You may answer if that's something that your office has discussed and raised concerns about.

THE WITNESS:  Yeah, I am not sure I am understanding the question being asked.

MS. LANG:  So if we could -- I think I can refresh recollection with Ms. Connor's deposition transcript at page 102.

BY MS. LANG:

Q.  And if you could look at lines 17 to 21?

A.  Yes, I see that.

Q.  So it's still, sitting here today, a concern of your office that one of the problems with HB2243 is that anyone could submit a list of voters suspected not to be U.S. citizens for the County to investigate?

A.  That's one concern, yes.

Q.   Okay.  Is this a concern that's been expressed to you by any county recorders?

        MR. LANGHOFER:  Hearsay.

        THE WITNESS:  I don't recall.

        THE COURT:  Overruled.  You may answer yes or no, or you don't recall.

        THE WITNESS:  I don't recall.

        MS. LANG:  Can we pull up Plaintiffs' Exhibit 196?

BY MS. LANG:

Q.   I will note this is an email from Stephen Richer.  And who is Stephen Richer?

A.   He's the Maricopa County Recorder.

Q.   And do you see your name included in the "To" line here?

A.   Yes.

Q.   And what's the date on this email?

A.   June 15th, 2022.

Q.   Okay.  And here Mr. -- or Recorder Richer writes, does this get rid of the situation whereby any person can submit its list, and then we have to check.  EG, hi, I used my super secret research program to figure out that these 300,000 people aren't citizens.  Please check the citizenship of every single one of them right now.

        Do you see that?

A.   Yes.

Q.   Does this refresh your recollection of whether or not

you've ever heard from county recorders about the concern that this statute might allow -- might force county recorders to investigate any database that was sent to them about citizenship?

A.  Yes, it does.  Please remember, I would have received this when I was a Deputy County Attorney, not in my capacity as the state elections director.

Q.  Understood.

MS. LANG:  I would like to move in Plaintiffs' Exhibit 196?

THE COURT:  Is there any objection?

MR. LANGHOFER:  I don't think it's admissible for the truth of the matter, Your Honor.

THE COURT:  I don't think it is offered for the truth.

MR. LANGHOFER:  In that case, no objection.

MS. LANG:  It is also a statement of party opponent, Your Honor.  Stephen Richer is a defendant in this matter.

THE COURT:  It's -- I don't know how it's being offered for the truth of anything.  It is just he has expressed a concern.  It is not a true-or-false situation.

MS. LANG:  I agree, Your Honor.

THE COURT:  Okay.  Without objection -- whatever this number is, I don't see the number.

MS. LANG:  Plaintiffs' Exhibit 196.

THE COURT:  196 is admitted.

(Exhibit Number 196 is admitted.)

MS. LANG:  Thank you.

BY MS. LANG:

Q.  And in your experience in elections, is it the case that sometimes bad faith actors do submit these kind of voluminous materials?

A.  It's hard to make such a broad generalization, but, yes, there are cases where nuisance complaints are filed.

Q.  Okay.  Thank you.  Do you believe that Arizona has strong safeguards in place to protect against voter fraud?

A.  Yes.

Q.  Based on your personal experience in elections these many years in Arizona, are you personally aware of any specific instances of noncitizen voting in Arizona?

A.  No.

MR. LANGHOFER:  Foundation.

THE COURT:  Objection is overruled.

You may answer -- or the answer, "no," has been given.

MS. LANG:  Okay.

BY MS. LANG:

Q.  Since the 2020 election, there's been a high volume of misinformation about elections in Arizona; is that correct?

A.  Yes.

Q.  And that has led to heated rhetoric and false allegations against election officials; is that correct?

A.  Yes.

Q.  Okay.  And have election officials experienced harassment as a result of these false allegations?

A.  Yes.

Q.  All right.  And to your knowledge, have some election officials faced death threats?

A.  Yes.

Q.  And are you aware that Secretary Fontes testified before Congress last week, partially on this topic?

A.  Yes.

Q.  Did you watch Secretary Fontes' testimony?

A.  I did not.

Q.  Okay.  Have you seen his written testimony?

A.  I have, yes.  And he's in the courtroom today, if I could introduce him.

          MS. LANG:  Thank you very much for being here, Secretary Fontes.

BY MS. LANG:

Q.  And would you agree with his characterization that election officials are now, quote, "Live with the reality of go-bags for members of our families so that we can leave our homes at a moment's notice."

          MR. LANGHOFER:  Objection that it calls for confirmation about court statements.

          MS. LANG:  I'm sorry, I didn't quite hear the

objection.

THE COURT:  It doesn't matter; it was sustained.

MS. LANG:  I am just trying to understand how I might rephrase.

THE COURT:  Calls for an out-of-court statement.

MS. LANG:  By Secretary Fontes.

THE COURT:  Yes.

MS. LANG:  As --

THE COURT:  Why don't you ask her a direct question.

MS. LANG:  Okay.

BY MS. LANG:

Q.  Are election officials now living with the reality of go-bags for their members and families so that they can leave their homes at a moment's notice?

A.  Election officials live with the reality that the hostility, misinformation, and threats exist.

Q.  And has your office hired a state-wide security officer in part in response to this new environment?

A.  Yes, the office has a CISO, a Chief Information Security Officer.

Q.  And does your office now conduct monthly security meetings?

A.  I can't say how frequently they are.  There are many security meetings.  He, Michael Moore, CISO, he predominately works on the cybersecurity part in monitoring threats.  We also have another security officer who handles more of the physical

security requirements.

Q.   And have some election officials in Arizona resigned in light of this present environment?

A.   Yes.

Q.   In fact, have election offices in Arizona experienced unusually high turnover in the past couple of years?

A.   Yes.

Q.   And isn't it true that Arizona today ranks second in the nation for negative turnover among top election officials?

MR. LANGHOFER:  Foundation.

THE COURT:  Sustained.

BY MS. LANG:

Q.   Do you know how Arizona ranks as far as election -- as far as turnover among top election officials in Arizona?

A.   I don't.

Q.   Okay.  Are you aware of the criminal penalty provisions in HB2492?

A.   Yes.

Q.   Okay.  And have election officials expressed any concerns to the Secretary of State's office about the existence of these criminal sanctions?

A.   Yes.

Q.   Can you describe to me the nature of those concerns?

A.   Well, specifically are you talking about criminal penalties for extending a deadline?  I guess you will have to be more

specific, because there are a number of new criminal penalties.

Q.  Yes, so maybe I'll start there.  So Arizona has recently introduced a number of new criminal penalties that could apply to election officials; is that correct?

A.  Yes.

Q.  Okay.  And is it correct that some of those provisions in HB2492 relate to how election officials process applications without documentary proof of citizenship?

A.  I'm sorry, you were speaking really fast.  Can you --

Q.  Fair.  Is one of those criminal penalties new penalties related to how county election officials -- to whether county election officials follow requirements related to applications submitted without documentary proof of citizenship?

A.  Yes.

Q.  Okay.  And so I think you testified that county -- that county recorders have expressed concerns to the Secretary of State's Office about these criminal sanctions; is that right?

A.  Yes.

Q.  And then I had asked, can you describe to me the nature of those concerns?

A.  Most of the concerns are related to the deadline issue and meeting the deadlines.

Q.  Okay.

A.  For example, these statutes went into effect January 1st of 2023, but we're embroiled in litigation.  There are also

campaign finance deadlines that caused a lot of concern.

So I added a provision about deadlines falling on a weekend or holiday, we would follow the Rules of Civil Procedure about the next business day being the deadline.

Those have concerns.  As far as the ones you raise about DPOR, that's been discussed but I don't know if I would characterize it as a concern at this point because we have not gotten to that point.

Q.  Okay.  Particularly, in the current climate, would you say that added criminal sanctions on election officials adds to their fears around doing their jobs?

A.  Yes.

Q.  And particularly in the current climate, would you agree that these sanctions -- added criminal sanctions against election officials add to the difficulty of retaining experienced election officials in Arizona?

A.  Yes.

Q.  And I think you testified a moment ago that you have looked at Secretary Fontes' written testimony to Congress; is that correct?

A.  I did look at it this morning.  I understand it was emailed out last night.

Q.  Did you have any involvement with Secretary Fontes' preparation for that hearing?

A.  No.

Q.  Okay.

        MS. LANG:  Your Honor, we would like to be able to move in Secretary Fontes' written testimony as a statement of a party opponent.

        THE COURT:  I am not sure this is the time.  Let's finish our questions of this witness.

        MS. LANG:  Fair enough, Your Honor.

BY MS. LANG:

Q.  You mentioned just a moment ago that HB2492 went in -- let me -- one moment.  HB2492 took effect January 1st of this year; is that correct?

A.  Yes.

Q.  And is that also true for HB2243?

A.  Yes.

Q.  Okay.  And your office is charged with interpreting implementing Arizona election laws, correct?

A.  The Secretary of State's office as well as any election official.

Q.  Yes, of course.  And during your deposition in this case, you testified that the Secretary's actively taking a number of steps to prepare for the implementation of these laws, correct?

A.  Correct.

Q.  And so if this Court issues a ruling post trial, finding that some of the challenged provisions do not violate federal law, is it your intent to take the necessary steps on the

Secretary's end to implement those laws?

A.   Yes.

Q.   I just have two more questions returning to a prior topic, Ms. Connor, which is the "reason to believe" standard in HB2243.  So if we can return to Plaintiffs' Exhibit 2.  And it's House Bill 2243, page 6.

And I'd like to look at section H, which contains this "reason to believe" standard.  If you could just take a quick review of it.

A.   Okay.

Q.   As written, it's your view that whether or not something constitutes a reason to believe someone is not a citizen is a decision that has to be made by the county recorder; is that right?

A.   Yes.

Q.   And absent any guidance in the Elections Procedures Manual about that standard, your office would be powerless to issue any binding guidance on the county recorders on how to apply this standard, correct?

A.   There is a standard for, quote, unquote, reason to believe in the campaign finance section.  So if the county recorders needed guidance, they could refer to that.  But ultimately, it would be up to their discretion.

Q.   Okay.

MS. LANG:  I have no further questions for this

witness.  I believe my colleague Mr. Sherman has a handful, so I will pass the witness to Mr. Sherman, and then we will hopefully quickly pass you on to the defense.  Thank you.

                    DIRECT EXAMINATION

BY MR. SHERMAN:

Q.  Good morning, Ms. Connor.  My name is John Sherman.  I represent Poder Latinx and Chicanos Por La Causa in this litigation.

       I want to quickly just revisit your testimony regarding the lack of guidance on HB2492 and HB2243 and the proposed 2023 EPM.

       If there's no injunction barring enforcement, does your office intend to hold off on adding guidance on HB2492 and 2243 to the EPM until the conclusion of this litigation through all appeals?

A.  Our office is going to seek legal advice from the Attorney General's Office and follow that advice, accordingly.

Q.  Is it fair to say at this point you don't know?

A.  I don't know what?

Q.  That you don't know whether you'll add -- whether or when you'll add guidance on the Challenged Laws to the proposed 2023 EPM?

A.  Correct.

Q.  If the EPM is approved by the Governor and Attorney General on or before December 31st, is it your understanding that it

cannot be revised again until 2025?

A.   Yes.

Q.   If the Arizona Legislature enacts a new election law between biennial EPM revisions, is it your understanding that the Secretary of State is obligated to implement that new law even though the EPM cannot be updated until 2025?

A.   Yes.  The legislation would be implemented in a year that the EPM is not being revised.  The Secretary of State's EPM, they're rules that are essentially subordinate to the -- or at -- written under the direction of the legislature.  So regardless of what's in the Secretary of State's manual, any legislation would be implemented.

Q.   Understood.  But the EPM is only revised once every two years, correct?

A.   That's correct.  There have been exceptions though; for example, electronic adjudication.  There was legislation passed after the EPM, I guess it was 2018, or somewhere around there.

But that, and the legislation included language that the Secretary of State shall prescribe rules and include an addendum in the EPM.  So if the legislature was so inclined to have legislation be included in the manual, they could do so through that legislation.

Q.   Understood.  Do you understand there to be provisions like that in HB2492 or HB2243?

THE COURT:  She really doesn't have to tell us what is

or is not in the statute, because they are admitted exhibits.

MR. SHERMAN:  Understood, Your Honor.

BY MR. SHERMAN:

Q.  Is there any way to issue binding guidance to county recorders outside of the EPM?

A.  No.

Q.  And lastly, is it your understanding that it is the responsibility of county recorders to enforce Arizona election statutes, regardless of whether there's EPM guidance on them?

A.  Absolutely.

Q.  Thank you very much.

MR. SHERMAN:  No further questions.

THE COURT:  Cross.

MR. WHITAKER:  Yes, Your Honor.

CROSS-EXAMINATION

BY MR. WHITAKER:

Q.  Good morning, Ms. Connor.  I am Josh Whitaker for the State and Attorney General.

A.  Good morning.

Q.  I will be asking you questions.  I might be done by noon. We will see how it goes.

First of all, thank you very much for your service to this State and everything you do, including being here today.

I would like to start by pulling up again Plaintiffs' Exhibit 2, which was, I believe HB2243.  You were asked some

questions about that.

(Mr. Whitaker having technical difficulties.)

MR. WHITAKER:  I will try to work without the exhibit for now, and if that works, we can just proceed.

BY MR. WHITAKER:

Q.  Do you recall the provision in HB2243 that says something to the effect of, each month the Secretary of State does this monthly check with motor vehicle records?

A.  Correct, yes, I do.

Q.  Okay.  And I just don't know if it was asked on direct, is that being implemented?

A.  It's not being implemented.  My understanding from our technology staff or vendor, that the amount of -- I don't know the terminology, but the amount of bandwidth, essentially, to run that kind of data monthly would just overwhelm the system..

Q.  You mentioned on direct exam some concerns about -- oh, here we go.  Let's go to, I think, page 3.  Okay.  So at the top of this document -- I am sorry, let's go to the next page.

So 10 there is the provision that mentions obtaining information and confirms that a person is not a United States citizen, including the jury summary report.

Do you recall that provision?

A.  Yes.

Q.  Okay.  And I think you said one of your concerns was that you wouldn't be able to confirm from the jury summary report

that the person did in fact say on the questionnaire that they are not a citizen; am I getting that concern right?

A.  Yes.

Q.  Okay.  Would it be possible to ask the person who self-reports whether they are a citizen?

A.  Yes.

Q.  Okay.

A.  And I think the statute would require that.

Q.  And what part of the statute do you think would require that?

THE COURT:  You send the notice and they have 35 days to respond.

THE WITNESS:  Correct.

MR. WHITAKER:  Okay.  All right.

BY MR. WHITAKER:

Q.  Now, let's go to -- I think it's page 7.  Actually no, it is going to be on the previous page.  It starts on the previous page.

Well, while that's working, do these laws also require the Secretary to provide a summary report to the legislature each quarter about these jury summary reports that are received?

A.  Yes.

Q.  All right.  And have you provided at least some of those reports to the legislature?

A.   We have provided every report, yes.

Q.   Oh, okay.  Could we pull up Defense Exhibit 805 -- oh, okay, we'll come back to that.  Let's move on to a different topic.

We've heard a lot about the Elections Procedures Manual today; are there other ways in which the Secretary can have discussions with the county recorders that might develop a consensus that aren't the Elections Procedures Manual?

A.   Yes.  The -- if you would like me to elaborate, there's a Voter Registration Advisory Committee that's been in existence for well over a decade.  So it's a committee made up of the 15 county recorders and the Secretary of State, or his designee.

And the purpose is to essentially come to an agreement among the counties in the state as to how to interpret certain laws, how to implement certain laws.

Q.   And did you mention -- how often do they meet?  Or do they meet?

A.   There's no schedule; it's as needed.

Q.   Okay.  Is the Secretary legal counsel for county recorders, or do they have their own legal counsel?

A.   The counties have their own legal counsel.

Q.   All right.

        MR. WHITAKER:  Any luck on the tech side of things?

        MR. LANGHOFER:  We are ready.

        MR. WHITAKER:  Okay.

BY MR. WHITAKER:

Q.   So this is Defense Exhibit 805.  Is this one of the quarterly reports to the legislature we were talking about?

A.   Yes.

Q.   All right.

          MR. WHITAKER:  And can we go to the next page?

BY MR. WHITAKER:

Q.   So number 3 there, the first bullet point, can you explain what that first bullet point is conveying to the legislature?

          THE COURT:  Is this document in evidence?

          MR. WHITAKER:  I don't think it is.  I move to admit Defense Exhibit 805 into evidence.

          THE COURT:  Is there any objection to 805?

          MS. LANG:  One moment, Your Honor.

BY MR. WHITAKER:

Q.   Ms. Connor, can you explain --

          THE COURT:  Excuse me, we're waiting to hear if Ms. Lang has an objection to the admission of 805.

          MS. LANG:  No, Your Honor.

          THE COURT:  Without objection, 805 is admitted.

          (Exhibit Number 805 is admitted.)

BY MR. WHITAKER:

Q.   Ms. Connor, can you explain what's being conveyed by that first bullet point, to the extent it's not already obvious?

A.   As Judge Bolton noted, within a certain amount of time

the -- or the county recorder shall send a notice to the person who indicated he or she was not a citizen, that that person shall respond within 35 days as to whether they're a citizen. So that would be the notice.

Q. All right. And I take it that the number 373 there, refers to the persons -- so let me back up a second.

Has your office been receiving summary reports from multiple counties about people who self-report as noncitizens as part of the jury process?

A. The reports go directly to the counties.

Q. Okay. So you are not aware of whether your office receives those reports?

A. I believe we receive some of them. I think that has been an issue that we would like to get all of the reports.

Q. I see. So the number 373, do you know what that's based on?

A. I don't know. Someone else gave me this information. There must be some tracking system that --

Q. All right.

A. -- exists.

Q. I see that the second and third bullet points there say that the number of notices that have been sent out -- it says, process is in development. And the number of registrations that have been canceled, it says, process is in development.

Can you explain what that means? What that

development process is like?

THE COURT:  I think we know what it means, Mr. Whitaker.  They haven't taken any steps to implement this part of the statute yet.

MR. WHITAKER:  Fair enough, Your Honor.  I will move on.

Can we pull up Defense Exhibit 806.

BY MR. WHITAKER:

Q.  Ms. Connor, is this the next quarterly report?

A.  Yes.

MR. WHITAKER:  I move to admit Defense Exhibit 806 into evidence.

MS. LANG:  Your Honor, I do think I want to lodge a hearsay objection here to the extent it's being submitted for the truth of the matter asserted.  The witness has testified that she's not sure where these numbers come from.

THE COURT:  The objection is overruled.  806 is admitted.

(Exhibit Number 806 is admitted.)

MR. WHITAKER:  I think actually let's -- I want to ask more questions about 806.

BY MR. WHITAKER:

Q.  Ms. Connor, we heard a lot about the Elections Procedures Manual.  I understand that the Secretary received a lot of public comments on the draft.  It was made public in late July;

is that right?

A.   Correct.

Q.   All right.  And you mentioned that some of the comments were reacting badly to the addition of the HB2492 requirements in the EPM, or maybe I'm --

A.   Yeah, I would say that the comments requested that those sections be removed entirely because if they were included and ultimately this Court made a decision that conflicted with the EPM, it could cause confusion to the counties who follow the EPM, and then we would be stuck with that language for another -- for two years.

Q.   Understood.  Were there also comments -- well, were those the only kinds of comments received during the public comment period?

A.   No, no.  We received a range of comments.

Q.   What were some of the comments about citizenship in particular?

A.   Well, I would -- I would estimate 25 percent of the comments were essentially form letters that someone had sent a list to start a letter writing campaign or a comment campaign, and that campaign included comments that simply said, "Make sure voters prove citizenship," or "Voters should be citizens," something to that effect, as though documentary proof of citizenship was not already required since -- well, I guess almost 20 years now.

So the person -- those persons apparently did not understand that.  But there were a number of comments about citizenship that were simply just erroneous about what was being done.

MR. WHITAKER:  Can we pull up Defense Exhibit 766?

BY MR. WHITAKER:

Q.  Do you recognize this document, Ms. Connor?

A.  Yes, actually it's the printed or the document that was created through the portal for public comments.

Q.  And did the Secretary's office make this available on the website?

A.  Yes.

Q.  All right.

MR. WHITAKER:  Can we go to page 3?

BY MR. WHITAKER:

Q.  So do you see the top comment on page 3?  Well, I think -- can you scroll up a little bit?

A.  Yes, I see that.

Q.  Is this an example of the kind of comment you were talking about earlier?

A.  Yeah, that's one example.

Q.  Uh-huh.  Okay.  And were there several comments along these lines?

A.  Yes, I would say several comments about the fed-only voters and citizenship.

THE COURT:  Before we spend a whole lot more time on the comments that were received to a draft that's since been revised and finalized, I would really like to know where we're going with the relevance of the comments.

MR. WHITAKER:  I think, Your Honor, it's relevant to what members of the public are perceiving about voting laws in Arizona.

THE COURT:  Why is that relevant to whether they're constitutional or violative of federal law?

MR. WHITAKER:  One interest that we have been asserting in this litigation is that it's important to increase voter confidence in voting laws.  And so evidence of how voters feel about voting laws is relevant to that interest.

THE COURT:  I really don't know that these comments would track with that.

MR. WHITAKER:  All right.  I will move on, Your Honor.

Can we pull up Defense Exhibit 750?

BY MR. WHITAKER:

Q.  Ms. Connor, do you recognize this document?

MS. LANG:  Could we possibly zoom in?

THE WITNESS:  Yes, I do.

BY MR. WHITAKER:

Q.  What is it?

A.  These are the list of -- well, the beginning of the list of VRAC documents that have been issued, but these were written

under the prior voter registration database. I know that just because of the numbering system has changed for the current AVID database, but nevertheless these were just the VRAC papers under the power of profile system.

Q. So these are -- I understand.

MR. WHITAKER: Let's go to page 220 to try to make it concrete.

THE COURT: I absolutely don't understand what this is.

MR. WHITAKER: Oh, okay. I will try to say more about it.

BY MR. WHITAKER:

Q. So you mentioned earlier the Voter Registration Advisory Commitee or VRAC, right?

A. Yes.

Q. And you mentioned earlier that the Secretary of State and the county recorders are members of this committee?

A. Yes.

Q. And I believe you mentioned earlier that that is one way in which recorders can reach consensus on an issue is by --

THE COURT: Okay, I remember all that. I just have no idea what this document is.

MR. WHITAKER: Okay.

THE COURT: That has apparently 220 pages.

MR. WHITAKER: It is a long document.

BY MR. WHITAKER:

Q.  Ms. Connor, can you explain how these, for example, on issue 0152, how that came about as a result of the VRAC committee process.

A.  Well, the county recorders wanted to be consistent -- you are talking about this issue paper specifically?

Q.  Sure.

A.  In general.  Well, the VRAC committee is to provide consistency and to come to an agreement on --

THE COURT:  Okay, hold on.  But what is the document? It is apparently 13 and a half years old, but what is it?

THE WITNESS:  It is a document -- well, it is a compilation of all of the issue papers or advisory opinions or agreements reached among the counties and the Secretary of State.

So the VRAC committee started prior to 2010, and all of that index reflects the issue papers released prior to 2016.

THE COURT:  Okay.  So all of this would relate to issues that are described and then have a recommendation from whatever the earliest date is of these pages to 2016?

THE WITNESS:  Correct.

THE COURT:  Okay.

BY MR. WHITAKER:

Q.  Can you take a moment to read the first two paragraphs here in issue 0152?

A.   Okay.   I would like to say though, this is outdated for --
under the new AVID system, because the possible duplication
issue is programmed into the system itself.   It's not done
manually.

Q.   I understand what you are saying.   I may come back to this.

MR. WHITAKER:   Let's go on to Defense Exhibit 935.

BY MR. WHITAKER:

Q.   Do you recognize this document, Ms. Connor?

A.   I do not.

Q.   Okay.   Do you think it is a document --

MR. WHITAKER:   Can we zoom out a little bit?

BY MR. WHITAKER:

Q.   Do you think it's a document that Yolanda Morales may
recognize better?

MR. MORGAN:   Objection, Your Honor.

THE COURT:   She says she doesn't recognize it, so how
could she say who would?

MR. WHITAKER:   That's fair, Your Honor.   I think I may
leave these questions for another witness.   So Ms. Connor, I
have no further questions for you at this time.   And thank you
very much for your time.

THE WITNESS:   Thank you.

THE COURT:   Is there any additional cross?

MR. LANGHOFER:   There will be, Your Honor.   I will go
more than 10 minutes.   You want to start now or would you

388

prefer to break for lunch?

THE COURT:  Yes.

CROSS-EXAMINATION

BY MR. LANGHOFER:

Q.  All right.  Good morning still, Ms. Connor.  The -- do you know the most common way of acquiring United States citizenship?

THE COURT:  I think being born here.  Do you think that's probably it?

THE WITNESS:  I agree, yes.

THE COURT:  Okay.

BY MR. LANGHOFER:

Q.  You asked a question on direct about whether stating your birthplace had anything to do with confirming your qualifications for voting.  It's certainly true that being a citizen is just a requirement for voting; am I right?

A.  You were speaking really fast.  I'm sorry.

Q.  It is true that being a citizen is one of the requirements for voting in Arizona?

A.  Yes.

Q.  Okay.  And how many times can one person have -- how many active registrations can one person have in Arizona at the same time?

A.  One.

Q.  Okay.  So requirement for a new registration is to not

already have an existing active registration, right?

A.   Correct.

Q.   If the county recorders would testify they use birthplace information to determine whether a new application is duplicative of an existing registration, that would also then help determine whether the registrant is qualified for a new registration?

MS. LANG:   Objection, foundation.   Assumes facts not in in evidence.

THE COURT:   Overruled.

You may answer.

THE WITNESS:   Yes.

BY MR. LANGHOFER:

Q.   The Court has been beaten to death with the same five pages of the EPM.   I am going to try to not show them, because it slows us down and we're all hungry -- or at least one of us is hungry.

Do you remember the part of the EPM, it's on pages 4 and 5 of Exhibit 6, that talks about if someone has a changed name, usually for marriage, and they provide a birth certificate, how the county recorders should evaluate whether that birth certificate is really for their proposed registrant?

A.   Yes.

Q.   Do you recall whether all five of the fields, including birthplace, that it lists are required for the recorders to

review, or whether it is any of the five?

A.  I don't recall.

Q.  Okay.  I'm sorry.  Let's take a look then.  Exhibit 6, page 4 and 5.  All right.  So we are going to start at the bottom of page 4.  It goes on to page 5, and let's just look at the sentence that I've highlighted here, and I am going to highlight the words at least for you.  Give us a read and tell us your understanding.

A.  So, yes, they -- all five required.

Q.  Thank you.  So is there a rule in Arizona about whether dead people can vote?

A.  Yeah, dead people cannot vote, but had someone voted early and subsequently died, their early ballot would still count.

Q.  If you are doing list maintenance and, you know, removing from the rolls people who are felons and so on, dead people among them, is it an accurate determination of whether someone is alive relevant determining whether -- continued to be qualified to vote in the state?

A.  Yes.

Q.  Okay.  What about when someone mails in a mail-in ballot.  We call them early ballots here.  They sign the outside of the envelope.  You are not sure the signature matches.  In fact, the county recorder thinks they don't.

So they have the phone call that that you were discussing with the Judge earlier, where they ask them some

security questions.  Are the answers to those security questions relevant to whether that person's signature on the ballot will count and the ballot inside of it will count?

A.  Yes.

Q.  Okay.  So I mean, I think it's true in Arizona, that one person cannot vote a different person's ballot, correct?

A.  Correct.

Q.  Unless there was a disability; I guess there's an exception for that?

A.  Correct.

Q.  Okay.

A.  Well, if there is a disability, someone else can sign, but it would be the person with the disability's ballot.

Q.  Right.  But I guess in this context though, let's say I mail in my ballot, they think it doesn't match, they call me.

If I can't tell them my birthplace information, my answer to that question on the phone would affect whether -- someone calls, let's say, maybe it's not me, and the person who calls can't provide my birthplace information, the answer ends up determining whether this ballot counts, right?

A.  It possibly could.

Q.  Okay.  Now, when someone -- I want to switch focus somewhat.  Let's talk about the data at ADOT.  If -- do you have any reason to believe that ADOT is administering the DPOC check process in some sort of like biased or not neutral way?

MS. LANG:  Objection, lack of foundation.

THE COURT:  Overruled.

You may answer if you have any reason to believe.

THE WITNESS:  No.

BY MR. LANGHOFER:

Q.  Okay.  And do you have any reason to believe that they're -- the data they're providing to you, with the exception of I think there was an incident in 2022 we can talk about, but apart from that, do you have any reason to believe that their data is not reliable -- when I say "you guys," for the county recorders to rely on in processing these applications?

A.  The information is reliable.

Q.  Okay.  Even though the county recorders have not actually seen the DPOC that MVD is reflecting in its database?

A.  Correct.

Q.  Okay.  Let me ask a question, just a slightly different focus, do you have any reason to believe the judicial system in Arizona that gives you these jury questionnaires is processing those jury questionnaires in a biased way?

A.  No.

Q.  Have you seen any evidence that the data they're providing to you is corrupt and unreliable?

A.  No.

THE COURT:  I think Mr. Langhofer is getting to some

of your earlier testimony that your concern about using the jury summary report has to do with the fact that you or the county recorders don't have access to the actual questionnaire that was completed by the juror where supposedly it was marked "not a citizen."

THE WITNESS:  Right.

THE COURT:  Why do you have that concern about the jury summaries but you don't have a similar concern about not seeing the documented proof of citizenship that the MVD had in order to issue the driver's license that required it?

THE WITNESS:  Yes.  When I was at the Maricopa County Attorney's Office, when I first started, so it was probably 2005 or 2006, the County Attorney was Andrew Thomas, and he prosecuted 11 cases where someone had declared themselves not a citizen, and they were citizens.

So I guess based on that personal experience, people -- all of them were lying.  They were citizens.

THE COURT:  Let me interrupt you a second.

THE WITNESS:  Yes.

THE COURT:  That's because the person filled out the jury questionnaire and lied.

THE WITNESS:  Yes.

THE COURT:  You had expressed concern about the accuracy of the line that says, "John Smith said not a citizen."

THE WITNESS:  Yes.

THE COURT:  And you said you were concerned about that because you couldn't see the actual form that John Smith filled out by hand or electronically?

THE WITNESS:  Yes.

THE COURT:  Why wouldn't it have the same -- why wouldn't you have the same confidence in that summary that you have in the information you get back from the Department of Motor Vehicles that you consider a hard match, when you've never seen what they provided to the Department of Motor Vehicles.

THE WITNESS:  Because the -- there's room for human error.  There are enough common names that it could be mistake -- a mistake.  I just -- it is just a concern I have, but by no means does that prevent any of the other members of the VRAC committee from pursuing an advisory opinion on that.

BY MR. LANGHOFER:

Q.  All right.  Let's change gears somewhat.  I want to show you another exhibit.  We're going to take a look at what's been marked as Exhibit 896.

And this purports to be the official canvass for the 2014 general election, might even say it was taken from your website.  It does not say that.

Do you recognize this document, ma'am?

A.  Yes, it's the 2014 general election canvass.

Q.  And a canvass is the official summary of the state election results, correct?

A.  Correct.

Q.  All right.  Let's -- same question for 897, which is now on the screen.  This is, I think the 2016 primary.  Same concept, different election, right?

A.  Yes.

Q.  All right.  And we are going to look now at Exhibit 23.  This is now the general election 2022.  Same concept, different elections, right?

A.  Yes.

        MR. LANGHOFER:  All right, Your Honor.  I move into evidence Exhibit 23, 896 and 897.

        MS. LANG:  No objection.

        THE WITNESS:  Could you repeat what you said?

        THE COURT:  He was actually speaking to me.

        THE WITNESS:  Oh, I'm sorry.

        THE COURT:  Without objection, 23, 896, and 897 --

        MR. LANGHOFER:  Yes, ma'am.

        THE COURT:  -- are admitted.

        (Exhibit Numbers 23, 896, and 897 are admitted.)

BY MR. LANGHOFER:

Q.  Ma'am, I want to -- Ms. Connor, I want to look now at -- let's start with -- I will try to do these in chronological order if my notes serve.

We are going to start with the 2014 general election, and I am going to direct your attention here to CD2, the race between Ron Barber and Martha McSally.  The canvass result in that race was just 161 notes, wasn't it?  The margin of victory was 161?

A.  I have no reason to disagree, but, yeah, it appears that way.

Q.  Okay.  Let's look at 897 now.  This is the 2016 primary, and we're going to look to CD5.  We are at the top now of page 3.  And we are looking at just the Republican primary.  This is Andy Briggs versus Christine Jones.  So over here in the right-hand column, the margin of victory and loss in this was initially just 16 votes; am I right?

MS. LANG:  Objection, lack of foundation.  I mean, we're just reading these documents, but Ms. Connor has --

THE COURT:  Hold on, hold on.  I did not ask for a speaking objection.

MS. LANG:  Okay.

THE COURT:  This is a document in evidence.  He's going through what it says, presumably because there's going to be a question at the end about some margin of -- small margin between these cast votes.  So the objection is overruled.

MR. LANGHOFER:  Okay.

BY MR. LANGHOFER:

Q.  And let's look at Exhibit 23, which is actually a document

from the plaintiffs here, and we're going to look at page 10.
And on this one, we've got the Attorney General race.  The
margin of victory that was certified here was 511 votes; did I
get that right?

A.   Correct.

Q.   All right.

          MR. LANGHOFER:  Your Honor, I actually don't have
questions for her about these margins except to like alert the
Court to it.  This is more of a closing argument issue, but we
just needed it in the record.

          THE COURT:  Okay.  Well, we'll break for lunch and
reconvene at 5 minutes after 1:00.

          (Proceedings concluded at 12:04 p.m.)

398

C E R T I F I C A T E

I, ELVA CRUZ-LAUER, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 13th day of November, 2023.

s/Elva Cruz-Lauer
Elva Cruz-Lauer, RMR, CRR

UNITED STATES DISTRICT COURT