**UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA**

Mi Familia Vota, et al.,

Plaintiffs,

v.

Adrian Fontes, in his official capacity as Arizona Secretary of State, et al.,

Defendants.

**AND CONSOLIDATED CASES.**

Case No. 2:22-cv-00509-SRB (Lead)

**PLAINTIFFS' JOINT PROPOSED FINDINGS OF FACT**

No. CV-22-00519-PHX-SRB
No. CV-22-01003-PHX-SRB
No. CV-22-01124-PHX-SRB
No. CV-22-01369-PHX-SRB
No. CV-22-01381-PHX-SRB
No. CV-22-01602-PHX-SRB
No. CV-22-01901-PHX-SRB

# TABLE OF CONTENTS

Page

PROPOSED FINDINGS OF FACT ..... 1
I. Procedural History ..... 1
II. Arizona Voter Registration ..... 4
III. Arizona Voter Statistics and Demographics ..... 7
IV. Historical Background of Challenged Laws ..... 13
A. Arizona's History and Conditions of Discrimination ..... 13
B. Arizona's History of Discrimination Against the AANHPI Community ..... 21
V. The Challenged Laws' Legislative History ..... 26
A. Political Climate Prior to the Passage of the Challenged Laws ..... 26
B. Legislative Process in Arizona and the 2022 Legislature ..... 27
C. Legislative History of HB 2492 and 2243 ..... 28
1. Legislative History of HB 2492 ..... 29
2. Legislative History of HB 2617 and HB 2243 ..... 35
3. Pre-Passage Analysis of the Challenged Laws ..... 41
VI. Challenged Provisions of HB 2492 and HB 2243 ..... 44
A. HB 2492 ..... 44
B. HB 2243 ..... 47
VII. Current Documentary Proof of Citizenship for Voter Registration Procedures and Databases Referenced in the Challenged Provisions ..... 49
A. Establishing Proof of Citizenship ..... 49
B. HAVA Checks ..... 50
C. ADOT ..... 56
1. ADOT Background and Credentialing ..... 56
2. The Stale Nature of ADOT's Authorized Presence Data as to Naturalized Citizens ..... 57
3. Accuracy Challenges with Use of ADOT Data for Citizenship Verification ..... 61
D. USCIS SAVE System ..... 62
E. SSA Database ..... 69
F. NAPHSIS and Other Databases ..... 71

VIII. Birthplace ... 73
A. Current Birthplace Requirements Under Arizona Law ... 73
B. Arizona Election Officials Do Not Use Birthplace Information to Determine a Voter's Qualifications ... 73
C. Birthplace Does Not Help Arizona Election Officials Establish or Verify a Voter's Identity ... 78
IX. Implementation of Documentary Proof of Citizenship Requirements and Citizenship Investigation Procedures ... 84
A. Lack of Statewide Guidance on Citizenship Verification and the Challenged Provisions ... 86
B. McDonald Findings on Consistency of Implementation ... 88
C. The Challenged Laws' Citizenship Investigation Procedures ... 91
D. Overall Challenges of Database-Matching Under the Challenged Laws ... 95
1. The Databases at Issue Lack Sufficient Accuracy on Citizenship Status ... 95
2. Arizona Election Officials Do Not Have Access to the Databases ... 97
E. Implementation of Citizenship Investigation Provisions ... 97
1. ADOT Data Transfer to the Secretary of State to Comply with HB 2243 ... 97
2. County Recorders' Non-Uniform Understanding of Citizenship Investigation Provisions ... 99
i. Dr. McDonald's Opinions Regarding Differential Interpretation and Implementation ... 99
ii. Information That a Voter Registration Applicant or Registered Voter is Not a United States Citizen ... 101
iii. Reason to Believe ... 104
iv. Database-Matching Mechanics ... 107
F. Language Accessibility of DPOC Notice Letters for Limited English Proficient Voters is Narrow and Provides No Notice in Asian Languages ... 107
G. Cancellation and Reinstatement of Voters ... 108
X. Costs and Impacts of Challenged Laws ... 109
A. Plaintiff Testimony Regarding Costs of Laws ... 109
B. Expert Testimony ... 110
1. Testimony of Dr. Traci R. Burch, Ph.D. ... 110

2. Defendants' Response to Dr. Burch ....... 115
3. Dr. McDonald Testimony ....... 116
4. Dr. Hoekstra Testimony Concerning Dr. McDonald and Response ....... 118

XI. Documentary Proof of Residence ....... 119

XII. The Evidence Shows that Voter Fraud in Arizona is Rare and Arizona's Elections are Reliable, Undermining the State's Purported State Interests ....... 122

A. Voter Fraud Was Illegal in Arizona Long Before the Challenged Provisions ....... 122

B. Voter Fraud in Arizona is Rare, and Voter Fraud by Non-Citizens in Arizona is Rarer Still ....... 122

C. Dr. Minnite's Testimony Further Undermines Any Purported State Interests in the Challenged Laws ....... 127

1. Dr. Minnite is qualified to testify as an expert on voter fraud ....... 127
2. Voter fraud is exceedingly rare, both nationally and in Arizona, and the incidence of voter fraud attributable to non-citizens in Arizona is essentially non-existent. ....... 128
3. The Challenged Laws will not further reduce the incidence of voter fraud in Arizona because it is already rare. ....... 131
4. Repeated false allegations about voter and election fraud undermine public confidence in the election system, and there is no persuasive reason to believe that the Challenged Laws will improve voter confidence. ....... 132

D. There is No Evidence to Support the State's Purported Interests in the Challenged Laws ....... 132

XIII. Plaintiffs ....... 135

A. Mi Familia Vota ....... 135
B. Voto Latino ....... 139
C. Southwest Voter Registration Education Project ....... 144
D. Promise Arizona ....... 145
E. Arizona Asian American Native Hawaiian And Pacific Islander For Equity Coalition ....... 146
F. Poder Latinx ....... 148
G. Chicanos Por La Causa, Inc. ....... 150
H. Chicanos Por La Causa Action Fund ....... 153
I. Arizona Coalition for Change ....... 155
J. Arizona Students' Association ....... 156

K. San Carlos Apache Tribe ........ 158
L. Tohono O'odham Nation ........ 160
M. Gila River Indian Community ........ 161
N. Alanna Siquieros ........ 161
O. Keanu Stevens ........ 161
P. LaDonna Jacket ........ 161
Q. Democratic National Committee and Arizona Democratic Party ........ 162
CERTIFICATE OF SERVICE ........ 172

## PROPOSED FINDINGS OF FACT

### I. Procedural History

1. Arizona enacted the two laws challenged in this litigation, House Bills ("HB") 2492 and 2243 (the "Challenged Laws"), on March 30, 2022, and July 6, 2022, respectively.

2. On March 31, 2022, Mi Familia Vota ("MFV"), Living United for Change in Arizona ("LUCHA"), and others filed complaints, seeking injunctive relief against the Challenged Laws. *Mi Familia Vota v. Fontes*, No. 2:22-cv-00509-SRB (D. Ariz. Mar. 31, 2022) ECF No. 1; *Living United for Change in Ariz. v. Fontes*, No. 2:22-cv-00519-SRB (D. Ariz. Mar. 31, 2022) ECF No. 1. Thereafter, the United States and five additional groups of plaintiffs sued to enjoin the laws. Compls., *United States v. Arizona*, No. 2:22-cv-01124-SRB (D. Ariz. July 5, 2022) ECF No. 1; *Poder Latinx v. Fontes*, No. 2:22-cv-1003-MTL (D. Ariz. June 9, 2022) ECF No. 1; *Democratic Nat'l Comm. v. Fontes*, No. 2:22-cv-01369-SRB (D. Ariz. Aug. 15, 2022) ECF No. 1; *Ariz. Asian Am. Native Hawaiian & Pac. Islander for Equity Coal. v. Fontes*, No. 2:22-cv-01381-SRB (D. Ariz. Aug. 16, 2022) ECF No. 1; *Promise Ariz. v. Fontes*, No. 2:22-cv-01602-SRB (D. Ariz. Sept. 20, 2022) ECF No. 1; *Tohono O'odham Nation v. Mayes*, No. 2:22-cv-01901-SRB (D. Ariz. Nov. 7, 2022) ECF No. 1.[1]

3. The Court consolidated all eight suits into the instant case. ECF Nos. 39, 48, 69, 79, 91, 164, 193.

4. All Plaintiffs have made at least one of the following claims: the Challenged Laws (1) place an undue burden on the right to vote, violating the First and Fourteenth Amendments to the United States Constitution; (2) enable arbitrary and disparate treatment of voters, violating the Equal Protection Clause of the Fourteenth Amendment ("Equal Protection Clause"); (3) enable national origin discrimination in violation of the Fourteenth Amendment; (4) discriminate based on race, violating the Fourteenth and Fifteenth

---

[1] Unless otherwise noted, all docket references are to the *Mi Familia Vota* docket, No. 2:22-cv-00509.

Amendments; (5) deprive Plaintiffs and those they serve of procedural due process (6) violate § 10101 of the Civil Rights Act of 1964 (the "Materiality Provision"); (7) violate Sections 5, 6, 7 and 8 of the National Voter Registration Act ("NVRA"); and (8) violate the Voting Rights Act. ECF No. 304 at 14.[2]

5. All Plaintiffs sued the Arizona Secretary of State, and some Plaintiffs additionally sued the Arizona Attorney General, Arizona's fifteen County Recorders and the Director of the Arizona Department of Transportation. In addition to these named Defendants, two sets of parties intervened to defend the Challenged Laws. First, on August 23, 2022, the Republican National Committee ("RNC") intervened. *Democratic Nat'l Comm. v. Fontes*, No. 2:22-cv-01369-SRB (D. Ariz.) ECF No. 18. Then, on April 26, 2023, the President of the Arizona Senate, Warren Petersen, and the Speaker of the Arizona House of Representatives, Ben Toma, intervened. ECF No. 363.

6. The Attorney General and the RNC moved to dismiss the consolidated case. ECF Nos. 127, 197, 179, & 200. After oral argument, ECF Nos. 163 & 187, on February 16, 2023, the Court denied the motions to dismiss as to the vast majority of the consolidated Plaintiffs' claims. ECF Nos. 304 & 316.

7. On August 25, 2022, Plaintiff Arizona Asian American Native Hawaiian and Pacific Islander for Equity Coalition filed a motion for preliminary injunction to prohibit the Defendants from implementing HB 2243 in any respect, including from sending notices of cancellation or removing or purging voters' registrations, pending final judgment in this lawsuit. *See* CV-22-01381-PHX-SRB at ECF No. 32. Numerous County Recorders understood that HB 2243 was to go into effect on September 24, 2022, ahead of the 2022 general election. *See id*; *see also id.* ECF No. 35. On September 8, 2022, the Court granted the preliminary injunction motion, ordering that no Defendant "take any action to

---

[2] Each of the non-U.S. Plaintiffs with claims under the NVRA sent a separate letter to the Arizona Secretary of State, with notice of violation of the NVRA. *See* PX 596 (Democratic National Committee and Arizona Democratic Party), PX 597 (MFV and Voto Latino), ECF No. 169-1 (Poder Latinx), PX 317 (Arizona Asian American Native Hawaiian & Pacific Islander for Equity Coalition), PX 318 (Promise Arizona and Southwest Voter Registration Education Project), PX 408 & 409 (LUCHA).

implement or enforce HB 2243 in a manner that would remove any voter's eligibility to vote in the 2022 general election or disqualify any otherwise-valid ballot. *See id.* at ECF No. 54. The Court's order also provided that no Defendant "shall take any action to implement or enforce HB 2243's amendments to Arizona Revised Statutes ("A.R.S.") § 16-165 (*e.g.*, as set forth in HB 2243, particular database reviews/investigations, distribution of letters, cancellation of voters' registrations, referral for criminal investigation) before January 1, 2023." *Id.*

8. Thereafter, all parties moved for partial summary judgment. ECF Nos. 364, 365, 367, 368, 369, 388, 389, 390, 391, 392, 393, 394, 395, 396, 397, 398, 399, & 400. On September 14, 2023, the Court issued an order (ECF No. 534) resolving those motions and granting summary judgment on the following claims:

- For Plaintiffs on the claims that Section 6 of the NVRA preempts HB 2492 §§ 4 and 5's requirement that applicants who use the so-called "Federal Form" (a term defined below in paragraph 13) submit DPOC in order to vote in presidential elections or to vote by mail. ECF No. 534 at 9-15.
- For Plaintiffs on the claims that Section 6 of the NVRA preempts HB 2492 § 5's "DPOR Requirement" (a term defined below in paragraph VI) as applied to Federal Form applicants. ECF No. 534 at 9.[3]
- For Plaintiffs on the claims that HB 2243 § 2 violates Section 8(c) of the NVRA. ECF No. 534 at 15-18.
- For Plaintiffs on the claims that HB 2492 § 4's Checkmark Requirement violates the Materiality Provision of the Civil Rights Act as applied to individuals who have provided DPOC. ECF No. 534 at 24-27.
- For Plaintiffs on the claims that the reference in A.R.S. §§ 16-123 to 16-579(A)(1) are examples, not an exhaustive list, of the documents that can be used to satisfy the

[3] As a result of the Court's partial summary judgment order, the Tohono O'odham Plaintiffs moved unopposed to withdraw their constitutional challenge to the documentary proof of residence requirement. ECF No. 609 at 5 n.2.

DPOR Requirement in A.R.S. § 16-123 and that A.R.S. § 16-123 does not require a standard street address. ECF No. 534 at 33.

- For Plaintiffs on the claims that documents additional to those listed in A.R.S. § 16-579(A)(1) satisfy A.R.S. § 16-123. ECF No. 534 at 33-34.
- For the Attorney General on the claims that HB 2492 § 4's Checkmark Requirement violates the Materiality Provision of the Civil Rights Act, as applied to individuals who do not provide DPOC. ECF No. 534 at 27-29
- For the Attorney General on the claim that HB 2243 is void-for-vagueness. ECF No. 534 at 30-32.

9. In addition, the Court granted in part and denied in part Defendants' motion for summary judgment on Plaintiffs' claim under Section 8(b) of the NVRA. *Id.* at 19-21, 34. The Court also declared that Arizona must abide by the LULAC Consent Decree (a term defined below in paragraph 14) and, specifically, must treat applicants who use the "State Form" (a term defined below in paragraph 13) and Federal Form applicants equally for purposes of registering for federal elections. *Id.* at 21-22, 34. In addition, the Court denied summary judgment as to the following: (1) Plaintiffs' and Defendants' claims regarding whether County Recorders may reject State Form applications that do not list birthplace, as there were material issues of fact that precluded summary judgment (*id.* at 29); (2) Poder Plaintiffs' Civil Rights Act claims under 52 U.S.C. § 10101(a)(2)(A), as moot (*id.* at 20 n.10, 35); and (3) Defendants' claims that the Challenged Laws do not violate Section 8(a) of the NVRA, as there were material issues of fact that precluded summary judgment (*id.* at 18-19).

10. The Court held a nine-day bench trial beginning on November 6, 2023.

## II. Arizona Voter Registration

11. Arizona law provides the qualifications to vote in the state. These include that a person be a U.S. citizen at least eighteen years of age, who has resided in the state for a prescribed time, has not been convicted of treason or a felony (unless voting rights have been restored), has not been adjudicated to be incapacitated, and is able to write a

name or make a mark (unless unable due to physical disability). Ariz. Const. art. VII, § 2, cl. A; A.R.S. § 16-101.

12. Since 2004, Arizona has required documentary proof of citizenship ("DPOC") to vote in state and local elections, A.R.S. § 16-166(F). The state has never been permitted to apply the DPOC requirement to federal elections. *See, e.g.*, *Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 20 (2013); *Kobach v. U.S. Election Assistance Comm'n*, 772 F.3d 1183, 1188 (10th Cir. 2014); *see also* Stipulated Fact (ECF No. 571-1) No. 17.

13. As a result, Arizona has a bifurcated voter registration regime depending on whether the voter has provided DPOC. After the Supreme Court's decision in *Inter Tribal Council of Arizona*, that system distinguished voters who registered using a State Form from those who registered using a Federal Form. ECF No. 304 at 3; PX 257. If voters registered using the Arizona state form ("State Form"), they were required to submit DPOC and applications without DPOC were denied. *Id.*; PX 6 at 15; PX 404; PX 436; Tr. Day 1 AM, 89:9-15 (Petty). If voters registered using the form created by the United States Election Assistance Commission (the "Federal Form"), a form that does not require DPOC, they would be registered only in federal elections (i.e., as "federal-only" voters) until they provided DPOC. *Id.* The Federal Form is available in 21 languages, including English, Spanish, Bengali, Chinese, Hindi, Japanese, Korean, Tagalog, and Vietnamese. *See* ECF No. 672 (Plaintiffs' Revised Request for Judicial Notice), ¶ 38. The State Form is in English and Spanish only. Stipulated Fact (ECF 571-1) No. 23.

14. In 2018, after litigation brought by League of United Latin American Citizens of Arizona ("LULAC") and Arizona Students' Association, the then-Arizona Secretary of State entered into a consent decree requiring that Arizona not treat registrants differently based on their use of the Federal Form (the "LULAC Consent Decree"). *See* Stipulated Fact (ECF 571-1) No. 19; ECF No. 124 ¶¶ 83-84; ECF No. 388, Ex. 12. Therefore, regardless of the form used, registrants who do not provide DPOC, but are otherwise eligible applicants, are registered as federal-only voters while registrants who do

provide DPOC are registered as full ballot voters.

15. Regardless of whether voters use the State Form or Federal Form, they must provide the following in order to be registered: (1) name, (2) residence address or location, (3) date of birth; (4) signature, and (5) the answer "yes" to the question "Are you a citizen of the United States of America?" (or an affirmation that the registrant is a U.S. citizen). PX 6 at 31.

16. Voters may register using the State Form through the Arizona Department of Transportation ("ADOT") Motor Vehicle Division ("MVD"). ECF No. 304 at 3; PX 6 at 15. Public assistance agencies that are required to help with voter registration typically use the State Form, which requires DPOC. Tr. Day 1 AM, 89:9-15 (Petty).

17. The State Form also includes several optional fields, including a space for the registrant's "state or country of birth," state driver's license number, and social security number. PX 6 at 31-32; PX 27. Because HB 2492 has not yet been implemented, election officials may not reject a State Form for failure to provide the optional birthplace information. PX 6 at 33. The Federal Form does not have a field for an applicant to provide place of birth. Stipulated Fact (ECF No. 571-1) No. 48.

18. If a registrant uses a paper application form to register to vote, election officials manually enter data from the form into voter registration databases. Tr. Day 1 AM, 30:8-15, 99:9-11 (Petty); Tr. Day 3 AM, 624:11-20 (Morales).

19. The Arizona Secretary of State issues binding guidance to County Recorders for registering voters and conducting elections through the Arizona Elections Procedures Manual ("EPM"); there is no way for the Secretary of State's office to issue binding guidance to County Recorders outside of the EPM. A.R.S. § 16-452; Tr. Day 1 AM, 24:23-25:9 (Petty); Tr. Day 1 PM, 320:10-12, 375:4-6 (Connor); Tr. Day 8 PM, 2012:14-21 (Hiser); Hansen Dep. 41:10-18; Garcia Dep. 25:22-26:19; Lewis Dep. 22:12-15; Webber Dep. 27:8-18. Today, County Recorders follow the 2019 EPM, the last version to receive the approvals that state law requires for an EPM to take effect, namely approvals by the Governor, Secretary of State, and Attorney General. ECF No. 388 ¶ 12; *see also* PX 6;

Stipulation as to the County Recorders (ECF No. 622-1) No. 2; Tr. Day 1 AM, 25:14-16 (Petty).

20. On September 30, 2023, Arizona Secretary of State Adrian Fontes submitted a proposed updated EPM to Governor Katie Hobbs and Attorney General Kris Mayes. Stipulated Fact (ECF 571-1) No. 68; PX 11. The proposed 2023 EPM largely does not contain guidance on implementing the Challenged Laws. *See* PX 11; *see also* Tr. Day 2 AM, 321:22-325:12, 373:12-23 (Connor). As of this filing, Governor Hobbs and Attorney General Mayes have not yet approved the proposed 2023 EPM; they may do so before December 31, 2023. A.R.S. § 16-452(B).

21. The Arizona Secretary of State and the fifteen County Recorders comprise the state's Voter Registration Advisory Committee ("VRAC"). VRAC aims to establish uniform practices related to voter registration that are not addressed in any statute or the EPM but unlike the EPM, VRAC guidance is not legally binding. Tr. Day 1 AM, 26:8-28:2 (Petty). There is no final VRAC guidance addressing either HB 2492 or HB 2243. Tr. Day 1 AM, 74:24-75:9 (Petty). VRAC guidance can only be adopted by unanimous vote of the members of the committee. Tr. Day 1 AM, 27:16-21 (Petty). No such guidance has been adopted during Secretary Fontes' tenure. Tr. Day 2 PM, 408:17-20 (Connor). It has been "quite a while" since a VRAC paper has been adopted. Tr. Day 8 PM, 2043:7-10 (Hiser).

## III. Arizona Voter Statistics and Demographics

22. According to the 2020 Census, Arizona has a total population of 7,151,502 and a voting-age population of 5,541,976. ECF No. 672 (Plaintiffs' Revised Request for Judicial Notice), ¶¶ 1-2. The Census Bureau's 2017-2021 American Community Survey ("ACS") estimated that the U.S. *citizen* voting-age population (CVAP) of Arizona is 5,000,102. *Id.* ¶ 3. As of July 2023, there were 4,198,726 active registered voters in Arizona. Stipulated Fact (ECF 571-1) No. 26. Maricopa County is the largest county in Arizona and has the largest registered voter population, with approximately 2.5 million active registered voters, and approximately 4 million registered voters, including inactive status voters. Tr. Day 1 AM, 22:15-23:2 (Petty).

23. There are 19,439 federal-only voters among the active registered voters in Arizona. PX 336. In Maricopa County there are approximately 11,000 active federal-only voters, and a little over 9,000 inactive federal-only voters. Tr. Day 1 AM, 50:20-23 (Petty). Of the active federal-only voters in Maricopa County, there are nearly 6,000 on the active early voting list.[4] *Id.* at 51:19-24.

24. In 2022, the Census Bureau estimated that Arizona's population was 52.9% White alone (not Hispanic or Latino); 32.5% Hispanic or Latino; 5.5% Black or African American alone; 3.9% Asian alone; and 0.3% Native Hawaiian and Other Pacific Islander alone. ECF No. 672 (Plaintiffs' Revised Request for Judicial Notice), ¶ 20.

25. The racial breakdown in Maricopa County is summarized in the table below. *Id.* ¶ 33.

| **Race and Hispanic Origin** | |
|---|---|
| White alone, percent | 84.2% |
| Black or African American alone, percent (a) | 4.5% |
| American Indian and Alaska Native alone, percent (a) | 4.4% |
| Asian alone, percent (a) | 3.4% |
| Native Hawaiian and Other Pacific Islander alone, percent (a) | 0.3% |
| Two or More Races, percent | 3.3% |
| Hispanic or Latino, percent (b) | 38.5% |
| White alone, not Hispanic or Latino, percent | 50.1% |

26. Likewise, the racial breakdown in Pima County, Arizona's second largest by population, is summarized in the table below. *Id.* ¶ 34.

| **Race and Hispanic Origin** | |
|---|---|
| White alone, percent | 84.2% |
| Black or African American alone, percent (a) | 4.5% |
| American Indian and Alaska Native alone, percent (a) | 4.4% |
| Asian alone, percent (a) | 3.4% |
| Native Hawaiian and Other Pacific Islander alone, percent (a) | 0.3% |
| Two or More Races, percent | 3.3% |
| Hispanic or Latino, percent (b) | 38.5% |
| White alone, not Hispanic or Latino, percent | 50.1% |

27. The 2021-2022 ACS estimated that Arizona's population of naturalized U.S.

---

[4] The active early voting list provides that a "voter shall be sent an early ballot by mail automatically for any election at which a voter at that residence address is eligible to vote," unless the voter is removed under new removal requirements currently being challenged. A.R.S. § 16-544(H) (detailing active early voting list); *Mi Familia Vota v. Hobbs*, 608 F. Supp. 3d 827, 864-67 (D. Ariz. 2022) (denying motion to dismiss a challenge to the changed early voting list removal procedures).

citizens is 477,730, and that those of voting age total 436,816. *Id.* ¶¶ 4-5. Many of those have recently joined the Arizona electorate. According to the U.S. Department of Homeland Security ("DHS"), 135,946 citizens of voting age have naturalized in Arizona between fiscal year 2013 and 2022, including 16,396 in 2022. ECF No. 672 (Plaintiffs' Revised Request for Judicial Notice), ¶ 36.[5]

28. Significant percentages of naturalized citizens in Arizona are of Asian or Hispanic/Latino origin. The below table summarizes DHS data regarding persons of voting age naturalized in Arizona during fiscal years 2013 to 2022, including those whose country of birth is an Asian country or Mexico, Cuba, Guatemala, or Colombia, which are a subset of origin countries with populations considered of Hispanic or Latino origin.[6] *Id.* ¶ 36.

| FY | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|---|---|---|
| Arizona | 13,165 | 11,268 | 13,748 | 11,374 | 12,462 | 12,072 | 14,277 | 13,672 | 17,512 | 16,396 |
| Asia | 3,579 | 3,173 | 4,043 | 3,314 | 3,206 | 3,170 | 4,469 | 4,570 | 5,471 | 4,923 |
| Mexico | 5,813 | 5,172 | 5,912 | 4,943 | 6,375 | 6,052 | 6,132 | 5,362 | 7,102 | 6,623 |
| Cuba | 130 | 104 | 133 | 158 | 143 | 109 | 180 | 194 | 420 | 368 |
| Guatemala | 139 | 105 | 168 | 99 | 117 | 113 | 120 | 110 | 140 | 159 |
| Colombia | 110 | 86 | 109 | 70 | 94 | 63 | 121 | 95 | 161 | 109 |

29. In Arizona, Asian and Pacific Islander population in 1960 was 5,380 and in 1990 was 55,206. *Id.* ¶ 16. According to the 2020 Census, Arizona's Asian voting-age population is 205,298, and its Native Hawaiian and Other Pacific Islander voting-age population is 11,803. *Id.* ¶ 9.

30. Looking more recently in Arizona, the population of Asian Alone or in Combination increased 52.1% from 2010 to 2020. By county, the population increase of these groups over the same period was: Greenlee – 92.6%; Gila – 85.3%; Yavapai – 72.6%;

[5] According to DHS, 969,380 persons became naturalized U.S. citizens during Fiscal Year 2022. ECF No. 672 (Plaintiffs' Revised Request for Judicial Notice), ¶ 35.

[6] DHS does not provide a single combined number for "Hispanic or Latino." According to the Federal Register, the definition of "Hispanic or Latino" is: A person of Cuban, Mexican, Puerto Rican, Cuban, South or Central American, or other Spanish culture or origin, regardless of race. The term, "Spanish origin," can be used in addition to "Hispanic or Latino." ECF No. 672 (Plaintiffs' Revised Request for Judicial Notice), ¶ 37.

Coconino – 63.3%; Maricopa – 59.6%; Apache – 51.1%; Santa Cruz – 45.8%; Mohave – 43.6%; Pima – 30.9%; La Paz 2– 28.4%; Pinal – 27.8%; Graham – 20.7%; Navajo – 14.6%; Cochise – 10.7%; Yuma – 10.1%. *Id.* ¶ 17.

31. Likewise, the population of Native Hawaiian and Other Pacific Islander Alone or in Combination increased 48.2% from 2010 to 2020. By county, the population increase of these groups over the same period: Greenlee – 487.5%; La Paz – 444.4%; Gila – 121.7%; Apache – 94.4%; Coconino – 70.9%; Santa Cruz – 57.8%; Yavapai – 54.7%; Maricopa – 54.4%; Mohave – 43.2%; Navajo – 39.4%; Pima – 38.3%; Pinal – 34.1%; Cochise – 20.9%; Graham – 10.4%; Yuma – 2.8%. ECF No. 672 (Plaintiffs' Revised Request for Judicial Notice), ¶ 18.

32. The Asian American, Native Hawaiian, and Pacific Islander ("AANHPI") voting age population in Arizona is predominantly made up of naturalized citizens. According to Census Bureau data from 2020, 61.5% of the AANHPI citizen voting age population in Arizona are naturalized U.S. citizens. *Id.* ¶¶ 6-7 (calculated from the information in those paragraphs as: (35042+48296+306+410) / (21874+35042+21655+48296+5066+306+3958+410) = 61.5%). Many foreign-born Asian Arizonans are newer arrivals to Arizona. The 2020-2021 ACS estimated that, for Asian Arizonans born outside the U.S., 20.9% entered the U.S. between 2000 and 2009, and 35.1% entered in 2010 or later. ECF No. 672 (Plaintiffs' Revised Request for Judicial Notice), ¶ 10.

33. Hispanics and Latinos likewise have a sizeable naturalized population. According to Census Bureau data from 2021, 17.5% of the Hispanic citizen voting age population in Arizona are naturalized U.S. citizens. ECF No. 672 (Plaintiffs' Revised Request for Judicial Notice), ¶ 31. According to Census Bureau data from 2021, for Hispanic Arizonans born outside the U.S., 25.4% entered the U.S. between 2000 and 2009, and 17.4% entered in 2010 or later. ECF No. 672 (Plaintiffs' Revised Request for Judicial Notice), ¶ 24. The non-white Hispanic or Latino population increased 15.7% between 2010 and 2020. ECF No. 672 (Plaintiffs' Revised Request for Judicial Notice), ¶ 19.

34. Other demographic groups have also increased in size in recent years. The Black or African American population increased 40.1% between 2010 and 2020 and the American Indian and Alaska Native population grew 28.3% between 2010 and 2020. ECF No. 672 (Plaintiffs' Revised Request for Judicial Notice), ¶¶ 21-22. By contrast, the precent change of white alone population relative to the total population declined by 7.4% in the same time period. ECF No. 672 (Plaintiffs' Revised Request for Judicial Notice), ¶ 23.

35. The Hispanic and Asian portions of the Arizona electorate in particular have the potential to continue to grow. The below table summarizes (using Census Bureau data from 2020) the percentage of registered U.S. citizen voters by sex, race, and Hispanic-origin in Arizona. ECF No. 672 (Plaintiffs' Revised Request for Judicial Notice), ¶ 8. As shown, Americans of Hispanic descent have the lowest estimated percentage of registered U.S. citizen voters in Arizona, and Asian Americans have the second-lowest estimated percentage.

| Sex, Race, and Hispanic-Origin | Percent Registered (Citizen) |
|---|---|
| Total | 76.4 |
| Male | 72.4 |
| Female | 80.3 |
| White alone | 76.3 |
| White non-Hispanic alone | 80.1 |
| Black alone | 79.2 |
| Asian alone | 70.2 |
| Hispanic (of any race) | 66.8 |
| White alone or in combination | 76.5 |
| Black alone or in combination | 82.2 |
| Asian alone or in combination | 73.5 |

36. While the table above focuses on those already U.S. citizens, a large percentage of Asians in Arizona can still become U.S. citizens. The citizen voting age of

Asians in Arizona from the 2020 ACS is 126,867 (ECF No. 672 (Plaintiffs' Revised Request for Judicial Notice), ¶ 6) and the voting age population of Asians in Arizona from the 2020 Census is 205,298 (ECF No. 672 (Plaintiffs' Revised Request for Judicial Notice), ¶ 9), meaning around 78,431 (or 39.2% of) voting age Asians in Arizona can potentially naturalize and become part of Arizona's electorate.

37. Sizeable portions of these population also have limited English proficiency, indicating potential issues and burdens with English language documents. Indeed, the AANHPI community in Arizona speaks over 100 different languages. Tr. Day 5 PM, 1267:5-16 (Tiwamangkala). There are members of the AANHPI community in Arizona who do not speak English very well or at all. Tr. Day 5, PM 1270:22-1271:17 (Tiwamangkala).

38. According to Census Bureau data from 2020, over 25% of AANHPI Arizonans are limited English proficient. ECF No. 672 (Plaintiffs' Revised Request for Judicial Notice), ¶¶ 11-12 (calculated using data from the cited paragraphs as follows: (3385+55565+726+803) / (227326+13417) = 25.1%). Focusing on who can currently vote, according to Census Bureau data from 2021, over 28% of Asian Arizonans over the age of 18 are limited English proficient and over 27% of AANHPI Arizonans over the age of 18 are limited English proficient. *Id.* ¶¶ 14-15 (calculated using data from the cited paragraphs as follows: 53422/190029 = 28.1%) (and: (53422+1109) / (190029+10846) = 27.1%).

39. Similarly, according to Census Bureau data from 2020, over 18% of Spanish-speaking Arizonans speak English "not well" or "not at all." *Id.* ¶ 32. The 2011-2015 ACS estimated that over 15% of Hispanic households in Arizona are limited English speaking. *Id.* ¶ 25. The 2016-2020 5-year ACS estimated that the total Hispanic or Latino population 5 years of age and over in Arizona is 2,063,116, of which 90,226 native and 329,741 foreign born are limited English proficient (20.4%). *Id.* ¶ 13. The 2021-2022 1-year ACS estimated that the total Hispanic or Latino population 5 years of age and over in Arizona is 2,207,532, of which 115,674 native and 323,719 foreign born are limited English proficient (19.9%). *Id.* ¶ 26.

40. Additionally, certain Native American languages spoken in Arizona, such as Apache, cannot be transcribed in the same way as English and must be translated orally. Tr. Day 4 PM, 1008:11-1009:14 (Rambler).

41. Some populations are also more likely to be affected by poverty and economic disparities in Arizona. According to Census data, Latinos in Arizona have a higher poverty rate compared to the overall population, and more than twice that of white Arizonans. [cite/] Specifically, 19.2 percent of Latinos live in a household with an income falling below the poverty line, compared to only 9.6 percent of white Arizonans and 14.1 percent of the overall population. ECF No. 672 (Plaintiffs' Revised Request for Judicial Notice), ¶ 27. Relatedly, the median household income amongst Latinos in Arizona also falls below the median household income statewide. According to the 2020 ACS, the median household income amongst the Latino population in Arizona is $52,399, compared to $61,529 in the total population and $66,973 amongst white Arizonans. *Id.* ¶ 28.

42. According to Census data, Latinos in Arizona face greater disparities than white Arizonans in education as well. Only 71.7 percent of Latinos in Arizona have received a high school diploma or the equivalent, compared to 94.8 percent of the white population. The disparity is similar in postsecondary education, with only 14.3 percent of Latinos having a bachelor's degree or higher, compared to 36.6 percent of white Arizonans. ECF No. 672 (Plaintiffs' Revised Request for Judicial Notice), ¶ 29; see also *infra* Section IV.A (Arizona's History and Conditions of Discrimination).

43. Furthermore, according to Census data, Latinos are unemployed at a rate higher than the overall population, with an unemployment rate of 6.2 percent, compared to only 5.8 percent amongst the overall population and 5.0 percent amongst white Arizonans. ECF No. 672 (Plaintiffs' Revised Request for Judicial Notice), ¶ 30.

## IV. Historical Background of Challenged Laws

### A. Arizona's History and Conditions of Discrimination

44. Arizona has a long history of discrimination, both state-sponsored and generalized, on the basis of race, ethnicity, and national origin, and lasting conditions of

discrimination against groups on those bases continues today. Tr. Day 6 AM, 1399:21-24 (Burton). The Secretary of State admits that the history of discrimination against Native Americans, Latinos, voters of color, and members of language minority communities is well documented. ECF No. 124 ¶¶ 162, 178.

45. From November 1, 1972, until June 25, 2013, when the Supreme Court decided *Shelby County v. Holder*, 570 U.S. 529 (2013), the State of Arizona was subject to the preclearance provisions of Section 5 of the Voting Rights Act because of its use of voting practices that disproportionately burdened members of language minority communities. Apache, Navajo, and Coconino Counties were also historically covered. 28 C.F.R. pt. 51, App. (2012); 40 Fed. Reg. 43746; 30 Fed. Reg. 9897-02, 14505-02; ECF No. 124 ¶ 163; Tr. Day 6 PM, 1438:9-1429:6, 1525:1-14 (Burton).

46. Plaintiffs introduced evidence on these topics from Dr. Orville Vernon Burton. Dr. Burton is the Judge Matthew J. Perry Distinguished Professor of History and Geography, Professor of Global Black Studies, Professor of Sociology and Anthropology, and Professor of Computer Science at Clemson University. Tr. Day 6 AM, 1391:14-17 (Burton). Dr. Burton holds a Ph.D. in American History from Princeton University. Tr. Day 6 AM, 1392:2-21 (Burton). He has published more than 20 books and about 300 articles and edited numerous others, many of which are on the topics of his expertise: American history, race relations, the intent of laws, socioeconomic inequality, voting behavior, legislative histories, discrimination, and regional histories. Tr. Day 6 AM, 1392:24-1393:23, 1396:8-14, 1399:2-18, 1403:17-22 (Burton). Some of the publications he has published or edited, as well as the courses he teaches, include conducting research on Arizona history and socioeconomic conditions. Tr. Day 6 AM, 1393:24-1395:7 (Burton). He has provided his expert opinion in approximately 20 voting rights cases for a variety of parties and in a range of jurisdictions across the country, and has never had his expert opinion excluded. Tr. Day 6 AM, 1395:8-1398:19 (Burton). Defendants offered no expert testimony to rebut the testimony of Dr. Burton.

47. The Court finds that Dr. Burton is qualified to provide the expert analysis

and opinions offered in this matter. Having observed Dr. Burton's testimony, the Court credits his analyses, opinion, and testimony, and grants them substantial weight.

48. Throughout its history, Arizona has been deemed the "twelfth star of the Confederacy" and, later, the "Jim Crow Southwest" because of its patterns of racial animus and discrimination similar to those of the states of the former Confederacy. Tr. Day 6 PM, 1412:9-1413:2, 1428:14-21 (Burton). After the Civil War, many Americans who moved to Arizona came from states that were part of the Confederacy, and those settlers were very influential. Tr. Day 6 PM, 1412:15-1413:24, 1427:24-1428:21 (Burton). Driven by discriminatory post-Confederacy and manifest destiny ideologies, many early white Arizona settlers sought to displace and segregate from minority residents in Arizona, particularly Native Americans and Latinos, leading to laws that discriminated against minority groups. Tr. Day 6 PM, 1413:3-1414:21 (Burton).

49. Immediately after statehood, Arizona banned interracial marriage. Tr. Day 6 PM, 1415:1-21 (Burton). Historically, Arizona passed specific laws in 1865 barring intermarriage between Asians and white persons. Tr. Day 6 AM, 1346:19-1347:15 (Chang). In 1931, Arizona expanded its law barring interracial marriage. By the 1960s, Arizona was one of a minority of states that still banned interracial marriage, and it ended in Arizona only as a result of a court injunction. Tr. Day 6 PM, 1415:1-21 (Burton).

50. Arizona has also historically had discriminatory laws and practices in employment. For example, in its early years, Arizona required that people employed in the mining industry spoke English, discriminating against Native American, Latino, and Asian-American residents. Tr. Day 6 PM, 1417:6-10 (Burton). The state also legislated against Chinese-owned businesses in particular, and required by constitutional provision that most companies ensure that 80% or more of their employees were native-born U.S. citizens. Tr. Day 6 PM, 1417:11-1418:7 (Burton). The U.S. Supreme Court ruled the latter requirement was unconstitutional, finding the provision was introduced under the unlawful and discriminatory assumption that "the employment of aliens unless restrained was a peril to the public welfare." *Truax v Raich*, 239 US 33, 41 (1915).

51. Arizona has a long and continuing history of discrimination in education. Though Congress required that the Arizona territory nullify its territorial school segregation law when it became a state, after statehood Arizona passed a new law enabling localities to mandate school segregation; such mandates were widespread and discriminated against Black, Latino and Native American students. Tr. Day 6 PM, 1418:23-1420:17:2 (Burton). Arizona schools were segregated until a state court invalidated the segregation law in 1953. Tr. Day 6 PM, 1421:21-23, 1508:11-14, 1545:19-22 (Burton). Even after the courts ended de jure school segregation, de facto education discrimination in schools continued because the state required English-only classroom instruction. Non-English speakers, particularly but not exclusively Native Americans and Latinos, could take only very basic courses in English rather than age-appropriate ones, leading many to have reduced educational achievement and opportunities. The English-only instruction requirement and resulting inequalities continue today. Tr. Day 6 PM, 1423:5-23 (Burton).

52. In 1988, the Arizona Constitution was amended by ballot initiative to provide that "[t]he State and all political subdivisions of [the] State shall act in English and in no other language." ECF No. 124 ¶ 180. The English-only requirement was invalidated by the Arizona Supreme Court as violating the First and Fourteenth Amendments. *Ruiz v. Hull*, 957 P.2d 984, 998, 1000 (Ariz. 1998).

53. Housing discrimination has long been prevalent in Arizona. Because of racial covenants, government-sponsored housing segregation called redlining, and highway construction, minority groups have experienced housing discrimination, which results in adverse living environments including more often having to live near manufacturing areas and being exposed to environmental dangers. Tr. Day 6 PM, 1424:1-1426:11 (Burton). Specifically, in 1921, Arizona passed an "alien land law" that barred non-U.S. citizens ineligible to become citizens—which was largely just AAPIs in Arizona—from owning land. Tr. Day 6 AM, 1349:16-1350:5 (Chang). Similarly, public spaces were segregated such that certain minority residents, particularly Black people, often were not allowed in restaurants or other public accommodations, and swimming pools were open to white

people on some days and minorities on others. Tr. Day 6 PM, 1426:20-1427:8 (Burton).

54. Arizona has a long history of official discrimination in voting as well. Before Arizona became a state, the territorial government adopted a literacy test for voting, in part because of the prevalent "idea that Mexican Americans are ignorant or even purchasable," which was espoused by the Arizona Attorney General. Tr. Day 6 PM, 1429:1-14 (Burton). Arizona renewed its literacy test in 1912, after it became a state, and the test was widely used for racial profiling and to effectuate discrimination and intimidation campaigns against minority voters until 1972, when the U.S. Supreme Court invalidated it. Tr. Day 6 PM, 1429:19-1431:22 (Burton). The test had a particularly disparate impact because of Arizona's history of discrimination in education: disadvantaged minority groups had a harder time passing the test because of the poor education the state provided to those communities. Tr. Day 6 PM, 1431:25-1432:14 (Burton).

55. Native Americans were not allowed to vote in Arizona when they gained citizenship in 1924; they gained the right to vote only as the result of a state court decision in 1948. Even after 1948, many Native Americans were unable to vote because they were not proficient in English and could not pass the state's literacy test, as well as other environmental factors that reduced Native Americans' ability to vote on an equal basis. Tr. Day 6 PM, 1432:16-1434:1 (Burton).

56. For decades, Arizona has employed discriminatory voter list maintenance practices. In the 1970s and 1980s, Arizona counties would frequently and systematically purge their entire voter registrations lists under state laws at the time. These practices adversely affected minority voters. For example, Maricopa County in the 1970s purged its entire voter list, requiring every eligible citizen to re-register. The Maricopa County election official in charge of the process attempted to require proof of U.S. citizenship when people sought to re-register, despite no law mandating such proof. There was significant public and official backlash to these discriminatory attempts to require proof of U.S. citizenship to re-register. These practices and other obstacles made it more difficult for minorities to re-register. Tr. Day 6 PM, 1434:19-1437:14, 1515:24-1516:3 (Burton).

57. In 2012, Maricopa County printed voter registration cards in Spanish with the incorrect election date. *See* ECF No. 124 ¶ 182.

58. As a result of Arizona's history of discrimination, there remain significant differences in socioeconomic status and achievement between white Arizonans and minority groups, particularly with regard to education, wealth, housing, and employment. Tr. Day 6 AM, 1399:24-1400:4 (Burton); Tr. Day 6 PM, 1442:14-1443:13 (Burton); *see also supra* Section III.

59. For example, students of color score lower than non-Hispanic white students in almost every educational attainment measure. In particular, Black students score 32 points lower than white students in fourth grade mathematics testing, Native American students' graduation rate is only 72% of students that enroll, and minority students are more likely to receive school discipline than white students. Tr. Day 6 PM, 1446:21-1447:24 (Burton); *see also* ECF No. 672 (Plaintiffs' Revised Request for Judicial Notice), ¶¶ 29, 50-52. Non-white Arizonans are more likely to live in poverty, are less likely to own homes, and face worse health conditions than white Arizonans. Tr. Day 6 PM, 1449:25-1450:11 (Burton); *see also* ECF No. 672 (Plaintiffs' Revised Request for Judicial Notice), ¶¶ 27-28, 30.

60. Those differences in education, wealth, housing, and employment status make it more difficult for members of minority groups, including Latino, Black, Asian American, and Native Arizonans, to register and vote; those disadvantages will be exacerbated by the Challenged Laws. Tr. Day 6 AM, 1399:25-1400:4 (Burton); Tr. Day 6 PM, 1427:9-19, 1442:18-1444:1, 1448:18-1449:13 (Burton). For example, difficult conditions on Native American reservations create extra burdens that make it more challenging for these voters to participate and comply with new voting requirements. Tr. Day 6 PM, 1434:8-18 (Burton). In general, lower levels of education and wealth among minority groups make it more difficult to understand complex voting and registration requirements and to obtain materials necessary to vote. Tr. Day 6 PM, 1450:12-1451:7 (Burton).

61. In 1982, there were no laws that were analogous to the challenged provisions of HB 2492 and HB 2243. Tr. Day 6 PM, 1437:15-1438:8, 1540:2-9 (Burton); *see also* ECF No. 124 ¶ 190 (Arizona Secretary of State admitting that laws analogous to the challenged provisions in HB 2492 and HB 2243 were not in place in Arizona at the time of the passage of the Voting Rights Act of 1965 or its amendments). For DPOC, for example, Arizona appears to have been the first state in the country to mandate such a requirement in 2004. Tr. Day 6 PM, 1439:23-1440:1 (Burton). Thus, the challenged laws substantially depart from the standard practice in 1982.

62. In recent years, Arizona has continued to impose voting rules that are more burdensome than rules in other states. For example, Arizona has used each of the five "disenfranchising devices," identified in a report by the U.S. Commission on Civil Rights, that have proliferated since the preclearance provisions of the Voting Rights Act was rendered inoperable in 2013. Tr. Day 6 PM, 1438:9-1439:19 (Burton). Those devices include: a voter identification requirement; a proof of citizenship requirement; use of voter purges; cutbacks to early voting opportunities; and widespread polling place closures. Tr. Day 6 PM, 1439:20-1441:10 (Burton).

63. During the years that those five devices have been enforced, Arizona's demographics have been changing. Over the last two decades, the non-Hispanic white population has decreased in proportion to the state's population as a whole, while the Latino, Black, Native, and AANHPI populations make up a greater percentage of Arizonans. Tr. Day 6 PM, 1444:17-1445:8 (Burton); *supra* Section III; ECF No. 672 (Plaintiffs' Revised Request for Judicial Notice), ¶¶ 9-24. Relatedly, the foreign-born population in Arizona has increased by 39.6% since 2000. About half of foreign-born residents are naturalized citizens, which represents about a 30% increase in the percentage of foreign-born residents who are naturalized. Tr. Day 6 PM, 1445:16-1446:5 (Burton); *see also supra* Section III; ECF No. 672 (Plaintiffs' Revised Request for Judicial Notice), ¶¶ 35-36.

64. Arizona's recent history of racial profiling, including in the 1997 "Chandler

Roundup"; the profiling directed by Maricopa County Sheriff Joe Arpaio; and the "show me your papers" law (SB 1070), has created an "intimidation factor" that creates disparate voting burdens for citizens of color. People who have been targeted based on their ethnicity or skin color may be less likely to register to vote, particularly when required to provide additional documentation because they do not want to "risk being singled out." Tr. Day 6 PM, 1451:8-1452:10 (Burton); *see also* Tr. Day 4 PM, 935:13-936:7, 993:18-994:7 (Burch). At trial, numerous voters and organizational representatives described the significant fears and chilling effects that voters will experience because of HB 2492 and HB 2243. *See, e.g.*, Tr. Day 1 PM, 236:12-23 (Patel); Tr. Day 2 PM, 461:21-462:7 (Nitschke); Tr. Day 2 PM, 480:9-481:18, 493:19-495:3 (Guzman); Tr. Day 3 PM, 740:20-23 (Camarillo); Tr. Day 4 AM, 786:12-788:8, 806:21-807:18 (Rodriguez-Greer); Tr. Day 5 PM, 1274:19-1275:3, 1275:16-1276:1, 1279:17-25 (Tiwamangkala).

65. Arizona political candidates have long used racial appeals in their campaigns, and such appeals have continued in recent years, including overt racial appeals in campaigns as well as those using coded language, such as the word "illegals." Tr. Day 6 AM, 1400:4-8 (Burton); Tr. Day 6 PM, 1452:15-1454:19 (Burton).

66. The alleged problem of voter fraud has been used since Reconstruction to justify racially discriminatory restrictive voting laws, such as poll taxes. Today in Arizona the term "voter fraud" is often in context used as a racially coded term, including by former President Donald Trump, to imply that some minority voters are unlawfully voting despite not being U.S. citizens or otherwise are not trustworthy. References to voter fraud as a justification for the Challenged Laws are often racially coded appeals. Tr. Day 6 PM, 1453:17-1455:16, 1459:9-16 (Burton).

67. Illustrations of more direct racial appeals in campaigns include numerous statements from former President Trump and his surrogates speaking in Arizona; one congressional candidate claiming that "Middle Easterners" were only in the United States to hurt Americans; an Arizona state legislator saying that non-native English speaking children were a burden and that there were not "enough white kids to go around"; and in

2023, U.S. Representative Eli Crane using the term "colored people." Tr. Day 6 PM, 1456:15-1457:14, 1546:25-1547:12 (Burton).

68. Recognizing the older and recent history of discrimination in Arizona as well as the unequal conditions that persist today because of that history, and based on the evidence presented and discussed throughout this opinion, the Court finds that the Challenged Laws will have a discriminatory effect and were passed with discriminatory intent. Tr. Day 6 AM, 1400: 9-12 (Burton); Tr. Day 6 PM, 1441:19-23, 1442:18-1443:13, 1448:18-1449:24, 1450:12-1451:7 (Burton); *see also* Tr. Day 4 PM, 931:5-936:7, 935:13-936:7, 940:6-944:12, 993:18-994:7 (Burch) (describing heightened costs to voting that minority voters face in Arizona).

**B. Arizona's History of Discrimination Against the AANHPI Community**

69. One of the defining features of Asian American history is a long and deep history of anti-Asian American discrimination. Tr. Day 6 AM, 1335:14-24 (Chang).

70. Plaintiffs introduced expert evidence concerning this topic from historian Dr. Derek Chang. Dr. Chang holds a Ph.D. in American History from Duke University and currently holds the position of Associate Professor of History and Asian American Studies at Cornell University, where he has taught since 2008. Tr. Day 6 AM, 1333:15-20; 1334:3-7 (Chang). At Cornell, he serves as the Director of Undergraduate Studies in the Department of History and interim Director of Public History in the Department of History, and teaches classes in U.S. History, Asian American History, the History of American Race Relations, Immigration History, and Asian American Studies. Tr. Day 6 AM, 1334:8-25 (Chang). He has published a book examining Chinese immigration to the U.S. and several scholarly articles. Tr. Day 6 AM, 1335:1-5 (Chang). He currently serves as a member of the Association for Asian American Studies, the Organization of American Historians, the American Historical Association, and the American Studies Association. Tr. Day 6 AM, 1335:6-13 (Chang).

71. The Court finds that Dr. Chang is qualified to provide the expert analysis and opinions he offered in this matter. Having observed Dr. Chang's testimony, the Court

credits his analyses, opinion, and testimony, and grants them substantial weight.

72. Asian American and Pacific Islander ("AAPI")[7] history demonstrates the notion of AAPIs as the "perpetual foreigner," or relatedly the "alien citizen" and "non-American," a notion stemming from the fact that that immigrants from Asia were barred for a long period of time from becoming naturalized U.S. citizens. Tr. Day 6 AM, 1339:8-1340:5, 1346:4-18 (Chang). The Federal Chinese Exclusion Act of 1882 further solidified this notion. Tr. Day 6 AM, 1348:1-23 (Chang). So too did Supreme Court opinions, which rejected the pleas of people of Asian descent to be considered American. Tr. Day 6 AM, 1348:24-1349:15 (Chang).

73. For example, during the Second World War, people of Japanese descent were incarcerated as enemy *aliens* because of their association with Japan, even though roughly 70 percent of those incarcerated were American citizens by birth. Tr. Day 6 AM, 1340:6-19 (Chang).

74. As another example, during the COVID-19 pandemic, then-President Trump and others associated those of Chinese descent, or those thought to be of Chinese descent or related to China, with the COVID-19 virus and likened them to the worst kind of invasion and attack on the United States since Pearl Harbor, resulting in a marked increase in anti-Asian discrimination and violence. Tr. Day 6 AM, 1341:3-19 (Chang).

75. Scholars often break AAPI history into three broad historical periods: the Period of Immigration, from the mid-nineteenth century to roughly 1882; the Period of Exclusion, from 1882 to the mid-twentieth century; and the Period of Post-Exclusion, from the mid-twentieth century (specifically around the passage of the 1965 Immigration Act) to the present. Tr. Day 6 AM, 1337:24-1338:19 (Chang).

76. In all three periods, the immigration, arrival, and settlement of AAPIs is

---

[7] Dr. Chang used the term AAPI throughout his testimony, explaining that it is meant to encompass both those who trace their ancestry to Asia and those who trace their ancestry to the Pacific Islands, including the Philippines, Hawaii, Guam, America Samoa, and other places. The terms is used by the Federal Census and Dr. Chang's use of the term is consistent with scholarship in the area. The term is adopted herein when referring to Dr. Chang's testimony.

usually followed by a reaction to their presence, motivated by concerns and sometimes outright fears, real or perceived, that larger numbers of AAPIs might adversely influence social, cultural, and political life. Tr. Day 6 AM, 1338:20-1339:7, 1352:23-1353:13 (Chang); *see also id.* at 1345:4-1352:23, 1353:25-1354:6, 1384:10-19 (Chang).

77. During the Period of Immigration, there was the first large-scale immigration of people from Asia to the United States. Almost immediately, there were responses, such as the Foreign Miners' Tax in California and the federal Page Act. Neither law identified people of Chinese descent as targets, but the historical implementations show that people of Chinese descent were the targets. Tr. Day 6 AM, 1345:4-1346:3 (Chang). The Page Act effectively stopped the immigration of Chinese women into the United States through its discriminatory application. Tr. Day 6 AM, 1345:20-1346:3 (Chang).

78. During the Period of Immigration, Arizona barred intermarriage between Asians and white people, understood to discourage family formation of AAPIs and to discourage settlement, and places like Phoenix attempted to pass laws restricting residential settlement of Asians. Tr. Day 6 AM, 1346:19-1347:15 (Chang). A newspaper article in Prescott, Arizona, suggested there were too many Chinese in the town when the number increased from three to four. Tr. Day 6 AM, 1347:16-25 (Chang).

79. During the Period of Exclusion, the federal government passed the Chinese Exclusion Act, barring all Chinese immigration, which was followed by restrictions on all Asian immigration to the United States. Tr. Day 6 AM, 1348:1-23 (Chang).

80. Also during the Period of Exclusion, Arizona passed an "alien land law" that did not specify any particular ethnicity or country of origin, but barred aliens ineligible to become U.S. citizens—a designation that applied only to people of Asian descent—from owning land. Tr. Day 6 AM, 1349:16-1350:5 (Chang). This formulation of "aliens ineligible for citizenship" becomes a code for people from Asia. Tr. Day 6 AM, 1350:3-5 (Chang); *see also* 1349:16-1350:5 (Chang).

81. Since around the start of the Period of Post-Exclusion, Arizona has seen a marked uptick in AAPI immigration, with 5,380 AAPIs in the state in 1960, 55,206 AAPIs

in the state in 1990, and more than 250,000 AAPIs in the state in 2020. Tr. Day 6 AM, 1351:20-1352:8 (Chang); ECF No. 672 (Plaintiffs' Revised Request for Judicial Notice), ¶¶ 1, 16, 20; *supra* Section III. These AAPI immigrants come from various countries—many trace their ancestry to China, Taiwan, Korea, South Asia, Japan, Cambodia, and Laos, among others—and are economically diverse—especially working class refugees from Vietnam, who began entering the United States after 1965. Tr. Day 6 AM, 1350:6-1351:4, 1352:9-22 (Chang).

82. From 2010 to 2020, Arizona has seen around a 50% increase in Asian population and around a 50% increase in Native Hawaiian and Pacific Islander population. Tr. Day 6 AM, 1353:14-1354:14 (Chang); ECF No. 672 (Plaintiffs' Revised Request for Judicial Notice), ¶¶ 17-18.

83. Arizona's AAPI population comprises around 4.6% of the electorate, which is large enough, as a block, to change the outcome of elections given the thin margins of victory that Arizona has seen recently. Tr. Day 6 AM, 1354:15-1356:12 (Chang). For example, the 2020 presidential race in Arizona was decided by 10,457 votes. ECF No. 672 (Plaintiffs' Revised Request for Judicial Notice), ¶ 47. By contrast, 4.6% of the electorate (4,198,726 registered voters (Stipulated Fact (ECF 571-1) No. 26)) is 193,141 voters.

84. Most of the Arizona AAPI electorate is foreign born and around 60% of the eligible voting population are naturalized citizens. Tr. Day 6 AM, 1354:19-1355:4 (Chang); *supra* Section III; ECF No. 672 (Plaintiffs' Revised Request for Judicial Notice), ¶¶ 6-7.

85. Over 25% of those considered Asian-only have limited English proficiency and over 28% of those considered Asian-only and age 18 or over have limited English proficiency. Tr. Day 6 AM, 1358:25-1359:12 (Chang); *supra* Section III; ECF No. 672 (Plaintiffs' Revised Request for Judicial Notice), ¶¶ 11, 14.

86. Subsequent reauthorizations and amendments of the Voting Rights Act focused on disabilities of limited English proficiency voters and ensuring that those persons have access to the ballot. The Challenged Laws' short 35-day notice period to provide

DPOC unduly burdens AAPI voters with limited English proficiency voters because it is harder for them to access resources to translate materials. Tr. Day 6 AM, 1359:13-1360:4 (Chang).

87. Requiring birthplace on the voter registration form has a particular set of meanings for AAPI people because of their history of naturalization and barriers to citizenship. For example, when Japanese Americans on the West Coast were incarcerated during the Second World War, they were identified, in part, by their birthplace. So asking for birthplace triggers questions in AAPI communities about how that information might be used. Similarly, asking for documentary proof of citizenship can also act as a barrier to AAPI participation because of that history. Tr. Day 6 AM, 1356:22-1357:22 (Chang).

88. Indeed, some in the AANHPI community in Arizona have immigrated to escape political terror. Tr. Day 5 PM, 1267:5-16 (Tiwamangkala). And some in the AANHPI community in Arizona expressed fear of government prosecution from the passage of the Challenged Laws. Tr. Day 5, 1274:19-1275:3 (Tiwamangkala).

89. Laws and governmental actions against AAPIs throughout history have occurred even without AAPIs specifically being identified. For example, the Executive Order that incarcerated Japanese Americans during the Second World War did not even refer to Japanese Americans. Tr. Day 6 AM, 1340:20-1341:2 (Chang). As another example, California passed the Foreign Miners' Tax, which also did not identify people of Chinese descent, but was implemented in a way that people of Chinese descent were the targets. Tr. Day 6 AM, 1345:14-19 (Chang). And Congress passed the Page Act, which again did not mention Chinese people specifically, but historians have established that its intention and effect was to effectively stop the immigration of Chinese women into the United States. Tr. Day 6 AM, 1345:20-1346:3 (Chang). In all instances, AAPIs were targeted.

90. In part because of this history of discrimination, AANHPIs in Arizona feel that discrimination is a top issue for the AANHPI community. Tr. Day 5 PM, 1266:15-1267:1 (Tiwamangkala).

91. As in the long history of discrimination against AAPIs and the patterns that

emerge from that history, the current growth of AAPI residents and voters is one that similarly invokes a negative reaction in order to limit the influence of AAPIs in the state of Arizona. Tr. Day 6 AM, 1356:1-18, 1360:5-13 (Chang).

## V. The Challenged Laws' Legislative History

### A. Political Climate Prior to the Passage of the Challenged Laws

92. The November 2020 presidential election in Arizona was decided by a margin of 10,457 votes, with 1,672,143 votes cast for President Biden and 1,661,686 votes cast for former President Trump. Stipulated Fact (ECF 571-1) No. 154; ECF No. 672 (Plaintiffs' Revised Request for Judicial Notice), ¶ 47.

93. On January 6, 2021, then-President Trump said in a speech to supporters: "In the state of Arizona, over 36,000 ballots were illegally cast by non-citizens. Two thousand ballots were returned with no address. More than 22,000 ballots were returned before they were ever supposedly mailed out. They returned, but we haven't mailed them yet. Eleven thousand six hundred more ballots and votes were counted, more than there were actual voters. You see that? So you have more votes again than you have voters. One hundred and fifty thousand people registered in Maricopa County after the registration deadline. One hundred and three thousand ballots in the county were sent for electronic adjudication with no Republican observers." *See* https://www.npr.org/2021/02/10/966396848/read-trumps-jan-6-speech-a-key-part-of-impeachment-trial; https://www.youtube.com/live/lBH7ql34Ex0?feature=shared&t=3190 (beginning 53:12); Tr. Day 7 AM, 1597:5-11 (Minnite).

94. In the wake of the 2020 presidential election, Rudolph Giuliani—counsel to former President Trump—stated on various occasions that between 32,000 and a "few hundred thousand" "illegal aliens" voted in Arizona. A state appellate court in New York later deemed these statements "false and misleading." *In The Matter Of Rudolph W. Guiliani*, 146 N.Y.S. 3d 266, 268, 279-80 (App. Div. 2021).

95. These false claims of voter fraud were echoed by members of the Arizona Legislature (including the authors of the Challenged Laws) prior to enactment of the

Challenged Laws. Tr. Day 4 AM, 823:15-824:13, 870:9-13 (Quezada); Tr. Day 7 AM, 1598:2-7 (Minnite); *see also* Toma Dep. 89:12-23, 92:23-93:10, 93:12-18 (election-fraud theories had "a sympathetic ear among some legislative Republicans").

96. In 2021, the Arizona Senate convened a committee on election fraud to audit the 2020 election separate from the regular audit processes established in state law. *See, e.g.*, A.R.S. § 16-602. The committee subpoenaed election materials and enlisted a third-party firm to conduct the ad hoc audit. Ultimately, the committee published a report that concluded there was no evidence of voter fraud. Tr. Day 4 AM, 824:14-825:9, 826:22-827:3 (Quezada). Senator Quezada testified that he had never before seen such a committee formed before during his tenure. Tr. Day 4 AM, 825:13-16 (Quezada).

97. It was against this backdrop of unfounded election fraud theories that HB 2492 and HB 2243 were introduced and passed. Toma Dep. 93:6-18.

**B. Legislative Process in Arizona and the 2022 Legislature**

98. When a legislator has an idea for a bill, they will propose an outline of the bill to legislative counsel and work with them to draft a bill reflecting what the legislator wants to accomplish. Toma Dep. 53:16-55:7. From there, the legislator decides whether or not to introduce the bill and become its sponsor. *Id.*

99. The Presiding Officer, such as the President of the Arizona Senate or the Arizona Speaker of the House, then first reads a bill and assigns it to one or more committees. A bill is first presented, potentially debated, and voted on during a committee. Tr. Day 4 AM, 819:21-20:11 (Quezada). Later, it is up to the respective committee chairman to decide whether a bill is provided a hearing. *Id.*

100. If a bill was assigned to only one committee and passes through that committee, it then goes to the Rules Committee. Tr. Day 4 AM, 820:12-24 (Quezada); Toma Dep. 173:18-174:2.

101. The purpose of the Rules Committee is to ensure that all bills are in proper form and constitutional. Toma Dep. 40:16-20, 173:18-174:2; Petersen Dep. 30:22-24, 35:22-25. Rules Committee counsel reviews bills and provides the Arizona legislature a

report on whether a bill might conflict with other Arizona or federal law. Tr. Day 4 AM, 821:2-18 (Quezada); Petersen Dep. 39:20-40:1. The Rules Committee counsel is the only person in the legislature whose job is to opine on the constitutionality of bills. Toma Dep. 176:25-177:11. Rules Committee counsel and the concerns they raise are considered credible. Toma Dep. 133:18-22.

102. A bill gets out of the Rules Committee after (1) Rules Committee counsel provides a report, (2) potential debate on the bill, (3) and committee vote. Tr. Day 4 AM, 821:19-23 (Quezada).

103. After the Rules Committee, the bill goes to a caucus where Democrats and Republicans receive a summary of the bill and review it. Tr. Day 4 AM, 821:24-822:1 (Quezada).

104. After caucus, the bill goes to the floor, either to Committee of the Whole or a third read. The bill goes directly to a third read if there are no amendments to the bill. Tr. Day 4 AM, 822:1-3 (Quezada).

105. A bill goes to the Committee of the Whole for two reasons: (1) there are further amendments to the bill or (2) to provide an opportunity to debate the bill. Tr. Day 4 AM, 822:4-11 (Quezada).

106. With respect to a bill that is in the Committee of the Whole that has amendments, Arizona legislators debate and vote on the proposed amendments and then vote on the bill as amended. Tr. Day 4 AM, 822:12-17 (Quezada). If a bill gets voted in favor with amendments while in the Committee of the Whole, it is deemed as a "do pass" amended bill. Tr. Day 4 AM, 822:24-823:3 (Quezada).

107. After the Committee of the Whole gives a "do pass" recommendation on a bill, the bill goes on to a third read. The third read is the recorded vote of a bill. During the third read, members of the Arizona legislature can provide their vote explanation which can turn into a debate. Tr. Day 4 AM, 823:4-14 (Quezada).

**C. Legislative History of HB 2492 and 2243**

108. HB 2492 and HB 2243 were both passed during the 55th Legislature, Second

Regular Session, which ran from the second Monday in January 2022 to June 24, 2022. Tr. Day 4 AM, 815:7-10 (Quezada); Toma Dep. 69:4-5.

**1. Legislative History of HB 2492**

109. On January 24, 2022, HB 2492 was introduced to the Arizona House of Representatives and read for the first time. Stipulated Fact (ECF 571-1) No. 42. Representative Jake Hoffman, a Republican member of the House of Representatives, was the prime sponsor of HB 2492. Toma Dep. 139:19-20. Representative Toma, then House Majority Leader, now current Speaker of the Arizona House of Representatives, co-sponsored and voted for HB 2492. ECF No. 348 at 4; Toma Dep. 27:16-23.

110. The substance of HB 2492 was authored by the Arizona Free Enterprise Club. Petersen Dep, 158:7-13; 159:10-11, 19-160:4; *see also* PX 54 at 5-7. In touting HB 2492, the Arizona Free Enterprise disseminated materials echoing President Trump's words (*see supra* ¶ 93) to legislators that falsely claimed "How More Illegals Started Voting in AZ Elections and How House Bill 2492 Is Going to Fix It." Petersen Dep. 173:15-22; PX 602.[8]

111. Martín Quezada served as a state legislator for the last ten years. In his last eight years of service, Quezada was in the Arizona Senate. Quezada's last legislative session was the Second Regular Session of the 55th Legislature. Tr. Day 4 AM, 811:11-15, 814:14-22 (Quezada).

112. The term "illegals" is often used as coded language to refer to racial and ethnic minorities, including people of Latin descent. Tr. Day 4 AM, 867:18-24 (Quezada); Tr. Day 6 PM, 1452:15-1454:19 (Burton).

113. Based on Quezada's experience, the term "illegals" is very offensive because the term takes away the humanity of people who are victims of a broken immigration system and is used to scare people and imply criminality. Tr. Day 4 AM, 868:13-869:5

[8] PX 598-605 are deposition exhibits introduced during the Legislator Intervenor-Defendant depositions that Plaintiffs have moved to admit in the concurrently filed Motion to Admit Certain Deposition Exhibits From Legislator Defendants' Depositions.

(Quezada).

114. Senator Warren Petersen testified that he has "probably" used the word "illegals" to describe groups of people, but also testified that he is not "surprise[d]" that people find the term "illegals" offensive. Petersen Dep. 173:3-4, 6, 173:8-10, 13.

115. Hoffman used the term "illegals" during Quezada's Director Nominations confirmation hearing on May 31, 2023. Quezada objected to Hoffman's use of the derogatory term. DX 975 at 75-76.

116. On February 16, 2022, the House Government and Elections Committee held a hearing to discuss HB 2492. PX 54. At this hearing, the committee Chairman called Hoffman, HB 2492's prime sponsor, to speak. *Id.* Hoffman told the committee that "[i]n 2018, 1700 individuals who has [sic] not provided DPOC, DPOC voted in the general election for federal office. In 2020, after the LULAC consent decree was in effect, the number of people without documentary proof of citizenship had swelled to over 11,600 individuals." *Id.* at 3.

117. After Hoffman finished speaking, the Chairman opened the floor to questions for the speaker. *Id.* at 4. Representative Liguori asked the first question about the bill. *Id.* at 4-5. Instead of responding to Liguori's question, however, Hoffman asked Greg Blackie, a relatively new lobbyist working for the Free Enterprise Club, the conservative lobbying group that authored the bill, to respond. *See id.* at 5; *see also* Toma Dep. 139:21-23, 25, 146:7-22, 146:25-147:24; Petersen Dep. 169:6-19; ECF No. 455-5 (Scot Mussi Declaration) at ¶ 3. Hoffman told the committee, "I've been working with the Free Enterprise Club on this bill, and they've spent hundreds of hours digging into this." PX 54 at 5.

118. Greg Blackie reiterated that the "consent decree" resulted in "the complete proliferation of the federal only voter list": "[a]s the sponsor stated in 2018, around 1700 individuals voted who hadn't provided proof of citizenship. By 2020, that has grown to 11,600." *Id.* at 6-7.

119. Toma was not aware of Greg Blackie providing any evidentiary support for

Free Enterprise Club's suggestion that federal-only voters were not actually eligible to vote in federal elections. Toma Dep. 189:4-11. Toma was also not aware of the Arizona Free Enterprise Club ever providing the legislature with research or evidence about the impact of HB 2492 or HB 2243. Toma Dep. 150:3-7.

120. While legislators may ask experts to testify in support of their bills, Toma could not identify what expertise, if any, Greg Blackie had. Toma Dep. 166:18-20, 22, 24-25, 167:6-7.

121. On February 22, 2022, the House Majority Caucus met and discussed HB 2492. PX 598; *see also* Toma Dep. 167:15-168:5 (establishing that this meeting occurred during the 55th Legislature, *Second* Session). Hoffman, the bill's sponsor, told the caucus that "[t]his is a bill that I have been working on with the Free Enterprise Club. In 2018, 17 individuals voted in the general election without proper identification. That number swelled up in 2020 and this bill fixes that and allows us to go up right to the line and ensure that there is proof of citizenship." PX 598.

122. In explaining the necessity of HB 2492, Hoffman added that the bill "requires county recorders to ensure *they* are documented." PX 598 (emphasis added).

123. Toma was not aware of Hoffman or anyone else in the caucus providing evidence or support for the notion that seventeen individuals voted in the 2018 general election without proper identification or the notion that this number swelled in 2020. Toma Dep. 170:21-171:5.

124. Also on February 22, 2022, the House Rules Committee held a hearing to discuss HB 2492. PX 57. Jennifer Holder, the House Rules Committee Counsel, advised the Committee that HB 2492 was likely unconstitutional and violated the NVRA. *Id* at 2-3. Toma was a member of the House Rules Committee in attendance at this hearing. Toma Dep. 173:6-8, 10-13,15-17. Notwithstanding the House Rules Committee Counsel's advice that HB 2492 was likely unconstitutional and violated the NVRA, Toma voted yes on HB 2492. Toma Dep. 180:16-19. So too did the majority of members of the House Rules Committee. See PX 57 at 6-7.

125. Representative Travis Grantham was the Chairman of the House Rules Committee during this February 22, 2022 hearing. *Id.* at 2. Grantham voted yes on HB 2492 during this hearing. *Id.* at 7. In explaining his vote, Grantham admitted that HB 2492 was likely unconstitutional, but voted for it anyways, telling the Committee: "We have local control of our elections. We fight for local control of our elections, yet when there's an overreach by the federal government, we're willing to accept it as, well, they're allowed to preempt because of this, and this court says this. *I strongly reject that notion, and I think this is a fight worth having. I may lose*." *Id.* (emphasis added).

126. The bill was later discussed by the Arizona Senate Judiciary Committee on March 10, 2022, with Petersen serving as the Chairman of the Committee and Quezada and Senator Sonny Borelli also present. Tr. Day 4 AM, 826:19-21, 827:9-11, 829:1-2 (Quezada); PX 61. Before the Senate Judiciary Committee met, however, Greg Blackie of the Free Enterprise Club sent the Republican members of the committee, including Petersen, an email urging them to support HB 2492. Petersen Dep. 196:5-18; PX 603. Among other assertions in the email, Mr. Blackie wrote that "currently there are more than 36,000 individuals registered to vote who have never proven their citizenship status." PX 603. He also wrote, referring to the purported constitutionality of HB 2492, that "Arizona has the Plenary Power" and "Power Over Our Own Registration Form." Petersen Dep. 196:23-198:13; PX 603. Petersen did nothing to verify these assertions, which seemed "reliable," though Petersen did not know whether Greg Blackie was a constitutional scholar or even a lawyer. Petersen Dep. 197:7-10, 198:14-199:2. Nonetheless, Petersen "felt confident" in repeating each of these claims during the March 10, 2022 Senate Judiciary Committee hearing. Petersen Dep. 196:23-198:13,199:3-9; PX 61 at 39-40.

127. While Petersen testified that he may have seen the 36,000 figure on the Secretary of State's website too, he admitted that he relied on the Free Enterprise Club's email for the case law. Petersen Dep. 193:7-20, 198:14-199:2.

128. During the March 10, 2022 Senate Judiciary Committee hearing, a number of constituents and interest groups, including representatives from the American Civil

Liberties Union, League of Women Voters, and others, spoke in opposition to HB 2492, including because the bill may disparately affect their own constituents. *See* PX 61. Greg Blackie of the Free Enterprise Club was the sole speaker who advocated for the bill. *See id.* Each speaker was given 90 seconds to speak. *Id.* at 5. Greg Blackie spoke first, and was originally limited to 90 seconds, like the other speakers. But when the other speakers finished, the Chairman called Greg Blackie back up to respond to the allegations made by the other speakers, including the claim that HB 2492 violates *Inter Tribal Council*. *Id.* at 21. He was not subject to any further time limitations. *See id.*

129. During this and other Senate Judiciary Committee meetings, Quezada sat next to Borelli, then Senate Republican Whip. PX 61a. Borrelli would consistently mute his microphone and lean over to Quezada to share his commentary on Arizona's 2022 election bills, including during the March 10, 2022 Judiciary Committee meeting. Tr. Day 4 AM, 874:2-875:2 (Quezada); Tr. Day 4 PM, 906:12-16 (Quezada); PX 61a. Borrelli would often make comments to Quezada such as "It's your people over there in your neighborhood that are doing this and that's why . . . we are bringing these bills forward." Tr. Day 4 AM, 875:3-876:2 (Quezada).

130. Borrelli was quite vocal in his belief that people who should not be voting were voting. Borrelli believed that such persons came from District 29, i.e., Quezada's constituents. Tr. Day 4 AM, 875:3-876:2 (Quezada). District 29 has the highest percentage of Latino population in Arizona and has one of the highest percentages of lower income communities, refugees, and monolingual Spanish-speaking members of the population. Tr. Day 4 AM, 813:20-814:4 (Quezada). Over the years, there has been an increase of Latino voter turnout in District 29. Tr. Day 4 AM, 814:5-13 (Quezada).

131. Borrelli often shared such disparaging comments in other committees that Quezada sat on, the Senate floor, the Senate gallery, the Senate lobby, and the members' lounge. Tr. Day 4 PM, 907:7-23 (Quezada); PX 61a.

132. During the March 10, 2022, Senate Judiciary Committee hearing, Quezada stated "look at the room, look at the people you're sitting next to in this room" to point out

that the impacts of HB 2492 would have a disproportionate impact on the crowd of people of color who were in attendance of the hearing. Tr. Day 4 AM, 830:6-25 (Quezada); PX 61 at 35. The audience audibly reacted in agreement to Quezada's comments. Tr. Day 4 AM, 832:14-20 (Quezada); PX 61 at 35-36.

133. Petersen found Quezada's comments to be ridiculous. PX 61 at 35. Because of this, Quezada did not get to finish explaining his position on HB 2492. In the middle of Quezada's vote explanation, Petersen interrupted him and recessed the committee. Tr. Day 4 AM, 831:12-16, 832:14-23 (Quezada); PX 61 at 35-36.

134. Quezada was cut off frequently when other bills, similar to HB 2492 and HB 2243, came up. The interruptions became one of the strategies within the Arizona Legislature to always call a point of order whenever Quezada raised any issues of race. Tr. Day 4 PM, 915:4-9 (Quezada).

135. After recessing the committee, Quezada got up to leave the dais and went into a hallway. Later, Petersen approached Quezada in the hallway, got in his face, and told Quezada "[l]ike why are you riling up to crowd?" and "[t]his is your fault that we have to recess[.]" During the confrontation, the Sergeant at Arms had to physically separate Senators Petersen and Quezada. Tr. Day 4 AM, 831:17-832:3 (Quezada).

136. HB 2492 went to the Rules Committee after the March 10, 2022, Arizona Senate Judiciary Committee Hearing and before the Senate floor session. Tr. Day 4 AM, 835:3-8 (Quezada). The Senate Rules Committee counsel told the Committee that HB 2492 as drafted violated the National Voter Registration Act and conflicted with the United States Supreme Court's decision in *Arizona v. Inter Tribal Council of Arizona*. PX 62 at 7.

137. On March 23, 2022, HB 2492 went to the Senate floor and was passed. Tr. Day 4 AM, 834:9-13 (Quezada); PX 62 at 22.

138. On March 30, 2022, then-Governor Doug Ducey signed Arizona HB 2492 into law. DX 704; PX 1; Stipulated Fact (ECF 571-1) No. 43. On April 22, 2022, then-Governor Ducey signed Senate Bill 1638 ("S.B. 1638"), which made a technical amendment to HB 2492 and delayed the effective date for all of HB 2492's provisions to

December 31, 2022. Stipulated Fact (ECF 571-1) No. 44.

139. HB 2492 went into effect on January 1, 2023. Stipulated Fact (ECF 571-1) No. 45.

**2. Legislative History of HB 2617 and HB 2243**

140. HB 2243 was introduced on January 18, 2022. Hoffman was HB 2243's prime sponsor. DX 705; DX 706; https://apps.azleg.gov/BillStatus/BillOverview/76698.

141. When introduced, HB 2243 sought to add only one additional clause to A.R.S. § 16-152, adding "a statement on the voter registration form specifying that if a registrant permanently moves to another state after registering in this state, the voter registration will be cancelled." DX 705. HB 2243 became a vehicle to pass the vetoed HB 2617. Petersen Dep. 216:3-16.

142. HB 2617 was also introduced on January 31, 2022. PX 67 at 1. Representative Joseph Chaplik was HB 2617's prime sponsor. PX 67 at 1; Toma Dep. 227:18-22. As passed by the Arizona Legislature, HB 2617 required, *inter alia*, the Secretary of State to compare the voter registration database to ADOT records for lack of citizenship, County Recorders to compare voter registrations to the SSA database and the Systematic Alien Verification system, and to cancel voter registrations if DPOC and DPOR were not provided within 90 days of receiving a notice from County Recorders requesting such information. Petersen Dep. 238:15-245:24; PX 4.

143. Like HB 2492, HB 2617 and the enacted HB 2243 were authored by the Arizona Free Enterprise Club. Petersen Tr. 158:7-13, 159:19-160:4, 238:4-8. In fact, the Free Enterprise Club authored "most of it." Petersen Dep. 238:4-8.

144. HB 2617 was assigned to the Senate Government Committee in 2022. Tr. Day 4 AM, 836:13-17 (Quezada); PX 67 at 1-2.

145. Quezada was a member of the Senate Government Committee and attended the Government Committee Hearing on HB 2617 on March 14, 2022. Tr. Day 4 AM, 837:24-838:2, 865:2-15 (Quezada).

146. Greg Blackie of the Arizona Free Enterprise Club testified to all of the

detailed aspects of HB 2617 and was viewed as the expert witness by the Senate Government Committee on March 14, 2022. Through his testimony, there was a well-known implication that Greg Blackie was involved in helping create HB 2617 and putting it forward before the Arizona Legislature. Tr. Day 4 AM, 865:21-866:3 (Quezada); PX 495 at 9-10.

147. On May 25, 2022, the Arizona legislature passed HB 2617. Stipulated Fact (ECF 571-1) No. 49.

148. On May 27, 2022, then-Governor Ducey vetoed HB 2617. Stipulated Fact (ECF 571-1) No. 50.

149. In the letter explaining the veto of HB 2617, then-Governor Ducey stated that HB 2617 failed to provide "necessary safeguards" to "protect the vote of any Arizonian who is eligible and lawfully registered." He also stated that the implementation of HB 2617's provision that a County Recorder cancel the voter registration of a voter if the recorder receives information that provides the basis for determining that the person is not a qualified elector, is "vague and lacks any guidance for how a county recorder would confirm such determination." He further stated that lawfully registered voters "deserve to know that their right to vote will not be disturbed without sufficient due process" and that the provision would leave the election system "vulnerable to bad actors who seek to falsely allege a voter is not a qualified elector." PX 53.

150. After Governor Ducey vetoed HB 2617, Chaplik reached out to Toma to help him figure out a way to address the Governor's concerns and get the substance of HB 2617 into another bill and onto the Governor's desk. Toma Dep. 232:19-233:7.

151. Toma advised Chaplik to work with the Governor's staff to come to an agreement on the content of the bill, and once that was agreed on, Toma assured him that they would find a way to get it done. Toma Dep. 233:8-18.

152. After Chaplik came to an agreement with the Governor's staff, he approached Toma and House leadership again on how to get the bill passed. Toma Dep. 235:7-23.

153. On or around June 17, 2022, Aimee Rigler (also known as Aimee Yentes, Petersen Dep. 163:13-16), of the Free Enterprise Club, texted Toma to ask him whether the Speaker of the House—then Russell Bowers—had approved HB 2617 for late introduction. Toma Dep. 24:21-24, 240:23-241:3, 242:24-243:18; *see also* PX 600.

154. At this point in the Legislative Session, committee hearings were done. Toma Dep. 236:1, 3-18. Chaplik could have waited to reintroduce the bill during the next session, which was commonly done, so that the bill could go through the full committee process. Toma Dep. 237:8-11, 240:4-5, 240:9-10.

155. Instead, it was decided to drop the substance of HB 2617 into HB 2243, a bill dealing with the same section of law. Toma Dep. 235:7-23,240:2-3 (when asked whether he advised Chaplik to wait until the next session, Toma testified "I don't recall. I don't recall. Probably not.").

156. In response to Aimee Rigler's text message, Toma provided Arizona Free Enterprise Club with a plan forward for the bill: to drop HB 2617's content into HB 2243. Toma Dep. 246:23-247:6; *see* PX 600. Toma considered this the best course of action, and the easiest way for Arizona Free Enterprise Club to get *its* bill through in this session rather than wait for the next session. Toma Dep. 246:23-247:6, 257:13-17; *see* PX 601.

157. After this text exchange between Free Enterprise Club and Toma, *their* bill was sent to the Senate where it was attached to HB 2243, as discussed. Toma Dep. 249:16-22. Toma did not share this plan with House Democrats, and he was unaware of anyone else doing so. Toma Dep. 257:18-21, 23-24.

158. On the last day of the legislative session, Petersen introduced a floor amendment to HB 2243 in the Committee of the Whole, that was meant to reintroduce HB 2617. Tr. Day 4 AM, 850:4-11 (Quezada); Petersen Dep. 268:6-22, 269:2-10; DX 708. But this floor amendment drastically changed the substance of HB 2243 and HB 2617. Tr. Day 4 AM, 859:15-19 (Quezada); PX 2 at 5-6; PX 4 at 2-3; DX 706; DX 708. The changes made to the provisions from the vetoed HB 2617 and added into HB 2243 include, (1) the 90-day notice period for suspected non-citizens (but not non-residents) going down to 35

days; (2) mandating voter registration cancellation for suspected non-citizens who did not provide of documentary proof of citizenship (whereas potential non-residents are placed on inactive status for failure to return a form attesting to their residency); and (3) subjecting federal-only voters to matching with the Systematic Alien Verification for Entitlements Program ("SAVE") system. Tr. Day 4 AM, 850:22-851:13 (Quezada); PX 2 at 5-7; PX 4 at 2-5; DX 706; DX 708.

159. Notwithstanding these key changes, Petersen falsely represented to the Committee of the Whole that his Amendment is "basically what was House Bill 2617." PX 499 at 3; Petersen Dep. 290:4-6, 8. Petersen told the Committee that his Amendment was meant to address the Governor's veto letter on HB 2617, and that his Amendment "adds additional notice requirements, but besides that, it's identical to the prior bill." PX 499 at 3. Petersen admitted that his explanation of his amendment during this session "could have been better." Petersen Dep. 290:4-6, 8.

160. Free Enterprise Club was working directly with Senate staff on this amendment. Petersen Dep. 249:7-9; PX 604.

161. Petersen testified that he believed that 35 days was a "reasonable" time to provide DPOC. Petersen Dep. 227:8-22, 305:1-6, 308:6-10, 308:12-309:3, 311:5-11. But he could not give any explanation as to why, simply stating that he believed Chaplik worked with Governor Ducey to address his concerns and that 35 days was "reasonable" because these were important documents that everyone "should" have. Petersen Dep. 227:8-11, 14-22, 276:14-16, 18-21, 23-277:4.

162. But Petersen also believed that the 90-day period to provide DPOC in HB 2617 was "reasonable." Petersen Dep. 239:15-22, 240:20-25. However, Petersen did not make any effort to find out how many Arizonans did in fact readily have available DPOC and how many Arizonans did not, nor did he know of anyone in the Arizona Legislature who did. Petersen Dep.126:24-127:3, 5-16, 18-128:15, 129:1-6, 8-15, 17-20, 22-130:6, 130:16-23, 25-131:1, 313:5-19.

163. Toma was not aware of anyone in the legislature discussing the issue of the

appropriate amount of time for naturalized citizens to respond with DPOC to a letter asking them to verify their citizenship. Toma Dep. 116:6-11, 15-117:1, 5-8. Toma testified that he believed that 30 days is enough time for people to respond with DPOC to such a letter, but that he has no understanding of whether there are naturalized citizens who may need more time to respond to such a letter with DPOC. Toma Dep. 115:20-116:2, 117:9-12, 15-16.

164. There is no justification given for the 35-day notice and cure period in the public legislative record about the amendment, either. *See* PX 499.

165. During the June 22, 2022 Committee of the Whole session on HB 2243, Quezada pointed out that Petersen's explanation of his amendment was not entirely accurate. The point of Quezada's comments was that there were some significant differences that Senator Petersen left out in his amendment explanation such as the differing notice requirements between HB 2617 and HB 2243. Tr. Day 4 AM, 859:20-860:8 (Quezada); PX 499 at 3-5, PX 2 at 5-7, PX 4 at 2-5.

166. Petersen himself did not seem to know or care about the changes between HB 2617 and his amendment to HB 2243 because he did not write the substance nor negotiate it with the Governor's office. Petersen Dep. 247:7-20, 289:7-290:6, 8. According to Petersen, that was done by Chaplik. Petersen Dep. 276:14-16, 18-277:15, 17-278:14, 289:7-290:6, 8, 293:19-25, 294:2-4. On the last day of the session, Petersen received an email from Greg Blackie with talking points about the amendment. Petersen Dep. 298:5-22; *see* PX 605.

167. Petersen did not know whether the Social Security Administration database that HB 2617 and now HB 2243 requires County Recorders to consult includes information about citizenship or not, but voted for the bill nonetheless. Petersen Dep. 245:19-24. In touting HB 2617, the Arizona Free Enterprise Club falsely suggested that the Social Security Administration database could help verify citizenship. Petersen Dep. 256:9-14: *see* PX 605.

168. Senators first received Petersen's amendment within minutes of actually voting on the amendment on the floor. Tr. Day 4 AM, 860:9-13 (Quezada); *see also*

Petersen Dep. 273:1-13,15.

169. Senators did not have the opportunity to thoroughly read Petersen's amendment or the opportunity to check in with stakeholders to review the amendment with staff. Tr. Day 4 AM, 860:15-18 (Quezada); Petersen Dep. 268:14-22. Nor was there time to do a full analysis of the amendment, including a Rules Committee review. PX 500 at 2-3.

170. In fact, Toma himself was not aware that the notice period for suspected non-citizens to cure had been shortened from 90 days to 35 in the revised bill *until the date of his deposition*, November 28, 2023. Toma Dep. 253:6-8, 10-11, 261:12-16.

171. There was no opportunity to delay the vote on Petersen's amendment. Tr. Day 4 AM, 862:14-15 (Quezada).

172. It was not common to receive significant amendments, like Petersen's amendment on HB 2243, with such little notice late in the legislative process. Tr. Day 4 AM, 860:23-861:9, 882:2-7 (Quezada). Toma could not recall another example of a vetoed voting bill whose substance was dropped into the shell of another bill late in the same session and passed. Toma Dep. 238:3-239:3.

173. After Petersen's amendment was adopted on June 22, 2022, during the Committee of Whole, the amended version of HB 2243 did not go through any Rules Committee. PX 500 at 2-3.

174. The different consequences under HB 2243 for someone who is suspected of not being a citizen and someone who is suspected of having an out-of-state license is part of the reason why Quezada spoke against HB 2243 and ultimately voted no on the law. Tr. Day 4 AM, 853:23-854:12 (Quezada); PX 2 at 5-6; DX 708.

175. HB 2243 was signed into law during the 2022 55th Legislature, Second Regular Session. Stipulated Fact (ECF 571-1) No. 51.

176. At the time HB 2492 and HB 2243 were passed, they were expected to go into effect ninety (90) days after the end of the Legislative Session. Toma Dep. 68:16-21; Petersen Dep. 146:6-13. The Session ended on June 24, 2022, meaning that both laws were

expected to become effective in or around September 24, 2022, a few weeks before the November 2022 general election. *See* Toma Dep. 68:22-25, 69:6-9; Petersen Dep. 147:9-25.

177. Petersen understood that some voters may be removed from the rolls in advance of the November 2022 election. Petersen Dep. 150:1-7, 10-16, 19-20. He believes laws should go into effect when they are supposed to and would be disappointed if they are not. Petersen Dep. 153:4-5, 7-11.

**3. Pre-Passage Analysis of the Challenged Laws**

178. It is within the legislature's realm to examine evidence of whether non-citizens had registered to vote to assess whether legislation makes sense for Arizona. Toma Dep. 102:17-25, 103:5-6.

179. Legislators should make decisions about election reform based on hearings where parties present the truth. Toma Dep. 62:14-22. It is irresponsible and bad judgment to present unsubstantiated claims in a legislative forum. Toma Dep. 59:23-60:7, 62:7-10, 62:12.

180. But Toma did not know whether there even exists a problem of non-citizen voting in Arizona. Toma Dep. 102:22-25, 103:5-6, 103:8-11, 103:14-15, 103:17-19. Toma was himself unaware of any specific "illegals" who have voted in Arizona. Toma Dep. 98:23-25, 99:6-10, 158:3-5, 158:8-9. And during the course of the debate and passage of the challenged laws, Toma could not recall any evidence of non-citizen voter fraud being presented to the legislature. Toma Tr. 99:12-15, 99:18. The legislature never established that any non-citizen had ever registered to vote in Arizona. Toma Dep. 99:20-22, 100:1-5, 102:7-21; Petersen Dep. 84:15-85:5.

181. Toma did not recall any official meetings or public hearings where claims were made that illegal immigrants are voting. He recalled one unofficial, offsite meeting in December 2020 where such claims were made, but Toma did not attend and was unaware of any evidence presented during that meeting to substantiate that theory. Toma Dep. 97:23-98:12, 98:18-22.

182. Petersen also could not identify any evidence presented in official legislative hearings about the challenged laws that non-citizens were actually registering to vote and voting in Arizona elections. *See* Petersen Dep. 95:6-8, 95:11-96:10, 184:18-185:6, 185:9-11, 185:16-20. He was not aware of anyone speaking to the Arizona Attorney General about any non-citizen voting. Petersen Dep. 98:6-100:6, 100:21-24, 101:1-5, 101:21-23. The only evidence of non-citizens registering to vote or voting of which Petersen was aware was a single post he saw on Twitter where a person wrote, "I'm a DACA . . . this law could affect me and make it so I can't vote." Petersen Dep. 86:23-25, 87:3-22, 92:7-9, 92:12-24, 94:17-19, 94:21-22; *see also* Petersen Dep. 98:6-100:6. Though he voted for laws based on this Tweet, Petersen did not know whether this person had actually registered to vote or had voted, nor did he report this person to the police. Petersen Dep. 89:12-18, 89:20-22, 93:1-13, 93:15-94:11, 94:14-15.

183. Petersen also testified that he voted for these laws because constituents were concerned about election integrity. Petersen Dep. 86:23-25, 87:3-22. Petersen did not himself investigate whether non-citizens had actually registered to vote. *See* Petersen Dep. 88:12-24. He also did not examine whether the challenged laws would address constituents' concerns. Petersen Dep. 87:24-88:4, 88:7-10. Beyond his own belief that it is "common sense," Petersen did not evaluate whether the laws would in fact further Arizona's interest in "safe and secure elections" and would improve voter confidence. Petersen Dep. 105:23-106:2, 106:22-24, 107:4-110:3.

184. During the legislative process, constituents and other interest groups including the Arizona Association of Counties, a lobbying group advocating on behalf of County Recorders, raised concerns to legislators about potential negative consequences of the Challenged Laws, including that they might chill eligible voters or erect barriers to voting for certain types of voters and that HB 2492 was likely unconstitutional and in violation of the NVRA. *See* Toma Dep. 180:20-181:1, 183:20-184:7, 184:10-14, 203:10-22, 205:7-11, 206:16-21; Petersen Dep. 210:4-16; PX 61.

185. Toma did not recall responding to these constituents or the Arizona

Association of Counties, though he agreed the constituents' concerns were generally legitimate and that he generally takes seriously concerns raised by the Arizona Association of Counties. Toma Dep. 133:8-9, 133:13-25, 134:6, 185:20-23, 204:3-21, 205:22-25, 206:22-24. Petersen did not respond to similar constituent emails expressing concern about the bill. Petersen Dep. 210:12-121, 210:24-211:19, 211:22-212:21. Toma was not aware of any member of the legislature investigating the Arizona Association of Counties' concerns. Toma Dep. 186:2-4, 186:7-15, 186:17-18.

186. While legislators were repeatedly warned that the laws could disparately impact certain groups of voters, while HB 2492, HB 2617, and HB 2243 were being debated, Toma and Petersen were unaware of any member of the legislature evaluating how these laws would affect voters based on national origin, race, ethnicity, age, or socioeconomic status. Toma Dep. 123:3-11, 123:14-24, 124:2-8, 124:11; Petersen Dep. 111:25-112:16, 112:20-21, 112:23-113:16, 113:19-114:8, 114:10-19, 116:17-117:6, 117:9.

187. Petersen did not analyze whether or how the challenged laws would affect naturalized citizens versus native-born citizens, except to say that he believed it was "reasonable" to expect people to provide DPOC based on his own "personal evaluation." Petersen Dep. 117:16-118:11, 118:14-119:9. This personal evaluation that providing DPOC was "reasonable" was informed by a conversation he had with his wife, a Mexican national, and his sister-in-law, who has since naturalized. Petersen Dep. 119:10-120:8, 120:13-19, 121:10-18. Petersen could not identify anything further he did, or anyone else in the legislature did, to evaluate whether the challenged laws might affect naturalized citizens or voters with non-citizens in their household differently. Petersen Dep. 120:21-121:5, 121:7-8, 121:10-23, 122:2-4, 122:7. Toma was also unaware of anyone in the legislature evaluating these laws in the context of voters who obtained citizenship by birth versus those who obtained citizenship through naturalization. Toma Dep. 124:13-17, 124:19-20, 124:23-24, 125:1-10.

188. Similarly, Petersen was not aware whether US-born citizens versus naturalized citizens would be impacted by checks against the SAVE system. Petersen Dep.

219:5-6, 219:8-9, 219:17-219:24, 220:2-13, 220:17-19, 220:22.

189. Toma was also unaware of anyone evaluating the potential impact of the investigation and potential prosecution provisions of the Challenged Laws to determine whether they would deter voters, or County Recorders from registering would-be voters. Toma Dep. 126:21-127:1, 127:4-14, 127:17-24, 128:2-8; Petersen Dep. 134:14-18, 134:21-136:15, 136:18. Petersen agreed that there would be a cost to responding to an investigation but did not do anything to determine what that cost was or how it would impact different voters. Petersen Dep. 131:10-24, 228:12-14.

190. Toma and Petersen were also unaware of any member of the legislature analyzing the time required to obtain DPOC, the costs of obtaining DPOC, or whether such costs would be prohibitive or restrictive for any group of voters. Toma Dep. 125:11-13, 125:16-20, 125:23-126:4, 126:8; Petersen Dep. 127:22-129:6, 129:8-15, 129:17, 129:19-20, 129:22-130:23, 130:25-131:1, 225:17-19, 226:2, 226:5-9, 226:11-227:2, 227:4-11, 227:14-22.

## VI. Challenged Provisions of HB 2492 and HB 2243

### A. HB 2492

191. HB 2492 amends Arizona Revised Statutes Sections 16-112, 16-121, 16-121.01, 16-134, and 16-165, and adds Sections 16-123, 16-127, and 16-143 concerning voter registration. PX 1.

192. Sections 1 and 3 of HB 2492 purport to make the provision of DPOC a qualification for registration to vote and voting. PX 1 at 2, 3.

193. Section 4 of HB 2492 amends Section 16-121.01(A) of the Arizona Revised Statutes such that proper registration requires the applicant to provide documentary proof of location of residence (the "DPOR Requirement");[9] the applicant's place of birth (the "Birthplace Requirement"), and a mark in the "yes" box next to the citizenship question

[9] The DPOR requirement is further outlined in Section 5 of HB 2492. PX 1 at 6,7.

(the "Checkmark Requirement"). PX 1 at 4.[10] Failure to provide DPOR, birthplace, or the requisite checkmark means the application is incomplete and voter shall not be registered. *Id.* at 4-5.

194. Section 4 of HB 2492 also mandates that other than Federal Forms, all registrations forms submitted without DPOC must be rejected by the County Recorder's office. Under HB 2492, failing to reject such forms would be a class 6 felony. *Id.* at 5; ECF No. 189 ¶ 32. That provision of HB 2492, if implemented, would have unraveled the LULAC Consent Decree. ECF No. 189 ¶ 66.[11]

195. Section 4 of HB 2492 also mandates "that county recorders investigate the citizenship status of new registration applicants using the federal registration form if the submitted form is not accompanied by DPOC." ECF No. 189 ¶ 33; ECF No. 169 ¶ 33.

196. HB 2492 requires "the County Recorder or other officer in charge of elections" to compare voter registrations submitted via the Federal Form without satisfactory evidence of citizenship against databases, provided the county has access, including the Arizona Department of Transportation database of driver licenses or nonoperating identification licenses, the Social Security Administration database, the U.S. Citizenship and Immigration Services ("USCIS") SAVE system, and the National Association for Public Health Statistics and Information Systems Electronic Verification of Vital Events System. PX 1 at 5-6; *see* A.R.S. § 16-121.01; Stipulated Fact (ECF 571-1) No. 47.

197. The Secretary of State admits that the Social Security Database, Arizona Department of Transportation database, and Public Health Vital Statistics Database "may be potentially unreliable and potentially outdated." PX 170 Rog No. 4. The Secretary of State further admits that the Secretary of State's office "is not in charge" of the Social Security Database, Arizona Department of Transportation database, and Public Health

---

[10] This Court already addressed the claims against the Checkmark Requirement in its ruling on summary judgment. ECF No. 534 at 24-27.

[11] This Court has already held that this provision is unlawful because the provisions of the LULAC Consent Decree remain in effect. ECF No. 534 at 21-22, 32.

Vital Statistics Database, and therefore "cannot assure that such databases are up to date with accurate information." See PX 170 Rog No. 4.

198. To conduct this inquiry, HB 2492 provides that election officials must "use all available resources," including any "state, city, town, county or federal database relating to voter registration to which the county recorder has access," to "verify the citizenship status" of voter registration applicants and registered voters who have not provided proof of citizenship." PX 1 at 5-6; ECF No. 189 ¶ 5; *see also* ECF No. 189 ¶ 123; ECF No. 169 ¶ 123.

199. If, in conducting this inquiry into all available databases, the County Recorder matches the applicant with information that the applicant is not a citizen, the County Recorder is directed to automatically reject the registration application *and* forward the application to both the County Attorney and the Attorney General for investigation. PX 1 at 6; s*ee* A.R.S. § 16-121.01(E).

200. While notice is given to registration applicants who are "matched" to information indicating they are not U.S. citizens, HB 2492 fails to give these individuals an opportunity to affirm their citizenship or submit DPOC prior to the rejection of their application and reflexively refers the applicant to law enforcement for investigation. ECF No. 189 ¶ 141; ECF No. 169 ¶ 141.

201. Under HB 2492, the County Recorder's efforts to investigate the citizenship status of voter registration applicants must be recorded. HB2492 further provides that if a County Recorder "fails to attempt to verify the citizenship status of an applicant," the County Recorder would be guilty of a felony if such applicant is a non-citizen. PX 1 at 6.

202. If a County Recorder's inquiry into the citizenship status of a Federal Form applicant who did not submit DPOC does not yield a "match" to any citizenship information, Section 5 of HB 2492 further restricts the right to vote of these "federal-only" voters by denying them the right to vote in presidential elections or vote by mail.[12]

---

[12] This Court already addressed the claims against the restrictions on presidential and mail voting in its ruling on summary judgment. ECF No. 534 at 9-15.

203. Section 7 of HB 2492 adds Section 16-143, which provides, in part, that the Secretary of State and County Recorders submit to the Attorney General a list of individuals who have registered to vote but have not provided DPOC and that the Attorney General "shall use all available resources to verify the citizenship status" of the applicants and "shall prosecute individuals who are found to not be United States citizens pursuant to Section 16-182." PX 1 at 8. This section refers to the same set of databases for purposes of verifying citizenship as Section 4.

**B. HB 2243**

204. HB 2243 amends Arizona Revised Statues Section Sections 16-152, 16-165, and 21-314 concerning voter registration and cancellations, and jury questionnaires. PX 2.

205. Section 2 of HB 2243 added A.R.S. § 16-165(A)(10) which states that "the county recorder shall cancel a registration: . . . When the county recorder obtains information pursuant to this section and confirms that the person registered is not a United States citizen, including when the county recorder receives a summary report from the Jury Commissioner or Jury Manager Pursuant to Section 21-314 that the person is not a United States citizen." PX 2 at 5.

206. Before the County Recorder cancels the registration pursuant to the section, they must "send the person notice by forwardable mail that the person's registration will be canceled in thirty five days unless the person provides satisfactory evidence of United States citizenship pursuant to Section 16-166 . . . If the person registered does not provided satisfactory evidence within thirty five days, the county recorder shall cancel the registration and notify the county attorney and Attorney General for possible investigation." PX 2 at 5.

207. HB 2243 keeps in place the notice period of 90 days from HB 2617 for registrants suspected of having been issued a license or identification in another state. *Compare* PX 2 at 6, line 35 (90 days) with PX 4, p. 3, line 18 (90 days).

208. However, for registrants suspected to be noncitizens, HB 2243 shortens the notice period from 90 days, as originally provided in HB 2617, to 35 days. *Compare* PX 2,

at 5, line 13 (35 days) with PX 4, at 2, line 18 (90 days).

209. Section 2 of HB 2243 also requires that the Secretary of State and/or County Recorders engage in a number of database checks, in most cases monthly, to re-confirm the registration status of already-registered voters. This includes checking for U.S. citizenship information in the driver license database, the Social Security Administration database, the SAVE system maintained by the United States Citizenship and Immigration Services, the Electronic Verification of Vital Events System maintained by a National Association for Public Health Statistics and Information Systems, and other city, town, county, state, and federal databases. In particular, as added by HB 2243, A.R.S. § 16-165(H) provides that, "to the extent practicable, each month the County Recorder shall compare persons who are registered to vote in that county and who the County Recorder has *reason to believe* are not United States citizens and persons who are registered to vote without satisfactory evidence of citizenship as prescribed by section 16-166 with the Systematic Alien Verification for Entitlements Program maintained by the United States Citizenship and Immigration Services to verify the citizenship status of the persons registered." PX 2 at 6-7 (emphasis added).

210. Former Arizona Governor Ducey signed HB 2243 into law on July 6, 2022. Stipulated Fact (ECF 571-1) No. 58.

211. HB 2243 went into effect on September 24, 2022. ECF No. 388-4.

212. The Secretary of State has not provided any guidance to County Recorders on how to implement either HB 2492 or HB 2243. Tr. Day 1 AM, 74:19-23 (Petty). As of the date of trial, the Maricopa County Recorder's office had no information about, if HB 2243 or HB 2492 were implemented, what criteria to use for matching against the databases other than the ones the office already matches against. Tr. Day 1 AM, 79:18-80:6 (Petty). Ms. Janine Petty, the Senior Director of Voter Registration for Maricopa County Recorder's Office, was not aware of what steps the office should take if two databases provided conflicting results about citizenship status. Tr. Day 1 AM, 80:7-10 (Petty). Nor does Maricopa County have information about what would constitute a "reason to believe"

a registrant is a non-citizen, nor any plans as to how to make a determination of whether the office has a "reason to believe" someone is a non-citizen. Tr. Day 1 AM, 80:11-19 (Petty).

## VII. Current Documentary Proof of Citizenship for Voter Registration Procedures and Databases Referenced in the Challenged Provisions

### A. Establishing Proof of Citizenship

213. A voter applicant can satisfy the DPOC requirement by a verified AZ driver's license or identification number issued after October 1, 1996, an out-of-state driver's license *if* it indicates citizenship on its face, a U.S. birth certificate, a U.S. passport, a U.S. naturalization certificate or unique immigration identifier verified through SAVE, or a tribal identification number. PX 6 at 17-20; Tr. Day 1 AM, 53:21-54:14 (Petty).

214. For out-of-state driver's licenses, birth certificates, passports and naturalization documents, paper copies must be submitted. When an applicant submits a copy of DPOC to satisfy the requirement, County Recorders are permitted to destroy that documentation after two years. PX 6 at 25. Maricopa County follows that retention schedule, does not digitize those documents, and destroys all copies of DPOC after two years. Tr. Day 1 AM, 56:4-8 (Petty).

215. For Arizona driver's license or identification numbers, election officials rely on the HAVA check process to verify citizenship, *see infra* Section VII.B; for unique immigration identifiers, election officials rely on the SAVE system to verify citizenship, *see infra* Section VIII.D; and for tribal identification numbers, election officials accept those identifiers as DPOC without any further verification. PX 6 at 19-20.

216. Many citizens residing in Arizona do not have copies of or ready access to documents that can establish their citizenship. Tr. Day 1 AM, 84:10-85:25 (Petty); Tr. Day 2 PM, 469:8-470:3 (Nitschke); Tr. Day 5 PM, 1273:22-1274:3 (Tiwamangkala); Tr. Day 9 AM, 2127:24-2128:5, 2128:9-13 (Knuth). As discussed *infra* in Section X, there are costs associated with obtaining the types of documentation that satisfy the DPOC requirement.

### B. HAVA Checks

217. Most voter registration applicants that satisfy the DPOC requirement do so when County Recorders compare the registrant's information with the ADOT MVD records database, a process commonly referred to as the HAVA check (a reference to the Help America Vote Act). Tr. Day 1 AM, 53:17-20 (Petty).

218. Once information on a voter registration application is entered into AVID, the next step is for the County Recorder to conduct a HAVA check. Tr. Day 3 AM, 610:12-15 (Morales). This process is the same for Maricopa and Pima Counties which use a different voter registration database. Tr. Day 1 AM, 28:7-24 (Petty); Hiser Dep. 21:11-17, 39:14-40:4, 63:12-64:21.

219. Arizona counties currently conduct a HAVA Check each time an individual submits a new voter registration application, or updates their voter registration, for two purposes: first, to verify a voter registrant's identity (i.e. the identifying information on the registration form matches the identifying information for an individual in the motor vehicle or Social Security databases) pursuant to the Help America Vote Act, and, second, to acquire DPOC from the MVD database, if available. Tr. Day 3 AM, 614:17-615:6, 615:11-14 (Morales); Tr. Day 1 AM, 33:15-34:4 (Petty).

220. No actual documents, such as DPOC or immigration documents, are exchanged through the HAVA check. Tr. Day 3 AM, 613:10-14 (Morales). A HAVA check can be run without a driver's license number, state ID number, or social security number. Trial Day 3 AM, 611:16-19 (Morales).

221. ADOT's system (known as MAX) connects to the Secretary of State's AVID system through an API,[13] which allows AVID to send a request to ADOT's system via an API to query certain data for an individual MVD customer. The API then returns specific customer information for matching records, which includes information about that person's

[13] "API" stands for Application Program Interface. It is a technical specification that allows two programs to connect with one another over a network. Tr. Day 3 AM, 561:6-13 (Jorgensen); PX 234.

authorized presence or citizenship status as it exists in MVD's system at the time of the query. This API is used for HAVA checks. Jorgensen Dep. 86:4-19, 87:2-10, 101:18-102:4, 105:1-20. Stipulated Fact (ECF 571-1) Nos. 100, 102, 103, 104. The API interface allows the Secretary of State to request a specific set of data and have ADOT return the requested data, including records, to the Secretary of State. Stipulated Fact (ECF 571-1) No. 102; Jorgensen Dep. 86:4-19, 87:2-10; Tr. Day 3 AM, 561:6-13 (Jorgensen); PX 234.

222. The HAVA Check first compares an individual's information as provided on a voter registration application to MVD records to see if there are matching records. PX 594; Tr. Day 3 AM, 610:16-19 (Morales). A HAVA check queries the information in the MVD database in real time. Morales Dep. 24:11-25:1.

223. If no matching records are available from ADOT, the HAVA Check then goes on to compare a voter registrant's information with the Social Security Administration ("SSA") database. Tr. Day 1 AM, 37:22-38:5 (Petty); PX 594. If no matching records are available from ADOT or SSA, pursuant to the Help America Vote Act, the voter must provide an identifying document before casting a ballot. Tr. Day 1 AM, 37:6-15 (Petty).

224. Arizona County Recorders conduct HAVA Checks through the AVID system, which provides the Recorders with access to ADOT's information through AVID's API connection with MVD. Stipulated Fact (ECF 571-1) Nos. 71, 99; Tr. Day 1 AM, 32:24-33:1 (Petty). County Recorders have no access to MVD data other than within AVID. Day 1 AM, Tr. 33:2-7. (Petty)

225. During a HAVA Check, counties may get either a "hard," "soft," or no match with ADOT records. Tr. Day 1 AM, 34:5-13 (Petty); Tr. Day 3 AM, 610:20-25 (Morales); PX 594; PX 378; PX 256 at 10. In virtually all cases, a "hard" match usually results in a single match with ADOT records where the matched information entered by counties exactly matches the information in ADOT records. "Soft" matches may provide counties with more than one possible match, and County Recorders must choose which ADOT record, if any, reflects the same individual as the voter registrant. Tr. Day 5 AM, 1080:2-18 (McDonald); Tr. Day 3 AM, 611:1-4, 611:20-612:10 (Morales). That process requires

County Recorders to make a judgment call about the match, a procedure that inherently incorporates some discretion. Tr. Day 1 AM, 36:5-37:6 (Petty).

226. If a HAVA Check results in a match with ADOT records, counties obtain a voter registrant's authorized presence and/or citizenship status as it is maintained in ADOT records at the time of the match. Stipulated Fact as to the County Recorders (ECF 622-1) No. 5; Tr. Day 3 AM, 612:23-613:3 (Morales); Tr. Day 1 AM, 36:15-22 (Petty).

227. Since ADOT only began requiring proof of citizenship or authorized presence on October 1, 1996, only licenses issued after that date can provide adequate DPOC for voter registration. Tr. Day 8 AM, 1950:24-1951:1, 1957:16-18 (Richman).

228. Depending on the authorized presence value provided by ADOT, after the HAVA check, the voter's record in AVID will automatically reflect, with a code, whether their citizenship is verified or not, based on the authorized presence or citizenship status as it exists in MVD's system at that time. Tr. Day 3 AM, 613:15-19 (Morales); Tr. Day 1 AM, 39: 7-14 (Petty); Jorgensen Dep. 109:22-110:3; PX 234 at 8.

229. There are six potential authorized presence values that can be obtained from ADOT in the course of the HAVA check: (1) a naturalized citizen, (2) resident permanent alien, (3) a temporary visa, (4) U.S. citizen, (5) Canadian, and (6) U.S. territories that do not grant citizenship. Morales Dep. 29:10-24. County Recorders can only obtain authorized presence information through the HAVA check. Tr. Day 3 AM, 615:7-10 (Morales). More specifically, the Secretary of State will receive the actual numerical values for each of the "foreign" and "non-foreign" subcategories as they exist in the MAX system, such as "1" for Naturalized Citizen; and "4" for U.S. Citizen/Non-Foreign. Stipulated Fact (ECF 571-1) No. 104; Jorgensen Dep. 101:18-102:4; PX 234 at 4.

230. County Recorders often still use the term "F-type license" to refer to individuals with MVD credentials within the foreign category, even though MVD no longer uses that particular term. Stipulated Fact (ECF 571-1) Nos. 89, 90, 91.

231. To locate a record in MVD, the Secretary of State's AVID API connection must include data that matches data in ADOT's MAX system in order for ADOT to

produce a record return. Jorgensen Dep. 100:2-12. If the API is not able to find a match based on any provided driver's license number, it will rely on last name and date of birth to find a match. If those fields fail to produce a match, the API will rely on last name and first name to find a match. Jorgensen Dep. 118:20-119:16; PX 234. ADOT can return up to 50 soft matches to the County Recorder via the AVID system. Tr. Day 5 AM, 1080:19-1081:8 (McDonald); Tr. Day 3 AM, 563:5-7 (Jorgensen); Jorgensen Dep. 121: 2-13

232. The MVD/AVID API does not give the user any additional criteria on what would be needed for an exact match or how to narrow a query to obtain fewer results. Jorgensen Dep. 123:2-7, 124:7-12; Tr. Day 3 AM, 563:8-11 (Jorgensen).

233. The AVID system narrows the matches with MVD using a set of matching criteria. Smith Dep. 125:79-126:8; DX 935 at 2. There are four different sets of criteria, each of which can result in a soft match, as follows: (1) Exact match between MVD and AVID of last name, first three characters of first name, Last 4 of SSN; (2) Exact match between MVD and AVID of last name, first three characters of first name, and DOB; (3) Exact match between MVD and AVID of first name, DOB, and Last 4 of SSN; and (4) exact match to credential number. Tr. Day 5 AM, 1082:9-1083:1 (McDonald); DX 935 at 2. The matching algorithm requires all characters be the same, including spacing and apostrophes, and would not recognize one name of a two-name last name as a match. Smith Dep. 128:8-129:5, 130:10-131:9.

234. The treatment of MVD credential number as a soft match rather than a hard match reflects the likelihood of an indeterminate match with the ADOT database requiring an exercise of discretion by County Recorders. Tr. Day 5 AM, 1086:4-7 (McDonald).

235. Transposition or other incorrect data entry of names, birth dates, or the last four digits of the social security number can affect accuracy of matching. Tr. Day 5 AM, 1086:16-1088:5 (McDonald). Errors can include both a failure to associate an individual with the correct record in another database, or incorrect association of a voter record with a different record that is not in fact the same individual. Tr. Day 5 AM, 1085:9-1088:15 (McDonald). Errors may also be caused when the HAVA check reviews extraneous records

in addition to records of state-issued IDs. PX 220.

236. Dr. Michael McDonald found as many as 12,051 individuals could be identified within the voter file as matching one or more other records using the soft match process. Tr. Day 5 AM, 1084:20-1085:8 (McDonald).

237. If the ADOT records indicate U.S. citizenship—when the authorized presence value is one (naturalized citizen) or four (U.S. citizen)—or if DPOC is provided with a voter registration application, the voter registration database reflects that the voter registrant is a U.S. citizen by having the "yes" box checked under the "citizenship verified" field. Tr. Day 3, AM 613:20-24 (Morales). Assuming that this person submitted a complete voter registration application, they would be registered as a full ballot voter. Tr. Day 1 AM, 41:7-11 (Petty); Tr. Day 3 AM, 617:2-7 (Morales).

238. If there is no match with ADOT records—i.e. the applicant does not have an Arizona ID or driver's license (or that ID is expired), Tr. Day 1 AM, 34:19-35:12 (Petty)--and the individual did not provide another form of DPOC, County Recorders currently designate the voter registrant as a "federal only" active voter, and the voter registration database reflects that the "no" box is checked under the "citizenship verified" field. Tr. Day 3 AM, 617:8-13 (Morales). At that time, County Recorders send those voters a notice of their federal-only status and explain that DPOC is required for them to become full-ballot voters. PX 6; Tr. Day 1 AM, 42:9-25 (Petty).

239. Likewise, if the match with ADOT records is for a license issued before October 1, 1996, and the individual did not provide another form of DPOC, counties currently designate the new voter registrant as a "federal only" active voter, and the voter registration database reflects that the "no" box is checked under the "citizenship verified" field. Tr. Day 1 AM, 40:25-41:6, 43:18-44:12 (Petty).

240. If the ADOT records reflect an authorized presence value indicating non-citizenship, the applicant is not registered to vote. Rather, the individual is put into a "suspense" category and cannot vote unless and until they provide DPOC. Tr. Day 1 AM, 41:16-42:19 (Petty). At the time the applicant is placed in suspense, the County Recorder

sends the applicant a notice letter requesting DPOC. The suspended applicant can provide DPOC prior to the next general election and have their registration made active effective the date of their initial application. Tr. Day 1 AM, 42:9-15 (Petty). If the applicant does not provide DPOC prior to the next general election, they will be required to reapply altogether to become a registered voter. Tr. Day 1 AM, 43:12-17 (Petty).

241. HB 2492 changes this current practice with respect to voters matched to ADOT records reflecting a non-citizenship status because it requires that those applications be rejected outright, rather than placed in suspense, and does not provide for a cure period. Tr. Day 1 PM, 158:20-160:2 (Petty); A.R.S. § 16-121.01(E).

242. When a voter updates their voter registration, and a HAVA Check results in a matching ADOT record that does not indicate U.S. citizenship—i.e. when the authorized presence values are anything other than one or four—the voter registration database will automatically mark the "no" box under the "citizenship verified" field whether or not the voter registrant previously provided DPOC. Tr. Day 3 AM, 613:25-614:3 (Morales). County Recorders need to manually override that change to accurately reflect the voter registrant's citizenship verification based on previously provided information. Tr. Day 3 AM, 613:25-614:3, 616:2-14 (Morales). That means that if a voter registration application (new or update) is accompanied by DPOC other than that obtained through ADOT, a County Recorder must override the default "no" in the AVID record after the HAVA check is complete or the registrant will not be considered a full ballot voter. Tr. Day 3 AM, 616:2-14 (Morales).

243. Expired IDs do not serve as the basis of a HAVA check match, either a hard or soft match and, therefore, cannot serve as DPOC for an applicant. Tr. Day 1 AM, 35:5-12, 47:6-11 (Petty); PX 199. The Maricopa County Recorder has requested that this be changed because the citizenship documents in ADOT's possession should be valid regardless of whether the license itself has expired, but this change has not been made. Tr. Day 1 AM, 47:13-17 (Petty); PX 199.

244. The County Recorders do not conduct any checks against MVD data related

to citizenship status after the point of registration, unless there is a voter-initiated change to the record. Tr. Day 1 AM, 96:11-15 (Petty).

### C. ADOT

#### 1. ADOT Background and Credentialing

245. Eric Russell Jorgensen is the Director of the MVD at ADOT, a position he has held for more than eight years. Stipulated Fact (ECF 571-1) No. 73; Tr. Day 3 AM, 536:14-16, 20-21 (Jorgensen); Jorgensen Dep. 21:1-10. As MVD Director of ADOT, Mr. Jorgensen guides the policies, strategy, and operations of the MVD in its functions of providing customer service at Arizona MVD offices. Jorgensen Dep. 21:13-16.

246. MVD manages two types of customer credentials: driver licenses and state-issued identification cards, using its MAX system. Jorgensen Dep. 27:21-25, 28:10-29:4. Stipulated Fact (ECF 571-1) Nos. 74, 75 & 77. If proper requirements are met, both U.S. citizens and non-U.S. citizens, including Lawful Permanent Residents, DACA-holders, and visa-holders, can receive a driver license or state-issued identification in Arizona, as long as they can show "authorized presence." Jorgensen Dep. 30:18-31:8, 31:22-32:2. Stipulated Fact (ECF 571-1) Nos. 78, 79, 81, 82, 83; Jorgensen Dep. 31:1-4, 31:14-18, 31:19-21. United States citizens prove their authorized presence by demonstrating their citizenship status. Tr. Day 3 AM, 539:9-16 (Jorgensen).

247. For purposes of getting a driver's license, the MVD determines whether an individual has authorized presence by reviewing supporting documents that the individual presents to MVD. Stipulated Fact (ECF 571-1) No. 80; Jorgensen Dep. 31:9-13. Documentation establishing authorized presence includes the following: an original or certified copy of a birth certificate issued by any state, territory or possession of the U.S.,[14] a U.S. Certificate of Birth Abroad, an unexpired U.S. passport or passport card, an unexpired USCIS Employment Authorization Document, U.S. Certificate of Naturalization, a U.S. Certificate of Citizenship, an I-94 Form with an unexpired foreign

[14] Puerto Rico birth certificates must be issued July 1, 2010 or later.

passport and an unexpired U.S. Visa, and a Permanent Resident Card/Resident Alien Card. In most cases, a document showing authorized presence in the United States has to be unexpired, except for a U.S. passport which may be expired. Jorgensen Dep. 38:9-39:23; Tr. Day 3 AM, 552:15-553:3, 553:10-16 (Jorgensen); PX 231 at 3.

248. MVD's MAX system serves both as a front-end system that MVD customer service representatives use to issue a credential, including driver's licenses, to a customer, as well as serving as the online portal and the MVD's record management system, including customer records. Tr. Day 3 AM, 540:5-11, 540:14-23 (Jorgensen); Jorgensen Dep. 25:8-20.

249. An "original credential" is the first issuance of a credential, not a subsequent renewal or reinstatement of the same credential. Jorgensen Dep. 35:20-23; Stipulated Fact (ECF 571-1) No. 84. An original credential is issued for a specific period of time. To maintain its validity, the credential must be renewed. Jorgensen Dep. 61:18-20; PX 233 at 1. Upon renewal, a customer will get a new expiration date for their credential. Jorgensen Dep. 62:21-23; PX 233 at 1. A reinstatement credential is issued in cases where one attempts to reinstate their driving privileges after they were suspended or revoked. Tr. Day 3 AM, 569:24-570:7 (Jorgensen). A "duplicate" refers to a new version of an existing credential. Tr. Day 3 AM, 555:22-556:4 (Jorgensen), PX 231 at 2. ADOT uses USCIS's SAVE system for verification of authorized presence when someone applies for an Arizona credential. If the prospective credential is REAL ID-compliant, ADOT will use the SAVE system for any non-citizen authorized presence category. If the credential is non-REAL ID-compliant, ADOT may use the SAVE program. Jorgensen Dep. 41:17-42:7. ADOT does not use SAVE for anyone who presents a United States birth certificate since SAVE does not verify U.S.-born citizens. Jorgensen Dep. 42:21-43:10, 44:9-14.

**2. The Stale Nature of ADOT's Authorized Presence Data as to Naturalized Citizens**

250. ADOT's records may not accurately reflect an individual's citizenship

status.[15] Tr. Day 5 AM, 1071:14-1079:7 (McDonald); Tr. Day 8 AM, 1950:20-1952:20 (Richman). ADOT citizenship information is a record at a point in time and can be out of date. Tr. Day 5 AM, 1073:13-17 (McDonald). Indeed, Defense expert Dr. Jesse Richman acknowledged that "the MVD database isn't necessarily updated at the time an individual becomes a U.S. citizen." Tr. Day 8 AM, 1951:7-10 (Richman). Dr. Richman further testified that the ADOT MAX system legal presence information is not always up to date. Tr. Day 8 AM, 1951:19-23 (Richman).

251. Richman acknowledged that "not every interaction with ADOT requires someone to provide proof of citizenship or authorized presence," and, in particular, "if the credential issuance is a duplicate issuance and it's not a real ID," they would not need to provide proof of citizenship or authorized presence. Tr. Day 8 AM, 1951:24-1952:20 (Richman).

252. Richman acknowledged that "the MVD database isn't necessarily updated at the time an individual becomes a U.S. citizen." Tr. Day 8 AM, 1951:7-10 (Richman). Dr. Richman further testified that the ADOT MAX system's legal presence information is not always up to date. Tr. Day 8 AM, 1951:19-23 (Richman).

253. Frequently, applicants for whom ADOT has a non-citizenship record respond to the notice letters by providing DPOC and become active voters. Tr. Day 1 AM, 43:1-7 (Petty); Tr. Day 1 PM, 156:25-157:6 (Petty). These individuals are predominantly people who naturalized and became a U.S. citizen after they last interacted with ADOT. Tr. Day 1 AM, 46:13-24 (Petty); Tr. Day 1 PM, 157:7-9 (Petty).

254. As such, Ms. Petty clarified that while she believes ADOT data is reliable, by that she means that it reliably reflects the data received by ADOT at the time the agency

---

[15] For purposes of getting a driver's license and a non-driving state issued identification, a U.S. Certificate of Naturalization, a U.S. Certificate of Citizenship, an I-94 Form with an unexpired foreign passport and an unexpired U.S. Visa, and a Permanent Resident Card/Resident Alien Card are all acceptable primary documents that would establish authorized presence. In most cases, identifications showing authorized presence in the United States have to be non-expired other than an expired U.S. passport. Stipulated Fact (ECF No. 571-1) No. 85; Tr. Day 3 AM, 552:15-553:3, 553:10-16 (Jorgensen); Jorgensen Dep. 38:9-39:23; PX 231 at 3.

interacted with the voter but not that it reliably reflects *current* citizenship status. Tr. Day 1 PM, 157:14-158:1 (Petty). To the contrary, her experience confirms that many applicants flagged as non-citizens by ADOT are in fact naturalized citizens. Tr. Day 1 PM, 158:2-5 (Petty).

255. One source of stale information is that licenses in Arizona do not need to be renewed very frequently, with the result that many people naturalize before their license must be renewed. Jorgensen Dep. 64:15-22 (non-REAL ID-compliant/legacy driver's license typically valid up to age 65); Jorgensen Dep. 60:25-61:3, 64:15-19, 64:23-65:21 (both REAL and non-REAL ID licenses can be valid longer than eight years without requiring renewal); Jorgensen Dep. 61:4-6 (certain credentials valid longer than 10 years); Stipulated Fact (ECF 571-1) No. 92; Jorgensen Dep. 63:15-64:14; PX 233 at 2 (for customers over age 60 and out-of-state students, renewal required every 5 years); Tr. Day 3 AM, 544:20-545:1 (Jorgensen) (authorized presence proof for permanent residents expires in ten years).

256. MVD customers who are categorized under a foreign authorized presence subcategory are not legally required to do anything to update their MVD citizenship status if their license is still unexpired and valid but was obtained prior to naturalization if they naturalize as a U.S. citizen. Jorgensen Dep. 68:19-69:2; Stipulated Fact (ECF 571-1) No. 93. As a result, it is possible for such customers to retain old credentials that fail to reflect their current U.S. citizenship status for long periods of time. Tr. Day 3 AM, 560:2-14 (Jorgensen). MVD does not track whether customers with valid credentials based on foreign authorized presence have naturalized as U.S. citizens since obtaining their credential. Jorgensen Dep. 69:20-24; Stipulated Fact (ECF 571-1) No. 95; Tr. Day 3 AM, 561:1-5 (Jorgensen). Besides, when renewal is required, ADOT is unaware of the number of people who update their driver license or credential immediately after naturalization as a U.S. citizen. Jorgensen Dep. 71:1-5. 72:7-9.

257. ADOT records reflect the customer's last interaction at which the customer was required to provide proof of authorized presence or citizenship; not every interaction

a customer has with ADOT requires providing proof of authorized presence or citizenship. Tr. Day 8 AM, 1951:19-1952:3 (Richman).

258. Defense expert Dr. Jesse Richman acknowledged that "not every interaction with ADOT requires someone to provide proof of citizenship or authorized presence," and, in particular, "if the credential issuance is a duplicate issuance and it's not a real ID" they would not need to provide proof of citizenship or authorized presence." Tr. Day 8 AM, 1951:24-1952:20 (Richman).

259. In fact, there are a number of transactions that do not require MVD customers to provide proof of authorized presence, which contributes to the staleness of authorized presence information in the MVD database:

a. Transactions that involve a non-REAL ID compliant credential do not require a customer to provide proof of authorized presence to obtain a duplicate that has not expired. Tr. Day 3 AM, 545:17-546:1, 559:17-560 (Jorgensen). These are sometimes referred to as "duplicate" transactions.

b. If an individual has an extended Arizona driver license, commercial driver license, instruction permit, or identification card, they are not required to show authorized presence once again. These credentials could serve as proof of authorized presence in specific cases. Tr. Day 3 AM, 580:10-581:5 (Jorgensen); PX 428.

c. Examples of "duplicate" issuances which do not require proof of authorized presence and could therefore lead to the issuance of a foreign-status license to a person who has since naturalized include the following:

i. Address update. Tr. Day 3 AM, 556:5-9 (Jorgensen).

ii. Marriage and name change. Tr. Day 3 AM, 556:16-24 (Jorgensen).

iii. Lost credential requiring replacement. Tr. Day 3 AM, 558:1-4 (Jorgensen).

iv. Change to other information reflected on the face of the license, such as their photo, weight, height, and address. Tr. Day 3 AM, 558:5-12 (Jorgensen).

260. For a naturalized citizen to update their citizenship status maintained in ADOT's database, the person must visit an ADOT office in person and present documentary proof of citizenship. Stipulated Fact (ECF 571-1) No. 94. ADOT does not otherwise receive updates regarding citizenship status of people who naturalize. Jorgensen Dep. 73:11-14; Stipulated Fact (ECF 571-1) No. 98. To prove that someone is a naturalized U.S. citizen for purposes of obtaining an Arizona driver's license, the individual needs to show an official copy of their naturalization certificate. A replacement copy of their naturalization certificate is not enough. Jorgensen Dep. 72:25-73:10.

261. A person with a foreign-type driver license or state-issued identification would continue to have a foreign-type license or identification card if that person did not renew their license or identification card and show evidence of naturalization as a U.S. citizen. Jorgensen Dep. 71:25-72:5; Stipulated Fact (ECF 571-1) No. 97. For foreign authorized presence customers renewing a credential, such customers obtain an expiration date based on their provided foreign authorized presence documentation. Jorgensen Dep. 62:24-63:3; PX 233 at 1.

262. A newly naturalized citizen who submits a voter registration application may still be identified as ineligible using MVD or SAVE system checks if they did not acquire a new driver's license or otherwise update their citizenship status with ADOT upon naturalization. *See supra* ¶¶ 250-61.

**3. Accuracy Challenges with Use of ADOT Data for Citizenship Verification**

263. Dr. McDonald testified that simple database entry errors in the ADOT system would lead to "individuals being incorrectly identified as non-citizens" because their information is not correct in the database, and correct information is necessary for a successful match. Tr. Day 5 AM, 1077:13-1078:23 (McDonald). According to ADOT,

internal weekly error checks of a sample of ADOT records are only correct "85 to 89 percent" of the time. Tr. Day 3 AM, 548:12-21 (Jorgensen); Jorgensen Dep. 190:25-191:18; Stipulated Fact (ECF 571-1) No. 115.

264. In October 2022, an incident affecting ADOT data resulted in thousands of voters being erroneously marked as lacking DPOC in the MVD system and downgraded to federal only Status. Tr. Day 8 PM, 2025:3-2027:13 (Hiser), Petty Dep. 94:20-96:9; Lewis Dep. 59:6-10, 59:17-60-2, 60:8-61:8; Hiser Dep. 198:16-201:6; PX 207; PX 220; PX 226. The Secretary of State alerted County Recorders to the error and instructed the recorders to conduct additional investigation and re-issue ballots as necessary. *E.g.*, PX 207; PX 220; PX 226.

265. If a person has already demonstrated proof of authorized presence, there is no requirement to show proof of authorized presence when renewing a non-REAL ID-compliant driver's license, assuming that their authorized presence has not expired. Tr. Day 3 AM, 544:9-14 (Jorgensen); Jorgensen Dep. 125:21-126:19; PX 231 at 2.

**D. USCIS SAVE System**

266. DHS USCIS administers the SAVE system. Stipulated Fact (ECF 571-1) No. 116.

267. The SAVE system is a web-based, point-in-time data retrieval system that enables federal, state, and local benefit-granting agencies to access immigration and citizenship status information for a benefits applicant in order to determine that applicant's eligibility for the benefit. USCIS Dep. 25:1-16, 38:12-13. Stipulated Fact (ECF 571-1) No. 117.

268. The SAVE system is not a database or a system of record origin, but rather relies on source record systems that are maintained by different DHS agencies, including USCIS. USCIS Dep. 26:1-10; Stipulated Fact (ECF 571-1) No. 118.

269. Arizona County Recorders have access to the SAVE system. Stevens Dep. 62:5-9; Hansen Dep. 113:23-25; Asrarynezami Dep. 43:18-44:1; Merriman Dep. 41:16-18; Milheiro Dep. 32:18-20; Garcia Dep. 58:14-16; Petty Dep. 102:25-103:4); Durst Dep.

154:8-15; Hiser Dep. 206:8-13; Lewis Dep. 66:13-19; Stipulated Fact (ECF 571-1) No. 119.

270. Arizona's fifteen County Recorders have access to the SAVE system through the Arizona Secretary of State's Memorandum of Agreement with USCIS (the "SAVE MOA") and the Arizona Secretary of State's account. USCIS Dep. 48:6-9; PX 266 at 2; Stipulated Fact (ECF 571-1) No. 128.

271. SAVE is an entirely separate system from AVID and the HAVA checks. Tr. Day 3 AM, 616: 21-24 (Morales).

272. The 2019 EPM provides that, for proof of citizenship purposes, if a registrant does not present originals or copies of documents but just provides a citizenship number, including a Naturalization Certificate Number, Citizenship Certificate Number, or Alien Registration Number, this number must be verified against the SAVE system by the County Recorder before the number can be deemed satisfactory DPOC. PX 6 at 19; Stipulated Fact (ECF 571-1) No. 120; Tr. Day 3 AM, 616:15-24 (Morales).

273. When a County Recorder inputs an applicant's immigration number into the SAVE system, the system can return a match with citizenship verified, a match with citizenship not verified, or no match. Tr. Day 1 AM, 58:2-8 (Petty).

274. A match with citizenship verified establishes naturalized or derived U.S. citizenship. USCIS Dep. 25:9-16; PX 271 at 13; PX 275 at 3; Tr. Day 8 PM, 2028:13-19 (Hiser); Tr. Day 8 PM, 2090:22-2091:3 (Johnston). But a match with citizenship not verified or no match does not establish a lack of U.S. citizenship, as the SAVE system cannot confirm a lack of U.S. citizenship. USCIS Dep. 152:24-153:6.

275. Like with the HAVA match process, if the SAVE system provides a match with citizenship verified, the voter is registered as a full-ballot voter. If the SAVE system provides a match with citizenship not verified, the applicant is not registered until they provide DPOC. Finally, if the SAVE system provides no match, the applicant is registered as a federal-only voter until they provide DPOC. Tr. Day 1 AM, 58:17-59:13 (Petty).

276. There can be a delay between when a registrant becomes a U.S. citizen and

when that registrant's citizenship status has been updated in the SAVE system. PX 6 at 24; USCIS Dep. 37:19-38:4, 38:8-18. The Maricopa County Recorder's office has experienced delays between naturalization and the SAVE system updates. Tr. Day 1 AM, 60:21-61:6 (Petty). The Election Procedures Manual states that "often there is a delay between when a registrant becomes a U.S. citizen and when that registrant's citizenship status has been updated in SAVE." PX 6 at 24. The EPM further states that "certain precautions must be taken if a County Recorder receives a voter registration form within two weeks of a registration deadline that contains a Citizenship, Naturalization or Alien Registration Number . . ." PX 6 at 24.

277. The SAVE system can only be used to verify or provide confirmation of naturalized or derived U.S. citizenship. USCIS Dep. 28:8-14; PX 274-1.

278. The SAVE system cannot verify or provide confirmation of U.S.-born citizenship. USCIS Dep. 27:22, 28:8-11; Stipulated Fact (ECF 571-1) No. 122.

279. To verify a benefit applicant's status in the SAVE system, the user agency must have the applicant's biographic information (first name, last name and date of birth) and a numeric identifier (Alien Number; Form I-94, Arrival/Departure Record, number; Student and Exchange Visitor Information System (SEVIS) ID number; or unexpired foreign passport number). https://www.uscis.gov/save/about-save/save-verification-process; Stipulated Fact (ECF 571-1) No. 131. SAVE cannot verify an applicant's status using only first and last name or birthplace. https://www.uscis.gov/save/about-save/save-verification-process; Stipulated Fact (ECF 571-1) No. 132.

280. Therefore, the SAVE system is only useful if the County Recorder has the applicant's alien registration number or other immigration number. Tr. Day 1 AM, 56:24-57:3 (Petty). County Recorders only have access to such numbers when a voter registration applicant provides one on their registration form, which is relatively rare. Tr. Day 1 AM, 57: 15-58:1 (Petty). They do not have access to immigration numbers from any other source. *Id.* Not many applicants provide immigration numbers on their voter registration numbers, and the Maricopa County Recorder's office does not have access to them through

MVD or any other source. *Id.*

281. The Federal Form does not include a space for, or instructions about, providing an immigration number. PX 28; Tr. Day 1 AM, 67:13-68:15 (Petty).

282. The SAVE system cannot verify citizenship status based on State Department documentation, such as U.S. passports. USCIS Dep. 27:23-28:7.

283. The SAVE system does not use Social Security Administration systems for verification of citizenship status. USCIS Dep. 27:22-23. Stipulated Fact (ECF 571-1) No. 123.

284. There are limitations on SAVE's ability to verify citizenship. Name discrepancies prevent verification of naturalized and derived citizenship in the SAVE system. USCIS Dep. 36:17-38:4, 38:8-18, 112:5-114:12, 115:24-116:12, 117:20-118:4, 118:12-18. Maiden name changes following marriage are one of the more common types of record changes that USCIS observes. USCIS Dep. 167:5-168:17; Stipulated Fact (ECF 571-1) No. 136. And SAVE system officials have observed data integrity issues in DHS records that preclude the verification of a voter registration applicant in the SAVE system, including data transposition, letters and numbers out of sequence, typographical errors, names that are truncated because they are too long for the SAVE system, and outdated names that predate a name change due to marriage. USCIS Dep. 112:5-12, 114:5-12, 115:24-116:12, 116:18-117:1.

285. Only six states have existing Memoranda of Agreement ("MOAs") to use the SAVE system for election administration functions, including voter registration and/or voter list maintenance. USCIS Dep. 31:22-25, 208:21-24; Stipulated Fact (ECF 571-1) No. 124.

286. The SAVE MOA between USCIS and the Arizona Secretary of State is solely for the purpose of "verifying citizenship and immigration status information of non-citizen and naturalized or derived U.S. citizen registrants (registrants) when they register to vote (benefit)." PX 266 at 2; Stipulated Fact (ECF 571-1) Nos. 125, 126 & 127.

287. At present, the Arizona Attorney General does not have an MOA with USCIS

to use the SAVE system and, accordingly, does not have direct access to the SAVE system. USCIS Dep. 58:13-25, 60:9-12, 62:20-63:7; Thomas Dep. 305:5-9, 305:11-15.

288. Access to the SAVE system is contingent upon following the terms of the user agency's MOA with USCIS, the SAVE Program Guide, the SAVE Voter Registration Fact Sheet, and the web-based tutorial given to user agencies. USCIS Dep. 87:23-88:10, 90:11-91:1, 102:12-22; PX 266 at 4; PX 271 at 9.

289. The SAVE MOA requires user agencies to "[u]se any information provided by DHS-USCIS under this MOA solely for the purpose of determining the eligibility of persons applying for the benefit issued by the User Agency . . ." PX 266 at 4; Stipulated Fact (ECF 571-1) No. 129. Similarly, the SAVE Program Guide issued by USCIS states that: "Users may run SAVE verifications only on benefit applicants." PX 271 at 9; Stipulated Fact (ECF 571-1) No. 130.

290. The Arizona Secretary of State's Office itself does not have authorization to verify voter registration applicants through the SAVE system. USCIS Dep. 47:19-23. Similarly, at present, the Arizona Secretary of State and the County Recorders do not have authorization through the SAVE MOA to conduct SAVE system verification of any currently registered Arizona voters after initial voting eligibility determinations have been made. USCIS Dep. 56:21-57:19; PX 271 at 9; PX 266 at 2, 4. Tr. Day 2 AM, 348:23- 350:8 (Connor). At present, neither the Arizona Secretary of State nor the County Recorders have authorization through the SAVE MOA to use the SAVE system for the purpose of removing or cancelling voters from the voter list. PX 266 at 2; Tr. Day 2 AM, 348:23-350:8 (Connor). At present, the SAVE MOA does not authorize the use of the SAVE system for an investigative purpose. USCIS Dep. 63:8-14. PX 266 at 2.

291. In response to the Court's question whether the "periodic database check that's in [the Challenged Provisions] for SAVE can[] be executed," defense expert Dr. Jesse Richman testified "the State isn't doing that and their agreement [with USCIS] doesn't contemplate doing that." Tr. Day 8 AM, 1946:19-1947:2 (Richman).

292. Given that various County Recorders have access to the SAVE system, the

Secretary of State's Elections Director is not aware of how Arizona's MOA with USCIS will be enforced to make sure County Recorders do not use SAVE beyond the scope of the access that the MOA allows. Tr. Day 2 AM. 352: 14-19 (Connor). The SOS office does not do any kind of audit or check to ensure compliance, and the Secretary of State's office does not monitor the County Recorders' use of the SAVE system. *Id.* 353: 7-16.

293. When the SAVE system cannot verify the naturalized or derived U.S. citizenship of the voter registration applicant, the SAVE MOA and the SAVE Program Guide mandate that additional verification procedures be initiated. The Arizona Secretary of State and the County Recorders have never sought and obtained an exemption from this requirement. PX 266 at 4; PX 271 at 9-10; PX 274 at 2; USCIS Dep. 91:23-92:3, 93:3-6, 98:11-23, 98:24-99:6.

294. USCIS's backlog for additional verification has existed since the middle of 2021 and is currently estimated to be approximately 120,000 cases, with approximately 100,000 cases at the second of three levels of verification. USCIS Dep. 135:16-21, 137:15-19. USCIS staff work through the backlog of additional verification cases on a "first in, first out" basis" with no priority given to voter registration cases. USCIS Dep. 135:22-136:6, 136:9-11; Stipulated Fact (ECF 571-1) No. 137.

295. The SAVE MOA requires user agencies to "[e]nsure all Users perform any additional verification procedures the SAVE Program requires . . . For voter registration verification, User agency must institute additional verification for any registrant that does not verify as a naturalized or derived citizen on initial verification, including in all cases where the User Agency receives any SAVE response other than that of naturalized or derived citizen." PX 266 at 4; Stipulated Fact (ECF 571-1) No. 133. USCIS's Fact Sheet, which is binding on user agencies, similarly provides a "user agency must conduct second step additional verification for any individual that does not verify as a U.S. citizen after initial verification . . . [i]t is not appropriate for a user agency to conduct verifications if it does not intend to complete the verification process." PX 274 at 2. And the SAVE Program Guide requires that "Users must perform any and all additional verification procedures

SAVE requires . . . the user must continue the verification process to ensure that SAVE can conduct the necessary research on behalf of the benefit applicant. This is necessary because user agencies may not rely on a SAVE response to deny an application for benefits unless the agency has followed all SAVE verification procedures." PX 271 at 9-10 Stipulated Fact (ECF 571-1) No. 134.

296. While USCIS requires users, including Arizona County Recorder offices, to perform additional verification procedures for any voter registrant not verified as a U.S. citizen upon an initial query of the SAVE system, Arizona counties are not familiar with and do not regularly initiate USCIS's additional verification procedures. Stevens Dep. 72:21-73:1; Asrarynezami Dep. 92:15-22; Milheiro Dep. 35:8-10; Garcia Dep. 62:11-16; Hiser Dep. 209: 4-9; Lewis Dep. 71:20-72:3; Webber Dep. 88:23-89:5. For example, Ms. Petty testified that she is not aware of USCIS's additional verification procedures following an initial verification SAVE query that yields no match or a status other than naturalized or derived citizenship, and that if her office was using them, she would be aware of it. Tr. Day 1 AM, 61:11-21 (Petty).

297. As Dr. McDonald testified, many Arizona counties are not following up on additional verification requests from SAVE. Tr. Day 5 AM, 1096:23-1097:24 (McDonald) (discussing PX 269 and data that Arizona election officials responded to 162 of 2,892 manual verification requests made since 2016) *see also* Stipulated Fact (ECF 571-1) No. 147; USCIS Dep. 49:3-15, 175:7-25, 176:14-22.

298. Arizona's County Recorders fulfill the requirement to initiate additional verification procedures at very low rates and in a non-uniform manner—some counties intiate additional verification more consistently than others. This is evident from the data USCIS produced on Arizona County Recorders' usage of the SAVE system:

a. According to USCIS SAVE data, the Maricopa County Recorder's office initiated additional verification procedures for 3 of the 1,064 individuals whose initial verification failed to confirm their citizenship in 2020, 5 of 413 such individuals in 2021, and 4 of 494 such individuals

in 2022. Stipulated Fact (ECF 571-1) Nos. 138, 139, 140; PX 268 at 1; USCIS Dep. 48:10-49:1, 175:7-25, 176:14-22.

b. According to USCIS SAVE data, the Pima County Recorder's office initiated additional verification for 107 of the 232 individuals whose initial verification failed to confirm their citizenship in 2020, 4 of 16 such individuals in 2021, and 2 of 45 such individuals in 2022. Stipulated Fact (ECF 571-1) Nos. 141, 142, 143; PX 268 at 1; USCIS Dep. 48:10-49:1, 175:7-25, 176:14-22.

c. According to USCIS SAVE data, in 2020, the other 13 County Recorder offices collectively initiated additional verification for 18 of the 129 individuals whose initial verification failed to confirm their citizenship in 2020, 5 of 50 such individuals in 202, and 6 of 59 such individuals in 2022. Stipulated Fact (ECF 571-1) Nos. 144, 145, 146. PX 268-1; USCIS Dep. 48:10-49:1, 175:7-25, 176:14-22.

299. The SAVE MOA requires Arizona County Recorders to provide to voter registration applicants whose naturalized or derived citizenship could not be verified in the SAVE system, adequate written notice of the failure to verify their citizenship status and information on how to correct, update, renew, or obtain their DHS records. PX 266 at 5, 11, 12; USCIS Dep. 89:3-14, 108:10-111:24. Aside from a Spanish-language website and a multilingual webpage, SAVE-related materials and resources created by USCIS, including fact sheets and notices on how to correct and update a DHS record, have not been translated and made available in different languages. Additionally, the USCIS-AZSOS MOA does not require that such SAVE-related materials and resources provided to benefit applicants be made available in translation. USCIS Dep. 165:23-166:23.

**E. SSA Database**

300. Arizona election officials only have access to SSA records through the HAVA checks run through ADOT. Stipulated Fact as to the County Recorders (ECF 622-1) No. 6; Tr. Day 1 AM, 38:21-39:1 (Petty).

301. An SSA match cannot prove citizenship; SSA matching provided through AVID does not provide any information about citizenship. Tr. Day 1 AM, 38:16-20 (Petty).

302. Arizona election officials do not have access to any citizenship data contained within SSA records and do not receive any such data through the HAVA checks. *See* https://www.ssa.gov/open/havv/#hava; *see also* Tr. Day 1 AM, 66:19-67:5 (Petty); Connor Dep. 184:2-10; Stipulation as to the County Recorders (ECF 622-1) No. 7; Tr. Day 5 AM, 1090:23-1091:6 (McDonald).

303. Defense expert Dr. Jesse Richman acknowledged that Social Security Administration databases do not provide information on citizenship. Tr. Day 8 AM, 1939:13-15 (Richman).

304. According to the Social Security Administration ("SSA"), it is not the agency responsible for making citizenship determinations, its records "do not provide definitive information on citizenship," "SSA does not have citizenship information for all individuals who have been issued an SSN," and there is no obligation for an individual to report a change in their immigration status unless the individual is receiving Social Security payments. Stipulated Fact (ECF 571-1) Nos. 148, 149, 150. About a quarter of SSA records do not contain citizenship information. Tr. Day 5 AM, 1091:10-13 (McDonald).

305. The citizenship information in the SSA database, which Arizona election officials cannot even access, only "represents a snapshot of the individual's citizenship status at the time of their interaction with SSA." Stipulated Fact (ECF 571-1) No. 151.

306. The SSA database has an error rate of about 6%. Tr. Day 5 AM, 1093:6-8 (McDonald).

307. The SSA database relies on soft matching with the last four digits of a social security number, so the same name can have multiple records, and entering the same name twice can result in two different records. Tr. Day 5 AM, 1092:16-1093:5 (McDonald).

308. According to the Social Security Administration, HAVA checks rely on an exact match algorithm. Office of Inspector General, Social Security Administration, Accuracy of the Help America Vote Verification Program Responses, Report: A-03-09-

29115, Social Security Administration: Washington, DC (November, 2009); ECF No. 672 (Plaintiffs' Revised Request for Judicial Notice), ¶ 49.

309. The Attorney General's Office does not have direct access to the SSA databases and has to make requests for SSA data via fax. Responses from the SSA indicate if the Social Security Number provided is a match or not a match but do not indicate the subject's citizenship. Thomas Dep. 295:9-18, 297:2-10, 297:18-298:2; Stipulated Fact (ECF 571-1) No. 152.

**F. NAPHSIS and Other Databases**

310. County Recorders do not have access to the NAPHSIS database. As Ms. Petty testified, the Maricopa Recorder's office did not have access to the National Association for Public Health Statistics and Information Systems (NAPHSIS) Electronic Verification of Vital Event (EVVE) System, and further that she did not know what it was, had not heard of it, and had not heard it being discussed at any VRAC meeting. Tr. Day 1 AM, 68:19-70:16. (Petty).

311. Defense expert Dr. Jesse Richman acknowledged that County Recorders testified they do not have access to the NAPHIS database. Tr. Day 8 AM, 1939:21-24 (Richman). Dr. Richman further testified that one of the "key limitations" of the NAPHSIS data was that it would not be helpful in providing information about people born outside the United States. Tr. Day 8 AM, 1941:11-21 (Richman).

312. The Electronic Registration Information Center (ERIC) does not provide Arizona election officials with citizenship information. Tr. Day 1 AM, 70:19-71:7 (Petty).

313. Arizona election officials are unaware of any other databases to which they have access that contain citizenship data. Tr. Day 1 AM, 71:4-7 (Petty); Tr. Day 8 PM, 2031:15-21 (Hiser); Lewis Dep. 78:21-79:4; Webber Dep. 93:18-21.

314. Notwithstanding the County Recorders' lack of access to reliable databases with current citizenship data, election officials have expressed concern that the catch-all database provisions in HB 2492 and HB 2243 could require election officials to investigate, and potentially refer for prosecution, voters on lists of alleged non-citizens submitted by

third-party groups. Tr. Day 2 AM, 362:21-364:7 (Connor); PX 196. Such a requirement would put an enormous strain on the resources of County Recorders. Tr. Day 8 PM, 2045:5-11 (Hiser).

315. Matthew Martin, the Jury Administrator for Maricopa County, testified that "[i]n January 2023, . . . the Jury Office began providing monthly reports to both the Secretary of State and the Recorder's Office listing prospective jurors who informed the Jury Office that they were not a resident of Maricopa County or were not a citizen of the United States." DX 970. Mr. Martin testified that prospective jurors can inform the Jury Office of their citizenship status by "provid[ing] a statement in writing (letter, email, or fax) [to the Jury Office] stating that [they are] not a citizen of the United States," although these statements "are not [made] under penalty of perjury." *Id.* This citizenship information is then inputted into the jury management system, which is then used to create the monthly reports that are sent to the Secretary of State and the Maricopa County Recorder's Office. *Id.* Although Mr. Martin testified that "[t]hese reports accurately reflect the information contained in the jury management system as of the date of export," he also testified that "[t]he Jury Office does not attempt to confirm the accuracy of citizenship information provided by prospective jurors." *Id.*

316. The Secretary of State's Elections Director also testified that she is skeptical of County Recorders' reliance on the jury summary reports to remove voters from the rolls because the County Recorders never receive the underlying questionnaires from the jurors. Tr. Day 2 AM 360:2-16 (Connor). Therefore, County Recorders cannot confirm the accuracy of the report, *id.* 361:7-16 (Connor). And, related to Martin's testimony, that means County Recorders will not know if the report was made under penalty of perjury or not. Moreover, unlike the Secretary's data-sharing agreement and working relationship with MVD, the summary jury reports election officials receive are not governed by any contract, and election officials do not have the same working relationship with jury administrators that they have with MVD to understand how the reports are compiled and maintained. Tr. Day 2 PM, 412:21-414:15 (Connor).

## VIII. Birthplace

### A. Current Birthplace Requirements Under Arizona Law

317. A voter registrant's birthplace is not an eligibility criterion to vote in Arizona. Ariz. Const. art. 7 § 2; PX 6 at 16-17; Tr. Day 2 AM, 311:7-312:17 (Connor).

318. Since 1979, Arizona's voter registration form has contained an optional space for prospective voters to write their "state or country of birth." Stipulated Fact (ECF No. 571-2) No. 3.

319. Arizona election officials have historically accepted otherwise valid state voter registration forms even when no birthplace was provided. PX 6 at 33; Tr. Day 1 AM, 97:14-23 (Petty); Tr. Day 2 AM, 309:22-310:4 (Connor).

320. Approximately one-third of active and inactive voter records in Arizona's voter registration database lack birthplace information. Tr. Day 3 PM, 659:13-21 (Hersh).

### B. Arizona Election Officials Do Not Use Birthplace Information to Determine a Voter's Qualifications

321. The Arizona County Recorders, the Arizona election officials whose offices are generally responsible for processing voter registration forms in Arizona, do not use birthplace information from voter registrants to determine or confirm whether a voter is qualified to vote. *See* Tr. Day 1 AM, 100:25-101:9, 102:1-12 (Petty); Tr. Day 2 AM, 311:22-312:14 (Connor); Tr. Day 8 PM, 2055:18-2056:8 (Hiser); Johnston Dep. 33:2-9; PX 6 at 16-17, 17-18, 29; PX 116 Rog No. 1, PX 119 Rog No. 1, PX 129 Rog No. 1, PX 139 Rog No. 1, PX 165 Rog No. 1, PX 182 Rog No. 1.

322. The Office of the Arizona Secretary of State does not use birthplace information from voter registrants for any purpose related to voter registration. Tr. Day 2 AM, 316:7-11 (Connor). The Secretary of State admitted that "[a] voter's birthplace is wholly immaterial to their qualifications to vote" and "[a] person's place of birth has no bearing whether they are eighteen, currently a citizen of the United States, or a resident of Arizona and the specific jurisdiction in which they are registering." ECF No. 124 ¶ 56; ECF No. 67 ¶ 56; Tr. Day 2 AM, 311:22-312:17 (Connor).

323. Birthplace is not used by Arizona election officials, nor can it be used, to establish or confirm a prospective registrant's current place of residence. Stipulation as to the County Recorders (ECF No. 622-1) No. 1.

324. An individual's place of birth does not necessarily determine their citizenship status. Tr. Day 1 AM, 101:3-9 (Petty) (agreeing that where someone is born does not determine whether they are a U.S. citizen).

325. For example, persons born outside the United States can still be United States citizens by birth. PX 274 at 1 n.1 (defining "derived citizens"). Additionally, persons born outside the United States who do not have citizenship from birth may later obtain citizenship, including through naturalization. *See supra* ¶ 27 (naturalized citizen statistics).

326. Arizona County Recorders do not use voter registrants' birthplace information to determine citizenship status. Tr. Day 1 AM, 100:25-101:9, 103:2-11 (Petty); Tr. Day 2 AM, 311:22-25 (Connor); PX 116 Rog No. 1, PX 119 Rog No. 1, PX 129 Rog No. 1, PX 139 Rog No. 1, PX 165 Rog No. 1, PX 182 Rog No. 1.

327. Instead, Arizona County Recorders determine a voter registrant's citizenship status through the "HAVA check" process and through the examination of documentary proof of citizenship provided by registrants. Tr. Day 1 AM, 32:19-33:14, 33:23-34:1, 103:2-7 (Petty); PX 6 at 17-25 (documentary proof of citizenship requirements), 23 (procedures to electronically verify identity and citizenship).

328. During the HAVA check process, the state's voter registration system does not use birthplace to match a voter record to a record within the MVD database. DX 935 at 2.

329. Arizona County Recorders also do not use birthplace information to verify identity while checking for duplicate registration records across counties. Tr. Day 1 AM, 103:2-11 (Petty); Tr. Day 2 AM, 315:16-316:2 (Connor).

330. Prior to the enactment of HB 2492, Arizona was able to identify prospective registrants on the voter registration system without any birthplace information through AVID's electronic verification procedures. PX 6 at 37 (noting that "[a] match against

AZMVD records or SSA database confirms the registrant's identity").

331. Arizona's automatic de-duplication process to determine whether a new voter record matches an existing record does not use birthplace as one of the matching criteria. Tr. Day 3 AM, 615:15-24 (Morales); DX 935 at 1 (listing first name, last name, date of birth, last four digits of a social security number, and Arizona identification number as duplicate registration match criteria for AVID).

332. Arizona County Recorders do not use birthplace information to determine whether a voter registration applicant has an existing registration record within the county. Tr. Day 1 AM, 102:1-12 (Petty); Lewis Dep. 105:10-106:11, 106:19-107:6; Stevens Dep. 122:19-124:3; PX 116 Rog No. 1, PX 119 Rog No. 1, PX 129 Rog No. 1, PX 139 Rog No. 1, PX 165 Rog No. 1, PX 182 Rog No. 1.

333. While it is "possible" for County Recorders to look at birthplace when querying existing records within the county, no County Recorder actually uses birthplace to identify a voter on their registration database. Tr. Day 1 AM, 102:1-12, 102:21-103:1, 165:24-166:8 (Petty); PX 116 Rog No. 1, PX 119 Rog No. 1, PX 129 Rog No. 1, PX 139 Rog No. 1, PX 165 Rog No. 1, PX 182 Rog No. 1; Webber Dep. 183:6-185:9.

334. Neither the Office of the Arizona Secretary of State nor the County Recorders have any means of verifying a voter registrant's birthplace information. Tr. Day 2 AM, 316:3-6, 326:13-16 (Connor); Tr. Day 1 AM, 103:21-104:5 (Petty); Tr. Day 8 PM, 2054:8-14 (Hiser); *see also* Shreeve Dep. 38:3-9; Lewis Dep. 106:6-11; Lerma Dep. 55:3-6.

335. Some counties may at times use birthplace (amongst other information) as a security question when speaking to a registered voter on the phone to confirm that the voter is who he or she is purporting to be. *See* Tr. Day 8 PM, 2055:18-21 (Hiser); PX 6 at 282; Webber Dep. 186:5-9; PX 116 Rog No. 1, PX 119 Rog No. 1, PX 129 Rog No. 1, PX 165 Rog No. 1 (confirming that birthplace is not used for any purpose); PX 139 Rog. No. 1, PX 182 Rog No. 1 (confirming that birthplace is used only as a security question and only when birthplace information is provided).

336. In these instances, the caller is already a registered voter, and the County

Recorders are therefore not using security questions to determine voter eligibility or verify identity for purposes of voter registration. *See* PX 6 at 219-20 (verifying identity of a voter who wishes to verify the status of their voted provisional ballot); *see also* Webber Dep. 186:5-13.

337. Moreover, Arizona County Recorders have been able to verify callers' identities even when no birthplace was provided—that is, when the optional birthplace field was not filled in. Tr. Day 1 AM, 97:17-23, 168:13-169:9, 170:5-8 (Petty); Tr. Day 8 PM, 2054:20-24 (Hiser); PX 129 Rog No. 1 ("Failure to provide birthplace would not affect our ability to confirm the applicant['s] identity or their eligibility to register to vote in Arizona.").

338. This is because County Recorders have access to other information in any given voter record, such as the last four digits of the registrant's social security number or the registrant's date of birth, that they can and do use as security questions to confirm a caller's identity. Tr. Day 1 AM, 102:1-20, 166:10-167:3 (Petty); Tr. Day 8 PM, 2003:6-8, 2003:20-2004:3 (Hiser); *see also* Webber Dep. 186:5-25; Casner Dep. 42:15-43:8; PX 6 at 220 (allowing officials to use "other information that could confirm the voter's identity if compared with the voter registration information on file" for verifying the identity of voters who are calling regarding their provisional ballots).

339. In fact, some County Recorders consider information other than birthplace to be more effective in distinguishing voters for security purposes. In Pima County, for example, if an election official used birthplace as a security question and the voter answered, "Arizona," that answer would be insufficient for identity verification without a follow-up question because it is "such a common birthplace for Arizona registered voters that it would not distinguish them for security purposes." Tr. Day 8 PM, 2056:18-2058:21 (Hiser).

340. No county election officials have expressed the need or desire to have birthplace become a mandatory field on voter registration forms to carry out their voter registration duties. Tr. Day 2 AM, 314:21-25 (Connor); PX 116 Rog No. 1 ("The Coconino

County Recorder does not currently and does not anticipate using birthplace information to verify or confirm Voter Registration Applicant's identity or eligibility to register and vote in Arizona.").

341. The Elections Procedures Manual lists a handful of additional instances where election officials may use birthplace information. PX 6 at 18-19 (birth certificates), 19 (passport), 47-48 (deceased voters), 61-62 (ballot-by-mail request form). However, election officials have been able to follow the Manual even when the birthplace field was optional. Tr. Day 1 PM, 168:21-169:9, 170:5-8 (Petty).

342. Some of these instances where birthplace is mentioned in the Elections Procedures Manual list birthplace as an *optional* field that County Recorders may examine. PX 6 at 47-48, 61-62; Tr. Day 1 PM, 165:5-23 (Petty) (ballot-by-mail request form); Tr. Day 1 PM, 168:21-169:9 (matching of deceased voters). Similarly, County Recorders may send notices to voter registrants seeking additional information, and those forms may contain an optional field for birthplace information. *Id.* at 167:4-168:12.

343. In the procedures outlined for inspecting birth certificates, birthplace plays no identification role: a registrant simply needs to copy over the birthplace information from the birth certificate being submitted as documentary proof of citizenship only if the registrant has a name that does not match the birth certificate and cannot provide any documentation to show the legal name change. PX 6 at 18-19.

344. The last instance where birthplace is mentioned in the Elections Procedures Manual instructs County Recorders to refer to the pages of the passport that contain the photo, passport number, name, nationality, date of birth, gender, place of birth, and signature. PX 6 at 19. The birthplace information on that page does not establish that voter's eligibility or identity any more than the gender information on the same page of the passport—it just happens to be on the same page as the other identification information. *Id.* Nor is birthplace the determinative factor in whether an election official accepts the submitted passport page as documentary proof of citizenship. Tr. Day 1 PM, 162:17-163:20 (Petty); Tr. Day 2 AM, 328:20-329:2 (Connor).

### C. Birthplace Does Not Help Arizona Election Officials Establish or Verify a Voter's Identity

345. In addition to evidence showing that county officials do not use birthplace for any eligibility or identification purposes, the United States' expert Dr. Eitan Hersh testified to the lack of usefulness of birthplace for identifying voters within the Arizona voter registration database. *See generally* Tr. Day 3 PM, 642-725 (Hersh).

346. Dr. Hersh is a Professor of Political Science at Tufts University. Tr. Day 3 PM, 642:24-643:4 (Hersh). Dr. Hersh has researched U.S. elections, election administration, and the quality of voter registration lists. *Id.* at 643:8-18. He has testified more than ten times in federal and state courts on the topics of voter registration, voter ID laws, mail voting laws, quality of voter registration data, and linking voter registration data to other datasets. *Id.* at 644:22-646:8.

347. No party objected to Dr. Hersh serving as an expert in voter registration databases and the use of voter registration data in election administration. The Court finds that Dr. Hersh is qualified to provide the expert analysis and opinions offered in this matter. Having observed Dr. Hersh's testimony, the Court credits his analyses, opinion, and testimony, and grants them substantial weight.

348. Dr. Hersh analyzed Arizona's voter registration records to assess whether birthplace could be helpful for identifying or distinguishing between voters. Tr. Day 3 PM, 647:2-12, 649:23-650:14, 653:19-654:9 (Hersh).

349. According to Dr. Hersh's analysis of Arizona's voter registration data, birthplace information does not help County Recorders in identifying voters or distinguishing between voters with similar characteristics, such as voters who share the same name and date of birth. *See generally* Tr. Day 3 PM, 647:13-18, 654:10-655:10 (Hersh).

350. Dr. Hersh's reasons are three-fold. First, the birthplace data contained in Arizona's voter registration database is riddled with errors, typos, and ambiguous entries that make the data unusable to understand where a registrant was born. Tr. Day 3 PM,

647:21-648:4, 651:25-653:18 (Hersh).

351. When a registrant includes birthplace information on the State Form, Arizona County Recorders replicate that information exactly as the registrant provided it into the applicable voter registration system, without any consistent method of encoding the information. Tr. Day 1 AM, 99:15-20 (Petty); Hiser Dep. 269:13-271:2.

352. For example, if a registrant writes "CA" as their "state or country of birth," the answer is entered as "CA," without any indication of whether it is referring to the state of California or the country of Canada. Similarly, if a registrant writes "AZ," that response would be recorded exactly as written and without any indication of whether the registrant means the state of Arizona or the country of Azerbaijan. Tr. Day 1 AM, 99:21-100:1 (Petty); Tr. Day 2 AM, 313:21-314:15 (Connor); *see also* Asrarynezami Dep. 102:13-25; Tr. Day 3 PM, 651:25-652:19 (Hersh) (explaining that "there's no way to distinguish state names from country names sometimes" in Arizona's birthplace data).

353. Some Arizona registrants have written the name of a town, city, or county in the "state or country of birth" field, and such responses are recorded exactly as written. Tr. Day 1 AM, 100:2-8 (Petty); Tr. Day 3 PM, 652:20-653:4 (Hersh) (giving examples of city and county names in the birthplace data, such as "San Luis" or "Sonora," which exist in multiple countries).

354. Some Arizona voter registrants have been born on Native American lands that transcend state boundaries. Tr. Day 3 PM, 653:12-653:18 (Hersh).

355. Hundreds of Arizona voter registrants have put as their birthplace countries that do not exist anymore, such as the U.S.S.R., Yugoslavia, Czechoslovakia, Rhodesia, and Zaire. These entries present ambiguity because a registrant could have two different ways of representing their birthplace: for example, a voter registrant could put "USSR" or "Lithuania" if they were born in what is now Lithuania. Tr. Day 3 PM, 653:5-11 (Hersh).

356. Moreover, Arizona's voter registration database is riddled with typos and inscrutable data entries for birthplace, such as "GW." Tr. Day 3 PM, 647:21-648:4, 664:9-16, 665:1-7 (Hersh).

357. The State Form provides no instruction or guidance to voter registrants on how to input birthplace information in a standardized way. Tr. Day 1 AM, 100:9-15 (Petty); PX 27 (State Form).

358. Because the Arizona voter registration database's birthplace data are not uniformly kept, birthplace cannot be reliably used to identify an Arizona voter or differentiate between two Arizona voters who share similar characteristics, such as name, date or birth, or identification numbers. Tr. Day 3 PM, 667:18-668:1 (Hersh).

359. Second, even if Arizona's birthplace data were perfectly collected, it would not help County Recorders identify or distinguish between voters within the voter registration database. Nearly all voter registration records—all but 2,734 records, or over 99.94% of Arizona's registration records—are uniquely identified simply by the registrant's name and birthdate alone. Tr. Day 3 PM, 654:17-21, 658:20-659:4 (Hersh); PX 595 at 3.

360. Moreover, Arizona's voter registration database contains an ID number for almost all active and inactive registered voters: about 99.6% of those registrants have either their Arizona state identification number or the last four digits of their social security number in the registration record. Tr. Day 3 PM, 651:6-9 (Hersh). Arizona state ID numbers contained in the voter registration database are unique for almost all registrants except for about 1,400 records out of 4.7 million registrants. *Id.* at 670:9-14.

361. In cases where ID numbers distinguish between two records with the same name and birthdate, birthplace data are superfluous. The fact that two registrants named Michael Smith with the same birthdate happen to be born in Arizona is not surprising, given that numerous people who are registered to vote in Arizona were born in Arizona; it is the ID number that indicates these are two different people. Tr. Day 3 PM, 660:20-661:2 (Hersh). According to the Arizona Department of Health Services, 76,781 persons were born in Arizona in 2020. ECF No. 672 (Plaintiffs' Revised Request for Judicial Notice), ¶ 45. According to the Centers for Disease Control and Prevention, 3,664,292 persons were born in the United States in 2021. *Id.* ¶ 44.

362. On the other hand, the fact that two people named Michael Smith with the same birthdate were born in two different places is not useful or necessary to determine whether they are two different people if their distinct ID numbers are known. Tr. Day 3 PM, 661:3-8 (Hersh).

363. In combination with a registrant's name and birthdate, Arizona state ID numbers and the last four digits of a social security number can differentiate all but 720 voter records within Arizona's voter registration database, out of 4.7 million records. Tr. Day 3 PM, 659:13-662:6 (Hersh); PX 595 at 5-6.

364. In other words, it is exceedingly rare that birthplace information could even be theoretically helpful in distinguishing a voter from another one with similar characteristics, even if Arizona's birthplace data were perfectly collected. Among those 720 records that share the same name, birthdate, and ID numbers, birthplace is superfluous for 660 records that have compatible birthplaces listed: two records sharing the same name, birthdate, and ID numbers would lead a reasonable election official to conclude that they belonged to one registrant, even without any birthplace information. Tr. Day 3 PM, 662:7-663:8, 702:5-15 (Hersh).

365. According to Dr. Hersh's analysis, 24 records (12 pairs) out of 4.7 million records in the Arizona voter registration database fall into a scenario whereby birthplace information could potentially provide some information if the data were perfectly collected: where two records have the same name, birthdate, and ID numbers but list conflicting birthplaces. Tr. Day 3 PM, 663:13-25 (Hersh). This is, according to Dr. Hersh, "an infinitesimally small fraction of the voter file" that might benefit from birthplace information if the data were perfectly collected. *Id.* at 668:14-17. However, because Arizona's birthplace data are riddled with errors or undecipherable in some cases (for example, "GW" as a birthplace), Dr. Hersh concluded that the conflicting birthplaces listed in those 24 instances likely represent "erroneous piece[s] of data" or "weird scenarios" that emerge, such as a person who was born in a hospital in Nevada but was raised in Arizona. In his opinion, collecting birthplace information in these cases led to data anomalies rather

than resolving the question of whether two records belonged to one registrant. *Id.* at 664:9-665:12, 719:21-720:22.

366. Dr. Hersh found zero cases out of 4.7 million records in the Arizona voter registration database where birthplace information could help distinguish between two records that are missing ID numbers. PX 595 at 10; Tr. Day 3 PM, 666:21-667:8 (Hersh).

367. Lastly, Dr. Hersh explained that birthplace is not helpful for identifying voters because birthplace is a weak differentiator. Most people who are registered to vote in Arizona were born in the United States, and millions of those voters were born in Arizona. Tr. Day 3 PM, 648:13-20 (Hersh). According to Arizona's voter registration data, almost 200,000 voter records state that the registrant's "state or country of birth" was "U.S." *Id.* at 703:1-5; Hansen Dep. 121:21-122:8 (noting that some registrants just write "USA" in birthplace field). As a result, the fact that two records share the same state or country of birth does not help county officials confirm whether the two records belong to the same registrant or two different registrants. Tr. Day 3 PM, 657:3-658:6 (Hersh).

368. To illustrate, Dr. Hersh analyzed Arizona's birthplace data for the top four most common first name-last name combinations in the Arizona voter registration database: Michael Smith, Maria Garcia, Maria Lopez, and Robert Smith. Tr. Day 3 PM, 655:18-656:5 (Hersh). Almost everyone named Michael Smith and Robert Smith in the Arizona voter registration database who provided their birthplace was born in the United States, and twenty to thirty percent of those were born in Arizona. *See* PX 595 at 2. Half of voter registrants named Maria Garcia and Maria Lopez who provided their birthplace were born in Mexico, and most of the other half were born in Arizona, meaning that birthplace does not differentiate between two Maria Garcia's fifty percent of the time. *Id.*; Tr. Day 3 PM, 657:3-658:6 (Hersh). The same principle applies to situations whereby someone has duplicate records because of a changed last name or a nickname: birthplace again is not a useful differentiator between multiple records with the same first name, or the same last name. *Id.* at 671:7-20. These examples illustrate that when election officials most need other pieces of information to determine if two records belong to the same

registrant or two different registrants, birthplace is not very helpful. *Id.* at 657:5-658:6.

369. Birthplace's lack of utility as an identifier is in stark contrast to the last four digits of a social security number, which differentiates two people 9,999 times out of 10,000 times, and the Arizona identification number, which is generally unique (all but 1,400 instances among 4.7 million registration records). Tr. Day 3 PM, 670:9-14, 658:1-6 (Hersh). And nearly all—99.6%—of voter records in Arizona have one of these two numbers. *Id.* at 651:6-9.

370. Dr. Hersh's conclusion on the usefulness of birthplace as a way to identify voters also shows why birthplace is not helpful as a security question for confirming a voter's identity on the phone: birthplace is not a good differentiator between voters or a meaningful security question, as most registered voters in Arizona were born in the same country and same state. Tr. Day 3 PM, 671:21-673:2 (Hersh).

371. County practices on security questions confirm Dr. Hersh's conclusion based on the statewide voter registration data. For example, in Pima County, which has 630,000 active registered voters, county officials would ask a follow-up question if "Arizona" was the birthplace answer when attempting to confirm a caller's identity, because so many registered Arizona voters were born in Arizona. Tr. Day 8 PM, 2045:8-11, 2056:18-2058:21 (Hiser); PX 438.

372. The Office of the Arizona Secretary of State currently has not provided any guidance on updating or supplementing the existing birthplace data in the voter registration database for voters who did not include birthplace when they initially registered. PX 11 (Draft 2023 EPM); Tr. Day 2 AM, 357:11-17, 358:24-359:1, 326:1-16 (Connor) (noting that it would be very hard to collect that information for already registered voters).

373. The Office of the Arizona Secretary of State has not promulgated any standardized system for entering birthplace information into the voter registration database. Tr. Day 2 AM, 323:7-22 (Connor).

374. The Office of the Arizona Secretary of State has not provided any guidance to Arizona County Recorders on how to implement HB 2492's birthplace requirement,

other than to note that birthplace is no longer an optional field. Tr. Day 1 AM, 74:19-23 (Petty); Tr. Day 2 AM, 322:13-323:22 (Connor).

375. However, even if Arizona were to fill in standardized birthplace information for already registered voters and require standardized entries for future registrants, birthplace would still not be helpful for identifying voters. According to Dr. Hersh's analysis, even with perfectly collected data, birthplace would be useful in almost no circumstance because almost all voter records already have name, birthdate, and ID numbers, and because birthplace is not helpful for differentiating between individuals, especially compared to birthdate and ID numbers. Tr. Day 3 PM, 673:4-674:1, 678:1-7 (Hersh).

## IX. Implementation of Documentary Proof of Citizenship Requirements and Citizenship Investigation Procedures

376. The County Recorders intend to implement the Challenged Laws upon receiving guidance from the Secretary of State and/or this Court. Tr. Day 1 PM, 160:3-15 (Petty); PX 111, PX 118, PX 121, PX 123, PX 127, PX 136, PX 146, PX 151, PX 156, PX 174, PX 175. Likewise, Colleen Connor testified that, upon a ruling from this Court about which provisions pass muster under federal law, the Secretary's office intends to take the necessary steps to implement any Challenged Provisions not enjoined by this Court. Tr. Day 2 AM, 371:23-372:2 (Connor).

377. While the testimony from the Secretary of State's office and most County Recorders was that the Challenged Laws have not yet been implemented because they are awaiting this Court's rulings, that testimony is not uniform across all counties. Documents and testimony establish that Cochise County has been implementing at least some of the challenged HB 2492 and/or HB 2243 provisions since their enactment. In deposition testimony, the Cochise County Recorder indicated that Cochise County has a potential policy or practice of rejecting or holding in suspended status the registration of voter applications it receivers that are not accompanied by documentary proof of citizenship and/or documentary proof of residence under the requirements of HB 2492 and HB 2243.

(*e.g.*, Stevens Dep. 24:16-31:19, 80:5-86:21, 88:24-91:20, 125:21-128:2). Documents obtained from subsequent requests reflect Cochise County's specific dispositions on voter registration applications. PX 506, PX 507, PX 508, PX 509, PX 510, PX 511. The documents indicate that Cochise County has rejected or held in suspended status both state and federal form applications that do not provide DPOC and/or DPOR. For example, in the "Suspense Invalid Addresses and No Proof of Citizenship" file and the "Suspense No Proof of Citizenship" file that Cochise County produced, there appear to be twelve rejected or suspended state form applications, three rejected or suspended federal form applications, and three state form applicants improperly put on the federal-only list because of HB 2492. PX 509, PX 510.

378. Plaintiffs introduced extensive evidence concerning existing proof of citizenship requirements and how they have been administered, as well as the challenged procedures for investigating citizenship. The record contains testimony from several representatives of the offices of the Secretary of State and Attorney General, as well as all fifteen of Arizona's County Recorders.

379. Plaintiffs also introduced extensive expert evidence concerning these topics from political scientist Dr. Michael P. McDonald. The Court finds that Dr. McDonald is qualified to provide the expert analysis and opinions offered in this matter. Having observed Dr. McDonald's testimony, the Court credits his analyses, opinion, and testimony, and grants them substantial weight.

a. Dr. McDonald holds a doctorate in political science and is a Professor of Political Science at the University of Florida, a position he has held for approximately ten years. He teaches courses in elections, including election law and election data science. Dr. McDonald's expertise includes elections, voting, election administration, methodology, public opinion. He has published articles on the accuracy and reliability of voter registration information, including a publication relating to matching voter registration data and has served as a peer reviewer in

top journals in the field of political science upwards of 50 times. Tr. Day 5 AM, 1059:25-1060:22, 1062:20-1063:6 (McDonald).

b. Dr. McDonald has consulted with election officials across the country on improving the accuracy of voter registration database information. He has published on the use of Census data, served on a liaison group appointed by the National Academy of Sciences to the Census Bureau, and published a book regarding the use of quantitative methodologies. Tr. Day 5 AM, 1060:25-1062:19 (McDonald).

c. Dr. McDonald has provided expert testimony approximately 15 times and was found qualified to do so each time. Tr. Day 5 AM, 1063:14-1064:15.

### A. Lack of Statewide Guidance on Citizenship Verification and the Challenged Provisions

380. HB 2492 and HB 2243 fail to define what constitutes "information that the applicant is not a United States citizen" under A.R.S. § 16-121.01I, a "reason to believe" a registered voter is not a citizen under A.R.S. § 16-165(I), or a "database relating to voter registration" under A.R.S. § 16-121.01(D.5). PX 11.

381. Neither HB 2492 nor HB 2243 enumerates what specific "information" establishes that a voter registration applicant or a registered voter is not a U.S. citizen. ECF No. 189 ¶ 46; *see also id.* ¶ 122.

382. HB 2492 and HB 2243 do not articulate how to "confirm" a lack of U.S. citizenship, and HB 2243 does not articulate what would constitute a "reason to believe" an individual is not a U.S. citizen. ECF No. 189 ¶ 126.

383. HB 2243 does not specify what type, set, or combination of "information" establishes that a registered voter "is not a United States citizen" or what information is sufficient to match an individual in a database with the registered voter or applicant. Some United States citizens may be erroneously flagged as non-citizens based on potentially outdated and inaccurate data. ECF No. 189 ¶¶ 9, 44; *see also id.* ¶ 126.

384. The Secretary of State has admitted that HB 2243 "does not include any indicia or criteria that would provide a predicate for the County Recorder's 'reason to believe' a person is not a United States citizen." ECF No. 189 ¶¶ 41, 114.

385. The Secretary of State's representative has asserted that what constitutes a "reason to believe" a registered voter is not a U.S. citizen is a determination to be made by individual County Recorders. Tr. Day 2 AM, 372:11-15 (Connor); Connor Dep. 249:3-9.

386. The term "reason to believe" is not a phrase the Attorney General's lead elections investigator has come across in his quarter century of experience as a criminal investigator; nor is it a term law enforcement officers typically operate under like "probable cause" and "reasonable doubt." Tr. Day 9 AM, 2135:11-2136:9 (Knuth).

387. The Attorney General's Office has not done any training with County Recorders on what "reason to believe" means in the context of HB 2243. Tr. Day 9 AM, 2137:15-18 (Knuth).

388. The proposed 2023 Election Procedures Manual, dated September 29, 2023, contains no interpretation or guidance for enforcing the following provisions in HB 2492 and HB 2243: A.R.S. §§ 16-121.01(D), 16-121.01(E), and 16-121.01(F) (HB 2492 § 4); A.R.S. § 16-143 (HB 2492.§ 7); A.R.S. § 16-165(A)(10) (HB 2492 § 8 and further revised by HB 2243 § 2); and A.R.S. §§ 16-165(G), 16-165(H), 16-165(I), 16-165(J), and 16-165(K) (HB 2243 § 2). PX 11.

389. The proposed 2023 Elections Procedures Manual does not include any express definition, guidance, or information regarding what constitutes "information that the applicant is not a United States citizen" under A.R.S. § 16-121.01(E), a "reason to believe" a registered voter is not a citizen under A.R.S. § 16-165(I), or a "database relating to voter registration" under A.R.S. § 16-121.01(D)(5). PX 11.

390. The proposed 2023 Elections Procedures Manual does not include any definition, guidance, or information regarding what constitutes "information . . . that the person registered is not a United States citizen," pursuant to A.R.S. § 16-165(A)(10). PX 11.

**B. McDonald Findings on Consistency of Implementation**

391. Dr. McDonald opined that Arizona counties follow "non-uniform documentary proof of citizenship or DPOC requirements or implementation" and that "County Recorders are unevenly implementing current DPOC procedures within the State of Arizona." Tr. Day 5 AM, 1069:7-9, 1105:13-16, 1116:10-15 (McDonald). In support of this analysis, Dr. McDonald presented several analyses of cancellation and suspension of voters, as well as federal-only voters. *Id.* 1105:17-1117:15.

392. Data on cancellation for invalid citizenship among Arizona Counties reflects anomalies and non-uniform implementation of current DPOC procedures. Tr. Day 5 AM, 1107:12-22 (McDonald); PX 334.

a. Pima, the second largest county in Arizona in active registered voters (with 632,390), showed 0 cancellations for invalid citizenship proof. Tr. Day 5 AM, 1107: 15-18 (McDonald); PX 334.

b. Maricopa County, with 2,472,392 active registered voters, had 232 cancellations for invalid citizenship proof. Tr. Day 5 AM, 1107:19 (McDonald); PX 334.

c. Pinal County, with 258,265 active registered voters, had 825 cancellations for invalid citizenship proof. Tr. Day 5 AM, 1107:19 (McDonald); PX 334.

d. Navajo County, which has 69,427 active registered voters, had 152 cancellations for invalid citizenship proof, while Coconino County, with 89,541 active registered voters, had 0 cancellations for invalid citizenship proof. PX 334.

e. These disparities in cancellations by county cannot be explained by the distribution of non-citizens because non-citizens tend to be located in more populous counties, which does not explain the observed disparities. Tr. Day 5 AM, 1109:7-24 (McDonald).

393. Data on voters suspended for invalid citizenship among Arizona counties

reflects anomalies and non-uniform implementation of DPOC procedures. Tr. Day 5 AM, 1113:17-25 (McDonald); PX 335:

a. Pima County had 632,390 active registered voters and 0 voters suspended for invalid citizenship proof. Tr. Day 5 AM, 1111:17-23 (McDonald); PX 335.

b. Maricopa County had 2,472,392 active registered voters (PX 335) and fifteen voters suspended for invalid citizenship proof. Tr. Day 5 AM, 1111:22-1112:17 (McDonald).

c. Cochise County with 76,741 active registered voters had 1,261 voters suspended for invalid citizenship proof. PX 335.

d. Navajo County had 69,427 active registered voters and 1,296 voters suspended for invalid citizenship proof. PX 335.

e. Yavapai County had 166,361 active registered voters and 1,344 voters suspended for invalid citizenship proof. PX 335.

394. Maricopa County's data on suspensions for invalid citizenship proof is not consistent with data for Counties with significantly smaller numbers of active registered voters who each had more than 1,000 voters suspended for invalid citizenship proof. Tr. Day 5 AM, 1112:12-17 (McDonald); PX 335.

395. Data on federal-only voters among Arizona counties reflects non-uniform implementation of DPOC procedures. Tr. Day 5 AM, 1115:3-17 (McDonald); PX 336.

a. There are a total of 19,439 federal-only voters among active registered voters. PX 336.

b. Cochise County, with 76,741 active registered voters, has 188 federal-only voters. Tr. Day 5 AM, 1115:8-13 (McDonald); PX 336.

c. Coconino County, with 89,541 active registered voters, has 636 federal-only voters. Tr. Day 5 AM, 1115:8-13 (McDonald); PX 336.

d. Yavapai County, with 166,361 active registered voters, has 203 federal-only voters. PX 336.

396. While the intervenors (RNC and legislative leaders) offered Dr. Jesse Richman to rebut Dr. McDonald's analysis concerning the inconsistent implementation of existing DPOC requirements, Dr. Richman's criticism (on direct) focused on the point that Dr. McDonald's consideration of data of cancelled and suspended voters was underinclusive, undercounting the numbers underlying Dr. McDonald's conclusions. But on cross-examination, Dr. Richman acknowledged that he was able to replicate Dr. McDonald's analysis and had "no issues" with Dr. McDonald's numbers. Tr. Day 8 AM, 1955:1-3, 1956:23-24 (Richman). In light of this concession, Dr. Richman's opinion concerning Dr. McDonald's analysis is entitled to no weight.

397. Beyond Dr. McDonald's findings, Arizona election officials have also historically failed to establish uniform policies to handle third-party allegations that certain voters are ineligible. These are some examples from the trial testimony:

a. The Pima County Recorder's office has historically received "information" from private groups and individuals "who considered themselves citizen election integrity investigators" alleging that certain registered voters had "moved out of the jurisdiction." When such allegations were made, the County Recorder's staff would discuss what to do with their counsel and whether they should "do additional research to verify that information based off [their] resources and if [they] had the time." Tr. Day 8 PM, 2033:4-2034:6 (Hiser).

b. These third-party allegations were handled on a case-by-case basis with counsel, and the Pima County Recorder's office did not issue any written, standardized guidance or policy for all staff on how to deal with reports containing allegations of voter ineligibility. Tr. Day 8 PM, 2034:20-2035:1 (Hiser).

c. In some cases, the Pima County Recorder's office would already have an updated registration for the voter in question; in others, the allegation was "questionable, at best." Trial Tr. Day 8 2034:7-15 (Hiser). These

reports from third-party groups became more frequent toward the end of 2021 and the beginning of 2022, and one particular group's mission is to identify voters that "should not be on the voter rolls in states." *Id.* 2034:16-19 (Hiser). In one case, the Pima County Recorder's office received a list of approximately 4,000 registered voters that a private group or citizen alleged were ineligible to vote. *Id.* 2045:5-11 (Hiser).

d. The Apache County Recorder's office has not issued any written, standardized guidance or policy for all staff on how to handle reports containing allegations of voter ineligibility and would deal with such situations on a case-by-case basis in consultation with the County Attorney. Tr. Day 8 PM, 2076:5-16 (Shreeve).

**C. The Challenged Laws' Citizenship Investigation Procedures**

398. As discussed *supra* in Section VI, HB 2492 requires County Recorders to compare Federal Form registrants to the ADOT, SSA, SAVE, and NAPHSIS databases. See A.R.S. § 16-121.01. Stipulated Fact (ECF 571-1) No. 47. HB 2243 requires (i) County Recorders to cancel registrations upon receipt of information "that a person registered is not a United States citizen" and confirmation of the same, and to monthly check the SAVE system any registered voter whom the Recorder has "reason to believe" is not a United States citizen, and (ii) the Secretary of State to monthly compare the voter roll against the ADOT database. Together, these procedures are referred to as the "Citizenship Investigation Procedures."

399. The author of HB 2243, and its predecessor legislation, HB 2617, (*see supra,* ¶¶ 142-44) and Petersen both understood that there is room for "interpretation" by County Recorders to ensure database checks that work best for them, and in fact that was the "intent". Petersen Dep. 262:7-12, 262:14-16.

400. While the Challenged Laws' Citizenship Investigation Procedures have not been implemented yet, the Arizona Secretary of State, as Arizona's chief election official, has provided some indication as to how these provisions will be interpreted and

implemented. These indications confirm that voters will be subjected to investigation and potential cancellation of their registration and prosecution based on subjective, ill-defined, non-uniform and discretionary standards; as discussed *supra* at Section IV, these burdens will fall disproportionately on naturalized citizens and members of the Latino, AAPI, and Native American communities. In particular, in conjunction with this litigation, the Secretary of State has admitted:

a. "HB 2492 requires county recorders to subject applicants and registered voters to investigation and potential cancellation of voter registrations based on 'information' that the applicant or registered voter 'is not a United States citizen.'" ECF No. 189 ¶ 7.

b. "HB 2492 and HB 2243 authorize the county recorders to reject registration forms, cancel existing registered voters' records, and subject those individuals to investigation and prosecution based on certain citizenship information derived from potentially outdated and unreliable sources." ECF No. 189 ¶ 5.

c. "HB 2492 and HB 2243 require county recorders to use 'all available resources' to verify U.S. citizenship status when an applicant does not include DPOC, and that some United States citizens may be erroneously identified as non-citizens based on potentially outdated and inaccurate information." ECF No. 189 ¶ 91.

d. "HB 2492 and HB 2243 require the county recorders to reject registration forms and cancel voter registrations based on 'information' that the applicant or registered voter 'is not a United States citizen.'" ECF No. 189 ¶ 5.

e. "HB 2492 requires the Secretary and county recorders to provide a list of individuals who have not submitted proof of citizenship required under Arizona law; that HB 2492 provides that the Attorney General must investigate the citizenship status of and potentially prosecute

individuals on those lists." ECF No. 189 ¶ 5.

f. "[T]he Secretary of State and Arizona's fifteen county recorders are required to provide to the Attorney General a list and the applications of all registered congressional-only voters who have not satisfied the DPOC requirement. A.R.S. § 16-143(A), as enacted by 2022 Ariz. Sess. Laws, ch. 99, § 7." ECF Nos. 169 & 189 ¶ 37. In response to an interrogatory, the Attorney General similarly acknowledged that the Challenged Laws provide "The Secretary of State and County Recorders are directed to make available to the Attorney General a list of individuals registered to vote who have not provided satisfactory evidence of citizenship, as well as their registration applications. Then the Attorney General is directed to attempt to verify citizenship status, including consulting certain databases, and to prosecute individuals found to be non-citizens. *See* A.R.S. § 16-143." PX 105 Rog No. 2.

g. "The Attorney General is . . . required to search any federal, state, or local government database and any other voter registration database, i.e., the same citizenship investigation procedures that county recorders are required to use when a federal registration form is submitted without DPOC. A.R.S. § 16-143(B), as enacted by 2022 Ariz. Sess. Laws, ch. 99, § 7." ECF Nos. 169 &189 ¶ 37.

h. The Attorney General is required "to prosecute individuals who are found to not be United States citizens" for registration fraud under A.R.S. § 16-182. ECF Nos. 189 ¶ 37.

i. "[U]nder HB 2243, if a county recorder 'obtains information pursuant to this section and confirms that the person registered is not a United States citizen,' and if after receiving a notice the voter does not provide proof of citizenship within 35 days, the recorder must cancel the registration." ECF Nos. 169 & 189 ¶ 39.

j. Under HB 2243, "if a county recorder obtains information and confirms that a registered voter is not a United States citizen, which may be based on potentially unreliable and outdated sources, and if, after receiving a notice, the voter does not provide proof of citizenship within 35 days, the recorder must cancel the registration and notify the county attorney and Attorney General for possible investigation." ECF No. 388 ¶ 50; *see also* ECF Nos. 169 & 189 ¶ 126.

k. A.R.S. § 16-165(I) "requires a different 'standard, practice, or procedure' for determining a voter's qualifications for voters who a county recorder 'has reason to believe are not United States citizens' than for voters who a county recorder does not have reason to believe are not United States citizens." ECF No. 189 ¶ 102.

l. Under HB 2243, those who "are not suspected of lacking U.S. citizenship [and] will not be subjected to the investigation and potential cancellations [sic] provisions set forth in HB 2243." ECF No. 189 ¶¶ 102-03.

401. Though the Attorney General's Office has not received referrals from County Recorder's Offices for possible investigation under the challenged laws, the Office evaluates referrals on a case-by-case basis. Tr. Day 9 AM, 2124:4-16 (Knuth).

402. If the Office received a referral, it would assess the referral, decide whether a further, more complete investigation is warranted, and then potentially conduct an investigation. Tr. Day 9 AM, 2134:18-2135:5 (Knuth).

403. The Office investigated the referral by the Yuma County Recorder's Office of possible false voter registration forms and decided against pursuing prosecution. Tr. Day 9 AM, 2124:17-2126:3 (Knuth).

404. The Attorney General's Office would investigate and potentially prosecute a violation the challenged laws if it receives a referral. Tr. Day 9 AM, 2127:16-23 (Knuth).

### D. Overall Challenges of Database-Matching Under the Challenged Laws

405. HB 2243 "requires the Secretary and county recorders to engage in a number of database checks, in most cases monthly and to the extent practicable, to confirm registered voters' residence and/or citizenship status . . . ." No. 2:22-cv-01381-SRB, ECF No. 63 ¶ 85. That statutory mandate is not practicable for a number of reasons discussed in detail in Sections VII.B-F. Two of the primary reasons are lack of accuracy of the database and election official's lack of access to the database.

#### 1. The Databases at Issue Lack Sufficient Accuracy on Citizenship Status

406. Dr. McDonald opined that the databases required to be utilized in the Challenged Provisions are subject to "multiple failure points" including failures "for matching and the timeliness of the information found" and that these issues "disproportionately . . . impact naturalized citizens" and the databases are "unreliable for the purpose of determining citizenship verification." Tr. Day 5 AM, 1069:2-7, 1102:23-1103:1 (McDonald).

407. Dr. McDonald further opined that all large databases are subject to errors created by data entry and other human error. Tr. Day 5 AM, 1077:15-1078:11 (McDonald). Defense expert Dr. Jesse Richman agreed "all database have limitations." Tr. Day 8 AM, 1939:1-5 (Richman).

408. Dr. McDonald also opined that the databases at issue in the Challenged Provisions are unreliable for the purposes of determining citizenship verification. Tr. Day 5 AM, 1102:20-1103:1 (McDonald).

409. The Secretary of State admits that "certain of the databases listed in HB 2492 and HB 2243 may include potentially outdated and unreliable information." ECF No. 189 ¶ 51; PX 170.

410. Large databases such as the ones relied on in the Challenged Laws are prone to data entry errors. Tr. Day 5 AM, 1077:15-1078:11, 1078:24-1079:7 (McDonald).

411. Databases can fail to match names due to inexact matching of names,

differences in spelling of names, inconsistent use of hyphens in a last name, inconsistent use of a changed name or middle name. Tr. Day 5 AM, 1085:9-1087:22. (McDonald). Databases can fail to match names due to transcription errors. *Id.* 1087:23-1088:5.

412. In the absence of a unique identifier in a database, the database will yield multiple results for any individual query. Tr. Day 5 AM, 1080:19-1081:8 (related to ADOT database); 1092:16-1093:5 (related to the SSA database); 1094:24-1095:8, 1096:8-17 (with respect to the SAVE system) (McDonald).

413. The Secretary of State admits that the office "is not aware of any database that has current, up-to-date citizenship status information for all residen[ts] of the United States or Arizona and that existing databases that she is aware of may contain outdated or inaccurate citizenship status information." ECF No. 189 ¶ 127.

414. The Secretary of State admits that HB 2243 "requires that county recorders, to the extent practicable, check the SAVE System each month 'to verify the citizenship status' of any 'persons who are registered to vote in that county and who the county recorder has reason to believe are not United States citizens.'" ECF No. 189 ¶¶ 111, 112; *see also id*. 189 ¶¶ 94, 128. The Secretary of State admits that "SAVE is not a universal or exhaustive list of U.S. citizens and may contain outdated or inaccurate data on citizenship status." *Id.* ¶¶ 52, 93, 111.

415. Some County Recorders admit that they have encountered inaccurate or outdated information when searching AVID. PX Nos. 129, 157.

416. Currently, HAVA matches only occur at the point of registration, and not on an ongoing basis. HAVA checks only recur if the voter provides either a new registration form or the letter with the driver's license number on it for the recorders' office to check. There is no constant, ongoing check. Tr. Day 1 AM, 53:4-16 (Petty).

417. Under HB 2243, voters whose records are out of date in ADOT will be caught in a "loop" in which they have to repeatedly show DPOC until they go in person to MVD to update their citizenship status. This loop is created because HB 2243 applies to current registrants, including full-ballot voters who have provided DPOC but still have outdated

citizenship status in ADOT records. Such voters will continue to be identified on a monthly basis when the required comparison is made until they update their MVD status Tr. Day 5 AM, 1071:24-1072: 7; 1075:17-1076:8 (McDonald).

418. While the intervenors (RNC and legislative leaders) offered Dr. Jesse Richman to rebut Dr. McDonald's analysis of the database limitations, Dr. Richman acknowledged (i) there were significant limitations in using each of the databases to check citizenship status, and (ii) that current restrictions prevent election officials from using the databases in the manner called for in the statutes. Tr. Day 8 AM, 1939:1-1952:20 (Richman).

**2. Arizona Election Officials Do Not Have Access to the Databases**

419. As detailed above, *supra* Section VII, Arizona election officials do not have access to many of the databases required to be used in the Challenged Provisions.

420. The Attorney General does not have access to citizenship databases or other investigative tools to make authoritative determinations of citizenship and cannot use them in the ways required by the Challenged Laws. Lawson Dep. 201:10-17, 204:3-9; Thomas Dep. 306:2-6.

**E. Implementation of Citizenship Investigation Provisions**

**1. ADOT Data Transfer to the Secretary of State to Comply with HB 2243**

421. To comply with HB 2243, ADOT currently provides the Secretary of State with a customer extract containing records of all ADOT credential holders—currently approximately 7.3 million records—along with their documented authorized presence or citizenship status as documented to ADOT and their current and prior addresses on a monthly basis to the Secretary of State. Stipulated Fact (ECF No. 571-1) Nos. 101, 105, 107, 108, 112; Jorgensen Dep. 131:15-132:13, 19-21, 134:8-11; Tr. Day 3 AM, 566:24-568:3, 570:11-21-573:7-19 (Jorgensen); PX 234 at 1-2. ADOT has sent this customer extract to the Secretary of State with the same specifications every month since December 2022. Jorgensen Dep. 143:2-4. Stipulated Fact (ECF No. 571-1) No. 112.

422. The customer extract includes a "Noncitizen" field that will be marked "Y" if ADOT records indicate that the customer has a foreign-type license; otherwise, it will be blank. Jorgensen Dep. 111:4-17, 133:23-25, 138:6-15, Stipulated Fact (ECF No. 571-1) No. 106; Jorgensen Dep. 138:6-15; PX 234 at 1. The value in the "NonCitizen" field reflects which authorized presence category the customer is assigned by MVD. Tr. Day 3 AM, 571:2-16; PX 234 at 1. If there is a "Y" in the "NonCitizen" field in the customer extract, the "Y" only reflects the point in time in which ADOT last issued a credential to a customer, including the type of authorized presence proof the customer provided at the time of their credential issuance and what authorized presence category ADOT placed such customer at the time of issuance. Tr. Day 3 AM, 571:21-572:6 (Jorgensen), PX 234 at 1. Beyond the "NonCitizen" field, ADOT does not provide any documents or data about the authorized presence or citizenship status documents that were presented by the customer. Jorgensen Dep. 139:16-20. Stipulated Fact (ECF No. 571-1) No. 111.

423. Under the following situations, the customer extract would contain a "Y" in the NonCitizen field and would therefore reflect out of date information regarding citizenship for the same reason as the current "HAVA check" picks up outdated information:

a. Recently naturalized citizen with unexpired foreign type credential, and who had not voluntarily presented naturalization to ADOT. Tr. Day 3 AM, 572:11-15 (Jorgensen); PX 234 at 1.

b. Naturalized citizen customer with a foreign status is in the process of getting a new credential and is awaiting SAVE verification Jorgensen Dep. 137:20-138:5; PX 234 at 1.

c. Naturalized citizen customer with credential that expired due to expiration of their respective foreign authorized documentation, and has presented reflecting naturalization but is awaiting SAVE verification, Jorgensen Dep. 138:6-15; PX 234 at 1.

424. The Secretary of State's first download of the customer extracts was done in

December of 2022. Tr. Day 3 AM, 573:7-19 (Jorgensen); Jorgensen Dep. 132:14-16, 19-21.

425. ADOT has not provided the Secretary of State's office with any specific safeguards to prevent data mismatches regarding the identity of customers in the customer extract. Tr. Day 3 AM, 576:16-21 (Jorgensen); Jorgensen Dep. 147:21-148:7.

426. Beyond providing information, ADOT does not participate in any of the comparisons that the Secretary of State would be required to conduct under 16-165(F) of HB 2243, and has not provided any matching criteria to the Secretary of State for conducting database comparisons under HB 2243; nor has the Secretary of State developed criteria or logic for use of the extract. Jorgensen Dep. 149:6-18, 150:20-24; Tr. Day 3 AM, 574:4-7 (Jorgensen); Smith Dep. 105:20-106:11, 15-17, 19-24, 115:15-116:1.

427. To date, ADOT has not changed the API interface or the HAVA check. Jorgensen Dep. 89:10-13.

### 2. County Recorders' Non-Uniform Understanding of Citizenship Investigation Provisions

#### i. Dr. McDonald's Opinions Regarding Differential Interpretation and Implementation

428. Dr. McDonald opined that Arizona counties "are interpreting current policies differently and implementing current policies differently"; that "[t]he new laws will create more opportunities for discretion . . . among local County Recorders, and so likely they're just going to continue doing what they're doing now"; and "this discretion that will be afforded by these new laws will exacerbate the existing trends that we see right now in non-uniform implementation of DPOC requirements." Tr. Day 5 AM, 1069:10-13, 1116:24-1117:6.

429. For example, Dr. McDonald noted that the Santa Cruz County Recorder's office asserts that if presented with lists of citizens alleged to be non-citizens by a third party, it would need to consult their legal counsel. Tr. Day 5 AM, 1120:10-1121:5 (McDonald). Conversely, Cochise County asserts that if presented with lists of citizens

alleged to be non-citizens by a third party, it would not consider that information to be reason to believe these individuals were non-citizens. *Id.* And La Paz County, if presented with lists of citizens alleged to be non-citizens by a third party, asserts that it would need to further research the information, but would not change a registration based solely on that information. *Id.*

430. Similarly, Dr. McDonald noted the Santa Cruz County stated that information from a neighbor, an anonymous call or by mail would be information they would need to act upon in determining whether the information constituted a reason to believe an individual was not a citizen. Tr. Day 5 AM, 1119:18-1120:2 (McDonald). He further noted that Maricopa County indicated it would need guidance on whether information from a neighbor, an anonymous call, or by mail constituted a reason to believe an individual was not a citizen. *Id.* And Cochise County indicated that information from a neighbor, an anonymous call or by mail would not constitute reason to believe an individual was not a citizen. *Id.*

431. Dr. McDonald also noted that County Recorders provided different positions on whether a person erroneously identified as a non-citizen due to incorrect information in the ADOT database could be added back to the rolls after the registration deadline had passed. Tr. Day 5 AM, 1121:10-25. (McDonald). He noted that Cochise County asserted that a voter "could not be added back to the rolls if the registration deadline has passed." *Id.* 1121:20-21. Conversely, Pinal County asserted that whether a removed voter could be reinstated after the registration deadline would depend on the circumstances. *Id.* 1121:21-24. And Coconino County asserted that if the voter was erroneously identified as a non-citizen, their registration would be restored after the registration deadline, and that voter would be able to vote in the next election. *Id.* 1121: 24-25.

432. Dr. McDonald also testified that County Recorders took various and diverse positions on the reliability of information received from ADOT regarding the non-citizenship of registrants during a HAVA check. Tr. Day 5 AM, 1122:5-17 (McDonald). He noted that the Navajo and Graham County Recorders believe that citizenship

information received from ADOT is accurate and definitive. Conversely, he observed that Yavapai County, Cochise County, Pima, and Pinal all indicate that citizenship information from ADOT is not necessarily reliable. *Id.* 1121:18-22.

433. While Dr. McDonald provided a summary overview of the issues he has concluded will undermine uniform implementation, there is extensive evidence in the record – in the form of County Recorder testimony – as to how the County Recorders understand their obligations and expect to implement the Citizenship Investigation Procedures. The following subsections provide a summary of that testimony concerning several of the Challenged Provisions' major investigative procedures.

**ii. Information That a Voter Registration Applicant or Registered Voter is Not a United States Citizen**

434. HB 2492 requires County Recorders to search databases for "information" that voter registration applicants who did not provide DPOC are not US citizens, and HB 2243 requires the County Recorders to take certain steps if they "obtain[] information . . . that the person registered is not a United States citizen." A.R.S. § 16-121.01(E); A.R.S. § 16-165(A)(10). How the County Recorder's office is to "confirm[]" that information is not specified in A.R.S. § 16-165(A)(10). Implementation of this provision will result in registrants and voters being subject to investigation and potential cancellation based on subjective, ill-defined, non-uniform and discretionary standards. The risk that voters will be burdened is already evident in the varying approaches County Recorders intend to take concerning these provisions.

435. The Secretary of State's office has admitted that "HB 2492 and HB 2243 do not specify what information suffices to determine that a voter registration applicant or registered voter is not a U.S. citizen." ECF No. 189 ¶ 9.

436. Section 2 of HB 2243 requires a County Recorder to take certain actions if it "obtains information . . . that [a] person registered is not a United States Citizen." A.R.S. § 16-165(A)(10).

437. County Recorders have different understandings regarding whether a phone

call from the voter registration applicant or registered voter would qualify as information that the applicant or voter is not a U.S. citizen. Some testified that it would (*e.g.*, Milheiro Dep. 55:25-56:4); others testified that it would not (*e.g.*, Stevens Dep. 40:6-8; Webber Dep. 44:12-14); and still others testified that they would need verification that the voter in question was communicating this information (*e.g.*, Merriman Dep. 84:16-23; Durst Dep. 143:22-144:3).

438. County Recorders have different understandings regarding whether a letter or email from the voter registration applicant or registered voter would qualify as information that the applicant or voter is not a U.S. citizen. Some testified that a letter or email would (*e.g.*, Milheiro Dep. 56:5-10); another testified that they might (Merriman Dep. 85:18-19); and others testified that they would not (*e.g.*, Stevens Dep. 40:9-14; Webber Dep. 44:15-45:2).

439. County Recorders have different understandings regarding whether a phone call from someone claiming to be the voter registration applicant's or registered voter's family member would constitute information that the applicant or voter is not a U.S. citizen. Some testified that it would (*e.g.*, Milheiro Dep. 56:11-15), while others testified that it would not (*e.g.*, Hansen Dep. 73:16-22; Webber Dep. 44:22-24).

440. County Recorders have different understandings regarding whether a letter from an unrelated private person would constitute information that a voter registration applicant or registered voter is not a U.S. citizen. One county testified that they would accept it as information that the applicant or voter was not a U.S. citizen (*e.g.*, Milheiro Dep. 56:16-18); others testified that it would not (*e.g.*, Stevens Dep. 40:19-20; Hansen Dep. 73:24-74:5).

441. County Recorders have different understandings regarding whether a phone call from Arizona law enforcement would constitute information that the voter registration applicant or registered voter is not a U.S. citizen. One county recorder testified that it would (Milheiro Dep. 56:19-24); others testified that it would not (*e.g.*, Stevens Dep. 40:21-23; Lerma Dep. 93:16-19); another testified that they would request "evidence" or

"documentation" from the law enforcement agency to confirm the applicant or voter was not a U.S. citizen (Webber Dep. 45:3-8); and others testified that they would need to consult with legal counsel or speak with the applicant or voter before determining their citizenship (Hansen Dep. 74:7-11; Merriman Dep. 86:15-20).

442. County Recorders have different understandings regarding whether an email or letter from Arizona law enforcement would constitute information that the voter registration applicant or registered voter is not a U.S. citizen. One County Recorder testified that they would accept this (Milheiro Dep. 56:25-57:3); others testified that they would not (*e.g.*, Stevens Dep. 41:2-5; Webber Dep. 45:18-22); and another testified that they would need to reach out to the voter in question (*e.g.*, Merriman Dep. 86:1-87:12).

443. County Recorders have different understandings regarding whether a phone call from another state's law enforcement agency would constitute information that the registrant or applicant is not a U.S. citizen. One County Recorder testified that they would ask for "evidence" or "documentary proof" from that agency (Webber Dep. 45:3-8); some testified that it would not (Stevens Dep. 40:24-41:1); and still others testified that they would need to speak with their legal counsel or the applicant or voter in question (*e.g.*, Hansen Dep. 74:13-16; Merriman Dep. 86:15-87:8).

444. County Recorders have different understandings regarding whether an email or letter from another state's law enforcement agency would constitute information that a voter registration applicant or registered voter is not a U.S. citizen. One County Recorder testified that it would (Milheiro Dep. 57:4-7); others testified that it would not (Stevens Dep. 41:6-8; Webber Dep. 45:18-22); and still others testified that they would need to reach out to the applicant or voter (Merriman Dep. 86:21-87:5).

445. County Recorders have different understandings regarding whether an anonymous phone call or email would constitute information that a voter registration applicant or registered voter is not a U.S. citizen. Some County Recorders testified that this would constitute non-citizenship information (Milheiro Dep. 57:9-15; Asrarynezami Dep. 96:22-97:4); another testified that an anonymous call would cause them to "reach out to

the voter" (Merriman Dep. 87:13-18); others testified that it would not constitute non-citizenship information (Stevens Dep. 41:9-10; Webber Dep. 45:23-24); and one county recorder testified that they would need to "go to legal counsel" (Moreno Dep. 73:12-20).

446. County Recorders have different understandings regarding whether lists provided by third-party organizations would constitute information that a voter registration applicant or registered voter is not a U.S. citizen. One county recorder testified that it would (Milheiro Dep. 57:17-20); others testified that it would not (Stevens Dep. 41:11-14; Webber Dep. 45:25-46:2); another testified that this would lead them to "look into it," but not "act on it right away" (Garcia Dep. 106:13-21); and another county recorder testified that they would need to consult with counsel (Moreno Dep. 61:14-23).

**iii. Reason to Believe**

447. Section 2 of HB 2243 requires County Recorders to take certain actions if they have "reason to believe . . . persons who are registered to vote . . . are not United States citizens" or "who are registered to vote without satisfactory evidence of proof of citizenship." A.R.S. § 16-165(H). Implementation of this provision will result in registrants and voters being subject to investigation and potential cancellation based on this subjective, undefined, and inherently discretionary standard. The risk that voters will be burdened is already evident in the varying approaches County Recorders intend to take concerning this provision.

448. The Secretary of State's office's understanding of how that A.R.S. § 16-165(I) must be implemented is that the provision gives each County Recorder's office the "discretion" to determine what constitutes a "reason to believe" a registered voter is not a U.S. citizen. Tr. Day 2 AM, 372:11-23 (Connor).

449. A.R.S. § 16-165(I) would require multiple staff members at County Recorders' offices to use their discretion to determine whether certain information or situations give rise to a "reason to believe" a particular registered voter is not a U.S. citizen. Tr. Day 8 PM, 2035:14-2036:6 (Hiser). In the Pima County Recorder's office, an estimated 15 or 16 individuals would have discretionary authority to determine what constitutes a

"reason to believe" a registered voter is not a U.S. citizen under A.R.S. § 16-165(I). Tr. Day 8 PM, 2036:7-12 (Hiser).

450. County Recorders have different understandings regarding whether a registered voter who is still associated with an F-type license in MVD's records would give their office reason to believe that a registered voter is not a U.S. citizen. Some County Recorders testified that it would not (*e.g.*, Lerma Dep. 97:10-13; Webber Dep. 63:10-14); others testified that it would not if the DPOC requirement was otherwise satisfied (*e.g.*, Hansen Dep. 89:24-90:5; Milheiro Dep. 66:21-67:4; Durst Dep. 88:8-14); and another testified that it might (Stevens Dep. 54:14-19).

451. County Recorders have different understandings regarding whether a phone call or email from the registered voter in question would provide reason to believe that a registered voter is not a U.S. citizen. Some County Recorders testified that it would not (*e.g.*, Stevens Dep. 52:20-23; Webber Dep. 44:12-18), while others testified that it would (*e.g.*, Hansen Dep. 87:6-14, 87:22-88:2 (noting that they would first verify identity of caller); Milheiro Dep. 65:3-4, 65:21-66:2).

452. County Recorders have different understandings regarding whether a signed letter from the voter would give their office reason to believe that a registered voter was not a U.S. citizen. Some testified that it would not (*e.g.*, Stevens Dep. 52:24-25; Webber Dep. 44:19-21), while others testified that it would (*e.g.*, Hansen Dep. 88:3-4; Milheiro Dep. 65:5-6), and another testified that it might (Lewis Dep. 45:22-46:17).

453. County Recorders have different understandings regarding whether a letter from the registered voter's neighbor would give their office reason to believe that the voter is not a U.S. citizen. Some testified that it would not (*e.g.*, Stevens Dep. 53:4-7; Hansen Dep. 88:8-10), while another testified that their office would have to "act upon" that letter (Moreno Dep. 72:19-22) and still another testified that they would not act solely "because someone is contacting [them]" and that they would need some "proof" and confirmation of identity (Garcia Dep. 111:13-19).

454. County Recorders have different understandings regarding whether a phone

call from law enforcement in Arizona would give their office reason to believe that a registered voter is not a U.S. citizen. Some testified that it would not (*e.g.*, Stevens Dep. 53:8-10; Milheiro Dep. 65:15-18), while others testified that it might (*e.g.*, Webber Dep. 62:10-14) or that their office "would need something documented" (Garcia Dep. 111:20-23).

455. County Recorders have different understandings regarding whether a phone call from law enforcement in another state would give their office reason to believe that a registered voter is not a U.S. citizen. Some County Recorders testified that it would not (*e.g.*, Stevens Dep. 53:11-13); another testified that they "would need something documented" (Garcia Dep. 111:20-23); and another testified that this would "quite possibly" trigger a SAVE search (Webber Dep. 62:10-14).

456. County Recorders have different understandings regarding whether an email or letter from Arizona law enforcement could provide reason to believe that a registered voter is not a U.S. citizen. Some testified that it would not (*e.g.*, Milheiro Dep. 65:19-21); another county recorder testified that they "would need something documented" (Garcia Dep. 111:20-23); and others testified that it might give them "reason to believe" (*e.g.*, Stevens Dep. 53:14-17; Webber Dep. 62:15-19).

457. County Recorders have different understandings regarding whether an email or letter from law enforcement in another state would give their office reason to believe that a registered voter is not a U.S. citizen. Some testified that it would not (*e.g.*, Stevens Dep. 53:18-20; Milheiro Dep. 65:22-24); another testified that they "would need something documented" (Garcia Dep. 111:20-23); and still another testified that it might (Webber Dep. 62:15-19).

458. County Recorders have different understandings regarding whether an anonymous phone call or email would give their office reason to believe that a registered voter is not a U.S. citizen. While many County Recorders have testified that this would not give them such a reason to believe the voter is not a U.S. citizen (*e.g.*, Stevens Dep. 53:21-23; Hansen Dep. 88:25-89:3), one county recorder testified that it was something they

would have to "act upon" (Moreno Dep. 72:15-22).

#### iv. Database-Matching Mechanics

459. County Recorders have different understandings as to whether the database-matching procedures enumerated in HB 2243 (A.R.S. § 16-165(G)-(K)) constitute the means by which County Recorders are to *obtain* information that registered voters lack of U.S. citizenship under A.R.S. § 16-165(A)(10) or the means by which they are to *confirm* such information under A.R.S. § 16-165(A)(10) or, counterintuitively, both. *See, e.g.*, Weber Dep. 50:3-11, 15-19 (databases should be used to both obtain and confirm non-citizenship information); Stevens Dep. 47:13-20, 48:18-22 (uncertain as to whether these databases should be used to obtain or confirm information as to lack of U.S. citizenship); Milheiro Dep. 59:22-60:6 (enumerated databases in HB 2243 can be used to confirm lack of U.S. citizenship).

### F. Language Accessibility of DPOC Notice Letters for Limited English Proficient Voters is Narrow and Provides No Notice in Asian Languages

460. Under the Challenged Laws, when a County Recorder is proceeding to reject or cancel a registration for failure to provide adequate documentary proof of citizenship or because they have obtained information an individual is not a United States citizen, they are required to mail a notice to the voter. A.R.S. §§ 16-165(A)(10), 16-165(K), 16-121.01(C). The notice County Recorders provide is likely to be inadequate, particularly for limited English proficient voters, in light of current practices.

461. In Apache County, Arizona, notice letters regarding missing documentary proof of citizenship are sent by mail to voters and prospective voters only in English and/or Spanish language, or could be translated to Navajo. Tr. Day 8 PM, 2073:23-2074:2 (Shreeve).

462. In Maricopa County, Arizona, notice letters regarding missing documentary proof of citizenship are sent by mail to voters and prospective voters only in English and/or Spanish language. Tr. Day 1 AM, 89:16-24 (Petty). These notices are sent by non-forwardable mail. *Id.* 89:25-90:25.

463. In Navajo County, Arizona, notice letters regarding missing documentary proof of citizenship are sent by mail to voters and prospective voters only in English and/or Spanish language.

464. In Pima County, Arizona, notice letters regarding missing documentary proof of citizenship are sent by mail to voters and prospective voters only in English and/or Spanish language. Tr. Day 8 PM, 2037:14-20 (Hiser).

465. In Yuma County, Arizona, notice letters regarding missing documentary proof of citizenship are sent by mail to voters and prospective voters only in English and/or in Spanish language if needed. Tr. Day 8 PM, 2090:4-9 (Johnston).

466. No counties in Arizona provide notice letters in languages other than English, Spanish, Native languages, and Braille. Tr. Day 1 PM, 162:2-16 (Petty); Garcia Dep 53:8-54:2; *see also* Durst Dep. 78:3-14.

467. Notice letters sent to the AANHPI community are not sent in AANHPI languages. Tr. Day 5 PM, 1273:5-21 (Tiwamangkala).

**G. Cancellation and Reinstatement of Voters**

468. County Recorders have different understandings regarding whether they can reinstate a voter when that voter has been removed from the rolls based upon an erroneous determination that they are not a U.S. citizen and that error is not discovered until after the registration deadline has passed. Some County Recorders testified that that they would reinstate the voter in such circumstances (*e.g.*, Hansen Dep. 91:13-18; Tr. Day 8 PM, 2036:13-2037-10 (Hiser)); others testified that they would need guidance from legal counsel (*e.g.*, Garcia Dep. 114:2-15); other county recorders testified that they were unsure, with Yavapai noting it would be determined by a "judgment call" (*e.g.*, Durst Dep. 164:22-165:3; Webber Dep. 94:23-96:8); and finally, some testified that they could not reinstate erroneously removed voters after the registration deadline passed (*e.g.*, Stevens Dep. 78:2-20).

469. There is no guidance in the EPM or any other source on whether reinstatement after a registration deadline had passed would be permissible in the case of

erroneous removal. Webber Dep. 94:23-95:5; Tr. Day 8 PM, 2037:2-10 (Hiser). The Pima County Recorder's office has no established policy or practice on how to handle such situations. Tr. Day 8 PM, 2037:11-13 (Hiser).

## X. Costs and Impacts of Challenged Laws

### A. Plaintiff Testimony Regarding Costs of Laws

470. Many citizens residing in Arizona who are eligible to vote do not have copies of or ready access to documents that can establish their citizenship. Tr. Day 2 PM, 462:8-12 (Nitschke); Tr. Day 5 PM, 1273:22-1274:4 (Tiwamangkala). The Attorney General's lead elections investigator agrees that not everyone in Arizona has a driver's license or state ID and that certain populations, like younger and older people, are less likely to have a driver's license or state ID. Tr. Day 9 AM, 2127:24-2128:5, 2128:9-13 (Knuth). And some Arizonans who are eligible to vote lack easy access to DPOC because their documents are located in another state; this can be particularly true for many students that move to Arizona from out-of-state for school and whose records may remain with their parents. Tr. Day 2 PM, 469:8-470:3 (Nitschke). And there are members of the AANHPI community in Arizona who do not have physical copies of their naturalization paperwork. Tr. Day 5 PM, 1273:22-1274:4 (Tiwamangkala).

471. There are financial costs associated with obtaining the types of documentation that satisfy the DPOC requirement. Tr. Day 4 PM, 944:20-946:11, 947:16-948:6 (Burch). In Arizona, the fee for obtaining a driver's license can range from $10 to $25. Stipulated Fact (ECF 571-1) No. 69. The fee for an Arizona identification card is $12 for those under the age of 65. Stipulated Fact (ECF 571-1) No. 70. Moreover, to obtain a license or identification card, an applicant must provide proof of identification, age, residence, and citizenship or authorized presence, such as a birth certificate, U.S. passport, or naturalization certificate. Tr. Day 3 AM, 538:20-539:23 (Jorgensen). Arizona charges a fee of $35.50 to obtain a copy of a birth certificate. ECF No. 672 (Plaintiffs' Revised Request for Judicial Notice), ¶ 39. In Arizona, an ordered copy of a birth certificate is sent through regular mail, though additional fees may be paid to expedite shipping. *Id.*

472. There are also timing costs for obtaining the requisite citizenship proof documents. For Arizona residents born in other states, it can take several months to get a copy of a birth certificate: a mailed request for a birth certificate takes ten to twelve weeks to California. Petersen Dep. 311:16-312:14.

473. Many people do not have passports. According to the U.S. Census Bureau's 2017-2021 five-year American Community Survey, the total citizen voting age population of the United States is 235,667,240. According to the United States Department of State, there were 151,814,305 total valid U.S. passports in circulation in 2022. ECF No. 672 (Plaintiffs' Revised Request for Judicial Notice), ¶ 61. Even if every valid U.S. passport in circulation in 2022 belonged to someone over the age of eighteen, that would still mean that over 36% of the U.S. citizen voting age population does not have a valid U.S. passport.

474. U.S. passport books cost $130 to $160, assuming an applicant can present evidence of citizenship, with an extra fee of $150 if the applicant cannot. ECF No. 672 (Plaintiffs' Revised Request for Judicial Notice), ¶ 40. Current processing times to apply for a passport are 7 to 10 weeks for routine processing and 3 to 5 weeks for expedited processing, excluding mailing times, which could add up to 4 additional weeks. ECF No. 672 (Plaintiffs' Revised Request for Judicial Notice), ¶ 41. Expedited processing of a U.S. passport application costs $60. ECF No. 672 (Plaintiffs' Revised Request for Judicial Notice), ¶ 40.

475. The current fee for replacing a naturalization certificate is $555. ECF No. 672 (Plaintiffs' Revised Request for Judicial Notice), ¶ 42; Tr. Day 4 PM 947:16-948:6 (Burch).

476. The current processing time to obtain a replacement naturalization certificate can be six to eight months or longer. ECF No. 672 (Plaintiffs' Revised Request for Judicial Notice), ¶ 43; Tr. Day 5 PM, 1274:4-8 (Tiwamangkala).

**B. Expert Testimony**

**1. Testimony of Dr. Traci R. Burch, Ph.D.**

477. Dr. Traci R. Burch is a tenured associate professor of political science at

Northwestern University and a research professor at the American Bar Foundation, roles that she has held since 2007. Tr. Day 4 PM, 923:23-924:20 (Burch). She holds a Ph.D. from Harvard University in Government and social policy, and an undergraduate degree in politics from Princeton University. Tr. Day 4 PM, 923:17-21 (Burch). Dr Burch's research and teaching focus on political science and public policy—especially in the context of American political participation, the welfare state, and criminal justice. Tr. Day 4 PM, 924:5-14 (Burch). Dr. Burch also peer reviews articles submitted to scholarly journals. Tr. Day 4 PM, 925:16-23 (Burch).

478. Dr. Burch has won several awards for her work. Her dissertation examining the effect of felony convictions on political participation received several awards, including awards from Harvard (for best political science dissertation) and various branches of the American Political Science Association. Tr. Day 4 PM, 925:3-12 (Burch). In addition, Dr. Burch's book, Trading Democracy for Justice, has won several national awards from the American Political Science Association. Tr. Day 4 PM, 925:13-15 (Burch).

479. Dr. Burch has testified as an expert witness on political participation in eight prior cases. Tr. Day 4 PM, 926:20-927:9 (Burch). In every case, Dr. Burch was qualified to serve as an expert, and the court relied on her expert conclusions. Tr. Day 4 PM, 927:10-15 (Burch).

480. The Court finds that Dr. Burch is qualified to provide the expert analysis and opinions offered in this matter. Having observed Dr. Burch's testimony, the Court credits his analyses, opinion, and testimony, and grants them substantial weight.

481. Dr. Burch testified about the burdens that HB 2492 and HB 2243 impose and those laws' likely effects, concluding that implementation of the laws would "increase the costs to voting in Arizona" and "likely decrease voter registration and thus voting among some otherwise eligible voters." Tr. Day 4 PM, 930:23-931:13, 931:7-10, 969:5-15 (Burch).

482. Professor Burch reached this conclusion by reviewing relevant social science literature and data, and applying the rational-choice framework that is recognized in the

social sciences as a preferred method of evaluating various forms of human behavior, including participation in government programs such as voting. Tr. Day 4 PM, 930:4-11; 931:20-932-6, 932:9-24 (Burch).

483. In its simplest form, the rational-choice framework predicts that if the perceived probable rewards of an action (such as voting) outweigh the probable corresponding costs, an individual will perform the action, and vice-versa. Tr. Day 4 PM, 931:20-932:6, 932:9-11 (Burch).

484. The field of political science recognizes three kinds of costs associated with participation in government programs, including voting. Tr. Day 4 PM, 933:4-10 (Burch). These are (1) learning costs, i.e., the costs of acquiring information about eligibility and participation requirements, such as learning about how to register to vote, Tr. Day 4 PM, 933:13-17, 936:17-19 (Burch); (2) compliance costs, i.e., the costs of meeting those requirements, such as costs to obtain and present the necessary documentation, Tr. Day 4 PM, 934:10-25, 936:20-937:3 (Burch); and (3) psychological costs, i.e., the stigma, anxiety, fear, or other emotional burdens associated with participation in a government program, especially where there are concerns about surveillance, investigation, or prosecution resulting from participation, Tr. Day 4 PM, 935:15-936:7, 937:4-8 (Burch). Such concerns are particularly acute among racial and ethnic minorities. Tr. Day 4 PM, 947:10-15 (Burch).

485. Those who have a higher socioeconomic status (including income, education level, language fluency, internet access, and access to a vehicle) are generally better able to bear all of the various costs associated with voting than those of lower socioeconomic status. Tr. Day 4 PM, 931:5-7; 940:6-941:24;.940:20-944:12 (Burch).

486. Published studies in the field of political science have demonstrated that the imposition of any or all of the costs that Professor Burch identified can reduce participation in government programs, even among persons otherwise eligible to participate, Tr. Day 4 PM, 939:8-14, 939:23-940:5, 946:12-947:9 (Burch). For example, in reaching her conclusions regarding the likely effects of HB 2492 and HB 2243, Professor Burch

considered a 2007 report from the U.S. Government Accountability Office regarding the 2006 introduction of a DPOC requirement for the Medicaid program. The study found that 22 states reported that individuals who appeared to be eligible citizens were removed from the Medicaid rolls because of their inability to meet the DPOC requirement, and that one state reported that 18,000 recipients who appeared to be citizens were denied coverage or terminated from the program in the first seven months after the requirement took effect, because they could not provide DPOC. Tr. Day 4 PM, 956:18-960:22; 980:2-6 (Burch); Tr. Day 8 AM, 1849:9-1850:10 (Hoekstra).

487. If implemented, HB 2492 and HB 2243 would increase the compliance costs to voting in Arizona by requiring DPOC both to register to vote and, in certain circumstances, to avoid removal from the voting rolls. Tr. Day 4 PM, 969:5-9 (Burch). Many eligible citizens in Arizona might not have easy access to DPOC, including thousands of current federal-only voters. Tr. Day 4 PM, 949:19-23; 973:7-14 (Burch). Indeed, a 2020 article published by the intervenors' expert, Professor Mark Hoekstra of Baylor University, cited a report finding that nearly seven percent of U.S. citizens did not have ready access to DPOC. Tr. Day 8 AM, 1838:24-1839:5, 1837:19-1840:17 (Hoekstra).

488. The financial costs of obtaining DPOC—to the extent that the documents are available and accessible at all—can be significant. Tr. Day 4 PM, 934:10-25; 969:5-9 (Burch). For example, as mentioned above, in Arizona, a copy of a post-1948 birth certificate costs $35.50, *supra* Section X.A, which represents a full day of income for a single person living at the poverty line. Tr. Day 4 PM, 944:24-945:6; 945:24-25 (Burch). Other DPOC is even more expensive; naturalization certificates, for example, can cost nearly $1,200—more than *one month* of income for an individual living at the poverty line in Arizona. Tr. Day 4 PM, 946:4-8, 947:20-948:6 (Burch). These financial costs of obtaining DPOC will likely deter eligible citizens from registering to vote and voting. Tr. Day 4 PM, 946:9-11 (Burch). This is especially true given that the challenged laws give voters flagged as potential non-citizens only 35 days to provide DPOC to avoid being purged from the rolls; for certain voters—especially naturalized citizens, poorer voters,

voters of color, and voters with low English proficiency—this will simply not be enough time to obtain and provide DPOC. A.R.S. § 16-165(A)(10).

489. If implemented, HB 2492 and HB 2243 would also increase the psychological costs of voting for some voters who fear government surveillance, investigation, and prosecution. Tr. Day 4 PM, 946:12-16, 969:5-9 (Burch); *see also* Tr. Day 5 PM, 1267:5-16 (testifying that some in the AANHPI community in Arizona have immigrated to escape political terror), 1274:19-1275:3 (testifying that some in the AANHPI community in Arizona have expressed fear of government prosecution from the passage of the Challenged Laws) (Tiwamangkala); Tr. Day 6 AM, 1356:22-1357:22 (testifying that events like use of birthplace to incarcerate Japanese during the Second World War triggers questions in AAPI community about how information may be used) (Chang); Tr. Day 3 PM, 740:20-23, 741:25-742:20 (Camarillo) (testifying that implementation of HB 2243 will have a chilling effect on voting amongst Latino voters); Tr. Day; Tr. Day 2 PM, 480:9-481:18 (Guzman) (testifying that implementation of the Challenged Laws, including investigation procedures, will chill voting amongst Latino communities). Subjecting registrants who are unable to provide DPOC to potential criminal investigation and prosecution will exacerbate concerns about adverse consequences resulting from increased government attention that may deter voting. Tr. Day 4 PM, 946:12-947:9, 972:14-23, 993:6-17 (Burch); *see also* Tr. Day 6 AM, 1356:22-1357:22 (Chang). These psychological costs will be especially felt by communities that have a historically fraught relationship with law enforcement, including racial minorities and citizens with non-citizen family members. Tr. Day 4 PM, 993:18-994:7 (Burch).

490. Arizonans vary widely in their ability to bear the increased costs that HB 2492 and HB 2243 would impose. For example, based on U.S. Census survey data, a significant number of people in Arizona do not have a high school diploma, fall below the poverty line, do not have access to a vehicle, do not have Internet access, or do not speak English fluently. Tr. Day 4 PM, 940:20-944:12 (Burch). Notably, the data show that these resource disadvantages occur with greater frequency among different racial and ethnic

groups. Tr. Day 4 PM, 940:20-944:12 (Burch).

491. Accordingly, if fully implemented, HB 2492 and HB 2243 would increase the costs to voting in Arizona, and thus would likely decrease registration and voting by some—and potentially thousands of—otherwise eligible voters.

**2. Defendants' Response to Dr. Burch**

492. Neither the Defendants nor Intervenors objected to any of the foregoing expert testimony from Professor Burch, despite the Court's instruction that objections were to be made in response to specific opinions offered at trial. Tr. Day 4 PM, 927:16-23 (Burch).

493. Although the Arizona Attorney General retained her own expert in the field of political science (Professor Robert Stein of Rice University) to rebut Professor Burch's testimony at trial—as stated in the Joint Pretrial Order, ECF 609 at 39-40—the Attorney General offered no expert rebuttal of Dr. Burch's testimony at trial, through Professor Stein or otherwise.

494. Only the intervenors (the Republican National Committee, Arizona House Speaker Ben Toma, and Arizona Senate President Warren Petersen) offered expert testimony to rebut Professor Burch, via Mark Hoekstra, Professor of Economics at Baylor University. Tr. Day 7 AM, 1654:7-12. (Hoekstra).

495. Although Professor Hoekstra testified that he believed that HB 2492 and HB 2243 will not have any negative "net effect" on voter participation, he made clear that he was not ruling out Professor Burch's conclusion that some voters would be adversely affected. Rather, his expert opinion "is not that there will be no voters who are adversely affected"; it is that "on net, any number of adversely affected voters will be counter-balanced by voters who come into the system." Tr. Day 7 PM, 1830:12-1832:1 (Hoekstra).

496. Moreover, the study that Professor Hoekstra believed to be the most thorough assessment of what he viewed as laws analogous to HB 2492 and HB 2243 (i.e., laws imposing voter ID requirements) concluded that such laws were shown to have a negative 0.1 percent effect on voter turnout, within a statistical range of negative 3.0 percent and

positive 2.8 percent, amounting to a potential loss of between 2,200 and 66,000 votes in Arizona (based on the 2.2 million votes cast in Arizona's 2022 election). Tr. Day 8 AM, 1861:11-1864:4 (Hoekstra).

**3. Dr. McDonald Testimony**

497. Dr. Michael McDonald testified that (i) there are multiple failure points in database matching; (ii) that these database matching failures will disproportionately impact naturalized citizens; (iii) that Counties presently implement DPOC requirements in a non-uniform manner; (iv) that Counties will exercise discretion in implementing the Challenged Laws that will exacerbate existing trends in non-uniform implementation of DPOC; (v) that the people most likely to be impacted by the Challenged Laws tend to be younger, more diverse and less partisan than active registered voters as a whole in Arizona; and (vi) the Challenged Laws will have both immediate and long term impacts on the voting behavior of individuals impacted by these laws. Tr. Day 5 AM, 1069:1-22 (McDonald)

498. According to data from ADOT database and the AVID database, 6,084 full-ballot voters who provided DPOC to County Recorders are identified as non-citizens in the ADOT database. Tr. Day 5 AM, 1088:23-1089:5 (McDonald).

499. Naturalized voters are most likely to be impacted by the Challenged Laws. Tr. Day 5 AM, 1134:19-25 (McDonald).

500. Once implemented, the burdens of the database matching scheme enacted by HB 2243 and 2493 fall particularly on naturalized citizens more so than other voters. Tr. Day 5 AM, 1069:1-13; 1089:10-16; 1103:8-10; 1134:19-25 (McDonald); Tr. Day 5 PM, 1164: 1-1165:2 (McDonald)

501. There are 111,513 individuals of voting age who have naturalized within Arizona since 2015. Tr. Day 5 AM, 1103:17-20 (McDonald).

502. 66% of the voting age population within the State of Arizona is non-Hispanic white; among naturalized citizens, only 32.6% are non-Hispanic white. Tr. Day 5 AM, 1104:4-9 (McDonald).

503. 34% of Arizona's voting age population is Hispanic, while 67.4% of

naturalized citizens are Hispanic. Tr. Day 5 AM, 1104: 10-14 (McDonald).

504. 4.8% of the voting age population is Asian or Pacific Islander, while among naturalized citizens in Arizona 35.8% are Asian or Pacific Islander. Tr. Day 5 AM, 1104:14-17 (McDonald).

505. 6.1% of the voting age population in Arizona is African American, while among naturalized citizens 7.9% are African American. Tr. Day 5 AM, 1104:18-21 (McDonald).

506. Federal-only voters have not provided DPOC and are going to be subject to the database matching of the Challenged Laws. Tr. Day 5 AM, 1124:2-9 (McDonald).

507. There are a total of 19,439 federal only voters among the active registered voters in Arizona. PX 337.

508. Relying on census data and geocoding analysis, the average community all active registered voters reside in is 62.9% non-Hispanic White; whereas the average community federal only voters reside in is 47.3% Non-Hispanic white. Tr. Day 5 AM, 1126:24-1127:6 (McDonald); PX 337.

509. Relying on census data and geocoding analysis, the average community all active registered voters reside in is 26.9% Hispanic; whereas the average community federal only voters reside in is 36.4% Hispanic. PX 337.

510. Relying on census data and geocoding analysis, the average community all active registered voters reside in is 4.8% Black, whereas the average community federal-only voters reside in is 7.8% black. PX 337

511. Relying on census data and geocoding analysis, the average community all active registered voters reside in is 4.2% Native American, whereas the average community Native American voters reside in is 5.0% Native American. PX 337

512. Relying on census data and geocoding analysis, the average community all active registered voters reside in is 4.9% Asian American/Pacific Islander, whereas the average community federal only voters reside in is 5.6% Asian American/Pacific Islander. PX 337.

513. Relying on surname matching analysis, the average community all active registered voters reside in is 71.2% non-Hispanic White; whereas the average community federal only voters reside in is 53.3% Non-Hispanic white. PX 338.

514. Relying on surname matching analysis, the average community all active registered voters reside in is 23.1% Hispanic; whereas the average community federal only voters reside in is 37.8% Hispanic. PX 338.

515. Relying on surname matching analysis, the average community all active registered voters reside in is 1.7% Black, whereas the average community federal-only voters reside in is 5.2% black. PX 338

516. Relying on surname matching analysis, the average community all active registered voters reside in is 2.2% Asian American/Pacific Islander, whereas the average community federal only voters reside in is 2.5% Asian American/Pacific Islander. PX 338.

517. 49.9% of federal only voters are between the ages of 18-29, whereas only 16.4% of all active registered voters are between the ages of 18-29. Tr. Day 5 AM, 1131: 5-12 (McDonald); PX 339.

518. 22% of all active registered voters are between the ages of 45 and 59, whereas 11.6% of federal only voters are between the ages of 45 and 59. PX 339.

519. 38% of all active registered voters are over the age of 60, whereas 14.8% of federal only voters are over 60. Tr, Day 5 AM, 1131: 5-12 (McDonald); PX 339.

520. Among all active registered voters in Arizona, 28.7% have no party affiliation, whereas among federal only voters 52.5% have no party affiliation. Tr. Day 5 AM, 1133: 19-1134:1 (McDonald); PX 340.

521. Active registered voters are the appropriate benchmark for comparison because it is firmly established in academic, scholarly work on voter turnout that individuals who register to vote and vote are different in fundamental ways from individuals who do not register to vote and vote. Tr. Day 5 AM, 1132:7-22 (McDonald).

**4. Dr. Hoekstra Testimony Concerning Dr. McDonald and Response**

522. Dr. Hoekstra's opinions as they relate to election administration are accorded

minimal weight. In preparing his opinions, Dr. Hoekstra did not review any deposition testimony of representatives of the Secretary of State's office, the MVD director, or USCIS, and reviewed no more than four of the fifteen County Recorder depositions, Tr. Day 7 PM, 1807:14-1808:1 (Hoekstra). He also did not review the Election Procedures Manual. Tr. Day 7 PM, 1808:2-4 (Hoekstra). He was further not aware of either the penalties for a perjury conviction or of the immigration-related consequences for registering to vote as a non-citizen. Tr. Day 7 PM, 1806:18-1807:6 (Hoekstra).

523. Although his own analysis reflected comparisons against the total Arizona population, Professor Hoekstra agreed that, if federal-only voters were all citizens, Dr. McDonald's benchmark of active registered voters would be the appropriate one to assess proportional or disproportional effects. Tr. Day 7 PM, 1810:19-23 (Hoekstra).

## XI. Documentary Proof of Residence

524. At the summary judgment stage, this Court held that the DPOR requirement is preempted by Section 6 of the NVRA as applied to Federal Form applications for registration in federal elections. After that ruling, Defendant-Intervenors have argued that the State can lawfully treat State Form and Federal Form applications differently, i.e., register Federal Form applications submitted without DPOR for federal elections (as "federal only" voters) while rejecting outright State Form applications submitted without DPOR. This would result in the same scenario that existed with respect to DPOC prior to the LULAC Consent Decree and resulted in the rejection of many State Form applications that would have been otherwise eligible for Federal-only status. Tr. Day 1 AM 86:8-15 (Petty). The Secretary of State's representative testified that this was an issue where the office "need[s] legal advice." Tr. Day 2 AM, 343:7-344:3 (Connor).

525. Plaintiffs maintain that such a system would be unlawful under both the Equal Protection Clause of the U.S. Constitution and the NVRA.

526. The Secretary of State's draft of the 2023 Election Procedures Manual submitted to the Attorney General and Governor on September 30 incorporates some, but not all, of this Court's order with respect to the DPOR requirement. Specifically, it

incorporates this Court's orders with respect to what constitutes adequate DPOR but does not yet incorporate this Court's order that the DPOR requirement is preempted by Section 6 of the NVRA. PX 11; *see also* PX 13; Tr. Day 2 AM, 337:23-338:7 (Connor). To the contrary, as written, the current draft EPM implies that DPOR is a mandatory requirement for all registrations except UOCAVA voters. PX 11, PX 13.

527. The Secretary has not issued any guidance regarding this Court's orders on the DPOR requirement. Tr. Day 1 AM, 82:18-83:11 (Petty).

528. There is also no existing template for registration applicants to use for the written confirmation of residence option this Court ordered for persons experiencing homelessness. Tr. Day 1 AM, 83:22-84:6 (Petty); Tr. Day 2 AM 341:5-17 (Connor). Nor is there any template declaration of residence option for individuals without easy access to DPOR or any guidance from the Secretary as to whether such a declaration should be accepted. Tr. Day 1 AM, 161:15-162:1 (Petty).

529. As such, County Recorders continue to await guidance on how to implement the DPOR requirement, including with respect to any differential treatment of State Form and Federal Form applicants. Tr. Day 1 AM, 83:15-17 (Petty).

530. Many Arizona residents, including those who live in rural areas or on Native American reservations, lack standard addresses. Tr. Day 8 PM, 2078:9-12 (Shreeve). Voters who lack standard addresses can provide their residence to a County Recorder by drawing the location where they live. Tr. Day 8 PM, 2078:13-16 (Shreeve).

531. Based on her over fifteen years of experience in voter registration, Janine Petty testified that certain populations of potential voters are more likely to struggle to provide documentation of their residence, including voters living in rural areas, voters experiencing homelessness, voters who do not speak English as a first language, and students. Tr. Day 1 AM, 84:10-85:25 (Petty). With respect to students in particular, she noted that they have "lots of problems with documentary proof of residency and citizenship" because "[m]ost of their documents are with their moms and dads." Tr. Day 1 AM, 85:4-11 (Petty). With respect to voters with nontraditional street addresses, Ms. Petty

testified that she was unfamiliar with any identification documents that would identify such residences. Petty Dep. 171:22-172:18. Former Pima County Chief Deputy Recorder Hilary Hiser testified similarly, noting that people who are transient and people who live in campers or RVs often have no fixed address and would struggle to comply with the requirement. Tr. Day 8 PM, 2045:17-2046:22 (Hiser).

532. The Federal Form application provides election officials with no additional information about a voter's residence than the State Form. PX 27; PX 28. Arizona has made no request to the Election Assistance Commission to add instructions regarding documentary proof of residence to the Arizona state-specific instructions on the Federal Form. Connor Dep. 217:17-23.

533. At trial, no election official that testified could identify any election administration purpose for treating State and Federal Form applicants without DPOR differently. Tr. Day 1 AM, 88:2-24 (Petty); Tr. Day 8 PM, 2047:15-2048:13 (Hiser). To the contrary, former Chief Deputy Recorder of Pima County Hilary Hiser testified that such a bifurcated system would "make [voter registration] really difficult", be "very time consuming," cause confusion, and would not "make operational sense from the terms of effective use of resources." Tr. Day 8 PM, 2049:9-2050:11()Hiser).

534. The County Recorders have robust systems in place to verify residential addresses and precinct voters appropriately without any documentary proof of residency requirement. *See, e.g.*, Petty Dep. 158:1-160:11,162:3-169:22; PX 192 at 2-3. These systems account for individuals with nontraditional residential street addresses. *Id.*

535. Most voters that register with paper form applications use the State Form, not the Federal Form. Tr. Day 1 AM, 88:25-89:4 (Petty). Third party voter registration groups largely rely on State Forms, which are provided to them by county election officials. Tr. Day 1 AM, 89: 5-8 (Petty).

536. Public assistance agencies required to provide voter registration services under the NVRA rely on the State Form to provide those services. Tr. Day 1 AM, 89:9-15 (Petty). The Secretary of State's office provides those agencies with specially coded

versions of the State Form for them to use to enable tracking of the source of applications. Connor Dep. 243:23-244:5. More generally, the Secretary of State's office plays a role in ensuring public assistance agencies provide the services mandated by the NVRA. Connor Dep. 241:2-6.

## XII. The Evidence Shows that Voter Fraud in Arizona is Rare and Arizona's Elections are Reliable, Undermining the State's Purported State Interests

### A. Voter Fraud Was Illegal in Arizona Long Before the Challenged Provisions

537. Prior to HB 2492 and HB 2243, Arizona had policies, laws, or procedures in place designed to prevent noncitizens from voting or registering. Stipulated Fact (ECF 571-1) No. 155; Tr. Day 9 AM, 2126:19-2127:1, 2127:12-14 (Knuth).

538. Indeed, it was a felony in Arizona to register or cast a ballot when ineligible to do so, Tr. Day 7 PM, 1710:12-14 (Lawson), and for a non-U.S. citizen to register to vote in Arizona. Tr. Day 9 AM, 2126:19-2127:1, 2127:12-14 (Knuth).

539. The Attorney General's Office also had authority to prosecute people for illegally registering and voting and continues to have that authority. Tr. Day 9 AM, 2127:2-7 (Knuth).

### B. Voter Fraud in Arizona is Rare, and Voter Fraud by Non-Citizens in Arizona is Rarer Still

540. The Attorney General admits that voter fraud in Arizona is rare and voter fraud committed by non-citizens in Arizona is "extremely rare." Tr. Day 7 PM, 1687:6-13 (Lawson); *see also* Thomas Dep. 319:11-13, 328:2-6.

541. Since the beginning of 2010, there have been dozens of elections in Arizona, including primary and general elections, and millions of ballots cast. Tr. Day 7 PM, 1700:9-14 (Lawson). In the November 2020 election in Arizona, 3,387,326 votes were cast for president of the United States. Stipulated Fact (ECF 571-1) No. 153; ECF No. 672 (Plaintiffs' Revised Request for Judicial Notice), ¶ 46. As discussed above, the 2020 presidential election in Arizona was decided by a slim margin of votes, and then-President

Trump and others claimed that 36,000 non-citizens illegally voted in Arizona. *See supra* Section V.A.

542. Following the 2020 election, the Arizona Attorney General's office prioritized investigating allegations of voter fraud. The office assigned all 72 of its agents to the project, and in total, agents spent "ten thousand plus hours [] diligently investigating" claims of alleged voter fraud. Thomas Dep. 322:24-323:23, 326:19-327:14; *see also* Tr. Day 7 AM, 1592:5-14 (Minnite) (discussing the Attorney General's press release).

543. All criminal "matters opened as a result of the Arizona State Senate/Cyber Ninjas Audit were closed without the filing of charges." Thomas Dep. 253:7-18; *see also* PX 401 (stating that "the EIU was unable to find any evidence . . . that 34,000 – 35,000 votes were 'inserted' into Pima [C]ounty's system during the 2020 General Election").

544. In 2021, a months-long investigation by the Associated Press reported that only four of Arizona's fifteen counties had forwarded potential election-related criminal cases to local prosecutors, totaling roughly 200 cases. Tr. Day 7 AM, 1583:4-19 (Minnite). Not a single one of those cases alleged illegal voting by a non-citizen. Tr. Day 7 AM, 1583:20-23 (Minnite).

545. According to the current Arizona Attorney General, the state's "election integrity unit searched widely for voter fraud and found scant evidence of it occurring in Arizona . . . because instances of voter fraud are exceedingly rare." Thomas Dep. 317:15-319:10.

546. The Attorney General's Office publishes and regularly updates a list of election related prosecutions starting with the 2008 election cycle (hereinafter the "Election Prosecutions List"). Tr. Day 7 PM, 1687:14-23, 1689:7-24, 1698:15-19 (Lawson). The Attorney General produced this list in response to an interrogatory asking for every instance of non-citizen registration and voting in Arizona. *See* PX 292; Stipulated Fact (ECF 571-1) No. 156. The Attorney General's lead elections prosecutor, Todd Lawson, agreed that its response was not limited to prosecutions by the Attorney General's Office and covered instances of non-citizen voting in political subdivisions within Arizona by any

prosecuting authority. Tr. Day 7 PM, 1703:15-1704:23 (Lawson).

547. The Election Prosecutions List identifies only 38 prosecutions related to illegal voting since 2008, during which time millions of ballots were cast in Arizona elections. Tr. Day 7 PM, 1689:20-23, 1700:12-14 (Lawson).

548. None involved a charge of non-citizen voting. Tr. Day 7 PM, 1689:25-1690:7, 1699:23-25, 1706:7-16 (Lawson). There have been no additional prosecutions involving non-citizen voting since the list was last updated on April 4, 2023. Tr. Day 7 PM, 1697:20-23 (Lawson).

549. The Election Prosecutions List is considered authoritative within the Attorney General's Office, and Prosecutor Lawson maintains the list and ensures its accuracy. Tr. Day 7 PM, 1698:12-14, 1699:8-11, 1699:12-22, 1700:1-8 (Lawson).

550. Out of those 38 prosecutions, twenty-two involved voting by individuals in multiple states, six involved voting by individuals who were ineligible to vote due to their status as felons, seven involved voting by individuals on behalf of relatives, and one involved an individual voting twice in the same election. *See* PX 292.

551. The Attorney General admitted that none of the 38 convictions obtained by the Attorney General's office for illegal voting since 2010 in Arizona involved voting by a non-U.S. citizen. Tr. Day 7 PM, 1690:15-17 (Lawson); PX 292.

552. To the Attorney General's knowledge, since 2010, the Arizona Attorney General's Office has not convicted a single person for registering to vote or casting a ballot as a non-U.S. citizen. Stipulated Fact (ECF 571-1) No. 157.

553. There are several means by which the Attorney General's Office may receive information or complaints about possible violations of election laws, including through a portal maintained by the Attorney General's Election Integrity Unit, which permits members of the public to submit election-related complaints. Tr. Day 9 AM, 2109:11-2109:20, 2128:14-23, 2129:18-20 (Knuth). Complaints can be submitted to the portal by anyone with an Internet connection, including by people outside of Arizona, and can be made anonymously. Tr. Day 9 AM, 2129:18-2130:4 (Knuth). The Attorney General's

Office evaluates all complaints, even those submitted anonymously. Tr. Day 9 AM, 2130:9-21 (Knuth).

554. Thousands of complaints have been submitted through the portal, some of which have concerned allegations of non-citizen voting. Tr. Day 9 AM, 2109:11-2109:20, 2128:25-2129:8 (Knuth).

555. Most of the complaints that the Attorney General's Office has received alleging non-citizen voting in Arizona were sweeping, broad complaints with general concerns that non-citizens may be voting, but some complaints about non-citizen voting contained specific allegations about specific individuals that could be investigated. Tr. Day 9 AM, 2109:14-2110:7, 2121:12-23 (Knuth).

556. The Attorney General's Office makes an initial credibility determination for every complaint received in the Election Integrity Unit portal to determine if a further, more complete investigation is warranted. Tr. Day 9 AM, 2129:9-17, 2130:5-14 (Knuth).

557. In total, since 2010, the Office has conducted approximately two hundred to three hundred investigations into election-related offenses. Tr. Day 7 PM, 1700:21-1701:7 (Lawson); Tr. Day 9 AM, 2128:25-2129:8 (Knuth).

558. From 2020 to present, of the over 4,300 allegations of voter fraud received through its Election Integrity Unit portal, "not a lot" of the complaints alleged non-citizen voter fraud and none resulted in a prosecution or conviction of a non-U.S. citizen for illegally voting. Tr. Day 9 AM, 2109:11-20 (Knuth) (describing number of non-citizen complaints); Tr. Day 7 AM, 1589:22-1591:2 (Minnite); *see also* Tr. Day 9 AM, 2133:23-2134:3 (Knuth); PX 286; PX 287.

559. The Attorney General's Office also receives election-related complaints from the Secretary of State, other agencies within Arizona, and County Recorders. Tr. Day 9 AM, 2130:23-2131:4 (Knuth).

560. The dedicated investigator for the Attorney General's Election Integrity Unit, Bill Knuth, agreed he would forward cases to prosecutors if there was probable cause that a non-citizen has voted or registered. Tr. Day 9 AM, 2132:13-2133:2 (Knuth). He could

not recall any instance where he concluded a complaint that a non-citizen had voted was valid and warranted prosecution. Tr. Day 9 AM, 2120:19-2121:9, 2133:7-2134:3 (Knuth). In fact, Knuth could not recall a single investigation he had ever done into an allegation of non-citizen voting that resulted in him concluding that a non-citizen had voted and prosecuting the individual. Tr. Day 9 AM, 2133:23-2134:3 (Knuth).

561. Knuth stated that many times during these investigations he will speak directly to the subject of the investigation and that they may need to retain counsel. Tr. Day 9 AM, 2131:14-17; 2132:8-12.

562. The Attorney General is only aware of two cases involving non-citizens who are alleged to have voted, and neither have resulted in a conviction and neither are public. Tr. Day 7 PM, 1691:11-1694:8 (Lawson). Both cases are sealed and involved individuals who engaged in systematic identity theft over a number of years, in which alleged voter fraud was just one aspect of their broader alleged offenses. Tr. Day 7 PM, 1707:8-1708:4 (Lawson). Lawson is not aware of any other case involving a voting allegation in Arizona with a similar set of facts. Tr. Day 7 PM, 1707:16-23 (Lawson).

563. The members of the Arizona Legislature who debated and voted on the challenged laws could not have known about these two cases. Tr. Day 7 PM, 1708:13-23, 1708:1-2, 1704:3-7 (Lawson).

564. Beyond the two sealed cases, Lawson has not identified any instances of non-citizen voting in Arizona. Tr. Day 7 PM, 1705:25-1706:3 (Lawson).

565. When asked if he was familiar with instances where a non-citizen allegedly voted in Arizona, but the Attorney General's office lacked sufficient evidence to prosecute, Lawson pointed only to an example where his office's investigation confirmed the citizenship of an individual alleged to have voted illegally. Tr. Day 7 PM, 1695:22-1696:16 (Lawson). He pointed to no instances where his office believed a non-citizen voted illegally but his office declined to prosecute for want of evidence. *Id.*

566. Arizona County Recorders are not aware of any instance of non-U.S. citizens registering to vote or voting. Tr. Day 1 AM, 92:8-14 (Petty) (testifying that Maricopa has

not identified any cases of non-citizen voting from 2013 to present); Asrarynezami Dep. 75:17-19, 75:22-24; Merriman Dep. 66:16-22; Hansen Dep. 62:8-22; Webber Dep. 104:10-13; Munoz and Johnston Dep. 95:2-7; Hiser Dep. 243:3-7; PX 102 Rog. No. 9 (Apache Resp. Interrogs. admitting that no known instances of non-citizen fraud since January 1, 2013 to present); PX 116 Rog. No. 9 (Coconino Resp. Interrogs.); PX 122 Rog. No. 9 (Graham Resp. Interrogs.); PX 129 Rog. No. 9 (Greenlee Resp. Interrogs.); PX 134 Rog. No. 9 (La Paz Resp. Interrogs.); PX 148 Rog. No. 9 (Mohave Resp. Interrogs.); PX 153 Rog. No. 9 (Navajo Resp. Interrogs.); PX 179 Rog. No. 9 (Yavapai Resp. Interrogs.); PX 182 Rog. No. 9 (Yuma Resp. Interrogs.); *see also* Lewis Dep. 113:11-13 (not aware of prosecutions for voter fraud); Moreno Dep. 78:23-79:1 (similar).

567. Similarly, the Secretary of State admits that there is no evidence of widespread voter fraud or non-U.S. citizen voting in Arizona. ECF No. 124 ¶ 198. In fact, Elections Director Connor testified that she was not familiar with any instance of non-U.S. citizens voting. Tr. Day 2 AM, 365:12-15.

568. The Secretary of State also admits that since 2020, Arizona's elections have come under tremendous scrutiny in various official and unofficial audits, but none of these reviews have surfaced legitimate claims of widespread fraud or non-U.S. citizens voting in Arizona elections because no such fraud exists. ECF No. 124 ¶ 200.

569. In addition to those audits, the Secretary of State admits that plaintiffs brought at least nine different post-election lawsuits in Arizona state and federal courts challenging the validity of the 2020 General Election, and the courts unanimously rejected the claims. ECF No. 124 ¶ 199.

570. Nonetheless, as the Secretary of State acknowledges, various actors have continued to make baseless allegations that Arizona's elections suffer from fraud and non-U.S. citizen voters. ECF No. 124 ¶ 202.

## C. Dr. Minnite's Testimony Further Undermines Any Purported State Interests in the Challenged Laws

### 1. Dr. Minnite is qualified to testify as an expert on voter fraud

571. Dr. Minnite is a tenured professor at Rutgers University in the Department of Public Policy and Administration, where she has taught for 12 years. Tr. Day 7 AM, 1555:17-1556:2 (Minnite). She has a Bachelor of Arts degree in History and a Master's degree and Ph.D. in Political Science. Tr. Day 7 AM, 1555:13-16 (Minnite). Dr. Minnite has studied the incidence of voter fraud in American elections for over twenty years. Tr. Day 7 AM, 1556:3-9 (Minnite).

572. Dr. Minnite's book—The Myth of Voter Fraud—is the only peer-reviewed book regarding the incidence of voter fraud in the United States. Tr. Day 7 AM, 1557:13-1558:24 (Minnite). It has been recognized by the Government Accountability Office as a scientifically reliable study of the incidence of voter fraud. Tr. Day 7 AM, 1558:25-1559:13 (Minnite).

573. Dr. Minnite has testified as an expert witness in more than a dozen cases. Tr. Day 7 AM, 1559:16-22 (Minnite). No court has found that Dr. Minnite is not a qualified expert on the issue of voter fraud, that her testimony on the issue was not credible, or that she was biased. Tr. Day 7 AM, 1560:6-13 (Minnite).

574. Dr. Minnite has also testified before other government bodies about the issue of voter fraud, including subcommittees for the U.S. House and the U.S. Senate, and the U.S. Commission on Civil Rights. Tr. Day 7 AM, 1561:8-16 (Minnite).

575. No party objected to Dr. Minnite serving as an expert in the incidence of voter fraud. The Court finds that Dr. Minnite is qualified to provide the expert analysis and opinions offered in this matter. Having observed Dr. Minnite's testimony, the Court credits his analyses, opinion, and testimony, and grants them substantial weight.

**2. Voter fraud is exceedingly rare, both nationally and in Arizona, and the incidence of voter fraud attributable to non-citizens in Arizona is essentially non-existent.**

576. Dr. Minnite testified that the incidence of voter fraud, including non-citizen voter fraud, both nationally and in Arizona, is exceedingly rare. Tr. Day 7 AM, 1563:3-6, 1572:10-13, 1572:23-1573:7, 1578:4-8, 1578:13-1582:7, 1583:4-1596:2 (Minnite).

577. To reach that opinion, Dr. Minnite applied the "mixed methods approach,"

consulting a wide variety of quantitative and qualitative sources, including on the federal, state, and county level. Tr. Day 7 AM, 1570:12-1571:4 (Minnite). Among those sources were social scientific research; federal prosecution data; Arizona state and county-level sources, including state prosecution data; third-party databases; and allegations of voter fraud, including by elected officials. Tr. Day 7 AM, 1570:12-1571:4, 1571:8-1598:14 (Minnite).

578. This "mixed methods" approach that Dr. Minnite used to conclude that voter fraud nationally and in Arizona is rare is the same approach she used in her peer-reviewed book. Tr. Day 7 AM, 1565:15-16, 1598:15-18 (Minnite). It is also applied by social scientists regularly in situations like the one here—where the sources of data are incomplete and scattered. Tr. Day 7 AM, 1564:6-10 (Minnite). Social scientists using the mixed methods approach review qualitative and quantitative sources to identify patterns and draw a conclusion from the data when the sources converge on an answer. Tr. Day 7 AM, 1564:11-1565:4 (Minnite).

579. Following that approach here, each of these sources repeatedly led to the conclusion that voter fraud—both nationally and in Arizona—is exceedingly rare. *See, e.g.*, Tr. Day 7 AM, 1571:14-1572:13 (GAO 2014 audit), 1572:14-1573:5 (peer reviewed quantitative studies), 1589:22-1593:9 (Arizona Attorney General's Election Integrity Unit task force), 1585:22-1586:7 (sparse history of voter fraud convictions in Arizona), 1584:13-15, 1587:5-8 (county-level reports and prosecutions), 1583:4-1583:23 (Associated Press investigation), 1593:10-1595:23 (third-party databases, including from Heritage Foundation and Arizona University's school of journalism project), 1579:14-1581:17 (highly motivated federal prosecution effort) (Minnite). These sources find minuscule instances of voter fraud, during time periods in which close to a billion votes were cast. Tr. Day 7 AM, 1581:18-21 (Minnite).

580. Dr. Minnite testified that the sole study to find that voter fraud by non-citizens is not rare, authored by Dr. Jesse Richman, is not considered credible or reliable within the field of political science. Tr. Day 7 AM, 1573:8-1578:3 (Minnite). In an

unprecedented move, 200 political scientists signed a letter rebuking Dr. Richman's findings. Tr. Day 7 AM, 1575:3-12 (Minnite). Additionally, three political scientists, including Dr. Stephen Ansolabehere of Harvard University who created the data that Dr. Richman relied upon, published a peer-reviewed rebuttal to Dr. Richman's study explaining that Dr. Richman's conclusions were attributable to measurement error and that the likely percentage of non-citizen voters in recent United States elections was zero. Tr. Day 7 AM, 1575:13-1576:13 (Minnite).

581. Dr. Richman did not offer an opinion in this case that there has been voting by non-citizens in Arizona. While Dr. Richman testified at length about an analysis he performed (DX 974) finding 1,779 full ballot voters on AVID that ADOT records indicated were non-citizens, he testified that he was not offering this analysis to show that these individuals were non-citizens. Tr. Day 8 AM, 1930:12-15 (Richman).

582. Even if Dr. Richman was offering this analysis to suggest that non-citizens had registered to vote in Arizona, the analysis is not reliable and is entitled to zero weight. Dr. Richman acknowledged on direct examination that the 1,779 people identified could be nothing more than data entry errors, matching errors, or staleness in the data. Tr. Day 8 AM, 1930:17-1931:11 (Richman). And on cross-examination, Dr. Richman testified:

- he could not be "certain" of this analysis. Tr. Day 8 PM, 1969:5-1969:11 (Richman);
- in his initial analysis, he mischaracterized the data he was presenting as only involving individuals who had received or renewed their license, when it included more than 900 people who had received a "duplicate" and were never required to show proof of citizenship or authorized presence for that issuance. Tr. Day 8 PM, 1967:5-16, 1971:10-1972:7 (Richman);
- between his initial and supplemental reports, he made significant methodological changes in his calculation. Tr. Day 8 PM, 1974:13-1975:15 (Richman);
- even as revised, Dr. Richman acknowledged that in neither his original nor his revised analysis did he account for (i) staleness in the ADOT data, (ii) data entry errors, (iii) people who registered to vote before DPOC was required in 2005, Tr.

Day 8 PM, 1970:15-25, 1971:7-9, 1972:14-1973:8, Tr. 1975:17-1978:16 (Richman).

These flaws are both methodological and based on using data in a manner which it is not intended to be used to draw inappropriate conclusions, and demonstrate the unreliability of Dr. Richman's analysis. And they are similar in nature to issues on which Dr. Richman has been criticized in the past. ECF No. 621-14; Tr. Day 7 AM, 1573:8-1578:3 (Minnite); Tr. Day 5, 1152:14-1154:20 (McDonald).

583. Dr. Minnite testified that former President Trump's claim that 36,000 non-citizens voted in Arizona's 2020 election and similar claims made by members of the Arizona Legislature at the time were based on the number of registered federal only voters in Arizona and had no basis. Tr. Day 7 AM, 1597:5-1598:8, 1600:12-1601:5 (Minnite).

584. Dr. Minnite also testified that because she uses the mixed methods approach, her review of numerous sources also uncovers instances of voters unintentionally violating election laws, including mistaken non-citizen voter registration in states other than Arizona. Tr. Day 7 AM, 1569:7-1570:2 (Minnite). Based on that evidence, she testified that there is no evidence that non-citizens have accidentally registered to vote in Arizona and there is no reason to believe it is a systematic problem in Arizona. Tr. Day 7 AM, 1569:16-20, 1606:2-11 (Minnite); *see also* Tr. Day 7 AM, 1585:6-1587:8 (Minnite) (discussing PX 292). Dr. Minnite further testified that the incidence of mistaken non-citizen voter registration is not common or widespread. Tr. Day 7 AM, 1633:23-1634:7 (Minnite).

585. Defendants' experts, Dr. Hoekstra and Dr. Richman, do not identify any contrary evidence of non-citizen voting intentionally or unintentionally. Tr. Day 7 AM, 1587:19-1588:2, 1600:18-20, 1605:22-1606:1 (Minnite).

**3. The Challenged Laws will not further reduce the incidence of voter fraud in Arizona because it is already rare.**

586. Building off of her first opinion and again using the mixed methods approach, Dr. Minnite opined that the Challenged Laws will not reduce voter fraud because

it is so rare. Tr. Day 7 AM, 1563:7-14, 1599:7-13, 1601:17-22 (Minnite).

587. In reaching this conclusion, Dr. Minnite also reviewed the legislative record for the Challenged Laws. She found that there was no evidence in the legislative record that non-citizen voting is a problem in Arizona or that federal only voters are likely to be non-citizens, even though legislators referenced the number of federal only voters as the driving concern behind the Challenged Laws. Tr. Day 7 AM, 1599:13-1600:17 (Minnite). Similarly, neither Dr. Hoekstra nor Dr. Richman identified any federal only voters who are non-citizens in their reports, and the Secretary of State's office has publicly stated that it is wrong to assume that federal only voters are non-citizens. Tr. Day 7 AM, 1600:18-1601:5 (Minnite). Indeed, Dr. Minnite saw no evidence in this case that federal only voters are non-citizens. Tr. Day 7 AM, 1600:15-17 (Minnite).

#### 4. Repeated false allegations about voter and election fraud undermine public confidence in the election system, and there is no persuasive reason to believe that the Challenged Laws will improve voter confidence.

588. Dr. Minnite opined that there is no persuasive evidence for believing that so-called election integrity laws improve voter confidence in elections. Tr. Day 7 AM, 1563:18-20, 1602:1-11, 1613:4-1614:20 (Minnite). Instead, Dr. Minnite testified that the emerging social science research suggests that false claims of election fraud are what depresses voter confidence in elections. Tr. Day 7 AM, 1563:20-21, 1603:19-1604:5, 1607:20-1608:24 (Minnite).

589. Dr. Minnite reached these conclusions based on her review of published research articles on the subject. Tr. Day 7 AM, 1602:1-11, 1603:19-1604:5, 1607:20-1608:24, 1613:4-1614:20 (Minnite).

### D. There is No Evidence to Support the State's Purported Interests in the Challenged Laws

590. The Attorney General indicated in responses to interrogatories that the Challenged Laws might be justified by a state interest in "ensuring that members of the public trust elections" and "may help alleviate" doubt that "some members of the public

may feel . . . about election results, rightly or wrongly." Tr. Day 7 PM, 1711:6-12, 1712:2-13 (Lawson) (quoting interrogatory responses). However, at trial, the Attorney General Office's lead prosecutor for election-related offenses, Todd Lawson, admitted that it was speculative to believe that the challenged laws would help alleviate public doubt about the accuracy of election results. Tr. Day 7 PM, 1711:6-1712:17 (Lawson).

591. Petersen similarly testified that he took no steps to evaluate whether the Challenged Laws would increase confidence in elections, instead relying on his "common sense." Petersen Dep. 107:16-110:3.

592. The Attorney General has also indicated that the Challenged Laws might be justified by the state's "general interest" in limiting voter registration to individuals who are eligible to vote, Tr. Day 7 PM, 1709:18-1710:10 (Lawson), but as Dr. Minnite testified, the previous laws already accomplished this goal. Tr. Day 7 AM, 1601:17-22.

593. Beyond these two above-described interests, Defendants have not identified any additional state interests that it believes the Challenged Laws would promote. *See* Tr. Day 7 PM, Tr. 1711:18-1712:22 (Lawson); *see also* ECF No. 569; ECF No. 600.

594. The Secretary of State admits that "the challenged provisions do not advance any legitimate regulatory interest in ensuring free, fair, and secure elections, furthering the orderly and efficient administration of elections, or preventing fraud in elections." ECF No. 189 ¶ 8.

595. With respect to each of the challenged provisions, the Secretary of State also admits that "there is no rational or strong interest served by the DPOC Requirement, Birthplace Requirement, Checkmark Requirement, or the mandated use of potentially outdated and incorrect citizenship data to purge eligible voters from the rolls." ECF No. 124 ¶ 197.

596. Not only could the Maricopa County Recorder not identify any county interests served by the Challenged Laws when asked, but he believes the Challenged Laws "may make access to registration much more difficult." PX 139 Rog. No. 10.

597. Nor do summary reports from juror managers provide any evidence that non-

citizens are registered to vote that can form any basis for state interest. As an initial matter, the summary reports do not include the jury questionnaire as completed by a prospective juror. DX 970, ¶ 11. Moreover, prospective jurors are identified through voter registration lists and records from ADOT that include individuals who are both citizens and non-citizens. *Id.* ¶¶ 6-9. As such, it is no surprise that prospective jurors who were always non-citizens and who are not registered voters indicate on their questionnaire that they are non-citizens. Moreover, as the Maricopa County juror managers stated in declaration, only 32% of juror questionnaires are completed online under penalty of perjury, while the remaining 68% of completed juror questionnaires are not made under penalty of perjury. *Id.* ¶ 17.

598. Plaintiffs presented persuasive testimony that the Challenged Laws will actually undermine the State's interest in effective election administration. For example, Janine Petty testified that members of her office have expressed concern about the provisions in the Challenged Laws that expose election officials to strict criminal liability. Tr. Day 1 AM, 74:12-14 (Petty). Likewise, Hilary Hiser testified that she was very familiar with the criminal sanctions in the Challenged Laws because putting criminal penalties on election officials makes retention of those officials more difficult, workers fear that they could face criminal penalties for making a mistake, and this is a "constant area of concern for staff and election officials." Tr. Day 8 PM, 2052:2-23 (Hiser).

599. Elections Director Colleen Connor testified that the past several years of heated rhetoric and misinformation about Arizona elections has already had a serious detrimental effect on election administration. Tr. Day 2 AM, 365:21-368:7 (Connor). As a result of campaigns of misinformation, election officials have faced harassment, death threats, and hostility from the public, *id.* at 366:2-7, and many election officials have chosen to resign leading to very high rates of election administrator turnover in Arizona in recent years, *id.* at 368:2-7.

600. She further testified that the Legislature's addition of criminal penalties against election officials only adds to those officials' fears about doing their jobs and the difficulties of retaining qualified and experienced election workers. *Id.* 370:13-17; *see also*

Tr. Day 8 PM, 2052:24-2053:9 (Hiser).

601. The Secretary of State, the State of Arizona, and the Attorney General admit that the intent to discriminate against Native voters, naturalized U.S. citizens, Latino voters, and members of language minority communities is not a legitimate governmental purpose. ECF No. 124 ¶ 194; ECF No. 328 ¶ 194.

## XIII. Plaintiffs

602. The facts regarding the Plaintiffs' respective standing are set forth below. *See also* Plaintiffs' Joint Proposed Conclusions of Law, at Exhibit A (Non-U.S. Plaintiffs' Standing Chart) (filed concurrently).

### A. Mi Familia Vota

603. Plaintiff Mi Familia Vota ("MFV") is a national, non-profit civic engagement organization headquartered in Phoenix, Arizona. Tr. Day 4 AM, 780:20-25 (Rodriguez-Greer); ECF No. 65 ¶ 16.

604. MFV's mission is to unite Latino, immigrant, and allied communities to promote social and economic justice through increasing civic participation in the Latino community by encouraging leadership development, citizenship, and issue organizing. ECF No. 65 ¶ 16; ECF No. 150-1 ¶ 2. MFV works to ensure that as many people as possible can participate in the democratic process, including members of the Latino community. Tr. Day 4 AM, 781:22-782:2 (Rodriguez-Greer). Thus, MFV's voter education efforts include providing resources in Spanish and making information related to elections accessible so that ordinary Arizonans can understand the democratic process. Tr. Day 4 AM, 781:22-782:13, 785:4-17 (Rodriguez-Greer).

605. MFV serves communities that include individuals from Latin American countries, those who identify as Latino, and Spanish speakers. Tr. Day 4 AM, 784:23-785:3 (Rodriguez-Greer). Many people in these communities were born outside of the United States, are newly naturalized citizens, or did not receive a formal education. Tr. Day 4 AM, 785:9-12, 785:18-23 (Rodriguez-Greer).

606. MFV helps the communities it serves understand how they can address issues

that are important to them through civic participation. Tr. Day 4 AM, 785:13-16 (Rodriguez-Greer).

607. MFV accomplishes its mission by doing year-round voter engagement work so that it is viewed as a "trusted community resource." Tr. Day 4 AM, 782:14-18 (Rodriguez-Greer). This work includes providing voter education workshops and community learning events; working with young people through MFV's youth engagement summits and youth fellowships; expanding the electorate by helping eligible legal permanent residents navigate the citizenship application process; attending civic engagement events; and registering voters in the community through tabling at events and using paid canvassers. Tr. Day 4 AM, 782:14-783:24 (Rodriguez-Greer); *see also* ECF No. 150-1 ¶ 3.

608. MFV provides extensive training to its canvassers, including on the registration form itself to how to approach individuals in the community. Tr. Day 4 AM, 783:25-784:7. (Rodriguez-Greer). This training is important for being able to help reach members in the communities MFV serves, as community members are often hesitant to share personal information with the government, including whether they were born outside of the United States. Tr. Day 4 AM, 786:12-787:3, 787:15-788:8 (Rodriguez-Greer).

609. MFV is also building out a program to train volunteer ambassadors who can help family members and neighbors create a plan to vote and teach them about the democratic process. Tr. Day 4 AM, 793:17-24. (Rodriguez-Greer). Ambassadors would be responsible for helping community members understand basic election concepts they may be unfamiliar with, such as the difference between a midterm election and a general election. *Id.*

610. Since 2016, MFV has registered over 60,000 new voters in Arizona. ECF No. 150-1 ¶ 2. MFV has registered over 30,000 voters in Arizona in the last two years. Tr. Day 4 AM, 784:12-14, 780:18-19 (Rodriguez-Greer).

611. MFV finances its work through fundraising, grants, and independent donors, and has limited funds to accomplish its mission in Arizona. Tr. Day 4 AM, 781:9-12, 16-

21 (Rodriguez-Greer).

612. For 2023, MFV's approximate operating budget is about $1.5 million. Tr. Day 4 AM, 781:13-15 (Rodriguez-Greer).

613. In 2022, MFV spent approximately $1.5 million on voter engagement efforts. Tr. Day 4 AM, 784:15-18 (Rodriguez-Greer).

614. MFV anticipates that its voter engagement budget during the 2024 election cycle will be significantly higher than its 2022 budget. Tr. Day 4 AM, 784:19-22 (Rodriguez-Greer).

615. HB 2492 frustrates MFV's mission and requires it to divert resources as a result of that frustration of mission. Tr. Day 4 AM, 786:12-787:3, 787:15-788:8, 791:16-792:4 (Rodriguez-Greer); *see also* ECF No. 150-1 ¶ 8.

616. If HB 2492's Birthplace Requirement is implemented, it will be more difficult for MFV to accomplish its mission. The communities that MFV serves are hesitant to share their birthplace information because, based on personal experience, they often do not feel safe sharing that information with the government. Tr. Day 4 AM, 786:12-787:3, 787:15-788:8 (Rodriguez-Greer). Even apart from this resistance, MFV often engages with potential registrants at places on the street where they are in a hurry to get somewhere else, and therefore choose not to fill out optional portions of the state form, such as the birthplace section. Tr. Day 4 AM, 788:14-789:4 (Rodriguez-Greer).

617. MFV's representative testified that in her own personal experience as a naturalized citizen growing up in an area with heavy Border Patrol presence, she was always warned to not disclose her birthplace information for her own safety. Tr. Day 4 AM, 786:15-787:3 (Rodriguez-Greer). In her prior college access work, many students—who are themselves citizens but who have undocumented parents—have refused to fill out the Free Application for Federal Student Aid (FAFSA) due to concerns about disclosing their parents' birthplace, and the communities that MFV serves are concerned about sharing their birthplace information. Tr. Day 4 AM, 787:15-788:8 (Rodriguez-Greer).

618. For similar reasons, if HB 2492's citizenship Checkmark Requirement is

implemented, it will be more difficult for MFV to accomplish its mission because its members may not fill out the box due to confusion or because they are in a hurry. *See* Tr. Day 4 AM, 788:14-789:4, 791:16-792:4 (Rodriguez-Greer).

619. As a result of HB 2492's DPOC Requirement, certain voters will not be permitted to vote by mail or in presidential elections, which will also make it more difficult for MFV to accomplish its mission.

620. Limiting the ability to vote by mail will impact the communities that MFV serves and discourage them from participating in the democratic process. Tr. Day 4 AM, 789:14-790:17 (Rodriguez-Greer). The ability to vote by mail has allowed MFV to "motivate and encourage and excite people about voting in Arizona" and has allowed MFV to be "extremely successful in helping increase participation." Tr. Day 4 AM, 790:1-11 (Rodriguez-Greer); *see also* ECF No. 150-1 ¶ 9. MFV's community members are "excit[ed] and relie[ved]" to be able to vote by mail, which allows them to research the issues on the ballot and mail their ballot in rather than having to take time off of work to vote. Tr. Day 4 AM, 790:1-9 (Rodriguez-Greer).

621. Presidential elections are important to MFV's outreach and voter engagement efforts because being able to vote for president is "one of the things [MFV's community members] get really excited about." Tr. Day 4 AM, 790:24-791:5 (Rodriguez-Greer).

622. Even though HB 2492 is not currently being enforced, MFV is deeply concerned about the impact the law will have on Arizona voters, the communities MFV services, and on MFV's ability to accomplish its mission. Tr. Day 4 AM, 791:11-794:6 (Rodriguez-Greer).

623. MFV will have to redirect significant resources if HB 2492 goes into effect. Tr. Day 4 AM, 809:24-810:1 (Rodriguez-Greer); *see also* ECF No. 150-1 ¶¶ 12-19.

624. For example, MFV will have to "reshift [its] entire focus [to] go into crisis mode" to try and address confusion created by the law and help its community members understand its impact on the registration and voting process. Tr. Day 4 AM, 791:16-24

(Rodriguez-Greer). This will impact MFV's budget and force MFV to "reallocate [their] limited resources to try and fill in the gaps of knowledge, but also to help convince [community members] that they should still participate in spite of the changes" caused by HB 2492. Tr. Day 4 AM, 791:25-792:4 (Rodriguez-Greer).

625. MFV does not have any additional resources to dedicate to its efforts in response to HB 2492, so MFV will have to reallocate funding from its other programming, such as its youth engagement work and its work helping legal permanent residents with the citizenship application process. Tr. Day 4 AM, 792:9-18 (Rodriguez-Greer). Similarly, once the law goes into effect, MFV will also have to shift the focus of its ambassadors program—meant to educate community members about election basics—to focus specifically on educating community members about HB 2492 and its effects. Tr. Day 4 AM, 792:19-21, 793:25-794:6 (Rodriguez-Greer). These changes will frustrate MFV's ability to conduct its proactive work focused on increasing participation and getting people excited about participating in the democratic process. *Id.* MFV also cannot afford to hire new staff, so it will have to reallocate its existing staff to efforts to address HB 2492, limiting their ability to work on their high priority projects for MFV. Tr. Day 4 AM, 795:22-796:3 (Rodriguez-Greer).

626. In response to HB 2492, MFV would also have to make changes to its voter registration program, and spend time, money, and resources on creating a new training program for canvassers and staff and on training those individuals. Tr. Day 4 AM, 792:24-793:12. (Rodriguez-Greer). MFV's ability to register voters would also be impacted because MFV will have to convince applicants to provide sensitive personal information they are hesitant to share with the government. Tr. Day 4 AM, 793:1-9. (Rodriguez-Greer).

627. "[I]n short [HB 2492] would be very disruptive to what [MFV] aim[s] to do today. [MFV would] have to change a lot." Tr. Day 4 AM, 792:21-23 (Rodriguez-Greer).

**B. Voto Latino**

628. Voto Latino is a 501(c)(4) nonprofit, social welfare organization that operates in Arizona, Nevada, Texas, Pennsylvania, and North Carolina and works to ensure

that Latino voters are enfranchised and included in the democratic process. Tr. Day 1 PM, 217:4-6, 218:8-10 (Patel); ECF No. 65 ¶ 19. Voto Latino considers Arizona to be the most important state out of those it operates in towards furthering its mission. Tr. Day 1 PM, 218:11-219:16 (Patel).

629. Voto Latino's mission is to educate and empower a new generation of Latino voters in Arizona and elsewhere, ultimately guiding the Latino community towards full realization of its political power. Tr. Day 1 PM, 217:7-11 (Patel); *see also* ECF No. 65 ¶ 19.

630. Voto Latino's constituents in Arizona include Latinos who are eligible to vote but not yet registered, low-propensity voters, younger Latino voters aged 18-29, naturalized citizens, voters for whom English is their second language, first-generation voters, and voters navigating the process for the first time. Tr. Day 1 PM, 219:23-220:24, 223:19-224:6 (Patel).

631. Voto Latino accomplishes its mission through three bodies of work: voter registration, voter turnout or Get Out the Vote, and advocacy. Tr. Day 1 PM, 217:12-218:5 (Patel). Because traditional outreach methods often fall short when reaching out to Voto Latino's community members, Voto Latino communicates with its constituents through platforms and channels that its constituents are already using, such as social media, paid online advertising, and text messaging. Tr. Day 1 PM, 224:7-225:20 (Patel).

632. From 2017 to 2020, Voto Latino registered over 50,000 new voters in Arizona. *See* ECF No. 150-2 ¶ 3. Voto Latino has spent millions of dollars on voter registration efforts in Arizona and has registered over 60,000 Arizonans since 2012, including over 40,000 successful registrations in 2020. Tr. Day 1 PM, 220:25-221:11, 221:17-19, 240:4-9 (Patel). As part of its voter registration efforts, Voto Latino engages in "chase programming," which involves following up with individuals who Voto Latino helped with the voter registration process but who were not successfully registered. Tr. Day 1 PM, 221:20-222:6, 222:16-23 (Patel). These rejected voter applicants are eligible voters who had their registration rejected for one reason or another, including human error

in completing the registration form or not having the right ID documents. Tr. Day 1 PM, 222:7-23 (Patel).

633. Voto Latino has also spent millions of dollars on its Get Out the Vote efforts in Arizona, which entail direct communications, paid digital advertising, social media campaigns, peer-to-peer text messaging, and in-person activation, such as Get Out the Vote rallies. Tr. Day 1 PM, 224:14-225:11, 240:10-14 (Patel).

634. Voto Latino has spent hundreds of thousands of dollars in Arizona over the past several election cycles on advocacy efforts to inform its constituents about issues that impact them and where candidates stand on those issues. Tr. Day 1 PM, 225:12-20, 240:15-19 (Patel).

635. Voto Latino finances its work through donations from individuals, foundations, and its online grassroots fundraising campaigns. Tr. Day 1 PM, 225:21-24 (Patel). Due to its limited funds, Voto Latino makes hard choices about how to allocate its resources and is not able to do everything it wants to do within its three bodies of work in Arizona or nationally. Tr. Day 1 PM, 225:25-226:9 (Patel). Consequently, if Voto Latino has to spend more resources on voter registration because the cost of registering voters increases, it will have fewer resources to dedicate to its Get Out the Vote and advocacy efforts, which are also critical to its mission. Tr. Day 1 PM, 225:21-226:22 (Patel).

636. HB 2492 frustrates Voto Latino's mission and has already required it to divert resources as a result. After HB 2492 passed, Voto Latino created content, including videos, infographics, tool kits, and press releases, to help its constituents understand the law, which required Voto Latino to spend money and reallocate its staff's time to work on these projects. Tr. Day 1 PM, 237:9-19, 253:22-254:22 (Patel). Voto Latino will be required to continue diverting resources in the future as well due to HB 2492.

637. HB 2492's Birthplace Requirement will make it more difficult for Voto Latino to accomplish its mission. It will disproportionately impact naturalized citizens and people born outside the United States—Voto Latino's core constituencies. Tr. Day 1 PM, 222:7-23, 227:10-228:11, 229:4-15, 256:2-22 (Patel). Moreover, by creating an additional

barrier to successfully registering, the Birthplace Requirement will increase the number of Voto Latino's constituents who fail to register due to human error in completing "a long, complicated form." *Id.* This increase in the number of applicants who are not successfully registered to vote due to the unnecessary additional barrier imposed by the Birthplace Requirement will frustrate Voto Latino's mission of registering and engaging as many Latino voters as possible. *Id.*

638. Similarly, HB 2492's Citizenship Checkmark Requirement will make it more difficult for Voto Latino to accomplish its mission because it too, is another unnecessary barrier that will result in a greater number of rejected registration applications. Tr. Day 1 PM, 222:7-11, 227:10-228:11, 246:11-13, 256:2-22 (Patel).

639. The Birthplace Requirement and Citizenship Checkmark Requirement will force Voto Latino to spend more resources chasing greater numbers of unsuccessful applicants in order to help them again try to register to vote. Tr. Day 1 PM, 230:24-231:8, 256:9-22 (Patel). This will result in fewer resources being available for Voto Latino's Get Out the Vote and advocacy programming. Tr. Day 1 PM, 229:17-230:8, 230:24-231:8, 256:9-22 (Patel). These chase efforts also can only occur *after* an election once Arizona provides updated voting rolls reflecting who successfully registered to vote, thus permitting Voto Latino to see which of its community members did not make the rolls. Accordingly, even if Voto Latino can successfully chase and register a community member who did not make the rolls, it will only be after that person was already deprived of the opportunity to vote in a particular election, further frustrating Voto Latino's mission. Tr. Day 1 PM, 222:25-223:18, 230:24-231:12, 256:9-22 (Patel).

640. HB 2492's DPOC Requirement will also frustrate Voto Latino's mission.

641. Voto Latino primarily relies on the state form when it registers voters in Arizona, and—under HB 2492—state form applicants who do not provide DPOC will now have their registrations rejected entirely, rather than—as now—registered as a federal-only voter. This will disproportionately impact Voto Latino's constituents—particularly college students who often only have a school ID—frustrating Voto Latino's ability to register and

turn out those voters. Tr. Day 1 PM, 234:11-235:1 (Patel).

642. The ability to vote by mail is of great importance to the Latino community in Arizona, and Voto Latino focuses its Get Out the Vote efforts on voting by mail and early voting. ECF No. 150-2 ¶ 10. If certain voters can no longer vote by mail due to HB 2492, it will frustrate Voto Latino's ability to increase political engagement. *Id.* It will also force Voto Latino to spend resources tailoring its Get Out the Vote campaigns to advise voters who cannot vote by mail or in presidential elections. *Id.* ¶ 14.

643. HB 2492 subjects voters to investigation by the Attorney General, which will have a chilling effect on Voto Latino's constituents' willingness to register to vote, reducing voter registration rates among Voto Latino's constituents in Arizona. Tr. Day 1 PM, 236:9-237:4 (Patel). This will further frustrate Voto Latino's mission of enfranchising voters and cause it to reallocate resources from other programming in response. Tr. Day 1 PM, 236:9-237:8 (Patel).

644. In response to HB 2492's provisions, Voto Latino will have to spend more resources to register the same numbers of voters, which will in turn take away resources from its turnout and advocacy work in Arizona and require Voto Latino to pull resources from its programming in other states. Tr. Day 1 PM, 238:17-23, 239:6-240:3 (Patel). Voto Latino does not have additional resources to hire more staff; it has already had to—and will continue to have to—reallocate its staff time in response to HB 2492. Tr. Day 1 PM, 254:13-22 (Patel).

645. Voto Latino plans to register 40,000 new voters in Arizona during the 2024 election cycle; to reach 375,000 low propensity voters Arizona with its Get Out the Vote efforts; and to reach out to 450,000 voters through its advocacy programming. Tr. Day 1 PM, 240:20-241:3 (Patel). HB 2492, however, will increase the costs of its voter registration efforts on a per registrant basis, forcing it to allocate funds from its advocacy work and decreasing the size of the audience for its advocacy programming, further undercutting its mission. Tr. Day 1 PM, 240:20-241:25 (Patel).

**C. Southwest Voter Registration Education Project**

646. Southwest Voter Registration Education Project ("SVREP") is a non-profit and non-partisan organization committed to the mission of empowering Latinos through their vote and improving the participation of the Latino community across the United States in the democratic process, through voter registration, voter education, and voter engagement activities. SVREP's targeted demographic is Latino voters. Tr. Day 3 PM, 729:10-14, 730:4-6, 730:7-11, 732:17-21 (Camarillo).

647. SVREP's mission-critical activities, including voter registration, voter education, and voter turnout, demand money, time, staff, and resources. SVREP works in every state and local election in Arizona. Tr. Day 3 PM, 730:12-13, 730:20-23, 731:4-19, 732:8-16, 738:21-739:1, 746: 21-24, 763:24-764:7 (Camarillo).

648. For 2020, SVREP has registered 25,000 Latino voters in Arizona. For 2022, SVREP has registered 10,000 Latino voters in Arizona. For 2023, SVREP has registered 5,000 Latino voters in Arizona. Tr. Day 3 PM, 736:9-17 (Camarillo).

649. For 2024, SVREP plans to continue its voter registration efforts in Arizona by engaging high schools and community colleges, conducting door-to-door efforts, and establishing voter registration sites. Tr. Day 3 PM, 735:24-736:7 (Camarillo).

650. For 2024, SVREP also plans to turn out the vote in Arizona. To accomplish Latino turnout, SVREP anticipates engaging in door-to-door efforts, phone-banking, emailing, texting, and incorporating social media strategies. Tr. Day 3 PM, 737:4-15 (Camarillo).

651. SVREP's 2024 plans also involve engaging in voter education activities in Arizona. Tr. Day 3 PM, 738:5-11 (Camarillo).

652. If HB 2243 is implemented, SVREP would divert its money, time, and resources, including staff, to assist people with getting their DPOC to respond to the 35-day notice letters requiring DPOC, rather than pursuing and advancing their mission. Tr. Day 3 PM, 740:8-19, 743:8-18 (Camarillo).

653. If HB 2243 is implemented, SVREP would divert its money, time, and

resources, including staff, to assist those voters who have been purged under the challenged law. If this were to occur, SVREP would have to neglect their projected 2024 voter registration, voter education, and voter turnout goals in Arizona. Tr. Day 3 PM, 741:6-24, 741:25-742:6, 742:21-743:7, 743:8-18 (Camarillo).

654. The implementation of HB 2243 would ultimately stop SVREP from educating and expanding the Latino electorate in Arizona and would obligate the organization to instead focus and invest its money, time, and resources to keep registered Latino voters on Arizona's voter rolls. Tr. Day 3 PM, 743:20-744:8, 744:9-18, 744:19-745:4 (Camarillo).

**D. Promise Arizona**

655. Plaintiff Promise Arizona ("PAZ") is a community non-profit organization that is committed to the mission of improving and increasing the participation of Latino and other communities across the State of Arizona in the electoral process through voter registration, voter education, and voter engagement activities. Tr. Day 6 AM, 1307:3-7, 1307:24-1308:3, 1308:7-14, 1313:6-8, 15-17, 1314:11-23 (Falcon).

656. Promise Arizona is a membership organization. As of November 14, 2023, Promise Arizona has 1,043 members. PAZ members pay dues and gain access to the organization's services such as adult education and assistance with the naturalization process. The majority of PAZ members reside in Maricopa County. Tr. Day 6 AM, 1308:15-1309:4, 1310:16-17 (Falcon).

657. Some PAZ members include naturalized U.S. citizens who are registered to vote in Arizona. Tr. Day 6 AM, 1321:23-25, 1322:1-3 (Falcon).

658. PAZ's mission-critical activities, including voter registration, voter education, and voter turnout, demand money, time, staff, and resources. Tr. Day 6 AM, 1309:5-23, 1313:15-17, 1314:11-1315:1 (Falcon).

659. For the last ten years, Promise Arizona has registered around 63,000 to 63,434 voters in Arizona. For 2024, PAZ plans to engage in voter turnout work in Arizona. Tr. Day 6 AM, 1314:7-10, 1316:18-20, 1316:24-1317:1 (Falcon).

660. If HB 2243 is implemented, PAZ would divert its money, time, and resources, including its paid staff, field organizers, and volunteers, to assist people with getting their DPOC to respond to the 35-day DPOC notices and help those who have been purged under the law, rather than pursuing and advancing their mission. This process would require Promise Arizona to train its staff on how to best help impacted voters. Tr. Day 6 AM, 1318:24-1319:20, 1320:3-1321:20, 1322:20-1323:3 (Falcon).

661. If HB 2243 is implemented, Promise Arizona would need to update its literature, website, host numerous staff trainings, and spend money in order to best address and counteract the challenged law. Tr. Day 6 AM, 1328:20-1329:7, 11-20 (Falcon).

662. If HB 2243 is enforced, the challenged law will undo the work PAZ has been doing for over the past decad***e.*** Tr. Day 6 AM, 1321:8-20 (Falcon).

663. If HB 2243 is implemented, Promise Arizona members, including naturalized citizens who are registered to vote, will feel penalized and lose faith in the electoral system. Tr. Day 6 AM, 1318:24-1319:20, 1322:4-14, 1322:20-1323:3 (Falcon).

### E. Arizona Asian American Native Hawaiian And Pacific Islander For Equity Coalition

664. Plaintiff Arizona Asian American Native Hawaiian And Pacific Islander For Equity Coalition ("Equity Coalition") is an Arizona state-wide non-profit and non-partisan organization. Tr. Day 5 PM, 1265:11-13 (Tiwamangkala); 22-cv-1381, ECF No. 33 ¶ 2.

665. Equity Coalition is committed to the mission of improving the participation of marginalized communities in Arizona, with a particular focus on expanding representation, increasing civic engagement, and developing young leaders for the more than 357,000 Asian Americans, Native Hawaiians, and Pacific Islanders ("AANHPIs") in the state. Tr. Day 5 PM, 1265:18-23; 1267:1720 (NTiwamangkala); Tr. 1267:17-20 (November 13 PM M. Tiwamangkala); 22-cv-1381, ECF No. 33 ¶¶ 2-7.

666. After the passage of the Challenged Laws, Equity Coalition paused its voter registration work to determine how the Challenged Laws could impact the people Equity Coalition attempts to register. Tr. Day 5 PM, 1274:12-18 (Tiwamangkala).

667. After the passage of the Challenged Laws, Equity Coalition reduced voter registration goals, which caused Equity Coalition to lose funding. Tr. Day 5 PM, 1275:4-8, 1278:20-1279:25 (Tiwamangkala); 22-cv-1381, ECF No. 33 ¶ 10.

668. After the passage of the Challenged Laws, Equity Coalition hired a new employee so that Tiwamangkala could divert more of her time to focusing on voting rights in Arizona. Tr. Day 5 PM, 1281:2-9 (Tiwamangkala); 22-cv-1381, ECF No. 33 ¶ 3.

669. If the Challenged Laws are implemented, Equity Coalition would have to retrain canvassers, volunteers, subgrantees, and fellows on how to do voter registration with the Challenged Laws in place. Equity Coalition would also have to train these people on how to address the concerns and fears from the AANHPI community because of the Challenged Laws. Tr. Day 5 PM, 1275:16-1276:1 ( Tiwamangkala).

670. If the Challenged Laws are implemented, Equity Coalition would have to expand the services of its subgrantee, Island Liaison, to assist more people with getting their DPOC to respond to the 35-day notice letters requiring DPOC. Tr. Day 5 PM, 1275:16-1276:1 (Tiwamangkala).

671. If the Challenged Laws are implemented, Equity Coalition would have to also expend resources on translation. Equity Coalition would update its already-created voter registration instructions on its website and have that information translated, which is costly and on the order of 25 cents per word. Tr. Day 5 PM, 1270:18-21, 1275:16-1276:1 (Tiwamangkala).

672. Equity Coalition does not have the resources to accomplish all of those tasks. Tr. Day 5 PM, 1276:2-3 (Tiwamangkala).

673. If the Challenged Laws are implemented, Equity Coalition would have to change its voter registration priorities to responding to the Challenged Laws and helping the AANHPI community to obtain DPOC, educating the community, educating volunteers, rather than the actual collection of voter registration forms, which will also have negative impacts on Equity Coalition's other programs and would hurt Equity Coalition's mission. Tr. Day 5 PM, 1265:24-1266:8, 1276:4-18 (Tiwamangkala).

674. In the 2020 elections, Equity Coalition helped increase the AANHPI voter turnout in Arizona by 58% from the 2016 elections. 22-cv-1381, ECF No. 33 ¶ 5.

**F. Poder Latinx**

675. Plaintiff Poder Latinx is a non-partisan civic and social justice organization.

676. Poder Latinx's mission is to build a sustained bloc of Latinx voters in battleground states. Tr. Day 5 PM, 1285:6-10 (Herrera).

677. Poder Latinx serves Arizona's marginalized communities, primarily black indigenous people of color ("BIPOC"). Tr. Day 5 PM, 1285:25-1286:5 (Herrera).

678. Poder Latinx works locally to expand the electorate by conducting year-round civic engagement activities, community empowerment, leadership development, and issue-based organizing. Tr. Day 5 PM, 1285:13-16 (Herrera).

679. Poder Latinx carries out its mission to expand the electorate by encouraging citizens through voter registration, voter mobilization, voter protection, and voter education efforts. Tr. Day 5 PM, 1285:13-23, 1285:25-1286:5, 1286:8-14, 1286:25-1287:4, 1288:15-21 (Herrera).

680. Poder Latinx conducts its activities under organizational branding in order to build its reputation within the Arizona community, which is critical to building the community trust that allows it to be effective in its mission. Tr. Day 5 PM, 1287:5-23 (Herrera).

681. Poder Latinx's voter empowerment activities are resource intensive, requiring time, money, and manpower. Tr. Day 5 PM, 1287:24-1288:5, 1288:9-12, 1288:15-21 (Herrera).

682. It currently costs approximately $50 for each new voter that Poder Latinx registers. Tr. Day 5 PM, 1288:7-8 (Herrera)

683. For 2023, Poder Latinx has a goal of registering 4,600 new voters. For 2024—an election year—the organization aims to register 9,000 new voters. Tr. Day 5 PM, 1286:21-23 (Herrera).

684. Poder Latinx will suffer direct and immediate injuries if the Citizenship

Investigation Procedures in HB 2492 and HB 2243 ("CIPs")[16] are permitted to go into effect. Tr. Day 5 PM, 1290:5-10, 1290:18-1291:7, 1291:11-25 (Herrera); Tr. Day 6 AM, 1299:16-1300:22, 1300:25-1301:11, 1301:18-1302:4, 1302:7-1302:14, 1302:18-23 (Herrera).

685. The CIPs will harm Poder Latinx because the organization will be forced to divert time, resources, and money towards registering and re-registering eligible voters who were either were removed from the rolls or unlawfully denied registration. Tr. Day 5 PM, 1291:11-25 (Herrera); Tr. Day 6 AM, 1300:9-14 (Herrera).

686. The CIPs will harm Poder Latinx because the organization will be forced to divert time, resources, and money towards updating and creating programming and materials to combat the effects of the laws, both as individuals are removed from the rolls or erroneously denied registration and as fear spreads through the community the organization serves. Tr. Day 5 PM, 1290:18-1291:7, 1291:11-25 (Herrera); Tr. Day 6 AM, 1299:16-1300:5, 1300:9-22 (Herrera).

687. The CIPs will harm Poder Latinx because the organization will be forced to divert time, resources, and money towards hiring new staff and/or reassigning existing staff and volunteers to combat the effects of the laws. Tr. Day 5 PM, 1291:11-25 (Herrera); Tr. Day 6 AM, 1299:16-1300:5, 1300:9-17 (Herrera).

688. The CIPs will harm Poder Latinx's reputation in the community it serves, as community members learn that they may be removed from the voting rolls or not added to the voter rolls after registering with Poder Latinx. Tr. Day 6 AM, 1300:25-1301:11, 1301:18-1302:4 (Herrera).

689. The CIPs will harm Poder Latinx because the unlawful denial of registration applications or the removal from the voting rolls of eligible voters—or the fear that someone may be wrongfully denied, removed, or investigated once the laws are

---

[16] The CIPs are defined as A.R.S. §§ 16-121.01(D) and 16-121.01(E), as enacted by HB 2492 § 4; A.R.S. § 16-143, as enacted by HB 2492 § 7; A.R.S. § 16-165(A)(10), as enacted by HB 2492 § 8 and amended by HB 2243 § 2; and A.R.S. §§ 16-165(G), 16-165(H), 16-165(I), 16-165(J), and 16-165(K), as enacted by HB 2243 § 2.

implemented—will chill eligible voters from engaging with Poder Latinx, causing the organization to invest more time, resources, and money to sustain its impact. Tr. Day 6 AM, 1301:18-1302:4, 1302:7-14 (Herrera).

690. If the laws go into effect, Poder Latinx estimates that it will cost an additional $10 or $20 to register each new voter. Tr. Day 6 AM, 1299:20-1300:22 (Herrera).

691. Poder Latinx will be forced to divert resources from its other mission-critical activities, including its issue-based campaigns, to address harm caused by the implementation of the laws. Tr. Day 6 AM, 1302:7-14, 1302:18-23 (Herrera).

**G. Chicanos Por La Causa, Inc.**

692. Plaintiff Chicanos Por La Causa, Inc. ("CPLC") is a 501(c)(3) nonprofit and community development organization. Tr. Day 1 PM, 175:17-19 (Garcia).

693. CPLC formed in 1969 to fight discrimination against the Mexican-American community. Tr. Day 1 PM, 176:22-177:6 (Garcia).

694. CPLC's mission is to drive the political and economic empowerment of Latinos. Tr. Day 1 PM, 176:15-20 (Garcia); Tr. Day 2 PM, 478:5-6 (Guzman).

695. With offices in five states, CPLC impacts more than 2 million lives every year through its work on civic engagement and voter mobilization, health and human services, housing, education, economic development, and advocacy. Tr. Day 1 PM, 177:9-17, 178:10-18, 213:23-24 (Garcia); Tr. Day 2 PM, 478:6-15 (Guzman).

696. CPLC works throughout Arizona to engage low-propensity voters, including Latino voters and voters from marginalized communities, through voter registration, voter education, voter protection, and voter mobilization efforts. Tr. Day 1 PM, 178:10-179:5, 179:7-22, 180:1-183:3, 184:5-186:7, 186:20-188:4 (Garcia); Tr. Day 2 PM, 478:18-479:17, 483:17-21, 484:2-10 (Guzman).

697. CPLC's voter empowerment activities are resource intensive, requiring time, money, and manpower. Tr. Day 1 PM, 180:11-25, 188:7-18 (Garcia); Tr. Day 2 PM, 478:18-479:17, 483:17-484:10 (Guzman).

698. In the 2022 election cycle, CPLC registered 37,000 new voters. Tr. Day 1

PM, 180:17-18, 181:5-13 (Garcia).

699. In the 2022 election cycle, CPLC spent $5.7 million on canvassing and registration efforts. Tr. Day 1 PM, 203:6-8 (Garcia).

700. For the upcoming election, CPLC aims to register the same number of new voters. Tr. Day 1 PM, 183:10-25 (Garcia).

701. CPLC is able to be effective in its mission and work in part because of its reputation within the community, built on decades of serving the community with cultural competency. Tr. Day 1 PM, 185:11-186:19, 188:7-18, 196:8-17 (Garcia); Tr. Day 2 PM, 485:20-486:3 (Guzman).

702. CPLC will suffer direct and immediate injuries if the Citizenship Investigation Provisions in HB 2492 and HB 2243 ("CIPs") are permitted to go into effect. Tr. Day 1 PM, 191:4-194:6, 194:13-195:4, 195:24-197:1 (Garcia); Tr. Day 2 PM, 480:10-24, 481:4-482:21, 483:5-14, 483:17-484:1, 484:13-25, 485:5-19, 486:6-12, 486:16-487:2, 487:9-21, 491:8-15, 493:19-494:2, 495:25-496:14f, 497:25-498:16, 504:21-506:3 (Guzman).

703. The CIPs will harm CPLC because the organization will be forced to divert time, resources, and money towards registering and re-registering eligible voters who were either were removed from the rolls or unlawfully denied registration. Tr. Day 1 PM, 189:3-190:7, 191:13-22, 193:22-194:2, 195:24-196:4 (Garcia); Tr. Day 2 PM, 483:5-14, 484:13-25 (Guzman).

704. The CIPs will harm CPLC because the organization will be forced to divert time, resources, and money towards updating and creating programming and materials to combat the effects of the laws. Tr. Day 1 PM, 191:8-12, 191:18-22, 192:6-11, 192:22-193:7, 193:15-194:6, 214:9-23 (Garcia); Tr. Day 2 PM, 482:25-483:14, 484:13-25, 485:5-19 (Guzman).

705. The CIPs will harm CPLC because the organization will be forced to divert time, resources, and money towards hiring new staff and/or reassigning existing staff and volunteers to combat the effects of the laws. Tr. Day 1 PM, 191:13-15, 191:18-22, 192:6-

1, 192:22-193:7, 193:15-194:6, 204:3-12 (Garcia); Tr. Day 2 PM, 484:22-25 (Guzman).

706. The CIPs will harm CPLC's reputation in the community it serves, as community members learn that they may be removed from the voting rolls or not added to the voter rolls after registering with CPLC or if CPLC is unable to assist those who are removed from the rolls or denied registration. Tr. Day 1 PM, 191:4-7, 191:15-17, 194:13-195:4, 207:1-208:2, 208:17-209:5 (Garcia); Tr. Day 2 PM, 481:4-482:21, 486:6-12 (Guzman).

707. The CIPs will harm CPLC because the unlawful denial of registration applications or the removal from the voting rolls of eligible voters—or the fear that someone may be wrongfully denied, removed, or investigated once the laws are implemented—will chill eligible voters from engaging with CPLC, causing the organization to invest more time, resources, and money to sustain its impact. Tr. Day 1 PM, 189:3-190:7, 190:21-191:17, 193: 3-7, 193:22-194:2, 194:13-195:4, 207:1-208:2, 208:17-209:5 (Garcia); Tr. Day 2 PM, 480:10-24, 481:4-482:21, 491:8-15, 493:19-494:2, 495:25-496:14,, 497:25-498:16, 504:21-506:3 (Guzman).

708. The reputational harm that CPLC will suffer if these laws go into effect will harm other mission-critical activities that CPLC engages in, as community members will be mistrustful of the organization moving forward. Tr. Day 1 PM, 194:13-195:4. 208:17-209:5 (Garcia); Tr. Day 2 PM, 481:4-482:21, 486:16-487:2 (Guzman).

709. CPLC will be forced to divert resources from its other mission-critical activities, including its voter mobilization efforts, to address harm caused by the implementation of the laws. Tr. Day 1 PM, 191:23-192:3, 192:15-21, 193:10-14, 196:21-197:1 (Garcia); Tr. Day 2 PM, 483:17-484:1, 487:9-21 (Guzman).

710. If the laws were implemented, CPLC estimates that about 20-30 percent of the budget that it currently uses for canvassing and registering individuals to vote will be diverted to addressing harm caused by the implementation of the laws. Tr. Day 1 PM, 203:6-22 (Garcia).

### H. Chicanos Por La Causa Action Fund

711. Plaintiff Chicanos Por La Causa Action Fund ("CPLC Action Fund") is a 501(c)(4) non-profit advocacy organization. CPLC Action Fund's mission is to support CPLC's mission. Tr. Day 1 PM, 175:19-20, 177:18-22 (Garcia); *see supra* ¶ 694.

712. Chicanos Por La Causa Action Fund's advocacy efforts include community-based activism, events focusing on social justice and equity issues, and lobbying and leverage of elected officials and leaders. Tr. Day 1 PM, 176:1-3, 177:18-22, 213:23-25 (Garcia).

713. Chicanos Por La Causa Action Fund also works to engage low-propensity voters, including Latino voters and voters from marginalized communities, through voter registration, voter education, voter protection, and voter mobilization efforts. Tr. Day 1 PM, 178:10-18. 178:25-179:22, 180:1-183:3, 184:5-186:7, 186:20-188:4 (Garcia).

714. In the 2022 election cycle, CPLC Action Fund's efforts, including a $10 million investment, led to the registration of 37,000 new voters. Tr. Day 1 PM, 179:10-12, 180:17-18, 181:5-13 (Garcia).

715. For the upcoming election, CPLC Action Fund aims to register the same number of new voters. Tr. Day 1 PM, 183:10-25 (Garcia).

716. CPLC Action Fund is able to be effective in its mission and work in part because of CPLC's reputation within the community, built on decades of serving the community with cultural competency. Tr. Day 1 PM, 185:11-186:19, 188:7-18, 196:8-17 (Garcia).

717. CPLC Action Fund will suffer direct and immediate injuries if the Citizenship Investigation Provisions in HB 2492 and HB 2243 ("CIPs") are permitted to go into effect. Tr. Day 1 PM, 191:4-194:6, 194:13-195:4, 195:24-197:1 (Garcia).

718. The CIPs will harm CPLC Action Fund because the organization will be forced to divert time, resources, and money towards registering and re-registering eligible voters who were either were removed from the rolls or unlawfully denied registration. Tr. Day 1 PM, 189:3-190:7, 191:13-22, 193:22-194:2, 195:24-196:4 (Garcia).

719. The CIPs will harm CPLC Action Fund because the organization will be forced to divert time, resources, and money towards updating and creating programming and materials to combat the effects of the laws. Tr. Day 1 PM, 191:8-12, 191:18-22, 192:6-11, 192:22-193:7, 193:15-194:6, 214:9-23 (Garcia).

720. The CIPs will harm CPLC Action Fund because the organization will be forced to divert time, resources, and money towards hiring new staff and/or reassigning existing staff and volunteers to combat the effects of the laws. Tr. Day 1 PM, 191:13-15, 191:18-22, 192:6-11, 192:22-193:7, 193:15-194:6, 204:3-12 (Garcia).

721. The CIPs will harm CPLC Action Fund because the aforementioned harm to CPLC's reputation will hinder CPLC Action Fund's effectiveness. Tr. Day 1 PM, 191:4-7, 191:15-17, 194:13-195:4, 207:1-208:2, 208:17-209:5 (Garcia).

722. The CIPs will harm CPLC Action Fund because the unlawful denial of registration applications submitted by CPLC or the removal from the voting rolls of eligible voters registered by CPLC, and consequent reputational harm, will chill eligible voters from engaging with CPLC, causing the organization to invest more time, resources, and money to sustain its impact. Tr. Day 1 PM, 189:3-190:7, 190:21-191:17, 193:3-7, 193:22-194:2, 194:13-195:4, 207:1-208:2, 208:17-209:5 (Garcia).

723. The reputational harm that CPLC will suffer if these laws go into effect will harm other mission-critical activities that CPLC Action Fund supports, as community members will be mistrustful of the organization moving forward. Tr. Day 1 PM, 194:13-195:4, 208:17-209:5 (Garcia).

724. CPLC Action Fund will be forced to divert resources from its other mission-critical activities, including its voter mobilization efforts, to address harm caused by the implementation of the laws. Tr. Day 1 PM, 191:23-192:3, 192:15-21, 193:10-14, 196:21-197:1 (Garcia).

725. If the laws were implemented, CPLC Action Fund estimates that about 20-30 percent of the budget that it currently uses for canvassing and registering individuals to vote will be diverted to addressing harm caused by the implementation of the laws. Tr. Day

1 PM, 203:6-22 (Garcia).

**I. Arizona Coalition for Change**

726. Plaintiff Arizona Coalition for Change (AZC4C) is a nonpartisan, nonprofit membership organization based in Arizona that operates in Maricopa, Pima, and Pinal Counties. Tr. Day 1 PM, 258:1-20 (Bolding).

727. AZC4C's mission is to empower historically disadvantaged communities to change their conditions through civic engagement, building civic power, and community collaboration. Tr. Day 1 PM, 258:12-15 (Bolding).

728. AZC4C primarily focuses on Black, Brown, Indigenous and communities, young people, and women. Tr. Day 1 PM, 258:21-25 (Bolding).

729. AZC4C organizes and hosts civic engagement programming, including a civic leadership development program for high school students, voter registration drives, and voter education initiatives. These programs are advertised, organized, and hosted by AZC4C staff. Tr. Day 1 PM, 259:9-261:12 (Bolding).

730. AZC4C registers voters at high-traffic locations, such as grocery stores and small businesses. AZC4C staffs its voter-registration drives with one to two staff members per location at multiple locations. AZC4C provides voters with voter registration materials, assists them in filling out the form, verifies that the voter has the necessary government identification, and files the form for the voter. Tr. Day 1 PM, 267:7-269:12 (Bolding).

731. Voter registration and education activities are key to AZC4C's mission of encouraging the civic engagement of historically disadvantaged communities. Tr. Day 1 PM, 258:12-261:12 (Bolding).

732. It takes AZC4C on average ten hours to put on a voter education event. Tr. Day PM, 261:16-25 (Bolding).

733. AZC4C pays to advertise its voter education programming through social media, email, texting, and fliers. Tr. Day 1 PM, 262:1-24 (Bolding).

734. If HB 2492 and HB 2243 go into effect, AZC4C will be required to educate voters about the new laws because the laws create a significant barrier to individuals who

may want to register to vote or engage in other civic activities. AZC4C will pay to advertise these voter education programs. Tr. Day 1 PM, 265:4-266:3 (Bolding).

735. If HB 2492 and HB 2243 go into effect, AZC4C will change its voter-registration program by implementing new training for AZC4C staff and volunteers, checking voter databases to ensure that voters are actually registered, and increasing the amount of time spent registering voters. These measures will require additional staffing, which will increase AZC4C's costs. Tr. Day 1 PM, 270:20-273:23 (Bolding).

736. If HB 2492 and HB 2243 go into effect, AZC4C will spend more time and resources registering voters and less time and resources on its high-school civic leadership development program. Tr. Day 1 PM, 273:25-274:18 (Bolding).

**J. Arizona Students' Association**

737. Plaintiff Arizona Students' Association ("ASA") is a nonpartisan, nonprofit membership organization based in Arizona.

738. ASA is student-led and represents the collective interest of the more than 140,000 university students and over 400,000 community college students in Arizona.

739. ASA advocates at the local, state, and national levels for the interests of students. As a core part of its mission, ASA encourages students throughout Arizona to register to vote through voter registration activity. Tr. Day 2 PM 447:20-448:5 (Nitschke).

740. ASA members include all students enrolled in Arizona's public universities, Grand Canyon University, and community colleges. Some of its members are people of color, including Latinos, and some are naturalized citizens born outside the United States. Tr. Day 2 PM, 446:17-25, 463:13-22, 465:8-9, 473:9-11 (Nitschke). ASA advocates on behalf of those members, who are the primary beneficiaries of its work; the members influence ASA through their general sentiment on issues, polling on young people, and direct input from students, fellows, club meetings, conversation at registration tables on campus Tr. Day 2 PM, 473:12-25 (Nitschke).

741. Some ASA members lack DPOR and DPOC. Tr. Day 2 PM, 462:8-10 (Nitschke). Some members attempting to register do not have easy access to an Arizona

driver's license issued after 1996, a U.S. birth certificate, a U.S. passport, a tribal identity card, or a naturalization number, because one or more of those documents are located in another state. Tr. Day 2 PM, 469:8-470:3 (Nitschke).

742. ASA prefers to provide the State Form to registrants rather than the Federal Form, because if members use the State Form but do not provide proof of citizenship, they can still be registered as federal-only voters; if they later provide proof of citizenship, they will be full-ballot voters. Tr. Day 2 PM 451:16-452:3 (Nitschke).

743. After the passage of the Challenged Laws, ASA has spent time updating all of its training documents to specifically address the birthplace requirement, has spent slightly less than 100 additional hours training student volunteers per year due to the Challenged Laws, has spent time ensuring that federal-only voters were being registered, and has incurred printing and ink costs between $150 and $210 in order to provide these training documents to staff and volunteers. Tr. Day 2 PM, 452:9-13, 453:15-17; 458:24-25, 467:1-4 (Nitschke).

744. If the Challenged Laws are implemented, ASA will spend more time and effort to try to ensure that all registrants have DPOC and DPOR before they register and provide DPOC and DPOR at the registration table, rather than asking them to send documentation later, and may turn away members who are unable to provide required documentation Tr. Day 2 PM, 454:16-24, 455:4-13, 458:9-16 (Nitschke).

745. If the Challenged Laws are implemented, ASA already has and will have to divert its financial resources away from its other work. ASA holds a youth empowerment summit where it brings students to the Arizona State Capitol to meet with legislators; it also has plans to educate students about ballot issues using door-to-door canvassing, printing materials, and town hall trainings. ASA will be unable to spend as much time and money on those efforts because it will divert resources to compliance with the Challenged Laws. Tr. Day 2 PM, 460:7-461:5 (Nitschke).

746. If the Challenged Laws, and particularly the DPOR, DPOC, and Birthplace Requirements, are implemented, ASA's process of registering members to vote would be

slowed down; that process is already time-consuming, and making it more time-consuming would mean fewer students will register to vote. Tr. Day 2 PM, 454:13-456:7, 461:14-20 (Nitschke).

747. If the Challenged Laws are implemented, ASA will spend between $100 and $110 per month for 10 or 11 staff members and organizers to use a smartphone application that allows users to scan documents and redact information, to upload registrants' DPOR and DPOC. Tr. Day 2 PM, 456:13-25, 457:4-7, 474:3-7 (Nitschke).

748. If the Challenged Laws are implemented, ASA would have to spend time determining whether the students that it has registered remain on the rolls by reviewing its own list of voters it has registered and comparing it with the state's list of registered voters. Tr. Day 2 PM 459:1-10 (Nitschke).

749. If the Challenged Laws are implemented and ASA does not devote additional time and resources to its voter registration efforts, fewer students will register to vote and more students will register out of state where they do not live, using their parents' addresses. Tr. Day 2 PM, 459:11-460:2 (Nitschke).

750. If the Challenged Laws are implemented, ASA will not be able to register as many voters, even if it diverts resources toward complying with the Challenged Laws. Tr. Day 2 PM, 456:3-4; 461:6-20 (Nitschke).

751. If the Challenged Laws are implemented, ASA members will be deterred from registering to vote for fear of investigation by the government and would be more likely to remain registered in the state where their parents live. Tr. Day 2 PM, 461:2-462:4, 468:6-10, 468:13 (Nitschke).

752. If the Challenged Laws are implemented, ASA student members may have less confidence in elections. Tr. Day 2 PM, 464:18-19 (Nitschke).

### K. San Carlos Apache Tribe

753. The San Carlos Apache Tribe ("Tribe") is a federally recognized Indian Tribe organized pursuant to Section 16 of the Indian Reorganization Act of June 18, 1934 (48 Stat. 984). 86 Fed. Reg. 7554. Stipulated Fact (ECF 571-1) No. 1.

754. The San Carlos Apache Reservation ("Reservation") in eastern Arizona is currently the tenth largest Indian reservation in the United States, covering an area of approximately 2,855 square miles, or 1.8 million acres. Stipulated Fact (ECF 571-1) No. 2.

755. The Reservation was established (and subsequently diminished) by several Executive Orders and Acts of Congress, including Executive Orders of November 9, 1871 and December 14, 1872 (establishing the White Mountain and San Carlos Reservations). *See* Executive Orders of August 5, 1873; July 21, 1874; April 27, 1876; October 30, 1876; January 26, 1877; and March 31, 1877 (diminishing the White Mountain and San Carlos Reservations); and the Act of June 7, 1897, 30 Stat. 64 (creating the Fort Apache Reservation and establishing the Fort Apache Agency "to cover and have jurisdiction" over the Reservation). Stipulated Fact (ECF 571-1) No. 3.

756. The Reservation spans across Gila, Graham, and Pinal Counties and is home to approximately 13,000 to 14,000 members, while the remainder of the Tribe's approximately 17,300 members live off-Reservation. Tr. Day 4 PM 996:10-21 (Rambler)

757. The Tribe works with County Recorders to register eligible members to vote in Arizona elections. Tr. Day 4 PM 999:17-23 (Rambler).

758. The Tribe has engaged and continues to engage in voter education, registration, and engagement activities for its members to facilitate participation in nontribal elections. Tr. Day 4 PM, 999:17-23 (Rambler).

759. There is no uniform street numbering system for residences on the San Carlos Apache Reservation. Residences on the Reservation typically do not have building numbers or street names. Tr. Day 4 PM, 996:22-997:4 (Rambler).

760. Some Members of the San Carlos Apache Tribe lack an Arizona Driver's License. Tr. Day 4 PM, 999:10-12 (Rambler).

761. Tribe Members who have an Arizona Driver's License may not have a residential address listed on the face of their license; instead, they will use the nearest address available (such as a highway mile marker). Tr. Day 4 PM, 997:12-998:22

(Rambler).

762. San Carlos Apache Tribal Identification Cards contain post office boxes, rather than physical residential addresses. Tr. Day 4 PM, 998:11-16 (Rambler).

763. The San Carlos Apache Tribe works from a fixed budget, approved by the San Carlos Council. The 2024 Budget has already been finalized. Tr. Day 4 PM, 1000:6-13 (Rambler).

764. If the San Carlos Apache Tribe were to increase resources devoted to voter registration efforts to address the proof of residence requirement, those resources would be diverted from other programs funded by the Tribe's budget, such as education and services for elders, veterans and youth programs. Tr. Day 4 PM, 1003:9-21 (Rambler).

765. Implementing a mapping system to establish a uniform addressing system for residences on the San Carlos Apache Reservation would cost about $10 million. Tr. Day 4 PM, 998:2-10 (Rambler).

766. Some Members of the San Carlos Apache Tribe, such as those who are experiencing homelessness or temporarily staying with a relative, lack a permanent residence altogether. Tr. Day 4 PM, 998:17-22 (Rambler).

**L. Tohono O'odham Nation**

767. Tohono O'odham Nation is a federally recognized Tribe. 87 Fed. Reg. 4636, 4639 (January 28, 2022). The legislative and executive powers of the Tohono O'odham Nation are vested in the Tohono O'odham Council and the Office of the Chairman, respectively. Constitution of the Tohono O'odham Nation, art. V § 1 & art. VII § 1 (March 6, 1986). Among the enumerated powers of the Council and Chairman are the authority to promote, protect and provide for public health, peace, morals, education, and general welfare of the Tohono O'odham Nation and its members and to act as the official representative of the Tohono O'odham Nation. *Id.*, art. VI § (1)(c)(2) & art. VII § (2)(f). Stipulated Fact (ECF 571-1) No. 5.

768. According to the 2020 Census, approximately 6,713 voting age individuals live on Tohono O'odham lands. U.S. Census, 2020 Census Redistricting Data (Public Law

94-171) Summary File, Race for the Population 18 Years and Older, Table P3 (Tohono O'odham Nation Reservation and Off-Reservation Trust Land, AZ). Stipulated Fact (ECF 571-1) No. 6.

**M. Gila River Indian Community**

769. Gila River Indian Community is a federally recognized Tribe. 87 Fed. Reg. 4636, 4638 (January 28, 2022). The Community is governed by the Gila River Community Council, which has among its enumerated powers the authority to promote and protect the health, peace, morals, education, and general welfare of the Community and its members and to act for and on behalf of those members. *Constitution and Bylaws of the Gila River Indian Community of Arizona*, art. XV, § 1(a)(9) (codified by Gila River Indian Community Council on July 7, 2021). Stipulated Fact (ECF 571-1) No. 7.

770. According to the 2020 Census, approximately 9,268 voting age individuals live on the Gila River Reservation. U.S. Census, 2020 Census Redistricting Data (Public Law 94-171) Summary File, Race for the Population 18 Years and Older, Table P3 (Gila River Indian Reservation, AZ). Stipulated Fact (ECF 571-1) No. 8.

**N. Alanna Siquieros**

771. Alanna Siquieros is an enrolled member of the Tohono O'odham Nation and resides on the Tohono O'odham Reservation.

772. Ms. Siquieros turned 18 and became eligible to vote in Arizona on January 2, 2023. Ms. Siquieros intends to vote.

**O. Keanu Stevens**

773. Keanu Stevens is an enrolled member of the Tohono O'odham Nation and resides on the Tohono O'odham Reservation.

774. Mr. Stevens will turn 18 and become eligible to vote in Arizona on November 4, 2023. Mr. Stevens intends to vote when he is eligible.

**P. LaDonna Jacket**

775. LaDonna Jacket is an enrolled member of the Hopi Tribe and resides on the Hopi Reservation.

776. Ms. Jacket turned 18 and became eligible to vote in Arizona on May 4, 2023. Ms. Jacket intends to vote.

**Q. Democratic National Committee and Arizona Democratic Party**

777. Plaintiff Democratic National Committee (DNC) is the national organizational arm of the Democratic Party in the United States. Tr. Day 2 PM, 422:10-12 (Reid). The DNC runs the Democratic Party's national operations, with the goal of electing Democratic candidates up and down the ballot, including in races for president and other federal offices, along with candidates in Arizona state and local elections. Tr. Day 2 PM, 422:13-25 (Reid). Plaintiff Arizona Democratic Party (ADP) is the operating arm of the Democratic Party in Arizona. Tr. Day 2 PM, 508:1-3 (Dick). Like the DNC, the ADP works to elect Democratic candidates in presidential and other federal elections in Arizona, along with Democratic candidates running in state and local elections in the state. Tr. Day 2 PM, 508:1-3 (Dick).

778. To achieve their missions, the DNC and the ADP work to persuade registered voters to support Democratic candidates and help citizens likely to support Democratic candidates register to vote and cast a valid ballot. Tr. Day 2 PM, 423:21-424:10 (Reid); 509:13-24 (Dick). Both organizations will continue to undertake these efforts in Arizona, in 2024 and beyond. Tr. Day 2 PM, 423:24-424:13 (Reid); 508:19-20 (Dick).

779. There are approximately 1.26 million registered Democratic voters in Arizona. Tr. Day 2 PM, 508:9-10 (Dick).

780. Both the DNC and the ADP have cyclical budgets that depend on the timing of the election cycle; a typical annual budget for each organization, however, is on the order of at least several million dollars. Tr. Day 2 PM, 423:14-20 (Reid); 509:6-9 (Dick). All money raised and spent by the DNC and the ADP goes toward the mission of electing Democratic candidates. Tr. Day 2 PM, 423:21-23 (Reid); 509:10-12 (Dick).

781. The DNC's membership comprises grassroots Democratic supporters who help Democratic candidates win elections, along with formal voting members of the DNC. Tr. Day 2 PM, 434:10-435:5 (Reid).

782. The ADP's members are Democratic voters and supporters. Tr. Day 2 PM, 519:12-520:5 (Dick).

783. The DNC's and the ADP's membership will be harmed by HB 2492's implementation because, as described in further detail herein, implementation would hinder the election of Democrats in federal, state, and local elections in Arizona. Tr. Day 2 PM, 434:23-435:5, 443:18-444:5 (Reid); 522:22-523:3 (Dick).

784. If HB 2492 were implemented, and certain voters thus prevented from participating in presidential elections, it would be more difficult for the DNC and the ADP to accomplish their missions. If HB 2492 were implemented, individuals who have registered without providing DPOC —and such people are much more likely to be Democrats than Republicans (Tr. Day 2 PM, 510:9-24 (Dick))—would lose the ability to vote in presidential elections. This would mean not only that fewer Democratic supporters in Arizona could cast a ballot for the Democratic nominee for president, but also that registered Democrats in Arizona who can vote for president would be less likely to have their presidential candidate of choice (which is also the candidate of choice of the DNC and the ADP) win. Tr. Day 2 PM, 424:14-425:3 (Reid); 511:1-15 (Dick).

785. In addition, preventing Democratic supporters from voting in presidential elections would negatively affect Democratic prospects in down-ballot races, by neutralizing the increased enthusiasm and turnout that are typical for non-presidential contests that appear on the same ballot as a presidential race; if a voter cannot vote for her preferred presidential candidate, she might decide not to vote at all. Tr. Day 2 PM, 425:4-10 (Reid); 511:16-512:3 (Dick).

786. In response, the DNC and the ADP would need to spend time, money, and other resources to replace or mobilize voters who would be blocked from voting for president, particularly given that Arizona is a state where margins are razor thin. Tr. Day 2 PM, 425:11-21, 431:20-22 (Reid); 512:11-25 (Dick). This would require the DNC and the ADP to rework and increase efforts to register new Democratic voters or to persuade other voters to support the Democratic presidential nominee. Tr. Day 2 PM, 425:11-21

(Reid); 512:11-25 (Dick). Doing so would divert resources from the DNC's and the ADP's other efforts to elect Democrats nationwide. Tr. Day 2 PM, 425:22-426:4 (Reid); 512:11-25 (Dick).

787. The DNC and the ADP encourage Democratic supporters in Arizona to vote by mail because the organizations want to make it as easy as possible for their supporters to vote, and voting by mail tends to be a common, convenient way for people in Arizona to vote. Tr. Day 2 PM, 426:5-16 (Reid); 513:2-21 (Dick).

788. Democrats, moreover, are particularly likely to vote by mail. For example, in Arizona, more than nine out of every ten Biden voters in 2020 voted by mail. Tr. Day 2 PM, 427:5-8 (Reid).

789. If HB 2492 were implemented, individuals who registered without providing DPOC—and those individuals are much more likely to be Democrats than Republicans (Tr. Day 2 PM, 510:9-24 (Dick))—would lose the ability to vote by mail. Because this would force these voters to cast a ballot in-person, at least some Democratic supporters would be deterred from voting altogether. Tr. Day 2 PM, 427:9-20 (Reid). This would mean that there would be fewer total Democratic voters in Arizona, reducing the chances that Democratic candidates would win. Tr. Day 2 PM, 427:9-20 (Reid).

790. In response, the DNC and the ADP would need to spend time, money, and other resources to, for example, register additional eligible voters likely to support Democratic candidates, or create additional "get out the vote" programs focused on in-person voting. Tr. Day 2 PM, 427:21-428:6 (Reid); 513:22-514:13 (Dick). Doing so would divert resources from the DNC's and the ADP's other efforts to elect Democrats. Tr. Day 2 PM, 428:8-14 (Reid); 514:14-16 (Dick).

791. Adding birthplace as a required section on the state registration form-for thousands of registration forms, processed by thousands of volunteers-would slow the registration process, make the DNC's and the ADP's voter-registration efforts less productive, and ultimately lead to fewer Democratic votes. Tr. Day 2 PM, 428:21-429:25 (Reid).

792. Requiring birthplace information would especially harm Democrats because sensitive questions about birthplace tend to trigger fear and concern—especially among Hispanic voters, a key Democratic base in Arizona, who face disproportionate law-enforcement and citizenship-related scrutiny. Tr. Day 2 PM, 441:6-17, 444:7-19 (Reid); 516:9-21 (Dick).

793. In response, the DNC and the ADP would need to spend time, money, and other resources on additional registration staffing, training, and quality control efforts-at both the front end (helping the individual to fill out the form) and the back end (ensuring that all mandatory fields are filled out correctly). Tr. Day 2 PM, 429:19-25, 437:18-439:11 (Reid); 514:17-516:21 (Dick). Doing so would divert resources from the DNC's and the ADP's other efforts to elect Democrats. Tr. Day 2 PM, 429:19-25 (Reid).

794. If HB 2492 were implemented, such that certain voters who registered to vote without providing adequate DPOC could be subject to criminal investigation and prosecution, it would cause a chilling effect on registering to vote. Tr. Day 2 PM, 430:1-15 (Reid); 516:22-517:11 (Dick). This effect would be especially pronounced on eligible voters who are the first in the family to register, who have not grown up around voting, or who may not be familiar with the specifics of voting. Tr. Day 2 PM, 430:1-15 (Reid).

795. In addition, implementation of HB 2492 would create confusion about the risks associated with registering to vote. Tr. Day 2 PM, 430:16-23 (Reid). This confusion would likely most afflict mixed-citizenship households, who may not want to attract any law-enforcement scrutiny. Tr. Day 2 PM, 430:16-23 (Reid); 516:22-517:11(Dick).

796. In response to these harms, the DNC and the ADP would need to divert time, money, and other resources on additional voter registration training-to account not only for the requirements of the new law, but also for its potential chilling effects. Tr. Day 2 PM, 430:24-431:8 (Reid); 517:12-21 (Dick). In addition, because the DNC's and the ADP's registration efforts would be less productive, the organization would have to find additional and new voters to register. Tr. Day 2 PM, 431:9-12 (Reid); 517:12-21 (Dick).

797. If HB 2492 were implemented, it would be more difficult for the DNC and

the ADP to compete in elections. The Democratic Party's margins in Arizona are razor thin; President Biden won the state by fewer than 12,000 votes in 2020, and some state races can be decided by just a few hundred votes. Tr. Day 2 PM, 431:16-24; 433:9-23 (Reid); 512:11-25 (Dick). As the Democratic Party is thus fighting for every vote, any possible adversity—including HB 2492's implementation—risks undermining Democratic victories in the state. Tr. Day 2 PM, 433:15-23 (Reid); 518:18-21 (Dick).

798. According to DNC modeling, if implemented, HB 2492 would disproportionately impact younger voters and voters of color, particularly Hispanic voters, which are groups that are relatively likely to support Democratic candidates in Arizona. Tr. Day 2 PM, 441:6-17 (Reid).

799. The DNC and the ADP have already incurred costs because of HB 2492. The DNC and the ADP have already begun strategizing and budgeting for 2024 efforts in Arizona, including by planning on how to allocate additional resources in Arizona to overcome the hurdles presented by HB 2492's implementation. Tr. Day 2 PM, 432:9-25 (Reid); 517:22-518:17 (Dick).

800. If the court were to strike down HB 2492, the DNC and the ADP would not confront the harms discussed above. Tr. Day 2 PM, 433:24-434:2 (Reid); 518:25-519:2 (Dick).

DATED: December 12, 2023 Respectfully submitted,

**ARNOLD & PORTER KAYE SCHOLER, LLP**
John A. Freedman*
Jeremy Karpatkin*
Erica McCabe*
Leah Motzkin*
601 Massachusetts Ave., N.W.
Washington, D.C. 20001
John.Freedman@arnoldporter.com
Jeremy.Karpatkin@arnoldporter.com
Erica.McCabe@arnoldporter.com
Leah.Motzkin@arnoldporter.com
(202) 942-5000

*/s/ Jon Sherman*
**FAIR ELECTIONS CENTER**
Jon Sherman*
Michelle Kanter Cohen*
Beauregard Patterson*
Emily Davis*
1825 K St. NW, Ste. 701
Washington, D.C. 20006
jsherman@fairelectionscenter.org
mkantercohen@fairelectionscenter.org
bpatterson@fairelectionscenter.org
edavis@fairelectionscenter.org
(202) 331-0114

**ARIZONA CENTER FOR LAW IN THE PUBLIC INTEREST**
Daniel J. Adelman (AZ Bar No. 011368)
352 E. Camelback Rd., Suite 200
Phoenix, AZ 85012
danny@aclpi.org
(602) 258-8850

**ARNOLD & PORTER KAYE SCHOLER, LLP**
Leah R. Novak*
Andrew Hirschel*
250 West 55th Street
New York, NY 10019
Leah.Novak@arnoldporter.com
Andrew.Hirschel@arnoldporter.com
(212) 836-8000

*Attorneys for Poder Latinx, Chicanos Por La Causa, and Chicanos Por La Causa Action Fund*

/s/ *Ernest Herrera*
**MEXICAN AMERICAN LEGAL DEFENSE AND EDUCATIONAL FUND**
Ernest Herrera*
Erika Cervantes*
634 South Spring Street, 11th Floor
Los Angeles, CA 90014
Telephone: (213) 629-2512
Facsimile: (213) 629-0266
eherrera@maldef.org
ecervantes@maldef.org

**ORTEGA LAW FIRM**
Daniel R. Ortega Jr.
361 East Coronado Road, Suite 101
Phoenix, AZ 85004-1525
Telephone: (602) 386-4455
Email: danny@ortegalaw.com

*Attorneys for Promise Arizona and Southwest Voter Registration Education Project*

/s/ *Christopher D. Dodge*
**HERRERA ARELLANO LLP**
Roy Herrera (AZ Bar No. 032901)
Daniel A. Arellano (AZ Bar. No. 032304)
Jillian L. Andrews (AZ Bar No. 034611)
530 East McDowell Road
Suite 107-150
Phoenix, Arizona 85004-1500
Phone: (602) 567-4820
roy@ha-firm.com
daniel@ha-firm.com
jillian@ha-firm.com

**ELIAS LAW GROUP LLP**
Marc E. Elias*
Elisabeth C. Frost*
Christopher D. Dodge*
Mollie DiBrell*
Alexander F. Atkins*
Daniela Lorenzo*
Qizhou Ge*
250 Massachusetts Ave NW, Suite 400
Washington, DC 20001
Phone: (202) 968-4513
Facsimile: (202) 968-4498
melias@elias.law
efrost@elias.law
cdodge@elias.law
mdibrell@elias.law
aatkins@elias.law
dlorenzo@elias.law
age@elias.law

*Attorneys for Mi Familia Vota and Voto Latino*

/s/ Danielle Lang

**BARTON MENDEZ SOTO**
James Barton (AZ Bar No. 023888)
401 W. Baseline Road
Suite 205
Tempe, AZ 85283
480-418-0668
james@bartonmendezsoto.com

**CAMPAIGN LEGAL CENTER**
Danielle Lang*
Jonathan Diaz*
Molly Danahy*
Hayden Johnson*
Brent Ferguson*
1101 14th St. NW, Suite 400
Washington, D.C. 20005
(202) 736-2200
dlang@campaignlegalcenter.org
jdiaz@campaignlegalcenter.org
mdanahy@campaignlegalcenter.org
hjohnson@campaignlegalcenter.org
nhansen@campaignlegalcenter.org

**DEPARTMENT OF JUSTICE**
**SAN CARLOS APACHE TRIBE**
Alexander B. Ritchie
(AZ Bar No. 019579)
Attorney General
Chase A. Velasquez*
NM Bar No. 019148
Assistant Attorney General
Post Office Box 40
16 San Carlos Ave.
San Carlos, AZ 85550
Alex.Ritchie@scat-nsn.gov
Chase.Velasquez@scat-nsn.gov

**FREE SPEECH FOR PEOPLE**
Courtney Hostetler* (MA# 683307)
John Bonifaz* (MA# 562478)
Ben Clements* (MA# 555082)
Ronald Fein* (MA# 657930)
1320 Centre Street, Suite 405
Newton, MA 02459
(617) 249-3015
chostetler@freespeechforpeople.org
jbonifaz@freespeechforpeople.org
bclements@freespeechforpeople.org
rfein@freespeechforpeople.org

**MAYER BROWN LLP**
Lee H. Rubin* (CA# 141331)
Two Palo Alto Square, Suite 300
3000 El Camino Real
Palo Alto, CA 94306-2112
(650) 331-2000
lrubin@mayerbrown.com

Gary A. Isaac* (IL# 6192407)
Daniel T. Fenske* (IL# 6296360)
William J. McElhaney, III*
(IL# 6336357)
71 S. Wacker Drive
Chicago, IL 60606
(312) 782-0600
dfenske@mayerbrown.com
gisaac@mayerbrown.com
Rachel J. Lamorte* (NY# 5380019)
1999 K Street NW
Washington, DC 20006
(202) 362-3000
rlamorte@mayerbrown.com

*Attorneys for Living United for Change in Arizona, League of United Latin American Citizens, Arizona Students' Association, ADRC Action, Inter Tribal Council of Arizona, Inc., San Carlos Apache Tribe, and Arizona Coalition for Change*

/s/ Christopher E. Babbitt

**PAPETTI SAMUELS WEISS MCKIRGAN LLP**
Bruce Samuels (AZ Bar No. 015996)
Jennifer Lee-Cota (AZ Bar No. 033190)
bsamuels@pswmlaw.com
jleecota@pswmlaw.com
Scottsdale Quarter
15169 North Scottsdale Road
Suite 205
Scottsdale, AZ 85254
+1 480 800 3530

**WILMER CUTLER PICKERING HALE AND DORR LLP**
Seth P. Waxman*
Daniel S. Volchok*
Christopher E. Babbitt*
seth.waxman@wilmerhale.com
daniel.volchok@wilmerhale.com
christopher.babbitt@wilmerhale.com
2100 Pennsylvania Avenue N.W.
Washington, D.C. 20037
+1 202 663 6000 (telephone)
+1 202 663 6363 (facsimile)

*Attorneys for the Democratic National Committee and Arizona Democratic Party*

/s/ Amit Makker

**LATHAM & WATKINS LLP**
Sadik Huseny*
*sadik.huseny@lw.com*
Amit Makker*
*amit.makker@lw.com*
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6538
Telephone: (415) 391-0600
Facsimile: (415) 395-8095

**ASIAN AMERICANS ADVANCING JUSTICE-AAJC**
Niyati Shah*
*nshah@advancingjustice-aajc.org*
Terry Ao Minnis*
*tminnis@advancingjustice-aajc.org*
1620 L Street NW, Suite 1050
Washington, DC 20036
Telephone: (202) 296-2300
Facsimile: (202) 296-2318

**SPENCER FANE**
Andrew M. Federhar
(AZ Bar No. 006567)
*afederhar@spencerfane.com*
2415 East Camelback Road, Suite 600
Phoenix, AZ 85016
Telephone: (602) 333-5430
Facsimile: (602) 333-5431

*Attorneys for Plaintiff Arizona Asian American Native Hawaiian and Pacific Islander for Equity Coalition*

**U.S. DEPARTMENT OF JUSTICE**

GARY M. RESTAINO
United States Attorney, District of Arizona

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

/s/ Jennifer J. Yun
RICHARD A. DELLHEIM
EMILY R. BRAILEY
SEJAL JHAVERI
MARGARET M. TURNER
JENNIFER J. YUN
Civil Rights Division, Voting Section
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530
(202) 353-5724
Richard.Dellheim@usdoj.gov
Emily.Brailey@usdoj.gov
Sejal.Jhaveri@usdoj.gov
Margaret.M.Turner@usdoj.gov
Jennifer.Yun@usdoj.gov

*Attorneys for the United States*

/s/ Allison Neswood
**OSBORN MALEDON, P.A.**
David B. Rosenbaum
AZ No. 009819
Joshua J. Messer
AZ No. 035101
2929 North Central Avenue, 21st Floor
Phoenix, Arizona 85012-2793
(602) 640-9000
drosenbaum@omlaw.com
jmesser@omlaw.com

**LAWYERS COMMITTEE FOR CIVIL RIGHTS UNDER LAW**
Ezra Rosenberg*
DC No. 360927, NJ No. 012671974
Jim Tucker**
AZ No. 019341
Ryan Snow*
1500 K Street NW, Suite 900
Washington, DC 20005
(202) 662-8600 (main)
erosenberg@lawyerscommittee.org
jtucker@lawyerscommittee.org
rsnow@lawyerscommittee.org

**NATIVE AMERICAN RIGHTS FUND**
Allison A. Neswood*
CO No. 49846
neswood@narf.org
Michael S. Carter
AZ No. 028704, OK No. 31961
carter@narf.org
Matthew Campbell*
NM No. 138207, CO No. 40808
mcampbell@narf.org
Jacqueline D. DeLeon*
CA No. 288192
jdeleon@narf.org
1506 Broadway
Boulder, CO 80301
(303) 447-8760 (main)

Samantha B. Kelty
AZ No. 024110, TX No. 24085074
kelty@narf.org
950 F Street NW, Suite 1050,
Washington, D.C. 20004
(202) 785-4166 (direct)

**GILA RIVER INDIAN COMMUNITY**
Thomas L. Murphy
AZ No. 022953
Javier G. Ramos
AZ No. 017442
Post Office Box 97
Sacaton, Arizona 85147
(520) 562-9760
thomas.murphy@gric.nsn.us
javier.ramos@gric.nsn.us
*Representing Gila River Indian Community Only*

**TOHONO O'ODHAM NATION**
Howard M. Shanker (AZ Bar 015547)
Attorney General, Tohono O'odham Nation
Marissa L. Sites (AZ Bar 027390)
Assistant Attorney General, Tohono O'odham Nation
P.O. Box 830
Sells, Arizona 85634
(520) 383-3410
Howard.Shanker@tonation-nsn.gov
Marissa.Sites@tonation-nsn.gov
*Representing Tohono O'odham Nation Only*

*Attorneys for Tohono O'odham Nation, Gila River Indian Community, Keanu Stevens, Alanna Siquieros, and LaDonna Jacket*

**Admitted Pro Hac Vice*
***Admitted in Arizona, D.C. and Nevada*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of this document was served on all counsel of record through the Court's CM/ECF system on the 12th of December 2023.

DATED: December 12, 2023

*<u>/s/ John A. Freedman</u>*
John A. Freedman