**UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA**

Mi Familia Vota, et al.,

Plaintiffs,

v.

Adrian Fontes, in his official capacity as Arizona Secretary of State, et al.,

Defendants.

Case No. 2:22-cv-00509-SRB (Lead)

PLAINTIFFS' JOINT PROPOSED CONCLUSIONS OF LAW

**AND CONSOLIDATED CASES.**

No. CV-22-00519-PHX-SRB
No. CV-22-01003-PHX-SRB
No. CV-22-01124-PHX-SRB
No. CV-22-01369-PHX-SRB
No. CV-22-01381-PHX-SRB
No. CV-22-01602-PHX-SRB
No. CV-22-01901-PHX-SRB

# TABLE OF CONTENTS


Page

I. Jurisdiction and Venue ..... 1

II. Standing ..... 1

A. Organizational Standing ..... 1

B. Associational Standing ..... 2

III. HB 2492's Birthplace Requirement Violates the Materiality Provision of the Civil Rights Act of 1964 ..... 3

A. Parties ..... 3

B. The Materiality Provision of the Civil Rights Act of 1964 ..... 3

C. Birthplace is not Material to Determining a Voter's Qualifications ..... 5

D. Birthplace is Not and Cannot Be Used to Establish or Confirm Identity ..... 8

E. Confirming Identity with Immaterial Information Violates the Materiality Provision ..... 9

F. Administrative Uses of Birthplace Do Not Make Birthplace Material ..... 11

IV. A.R.S. § 16-165(I) Violates the 1964 Civil Rights Act's Different Standards, Practices, or Procedures Provision, 52 U.S.C. § 10101(a)(2)(A) ..... 12

V. Private Parties Can Enforce the Materiality and Different Standards, Practices, or Procedures Provisions of the Civil Rights Act of 1964 ..... 16

A. Private Enforcement of the Materiality Provision Via Section 1983 ..... 16

B. Private Enforcement of the Materiality Provision Under the 1964 Civil Rights Act ..... 21

C. 52 U.S.C. § 10101(a)(2)(A) May Be Enforced Via 42 U.S.C. § 1983 or Directly Under the Civil Rights Act ..... 22

VI. HB 2492 And HB 2243 Violate the National Voter Registration Act ("NVRA") ..... 25

A. Section 6 of the NVRA Preempts HB 2243 ..... 25

B. HB 2492 Sections 7 and 8 and HB 2243 Section 2 Cause Non-Uniform and Discriminatory Treatment of Registered Voters in Violation of Section 8(b) of the NVRA ..... 26

C. HB 2492 Violates the 90-Day Provision of NVRA Section 8 ..... 32

VII. The Citizenship Investigation Procedures Cause the Arbitrary and Disparate Treatment of Voter Registration Applicants and Registered Voters in Violation of the Equal Protection Clause ..... 33

VIII. The Challenged Laws Target Protected Classes in Violation of the Fourteenth and Fifteenth Amendments .......... 36

A. The Challenged Laws Were Motivated by a Discriminatory Purpose .......... 36

B. The Challenged Laws Facially Discriminate on the Basis of National Origin and/or Alienage .......... 42

IX. A.R.S. § 16-165(I) Violates the Fourteenth and Fifteenth Amendments' Prohibition on Unfettered Discretion in Voter Registration Systems .......... 45

X. The Challenged Laws Impose an Undue Burden on the Right to Vote, in Violation of the First and Fourteenth Amendments to the U.S. Constitution .......... 47

A. The Challenged Laws Burden the Right to Vote .......... 49

B. The Purported Justifications Underlying Each of the Challenged Laws Are Not Sufficiently Weighty to Justify the Burdens .......... 51

XI. The Challenged Laws Violate Voters' Procedural Due Process Rights .......... 53

XII. The Challenged Laws Violate Section 2 of the Voting Rights Act .......... 57

A. The Size of the Burden .......... 59

B. The Disparate Impact .......... 59

C. The Challenged Laws Substantially Depart from Standard Practice in 1982 .......... 60

D. Opportunities in the Voting System Do Not Reduce the Disparate Burdens .......... 62

E. The State's Interest .......... 64

F. Senate Factor 1: Arizona's History of Discrimination .......... 65

G. Senate Factor 5: Lasting Effects of Arizona's Discrimination .......... 66

H. Additional Senate Factors Favor Plaintiffs .......... 66

XIII. Documentary Proof of Residence: Differential Treatment of State and Federal Form Voters Violates the Equal Protection Clause and the National Voter Registration Act .......... 67

A. The Equal Protection Clause Prohibits Differential DPOR Treatment .......... 68

B. Sections 6 and 8(a) of the NVRA Prohibit Differential DPOR Treatment .......... 71

C. Section 7 of the NVRA Prohibits Differential DPOR Treatment of Forms from Public Assistance Agencies .......... 73

# PROPOSED CONCLUSIONS OF LAW

## I. Jurisdiction and Venue

1. This Court has original jurisdiction over this action under 28 U.S.C. §§ 1331, 1345, and 2201(a) and 52 U.S.C. §§ 20510(a) and 10101(d).

2. Venue is proper in this Court under 28 U.S.C. §§ 82 and 1391(b).

## II. Standing

3. To establish Article III standing, Plaintiffs must demonstrate that "(1) they have suffered an injury-in-fact, meaning an injury that is 'concrete and particularized' and 'actual and imminent,' (2) the alleged injury is 'fairly traceable' to the defendants' conduct, and (3) it is 'more than speculative' that the injury is judicially redressable." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 662-63 (9th Cir. 2021) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)).

### A. Organizational Standing

4. An organization has standing if it shows "that the defendant[s]' behavior has frustrated its mission and caused it to divert resources in response to that frustration of purpose." *Sabra v. Maricopa Cnty. Cmty. Coll. Dist.*, 44 F.4th 867, 879-80 (9th Cir. 2022); *see also Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1040-41 (9th Cir. 2015).

5. Political parties may also establish competitive standing—a form of organizational standing—by showing that the challenged action harms the parties' chances of electoral success. *Mecinas v. Hobbs*, 30 F.4th 890, 897-98 (9th Cir. 2022); *see also Democratic Nat'l Comm. v. Reagan*, 329 F. Supp. 3d 824, 841 (D. Ariz.) (the Arizona Democratic Party ("ADP") had organizational standing because the challenged law would require it to divert resources to different voter-outreach strategies), *aff'd*, 904 F.3d 686 (9th Cir. 2018).

6. Through testimony of organizational representatives, the non-U.S. Plaintiffs have established that they each have standing to press all their respective challenges to HB 2492 and HB 2243 (the "Challenged Laws"), because the laws (1) frustrate their individual organizational missions, which include encouraging civic engagement among the

communities they serve and, in the case of the Democratic National Party ("DNC") and the ADP, electing Democrats in Arizona, and (2) force the organizations to divert time, money, and other resources to address the Challenged Laws, and to incur new costs to effectively conduct voter-registration efforts. For the Court's convenience, the non-U.S. Plaintiffs submit as Exhibit A, a chart with citations to the evidence that supports each Plaintiff's standing. *See also* ECF No. 304 at 16-18.

**B. Associational Standing**

7. To demonstrate standing to sue on behalf of its members (associational or representational standing), an organization must show that "(1) at least one of its members would have standing to sue in his own right, (2) the interests the suit seeks to vindicate are germane to the organization's purpose, and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 681-82 (9th Cir. 2023) (en banc).

8. Plaintiffs Promise Arizona, San Carlos Apache Tribe, Arizona Students' Association, the DNC, and the ADP have each established, through testimony of their respective organizational representatives or members, that they each have standing to press all their respective challenges to HB 2492 and HB 2243 because (1) members and constituents of each organization would have standing to sue in their own right; (2) each organization seeks to protect interests that are germane to its organizational purpose or purposes; and (3) none of the claims asserted by the organizations and none of the relief they request requires the participation of any organization's individual members in this lawsuit.[1]

---

[1] Because the Tohono O'odham Plaintiffs effectively received the relief they were seeking on summary judgment and were unopposed by any Defendant in their requested relief, they did not present evidence at trial. Defendants, however, stipulated to facts sufficient to establish the Tohono O'odham Nation's and Gila River Indian Community's parens patriae standing. *See* ECF 609 at 29 (citing Stipulated Fact (ECF No. 571-1) Nos. 5-8). In any event, only one plaintiff need establish standing to maintain a claim, *Department of Commerce v. New York*, 139 S. Ct. 2551, 2565 (2019). Standing on the Section 6 NVRA

### III. HB 2492's Birthplace Requirement Violates the Materiality Provision of the Civil Rights Act of 1964

#### A. Parties

9. The Civil Rights Act of 1957 authorizes the U.S. Attorney General to file a civil action on behalf of the United States seeking injunctive, preventive, and permanent relief for violations of Section 101 of the Civil Rights Act of 1964. 52 U.S.C. § 10101(c).

10. The non-U.S. Plaintiffs may enforce the Materiality Provision of the Civil Rights Act of 1964 via 42 U.S.C. § 1983 or directly under the Civil Rights Act itself. *See Migliori v. Cohen*, 36 F.4th 153, 156-57 (3d Cir. 2022);[2] *Schwier v. Cox* (*Schwier I*), 340 F.3d 1284, 1297 (11th Cir. 2003); *La Union del Pueblo Entero v. Abbott*, 618 F. Supp. 3d 388, 431-32 (W.D. Tex. 2022), *appeal filed sub nom. OCA-Greater Hous. v. Nelson*, No. 22-50778 (5th Cir. Aug. 31, 2022).

11. Defendant State of Arizona is one of the states of the United States. Arizona is subject to Section 101 of the Civil Rights Act of 1964. *See* 52 U.S.C. § 10101(c) (authorizing a state to be joined as a defendant when any state official or subdivision is alleged to have violated Section 101).

12. Defendant Adrian Fontes is the Arizona Secretary of State. The Secretary of State is the chief state election officer. Ariz. Const. art. V, § 9; A.R.S. § 16-142. In this role, Secretary Fontes is responsible for helping enforce HB 2492. *See* HB 2492 § 7 (adding A.R.S. § 16-143).

#### B. The Materiality Provision of the Civil Rights Act of 1964

13. The Materiality Provision of Section 101 of the Civil Rights Act of 1964 prohibits any person "acting under color of law" from "deny[ing] the right of any individual to vote in any election because of an error or omission on any record or paper relating to

---

challenge to the DPOR requirement, on which the Tohono O'odham Plaintiffs prevailed at summary judgment, has been amply demonstrated by Plaintiffs in the consolidated action.

[2] The Supreme Court vacated *Migliori* after the underlying dispute became moot. *See Ritter v. Migliori*, 143 S. Ct. 297 (2022) (citing *United States v. Munsingwear, Inc.*, 340 U.S. 36 (1950)). Despite this, the substantive analysis in *Migliori* "has persuasive value." *Garnier v. O'Connor-Ratcliff*, 41 F.4th 1158, 1174 n.10 (9th Cir. 2022).

any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election." 52 U.S.C. § 10101(a)(2)(B).

14. The word "vote" in the provision is defined to include "all action necessary to make a vote effective including, but not limited to, registration or other action required by State law prerequisite to voting, casting a ballot, and having such ballot counted and included in the appropriate totals." 52 U.S.C. § 10101(c).

15. Under HB 2492, Arizona's County Recorders may not register any voter-registration applicants who failed to provide their place of birth information on the Arizona voter registration form. A.R.S. § 16-121.01(A) (codifying HB 2492 § 4). Arizonans cannot vote without being registered to vote. *See id.* § 16-122 ("No person shall be permitted to vote unless such person's name appears as a qualified elector in both the general county register and in the precinct register or list of the precinct and election districts").

16. Arizona's voter registration form is a "record or paper relating to [] application [or] registration . . . requisite to voting." 52 U.S.C. § 10101(a)(2)(B). Arizona requires its "state voter registration form" to be "printed in a form prescribed by the Secretary of State." A.R.S. § 16-152(C). Arizona's online voter registration form is a "record" within the meaning of the statute. *Cf.* 5 U.S.C. § 552a(a)(4) (defining "record" as "any item, collection, or grouping of information"); 44 U.S.C. § 2201(1) ("documentary material"); *id.* § 3301(a)(1)(A) ("all recorded information, regardless of form or characteristics"); *see also* 5 U.S.C. § 552(f)(2) (noting that "record" includes information maintained "in any format, including an electronic format"); *Record*, Black's Law Dictionary (11th ed. 2019) ("Information that is inscribed on a tangible medium or that, having been stored in an electronic or other medium, is retrievable in perceivable form.").

17. Failure to include one's birthplace information on the Arizona voter registration form is an "error or omission on [a] record or paper." 52 U.S.C. § 10101(a)(2)(B); *see Migliori*, 36 F.4th at 157 (addressing failure to provide a handwritten date on mail-in ballot envelopes under the Materiality Provision); *Martin v. Crittenden*,

347 F. Supp. 3d 1302, 1306 (N.D. Ga. 2018) (addressing "failure to provide" requested information); *see also Omission*, Black's Law Dictionary (11th ed. 2019) ("Something that is left out, left undone, or otherwise neglected."); 10 Cong. Rec. 6715 (1964) (statement of Sen. Kenneth Keating) (describing legislative intent of Section 101 to address failure to complete paperwork requirements for redundant information).

18. Failure to register applicants who do not provide their place of birth on the state voter registration form therefore results in "deny[ing] the right of an[] individual to vote . . . because of an . . . omission on a[] record or paper relating to . . . registration." 52 U.S.C. § 10101(a)(2)(B).

**C. Birthplace is Not Material to Determining a Voter's Qualifications**

19. A voter registration applicant's failure to provide birthplace information is "not material in determining whether such individual is qualified under State law to vote in such election." 52 U.S.C. § 10101(a)(2)(B).

20. The word "material" in this context means the required information must "actually impact[] an election official's [voter] eligibility determination." ECF No. 534 at 26. In other words, "material" information must be more than merely "useful" or "minimally relevant." *Id.* at 25-26; *see Diaz v. Cobb*, 435 F. Supp. 2d 1206, 1213 (S.D. Fla. 2006) (deeming not material a "failure to provide information . . . that is *not directly relevant* to the question of eligibility" (emphasis added)); *La Union del Pueblo Entero v. Abbott* (*LUPE I*), 604 F. Supp. 3d 512, 542 (W.D. Tex. 2022) (describing a state law provision challenged under the Materiality Provision as requiring "information that is unnecessary and therefore not material to determining an individual's qualifications to vote under [state] law"); *Ford v. Tenn. Senate*, No. 06-2031 D V, 2006 WL 8435145, at *10 (W.D. Tenn. Feb. 1, 2006) (finding a second signature requirement to not be material because it was "a redundant safeguard, helpful but not essential to determining whether an individual was qualified to vote").

21. The distinction between "material" and "minimally relevant" in this context is evident in the practices that the Materiality Provision was enacted to eradicate, such as

"disqualifying an applicant who failed to list the exact number of months and days in his age." *Condon v. Reno*, 913 F. Supp. 946, 950 (D.S.C. 1995). A voter's age in months and days was deemed not material under the statute, notwithstanding the fact that the required information was nominally connected to age, a qualification criterion.

22. The definition of "material" in other statutory contexts confirms that, to be "material," information must be more than minimally or potentially relevant to the inquiry at hand. *See, e.g.*, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (defining "material fact" for the purposes of summary-judgment motions as facts that "might affect the outcome" of the case); *Cone v. Bell*, 556 U.S. 449, 469-70 (2009) (defining materiality for purposes of *Brady* violations as "a reasonable probability that . . . the result of the proceeding would have been different"); *Kungys v. United States*, 485 U.S. 759, 771-72 (1988) (defining materiality for purposes of the Immigration and Nationality Act as "predictably capable of affecting" an official decision); *United States v. Uchimura*, 125 F.3d 1282, 1285 (9th Cir. 1997) (defining materiality for purposes of tax fraud cases as "necessary to a determination of whether" tax is owed).

23. The materiality analysis starts with comparing the required information to the state's enumerated state-law qualifications to vote. *Migliori*, 36 F.4th at 162-63; *Martin*, 347 F. Supp. 3d at 1308-09.

24. In Arizona, voter qualifications are limited to age, U.S. citizenship, residency, ability to write one's name or make one's mark, lack of treason or felony convictions or, if convicted, a restoration of civil rights, and no adjudications of incapacity. Ariz. Const. art. VII § 2; A.R.S. § 16-101.

25. The only qualification criterion at issue here is U.S. citizenship. As a matter of law, birthplace cannot establish a voter registrant's citizenship status. Persons born in the United States can still be noncitizens if they were born to diplomat parents, for example. *See* 8 C.F.R. § 101.3(a)(1). And, of course, individuals born outside the United States can be citizens if they were born to United States citizen parents or acquire citizenship through the naturalization process—a point the Arizona Attorney General concedes. ECF No. 436

at 35. These examples, by no means exhaustive, demonstrate that birthplace is not, and cannot be, material to determining a registrant's citizenship. As a result, birthplace cannot be used—and is not used in Arizona, PFOF Nos. 326-28—as a proxy for determining a registrant's citizenship status.

26. Defendant-Intervenor Republican National Committee's ("RNC") argument that birthplace is material to voter eligibility because birthplace is "highly correlated with" citizenship status falls short. *See* ECF No. 586 at 9. The Materiality Provision requires that any omission leading to denial of the right to vote be material "in *determining* whether such individual is qualified" to vote, 52 U.S.C. § 10101(a)(2)(B), and a voter's citizenship status cannot be *determined* based on a correlation or statistical likelihood of the voter's citizenship status. Nor, as just noted, do any state or county election officials actually use birthplace to determine citizenship status. PFOF Nos. 326-28 (state and county testimony that birthplace has no use for determining citizenship status).

27. That no form may be rejected based on the answer to the birthplace question on Arizona's voter registration further belies the contention that birthplace information is material to determining a registrant's qualifications to vote. *See* PFOF No. 351. The Third Circuit found that the rejection of mail-in ballots without a handwritten date violated the Materiality Provision because mail-in ballots with wrong dates—for example, a date in the future, or a series of numbers that could not constitute a date—were accepted, whereas omission of a date required rejecting a ballot. *See Migliori*, 36 F.4th at 163-64 ("If the substance of the string of numbers does not matter, then it is hard to understand how one could claim that this requirement has any use in determining a voter's qualifications."). The same logic applies here. Arizona election officials are unable to verify a voter's birthplace, and County Recorders accept whatever is written—including typos and gibberish like "GW"—as a "state or country of birth." *See* PFOF Nos. 334, 356. Arizona's acceptance of any answer for birthplace confirms that election officials do not use birthplace information to determine a registrant's eligibility; rather, under HB 2492, the

birthplace field is used solely to reject voter registration applications. The Materiality Provision prohibits such practice.

**D. Birthplace is Not and Cannot Be Used to Establish or Confirm Identity**

28. Defendants have argued that birthplace "*can* be a mechanism for confirming the identity" of a voter and therefore is material to a voter's qualifications to vote. ECF No. 586 at 5 (emphasis added). But birthplace information is not and cannot be used to establish a voter's identity in Arizona, nor is it helpful for confirming a voter's identity. *See generally* PFOF Nos. 329-75.

29. Arizona's voter registrants are not and cannot be identified by their birthplace. *See* PFOF Nos. 329-33 (state and county officials do not use birthplace to identify a voter); PFOF No. 367 (hundreds of thousands of voters have the same country or state of birth within the Arizona voter registration database). Even when birthplace was an optional field, Arizona election officials were able to identify those registrants and determine their eligibility. PFOF No. 330. This lack of actual use by election officials demonstrates that birthplace is immaterial to determining a voter's identity. *See Pa. State Conf. of NAACP v. Schmidt*, No. 1:22-CV-339, 2023 WL 8091601, at *32 (W.D. Pa. Nov. 21, 2023) (finding a date requirement on a mail-in ballot envelope immaterial because election officials did not use the date "to determine when a voter's mail ballot was received," nor "for any purpose related to determining" voter qualifications), *appeal filed*, No. 23-1366 (3d Cir. Dec. 7, 2023); *La Union del Pueblo Entero v. Abbott* (*LUPE II*), No. 21-cv-00844, 2023 WL 8263348, at *17 (W.D. Tex. Nov. 29, 2023) (finding an ID number requirement for mail voting to violate the Materiality Provision because "election officials do *not* use the ID numbers . . . to confirm voters' identities but to reject their voting materials" (emphasis in original)), *appeal filed*, No. 23-50885 (5th Cir. Dec. 5, 2023).

30. That County Recorders may note birthplace information on existing records when ascertaining whether a registration application is for a new voter or an already registered voter within the county is irrelevant to this materiality inquiry. Any number of mandatory or optional fields on voter records can match when a County Recorder queries

voter records. But the fact that some fields are available does not make those fields "material," and a field is not material if the information provided does not "actually impact" an election official's analysis in determining a voter's identity. ECF No. 534 at 26.

31. Arizona's birthplace information also cannot be used to confirm a registrant's identity due to (1) the error-ridden nature of the data collected for "state or country of birth" in Arizona; (2) the existence of much better collected and widely available identification numbers for voter registration records; and (3) the inherent nature of birthplace as a weak differentiator among Arizona voter registrants, a plurality of whom were born in the same country and state. *See* PFOF Nos. 345-75.

32. Birthplace information is therefore not material to establishing or confirming a voter registrant's identity in Arizona.

**E. Confirming Identity with Immaterial Information Violates the Materiality Provision**

33. Even if Arizona could use birthplace to confirm a voter registrant's identity, such an exercise would amount to confirming a registrant's identity that has already been established by much more precise and determinative means, such as date of birth and ID numbers. *See* PFOF Nos. 359-69 (Hersh testimony). Requiring information for the purposes of confirming a voter's identity when identity has already been established violates the Materiality Provision. Put differently, whether birthplace could theoretically be helpful for confirming a voter's identity is not the proper inquiry under the Materiality Provision: once a voter's identity is established; duplicative requirements to confirm the voter's identity are not material to determining that already-identified voter's eligibility. And if the required information is not material to determining a voter's qualifications, it violates the Materiality Provision. *See LUPE II*, 2023 WL 8263348, at *18 (holding that "[o]nce election officials have determined an applicant or voter's identity, additional requirements that confirm identity are not material to determining whether the applicant or voter is qualified to vote or vote by mail and compounds the chance for error and disenfranchisement."); *Martin*, 347 F. Supp. 3d at 1308-09 (finding that requiring a voter's

birth year on a ballot envelope was immaterial when the voter's age was already confirmed).

34. Further, rejecting voter registration applications based on omissions of information that could purportedly be used to re-confirm identity several ways would have no limiting principle. For example, a registrant's eye color, mother's maiden name, high school mascot, or any number of personal characteristics could theoretically be used to further confirm that registrant's identity. But none of those characteristics affect Arizona's process for determining whether the registrant meets Arizona's qualifications to vote. Requiring duplicative information imposes hurdles to vote and compounds the chance for immaterial errors and omissions—the precise outcome the Materiality Provision prohibits. *See Schwier I*, 340 F.3d at 1294 (explaining the purpose of the Materiality Provision as prohibiting "the practice of requiring unnecessary information for voter registration with the intent that such requirements would increase the number of errors or omissions on the application forms, thus providing an excuse to disqualify potential voters").

35. That birthplace can, "when coupled with other data points . . . alert the County Recorder to potentially fraudulent or falsified registration applications" is irrelevant to the analysis. ECF No. 586 at 10. The Materiality Provision contains no exception for laws aimed to prevent fraud: the Provision prohibits denying an eligible voter's right to vote based on information that is not material to determining voter qualifications, even as a preventive measure against voter fraud. *See Schwier v. Cox* (*Schwier II*), 412 F. Supp. 2d 1266, 1276 (N.D. Ga. 2005) (rejecting contention that any information that "could help to prevent voter fraud" is material to voter qualifications), *aff'd*, 439 F.3d 1285 (11th Cir. 2006); *Migliori*, 36 F.4th at 163 (rejecting a fraud-prevention justification because "whatever sort of fraud deterrence or prevention this requirement may serve, it in no way helps the Commonwealth determine whether a voter's age, residence, citizenship, or felony status qualifies them to vote"); *LUPE II*, 2023 WL 8263348, at *9 ("While Texas undoubtedly has an interest in deterring and preventing voter fraud, that interest must yield to a qualified voter's right, under Section 101 of the [Civil

Rights Act], to have their ballot counted despite immaterial paperwork errors."). Put simply, "Materiality Provision violations are prohibited no matter their policy aim." *Id.* at *8.

36. Even if the Materiality Provision contained such an exception for fraud prevention—which it emphatically does not—Defendants failed to put forth any evidence that Arizona election officials use birthplace for that purpose. In addition, many registrants in Arizona share the same state or country of birth. *See* PFOF No. 367. And Arizona election officials have no means to verify registrants' birthplace information. *See* PFOF No. 334. Thus, birthplace cannot help a County Recorder determine whether a registrant made an inadvertent mistake or recorded an ambiguous birthplace, or if someone was attempting to impersonate a voter.

**F. Administrative Uses of Birthplace Do Not Make Birthplace Material**

37. Election officials' occasional use of birthplace in election administration does not make a voter's birthplace material to determining the voter's qualifications.

38. Arizona's Elections Procedures Manual ("EPM") contains a handful of scenarios whereby election officials might use optional birthplace information when provided by registered voters. Unsurprisingly, many of these uses simply underscore that birthplace is one of many optional pieces of information that election administrators can use to match across various records: a voter record to a ballot-by-mail request; a voter record to a death notice; or a form returned from a registrant that supplies missing information to the original registration form submitted by the same registrant. *See* PFOF Nos. 341-44. None of these examples indicate that election administrators use birthplace information to determine a voter's qualifications. And lacking birthplace information for one third of registered voters—more than one million voters—has never prevented Arizona's election officials from being able to match these records or carry out other election administration duties, such as looking for the right page on the passport presented as documentary proof of citizenship ("DPOC") or matching a birth certificate to a registrant who lacks documentation for a legal name change. *See* PFOF No. 341.

39. Even if the EPM *required* election officials to use birthplace, that would still violate the Materiality Provision. The Materiality Provision applies whether a state passes or enforces a law or takes actions that exceed state law. *See* ECF No. 304 at 32 n.16 (rejecting the State's argument that the Materiality Provision prohibits only "ad hoc executive actions that exceed state law"). In other words, Arizona could not avoid liability under the Materiality Provision by simply codifying its use of immaterial information in the EPM.

40. Lastly, using birthplace as a security question to ascertain the identity of a voter over the telephone does not make birthplace information material to determining a voter's qualifications. Birthplace has been one of several pieces of optional information used to verify the identity of individuals who call the County Recorders' offices. *See* PFOF Nos. 335-38. No county has ever expressed the need to have birthplace become a mandatory field to use it as a security question or for any other purpose. PFOF No. 340. In fact, some counties would ask follow-up questions in addition to birthplace as a security question because birthplace is not a good differentiator between Arizona's registered voters. PFOF No. 339. Moreover, election officials ask these security questions of *registered* voters, and no answer to security questions would change the status of registration records that belong to registrants whose qualifications have already been determined. Rejecting a voter registration application because of a hypothetical desire to later ask a caller to provide birthplace information therefore violates the Materiality Provision because birthplace is not used to determine voter qualifications.

## IV. A.R.S. § 16-165(I) Violates the 1964 Civil Rights Act's Different Standards, Practices, or Procedures Provision, 52 U.S.C. § 10101(a)(2)(A)

41. A.R.S. § 16-165(I), the "reason to believe" provision, causes County Recorders to apply standards, practices, and procedures to determine the voter qualifications of registered voters who are suspected to lack U.S. citizenship that are different from the standards, practices, and procedures applied to other registered voters within the same county.

42. A violation of 52 U.S.C. § 10101(a)(2)(A) is established when (a) a person "acting under color of law"; (b) "in determining whether any individual is qualified under State law or laws to vote in any election"; (c) applies "any standard, practice, or procedure"; that is (d) "different from the standards, practices, or procedures applied under such law or laws to other individuals within the same county, parish, or similar political subdivision who have been found by State officials to be qualified to vote."

43. A.R.S. § 16-165(I) requires County Recorders to do what Section 10101(a)(2)(A) forbids: it commands a wholly subjective evaluation of registered voters' eligibility and the impositions of differential standards, practices, and procedures—specifically a search of the Systematic Alien Verification for Entitlements ("SAVE") system for citizenship information—based on nothing more than the arbitrary and subjective impressions, guesses, and suspicions of County Recorders' staff, not evidence of ineligibility. *See Shivelhood v. Davis*, 336 F. Supp. 1111, 1114-15 (D. Vt. 1971) (holding registrars could not require college students to provide more proof of residence than non-students merely because they suspected college students were not residents of town); *Frazier v. Callicutt*, 383 F. Supp. 15, 17-20 (N.D. Miss. 1974) (finding Section 10101(a)(2)(A) violation by application of "obviously different standard[s]" for students and non-students).

44. As evidenced by the Secretary of State's office's understanding that A.R.S. § 16-165(I) must be implemented such that each County Recorder's office has the "discretion" to determine what constitutes a "reason to believe" a registered voter is not a U.S. citizen, PFOF No. 448, and the County Recorders' markedly different understandings of the subjective phrase "reason to believe," *see* PFOF Nos. 449-58, A.R.S. § 16-165(I) has vested County Recorders with unbridled discretion to scrutinize registered voters for a lack of citizenship for *any* reason to believe they are not citizens, including mere suspicion. *See also* PFOF Nos. 380, 382, 384-89, 391-97, 428, 430.

45. Not only is the "reason to believe" standard in A.R.S. § 16-165(I) impermissibly subjective, but it has demonstrably resulted in varying "standards, practices,

[and] procedures," 52 U.S.C. § 10101(a)(2)(A). PFOF Nos. 428-59, 468-69. A.R.S. § 16-165(I) requires applying different standards, practices, and procedures to eligible voters within the same county, because whenever County Recorders' staff suspect a voter is not a citizen, even without concrete evidence, that voter will be subjected to an extra citizenship check and potential cancellation. Because A.R.S. § 16-165(I) directs County Recorders to subject some—but not all—registered voters to additional procedures, specifically SAVE citizenship verification, based on a subjective standard, *any* enforcement of this subsection will cause the application of different "standards, practices, [and] procedures" to determine their voting qualifications. 52 U.S.C. § 10101(a)(2)(A).

46. The Secretary of State has already admitted that A.R.S. § 16-165(I) violates the 1964 Civil Rights Act by "requir[ing] a different 'standard, practice, or procedure' for determining a voter's qualifications for voters who a county recorder 'has reason to believe are not United States citizens' than for voters who a county recorder does not have reason to believe are not United States citizens." PFOF No. 400(k). The Secretary of State has also admitted that A.R.S. § 16-165(I) directs County Recorders to sort voters into two categories: those who will be subjected to an extra SAVE search and those who "are not suspected of lacking U.S. citizenship [and] will not be subjected to the investigation and potential cancellations [*sic*] provisions set forth in HB 2243." PFOF No. 400(l).

47. Some Arizona statutes that utilize a "reason to believe" standard require the decisionmaker to rely on information and evidence, including affidavits that memorialize and attest to the basis for the "reason to believe," or require an investigator to execute a written certification substantiating their "reason to believe." *See, e.g.*, A.R.S. § 13-3016(D)(2) (requiring an investigator or prosecutor to execute a written certification that there is "reason to believe" that providing notice may result in danger to the safety of any person or harm to an investigation); *id.* § 9-461.11(F)(1)(d) (providing property owners with notice opportunity to share information and evidence that may be found to constitute "reason to believe" that a joint development project could cause harm); *id.* § 14-5415(C)

(requiring affidavits to show that there is "reason to believe" that a trust beneficiary is no longer in need of protection).

48. Defendants urge this Court to reject this claim because A.R.S. § 16-165(I) "employs a ubiquitous legal rubric . . . to trigger narrow investigations that relate directly to a substantive qualification for voting . . ." ECF No. 586 at 14. But that statement does not track the actual text and legal prohibition in 52 U.S.C. § 10101(a)(2)(A), which prohibits the application of a "standard, practice or procedure" that is different from those applied to other registered voters deemed qualified in the same county. Furthermore, Defendants have pointed to no *voting* law anywhere in the country that employs a "reason to believe" standard. Citations to federal and state campaign finance laws notwithstanding, ECF No. 586 at 12-13, Defendants have not established that this law is "ubiquitous" (*id*. at 14) in the voting context, and the 1964 Civil Rights Act demonstrates why.

49. Defendants argue that "A.R.S. § 16-165(I) does not regulate or exact any demands on voters; it simply establishes criteria for additional research by a county recorder." ECF No. 586 at 13. But this argument is incorrect for three reasons. First, A.R.S. § 16-165(I) need not make any "demands on voters" in order to be barred as unlawful differential treatment by 52 U.S.C. § 10101(a)(2)(A). Second, this provision lacks any "criteria for additional research"; it only contains a subjective, unclear standard that is already defying uniform understanding and implementation. PFOF Nos. 449-58. Fifteen County Recorders, their staff, and their counsel have not arrived at a common understanding of this subjective standard. PFOF Nos. 380, 382, 384-89, 391-97, 428-33, 448-58. Third, a naturalized registered voter unnecessarily subjected to a SAVE query may be forced to undergo USCIS's additional verification procedures or otherwise correct and update records that the SAVE system accesses and/or supply DPOC once again to establish U.S. citizenship. PFOF Nos. 266-99.

50. Defendants argue that A.R.S. § 16-165(I) complies with the 1964 Civil Rights Act because it is "tethered directly to the verification of an undisputedly valid voting qualification—*i.e.*, United States citizenship." ECF No. 586 at 13. That U.S. citizenship is

a requirement to vote is not in dispute. But this obvious point has no bearing on whether A.R.S. § 16-165(I) mandates that County Recorders apply different "standards, practices, or procedures," based on nothing more than their subjective assessment of that voting qualification. An election official may not call into question and apply an extra investigation to a registered voter's citizenship based simply on any subjective reason to believe non-U.S.-citizenship, any more than they could investigate a voter's age or residence in Arizona based on any subjective reason to believe that the voter is not at least 18 years old or a resident of Arizona. Such conduct is exactly what 52 U.S.C. § 10101(a)(2)(A) was intended to prohibit.

51. Defendants also continue to cite *Ballas v. Symm*, 494 F.2d 1167, 1171-72 (5th Cir. 1974), ECF No. 586 at 13, notwithstanding the fact that *Ballas* has not been good law since 1979.[3] The Texas statute at issue in *Ballas*, which presumed non-residency of college students, and the Waller County registrar's practice of requiring students to complete a residency questionnaire, were both subsequently enjoined. *See Whatley v. Clark*, 482 F.2d 1230, 1234 (5th Cir. 1973) (enjoining statute); *Symm v. United States*, 439 U.S. 1105 (1979) (summarily affirming *United States v. Texas*, 445 F. Supp. 1245 (S.D. Tex. 1978) (three-judge panel)). *See generally Johnson v. Waller Cnty.*, 593 F. Supp. 3d 540, 615 (S.D. Tex. 2022) (summarizing history).

## V. Private Parties Can Enforce the Materiality and Different Standards, Practices, or Procedures Provisions of the Civil Rights Act of 1964

52. Private parties can enforce both the Materiality and Different Standards, Practices, or Procedures Provisions of the Civil Rights Act of 1964 via Section 1983 or directly under the Act.

### A. Private Enforcement of the Materiality Provision Via Section 1983

53. The Materiality Provision can be enforced by private parties via Section 1983. *See Migliori*, 36 F.4th at 156-57; *Schwier I*, 340 F.3d at 1297. Private parties can

[3] Poder Latinx and CPLC noted this in their Reply Brief in Support of their Motion for Partial Summary Judgment. ECF No. 474 at 12.

enforce federal laws via Section 1983 when Congress intends for those laws to create a federal right. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002). A statute demonstrates such intent when "its text [is] phrased in terms of the person benefited" and contains "rights-creating" language "with an unmistakable focus on the benefited class." *Id.* at 284, 287.

54. The Materiality Provision plainly demonstrates such an intent by protecting "the *right of any individual to vote* in any election" from being denied based on immaterial registration requirements. 52 U.S.C. § 10101(a)(2)(B) (emphasis added). The "focus" of the Provision's text is "the protection of each individual's right to vote," *Schwier I*, 340 F.3d at 1296, and it "places all citizens qualified to vote at the center of its import," *Migliori*, 36 F.4th at 164 (cleaned up). This is similar to language the Supreme Court found sufficient to confer a private right in a decision earlier this year. *Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 184-86 (2023).

55. The Materiality Provision's text also parallels the rights-conferring language in Titles VI and IX, which the Supreme Court held confers an enforceable private right of action. *Gonzaga*, 536 U.S. at 284. Specifically, the Materiality Provision's "[n]o person . . . shall" formulation targets "the denial of rights to individuals" and is "clearly analogous to the rights-creating language [in Titles VI and IX] cited by the Supreme Court in *Gonzaga*." *Schwier I*, 340 F.3d at 1291, 1296. Moreover, even though the Materiality Provision is framed as a directive to the state, the Supreme Court and the Ninth Circuit have held that such statutes can confer a private right of action. *See, e.g.*, *Talevski*, 599 U.S. at 185; *Watson v. Weeks*, 436 F.3d 1152, 1160 (9th Cir. 2006).

56. Congress is not limited to conferring novel private rights by statute. Regardless, the Materiality Provision confers the novel right not to be denied the franchise "because of an [immaterial] error or omission on any record or paper relating to any application, registration, or other act requisite to voting." 52 U.S.C. § 10101(a)(2)(B).

57. Finally, the legislative history confirms that the Materiality Provision creates a private right. Private plaintiffs routinely enforced provisions of the Civil Rights Act after its enactment. *See, e.g.*, *Smith v. Allwright*, 321 U.S. 649 (1944); *Chapman v. King*, 154

F.2d 460 (5th Cir. 1946); *Brown v. Baskin*, 78 F. Supp. 933 (D.S.C. 1948). In 1957, Congress passed an amendment titled "To Provide Means of Further Securing and Protecting the Right To Vote," which granted the U.S. Attorney General power to enforce the Act. Civil Rights Act of 1957, Pub. L. No. 85-315, § 131, 71 Stat. 634, 637 (1957). At the time, the Judiciary Committee identified the amendment's statutory purpose as "provid[ing] means of *further* securing and protecting the civil rights of persons within the jurisdiction of the United States," recognizing that "section 1983 . . . has been used [by private actors] to enforce . . . section [10101]." H.R. Rep. No. 85-291 (1957) (emphasis added). As the Eleventh Circuit concluded, the Judiciary Committee's 1957 report on the amendment "demonstrates an intense focus on protecting the right to vote and does not support the conclusion that Congress meant merely to substitute one form of protection for another." *Schwier I*, 340 F.3d at 1295 (citing H.R. Rep. No. 85-291). Similarly, the Attorney General testified at the time that the 1957 amendment would "not take away the right of the individual to start his own action . . . . Under the laws amended if this program passes, private parties will retain the right they have now to sue in their own name." 85th Cong. 73, 203, 1; 60-61, 67-73 (1957).

58. Because Plaintiffs have "demonstrat[ed] that [the Materiality Provision] confers rights on a particular class of persons, the right is presumptively enforceable by § 1983." *Gonzaga*, 536 U.S. at 274 (citation omitted). This presumption can only be overcome if Congress forbade Section 1983's use either expressly in the statute or implicitly by creating a "comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983." *Talevski*, 599 U.S. at 186.

59. The Civil Rights Act does not expressly forbid the use of Section 1983 to enforce the Materiality Provision, nor does it expressly grant the Attorney General exclusive enforcement power. *See Migliori*, 36 F.4th at 160-61.

60. The Attorney General's enforcement power is also not a comprehensive enforcement scheme that is incompatible with private enforcement of the Materiality Provision. The Supreme Court has found "implicit preclusion" in only three cases, each of

which "concerned statutes with self-contained enforcement schemes that included statute-specific rights of action." *Talevski*, 599 U.S. at 189 (collecting cases). The Materiality Provision, on the other hand, lacks "a private judicial right of action, a private federal administrative remedy, or any carefu[l] congressional tailor[ing] that § 1983 actions would distort." *Id.* at 190 (cleaned up). Nor does the Materiality Provision contain an administrative exhaustion requirement or a more restrictive private remedy. *Migliori*, 36 F.4th at 160, 162. Rather, Section 10101(d) contemplates claims by non-U.S. litigants, authorizing suits in federal court "without regard to whether the party aggrieved shall have exhausted" any remedies provided by law. *Id.* at 160; *Schwier I*, 340 F.3d at 1296 (explaining this language was intended to "remove[] procedural roadblocks to suits" by private plaintiffs).

61. Section 10101(e) also does not provide a comprehensive scheme that is incompatible with private enforcement of the Materiality Provision. The litigation procedure outlined in Section 10101(e) is initiated only "upon request of the Attorney General," where the court finds a "pattern or practice" of vote denial "on account of race or color," and allows for affected members of the targeted racial group to "appl[y]" for an "order declaring [the applicant] qualified to vote." 52 U.S.C. § 10101(e). This narrow application process is not a comprehensive scheme that is incompatible with private enforcement of the Materiality Provision. *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 120 (2005).

62. Finally, it is in fact arguable whether the *Gonzaga* test applies to laws, like the Materiality Provision, that are enacted pursuant to Congress's authority to enforce the Reconstruction Amendments. The *Gonzaga* test was developed to curb the proliferation of Section 1983 enforcement for statutes enacted pursuant to Congress's spending authority. 536 U.S. 273; *see also Talevski*, 599 U.S. at 193 (Barrett, J., concurring) ("Gonzaga sets the standard for determining when a *Spending Clause* statute confers individual rights.") (emphasis added).

63. But Section 1983 was specifically enacted to provide a cause of action to enforce statutes, like 52 U.S.C. § 10101, that are enacted pursuant to Congress's Fourteenth and Fifteenth Amendment enforcement powers. *See* 42 U.S.C § 1983; *see also* U.S. Const. amend. XIV, § 3 ("No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; . . . nor deny to any person within its jurisdiction the equal protection of the laws."); *id.* § 5 ("The Congress shall have the power to enforce, by appropriate legislation, the provisions of this article."); *id.* § 1 ("The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude."); *id.* § 2 ("The Congress shall have the power to enforce this article by appropriate legislation."); Act of Apr. 20, 1871, 17 Stat. 13 ("An Act to enforce the Provisions of the Fourteenth Amendment to the Constitution of the United States, and for other Purposes."); Act of July 2, 1964, 78 Stat. 241 ("An Act to enforce the constitutional right to vote").

64. While the Supreme Court has expressed some greater hesitancy about when Section 1983 provides a cause of action for statutes enacted pursuant to the Constitution's Spending Clause, *see*, *e.g.*, *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 28 (1981), it has been universally accepted that Section 1983 creates a cause of action for statutes protecting civil rights and equal protection. *See, e.g.*, *Maine v. Thiboutot*, 448 U.S. 1, 8 (1980) (acknowledging that extending Section 1983 to laws securing civil rights and equal protection was "a principal purpose" of Congress); *id.* at 6 (rejecting petitioners' argument that the cause of action under § 1983 "should be read as *limited* to civil rights or equal protections laws") (emphasis added); *id*. at *21-22 (Powell, J., dissenting) (noting that Justice Powell, joined by Chief Justice Burger and Justice Rehnquist, would have held that Section 1983 only provides a cause of action for statutes "providing for the equal rights of citizens"); *see also Talevski*, 599 U.S. at 225 n.12 (Thomas, J. dissenting) (dissenting from extension of Section 1983 cause of action to Federal Nursing Home Reform Act enacted pursuant to Congress's spending authority and suggesting that § 1983 was more

appropriately "confined to laws enacted under Congress' Reconstruction Amendments enforcement powers").

65. As such, whatever limits may exist on Section 1983's application to statutes enacted under Congress's spending authority, there is no doubt that Section 1983 provides a cause of action for private enforcement of the Materiality Provision, which was enacted pursuant to the Court's enforcement powers under the Reconstruction Amendments. *See Talevski*, 599 U.S. at 192 ("By its terms, § 1983 is available to enforce every right that Congress validly and unambiguously creates.").

**B. Private Enforcement of the Materiality Provision Under the 1964 Civil Rights Act**

66. The Materiality Provision can also be enforced by private parties directly under the Civil Rights Act.

67. Plaintiffs suing under an implied right of action "must show that the statute manifests an intent 'to create not just a private *right* but also a private *remedy*.'" *Gonzaga*, 536 U.S. at 284 (quoting *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001)). There must be "affirmative evidence" that Congress intended to create a private remedy. *Sandoval*, 532 U.S. at 293 n.8.

68. The text of the Civil Rights Act provides "affirmative evidence" that Congress created a private remedy. Specifically, Section 10101(d) establishes jurisdiction for any "proceedings instituted" by a "party aggrieved" to enforce the law. *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 644 (2002) (statute permitting "[a]ny party aggrieved" to "bring an action" "reads like the conferral of a private right of action" (citation omitted)); *Morse v. Republican Party of Va.*, 517 U.S. 186, 233 (1996).

69. Also, the history of the Civil Rights Act further supports the conclusion that Congress intended to create a private remedy. Private litigants obtained equitable remedies under the Civil Rights Act for decades before Congress amended the Act to provide for enforcement by the Attorney General. *Schwier I*, 340 F.3d at 1295. Congress was aware of this history when it amended the statute in 1957 and made clear that the U.S. Attorney

General's enforcement power was meant to supplement the existing right of private litigants, as evidenced by the title of the amendment and the Judiciary Committee's report. Civil Rights Act of 1957, Pub. L. No. 85-315, § 131 71 Stat. 634, 637 (1957); H.R. Rep. No. 85-291 (1957). The Attorney General also confirmed this view at the time. 85th Cong. 73, 203, 1; 60-61, 67-73 (1957). Furthermore, "[a]fter the 1957 amendment . . . private plaintiffs continued to bring their own causes of action under other provisions of the Act, including the Materiality Provision of 1964." *Tex. Democratic Party v. Hughs*, 474 F. Supp. 3d 849, 858 (W.D. Tex. 2020) (collecting cases), *rev'd and remanded on other grounds*, 860 F. App'x 874 (5th Cir. 2021).

### C. 52 U.S.C. § 10101(a)(2)(A) May Be Enforced Via 42 U.S.C. § 1983 or Directly Under the Civil Rights Act

70. 52 U.S.C. § 10101(a)(2)(A) of the 1964 Civil Rights Act, the different standards, practices, or procedures provision, may also be enforced by private litigants. Poder Latinx and CPLC incorporate Sections V.A and V.B of these Conclusions of Law, which concern the enforceability of 52 U.S.C. § 10101(a)(2)(B) by private litigants. Because the Standards, Practices, and Procedures Provision (Section 10101(a)(2)(A)) and the Materiality Provision (Section 10101(a)(2)(B)) are part of the same provision, almost all of the arguments asserted in Sections V.A and V.B above—excluding only those specific to the text of Subsection 10101(a)(2)(B)—apply to Section 10101(a)(2)(A) with equal force and support a finding of private enforceability here as well. This Court must resolve the private right of action dispute as to 52 U.S.C. § 10101(a)(2)(A), as only Poder Latinx and CPLC have asserted this particular claim.

71. Poder Latinx and CPLC may enforce 52 U.S.C. § 10101(a)(2)(A) through 42 U.S.C. § 1983. Subsection 10101(a)(2)(A) of the 1964 Civil Rights Act "confers an individual right" and is therefore "presumptively enforceable" by private plaintiffs under Section 1983. *Gonzaga*, 536 U.S. at 284. Plaintiffs only need to show that these provisions create "specific, individually enforceable rights" that provide a "basis for private enforcement." *Id.* at 281. "Plaintiffs suing under § 1983 do not have the burden of showing

an intent to create a private remedy because § 1983 generally supplies a remedy for the vindication of rights secured by federal statutes." *Id.* at 284.

72. Under *Gonzaga*, a court must determine whether the federal statute contains "explicit rights-creating" terms and "explicit 'right- or duty-creating language.'" 536 U.S. at 284 & n.3 (quoting *Cannon v. Univ. of Chi.*, 441 U.S. 677, 690 n.13 (1979)). Courts also consider the three factors set forth in *Blessing v. Freestone*, 520 U.S. 329 (1997), which were reaffirmed in *Gonzaga*, 536 U.S. at 282: (1) Congressional intent to "benefit the plaintiff"; (2) the creation of a right "not so 'vague and amorphous' that its enforcement would strain judicial competence"; and (3) an "unambiguous[]" "binding obligation." *Blessing*, 520 U.S. at 340-41 (citations and quotation marks omitted); *id.* at 341 ("[T]he provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms.").

73. Subsection 10101(a)(2)(A) shares the prototypical rights-creating language—"No person . . . shall"—with the Materiality Provision. That prefatory phrase parallels standard rights-creating language from other statutes, which courts have found confer an enforceable private right via 42 U.S.C. § 1983. *Gonzaga*, 536 U.S. at 284. *Gonzaga* itself contrasted the nondisclosure provisions of the Family Educational Rights and Privacy Act with "the individually focused terminology of Titles VI and IX ('No person . . . shall . . . be subjected to discrimination')." *Id.* at 287.

74. Like the Materiality Provision, Subsection 10101(a)(2)(A) creates an individually enforceable right, specifically an individual right against discrimination in voter qualification standards, practices, and procedures. The text of Subsection 10101(a)(2)(A) is likewise "phrased in terms of the persons benefited," *Gonzaga*, 536 U.S. at 274, and satisfies each of the *Blessing* factors. "No person acting under color of law shall" also echoes Section 1983 itself. *See* 42 U.S.C. § 1983 ("Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States . . .").

75. As to *Blessing* factor 1, Section 10101(a)(2)(A) is focused on individual voters ("any individual"). It was intended to benefit individual voters, *Blessing*, 520 U.S. at 340, and does not have "an 'aggregate' focus." *Gonzaga*, 536 U.S. at 288 (quoting *Blessing*, 520 U.S. at 343-44). Section 10101(a)(2)(A) also meets *Blessing* factor 2 because its prohibition of discrimination in voter qualification procedures is an objective and administrable standard and "not so 'vague and amorphous' that its enforcement would strain judicial competence." *Blessing*, 520 U.S. at 340-41. Finally, Section 10101(a)(2)(A) satisfies *Blessing* factor 3, as it "unambiguously impose[s] a binding obligation on" state and local election officials and is "couched in mandatory, rather than precatory, terms." 520 U.S. at 341. Section 10101(a)(2) uses the mandatory "shall."

76. It would be anomalous and contrary to canons of statutory interpretation to single out Subsection 10101(a)(2)(A) as only enforceable by the federal government, given Subsection 10101(a)(2)—as a whole—gives individual voters concrete rights against different types of discriminatory and arbitrary conduct. It is well-established that "a section of a statute should not be read in isolation from the context of the whole Act." *Richards v. United States*, 369 U.S. 1, 11 (1962). The argument that Congress intended to confer an individually enforceable right for only some, but not all, subparts of subsection 10101(a)(2) is unsubstantiated and untenable. The Supreme Court has frequently stated that the "[s]urrounding provisions" in a statute "guide [its] interpretation." *Esquivel-Quintana v. Sessions*, 581 U.S. 385, 393 (2017); *see also Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 99-100 (1992) ("[W]e must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law.") (citations and quotation marks omitted). Divergent results for intertwined or closely linked statutory provisions would be illogical. *Cf. Johnson v. Hous. Auth. of Jefferson Parish*, 442 F.3d 356, 362 (5th Cir. 2006) ("Logic prevents the conclusion that Congress could have intended to create enforceable rights for one group of Housing Act rental assistance recipients but not the other.").

77. Accordingly, as with the Materiality Provision in Subsection 10101(a)(2)(B), this Court should find that Subsection 10101(a)(2)(A) is presumptively enforceable by

private plaintiffs via 42 U.S.C. § 1983. And for reasons explained in Section V.A, the Intervenor-Defendants have failed to rebut this presumption of private enforceability. Alternatively, Poder Latinx and CPLC may enforce Subsection 10101(a)(2)(A) directly under the 1964 Civil Rights Act, as Congress intended to create a private remedy directly under the statute, as explained in Section V.B.

## VI. HB 2492 And HB 2243 Violate the National Voter Registration Act ("NVRA")

### A. Section 6 of the NVRA Preempts HB 2243

78. Section 6 of the NVRA requires states to "accept and use" the Federal Form for registering voters for all federal elections. 52 U.S.C. § 20505(a)(1). The Federal Form requires that applicants attest under penalty of perjury that they meet voter "eligibility requirement[s] (including citizenship)." *Id.* § 20508(b)(2). The Federal Form does not require more from applicants to prove their citizenship. *Id.*

79. As this Court explained in holding that Section 6 preempts HB 2492's DPOC requirement for voting in presidential elections and voting-by-mail, a state law may be preempted if "it is impossible for a private party to comply with both state and federal requirements," or if the state law "creates an unacceptable obstacle to the accomplishment and execution of the full purpose and objectives of Congress." ECF No. 534 at 9 (quoting *Chamber of Com. v. Bonta*, 62 F.4th 473, 482 (9th Cir. 2023)).

80. The "accept and use" requirement preempts Section 2 of HB 2243, which forces County Recorders to ignore that requirement. Rather than "accept and use" the Federal Form, for which no DPOC is required, HB 2243 requires County Recorders to, within a month, compare such registrants against databases for the purposes of removing such federal-only registrants who have not provided DPOC or for others whom the county recorder has "reason to believe" are not U.S. citizens. HB 2243 § 2 (amending A.R.S § 16-165); *see also* PFOF No. 158. Voters who did not register with DPOC (to wit, Federal Form users) are subject to additional investigation procedures under Section 2 of HB 2243 in order to remain on the rolls and vote in federal elections.

81. By imposing "requirement[s] of evidence of citizenship [to vote in federal elections] not required by the Federal Form," Section 2 of HB 2243 "is 'inconsistent with' the NVRA's mandate that States 'accept and use' the Federal Law," and is thus preempted by the NVRA. *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 15 (2013).

82. One purpose of the NVRA is to "enhance[] the participation of eligible citizens as voters." 52 U.S.C. 20501(b)(2). The simplicity of the Federal Form provides a "backstop" to further this goal. *Inter Tribal*, 570 U.S. at 12.

83. The evidence presented at trial establishes that HB 2243's provisions will decrease voter registration and participation in elections by citizens otherwise eligible to vote, PFOF Nos. 64, 470-91, 497-521, and that the Federal Form's attestation is and was sufficient to prevent non-citizens from voting, *see* PFOF Nos. 180-82 (no evidence of non-citizen voting presented to the Legislature as it debated and passed Challenged Laws), 576-87 (non-citizen voting, nationally and in Arizona, is essentially non-existent); Stipulated Fact (ECF No. 571-1) No. 157 (Attorney General unaware of any conviction for non-citizen voting since 2010).

84. Section 6 of the NVRA also preempts Section 2 of HB 2243 because HB 2243's requirements "create[] an unacceptable obstacle to the accomplishment and execution of the full purpose and objectives of Congress." *Bonta*, 62 F.4th at 482; *see also Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000). By creating an investigation and purge scheme for Federal Form voters who do not comply with DPOC requirements that is not required by the Federal Form, HB 2243 frustrates the NVRA's—and Federal Form's—purpose of creating a straightforward means of "increasing the number of eligible citizens who register to vote" through the Federal Form and to "enhance[] the participation of eligible citizens as voters in elections for Federal office." 52 U.S.C. § 20501(b)(1)-(2).

### B. HB 2492 Sections 7 and 8 and HB 2243 Section 2 Cause Non-Uniform and Discriminatory Treatment of Registered Voters in Violation of Section 8(b) of the NVRA

85. Pursuant to Section 8(b) of the NVRA, "[a]ny State program or activity to protect the integrity of the electoral process by ensuring the maintenance of an accurate and current voter registration roll for elections for Federal office" must be "uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965." 52 U.S.C. § 20507(b)(1).

86. The "uniform [and] nondiscriminatory" requirement is violated when a voter-roll maintenance program causes the non-uniform or discriminatory treatment of classes of voters, or where the program has a discriminatory effect on a group of registered voters. *See Project Vote v. Blackwell*, 455 F. Supp. 2d 694, 703-04 (N.D. Ohio 2006) (violation of Section 8(b) based on law that treated different classes of registration drive participants differently); *United States v. Florida*, 870 F. Supp. 2d 1346, 1350-51 (N.D. Fla. 2012) (state purge program "probably ran afoul of [NVRA section 8(b)] because its methodology made it likely that newly naturalized citizens were the primary individuals who would have to respond and provide documentation").

87. A registered voter list maintenance program or activity violates Section 8(b) of the NVRA if it is *either* non-uniform *or* discriminatory. 52 U.S.C. § 20507(b)(1).

88. Sections 7 and 8[4] of HB 2492 and Section 2 of HB 2243, separately and in combination, violate Section 8(b) of the NVRA by subjecting voters to arbitrary and non-uniform treatment generally and subjecting some, but not all, registered Arizona voters to investigation and additional DPOC requirements: specifically, naturalized registered voters, registered voters who did not provide DPOC, who register using the Federal Form, or who County Recorders have "reason to believe" are not U.S. citizens. *See* HB 2492 § 7 (enacting A.R.S § 16-143(B)) (imposing requirement on Attorney General to investigate citizenship of registered voters who registered to vote without providing DPOC); HB 2243 § 2 (enacting A.R.S. § 16-165(I)-(K)) (requiring County Recorders to conduct citizenship

[4] HB 2243 amended and superseded the language in Section 8 of HB 2492, *see* PX 2. To the extent the language of HB 2492 is reinstated due to HB 2243 Section 2 being found invalid, HB 2492 violates Section 8 of the NVRA because it creates a systematic voter-roll maintenance program that causes the non-uniform or discriminatory treatment of classes of voters and has no mechanism for suspension within 90 days of federal elections.

checks of registered voters using government databases, including by searching SAVE system where County Recorders have "reason to believe" a voter lacks U.S. citizenship or where a voter has not provided DPOC); *see also* Stipulated Fact (ECF No. 571-1) Nos. 121-22, 131-32 (SAVE database cannot be used to investigate citizenship of native-born U.S. citizens).

89. HB 2492 Sections 7 and 8 and HB 2243 Section 2 violate Section 8(b) of the NVRA for four distinct reasons, each of which is sufficient to establish a violation: (1) these provisions cause the arbitrary and non-uniform treatment of registered voters; (2) these provisions cause the non-uniform treatment of naturalized registered voters as compared to U.S.-born citizens; (3) these provisions create a discriminatory presumption and effect on naturalized registered voters; and (4) these provisions will have a discriminatory effect on AANHPI and Latino voters in Arizona.

90. Rather than duplicate Conclusions of Law from other sections here, each of these four reasons for finding a violation of Section 8(b) of the NVRA incorporates and is buttressed by the Conclusions of Law in the sections pertaining to 52 U.S.C. § 10101(a)(2)(A), *see supra* at Section IV, and the *Bush v. Gore* equal protection claim, *see infra* at Section VII.

91. First, HB 2492 Sections 7 and 8 and HB 2243 Section 2 violate Section 8(b) of the NVRA because they cause the arbitrary and non-uniform treatment of registered voters in Arizona, particularly for naturalized citizens whose prior status as non-citizens will be reflected in stale and outdated government transaction data, including MVD data and data accessed by the SAVE system. *See generally* PFOF Nos. 19-21, 22-43, 191-212, 217-316, 376-469, 497-523.

92. As the Attorney General and State have argued, "non-uniform," at a minimum, means "apply[ing] to less than an entire jurisdiction." ECF No. 534 at 21 n.11. As this Court found in its Order on the Cross-Motions for Partial Summary Judgment, "the text of the Voting Laws mandates purges that apply to 'less than an entire jurisdiction,' as only those registrants whom recorders have 'reason to believe' are noncitizens will be

subject to heightened scrutiny through, *inter alia*, the Systematic Alien Verification for Entitlements program." *Id.* Similarly, these laws subject voters who originally registered without satisfactory evidence of citizenship (to wit, Federal Form users) to additional investigation procedures. Accordingly, HB 2492 Sections 7 and 8 and HB 2243 Section 2 necessarily cause the non-uniform treatment of registered voters. Because these investigation provisions "do not apply to everyone," they violate Section 8(b), the NVRA's uniform and nondiscriminatory requirement. *Project Vote*, 455 F. Supp. 2d at 703 (explaining that an Ohio law imposing requirements on only certain types of persons was "on its face [] not a uniform and non-discriminatory attempt to protect the integrity of the electoral process").

93. The evidence establishes that HB 2492 Sections 7 and 8 and HB 2243 Section 2 confer unbounded discretion upon the County Recorders to interpret and implement these citizenship investigation standards and procedures differently. This arbitrary and non-uniform treatment of registered voters is caused by the following features of the existing DPOC scheme and the new citizenship investigation scheme that HB 2492 Sections 7 and 8 and HB 2243 Section 2 have created:

(a) the reliance upon stale government data from ADOT, SAVE, and other government databases, *see* PFOF Nos. 217-316, 376-469;

(b) the use of unreliable methodologies for matching registered voters against government databases, *see generally* PFOF Nos. 217-299, 405-420, 421-427;

(c) the subjective, unclear standards not defined or clarified in statute or in the proposed 2023 EPM, *see generally* PFOF Nos. 19-21, 191-212, 380-90, 398-400, 434-36, 447-49;

(d) the discretion afforded to County Recorders, their staff, and their counsel to interpret and apply those subjective, unclear standards, *see generally* PFOF Nos. 19-21, 191-212, 380-90, 398-400, 434-36, 447-49;

(e) County Recorders' inconsistent, non-uniform understandings of how the CIPs must be implemented, *see generally* PFOF Nos. 377-79, 391-97, 428-59, 468-69;

(f) County Recorders' inconsistent, non-uniform application of the current DPOC requirement and inconsistent, non-uniform use of USCIS's SAVE system, in particular USCIS's additional verification procedures, *see generally* PFOF Nos. 295-98; and

(g) County Recorders' inconsistent, non-uniform understandings of whether they may reinstate erroneously removed voters after the registration deadline, *see generally* PFOF Nos. 468-69.

94. County Recorders lack guidance and a common understanding regarding HB 2492 Sections 7 and 8 and HB 2243 Section 2's subjective terms and standards. PFOF Nos. 212, 380-90, 428-58. In fact, allowing County Recorders to implement these provisions differently was the "intent." PFOF No. 399. This leaves "local county officials [to] interpret and apply the [laws] differently," rendering HB 2243's removal program non-uniform and arbitrary. *Common Cause Ind. v. Lawson*, 327 F. Supp. 3d 1139, 1149, 1153 (S.D. Ind. 2018). Indeed, the evidence of non-uniform and arbitrary implementation of HB 2492 Sections 7 and 8 and HB 2243 Section 2 is underscored by Dr. Michael McDonald's expert testimony that the County Recorders' implementation of *current* DPOC requirements vary. PFOF Nos. 391-97.

95. Second, HB 2492 Sections 7 and 8 and HB 2243 Section 2 violate Section 8(b) of the NVRA because, as Dr. McDonald testified, these provisions have a non-uniform impact on naturalized citizens in Arizona. *See* PFOF Nos. 250-62, 276-78, 497-523. This non-uniform impact is caused by the same features of the existing DPOC scheme and the new citizenship investigation scheme in HB 2492 Sections 7 and 8 and HB 2243 Section 2, as referenced above in Conclusion of Law No. 80.

96. Because of the above features, naturalized registered voters are subjected to non-uniform treatment and either erroneously removed from the voter rolls or forced to

repeatedly provide DPOC under HB 2243. *See Florida*, 870 F. Supp. 2d at 1350-51 (state purge program based on stale government data "probably ran afoul" of Section 8(b) of NVRA "because its methodology made it likely that newly naturalized citizens were the primary individuals who would have to respond and provide documentation"). HB 2492 Sections 7 and 8 and HB 2243 Section 2 effectively create a non-uniform presumption against the eligibility of naturalized registered voters.

97. Third, HB 2492 Sections 7 and 8 and HB 2243 Section 2 violate Section 8(b) of the NVRA because they effectively create a de facto presumption against the eligibility of naturalized registered voters. In this way, naturalized registered voters are subjected to discriminatory treatment under this presumption against their voting eligibility and either erroneously removed from the voter rolls or forced to provide DPOC repeatedly to rebut this discriminatory presumption. This discriminatory presumption and treatment are caused by the same features of the existing DPOC scheme and the new citizenship investigation scheme in HB 2492 Sections 7 and 8 and HB 2243 Section 2, as referenced above in Conclusion of Law No. 80.

98. Defendants argue that every requirement for voter registration or cancellation has a disproportionate impact on some group. ECF No. 586 at 17-19. Leaving aside the fact that this argument is not responsive to the first reason for the NVRA 8(b) violation (arbitrary and non-uniform treatment of voters generally), HB 2492 Sections 7 and 8 and HB 2243 Section 2 do not create a uniform, neutral list maintenance system, but rather a discriminatory presumption against naturalized registered voters, which is necessarily created by the features outlined in Conclusion of Law No. 80, but in particular, the reliance on government databases reflecting stale immigration and citizenship status data.

99. Contrary to Defendants' arguments, *see* ECF No. 586 at 17-19, HB 2492 Sections 7 and 8 and HB 2243 Section 2 do not function like voter removal programs based on an objective, verified, and accurate database of death notices or residential address changes. In addition to all the matching methodology and data integrity problems recounted by Dr. McDonald's testimony, PFOF Nos. 405-20, and the USCIS Rule 30(b)(6) designees,

PFOF Nos. 273-99, HB 2492 Sections 7 and 8 and HB 2243 Section 2 function to remove voters based on erroneous assumptions about the accuracy or utility of stale government data. HB 2243 removes voters first and asks questions later. In this way, these provisions are built on unreliable citizenship data and a process that skews the use of that data to impose a discriminatory effect on naturalized voters.

100. Lastly, HB 2492 Sections 7 and 8 and HB 2243 Section 2 violate Section 8(b) because the evidence at trial also establishes that these provisions will have a disparate impact on not just naturalized citizens but also voters in certain racial and ethnic minority groups more broadly, including members of the Latino and AANHPI communities. *Project Vote*, 455 F. Supp. 2d at 703-04 (explaining that a law with discriminatory effects on certain groups violates Section 8(b) of the NVRA). These are groups that are more likely to have been registered using the Federal Form, who do not have ready access to DPOC or are more likely to lack resources necessary to obtain DPOC, who may have stale citizenship data in the databases, may be chilled from registering in light of HB 2492 Sections 7 and 8 and HB 2243 Section 2's investigation and prosecution provisions, who are of limited English proficiency, or whose eligibility status may be subject to heightened scrutiny in today's political climate in Arizona. *See* PFOF Nos. 60, 64, 68, 84-87, 460-67, 470-90, 499-516.

**C. HB 2492 Violates the 90-Day Provision of NVRA Section 8**

101. Section 8 of the NVRA requires that states "complete, not later than 90 days prior to the date of a primary or general election for Federal office, any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters." 52 U.S.C. 20507(c)(2)(A).

102. Section 8 of HB 2492 added 16-165(A)(10) as a ground when a County Recorder shall cancel a registration: "When the county recorder receives and confirms information that the person registered is not a United States citizen." HB 2243 amended, and entirely superseded, this language in HB 2492.

103. To the extent the language of HB 2492 is reinstated due to HB 2243 Section 2 being found invalid, HB 2492 violates Section 8 of the NVRA because the above language creates a systematic removal program with no mechanism for suspension within 90 days of federal elections.

### VII. The Citizenship Investigation Procedures Cause the Arbitrary and Disparate Treatment of Voter Registration Applicants and Registered Voters in Violation of the Equal Protection Clause

104. The Supreme Court's decision in *Bush v. Gore*, prohibits "arbitrary and disparate treatment" in either the "allocation of the franchise" or "the manner of its exercise." 531 U.S. 98, 104 (2000) (per curiam). Specifically, the Court concluded that the "absence of specific standards" to implement a subjective and unclear "intent of the voter" standard caused "arbitrary and disparate treatment" of voters in violation of the Equal Protection Clause. *Id*. at 104-09.

105. The Citizenship Investigation Procedures ("CIPs")[5] in HB 2492 and HB 2243, separately and in combination, violate the Equal Protection Clause because they cause the arbitrary and disparate treatment of voter registration applicants and registered voters in Arizona, particularly naturalized applicants and voters. *See generally* PFOF Nos. 19-21, 22-43, 191-212, 217-99, 376-469, 497-523.

106. The CIPs cause arbitrary and disparate treatment of registered voters in Arizona, particularly for naturalized citizens whose prior status as non-citizens will repeatedly be unearthed in stale government transaction data. PFOF Nos. 217-99, 398-427. The CIPs cause this arbitrary and disparate treatment because they rely upon—and their enforcement will be impacted by—the following:

(a) stale government data from ADOT, SAVE, and other government databases or systems, *see generally* PFOF Nos. 217-316, 376-469;

---

[5] The CIPs are defined as A.R.S. §§ 16-121.01(D) and 16-121.01(E), as enacted by HB 2492 § 4; A.R.S. § 16-143, as enacted by HB 2492 § 7; A.R.S. § 16-165(A)(10), as enacted by HB 2492 § 8 and amended by HB 2243 § 2; and A.R.S. §§ 16-165(G), 16-165(H), 16-165(I), 16-165(J), and 16-165(K), as enacted by HB 2243 § 2.

(b) unreliable methodologies for matching voter registration applicants and registered voters against government databases, *see generally* PFOF Nos. 217-99, 405-20, 421-27;

(c) subjective, unclear standards not defined or clarified in statute or in the proposed 2023 EPM, *see generally* PFOF Nos. 19-21, 191-212, 380-90, 398-400, 434-36, 447-49;

(d) the discretion afforded to County Recorders, their staff, and their counsel to interpret and apply those subjective, unclear standards, *see generally* PFOF Nos. 19-21, 191-212, 380-90, 398-400, 434-36, 447-49;

(e) County Recorders' inconsistent, non-uniform understandings of how the CIPs must be implemented, *see generally* PFOF Nos. 377-79, 391-97, 399, 428-59, 468-69;

(f) County Recorders' inconsistent application of the current DPOC requirement and inconsistent use of USCIS's SAVE system, in particular USCIS's additional verification procedures, *see generally* PFOF Nos. 295-98; and

(g) County Recorders' inconsistent understandings of whether they may reinstate erroneously removed voters after the registration deadline, *see generally* PFOF Nos. 468-69.

Accordingly, the CIPs necessarily cause the arbitrary and disparate treatment of voter registration applicants and registered voters both across Arizona's fifteen counties and within individual counties.

107. The absence of specific standards in the CIPs has already caused the Secretary of State's office to leave the interpretation and implementation of key, undefined terms and standards to the discretion and subjective views of Arizona's fifteen County Recorders, as well as their staff and counsel, and caused the County Recorders to reach inconsistent, non-uniform understandings of how the CIPs must be implemented. *See generally* PFOF Nos. 378-79, 391-97, 399, 428-59, 468-69. Instead of the CIPs' subjective, unclear terms and standards, the Legislature could have enacted:

(a) a specific list of data that constitutes "information" that a voter registration applicant or registered voter is not a citizen (HB 2492 §§ 4, 8; HB 2243 § 2);

(b) a finite set of specifically named "database[s] relating to voter registration" (HB 2492 § 4);

(c) specific, clear procedures for a county recorder to "obtain" and then separately "confirm" information that a voter lacks citizenship (HB 2243 § 2; HB 2492 § 8);[6] and

(d) a specific list of circumstances or data that confers a "reason to believe" a registered voter is not a citizen (HB 2243 § 2).

108. Even the database-matching scheme in A.R.S. § 16-121.01(D) is what County Recorders must do "at a minimum" to "verify the citizenship status of the applicant," giving County Recorders significant discretion as to what constitutes "information" that the applicant is not a U.S. citizen. A.R.S. § 16-121.01(E). Instead of charting a path with objective requirements and scenarios and clearly delineated rules and databases, the Legislature opted for a scheme permeated with subjective standards, guaranteeing the county-by-county inconsistency in understanding and implementation demonstrated by the evidence. Indeed, allowing County Recorders to implement the CIPs in a discretionary manner and in different ways was the "intent." PFOF No. 399. The CIPs have caused county registrars to interpret and apply the laws differently, rendering HB 2492 and HB 2243's enforcement arbitrary. The Equal Protection Clause protects voters from the vagaries of County Recorders guessing as to the intended statutory meaning, with varying determinations resulting in quite different enforcement of the CIPs depending on which county the applicant or voter happens to live in. Further, the evidence of arbitrary and disparate implementation of the CIPs is underscored by Dr. McDonald's expert testimony that County Recorders' implementation of *current* DPOC requirements vary. PFOF Nos. 391-97.

---

[6] The superseded language in HB 2492's version of A.R.S. § 16-165(A)(10) was: "when the county recorder receives and confirms information that the person registered is not a United States citizen."

109. The CIPs mix unfettered discretion and inherently discriminatory enforcement mechanisms. In *Boustani v. Blackwell*, a district court in Ohio addressed a similar law that allowed for challenges of a voter's eligibility based on citizenship and paired those challenges with procedures that imposed disparate burdens for proving citizenship on naturalized citizens. 460 F. Supp. 2d 822 (N.D. Ohio 2006). There, the district court explained: "This Court harbors grave concerns about the ramifications of implementing [the challenged law]. There is a very real possibility of 'profiling' voters by poll workers or election judges exercising an unfettered ability to challenge on the basis of appearance, name, looks, accent or manner. The Ohio statute offers no clear standards to guide the inquiry into citizenship." *Id.* at 827. Similar concerns regarding arbitrary and disparate treatment of naturalized citizens arise here.

110. Furthermore, as demonstrated by Dr. McDonald's testimony, the CIPs cause a unique and disparate impact on naturalized citizens registering and registered to vote in Arizona. *See generally* PFOF Nos. 497-523.

111. Contrary to Defendants' arguments, the U.S. Supreme Court did not even mention, let alone apply, the *Anderson-Burdick* framework in deciding *Bush v. Gore.* As this Court has already found, no authority holds that *Anderson-Burdick* displaces all other Fourteenth Amendment or constitutional doctrines and causes of action. *See* ECF No. 304 at 22 n.11.

## VIII. The Challenged Laws Target Protected Classes in Violation of the Fourteenth and Fifteenth Amendments

### A. The Challenged Laws Were Motivated by a Discriminatory Purpose

112. Laws that discriminate based on race and national origin violate the Fourteenth and Fifteenth Amendments. Discrimination can be demonstrated by establishing that the enactment of a law was motivated by a discriminatory purpose under the totality of the relevant facts, including (1) the disproportionate impact of the official action and whether it bears more heavily on one race than another; (2) the historical background of the decision; (3) the specific sequence of events leading to the challenged

action; (4) departures from normal procedures or substantive conclusions; and (5) the relevant legislative or administrative history. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266-68 (1977); *Arce v. Douglas*, 793 F.3d 968, 977-78 (9th Cir. 2015); *Washington v. Davis*, 426 U.S. 229, 242 (1976).

113. In establishing a violation of the Fourteenth and Fifteenth Amendments, Plaintiffs need not prove that "the discriminatory purpose was the sole purpose of the challenged action, but only that it was a motivating factor." *Arce*, 793 F.3d at 977. Here, the authors and proponents of the Challenged Laws, the Arizona Free Enterprise Club, engaged in racial appeals by calling out "illegals." *See* PFOF Nos. 110, 121-22, 143, 146, 156, 160. And more than one legislator understood this term to be racially offensive. *See* PFOF Nos. 112-14, 126. Despite this, legislators ignored the discriminatory goals of the Arizona Free Enterprise Club; did nothing to evaluate the impact of the Challenged Laws on AANHPIs, Latinos, and naturalized citizens even after constituents and other legislators pointed out a harmful, disproportionate impact on these groups; and engaged in, or tolerated, discriminatory conduct during hearings. *See* PFOF Nos. 128-35, 162-63, 178-90. As such, there is no recourse but to ascribe discriminatory intent to the entire Legislature and not limit it to a few bad apples. The totality of the evidence presented at trial and consideration of the *Arlington Heights* factors demonstrates that the Challenged Laws were motivated by a discriminatory purpose.

114. Regarding the first *Arlington Heights* factor, the evidence shows that the Challenged Laws will disproportionately impact AANHPIs, Latinos, and naturalized citizens. PFOF Nos. 60, 68, 250-62, 276-78, 400, 497-523. Naturalized citizens in Arizona are overwhelmingly AANHPIs and Latinos. PFOF Nos. 28, 84. As an initial matter, databases used to identify potential noncitizens, like ADOT, or verify citizenship, like the SAVE system, are more likely to falsely identify naturalized citizens as noncitizens compared to U.S. born citizens. *See* PFOF Nos. 250, 255-62, 277, 499, 503-04. The databases utilized by the laws to ascertain citizenship contain "multiple failure points," that make them "unreliable for the purpose of determining citizenship verification," which

ultimately will "disproportionately . . . impact naturalized citizens." PFOF No. 406. Next, federal-only voters, one of the targets of HB 2243(H)'s database matching and purging schemes, are overwhelmingly naturalized, AANHPI and Latino voters. PFOF Nos. 509, 512, 514, 516. Racial minority groups, including the AANHPI and Latino communities will also be disproportionately impacted by the Challenged Laws for myriad of reasons, including that the financial costs of obtaining DPOC, and the duration that it takes to acquire such documents. PFOF Nos. 487-90. Moreover, the evidence shows that AANHPI and Latino voters will be further deterred from registering to vote or in responding to investigations under the Challenged Laws because their community faces unique psychological costs stemming in its fear of government surveillance and prosecution, some of which stems from historical discrimination. PFOF Nos. 64, 87-88, 489. Moreover, the DPOC notice letters that the Challenged Laws require County Recorders to send to those who they have reason to believe are not U.S. citizens are inadequate for limited English proficient voters, which disproportionately harms the AANHPI community because it has a relatively high limited English proficient population as compared to the rest of Arizona voters. PFOF Nos. 460-67.

115. For the second *Arlington Heights* factor, the evidence, including that of the Secretary of State's own admission of such, demonstrates that the Challenged Laws are part of a long history of discrimination in Arizona against voters of color and naturalized citizens. PFOF Nos. 44, 54, 68, 90-91. Dr. Derek Chang testified that Asian American and Pacific Islander ("AAPI"[7]) throughout their history in the United States have been characterized as "perpetual foreigner[s]," or relatedly as "alien citizen[s]" and "non-American[s]." PFOF No. 72. AAPI history demonstrates that the immigration and attempted settlement of AAPIs is usually followed by a hostile reaction to their growing

---

[7] Dr. Chang used the term AAPI throughout his testimony, explaining that it is meant to encompass both those who trace their ancestry to Asia and those who trace their ancestry to the Pacific Islands, including the Philippines, Hawaii, Guam, America Samoa, and other places. The terms is used by the Federal Census and Dr. Chang's use of the term is consistent with scholarship in the area. The term is adopted herein when referring to Dr. Chang's testimony.

presence. PFOF No. 76. Dr. Chang concluded that the passage of the Challenged Laws shortly after the current growth of AAPI residents and voters in Arizona is reflective of historical patterns whereby AAPI's growing presence invokes a negative reaction to limit the political influence of AAPIs. PFOF No. 91. Dr. Orville Burton similarly testified about Arizona's history of discrimination against Latino, Black, Native American, naturalized citizens and other minority communities in areas as wide ranging as access to education opportunities, economic integration, and housing equality all in an effort to curtail these minority groups' political power. PFOF Nos. 49-64. Beyond these areas of discrimination, Dr. Burton testified about Arizona's history of passing discriminatory voting laws, which are often called for on the basis of unsubstantiated voter fraud claims, to further marginalize these groups, a phenomenon which the Challenged Laws represent today. PFOF Nos. 65-68.

116. Regarding the third *Arlington Heights* factor, the evidence presented also shows that the Challenged Laws were passed in the aftermath of unsubstantiated claims of widespread voter fraud. PFOF Nos. 93-97, 180-82, 540-41, 545, 548, 551, 562-70, 576. For instance, the Challenged Laws were passed after President Donald Trump stated during his January 6, 2021, speech questioning the legitimacy of the 2020 presidential election results that 36,000 non-citizens voted in Arizona's 2020 election, despite there being no basis for that assertion. PFOF No. 93. These unsubstantiated claims were echoed by members of the Arizona Legislature in the aftermath of President Trump's January 6, 2021, speech prior to the passage of the Challenged Laws. PFOF No. 95. In response to these unsubstantiated claims of voter fraud in Arizona's 2020 election, the Senate formed unprecedented election fraud related committees in 2021. PFOF No. 96. Misinformation campaigns regarding voter fraud also led to election officials facing harassment and death threats from the public, leading many to resign. PFOF No. 598. It was against this backdrop of unfounded election fraud theories that the Challenged Laws were introduced. PFOF No. 97.

117. Moreover, the evidence demonstrates that even if the Legislature only responded to its constituents' concerns based on misinformation spread in the wake of the 2020 election, that misinformation reflects animosity toward AANHPIs, Latinos, voters of color, and naturalized citizens that can be imputed to the Legislature. PFOF Nos. 65-66, 93-94, 110-15, 122, 129. *See Ave. 6E Invs., LLC v. City of Yuma*, 818 F.3d 493, 504 (9th Cir. 2016) (holding "the presence of community animus can support a finding of discriminatory motives by government officials, even if the officials do not personally hold such views"); *see also Stewart B. McKinney Found., Inc. v. Town Plan & Zoning Comm'n of Town of Fairfield*, 790 F. Supp. 1197, 1212 (D. Conn. 1992) (finding that discriminatory intent can be evinced when government officials "bowed to the political pressure exerted by" private individuals who were motivated by impermissible discriminatory animus); *Dailey v. City of Lawton*, 425 F.2d 1037, 1039 (10th Cir. 1970) (same). The legislators did not attempt to ascertain whether the Challenged Laws would, in fact, address any constituent concern (legitimate or otherwise) nor did they evaluate the impact on AANHPIs, Latinos, voters of color, and naturalized citizens. PFOF Nos. 127-28, 132-33, 161-64, 183-90. Instead, the legislators abdicated that responsibility entirely to the Arizona Free Enterprise Club. PFOF Nos. 117-20, 126, 128, 160-63. And not only did the Arizona Free Enterprise Club not assess whether the Challenged Laws addressed any legitimate state interest nor what impact the Challenged Laws may have on AANHPIs, Latinos, and naturalized citizens, they instead disseminated false and misleading information to the Legislature. *See, e.g.*, PFOF Nos. 119, 167.

118. As to the fourth *Arlington Heights* factor, the evidence demonstrates that the Challenged Laws were passed in an irregular and expedited fashion, departing from normal procedures without fulsome debate or discussion of how the laws would be implemented or what problems they were addressing. *See Veasey v. Abbott*, 830 F.3d 216, 236-37 (5th Cir. 2016) (finding the legislatures expedited procedures to pass the challenged legislation as indicative of discriminatory intent); *see also*, *Ave. 6E Invs.*, 818 F.3d at 507 ("A city's decision to disregard the zoning advice of its own experts can provide evidence of

discriminatory intent."). For instance, Governor Ducey vetoed the prior iteration of HB 2243 (HB 2617) for lacking "sufficient due process" protections. PFOF No. 149; PX 53. In response, in the last two days of the legislative session, the Senate amended HB 2243 to include a modified version of HB 2617. PX 708; PFOF No. 158. While the last minute floor amendment was represented as containing minimal changes as between HB 2617 and HB 2243, it included significant changes that include, but are not limited to, reducing the 90-day notice provision response period to provide DPOC, mandating voter registration cancellations of suspected non-citizens but not for non-residents (who are placed on inactive status that does not require re-registration), and checking federal-only voters status with the SAVE system as opposed to only those County Recorders had "reason to believe" were non-citizens. PFOF Nos. 158-59. Other Senators received the amendment within minutes of the floor vote and did not have time to fully analyze the amendment, which had not been through the robust committee review process either. PFOF Nos. 168-73. The Legislature also passed HB 2492 in an irregular fashion. The House Rules Attorney told the House Rules Committee when it evaluated HB 2492 that the law was unconstitutional, but the House Rules committee, and ultimately the Legislature, willfully ignored the House Rules Attorney's finding when passing the law. PFOF Nos. 124-25. Similarly, the Senate Rules Committee counsel stated that HB 2492 conflicted with federal law (including the NVRA), but that statement was also ignored. PFOF No. 136; PX 62 at 7:3-10:10.

119. On the fifth *Arlington Heights* factor, the evidence demonstrates that members of the Arizona Legislature that voted in favor of the Challenged Laws made coded statements to refer to groups targeted by the laws in derogatory ways. PFOF Nos. 112-15, 122, 129-30. In addition, the evidence shows that legislators relied heavily on the Arizona Free Enterprise Club, an organization that also made derogatory statements regarding groups targeted by the laws, to draft the Challenged Laws and defend them during legislative hearings. PFOF Nos. 110, 112, 117-18, 121, 126, 128, 143, 146, 153-57, 160. *See Gonzalez v. Douglas*, 269 F. Supp. 3d 948, 967-68 (D. Ariz. 2017) (striking down an Arizona bill for being passed with discriminatory intent towards Hispanic persons in

part because proponents of the bills "used code words" during legislative proceedings and other public discussions regarding the bill such as "illegal immigrant" to "refer to Mexican Americans in a derogatory way").

### B. The Challenged Laws Facially Discriminate on the Basis of National Origin and/or Alienage

120. The evidence also demonstrates that the Challenged Laws facially and categorically discriminate against persons on the basis of their national origin and/or alienage, which, "regardless of purported motivation, is presumptively invalid." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272 (1979); *see also City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985) ("[W]hen a statute classifies by race, alienage, or national origin . . . [they] are subjected to strict scrutiny and will be sustained only if they are suitably tailored to serve a compelling state interest."); *Graham v. Richardson*, 403 U.S. 365, 371-72 (1971). First, HB 2492 Section 4 includes a "birthplace requirement" that requires registrants to provide information about their national origin and/or alienage, which the Attorney General asserts "facilitates ascertaining if a registrant is a U.S. citizen." ECF No. 127 at 7; PX 1. Indeed, the Attorney General asserts that if the law is implemented, the State would use this information to classify registrants based on their national origin and/or alienage in trying to ascertain whether a voter is a citizen. ECF No. 127 at 19 n.6. Likewise, the RNC argues that birthplace is material because it is "highly correlated with, if not always dispositive of, citizenship status." ECF No. 586 at 10. These explanations are nothing more than admissions that the birthplace requirement is an explicit scheme to classify and sort voters based on their national origin and/or alienage, and to do so for the purpose of burdening citizens born outside of the United States.

121. Second, Section 2 of HB 2243 separates out naturalized citizens and those a County Recorder "has reason to believe" are not U.S. citizens for disparate treatment. Section 2 of HB 2243 requires County Recorders to compare a registered voter to SAVE every month, if the County Recorder "has reason to believe" such voter is not a U.S. citizen, or if a voter has not provided DPOC. PFOF No. 209; A.R.S. § 16-165(I). The evidence

demonstrates that the SAVE system is the only source checked under this provision, and that the SAVE system only accesses information about registrants who were born outside the United States. PFOF Nos. 273-74, 277-78, 280, 284; Stipulated Fact (ECF No. 571-1) No. 122. This constitutes facial discrimination on the basis of national origin and/or alienage, in violation of the Fourteenth Amendment, because the SAVE provision subjects naturalized citizen voters—citizens who were once aliens—to additional barriers to voting "that native-born citizens who were not aliens do not have to surmount." *See Faruki v. Rogers*, 349 F. Supp. 723, 729 (D.D.C. 1972) (foreign service requirement only applying to naturalized citizens unconstitutionally classified individuals on basis of alienage).

122. Third, the evidence establishes that the other databases identified in HB 2243 to be used to "confirm citizenship" do not have reliable, up-to-date citizenship information. PFOF Nos. 197, 250, 255, 259, 303-06, 311-14, 407. Therefore, HB 2243's design on its face targets eligible naturalized citizens because stale U.S. citizenship data will only impact individuals whose citizenship status has changed, e.g., people who were not previously U.S. citizens but became U.S. citizens by naturalizing. Because natal U.S. citizenship status is almost entirely static, native-born U.S. citizens will never be targeted for removal based on stale citizenship data.

123. For this reason, courts have easily found that relying on citizenship data from databases that are not intended to and do not have current U.S. citizenship data discriminates between naturalized and native-born citizens. In *Texas LULAC v. Whitley*, a federal court determined that when Texas launched a program to check the voter rolls against citizenship status held in the state's driver's license database, nearly 100,000 new American voters were caught up in the purge, while only a very small number of identified registrants were actually ineligible to vote. No. SA-19-CA-074-FB, 2019 WL 7938511 at *1 (W.D. Tex. Feb. 27, 2019). The court held that as a result of "inherent" flaws in the data relied on, "naturalized Americans were burdened with . . . ham-handed and threatening correspondence from the state" about their citizenship status, while "no native-born Americans were subjected to such treatment." *Id.*

124. Similarly, a federal court in Florida found "major flaws" in a similar voter purge program, which also relied on driver's license data to identify potential non-U.S. citizens on the voter rolls. *Florida*, 870 F. Supp. 2d at 1347. Once again, because of the lag time between when a person naturalized and when they had to renew their driver's license, the court found that the list was compiled "in a manner certain to include a large number of citizens," *id.* at 1348, and was "likely to have a discriminatory impact," *id.* at 1350.

125. In *Boustani v. Blackwell*, an Ohio law pertaining to challenges to voter eligibility required only naturalized citizens whose citizenship status was challenged to produce documentary proof of citizenship. 460 F. Supp. 2d 822 (N.D. Ohio 2006). The district court concluded that the law violated the Equal Protection Clause because it "create[d] an unequal application of voting requirements and lacks the justification of promoting a compelling governmental interest." *Id.* at 826.

126. The district court further explained the dignitary harms of such a discriminatory system: "This Court has personally presided over numerous naturalization ceremonies and has witnessed firsthand the joy of these new Americans and their intense desire to participate in this nation's democratic process. There is no such thing as a second-class citizen or a second-class American. Frankly, without naturalized citizens, there would be no America. It is shameful to imagine that this statute is an example of how the State of Ohio says 'thank you' to those who helped build this country." *Id.* at 827. The discriminatory procedures put into place by HB 2492 and HB 2243 are an equally harmful and unlawful manner of welcoming new Arizona citizens into the electorate.

127. While Defendants may argue that the provisions of HB 2492 and HB 2243 do not contain as explicit a classification, the evidence is overwhelming that the systems they erect—which rely on data well known to be stale and a database *solely* dedicated to people born outside the United States—is designed in a manner that inherently targets naturalized U.S. citizens for burdens not imposed on their native-born peers. As such, the laws classify based on national origin and/or alienage even if they do so via proxy. After all, as the Supreme Court recently stated: "[W]hat cannot be done directly cannot be done

indirectly. The Constitution deals with substance, not shadows, and the prohibition against racial [or in this case, national origin and/or alienage] discrimination is levelled at the thing, not the name." *Students for Fair Admissions v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 230 (2023) (internal quotation marks and citation omitted).

128. Given the similarities between the program at issue here and the discriminatory programs in Florida and Texas, and the fact that there are no safeguards in place to ensure that people flagged through the database matching process are *currently* non-U.S. citizens before subjecting them to additional burdens that no native-born citizen will face, the Court finds that HB 2492 and HB 2243 facially discriminate on the basis of national origin and/or alienage.

## IX. A.R.S. § 16-165(I) Violates the Fourteenth and Fifteenth Amendments' Prohibition on Unfettered Discretion in Voter Registration Systems

129. A.R.S. § 16-165(I), the "reason to believe" provision, causes County Recorders to violate the Fourteenth and Fifteenth Amendments' prohibition on unfettered discretion in voter registration systems.

130. The Fourteenth Amendment's Equal Protection Clause prohibits racial and national origin discrimination. To guard against this in the voting rights context, one rule that courts have enforced as a preventative measure is prohibiting the vesting of unfettered discretion upon voting registrars. *See Davis v. Schnell*, 81 F. Supp. 872, 878 (S.D. Ala. 1949), *aff'd*, 336 U.S. 933 (1949) (holding that local registrars' "arbitrary power" and "unlimited discretion" in administering constitutional understanding test amounted to a denial of equal protection of the law under Fourteenth Amendment); *Hernandez v. State of Tex.*, 347 U.S. 475, 479 (1954) (discrimination on basis of national origin violates Fourteenth Amendment).

131. The Fifteenth Amendment prohibits racial discrimination concerning "the right of citizens of the United States to vote." U.S. Const. amend. XV. The same rule has been applied in Fifteenth Amendment cases. *Louisiana v. United States*, 380 U.S. 145, 152-53 (1965) (striking down arbitrary constitutional understanding test for voter registration

because laws that are "completely devoid of standards and restraints" and thereby confer unfettered discretion upon registrars enable racial discrimination). Racial discrimination "is the inescapable effect of a subjective requirement . . . barren of standards and safeguards, the administration of which rests in the uncontrolled discretion of a registrar." *United States v. Louisiana*, 225 F. Supp. 353, 381 (E.D. La. 1963), *aff'd*, 380 U.S. 145 (1965).

132. The Secretary of State's office understands A.R.S. § 16-165(I) to give each County Recorder's office the "discretion" to determine what constitutes a "reason to believe" a registered voter is not a U.S. citizen. PFOF No. 448. A.R.S. § 16-165(I) commands a wholly subjective evaluation of registered voters' citizenship and requires a search of the SAVE system based on nothing more than arbitrary and subjective impressions, guesses, and suspicions of County Recorders' staff, not evidence of ineligibility.

133. The County Recorders have reached markedly different understandings of the subjective phrase "reason to believe." PFOF Nos. 449-58. Fifteen County Recorders, their numerous staff, and their counsel have not reached a common understanding of how this subjective standard should be enforced. PFOF Nos. 380, 382, 384-89, 391-97, 428, 430, 448-58. A.R.S. § 16-165(I) has vested County Recorders and their staff with unbridled discretion to scrutinize particular registered voters for a lack of citizenship. As was true of the constitutional understanding test struck down in *Louisiana*, A.R.S. § 16-165(I)'s subjective and arbitrary standard enables—and masks—discriminatory treatment.

134. Accordingly, the "reason to believe" standard in A.R.S. § 16-165(I) is impermissibly subjective: whenever County Recorders' staff suspect a voter is not a citizen, even without concrete evidence, they are not only empowered, but required, to subject that voter to an extra citizenship check and potential cancellation. Because such unfettered discretion in voter registration has historically enabled discrimination, such practices violate the Fourteenth and Fifteenth Amendments.

135. Defendants' argument that this claim should be analyzed under *Anderson-Burdick* is incorrect. ECF No. 585 at 23. In addition to the fact that *Anderson-Burdick* does not displace all other Fourteenth Amendment claims (*see supra* Conclusion of Law No. 111), *Louisiana* was decided under the Fifteenth Amendment, and *Anderson-Burdick* does not implicate the Fifteenth Amendment. This Court has already implicitly ruled against Defendants' argument: in its February 16, 2023 Order on the motion to dismiss, this Court applied *Louisiana*'s standard. ECF No. 304 at 26 n.14.

## X. The Challenged Laws Impose an Undue Burden on the Right to Vote, in Violation of the First and Fourteenth Amendments to the U.S. Constitution[8]

136. State laws that burden the right to vote violate the First and Fourteenth Amendments, unless relevant and legitimate state interests of sufficient weight justify the burdens. *See Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983); *Burdick v. Takushi*, 504 U.S. 428, 434 (1992).

137. In assessing the extent to which a law burdens the right to vote, the court "must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that [Plaintiffs] seek[ ] to vindicate." *Anderson*, 460 U.S. at 789. The more severely a law burdens the right to vote, the more strictly the law must be scrutinized. *Burdick*, 504 U.S. at 434; *Ariz. Libertarian Party v. Reagan*, 798 F.3d 723, 729-30 (9th Cir. 2015). But even where a burden is slight, it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation. *See, e.g.*, *ADP v. Hobbs*, 18 F.4th 1179, 1194-95 (9th Cir. 2021); *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008) (plurality). And where a law's burden on the right to vote is "severe," the law "is subject to strict scrutiny," requiring the most

[8] Plaintiffs acknowledge the Court's ruling (ECF No. 600) that trial would be limited to claims that could provide relief beyond what the Court granted in its summary-judgment ruling. Plaintiffs address in this section the burdens imposed by both Challenged Laws because they operate in conjunction to impose interrelated burdens on the right to vote.

compelling state interest (and narrow tailoring) to withstand constitutional challenge. *Soltysik v. Padilla*, 910 F.3d 438, 444 (9th Cir. 2018); *see also Burdick*, 504 U.S. at 434.

138. Courts analyze a challenged law's burden on the right to vote by examining the imposition on both voters' and candidates' participation in the political process, including voters' ability to vote for their candidates of choice. *Anderson*, 460 U.S. at 781, 786-87. In other words, courts look to "the effect of the regulations on the voters, the parties and the candidates" and "evidence of the real impact the restriction has on the [political] process." *Green Party of Tenn. v. Hargett*, 767 F.3d 533, 547 (6th Cir. 2014) (alteration in original).

139. Courts employ heightened levels of scrutiny in examining laws that impose "'a particular burden on an identifiable segment' of voters" because those laws "are more likely to raise constitutional concerns." *ADP v. Hobbs*, 18 F.4th at 1190 (quoting *Anderson*, 460 U.S. at 792); *see also Obama for Am. v. Husted*, 697 F.3d 423, 431 (6th Cir. 2012) (applying heightened scrutiny to a law that restricted mail voting within three days of an election because, even though the policy did not legally prevent casting a ballot, the challenged law would result in fewer eligible voters—disproportionately female, older, and of lower income and education attainment—from voting). Of particular relevance here, the Tenth Circuit has held that a DPOC requirement imposed a "significant burden" on the right to vote, necessitating heightened scrutiny. *Fish v. Schwab* (*Fish II*), 957 F.3d 1105, 1127-32 (10th Cir. 2020).

140. Each of the Challenged Laws' burdens is not "generally applicable, evenhanded, [or] politically neutral." *Pub. Integrity All., Inc. v. City of Tucson*, 836 F.3d 1019, 1024 (9th Cir. 2016).

141. Instead, the laws would affect "an identifiable segment of [] voters." *Anderson*, 460 U.S. at 793. Specifically, as in *Husted*, where the challenged law disproportionately affected voters who were "women, older, and of lower income and education attainment," 697 F.3d at 431, each of the Challenged Laws would disproportionately affect U.S. citizens who are of lower socioeconomic status and/or U.S.

citizens who are people of color and/or naturalized U.S. citizens. *See* PFOF Nos. 484-91; Tr. Day 4 PM, 931:5-936:7, 935:13-936:7, 940:6-944:12, 945:14-946:8, 993:18-994:7 (Burch). Each Challenged Law would also affect voters who are more likely to be Democrats than Republicans. Tr. Day 2 PM, 510:9-24 (Dick).

**A. The Challenged Laws Burden the Right to Vote**

142. Each of the Challenged Laws would burden the right to vote by subjecting eligible registrants and already-registered voters to potential registration cancellation, investigation, and prosecution based on whether they have provided satisfactory DPOC. Canceling an eligible voter's registration prevents her from voting altogether, and subjecting registrants and voters to potential investigation and prosecution would likely deter and exclude eligible citizens from fully participating in Arizona's electoral process. *See* PFOF No. 489.

143. In addition to prohibiting federal-only voters (*i.e.*, voters who have not provided DPOC) from voting in presidential elections and voting by mail (which this Court has already held to be a violation of the NVRA, ECF No. 534 at 9), HB 2492 would further burden the right to vote by directing state and county election officials to create a "blacklist" of voters who those officials decide are not U.S. citizens, so that those voters could be subjected to investigation, prosecution, and removal from the voter rolls. A.R.S. § 16-143.

144. HB 2243 would impose additional burdens by providing that if a County Recorder "obtains information" that a registrant is not a U.S. citizen (though what constitutes "information" is undefined), the registrant can avoid cancellation, investigation, and prosecution only by providing "satisfactory evidence of United States citizenship" within 35 days. A.R.S. § 16-165(A)(10). "Satisfactory evidence" of citizenship might be costly to obtain, not be available within 35 days, or not be available at all. *See* PFOF Nos. 470-523. If a voter does not provide "satisfactory" evidence of U.S. citizenship within the 35-day window, County Recorders would be required to cancel his or her voter registration and "notify the county attorney and attorney general for possible investigation" and

prosecution. A.R.S. § 16-165(A)(10). And after this 35-day period lapsed, there would be no way—such as through a hearing or an affidavit process—for the voter to cure the registration, for example by providing DPOC and an explanation of why it was not submitted sooner. An individual must register to vote 29 days before an election in Arizona in order to be eligible to vote in that election. *See* A.R.S. § 16-120. There is therefore no "safety valve," such as a provisional voting option or process by which a voter can cure registration, for voters whose registration may be canceled shortly before a state or local election that is not contemporaneous with a federal election. *See Fish II*, 957 F.3d at 1129 (distinguishing the state's DPOC requirement for voting from the DPOC requirement upheld by *Crawford*, in part, because of lack of a provisional voting option).

145. HB 2243's requirement to provide DPOC within the 35-day window would be very difficult for some voters, due to the costs of documentation and long wait times. *See* PFOF No. 470-523. It is very likely that 35 days would simply not be enough time for many voters, especially naturalized citizens, voters of color, those with low English proficiency, and those who are poor. *See* PFOF Nos. 471-76. HB 2243's provision regarding the use of the SAVE program specifically targets naturalized U.S. citizen voters because the SAVE program can only be used to verify or provide confirmation of naturalized or derived U.S. citizenship and cannot be used to verify or provide confirmation of U.S.-born citizenship. PFOF Nos. 277-78; *see also* A.R.S. § 16-165(I).

146. The burdens of these laws are exacerbated by the databases on which they require officials to rely. The provisions of each Challenged Law that identify registrants and registered voters as suspected non-U.S. citizens depend on several databases and programs, including the SAVE program, the driver-license database, and the Social Security Administration database, each of which is ill-suited to determine whether a person is a U.S. citizen because they do not contain up-to date or accurate citizenship data. *See* PFOF Nos. 213-316, 376-469. In addition, under HB 2243 (and because of these ill-suited databases), voters may be stuck in a loop—subject to multiple notices, even when they

have already provided the requisite DPOC. PFOF No. 417; *see also* Tr. Day 3 PM, 741:25-742:20 (Camarillo). This dependence risks erroneously burdening the right to vote.

147. The burdens are further exacerbated by the lack of a consistent plan for enforcement of each of the Challenged Laws. County Recorders, who are responsible for implementing the laws, testified that they are unclear about the database-matching requirements and what constitutes "information that the applicant is not a United States Citizen." *See* PFOF Nos. 376-469.

### B. The Purported Justifications Underlying Each of the Challenged Laws Are Not Sufficiently Weighty to Justify the Burdens

148. After assessing the burdens of the Challenged Laws, the Court must evaluate the "precise interests put forward by the State as justifications for the burden imposed by its rule" and determine the "legitimacy and strength" of those asserted interests, including "the extent to which those interests make it necessary to [impose the] burden" at all. *Anderson*, 460 U.S. at 789.

149. Given the significant burdens that HB 2492 and HB 2243 each would impose on the fundamental right to vote, the laws must withstand heightened constitutional scrutiny. *See Burdick*, 504 U.S. at 433-34.

150. Defendants have articulated two purported interests underlying the Challenged Laws: (1) preventing voter fraud and (2) increasing voter confidence. But these interests are not sufficiently weighty on the record here, nor are the Challenged Laws sufficiently targeted to those purported interests.

151. First, while the interest in preventing voter fraud is valid, it is insufficient, absent compelling evidence of actual occurrences of voter fraud among non-citizens, to justify the burdens that HB 2492 and HB 2243 would impose. The record indicates that instances of voter fraud in Arizona are rare, and voter fraud by non-citizens is even rarer. *See* PFOF No. 537-601. Speaker of the Arizona House of Representatives, Ben Toma, for example, admitted that he is not sure whether there is a problem of non-citizens voting in Arizona, and the Arizona Legislature never established that any non-citizen had ever

registered to vote in the state. PFOF No. 180. Similarly, no county recorder in Arizona was familiar with any instances of non-U.S. citizens registering to vote or voting. PFOF No. 566. The Secretary of State, too, admitted that there is no evidence of widespread voter fraud in Arizona. PFOF Nos. 567-70.

152. Arizona officials and Dr. Lorraine Minnite testified that Arizona had policies and procedures in place to prevent unlawful voting, including voting by non-U.S. citizens, before the passage of HB 2492 and HB 2243. *See* PFOF Nos. 537-601.

153. Second, the record does not support the justification that the Challenged Laws would increase voter confidence. According to experts, there is very little social-science evidence that restrictive voting laws increase public confidence in elections. PFOF Nos. 586-87. In fact, research cited by Defendants' experts demonstrates no increase in public confidence from the voter-identification laws they contend to be analogous. Tr. Day 7 AM, 1864:5-17, 1866:17-24 (Hoekstra). A representative from the Arizona Attorney General's office even agreed that any state interest in restoring faith in elections was purely speculative, and Senator Petersen testified that he took no steps to evaluate whether the Challenged Laws would increase confidence in elections. PFOF Nos. 590-91. Additionally, Dr. Minnite testified that the emerging social-science research suggests that false claims of election fraud are what depress voter confidence in elections. PFOF Nos. 588-89.

154. Although increasing public confidence in elections is a valid state interest, the record does not establish that the Challenged Laws would further that interest. This is particularly important because the burdens are significant and fall more heavily on and target voters of color and naturalized U.S.-citizen voters.

155. Put simply, Defendants have failed to establish any state interest sufficiently weighty to justify the significant, unreasonable, and discriminatory burdens that would be imposed by the Challenged Laws. *See Crawford*, 553 U.S. at 190; *League of Women Voters of Fla., Inc., v. Detzner*, 314 F. Supp. 3d 1205, 1221 (N.D. Fla. 2018).

## XI. The Challenged Laws Violate Voters' Procedural Due Process Rights

156. Section 2 of HB 2243 and Section 4 of HB 2492 violate voter and voter registration applicants' procedural due process rights.[9] The Court has already determined that procedural due process challenges to election laws are evaluated under the *Anderson-Burdick* balancing test. ECF No. 304 at 27-28. For laws that impose a severe burden on the right to vote, the state must meet strict scrutiny and show a compelling interest narrowly tailored to serve that interest. *Pierce v. Jacobsen*, 44 F.4th 853, 859-60 (9th Cir. 2022). Lesser burdens have to meet less demanding scrutiny, however even where a burden is slight, it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation. *See, e.g.*, *Crawford*, 553 U.S. at 191.

**Section 2 of HB 2243**

157. Section 2 of HB 2243 significantly burdens voters' procedural due process rights by cancelling a voter's registration, when a county recorder obtains information that the person registered may not be a United States citizen, without an adequate opportunity for the voter to contest or cure and forwarding their information to the county attorney and Attorney General for potential investigation. PFOF Nos. 205-09.

158. The evidence shown at trial established that then-Arizona Governor Doug Ducey vetoed HB 2617, a predecessor bill to HB 2243, for lacking "sufficient due process" protections by providing Arizonans accused of lacking U.S. citizenship only 90 days to provide documentary proof of citizenship or have their registration cancelled. PFOF Nos. 148, 149. Despite this, the Senate amended HB 2243 to include a modified version of HB 2617, which then passed the House, and was then signed into law reducing the response period to provide DPOC from HB 2617's 90 days to only 35 days for those accused of

---

[9] As noted above, HB 2243 amended and superseded the language in Section 8 of HB 2492, *see* PX 2. To the extent the language of HB 2492 is reinstated due to Section 2 of HB 2243 being found invalid, HB 2492 also violates voter's due process rights because it does not provide voter registration applicants an opportunity to contest or cure a County Recorder's assessment that they are not a United States citizen and referral to the county attorney and Attorney General for investigation.

lacking U.S. citizenship. PFOF Nos. 155-58, 208; Stipulated Fact (ECF No. 571-1) Nos. 51-58.

159. The evidence shows that County Recorders responsible for implementing Section 2 of HB 2243 are unclear about the database matching requirements and what constitutes "information" that "confirms the person registered is not a United States Citizen." PFOF Nos. 434-46, 459. They are also unclear on what constitutes a "reason to believe" a voter is not a United States citizen. PFOF Nos. 447-58. Those same County Recorders are responsible for canceling a voter's registration based on Section 2 of HB 2243 and referring the voter to the county attorney and Attorney General for investigation, unless the voter provides satisfactory evidence citizenship within 35 days. PFOF No. 206.

160. The evidence shows that Section 2 of HB 2243 creates a severe procedural burden, particularly for voters of color and naturalized citizens, to acquire the necessary DPOC in the short 35-day timeframe. For instance, the notice letters County Recorders are required to send to those who they plan to remove from the rolls are only in English, Spanish, and/or Navajo and are not in any AANHPI languages. PFOF Nos. 460-76. Many citizens residing in Arizona who are eligible to vote lack copies of or ready access to documents that can establish their citizenship. The issue of obtaining documents to prove citizenship is accentuated by compliance, financial, and psychological costs voters who would be required to obtain them, to avoid being purged from the rolls and subject to potential criminal investigations. PFOF Nos. 470-76, 484-89. These increased costs would bear more heavily on voters of color. PFOF No. 490.

161. The evidence presented also demonstrates that recently naturalized citizens are more likely to be falsely identified as non-citizens due to outdated citizenship data in the databases used for matching and therefore more likely to be subject to an investigation. PFOF Nos. 250-62, 406-16.

162. Evidence also shows that County Recorders are required to cancel a voter's registration upon failure to provide DPOC within 35 days, and referral to the county

attorney and the U.S. Attorney General based on limited and inaccurate information derived from juror summary reports. PFOF Nos. 205-06, 314-15; *see also* DX 970.

163. Additionally, the potential for a criminal investigation into a voter's citizenship status and potential prosecution would also impose a severe burden on their right to vote. If investigated, a voter may be subject to interviews by investigators and may have to hire legal representation. PFOF Nos. 189, 561.

**Section 4 of HB 2492**

164. Section 4 of HB 2492 significantly burdens voters' procedural due process rights by rejecting a voter's registration application upon determination that the applicant is not a citizen based on database matching and forwarding the application to the county attorney and Attorney General for investigation, without allowing the applicant any opportunity to contest or cure such determination. PFOF Nos. 195-220.

165. The evidence presented shows that County Recorders lack guidance on what criteria to use for matching across databases to verify citizenship status. As explained with respect to HB 2243, the databases can be unreliable and recently naturalized citizens are more likely to be falsely identified as non-citizens through matching. PFOF Nos. 212, 250-62, 405-16, 434-46.

166. Further, as noted above, a criminal investigation based on these database checks into the applicant's citizenship status would impose a severe burden. PFOF Nos. 189, 561.

**State Interest**

167. On the other side of the *Anderson-Burdick* balancing test, no evidence was shown demonstrating that there was a compelling state interest for the Challenged Laws, or even a legitimate interest of sufficient weight. *See supra* at Section X.B.

168. Additionally, no evidence was shown explaining or justifying the additional burdens flowing from reducing the notice period from 90 days in HB 2617 to 35 days in HB 2243. The evidence showed that this change was added to HB 2243 at the very end of the legislative session, and the amendments were hardly discussed in either chamber of the

Legislature, including Senator Peterson misrepresenting the substance of his floor amendment. PFOF Nos. 158-59. Indeed, Senator Petersen was unable to provide an explanation and did not make an effort to find out whether a 35-day notice period was reasonable. PFOF Nos. 161-62. Likewise, Speaker Toma testified that he was unaware of anyone in the Legislature discussing the issue of the appropriate amount of time for naturalized citizens to respond with DPOC to a letter asking them to verify their citizenship. PFOF No. 163. Further underscoring that lack of any justification for the reduction, Speaker Toma, who brokered the deal to put HB 2617 into HB 2243, was not even aware of the change in notice period until he was deposed in this case. PFOF No. 170. While the Court is unaware of any evidence that justified even the 90-day notice period in HB 2617, because as evidence shows that it can take more than 90 days to obtain DPOC, *see e.g.*, PFOF Nos. 472, 476, there is no evidence that justifies reducing that 90-day period, which the Legislature had previously deemed appropriate in passing HB 2617, to only 35 days.

169. Also, there was no evidence established at trial that demonstrated rejecting registrants, or cancelling registrations based on database matching or juror questionnaires would address a compelling state interest, as they are unreliable for determining citizenship status. PFOF Nos. 315, 597.

170. There was also no evidence shown that justifies either Section 2 of HB 2243 or Section 4 of HB 2492's requirement that County Recorders refer rejected registrants or cancelled voters to county attorneys or the Attorney General for investigation. The evidence demonstrates that instances of voter fraud attributable to non-citizens voting is exceedingly rare. *See supra* Conclusion of Law Nos. 151-52. The U.S. Attorney General has previously received thousands of investigation referrals regarding alleged voter fraud but has not convicted a single person since 2010 for registering to vote or casting a ballot as a non-U.S. citizen. PFOF Nos. 552, 555-60. There was no evidence presented that the investigations referrals under the Challenged Laws would prevent non-citizens from registering or voting.

171. In sum, the evidence at trial demonstrated that the Challenged Laws place a severe burden on Arizonans' right to vote without due process, and do not advance a compelling state interest that is narrowly tailored. Even if the Challenged Laws were to create less than a severe burden, there was no evidence presented to establish that they serve a relevant and legitimate state interest that is sufficiently weighty to justify the limitations they impose.

## XII. The Challenged Laws Violate Section 2 of the Voting Rights Act

172. A state law violates Section 2 of the Voting Rights Act if it "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color" or language-minority status. 52 U.S.C. § 10301(a). In Section 2 cases, courts must consider "the totality of circumstances" and whether "the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members" of a protected class "in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id.* § 10301(b).

173. In *Brnovich v. Democratic Nat'l Comm.*, the Supreme Court "decline[d] . . . to announce a test" applicable to all Section 2 vote denial claims. 141 S. Ct. 2321, 2336 (2021). Instead, it discussed five "guideposts" helpful in analyzing such claims: the size of the burden imposed by the rule in question; "the degree to which a voting rule departs from what was standard practice when § 2 was amended in 1982;" the disparate impact on members of different racial and ethnic groups; "opportunities provided by a State's entire system of voting;" and the strength of the State's interests in imposing the rule. *Id.* at 2338-40.

174. The *Brnovich* Court made clear that the five guideposts it identified are not exclusive and that Section 2 "requires consideration of 'the totality of circumstances.'" 141 S. Ct. at 2340. Thus, the "Senate factors" identified in *Thornburg v. Gingles*, 478 U.S. 30,

36 (1986), should not "be disregarded." *Brnovich*, 141 S. Ct. at 2340;[10] *see also Fair Fight Action, Inc. v. Raffensperger*, 634 F. Supp. 3d 1128, 1240-41 (N.D. Ga. 2022) (applying "the relevant *Brnovich* guideposts and *Gingles* Senate factors"); *Sixth Dist. of Afr. Methodist Episcopal Church v. Kemp*, 574 F. Supp. 3d 1260, 1277 (N.D. Ga. 2021) (concluding that *Brnovich*'s list of guideposts "is neither exhaustive nor prescriptive"). This is especially true because *Brnovich* concerned rules about casting votes that were different in nature than the registration laws at issue here. *See Fair Fight Action*, 634 F. Supp. 3d at 1241. Both before and after *Brnovich*, "given that section 2 requires courts to consider 'the totality of circumstances,' it is axiomatic that no one factor controls." *Fla. State Conf. of NAACP v. Lee*, 566 F. Supp. 3d 1262, 1290 (N.D. Fla. 2021).

175. Evidence presented at trial establishes that the Challenged Laws violate Section 2. The provisions at issue create sizeable burdens that do not just make voting more difficult, but completely prevent some eligible people from voting. Latino and naturalized citizens will be especially burdened, creating a disparate impact. Further, none of the Challenged Laws were typical in 1982 when the amended Section 2 was enacted, and Arizona's election laws as a whole do not provide voters affected by the Challenged Laws with any way to vote. The State has put forth no strong or even legitimate justification supporting the laws. Finally, there is no question that Arizona has a long history of official discrimination that still affects Latino and naturalized citizens today, that Arizona has underserved its Latino and naturalized citizens, that those citizens are still underrepresented in elected office, or that racial appeals in campaigning are present in Arizona.

---

[10] Some of the applicable Senate factors are: the extent of historical official discrimination that affected voting or the democratic process; whether members of the group in question "bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;" "whether political campaigns have been characterized by overt or subtle racial appeals;" "the extent to which members of the minority group have been elected to public office in the jurisdiction;" and whether elected officials are unresponsive to the needs of the minority group. *Gingles*, 478 U.S. at 37.

**A. The Size of the Burden**

176. The Challenged Laws will create a large and often insurmountable burden for Latino and naturalized citizens. Testimony from Dr. McDonald and others established the provisions that require election officials to reject registration applications or remove voters from the rolls based on database matching will undoubtedly lead to rejections and removals of eligible citizens. PFOF Nos. 228, 235, 250, 255-65; Tr. Day 5 AM, 1073:13-17, 1077:15-1078:11, 1102:20-1103:1 (McDonald); Tr. Day 1 PM, 156:25-158:15 (Petty). Many people will be turned away on Election Day, with no opportunity to cast a ballot.

177. The laws' additional DPOC requirements, the requirement that applicants list place of birth on registration forms, and the provisions threatening naturalized citizens with criminal investigation create fear and unusual burdens for Latino and naturalized citizens, as testimony at trial established. PFOF Nos. 484-86; Tr. Day 4 PM, 930:23-931:13, 934:18-21, 936:1-7, 949:19-23, 969:5-15 (Burch); Tr. Day 5 PM, 1290:16-1291:7 (Herrera); Tr. Day 1 PM, 190:19-25 (Garcia); Tr. Day 2 PM, 480:10-481:18, 486:6-12, 504:21-506:3 (Guzman).

178. Likewise, socioeconomic disparities interact with administrative requirements such as DPOC to make the costs of registering to vote and voting difficult for many voters to overcome. PFOF Nos. 60, 485. These burdens weigh heavily in favor of finding a Section 2 violation, and go well beyond those at issue in *Brnovich*, where the Court emphasized that the laws simply required voters to go to the correct precinct or to a nearby mailbox to send an absentee ballot. *Brnovich*, 141 S. Ct. at 2344-46. And "cumulatively, the panoply of restrictions results in greater disenfranchisement than any of the law's provisions individually." *N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 231 (4th Cir. 2016).

**B. The Disparate Impact**

179. The laws at issue will also disparately impact Latino and naturalized citizens, and the "size of [the] disparity" is large. *Brnovich*, 141 S. Ct. at 2339. Indeed, trial evidence established that the unreliable database checks required by the Challenged Laws will very

rarely affect U.S.-born citizens; errors in database matching will almost always affect naturalized citizens because only naturalized citizens will be affected by the staleness of outdated citizenship data (U.S.-born citizens' status is not variable in the same way). Tr. Day 5 AM, 1077:15-1078:16, 1097:25-1098:20, 1103:2-10 (McDonald). Moreover, the SAVE system that must be used pursuant to the Challenged Laws is not used to verify U.S. birth certificates, but is used to check the status of newly naturalized citizens. PFOF No. 267; Tr. Day 5 AM, 1073:5-17 (McDonald).

180. Evidence also showed that the database checks will have a large disparate impact on Latinos, who are much more likely than others to be naturalized citizens. Tr. Day 5 AM, 1104:4-17 (McDonald). It also demonstrated that the remaining provisions, such as the DPOC and birthplace requirements and the threat of criminal investigation, impose significantly greater financial and psychological costs on naturalized citizens and Latinos than they do on other voters. Tr. Day 4 PM, 935:13-936:7, 940:6-944:12 (Burch); Tr. Day 5 PM, 1290:16-1291:7 (Herrera). For example, a citizenship certificate can cost $1,170, and will be needed by naturalized citizens, not U.S.-born citizens. Tr. Day 4 PM, 947:20-948:6 (Burch). Latinos and naturalized citizens are more likely to live in poverty than white Arizonans, making it more difficult to bear those costs. PFOF No. 59.

### C. The Challenged Laws Substantially Depart from Standard Practice in 1982

181. The Challenged Laws "depart[] from what was standard practice when § 2 was amended in 1982." *Brnovich*, 141 S. Ct. at 2338. Dr. Burton testified, unrefuted by Defendants or any rebuttal expert witness, that a thorough search of historical records did not reveal analogous provisions to the Challenged Laws that were in place in 1982, in Arizona or elsewhere. PFOF No. 61; Tr. Day 6 PM, 1437:15-1438:8, 1540:2-9 (Burton). Dr. Burton instead discovered an illegitimate attempt by a Maricopa County election official to seek DPOC for registration in the 1970s, which was widely condemned as both discriminatory and unlawful. PFOF No. 56.

182. Additional legal research also did not uncover any analogous 1982 laws. Notably, during the 1982 VRA debates, one representative discussed the potential of proof of citizenship requirements with a testifying witness. Extension of the Voting Rights Act: Hearings before the Subcommittee on Civil and Constitutional Rights, House Judicial Committee, 97th Cong., 1st Sess. 900 (June 5, 1981) (Rep. Hyde exchange with witness Dawson). But the witness did not identify an example and the 1982 Amendments debates did not otherwise discuss any then-existing DPOC law. *Id.* Moreover, in 1997, the Arizona Legislature considered and rejected a DPOC bill, establishing that it was not the law as of 1997. ECF No. 672 (Judicial Notice), ¶ 53. Instead, Arizona was the first state in the country to mandate DPOC in 2004. PFOF No. 61.

183. RNC misjudges its examples of purported analogous 1982 laws. First, RNC fails to identify any laws related to several of the challenged provisions, including, for example, the DPOR requirements, DPOC-related registration purges, database matching, and several others. *See, e.g.*, ECF No. 586 at 23. Second, the examples RNC raises concerning DPOC are inapposite. Arizona making U.S. citizenship a constitutional voter eligibility requirement is not analogous to the DPOC provisions that make providing specific proof of citizenship a requirement. The example RNC provides from the 1981 law in Georgia required voters to prove *identity* (not citizenship) through a driver's license, birth certificate, "*or any other document* as will reasonably reflect" identity. *Fair Fight Action*, 634 F. Supp. 3d at 1242. This relaxed identity-establishing provision is far afield from the stringent DPOC requirements in HB 2492 and HB 2243. Third, RNC's birthplace requirement analogue is both inapt and temporally irrelevant. RNC identifies a statehood era law purporting to seek an applicants' "county" (not country) "of nativity" for voter registration. *Cf.* ECF No. 586 at 23 (misquoting Election Laws Arizona at 9, § 2885 (1913), perma.cc/79VS-9368). But that 1913 law asking for county origin (enacted at a height of nativist sentiments during Arizona's statehood era) is not akin to the birthplace requirement here. Moreover, RNC does not provide, and the Court has not found, any indication that

this distinct 1913 law remained in place seventy years later to be relevant under *Brnovich*'s 1982 laws guidepost.

184. Overall, RNC's examples are misstated or dissimilar to these laws. And even accepting RNC's comparisons and descriptions of the laws it identifies, two supposed examples of a DPOC requirement and one for birthplace hardly represent the type of "standard practice[s]" that "have a long pedigree or are in widespread use" to be pertinent under *Brnovich*. *Cf.* 141 S. Ct. at 2339. For its part, the State has not identified any analogous 1982 laws. Rather, the Secretary of State admits that there were no laws analogous to HB 2492 and HB 2243 in Arizona in 1982. ECF No. 124, ¶ 190. Therefore, this *Brnovich* guidepost favors Plaintiffs because HB 2492 and HB 2243 significantly depart from standard practices in 1982.

### D. Opportunities in the Voting System Do Not Reduce the Disparate Burdens

185. Further, "the opportunities provided by [Arizona's] entire system of voting" do not lessen the Challenged Laws' disparate burdens. *Brnovich*, 141 S. Ct. at 2339.

186. In *Brnovich*, the Court highlighted that although the challenged assigned-precinct rule imposed some burdens, Arizona voters could mostly avoid the disparate impact because they can request an early ballot without excuse and mail that ballot or drop it off. *Id.* at 2345. Here, by contrast, other avenues in Arizona's voting system do not reduce the practical burdens of the Challenged Laws' significant disparate impacts. The Challenged Laws create barriers to becoming fully registered and staying registered in the first place, and subject voters to persistent fears of prosecution that chills their voting activity.

187. Overall, there are significant learning, compliance, and psychological barriers of complying with the Challenged Laws, further demonstrating that the voting system is not open to minority voters to avoid the disparate burdens. PFOF Nos. 64, 68, 471, 481-90.

188. For many of the Challenged Laws, there are no ways for voters to get around the imposed obstacles. For example, voters without DPOC or sufficient DPOR applying using a state form will have their applications rejected. Voters removed from the rolls for lack of DPOC are fully prevented from voting and may be unable to re-register. And permeating the Challenged Laws are reporting and investigatory requirements that heighten voters' fears and turn them off from the voting process altogether. PFOF Nos. 64, 88, 484, 489, 686. Thus, unlike in *Brnovich*, the Challenged Laws do not simply "affect only one method of voting among several." *Fair Fight Action*, 634 F. Supp. 3d at 1244. Instead, in large part because "there are no alternative means of registering to vote" to avoid the Challenged Laws, the early voting options deemed important in *Brnovich* do not carry water here. *See id.*

189. In any event, Arizona's voting system is not as open as Defendants may suggest. As Dr. Burton explained, Arizona has all five "disenfranchising devices" identified in a 2018 U.S. Commission on Civil Rights report that have reduced opportunities for voters since the end of VRA preclearance requirements. PFOF Nos. 62-63. Those devices include: a voter identification requirement; a proof of citizenship requirement; use of voter purges; cutbacks to early voting opportunities; and widespread polling place closures. PFOF Nos. 62-63.

190. In recent years, including in pending litigation, laws concerning cutbacks in early voting opportunities and the use of voter purges have been challenged in court, further supporting that the openness of Arizona's voting system related to these laws is contested. *See, e.g.*, *Mi Familia Vota v. Hobbs*, 608 F. Supp. 3d 827, 864 (D. Ariz. 2022) (denying motion to dismiss a challenge to early voting list restriction); *Ariz. All. for Retired Ams. v. Hobbs*, 630 F. Supp. 3d 1180, 1189 (D. Ariz. 2022) (ruling that plaintiffs were likely to succeed on claim challenging registration cancellation provision). Thus, viewing the Challenged Laws in the context of Arizona's overall voting system favors Plaintiffs.

**E. The State's Interest**

191. The evidence at trial confirmed that Arizona has no "strong state interest[]" supporting the Challenged Laws. *Brnovich*, 141 S. Ct. at 2340. Arizona claims it needs to secure its elections from fraud and maintain voter confidence. But the Attorney General admits, and trial evidence proves, that voter fraud attributable to non-citizens in Arizona is essentially non-existent. PFOF Nos. 540-69, 576, 579-85. Thus, unsurprisingly, the Arizona Attorney General has not convicted anyone for registering to vote or voting as a noncitizen since 2010, *see* Stipulated Fact (ECF 571-1) No. 157, and County Recorders have confirmed that they are unaware of noncitizens voting in their counties. PFOF No. 566.

192. Evidence also established that the laws are more likely to *decrease* confidence in the voting system than increase it, because false claims of fraud raise unfounded doubts about the reliability of the electoral process. PFOF No. 588. Further, the Attorney General Office's lead prosecutor has acknowledged that its prediction that the laws will promote voter confidence was speculative. PFOF Nos. 590, 752.

193. Further, while Arizona may legitimately seek to prevent voter fraud, "there cannot be a total disconnect between the State's announced interests and the statute enacted." *Veasey*, 830 F.3d at 262. Here, the required connection simply does not exist. The birthplace requirement cannot serve to reduce fraud because a person's birthplace is immaterial to their eligibility to vote, and trial evidence showed that birthplace cannot be used to confirm identity. *See generally* PFOF Nos. 329-75. The provision is instead a clear effort to place foreign-born voters under extra scrutiny. The same is true for the DPOC, database matching, and criminal investigation provisions, considering the extremely low rate of voter fraud in Arizona: the "tenuous fit between the expressed policy and the provisions of the law bolsters the conclusion that minorities are not able to equally participate in the political process." *Veasey*, 830 F.3d at 262-63.

**F. Senate Factor 1: Arizona's History of Discrimination**

194. Under the totality analysis and Senate Factor 1, "courts consider the extent of any historical discrimination burdening the right to vote." ECF No. 204 at 34. Such historical background and patterns are relevant to both discriminatory effects under Section 2 and unconstitutional intentional discrimination. *See N.C. State Conference of NAACP*, 831 F.3d at 223-24 ("A historical pattern of laws producing discriminatory results provides important context for determining whether the same decisionmaking body has also enacted a law with discriminatory purpose."); *Arlington Heights*, 429 U.S. at 267 (similar).

195. Defendants do not dispute that minority voters in Arizona have "suffered discrimination in the past," *Brnovich*, 141 S. Ct. at 2340, or that such discriminatory patterns are both widespread and devastating. As the Ninth Circuit detailed, "[f]or over a century, Arizona has repeatedly targeted its American Indian, Hispanic, and African American citizens, limiting or eliminating their ability to vote and to participate in the political process." *DNC v. Hobbs*, 948 F.3d 989, 998 (9th Cir. 2020) (en banc), *rev'd on other grounds in Brnovich*, 141 S. Ct. 2321. This history and patterns of discrimination are well-documented, *see id.* at 1017-27 (detailing history), which Dr. Burton further detailed at trial. PFOF Nos. 48-56.

196. Concerning voting discrimination, for example, Arizona has a history of completely disenfranchising minority voters, imposing a discriminatory literacy test used for decades to deny voting or deter voters through intimidation, and employing discriminatory voter purge practices. PFOF Nos. 54-56. To illustrate, Arizona unsuccessfully challenged the Congressional ban on literacy tests in 1970, during which the U.S. Supreme Court noted the stark disparities in Latino and Native voters' participation. *Oregon v. Mitchell*, 400 U.S. 112, 118, 132 (1970). Because of its long history of discriminatory burdens on minority voting, Arizona was one of nine states subject to VRA preclearance requirements, and the DOJ declined to preclear numerous discriminatory laws. PFOF Nos. 45, 62; *Hobbs*, 948 F.3d at 1024-25 (collecting preclearance objections).

197. Outside of voting, Arizona has a long history of discrimination in education, housing, employment, public accommodations, government services, and other social institutions such as marriage. PFOF Nos. 48-53, 78. Official discrimination has continued to today. Recent high-profile incidents that discriminate against and strike fear in minority groups include the Chandler Roundup and those related to Sheriff Joe Arpaio's practices and the SB 1070 "show me your papers" law. PFOF No. 64. Because of Arizona's history of discrimination, some scholars have deemed it "Jim Crow Southwest." PFOF No. 48; *see also* Kristina M. Campbell, *Rising Arizona: The Legacy of the Jim Crow Southwest on Immigration Law and Policy After 100 Years of Statehood*, 24 Berkeley La Raza L.J. 1, 13 (2014). The Challenged Laws interact with Arizona's history and persistent patterns of discrimination to impose continuing disparate burdens on minority voters. PFOF Nos. 60, 68.

**G. Senate Factor 5: Lasting Effects of Arizona's Discrimination**

198. Under Senate Factor 5, the discrimination that Arizona minority voters have faced has led to inequality in education, wealth, health, housing, and overall wellbeing that persists today. "The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by [minority] and white voters to elect their preferred representatives" or to participate in the political process. *Gingles*, 478 U.S. at 47. Minority groups, particularly Latino, Black, and Native American Arizonans, face stark disparities in these social areas. PFOF Nos. 42-43, 54, 58-60, 64; *see also Hobbs*, 948 F.3d at 1027-28 (noting lasting disparities).

199. Defendants do not seriously contest the existence of the significant current and historical inequality and discrimination in Arizona. The continuing disparities today directly relate to economic and social disadvantage driven by past structural and intentional discrimination, which magnifies the impact of the Challenged Laws. PFOF Nos. 63-64, 68, 471, 481-90.

**H. Additional Senate Factors Favor Plaintiffs**

200. Other Senate factors, particularly factors 2, 6, 7, 8, and 9 demonstrate that Plaintiffs have satisfied Section 2's totality of circumstances test here. First, under Factor 2, "[v]oting in Arizona is racially polarized." *Hobbs*, 948 F.3d at 1026. Second, as Dr. Burton explained, racial appeals in political campaigns under Factor 6 continue to today and are often tied to the claims of voter fraud that are pervasive in Arizona but lack legitimacy. PFOF Nos. 65-67, 74. The Ninth Circuit has detailed several other racial appeals in campaigning. *See, e.g.*, *Hobbs*, 948 F.3d at 1027-28; *accord DNC v. Reagan*, 329 F. Supp. at 876-77 (further discussing racial appeals in electoral environment). Third, under Factor 7, "it is undisputed that American Indian, Hispanic, and African American citizens are underrepresented in public office in Arizona." *Hobbs*, 948 F.3d at 1029. Fourth, under Factor 8, there is "extensive undisputed evidence showing that Arizona has significantly underserved its minority population." *Id.* at 1030. Finally, as noted *supra*, the tenuousness of Arizona's justification behind the laws further supports Plaintiffs under Factor 9.

201. In sum, trial evidence showed that, considering the totality of the circumstances, the Challenged Laws "result[] in a denial or abridgement" of Latino and naturalized Arizonans' right to vote. 52 U.S.C. § 10301(a).

## XIII. Documentary Proof of Residence: Differential Treatment of State and Federal Form Voters Violates the Equal Protection Clause and the National Voter Registration Act

202. In the partial summary judgment order, the Court held that "Section 6 [of the NVRA] preempts HB 2492's DPOR requirement." ECF No. 534 at 9. No party opposed the Plaintiffs' motion for summary judgment on this issue. But just as the ruling in *Arizona v. Inter Tribal Council of Arizona*, holding that Section 6 of the NVRA preempts Arizona's DPOC requirement, led to the disparate treatment of State and Federal Form applicants, Defendant-Intervenor RNC argues that, under HB 2492, State Forms submitted without DPOR must be rejected even though otherwise identical Federal Forms submitted without DPOR cannot be rejected pursuant to this Court's order. ECF No. 586 at 21.

203. The Court finds that such arbitrary differential treatment of voters based solely on the paper form they use to register to vote violates both the Equal Protection Clause and the National Voter Registration Act.

**A. The Equal Protection Clause Prohibits Differential DPOR Treatment**

204. As noted above, the Supreme Court held in *Bush v. Gore* that "arbitrary and disparate treatment" in either the "allocation of the franchise" or "the manner of its exercise" is unlawful. 531 U.S. at 104; *see also Ne. Ohio Coal. for Homeless v. Husted*, 696 F.3d 580, 598 (6th Cir. 2012) (recognizing *Bush v. Gore* arbitrary and disparate treatment claim); *Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 882, 894 (9th Cir. 2003) (same), *rev'd on other grounds*, 344 F.3d 914 (9th Cir. 2003) (en banc). Likewise, the Ninth Circuit has held that "[r]estrictions on voting can burden equal protection rights as well as 'interwoven strands of "liberty"' protected by the First and Fourteenth Amendments." *Dudum v. Arntz*, 640 F.3d 1098, 1105-06 (9th Cir. 2011) (quoting *Anderson*, 460 U.S. at 787).

205. While Defendants argue that *Bush v. Gore* "does not supply an independent or freestanding claim or applicable doctrinal rubric," ECF No. 571 at 17, they do not explain why the principles of *Bush v. Gore* would not apply to circumstances where otherwise similarly situated voters are treated in an arbitrary and disparate manner. They do, under the longstanding Equal Protection principles that "a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972).

206. In any event, the *Anderson-Burdick* framework results in the same analysis. Under that framework, only "reasonable, nondiscriminatory restrictions" are subject to a more relaxed standard of review. *Burdick*, 504 U.S. 434. Moreover, *Anderson-Burdick* imposes a "means-end fit framework," *Pub. Integrity All.*, 836 F.3d at 1024, that necessarily requires states to justify decisions to treat similarly situated voters differently. *See Obama for Am. V. Husted*, 697 F.3d at 435 (holding a voting restriction unlawful

because it differentiated among groups of voters where "there [wa]s no relevant distinction between the two groups").

207. The undisputed evidence establishes that, at least with respect to establishing residence, there is no rational or relevant distinction between voter registration applicants who happen to use the State Form or the Federal Form (and that, indeed, drawing such a distinction would wreak havoc on election administration). *See* PFOF Nos. 532-33. As this Court has previously noted, the forms are "substantively indistinguishable," ECF No. 534 at 22 n.13. Moreover, given this Court's holding that the LULAC Consent Decree remains in place with respect to DPOC, *id.* at 21-22, it would be illogical to treat State Form and Federal Form applicants equally as to one documentary proof requirement (DPOC) and not the other (DPOR).

208. The undisputed evidence further establishes that such differential treatment will necessarily burden voters because otherwise eligible voter registration applicants will have their applications denied for lack of DPOR solely because they submitted a State rather than Federal Form, just as occurred with DPOC prior to the LULAC Consent Decree. PFOF Nos. 524 (citing Petty testimony regarding the denials that occurred prior to the consent decree), 535 (finding that most voters use the State Form).

209. Moreover, Plaintiffs offered testimony establishing that, notwithstanding the relatively broad definition of DPOR adopted by this Court (*see* ECF No. 534 at 33-34), the DPOR requirement will still impose a meaningful and disparate burden on some voters. PFOF Nos. 528, 530-31. For example, given the lack of any present general declaration of residence option (except for those experiencing homelessness, *see* ECF No. 534 at 34), PFOF No. 528, people living in rural areas without a standard address who lack an ADOT credential or tribal identification will still struggle to obtain and provide a compliant DPOR document. And any additional documentation requirement adds logistical burdens because voters must have access to printers or copiers to comply.

210. While Intervenor-Defendant RNC argues that "sufficient corroboration of . . . Arizona residency [is] necessary to verify a registrant's eligibility and to administer the election process," ECF No. 586 at 19,[11] this argument fails for two reasons.

211. First, it does not provide a rational reason for treating State Form and Federal Form applicants differently. The question is not whether requiring DPOR is ever rational (in fact, this claim does not challenge the DPOR requirement for registration in state elections) but rather whether, for purposes of registering for federal elections, requiring DPOR can rationally hinge on the piece of paper an applicant turns in. That distinction is at the heart of Plaintiffs' Equal Protection claim and Intervenor-Defendant does not answer it. *See, e.g.*, *Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 590 (9th Cir. 2008) ("[T]he question here is not simply whether administrative costs were a rational reason for denying Lazy Y's bid. In short, Lazy Y's claims suggest that administrative costs only matter in some cases—i.e., when the high bidder is a conservationist. The real question is whether there is a rational basis for this distinction. On this record, there is not.").

212. Second, in the nine-day trial, Intervenor-Defendant RNC did not put forward *any* evidence to support the bald factual proposition that DPOR is necessary to administer the election process, or in other words, that the current systems for verifying residence are insufficient. To the contrary, this Court finds that the record evidence uniformly supports the proposition that DPOR is not necessary to election administration. PFOF Nos. 533-34.

213. On this record, just as "it would be utterly irrational to limit the franchise on the basis of height or weight," it would be utterly irrational to allocate access to the franchise based on the heading on the voter's registration form. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. at 452 (Stevens, J., concurring).

214. It is well-established that "since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged

[11] Defendants' trial briefs did not address the Equal Protection Clause claim addressed here. *See* ECF Nos. 583, 585-86. This argument was only raised in Intervenor-Defendant RNC's briefing on the NVRA issues related to differential treatment of the State and Federal Forms. ECF No. 586 at 19-22.

infringement of the right of citizens to vote must be carefully and meticulously scrutinized." *Reynolds v. Sims*, 377 U.S. 533, 562 (1964). This Court finds that, at minimum, such a fundamental right cannot be withheld solely based on the arbitrary and unsupported distinction of whether a voter submitted a State Form or Federal Form.

**B. Sections 6 and 8(a) of the NVRA Prohibit Differential DPOR Treatment**

215. In the partial summary judgment opinion in this case, the Court held that even if the LULAC Consent Decree was not still in effect, the NVRA would preclude Arizona from requiring DPOC from State Form applicants for purpose of registering for federal elections. ECF No. 534 at 22 n.13 ("As long as Arizona has chosen to produce a State Form that offers registration for federal elections, it must abide by the requirements outlined in Section 6."). The precise same logic applies to DPOR.

216. The NVRA protects applicants using the State Form to register for federal elections. While Section 6 of the NVRA allows states to develop and use their own state mail voter registration form for registration in federal elections, 52 U.S.C. § 20505(a)(2), those state mail voter registration forms must meet the requirements of Section 9.

217. Pursuant to Sections 6 and 9, a state mail voter registration "may require only such identifying information . . . and other information . . . as is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration." 52 U.S.C. § 20508(b)(1); *Fish I*, 840 F.3d at 737-38 (construing Section 5 of the NVRA but holding that the requirements of Section 5 and Section 9 are "analogous").

218. Thus, any additional requirements imposed by a state mail voter registration form must be supported by actual evidence that such requirements are "necessary" to assessing eligibility or administering voter registration. *Fish II*, 957 F.3d 1105 (affirming district court's holding, after trial, that Kansas's DPOC requirement exceeded the "minimum amount of information necessary" standard for motor vehicle agency registrations because Kansas failed to show that an affirmation of citizenship was insufficient).

219. Intervenor-Defendant RNC argues that *Fish I* and *II* are inapplicable because they addressed the NVRA's motor voter provision and according to the RNC the motor voter provision's "minimum information necessary" standard is stricter than Section 9. ECF No. 586 at 22 n.12. But even assuming "minimum information necessary" is stricter than "information . . . as is necessary," such parsing of words does not change the record in this case and the lack of evidence that DPOR is necessary at all. *Fish I*, 840 F.3d. at 734.

220. While residency is a prerequisite to voter eligibility, ECF No. 586 at 20, the RNC failed to produce any evidence that current procedures, including attestation to residency, are insufficient for election officials to administer that requirement. *Fish II*, 957 F.3d at 1142 (noting that Kansas failed to show that noncitizens were voting prior to imposition of the DPOC requirement).

221. Given that (1) DPOR is not required by the Federal Form, (2) Defendants put forward no evidence that DPOR is "necessary" to assessing an applicant's eligibility or voter registration administration, and (3) the record evidence reflects that the DPOR requirement is *not* necessary to election administration, the Court finds that imposing the DPOR requirement on applications to register to vote in federal elections runs afoul of Section 6 of the NVRA.

222. For similar reasons, any practice denying State Form applications for purposes of registration in federal elections solely because they lack DPOR also runs afoul of Section 8(a) of the NVRA.

223. Section 8 requires that each State "ensure that any eligible applicant is registered to vote" if their "valid voter registration form" is received "not later than the lesser of 30 days, or the period provided by State law, before the date of the election." 52 U.S.C. § 20507(a)(1). Since voter registration applications to register in federal elections are "valid" regardless of whether they include DPOR, *see supra*, any denial on that basis runs afoul of Section 8(a).

**C. Section 7 of the NVRA Prohibits Differential DPOR Treatment of Forms from Public Assistance Agencies**

224. Plaintiffs have established that the differential treatment of State and Federal Form applications violates Section 7 of the NVRA because such treatment will result in public assistance agencies mandated to provide voter registration services failing to distribute a voter registration form that is the "equivalent" of the Federal Form. 52 U.S.C. § 20506(a)(6)(A).

225. It is undisputed that public assistance agencies in Arizona rely on the State Form applications supplied to them by the Secretary of State to provide their NVRA-mandated voter registration services. PFOF No. 536.

226. To examine the requirements of Section 7, the Court will "begin with the statutory text and end there if the statute's language is plain." *United States v. Lopez*, 998 F.3d 431, 435 (9th Cir. 2021). This Court finds that a form is not the "equivalent" of the Federal Form if it will be rejected for failure to provide accompanying DPOR where the Federal Form would not. This is not a particularly close call given the plain meaning of equivalent, which means "something equal in value or worth" as well as "something tantamount or virtually identical." *Equivalent*, Oxford English Dictionary, Oxford University Press, September 2023; *see also Equivalent (noun)*, Cambridge Dictionary, ("something that has the same amount, value, purpose, qualities, etc. as something else"); *Equivalent (adj)*, Black's Law Dictionary (11th ed. 2019) ("1. Equal in value, force, amount, effect, or significance. 2. Corresponding in effect or function; nearly equal; virtually identical."); *see also Fed. Election Comm'n v. Wis. Right To Life, Inc.*, 551 U.S. 449, 470 (2007) (Op. of Roberts, C.J.) (adopting strict definition of "functional equivalent").

227. Nonetheless, Intervenor-Defendant RNC argues for a different definition of "equivalent," proposing that "the State Form retains its 'equivalency' to the Federal Form for NVRA purposes as long as the informational items it requires are necessary to

ascertaining voters' qualifications and administering elections—even if the EAC has opted not to include the same fields in the Federal Form." ECF No. 586 at 20.

228. But such a contortion of the plain meaning of equivalent is not appropriate here. The statute prescribes that the agencies use "*the* mail voter registration application form described in section 20508(a)(2)" or its equivalent. 52 U.S.C. 20506(a)(6) (emphasis added). In turn, Section 20508(a)(2) directs the Election Assistance Commission to create a mail voter registration application, i.e. the Federal Form. Therefore, the statute does not, as the RNC suggests (ECF No. 586 at 19), say that agencies can use the Federal Form or any form that applies with 20508(b)'s standards (in fact Section 7 does not reference the standards of 20508(b) at all). If Congress wanted to say that was the rule, it could have. Instead, it said that agencies can use the Federal Form or its equivalent. *See, e.g.*, *Valdez v. Squier*, 676 F.3d 935, 946 (10th Cir. 2012) (rejecting interpretation of Section 7 term contrary to plain meaning because "there is no express indication by Congress that it intended for the phrase, as used in Section 7, to carry a specialized—and indeed, unusual—meaning" (citation and quotations omitted)); *Ga. State Conf. of N.A.A.C.P. v. Kemp*, 841 F. Supp. 2d 1320, 1339 (N.D. Ga. 2012) (reaching similar conclusion).

229. In any event, for the reasons stated above, even if the RNC's contorted reading applied, the RNC has failed to produce any evidence that the DPOR requirement complies with Section 20508(b)'s requirements. It does not.

DATED: December 12, 2023 Respectfully submitted,

**ARNOLD & PORTER KAYE SCHOLER, LLP**
John A. Freedman*
Jeremy Karpatkin*
Erica McCabe*
Leah Motzkin*
601 Massachusetts Ave., N.W.
Washington, D.C. 20001
John.Freedman@arnoldporter.com
Jeremy.Karpatkin@arnoldporter.com
Erica.McCabe@arnoldporter.com
Leah.Motzkin@arnoldporter.com
(202) 942-5000

*/s/ Jon Sherman*
**FAIR ELECTIONS CENTER**
Jon Sherman*
Michelle Kanter Cohen*
Beauregard Patterson*
Emily Davis*
1825 K St. NW, Ste. 450
Washington, D.C. 20006
jsherman@fairelectionscenter.org
mkantercohen@fairelectionscenter.org
bpatterson@fairelectionscenter.org
edavis@fairelectionscenter.org
(202) 331-0114

**ARIZONA CENTER FOR LAW IN THE PUBLIC INTEREST**
Daniel J. Adelman (AZ Bar No. 011368)
352 E. Camelback Rd., Suite 200
Phoenix, AZ 85012
danny@aclpi.org
(602) 258-8850

**ARNOLD & PORTER KAYE SCHOLER, LLP**
Leah R. Novak*
Andrew Hirschel*
250 West 55th Street
New York, NY 10019
Leah.Novak@arnoldporter.com
Andrew.Hirschel@arnoldporter.com
(212) 836-8000

*Attorneys for Poder Latinx, Chicanos Por La Causa, and Chicanos Por La Causa Action Fund*

/s/ *Ernest Herrera*
**MEXICAN AMERICAN LEGAL DEFENSE AND EDUCATIONAL FUND**
Ernest Herrera*
Erika Cervantes*
634 South Spring Street, 11th Floor
Los Angeles, CA 90014
Telephone: (213) 629-2512
Facsimile: (213) 629-0266
eherrera@maldef.org
ecervantes@maldef.org

**ORTEGA LAW FIRM**
Daniel R. Ortega Jr.
361 East Coronado Road, Suite 101
Phoenix, AZ 85004-1525
Telephone: (602) 386-4455
Email: danny@ortegalaw.com

*Attorneys for Promise Arizona and Southwest Voter Registration Education Project*

/s/ *Christopher D. Dodge*
**HERRERA ARELLANO LLP**
Roy Herrera (AZ Bar No. 032901)
Daniel A. Arellano (AZ Bar. No. 032304)
Jillian L. Andrews (AZ Bar No. 034611)
1001 North Central Avenue
Suite 404
Phoenix, Arizona 85004
Phone: (602) 567-4820
roy@ha-firm.com
daniel@ha-firm.com
jillian@ha-firm.com

**ELIAS LAW GROUP LLP**
Marc E. Elias*
Elisabeth C. Frost*
Christopher D. Dodge*
Mollie DiBrell*
Alexander F. Atkins*
Daniela Lorenzo*
Qizhou Ge*
250 Massachusetts Ave NW, Suite 400
Washington, DC 20001
Phone: (202) 968-4513
Facsimile: (202) 968-4498
melias@elias.law
efrost@elias.law
cdodge@elias.law
mdibrell@elias.law
aatkins@elias.law
dlorenzo@elias.law
age@elias.law

*Attorneys for Mi Familia Vota and Voto Latino*

/s/ Danielle Lang

**BARTON MENDEZ SOTO**
James Barton (AZ Bar No. 023888)
401 W. Baseline Road
Suite 205
Tempe, AZ 85283
480-418-0668
james@bartonmendezsoto.com

**CAMPAIGN LEGAL CENTER**
Danielle Lang*
Jonathan Diaz*
Molly Danahy*
Hayden Johnson*
Brent Ferguson*
1101 14th St. NW, Suite 400
Washington, D.C. 20005
(202) 736-2200
dlang@campaignlegalcenter.org
jdiaz@campaignlegalcenter.org
mdanahy@campaignlegalcenter.org
hjohnson@campaignlegalcenter.org
nhansen@campaignlegalcenter.org

**DEPARTMENT OF JUSTICE**
**SAN CARLOS APACHE TRIBE**
Alexander B. Ritchie
(AZ Bar No. 019579)
Attorney General
Chase A. Velasquez*
NM Bar No. 019148
Assistant Attorney General
Post Office Box 40
16 San Carlos Ave.
San Carlos, AZ 85550
Alex.Ritchie@scat-nsn.gov
Chase.Velasquez@scat-nsn.gov

**FREE SPEECH FOR PEOPLE**
Courtney Hostetler* (MA# 683307)
John Bonifaz* (MA# 562478)
Ben Clements* (MA# 555082)
Ronald Fein* (MA# 657930)
1320 Centre Street, Suite 405
Newton, MA 02459
(617) 249-3015
chostetler@freespeechforpeople.org
jbonifaz@freespeechforpeople.org
bclements@freespeechforpeople.org
rfein@freespeechforpeople.org

**MAYER BROWN LLP**
Lee H. Rubin* (CA# 141331)
Two Palo Alto Square, Suite 300
3000 El Camino Real
Palo Alto, CA 94306-2112
(650) 331-2000
lrubin@mayerbrown.com

Gary A. Isaac* (IL# 6192407)
Daniel T. Fenske* (IL# 6296360)
William J. McElhaney, III*
(IL# 6336357)
71 S. Wacker Drive
Chicago, IL 60606
(312) 782-0600
dfenske@mayerbrown.com
gisaac@mayerbrown.com
Rachel J. Lamorte* (NY# 5380019)
1999 K Street NW
Washington, DC 20006
(202) 362-3000
rlamorte@mayerbrown.com

*Attorneys for Living United for Change in Arizona, League of United Latin American Citizens, Arizona Students' Association, ADRC Action, Inter Tribal Council of Arizona, Inc., San Carlos Apache Tribe, and Arizona Coalition for Change*

*/s/ Christopher E. Babbitt*
**PAPETTI SAMUELS WEISS MCKIRGAN LLP**
Bruce Samuels (AZ Bar No. 015996)
Jennifer Lee-Cota (AZ Bar No. 033190)
bsamuels@pswmlaw.com
jleecota@pswmlaw.com
Scottsdale Quarter
15169 North Scottsdale Road
Suite 205
Scottsdale, AZ 85254
+1 480 800 3530

**WILMER CUTLER PICKERING HALE AND DORR LLP**
Seth P. Waxman*
Daniel S. Volchok*
Christopher E. Babbitt*
Britany Riley-Swanbeck*
seth.waxman@wilmerhale.com
daniel.volchok@wilmerhale.com
christopher.babbitt@wilmerhale.com
britany.riley-swanbeck@wilmerhale.com
2100 Pennsylvania Avenue N.W.
Washington, D.C. 20037
+1 202 663 6000 (telephone)
+1 202 663 6363 (facsimile)

Kelsey Quigley*
kelsey.quigley@wilmerhale.com
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
+1 650 858 6000 (telephone)
+1 650 858 6100 (facsimile)

*Attorneys for the Democratic National Committee and Arizona Democratic Party*

*/s/ Amit Makker*
**LATHAM & WATKINS LLP**
Sadik Huseny*
*sadik.huseny@lw.com*
Amit Makker*
*amit.makker@lw.com*
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6538
Telephone: (415) 391-0600
Facsimile: (415) 395-8095

**ASIAN AMERICANS ADVANCING JUSTICE-AAJC**
Niyati Shah*
*nshah@advancingjustice-aajc.org*
Terry Ao Minnis*
*tminnis@advancingjustice-aajc.org*
1620 L Street NW, Suite 1050
Washington, DC 20036
Telephone: (202) 296-2300
Facsimile: (202) 296-2318

**SPENCER FANE**
Andrew M. Federhar
(AZ Bar No. 006567)
*afederhar@spencerfane.com*
2415 East Camelback Road, Suite 600
Phoenix, AZ 85016
Telephone: (602) 333-5430
Facsimile: (602) 333-5431

*Attorneys for Plaintiff Arizona Asian American Native Hawaiian and Pacific Islander for Equity Coalition*

**U.S. DEPARTMENT OF JUSTICE**

GARY M. RESTAINO
United States Attorney, District of Arizona

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

*/s/ Jennifer J. Yun*
RICHARD A. DELLHEIM
EMILY R. BRAILEY
SEJAL JHAVERI
MARGARET M. TURNER
JENNIFER J. YUN
Civil Rights Division, Voting Section
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530
(202) 353-5724
Richard.Dellheim@usdoj.gov
Emily.Brailey@usdoj.gov
Sejal.Jhaveri@usdoj.gov
Margaret.M.Turner@usdoj.gov
Jennifer.Yun@usdoj.gov

*Attorneys for the United States*

/s/ *Allison Neswood*
**OSBORN MALEDON, P.A.**
David B. Rosenbaum
AZ No. 009819
Joshua J. Messer
AZ No. 035101
2929 North Central Avenue, 21st Floor
Phoenix, Arizona 85012-2793
(602) 640-9000
drosenbaum@omlaw.com
jmesser@omlaw.com

**LAWYERS COMMITTEE FOR CIVIL RIGHTS UNDER LAW**
Ezra Rosenberg*
DC No. 360927, NJ No. 012671974
Ryan Snow*
1500 K Street NW, Suite 900
Washington, DC 20005
(202) 662-8600 (main)
erosenberg@lawyerscommittee.org
jtucker@lawyerscommittee.org
rsnow@lawyerscommittee.org

**NATIVE AMERICAN RIGHTS FUND**
Allison A. Neswood*
CO No. 49846
neswood@narf.org
Michael S. Carter
AZ No. 028704, OK No. 31961
carter@narf.org
Matthew Campbell*
NM No. 138207, CO No. 40808
mcampbell@narf.org
Jacqueline D. DeLeon*
CA No. 288192
jdeleon@narf.org
1506 Broadway
Boulder, CO 80301
(303) 447-8760 (main)

Samantha B. Kelty
AZ No. 024110, TX No. 24085074
kelty@narf.org
950 F Street NW, Suite 1050,
Washington, D.C. 20004
(202) 785-4166 (direct)

**GILA RIVER INDIAN COMMUNITY**
Javier G. Ramos
AZ No. 017442
Post Office Box 97
Sacaton, Arizona 85147
(520) 562-9760
thomas.murphy@gric.nsn.us
javier.ramos@gric.nsn.us
*Representing Gila River Indian Community Only*

**TOHONO O'ODHAM NATION**
Howard M. Shanker (AZ Bar 015547)
Attorney General, Tohono O'odham Nation
Marissa L. Sites (AZ Bar 027390)
Assistant Attorney General, Tohono O'odham Nation
P.O. Box 830
Sells, Arizona 85634
(520) 383-3410
Howard.Shanker@tonation-nsn.gov
Marissa.Sites@tonation-nsn.gov
*Representing Tohono O'odham Nation Only*

*Attorneys for Tohono O'odham Nation, Gila River Indian Community, Keanu Stevens, Alanna Siquieros, and LaDonna Jacket*

**Admitted Pro Hac Vice*
***Admitted in Arizona, D.C. and Nevada*
.

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of this document was served on all counsel of record through the Court's CM/ECF system on the 12th of December 2023.

DATED: December 12, 2023

Daniel A. Arellano
Daniel A. Arellano