1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Mi Familia Vota, et al., | No. CV-22-00509-PHX-SRB (Lead) |
| Plaintiffs, | **DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| v. | |
| Adrian Fontes, et al., | |
| Defendants. | |
| AND CONSOLIDATED CASES. | No. CV-22-00519-PHX-SRB<br>No. CV-22-01003-PHX-SRB<br>No. CV-22-01124-PHX-SRB<br>No. CV-22-01369-PHX-SRB<br>No. CV-22-01381-PHX-SRB<br>No. CV-22-01602-PHX-SRB<br>No. CV-22-01901-PHX-SRB |

1

# TABLE OF CONTENTS

## FINDINGS OF FACT

I.           **History of Arizona's Proof of Citizenship Requirement** ......................... 7

        A.    **In 2004, Arizona voters decided to require proof of citizenship to register to vote.** ....................... 7

        B.    **In *Gonzalez*, this Court upheld the proof of citizenship requirement.** .... 9

        C.    **In *Inter Tribal*, the Supreme Court deemed the proof of citizenship requirement partially preempted, but its decision was limited.** ........... 11

        D.    **In the *LULAC* Consent Decree, the Arizona Secretary of State agreed to allow more voters to register without proof of citizenship.** .................. 13

        E.    **The EPM provides details on how county recorders address proof of citizenship.** ........................ 15

II.          **Risk of Ineligible Voters Registering or Voting** ....................................... 18

        A.    **There is a risk of non-citizens registering and voting, and there is evidence that it occurs, but very rarely.** ....................... 18

        B.    **Absence of evidence is not always evidence of absence.** ........................ 24

        C.    **There is evidence of other kinds of ineligible voters registering and voting or attempting to do so.** ........................ 25

        D.    **Elections in Arizona are sometimes decided by tiny margins.** ............... 28

III.        **Risk of Low Voter Confidence in Elections** ............................................. 28

        A.    **Arizonans are concerned about election integrity and the possibility of non-citizens registering and voting.** ........................ 28

        B.    **The challenged laws may improve Arizonans' confidence in elections.** 29

IV.        **Legislative History of Challenged Laws** ................................................... 30

        A.    **House Bill 2492** ........................ 30

        B.    **House Bill 2243** ........................ 33

V.          **Procedural History of This Case** ............................................................... 35

        A.    **Plaintiffs are challenging the laws on their face, before implementation.** ........................ 35

        B.    **The Court has already ruled on parts of the challenged laws.** ............... 36

        C.    **Significant parts of the challenged laws remain at issue.** ....................... 37

**VI.        Pre-Registration Citizenship Verification Process (HB 2492 § 4)** .........**37**

    **A.    HB 2492's citizenship verification process is generally consistent with policies that counties were already following.** ................................ 37

    **B.    Plaintiffs have not shown that county recorders will use the databases in HB 2492 unreliably for citizenship verification.** ................................ 39

    **C.    Adding databases to the pre-existing citizenship verification process increases accuracy and efficiency.** ................................ 48

    **D.    Adding databases to the pre-existing citizenship verification process also improves voter confidence.** ................................ 49

    **E.    Plaintiffs have not shown that referrals to the county attorney and Attorney General would cause harm.** ................................ 49

    **F.    Plaintiffs' other concerns about implementation are unsupported.** ....... 50

    **G.    Plaintiffs have not shown actual or imminent concrete and particularized injury due to HB 2492's citizenship verification process.** ................................ 55

**VII.       Post-Registration Citizenship Review (HB 2243 § 2)** .............................**69**

    **A.    HB 2243's citizenship review process is similar to policies regarding juror disclosures of non-citizenship that counties were already following.** ................................ 69

    **B.    Plaintiffs have not shown that county recorders will use the data sources in HB 2243 unreliably for citizenship review.** ................................ 70

    **C.    Post-registration citizenship review improves accuracy of voter rolls.** .. 78

    **D.    Post-registration citizenship review improves voter confidence.** ........... 79

    **E.    Using multiple data sources in post-registration citizenship review further increases accuracy and efficiency.** ................................ 79

    **F.    Plaintiffs have not shown that referrals to the county attorney and Attorney General would cause harm.** ................................ 80

    **G.    Plaintiffs' other concerns about implementation are unsupported.** ....... 81

    **H.    Plaintiffs have not shown actual or imminent concrete and particularized injury due to HB 2243's citizenship review process.** ..... 84

**VIII.      Referring Federal-Only Voters to Attorney General (HB 2492 § 7)** .....**97**

    **A.    The referrals to the Attorney General have not been made.** .................. 97

    **B.    The Attorney General has not attempted to verify citizenship of these registrants.** ................................ 97

**C.**   **Plaintiffs have not shown that, if the Attorney General attempts to verify citizenship, she would do so in a harmful or unreliable way.** ..... 98

**D.**   **Plaintiffs have not shown that the Attorney General would prosecute anyone under A.R.S. § 16-143, much less wrongfully.** ........................... 100

**E.**   **The Attorney General's verification of citizenship may increase voter confidence.** ................................................................................. 101

**F.**   **Plaintiffs have not shown actual or imminent concrete and particularized injury due to the referral of federal-only voters to Attorney General.** ....................................................................... 102

**IX.**   **Birth Place Requirement (HB 2492 § 4)** ......................................... **111**

**A.**   **Uses of Birthplace Information** ................................................. 112

**B.**   **Applicants' notice and opportunity to cure** ............................. 115

**C.**   **Non-US Plaintiffs have not shown actual or imminent concrete and particularized injury due to HB 2492's birth place requirement** ........ 116

**X.**   **Proof of Location of Residence (HB 2492 § 5)** ............................. **123**

**A.**   **How the Court has interpreted the requirement** ...................... 123

**B.**   **How County Recorders may apply the requirement** ................ 124

**C.**   **Plaintiffs have not shown actual or imminent concrete and particularized injury due to HB 2492's proof of location of residence requirement.** .................................................................. 124

**XI.**   **Lack of Discriminatory Intent** ........................................................ **128**

**A.**   **Disparate Impact** ........................................................................ 129

**B.**   **Historical Background** ................................................................ 131

**C.**   **Events Preceding Passage** ......................................................... 132

**D.**   **Procedural Departures** ............................................................... 132

**E.**   **Substantive Departures** ............................................................. 133

**F.**   **Legislative History** ..................................................................... 134

**G.**   **Unpersuasive Evidence from Plaintiffs' Expert Derek Chang** ........... 136

**H.**   **Unpersuasive Evidence from Plaintiffs' Expert Orville Vernon Burton** .............................................................................................................. 138

**CONCLUSIONS OF LAW**

**I.**   **Generally Applicable Legal Standards** ............................................. **142**

**A.**   **Standing** ....................................................................................... 142

B. Ripeness ................................................................. 143

C. Injunctive and declaratory relief ................................. 144

D. Facial versus as-applied Challenges ........................... 145

II. Legal Standards for Plaintiffs' Causes of Action ................................... 146

A. Undue burden on right to vote ................................... 146

B. Discriminatory intent ................................................ 148

C. Differential treatment not based on protected classification .............. 151

D. Arbitrary and disparate treatment and/or unfettered discretion........ 151

E. 52 U.S.C. § 10101(A)(2)(A): Discriminatory standards, practices or procedures ........................................ 152

F. 52 U.S.C. § 10101(A)(2)(B): Materiality.................................... 152

G. NVRA Section 6: "Accept and use" requirement ................. 153

H. NVRA Section 8(b): Uniform & non-discriminatory list maintenance ........................................................... 153

I. NVRA Section 7: Public assistance agencies........................... 153

J. NVRA Sections 6 and 8(a): Proof of residence location requirement for State Form............................ 153

K. Voting Rights Act of 1965, Section 2 ........................... 154

L. Plaintiffs that Presented No Evidence on Standing ............... 154

III. Pre-Registration Citizenship Verification Process (HB 2492 § 4) ....... 155

A. Plaintiffs lack standing to challenge these provisions at this time....... 155

B. Alternatively, Plaintiffs lack standing to challenge the provisions requiring MVD and SAVE checks, and the other challenges are unripe. ...................... 156

C. Plaintiffs have not shown that HB 2492's citizenship verification process imposes an unconstitutional burden on the right to vote....... 157

D. Plaintiffs have not shown that HB 2492's citizenship verification process violates equal protection or is otherwise improperly arbitrary. ...................... 160

E. Plaintiffs have not shown that HB 2492's citizenship verification process violates NVRA § 7........................ 163

F. Plaintiffs have not shown that HB 2492's citizenship verification process violates Section 2 of the Voting Rights Act. .................... 164

**IV.**     **Conclusions about Post-Registration Citizenship Review (HB 2243 § 2) 168**

    **A.**     **Plaintiffs lack standing to challenge these provisions at this time.**....... 168

    **B.**     **Alternatively, Plaintiffs' challenges to the post-registration citizenship review process are unripe.**........................................................................ 169

    **C.**     **Plaintiffs have not shown that HB 2243's citizenship review process imposes an unconstitutional burden on the right to vote.**.................... 170

    **D.**     **HB 2243's citizenship review process does not violate equal protection.**....................................................................................................... 172

    **E.**     **The citizenship review process does not violate NVRA § 6.**................. 175

    **F.**     **The citizenship review process does not violate NVRA § 8(b).**........... 176

    **G.**     **These provisions do not violate Section 2 of the Voting Rights Act.** ... 179

    **H.**     **The "reason to believe" provision does not provide unfettered discretion in violation of the Fourteenth and Fifteenth Amendment**.. 182

    **I.**     **The "reason to believe" provision does not violate the Non-Discrimination Provision (52 U.S.C. § 10101(a)(2)(A)).**........................ 183

**V.**     **Conclusions about Referring Federal-Only Voters to Attorney General (HB 2492 § 7)**.............................................................................................. **186**

    **A.**     **Plaintiffs lack standing to challenge the requirement to refer certain voters to the Attorney General, or alternatively, such challenges are unripe.**................................................................................................... 186

    **B.**     **Referring to the Attorney General voters who have not provided proof of citizenship does not impose an undue burden on the right to vote.** 187

    **C.**     **This provision does not violate equal protection.**................................... 187

    **D.**     **These provisions do not violate NVRA § 8(b).**....................................... 189

**VI.**     **Conclusions about Birth Place Requirement (HB 2492 § 4)** ............... **194**

    **A.**     **Non-US Plaintiffs lack standing to challenge the birthplace requirement.**.............................................................................................. 194

    **B.**     **The birth place requirement does not impose an unconstitutional burden on the right to vote.**...................................................................... 194

    **C.**     **This provision does not violate equal protection.**................................... 195

    **D.**     **This provision does not violate the Materiality Provision (52 U.S.C. § 10101(a)(2)(B)).**................................................................................... 196

    **E.**     **These provisions do not violate NVRA § 7**............................................ 200

      **F.**    **These provisions do not violate Section 2 of the Voting Right Act.**...... 201

**VII.**    **Conclusions about Proof of Location of Residence (HB 2492 § 5) ...... 203**

      **A.**    **Plaintiffs lack standing to challenge this provision at this time.**........... 203

      **B.**    **Plaintiffs have not shown that requiring proof of location of residence for State Forms but not Federal Forms for federal elections would be an unconstitutional burden on the right to vote.** ........................................ 203

      **C.**    **The proof of location of residence requirement does not violate equal protection.** .......................................................................................... 204

      **D.**    **This provision does not violate NVRA § 6 or § 8(a).**............................ 207

**VIII.**    **Discriminatory Intent**................................................................................**210**

The active Defendants (the State, Attorney General, RNC, and Legislative Intervenors) respectfully submit the following proposed findings of fact and conclusions of law.

## FINDINGS OF FACT

I.   **History of Arizona's Proof of Citizenship Requirement**

    A.   **In 2004, Arizona voters decided to require proof of citizenship to register to vote.**

    1.   In November 2004, Arizona voters approved a voter initiative called Proposition 200. *Gonzalez v. Arizona*, Case No. CV-06-1268-PHX-ROS, 2008 WL 11395512, *1 (D. Ariz. Aug. 20, 2008).

    2.   Under Proposition 200, individuals wishing to register to vote in Arizona must provide proof of citizenship, not just affirmation of citizenship. Specifically:

> The county recorder shall reject any application for registration that is not accompanied by satisfactory evidence of United States citizenship. Satisfactory evidence of citizenship shall include any of the following:
>
> 1. The number of the applicant's driver license or nonoperating identification license issued after October 1, 1996 by the department of transportation or the equivalent governmental agency of another state within the United States if the agency indicates on the applicant's driver license or nonoperating identification license that the person has provided satisfactory proof of United States citizenship.
>
> 2. A legible photocopy of the applicant's birth certificate that verifies citizenship to the satisfaction of the county recorder.
>
> 3. A legible photocopy of pertinent pages of the applicant's United States passport identifying the applicant and the applicant's passport number or presentation to the county recorder of the applicant's United States passport.
>
> 4. A presentation to the county recorder of the applicant's United States naturalization documents or the number of the certificate of naturalization. If only the number of the certificate of naturalization is provided, the applicant shall not be included in the registration rolls until the number of the certificate of naturalization is verified with the United States immigration and naturalization service by the county recorder.

5. Other documents or methods of proof that are established pursuant to the [I]mmigration [R]eform and [C]ontrol [A]ct of 1986.

6. The applicant's bureau of Indian affairs card number, tribal treaty card number or tribal enrollment number.

*Gonzalez*, 2008 WL 11395512, at *2 (quoting A.R.S. § 16-166(F)).[1]

3.  The proof of citizenship requirement does not apply to voters already registered in Arizona, unless they change registration from one county to another:

. . . [A]ny person who is registered in this state on the effective date of this amendment to this section is deemed to have provided satisfactory evidence of citizenship and shall not be required to resubmit evidence of citizenship unless the person is changing voter registration from one county to another.

A.R.S. § 16-166(G).[2]

4.  The proof of citizenship requirement does not apply to voters who simply wish to modify registration with a new residence ballot:

A person who modifies voter registration records with a new residence ballot shall not be required to submit evidence of citizenship. After citizenship has been demonstrated to the county recorder, the person is not required to resubmit satisfactory evidence of citizenship in that county.

A.R.S. § 16-166(I).

5.  Proposition 200 also requires county recorders to make a record of proof of citizenship having been submitted, and to keep the underlying citizenship documents for at least two years:

After a person has submitted satisfactory evidence of citizenship, the county recorder shall indicate this information in the person's permanent voter file. After two years the county recorder may destroy all documents that were submitted as evidence of citizenship.

A.R.S. § 16-166(J).

---

[1] The language in A.R.S. § 16-166(F), (G), (H), (I), and (J) is the same today as when Proposition 200 became law, so this document does not cite specific years for these statutes.
[2] Proposition 200 also clarified that "proof of voter registration from another state or county is not satisfactory evidence of citizenship." A.R.S. § 16-166(H).

1

**B.    In *Gonzalez*, this Court upheld the proof of citizenship requirement.**

2    6.    The proof of citizenship requirement in Proposition 200 prompted lawsuits,

3  and in July 2008, this Court held a bench trial to determine whether to issue a permanent

4  injunction.  *Gonzalez*, 2008 WL 11395512, at *1 & n.1.

5
6

**1.    In *Gonzalez*, this Court observed that election officials resolved problems during implementation.**

7    7.    The proof of citizenship requirement had been implemented for years before

8  the *Gonzalez* trial, so the Court evaluated how the requirement operated in practice, after

9  election officials had an opportunity to address problems.  For example, the Court observed:

10    a.    Under procedures implemented immediately after Proposition 200,

11  certain immigration-related information from naturalized citizens could not be used

12  with the USCIS Systematic Alien Verification for Entitlements ("SAVE") program,

13  so the "procedures were amended" to allow submission of other information that

14  could be used with SAVE.  *Gonzalez*, 2008 WL 11395512, at *2.

15    b.    The Secretary of State made "significant efforts" to "liberally construe

16  questions raised regarding the right of an elector to vote in favor of allowing the

17  elector to vote."  *Id.* at *17 n.19.

18    c.    Overall, when "problems[] surfaced regarding Proposition 200's

19  implementation, the response by the State and County Defendants was consistent

20  and immediate."  *Id.* at *20 n.22.

21
22

**2.    In *Gonzalez*, this Court held that the proof of citizenship requirement did not unconstitutionally burden the right to vote.**

23    8.    In the *Gonzalez* trial, the Court considered evidence of the availability and

24  cost of proof of citizenship, the process by which county recorders verify citizenship, and

25  the impact of the proof of citizenship requirement.  *Gonzalez*, 2008 WL 11395512, at *4–

26  8.

27

28

9. The Court concluded that "[n]aturalized citizens do not suffer an excessive burden due to Proposition 200," and further, "Proposition 200's burden on Arizona citizens as a whole is not excessive." *Id.* at \*17–18.

10. The Court also considered evidence of voter fraud—while acknowledging that "an evidentiary showing of fraud is not required to find a government's interest in preventing fraud to be important"—and concluded that "Defendants' interest in preventing voter fraud is an important governmental interest in Arizona." *Id.* at \*8–9, 19.

11. The Court also considered the State's asserted interest in protecting voter confidence in the electoral system and concluded that "Defendants' interest in protecting voter confidence is an important governmental interest in Arizona." *Id.* at \*19.

12. In sum, the Court concluded that "Proposition 200 enhances the accuracy of Arizona's voter rolls and ensures that the rights of lawful voters are not debased by unlawfully cast ballots" and that "Defendants' important interests outweigh the modest burden on the right to vote imposed by Proposition 200." *Id.* at \*19 (capitalization altered).

### 3. In *Gonzalez*, this Court held that the proof of citizenship requirement did not violate equal protection.

13. In the *Gonzalez* trial, the Court considered evidence of whether Arizona unconstitutionally discriminated against naturalized citizens in requiring proof of citizenship. *Gonzalez*, 2008 WL 11395512, at \*19–21.

14. For example, the Court interpreted the findings and declaration that accompanied Proposition 200 as showing "a concern with illegal immigrants, not with naturalized citizens." *Id.* at \*20.

15. The Court concluded that the plaintiffs "failed to establish intentional discrimination" and thus "have not proved that Proposition 200's proof of citizenship requirement violates the Equal Protection Clause by discriminating against naturalized citizens." *Id.* at \*21.

4.    In *Gonzalez*, this Court held that the proof of citizenship requirement did not violate Voting Rights Act § 2.

16.    In the *Gonzalez* trial, the Court considered evidence of whether the proof of citizenship requirement abridged voting rights of Latinos and Native Americans in violation of Section 2 of the Voting Rights Act ("VRA"). *Gonzalez*, 2008 WL 11395512, at *22–27.

17.    The Court concluded that the plaintiffs failed to establish a violation as to either group. *Id.* at *27.

C.    In *Inter Tribal*, the Supreme Court deemed the proof of citizenship requirement partially preempted, but its decision was limited.

18.    Section 6 of the National Voter Registration Act ("NVRA") requires that states "accept and use" the federal mail registration form (the "Federal Form") when registering voters for federal elections.  52 U.S.C. § 20505(a)(1).

19.    In 2013, the Supreme Court held that NVRA § 6 "precludes Arizona from requiring a Federal Form applicant to submit information beyond that required by the form itself."  *Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 20 (2013).

20.    However, the *Inter Tribal* decision is limited in several ways described below.

1.    *Inter Tribal* is limited to federal elections and Federal Forms.

21.    *Inter Tribal* does not preclude Arizona from requiring information beyond the Federal Form when registering voters for *state* elections.  Rather, the decision is limited to federal elections only.  *See* 570 U.S. at 5 (stating that NVRA governs registration "in *federal* elections") (quoting *Young v. Fordice*, 520 U.S. 273, 275 (1997)) (emphasis in original).[3]

22.    Nor does *Inter Tribal* preclude Arizona from requiring information beyond the Federal Form in the context of a *state-developed* registration form ("State Form")—for any election.  Indeed, the Supreme Court expressly confirmed that "state-developed forms may require information the Federal Form does not" and "can be used to register voters in both state and federal elections."  570 U.S. at 12.

---

[3] The RNC and Legislative Intervenors have argued that the *Inter Tribal* holding is limited to federal congressional elections.  *See* Doc. 367 at 1; Doc. 369.

23.     After *Inter Tribal*, the Arizona Attorney General opined that, to continue implementing Proposition 200 consistent with *Inter Tribal*, election officials must establish "two distinct voter registration rolls."  Ariz. Op. Atty. Gen. No. I13-011, 2013 WL 5676943, at *3.

### 2.     *Inter Tribal* allows states to deny registration based on information in their possession establishing ineligibility.

24.     The *Inter Tribal* decision clarifies that "while the NVRA forbids States to demand that an applicant submit additional information beyond that required by the Federal Form, it does not preclude States from denying information based on information in their possession establishing the applicant's ineligibility."  570 U.S. at 15 (cleaned up).

25.     The *Inter Tribal* decision does not elaborate on situations in which states may deny registration based on information in their possession establishing ineligibility.

### 3.     *Inter Tribal* raises but does not resolve constitutional concerns.

26.     In *Inter Tribal*, the Supreme Court noted that "it would raise serious constitutional doubts if a federal statute precluded a State from obtaining the information necessary to enforce its voter qualifications," because the Elections Clause of the Constitution "empowers Congress to regulate *how* federal elections are held, but not *who* may vote in them."  570 U.S. at 16–17.

27.     However, the Supreme Court did not think resolving these concerns was a "necessity" in *Inter Tribal*, because Arizona had another possible way to require proof of citizenship on Federal Forms: Arizona could ask the Election Assistance Commission ("EAC") to "alter the Federal Form to include information the State deems necessary to determining eligibility."  570 U.S. at 18–20.

28.     After the *Inter Tribal* decision, Arizona did ask the EAC to alter the Federal Form to include state-specific instructions regarding proof of citizenship, but the EAC refused.  A district judge ruled that the EAC had a duty to grant Arizona's request, but the Tenth Circuit reversed that ruling.  *See Kobach v. U.S. Election Assistance Comm'n*, 772 F.3d 1183, 1187–88 (10th Cir. 2014).

1

2

### 4.    *Inter Tribal* **summary**

29.    Here is a summary of the law after *Inter Tribal*:

---

- For <u>State Form</u> applicants who omit proof of citizenship:
  - o    For state elections, the State may deny registration; and
  - o    For federal elections, the State may deny registration.
- For <u>Federal Form</u> applicants who omit proof of citizenship:
  - o    For state elections, the State may deny registration; and
  - o    For federal elections, the State may *not* deny registration based on the applicant's omission of proof of citizenship, but *may* deny registration based on information in the State's possession establishing ineligibility.

---

### D.    **In the *LULAC* Consent Decree, the Arizona Secretary of State agreed to allow more voters to register without proof of citizenship.**

30.    In June 2018, the Arizona Secretary of State and Maricopa County Recorder agreed to a consent decree in a lawsuit by the League of United Latin American Citizens of Arizona ("LULAC") and the Arizona Students' Association.  *See* Case No. 2:17-cv-04102-DGC, Doc. 37 (D. Ariz. June 18, 2018) (*LULAC* Consent Decree); Trial Ex. 24 (same).

31.    The *LULAC* plaintiffs alleged that county recorders were processing State Forms differently from Federal Forms with respect to proof of citizenship.  Specifically, State Form applicants who omitted proof of citizenship were not registered for any election, whereas Federal Form applicants who omitted proof of citizenship were checked against Motor Vehicle Division ("MVD") data and, depending on the result, may be registered for at least some elections.  *See* Trial Ex. 24 at 1–2.

32.    The Arizona Secretary of State denied that these voter registration policies were illegal, but nevertheless agreed to adopt revised policies.  Trial Ex. 24 at 2–3.

33.    Under the policies in the Consent Decree, State and Federal Form applicants are treated the same with respect to proof of citizenship.  Specifically:

- 13 -

- For <u>State Form</u> applicants who omit proof of citizenship, MVD data are checked and:

  o   If MVD data show proof of citizenship, the applicant is registered for <u>state and federal elections</u>;

  o   If MVD data show a foreign-type license, the applicant is <u>not eligible for any election</u>; and

  o   If MVD data show neither proof of citizenship nor a foreign-type license, the applicant is registered for <u>federal elections only</u>.

- For <u>Federal Form</u> applicants who omit proof of citizenship, MVD data are checked and:

  o   If MVD data show proof of citizenship, the applicant is registered for <u>state and federal elections</u>;

  o   If MVD data show a foreign-type license, the applicant is <u>not eligible for any election</u>; and

  o   If MVD data show neither proof of citizenship nor a foreign-type license, the applicant is registered for <u>federal elections only</u>.

Trial Ex. 24 at 8–10, 13–14.

34.     In addition, under the policies in the Consent Decree, applicants are notified when MVD data show a foreign-type license (rendering the applicant not eligible), as well as when MVD data show neither proof of citizenship nor a foreign-type license (rendering the applicant a federal-only voter).  Trial Ex. 24 at 9–10, 13–14.

35.     The policies in the Consent Decree have the effect of allowing additional voters who omit proof of citizenship to vote in federal elections.  For example, under the policies in the Consent Decree, State Form applicants who never provide proof of citizenship and for whom MVD has no data are registered as federal-only voters.  Trial Ex. 24 at 10, § 2.d.ii.  Yet under *Inter Tribal*, the State could deny registration for such voters, because "state-developed forms may require information the Federal Form does not" and "can be used to register voters in both state and federal elections."  570 U.S. at 12.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**E.      The EPM provides details on how county recorders address proof of citizenship.**

36.      In Arizona, the Elections Procedures Manual ("EPM") is a series of rules issued by the Secretary of State after approval by the Governor and Attorney General. A.R.S. § 16-452(B).

37.      The EPM is binding on county recorders to the extent it addresses topics authorized by statute, and it acts as guidance for county recorders to the extent it addresses other topics. *McKenna v. Soto*, 250 Ariz. 469, 473–74 ¶¶ 20–21 (2021).

38.      The EPM can serve a "gap-filling function" by answering questions not spelled out in statutes. *See* Trial Tr. 25:3-5 (Day 1 AM, testimony of J. Petty).

**1.      The 2019 EPM contains rules on proof of citizenship, including how to use MVD data, SAVE data, and juror disclosures.**

39.      The 2019 EPM is the current operative version. *See* Trial Ex. 6 (2019 EPM); *see also* Trial Tr. 25:14-16 (Day 1 AM, testimony of J. Petty).

40.      "The purpose of the 2019 EPM is to ensure election practices are consistent and efficient throughout Arizona." *McKenna*, 250 Ariz. at 473 ¶ 20.

41.      The 2019 EPM contains many rules on voter registration. *See* Trial Ex. 6 at 1–45.

42.      Under the 2019 EPM, for State and Federal Form applicants who omit proof of citizenship, MVD data are checked and:

o      If MVD data show proof of citizenship, the applicant is registered for state and federal elections;

o      If MVD data show a foreign-type license, the applicant is not eligible for any election; and

o      If MVD data show neither proof of citizenship nor a foreign-type license (and proof of citizenship is not otherwise available), the applicant is registered for federal elections only.

1  *See* Trial Ex. 6 at. 6–8; *accord* Trial Tr. 39:7–42:19, 49:3–50:7 (Day 1 AM, testimony of J.

2  Petty).[4]

3      43.     In addition, under the 2019 EPM, applicants are notified when MVD data

4  show a foreign-type license (rendering the applicant not eligible), as well as when MVD

5  data show neither proof of citizenship nor a foreign-type license (rendering the applicant a

6  federal-only voter).  *See* Trial Ex. 6 at. 6–8; *accord* Trial Tr. 41:16–42:19, 50:2-17 (Day 1

7  AM, testimony of J. Petty).

8      44.     The 2019 EPM also contains rules for using the USCIS SAVE database.  *See*

9  Trial Ex. 6 at 9–10.

10     45.     Specifically, under the 2019 EPM, for State and Federal Form applicants who

11  provide an immigration-related number, SAVE is checked and:

12     o     If SAVE returns a U.S. citizen status, the applicant is registered for <u>state and</u>
13           <u>federal elections</u>;

14     o     If SAVE returns a non-citizen status, the applicant is <u>not eligible for any</u>
15           <u>election</u>; and

16     o     If SAVE is unable to find a match (and proof of citizenship is not otherwise
            available), the applicant is registered for <u>federal elections only</u>.

17  *See* Trial Ex. 6 at 9–10; *accord* Trial Tr. 56:9–59:13 (Day 1 AM, testimony of J. Petty).[5]

18     46.     In addition, under the 2019 EPM, applicants are notified when SAVE returns

19  a non-citizen status (rendering the applicant not eligible), as well as when SAVE is unable

20  to find a match (rendering the applicant a federal-only voter).  *See* Trial Ex. 6 at 9–10;

21  *accord* Trial Tr. 58:24–59:13 (Day 1 AM, testimony of J. Petty).

22     47.     The 2019 EPM also contains rules for when prospective jurors disclose that

23  they are not citizens.  *See* Trial Ex. 6 at 36–37.

24

25

26  [4] The 2014 EPM also contained rules for use of MVD data regarding citizenship.  *See* Trial

27  Ex. 18 (2014 EPM) at 18, 20, 24.

28  [5] The 2014 EPM also contained rules for use of SAVE data regarding citizenship.  *See* Trial
    Ex. 18 at 19–20, 25.

48.     Specifically, under the 2019 EPM:

o     County recorders periodically <u>receive information</u> regarding prospective jurors who have disclosed that they are not a U.S. citizen.

o     Before cancelling registration, the county recorder must <u>confirm</u> that the registrant does not already have proof of citizenship documented in the registration database.

o     In addition, before cancelling registration, the county recorder must <u>send the registrant a letter</u> explaining that registration will be canceled unless proof of citizenship is submitted in 35 days.

*See* Trial Ex. 6 at 36–37; *accord* Trial Tr. 105:24–107:3 (Day 1 AM, testimony of J. Petty).[6]

49.     In addition, if registration is ultimately cancelled, the county recorder must notify the registrant of cancellation and explain how to re-register.  *See* Trial Ex. 6 at 37.

**2.     The 2023 EPM is under review, and even after finalization, modifications and other sources of guidance are possible.**

50.     The Secretary of State has submitted a draft 2023 EPM for the Governor and Attorney General to review.  *See* Trial Ex. 11 (draft 2023 EPM).

51.     The deadline for issuing the final version of the 2023 EPM is December 31. A.R.S. § 16-452(A).

52.     Even after an EPM is issued, the Secretary of State may issue modifications after approval by the Governor and Attorney General.  For example, that is what happened after the *LULAC* Consent Decree.  *See* Trial Ex. 8 (2019 addendum to 2014 EPM).

53.     Apart from the EPM, there are other ways in which county recorders can develop a consensus on voter registration practices.  For example:

a.     Each county recorder is a member of the Voter Registration Advisory Committee, whose goal is to come up with uniform practices on voter registration issues.  *See* Trial Tr. 26:8–27:24 (Day 1 AM, testimony of J. Petty).

b.     County recorders can discuss among themselves and seek legal advice from county attorneys.  *See, e.g.*, C. Connor Dep. at 193:14-18.

---

[6] In contrast, under the 2014 EPM, a juror disclosure of non-citizenship would result in cancellation, and advance notice to the registrant was not required.  *See* Trial Ex. 18 at 29.

c.      The Secretary of State can publish guidance documents other than the EPM on its website.  *See, e.g.*, C. Connor Dep. at 57:11-15.

## II.      Risk of Ineligible Voters Registering or Voting

### A.      There is a risk of non-citizens registering and voting, and there is evidence that it occurs, but very rarely.

#### 1.      Evidence from the Attorney General's office

54.      The Arizona Attorney General's office is currently aware of two indictments brought by the Attorney General against alleged non-citizen voters in recent years.  Trial Tr. 1691:11-13 (Day 7 PM, testimony of T. Lawson).

55.      In one case, a non-citizen is alleged to have fraudulently assumed the identity of a deceased U.S. citizen and voted under that citizen's identity.  This case is currently on warrant status.  Trial Tr. 1692:5–1693:15 (Day 7 PM, testimony of T. Lawson).

56.      In the other case, a non-citizen is alleged to have fraudulently obtained benefits from the Arizona Health Care Cost Containment System and falsely registered to vote.  This case is also on warrant status.  Trial Tr. 1693:16–1694:15 (Day 7 PM, testimony of T. Lawson).

57.      The Attorney General's Election Integrity Unit has also received sporadic complaints from members of the public about non-citizens voting in Arizona, and occasionally such complaints have contained a specific allegation about a specific individual voting.  Trial Tr. 2109:6–2110:2 (Day 9, testimony of B. Knuth).

58.      However, the Election Integrity Unit's investigator does not recall ever recommending prosecution of such allegations.   Trial Tr. 2120:11–2121:9 (Day 9, testimony of B. Knuth).

59.      The Election Integrity Unit's prosecutor agrees that voter fraud in Arizona is rare, and voter fraud with non-citizens in Arizona is extremely rare.  Trial Tr. 1687:6-13 (Day 7 PM, testimony of T. Lawson).

1

### 2.     Evidence regarding county attorney offices

2     60.     In addition to the Attorney General's office, Arizona's fifteen county

3     attorneys are entrusted by statute with the enforcement of voting laws.   *See* A.R.S. § 16-

4     1021; Trial Tr. 1688:23–1689:6 (Day 7 PM, testimony of T. Lawson).

5     61.     County attorney offices were not deposed in this case or served written

6     discovery about voter fraud in this case.  Defs. Stipulated Facts 13 & 14 (Doc. 571-2 at 3).

7     62.     When asked whether there were "any convictions in Arizona for non-citizen

8     voting prior to 2009," Plaintiffs' expert, Dr. Minnite, testified that she was aware of thirteen

9     cases of non-citizen voting prosecutions by the Maricopa County Attorney's Office in

10    2007/2008.  *See* Trial Tr. 1588:3-23 (Day 7 AM, testimony of L. Minnite).

11

### 3.     County recorder knowledge

12    63.     County recorders are generally unaware of non-citizens registering or voting,

13    but there are exceptions.  For example, the Maricopa County Recorder representative

14    recalled "one or two instances" in which the recorder's office learned that a registrant stated

15    to the jury office that he or she was a non-citizen and then, when the recorder's office

16    contacted the registrant, expressly confirmed non-citizenship. *See* Trial Tr. 107:4-24 (Day

17    1 AM, testimony of J. Petty).

18    64.     The Maricopa County Recorder representative also recalled an unspecified

19    number of (more common) instances when a registrant stated to the jury office that he or

20    she was a non-citizen and then, when the recorder's office sent a letter requesting proof of

21    citizenship, did not respond. *See* Trial Tr. 106:22–107:3, 107:16-19 (Day 1 AM, testimony

22    of J. Petty).

23    65.     Often, county recorders simply do not know whether non-citizens are

24    registering or voting.  For example:

25             a.     When the Pima County Recorder's Office was asked to identify each

26             instance in which it had established that a non-citizen registered or voted in recent

27             years, the office responded that Pima County does not currently track this

28             information.  Trial Ex. 157 at 8;H. Hiser Dep. at 241:14-242:11.

1      b.     When the Pinal County Recorder's Office was asked a similar

2 question, the office responded that it "is neither a law enforcement nor prosecutorial

3 agency and does not determine who commits 'voter fraud,' and such request is better

4 suited for the Arizona Attorney General's Office, which investigates and prosecutes

5 allegations of voter fraud." D. Lewis Dep. at 114:19–115:1.

6          **4.**     **Comparison of voter registration data with MVD data**

7      66.     Dr. Richman's analysis of voter registration data and MVD data found that

8 there are 1,779 active full-ballot voters (i.e. voters eligible for state and federal elections)

9 who, either on or after their registration date, presented MVD with evidence of non-

10 citizenship such as a green card. *See* Trial Ex. 930; Trial Tr. 1927:22–1928:7 (Day 8 AM,

11 testimony of J. Richman).

12      67.     Plaintiffs' expert did not dispute this calculation. *See* Trial Tr. 1252:2-21

13 (Day 5 AM, testimony of M. McDonald).

14      68.     Dr. Richman also testified that, to his memory, about 400 of those persons

15 registered on the same day they transacted with MVD. *See* Trial Tr. 1928:8–1929:15 (Day

16 8 AM, testimony of J. Richman).

17      69.     Plaintiffs' expert had a similar memory; he recalled about 450 such persons.

18 *See* Trial Tr. 1252:22–1253:13 (Day 5 PM, testimony of M. McDonald).

19      70.     To clarify, Dr. Richman did not conclude that any or all of these 1,779

20 individuals are in fact non-citizens, but rather that these instances deserve follow-up. *See*

21 Trial Tr. 1930:12–1932:2 (Day 8 AM, testimony of J. Richman).

22      71.     Trial testimony also showed that sometimes people who lack proof of

23 citizenship attempt to register to vote but are not added to the voter rolls:  When the

24 Maricopa County Recorder checks the MVD database and sees information that a voter was

25 not a citizen at the time they interacted with the MVD, that voter is put on suspense status—

26 meaning he may not vote—and sent a notice letter informing him that the Recorder has

27 information he is not a citizen.  Trial Tr. 111:15-25 (Day 1 AM, testimony of J. Petty).

28

72.     If the voter never responds he remains in suspense status until the next general election, and if the Recorder still does not hear anything the voter is moved to a not registered/not eligible status.  *Id.* at 112:11-23.

73.     In Maricopa County alone, 11,730 registrants between January 2004 and January 2023 were placed into a suspense category—i.e. not allowed to vote—because they were "confirmed" as "Non-Citizen[s]."  Trial Ex. 769 (MC000870).  This figure includes persons whose MVD information suggested noncitizenship.  Trial Tr. 152:18-25 (Day 1 PM, testimony of J. Petty).

### 5.     Possibility of renounced citizenship

74.     Although rare, it is possible for a person to be a U.S. citizen when registering to vote, then renounce citizenship.  *See* 8 U.S.C. § 1481.

75.     According to the U.S. Department of the Treasury:

a.     1,024 individuals chose to expatriate and thereby lost U.S. citizenship during the fourth quarter of 2022.  88 Fed. Reg. 5418 (Jan. 27, 2023).

b.     536 individuals chose to expatriate and thereby lost U.S. citizenship during the first quarter of 2023.  88 Fed. Reg. 23270 (Apr. 19, 2023).

c.     830 individuals chose to expatriate and thereby lost U.S. citizenship during the second quarter of 2023.  88 Fed. Reg. 47238 (July 22, 2023).

76.     For example, the Jury Administrator for the Maricopa County Judicial Branch, who oversees the compilation of juror non-citizenship disclosures for the Secretary of State and Maricopa County Recorder, recalls a prospective juror who explained that he now lives in Mexico and had renounced his U.S. citizenship.  Trial Ex. 970, ¶¶ 2, 11, 27.

77.     Plaintiffs' expert acknowledged that, with respect to full-ballot voters who presented evidence of non-citizenship to MVD after they registered to vote, one possible explanation is that some of them renounced their citizenship after registration.  *See* Trial Tr. 1171:21–1172:5 (Day 5 PM, testimony of M. McDonald).

### 6.    Possibility of human error in registration process

78.    Adding a paper voter registration form to the registration database involves manual data entry by county recorder staff.  *See, e.g.*, Trial Tr. 30:8-15 (Day 1 AM, testimony of J. Petty).

79.    Other parts of the registration process involve manual data entry too.  For example, if an MVD check for an applicant returns no match, a field in the registration database named "Citizenship Verified" is automatically marked "No," but staff can manually change it to "Yes"—as they should when, for example, the applicant follows up with a valid document such as a birth certificate.  Y. Morales Dep. 56:9–57:14.

80.    Sometimes county recorder staff exercise a degree of judgment in the registration process.  For example, staff may "visually verify" an out-of-state driver's license that is presented as proof of citizenship.  *See* Trial Ex. 6 (2019 EPM) at 4.  Similarly, when an MVD check for an applicant results in a "soft match," staff exercise "some level of discretion" when comparing the applicant's information with the MVD result and asking "does it appear that this person is the same person."  Trial Tr. 36:18–37:11 (Day 1 AM, testimony of J. Petty).

81.    Thus, mistakes can happen.  For example, Plaintiffs' expert acknowledged that, with respect to full-ballot voters who presented evidence of non-citizenship to MVD after they registered to vote, one possible explanation is that some of them had been mistakenly marked by county recorder staff as having provided proof of citizenship.  *See* Trial Tr. 1171:11-20 (Day 5 PM, testimony of M. McDonald).

### 7.    Examples from other states

82.    Plaintiffs' expert, Dr. Minnite, provided examples of non-citizens mistakenly registering and voting in other states:

    a.    In a 1996 California election, hundreds of non-citizens were alleged to have illegally voted, but prosecution was not pursued because the California Secretary of State determined there was no criminal intent.  Trial Tr. 1625:13–1626:8, 1627:12–1628:10 (Day 7 AM, testimony of L. Minnite).

b.     Another incident involved a person from the Philippines who had recently immigrated but was not yet a citizen.  She inadvertently registered to vote after being offered by a local government official, then voted while ineligible, and was nearly deported.  *Id.* 1626:9–1627:10, 1628:13-16.

c.     A similar incident involving a different non-citizen led to his deportation alongside his American-citizen wife and daughter.  *Id.* 1628:16-19.

d.     Another instance of mistaken registration and voting occurred in Alaska, when a non-citizen was sent a registration form before he became a citizen and he subsequently registered and voted.  *Id.* 1628:24–1629:8.

83.     Although Professor Minnite provided these examples, they fall outside her definition of "voter fraud" because they involved mistakes, not deception, and she did not offer an account of how frequently such incidents occur.  Trial Tr. 1629:9-16, 1630:10-12 (Day 7 AM, testimony of L. Minnite).

### 8.     Juror disclosures of non-citizenship

84.     The Secretary of State reported that in the first quarter of 2023, 373 persons stated on jury questionnaires that they are not U.S. citizens.  Trial Ex. 805 at 2.

85.     The Secretary of State reported that in the second quarter of 2023, 951 persons stated on jury questionnaires that they are not U.S. citizens.  Trial Ex. 806 at 2.

86.     It is not currently known how many of these persons are registered voters who were telling the truth about their citizenship on the jury questionnaire.  The Secretary of State reported that the process for notifying and potentially cancelling registration for these individuals is "in development."  Trial Ex. 805 at 2; Trial Ex. 806 at 2.

87.     To illustrate how at least one county compiles information about juror non-citizenship disclosures, the Jury Administrator for the Maricopa County Judicial Branch submitted a declaration in this matter.  *See* Trial Ex. 970.

88.     To summarize, the Jury Office (1) automatically collects responses to juror prescreen questionnaires that are completed online under penalty of perjury, and (2) manually enters information that prospective jurors otherwise communicate in writing

1  but not under penalty of perjury.  Then the Jury Office provides a .txt file to the Secretary
2  of State and Recorder's Office that contains the full name, address, and date of birth of each
3  prospective juror who disclosed non-citizenship.  *See* Trial Ex. 970, ¶¶ 11–26.

4      89.    The Jury Office has been regularly providing such files to the Recorder's
5  Office for the last few years, since before HB 2492 or HB 2243.  *See* Trial Ex. 970, ¶ 11.

6          **9.    Possibility of intentional untruthful information about citizenship**
7      90.    Sometimes people say something untruthful about their citizenship to achieve
8  a desired goal.  For example:

9          a.    The Secretary of State's representative recalled eleven prosecutions,
10     in 2005 or 2006, where someone falsely declared themselves not a citizen on a juror
11     questionnaire.  Trial Tr. 393:7-22 (Day 2 AM, testimony of C. Connor).

12         b.    A former Pima County Recorder employee recalled that sometimes
13     registered voters declared themselves not a citizen on a juror questionnaire, but then
14     later explained that "in reality, I am a citizen. I just said this so I didn't have to serve
15     on a jury."  Trial Tr. 2004:4–2005:1 (Day 8 PM, testimony of H. Hiser).

16     **B.    Absence of evidence is not always evidence of absence.**
17     91.    As Plaintiffs' expert acknowledged, the number of prosecutions for a crime
18  does not include crimes that go undetected or crimes that cannot be traced back to a
19  particular person.  *See* Trial Tr. 1620:21–1621:5 (Day 7 AM, testimony of L. Minnite).

20     92.    Voter fraud can be difficult to detect.  *See* Trial Tr. 1565:23–1566:8, 1567:14-
21  22 (Day 7 AM, testimony of L. Minnite); Trial Tr. 1747:3–1748:2 (Day 7 PM, testimony
22  of M. Hoekstra).

23     93.    By analogy, only seven percent of reported property crimes are prosecuted,
24  and in that context, there is generally a known victim with an incentive to report the crime.
25  *See* Trial Tr. 1748:17–1749:5 (Day 7 PM, testimony of M. Hoekstra).

26     94.    In addition, the number of prosecutions for a crime does include situations
27  where the required criminal mental state does not exist.  For example, in Arizona, mistaken
28  registration of ineligible persons, without more, does not constitute false registration.  *See*

A.R.S. § 16-182(A) (prohibiting "knowingly" registering a person "knowing" that the person is ineligible).

95.     The investigator in the Attorney General's Election Integrity Unit does not believe the office can "conclusively" determine with its current database tools that an individual is not a citizen, given the office's relative lack of access to federal information. *See* Trial Tr. 2110:5–2111:12 (Day 9, testimony of B. Knuth).

**C.     There is evidence of other kinds of ineligible voters registering and voting or attempting to do so.**

**1.     Double voting**

96.     The Arizona Attorney General's Office has published online a list of voting-related prosecutions since at least 2013.   *See* Trial Tr. 1687:14–1688:2 (Day 7 PM, testimony of T. Lawson).

97.     As of April 2023, the Attorney General's Office had initiated 38 prosecutions related to illegal voting by individuals since 2010, as well as four more such prosecutions that were charged and sealed pending the defendant's arrest.   Trial Ex. 292 at 1–6; *see* Trial Tr. 1688:3-19, 1689:7-24 (Day 7 PM, testimony of T. Lawson).

98.     These are cases prosecuted by the Attorney General.   There are other agencies in Arizona with authority to prosecute voting-related crimes, such as county attorney offices.   *See* Trial Tr. 1688:21–1689:6 (Day 7 PM, testimony of T. Lawson).

99.     The most common type of illegal voting case on the Attorney General's list of prosecutions is "double voting" cases, where a person votes in more than one jurisdiction on the same date.   The list shows 24 successful prosecutions for such cases where the defendant voted in both Arizona and another state.   Trial Ex. 292 at 1–3; *see* Trial Tr. 1689:25–1690:4 (Day 7 PM, testimony of T. Lawson).

**2.     Faulty registration forms submitted by third parties**

100.     The Maricopa County Recorder's representative testified that the office has received "suspicious" registration forms from third-party voter registration drives—for example, forms where the name resembles an existing voter but the date of birth is different,

or the Social Security number is transposed, or signatures do not match, or addresses are off, or the form appears prefilled out by one person and signed by another, or the person that filled out the form does not match prior forms on the voter's existing record. *See* Trial Tr. 136:12–137:20 (Day 1 PM, testimony of J. Petty).

101.   The Maricopa County Recorder's representative "noticed an influx" of such forms beginning in the 2022 election cycle, when the office received "thousands" of such forms. Trial Tr. 137:21-24 (Day 1 PM, testimony of J. Petty).

102.   The Pima County Recorder's Office had a similar experience, receiving up to "hundreds of forms a day" from voter registration groups during the 2022 cycle, some of which were invalid. Trial Tr. 1995:7–1996:19 (Day 8 PM, testimony of H. Hiser).

103.   For example, the Pima County Recorder's Office received duplicate registration forms that purported to be for the same person but with slightly different birth dates, Social Security numbers, or other information. The Office also received registration forms that purported to be for voters who "had been deceased for quite some time." Trial Tr. 1995:21–1998:15 (Day 8 PM, testimony of H. Hiser).

104.   The Apache County Recorder's Office also experienced an incident like this in 2022, where 20 to 25 suspicious forms (a high number for that office) were submitted on a single day. Trial Tr. 2066:12–2069:7 (Day 8 PM, testimony of A. Shreeve).

105.   The Apache County official who received these forms knew that at least one form was invalid because it was submitted under the name of her adopted brother, who had recently been released from prison after a felony conviction. Trial Tr. 2070:14-22 (Day 8 PM, testimony of A. Shreeve). The form also listed her parents' address even though the adopted brother did not reside there but was "living on the streets." *Id.* at 2070:17-20.

106.   The Yuma County Recorder's Office also experienced surges of hundreds or thousands of registrations submitted by third-party registration groups right before election cycles, and some of these forms contained falsified birth date information, or an incorrect address, or one voter's name mixed with another person's date of birth, or problems with

the applicant's Social Security number, handwriting, or signature, or a mismatch with MVD data. *See* Trial Tr. 2083:6–2085:5 (Day 8 PM, testimony of S. Johnston).

107.   In some instances, the Yuma County Recorder's Office identified specific people whose information on the forms they knew to be false because "it's a small town" and the Recorder's Office could identify false birth dates or residences.  Trial Tr. 2083:13-19 (Day 8 PM, testimony of S. Johnston).

108.   Such forms were "almost always brought in by the third-party groups" rather than the individual registrant.  Trial Tr. 2084:5-13 (Day 8 PM, testimony of S. Johnston).

109.   The Yuma County Recorder's Office sometimes referred these incidents to the Attorney General's office.  Trial Tr. 2086:3-21 (Day 8 PM, testimony of S. Johnston).

110.   In one such instance, the investigator in the Attorney General's Election Integrity Unit was able to determine that four or five such registration applicants had been approached by the same person to fill out multiple registration forms under the same name, but with differences in identifying details like Social Security number and date of birth. Trial Tr. 2124:17–2125:19 (Day 9, testimony of B. Knuth).

111.   The investigator was able to identify an individual employed by a third-party registration group who was responsible for these registrations, but after speaking with her, the investigator and the assigned prosecutor determined that they could not establish the requisite culpability for a prosecution because "[s]he was following what she was instructed to do."  Trial Tr. 2125:20–2126:3 (Day 9, testimony of B. Knuth).

112.   Mi Familia Vota is one group that submits voter registration forms in large numbers on behalf of registrants.  Since 2021, Mi Familia Vota has submitted more than 30,000 registration forms in Arizona.  *See* Trial Tr. 780:16-23, 784:12-14, 800:10-14 (Day 4 AM, testimony of C. Rodriguez-Greer).

113.   Despite Mi Familia Vota's best efforts, mistakes are "definitely made," and Mi Familia Vota believes that it is required to turn in every form it collects.  *See* Trial Tr. 804:15-23, 806:6-9 (Day 4 AM, testimony of C. Rodriguez-Greer).

114.    Mi Familia Vota does not have a way to check the authenticity of forms they submit and does not have the resources to check whether, for example, one of its field workers turns in fourteen or fifteen registration forms for the same person.  *See* Trial Tr. 806:10-20 (Day 4 AM, testimony of C. Rodriguez-Greer).

**D.    Elections in Arizona are sometimes decided by tiny margins.**

115.    The 2014 general election in Arizona's Second Congressional District was decided by a margin of 161 votes.  *See* Trial Ex. 896 at 1; Trial Tr. 396:1-7 (Day 2 AM, testimony of C. Connor).

116.    The 2016 Republican Primary for Arizona's Fifth Congressional District was decided by a margin of 16 votes.  *See* Trial Ex. 897 at 3; Trial Tr. 396:8-23 (Day 2 AM, testimony of C. Connor).

117.    The 2022 general election for the Arizona Attorney General was initially decided by a margin of 511 votes (not including the subsequent recount).  *See* Trial Ex. 23 at 10; Trial Tr. at 396:25–397:5 (Day 2 AM, testimony of C. Connor).

**III.    Risk of Low Voter Confidence in Elections**

**A.    Arizonans are concerned about election integrity and the possibility of non-citizens registering and voting.**

118.    At trial, former Senator Quezada acknowledged that since the 2020 election, members of the public expressed concerns to the Arizona Legislature that "there are people who are voting that shouldn't be voting," and the "theme of the general kind of commentary was that people who shouldn't be voting are voting and they are noncitizens."  Trial Tr. 877:8–878:17 (Day 4 AM, testimony of M. Quezada).

119.    President Petersen and Speaker Toma both noted that the public and many of their constituents are concerned about election integrity. *See* W. Petersen Dep. at 87:3-11, 88:15-24, 106:4-21, 108:2-16; B. Toma Dep. at 94:23-95:4, 112:23-113:5, 269:12-15.

120.    According to the prosecutor in the Attorney General's Election Integrity Unit, members of the public have expressed concern that a lack of a proof of citizenship

requirement could allow non-citizens to vote.  *See* Trial Tr. 1696:18-25 (Day 7 PM, testimony of T. Lawson).

121.   According to the investigator in the Attorney General's Election Integrity Unit, members of the public have expressed concern that non-citizens may be voting because proof of citizenship is not required for federal elections.  *See* Trial Tr. 2121:12-23 (Day 9, testimony of B. Knuth).

122.   To take two examples of complaints submitted by members of the public to the Election Integrity Unit:

> a.   One person expressed concern that election officials "are allowing non-U.S. citizen to vote in Federal elections like the Presidential election coming up this November 3rd 2020."  Trial Ex. 286, Row 2283, Column V.

> b.   One person expressed concern after he noticed on a registration form that "without proof of citizenship you will receive a federal only ballot," because he thought this "appears to be a way to receive illegal votes from non-US citizens." Trial Ex. 287, Row 453, Column V.

123.   In the process of drafting the 2023 EPM, the Secretary of State allowed the public to make comments for two weeks in August 2023. *See* Trial Tr. 321:9-12, 381:23–382:2 (Day 2 AM, testimony of C. Connor).

124.   About 25 percent of those comments were essentially form letters stating things like "Make sure voters prove citizenship" or "Voters should be citizens."  In addition, there were "several comments about the fed-only voters and citizenship."  Trial Tr. 382:16–383:25 (Day 2 AM, testimony of C. Connor).

**B.   The challenged laws may improve Arizonans' confidence in elections.**

125.   As Dr. Hoekstra explained, one potential benefit of HB 2492 and HB 2243 is to help persuade Arizonans that the State is taking precautions to make it harder for non-citizens to vote (and, in general, for voter fraud to occur).  Trial Tr. 1751:18–1752:9 (Day 7 PM, testimony of M. Hoekstra).

126.    According to Dr. Hoekstra, at least one academic study found that informing voters about an election integrity law improved voter confidence by a few percentage points.  Trial Tr. 1752:10–1753:16 (Day 7 PM, testimony of M. Hoekstra).

127.    Plaintiffs have not shown that HB 2492 and HB 2243 will not improve Arizonans' confidence in elections.

## IV.    Legislative History of Challenged Laws

### A.    House Bill 2492

128.    HB 2492 was introduced to the Arizona House of Representatives on January 24, 2022 and read for the first time.  Pls. Stipulated Fact 42 (Doc. 571-1 at 5-6).

129.    Representative Jake Hoffman was the prime sponsor of HB 2492.  *See* Trial Tr at 890:5-6 (Day 4 PM, testimony of M. Quezada)

130.    Representative Hoffman explained during legislative hearings that HB 2492 was meant to ensure that only eligible voters cast ballots and that the bill "is in keeping with the will of the voters passed in 2004, Proposition 200, that satisfactory evidence of United States citizenship shall be requested."  Trial Ex. 54 at 4:16-18; *see also id.* at 24:1-7 ("[T]he decision comes down to whether or not you want to ensure that only legal citizens are casting ballots in our elections."); Trial Ex. 55 at 3:17-22, 4:7-22 (HB 2492 "allows us— under the Supreme Court ruling that exists, allows us to go right up to the line so that we don't violate what the Supreme Court asked, but it does allow us to be good stewards of the voter rolls and ensure that there's documentary proof of citizenship for voters." HB 2492 "just ensures that we don't have non-citizens voting."); Trial Ex. 58 at 6:13-24 ("This bill doesn't infringe on anyone's legal right to vote. This doesn't infringe on any legal votes that are cast. All it does is ask that when you are submitted a voter registration form, you provide documentary proof of citizenship, as is allowed and permissible by the Supreme Court, by federal law, and required by state law. So this bill does nothing other than ensure that non-citizens are not voting in Arizona elections and American elections, which I might say, one could classify non-citizens voting as foreign interference in our elections.").

131.   HB 2492 passed the House Rules Committee on February 22, 2022.   Trial Ex. 57 at 7:15-17.

132.   At the February 28, 2022 House Floor Session, Representative Hoffman stated that in a recent Rasmussen poll, "roughly 85 percent of Americans support greater election security and integrity, including things like universal ID and proof of citizenship to vote." Trial Ex. 59 at 7:8-12.  Representative Finchem agreed, noting that "[i]t occurs to me in order to get to the 85 percent number . . . we have people on both sides of the aisle recognize that there's a problem and are ready for a solution; because there's no way we could get to 85 percent nationwide when you do the math between registered voters who are Democrat, Republican[,] and Independent. So with that, I think we have the operation— opportunity to do something that is totally bipartisan, nonpolitical. This is about making sure that we secure our elections." *Id.* at 7:18-8:4.  In explaining his vote, Representative Hoffman stated that "we do want voters to actually be citizens." *Id.* at 15:10-11.

133.   At a March 10, 2022 hearing before the Senate Judiciary Committee, in response to a question about the place of birth requirement, Greg Blackie, a representative of Free Enterprise Club, stated that "[p]lace of birth is useful in identifying in some of these databases, having their name, date of birth and place of birth is how you can sometimes get a better match of who the individual is, which will help us find proof of citizenship for somebody who didn't provide it when they applied." Trial Ex. 61 at 24:14-20.

134.   At the March 10 hearing, Senator Petersen, in explaining his vote, stated: "The issue here is that only U.S. citizens can vote. And the legislature, the states, Arizona has plenary power to determine voter qualification. . . . States retain the flexibility to design and use their own registration forms. That is what we are doing here. It is integrity of elections." Trial Ex. 61 at 39:20-19.

135.   Similarly, at the March 23, 2022 Senate Floor Session, Senator Petersen explained that "[t]he issue is making sure that citizens of this country are voting.  And if you're not a citizen of this country, you're not allowed to vote.  That is the issue at hand." Trial Ex. 62 at 16:2-8.

136.    Then-President Fann, in explaining her vote, stated that the bill impacts "everybody because this is our sacred right to vote. It doesn't matter if you're a man or a woman or what race you are. What matters is you are a citizen of the United States and your voice should be heard. And you should know that when you vote that only legal votes are being counted. . . . It's not voter suppression because this protects the minorities. It protects every single vote in this nation." *Id*. at 20:13-14:8.

137.    Former Senator Quezada did not vote in favor of HB 2492. *Id.* at 10:10.

138.    On March 30, 2022, then-Governor Ducey signed HB 2492 into law.  Pls. Stipulated Fact 43 (Doc. 571-1 at 6).

139.    Governor Ducey issued a signing letter for HB 2492, which noted that Arizonans "value election integrity, which can and should exist in tandem to, not in conflict with, access to the ballot box."  Trial Ex. 704.  He further stated that HB 2492 addresses "a growing number of new registrants participating in elections who have not provided evidence of citizenship."  *Id.*  According to Governor Ducey, "H.B. 2492 provides clarity to Arizona law on how officials process federal form voter registration applications that lack evidence of citizenship. Furthermore, H.B. 2492 ensures that the Attorney General's office has the data needed to properly determine if a person who has registered with the federal form is in fact a non-citizen. Under H.B. 2492, a person who registers with the federal form and who is found to not be a United States citizen will be prosecuted under our existing statutes. Election integrity means counting every lawful vote and prohibiting any attempt to illegally cast a vote. H.B. 2492 is a balanced approach that honors Arizona's history of making voting accessible without sacrificing security in our elections." *Id.*

140.    On April 22, 2022, then-Governor Ducey signed Senate Bill 1638, which made a technical amendment to HB 2492 and delayed the effective date for all of HB 2492's provisions to December 31, 2022.  Pls. Stipulated Fact 44 (Doc. 571-1 at 6).

141.    HB 2492 went into effect on January 1, 2023.  Pls. Stipulated Fact 45 (Doc. 571-1 at 6).

1

**B.     House Bill 2243**

2     142.    Representative Joseph Chaplik was the prime sponsor of House Bill 2617

3   ("HB 2617").  When Representative Chaplik summarized the bill to the House Government

4   and Elections Committee, he stated that "it allows for the counties to clean up the voter roll,

5   basically a maintenance program to make sure that who we're sending ballots to, actually

6   are residents of Arizona."  Trial Ex. 490 at 2:18-21.

7     143.    In other legislative hearings, Representative Chaplik explained his view that

8   HB 2617 was a "simple, common sense, election integrity bill to help clean up the voter roll

9   maintenance."  Trial Ex. 495 at 4:19-23; *see also* Trial Ex. 494 at 10:19-21 (Representative

10  Chaplik: "This is a maintenance clean up activity that they should be doing in their position

11  today.").

12    144.    On May 25, 2022, the Arizona legislature passed HB 2617.  Pls. Stipulated

13  Fact 49 (Doc. 571-1 at 6).

14    145.    On May 27, 2022, Governor Ducey vetoed HB 2617.  Pls. Stipulated Fact 50

15  (Doc. 571-1 at 6).

16    146.    In his letter explaining his veto, Governor Ducey expressed support for

17  several provisions in HB 2617, including those that would allow a county recorder "to make

18  an objective determination to initiate the process of removing a person from the voter rolls

19  because they are not qualified to vote in Arizona."  Trial Ex. 53.  Specifically, Governor

20  Ducey stated that the "state *should* be notifying counties when a registered voter has

21  received an out-of-state license," and that the procedure "outlined in the bill that describes

22  how counties are notified when a prospective juror is not a U.S. citizen also provides tools

23  to make sure only qualified electors are participating in Arizona elections . . . should be

24  codified in statute. . . . Further to the extent practicable, recorders should be completing

25  monthly comparisons to the databases that are delineated in the bill."  *Id.*  Governor Ducey

26  concluded by stating: "I look forward to working with the sponsor and I am hopeful the

27  aspects of the bill outlined above will be returned to my desk this session."  *Id.*

28

147.    HB 2243 was first introduced and had its first House reading on January 18, 2022, but did not contain the provisions challenged in this case.  Pls. Stipulated Fact 52 (Doc. 571-1 at 6).

148.    Representative Chaplik worked with the governor's office to make amendments to the substance of HB 2617. B. Toma Dep. at 234:14-21.

149.    After receiving approval from the governor's office as to the proposed changes, a floor amendment was made to HB 2243 that included the amendments to HB 2617.  The substance of the bill was amended to track well known content and timing requirements in the EPM and the NVRA.  The EPM has long provided a 35-day period for responding to a notice of potential cancellation.  *See* Trial Ex. 6 at 36-40.  And the NVRA contemplates delivering to a voter "a postage prepaid and pre-addressed return card, sent by forwardable mail" before cancellation.  *See* 52 U.S.C. § 20507(d)(2).  Accordingly, the portion of HB 2617 requiring only "notice that the registration will be cancelled in ninety days unless the person provides satisfactory evidence that the person is qualified," *see* Trial Ex. 4 at § 1, was modified when amended into HB 2492 to track the EPM and NVRA precedents, *see* W. Petersen Dep. at 299:18-24, 303:24-304:2, 306:3-10.

150.    On June 22, 2022, the Senate met as a "Committee of the Whole" to discuss HB 2243 and Warren Petersen's proposed a floor amendment to HB 2243, which was adopted.  Pls. Stipulated Fact 53 (Doc. 571-1 at 6).

151.    Senator Petersen explained that the Floor Amendment was "basically what was House Bill 2617" but that it addressed concerns raised by Governor Ducey in his veto letter and had a 35-day notice period.  Trial Ex. 499 at 3:9-25.

152.    Senator Petersen and Representative Toma both testified that it was not unusual to have substantive amendments to bills that late in the sessions.  B. Toma Dep. Tr. at 237-238; W Petersen Dep. at 322:24-323:6.

153.    On June 23, 2022, HB 2243 had its third Senate reading and the amended version of HB 2243 passed the Arizona Senate on a 16-12-2-0-0 vote.  Pls. Stipulated Fact 54 (Doc. 571-1 at 7).

154.    On June 23, 2022, HB 2243 was later transferred back to Arizona House of Representatives.  Pls. Stipulated Fact 55 (Doc. 571-1 at 7).

155.    On June 23, 2022, HB 2243 had its final House reading and passed the Arizona House of Representatives with a 31-27-2-0-0 vote.  Pls. Stipulated Fact 56 (Doc. 571-1 at 7).

156.    Former Senator Quezada did not vote in favor of HB 2243.  *See* Trial Ex. 500, at 2:21-4:1.

157.    On June 24, 2022, HB 2243 was transmitted to former Governor Ducey.  Pls. Stipulated Fact 57 (Doc. 571-1 at 7).

158.    Former Governor Ducey signed HB 2243 into law on July 6, 2022.  Pls. Stipulated Fact 58 (Doc. 571-1 at 7).

159.    Legislators who voted in favor of H.B. 2243 and H.B. 2492, include: Walt Blackman, who is black; Lupe Diaz, who is Hispanic; Theresa Martinez, who is Hispanic; Quang Nguyen, who is a naturalized citizen from Vietnam; and TJ Shope, who is Hispanic. B. Toma Dep. at 267:22-268:25; Trial Ex. 975 at 81:5.

**V.    Procedural History of This Case**

   **A.    Plaintiffs are challenging the laws on their face, before implementation.**

160.    Plaintiffs in this consolidated case sued before implementation of HB 2492 or HB 2243 was possible.  They sued on March 30, March 31, June 9, July 5, August 15, August 16, and September 20 of 2022, respectively.  *See* Case Nos. 2:22-cv-00509; 2:22-cv-00519; 2:22-cv-01003; 2:22-cv-01124; 2:22-cv-01369; 2:22-cv-01381; 2:22-cv-01602.[7]

161.    The county recorders, faced with these lawsuits, have declared themselves nominal parties and generally have not yet implemented HB 2492 or HB 2243.  *See, e.g.*, Trial Ex. 136 at 3-6 (Maricopa County Recorder responses to interrogatories); Trial Tr. 74:19–75:15, 79:4–80:23, 83:12-21, 93:20-25, 98:10-22, 112:1-6, 114:20–115:9, 116:9-14,

---

[7] An eighth complaint, led by the Tohono O'odham Nation, was filed on November 7, 2022. *See* Case No. 2:22-cv-01901.  These plaintiffs are no longer participating actively, having been satisfied with the Court's summary judgment ruling.  *See* Docs. 565, 588, 596.

118:5-10 (Day 1 AM, testimony of J. Petty) (listing various ways in which laws have not yet been implemented).[8]

162.    Given the general lack of implementation, Plaintiffs are challenging the laws on their face, not as the laws have been applied in a particular context.

**B.    The Court has already ruled on parts of the challenged laws.**

163.    The Court's summary judgment ruling addressed significant aspects of HB 2492 and HB 2243.  *See* Doc. 534.  The Court held:

a.    NVRA § 6 "preempts H.B. 2492's restriction on registration for presidential elections and voting by mail." *Id.* at 33.

b.    "Arizona must abide by the LULAC Consent Decree and register otherwise eligible State Form users without [proof of citizenship] for federal elections." *Id.* at 34.

c.    "Arizona may not reject a voter registration solely on the basis that the registration does not contain a checkmark in the box next to the question regarding citizenship, if the applicant provides [proof of citizenship] and is otherwise eligible to vote." *Id.* at 34.

d.    HB 2243's list maintenance provisions allow "systematic cancellation of registrations within 90 days of an election" in violation of NVRA § 8(c). *Id.* at 34.

e.    HB 2492's proof of location of residence requirement is preempted by NVRA § 6 with respect to registering Federal Form applicants for federal elections. *Id.* at 9.

f.    HB 2492's proof of location of residence requirement can be satisfied in a variety of ways, detailed in the summary judgment ruling. *See id.* at 33–34.

---

[8] A limited exception appears to be the Cochise County Recorder's Office, which indicated that during the pendency of this litigation it is placing applicants who omit proof of citizenship into a suspense status rather than registering them as federal-only voters. *See* D. Stevens Dep. at 28:12-19, 80:5–81:24.

**C.      Significant parts of the challenged laws remain at issue.**

164.    The Court's summary judgment ruling did not address significant aspects of HB 2492 and HB 2243, including the following:

      a.      **Pre-registration citizenship verification:**  Parts of HB 2492 § 4 specify a pre-registration citizenship verification process for Federal Form applicants who omit proof of citizenship.  *See* A.R.S. § 16-121.01(D), (E).

      b.      **Post-registration citizenship review:** Parts of HB 2243 § 2 specify a post-registration list maintenance process to ensure existing registrants are citizens. *See* A.R.S. § 16-165(A)(10), (G), (H), (I), (J), (K), (L).

      c.      **Referral of federal-only voters to Attorney General:**  HB 2492 § 7 directs the Secretary of State and county recorders to provide the Attorney General a list of registrants who have not provided proof of citizenship, and directs the Attorney General to investigate.  *See* A.R.S. § 16-143.

      d.      **Birth place requirement**: Part of HB 2492 § 4 presumptively requires State Form applicants to write their place of birth.  *See* A.R.S. § 16-121.01(A).

      e.      **Proof of location of residence**:  Part of HB 2492 § 5 requires registration applicants to submit proof of location of residence (as clarified by the Court's summary judgment ruling).  *See* A.R.S. § 16-123.

**VI.      Pre-Registration Citizenship Verification Process (HB 2492 § 4)**

**A.      HB 2492's citizenship verification process is generally consistent with policies that counties were already following.**

165.    The basic steps in HB 2492's pre-registration citizenship verification process (after the Court's summary judgment ruling) are as follows.  For Federal Form applicants who omit proof of citizenship,[9] county recorders must check databases (if they have access) and:

---

[9] Under HB 2492 as originally enacted, these steps apply to *Federal Form* applicants who omit proof of citizenship, whereas *State Form* applicants who omit proof of citizenship would simply be denied registration.  *See* A.R.S. § 16-121.01(C).  However, the Court's

o      If the data show proof of citizenship, the applicant is registered for <u>state and federal elections</u>;

o      If the data show non-citizenship, the applicant is <u>not eligible for any election</u>; and

o      If the data are inconclusive as to citizenship, the applicant is registered for <u>federal elections only</u> (presumably[10]).

*See* A.R.S. § 16-121.01(D), (E).

166.    In addition, such applicants are to be notified when the data show non-citizenship (rendering the applicant not eligible), as well as when the data are inconclusive as to citizenship (rendering the applicant a federal-only voter).  *See* A.R.S. § 16-121.01(E).

167.    These steps resemble the pre-existing policies in the *LULAC* Consent Decree regarding MVD data.  *See* Trial Ex. 24 at 8–10, 13–14.

168.    These steps also resemble the pre-existing policies in the 2019 EPM regarding MVD data and SAVE data.  *See* Trial Ex. 6 at 6–8, 9–10.

169.    That said, some parts of HB 2492's citizenship verification process differ from pre-existing policies.  Most notably:

a.    HB 2492's process lists more databases than county recorders currently use for citizenship verification purposes.  *Compare* A.R.S. § 16-121.01(D), *with* Trial Ex. 6 (2019 EPM) at 6–11.

b.    Also, under HB 2492, if the data show non-citizenship, county recorders must not only deny registration but also forward the application to the county attorney and Attorney General for investigation.  *See* A.R.S. § 16-121.01(E).

---

summary judgment ruling deemed this treatment of State Form applicants inconsistent with the *LULAC* Consent Decree.  *See* Doc. 534 at 34.

[10] Under HB 2492 as originally enacted, if the data were inconclusive as to citizenship, the applicant could not vote in presidential elections or by mail with an early ballot until proof of citizenship is provided.  *See* A.R.S. § 16-121.01(E).  However, the Court's summary judgment ruling deemed this provision preempted by NVRA § 6.  *See* Doc. 534 at 33.

**B.      Plaintiffs have not shown that county recorders will use the databases in HB 2492 unreliably for citizenship verification.**

   **1.      MVD data**

170.    County recorders have long used MVD data for citizenship verification.  For example:

   a.      In the *Gonzalez* trial, this Court observed that driver's licenses are verified using the Secretary of State's online voter registration system, which compares information "against the MVD database" and flags applicants who have foreign-type licenses, i.e., "licenses to non-citizens who establish lawful presence." *Gonzalez*, 2008 WL 11395512, at *6.

   b.      Similarly, under the *LULAC* Consent Decree, MVD data are to be used for citizenship verification.  *See* Trial Ex. 24 at 8–10, 13–14.

   c.      Similarly, under the 2019 EPM, MVD data are to be used for citizenship verification.  *See* Trial Ex. 6 at. 6–8.

171.    MVD data are generally reliable for citizenship verification purposes.  For example:

   a.      In the *Gonzalez* trial, this Court found a "reasonable relationship between the type of license issued and a person's citizenship status." *Gonzalez*, 2008 WL 11395512, at *6–7.

   b.      Both Plaintiffs' and Defendants' experts agreed that MVD data are generally reliable.  *See* Trial Tr. 1189:24–1190:1 (Day 5 PM, testimony of M. McDonald); Trial Tr. 1907:2-16 (Day 8 AM, testimony of J. Richman).

   c.      Under the current MVD system, an MVD representative "would have to make multiple errors" to mistakenly flag a licensee as a non-citizen.  Trial Tr. 548:14–585:1 (Day 3 AM, testimony of E. Jorgensen).  Similarly, under the previous MVD system, the "default setting" was citizenship, so an MVD representative "would have to add a foreign characteristic" in error to mistakenly flag a licensee as a non-citizen. *Id.* 582:2-19.

1          d.      Although MVD representatives sometimes make data entry errors, the
2 vast majority of MVD transactions have "no error anywhere on the transaction."
3 Trial Tr. 548:9-21 (Day 3 AM, testimony of E. Jorgensen).  Even when there is an
4 error, it is often something mundane such as "an improper scan."  *Id.* 548:22–
5 549:22.[11]

6          e.      Although MVD data sometimes yield only a "soft match" with a voter
7 registration applicant, county recorders have procedures for determining whether the
8 match is correct, and supervisors are available to assist.  *See, e.g.*, Trial Tr. 36:18–
9 37:11 (Day 1 AM, testimony of J. Petty).  Plaintiffs' expert could not identify any
10 voter who was negatively affected by the "soft match" procedure.  *See* Trial Tr.
11 1181:20-22 (Day 5 PM, testimony of M. McDonald).

12      172.   If MVD data indicate that a person has a foreign-type license, that means the
13 person provided a form of non-citizen authorized presence at the time of the MVD
14 transaction.  *See* Pls. Stipulated Facts 78–91 (Doc. 571-1 at 8–9).

15      173.   Because a non-citizen can become naturalized after transacting with MVD
16 and need not notify MVD of naturalization, it is possible for a recently naturalized citizen
17 to still have a foreign-type license.  *See* Pls. Stipulated Facts 93–97 (Doc. 571-1 at 9–10).

18      174.   That said, a naturalized citizen cannot have a foreign-type license indefinitely,
19 because such licenses have an expiration date (which usually coincides with when the
20 underlying authorized presence document expires).  Once a naturalized citizen renews their
21 license, MVD would then identify the person as a citizen.  *See* Trial Ex. 233 (MVD policy
22 on Credential Renewal) at 4–5; E. Jorgensen Dep. 67:12–68:18, 71:11-20.

23      175.   The possibility that a recently naturalized citizen may still have a foreign-
24 type license does not mean county recorders will use MVD data unreliably, for several reasons:

25          a.      Election officials are generally aware of the possibility that a recently
26 naturalized citizen may still have a foreign-type license.  For example, the State Form

---

[11] MVD does not test specifically for error rates in the citizenship field.  Trial Tr. 587:13-17 (Day 3 AM, testimony of E. Jorgensen).

has instructions for this situation: "[I]f your license was issued when you were *not* a U.S. citizen but you later became a citizen, complete Box 11 [which requests an immigration-related number] or provide another form of proof of citizenship."  Trial Ex. 27 (State Form) at 3.[12]

b.      Naturalized citizens may submit something besides a driver's license number as proof of citizenship when they register.  For example, some naturalized citizens register to vote at their naturalization ceremony, using a naturalization certificate.  *See* Trial Ex. 6 (2019 EPM) at 10 (explaining process of registering at naturalization ceremony); *accord Gonzalez*, 2008 WL 11395512, at *21 n.24 (noting that "counties often, if not always, attend naturalization ceremonies" where applicants may present "naturalization certificate as proof of citizenship").

c.      Even if a recently naturalized citizen submits a foreign-type license number as his or her only proof of citizenship:  The county recorder must then notify the applicant, in which case the applicant can provide alternate proof such as an immigration-related number.  *See* A.R.S. § 16-121.01(E); Trial Ex. 6 at 7–8; *accord Gonzalez*, 2008 WL 11395512, at *17 ("[I]f a newly naturalized citizen uses a [foreign-type] license to register to vote and is required to provide additional proof of citizenship, the applicant merely has to file a new form to register using his or her [alien registration] number.").

176.    Plaintiffs' expert compared voter registration data with MVD data and found 6,048 instances of full-ballot voters (i.e. voters who according to a county recorder provided proof of citizenship) for whom MVD showed a foreign-type license.  Trial Tr. 1088:16–1089:5 (Day 5 AM, testimony of M. McDonald).  However, he did not calculate what percentage of the total MVD foreign-type license transactions this constituted.  Trial Tr. 1189:20-23 (Day 5 PM, testimony of M. McDonald).  He also acknowledged that this number could include:

---

[12] The EAC refused Arizona's request to alter the Federal Form to include state-specific instructions regarding proof of citizenship.  *See Kobach*, 772 F.3d at 1187–88.

a.      Naturalized citizens who simply submitted proof of citizenship other than a driver's license (such as an immigration-related number) with their voter registration form;

b.      Naturalized citizens who initially submitted a foreign-type license with their voter registration form, and upon being notified that the license was foreign-type, submitted alternate proof (such as an immigration-related number);

c.      Persons who are *non*-citizens but were mistakenly registered by county recorders as full-ballot voters;

d.      Persons who were citizens when they registered to vote, then *renounced* citizenship, then later transacted with MVD.

*Id.* 1170:9–1172:5.

177.   Plaintiffs have not identified anyone who was ultimately unable to register to vote because of how county recorders use MVD data—even though county recorders have been using MVD data for citizenship verification since before the *Gonzalez* trial in 2008.

### 2.     SAVE data

178.   County recorders have long used SAVE data for citizenship verification.  For example:

a.      In the *Gonzalez* trial, this Court observed that alien registration numbers "are verified using USCIS's online system called the Systematic Alien Verification for Entitlements Program."  *Gonzalez*, 2008 WL 11395512, at *6.

b.      Under the 2019 EPM, SAVE data are used for citizenship verification.  *See* Trial Ex. 6 at 9–10.

179.   MVD also uses SAVE data for citizenship verification.  *See* Trial Tr. 588:4-20 (Day 3 AM, testimony of E. Jorgensen).

180.   SAVE data are generally reliable for purposes of citizenship verification.  *See, e.g.*, USCIS Dep. 209:12-23.

181.   Plaintiffs' expert claimed that the SAVE database sometimes experiences lag, but he could not specify a typical lag time, and he eventually admitted that a lag time of

1    more than two days would be atypical.  *See* Trial Tr. 1182:7-23, 1214:19–1215:21 (Day 5

2    PM, testimony of M. McDonald).

3        182.    Plaintiffs' expert claimed that the SAVE database sometimes has reliability

4    issues, but he could not identify any Arizona voter who has been affected.  *See* Trial Tr.

5    1181:25–1182:3 (Day 5 PM, testimony of M. McDonald).

6        183.    Plaintiffs' expert claimed there were times when the SAVE database could

7    not answer a query by county recorders and requested more information, but county

8    recorders did not provide it.  But he acknowledged that in those situations perhaps county

9    recorders just followed up with the applicant to get different proof of citizenship, such as a

10   copy of the applicant's certificate of naturalization.  *See* Trial Tr. 1184:5–1187:9 (Day 5

11   PM, testimony of M. McDonald); *accord Gonzalez*, 2008 WL 11395512, at *17 (explaining

12   that naturalized citizen may provide, instead of immigration-related number, copy of

13   naturalization certificate, copy of U.S. passport, or driver's license number).

14       184.    In any event, the possibility of database issues with SAVE does not mean

15   county recorders will use SAVE unreliably, for two reasons:

16           a.      Election officials are generally aware of possible database issues.  For

17       example, the 2019 EPM acknowledges the possibility of delay between when a

18       registrant becomes a U.S. citizen and when SAVE is updated and directs county

19       recorders to take precautions accordingly.  *See* Trial Ex. 6 (2019 EPM) at 10–11.

20           b.      Even if a recently naturalized citizen submits an immigration-related

21       number as the only proof of citizenship and SAVE does not work properly:  The

22       county recorder must then notify the applicant, in which case the applicant can

23       provide alternate proof such as a copy of a naturalization certificate.  *See* A.R.S.

24       § 16-121.01(E); Trial Ex. 6 at 5, 9–10; *accord Gonzalez*, 2008 WL 11395512, at *17

25       (listing options for proof of citizenship).

26       185.    Plaintiffs have not identified anyone who was ultimately unable to register to

27   vote because of how county recorders use SAVE data—even though county recorders have

28   been using SAVE data for citizenship verification since before the *Gonzalez* trial in 2008.

### 3.   Social Security Administration data

186.   County recorders have long used Social Security Administration ("SSA") data to help confirm an applicant's identity.  For example:

a.   In the *Gonzalez* trial, this Court noted that the Secretary of State's online registration system "checks voter registration information against the Social Security Administration database."  *Gonzalez*, 2008 WL 11395512, at *6 & n.10.

b.   Under the 2019 EPM, checking SSA data (along with MVD data) "confirms the registrant's identity and helps ensure the integrity of registration rolls."  Trial Ex. 6 (2019 EPM) at 23; *accord* Trial Tr. 37:22–38:15 (Day 1 AM, testimony of J. Petty).

187.   However, county recorders do not have direct access to SSA data.  Rather, they have access through the statewide voter registration database (AVID), which itself has access through MVD.  *See* Trial Tr. 38:21–39:1 (Day 1 AM, testimony of J. Petty).

188.   The current way in which county recorders (indirectly) access SSA data does not provide them citizenship information.  *See* Trial Tr. 38:16-20, 67:2-5 (Day 1 AM, testimony of J. Petty).

189.   Plaintiffs have not presented evidence of any plan for county recorders to obtain more access to SSA data than they have now.  In fact, Plaintiffs' expert testified that although the SSA database "does have citizenship information," county recorders "would not have access" to it as currently configured.  Trial Tr. 1090:13–1091:6 (Day 5 AM, testimony of M. McDonald).

190.   HB 2492 directs county recorders to check SSA databases only if "the county has access."  A.R.S. § 16-121.01(D).  Plaintiffs have not shown that county recorders have access, or will have access, to SSA databases for citizenship verification purposes.

191.   In the hypothetical event that county recorders gain access to SSA data for citizenship verification, Plaintiffs have not shown that the data would be unreliable for this purpose.

192.    Plaintiffs' expert claims to have reviewed the reliability of the SSA database, but he "didn't have the data" in the same way he had voter registration data and MVD data, so instead he relied on "reports back in the 2000s."  He admitted the reports were "a little dated," but said he "do[es]n't think" circumstances have changed since then.  *See* Trial Tr. 1092:4-15 (Day 5 AM, testimony of M. McDonald).

193.    Plaintiffs' expert testified that, based on those reports in the 2000s, the error rate in the SSA database was "about six percent."  Trial Tr. 1093:6-8 (Day 5 AM, testimony of M. McDonald).[13]

194.    Even assuming this error rate to be true today, this does not mean county recorders would use the data unreliably, for two reasons:

a.    In other contexts, when election officials have become aware of database issues, they have adjusted accordingly.  *See, e.g.*, Trial Ex. 27 at 3 (State Form explaining what to do if driver's license was obtained before naturalizing); Trial Ex. 6 at 10–11 (EPM noting SAVE lag).

b.    Even if an applicant submits Social Security information as proof of citizenship and the SSA database does not work properly:  The county recorder must then notify the applicant, in which case the applicant can provide alternate proof. *See* A.R.S. § 16-121.01(E).

195.    Plaintiffs have not identified anyone who has been or will be unable to register to vote based on the hypothetical future use of SSA data for citizenship verification purposes.

**4.    National Association for Public Health Statistics and Information Systems electronic verification of vital events**

196.    The National Association for Public Health Statistics and Information Systems ("NAPHSIS") is an organization that collects vital record data, such as birth date

---

[13] Plaintiffs' expert also testified that, if county recorders were to look up "just the last four digits" of a Social Security number, the database could return multiple matches.  *See id.* 1092:16–1093:5. But this testimony was in reference to the "HAVV system," which he acknowledged is not for citizenship verification. *See id.* 1090:15–1091:6.

and birth place information, from across the country.  *See* Trial Tr. 1099:16-25, 1100:21–1101:4 (Day 5 AM, testimony of M. McDonald); Trial Tr. 1909:1-15, 1910:1–1911:17 (Day 8 AM, testimony of J. Richman).

197.  County recorders do not currently have access to NAPHSIS data, nor is it currently mentioned in the EPM.  *See, e.g.*, Trial Tr. 68:19–69:16 (Day 1 AM, testimony of J. Petty); *see generally* Trial Ex. 6 (2019 EPM).

198.  Plaintiffs have not presented evidence of any plan for county recorders to obtain access to NAPHSIS data.  However, Plaintiffs' expert testified that NAPHSIS allows data searching by "[a]nyone who has a contract with them that they've granted access to their system."  Trial Tr. 1099:16–1101:4 (Day 5 AM, testimony of M. McDonald).

199.  If county recorders gain access to NAPHSIS for citizenship verification purposes, the data could be used for that purpose.  For example, if a registration applicant claims to have been born in a specific U.S. state, vital record data collected by NAPHSIS could be used to verify that claim.  *See* Trial Tr. 1911:18–1913:17 (Day 8 AM, testimony of J. Richman).

200.  Other states currently use NAPHSIS data for voter registration purposes.  For example, Missouri uses it to establish voter identification.  *See* Trial Tr. 1914:15-20 (Day 8 AM, testimony of J. Richman).

201.  The U.S. Election Systems Commission has recommended NAPHSIS data as a tool for states to improve election practices.  *See* Trial Tr. 1914:23–1915:7 (Day 8 AM, testimony of J. Richman).

202.  The Social Security Administration uses NAPHSIS data to verify individuals' birth information.  *See* Trial Tr. 1909:8-15, 1942:14-16 (Day 8 AM, testimony of J. Richman).

203.  Plaintiffs have not shown that NAPHSIS data would be unreliable for citizenship verification purposes.  Plaintiffs' expert explained its general nature but did not analyze it.  *See* Trial Tr. 1099:16–1101:5 (Day 8 AM, testimony of McDonald).

204.    Even if issues with NAPHSIS data arise, that does not mean county recorders would use the data unreliably, for two reasons:

    a.    In other contexts, when election officials have become aware of possible database issues, they have adjusted accordingly.  *See, e.g.*, Trial Ex. 27 at 3 (State Form explaining what to do if driver's license was obtained before naturalizing); Trial Ex. 6 at 10–11 (EPM noting SAVE lag).

    b.    Even if an applicant submits birthplace information and NAPHSIS does not work properly, the county recorder must then notify the applicant, and the applicant could provide alternate proof.  *See* A.R.S. § 16-121.01(E).

205.    Plaintiffs have not identified anyone who has been or will be unable to register to vote based on the possible future use of NAPHSIS data for citizenship verification purposes.

**5.    Any other database relating to voter registration, including Electronic Registration Information Center data**

206.    The Electronic Registration Information Center ("ERIC") is an organization made up of participating states, including Arizona.  *See* Trial Tr. 70:19-25 (Day 1 AM, testimony of J. Petty).

207.    Each participating state periodically exports motor vehicle data and voter registration data, and the data become intermingled together.  Trial Tr. 95:20–96:6 (Day 1 AM, testimony of J. Petty).

208.    The participating states receive reports, based on each state's information, to help in list maintenance.  *See* Trial Tr. 70:22-25 (Day 1 AM, testimony of J. Petty); Trial Tr. 2044:6-9 (Day 8 PM, testimony of H. Hiser).

209.    In Arizona, the Secretary of State is responsible for acquiring information from ERIC, sorting it, and distributing it to county recorders.  Trial Ex. 6 (2019 EPM) at 36.

210.    County recorders do not currently receive citizenship information from ERIC.  *See* Trial Tr. 71:1-3 (Day 1 AM, testimony of J. Petty).

211.   Plaintiffs have not presented evidence of any plans for county recorders to begin receiving citizenship information from ERIC.

212.   Plaintiffs have not shown that ERIC, if used for citizenship verification purposes, would be unreliable.

213.   Plaintiffs have not identified anyone who has been or will be unable to register to vote based on the possible future use of ERIC for citizenship verification purposes.

214.   Beyond the databases described above, county recorders are not aware of other databases to which they have access that could verify citizenship.  *See, e.g.*, Trial Tr. 714-7 (Day 1 AM, testimony of J. Petty).

**C.   Adding databases to the pre-existing citizenship verification process increases accuracy and efficiency.**

215.   As explained above, county recorders currently use MVD and SAVE data for citizenship verification, but not SSA, NAPHSIS, or ERIC data.

216.   The fact that county recorders currently use multiple databases for citizenship verification (MVD and SAVE) makes the process more accurate and efficient.   For example, if a naturalized citizen submits a driver's license number as the only proof of citizenship but is flagged by MVD as a foreign-type license, ordinarily she would not be registered for state or federal elections until alternate proof if provided.  *See* Trial Ex. 6 (2019 EPM) at 7.  But county recorders also use SAVE, so if the abovementioned applicant also included immigration-related information on her form (as expressly instructed in the State Form), the county recorder could use SAVE to verify citizenship without requiring the applicant to do more.  *See id.* at 9; *see also* Trial Tr. 1907:24–1908:25 (Day 8 AM, testimony of J. Richman) (explaining this point).

217.   And including more databases in this verification process, if implemented reasonably, would make the process even more accurate and efficient.  For example, under current procedures, if a natural-born citizen submits a driver's license number as the only proof of citizenship but is not matched with MVD at all (or submits no driver's license number), ordinarily that applicant would be registered only for federal elections until

alternate proof if provided.  *See* Trial Ex. 6 (2019 EPM) at 6–7.  But if county recorders began using NAPHSIS, and if the abovementioned applicant had listed a specific U.S. state of birth on his or her form, the county recorder could use NAPHSIS to verify birthplace (and thus citizenship) without requiring the applicant to do more.  *See* Part VI.B.4 above; *see also* Trial Tr. 1911:18–1913:17 (Day 8 AM, testimony of J. Richman) (explaining this point).[14]

**D.    Adding databases to the pre-existing citizenship verification process also improves voter confidence.**

218.    Returning to the last example above:   Under pre-existing procedures, a registration applicant who submits a driver's license as the only proof of citizenship and is not matched with MVD would be registered for federal elections.  *See* Trial Ex. 6 (2019 EPM) at 6–7.  But members of the public may suspect that such registrants are not citizens and thus feel less confident that Arizona elections are being decided entirely by citizens. *See* Part III.A above.

219.    However, if county recorders were to use additional databases—for example, using NAPHSIS to verify applicants' states of birth—the above-described federal-only voter could be confirmed as a citizen and become a full-ballot voter.  *See* Part VI.B.4 above. This, in turn, could improve public confidence in Arizona elections.  *See* Trial Tr. 1935:14–1937:2 (Day 8 AM, testimony of J. Richman) (explaining this point).

**E.    Plaintiffs have not shown that referrals to the county attorney and Attorney General would cause harm.**

220.    Under HB 2492's citizenship verification process, if the data show non-citizenship, county recorders must "forward the application to the county attorney and attorney general for investigation."  A.R.S. § 16-121.01(E).

221.    There is no evidence that such a referral has been made.

---

[14] This information is most likely to affect the approximately 5% of Arizona voters who are not matched to the MVD system, but whose citizenship may be verified (without placing further documentation burdens on the voter) based on the voter's name, birth date, and birth place information available in NAPHSIS.  *See* Trial Tr. 1912:7–1913:11 (Day 8 AM, testimony of J. Richman).

1   222.   There is no evidence that if such a referral were made, the county attorney or
2   Attorney General would open an investigation.

3   223.   There is no evidence that if the county attorney or Attorney General were to
4   open an investigation, they would investigate in a way that would cause harm or otherwise
5   be improper.

6   224.   For example, for current investigations into the citizenship status of a voter,
7   the Attorney General's Office would review databases, including some used in current voter
8   registration processes and cited by HB 2492.  *See* Trial Tr. 2114:22–2116:21, 2117:8–
9   2119:6 (Day 9, testimony of B. Knuth) (discussing review of MVD and SSA information).
10  If there is no evidence to substantiate a complaint that a voter is not a citizen, investigators
11  do not open an investigation.  *Id.* 2118:15–2119:6.   The Election Integrity Unit's
12  investigator has never needed to contact an individual in connection with a citizenship
13  voting investigation.  *Id.* 2138:25-2139:14.  And while an investigator may speak to the
14  registered voter, their family members, or potentially their employer, if needed,
15  investigators generally would not do so absent unusual circumstances.  *Id.* 2131:5–2132:7.

16      **F.    Plaintiffs' other concerns about implementation are unsupported.**

17          **1.    Concern about unduly burdening applicants**

18  225.   In *Gonzalez*, this Court considered evidence of the availability and cost of
19  proof of citizenship, as well as the process by which county recorders verify citizenship,
20  and concluded that requiring proof of citizenship does not excessively burden naturalized
21  citizens or the general population.  *See Gonzalez*, 2008 WL 11395512, at *4–8, 17–18.

22  226.   Plaintiffs have not shown that HB 2492's citizenship verification process will
23  burden citizens more than the process examined and approved in the *Gonzalez* trial.

24  227.   If anything, HB 2492's citizenship verification process is less burdensome
25  because it adds more ways in which citizenship can be verified independent of the voter.
26  *See* Part VI.C above.

27  228.   Plaintiffs have not identified any citizen in Arizona who is likely to be
28  burdened by HB 2492's citizenship verification process, much less unduly so.

229.    Plaintiffs' expert Dr. Burch did not identify anyone who will be affected by the challenged laws, nor did she try to quantify how many people (if any) will be affected. Trial Tr. 974:20-25 (Day 4 PM, testimony of T. Burch).

230.    Similarly, Plaintiffs' expert Dr. McDonald is not aware of any specific voter who will be affected by the challenged laws.  Trial Tr. 1193:2-11 (Day 5 PM, testimony of M. McDonald).

231.    Plaintiffs' expert Dr. Burch is not aware of any citizen in Arizona who lacks proof of citizenship, nor did she try to quantify how many citizens in Arizona lack proof of citizenship, nor did she try to quantify how many federal-only voters lack proof of citizenship.  Trial Tr. 970:20–971:5, 973:7-23 (Day 4 PM, testimony of T. Burch).

232.    Similarly, Plaintiffs' expert Dr. McDonald is not aware of any citizen in Arizona who lacks proof of citizenship.  Trial Tr. 1187:10-20 (Day 5 PM, testimony of M. McDonald).

233.    Plaintiffs' expert Dr. Burch cited a General Accountability Office ("GAO") report about Congress' decision to begin requiring certain Medicaid applicants to show proof of citizenship rather than just attest to citizenship.  *See* Trial Tr. 976:8-19 (Day 4 PM, testimony of T. Burch).  According to the GAO, 12 states reported that the requirement had no effect; 10 reported that they did not know the effect; and 22 reported declines in enrollment, and a majority of those 22 attributed the decline to delays or losses for applicants who appeared to be citizens.  *See id.* 977:16–978:2.  However, the Centers for Medicare & Medicaid Services ("CMS") criticized the GAO report, stating that the title was misleading given the survey results and lack of supporting data and that the report reached conclusions largely based on state responses unsubstantiated by enrollment data.  *See id.* 978:3-25; *see also* Trial Tr. 1660:22–1661:7 (Day 7 AM, testimony of M. Hoekstra).

234.    In contrast, as explained by Dr. Hoekstra, a well-designed study concluded that Congress' proof of citizenship requirement for Medicaid did not cause a statistically significant enrollment decrease among citizens, but did appear to deter participation among non-citizens.  *See* Trial Tr. 1660:6–1667:19 (Day 7 AM, testimony of M. Hoekstra).

235.    Well designed studies of voter ID requirements more generally have not yielded statistically significant evidence of adverse effects on voter turnout.  For example, an analysis of 1.6 billion observations over a ten-year period found that voter ID laws had no effect on overall voter turnout, and were associated with a statistically significant *increase* in turnout among Hispanic voters.  *See* Trial Tr. 1667:24–1670:25 (Day 7 AM, testimony of M. Hoekstra).

236.    Prior research conducted in other contexts by Dr. Minnite and Dr. Hersh, both of whom testified as experts for Plaintiffs in this case, likewise found that effects of voter ID laws on participation rates were either inconclusive or minimal.  *See* Trial Tr. 1728:3-19 (Day 7 PM, testimony of M. Hoekstra).

237.    Plaintiffs' expert Dr. Burch is not aware of any citizen in Arizona who fears being investigated as a result of these challenged laws, nor has she spoken with any Arizona voter.  Trial Tr. 972:2-25 (Day 4 PM, testimony of T. Burch).

238.    Similarly, Plaintiffs' expert Dr. McDonald has not spoken with any Arizona voter about how they might feel about the possibility of investigation or anything else about the challenged laws.  Trial Tr. 1193:12–1194:3 (Day 5 PM, testimony of M. McDonald).

239.    Plaintiffs' expert Dr. Burch cited data indicating reluctance by Hispanic individuals to respond to Census surveys, but these data do not distinguish between citizen and non-citizen respondents and thus have limited relevance to voter registration, which is limited to citizens.  *See* Trial Tr. 1744:7–1745:8 (Day 7 PM, testimony of M. Hoekstra).

240.    In contrast, a study directly pertaining to resulting voting behavior by individuals who had been subjected to citizenship inquiries during an (eventually aborted) list maintenance program in Florida found that individuals who had received and responded to correspondence from elections officials requesting citizenship documentation were *more* likely to vote in the next election than individuals who had not responded.  *See* Trial Tr. 1736:3–1737:19 (Day 7 PM, testimony of M. Hoekstra).

241.    Plaintiffs' expert Dr. McDonald's opinion that interactions with law enforcement depress turnout among minority voters was predicated in part on a study by

Dr. Burch that does not purport to examine any causal relationship between encounters with the criminal justice system and voting. *See* Trial Tr. 1737:24–1738:23 (Day 7 PM, testimony of M. Hoekstra). And none of the studies on which Dr. McDonald relied considered a challenge to someone's voter registration as opposed to some other unlawful act. *See id.* 1738:24–1741:15.

### 2. Concern about applicants not receiving adequate notice or opportunity to cure

242. Under the citizenship verification procedures that existed before HB 2492, registration applicants for whom database checks indicate non-citizenship or lack of proof of citizenship would receive notice, thereby having an opportunity to cure by submitting alternate proof of citizenship. *See* Trial Ex. 6 (2019 EPM) at 6–10.

243. There is no evidence that HB 2492's citizenship verification process would require inadequate notice and opportunity to cure. Quite the opposite: Under HB 2492, county recorders now have a statutory obligation to "notify the applicant" when database checks indicate non-citizenship or are inconclusive as to citizenship. A.R.S. § 16-121.01(E).

244. The statutory obligation to "notify the applicant" in HB 2492 is not limited to specific languages. Moreover, there is no evidence that county recorders would refuse to translate if asked. *See, e.g.*, Trial Tr. 2059:7-9 (Day 8 PM, testimony of H. Hiser) (explaining that office would translate letter if asked).

245. Similarly, the statutory obligation to "notify the applicant" in HB 2492 is not limited to non-forwardable mail.

246. Plaintiffs have not identified anyone who did not receive adequate notice or opportunity to cure under the pre-existing procedures for citizenship verification.

247. Plaintiffs have not identified anyone who will not receive adequate notice or opportunity to cure under HB 2492's citizenship verification process.

248. Plaintiffs' expert Dr. McDonald is not aware of anyone in Arizona who was sent a request for proof of citizenship under existing procedures and did not receive the

1    request, could not read it, or had difficulty responding to it. *See* Trial Tr. 1178:2-19 (Day

2    5 PM, testimony of M. McDonald).

3                    **3.      Concern about inconsistent implementation**

4          249.    Historically, election officials in Arizona have been able to reach consensus

5    on procedures for verifying citizenship. *See, e.g.*, *Gonzalez*, 2008 WL 11395512, at \*20

6    n.2 (noting that when "problems[] surfaced regarding Proposition 200's implementation,

7    the response by the State and County Defendants was consistent and immediate").

8          250.    For example, the 2019 EPM includes detailed procedures on using MVD and

9    SAVE data for citizenship verification, which have been refined after years of experience.

10   *See* Trial Ex. 6 at 6–10.

11         251.    The 2023 draft EPM is under review, and in any event, there are additional

12   ways in which election officials can reach consensus too. *See* Part I.E.2 above.

13         252.    Plaintiffs have not shown that county recorders have been substantially

14   inconsistent in implementing citizenship verification procedures before HB 2492.

15         253.    To the extent there have been differences among county recorders in the past

16   regarding how to handle proof of citizenship:

17              a.      In many cases differences can be resolved simply by educating

18         recorders about the EPM or the databases used. *See, e.g.*, Trial Tr. 1187:21–1188:10

19         (Day 5 PM, testimony of M. McDonald) (opining that perceived outlier behavior of

20         Pima County "would be a variance from the Elections Procedures Manual"); *id.*

21         1175:2–1176:13 (opining that, though some county recorders have expressed

22         differing views on whether MVD data is "fully dispositive" of citizenship, the

23         majority of recorders have the better view).

24              b.      In some cases, differences are to be expected because the task involves

25         a degree of judgment. *See, e.g.*, Part II.A.6 above.

26         254.    Plaintiffs' expert expressed concern that county recorder behavior may

27   change once it is "a felony if they knowingly register an individual who is not a citizen."

28   Trial Tr. 1101:7–1102:7 (Day 5 AM, testimony of M. McDonald).    This concern is

1  speculative, and in any event, similar criminal provisions already existed before the

2  challenged laws.  *See* A.R.S. § 16-182 (knowing registration of ineligible person is class 6

3  felony); A.R.S. § 16-183 (knowing disregard of Title 16, chapter 1 is class 6 felony).

4  255.   Plaintiffs have not shown that county recorders will be inconsistent in how

5  they implement HB 2492's citizenship verification process.

6  **4.    Concern about county recorders using SAVE in a manner inconsistent with USCIS authorization**

7

8  256.   HB 2492 directs county recorders to check databases "provided the county

9  has access."  A.R.S. § 16-121.01(D).  In addition, for SAVE in particular, HB 2492 directs

10  county recorders to check the database "if practicable."  A.R.S. § 16-121.01(D)(3).

11  257.   County recorders access SAVE pursuant to the Secretary of State's

12  memorandum of agreement with USCIS.  *See* Trial Ex. 6 (2019 EPM) at 9.  Accordingly,

13  for purposes of HB 2492, county recorders do not currently have "access" to SAVE for a

14  use inconsistent with USCIS authorization, nor would such a use be "practicable."

15  258.   To the extent Plaintiffs are concerned that county recorders may use SAVE

16  in a manner inconsistent with USCIS authorization, Plaintiffs have not shown that county

17  recorders will use SAVE in this way, nor that such a use would be the result of HB 2492.

18  **G.    Plaintiffs have not shown actual or imminent concrete and particularized injury due to HB 2492's citizenship verification process.**

19

20  **1.    Lack of injury generally**

21  259.   No Plaintiff has presented evidence that any citizen will be unable to register

to vote due to HB 2492's citizenship verification process.  *See, e.g.*, Trial Tr. 1281:24-

22  1282:2 (Day 5, testimony of M. Tiwamangkala, Arizona Asian American Native Hawaiian

23  and Pacific Islander for Equity Coalition); Trial Tr. 1304:8-10 (Day 6 AM, testimony of N.

24  Herrera, Poder LatinX).

25  260.   No Plaintiff has identified any citizen who would be unable to provide proof

26  of citizenship as defined in A.R.S. § 16-166(F).  *See, e.g.*, Trial Tr. 210:13-17, 21-22 (Day

27  1 PM, testimony of J. Garcia, Chicanos Por La Causa Action Fund); 248:9-13, 17 (Day 1

28

PM, testimony of A. Patel, Voto Latino); 282:16-283:3 (Day 1 PM, testimony of R. Bolding, Arizona Coalition for Change); Trial Tr. at 442:17-443:3 (Day 2 PM, testimony of R. Reid Democratic National Committee); 470:4-6 (Day 2 PM, testimony of K. Nitschke, Arizona Student's Association); 522:4-17 (Day 2 PM, testimony of M. Dick, Arizona Democratic Party); Trial Tr. 754:24-755:4 (Day 3 PM, testimony of L. Camarillo, Southwest Voter Registration Education Project); Trial Tr. 807:19-808:1 (Day 4 AM, testimony of C. Rodriguez-Greer, Mi Familia Vota); Trial Tr. 1282:8-13 (Day 5, testimony of M. Tiwamangkala, Arizona Asian American Native Hawaiian and Pacific Islander for Equity Coalition); Trial Tr. 1305:3-8 (Day 6 AM, testimony of N. Herrera, Poder LatinX); Trial Tr. 1330:25-1331:5, 1331:11-12 (Day 6 AM, testimony of P. Falcon, Promise Arizona).

261.    No Plaintiff will suffer, and no Plaintiff claims, a cognizable injury if a non-citizen is unable to register to vote due to HB 2492's citizenship verification process. *See, e.g.*, Trial Tr. 248:5-6 (Day 1, testimony of A. Patel, Voto Latino).

### 2.    Mi Familia Vota Plaintiffs

262.    Mi Familia Vota presented no evidence that it, or anyone it serves, has been or will be injured due to HB 2492's citizenship verification process, nor that its mission will be perceptibly impaired due to this process.

263.    Voto Latino presented no evidence that it, or anyone it serves, has been or will be injured due to HB 2492's citizenship verification process, nor that its mission will be perceptibly impaired due to this process.

264.    Voto Latino's managing director testified that after the bill was passed, the organization produced educational content regarding HB 2492 generally. Trial Tr. 237:11-15 (Day 1 PM, testimony of A. Patel, Voto Latino). Voto Latino provided no evidence that this content addressed HB 2492's citizenship verification process. Regardless, this type of expenditure does not constitute an injury attributable to HB 2492's citizenship verification process because it is part of the organization's regular mission to inform voters regarding the registration and voting process. *Id.* 217:14-218:1.

265.    Voto Latino's claim of injury related to HB 2492's citizenship verification process is based on an incorrect interpretation that if a voter registration form is not accompanied by proof of citizenship and cannot be acquired by a county recorder, that the voter will not be registered as a federal only voter, contrary to this Court's earlier ruling. *See* Trial Tr. 235:2-15; Doc. 534 at 34.

266.    Voto Latino's regular mission includes voter registration activities, including registering new voters.  Trial Tr. 217:14-218:1.  Voto Latino speculated that it will need to engage with more potential voters to successfully register a voter as a result of HB 2492's birth place requirement and generally asserted that HB 2492 will make it more difficult to register Latino voters.  *Id.* 229:17-24, 238:9-16.  Voto Latino presented no evidence to support these assertions, which, even if true, would not constitute an injury because such activities are part of Voto Latino's regular mission. Voto Latino also presented no evidence that HB 2492's citizenship verification process would cause this alleged harm.

267.    Voto Latino claims that a potential Attorney General investigation under HB 2492 will dampen voter registration in the Latino community. Trial Tr. 236:9-23. Voto Latino did not specify whether its concerns applied to a potential investigation conducted after HB 2492's citizenship verification process or HB 2492's provision to refer federal-only voters to the Attorney General. Voto Latino also presented no evidence to support its assertion that HB 2492 generally will impact voter registration rates. While an investigation under HB 2492's citizenship verification process is theoretically possible, it is not impending and Voto Latino presented no evidence that it, or anyone, is likely to be harmed by to such an investigation.

268.    Voto Latino has also speculated that it will need to spend additional resources if investigation referral provisions are implemented, to achieve similar levels of voter turnout. Trial Tr. 236:24-237:8. Again, Voto Latino did not specify whether its concerns applied to a potential Attorney General investigation conducted after HB 2492's citizenship verification process or HB 2492's provision to refer federal-only voters to the Attorney General. Regardless, Voto Latino presented no evidence to support its assertion that HB

2492 generally would impact voter turnout. Even if true, spending resources encouraging registered voters to vote is part of Voto Latino's regular mission and does not constitute an injury.

### 3.   LUCHA Plaintiffs

269.   Living United for Change ("LUCHA") presented no evidence that it, any of its members, or anyone it serves, has been or will be injured due to HB 2492's citizenship verification process, nor that its mission will be perceptibly impaired due to the process.

270.   League of United Latin American Citizens Arizona ("LULAC") presented no evidence that it, any of its members, or anyone it serves, has been or will be injured due to HB 2492's citizenship verification process, nor that its mission will be perceptibly impaired due to the process.

271.   Despite having half a million members and having been a party to this lawsuit for approximately one year, the Arizona Students' Association has not identified any specific member who has been or is likely to be injured by HB 2492's citizenship verification process. Trial Tr. 446:18-21; 466:2-5 (Day 2 PM, testimony of K. Nitschke, Arizona Student's Association).

272.   The Arizona Students' Association presented no evidence at trial that its mission will be perceptibly impaired by HB 2492's citizenship verification process.

273.   The co-Executive Director of the Arizona Students' Association testified that the organization updated its voter registration training materials after HB 2492 was passed "to specifically address the state or country of birth." Trial Tr. 452:9-13. Arizona Students' Association provided no evidence that it updated materials to address HB 2492's citizenship verification process. Regardless, this type of expenditure does not constitute an injury because it is part of the organization's regular mission to train those conducting voter registration on its behalf. Trial Tr. 452:19-23.

274.   Arizona Students' Association claim of injury related to HB 2492's citizenship verification process is based on an incorrect interpretation that if an applicant's registration form lacks proof of citizenship, that individual will not be registered as a federal

1   only voter. *See* Trial Tr. 457:21-458:8. But this Court already resolved that issue in its

2   earlier ruling. *See* Doc. 534 at 33-34.

3        275.   Under Arizona Students' Association's current voter registration process, a

4   student who does not have proof of citizenship on their person at the time of registration is

5   instructed to directly provide this documentation to county recorders to become a full-ballot

6   voter. Trial Tr. 472:13-22. Arizona Students' Association asserts that if HB 2492's

7   citizenship verification process is implemented, it will need to alter its current process to

8   "take on that follow-up step" and will be required to purchase an upgraded subscription to

9   a camera application to redact citizenship documents. *Id*. But Arizona Students' Association

10  presented no evidence that it would suffer injury if it does not spend these resources, nor

11  that such costs are necessary in light of HB 2492's citizenship verification process. Rather,

12  Arizona Students' Association testified that it would like to be able to redact documentary

13  proof of citizenship so it can "send [the documents] to partners." Trial Tr. 472:2-12. Any

14  costs from purchasing an upgraded camera application are self-inflicted, not an injury

15  attributable to HB 2492's citizenship verification process.

16       276.   The co-Executive Director of the Arizona Students' Association agreed that

17  to confirm a voter's citizenship, a county recorder needs access to that voter's proof of

18  citizenship. Trial Tr. 468:22-469:7.

19       277.   Arizona Democracy Resource Center Action presented no evidence that it,

20  any of its members, or anyone it serves, has been or will be injured due to HB 2492's

21  citizenship verification process, nor that its mission will be perceptibly impaired due to the

22  process.

23       278.   Inter Tribal Council of Arizona Inc. presented no evidence that it, or any of

24  its members, has been or will be injured due to HB 2492's citizenship verification process,

25  nor that its mission will be perceptibly impaired due to the process.

26       279.   The San Carlos Apache Tribe presented no evidence that it, or any of its

27  members, have been or will be injured by HB 2492's citizenship verification process, nor

28  that its mission will be perceptibly impaired due to HB 2492's citizenship verification

process.

280.    Despite having hundreds of members and having been a party to this lawsuit for approximately one year, Arizona Coalition for Change has not identified any specific member who has been or is likely to be injured by HB 2492's citizenship verification process.  Trial Tr. 280:24-281:3, 281:24-25, 282:4-10 (Day 1 PM, testimony of R. Bolding, Arizona Coalition for Change).

281.    Arizona Coalition for Change presented no evidence that it has spent or reallocated any money or hired staff in response to HB 2492's citizenship verification process, that it would suffer an injury if it does not use resources in response to HB 2492's citizenship verification process, nor that its mission will be perceptibly impaired due to the process.

282.    Arizona Coalition for Change's estimates regarding potential future expenditures in response to HB 2492's citizenship verification process are based on its mistaken belief that the law prevents county recorders from processing a form that is not accompanied by a physical copy of proof of citizenship.  Trial Tr. 270:20-271:4 (discussing need to obtain a secure cell phone to document proof of citizenship), 277:21-278:10 (discussing its views on how the law would operate).  Based on this misunderstanding, Arizona Coalition for Change presumes it may need to increase staff and speak to additional potential registrants.  Trial Tr. 273:5-17, 275:20-25, 284:12–285:9.

283.    Even as to this claim of injury, Arizona Coalition for Change only believes that some individuals "may" not have proof of citizenship "at the particular time [Arizona Coalition for Change is] trying to register them," and has identified no eligible voter who would be unable to provide proof of citizenship when submitting a registration form.  Trial Tr. 277:2-5; 282:11–283:3.

284.    Arizona Coalition for Change has no internal documents outlining any reallocation of funds that may happen if HB 2492's citizenship verification process is implemented.  Trial Tr. 298:19-23 (Day 2 AM, testimony of R. Bolding, Arizona Coalition for Change).

285.   Arizona Coalition for Change's regular mission includes voter education events to discuss "changes in Arizona law" and "changes with regards to specific policies." Trial Tr. 262:25–263:9 (Day 1 PM, testimony of R. Bolding, Arizona Coalition for Change). Arizona Coalition for Change generally claims it will need to conduct voter education events in response to HB 2492 and HB 2243. Trial Tr. 265:4-17. Even if Arizona Coalition for Change were to provide voter education events that include information about HB 2492's citizenship verification process, that is not an injury because such activities are part of its regular mission.

286.   Arizona Coalition for Change's regular mission includes voter education advertisements that inform voters about the content, timing, and location of elections.  Trial Tr. 260:3-12, 264:10-15.  Arizona Coalition for Change generally speculates that it would create voter education advertisements about HB 2492 and HB 2243. Trial Tr. 265:18-21. Arizona Coalition for Change presented no evidence that these advertisements would address HB 2492's citizenship verification process. Even if Arizona Coalition for Change were to spend resources on voter education advertisements that include information about HB 2492's citizenship verification process, that is not an injury because such activities are part of its regular mission.

287.   As part of Arizona Coalition for Change's regular voter registration mission, it provides daily training to staff and volunteers discussing "any changes in particular that may have happened in the law."  Trial Tr. 269:13-24.  Arizona Coalition for Change presented no evidence that its daily training would cover county recorder processing information such as HB 2492's citizenship verification process. Regardless, because Arizona Coalition for Change's regular mission includes providing training on changes in the law, any such training on the citizenship verification process would not be an injury.

288.   Arizona Coalition for Change's regular mission includes speaking to potential voters during voter registration efforts.  Trial Tr. 268:19-25. Arizona Coalition for Change estimates that it speaks to ten individuals for every completed voter registration form.  Trial Tr. 270:3-4. It speculates that it will need to speak to more individuals to obtain a complete

voter registration form if HB 2492 (not necessarily HB 2492's citizenship verification process) is implemented.  Trial Tr. 275:13-17. Arizona Coalition for Change presented no evidence to support this claim.  Even if true, speaking to more individuals during voter registration work is not an injury because such activities are part of its regular mission.

### 4. Poder LatinX Plaintiffs

289.    Poder LatinX presented no evidence that it, any of its members, or anyone it serves has been or will be injured by HB 2492's citizenship verification process, that it would suffer an injury if it does not use resources in response to the provisions, nor that its mission will be perceptibly impaired due to these provisions.

290.    Poder LatinX has not spent money nor hired staff in response to HB 2492 generally, let alone HB 2492's citizenship verification process.  Trial Tr. 1303:15-22 (Day 6 AM, testimony of N. Herrera, Poder LatinX).

291.    Poder LatinX's estimates regarding potential future expenditures in response to HB 2492's citizenship verification process are speculative because the organization does not know the impact the laws may have. *See* Trial Tr. 1291:11-19 (Day 5 PM, testimony of N. Herrera, Poder LatinX). Poder LatinX has no internal documents outlining any reallocations of funds that may happen if HB 2492's citizenship verification process is implemented.  Trial Tr. 1304:1-4 (Day 6 AM, testimony of N. Herrera, Poder LatinX).

292.    Poder LatinX claims that HB 2492's citizenship verification process may dampen voter registration in the Latino community. Trial Tr. 1290:13-21 (Day 5 PM, testimony of N. Herrera, Poder LatinX). Poder LatinX presented no evidence to support its assertion that HB 2492 generally will impact voter registration rates. Nor did it present evidence that it, or anyone, is likely to be harmed by HB 2492's citizenship verification process.

293.    Poder LatinX claims that HB 2492's citizenship verification process may injure its reputation. Trial Tr. 1300:23-1301:7. This claim is not based on any evidence, only on speculation that HB 2492's citizenship verification process would result in the removal of an eligible voter. *Id.* It presumes that a county recorder would be unable to

confirm the citizenship status of naturalized citizen who had not updated their citizenship status with MVD. Trial Tr. 1304:11-16 (Day 6 AM, testimony of N. Herrera, Poder LatinX). And it presumes that some unknown persons might attribute that outcome to Poder LatinX and subsequently question the organization's work. Trial Tr. 1301:14-25.

294.    An "integral" part of Poder LatinX's regular mission involves voter engagement and community outreach. Trial Tr. 1286:25-1287:4, 1288:1-5 (Day 5 PM, testimony of N. Herrera, Poder LatinX) (discussing voter engagement ad campaigns and in person canvassing). Poder LatinX generally speculates that if HB 2492 is implemented, the organization will need to increase its in-person and advertising outreach efforts. Trial Tr. 1300:9-17 Day 6 AM, testimony of N. Herrera, Poder LatinX). Poder LatinX presented no evidence to support this claim nor evidence that such costs would be incurred in response to HB 2492's citizenship verification process. Regardless, continuing voter outreach work is not an injury because such activities are part of Poder LatinX's regular mission.

295.    Chicanos Por La Causa Action Fund presented no evidence that it, or anyone it serves, has been or will be injured by HB 2492's citizenship verification process, nor that it would suffer an injury if it does not spend resources in response to the provisions, nor that its mission will be perceptibly impaired due to the citizenship verification process.

296.    To the knowledge of its Executive Director, Chicanos Por La Causa Action Fund has not spent money nor hired staff in response to HB 2492's citizenship verification process. Trial Tr. 202:25–203:3, 203:25–204:2 (Day 1 PM, testimony of J. Garcia, Chicanos Por La Causa Action Fund).

297.    Chicanos Por La Causa Action Fund's estimates regarding potential future resource or staffing reallocations in response to HB 2492 generally are speculative because the organization does not know the impact the laws may have.  *See* Trial Tr. 204:3-24. They are also based on an incorrect interpretation that HB 2492's citizenship verification process could be initiated due to "almost anything," including an individual's last name. *Id.* 199:10-13. Chicanos Por La Causa Action Fund presented no evidence that any reallocation costs would be attributable to HB 2492's citizenship verification process. And Chicanos Por La

Causa Action Fund has no internal documents outlining any reallocations of funds that may happen if HB 2492's citizenship verification process is implemented.  *Id.* 215:7-11.

298.    Chicanos Por La Causa Action Fund's regular mission includes voter registration and canvassing activities that include speaking to and "reengag[ing]" potential voters.  Trial Tr. 179:6-12, 183:12-18. The organization's Executive Director estimated that the organization may have to speak to up to 30% more individuals to register individuals if HB 2492 generally is implemented.  *Id.* 191:13-17.  Chicanos Por La Causa Action Fund presented no evidence to support this claim or evidence that such costs would be incurred in response to HB 2492's citizenship verification process. Regardless, speaking to individuals during voter registration work is not an injury because such activities are part of its regular mission.

299.    Chicanos Por La Causa Action Fund's regular mission includes educating voters, including providing information to dispel concerns individuals may have regarding why certain information is requested during voter registration.   Trial Tr. 182:3-14. Chicanos Por La Causa Action Fund will not suffer injury if its voter education includes information about HB 2492's citizenship verification process because such activities are part of its regular mission.

300.    Chicanos Por La Causa Action Fund also asserts it will suffer a reputational injury if HB 2492's citizenship verification process leads to citizenship investigation. Trial Tr. 191:1-12, 194:13-195:4. This claim is not based on any evidence, only on speculation that HB 2492's citizenship verification process would result in the removal of an eligible voter and that some unknown persons might attribute that outcome to Chicanos Por La Causa Action Fund and subsequently question the organization's community understanding. *Id.; id.* 207:1-4.

301.    Chicanos Por La Causa, Inc. presented no evidence that it, or anyone it serves, has been or will be injured by HB 2492's citizenship verification process, nor that it would suffer an injury if it does not spend resources in response to the provisions, nor that its mission will be perceptibly impaired due to the citizenship verification process.

302.     Chicanos Por La Causa, Inc. presented no evidence that it has spent money or hired staff in response to HB 2492 generally, let alone HB 2492's citizenship verification process. Trial Tr. 489:9-12, 492:9-12 9 (Day 2 PM, testimony of L. Guzman, Chicanos Por La Causa, Inc.).

303.     Chicanos Por La Causa, Inc. claims that it will need to spend resources or reallocate staff generally in response to HB 2492. *See* Trial Tr. 483:15-484:1. This claim is speculative because the organization does not know what impact the laws may have. Regardless, Chicanos Por La Causa, Inc. presented no evidence that such costs would be incurred in response to HB 2492's citizenship verification process.

304.     Chicanos Por La Causa, Inc. presented no evidence that it has begun to internally prepare for any reallocations of funds or staff if HB 2492 generally or HB 2492's citizenship verification process is implemented.  Trial Tr. 490:2-10.

305.     Chicanos Por La Causa, Inc.'s regular mission includes providing education materials in response to changes in law, and it will prepare updated educational materials regardless of whether HB 2492's citizenship verification process is implemented.  Trial Tr. 488:11-20.  Chicanos Por La Causa, Inc. acknowledges that current voter registration procedures include citizenship database checks and that those have not caused fear in the community. *See* Trial Tr. 502:2-9. Chicanos Por La Causa, Inc. will not suffer injury if it provides educational materials about HB 2492's citizenship verification process, because such activities are part of its regular mission.

306.     Chicanos Por La Causa, Inc. claims that a potential citizenship investigation under HB 2492 will dampen voter registration in the Latino community. Trial Tr. 480:10-21. It presented no evidence to support this assertion. And while an investigation after HB 2492's citizenship verification process is theoretically possible, it is not impending and Chicanos Por La Causa, Inc. presented no evidence that it, or anyone, is likely to be harmed by such an investigation.

307.     Chicanos Por La Causa, Inc. also asserts it will suffer a reputational injury if HB 2492's citizenship verification process leads to citizenship investigation. Trial Tr.

482:12-21, 486:4-12. This claim is based on a speculative and attenuated chain of events requiring, for example, that Chicanos Por La Causa, Inc. registers a naturalized citizen without providing a copy of that individual's proof of citizenship, the individual has not updated their citizenship status with MVD, the individual's citizenship status has not been updated or is unavailable in SAVE, the individual fails to respond to the notice from the county recorder that it lacks proof of citizenship, the Attorney General determines there is a reasonable basis to open an investigation into the individual's citizenship status, the investigation becomes public, and some unknown persons attribute the causation for this chain of events to Chicanos Por La Causa, Inc. and decline to participate in other Chicanos Por La Causa, Inc. programs as a result. Trial Tr. 486:13-20, 495:5-21, 499:10-17.

### 5.   Democratic National Committee Plaintiffs

308.   Despite having millions of members and having been a party to this lawsuit for approximately one year, the Democratic National Committee has not identified any specific member who has been or is likely to be injured by HB 2492's citizenship verification process. *See* Trial Tr. 434:12-19, 435:6-12 (Day 2 PM, testimony of R. Reid Democratic National Committee).

309.   The Democratic National Committee presented no evidence that it has spent any resources to date in response to HB 2492 generally, let alone HB 2492's citizenship verification process. Trial Tr. 432:9-21.

310.   The Democratic National Committee's estimates regarding spending future resources in response to HB 2492 generally are speculative. Trial Tr. 432:22-25 (acknowledging uncertainty regarding the impact of the law and its implementation). And the Democratic National Committee presented no evidence that it would spend resources in response to HB 2492's citizenship verification process in particular.

311.   The Democratic National Committee claims that implementing HB 2492 generally may decrease voter registration or participation. Trial Tr. 425:1-3. The Democratic National Committee presented no evidence to support this assertion, nor evidence that HB 2492's citizenship verification process in particular may cause this result.

And the Democratic National Committee presented no evidence that it, or any individual member, is likely to be harmed by such an investigation.

312.    Despite having millions of members and having been a party to this lawsuit for approximately one year, the Arizona Democratic Party has not identified any specific member who has been or is likely to be injured by HB 2492's citizenship verification process.

313.    The Arizona Democratic Party asserts that it spent resources in response to HB 2492 generally, not HB 2492's citizenship verification process in particular, but those resources were devoted to a review of the draft 2023 Elections Procedures Manual. Trial Tr. 520:23-521:8. This activity is part of the organization's normal business and would have occurred regardless of HB 2492 and thus is not an injury attributable to HB 2492.

314.    The Arizona Democratic Party claims that implementing HB 2492 generally may decrease voter registration or participation. Trial Tr. 516:22-517:11. The Arizona Democratic Party presented no evidence to support this assertion, nor evidence that HB 2492's citizenship verification process in particular may cause this result. The Arizona Democratic Party's Executive Director testified that that no individual registering to vote has expressed to her a fear that registering to vote may lead to an investigation into their citizenship status. Trial Tr. 521:9-20. And the Arizona Democratic Party presented no evidence that it, or any individual member, is likely to be harmed by such an investigation.

### 6.    Arizona Asian American Native Hawaiian and Pacific Islander for Equity Coalition ("Equity Coalition")

315.    Equity Coalition has not identified anyone who will is likely to be injured by HB 2492's citizenship verification process.  Trial Tr. 1281:24–1282:2 (Day 5, testimony of M. Tiwamangkala, Equity Coalition).

316.    Equity Coalition has not spent funds in response to HB 2492's citizenship verification process.  Trial Tr. 1278:20-23

317.    Equity Coalition has not shown that it would suffer injury if it does not spend resources in response to HB 2492's citizenship verification process, nor that its mission will

1  be perceptibly impaired due to HB 2492's citizenship verification process.

2       318.    Equity Coalition's estimates regarding potential future resource or staffing

3  reallocations in response to HB 2492's citizenship verification process are speculative

4  because the organization does not know how the laws will be implemented or the extent to

5  which the laws might impact their constituency. Equity Coalition has no internal documents

6  outlining any reallocations of funds that may happen if HB 2492's citizenship verification

7  process is implemented.  Trial Tr. 1280:6-9.

8       319.    Equity Coalition's regular mission includes training those who conduct voter

9  registrations on its behalf.  Trial Tr. 1269:5-9.  Equity Coalition's regular training activities

10  will proceed regardless of whether HB 2492's citizenship verification process is

11  implemented. *Id.* 1278: 16-18.  Equity Coalition will not suffer injury if its training includes

12  information about HB 2492's citizenship verification process because such activities are

13  part of its regular mission.

14       320.    Equity Coalition's regular mission includes assisting individuals with

15  obtaining naturalization paperwork. Trial Tr. 1273:22-1274:3. Equity Coalition asserts that

16  HB 2492 generally will increase the need for such paperwork. *See id.* 1275:21-23. Even if

17  true, Equity Coalition will not suffer an injury if it continues to assist individuals with

18  obtaining naturalization paperwork because such activities are part of its regular mission.

19       **7.**    **Promise Arizona Plaintiffs**

20       321.    Promise Arizona Plaintiffs are not challenging HB 2492's citizenship

21  verification process. *See* Promise Arizona Complaint, No. 2:22-cv-01602-SRB, Doc. 1.

22       **8.**    **United States**

23       322.    The United States is not challenging HB 2492's citizenship verification

24  process beyond what the Court has already ruled.  *See* United States Complaint, No. 2:22-

25  cv-01124-SRB, Doc. 1.

26

27

28

## VII. Post-Registration Citizenship Review (HB 2243 § 2)

### A. HB 2243's citizenship review process is similar to policies regarding juror disclosures of non-citizenship that counties were already following.

323.   The basic steps in HB 2243's post-registration citizenship review process are as follows:[15]

○   A county recorder may "obtain[] information" that a registrant is not a U.S. citizen.  Such information may come from a jury commissioner report, a Secretary of State review of MVD data, or a county recorder review of other data.  *See* A.R.S. § 16-165(A)(10), (G), (H), (I), (J).

○   Before cancelling registration, the county recorder must "confirm[]" that the registrant is not a citizen.  Confirmation requires, at minimum, reviewing relevant databases to which the county recorder has access, to the extent practicable.  *See* A.R.S. § 16-165(A)(10), (K).

○   In addition, before cancelling registration, the county recorder must send the registrant a letter by forwardable mail, with a prepaid return envelope, explaining that registration will be canceled unless proof of citizenship is submitted in 35 days.  A.R.S. § 16-165(A)(10).

324.   If a registration is cancelled, the county recorder must notify the registrant of the cancellation and explain how to re-register.  A.R.S. § 16-165(L).[16]

325.   These steps generally resemble pre-existing policies in the 2019 EPM, regarding when county recorders may cancel a registration based on the registrant's self-report of non-citizenship as a prospective juror.  *See* Trial Ex. 6 at 36–37.

326.   Some parts of HB 2243's citizenship review process differ from pre-existing policies.  Most notably:

a.   HB 2243's review process mentions additional data sources (not just juror disclosures), and it affirmatively directs the Secretary of State and county recorders (when practicable) to review certain databases.  *Compare* A.R.S. §§ 16-165(A)(10), (G), (H), (I), (J) *with* Trial Ex. 6 (2019 EPM) at 36–37.

---

[15] Parts of HB 2243 also create a post-registration *residency* review process.  *See* A.R.S. § 16-165(A)(9), (E), (F).  Plaintiffs focus on the citizenship review provisions, however.

[16] HB 2243's citizenship review process supersedes the short provision in HB 2492 about citizenship review.  *See* HB 2492 § 8 (enacting prior version of A.R.S. § 16-165(A)(10)).

b.      Also, under HB 2243, after a registration is cancelled, county recorders must not only notify the registrant but also notify the county attorney and Attorney General for possible investigation.  *See* A.R.S. § 16-165(A)(10), (L).

**B.      Plaintiffs have not shown that county recorders will use the data sources in HB 2243 unreliably for citizenship review.**

**1.      Juror disclosures of non-citizenship**

327.    County recorders have long considered prospective jurors' self-reports of non-citizenship as a potential reason to cancel registration, though the exact procedures have varied over time.  For example:

a.      Under the 2019 EPM, if a county recorder learns that a registrant declared as a non-citizen on a juror form, the recorder may cancel the registration only after (1) confirming that the registrant does not already have proof of citizenship documented in his or her voter file, and (2) sending the registrant a letter explaining that registration will be canceled unless proof of citizenship is submitted in 35 days. *See* Trial Ex. 6 at 36–37; *accord* Trial Tr. 105:24–107:3 (Day 1 AM, testimony of J. Petty).

b.      Previously, under the 2014 EPM, if a county recorder learned that a registrant disclosed non-citizenship on a juror form, the recorder was directed to cancel the registration, and *no* confirmation or advance notice to the registrant was required.  *See* Trial Ex. 18 at 29.  The recorder was also permitted to forward the questionnaire to the county attorney or the Secretary of State for possible referral to the Attorney General.  *See id.*

328.    The difficulty is that juror self-reports of non-citizenship are sometimes reliable, sometimes not.  For example:

a.      A Maricopa County Recorder representative testified that in her experience, after sending letters to registrants who declared as non-citizens on a juror form, the registrants often would not respond at all, but on rare occasions registrants would respond by expressly confirming non-citizenship—she recalled "one or two

instances" when that happened. *See* Trial Tr. 106:8–107:24 (Day 1 AM, testimony of J. Petty).

      b.    A former Pima County Recorder employee testified that in her experience, sometimes citizens lie about their status on a juror form to avoid jury duty. *See* Trial Tr. 2004:4–2005:1. On the flip side, sometimes non-citizens answer truthfully about their status on a juror form but later become naturalized, so their answer is no longer applicable. *See id.* 2005:2-15.

329.    Although prospective jurors do not always respond truthfully on juror forms, the process by which responses are recorded is generally reliable. For example, in the Maricopa County Judicial Branch, responses of prospective jurors are either recorded automatically (from an online questionnaire) or entered into a database by staff pursuant to a review process. *See* Trial Ex. 970 (Declaration of Matthew Martin), ¶¶ 12–20.

330.    Under HB 2243's post-registration citizenship review process, juror disclosures of non-citizenship would continue to be a data source for possibly canceling a voter's registration. *See* A.R.S. § 16-165(A)(10). Before canceling, however, the county recorder would need to (1) confirm that the registrant is not a U.S. citizen, and (2) send the registrant a letter, by forwardable mail and with a prepaid return envelope, explaining that registration will be canceled unless proof of citizenship is submitted in 35 days. *See id.*

331.    Plaintiffs have presented no evidence that a county recorder has undertaken or will soon undertake this process pursuant to HB 2243.

332.    Although it is currently unknown exactly how county recorders will "confirm" non-citizenship after receiving a juror disclosure, two points can be made:

      a.    Confirmation requires reviewing relevant databases to which the county recorder has access, to the extent practicable. A.R.S. § 16-165(K).

1    b.    Confirmation may also involve checking a voter's registration file to

2    ensure there is no record that proof of citizenship was previously submitted.  *See*

3    Trial Ex. 6 (2019 EPM) at 36–37.[17]

4    333.    In any event, Plaintiffs have not shown that county recorders, upon receiving

5    a juror disclosure of non-citizenship, would fail to "confirm" non-citizenship before

6    cancelling a registration under HB 2243.

7    334.    Moreover, the fact that the statute requires 35-day advance notice to the

8    registrant, by forwardable mail and with a prepaid preaddressed return envelope, helps

9    ensure that any mistakes can be cured by the registrant.  *See* A.R.S. § 16-165(A)(10).

10    335.    Plaintiffs have not identified any citizen whose registration has been or will

11    be incorrectly cancelled after a juror disclosure of non-citizenship under HB 2243.

12    **2.    Secretary of State review of MVD data**

13    336.    County recorders have long used MVD data for *pre*-registration citizenship

14    verification.  *See* Part VI.B.1 above.

15    337.    MVD data are generally reliable for citizenship verification, and the

16    possibility that a recently naturalized citizen may still have a foreign-type license does not

17    mean county recorders will use MVD data unreliably.  *See* Part VI.B.1 above.

18    338.    Under HB 2243, county recorders would use MVD data for *post*-registration

19    citizenship review as well.  *See* A.R.S. § 16-165(A)(10), (G).

20    339.    County recorders already use MVD data for post-registration citizenship

21    review in some situations, namely, when a voter initiates a change to a record.  *See* Trial

22    Tr. 53:4-16, 96:11-15 (Day 1 AM, testimony of J. Petty).

23    340.    Under HB 2243, MVD data would be used more frequently.  Each month, the

24    Secretary of State would compare the statewide voter registration database to the MVD

25    database, then notify county recorders if an existing registrant is not a U.S. citizen.  *See*

26    A.R.S. § 16-165(G).

27

28    [17] If proof of citizenship was previously submitted, county recorders must keep a record of that fact in the registrant's "permanent voter file."  A.R.S. § 16-166(J).

341.   MVD has been sending a very large file to the Secretary of State each month for this purpose.  *See* Trial Tr. 566:24–573:19 (Day 3 AM, testimony of E. Jorgensen); *see also* Trial Ex. 234 at 1 (list of fields in MVD monthly customer extract).

342.   So far, however, the Secretary of State has not used this MVD file, and it is unknown whether or how the file will be used.  *See* Trial Tr. 376:6-15 (Day 2 AM, testimony of C. Connor); Trial Tr. 622:4–623:6, 633:3-9 (Day 3 AM, testimony of Y. Morales).

343.   Even assuming the Secretary of State uses the very large MVD file as the basis for notifying county recorders that a registrant is not a U.S. citizen, county recorders could not cancel registration without (1) confirming that the registrant is not a U.S. citizen, and (2) sending the registrant a letter, by forwardable mail and with a prepaid return envelope, explaining that registration will be canceled unless proof of citizenship is submitted in 35 days.  A.R.S. § 16-165(A)(10).

344.   Again, Plaintiffs have presented no evidence that a county recorder has undertaken or will soon undertake this process pursuant to HB 2243.

345.   Again, although it is currently unknown exactly how county recorders will "confirm" non-citizenship after receiving a notice from the Secretary of State based on a review of MVD data, two points can be made:

a.   Confirmation requires reviewing relevant databases to which the county recorder has access, to the extent practicable.  A.R.S. § 16-165(K).

b.   Confirmation may also involve checking a voter's registration file to ensure there is no record that proof of citizenship was previously submitted.  *See* Trial Ex. 6 (2019 EPM) at 36–37.[18]

346.   In any event, Plaintiffs have not shown that county recorders, upon receiving a notice from the Secretary of State based on MVD data, would fail to "confirm" non-citizenship before cancelling a registration under HB 2243.

---

[18] If proof of citizenship was previously submitted, county recorders must keep a record of that fact in the registrant's "permanent voter file."  A.R.S. § 16-166(J).

347.    Moreover, the fact that the statute requires 35-day advance notice to the registrant (by forwardable mail and with a prepaid preaddressed return envelope) helps ensure that any mistakes can be cured by the registrant.  *See* A.R.S. § 16-165(A)(10).

348.    Plaintiffs have not identified any citizen whose registration has been or will be incorrectly cancelled after a notice from the Secretary of State based on MVD data.

### 3.    County recorder review of SAVE data

349.    County recorders have long used SAVE data for *pre*-registration citizenship verification.  *See* Part VI.B.2 above.

350.    SAVE data are generally reliable for citizenship verification, and the possibility of database issues does not mean county recorders will use SAVE data unreliably.  *See* Part VI.B.2 above.

351.    Under HB 2243, county recorders are directed to check SAVE each month to review citizenship of some registrants, but only "[t]o the extent practicable."  *See* A.R.S. § 16-165(A)(10), (I).

352.    Currently, county recorders do not use SAVE for *post*-registration citizenship review.  Indeed, the 2019 EPM directs that SAVE "shall not be used for list maintenance purposes."  Trial Ex. 6 at 5 n.6.  And the Secretary of State's representative testified that using SAVE for post-registration citizenship review is not currently permitted by the Secretary's agreement with USCIS.  *See* Trial Tr. 348:23–350:7 (Day 2 AM, testimony of C. Connor).

353.    Accordingly, use of SAVE for post-registration citizenship review is not currently practicable.  *See* Trial Tr. 350:5-7 (Day 2 AM, testimony of C. Connor).

354.    Plaintiffs have not shown that county recorders will use SAVE for post-registration citizenship review under HB 2243.  However, if it becomes practicable for county recorders to use SAVE for post-registration citizenship review, the data could be used reliably for that purpose.  *See* Part VI.B.2 above.

355.    If county recorders were to use SAVE for post-registration citizenship review, county recorders could not cancel registration without (1) confirming that the registrant is

1    not a U.S. citizen, and (2) sending the registrant a letter explaining that registration will be

2    canceled unless proof of citizenship is submitted in 35 days.  A.R.S. § 16-165(A)(10).

3        356.    Again, Plaintiffs have presented no evidence that a county recorder has

4    undertaken or will soon undertake this process pursuant to HB 2243.

5        357.    Again, although it is currently unknown exactly how county recorders would

6    "confirm" non-citizenship after checking SAVE, two points can be made:

7            a.    Confirmation requires reviewing relevant databases to which the

8        county recorder has access, to the extent practicable.  A.R.S. § 16-165(K).

9            b.    Confirmation may also involve checking a voter's registration file to

10       ensure there is no record that proof of citizenship was previously submitted.  *See*

11       Trial Ex. 6 (2019 EPM) at 36–37.[19]

12       358.    In any event, Plaintiffs have not shown that county recorders, after reviewing

13   SAVE, would fail to "confirm" non-citizenship before cancelling registration under HB

14   2243.

15       359.    Moreover, the fact that the statute requires 35-day advance notice to the

16   registrant (by forwardable mail and with a prepaid preaddressed return envelope) helps

17   ensure that any mistakes can be cured by the registrant.  *See* A.R.S. § 16-165(A)(10).

18       360.    Plaintiffs have not identified any citizen whose registration has been or will

19   be incorrectly cancelled after a county recorder review of SAVE data under HB 2243.

20       **4.    County recorder review of SSA data**

21       361.    County recorders have long used SSA data to help confirm an applicant's

22   identity.  *See* Part VI.B.3 above.

23       362.    County recorders do not have direct access to SSA data, and the current way

24   in which county recorders (indirectly) access SSA data does not provide them citizenship

25   information.  *See* Part VI.B.3 above.

26

27

28   _____

     [19] If proof of citizenship was previously submitted, county recorders must keep a record of
     that fact in the registrant's "permanent voter file."  A.R.S. § 16-166(J).

363.   Plaintiffs have not presented evidence of any plan for county recorders to obtain more access to SSA data than they have now.

364.   Under HB 2243, county recorders are directed to check SSA data each month, but only "[t]o the extent practicable."  *See* A.R.S. § 16-165(A)(10), (H).  Because county recorders do not have direct access to SSA data (nor any access to SSA data regarding citizenship), use of SSA data for citizenship review is not currently practicable.

365.   In the event that county recorders gain access to SSA data for citizenship review, Plaintiffs have not shown that the data would be unreliable for that purpose.  *See* Part VI.B.3 above.

366.   Even if county recorders were to use SSA data for citizenship review, county recorders still could not cancel registration without (1) confirming that the registrant is not a U.S. citizen, and (2) sending the registrant a letter explaining that registration will be canceled unless proof of citizenship is submitted in 35 days.  A.R.S. § 16-165(A)(10).

367.   Again, Plaintiffs have presented no evidence that a county recorder has undertaken or will soon undertake this process under HB 2243.

368.   Again, although it is currently unknown exactly how county recorders would "confirm" non-citizenship after checking SSA data, two points can be made:

a.   Confirmation requires reviewing relevant databases to which the county recorder has access, to the extent practicable.  A.R.S. § 16-165(K).

b.   Confirmation may also involve checking a voter's registration file to ensure there is no record that proof of citizenship was previously submitted.  *See* Trial Ex. 6 (2019 EPM) at 36–37.[20]

369.   In any event, Plaintiffs have not shown that county recorders, after reviewing SSA data, would fail to "confirm" non-citizenship before cancelling registration under HB 2243.

---

[20] If proof of citizenship was previously submitted, county recorders must keep a record of that fact in the registrant's "permanent voter file."  A.R.S. § 16-166(J).

370.     Moreover, the fact that the statute requires 35-day advance notice to the registrant (by forwardable mail and with a prepaid preaddressed return envelope) helps ensure that any mistakes can be cured by the registrant.  *See* A.R.S. § 16-165(A)(10).

371.     Plaintiffs have not identified any citizen whose registration has been or will be incorrectly cancelled after a county recorder review of SSA data under HB 2243.

**5.     County recorder review of NAPHSIS electronic verification of vital events data**

372.     NAPHSIS collects vital record data such as birth place information, but county recorders do not currently have access to NAPHSIS data.  *See* Part VI.B.4 above.

373.     Plaintiffs have not presented evidence of any plan for county recorders to obtain access to NAPHSIS data, but NAPHSIS allows data searching by anyone with a contract and whom they've granted access.  *See* Part VI.B.4 above.

374.     Under HB 2243, county recorders are directed to check NAPHSIS data to review citizenship of registrants who never provided proof of citizenship, but only if the data is "accessible."  *See* A.R.S. § 16-165(A)(10), (J).  Because county recorders do not have access to NAPHSIS data, the data is not currently accessible for citizenship review.

375.     If county recorders gain access to NAPHSIS data for citizenship review, the data could be used reliably for that purpose.  *See* Part VI.B.4 above.

376.     Even if county recorders were to use NAPHSIS data for citizenship review, county recorders still could not cancel registration without (1) confirming that the registrant is not a U.S. citizen, and (2) sending the registrant a letter explaining that registration will be canceled unless proof of citizenship is submitted in 35 days.  A.R.S. § 16-165(A)(10).

377.     Again, Plaintiffs have presented no evidence that a county recorder has undertaken or will soon undertake this process under HB 2243.

378.     Again, although it is currently unknown exactly how county recorders would "confirm" non-citizenship after checking NAPHSIS data, two points can be made:

a.     Confirmation requires reviewing relevant databases to which the county recorder has access, to the extent practicable.  A.R.S. § 16-165(K).

b.      Confirmation may also involve checking a voter's registration file to ensure there is no record that proof of citizenship was previously submitted.  *See* Trial Ex. 6 (2019 EPM) at 36–37.[21]

379.    In any event, Plaintiffs have not shown that county recorders, after reviewing NAPHSIS data, would fail to "confirm" non-citizenship before cancelling registration under HB 2243.

380.    Moreover, the fact that the statute requires 35-day advance notice to the registrant (by forwardable mail and with a prepaid preaddressed return envelope) helps ensure that any mistakes can be cured by the registrant.  *See* A.R.S. § 16-165(A)(10).

381.    Plaintiffs have not identified any citizen whose registration has been or will be incorrectly cancelled after a county recorder review of NAPHSIS data under HB 2243.

**C.    Post-registration citizenship review improves accuracy of voter rolls.**

382.    HB 2243's post-registration citizenship review process, if implemented reasonably, would improve the accuracy of voter rolls.  For example:

a.      It is possible for a registered voter to renounce citizenship.  *See* Part II.A.5 above.  Post-registration citizenship review would help identify such persons. For example, if a registered voter renounces citizenship and then obtains a foreign-type license, a post-registration MVD check could identify the change.  *See* Trial Ex. 6 (2019 EPM) at 7–8.

b.      It is possible for a non-citizen to become a registered voter, including by human error.  *See* Part II.A.6.  Post-registration citizenship review would help identify such persons.  For example, if a mistakenly registered non-citizen obtains a foreign-type driver's license, a post-registration MVD check could flag the situation. *See* Trial Ex. 6 (2019 EPM) at 7–8.[22]

---

[21] If proof of citizenship was previously submitted, county recorders must keep a record of that fact in the registrant's "permanent voter file."  A.R.S. § 16-166(J).

[22] There are 1,779 active full-ballot voters (i.e. voters eligible for state and federal elections) who, either on or after their registration date, presented to MVD evidence of non-citizenship such as a green card.  *See* Part II.A.4 above.

c.     It is possible for a citizen to register to vote but omit proof of citizenship and thus be a federal-only voter. *See* Trial Ex. 6 (2019 EPM) at 8. If such a person later obtains a driver's license indicating citizenship, a post-registration MVD check could confirm citizenship, allowing the person to a full-ballot voter. *See id.* at 6.[23]

**D.     Post-registration citizenship review improves voter confidence.**

383.     Returning to the last example above: Not only is it possible for a citizen to register to vote, omit proof of citizenship, and become a federal-only voter; it happens with some frequency. For example, the Maricopa County Recorder's representative testified that there are more than 11,000 active federal-only voters in Maricopa County, many of whom may be citizens. *See* Trial Tr. 50:10–52:6 (Day 1 AM, testimony of J. Petty).

384.     However, members of the public may suspect that such registrants are not citizens and thus feel less confident that Arizona elections are being decided entirely by citizens. *See* Part III.A above.

385.     If county recorders were to do post-registration citizenship review—for example, use MVD data to discover that a citizen who had no driver's license during registration now does—such individuals could become full-ballot voters. *See* Trial Ex. 6 (2019 EPM) at 6. This, in turn, could improve public confidence in Arizona elections. *See* Trial Tr. 1935:14–1937:2 (Day 8 AM, testimony of J. Richman) (explaining this point).

**E.     Using multiple data sources in post-registration citizenship review further increases accuracy and efficiency.**

386.     Using multiple databases in HB 2243's citizenship review process, if implemented reasonably, would further increase accuracy and efficiency.

387.     For example, juror disclosures of non-citizenship are sometimes unreliable. *See* Part VII.B.1 above. But if a county recorder receives a juror disclosure, then checks another data source such as MVD and sees that the registrant recently obtained a driver's

---

[23] There are 122 individuals who may have registered as federal-only voters because they lacked proof of citizenship at the time but have since provided MVD proof of citizenship. *See* Trial Tr. 1915:8–1916:5 (Day 8 AM, testimony of J. Richman).

license indicating citizenship, the county recorder may decide not to initiate the 35-day letter and potential cancellation process. *See* A.R.S. § 16-165(K).

388.   To take another example:  If a county recorder receives a juror disclosure of non-citizenship, *and* MVD data returns no match, but then the county recorder checks NAPHSIS data using the registrant's birth place information and confirms the registrant was born in the United States, here too the county recorder may decide not to initiate the 35-day letter and potential cancellation process. *See* A.R.S. § 16-165(K); *see also* Trial Tr. 1911:18–1913:17 (Day 8 AM, testimony of J. Richman) (explaining this point).[24]

### F.   Plaintiffs have not shown that referrals to the county attorney and Attorney General would cause harm.

389.   Under HB 2243's citizenship review process, if the county recorder confirms non-citizenship *and* sends the letter by forwardable mail requesting proof of citizenship in 35 days *and* receives no response, the county recorder must not only cancel registration but "forward the application to the county attorney and attorney general for investigation." A.R.S. § 16-16-165(A)(10).

390.   There is no evidence that such a referral has been made.

391.   If such a referral were made and the Attorney General decided to investigate, there is no evidence that the Attorney General would investigate in a way that would cause harm or otherwise be improper.

392.   For example, for current investigations into the citizenship status of a voter, the Attorney General's Office would review databases, including some used in current voter registration processes and cited by HB 2243. *See* Trial Tr. 2114:22-2116:21, 2117:8-2119:6 (Day 9, testimony of B. Knuth) (discussing review of MVD and SSA information). If there is no evidence to substantiate a complaint that a voter is not a citizen, investigators do not

---

[24] This information is most likely to affect the approximately 5% of Arizona voters who are not matched to the MVD system, but whose citizenship may be verified (without placing further documentation burdens on the voter) based on the voter's name, birth date, and birth place information available in NAPHSIS. *See* Trial Tr. 1912:7–1913:11 (Day 8 AM, testimony of J. Richman).

1   open an investigation.  *Id.* 2118:15-2119:6.  The Election Integrity Unit's investigator has

2   never needed to contact an individual in connection with a citizenship voting investigation.

3   *Id.* 2138:25-2139:7.  And while an investigator may speak to the registered voter, their

4   family members, or potentially their employer, if needed, investigators generally would not

5   do so absent unusual circumstances.  *Id.* 2131:5–2132:7.

6          **G.**     **Plaintiffs' other concerns about implementation are unsupported.**

7                **1.**     **Concern about unduly burdening applicants**

8         393.   In *Gonzalez*, this Court considered evidence of the availability and cost of

9   proof of citizenship, as well as the process by which county recorders verify citizenship,

10  and concluded that requiring proof of citizenship does not excessively burden naturalized

11  citizens or the general population.  *See Gonzalez*, 2008 WL 11395512, at *4–8, 17–18.

12        394.   Plaintiffs have not shown that HB 2243's post-registration citizenship review

13  process will burden citizens more than the process examined and approved in the *Gonzalez*

14  trial.  In particular:

15            a.   The database reviews in HB 2243 do not require the registrant to do

16  anything (though they add work for the county recorders and Secretary of State).  *See*

17  A.R.S. § 16-165(A)(10), (G), (H), (I), (J).

18            b.   There is no evidence that a county recorder has, or will, mistakenly

19  "confirm" as a non-citizen someone who is a citizen under this process.  *See* A.R.S.

20  § 16-165(A)(10), (K).

21            c.   Even if a county recorder mistakenly "confirms" as a non-citizen

22  someone who is a citizen, the cure process is simple:  The registrant is sent a 35-day

23  notice and can respond with proof of citizenship.  A.R.S. § 16-165(A)(10).

24        395.   Plaintiffs have not identified any citizen in Arizona who is likely to be

25  burdened by HB 2243, much less unduly so.

26        396.   To the extent Plaintiffs' experts raised concerns about burdens on applicants,

27  these concerns are unsupported for the reasons explained above.  *See* Part VI.F.1 above.

28

2.    **Concern about applicants not receiving adequate notice or opportunity to cure**

397.    In the hypothetical event that a county recorder mistakenly "confirms" as a non-citizen someone who is a citizen, the required 35-day notice provides ample opportunity to cure.  For comparison:

a.    Under the 2019 EPM regarding juror disclosures of non-citizenship, county recorders are directed to give 35-day notice, but forwardable mail and a prepaid preaddressed return envelope are *not* required.  *See* Trial Ex. 6 at 36–37.

b.    Under the 2014 EPM regarding juror disclosures of non-citizenship, county recorders were not directed to give *any* advance notice.  *See* Trial Ex. 18 at 29.

c.    Under the 2019 EPM regarding other reasons for cancellation, county recorders were not directed to give *any* advance notice.  *See, e.g.*, Trial Ex. 6 at 33–34 (registrants flagged as deceased are automatically cancelled), 34–35 (registrants flagged for felony conviction are cancelled and sent letter confirming cancellation).

398.    Plaintiffs have not identified anyone who will not receive adequate notice or opportunity to cure under HB 2243's citizenship review process.

399.    Plaintiffs' expert Dr. McDonald is not aware of anyone in Arizona who was sent a request for proof of citizenship under existing procedures and did not receive the request, could not read it, or had difficulty responding to it.  *See* Trial Tr. 1178:2-19 (Day 5 PM, testimony of M. McDonald).

400.    Plaintiffs' expert Dr. McDonald speculates that registrants who previously provided proof of citizenship to a county recorder, but have not yet provided updated citizenship information to MVD, may be caught in a "monthly loop" where MVD data will flag them as non-citizens every month.  *See, e.g.*, Trial Tr. 1071:24–1072:5 (Day 5 AM, testimony of M. McDonald).  But this "loop" assumes, without basis, that county recorders will not take the basic step of checking whether a registrant who is flagged as a non-citizen by MVD previously submitted proof of citizenship—something county recorders already

do, for example, in the context of juror disclosures of non-citizenship.  *See* Trial Ex. 6 (2019 EPM) at 36–37.

### 3.    Concern about inconsistent implementation

401.    Historically, election officials in Arizona have been able to reach consensus on procedures regarding citizenship review.  For example, the 2019 EPM includes procedures regarding juror disclosures of non-citizenship, which have been refined after years of experience.  *See* Trial Ex. 6 at 36–37.

402.    The 2023 draft EPM is under review, and in any event, there are additional ways in which election officials can reach consensus too.  *See* Part I.E.2 above.

403.    Plaintiffs have not shown that county recorders have been substantially inconsistent in implementing proof of citizenship procedures in the past.  To the extent there have been differences, in many cases differences can be solved simply by educating recorders, and in some cases differences are to be expected because the task involves a degree of judgment.  *See* Part II.A.6 above.

404.    Plaintiffs speculate that county recorders will act inconsistently in applying HB 2243 based on their differing answers to hypothetical questions during depositions, such as what counts as a "reason to believe" someone is a non-citizen, without the benefit of written guidance on implementation or the advice of legal counsel.  But as Dr. Richman explained, these hypothetical questions were "vague" and understandably likely to elicit "a confused and perhaps confusing set of answers."  Trial Tr. 1919:14–1920:17 (Day 8 PM, testimony of J. Richman).

405.    Plaintiffs do not identify any actual instance in which county recorders have implemented HB 2243 inconsistently.  *See, e.g.*, Trial Tr. 1188:13–1189:2 (Day 5 PM, testimony of M. McDonald).

406.    Plaintiffs have not shown that county recorders will be inconsistent in how they implement HB 2243's citizenship review process.

### 4. Concern about county recorders using SAVE in a manner inconsistent with USCIS authorization

407. HB 2243 directs county recorders to check SAVE each month, for certain groups, "[t]o the extent practicable." A.R.S. § 16-165(I).

408. County recorders access SAVE pursuant to the Secretary of State's memorandum of agreement with USCIS. *See* Trial Ex. 6 (2019 EPM) at 9. Accordingly, for purposes of 2243, county recorders do not currently have "access" to SAVE for a use inconsistent with USCIS authorization, nor would such a use be "practicable."

409. To the extent Plaintiffs are concerned that county recorders may use SAVE in a manner inconsistent with USCIS authorization, Plaintiffs have not shown that county recorders will use SAVE in this way, nor that such a use would be the result of HB 2243.

### H. Plaintiffs have not shown actual or imminent concrete and particularized injury due to HB 2243's citizenship review process.

#### 1. Lack of injury generally

410. No Plaintiff has presented evidence that any eligible voter will be removed from the voter rolls due to HB 2243's citizenship review process. *See, e.g.*, Trial Tr. 209:6-9 (Day 1 PM, testimony of J. Garcia, Chicanos Por La Causa Action Fund).

411. Because only citizens are entitled to vote, no Plaintiff will suffer any injury if a non-citizen is removed from the voter roll. *See, e.g.*, Trial Tr. 205:23-25 (Day 1 AM, testimony of J. Garcia, Chicanos Por La Causa Action Fund).

#### 2. Mi Familia Vota Plaintiffs[25]

412. Mi Familia Vota presented no evidence that it, or anyone it serves, has been or will be injured due to HB 2243's citizenship review process, nor that its mission will be perceptibly impaired due to this process.

413. Voto Latino presented no evidence that it, or anyone it serves, has been or will be injured due to HB 2243's citizenship review process, nor that its mission will be

---

[25] The Mi Familia Vota plaintiffs did not challenge HB 2243 or HB 2492 § 8. *See* Doc. 65. Nevertheless, Voto Latino's representative generally voiced concerns about investigation referrals, so Defendants explain why those concerns do not create standing here.

1   perceptibly impaired due to this process.

2        414.   Voto Latino presented no evidence that it has spent or reallocated money or

3   hired staff in response to HB 2243.  Voto Latino's managing director testified that after the

4   bill was passed the organization produced educational content regarding HB 2492

5   generally, but presented no evidence that this content addressed HB 2243 at all. Trial Tr.

6   237:11-15 (Day 1 PM, testimony of A. Patel, Voto Latino). Regardless, this type of

7   expenditure does not constitute an injury attributable to HB 2243's citizenship review

8   process because it is part of the organization's regular mission to inform voters regarding

9   the registration and voting process. *Id.* 217:14-218:1.

10       415.   Voto Latino claims that a potential Attorney General investigation under HB

11  2492 will dampen voter registration in the Latino community. Trial Tr. 236:9-23. Voto

12  Latino did not specifically assert that a potential investigation under HB 2243's citizenship

13  review process would impact voter registration, nor did it present evidence to support its

14  assertion that HB 2492's referral provisions would impact voter registration rates.

15  Regardless, while theoretically possible, a citizenship investigation under HB 2243 is not

16  impending and Voto Latino presented no evidence that it, or anyone, is likely to be harmed

17  by such an investigation.

18       416.   Voto Latino has also speculated that it will need to spend additional resources

19  if HB 2492's investigation referral provisions are implemented to achieve similar levels of

20  voter turnout. Trial Tr. 236:24-237:8. Voto Latino did not make this claim with respect to

21  HB 2243, nor did it present evidence to support its assertion that HB 2492's referral

22  provisions would impact voter turnout. Even if true, spending resources encouraging

23  registered voters to vote is part of Voto Latino's regular mission and does not constitute an

24  injury.

25            **3.    LUCHA Plaintiffs**

26       417.   LUCHA presented no evidence that it, any of its members, or anyone it serves,

27  has been or will be injured due to HB 2243's citizenship review process, nor that its mission

28  will be perceptibly impaired due to the process.

418.    LULAC presented no evidence that it, any of its members, or anyone it serves, has been or will be injured due to HB 2243's citizenship review process, nor that its mission will be perceptibly impaired due to the process.

419.    Despite having half a million members and having been a party to this lawsuit for approximately one year, the Arizona Students' Association has not identified any specific member who has been or is likely to be injured by HB 2243's citizenship review process. Trial Tr. 446:18-21; 466:2-5 (Day 2 PM, testimony of K. Nitschke, Arizona Student's Association).

420.    The Arizona Students' Association presented no evidence at trial that its mission will be perceptibly impaired by HB 2243's citizenship review process.

421.    Arizona Students' Association presented no evidence that it has spent or reallocated money or hired staff in response to HB 2243. The co-Executive Director of the Arizona Students' Association testified that the organization updated its voter registration training materials after HB 2492 was passed "to specifically address the state or country of birth."  Trial Tr. 452:9-13. Arizona Students' Association provided no evidence that it updated materials to address HB 2243's citizenship review process. Regardless, this type of expenditure does not constitute an injury because it is part of the organization's regular mission to train those conducting voter registration on its behalf. *Id.* 452:19-23.

422.    The co-Executive Director of the Arizona Student's Association agreed that to confirm a voter's citizenship, a county recorder needs access to that voter's proof of citizenship. Trial Tr. 468:22-469:7.

423.    Arizona Democracy Resource Center Action presented no evidence that it, any of its members, or anyone it serves, has been or will be injured due to HB 2243's citizenship review process, nor that its mission will be perceptibly impaired due to the process.

424.    Inter Tribal Council of Arizona Inc. presented no evidence that it, or any of its members, has been or will be injured due to HB 2243's citizenship review process, nor that its mission will be perceptibly impaired due to the process.

425.    The San Carlos Apache Tribe presented no evidence that it, or any of its members, has been or will be injured due to HB 2243's citizenship review process, nor that its mission will be perceptibly impaired due to the process.

426.    Despite having hundreds of members and having been a party to this lawsuit approximately one year, Arizona Coalition for Change has not identified any member who has been injured or is likely to be injured by HB 2243's citizenship review process. Trial Tr. 280:24-281:3, 281:24-25, 282:4-10 (Day 1 PM, testimony of R. Bolding, Arizona Coalition for Change).

427.    Arizona Coalition for Change presented no evidence that it has spent or reallocated any money or hired staff in response to HB 2243's citizenship review process, nor that it would suffer an injury if it does not use resources in response to HB 2243's citizenship review process, nor that its mission will be perceptibly impaired due to the process.

428.    Arizona Coalition for Change's estimates regarding potential future expenditures in response to HB 2243's citizenship review process are based on an unsupported assumption that, for a "high number of individuals," HB 2243's citizenship review process will incorrectly identify an eligible voter for cancellation, that individual will not receive or read the notice from county recorders that his or her registration is being canceled, and will falsely conclude that he or she is still eligible to vote. Trial Tr. 271:15-24, 272:22-273:3. Based on this theoretical chain of events, Arizona Coalition for Change states that it may alter its voter engagement work to confirm registration status for anyone who states that they are currently registered to vote. *Id.* 271:18-272:7. But Arizona Coalition for Change presented no evidence that this hypothetical is impending.

429.    Arizona Coalition for Change has no internal documents outlining any reallocations of funds that may happen if this provision of the law is implemented. Trial Tr. 298:19-23 (Day 2 AM, testimony of R. Bolding, Arizona Coalition for Change).

430.    Arizona Coalition for Change's regular mission includes voter education advertisements that inform voters about the content, timing, and location of elections.  Trial

Tr. 260:3-12, 264:10-15 (Day 1 PM, testimony of R. Bolding, Arizona Coalition for Change)..  Arizona Coalition for Change generally speculates that, if HB 2492 and HB 2243 implemented, it would create voter education advertisements about the laws. *Id.* 265:18-21. Arizona Coalition for Change presented no evidence that these advertisements would address HB 2243's citizenship review process. Even if Arizona Coalition for Change were to spend resources on voter education advertisements that include information about HB 2243's citizenship review process, that is not an injury because such activities are part of its regular mission.

431.    Arizona Coalition for Change's regular mission includes voter education events to discuss "changes in Arizona law" and "changes with regards to specific policies." Trial Tr. 262:25–263:9. Arizona Coalition for Change claims it will need to conduct voter education events in response to HB 2492 and HB 2243 generally (though it states that such events would provide information regarding voter registration, not post-registration issues). *Id.* 265:4-17. Even if Arizona Coalition for Change were to provide voter education events that include information about HB 2243's citizenship review process, that is not an injury because such activities are part of its regular mission.

### 4.    Poder LatinX Plaintiffs

432.    Poder LatinX has not identified anyone who has been or is likely to be injured in response to HB 2243's citizenship review process. Trial Tr. 1304:17-19 (Day 5 PM, testimony of N. Herrera, Poder LatinX).

433.    Poder LatinX presented no evidence that it has been or will be injured due to HB 2243's citizenship review process, nor that it would suffer an injury if it does not use resources in response to the provisions, nor that its mission will be perceptibly impaired due to these provisions.

434.    Poder LatinX has not spent any money nor hired any staff in response to HB 2243 generally or its citizenship review process. Trial Tr. 1303:15-22 (Day 6 AM, testimony of N. Herrera, Poder LatinX).

435.    Poder LatinX's estimates regarding potential future expenditures in response to HB 2243's citizenship review process are speculative because the organization does not know the impact the laws may have. Poder LatinX has no internal documents outlining any reallocations of funds that may happen if this provision of the law is implemented. Trial Tr. 1304:1-4.

436.    An "integral" part of Poder LatinX's regular mission involves voter engagement and community outreach. Trial Tr. 1286:25-1287:4, 1288:1-5 (Day 5 PM, testimony of N. Herrera, Poder LatinX) (discussing voter engagement ad campaigns and in person canvassing). Poder LatinX generally speculates that if HB 2243 is implemented, the organization will need to increase its in-person and advertising outreach efforts. Trial Tr. 1300:9-17 (Day 6 AM, testimony of N. Herrera, Poder LatinX). Poder LatinX presented no evidence to support this claim nor evidence that such costs would be incurred in response to HB 2243's citizenship review process. Regardless, continuing voter outreach work is not an injury because such activities are part of Poder LatinX's regular mission.

437.    Poder LatinX claims that its reputation may be injured if naturalized citizens are removed from the voter rolls, without specifying whether it asserts HB 2243's citizenship review process might cause this harm. *See* Trial Tr. 1300:23-1301:7, 1304:11-16. This claim is based solely on speculation that if this hypothetical occurred, some unknown person might attribute that outcome to Poder LatinX, and subsequently question the organization's work. *Id.; id.* 1301:14-25.  Again, Poder LatinX has not identified anyone who has been or is likely to be injured in response to HB 2243's citizenship review process. *Id.* 1304:17-19.

438.    Chicanos Por La Causa Action Fund presented no evidence that it, or anyone it serves, has been or will be injured by HB 2243's citizenship review process, nor that it would suffer an injury if it does not spend resources in response to the provisions, nor that its mission will be perceptibly impaired due to this process.

439.    To the knowledge of its Executive Director, Chicanos Por La Causa Action Fund has not spent money nor hired staff in response to HB 2243's citizenship review

1  process. Trial Tr. 202:25–203:3, 203:25–204:2 (Day 1 PM, testimony of J. Garcia, Chicanos
2  Por La Causa Action Fund).

3      440.    Chicanos Por La Causa Action Fund's estimates regarding potential future
4  resource or staffing reallocations in response to HB 2243's citizenship review process are
5  speculative because the organization does not know the impact the laws may have, nor can
6  it estimate how many individuals may be "unfairly" taken off the voter rolls. *See* Trial Tr.
7  203:15-22, 204:3-24. Chicanos Por La Causa Action Fund has no internal documents
8  outlining any reallocations of funds that may happen if HB 2243's citizenship review
9  process is implemented. *Id.* 215:7-11.

10     441.    Chicanos Por La Causa Action Fund's claims that HB 2243's citizenship
11 review process may injure some unidentified individual who does not respond to a
12 cancellation notice and is removed from the voter roll. Trial Tr. 199:16-24. But its Executive
13 Director acknowledges that important paperwork is often sent by mail and mail is a facet of
14 everyday life. *Id.* 211:9-212:2.

15     442.    Chicanos Por La Causa Action Fund's regular mission includes voter
16 registration and canvassing activities that include speaking to potential voters.  Trial Tr.
17 179:6-17.  The organization's Executive Director estimated that the organization may have
18 to speak to up to 30% more individuals to register individuals if both HB 2492 and HB 2243
19 were implemented.  *Id.* 191:1-17.  Chicanos Por La Causa Action Fund presented no
20 evidence to support this claim or evidence that such costs would be incurred in response to
21 HB 2243's citizenship review process. Regardless, speaking to more individuals during
22 voter registration work is not an injury because such activities are part of its regular mission.

23     443.    Chicanos Por La Causa Action Fund's regular mission includes contacting
24 low propensity voters and "reengag[ing]" prospective voters. Trial Tr. 183:12-18. Chicanos
25 Por La Causa Action Fund will not suffer an injury to the extent it spends resources on
26 engaging with voters regarding HB 2243's citizenship review process because such
27 activities are part of its regular mission.

28

444.    Chicanos Por La Causa Action Fund's regular mission includes providing voter education information, including information to dispel concerns that the government may be attempting to find out "information about you or your community or perhaps your family" through the voter registration process. Trial Tr. 182:3-16. Chicanos Por La Causa Action Fund will not suffer an injury to the extent it provides voter education information regarding HB 2243's citizenship review process because such activities are part of its regular mission.

445.    Chicanos Por La Causa Action Fund claims that HB 2243's citizenship review process will dampen voter registration in the Latino community. Trial Tr. 189:5-16. But its claim is premised on the assumption that the laws will result in properly registered citizens being removed from the rolls due to outdated or erroneous database information. *Id.* Chicanos Por La Causa Action Fund has not identified anyone who is likely to be harmed under its hypothetical, nor presented evidence that this possibility is impending.

446.    Chicanos Por La Causa, Inc. presented no evidence that it, or anyone it serves, has been or will be injured by HB 2243's citizenship review process, nor that it would suffer an injury if it does not spend resources in response to the provisions, nor that its mission will be perceptibly impaired due to this process.

447.    Chicanos Por La Causa, Inc. presented no evidence that it has spent money or hired staff in response to HB 2243's citizenship review process. Trial Tr. 489:9-12, 492:9-12 (Day 2, testimony of L. Guzman, Chicanos Por La Causa, Inc.).

448.    Chicanos Por La Causa, Inc. claims that it will need to spend resources or reallocate staff generally in response to HB 2243. Trial Tr. 483:15-484:1. This claim is speculative because the organization does not know what impact the laws may have. Regardless, Chicanos Por La Causa, Inc. presented no evidence that such costs would be incurred in response to HB 2243's citizenship verification process.

449.    Chicanos Por La Causa, Inc. presented no evidence that it has begun to internally prepare for any reallocations of funds or staff if HB 2243's citizenship verification is implemented.  Trial Tr. 490:2-10.

450.    Chicanos Por La Causa, Inc.'s claims of injury are based on speculation that the law will remove eligible voters from the roll. Trial Tr. 497:25-480:8. Chicanos Por La Causa, Inc. has no estimate for the potential number of individuals who may be removed due to HB 2243's citizenship verification process. Trial Tr. 502:17-24.

451.    Chicanos Por La Causa, Inc.'s regular mission includes providing education materials in response to changes in law, and it will prepare updated educational materials regardless of whether HB 2243's citizenship verification process is implemented.  Trial Tr. 488:11-20.   Chicanos Por La Causa, Inc. acknowledges that current voter registration procedures include citizenship database checks and that those have not caused fear in the community. Trial Tr. 502:2-9. Chicanos Por La Causa, Inc. will not suffer injury if it provides education materials that include information about HB 2243's citizenship verification process, because such activities are part of its regular mission.

452.    Chicanos Por La Causa, Inc. claims that a potential citizenship investigation under HB 2243 will dampen voter registration in the Latino community. Trial Tr. 480:10-21. It presented no evidence to support this assertion. And while an investigation under the laws is theoretically possible, it is not impending, and Chicanos Por La Causa, Inc. presented no evidence that it, or anyone, is likely to be harmed by such an investigation.

453.    Chicanos Por La Causa, Inc. also asserts that it will suffer a reputational injury if HB 2243's citizenship verification process cancels the registration of an eligible individual it helped register. Trial Tr. 482:12-21, 486:4-12. This claim is based on a speculative and attenuated chain of events requiring, for example, that Chicanos Por La Causa, Inc. registers a naturalized citizen without providing a copy of that individual's proof of citizenship, the individual has not updated their citizenship status with MVD, the individual's citizenship status has not been updated or is unavailable in SAVE, the individual fails to respond to the notice from the county recorder that it lacks proof of citizenship, the Attorney General determines there is a reasonable basis to open an investigation into the individual's citizenship status, the investigation becomes public, and some unknown persons attribute the causation for this chain of events to Chicanos Por La

Causa, Inc. and decline to participate in other Chicanos Por La Causa, Inc. programs as a result. Trial Tr. 486:13-20, 495:5-21, 499:10-17. Again, Chicanos Por La Causa, Inc. presented no evidence that anyone is likely to be subject to such an investigation. And it acknowledges that current voter registration procedures include similar citizenship database checks and those have not caused fear in the community. Trial Tr. 502:2-9.

### 5.  Democratic National Committee Plaintiffs[26]

454.   Despite having millions of members and having been a party to this lawsuit for approximately one year, the Democratic National Committee has not identified any specific member who has been or is likely to be injured by HB 2243's citizenship review process. Trial Tr. 434:12-19, 435:6-12 (Day 2 PM, testimony of R. Reid Democratic National Committee).

455.   The Democratic National Committee presented no evidence that it has been or is likely to be injured by HB 2243. *See* Trial Tr. 432:9-21 (confirming no expenditure of resources to date). The Democratic National Committee estimates that it may spend resources in response to HB 2492. Trial Tr. 432: 22-25 (acknowledging uncertainty regarding the impact of the law and its implementation). But it makes no such claim regarding HB 2243.

456.   The Democratic National Committee claims that implementing HB 2492 generally may decrease voter registration or participation. Trial Tr. 425:1-3. It does not raise the same claim with respect to HB 2243 and regardless, presents no evidence to support its assertion or that it, or any individual member, is likely to be harmed by HB 2243's citizenship review process.

457.   Despite having millions of members and having been a party to this lawsuit for approximately one year, the Arizona Democratic Party has not identified any specific member who has been or is likely to be injured by HB 2243's citizenship review process.

458.   The Arizona Democratic Party asserts that it spent resources in response to

---

[26] The Democratic National Committee plaintiffs did not challenge HB 2243, but did challenge HB 2492 § 8, and so Defendants address lack of standing for that claim here.

HB 2492, not HB 2243, but those resources were devoted to a review of the draft 2023 Elections Procedures Manual. Trial Tr. 520:23-521:8 (Day 2 PM, testimony of M. Dick, Arizona Democratic Party). This activity is part of the organization's normal business and would have occurred regardless of HB 2243 and thus is not an injury attributable to HB 2243.

459.    The Arizona Democratic Party claims that implementing HB 2492 generally may decrease voter registration or participation. Trial Tr. 516:22-517:11. It does not raise the same claim with respect to HB 2243, and regardless, presents no evidence to support its assertion and its Executive Director testified that no individual registering to vote has expressed to her a fear that registering to vote may lead to an investigation into their citizenship status. *Id.* 521:9-20. The Arizona Democratic Party presented no evidence that it, or any individual member, is likely to be harmed by HB 2243's citizenship review process.

### 6.    Equity Coalition Plaintiff

460.    Equity Coalition has not identified anyone who has been or is likely to be injured by HB 2243's citizenship review process. Trial Tr. 1281:24-1282:2 (Day 5, testimony of M. Tiwamangkala, Equity Coalition).

461.    Equity Coalition has not spent funds in response to HB 2243's citizenship review process. Trial Tr. 1278:20-23.

462.    Equity Coalition has not shown that it would suffer an injury if it does not spend resources in response to HB 2243's citizenship review process, nor that its mission will be perceptibly impaired due to the process.

463.    Equity Coalition's estimates regarding potential future resource or staffing reallocations in response to HB 2243's citizenship review process are speculative because the organization does not know how the laws will be implemented and the extent to which the laws might impact its constituency. Equity Coalition has no internal documents outlining any reallocations of funds that may happen if this provision of the law is implemented. Trial Tr. 1280:6-9.

464.    Equity Coalition's regular mission includes assisting individuals with obtaining naturalization paperwork. Trial Tr. 1269:5-9. Equity Coalition's claim that there will be an increased need for naturalized citizens to provide paperwork as a result of HB 2243's citizenship review process is speculative and unsupported. *See* Trial Tr. 1275:21-23. Even if true, Equity Coalition will not suffer an injury if it continues to assist individuals with obtaining naturalization paperwork in response to HB 2243's citizenship review process because such activities are part of its regular mission.

### 7.    Promise Arizona Plaintiffs

465.    Despite having over 1,000 members and having been a party to this lawsuit approximately one year, Promise Arizona has not identified any specific member who has been or is likely to be injured by HB 2243's citizenship review process. *See* Trial Tr. 1308:15-21, 1326:10-13 (Day 6 AM, testimony of P. Falcon, Promise Arizona). Nor it is able to identify any voter in Arizona who will be affected by HB 2243's citizenship review process. *Id.* at 1326:14-17.

466.    Promise Arizona's Executive Director testified that the organization's standard practice when assisting naturalized citizens in registering to vote is to provide that individual's naturalization certificate number on the registration form. Trial Tr. 1315:6-13. A verified certificate of naturalization number constitutes satisfactory evidence of citizenship. *See* A.R.S. § 16-166(F)(4); HB 2243 § 2.

467.    Promise Arizona has not spent or reallocated any money in response to HB 2243's citizenship review process. Trial Tr. 1329:11-13.

468.    Promise Arizona has not shown that it would suffer an injury if it does not use resources in response to HB 2243's citizenship review process, nor that its mission will be perceptibly impaired due to the process.

469.    Promise Arizona's estimates regarding future resource or staffing reallocations are speculative because the organization does not know how the laws will be implemented and the extent to which the laws might impact its members. For example, Promise Arizona's Executive Director testified that the organization does not know how

County Recorders will treat individuals who have previously provided their A-number and driver's license number. Trial Tr. 1326:3-9.

470.    Promise Arizona's regular mission includes updating its voter registration training to incorporate substantive changes to registration requirements. Trial Tr. 1329:21-1330:3. Promise Arizona will not suffer an injury to the extent it spends resources updating voter registration training to include information on HB 2243's citizenship review process because such activities are part of its regular mission.

471.    Southwest Voter Registration Education Project has not identified any specific member who has been or is likely to be injured by HB 2243's citizenship review process.

472.    Southwest Voter Registration Education Project has not spent or reallocated any money nor hired any staff in response to HB 2243's citizenship review process. Trial Tr. 747:21-24, 753:12-14 (Day 3 PM, testimony of L. Camarillo, Southwest Voter Registration Education Project).

473.    Southwest Voter Registration Education Project has not shown that it would suffer an injury if it does not spend resources in response to HB 2243's citizenship review process, nor that its mission will be perceptibly impaired due to the process.

474.    Southwest Voter Registration Education Project's estimates of future resource or staffing reallocations are speculative, contingent on how the laws are enforced, and based on an unsupported assumption that individuals will have to resubmit proof of citizenship on a monthly basis. Trial Tr. 743:5-7, 750:12-14, 750:23-751:1.

475.    Southwest Voter Registration Education Project has no internal estimate regarding how much money it will spend money if this provision of the law is implemented and has no internal documents outlining any reallocations of funds that may happen. Trial Tr. 749:20-22, 750:8-11.

476.    Southwest Voter Registration Education Project's claim of future injury is speculative and based on an illogical assumption that HB 2243's citizenship review process may affect "a million voters"—the entire universe of potentially eligible Latino voters—

and result in the removal of native born and naturalized citizens regardless of the availability of proof of citizenship for such individuals. Trial Tr. 751:7-11; 761:2-17.

477.   Southwest Voter Registration Education Project's regular mission includes contacting and engaging voters. Trial Tr. 737:8-15. Southwest Voter Registration Education Project will not suffer an injury if it spends resources on engaging with voters regarding HB 2243's citizenship review process because such activities are part of its regular mission.

### 8.   United States

478.   The United States is not challenging HB 2243's citizenship verification process.  *See* United States Complaint, No. 2:22-cv-01124-SRB, Doc. 1.

## VIII.   Referring Federal-Only Voters to Attorney General (HB 2492 § 7)

### A.   The referrals to the Attorney General have not been made.

479.   Under HB 2492, the Secretary of State and county recorders are directed to make available to the Attorney General (1) a list of all existing registrants who have not provided proof of citizenship,[27] and (2) on or before October 30, 2022, the applications of such registrants.  A.R.S. § 16-143(A).

480.   These lists and applications have not been provided.  *See, e.g.*, Trial Tr. 113:20–114:1 (Day 1 AM, testimony of J. Petty); Trial Tr. 2122:7-8 (Day 9, testimony of B. Knuth); B. Knuth Dep. at 37:12-17, 37:21-23, 38:7-22.

481.   The deadline of October 30, 2022 passed more than a year ago.

### B.   The Attorney General has not attempted to verify citizenship of these registrants.

482.   Under HB 2492, the Attorney General is directed to "use all available resources to verify the citizenship status" of the abovementioned registrants, including "at a minimum" comparing the applications with certain databases, and then must submit a report to the Secretary of State, Senate President, and House Speaker by March 31, 2023

---

[27] Persons who were already registered in Arizona on the effective date of Proposition 200 are "deemed to have provided satisfactory evidence of citizenship" unless they subsequently change registration from one county to another.  A.R.S. § 16-166(G).

detailing all findings.  A.R.S. § 16-143(B), (E).

483.   Having not received the referrals, the Attorney General has not attempted to verify the citizenship status of the abovementioned registrants.  *See* B. Knuth Dep. at 37:12-17, 37:21-23, 38:7-22.

484.   The deadline of March 31, 2023 passed more than six months ago.

485.   On that deadline, the Attorney General's Office provided a report to the Secretary of State, Senate President, and House Speaker, which stated: "The Attorney General has no findings to report at this time.  The Attorney General's Office looks forward to working with the Secretary of State and the Legislature on this matter."  Trial Ex. 285; *see also* B. Knuth Dep. at 43:23-25, 44:9-45:1.

### C.   Plaintiffs have not shown that, if the Attorney General attempts to verify citizenship, she would do so in a harmful or unreliable way.

486.   The Attorney General has not created any specific plans or policies at this time for attempting to verify citizenship pursuant to A.R.S. § 16-143.  *See* Trial Tr. at 2123:15-20 (Day 9, testimony of B. Knuth).

487.   If the Attorney General's Office were to suddenly get referrals for every historic registrant and attempted registrant who did not provide proof of citizenship, it would be a huge list.  *E.g.*, Trial Tr. 51:11-52:6 (Day 1 AM, testimony of J. Petty) (testifying that there are 11,143 active federal-only voters in Maricopa County and 9,488 inactive federal-only voters in the county).

488.   In that situation, it is unclear how many "available resources" the Attorney General's Office could dedicate to the task and, thus, how long it would take.

489.   The Attorney General's Office is not well-equipped to make conclusive determinations about citizenship, given the office's relative lack of access to federal information.  *See* Trial Tr. 2110:5–2111:12 (Day 9, testimony of B. Knuth).

490.   However, investigators in the Attorney General's Office can generally feel confident about confirming that person *is* a citizen (as opposed to being a *non-*citizen), based on their experience and certain tools available.  *See* Trial Tr. 2123:3-13 (Day 9,

1    testimony of B. Knuth).

2         491.    Investigators in the Attorney General's Office often use tools not listed in

3    A.R.S. § 16-143.  For example, the Attorney General's office can access law-enforcement

4    databases including one called "TLO" that is supported by the credit reporting agency

5    TransUnion.  Trial Tr. 2115:4-16 (Day 9, testimony of B. Knuth).  This database provides

6    identifying information such as address and employment history, dates of birth, and social

7    security numbers, but it does not provide citizenship information. *Id.* 2115:18-23.

8         492.    The Attorney General's office also can access the MVD database, which

9    provides identifying information.  Trial Tr. 2116:12-21 (Day 9, testimony of B. Knuth). In

10   addition to information on the face of the license, through their access, investigators at the

11   Attorney General's office can see a licensee's historical photographs and signatures.  K.

12   Thomas Dep. at 302:9-15.  Investigators cannot determine from their limited access to MVD

13   data if an individual is a citizen or, if a non-citizen, their authorized presence status. *See id.*

14   at 304:18-23, 314:12-22.

15        493.    Investigators from the Attorney General's office cannot determine citizenship

16   status based on their limited access to MVD records alone; however, this data is used as

17   part of an investigator's assessment into the merits of an allegation of non-citizenship. *See*

18   K. Thomas Dep. at 312:23-313:5; B. Knuth Dep. at 113:11-24 (discussing standard

19   investigative steps with respect to citizenship investigation).

20        494.    The Attorney General's office can request information from the Social

21   Security Administration, Trial Tr. 2117:11-14 (Day 9, testimony of B. Knuth), but the

22   access is limited and cannot show whether someone is a citizen, *id.* 2118:2-10.

23        495.    The Attorney General's office does not have access to SAVE. *See* B. Knuth

24   Dep. at 123:15-24; K. Thomas Dep. at 305:5-24, 308:6-11.  The office has no specific plans

25   to obtain access to SAVE. *Id.*

26        496.    The Attorney General's office does not have currently access NAPHSIS.  Its

27   investigators are not generally familiar with the database and have expressed concerns with

28   its use because NAPHSIS is run by an organization, not a government.  K. Thomas Dep. at

1  305:5-24, 309:21-310:5.

2      497.   The Attorney General's office does not have access to any other database

3  related to voter registration.  K. Thomas Dep. at 307:5-19.

4      498.   In the past, when presented with an allegation that a non-citizen is registered

5  to vote, the Attorney General's office conducted a database review.  Trial Tr. 2114:22-

6  2116:21, 2117:8-2119:6 (Day 9, testimony of B. Knuth).  If an initial review of databases

7  indicates that an allegation lacked merit, an investigation was not opened. *Id.* 2118:15-

8  2119:6.

9      499.   Because A.R.S. § 16-143 would require the same database-review, it is

10 entirely possible that an individual would be unaware that the Attorney General conducted

11 a merit assessment or even an investigation into their citizenship status.  Trial Tr. 2140:23-

12 2141:1 (Day 9, testimony of B. Knuth); *see also* B. Knuth Dep. at 32:8-17 (explaining that

13 individuals are not notified they are under investigation until and unless an investigator

14 needs to speak with them).

15     500.   The Election Integrity Unit's investigator has never contacted a voter in

16 connection with an investigation into their citizenship.  Trial Tr. 2138:25-2139:7.  Although

17 investigators may speak to the registered voter, their family members, or potentially their

18 employer, if needed, investigators generally would not do so absent "really strange

19 circumstance[s]" and, instead, through database review, are generally able to "reach a

20 conclusion that [they are] comfortable with without [contacting the voter]."   Trial Tr.

21 2131:52132:7, 2139:3-4 (Day 9, testimony of B. Knuth).

22
23     **D.    Plaintiffs have not shown that the Attorney General would prosecute
             anyone under A.R.S. § 16-143, much less wrongfully.**

24     501.   Under HB 2492, the Attorney General is directed to "prosecute individuals

25 found to not be United States citizens" pursuant to A.R.S. § 16-182.  *See* A.R.S. § 16-

26 183(D).

27     502.   This step would occur only after an investigator is satisfied that a crime has

28 occurred and referred the case to a prosecutor for a separate evaluation under the office's

charging standard.  Trial Tr. 2132:21-2133:2 (Day 9, testimony of B. Knuth).  That charging standard requires that the Office believe there is a "reasonable likelihood of conviction" to the standard of a beyond a reasonable doubt.  Trial Tr. 1695:15-21 (Day 7, testimony of T. Lawson).

503.   In the context of A.R.S. § 16-182, the Attorney General's charging standard means that an individual would only be prosecuted if the Office found that if the matter was presented to a trial jury, it is likely that jury would return a verdict that it is beyond a reasonable doubt that the charged individual person *knowingly* registered while ineligible to vote.

504.   The Attorney General has no current plans to prosecute any such persons.

505.   Plaintiffs have presented no evidence that the Attorney General is likely to find that any case merits investigation under A.R.S. § 16-143 or that a prosecution under the statute is likely—much less that a wrongful prosecution is likely to occur.

**E.   The Attorney General's verification of citizenship may increase voter confidence.**

506.   A.R.S. § 16-143 may increase voter confidence by resolving general citizen concerns that individuals on the Federal Only list may not be U.S. citizens.  *See* Part II.A (discussing concerns from the public regarding elections, including absence of proof of citizenship for Federal-only voters); Trial Tr. 1696:18-22 (discussing public complaints that "a lack of a proof of citizenship requirement could allow non-citizens to vote").

507.   A.R.S. § 16-143 would instill confidence that the Attorney General has evaluated and, for example, determined there is no evidence to suggest that the federal-only list is comprised of non-citizens.

**F.    Plaintiffs have not shown actual or imminent concrete and particularized injury due to the referral of federal-only voters to Attorney General.**

### 1.    Lack of injury generally

508.    No Plaintiff has identified anyone who has been or is likely to be injured by HB 2492's referral provision.

509.    No Plaintiff will suffer, and no Plaintiff claims, a cognizable injury if a non-citizen is removed from the voter rolls after an investigation by the Attorney General.

### 2.    Mi Familia Vota Plaintiffs

510.    Mi Familia Vota presented no evidence that it, or anyone it serves, has been or will be harmed by HB 2492's referral provision, nor that its mission will be perceptibly impaired due to this provision.

511.    Voto Latino has not identified anyone who has been or is likely to be injured due to HB 2492's referral provision. Trial Tr. 252:12-13 (Day 1 PM, testimony of A. Patel, Voto Latino). Voto Latino also does not know if anyone who might be investigated is or is not a citizen. Trial Tr. 252:18-21.

512.    Voto Latino presented no evidence that it, or anyone it serves, has been or will be harmed by HB 2492's referral provision, nor that its mission will be perceptibly impaired due to this provision.

513.    Voto Latino's managing director testified that after the bill was passed the organization produced educational content regarding HB 2492 generally. Trial Tr. 237:11-15. Voto Latino provided no evidence that this content addressed HB 2492's referral provision. Regardless, this type of expenditure does not constitute an injury attributable to HB 2492's referral provision because it is part of the organization's regular mission to inform voters regarding the registration and voting process. Trial Tr. 217:14-218:1.

514.    Voto Latino's regular mission includes voter registration activities, including registering new voters. Trial Tr. 217:14-218:1. Voto Latino speculated that it will need to engage with more potential voters to successfully register a voter as a result of HB 2492's birth place requirement and generally asserted that HB 2492 will make it more difficult to

register Latino voters.   Trial Tr. 229:17-24, 238:9-16.  Voto Latino presented no evidence to support these assertions, nor evidence that HB 2492's referral provision, pertaining to already registered voters, would impact new registrations. Even if it would impact new registrations, this is not an injury because engaging with potential voters is part of Voto Latino's regular voter registration mission.

515.   Voto Latino claims that a potential Attorney General investigation under HB 2492 will dampen voter registration in the Latino community. Trial Tr. 236:9-23. Voto Latino did not specify whether its concerns applied to a potential Attorney General investigation conducted after HB 2492's citizenship verification process or HB 2492's referral provision. Regardless, Voto Latino presented no evidence to support its assertion that HB 2492 will impact voter registration rates. And Voto Latino presented no evidence that it, or anyone, is likely to be harmed by such an investigation.

516.   Voto Latino has also speculated that it will need to spend additional resources if investigation referral provisions are implemented to achieve similar levels of voter turnout. Trial Tr. 236:24-237:8. Again, Voto Latino did not specify whether its concerns applied to a potential Attorney General investigation conducted after HB 2492's citizenship verification process or HB 2492's referral provision. Regardless, Voto Latino presented no evidence to support its assertion that HB 2492 would impact voter turnout and, even if that is true, encouraging registered voters to vote is part of Voto Latino's regular mission and does not constitute an injury.

### 3.    LUCHA Plaintiffs

517.   LUCHA presented no evidence that it, any of its members, or anyone it serves, has been or will be injured due to HB 2492's referral provision, nor that its mission will be perceptibly impaired due to the provision.

518.   LULAC presented no evidence that it, any of its members, or anyone it serves, has been or will be injured due to HB 2492's referral provision, nor that its mission will be perceptibly impaired due to the provision.

519.   Despite having half a million members and having been a party to this lawsuit

1    for approximately one year, Arizona Students' Association has not identified anyone who

2    that has been or is likely to be injured due to HB 2492's referral provision. Trial Tr. at

3    446:18-21; 466:2-5 (Day 2 PM, testimony of K. Nitschke, Arizona Student's Association).

4        520.    Arizona Students' Association presented no evidence that it has spent or

5    reallocated money or hired staff (or expects to do so) in response to the referral provision,

6    nor that its mission will be perceptibly impaired due to the referral provision.

7        521.    Arizona Students' Association's claim that a potential investigation under HB

8    2492 may discourage students from registering to vote is speculative. Trial Tr. 461:21-

9    462:4. Arizona Students' Association did not specify whether its concerns applied to a

10   potential Attorney General investigation conducted after HB 2492's citizenship verification

11   process or HB 2492's referral provision. And it presented no evidence that anyone is likely

12   to be subject to such an investigation or that an investigation of a previously registered voter

13   would impact a potential student registration.

14       522.    Arizona Democracy Resource Center Action presented no evidence that it,

15   any of its members, or anyone it serves, has been or will be injured due to HB 2492's referral

16   provision, nor that its mission will be perceptibly impaired due to the provision.

17       523.    Inter Tribal Council of Arizona Inc. presented no evidence that it, any of its

18   members, has been or will be injured due to HB 2492's referral provision, nor that its

19   mission will be perceptibly impaired due to the provision.

20       524.    The San Carlos Apache Tribe presented no evidence that it, any of its

21   members, has been or will be injured due to HB 2492's referral provision, nor that its

22   mission will be perceptibly impaired due to the provision.

23       525.    Despite having hundreds of members and having been a party to this lawsuit

24   for approximately one year, Arizona Coalition for Change has not identified any member

25   who has been or is likely to be injured by HB 2492's referral provision. Trial Tr. 280:24-

26   281:3, 281:24-25, 282:4-10 (Day 1 PM, testimony of R. Bolding, Arizona Coalition for

27   Change).

28       526.    Arizona Coalition for Change presented no evidence that it has spent or

reallocated money or hired staff (or expects to do so) in response to HB 2492's referral provision, nor that it would suffer an injury if it does not use resources in response to HB 2492's referral provision, nor that its mission will be perceptibly impaired due to the referral provision.

527.    Arizona Coalition for Change has no internal documents outlining any reallocations of funds that may happen if this provision of the law is implemented. Trial Tr. 298:19-23 (Day 2 AM, testimony of R. Bolding, Arizona Coalition for Change).

528.    Arizona Coalition for Change's regular mission includes voter education events to discuss "changes in Arizona law" and "changes with regards to specific policies." Trial Tr. 262:25–263:9 (Day 1 PM, testimony of R. Bolding, Arizona Coalition for Change). Arizona Coalition for Change generally claims that it will need to conduct voter education events in response to HB 2492 and HB 2243. Trial Tr. 265:4-17. Even if Arizona Coalition for Change were to provide voter education events that include information about HB 2492's referral provision, that is not an injury because such activities are part of its regular mission.

529.    Arizona Coalition for Change's regular mission includes speaking to potential voters during voter registration efforts.  Trial Tr. 268:19-25. Arizona Coalition for Change estimates that it speaks to ten individuals for every completed voter registration form.  Trial Tr. 270:3-4. Arizona Coalition for Change has speculated that it will need to speak to more individuals to obtain a complete voter registration form if HB 2492 (not necessarily HB 2492's referral provision) is implemented. Trial Tr. 275:13-17. Arizona Coalition for Change has presented no evidence to support this claim.  Even if true, speaking to more individuals during voter registration work is not an injury because such activities are part of its regular mission.

530.    Arizona Coalition for Change's regular mission includes voter education advertisements that inform voters about the content, timing, and location of elections.  Trial Tr. 260:3-12, 264:10-15.  Arizona Coalition for Change generally speculates that it would create voter education advertisements about HB 2492 and HB 2243. Trial Tr. 265:18-21.

1    Arizona Coalition for Change presented no evidence that these advertisements would

2    address HB 2492's referral provision. Even if Arizona Coalition for Change were to spend

3    resources on voter education advertisements that include information about HB 2492's

4    referral provision, that is not an injury because such activities are part of its regular mission.

5         531.   As part of Arizona Coalition for Change's regular voter registration mission,

6    it provides daily training to staff and volunteers discussing "any changes in particular that

7    may have happened in the law."   Trial Tr. 269:13-24. Arizona Coalition for Change

8    presented no evidence that its daily training would cover HB 2492's referral provision.

9    Regardless, because Arizona Coalition for Change's regular mission includes providing

10   training on changes in the law, any such training would not be an injury.

11              **4.    Poder LatinX Plaintiffs**

12        532.   Poder LatinX has not identified anyone who has been or is likely to be injured

13   due to HB 2492's referral provision. Trial Tr. 1304:17-19 (Day 6 AM, testimony of N.

14   Herrera, Poder LatinX).

15        533.   Poder LatinX presented no evidence that it has been or will be injured due to

16   HB 2492's referral provision, nor that it would suffer an injury if it does not use resources

17   in response to the provision, nor that its mission will be perceptibly impaired due to the

18   provision.

19        534.   Poder LatinX has not spent any money nor hired any staff in response to HB

20   2492 generally or in response to the referral provision. Trial Tr. 1303:15-22.

21        535.   Poder LatinX's estimates regarding potential future spending are in response

22   to HB 2492 generally, not HB 2492's referral provision in particular, and are speculative

23   because the organization does not know the impact the laws may have. *See* Trial Tr. 1300:1-

24   20. Poder LatinX has no internal documents outlining any reallocations of funds that may

25   happen if this provision of the law is implemented. Trial Tr. 1304:1-4.

26        536.   An "integral" part of Poder LatinX's regular mission involves voter

27   engagement and community outreach. Trial Tr. 1286:25-1287:4, 1288:1-5 (Day 5 PM,

28   testimony of N. Herrera, Poder LatinX) (discussing voter engagement ad campaigns and in

person canvassing). Poder LatinX generally speculates that if HB 2492 is implemented, the organization will need to increase its in-person and advertising outreach efforts. Trial Tr. 1300:9-17 (Day 6 AM, testimony of N. Herrera, Poder LatinX). Poder LatinX presented no evidence to support this claim nor evidence that such costs would be incurred in response to HB 2492's referral provision. Regardless, continuing voter outreach work is not an injury because such activities are part of Poder LatinX's regular mission.

537.    Poder LatinX claims that its reputation may be injured if naturalized citizens are removed from the voter rolls, without specifying whether it asserts that HB 2492's referral provision might cause this harm. *See* Trial Tr. 1300:23-1301:7, 1304:11-16. This claim is based solely on speculation that if this hypothetical occurred, some unknown person might attribute that outcome to Poder LatinX and subsequently question the organization's work. *Id.; id.* 1301:14-25.  Again, Poder LatinX has not identified anyone who has been or is likely to be injured in response to HB 2492's referral provision. *Id.* 1304:17-19.

538.    Chicanos Por La Causa Action Fund presented no evidence that it, or anyone it serves, has been or will be injured due to HB 2492's referral provision, nor that it would suffer an injury if it does not use resources in response to the provision, nor that its mission will be perceptibly impaired due to the provision.

539.    To the knowledge of its Executive Director, Chicanos Por La Causa Action Fund has not spent any money nor hired any staff in response to HB 2492's referral provision. Trial Tr. 202:25–203:3, 203:25–204:2 (Day 1 PM, testimony of J. Garcia, Chicanos Por La Causa Action Fund).

540.    Chicanos Por La Causa Action Fund's estimates regarding potential future resource or staffing reallocations are in response to HB 2492 generally, not the referral provision, and in any event are speculative because the organization does not know the impact the laws may have. Trial Tr. 203:15-22, 204:13-24. Chicanos Por La Causa Action Fund has no internal documents outlining any reallocations of funds that may happen if this provision of the law is implemented. Trial Tr. 215:7-11.

541.    Chicanos Por La Causa Action Fund's regular mission includes providing voter education information, including information to dispel any concerns individuals may have regarding why certain information is solicited during voter registration and that the government is not attempting to find out "information about you or your community or perhaps your family." Trial Tr. 182:3-16. Chicanos Por La Causa Action Fund will not suffer injury if its voter education includes information about HB 2492's referral provision because such activities are part of its regular mission.

542.    Chicanos Por La Causa, Inc. presented no evidence that it, or anyone it serves, has been or will be injured by HB 2492's referral provision, nor that it would suffer an injury if it does not spend resources in response to the provisions, nor that its mission will be perceptibly impaired due to this process.

543.    Chicanos Por La Causa, Inc. presented no evidence that it has spent any money nor hired any staff in response to HB 2492 generally or in response to HB 2492's referral provision. Trial Tr. 489:9-12, 492:9-12 (Day 2, testimony of L. Guzman, Chicanos Por La Causa, Inc.).

544.    Chicanos Por La Causa, Inc. claims that it will need to spend resources or reallocate staff in response to HB 2492 generally. Trial Tr. 483:15-484:1. This claim is speculative because the organization does not know what impact the laws may have. Regardless, Chicanos Por La Causa, Inc. presented no evidence that such costs would be incurred in response to HB 2492's referral provision.

545.    Chicanos Por La Causa, Inc. presented no evidence that the organization has begun to internally prepare for any reallocations of funds or staff if HB 2492 generally, or the referral provision, is implemented. Trial Tr. 490:2-10.

546.    Chicanos Por La Causa, Inc.'s regular mission includes providing education materials in response to updated educational laws, and it will prepare updated educational materials regardless of the implementation of HB 2492's referral provision. Trial Tr. 488:11-20. Because such activities are part of its regular mission, Chicanos Por La Causa, Inc. will not suffer an injury if it provides voter education materials regarding HB 2492's

1    referral provision.

2         547.   Chicanos Por La Causa, Inc.'s regular mission includes providing voter

3    education information, including information regarding current voter registration

4    procedures. Chicanos Por La Causa, Inc. acknowledges that current voter registration

5    procedures include citizenship database checks and that those have not caused fear in the

6    community. Trial Tr. 502:2-9. Chicanos Por La Causa, Inc. will not suffer an injury if it

7    provides voter education information regarding HB 2492's referral provision, because such

8    activities are part of its regular mission.

9         548.   Chicanos Por La Causa, Inc. also asserts that it may suffer a reputational

10   injury if HB 2492's referral provision is implemented. Trial Tr. 482:12-21, 486:4-12. This

11   claim is based on speculation that the Attorney General will inform individuals subject to

12   this provision that they are under investigation, that the Attorney General will ultimately

13   direct county recorders to remove eligible voters from the roll, and that some unknown

14   persons attribute the causation for this chain of events to Chicanos Por La Causa, Inc. and

15   decline to participate in other Chicanos Por La Causa, Inc. programs as a result *See* Trial

16   Tr. 484:13-17, 495:4-21.

17        549.   Chicanos Por La Causa, Inc. claims that a potential Attorney General

18   investigation under HB 2492 will dampen voter registration in the Latino community. *See*

19   Trial Tr. 481:4-18. Chicanos Por La Causa, Inc. did not specify whether its concerns applied

20   to a potential Attorney General investigation conducted after HB 2492's citizenship

21   verification process or HB 2492's referral provision. Chicanos Por La Causa, Inc. presented

22   no evidence to support its assertion that HB 2492 will impact voter registration rates. And

23   Chicanos Por La Causa, Inc. presented no evidence that it, or any individual, is likely to be

24   harmed by to such an investigation.

25        **5.     Democratic National Committee Plaintiffs**

26        550.   Despite having millions of members and having been a party to this lawsuit

27   for approximately one year, the Democratic National Committee has not identified any

28   specific member who has been or is likely to be injured by the HB 2492's referral provision.

Trial Tr. 434:12-19, 435:6-12 (Day 2 PM, testimony of R. Reid Democratic National Committee).

551.    The Democratic National Committee presented no evidence that it has spent any resources to date in response to HB 2492 generally, let alone HB 2492's referral provision. Trial Tr. 432:9-21.

552.    The Democratic National Committee's estimates regarding future expenditures in response to HB 2492 generally are speculative. Trial Tr. 432: 22-25 (acknowledging uncertainty regarding the impact of the law and its implementation). And the Democratic National Committee presented no evidence that it would spend resources in response to HB 2492's referral provision in particular.

553.    The Democratic National Committee claims that implementing HB 2492 generally may decrease voter registration or participation. Trial Tr. 425:1-3. The Democratic National Committee presented no evidence to support this assertion, nor evidence that HB 2492's referral provision in particular may cause this result. And the Democratic National Committee presented no evidence that it, or any individual member, is likely to be harmed by to such an investigation.

554.    Despite having millions of members and having been a party to this lawsuit for approximately one year, the Arizona Democratic Party has not identified any specific member who has been or is likely to be injured by the HB 2492's referral provision.

555.    The Arizona Democratic Party asserts that it spent resources in response to HB 2492 generally, not HB 2492's referral provision in particular, but those resources were devoted to a review of the draft 2023 Elections Procedures Manual. Trial Tr. 520:23-521:8 (Day 2 PM, testimony of M. Dick, Arizona Democratic Party). This activity is part of the organization's normal business and would have occurred regardless of HB 2492 and thus is not an injury attributable to HB 2492.

556.    The Arizona Democratic Party claims that implementing HB 2492 generally may decrease voter registration or participation. Trial Tr. 516:22-517:11. The Arizona Democratic Party presented no evidence to support this assertion, nor evidence that HB

2492's referral provision in particular may cause this result. The Arizona Democratic Party's Executive Director testified that that no individual registering to vote has expressed to her a fear that registering to vote may lead to an investigation into their citizenship status. Trial Tr. 521:9-20. And the Arizona Democratic Party presented no evidence that it, or any individual member, is likely to be harmed by to such an investigation.

### 6.    Equity Coalition Plaintiff

557.    Equity Coalition presented no evidence that it, or anyone it serves, has been or will be injured in response to HB 2492's referral provision, nor that it would suffer an injury if it does not use resources in response to HB 2492's referral provision, nor that its mission will be perceptibly impaired due to the provision. *See* Trial Tr. 1281:24–1282:2, 1278:20-23 (Day 5, testimony of M. Tiwamangkala, Equity Coalition).

558.    Equity Coalition has no internal documents outlining any reallocations of funds that may happen if this provision of the law is implemented. Trial Tr. 1280:6-9.

### 7.    Promise Arizona Plaintiffs

559.    Promise Arizona Plaintiffs are not challenging HB 2492's referral provision. *See* Promise Arizona Complaint, No. 2:22-cv-01602-SRB, Doc. 1.

### 8.    United States

560.    The United States is not challenging HB 2492's referral provision. *See* United States Complaint, No. 2:22-cv-01124-SRB, Doc. 1.

## IX.    Birth Place Requirement (HB 2492 § 4)

561.    Since the beginning of statehood, Arizona's state voter registration form has included a field for the applicant's place of birth. *See* 1913 Revised Statutes of Ariz. § 2885 (county recorder must record a registrant's "country of nativity," and, "if naturalized," documentation of the same).

562.    A statutory amendment enacted in 1993 expressly designated place of birth as an optional item of information. *See* 1993 Ariz. Laws ch. 98, § 10 (adopting A.R.S. § 19-121.01, which specifies the minimum required elements of a valid registration).

563.   HB 2492 provides that a registrant's disclosure of his or her place of birth is a necessary attribute of a valid State Form.  *See* A.R.S. § 16-121.01(A).

### A.    Uses of Birthplace Information

564.   The county recorders have long collected and stored birthplace data on a voluntary basis from those registrants who have provided it.   For example, the Service Arizona website maintained by ADOT, through which individuals can register to vote or update existing registrations, includes in its online form a drop-down menu of states and countries, which users can use to indicate their place of birth.  *See* Trial Tr. 120:19–23 (Day 1 AM, testimony of J. Petty); Trial Ex. 767 at 7, 19–35.

565.   A constellation of identifiers that includes birthplace can enable county recorders to identify putative registrations that are duplicative of existing registrations or that have been submitted in the name of ineligible applicants (*e.g.*, deceased individuals). *See* U.S. State Department's Foreign Affairs Manual, 8 FAM 403.4-6(A) (requiring provision of birthplace on U.S. passport applications because it "is an integral part of establishing an individual's identity.  It distinguishes that individual from other persons with similar names and/or dates of birth, and helps identify claimants attempting to use another person's identity"), available at Doc. 365-1 at 107.[28]

566.   The universal collection of birthplace information from all State Form registrants will assist in enabling county recorders to (i) confirm putative voters' identities in various electoral settings, and (ii) flag potentially unlawful or duplicative registrations.

### 1.    Birth place may be used for identity verification.

567.   In various election administration contexts, county recorders use birthplace information in combination with other data to confirm a putative voter's identity.  For example, if two putative registrants share the same name and birthday, divergent birthplaces

---

[28] The Court takes judicial notice of this provision of the Foreign Affairs Manual.  *See Bona Fide Conglomerate, Inc. v. SourceAmerica*, 377 F. Supp. 3d 1093, 1111 n.6 (S.D. Cal. 2019) (taking judicial notice of U.S. Department of Defense Manual).

1   could be used to ascertain and confirm the unique identity of each individual.  *See* Trial Tr.

2   2064:5–12 (Day 8 PM, testimony of H. Hiser), 132:2–8 (Day 1, testimony of J. Petty).

3       568.   In the current Arizona voter registration system, Plaintiffs' expert testified

4   there are at least 684 known instances of two registered voters sharing identical names,

5   dates of birth, and either last four digits of their Social Security number or their ADOT

6   number.  In 24 of those cases, the registrants had designated incompatible birthplaces,

7   which suggests an incongruity of identity.  *See* Trial Ex. 972; Trial Tr. 699:20–700:17 (Day

8   3 PM, testimony of E. Hersh).  And in 16 of those cases, Plaintiffs' expert agreed that the

9   different birthplaces were unambiguously different states.  Trial Tr. 720:24–721:2 (Day 3

10   PM, testimony of E. Hersh).  In other cases (*i.e.*, the majority), birthplace information helps

11   confirm the duplicative nature of the two registrations.

12       569.   This is a conservative estimate for several reasons, including:

13           a.   Plaintiffs' expert only counted names as identical if they were exactly

14   the same: for example, he counted "Michael Smith" different from "Mike Smith."

15   Trial Tr. 684:12–687:14 (Day 3 PM, testimony of E. Hersh).  Yet county recorders

16   are not nearly so exact in their matching process.  *See* Trial Ex. 935.

17           b.   Because birthplace has previously been a voluntary field, only about

18   two-thirds of voters have birthplace in the data at all.  Trial Tr. 677:23-25 (Day 3

19   PM, testimony of E. Hersh).

20           c.   Because birthplace has previously been an optional field, it has not

21   been elicited or kept in a uniform manner, so answers have not always been clear.

22   For example, it is not clear whether the answer "CA" would mean Canada or

23   California.  *Id.* 651:25–652:19, 677:20-22, 678:24–679:2.

24       570.   Birthplace is regularly used as a security question or other identity verification

25   device in interactions between voters and elections officials. For example, certain notices

26   issued by the Maricopa County Recorder are accompanied by a return form that requests

27   the voter's birthplace to assist the county recorder in identifying that individual's unique

28

1   registration record.  *See* Trial Tr. 121:7-122:3 (Day 1 AM, testimony of J. Petty); 2002:5–

2   20 (Day 8 PM, testimony of H. Hiser); Trial Ex. 773.

3       571.   Although many Arizona voters were born in Arizona, many were not.  For

4   example, the most common name with a birthplace in the voter file is Michael Smith (369

5   instances), but fewer than half of these Michael Smiths were born in Arizona (115

6   instances).  Trial Tr. 679:3–680:7 (Day 3 PM, testimony of E. Hersh).

7       572.   Voters can and do provide their birthplace on early ballot request forms or

8   provisional ballot envelopes, which the county recorder can then compare to the

9   corresponding registration record and corroborate the voter's identity.  *See* A.R.S. § 16-

10  542(A); Trial Ex. 6 at 47, 48, 206; Trial Tr. 135:1–16 (Day 1 AM, testimony of J. Petty).

11      573.   In telephone communications with a voter (to, for example, verify the

12  authenticity of a signature contained on an early ballot submission affidavit), staff in a

13  county recorder's office may ask for confirmation of birthplace as a security question to

14  verify that the counterparty to the phone call is the same person as the registered voter.  *See*

15  Trial Tr. 390:20–391:21 (Day 2, testimony of C. Connor); 2002:21–2004:3 (Day 8 PM,

16  testimony of H. Hiser).

17      574.   Birthplace information that is included in a form of documentary proof of

18  citizenship also serves identity verification functions.  For example, when a voter provides

19  as documentary proof of citizenship a birth certificate or passport that features a last name

20  different from the one indicated on the registration form, the county recorder may use other

21  items of personal information, including birthplace, to cross-check the individual's identity.

22  Trial Ex. 6 at 4–5; Trial Tr. 122:24–123:16, 134:18–24 (Day 1 AM, testimony of J. Petty)

23  (acknowledging the birth place could be helpful to determining identity when birth

24  certificate is provided).

25              **2.    Birth place may be used for eligibility verification.**

26      575.   In addition to aiding county recorders in confirming putative voter's identity

27  in various voting-related transactions, birthplace data also can flag initial registrations that

28  may be fraudulent, duplicative or otherwise invalid.  For example, if a putative new

1   registrant has the same name and other identifying information as an existing registrant,

2   place of birth can be used to assist in ascertaining whether the new registration is a duplicate

3   and must be rejected.  *See* Trial Tr. 132:2–8 (Day 1 AM, testimony of J. Petty), 389:3–12

4   (Day 2 AM, testimony of C. Connor).

5       576.    Birthplace data also has utility in certain list maintenance activities.  When a

6   county recorder receives information (through, for example, an obituary notice) that a voter

7   may have died, birthplace information is used in conjunction with other items to confirm

8   that the deceased individual is a registered voter, which, in turn, can facilitate cancelation

9   of the registration.  *See* Trial Tr. 122:13–21 (Day 1 AM, testimony of J. Petty); Trial Ex. 6

10  at 34.

11      577.    HB 2243 authorizes the use of NAPHSIS, a consortium of state government

12  agencies.  *See* A.R.S. § 16-165(J); Trial Tr. 1909:1–1911:13 (Day 8 PM, testimony of J.

13  Richman).  The Vital Events System includes, for individuals born in the United States,

14  birthplace information.  *See* Trial Tr. 1910:16–20 (Day 8 PM, testimony of J. Richman).

15  Although NAPHSIS data is not a statutorily recognized form of documentary proof of

16  citizenship, birthplace information in the database could be material to resolving questions

17  concerning a registrant's citizenship that may arise during the course of list maintenance

18  activities.  For example, a voter with Federal Only status whom NAPHSIS has identified as

19  an individual born in the United States may be eligible for redesignation as a full-ballot

20  voter. *See id.* 1934:16–1935:13.

21      **B.    Applicants' notice and opportunity to cure**

22      578.    Under HB 2492, a submitted State Form in which the applicant has failed to

23  designate a birthplace is not rejected, but rather is placed in suspense status.  The county

24  recorder will then provide the applicant with written notice of the deficiency.  If the missing

25  birthplace is provided (and the form otherwise is legally sufficient) before 7:00 p.m. on the

26  date of the next ensuing election, the applicant will be deemed registered as of the date the

27  registration was first received.  *See* A.R.S. § 16-134(B).

28

**C.** **Non-US Plaintiffs have not shown actual or imminent concrete and particularized injury due to HB 2492's birth place requirement**

**1.** **Lack of injury generally**

579.    No Plaintiff has presented evidence that any eligible voter in Arizona will be unable to satisfy the birth place requirement or will be or is likely to be injured by the requirement.[29]

**2.** **Mi Familia Vota Plaintiffs**[30]

580.    Although Mi Familia Vota has been a party to this litigation for approximately a year, it not identified any individual who will be, or is likely to be injured, by the birth place requirement.

581.    Mi Familia Vota has not spent or reallocated money or hired staff in response to the birth place requirement. Trial Tr. 794:17-23 (Day 4 AM, testimony of C. Rodriguez-Greer, Mi Familia Vota). Nor has it shown that it would suffer an injury if it does not utilize resources in response to HB 2492's birth place requirement, nor that its mission will be perceptibly impaired due to the birth place requirement.

582.    Mi Familia Vota has no internal documents outlining any reallocations of funds that may happen if this provision of the law is implemented and cannot predict the financial impact, if any, on the organization if HB 2492's birth place requirement was implemented. Trial Tr. 794:24-795:1, 795:16-20.

583.    Mi Familia Vota's estimates regarding expending resources in the future in response to the birth place provision are speculative. For example, Mi Familia Vota speculated that individuals will decline to provide information required to register to voter and the organization will need to provide additional voter registration training to address

---

[29] Defendants concede that the United States has standing to challenge the materiality of birth place under 52 U.S.C. § 10101(A)(2)(B). Defendants note, however, that the United States similarly did not identify any individual who would be unable to complete the requirement or would be harmed by the requirement if implemented.
[30] The Mi Familia Vota plaintiffs only challenged the materiality of the birth place provision and did not claim that the birth place requirement was an undue burden on the right to vote. *See* Doc. 65 at 19-26. Nevertheless, representatives testifying on behalf of these plaintiffs presented unsupported theories that the birth place requirement may be a burden on voters and so Defendants address their lack of standing to bring such a claim here.

this scenario.  Trial Tr. 792:24-793:12. When questioned by the Court, however, Mi Familia Vota's state director cited the time constraints and the optional nature of the field as the reason individuals currently do not complete it. Trial Tr. 788:18-789:4.

584.    As part of Mi Familia Vota's regular voter registration activities, it provides "extensive" training to its staff and volunteers. Trial Tr. 784:1-7. The organization will not suffer an injury if it provides voter registration training that birth place is a required field because such activities are part of its regular mission.

585.    Voto Latino has not identified any individual who will be, or is likely to be injured, by the birth place requirement.

586.    Voto Latino's assertion that its constituency may be "tripped up" or misunderstand the form's request for an applicant to provide their place of birth lacks any evidentiary support and presumes that the form will contain no instructions regarding how to complete this field. Trial Tr. 227:10-228:8, 229:4-7 (Day 1 PM, testimony of A. Patel, Voto Latino).

587.    Voto Latino has not shown that it would suffer an injury if it does not utilize resources in response to HB 2492's birth place requirement, nor that its mission will be perceptibly impaired due to the birth place requirement.

588.    Voto Latino's regular mission includes voter registration for which it utilizes State Form, containing a field for birth place information. *See* Trial Tr. 229:4-10. Voto Latino presented no evidence that the implementation of HB 2492's birth place requirement would impact is standard operations in its voter registration activities.

589.    Voto Latino's regular mission includes voter registration activities, including registering new voters. Voto Latino speculated that it will need to engage with more potential voters to successfully register a voter as a result of HB 2492's birth place requirement. Trial Tr. 229:17-24. Voto Latino has presented no evidence to support its assertion that Latino registrations would be unable to complete the birth place field at all, or at a higher proportion than non-Latino voters. Even if true, Voto Latino will not suffer an injury to the extent it speaks to individuals during its voter registration work if HB 2492's

birth place requirement is implemented because such activities are part of its regular mission.

590.   Voto Latino's regular mission includes voter engagement through "chase programming," which involves contacting individuals with whom the organization previously interacted but who did not ultimately register to vote.  Trial Tr. 221:20–222:6. Voto Latino speculated that it will spend resources contacting individuals who "were not able to successfully submit [a registration form] with the Arizona Secretary of State" or whose form was not ultimately accepted, due to HB 2492's birth place requirement.  *Id.*; *id.* at 230:24-231:8. Even if true, this expenditure would not be an injury because such activities are part of its regular mission.

### 3.   LUCHA Plaintiffs

591.   LUCHA presented no evidence that it, any members of its organization, or any individuals it provides services to, have been or will be injured due to HB 2492's birth place requirement, nor that its mission will be perceptibly impaired due to the requirement.

592.   LULAC presented no evidence that it, any members of its organization, or any individuals it provides services to, have been or will be injured due to HB 2492's birth place requirement, nor that its mission will be perceptibly impaired due to the requirement.

593.   Despite having hundreds of members and having been a party to this lawsuit for approximately one year, Arizona Student's Association has not identified any member who has been or likely to be injured by HB 2492's birth place provision. Trial Tr. 446:18-21; 466:2-5 (Day 2 PM, testimony of K. Nitschke, Arizona Student's Association).

594.   The Arizona Student's Association's presented no evidence that its mission will be perceptibly impaired due to the birth place requirement.

595.   The co-Executive Director of the Arizona Student's Association testified that the organization updated its voter registration training materials after HB 2492 was passed "to specifically address the state or country of birth."  Trial Tr. 452:9-13. Regardless, this type of expenditure does not constitute an injury because it is part of the organization's regular mission to train those conducting voter registration on its behalf. Trial Tr. 452:19-

23.

596.   As part of the Arizona Student's Association's regular voter registration mission, the organization already encourages applicants to complete the entirety of the State Form, including place of birth. Trial Tr. 450:6-18. Testimony from the Arizona Student's Association's co-Executive Director indicates that the organization has begun to highlight birth place as a required entry for individuals complete when registering to vote. Trial Tr. 464:3-5. Arizona Student's Association presented no evidence that the implementation of HB 2492's birth place requirement has or would impact its regular voter registration activities, including a registrant's ability or likelihood of completing the form.

597.   Arizona Student's Association claims that the implementation of HB 2492's birth place requirement would require it to spend additional time conversing with potential registrants during voter registration activities. Trial Tr. 455:14-23. Because Arizona Student's Association's regular mission includes conversing with potential registrants, the organization will not suffer an injury if it continues to this work.

598.   Arizona Democracy Resource Center Action presented no evidence that it, any members of its organization, or any individuals it provides services to, have been or will be injured due to HB 2492's birth place requirement, nor that its mission will be perceptibly impaired due to the requirement.

599.   Inter Tribal Council of Arizona Inc. presented no evidence that it or any members of its organization have been or will be injured due to HB 2492's birth place requirement, nor that its mission will be perceptibly impaired due to the requirement.

600.   The San Carlos Apache Tribe presented no evidence that it or any members of the Tribe have been or will be injured due to HB 2492's birth place requirement, nor that its mission will be perceptibly impaired due to the requirement.

601.   Despite having hundreds of members and having been a party to this lawsuit for approximately one year, Arizona Coalition for Change has not identified any member who has been or likely to be injured by HB 2492's birth place provision. Trial Tr. 280:24-

281:3, 281:24-25, 282:4-10 (Day 1 PM, testimony of R. Bolding, Arizona Coalition for Change).

602.    Arizona Coalition for Change presented no evidence that it has suffered an injury in response to the HB 2492's birth place provision, that it would suffer an injury if it does not utilize resources in response to the provision, nor that its mission will be perceptibly impaired due to the provision.

603.    As part of Arizona Coalition for Change's regular voter registration mission, the organization uses the State Form, with a field for birth place information, and seeks to obtain a "complete voter registration form for individuals." Trial Tr. 285:2-6. Arizona Coalition for Change presented no evidence that the implementation of HB 2492's birth place requirement would impact is regular operations in its voter registration mission.

604.    As part Arizona Coalition for Change's voter registration mission, it provides daily training to its voter registration staff and volunteers addressing "any changes in particular that may have happened in the law." Trial Tr. 269:13-24 (Day 2 AM, testimony of R. Bolding, Arizona Coalition for Change). Arizona Coalition for Change generally claims it will need to conduct voter education events in response to HB 2492 and HB 2243. Trial Tr. 265:4-17 (Day 1 PM, testimony of R. Bolding, Arizona Coalition for Change). Because providing staff and volunteers with training on changes in the law is part of its regular mission, providing training on HB 2492's birth place requirement is not an injury.

### 4.    Poder LatinX Plaintiffs

605.    Poder LatinX Plaintiffs are not challenging HB 2492's birth place requirement. *See* Doc. 169.

### 5.    Democratic National Committee Plaintiffs

606.    Despite having millions of members and having been a party to this lawsuit for approximately one year, the Democratic National Committee has not identified any member who has been or likely to be injured by HB 2492's birth place provision. Trial Tr. 434:12-19, 435:6-12; 435:25-436:4 (Day 2 PM, testimony of R. Reid Democratic National Committee).

607.     The Democratic National Committee presented no evidence that it has expended any resources to date in response to HB 2492 generally, let alone HB 2492's birth place provision. Trial Tr. 432:9-21.

608.     The Democratic National Committee's estimates regarding expending future resources in response to HB 2492 generally are speculative. Trial Tr. 432: 22-25 (acknowledging uncertainty regarding the impact of the law and its implementation). And the Democratic National Committee presented no evidence that it would spend resources in response to HB 2492's birth place provision in particular.

609.     The Democratic National Committee's regular mission includes voter registration with the State Form, which includes a field for place of birth. Trial Tr. 436:23-437:1. The Democratic National Committee claims that the implementation of HB 2492's birth place requirement would require it to spend additional time conversing with potential registrants during voter registration and make its programs "slightly less productive." Trial Tr. 429:10-18. Because voter registration and speaking to applicants is part of the Democratic National Committee's regular mission, continuing to do this work is not an injury.

610.     As part of the Democratic National Committee's regular voter registration mission, the organization already provides training that the birth place field is optional. Trial Tr. 437:14-16. Continuing to provide training regarding the requirement (or absence thereof) for the birth place field is not an injury.

611.     Despite having millions of members and having been a party to this lawsuit for approximately one year, the Arizona Democratic Party has not identified any member who has been or likely to be injured by HB 2492's birth place provision. Trial Tr. 435:6-12; 435:25-436:4 (Day 2 PM, testimony of M. Dick, Arizona Democratic Party).

612.     The Arizona Democratic Party claims that birth place is a "sensitive" inquiry and speculates that individuals may not wish to complete the form, but has no evidence to support this assertion, nor does it have any knowledge of a potential registrant previously expressing a desire to not complete birth place or other optional fields. Trial Tr. 515:5-

516:7.

613.    The Arizona Democratic Party asserts that it spent resources in response to HB 2492 generally, not HB 2492's birth place requirement in particular, but those resources were devoted to a review of the draft 2023 Elections Procedures Manual. Trial Tr. 520:23-521:8. This activity is part of the organization's normal business and would have occurred regardless of HB 2492 and thus, is not an injury attributable to HB 2492.

### 6.    Equity Coalition Plaintiff

614.    Equity Coalition has not identified any individual who will be, or is likely to be injured, by the birth place requirement. Trial Tr. 1281:24-1282:2 (Day 5, testimony of M. Tiwamangkala, Equity Coalition).

615.    Equity Coalition has not spent funds in response to the birth place requirement. Trial Tr. 1278:20-23.

616.    Equity Coalition has not shown that it would suffer an injury if it does not utilize resources in response to HB 2492's birth place requirement, nor that its mission will be perceptibly impaired due to the birth place requirement.

617.    Equity Coalition's estimates regarding potential future resource or staffing reallocations in response to birth place requirement are speculative because the organization does not know how the laws will be implemented and the extent to which the laws might impact its constituency. Equity Coalition has no internal documents outlining any reallocations of funds that may happen if this provision of the law is implemented. Trial Tr. 1280:6-9.

618.    As part of Equity Coalition's regular voter registration mission, the organization uses the State Form, with a field for birth place information. Trial Tr. 1271:18-20.  Equity Coalition presented no evidence that the implementation of HB 2492's birth place requirement would impact is regular operations in its voter registration activities.

619.    Equity Coalition's regular mission includes providing training to those who conduct voter registrations on its behalf. Trial Tr.1269:5-9. Equity Coalition's regular training activities will proceed regardless of the implementation of HB 2492's birth place

- 122 -

requirement. Trial Tr. 1278:16-18. Equity Coalition will not suffer an injury if it provides voter registration training that addresses the birth place requirement because such activities are part of its regular mission.

### 7. Promise Arizona Plaintiffs

620.    Promise Arizona Plaintiffs are not challenging birth place requirement. *See* Promise Arizona Complaint, No. 2:22-cv-01602-SRB, Doc. 1.

## X.   Proof of Location of Residence (HB 2492 § 5)

### A.   How the Court has interpreted the requirement

621.    The Court held that H.B. 2492's proof of location of residence requirement is preempted by NVRA § 6 with respect to registering Federal Form applicants for federal elections.  Doc. 534 at 9.

622.    The Court clarified H.B. 2492's proof of location of residence requirement in several ways:

a.    Although the requirement references a list of documents that can be used to prove location of residence, that list is not exhaustive;

b.    The requirement can be met without a standard street address;

c.    The requirement can be met with a valid unexpired Arizona driver license or nonoperating ID, regardless of whether the address on the license/ID matches the registration form and even if the license/ID lists only a P.O. box;

d.    The requirement can be met with a tribal identification document, regardless of whether the document contains a photo, physical address, P.O. box, or no address;

e.    The requirement can be met with written and signed confirmation that the registrant qualifies pursuant to A.R.S. § 16-121(B) regarding registration of persons who do not reside at a fixed, permanent, or private structure.

Doc. 534 at 33–34.

**B.     How County Recorders may apply the requirement**

623.    Under HB 2492 § 5, if a federal form is not accompanied by proof of location of residence, the county recorder must register the applicant for federal elections, but not state elections. *See* Doc. 534 at 34. He or she shall also notify the applicant pursuant to A.R.S. § 16-134(B) that the application is incomplete and request proof of location of residence. *See* A.R.S. § 16-121.01(A).

624.    Conversely, if a county recorder receives a state form without proof of location of residence, he or she may not register the applicant for either federal or state elections. *See* A.R.S. § 16-121.01(A). Instead, the county recorder shall notify the applicant pursuant to A.R.S. § 16-134(B) that the application is incomplete, request proof of location of residence, and shall not register the voter until all of the required information is returned. *Id.*

625.    This system is permissible because Arizona may require information beyond the Federal Form on the State Form for any election.  Indeed, the Supreme Court expressly confirmed that "state-developed forms may require information the Federal Form does not." *Inter Tribal*, 570 U.S. at 12; *see* Part I.C above.

**C.     Plaintiffs have not shown actual or imminent concrete and particularized injury due to HB 2492's proof of location of residence requirement.**

**1.  Lack of injury generally**

626.    Plaintiffs have asserted that various groups of individuals, such as tribal members, students, and homeless individuals may be unable to provide proof of location of residence. *See* Trial Tr. 84:10-21 (Day 1 AM, testimony of J. Petty). After the Court's construction of the requirement, Plaintiffs general allegations that such groups would be unable to provide proof are unpersuasive. *See* Doc. 534 at 33–34.

627.    Tribal members, for example, may satisfy the document with any tribal identification document regardless of whether the document contains a photo, physical address, P.O. box, or no address. Trial testimony indicates that such documents are commonly distributed to all tribal members. *See* Trial Tr. 998:11-12 (Day 4, testimony of

T. Rambler, San Carlos Apache Tribe) (confirming that the Tribe creates and distributes tribal identification numbers to all of its members).

628. Individuals who do not live at a fixed residence may provide a written and signed confirmation of their residence consistent with the Court's construction. *See* Doc. 534 at 33–34.

629. Students might satisfy proof of location of residence through a number of means, including providing documentation confirming their residence at university housing, a copy of traditional lease, or utility bill, or other piece of documentation with the student's name and address. *See, e.g.*, Trial Tr. 450:6-9, 471:4-5 (Day 2 PM, testimony of K. Nitschke, Arizona Student's Association) (confirming that some students currently register at their dorm address and that students likely sign a lease to reside in the dorms).

630. Because county recorders are awaiting guidance on what documentation might satisfy A.R.S. § 16-123 in addition to the documentation listed in A.R.S. § 16-579(A)(1) and examples provided by the Court, Plaintiffs contention that certain groups will be unable to satisfy the requirement challenge is premature. Trial Tr. Day 1 at 83:3-17.

631. Regardless, Plaintiffs have not presented any reliable evidence as to the number of these applicants or voting eligible persons generally who lack sufficient proof of location of residence or are unable to attain it to indicate that it represents an undue burden.

632. Plaintiffs have not identified a single eligible voter who might be unable to satisfy HB 2492's proof of location of residence.

**2. Mi Familia Vota Plaintiffs**

633. Mi Familia Vota Plaintiffs are not challenging HB 2492's proof of location of residence requirement. *See* Doc. 65.

**3. LUCHA Plaintiffs**

634. LUCHA presented no evidence that it, any members of its organization, or any individuals it provides services to have been or will be injured due to HB 2492's proof of location of residence requirement, nor that its mission will be perceptibly impaired due to the requirement.

635.   LULAC presented no evidence that it, any members of its organization, or any individuals it provides services to have been or will be injured due to HB 2492's proof of location of residence requirement, nor that its mission will be perceptibly impaired due to the requirement.

636.   Despite having thousands of members and having been a party to this lawsuit for approximately, Arizona Student's Association has not identified any specific member who has been or is likely to be injured by HB 2492's proof of location of residence provision or who would be unable to provide proof of location of residence. Trial Tr. 446:18-21; 466:2-5 (Day 2 PM, testimony of K. Nitschke, Arizona Student's Association).

637.   Arizona Student's Association claims that students may be unable to satisfy the HB 2492's proof of location of residence requirement. In addition to being premature as the Secretary of State has not indicated what documents may satisfy the requirement, testimony from Executive Director of the Arizona Student's Association undermines the claim that students who live on campus are unlikely to have any documentation reflecting their on-campus address. *See* Trial Tr. 471:1-5 (acknowledging that students likely enter into a lease with the university to live in university housing).

638.   Arizona Student's Association's current voter registration process involves providing applicants with a card that provides student's with funds to obtain a state identification card or driver's license if registering to vote. Trial Tr. 455:4-7. A valid unexpired Arizona driver license or nonoperating ID satisfies the proof of location of residence requirement.

639.   Arizona Democracy Resource Center Action presented no evidence that it, any members of its organization, or any individuals it provides services to have been or will be injured due to HB 2492's proof of location of residence requirement, nor that its mission will be perceptibly impaired due to the requirement.

640.   Inter Tribal Council of Arizona Inc. presented no evidence that it, or any members of its organization, have been or will be injured due to HB 2492's proof of location of residence requirement, nor that its mission will be perceptibly impaired due to the

1    requirement.

2    641.   The San Carlos Apache Tribe creates and distributes tribal identification

3    numbers to all of its members. Trial Tr. 998:11-12 (Day 4 PM, testimony of T. Rambler,

4    San Carlos Apache Tribe). A member of San Carlos Apache Tribe could satisfy the HB

5    2492's proof of location of residence requirement by providing any tribal identification

6    document issued by the San Carlos Apache Tribe.

7    642.   The San Carlos Apache Tribe did not identify any tribal member eligible to

8    vote who would be unable to provide proof of location of residence.

9    643.   Despite having hundreds of members and having been a party to this lawsuit

10   for approximately, Arizona Coalition for Change has not identified any member who has

11   been or is likely to be injured by HB 2492's proof of location of residence requirement.

12   Trial Tr. 280:24-25, 281:3, 24, 282:4-10 (Day 1 PM, testimony of R. Bolding, Arizona

13   Coalition for Change).

14   644.   Arizona Coalition for Change presented no evidence at trial that any of its

15   members would be unable to provide proof of location of residence.

16   645.   Arizona Coalition for Change presented no evidence that it, any members of

17   its organization, or any individuals it provides services to have been or will be injured due

18   to HB 2492's proof of location of residence requirement, nor that its mission will be

19   perceptibly impaired due to the requirement.

20            **4.     Poder LatinX Plaintiffs**

21   646.   Poder LatinX Plaintiffs challenged HB 2492's proof of location of residence

22   requirement under NVRA § 6. *See* Doc. 169. The Court has already resolved this claim. *See*

23   Doc. 534 at 34.

24            **5.     Democratic National Committee Plaintiffs**

25   647.   Democratic National Committee Plaintiffs are not challenging proof of

26   location of residence requirement. *See* Democratic National Committee Complaint, No.

27   2:22-cv-01369-SRB, Doc. 1.

28

### 6. Equity Coalition Plaintiff

648.    Equity Coalition presented no evidence that it, or any individuals it provides services to have been or will be injured due to HB 2492's proof of location of residence requirement, nor that its mission will be perceptibly impaired due to the requirement. *See* Trial Tr. 1281:24–1282:2, 1278:20-23 (Day 5, testimony of M. Tiwamangkala, Equity Coalition).

649.    Equity Coalition presented no evidence that any individual that it serves would be unable to provide proof of location of residence as construed by the Court.

### 7. Promise Arizona Plaintiffs

650.    Promise Arizona Plaintiffs are not challenging HB 2492's proof of location of residence requirement. *See* Promise Arizona Complaint, No. 2:22-cv-01602-SRB, Doc. 1.

### 8. United States

651.    The United States challenged HB 2492's proof of location of residence requirement under NVRA § 6. *See* United States Complaint, No. 2:22-cv-01124-SRB, Doc. 1. The Court has already resolved this claim. *See* Doc. 534 at 34.

## XI.    Lack of Discriminatory Intent

652.    There is no persuasive evidence that, in adopting the challenged laws, the Arizona Legislature was motived by racial animus.

653.    HB 2492 and HB 2243 do not on their face distinguish between or discriminate among individuals based on race, ethnicity, national origin, or any other constitutionally protected classification.

654.    Moreover, the Plaintiffs have not supplied sufficient evidence to satisfy any of the *Arlington Heights* factors (listed and analyzed *infra* in the Conclusions of Law) and have fallen short of an aggregate evidentiary showing sufficient to overcome a presumption of legislative good faith.

## A.     Disparate Impact

655.    At this juncture, the evidence does not establish that HB 2492 or HB 2243 will disproportionately affect any racial or ethnic minority group.

656.    With respect to HB 2492's pre-registration documentary proof of citizenship requirement, although Arizona has maintained a documentary proof of citizenship requirement continuously since 2005, Plaintiffs have not identified a single individual who is eligible to register as a full-ballot voter but cannot provide documentary proof of citizenship.  By extension, the Plaintiffs have not established that the citizenship database checks disproportionately burden a racial or ethnic group.

657.    The weight of the expert testimony supports a finding that the pre-registration documentary proof of citizenship requirement has had—and will continue to have—no statistically significant impact on turnout by eligible members of racial and ethnic minority groups.  *See generally* Trial Tr. 1660:6–1670:25 (Day 7, testimony of M. Hoekstra).  Professor McDonald, who maintains a voluminous set of turnout data, testified that analyzing the effect of Arizona's documentary proof of citizenship requirement would likely show no effect.  *See* Trial Tr. 1245:6-1246:18 (Day 5, testimony of M. McDonald).  Similarly, quantitative research, published in well regarded journals by accomplished academic professionals, supports the hypothesis that documentary proof of citizenship requirements have no statistically significant effect on citizens.  *See* Trial Tr. 1660:6–1667:19 (Day 7 PM, testimony of M. Hoekstra) (documentary proof of citizenship requirement for Medicaid beneficiaries).  Similar research indicates that voter ID requirements and notice letters *increase* turnout for Latino voters without reducing turnout for any other racial and ethnic groups.  *See id.* at 1667:25–1670:25 (summarizing a study, based on 1.6 billion observations, re: the effect of voter ID laws on turnout based on ethnicity); *id.* 1716:8–1723:20 (analyzing marginal turnout differences pre- and post-*Shelby County*).

658.    New evidence may emerge in connection with any expansion of Arizona's database checks, but given the state's history of relying on such processes without apparent

1    disparate burdens based on race or ethnicity, it would be premature for the Court to conclude

2    that continued reliance on and the proposed expansion of such database checks will be

3    unreliable or have a disparate impact against protected minority groups.

4        659.    Similarly, Plaintiffs have not identified any eligible person who will use the

5    State Form to register to vote but will be unwilling or unable to provide his or her place of

6    birth.

7        660.    There is no evidence that the list maintenance programs created by the

8    challenged laws will inflict an adverse and disproportionate impact on minority groups.

9    The trial testimony suggests the list maintenance practices and related investigations, if any,

10    will be largely if not entirely conducted through database checks without the voters'

11    knowledge. *See* Trial Tr. 2138:19-2141:12 (Day 9, testimony of B. Knuth). Moreover,

12    there is credible academic research indicating that, to the extent registered voters are

13    informed of an official inquiry concerning their citizenship, their turnout rates increase

14    rather than decrease. *See* Trial Tr. at 1736:3–1737:19 (Day 7 PM, testimony of M.

15    Hoekstra) (discussing notice letters sent to Florida voters).

16        661.    Generally speaking, there are three main triggers that will cause the county

17    recorder (or, in some instances, the Attorney General) to conduct additional inquiries to

18    confirm a registrant's eligibility.

19        662.    First, data periodically transmitted or made available by ADOT, the Social

20    Security Administration or juror questionnaires indicates that the registrant is not a U.S.

21    citizen or not a resident of Arizona. *See* A.R.S. § 16-165(A)(9), (G), (H). Plaintiffs have

22    provided no evidence that members of minority groups are more likely than others to be

23    identified erroneously as a non-citizen or non-resident by any of the foregoing databases,

24    and both Plaintiffs' and Defendants' expert agreed that ADOT data is generally reliable.

25    *See* Trial Tr. 1189:24–1190:1 (Day 5 AM, testimony of M. McDonald); Trial Tr. 1907:2–

26    16 (Day 8 AM, testimony of J. Richman).

27        663.    Second, a county recorder must query SAVE if the recorder has "reason to

28    believe" a registrant is not a U.S. citizen. *See* A.R.S. § 16-165(I). Plaintiffs have presented

no evidence that any county recorder will use this discretion in a manner that targets individuals in whole or in part on the basis of their race, ethnicity, or other protected classification.

664.   Third, the county recorder must, for all Federal Only voters, search SAVE and, if available, the vital events system of the National Association for Public Health Statistics and Information Systems.  As an initial matter, using Arizona's total population as the appropriate benchmark, the predicted demographic composition of Federal Only voters is approximately proportionate to minority groups' representation in the population as a whole.  *See* Trial Ex. 907, 908, 909; Trial Tr. 1755:16–1760:3 (Day 7 PM, testimony of M. Hoekstra).  Further, the evidence establishes that both databases are generally reliable, *see* Trial Tr. 1189:24–1190:1 (Day 5, testimony of M. McDonald); Trial Tr. 1907:2–16 (Day 8, testimony of J. Richman), and Plaintiffs have failed to show that any processing delays are substantial or have caused or will cause otherwise eligible voters to be erroneously removed from the voter rolls.

665.   Plaintiffs accordingly have not shown that any of the challenged provisions will exert a disparate impact on any minority group.

**B.   Historical Background**

666.   Although Plaintiffs' experts recounted various instances of official discrimination committed since Arizona's territorial days, they fail to link any of those wrongs to any legislator or stakeholder who participated in the drafting, debate and passage of these bills.  Similarly, Plaintiffs have failed to draw any factual nexus between discriminatory enactments of prior legislatures and the specific legislators who voted to adopt H.B. 2492 and H.B. 2243.

667.   Although Arizona's history undisputedly is blemished by wrongs committed against its Hispanic, black, and Native American citizens, the Plaintiffs' selective historical evidence elides the complexity, nuance and diversity of the state's evolution, and, in any event, fails to forge any articulable direct or even circumstantial factual link to the motives animating these particular bills.

C.     **Events Preceding Passage**

668.   The events that preceded, and may have precipitated, the passage of H.B. 2492 and H.B. 2243 do not evince any discriminatory purpose.

669.   The evidence indicates that HB 2492 and HB 2243 were propelled primarily by concerns or beliefs that Arizona's election system is vulnerable to illegal votes cast by ineligible individuals.   Irrespective of whether this premise is factually sound, such concerns do not manifest discriminatory animus on the basis of race.

D.     **Procedural Departures**

670.   There is no evidence that the Fifty-Fifth Legislature violated or substantially departed from its internal rules or procedures in adopting HB 2492 and HB 2243.

671.   HB 2243 was the successor to HB 2617, which Governor Ducey had vetoed. H.B. 2243, which modified specific features of HB 2617 to which the Governor had objected, was reintroduced as a floor amendment adopted in the waning days of the legislative session.   These procedural attributes of the bill's creation and passage are not aberrant or suspect.

672.   First, it is undisputed that HB 2617 itself was introduced, debated and passed through customary legislative channels, and that the Governor's veto was not predicated on a belief that the bill was discriminatory.  *See* Trial Ex. 53.

673.   The use of floor amendments to revive moribund bills is neither unusual nor traditionally associated with the adoption of discriminatory laws and practices.  Rather, the evidence indicates the process is normal in the Arizona Legislature, including during the closing days of a legislative session.   B. Toma Dep. at 264:21-265:9; W. Petersen Dep. at 319:3-24, 333:17-334:2.

674.   In arguing for procedural irregularity, the Plaintiffs emphasize that a staff attorney advised the House Rules Committee that H.B. 2492 "likely presents a preemption issue with the National Voter Registration Act as well as a conflict with fairly recent U.S. Supreme Court case law." *See* Trial Ex. 57 at 2:11-14.  After some discussion, a majority of the House Rules Committee voted to approve the bill notwithstanding the staff attorney's

analysis.  *See id.* at 7:15-17.  There is no evidence that House staff attorneys expressed similar concerns as to HB 2243 or 2617, or that Senate staff attorneys raised such concerns as to any of the three bills.  When legal staff raise concerns for the House Rules Committee, members may vote against the recommendations of staff attorneys for varied reasons unrelated to race, including disagreement on substantive legal questions, an interest in amending a bill at a later stage of proceedings, or an interest in developing the relevant case law.  *See* B. Toma Dep. at 174:3-175:10, 177:5-11; Trial Ex. 57 at 7:3-15.  Even if the legal analysis of the House staff attorney was substantively correct as to HB 2492, such concerns were expressed by only one staff attorney in only one legislative chamber concerning only one of the three bills at issue here.  There is no evidence that such concerns transgress the ordinary bounds of legislative process, discussion, or approvals.

675.    The fact that the floor amendment's introduction and adoption was hurried is not the type of procedural irregularity that bespeaks improper motives, particularly when the underlying policy (as originally presented in HB 2617) had been the subject of extensive consideration.

### E.    Substantive Departures

676.    HB 2492 is consistent with Arizona's longstanding election law infrastructure, which since 2005 has included a documentary proof of citizenship requirement for State Form registrants.  While H.B. 2492 seeks to (1) restore the protocols for processing Federal Form and State Form registrants that existed prior to the 2018 *LULAC* Consent Decree, and (2) attach additional consequences to failure to establish U.S. citizenship (namely, an inability to vote by mail or in presidential elections), it does not alter the basic contours of the documentary proof of citizenship requirement itself, or limit the means by which registrants can satisfy it.

677.    Similarly, Arizona law has long relied on databases and other official information repositories, such as ADOT, the Department of Health, juror records, the U.S. Postal Service and the Electronic Registration Information Center, to identify and contact

1   potentially ineligible voters.  *See* Trial Ex. 6 at 36–39.  HB 2243 merely supplements this

2   roster with other reliable sources of government records (namely, SAVE and NAPHSIS).

3       678.   The substantive changes to HB 2617, when it was amended into HB 2243,

4   were likewise reflective of pre-existing law.  After Governor Ducey concluded that HB

5   2617 did not adequately protect potentially qualified voters from undue cancellations, *see*

6   Trial Ex. 53, the substance of the bill was amended to incorporate content and timing

7   requirements in the EPM and the NVRA.  The EPM has long provided a 35-day period for

8   responding to a notice of potential cancellation.  *See* Trial Ex. 6 at 36-40.  And the NVRA

9   contemplates delivering to a voter "a postage prepaid and pre-addressed return card, sent

10  by forwardable mail" before cancellation.  *See* 52 U.S.C. § 20507(d)(2).  Accordingly, the

11  portion of HB 2617 requiring only "notice that the registration will be cancelled in ninety

12  days unless the person provides satisfactory evidence that the person is qualified," *see* Trial

13  Ex. 4 at § 1, was modified when amended into HB 2243 to track these EPM and NVRA

14  precedents, *see* W. Petersen Dep. at 299:18-24, 303:24-304:2, 306:3-10.

15      **F.    Legislative History**

16      679.   Nothing in the legislative history reflects an intent to suppress voter

17  registration or turnout among eligible individuals who are members of minority groups.

18      680.   Statements by HB 2492 and HB 2243's sponsors and supporters consistently

19  articulated a desire to protect Arizona elections from the perceived risk of unlawful voting

20  by non-citizens and/or non-residents.

21      681.   Although the Plaintiffs urge this Court to infer from former Senator

22  Quezada's testimony that Senator Borrelli acted with racial animus, the evidence in this

23  case does not support such an inference.  Senator Quezada was unable to specify the words

24  allegedly spoken by Senator Borrelli, *see* Trial Tr. 903:23-904:12, 909:5-8 (Day 4,

25  testimony of M. Quezada); where or when they were alleged spoken, *id.* 905:17-907:11; the

26  bill(s) under consideration at the time, *id.* 905:11-16, 911:3-4; or whether the alleged

27  comment was made in the context of a hearing concerning the challenged laws or more

28  generally during the session but concerning voting rights more broadly, *id.* 907:2-23.

Moreover, Senator Quezada produced no notes, emails, or text messages contemporaneously documenting the alleged incident, 914:6-20; although he stated on the record all his reasons for opposing the challenged laws, Senator Quezada never raised the alleged comment contemporaneously on the record, 914:21-915:20; and although the Senate has an ethics process for punishing members for racially insensitive remarks with which he is familiar, Senator Quezada never filed an ethics complaint concerning the alleged incident, 911:23-913:2.  Instead, Senator Quezada did not disclose the alleged comment to the Plaintiffs for more than a year, waiting until after the prime sponsor of the challenged laws presided over a confirmation hearing that ultimately recommended against Senator Quezada's confirmation to statewide office, leading to Senator Quezada's withdrawal from consideration.  *Id.* 889:25-897:22, 916:9-917:3.  The failure of Senator Quezada's nomination was based at least in part on his history of accusing Republican colleague of racism, Trial Ex. 975 at 62:15-73:23, 123:19-124:14, and indeed, Senator Quezada has a history of making comments that invite such an interpretation, *see* Trial Tr. 895:16-897:13, 897:23-898:21; Trial Ex. 974.  Together, these circumstances prevent this Court from attributing to Senator Quezada's testimony the weight and significance urged by the Plaintiffs.

682.    Even if Senator Borrelli had used the phrase "your people" in the context of a discussion of the challenged laws, *see* Trial Tr. 911:5-9 (Day 4, testimony of M. Quezada), such words are consistent with political rather than racial tensions—particularly given the context of interference by public attendees with legislative proceedings, which forced an adjournment of the hearing while Senator Quezada was arguing against voting rights laws from the dais, *see id.* 831:12-833:24. In these circumstances, Senator Borrelli's alleged use of the phrase "your people" is insufficient to overcome a presumption of legislative good faith.

683.    Moreover, there is no reason to believe Senator Borrelli was competent to relay the subjective motivations of the forty-five other legislators who voted for the challenged laws and who, as a matter of law, are not the agents or puppets of Senator

1   Borrelli.  Even if Plaintiffs had proven isolated statements by a specific legislator that
2   evinced a suspect motive, any such intention could not—absent substantial additional
3   evidence—be imputed to the Legislature as whole.

4   684.   The Court concludes that Plaintiffs have failed to demonstrate that a
5   discriminatory purpose was a motivating factor in the enactment of HB 2492 or HB 2243
6   and have not overcome the presumption of legislative good faith.

7   **G.   Unpersuasive Evidence from Plaintiffs' Expert Derek Chang**

8   685.   Plaintiffs offered the testimony of Professor Chang on historical patterns and
9   similarities between the passage of HB 2492 and HB 2243 and other discriminatory laws.
10  Trial Tr. 1335:17- 19 (Day 6, testimony of D. Chang).

11  686.   Professor Chang's analysis is not useful to the Court's fact-finding role
12  because it ignores specific, contemporaneous facts in favor of "broad historical patterns"
13  without regard for the applicability of the historical patterns to the laws at issue and
14  overlooks relevant information that contradicts his conclusions.

15  687.   For example, Professor Chang opined that HB 2376 was similar to a 1921
16  Arizona "alien land law," which barred Asian-born individuals from owning land. *See* Trial
17  Tr. 1349:16-22, 1375:14-17, 1349:24-1350:2. HB 2367 is not an "alien land law," but
18  restricts state land sales and leases to foreign governments or companies affiliated with
19  countries such as Cuba, Iran, Russia, Saudi Arabia, Syria, and Venezuela.  HB 2376, 56th
20  Leg., 1st Sess. (Ariz. 2023); *see* Trial Tr. 1376:5-7, 22-24.

21  688.   Professor Chang did not read HB 2376 in its entirety before concluding it
22  restricted land ownership based on Asian country of origin and thus, was similar to the 1921
23  alien land law.  Trial Tr. 1375:14-21.  He did not watch the hearings about this bill before
24  describing it as a modern-day alien land law. Trial Tr. 1376:25-1377:2. Nor did he
25  familiarize himself with the issue of foreign governments leasing Arizona's land before
26  offering an opinion on the allegedly discriminatory nature of the law.  Trial Tr. 1378:1-5.

27  689.   Professor Chang took a substantively similar approach to opining on HB 2492
28  and HB 2243. Professor Chang did not review the legislative history for either law, stating

1  that he did not think the legislative history would contain anything "particularly damning."

2  Trial Tr. 1342:9-12, 1382:8-16

3  690.  In reaching his conclusions, Professor Chang also overlooked historical

4  information that might controvert his opinions. For example, Professor Chang based his

5  opinions in part on Arizona's 1865 anti-miscegenation law, Trial Tr. 1347:6-12, but did not

6  acknowledge that Arizona repealed such laws before the U.S. Supreme Court declared them

7  unconstitutional in *Loving v. Virginia*, even though Professor Chang was aware of that

8  Arizona's repeal pre-dated *Loving*.  Trial Tr. 1382:20-1383:1.  A methodology which

9  reviews incomplete information to confirm preselected opinions, rather than a neutral

10  review of all relevant information, lacks credibility.

11  691.  In addition, Professor Chang generally lacks familiarity with Arizona history,

12  raising questions about his ability to credibly opine about the nexus between the challenged

13  laws and the history of Asian American treatment in Arizona. *See, e.g.*, Trial Tr. 1333:18-

14  1335:13, 1364:3-25.

15  692.  Professor Chang is "a qualitative historian" who uses "census data broadly in

16  sort of very general terms" but does not do "fine-grained statistical analysis of that data."

17  Trial Tr. 1362:14-23. This raises questions about the credibility of his presentation of

18  statistical data.  *See id.* 1353:14-1360:4, 1362:3-13.

19  693.  Professor Chang also presented statistical data in a misleading manner,

20  asserting that there was a 50 percent increase in anti-Asian violence in Phoenix between

21  2019 and 2020. Trial Tr. 1383:2-1384:24. That figure, though accurate, constituted an

22  increase in reports of anti-Asian violence in Phoenix from two in 2019 to three in 2020. *Id.*

23  1385:3-9.

24  694.  Trial testimony also indicates that Professor Chang advocates unorthodox

25  views on racial issues and may not have reviewed relevant information in an unbiased

26  manner. For example, in September 2020 Professor Chang signed a letter accusing his

27  employer, Cornell University, of being complicit in white supremacy. Trial Tr. 1366:14-

28

1367:2. In the letter, Professor Chang called for race-conscious undergraduate admissions and race-based student funding. *Id.* 1369:3-8, 1369:24-1370:16.

695.    These facts and Professor Chang's decision to ignore specific contemporaneous information about the challenged laws in favor of "broad" comparisons to inapposite decades- or century-old laws when assessing HB 2492 and HB 2243 prevent this Court from basing a finding of racial animus on Professor Chang's analysis.  Trial Tr. 1377:3-8; *see id.* 1343:11-24.

696.    Aside from his historical analysis, Professor Chang opined regarding the effects of the challenged laws on voters with limited English proficiency.  Trial Tr. 1359:2-1360:4. Professor Chang is not a predictive social scientist and, prior to this case, had never written about the effects of English language proficiency on political participation.  Trial Tr. 1361:20-23, 1363:12-13. Professor Chang's views on the possible effects of the challenged laws are not related to his training as a historian, and do not provide an adequate evidentiary basis for a finding of disparate impact, or for this Court to impose language assistance requirements that go beyond Section 203 of the Voting Rights Act.

## H.    Unpersuasive Evidence from Plaintiffs' Expert Orville Vernon Burton

697.    Plaintiffs offered the testimony of Professor Burton as "an expert in American history, voting behavior, discrimination, socioeconomic status and equality and historical intent."  Trial Tr. 1403:20-22 (Day 6, testimony of O. Burton).

698.    Professor Burton has provided expert testimony in as many as thirty voting rights cases, always on behalf of the party challenging the laws.  *See* Trial Tr. 1395:8-1396:7, 1505:4-8, 1543:15-1544:15. In every case where Professor Burton has been asked to consider whether a jurisdiction has a history of racism, he has concluded that it does.  Trial Tr. 1481:2-6.

699.    Professor Burton lacks extensive familiarity with Arizona history, and relied to an unusual degree on his prepared written report rather than his own command of the facts. *See, e.g.,* Trial Tr. 1457:16-23.

700.   During trial testimony, Professor Burton conflated New Mexico and Arizona. *See* Trial Tr. 1491:16-1493:23. And twice confused Arizona with other states. *Id.* 1471:17-23, 1510:2-9.

701.   Professor Burton also overstated his publication record on Arizona history. *See* Trial Tr. 1393:24-1394:20, 1466:16-1476:8. For example, Professor Burton stated his book *Age of Lincoln*, which discusses history from about 1820 to the early 20th century, addressed Arizona history. *Id.* 1468:5-7, 1468:13-21.  The word "Arizona" appears once in the book and once in the index. *Id.* 1469:2-1470:23. Rather than acknowledging that the book does not prominently address Arizona history, Professor Burton contended that it discussed Arizona-related topics.  *See id.* 1469:2-1470:23 (claiming that the book's discussions on railroads constituted addressing Arizona history because "railroads are central to Arizona . . . .").

702.   In another instance, Professor Burton claimed that a book regarding Supreme Court history constituted past work regarding Arizona history because it discussed cases that originated in Arizona and individuals with Arizona connections like Chief Justice William Rehnquist and Justice Sandra Day O'Connor.  Trial Tr. 1467:4-13, 1467:14-21.

703.   This misleading characterization of his publication history regarding Arizona raises questions regarding of Professor Burton's candor and fluency in Arizona historical matters.

704.   Professor Burton's testimony also reflected that his opinions omit relevant, contradictory facts. For example, Professor Burton's opined that Arizona "has similarities" with former Confederate states, "particularly in the laws of discrimination, the laws of voting, the laws of Jim Crow," and "miscegenation laws."  Trial Tr. 1486:15-22.  But this opinion wholly failed to address Arizona's history of fealty to the Union. *See, e.g.*, *id.* 1496:14-24 (failure to include portions of governor's speech supporting the Union), 1498:17-1499:23 (failure to acknowledge Article II of Arizona territorial Bill of Rights "clearly" committed Arizona to the Union); 1499:24-1500:25 (failure to acknowledge Arizona laws prohibiting slavery). Professor Burton either lacked a full understanding of

1   Arizona history, or chose not to include relevant context that would challenge his opinion

2   that Arizona was similar to Confederate states.

3       705.   Professor Burton also testified that Arizona politicians had made racial

4   appeals in political campaigns.  Trial Tr. 1455:18-1456:22. But nearly all the examples

5   offered by Professor Burton involved politicians who subsequently suffered adverse

6   consequences in the wake of such comments. Professor Burton's testimony failed to

7   acknowledge the consequences suffered by the speakers until pressed in cross-examination.

8   *See, e.g.*, *id.* 1462:10-19 (politician lost election after racially charged comments in 2014);

9   1463:5-14. (politician censured after racially insensitive comments). Again, this lack of

10  candor and failure to provide context raises questions regarding the reliability of Professor

11  Burton's opinions.

12      706.   Professor Burton failed to consider relevant information before offering an

13  opinion on Arizona's voting practices and relied on inaccurate sources. *See, e.g.*, Trial Tr.

14  1534:24-1535:23 (did not consider Arizona's 27-day in-person early voting period,

15  widespread vote-by-mail practices, emergency voting period, or special elections boards);

16  Trial Day 6 at 1536:12-16 (not aware that Arizona's early voting enters are open after 5:00

17  p.m.); 1528:1-14, 1529:4-1531:16, 1532:13-1534:3. (discussing reliance on Demos report

18  that contained inaccurate information regarding cancellation notice procedures). This

19  renders Professor Burton's opinions on Arizona's voting procedures unreliable.

20      707.   Professor Burton's lack of candor, lack of familiarity with Arizona history

21  and voting procedures, and failure to consider relevant facts render his testimony

22  unpersuasive on the salient issues.

23      708.   Professor Burton's failure to consider relevant facts also makes his testimony

24  not probative. For example, Professor Burton's analogy between Arizona and the former

25  Confederacy is central to his opinions.  *See, e.g.*, Trial Tr. 1412:12-1415:24, 1420:18-

26  1422:2, 1426:20-1428:21.  But that analogy is fatally flawed by Professor Burton's failure

27  to acknowledge key facts and context that undercut it.  *See* ¶ 704 above.

28

1    709.    Similarly, Professor Burton's testimony largely failed to address the passage

2    of the challenged laws.  *See* Trial Tr. 1479:13-1480:6, 1542:8-24 (testimony that Professor

3    Burton looked at only "a little bit of legislative history" regarding the challenged laws).

4    And though Professor Burton testified conclusorily that the laws had discriminatory intent,

5    he provided no basis for that conclusion that related directly to the political figures involved.

6    *Id.* 1400:9-16, 1441:17-23. Professor Burton's generic assertion of discriminatory intent is

7    unsupported and therefore does not assist the Court in its fact-finding role.

**CONCLUSIONS OF LAW**

**I.    Generally Applicable Legal Standards**

   **A.    Standing**

   1.    To establish standing, non-U.S. Plaintiffs "must show [(1)] that [it] is under threat of suffering 'injury in fact' that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; [(2)] it must be fairly traceable to the challenged action of the defendant; and [(3)] it must be likely that a favorable judicial decision will prevent or redress the injury." *Summers v. Earth Island Inst.,* 555 U.S. 488, 493 (2009) (citation omitted).

   2.    Standing must be established as of the time the complaint was filed. *See LA All. for Hum. Rts. v. Cnty. of Los Angeles*, 14 F.4th 947, 959 n.9 (9th Cir. 2021).

   3.    "Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).  This means that non-U.S. Plaintiffs must set forth specific facts "supported adequately by the evidence adduced at trial." *Id.* (internal citation omitted).

   4.    When asserting standing based on a future harm, a plaintiff may not rest on a "highly attenuated chain of possibilities." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013); *see also Wright v. Serv. Emps. Int'l Union Loc. 503*, 48 F.4th 1112, 1118 (9th Cir. 2022) (plaintiff cannot rely "on mere conjecture" about defendants' possible actions, but must present "concrete evidence to substantiate [her] fears" (cleaned up)).

   **1.    Representational standing**

   5.    To establish representational standing, non-U.S. Plaintiffs must "identify members who have suffered the requisite harm." *Summers*, 555 U.S. at 499.

   6.    The "requirement of naming the affected members has never been dispensed with in light of statistical probabilities, but only where *all* the members of the organization are affected by the challenged activity." *Id.* at 498–99.

1

## 2.    Organizational standing

2        7.    To establish organizational standing, a non-U.S. Plaintiff organization must

3  show "that the defendant's behavior has frustrated its mission and caused it to divert

4  resources in response to that frustration of purpose." *E. Bay Sanctuary Covenant v. Biden*,

5  993 F.3d 640, 663 (9th Cir. 2021).

6        8.    Litigation costs do not suffice to confer standing; the organization "must

7  instead show that it would have suffered some other injury if it had not diverted resources

8  to counteracting the problem." *La Asociacion de Trabajadores de Lake Forest v. City of*

9  *Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010).  In other words, "[a]n organization may

10  sue only if it was forced to choose between suffering an injury and diverting resources to

11  counteract the injury." *Id.* n.4.

12        9.    Moreover, an organization's mission must be not just slightly frustrated, but

13  "perceptibly impaired," and the diversion of resources must be more than just "a setback to

14  the organization's abstract social interests." *Havens Realty Corp. v. Coleman*, 455 U.S. 363

15  (1982).  It is not enough for an organization to spend resources in a way that is "business as

16  usual." *Friends of the Earth v. Sanderson Farms, Inc.*, 992 F.3d 939, 942 (9th Cir. 2021)

17  (cleaned up); *see also, e.g.*, *Am. Diabetes Ass'n v. U.S. Dep't of the Army*, 938 F.3d 1147

18  (9th Cir. 2019) (staff call time was not injury to confer standing where such calls were

19  already part of staff's duties); *Fair Elections Ohio v. Husted*, 770 F.3d 459, 459–60 (6th

20  Cir. 2014) ("[I]t is not an injury to instruct election volunteers about absentee voting

21  procedures when the volunteers are being trained in voting procedures already[.]").

22        10.    Plaintiffs "cannot manufacture standing merely by inflicting harm on

23  themselves based on their fears of hypothetical future harm that is not certainly impending."

24  *Clapper,* 568 U.S. at 416.

25        **B.    Ripeness**

26        11.    Ripeness, a concept related to standing, is "peculiarly a question of timing,"

27  designed to "prevent the courts, through avoidance of premature adjudication, from

28

entangling themselves in abstract disagreements." *Thomas v. Anchorage Equal Rts. Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000) (en banc) (cleaned up).

12.    "The constitutional component of the ripeness inquiry is often treated under the rubric of standing." *Thomas*, 220 F.3d at 1138.  Courts consider whether plaintiffs face "a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement," or whether the alleged injury is too "imaginary" or "speculative" to support jurisdiction. *Id.* at 1139 (cleaned up).

13.    Even in cases where the constitutional component of ripeness is met, courts may "decline to exercise jurisdiction under the prudential component of the ripeness doctrine." *Thomas*, 220 F.3d at 1141.  This prudential analysis is guided by two overarching considerations: "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Id.*

14.    For example, when a dispute is "devoid of any specific factual context," then it is "unfit for judicial resolution." *Thomas*, 220 F.3d at 1141.

15.    Similarly, when a government defendant is "forced to defend [laws] in a vacuum and in the absence of any particular victims," then the government defendant "would suffer hardship" if the case were adjudicated. *Thomas*, 220 F.3d at 1142.

16.    An exercise of prudential ripeness would mean "deferring resolution of this matter to a time when a real case arises." *Thomas*, 220 F.3d at 1142.

**C.    Injunctive and declaratory relief**

17.    To secure a permanent injunction, "[a] plaintiff must demonstrate: (1) [] it has suffered an irreparable injury; (2) [] remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) [] considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) [] the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 126 S.Ct. 1837, 1839 (2006).

18.     Moreover, "absent a threat of immediate and irreparable harm, the federal courts should not enjoin a state to conduct its business in a particular way." *Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1042 (9th Cir. 1999) (en banc).

19.     A "failure to establish a likelihood of future injury similarly renders [a] claim for declaratory relief unripe." *Hodgers-Durgin*, 199 F.3d at 1044.

20.     Plaintiffs have the burden by a preponderance of the evidence. *Walters v. Reno*, 145 F.3d 1032, 1048 (9th Cir. 1998).

21.     Standing to seek injunctive relief as to one statutory provision does mean standing to seek injunctive relief as to all.  At least one plaintiff must have standing "to challenge a *given provision*" when injunctive relief is sought. *One Wisconsin Inst., Inc. v. Nichol*, 186 F. Supp. 3d 958, 965 (W.D. Wisc. 2016) (emphasis added); *see also TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2210 (2021) (plaintiff must demonstrate standing separately for each form of relief sought).

### D.     Facial versus as-applied Challenges

22.     Plaintiffs bring facial challenges to HB 2492 and HB 2243, so they must "establish[] that no set of circumstances exists under which the [law] would be valid, i.e., that the law is unconstitutional in all of its applications." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449–50 (2008) (cleaned up); *see also Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 202 (2008) ("A facial challenge must fail where the statute has a plainly legitimate sweep." (cleaned up)).[31]

23.     "In determining whether a law is facially invalid," courts "must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases." *Wash. State Grange*, 552 U.S. at 449–50.

---

[31] "[A] plaintiff generally cannot prevail on an *as-applied* challenge without showing that the law has in fact been (or is sufficiently likely to be) unconstitutionally *applied* to him." *McCullen v. Coakley*, 573 U.S. 464, 485 n.4 (2014).

1

## II.   Legal Standards for Plaintiffs' Causes of Action

2

### A.   Undue burden on right to vote

3   24.   A claim that a law unduly burdens the right to vote is evaluated under the
4   *Anderson-Burdick* framework.   Courts must weigh "the character and magnitude of the
5   asserted injury to the rights protected by the First and Fourteenth Amendments that the
6   plaintiff seeks to vindicate" against "the precise interests put forward by the State as
7   justifications for the burden imposed by its rule," taking into consideration "the extent to
8   which those interests make it necessary to burden the plaintiff's rights."   *Ariz. Democratic*
9   *Party v. Hobbs*, 18 F.4th 1179, 1187 (9th Cir. 2021) (cleaned up).

10   25.   "A law that imposes a 'severe' burden on voting rights must meet strict
11   scrutiny."   *Id.* (citation omitted).   "Lesser burdens, however, trigger less exacting review,
12   and a State's 'important regulatory interests' will usually be enough to justify 'reasonable,
13   nondiscriminatory restrictions.'"   *Id.* (citation omitted).

14   26.   The "burden" of a challenged voting law is measured by the difficulty of
15   compliance, not the consequence of non-compliance (*i.e.*, disenfranchisement).   *See Ariz.*
16   *Democratic Party v. Hobbs*, 18 F.4th 1179, 1188 (9th Cir. 2021).

17   27.   "[W]hen a challenged rule imposes only limited burdens on the right to vote,
18   there is no requirement that the rule is the only or the best way to further the proffered
19   interests." *Dudum v. Arntz*, 640 F.3d 1098, 1114 (9th Cir. 2011).

20   28.   While a State is expected to "put forward" "interests," *Crawford v. Marion*
21   *Cnty. Election Bd.*, 553 U.S. 181, 190 (2008), that are more than "merely 'speculative,'"
22   *Soltysik v. Padilla*, 910 F.3d 438, 449 (9th Cir. 2018), the *Anderson-Burdick* framework
23   does not entail any shifting of the burden of proof.   *See Short v. Brown*, 893 F.3d 671, 679
24   (9th Cir. 2018) (summarily crediting state's "general interest in increasing voter turnout and
25   specific interest in incremental election-system experimentation"); *cf. Curling v.*
26   *Raffensperger*, 1:17-cv-2989-AT, 2020 WL 6065087, at *10 (N.D. Ga. Oct. 14, 2020)
27   (clarifying that court had not shifted the burden to the State in conducting *Anderson-Burdick*
28   analysis).

1    29.    The State need not catalogue all interests served by the challenged legislation

2    either at the time of its enactment or at any specific procedural juncture in subsequent

3    litigation.  *See Soltysik v. Padilla*, 910 F.3d 438, 450 n.8 (9th Cir. 2018) (rejecting argument

4    that State was precluded from relying on rationales not stated in the legislative history, and

5    suggesting that a "state interest apparently articulated for first time at oral argument" could

6    be properly considered (citations omitted)).

7    30.    In acting to pursue state interests, legislatures are not confined to purely

8    reactionary roles.  A state legislature "may take action to prevent election fraud without

9    waiting for it to occur and be detected within its own borders." *Brnovich v. Democratic*

10   *Nat'l Comm.*, 141 S. Ct. 2321, 2348 (2021); *see also Burson v. Freeman*, 504 U.S. 191, 209

11   (1992) (legislatures "should be permitted to respond to potential deficiencies in the electoral

12   process with foresight rather than reactively, provided that the response is reasonable and

13   does not significantly impinge on constitutionally protected rights."); *Feldman v. Arizona*

14   *Sec'y of State's Off.*, 843 F.3d 366, 390 (9th Cir. 2016) ("Courts recognize that legislatures

15   need not restrict themselves to a reactive role . . . .").

16   31.    Accordingly, Defendants need not prove actual voter fraud occurring in

17   Arizona prior to the passage of the Voting Laws.  *See Munro v. Socialist Workers Party*,

18   479 U.S. 189, 195–96 (1986) (rejecting argument that State had to prove "actual voter

19   confusion" because "[s]uch a requirement would necessitate that a State's political system

20   sustain some level of damage before the legislature could take corrective action"); *Common*

21   *Cause/Georgia v. Billups*, 554 F.3d 1340, 1353–54 (11th Cir. 2009) ("The NAACP and

22   voters argue that the district court erred by not requiring Georgia to prove both that in-

23   person voter fraud existed and that requiring photo identification is an effective remedy, but

24   Georgia did not have that burden of proof."); *League of Women Voters of Fla. Inc. v. Fla.*

25   *Sec'y of State*, 66 F.4th 905, 925 (11th Cir. 2023) ("The Supreme Court has already held

26   that deterring voter fraud is a legitimate policy on which to enact an election law, even in

27   the absence of any record evidence of voter fraud." (quotation omitted)).

28

32.     "A State indisputably has a compelling interest in preserving the integrity of its election process." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam) (internal quotation marks omitted).

33.     "There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters.  Moreover, the interest in orderly administration and accurate recordkeeping provides a sufficient justification for carefully identifying all voters participating in the election process." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 196 (2008).  In addition, a state's interest in protecting "public confidence in the integrity of the electoral process has independent significance, because it encourages citizen participation in the democratic process." *Crawford*, 553 U.S. at 197.

34.     "[I]t is practically self-evidently true that implementing a measure designed to prevent voter fraud would instill public confidence." *Feldman v. Arizona Sec'y of State's Off.*, 843 F.3d 366, 391 (9th Cir. 2016) (citation omitted).

35.     The court does not "require elaborate, empirical verification of the weightiness of the State's asserted justifications." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 364 (1997).

36.     <u>Note</u>:  As previously held, claims that HB 2492 and HB 2243 do not afford sufficient "procedural due process" are also evaluated under the *Anderson-Burdick* framework.  Doc. 304 at 27 (citing *Ariz. Democratic Party v. Hobbs*, 18 F.4th 1179, 1195 (9th Cir. 2021) (Mem); *Ariz. Democratic Party v. Hobbs*, 976 F.3d 1081, 1086 n.1 (9th Cir. 2020)).

**B.     Discriminatory intent**

37.     "Whenever a challenger claims that a state law was enacted with discriminatory intent, the burden of proof lies with the challenger, not the State." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018).

38.     HB 2492 and HB 2243 do not on their face distinguish between or discriminate among individuals based on race, ethnicity, national origin, or any other constitutionally protected classification.  *See Mitchell v. Washington*, 818 F.3d 436, 446

(9th Cir. 2016) (unless the relevant enactment or state action "expressly classifies persons on the bases of race or national origin," plaintiff must prove discriminatory intent).  Because HB 2492 and HB 2243 are facially neutral, Plaintiffs must prove that "a discriminatory purpose was a motivating factor for the legislation."  *United States v. Carrillo-Lopez*, 68 F.4th 1133, 1139 (9th Cir. 2023).

39.     Any evidence adduced in support of an intentional discrimination claim "must be considered in light of the strong 'presumption of good faith' on the part of legislators." *Carillo-Lopez*, 68 F.4th at 1140 (quoting *Miller v. Johnson*, 515 U.S. 900 (1995)).

40.     Plaintiffs must show "more than intent as volition or intent as awareness of consequences" and most show that the legislature selected "a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group."  *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979) (citations omitted).

41.     The court presumes that the Arizona Legislature acted in good faith.  *Abbott v. Perez,* 138 S. Ct. 2305, 2324 (2018); *Fusilier v. Landry,* 963 F.3d 447, 464 (5th Cir. 2020).  "The allocation of the burden of proof and the presumption of legislative good faith are not changed by a finding of past discrimination.  Past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful." *Abbott*, 138 S. Ct. at 2324–25 (cleaned up).

42.     The motives of a single legislator, even if stated publicly, cannot be imputed to the legislature as a whole.  *See United States v. O'Brien,* 391 U.S. 367, 383-84 (1968) ("What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork."); *N.L.R.B. v. SW Gen., Inc.*, 580 U.S. 288, 307 (2017) ("floor statements by individual legislators rank among the least illuminating forms of legislative history"); *Va. Uranium, Inc. v. Warren*, ___ U.S. ___, 139 S. Ct. 1894, 1907-08 (2019) (plurality opinion) ("Trying to discern what motivates legislators individually and collectively invites speculation and risks overlooking the reality that individual Members of Congress often

1    pursue multiple and competing purposes, many of which are compromised to secure a law's
2    passage and few of which are fully realized in the final product.").

3         43.    Nor can a legislator's allegedly improper motives be imputed to other
4    legislative members.  *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2350 (2021)
5    ("the legislators who vote to adopt a bill are not the agents of the bill's sponsor or
6    proponents").  When presented with statements or actions by a given legislator that are
7    alleged to manifest a discriminatory intent, courts cannot rely on a "cat's paw theory"—*i.e.*,
8    the notion that another legislator "is a 'dupe' who is 'used by another to accomplish his
9    purposes'"—as a mechanism to impute that intent to the legislative body as a whole.  *Id.*

10        44.    Public statements made by legislators who opposed the bills are not entitled
11   to any weight in determining the collective intent of the legislature in enacting the bills.  *See*
12   *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 203 n.24 (1976) (explaining that warnings of
13   the potentially vast impact of a bill by "legislative opponents[— ]who [i]n their zeal to
14   defeat a bill . . . understandably tend to overstate its reach"—should be "entitled to little
15   weight" (internal quotation marks omitted)); *League of Women Voters of Fla. Inc. v. Fla.*
16   *Sec'y of State*, 66 F.4th 905, 940 (11th Cir. 2023) ("the concerns expressed by political
17   opponents during the legislative process are not reliable evidence of legislative intent").

18        45.    In addition to assessing the existence or absence of a disparate impact, "[t]he
19   Court considers factors such as (1) the 'historical background of the decision,'
20   (2) the 'specific sequence of events leading up to the challenged decision,' (3) '[d]epartures
21   from the normal procedural sequence,' (4) '[s]ubstantive departures,' and (5) 'legislative or
22   administrative history.'"  *Carillo-Lopez*, 68 F.4th at 1140 (quoting *Village of Arlington*
23   *Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252 (1977)).

24        46.    Plaintiffs have not presented any evidence that the challenged laws were
25   enacted with a discriminatory purpose or with the intent to discourage particular groups of
26   eligible voters from voting.

27

28

C.   **Differential treatment not based on protected classification**

47.   As previously held, to the extent HB 2492 and HB 2243 treat groups differently *not* based on a protected classification—such as Federal Form applicants versus State Form applicants—there need only be a "rational basis" for the difference.  Doc. 304 at 22 (citing *McDonald v. Bd. of Election Com'rs of Chicago*, 394 U.S. 802, 808–09 (1969); *Weber v. Shelley*, 347 F.3d 1101, 1107 n.2 (9th Cir. 2003)).

D.   **Arbitrary and disparate treatment and/or unfettered discretion**

48.   At least one plaintiff claims that the "citizenship investigation procedures" in the challenged laws cause "arbitrary and disparate treatment" of voter registration applicants and registered voters.  *See* Doc. 609 at 18.  Similarly, at least one plaintiff claims that a specific investigation procedure—namely the provision directing county recorders to compare SAVE with registrants who they have "reason to believe" are not citizens—gives "unfettered discretion in voter registration."  *See* Doc. 609 at 20–21.

49.   The plaintiffs do not agree among themselves which legal standard governs, though the claims are similar.  They say the former should be analyzed under *Bush v. Gore*, 531 U.S. 98, 104 (2000), while the latter should be analyzed under cases such as *Louisiana v. United States*, 380 U.S. 145, 152–53 (1965).  *See* Doc. 609 at 18, 20–21.  Meanwhile, Defendants assert that the more familiar frameworks of *Anderson-Burdick* or the Equal Protection Clause dichotomy of suspect versus non-suspect classifications apply.  *See* Doc. 609 at 18, 21.  The Court previously noted these differences without conclusively resolving them.  *See* Doc. 304 at 22 n.11, 26 n.14.

50.   There is no basis for departing from *Anderson-Burdick* or traditional modes of Equal Protection Clause analysis here.  *See Arizona Democratic Party v. Hobbs*, 18 F.4th 1179, 1195 (9th Cir. 2021) ("The Supreme Court repeatedly has assessed challenges to election laws . . . under the framework now described as the *Anderson/Burdick* framework."); *Dudum v. Arntz*, 640 F.3d 1098, 1106 n.15 (9th Cir. 2011) (noting that courts have addressed voting rights claims premised on various provisions of the First or Fourteenth Amendments "collectively using a single analytic framework").  To the extent

these claims assert an undue burden on the right to vote, *Anderson-Burdick* applies.  To the extent these claims assert intentional discrimination based on a suspect classification, the Equal Protection Clause and/or the Fifteenth Amendment applies (and if it is differential treatment not based on a protected classification, only a rational basis is needed). *See Davis v. Commonwealth Election Comm'n*, 844 F.3d 1087, 1094 n.5 (9th Cir. 2016) (in the Fifteenth Amendment context, as in the Equal Protection Clause context, courts "analyze discriminatory intent when a restriction is race-neutral on its face").

51.    Alternatively, these claims can be rejected under any framework, as explained below.

### E.    52 U.S.C. § 10101(A)(2)(A): Discriminatory standards, practices or procedures

52.    When "determining whether an individual is qualified under State law or laws to vote in any election," an elections official may not "apply any standard, apply any standard, practice, or procedure different from the standards, practices, or procedures applied under such law or laws to other individuals within the same county, parish, or similar political subdivision who have been found by State officials to be qualified to vote." 52 U.S.C. § 10101(a)(2)(A).

### F.    52 U.S.C. § 10101(A)(2)(B): Materiality

53.    An elections official may not "deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election." 52 U.S.C. § 10101(a)(2)(B).

54.    The Court previously held that a required item of information or documentation is "material" if it has "some probability of actually impacting an election official's eligibility determination."  Doc. 534 at 26.

### G.     NVRA Section 6: "Accept and use" requirement

55.     Section 6 of the NVRA requires that States "accept and use" the Federal Form promulgated by the Election Assistance Commission to register eligible individuals to vote in federal elections.  *See* 52 U.S.C. § 20505(a)(1).

### H.     NVRA Section 8(b): Uniform & non-discriminatory list maintenance

56.     Section 8(b) of the NVRA provides that States' programs or activities in maintaining voter registration lists used for federal elections "shall be uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965."  52 U.S.C. § 20507(b)(1).

### I.     NVRA Section 7: Public assistance agencies

57.     Section 7 of the NVRA requires that States must distribute at public agencies that provide services or assistance in addition to voter registration either the Federal Form or the State Form "if it is equivalent to the" Federal Form.  52 U.S.C. § 20506(a)(6)(A)(ii).

### J.     NVRA Sections 6 and 8(a): Proof of residence location requirement for State Form

58.     Section 6 of the NVRA provides that a State may use its own mail-in State Form to register eligible individuals in federal elections if the State Form "meets all of the criteria stated in" Section 9 of the NVRA.  52 U.S.C. § 20505(a)(2).

59.     Section 9 of the NVRA provides that a mail-in registration form may include "information . . . as is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process."  52 U.S.C. § 20508(b)(1).

60.     Section 8(a) of the NVRA requires States to register eligible individuals to vote in the next ensuing federal election if the registrant submits a "valid" registration form "not later than the lesser of 30 days, or the period provided by State law, before the date of the election."  52 U.S.C. § 20507(a)(1).  Arizona law requires that valid registrations be submitted no later than 29 prior to an election for the registrant to be eligible to vote in that election.  *See* A.R.S. § 16-120(A).

**K.    Voting Rights Act of 1965, Section 2**

61.    Section 2 of the Voting Rights Act of 1965 prohibits any State law, standard, practice, or procedure that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race of color," in violation of Section 2 of the VRA. 52 U.S.C. § 10301.

62.    Section 2 is violated if, "based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a [racial or ethnic group] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b).

63.    The U.S. Supreme Court has enumerated the following non-exhaustive list of five "guideposts" that courts should consider in evaluating the "totality of the circumstances" in a Section 2 case, namely, (1) "the size of the burden imposed by a challenged voting rule," (2) "the degree to which a voting rule departs from what was standard practice when § 2 was amended in 1982," (3) "[t]he size of any disparities in a rule's impact on members of different racial or ethnic groups," (4) "opportunities provided by a State's entire system of voting," and (5) "the strength of the state interest served by a challenged voting rule." *Brnovich v. Democratic Nat'l. Comm.*, 141 S. Ct. 2321, 2338–39 (2021).

**L.    Plaintiffs that Presented No Evidence on Standing**

64.    Four of the LUCHA Plaintiffs—namely, LUCHA, Arizona Democracy Resource Center Action, LULAC, and Inter Tribal Council of Arizona, Inc.—did not present any evidence at trial regarding their standing, including as to their mission or diversion of resources as a result of the challenged laws.

65.    These Plaintiffs' claims are therefore dismissed.

III.    **Pre-Registration Citizenship Verification Process (HB 2492 § 4)**

A.      **Plaintiffs lack standing to challenge these provisions at this time.**

1.      **For representational standing, no Plaintiff presented evidence of any individual being harmed.**

63.     The membership organizations that challenged HB 2492's citizenship verification process—Arizona Students' Association, the Democratic National Committee, the Arizona Democratic Party—did not identify any specific member of their organization who has suffered or imminently will suffer an injury as a result of these provisions. *See* Findings of Fact § VI.G.3, 5.

64.     Accordingly, Plaintiffs failed to establish representational standing to challenge HB 2492's citizenship verification process. *See Summers*, 555 U.S. at 498–99.

2.      **No Plaintiff established organizational standing to challenge these provisions.**

65.     With respect to HB 2492's citizenship verification process, no Plaintiff established that they were likely to suffer a concrete and particularized actual or imminent injury caused by the law. Rather, Plaintiffs raised general, hypothetical grievances. *See* Findings of Fact § VI.G.

66.     Such grievances do not confer standing. *See Wright*, 48 F.4th at 1118.

67.     Plaintiffs' claimed harms consist of activities such as voter registration, voter education, and voter engagement that are part of their regular mission. *See* Findings of Fact § VI.G.

68.     Such activities as part of their regular mission do not confer standing. *See Friends of the Earth*, 992 F.3d at 942.

69.     Some Plaintiffs also raised reputational fears based on a highly attenuated chain of possibilities, but no Plaintiff presented concrete evidence that these fears are likely to come to pass. *See* Findings of Fact § VI.G.

70.     Such attenuated fears do not confer standing. *See Wright*, 48 F.4th at 1118.

71.     None of the Mi Familia Vota Plaintiffs established standing to challenge HB 2492's citizenship verification process, so their claims are dismissed.  *See* Findings of Fact § VI.G.2.

72.     None of the LUCHA Plaintiffs established standing to challenge HB 2492's citizenship verification process, so their claims are dismissed.  *See* Findings of Fact § VI.G.3.

73.     None of the Poder LatinX Plaintiffs established standing to challenge HB 2492's citizenship verification process, so their claims are dismissed.  *See* Findings of Fact § VI.G.4.

74.     None of the Democratic National Committee Plaintiffs established standing to challenge HB 2492's citizenship verification process, so their claims are dismissed.  *See* Findings of Fact § VI.G.5.

75.     Equity Coalition did not establish standing to challenge HB 2492's citizenship verification process, so its claim is dismissed.  *See* Findings of Fact § VI.G.6.

**B.      Alternatively, Plaintiffs lack standing to challenge the provisions requiring MVD and SAVE checks, and the other challenges are unripe.**

76.     The absence of proof of injury is especially striking with respect to the requirements of MVD and SAVE checks, because county recorders have been running MVD and SAVE checks for citizenship verification since before the trial in *Gonzalez* in 2008.  *See* Findings of Fact §§ I.D, I.E, VI.A, VI.B.1, VI.B.2.

77.     Failure to prove injury from MVD and SAVE checks that have long been in place confirms that Plaintiffs lack standing to challenge those parts of the law.  *See Summers*, 555 U.S. at 493.

78.     As for other parts of the citizenship verification process—SSA checks, NAPHSIS checks, ERIC checks, and referrals to investigators—Plaintiffs' challenges are unripe because Plaintiffs have not shown how (or in some cases whether) the provisions will be implemented, nor how (or in some cases whether) they will likely be affected.  *See* Findings of Fact § VI.B.3, B.4, B.5, B.6.

79.     Such challenges are unripe as a constitutional matter because Plaintiffs' fears are "speculative."  *See Thomas*, 220 F.3d at 1139 (en banc).

80.     Alternatively, such challenges are unripe as a prudential matter, and the Court in its discretion "defer[s] resolution of this matter to a time when a real case arises." *Thomas*, 220 F.3d at 1142.[32]

**C.     Plaintiffs have not shown that HB 2492's citizenship verification process imposes an unconstitutional burden on the right to vote.**

**1.     Strict scrutiny is not appropriate.**

81.     Strict scrutiny "is not warranted because Plaintiffs have failed to demonstrate that the character and magnitude of the asserted injury excessively burdens the right to vote."  *Gonzalez*, 2008 WL 11395512, at *16; *see also Ariz. Democratic Party*, 18 F.4th at 1187.

82.     The "burden" of a voting-related requirement is gauged by the practical difficulty of compliance, ***not*** the legal consequences of non-compliance (*i.e.*, disenfranchisement).  *See Ariz. Democratic Party*, 18 F.4th at 1188.

83.     ***First***, Plaintiffs have not shown that county recorders will unreliably implement MVD checks under HB 2492.  Indeed, county recorders have been doing MVD checks for years.  *See* Findings of Fact §§ I.D, I.E, VI.B.1.

84.     Although a recently naturalized citizen may be flagged by MVD as having a foreign-type license, there is still a reasonable relationship between MVD data and citizenship, and any burden on such individuals is light because they have an opportunity to submit alternate proof of citizenship.  *See* Findings of Fact § VI.B.1; *accord Gonzalez*, 2008 WL 11395512, at *17 ("[I]f a newly naturalized citizen uses a [foreign-type] license to register to vote and is required to provide additional proof of citizenship, the applicant merely has to file a new form to register using his or her [alien registration] number.").

---

[32] If the Court concludes that Plaintiffs lack standing to challenge HB 2492's citizenship verification process, or alternatively that such challenges are unripe, the Court may wish to proceed to Part V below.

85.     Plaintiffs have identified no one who was or will be unable to register based on how county recorders have used or will use MVD data.  *See* Finding of Fact § VI.B.1.

86.     ***Second***, Plaintiffs have not shown that county recorders will unreliably implement SAVE checks under HB 2492, and indeed, county recorders have been doing SAVE checks for years.  *See* Findings of Fact §§ I.E, VI.B.2.

87.     Although there are sometimes minor issues with SAVE, such as a lag, there is still a reasonable relationship between SAVE data and citizenship with respect to naturalized citizens, and any burden on individuals who experience a problem is light because they have an opportunity to submit alternate proof of citizenship.  *See* Findings of Fact § VI.B.2; *accord Gonzalez*, 2008 WL 11395512, at *17 (explaining that naturalized citizen may provide, instead of immigration-related number, copy of naturalization certificate, copy of U.S. passport, or driver's license number).

88.     Plaintiffs have identified no one who was or will be unable to register based on how county recorders have used or will use SAVE data.  *See* Findings of Fact § VI.B.2.

89.     ***Third***, Plaintiffs have not shown that county recorders will unreliably implement checks of any other database under HB 2492, including SSA data, NAPHSIS data, and ERIC data.  *See* Findings of Fact § VI.B.3, 4, 5.

90.     Indeed*,* county recorders do not currently have access to these databases for citizenship purposes, and it is not clear when (or whether) they will.  *See* Findings of Fact § VI.B.3, 4, 5.

91.     Even if problems arise during implementation, county recorders can adjust, and any burden on individuals who experience a problem is light because they have an opportunity to submit alternate proof of citizenship.  *See* Findings of Fact §§ I.B.1, VI.B.3, 4, 5.

92.     Plaintiffs have identified no one who will be unable to register based on how county recorders may use SSA data, NAPHSIS data, or ERIC data.  *See* Finding of Fact § VI.B.3, 4, 5.

93.     **Fourth**, Plaintiffs have not shown that referrals to the county attorney and Attorney General would cause harm.  *See* Findings of Fact § VI.E.

94.     **Fifth**, the citizenship verification process includes an obligation to notify applicants if problems arise, and Plaintiffs' concerns that this notice process is insufficient are unsupported.  *See* Findings of Fact § VI.F.2.

95.     **Sixth**, overall, Plaintiffs' fears that the citizenship verification process will impose a significant burden on applicants are unsupported.  *See* Findings of Fact § VI.F.1, F.2.

> ### 2.     The State's important interests outweigh any burden imposed by the citizenship verification process.

96.     "Defendants' interest in preventing voter fraud is an important governmental interest in Arizona."  *Gonzalez*, 2008 WL 11395512, at *19.

97.     The State "may take action to prevent election fraud without waiting for it to occur and be detected within its own borders."  *Brnovich*, 141 S. Ct. at 2348; *see also Gonzalez*, 2008 WL 11395512, at *19 ("[A]n evidentiary showing of fraud is not required to find a government's interest in preventing voter fraud to be important.").

98.     Although a showing is not required, Defendants have nevertheless shown that there is a risk of non-citizens registering and voting, as well as evidence that it occurs, albeit very rarely.  *See* Findings of Fact § II.A, B, C.

99.     Defendants have also shown that HB 2492's citizenship verification process would address that risk, while also making the existing process more efficient for some applicants.  *See* Findings of Fact § II.C.

100.    In addition, "Defendants' interest in protecting voter confidence is an important governmental interest in Arizona."  *Gonzalez*, 2008 WL 11395512, at *19.

101.    "[I]t is practically self-evidently true that implementing a measure designed to prevent voter fraud would instill public confidence."  *Feldman*, 843 F.3d at 391; *see also Gonzalez*, 2008 WL 11395512, at *19 (finding interest in protecting voter confidence important without citing evidence).

102.    Again, although a showing is not required, Defendants have shown that there is a risk of low voter confidence in elections in Arizona.  *See* Findings of Fact §§ II.D, III.

103.    Defendants have also shown that the citizenship verification process would address that risk.  *See* Findings of Fact § III.B, VI.D.

104.    The State's interests in preventing non-citizens from registering or voting and in protecting voter confidence in elections outweigh the burdens asserted by Plaintiffs.

105.    HB 2492's citizenship verification process does not impose an unconstitutional burden on the right to vote.

**D.     Plaintiffs have not shown that HB 2492's citizenship verification process violates equal protection or is otherwise improperly arbitrary.**

**1.     Differential treatment of Federal Form and State Form applicants**

106.    Non-U.S. Plaintiffs allege (apparently)[33] that HB 2492's pre-registration citizenship verification process accords "arbitrary and disparate treatment" to registrants by requiring county recorders to conduct expanded database checks to verify the citizenship status of Federal Form applicants (but not State Form applicants) who do not provide proof of citizenship, *see* A.R.S. § 16-121.01(D)-(E).  *See* Doc. 609 at 17, Doc. 610 at 2–3.

107.    Although Plaintiffs, citing *Bush v. Gore*, 531 U.S. 98 (2000), frame this facet of their challenge as a freestanding claim, "the *Burdick* standard had been almost universally recognized by the federal courts as the appropriate test for equal protection challenges to state election laws, particularly those dealing with the 'mechanics of elections.'"  *Paralyzed Veterans of Am. v. McPherson*, No. C-06-4670-SBA, 2008 WL 4183981, at *18 (N.D. Cal. Sept. 9, 2008); *see also Arizona Democratic Party v. Hobbs*, 18 F.4th 1179, 1195 (9th Cir. 2021) ("The Supreme Court repeatedly has assessed challenges to election laws . . . under the framework now described as the *Anderson/Burdick* framework."); *Dudum v. Arntz*, 640 F.3d 1098, 1106 n.15 (9th Cir. 2011) (noting that courts have addressed voting rights claims premised on various provisions of the First or Fourteenth Amendments "collectively using a single analytic framework").

---

[33] Defendants are unsure of the exact nature of Plaintiffs' claim here.

108.    Further, "*Bush* is of limited precedential value." *Wise v. Circosta*, 978 F.3d 93, 100 n.7 (4th Cir. 2020); *see also Lemons v. Bradbury*, 538 F.3d 1098, 1106 (9th Cir. 2008) (expressing doubt as to whether *Bush* is "applicable to more than the one election to which the [Supreme] Court appears to have limited it").

109.    Even if *Bush* created an independently cognizable theory, however, HB 2492's pre-registration citizenship verification process does not inflict arbitrary or disparate treatment.

110.    As an initial matter, the Federal Form and State Form applications embody two legally distinct methods of registration, and hence may be permissibly governed by different standards and procedures. *See Donald J. Trump for President, Inc. v. Boockvar*, 493 F. Supp. 3d 331, 387 (W.D. Pa. 2020) (characterizing as "*Bush*'s core proposition" the principle "that a state may not take the votes of two voters, similarly situated in all respects, and, for no good reason, count the vote of one but not the other"); *cf. Gonzalez v. Arizona*, No. CV 06-1268-PHX-ROS, 2007 WL 9724581, at *2 (D. Ariz. Aug. 28, 2007) (rejecting argument that photo ID requirement that applied only to in-person voters was an impermissibly disparate procedure in violation of 52 U.S.C. § 10101(a)(2)(A) "[b]ecause early voting and voting at the polls are different types of voting").

111.    Any differential treatment of State Form applicants relative to Federal Form applicants is not arbitrary because it is impelled by federal law. *See Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1 (2013).  Pursuant to the NVRA, if an otherwise valid Federal Form lacks proof of citizenship, Arizona must register the applicant to vote in federal elections. *See Inter Tribal*, 570 U.S. at 20.  By contrast, the State can permissibly reject State Form applications that are not accompanied by proof of citizenship. *See id.* at 12 ("States retain the flexibility to design and use their own registration form").

112.    HB 2492's provision requiring the county recorders to check certain databases to verify the citizenship status of Federal Form applicants is fully consistent with federal law.  The NVRA "does not preclude States from 'denying registration based on information in their possession establishing the applicant's ineligibility.'" *Inter Tribal*, 570

U.S. at 15.  Further, because the NVRA requires Arizona to afford at least a limited (*i.e.*, Federal Only) status to such individuals, it is not "arbitrary" for the State to tailor a database checking regime that is specific to Federal Form applications.

113.   Pursuant to the *LULAC* Consent Decree, Arizona conducts checks of MVD data to attempt to verify the citizenship status of all Federal Form and State Form applicants who did not provide DPOC.  *See* Doc. 534 at 21.  Arizona also has historically conducted checks of SAVE as well.  *See* Trial Ex. 6, pgs. 9–10.

114.   Although A.R.S. § 16-121.01(D) authorizes the use of additional databases (e.g., NAPHSIS) for Federal Form applicants who omit proof of citizenship, there is no evidence that these supplementary database checks will cause substantial or systematic disparities in the acceptance rates of Federal Form applications relative to State Form applications.  *See Lemons v. Bradbury*, 538 F.3d 1098, 1106 (9th Cir. 2008) ("isolated discrepancies" do not establish a *Bush* violation).  Indeed, Plaintiffs have not identified any individual without proof of citizenship who would be unable to register as a full-ballot voter using the State Form (as processed under the *LULAC* Consent Decree) but could successfully register using a Federal Form processed under A.R.S. § 16-121.01(D)-(E).

115.   In sum, because (1) Federal Form and State Form applications represent inherently distinct and independent methods of registration and (2) the NVRA, as interpreted in *Inter Tribal*, allows States to append additional prerequisites to the State Form, HB 2492's differential treatment of Federal Form and State Form registrants for purposes of verifying citizenship is not unconstitutionally "arbitrary and disparate."

116.   In addition, the dichotomy between State Form registrations and Federal Form registrations does not correspond to any constitutionally protected suspect classification.  Thus, under the Equal Protection Clause's traditional tiers of scrutiny, laws that afford differential treatment to State Form applicants relative to Federal Form applicants comply with the Fourteenth Amendment if they have a rational basis.  *See* Doc. 304 at 23 n.12.

117.   Rational basis review is "the least exacting type of scrutiny," and countenances any statutory mandate or restriction that is "rationally related to a legitimate governmental purpose." *Green v. City of Tucson*, 340 F.3d 891, 896 (9th Cir. 2003). Further, "courts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends. A classification does not fail rational-basis review because it 'is not made with mathematical nicety or because in practice it results in some inequality.'" *Aleman v. Glickman*, 217 F.3d 1191, 1201 (9th Cir. 2000) (cleaned up).

118.   Because an applicant's citizenship "is of paramount importance when determining his or her eligibility to vote," *Gonzalez*, 435 F. Supp. 2d at 1002, it is rational for the State to check sources of official data to verify an applicant's citizenship status.

119.   The use of a slightly expanded selection of databases for Federal Form applicants relative to State Form applicants (under the *LULAC* consent decree) is not irrational.

### 2.    Other alleged arbitrariness

120.   To the extent Non-U.S. Plaintiffs are alleging that HB 2492's pre-registration citizenship verification process improperly accords "arbitrary and disparate treatment" to registrants in some other way, they have not demonstrated this.

121.   HB 2492's pre-registration citizenship verification process generally contemplates using reliable databases in appropriate ways, though many of the details are not yet implemented. *See* Findings of Fact § VI.A, B, C, D, E, F.

### E.    Plaintiffs have not shown that HB 2492's citizenship verification process violates NVRA § 7.

122.   Section 7 of the NVRA requires "voter registration agencies" that also provide public assistance to distribute either the Federal Form or "the office's own form if it is equivalent to" the Federal Form. 52 U.S.C. § 20506(a)(6). It is undisputed that Arizona "voter registration agencies" make available the State Form.

123.    The NVRA provides that "a State may develop and use a mail voter registration form that meets all of the criteria stated in [Section 9 of the NVRA]." 52 U.S.C. § 20505(a)(2).

124.    Section 9 provides that a voter registration form may include any information "necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process." 52 U.S.C. § 20508(b)(1).

125.    It follows that the State Form is "equivalent" to the Federal Form if its required fields are limited to information "necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process." 52 U.S.C. § 20508(b)(1).

126.    This Court previously found that HB 2492's proof of citizenship requirement is compliant with Section 9 because "[d]etermining whether an individual is a United States citizen is of paramount importance when determining his or her eligibility to vote." *Gonzalez v. Arizona*, 435 F. Supp. 2d 997, 1002 (D. Ariz. 2006); *see also Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 12 (2013) (explaining that NVRA-compliant "state-developed forms may require information the Federal Form does not").

127.    Because HB 2492's pre-registration citizenship review process requires on the State Form information that is "necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process," the State Form retains its equivalency to the Federal Form, and hence can be distributed at voter registration agencies in compliance with Section 7 of the NVRA.

**F.    Plaintiffs have not shown that HB 2492's citizenship verification process violates Section 2 of the Voting Rights Act.**

128.    A state law violates Section 2 of the Voting Rights Act of 1965 if it "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race of color." 52 U.S.C. § 10301(a). In adjudicating a Section 2 claim, the Court must

1    assess "the totality of the circumstances," *id.* § 10301(b), which include five "guideposts"

2    outlined by the Supreme Court in *Brnovich v. Democratic National Committee*, 141 S. Ct.

3    2321 (2021).

4                    **1.    Size of the Burden**

5              129.    The Plaintiffs have failed to establish that HB 2492's citizenship verification

6    process imposes any cognizable burden on the voting rights of any identifiable segment of

7    the electorate.

8              130.    This Court previously found no evidence that more than a *de minimus* number

9    of voters were unable to satisfy the proof of citizenship requirement, nor that the

10   requirement precluded any otherwise eligible individual from registering to vote.  *See* Doc.

11   1041, Findings of Fact and Conclusions of Law, *Gonzalez v. Arizona*, No. 2:06-cv-01268-

12   ROS (D. Ariz.  Aug. 20, 2008) at 32.  The Plaintiffs here likewise have failed to identify

13   any individual who possesses all the substantive qualifications prescribed by A.R.S. § 16-

14   101(A)—to include U.S. citizenship—but who is unable to furnish proof of citizenship.

15             131.    Arizona residents can, and most do, satisfy the proof of citizenship

16   requirement simply by disclosing on their voter registration form their Arizona driver's

17   license number or other state-issued identification number.  *See* A.R.S. §§ 16-166(F)(1),

18   16-121.01(A); Tr. 53:17–20 (Testimony of J. Petty).  Although individuals who lack such

19   a credential would need to provide an alternative form of proof of citizenship, such as a

20   birth certificate or U.S. passport, such "[m]ere inconveniences cannot be enough to

21   demonstrate a violation of § 2." *Brnovich*, 141 S. Ct. at 2339; *Crawford v. Marion County

22   Election Bd.*, 553 U.S. 181, 198 (2008) (plurality op.) ("For most voters who need them,

23   the inconvenience of making a trip to the BMV, gathering the required documents, and

24   posing for a photograph surely does not qualify as a substantial burden on the right to

25   vote.").

26             132.    This factor accordingly favors Defendants.

27

28

1

2. **Laws and Practices in 1982**

2     133.    The Arizona Constitution has always limited the franchise to U.S. citizens.

3    *See* Ariz. Const. art. VII, § 2.  While the proof of citizenship requirement is of more recent

4    origin, it "speaks to the State's policy of trying to enforce the citizenship requirement prior

5    to 1982." *Fair Fight Action v. Raffensperger*, 634 F. Supp. 3d 1128, 1243 (N.D. Ga. 2022)

6    (citing citizenship requirement in 1976 Georgia Constitution in concluding that recently

7    enacted citizenship verification checks were consistent with 1982-era laws).

8     134.    This factor accordingly favors Defendants.

9

3. **Disparate Impact**

10    135.     The Plaintiffs have not established that any of the challenged provisions will

11    inflict a burden on minority voters that is both material and disproportionate.  *See Brnovich*,

12    141 S. Ct. at 1239 ("[T]he mere fact there is some disparity in impact does not necessarily

13    mean that a system is not equally open or that it does not give everyone an equal opportunity

14    to vote.  The size of any disparity matters.").

15    136.    The citizenship verification process is race-neutral, and Plaintiffs have not

16    shown that qualified electors who are racial or ethnic minorities have been or will be unable

17    to establish or maintain their registration to vote in state and local elections as a result.

18    137.    Of the approximately 4,165,313 active registered voters in Arizona, 19,439—

19    or 0.47%—have Federal Only status.  *See* Trial Ex. 338.

20    138.    An analysis by Plaintiffs' expert, Dr. Michael McDonald, indicates that only

21    approximately 0.77% of all registered Hispanic voters have Federal Only status.  *See* Trial

22    Ex. 338.  Similarly, just 0.53% of all registered Asian/Pacific Islander voters have Federal

23    Only status. *Id.*

24    139.    Further, Dr. McDonald's disparate impact analysis assumes that every

25    Federal Only voter is a United States citizen.  The actual rate of citizenship among Federal

26    Only voters is unknown.

27    140.    If instead the total population of Arizona is used as a benchmark, the predicted

28    demographic composition of Federal Only voters is approximately proportionate to

1   minority groups' representation in the population as a whole.  *See* Trial Ex. 907, 908, 909;
2   Trial Tr. 1755:16–1760:3 (Testimony of M. Hoekstra).

3        141.   Even assuming that all Federal Only voters are, in fact, United States citizens,
4   the very low incidence of Federal Only registrations across all racial and ethnic groups
5   demonstrates that the proof of citizenship requirement does not exert a substantial and
6   disproportionate effect on eligible voters who are members of minority groups.  *See*
7   *Brnovich*, 141 S. Ct. at 2345 ("A policy that appears to work for 98% or more of voters to
8   whom it applies—minority and non-minority alike—is unlikely to render a system
9   unequally open"); *Fair Fight Action*, 634 F. Supp. 3d at 1244 (finding no disparate impact
10  where citizenship checks affected "less than one percent of any minority group").

11       142.   This factor accordingly favors Defendants.

12               **4.       Overall System of Voting**

13       143.   The Supreme Court has recognized that "Arizona law generally makes it very
14  easy to vote."  *Brnovich*, 141 S. Ct. at 2330.

15       144.   Registrants are afforded multiple options for complying with the proof of
16  citizenship requirement, including the provision of an Arizona driver's license number,
17  birth certificate, U.S. passport, naturalization certificate, or official tribal documentation.
18  *See* A.R.S.  § 16-166(F).  In addition, if an applicant submits a completed Federal Form
19  without DPOC, the county recorders will affirmatively search all available databases in an
20  attempt to verify the applicant's citizenship status and, if successful, will register the
21  applicant as a full-ballot voter.  *See* A.R.S. § 16-121.01(D), (E).

22       145.   This factor accordingly favors Defendants.

23               **5.       State Interests**

24       146.   H.B. 2492's pre-registration citizenship verification process advances the
25  State of Arizona's important governmental interests in preventing unlawful voting by non-
26  citizens and maintaining public confidence in the integrity of the electoral process.  *See*
27  *Brnovich*, 141 S. Ct. at 2348 ("a State may take action to prevent election fraud without

28

1   waiting for it to occur and be detected within its own borders"); Conclusions of Law *supra*
2   § C.2.

3       147.    This factor accordingly favors Defendants.

4       148.    The Court finds that the Plaintiffs have failed to establish that, under the
5   totality of the circumstances, H.B. 2492's pre-registration citizenship review process results
6   in a denial or abridgement of the right of any citizen of the United States to vote on account
7   of race of color.

8   **IV.       Conclusions about Post-Registration Citizenship Review (HB 2243 § 2)**

9       **A.       Plaintiffs lack standing to challenge these provisions at this time.**

10      149.    As to representational standing, the membership organizations that
11  challenged HB 2243's citizenship review process—Arizona Students' Association, the
12  Democratic National Committee, the Arizona Democratic Party, and Promise Arizona—
13  failed to establish representational standing because no Plaintiff identified a specific
14  member of their organization who has suffered or imminently will suffer an injury as a
15  result of these provisions.  *See* Findings of Fact § VII.H.3, 5.

16      150.    Accordingly, Plaintiffs failed to establish representational standing to
17  challenge HB 2243's citizenship review process.  *See Summers*, 555 U.S. at 498-99.

18      151.    As to organizational standing, no Plaintiff established that they were likely to
19  suffer a concrete and particularized actual or imminent injury caused by the law.  Rather,
20  Plaintiffs raised general, hypothetical grievances.  *See* Findings of Fact § VII.H.

21      152.    Such grievances do not confer standing.  *Wright*, 48 F.4th at 1118.

22      153.    Plaintiffs' claimed harms consisted of activities such as voter registration,
23  voter education, and voter engagement that are part of its regular mission.  *See* Findings of
24  Fact § VII.H.

25      154.    Such activities as part of their regular mission do not confer standing.  *See*
26  *Friends of the Earth*, 992 F.3d at 942.

27

28

155.     Some Plaintiffs also raised reputational fears based on a highly attenuated chain of possibilities, but no Plaintiff presented concrete evidence that these fears are likely to come to pass.  *See* Findings of Fact § VII.H.

156.     None of the LUCHA Plaintiffs established standing to challenge HB 2243's citizenship review process, so their claims are dismissed.  *See* Findings of Fact § VII.H.

157.     None of the Poder LatinX Plaintiffs established standing to challenge HB 2243's citizenship review process, so their claims are dismissed.  *See* Findings of Fact § VII.H.

158.     The Democratic National Committee Plaintiffs challenged HB 2492 § 8, not HB 2243. Regardless, they did not establish standing to challenge the review processes as described in either bill, so their claims are dismissed.  *See* Findings of Fact § VII.H.

159.     Equity Coalition did not establish standing to challenge HB 2243's citizenship review process, so their claims are dismissed.  *See* Findings of Fact § VII.H.

160.     None of the Promise Arizona Plaintiffs established standing to challenge HB 2243's citizenship review process, so their claims are dismissed.  *See* Findings of Fact § VII.H.

**B.**     **Alternatively, Plaintiffs' challenges to the post-registration citizenship review process are unripe.**

161.     As an alternative to lack of standing, Plaintiffs' challenges to HB 2243's citizenship review process are unripe because Plaintiffs have not shown how (or in some cases whether) the provisions will be implemented, nor how (or in some cases whether) they will likely be affected.  *See* Findings of Fact § VII.B.

162.     Such challenges are unripe as a constitutional matter because Plaintiffs' fears are "speculative."  *See Thomas*, 220 F.3d at 1139 (en banc)

163.     Alternatively, such challenges are unripe as a prudential matter, and the Court in its discretion "defer[s] resolution of this matter to a time when a real case arises." *Thomas*, 220 F.3d at 1142.

**C.**      **Plaintiffs have not shown that HB 2243's citizenship review process imposes an unconstitutional burden on the right to vote.**

**1.      Strict scrutiny is not appropriate.**

164.      Strict scrutiny "is not warranted because Plaintiffs have failed to demonstrate that the character and magnitude of the asserted injury excessively burdens the right to vote." *Gonzalez*, 2008 WL 11395512, at \*16; *see also Ariz. Democratic Party*, 18 F.4th at 1187.

165.      ***First***, Plaintiffs have not shown that county recorders will use the data sources in HB 2243 unreliably for citizenship review.  County recorders are already familiar with several of the data sources (juror disclosures, MVD, and SAVE).  And it is not clear when, or whether, county recorders will gain access to others for citizenship review purposes (SSA, NAPHSIS).  *See* Findings of Fact § VII.B.

166.      ***Second***, even if a county recorder receives an indication of non-citizenship, the county recorder is required to "confirm" non-citizenship before initiating the notice and potential cancellation process.  *See* A.R.S. § 16-165(A)(10).  Confirmation requires reviewing other databases, and it may also involve checking the voter's registration file to ensure there is no record that proof of citizenship was previously submitted.  *See* A.R.S. § 16-165(K); Trial Ex. 6, pgs. 36-37.  Plaintiffs have not shown that county recorders will fail to "confirm" non-citizenship under HB 2243.  *See* Findings of Fact § VII.B.

167.      ***Third***, in addition to "confirming" non-citizenship, the county recorder cannot cancel registration without sending the registrant a letter, by forwardable mail and with a prepaid return envelope, requesting proof of citizenship in 35 days.  A.R.S. § 16-165(A)(10).  This helps further ensure that any mistakes can be cured by the registrant.  *See* Findings of Fact § VII.B.

168.      Plaintiffs have not shown that any citizen's registration will be incorrectly cancelled pursuant to HB 2243.

169.      Even after cancellation, county recorders are required to send the (former) registrant another notice, this time describing the reason for cancelation and explaining how

to re-register.  A.R.S. § 16-165(L).  This helps further ensure than any mistakes can be cured by the registrant.  *See* Findings of Fact § VII.B.

170.    In addition, after cancellation, county recorders are required to send a referral to the county attorney and attorney general.  A.R.S. § 16-165(L).  But no referral has occurred yet, and Plaintiffs have not shown that such a referral would cause harm.  *See* Findings of Fact § VII.E.

171.    Overall, Plaintiffs' fears that the notice process in HB 2243 is insufficient are unsupported.  *See* Findings of Fact § VII.G.2.

172.    Overall, Plaintiffs' fears that the citizenship review process will impose a significant burden are unsupported.  *See* Findings of Fact § VII.G.1.

173.    Overall, Plaintiffs' fears that the citizenship review process will be applied inconsistently are unsupported.  *See* Findings of Fact § VII.G.3.

### 2. The State's important interests outweigh any burden imposed by the citizenship verification process.

174.    "Defendants' interest in preventing voter fraud is an important governmental interest in Arizona."  *Gonzalez*, 2008 WL 11395512, at *19.

175.    The State "may take action to prevent election fraud without waiting for it to occur and be detected within its own borders."  *Brnovich*, 141 S. Ct. at 2348; *see also Gonzalez*, 2008 WL 11395512, at *19 ("[A]n evidentiary showing of fraud is not required to find a government's interest in preventing voter fraud to be important.").

176.    Although a showing is not required, Defendants have shown that there is a risk of non-citizens registering and voting, as well as evidence that it occurs, albeit very rarely.  *See* Findings of Fact § II.A, B, C.

177.    Defendants have also shown that HB 2243's citizenship review process would address that risk, while also making the existing review process more efficient.  *See* Findings of Fact § VII.C, E.

178.    In addition, "Defendants' interest in protecting voter confidence is an important governmental interest in Arizona."  *Gonzalez*, 2008 WL 11395512, at *19.

179.    "[I]t is practically self-evidently true that implementing a measure designed to prevent voter fraud would instill public confidence." *Feldman*, 843 F.3d at 391; *see also Gonzalez*, 2008 WL 11395512, at *19 (finding interest in protecting voter confidence important without citing evidence).

180.    Again, although a showing is not required, Defendants have shown that there is a risk of low voter confidence in elections in Arizona. *See* Findings of Fact §§ II.D, III.

181.    Defendants have also shown that the citizenship review process would address that risk. *See* Findings of Fact § VII.D.

182.    The State's interests in preventing non-citizens from registering or voting and in protecting voter confidence in elections outweigh the burdens asserted by Plaintiffs.

183.    HB 2243's citizenship review process does not impose an unconstitutional burden on the right to vote.

**D.    HB 2243's citizenship review process does not violate equal protection.**

184.    Non-U.S. Plaintiffs allege that HB 2243's provisions mandating post-registration database checks and potential follow-up inquiries violate the Equal Protection Clause of the Fourteenth Amendment on the grounds that they accord "arbitrary and disparate treatment" to registrants. *See* Doc. 609 at 18, Doc. 610 at 2-3

185.    Although Plaintiffs, citing *Bush v. Gore*, 531 U.S. 98 (2000), frame this facet of their challenge as freestanding claim, "the *Burdick* standard had been almost universally recognized by the federal courts as the appropriate test for equal protection challenges to state election laws, particularly those dealing with the 'mechanics of elections.'" *Paralyzed Veterans of Am. v. McPherson*, No. C-06-4670-SBA, 2008 WL 4183981, at *18 (N.D. Cal. Sept. 9, 2008); *see also Arizona Democratic Party v. Hobbs*, 18 F.4th 1179, 1195 (9th Cir. 2021) ("The Supreme Court repeatedly has assessed challenges to election laws . . . under the framework now described as the *Anderson/Burdick* framework."); *Dudum v. Arntz*, 640 F.3d 1098, 1106 n.15 (9th Cir. 2011) (noting that courts have addressed voting rights claims premised on various provisions of the First or Fourteenth Amendments "collectively using a single analytic framework").

186.    Further, "*Bush* is of limited precedential value." *Wise v. Circosta*, 978 F.3d 93, 100 n.7 (4th Cir. 2020); *see also Lemons v. Bradbury*, 538 F.3d 1098, 1106 (9th Cir. 2008) (expressing doubt as to whether *Bush* is "applicable to more than the one election to which the [Supreme] Court appears to have limited it").

187.    Even if *Bush* created an independently cognizable theory, however, H.B. 2243's list maintenance programs do not inflict "arbitrary and disparate treatment."

188.    The statutorily prescribed list maintenance practices apply statewide on a uniform basis. *See* A.R.S. § 16-165(A)(10), (G), (H), (I), (J).

189.    Because the triggers for database checks apply to all counties and prescribe a generally applicable set of unitary criteria, Plaintiffs' *Bush* claim is unviable on its face. *See Weber v. Shelley*, 347 F.3d 1101, 1107 (9th Cir. 2003) (state's use of touch-screen voting did not violate Equal Protection Clause, notwithstanding the risks of errors or vulnerabilities in particular elections).

190.    Further, even if Plaintiffs had shown that the database checks, as applied to particular individuals, may produce errors or inaccurate results, this possibility does not render the list maintenance program itself "arbitrary and disparate." *See Lemons*, 538 F.3d at 1106 (procedures for signature verification complied with *Bush*, notwithstanding evidence of "isolated discrepancies" and potentially erroneous signature rejections).

191.    Similarly, the "reason to believe" standard embodies an entrenched and widely understood legal concept; it is not inherently vague. *See* Doc. 534 at 31 n.20; *see also* Trial Tr. 372:16-23 (Day 2 AM, testimony of M. Connor) (stating that if county recorders need guidance, they could refer to the definition of "reason to believe" in the EPM campaign finance section).  Plaintiffs have not provided evidence that the county recorders will apply this discretion in an arbitrary or unreasonable manner, and the mere possibility that county recorders may have divergent assessments of highly fact-specific scenarios does not establish that the list maintenance program itself is arbitrary and disparate. *See Lemons*, 538 F.3d at 1107 (disparate signature rejection rates across countries did not demonstrate that the controlling legal standards were impermissibly non-uniform).

192.    Finally, none of HB 2243's investigatory triggers automatically result in a voter's removal from the rolls.  Rather, if a database check yields evidence that a voter is not a citizen, the voter is notified in a letter sent via forwardable mail and afforded 35 days in which to provide confirmation of eligibility.  *See* A.R.S. § 16-165(A)(10), (F).

193.    Accordingly, Plaintiffs have failed to show that H.B. 2243's list maintenance programs impose "arbitrary and disparate treatment" in violation of the Equal Protection Clause.

194.    In addition, H.B. 2243's prescribed triggers for list maintenance checks do not correspond to any constitutionally protected suspect classification.  Thus, under the Equal Protection Clause's traditional tiers of scrutiny, laws that afford differential treatment based on specific database flags or Federal Only status comply with the Fourteenth Amendment if they have a rational basis.  *See* Doc. 304 at 23 n.12.

195.    Rational basis review is "the least exacting type of scrutiny," and countenances any statutory mandate or restriction that is "rationally related to a legitimate governmental purpose."  *Green v. City of Tucson*, 340 F.3d 891, 896 (9th Cir. 2003).  Further, "courts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends.  A classification does not fail rational-basis review because it 'is not made with mathematical nicety or because in practice it results in some inequality.'" *Aleman v. Glickman*, 217 F.3d 1191, 1201 (9th Cir. 2000) (cleaned up).

196.    Because an applicant's citizenship is "of paramount importance when determining his or her eligibility to vote," *Gonzalez*, 435 F. Supp. 2d at 1002, it is rational for the State to conduct additional inquiries if data found in official government records, such as ADOT or SAVE, indicate that a registrant is not a U.S. citizen.  Similarly, because the citizenship status of Federal Only voters has not been verified by reference to documentary proof, it is rational to direct the county recorders to periodically check available databases for confirmation of such individuals' citizenship status.  *See generally*

*Inter Tribal Council*, 570 U.S. at 15 (recognizing that States may use information available to them to deny registration to ineligible individuals).

### E.    The citizenship review process does not violate NVRA § 6.

197.    Equity Coalition alleges that H.B. 2243 violates Section 6 of the NVRA to the extent it requires the county recorders to conduct queries in the SAVE system with respect to "persons who are registered to vote without satisfactory evidence of citizenship." A.R.S. § 16-165(I).  These individuals generally are registered under a Federal Only status, which allows them to vote only in elections for federal offices.

198.    Section 6 of the NVRA mandates that States must "accept and use" the Federal Form promulgated by the Election Assistance Commission ("EAC") to register individuals to vote in federal elections.  *See* 52 U.S.C. § 20505(a)(1).

199.    Section 6 prevents States from requiring a Federal Form applicant to submit information in addition to that required by the EAC as a condition of registering to vote in federal elections.  *See Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 19 (2013).   But Section 6 "does not preclude States from 'deny[ing] registration based on information in their possession establishing the applicant's ineligibility.'"  *Id.* at 15.

200.    A.R.S. § 16-165(I) neither conflicts with, nor obstructs any purpose of, Section 6.  A Federal Form applicant's registration is subject to cancelation under A.R.S. § 16-165(I) only if information obtained from SAVE indicates that the registrant is not a U.S. citizen.  The SAVE system is substantially accurate and reliable, and Equity Coalition has not shown that any qualified Federal Only voters have been or will be erroneously removed from the voter rolls pursuant to A.R.S. § 16-165(I).

201.    Section 6 does not prohibit States from removing ineligible Federal Form registrants from the voter rolls.  *See Inter Tribal Council*, 570 U.S. at 15 n.7 (Section 6 "only requires a State to register an "*eligible* applicant" who submits a timely Federal Form").

202.    Section 6 accordingly does not preempt A.R.S. § 16-165(I).

1
**F.** **The citizenship review process does not violate NVRA § 8(b).**

2      203.   Certain Non-U.S. Plaintiffs assert that the list maintenance programs created

3   by HB 2492 and HB 2243 are non-uniform and/or discriminatory, and thus violate Section

4   8(b) of the NVRA, because they will disproportionately affect some "groups" of voters—

5   namely, naturalized citizens, Latinos, and Federal Only voters.[34]

6      204.   Certain Non-U.S. Plaintiffs assert that the list maintenance programs created

7   by HB 2243 are non-uniform and/or discriminatory, and thus violate Section 8(b) of the

8   NVRA, because they will disproportionately affect some "groups" of voters—namely,

9   naturalized citizens, Latinos, and Federal Only voters.[35]

10     205.   Section 8(b) of the NVRA provides that any voter list maintenance program

11   conducted by a State with respect to individuals who are registered to vote in federal

12   elections must be "uniform [and] non-discriminatory."  52 U.S.C. § 20507(b)(1).

13     206.   A list maintenance program is uniform and non-discriminatory if the criteria

14   upon which it is premised (1) apply on a statewide basis and (2) pertain solely the voter's

15   legal qualifications (*e.g.*, age, citizenship and residency), rather than a trait or characteristic

16   that is extrinsic to a legal qualification.

17     207.   HB 2243 prescribes several alternative circumstances that will trigger

18   additional inquiries into the validity of a voter's registration.  Specifically:

19          a.     The voter has not provided proof of citizenship, in which case the

20          county recorder must, "[t]o the extent practicable," conduct monthly checks of the

21          SAVE system and, "if accessible," the vital events database maintained by the

22

23

_____

24   [34] *See* Doc. 169, Poder Latinx Sec. Am. Compl., ¶ 89 (naturalized citizens and Latinos);
     Doc. 1, No. 2:22-cv-01602-SRB, Promise Arizona Compl. ¶ 156 (naturalized citizens and
25   Latinos); Doc. 1, No. 2:22-cv-01369-DJH, DNC Compl. ¶ 78 (Federal Only voters); *see
     also* Doc. 67, LUCHA Am. Compl. ¶ 361 (generally alleging removals from the voter rolls
26   "based on inaccurate and outdated data and information sources").
     [35] *See* Doc. 169, Poder Latinx Sec. Am. Compl., ¶ 89 (naturalized citizens and Latinos);
27   Doc. 1, No. 2:22-cv-01602-SRB, Promise Arizona Compl. ¶ 156 (naturalized citizens and
     Latinos); Doc. 1, No. 2:22-cv-01369-DJH, DNC Compl. ¶ 78 (Federal Only voters); *see
28   also* Doc. 67, LUCHA Am. Compl. ¶ 361 (generally alleging removals from the voter rolls
     "based on inaccurate and outdated data and information sources").

National Association for Public Health Statistics and Information Systems. *See* A.R.S. § 16-165(I), (J).

      b.     The county recorder has "reason to believe" a registrant is not a U.S. citizen, in which case the county recorder must, "[t]o the extent practicable," conduct a monthly check of the SAVE system. *See* A.R.S. § 16-165(I).

      c.     Data provided by ADOT indicates that a registrant is not a U.S. citizen or has obtained a driver's license (or equivalent official identification) in another state. *See* A.R.S. § 16-165(F), (G).

      d.     Information in the Social Security Administration Database indicates that the registrant is not eligible to vote. *See* A.R.S. § 16-165(H).

      e.     Summary reports from the Jury Commissioner or Jury Manager indicate that a registrant is not a resident of the county or is not a U.S. citizen. *See* A.R.S. § 16-165(A)(9)(b), (A)(10).

208.   If the database checks or reports described above yield evidence that the registrant is not a U.S. citizen, the county recorder must send to the registrant by forwardable mail a notice stating that the registration will be canceled unless the individual furnishes proof of citizenship within 35 days. *See* A.R.S. § 16-165(A)(10). If proof is not timely provided, the county recorder must cancel the registration and then transmit by forwardable mail a notice containing the reasons for the cancelation and instructions for how to properly register, if eligible to do so. *See id.* § 16-165(L).

209.   Each of the foregoing list maintenance programs applies uniformly on a statewide basis to every county in Arizona, and there is no evidence that any county recorder either will fail to comply with, or will deviate materially from, the controlling statutory provisions.

210.   Each of the foregoing list maintenance programs is non-discriminatory because the investigatory criteria are predicated solely on information concerning a substantive qualification for registration (namely, U.S. citizenship or Arizona residency)—and not a characteristic that is extrinsic to voting eligibility (such as race or national origin).

1  *See generally Common Cause of Colo. v. Buescher*, 750 F. Supp. 2d 1259, 1275 (D. Colo.

2  2010) (rejecting challenge to law requiring new registrants to confirm addresses, reasoning

3  that "'eligibility' is the linchpin of a state's obligations regarding voter registration and list

4  maintenance programs").

5      211.   That a list maintenance program may have an incidental effect on a particular

6  "group" of voters (however defined) does not render it non-uniform or discriminatory, as

7  long as the list maintenance program does not rely on or incorporate information that is

8  extrinsic to an individual's legal eligibility to vote.

9              **1.    Naturalized Citizens and Latino Voters**

10     212.   The list maintenance programs are not non-uniform or discriminatory with

11  respect to naturalized citizens or Latino individuals because none of the statutory triggers

12  for investigating a voter's eligibility requires or authorizes the county recorder to consider

13  the registrant's naturalization status or ethnicity.

14     213.   While the SAVE system contains information concerning only individuals

15  born outside the United States, HB 2243 requires SAVE system queries with respect to ***all***

16  voters who have failed to provide proof of citizenship or for whom the county recorder has

17  "reason to believe" citizenship is lacking—irrespective of the race, national origin or

18  immigration status of those voters.  *See* A.R.S. § 16-165(I).

19     214.   None of the other statutory triggers for investigative checks—namely, Federal

20  Only status or indicia of non-citizenship in data maintained by ADOT, the Social Security

21  Administration or Jury Commissioner—has any nexus to a voter's naturalization status,

22  race or ethnic background.

23     215.   These queries accordingly are not non-uniform or discriminatory with respect

24  to Latino or naturalized citizen voters.

25              **2.    Federal Only Voters**

26     216.   Federal Only voters are neither a protected class nor a legally cognizable

27  "group" for purposes of Section 8(b).

28

217.    Federal Only status is not a characteristic that is extrinsic to an individual's eligibility to vote.  To the contrary, Federal Only status is innately and entirely defined by an individual's failure to provide documentary proof of a substantive voting qualification (*i.e.*, U.S. citizenship).  Periodic database checks with respect to such individuals—which typically will not require any action on the part of the voter, or even an awareness by the voter that the check has occurred—do not render a list maintenance program non-uniform or discriminatory, within the meaning of Section 8(b).  *See generally Inter Tribal Council*, 570 U.S. at 15 (the NVRA "does not preclude States from 'deny[ing] registration based on information in their possession establishing the applicant's ineligibility'"); *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1344 (11th Cir. 2014) (The NVRA "is premised on the assumption that citizenship is one of the requirements for eligibility to vote.").

218.    Accordingly, HB 2243's post-registration checks are uniform and non-discriminatory, and thus facially compliant with Section 8(b) of the NVRA.

**G.     These provisions do not violate Section 2 of the Voting Rights Act.**

219.    A state law violates Section 2 of the Voting Rights Act of 1965 if it "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race of color."  52 U.S.C. § 10301(a).  In adjudicating a Section 2 claim, the Court must assess "the totality of the circumstances," *id.* § 10301(b), which include five "guideposts" outlined by the Supreme Court in *Brnovich v. Democratic National Committee*, 141 S. Ct. 2321 (2021).

**1.     Size of the Burden**

220.    H.B. 2243's list maintenance programs do not exact a substantial burden on either voters as a whole or any identifiable segment of the electorate.

221.    As the Court previously found, H.B. 2243's list maintenance provisions primarily "regulate[] county recorders, not registered voters."  Doc. 534 at 31.  The receipt of data or information indicating that a registered voter may be a non-citizen or not a resident of Arizona merely triggers additional inquiries by the county recorder.  It does not necessarily entail any action on the part of the voter.

222. If a voter is identified as a potential non-citizen, he or she is provided written notice via forwardable and a 35-day period in which to provide DPOC to the county recorder. *See* A.R.S. § 16-165(A)(10). Requiring DPOC as a component of a valid and complete voter registration does not impose a substantial burden. *See* Conclusions of Law § II.C.1.

223. Plaintiffs have furnished no evidence that any identifiable qualified voter has been or will be wrongfully removed from the voter registration rolls as a direct and proximate result of the list maintenance protocols.

### 2. Laws and Practices in 1982

224. Arizona's list maintenance practices in approximately 1982, when the Voting Rights Act was amended, were consistent with—and in some respects more stringent than—the protocols set forth in H.B. 2243. In addition to regularly checking voter rolls against Department of Health death records and court records to identify ineligible registrations, the county recorders were required to automatically cancel the registration of any person who had not voted in the previous general election (followed by a written notice to the voter and opportunity to restore the registration). *See* A.R.S. §§ 16-165(B)-(C), 16-166, as codified by 1979 Ariz. Laws ch. 209, § 3. Further, laws in effect in approximately 1982 permitted any person to initiate a court action to remove allegedly ineligible voters from the rolls. *See id.* § 16-167, as codified by 1979 Ariz. Laws ch. 209, § 3.

225. H.B. 2243's enhancements to existing list maintenance programs, which allow for expanded uses of databases of official government records to verify the continued eligibility of registered voters, are consistent with 1982-era laws. H.B. 2243's provisions are *more* protective of voting rights than their 1982 analogues to the extent they (1) do not allow the mere failure to vote to serve as a predicate for the cancelation of a registration and (2) that voters are entitled to receive a pre-cancelation written notice and opportunity to verify their eligibility, *see* A.R.S. § 16-165(A)(10), (F).

226. This factor accordingly favors Defendants.

### 3.      Disparate Impact

227.    The Plaintiffs have not established that H.B. 2243's list maintenance provisions will inflict a burden on minority voters that is both material and disproportionate. *See Brnovich*, 141 S. Ct. at 1239 ("[T]he mere fact there is some disparity in impact does not necessarily mean that a system is not equally open or that it does not give everyone an equal opportunity to vote.  The size of any disparity matters.").

228.    The statutory criteria for list maintenance inquiries—*i.e.*, Federal Only status or the receipt of data from ADOT, the Social Security Administration or juror questionnaires indicating potential non-citizenship or lack of Arizona residency—are race neutral, and there is no evidence that these databases are more likely to contain outdated or inaccurate information with respect to minority individuals relative to white individuals.

229.    Although the county recorders also may initiate SAVE system queries when they have "reason to believe" a voter is not a U.S. citizen, *see* A.R.S. § 16-165(I), the Plaintiffs have offered no evidence that the county recorders will employ this criterion in a discriminatory manner that targets any particular minority group.

230.    Even assuming that members of certain racial or ethnic minority groups are disproportionately likely to satisfy an investigatory trigger, there is insufficient evidence that any affected individuals will be *incorrectly* identified as non-citizens by the SAVE system or other database used by the county recorder.  *See Fair Fight Action*, 634 F. Supp. 3d at 1207–08 (concluding that potential burdens resulting from erroneous vital records matching during list maintenance were "pure conjecture" absent evidence that specific voters had their registrations erroneously canceled).

231.    This factor accordingly favors Defendants.

### 4.      Overall System of Voting

232.    The Supreme Court has recognized that "Arizona law generally makes it very easy to vote." *Brnovich*, 141 S. Ct. at 2330.

233.    If a voter is identified as a potential non-citizen during list maintenance checks, he or she is notified of the finding and afforded 35 days in which to provide DPOC.

*See* A.R.S. § 16-165(A)(10).   If the registration subsequently is canceled, the voter is entitled to notice of the cancelation and instructions governing how to properly re-register, if eligible to do so.  *See id.* § 16-165(L).

234.   This notice and opportunity to cure requirement significantly mitigates alleged "burden" attributable to H.B. 2243's list maintenance programs.

235.   This factor accordingly favors Defendants.

### 5.   State Interests

236.   H.B. 2243's list maintenance provisions advance the State of Arizona's important governmental interests in preventing unlawful voting by non-citizens and maintaining public confidence in the integrity of the electoral process.  *See Brnovich*, 141 S. Ct. at 2348 ("a State may take action to prevent election fraud without waiting for it to occur and be detected within its own borders"); Conclusions of Law *supra* § C.2.

237.   This factor accordingly favors Defendants.

238.   The Court finds that the Plaintiffs have failed to establish that, under the totality of the circumstances, H.B. 2243's list maintenance provisions result in a denial or abridgement of the right of any citizen of the United States to vote on account of race of color.

### H.   The "reason to believe" provision does not provide unfettered discretion in violation of the Fourteenth and Fifteenth Amendment

239.   Non-U.S. Plaintiffs allege that A.R.S. § 16-165(I), which requires county recorders to conduct searches of the SAVE system if the recorder has "reason to believe" a registered voter is not a U.S. citizen, impermissibly confers "unfettered discretion," which in turn enables racial or national origin discrimination.  *See* Doc. 609 at 20-21 (citing *Louisiana v. United States*, 380 U.S. 145 (1965)).

240.   Preliminarily, it is, at best, unclear as to whether Plaintiffs' "unfettered discretion" theory embodies a freestanding and independently cognizable voting rights claim under the Fourteenth or Fifteenth Amendment.  *See Dudum v. Arntz*, 640 F.3d 1098, 1106 n.15 (9th Cir. 2011) (noting that courts have addressed voting rights claims premised on various provisions of the First or Fourteenth Amendments "collectively using a single

analytic framework"). Even assuming that this theory is not subsumed into Plaintiffs' *Anderson-Burdick* and intentional discrimination theories, however, it still fails as a matter of law.

241. This Court already found that the "reason to believe" standard "is not 'so indefinite as to allow arbitrary and discriminatory enforcement,' but is common in statutory drafting." Doc. 534 at 31 n.20. This finding necessarily disposes of Plaintiffs' substantively indistinguishable proposition that the "reason to believe" standard confers "unfettered discretion" that conduces racial or national origin discrimination.

242. In addition, Plaintiffs have provided no evidence that any county recorder will interpret or apply the "reason to believe" criterion in a manner that targets or otherwise discriminates against individuals who are members of racial or ethnic minority groups.

243. Accordingly, A.R.S. § 16-165(I) does not unconstitutionally confer on county recorders "unfettered discretion" that facilitates racial or national origin discrimination.

## I.    The "reason to believe" provision does not violate the Non-Discrimination Provision (52 U.S.C. § 10101(a)(2)(A)).

244. The Civil Rights Act of 1964 provides that when "determining whether any individual is qualified under State law or laws to vote in any election," officials may not "apply any standard, practice, or procedure different from the standards, practices, or procedures applied under such law or laws to other individuals within the same county . . . who have been found by State officials to be qualified to vote," 52 U.S.C. § 10101(a)(2)(A) (the "Non-Discrimination Provision").

245. Premising their claim on 42 U.S.C. § 1983, the Poder Latinx Plaintiffs allege that H.B. 2243 violates the Non-Discrimination Provision by directing county recorders to search the SAVE system if the county recorder has "reason to believe" that the voter is not a U.S. citizen. *See* A.R.S. § 16-165(I).

### 1.    Private Right of Action

246. To properly invoke Section 1983, the Non-U.S. Plaintiffs must show that Section 10101 "'unambiguously confer[s]' 'individual rights upon a class of beneficiaries'

to which the plaintiff belongs." *Health and Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 183 (2023) (quoting *Gonzaga Univ. v. Doe*, 536 U.S. 273 (2002)).  This inquiry entails "consider[ing] whether the statute: (1) is intended to benefit a class of individuals of which the Plaintiff is a member; (2) sets forth a standard, clarifying the nature of the right, that makes the right capable of enforcement by the judiciary; and (3) is mandatory, rather than precatory in nature." *Crowley v. Nevada ex rel. Nev. Sec'y of State*, 678 F.3d 730, 735 (9th Cir. 2012) (citing *Blessing v. Freestone*, 520 U.S. 329, 340–41 (1997).  It is not sufficient that "the plaintiff falls within the general zone of interest that the statute is intended to protect." *Gonzaga Univ.*, 536 U.S. at 283.

247.   The Poder Latinx Plaintiffs all are entities—not natural persons.  Because they do not and cannot exercise the franchise, they are not beneficiaries of any protections afforded by Section 10101.

248.   Section 10101 does not itself "unambiguously confer[]" any independent or freestanding statutory "right."  Rather, it prohibits certain state-imposed constraints on the pre-existing constitutional right to vote.  Even if the Poder Latinx Plaintiffs and/or third parties whose interests they purport to represent are incidental beneficiaries of these protections, Section 10101 is structured primarily as an affirmative prohibition on acts and practices by States and political subdivisions, rather than the fount of new, discrete individual "rights." *See, e.g.*, *Lil' Man in the Boat, Inc. v. City and Cnty. of San Francisco*, 5 F.4th 952, 959–60 (9th Cir. 2021); *Logan v. U.S. Bank Nat'l Ass'n*, 722 F.3d 1163, 1170–71 (9th Cir. 2013); *All. of Nonprofits for Ins. Risk Retention Grp. v. Kipper*, 712 F.3d 1316, 1326 (9th Cir. 2013).

249.   Even assuming that Section 10101 does create an individual "right," the Defendants have defeated any inference of a private cause of action under Section 1983 by demonstrating that Congress "creat[ed] a comprehensive enforcement scheme that is incompatible with individual enforcement under §1983." *Gonzaga*, 536 U.S. at 284 n.4.

250.   Section 10101(c) expressly authorizes the Attorney General to enforce the statute's terms.  Additionally, Section 10101(c)'s allowance of claims by a limited class of

1    private plaintiffs upon a prior judicial finding of a "pattern or practice" of violations

2    necessarily implies that a generalized right of enforcement under Section 1983 is

3    unavailable. *See Talevski*, 143 S. Ct. at 1461; *Stilwell v. City of Williams*, 831 F.3d 1234,

4    1244 (9th Cir. 2016) ("[W]hen Congress creates a right by enacting a statute but at the same

5    time limits enforcement of that right through a specific remedial scheme that is narrower

6    than § 1983, a § 1983 remedy is precluded.").

7        251.   Because the Poder Latinx Plaintiffs have failed to prove that Section 10101

8    "unambiguously confer[s]," *Talevski*, 143 S. Ct. at 1450, any specific statutory right on the

9    them, and because Congress impliedly foreclosed a remedy under Section 1983, the Poder

10   Latinx Plaintiffs lack a private right of action to enforce Section 10101. *See, e.g.*, *Ne. Ohio*

11   *Coal. For the Homeless v. Husted*, 837 F.3d 612, 630 (6th Cir. 2016) (holding there is no

12   private right of action to enforce Section 10101); *Democratic Congressional Campaign*

13   *Comm. v. Kosinski*, 614 F. Supp. 3d 20, 48 (S.D.N.Y. 2022) (same).

14           **2.    Merits**

15       252.   Even if the Non-Discrimination Provision were privately enforceable, the

16   Poder Latinx Plaintiffs have failed to prove that H.B. 2243 effectuates discriminatory

17   standards, practices or procedures in voting registration.

18       253.   H.B. 2243 requires county recorders to search the SAVE system when they

19   have "reason to believe" that a registered voter is not a United States citizen. *See* A.R.S. §

20   16-165(I).

21       254.   This provision does not on its face establish disparate standards, practices or

22   procedures for ascertaining a voter's qualifications.  As the Court previously found, the

23   "reason to believe" standard "is not 'so indefinite as to allow arbitrary and discriminatory

24   enforcement,' but is common in statutory drafting."  Doc. 534 at 31 n.20.  Further, A.R.S.

25   § 16-165(I) is facially neutral and generally applicable; any and all registered voters are

26   subject to a SAVE check if there is "reason to believe" they are not a citizen.

27       255.   The Poder Latinx Plaintiffs have failed to establish that the county recorders

28   have applied or will apply the "reason to believe" rubric in an arbitrary or discriminatory

manner.  Absent evidence of arbitrary or discriminatory enforcement practices, a county recorder does not violate the Non-Discrimination Provision by conducting individualized inquiries into a voter's eligibility when the county recorder has a good faith "reason to believe" the voter may not be a citizen.  *See Ballas v. Symm*, 494 F.2d 1167, 1171 (5th Cir. 1974) (registrar's policy of issuing a questionnaire to voter when registrar was uncertain of voter's residency status did not violate Section 10101(a)(2)(A), explaining that "[t]he standard for registration is the same for all applicants").

256.    In addition, a finding of "reason to believe" does not cause any suspension or cancelation of a voter's registration, but rather merely requires the county recorder to run a check of the SAVE system, which is substantially accurate and reliable.  If the SAVE system indicates that the voter is not a U.S. citizen, the voter is provided written notice and an opportunity to provide documentary proof of citizenship.  *See* A.R.S. § 16-165(A)(10).

257.    Because the Poder Latinx Plaintiffs have not proved that (1) the county recorders will apply the "reason to believe" standard in an arbitrary or discriminatory manner, or (2) any qualified elector has been, or will be, wrongfully removed from the voter rolls as a result of a SAVE check conducted pursuant to A.R.S. § 16-165(I), their claim under the Non-Discrimination Provision fails.

**V.      Conclusions about Referring Federal-Only Voters to Attorney General (HB 2492 § 7)**

**A.      Plaintiffs lack standing to challenge the requirement to refer certain voters to the Attorney General, or alternatively, such challenges are unripe.**

258.    A.R.S. § 16-143 directs county recorders and the Secretary of State to refer to the Attorney General lists of voters who have not provided proof of citizenship.

259.    No such referral has been made, no such investigation has been opened, and Plaintiffs have not shown that any such investigation would be harmful or unreliable.  *See* Findings of Fact § VIII.A, B, C, D.

260.    Plaintiffs have not shown that they, or any of their members, have or will imminently suffer an injury caused by these provisions.  *See* Finding of Fact § VIII.F.

1        261.    Plaintiffs therefore lack standing to challenge these provisions.

2        262.    Alternatively, Plaintiffs' challenges are unripe, constitutionally and

3    prudentially.

4        **B.    Referring to the Attorney General voters who have not provided proof of citizenship does not impose an undue burden on the right to vote.**

5        263.    Plaintiffs have not shown that their right to vote, or the right of any eligible

6    voter, will be burdened at all by this referral provision.  *See* Findings of Fact § VIII.A, B,

7    C, D, F.

8        264.    The State has important interests in preventing ineligible persons from voting

9    and in protecting voter confidence, which are served by verifying that voters are eligible.

10   *See Brnovich*, 141 S. Ct. at 2348; *Feldman*, 843 F.3d at 391; *see also* Findings of Fact §

11   VIII.E.

12       265.    The State's interests outweigh the speculative burdens asserted by Plaintiffs.

13       266.    HB 2492 does not impose an unconstitutional burden on the right to vote by

14   directing referrals to the Attorney General of voters who have not provided proof of

15   citizenship.

16       **C.    This provision does not violate equal protection.**

17       267.    Non-U.S. Plaintiffs allege that H.B. 2492's requirement that a list of Federal

18   Only voters be provided to the Attorney General for additional investigation, *see* A.R.S. §

19   16-143, violates the Equal Protection Clause of the Fourteenth Amendment on the grounds

20   that it accords "arbitrary and disparate treatment" to registrants.  *See* Doc. 609 at 18, Doc.

21   610 at 2–3.

22       268.    Although Plaintiffs, citing *Bush v. Gore*, 531 U.S. 98 (2000), frame this facet

23   of their challenge as freestanding claim, "the *Burdick* standard had been almost universally

24   recognized by the federal courts as the appropriate test for equal protection challenges to

25   state election laws, particularly those dealing with the 'mechanics of elections.'"  *Paralyzed*

26   *Veterans of Am. v. McPherson*, No. C-06-4670-SBA, 2008 WL 4183981, at *18 (N.D. Cal.

27   Sept. 9, 2008); *see also Arizona Democratic Party v. Hobbs*, 18 F.4th 1179, 1195 (9th Cir.

28   2021) ("The Supreme Court repeatedly has assessed challenges to election laws . . . under

1    the framework now described as the *Anderson/Burdick* framework."); *Dudum v. Arntz*, 640

2    F.3d 1098, 1106 n.15 (9th Cir. 2011) (noting that courts have addressed voting rights claims

3    premised on various provisions of the First or Fourteenth Amendments "collectively using

4    a single analytic framework").

5         269.   Further, "*Bush* is of limited precedential value."  *Wise v. Circosta*, 978 F.3d

6    93, 100 n.7 (4th Cir. 2020); *see also Lemons v. Bradbury*, 538 F.3d 1098, 1106 (9th Cir.

7    2008) (expressing doubt as to whether *Bush* is "applicable to more than the one election to

8    which the [Supreme] Court appears to have limited it").

9         270.   Even if *Bush* created an independently cognizable theory, however, H.B.

10   2492's referral mechanism is not "arbitrary and disparate."

11        271.   The statutorily prescribed criteria for referrals and database checks apply

12   statewide on a uniform basis.  Specifically, the class of referred individuals consists of all

13   individuals who were registered to vote under a Federal Only designation as of October 31,

14   2022, and the Attorney General must attempt to verify the citizenship status of each such

15   individual using an enumerated list of databases.  *See* A.R.S. § 16-143.

16        272.   Because the statute prescribes a generally applicable set of unitary criteria and

17   protocols, Plaintiffs' *Bush* claim is unviable on its face.  *See Weber v. Shelley*, 347 F.3d

18   1101, 1107 (9th Cir. 2003) (state's use of touch-screen voting did not violate Equal

19   Protection Clause, notwithstanding the risks of errors or vulnerabilities in particular

20   elections).

21        273.   Further, even if Plaintiffs had shown that H.B. 2492's referral mechanism, as

22   applied to particular individuals, may produce errors or inaccurate results, this possibility

23   does not render the program itself "arbitrary and disparate."  *See Lemons*, 538 F.3d at 1106

24   (procedures for signature verification complied with *Bush*, notwithstanding evidence of

25   "isolated discrepancies" and potentially erroneous signature rejections).

26        274.   Accordingly, Plaintiffs have failed to show that H.B. 2492's referral

27   mechanism imposes "arbitrary and disparate treatment" in violation of the Equal Protection

28   Clause.

275.    In addition, H.B. 2492's prescribed trigger for referral to the Attorney General—*i.e.*, Federal Only voter registration status as of October 31, 2022, *see* A.R.S. § 16-143—does not correspond to any constitutionally protected suspect classification.  Thus, under the Equal Protection Clause's traditional tiers of scrutiny, laws that afford differential treatment based on Federal Only status comply with the Fourteenth Amendment if they have a rational basis.  *See* Doc. 304 at 23 n.12.

276.    Rational basis review is "the least exacting type of scrutiny," and countenances any statutory mandate or restriction that is "rationally related to a legitimate governmental purpose."  *Green v. City of Tucson*, 340 F.3d 891, 896 (9th Cir. 2003).  Further, "courts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends.  A classification does not fail rational-basis review because it 'is not made with mathematical nicety or because in practice it results in some inequality.'" *Aleman v. Glickman*, 217 F.3d 1191, 1201 (9th Cir. 2000) (cleaned-up).

277.    Because an applicant's citizenship is "of paramount importance when determining his or her eligibility to vote," *Gonzalez*, 435 F. Supp. 2d at 1002, it is rational for the State to check available databases for confirmation of citizenship status when a voter has not previously provided documentary proof of his or her citizenship.  *See generally Inter Tribal Council*, 570 U.S. at 15 & n.7 (recognizing that States may use information available to them to deny registration to ineligible individuals).

**D.    These provisions do not violate NVRA § 8(b).**

278.    Certain Non-U.S. Plaintiffs assert that H.B. 2492's requirement that the names of Federal Only voters be provided to the Attorney General for additional inquiries is a non-uniform and/or discriminatory list maintenance program, and thus violates Section 8(b) of the NVRA.

279.    Section 8(b) of the NVRA provides that any voter list maintenance program conducted by a State with respect to individuals who are registered to vote in federal elections must be "uniform [and] non-discriminatory."  52 U.S.C. § 20507(b)(1).

280.    A list maintenance program is uniform and non-discriminatory if the criteria upon which it is premised (1) apply on a statewide basis and (2) pertain solely the voter's legal qualifications (*e.g.*, age, citizenship and residency), rather than a trait or characteristic that is extrinsic to a legal qualification.

281.    Federal Only voters are neither a protected class nor a legally cognizable "group" for purposes of Section 8(b).

282.    Federal Only status is not a characteristic that is extrinsic to an individual's eligibility to vote.  To the contrary, Federal Only status is innately and entirely defined by an individual's failure to provide documentary proof of a substantive voting qualification (*i.e.*, U.S. citizenship).

283.    Every individual who was registered with Federal Only status as of October 31, 2022 is subject to a uniform protocol for database checks by the Attorney General.  *See* A.R.S. § 16-143.  The Attorney General can proceed with formal prosecutorial action if, and only if, she determines that a registrant is not a U.S. citizen and "knowingly" registered to vote despite being ineligible to do so.  *See id.* §§ 16-143(D), 16-182.

284.    A standardized protocol of database inquiries with respect to individuals who have not provided documentary proof of a substantive voting qualification—which typically will not require any action on the part of the voter, or even an awareness by the voter that the check has occurred—is not non-uniform or discriminatory within the meaning of Section 8(b).  *See generally Inter Tribal Council*, 570 U.S. at 15 (the NVRA "does not preclude States from 'deny[ing] registration based on information in their possession establishing the applicant's ineligibility'"); *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1344 (11th Cir. 2014) (The NVRA "is premised on the assumption that citizenship is one of the requirements for eligibility to vote.").

285.    H.B. 2492's referral mechanism accordingly embodies a uniform and non-discriminatory list maintenance program that is facially compliant with Section 8(b) of the NVRA.

1

2       **E.**      **These provisions do not violate Section 2 of the Voting Right Act.**

3      286.   A state law violates Section 2 of the Voting Rights Act of 1965 if it "results

4 in a denial or abridgement of the right of any citizen of the United States to vote on account

5 of race of color." 52 U.S.C. § 10301(a). In adjudicating a Section 2 claim, the Court must

6 assess "the totality of the circumstances," *id.* § 10301(b), which include five "guideposts"

7 outlined by the Supreme Court in *Brnovich v. Democratic National Committee*, 141 S. Ct.

8 2321 (2021).

9                **1.**     **Size of the Burden**

10      287.   There is no evidence that the referral of Federal Only voters to the Attorney

11 General will burden any specific voter or identifiable subset of the electorate.

12      288.   H.B. 2492 requires the Attorney General to conduct certain specified database

13 searches and otherwise "use all available resources to verify the citizenship status of the

14 applicant." A.R.S. § 16-143(B). The referral and investigatory processes on their face

15 require no action on the part of the voter.

16      289.   The Attorney General "shall prosecute individuals who are found to not be

17 United States citizens pursuant to § 16-182." A.R.S. § 16-143(D). Section 16-182, in turn,

18 provides that it is a class 6 felony to "knowingly" register to vote when ineligible to do so.

19      290.   The mere possibility of an investigation in the form of database searches by

20 the Attorney General is not, by itself, a cognizable "burden." *See, e.g.*, *Abbott v. Pastides*,

21 900 F.3d 160, 179 (4th Cir. 2018) (holding that "a threatened administrative inquiry will

22 not be treated as an ongoing First Amendment injury sufficient to confer standing unless

23 the administrative process itself imposes some significant burden, independent of any

24 ultimate sanction").

25      291.   No Plaintiff has provided evidence that it (or any third party it purports to

26 represent) will be required to undertake any particular action or activity as a result of a

27 referral made to the Attorney General under H.B. 2492.

28

292.    No Plaintiff has alleged that it (or any third party it purports to represent) will, in fact, be prosecuted for knowingly registering to vote.  *See Friendly House v. Napolitano*, 419 F.3d 930, 932 (9th Cir. 2005) (finding no injury in connection with criminal prohibitions of Proposition 200, which amended voter registration and public benefits requirements, where "plaintiffs have not articulated (1) a concrete plan to violate Proposition 200, (2) evidence that prosecuting authorities have communicated a specific warning or threat to initiate proceedings, or (3) a history of past persecution").

293.    Accordingly, any alleged "burden" associated with H.B. 2492's provision requiring the referral of Federal Only voters for additional database checks by the Attorney General is speculative and, at most, minimal.

### 2.    Laws and Practices in 1982

294.    Although no exact analogue to A.R.S. § 16-143 existed forty years ago, Arizona's overall list maintenance practices in approximately 1982, when the Voting Rights Act was amended, incorporated mechanisms for affirmatively identifying, investigating and, if appropriate, canceling potential invalid voter registrations.  In addition to regularly checking voter rolls against Department of Health death records and court records to identify ineligible registrations, the county recorders were required to automatically cancel the registration of any person who had not voted in the previous general election (followed by a written notice to the voter and opportunity to restore the registration).  *See* A.R.S. §§ 16-165(B)-(C), 16-166, as codified by 1979 Ariz. Laws ch. 209, § 3.  Further, laws in effect in approximately 1982 permitted any person to initiate a court action to remove allegedly ineligible voters from the rolls.  *See id.* § 16-167.

295.    In addition, the predicate statute for any criminal prosecutions of voters found to have knowingly registered when ineligible to do so—*i.e.*, A.R.S. § 16-182—was in effect in 1982 in substantially the same form.  *See* 1979 Ariz. Laws. ch. 209, § 3.

296.    H.B. 2492's mechanism for referring Federal Only voters to the Attorney General for additional database inquires and, if warranted, potential prosecution, is consistent with 1982-era laws.

297.   This factor accordingly favors Defendants.

### 3.   Disparate Impact

298.   Because Plaintiffs have provided no evidence that H.B. 2492's provision that Federal Only voters will be subject to additional database queries by the Attorney General wil any burden on any identifiable eligible voter, it necessarily follows that Plaintiffs have failed to demonstrate an adverse disparate impact on any racial or ethnic minority group.

299.   The statutory criteria for a referral—*i.e.*, "Federal Only" status—is race neutral.

300.   Even assuming that members of certain racial or ethnic minority groups are disproportionately overrepresented among Federal Only voters, there is insufficient evidence that any affected individuals will be *incorrectly* identified as non-citizens by the databases the Attorney General is required to query.  *See Fair Fight Action*, 634 F. Supp. 3d at 1207–08 (concluding that potential burdens resulting from erroneous vital records matching during list maintenance were "pure conjecture" absent evidence that specific voters had their registrations erroneously canceled).

301.   If anything, the renewed and expanded database inquiries required by H.B. 2492 allow Federal Only voters' citizenship status to be verified by reference to a broader set of repositories containing updated information, which, in turn, may enable some Federal Only voters to be reclassified to full-ballot status.  *See* Tr. 1934:16-–935:13 (Testimony of J. Richman).

302.   This factor accordingly favors Defendants.

### 4.   Overall System of Voting

303.   The Supreme Court has recognized that "Arizona law generally makes it very easy to vote."  *Brnovich*, 141 S. Ct. at 2330.

304.   The referral provision of H.B. 2492 does not impose any additional restrictions or prohibitions in connection with registration or voting.  Rather, it operates only as a mandate on the Attorney General to conduct additional database checks, for the purpose of verifying the current citizenship status of Federal Only voters and, if appropriate,

upgrading them to full-ballot status. Any prosecutions resulting from the database checks would be premised on a longstanding (and unchallenged) statutory prohibition on knowingly registering to vote when ineligible to do so, which H.B. 2492 does not amend or expand.

305.    This factor accordingly favors Defendants.

### 5.    State Interests

306.    H.B. 2492's referral provision advances the State of Arizona's important governmental interests in preventing unlawful voting by non-citizens and maintaining public confidence in the integrity of the electoral process. *See Brnovich*, 141 S. Ct. at 2348 ("a State may take action to prevent election fraud without waiting for it to occur and be detected within its own borders").

307.    This factor accordingly favors Defendants.

308.    The Court finds that the Plaintiffs have failed to establish that, under the totality of the circumstances, H.B. 2492's referral provision results in a denial or abridgement of the right of any citizen of the United States to vote on account of race of color.

## VI.    Conclusions about Birth Place Requirement (HB 2492 § 4)

### A.    Non-US Plaintiffs lack standing to challenge the birthplace requirement.

309.    Non-U.S. Plaintiffs have not shown they will suffer an actual or imminent concrete and particularized injury due to the birth place requirement. *See* Findings of Fact § IX.C.

310.    Accordingly, Non-U.S. Plaintiffs lack standing to challenge the birth place requirement. *See Wright*, 48 F.4th at 1118.

### B.    The birth place requirement does not impose an unconstitutional burden on the right to vote.

311.    Writing one's state or country of birth is not burdensome.

312.    The birth place requirement imposes no burden on the right to vote, or at most, a very minimal one.

313.   The State has an important interest in "carefully identifying all voters participating in the election process."  *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 196 (2008).

314.   The birth place requirement serves that important interest by providing information that can confirm identity.  *See* Findings of Fact § IX.A.1.

315.   The State also has an important interest in "counting only the votes of eligible voters," as well as protecting "public confidence in the integrity of the electoral process." *Crawford*, 553 U.S. at 197.

316.   The birth place requirement serves that important interest too, by providing information that can confirm citizenship.  *See* Findings of Fact § IX.A.2

317.   Any minimal burden imposed by the birth place requirement is outweighed by the State's important interests.

318.   Plaintiffs have not shown that the birth place requirement imposes an unconstitutional burden on the right to vote.

**C.     This provision does not violate equal protection.**

319.   Non-U.S. Plaintiffs allege that H.B. 2492 violates the Equal Protection Clause of the Fourteenth Amendment by requiring individuals who choose to register to vote using the State Form (rather than the Federal Form) to provide their place of birth.  *See* Doc. 610 at 3; A.R.S. § 16-121.01(A).

320.   The dichotomy between State Form registrations and Federal Form registrations does not correspond to any constitutionally protected suspect classification. Thus, under the Equal Protection Clause's traditional tiers of scrutiny, laws that afford differential treatment to State Form registrants relative to Federal Form registrants comply with the Fourteenth Amendment if they have a rational basis.  *See* Doc. 304 at 23 n.12.

321.   Rational basis review is "the least exacting type of scrutiny," and countenances any statutory mandate or restriction that is "rationally related to a legitimate governmental purpose."  *Green v. City of Tucson*, 340 F.3d 891, 896 (9th Cir. 2003). Further, "courts are compelled under rational-basis review to accept a legislature's

generalizations even when there is an imperfect fit between means and ends. A classification does not fail rational-basis review because it 'is not made with mathematical nicety or because in practice it results in some inequality.'" *Aleman v. Glickman*, 217 F.3d 1191, 1201 (9th Cir. 2000) (cleaned-up).

322.    An individual's place of birth is rationally—albeit imperfectly—related to his or her citizenship, to the extent that individuals born in the United States are highly likely to be citizens of this country.  In addition, birthplace has utility in assisting the county recorders confirm a voter's identity in various election-related transactions or communications.  *See* Findings of Fact § IX.A.1.    The inclusion of birthplace as a mandatory field in the State Form hence is not irrational.

323.    The State's exemption of Federal Form applications from H.B. 2492's birthplace requirement is *per se* rational because federal law prohibits Arizona from supplementing the Federal Form with additional state law mandates.  *See Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 20 (2013).

### D.    This provision does not violate the Materiality Provision (52 U.S.C. § 10101(a)(2)(B)).

324.    The Civil Rights Act of 1964 prohibits officials of a State or political subdivision from "deny[ing] the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election," 52 U.S.C. § 10101(a)(2)(B) (the "Materiality Provision").

325.    Both the United States and five groups of Non-U.S. Plaintiffs allege that the Birth Place Requirement violates the Materiality Provision.

### 1.    Private Right of Action

326.    The United States' standing to bring this claim is undisputed.  *See* 52 U.S.C. § 10101(c).

327.   Because they have requested in their respective complaints awards of attorneys' fees and costs pursuant to 42 U.S.C. § 1988, each Non-U.S. Plaintiff asserting a claim under the Materiality Provision must establish the existence of a private right of action to enforce the statute's terms via Section 1983. *See Garnett v. Zeilinger*, 485 F. Supp. 3d 206, 215 (D.D.C. 2020) ("*each* plaintiff must have standing in order to recover attorney's fees.").

328.   To properly invoke Section 1983, the Non-U.S. Plaintiffs must show that Section 10101 "'unambiguously confer[s]' 'individual rights upon a class of beneficiaries' to which the plaintiff belongs." *Health and Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 183 (2023) (quoting *Gonzaga Univ. v. Doe*, 536 U.S. 273 (2002)).  This inquiry entails "consider[ing] whether the statute: (1) is intended to benefit a class of individuals of which the Plaintiff is a member; (2) sets forth a standard, clarifying the nature of the right, that makes the right capable of enforcement by the judiciary; and (3) is mandatory, rather than precatory in nature." *Crowley v. Nevada ex rel. Nev. Sec'y of State*, 678 F.3d 730, 735 (9th Cir. 2012) (citing *Blessing v. Freestone*, 520 U.S. 329, 340–41 (1997).  It is not sufficient that "the plaintiff falls within the general zone of interest that the statute is intended to protect." *Gonzaga Univ.*, 536 U.S. at 283.

329.   The Non-U.S. Plaintiffs all are entities—not natural persons.  Because they do not and cannot exercise the franchise, they are not beneficiaries of any protections afforded by the Materiality Provision.

330.   Section 10101 does not itself "unambiguously confer[]" any independent or freestanding statutory "right."  Rather, it prohibits certain state-imposed constraints on the pre-existing constitutional right to vote.  Even if the Non-U.S. Plaintiffs and/or third parties whose interests they purport to represent are incidental beneficiaries of these protections, Section 10101 is structured primarily as an affirmative prohibition on acts and practices by States and political subdivisions, rather than the fount of new, discrete individual "rights." *See, e.g.*, *Lil' Man in the Boat, Inc. v. City and Cnty. of San Francisco*, 5 F.4th 952, 959–60 (9th Cir. 2021); *Logan v. U.S. Bank Nat'l Ass'n*, 722 F.3d 1163, 1170–71 (9th Cir. 2013);

*All. of Nonprofits for Ins. Risk Retention Grp. v. Kipper*, 712 F.3d 1316, 1326 (9th Cir. 2013).

331.    Even assuming that Section 10101 does create an individual "right," the Defendants have defeated any inference of a private cause of action under Section 1983 by demonstrating that Congress "creat[ed] a comprehensive enforcement scheme that is incompatible with individual enforcement under §1983." *Gonzaga*, 536 U.S. at 284 n.4.

332.    Section 10101(c) expressly authorizes the Attorney General to enforce the statute's terms.  Additionally, Section 10101(c)'s allowance of claims by a limited class of private plaintiffs upon a prior judicial finding of a "pattern or practice" of violations necessarily implies that a generalized right of enforcement under Section 1983 is unavailable.  *See Talevski*, 143 S. Ct. at 1461; *Stilwell v. City of Williams*, 831 F.3d 1234, 1244 (9th Cir. 2016) ("[W]hen Congress creates a right by enacting a statute but at the same time limits enforcement of that right through a specific remedial scheme that is narrower than § 1983, a § 1983 remedy is precluded.").

333.    Because the Non-U.S. Plaintiffs have failed to prove that Section 10101 "unambiguously confer[s]," *Talevski*, 143 S. Ct. at 1450, any specific statutory right on the Non-U.S. Plaintiffs, and because Congress impliedly foreclosed a remedy under Section 1983, the Non-U.S. Plaintiffs lack a private right of action to enforce the Materiality Provision.  *See, e.g.*, *Ne. Ohio Coal. For the Homeless v. Husted*, 837 F.3d 612, 630 (6th Cir. 2016) (holding there is no private right of action to enforce Section 10101); *Democratic Congressional Campaign Comm. v. Kosinski*, 614 F. Supp. 3d 20, 48 (S.D.N.Y. 2022) (same).

### 2.    Materiality Provision

334.    Even if Section 10101 is privately enforceable, the Non-U.S. Plaintiffs have failed to establish that birthplace is not "material" to a determination of a putative voter's eligibility.

335.    A required field or informational item on a registration form or other voting-related document is "material," within the meaning of the Materiality Provision, if it has

1    "some probability of impacting an election official's" determination that an individual is,

2    in fact, a qualified elector.  *See* Doc. 534 at 26.  The statute "does not establish a least-

3    restrictive-alternative test for voter registration applications."  *Fla. State Conference of*

4    *N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1175 (11th Cir. 2008).

5         336.   Place of birth is "material" to determining a putative registrant's eligibility

6    because, when coupled with other items of identifying information, it has "some

7    probability" of affecting a county recorder's determination of whether the submitted

8    registration is lawful and valid.  In particular, a constellation of identifiers that includes

9    birthplace can enable county recorders to identify putative registrations that are duplicative

10   of existing registrations or that have been submitted in the name of ineligible applicants

11   (*e.g.*, deceased individuals).  *See* U.S. State Department's Foreign Affairs Manual, 8 FAM

12   403.4-6(A) (requiring provision of birthplace on U.S. passport applications because it "is

13   an integral part of establishing an individual's identity.  It distinguishes that individual from

14   other persons with similar names and/or dates of birth, and helps identify claimants

15   attempting to use another person's identity").

16        337.   In addition, a mandated item of information is "material" if it—either by itself

17   in or conjunction with other data—has "some probability of impacting an election

18   official's" confirmation, Doc. 534 at 26, of a putative voter's identity at any point in the

19   voting or election administration process.  *See League of Women Voters of Ark. v. Thurston*,

20   No. 5:20-cv-05174, 2023 WL 6446015, at *17 (W.D. Ark. Sept. 29, 2023) (identity-

21   verifying information is "material" if it equips officials to verify that voters "remain

22   qualified, and are the same people who have already been qualified"); *Indiana Democratic*

23   *Party v. Rokita*, 458 F. Supp. 2d 775, 841 (S.D. Ind. 2006) ("verifying an individual's

24   identity is a material requirement of voting"); *cf. Vote.org v. Byrd*, No. 4:23-cv-111-AW-

25   MAF, 2023 WL 7169095, at *6 (N.D. Fla. Oct. 30, 2023) (requirement that voter

26   registration forms contain wet signature did not violate the Materiality Provision).

27        338.   Both existing Arizona election procedures and H.B. 2243 enable the county

28   recorders to use birthplace information to confirm a putative voter's identity and, by

1   extension, eligibility at various post-registration junctures. *See* Trial Ex. 6, at pp. 4–5, 47,

2   48, 206; H.B. 2243 § 2, A.R.S. § 16-165(J) (authorizing access to vital events records

3   maintained by the National Association for Public Health Statistics and Information

4   Systems, which includes birthplace information, to verify citizenship).

5        339.   Because place of birth can and does have "some probability of impacting an

6   election official's" determination of (1) the validity of a registration application and/or (2)

7   the identity of a putative voter in various registration and election administration contexts,

8   it is "material" to an individual's eligibility to vote under Arizona law.

9        **E.    These provisions do not violate NVRA § 7**

10       340.   Section 7 of the NVRA requires "voter registration agencies" that also

11  provide public assistance to distribute either the Federal Form or "the office's own form if

12  it is equivalent to" the Federal Form. 52 U.S.C. § 20506(a)(6).  It is undisputed that Arizona

13  "voter registration agencies" make available only the State Form.

14       341.   The NVRA provides that "a State may develop and use a mail voter

15  registration form that meets all of the criteria stated in [Section 9 of the NVRA]." 52 U.S.C.

16  § 20505(a)(2).

17       342.   Section 9 provides that a voter registration form may include any information

18  "necessary to enable the appropriate State election official to assess the eligibility of the

19  applicant and to administer voter registration and other parts of the election process."  52

20  U.S.C. § 20508(b)(1).

21       343.   It follows that the State Form is "equivalent" to the Federal Form if its

22  required fields are limited to information "necessary to enable the appropriate State election

23  official to assess the eligibility of the applicant and to administer voter registration and other

24  parts of the election process."  52 U.S.C. § 20508(b)(1).

25       344.   A State Form may require information or documentation different from, or in

26  addition to, that mandated by the Federal Form and still be consistent with the NVRA.  *See*

27  *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 12 (2013) (explaining that NVRA-

28  compliant "state-developed forms may require information the Federal Form does not").

345.    Birthplace information, particularly when used in conjunction with items of information, enables elections officials to confirm putative voters' identity and facilitates the flagging of potentially duplicative or falsified registrations. It hence is "necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process."   52 U.S.C. § 20508(b)(1).

346.    The Birthplace Requirement accordingly does not render the State Form not "equivalent" to the Federal Form, for purposes of NVRA Section 7.

**F.    These provisions do not violate Section 2 of the Voting Right Act.**

347.    A state law violates Section 2 of the Voting Rights Act of 1965 if it "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race of color."  52 U.S.C. § 10301(a).  In adjudicating a Section 2 claim, the Court must assess "the totality of the circumstances," *id.* § 10301(b), which include five "guideposts" outlined by the Supreme Court in *Brnovich v. Democratic National Committee*, 141 S. Ct. 2321 (2021).

**1.    Size of the Burden**

348.    H.B. 2942's Birthplace Requirement does not impose any discernible burden on the voting rights of any racial or ethnic minority group.  Plaintiffs have provided no evidence that any otherwise eligible individual is unable to write this basic item of information on the State Form.  *See generally Ariz. Democratic Party v. Hobbs*, 18 F.4th 1179, 1188 (9th Cir. 2021) (agreeing that "the burden imposed by a challenged law [is not] measured by the consequence noncompliance").

349.    This factor accordingly favors Defendants.

**2.    Laws and Practices in 1982**

350.    Arizona has collected birthplace information during the voter registration process since the inception of statehood.  *See* 1913 Revised Statutes of Ariz. § 2885 (county recorder must record a registrant's "country of nativity," and, "if naturalized," documentation of the same).  An applicant's "[s]tate or country of birth" likewise was an

enumerated, and seemingly required, item on the Arizona voter registration form as it existed in approximately 1982, and nothing in other contemporaneous statutory provisions indicates that birthplace was, at that time, an optional item.  *See* A.R.S. § 16-152(A)(9), codified in 1979 Ariz. Laws. ch. 209, § 3.  Birthplace was expressly converted to an optional field in 1993.  *See* 1993 Ariz. Laws ch. 98, § 10 (adopting A.R.S. § 19-121.01, which specifies the minimum required elements of a valid registration).  The reinstatement of this previously optional field to a required item is not a material deviation from laws and practices that were prevalent in 1982.

351.    This factor accordingly favors Defendants.

### 3.    Disparate Impact

352.    The Plaintiffs have not established that the Birthplace Requirement will inflict a burden on minority voters that is both material and disproportionate.  *See Brnovich*, 141 S. Ct. at 1239 ("[T]he mere fact there is some disparity in impact does not necessarily mean that a system is not equally open or that it does not give everyone an equal opportunity to vote.  The size of any disparity matters.").

353.    The Birthplace Requirement applies to all applicants who choose to register using the State Form, and there is no evidence that any identifiable racial or ethnic minority group is less likely than white registrants to know or be able to provide his or her place of birth.

354.    This factor accordingly favors Defendants.

### 4.    Overall System of Voting

355.    The Supreme Court has recognized that "Arizona law generally makes it very easy to vote."  *Brnovich*, 141 S. Ct. at 2330.

356.    The provision of birthplace information is entails no more than *de minimis* time or effort, and even if a registrant inadvertently fails to do so, he or she is afforded written notice and the registration will be held in suspense until the deficiency is remedied, at which time it will become fully effective.  *See* A.R.S. §§ 16-121.01(A), 16-134(B).

357.    This factor accordingly favors Defendants.

### 5. State Interests

358.    The Birthplace Requirement facilitates county recorders' verification of putative voters' identity and, by extension, eligibility, and thereby advances Arizona's important governmental interests in preventing unlawful voting by ineligible persons and maintaining public confidence in the integrity of the electoral process.  *See Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 195-96 (2008).

359.    This factor accordingly favors Defendants.

360.    The Court finds that the Plaintiffs have failed to establish that, under the totality of the circumstances, the Birthplace Requirement result in a denial or abridgement of the right of any citizen of the United States to vote on account of race of color.

## VII.    Conclusions about Proof of Location of Residence (HB 2492 § 5)

### A.    Plaintiffs lack standing to challenge this provision at this time.

361.    Now that the Court has clarified the meaning of the proof of location of residence requirement, Doc. 534 at 33-34, no Plaintiff has shown actual or imminent concrete and particularized injury due to the requirement.  *See* Findings of Fact § X.A, B, C.

362.    Accordingly, no Plaintiff has standing to challenge the provision further.  *See Wright*, 48 F.4th at 1118.

### B.    Plaintiffs have not shown that requiring proof of location of residence for State Forms but not Federal Forms for federal elections would be an unconstitutional burden on the right to vote.

363.    Now that the Court has clarified the meaning of the proof of location of residence requirement, Doc. 534 at 33-34, Plaintiffs are no longer generally challenging the State's ability to require proof of location of residence as a component of the State Form.

364.    Rather, Plaintiffs are only challenging "any differential application" of the requirement "between State and Federal Form applicants."  Doc. 610 at 5.

365.    But any differential application is caused by the Supreme Court's ruling that NVRA § 6 "precludes Arizona from requiring a Federal Form applicant to submit information beyond that required by the form itself."  *Inter Tribal*, 570 U.S. at 1.

366.    For this reason, this Court ruled at summary judgment that the State could not require proof of location of residence, as to the Federal Form for federal elections.  Doc. 534 at 9.

367.    But the Supreme Court also confirmed that differential treatment is permissible, explaining that "state-developed forms may require information the Federal Form does not" and "can be used to register voters in both state and federal elections." *Inter Tribal*, 570 U.S. at 12.

368.    Plaintiffs' undue burden theory is thus foreclosed by *Inter Tribal*.

369.    In any event, Plaintiffs have not shown their right to vote, or anyone's right to vote, would be burdened by the proof of location of residence requirement now that the Court has clarified its meaning.  *See* Findings of Fact § X.A, B, C.

370.    And any such burden would be outweighed by the State's important interests in preventing ineligible voters (here, non-residents) from voting and protecting voter confidence in elections.

371.    HB 2492's proof of location of residence requirement does not impose an unconstitutional burden on the right to vote.

## C.    The proof of location of residence requirement does not violate equal protection.

372.    Non-U.S. Plaintiffs allege that H.B. 2492 violates the Equal Protection Clause of the Fourteenth Amendment by requiring the rejection of State Form applications that lack documentary proof of residence.   *See* Doc. 609 at 17, Doc. 610 at 2; A.R.S. § 16-123.

373.    Although Plaintiffs, citing *Bush v. Gore*, 531 U.S. 98 (2000), frame this facet of their challenge as freestanding claim, "the *Burdick* standard had been almost universally recognized by the federal courts as the appropriate test for equal protection challenges to state election laws, particularly those dealing with the 'mechanics of elections.'" *Paralyzed Veterans of Am. v. McPherson*, No. C-06-4670-SBA, 2008 WL 4183981, at *18 (N.D. Cal. Sept. 9, 2008); *see also Arizona Democratic Party v. Hobbs*, 18 F.4th 1179, 1195 (9th Cir.

2021) ("The Supreme Court repeatedly has assessed challenges to election laws . . . under the framework now described as the *Anderson/Burdick* framework.").

374.   Further, "*Bush* is of limited precedential value." *Wise v. Circosta*, 978 F.3d 93, 100 n.7 (4th Cir. 2020); *see also Lemons v. Bradbury*, 538 F.3d 1098, 1106 (9th Cir. 2008) (expressing doubt as to whether *Bush* is "applicable to more than the one election to which the [Supreme] Court appears to have limited it").

375.   Even if *Bush* created an independently cognizable theory, however, H.B. 2492's DPOR requirement for State Form applicants does not inflict arbitrary or disparate treatment.

376.   As an initial matter, the Federal Form and State Form applications embody two legally distinct methods of registration, and hence may be permissibly governed by different standards and procedures. *See Donald J. Trump for President, Inc. v. Boockvar*, 493 F. Supp. 3d 331, 387 (W.D. Pa. 2020) (characterizing as "*Bush*'s core proposition" the principle "that a state may not take the votes of two voters, similarly situated in all respects, and, for no good reason, count the vote of one but not the other"); *cf. Gonzalez v. Arizona*, No. CV 06-1268-PHX-ROS, 2007 WL 9724581, at *2 (D. Ariz. Aug. 28, 2007) (rejecting argument that photo ID requirement that applied only to in-person voters was not an impermissibly disparate procedure in violation of 52 U.S.C. § 10101(a)(2)(A) "[b]ecause early voting and voting at the polls are different types of voting").

377.   Any differential treatment of State Form applicants relative to Federal Form applicants is not arbitrary because it is impelled by federal law. *See Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 20 (2013) (holding that States cannot supplement the Federal Form with their own mandates).

378.   Pursuant to the NVRA, if an otherwise valid Federal Form lacks DPOR, Arizona must register the applicant to vote in federal elections. *See Inter Tribal Council*, 570 U.S. at 20.

379.   Because Arizona residency is a substantive prerequisite to registration, however, Arizona may require documentary proof of residency as a component of a

complete State Form, and hence may permissibly reject State Form applications that lack sufficient DPOR.  *See Inter Tribal Council*, 570 U.S. at 12 (the State Form "may require information the Federal Form does not"); *cf. Gonzalez v. Arizona*, 435 F. Supp. 2d 997, 1002 (D. Ariz. 2006) (the State Form may require "information that will enable the state to determine eligibility and to administer the registration and election process"); A.R.S. § 16-101(A)(3).

380.   Any differential treatment of State Form applications that lack documentary proof of residency relative to Federal Form applications does not reflect an "arbitrary" policy decision by Arizona, but rather is necessitated by the bifurcated registration system contemplated by the NVRA and ratified by *Inter Tribal Council*.

381.   In sum, because (1) Federal Form and State Form applications represent inherently distinct and independent methods of registration and (2) the NVRA, as interpreted in *Inter Tribal Council*, allows States to append additional prerequisites to the State Form, H.B. 2492's differential treatment of Federal Form and State Form registrants with respect to documentary proof of residency is not unconstitutionally "arbitrary and disparate."

382.   In addition, the dichotomy between State Form registrations and Federal Form registrations do not correspond to any constitutionally protected suspect classification.  Thus, under the Equal Protection Clause's traditional tiers of scrutiny, laws that afford differential treatment to State Form registrants relative to Federal Form registrants comply with the Fourteenth Amendment if they have a rational basis.  *See* Doc. 304 at 23 n.12.

383.   Rational basis review is "the least exacting type of scrutiny," and countenances any statutory mandate or restriction that is "rationally related to a legitimate governmental purpose."  *Green v. City of Tucson*, 340 F.3d 891, 896 (9th Cir. 2003).  Further, "courts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends.  A classification does not fail rational-basis review because it 'is not made with mathematical

1    nicety or because in practice it results in some inequality.'" *Aleman v. Glickman*, 217 F.3d
2    1191, 1201 (9th Cir. 2000) (cleaned-up).

3        384.   Because an applicant's residency "is of paramount importance when
4    determining his or her eligibility to vote," *Gonzalez*, 435 F. Supp. 2d at 1002 (referencing
5    citizenship); A.R.S. § 16-101(A)(3), it is rational for the State to require documentary proof
6    of residency in its own State Form and to reject non-compliant applications.

7        **D.    This provision does not violate NVRA § 6 or § 8(a)**.

8        385.   H.B. 2492 requires the county recorders to reject any State Form that is not
9    accompanied by documentary proof of residency, *see* A.R.S. §§ 16-121.01(A), 16-123,
10   which some Non-U.S. Plaintiffs alleges violates Section 6 and Section 8(a) of the NVRA.

11                       **1.    Section 6**

12       386.   Section 6 of the NVRA authorizes States to "develop and use a mail voter
13   registration form that meets all of the criteria stated in [Section 9] for the registration of
14   voters in elections for Federal office." 52 U.S.C. § 20505(a)(2). Section 9, in turn, permits
15   the inclusion in the State Form of required fields for any information "necessary to enable
16   the appropriate State election official to assess the eligibility of the applicant and to
17   administer voter registration and other parts of the election process."  52 U.S.C. §
18   20508(b)(1).

19       387.   This Court previously found that Arizona can, consistent with Sections 6 and
20   9 of the NVRA, permissibly prescribe that documentary proof of citizenship is a mandatory
21   element of a valid State Form, on the grounds that "[d]etermining whether an individual is
22   a United States citizen is of paramount importance when determining his or her eligibility
23   to vote." *Gonzalez v. State of Arizona*, 435 F. Supp. 2d 997, 1002 (D. Ariz. 2006); *see also*
24   *Inter Tribal Council*, 570 U.S. at 12 (noting that the NVRA contemplates that "state-
25   developed forms may require information the Federal Form does not," adding that "[t]his
26   permission works in tandem with the requirement that States 'accept and use' the Federal
27   Form").

28

388.    For the same reason, Arizona can, consistent with Sections 6 and 9 of the NVRA, prescribe that documentary proof of residence is a mandatory element of a valid State Form.   "The plain meaning [of Section 9] is if the state deems some information necessary to identify the applicant, the information can be required.   The state may require a signature, data relating to prior registration, and such other information that will enable the state to determine eligibility and to administer the registration and election process.   Therefore, in the identification process the state is allowed to determine eligibility."   *Gonzalez*, 435 F. Supp. 2d at 1002.   Like U.S. citizenship, Arizona residency is a substantive qualification to register to vote in this State.   *See* A.R.S. § 16-101(A)(3).   The State thus may require documentary proof of residence as a mechanism to verify a putative registrant's eligibility.

389.    Because the documentary proof of residence requirement is compliant with Section 9 (and, by extension, Section 6) of the NVRA, H.B. 2492's directive that county recorders must reject State Form applications that lack documentary proof of residence is not preempted.

## 2.    Section 8(a)

390.    Section 8(a) of the NVRA provides that, if a "valid" registration form is submitted at least 29 days prior to a federal election, the applicant must be registered to vote in that federal election.   *See* 52 U.S.C. § 20507(a)(1) (safe harbor applies to valid registrations submitted   "not later than the lesser of 30 days, or the period provided by State law, before the date of" a federal election); *see* A.R.S. § 16-120(A) (requiring that registration forms must be received at least 29 days prior to an election to qualify the applicant to vote in that election).

391.    A corollary, however, is that a State is not required to accept and process a timely submitted registration form that is not "valid."   *See Diaz v. Cobb*, 541 F. Supp. 2d 1319, 1331 n.10 (S.D. Fla. 2008) (Section 8(a) "recognized the right of states to demand a 'valid' form prior to the registration deadline.")

392.    For the reasons set forth above, H.B. 2492's requirement that a valid State Form must include documentary proof of residence is not inconsistent with, or preempted by, Sections 6 or 9 of the NVRA.

393.    It follows that a State Form that lacks documentary proof of residence is not "valid" under Arizona law, and hence Section 8(a) does not require Arizona to register applicants who timely submit an invalid State Form.

**E.    This provision does not violate NVRA § 7**

394.    Section 7 of the NVRA requires "voter registration agencies" that also provide public assistance to distribute either the Federal Form or "the office's own form if it is equivalent to" the Federal Form.  52 U.S.C. § 20506(a)(6).  It is undisputed that Arizona "voter registration agencies" make available only the State Form.

395.    The NVRA provides that "a State may develop and use a mail voter registration form that meets all of the criteria stated in [Section 9 of the NVRA]."  52 U.S.C. § 20505(a)(2).

396.    Section 9 provides that a voter registration form may include any information "necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process."  52 U.S.C. § 20508(b)(1).

397.    It follows that the State Form is "equivalent" to the Federal Form if its required fields are limited to information "necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process."  52 U.S.C. § 20508(b)(1).

398.    This Court previously found that H.B. 2492's documentary proof of citizenship requirement is compliant with Section 9 because "[d]etermining whether an individual is a United States citizen is of paramount importance when determining his or her eligibility to vote."  *Gonzalez v. Arizona*, 435 F. Supp. 2d 997, 1002 (D. Ariz. 2006); *see also Inter Tribal Council*, 570 U.S. at 12 (explaining that NVRA-compliant "state-developed forms may require information the Federal Form does not").

399.    Similarly, because Arizona residency is a prerequisite to qualified elector status, *see* A.R.S. § 16-101(A)(3), H.B. 2492's documentary proof of residency requirement likewise is "necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process." 52 U.S.C. § 20508(b)(1); *cf. Common Cause of Colo. v. Buescher*, 750 F. Supp. 2d 1259, 1275 (D. Colo. 2010) (rejecting challenge to law requiring new registrants to confirm addresses, reasoning that "'eligibility' is the linchpin of a state's obligations regarding voter registration and list maintenance programs").

400.    The pre-registration documentary proof of residency requirement accordingly does not render the State Form not "equivalent" to the Federal Form, for purposes of NVRA Section 7.

## VIII.    Discriminatory Intent

392.    Discrimination on the basis of citizenship is not discrimination on the basis of race.  The latter is undisputedly unlawful in this context, *see* U.S. Const. amend. XIV, while the former is both contemplated by the U.S. Constitution and has always been required by the Arizona Constitution, *see* U.S. Const. amends. XV, XIX, XXIV, XXVI; Ariz. const. art. VII, § 2.

393.    Because H.B. 2492 and H.B. 2243 are facially neutral, Plaintiffs must prove that "a discriminatory purpose was a motivating factor for the legislation." *United States v. Carrillo-Lopez*, 68 F.4th 1133, 1139 (9th Cir. 2023).

394.    "Whenever a challenger claims that a state law was enacted with discriminatory intent, the burden of proof lies with the challenger, not the State." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018).

395.    Any evidence adduced in support of an intentional discrimination claim "must be considered in light of the strong 'presumption of good faith' on the part of legislators." *Carrillo-Lopez*, 68 F.4th at 1140 (quoting *Miller v. Johnson*, 515 U.S. 900 (1995)).

396.    Discriminatory impact is one element in a discriminatory intent analysis.  But "[a] court may not infer a discriminatory motive based solely on evidence of a

1   disproportionate impact except in rare cases where 'a clear pattern, unexplainable on

2   grounds other than race, emerges from the effect of the state action.'" *Carillo-Lopez*, 68

3   F.4th at 1141 (quoting *Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S.

4   252, 266 (1977))).

5   397.   In addition to discriminatory impact, "[t]he Court considers factors such as

6   (1) the 'historical background of the decision,' (2) the 'specific sequence of events leading

7   up to the challenged decision,' (3) '[d]epartures from the normal procedural sequence,' (4)

8   '[s]ubstantive departures,' and (5) 'legislative or administrative history.'" *Carillo-Lopez*,

9   68 F.4th at 1140 (quoting *Arlington Heights*, 429 U.S. 252).

10   398.   Plaintiffs have not supplied sufficient evidence to satisfy any of the *Arlington*

11   *Heights* factors, and have fallen far short of an aggregate evidentiary showing sufficient to

12   overcome the presumption of legislative good faith.

13   399.   First, as discussed above, the Plaintiffs cannot at this juncture prove that the

14   challenged laws will have a discriminatory impact based on income, naturalization status,

15   race, ethnicity, or any other protected class.  The history of Arizona's DPOC requirement

16   has produced no apparent evidence of disparate impact.   Meanwhile, there are

17   methodologically rigorous studies demonstrating that the implementation of a DPOC

18   requirement, voter ID requirements, and list maintenance programs have not resulted in

19   disparate impacts.  Although a different result may follow after data is gathered following

20   the implementation of the laws, at present the disparate impact factor therefore favors the

21   Defendants.

22   400.   Second, "[t]he allocation of the burden of proof and the presumption of

23   legislative good faith are not changed by a finding of past discrimination." *Abbott*, 138 S.

24   Ct. at 2324.

25   401.   Discriminatory laws or policies enacted decades in the past are not a proxy

26   for the intentions of the Fifty-Fifth Arizona Legislature in 2022. *See Abbott*, 138 S. Ct. at

27   2324 ("[P]ast discrimination cannot, in the manner of original sin, condemn governmental

28   action that is not itself unlawful." (citation omitted)); *Carillo-Lopez*, 68 F.4th at 1150

1    (discriminatory law enacted 23 years earlier by "a legislature with 'a substantially different

2    composition'" was not probative of contemporaneous legislative intent); *League of Women*

3    *Voters of Fla., Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 923 (11th Cir. 2023) ("[A] federal

4    court must remain 'mindful of the danger of allowing the old, outdated intentions of

5    previous generations to taint [the state]'s legislative action forevermore on certain topics."

6    (citation omitted)).

7         402.    Plaintiffs have failed to draw any factual nexus between discriminatory

8    enactments of prior legislatures and the specific legislators who voted to adopt H.B. 2492

9    and H.B. 2243.  *See Abbott*, 138 S. Ct. at 2327 (actions of past legislature are relevant only

10   "to the extent that they naturally give rise to—or tend to refute—inferences regarding the

11   intent of the" legislature that passed the challenged laws).

12        403.    The historical background factor from *Arlington Heights* therefore favors the

13   Defendants.

14        404.    Third, H.B. 2492 and H.B. 2243 were seemingly propelled primarily by

15   concerns or beliefs that Arizona's election system is vulnerable to illegal votes cast by

16   ineligible individuals.  Irrespective of whether this premise is factually sound, it does not

17   manifest discriminatory animus.  *See Brnovich*, 141 S. Ct. at 2349 (noting that while

18   "enflamed partisanship" may have been the impetus for the challenged law, "partisan

19   motives are not the same as racial motives"); *Democratic Nat'l. Comm. v. Reagan*, 329 F.

20   Supp. 3d 824, 880 (D. Ariz. 2018) (finding that, while bill sponsor's efforts "were marked

21   by unfounded and often farfetched allegations of ballot collection fraud," they "spurred a

22   larger debate in the legislature about the security" of voting processes, and that other

23   "proponents appear to have been sincere in their beliefs that this [third party ballot

24   collection] was a potential problem that needed to be addressed");[36] *League of Women*

25   *Voters*, 66 F.4th at 925 (lack of evidence of extant voter fraud did not mean that legislators'

26

27   _____

28   [36] Although the Ninth Circuit reversed the judgment, *see* 948 F.3d 989 (9th Cir. 2020), the Supreme Court subsequently found that "[t]he District Court's finding on the question of discriminatory intent had ample support in the record."  *Brnovich*, 141 S. Ct. at 2349.

professed anti-fraud motivation was suspect).  The sequence of events factor from *Arlington Heights* therefore favors the Defendants.

405.   Fourth, because the path of the challenged laws through the Arizona Legislature did not rely on extraordinary legislative procedures or approvals, as discussed above, it cannot be said that any departures from the ordinary course are "unexplainable on grounds other than race."  *Carillo-Lopez*, 68 F.4th at 1141 (quoting *Arlington Heights*, 429 U.S. at 266)).

406.   The fact that the floor amendment's introduction and adoption was hurried is not the type of procedural irregularity that bespeaks improper motives, particularly when the underlying policy (as originally presented in H.B. 2617) had been the subject of extensive consideration.  *See Abbott*, 138 S. Ct. at 2328–29 & n.23 ("[W]e do not see how the brevity of the legislative process can give rise to an inference of bad faith—and certainly not an inference that is strong enough to overcome the presumption of legislative good faith," and noting the "significant time and effort that went into consideration of the" challenged enactment).

407.   The procedural departures factor from *Arlington Heights* therefore favors the Defendants.

408.   Fifth, H.B. 2492 is substantively consistent with Arizona's longstanding election law infrastructure, not altering the basic contours of the DPOC requirement itself or substantially limiting the means by which it may be satisfied.  Similarly, the substantive changes to H.B. 2617, when it was amended into H.B. 2243, were likewise reflective of pre-existing law.  Specifically, the portion of H.B. 2617 requiring only "notice that the registration will be cancelled in ninety days unless the person provides satisfactory evidence that the person is qualified," *see* Trial Ex. 4 at § 1, was modified when amended into H.B. 2243 to track substantive provisions in the EPM and the NVRA.  *See* 52 U.S.C. § 20507(d)(2); Trial Ex. 6 at 36-40.  *See Arlington Heights*, 429 U.S. at 267 (substantive departures are evident when "the factors usually considered important by the decisonmaker strongly favor a decision contrary to the one reached"); *Democratic Nat'l. Comm.*, 329 F.

- 213 -

Supp. 3d at 881 (differences between enacted bill and prior iterations in earlier legislative sessions, including the addition of harsher penalties, was insufficient to show a substantive departure). The substantive departures factor from *Arlington Heights* therefore favors the Defendants.

409. Sixth, whether or to what extent the sentiments of Arizona legislators were factually supported or were premised on partisan considerations is irrelevant to the *Arlington Heights* analysis. *See Brnovich*, 141 S. Ct. at 2349 (sponsor's "enflamed partisanship" was not tantamount to a racial motive).

410. When presented with statements or actions by a given legislator that are alleged to manifest a discriminatory intent, courts cannot rely on a "cat's paw theory"—*i.e.*, the notion that another legislator "is a 'dupe' who is 'used by another to accomplish his purposes'"—as a mechanism to impute that intent to the legislative body as a whole. *Brnovich v. Democratic Nat'l. Comm.*, 141 S. Ct. 2321, 2350 (2021).

411. Moreover, even if Plaintiffs had proven isolated statements by a specific legislator that evinced a suspect motive, any such intention could not—absent substantial additional evidence—be imputed to the Legislature as whole. *See Brnovich*, 141 S. Ct. at 2350 (repudiating the "cat's paw" theory of legislative intent); *League of Women Voters*, 66 F.4th at 932 (criticizing district court's reliance "on a single statement by the sponsor that, in context, offers no evidence of discriminatory intent. And in any event, the explanatory value of an isolated statement would be limited"); *N.C. State Conference of the NAACP v. Raymond*, 981 F.3d 295, 307 (4th Cir. 2020) (rejecting finding of discriminatory intent that "stemmed from the comments of a few individual legislators and relied too heavily on comments made by the bill's opponents").

412. The legislative history factor from *Arlington Heights* therefore favors the Defendants.

413. Although the challenged laws may be subject to legal challenges for other reasons, the application of law to the evidence in this case persuades the Court, both

doctrinally under the *Arlington Heights* standard and subjectively as the trier of fact, that the challenged laws were not provably borne of racial animus.


DATED this 12th day of December, 2023.


**KRISTIN K. MAYES**
**ATTORNEY GENERAL**


By:   /s/Joshua M. Whitaker
      Joshua D. Bendor (No. 031908)
      Hayleigh S. Crawford (No. 032326)
      Joshua M. Whitaker (No. 032724)
      Kathryn E. Boughton (No. 036105)
      Timothy E.D. Horley (No. 038021)

      *Attorneys for Defendants*
      *Attorney General Kris Mayes,*
      *ADOT Director Jennifer Toth,*
      *and State of Arizona*


**COUNSEL FOR REPUBLICAN**
**NATIONAL COMMITTEE**


By:  /s/Kory Langhofer

Kory Langhofer, AZ Bar 024722
Thomas Basile, AZ Bar 031150
Statecraft PLLC
649 N. Fourth Avenue, First Floor
Phoenix, Arizona 85003
(602) 382-4078
kory@statecraftlaw.com
tom@statecraftlaw.com

Tyler Green*
Cameron T. Norris*
James P. McGlone*
Consovoy McCarthy PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423

- 215 -

tyler@consovoymccarthy.com
cam@consovoymccarthy.com
jim@consovoymccarthy.com

*admitted pro hac vice*

*Counsel for Intervenor-Defendant*
*Republican National Committee*

**GALLAGHER & KENNEDY, P.A.**

By:  /s/Hannah H. Porter

Kevin E. O'Malley
Hannah H. Porter
Ashley E. Fitzgibbons
2575 East Camelback Road
Phoenix, Arizona 85016-9225

*Attorneys for Intervenor-Defendants Toma*
*and Petersen*