# Exhibit 7

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

| | |
|---|---|
| Mi Familia Vota, et al., | |
| Plaintiffs, | Case No. 2:22-cv-00509-PHX-SRB (Lead) |
| v. | |
| Adrian Fontes, in his official capacity as Arizona Secretary of State, et al., | No. CV-22-00519-PHX-SRB<br>No. CV-22-01003-PHX-SRB<br>No. CV-22-01124-PHX-SRB<br>No. CV-22-01369-PHX-SRB<br>No. CV-22-01381-PHX-SRB<br>No. CV-22-01602-PHX-SRB<br>No. CV-22-01901-PHX-SRB |
| Defendants. | |
| AND CONSOLIDATED CASES. | |

VIDEOTAPED DEPOSITION OF WARREN PETERSEN

Phoenix, Arizona

December 5, 2023

Prepared by:
CINDY MAHONEY, RPR, RMR
Certified Court Reporter
Certificate No. 50680

CERTIFIED TRANSCRIPT

# I N D E X


| WITNESS | PAGE |
|---|---|
| WARREN PETERSEN | |
| EXAMINATION BY MS. SHAH | 12 |
| EXAMINATION BY MR. LANGHOFER | 329 |


## EXHIBITS MARKED


| EXHIBITS | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 427 | Senate Rules Fifty-Sixth Legislature 2023-2024 | 49 |
| Exhibit 428 | Document titled Loyalty Oath of Office | 66 |
| Exhibit 429 | Article IV. Legislative Department Part 1. Initiative Referendum | 74 |
| Exhibit 430 | Verification, Warren Petersen, President of the Arizona Senate | 83 |
| Exhibit 431 | April 21, 2022, email string INT-LEG 028202 - 028206 | 102 |
| Exhibit 432 | Intervenor-Defendants Speaker Toma and President Petersen's Brief Re Legislative Privilege Discovery Dispute | 141 |
| Exhibit 433 | February 8, 2022, email from Arizona Free Enterprise Club INT-LET 003211 - 003213 | 171 |
| Exhibit 434 | March 10, 2022, email LEG LOG03082 - 03084 | 196 |
| Exhibit 435 | March 15, 2022, email LEG LOG03958 | 199 |

EXHIBITS MARKED

| EXHIBITS | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 436 | March 23, 2022, email with attachments<br>LEG LOG04789 - 04796 | 205 |
| Exhibit 437 | March 10, 2022, email<br>INT-LEG 010646 | 210 |
| Exhibit 438 | Document titled HB 2243: voter registration; state residency; cancellation<br>Sponsor: Representative Hoffman, LD 12, House Engrossed | 214 |
| Exhibit 439 | Document titled 55th Legislature, 2nd Regular Session<br>LEG LOG14261 - 14274 | 215 |
| Exhibit 440 | Arizona State Senate Fifty-Fifth Legislature, Second Regular Session<br>Amended Fact Sheet for H.B. 2617 | 238 |
| Exhibit 441 | May 23, 2022, email<br>LEG LOG12929 - 12932 | 247 |
| Exhibit 442 | May 10, 2022, email with attachment<br>LEG LOG11595 - 11601 | 248 |
| Exhibit 443 | May 23, 2022, email<br>LEG LOG12933 | 249 |
| Exhibit 444 | May 23, 2023, email with attachments<br>LEG LOG13434 - 13436 | 252 |
| Exhibit 445 | Floor Amendment Explanation<br>Amendment drafted by: Mike Hans | 273 |
| Exhibit 446 | June 7, 2022, email with attachment<br>LEG LOG14133 | 291 |

EXHIBITS MARKED

| EXHIBITS | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 447 | June 22, 2022, email LEG LOG14228 | 298 |
| Exhibit 448 | Vital Records Processing Times 10/11/23, 1:04 PM | 312 |
| Exhibit 449 | ADHS - Vital Records - Ordering Options, 10/11/23, 1:06 PM | 314 |
| Exhibit 450 | United States Census Bureau QuickFacts | 315 |
| Exhibit 451 | Document titled Poverty Thresholds for 2022 by Size of Family and Number of Related Children Under 18 Years | 316 |

PREVIOUSLY MARKED EXHIBITS

| | |
|---|---|
| PX Exhibit 2 | Page 147 |
| PX Exhibit 4 | Page 278 |
| Petty Exhibit 6 | Page 30 |
| PX Exhibit 51 | Page 80 |
| Exhibit 61 | Page 190 |
| Toma Exhibit 402 | Page 402 |
| Toma Exhibit 407 | Page 71 |
| Toma Exhibit 408 | Page 83 |
| PX Exhibit 499 | Page 268 |

THE VIDEOTAPED DEPOSITION OF WARREN PETERSEN commenced at 9:09 a.m. on December 5, 2023, at the law offices of Spencer Fane, 2415 East Camelback Road, Suite 600, Phoenix, Arizona, before Cindy Mahoney, RPR, RMR, Arizona Certified Court Reporter No. 50680.

* * *

APPEARANCES:

For Poder Latinx, Chicanos Por La Causa, and Chicanos Por La Causa Action Fund (via videoconference):
ARNOLD & PORTER KAYE SCHOLER LLP
By: Leah Motzkin, Esq.
601 Massachusetts Avenue NW
Suite 1000
Washington, D.C. 20001
202-942-5000
Leah.motzkin@arnoldporter.com

For Mi Familia Vota and Voto Latino (via videoconference):
ELIAS LAW GROUP LLP
By: Elisabeth C. Frost, Esq.
250 Massachusetts Avenue NW
Suite 400
Washington, D.C. 20001
202-968-4490
Efrost@elias.law

For Promise Arizona and Southwest Voter Registration Education Project:
MEXICAN AMERICAN LEGAL DEFENSE AND EDUCATIONAL FUND
By: Erika Cervantes, Esq.
634 South Spring Street
11th Floor
Los Angeles, California 90014
213-629-2512
Ecervantes@maldef.org

APPEARANCES CONTINUED:

For Living United for Change in Arizona; League of United Latin American Citizens; Arizona Students' Association; ADRC Action; Inter Tribal Council of Arizona, Inc.; San Carlos Apache Tribe; and Arizona Coalition for Change (all via videoconference):

CAMPAIGN LEGAL CENTER
By: Danielle M. Lang, Esq.
Hayden Johnson, Esq.
Molly Danahy, Esq.
1101 14th Street NW
Suite 400
Washington, D.C. 20005
202-736-2200
Dlang@campaignlegalcenter.org
Hjohnson@campaignlegalcenter.org
Mdanahy@campaignlegalcenter.org

For the Arizona Asian American Native Hawaiian and Pacific Islander for Equity Coalition:

LATHAM & WATKINS, L.L.P.
By: Catherine A. Rizzoni, Esq.
Amit Makker, Esq. (via videoconference)
Scott Kanchuger, Esq. (via videoconference)
505 Montgomery Street
Suite 2000
San Francisco, California 94111
415-391-0600
Cat.rizzoni@lw.com
Amit.makker@lw.com
Scott.kanchuger@lw.com

-and-

ASIAN AMERICANS ADVANCING JUSTICE
By: Niyati Shah, Esq.
1620 L Street NW
Suite 1050
Washington, D.C. 20036
202-815-1098
Nshah@advancingjustice-aajc.org

APPEARANCES CONTINUED

For Tohono O'odham Nation, Gila River Indian Community, Keanu Stevens, Alanna Siquieros, and LaDonna Jacket (via videoconference):
NATIVE AMERICAN RIGHTS FUND
By: Allison Neswood, Esq.
950 F Street NW
Suite 1050
Washington, D.C. 20004
202-785-4166
Neswood@narf.org

For the Democratic National Committee and Arizona Democratic Party (via videoconference):
WILMER CUTLER PICKERING HALE AND DORR, LLP
By: Kelsey Quigley, Esq.
2600 El Camino Real
Suite 400
Palo Alto, California 94306
650-858-6000
Kelsey.quigley@wilmerhale.com

For the United States (via videoconference):
U.S. DEPARTMENT OF JUSTICE
CIVIL RIGHTS DIVISION, VOTING SECTION
By: Margaret Turner, Esq.
4 Constitution Square
150 M Street NE
Washington, D.C. 20002
202-305-5533

For Attorney General Kris Mayes, ADOT Director Jennifer Toth, and State of Arizona (via videoconference):
OFFICE OF THE ARIZONA ATTORNEY GENERAL
By: Timothy E. Horley, Esq.
2005 North Central Avenue
Phoenix, Arizona 85004
602-542-7932
Timothy.horley@azag.gov

APPEARANCES CONTINUED:

For Yavapai County Recorder Michelle Burchill (via videoconference):
YAVAPAI COUNTY ATTORNEY'S OFFICE
By: Michael J. Gordon, Esq.
225 East Gurley Street
Prescott, Arizona 86301
928-554-8725
Michael.gordon@yavapaiaz.gov

For Intervenor Republican National Committee:
STATECRAFT, PLLC
By: Kory A. Langhofer, Esq.
649 North 4th Avenue
Suite B
Phoenix, Arizona 85003
602-571-4275
Kory@statecraftlaw.com

For Intervenors Ben Toma and Warren Petersen:
GALLAGHER & KENNEDY PA
By: Kevin E. O'Malley
Hannah Hatch Porter, Esq.
2575 East Camelback Road
Suite 1100
Phoenix, Arizona 85016
602-530-8400
Kevin.omalley@gknet.com
Hannah.porter@gknet.com

ALSO PRESENT:

Rusty Crandell
Linley Wilson (via videoconference)
Anna Critz (via videoconference)
Jimmie Sullivan, Videographer

TRANSCRIPT OF PROCEEDINGS

09:09:41 THE VIDEOGRAPHER: We are on the record.
09:09:42 Time on the monitor is 9:09 a.m. Arizona time. Here begins
09:09:48 Volume 1, Media Number 1, in the deposition of Mr. Warren
09:09:53 Petersen, in the matter of Mi Familia Vota, et al., versus
09:09:59 Adrian Fontes, in the United States District Court of
09:10:03 Arizona, Case Number 2:22-cv-00509-SRB.
09:10:17 Today's date is December 5th, 2023. Our
09:10:21 court reporter is Cindy Mahoney. I am Jimmie Sullivan,
09:10:26 certified legal videographer, representing Coash Court
09:10:26 Reporting & Video.
09:10:33 This deposition is taking place at 2415 East
09:10:38 Camelback Road, Suite 600, Phoenix, Arizona.
09:10:42 Counsels, would you please identify
09:10:46 yourselves.
09:10:47 MS. SHAH: Niyati Shah on behalf of Arizona
09:10:50 AANHPI for Equity.
09:10:52 MS. CERVANTES: Erika Cervantes, representing
09:10:55 Promise Arizona plaintiffs.
09:10:56 MS. RIZZONI: Cat Rizzoni, also on behalf of
09:10:58 plaintiffs Arizona AANHPI for Equity.
09:11:03 MR. O'MALLEY: Kevin O'Malley and Hannah
09:11:04 Porter on behalf of the intervenors, Speaker Toma and
09:11:08 President Petersen.

09:11:09 MR. LANGHOFER: Kory Langhofer for the RNC.

09:11:11 MR. CRANDELL: Rusty Crandell, in-house counsel for the Senate majority.

09:11:19 THE VIDEOGRAPHER: Okay. Anyone on Zoom want to identify?

09:11:23 MR. HORLEY: Yes. I'm Tim Horley for the State and attorney general.

09:11:27 MR. MAKKER: Amit Makker, from Latham & Watkins, on behalf of the Arizona Asian American Native Hawaiian Pacific Islander for Equity Coalition plaintiff.

09:11:41 MS. FROST: Elisabeth Frost on behalf of Mi Familia Vota and Voto Latino plaintiff.

09:11:50 MS. QUIGLEY: Kelsey Quigley, from WilmerHale, on behalf of the Democratic National Committee and the Arizona Democratic Party.

09:11:58 MR. GORDON: Mike Gordon on behalf of the Yavapai County recorder.

09:12:06 THE VIDEOGRAPHER: Would the court reporter please swear in the witness.

09:12:09 WARREN PETERSEN,
the witness herein, being first duly sworn,
was examined and testified as follows:

09:12:19 MR. O'MALLEY: Counsel, I have a suggestion

09:12:20 that might expedite the examination. I don't believe relevance is necessarily a form objection. It is generally reserved anyway. But if you're in agreement, I'd like to have on the record that we don't need to object on relevancy grounds, that that's a reserved objection, so as not to unnecessarily interrupt your questioning.

09:12:45 MS. SHAH: I think that, like, I -- for -- I'm just trying -- it's not that I'm objecting to it. I'm mostly thinking in terms of transcripts and how we're going to address it, because I think the global objections tend to get a little confusing for the court. And that's what I'm thinking about here, not for -- that what you're suggesting is something that I necessarily have an issue with.

09:13:04 MR. O'MALLEY: Part of my thinking on it is that over the course, I assume, of the next week or so, you're going to designate only limited portions of these depositions. And so we can then be more specific in our objection to whatever you actually designate in the designations. And that would simplify having to object on relevancy grounds to lines of questioning that perhaps you don't even designate.

09:13:33 MS. SHAH: Yeah. Why don't we actually have you do it just so that it's -- with each line, that way we're, you know -- for now. And then if it -- if we're

09:13:47 feeling like it's going okay, we'll keep going. Otherwise,
09:13:49 we'll come back and revisit it, if that's okay.
09:13:51 MR. O'MALLEY: So we're going to do --
09:13:52 MS. SHAH: You're going to make them.
09:13:53 MR. O'MALLEY: Make them.
09:13:54 MS. SHAH: For now. And then we'll see --
09:13:55 hopefully we won't have that issue.
09:13:57 MR. O'MALLEY: Okay. Go ahead.
09:13:57 MS. SHAH: Okay.
09:13:59
09:13:59 EXAMINATION
09:13:59 BY MS. SHAH:
09:13:59 Q. Can you please state your name for the full
09:13:59 record -- can you state your full name for the record and
09:14:05 your full title, please.
09:14:05 A. Yeah. It's Warren Petersen. I'm the Arizona
09:14:08 Senate president.
09:14:08 Q. And for today's deposition, I just want to make
09:14:12 sure the record is clear on a couple of points.
09:14:15 Do you understand that you are testifying
09:14:16 under oath today?
09:14:17 A. I do.
09:14:18 Q. And do you understand a court reporter is
09:14:20 transcribing this deposition?
09:14:21 A. Yes.

09:14:22 Q. So with that in mind, please answer all questions
09:14:25 audibly and clearly. Please let me know if you don't
09:14:29 understand a question or need me to repeat any part of it.
09:14:32 And if I ask a question and you answer it, I will assume
09:14:35 that you have understood the question. Does that all make
09:14:38 sense?
09:14:38 A. Uh-huh.
09:14:39 Q. And if at any time you need to take a break, just
09:14:41 let me know. We'll go ahead and do that. The only thing
09:14:43 is that if I've asked a question, I'd ask that you please
09:14:47 finish answering that question before taking the break.
09:14:49 Does that work?
09:14:49 A. Yep.
09:14:49 Q. And is there any reason that you cannot testify
09:14:52 truthfully today?
09:14:53 A. No.
09:14:59 MR. O'MALLEY: For the benefit of the court
09:15:00 reporter, President Petersen, she can't take down uh-huhs.
09:15:04 And it's -- you answered one of the questions that way.
09:15:04 THE WITNESS: Okay.
09:15:06 MR. O'MALLEY: Try to use a yes or no.
09:15:06 THE WITNESS: Okay.
09:15:09 BY MS. SHAH:
09:15:09 Q. So I'm going to repeat that last question.
09:15:12 Is there any reason you can't testify

truthfully today?
A. No.
Q. And is there any reason that you can't give complete and accurate testimony today?
A. No.
Q. Okay.
MS. SHAH: And I'm going to assume that if one defendant attorney objects, we're going to make sure that it goes on behalf of everybody. Does that work for everybody?
MR. O'MALLEY: It does.
MR. LANGHOFER: Yes.
MS. SHAH: Great.
BY MS. SHAH:
Q. Okay. So let's talk a little bit about how you've prepared for today's deposition. And please remember, I'm never trying to ask you to share the content of any conversations you've had with your lawyers. But is that okay?
A. Yes.
Q. Okay. So when did you begin preparing for today's deposition?
A. It was a few days ago.
Q. Like three? Four? Five?
A. I actually don't remember the exact day. I've had

09:16:00 a lot of meetings.
09:16:01 Q. Was it over the weekend?
09:16:02 A. I don't remember.
09:16:07 Q. Did you prepare over the weekend?
09:16:09 A. Did I prepare over the -- no, I did not prepare
09:16:12 over the weekend.
09:16:12 Q. Did you prepare before the weekend?
09:16:13 A. Let's see. I -- we met. I had a meeting with my
09:16:24 attorneys to prepare for the deposition. That was my
09:16:27 preparation. I don't remember which -- I don't remember
09:16:28 which day it was. It was before this meeting, obviously.
09:16:32 Q. And how many times did you meet with your
09:16:34 attorneys?
09:16:35 A. Just once.
09:16:36 Q. Okay. And how long was that meeting?
09:16:38 A. It was about three hours.
09:16:40 Q. And other than the meetings with your attorneys,
09:16:44 did you have any other meetings to prepare for this
09:16:46 deposition?
09:16:47 A. No.
09:16:47 Q. And at the meetings with your attorney, was
09:16:53 anybody other than your attorney present?
09:16:54 A. No.
09:16:55 Q. Did you review any documents in preparation for
09:17:01 this?

09:17:01 A. We did.
09:17:02 Q. What documents?
09:17:03 A. So we looked at -- let's see. We went over the
09:17:08 bills. We looked at some transcripts. And those are what
09:17:17 I recall.
09:17:18 Q. Okay. And have those documents been produced to
09:17:20 us?
09:17:20 A. I don't know.
09:17:21 MR. O'MALLEY: For the purposes of the
09:17:22 record, yes. We did not show him anything that you don't
09:17:25 have copies of.
09:17:25 BY MS. SHAH:
09:17:26 Q. Did you take any notes during these meetings?
09:17:28 A. No.
09:17:30 Q. Did you meet with any current or former members or
09:17:33 staff of the House or Senate to prepare for your
09:17:36 deposition?
09:17:37 A. No.
09:17:41 Q. Okay. In addition to those meetings, did you
09:17:43 discuss your deposition with any current or former members
09:17:46 or staff of the House or Senate?
09:17:50 A. No.
09:17:51 Q. And other than what we've just discussed, did you
09:17:53 speak to anyone else about your deposition today?
09:17:56 A. I think I told -- I've told a couple people that I

09:18:06 was going to be in a deposition, yes.
09:18:10 Q. Did you -- who did you tell?
09:18:12 A. I told my mom and -- let's see. I don't recall
09:18:23 who else I told -- mentioned -- mentioned I have a
09:18:27 deposition, so . . .
09:18:27 Q. Did you communicate with Representative Toma?
09:18:32 A. Yes.
09:18:33 Q. Can you describe those communications, please?
09:18:39 A. What was -- can you be more specific?
09:18:41 Q. Sure.
09:18:41 Did you communicate to Representative Toma
09:18:44 about this case?
09:18:47 A. No.
09:18:47 Q. Did you communicate to him about his deposition?
09:18:50 A. Yes, I did.
09:18:53 Q. Can you describe the content of those
09:18:55 conversations?
09:18:56 A. Yeah. "How did it go?"
09:18:57 Q. And what did he say?
09:18:59 A. "Glad it's over. It was long." That was about
09:19:04 it.
09:19:05 Q. Anything else?
09:19:06 A. No.
09:19:06 Q. When was this?
09:19:09 A. I don't remember. I've seen him -- like, I've

09:19:12 seen him several times. It was -- it was probably a day
09:19:17 after he had his deposition, and there's been no discussion
09:19:22 about it. We haven't talked about it since then.
09:19:24 Q. And have you read -- you mentioned earlier that
09:19:31 you reviewed some transcripts. Did you review Speaker
09:19:34 Toma's transcript of this deposition?
09:19:38 A. No, I didn't review his transcript.
09:19:40 Q. And -- so what transcripts did you review?
09:19:44 A. I reviewed, I guess, a motion that was made, the
09:19:52 bills, and transcript. I don't -- that's how it was
09:20:05 described to me -- was the transcript, so . . .
09:20:08 Q. Do you think it was a transcript of some
09:20:11 legislative hearings or meetings?
09:20:14 A. That's probably what it was.
09:20:16 Q. Or --
09:20:17 A. I --
09:20:17 Q. Or trial transcripts?
09:20:18 A. I -- we did, yes. There was a transcript of --
09:20:23 that's correct -- was -- I recall now there was a
09:20:25 transcript of things I had said in a hearing and what I --
09:20:33 comments I had made on the floor speech. So yes.
09:20:35 Q. Okay. And you mentioned "the bills." By that, do
09:20:44 you mean HB 2492?
09:20:46 A. Yeah, the two bills that are -- that are in
09:20:49 question here.

09:20:49 Q. And -- and what about -- so just to make the record clear, that's HB 2492 and HB 2243; correct?
09:20:56 A. As I understand it, that's correct.
09:20:58 Q. And what about HB 2617?
09:21:01 A. That -- from what I understand, that was -- yes, there was some discussion about HB 2617 as well.
09:21:15 Q. Okay. And you mentioned some -- a motion that you reviewed. Can you tell me what you meant by that?
09:21:23 A. Yeah. It was a motion that was made to the court, I believe. I don't recall exactly what it was.
09:21:29 Q. A motion on your behalf or --
09:21:30 A. Yeah, it was a --
09:21:32 Q. -- somebody else?
09:21:33 A. -- motion that the speaker and I had made, I believe. Or --
09:21:35 Q. Was it --
09:21:37 THE COURT REPORTER: One at a time, please.
09:21:40 MS. SHAH: Sorry.
09:21:40 THE WITNESS: What's that?
09:21:42 THE COURT REPORTER: One at a time, please.
09:21:42 THE WITNESS: Okay.
09:21:43 As I recall, it was -- it was something that we -- I think it was something we had to sign, so . . .
09:21:48 BY MS. SHAH:
09:21:49 Q. Okay. Did you review any other documents in

09:21:56 preparation for this deposition?
09:21:57 A. Not that I recall.
09:21:59 Q. No emails? Texts?
09:22:04 A. Yes. Reviewed some emails, looked at some emails
09:22:09 that were sent to me.
09:22:10 Q. That were -- emails that were sent to you by whom?
09:22:14 A. There was an email from Greg Blackie that I
09:22:20 remember.
09:22:21 Q. Any other emails?
09:22:23 A. That's the only one I remember.
09:22:25 Q. What about texts?
09:22:27 A. No.
09:22:27 Q. And just again, to confirm, those emails have been
09:22:30 produced to us?
09:22:32 MR. O'MALLEY: Yes. All emails that were
09:22:34 reviewed with the witness have been previously produced.
09:22:36 BY MS. SHAH:
09:22:37 Q. Okay. Did you listen to or watch any recorded
09:22:42 materials in order to prepare?
09:22:43 A. Not that I recall.
09:22:49 THE VIDEOGRAPHER: Counselor, you're clicking
09:22:51 your pen right in the -- that -- I'm sorry.
09:22:52 MS. SHAH: It's all right. I'm going to do
09:22:54 it again, so just -- just --
09:22:55 THE WITNESS: Do it right next to the mic.

09:22:57 MS. SHAH: -- fair warning.
09:22:59 BY MS. SHAH:
09:23:03 Q. So did any of those materials that you reviewed
09:23:07 refresh your recollection about the testimony that you're
09:23:09 going to give today?
09:23:11 MR. O'MALLEY: Object to the form.
09:23:14 BY MS. SHAH:
09:23:15 Q. You can answer.
09:23:16 A. Oh.
09:23:16 MR. O'MALLEY: Yes. President Petersen, just
09:23:18 for your benefit and the record --
09:23:20 THE WITNESS: Yeah.
09:23:20 MR. O'MALLEY: -- if I interject an objection
09:23:22 or Mr. Langhofer here interjects an objection, you can go
09:23:26 ahead and answer the question if you're capable of doing so
09:23:30 unless I would instruct you not to answer a question.
09:23:32 THE WITNESS: Okay.
09:23:33 Can you be more specific?
09:23:35 BY MS. SHAH:
09:23:36 Q. Right. We've just talked about the things you've
09:23:38 reviewed in preparation for today.
09:23:39 A. Uh-huh.
09:23:40 Q. Did those materials refresh your recollection
09:23:42 about the testimony that you will be giving today?
09:23:44 A. Yes.

09:23:44 Q. So which documents helped you refresh your recollection specifically?
09:23:49 A. The documents that reviewed some of the things that I said in committee and on the floor. Also some of the bills -- part of the bills.
09:24:08 Q. What -- how did the bills refresh your recollection?
09:24:13 A. I couldn't remember the numbers specifically. We vote on hundreds, thousands of bills, so you don't -- I couldn't remember the numbers. Couldn't remember some of the content of the bills. Again, because we vote on so many things. And even since then, working on a lot of new bills and a lot of different things so . . .
09:24:40 Q. Anything else?
09:24:42 A. No.
09:24:44 Q. And other than what we've already discussed, did you do anything else to prepare for this deposition?
09:24:51 A. Not that I recall.
09:24:52 Q. Let's talk a little bit about the documents that you were required to produce.
09:24:58 Are you retaining your documents regarding this action on the challenged laws?
09:25:04 A. I'm doing whatever my attorneys have said that I need to do in that fashion.
09:25:11 Q. So that's yes, that you are doing that?

09:25:12 A. My understanding is yes.
09:25:15 Q. And when did you begin retaining your documents?
09:25:19 A. I've followed all their instructions. I don't know -- I don't recall exactly when, but as my attorneys have given me instructions, I followed their instructions with documents.
09:25:30 Q. Would you say it's been since last summer? The summer before that?
09:25:39 A. It was when my attorneys told me to do that.
09:25:43 Q. And you've reviewed the requests to produce documents in this litigation?
09:25:50 A. Reviewed the requests from who?
09:25:57 Q. From the plaintiffs in this case.
09:26:00 A. I don't -- I did not personally review them. My attorneys reviewed them, and I complied with what they asked me to do.
09:26:09 Q. What did -- like, so you produced documents to your attorneys in response to these requests. Am I correct?
09:26:15 A. That's correct. Or we actually have a full-time attorney that specifically works on collecting documents.
09:26:25 Q. When you say "we," what do you mean by that?
09:26:27 A. The legislature.
09:26:28 Q. So the legislature's attorneys reviewed and produced the documents in this case?

09:26:34 A. From what I understand, that's correct.
09:26:36 Q. Did -- you didn't personally search for documents to be produced in this case?
09:26:41 A. I -- I did not search -- I did not personally do a search. I did a search as my -- all the -- any search I did, it was according to what my attorneys told me to do. The attorneys at the capitol -- there's an attorney at the capitol who searches -- all our records are available to be searched, and he searched those.
09:27:12 Q. Okay. I want to just break that up because I'm -- to make sure I understand clearly.
09:27:17 You did whatever your attorneys told you to do, and I'm not asking you to reveal the contents of that. But did that mean that you actually searched for documents yourself?
09:27:26 A. I didn't search for documents myself.
09:27:30 Q. Okay.
09:27:31 A. The only thing I searched for myself was their instructions on text messages. I did do a search on the text messages.
09:27:41 Q. Okay. And what about emails?
09:27:44 A. All of those were done by the attorney -- an attorney at the capitol.
09:27:50 Q. Does that include your official email as a senator?

09:27:53 A. Correct.
09:27:54 Q. What about your personal email?
09:27:56 A. That does not include my personal email.
09:28:01 Q. Did you search for documents in your personal email?
09:28:05 A. I wouldn't have any documents in my personal email.
09:28:07 Q. Okay. Other than text messages, what about other formats like Zoom or Slack notes?
09:28:23 A. I wouldn't -- I don't -- I wouldn't have anything -- I wouldn't have anything in that. I wouldn't have anything on Zoom or Slack. I don't have Slack notes.
09:28:32 Q. Okay. Any other chat functionality? IM?
09:28:40 A. No.
09:28:41 Q. Okay.
09:28:42 A. I use text messages.
09:28:44 Q. So you're not withholding any documents in response to these requests and you've provided everything to counsel; correct?
09:28:50 A. Absolutely. Yes.
09:28:51 Q. And you are currently the president of the Senate; is that right?
09:29:01 A. That's correct.
09:29:02 Q. Okay. And how long have you held that position?
09:29:04 A. Since -- let's see. Technically, it would be

09:29:11 January.
09:29:13 Q. And what are your responsibilities as president of
09:29:18 the Senate?
09:29:19 A. As president of the Senate, I am in charge of -- I
09:29:30 have the final say on, I guess, hirings, firings at the
09:29:34 capitol. So staff, the building, the regular order.
09:29:52 I'm -- as a leader of the -- as a leader of the chamber.
09:29:58 Q. When you say "staff," what do you mean by that?
09:30:01 A. So hiring and actually -- actually, so I hire the
09:30:05 chief of staff and then they hire and fire people,
09:30:12 but . . .
09:30:13 Q. That's for you personally or for the whole Senate?
09:30:17 A. For the whole Senate.
09:30:18 Q. And what about the staff of individual senators?
09:30:23 A. Ultimately, they are -- ultimately, all the staff
09:30:29 there is -- what's the word I'm looking for? I mean,
09:30:37 ultimately -- yeah, it's the Senate president who
09:30:40 ultimately determines employment at the Senate.
09:30:44 Q. Okay. And how did you become president of the
09:30:48 Senate?
09:30:49 A. I was elected by my peers.
09:30:51 Q. Was it a contested election?
09:30:53 A. It was.
09:30:54 Q. Who ran against you?
09:30:56 A. So it was -- so there's a kind of informal vote

09:31:04 that takes place between the caucuses -- both caucuses.
09:31:10 You'll have the Republican caucus that will meet, and
09:31:13 they'll have an election for their leadership. It's not
09:31:18 binding technically. And the Democrats will also do the
09:31:23 same thing.
09:31:25 That will determine -- or at least this is
09:31:28 tradition. You don't have to follow this, but this is
09:31:32 traditionally how it goes.
09:31:34 The names that come out of those meetings are
09:31:37 presented on opening day. And so a lot of times, it will
09:31:44 simply be the only name that will be put forward is the --
09:31:50 the Republican -- you know, whoever is in the majority,
09:31:53 that will typically just be the one that's voted on. But
09:31:57 it could be -- they could -- anyone can make a motion or
09:32:01 nominate somebody to be become the president.
09:32:05 Q. So you said it was a contested. Was it contested
09:32:08 within your caucus?
09:32:10 A. Was it a contested race?
09:32:12 Q. Yes.
09:32:13 A. When you say "contested race," what I understood
09:32:15 that to mean, did somebody run against me?
09:32:17 Q. Yes.
09:32:18 A. Yes. There were actually three candidates in the
09:32:24 race.
09:32:26 Q. Who --

09:32:27 A. So there was Senator Mesnard, Senator Gowan, and
09:32:33 myself.
09:32:35 Q. And do you hold any other positions in the Senate?
09:32:39 A. Besides the Senate president? I sit as the
09:32:43 chairman on the rules committee.
09:32:47 Q. Anything else?
09:32:49 A. I don't think I've given myself any other titles.
09:32:56 No. Just the -- just chairman of rules, I believe, is all
09:33:00 I've assigned myself to.
09:33:01 Q. And earlier -- and let me know if I got this
09:33:05 wrong -- when you said that you were responsible for the
09:33:08 regular order, could you explain that a little bit more?
09:33:12 A. Sure. So I -- when I'm conducting an -- and this
09:33:22 goes for anybody who's chairing at any time. It's our job
09:33:27 to maintain order and decorum as we're basically -- to
09:33:32 conduct or lead a meeting. So that's delegated.
09:33:35 It's not always me. If I'm in the chair,
09:33:38 it's me. If it's -- if there's a committee hearing, then
09:33:43 it's whoever is the -- the chair of that committee,
09:33:47 so . . .
09:33:47 Q. And just to clarify, if it's a committee meeting
09:33:51 and you're a part of it but you're not the chair, would you
09:33:54 still be responsible for the order?
09:33:58 A. What I would say is I -- I do appoint the
09:34:05 chairman. I appoint the committee members. So it's --

09:34:11 it's delegated to the chairman to -- to maintain order and
09:34:16 to run that committee.
09:34:20 Q. And these positions that we've discussed, those
09:34:24 are for the 56th legislature; correct?
09:34:27 A. Correct.
09:34:28 Q. And did you hold any positions in the second 55th
09:34:31 legislature?
09:34:32 A. I did.
09:34:33 Q. What were those?
09:34:36 A. Let's see. I was the judiciary chairman. I sat
09:34:55 on ethics and -- and what other committee was I on? I
09:35:00 believe I was on either government or elections. Might be
09:35:06 confusing that with a different year. I've been down there
09:35:10 12 years so, yeah. So judiciary chairman, ethics, and I
09:35:21 believe it was government.
09:35:22 Q. And what were your responsibilities as a judiciary
09:35:30 chair?
09:35:30 A. I hear or not hear. I decide what bills are heard
09:35:33 or not heard in the committee. And so we will either make
09:35:41 a recommendation for them to pass out of the committee or
09:35:45 not to pass out of the committee.
09:35:48 Q. Okay. And what about for ethics? And -- well,
09:35:54 let's go with that first.
09:35:55 A. So for the ethics committee, that primarily
09:35:59 consists of -- if there's -- usually it could -- again,

things are kind of flexible at the legislature. But it will usually be if there's some kind of a complaint lodged against another member, then the ethics committee will take up the responsibility to either look into that or not look into it. If they do look into it, they can make a recommendation or not make a recommendation.

Q. And what about the government and elections committee?

A. So government committee usually hears bills that have to do with Title 9 or Title 11. Title 9 would be cities. Title 11 are counties.

And then it may -- it's -- it's a broad -- it's also a broad committee. So it can cover other things. But that's primarily, at least currently, how -- how it functions, what it would, you know -- what you -- what you would hear in that committee.

Q. And you are also the rules chair; correct?

A. Now I'm the -- I'm currently the rules chairman, yes.

Q. You weren't --

A. I was not on rules at that time.

Q. Okay. And what is -- what is the rules chair?

A. So -- well, the rules committee is tasked to see if bills are constitutional and proper in form.

Q. Okay. And so your responsibilities as the chair

is to do what?
A. My responsibility is to -- as I think always, the number one responsibility of the chair is order, decorum, to, you know, I guess carry out the meeting, carry out the business. The -- the purpose of that committee, as I mentioned, is to make sure bills are constitutional and proper. So we would hear bills and -- or not.
The rules chairman does not have to put anything into rules if he does not want to. The bills that -- that the chairman wants to hear in rules, the committee will look at those and decide if they -- if those -- they believe those are constitutional and proper.
Q. So am I understanding your testimony correct that you don't have to look at all the bills in the rules committee; you can --
A. The chairman --
Q. -- choose --
A. Well, the chairman does not have to hear all the bills. The chairman will look at -- the chairman will review all the bills, but the chairman does not have to hear all the bills.
Q. What is the difference between hearing a bill and reviewing a bill?
A. Well, a review -- this is just my personal opinion -- but review is something not -- I mean, it could

09:39:04 happen in committee too, but it's something that a chairman
09:39:07 would do to see if they want to have the bill heard or not
09:39:11 in the committee. Hearing -- "heard" means that it's --
09:39:15 it's brought into the committee and actually heard.
09:39:19 Q. By the members of the committee?
09:39:21 A. Uh-huh.
09:39:22 Q. And so if it's not heard, is there any analysis
09:39:25 done whether a particular bill is constitutional or not?
09:39:29 A. There may be. There may not be. The chairman may
09:39:34 do some analysis on his own and members could also do
09:39:39 analysis on their own but nothing formal by the committee.
09:39:43 Q. And -- and does review include just the members
09:39:49 and the chairman, or does it include staff of some sort of
09:39:54 the rules committee?
09:39:55 A. It's however the chairman wants to do it. It's at
09:39:59 the discretion of the chairman.
09:39:59 Q. Okay. Do you know how it was -- how is it done
09:40:04 currently when you're the chair?
09:40:06 MR. O'MALLEY: Objection. Overly broad.
09:40:08 Go ahead.
09:40:08 THE WITNESS: Yeah, I was -- I was just going
09:40:09 to ask you to be specific.
09:40:11 It's up to the chair. So it -- chairman's do
09:40:14 it differently. Some chairman's will have vice chairs in
09:40:17 the room; some chairman's will bring other members of the

committee into the room.

One year I actually went -- I had a chairman that asked me to go into his committee that I didn't even sit on. He wanted me to help him review his bills. So it's really up to the chair.

The chair decides what level of staff he wants there, if any. He doesn't have to have staff there. So it's up to the chairman.

BY MS. SHAH:

Q. So I was asking: Since you are now the chair, how are you conducting this? Are you doing it yourself? Are you -- do you have staff on the rules committee that does it? Do you have members do it? How are you doing this?

MR. O'MALLEY: Objection. Irrelevant.

MS. SHAH: You can answer.

MR. O'MALLEY: You can answer.

THE WITNESS: So your -- you specifically want to know about the rules committee?

MS. SHAH: Uh-huh.

THE WITNESS: How do I review bills on the rules committee?

BY MS. SHAH:

Q. Uh-huh. As the chair.

A. As the chairman.

So as the chairman, I will have our staff

09:41:22 attorney there, will also have the rules attorney there.
09:41:26 And we'll -- we will review the list of bills -- excuse me.
09:41:31 We'll review the list of bills that are available to go to
09:41:36 rules -- or at least the list of bills that I want to
09:41:39 review, that the chairman decides to review. And then we
09:41:44 will look at those and see if -- we'll kind of just kind of
09:41:50 go through them, review them, and see which bills that --
09:41:56 that I decide to calendar at that point.
09:41:59 Q. And once you do that, once you decide to calendar
09:42:05 a bill -- well, actually, let me step back.
09:42:09 What is the basis for making that decision of
09:42:12 whether to calendar a bill or not?
09:42:13 A. Me --
09:42:13 MR. O'MALLEY: Objection. Relevance.
09:42:14 THE WITNESS: Yeah, me personally?
09:42:14 BY MS. SHAH:
09:42:16 Q. What factors do you consider with your staff
09:42:19 attorney and the rules attorney just -- that you just
09:42:20 mentioned?
09:42:20 MR. O'MALLEY: Objection. Relevance.
09:42:21 THE WITNESS: Yeah, I mean, I can't -- so
09:42:22 me -- I can tell you me personally.
09:42:25 What do I personally do, or you're talking
09:42:29 chairman in general?
09:42:29 BY MS. SHAH:

09:42:31 Q. You as the chair.
09:42:31 A. When I'm the chairman --
09:42:31 Q. Uh-huh.
09:42:32 A. -- what do I do?
09:42:33 MR. O'MALLEY: Same objection.
09:42:34 THE WITNESS: Yeah, I mean, it could be -- it
09:42:37 could be a million different things. It's hard to say.
09:42:42 Because it could be this bill needs to move quicker so
09:42:47 we've got to calendar this bill. There's a deadline.
09:42:51 It could be this is -- this is a important
09:42:57 policy that -- you know, that I personally want to -- to
09:43:04 move forward. It could be I feel like this is clearly
09:43:10 unconstitutional, so I'm not going to move it forward. It
09:43:14 could be -- so, I mean, it just -- it depends. It could be
09:43:17 a number of things.
09:43:18 BY MS. SHAH:
09:43:18 Q. So it's subjective?
09:43:20 A. It's very subjective. It's completely up to the
09:43:22 chairman what they calendar, don't calendar. They don't
09:43:26 have to calendar anything if they don't want to calendar
09:43:29 anything.
09:43:30 Q. Okay. And then so am I correct in understanding
09:43:34 that the rules committee's purpose is to ensure that bills
09:43:37 are proper in form and constitutional?
09:43:40 A. That's correct.

09:43:40 Q. So what does constitutional -- constitutionality
09:43:45 review really entail then?
09:43:48 A. Well, it's first the member -- the
09:43:53 constitutionality review is the members of that committee
09:44:00 looking at the bill. It's their -- it's a lot of things.
09:44:06 Some of that includes their personal opinions.
09:44:10 It also includes feedback that they get
09:44:16 from -- you know, that they get -- what they hear in the
09:44:21 committee, the information they hear in the committee. But
09:44:23 it also includes things they hear maybe before committee or
09:44:27 outside of committee, people giving them their advice or
09:44:30 their opinions on the constitution.
09:44:33 So it's really just each member collecting
09:44:36 information and then making a decision whether they think a
09:44:40 bill is constitutional and proper.
09:44:41 Q. And so when you say that committee, that would be
09:44:45 the committee where the bill originated?
09:44:49 A. No. I'm talking about -- I'm talking about the
09:44:52 rules committee right now.
09:44:55 Are you talking about other committees?
09:44:56 Q. I was trying to understand what your testimony
09:44:58 was.
09:44:59 A. What's the -- okay. I guess, what's the question?
09:45:06 We can go back to the question.
09:45:08 MS. SHAH: Could you just repeat back his

last answer?

(The record was read by the reporter as follows:

ANSWER: Well, it's first the member -- the constitutionality review is the members of that committee looking at the bill. It's their -- it's a lot of things.)

BY MS. SHAH:

Q. So I was -- that committee, that's what I'm talking about, when you say "members of that committee."

A. Oh, members of that committee.

Okay. So I'm speaking about the rules committee.

Q. You are speaking --

A. Yeah.

Q. So the rules committee will --

A. Yeah, because another committee will have a different objective. So if it's, for example, government, their objective is -- well, it's really just policy driven at that point. Do they agree or disagree with the policy?

Q. So the constitutionality review only happens in the rules committee; is that correct?

A. That is a -- I wouldn't say "only." But I would say that is -- it -- it definitely happens there. That's the purpose of that committee. There is constitutionality

reviews in other ways.

You could -- like I said, members will gather information. You may hear it -- and this is common and won't surprise any of you as attorneys. But in other committees, you can also -- of course, objections or support for a bill may be due to its constitutionality and what people think, whether it's constitutional or not, and the arguments for constitutionality or against constitutionality.

Q. And so in the rules committee, the constitutionality reviews can be done based on a member's personal opinion. Doesn't have to be done by a lawyer; correct?

A. The -- the -- to be on the rules committee, you do not have to be an attorney.

Q. So --

A. I mean, the legislature is a citizen, you know, elected body, and you have people from all walks of life there. There's actually not enough attorneys at the legislature to staff the rules committee with attorneys, so . . .

Q. And so that determination does not have to be made by an attorney; it can be made by a member who is not an attorney?

MR. O'MALLEY: Object to the form. Overbroad

09:47:39 and vague.
09:47:40 THE WITNESS: The rules committee votes on
09:47:44 whether they feel a bill is constitutional and proper.
09:47:49 That is the way the structure has been, you know, for a
09:47:57 long time.
09:47:58 BY MS. SHAH:
09:47:58 Q. So -- and members include nonattorneys?
09:48:01 A. Yeah. Members include non attorneys.
09:48:03 Q. And so based on that vote, nonattorneys can decide
09:48:06 on the constitutionality of a bill --
09:48:06 MR. O'MALLEY: Object --
09:48:06 BY MS. SHAH:
09:48:08 Q. -- on the rules committee?
09:48:09 MR. O'MALLEY: Object to the form. Misstates
09:48:10 his testimony.
09:48:12 THE WITNESS: Yeah. You -- the members --
09:48:17 yeah, the members of the committee -- you do not have to be
09:48:21 an attorney to be a member of the rules committee.
09:48:24 BY MS. SHAH:
09:48:25 Q. And the rules committee, though, has a lawyer;
09:48:29 correct?
09:48:29 A. There is a rules attorney who makes
09:48:32 recommendations as to whether he feels a bill is
09:48:37 constitutional or not.
09:48:39 Q. And does that lawyer do so for all the bills?

09:48:43 A. He does.
09:48:43 Q. And is that -- and was that the case in the 55th
09:48:54 legislature as well, the second 55th legislature?
09:48:57 MR. O'MALLEY: Objection. Lack of
09:48:58 foundation.
09:48:59 THE WITNESS: As I recall, there -- yes. As
09:49:08 long as I've been at the legislature, there's been a rules
09:49:10 attorney who provides a recommendation to the committee.
09:49:14 BY MS. SHAH:
09:49:17 Q. And does the rules committee opine on the
09:49:22 constitutionality -- when we're talking about bills, does
09:49:24 that include amendments as well?
09:49:30 A. They do opine on amendments if they're in the
09:49:34 committee. They can also opine to it. They can -- at --
09:49:43 at a request, they can if they're not in the committee.
09:49:48 Q. Who -- who's "they"?
09:49:51 A. If a member of the legislature requests an opinion
09:49:54 from the rules attorney, he can give it to them at any
09:49:57 time.
09:49:57 Q. Okay. So when were you first elected to the
09:50:02 Arizona legislature?
09:50:03 A. In 2012.
09:50:05 Q. And that was in the House; correct?
09:50:08 A. That was in the House, yes.
09:50:10 Q. And then when was the first time that you were

09:50:13 elected to the Senate?
09:50:16 A. It was four years after that.
09:50:20 Q. 2016?
09:50:21 A. Yes.
09:50:22 Q. Okay. And have you been in the legislature
09:50:26 continuously in some capacity since 2012?
09:50:29 A. Yes.
09:50:30 Q. And so you were in the Senate during the first
09:50:38 55th legislative session; correct?
09:50:40 A. Yes.
09:50:45 Q. And so am I correct that you've had elections in
09:50:49 2012, 2014, 2016, 2018, 2020, and 2022?
09:50:56 A. Yes. Don't be jealous.
09:50:59 Q. Not at all. I would never want to run.
09:51:01 A. It's -- it's a lot. It's -- it's a lot of
09:51:05 elections.
09:51:07 I had a -- yeah. Envy the four-year terms.
09:51:13 It's -- anyways, yeah. You run a lot.
09:51:16 Q. And -- so sorry. This is -- this is correct.
09:51:20 Like, so for both House and Senate, you run
09:51:23 every two years?
09:51:24 A. Correct. It's not like the federal level.
09:51:26 Q. And you are confident in the results of the
09:51:29 elections that brought you into office; correct?
09:51:31 MR. O'MALLEY: Objection. Overly broad.

09:51:33 Vague.
09:51:34 MR. LANGHOFER: Relevance.
09:51:35 THE WITNESS: Can you be more specific?
09:51:35 BY MS. SHAH:
09:51:36 Q. You have no reason to doubt that you didn't win
09:51:38 your elections, do you?
09:51:40 MR. O'MALLEY: Same objections.
09:51:41 THE WITNESS: I don't have a reason to
09:51:43 believe I did not win my elections, no.
09:51:46 BY MS. SHAH:
09:51:46 Q. So you're confident in the results of the
09:51:48 elections that you were in; correct?
09:51:50 MR. O'MALLEY: Objection. Overly broad.
09:51:51 Vague. Relevance.
09:51:52 THE WITNESS: I won all of my elections.
09:51:55 BY MS. SHAH:
09:51:55 Q. And so you're confident in the outcomes of those
09:51:57 elections; yes?
09:51:58 MR. LANGHOFER: Asked and answered.
09:51:59 MR. O'MALLEY: Asked and answered. Same
09:52:00 objections.
09:52:02 THE WITNESS: I won all of my elections.
09:52:05 MS. SHAH: We can say that that's not
09:52:07 responsive.
09:52:07 BY MS. SHAH:

09:52:09 Q. Do you believe that you were elected by noncitizens?
09:52:13 A. Do I believe I was elected by noncitizens? I don't believe I was elected by noncitizens, no.
09:52:26 Q. Can you think of any Arizona elections right now that you weren't fully confident in?
09:52:34 MR. O'MALLEY: Objection. Overly broad. Vague. Relevancy.
09:52:44 THE WITNESS: I have -- I thought the attorney general's race was extremely close: 257 votes. From what I understand, there were some votes that didn't get to get -- that weren't able to be counted. So I thought that race was extremely close.
09:53:11 BY MS. SHAH:
09:53:11 Q. Okay. And am I correct that with the exception of the 2022 elections, all of the elections that you were in were prior to the enactment of the challenged laws in these cases?
09:53:29 A. They were.
09:53:33 Q. And you -- you understand the right that those laws were not being implemented in the 2022 election; correct?
09:53:45 A. If -- I know that if any law is not a law yet, it's not being implemented.
09:53:52 Q. Well -- okay.

09:53:53 Do we agree that HB 2492 and HB 2243 passed in the second 55th legislative session, which ended in --
09:53:59 A. Yes.
09:54:04 Q. -- summer of 2022?
09:54:04 A. Yes.
09:54:05 Q. So do you agree now that these laws were not being implemented in November 2022, which was your last election?
09:54:13 A. Yes.
09:54:13 Q. Okay. And you -- am I correct that you testified earlier that you are confident that you won your elections?
09:54:20 MR. O'MALLEY: Objection. Asked and answered.
09:54:21 MR. LANGHOFER: Asked and answered. It's badgering.
09:54:23 THE WITNESS: As I mentioned, I have won every election since 2012.
09:54:28 BY MS. SHAH:
09:54:30 Q. And so in your mind, these provisions were not necessary to have -- allow you to have confidence in the results of your elections; correct?
09:54:39 MR. O'MALLEY: Objection. Objection. That's vague. It's ambiguous. And it's hypothetical.
09:54:43 THE WITNESS: Yeah, I'm just going to say I am always working to increase voter confidence in elections. Right now, we have a record number of people

09:54:55 who are concerned about election integrity. So it's always
09:54:58 a good idea to work on election integrity.
09:55:01 BY MS. SHAH:
09:55:01 Q. What did you do before you were elected to the
09:55:04 legislature?
09:55:05 A. I work in real estate. So I still do.
09:55:10 Q. And so this is not your full-time job?
09:55:12 A. No.
09:55:13 Q. And other than real estate, do you have any other
09:55:19 jobs?
09:55:20 A. No. I -- I work two jobs under the real estate
09:55:31 hat. So I'm a real estate broker, but I also work for a
09:55:40 new home builder for a construction company.
09:55:45 Q. So what percentage of your time is spent on
09:55:47 matters related to the legislature?
09:55:50 A. It depends. As president, it's much more than
09:55:57 when I was not president. So it can be -- can be 40 hours
09:56:01 a week. When you're in session, it can be -- even when
09:56:08 you're not the president, it could be 40 hours a week.
09:56:12 When you're out of session, it will typically
09:56:15 be -- it will be less time. It could be as little as, you
09:56:19 know, 10 hours a week. So anywhere from 10 to 40 hours a
09:56:23 week is kind of a -- a range, just depending on, you know,
09:56:27 where you're at via session and position.
09:56:32 Q. Am I correct that this current session has been --

09:56:36 the legislature has been out of session since July of this
09:56:39 year? Is that correct?
09:56:40 A. That's correct.
09:56:40 Q. I'm going to show you what's been marked as Toma
09:56:51 402. It's Tab 1.
09:57:15 And you agree that you intervened in about
09:57:22 April 2023 in this case?
09:57:26 A. Yes, I do.
09:57:35 Q. And so you would agree that that's a little over
09:57:38 eight months since the second 55th legislature ended in
09:57:42 June 2022; right?
09:57:43 A. Uh-huh.
09:57:44 Q. Okay. And --
09:57:45 A. Yes.
09:57:45 Q. -- would it be accurate to say that you intervened
09:57:51 in this case on behalf of the Arizona Senate to represent a
09:57:55 unique perspective that is important to a full
09:57:57 understanding of the State's interests in this case?
09:58:00 A. Yes. We -- I intervened as -- in my official
09:58:04 capacity as the Senate president.
09:58:06 Q. And would you agree it was to provide a unique
09:58:08 perspective that is important to a full understanding of
09:58:11 the State's interests in this case?
09:58:12 A. Yes. It's -- I would agree that it's to make sure
09:58:16 that the laws we pass are defended and upheld.

09:58:22 Q. So do you see -- if you go on page 8 --
09:58:22 A. Uh-huh.
09:58:26 Q. -- line 16, it says -- I'm going to just say
09:58:32 ". . . the Arizona House of Representatives have authorized
09:58:35 the Speaker and President to bring claims on behalf of
09:58:40 their respective bodies . . ."
09:58:41 And then if you go to page 10, the very
09:58:46 bottom, starting at the end of line 26, it says, "The
09:58:49 Speaker and President, on behalf of their chambers,
09:58:53 represent a unique perspective that is important to a full
09:58:55 understanding of the State's interests."
09:58:57 Do you agree with that sentence, the Speaker
09:58:59 and the House -- president of -- on behalf of their
09:59:02 chambers represent a unique perspective that is important?
09:59:06 A. What line is that and what page?
09:59:10 Q. So page 26, at the end of line 26 going on to the
09:59:14 top of page 11.
09:59:15 A. Okay. Yeah. That's -- what I would say -- I
09:59:30 characterize it as that the legislature, the Senate, it's
09:59:38 not my unique perspective. It's the Senate's unique
09:59:43 perspective and the House's unique perspective. So it's
09:59:47 worded a little weird, but -- so to me, it's the Senate and
09:59:53 the House's perspective.
09:59:54 Q. And what does that mean, "unique perspective"?
09:59:58 A. What it means is that -- to me, personally -- I

10:00:05 can't speak for the rest of the legislature. But to me,
10:00:10 personally, what it means is that the -- the bodies, you
10:00:18 know, authored, listened to, heard, processed these bills,
10:00:26 and so they have a unique perspective because the bodies,
10:00:32 you know, heard and passed these bills.
10:00:35 Q. And you're aware that the Republican National
10:00:42 Committee, the RNC, intervened in May 2022 in this case?
10:00:46 A. I wasn't aware of the exact time.
10:00:50 Q. But you're aware that they did intervene?
10:00:52 A. I'm aware that they've intervened.
10:00:54 Q. And you're aware that they inter- -- you were
10:00:56 aware that they had intervened when you intervened;
10:00:59 correct?
10:00:59 A. I didn't know it was at the same time.
10:01:00 Q. Okay.
10:01:00 A. I wasn't sure of that.
10:01:02 Q. Would it have made a difference in your decision
10:01:15 to intervene had you known that the RNC had intervened
10:01:18 prior to that?
10:01:19 MR. LANGHOFER: Objection.
10:01:19 MR. O'MALLEY: Objection. Calls for a
10:01:21 hypothetical.
10:01:22 MR. LANGHOFER: Speculation.
10:01:23 THE WITNESS: Yeah, again, I can only speak
10:01:26 from my personal perspective. To me, it's important that

10:01:32 the laws that we pass are upheld and that they're
10:01:39 implemented. So if they're not going to be defended, then
10:01:44 the Senate -- I think it's appropriate for the Senate and
10:01:46 the House to defend those laws.
10:01:49 BY MS. SHAH:
10:01:51 Q. And did you think that the RNC wouldn't defend
10:01:53 these laws properly?
10:01:55 A. I -- I don't speak for the RNC. I have no idea
10:01:58 what the RNC is going to do.
10:02:00 Q. But I'm asking if you think that they wouldn't
10:02:02 have.
10:02:02 A. I --
10:02:02 MR. O'MALLEY: Objection. Calls for
10:02:04 speculation.
10:02:04 THE WITNESS: I -- I hadn't thought about it.
10:02:07 Not something I thought about.
10:02:08 BY MS. SHAH:
10:02:10 Q. Okay. So let's go to Tab 2, which is -- I'm going
10:02:18 to mark that as legislature -- "Senate Rules of the
10:02:21 Fifty-Sixth Legislature."
10:02:21 (The document was marked as Exhibit 427
10:02:21 for identification.)
10:02:21 BY MS. SHAH:
10:02:53 Q. So I think this has been marked as 427.
10:02:55 Do you recognize this document, which is

10:02:57 titled "Senate Rules 56th Legislature, State of Arizona,
10:03:02 2023-2024"?
10:03:04 MR. O'MALLEY: I'm sorry. Go ahead. I
10:03:05 thought you were done.
10:03:07 MS. SHAH: That's it.
10:03:07 BY MS. SHAH:
10:03:08 Q. Do you recognize this document?
10:03:09 MR. O'MALLEY: Object. Irrelevant.
10:03:12 Go ahead.
10:03:14 THE WITNESS: Well, this looks similar to our
10:03:19 rules -- the language looks similar to our rules booklets
10:03:24 that we have at the Senate.
10:03:24 MS. SHAH: Okay.
10:03:26 THE WITNESS: I don't recognize this
10:03:27 partic- -- I've never seen this particular document before,
10:03:30 but --
10:03:30 MS. SHAH: Okay.
10:03:31 THE WITNESS: -- the contents, they seem to
10:03:33 be the same as what we have in our Senate rules booklets.
10:03:35 BY MS. SHAH:
10:03:35 Q. But -- but the -- the 56th legislature that you
10:03:39 were the president of, did -- you agree that they
10:03:42 established rules; correct?
10:03:44 A. We -- yes, every legislature we vote on rules.
10:03:48 Q. And what role did you play in adopting the rules

10:03:54 for the 56th legislature?
10:03:56 MR. LANGHOFER: Relevance.
10:03:59 THE WITNESS: What role did I play?
10:04:01 MS. SHAH: Uh-huh.
10:04:04 THE WITNESS: Can you be more specific?
10:04:05 BY MS. SHAH:
10:04:05 Q. Did you have any role in --
10:04:08 A. I would say my role was that of all the members.
10:04:13 We all voted on the rules, whether to approve them or not
10:04:17 approve them.
10:04:18 Q. Did you propose them, the rules?
10:04:20 MR. O'MALLEY: Objection. Irrelevant.
10:04:23 THE WITNESS: Honestly, I don't know that I
10:04:27 did -- I don't remember if I did or if it -- it might have
10:04:31 been -- it was probably the majority leader, but I don't
10:04:33 remember who made the motion to adopt the rules.
10:04:37 BY MS. SHAH:
10:04:37 Q. Okay. Do you know who drafted the rules?
10:04:42 MR. O'MALLEY: Objection. Relevance.
10:04:43 THE WITNESS: A member of staff drafted the
10:04:49 rules.
10:04:50 BY MS. SHAH:
10:04:50 Q. Do you know whose staff?
10:04:52 A. I don't -- I don't recall which member of staff
10:04:54 drafted the rules.

10:04:56 Q. Do you know if there were rules for the 55th legislature?
10:05:00 A. As from what I understand, we had rules for every legislature.
10:05:07 Q. If I said that there weren't rules for the 55th, would you agree that that's a possibility, that there wasn't Senate rules for the 55th legislature?
10:05:16 A. I would not agree with that.
10:05:18 Q. Okay. Do you know where I could find the rules for the 55th legislature?
10:05:22 A. I do.
10:05:23 Q. Where?
10:05:24 A. At the legislature.
10:05:26 Q. Would they be on your website?
10:05:29 A. I don't know.
10:05:31 Q. So there would be just be a physical copy at the legislature?
10:05:35 A. Yeah.
10:05:35 Q. Okay.
10:05:36 A. There's a booklet. Actually, the secretary -- you could get them from the Senate secretary.
10:05:42 Q. Okay. Is it your understanding that members of the Senate are expected to comply with the rules of the Senate?
10:05:50 A. Do we expect them to comply?

10:05:56 I think the rules -- the rules are important, and the rules give us an important guideline and process. They kind of -- they kind of help us -- they help us be effective. But the rules are -- the rules are whatever the body determines.

10:06:21 And so while we have rules, we actually suspend the rules quite a bit, or we'll have a temporary rule or -- it's really whatever the majority decides.

10:06:34 Q. But they're codified in these rules; correct?

10:06:37 A. I -- I don't -- I don't know if I'd use the word "codified." We vote on rules. We approve rules. And then for us to change the rules, it takes 31 members to change rules. And that happens during the session. It's not unusual. You'll have the rules suspended several times.

10:07:01 But the body -- the 31 members -- not 31 -- I'm sorry. I'm thinking of the House -- 16 members. 16 members in the Senate would have to agree with that. 31 in the House would have to agree with that, so --

10:07:13 Q. And is 16 a simple majority?

10:07:16 A. It is.

10:07:17 Q. Okay. But -- so once these rules have been voted on, members are expected to comply with them as they currently stand?

10:07:26 MR. O'MALLEY: Objection. Asked and answered.

10:07:27 THE WITNESS: Yeah, I would say -- I would
10:07:31 say the same thing again that I've said before.
10:07:34 BY MS. SHAH:
10:07:34 Q. Okay. And then going back to that exhibit that I
10:07:36 just sent you for 27. Rule 2N, could you read that for me,
10:07:43 please.
10:07:43 MR. O'MALLEY: Objection.
10:07:44 MS. SHAH: You don't have to read it out
10:07:47 loud.
10:07:47 MR. O'MALLEY: Irrelevant.
10:07:48 THE WITNESS: Rule 2N?
10:07:56 MS. SHAH: Yes.
10:07:56 THE WITNESS: Okay.
10:07:57 BY MS. SHAH:
10:08:10 Q. Have you read it?
10:08:11 A. Yeah.
10:08:11 Q. Do you agree that this is a new rule for the
10:08:16 Senate that doesn't exist in the 55th legislature?
10:08:20 A. As I recall, this was a newly-adopted rule, yes.
10:08:24 Q. Okay. And so when you filed the motion to
10:08:34 intervene, that was on behalf of the legislature -- or the
10:08:37 Senate; correct?
10:08:39 A. That's correct.
10:08:40 Q. Okay. And you agree that even though there are
10:08:54 new rules, that are some things that are common from each

10:08:57 legislative session from one to the other; correct?
10:08:59 A. Yeah. There's traditions that carry forward. And
10:09:04 then there's -- it seems -- my personal experience has been
10:09:10 that rules have -- there's always -- seems like there's
10:09:16 always a few rules that change every session -- with every
10:09:19 session. It's usually, you know, just to try to maintain
10:09:27 good working order.
10:09:30 There's something that people -- that that
10:09:32 personality of that body, something that they like to see.
10:09:37 But for the most part, the -- the corpus of the rules is
10:09:42 untouched.
10:09:44 Q. And you would agree with me, though, that --
10:09:48 right? -- the rules for the second 55th legislature kind of
10:09:53 allow for uniformity of the process of passing bills?
10:09:57 A. Yes. They give you something to -- you know, to
10:10:02 look at as your baseline of how you're going to carry out
10:10:06 your business.
10:10:06 Q. And for that same session, you would agree that
10:10:09 the rules kind of set out time for people to consider the
10:10:13 bills?
10:10:14 MR. LANGHOFER: Which session?
10:10:15 MS. SHAH: The 55th -- second 55th, same
10:10:18 session.
10:10:19 THE WITNESS: Can you be more specific? Can
10:10:23 you tell me what exactly you're talking about?

10:10:25 BY MS. SHAH:
10:10:26 Q. I'm just saying, like, you would agree that the rules of the 55th legislature, the second -- I'm just going to talk about the second 55th when I mention the 55th because it's a mouthful.
10:10:35 Do you agree that there should be time to -- the rules provided for time to consider the bills, generally speaking?
10:10:41 MR. O'MALLEY: Objection. Overly broad.
10:10:43 THE WITNESS: I -- yeah, I don't understand what you're asking me.
10:10:44 BY MS. SHAH:
10:10:45 Q. Okay. Would there be hearings, time to allow for hearings on bills under the rules?
10:10:49 MR. LANGHOFER: Foundation.
10:10:50 THE WITNESS: Yeah, I still don't -- I still don't get where you're going with this. I don't understand.
10:10:58 Is there time to hear bills? There is time -- yeah, we have time to hear bills.
10:11:03 BY MS. SHAH:
10:11:04 Q. Okay. To review them? To analyze them? To understand them?
10:11:08 MR. LANGHOFER: Foundation.
10:11:10 THE WITNESS: Yeah. Each session -- I mean,

10:11:16 every session, bills are introduced. And then some bills
10:11:24 can go through the process in a matter of days. And some
10:11:28 bills can go through the process. They can take the whole
10:11:32 session. Some bills have been -- have come back and
10:11:36 they've been heard for years.
10:11:39 BY MS. SHAH:
10:11:39 Q. Okay.
10:11:39 A. So it just -- there's a whole variety of time.
10:11:44 Q. And you agree that the rules provide for the
10:11:48 constitutionality review under the rules committee; right?
10:11:51 MR. LANGHOFER: Foundation.
10:11:55 THE WITNESS: Can you show me where you're --
10:11:57 what you're talking about, like, in the rules?
10:11:59 BY MS. SHAH:
10:12:00 Q. Well, I would assume it's going to be the same,
10:12:02 but I -- to be honest, since we don't have the 55th, that's
10:12:07 why I was asking you, to be honest with you, that the 55th
10:12:09 rules are just not available anywhere that I can find. But
10:12:13 we'll -- I'll take your word for it that there were.
10:12:17 But the rules of the Senate provide the --
10:12:19 that there's a rules committee that reviews the
10:12:21 constitutionality of bills; correct?
10:12:23 MR. O'MALLEY: I think he asked you to direct
10:12:25 him to what it is you're asking about.
10:12:27 THE WITNESS: Yeah, I just want to make sure

10:12:28 I know what you're talking about. Can you show me in the rules what you're talking about, please?
10:12:31 BY MS. SHAH:
10:12:33 Q. Sure. Again, this is for the 56th but -- I think --
10:12:36 A. Right. It's fine. Yeah, they're very -- as I mentioned, 90 percent of the rules are --
10:12:41 Q. Sure. So I believe it's Rule 7. Rule 7 of the rules committee, I believe.
10:12:50 A. Yeah, so Rule 7 names off all of the standing committees.
10:12:54 Q. Sure.
10:12:55 A. So these are your -- these are your meeting -- these are your committees that are going to meet regularly.
10:13:01 Q. Okay.
10:13:21 A. So if we're looking at 12C, "The Rules Committee of the Senate shall have the following powers and duties." So the committee on rules shall consider the bill and propose --
10:13:37 THE COURT REPORTER: If you could speak -- slow down. I need to understand you.
10:13:39 THE WITNESS: Oh, sorry.
10:13:39 So the committee on rules, this is C12 -- C5. That's weird. It's not 12C. It's C5.
10:13:47 BY MS. SHAH:

Q. Yes. Thank you. C5.
A. Hold on. Hold on.
Q. Yeah.
A. Yeah. A, B, C. Sorry.
So C5, "The Committee on Rules shall consider the bill and propose amendments thereto for constitutionality and proper form and reasonable germaneness of any amendments."
Oh, yeah, also germane.
Q. So that's correct that there is constitutionality review by the rules committee --
A. Yeah.
Q. -- and you agree that there was a similar or substantially similar rule for the 55th legislature?
MR. LANGHOFER: Foundation.
THE WITNESS: Yes. The -- I would say in the 55th, there -- as long as I have been there, there has always been a rules committee that considers whether a bill is constitutional or proper.
BY MS. SHAH:
Q. And it includes the amendments in there as well; correct?
A. Uh-huh.
Q. And then let's --
MR. O'MALLEY: Remember, a yes or a no.

THE WITNESS: Yes.
BY MS. SHAH:
Q. Thank you. I appreciate that.
Can you -- let's talk a little bit just about how the legislative process works under normal course for members.
It's your normal practice to do homework of a bill, kind of review it, understand it?
MR. O'MALLEY: Objection. Overly broad.
THE WITNESS: I was just going to say, are you speaking to me personally?
BY MS. SHAH:
Q. Yeah.
A. My personal opinion, what I do personally?
Q. Uh-huh.
A. Again, it just depends. There's thousands of bills. There's bills that don't have a prayer to make it through the process. There's bills that are high priority. There's your own personal bills that you draft. You know those very, very as well.
When other people draft a bill, you have members that -- you know, your review will usually be -- or mine personally, I will review before I vote on it, but I don't necessarily review bills that aren't -- until they're ready to be heard or, you know, going through the process.

10:15:58 Q. But you agree that if you -- you -- it's important to understand a bill before you vote on it; correct?
10:16:05 A. Is it important to understand a bill? I personally think it's important to understand a bill before you vote on it.
10:16:17 Q. So you wouldn't vote to pass a law that you haven't examined and looked at the pros and cons of; right?
10:16:23 MR. O'MALLEY: Objection. Overly broad. Vague. Hypothetical.
10:16:27 THE WITNESS: Again, personally, I -- yes, I review all bills -- the bills I vote -- before I vote on a bill, I review it and -- to determine whether I'm going to vote yes or no, whether it's good policy or bad policy.
10:16:43 BY MS. SHAH:
10:16:43 Q. I appreciate that, you know, different members will have different conclusions or opinions. But you agree that it is the job of legislators to assess bills before they vote on them; correct?
10:16:57 MR. O'MALLEY: Objection. Overly broad. Vague.
10:16:59 THE WITNESS: Yeah, I was just going to say I don't -- that's -- they don't have a job description. Legislators have all different kinds of motives. They have different reasons why they run. They have different ways of how they do things. Some members will specifically just

10:17:20 rely on -- they may rely on simply feedback. I mean, it -- it just completely depends on the member.
10:17:28 BY MS. SHAH:
10:17:30 Q. And you mentioned that you would know about a bill that you drafted or sponsored really well; is that correct? I don't want to mischaracterize what you said earlier.
10:17:43 A. If I was -- if I author my own bill, yeah. Members who author, they write their own bill, they know them well.
10:17:50 I was giving an example of how well you know a bill to how little you know a bill. There's thousands of bills. And so it tends to be if they're your bills, you know them pretty well.
10:18:02 If you authored them -- there's a difference between your bill and authoring a bill. If you authored a bill, I mean you actually wrote it yourself. Nobody else, you know, wrote it.
10:18:12 Q. So -- and let's just drill down on that distinction.
10:18:15 So if you -- to your -- what you just said about authoring, you would then be known as the prime sponsor of that bill. Is that a fair understanding?
10:18:23 A. Yeah. If you -- you're the prime sponsor of the bill if you are the -- yeah, exactly, the author of the bill.

10:18:34 Q. Okay. And that's -- how is that different from
10:18:36 being, say, a cosponsor of the bill?
10:18:38 A. A cosponsor will not typically -- they can, but
10:18:42 again, like, the legislature is flexible. There's no set
10:18:46 rules on how you conduct yourself or want to move a bill
10:18:51 you're passionate about forward or dispassionate about.
10:18:54 But a cosponsor will not typically go to the
10:18:58 hearings, testify on the bill. They will not shepherd it
10:19:07 as much through the process or be -- or even be as familiar
10:19:09 with the process.
10:19:10 You may have cosponsors that don't -- that
10:19:13 aren't as, you know, involved with the bill because they're
10:19:16 working on lots of other bills.
10:19:21 Q. And what about amendments? If you author an
10:19:26 amendment, you agree that you would be really familiar with
10:19:31 that amendment and how it would interact with the bill that
10:19:33 you're amending?
10:19:35 A. It depends. If you -- if you personally authored
10:19:40 it, like it was your idea. If you just agreed to carry the
10:19:45 amendment, then you may not be as familiar with it.
10:19:48 Q. What is the difference between authoring and
10:19:51 carrying an amendment?
10:19:51 A. Authoring it means you -- you wrote it.
10:19:53 Q. Uh-huh.
10:19:54 A. You wrote it yourself.

Q. And what about carrying?

A. Carrying it means -- so, for example, there may be -- if you don't sit on a committee but you need an amendment done, you'll typically ask the chairman of that committee. You may ask another member, but you'll typically ask -- I mean, this is just current tradition.

A lot of times you'll ask the chairman to -- to carry that amendment for you even if it was -- it may have been authored by you. You've drafted -- you wrote it. But they -- they've offered the amendment, because you can't offer it because you're not in the committee. You're not a member of that committee, so you cannot offer an amendment if you're not a member of the committee. Only members of the committee can offer the amendment.

Q. And by "you," you mean like -- I know you were using "you" generally --

A. The legislator. That legislator.

Q. A particular legislator?

A. Yeah.

Q. Okay.

MR. O'MALLEY: Counsel, we've been going a while. When you get to a good breaking point, why don't we just take a five-minute recess.

MS. SHAH: Yeah. Just one or two more questions.

10:21:00 MR. O'MALLEY: That's fine.
10:21:13 MS. SHAH: Actually, why don't we take a break.
10:21:15 MR. O'MALLEY: Sounds good.
10:21:16 MS. SHAH: How long would you like to take?
10:21:18 MR. O'MALLEY: Just -- let's try to keep them as short as we can. Five minutes or so. You know, we've got --
10:21:23 MS. SHAH: Okay.
10:21:23 MR. O'MALLEY: -- likely a long day; right?
10:21:27 MS. SHAH: Come back at --
10:21:28 THE VIDEOGRAPHER: We are off the record. Time on the monitor is 10:21. This will end Media Number 1.
10:37:04 (A recess ensued.)
10:37:04 THE VIDEOGRAPHER: We are back on the record. Time on the monitor is 10:37. This will begin Media Number 2.
10:37:31 BY MS. SHAH:
10:37:35 Q. Senator Petersen, did you have to take an oath of office to become a member of the legislature?
10:37:40 A. As I recall, yes.
10:37:41 Q. And do you have to do it each time you're elected?
10:37:45 A. As I -- as I recall, yes.
10:37:47 Q. Do you recall what it said?

10:37:49 A. That I agree to uphold the Constitution and laws
10:37:56 of the state to the best my ability.
10:38:00 Q. Did you attest to your citizenship?
10:38:02 A. Did I what?
10:38:02 Q. Did you have to attest to your citizenship in that
10:38:05 oath?
10:38:09 MR. LANGHOFER: Foundation.
10:38:10 THE WITNESS: Yeah, I -- I mean, of course
10:38:14 not.
10:38:15 BY MS. SHAH:
10:38:17 Q. Okay. So let's look at Tab 3.
10:38:22 MS. SHAH: It needs to be marked as an
10:38:24 exhibit.
10:38:24 (The document was marked as Exhibit 428
10:38:24 for identification.)
10:38:24 BY MS. SHAH:
10:38:33 Q. While we're doing that, do you recall if you take
10:38:35 that oath in writing?
10:38:37 A. Actually, I believe you do. It's the secretary
10:38:42 of -- I think there's -- I think there's something in
10:38:45 writing.
10:39:04 MS. SHAH: Can you mark that as an exhibit?
10:39:06 Okay. 428?
10:39:08 THE COURT REPORTER: Yes.
10:39:09 MS. SHAH: Okay.

BY MS. SHAH:
Q. So is this the oath that has been marked as Exhibit 428? Sorry. Does that look like the oath that you have to take?
A. It does.
Q. Okay. So when you take this oath, you did not have to provide any proof of your citizenship?
A. No, you don't -- you don't have to when you're -- there is no requirement when you -- when you take the oath.
Q. It's just the --
THE VIDEOGRAPHER: Ma'am, I'm so sorry. I'm going to have to go off the record a minute. I'm getting feedback. And I think when I was down there, some interference came through. Can you give me a minute?
MS. SHAH: Sure.
THE VIDEOGRAPHER: Okay. We are off the record. Time on the monitor is 10:39.
(An off-the-record discussion ensued.)
THE VIDEOGRAPHER: We're back on the record. Time on the monitor is 10:42.
BY MS. SHAH:
Q. So you -- Senator Petersen, coming back to this oath, you agree that you have to uphold the laws and the Constitution of the state of Arizona; correct?
MR. O'MALLEY: Object to the form.

10:42:52 THE WITNESS: I agree that I took the oath to do that.

10:42:56 BY MS. SHAH:

10:42:57 Q. And you understand that the Arizona constitution requires you to be a citizen of the United States in order to be a member of the legislature?

10:43:06 MR. LANGHOFER: Legal opinion.

10:43:08 THE WITNESS: I'm sorry?

10:43:09 MR. O'MALLEY: There was an objection. Called for a legal opinion.

10:43:11 THE WITNESS: Oh, okay.

10:43:17 Yes.

10:43:18 BY MS. SHAH:

10:43:18 Q. And so -- and am I correct that this oath was good enough to take your word for it, that you are a citizen of the United States?

10:43:27 MR. O'MALLEY: Objection. Form.

10:43:30 THE WITNESS: I would not -- let me see if I understand your question.

10:43:35 Are you asking if I take this oath of office, that means I'm a citizen of the United States?

10:43:43 BY MS. SHAH:

10:43:44 Q. Well, if you -- you just agreed -- right? -- that this oath -- that you will uphold the Constitution of the state of Arizona as part of this oath; correct?

10:43:52 A. Yes.
10:43:54 Q. And you also agree that it's your understanding that you have to be a citizen of the United States in order to be a member of the legislature under the Arizona constitution; correct?
10:44:04 A. Correct.
10:44:04 Q. And you also just said that you didn't provide any documentary citizenship when you took this oath of office; correct?
10:44:13 A. Not that I recall.
10:44:14 Q. So then you agree that your oath was enough to attest that you are a citizen of the United States as required by the Constitution of Arizona?
10:44:23 MR. O'MALLEY: Objection.
10:44:23 THE WITNESS: Yeah, I -- I --
10:44:26 MR. O'MALLEY: Irrelevant.
10:44:26 THE WITNESS: I mean, I don't agree with that statement that an oath -- like, you're concluding there could be somebody who -- I mean, that's not the point of -- that point doesn't -- at the oath of office, if there's no required for citizenship, then I don't see how that -- by taking that oath, that proves that you're a citizen.
10:44:50 BY MS. SHAH:
10:44:50 Q. Well, do you agree that this oath said that you have to uphold the Constitution of the state of Arizona;

10:44:55 correct?
10:44:55 A. I do.
10:44:56 Q. And so you're saying that unless it's -- the specific provision of the Constitution is not mentioned, you don't have to uphold it?
10:45:03 MR. O'MALLEY: Objection. Argumentative.
10:45:04 THE WITNESS: No. No, I did not say that. I said if there's no requirement here to prove that you're a citizen, I don't understand your line of thinking that -- I don't understand why you're asking that or saying that you -- that that proves that I'm a citizen when there's no proof of citizenship here.
10:45:23 BY MS. SHAH:
10:45:23 Q. I'm saying that you -- the Constitution of Arizona requires you to be a citizen. And when you swear or affirm that you will uphold the Constitution of the United States, that you are swearing and affirming, including the fact that you are a U.S. citizen; correct?
10:45:38 MR. O'MALLEY: Objection. Asked and answered.
10:45:41 MR. LANGHOFER: Argumentative.
10:45:42 MR. HORLEY: Argumentative.
10:45:42 THE WITNESS: Yeah, just I -- if you're saying that by me taking this oath, I'm proving I'm a citizen, I -- I disagree with that.

10:45:52 BY MS. SHAH:
10:45:52 Q. Okay. And so did you prove your citizenship in
10:45:55 any other way when you were elected?
10:46:00 MR. LANGHOFER: Legal conclusion.
10:46:01 THE WITNESS: Not that I recall. Not a bad
10:46:08 idea for a bill, though.
10:46:11 BY MS. SHAH:
10:46:14 Q. And then let's do -- to be nominated to run for
10:46:20 office in Arizona, you have to submit a declaration
10:46:24 attesting to the facts that you have the qualifications to
10:46:27 run for office; is that correct?
10:46:29 MR. O'MALLEY: Objection. Legal conclusion.
10:46:31 THE WITNESS: As I recall, that -- that's the
10:46:34 case.
10:46:34 BY MS. SHAH:
10:46:36 Q. And does that include declaring your citizenship?
10:46:39 MR. O'MALLEY: Same objection.
10:46:40 THE WITNESS: I would have to -- can -- if
10:46:42 you can show me the form, I could answer the question. But
10:46:45 without seeing the form, I can't remember.
10:46:48 BY MS. SHAH:
10:46:49 Q. Well, I'll show you the -- let me give you Tab 3b.
10:46:55 It's been previously marked as Toma Exhibit 407. .
10:47:08 MS. RIZZONI: What tab was that?
10:47:17 MS. SHAH: 3b, Toma 407.

BY MS. SHAH:
Q. So if you look down at 16-311 D, it says, "All persons desiring to become a candidate shall file with the nomination paper provided for in subsection A of this section a declaration, which shall be printed in a form prescribed by the secretary of state. The declaration shall include facts sufficient to show that," among other things, "the candidate will be qualified at the time of election to hold the office the person seeks." Correct?
A. Yeah. Hold on.
I agree that that's what it says, yes.
Q. You agree that one of those qualifications would be citizenship; correct?
MR. O'MALLEY: Objection. Calls for a legal conclusion.
THE WITNESS: Yeah, again, if you can show me. I don't see that here. If there's somewhere you can show me where it says that, I'd be happy to opine on it.
BY MS. SHAH:
Q. Well, you agree that the Constitution requires you to be a citizen to run for office; correct?
MR. O'MALLEY: Objection. Asked and answered.
MR. LANGHOFER: Legal opinion.
MS. SHAH: Well, I'm sorry. I just want to

10:48:37 come back for second. I don't want to be here, but I'm just saying that -- asked and answered, but if he doesn't remember, I have to repeat the question; right?

10:48:47 MR. O'MALLEY: You know, actually, what he's asking you, if you want to expedite it, he's asking you: Is there something in this statute that refers to proof of citizenship? I understand your legal argument that you're trying to make, but if you're trying to communicate with the witness, he's asking you what is it you're referring to that refers to proof of residency or citizenship or whatever. That's what he's asking you.

10:49:09 It's not my -- I'm not trying to explain how it should work. I'm just asking you to communicate with the witness. That's what I understood he was asking.

10:49:18 THE WITNESS: Yeah, I don't see the citizenship requirement here, so . . .

10:49:23 BY MS. SHAH:

10:49:23 Q. Well, I'm just trying to say --

10:49:24 A. I don't see it.

10:49:25 Q. -- do you agree that you have to be qualified at the time of election to hold the office the person seeks and do you agree that one of those qualifications is being a United States citizen?

10:49:34 MR. LANGHOFER: Compound. Legal opinion.

10:49:41 THE WITNESS: If you want to show me in the

Constitution -- if you want to -- I would need to review the Constitution --
BY MS. SHAH:
Q. Okay.
A. -- to see that -- to see what it says. I've read it -- I've read it before, but it's been a while.
Q. Sure.
MS. SHAH: No, no, no. It's Tab 3a.
(The document was marked as Exhibit 429 for identification.)
MS. SHAH: It's Article 4, Section 2.
MR. O'MALLEY: Is this one marked?
MS. SHAH: No. We need to mark it.
MR. O'MALLEY: I'm sorry. And you said what section?
MS. SHAH: Section 4 -- I mean, Article 2, Section -- Article 4, Section 2.
MR. O'MALLEY: Thank you.
THE WITNESS: Part 2?
BY MS. SHAH:
Q. Article 4, Section 2, "Qualifications of members of legislature."
"Section 2. No person shall be a member of the Legislature unless he shall be a citizen of the United States at the time of his election," nor shall he be at --

"nor unless he shall be at least twenty-five years of age, and shall have been a resident of Arizona at least three years and of the county from which he is elected at least one year before his election."
Did I read that correctly?
MR. O'MALLEY: I don't think he's on the same page you are. Can I assist him?
MR. LANGHOFER: So the record is clear, I think we're talking about Article 4, part 2, Section 2.
MR. O'MALLEY: I think she's reading from that.
THE WITNESS: Oh, okay. Part 2, Section 2. Okay.
Okay. Yes, it is a constitutional requirement to be a citizen of the United States.
BY MS. SHAH:
Q. And so that should be one of the qualifications; right?
A. That is a -- yes, as I understand, that is a qualification to be a member of the legislature.
Q. And you did that when you ran; correct?
A. Did what?
Q. Declared that you were a U.S. citizen.
A. I did not. I declared that I met the qualifications.

10:51:45 Q. Did you provide any documentation about meeting those qualifications?
10:51:50 A. Not that I recall.
10:51:52 Q. So when you run for your office, other than declaring that you meet those qualifications, you didn't provide any evidence or proof that you were a citizen; correct?
10:52:03 A. Not that I recall.
10:52:05 Q. Okay. And you mentioned earlier that you thought it would be good to have this legislation to have documentary proof of citizenship?
10:52:15 A. Yeah. I think that would be great. I mean, obviously, if you're showing up to -- and if -- I mean, there's no check right there. That would be -- you could -- I think it would be a good requirement for them to ask for a birth certificate or, you know, proof of citizenship, naturalization, whatever. That could be -- not a bad idea.
10:52:35 Q. And so do you believe that there are legislatures without citizenship currently?
10:52:42 A. Do I believe?
10:52:43 Q. Yeah.
10:52:43 A. I have no idea.
10:52:44 Q. So you think there could be?
10:52:46 MR. O'MALLEY: Objection. Calls for

10:52:48 speculation.
10:52:48 THE WITNESS: I have no idea. I would need to think about that. It's not something I've thought about.
10:52:53 BY MS. SHAH:
10:52:54 Q. Would you have to think about that if you were to propose a legislation that you think is a good idea?
10:52:59 MR. O'MALLEY: Objection. Speculation.
10:53:00 THE WITNESS: Would I have to think about that? Not necessarily. No. The question is: Is this good policy or bad policy? That's the question.
10:53:09 I think it's good policy to have, you know, steps or requirements to prove you meet qualifications. So I would think that's a good -- that's a good policy.
10:53:24 BY MS. SHAH:
10:53:27 Q. So sitting here today, do you have any reason to believe that your fellow members are not citizens?
10:53:32 MR. O'MALLEY: Objection. Lack of foundation.
10:53:34 MR. LANGHOFER: Speculation.
10:53:35 THE WITNESS: So do I believe any of the -- my fellow legislators are not citizens?
10:53:42 BY MS. SHAH:
10:53:43 Q. That is correct.
10:53:43 A. I have no idea.

10:53:46 Q. Do you have any reason to believe that your fellow legislators are noncitizens?
10:53:52 MR. O'MALLEY: Same objection.
10:53:54 MR. HORLEY: Asked and answered.
10:53:55 THE WITNESS: Yeah, I -- I haven't thought about it. I don't know. I don't know if they are or not.
10:53:59 BY MS. SHAH:
10:54:02 Q. Do you have any reasons to believe that?
10:54:04 MR. O'MALLEY: Objection. Asked and answered.
10:54:07 THE WITNESS: Yeah, I haven't -- I haven't done any -- I haven't looked into it. I don't know. I don't know.
10:54:12 BY MS. SHAH:
10:54:17 Q. And are you a registered voter in Arizona?
10:54:20 A. I am.
10:54:21 Q. And when did you register to vote?
10:54:24 A. As soon as I could when I was 18.
10:54:28 Q. What year did you turn 18?
10:54:31 A. Oh, gosh, I don't know. I can tell you -- can I tell you what year I was born in?
10:54:36 Q. Sure.
10:54:36 A. So I was born in '76. So add 18 to that. Add 18 to 76.
10:54:46 MR. LANGHOFER: 1994.

10:54:48 THE WITNESS: There you go. 1994.
10:54:51 THE COURT REPORTER: If you could keep your voice up, please.
10:54:53 THE WITNESS: Yeah.
10:54:55 BY MS. SHAH:
10:54:57 Q. So you registered to vote in 1994; is that correct?
10:55:01 A. Uh-huh. Yes.
10:55:02 Q. And when you did, did you provide documentary proof of citizenship when you registered to vote?
10:55:06 A. I don't remember.
10:55:07 Q. But you agree that it wasn't a requirement in 1994?
10:55:11 MR. O'MALLEY: Objection. Calls for conclusion.
10:55:13 THE WITNESS: I don't agree with that. I don't know.
10:55:13 BY MS. SHAH:
10:55:16 Q. You don't -- well, do you not know or do you not agree?
10:55:20 A. That it was a requirement?
10:55:21 Q. To provide documentary proof of citizenship.
10:55:23 A. I don't remember if they required it or not.
10:55:25 Q. Okay.
10:55:33 MS. SHAH: Can we do Tab 4, which has been

10:55:35 previously marked as Exhibit PX 51.
10:55:35 BY MS. SHAH:
10:56:27 Q. And then do you see where it says the governor, in
10:56:30 signing 2492, that "Importantly, anyone who was registered
10:56:36 to vote in Arizona prior to Prop 200's passage was deemed
10:56:41 to have provided" documentary proof of citizenship "and not
10:56:44 required to resubmit evidence of citizenship. HB 2492 does
10:56:50 not disturb the safe harbor granted to Arizona voters who
10:56:53 registered to vote prior to Prop 200's passage."
10:56:57 Do you agree with the governor's
10:56:59 interpretation there?
10:56:59 MR. LANGHOFER: Legal opinion.
10:57:06 THE WITNESS: If I understand this right, it
10:57:09 sounds like this is saying the law moves forward
10:57:13 prospectively. Is that what he's saying? Is that what I'm
10:57:15 reading here?
10:57:15 BY MS. SHAH:
10:57:15 Q. Well, I'm asking you: I -- that you don't have to
10:57:18 provide documentary proof of citizenship if you register
10:57:21 prior to Prop 200's passage; is that correct?
10:57:25 MR. LANGHOFER: Legal opinion.
10:57:26 THE WITNESS: I don't -- I don't know. I
10:57:27 mean, the -- so I can't speak for Governor Ducey. I don't
10:57:34 know what he was thinking or saying when he wrote this
10:57:37 letter.

10:57:38 It looks like, to me, he's saying that -- again, it's my personal opinion that he's saying that it's going to take effect prospectively -- is what it sounds like to me. I'm not sure what he's -- I'm not exactly sure what he's -- you'd have to ask the governor. You'd have to ask -- have to ask him. But it looks like he's saying it's prospective, the law.

10:58:06 BY MS. SHAH:

10:58:06 Q. So based on your understanding, do you think that if you registered before 2004, you have to provide documentary proof of citizenship under HB 2492?

10:58:14 MR. LANGHOFER: Legal opinion.

10:58:16 MR. O'MALLEY: Join.

10:58:16 THE WITNESS: From what I understand, you don't have to -- you wouldn't have to.

10:58:24 BY MS. SHAH:

10:58:24 Q. That is your understanding?

10:58:25 A. Yeah.

10:58:25 Q. Okay. And so you would agree -- you agree, then, with what the governor has said here?

10:58:29 MR. LANGHOFER: Legal opinion.

10:58:31 MR. HORLEY: Argumentative.

10:58:34 THE WITNESS: I would just say again, I understand this to mean it's prospective. That's what I understand. So yeah, if that's what he's saying, then

10:58:43 yeah, I agree with him. But --
10:58:45 MS. SHAH: Okay. Sorry. And just one --
10:58:48 I -- I have marked this previously as PX 51. Do you want
10:58:53 us to mark it as a separate exhibit?
10:58:55 THE COURT REPORTER: That's up to you.
10:58:56 MS. SHAH: So then I think we can just leave
10:58:58 it as PX 51 to avoid confusion, if everybody's okay with
10:59:01 that.
10:59:01 MR. O'MALLEY: That's fine.
10:59:02 MR. LANGHOFER: That's good.
10:59:04 MS. SHAH: Just sidebar on that one.
10:59:06 BY MS. SHAH:
10:59:06 Q. Okay. So then -- so based on your understanding
10:59:09 of 2492, that means that you didn't have to provide
10:59:13 documentary proof of citizenship when you registered in
10:59:14 1994; correct?
10:59:16 MR. LANGHOFER: Legal opinion.
10:59:16 THE WITNESS: I don't know. The law could
10:59:19 have changed. Happens all the time.
10:59:21 BY MS. SHAH:
10:59:21 Q. Do you -- but you -- did you -- do you recall?
10:59:23 A. I -- I don't --
10:59:24 MR. O'MALLEY: Objection. Asked and
10:59:25 answered.
10:59:25 THE WITNESS: -- recall.

10:59:25 BY MS. SHAH:
10:59:42 Q. Okay. Let's go on to Tab 5. It's been previously
10:59:56 marked as Toma 408. .
10:59:59 MS. SHAH: And 5A, which we need to mark as,
11:00:03 I believe, 429.
11:00:18 (An off-the-record discussion ensued.)
11:00:48 (The document was marked as Exhibit 430 for
11:00:53 identification.)
11:00:53 BY MS. SHAH:
11:00:55 Q. So do you recognize these as your interrogatory
11:00:59 responses?
11:01:00 A. Yes.
11:01:02 Q. And Exhibit 430 is your signature verifying them
11:01:05 under penalty of perjury?
11:01:07 A. Correct.
11:01:08 Q. And so to the best of your knowledge, they were
11:01:11 true and correct at the time?
11:01:12 A. Yes.
11:01:13 Q. So for what's Exhibit 408 -- Toma 408, if you look
11:01:20 at Interrogatory 2 on page 6. And the response, which
11:01:28 starts after some objections on page 7, it says, "It is not
11:01:32 the role of the Arizona Legislature, as a legislative body,
11:01:36 to 'establish' whether a non-U.S. citizen has registered to
11:01:40 vote in Arizona."
11:01:44 A. Okay.

11:01:45 Q. And then if you take a look at Interrogatory 3, which is on page 7. And I think your response, after some objections, starts on page 8. It says it is, again, not the role of the legislature -- Arizona legislature, as a legislative body, to "establish" whether a noncitizen -- non-U.S. citizen has registered to vote in Arizona.

11:02:14 MR. O'MALLEY: Just for the record --

11:02:14 THE WITNESS: Right.

11:02:14 MR. O'MALLEY: -- I think you misread that.

11:02:16 MS. SHAH: Oh, sorry.

11:02:17 MR. O'MALLEY: I think you said "whether a non-registered -- non-registered citizen has voted" or something like that. I don't think you read it correctly.

11:02:25 BY MS. SHAH:

11:02:26 Q. Let me try it again.

11:02:27 For your response to Interrogatory 3 on page 8, after objections: "It is not the role of the Arizona Legislature, as a legislative body, to 'establish' whether a non-U.S. citizen has" registered to vote --

11:02:39 A. "Has voted."

11:02:40 Q. -- "has voted in Arizona"; is that correct?

11:02:43 A. Yeah.

11:02:43 Q. Okay.

11:02:43 A. Well, that's what it says. Yeah, that's what it says right here.

11:02:48 Q. And you -- you signed, verifying under penalty of
11:02:54 perjury, that this is true; correct?
11:02:58 A. Yeah.
11:02:58 Q. Okay. So you agree with that; correct?
11:03:01 A. Yeah, I agree with it.
11:03:03 Q. So based on that response, that means that in
11:03:07 connection with the enactment of HB 2492, 2617, and 2243,
11:03:13 the legislature did not establish whether noncitizens
11:03:17 actually registered to vote in Arizona; correct?
11:03:19 MR. O'MALLEY: Objection. Misstates the
11:03:22 exhibit.
11:03:22 THE WITNESS: Yeah, I -- can you -- can you
11:03:25 say -- can you say that again, please?
11:03:25 BY MS. SHAH:
11:03:29 Q. Sure.
11:03:30 A. Can you repeat your question?
11:03:31 Q. So based on your responses to interrogatories,
11:03:34 that means that in connection with the enactment of the
11:03:37 challenged laws --
11:03:37 A. Uh-huh.
11:03:37 Q. -- HB 2492, 2617, 2243 -- the legislature did not
11:03:43 establish whether any noncitizens had actually registered
11:03:46 to vote in Arizona?
11:03:48 MR. O'MALLEY: Objection. Misstates the
11:03:51 exhibit.

11:03:53 THE WITNESS: Are you saying --
11:03:53 MR. O'MALLEY: Objection. Misstates the
11:03:53 exhibit.
11:03:53 Go ahead.
11:03:53 THE WITNESS: Yeah. I was just going to say,
11:03:55 are you saying -- you said -- are you saying "establish" as
11:03:58 in the quotations here where they're quoting -- looks like
11:04:00 case law? Or are you saying established in -- what -- what
11:04:07 this means is that we are not the executive branch.
11:04:11 Establishing meaning we didn't do -- we're not the ones who
11:04:15 enforce the law.
11:04:16 So we don't -- it's not our job to go and
11:04:20 personally check them, but it is our job to write policy.
11:04:23 So we can -- it is our job to write a policy that says
11:04:27 whether someone should be a citizen or not to vote.
11:04:34 So yeah, our role is policy, but our role is
11:04:37 not to enforce the laws. I think that's how I understand
11:04:44 this AS what this says.
11:04:47 And I agree with that. I agree that we're --
11:04:49 it's not our job to enforce the laws. It is our job to set
11:04:52 policy.
11:04:53 BY MS. SHAH:
11:04:53 Q. So in setting the policy, you didn't find out
11:04:57 whether any noncitizens actually registered to vote;
11:05:00 correct?

11:05:00 MR. O'MALLEY: Objection. Vague.
11:05:03 You mean him personally?
11:05:06 THE WITNESS: Yeah, I can only speak for
11:05:07 myself personally. I -- I have heard -- I mean, me
11:05:16 personally, I have heard that that's a problem and a
11:05:19 concern with my constituents. And also that there's a high
11:05:26 number of people that aren't required to show citizenship
11:05:32 to vote.
11:05:33 And so part of my review -- or, I mean, part
11:05:38 of it. A small piece of the big puzzle is, yeah, my
11:05:43 constituents are very concerned about this. So -- and I
11:05:47 have heard of -- of -- I have heard of -- in fact, I
11:05:55 actually have seen it. I actually saw something on Twitter
11:06:01 where a person said, "I'm a DACA" -- and I think this was
11:06:07 in my comments on the -- maybe this was in my comments. I
11:06:13 don't know if it was or not -- but where someone said, "I'm
11:06:13 a member of -- you know, this law could affect me and make
11:06:17 it so I can't vote. And I'm a member of -- or I'm part of
11:06:20 DACA."
11:06:20 So if they're voting and they're not a
11:06:25 citizen, then that's an example of, you know, someone
11:06:28 who's -- who's voting that's not a citizen, so . . .
11:06:28 BY MS. SHAH:
11:06:38 Q. So you mentioned some constituents' concerns;
11:06:41 correct?

11:06:41 A. Yes.
11:06:42 Q. And did you actually see whether those concerns were true? Did you do any research to evaluate whether that's, in fact, true?
11:06:57 MR. LANGHOFER: Form.
11:06:57 MR. HORLEY: Compound.
11:06:58 THE WITNESS: So I don't remember everything I did. I don't know if that was part of it or not. I took my experience as a whole on the issue to decide whether that was good policy or bad policy.
11:07:21 BY MS. SHAH:
11:07:21 Q. But did you actually see or investigate whether noncitizens had actually registered to vote?
11:07:30 A. What do you mean?
11:07:31 Q. You said this was a concern of your constituents. So did you --
11:07:34 A. Right.
11:07:34 Q. -- actually see whether that was, in fact, happening?
11:07:38 A. So again, I have heard of that. So what I have seen -- I don't remember exactly what I did and what kind of investigation I did. But I have seen and heard things that have concerned me and concerned my -- and are great concern to my constituents.
11:08:05 Q. So what -- what things have you seen and heard

11:08:09 that concerned you?
11:08:10 A. Well, for one thing, I've heard and seen that
11:08:14 there's very little requirements to -- to register to vote.
11:08:24 It could be a proof of residency or -- and, like, as I
11:08:30 mentioned, that Twitter post that I saw where somebody
11:08:33 said, "This law will affect my ability to vote. You know,
11:08:40 I'm -- you know, I'm DACA," or something along those lines,
11:08:47 so . . .
11:08:47 Q. And that was concerning to you?
11:08:49 A. Well, it's concerning if citizens -- if noncit- --
11:08:55 I'm concerned if noncitizens are voting.
11:08:57 Q. And so when -- you mentioned that tweet and that
11:09:01 was concerning. Did you follow up with that person to see
11:09:03 if they were, in fact, registered to vote?
11:09:05 A. I think that would be a really bizarre thing to
11:09:10 do.
11:09:11 Q. But you were concerned about it and you did
11:09:13 nothing?
11:09:14 MR. O'MALLEY: Objection. Argumentative.
11:09:15 THE WITNESS: Yeah, like, I'm going to text
11:09:17 message this person on Twitter and -- that just seems
11:09:21 really strange to me.
11:09:22 BY MS. SHAH:
11:09:22 Q. Did you find out if anybody who was a noncitizen
11:09:25 was, in fact, registered to vote?

11:09:28 MR. LANGHOFER: Asked and answered.
11:09:28 THE WITNESS: Yeah, I -- yeah, I'm just going
11:09:30 to say the same. I think I've already answered this
11:09:34 question.
11:09:34 BY MS. SHAH:
11:09:34 Q. Which is what?
11:09:35 A. That I don't recall. It's what I've already said.
11:09:39 It's what I've already said to you.
11:09:41 Q. You don't recall that you --
11:09:44 A. I don't recall all the investigation that I did.
11:09:46 I don't recall all the investigation that I did. But I do
11:09:50 have -- you know, I've had experience that has -- has led
11:09:54 me to have concern that noncitizens are voting. That
11:09:59 experience.
11:09:59 Q. What experience?
11:09:59 MR. O'MALLEY: Objection. Asked and
11:10:00 answered.
11:10:00 THE WITNESS: I just -- yeah --
11:10:01 BY MS. SHAH:
11:10:02 Q. I just want to make sure I understand, like, the
11:10:03 full total of your experience here; right?
11:10:05 You said that you had this Twitter that you
11:10:08 saw --
11:10:08 A. Yeah.
11:10:09 Q. -- which you didn't follow up on. You didn't

11:10:12 look; correct?
11:10:14 MR. O'MALLEY: Objection. Asked and
11:10:15 answered.
11:10:15 THE WITNESS: There's -- there's other things
11:10:17 too. I don't remember all of them. I don't remember the
11:10:19 specifics of them. But these are experience -- experiences
11:10:23 that -- and again, more than anything is the high -- high
11:10:28 number of my constituency that -- I don't think it's
11:10:32 unreasonable for people to want people that are -- that are
11:10:40 eligible to vote to be -- to want people that are voting to
11:10:45 make sure that they're eligible to vote. I don't think
11:10:47 that's unreasonable. I don't think that's an unreasonable
11:10:51 policy.
11:10:52 BY MS. SHAH:
11:10:52 Q. So for the record, you did not independently
11:10:55 verify that there was any noncitizens who were registering
11:10:59 to vote; correct?
11:10:59 MR. O'MALLEY: I'm going to object. It's
11:11:01 been asked and answered. It's to the point of badgering
11:11:03 him. He told you four or five times what he remembers.
11:11:07 Do you have anything to add?
11:11:08 THE WITNESS: I don't. I would just say the
11:11:09 same thing, so . . .
11:11:09 BY MS. SHAH:
11:11:24 Q. You have no other concrete examples of any

11:11:26 noncitizens registering to vote; correct?

11:11:28 MR. O'MALLEY: Objection. Asked and
11:11:30 answered.

11:11:31 THE WITNESS: Yeah, I've shared with you my
11:11:35 thought process, so --

11:11:35 BY MS. SHAH:

11:11:37 Q. Well, let's -- slightly different question here.
11:11:40 Do you have any -- sitting here today, do you
11:11:46 have any idea if any noncitizens actually voted?

11:11:49 MR. O'MALLEY: Objection. Asked and
11:11:50 answered.

11:11:51 MS. SHAH: Actually, no, this is different.
11:11:53 Again, we talked about registration. Now we're talking
11:11:56 about actual voting. Those are two very different things.

11:12:01 THE WITNESS: I don't have -- I mean, besides
11:12:08 what I have shared with you, I don't remember. I have -- I
11:12:14 have the person who, on Twitter -- basically, what I
11:12:17 understood them saying is "I'm voting as a noncitizen."
11:12:22 And I've heard of -- there's low qualifications, low
11:12:29 requirements to be able to -- standards to be able to vote.
11:12:34 And there's a high number of people who have not proven
11:12:41 citizenship to vote.

11:12:43 So yeah, there's concern. There's concern
11:12:49 that ineligible people may be voting.

11:12:52 BY MS. SHAH:

11:12:53 Q. And to make sure I understand, you think that the
11:12:55 tweet that you just mentioned, that person had said that
11:12:57 they voted; correct?
11:12:58 A. That's how --
11:12:59 Q. Did I understand you correctly?
11:13:00 A. That's how I understood it.
11:13:02 Q. And so did you refer that person for
11:13:04 investigation?
11:13:04 A. No, I did not.
11:13:05 Q. Why not?
11:13:06 A. Who would I refer them to?
11:13:10 Q. It's unlawful. If you were aware of a crime,
11:13:14 wouldn't you report it?
11:13:15 MR. O'MALLEY: Objection. Vague. Relevance.
11:13:18 THE WITNESS: I didn't report them.
11:13:20 BY MS. SHAH:
11:13:21 Q. Why not?
11:13:21 A. Why not? I don't recall why not. Why would I?
11:13:26 Q. You said --
11:13:26 A. I mean --
11:13:28 Q. -- you were concerned and you didn't --
11:13:30 A. -- I'm going to go after and attack someone on
11:13:33 Twitter that I saw, try to -- yeah. Yeah, anyways, go
11:13:41 ahead.
11:13:41 Q. Well, you were concerned by something on Twitter

11:13:45 and you decided to do nothing about it. I'm not asking if
11:13:49 you got into a Twitter war with them.
11:13:51 A. I actually --
11:13:51 Q. I'm asking you --
11:13:52 A. I actually did do something about it. I voted for
11:13:54 a law --
11:13:54 Q. Yes.
11:13:54 A. -- to make sure that citizens vote.
11:13:56 Q. But this particular thing that caused so much
11:14:00 concern to you, you did not refer them to any sort of
11:14:03 criminal investigation; correct?
11:14:04 MR. O'MALLEY: Objection. Asked and
11:14:05 answered.
11:14:05 THE WITNESS: No, I didn't. I've said I did
11:14:07 not, so . . .
11:14:07 BY MS. SHAH:
11:14:17 Q. And besides the Twitter post, do you have any
11:14:21 other examples of any noncitizens actually voting?
11:14:26 A. Not that I can --
11:14:28 MR. HORLEY: Asked and answered.
11:14:28 THE WITNESS: Yeah, I mean, not that I can
11:14:30 specifically think of right now.
11:14:32 BY MS. SHAH:
11:14:33 Q. And do you know if anybody else in the legislature
11:14:36 did?

11:14:36 MR. O'MALLEY: Objection. Lack of foundation. Speculation.
11:14:38 THE WITNESS: I can't -- I can't speak for other people.
11:14:40 BY MS. SHAH:
11:14:54 Q. But do you agree that the legislature did not have any -- put any evidence on the public record -- correct? -- of noncitizens registering to vote?
11:15:07 MR. LANGHOFER: Foundation.
11:15:09 MR. O'MALLEY: Objection. Foundation.
11:15:10 THE WITNESS: Yeah, I can't speak for the legislature. I can only speak for myself.
11:15:15 BY MS. SHAH:
11:15:16 Q. But --
11:15:16 A. It's all in the record.
11:15:18 Q. And so if it's there -- if there was anything, it would be there; correct?
11:15:22 A. Should be. There should be -- it should be on the record.
11:15:25 Q. So yes?
11:15:26 A. It's all -- what the -- what the legislature deliberated in public is on the record.
11:15:31 Q. So if there was any findings to noncitizens registering to vote, that would be on the record; correct?
11:15:38 A. No.

11:15:40 Q. Okay.
11:15:41 A. If there were any findings presented to the
11:15:44 legislature, that would be on the record.
11:15:47 Q. Okay.
11:15:47 A. So . . .
11:15:52 Q. And same thing for noncitizens actually voting;
11:15:55 correct? That would also -- findings would be on the
11:15:57 record; correct? Presented findings?
11:16:01 A. If they were presented to the legislature, it
11:16:03 would be on the record.
11:16:04 Q. Do you know if you -- let's go back for a second.
11:16:23 If we go back to -- sorry. One -- one
11:16:34 further question to just clarify.
11:16:36 The evidence that the legislature based its
11:16:40 decision on in passing these bills, that would be on the
11:16:42 record; correct?
11:16:43 MR. O'MALLEY: Objection. Lack of
11:16:44 foundation. Overly broad.
11:16:46 THE WITNESS: No. I said what's -- it's --
11:16:51 it's -- I can't speak for other members. But you take into
11:16:56 account many things: personal experience, things that are
11:17:02 not put into the public, and things that are put into the
11:17:05 public. All of those things are part of deliberating as to
11:17:08 whether you're going to vote yes or no on a bill.
11:17:14 BY MS. SHAH:

Q. So there are things that are not public that you would have -- that have not been made public?

MR. O'MALLEY: Objection. Speculation. Vague.

THE WITNESS: That doesn't -- I'm sorry. That doesn't make sense, what you're saying.

BY MS. SHAH:

Q. I'm just trying to understand what you just said, that there are both public and nonpublic --

A. Yeah. So --

Q. What did you mean by that?

A. For example, let's say that a legislator saw somebody vote illegally, but there's no public record of that. He -- that might be a reason he votes yes for the bill. And it wasn't in the public record.

Q. So just --

A. I'm just saying there's -- there's reasons in the public record and reasons outside of the public record why people make their decisions --

Q. I understand.

A. -- including -- I mean, it could be a number of things.

Q. But taking this example that you just gave of seeing somebody illegally voting, if -- you're saying that that would not be in the public record, including whether

11:18:14 there was any charges filed?
11:18:16 A. Yeah. It might -- I'm saying it might not be. It
11:18:19 doesn't have to be --
11:18:20 Q. Okay.
11:18:20 A. -- for someone to make a decision.
11:18:28 Q. And so I want to just go back again to that --
11:18:32 your response to Interrogatory 2. And look at page 7 where
11:18:36 your answer goes on to say -- and this is in relation to
11:18:42 noncitizens registering to vote.
11:18:45 You go: "Upon information and belief,
11:18:48 current and former members of the Arizona Attorney
11:18:52 General's office may have information related to the
11:18:54 enforcement of Arizona's voting laws and whether any
11:18:57 individual has violated said laws."
11:19:00 A. Yeah.
11:19:01 Q. Correct?
11:19:01 A. Correct.
11:19:03 Q. Did you speak with any of the current and former
11:19:09 members of the Arizona Attorney General's Office that --
11:19:13 about this information?
11:19:14 A. So here's what I -- here's what I have -- what I
11:19:23 recall is that the -- two things. Not only this, but the
11:19:32 attorney general -- we had an elections task force and --
11:19:37 or election integrity task force, and they were
11:19:40 investigating fraud. We had some communication with

11:19:45 them -- or I should say I had -- I had received some
11:19:50 communication from them, and it may have just been that --
11:19:55 it may have just been their releases or press releases or
11:19:59 whatever.
11:20:01 I'm also aware of, in Yuma County, there was
11:20:06 an individual who was indicted and prosecuted -- or
11:20:12 prosecuted for voter fraud. So both of those were things
11:20:20 that I'm aware of.
11:20:22 Q. Right.
11:20:22 But what I was trying to ask is: Like, did
11:20:25 that -- did you talk to them specifically about noncitizens
11:20:28 registering to vote, the attorney general's election
11:20:31 integrity task force you mentioned?
11:20:35 A. When?
11:20:37 Q. When you were considering these bills.
11:20:40 A. I may have. I don't recall.
11:20:48 Q. And did they tell you that there were any
11:20:50 noncitizens registering to vote?
11:20:53 A. Not that I recall.
11:20:54 Q. Okay. And the one in Yuma, was it that a
11:20:57 noncitizen registered to vote?
11:21:00 A. I believe it was a ballot harvesting case.
11:21:03 Q. So not?
11:21:05 A. From what I understand, it was ballot harvesting
11:21:07 was the fraud that was occurring.

11:21:10 Q. And again, did -- did you talk to the Attorney
11:21:14 General's Office about noncitizens actually voting?
11:21:18 A. I mean, I'm trying to think if there's a specific
11:21:24 conversation with them.
11:21:28 I don't -- I don't recall a specific
11:21:30 conversation I had with them about that.
11:21:31 Q. Okay. And do you know if anybody in the Senate or
11:21:36 legislature did that?
11:21:37 MR. O'MALLEY: Objection. Lack of
11:21:38 foundation. Calls for speculation.
11:21:39 THE WITNESS: Yeah, I can't speak for other
11:21:41 members of the legislature.
11:21:42 BY MS. SHAH:
11:21:43 Q. But if they had, would that be a finding that
11:21:45 would have been made public?
11:21:45 MR. O'MALLEY: Objection. Calls for
11:21:47 speculation.
11:21:47 THE WITNESS: It could be. It may not be.
11:21:50 It's up to -- would be up to the member.
11:21:52 BY MS. SHAH:
11:22:00 Q. Let's go to -- and again, I just -- so you're
11:22:12 sitting here today and you're just saying that you are not
11:22:16 aware of any other legislators talking to the attorney
11:22:21 general about noncitizens registering to vote; correct?
11:22:24 MR. LANGHOFER: Foundation. Speculation.

11:22:25 THE WITNESS: Not that I'm aware of.
11:22:29 BY MS. SHAH:
11:22:30 Q. And you are not aware of any other legislators
11:22:32 talking to the attorney general about noncitizens actually
11:22:35 voting; correct?
11:22:36 MR. LANGHOFER: Lack of foundation.
11:22:39 THE WITNESS: Yeah, actually -- what was your
11:22:42 prior question?
11:22:43 BY MS. SHAH:
11:22:43 Q. Sure.
11:22:43 I'm asking if you are aware --
11:22:43 A. Uh-huh.
11:22:47 Q. -- of the Senate or the legislature talking to the
11:22:54 Attorney General's Office about noncitizens registering to
11:22:56 vote. That was my first question.
11:22:57 A. Okay. And then your second question?
11:22:59 Q. Was actually about voting.
11:23:00 A. Yes. That I -- yes, I am aware of members that
11:23:07 have -- they -- they've had discussions with the attorney
11:23:11 general about voter fraud, Election Integrity Unit.
11:23:15 Q. And -- but I'm asking specifically: Did that
11:23:18 include about noncitizens voting?
11:23:20 A. I don't know. I'm not sure.
11:23:22 Q. All right. Let's go to Tab 6, which is
11:23:38 Bates-stamped INT-LEG 028202 through 028206.

11:23:48 MS. SHAH: We need to mark it, I believe, as 431.
11:24:01 (The document was marked as Exhibit 431 for identification.)
11:24:01 BY MS. SHAH:
11:24:12 Q. So Senator Petersen, do you see at the top that you are in the "To" line here?
11:24:20 A. I do. Uh-huh.
11:24:22 Q. Okay. Great.
11:24:24 Do you recognize this email chain?
11:24:26 A. I don't.
11:24:28 Q. Okay. Well, let's go look at -- I think it's page -- what's like -- you'll see what I'm calling Bates stamp INT-LEG and then page -- that would be 8 -- 028204.
11:24:50 A. 204?
11:24:52 Q. Uh-huh.
11:24:52 A. Okay.
11:24:53 Q. And it says -- well, first, who is Senator Sally Ann Gonzales?
11:25:05 A. She's a senator in the Arizona leg- -- she was serving as senator in the Arizona legislature at that time.
11:25:10 Q. Okay. And she writes, if you see kind of in the middle of the page, "We as sitting senators have not been presented with any evidence of any fraud in the 2020 election."

You see that?
A. I do.
Q. And so do you agree with that?
A. I don't.
Q. Okay. You -- there was evidence presented of voter fraud?
A. As I said, what I -- I was aware of investigations by the -- several. Like, there were -- as I recall, there were many by the attorney general, many investigations into voter fraud. And then there was actually prosecution down in Yuma.
And I don't think Senator Gonzales can -- I don't think a statement from one senator -- she can't speak for everyone and say none of us have been presented with anybody -- anything. So -- and, I mean --
Q. Okay.
A. -- this is a -- like, the odds of -- anyways . . .
Q. If we go to -- first, before, who is Senator Paul Boyer?
A. Senator Paul Boyer is a -- was a senator at the time that he wrote this.
Q. And he's a fellow Republican; correct?
A. He is -- he was a registered Republican at that time.

11:26:42 Q. Okay. And I believe that he writes that -- let's see. It's the first page on 28202, second paragraph, second sentence -- or second line: ". . . for over a year in every single private and public conversation I've ever had with anyone about the 2020 election, I've not once said [that] there was election fraud" --
11:27:14 A. Uh-huh.
11:27:15 Q. -- right?
11:27:18 "I've since learned [sic] that there were two cases referred to the Attorney General's office of what you've referred to as voter fraud but I've seen nothing to convince me of election fraud in Arizona;" correct?
11:27:29 A. That's what this says.
11:27:31 Q. And do you agree with that?
11:27:34 MR. O'MALLEY: Objection. Overly broad. Vague. Irrelevant.
11:27:36 THE WITNESS: Yeah, I answered. I don't agree. And I can't -- you know, I can't speak for Paul Boyer. Paul Boyer has his own opinions, and his opinion is his own opinion. There's 30 senators that have their own opinions. There's 60 representatives that have their own opinions.
11:27:58 BY MS. SHAH:
11:27:58 Q. So did you -- but -- so you -- do you disagree with both Senator Boyer and Senator Gonzales?

11:28:05 A. I do disagree with them --
11:28:05 Q. And --
11:28:07 A. -- respectfully.
11:28:08 Q. -- did you respond to them?
11:28:09 A. I didn't even -- I didn't -- this may -- I don't
11:28:17 know if this surprises you, but I get thousands of emails.
11:28:20 And when I'm cc'd on -- on a lot of CCs that aren't
11:28:29 directly to me, it's -- I don't read all of them. So I
11:28:35 didn't read this.
11:29:13 MS. SHAH: Maybe take a two-minute break, if
11:29:15 that's okay.
11:29:20 THE VIDEOGRAPHER: We are off the record.
11:29:22 Time on the monitor is 11:28.
11:40:58 (A recess ensued.)
11:40:58 THE VIDEOGRAPHER: We are back on the record.
11:41:09 Time on the monitor is 11:40.
11:41:14 BY MS. SHAH:
11:41:16 Q. Okay. So, Senator Petersen, earlier you agreed
11:41:23 that you intervened to provide a unique perspective;
11:41:27 correct?
11:41:27 A. Not me personally but for the Senate to provide
11:41:31 their unique perspective.
11:41:32 Q. Correct.
11:41:33 And from the perspective of the Senate, what
11:41:37 are the State interests, then, that are served by these

11:41:42 challenged laws?
11:41:43 A. Safe and secure elections.
11:41:45 Q. What do you mean by that?
11:41:47 A. What I mean is elections that people can rely on
11:41:54 and count on. And there's all levels of that. There could
11:42:00 be high confidence, low confidence. I don't know that we
11:42:05 ever reach 100 percent. But I think from the position as a
11:42:09 lawmaker, as long as there's a lack of confidence in -- in
11:42:15 the election, then there's an interest for us to -- that's
11:42:19 going to be something that you're going to say a priority
11:42:22 of legislators.
11:42:24 I mean, I don't know if you guys have seen
11:42:26 the polling. I would imagine you have. There's a -- very
11:42:29 high-level Democrats and Republicans -- I mean, Democrats
11:42:33 too, there's a high level of concern about elections, which
11:42:40 you look at -- I mean, the difference between us and other
11:42:44 countries and concerns, you -- I mean, election security is
11:42:53 so critical to know that you, as a citizen, can move
11:42:57 forward with -- with a -- with, you know, results and with
11:43:04 knowing that you -- the person you voted for or the person
11:43:08 who wins, won.
11:43:10 Q. So how did the Senate evaluate if the challenged
11:43:16 laws would affect this confidence levels that you are
11:43:20 concerned about?
11:43:21 MR. O'MALLEY: Objection. Foundation.

11:43:26 THE WITNESS: I can only -- yeah. I'm sorry.
11:43:27 Go ahead.
11:43:28 MR. O'MALLEY: Foundation.
11:43:28 THE WITNESS: I can only speak for myself
11:43:30 personally. I can't speak for all of the other members.
11:43:33 For me, the polling has been a big part of it. I've been
11:43:36 surprised by how high the number of people that are
11:43:38 concerned about our elections.
11:43:41 So that's part of it. It's just my
11:43:44 constituents. It's -- as I'm talking to people, we are --
11:43:50 legislators are -- you know, we're very connected to -- to
11:43:55 our districts. And I hear it a lot. I hear it a lot.
11:44:00 People are worried about election integrity.
11:44:02 BY MS. SHAH:
11:44:02 Q. Right. No, I understand that.
11:44:04 But I'm asking: How did you -- how did these
11:44:07 challenged laws -- did you evaluate how these challenged
11:44:10 laws would affect that confidence that you're concerned
11:44:10 about?
11:44:13 A. How would these laws -- the laws that we passed,
11:44:16 how would they affect confidence?
11:44:17 Q. The challenged laws, yes.
11:44:18 Did you evaluate that?
11:44:19 A. Yes. They would increase confidence.
11:44:22 Q. How did you evaluate that?

11:44:23 A. Common sense.
11:44:24 Q. And then you mentioned that there's this -- you know, you mentioned that there's really high -- you've seen polling record number of people concerned. Is that since -- you agree that's since the 2020 presidential elections?
11:44:40 A. I don't know exactly when. I mean, it's been -- it's definitely -- I've just noticed that it's increased. It's always a concern, I think. I think it's always been a concern.
11:44:53 I think you'd -- I mean, I think it would be really strange if somebody wasn't concerned about having safe and secure elections. But I am -- but it's definitely -- it's the highest I've ever seen it, the number of people that are concerned about -- where it's a very, like, high priority or high concern for them.
11:45:13 Q. Sorry.
11:45:17 And other than common sense, did you do anything to evaluate whether these challenged laws would affect the confidence that you're concerned about?
11:45:28 A. You mean like -- I'm not sure what you mean. Like a poll? Like a scientific experiment? Or what -- what are you suggesting?
11:45:38 Q. Did you do anything at all?
11:45:39 A. Could you give me an example?

11:45:41 Q. Sure.
11:45:42 Okay. Let's go with yours. Let's -- did you do a poll?
11:45:45 A. So I didn't personally do a poll, but I've seen the results of -- I've seen the polls -- I've seen polls, so . . .
11:45:55 Q. About these challenged laws?
11:45:57 A. No. About election integrity.
11:45:59 Q. That's what I'm asking. I'm talking about how these challenged laws would affect voter confidence.
11:46:05 What, other than common sense, your prior testimony --
11:46:08 A. Yeah. It --
11:46:09 Q. -- what did you do to evaluate whether it would affect -- I need to finish my question, sir.
11:46:12 A. Sorry. Go ahead.
11:46:14 Q. So other than your common sense, what else did you do to evaluate whether these challenged laws would have an effect on voter confidence?
11:46:23 A. I just -- to me, it's -- to me, it's -- I think it's -- I don't know how it could do anything else but improve voter confidence. It doesn't seem like -- I can't imagine wasting thousands of dollars on a poll or -- or doing that on a lot of things that are just -- I mean, it's self-evident, I think, so . . .

11:46:55 Q. So to -- just to clarify, so sitting here today, nothing else; correct?
11:46:59 A. Not that I recall.
11:47:01 Q. Okay.
11:47:14 A. If you can go ahead and skip to the end of the notebook.
11:47:20 Q. Then if you want to skip ahead, I'll do that for you.
11:47:35 So do you know if the -- anybody else in the Senate or legislature did anything to evaluate whether these laws would have any impact on voter confidence?
11:47:44 MR. O'MALLEY: Objection. Lack of foundation. Speculation.
11:47:46 THE WITNESS: Yeah, so I -- not that I recall, but -- you know, I take that back. I -- well, I guess it's the same things that I was talking about earlier.
11:48:00 There's -- and I don't take, you know, their word for it. This is hearsay, which -- for me, I -- I knew first hand of the attorney general's investigation into fraud. I knew of the fraud in Pima County. But I think there were members who -- I think that there were members who, I think, had said they had, you know, proof of these things. But I personally did not have, you know -- I personally didn't do anything to -- to look into those

11:48:40 things.

11:48:40 BY MS. SHAH:

11:48:41 Q. Sorry. Two things, I think, to clarify.

11:48:44 One, did you say "Pima" or "Yuma"?

11:48:46 A. I'm sorry. Yuma.

11:48:48 Q. Okay.

11:48:49 A. Yuma.

11:48:49 Q. Again, I'm not talking about that.

11:48:51 I'm asking what -- do you know of anything
11:48:55 that the Senate or legislature did to evaluate whether the
11:48:59 challenged laws themselves would have any impact on voter
11:49:01 confidence?

11:49:02 MR. LANGHOFER: Foundation.

11:49:04 THE WITNESS: So -- okay. Specifically to
11:49:09 that, I don't recall anything that another legislator did
11:49:13 in that regard.

11:49:13 BY MS. SHAH:

11:49:14 Q. Okay. Do you know -- did you do anything to
11:49:25 evaluate how the challenged laws would affect different
11:49:29 groups of potential voters?

11:49:35 A. Did I do anything? I mean, I think I always do --
11:49:42 I'm always considering that. That's always part of my
11:49:46 consideration is -- as I'm looking at any law is how does
11:49:51 this impact and affect people?

11:49:53 Q. Specifically, did you look to see how these

challenged laws would impact potential voters by race?

A. Yeah. I considered -- I mean, I considered how this law impacts everyone. It doesn't impact anybody by race. It treats everybody the same.

Q. How did you do that? How did you decide that?

A. How did I do that? Because I read the bill, and it never said anywhere that it discriminates against a specific -- it doesn't discriminate against any race. Treats everybody the same. Everybody gets treated exactly the same for this law.

Q. Other than reading the law, did you do anything else to evaluate how this law -- how the challenged laws would impact people by race?

A. No. Not that I recall, no.

Q. Do you know if anybody in the legislature did that?

MR. O'MALLEY: Objection. Lack of foundation.

MR. LANGHOFER: Foundation.

THE WITNESS: So I'm not aware that anyone did that that I know of.

BY MS. SHAH:

Q. Okay. Do you know if anybody -- well, let me ask you first: Do you evaluate how these laws would impact different potential voters by ethnicity?

11:51:06 A. Again, I think it's kind of the same answer. I
11:51:10 always look at how -- I just think it's a general thing,
11:51:14 not just ethnicity. It's everything. How does this law --
11:51:18 not that specifically, but I look at how the laws impact --
11:51:23 look at how this law impacts people.
11:51:26 I don't think it impacts people by ethnicity.
11:51:33 I think it -- I didn't see that. There was no impact for
11:51:36 me to look for. I didn't see it. So -- but I just looked
11:51:40 at it in general: How does this law impact the citizens of
11:51:43 Arizona?
11:51:44 Q. And am I correct that you evaluated that again by
11:51:48 reading the bill and not anything else?
11:51:50 A. Correct.
11:51:51 Q. Okay. Did you -- do you know if anybody in the
11:51:54 legislature did any sort of evaluation about the impact of
11:51:57 these laws by ethnicity?
11:51:58 MR. O'MALLEY: Objection. Foundation.
11:52:00 Speculation.
11:52:01 THE WITNESS: Not that I'm aware of.
11:52:02 BY MS. SHAH:
11:52:03 Q. And did you evaluate how these laws would impact
11:52:08 potential voters by age?
11:52:12 A. Again, it's the same answer as I said before. I
11:52:16 don't -- I don't believe it impacts people by age. It
11:52:20 treats every age the same.

11:52:22 Q. And --
11:52:22 A. Treats everybody the same.
11:52:23 Q. And again, just by reading, not by any other
11:52:25 independent evaluation?
11:52:27 A. Not -- not that I -- would I -- I mean, that's the
11:52:30 best way for me to articulate it, yes.
11:52:33 Q. Okay. Do you know if anybody else in the
11:52:35 legislature did that?
11:52:36 MR. O'MALLEY: Objection. Foundation.
11:52:38 THE WITNESS: Not specifically -- not beyond
11:52:43 their normal process.
11:52:44 BY MS. SHAH:
11:52:46 Q. Can you explain what you mean by that?
11:52:48 A. I'm not aware of any specific, like, special
11:52:51 studies or, you know, things that were conducted. It was
11:52:58 normal, like all bills -- to me, it was a very normal bill.
11:53:04 Didn't have -- you know, there was no scientist -- like I
11:53:12 said, there was no -- there was no specific thing done with
11:53:16 it that I'm aware of.
11:53:17 Q. And then -- but in the normal course, some bills
11:53:26 will have findings made; correct?
11:53:28 A. Like what?
11:53:29 Q. Well, do any bills have findings made about their
11:53:35 impact?
11:53:35 A. Well, there are some bills where -- what I would

11:53:38 say is there are some bills -- sometimes you'll have a
11:53:42 group that will bring in -- like polling. They'll do
11:53:47 polling -- public opinion polling on a bill.
11:53:50 But. I mean, that's kind of how we are as
11:53:52 legislators. We're like -- we're constantly doing public
11:53:55 opinion polls. We're taking the feedback. And that's
11:54:00 really one of the biggest things. We're taking the
11:54:04 feedback from our constituents, and that's generating, you
11:54:07 know, a lot of these -- these ideas that come forward at
11:54:11 the legislature.
11:54:12 Q. Understand.
11:54:13 But I want to make sure that -- so other
11:54:15 than, like, polling, would -- would there be any other
11:54:18 findings made about impacts of law? I'm just speaking
11:54:21 generally, like, you know --
11:54:22 A. I just don't know what those would be, so I . . .
11:54:24 Q. Well, so, for example, like, how much it would
11:54:27 perhaps -- like, the cost might be of implementing a
11:54:31 particular bill, would that be a finding that sometimes is
11:54:33 made?
11:54:35 A. I mean, it could be. I mean, you have people that
11:54:44 work on bills that may do extra work on a bill. But there
11:54:50 was nothing unusual done with this bill. It was very
11:54:53 normal.
11:54:54 Q. I understand that.

11:54:55 But I'm just saying, like, these are -- I'm trying to understand -- not just these bills, but just in general. Like, we've talked earlier about findings, and that's what I'm trying to understand was when the legislature makes findings -- right? -- can that -- can those findings sometimes include the impact of those bills -- potential impact?

11:55:14 A. I wouldn't -- I wouldn't characterize it that way.

11:55:18 Q. How would you characterize it?

11:55:19 A. I would characterize it -- really, what I have said before. Members take into account all the information they receive and then they make a decision based off of all the information they take in.

11:55:33 Q. So members can receive information about how a proposed legislation could have impact on --

11:55:41 A. They could. It's possible.

11:55:43 Q. Okay. All right. So did you evaluate how these laws would impact voters by socioeconomic status?

11:55:54 A. Beyond -- again, I don't -- I don't -- yes, I did my own evaluation. I don't think it impacts people by socioeconomic status. I don't -- I don't see why that would even come up, so . . .

11:56:12 Q. And how did you evaluate that?

11:56:16 A. Again, I read the bill. It doesn't -- nowhere in the bill does it say it's going to discriminate against

11:56:22 someone who's poor, someone who's rich, or -- so there's
11:56:27 no --
11:56:28 Q. So nothing other than just reading the text?
11:56:30 A. Yeah. My understanding of the language.
11:56:33 Q. And do you know if anybody in the legislature did
11:56:35 that?
11:56:36 MR. O'MALLEY: Objection. Lack of
11:56:36 foundation.
11:56:38 THE WITNESS: I'm not aware of that.
11:56:40 BY MS. SHAH:
11:56:40 Q. And did you evaluate how the challenged laws would
11:56:44 affect voters who had obtained citizenship by birth or
11:56:50 through naturalization?
11:56:53 A. Can you repeat that question, please?
11:56:55 Q. Yeah.
11:56:56 Did you evaluate how the challenged laws
11:56:59 would affect voters who had obtained citizenship by birth
11:57:04 or through naturalization?
11:57:09 A. Again, I just did my personal evaluation of that.
11:57:13 Q. What is your personal evaluation of that?
11:57:15 A. My personal evaluation is that it's reasonable to
11:57:21 show your citizen- -- to need to show that you're a citizen
11:57:27 to be able to vote.
11:57:28 Q. Did you evaluate whether that would be different
11:57:32 for folks who are born in the United States versus those

11:57:35 who are naturalized?
11:57:37 A. I see it differently than perhaps your -- how
11:57:42 you're seeing it. I see it as they're all -- whoever is
11:57:47 naturalized is treated the same. Whoever was born as a --
11:57:51 as a citizen is treated the same. So I see -- I don't see
11:57:58 this -- I don't see a disparate impact.
11:58:03 Q. But -- so -- fair enough.
11:58:05 But -- so that means that you didn't see
11:58:07 whether there was going to be any difference in impact
11:58:10 between citizens who were born here versus those who
11:58:14 naturalized; correct?
11:58:15 MR. O'MALLEY: Objection. Asked and
11:58:15 answered.
11:58:16 THE WITNESS: Yeah, I would just say the
11:58:17 same -- just repeat the same thing that I said. I don't --
11:58:23 I don't see how it impacts them differently.
11:58:25 BY MS. SHAH:
11:58:27 Q. Okay. And so you didn't --
11:58:30 A. So it's a personal -- my answer is I did a
11:58:33 personal evaluation.
11:58:34 Q. And what does that personal evaluation entail?
11:58:36 A. Well, a lot of things.
11:58:38 Q. Such as?
11:58:39 A. Like, I couldn't -- like, we could go on for a
11:58:41 long time -- but maybe for days. It's -- it's just all my

11:58:46 experiences, you know. It's is this reasonable? Is
11:58:54 this -- you know, does -- how does this -- how does this
11:59:00 impact people? Does this impact people?
11:59:03 Whatever it is that, you know, forms how
11:59:05 we -- who we are and how we think, it's -- I evaluate the
11:59:11 bill based on my -- you know, where I'm at and how does
11:59:17 this impact people. Does this -- and I don't see how it
11:59:20 impacts anybody differently than anybody else. I saw it as
11:59:23 a fair -- as a fair bill.

11:59:27 Q. So specifically with the difference between people
11:59:31 born in the United States versus those who were
11:59:33 naturalized, you didn't look at or talk to anybody about --
11:59:38 like, did you look to any experts or academics about this?

11:59:42 A. I actually talked to people who weren't citizens.

11:59:45 Q. Who -- I'm sorry. Who?

11:59:46 A. I actually talked to people who weren't citizens.

11:59:48 Q. I'm talking about --

11:59:49 A. And they told me they thought it was reasonable.
11:59:52 In fact, they told me they -- they wouldn't expect for me
11:59:57 to be able to vote in their country. So yeah, I mean,
12:00:03 I've -- that was part of a discussion I had had before,
12:00:08 part of my experience.

12:00:09 Q. But did you talk to people who are naturalized
12:00:12 versus who were born here about any differences that they
12:00:15 experience?

12:00:17 A. So my sister-in-law was naturalized here. I actually asked her about it as well. She thought it was reasonable.
12:00:23 Q. And so you did do some evaluation of whether this would have an impact on --
12:00:27 A. Yeah, I did.
12:00:28 Q. -- naturalized versus people who are born in the United States?
12:00:34 MR. O'MALLEY: Let her finish.
12:00:34 THE WITNESS: Sorry.
12:00:35 MR. O'MALLEY: You're talking over each other.
12:00:36 THE WITNESS: Okay. I apologize.
12:00:38 So yes, as we're talking, I do remember now having that discussion with my sister-in-law. I also had the discussion with a noncitizen, and both of them said they thought it was reasonable. So that helps in part of the decision-making process. It's not everything, but it's just part of what you weigh as you make a decision.
12:00:59 BY MS. SHAH:
12:00:59 Q. Did you evaluate any other things to evaluate the impact between people who are born here versus voters who are naturalized, other than those two individuals?
12:01:08 A. Not that I remember right now, no.
12:01:10 Q. So no reports or studies?

12:01:13 A. No.
12:01:13 Q. No datasets?
12:01:17 A. Not that I can think of right now.
12:01:19 Q. Do you know if anybody in the legislature did
12:01:22 that?
12:01:22 MR. O'MALLEY: Lack of foundation.
12:01:24 THE WITNESS: I'm not -- I don't know. I
12:01:27 don't know if they did or not.
12:01:28 BY MS. SHAH:
12:01:29 Q. Okay. Did you evaluate how these laws may impact
12:01:39 a voter who had noncitizen members in their household?
12:01:44 A. Yeah. Again, just a personal evaluation.
12:01:49 Q. Again, what do you mean by that?
12:01:51 A. So my wife is not a citizen of this country.
12:01:56 She's a citizen in Mexico.
12:01:57 Q. Okay.
12:01:58 A. So I asked her about it. She thought it was
12:02:01 reasonable.
12:02:02 Q. Did you do -- talk to anybody else about that,
12:02:06 about a voter who had noncitizen members in their
12:02:10 household?
12:02:10 A. Again, it would be a discussion with perhaps --
12:02:26 not that I recall. Not specifically.
12:02:29 Q. Okay. Do you know --
12:02:30 A. Trying to think, but I can't think of anything

12:02:32 right now.
12:02:34 Q. Do you know if anybody in the legislature had any
12:02:36 evaluations done of whether -- how these laws might affect
12:02:40 voters who had noncitizen members in their household?
12:02:42 MR. LANGHOFER: Foundation.
12:02:43 MR. O'MALLEY: Lack of foundation.
12:02:44 THE WITNESS: Not that I'm aware of.
12:02:47 BY MS. SHAH:
12:02:50 Q. Did you do any evaluation on how these laws may --
12:02:55 challenged laws may impact voters by marital status?
12:03:00 A. Again, it's just a personal evaluation. Don't
12:03:04 think that that -- I don't think that marital -- that this
12:03:07 impacts people differently whether they're married or not.
12:03:13 Q. And again, just -- I'm going to -- I'm sorry.
12:03:15 Just to clarify for the record.
12:03:16 To confirm, your personal evaluation would be
12:03:20 the conversations that you had with your wife, your
12:03:22 sister-in-law, or reading the text; correct?
12:03:24 A. Correct.
12:03:25 Q. Okay. And do you know if anybody in the
12:03:28 legislature did any evaluation of how these laws would
12:03:32 impact voters by marital status?
12:03:34 MR. LANGHOFER: Foundation.
12:03:35 MR. O'MALLEY: Foundation.
12:03:37 THE WITNESS: Again, I don't -- I don't know

12:03:41 if they did or not.
12:03:43 BY MS. SHAH:
12:03:43 Q. Okay.
12:03:43 A. I don't speak for them.
12:03:45 Q. Do you know if there was any evaluation done of
12:03:50 the impact of these challenged laws by gender?
12:03:53 MR. O'MALLEY: Objection. Vague.
12:03:55 THE WITNESS: Yeah, again, personal
12:03:57 evaluation. I don't -- my personal opinion is this doesn't
12:04:02 impact people differently based on their gender.
12:04:02 BY MS. SHAH:
12:04:06 Q. Again, personal evaluation would be in
12:04:11 conversations with these two individuals and your reading
12:04:15 of the text?
12:04:15 A. No. No. This is my -- just my own personal
12:04:18 evaluation and feedback from -- just feedback from either
12:04:25 my -- you know, my constituents.
12:04:26 Q. For gender? Okay.
12:04:28 A. Like, I never heard -- is -- I guess more than
12:04:31 anything, it's an absence of -- I never heard any
12:04:34 opposition whatsoever to -- or concern of -- you know, that
12:04:43 it -- that it impacted --
12:04:43 Q. I think you need to speak louder. She is having a
12:04:46 hard time hearing.
12:04:47 A. Oh, okay. I've -- I --

12:04:47 Q. No, Not the mike. The mike doesn't help her.
12:04:49 A. I'm just saying for me, there's -- I've never
12:04:51 had -- I have never heard anyone say this impacts gender.
12:04:55 It's not something I've ever heard.
12:04:57 Q. But outside of not hearing anything, did you do
12:05:01 anything to evaluate whether it did?
12:05:02 A. No.
12:05:02 Q. Do you know if anybody in the legislature did
12:05:04 that?
12:05:05 MR. O'MALLEY: Objection. Foundation.
12:05:06 THE WITNESS: I'm not aware of anybody that
12:05:07 did.
12:05:08 BY MS. SHAH:
12:05:08 Q. Okay. And did you evaluate how these laws would
12:05:11 impact potential voters by party -- or political party,
12:05:14 rather?
12:05:16 A. Just by my personal evaluation that it does not.
12:05:21 It doesn't -- it applies to all parties equally.
12:05:23 Q. And again, your personal evaluation is?
12:05:27 A. Just my personal experience.
12:05:28 Q. Which is based on reading the text?
12:05:30 A. Uh-huh.
12:05:30 Q. Anything else?
12:05:31 A. And just feedback from, you know, just what I
12:05:35 learned from -- what I learned from people. I didn't

12:05:38 hear -- I don't recall any Democrats saying that. So they
12:05:54 may have -- in action committee, they may have. But again,
12:05:58 I can't speak -- I can't speak for them.
12:06:00 Q. So, sir, I'm just going to say that I think the
12:06:03 mike only helps with the camera. So when you fade out,
12:06:05 Cindy is, like, leaning over --
12:06:05 A. Oh, okay.
12:06:06 Q. -- to hear what you're saying.
12:06:07 A. Oh, she has to hear me?
12:06:09 Q. Cindy has to hear you.
12:06:10 A. Okay. I'm not --
12:06:10 Q. So . . .
12:06:11 A. Yeah, it -- the -- I may have -- the Democrats may
12:06:14 have said that. That may have been an argument that they
12:06:18 made but -- as it was moving through the process. Those
12:06:25 are their words.
12:06:28 Q. Did you do anything to evaluate whether that was
12:06:31 true or false?
12:06:33 A. Oh, no. I knew it was false.
12:06:35 Q. How did you know it was false?
12:06:37 A. Because the Democrat -- no, I'm kidding. I'm
12:06:39 joking now.
12:06:42 Because it doesn't. It's -- applies to -- it
12:06:46 applies to everybody equally. I think that a lot of
12:06:50 times -- may not surprise you -- but as we're going through

12:06:54 the process, people will say -- you know, you'll often hear
12:07:00 -- people will say "This is unconstitutional" when it's
12:07:05 perfectly constitutional. But it's used to -- because they
12:07:11 want to make, you know -- they disagree with policy.
12:07:13 So . . .
12:07:13 Q. But you didn't -- other than -- but you didn't do
12:07:17 anything specifically to evaluate whether these were true
12:07:19 or false?
12:07:21 MR. O'MALLEY: Objection. Asked and
12:07:22 answered.
12:07:22 THE WITNESS: Did I do anything to see if it
12:07:30 was true or false? Again, it's just -- reading the text,
12:07:43 yeah, I look at the text of it and it applies to everybody.
12:07:47 It doesn't say anything in the text that this affects one
12:07:52 party over another party.
12:07:53 BY MS. SHAH:
12:07:54 Q. So nothing else?
12:07:54 A. No. Just personal -- somebody saying something
12:07:58 personally. And they also didn't do anything. They didn't
12:08:02 show any proof or show any -- I mean, they had no proof,
12:08:08 so . . .
12:08:09 Q. Did you ask them to provide any proof?
12:08:13 A. Not that I'm aware of. Not that I recall.
12:08:16 Q. Did you look into the cost of obtaining
12:08:23 documentary proof of citizenship?

A. I did not, no.

Q. Do you know whether these could be prohibitive for somebody?

MR. O'MALLEY: Objection. Speculation.

THE WITNESS: I personally don't think it's prohibitive. I don't. I think you -- I mean, people have to show ID to buy a pack of cigarettes, to buy alcohol. It's -- ID is shown and -- or citizenship and ID is shown in, you know, every -- you know, as far as I know, every country in the world. These are normal requirements in every country of the world. I don't think it's unreasonable or costly to carry something that you're supposed to already have.

BY MS. SHAH:

Q. But an ID isn't necessarily the same thing as documentary proof of citizenship; correct?

MR. O'MALLEY: Objection. Legal conclusion.

THE WITNESS: It could be. Yeah, an ID could be different, but it could also be proof of citizenship. It could be; it might not be, so . . .

BY MS. SHAH:

Q. Do you -- so again, what did you do to evaluate whether getting documentary proof of citizenship is costly for somebody or not?

A. It's just my knowledge -- personal knowledge that

12:09:55 it's -- it's not costly to have a copy of your birth
12:10:00 certificate. It's not costly to have your proof of
12:10:05 naturalization. These are important documents that people
12:10:09 should keep and hold on to.
12:10:10 Q. So do you know how much it costs to get a birth
12:10:17 certificate?
12:10:17 A. I mean, it depends on what state. Approximately.
12:10:29 It's -- I think it's around probably $15 or so.
12:10:34 Q. Okay. And do you know how much it costs to get a
12:10:38 passport?
12:10:40 A. I don't know off the top of my head. It's been a
12:10:46 few years since I got mine.
12:10:47 Q. About how much it may cost to get a duplicate
12:10:51 naturalization certificate?
12:10:54 A. Off the top of my head, I don't know what that is.
12:10:58 Q. Do you know how much it would cost to get a REAL
12:11:03 ID?
12:11:03 A. My understanding is that that is issued with the
12:11:11 driver's license now -- where you can get that with your
12:11:16 driver's license now. I'm trying to think.
12:11:18 I think I did get a REAL ID recently, or I
12:11:21 got a copy of it. It was like 12 -- I don't know off the
12:11:25 top of my head. I'd have to guess. I would be
12:11:27 speculation. I think it was about 12 bucks, from what I
12:11:30 recall.

12:11:30 Q. So other than your personal experience, you didn't
12:11:32 look into what it might cost to get documentary proof of
12:11:36 citizenship; correct?
12:11:37 A. No.
12:11:37 Q. Okay. And do you know if anybody in the
12:11:40 legislature did that?
12:11:41 MR. O'MALLEY: Lack of foundation.
12:11:42 THE WITNESS: Not that I'm aware of.
12:11:45 BY MS. SHAH:
12:11:45 Q. Did you look into how much time it would take to
12:11:51 get a documentary proof of citizenship?
12:11:55 A. Did I look into it? I didn't -- no, I did not
12:12:09 look into that.
12:12:10 Q. Do you know if anybody in the legislature did
12:12:12 that?
12:12:12 MR. O'MALLEY: Lack of foundation.
12:12:13 THE WITNESS: Not that I'm aware of, no.
12:12:16 BY MS. SHAH:
12:12:25 Q. Did you look into whether it would be relatively
12:12:29 easy or difficult of getting and providing DPOC?
12:12:33 MR. O'MALLEY: Objection. Vague.
12:12:35 THE WITNESS: What's DPOC?
12:12:36 BY MS. SHAH:
12:12:37 Q. Documentary proof of citizenship.
12:12:41 A. I did not look into it any more than just --

12:12:46 again, my personal knowledge and experience that
12:12:52 documents -- important documents that you have, you should
12:12:59 be able to provide those. You should have -- you -- anyone
12:13:03 who is a citizen should have those important documents.
12:13:07 It's not unreasonable to expect a person to have a copy of
12:13:12 their -- an original copy of their -- of their citizenship.
12:13:18 Q. I'm sorry. And maybe Cindy can read this back.
12:13:21 But what is it that you said that you think
12:13:22 it's -- what kind of documents? I missed -- I just --
12:13:26 A. Proof of citizenship.
12:13:26 Q. No. No. You said something about, like, there's
12:13:28 some important documents or something along those lines.
12:13:31 A. Oh, yeah. I was saying if you have really
12:13:33 important documents that you use for all sorts of things, I
12:13:37 don't think it's unreasonable for people to have those.
12:13:40 Q. Okay. So have you looked into any studies or any
12:13:44 reports, other than your personal experience, about the
12:13:49 race of people having these important documents?
12:13:53 A. No.
12:13:57 Q. Okay. So do you know if anybody in the
12:13:59 legislature did any evaluation on the relative ease or
12:14:04 difficulty of obtaining and providing documentary proof of
12:14:07 citizenship?
12:14:07 MR. O'MALLEY: Foundation.
12:14:08 THE WITNESS: Yeah, I don't know if they did

12:14:10 or not.
12:14:11 BY MS. SHAH:
12:14:13 Q. Do you -- did you evaluate whether provisions in these challenged laws requiring county recorders to refer voters to the county and attorney general for potential investigation would deter anybody from registering to vote?
12:14:32 A. Is that one question?
12:14:34 Q. Yeah.
12:14:35 A. Okay. Can you repeat the question?
12:14:36 Q. Sure.
12:14:37 Did you evaluate whether the provisions in these bills that require county recorders to refer certain voters to the county and attorney general for potential investigation would deter them from registering to vote?
12:14:52 A. Yeah. Just -- again, just my personal evaluation. I don't think it deters anybody who is a legal citizen from voting. That's my evaluation.
12:15:03 Q. And did you look into whether responding to these investigations would be costly for anybody?
12:15:13 A. I would say, based off of my experience, my evaluation of that was it won't because there are very -- there's a high standard. There's a very high standard for these investigations to -- to happen. So my personal evaluation is that it would not be costly.
12:16:02 Q. What is the standard for these investigations?

MR. O'MALLEY: Objection to the extent it calls for a legal conclusion.

MS. SHAH: I'm asking because he said his understanding, and that's what I want to know.

THE WITNESS: Yeah, it's just that's my understanding, just personal experience. Like you said before -- you asked me, "Why didn't you call the police on the Twitter?" Well, they're not going to do anything. That's why. I didn't think they'd do anything.

So my experience is -- and -- and they'll say it. You'll hear -- you'll hear them say it. Like, these are -- these are not -- they'll prioritize what they think -- I mean, my dad had his phone stolen. We knew who stole it. We couldn't get somebody to go over and prosecute the people who stole his phone. I mean -- so no, I didn't -- as I evaluated it, I didn't think this would cost -- that's what I mean by -- by a high standard.

They -- they -- it's my personal experience that there's a lot of times that police do not investigate unless they're very -- unless they feel like there's something there. If you have -- I mean, I don't have it memorized, but, you know, there's, you know, probable cause and reasonable suspicion and all -- and these different standards that are out there. And I don't think you're going to have -- I haven't seen -- I mean, we saw the

12:17:40 cases. You're not talking about a high number of people.
12:17:45 And if you are, it's because there's something there.
12:17:48 So . . .
12:17:49 BY MS. SHAH:
12:17:49 Q. You mentioned things like high level of probable
12:17:53 cause or something along those lines; right? Do you know
12:17:55 if any of those standards were in these legislation --
12:17:58 A. I don't --
12:17:58 MR. O'MALLEY: Objection. Calls for a legal
12:18:00 conclusion.
12:18:00 THE WITNESS: Yeah, so --
12:18:00 BY MS. SHAH:
12:18:01 Q. I was interrupted.
12:18:01 Are they -- are they actually just verbatim?
12:18:04 A. I don't -- as I recall, there's no legal standard
12:18:06 in -- there's no --
12:18:06 Q. Okay.
12:18:07 A. -- legal standard --
12:18:08 Q. And then I want to go back -- you mentioned that
12:18:10 thing about the -- the Twitter situation. I want to come
12:18:14 back to that for just a quick second.
12:18:16 Earlier we talked about the -- I believe the
12:18:21 Election Integrity Unit -- right? -- at the attorney
12:18:22 general's --
12:18:22 A. Yeah.

12:18:23 Q. You're aware of that --
12:18:23 A. Yes.
12:18:24 Q. -- right?
12:18:24 A. Uh-huh.
12:18:25 Q. And what is your understanding of that unit?
12:18:32 A. That it's something that you can report -- you can
12:18:37 report fraud to.
12:18:40 Q. Did you report this tweeter to that unit?
12:18:42 A. I didn't, no.
12:18:43 Q. Why not?
12:18:44 A. I didn't think that they would be able to
12:18:46 identify -- I don't know. I didn't think -- I didn't
12:18:49 necessarily think they would do anything with it, so . . .
12:18:52 Q. And then did you know if the legislature evaluated
12:18:59 whether the provisions of these bills subjecting county
12:19:04 recorders to refer certain voters to the county attorney
12:19:07 general for potential investigation would deter them from
12:19:11 registering to vote?
12:19:12 MR. O'MALLEY: Objection. Asked and
12:19:14 answered. Foundation.
12:19:14 THE WITNESS: Again, yeah, just my personal
12:19:17 evaluation. Didn't -- I didn't feel like that would --
12:19:17 BY MS. SHAH:
12:19:19 Q. Again, your personal evaluation is just based on
12:19:22 your personal experience, not on anything else; correct?

12:19:24 A. Correct. Reading the bill, personal experience.
12:19:27 Q. And then did you evaluate whether the provisions in these bills subjecting county recorders themselves to potential committal investigation and prosecution would deter them from registering people to vote?
12:19:53 A. Kind of. I mean, just -- there was -- I recall some committee testimony. And they didn't say -- that wasn't something that they -- as I recall -- you know, I -- I don't recall.
12:20:13 I mean, I know we took into account their testimony. I don't recall exactly what it was. So -- so I would say that would be something that we took into account.
12:20:21 Q. So -- and again, just to clarify, you would have taken it into account had they testified, I believe -- or at the hearing about whether this would have deterred them or not; right?
12:20:36 A. What I'm saying is that that would be something we'd take into consideration.
12:20:41 Q. Okay. So did they?
12:20:44 A. Yeah, I don't -- I don't remember them saying it would deter people from registering to vote.
12:20:48 Q. Okay. So -- but do you remember whether any county recorders testified?
12:20:56 A. They all -- I -- I -- I'm sure they did. They

12:21:03 would -- they would be -- normally, they would testify on a
12:21:06 bill like this, so I would imagine they did. I don't
12:21:09 remember their specific testimony, but I imagine they did.
12:21:12 Q. And so you don't recall whether they were in
12:21:14 support or in opposition to these challenged laws; correct?
12:21:19 A. Not off the top of my head.
12:21:23 Q. So -- but other than the testimony that they would
12:21:28 have provided, you didn't consider anything else about
12:21:32 whether the provisions in these challenged laws that would
12:21:37 subject them to criminal investigation, prosecution would
12:21:40 deter them from registering to vote?
12:21:43 A. I can only speak for myself. Not that I -- I
12:21:48 don't recall anything else that I took into consideration.
12:21:51 Q. Okay. Are you aware if anybody else in the
12:21:54 legislature did?
12:21:54 MR. O'MALLEY: Objection. Lack of
12:21:55 foundation.
12:21:55 THE WITNESS: I'm not.
12:21:56 BY MS. SHAH:
12:21:57 Q. Okay. Did you conduct any sort of cost-benefit
12:22:03 analysis or study in connection with the challenged laws?
12:22:07 A. Besides my personal evaluation, I -- there was
12:22:12 nothing else that I -- that I did. Besides my -- besides
12:22:16 my personal evaluation, no.
12:22:18 Q. Okay. And do you know if anyone else in the

12:22:22 legislature did that?
12:22:24 MR. O'MALLEY: Lack of foundation.
12:22:24 THE WITNESS: I don't.
12:22:25 BY MS. SHAH:
12:22:26 Q. And do you know -- did you look at any other
12:22:29 studies or reports in connection with the challenged laws?
12:22:34 A. Not that I recall.
12:22:52 Q. So what -- can you tell me what is the interest in
12:22:59 preventing federal-only voters from voting by mail here?
12:23:06 MR. LANGHOFER: Relevance. It's already been
12:23:11 disclosed.
12:23:15 THE WITNESS: Can you be more specific?
12:23:17 BY MS. SHAH:
12:23:18 Q. Well, do you agree that HB 2492 says that
12:23:25 federal-only voters can't vote by mail?
12:23:32 MR. LANGHOFER: Legal conclusion.
12:23:34 THE WITNESS: I would have to read -- I would
12:23:36 have to -- have to refresh my recollection from the bill.
12:23:41 MS. SHAH: Let me see if we can't get a copy
12:23:44 of that. Let's go off the record so we can get a copy.
12:23:48 THE VIDEOGRAPHER: We are off the record.
12:23:51 Time on the monitor is 12:23. This will end Media
12:23:59 Number 2.
12:24:01 (A recess ensued.)
12:26:10 THE VIDEOGRAPHER: We are back on record.

12:26:22 Time on the monitor is 12:25. This will begin Media Number 3.
12:26:30 BY MS. SHAH:
12:26:31 Q. Okay. So can you tell me what's the interest in allowing federal-only voters to vote for congressional -- U.S. congressional elections but not in presidential elections?
12:26:48 A. Can you repeat the question?
12:26:49 Q. Yeah.
12:26:50 What is the interest in allowing --
12:26:52 A. Whose interest?
12:26:53 Q. The State's interest.
12:26:56 A. Okay. What is the State's interest? Okay. Go ahead.
12:26:58 Q. In allowing federal-only voters to vote in congressional elections but preventing federal-only voters from voting in presidential elections?
12:27:08 MR. LANGHOFER: Relevance. Foundation.
12:27:10 THE WITNESS: So this is actually -- I mean, I would have -- I'd be spec- -- purely speculating. This was done by the legislature before I was there. So I would have to just give you my personal opinion.
12:27:29 Are you talking about why we have a federal-only ballot instead of a -- why do we have -- why does Arizona have federal-only ballots?

12:27:37 BY MS. SHAH:
12:27:38 Q. No. I'm talking about why 2492 seeks to prevent federal-only voters from voting in presidential elections but not in congressional elections.
12:27:47 A. Oh, okay.
12:27:49 MR. O'MALLEY: Object to the extent it calls for a legal conclusion.
12:27:53 MR. LANGHOFER: Relevance. Foundation.
12:27:55 THE WITNESS: Yeah, I would have to -- you'd have -- I'd have to read the language of the bill.
12:28:00 BY MS. SHAH:
12:28:04 Q. Fair enough.
12:28:05 But I just want to like -- but -- but just practically speaking, what is the -- what is the interest in that? Like, differentiating between congressional and presidential elections?
12:28:14 MR. O'MALLEY: Objection. Relevance.
12:28:17 MR. LANGHOFER: Same objection.
12:28:17 MR. O'MALLEY: Same objection.
12:28:19 THE WITNESS: Well, I mean, I'd have to think about this for a little bit.
12:28:21 But one thing is that the presidential -- are you talking presidential general or are you talking the primary elections? What are we talking about here?
12:28:33 BY MS. SHAH:

12:28:33 Q. Talking about presidential elections generally, general elections.
12:28:37 A. So in the primary election, I could see why we would have it separate. There would be reasons for that. I don't remember the policy arguments -- just off the top of my head, I don't remember the policy arguments for that.
12:28:52 Q. But you voted for 2492; correct?
12:28:55 A. I did.
12:28:57 Q. And so what was your reason for saying that there should be a difference between voting for presidential elections and congressional elections?
12:29:04 MR. LANGHOFER: Form. Scope.
12:29:06 THE WITNESS: Yeah, again, I'd have to read everything. And the -- I don't remember what the reason was at the time. I think -- I kind of think, but I would be guessing what that was. I would have to study -- would have studied the bill, studied the language.
12:29:19 So I think -- I mean, I think I know, but I don't want to -- I don't want to speculate why. I don't remember. I would have to go back in time to remember why I thought that was the right policy.
12:29:32 But without that, I would have to look at the current policy. I would have to study the current policy and get it.
12:29:38 MS. SHAH: Guess what? Let's go on break.

12:29:40 Lunch is here.
12:29:41 THE WITNESS: Okay. Great.
12:29:42 THE VIDEOGRAPHER: We are off the record.
12:29:46 Time on the monitor is 12:29.
13:04:29 (A recess ensued.)
13:04:29 THE VIDEOGRAPHER: We are back on the record.
13:04:42 Time on the monitor is 1:04 p.m.
13:04:52 BY MS. SHAH:
13:04:53 Q. So, Senator Pearson [sic], do you -- I'm going to
13:04:58 hand you what's Tab 7. It's a brief that was filed on your
13:05:06 behalf about, you know, legislative privilege. I just
13:05:10 wanted to draw your attention to one thing.
13:05:10 A. Okay.
13:05:10 (An off-the-record discussion ensued.)
13:05:10 (The document was marked as Exhibit 432
13:05:29 for identification.)
13:05:29 BY MS. SHAH:
13:05:29 Q. And there on -- I think it's -- I believe it's on
13:05:34 pages 4 -- starting at the bottom of page 4, like, where it
13:05:39 says 4 on the bottom. Do you see that? Line 25-ish? It
13:05:48 says, "Here, the Speaker and President." Do you see that?
13:05:50 A. Yes.
13:05:51 Q. Okay. So I'm just going to read that first.
13:05:53 "Here, the President -- I'm sorry -- "Here,
13:05:55 the Speaker and President have not asserted a defense based

13:05:58 upon privileged materials or information that Plaintiffs
13:06:01 cannot defend without access to that same privileged
13:06:04 information. To the contrary, the Speaker and President's
13:06:08 defense with respect to legislative intent relies solely
13:06:11 upon the publicly available legislative history materials
13:06:14 from the Arizona Legislature's website."
13:06:17 Did I read that correctly?
13:06:19 A. You did.
13:06:21 Q. You agree with that; correct?
13:06:22 A. Did I agree with this --
13:06:25 Q. Yes.
13:06:25 A. -- when it was done?
13:06:27 Q. Yes.
13:06:27 A. Do I agree with it now?
13:06:32 "Here, the Speaker and President have not
13:06:35 asserted a defense based upon" --
13:06:36 THE COURT REPORTER: I need to be able to
13:06:37 understand you.
13:06:38 THE WITNESS: Oh, okay. I'll just read in my
13:06:40 head.
13:06:58 MR. HORLEY: Sorry to interrupt. This is Tim
13:06:59 Horley for the state AG. We're -- for those of us on Zoom,
13:07:03 we're not having any video feed right now.
13:07:08 MS. SHAH: Sorry about that.
13:07:10 MR. LANGHOFER: Welcome back.

13:07:15 BY MS. SHAH:
13:07:15 Q. So, Senator, do you -- do you agree with that?
13:07:17 A. I'm trying to make sure I have this in context. I
13:07:25 want to read this for a minute.
13:07:27 Q. Well, okay. Maybe I can just simplify this.
13:07:28 I just want to know what -- you agree that
13:07:30 everything you considered on this would be on the website.
13:07:33 That's all I want to confirm with you.
13:07:36 A. On what? Everything on this on -- what's "this"?
13:07:40 Q. Sorry. You are correct. Let me -- totally fair.
13:07:44 That anything about your defense of the
13:07:47 legislature's intent regarding the enactment of the
13:07:49 challenged laws relies solely upon those things that are
13:07:52 available on the website; correct?
13:07:53 A. Okay. Then I'm not using -- I didn't use
13:07:57 privileged information to make my decision.
13:08:00 Q. I'm saying that everything that you relied upon on
13:08:03 that is on the website; correct?
13:08:07 MR. LANGHOFER: Object. Misstates evidence.
13:08:09 MS. SHAH: Well, that's what I'm asking. I
13:08:10 don't want to misstate it.
13:08:10 BY MS. SHAH:
13:08:12 Q. That's what I'm trying to ask is that -- the
13:08:14 legislature's intent, the evidence relied on, is on the
13:08:17 website; correct?

13:08:18 MR. O'MALLEY: Object. It calls for a legal
13:08:20 conclusion.
13:08:22 THE WITNESS: So, I mean, I believe that -- I
13:08:34 mentioned this before, that people also they use their
13:08:40 experience. They use, you know, feedback from constituents
13:08:46 and so forth. I guess that's not -- that's not privileged.
13:08:49 So necessarily, that's -- that's still public information.
13:08:54 So yeah, I guess I -- I guess I do agree with that.
13:08:58 BY MS. SHAH:
13:08:58 Q. Okay. So again -- but -- so that's a fair point.
13:09:02 Correspondence with constituents about the
13:09:04 challenged laws, that's not on the website, though;
13:09:09 correct?
13:09:09 A. No, it's not. It's not on video. It can be.
13:09:14 It's not -- not -- it's not always there. Not -- if you're
13:09:19 at a district meeting or if you, you know -- or somebody --
13:09:26 but it is all -- you know, if they've sent you an email,
13:09:28 it's there. If they've met with you, then -- you know,
13:09:34 so --
13:09:35 Q. When you say "it's there," what do you mean by
13:09:37 that? It's on the website?
13:09:38 A. If it's sent in email, then that's public. I
13:09:41 mean, that's available to the public.
13:09:42 Q. And would you have produced that?
13:09:44 A. Yeah.

13:09:45 Q. Okay. And was there -- if there was correspondence among legislative members, staffs, and interns, would that be on the website?
13:09:59 A. It would either be on the website. It would be in members' emails.
13:10:04 Q. Which would be publicly available?
13:10:06 A. Uh-huh.
13:10:06 Q. Including between members?
13:10:08 A. Yes.
13:10:09 Q. Okay. And that would have been produced?
13:10:11 A. Yes.
13:10:11 Q. Okay. So was there -- and then what about the correspondence with third-party interest groups?
13:10:25 A. Same thing. We get -- we would get emails from them or they would present in committee, so . . .
13:10:34 Q. And again, just to clarify, because I think I may have misunderstood, but is your testimony that emails between legislators will be on the website?
13:10:42 A. It's -- it's not on the website. It's available to the public.
13:10:45 Q. Okay.
13:10:45 A. They're -- they're public records.
13:10:48 Q. All right. And then just go back to -- I think we talked about this a little bit earlier, but I just wanted to just clarify this real quickly; right?

13:11:03 You -- is it your understanding that -- your understanding is that HB 2492 and HB 2243 are not being implemented -- correct? -- right now?
13:11:17 A. It is my understanding that they're -- that it's in litigation. So it's -- that it's on hold, yeah.
13:11:25 Q. Right.
13:11:25 But you agree that the general effective date for those laws were passed -- that were passed in the second legislative session, such as HB 2492 and HB 2243, that would have been in -- I believe September 24, 2022. Does that sound right?
13:11:41 A. It would be 90 days after session ends. I don't know --
13:11:43 Q. Okay.
13:11:44 A. I don't know when that was without looking it up.
13:11:46 Q. But that was your understanding that that would be the effective date: 90 days?
13:11:50 A. Unless there was an effective date written into the bill that I'm -- you know, I'd have to look at the bill.
13:11:55 Q. And you agree that -- does it refresh your recollection if I tell you that the effective date, to your point, for 2492 was moved so that it wouldn't go into effective effect until January 2023?
13:12:08 A. Okay. That sounds -- that does not surprise me.

13:12:11 Q. Okay. But do you -- but you agree that that
13:12:14 didn't actually happen for HB 2243. Do you recall that?
13:12:19 A. What do you mean?
13:12:19 Q. That the effective date was the standard 90 days
13:12:22 after the session?
13:12:23 A. I -- I don't know. I'd have to look at the bill
13:12:26 to see if it was.
13:12:27 Q. Okay.
13:12:28 MS. SHAH: I think -- can we -- I believe
13:12:37 it's PX 2. That's 2243. We -- we just leave it as PX 2,
13:13:10 or would you like to mark this?
13:13:11 We'll leave it as PX 2.
13:13:30 THE WITNESS: I don't see -- I don't see -- I
13:13:31 don't see an effective date on here.
13:13:34 BY MS. SHAH:
13:13:34 Q. Okay. So --
13:13:36 A. So it would be 90 days after session ended.
13:13:39 Q. And so I will represent to you that 90 days would
13:13:42 have been September 24th. And if I'm wrong, we'll correct
13:13:47 the record.
13:13:47 But September 2022 no less would have been
13:13:51 the effective date. So that would mean that when you
13:13:57 passed this law, before the -- they were challenged;
13:14:00 right --
13:14:01 A. Uh-huh.

13:14:01 Q. -- that it would have been in effect before the
13:14:04 next federal election in November 2022 then --
13:14:07 A. Correct.
13:14:07 Q. -- right?
13:14:08 And is it correct that just generally -- I'm
13:14:13 not going into the weeds of the legislation -- but that
13:14:16 HB 2020 -- 2243 deals with the cancelation of certain voter
13:14:20 registrations; correct?
13:14:21 A. Right.
13:14:21 Q. And so that -- it's your understanding that in
13:14:24 that situation, there would have been some voters who could
13:14:27 have gotten canceled before the November 2022 election;
13:14:31 correct?
13:14:31 MR. O'MALLEY: Objection. Calls for
13:14:32 speculation.
13:14:32 MR. LANGHOFER: Foundation.
13:14:33 THE WITNESS: So --
13:14:35 MR. LANGHOFER: Legal conclusion.
13:14:36 THE WITNESS: Yeah. So my understanding is
13:14:39 it would -- it wouldn't eliminate voters. It would
13:14:41 eliminate -- it would remove people who are not eligible to
13:14:45 vote.
13:14:45 BY MS. SHAH:
13:14:46 Q. Okay. So it would have -- but we can agree --
13:14:49 correct? -- that it would have removed some people off the

voter rolls; correct?
MR. O'MALLEY: Objection. Calls for speculation.
MR. LANGHOFER: Foundation. Legal conclusion.
THE WITNESS: So again, I would just say that it -- it -- it's no different than other states where you are updating your voter rolls to make sure your voter rolls are accurate. People that are actually eligible to vote.
BY MS. SHAH:
Q. I'm just trying to get a sense of the time lime here based, like, when the past -- right? -- that some people, for whatever reasons --
A. Uh-huh.
Q. -- may have been -- could be removed; right? -- or canceled --
A. Yeah.
Q. -- as a result of this legislation, before the federal election, though; correct?
MR. LANGHOFER: Same objections.
THE WITNESS: I respectfully disagree.
When you say -- I just wouldn't characterize it that way. I would say eligible voters would not be removed.
BY MS. SHAH:

13:15:39 Q. I wasn't talking about removed. I said -- to be clear -- let me rephrase my question so we're clear on this.
13:15:41
13:15:43
13:15:43 So I'm not -- that it was your understanding that when this bill was passed, that some people who were currently on the voter rolls would be removed before the November 2022 election; correct?
13:15:46
13:15:51
13:15:57
13:15:58 MR. LANGHOFER: Same objections.
13:15:58 MR. O'MALLEY: Same objection.
13:15:59 THE WITNESS: So I would -- again, I would just say that my understanding is that ineligible voters would be removed.
13:16:01
13:16:06
13:16:08 BY MS. SHAH:
13:16:09 Q. But there were -- so they -- but they would have been on the rolls -- correct? -- and they would have been removed?
13:16:10
13:16:11
13:16:12 MR. O'MALLEY: Objection. Calls for speculation.
13:16:13
13:16:13 THE WITNESS: Ineligible -- ineligible voters would be removed.
13:16:16
13:16:16 BY MS. SHAH:
13:16:17 Q. Okay.
13:16:17 A. That's my -- that's my answer.
13:16:19 Q. Okay. And you -- do you recall or are you aware that there was a preliminary injunction filed to stop
13:16:26

13:16:31 HB 2243 from going into effect before November 2022
13:16:35 elections?
13:16:37 A. Vaguely, yes.
13:16:40 Q. Okay. All right. And -- and did you know -- or
13:16:45 do you know that the AG did not oppose that delay?
13:16:49 MR. LANGHOFER: Relevance.
13:16:51 THE WITNESS: I may have known. I -- I don't
13:16:58 remember that right now, but I -- I'm sure -- I imagine --
13:17:03 I don't remember right now.
13:17:03 BY MS. SHAH:
13:17:04 Q. Okay.
13:17:06 A. It doesn't surprise me. But --
13:17:06 Q. Okay.
13:17:09 A. But I don't specifically remember, so . . .
13:17:12 Q. Did you -- but you didn't seek to inter- --
13:17:15 intervene at that time; right?
13:17:24 A. I -- we intervened when -- whenever the date is
13:17:26 for intervention. I don't remember how it compared to that
13:17:29 time.
13:17:31 Q. It wasn't -- we just talked about this, but it
13:17:32 wasn't this until 2023. So no; right?
13:17:36 MR. LANGHOFER: Asked and answered.
13:17:37 THE WITNESS: Yeah, so -- when did you say it
13:17:40 was that the -- who was the -- what -- what did you say the
13:17:44 date was when the attorney general didn't --

BY MS. SHAH:
Q. I'm just saying it was some -- there was --
A. I mean, I would -- I would have to -- if someone wants to give me a pen, I can --
Q. No. I'm just saying there's 2022 --
THE COURT REPORTER: I need one at a time, please.
BY MS. SHAH:
Q. 2022 and 2023 --
A. Yeah.
Q. You agree that 2023 comes after 2022?
MR. O'MALLEY: Objection. Argumentative.
THE WITNESS: I'm pretty sure it does.
BY MS. SHAH:
Q. Yes.
So for that reason, you agree that you didn't intervene before November 2022?
A. So I was not the Senate president in November 2022. I wouldn't have been -- you mean the -- did the Senate not intervene? Yeah, the Senate did not intervene until -- until we did.
Q. And you were a member of the Senate at that time; correct?
A. I was a member of the Senate in 2022, yes.
Q. So did you suggest that they do that at that time

13:18:36 to anybody?
13:18:38 A. I don't recall. I don't remember if I made that
13:18:43 suggestion or not.
13:18:43 Q. Okay. Were you disappointed that it didn't go
13:18:48 into effect before November 2022?
13:18:49 MR. LANGHOFER: Relevance.
13:18:53 THE WITNESS: I -- I think laws should always
13:18:56 go into effect when they're supposed to. So yes, I would
13:19:02 be disappointed if a law does not go into effect when it's
13:19:06 supposed to go into effect. I would imagine most citizens
13:19:08 would.
13:19:11 BY MS. SHAH:
13:19:22 Q. Okay. Let's talk about the specifics of these
13:19:29 challenged laws in the case. We can start with 2492.
13:19:33 And we'll -- you know, you -- you voted to
13:19:36 pass it; correct?
13:19:38 A. Yes, I did.
13:19:38 Q. And just generally speaking, what is your
13:19:43 understanding of HB 2492's provisions?
13:19:52 A. I would have to look at -- I would have to look at
13:19:55 the bill.
13:19:55 Q. I mean, you testified earlier in preparation that
13:19:58 you did look at these bills. Do you not remember?
13:20:00 A. I've spent --
13:20:01 MR. LANGHOFER: Badgering.

13:20:02 THE WITNESS: I've spent hours and hours on other bills. I've spent hours and hours looking at budgets. I've been in lots of meetings since we -- since we met. So I -- if you have the bill, I'd love to look at the bill.

13:20:13 BY MS. SHAH:

13:20:13 Q. And -- and you don't recall it even though you moved -- what these bills did just generally, even though you moved to intervene to defend these --

13:20:22 MR. LANGHOFER: Asked and answered --

13:20:22 BY MS. SHAH:

13:20:22 Q. -- bills?

13:20:23 MR. LANGHOFER: Badgering.

13:20:23 The man said he needs to see the bill.

13:20:25 THE WITNESS: Yeah, I would love to see the bill so I can talk to you more specifically about the bill. I'm sitting here in a deposition. I don't want to speculate. I don't want to -- I don't want to remember --

13:20:35 BY MS. SHAH:

13:20:36 Q. I'm not asking you to speculate.

13:20:37 I'm asking you just generally, do you not know?

13:20:39 MR. O'MALLEY: Asked and answered.

13:20:40 THE WITNESS: Yeah, I would like to see the bill.

BY MS. SHAH:
Q. So just -- if you answer -- if you know or don't, then I can show you the bill. I just want to know if you do not know generally what these bills did.
A. I don't want to guess about the bill. I would -- I don't want to speculate about what's in the bill. I would rather -- I would rather speak specifically.
Q. Okay.
A. I don't to like to guess. So if you have a copy of the bill, I'd love -- I'd be happy to look at it and talk about it.
MS. SHAH: I will mark that as nonresponsive testimony. We can move on. And let the judge decide what to do about that.
BY MS. SHAH:
Q. Okay. So let's talk about what role you played in the enactment of HB 2492.
Did you or your staff play any role in drafting it?
A. I didn't play any role in drafting it.
Q. Did your staff?
MR. LANGHOFER: Foundation.
MR. O'MALLEY: Objection. Vague.
THE WITNESS: When you say my staff -- so leg council drafts the bills. Leg council is not my staff.

13:21:46 So -- now, there may have been -- that's a very broad
13:21:52 question.
13:21:52 So drafting, if you mean drafting any part
13:21:56 of -- along the way, there would be a point where our -- if
13:22:01 there's amendments, then you'd have analysts -- there's a
13:22:08 nonpartisan analyst in the basement that would help with
13:22:12 that, but it would still go to -- leg council ultimately
13:22:17 ends up drafting everything --
13:22:18 BY MS. SHAH:
13:22:18 Q. Fair enough. Let me just interrupt you there.
13:22:20 And I agree this is me not knowing the technical wording
13:22:23 here.
13:22:23 So earlier you talked about authoring and
13:22:27 being a prime sponsor --
13:22:29 A. Yeah.
13:22:30 Q. -- like, those things, like, authoring --
13:22:30 A. Yeah.
13:22:30 Q. Did you -- did you author the HB 2492?
13:22:33 A. No.
13:22:34 Q. Did anybody on your staff?
13:22:36 MR. LANGHOFER: Foundation.
13:22:37 THE WITNESS: No. No. Not that I'm -- well,
13:22:40 not that I'm aware of, so . . .
13:22:40 BY MS. SHAH:
13:22:41 Q. Were you -- you weren't a sponsor of HB 2492;

correct?

A. Not that I remember.

Q. Okay. Why not?

A. Why? I mean, it -- that's -- I could -- I don't know. I'd have to go back in time. And, I mean, when members file their bills, they go around and look for sponsors, and sometimes they don't. I -- a lot of my bills I introduce, I just -- I don't look for a sponsor -- for cosponsors on a lot of my bills. I just draft them and drop them.

So I might not have even been asked to cosponsor. A lot of times if I don't have time to read the bill, I don't cosponsor. So I would have to speculate. I -- without -- I don't know.

I don't recall being asked to cosponsor. I didn't know -- if I didn't know it existed, I wouldn't know to go ask to cosponsor until it was dropped. I mean, who knows? There's a lot of --

Q. And did -- did HB 2492 come before you as a member of any Senate committees?

A. It did.

Q. Which ones?

A. It's definitely came in through judiciary. So I don't -- I don't think it went through any other committees that I sat on.

13:24:04 Q. And did you participate in any of those judiciary
13:24:08 committee hearings on 2492?
13:24:10 A. Yes.
13:24:10 Q. Do you know how many hearings there were?
13:24:14 A. On 2492? I think there was just the one. I think
13:24:18 it was just one week of hearings.
13:24:19 Q. Do you know who did author HB 2492?
13:24:25 MR. O'MALLEY: Objection. Lack of
13:24:26 foundation.
13:24:26 THE WITNESS: I know that the Free Enterprise
13:24:32 Club helped author it. And then -- I'm trying to remember.
13:24:39 The reason why I wanted to look at the bill is because I'm
13:24:43 confusing 2492 with 2243.
13:24:44 BY MS. SHAH:
13:24:44 Q. You have 2243 in front of you; right?
13:24:47 A. I do. But I also want to look at 20 -- I'd like
13:24:50 to see the other bill, but --
13:24:51 Q. Okay.
13:24:51 A. I guess I didn't bring my own.
13:24:53 Q. I'm -- I'm not trying to -- I just want to get
13:24:53 through some of these preliminaries.
13:24:55 A. Okay.
13:24:55 Q. So I -- I wasn't asking about specifically. I was
13:24:57 just asking about the generalities before --
13:24:59 A. I just want to be accurate when I'm --

13:25:00 Q. Yeah.
13:25:01 A. You know --
13:25:01 Q. So --
13:25:02 A. -- if you want more information.
13:25:03 Q. Okay. But -- but let's go back to this line so
13:25:06 that we keep it all organized in the transcript.
13:25:11 So you said earlier, I believe -- if I'm
13:25:13 mischaracterizing your earlier testimony, you tell me.
13:25:16 A. No problem.
13:25:16 Q. But that you said that Free Enterprise authored
13:25:21 it?
13:25:21 MR. O'MALLEY: Objection. Misstates his
13:25:22 testimony.
13:25:25 MS. SHAH: Well, I --
13:25:25 THE WITNESS: No. I -- what I said was --
13:25:27 MR. O'MALLEY: You're telling me two
13:25:27 questions ago and you don't remember his answer?
13:25:29 Go ahead.
13:25:29 THE WITNESS: I was just saying I know that
13:25:32 they had something to do with -- I know they helped author
13:25:34 it. I don't know if they completely authored it. I know
13:25:37 that they were a big proponent of it. I know they helped
13:25:41 author it. So that's what I know.
13:25:44 BY MS. SHAH:
13:25:44 Q. And what do you understand when they say that they

13:25:47 authored it?
13:25:48 A. "Authored it" means -- means they are the ones who drafted it. They wrote -- I should just say they wrote it. They -- so . . .
13:25:59 Q. Okay. And are you familiar with the Arizona Free Enterprise Club?
13:26:06 A. Yeah, I'm familiar with it.
13:26:08 Q. And do you agree that they're a lobbying organization affiliated with the Republican Party; correct?
13:26:14 MR. O'MALLEY: Objection. Lacks foundation.
13:26:15 THE WITNESS: They are not affiliated with the Republican Party, as far as I know. But I know they're a lobbying organization.
13:26:27 I think there's thousand of lobbyists, and every year, they bring language or ask people to run bills that they have authored. And, you know, it's ultimately up to the members to decide whether they want to be -- whether they want to sponsor it or not.
13:26:46 BY MS. SHAH:
13:26:46 Q. Do you know how Free Enterprise Club is funded?
13:26:49 A. I don't. I don't know how they're funded.
13:26:52 Q. What is your relationship with the Free Enterprise Club?
13:26:57 MR. O'MALLEY: Objection. Assumes facts not in evidence.

13:26:59 THE WITNESS: We're -- like, what -- what
13:27:02 kind of relationship? Like, I don't want to say we're
13:27:05 married. What do you mean by "relationship"? It's the
13:27:07 same -- I would characterize it as the same relationship I
13:27:10 have with all the lobbying firms down at the Arizona
13:27:13 capitol.
13:27:14 BY MS. SHAH:
13:27:15 Q. Do you know that the -- well, let's go back to --
13:27:19 do you know who Greg Blackie is?
13:27:21 A. I do.
13:27:21 Q. Is he part of the Free Enterprise Club?
13:27:24 A. I think he's still part of the Free Enterprise
13:27:26 Club.
13:27:26 Q. Okay.
13:27:27 A. He might not be, but I think he's still there. I
13:27:30 would have to check.
13:27:31 Q. Okay. Sure.
13:27:33 And -- but what -- was he there at the time
13:27:36 HB 2492 was --
13:27:40 A. Yeah. Yeah, he was.
13:27:40 THE COURT REPORTER: I need one at a time,
13:27:42 please.
13:27:42 Do you want to finish the question?
13:27:42 MR. O'MALLEY: Let her finish. You talked
13:27:42 over her.

13:27:42 THE WITNESS: Oh, okay. Sorry.
13:27:42 BY MS. SHAH:
13:27:45 Q. And how often did you communicate with him?
13:27:49 MR. O'MALLEY: Objection. Vague.
13:27:50 THE WITNESS: On this bill? Or what do you
13:27:53 mean?
13:27:53 BY MS. SHAH:
13:27:53 Q. Well, let's just talk about this bill first.
13:27:56 A. I don't recall. I don't recall communicating with
13:27:59 him very much on this bill. I -- I was shown some emails
13:28:04 that he sent to me. But honestly, outside of that, I
13:28:12 don't -- I don't remember any discussion with him on the
13:28:14 bill.
13:28:15 Q. Do you -- did you text with him about the --
13:28:20 A. No.
13:28:21 Q. What about did you have a call or --
13:28:24 A. I don't remember.
13:28:25 Q. Zoom or Slack or Teams or anything like that?
13:28:30 A. I don't think so. Not that I can remember.
13:28:32 Q. So you would say that they were just emails?
13:28:34 A. Yes. I know I got emails, and that was just
13:28:37 because they showed them to me. But I know I did get some
13:28:41 emails from him.
13:28:41 Q. Outside of this, how often do you communicate with
13:28:45 Greg Blackie?

13:28:48 MR. LANGHOFER: Relevance.
13:28:50 THE WITNESS: What's that?
13:28:51 MR. LANGHOFER: Relevance.
13:28:52 THE WITNESS: Yeah, I mean, it's -- I
13:28:53 probably haven't talked to -- do you want to know the last
13:28:55 time I talked to him?
13:28:56 BY MS. SHAH:
13:28:56 Q. No. I just said how often.
13:28:59 MR. LANGHOFER: Same objection.
13:29:00 THE WITNESS: I don't know. Not very often.
13:29:01 No more than any other lobbyist at the legislature.
13:29:05 BY MS. SHAH:
13:29:06 Q. Do you know Aimee Rigler?
13:29:06 A. Yes.
13:29:11 Q. Is she now -- does she now go by Aimee Yentes?
13:29:14 A. Yes.
13:29:14 Q. And she's at Free Enterprise Club; correct?
13:29:16 A. Yes.
13:29:17 Q. And -- okay.
13:29:18 And how often do you communicate with her?
13:29:20 MR. LANGHOFER: Relevance.
13:29:21 THE WITNESS: It would be the same answer.
13:29:25 It would be infrequent and no more than -- similar
13:29:29 relationship with the other lobbyists at the capitol.
13:29:32 BY MS. SHAH:

Q. And what is the mode of your communication with her?
A. It will almost always be a meeting.
Q. So do you email with her?
A. Do I email with her? I don't do a lot of emails myself. I've probably received emails from her. Those would be available if -- if they're not already -- if you don't already have them. But I would -- it would almost always be a meeting, so . . .
Q. Okay. And what about texting?
A. I wouldn't -- I don't really -- I don't text. There's -- I wouldn't be texting with her.
Q. And meetings would be in person, so not over, like, Zoom or anything like that; correct?
A. I don't recall ever doing a Zoom meeting with -- oh, well, I have done a Zoom meeting with the Free Enterprise Club, actually, before. They asked me to speak to their group one time. So -- but I didn't -- but no, I don't recall doing a Zoom meeting with her specifically on this.
Q. But you did meet with her about 2492?
A. I don't know if I met with her. It probably would have been -- probably would have been Greg. I don't remember meeting with her on 2492.
Q. And since -- do you have -- do you know about

13:31:09 Greg's educational background?
13:31:12 A. I don't.
13:31:13 Q. Can you tell -- going back to that meeting, what
13:31:27 did you ask -- what did they ask to speak to you about?
13:31:33 A. It was like a legislative update or it would have
13:31:37 been, like, priorities for the session or, you know, things
13:31:44 I was going to focus on.
13:31:45 Q. Was this one of the priorities that they wanted to
13:31:47 talk about?
13:31:47 A. No. It was my priorities. It wasn't their
13:31:49 priorities. Just, like, things I'm thinking of, bills I'm
13:31:53 thinking of running, stuff like that. And some general Q
13:31:56 and A at the end.
13:31:58 Q. Okay. Did the Free Enterprise Club provide the
13:32:03 legislature -- legislature with information on the legality
13:32:07 of HB 2492?
13:32:08 MR. O'MALLEY: Objection. Lack of
13:32:11 foundation.
13:32:11 THE WITNESS: Did they provide the legality?
13:32:14 Well, it wasn't the law yet.
13:32:16 BY MS. SHAH:
13:32:16 Q. The information on the legality of HB 2492?
13:32:20 MR. O'MALLEY: Same objection.
13:32:21 THE WITNESS: What -- what do you mean by
13:32:23 "legality"?

BY MS. SHAH:
Q. Well, I'm saying, like, since you said that they authored -- they wrote it; right? That was your earlier testimony?
A. Uh-huh.
Q. When they --
MR. O'MALLEY: Objection.
MR. LANGHOFER: Misstates his testimony.
MR. O'MALLEY: Misstates testimony.
MS. SHAH: I -- can we go back to see whether he said that -- I would say that they wrote it? So it was -- forget it. It's in there. It's fine.
BY MS. SHAH:
Q. Did -- so again -- so you said that they authored -- well, never mind.
I'm going to say -- so the Free Enterprise Club authored HB 2492. Did they provide any information on whether they thought it was lawful?
MR. O'MALLEY: Objection. Misstates the testimony.
THE WITNESS: Did they -- did they provide -- I don't -- that seems like a weird thing. We're proposing a new law. So I don't think anyone has ever said -- I don't recall anybody ever saying, "This is lawful. Please propose this lawful law." Do you know what I'm saying?

I'm not following you. I'm sorry.

BY MS. SHAH:

Q. That's fine. I just wanted to get your understanding, and it's fine.

Did the Free Enterprise Club ever provide the legislature with information about the impact of HB 2492 on Arizona's voting population?

MR. O'MALLEY: Lack of foundation.

THE WITNESS: So the only impact I think that they shared or their arguments were that this would increase -- you know, this would increase voter integrity and increase voter confidence, so . . .

BY MS. SHAH:

Q. And what did they provide for that?

A. I don't remember. They -- they would send -- I'm sure they sent out -- you know, they sent out emails and information -- emails, probably printouts that they handed out to the members, so . . .

Q. Do you recall our earlier conversation about what you did to evaluate the impact of Arizona -- of the challenged laws?

A. Yeah, mostly.

Q. So was -- when you answered, you weren't considering what Free Enterprise Club had provided?

A. Yeah. As I mentioned, I consider everything. I

13:34:49 don't -- it's not just what they provide. It's -- that's a
13:34:52 piece of the puzzle. But I consider everything. It's not
13:34:56 all.
13:34:57 But yeah, that's -- what they shared is part
13:34:59 of what goes into the consideration.
13:35:01 Q. And do you know if they provided the legislature
13:35:07 with information on the administrability of HB 2492?
13:35:13 MR. O'MALLEY: Lack of foundation.
13:35:15 THE WITNESS: Can you be more specific?
13:35:18 BY MS. SHAH:
13:35:19 Q. Yeah.
13:35:19 Did they provide any information about
13:35:21 whether it was feasible to implement, for example?
13:35:24 MR. O'MALLEY: Lack of foundation.
13:35:30 THE WITNESS: I mean, again, that seems like
13:35:34 a strange thing to do. So they -- I mean, I don't know
13:35:44 that anybody does that in the process.
13:35:46 Are you saying did they talk about how -- how
13:35:50 hard will this be to implement this law? Is that what
13:35:54 you're talking about?
13:35:55 BY MS. SHAH:
13:35:56 Q. I don't want to characterize it as hard or easy,
13:35:58 but yeah, to -- to -- like, what it would take to --
13:36:01 A. Was it easy or difficult? I don't -- they didn't
13:36:06 say anything about -- they didn't say anything about that.

13:36:11 So as far as I know, there was no -- nothing about whether
13:36:16 it would be hard or difficult or easy to -- I didn't see it
13:36:22 as -- anyways . . .
13:36:25 So no, I guess the answer is no. Not that
13:36:26 I'm aware.
13:36:27 Q. And can you explain what their involvement was --
13:36:36 Fair [sic] Enterprise Club's involvement was in the
13:36:37 enactment of HB 2492?
13:36:40 A. Yeah. It was what I shared before so they -- I
13:36:43 know they help- -- they helped author it. It's very
13:36:48 possible I don't know what the sponsor did with it. The
13:36:51 sponsor could have, you know, changed it a lot, a little.
13:36:56 I'm not sure what the -- what the sponsor did with it.
13:37:01 I know they did that. I know they testified
13:37:03 in favor of committee. I know they sent emails in support
13:37:07 of it.
13:37:08 So I'm trying to think if there's anything
13:37:11 else they did that I'm aware of. That's all I can think of
13:37:14 right now, so . . .
13:37:15 Q. Did they offer any findings?
13:37:19 MR. LANGHOFER: Objection. Vague.
13:37:20 THE WITNESS: Yeah, I don't know what you
13:37:21 mean by "findings."
13:37:22 BY MS. SHAH:
13:37:23 Q. About these laws and how they would affect

13:37:27 Arizonans.
13:37:30 A. They -- well, they -- their arguments are that
13:37:34 this will be a positive impact, simply just that it's a --
13:37:37 so their findings are that it would have been a positive
13:37:40 impact on Arizona and good for voter integrity.
13:37:43 Q. Do you know what they based that on?
13:37:45 MR. O'MALLEY: Objection. Lack of
13:37:47 foundation.
13:37:47 MR. LANGHOFER: Speculation.
13:37:48 THE WITNESS: Yeah, I can't speak for them.
13:37:50 I don't know what they base it on. It's the same things
13:37:54 we -- I don't know.
13:37:56 BY MS. SHAH:
13:37:56 Q. So you just don't know?
13:37:57 A. I don't know. I don't know what they based it on.
13:38:00 Q. Do you think that the Free Enterprise provided you
13:38:04 and the legislature with accurate information about HB
13:38:08 2492?
13:38:08 MR. O'MALLEY: Objection. Overly broad.
13:38:11 Foundation.
13:38:11 THE WITNESS: I have no reason to believe it
13:38:14 was inaccurate. So I believe it was -- I believe it was
13:38:17 accurate information. They've been -- I think they've
13:38:22 been, you know, reliable -- a reliable group.
13:38:26 BY MS. SHAH:

13:38:26 Q. And so you agree that they informed your views
13:38:29 about HB 2492?
13:38:31 A. I believe they're part of it. I don't believe
13:38:33 they're -- it's not decisive, but it's a part -- something
13:38:39 to consider.
13:38:42 Q. Do you recall when you first became aware of HB
13:38:46 2492?
13:38:47 A. I don't.
13:38:48 Q. Okay. Do you recall who may have shared it with
13:38:51 you for the first time?
13:38:52 A. I don't remember.
13:38:54 Q. Okay. Let's look at Tab 9, which I believe is
13:39:07 Bates-stamped INT-LEG 003211.
13:39:07 (The document was marked as Exhibit 433
13:39:28 for identification.)
13:39:28 BY MS. SHAH:
13:39:31 Q. That's 433.
13:39:36 And do you see that is an email from the
13:39:39 Arizona Free Enterprise Club to you that was sent on
13:39:42 February 8th --
13:39:44 A. Yep.
13:39:44 Q. -- 2022?
13:39:46 A. Yes.
13:39:46 Q. And it says -- the headline of this email says,
13:39:50 "How More Illegals Started Voting in AZ Elections and How

13:39:57 House Bill 2492 is Going to Fix It"; correct?
13:40:01 A. No. The headline -- the subject was "5 key
13:40:05 provisions." That's one of the provisions in there.
13:40:10 Q. I'm sorry. I couldn't hear what you said.
13:40:12 A. Oh, so the subject was "5 key provisions in
13:40:15 HB2492." And then that -- what you read was one of the
13:40:18 head -- was one of the topic headers or paragraph headers.
13:40:21 Q. Okay. And so they used that term in the header:
13:40:28 "Illegals"; correct?
13:40:29 A. Correct.
13:40:30 Q. What do you understand that to mean?
13:40:34 MR. LANGHOFER: Foundation.
13:40:36 THE WITNESS: So what -- what do I understand
13:40:40 them to mean by their headline? Well, I can't --
13:40:42 BY MS. SHAH:
13:40:42 Q. No, I just want you to --
13:40:43 A. I can't speak for the Free Enterprise Club.
13:40:45 Q. Sorry. I just want to say: What do you
13:40:47 understand the word or the term "illegals" to mean?
13:40:49 A. Me personally --
13:40:50 MR. LANGHOFER: Foundation.
13:40:52 THE WITNESS: Me personally, what I
13:40:53 understand that to mean is people who are here illegally.
13:41:00 BY MS. SHAH:
13:41:02 Q. And you've heard this term being used by others?

13:41:05 A. Yeah.
13:41:06 Q. Yeah?
13:41:07 Have you ever used the term "illegals" to
13:41:09 describe any group of people?
13:41:12 MR. LANGHOFER: Relevance.
13:41:17 THE WITNESS: I probably have.
13:41:20 BY MS. SHAH:
13:41:20 Q. Okay. And are you aware that people from Latin
13:41:26 America or Asia or other communities may find that term
13:41:30 offensive?
13:41:31 MR. O'MALLEY: Objection. Lack of
13:41:34 foundation.
13:41:34 THE WITNESS: That doesn't surprise me.
13:41:37 BY MS. SHAH:
13:41:38 Q. And do you think that this -- what was here, the
13:41:41 -- this -- the substance of this email -- right? -- do you
13:41:47 know if whether it was, like, put on their website or
13:41:49 disseminated widely?
13:41:51 A. It looks like an email that went to everybody.
13:41:56 Honestly, I probably didn't even see this. And my
13:41:59 assistant would have screened it as not directly to me,
13:42:05 so . . .
13:42:05 Q. What is your assistant's name?
13:42:07 A. Her name is Heather.
13:42:08 Q. What's her last name?

13:42:10 A. Covert.
13:42:12 Q. And -- but you said this is typical?
13:42:15 A. Yeah. Like, they -- this looks like an email
13:42:20 blast that went to the whole legislature.
13:42:22 Q. And this is a common example of blasts from
13:42:26 lobbyists?
13:42:27 A. Yeah. I'd say it's normal.
13:42:29 Q. Did -- do you know if anybody else sent you
13:42:32 similar messages about illegals voting?
13:42:34 A. Not that I recall.
13:42:35 Q. Do you agree that this is the kind of messaging
13:42:42 that could undermine voter confidence in the Democratic
13:42:46 system?
13:42:46 MR. O'MALLEY: Objection. Calls for
13:42:48 speculation.
13:42:48 MR. LANGHOFER: Foundation.
13:42:49 THE WITNESS: Do I agree that this is the
13:42:51 kind of message that could undermine voter confidence? No,
13:43:04 I don't.
13:43:04 BY MS. SHAH:
13:43:04 Q. So you don't think that the message that illegals
13:43:06 are voting and taking over would undermine confidence?
13:43:09 MR. O'MALLEY: Objection. Misstates the
13:43:12 document. Calls for speculation.
13:43:13 THE WITNESS: So I think -- I mean, if people

think that noncitizens are voting or ineligible voters are voting, yeah, I think that undermines -- that would. I don't know that -- anyways . . .

So I understand what you're asking. So, yeah, if people believe that, that there are -- if people hear -- hear that, then, yeah, they're going to be concerned.

BY MS. SHAH:

Q. And then going back to the heading about -- how -- where -- the part where it says, you know, how House Bill 2492 is going to fix it; right?

Speaking of that fix, like, the Free Enterprise Club is saying that that is the bill that's going to fix this issue; correct?

A. I can't speak for the Free Enterprise Club. I don't know what they were trying to say.

Q. Okay. I'm saying based on this email.

A. I don't know what the -- I can't -- I don't know what they're thinking. I don't know what the Enterprise Club was thinking.

Q. When you just -- just based on that one sentence, "How More Illegals Started Voting in AZ and How House Bill 2492 is Going to Fix It," what do you understand that to mean?

MR. O'MALLEY: Objection. Lack of

13:44:37 foundation.
13:44:38 MR. LANGHOFER: Speculation.
13:44:40 THE WITNESS: I understand that to mean that
13:44:46 they are -- have a voter -- they have an election integrity
13:44:50 bill that they're going to be putting forward.
13:44:52 BY MS. SHAH:
13:44:53 Q. Because illegals are voting?
13:44:56 MR. O'MALLEY: Objection. Lack of
13:44:59 foundation.
13:44:59 MR. LANGHOFER: Speculation.
13:45:00 THE WITNESS: This is their story, not mine.
13:45:03 BY MS. SHAH:
13:45:03 Q. But based on this, I'm saying.
13:45:06 MR. LANGHOFER: Same objection.
13:45:07 MR. O'MALLEY: Lack of foundation.
13:45:08 THE WITNESS: Saying what?
13:45:09 BY MS. SHAH:
13:45:10 Q. Based on this; right? They're saying that HB 2492
13:45:13 is going to, quote/unquote, fix more illegals from voting?
13:45:18 MR. O'MALLEY: Objection.
13:45:19 THE WITNESS: That's their -- that is their
13:45:20 statement.
13:45:20 BY MS. SHAH:
13:45:20 Q. Okay. Do you think this happens a lot that, you
13:45:39 know, a lobbyist will tell, you know, officials, a

13:45:44 legislator there is a problem, and here's how you fix it
13:45:47 through this piece of legislation or policy?
13:45:51 A. That's normal, very normal for lobbyists to --
13:45:55 that's their whole name: Lobby. They come down and lobby
13:45:58 for things. It's part of the lobbying process.
13:46:01 Q. So they come up with the problem and the cure?
13:46:03 MR. O'MALLEY: Objection.
13:46:05 THE WITNESS: Lobbyists have something
13:46:10 they're pushing for. They -- they're lobbying. I mean,
13:46:13 it's just -- it's in its name.
13:46:13 BY MS. SHAH:
13:46:17 Q. And as a legislator, do you normally allow a
13:46:19 lobbyist group to tell you what a problem is and then write
13:46:23 legislation for it?
13:46:24 MR. O'MALLEY: Objection. Lack of
13:46:26 foundation. Calls for speculation.
13:46:26 MR. LANGHOFER: Vague.
13:46:27 THE WITNESS: No. I decide what I run and
13:46:30 don't run myself.
13:46:32 BY MS. SHAH:
13:46:33 Q. I just couldn't hear you.
13:46:34 A. I decide. I decide. I don't let them tell me
13:46:38 what to do, no.
13:46:40 Q. Okay. This call about illegals voting, that was
13:46:45 something that former President Trump said right before the

13:46:47 January 6th insurrection; correct?
13:46:50 MR. O'MALLEY: Objection. Relevance.
13:46:51 THE WITNESS: I don't know.
13:46:51 BY MS. SHAH:
13:46:54 Q. Is it your view that illegals are voting, as Free
13:46:58 Enterprise Club suggests?
13:47:00 A. As I mentioned earlier, I'm concerned about it. I
13:47:02 want to make sure that legal citizens are voting.
13:47:05 Q. But you have -- other than your -- what you called
13:47:09 your personal evaluation, you have no evidence that
13:47:12 noncitizens are, in fact, voting in Arizona; correct?
13:47:15 MR. O'MALLEY: Objection. Asked and
13:47:16 answered.
13:47:21 THE WITNESS: I wouldn't say no -- none.
13:47:24 I've heard of false -- I've heard of false registration
13:47:31 forms. I've heard of people that didn't exist. They're
13:47:37 certainly not citizens if they don't exist.
13:47:40 BY MS. SHAH:
13:47:41 Q. But there is no -- you said there's no evidence
13:47:45 that you knew of that noncitizens were, in fact, voting in
13:47:48 Arizona; correct?
13:47:49 MR. O'MALLEY: Objection. Misstates his
13:47:51 testimony.
13:47:51 THE WITNESS: It's exactly as I said. I
13:47:54 actually have heard of -- I mean, they've -- I've heard of

13:48:01 people they haven't been able to identify. So those would
13:48:05 be noncitizens.
13:48:06 BY MS. SHAH:
13:48:06 Q. But you didn't actually go see if that actually
13:48:08 happened; correct?
13:48:10 A. I didn't see if it happened, no.
13:48:14 Q. And so despite this, though, you thought that the
13:48:17 leg- -- you thought that this legislation should pass to
13:48:20 address this nonexistent problem?
13:48:22 MR. O'MALLEY: Objection. Argumentative.
13:48:24 MR. LANGHOFER: Argumentative.
13:48:26 BY MS. SHAH:
13:48:27 Q. Sorry. We should wait until his mic's back on.
13:48:29 A. I don't believe its a nonexistent problem. I
13:48:32 think election integrity is important. We have a lot of
13:48:39 people who are concerned about the integrity of our
13:48:42 elections, as can be seen by the poll. So there's never a
13:48:47 bad time to implement a good policy. So I think it's a
13:48:53 good policy to make sure citizens are voting.
13:48:56 Q. But -- so -- and we'll come back to this good
policy, but --
THE COURT REPORTER: Sorry. Can you repeat
that?
MS. SHAH: Yeah. Yeah. Sorry. I was
covering my mouth.

BY MS. SHAH:
13:49:03 Q. What is your understanding of what good policy is?
13:49:05 MR. O'MALLEY: Objection. Overly broad.
13:49:08 Vague.
13:49:09 MS. SHAH: Sorry. Could you just repeat his
13:49:11 last answer back.
(The record was read by the reporter as follows:
ANSWER: I don't believe it's a nonexistent problem. I think election integrity is important. We have a lot of people who are concerned about the integrity of our elections, as can be seen by the poll. So there's never a bad time to implement a good policy. So I think it's good policy to make sure citizens are voting.)
13:49:33 BY MS. SHAH:
13:49:33 Q. You just said it's "never a bad time to implement
13:49:36 a good policy."
13:49:36 What, in your opinion, is a good policy?
13:49:39 MR. O'MALLEY: Objection. Overly broad.
13:49:41 Vague.
13:49:41 MR. LANGHOFER: Vague.
13:49:42 THE WITNESS: Well, I'll give one example.
13:49:43 Good policy is election integrity.

13:49:46 BY MS. SHAH:
13:49:46 Q. But just --
13:49:47 A. I can give more examples of good policy.
13:49:50 Q. Okay. Let me ask you this: Do you think it's --
13:49:52 a good policy is something that is a real world problem?
13:49:56 A. Good policy, yeah, should be. Good policies are
13:50:03 real world problems.
13:50:04 Q. I'm sorry. And I --
13:50:06 A. Election integrity is a real world problem. All
13:50:09 you've got to do is look at other countries.
13:50:11 Q. Do you agree that solving a real world problem is
13:50:15 a -- like, is something that's good policy?
13:50:17 A. I believe we should solve real world problems,
13:50:20 100 percent.
13:50:21 Q. And that would make a good policy; correct?
13:50:24 A. Not necessarily. But I believe we should solve
13:50:33 real world problems.
13:50:34 Q. Wait. So -- sorry.
13:50:34 You don't think it's good policy to solve
13:50:37 real problem world problems? I'm sorry. I'm just trying
13:50:39 to understand.
13:50:40 A. I think we should solve real world problems, and I
13:50:44 think we should also pass good policy. Sometimes people
13:50:48 try to use bad policy to pass real world problems.
13:50:52 Does that make sense?

Q. No.
A. Okay. Well, that's my answer.
Q. Okay. All right. Well, would you agree that policy choices should be based on actual evidence?
MR. O'MALLEY: Objection. Vague. Overbroad.
THE WITNESS: Not necessarily, no. A lot of policy is based on principles, not based on actual evidence.
BY MS. SHAH:
Q. Okay. So --
A. We're not law enforcement. We're policymakers.
Q. And so you agree -- right? -- that -- so you would -- you would share Free Enterprise's -- Free Enterprise Club's concern that more illegals have started to vote in Arizona elections?
A. Those are -- that's the Free Enterprise Club's words. Those are not my words. My concern is election integrity, safe and secure elections.
Q. Okay.
A. And I want to make sure that citizens are voting.
Q. But would you agree with Free Enterprise's position?
MR. O'MALLEY: Objection. Asked and answered.
THE WITNESS: Yeah, I've -- I have answered

13:52:02 the question, so . . .
13:52:04 MS. SHAH: Some of these are speaking
13:52:05 objections that I think we need to call a stop on here.
13:52:05 BY MS. SHAH:
13:52:07 Q. Because we're not -- we're not saying that this
13:52:11 is -- that these are your words. I'm saying: Do you agree
13:52:13 with those words? It's a different question.
13:52:15 A. I wouldn't --
13:52:15 MR. LANGHOFER: Vague.
13:52:15 THE WITNESS: I wouldn't -- I wouldn't say
13:52:16 that. So it's just a mischar- -- I agree with them that we
13:52:21 need to have integrity in our elections. I don't agree
13:52:26 with how they're -- I don't necessarily agree with how
13:52:29 they're saying it. I wouldn't say it that way.
13:52:30 BY MS. SHAH:
13:52:42 Q. This email doesn't really cite any evidence that
13:52:47 illegals have voted in elections; right?
13:52:51 A. I would have to read the email.
13:52:52 Q. Yep. That's why you have it.
13:53:03 A. So I don't see any evidence in here that they
13:54:07 share where there are noncitizen voting.
13:54:13 Q. And would you have expected the Free Enterprise
13:54:18 Club to have evidence of this claim?
13:54:22 MR. O'MALLEY: Objection. Lack of
13:54:23 foundation. Speculation.

13:54:24 THE WITNESS: Would I expect the Free
13:54:28 Enterprise Club to have the evidence of this claim?
13:54:30 BY MS. SHAH:
13:54:31 Q. To have -- yes. To have evidence that they
13:54:35 believe illegals voted in Arizona elections.
13:54:37 MR. LANGHOFER: Same objections.
13:54:38 THE WITNESS: I would -- I would expect for
13:54:41 them to have a reason why they're saying what they're
13:54:43 saying.
13:54:43 BY MS. SHAH:
13:54:44 Q. Would you think that reason would include evidence
13:54:46 of illegals voting in Arizona?
13:54:48 MR. O'MALLEY: Same objections.
13:54:49 THE WITNESS: I'm not sure what their reason
13:54:51 would be. It could be -- I don't know. I don't know what
13:54:53 it is. I can't speak for Free Enterprise Club.
13:54:58 BY MS. SHAH:
13:54:58 Q. Would it -- and in connection with the passage of
13:55:02 HB 2492, the legislature didn't make any findings that
13:55:08 illegals voted in Arizona elections; correct?
13:55:14 A. Did the legislature make any findings --
13:55:14 Q. Uh-huh.
13:55:17 A. -- that illegals voted? I'm not sure that's -- I
13:55:22 don't know how we -- I don't think the legislature -- I
13:55:27 still don't know what you mean by "findings."

13:55:31 I think there are legislators who think that
13:55:34 that's occurring. But again, that's -- I can only speak
13:55:40 for myself. So I'm not aware of a finding -- a legislative
13:55:49 finding, no.
13:55:49 Q. Did they have -- did they find any actual evidence
13:55:53 of illegals voting in Arizona?
13:55:57 MR. O'MALLEY: Objection. Lack of
13:55:58 foundation. Speculation.
13:55:58 THE WITNESS: Yeah, I don't -- it's -- that
13:56:01 would be law enforcement. I just don't see that's
13:56:05 something the legislature does.
13:56:06 BY MS. SHAH:
13:56:06 Q. Did they collect any such information from law
13:56:09 enforcement?
13:56:09 MR. LANGHOFER: Foundation.
13:56:10 THE WITNESS: So as I mentioned before, we
13:56:12 have heard -- or I have heard at least -- I know -- I
13:56:16 believe other legislators have heard from the attorney
13:56:18 general on fraud investigations as well as what occurred in
13:56:26 Yuma County.
13:56:27 BY MS. SHAH:
13:56:27 Q. And then at the end of the email, it concludes:
13:56:37 "Taken together, each of these five provisions will largely
13:56:41 prevent individuals from being registered if they don't
13:56:43 provide DPOC and, as for persons already on the

13:56:50 Federal-Only Voter list, assert our constitutional power to
13:56:52 prevent these individuals from voting for Presidential
13:56:57 electors and from voting by mail."
13:56:59 Do you see that?
13:56:59 A. I do.
13:57:00 Q. This doesn't say that it will prevent illegals
13:57:03 from being registered, voting for presidential elections,
13:57:07 or voting by mail; right, though?
13:57:09 A. It says to prevent these individuals from voting
13:57:14 for presidential elections and from voting by mail. Yeah,
13:57:19 it does say that.
13:57:20 Q. So you -- you read "these individuals" as
13:57:23 illegals?
13:57:27 MR. O'MALLEY: Objection. Lack of
13:57:28 foundation.
13:57:29 THE WITNESS: I don't know what they meant by
13:57:31 individuals. So I'm not sure what that means.
13:57:34 BY MS. SHAH:
13:57:35 Q. So -- so what I'm saying is then -- well, it's one
13:57:37 or the other; right? They either are saying that it will
13:57:42 prevent illegals or --
13:57:43 A. I mean, I would read it as ineligible voters. So
13:57:48 not necessarily -- not necessarily people who are here
13:57:58 illegally. I'd say --
13:57:58 Q. But that --

13:57:59 A. -- it could be somebody from another state that's
13:58:02 not supposed to be voting here, so . . .
13:58:06 Q. And you would agree, however, that 2492 isn't just
13:58:14 limited to, quote/unquote, illegals, but it will just
13:58:16 prevent anybody who doesn't have documentary proof of
13:58:19 citizenship from voting?
13:58:20 A. Right. That's how -- I think that's -- I believe
13:58:22 that's how I understand it.
13:58:24 Q. Right.
13:58:27 But just because you don't have documentary
13:58:29 proof of citizenship doesn't mean you're ineligible to
13:58:32 vote; correct?
13:58:36 MR. LANGHOFER: Speculation. Legal
13:58:37 conclusion.
13:58:38 THE WITNESS: Can you say that again?
13:58:43 BY MS. SHAH:
13:58:43 Q. Yeah.
13:58:43 So you understand that what 2492 actually
13:58:46 does is prevent eligible U.S. citizens from voting or
13:58:51 registering if they don't provide documentary proof of
13:58:56 citizenship, potentially; correct?
13:58:58 A. I don't understand it as -- I don't believe it
13:59:02 prevents eligible voters from voting.
13:59:08 Q. So you agree that 2492 --
13:59:10 A. If -- if they -- I mean --

13:59:12 Q. I've got to finish my question.
13:59:13 A. Okay. Go ahead.
13:59:14 Q. You agree that HB 2492 does not allow you to
13:59:18 register and vote if you don't provide documentary proof of
13:59:23 citizenship; correct?
13:59:24 A. Correct.
13:59:25 Q. But you could be eligible and still not have
13:59:28 provided documentary proof of citizenship; correct?
13:59:30 MR. O'MALLEY: Objection. Vague.
13:59:32 MR. LANGHOFER: Speculation.
13:59:32 THE WITNESS: So to me, that's the same as
13:59:34 saying you could be eligible to buy a package of cigarettes
13:59:37 but you don't because you don't show your ID. I mean,
13:59:40 it's -- no, they're eligible. They're eligible to vote.
13:59:44 They just need to follow steps to vote. It doesn't --
13:59:49 doesn't mean you're ineligible. You're eligible. You just
13:59:53 didn't follow the steps.
13:59:54 BY MS. SHAH:
13:59:55 Q. And -- and according to this, if you don't have
13:59:57 documentary proof of citizenship, you can't vote for
14:00:00 presidential electors; correct?
14:00:03 A. That's what it says.
14:00:04 Q. And so you agree that HB 2492 is supposed to be an
14:00:10 effort to assert the State's constitutional power
14:00:15 over presidential elections?

14:00:15 THE COURT REPORTER: Sorry. "Supposed to be an effort to" do what?
14:00:17 MS. SHAH: Sorry.
14:00:17 BY MS. SHAH:
14:00:18 Q. Supposed to be an effort to assert the State's constitutional power over presidential elections and voting by mail; correct?
14:00:23 MR. LANGHOFER: Foundation. Relevance.
14:00:26 THE WITNESS: It does assert -- my understanding is that yes, it asserts our authority that we have to determine, you know, our registration form that can be registered to vote -- requirements, eligibility requirements to register to vote.
14:00:44 BY MS. SHAH:
14:00:44 Q. And for presidential elections; correct?
14:00:46 A. Yes.
14:00:46 MR. LANGHOFER: Same objection.
14:00:48 BY MS. SHAH:
14:00:48 Q. And do you -- do you vote by mail?
14:00:49 A. I do.
14:00:49 Q. And you registered -- right? -- in 1994? That was our earlier testimony.
14:00:53 A. Uh-huh.
14:00:54 Q. And so you didn't provide documentary proof of citizenship; correct?

14:00:56 MR. O'MALLEY: Objection. Asked and answered.
14:00:57 THE WITNESS: Yeah, I already answered that question.
14:00:59 BY MS. SHAH:
14:01:01 Q. Okay. So let's go to what is Tab 11. It's been marked as PX 61A.
14:01:13 MR. O'MALLEY: And we've been going about another hour. So when you're done with this exhibit, I'd like to take a break.
14:01:21 MS. SHAH: Before we do this, why don't we take a break.
14:01:24 THE WITNESS: Okay. Great. Thanks.
14:01:26 THE VIDEOGRAPHER: We are off the record. Time on the monitor is 2:01.
14:14:57 (A recess ensued.)
14:14:57 THE VIDEOGRAPHER: We are back on the record. Time on the monitor is 2:14 p.m.
14:15:24 BY MS. SHAH:
14:15:25 Q. Okay. Senator Petersen, we were at what was marked previously as PX 61 A. This is a transcript from the judiciary committee hearing held on March 10; correct?
14:15:38 MR. O'MALLEY: We don't have this.
14:15:39 MS. SHAH: Got to pass it out first.
14:15:50 THE WITNESS: Got it.

14:15:50 Oh, wow. Some light reading for you.
14:15:50 BY MS. SHAH:
14:15:51 Q. I promise we don't have to read the whole thing.
14:15:54 MR. O'MALLEY: This doesn't have a marking on
14:15:56 it like the other one.
14:15:57 MS. SHAH: The -- it's because it was
14:15:59 admitted on, like, the last day of trial. So --
14:16:03 MR. O'MALLEY: All right. So what is it?
14:16:04 MS. SHAH: PX 61 A.
14:16:06 MR. O'MALLEY: 61 A.
14:16:06 MS. SHAH: Yeah.
14:16:07 MR. O'MALLEY: Okay. Thank you.
14:16:07 BY MS. SHAH:
14:16:08 Q. And so -- and at that hearing -- right? -- you
14:16:11 discussed and voted on HB 2492, generally; correct?
14:16:15 A. Correct.
14:16:15 Q. Okay. So then if you want to flip over to
14:16:20 page 39.
14:16:22 A. Okay.
14:16:22 Q. And I believe you start speaking at line 19. Am I
14:16:33 right?
14:16:33 A. Yes.
14:16:34 Q. And you state there is -- this was in the context
14:16:38 of HB 2492. You say, quote: "The issue here is that only
14:16:43 U.S. citizens can vote. And the legislature, the state

[sic], Arizona has plenary power to determine voter qualifications."

Did I read that correctly?

A. Yes.

Q. What do you mean by that?

A. I mean that the state of Arizona, we get to determine the voter qualifications. We have full authority on that for as far as Arizona elections go.

Q. What is your basis for saying that you have that authority as Arizona?

MR. LANGHOFER: Legal conclusion.

THE WITNESS: My basis on that was what I had studied from the Constitution, what I looked at in the Constitution.

BY MS. SHAH:

Q. Okay.

A. I guess I continue to say it right here. So Article 1, Section 2, "Electors in each state shall have the qualification requisite for electors of the most" --

THE COURT REPORTER: Could you repeat that?

THE WITNESS: Oh, I'm sorry.

"The electors in each state shall have the qualifications requisite for electors of the most numerous branch of the state" -- anyways, go ahead. So . . .

BY MS. SHAH:

14:17:50 Q. And then since you're there, around line 5 you
14:17:54 say, but what we are seeing -- "Well," we now -- "we have
14:17:57 now currently 36,000 people in Arizona who are registered
14:18:01 to vote, who have not proven their citizenship status."
14:18:05 Did I read that correctly?
14:18:05 A. You did.
14:18:06 Q. And so what was the basis of your statement there?
14:18:09 A. That was a number -- I believe I had gotten that
14:18:13 from the secretary of state, as I recall. It was from the
14:18:20 secretary of state. There's 36,000 federal-only ballots is
14:18:25 what I was referring to and that there's no process to
14:18:28 require citizen -- there's no citizenship requirements for
14:18:31 those ballots.
14:18:33 Q. When you say you'd gotten that from the secretary
14:18:37 of state, what do you mean?
14:18:38 A. I think -- I think that was a number -- I'm trying
14:18:43 to remember where I got the number from. And I think it
14:18:45 was a number that I got from the secretary of state. It
14:18:48 might even be -- I think it's -- I think it's published. I
14:18:51 think it's on their -- might be on their website.
14:18:53 Q. Do you think you may have gotten it from the Free
14:19:01 Enterprise Club instead?
14:19:01 A. No.
14:19:02 Q. Okay. I'm going to go down to a few lines in
14:19:07 line 14. You say, "Arizona has complete power over our own

14:19:12 registration form. This is from Arizona versus Inter Tribal Council of Arizona. States retain the flexibility to design and use their own registration forms. That is what we are doing here."

Did I read that correctly?

A. Yes.

Q. And have you read that decision?

A. I read a portion of it. And I read a letter referring to it.

Q. Well, what do you mean you read a letter referring to it?

A. There was a letter that was sent out from a group -- from a bunch of organizations who had quoted that -- that ruling.

Q. And so you were basing that on that letter?

A. Correct.

Q. Was it potentially the Free Enterprise Club that might have sent you that?

A. As -- it may have come from them. I -- as I recall, it was actually a bunch of -- it was from a bunch of people. I don't know who sent the letter, but there -- it was signed by a large group of people.

Q. And let's just -- sorry. I want to come back to the 36,000 fact.

Am I correct in understanding that your

14:20:38 testimony is that there was no citizenship requirement for
14:20:40 those ballots, or were you saying that there is no
14:20:43 documentary proof of citizenship requirement for those
14:20:48 voters?
14:20:48 A. My understanding is to -- you don't -- do not have
14:20:51 to -- there are no citizenship requirements to get a
14:20:54 federal-only ballot.
14:20:55 Q. Okay.
14:20:57 A. So wasn't saying they were not citizens. This is
14:21:01 exactly what I said, that they're just -- they haven't
14:21:04 proven it, so we don't know. We just don't know. It's
14:21:07 uncertainty.
14:21:08 Q. And do you know -- going back to that letter that
14:21:17 you mentioned.
14:21:18 A. Uh-huh.
14:21:18 Q. Do you know if that was from a lawyer?
14:21:22 A. Without seeing the letter, I -- I would -- I
14:21:27 wouldn't -- I wouldn't be able to tell you. I would need
14:21:29 to look at the letter.
14:21:30 Q. Okay. But you don't -- sitting here, you don't
14:21:32 recall?
14:21:32 A. I don't remember right now.
14:21:33 Q. Okay. Do you -- well -- all right. Let's take a
14:21:38 look at what is Tab 12. I believe that is marked as
14:21:46 LEG LOG 3082 through 3084. It's like an email with an

14:21:52 attachment from Mr. Blackie.
14:21:52 (The document was marked as Exhibit 434
14:22:13 for identification.)
14:22:13 BY MS. SHAH:
14:22:14 Q. And do you see in that -- and do you see that you
14:22:15 are sent that email?
14:22:17 A. Yes, I do.
14:22:17 Q. Who are the other people that are there?
14:22:20 A. So you have -- it looks like it's Wendy -- it's
14:22:28 Senator Rogers, Senator Barto, Senator Leach, and Senator
14:22:31 Borrelli would be everybody on the judiciary committee.
14:22:34 Q. And are they all part of the Republican caucus?
14:22:37 A. All of them are Republican -- registered
14:22:40 Republicans, as far as I know.
14:22:42 Q. And this email was sent on March 10th at 7:49 a.m.
14:22:46 So I guess the day -- like, earlier of the day of the
14:22:49 hearing; correct?
14:22:50 A. I believe that's correct.
14:22:53 Q. Okay. And it's -- the subject is "Please support
14:22:57 HB 2492," and it attaches the voter registration fact
14:23:02 sheet.
14:23:02 A. Uh-huh.
14:23:03 Q. But staying in the email for a minute -- right?
14:23:07 -- you talk about HB 2492. It's -- I believe it's one,
14:23:11 two, three -- the fourth paragraph down.

It says, you know, "HB 2492 tackles this problem, staying within the framework of Inter Tribal Council, while asserting our Constitutional authority over elections."

Do you see that?

A. Yes.

Q. Is Mr. Blackie a constitutional scholar?

A. I have no idea.

Q. Is he a lawyer?

A. I don't know.

Q. Okay. And then if we look at the -- the fact sheet -- right? -- at -- I believe it's 3083. And do you see in the -- under the heading "Impact"?

A. Yes --

Q. And it says --

A. -- I see it.

Q. -- "currently there are more than 36 -- 36,000 individuals registered to vote who have never proven their citizenship status."

Do you see that?

A. I do.

Q. And that is something that you had talked about in your testimony?

A. I did.

Q. Yeah.

14:24:08 And then if we go to the next page and we
14:24:13 talk -- look -- do you see the heading "Arizona has the
14:24:17 Plenary Power"?
14:24:18 A. Uh-huh.
14:24:18 Q. And that was also something that you talked about;
14:24:20 right?
14:24:20 A. It was.
14:24:21 Q. And then lower down you say, "Power Over Our Own
14:24:25 Registration Form" heading.
14:24:27 Do you see that?
14:24:28 A. I do.
14:24:28 Q. And again, that was also something --
14:24:31 A. Yep.
14:24:31 Q. Did you do anything to verify these assertions by
14:24:36 Free Enterprise?
14:24:36 A. Did I do anything to verify these assertions?
14:24:49 Well, as far as -- as I mentioned, I don't believe -- I
14:24:52 don't think I got the 36,000 from them. I think that -- as
14:24:56 I recall, I got that from the secretary of state.
14:24:59 But yeah, I mean, the Constitution -- I read
14:25:07 the Constitution. So that was accurate. And I didn't
14:25:14 double-check the -- I mean, I -- I did rely on this for
14:25:21 the -- for the case law of the case. So beyond that, no.
14:25:28 I -- I believe this to be -- I -- you know, I
14:25:33 believe they have accurate information here. I felt

14:25:37 like -- I felt like they had -- you know, I felt like that
14:25:40 information was -- was reliable.
14:25:43 Q. So then -- so you felt confident in repeating them
14:25:45 to your colleagues during the hearing?
14:25:47 A. I felt confident in -- either I agreed with -- you
14:25:53 know, I felt confident in what I shared --
14:25:55 Q. Okay.
14:25:56 A. -- which was quoting the Constitution and case
14:26:00 law.
14:26:00 Q. Okay. Let's move on to another document.
14:26:06 And --
14:26:06 MR. O'MALLEY: Counsel, did you identify this
14:26:08 one with an exhibit number?
14:26:10 MS. SHAH: I believe I did not. Thank you.
14:26:12 We should do that, please.
14:26:14 MS. RIZZONI: 434.
14:26:16 MS. SHAH: 434. Thank you.
14:26:23 MR. O'MALLEY: Sure.
14:26:25 BY MS. SHAH:
14:26:25 Q. And let's go to what is Tab 14. And it's
14:26:28 Bates-stamped LEG LOG 3958. It is an email from
14:26:37 Mr. Blackie to you, Senator. Do you see that? Well, you
14:26:40 haven't seen that. I'm sorry.
14:26:41 A. I will.
14:26:41 Q. Skipping right ahead. It's also 435.

14:26:41 (The document was marked as Exhibit 435
14:27:01 for identification.)
14:27:01 BY MS. SHAH:
14:27:04 Q. So do you see that it's an email from Mr. Blackie
14:27:07 to you on --
14:27:07 A. I do.
14:27:08 Q. -- Tuesday, March 15 --
14:27:11 A. Uh-huh.
14:27:11 Q. -- 2022?
14:27:12 The subject is "HB 2492 caucus"; right?
14:27:15 A. Yep.
14:27:16 Q. Okay. And then it says in the first paragraph,
14:27:19 "For caucus today, a response to the allegation that
14:27:21 HB 2492 will require millions to 'reregister.' HB 2492
14:27:28 will not force millions off the voter rolls and require
14:27:31 every voter to reregister."
14:27:34 Is that -- did I read that correctly?
14:27:35 A. I think so.
14:27:36 Q. Who -- who made that allegation?
14:27:39 A. I don't know.
14:27:41 Q. Do you think it might have been other members of
14:27:43 the Senate?
14:27:44 MR. O'MALLEY: Objection. Calls for
14:27:46 speculation.
14:27:46 THE WITNESS: I -- I don't remember where

that -- where that statement came from.

BY MS. SHAH:

Q. Could it possibly be other members of the caucus?

MR. O'MALLEY: Objection. Calls for speculation.

THE WITNESS: I don't remember. I don't recall.

BY MS. SHAH:

Q. Okay. Then you see the final paragraph, it says, "Meaning that anyone who registered to vote prior to 2005 is deemed to have provided satisfactory evidence of citizenship."

A. Uh-huh.

Q. "That stays intact and would apply to the new language in 16-101, qualifications of electors, as it references all of 16-166."

Do you see that?

A. I do.

Q. What do you understand Mr. Blackie to be referring to there?

A. I think this is similar to the governor's letter with prospective -- like, this goes prospectively from then, from 2005.

MR. LANGHOFER: You might want to speak up so that Cindy --

THE WITNESS: Oh, I just said that to me, it means that after -- this would apply to people from after 2005.

BY MS. SHAH:

Q. And do you agree that -- well, do you understand this to mean that Mr. Blackie is agreeing with the governor that people who registered before 2004 didn't have to provide documentary proof of citizenship?

MR. LANGHOFER: Foundation.

THE WITNESS: It sounds like the same argument to me --

BY MS. SHAH:

Q. Okay.

A. -- but I don't know. I don't know --

Q. Fair enough.

A. I can't speak for the two of them.

Q. Okay. And then just -- again, right at the top, the first clause of the paragraph: "For caucus today." Do you see that?

A. Uh-huh.

Q. What is -- what is that in reference to?

A. Caucus here, I'm not sure. He might be talking about our -- so there's a caucus meeting where the bill is presented. And so a bill will go through committee. And after committee, it will go to caucus. And caucus gives

the rest of the body the opportunity to learn about a bill that they didn't sit on the committee on.

Q. And --

A. So that's what -- I imagine that's what he's referring to.

Q. And a caucus, when you say that, would be members of one party?

A. It's usually members of one party. Sometimes we'll do a joint caucus, but it's almost always one caucus. But sometimes we do joint caucuses with the Democrats.

Q. In this instance, was it a joint caucus?

A. I don't think so. I think it was just the Republican --

Q. Okay.

A. -- Republican caucus.

And then the Democrats would be caucusing the bill at the same time, but just in a different room.

Q. And so then it says, "For caucus today, a response to the allegation"; correct? It goes on to say that?

Why was he providing you this information for the allegation?

MR. O'MALLEY: Objection. Lack of foundation. Calls for speculation.

THE WITNESS: I can't --

MR. LANGHOFER: Speculation.

14:30:40 THE WITNESS: I can't speak for him. I mean,
14:30:45 there's -- you can infer things, but I -- I don't know why.
14:30:48 BY MS. SHAH:
14:30:48 Q. But did you ask Mr. Blackie for any information to
14:30:52 respond to --
14:30:52 A. No.
14:30:53 Q. -- the allegation?
14:30:53 A. No, I didn't.
14:30:54 Q. Do you typically receive guidance or information
14:30:58 from people outside the legislature for caucus meetings?
14:31:01 A. All the time. Hundreds. Hundreds -- hundreds of
14:31:05 messages.
14:31:06 Q. Did you --
14:31:06 A. Just like this. Just like this on all the other
14:31:09 bills. Same thing on all the bills. Yes. This is very
14:31:13 normal.
14:31:13 Q. And did you, in fact, rely on this guidance to
14:31:17 address concerns the caucus might have had?
14:31:19 A. I don't know. I don't know if I even saw this
14:31:22 before. I might not have even seen this caucus. I don't
14:31:26 know if I spoke in caucus or not.
14:31:28 Q. Okay.
14:31:28 A. I don't remember speaking about it in caucus at
14:31:31 all, so . . .
14:31:32 Q. So you don't know whether it addressed your

14:31:36 colleagues' concerns?
14:31:36 A. I don't know if I talked -- I -- I will literally get -- all the lobbyists will send -- if they have a bill they're promoting, they will send things that can be shared in caucus with members or to discuss concerns. So I don't know that I even -- I don't remember seeing this or -- or using it in caucus. So --
14:32:01 Q. So then I want to go to another document. It's marked Tab 15, LEG LOG04789.
14:32:11 A. Okay.
14:32:12 Q. We have to pass it out to you so --
14:32:14 A. Okay.
14:32:14 Q. -- stay tuned.
14:32:15 A. No problem.
14:32:15 Q. Tab 15.
14:32:21 A. Kill another tree. Thank you.
14:32:21 (The document was marked as Exhibit 436 for identification.)
14:32:37 BY MS. SHAH:
14:32:43 Q. And so this email was sent, I believe, on March 23, again from Mr. Blackie --
14:32:53 A. Uh-huh.
14:32:55 Q. -- to a bunch of people, including you, on March 23rd; correct?
14:33:03 A. Yes.

14:33:03 Q. And you -- am I correct that the people in the "To" line are members of the Republican caucus?
14:33:15 A. Yes. Those are all -- yes, that's correct.
14:33:17 Q. Correct.
14:33:19 And so -- and this has the same analysis that was sent to you in that prior document earlier on March 15th?
14:33:28 A. Looks very similar.
14:33:30 Q. Okay. So --
14:33:36 MS. SHAH: Yeah, Cindy, have you marked this as 436?
14:33:38 THE COURT REPORTER: Yes.
14:33:39 MS. SHAH: Okay. Great.
14:33:40 BY MS. SHAH:
14:33:41 Q. All right. Let's just see.
14:33:47 Now, to finish up real quickly on 2492. Is -- right? You agree that 2492 says that if you don't provide documentary proof of citizenship, you can't vote in presidential elections; correct?
14:34:11 A. That is how I understand it, yes.
14:34:13 Q. And that you could vote in congressional elections; correct?
14:34:18 A. That's correct.
14:34:18 Q. Why -- why do that?
14:34:21 A. Because -- and I can only speak for myself.

14:34:30 Again, this is me speculating for the sponsor, of his motives for doing that.
14:34:35 I agree with the policy. But from what I understand, we couldn't -- we didn't feel like constitutionally we could include Congress. Otherwise, there would be -- not that it would be bad policy. It just -- it wouldn't be constitutional.
14:34:51 Q. Okay. And do -- when you say "not constitutional," you mean --
14:34:58 A. Meaning Congress has the constitutional authority over their own elections.
14:35:04 Q. I understand that.
14:35:05 But do you mean Arizona Constitution? The U.S. Constitution?
14:35:07 A. U.S. Constitution.
14:35:08 Q. And what are you basing that understanding on?
14:35:15 A. The Constitution.
14:35:18 Q. Your -- your reading --
14:35:18 A. Yeah.
14:35:20 Q. -- of the Constitution?
14:35:20 A. That's how I read it, yeah.
14:35:21 Q. Did you talk to a constitutional scholar about that?
14:35:25 A. No.
14:35:26 Q. Do you know if anybody in the legislature did?

14:35:29 MR. O'MALLEY: Foundation.
14:35:29 MR. LANGHOFER: Foundation.
14:35:30 THE WITNESS: We -- the -- the bill goes
14:35:33 through the rules committee. We have attorneys on our
14:35:38 staff. So yeah, there's -- the bill was vetted by many,
14:35:45 many attorneys. So I would say -- I don't want to call
14:35:50 them constitutional scholars, but people who are versed in
14:35:55 the Constitution.
14:35:59 BY MS. SHAH:
14:36:00 Q. And were you aware that the House Rules Committee
14:36:04 thought that the -- that provision was unconstitutional?
14:36:07 MR. O'MALLEY: Objection. Misstates the
14:36:08 record.
14:36:10 THE WITNESS: I was not aware of that. I
14:36:13 have not heard that until now.
14:36:14 BY MS. SHAH:
14:36:15 Q. And -- right.
14:36:17 You also agree that if you -- that 2492 will
14:36:22 say that if you're a federal-only voter, you cannot vote by
14:36:25 mail; is that right?
14:36:27 A. I believe that's correct.
14:36:29 Q. Why do that?
14:36:34 MR. LANGHOFER: Foundation.
14:36:35 THE WITNESS: Why do that if you're a
14:36:40 federal-only voter?

BY MS. SHAH:

Q. Uh-huh.

A. Because we don't know -- again, I'm speculating for what the sponsor was thinking and what others are thinking. My personal opinion was that it's reasonable if you don't have a means for -- there's no means for ID with the -- with the early mail-in ballot. If they go to the polls, then they're going to be less likely to -- if they're not eligible at the polls, there is -- they do require ID at the polls.

They don't require an ID when you mail in your ballot. So if there's no -- anyways, that was the thought process is that that's reasonable if there's no -- if there's no ID requirements with the early ballot.

Q. That is your understanding of why?

A. Yeah, that's my understanding -- or that would be my -- why I felt like it's a reasonable policy. I can't speak for the -- I don't know what the sponsor was thinking. I don't know what all the other members were thinking that were voting for it. It was just my own personal thoughts, and that's part of it, so . . .

Q. So somebody who voted for the law and somebody who intervened in this case, it's your understanding that that is why there's a difference between mail voting and in-person voting for federal-only voters?

14:38:09 A. I don't know why the sponsor wrote that. I don't know why they did it. I'm telling you why I felt like it was a reasonable thing for me to vote for.

14:38:18 Q. Okay. I'm going to show you what's Tab 16. It's been marked as Exhibit INT-LEG 010646. This will be 437.

14:38:31 (The document was marked as Exhibit 437 for identification.)

14:38:55 BY MS. SHAH:

14:39:07 Q. And do you see that it's an email to you from Kristy Samudio?

14:39:12 A. I do.

14:39:13 Q. Looks like she's a constituent; right?

14:39:15 A. Uh-huh.

14:39:18 Q. And she talks about her concerns about these bills; correct?

14:39:20 A. Yes.

14:39:20 Q. Did you respond to her?

14:39:23 A. Not that I recall.

14:39:24 Q. Did you take her views into consideration?

14:39:27 A. I take all views into consideration.

14:39:30 Q. So do you agree that she has a legitimate concern?

14:39:34 MR. O'MALLEY: Objection. Calls for speculation.

14:39:37 THE WITNESS: So when we get these kind of emails -- actually, I probably got 50 of these. This is a

14:39:45 form letter. It's written by somebody else. They just
14:39:48 fill it out.
14:39:50 So I do take it into consideration. I take
14:39:54 more into consideration, obviously, if it's a -- if I get
14:39:58 to have a personal conversation with them on the issue,
14:40:04 so . . .
14:40:04 BY MS. SHAH:
14:40:04 Q. You said that this was a form email; correct?
14:40:07 A. Yeah.
14:40:08 Q. That you may have gotten, I think you said some 50
14:40:10 times potentially?
14:40:11 A. No, I don't know. I don't know how many of these
14:40:12 I got. But I can tell just by looking at it, this is a
14:40:16 form letter.
14:40:16 Q. I -- fair -- I agree that it's a form letter. I
14:40:19 -- I think based on the production here, I think --
14:40:21 A. So a lot of -- I have actually found --
14:40:23 Q. Okay. We've got to --
14:40:23 A. Oh, go ahead.
14:40:23 MR. O'MALLEY: One at a time.
14:40:23 BY MS. SHAH:
14:40:25 Q. Yeah. Yeah.
14:40:25 So I -- I agree that this is a form email. I
14:40:27 think, based on production, this email was sent to your --
14:40:30 this form email, not from the same person, was sent some 31

14:40:34 different times. Does that sound --
14:40:37 A. Yeah. And I would say that I take this into
14:40:41 consideration, but I've also -- especially more when I have
14:40:45 called people or had discussions with people on a lot of
14:40:48 these sometimes, and they don't even know that they've sent
14:40:51 these letters. Sometimes people will just collect a list
14:40:54 of names, and they get approval to just send form letters.
14:40:58 So these form letters do not have the same
14:41:01 impact as a personally written letter. It has impact.
14:41:03 Obviously, there's an organization that's opposing this.
14:41:06 But -- so -- anyways, that's how I take it into
14:41:11 consideration.
14:41:12 Q. But -- so I represent to you that this email was
14:41:14 sent 31 times or produced 31 times to you. So at least 31
14:41:20 people chose to either consent to having this email sent on
14:41:24 their behalf or did send it on their behalf; correct?
14:41:27 A. Right.
14:41:27 Q. Okay. So they chose to do that?
14:41:29 A. Right. And at the same time, I have to take into
14:41:31 account the thousands of people that want me to make sure
14:41:34 that legal citizens are voting, so . . .
14:41:37 Q. And these were all thousands of people who sent
14:41:39 you personal emails?
14:41:40 A. I don't have a count on that. I'm just -- my
14:41:44 personal experience has been overwhelming that more people

than not want election integrity, has been my experience.
Q. Okay. Let's go ahead and we can move on to the next. I think we're moving along here.
Let's talk about 2617 and 2243. Do you recall that you pass -- voted to pass both of those legislations?
A. I don't -- I don't recall it. I know I did, but I don't remember it specifically. But yes, I know I voted for those things.
Q. Okay. And what is your understanding of the relationship between HB 2617 and HB 24 -- 2243?
MR. LANGHOFER: Vague.
THE WITNESS: What's the relationship between the two? What I remember is that they're similar to each other and that one got vetoed. And so there was a -- there was a -- the other bill was to address the veto concerns.
BY MS. SHAH:
Q. Do you recall that HB 2243 was a bill that originally was limited to adding a statement to the voter registration form stating that if a voter moves out of their state -- of the state, their registration could be canceled?
A. I didn't -- I don't remember that.
Q. Sound right?
MR. LANGHOFER: Foundation.

14:43:24 THE WITNESS: I don't remember that. But I don't doubt it. I just don't remember that that was the issue.
14:43:31 BY MS. SHAH:
14:43:32 Q. Okay.
14:43:32 A. The difference, so . . .
14:43:32 Q. Okay.
14:43:35 MS. SHAH: Can we do Tab 17, please. It is -- well . . .
14:43:36 (The document was marked as Exhibit 438 for identification.)
14:43:52 BY MS. SHAH:
14:43:53 Q. Looking at Exhibit 438, does that refresh your recollection about the original 2243?
14:43:59 A. 2243? Okay. Yeah.
14:44:25 Q. So you agree -- right? -- that 2243 was a bill that originally was limited to adding a statement about -- on the voter registration form saying that if a voter moves out of state, their registration would be canceled; correct?
14:44:38 A. Yes. That's what this -- that's how I read this.
14:44:41 Q. And so you -- would you also agree that 2617 was something that was just moved on to as -- by amendment into the substance of it -- of the vetoed 2617 was added to HB 2243?

MR. LANGHOFER: Foundation. Best evidence.

THE WITNESS: What I -- it's what I said before. As I recall, 2617 or -- I'm mixing the two.

There was one that was vetoed, came back. This happens all the time with the legislature. This is not unusual. They'll get vetoed and a member will try to -- either that session or, you know, will go to the next session, will try to revive the bill and address the veto concerns, try to get it passed out.

BY MS. SHAH:

Q. Okay. Let's do Tab 17a. It's LEG LOG14261.

MS. RIZZONI: This will be 439.

(The document was marked as Exhibit 439 for identification.)

BY MS. SHAH:

Q. If you go to pages 5 and 6 of this.

A. Uh-huh.

Q. Do you see -- if you take a look --

MR. O'MALLEY: Can you use the Bates number?

MS. SHAH: Yeah. I can say -- thank you. Yes. I believe it is 14265.

THE WITNESS: Okay.

BY MS. SHAH:

Q. I think it says, "As introduced."

Do you see where it says, "As introduced"?

14:46:22 A. Uh-huh.
14:46:22 Q. Right?
14:46:23 And then it says, "The substance of the vetoed HB2617 (Chaplik) was added to HB2243."
14:46:32 Do you see that?
14:46:32 A. Yes.
14:46:32 Q. So you agree -- right? -- that HB 2243 became a vehicle for passing what had been in HB 2617 to address the veto?
14:46:41 MR. LANGHOFER: Best evidence.
14:46:44 THE WITNESS: It's exactly what I've said twice now. So 2617 was vetoed. 2243 was moving -- was -- continued to move. And yes, 2617 -- the language from 2617 -- not 2617. That was dead -- the language was added in and addressed the veto concerns so that the governor would sign it and came back.
14:47:16 BY MS. SHAH:
14:47:16 Q. Okay. All right. So to talk about the enacted 2243, what is your just general understanding of its provisions?
14:47:27 MR. LANGHOFER: Best evidence. Foundation.
14:47:31 THE WITNESS: I'll have to refresh my memory.
14:47:34 BY MS. SHAH:
14:47:34 Q. You have it.
14:47:35 A. 22 -- did you say 2243?

14:47:41 Q. Uh-huh.
14:47:42 A. Oh, okay. We just read it.
14:47:44 Q. No, no. As passed. That's not as passed.
14:47:47 A. Oh, as passed?
14:47:48 Q. You have the -- yeah, as enacted.
14:47:50 A. Oh, okay.
14:47:50 MR. O'MALLEY: You have the bill in your
14:47:51 stack. Okay.
14:48:14 THE WITNESS: Okay. It's got basically
14:48:23 several provisions to make sure that we have eligible
14:48:26 voters on the voter rolls is how I would summarize it.
14:48:30 BY MS. SHAH:
14:48:31 Q. And you agree -- right? -- that 2243 right now is
14:48:38 not currently being implemented?
14:48:39 MR. LANGHOFER: Foundation.
14:48:41 THE WITNESS: From what I understand, it's
14:48:43 being -- it's being held as part of this litigation.
14:48:47 BY MS. SHAH:
14:48:47 Q. So if it gets implemented, what is your
14:48:52 understanding of the voters who would get canceled here?
14:48:56 MR. LANGHOFER: Speculation.
14:48:57 THE WITNESS: My understanding is that no
14:49:00 eligible voter would be canceled. Only ineligible voters
14:49:04 would be canceled. And that would be what we want. We
14:49:09 would want to have people who are qualified to vote, vote.

14:49:14 BY MS. SHAH:

14:49:16 Q. So do you see -- actually, let me see if I can -- I think it's Section H. I don't remember the exact page where it talks about county recorders comparing persons who they have reason to believe are not U.S. citizens to compare them to the systematic alien verification for eligibility system. Do you see that?

14:49:41 A. Uh-huh.

14:49:41 Q. Right.

14:49:44 Do you know what that is -- can I call it SAVE? Would you be okay if I did that?

14:49:50 MR. O'MALLEY: Sorry. I didn't hear that.

14:49:51 THE WITNESS: She said she'd call it SAVE.

14:49:51 BY MS. SHAH:

14:49:52 Q. Can I call it SAVE, the Systematic Alien Verification for Entitlement system?

14:49:55 A. Sure.

14:49:56 Q. Yeah? Okay.

14:49:56 So do you understand that -- what do you understand about SAVE?

14:49:59 A. I don't know anything more than what was in the bill here; that it's -- that they're using it to -- to help do -- to do a check here.

14:50:10 Q. Do you know whether --

14:50:11 A. A verification.

14:50:12 Q. Sorry. I didn't mean to cut you off.
14:50:14 MS. SHAH: Cindy, did you get that?
14:50:15 THE COURT REPORTER: Yes.
14:50:16 BY MS. SHAH:
14:50:16 Q. Do you understand that SAVE doesn't have
14:50:18 information about voters born in the United States?
14:50:21 MR. LANGHOFER: Foundation.
14:50:23 THE WITNESS: I'm not aware whether it does
14:50:26 or not.
14:50:26 BY MS. SHAH:
14:50:26 Q. So you passed a law -- or you voted for a law not
14:50:29 knowing how it would work?
14:50:31 MR. O'MALLEY: Objection. Argumentative.
14:50:35 THE WITNESS: It says how it's going to work
14:50:38 right here.
14:50:40 BY MS. SHAH:
14:50:41 Q. Well, I just asked you if you knew whether it had
14:50:43 information -- SAVE had information about --
14:50:46 A. There's lots of information on all of these things
14:50:48 on every single bill. You could go a mile deep on
14:50:51 everything. Nobody's going to know all of those things.
14:50:54 Q. So when you passed -- or voted to pass this law,
14:50:56 you didn't know whether SAVE had information about voters
14:51:00 born in the United States; correct?
14:51:01 MR. O'MALLEY: Objection. Asked and

answered.

THE WITNESS: I don't know whether they do or not.

BY MS. SHAH:

Q. Okay. So may I represent to you that SAVE does not have information about voters born in the United States, and based on that, would you understand that no U.S. born voter can be canceled based on the SAVE check?

A. That's your testimony. I don't -- I have no idea. I don't know whether that's true or not.

Q. Assuming that I was correct, would you agree?

A. If you're correct, I would agree. But if you're not correct, I won't.

Q. Okay.

A. So I would need to --

Q. That's fine.

And so that -- based on that, naturalized U.S. citizens can get canceled under a SAVE check, though; correct?

A. I'm not aware of that.

MR. LANGHOFER: Speculation.

THE WITNESS: I'm not aware of that.

BY MS. SHAH:

Q. And a U.S. born citizen has always been a citizen; correct? Their citizenship status doesn't change?

14:52:09 MR. O'MALLEY: Object to the form. Vague.
14:52:10 THE WITNESS: No, that's not true actually.
14:52:13 BY MS. SHAH:
14:52:13 Q. What do you mean?
14:52:15 A. Exactly what I said.
14:52:17 Q. Why is it not true?
14:52:18 A. Somebody can be born a citizen and then later not
14:52:21 be a citizen.
14:52:22 Q. Based on what?
14:52:23 A. They renounce their citizenship.
14:52:25 Q. Okay. Do you know if that person would come on
14:52:29 SAVE?
14:52:30 A. I don't know if they'd come on SAVE or not.
14:52:33 Q. Okay. Do you know how long it takes to update
14:52:43 your naturalization status on SAVE?
14:52:45 MR. O'MALLEY: Objection. Lack of
14:52:46 foundation.
14:52:49 THE WITNESS: I don't know how long it -- how
14:52:51 long that takes.
14:52:52 BY MS. SHAH:
14:52:52 Q. So you voted for this not knowing that?
14:52:55 A. I don't know. I don't know how long it takes, no.
14:53:00 Q. Do you know who's responsible for cancelling voter
14:53:25 registrations under HB 2243?
14:53:32 A. I think I do, but as I recall, it would be the

14:53:37 secretary of state. But I would have to --
14:53:41 Q. Do you think it's the county recorders?
14:53:44 A. I thought -- I thought it was --
14:53:50 MR. LANGHOFER: Legal conclusion. Best
14:53:52 evidence.
14:53:52 THE WITNESS: Yeah, I would have to reread
14:53:54 it. Have to study it again. I don't recall. I don't
14:53:57 remember. Huh-uh.
14:53:59 BY MS. SHAH:
14:53:59 Q. Do you -- well, since you have the statute in
14:54:01 front of you, do you know how long -- do you agree that
14:54:06 there's a process before a voter registration can be
14:54:08 canceled?
14:54:10 A. From what I understand, there is a process.
14:54:12 Q. What is your understanding of that process?
14:54:14 A. What is found within the bill here.
14:54:21 When the county recorder receives written
14:54:23 information from person registered, that person has a
14:54:25 change of address outside the county --
14:54:28 MR. LANGHOFER: Slow down for the court
14:54:29 reporter.
14:54:30 THE WITNESS: Oh, okay.
14:54:31 "Including when the county recorder either:
14:54:32 (a) Receives a form from the person pursuant to
14:54:34 Subsection E of this section on which the person has

confirmed that the person is not a resident of this state.

"(b) Receives a summary report from the jury commissioner or jury manager pursuant to Section 21-314 indicating that the person has stated that the person is not a resident of the county. Before the county recorder cancels a registration pursuant to this subdivision, the county recorder shall send the person notice by forwardable mail and a postage prepaid preaddressed return form requesting the person confirm by signing under penalty of perjury that the person is a resident of the county and is not knowingly registered to vote in another county or another state. The notice shall inform the person that failure to return the form within thirty five days will result in the person's registration being canceled. If the person fails to return the notice within thirty five days the county recorder shall cancel the person's registration.

"When the county recorder obtains information pursuant to this section and confirms that the person registered is not a United States citizen, including when the county recorder receives a summary report from the jury commissioner or jury manager pursuant to Section 21-314 indicating that a person who is registered to vote has stated that the person is not a United States citizen. Before the county recorder cancels a registration pursuant to this paragraph, the county recorder shall send the

14:55:58 person notice by forwardable mail that the person's registration will be canceled in thirty five days unless the person provides satisfactory evidence of United States citizenship pursuant to Section 16-166. The notice shall include a list of documents the person may provide and a postage prepaid preaddressed return envelope."

14:56:20 Q. So I think --

14:56:21 A. "If the person registered does not" --

14:56:22 Q. Sir.

14:56:22 A. Yes.

14:56:23 Q. Okay. So you agree that they have 35 days to prove their citizenship based on this before a county recorder cancels their voter registration?

14:56:31 A. If they had marked on a form that they weren't a citizen.

14:56:36 Q. Right. But --

14:56:37 A. Yeah.

14:56:38 Q. Okay.

14:56:38 A. So first they marked something saying they weren't a citizen. So then they have 35 days after they said they weren't a citizen to prove that they're -- you know, like, which time were you telling the truth? Then or now?

14:56:52 Q. Fair enough.

14:56:53 So 35 days to do that -- correct? -- to show their documentary proof of citizenship?

14:56:57 A. Yes.
14:56:58 Q. And it also says on A(10) -- right? -- that if they confirm that they're not a citizen, they'll also get this 35-day notice to provide their documentary proof of citizenship?
14:57:10 A. Correct.
14:57:10 Q. Okay. So -- and so if they don't provide the documentary proof of citizenship in 35 days, the county recorder will cancel them?
14:57:19 A. I'm sorry. I'm going to read.
14:57:28 Okay. So it says, "If the person registered does not provide satisfactory evidence within thirty five days, the county recorder shall cancel the registration and notify the county attorney and attorney general for possible investigation."
14:57:41 So yes, they'll be canceled after 35 days.
14:57:45 Q. And do you know how long it could take, for example, to find a copy -- obtain a copy of your naturalization certificate?
14:57:50 MR. O'MALLEY: Objection. Lack of foundation. Calls for speculation.
14:57:54 THE WITNESS: I mean, it could take less than an hour.
14:58:00 BY MS. SHAH:
14:58:01 Q. To get a copy of your naturalization certificate?

14:58:03 A. Oh, to get a copy or to produce your own copy?
14:58:06 Q. To get a copy of your naturalization certificate.
14:58:08 MR. O'MALLEY: Objection. Lack of
14:58:09 foundation. Calls for speculation.
14:58:10 THE WITNESS: I don't have the -- I don't
14:58:19 have that information in front of me. I would have to
14:58:21 research.
14:58:21 BY MS. SHAH:
14:58:22 Q. Did you do so before you voted for this law?
14:58:25 MR. LANGHOFER: Relevance.
14:58:26 THE WITNESS: Yeah, I mean, that's like --
14:58:29 you could do that on a million things. No.
14:58:34 BY MS. SHAH:
14:58:34 Q. Okay. Do you know how much it would cost to get a
14:58:37 copy of your naturalization certificate?
14:58:39 A. I feel like people should have basic documents,
14:58:43 especially important basic documents.
14:58:46 Q. But that's not my question.
14:58:48 Do you know how much it costs to get a copy?
14:58:51 A. Probably around 15 bucks, I would imagine.
14:58:54 Probably not much.
14:58:56 Q. But you don't know?
14:58:57 A. I think it's -- I -- when I've gotten -- all I
14:59:00 know is experience of getting copies of birth certificates.
14:59:05 I know it's about $15.

14:59:06 Q. So you didn't actually try to find that out before
14:59:09 you voted to pass these laws; correct?
14:59:12 MR. LANGHOFER: Relevance.
14:59:13 THE WITNESS: Yeah, nobody -- nobody -- that
14:59:16 was not information provided nor -- no, we didn't seek
14:59:19 after that information.
14:59:24 BY MS. SHAH:
14:59:24 Q. Okay. And so to be clear, you didn't determine
14:59:27 whether 35 days would be enough to provide documentary
14:59:33 proof of citizenship; correct?
14:59:34 A. I did --
14:59:34 MR. O'MALLEY: Objection. Relevance.
14:59:36 MR. LANGHOFER: Misstates evidence.
14:59:37 THE WITNESS: Yeah, I did determine that. I
14:59:39 felt like -- I feel like that's a reasonable amount of
14:59:41 time.
14:59:42 BY MS. SHAH:
14:59:45 Q. Based on what?
14:59:46 A. Based on people should have basic documents and
14:59:50 even copies. It's good practice.
14:59:53 Q. Anything else?
14:59:54 A. No.
14:59:55 Q. And you agree -- right? -- that under 2243, if
15:00:12 somebody does not provide documentary proof of --
15:00:16 documentary proof of citizenship after 35 days, that they

15:00:20 would be referred for criminal investigation?
15:00:23 MR. LANGHOFER: Legal conclusion. Best
15:00:24 evidence.
15:00:25 THE WITNESS: This says, "If the person
15:00:32 registered does not provide satisfactory evidence within
15:00:34 thirty five days, the county recorder shall cancel the
15:00:36 registration and notify the county attorney and attorney
15:00:38 general for possible investigation."
15:00:40 So it's a notification of possible
15:00:45 investigation -- for possible investigation.
15:00:48 BY MS. SHAH:
15:00:49 Q. And you agree that responding to a criminal
15:00:52 investigation can take resources, like time and money?
15:00:56 A. I think that's pretty -- pretty well known.
15:00:59 Q. Yeah.
15:00:59 And you would agree that a criminal
15:01:02 investigation can be scary or intimidating?
15:01:05 MR. O'MALLEY: Objection. Vague. Calls for
15:01:07 speculation.
15:01:08 THE WITNESS: It's not scary if you're not
15:01:11 breaking the law. You don't have to worry about it if
15:01:16 you're not breaking the law.
15:01:17 BY MS. SHAH:
15:01:18 Q. And if you are a naturalized citizen born outside
15:01:22 the United States, you agree that you would be less

15:01:24 familiar with the U.S. justice system; correct?
15:01:26 MR. O'MALLEY: Objection. Lacks foundation.
15:01:26 Speculation.
15:01:31 THE WITNESS: I think if somebody says
15:01:32 they're not a citizen on a form -- I mean, the whole
15:01:38 premise here is, first of all, you have to put this in
15:01:40 context. And I feel like you're taking this out of
15:01:42 context.
15:01:43 Somebody has, first of all, said, "I am not a
15:01:46 citizen." So that is where the basis of all of this is.
15:01:49 This is not somebody who said that they are a citizen.
15:01:54 They're saying, "I was not" -- "I am not a citizen." So
15:01:57 that's where you're starting here. This is somebody who
15:02:02 made that decision to tell somebody "I am not a citizen."
15:02:07 BY MS. SHAH:
15:02:09 Q. If you want to go to portion H here -- right? --
15:02:23 we're talking about the SAVE database matches; correct?
15:02:26 A. Uh-huh.
15:02:26 Q. And then if they are not matched after 35 days,
15:02:30 that registration is also canceled under A(10)?
15:02:45 I think you have to go back to A(10). I
15:02:47 think that relates back --
15:02:48 A. Yeah, I want to see if there's also a motion here
15:02:50 for -- talking A? Paragraph A?
15:02:58 Q. Subsection 10.

15:03:14 (An off-the-record discussion ensued.)
15:03:14 MS. SHAH: Let me just get my copy --
15:03:14 THE WITNESS: Yeah. I mean, that's --
15:03:16 MS. SHAH: -- because I feel like I'm not
15:03:17 directing him correctly --
15:03:17 THE WITNESS: Yeah, I'm not --
15:03:18 MS. SHAH: -- and this is frustrating. So
15:03:19 can we just go off the record. Like, I'm just running and
15:03:21 getting my copy of 2243.
15:03:22 MR. LANGHOFER: It's been about an hour.
15:03:25 Maybe we'll just break for five.
15:03:26 MS. SHAH: Sure.
15:03:27 THE VIDEOGRAPHER: We are off the record.
15:03:28 Time on the monitor is 3:03. This will end Media Number 3.
15:03:36 (A recess ensued.)
15:16:26 THE VIDEOGRAPHER: Okay. We are back on the
15:16:41 record. Time on the monitor is 3:16. This will begin
15:16:48 Media Number 4.
15:16:51 BY MS. SHAH:
15:16:51 Q. So, Senator Petersen, before we went on break, I
15:16:53 just want to clarify for the record -- right? -- do you
15:16:56 understand that under 2243, when a county recorder obtains
15:17:00 information pursuant to that legislation and confirms that
15:17:05 the person registered is not a United States citizen -- and
15:17:08 that can include the juror information -- that the county

recorder will send them a 35-day notice? If they don't respond, that person's registration is canceled, and they are referred to a criminal investigation.

Do you understand that?

A. I -- the way I understand it is that it's possible. It's possible investigation is what it says.

Q. Fair enough.

But that -- if they don't respond -- if a noncitizen -- confirmed noncitizen, by a county recorder, does not respond within 35 days, their registration is canceled; correct?

A. Yes.

Q. Okay. And that would include if the county recorder determines that from their SAVE database checks; correct?

MR. O'MALLEY: Objection. Calls for a legal conclusion.

THE WITNESS: I would have to reread it to see. So --

BY MS. SHAH:

Q. Look at H. County recorder --

A. -- receives a form --

Q. -- has reason to believe --

A. -- pursuant to Subsection B -- so Subsection E. Each month -- sorry. I'm just reading to myself. I'm

15:18:27 reading in my head.
15:18:31 Q. Do you see the section on the SAVE database that
15:18:34 we were talking about earlier?
15:18:35 A. Yeah. I'm reading -- well, it says -- so when I
15:18:38 go back here, it says, Including when the county recorder
15:18:49 either -- so A, receives a form from the person pursuant to
15:18:54 Subsection E.
15:18:56 So it's either Subsection E -- so I go down
15:18:59 here and I'll circle Subsection E. So it's either
15:19:03 Subsection E or B: Receives a summary report from the jury
15:19:08 commissioner or jury manager pursuant to Section 21
15:19:13 indicating that the person has stated the person is not a
15:19:16 resident of the county. So it's one of --
15:19:16 Q. Sir --
15:19:19 A. -- those two.
15:19:19 Q. I'm looking at A(10). Look at A(10). Are you at
15:19:22 A(10)?
15:19:24 A. I can see A(10), yes.
15:19:26 Q. It says -- do you see "When the county recorder
15:19:28 obtains information pursuant" --
15:19:28 A. Yes.
15:19:29 Q. -- "to this" --
15:19:30 A. Yes.
15:19:30 Q. -- "section"?
15:19:30 A. Yes.

15:19:30 Q. So "this section" would include H; correct?
15:19:38 MR. LANGHOFER: Legal conclusion.
15:19:39 THE WITNESS: I don't -- I don't -- that's
15:19:40 what I'm trying to read right now.
15:19:42 What I've got so far is that if it's
15:19:46 Subsection E or -- if it's A or B, then 10. But I would
15:19:54 need to read this to see how H applies. So, I mean, I'd
15:20:01 read -- I need to read E, F, G -- I need to read these. So
15:20:09 I don't know that -- it does say E --
15:20:09 BY MS. SHAH:
15:20:09 Q. Okay. So let's --
15:20:12 A. -- applied -- it does --
15:20:13 Q. Let's do this.
15:20:13 A. E does tie to 10, but I don't -- I don't know that
15:20:18 F, G, H, and I -- I don't know if those apply to 10 or not.
15:20:23 I need to read this to see if they apply. So far it
15:20:26 doesn't look like they do, but I --
15:20:26 Q. Okay.
15:20:28 A. If I read it and I'm wrong, I'm wrong. But so far
15:20:31 it just says E, and then -- it says, "Receives a form
15:20:37 pursuant to Subsection E." It doesn't say Subsection H.
15:20:40 It doesn't say --
15:20:42 Q. Okay. We're going to do this. I'll just try to
15:20:45 help you out for this for just one second. Let's see if we
15:20:47 can do this. Otherwise, we'll move on.

15:20:49 All right. Do you see -- so you're -- do you see Section 2 of this legislation that amends Section 16-165? Do you see that?
15:21:01 A. Section 2 --
15:21:04 Q. Of the bill.
15:21:07 A. What page are you on?
15:21:08 Q. I think on mine it's 3, but I don't know if that will be the same page for you.
15:21:14 A. You're on page 3?
15:21:15 Q. 3. It says, "Section 2, Section 16-165, Arizona Revised Statutes as amended by laws 2022" to be at the top of the page for me at line 3.
15:21:28 MR. O'MALLEY: Page 3.
15:21:30 THE WITNESS: Okay. Page 3.
15:21:31 MR. O'MALLEY: Right up here.
15:21:32 THE WITNESS: Okay.
15:21:33 BY MS. SHAH:
15:21:33 Q. Do you see Section 2?
15:21:34 A. Oh, there it is. Yep. I see it.
15:21:36 Q. You see Section 2?
15:21:37 A. Yep.
15:21:38 Q. Okay. Now, go -- if you go down, then you see A?
15:21:40 A. But that's not Section 2.
15:21:41 Q. No, no, no. I know. Just --
15:21:42 A. That's quoting --

15:21:43 Q. Sir --
15:21:43 A. That's --
15:21:43 Q. I'm just going to try to help you out here for a second. Just follow and let me finish my question.
15:21:47 A. I'm trying to help you out.
15:21:48 Q. Do you see Section -- do you see line 6? And do you see Section A?
15:21:53 A. First of all, you're referring me to Section 2.
15:21:55 Q. Correct.
15:21:56 A. This was not Section 2. This is -- this is E. You were under E. And the third line said -- okay. This is referring to a statute. This is not -- anyways . . .
15:22:22 Okay. Go ahead.
15:22:22 Q. So -- so you see that that -- under that, on line 6, I believe it says, A, the county recorder shall cancel a registration.
15:22:28 Do you see that --
15:22:28 A. Yes.
15:22:28 Q. -- in Section A --
15:22:29 A. Yes.
15:22:30 Q. -- right?
15:22:30 And then there's -- one, two, three, four, five -- and you can go -- and you see 10 --
15:22:33 A. Yes.
15:22:34 Q. -- right?

15:22:35 It says -- do you see where it says, "When the county recorder obtains information pursuant to this section"?
15:22:41 A. I do see that.
15:22:42 Q. Right?
15:22:43 And then you see -- and then you have B, C, D. Do you see all of those?
15:22:48 A. I do.
15:22:49 Q. Right?
15:22:50 And then go to H.
15:22:53 A. Okay.
15:22:53 Q. Is that the SAVE section?
15:22:55 A. Yes.
15:22:56 Q. And it's for that same section?
15:22:59 A. Yes.
15:23:00 Q. So this section means that if somebody is deemed to be -- confirmed to be a noncitizen based on the SAVE check, that the county recorder would send them a cancellation notice?
15:23:12 MR. LANGHOFER: Legal conclusion. Best evidence.
15:23:48 BY MS. SHAH:
15:23:49 Q. Sir?
15:23:49 A. Yeah, I'm reading this. I'm reading the bill.
15:23:58 Q. All right. So let's move on.

15:24:07 MR. O'MALLEY: You want to ask a different
15:24:08 question.
15:24:09 MS. SHAH: Yeah, I mean, because it's -- it's
15:24:09 just a simple --
15:24:09 MR. O'MALLEY: She's going to ask you a
15:24:11 different question, I think.
15:24:12 MS. SHAH: -- but if we can't -- if you don't
15:24:13 have the time to understand it, that will -- says -- speaks
15:24:15 for itself.
15:24:16 BY MS. SHAH:
15:24:17 Q. Okay. So did you author either 2617 or 2243 as it
15:24:26 was passed?
15:24:27 A. No.
15:24:28 Q. And did you sponsor it?
15:24:30 A. I sponsored the amendment on 2617.
15:24:34 Q. Okay. What about amendments for 2243?
15:24:38 A. I don't recall if I did or not.
15:24:40 Q. Okay. Did either bill come before you in any of
15:24:45 your member -- committees as -- that you were a member of
15:24:48 in the Senate?
15:24:50 A. I know that 20- -- I know that 2492 did.
15:25:00 MR. O'MALLEY: I think she's asking about the
15:25:01 other two.
15:25:01 Right?
15:25:02 MS. SHAH: Right.

15:25:02 THE WITNESS: The other two. I don't recall
15:25:04 if they did or not -- came through my committee or not.
15:25:04 BY MS. SHAH:
15:25:07 Q. Do you know who authored HB 2617?
15:25:11 A. I believe that was, again, the Free Enterprise
15:25:22 Club. I think they authored most of it. And then the
15:25:26 spon- -- I don't know what the sponsor's involvement was as
15:25:31 far as --
15:25:31 Q. Okay. Do you know if anybody else outside the
15:25:35 legislature had a hand in authoring 2617?
15:25:39 A. As far as I know, it would be them and the sponsor
15:25:43 that authored it.
15:25:44 Q. Okay. And you -- you voted to pass 2617?
15:25:49 A. I did.
15:25:49 Q. Okay. Let's take a look at Tab 19, which is PX 4.
15:25:55 It's the text of -- well, actually, you know what? Let's
15:26:02 just go to Tab 19 A, which is the summary. It will be
15:26:09 faster that way. 19 A.
15:26:16 MS. RIZZONI: Is this 440?
15:26:16 MS. SHAH: 440.
15:26:16 (The document was marked as Exhibit 440
15:26:27 for identification.)
15:26:27 BY MS. SHAH:
15:26:27 Q. So do you see that this is the fact sheet for
15:26:32 2617?

15:26:32 A. I do.
15:26:33 Q. It's the one that passed; correct?
15:26:36 A. Yes.
15:26:36 Q. Okay. And do you see -- if you look at numbers --
15:26:43 I believe under "Provisions," if you look at numbers 4 and
15:26:50 5 on page 2, you see a description that 2617 would amend
15:26:56 Arizona law to require county recorders to cancel existing
15:27:00 voter registrations if a registrant fails to provide
15:27:04 documentary proof of citizenship within 90 days of
15:27:05 receiving a notice from the county recorder; correct?
15:27:08 A. I see that.
15:27:09 Q. Why did the legislature settle on 90 days?
15:27:13 MR. O'MALLEY: Objection. Lack of
15:27:14 foundation. Calls for speculation.
15:27:16 THE WITNESS: I don't know why the
15:27:17 legislature settled on 90 days.
15:27:19 BY MS. SHAH:
15:27:19 Q. Why did you vote for a legislation that said
15:27:22 90 days?
15:27:22 A. I felt like that was a reasonable amount of time.
15:27:25 Q. To respond to a notice?
15:27:29 A. Uh-huh.
15:27:30 Q. Okay. And did you look into why that would be the
15:27:36 case?
15:27:38 MR. O'MALLEY: Objection. Vague.

15:27:39 THE WITNESS: Where would I look for that?
15:27:45 BY MS. SHAH:
15:27:45 Q. Did you look at any studies?
15:27:47 A. What studies would I look to for that?
15:27:50 Q. About how long it takes to respond to such
15:27:53 notices.
15:27:53 A. Where are those studies at?
15:27:55 Q. Do you -- are you aware of any?
15:27:56 A. I'm not -- I've never heard of such a study.
15:27:58 Q. Okay. And did you get any information from Free
15:28:01 Enterprise Club as to whether that would be a reasonable
15:28:02 time frame?
15:28:03 A. No.
15:28:04 Q. Okay. Any other outside organization?
15:28:08 A. No.
15:28:09 Q. Any other legislator?
15:28:11 A. No.
15:28:12 Q. Maybe the sponsor?
15:28:15 A. Not that I remember.
15:28:19 Q. Okay. So why do you think 90 days seems
15:28:22 reasonable to you?
15:28:23 A. Why do I think 90 days is reasonable? Because
15:28:29 that's -- three months is -- is a lot of time.
15:28:35 Q. So -- so you think that's reasonable?
15:28:38 A. I do.

15:28:39 Q. Okay. But there's no other reason why you think
15:28:43 it's reasonable?
15:28:44 A. "Reasonable" is a subjective term. You just --
15:28:51 you know, you apply that to yourself and --
15:28:54 Q. I'm only asking for what you think. So that's why
15:28:57 I'm saying -- you said it was reasonable, and I'm asking
15:28:59 you why you think that's correct.
15:29:00 MR. O'MALLEY: Just for the record, this is
15:29:03 one of the many times you've asked him for his personal
15:29:05 views after avowing to the court you weren't going to do
15:29:09 that.
15:29:09 But go ahead.
15:29:10 THE WITNESS: So my personal view is that you
15:29:20 can provide evidence within a day or two. And so 90 days
15:29:26 is more than a day or two. So especially when these are
15:29:32 basic and important documents. And if you've represented
15:29:34 that you're a citizen.
15:29:36 BY MS. SHAH:
15:29:37 Q. Okay. If you go down to numbers 9 and 10. And do
15:29:50 you see that it says it requires the secretary of state to
15:29:53 compare voter registration database to the driver's license
15:29:56 database maintained by ADOT and report to county recorders
15:30:00 if a registered voter is not a U.S. citizen in that
15:30:03 database? Correct?
15:30:05 A. Yes.

15:30:05 Q. Who do you understand will be affected by these
15:30:10 provisions?
15:30:11 MR. O'MALLEY: Objection. Vague.
15:30:11 MR. LANGHOFER: Speculation. Legal
15:30:16 conclusion.
15:30:18 THE WITNESS: I think it will impact
15:30:30 ineligible voters.
15:30:34 BY MS. SHAH:
15:30:35 Q. Do you agree that it will impact naturalized
15:30:37 citizens?
15:30:38 A. I think it will impact ineligible voters.
15:30:41 Q. Do you agree that an Arizona resident who is a
15:30:44 Green Card holder or a legal permanent resident can get a
15:30:47 driver's license or a state ID?
15:30:49 MR. O'MALLEY: Objection. Irrelevant.
15:30:51 MR. LANGHOFER: Legal conclusion.
15:30:53 THE WITNESS: Am I aware of that?
15:30:55 MS. SHAH: Uh-huh.
15:30:55 THE WITNESS: Actually, yeah.
15:30:57 BY MS. SHAH:
15:30:57 Q. And you agree that somebody -- that person can
15:31:01 subsequently naturalize and register to vote at a
15:31:04 naturalization ceremony; correct?
15:31:05 A. Yes, that's my understanding.
15:31:07 Q. And that they may not update their driver's

15:31:10 license or state ID?
15:31:12 MR. O'MALLEY: Objection. Calls for
15:31:14 speculation.
15:31:14 THE WITNESS: What I know is that that can be
15:31:15 done within a matter of days.
15:31:19 BY MS. SHAH:
15:31:19 Q. But you agree that they may not do so; correct?
15:31:22 MR. O'MALLEY: Objection. Speculation.
15:31:23 THE WITNESS: We may not do lots of things.
15:31:25 People may not do what they're supposed to do. People are
15:31:28 irresponsible. People don't do things on time. Yeah, that
15:31:34 could happen, but there's a -- a period where they can --
15:31:37 they have time where they can correct that.
15:31:37 BY MS. SHAH:
15:31:41 Q. And so you agree that naturalized citizens can be
15:31:43 impacted by these provisions?
15:31:44 MR. O'MALLEY: Objection. Overly broad
15:31:47 vague.
15:31:47 MR. LANGHOFER: Speculation.
15:31:48 THE WITNESS: I think all citizens are
15:31:50 impacted by this legislation.
15:31:52 BY MS. SHAH:
15:31:53 Q. Okay. Do you see -- do you know if there's any
15:31:58 laws out there that require somebody to update their
15:32:00 driver's license after they naturalize?

15:32:03 MR. LANGHOFER: Legal conclusion.
15:32:05 THE WITNESS: I would have to research that.
15:32:06 BY MS. SHAH:
15:32:07 Q. But sitting here today, do you know?
15:32:08 A. I'm not aware of it at this -- at this time.
15:32:10 Q. And then looking at Provision 11. Do you see
15:32:17 that? It talks about requiring county recorders to compare
15:32:21 registered voters with the Social Security Administration
15:32:24 database and, again, the Systematic Alien Verification
15:32:27 Eligibility, SAVE; correct?
15:32:30 A. I see that.
15:32:31 Q. Okay. So why would you compare with the SSA?
15:32:36 MR. LANGHOFER: Foundation.
15:32:38 THE WITNESS: That's a means to -- one means
15:32:43 to help determine citizenship.
15:32:46 BY MS. SHAH:
15:32:46 Q. So you're saying that you would look at the SSA
15:32:49 database to understand if somebody's a citizen?
15:32:52 A. No. What I'm saying is that it could be -- it can
15:32:56 help them determine whether they are or not.
15:32:59 Q. This is for somebody -- right? We understand that
15:33:03 2240 -- or I mean -- sorry -- 2617, these provisions apply
15:33:06 to somebody who is already on the voter registration
15:33:08 database; correct?
15:33:08 A. Correct.

15:33:09 Q. Right.
15:33:10 So -- and so at that point, they're looking to -- at the SSA database to see whether somebody is a citizen or not? That is your understanding?
15:33:19 MR. O'MALLEY: Objection. Asked and answered.
15:33:21 MR. LANGHOFER: Legal conclusion. Best evidence.
15:33:23 THE WITNESS: I think it does exactly what it says: Requires them to extent practicable -- practicable to compare it with it.
15:33:38 BY MS. SHAH:
15:33:38 Q. So I'm sorry. Just to be clear for the record, that -- to the extent it's practicable to see, compare to the SSA database to see if somebody's a citizen?
15:33:47 A. Yes.
15:33:47 Q. Okay.
15:33:48 A. That's what it says.
15:33:49 Q. Are you aware if the Social Security Administration database has information about citizenship?
15:33:57 A. I'm not aware if they are or not -- if they do or not.
15:34:12 Q. But you voted for this regardless?
15:34:15 A. I did.
15:34:16 Q. And then do you -- let's go to -- the "Amendments"

15:34:24 title. Do you see that? That's the next heading, like, on
15:34:27 page, I think, 3. Like, towards the bottom, three-fourths
15:34:35 of the way down.
15:34:35 A. Uh-huh.
15:34:36 Q. And it says -- if you go -- it starts on 3. And
15:34:40 then if you go to page 4 and on to numbers 4 and 5 under
15:34:44 that section. It says it amends HB 2617 as passed by the
15:34:49 House to send a juror summary report rather than the full
15:34:54 questionnaire; correct?
15:34:55 A. What line are you on?
15:34:57 Q. I'm looking at 4 -- numbers 4 and 5 under that
15:35:00 section.
15:35:01 A. Okay. "Requires a jury commissioner or jury
15:35:04 manager to forward to the SOS and a county recorder" --
15:35:07 that one?
15:35:08 Q. Yeah.
15:35:08 A. Okay.
15:35:09 Q. So -- right?
15:35:10 It says that it amends it to say you'd send
15:35:13 the summary report rather than the full questionnaire;
15:35:16 correct?
15:35:16 A. That's what it says.
15:35:17 Q. And this was your amendment; correct?
15:35:19 A. I don't recall.
15:35:24 Q. Okay. Let's --

15:35:28 MS. SHAH: Can we do Tab 20, please. It's
15:35:33 LEG LOG 9 -- 12929.
15:35:46 MS. RIZZONI: And this will be 441?
15:35:47 MS. SHAH: Uh-huh.
15:35:48 (The document was marked as Exhibit 441
15:35:54 for identification.)
15:35:54 BY MS. SHAH:
15:36:02 Q. Does that refresh your recollection?
15:36:07 A. It does.
15:36:10 Q. So you agree it was your amendment; right?
15:36:13 A. I sponsored the amendment. Did not author the
15:36:16 amendment.
15:36:16 Q. Fair enough.
15:36:17 And so you didn't author it. In fact, it was
15:36:23 Free Enterprise Club that authored it, and you were asked
15:36:26 to sponsor this amendment by representative Chaplik; is
15:36:29 that correct?
15:36:29 A. Representative Chaplik asked me if I'd sponsor the
15:36:33 amendment, and I agreed to sponsor the amendment. That is
15:36:34 correct.
15:36:34 Q. Okay. Is it also correct that fair elections --
15:36:38 sorry -- Free Enterprise Club authored the amendment?
15:36:42 MR. O'MALLEY: Objection. Lack of
15:36:42 foundation.
15:36:42 THE WITNESS: I don't recall.

15:36:44 MR. O'MALLEY: Speculation.
15:36:45 THE WITNESS: I don't recall.
15:36:46 I do remember that the sponsor asked me to --
15:36:52 to sponsor the amendment.
15:36:54 BY MS. SHAH:
15:37:00 Q. Okay. So let's do Tab 21. It's LEG LOG11595.
15:37:16 MS. RIZZONI: This is 442.
15:37:16 (The document was marked as Exhibit 442
15:37:19 for identification.)
15:37:19 BY MS. SHAH:
15:37:29 Q. So I know this email was originally, at the top,
15:37:34 forwarded to you by Heather Covert, who I believe is your
15:37:38 assistant; is that correct?
15:37:39 A. That's correct.
15:37:39 Q. But the email she forwards you were originally
15:37:42 copied on that; correct?
15:37:43 A. Yes.
15:37:43 Q. Okay. So this chain that was sent to you -- if
15:37:46 you go down and you look at what is page 11598, the Bates
15:37:53 number, do you -- are you there?
15:37:54 A. Yes.
15:37:55 Q. And do you see that Mr. Blackie emails Mike Hans
15:37:59 and Representative Chaplik and Aimee Yentes on April 25th,
15:38:03 2022, with the subject "HB 2617 Amendment." And it
15:38:08 purports to attach the amendment -- correct? -- which

15:38:11 include changing the juror questionnaire to summary?
15:38:15 A. I see that, yes.
15:38:16 Q. Okay. And Mike Hans is or was a legislative
15:38:21 research analyst with the Senate committee on government;
15:38:24 correct?
15:38:24 A. That's correct.
15:38:25 Q. So fair to say that based on this, Mr. Blackie was
15:38:28 working directly with the Senate staff on this amendment?
15:38:31 A. That's what it looks like from here.
15:38:33 Q. Okay. So am I correct, then, that HB 2617 passed
15:38:39 the Senate with your amendment on May 23, 2022?
15:38:46 MR. LANGHOFER: Best evidence.
15:38:47 THE WITNESS: I don't know if that's the
15:38:48 date. I don't remember if that's the date or not. I
15:38:50 assume that's -- it was about that time frame. So I have
15:38:53 no reason to believe otherwise.
15:38:55 BY MS. SHAH:
15:38:55 Q. Okay. And so let's go to Tab 22, which is
15:39:07 LEG LOG12933. I believe that's going to be 443.
15:39:07 (The document was marked as Exhibit 443
15:39:26 for identification.)
15:39:26 BY MS. SHAH:
15:39:27 Q. Do you see that this is an email from Mr. Blackie,
15:39:29 on May 23rd at 10:00 a.m., to the Republican caucus about
15:39:35 vote yes on HB 2617; correct?

15:39:38 A. I do, yes.

15:39:39 Q. Okay. So -- so this was before the bill passed
15:39:43 the Senate; correct?

15:39:43 A. Uh-huh.

15:39:44 Q. All right. And do you agree with his explanation
15:39:50 that starts in the third full paragraph, which says,
15:39:54 "Before cancellation, the voter would have 90 days to
15:39:58 respond to the notice with evidence of . . . eligibility"?

15:40:06 MR. LANGHOFER: Best evidence. Legal
15:40:07 conclusion.

15:40:10 THE WITNESS: I mean, I would have to compare
15:40:20 that to the language. But I -- I would imagine that's
15:40:25 accurate. So I have no reason to believe otherwise.

15:40:28 BY MS. SHAH:

15:40:29 Q. Okay. Did you get any information from him as to
15:40:35 why that would be sufficient time to respond?

15:40:39 A. No.

15:40:40 Q. Okay. And then it goes on to say in the last
15:40:44 paragraph, "HB 2617 is critical to ensure clean and current
15:40:49 voter rolls."

15:40:50 Do you see that?

15:40:51 A. I do.

15:40:51 Q. Okay. And it says "with a 90-day notice period to
15:40:56 protect eligible voters, ensuring that in Arizona it is
15:40:59 easy to vote, and hard to cheat"?

15:41:01 A. Yes.
15:41:01 Q. So how do you think that 90-day notice protects
15:41:05 eligible voters?
15:41:08 A. You'd have to ask --
15:41:08 MR. LANGHOFER: Asked and answered.
15:41:08 THE WITNESS: Yeah, you'd have to ask
15:41:11 Mr. Blackie. I didn't say that.
15:41:12 BY MS. SHAH:
15:41:12 Q. Do you disagree with that?
15:41:14 A. I don't. I'm not sure what he means by that. So
15:41:18 that's his --
15:41:20 Q. Okay.
15:41:20 A. That's not my statement.
15:41:21 Q. All right. Would you agree, though, that
15:41:24 naturalized voters can be eligible voters?
15:41:28 A. Can naturalized voters be eligible voters?
15:41:32 Absolutely.
15:41:32 Q. Okay. And just right before that paragraph, you
15:41:39 see Mr. Blackie writes, "The Floor amendment that will be
15:41:42 offered in" -- and I think he says "COW," but I think
15:41:46 that's means committee of the whole; correct?
15:41:47 A. Correct.
15:41:48 Q. -- "today addresses a request from the courts."
15:41:50 Do you see that?
15:41:50 A. Uh-huh.

15:41:51 Q. So fair to say that he knew that you would be offering this amendment before you made it?
15:41:56 MR. O'MALLEY: Object to the form.
15:42:00 THE WITNESS: He would -- he knew I was -- yeah, it's possible the sponsor told him I agreed to do that.
15:42:06 BY MS. SHAH:
15:42:07 Q. So -- but you didn't tell --
15:42:07 A. No.
15:42:09 Q. -- him that you were going to make this amendment?
15:42:10 A. Not that I remember, no. I spoke to -- I remember speaking to Representative Chaplik. I don't remember speaking to Greg about the amendment.
15:42:19 Q. Okay. Then let's go to Tab 23, which is LEG LOG13434.
15:42:35 MS. RIZZONI: This will be 444.
15:42:35 (The document was marked as Exhibit 444 for identification.)
15:42:43 BY MS. SHAH:
15:42:44 Q. Do you see this is an email from Mr. Blackie to you, with a subject header "HB 2617 Talking Points," and it was also sent on May 23rd; correct?
15:42:54 A. Yep.
15:42:55 Q. And did you ask Mr. Blackie for talking points?
15:43:00 A. No.

15:43:00 Q. So why did he send them to you, do you think?
15:43:04 A. Because --
15:43:04 MR. O'MALLEY: Lack of foundation.
15:43:05 MR. LANGHOFER: Speculation.
15:43:05 THE WITNESS: Because he's doing exactly what
15:43:07 all lobbyists do. They send talking points. And groups --
15:43:14 interest groups send talking points on -- on bills
15:43:19 they're -- they have authored, bills that they're pushing
15:43:21 or promoting.
15:43:23 BY MS. SHAH:
15:43:23 Q. All right. Well, let's look at the attachments
15:43:25 that he sent to you.
15:43:30 Do you know if you distributed them to
15:43:31 others?
15:43:33 A. No, I -- I don't remember distributing -- I don't
15:43:39 remember.
15:43:39 Q. Okay.
15:43:40 A. No. As far as I remember, I did not distribute
15:43:43 this to anybody.
15:43:44 Q. Okay. If you look at that -- what I believe is
15:43:48 13435 -- right? -- that fact sheet, it says, second full
15:43:53 paragraph, "People move within the state." Do you see
15:43:58 that?
15:43:58 A. Yes.
15:44:02 Q. So it says, "People move within the state, move to

15:44:06 new states, pass away, are convicted of felonies, or for other reasons become unqualified."
15:44:12 Do you agree with that?
15:44:14 A. That people move?
15:44:15 Q. Uh-huh.
15:44:16 A. Move to new states, pass away, or convicted of felonies or for other reasons become unqualified? Yes, I think that's an accurate statement.
15:44:24 Q. And then it goes on to talk about that's why states must take a proactive approach to utilize databases available that -- to cross-reference for eligibility. Do you see all of that --
15:44:38 A. Yes.
15:44:39 Q. -- that paragraph?
15:44:44 A. Uh-huh.
15:44:48 Q. Okay. Did you agree with that paragraph?
15:44:48 MR. O'MALLEY: Objection. Multiple.
15:44:49 THE WITNESS: Yeah, I don't -- what do you mean? What do you mean do I agree with this?
15:44:53 BY MS. SHAH:
15:44:54 Q. Do --
15:44:54 A. I think his first sentence is accurate. I think the second sentence is accurate. I don't know that that's the only reason that we do what we do. I think that's -- I think these are reasons to -- I think it is reasons to take

a proactive approach. So I guess -- I mean --
Q. What are other reasons?
A. What are other reasons?
MR. O'MALLEY: Objection. Vague.
THE WITNESS: Well, we want to make sure that we have eligible voters voting, so . . .
BY MS. SHAH:
Q. And so -- and so you think that individuals who died are likely to vote in Arizona elections?
A. I think that people that receive ballots to their house from people that have passed away can -- yeah, that opens a possibility for somebody else to vote. The dead people can't vote, but somebody else could vote for them. There's actually cases and prosecutions of people who have voted for even their own, you know, mothers or that have passed away. So I'm aware of -- I'm aware of that.
Q. And how do you think that 2617 would address that concern?
A. Because --
MR. LANGHOFER: Foundation.
THE WITNESS: It's part of cleaning up the rolls. You're checking to see if -- you're doing verifications.
BY MS. SHAH:
Q. And then do you see -- going back to that first

15:46:50 sentence again, you see "for other reasons become
15:46:54 unqualified"?
15:46:54 A. Uh-huh.
15:46:55 Q. What might those be?
15:46:56 A. I don't know what he was referring to.
15:46:59 Q. And sitting here today, you don't have any idea?
15:47:02 A. I don't have anything on the top of my mind right
15:47:06 now.
15:47:06 Q. Okay. If you go to -- further down and you look
15:47:09 at the SSA. Do you see that under the "Database Checks"?
15:47:12 A. Yep.
15:47:13 Q. And it says, "This database will help verify
15:47:17 citizenship status."
15:47:17 A. Uh-huh.
15:47:18 Q. Do you -- do you agree with that?
15:47:22 MR. LANGHOFER: Foundation.
15:47:23 THE WITNESS: You asked me this before. I
15:47:25 said I wasn't aware of it. But, I mean, obviously, you can
15:47:32 get a Social Security number. If you don't have a Social
15:47:38 Security number, that can be a flag for noncitizenship.
15:47:45 So again, whether it proves citizenship or
15:47:51 not, it may not, but it can help somebody -- I don't think
15:47:56 it's dispositive, but it can be helpful, so . . .
15:48:00 BY MS. SHAH:
15:48:00 Q. Then if you go to the next page -- right? -- it

15:48:07 says -- I think this is not part of the fact sheet. I
15:48:11 think this is a separate attachment. Correct?
15:48:13 A. Uh-huh.
15:48:14 Q. Right?
15:48:15 And it says at the top, the first paragraph,
15:48:20 second sentence, "Voter roll maintenance is arguably the
15:48:24 most important step in ensuring election integrity,
15:48:27 following the principle of garbage in, garbage out."
15:48:33 Do you see that?
15:48:33 A. I do.
15:48:33 Q. What do you understand that to mean?
15:48:39 MR. O'MALLEY: Lack of foundation.
15:48:40 MR. LANGHOFER: Foundation.
15:48:41 THE WITNESS: That he thinks cleaning the
15:48:43 voter rolls is important.
15:48:45 BY MS. SHAH:
15:48:46 Q. And you agree -- right? -- that voter rolls are
15:48:49 records of human beings?
15:48:54 MR. LANGHOFER: Vague.
15:48:56 THE WITNESS: Voter rolls are records of
15:48:58 human beings? Voter rolls, I'm pretty sure everyone on
15:49:08 there is a human.
15:49:09 BY MS. SHAH:
15:49:10 Q. Great.
15:49:10 A. Yeah.

Q. So is he saying that some of these people are garbage?

A. No. I think he was referring to -- well, again, I can't -- I'm speculating. I'd have to speculate. That's not how I read it.

Q. Okay.

A. He's saying bad information in, bad information out. So if you have people that are not eligible to vote or if you have bad information, out of date voter rolls, that's what he -- I think that's what he's referring to.

Q. So are you saying that county recorders are entering garbage information?

MR. O'MALLEY: Objection. Lack of foundation. Speculation.

THE WITNESS: I didn't say that, no. I didn't say that.

BY MS. SHAH:

Q. Is that your understanding of what he's saying here?

MR. O'MALLEY: Objection. Lack of foundation. Speculation.

MR. LANGHOFER: Speculation.

THE WITNESS: No. That's not -- I don't know what he's saying. Those are his words, not mine.

BY MS. SHAH:

Q. Okay. And then if you stay on that and then go to the -- I think it's the second to last heading: "Will this add a bunch of work for the counties?"
Do you see that?
A. Yes.
Q. And it says, "No. Many of these database checks are purportedly already being done."
Do you see that?
A. I do.
Q. What is your understanding about what -- these database checks are already being done?
MR. LANGHOFER: Foundation. Speculation.
THE WITNESS: He didn't specify. I don't know what he's -- I don't know what he's trying to say.
BY MS. SHAH:
Q. Do you do -- do you know if those database checks were already being done?
MR. O'MALLEY: Objection. Lack of foundation.
THE WITNESS: I don't know what he meant when he was saying "database checks are purportedly already being done." I didn't write this document.
BY MS. SHAH:
Q. I understand that.
And then again, the last heading says, "Will

15:51:06 this open up counties to lawsuits?"
15:51:08 Do you see that?
15:51:09 A. I do.
15:51:09 Q. And after that, he says, I think it's the sentence
15:51:17 that says -- starts: "The 'catch all' provision is broad."
15:51:20 Do you see that?
15:51:20 A. Uh-huh.
15:51:21 Q. "But that allows room for interpretation by the
15:51:24 counties to ensure they are doing database checks that work
15:51:29 best for them, to ensure voter rolls are properly
15:51:32 maintained."
15:51:32 Do you see that?
15:51:33 A. I do.
15:51:35 Q. Do you agree with that explanation?
15:51:39 A. What part?
15:51:40 Q. That entire sentence that I just read.
15:51:45 MR. LANGHOFER: Legal conclusion. Best
15:51:47 evidence.
15:51:47 THE WITNESS: So the -- there's a question at
15:51:50 the top. It says, "Will this open up the counties to
15:51:55 lawsuits?" And he is saying that he doesn't believe that
15:52:00 they will -- he will open them up to lawsuits.
15:52:09 I don't necessarily agree with that. I think
15:52:13 people can sue on anything and on all sorts of legislation.
15:52:19 I think this bill got some litigation. So I don't

15:52:23 necessarily agree with that, that it wouldn't open up the
15:52:27 counties to lawsuits.
15:52:28 BY MS. SHAH:
15:52:29 Q. Okay. But he -- well, let me ask you: Do you see
15:52:33 him, however, opining that because there's room for
15:52:38 interpretation, that that may be a reason why counties may
15:52:42 not be subject to lawsuits?
15:52:48 A. I don't agree with his statement that it won't
15:52:55 open up the county to lawsuits. I think people can sue on
15:53:01 anything. I don't -- I don't necessarily think this
15:53:04 changed it one way or another, so . . .
15:53:07 Q. That -- I understand that that's your opinion.
15:53:10 But I'm saying, he seems to suggest that
15:53:12 though; correct?
15:53:13 A. Right. I'm not going to -- I can't speak for Greg
15:53:16 Blackie. I don't -- I don't know what Greg Blackie is
15:53:18 thinking.
15:53:18 Q. Based on what's said here, though?
15:53:21 MR. O'MALLEY: Objection. Document speaks
15:53:22 for itself.
15:53:22 THE WITNESS: I don't know. I don't know. I
15:53:24 don't know what he means.
15:53:24 BY MS. SHAH:
15:53:24 Q. All right.
15:53:25 A. I'm not sure what he's trying to say.

15:53:30 Q. Do you agree, though, that 2617 does, however,
15:53:40 allow counties to interpret this to make sure that they're
15:53:47 doing database checks that work best for them to ensure
15:53:50 voter rolls are properly maintained?
15:53:52 MR. LANGHOFER: Legal opinion. Best
15:53:54 evidence.
15:53:56 BY MS. SHAH:
15:53:56 Q. Let me rephrase.
15:53:57 Is it your understanding that 2617, as
15:54:00 passed, allows room for interpretation by the counties to
15:54:02 ensure that they are doing database checks that work best
15:54:05 for them to ensure voter rolls are properly maintained?
15:54:09 MR. LANGHOFER: Same objection.
15:54:09 THE WITNESS: Yeah, that's -- my
15:54:10 understanding is that that was the intent. I know that
15:54:13 that was the intent.
15:54:13 BY MS. SHAH:
15:54:14 Q. Okay. So with that, you agree that counties can
15:54:18 disagree with each other or do things differently from each
15:54:20 other?
15:54:21 MR. O'MALLEY: Objection.
15:54:22 MR. LANGHOFER: Legal conclusion.
15:54:24 THE WITNESS: Do I think counties can
15:54:27 disagree each other?
15:54:27 BY MS. SHAH:

15:54:30 Q. Based on what you just said --
15:54:31 A. Counties can always disagree with each other.
15:54:33 Q. Okay.
15:54:34 A. On anything.
15:54:42 MS. SHAH: And can we take a two-minute
15:55:05 break? Is that okay?
15:55:06 MR. O'MALLEY: Sure.
15:55:07 THE VIDEOGRAPHER: We are off the record.
15:55:09 Time on the monitor is 3:54.
15:55:46 (A recess ensued.)
16:05:36 THE VIDEOGRAPHER: We are -- we are on the
16:05:52 record. Time on the monitor is 4:05.
16:05:56 BY MS. SHAH:
16:05:59 Q. So Governor Ducey vetoed HB 2617; correct?
16:06:06 A. As I recall.
16:06:07 MS. SHAH: So can we circulate Tab 26,
16:06:10 Exhibit -- it's marked as PX 53.
16:06:15 MS. RIZZONI: Also Toma Exhibit 424.
16:06:25 BY MS. SHAH:
16:06:26 Q. And do you agree that this is his letter
16:06:31 vetoing -- about vetoing 2617?
16:06:33 A. Yes.
16:06:34 Q. And do you see where -- can you go to what is,
16:06:41 like, paragraph 2. And I believe it's maybe the third
16:06:44 sentence that says -- it starts with: "It is equally

important that our laws include safeguards to protect the vote of any Arizonan who is eligible and lawfully registered. In this regard, HB 2617, while well intentioned, does not include these necessary safeguards."

Do you see that?

A. I do.

Q. Just talking that -- that first sentence that I read, "It is equally important." Do you agree with that?

A. I do think it's important. Yeah, I think it's important to protect people's right to vote that are eligible voters. I do.

Q. And you agree that it's important to protect naturalized citizens who are otherwise eligible to vote; right?

A. I do.

Q. Okay. And that interest is harmed when eligible, lawfully registered naturalized citizens are removed from the rolls because they failed to provide documentary proof of citizenship?

MR. LANGHOFER: Vague.

THE WITNESS: Yeah, I don't -- I don't think that's how it works, no. I think we're -- I think we're removing ineligible voters. I think the legislation removed ineligible voters. I don't think it removed eligible voters from the rolls.

16:08:10 BY MS. SHAH:
16:08:11 Q. So --
16:08:11 MR. LANGHOFER: Might want to speak up for the court reporter.
16:08:15 THE WITNESS: Okay. Yeah.
16:08:17 BY MS. SHAH:
16:08:17 Q. So -- but you would agree that it's important to ensure that eligible, lawfully registered naturalized citizens are, however, not removed from the rolls? That you would agree with; correct?
16:08:28 A. I do agree with that.
16:08:30 Q. Okay. And then going on to that other next sentence, it says, "In this regard." You see that sentence; right?
16:08:37 A. Uh-huh. Yeah. Yes.
16:08:37 Q. Do you agree with that sentence?
16:08:41 A. In this regard, while well intentioned, does not include -- no, I disagree with the governor.
16:08:47 Q. Why do you disagree with him?
16:08:49 A. Why do I disagree with him? Because I read 2617. I felt like it was reasonable. And I voted for it.
16:08:54 Q. So you thought it had the necessary safeguards?
16:08:57 A. I did. I felt like it was okay.
16:09:00 Q. Sorry. I didn't mean to --
16:09:01 A. Yes. I felt like it was reasonable.

16:09:03 Q. And had the necessary safeguards; yes?
16:09:06 A. Yes.
16:09:07 Q. What -- what did you think were the safeguards?
16:09:11 A. I would have to review the bill.
16:09:15 Q. Sitting here, you don't recall anything specific that -- that you felt like was a good safeguard?
16:09:20 A. I don't want to speak without looking at the language of the bill.
16:09:24 Q. Okay. We can come back to that in a minute. But I want to go back to -- just go through this letter for a second.
16:09:42 Do you see the, I guess, like, what are the third paragraph and the fourth paragraph? It's the third paragraph starting with "HB 2617 requires."
16:09:53 Do you see that paragraph of the veto letter?
16:09:58 A. "HB 2617 requires a county recorder" --
16:10:06 Q. If you could just read to yourself rather than loudly. Otherwise, it's going to drive poor Cindy crazy.
16:10:26 A. Yeah. Okay.
16:10:27 Q. Do you agree that paragraphs 3 and 4 basically lay out his concerns as to why he vetoed HB 2617?
16:10:38 MR. O'MALLEY: Objection. Lack of foundation.
16:10:41 THE WITNESS: Yeah, I agree that those are his concerns.

16:10:43 BY MS. SHAH:
16:10:45 Q. Right.
16:10:45 And you agree that one of his concerns was, and I quote, needing sufficient due process to ensure lawfully registered voters "know that their right to vote will not be disturbed"?
16:10:58 A. Yes.
16:10:58 Q. And you also agree that Governor Ducey believed that HB 2617 did not have sufficient guardrails to protect against bad actors who could seek to falsely elect a voter who is not a qualified elector?
16:11:15 MR. O'MALLEY: Objection. Lack of foundation. Best evidence.
16:11:16 THE WITNESS: That's his -- I see what -- yeah, I see that that's the governor's argument on the veto.
16:11:22 BY MS. SHAH:
16:11:23 Q. Okay. And then in your experience, though, just generally, did Governor Ducey exercise his veto pen very often?
16:11:35 A. That's a very subjective question. Did he exercise his veto pen very often? I would say it was normal. I don't know if it was often or a few. It seemed like a normal amount of vetoes.
16:11:56 Q. Sorry. So sitting here, you don't think it's

16:12:01 often; you just think it's normal?
16:12:02 A. Yeah, I don't think it was an inordinate amount,
16:12:10 but I don't think it was a small amount either for --
16:12:19 anyway -- so it just seemed like it was normal, the amount
16:12:22 of vetoes that he had.
16:12:23 Q. Okay. Okay. Let's -- let's move on to 2243.
16:12:31 MS. SHAH: Can we go to Tab 18. I think this
16:12:44 is the -- what's been previously marked as PX 499..
16:12:44 BY MS. SHAH:
16:13:06 Q. This is -- this has been -- you agree that this is
16:13:11 the transcript of the committee before the whole on
16:13:15 June 22, 2022?
16:13:17 A. Uh-huh.
16:13:19 Q. And you agree that you made a floor amendment to
16:13:23 HB 2243 in the Senate floor session for the Senate
16:13:28 committee of the whole; correct?
16:13:29 A. I did.
16:13:30 Q. And it was on this day; correct?
16:13:32 A. Uh-huh.
16:13:32 Q. And this is the last day of the second regular
16:13:35 session of the 55th legislature; correct?
16:13:37 A. Correct.
16:13:37 MR. LANGHOFER: Best evidence.
16:13:40 BY MS. SHAH:
16:13:42 Q. What was the purpose of your amendment?

16:13:43 MR. LANGHOFER: Foundation.
16:13:45 THE WITNESS: What was the purpose of the
16:13:46 amendment?
16:13:47 BY MS. SHAH:
16:13:47 Q. Uh-huh.
16:13:49 A. We -- the purpose was to add the bill that had
16:13:55 been vetoed before onto the other bill.
16:13:59 Q. So would I be correct in saying to add the
16:14:03 substance of HB 2617; correct?
16:14:05 A. I think that's fair.
16:14:06 Q. Okay. So why do that through a floor amendment in
16:14:12 the Senate rather than in the House?
16:14:17 A. Because there could be a number of reasons. I
16:14:21 would have to research why it was the case here. It's just
16:14:27 where the bill was at in the process. The bill was in the
16:14:30 Senate. It wasn't in the House. If it was in the House,
16:14:33 it could have been done in the House. But you have to find
16:14:40 a bill that's germane.
16:14:42 So again, I'm completely speculating here.
16:14:46 We'd have to research why -- why it was on this bill and at
16:14:51 that time, but it's likely that this bill was germane and
16:14:56 available. The sponsor agreed to -- to have it added to
16:15:00 the bill.
16:15:02 And so if the sponsor was okay with it, then
16:15:08 we were able to amend it on, and then it goes back to the

16:15:12 House. And the House votes on it after it's been amended
16:15:17 in the Senate.
16:15:17 Q. Can I -- so stepping back just so I understand,
16:15:23 when we say it's a "floor amendment," what does that mean?
16:15:27 A. So after a bill leaves committee, there's often
16:15:32 other changes or things that arise. And so the -- you have
16:15:39 an opportunity to do amendments on the floor. You can't do
16:15:45 a brand new bill per se, but if you have a bill that's
16:15:48 completely germane and fits within that section or title,
16:15:53 then you can amend onto that bill.
16:15:57 Q. Again, not -- just specific about this, just so I
16:16:03 understand the distinction, is -- is there another way you
16:16:05 can make an amendment that wouldn't be called a floor
16:16:07 amendment?
16:16:07 A. Yeah. You can amend when it's in committee. But
16:16:11 the bill was already out of committee.
16:16:13 Q. Okay.
16:16:13 A. So this had gone beyond the committee process by
16:16:17 the time that this was occurring.
16:16:19 Q. Understood.
16:16:19 And in this -- your floor amendment did pass;
16:16:24 right?
16:16:24 A. Yes, it did.
16:16:25 Q. And the substance of your amendment was ultimately
16:16:30 included in the final bill that was signed by the governor;

16:16:32 correct?
16:16:32 A. Correct.
16:16:33 Q. And you agree that it's now been codified, A.R.S. 16-165; correct?
16:16:40 A. Yes, that's correct.
16:16:42 Q. Okay. And, you know, if we go to -- I'm trying to find -- if we go to -- I think it's page 3 and line 9. I think you were starting to explain your floor amendment; is that right?
16:17:04 A. Yeah.
16:17:05 Q. And I'm going to just read it.
16:17:06 You said, "Just to be brief and concise here. This amendment is basically what was House Bill 2617, passed out of here. Went to the governor's desk. He vetoed it, and this amendment is that bill but addresses the veto letter and the one concern. And that one concern was this, that it requires a -- so this is the distinction here. It requires the county recorder, if a registered person does not provide satisfactory evidence within 35 days of receiving a jury summary report notice, to cancel the person's voter registration. And oh, I'm sorry. It's 5, requires the county recorder," therefore "canceling a person's voter registration after receiving information that the person is not a U.S. citizen to give them notice."
16:17:50 Did I read that correctly?

16:17:51 A. Yes.
16:17:52 Q. Okay. And so it adds -- so am I correct in
16:17:58 understanding what your -- your statement there is that it
16:18:01 "adds additional notice requirements, but besides that,
16:18:04 it's identical to the prior bill"?
16:18:05 Did I read that correctly?
16:18:06 A. That's my -- that was my explanation on the floor.
16:18:09 Q. Right. You're right. That is your explanation.
16:18:11 So did I read that correctly?
16:18:13 A. Uh-huh.
16:18:13 Q. And is it fair to say that members who would --
16:18:17 who voted to pass your amendment would have relied on this
16:18:20 explanation?
16:18:21 MR. O'MALLEY: Objection. Calls for
16:18:22 speculation.
16:18:23 MR. LANGHOFER: Foundation.
16:18:23 THE WITNESS: I would say no. There's other
16:18:27 testimony as well. And members read -- members read the
16:18:33 amendments, and they also read the engrossed bill. So no,
16:18:39 they don't rely on that alone.
16:18:40 BY MS. SHAH:
16:18:41 Q. So you're -- right.
16:18:42 So in addition to the other testimony, you
16:18:44 said that they can read the amendment; is that right?
16:18:47 A. That's correct.

16:18:48 MS. SHAH: And then can we do Tab 28.
16:18:55 It's -- we have to mark it as an exhibit. I don't know
16:18:58 what number we're on.
16:19:07 THE COURT REPORTER: We are at 445.
16:19:07 (The document was marked as Exhibit 445
16:19:16 for identification.)
16:19:16 BY MS. SHAH:
16:19:16 Q. And this is the floor amendment explanation, and
16:19:19 it attaches the actual draft of your amendment; correct?
16:19:25 A. I believe so. I think that's correct.
16:19:32 Q. Okay. And so you agree -- right? -- that this was
16:19:35 prepared on the same day -- right? -- as your floor
16:19:39 amendment?
16:19:41 MR. LANGHOFER: Best evidence. Foundation.
16:19:43 THE WITNESS: Yes. I believe that's correct.
16:19:44 BY MS. SHAH:
16:19:45 Q. Look at the first page. Right? It says --
16:19:46 A. Yep.
16:19:46 Q. Okay. And so when would a member have gotten this
16:19:53 document?
16:19:57 MR. LANGHOFER: Foundation.
16:19:57 THE WITNESS: The actual floor amendment?
16:19:59 BY MS. SHAH:
16:20:00 Q. This entire -- this thing. This explanation with
16:20:03 the attached actual text.

A. They get it while we're in committee of the whole.
Q. And that's -- okay.
So the same -- they would have gotten this the same day at least; correct?
A. Correct. Uh-huh.
Q. And not before?
A. Before what?
Q. Before that day.
A. What do you mean, "that day"?
Q. They wouldn't have gotten this document before --
A. Therefore, the amendment --
Q. -- June 22, 2022?
A. You can, but in most cases, you don't. It's almost always the same day so . . .
Q. So coming acting back to that transcript, am I correct that in understanding -- am I correct in understanding that your explanation was that this amendment meant that it was identical to 2617 plus addressing concerns of the governor by requiring the county recorder to cancel a voter registration after 35 days if satisfactory evidence is not provided, after a jury summary report notice, plus giving notice to an individual about whom a county recorder has information that the person is not a U.S. citizen?
A. Yeah, that was my explanation.

16:21:05 Q. And so -- okay.
16:21:07 And what do you mean by "It requires the county recorder, if a registered person does not provide satisfactory evidence within 35 days of receiving a jury summary report notice, to cancel the person's voter registration"?
16:21:24 A. What I meant was what we had read in the -- in the -- when we had gone over the -- when we reviewed the bill, that a -- that a person has 35 days to rectify -- to prove that their citizenship, if they've been noticed, that they have -- that they're not.
16:21:48 Q. And how does this address the governor's concerns?
16:21:54 MR. LANGHOFER: Foundation.
16:21:59 THE WITNESS: Because, as I recall, the governor was asking for --
16:22:19 MR. LANGHOFER: Speculation.
16:22:24 THE WITNESS: Well, I'll tell you how it addresses the governor's concern.
16:22:28 BY MS. SHAH:
16:22:28 Q. Okay.
16:22:29 A. The sponsor of the bill said that he prepared the amendment and the governor was okay with the amendment, that it was going to be signed. So that's how it addressed his concern.
16:22:46 Q. Okay. I want to, just for one second -- I'm going

to come back to what you just said, but I wanted to clarify first.

I'm talking about this particular sentence that you said on the floor statement. I wanted to understand --

A. I'm talking about that too. That's exactly what I'm talking about.

Q. I just -- I'm sorry. I've got to finish my question. That's the only thing I'm trying to do before you answer.

A. That's fine.

Q. I don't want to --

A. Okay.

Q. So this -- this sentence that you said, it requires 35 days notice, that sentence, how does that sentence address the governor's concerns?

MR. O'MALLEY: Lack of foundation.

THE WITNESS: I don't recall specifically why I said that, but I do remember that I was told that the amendment addressed the governor's concern. That was my intent and what I tried to convey to the body, so . . .

BY MS. SHAH:

Q. Okay. So who told you --

A. So the sponsor told me that the governor -- that the amendment was okayed by the governor's office, that it

16:23:44 would not be vetoed based off the amendment that had been
16:23:48 prepared.
16:23:48 Q. And this was Representative Chaplik?
16:23:52 A. Correct.
16:23:53 Q. Great. And then going back to -- it's 5,
16:23:59 "Requires a county recorder, before cancelling."
16:24:01 Do you see that?
16:24:02 A. Yeah. I don't -- I don't know why that's
16:24:06 transcribed like that. I don't know -- I don't remember
16:24:10 what I was trying to say there.
16:24:11 Q. But it says, "So it adds additional notice
16:24:13 requirements."
16:24:14 Do you see that?
16:24:14 A. I do see that. I saw that.
16:24:16 Q. What does that mean?
16:24:19 MR. LANGHOFER: Best evidence.
16:24:20 THE WITNESS: Yeah, so I -- I don't remember
16:24:22 now, but it -- my understanding was that it added notice
16:24:30 requirements to the bill.
16:24:31 BY MS. SHAH:
16:24:32 Q. Okay. And again, how --
16:24:34 A. Because the -- because that was -- the governor's
16:24:36 concern was that it didn't have -- there was something
16:24:40 wrong with the notice, so . . .
16:24:42 Q. So sitting here today, you're not aware of how

16:24:46 this would add -- address the governor's concern?
16:24:49 A. I can't remember exactly why it addressed his
16:24:53 concern.
16:24:53 Q. Okay.
16:24:56 A. Yeah. But that was -- anyways, I do remember
16:25:00 that. I do remember that he had cleared it. Had something
16:25:03 to do with notice requirements, so . . .
16:25:06 Q. And did you ask Representative Chaplik why it
16:25:16 addressed the governor's concern?
16:25:18 A. No.
16:25:20 Q. And so in -- you said that, you know, other than
16:25:26 these two things, your amendment was identical to HB 2617;
16:25:30 correct?
16:25:30 A. Correct.
16:25:32 Q. All right. Do you --
16:25:38 MS. SHAH: Let's go to Tab 19. It's
16:25:45 previously marked as PX 4..
16:25:45 BY MS. SHAH:
16:26:16 Q. This was the 2617 version that passed; correct?
16:26:22 A. Yes.
16:26:22 Q. If you go to page -- I believe page 2.
16:26:26 A. Okay.
16:26:27 Q. And if you see -- do you see line 7 starts with
16:26:32 paragraph (c)?
16:26:34 A. Yep.

16:26:35 Q. Do you know if this provision was included in your
16:26:38 amendment to 2243?
16:26:40 A. I don't know.
16:26:41 MR. LANGHOFER: Best evidence.
16:26:43 BY MS. SHAH:
16:26:44 Q. Okay. Do you -- do you see line -- I believe it's
16:26:51 line 16 starting with "Pursuant to"?
16:26:54 A. Yep.
16:26:56 Q. Do you know if that provision was included in
16:27:00 your --
16:27:00 A. I don't remember.
16:27:01 Q. Okay. And looking at page 2 again, and look at
16:27:09 C(2) on line 23.
16:27:11 A. Uh-huh.
16:27:11 Q. Do you know if this provision was included in
16:27:16 2243?
16:27:16 A. I don't remember if it was or not.
16:27:18 Q. Okay. Looking at page 4, line 9, J. Do you know
16:27:33 if this provision was included?
16:27:35 A. I don't recall if that was included or not.
16:27:41 Q. And then at the bottom, around line 37, line E?
16:27:50 A. I don't recall. I know there was something about
16:27:57 that that we read earlier, but I don't -- I don't -- I
16:28:01 don't remember if that was included or not.
16:28:03 MR. LANGHOFER: I'm sorry to interrupt. Is

16:28:05 this PX 4?
16:28:06 MS. SHAH: Yes.
16:28:14 BY MS. SHAH:
16:28:15 Q. So I think we've done -- going back to
16:28:22 Exhibit 445, which I believe was your amendment.
16:28:25 A. Okay.
16:28:26 Q. All right. And then maybe scroll down to the text
16:28:33 of your amendment.
16:28:34 A. Uh-huh.
16:28:35 Q. Right?
16:28:36 Do you see what was in 2617 that you just
16:28:40 looked at at line -- on page 2, subparagraph C starting at
16:28:48 line 7?
16:28:50 MR. LANGHOFER: I'm sorry. Which one?
16:28:51 MS. SHAH: So I'm saying -- looking at 2617,
16:28:55 line -- page 2, line 7, starting at paragraph C. In the
16:29:01 text of his amendment.
16:29:01 BY MS. SHAH:
16:29:03 Q. Is that in there?
16:29:06 A. There's paragraph A and B. This is paragraph C on
16:29:09 page 2.
16:29:10 Q. Where are you on your amendment? What page?
16:29:15 A. Senate amendments to HB 2243, page 2, line 7 is
16:29:23 paragraph A, 9(A).
16:29:31 Q. So you're saying that line 6 receives a form? Is

16:30:21 that what you're talking about?
16:30:22 A. Yeah. It's 9(A).
16:30:23 Q. Okay. And you think that's identical to line 7 in
16:30:28 2617 on page 2?
16:30:30 A. Nope. That is not identical.
16:30:46 Q. Okay. And then looking at page -- same in 2617,
16:30:52 page 2, C(1) starting at line 16, do you see that?
16:30:58 "Pursuant to"?
16:30:59 A. Oh, yeah. Uh-huh.
16:30:59 Q. Is that in your amendment identically?
16:31:04 A. It's not identical, no.
16:31:15 Q. All right. And if you look at 2617 page 2,
16:31:21 line 23, subparagraph C(2) there.
16:31:23 A. Okay.
16:31:28 Q. Pursuant to Subsection A, paragraph 10,
16:31:31 subdivision B of this section. Do you see that?
16:31:32 A. Uh-huh.
16:31:33 Q. Is that in there identically?
16:31:36 A. Well, part of the problem here is once you take
16:31:44 something out of a bill, the subsections change. The
16:31:49 paragraphs change. All the formatting changes. So no, the
16:31:54 language is not going to be identical.
16:31:58 But I think the point was that these same
16:32:00 provisions -- these are the same provisions but addressing
16:32:06 the governor's veto.

16:32:07 Q. So --
16:32:08 A. So saying "identical" technically isn't the best way to describe it. It would have been better to say that this is basically the same idea and concepts minus the change in the -- addressing the governor's veto concerns. That's my answer to that.
16:32:31 Q. So just -- I understand that and I appreciate that. I'm not talking about, like, the paragraph numbers or anything like that. I'm talking about the substance.
16:32:40 And if you look at 2617; right?
16:32:40 A. Uh-huh.
16:32:45 Q. And we look at that paragraph on -- starting at line 23; correct?
16:32:48 A. Uh-huh.
16:32:48 Q. "Pursuant to Subsection A, paragraph 10, subdivision (b)."
16:32:53 A. Uh-huh.
16:32:54 Q. And just stopping there and looking at subdivision (b), that's talking about issuing a driver's license in another state. Do you see that? It's on page 1 --
16:33:06 A. Are you on 2617?
16:33:07 Q. -- line 41.
16:33:08 Yep.
16:33:08 A. Okay.
16:33:09 Q. So that is referring to that Subsection B,

16:33:13 subdivision (b) that's on page 1, starting at line 41; correct?
16:33:18 A. Okay.
16:33:18 Q. Right?
16:33:19 And it's talking about if you've moved; right?
16:33:21 A. Yep.
16:33:21 Q. Okay. So -- and then it goes on to -- so -- so coming back to line 23; right?
16:33:25 A. Uh-huh.
16:33:29 Q. It's saying that if you basically moved or changed residence, ". . . the county recorder shall send notice that the registration will be canceled in ninety days unless that [sic] person provides satisfactory evidence that the person is qualified."
16:33:43 Do you see that?
16:33:44 A. Where are you at?
16:33:46 Q. So I'm going right --
16:33:47 A. What page are you on?
16:33:48 Q. Page 2, reading along line 23 through 26.
16:33:56 A. Okay. Person -- Subsection A, paragraph 10, subdivision (b) of this section?
16:34:00 Q. Just read to yourself.
16:34:04 A. Okay. You're on page 2 of HB 2617?
16:34:07 Q. Correct.

16:34:08 A. Okay. Line 23.
16:34:09 Q. Uh-huh.
16:34:10 A. All right. Yes, I see that.
16:34:11 Q. Right?
16:34:11 So it's saying that the registration will be canceled in 90 days for somebody who's moved; correct?
16:34:16 A. Uh-huh.
16:34:17 Q. Right.
16:34:18 Now, if you look at 2243 in your amendment --
16:34:23 A. Yep.
16:34:24 Q. -- am I correct? I believe that it now actually changes it to -- instead of cancelling, putting them in an inactive status.
16:34:34 A. Okay.
16:34:35 Q. So that's not -- that's a substantive change; correct? -- between inactive and cancellation?
16:34:41 A. Okay.
16:34:42 Q. Do you agree with that?
16:34:44 MR. O'MALLEY: Objection. Calls for a legal conclusion.
16:34:47 THE WITNESS: I agree it's not entirely the same.
16:34:50 BY MS. SHAH:
16:34:50 Q. Okay.
16:34:52 A. It's a similar concept. Same concept, but it's a

little different, so . . .
Q. Okay.
A. Okay.
Q. Putting aside the specifics here for just -- and stepping back. Do you agree that there is a difference between having inactive versus canceled?
MR. O'MALLEY: Calls for a legal conclusion.
THE WITNESS: They're not the same. But I would say this. These -- the way I read this and the way I saw this was that they are basically the same, except that they've -- the second time was addressing the governor's veto concerns. It was written in a way to address the governor's -- minus addressing the governor's veto concerns.
BY MS. SHAH:
Q. All right. And you let's go back to 2617. Go to page 4, line 9, paragraph J.
A. Uh-huh.
Q. Correct?
A. Yep.
Q. And we can -- you want to just let me know that that's also not the same as in your amendment; correct?
A. These two are not -- they're essentially the same. The difference is that we address the governor's veto. Same concepts.

16:36:21 I mean, you said it yourself earlier that you were putting 2617 into 2243. That's exactly what we're doing. That's exactly what happened. So formatting changes, words changes.

When they redrafted it, they changed some things. But the -- the point was -- is that this was 2617 amended to address the governor's concerns.

Q. But you agree that different words can have different meanings; correct?

MR. O'MALLEY: Objection. Vague.

THE WITNESS: I do. But I also think that different words can describe the same thing --

MS. SHAH: Okay.

THE WITNESS: You can describe the same thing using different words.

BY MS. SHAH:

Q. Let's -- coming back to the text of your amendment, if you look at page 2 of your amendment, line 10; right? I'm sorry.

Page 2, look at Section 10, beginning on line 23.

A. Okay.

Q. And you agree that this is changed to include jury summary reports and to change the notice letter time frame from 35 -- 90 days to 35 days?

16:37:38 MR. O'MALLEY: Objection. Compound.
16:37:40 THE WITNESS: I do agree that it was changed
16:37:43 to 35 days, yes.
16:37:44 BY MS. SHAH:
16:37:45 Q. Okay. And let's go to page 5 of your amendment.
16:37:53 A. Okay.
16:37:53 Q. And we're in Section H, line 22. And if you go to
16:38:01 the last word in that sentence starting with "and." Do you
16:38:06 see that?
16:38:06 A. "And immigration services to verify citizen-" --
16:38:11 that one?
16:38:11 Q. No. I'm looking -- I'm sorry. It's page 5,
16:38:15 line 22?
16:38:15 A. Okay.
16:38:16 Q. And the last word is "and." Do you see that in
16:38:16 that --
16:38:16 A. Yeah.
16:38:19 Q. And it says, "and persons who are registered."
16:38:21 Do you see that?
16:38:22 A. Yes.
16:38:22 Q. Okay. And it says, "and persons who are
16:38:24 registered to vote without satisfactory evidence of
16:38:26 citizenship as prescribed by Section 16-166."
16:38:30 A. Uh-huh.
16:38:30 Q. Now, going back to 2617 and looking at Section H.

16:38:37 A. Uh-huh.
16:38:38 Q. Do you agree that that clause was added in from
16:38:44 22 -- by your amendment? If you look, it's H on page 3.
16:38:58 A. Yeah, I'm reading it. I'm reading it right now.
16:39:01 Q. Okay.
16:39:09 A. Yeah, I agree it's written differently.
16:39:13 Q. So -- and do you agree with me that that clause,
16:39:16 "and persons who are registered to vote without
16:39:18 satisfactory evidence of citizenship," that would make them
16:39:22 federal-only voters; correct?
16:39:27 MR. LANGHOFER: Legal conclusion. Best
16:39:29 evidence.
16:39:30 THE WITNESS: I believe that's accurate.
16:39:47 BY MS. SHAH:
16:39:47 Q. Okay. So you would agree that your amendment
16:39:50 added federal-only voters to the SAVE matching in addition
16:39:54 to people -- county recorders have reason to believe are
16:39:57 not U.S. citizens; correct?
16:39:59 MR. O'MALLEY: Calls for a legal conclusion.
16:40:00 THE WITNESS: Yes, that's correct.
16:40:01 BY MS. SHAH:
16:40:02 Q. Okay. And then in your amendment, on page 6,
16:40:07 starting at line 19. Do you see that?
16:40:11 A. Yes.
16:40:12 Q. Going on through the rest, that's all new to 2617;

16:40:24 correct?
16:40:24 MR. LANGHOFER: Legal conclusion. Best
16:40:25 evidence.
16:40:26 THE WITNESS: Without -- without looking at
16:40:34 the language, I'll say sure.
16:40:36 BY MS. SHAH:
16:40:36 Q. I mean, you have it. Do you see it?
16:40:38 A. I know. I'm just --
16:40:39 Q. Well, because we need to put this clearly for the
16:40:42 record. That's why.
16:40:44 A. It's different. It's not the same. It was
16:40:49 changed to -- it's essentially the same concepts. There
16:40:54 may be some different requirements and things, and maybe
16:40:58 some things were added in. This was to address the
16:41:03 governor's veto letter, so . . .
16:41:06 Q. And the only reason you know that hit was done to
16:41:11 address the governor's veto was letter because
16:41:15 Representative Chaplik told you that?
16:41:18 A. Yeah. He said that it would -- anytime that
16:41:19 you're doing an amendment like that of something that has
16:41:22 been vetoed, it's -- me personally, my personal opinion,
16:41:29 that I want to make sure it's not going to be vetoed if
16:41:33 it's already been vetoed once.
16:41:35 Q. And you have no other basis for saying that
16:41:37 that -- these changes were to address the veto; correct?

16:41:40 A. No. I just -- I took his -- I took him at his
16:41:43 word. I think he was -- I believed he was telling me the
16:41:45 truth. I think he was. Got signed, so . . .
16:41:49 Q. And so is it fair to say that your explanation on
16:41:52 the floor amendment -- of the floor amendment on the last
16:41:55 day wasn't entirely accurate?
16:41:57 MR. O'MALLEY: Objection. Argumentative.
16:41:58 THE WITNESS: It could have been better.
16:42:00 BY MS. SHAH:
16:42:00 Q. Okay. Great.
16:42:02 So let's -- I want to just talk about why
16:42:06 would you use 2243 and amending it rather than just
16:42:11 starting over with a new legislation to get in the
16:42:14 substance of 2617.
16:42:15 MR. LANGHOFER: Asked and answered.
16:42:17 THE WITNESS: Yeah, I think I answered that.
16:42:19 But essentially it's -- the bill had already gone through
16:42:24 the whole process, had been vetted by the legislature, and
16:42:32 it was -- we were already out of committees. And so the
16:42:38 options at that point were amending it on to another bill.
16:42:46 BY MS. SHAH:
16:42:49 Q. And when did you first become aware of the effort
16:42:56 to make 2243 the vehicle for getting in the substance of
16:43:01 2617?
16:43:02 A. I don't remember.

16:43:03 Q. Why not just override the governor's veto?
16:43:10 A. Because the veto hasn't been overridden in 40 years. It takes a two-thirds vote by both bodies. And if you can work something out with the governor, it's -- again, these are purely my -- these would be my personal opinion. My personal motives would be that it would be better to try to work it out with the governor than veto override, which is highly unlikely.
16:43:47 Q. And so in order to override the governor's veto to get that two-thirds that you talked about, you'd actually have to work with Democrats to do that; right?
16:43:53 A. To get a two-thirds vote, you would need Democrats to vote with you.
16:43:58 Q. So why didn't you just try that?
16:44:01 A. A veto --
16:44:01 MR. LANGHOFER: Asked and answered.
16:44:02 THE WITNESS: Yeah. A veto hasn't passed in 40 years. A veto override has not passed in 40 years.
16:44:05 BY MS. SHAH:
16:44:16 Q. And so let's talk about -- let's go to Tab 29. It's LEG LOG14133.
16:44:40 MS. RIZZONI: This will be 446.
16:44:40 (The document was marked as Exhibit 446 for identification.)
16:44:53 BY MS. SHAH:

16:44:53 Q. And I know you're not on this email, but it's from Mr. Chaplik -- or Representative Chaplik -- correct? -- to Jake Agron and Art Harding --
16:45:07 A. Uh-huh.
16:45:10 Q. -- among others; correct?
16:45:11 A. Yep.
16:45:11 Q. About the HB 27 -- 2617 and juror forms?
16:45:14 A. Uh-huh.
16:45:15 Q. Right?
16:45:16 Okay. And it talks about "After further review." Do you see that?
16:45:27 A. Uh-huh.
16:45:27 Q. "After further review, current statute requires cancellation of registrants 'when reported by the elector on a signed juror questionnaire' that the person registered is a felon. This is reflected in the 2019 EPM" -- and by that, you understand that to be the Elections Procedure Manual; correct?
16:45:48 A. Yes.
16:45:48 Q. -- "and reflected in the previous 2014 Election Procedures Manual."
16:45:53 "What is also reflected in the 2014 EPM is the same requirement for cancellation of registration 'when a person indicates on a signed jury questionnaire that he or she is not a citizen."

16:46:07 Do you see that?
16:46:07 A. Uh-huh.
16:46:09 Q. And so do you understand this to be the basis of
16:46:12 why the 90-day notice letter was changed to the 35-day
16:46:16 period?
16:46:17 MR. O'MALLEY: Objection. Lack of
16:46:18 foundation. Speculation.
16:46:19 MR. LANGHOFER: Foundation.
16:46:19 THE WITNESS: Yeah, I didn't know this was
16:46:21 why.
16:46:22 BY MS. SHAH:
16:46:23 Q. But do you -- do you agree with his assessment?
16:46:28 MR. O'MALLEY: Objection. Vague.
16:46:28 THE WITNESS: Yeah --
16:46:28 MS. SHAH: Okay.
16:46:30 THE WITNESS: -- I don't know that I do or
16:46:31 not.
16:46:31 BY MS. SHAH:
16:46:32 Q. Fine.
16:46:32 Do you -- let me put it this way.
16:46:35 Do you know of any -- other than what
16:46:40 Representative Chaplik told you about working with the
16:46:42 governor's office, do you have any other basis or -- for
16:46:48 why changing the notice letter from 35 days to 90 days -- I
16:46:52 mean from 90 days to 35 days?

16:46:54 MR. O'MALLEY: Lack of foundation.
16:46:55 THE WITNESS: No. That was my understanding,
16:46:56 that it was -- any of the changes made were to address the
16:47:01 governor's concern, is my understanding.
16:47:02 BY MS. SHAH:
16:47:02 Q. And so there was no other information provided to
16:47:05 you or anybody on that day for why making that change;
16:47:08 correct?
16:47:08 A. No.
16:47:08 Q. Okay. And there was no other process to determine
16:47:12 why 35 days would be better than 90?
16:47:17 MR. O'MALLEY: Objection. Vague. Calls for
16:47:19 speculation.
16:47:19 THE WITNESS: No. Not that I recall.
16:47:21 BY MS. SHAH:
16:47:22 Q. Okay. And so you agree that there is less time
16:47:27 now to respond to the notice letter; correct?
16:47:30 A. 35 days is less than 90 days.
16:47:33 Q. Okay.
16:47:37 MR. O'MALLEY: Was this marked as an exhibit?
16:47:39 MS. SHAH: Yes. 446.
16:47:52 MR. LANGHOFER: Should that be 446 or 447?
16:47:55 MS. RIZZONI: I have it as 446.
16:47:59 BY MS. SHAH:
16:47:59 Q. Other than Representative Chaplik, do you know if

16:48:03 anybody else worked with the governor from the legislature
16:48:06 to address his concerns?
16:48:08 MR. LANGHOFER: Foundation. Speculation.
16:48:10 THE WITNESS: I'm not aware of anybody else.
16:48:13 BY MS. SHAH:
16:48:13 Q. Okay. Were you aware that there was a conference
16:48:24 call with the governor's office to discuss his veto of the
16:48:28 2617?
16:48:29 A. No. I was not aware of that.
16:48:31 Q. Do you know if the Fair [sic] Enterprise Club
16:48:45 worked with the governor's office to ensure that 2243 would
16:48:49 not be vetoed?
16:48:49 MR. O'MALLEY: Objection. Lack of
16:48:51 foundation.
16:48:51 THE WITNESS: I don't know.
16:48:58 BY MS. SHAH:
16:48:58 Q. Do you know if anybody else from outside the
16:49:01 legislature worked with the governor to ensure that 2243 as
16:49:04 amended wouldn't be vetoed?
16:49:06 MR. O'MALLEY: Same objection.
16:49:07 THE WITNESS: The only person I'm aware of
16:49:08 who worked with the governor's office was Representative
16:49:12 Joseph Chaplik.
16:49:14 BY MS. SHAH:
16:49:14 Q. Okay. And did your amendment go through either

16:49:17 the -- well, let me ask you: Did it go through the Senate
16:49:20 rules committee?
16:49:21 A. Did the amendment go through the rules committee?
16:49:24 MR. LANGHOFER: Best evidence.
16:49:26 THE WITNESS: I don't -- I don't believe that
16:49:30 it did. From what I recall, it did not.
16:49:34 BY MS. SHAH:
16:49:35 Q. And 2243, as amended by your amendment, did that
16:49:39 go through the Senate rules committee?
16:49:41 MR. LANGHOFER: Best evidence.
16:49:42 THE WITNESS: 2243. Okay. What was the
16:49:46 question before -- so 2243, as amended, included 2617.
16:49:51 What was the prior question? Did 2617 go
16:49:54 through?
16:49:55 BY MS. SHAH:
16:49:55 Q. No. Sorry. Your -- your -- just your
16:49:58 amendment -- your floor amendment --
16:49:59 A. Yeah.
16:49:59 Q. -- right?
16:50:00 Did that, just in of itself, go through the
16:50:02 rules committee and then --
16:50:03 A. No.
16:50:04 Q. And now once it got into 2243 --
16:50:06 A. No. Floor -- yeah, the floor amendments don't --
16:50:09 do not go through the rules committee.

16:50:11 Q. And did 2243, as amended by your floor amendment -- did that go through the rules committee?
16:50:17 A. No. I don't believe it did.
16:50:19 Q. Did it go through the rules committee in the House?
16:50:23 MR. LANGHOFER: Best evidence. Foundation.
16:50:25 THE WITNESS: I'm trying to see here. I'm not sure. I'm not sure if it did or not. I don't know.
16:50:34 BY MS. SHAH:
16:50:35 Q. And were there --
16:50:36 A. It's a question for the House.
16:50:38 Q. Were there any committee hearings on the bill HB 2243 as revised by your amendment?
16:50:45 A. Yes.
16:50:46 Q. When were those hearings?
16:50:48 A. It's the committee of the whole.
16:50:49 Q. So the same hearing as when you --
16:50:49 A. Yeah.
16:50:51 Q. -- made the amendments; correct?
16:50:52 A. Uh-huh.
16:50:53 Q. Okay. Is it -- am I correct that HB 2243 didn't have any sponsors on the Senate?
16:51:18 A. House bill -- I have no idea. I don't know.
16:51:20 Q. That's fine.
16:51:21 Is it normal to not have Senate sponsors?

16:51:25 A. It's -- yeah, you can have bills -- it's all over
16:51:27 the place. It depends. You can have bills that have
16:51:32 sponsors, bills that have no sponsors. It just depends on
16:51:34 what sponsor's strategy is.
16:51:39 Q. I'm going to show you what's been marked as --
16:52:07 well, what's Tab 31. I don't think it's been marked yet.
16:52:10 So it's 14228 -- LEG LOG14228.
16:52:16 A. Okay.
16:52:21 MS. RIZZONI: This will be 447.
16:52:21 (The document was marked as Exhibit 447
16:52:30 for identification.)
16:52:30 BY MS. SHAH:
16:52:32 Q. It's an email from Mr. Blackie to you. Do you see
16:52:34 that?
16:52:34 A. I do.
16:52:35 Q. On the same day of your floor amendment --
16:52:37 A. Uh-huh.
16:52:37 Q. -- correct?
16:52:39 And there he explains that this is largely
16:52:42 the same. And Representative Chaplik worked for you;
16:52:46 right? -- with the governor to address his concerns?
16:52:50 A. Yes.
16:52:51 Q. And so the Free Enterprise Club asked you to
16:52:56 sponsor this amendment?
16:52:57 A. No. They didn't. The sponsor asked me to sponsor

16:53:09 the amendment.
16:53:11 MR. LANGHOFER: Did you get that, Cindy?
16:53:15 THE COURT REPORTER: Yes.
16:53:16 BY MS. SHAH:
16:53:37 Q. Can you look at the first bullet in that email,
16:53:40 though. It says "Removes a provision." Do you see that?
16:53:42 A. Uh-huh.
16:53:43 Q. Do you agree with that description?
16:53:53 MR. LANGHOFER: Best evidence.
16:53:55 THE WITNESS: "Removes a provision that
16:53:58 required the cancellation of a registration when the county
16:54:02 recorder receives and confirms information that the person
16:54:05 registered is not qualified . . . catch-all cancellation
16:54:11 requirement."
16:54:13 I believe I would agree with the -- that
16:54:25 that's the intent.
16:54:28 BY MS. SHAH:
16:54:28 Q. Okay. And looking at the second bullet, it
16:54:39 "Amends the cancellation requirement for individuals who
16:54:43 are not U.S. citizens to align with [the] current process
16:54:46 in the Elections Procedures Manual"?
16:54:47 A. Uh-huh.
16:54:48 Q. Do you know whether that's true or not?
16:54:54 A. I believe that's true.
16:54:56 Q. What is your understanding of the current process

in the Elections Procedures Manual, then?

MR. LANGHOFER: Legal conclusion. Best evidence.

MR. O'MALLEY: You mean at that time, I assume.

MS. SHAH: Sorry. Yeah. Well, there's only the 2019. There's no other -- so . . .

THE WITNESS: Without the Elections Procedures Manual, I wouldn't be able to tell you.

BY MS. SHAH:

Q. But you -- wait. So -- but you agree that it does -- it's the same, but you don't know what it says?

A. I'm relying on what you're showing me. You're asking me if I believe that that's true.

Q. Right.

A. I believe that it's true. To verify it, I would have to get out the Elections Procedures Manual and compare it.

Q. But in order to believe it's true, do you -- you don't know what the Elections Procedures Manual says?

A. Nobody knows what the Elections Procedures Manual says.

Q. All right. All right. So let's -- I think if we want to go to --

A. Or they don't have the whole thing memorized. I

16:55:58 can tell you --
16:55:58 Q. That's fine.
16:55:59 A. -- you've got to -- you've got to --
16:56:00 Q. Let's go to Tab 32.
16:56:03 A. You've got to reference it.
16:56:04 Q. It's been previously marked as PX 6, which is the
16:56:08 2019 EPM.
16:56:24 If you go to page 36, which I believe is
16:56:42 correct.
16:56:44 MR. LANGHOFER: Just for the record, I don't
16:56:45 think this is the complete EPM.
16:56:47 MS. SHAH: Sorry?
16:56:48 MR. LANGHOFER: I don't think this is the
16:56:49 complete PX 6 or complete EMP. Petty Exhibit 6. It is the
16:56:55 complete Petty Exhibit 6.
16:56:55 MS. SHAH: Okay.
16:56:56 MR. LANGHOFER: But not PX -- not PX 6.
16:56:58 MS. SHAH: Okay. You scared me, but -- for a
16:57:01 minute.
16:57:02 BY MS. SHAH:
16:57:03 Q. Okay. So I'm sorry. Were you at page 36?
16:57:15 A. Yes.
16:57:16 Q. Okay. And do you see that paragraph on the juror
16:57:27 questionnaire there?
16:57:29 A. Which one? There's --

16:57:29 Q. Yeah.
16:57:30 A. -- 3, juror disclosure; there's 4, juror
16:57:35 disclosure.
16:57:36 Q. Number 4.
16:57:37 A. Okay.
16:57:38 Q. Right?
16:57:39 And so that's -- applies 35 days; am I
16:57:43 correct? It's, I believe, going on to page 37.
16:57:48 A. Okay. "The registrant must submit DPOC within
16:57:52 35" --
16:57:52 MS. SHAH: Read to yourself. That way Cindy
16:57:54 won't have to type it.
16:57:55 THE WITNESS: "The registrant must submit
16:57:57 DPOC within 35 days of the date of the notice to remain
16:58:02 eligible to vote and the registrant will be made a
16:58:05 'full-ballot' voter upon submission of DPOC."
16:58:10 BY MS. SHAH:
16:58:10 Q. Okay. So without going back to Mr. Blackie's
16:58:15 email, in that second bullet that you believe was accurate,
16:58:18 you now understand that there's a 35-day notice to provide
16:58:24 documentary proof of citizenship pursuant to the 2019 email
16:58:29 for cancelling voter registrations in juror questionnaires;
16:58:36 correct?
16:58:36 MR. O'MALLEY: You said "email." Did you
16:58:38 mean Elections Procedures Manual?

16:58:40 MS. SHAH: No, no, no. I'm going back to Mr. Blackie's email; right? That was 447, I believe.
16:58:41 BY MS. SHAH:
16:58:49 Q. Right? The second bullet that we were talking about in reference to that.
16:58:53 A. Yeah. So it says that it amends the cancellation requirement for individuals who are not U.S. citizens to align with the current process.
16:59:00 So he's saying that this aligns with what's currently written here: "The registrant must submit DPOC within 35 days" --
16:59:08 Q. Right.
16:59:08 And so this is -- and I'm asking -- the EPM is talking about when you get it for the juror questionnaire; correct?
16:59:15 A. "Juror Disclosure of Noncitizenship. Election officials also periodically receive court records for information regarding prospective jurors who stated on a juror questionnaire they are not a U.S. citizen. If a County Recorder receives such information, the County Recorder may cancel any registrant record that is a 'true match' only after following the completing the following steps." Okay.
16:59:44 Q. So again my question only is this: That 35 days is based on the EPM's instruction as it pertains to juror

16:59:53 questionnaires; correct?
16:59:54 A. Correct.
16:59:55 Q. Right.
16:59:56 And now -- Okay.
16:59:56 So then -- but HB 2243, as it was passed --
16:59:56 A. Uh-huh.
17:00:04 Q. -- applies to other circumstances when somebody is
17:00:08 shown to be a noncitizen; correct?
17:00:10 A. Correct.
17:00:11 Q. That includes matching with ADOT records; correct?
17:00:14 A. Uh-huh.
17:00:15 Q. And it includes when there's a reason to believe
17:00:18 by county recorders; correct?
17:00:19 A. Okay. Yes.
17:00:20 Q. Is that -- and it also includes when there are
17:00:25 federal-only voters who are not matched; correct?
17:00:27 A. Correct.
17:00:27 Q. Okay. And so why use the same time frame for all
17:00:31 those other circumstances outside the juror questionnaire?
17:00:34 MR. O'MALLEY: Objection. Calls for
17:00:36 speculation.
17:00:36 MR. LANGHOFER: Foundation.
17:00:37 THE WITNESS: So again, I can't speak for the
17:00:41 sponsor of the bill. They have their own reasons for doing
17:00:45 the 35 days.

17:00:49 To me, if you've got 35 days and it's
17:00:52 reasonable in here, in the EPM, for juror disclosure of
17:00:58 noncitizenship, as I have already answered and mentioned
17:01:00 before, I actually feel like people can provide those
17:01:05 documents in just a matter of days. So I think 35 days is
17:01:10 still reasonable.
17:01:12 BY MS. SHAH:
17:01:12 Q. But you agree that 2617 gave them 90 days to
17:01:18 respond in all of these circumstances; correct?
17:01:18 A. Correct. Uh-huh.
17:01:19 Q. And so why -- why make that change?
17:01:22 MR. O'MALLEY: Objection. Lack of
17:01:23 foundation. Speculation.
17:01:24 THE WITNESS: I don't know why the sponsor
17:01:26 and the governor agreed to that. So I know that the
17:01:31 sponsor and the governor worked it out, and as a result, I
17:01:36 got the amendment. So -- and I agreed to pass it.
17:01:39 BY MS. SHAH:
17:01:39 Q. And you didn't ask for any explanations about that
17:01:43 change?
17:01:43 A. I was -- I was -- I'm okay with the -- I'm okay
17:01:50 with the period being 35 days. I didn't have a problem
17:01:54 with anything that I saw when I read it.
17:01:56 Q. So no explanations were asked for?
17:01:58 A. The explanation to me was that -- I was -- I was

17:02:05 satisfied with the explanation that I received from the
17:02:08 sponsor.
17:02:09 Q. Okay. And when you made the amendment on the
17:02:15 floor and the floor amendment explanation that was
17:02:19 circulated with the amendment, did it have any other
17:02:22 explanations for why making those changes?
17:02:25 A. No. It was -- the main explanation was exactly
17:02:27 what I said on the floor, which is what I was told, was
17:02:30 that it was basically the same bill but with some changes
17:02:36 to address the governor's concern.
17:02:40 MR. LANGHOFER: What's our time on the
17:02:41 record, Cindy?
17:02:43 MS. SHAH: Are we going off the record?
17:02:45 THE VIDEOGRAPHER: Six -- six hours and seven
17:02:48 minutes.
17:02:50 BY MS. SHAH:
17:02:51 Q. Okay. So do you -- going back to Mr. Blackie's
17:02:57 email.
17:03:00 A. Uh-huh.
17:03:00 Q. Do you see in the last full paragraph before he
17:03:14 signs off, "These changes" are -- "keep the original."
17:03:19 Do you see that sentence?
17:03:20 A. Yes, I do.
17:03:21 Q. It says, "These changes keep the original HB 2617
17:03:24 intact, with targeted" processes to -- change -- "targeted

17:03:28 process changes to both bolster due process protections as
17:03:31 noted by the governor in his veto letter."
17:03:33 A. Uh-huh.
17:03:34 Q. Do you agree with that?
17:03:37 A. Here's what I agree with. They felt like --
17:03:42 meaning the sponsor and the governor -- felt like that met
17:03:47 his concerns. I didn't personally analyze it myself to see
17:03:53 if -- my motives are different than everybody else's
17:03:57 motives down there. I want election integrity.
17:04:01 I was satisfied with what was done before,
17:04:06 and I was satisfied with this. The sponsor worked
17:04:11 something out with the governor, and I was satisfied with
17:04:15 that explanation. And as I read through it, I didn't see
17:04:18 anything that I opposed.
17:04:23 MR. O'MALLEY: We've been going about another
17:04:24 hour. Can we take a short break?
17:04:26 MS. SHAH: Sure.
17:04:27 THE VIDEOGRAPHER: We are off the record.
17:04:29 Time on the monitor is 5:04. This will end Media Number 4.
17:19:28 (A recess ensued.)
17:19:28 THE VIDEOGRAPHER: We are back on the record.
17:19:57 THE WITNESS: Okay.
17:19:58 THE VIDEOGRAPHER: Time on the monitor is
17:20:00 5:19. This will begin Media Number 5.
17:20:05 BY MS. SHAH:

17:20:08 Q. So, Senator Petersen, this -- just to add context to my question, Representative Chaplik was working with the governor's office to address these concerns, including -- he had some concerns about due process; correct?

17:20:27 A. Uh-huh.

17:20:27 Q. And I know you weren't part of that, but just based on your personal understanding generally, would you agree when somebody has due process concerns that having 90 days is better than 35 days to respond to something, for due process concerns?

17:20:44 MR. LANGHOFER: Vague. Foundation.

17:20:46 THE WITNESS: So here's what I would say. For me, it's a matter -- when I'm looking at something personally, it's a matter of whether it's sufficient. I believe that this was sufficient.

17:20:59 And not only did I believe it, when -- what it means to me when Representative Chaplik says, "We have a consensus fix here," and -- and the governor had concerns -- which to me means he -- you know, he was probably hearing from the counties and others -- it signals to me that they have worked out -- they've worked out a compromise. And these are addressing the court's concerns, the counties' concerns. Just -- anyways . . .

17:21:33 So I think they're seeing that as -- I didn't hear from anybody when it went to 35 days that 35 days was

17:21:41 not reasonable. So to me, I feel like that's -- it's do you have enough time or do you not have enough time. And I think 35 days is more than enough time.

17:21:52 BY MS. SHAH:

17:21:52 Q. So just to break down some of what you said -- right? -- that you said that governor worked it out with other people. How do you know that?

17:22:01 A. I don't. I mean, I'm not -- it's just -- normally, that's -- that's -- a lot of times when the governor vetoes something, he's not just -- the governor doesn't read every single bill. He takes -- you know, he takes input and feedback from agencies and counties and interest groups. It's a lot like what legislators do.

17:22:24 And so I see that as compromise. I'm speculating, but I see it as not only compromise between Chaplik and him, but I think that he obviously resolved the concerns that came up to the governor from these other interest groups.

17:22:40 Q. But again, just to make the record clear, you don't know this; correct?

17:22:45 A. No. It's just --

17:22:47 Q. Okay.

17:22:48 A. It's how -- what I have seen with the legislature -- common at the legislature.

17:22:51 Q. Okay. And 35 days you think is sufficient, in

17:23:00 your view, based on what?
17:23:01 A. Well, for one, the Election Procedures Manual.
17:23:04 Q. Right.
17:23:06 As it pertains to the juror questionnaires;
17:23:08 correct?
17:23:08 A. Yeah. And I think -- I thought I saw other
17:23:10 35-day -- we could go -- we'd have to go through the
17:23:13 Election Procedures Manual. But yeah.
17:23:18 Q. But you testified earlier -- am I correct? -- that
17:23:28 you don't know how long it takes to get a copy of your
17:23:31 naturalization certificate; correct?
17:23:32 MR. O'MALLEY: Objection. Asked and
17:23:33 answered.
17:23:34 THE WITNESS: Without doing research, I don't
17:23:35 know the exact time.
17:23:36 BY MS. SHAH:
17:23:37 Q. What about -- didn't you also testify that you
17:23:41 don't know how long it would take to get a passport;
17:23:43 correct?
17:23:43 MR. O'MALLEY: Objection. Asked and
17:23:44 answered.
17:23:44 THE WITNESS: Not without looking at the time
17:23:47 frames.
17:23:47 BY MS. SHAH:
17:23:47 Q. All right. So --

17:23:53 A. I know that passports are good for ten years. So
17:23:58 once you've got one -- and I also know that when one is
17:24:01 about to expire, you can figure out what the time frames
17:24:04 are and apply for a new passport.
17:24:07 Q. And then coming back to this one more -- like, the
17:24:12 last thing and we can move on is you agree that it would be
17:24:14 easier if somebody had 90 days as opposed to 35 days to
17:24:18 respond?
17:24:18 A. 90 days is more than 35 days. I don't think that
17:24:23 it's -- I don't see why 35 days is not reasonable.
17:24:31 Obviously, 90 gives somebody more time but . . .
17:24:34 Q. So --
17:24:37 A. 100 days is more -- even more reasonable. Two
17:24:40 years is even more reasonable. But it's like, what's --
17:24:44 what do they need -- what's the right --
17:24:46 Q. And I want to come back to -- you had, I think,
17:24:49 testified earlier that, you know, you don't know how long
17:24:54 it takes to get a birth certificate because it depends on
17:24:56 what state you're from; correct?
17:24:58 A. Correct.
17:24:59 Q. But you agree that there are some current Arizona
17:25:03 residents that were born, say, in California, for example?
17:25:06 A. Yeah, I do. But they should have their birth
17:25:09 certificate.
17:25:09 Q. Okay. But assuming that they don't; right?

17:25:14 A. Well, then you have other -- there's a lot of
17:25:16 forms of -- there's other forms of ID that you can use --
17:25:19 Q. Let's look at Tab 33.
17:25:32 MS. RIZZONI: This will be 448.
17:25:32 (The document was marked as Exhibit 448
17:25:48 for identification.)
17:25:48 BY MS. SHAH:
17:25:48 Q. This is from -- a copy from the website. You see
17:25:52 that thing on the bottom about how long it takes to get
17:25:57 your birth certificate in California? It's about 10 to
17:26:00 12 weeks. Do you see that request for 30 --
17:26:02 A. Uh-huh.
17:26:02 Q. So that's longer than 35 days; correct?
17:26:05 A. It is.
17:26:06 Q. So did you consider that for some people; they
17:26:12 wouldn't be able to provide their DPOC within 35 days?
17:26:16 MR. O'MALLEY: Objection. Asked and
17:26:17 answered.
17:26:17 THE WITNESS: Yeah, again, I feel like
17:26:19 35 days is a reasonable amount of time to get some point --
17:26:23 some part of it. And not only that, it's not a matter of
17:26:27 getting it. It's something that you should already have.
17:26:30 We're assuming here that people don't keep their most
17:26:34 important -- your most important records, we're assuming
17:26:37 here that people don't keep those and have those.

17:26:40 BY MS. SHAH:
17:26:40 Q. Right.
17:26:40 So do you --
17:26:40 A. I think that's a --
17:26:42 Q. And do you know what percentage of Arizonans have
17:26:46 various documents proof of citizenship?
17:26:49 You keep saying that they should have, they
17:26:51 should have. Do you know how many do?
17:26:52 A. I haven't seen any statistics on how many people
17:26:57 do.
17:26:59 Q. Do you know how many don't?
17:27:01 A. I haven't seen any statistics on that.
17:27:03 Q. Did you try to find out?
17:27:05 A. I'm not sure where I would go to get that
17:27:08 information.
17:27:08 Q. But did you even try to look for it?
17:27:12 A. I don't feel like it's unreasonable. I don't feel
17:27:15 like the time frame is unreasonable. These are responsible
17:27:21 adults -- well, you'd hope.
17:27:23 Q. But -- and then right -- just one month prior,
17:27:27 though, in -- when it passed 2617, the legislature found
17:27:31 that 90 days was reasonable; correct?
17:27:32 A. That's correct. I don't know why the sponsor and
17:27:36 the governor came up with 35 days. That would be a
17:27:38 question for the sponsor and the governor.

17:27:41 MS. SHAH: And then I want to go to Tab 33a. 17:27:50 Did we mark the first one? 33?

17:27:53 MS. RIZZONI: Yeah, that was 448. So this 17:27:55 will be 449.

17:27:55 (The document was marked as Exhibit 449 17:28:06 for identification.)

17:28:06 BY MS. SHAH:

17:28:13 Q. And I think this shows how much it costs to get a 17:28:16 birth certificate from Arizona Department of Health 17:28:19 Services. Do you see that?

17:28:19 A. I do.

17:28:19 Q. Do you see that it's -- the certificate fee itself 17:28:23 is $20 and then the processing is 15.50. So it would cost 17:28:28 at least 33.50 plus any additional shipping fees to get 17:28:32 that?

17:28:33 MR. LANGHOFER: Objection.

17:28:33 THE WITNESS: That's actually --

17:28:34 MR. LANGHOFER: Misstates evidence.

17:28:36 THE WITNESS: Yeah, this is actually online 17:28:39 too. You can go down to our -- you can go down to the 17:28:42 county -- you can go down to the vital records and pick - 17:28:45 pick one up same day. It's $20.

17:28:48 BY MS. SHAH:

17:28:48 Q. Okay. So it would cost $20 to -- depending on 17:28:52 your situation, 20 to upwards of 33 -- $35?

17:28:57 A. Yeah. If you're going to order it online, then it could cost $35.
17:29:05 Q. Okay. And do you agree that there are Arizonans who live in poverty?
17:29:14 A. I do.
17:29:15 Q. Do you know what percentage?
17:29:19 A. I don't know the current percentage that are in poverty.
17:29:23 Q. Does about 12.5 percent -- does about 12.5 percent sound correct to you?
17:29:32 MR. LANGHOFER: Foundation.
17:29:34 THE WITNESS: I -- I would have to look. I would have to see -- you know, research that.
17:29:38 BY MS. SHAH:
17:29:39 Q. Okay. Let's look at 33b. And I believe that will be 450.
17:29:50 (The document was marked as Exhibit 450 for identification.)
17:30:08 BY MS. SHAH:
17:30:10 Q. That -- and that's a fact sheet from the Census Bureau; correct?
17:30:13 A. Yes.
17:30:13 Q. And do you see that first line about "Persons in poverty"?
17:30:18 A. It's really small print.

Q. Yep. It's right above the -- "People," right above it.
A. I see "Population," "Age and Sex," "Race" --
Q. Right. But going -- go right above "Population." Go "Population," "People," go above it.
A. "Persons in poverty, percent" of people. Uh-huh.
Q. And it says 12.5?
A. Yes.
Q. Right.
So for the Census Bureau, 12.5 percent of the poverty in Arizona?
A. Okay.
MR. LANGHOFER: Best evidence.
BY MS. SHAH:
Q. Okay. And do you know what the income threshold is for an individual to be considered living in poverty for -- by the Census Bureau here?
A. I don't know the latest number.
Q. If you do 33c, please. And that will be 451.
MS. RIZZONI: Uh-huh.
(The document was marked as Exhibit 451 for identification.)
BY MS. SHAH:
Q. And do you see at the top, for a single person, it's 14,880?

17:31:33 A. Uh-huh.
17:31:33 Q. According to the Census Bureau; is that right?
17:31:36 A. Yes.
17:31:37 Q. Do you know anybody who lives in poverty currently?
17:31:40 MR. LANGHOFER: Relevance.
17:31:41 THE WITNESS: I do.
17:31:42 BY MS. SHAH:
17:31:43 Q. You do.
17:31:43 And do you believe that they're entitled to vote for president?
17:31:48 A. Absolutely.
17:31:49 Q. Do you believe that they're entitled to vote, period?
17:31:52 A. I do.
17:31:52 Q. And did your amendment make any accommodations for people who would struggle to afford providing a copy of documentary proof of citizenship?
17:32:01 MR. O'MALLEY: Objection. Vague.
17:32:03 MR. LANGHOFER: Best evidence. Legal conclusion.
17:32:06 THE WITNESS: There is no -- as far as I know, it does not have anything for documents.
17:32:14 BY MS. SHAH:
17:32:14 Q. All right. So before I get to my last question, I

17:32:20 did have one quick question going back to something we had discussed earlier. I believe it was when we were talking about the email from Free Enterprise Club with regards to 2492 about how more illegals started voting in Arizona elections; correct?
17:32:40 A. Right.
17:32:40 Q. Do you recall that?
17:32:41 A. I recall our discussion about it.
17:32:42 Q. Okay. Fair enough.
17:32:44 So just in -- in the -- I think -- I believe your under- -- you had testified -- and if I'm wrong -- that you've heard people use that term; correct?
17:32:54 A. I've heard people say "illegals" before, yes.
17:32:57 Q. Have you heard that term being used by anybody in the legislature?
17:33:01 A. Not that I recall.
17:33:05 Q. Have you heard about it from any -- and I want to break that down, when I say "legislature," by members.
17:33:10 A. Right. No, I haven't heard any.
17:33:12 Q. What about staff?
17:33:14 A. Not that I recall.
17:33:16 Q. All right. So I think this might be my last, like, question.
17:33:24 And we've talked about how this amended HB 2243 was passed on the last day of the session --

17:33:33 correct? -- and sent to the governor?
17:33:34 A. Uh-huh.
17:33:35 Q. Do you know if there were other bills that were
17:33:40 sent in on that last day?
17:33:42 A. Oh, yeah. It's the largest -- the largest number
17:33:45 of bills are often sent on the last day.
17:33:48 Q. And any others that were similarly amended through
17:33:51 floor amendments before sending?
17:33:53 A. I -- off the top -- it's very common. I imagine
17:33:58 there were many that were -- in fact, a lot of times at the
17:34:03 end of session, these are all of your amended bills.
17:34:09 They're last-minute changes. You're trying to get
17:34:11 everybody -- build the consensus.
17:34:15 So I would think most of them have floor --
17:34:18 so whenever we have a COW, that means that there's
17:34:23 amendments, so . . .
17:34:23 Q. You call it the COW? That's great.
17:34:25 A. The COW. Sorry.
17:34:25 Q. I like it.
17:34:27 A. Yeah, I finally said something that I'm -- I was
17:34:29 going to try not to do any acronyms with you guys.
17:34:32 Yeah, so whenever we have the committee of
17:34:34 the whole, that means you're -- you're doing floor
17:34:37 amendments. So we have several -- many, many, so . . .
17:34:40 Q. And so he signed it; correct?

17:34:44 A. The governor signed the bill. Uh-huh.
17:34:46 Q. And it was with the general effective date; correct? We've talked about that.
17:34:50 A. Right. 90 days after session.
17:34:52 Q. And we talked about the fact that it was -- with a general effective date, it would have been in effect or being implemented before the November 2022 elections unless -- but there was a PI; correct?
17:35:07 A. Correct.
17:35:08 Q. And at that time, you hadn't intervened because you hadn't intervened until 2023; correct?
17:35:13 A. The Senate -- the Senate had not intervened.
17:35:13 Q. Correct.
17:35:13 A. Yeah.
17:35:15 Q. Correct. That is correct. That's a better answer. You are correct.
17:35:18 And so -- so at this point, wasn't the earliest it was going to go into effect, then, was going to be in 2023 in January; correct?
17:35:30 A. I'm sorry. What?
17:35:31 Q. It wasn't -- 2243 now, at this point, wasn't going to go into effect until 2023; correct?
17:35:36 A. Well, yeah. It wouldn't go -- it won't go into effect until after the litigation is resolved. So I don't know when it will go into effect, unless the litigation is

17:35:47 resolved.
17:35:47 Q. Well, I understand that. That's going into the implementation.
17:35:52 But I'm just saying at this point -- right? -- that it wasn't going to go into effect now until 2023; correct?
17:35:59 MR. LANGHOFER: Vague.
17:35:59 THE WITNESS: I still don't understand. To me -- to -- no. No. It's not going to go into effect. It will go into effect once the litigation -- assuming the litigation is resolved, so . . .
17:36:13 BY MS. SHAH:
17:36:14 Q. But -- so you didn't intervene. It's not in effect. So why didn't you just wait until the next session?
17:36:24 A. I wasn't the Senate president so -- and I don't know that there -- I think -- well, wasn't there -- when did the litigation come? I don't know when the litigation came.
17:36:39 Q. I mean, the litigation -- well, so --
17:36:41 A. I don't -- I don't -- yeah, I mean, I don't remember when -- I would just say when it was brought to my attention that -- of us -- the option of us intervening, that that's when we began the process of doing it.
17:37:04 Q. But did you -- why didn't you just -- okay.

17:37:07 But -- fine.
17:37:08 Putting it outside your intervention, why
17:37:10 didn't you just wait to reintroduce 2617 in the next
17:37:19 section?
17:37:19 MR. O'MALLEY: Objection. Vague.
17:37:20 Speculation.
17:37:20 MR. LANGHOFER: Speculation.
17:37:21 THE WITNESS: Why would I -- why would we
17:37:23 introduce something we already passed?
17:37:26 BY MS. SHAH:
17:37:26 Q. Because it was vetoed.
17:37:29 A. Oh, are you saying -- well, we put it on 2340. It
17:37:33 was on 2343, so it passed.
17:37:35 Q. So what I was trying to go back to -- it's like --
17:37:37 yes, but you put in the substance of 2617, that was vetoed,
17:37:41 got added to 2243; correct?
17:37:44 A. Oh, you're asking why did we not wait and rerun
17:37:48 2617?
17:37:49 Q. Correct.
17:37:49 A. You'd have to ask the sponsor. But I would
17:37:52 imagine it's like -- most members, they want to get their
17:37:56 bill passed. It's not uncommon. It's happened to me. I
17:38:01 imagine it's happened to several members.
17:38:03 We have a bill vetoed. We bring it back.
17:38:07 That session -- the same session, we get it passed. It's

17:38:12 easier to pass a bill that's already gone completely
17:38:16 through the process because everybody's familiar with it.
17:38:19 Everybody was familiar with this bill. It had already gone
17:38:22 all the way through the process.
17:38:24 So -- anyways, it's not -- this is not a --
17:38:29 this is not an abnormal thing.
17:38:31 Q. So two follow-ups to that.
17:38:33 But you could have -- right? -- just --
17:38:35 instead of doing it through 2243 amendment, you could have
17:38:39 waited to introduce it in the next session?
17:38:42 MR. O'MALLEY: Objection. Vague.
17:38:42 THE WITNESS: I didn't -- okay. So I agree
17:38:46 to do the amendment, but the sponsor wanted to continue to
17:38:52 push -- the original sponsor wanted to continue to push the
17:38:54 bill. And he chose to do that. That's -- I -- I'm not the
17:38:59 one who decided to introduce the amendment. I offered
17:39:05 to -- to carry it for them when they asked, but that was
17:39:10 their decision.
17:39:11 BY MS. SHAH:
17:39:12 Q. But -- so if you hadn't carried it, what would
17:39:15 have happened?
17:39:15 MR. O'MALLEY: Objection. Speculation.
17:39:17 THE WITNESS: Who knows? Either it would
17:39:22 have died or somebody else might have tried to pick it up.
17:39:26 I don't know.

17:39:26 BY MS. SHAH:
17:39:27 Q. And --
17:39:27 A. There's no way to know.
17:39:29 Q. Fair enough.
17:39:30 And you agree that the sponsor -- the prime
17:39:34 sponsor, I believe Representative Chaplik, could have
17:39:37 chosen to instead reintroduce it in the next session?
17:39:41 A. He could have chosen to introduce it in five years
17:39:43 from now. He can -- yeah, of course.
17:39:49 Q. And why did you agree to sponsor the amendment?
17:39:55 MR. O'MALLEY: Objection. Asked and
17:39:56 answered.
17:39:56 MR. LANGHOFER: Scope.
17:39:57 THE WITNESS: Because I agreed with the
17:39:59 policy.
17:40:00 BY MS. SHAH:
17:40:03 Q. And you said that -- you also testified earlier, I
17:40:06 believe, when we were talking about why amending as opposed
17:40:10 to reintroducing, that it was something that people were
17:40:12 familiar with and had been -- gone through the committee
17:40:15 hearing process; correct?
17:40:16 A. Correct.
17:40:16 Q. And that was a reason for why you would choose to
17:40:19 amend as opposed to --
17:40:20 A. Yeah.

17:40:20 Q. But --
17:40:21 A. And it's not -- I mean, it had been -- as I recall, there was debate on the floor. It's not like it -- there was opposition on the floor, as I recall, to the amendment. So it's not like it -- nobody knew about it. There was explanation, opposition.
17:40:39 But again, I mean, this is normal. It happens all the time.
17:40:42 Q. So I understand -- but I'm talking about -- so -- but your reason, one of them, was that this was something that members were familiar with 2617; correct?
17:40:50 A. Yes. The members were familiar with it.
17:40:52 Q. But as we've discussed, there were quite a few changes between 2617 and the amendment that you actually made?
17:40:59 A. Right.
17:40:59 Q. So they weren't actually familiar with all the changes; correct?
17:41:04 MR. O'MALLEY: Objection. Calls for speculation. Lack of foundation.
17:41:06 MR. LANGHOFER: Argumentative.
17:41:07 THE WITNESS: I disagree with that. It was very much the same things. It was very much the same idea. It's election integrity.
17:41:17 Not only that, the members -- the bills --

17:41:19 there's the amendment; there's the floor debate. So you --
17:41:22 you become familiar with it there. And then when it's
17:41:27 engrossed, you read -- you can read the engrossed version.
17:41:30 And then you vote on it.
17:41:32 Before you vote on it, you can also -- you
17:41:34 have another opportunity. There's -- you know, you have
17:41:37 time to review the bill. Read the bill.
17:41:39 BY MS. SHAH:
17:41:39 Q. And all of that happened on that last day,
17:41:41 though -- correct? -- what you just described?
17:41:43 A. As I recall, that's correct. But it had to go
17:41:51 through many, many steps: COW, caucus, other -- had to go
17:41:56 to the other chamber. And you'll have interest groups that
17:42:00 are watching these things too that also chime in and say "I
17:42:06 disagree with this" or "I agree with this."
17:42:08 And so it's not like members are just, you
17:42:13 know, passing stuff out without -- I mean, it went through
17:42:18 still -- it still went through a lot of steps.
17:42:20 Q. And all of those steps that you've mentioned, a
17:42:22 lot of those steps -- you said there are a lot of steps --
17:42:24 all of those steps happened during that one day; correct?
17:42:27 A. No. I would say the steps happened the whole
17:42:30 session. Because it was, you know, introduced earlier, the
17:42:34 concept came through earlier. The final concept was -- had
17:42:39 some changes to it, but it was still the same idea of, you

17:42:43 know, cleaning the voter rolls. This is how we have voter
17:42:46 rolls where we have eligible voters. That was the concept.
17:42:50 That was the principle. That principle was maintained
17:42:53 throughout the session.
17:42:55 Q. But the changes that we talked about -- they
17:42:57 didn't go through any of those steps that you talked about;
17:43:00 correct?
17:43:00 MR. O'MALLEY: Objection. Misstates his
17:43:01 testimony.
17:43:01 THE WITNESS: No, they did. Yeah, they did.
17:43:02 BY MS. SHAH:
17:43:02 Q. And so those changes, though, in order to go
17:43:04 through the steps, all happened on that one day; correct?
17:43:07 A. I don't know if they -- they may have all happened
17:43:09 on the same day at the end. But you still have caucus.
17:43:15 You have -- we have the COW. You have the caucus. You
17:43:19 have the floor vote. Then it has to go to the other side.
17:43:22 And the other side has to also caucus it and have a floor
17:43:26 vote as well.
17:43:29 Q. Fair enough. But --
17:43:30 A. And a committee of the whole to accept the -- and
17:43:33 they have to accept the amendments, so . . .
17:43:34 Q. And my question is with respect to your amendment.
17:43:37 Again, all of those steps happened on that last date, 22nd
17:43:40 of June; correct?

17:43:41 MR. O'MALLEY: Objection. Asked and
17:43:42 answered.
17:43:42 MR. LANGHOFER: Asked and answered.
17:43:43 THE WITNESS: Yeah, I'm going to just be
17:43:45 saying the same thing at this point.
17:43:46 BY MS. SHAH:
17:43:47 Q. Yes?
17:43:47 A. So yes.
17:43:48 MS. SHAH: I'm going to take a two-minute
17:43:50 break because I think that might be all I have. And then
17:43:54 if there is any follow-ups, we can deal with it.
17:43:56 THE VIDEOGRAPHER: We are off the record.
17:43:57 Time on the monitor is 5:43.
17:44:06 (A recess ensued.)
17:49:26 THE VIDEOGRAPHER: We are back on the record.
17:49:46 Time on the monitor is 5:49.
17:49:50 MR. O'MALLEY: Counsel, do you have more, or
17:49:53 you're done? Are we done with all plaintiffs' lawyers
17:49:56 questions?
17:49:56 MS. SHAH: Well, I'm going to just do that
17:49:58 hand-off real quick and we'll find out.
17:50:00 MR. O'MALLEY: Okay.
17:50:01 MS. SHAH: Okay. So, Mr. Petersen, thank you
17:50:02 today. I'm going to yield to any other plaintiffs, if they
17:50:06 have; otherwise, I can pass it to Mr. Langhofer, who I

17:50:08 think has some questions.
17:50:09 THE WITNESS: Okay.
17:50:13 MR. O'MALLEY: I take it by your silence, no
17:50:15 one has a question.
17:50:16
17:50:17 EXAMINATION
17:50:17 BY MR. LANGHOFER:
17:50:18 Q. All right. Senator Petersen, thanks for your
17:50:22 time. I probably only have 10 or 15 minutes, mostly in the
17:50:25 way of clarification.
17:50:26 First question is: In your role as an
17:50:30 elected official, have you learned of anyone who is an
17:50:36 adult citizen, who is a resident of Arizona but does not
17:50:41 have any of the following five things: Arizona driver's
17:50:45 license issued after 1996; a U.S. birth certificate; a U.S.
17:50:50 passport; tribal identity card; or naturalization number?
17:50:54 Do you know anyone like that?
17:50:56 A. I don't know anybody like that.
17:50:57 Q. What about among citizens that live below the
17:50:59 poverty line? Do you know anyone like that in that group?
17:51:04 A. I don't know anybody in that group.
17:51:06 Q. You were asked some questions --
17:51:07 A. I mean, I would say especially since those are
17:51:10 things required for assistance, so . . .
17:51:15 Q. What do you mean by "assistance"?

17:51:17 A. Like, government -- government -- if you're in
17:51:19 poverty and you're on -- you know, with programs, that's
17:51:22 something also expected in those -- in those programs: To
17:51:26 provide.
17:51:27 Q. You were asked about whether you had to prove your
17:51:31 citizenship in order to run for office or hold office. Do
17:51:36 you have a REAL ID?
17:51:37 A. I do.
17:51:38 Q. When did you get that?
17:51:39 A. I don't remember. It's been a few years.
17:51:43 Q. Are you aware of any process in Arizona for
17:51:47 challenging the qualifications of someone who's running to
17:51:50 vote -- or running for the legislature?
17:51:52 A. I am.
17:51:53 Q. How does that process work? Do you know?
17:51:56 A. Yeah. Opponents or, I guess, somebody who would
17:52:02 have standing could file a lawsuit saying that a candidate
17:52:09 is -- is not qualified by any of the qualifications,
17:52:14 whether that's citizenship or nomination to petitions or --
17:52:20 just whatever -- whatever requirements are to run for
17:52:23 office.
17:52:23 Q. Okay. Are you aware of any -- a history in
17:52:26 Arizona of anyone who's a noncitizen running for office?
17:52:30 A. I am not aware of that, no.
17:52:37 Q. Have you ever voted against bills introduced or

17:52:45 supported by the Free Enterprise Club?
17:52:47 A. Have I voted against their bills?
17:52:49 Q. Yeah.
17:52:50 A. Without looking at the record, I probably have.
17:52:58 But I -- off the top of my head, I don't know what my
17:53:01 voting record is with -- with their bills. So --
17:53:03 Q. When you were voting for the bills at issue in
17:53:06 this case, 2492 and 2243 -- I guess one could include 2617
17:53:12 as well -- were you aware of that email that used the word
17:53:16 "illegals" that you were going over previously with Niyati?
17:53:18 A. I don't believe -- I don't remember seeing the
17:53:20 email.
17:53:24 Q. Let's talk about floor amendments. And I want
17:53:27 to -- I want to cover -- we're going to spend a few minutes
17:53:32 talking about your floor amendment.
17:53:34 What is the -- what is the process for
17:53:35 introducing a floor amendment in the Senate?
17:53:38 A. The process for introducing a floor amendment, you
17:53:47 will -- I guess first there's a -- a concern with the bill
17:53:52 either that's raised in committee or somewhere along the
17:53:58 process, or there's some kind of amendment that wants to be
17:54:03 made to a bill.
17:54:07 People -- in order to amend a bill, you have
17:54:11 to protest. It's called a protest. You have to -- I
17:54:17 believe -- I believe it's protest. I want to say you can

17:54:20 protest the bill that will -- or if it was already amended in committee, then you don't have to protest it. But if it was unamended, it needs to be protested. And then it will go to committee of the whole.

17:54:32 Q. What does the protest mean?

17:54:34 A. It basically means that the bill doesn't have any amendments on it. You're protesting so that it can go into committee of the whole for amendments. Or it can even be that somebody just -- they want to make sure that it goes to committee of the whole to have further debate and further flesh out the bill.

17:54:55 Q. Is -- is it just the sponsors who can protest or can anyone?

17:55:00 A. Anyone can protest it -- any member can protest it. Of the body, not of the other chamber, but of that body. So you'll -- you'll make sure that it's -- in the COW calendar. You'll work with the analyst and LEG council to prepare the amendment. You'll want to make sure that you have support for the amendment.

17:55:23 If -- a lot of that work is done before floor because you'll see that almost all floor amendments pass. Almost all of them. And that's because they've been vetted.

17:55:36 Members will bring that up in caucus. Almost always. They'll even bring it up in committee. They'll

say, "I have a floor amendment coming." You'll hear that in caucus as well.

So -- or you'll -- you'll also see emails, floor amendments coming. So there is a process of making people aware. Members definitely do not want their floor amendments to die on the floor, and so there is -- there's vetting, at least in the concept. Whether you have the final draft or not, it's -- what it's going to do, that's -- that's very -- the good procedure, common strategy is that that's -- there some vetting done before it gets to the floor.

Q. Which members can introduce floor amendments?

A. Any member in that chamber can introduce a floor amendment. From -- any -- any member, regardless of party or whether they're the sponsor or not, the prime sponsor of the bill or not.

Q. You testified before that floor amendments are common. Are they more or less common as the session approaches its final days?

A. It -- it depends. But I would say there are definitely a lot of the floor amendments at the end because you're working with a lot of bills that have been going through stakeholder processes and trying to -- you know, they've got opposition or -- or -- and so you're -- it's very common that you're dealing with -- trying to just

17:57:05 build that consensus to get it -- get it back to the
17:57:08 governor -- or get it to the governor.
17:57:10 Q. If someone were to introduce a floor amendment in
17:57:14 a way that was procedurally improper, is there a process in
17:57:18 the Senate for flagging that and making the procedures be
17:57:21 followed?
17:57:22 A. Can you be more specific? Can you be more
17:57:29 specific in your question?
17:57:30 Q. Yeah.
17:57:30 So what's a point of order?
17:57:32 A. So a point of order is to notify -- to advise the
17:57:37 chair and the body that -- whatever it is -- that something
17:57:41 is a rule or something is not being done according to --
17:57:46 you know, according to the rules or the process.
17:57:48 Q. And when a member calls a point of order on the
17:57:53 floor of the Senate, where does that fit in sort of
17:57:58 priority of everything else that's going on in the Senate
17:58:00 floor at the time?
17:58:00 A. So the chairman will stop everything and take the
17:58:04 point of order. And if the member is in order, then that
17:58:08 point of order will be addressed immediately.
17:58:12 Q. Do you remember any points of order being raised
17:58:14 to your floor amendment to 2243?
17:58:17 A. No. Not that I recall.
17:58:20 Q. Let's look at Exhibit 445. This is the

17:58:32 document -- I don't know if they're marked in your stack
17:58:35 there.
17:58:35 A. Floor Amendment Explanation.
17:58:37 Q. That's right.
17:58:39 A. Okay. I have it.
17:58:40 Q. And then attached to -- well, a part of that
17:58:42 document is the text of your amendment.
17:58:51 You may have answered this before, but is a
17:58:53 document like this circulated before or after your -- well,
17:58:58 when is a document like this circulated to the members?
17:59:00 A. It's circulated at the beginning of the committee
17:59:03 of the whole.
17:59:03 Q. Okay. After the committee of the whole, do you
17:59:07 recall whether you guys went directly into the floor vote,
17:59:10 or was there break for caucus? I'm not trying to suggest
17:59:13 the answer. I'm just asking you.
17:59:14 A. I don't remember.
17:59:15 Q. Okay.
17:59:15 A. I don't remember how soon the floor vote was.
17:59:17 Q. Okay. So I said we were going to talk about 445.
17:59:21 Actually, like, why don't you hold that for a moment.
17:59:23 First I want to go through some of the
17:59:26 requirements in what's PX 4. This was the text of House
17:59:31 Bill 2617.
17:59:32 So do you have that in front of you, this --

17:59:34 A. Yeah. This one.
17:59:35 Q. Great.
17:59:36 A. Yeah.
17:59:37 Q. All right. And let's start with -- on page 2.
17:59:43 A. Okay.
17:59:44 Q. Line -- starting at line 16. So we're --
17:59:49 A. "Pursuant to Subsection A"?
17:59:49 Q. Yeah, that's right.
17:59:52 A. Okay.
17:59:53 Q. So why don't you read that silently to the yourself, just the first sentence that ends with "that the person is qualified." Tell you what, just read the whole paragraph.
18:00:04 A. Okay.
18:00:05 Q. Then we'll ask you about it.
18:00:06 A. All right. Okay.
18:00:18 Q. Okay. So as drafted in 2617, did -- was the county recorder required to tell the voter -- give the voter a form to return when they received this notice?
18:00:34 A. The county recorder is required to send the person a notice. Is that what you're asking?
18:00:49 Q. Right.
18:00:49 But in that notice, did 2617 require the county recorder to send the voter a form or just a notice?
18:00:56 A. Just a notice.

18:00:58 Q. Okay. Why don't you look now at the paragraph beginning on line 23. Same thing, read that. Then I'm going to ask you the same question about it.
18:01:08 A. Okay.
18:01:17 Q. Okay. So on this part of 2617, was the county recorder required to send the voter a form that they could mail back to prove citizenship?
18:01:26 A. No.
18:01:26 Q. All right. Same exercise on line 33, that paragraph 3 there. Why don't you read that. I'm going to ask you the same question.
18:01:37 A. No. No.
18:01:39 Q. Okay. No, it does not require them to send --
18:01:41 A. It doesn't require a form.
18:01:43 Q. All right. Now let's flip to Exhibit 445, your floor amendment.
18:01:46 A. Okay.
18:01:47 Q. And we're going to go to the part of this that includes your amendment language. We're going to look at page 2 of your amendment language.
18:01:56 A. Okay.
18:01:56 Q. And on line 9, that begins paragraph B. Do you see that?
18:02:03 A. Yeah.
18:02:03 Q. Read that to yourself, please, and let's talk

18:02:06 about that.
18:02:06 A. All right. Yeah. Okay.
18:02:29 Q. All right. What does -- does this provide any
18:02:33 more direction to the county recorders on what they need to
18:02:35 include with their notices?
18:02:36 A. Yeah. So they do need -- it says that they need
18:02:38 to include a form.
18:02:40 Q. By forwardable mail and postage prepaid on the
18:02:45 form; right?
18:02:46 A. Yes.
18:02:46 Q. All right. The top --
18:02:47 MS. SHAH: Objection. Calls for legal
18:02:53 conclusion.
18:02:54 BY MR. LANGHOFER:
18:02:55 Q. Top of the next page.
18:02:55 A. Okay.
18:02:56 Q. The first -- well, why don't we go back to page 2
18:02:59 and just read the whole paragraph 10 there.
18:02:59 A. Okay.
18:03:01 Q. I'm going to focus on the language at the
18:03:03 beginning of page 3 when you're done.
18:03:05 A. Okay. Okay.
18:03:34 Q. All right. So, sir, at the bottom of page 2, top
18:03:45 of page 3 --
18:03:45 A. Yeah.

Q. -- does this include any more guidance to the county recorders on how to send these notices, more than it did in 2617?

A. It does.

MS. SHAH: Objection. Legal conclusion.

BY MR. LANGHOFER:

Q. And what's the difference?

A. The difference is it says, "The county recorder shall send the person notice by forwardable mail that the person's registration will be canceled in 35 days unless the person provides satisfactory evidence of United States citizenship pursuant to Section 16-166. The notice shall include a list of documents the person may provide and a postage prepaid addressed return envelope."

Q. All right. We're going to do just one more. Now we're on page 4, paragraph E.

A. Okay.

THE COURT REPORTER: E?

MR. LANGHOFER: Yes, E, like echo.

BY MS. SHAH:

Q. Why don't you read that. It's a little bit long, but, you know, I'd like to get it right. So take your time and read that paragraph, please.

A. Okay.

Q. All right. Does -- relative to 2617, does this

18:05:20 portion of your floor amendment give the county recorders more guidance on what to include in their notifications to voters?
18:05:28 A. It does.
18:05:28 Q. How so?
18:05:30 A. It says, "The county recorder shall promptly send notice by forwardable mail to each person who has obtained a driver license or the equivalent of an Arizona nonoperating identification license in another state and a postage prepaid preaddressed return form requesting the person confirm by signing under penalty of perjury that the person is a resident of the state and is not knowingly registered to vote in another state or confirm that the person is not a resident of this state. The notice shall inform the person that failure to return the form within 90 days will result in the person's registration being placed in inactive status."
18:06:10 Q. All right. You can close that.
18:06:12 And what we're going to talk about now is Plaintiff's Exhibit 499.
18:06:15 A. Okay.
18:06:17 Q. This was the transcript from June 22nd.
18:06:21 A. 4 what?
18:06:22 Q. 99.
18:06:23 A. 499.

18:06:23 Q. So this is from the COW.
18:06:26 A. Okay. Is this early?
18:06:38 Q. No. Relatively late.
18:06:40 A. This is -- I don't have numbers on everything. Is
18:06:47 it -- okay. March 10, 2022?
18:06:48 Q. We're looking for June 22.
18:06:50 A. June 22. Okay.
18:06:51 Q. There will be a yellow sticker in the bottom
18:06:54 corner there.
18:06:58 A. This one. Okay.
18:07:00 Q. All right. So let's turn to page 4 of this
18:07:04 document.
18:07:04 A. Okay.
18:07:05 Q. And I'd like you to read from line 9 down to
18:07:13 line 22, please. Just to yourself.
18:07:15 A. All right. Okay.
18:07:44 Q. All right. Based on this, was there any
18:07:48 discussion on the floor before the committee of the whole
18:07:52 recommended 2243 do pass?
18:07:52 A. Yes.
18:07:56 Q. Was there any discussion of whether 2617, as
18:08:02 modified and grafted into 2243, had, in fact, addressed the
18:08:08 governor's concerns or whether it was still problematic?
18:08:12 A. Yeah. There are -- Senator Quezada, who's a
18:08:19 Democrat, mentioned that it was -- before he was saying it

was an okay bill -- it wasn't a great bill, but it was an okay bill. But then he does mention that -- he also mentions that it does address some of the concerns that were mentioned in the -- in the veto letter.

Q. And he says, in fact, the problems are still present in the substance of the floor amendment; right?

A. Correct.

Q. Okay. And on the next page, lines 4 through 7, give that a read to yourself, please.

A. Okay.

Q. All right. So was there also a discussion before the do pass recommendation about whether the time frames were appropriate in the amended 2243?

A. Yes.

Q. Okay. At the end of that, did the Senate take a vote on whether to recommend the passage of 2243?

A. It did.

Q. Why don't we look now at Petty Exhibit 6, which is the portion of the EPM.

A. EPM. Okay.

Q. For the record, we mentioned this on one of the breaks -- we discussed this on one of the breaks. I don't think it matters for present purposes, but Petty Exhibit 6 doesn't have all the pages to the EPM. But again, I don't think it matters for present purposes, I just want the

18:09:42 record to be clear. There is a full copy of it in the trial record. But that's nothing you need to concern yourself with.
18:09:48 A. Okay.
18:09:49 Q. It's just for Cindy and the record.
18:09:51 Why don't we look at page -- in this Petty Exhibit 6, why don't we look at page 37.
18:10:07 A. Okay.
18:10:09 Q. And the NVRA is the National Voter Registration Act. Are you familiar with that law, sir?
18:10:21 A. A little bit.
18:10:22 Q. Okay. And are you familiar that the -- are you familiar with the fact that the NVRA provides a process for notifying voters of upcoming cancellation of their registration?
18:10:36 A. A little bit. I'm somewhat aware of that.
18:10:38 Q. Fair.
18:10:39 Why don't you look at page 38 now, paragraphs 3 and 4. Just read those to yourself, if you will.
18:10:49 A. Okay.
18:10:54 Q. See how, according to the EPM, the -- and the NVRA process here requires the 35-day notice and response period?
18:11:03 A. I notice in paragraph 3 and paragraph 4, it's 35 days. I also noticed on page 37 that there are also

18:11:13 35 days, 35 days, 35 days, 35 days on just the these few pages. It's mentioned several times.
18:11:21 Q. Why don't we look at page 39, the final bullet point there. Same thing?
18:11:30 A. Yes. I see 35 days on that as well.
18:11:35 Q. Do you know -- I'm not asking you to -- please don't answer if you don't know. But do you know whether the 35-day notice in the response period is standard under the NVRA?
18:11:43 MS. SHAH: Objection. Calls for a legal conclusion.
18:11:45 THE WITNESS: I'm not aware whether that's the standard or not.
18:11:48 BY MR. LANGHOFER:
18:11:48 Q. Okay. I want to look now at page 40, also staying with Petty Exhibit 6.
18:11:55 You were asked at the beginning of today -- feels like yesterday -- about whether there could have been voter cancellations between September, when the bill was to become effective, and the general election in November.
18:12:12 Why don't -- I want to come back to that issue in a minute. But before we do that, why don't you read Section D on page 40 of Petty Exhibit -- Petty Exhibit 6.
18:12:22 A. Okay. Okay.

18:12:37 Q. All right. Did -- if the bill was to become
18:12:42 effective in September, that's less than 90 days before the
18:12:46 general election; right?
18:12:47 A. Right.
18:12:47 Q. Did anyone who supported 2243 ask you for more
18:12:55 time to consider your floor amendment?
18:12:58 A. No.
18:12:58 Q. You mentioned earlier that your wife is a Mexican
18:13:05 national. Is she a dual citizen or just a --
18:13:10 A. A resident.
18:13:12 Q. Okay. Green Card holder, I assume.
18:13:14 A. Uh-huh.
18:13:15 Q. I need a yes or no for that.
18:13:17 A. Yes.
18:13:17 Q. Thanks.
18:13:18 What language do you guys speak at home?
18:13:20 A. Spanish.
18:13:20 Q. Do you speak to her in English at home?
18:13:22 A. We only speak Spanish.
18:13:26 MR. LANGHOFER: All right. Those are all the
18:13:28 questions I have.
18:13:28 Anything from legislative counsel?
18:13:30 MR. O'MALLEY: Nothing from us.
18:13:32 Any follow-up?
18:13:33 MS. SHAH: Maybe. I just want to have two

18:13:35 minutes to consult, if that's okay.

18:13:37 MR. LANGHOFER: Great.

18:13:39 THE VIDEOGRAPHER: Okay. We are off the
18:13:46 record. Time on the video monitor is 6:13. This will end
18:13:52 Volume 1, Media Number 5 of the deposition of Warren
18:13:57 Petersen.

18:14:14 (A recess ensued.)

18:19:07 THE VIDEOGRAPHER: Okay. We are back on the
18:19:13 record. Time on the monitor is 6:18.

18:19:18 MS. SHAH: Mr. Petersen, I don't have
18:19:21 anything. I don't know if any of my co-counsel from the
18:19:25 Zoom have any redirect for you.

18:19:31 MR. O'MALLEY: I take it by your silence no
18:19:33 one has further questions.

18:19:36 MR. LANGHOFER: Okay. I will -- read and
18:19:36 sign, Kevin?

18:19:39 MR. O'MALLEY: Yes, we'll read and sign.

18:19:41 THE VIDEOGRAPHER: Okay. We are off the
18:19:42 record. Time on the monitor is 6:19. This ends Volume 1,
18:19:51 Media Number 5, of the deposition of Senator Warren
18:19:55 Petersen.

(The proceedings concluded at 6:19 p.m.)

______________________________
WARREN PETERSEN

STATE OF ARIZONA )
COUNTY OF MARICOPA )

BE IT KNOWN that the foregoing deposition was taken by me pursuant to stipulation of counsel; that I was then and there a Certified Court Reporter in the State of Arizona, and by virtue hereof authorized to administer an oath; that the witness before testifying was duly sworn by me to testify to the whole truth; pursuant to request, notification was provided that the deposition is available for review and signature; that the questions propounded by counsel and the answers of the witness thereto were taken down by me in shorthand and thereafter transcribed into typewriting under my direction; that the foregoing pages are a full, true and accurate transcript of all the proceedings had upon the taking of deposition, all done to the best of my skill and ability.

I FURTHER CERTIFY that I am in no way related to nor employed by any parties hereto; nor am I in any way interested in the outcome thereof.

Dated at Phoenix, Arizona, this 7th day of December, 2023.

Cindy Mahoney

CINDY MAHONEY, RPR, RMR NO. 50680

Exhibits


**427 Petersen Exhibit** 2:10 49:21

**428 Petersen Exhibit** 2:12 66:14 67:3

**429 Petersen Exhibit** 2:13 74:9

**430 Petersen Exhibit** 2:15 83:7,13

**431 Petersen Exhibit** 2:16 102:3

**432 Petersen Exhibit** 2:18 141:15

**433 Petersen Exhibit** 2:20 171:14

**434 Petersen Exhibit** 2:22 196:2

**435 Petersen Exhibit** 2:24 200:1

**436 Petersen Exhibit** 3:3 205:17

**437 Petersen Exhibit** 3:5 210:6

**438 Petersen Exhibit** 3:6 214:10,13

**439 Petersen Exhibit** 3:9 215:13

**440 Petersen Exhibit** 3:11 238:21

**441 Petersen Exhibit** 3:14 247:5

**442 Petersen Exhibit** 3:15 248:8

**443 Petersen Exhibit** 3:17 249:20

**444 Petersen Exhibit** 3:19 252:17

**445 Petersen Exhibit** 3:21 273:5 280:5 334:25 337:15

**446 Petersen Exhibit** 3:22 291:23

**447 Petersen Exhibit** 4:3 298:10

**448 Petersen Exhibit** 4:4 312:5

**449 Petersen Exhibit** 4:6 314:5

**450 Petersen Exhibit** 4:7 315:17

**451 Petersen Exhibit** 4:9 316:21


$


**$15** 128:8 226:25

**$20** 314:13,22,24

**$35** 314:25 315:2


(


**(a)** 222:24

**(b)** 223:2 282:16,19 283:1,22

**(c)** 278:24


0


**003211** 171:13

**010646** 210:5

**028202** 101:25

**028204** 102:14

**028206** 101:25


1


**1** 9:5 46:5 65:14 192:18 282:20 283:1 346:5,19

**10** 45:22 47:7 190:22 229:25 233:6,14,15 235:23 241:19 281:15 282:15 283:21 286:19,20 312:10 329:9 338:18 341:5

**100** 106:7 181:14 311:13

**10:00** 249:24

**10:21** 65:13

**10:37** 65:17

**10:39** 67:17

**10:42** 67:20

**10th** 196:15

**11** 30:10,11 47:17 190:6 244:6

**11598** 248:19

**11:28** 105:13

**11:40** 105:16

**12** 29:14 128:22,24 195:24 312:11

**12.5** 315:9 316:7,10

**12929** 247:2

**12:23** 137:22

**12:25** 138:1

**12:29** 141:4

**12C** 58:16,24

**13435** 253:21

**14** 193:25 199:20

**14,880** 316:25

**14228** 298:7

**14265** 215:21

**15** 200:7 205:9,15 226:20 329:9

**15.50** 314:13

**15th** 206:7

**16** 47:3 53:16,19 210:4 279:7 281:7 336:6

**16-101** 201:15

**16-165** 234:3,10 271:4

**16-166** 201:16 224:4 287:23 339:12

**16-311** 72:2

**17** 214:8

**17a** 215:11

**18** 78:18,19,23 268:7

**19** 191:20 238:15,17,18 278:16 288:23

**1994** 78:25 79:1,6,13 82:16 189:21

**1996** 329:15

**1:04** 141:7


2


**2** 49:18 65:18 74:11,16,17,19,21,23 75:9,12 83:20 98:7 137:23 147:10,12 192:18 234:2,4,10,18,20,23 235:8,10 239:6 263:24 278:21 279:12 280:12,16,21,23 281:4,7,12 283:20,24 286:18,20 336:4 337:20 338:17,23

**20** 158:16 247:1 314:25

**20-** 237:21

**200's** 80:5,9,20

**2004** 81:10 202:7

**2005** 201:10,23 202:3

**2012** 40:22 41:6,12 44:16

**2014** 41:12 292:20,22

**2016** 41:3,12

**2018** 41:12

**2019** 292:16 300:7 301:7 302:21

**2020** 41:12 102:24 104:5 108:5 148:7

**2022** 41:12 43:16,21 44:4,7 46:11 48:7 146:10 147:21 148:2,12 150:7 151:1 152:5,9,11,17,19,24 153:5 171:22 200:9 234:11 248:24 249:11 268:12 274:12 320:7 341:5

**2023** 9:9 46:7 146:24 151:21 152:9,11 320:11,19,22 321:6

**2023-2024** 50:2

**204** 102:15

**21** 232:11 248:6

**21-314** 223:3,21

**22** 216:25 249:18 268:12 274:12 287:7,13 288:3 341:6,7,15

**2240** 244:22

**2243** 19:2 44:1 85:7,21 146:2,9 147:2,10 148:7 151:1 158:13,15 213:4,11, 18 214:14,15,16,25 216:7, 12,19,25 217:13 221:24 227:23 230:9,22 237:11, 16 268:6,15 279:2,16 280:23 284:9 286:2 290:12,23 295:11,18 296:8,11,12,23 297:1,13, 21 304:5 318:25 320:21 322:16 323:9 331:8 334:23 341:19,22 342:13, 16 345:5

**22nd** 327:24 340:22

**23** 205:21 249:11 252:14 279:13 281:13 282:13 283:9,20 284:1 286:21 337:2

**2340** 322:12

**2343** 322:13

**23rd** 205:24 249:24 252:22

**24** 146:10 213:11

**2415** 9:13

**2492** 18:23 19:2 44:1 80:4,7 81:11 82:14 85:7, 21 137:14 139:2 140:7 146:2,9,23 153:14 155:17 156:18,25 157:19 158:2,5, 7,13 161:19 164:21,24 165:16,22 166:17 167:6 168:7 169:8 170:18 171:2, 7 172:1 175:11,23 176:18 184:19 187:3,18,24 188:3, 23 191:15,24 196:20,24 197:1 200:10,14 206:16, 17 208:18 237:21 318:4 331:8

**2492's** 153:19

**24th** 147:19

**25-ish** 141:20

**257** 43:10

**25th** 248:23

**26** 47:8,16 263:16 283:20

**2617** 19:4,6 85:7,21 213:4,11 214:22,24 215:3 216:8,12,13,14 237:11,15 238:4,10,13,25 239:6 244:22 246:7 248:24 249:10,25 250:19 252:21 255:17 262:1,9 263:14,21 264:3 265:20 266:14,16, 21 267:9 269:9 271:13 274:18 278:12,19 280:11, 15 281:4,6,12 282:10,21 283:24 285:16 286:2,6 287:25 288:25 290:14,24 292:7 295:8 296:12,13 305:8 306:24 313:21 322:3,15,18 325:11,14 331:8 335:24 336:17,23 337:5 339:3,25 341:21

**27** 54:5 292:7

**28** 273:1

**28202** 104:2

**29** 291:20

**2:01** 190:15

**2:14** 190:18

**2:22-cv-00509-srb** 9:8

**2N** 54:5,11

### 3

**3** 66:11 84:1,16 138:2 230:14 234:7,9,10,12,13, 14 246:2,5 266:20 271:7 288:3 302:2 337:10 338:21,24 343:19,24

**30** 104:20 312:11

**3082** 195:25

**3083** 197:12

**3084** 195:25

**31** 53:12,15,17 211:25 212:14 298:6

**32** 301:4

**33** 312:3 314:2,25 337:9

**33.50** 314:14

**33a** 314:1

**33b** 315:15

**33c** 316:19

**35** 224:11,20,24 225:8,16 227:9,25 229:19 231:10 271:20 274:20 275:4,9 276:15 286:25 287:3 293:24,25 294:11,18 302:7,10,14 303:11,24 304:25 305:1,5,22 308:9, 25 309:3,25 311:7,9,10 312:13,16,20 313:24 339:10 343:25 344:1,5

**35-day** 225:4 231:1 293:4 302:20 310:7 343:22 344:8

**36** 197:17 301:8,21

**36,000** 193:3,10 194:24 197:17 198:18

**37** 279:21 302:8 343:7,25

**38** 343:18

**39** 191:18 344:3

**3958** 199:21

**3:03** 230:14

**3:16** 230:17

**3:54** 263:9

**3a** 74:8

**3b** 71:22,25

### 4

**4** 74:11,16,17,21 75:9 79:25 141:19,20 230:18 238:15 239:5 246:6,11 266:20 278:17 279:18 280:1 285:17 302:2,4 307:19 335:23 339:16 340:23 341:11 342:8 343:19,24

**40** 45:17,19,22 291:3,18 344:15,23

**402** 46:5

**407** 71:23,25

**408** 83:3,19

**41** 282:22 283:1

**424** 263:18

**427** 49:21,24

**428** 66:14,23 67:3

**429** 74:9 83:5

**430** 83:7,13

**431** 102:2,3

**432** 141:15

**433** 171:14,17

**434** 196:2 199:16,17

**435** 199:25 200:1

**436** 205:17 206:11

**437** 210:5,6

**438** 214:10,13

**439** 215:12,13

**440** 238:19,20,21

**441** 247:3,5

**442** 248:7,8

**443** 249:19,20

**444** 252:16,17

**445** 273:4,5 280:5 334:25 335:20 337:15

**446** 291:22,23 294:21,22, 23

**447** 294:22 298:9,10 303:2

**448** 312:4,5 314:3

**449** 314:4,5

**450** 315:16,17

**451** 316:19,21

**499** 268:8 340:20,25

**4:05** 263:12

### 5

**5** 83:2 172:2,5 193:1 215:16 239:6 246:6,11 271:22 277:5 287:5,12 307:24 346:5,20

**50** 210:25 211:10

**51** 80:1 82:3,7

**53** 263:17

**55th** 29:6 40:2,3 41:9 44:2 46:10 52:1,5,7,10 54:18 55:13,22 56:3,4 57:16,17 59:14,17 268:21

**56th** 29:4 50:1,21 51:1 58:4

**5:04** 307:19

**5:19** 307:24

**5:43** 328:13

**5:49** 328:16

**5A** 83:4

**5th** 9:9

**6**

**6** 83:20 101:24 215:16 235:6,15 280:25 288:22 301:6,14,15,17 342:18,23 343:7 344:16,24

**60** 104:21

**600** 9:14

**61** 190:21 191:9,10

**61A** 190:7

**6:13** 346:4

**6:18** 346:9

**6:19** 346:19,22

**6th** 178:1

**7**

**7** 58:8,10 83:21 84:2 98:7 141:10 278:23 280:13,16, 23 281:3 342:8

**76** 78:23,24

**7:49** 196:15

**8**

**8** 47:1 84:3,17 102:14

**8th** 171:20

**9**

**9** 30:10 171:12 241:19 247:2 271:7 279:18 285:17 337:22 341:14

**9(A)** 280:24 281:2

**90** 58:7 146:12,17 147:4, 17,18 239:9,12,16,19 240:20,22 241:14 250:7 284:6 286:25 293:24,25 294:11,18 305:8 308:9 311:7,9,11 313:22 320:4 340:16 345:2

**90-day** 250:23 251:2 293:4

**99** 340:24

**9:09** 9:4

**A**

**A(10)** 225:2 229:20,21 232:16,17,18

**a.m.** 9:4 196:15 249:24

**A.R.S.** 271:3

**AANHPI** 9:18,22

**ability** 66:2 89:6

**abnormal** 323:6

**absence** 123:20

**Absolutely** 25:20 251:17 317:12

**academics** 119:13

**accept** 327:21,22

**access** 142:2

**accommodations** 317:16

**account** 96:21 116:11 135:10,13,15 212:20

**accurate** 14:4 46:15 149:9 158:25 170:17,23 198:21,25 250:13 254:8, 22,23 288:13 290:6 302:19

**acronyms** 319:21

**Act** 343:10

**acting** 274:15

**action** 22:22 125:2

**actors** 267:10

**actual** 92:14 182:4,7 185:5 273:9,22,25

**add** 78:23 91:21 259:3 269:6,8 278:1 308:1

**added** 214:24 216:4,14 269:22 277:18 288:2,16 289:14 322:16

**adding** 213:19 214:17

**addition** 16:19 272:23 288:16

**additional** 272:4 277:11 314:14

**address** 11:10 179:9 204:18 213:16 215:8 216:8 222:19 255:17 275:12 276:16 278:1 285:12,24 286:7 289:14, 17,25 294:3 295:2 298:21 306:10 308:3 342:3

**addressed** 204:25 216:15 275:23 276:20 278:2,9 334:21 339:14 341:22

**addresses** 251:23 271:15 275:18

**addressing** 274:18 281:24 282:5 285:11,13 308:22

**adds** 272:2,4 277:11

**administrability** 168:7

**Administration** 244:8 245:20

**admitted** 191:7

**adopt** 51:16

**adopting** 50:25

**ADOT** 241:22 304:10

**Adrian** 9:7

**adult** 329:13

**adults** 313:19

**advice** 36:11

**advise** 334:11

**affect** 87:17 89:6 106:23 107:18,21 108:20 109:10, 15 111:19,24 117:12,17 122:3 169:25

**affected** 242:1

**affects** 126:14

**affiliated** 160:9,11

**affirm** 70:15

**affirming** 70:17

**afford** 317:17

**AG** 142:22 151:5

**age** 75:1 113:22,24,25 316:3

**agencies** 309:12

**agree** 37:20 44:1,6 46:6, 9,21,24 47:12 50:22 52:6, 8 53:17,18 54:17,24 55:12,18 56:2,6 57:9 59:13 61:1,16 63:15 66:1 67:23 68:1 69:2,11,17,24 72:11,12,20 73:20,22 79:12,16,20 80:10 81:19 82:1 85:4,5 86:19 95:6 103:3 104:14,18 108:5 137:14 142:9,10,14 143:2, 6 144:8 146:7,21 147:1 148:24 152:11,16 156:11 160:8 171:1 174:11,17 181:11 182:3,12,21 183:6, 11,12,13 187:3,24 188:3, 23 202:5 206:17 207:3 208:18 210:21 211:15,23 214:16,22 216:7 217:13 220:11,12 222:11 224:11 227:23 228:12,16,25 242:9,12,21 243:7,15 247:10 250:5 251:14 254:3,16,19 256:15 257:17 260:14,23 261:1,8 262:1,18 263:20 264:8,12 265:7,10,11,16 266:20,24 267:3,8 268:10,14 271:3 273:11 284:18,21 285:5 286:8,23 287:2 288:2,6,7, 15 293:12 294:16 299:8, 15 300:11 305:8 307:4,5 308:8 311:6,21 315:3

323:12 324:5,10 326:15

**agreed** 63:19 68:23 105:18 199:5 247:19 252:5 269:22 305:15,17 324:14

**agreeing** 202:6

**agreement** 11:3

**Agron** 292:3

**ahead** 12:8 13:9 21:15 32:20 50:3,9 86:4 93:24 107:2 109:16 110:5,7 138:14 159:18 188:2 192:24 199:25 211:19 213:2 235:13 241:12

**Aimee** 163:13,15 248:23

**alcohol** 127:7

**alien** 218:6,15 244:9

**align** 299:20 303:8

**aligns** 303:9

**allegation** 200:13,19 203:19,21 204:7

**allowing** 138:5,10,15

**ambiguous** 44:22

**amend** 239:6 269:25 270:10,15 324:24 331:23

**amended** 234:11 270:1 286:7 295:19 296:8,12 297:1 318:24 319:7,11 332:1 342:13

**amending** 63:17 290:12, 20 324:18

**amendment** 63:15,16,20, 22 64:4,8,10,13,14 214:23 237:15 246:23 247:10,11, 12,16,19,22 248:4,24,25 249:8,11 251:19 252:2,10, 13 268:14,25 269:3,11 270:4,13,14,21,24 271:8, 13,15 272:12,24 273:8,9, 13,22 274:11,17 275:22 276:20,25 277:1 278:12 279:2 280:5,8,17,22 281:10 284:9 285:22 286:18 287:5 288:3,15,22 289:20 290:5 295:25 296:3,8,17 297:2,13 298:16,24 299:1 305:17 306:3,4,5 317:16 323:9, 13,16 324:10 325:5,14 326:1 327:23 331:15,17, 18,21 332:18,19 333:1,14 334:3,23 335:3,7 337:16, 19,20 340:1 342:6 345:6

**amendments** 40:12,13 59:6,8,21 63:14 156:5 237:16 245:25 270:7 272:19 280:23 296:24 297:19 319:8,16,24 327:22 331:13 332:7,8,21 333:4,6,12,17,21

**amends** 234:2 246:7,19 299:19 303:6

**America** 173:9

**American** 10:9

**Amit** 10:8

**amount** 227:15 239:20 267:24 268:2,3,4 312:20

**analysis** 32:7,10,11 136:21 206:5

**analyst** 156:6 249:4 332:17

**analysts** 156:5

**analyze** 56:22 307:7

**Ann** 102:19

**answering** 13:11

**anytime** 289:19

**apologize** 120:13

**applied** 233:12

**applies** 124:18 125:23,24 126:13 233:7 302:7 304:7

**apply** 201:14 202:2 233:15,16 241:4 244:22 311:4

**appoint** 28:24,25

**approach** 254:10 255:1

**approaches** 333:19

**approval** 212:7

**approve** 51:9,10 53:11

**Approximately** 128:7

**April** 46:7 248:23

**arguably** 257:6

**argument** 73:7 125:14 202:11 267:15

**Argumentative** 70:6,21, 22 81:22 89:19 152:12 179:10,11 219:13 290:7 325:21

**arguments** 38:8 140:5,6 167:10 170:2

**arise** 270:6

**Arizona** 9:4,8,14,17,20, 22 10:9,15 12:16 40:21 43:5 46:16 47:4 50:1 67:24 68:4,25 69:4,13,25 70:14 71:9 75:2 78:15 80:5,8 83:22,24 84:4,6,18, 21 85:9,23 98:11,19 102:20,21 104:12 113:10 138:25 142:6 160:5 161:5 167:20 170:5 171:19 178:11,21 182:15 184:5, 12,20 185:6 192:1,6,8,10 193:3,25 194:1,2 198:2 207:13 234:10 239:7 242:12 250:24 255:9 311:21 314:9 316:11 318:4 329:13,14 330:11, 23 340:8

**Arizona's** 98:13 167:7

**Arizonan** 264:2

**Arizonans** 170:1 313:5 315:3

**Art** 292:3

**Article** 74:11,16,17,21 75:9 192:18

**articulate** 114:6

**Asia** 173:9

**Asian** 10:9

**assert** 186:1 188:24 189:5,9

**asserted** 141:25 142:16

**asserting** 197:3

**assertions** 198:14,16

**asserts** 189:10

**assess** 61:17

**assessment** 293:12

**assigned** 28:9

**assist** 75:7

**assistance** 329:24,25

**assistant** 173:21 248:13

**assistant's** 173:23

**assume** 11:16 13:4 14:7 57:15 249:15 300:5 345:11

**Assumes** 160:24

**assuming** 220:11 311:25 312:23,24 321:10

**attach** 248:25

**attached** 273:25 335:6

**attaches** 196:20 273:9

**attachment** 196:1 257:2

**attachments** 253:11

**attack** 93:22

**attention** 141:12 321:23

**attest** 66:3,5 69:12

**attesting** 71:10

**attorney** 10:7 14:8 15:21, 22 23:21 24:7,22,23 34:1, 18 38:15,23,24 39:18,22 40:8,18 43:10 98:11,19,23 99:12 100:1,23 101:4,14, 19 103:9 104:10 110:20 131:5,13 133:23 134:16 151:25 185:18 225:14 228:7

**attorneys** 15:9,13,17 22:23 23:4,9,15,18,24 24:6,7,12 38:4,19,20 39:8 208:4,6

**audibly** 13:2

**author** 62:7,8,24 63:14 156:18 158:7,11 159:20, 23 169:10 237:11 247:11, 14

**authored** 48:3 62:14,15 63:18 64:9 159:10,21 160:1,2,16 166:3,15,17

238:4,6,12 247:15,22 253:8

**authoring** 62:15,21 63:21,23 156:13,16 238:10

**authority** 189:10 192:7, 10 197:3 207:10

**authorized** 47:4

**avoid** 82:7

**avowing** 241:10

**aware** 48:6,8,9,10,11,12 93:12 99:5,8 100:23 101:1,3,11,18 103:7 112:20 113:19 114:14,19 117:9 122:7 124:11 126:23 129:8,17 134:1 136:14 150:24 156:23 169:5,18 171:6 173:8 185:3 208:10,14 219:8 220:20,22 240:8 242:17 244:5 245:19,21 255:16 256:18 277:25 290:22 295:4,6,9,21 330:11,22,24 331:9 333:5 343:16 344:12

**AZ** 171:25 175:22

**B**

**back** 12:2 34:10 36:24,25 54:4 57:4 65:11,16 67:19, 22 73:1 96:11,12 98:6 105:15 110:15 130:7 133:19,21 137:25 140:20 141:6 142:25 145:23 157:5 159:5 161:8 165:3 166:10 175:9 179:13,20 180:6 190:17 194:23 195:13 215:4 216:16 229:21,22 230:16 232:5 255:25 266:9,10 269:25 270:3 274:15 276:1 277:5 280:4 283:9 285:5,16 286:17 287:25 302:18 303:1 306:17 307:21 311:5,16 318:1 322:14,24 328:15 334:1 337:7 338:17 344:21 346:8

**background** 165:1

**bad** 61:13 71:5 76:18 77:11 88:10 179:18 180:14,18 181:24 207:6 258:7,9 267:10

**badgering** 44:14 91:19 153:25 154:13

**ballot** 99:22,24 138:24 195:7 209:7,12,14

**ballots** 138:25 193:10,13 195:2 255:10

**Barto** 196:10

**base** 170:11

**based** 38:11 39:9 81:9 82:13 85:6,17 96:14 116:12 119:6 123:10 124:21 131:20 134:24 141:25 142:16 149:12 170:6,15 175:17,21 176:13,18 182:4,7 211:16, 24 220:7,8,17 221:9 224:12 227:18,19 236:17 249:7 261:18 263:1 277:1 303:25 308:7 310:1 341:17

**baseline** 55:16

**basement** 156:6

**basic** 226:16,17 227:19 241:16

**basically** 28:15 92:17 217:9 266:20 271:13 282:4 283:11 285:10 306:9 332:6

**basing** 194:15 207:16

**basis** 34:11 192:9,12 193:7 229:10 289:24 293:3,23

**Bates** 102:13 215:19 248:19

**Bates-stamped** 101:25 171:13 199:21

**began** 321:24

**begin** 14:21 23:2 65:17 138:1 230:17 307:24

**beginning** 286:20 335:11 337:2 338:21 344:17

**begins** 9:4 337:22

**behalf** 9:17,21,24 10:9, 11,14,16 14:9 19:11 46:16 47:5,9,13 54:21 141:11 212:16

**beings** 257:18,21

**belief** 98:10

**believed** 267:8 290:2

**benefit** 13:17 21:11

**big** 87:10 107:6 159:22

**biggest** 115:7

**bill** 31:22,23 32:2,8 34:10, 12 35:8,9 36:5,15,17 37:6 38:6 39:3,10,23 58:18 59:6,18 60:8,21 61:2,3,4, 12 62:4,7,8,11,15,16,22, 24,25 63:2,5,8,12,16 71:6 96:24 97:15 112:6 113:12 114:16 115:3,19,22,23 116:24,25 119:6,9 135:1 136:2 137:18 139:10 140:17 146:19,20 147:6 150:5 153:21 154:4,5,14, 16,25 155:3,5,6,10 157:13 158:12,17 162:5,8,10,13 172:1 175:11,13,23 176:5 202:23,24 203:1,17 205:3 208:3,5 213:16,18 214:16 215:8 217:7 218:22 219:20 222:16 234:5 236:24 237:18 250:2 260:25 266:4,8 269:6,7, 15,18,20,21,23 270:5,8, 10,16,25 271:13,15 272:5, 19 275:9,21 277:19 281:20 290:17,20 297:12, 23 304:24 306:9 309:11 320:1 322:22,24 323:1,3, 15 326:7 331:19,22,23 332:1,6,11 333:16 335:24 342:1,2 344:19 345:1

**bills** 16:4 18:10,22,24 22:5,6,9,11,13 29:18 30:9, 24 31:6,7,9,14,19,20,21 33:4,20 34:2,3,4,7 35:23 39:25 40:11 48:3,5 55:14, 20 56:7,14,19,20 57:1,3,4, 22 60:17,18,19,24 61:11, 17 62:12 63:13 96:15 99:15 114:16,20,23,25 115:1,22 116:2,7 131:12 134:15 135:3 153:23 154:2,8,12 155:4,25 157:6,7,9 160:15 165:11 204:15 210:15 253:7,8 298:1,2,3 319:3,6,11 325:25 330:25 331:2,6,7 333:22

**binding** 27:4

**birth** 76:16 117:12,17 128:1,5 226:24 311:18,23 312:10 314:9 329:15

**bit** 14:15 22:19 28:12 53:7 60:4 139:21 145:24 339:21 343:11,16

**bizarre** 89:15

**Blackie** 20:7 161:9 162:25 196:1 197:7 199:22 200:4 201:19 202:6 204:4 205:21 248:22 249:7,23 251:7,19 252:20,24 261:16 298:13

**Blackie's** 302:18 303:2 306:17

**blast** 174:4

**blasts** 174:5

**bodies** 47:6 48:2,4 291:3

**body** 38:18 53:5,15 55:9 83:22 84:5,18 203:1 276:21 332:15,16 334:12

**bolster** 307:1

**booklet** 52:20

**booklets** 50:11,19

**born** 78:21,23 117:25 118:4,10 119:11,24 120:7, 22 219:6,24 220:6,8,24 221:7 228:24 311:22

**Borrelli** 196:11

**bottom** 47:8 141:19,20 246:2 279:21 312:9 338:23 341:8

**Boyer** 103:20,21 104:19, 25

**branch** 86:9 192:24

**brand** 270:8

**break** 13:8,11 24:10 65:3 105:10 140:25 190:10,12

230:11,20 263:6 307:16 309:5 318:18 328:10 335:15

**breaking** 64:22 228:21, 22

**breaks** 342:22

**bring** 32:25 47:5 115:2 158:19 160:15 322:24 332:24,25

**broad** 30:12,13 32:19 41:25 42:13 43:7 56:9 60:9 61:8,19 96:18 104:15 156:1 170:19 180:3,21 243:17 260:5

**broker** 45:12

**brought** 32:4 41:24 321:22

**bucks** 128:24 226:20

**budgets** 154:3

**build** 319:13 334:1

**builder** 45:13

**building** 26:6

**bullet** 299:5,18 302:19 303:4 344:3

**bunch** 194:13,20 205:23 259:3

**Bureau** 315:21 316:10,17 317:2

**business** 31:5 55:17

**buy** 127:7 188:12

## C

**C(1)** 281:7

**C(2)** 279:13 281:13

**C12** 58:23

**C5** 58:23,24 59:1,5

**calendar** 34:8,9,12 35:9, 19,20 332:17

**California** 311:22 312:10

**call** 132:7 162:16 177:24 183:3 208:6 218:10,13,15 295:7 319:17

**called** 68:10 178:9 212:4 270:13 331:24

**calling** 102:13

**calls** 48:21 49:13 72:14 76:25 79:14 100:10,16 132:2 133:9 139:6 144:1 148:14 149:2 150:17 174:14,24 177:16 200:23 201:4 203:23 210:22 225:21 226:4 228:18 231:16 239:14 243:2 272:14 284:19 285:7 288:19 294:12 304:20 325:19 334:15 338:12 344:10

**Camelback** 9:14

**camera** 125:5

**cancel** 223:16 225:9,13 228:6 235:16 239:7 271:21 274:20 275:5 303:21

**cancelation** 148:7

**canceled** 148:12 149:16 213:22 214:19 217:20,23, 24 220:8,18 222:13 223:14 224:2 225:16 229:20 231:2,11 283:13 284:6 285:6 339:10

**canceling** 271:22

**cancellation** 236:19 250:7 284:16 292:14,23 299:11,13,19 303:6 343:14

**cancellations** 344:19

**cancelling** 221:23 277:6 284:12 302:22

**cancels** 223:6,24 224:13

**candidate** 72:3,8 330:17

**candidates** 27:23

**capable** 21:15

**capacity** 41:6 46:20

**capitol** 24:7,8,23 26:6 161:6 163:24

**card** 242:13 329:16 345:11

**carried** 323:20

**carry** 31:4 55:2,16 63:19 64:8 127:12 323:17

**carrying** 63:22 64:1,2

**case** 9:8 17:12 23:13,25 24:3 40:2 46:7,16,18,23 48:7 71:14 86:8 99:22 153:14 198:23 199:8 209:23 239:24 269:14 331:8

**cases** 43:18 104:10 133:1 255:14 274:13

**Cat** 9:21

**catch** 260:5

**catch-all** 299:13

**caucus** 27:2,17 196:12 200:10,13 201:3 202:18, 22,23,25 203:6,9,11,15,18 204:10,18,20,21,23 205:5, 7 206:2 249:24 326:12 327:15,16,18 332:24 333:2 335:15

**caucuses** 27:1 203:10

**caucusing** 203:16

**caused** 94:9

**cc'd** 105:7

**CCS** 105:7

**Census** 315:20 316:10,17 317:2

**ceremony** 242:23

**certificate** 76:16 128:2,6, 14 225:19,25 226:2,15 310:11 311:18,24 312:10 314:9,12 329:15

**certificates** 226:24

**certified** 9:11

**Cervantes** 9:19

**chain** 102:10 248:18

**chair** 28:17,19,22 29:17 30:17,22,25 31:3 32:18,23 33:5,6,10,23 35:1 334:12

**chairing** 28:14

**chairman** 28:5,8,25 29:1, 10,14 30:18 31:8,10,16, 18,19,20 32:1,9,13,15,16 33:2,8,24,25 34:5,24 35:2, 19 64:4,7 334:19

**chairman's** 32:23,24,25

**chairs** 32:24

**challenged** 22:22 43:17 85:19 106:1,22 107:17,22 108:19 109:7,10,18 111:11,19 112:1,12 117:11,16 122:10 123:6 131:4 136:5,9,21 137:6 143:13 144:12 147:23 153:14 167:21

**challenging** 330:12

**chamber** 26:7 326:13 332:15 333:13

**chambers** 47:9,14

**change** 53:12 55:5 220:25 222:19 281:20,21 282:5 284:15 286:24 294:7 305:11,20 306:25

**changed** 82:19 169:12 261:11 283:11 286:5,23 287:2 289:12 293:4

**changing** 249:1 293:24

**Chaplik** 216:4 247:16,18 248:23 252:12 277:3 278:8 289:18 292:2 293:22 294:25 295:23 298:20 308:2,17 309:16 324:6

**characterize** 47:19 116:8,9,10 149:22 161:4 168:22

**charge** 26:4

**charges** 98:1

**chat** 25:13

**cheat** 250:25

**check** 76:14 86:13 161:16 218:23 220:8,18 236:18

**checking** 255:22

**checks** 231:14 256:10 259:6,11,16,21 260:9 262:3,11

**chief** 26:10

**chime** 326:14

**choices** 182:4

**choose** 31:17 324:23

**chose** 212:15,18 323:15

**chosen** 324:7,8

**cigarettes** 127:7 188:12

**Cindy** 9:10 125:6,10 130:7 201:25 206:10 219:2 266:18 299:2 302:11 306:12 343:5

**circle** 232:9

**circulate** 263:16

**circulated** 306:5 335:9, 10,11

**circumstances** 304:7,19 305:9

**cite** 183:16

**cities** 30:11

**citizen** 38:17 68:5,15,21 69:3,12,22 70:9,11,15,18, 25 72:21 73:23 74:24 75:15,23 76:6 83:23 84:6, 12,19 86:15 87:21,22 106:18 117:22 118:5 121:14,15 130:4 131:16 193:12 220:24 221:7,8 223:19,23 224:15,20,21 225:3 228:24 229:5,10,11, 12,14 230:24 241:17,23 244:18 245:4,15 271:24 274:24 292:25 303:19 329:13 345:9

**citizen-** 117:22 287:10

**citizens** 77:17,22 89:10 94:8 113:9 118:10 119:14, 16 153:10 178:8,17 179:19 180:16 182:20 187:19 191:25 195:9 212:21 218:5 220:18 242:10 243:15,20 264:13, 17 265:9 288:18 299:20 303:7 329:19

**citizenship** 66:3,5 67:7 69:8,21 70:12 71:2,16 72:13 73:7,10,16 76:11, 17,20 79:10,22 80:6,7,19 81:11 82:15 87:7 92:22 117:12,17 126:25 127:8, 16,19,23 129:3,11,24 130:6,10,23 187:6,11,21 188:5,8,20 189:25 193:4, 12 195:1,3,6 197:19 201:12 202:8 206:18 220:25 221:10 224:4,12, 25 225:5,8 227:10,25 239:9 244:15 245:20 256:13,21 264:19 275:10 287:23 288:9 302:21 313:6 317:18 330:6,19 337:7 339:12

**claim** 183:23 184:2

**claims** 47:5

**clarification** 329:10

**clarify** 28:21 96:13 110:1 111:3 122:15 135:14 145:16,25 230:21 276:1

**clause** 202:18 288:2,7

**clean** 250:19

**cleaning** 255:21 257:14 327:1

**clear** 12:19 19:2 75:8 150:2 227:8 245:13 309:19 343:1

**cleared** 278:6

**clicking** 20:21

**close** 43:10,13 340:18

**Club** 158:11 160:6,20,23 161:11,13 163:17 164:17 165:14 166:17 167:5,24 171:19 172:17 175:13,15, 20 178:6 183:23 184:2,16 193:22 194:17 238:6 240:11 247:15,22 295:10 298:23 318:3 331:1

**Club's** 169:7 182:14,16

**co-counsel** 346:11

**Coalition** 10:10

**Coash** 9:11

**codified** 53:9,11 271:3

**colleagues** 199:4

**colleagues'** 205:1

**collect** 185:13 212:6

**collecting** 23:21 36:13

**comments** 18:21 87:15

**commissioner** 223:3,21 232:11 246:13

**committal** 135:4

**committee** 10:14 22:4 28:5,18,19,21,25 29:2,11, 19,20,21,24 30:3,8,9,13, 16,23 31:5,11,15 32:1,3,4, 5,11,14 33:1,3,12,18,21 36:4,9,10,11,16,17,19 37:6,9,10,11,13,16,17,22, 25 38:10,14,20 39:2,13, 17,18,20 40:8,10,14,15 48:7 57:10,21 58:9,16,18, 23 59:5,11,18 64:3,5,11, 12,13,14 125:2 135:7 145:15 158:2 169:15 190:22 196:11 202:24,25 203:2 208:4,10 238:2 249:4 251:21 268:11,16 270:5,15,16,18 274:1 296:2,3,9,21,25 297:2,4, 12,16 319:22 324:20 327:21 331:20 332:2,4,8, 10,25 335:11,13 341:18

**committee's** 35:23

**committees** 36:20 38:5 58:11,14 157:20,24 237:19 290:19

**common** 38:3 54:25 108:1,18 109:11,17 174:5 309:24 319:9 333:9,18,25

**communicate** 17:6,11, 14 73:8,13 162:3,24 163:20

**communicating** 162:9

**communication** 98:25 99:2 164:1

**communications** 17:8

**communities** 173:9

**company** 45:13

**compare** 218:6 241:21 244:7,12 245:11,14 250:11 300:17

**compared** 151:18

**comparing** 218:4

**complaint** 30:2

**complete** 14:4 193:25 301:11,14,15

**completely** 35:18 62:2 159:21 269:19 270:9 323:1

**completing** 303:22

**complied** 23:15

**comply** 52:23,25 53:22

**Compound** 73:24 88:6 287:1

**compromise** 308:22 309:14,15

**concept** 284:25 326:24 327:2 333:7

**concepts** 282:4 285:25 289:12

**concern** 87:6 88:15,24 90:13 92:23 94:10 106:15 108:9,10,16 123:21 182:14,17 210:21 255:18 271:16 275:18,24 276:20 277:23 278:1,3,9 294:4 306:10 331:19 343:2

**concerned** 45:1 87:11 88:23 89:1,11,17 93:21,25 106:24 107:8,18 108:4,12, 15,20 175:7 178:7 179:16 180:12

**concerns** 87:24 88:2 106:17 204:18 205:1,5 210:14 213:16 215:9 216:15 266:21,25 267:3 274:19 275:12 276:16 282:5 285:12,14 286:7 295:2 298:21 307:7 308:3, 4,8,10,19,22,23 309:17 341:23 342:3

**concise** 271:12

**concluded** 346:22

**concludes** 185:22

**concluding** 69:18

**conclusion** 71:4,12

72:15 79:15 127:17 132:2 133:10 137:16 139:7 144:2 148:18 149:5 187:14 192:11 222:4 228:2 231:17 233:2 236:20 242:5,16 244:1 245:7 250:10 260:17 262:22 284:20 285:7 288:11,19 289:2 300:2 317:21 338:13 339:5 344:11

**conclusions** 61:16

**concrete** 91:25

**conduct** 28:16 63:5 136:20

**conducted** 114:15

**conducting** 28:13 33:11

**conference** 295:6

**confidence** 44:19,24 106:6,8,23 107:18,21,24 108:20 109:10,19,22 110:11 111:12 167:12 174:12,18,22

**confident** 41:23 42:11,17 43:6 44:10 199:3,5,6

**confirm** 20:13 122:16 143:8 223:9 225:3 340:11, 13

**confirmed** 223:1 231:9 236:17

**confirms** 223:18 230:23 299:12

**confusing** 11:11 29:13 158:13

**confusion** 82:7

**Congress** 207:5,10

**congressional** 138:5,6, 16 139:4,15 140:11 206:21

**connected** 107:11

**connection** 85:7,18 136:21 137:6 184:18

**cons** 61:7

**consensus** 308:18 319:13 334:1

**consent** 212:15

**consideration** 111:23 135:19 136:13 168:5 210:19,20 211:3,4 212:3, 12

**considered** 112:2 143:7 316:16

**considers** 59:18

**consists** 29:25

**constantly** 115:5

**constituency** 91:8

**constituent** 210:12

**constituents** 87:6,11 88:15,24 107:10 115:8 123:17 144:5,11

**constituents'** 87:24

**constitution** 36:12 66:1 67:24 68:4,24 69:5,13,25 70:4,14,16 72:20 74:1,2 192:13,14 198:20,21 199:8 207:13,14,15,17,20 208:8

**constitutional** 30:24 31:6,12 32:8 35:24 36:1, 15 38:7 39:3,24 59:19 75:14 126:3 186:1 188:24 189:6 197:3,7 207:7,9,10, 22 208:7

**constitutionality** 36:1,4 37:5,21,25 38:6,8,9,11 39:10 40:11 57:10,22 59:7,10

**constitutionally** 207:5

**construction** 45:13

**consult** 346:1

**content** 14:17 17:16 22:11

**contents** 24:13 50:18

**contested** 26:22 27:16, 18,20

**context** 143:3 191:23 229:7,8 308:1

**continue** 192:17 323:13, 14

**continued** 216:13

**continuously** 41:6

**contrary** 142:3

**conversation** 100:4,6 104:4 167:19 211:5

**conversations** 14:18 17:17 122:17 123:13

**convey** 276:21

**convicted** 254:1,6

**convince** 104:12

**copied** 248:16

**copies** 16:11 226:24 227:20

**copy** 52:16 128:1,22 130:5,6 137:19,20 155:9 225:18,25 226:1,2,15,19 230:2,9 310:10 312:8 317:17 343:1

**corner** 341:9

**corpus** 55:10

**correct** 18:19 19:2,3 23:19,20 24:1 25:1,19,23 29:4,5 30:17 31:13 35:22, 25 37:22 38:13 39:21 40:23 41:9,11,19,22,24 42:12 43:15,22 44:9,20 45:25 46:2,3 48:13 50:23 53:9 54:22,23 55:1 57:22 59:10,22 61:2,18 62:5 67:24 68:14,25 69:5,6,9 70:1,18 71:11 72:9,13,21 75:21 76:7 77:24 79:7 80:20 82:16 83:15,17 84:21 85:2,4,9 86:25 87:25 91:1,17 92:1 93:3 94:11 95:7,17,24 96:7,8, 16 98:16,17 100:24 101:5 103:23 104:12 105:20,23 110:2 113:11,13 114:21 118:11 122:18,19 127:16 129:3 134:25 135:1 136:5 140:7 142:9 143:10,14,18, 25 144:13 146:3 147:19 148:3,5,8,13,25 149:1,19 150:7,15 152:23 153:16 157:1 160:9 163:17 164:14 172:1,9,10 175:14 178:1,11,21 179:5 181:15 184:20 187:12,21 188:5,6, 8,21 189:7,15,25 190:22 191:15,16 194:16,25 196:17,18 203:19 205:24 206:1,3,4,19,22,23 208:21 210:15 211:8 212:16 214:20 219:24 220:11,12, 13,19,25 224:24 225:6 227:2,10 229:1,17 231:11, 15 233:1 235:9 239:2,10 241:7,24 242:23 243:7,13 244:10,24,25 246:9,21,23 247:17,20,21 248:13,14, 16,25 249:5,6,10,25 250:3 251:21,22 252:22 257:2 261:14 263:14 265:10 268:16,18,21,22 269:8,9 271:1,2,4,5 272:2,25 273:9,10,15 274:4,5,16 277:4 278:13,14,19 282:13 283:2,25 284:6,11, 16 285:19,22 286:9 288:10,18,20 289:1,25 292:2,5,18 294:8,17 297:19,21 298:18 301:9 302:8,23 303:15 304:1,2, 8,9,10,13,16,17 305:9,10 308:4 309:20 310:5,9,11, 19 311:19,20 312:13 313:22,23 315:10,21 318:5,12 319:1,25 320:3, 8,9,11,13,15,16,19,22 321:6 322:16,19 324:21, 22 325:11,18 326:10,11, 21 327:7,13,25 342:7

**correctly** 75:5 84:13 93:5 142:7 192:3 193:5 194:5 200:17 230:5 271:25 272:6,9

**correspondence** 144:11 145:2,13

**cosponsor** 63:2,3,7 157:12,13,15,17

**cosponsors** 63:11 157:9

**cost** 115:18 126:24 128:13,16 129:2 132:17 226:14 314:13,24 315:2

**cost-benefit** 136:20

**costly** 127:12,23 128:1,2 131:19,24

**costs** 128:5,9 226:19 314:8

**council** 155:25 156:7 194:2 197:3 332:17

**counsel** 10:3,25 25:19 64:21 199:12 328:17 345:22

**Counselor** 20:21

**Counsels** 9:15

**count** 106:5 212:24

**counted** 43:12

**counties** 30:11 259:3 260:1,9,20 261:2,6 262:2, 10,18,23 263:2 308:20 309:12

**counties'** 308:23

**countries** 106:17 181:10

**country** 119:20 121:14 127:10,11

**county** 10:17 75:3 99:5 110:21 131:4,5,12,13 134:15,16 135:3,24 185:20 218:4 222:2,17,19, 23 223:5,7,10,11,16,17, 20,24,25 224:12 225:8,13, 14 228:6,7 230:22,25 231:9,13,21 232:5,13,19 235:15 236:2,18 239:7,10 241:22 244:7 246:14 258:11 261:9 266:16 271:18,22 274:19,23 275:3 277:6 283:12 288:17 299:11 303:20 304:13 314:21 336:18,20, 24 337:5 338:4 339:2,8 340:1,6

**couple** 12:19 16:25

**court** 9:7,10,11 10:18 11:11 12:23 13:17 19:9, 17,20 58:20 66:24 79:2 82:5 142:17 152:6 161:21 179:22 189:1 192:20 206:12 219:3 222:20 241:10 265:4 273:4 299:3 303:17 339:18

**court's** 308:22

**courts** 251:23

**cover** 30:13 331:14

**covering** 179:25

**Covert** 174:1 248:12

**COW** 251:20 319:15,17, 18 326:12 327:16 332:17 341:1

**Crandell** 10:2

**crazy** 266:18

**crime** 93:12

**criminal** 94:11 136:10 228:1,12,16 231:3

**critical** 106:18 250:19

**cross-reference** 254:11

**cure** 177:6

**current** 16:15,20 45:25 64:6 98:11,18 140:23 250:19 292:13 299:20,25 303:8 311:21 315:7

**cut** 219:1

## D

**DACA** 87:14,19 89:7

**dad** 132:13

**database** 229:17 231:14 232:2 241:21,22,24 244:9, 18,24 245:3,15,20 256:10, 12 259:6,11,16,21 260:9 262:3,11

**databases** 254:10

**datasets** 121:2

**date** 9:9 146:7,17,18,22 147:4,14,22 151:17,25 249:14 258:9 302:14 320:2,6 327:24

**day** 14:25 15:11 18:1 27:10 65:10 191:7 196:16 241:14,15 268:18,20 273:12 274:4,8,9,14 290:6 294:7 298:16 314:22 318:25 319:4,6 326:9,21 327:13,15

**days** 14:23 57:2 118:25 146:12,17 147:4,17,18 223:13,15 224:2,11,20,24 225:8,13,16 227:9,25 228:6 229:19 231:10 239:9,12,16,19 240:20,22 241:14 243:5 250:7 271:20 274:20 275:4,9 276:15 283:13 284:6 286:25 287:3 293:24,25 294:11,18 302:7,14 303:11,24 304:25 305:1,5, 8,22 308:9,25 309:3,25 311:7,9,10,13 312:13,16, 20 313:22,24 320:4 333:19 339:10 340:16 343:25 344:1,5 345:2

**dead** 216:14 255:12

**deadline** 35:9

**deal** 328:11

**dealing** 333:25

**deals** 148:7

**debate** 325:3 326:1 332:10

**December** 9:9

**decide** 29:18 31:11 34:8, 9 39:9 88:9 112:5 155:13 160:17 177:18,22

**decided** 94:1 323:16

**decides** 33:6 34:5 53:8

**decision** 34:11 36:14 48:17 96:15 98:5 116:12 120:19 143:16 194:7 229:14 323:18

**decision-making** 120:18

**decisions** 97:19

**decisive** 171:4

**declaration** 71:9 72:5,6

**declared** 75:23,24

**declaring** 71:16 76:5

**decorum** 28:15 31:3

**deemed** 80:5 201:11 236:16

**deep** 219:20

**defend** 49:4,6 142:2 154:9

**defendant** 14:8

**defended** 46:25 49:2

**defense** 141:25 142:4,16 143:11

**delay** 151:5

**delegated** 28:16 29:1

**deliberated** 95:22

**deliberating** 96:23

**Democrat** 125:21 341:25

**Democratic** 10:14,15 174:12

**Democrats** 27:4 106:14 125:1,13 203:10,16 291:11,12

**Department** 314:9

**depending** 45:23 314:24

**depends** 35:14 45:16 60:16 62:2 63:18 128:7 298:2,3 311:18 333:20

**deposition** 9:5,13 12:18, 24 14:16,22 15:9,19 16:17,20,24 17:1,5,14 18:2,6 20:1 22:17 154:17 346:5,20

**depositions** 11:18

**describe** 17:8,16 173:4 282:3 286:12,14

**description** 61:22 239:6 299:8

**design** 194:3

**designate** 11:17,19,22

**designations** 11:20

**desiring** 72:3

**desk** 271:14

**deter** 131:6,14 134:17 135:5,22 136:11

**determination** 38:22

**determine** 27:6 61:12 189:11 192:1,7 227:8,14 244:15,20 294:10

**determines** 26:18 53:5 231:14

**deterred** 135:16
**deters** 131:16
**die** 333:6
**died** 255:9 323:24
**difference** 31:22 48:17 62:14 63:21 106:16 118:9 119:10 140:10 209:24 214:6 285:5,24 339:7,8
**differences** 119:24
**differentiating** 139:15
**differently** 32:24 118:2, 16 119:8 122:13 123:10 262:19 288:6
**difficult** 129:20 168:24 169:2
**difficulty** 130:22
**direct** 57:23
**directing** 230:5
**direction** 338:4
**directly** 105:8 173:21 249:8 335:14
**disagree** 37:20 70:25 104:24 105:1 126:4 149:21 251:9 262:19,24 263:2 265:18,19,20 325:22 326:15
**disappointed** 153:4,9
**disclosed** 137:11
**disclosure** 302:2,3 303:16 305:2
**discretion** 32:16
**discriminate** 112:8 116:25
**discriminates** 112:7
**discuss** 16:20 205:5 295:7
**discussed** 16:23 22:16 29:3 191:15 318:2 325:13 342:22
**discussion** 18:2 19:6 67:18 83:6 119:21 120:15, 16 121:22 141:14 162:12 230:1 318:8 341:18,21 342:11
**discussions** 101:19 212:4
**disparate** 118:6
**dispassionate** 63:6
**dispositive** 256:23
**disseminated** 173:18
**distinction** 62:19 270:12 271:17
**distribute** 253:18
**distributed** 253:13
**distributing** 253:15
**district** 9:7 144:16
**districts** 107:12
**disturb** 80:8
**disturbed** 267:6
**document** 49:21,25 50:7, 15 66:14 74:9 83:7 102:3 141:15 171:14 174:24 196:2 199:10 200:1 205:8, 17 206:6 210:6 214:10 215:13 238:21 247:5 248:8 249:20 252:17 259:22 261:19 273:5,20 274:10 291:23 298:10 312:5 314:5 315:17 316:21 335:1,7,9,10 341:12
**documentary** 69:8 76:11 79:9,22 80:6,19 81:11 82:15 126:25 127:16,23 129:2,11,24 130:22 187:5, 10,20 188:4,8,20 189:24 195:3 202:8 206:18 224:25 225:4,8 227:9,24, 25 239:9 264:18 302:21 317:18
**documentation** 76:1
**documents** 15:24 16:2,6 19:25 22:1,3,19,21 23:2,6, 11,17,21,25 24:2,14,16 25:4,6,17 128:3 130:2,4,9, 12,14,18 224:5 226:16,17 227:19 241:16 305:5 313:6 317:23 339:13
**dollars** 109:23
**double-check** 198:22
**doubt** 42:5 214:2
**DPOC** 129:20,22 185:25 302:9,14,16 303:10 312:16
**draft** 60:19,21 157:9 273:9 333:8
**drafted** 51:18,20,25 62:5 64:9 160:3 336:17
**drafting** 155:19,20 156:3, 8
**drafts** 155:25
**draw** 141:12
**drill** 62:18
**drive** 266:18
**driven** 37:19
**driver** 340:8
**driver's** 128:19,20 241:21 242:14,25 243:25 282:19 329:14
**drop** 157:10
**dropped** 157:17
**dual** 345:9
**Ducey** 80:23 263:14 267:8,19
**due** 38:6 267:4 307:1 308:4,8,10
**duly** 10:22
**duplicate** 128:13
**duties** 58:17

**E**

**earlier** 18:4 28:10 44:10 62:6 76:9 105:18 110:17 116:3 133:22 145:24 153:22 156:13 159:7,8 166:3 167:19 178:7 189:22 196:16 206:6 232:3 279:23 286:1 310:9 311:17 318:2 324:17 326:23,24 345:8
**earliest** 320:18
**early** 209:7,14 341:2
**ease** 130:21
**easier** 311:7 323:1
**East** 9:13
**easy** 129:20 168:22,24 169:2 250:25
**echo** 339:19
**educational** 165:1
**effect** 81:3 109:19 146:24 148:1 151:1 153:5,8,9,10 320:6,18,22,24,25 321:5, 9,10,14
**effective** 53:4 146:7,17, 18,22,24 147:4,14,22 320:2,6 344:20 345:2
**effort** 188:24 189:2,5 290:22
**elect** 267:10
**elected** 26:21 38:18 40:20 41:1 43:1,3,4 45:4 65:23 71:3 75:3 329:12
**election** 26:22 27:3 43:21 44:7,16 45:1,2 72:9 73:21 74:25 75:4 98:24 99:12 101:20 102:25 104:5,6,12 106:9,17 107:13 109:8 133:23 140:3 148:2,12 149:19 150:7 176:4 179:15 180:10,25 181:9 182:17 213:1 257:7 292:20 303:16 307:9 310:2,8 325:24 344:20 345:3
**elections** 29:12 30:7 41:11,16,24 42:6,9,12,15, 18,22 43:5,16 44:10,20,25 98:23 106:2,4,15 107:8 108:6,13 138:6,7,16,17 139:3,4,16,24 140:1,2,11 151:2 171:25 179:17 180:13 182:15,18 183:12, 17 184:5,20 186:7,10 188:25 189:6,15 192:8 197:4 206:19,22 207:11 247:21 255:9 292:17 299:21 300:1,8,17,20,21 302:25 318:5 320:7

**elector** 267:11 292:14

**electors** 186:3 188:21 192:18,19,22,23 201:15

**eligibility** 189:12 218:7 244:10 250:8 254:11

**eligible** 91:10,11 148:21 149:9,23 187:19,23 188:7,12,14,16 209:9 217:10,23 250:24 251:3,15,16 255:6 258:8 264:2,11,13,16,25 265:8 302:15 327:2

**eliminate** 148:20,21

**Elisabeth** 10:11

**else's** 307:8

**email** 20:7 24:24 25:2,3,5,7 102:10 144:17,22 164:4,5 171:18,24 173:16,19 174:3 175:17 183:16,18 185:22 195:25 196:6,15,23 199:21 200:4 205:20 210:9 211:8,23,24,25 212:13,15 248:11,15 249:23 252:20 292:1 298:13 299:5 302:19,21,24 303:2 306:18 318:3 331:9,12

**emails** 20:3,4,6,9,13,15 24:21 105:6 145:5,14,17 162:10,20,21,23 164:5,6 167:16,17 169:15 210:25 212:23 248:22 333:3

**EMP** 301:14

**employment** 26:18

**enacted** 216:18 217:5

**enactment** 43:17 85:7,18 143:12 155:17 169:8

**end** 47:8,16 65:13 110:5 137:22 165:13 185:22 230:14 307:19 319:11 327:15 333:21 342:15 346:4

**ended** 44:2 46:10 147:17

**ends** 146:12 156:8 336:11 346:19

**enforce** 86:11,17,20

**enforcement** 98:13

182:11 185:10,14

**English** 345:18

**engrossed** 272:19 326:3

**ensued** 65:15 67:18 83:6 105:14 137:24 141:5,14 190:16 230:1,15 263:10 307:20 328:14 346:7

**ensure** 35:23 250:19 260:9,10 262:3,11,12 265:8 267:4 295:11,18

**ensuring** 250:24 257:7

**entail** 36:2 118:21

**entering** 258:12

**Enterprise** 158:10 159:10 160:6,20,22 161:11,12 163:17 164:17 165:14 166:16 167:5,24 169:7 170:16 171:19 172:17 175:13,15,19 178:6 182:14,16 183:22 184:2,16 193:22 194:17 198:15 238:5 240:11 247:15,22 295:10 298:23 318:3 331:1

**Enterprise's** 182:13,21

**entire** 260:16 273:24

**entitled** 317:10,13

**Entitlement** 218:16

**envelope** 224:6 339:14

**Envy** 41:17

**EPM** 292:16,22 301:7,11 303:13 305:2 342:19,20,24 343:21

**EPM's** 303:25

**equally** 124:18 125:24 263:25 264:8

**Equity** 9:18,22 10:10

**equivalent** 340:8

**Erika** 9:19

**essentially** 285:23 289:12 290:17

**establish** 83:23 84:5,18 85:8,22 86:6

**established** 50:23 86:8

**Establishing** 86:10

**estate** 45:6,9,11,12

**et al** 9:6

**ethics** 29:11,14,22,24 30:3

**ethnicity** 112:25 113:3,6,16

**evaluate** 88:3 106:22 107:17,23,25 108:19 109:14,18 110:10 111:10,19 112:12,24 113:21 116:17,23 117:11,16,24 119:5 120:21 121:10 124:6,14 125:17 126:7 127:22 131:3,11 135:2 167:20

**evaluated** 113:11 132:16 134:14

**evaluation** 113:15 114:4 116:20 117:19,20,21 118:20,21 120:4 121:12 122:9,11,16,21 123:5,9,12,16 124:17,19 130:21 131:15,17,21,24 134:22,24 136:22,24 178:10

**evaluations** 122:3

**everybody's** 82:7 323:2

**evidence** 76:6 80:7 95:7 96:14 102:24 103:5 143:19,24 160:25 178:10,19 182:4,8 183:16,20,23 184:2,4,11 185:5 201:11 215:1 216:10,21 222:5 224:3 225:12 227:13 228:3,5 236:21 241:14 245:8 249:12 250:8,9 260:18 262:6 267:13 268:23 271:19 273:14 274:21 275:4 277:16 279:4 283:14 287:22 288:9,12 289:3 296:4,10 297:6 299:9 300:3 314:18 316:13 317:20 339:11

**exact** 14:25 48:8 218:3 310:15

**examination** 11:1 12:11 329:6

**examined** 10:23 61:7

**examples** 91:25 94:18 181:3

**exception** 43:15

**excuse** 34:2

**executive** 86:9

**exercise** 267:19,22 337:9

**exhibit** 49:21 54:4 66:13,14,22 67:3 71:23 74:9 80:1 82:4 83:7,13,19 85:11,25 86:3 102:3 141:15 171:14 190:9 196:2 199:13 200:1 205:17 210:5,6 214:10,13 215:13 238:21 247:5 248:8 249:20 252:17 263:17,18 273:2,5 280:5 291:23 294:20 298:10 301:14,15 312:5 314:5 315:17 316:21 334:25 337:15 340:20 342:18,23 343:7 344:16,23,24

**exist** 54:18 178:16,17

**existed** 157:16

**existing** 239:7

**expect** 52:25 119:19 130:5 184:1,7

**expected** 52:23 53:22 183:22 330:3

**expedite** 11:1 73:5

**experience** 55:3 88:9 90:12,14,15,21 91:6 96:21 119:22,25 124:20 129:1 130:1,17 131:20 132:6,10,18 134:25 135:1 144:5 212:25 213:1 226:24 267:18

**experiences** 91:6 119:1

**experiment** 108:22

**experts** 119:13

**expire** 311:3

**explain** 28:12 73:12 114:13 169:6 271:8

**explains** 298:19

**explanation** 250:5 260:14 272:7,8,13 273:8, 24 274:17,25 290:4 305:25 306:1,4,7 307:13 325:6 335:3

**explanations** 305:19,24 306:6

**extent** 132:1 139:6 245:10,14

**extra** 115:22

**extremely** 43:10,13

F

**fact** 70:17 87:12 88:4,18 89:14,25 119:19 178:11, 20 194:24 196:20 197:11 204:17 238:24 247:14 253:21 257:1 315:20 319:10 320:5 341:22 342:5 343:13

**factors** 34:17

**facts** 71:10 72:7 160:24

**fade** 125:5

**failed** 264:18

**fails** 223:15 239:8

**failure** 223:13 340:15

**fair** 21:1 62:22 118:7 119:9 139:12 143:10 144:10 156:10 169:7 202:15 211:15 224:23 231:7 247:13,21 249:7 252:1 269:10 272:11 290:4 295:10 318:9 324:4 327:20 343:17

**false** 125:18,19,20 126:8, 12 178:15

**falsely** 267:10

**Familia** 9:6 10:12

**familiar** 63:9,15,20 160:5, 7 229:1 323:2,3 324:20 325:11,12,17 326:2 343:10,12,13

**fashion** 22:24

**faster** 238:18

**favor** 169:15

**feasible** 168:13

**February** 171:20

**federal** 41:22 148:2 149:19

**federal-only** 137:9,15 138:5,15,16,24,25 139:3 186:1 193:10 195:7 208:19,25 209:25 288:10, 16 304:16

**fee** 314:12

**feed** 142:23

**feedback** 36:7 62:1 67:13 115:6,8 123:16 124:24 144:5 309:12

**feel** 35:12 39:3 132:20 134:22 207:4 226:16 227:15 229:7 230:4 305:4 309:1 312:19 313:17

**feeling** 12:1

**feels** 39:23 344:18

**fees** 314:14

**fellow** 77:17,22 78:1 103:23

**felon** 292:16

**felonies** 254:1,7

**felt** 198:25 199:1,3,5,6 209:17 210:2 227:15 239:20 265:21,23,25 266:6 307:5,6

**Fifty-sixth** 49:20

**figure** 311:3

**file** 72:3 157:6 330:17

**filed** 54:20 98:1 141:10 150:25

**fill** 211:2

**final** 26:5 201:9 270:25 326:24 333:8,19 344:3

**finally** 319:20

**find** 52:9 57:18 86:23 89:24 173:9 185:5 225:18 227:1 269:17 271:7 313:13 328:21

**finding** 100:14 115:19 185:3,4

**findings** 95:23 96:2,7,8 114:21,23 115:14 116:3,5, 6 169:20,23 170:4 184:19, 21,25

**fine** 58:6 65:1 82:9 166:12 167:3,4 220:16 276:11 293:19 297:24 301:2 322:1

**finish** 13:11 109:15 120:9 161:23,24 188:1 206:16 235:4 276:8

**fire** 26:10

**firings** 26:5

**firms** 161:5

**fit** 334:16

**fits** 270:9

**five-minute** 64:23

**fix** 172:1 175:11,12,14,23 176:19 177:1 308:18

**flag** 256:20

**flagging** 334:5

**flesh** 332:11

**flexibility** 194:2

**flexible** 30:1 63:4

**flip** 191:17 337:15

**floor** 18:21 22:4 251:19 268:14,15 269:11 270:4,7, 13,21 271:8 272:7 273:8, 12,22 276:4 290:5 296:17, 24 297:1 298:16 306:4,8 319:8,14,23 325:3,4 326:1 327:17,18 331:13,15,17, 18 332:20,21 333:1,4,5,6, 11,12,13,17,21 334:3,16, 18,23 335:3,14,19 337:16 340:1 341:18 342:6 345:6

**focus** 165:7 338:20

**folks** 117:25

**follow** 27:7 89:13 90:25 188:15,17 235:4

**follow-up** 345:24

**follow-ups** 323:7 328:11

**Fontes** 9:7

**force** 98:23,24 99:13 200:15

**forget** 166:12

**form** 11:2 21:6 30:24 35:24 38:25 39:14 59:7 67:25 68:17 71:19,20 72:5 88:5 140:12 189:11 194:1 198:9 211:1,8,14,15,23,25 212:7,8 213:20 214:18 221:1 222:24 223:8,13 224:14 229:5 231:22 232:6 233:20 252:3 280:25 336:19,24 337:6, 14 338:7,9 340:10,15

**formal** 32:11

**formats** 25:9

**formatting** 281:21 286:3

**forms** 119:4 178:16 194:3 292:7 312:2

**forward** 27:11 35:12,13 55:2 63:6 80:14 106:19 115:9 176:5 246:14

**forwardable** 223:7 224:1 338:8 339:9 340:7

**forwarded** 248:12

**forwards** 248:15

**found** 211:17 222:16 313:21

**foundation** 40:5 56:15, 24 57:11 59:15 66:7 77:19 95:2,9,10 96:18 100:10,25 101:6 106:25 107:3 110:13 111:13 112:18,19 113:17 114:9 117:8 121:6 122:5,6,23,24 124:10 129:7,16 130:24 134:20 136:17 137:2 138:18 139:8 148:16 149:4 155:22 156:21 158:9 160:10 165:18 167:8 168:8,14 170:8,20 172:12, 21 173:12 174:16 176:1,9, 15 177:16 183:25 185:8, 15 186:15 189:8 202:9 203:23 208:1,2,23 213:25 215:1 216:21 217:15

219:7 221:17 225:21 226:4 229:2 239:14 244:13 247:24 253:3 255:20 256:16 257:12,13 258:14,21 259:12,19 266:23 267:13 269:1 272:16 273:14,21 275:13 276:17 293:7,8 294:1 295:3,14 297:6 304:22 305:13 308:11 315:11 325:20

**four-year** 41:17

**fourth** 196:25 266:13

**frame** 240:12 249:15 286:24 304:18 313:18

**frames** 310:23 311:3 342:12

**framework** 197:2

**fraud** 98:25 99:7,25 101:20 102:24 103:6,10 104:6,11,12 110:21 134:7 185:19

**Free** 158:10 159:10 160:5, 20,22 161:11,12 163:17 164:16 165:14 166:16 167:5,24 170:16 171:19 172:17 175:12,15 178:5 182:13,16,21 183:22 184:1,16 193:21 194:17 198:15 238:5 240:10 247:15,22 298:23 318:3 331:1

**front** 158:15 222:11 226:6 335:25

**Frost** 10:11

**frustrating** 230:7

**full** 12:13,14,15 46:17,22 47:10 90:21 192:7 246:8, 20 250:6 253:21 306:20 343:1

**full-ballot** 302:16

**full-time** 23:20 45:7

**fully** 43:6

**functionality** 25:13

**functions** 30:15

**funded** 160:20,21

G

**garbage** 257:8 258:2,12

**gather** 38:2

**gave** 97:23 305:8

**gender** 123:6,10,18 124:3

**general** 10:7 34:24 98:23 100:24 101:4,20 103:9 113:2,9 116:3 131:5,13 134:17 139:23 140:2 146:7 151:25 165:12 185:19 216:19 225:15 228:8 320:2,6 344:20 345:3

**general's** 43:10 98:12,19 99:12 100:2 101:14 104:10 110:20 133:24

**generalities** 158:24

**generally** 11:2 56:8 64:16 115:15 140:1 148:5 153:18 154:8,21 155:4 191:15 267:19 308:7

**generating** 115:8

**germane** 59:9 269:18,21 270:9

**germaneness** 59:8

**give** 14:3 21:5 40:18 53:2 55:15 67:14 71:22 108:25 138:22 152:4 180:24 181:3 271:24 336:18 340:1 342:9

**giving** 21:24 36:11 62:10 274:22

**Glad** 17:20

**global** 11:10

**Gonzales** 102:19 103:12 104:25

**good** 45:2 55:7 61:13 64:22 65:4 68:14 76:10,15 77:7,11,12,14 82:10 88:10 170:5 179:18,19,20 180:2, 14,15,19,20,25 181:3,5,6, 12,15,19,23 227:20 266:6 311:1 333:9

**Gordon** 10:16

**gosh** 78:20

**government** 29:12,15 30:7,9 37:18 249:4 330:1

**governor** 80:3,23 81:5,20 202:6 216:15 263:14 265:18 267:8,19 270:25 274:19 275:15,22 276:24 291:4,7 295:1,18 298:21 305:15,16 307:2,6,12 308:18 309:6,10,17 313:24,25 319:1 320:1 334:2

**governor's** 80:10 201:21 267:15 271:14 275:12,18 276:16,20,25 277:22 278:1,9 281:25 282:5 285:11,13,24 286:7 289:15,17 291:1,9 293:23 294:4 295:7,11,22 306:10 308:3 341:23

**Gowan** 28:1

**grafted** 341:22

**granted** 80:8

**great** 14:13 76:12 88:23 102:9 141:2 190:13 206:13 257:24 277:5 290:10 319:17 336:2 342:1 346:2

**Green** 242:13 345:11

**Greg** 20:7 161:9 162:25 164:23 252:13 261:15,16

**Greg's** 165:1

**grounds** 11:5,21

**group** 115:2 164:18 170:24 173:4 177:13 194:13,22 329:20,21

**groups** 111:20 145:13 253:6,7 309:13,18 326:13

**guardrails** 267:9

**guess** 18:9 26:5 31:4 36:23 110:16 123:19 128:23 140:25 144:6,8 155:5,9 158:19 169:4 192:17 196:16 255:1 266:12 330:16 331:8,19

**guessing** 140:16

**guidance** 204:9,17 339:1 340:2

**guideline** 53:2

**guys** 106:12 319:21 335:14 345:16

H

**hand** 110:20 141:10 238:10

**hand-off** 328:21

**handed** 167:17

**Hannah** 9:23

**Hans** 248:22 249:3

**happen** 32:1 131:23 147:2 243:12

**happened** 179:5,6 286:3 322:22,23 323:21 326:9, 21,22 327:13,14,24

**happening** 88:19

**happy** 72:18 155:10

**harbor** 80:8

**hard** 35:7 123:24 168:19, 22 169:2 250:25

**Harding** 292:3

**harmed** 264:16

**harvesting** 99:22,24

**hat** 45:12

**Hawaiian** 10:10

**HB** 18:23 19:2,4,6 44:1 80:7 81:11 85:7,21 137:14 146:2,9 147:2 148:7 151:1 153:19 155:17 156:18,25 157:19 158:7 161:19 165:16,22 166:17 167:6 168:7 169:8 170:17 171:2, 6 176:18 184:19 188:3,23 191:15,24 196:20,24 197:1 200:10,14 213:11, 18 214:24 216:7,8 221:24 238:4 246:7 248:24 249:10,25 250:19 252:21 263:14 264:3 266:14,16, 21 267:9 268:15 269:9 278:12 280:23 283:24

292:7 297:13,21 304:5 306:24 318:25

**HB2243** 216:4

**HB2492** 172:6

**HB2617** 216:4

**head** 128:11,15,23 136:6 140:6 142:20 172:7 232:1 331:5

**header** 172:8 252:21

**headers** 172:7

**heading** 175:9 197:13 198:2,9 246:1 259:2,25

**headline** 171:24 172:2,14

**Health** 314:9

**hear** 29:18 30:16 31:7,10, 18,21 36:8,9,10 38:3 56:19,20 107:12 125:1,8, 9,10 126:1 132:11 172:4 175:6 177:21 218:12 308:25 333:1

**heard** 29:18,19 32:2,3,4,7 48:3,5 57:5 60:25 87:4,5, 12 88:20,22,25 89:2 92:19 123:19,20 124:3,4 172:25 178:15,16,25 185:17,18 208:15 240:9 318:12,13, 14,17,19

**hearing** 18:20 28:18 31:22 32:3 123:24 124:5 135:16 190:22 191:14 196:17 199:4 297:17 308:20 324:21

**hearings** 18:13 56:13,14 63:8 158:2,4,6 297:12,15

**hears** 30:9

**hearsay** 110:19

**Heather** 173:24 248:12

**held** 25:24 190:22 217:17

**help-** 169:10

**helped** 22:1 158:11 159:20,22 169:10

**helpful** 256:23

**helps** 120:17 125:5

**high** 60:18 87:6 91:7 92:21 106:6,15 107:7 108:3,16 131:22 132:17 133:1,5

**high-level** 106:14

**highest** 108:14

**highly** 291:8

**hire** 26:9,10

**hiring** 26:9

**hirings** 26:5

**history** 142:5 330:22

**hit** 289:16

**hold** 28:3 29:6 59:2 72:9, 10 73:21 128:4 146:5 330:6 335:21

**holder** 242:13 345:11

**home** 45:13 345:16,18

**homework** 60:7

**honest** 57:16,17

**honestly** 51:13 162:11 173:20

**hope** 313:19

**Horley** 10:6 70:22 78:4 81:22 88:6 94:20 142:21, 22

**hour** 190:9 225:23 230:10 307:16

**hours** 15:16 45:17,19,22 154:1,2 306:14

**house** 16:16,21 40:23,24 41:20 47:4,13 49:4 53:16, 18 172:1 175:10,22 208:10 246:8 255:11 269:12,16,17 270:1 271:13 297:5,11,23 335:23

**House's** 47:21,23

**household** 121:11,21 122:4

**Huh-uh** 222:8

**human** 257:18,21,22

**hundreds** 22:9 204:11

**hypothetical** 44:22 48:22 61:9

**I**

**ID** 127:7,8,15,18 128:17, 21 188:13 209:6,10,11,14 242:14 243:1 312:2 330:7

**idea** 45:2 49:8 63:19 71:6 76:18,23 77:2,7,25 92:9 197:8 220:9 256:6 282:4 297:23 325:23 326:25

**ideas** 115:9

**identical** 272:5 274:18 278:12 281:3,5,11,22 282:2

**identically** 281:10,18

**identification** 49:22 66:15 74:10 83:8 102:4 141:16 171:15 196:3 200:2 205:18 210:7 214:11 215:14 238:22 247:6 248:9 249:21 252:18 273:6 291:24 298:11 312:6 314:6 315:18 316:22 340:9

**identify** 9:15 10:5 134:12 179:1 199:12

**identity** 329:16

**illegally** 97:13,24 172:23 186:24

**illegals** 171:25 172:9,19 173:3 174:9,21 175:22 176:7,19 177:24 178:5 182:14 183:17 184:5,12, 20,23 185:6 186:6,13,21 187:4 318:4,13 331:10

**IM** 25:13

**imagine** 106:13 109:23 136:2,3 151:8 153:10 203:4 226:20 250:12 319:9 322:21,23

**immediately** 334:21

**immigration** 287:10

**impact** 110:11 111:11,24 112:1,3,13,24 113:4,7,9, 15,21 114:24 116:6,7,15, 18 118:6,9 119:3,7 120:5, 22 121:10 122:10,22 123:6,10 124:15 167:6,9, 20 170:3,5 197:13 212:9 242:6,9,11

**impacted** 123:22 243:16, 21

**impacts** 112:3 113:5,6,24 115:14 116:20 118:16 119:8 122:13 124:3

**implement** 168:13,19 179:18 180:14,18

**implementation** 321:3

**implemented** 43:21,24 44:7 49:2 146:3 217:14,19 320:7

**implementing** 115:18

**important** 35:10 46:17,22 47:10,14 48:25 53:1,2 61:1,3,4 128:3 130:2,4,12, 14,18 179:15 180:11 226:17 241:16 257:7,15 264:1,8,9,10,12 265:7 312:24

**Importantly** 80:4

**improper** 334:4

**improve** 109:22

**in-house** 10:2

**in-person** 209:25

**inaccurate** 170:22

**inactive** 284:13,16 285:6 340:17

**include** 24:24 25:3 32:12, 13 39:7,8 40:12 71:16 72:7 101:22 116:6 184:11 207:5 224:5 230:25 231:13 233:1 249:1 264:1, 4 265:18 286:23 331:8 338:5,7 339:1,13 340:2

**included** 270:25 279:1,9, 15,19,20,24 296:12

**includes** 36:6,7,10 59:21 304:10,12,15 337:19

**including** 70:17 97:21,25 145:8 205:23 222:23 223:19 232:5 308:3

**income** 316:15

**increase** 44:24 107:24 167:11,12

**increased** 108:8

**independent** 114:4

**independently** 91:15

**indicating** 223:4,22 232:12

**indicted** 99:6

**individual** 26:14 98:14 99:6 274:22 316:16

**individuals** 120:23 123:13 185:24 186:2,9,12,17 197:18 255:8 299:19 303:7

**ineligible** 92:24 150:11,19 175:1 186:22 187:11 188:16 217:23 242:7,11 264:23,24

**infer** 204:2

**inform** 223:12 340:15

**informal** 26:25

**information** 36:9,14 38:3 98:10,12,20 116:11,13,14 142:1,3 143:16 144:7 159:4 165:15,22 166:17 167:6,17 168:7,12 170:17,23 185:13 198:25 199:2 203:20 204:4,9 219:6,18,19,23 220:6 222:18 223:17 226:6 227:5,6 230:23,25 232:20 236:2 240:10 245:20 250:15 258:7,9,12 271:23 274:23 294:6 299:12 303:18,20 313:15

**informed** 171:1

**infrequent** 163:23

**injunction** 150:25

**inordinate** 268:2

**input** 309:12

**instance** 203:11

**instruct** 21:16

**instruction** 303:25

**instructions** 23:3,5 24:19

**insurrection** 178:1

**INT-LEG** 101:25 102:14 171:13 210:5

**intact** 201:14 306:25

**integrity** 45:1,2 98:24 99:13 101:20 107:13 109:8 133:23 167:11 170:5 176:4 179:15,16 180:10,12,25 181:9 182:18 183:12 213:1 257:7 307:9 325:24

**intent** 142:4 143:12,24 262:15,16 276:21 299:16

**intentioned** 264:4 265:17

**Inter** 194:1 197:2

**inter-** 48:11 151:15

**interact** 63:16

**interest** 106:9 137:8 138:4,10,11,12,13 139:14 145:13 253:7 264:16 309:13,18 326:13

**interests** 46:18,23 47:11 105:25

**interference** 67:14

**interject** 21:13

**interjects** 21:14

**interns** 145:3

**interpret** 262:2

**interpretation** 80:11 260:8 261:6 262:10

**interrogatories** 85:17

**interrogatory** 83:10,20 84:1,16 98:7

**interrupt** 11:6 142:21 156:10 279:25

**interrupted** 133:13

**intervene** 48:9,18 54:21 151:16 152:17,20,21 154:9 321:13

**intervened** 46:6,15,19 48:7,10,12,18 105:19 151:17 209:23 320:10,11,12

**intervening** 321:23

**intervenors** 9:24

**intervention** 151:18 322:2

**intimidating** 228:17

**introduce** 157:8 322:9 323:10,16 324:8 333:12,13 334:3

**introduced** 57:1 215:24,25 326:23 330:25

**introducing** 331:17,18

**investigate** 88:12 132:19

**investigating** 98:25

**investigation** 88:22 90:10,11 93:8 94:11 110:20 131:6,14 134:17 135:4 136:10 225:15 228:1,8,10,13,17 231:3,6

**investigations** 103:7,9 131:19,23,25 185:19

**involved** 63:12

**involvement** 169:6,7 238:7

**Irrelevant** 33:14 50:8 51:12 54:10 69:16 104:16 242:15

**irresponsible** 243:11

**Islander** 10:10

**issue** 11:13 12:7 88:9 175:14 191:24 211:5 214:3 331:7 344:22

**issued** 128:18 329:15

**issuing** 282:19

J

**Jake** 292:3

**January** 26:1 146:24 178:1 320:19

**jealous** 41:13

**Jimmie** 9:10

**job** 28:14 45:7 61:17,22 86:12,13,14,20

**jobs** 45:10,11

**Join** 81:13

**joint** 203:9,10,11

**joking** 125:22

**Joseph** 295:23

**judge** 155:13

**judiciary** 29:10,14,16 157:23 158:1 190:22 196:11

**July** 46:1

**June** 46:11 268:12 274:12 327:25 340:22 341:6,7

**juror** 230:25 246:8 249:1 292:7,15 301:23 302:2,22 303:14,16,19,25 304:19 305:2 310:4

**jurors** 303:18

**jury** 223:2,3,20,21 232:10,11 246:13 271:20 274:21 275:4 286:23 292:24

**justice** 229:1

K

**Kelsey** 10:13

**Kevin** 9:23 346:16

**key** 172:2,5

**kidding** 125:21

**Kill** 205:16

**kind** 26:25 30:1,2 34:6 45:23 53:3 55:13,19 60:8 88:21 102:22 113:1 115:4 130:9 135:6 140:15 161:2 174:11,18 210:24 331:21

**kinds** 61:23

**knew** 110:19,21 125:19 132:13 178:20 219:17 252:1,4 325:5

**knowing** 106:20 156:11 219:12 221:21

**knowingly** 223:11 340:12

**knowledge** 83:16 127:25 130:1

**Kory** 10:1

**Kristy** 210:10

**L**

**lack** 40:4 77:18 95:1 96:17 100:9 101:6 106:8 110:12 112:17 117:7 121:6 122:6 129:7,16 136:16 137:2 158:8 165:17 167:8 168:8,14 170:7 173:11 175:25 176:8,15 177:15 183:24 185:7 186:14 203:22 221:16 225:20 226:3 239:13 247:23 253:3 257:12 258:13,20 259:18 266:22 267:12 276:17 293:6 294:1 295:13 305:12 325:20

**Lacks** 160:10 229:2

**Langhofer** 10:1 14:12 21:14 42:2,19 44:13 48:20,23 51:2 55:21 56:15,24 57:11 59:15 66:7 68:7 70:21 71:4 72:24 73:24 75:8 77:20 78:25 80:12,21 81:12,21 82:10, 17 88:5 90:1 95:9 100:25 101:6 111:13 112:19 122:5,23 137:10,16 138:18 139:8,18 140:12 142:25 143:19 148:16,18 149:4,20 150:8 151:6,22 153:6,25 154:10,13 155:22 156:21 163:1,3,9, 21 166:8 169:21 170:9 172:12,21 173:5 174:16 176:2,10,14 177:17 179:11 180:23 183:9 184:6 185:15 187:13 188:10 189:8,17 192:11 201:24 202:9 203:25 208:2,23 213:12,25 215:1 216:10,21 217:15,21 219:7 220:21 222:4,20 226:10 227:3,13 228:2 230:10 233:2 236:20 242:4,16 243:19 244:1,13 245:7 249:12 250:9 251:5 253:4 255:20 256:16 257:13,19 258:22 259:12 260:17 262:5,13,22 264:20 265:3 268:23 269:1 272:16 273:14,21 275:13,16 277:16 279:4, 25 280:14 288:11 289:2 290:15 291:16 293:8 294:22 295:3 296:4,10 297:6 299:2,9 300:2 301:10,13,17 304:22 306:11 308:11 314:16,18 315:11 316:13 317:6,20 321:7 322:7 324:13 325:21 328:3,25 329:7 338:14 339:6,19 344:14 345:20 346:2,15

**language** 50:11 117:4 139:10 140:17 160:15 201:15 216:13,14 250:12 266:8 281:22 289:5 337:19,20 338:20 345:16

**large** 194:22

**largely** 185:23 298:19

**largest** 319:5

**last-minute** 319:12

**late** 341:3

**latest** 316:18

**Latham** 10:8

**Latin** 173:8

**Latino** 10:12

**law** 43:23 61:6 80:14 81:7 82:18 86:8,11 87:17 89:6 94:6 111:23 112:3,10,11, 12 113:3,5,9 115:14 147:23 153:9 165:20 166:23,25 168:19 182:11 185:10,13 198:23 199:9 209:22 219:11,22 226:9 228:21,22 239:7 343:10

**lawful** 166:18,24,25

**lawfully** 264:2,17 265:8 267:5

**lawmaker** 106:8

**laws** 22:22 43:17,21 44:6 46:25 49:1,4,7 66:1 67:23 85:19 86:17,20 98:13,14 106:1,23 107:17,18,20,22 108:19 109:7,10,18 110:11 111:11,19 112:1, 12,24 113:4,16,21 116:18 117:11,16 121:10 122:3,9, 10,21 123:6 124:14 131:4 136:5,9,21 137:6 143:13 144:12 146:8 153:7,14 167:21 169:25 227:2 234:11 243:24 264:1

**lawsuit** 330:17

**lawsuits** 260:1,21,22 261:2,7,9

**lawyer** 38:12 39:20,25 195:16 197:9

**lawyers** 14:18 328:18

**lay** 266:20

**Leach** 196:10

**lead** 28:16

**leader** 26:7 51:15

**leadership** 27:3

**leaning** 125:6

**learn** 203:1

**learned** 104:9 124:25 329:12

**leave** 82:6 147:10,12

**leaves** 270:5

**led** 90:12

**leg** 155:24,25 156:7 195:25 199:21 205:9 215:11 247:2 248:6 249:19 252:15 291:21 298:7 332:17

**leg-** 102:20 179:8

**legal** 9:11 68:7,10 71:4,12 72:14,24 73:7,24 80:12,21 81:12,21 82:17 127:17 131:16 132:2 133:9,15,18 137:16 139:7 144:1 148:18 149:4 178:8 187:13 192:11 212:21 222:4 228:2 231:16 233:2 236:20 242:4,13,16 244:1 245:7 250:9 260:17 262:5, 22 284:19 285:7 288:11, 19 289:2 300:2 317:20 338:12 339:5 344:10

**legality** 165:15,19,22,25

**legislation** 76:10 77:7 116:15 133:7 148:6 149:18 177:2,14 179:8 230:23 234:2 239:18 243:21 260:24 264:23 290:13

**legislations** 213:6

**legislative** 18:13 41:9 44:2 55:1 60:5 83:22 84:5, 18 141:11 142:4,5 145:2 146:9 165:5 185:3 249:3 345:22

**legislator** 64:17,18 97:12 111:15 177:1,12 240:16

**legislators** 61:17,23 77:22 78:2 100:23 101:3 106:11 107:11 115:5 145:18 185:1,18 309:13

**legislature** 23:23 29:4,7 30:1 38:17,20 40:3,7,17, 21 41:5 45:5,15 46:1,10 47:19 48:1 49:19,20 50:1, 21,24 51:1 52:2,4,7,10,13, 17 54:18,21 55:13 56:3 59:14 63:4 65:21 68:6 69:4 74:22,24 75:20 83:22 84:4,18 85:8,21 94:24 95:6,12,21 96:3,9,14 100:8,12 101:13 102:21 110:10 111:10 112:15 113:15 114:8 115:10 116:5 117:5 121:4 122:2, 21 124:8 129:6,14 130:21 134:14 136:15 137:1 138:21 163:11 165:15 167:6 168:6 170:17 174:4 184:19,21,24 185:11 191:25 204:10 207:25 215:5 238:10 239:12,16 268:21 290:18 295:1,18 309:24 313:21 318:15,18 330:13

**legislature's** 23:24 142:6 143:12,24

**legislatures** 76:19

**legitimate** 210:21

**letter** 80:25 194:8,10,12, 15,21 195:13,17,19 201:21 211:1,14,15 212:9 263:20 266:10,15 271:16 286:24 289:15,17 293:4, 24 294:17 307:2 342:4

**letters** 212:6,7,8

**level** 33:6 41:22 106:15 133:5

**levels** 106:5,23

**license** 128:19,20 241:21 242:14 243:1,25 282:19 329:15 340:8,9

**life** 38:18

**light** 191:1

**lime** 149:11

**limited** 11:17 187:4 213:19 214:17

**lines** 11:21 89:7 130:12 133:6 193:24 342:8

**list** 34:2,3,4 186:1 212:6 224:5 339:13

**listen** 20:18

**listened** 48:3

**literally** 205:2

**litigation** 23:11 146:5 217:17 260:25 320:24,25 321:10,11,18,20

**live** 315:4 329:19

**lives** 317:4

**living** 316:16

**lobby** 177:4

**lobbying** 160:8,13 161:5 177:5,9

**lobbyist** 163:11 176:25 177:13

**lobbyists** 160:14 163:24 174:6 177:3,8 205:3 253:6

**lodged** 30:2

**LOG** 195:25 199:21 247:2

**LOG04789** 205:9

**LOG11595** 248:6

**LOG12933** 249:19

**LOG13434** 252:15

**LOG14133** 291:21

**LOG14228** 298:7

**LOG14261** 215:11

**long** 15:15 17:20 25:24 39:5 40:7 59:17 65:5,10 106:8 118:25 221:14,18, 19,22 222:11 225:17 240:5 310:10,18 311:17 312:9 339:21

**longer** 312:13

**looked** 16:3,4 20:4 61:7 78:12 113:8 130:16 192:13 280:12

**lot** 15:1 22:12,13 27:10 36:5 37:7 41:15,18 64:7 105:7 107:12 109:24 115:9 118:22 125:24 132:19 157:7,9,12,18 164:5 169:12 176:24 179:15 180:11 182:6 211:17 212:4 240:23 309:9,13 312:1 319:10 326:18,20 332:20 333:21, 22

**lots** 63:13 154:3 219:19 243:9

**loud** 54:9

**louder** 123:23

**loudly** 266:18

**love** 154:4,15 155:10

**low** 92:19 106:6

**lower** 198:8

**Lunch** 141:1

**M**

**made** 18:9,21 19:9,14 38:22,23 48:17 51:16 97:2 100:15 114:21,23 115:14, 20 125:15 153:2 200:19 229:14 252:2 268:14 294:3 297:19 302:15 306:3 325:15 331:22

**Mahoney** 9:10

**mail** 137:9,15 186:3,8,10 189:7,19 208:20 209:11, 24 223:8 224:1 337:7 338:8 339:9 340:7

**mail-in** 209:7

**main** 306:7

**maintain** 28:15 29:1 55:6

**maintained** 241:22 260:11 262:4,12 327:3

**maintenance** 257:6

**majority** 10:3 27:12 51:15 53:8,19

**make** 12:4,5,18 13:5 14:8 19:1 24:11 27:14 29:19 30:5,6 31:6 46:24 57:25 60:17 73:8 87:17 90:20 91:11 93:1 94:8 97:6,19 98:5 115:12 116:12 120:19 126:4 143:3,16 149:8 178:8 179:19 180:15 181:15,25 182:20 184:19,21 212:20 217:10 252:10 255:5 262:2 270:13 288:9 289:22 290:23 305:11 309:19 317:16 332:9,16,18

**makes** 39:22 116:5

**making** 34:11 36:14 294:7 306:6 333:4 334:5

**Makker** 10:8

**man** 154:14

**manager** 223:3,21 232:11 246:14

**Manual** 292:18,21 299:21 300:1,9,17,20,21 302:25 310:2,8

**March** 190:22 196:15 200:7 205:21,24 206:7 341:5

**marital** 122:10,12,22

**mark** 49:19 66:22 74:13 82:4 83:4 102:1 147:11 155:12 273:2 314:2

**marked** 46:4 49:21,24 66:12,14 67:2 71:23 74:9, 12 80:1 82:3 83:3,7 102:3 141:15 171:14 190:7,21 195:24 196:2 200:1 205:9, 17 206:10 210:5,6 214:10 215:13 224:14,19 238:21 247:5 248:8 249:20 252:17 263:17 268:8 273:5 278:17 291:23 294:20 298:5,6,10 301:6 312:5 314:5 315:17 316:21 335:1

**marking** 191:4

**married** 122:13 161:3

**match'** 303:22

**matched** 229:19 304:16

**matches** 229:17

**matching** 288:16 304:10

**materials** 20:19 21:3,23 142:1,5

**matter** 9:6 57:2 243:5 305:5 308:13,14 312:21

**matters** 45:15 342:23,25

**meaning** 86:10 201:10 207:10 307:6

**meanings** 286:9

**means** 32:3 47:25 48:2 63:23 64:2 68:21 82:14 85:6,18 86:9 118:8 160:2 186:17 202:2 209:6 236:16 244:14 251:10,21 261:22 308:17,19 319:15, 23 332:6

**meant** 19:8 186:16 259:20 274:18 275:7

**Media** 9:5 65:13,17 137:22 138:1 230:14,18 307:19,24 346:5,20

**meet** 15:12 16:15 27:2 58:14 76:5 77:13 164:21

**meeting** 15:8,11,15 28:16,21 31:4 58:13 76:1 144:16 164:3,9,15,16,19, 24 165:3 202:23

**meetings** 15:1,17,18,21

16:13,19 18:13 27:9 154:3 164:13 204:10

**member** 30:3 36:3,13 37:4 38:23 39:18 40:17 51:20,24 62:2 64:5,12,13 65:21 68:6 69:4 74:23 75:20 87:17,18 100:19 152:22,24 157:19 215:6 237:19 273:19 332:14 333:13,14 334:15,20

**member's** 38:11

**members** 16:15,20 28:25 32:5,10,12,25 33:13 36:4 37:5,10,11 38:2 39:7,8,16, 17 51:8 52:22 53:12,15, 16,17,22 60:6,22 61:15,25 62:8 64:14 74:21 77:17 96:20 98:11,19 100:12 101:18 107:5 110:22 116:11,14 121:11,20 122:4 145:2,8 157:6 160:17 167:18 200:21 201:3 203:6,8 205:5 206:2 209:19 272:11,18 318:18 322:21,23 325:11,12,25 326:16 332:24 333:5,12 335:10

**members'** 145:5

**memorized** 132:22 300:25

**memory** 216:22

**mention** 56:4 342:2

**mentioned** 17:4 18:4,22 19:7 31:6 34:19 44:15 58:7 62:4 70:4 76:9 87:24 89:5,12 93:2 99:13 108:2, 3 133:5,19 144:4 167:25 178:7 185:16 195:14 198:17 305:3 326:19 341:25 342:4,21 344:2 345:8

**mentions** 342:3

**Mesnard** 28:1

**message** 89:21 174:18, 21

**messages** 24:19,20 25:8, 16 174:9 204:12

**messaging** 174:11

**met** 15:8 75:24 144:18 154:4 164:22 307:6

**Mexican** 345:8

**Mexico** 121:15

**Mi** 9:6 10:12

**mic** 20:25

**mic's** 179:13

**middle** 102:23

**mike** 10:16 124:1 125:5 248:22 249:3

**mile** 219:20

**million** 35:7 226:12

**millions** 200:14,15

**mind** 13:1 44:18 166:15 256:7

**mine** 60:23 128:12 176:11 234:7 258:24

**minus** 282:4 285:13

**minute** 67:12,14 143:4 196:23 266:9 301:19 344:22

**minutes** 65:7 306:15 329:9 331:14 346:1

**mischar-** 183:11

**mischaracterize** 62:6

**mischaracterizing** 159:8

**misread** 84:9

**missed** 130:9

**misstate** 143:21

**Misstates** 39:14 85:10,24 86:2 143:19 159:12 166:8, 9,19 174:23 178:22 208:12 227:13 314:18 327:8

**misunderstood** 145:17

**mixing** 215:3

**mode** 164:1

**modified** 341:22

**mom** 17:3

**moment** 335:21

**money** 228:13

**monitor** 9:4 65:13,17 67:17,20 105:13,16 137:22 138:1 141:4,7 190:15,18 230:14,17 263:9,12 307:19,23 328:13,16 346:4,9,19

**month** 231:25 313:20

**months** 46:10 240:23

**mothers** 255:15

**motion** 18:9 19:7,9,11,14 27:14 51:16 54:20 229:23

**motives** 61:23 207:2 291:6 307:8,9

**mouth** 179:25

**mouthful** 56:5

**move** 35:8,12,13 63:5 106:18 155:13 199:10 213:2 216:13 233:25 236:25 253:22,25 254:4,6 268:6 311:6

**moved** 146:23 154:8,9 214:23 283:5,11 284:6

**moves** 80:14 213:20 214:18

**moving** 125:15 213:3 216:12

**Multiple** 254:17

**N**

**names** 27:9 58:10 212:7

**national** 10:14 48:6 343:9 345:9

**Native** 10:9

**naturalization** 76:17 117:13,18 128:3,14 221:15 225:19,25 226:2, 15 242:23 310:11 329:16

**naturalize** 242:22 243:25

**naturalized** 118:1,4,11 119:12,23 120:1,7,23 220:17 228:24 242:9 243:15 251:15,16 264:13, 17 265:8

**necessarily** 11:2,13 60:24 77:10 127:15 134:13 144:7 181:16 182:6 183:13 186:23 260:23 261:1,10

**needing** 267:4

**newly-adopted** 54:19

**ninety** 283:13

**Niyati** 9:17 331:10

**Nobody's** 219:21

**nominate** 27:15

**nominated** 71:8

**nomination** 72:4 330:19

**non-registered** 84:12

**non-u.s.** 83:23 84:6,19

**nonattorneys** 39:7,9

**noncit-** 89:10

**noncitizen** 84:5 89:24 92:18 99:21 120:16 121:11,20 122:4 183:21 231:9 236:17 304:8 330:23

**noncitizens** 43:2,3,4 78:2 85:8,22 86:24 88:13 89:11 90:13 91:16 92:1,9 94:18 95:8,23 96:6 98:9 99:11,18 100:2,24 101:4, 14,22 175:1 178:11,20 179:2

**noncitizenship** 256:20 303:16 305:3

**nonexistent** 179:9,14 180:9

**nonoperating** 340:9

**nonpartisan** 156:6

**nonpublic** 97:9

**nonresponsive** 155:12

**normal** 60:5,7 114:11,16, 20 115:24 127:10 174:7 177:3 204:16 267:23,24 268:1,4 297:25 325:7

**notebook** 110:6

**noted** 307:2

**notes** 16:13 25:9,12

**notice** 223:7,12,15 224:1, 4 225:4 231:1 236:19 239:10,21 250:8,23 251:2 271:20,24 272:4 274:22 275:5 276:15 277:11,18, 24 278:7 283:12 286:24 293:4,24 294:17 302:14, 20 336:19,21,23,24,25 339:9,12 340:7,14 343:22, 24 344:8

**noticed** 108:8 275:10 343:25

**notices** 240:6 338:5 339:2

**notification** 228:9

**notifications** 340:2

**notify** 225:14 228:7 334:11

**notifying** 343:14

**November** 44:7 148:2,12 150:7 151:1 152:17,19 153:5 320:7 344:20

**number** 9:5,8 31:3 35:15 44:25 65:14,18 87:7 91:8 92:21 97:21 107:7 108:4, 15 133:1 137:23 138:2 193:8,16,17,18 199:13 215:19 230:14,18 248:20 256:19,20 269:13 273:3 302:4 307:19,24 316:18 319:5 329:16 346:5,20

**numbers** 22:8,10 239:4,5 241:19 246:6,11 282:8 341:4

**numerous** 192:23

**NVRA** 343:9,13,21 344:9

## O

**O'MALLEY** 9:23 10:25 11:15 12:3,5,8 13:17,21 14:11 16:9 20:15 21:6,10, 13 32:19 33:14,16 34:14, 20 35:5 38:25 39:11,14 40:4 41:25 42:7,13,20 43:7 44:11,21 48:21 49:13 50:3,8 51:12,19 53:24 54:7,10 56:9 57:23 59:25 60:9 61:8,19 64:21 65:1,4, 6,10 67:25 68:9,17 69:14, 16 70:6,19 71:12,17 72:14,22 73:4 74:12,14,18 75:6,10 76:25 77:8,18 78:3,9 79:14 81:13 82:9, 23 84:7,9,11 85:10,24 86:2 87:1 89:19 90:16 91:2,18 92:2,10 93:14 94:12 95:1,10 96:17 97:3 100:9,16 104:15 106:25 107:3 110:12 112:17 113:17 114:9 117:7 118:12 120:9,11 121:6 122:6,24 123:7 124:10 126:9 127:4,17 129:7,16, 21 130:24 132:1 133:9 134:19 136:16 137:2 139:6,17,19 144:1 148:14 149:2 150:9,17 152:12 154:23 155:23 158:8 159:12,16 160:10,24 161:24 162:4 165:17,23 166:7,9,19 167:8 168:8,14 170:7,19 173:11 174:14, 23 175:25 176:8,15,20 177:7,15 178:2,12,22 179:10 180:3,21 182:5,23 183:24 184:13 185:7 186:14 188:9 190:1,8,23 191:4,8,10,12 199:12,18 200:23 201:4 203:22 208:1,12 210:22 211:20 215:19 217:7 218:12 219:13,25 221:1,16 225:20 226:3 227:12 228:18 229:2 231:16 234:13,15 237:1,5,22 239:13,25 241:8 242:3,15 243:2,8,17 245:5 247:23 248:1 252:3 253:3 254:17 255:4 257:12 258:13,20 259:18 261:19 262:21 263:7 266:22 267:12 272:14 276:17 284:19 285:7 286:10 287:1 288:19 290:7 293:6,13 294:1,12,20 295:13,20 300:4 302:24 304:20 305:12 307:15 310:12,20 312:17 317:19 322:5 323:11,22 324:11 325:19 327:8 328:1,17,22 329:3 345:23 346:13,17

**oath** 12:21 65:20 66:6,18 67:2,3,6,9,23 68:1,14,20, 24,25 69:8,11,18,20,22,24 70:24

**object** 11:4,20 21:6 38:25 39:11,14 50:8 67:25 91:18 139:6 143:19 144:1 221:1 252:3

**objecting** 11:8

**objection** 11:2,5,19 21:13,14 32:19 33:14 34:14,20 35:5 40:4 41:25 42:13 43:7 44:11,21 48:20,21 49:13 51:12,19 53:24 54:7 56:9 60:9 61:8, 19 68:9,17 69:14 70:6,19 71:12,17 72:14,22 76:25 77:8,18 78:3,9 79:14 82:23 85:10,24 86:2 87:1 89:19 90:16 91:2 92:2,10 93:14 94:12 95:1,10 96:17 97:3 100:9,16 104:15 106:25 110:12 112:17 113:17 114:9 117:7 118:12 123:7 124:10 126:9 127:4,17 129:21 132:1 133:9 134:19 136:16 139:17,18,19 148:14 149:2 150:9,17 152:12 155:23 158:8 159:12 160:10,24 162:4 163:9 165:17,23 166:7,19 169:21 170:7,19 173:11 174:14,23 175:25 176:8, 14,20 177:7,15 178:2,12, 22 179:10 180:3,21 182:5, 23 183:24 185:7 186:14 188:9 189:17 190:1 200:23 201:4 203:22 208:12 210:22 219:13,25 221:16 225:20 226:3 227:12 228:18 229:2 231:16 239:13,25 242:3, 15 243:2,8,17 245:5 247:23 254:17 255:4 258:13,20 259:18 261:19 262:13,21 266:22 267:12 272:14 284:19 286:10 287:1 290:7 293:6,13 294:12 295:13,20 304:20 305:12 310:12,20 312:17 314:16 317:19 322:5 323:11,22 324:11 325:19 327:8 328:1 338:12 339:5 344:10

**objections** 11:10 38:5 42:7,21 83:21 84:3,17 149:20 150:8 183:3 184:6, 13

**objective** 37:18,19

**objects** 14:8

**obtain** 225:18

**obtained** 117:12,17 340:7

**obtaining** 126:24 130:22

**obtains** 223:17 230:22 232:20 236:2

**occurred** 185:19

**occurring** 99:25 185:2 270:19

**odds** 103:17

**off-the-record** 67:18 83:6 141:14 230:1

**offensive** 173:10

**offer** 64:11,12,14 169:20

**offered** 64:10 251:20 323:16

**offering** 252:2

**office** 41:24 65:21 68:20 69:8,20 71:9,11 72:9,21 73:21 76:4 98:12,19 100:2 101:14 104:10 276:25 293:23 295:7,11,22 308:3 330:6,21,23

**official** 24:24 46:19 329:12

**officials** 176:25 303:17

**okayed** 276:25

**online** 314:19 315:1

**open** 260:1,20,22 261:1,9

**opening** 27:10

**opens** 255:12

**opine** 40:10,13,14 72:18

**opining** 261:5

**opinion** 31:25 38:12 40:17 60:14 68:7,10 72:24 73:24 80:12,21 81:2,12,21 82:17 104:19,20 115:3,6 123:9 138:22 180:20 209:5 261:12 262:5 289:21 291:6

**opinions** 36:6,12 61:16 104:19,21,22

**Opponents** 330:16

**opportunity** 203:1 270:7 326:6

**oppose** 151:5

**opposed** 307:14 311:7 324:18,24

**opposing** 212:10

**opposition** 123:21 136:5 325:4,6 333:24

**option** 321:23

**options** 290:20

**order** 20:19 26:6 28:12,15,23 29:1 31:3 55:7 68:5 69:3 291:9 300:19 315:1 327:12 330:6 331:23 334:10,11,15,20,21,22

**organization** 160:9,13 212:10 240:14

**organizations** 194:13

**organized** 159:6

**original** 130:6 214:14 306:21,24 323:14

**originally** 213:19 214:17 248:11,15

**originated** 36:17

**outcomes** 42:17

**Overbroad** 38:25 182:5

**Overly** 32:19 41:25 42:13 43:7 56:9 60:9 61:8,19 96:18 104:15 170:19 180:3,21 243:17

**overridden** 291:2

**override** 291:1,8,9,18

**overwhelming** 212:25

**P**

**p.m.** 141:7 190:18 346:22

**Pacific** 10:10

**pack** 127:7

**package** 188:12

**pages** 141:19 215:16 342:24 344:2

**paper** 72:4

**paragraph** 104:2 172:7 196:25 200:12 201:9 202:18 223:25 229:24 250:6,19 251:18 253:22 254:14,16 257:5 263:24 266:13,14,15 278:24 280:16,20,24 281:15 282:8,12,15 283:21 285:17 301:23 306:20 336:13 337:1,10,22 338:18 339:16,23 343:24

**paragraphs** 266:20 281:21 343:18

**part** 11:15 13:3 22:5 28:22 55:10 68:25 74:19 75:9,12 87:9,18 88:8 96:23 107:6,9 111:22 119:21,22 120:17,19 156:3 161:11,12 168:4 171:3,4 175:10 177:5 196:12 209:21 217:17 255:21 257:1 260:15 281:19 308:6 312:21 335:6 337:5,18

**partic-** 50:15

**participate** 158:1

**parties** 124:18

**party** 10:15 124:15 126:15 160:9,12 203:7,8 333:14

**pass** 29:20,21 46:25 49:1 61:6 153:16 179:8 181:23,24 190:24 205:11 213:5 219:22 227:2 238:13 254:1,6 270:21 272:12 305:17 323:1 328:25 332:21 341:19 342:12

**passage** 80:5,9,20 184:18 342:16

**passed** 44:1 48:5 107:20 146:8 147:23 150:5 215:9 217:3,4 219:11,22 237:12 239:2 246:7 249:10 250:2 255:11,16 262:10 271:14 278:19 291:17,18 304:5 313:21 318:25 322:9,13,22,25

**passing** 55:14 96:15 216:8 326:17

**passionate** 63:6

**passport** 128:10 310:18 311:4 329:16

**passports** 311:1

**past** 149:12

**Paul** 103:19,21 104:18,19

**Pearson** 141:9

**peers** 26:21

**pen** 20:22 152:4 267:19,22

**penalty** 83:14 85:1 223:9 340:11

**people** 16:25 26:10 36:11 38:7,18 44:25 55:8,19 60:21 87:7 91:9,10 92:21,24 95:4 97:19 106:4 107:7,10,13 108:4,15 111:24 112:13 113:5,6,24 115:21 116:20 119:3,7,10,14,16,23 120:7,22 122:13 123:10 124:25 126:1,2 127:6 128:3 130:15,18 132:15 133:1 135:5,22 144:4 148:21,25 149:9,13 150:5 160:15 172:23 173:4,8 174:25 175:5 178:16 179:1,16 180:11 181:23 186:23 193:3 194:21,22 196:8 202:2,7 204:10 205:23 206:1 208:7 212:4,6,15,20,22,25 217:25 226:16 227:19 243:10,11 253:22,25 254:4 255:10,11,13,14 258:1,8 260:24 261:9 288:17 305:4 309:7 312:15,23,25 313:9 316:1,5,6 317:17 318:12,13 324:19 331:23 333:5

**people's** 264:10

**percent** 58:7 106:7 181:14 315:9 316:6,10

**percentage** 45:14 313:5 315:6,7

**perfectly** 126:3

**period** 243:12 250:23 293:5 305:22 317:14 343:23 344:8

**periodically** 303:17

**perjury** 83:14 85:2 223:10 340:11

**permanent** 242:13

**person** 72:9 73:21 74:23 87:14 89:13,21 92:17 93:2,7 106:20 130:5 164:13 211:25 221:11 222:18,24,25 223:1,4,7,9,10,12,15,18,22,23 224:1,3,5,8 225:11 228:4 230:24 232:6,12 242:21 271:19,24 274:23 275:3,9 283:14,15,21 292:15,24 295:21 299:12 316:24 336:12,20 339:9,11,13 340:7,11,12,14,15

**person's** 223:14,16 224:1 231:2 271:21,23 275:5 339:10 340:16

**personal** 25:2,3,4,6 31:24 36:6 38:12 48:25 55:3 60:14,19 81:2 96:21 117:19,20,21 118:19,20,21 121:12 122:11,16 123:8,9,12,15 124:17,19,20 126:18 127:25 129:1 130:1,17 131:15,23 132:6,18 134:21,24,25 135:1 136:22,24 138:22 178:10 209:5,21 211:5 212:23,25 241:9,13 289:21 291:5,6 308:7

**personality** 55:9

**personally** 23:14 24:2,4 26:12 34:15,22,23 35:11 47:25 48:2 60:11,14,23

61:4,10 63:18 86:13 87:2, 4,5 105:21 107:5 109:4 110:24,25 126:19 127:5 172:20,22 212:9 289:21 307:7 308:14

**persons** 72:3 185:25 218:4 287:18,21 288:8 315:23 316:6

**perspective** 46:17,22 47:10,14,20,21,23,24 48:4,25 105:19,22,24

**pertains** 303:25 310:4

**Petersen** 9:6,25 10:21 12:16 13:18 21:10 65:20 67:22 102:6 105:18 190:20 230:20 308:1 328:23 329:8 346:6,10,21, 24

**petitions** 330:19

**Petty** 301:14,15 342:18, 23 343:6 344:16,23

**Phoenix** 9:14

**phone** 132:13,15

**physical** 52:16

**PI** 320:8

**pick** 314:21,22 323:24

**piece** 87:10 168:2 177:2

**Pima** 110:21 111:4

**place** 9:13 27:1 298:2

**plaintiff** 10:10,12

**Plaintiff's** 340:20

**plaintiffs** 9:20,22 23:13 142:1 328:24

**plaintiffs'** 328:18

**play** 50:25 51:3 155:18,20

**played** 155:16

**plenary** 192:1 198:3

**point** 34:8 37:20 64:22 69:19,20 91:19 144:10 146:23 156:4 245:2 281:23 286:6 290:20 312:20 320:17,21 321:4 328:5 334:10,11,15,20,21 344:4

**points** 12:19 252:21,24 253:6,7 334:22

**police** 132:7,19

**policies** 181:6

**policy** 35:11 37:19,20 61:13 77:11,12,14 86:13, 14,16,21,23 88:10 91:13 126:4 140:5,6,21,23 177:2 179:18,19,21 180:2,15,19, 20,25 181:3,5,6,12,15,19, 23,24 182:4,7 207:3,6 209:17 324:15

**policymakers** 182:11

**political** 124:15

**poll** 108:22 109:3,4,23 179:17 180:13

**polling** 106:13 107:6 108:4 115:2,3,13

**polls** 109:5 115:6 209:8,9, 10

**poor** 117:1 266:18

**population** 167:7 316:3, 4,5

**Porter** 9:24

**portion** 194:8 229:16 340:1 342:19

**portions** 11:17

**position** 25:24 45:24 106:7 182:22

**positions** 28:3 29:3,6

**positive** 170:3,4

**possibility** 52:6 255:12

**possibly** 201:3

**post** 89:5 94:17

**postage** 223:8 224:6 338:8 339:14 340:10

**potential** 111:20 112:1, 25 113:22 116:7 124:15 131:5,13 134:17 135:4

**potentially** 187:21 194:17 211:11

**poverty** 315:4,8,24 316:6, 11,16 317:4 329:20 330:2

**power** 186:1 188:24 189:6 192:1 193:25 198:3, 8

**powers** 58:17

**practicable** 245:10,14

**practically** 139:14

**practice** 60:7 227:20

**prayer** 60:17

**preaddressed** 223:8 224:6 340:10

**preliminaries** 158:21

**preliminary** 150:25

**premise** 229:6

**prepaid** 223:8 224:6 338:8 339:14 340:10

**preparation** 15:10,24 20:1 21:21 153:22

**prepare** 15:4,5,7,9,18 16:16 20:19 22:17 332:18

**prepared** 14:16 273:12 275:21 277:2

**preparing** 14:21

**prescribed** 72:6 287:23

**present** 15:22 145:15 342:6,23,25

**presented** 27:10 96:2,8,9 102:24 103:5,14 202:24

**president** 9:25 12:17 13:18 21:10 25:21 26:2,4, 17,19 27:15 28:4 45:16, 17,19 46:20 47:5,9,13 50:22 141:21,24,25 142:15 152:18 177:25 317:11 321:16

**President's** 142:3

**presidential** 108:5 138:6, 17 139:3,16,22,23 140:1, 10 186:2,7,10 188:21,25 189:6,15 206:19

**press** 99:3

**pretty** 62:13 152:13 228:14 257:21

**prevent** 139:2 185:24

186:2,6,9,21 187:5,19

**preventing** 137:9 138:16

**prevents** 187:23

**previous** 292:20

**previously** 20:16 71:23 80:1 82:3 83:2 190:21 268:8 278:17 301:6 331:10

**primarily** 29:24 30:14

**primary** 139:24 140:3

**prime** 62:21,23 156:14 324:5 333:15

**principle** 257:8 327:3

**principles** 182:7

**print** 315:25

**printed** 72:5

**printouts** 167:17

**prior** 43:17 48:19 80:5,9, 20 101:8 109:11 201:10 206:6 272:5 296:13 313:20

**priorities** 165:6,8,10,11

**prioritize** 132:12

**priority** 60:18 106:10 108:16 334:17

**private** 104:4

**privilege** 141:11

**privileged** 142:1,2 143:16 144:6

**proactive** 254:10 255:1

**probable** 132:22 133:5

**problem** 87:5 159:9 177:1,6,13 179:9,14 180:10 181:5,9,11,20 197:2 205:14 281:19 305:22

**problematic** 341:23

**problems** 181:7,13,17, 20,22,24 342:5

**procedurally** 334:4

**procedure** 292:17 333:9

**procedures** 292:21 299:21 300:1,9,17,20,21 302:25 310:2,8 334:5

**proceedings** 9:1 346:22

**process** 53:2 55:14 57:2, 3 60:5,18,25 63:9,10 92:5 114:11 120:18 125:15 126:1 168:17 177:5 193:11 209:13 222:12,14, 15 267:4 269:15 270:18 290:18 294:10 299:20,25 303:8 307:1 308:4,8,10 321:24 323:2,4 324:21 330:11,15 331:16,18,21 333:4 334:4,14 343:13,22

**processed** 48:3

**processes** 306:25 333:23

**processing** 314:13

**produce** 22:20 23:10 226:1

**produced** 16:6 20:14,16 23:17,25 24:3 144:24 145:10 212:14

**production** 211:16,24

**programs** 330:2,3

**prohibitive** 127:2,6

**promise** 9:20 191:3

**promoting** 205:4 253:9

**promptly** 340:6

**proof** 67:7 70:12 73:6,10 76:6,11,16 79:10,22 80:6, 19 81:11 82:15 89:4 110:23 126:20,22,25 127:16,19,23 128:2 129:2, 11,24 130:10,22 187:5,11, 20 188:4,8,20 189:24 195:3 202:8 206:18 224:25 225:4,8 227:10,24, 25 239:9 264:18 302:21 313:6 317:18

**Prop** 80:5,9,20

**proper** 30:24 31:7,12 35:24 36:15 39:3 59:7,19

**properly** 49:7 260:10 262:4,12

**proponent** 159:22

**propose** 51:11 58:19 59:6 77:7 166:25

**proposed** 116:15

**proposing** 166:22

**pros** 61:7

**prosecute** 132:15

**prosecuted** 99:6,7

**prosecution** 103:10 135:4 136:10

**prosecutions** 255:14

**prospective** 81:7,24 201:22 303:18

**prospectively** 80:15 81:3 201:22

**protect** 250:24 264:1,10, 12 267:9

**protections** 307:1

**protects** 251:2

**protest** 331:24,25 332:1, 2,5,12,14

**protested** 332:3

**protesting** 332:7

**prove** 70:8 71:2 77:13 224:12,21 275:10 330:5 337:7

**proven** 92:21 193:4 195:11 197:18

**proves** 69:22 70:11 256:21

**provide** 46:21 57:9,20 67:7 69:7 76:1,6 79:9,22 80:19 81:10 82:14 105:19, 21 126:22 130:3 165:14, 19 166:17,21 167:5,14 168:1,12 185:25 187:20 188:4 189:24 202:8 206:18 224:5 225:4,7,12 227:9,24 228:5 239:8 241:14 264:18 271:19 275:3 302:20 305:4 312:16 330:4 338:3 339:13

**provided** 25:18 56:7 72:4 80:6 136:8 167:24 168:6 170:16 188:8 201:11 227:5 274:21 294:6

**providing** 129:20 130:22 203:20 317:17

**proving** 70:24

**provision** 70:4 208:11 244:6 260:5 279:1,9,15,19 299:6,10

**provisions** 44:18 131:3, 11 134:15 135:2 136:9 153:19 172:3,5 185:23 216:20 217:10 239:5 242:2 243:16 244:22 281:24

**public** 95:7,22 96:22,23 97:1,2,9,13,15,18,25 100:15 104:4 115:3,5 144:7,22,23 145:20,22

**publicly** 142:5 145:6

**published** 193:19

**purely** 138:20 291:5

**purportedly** 259:7,21

**purports** 248:25

**purpose** 31:5 35:23 37:25 268:25 269:2,6

**purposes** 16:9 342:23,25

**pursuant** 222:24 223:3,6, 18,21,24 224:4 230:23 231:24 232:6,11,20 233:21 236:2 279:7 281:8, 15 282:15 302:21 336:7 339:12

**push** 323:14

**pushing** 177:9 253:8

**put** 27:11 31:8 95:7 96:22 173:17 229:6 289:9 293:20 322:12,15

**putting** 176:5 284:12 285:4 286:2 322:2

**puzzle** 87:10 168:2

**PX** 80:1 82:3,7 147:10,12 190:7,21 191:9 238:15 263:17 268:8 278:17 280:1 301:6,14,17 335:23

**Q**

**qualification** 75:20 192:19

**qualifications** 71:10 72:12 73:22 74:21 75:17, 25 76:2,5 77:13 92:19 192:2,7,23 201:15 330:12, 18

**qualified** 72:8 73:20 217:25 267:11 283:15 299:13 330:18 336:12

**question** 13:3,4,5,10,11, 24 18:25 21:15,16 36:23, 24 68:19 71:19 73:3 77:10,11 85:16 90:4 92:7 96:13 101:8,15,16 109:15 117:14 131:7,9 138:8 150:2 156:2 161:23 183:1, 7 188:1 190:4 226:18 235:4 237:2,6 260:19 267:21 276:9 296:12,13 297:11 303:24 308:2 313:25 317:25 318:1,23 327:23 329:4,11 334:8 337:3,11

**questioning** 11:6,21

**questionnaire** 246:9,20 249:1 292:24 301:24 303:15,19 304:19

**questionnaire'** 292:15

**questionnaires** 302:22 304:1 310:4

**questions** 13:1,19 64:25 159:17 328:19 329:1,22 345:21 346:14

**Quezada** 341:24

**quick** 133:21 318:1 328:21

**quicker** 35:8

**quickly** 145:25 206:16

**Quigley** 10:13

**quotations** 86:7

**quote** 191:24 267:4

**quote/unquote** 176:19 187:4

**quoted** 194:13

**quoting** 86:7 199:8 234:25

## R

**race** 27:18,20,24 43:10,13 112:1,4,8,13 130:18 316:3

**raised** 331:20 334:22

**ran** 26:24 75:21

**range** 45:23

**reach** 106:7

**read** 18:4 37:2 54:5,8,15 74:5,6 75:5 84:13 105:8,9 112:6 116:24 130:7 137:17 139:10 140:13 141:23 142:7,19 143:4 157:12 172:6 180:7 183:18 186:12,22 191:3 192:3 193:5 194:5,7,8,10 198:20 200:17 207:21 214:21 217:2 225:10 233:4,7,8,16,19 258:5 260:16 264:8 265:20 266:17 271:11,25 272:6,9, 18,19,24 275:7 279:23 283:23 285:9 302:11 305:23 307:13 309:11 326:3,7 336:10,12 337:2, 10,25 338:18 339:21,23 341:14 342:9 343:19 344:23 346:15,17

**reading** 75:10 80:16 112:11 113:12 114:3 117:3 122:18 123:13 124:21 126:12 135:1 191:1 207:18 231:25 232:1,4 236:24 283:20 288:4

**ready** 60:25

**real** 45:6,9,11,12 128:16, 21 145:25 181:5,7,9,11, 13,17,20,22,24 206:16 328:21 330:7

**reason** 13:14,25 14:3 42:5,8 77:16 78:1 97:14 140:9,14 152:16 158:12 170:21 184:8,11,14 218:5 231:23 241:1 249:16 250:13 254:24 261:6 288:17 289:16 304:12 324:23 325:10

**reasonable** 59:7 117:21 119:1,18 120:3,17 121:18 132:23 209:5,13,17 210:3 227:15 239:20 240:11,21, 22,24 241:2,3,6 265:21,25 305:2,6 309:1 311:10,13, 14 312:20 313:22

**reasons** 61:24 78:8 97:17,18 140:4 149:13 254:2,7,25 255:2,3 256:1 269:13 304:24

**recall** 16:5 17:3 18:19 19:10,22 20:2,20 22:18 23:4 40:6 51:24 54:19 65:22,24,25 66:17 69:10 71:5,13 76:3,8 82:21,25 90:7,9,10,11 93:18 98:22 99:16,19 100:5 103:8 110:3,15 111:15 112:14 121:23 125:1 126:23 128:25 133:15 135:6,8,9, 11 136:4,13 137:7 147:2 150:24 153:2 154:7 157:15 162:9 164:15,19 166:24 167:19 171:6,9 174:10 193:9 194:20 195:21 198:19 201:7 210:18 213:5,7,18 215:3 221:25 222:7 237:17 238:1 246:24 247:25 248:2 263:15 266:5 275:14 276:18 279:20,22 294:14 296:6 318:7,8,16, 21 325:3,4 326:11 334:24 335:14

**receive** 116:12,14 204:9 255:10 303:17

**received** 99:1 164:6 306:1 336:19

**receives** 222:17,24 223:2,20 231:22 232:6,10 233:20 280:25 299:12 303:20

**receiving** 239:10 271:20, 23 275:4

**recently** 128:21

**recess** 64:23 65:15 105:14 137:24 141:5 190:16 230:15 263:10 307:20 328:14 346:7

**recognize** 49:25 50:7,14 83:10 102:10

**recollection** 21:4,23 22:2,7 137:18 146:22 214:14 247:8

**recommend** 342:16

**recommendation** 29:20 30:6 40:8 342:12

**recommendations** 39:23

**recommended** 341:19

**record** 9:3 11:4 12:14,19 16:10 19:2 21:11 37:2 44:25 65:12,16 67:12,17, 19 75:8 84:7 91:15 95:7, 15,19,22,24 96:3,8,10,16 97:13,15,18,25 105:12,15 108:4 122:15 137:20,21, 25 141:3,6 147:20 180:7 190:14,17 208:13 230:8, 13,17,21 241:8 245:13 263:8,12 289:10 301:10 303:21 306:12,13 307:18, 21 309:19 328:12,15 331:4,6 342:21 343:1,2,5 346:4,9,19

**recorded** 20:18

**recorder** 10:17 222:17,23 223:5,7,16,17,20,24,25 224:13 225:9,13 228:6 230:22 231:1,9,14,21 232:5,19 235:15 236:2,18 239:10 246:14 266:16 271:18,22 274:19,23 275:3 277:6 283:12 299:12 303:20,21 336:18, 20,24 337:6 339:8 340:6

**recorders** 131:4,12 134:16 135:3,24 218:4 222:2 239:7 241:22 244:7 258:11 288:17 304:13 338:4 339:2 340:1

**records** 24:8 145:22 257:18,20 303:17 304:10 312:24 314:21

**rectify** 275:9

**redirect** 346:12

**redrafted** 286:5

**refer** 93:7,11 94:10 131:4, 12 134:16

**reference** 202:21 301:5 303:5

**references** 201:16

**referred** 104:10,11 228:1 231:3

**referring** 73:9 193:11 194:9,10 201:19 203:5 235:8,12 256:5 258:3,10 282:25

**refers** 73:6,10

**reflected** 292:16,20,22

**refresh** 21:4,23 22:1,6 137:18 146:21 214:13 216:22 247:8

**regard** 111:16 264:3 265:13,17

**register** 78:17 80:19 89:3 188:4 189:13 242:22

**registered** 78:15 79:6,10 80:4,9 81:10 82:15 83:23 84:6,19 85:9,22 86:24 88:13 89:14,25 99:21 103:24 185:24 186:7 189:12,21 193:3 196:13 197:18 201:10 202:7 222:18 223:11,19,22 224:8 225:11 228:5 230:24 241:23 244:8 264:3,17 265:8 267:5 271:18 275:3 287:18,22 288:8 292:15 299:13 340:13

**registering** 91:16 92:1 95:8,24 98:9 99:12,18 100:24 101:14 131:6,14 134:18 135:5,22 136:11 187:20

**registrant** 239:8 302:9, 13,15 303:10,21

**registrants** 292:14

**registration** 92:13 178:15 189:11 194:1,3 196:20 198:9 213:20,21

214:18,19 222:12 223:6, 14,16,24 224:2,13 225:14 228:7 229:20 231:2,10 235:16 241:21 244:23 271:21,23 274:20 275:6 283:13 284:5 292:23 299:11 339:10 340:16 343:9,15

**registrations** 148:8 221:24 239:8 302:22

**regular** 26:6 28:12 268:20

**regularly** 58:14

**reintroduce** 322:3 324:7

**reintroducing** 324:19

**related** 45:15 98:12

**relates** 229:22

**relation** 98:8

**relationship** 160:22 161:2,3,4 163:24 213:11, 13

**relative** 130:21 339:25

**releases** 99:3

**relevance** 11:2 34:14,20 42:2,14 51:2,19 93:14 137:10 138:18 139:8,17 151:6 153:6 163:1,3,21 173:5 178:2 189:8 226:10 227:3,12 317:6

**relevancy** 11:5,21 43:8

**reliable** 170:24 199:2

**relied** 143:17,24 272:12

**relies** 142:4 143:13

**rely** 62:1 106:4 198:22 204:17 272:20

**relying** 300:13

**remain** 302:14

**remember** 14:16,25 15:3, 10 17:25 20:8,10 22:8,10 51:14,16 59:25 71:20 73:3 79:11,23 88:7,21 91:5 92:16 120:14,24 135:21, 23 136:3 140:5,6,14,20 151:8,9,14,18 153:2,23 154:18 157:2 158:11 159:17 162:12,17,19 164:24 167:15 171:11 193:17 195:22 200:25 201:6 204:23 205:6 213:8, 14,23 214:1,2 218:3 222:8 240:19 248:3 249:14 252:11,12 253:15,16,18 276:19 277:9,17 278:2,5,6 279:11,17,24 290:25 321:22 330:10 331:11 334:22 335:17,19

**remembers** 91:20

**remove** 148:21

**removed** 148:25 149:15, 24 150:1,6,12,16,20 264:17,24 265:9

**Removes** 299:6,10

**removing** 264:23

**renounce** 221:10

**repeat** 13:3,24 36:25 73:3 85:16 117:14 118:15 131:9 138:8 179:22 180:5 192:20

**repeating** 199:3

**rephrase** 150:2 262:8

**report** 93:13,15 134:6,7,8 223:2,20 232:10 241:22 246:8,20 271:20 274:22 275:5

**reported** 292:14

**reporter** 9:10 10:18 12:23 13:18 19:17,20 37:2 58:20 66:24 79:2 82:5 142:17 152:6 161:21 179:22 180:7 189:1 192:20 206:12 219:3 222:21 265:4 273:4 299:3 339:18

**Reporting** 9:12

**reports** 120:25 130:17 137:6 286:24

**represent** 46:16 47:10,14 147:18 212:13 220:5

**representative** 17:6,11 247:16,18 248:23 252:12 277:3 278:8 289:18 292:2 293:22 294:25 295:22 298:20 308:2,17 324:6

**representatives** 47:4 104:21

**represented** 241:16

**representing** 9:11,19

**Republican** 27:2,12 48:6 103:23,24 160:9,12 196:12,13 203:13,15 206:2 249:24

**Republicans** 106:14 196:14

**request** 40:15 251:23 312:11

**requesting** 223:9 340:10

**requests** 23:10,12,18 25:18 40:17

**require** 131:12 193:12 200:14,15 209:10,11 239:7 243:24 336:23 337:13,14

**required** 22:20 69:13,21 79:23 80:7 87:7 299:11 329:24 336:18,20 337:6

**requirement** 67:9 70:8 73:16 75:15 76:15 79:12, 21 195:1,3 292:23 299:14, 19 303:7

**requirements** 77:13 89:3 92:20 127:10 189:12,13 193:12 195:6 209:14 272:4 277:12,19 278:7 289:13 330:20 335:23

**requires** 68:5 70:15 72:20 241:20 245:10 246:13 266:14,16 271:17, 18,22 275:2 276:15 277:6 292:13 343:22

**requiring** 131:4 244:7 274:19

**requisite** 192:19,23

**reread** 222:6 231:18

**reregister** 200:14,16

**rerun** 322:17

**research** 88:3 226:7 244:2 249:4 269:14,20 310:14 315:13

**reserved** 11:3,5

**residence** 283:12

**residency** 73:10 89:4

**resident** 75:2 223:1,5,10 232:13 242:12,13 329:13 340:12,14 345:10

**residents** 311:22

**resolved** 309:16 320:24 321:1,11

**resources** 228:13

**respect** 142:4 327:23

**respectfully** 105:3 149:21

**respective** 47:6

**respond** 105:4 204:5 210:17 231:2,8,10 239:21 240:5 250:8,16 294:17 305:9 308:9 311:8

**responding** 131:18 228:12

**response** 23:18 25:18 83:20 84:2,16 85:6 98:7 200:13 203:18 343:22 344:8

**responses** 83:11 85:17

**responsibilities** 26:2 29:16 30:25

**responsibility** 30:4 31:2, 3

**responsible** 28:11,23 221:23 313:18

**responsive** 42:24

**rest** 48:1 203:1 288:25

**resubmit** 80:7

**result** 149:18 223:14 305:16 340:16

**results** 41:23 42:11 44:20 106:19 109:5

**retain** 194:2

**retaining** 22:21 23:2

**return** 223:8,13,15 224:6 336:19 339:14 340:10,15

**reveal** 24:13

**review** 15:24 18:5,7,8 19:25 23:14 31:20,24,25 32:12 33:4,20 34:2,3,5,7 36:2,4 37:5,21 56:22 57:10 59:11 60:8,22,23,24 61:11,12 74:1 87:9 266:4 292:11,13 326:7

**reviewed** 18:5,9 19:8 20:4,16 21:3,21 22:3 23:10,12,15,24 275:8

**reviewing** 31:23

**reviews** 38:1,11 57:21

**revised** 234:11 297:13

**revisit** 12:2

**revive** 215:8

**rich** 117:1

**Rigler** 163:13

**Rizzoni** 9:21 71:24 199:16 215:12 238:19 247:3 248:7 252:16 263:18 291:22 294:23 298:9 312:4 314:3 316:20

**RNC** 10:1 48:7,18 49:6,8, 9

**Road** 9:14

**Rogers** 196:10

**role** 50:25 51:3,7,8 83:22 84:4,17 86:16 155:16,18, 20 329:11

**roll** 257:6

**rolls** 149:1,8 150:6,15 200:15 217:11 250:20 255:22 257:15,17,20,21 258:9 260:10 262:4,12 264:18,25 265:9 327:1,2

**room** 32:25 33:1 203:17 260:8 261:5 262:10

**rule** 53:8 54:5,11,17,19 58:8,10 59:14 334:13

**rules** 28:5,8 30:17,18,21, 22,23 31:8,9,10,14 32:14 33:12,18,21 34:1,4,18 35:23 36:19 37:12,16,22 38:10,14,20 39:2,13,18, 20,22 40:7,10,18 49:19 50:1,11,19,23,24,25 51:9, 11,16,18,21,25 52:1,3,5,7, 9,23 53:1,2,4,6,7,9,11,12, 13,14,21 54:25 55:4,5,10, 13,19 56:3,7,14 57:9,10, 13,18,20,21 58:2,7,9,16, 18,23 59:5,11,18 63:5 208:4,10 296:2,3,9,21,25 297:2,4 334:14

**ruling** 194:14

**run** 27:21 29:2 41:14,18, 20 61:24 71:8,11 72:21 76:4 160:15 177:18,19 330:6,20

**running** 165:12 230:8 330:12,13,23

**Rusty** 10:2

**S**

**safe** 80:8 106:2 108:13 182:18

**safeguard** 266:6

**safeguards** 264:1,4 265:22 266:1,3

**Sally** 102:18

**Samudio** 210:10

**sat** 29:10 157:25

**satisfactory** 201:11 224:3 225:12 228:5 271:19 274:21 275:4 283:14 287:22 288:9 339:11

**satisfied** 306:1 307:10, 11,12

**SAVE** 218:11,13,15,20 219:5,18,23 220:5,8,18 221:12,13,15 229:17 231:14 232:2 236:12,17 244:10 288:16

**scared** 301:18

**scary** 228:17,20

**scholar** 197:7 207:22

**scholars** 208:7

**scientific** 108:22

**scientist** 114:17

**Scope** 140:12 324:13

**screened** 173:21

**scroll** 280:7

**search** 24:2,4,5,16,19 25:4

**searched** 24:9,14,18

**searches** 24:8

**secretary** 52:20,21 66:19 72:6 193:9,10,14,18 198:19 222:1 241:20

**section** 72:5 74:11,15,16, 17,21,23 75:9,12 192:18 218:3 222:25 223:3,18,21 224:4 232:2,11,24 233:1 234:2,3,4,10,18,20,23 235:6,7,8,10,19 236:3,12, 14,16 246:7,12 270:9 281:16 283:22 286:20 287:7,23,25 322:4 339:12 344:23

**secure** 106:2 108:13 182:18

**security** 106:17 244:8 245:19 256:19,20

**seek** 151:15 227:5 267:10

**seeks** 72:9 73:21 139:2

**self-evident** 109:25

**Senate** 10:3 12:17 16:16, 21 25:21 26:3,4,12,13,17, 18,20 28:3,4 41:1,8,20 46:16,20 47:19,22 49:3,19 50:1,12,19 52:7,21,23,24 53:17 54:18,22 57:20 58:17 100:7 101:13 105:21,24 106:22 110:10 111:10 152:18,20,22,24 157:20 200:22 237:20 249:4,8,11 250:3 268:15 269:12,16 270:2 280:23 296:1,9 297:22,25 320:12 321:16 331:17 334:5,16, 17 342:15

**Senate's** 47:20

**senator** 24:25 28:1 65:20 67:22 102:6,18,20,21 103:12,13,19,21 104:25 105:18 141:9 143:2 190:20 196:10 199:22 230:20 308:1 329:8 341:24 346:20

**senators** 26:14 102:23 104:20

**send** 167:15 205:3,4 212:7,16 223:7,25 231:1 236:18 246:8,19 253:1,6,7 283:12 336:20,24 337:6, 13 339:2,9 340:6

**sending** 319:8

**sense** 13:6 97:6 108:1,18 109:11,17 149:11 181:25

**sentence** 47:12 104:3 175:21 254:22,23 256:1 257:6 260:4,16 263:25 264:7 265:13,14,16 276:3, 14,15,16 287:8 306:22 336:11

**separate** 82:4 140:4 257:2

**September** 146:10 147:19,21 344:19 345:2

**served** 105:25

**services** 287:10 314:10

**serving** 102:21

**session** 41:9 44:2 45:18, 20,24,25 46:1 53:13 55:1, 5,6,18,21,23 56:25 57:1,4 146:9,12 147:5,17 165:6 215:7,8 268:15,21 318:25 319:11 320:4 321:15 322:25 323:10 324:7 326:23 327:4 333:18

**set** 55:19 63:4 86:20

**setting** 86:23

**settle** 239:12

**settled** 239:16

**Sex** 316:3

**Shah** 9:17 11:7,23 12:4,6, 9,12 13:23 14:7,13,14 16:12 19:18,24 20:17,23 21:1,2,7,19 33:9,15,19,22

34:16,25 35:16 36:25 37:8 39:6,12,19 40:9 42:4,10, 16,23,25 43:14 44:17 45:3 49:5,17,23 50:5,6,13,17, 20 51:4,6,17,22 54:3,8,12, 14 55:22 56:1,12,21 57:6, 14 58:3,25 59:20 60:2,12 61:14 62:3 64:24 65:2,5,9, 11,19 66:10,12,16,22,25 67:1,15,21 68:3,13,22 69:23 70:13 71:1,7,15,21, 25 72:1,19,25 73:17 74:3, 8,11,13,16,20 75:16 77:5, 15,23 78:7,14 79:5,18,25 80:2,17 81:8,16 82:2,6,11, 12,20 83:1,4,9 84:10,14 85:14 86:22 87:23 88:11 89:23 90:5,19 91:14,24 92:6,12,25 93:16 94:16,23 95:5,13 96:25 97:7 100:13,20 101:2,9 102:1,5 104:23 105:10,17 107:14 111:2,17 112:22 113:20 114:12 117:10 118:17 120:20 121:9 122:8 123:2, 11 124:13 126:16 127:14, 21 129:9,18,23 131:2 132:3 133:4,12 134:23 136:19 137:4,13,19 138:3 139:1,11,25 140:25 141:8, 17 142:24 143:1,20,22 144:9 147:9,15 148:23 149:10,25 150:13,21 151:10 152:1,8,14 153:12 154:6,11,19 155:1,12,15 156:9,24 158:14 159:14, 24 160:19 161:7 162:2,7 163:7,12,25 165:21 166:1, 10,13 167:2,13 168:10,21 169:24 170:13,25 171:16 172:15,24 173:7,14 174:20 175:8 176:6,12,17, 23 177:11,20 178:4,18 179:3,12,24 180:1,5,17 181:1 182:9 183:2,4,15 184:3,10,17 185:12,21 186:18 187:16 188:18 189:3,4,14,18 190:5,11, 19,24 191:2,6,9,11,13 192:15,25 196:4 199:14, 17,19 200:3 201:2,8 202:4,12 204:3 205:19 206:10,13,14 208:9,16 209:1 210:8 211:7,21 213:17 214:4,8,12 215:10, 15,20,23 216:17,23 217:12,18 218:1,14 219:2, 4,10,16 220:4,23 221:3,20 222:9 225:24 226:8,13 227:7,17 228:11,23 229:15 230:2,4,7,12,19 231:20 233:10 234:17 236:22 237:3,7,10,25 238:3,20,23 239:17 240:2 241:18 242:8,18,20 243:6, 14,22 244:3,16 245:12 247:1,4,7 248:5,10 249:17,22 250:14 251:8 252:7,19 253:10 254:20 255:7,24 256:24 257:16, 23 258:17,25 259:15,23 261:3,23 262:7,17,25 263:5,13,16,19 265:1,6 267:1,17 268:7,9,24 269:4 272:21 273:1,7,16,23 275:19 276:22 277:20 278:16,18 279:5 280:2,3, 15,18 284:23 285:15 286:13,16 287:4 288:14, 21 289:6 290:9,21 291:19, 25 293:11,15,18 294:5,15, 21,24 295:5,16,24 296:7, 15 297:9 298:12 299:4,17 300:6,10 301:12,16,18,20 302:11,17 303:1,3 305:7, 18 306:13,16 307:17,25 309:4 310:16,24 312:7 313:1 314:1,7,23 315:14, 19 316:14,23 317:8,24 321:12 322:10 323:19 324:1,16 326:8 327:11 328:6,9,20,23 338:12 339:5,20 344:10 345:25 346:10

**share** 14:17 182:13 183:21

**shared** 92:4,16 167:10 168:4 169:9 171:9 199:6 205:4

**she'd** 218:13

**sheet** 196:21 197:12 238:24 253:21 257:1 315:20

**shepherd** 63:8

**shipping** 314:14

**short** 65:7 307:16

**show** 16:10 46:4 57:12 58:1 71:19,22 72:7,16,18 73:25 87:7 117:22 126:20 127:7 155:3 188:13 210:4 224:24 298:5

**showed** 162:22

**showing** 76:13 300:13

**shown** 127:8 162:10 304:8

**shows** 314:8

**sic** 104:9 141:9 169:7 192:1 283:14 295:10

**side** 327:17,18

**sidebar** 82:11

**sign** 19:23 216:16 346:16, 17

**signals** 308:20

**signature** 83:13

**signed** 85:1 194:22 270:25 275:23 290:3 292:15,24 319:25 320:1

**signing** 80:4 223:9 340:11

**signs** 306:21

**silence** 329:3 346:13

**silently** 336:10

**similar** 50:10,11 59:13,14 163:23 174:9 201:21 206:8 213:14 284:25

**similarly** 319:7

**simple** 53:19 237:4

**simplify** 11:20 143:5

**simply** 27:11 62:1 170:3

**single** 104:4 219:20 309:11 316:24

**sir** 109:15 125:4 224:9 232:14 235:1 236:23 338:23 343:10

**sister-in-law** 120:1,15 122:18

**sit** 28:4 33:4 64:3 203:2

**sitting** 77:16 92:8 100:22 102:23 110:1 154:17 195:20 244:4 256:6 266:5 267:25 277:25

**situation** 133:20 148:11 314:25

**skip** 110:5,7

**Skipping** 199:25

**Slack** 25:9,12 162:18

**slightly** 92:7

**slow** 58:21 222:20

**small** 87:10 268:3 315:25

**Social** 244:8 245:19 256:19

**socioeconomic** 116:18, 21

**solely** 142:4 143:13

**solve** 181:13,16,19,22

**solving** 181:11

**somebody's** 244:18 245:15

**sort** 32:13 94:10 113:15 136:20 334:16

**sorts** 130:14 260:24

**SOS** 246:14

**sound** 146:11 212:1 213:24 315:10

**sounds** 65:4 80:14 81:3 146:25 202:10

**Spanish** 345:17,19

**speak** 16:24 48:1,24 49:8 58:20 80:23 87:3 95:3,11, 12 96:20 98:18 100:11 103:13 104:18 107:4,5 123:4,23 125:3 136:12 155:7 164:17 165:4 170:10 172:17 175:15 184:16 185:2 201:24 202:16 204:1 206:25 209:18 261:15 265:3 266:7 304:23 345:16,18, 19

**speaker** 9:24 18:5 19:14 47:5,9,12 141:21,25

142:3,15
**speaking** 37:12,14 56:8 60:11 115:14 139:14 153:18 175:12 183:2 191:20 204:23 252:12,13
**speaks** 237:8 261:19
**spec-** 138:20
**special** 114:14
**specific** 11:18 17:9 21:18 32:22 42:3 51:5 55:24 70:4 100:3,5 112:8 114:14,18 136:3 137:12 168:9 266:5 270:11 334:7,8
**specifically** 22:2,8 23:21 33:17 61:25 94:22 99:11 101:21 111:14,25 113:4 114:10 119:10 121:23 126:7 151:14 154:16 155:7 158:23 164:19 213:8 276:18
**specifics** 91:6 153:13 285:4
**speculate** 140:19 154:18,20 155:6 157:13 258:4
**speculating** 138:20 207:1 209:3 258:4 269:19 309:15
**speculation** 48:23 49:14 77:1,8,20 95:2 97:3 100:10,17,25 110:13 113:18 127:4 128:24 148:15 149:3 150:18 170:9 174:15,24 176:2,10 177:16 183:25 185:8 187:13 188:10 200:24 201:5 203:23,25 210:23 217:21 220:21 225:21 226:4 228:19 229:3 239:14 242:4 243:3,8,19 248:1 253:4 258:14,21,22 259:12 272:15 275:16 293:7 294:13 295:3 304:21 305:13 322:6,7 323:22 325:20
**speech** 18:21
**spend** 331:14
**spent** 45:14 153:24

154:1,2
**spoke** 204:21 252:11
**spon-** 238:7
**sponsor** 62:22,23 156:14,25 157:8 160:18 169:11,12,13 207:1 209:4,18 210:1 237:14 238:11 240:18 247:16,18,19 248:3,4 252:5 269:22,24 275:21 276:24 298:24,25 304:24 305:14,16 306:2 307:6,11 313:23,25 322:20 323:13,14 324:5,6,10 333:15
**sponsor's** 238:7 298:4
**sponsored** 62:5 237:15 247:11
**sponsors** 157:7 297:22,25 298:3 332:12
**SSA** 244:12,17 245:3,15 256:10
**stack** 217:8 335:1
**staff** 16:16,21 26:6,8,10,14,15 32:13 33:6,7,12,25 34:17 38:20 51:20,23,24 155:18,21,24,25 156:20 208:5 249:8 318:20
**staffs** 145:2
**stakeholder** 333:23
**stamp** 102:14
**stand** 53:23
**standard** 131:22,25 132:17 133:15,18 147:4 344:8,13
**standards** 92:20 132:24 133:7
**standing** 58:10 330:17
**start** 153:14 191:20 336:4
**started** 171:25 175:22 182:14 318:4
**starting** 47:8 141:19 229:13 266:14 271:8 279:7 280:12,16 281:7 282:12 283:1 287:8 288:23 290:13 336:6

**starts** 83:21 84:3 246:5 250:6 260:5 263:25 278:23
**state** 10:7 12:13,14 50:1 66:2 67:24 68:25 69:25 72:6 105:25 128:7 142:22 187:1 191:23,25 192:6,18,22,24 193:9,10,15,18 198:19 213:21 214:19 222:1 223:1,12 241:20 242:14 243:1 253:22,25 282:20 311:19 340:9,12,13,14
**State's** 46:18,23 47:11 138:12,13 188:24 189:5
**stated** 223:4,23 232:12 303:18
**statement** 69:18 103:13 176:22 193:7 201:1 213:19 214:17 251:13 254:8 261:8 272:3 276:4
**states** 9:7 68:5,16,21 69:3,12 70:16 73:23 74:25 75:15 117:25 119:11 120:8 149:7 194:2 219:6,24 220:7 223:19,23 224:3 228:25 230:24 254:1,6,10 339:11
**stating** 213:20
**statistics** 313:9,12
**status** 116:18,21 122:10,22 193:4 197:19 220:25 221:15 256:13 284:13 340:17
**statute** 73:6 222:10 235:12 292:13
**Statutes** 234:11
**stay** 205:13 259:1
**staying** 196:23 197:2 344:15
**stays** 201:14
**step** 34:10 257:7
**stepping** 270:3 285:5
**steps** 77:13 188:15,17 303:23 326:12,18,19,20,21,22 327:6,13,24

**sticker** 341:8
**stole** 132:14,15
**stolen** 132:13
**stop** 150:25 183:3 334:19
**stopping** 282:18
**story** 176:11
**strange** 89:22 108:12 168:16
**strategy** 298:4 333:10
**structure** 39:4
**struggle** 317:17
**studied** 140:17 192:13
**studies** 114:15 120:25 130:16 137:6 240:3,4,7
**study** 136:21 140:16,23 222:7 240:9
**stuff** 165:12 326:17
**subdivision** 223:6 281:16 282:16,18 283:1,22
**subject** 136:10 172:2,5 196:19 200:10 248:24 252:21 261:7
**subjecting** 134:15 135:3
**subjective** 35:17,18 241:3 267:21
**submission** 302:16
**submit** 71:9 302:9,13 303:10
**subparagraph** 280:12 281:13
**subsection** 72:4 222:25 229:25 231:24 232:7,8,9,10 233:6,21 281:15 282:15,25 283:21 336:7
**subsections** 281:20
**subsequently** 242:22
**substance** 173:16 214:24 216:3 269:9 270:24 282:9 290:14,23 322:15 342:6

**substantially** 59:14

**substantive** 284:15

**sue** 260:24 261:9

**sufficient** 72:7 250:16 267:4,9 308:14,15 309:25

**suggest** 152:25 261:13 335:15

**suggesting** 11:13 108:23

**suggestion** 10:25 153:3

**suggests** 178:6

**Suite** 9:14

**Sullivan** 9:10

**summarize** 217:11

**summary** 223:2,20 232:10 238:17 246:8,20 249:1 271:20 274:21 275:5 286:24

**summer** 23:7,8 44:4

**support** 38:6 136:5 169:15 196:19 332:19

**supported** 331:1 345:5

**supposed** 127:13 153:8, 10 187:2 188:23 189:1,5 243:10

**surprise** 38:4 125:25 146:25 151:12 173:13

**surprised** 107:7

**surprises** 105:6

**suspend** 53:7

**suspended** 53:14

**suspicion** 132:23

**swear** 10:19 70:15

**swearing** 70:17

**sworn** 10:22

**system** 174:13 218:7,16 229:1

**systematic** 218:6,15 244:9

**T**

**tab** 46:5 49:18 66:11 71:22,24 74:8 79:25 83:2 101:24 141:10 171:12 190:6 195:24 199:20 205:9,15 210:4 214:8 215:11 238:15,17 247:1 248:6 249:18 252:14 263:16 268:7 273:1 278:16 291:20 298:6 301:4 312:3 314:1

**tackles** 197:1

**takes** 27:1 53:12 221:14, 19,22 240:5 291:3 309:11, 12 310:10 311:18 312:9

**taking** 9:13 13:11 69:22 70:24 97:23 115:6,7 174:22 229:7

**talk** 14:15 22:19 56:4 60:4 99:11 100:1 119:12,23 121:19 153:13 154:16 155:11,16 162:8 165:9 168:18 196:24 198:2 207:22 213:4 216:18 254:9 290:11 291:20 331:13 335:20 337:25 340:19

**talked** 18:3 21:20 92:13 116:3 119:14,16 133:22 145:24 151:20 156:13 161:24 163:5,6 197:22 198:5 205:2 291:10 318:24 320:3,5 327:5,6

**talking** 34:23 36:18,20 37:10 40:11 55:25 57:13 58:1,2 75:9 92:13 100:23 101:4,13 107:10 109:9 110:16 111:8 119:17 120:11,14 133:1 138:23 139:2,23,24 140:1 150:1 168:20 202:22 229:17,24 232:3 252:21,24 253:6,7 264:7 276:3,6,7 281:1 282:8,9,19 283:5 303:4,14 318:2 324:18 325:9 331:15

**talks** 210:14 218:4 244:7 292:10

**targeted** 306:25

**task** 98:23,24 99:13

**tasked** 30:23

**Teams** 162:18

**technical** 156:11

**technically** 25:25 27:4 282:2

**telling** 159:16 210:2 224:22 290:2

**temporary** 53:7

**ten** 311:1

**tend** 11:10

**term** 172:8,19,25 173:3,9 241:3 318:12,14

**terms** 11:9 41:17

**testified** 10:23 44:9 135:15,24 153:22 169:14 310:9 311:17 318:11 324:17 333:17

**testify** 13:14,25 63:8 136:1 310:17

**testifying** 12:20

**testimony** 14:4 21:4,24 31:13 36:21 39:15 109:12 135:7,11 136:3,7 145:17 155:13 159:8,13 166:4,8, 9,20 178:23 189:22 195:1 197:23 220:9 272:18,23 327:9

**text** 24:19,20 25:8,16 89:20 117:3 122:18 123:14 124:21 126:12,13, 14 162:14 164:11 238:16 273:25 280:7,17 286:17 335:7,23

**texting** 164:10,12

**texts** 20:3,11

**thereto** 59:6

**thing** 13:9 24:18 27:5 54:2 89:2,15 91:23 94:9 96:6 113:2 114:18 118:15 127:15 133:20 139:22 141:12 145:14 166:22 168:16 191:3 204:15 210:3 273:24 276:9 286:12,14 300:25 311:6 312:9 323:6 328:5 337:2 344:4

**things** 18:20 21:20 22:3, 12,13 30:1,13 35:7,15 36:5,10 37:7 54:25 61:25 72:8 88:22,25 91:4 92:14 96:21,22,23 97:1,22 98:22 99:7 109:24 110:16,24 111:1,3 114:15 115:7 118:22 120:21 130:14 133:5 143:13 156:16 165:6,11 170:11 177:5 204:2 205:4 213:9 219:19, 21 226:12 243:9,11 262:19 270:6 278:12 286:6 289:13,14 325:23 326:14 329:14,24

**thinking** 11:9,12,15 53:16 70:9 80:24 165:11, 12 175:19,20 209:4,5,19, 20 261:17

**thinks** 257:14

**third-party** 145:13

**thirty** 223:13,15 224:2 225:12 228:6

**thought** 43:9,13 49:15,16 50:4 76:9 77:3 78:5 92:5 119:18 120:2,17 121:17 140:21 166:18 179:7,8 208:11 209:13 222:3 265:22 310:6

**thoughts** 209:21

**thousand** 160:14

**thousands** 22:9 60:16 62:11 105:6 109:23 212:20,22

**three-fourths** 246:2

**threshold** 316:15

**tie** 233:14

**Tim** 10:6 142:21

**time** 9:4 13:8 19:17,20 28:14 30:21 39:5 40:19,25 45:14,21 48:8,14 55:19 56:6,7,13,19,20 57:8 65:13,17,23 67:17,20 72:8 73:21 74:25 82:19 83:17 102:21 103:22,25 105:13, 16 118:25 123:24 129:10

137:22 138:1 140:15,20 141:4,7 149:11 151:16,19 152:6,22,25 157:5,12 161:18,21 163:6 164:18 171:10 179:18 180:14,18 190:15,18 203:17 204:11 211:20 212:19 215:5 224:22 227:16 228:13 230:14,17 237:8 239:20 240:12,23 243:11,13 244:5 249:15 250:16 263:9,12 269:21 270:19 285:11 286:24 294:16 300:4 304:18 306:11 307:19,23 309:2,3 310:15, 22 311:3,11 312:20 313:18 320:10 325:8 326:7 328:13,16 329:9 334:18 339:22 342:12 345:6 346:4,9,19

**times** 15:12 18:1 27:10 53:14 64:7 91:20 125:25 132:19 157:12 211:11 212:1,14 241:9 309:9 319:10 344:2

**title** 12:15 30:10,11 246:1 270:9

**titled** 50:1

**titles** 28:7

**today** 12:21 13:15 14:1,4 16:24 21:5,21,24 77:16 92:8 100:22 110:1 200:13 202:18 203:18 244:4 251:23 256:6 277:25 328:24 344:17

**today's** 9:9 12:18 14:16, 21

**told** 16:25 17:3,4 23:9 24:6,12 91:20 119:18,19 252:5 276:19,23,24 289:18 293:22 306:8

**Toma** 9:24 17:6,11 46:4 71:23,25 83:3,19 263:18

**Toma's** 18:6

**top** 47:17 102:6 128:11, 15,23 136:6 140:5 202:17 234:11 248:11 256:7 257:5 260:20 316:24 319:9 331:5 338:11,15,23

**topic** 172:7

**total** 90:21

**totally** 143:10

**tradition** 27:7 64:6

**traditionally** 27:8

**traditions** 55:2

**transcribed** 277:9

**transcribing** 12:24

**transcript** 9:1 18:6,7,10, 11,12,18,20 159:6 190:21 268:11 274:15 340:22

**transcripts** 11:9 16:4 18:5,8,17

**treated** 112:9 118:4,5

**treats** 112:4,9 113:25 114:2

**tree** 205:16

**trial** 18:17 191:7 343:2

**tribal** 194:2 197:2 329:16

**true** 83:17 85:2 88:3,4 125:18 126:7,12 220:10 221:2,6 299:23,24 300:14, 16,19 303:21

**Trump** 177:25

**truth** 224:22 290:3

**truthfully** 13:15 14:1

**Tuesday** 200:7

**tuned** 205:13

**turn** 78:19 341:11

**tweet** 89:12 93:2

**tweeter** 134:8

**twenty-five** 75:1

**Twitter** 87:13 89:5,21 90:22 92:17 93:23,25 94:2,17 132:8 133:20

**two-minute** 105:10 263:5 328:9

**two-thirds** 291:3,10,12

**type** 302:12

**typical** 174:2

**typically** 27:13 45:20 63:3,7 64:4,6 204:9

**U**

**U.S.** 70:18 75:23 138:6 187:19 191:25 207:14,15 218:5 220:8,18,24 229:1 241:23 271:24 274:24 288:18 299:20 303:7,19 329:15

**Uh-huh** 13:7 21:22 32:6 33:19,23 35:3 46:12 47:2 51:4 59:23 60:15 63:24 79:8 85:20 101:12 102:8, 16 104:7 124:22 134:4 145:7 147:25 149:14 166:5 184:22 189:23 195:15 196:22 198:4 200:8 201:13 202:20 205:22 209:2 210:13 215:17 216:1 217:1 218:8 229:18 239:22 242:18 246:4 247:4 250:4 251:25 254:5,15 256:3,14 257:3 260:7 265:15 268:13,19 269:5 272:10 274:5 279:14 280:9 281:9,17 282:11,14,17 283:10 284:2,7 285:18 287:24 288:1 292:4,8,12 293:2 297:20 298:17 299:7,22 304:6,11 305:10 306:19 307:3 308:5 312:12 316:6, 20 317:1 319:2 320:1 345:12

**uh-huhs** 13:18

**ultimately** 26:15,17,18 156:7 160:16 270:24

**unamended** 332:3

**uncertainty** 195:12

**uncommon** 322:22

**unconstitutional** 35:13 126:2 208:11

**under-** 318:11

**undermine** 174:12,18,22

**undermines** 175:2

**understand** 12:20,23 13:3 19:3,5 24:1,11 36:21 43:11,20 52:3 56:10,18,23 58:21 60:8 61:2,3,4 68:4, 19 70:9,10 73:7 75:19 80:13 81:14,24,25 86:17 90:20 93:1,5 97:8,20 99:24 107:15 115:11,25 116:2,4 142:18 159:25 172:11,13,19,23 175:4,23 176:3 181:21 187:8,18,22 201:19 202:5 206:20 207:4,12 217:16 218:19, 20 219:5 220:7 222:14 230:22 231:4,5 237:8 242:1 244:18,21 257:11 259:24 261:12 270:3,12 276:5 282:7 292:17 293:3 302:20 321:2,8 325:9

**understanding** 23:1 31:13 35:22 46:18,22 47:11 52:22 62:22 69:2 81:9,17 82:13 117:4 128:18 132:4,6 134:5 146:1,2,4,16 148:10,19 150:4,11 153:19 167:4 180:2 189:10 194:25 195:5 207:16 209:15,16, 23 213:10 216:19 217:20, 22 222:15 242:24 245:4 258:18 259:10 262:9,15 272:3 274:16,17 277:18 294:2,4 299:25 308:7

**understood** 13:5 27:20 73:14 92:18 93:6 270:20

**uniformity** 55:14

**unique** 46:17,21 47:10, 14,20,21,24 48:4 105:19, 22

**unit** 101:20 133:23 134:5, 8

**United** 9:7 68:5,16,21 69:3,12 70:16 73:23 74:24 75:15 117:25 119:11 120:8 219:6,24 220:6 223:19,23 224:3 228:25 230:24 339:11

**unlawful** 93:12

**unnecessarily** 11:6

**unqualified** 254:2,7

256:2

**unreasonable** 91:9,12 127:12 130:5,15 313:17, 18

**untouched** 55:11

**unusual** 53:14 115:23 215:6

**upcoming** 343:14

**update** 165:5 221:14 242:25 243:24

**updating** 149:8

**upheld** 46:25 49:1

**uphold** 66:1 67:23 68:24 69:25 70:5,16

**upwards** 314:25

**utilize** 254:10

**V**

**vague** 39:1 42:1,14 43:8 44:22 61:9,20 87:1 93:14 97:4 104:16 123:7 129:21 155:23 162:4 169:21 177:17 180:4,22,23 182:5 183:9 188:9 213:12 221:1 228:18 239:25 242:3 243:18 255:4 257:19 264:20 286:10 293:13 294:12 308:11 317:19 321:7 322:5 323:11

**Vaguely** 151:3

**variety** 57:8

**vehicle** 216:8 290:23

**verbatim** 133:14

**verification** 218:6,16,25 244:9

**verifications** 255:23

**verify** 91:16 198:14,16 256:12 287:10 300:16

**verifying** 83:13 85:1

**versed** 208:7

**version** 278:19 326:3

**versus** 9:6 117:25 118:10 119:11,24 120:7,22 194:1 285:6

**veto** 213:16 215:8 216:9, 15 266:15 267:16,19,22 271:16 281:25 282:5 285:12,13,24 289:15,17, 25 291:1,2,7,9,15,17,18 295:7 307:2 342:4

**vetoed** 213:15 214:24 215:4,6 216:4,12 263:14 266:21 269:7 271:15 277:1 289:21,22,23 295:12,19 322:11,15,24

**vetoes** 267:24 268:5 309:10

**vetoing** 263:21

**vetted** 208:5 290:18 332:23

**vetting** 333:7,10

**vice** 32:24

**video** 9:12 142:23 144:14 346:4

**view** 178:5 241:13 310:1

**views** 171:1 210:19,20 241:10

**violated** 98:14

**vital** 314:21

**voice** 79:3

**Volume** 9:5 346:5,19

**Vota** 9:6 10:12

**vote** 22:9,11 26:25 39:9 50:24 53:11 60:23 61:2,5, 6,11,13,18 78:17 79:6,10 80:5,9 83:24 84:6,19 85:9, 23 86:15,24 87:8,18 88:13 89:3,6,14,25 91:10,11,17 92:1,20,22 94:8 95:8,24 96:24 97:13 98:9 99:12, 18,21 100:24 101:15 117:23 119:20 131:6,14 134:18 135:5,22 136:11 137:15 138:5,15 148:22 149:9 182:15 187:12 188:4,14,15,20 189:12,13, 19 191:25 193:4 197:18 201:10 206:18,21 208:19 210:3 217:25 223:11,22 239:18 242:22 249:25 250:25 255:9,12,13 258:8 264:2,10,13 267:5 287:22 288:8 291:3,12,13 302:15 317:11,13 326:4,5 327:17, 19 330:13 335:14,19 340:13 342:16

**voted** 27:13 51:9 53:21 84:12,20,21 92:9 93:3 94:5 106:20 140:7 153:15 183:17 184:5,20,23 191:15 209:22 213:5,8 219:11,22 221:21 226:9 227:2 238:13 245:23 255:15 265:21 272:12 330:25 331:2

**voter** 44:24 78:15 99:7 101:20 103:6,10 104:11 109:10,19,22 110:11 111:11 121:11,20 148:7 149:1,8 150:6 167:11,12 170:5 174:12,18 176:4 186:1 192:1,7 196:20 200:15,16 208:19,25 213:19,20 214:18 217:11, 23 220:8 221:23 222:12 224:13 239:8 241:21,23 244:23 250:7,20 257:6,15, 17,20,21 258:9 260:10 262:4,12 267:10 271:21, 23 274:20 275:5 302:16, 22 327:1 336:18,19,24 337:6 343:9 344:19

**voters** 80:8 111:20 112:1, 25 113:22 116:18 117:12, 17 120:22 122:4,10,22 124:15 131:5,13 134:16 137:9,15 138:5,15,16 139:3 148:11,20 149:23 150:11,19 175:1 186:22 187:23 195:4 209:25 217:11,20,23 219:6,23 220:6 242:7,11 244:8 250:24 251:3,15,16 255:6 264:11,23,24,25 267:5 288:10,16 304:16 327:2 340:3 343:14

**votes** 39:2 43:10,11 97:14 270:1

**voting** 87:20,22 89:11 90:13 91:10 92:14,18,24 94:18 96:6 97:24 98:13 100:2 101:5,17,22 131:17 137:9 138:17 139:3 140:10 167:7 171:25 174:9,22 175:1,2,22 176:7,19 177:24 178:5,8, 11,20 179:19 180:16 182:20 183:21 184:12 185:6 186:2,3,7,8,9,10 187:2,6,19,23 189:6 209:20,24,25 212:21 255:6 318:4 331:6,7

**Voto** 10:12

**W**

**wait** 179:13 181:18 300:11 321:14 322:3,17

**waited** 323:10

**walks** 38:18

**wanted** 33:4 141:12 145:24 158:12 165:8 167:3 276:1,4 323:13,14

**war** 94:2

**warning** 21:1

**Warren** 9:5 10:21 12:16 346:5,20,24

**wasting** 109:23

**watch** 20:18

**watching** 326:14

**Watkins** 10:9

**ways** 38:1 61:24

**website** 52:14 142:6 143:7,14,18,25 144:12,21 145:3,4,18,19 173:17 193:20 312:8

**weeds** 148:6

**week** 11:16 45:18,19,22, 23 158:6

**weekend** 15:2,4,6,7

**weeks** 312:11

**weigh** 120:19

**weird** 47:22 58:24 166:22

**Wendy** 196:9

**whatsoever** 123:21

**widely** 173:18

**wife** 121:14 122:17 345:8

**Wilmerhale** 10:14

**win** 42:5,9

**wins** 106:21

**withholding** 25:17

**won** 42:15,22 44:10,15 106:21

**word** 26:16 53:10 57:19 68:15 110:19 172:19 287:8,15 290:2 331:9

**worded** 47:22

**wording** 156:11

**words** 125:16 182:17 183:6,7 258:24 286:4,8, 12,15

**work** 13:12 14:9 45:2,6, 11,12 73:13 115:22 219:12,14 259:3 260:9 262:3,11 291:4,7,11 330:15 332:17,20

**worked** 295:1,11,18,22 298:20 305:16 307:11 308:21 309:6

**working** 22:12 44:24 55:7 63:13 249:8 293:22 308:2 333:22

**works** 23:21 60:5 264:22

**world** 127:10,11 181:5,7, 9,11,13,17,20,22,24

**worried** 107:13

**worry** 228:21

**wow** 191:1

**write** 62:8 86:13,14 177:13 259:22

**writes** 102:22 104:1 251:19

**writing** 66:18,21

**written** 146:18 211:1 212:9 222:17 285:12 288:6 303:10

**wrong** 28:11 147:19 233:19 277:24 318:11

**wrote** 62:16,17 63:23,25 64:9 80:24 103:22 160:3 166:3,11 210:1

**Y**

**Yavapai** 10:17

**year** 29:13 33:2 46:2 75:4 78:19,21 104:3 160:15

**years** 29:14 41:2,21 57:5 75:1,3 128:12 291:3,18 311:1,14 324:8 330:10

**yellow** 341:8

**Yentes** 163:15 248:23

**yesterday** 344:18

**yield** 328:24

**Yuma** 99:5,20 103:11 111:4,5,7 185:20

**Z**

**Zoom** 10:4 25:9,12 142:22 162:18 164:14,15, 16,19 346:12

# Exhibit 8

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

Mi Familia Vota, et al., )
) Case No:
Plaintiffs, ) 2:22-cv-00509-SRB
) (Lead)
vs. )
) CV-22-00519-PHX-SRB
Adrian Fontes, in his official ) CV-22-01003-PHX-SRB
capacity as Arizona Secretary of ) CV-22-01124-PHX-SRB
State, et al., ) CV-22-01369-PHX-SRB
) CV-22-01381-PHX-SRB
Defendants. ) CV-22-01602-PHX-SRB
________________________________) CV-22-01901-PHX-SRB
)
AND CONSOLIDATED CASES. )
________________________________)

DEPOSITION OF COCHISE COUNTY RECORDER
REPRESENTED BY DAVID W. STEVENS
VIDEOTAPED

Bisbee, Arizona
August 14, 2023

Reported by:
Jody L. Lenschow, RMR, CRR
Certified Court Reporter
Certification No. 50192

INDEX TO EXAMINATIONS

| WITNESS | PAGE |
|---|---|
| DAVID W. STEVENS | |
| EXAMINATION BY MR. SHERMAN | 10 |
| EXAMINATION BY MR. JOHNSON | 79 |
| EXAMINATION BY MS. BRAILEY | 88 |
| EXAMINATION BY MR. LANGHOFER | 92 |
| EXAMINATION BY MR. HORLEY | 100 |
| EXAMINATION BY MS. DIBRELL | 122 |
| RE-EXAMINATION BY MR. JOHNSON | 124 |
| RE-EXAMINATION BY MR. LANGHOFER | 129 |

INDEX TO EXHIBITS PREVIOUSLY MARKED

| NO. | DESCRIPTION | IDENTIFIED |
|---|---|---|
| Exhibit 19 | House Bill 2492 | 24 |
| Exhibit 21 | House Bill 2243 | 24 |
| Exhibit 24 | "What constitutes Documentary Proof of Residency?" | 82 |
| Exhibit 47 | State's Consolidated Motion to Dismiss Plaintiffs' Complaints Under Rules 12(B)(1) and (B)(6) | 20 |

INDEX TO EXHIBITS

| NO. | DESCRIPTION | IDENTIFIED |
|---|---|---|
| Exhibit 120 | Plaintiffs' Second Amended Notice of Deposition of Cochise County Recorder's Office Pursuant to Rule 30(b)(6) | 14 |
| Exhibit 121 | Defendant Cochise County Recorder David Stevens' Response to Plaintiff's First Request for Production of Documents | 16 |

INDEX TO EXHIBITS CONTINUED


| NO. | DESCRIPTION | IDENTIFIED |
| --- | --- | --- |
| Exhibit 122 | Cochise County Recorder's Response to the Consolidated Plaintiff's First Request for Production of Documents | 17 |
| Exhibit 123 | Defendant Cochise County Recorder David Stevens' Responses to Plaintiff's First Set of Interrogatories | 18 |
| Exhibit 124 | Responses of Cochise County Recorder David Stevens', In His Official Capacity, to First Set of Interrogatories Propounded Consolidated Plaintiffs | 19 |
| Exhibit 125 | 10/17/2022 e-mail to Cochise re MVD HAVA checks Follow Up AZSOS-239070-239071 | 64 |
| Exhibit 126 | No Voter identifying Information How Registered Excel Spreadsheet | 106 |
| Exhibit 127 | No Voter Identifying Information Voting History Excel Spreadsheet | 115 |
| Exhibit 128 | Cross State Voter Participation Report Excel Spreadsheet | 120 |

VIDEOTAPED DEPOSITION OF COCHISE COUNTY RECORDER
REPRESENTED BY DAVID W. STEVENS

was taken on August 14, 2023, commencing at 9:35 a.m., at the offices of the Cochise County Recorder, 1416 Melody Lane, Bisbee, Arizona, before Jody L. Lenschow, RMR, CRR, Certified Reporter No. 50192 for the State of Arizona, reported via Zoom Videoconferencing.

* * *

APPEARANCES:

For Living United for Change in Arizona, League of United Latin American Citizens, Arizona Students' Association, ADRC Action, Inter Tribal Council of Arizona, Inc., San Carlos Apache Tribe, and Arizona Coalition for Change:
CAMPAIGN LEGAL CENTER
By: Mr. Hayden Johnson (Via Zoom)
1101 14th Street NW
Suite 400
Washington, D.C. 20005
202-736-2200
hjohnson@campaignlegalcenter.org

FOR MI FAMILIA VOTA AND VOTO LATINO:
ELIAS LAW GROUP, L.L.P.
By: Ms. Mollie DiBrell (Via Zoom)
250 Massachusetts Avenue NW
Suite 400
Washington, D.C. 20001
202-968-4513
mdibrell@elias.law

APPEARANCES CONTINUED:

For Poder Latinx, Chicanos Por La Causa, and Chicanos Por La Causa Action Fund:

FAIR ELECTIONS CENTER
By: Mr. Jon Sherman (Via Zoom)
Mr. Beauregard Patterson (Via Zoom)
1825 K Street NW
Suite 450
Washington, D.C. 20006
202-331-0114
jsherman@fairelectionscenter.org
bpatterson@fairelectionscenter.org

For the Democratic National Committee and Arizona Democratic Party:

WILMER CUTLER PICKERING HALE AND DORR, L.L.P.
By: Ms. Britany Riley-Swanbeck (Via Zoom)
2100 Pennsylvania Avenue NW
Washington, D.C. 20037
202-663-6000
britany.riley-swanbeck@wilmerhale.com

For Promise Arizona and Southwest Voter Registration Education Project:

MEXICAN AMERICAN LEGAL DEFENSE AND EDUCATIONAL FUND:
By: Ms. Erika Cervantes (Via Zoom)
634 S. Spring Street
11th Floor
Los Angeles, California 90014
213-629-0266
ecervantes@maldef.org

For the Arizona Asian American Native Hawaiian and Pacific Islander for Equity Coalition:

LATHAM & WATKINS, L.L.P.
By: Mr. Scott Kanchuger (Via Zoom)
505 Montgomery Street
Suite 2000
San Francisco, California 94111-6538
415-391-0600
amit.makker@lw.com

APPEARANCES CONTINUED:

For the United States:
U.S. DEPARTMENT OF JUSTICE
CIVIL RIGHTS DIVISION, VOTING SECTION
By: Ms. Emily Brailey (Via Zoom)
950 Pennsylvania Avenue, NW
4CON 8th Floor
Washington, D.C. 20530
202-305-1734
emily.brailey@usdoj.gov

For Arizona Secretary of State and Adrian Fontes:
SHERMAN & HOWARD
By: Ms. Shayna Stuart (Via Zoom)
2555 E. Camelback Road
Suite 1050
Phoenix, Arizona 85016-4234
602-240-3008
sstuart@shermanhoward.com

For Arizona Attorney General's Office and
State of Arizona:
OFFICE OF THE ARIZONA ATTORNEY GENERAL
By: Mr. Timothy Horley (Via Zoom)
2005 N. Central Avenue
Phoenix, Arizona 85004
602-542-5025
timothy.horley@azag.gov

For Speaker Toma and President Petersen:
GALLAGHER & KENNEDY
By: Ms. Hannah H. Porter (Via Zoom)
2575 E. Camelback Road
Suite 1100
Phoenix, Arizona 85016
602-530-8175
hannah.porter@gknet.com

APPEARANCES CONTINUED:

For Cochise County:
COCHISE COUNTY ATTORNEY, CIVIL DIVISION
By: Mr. Paul Correa
P.O. Drawer CA
Bisbee, Arizona 85603
520-432-8700
CVAttymeo@cochise.az.gov

For Greenlee County:
GREENLEE COUNTY ATTORNEY'S OFFICE
by: Mr. Gary Griffith (Via Zoom)
P.O. Box 1717
Clifton, Arizona 85533-1717
928-865-4108
ggriffith@greenlee.az.gov

For Republican National Committee:
STATECRAFT, P.L.L.C.
By: Mr. Kory A. Langhofer (Via Zoom)
649 N. Fourth Avenue
Phoenix, Arizona 85003
602-382-4066
kory@statecraftlaw.com

ALSO PRESENT VIA ZOOM:
Mr. Jimmie Sullivan, Videographer
Mr. Daxon Ernyei, RNC

THE VIDEOGRAPHER: Okay. We are on the record. Time on the video monitor is 9:32. Here begins Volume 1, Media No. 1 in the deposition of 30(b)(6) Defendant Cochise County Recorder David W. Stevens in the matter of Mi Familia Vota, et al. versus Adrian Fontes in the United States District Court, District of Arizona, Case No. 2:22-cv-00509-SRB. Today's date is August 14th, 2023. Our court reporter is Jody Lenschow. I am Jimmie Sullivan, a certified legal videographer. We both represent Coash Reporting & Video. The deposition is taking place at 1415 Melody Lane, Bisbee, Arizona. And, Counsels, would you please identify yourselves.

MR. SHERMAN: Jon Sherman at Fair Elections Center. I'm representing the Poder Latinx plaintiffs.

MR. CORREA: I am Paul Correa for the Cochise County Attorney. I'm representing our County Recorder, David Stevens.

THE VIDEOGRAPHER: Is that everyone?

MS. DIBRELL: This is Mollie DiBrell from Elias Law Group on behalf of Plaintiffs Mi Familia Vota and Voto Latino.

MS. BRAILEY: Emily Brailey on behalf of the United States.

MS. CERVANTEZ: Erika Cervantez representing Promise Arizona Plaintiffs.

MS. RILEY-SWANBECK: Britany Riley-Swanbeck from Wilmer Hale representing the Democratic National Committee and the Arizona Democratic Party.

MR. JOHNSON: Hayden Johnson for the LUCHA plaintiffs.

MR. HORLEY: Tim Horley for the State of Arizona and the Arizona Attorney General.

MR. LANGHOFER: Kory Langhofer for the RNC.

MS. PORTER: Hannah Porter for Intervenor Speaker Toma and President Petersen.

MS. STUART: Shayna Stuart for the Arizona Secretary of State, Adrian Fontes.

THE VIDEOGRAPHER: Is that everyone?

All right. Would the court reporter please swear in the witness.

DAVID W. STEVENS,

called as a witness herein, having been first duly sworn by the Certified Court Reporter to speak the truth and nothing but the truth, was examined and testified as follows:

THE VIDEOGRAPHER: And you may proceed.

EXAMINATION

BY MR. SHERMAN:

Q. Thank you. Good morning, Mr. Stevens. Thanks for making time for this deposition today. My name is Jon Sherman. I'm with Fair Elections Center. I represent the Poder Latinx plaintiffs in this consolidated litigation.

Could you please state your full name for the record?

A. Sure. David Wayne Stevens, Cochise County Recorder.

Q. And how long have you been the County Recorder in Cochise County?

A. Six and a half years, roughly.

Q. And are you represented by an attorney today?

A. I am.

Q. And who is that?

A. Paul Correa.

Q. For today's deposition I want to make sure the record is clear on a couple of points.

Do you understand you are testifying under oath today?

A. I do.

Q. Do you understand a court reporter is transcribing this deposition?
A. I do.
Q. With that in mind I'd ask, you know, please answer questions audibly and clearly. Please let me know if you do not understand a question or need me to repeat any part of it. If I ask a question and you answer the question, I will assume that you understood the question. If you do not understand a question, however, please tell me so. Do you understand?
A. Yes.
Q. Great.
During this deposition attorneys may make same objections. Even if they make objections, unless your attorney specifically instructs you not to answer the question, you must still answer the question. Do you understand?
A. Okay.
Q. Any reason you can't testify truthfully today?
A. No.
Q. Is there any reason that you can't give full, complete and accurate testimony today?
A. No.
Q. Are you on any medications or experiencing any condition that would prevent you from giving full and

truthful testimony today?
A. No.
Q. If at any time you need to take a break, just please let me know. The only thing I ask is, if I've already asked a question that's pending, that you finish answering that question before asking to take a break. Do you understand?
A. I do.
Q. Great.
Have you ever been deposed before?
A. No.
Q. For today's deposition you are physically located in the County Recorder's Office in Bisbee?
A. Yes.
Q. Great.
And who else is in the room with you?
A. My attorney, Paul Correa.
Q. Anyone else?
A. No.
Q. Did you bring any materials with you to the deposition?
A. Well, I'm in my office, so yes.
Q. Do you have any of the exhibits before you?
A. We have them all.
Q. Okay, great.

I'll be referring to some of the previously marked exhibits, not too many of those, and then we have the six potential deposition exhibits in the Cochise County Recorder folder, but sounds like you have those in front of you.

Do you have any other documents in front of you beyond the exhibits?

A. I've got some printouts of some notes, a blank voter registration form.

Q. Okay. All right. Thanks very much.

So I want to direct your attention just to the first exhibit in the folder, which was marked as Exhibit A.

A. Coming my way.

Oh, okay.

Q. And what is this document?

A. It looks like it's the lawsuit, 00509.

Q. And if you scroll down to the -- or if you look down to the title, what is the title of this document?

A. This here?

Plaintiffs' Second Amended Notice of Deposition of Cochise County Recorder's Office Pursuant to Rule 30(b)(6).

Q. Great. Thank you.

And you've seen this before today?

A. I believe I have, yes.
Q. Could we mark this as Exhibit 120? I believe that's the next number.
Great.
Do you understand you have been designated as a representative to testify on behalf of the Cochise County Recorder's Office, not in your individual capacity?
A. Correct.
Q. Can we stipulate that whenever I say you or your, that will be the equivalent of saying your office or your offices?
A. Yes.
Q. Great.
Can we also stipulate that unless you specify otherwise, your use of the words I or me shall refer to the Cochise County Recorder's Office as a whole?
A. Yes.
Q. Great.
If you could just flip to the topics, which begin at the bottom of Page 4 and run through Page 9.
A. Got it.
Q. Did you review this list of deposition topics prior to this deposition?
A. I believe I have, yes.

Q. And are you prepared to address each of these today?
A. I believe so.
Q. Great.
What did you do to prepare for today's deposition?
A. Went through the lawsuits, printouts, went back through the two bills in question, and looked for any correspondence going back to when they became law.
Q. Did you meet with anyone from your office to prepare for today's deposition?
A. Just my lawyer.
Q. Okay. Did you discuss today's deposition with anyone else beyond your counsel?
A. Other than I have one, no.
Q. Okay. Did you review any documents to prepare for this deposition beyond what you've already stated?
A. Not that I recall, no.
Q. Okay. And anything else you did to prepare?
A. I don't understand.
Q. Anything else beyond what you've discussed that you did to prepare for today's deposition?
A. No, I don't believe so.
Q. Okay. If we could look at Exhibit B.
A. Oh, B. Okay.

Q. I think I've got these in order here.
And what is this document?
A. It is the Objections and Response to Plaintiff's Requests for Production.
Q. And you prepared this response in consultation with your lawyers; is that correct?
A. I did.
Q. And could we mark this as Exhibit 121?
Did review this document before today's deposition?
A. When we created it, I did.
Q. Okay. But you didn't read it again for this deposition, did you?
A. No.
Q. Okay. Do you want to take a quick look and just see if -- do you have any updates to your responses to this document, any responses for the Equity Coalition's first request for production of documents?
A. I believe no, I have no updates.
Q. Okay. Then if we could take a look at Exhibit C.
A. That would be the Cochise County Recorder's Response to the Consolidated Plaintiff's First Request for Production of Documents.
Q. Great. Thank you.

Could we mark this as Exhibit 122?
And did you create this document along with your -- in consultation with your counsel?
A. Yes.
Q. And did you review it before today's deposition?
A. No.
Q. Okay. Do you want to take a quick look and see if you have any updates to your responses in this document?
A. Yeah, there's just one to number 5.
Q. Okay. And what is that?
A. We don't use Google Codes. We have a process with our IT department to determine nonstandard addressing.
Q. Okay. Any other updates to your --
A. No.
Q. -- responses?
A. No.
Q. Okay. Other than those withheld for privilege and listed on any privilege log, are you withholding any responses or responsive documents on the basis of your objections?
A. I don't believe so.
Q. Okay. Can we take a look at Exhibit D in the

folder.
A. That would be the -- my responses to plaintiff's first set of interrogatories.
Q. Great.
Could we mark this document as Exhibit 123?
And you have seen this before, right; you created this in consultation with your counsel; is that correct?
A. Yes.
Q. And you verified this document at the time it was -- you responded to these interrogatories?
A. I'm not sure what you mean by verified.
Q. You signed and -- you signed the verification at the bottom, you approved them, correct?
A. Yes.
Q. Okay. Did you review these responses to the Equity Coalition interrogatories before this deposition?
A. No.
Q. Okay. Do you want to take a quick look and see if there's any updates to your responses?
A. I didn't see any. I was flipping through it. I think I'm good.
Q. Okay. No updates? All right.
And, lastly, if we could look at Exhibit E, what is this document?

A. My responses in the official capacity to first set of interrogatories propounded consolidated plaintiffs.
Q. Great.
Could we mark this as Exhibit 124?
And you approved this document, correct?
A. Yes.
Q. You created this in consultation with your counsel?
A. Yes.
Q. And did you confer with anyone besides your counsel in preparing this document?
A. I don't recall. I may have spoken to my chief deputy, but I don't recall.
Q. Got it.
Did you review it before today's deposition?
A. No, not today, no.
Q. Okay. Any updates to your responses? If you want, you can take a minute to look through.
A. No, I'm not aware of any updates on this one.
Q. Okay. All right, great. Thanks very much.
I want to pivot and ask you a couple questions about the election procedures manual. Is the version of the election procedures manual from 2019 still the currently operative version of the EPM that your office

uses?

A. Yes, it is.

Q. Is your office legally required to follow the election procedures manual?

MR. LANGHOFER: Form, calls for a legal conclusion.

BY MR. SHERMAN:

Q. You can answer.

A. Along with statute and constitution, yes.

Q. Can I direct you to -- this is one of the marked exhibits previously. It should be numbered 47, Lerma 47.

A. We're getting it.

Q. If it helps to find it, this was previously entered in the case. It's Document 127 from the case, State's Consolidated Motion to Dismiss Plaintiffs' Complaints Under Rules 12(B)(1) and (B)(6).

A. I've got it.

Q. Great.

If you could flip to Page 24, and that's Page 24 at the bottom, not the blue pagination up top.

Oh, I apologize. That's incorrect. I did mean the blue pagination at the top.

A. Oh, Page 24 at the top?

Q. Yeah, the blue pagination at the top, yeah, 24

of 46. I apologize.

And I'll just read what's in this bottom paragraph that I'm looking at.

You see the paragraph beginning Line 19?

A. Yes.

Q. Okay. It says, "Mecinas v. Hobbs is not to the contrary. There, the Ninth Circuit held that a claim asserted solely against the Secretary was redressable because the Secretary promulgates the election procedure manual, which the County Recorders are bound to follow. But unlike ballot order, registration procedures are not a proper subject for the EPM, and their inclusion in such would be improper and not bind the County Recorders."

Do you see that statement?

A. I do.

Q. Does your office agree with the Former Attorney General's position in this brief, that the EPM's instructions on voter registration are merely suggestions, but not legally binding?

MR. CORREA: Object to form.

MR. LANGHOFER: Object to form, calls for a legal conclusion.

This is Kory Langhofer. This might be a good time to clarify that we have a standing stipulation

that an objection by one defendant will be treated as an objection by all so we're not repeating each others' objections.

Jon, is that accurate?

MR. SHERMAN: That's accurate.

MR. CORREA: And feel free to jump in.

BY MR. SHERMAN:

Q. I could repeat the question, Mr. Stevens, if you --

A. Yeah, I'm a little confused as to what's going on, but this might --

Q. Okay. I'll repeat the question. The objections I think have been noted.

Does your office agree with the Former Attorney General's position that the EPM's instructions on voter registration are merely suggestions, but not legally binding?

A. I think you're asking for an opinion of my point. But we have to follow the EPM as written.

Q. So are all parts of the EPM legally binding on your office, including Chapter 1 on voter registration?

MS. STUART: Form.

MR. LANGHOFER: Form.

THE WITNESS: Yes.

BY MR. SHERMAN:

Q. Great.

Can legally binding guidance be conveyed by the Secretary of State's Office to your office by any other means outside the EPM?

MR. LANGHOFER: Form, calls for a legal conclusion.

THE WITNESS: I don't know.

BY MR. SHERMAN:

Q. So if a staff member at the Secretary of State's Office were to send your office an e-mail, would that be legally binding; would you be legally required to follow the instructions in that e-mail?

MS. STUART: Form.

MR. LANGHOFER: Same objection.

THE WITNESS: I don't know.

BY MR. SHERMAN:

Q. Okay. Is that true for -- so you're unsure, as the Cochise County Recorder, whether you're legally required to follow instructions from the Secretary of State's Office that come to you outside of the EPM?

MS. STUART: Form.

BY MR. SHERMAN:

Q. Is that correct?

A. I don't know.

Q. Okay. Are you aware of any other counties that are un -- any other County Recorders that are unsure whether they need to follow instructions that are given to them by the Secretary of State's Office outside of the EPM?

MR. LANGHOFER: Form.

THE WITNESS: I'm unaware what other counties do.

BY MR. SHERMAN:

Q. Okay. Are you aware of any counties that do not believe Chapter 1 on voter registration procedures is legally binding?

MR. LANGHOFER: Form.

THE WITNESS: No.

BY MR. SHERMAN:

Q. Okay. All right. So pivoting to the two challenged laws in this case, are you currently enforcing any part of H.B. 2492?

And when I refer to H.B. 2492, I mean, of course, the chaptered version that was enacted and signed.

And for your reference, yeah, as I ask questions about them, these are Petty Exhibits 19 and 21.

A. Yeah. Is there a specific area of this bill

you're looking at?
Q. No. For the purposes of this question I'm really just asking globally, are you currently enforcing any part of H.B. 2492?
A. I don't know. I'll have to check.
Q. Okay. If you could take a minute to look through.
A. I did not provide either of the two reports.
Q. Okay.
A. One was --
Q. For purposes of this question I'm just asking not what you're not doing, but what you are. Are you enforcing any piece of this legislation?
A. Yes.
Q. Which part?
A. People that register to vote without satisfactory evidence of citizenship.
Q. Okay. Are you referring to something new in this law or are you referring to the preexisting documentary proof of citizenship requirement, which has been around since 2005?
A. To the best of my knowledge, they're both the same.
Q. Are you enforcing any of the new citizenship investigation procedures in this -- in H.B. 2492 or any

of the database matching requirements?

A. To my knowledge, we always have on databases we have access to.

Q. And what do you mean by that in particular?

A. Well, I'm not aware of having access to social security database.

Q. All right. Well, maybe I'll ask some more specific questions as we go along about the particular database matching requirements; but are you -- are you currently enforcing, for instance, the documentary proof of residence requirement?

A. Yes, we are.

Q. And who are you enforcing it as to?

A. I don't understand that question.

Q. I'll rephrase.

Are you enforcing the documentary proof of residence requirement for both state form applicants and federal form applicants?

A. I've only received state form applicants, so I would say yes on that.

Q. Okay. So your office is currently rejecting state form applications unless they comply with the documentary proof of residence requirement?

A. We process them in and they're put in a suspended state.

Q. Understood.
So all forms that are coming in without documentary proof of residence are being held in an indefinite suspended status until they satisfy, can we just stipulate DPOR as shorthand for that?
A. Well, they have a 35-day window. We send them a letter.
Q. Okay.
A. So if they answer within that window, then the registration's changed to active.
Q. Okay. And did the Secretary of State's Office -- does the Secretary of State's Office know that you're currently enforcing the DPOR requirement?
A. I don't know.
Q. Did they instruct you not to enforce the DPOR requirement until the conclusion of this litigation?
A. I don't recall that, no.
Q. Okay. On the citizenship investigation procedures throughout H.B. 2492, are there any database matching -- are you engaging in any database matching for federal form applications that come in without documentary proof of citizenship? And we'll stipulate that DPOC will be shorthand for that.
A. My understanding is we're using what's available to us.

Q. Have you been referring any federal form applicants to law enforcement if they don't submit DPOC?
A. No.
Q. Okay. Have you been performing any database matching checks beyond the HAVA check and SAVE system checks?
A. There could be a match with the MVD; but other than that, no.
Q. Okay. The MVD database is the HAVA check, correct?
A. Correct.
Q. Okay. All right. Could we -- also, the same question with 2243; are you enforcing any part of H.B. 2243 at this time?
A. Yes.
Q. Which parts?
A. If they -- if they register without DPOC, they're sent a letter, and for 35 days they're put in suspense mode.
Q. Do you want to take a quick look through H.B. 2243?
A. Which part?
Q. Take a look down at Page 4. This is 16-165(A)(10). If you could just read that paragraph to yourself. And then I'd also take a look at the database

matching requirements that begin at the bottom of Page 5 and go onto Page 6. Those are the pieces I'm particularly interested in and want to know whether you're currently enforcing those pieces.

A. On Page 4 (A)(10), yes.

You wanted Page 5 (E)?

Q. And then at the bottom of Page 5, Subsection (F) through (J).

A. (F), okay.

Q. Those are the database matching requirements.

Are you engaging in those database matching procedures?

A. You said (F) through the bottom of Page 6?

Q. No, (F) through (J). So if you've read through (J) --

A. Oh, okay.

Q. Yeah.

Are you currently enforcing those database matching procedures?

A. I don't know. I'll have to check. I believe so, though.

Q. And is the Secretary of State's Office aware that you are enforcing --

A. I don't know --

Q. -- these provisions?

A. -- what they're aware of.
Q. Okay. Did the Secretary of State's Office instruct you not to enforce any part of H.B. 2243 until the conclusion of this litigation?
A. I don't recall.
Q. Okay. All right. I'll have some additional questions on this as we move along, but for now --
So your testimony is that you believe you are enforcing these provisions or that you're unsure?
A. Yes, we are -- we are doing the procedures of these two bills as best we can.
Q. All right. Understood. Okay.
So your office's position has been to implement these laws because their technical effective date was January 1st of this year and not to wait until the conclusion of this litigation; is that correct?
A. They're held in suspense waiting the conclusion of this.
Q. All right. So that's for H.B. 2492, where you get a new registration.
Under H.B. 2243 you're dealing with already existing registered voters, so what are -- are you removing people from the rolls --
A. No.
Q. -- based on these citizenship investigation

procedures?

A. No.

Q. All right. I just want to clarify this before we move on. So the provision you read at the top of Page 4 says, "When the County Recorder --" the full text actually says, "Causes for cancellation. The County Recorder shall cancel a registration." That's up in (A) on Page 3. And then Subpart (A)(10) says, "When the County Recorder obtains information pursuant to this section and confirms that the person registered is not a United States citizen."

Are you removing registered voters from the rolls based on the operation of Subpart (A)(10) here?

A. In respect to people already registered, no.

Q. Okay. All right. I'm glad we clarified that.

And you're holding off until the conclusion of this litigation?

A. To fulfill, yes. The statute requires cancellation, and we're holding off on that.

Q. Okay. Has your office seen the draft 2023 EPM?

A. What do you mean by seen?

Q. Have you reviewed it?

A. I have not reviewed it.

Q. Okay. Have you been provided with a copy of it?

A. I have by chapter over the last four or five months.
Q. Okay. So you've been able to provide feedback to the Secretary of State's Office on a chapter by chapter basis?
A. I've had that ability, yes. I have not provided any feedback.
Q. Okay. Got it.
Have you been part of any communications with the Secretary of State's Office regarding interpretation or implementation of H.B. 2492?
A. I'm not aware of any, no.
Q. Okay. Have you been part of any communications with the Secretary of State's Office over H.B. 2243?
A. I don't recall, no.
Q. Okay. Has your office been provided any other draft guidance or document beyond the draft 2023 EPM that elaborates on interpretation or implementation of H.B. 2492 and H.B. 2243?
A. I don't recall any, no.
Q. Okay. In 2021, was the draft EPM adopted?
A. By whom?
Q. So there was a draft EPM proposed by the then-Secretary of State Katie Hobbs' Office, correct?

A. Correct.
Q. But that ultimately wasn't jointly approved by the Governor and the Attorney General, correct?
A. That is my understanding. They have to sign off on it by the end of the year, and I believe they did not.
Q. Is it possible there will be no agreement on a revised and updated EPM this year?
A. I have no idea.
Q. Is it possible?
MR. CORREA: Form.
MR. LANGHOFER: Asked and answered.
BY MR. SHERMAN:
Q. All right. We can move on.
If there's no approved revised EPM by, say, this time next year, will you nevertheless be obligated to enforce all of the portions of H.B. 2492 and H.B. 2243 that are directed at County Recorders?
MS. STUART: Form.
MR. LANGHOFER: Form, calls for a legal conclusion.
THE WITNESS: I don't know.
BY MR. SHERMAN:
Q. Well, earlier you testified that you are charged with and legally bound to implement the EPM, you

said along with the Arizona statutes and the Arizona Constitution. So in the absence of an EPM, doesn't that mean that you'll be obligated to enforce the statutes as you -- as you have them?

MR. LANGHOFER: Same objection.

MS. STUART: Form.

THE WITNESS: Do I still answer this?

MR. CORREA: Yes.

THE WITNESS: Okay. In 2020 the U.S. District Court came in and changed our voter registration rules. So I don't know what the courts are going to do. I don't know if you remember that. They extended voter registration into the closed period. So I have no way of knowing what's going to happen in the future.

BY MR. SHERMAN:

Q. Well, let's just stipulate, assume for the moment there's no court order. Assuming there's no litigation whatsoever, if there's no -- no EPM that's adopted by this time next year, wouldn't your office be obligated to enforce H.B. 2492 and H.B. 2243?

MR. LANGHOFER: Objection.

MS. STUART: Form.

THE WITNESS: Without litigation or court interference, yes.

BY MR. SHERMAN:
Q. Okay. Thank you.
If you need to refer to the two statutes as we move along through this section, those are, again, Petty Exhibits 19 and 21. But I want to ask you just basically, what is information that a person is not a United States citizen?
MR. LANGHOFER: Objection, calls for a legal conclusion.
THE WITNESS: I'm not sure how to even answer that.
BY MR. SHERMAN:
Q. Well, currently, leaving aside these two laws, what does your office consider information that someone is not a U.S. citizen?
MR. LANGHOFER: Same objection.
THE WITNESS: I still -- I don't know.
BY MR. SHERMAN:
Q. All right. Maybe it's too broad.
So just to give a concrete example, is data in a government database showing noncitizenship 20 years ago information that a person is not a U.S. citizen today in 2023?
MR. LANGHOFER: Same objection.
THE WITNESS: I have no idea.

BY MR. SHERMAN:

Q. Okay. Do you know what your office would currently do with such information that's 20 years old?

A. No.

Q. Okay. If you do a HAVA check, for instance, and you see that an (F)-Type license was issued to someone 20 years ago, what does your office -- what conclusions does your office draw from that data?

A. I don't know. 20 years is a lot of time.

Q. Okay. And an (F)-Type license issued 20 years ago, right, only indicates that that person who holds that license was not a U.S. citizen 20 years ago, correct?

A. Correct.

Q. And what procedure does your office follow after seeing that the person was issued a license when they were not a U.S. citizen?

A. I would have to check. I don't know.

Q. Do you treat that as conclusive evidence that they're not a U.S. citizen today in 2023?

MR. LANGHOFER: Form.

THE WITNESS: Are you still referring to a 20-year-old license?

BY MR. SHERMAN:

Q. Correct. Yeah.

A. I would assume that MVD would have current data.

Q. Are you aware that some people don't update their (F)-Type license after they naturalize as U.S. citizens?

A. I have no idea how they do it.

Q. Okay. What I'm trying to assess is, when would information be too old for your office to rely on it as information of a lack of U.S. citizenship in the present day; 10 years, 15 years, 20 years? Where is, roughly, the line?

MR. LANGHOFER: Same objection.

MR. CORREA: Form.

THE WITNESS: There really isn't a line. Anything could be corrected in a day.

BY MR. SHERMAN:

Q. And what do you mean by that?

A. Well, they could have gone out and gotten a U.S. passport.

Q. So when you see old information in a database showing that the person was not a U.S. citizen some 10, 15 years ago, do you follow up with that applicant or voter?

A. In what respect?

Q. Do you send them a notice letter?

A. Not if it's that old, no.
Q. If it's that old, what do you do?
A. It depends on what the circumstance is.
Q. So let me make this concrete. You get an application in. You run a HAVA check. The HAVA check shows that they were issued a foreign-type license 10 years ago.
A. Okay.
Q. And they didn't update it, though they're claiming, right, that they're a U.S. citizen on this voter registration form.
So you can't register them at that point as full ballot voters, correct?
A. Right. We would send a letter.
Q. Okay. And what does that letter ask for?
A. Proof of citizenship, with a list of what they could bring in.
Q. Okay. I just wanted to clarify that.
So you're not treating that old (F)-Type license as conclusive evidence that they're not U.S. citizens in the present day; is that correct?
A. I believe so, that would be correct.
Q. Okay, great.
I have a few questions just about what does your office consider a valid source of information.

MR. SHERMAN: Kory, do you want to enter the usual sort of objection here globally to the next 13 questions?

MR. LANGHOFER: That sounds good. Maybe just let us know when you're done with that series.

MR. SHERMAN: Okay. And this is to the form and calls for a legal conclusion?

MR. LANGHOFER: Yes. Thanks, Jon.

BY MR. SHERMAN:

Q. Okay. So would your office consider anything beyond a government or voter registration database to be valid information that someone is not a U.S. citizen?

A. The valid information is listed in the EPM. That's what we would use.

Q. The EPM contains a list, right, of valid sources -- excuse me, valid proof of U.S. citizenship. I'm asking the opposite.

What are valid sources of information that someone lacks U.S. citizenship? So anything beyond the government or voter registration database, would anything qualify as valid proof of a lack of U.S. citizenship or valid information that someone lacks U.S. citizenship?

A. I don't understand the question. To me it sounds like you're trying to prove a negative.

There's a list of valid things that would provide citizenship, and that's what we go by.

Q. Is there any way to prove that negative, that someone is not a U.S. citizen?

A. I'm not aware of one, no.

Q. Okay. Would a phone call from a voter be valid information that someone is not a U.S. citizen?

A. No.

Q. How about an e-mail from the voter in question; would that be information that that voter is not a U.S. citizen?

A. No.

Q. A signed letter from that voter?

A. No.

Q. How about a phone call from a member of the voter's family, would that be valid information that that voter is not a U.S. citizen?

A. No.

Q. What about a letter from a neighbor?

A. No.

Q. What about a phone call from law enforcement in Arizona?

A. No.

Q. A phone call from law enforcement in another state?

A. No.
Q. What about an e-mail or letter from law enforcement in Arizona, would that be valid information that the voter is not a U.S. citizen?
A. No.
Q. An e-mail or letter from law enforcement in another state?
A. No.
Q. What about an anonymous call or e-mail?
A. No.
Q. And what about lists provided by third-party organizations like True the Vote, would those be valid sources of information that --
A. No.
Q. -- an applicant -- okay. All right.
MR. SHERMAN: So we'll end the global objection there. We'll return to sort of normal operating procedure now.
BY MR. SHERMAN:
Q. By what means can you confirm the authenticity of such information that a voter registration applicant is not a U.S. citizen?
A. I don't confer authenticity.
Q. By what means -- sorry. Did I -- I may have heard you incorrectly.

Is there any way you can confirm, not confer, but can you confirm the authenticity of information that a voter registration applicant is not a U.S. citizen?

A. I'm not sure what your question is.

Q. Sure.

If your office is provided with some kind of information beyond a government database that you have, that you routinely check, is there any way for your office to confirm the authenticity of that source of information?

A. Yeah, we don't determine authenticity.

Q. Okay. And by what means can you confirm the accuracy of information provided to your office that someone is not a U.S. citizen?

A. Say that one more time?

Q. By what means can you confirm the accuracy of any information provided to your office that someone is not a U.S. citizen?

A. Who's providing the data?

Q. Well, let's just stipulate that it comes to your office beyond a government -- outside of a government database.

A. Oh, I'm -- no.

Q. Okay. Has the Secretary of State's Office ever given your office a list of information that constitutes

evidence of a lack of U.S. citizenship?
A. I don't recall seeing one, no.
Q. What if you identify a registered voter who has already satisfied the DPOC requirement, but still holds an (F)-Type -- well, we already covered that. Excuse me. I'll withdraw that.
What if you identify a registered voter who is exempt from the DPOC requirement and has never shown DPOC because they registered prior to when DPOC took effect in 2005; is that information that would tend to show they are not a U.S. citizen?
MR. CORREA: Form.
MR. LANGHOFER: Same objection.
THE WITNESS: I'm not sure what you're asking.
BY MR. SHERMAN:
Q. These are folks who fall within the safe harbor of the DPOC requirement. They were essentially grandfathered into the law because they registered prior to when DPOC took effect in 2005.
Is the fact that they never showed DPOC and satisfied that requirement information that establishes that they're not U.S. citizens?
A. I would not review those records, no.
Q. Okay. So you would have no cause to be

reviewing the records of those folks who were exempt from the DPOC requirement?

A. Correct.

Q. Okay. What is a, quote/unquote, database relating to voter registration, end quote? Can it be something beyond AVID? Anything beyond AVID, could that constitute a database relating to voter registration?

MR. LANGHOFER: Same objection.

THE WITNESS: Not that I'm aware of.

BY MR. SHERMAN:

Q. Okay. H.B. 2492 refers to -- it has a phrase any other state, city, town, county or federal database and any other database relating to voter registration.

Could a list of voters you receive from another Arizona agency constitute a, quote, database relating to voter registration?

MR. LANGHOFER: Same objection.

THE WITNESS: I don't understand your question.

BY MR. SHERMAN:

Q. Could a -- I'll just re -- I'll rephrase it.

Could a list of voters, a list of registered voters, provided to your office by another Arizona agency, could that constitute a database relating to voter registration?

MR. LANGHOFER: Same objection.
THE WITNESS: As of now, no.
BY MR. SHERMAN:
Q. Okay. How about if you receive that same list of registered voters from another state's government agency?
MR. LANGHOFER: Same objection.
THE WITNESS: I'd have to see what the data looks like. I don't know.
BY MR. SHERMAN:
Q. But maybe it could, maybe it wouldn't?
MR. LANGHOFER: Same.
THE WITNESS: We do interstate transfer of data through the ERIC system.
BY MR. SHERMAN:
Q. Okay. Beyond -- so ERIC could constitute a database relating to voter registration?
MR. LANGHOFER: Same objection.
THE WITNESS: My understanding is yeah.
BY MR. SHERMAN:
Q. Anything beyond the statewide voter registration database in AVID or ERIC that could constitute a database relating to voter registration?
A. I'm not aware of one, no.
Q. If you were provided with a list of registered

voters by a private group or private citizen, could that constitute a database relating to voter registration?

A. I don't know.

Q. Maybe it could, maybe it couldn't?

MR. LANGHOFER: Same objection.

THE WITNESS: I don't know.

BY MR. SHERMAN:

Q. Okay. Is it clear or unclear in H.B. 2492 what constitutes a database relating to voter registration?

MR. LANGHOFER: Same objection.

THE WITNESS: It's unclear.

BY MR. SHERMAN:

Q. Thank you.

So please take a moment to look at the same section of H.B. 2243 that we were looking at. This is Petty Exhibit 21. And I'll direct your attention again -- we were just looking at this before. -- to the top of Page 4. This is 16-165(A)(10). And this directs County Recorders to cancel a registration, quote, when the County Recorder obtains information pursuant to this section and confirms that the person registered is not a United States citizen.

And after that language -- you can see that language I'm referring to, correct?

A. Yeah. The first two lines of Page 4?

Q. Page 4, Lines 5 through 7.
A. Okay, Section 10.
Q. Yeah, Section 10.
So after that language, right, H.B. 2243 down below -- we were reading this before. -- on Pages 5 and 6, lists a number of database matching procedures, correct, in Subparts (F) through (J)? Is that correct?
A. We looked at that, yes.
Q. How does one -- under this provision, how does one obtain information that a person registered is not a United States citizen?
A. I don't know.
Q. Are the listed database matching procedures in (F) through (J) the means by which one would obtain information on a lack of U.S. citizenship?
MR. LANGHOFER: Same objection.
THE WITNESS: I don't know.
BY MR. SHERMAN:
Q. Is it clear or unclear?
A. It would be unclear.
Q. Has your office received any guidance on how one obtains information that a person registered is not a United States citizen under this provision?
A. Not to my knowledge. Yeah, not to my knowledge, no.

Q. Okay. Thank you.
And, similarly, (A)(10) refers to confirming the information that has been previously obtained. How would your office confirm that a person registered is not a United States citizen under 16-165(A)(10)?
A. Ask that question one more time.
Q. Sure.
How would your office confirm the information it receives that someone is not a U.S. citizen under this provision?
A. We have a couple of databases that we do use. That would be the MVD or the SAVE.
Q. Okay. And those are listed below as well, right, in (F) through -- databases (F) -- excuse me, in provisions (F) through (J) below, correct, MVD in Sub (F), SAVE system in Sub (H); is that correct?
A. Yes.
Q. And so are these database matching procedures in Subsections (F) through (J), are these the means by which you confirm information that's separately obtained?
A. I don't know.
Q. Is it clear or unclear?
MR. LANGHOFER: Same objection.
THE WITNESS: Unclear.

BY MR. SHERMAN:

Q. What was the response? Sorry.

A. Oh. It was unclear.

Q. Unclear, okay.

Would you need guidance from the Secretary of State's Office to be able to implement this provision?

MR. LANGHOFER: Same objection.

THE WITNESS: I would expect some, yes.

BY MR. SHERMAN:

Q. Would you need it?

MR. LANGHOFER: Same objection, asked and answered.

BY MR. SHERMAN:

Q. All right, we can move on.

I want to direct your attention in particular to Subsection (H) here. This is on Page 6. It says, "To the extent practicable." Do you see this at Line 6 on Page 6?

A. Yes.

Q. "To the extent practicable, each month the County Recorder shall compare persons who are registered to vote in that county and who the County Recorder has reason to believe are not United States citizens," and then it goes on to say you'll perform a check against the SAVE system.

What would give your office a reason to believe a person is not a U.S. citizen?

MR. LANGHOFER: Same objection.

THE WITNESS: I don't know.

BY MR. SHERMAN:

Q. Is that language clear or unclear?

MR. LANGHOFER: Same objection.

THE WITNESS: It would be unclear to the extent practicable.

BY MR. SHERMAN:

Q. Well, what do you mean by that? I'm -- well, let me rephrase the question.

Is the phrase reason to believe are not United States citizens, is that particular phrase clear or unclear?

MR. LANGHOFER: Same objection.

THE WITNESS: I don't know.

BY MR. SHERMAN:

Q. You don't know whether it's clear or unclear to you?

MR. LANGHOFER: Asked and answered, same objection.

BY MR. SHERMAN:

Q. I'm not asking for you to interpret this.

A. Yeah.

Q. But I'm just asking, Mr. Stevens, if it's clear or unclear to you?

MR. LANGHOFER: Same objection.

THE WITNESS: It's -- I don't know.

BY MR. SHERMAN:

Q. Okay. The phrase to the extent practicable appears in a few of these different provisions, (G), (H) and (J). Is that phrase clear or unclear to you?

MR. LANGHOFER: Same objection.

THE WITNESS: It's unclear.

BY MR. SHERMAN:

Q. Okay. Has the Secretary of State's Office provided your office with a list of what would give you or your staff a valid reason to believe someone is not a U.S. citizen?

A. I don't recall ever seeing a list, no.

Q. Has the Secretary of State's Office provided your office with a list of what will not give you or your staff a valid reason to believe someone is not a U.S. citizen?

A. Not to my knowledge, no.

Q. I'm going to provide you with the same scenarios as before, but here the operative language is this phrase the County Recorder has reason to believe are not U.S. citizens.

MR. SHERMAN: Kory, for the next handful of questions, until I take us off, do you want to enter the same form and calls for a legal conclusion objection?

MR. LANGHOFER: Yes, please. Thanks.

MR. SHERMAN: All right.

BY MR. SHERMAN:

Q. So would anything beyond a government or voter registration database give your office reason to believe that a registered voter is not a U.S. citizen?

A. I'm not sure what you mean by government. Are you talking about just state or federal?

Q. Any government database.

Would anything beyond a government database of any level of government or a voter registration database, anything beyond those categories, give your office reason to believe that a registered voter is not a U.S. citizen?

A. I don't believe so, no.

Q. Okay. Would a phone call or e-mail from the voter in question give your office reason to believe that voter is not a U.S. citizen?

A. No.

Q. How about a signed letter from that voter?

A. No.

Q. A phone call from a member of the voter's family?

A. No.

Q. Would a letter from a neighbor give you reason to believe that the voter in question is not a U.S. citizen?

A. No.

Q. What about a phone call from law enforcement in Arizona?

A. No.

Q. A phone call from law enforcement in another state?

A. No.

Q. Would an e-mail or letter from law enforcement in Arizona give your office reason to believe that a particular registered voter is not a U.S. citizen?

A. Possible.

Q. How about an e-mail or letter from law enforcement in another state?

A. No.

Q. How about an anonymous call or anonymous e-mail?

A. No.

Q. And, finally, what about lists provided by third-party organizations like True the Vote?

A. No.
Q. A few more questions on this series before we go out of the objection.
What if the registered voter transposed the first and last name on their registration application form, just switched the two, put their first name in the last name and the last name in the first name; would that give you reason -- would that give you reason to believe they were not a U.S. citizen?
A. No.
Q. What if the registered voter recorded a foreign place of birth on their form?
A. No.
Q. What if you identify a registered voter who has already satisfied the DPOC requirement, but still appears to hold an (F)-Type license in the MVD database; is that reason to believe that they are not, in fact, a U.S. citizen?
A. Possibly.
Q. And what about registered voters who are exempt from the DPOC requirement because they registered prior to when it took effect in 2005; would that failure to show DPOC under this exemption give your office a reason to believe they are not U.S. citizens?
A. No.

Q. Okay. And has your office received any guidance on when your office would have reason to believe that a registered voter is not a U.S. citizen?

A. No.

Q. Lastly, on H.B. -- actually, this is in H.B. 2492, so Petty Exhibit 19. Just give me a sec to go over there.

If you scroll down to I believe this is Section 7, ARS 16-143. Yeah. It's on Page 7, Section 7 of the law.

A. Okay.

Q. And this begins at Line 15. I don't know if you want to take a second to just refresh your memory on this section. It's called federal only voters; attorney general; investigation report. I'm really just interested in Subsection (A), but you can take -- you can glance at the section really quickly.

A. Okay, I'm good.

Q. Great.

You didn't provide this list on or before October 31st, right?

A. No.

Q. Okay. And since the October 31st, 2022 and March 31st, 2023 deadlines noted in Subsection (A) of this provision have come and gone, is your office no

longer required by this provision to submit to the AG a list of registered voters who have not shown satisfactory DPOC?

MR. CORREA: Objection, calls for a legal conclusion.

THE WITNESS: Maybe I missed something, but I don't see the March date in Paragraph (A).

MR. CORREA: Is that down below?

THE WITNESS: Oh, it's --

BY MR. SHERMAN:

Q. Sorry. That's down below.

A. Next page, okay.

Q. Subsection (E) is the -- right, is the report, yeah. These deadlines, you agree, have come and gone, right?

A. Yes.

Q. Is this provision still binding on your office? Will you need to provide these, a list of these individuals in the future?

MR. CORREA: Same objection.

THE WITNESS: My understanding of the statute as it sits right now, no.

BY MR. SHERMAN:

Q. Okay. Thank you.

So I want to go back to ask you a few questions

about the HAVA check process and, really, a few questions about all of the databases. But before we proceed, do you want to take a break, or are you okay to keep going for now?

A. Yeah, I would take five or ten.

MR. SHERMAN: Okay. Why don't we say ten minutes. We can go off the record, come back at 10:43 your time.

THE WITNESS: 10:43? Sounds great.

THE VIDEOGRAPHER: Okay. We are off the record. Time on monitor is 10:34.

(A recess was taken.)

THE VIDEOGRAPHER: We are back on the record. Time on monitor is 10:43, and you may proceed.

MR. SHERMAN: Thank you. I just want to note for the record, before we proceed, that we're back on standard operating procedure, no longer subject to that agreed-upon objection that we entered before or lodged before.

MR. LANGHOFER: Noted. Thanks.

MR. SHERMAN: Thanks.

BY MR. SHERMAN:

Q. So I want to ask you, Mr. Stevens, about some of the databases your office currently accesses, and both about their current and potential future use if

these laws were to be implemented.
So could you just walk us through the mechanics of a HAVA check?
A. Yeah. We have a little button that says HAVA and we click it, and then the return data comes back to us. That sounds kind of simplistic, but that's all we do.
Q. Why does your office have to run Arizona driver's licenses and IDs against the Arizona MVD database?
A. You're asking why we have to do it?
Q. Right. Yeah, what's the purpose of it?
A. My understanding is, typically, the proof of citizenship is provided when they get their driver's license and is passed through from them to us.
Q. So it's not just for purposes of -- is it for purposes of identity, identification, or is it also for purposes of citizenship verification?
A. For identity.
Q. Okay. Not for U.S. citizenship verification?
A. No, but that information is provided, and if provided, it is passed through to us in our AVID system.
Q. Got it.
And so in AVID, when you run the HAVA check, what sort of results are returned; what do you see on

the screen?
A. Well, it populates the registrant's information of what's there. I can't give you a list of exactly everything.
Q. Okay. If the HAVA check returns information indicating that the person was not a U.S. citizen at the time they obtained their Arizona driver's license or state ID, could you just reiterate what steps you take after that point?
A. We would send a letter.
Q. Okay. And is the (F)-Type license the only MVD credential that requires additional proof of citizenship?
A. I don't recall.
Q. Okay. Is there such a thing as a foreign authorized presence license or ID card? Is that the same thing as an (F)-Type license or is that different?
A. I don't know. I don't issue those.
Q. Okay. And, again, that can only tell you -- the HAVA check can only tell you that the applicant or voter was not a U.S. citizen at some time in the past, correct?
A. My understanding, that it gives us the current data that's in the system.
Q. Right. But if you -- or if it shows you that

someone still holds an (F)-Type license that was issued some number of months or years ago, that only indicates to you, right, that they were -- that only proves that they were not a U.S. citizen at that point in the past, correct?

A. That would be my understanding, yes.

Q. Okay. And so when you follow -- how often do you encounter registrants with (F)-Type or foreign authorized presence licenses?

A. I don't know, but I don't think it's very often.

Q. Okay. And do you know how often those individuals provide DPOC in response to the notice letter?

A. No, I don't.

Q. And the notice letter, we don't have a copy before us, but could you tell me, does it ask whether -- does it ask the applicant for a naturalization certificate number, an alien registration number, both?

A. I thought I had one. I think there's a list of valid things that could be provided. I believe they are on it.

Q. Do you check both the naturalization certificate number and the alien registration number against a particular database?

A. I don't know. I'm not aware of a database that would have that.

Q. Okay. So let me ask this. Let me break this down a few different ways. If someone provides a copy of a naturalization certificate to your office, do you have to do anything to verify that naturalization certificate, or is that in and of itself documentary proof of citizenship?

A. I don't know. I think I'd need a certified copy, but I don't know.

Q. Okay. And then let's say no copy of the naturalization certificate is provided, but you're given a naturalization certificate number on that returned notice letter and/or an alien registration number. Do you have to do something to verify the naturalization certificate number and/or the alien registration number?

A. I don't recall off the top of my head. I don't do that daily work.

Q. Okay. So you're not certain -- as the County Recorder, you're not certain if staff members are doing anything to verify naturalization certificate or alien registration numbers?

A. I'll have to check on exactly what we're doing, yes.

Q. Who in your office would know the answer to

that?

A. My chief deputy would.

Q. Okay. What's that person's name?

A. It's Heather Lopez.

Q. Do you know -- do you have any familiarity with the SAVE system that's administered by the Department of Homeland Security?

A. I know we have access to it. We have one person that has an account.

Q. Okay. But that person is not you, I take it?

A. It is not me, correct.

Q. Got it.

So you don't have much familiarity with the SAVE system interface and --

A. No, I do not.

Q. Okay. Do you know what your office is doing with the SAVE system?

A. On a day-to-day basis they access when they need to; but, no, I don't.

Q. Okay. You're not sure when they need to, correct?

A. No.

Q. Okay. Does your existing agreement with ADOT's Motor Vehicle Division cover the uses outlined in H.B. 2492 and H.B. 2243?

A. I would have to assume so. I don't know.

Q. Have you been in communication with ADOT about modifying that agreement in any way?

A. No.

Q. Has your office encountered instances where a voter registration applicant who is a U.S. citizen was flagged erroneously as a noncitizen by way of a search of the MVD databases?

A. No, I don't have any knowledge of that problem.

Q. Okay. Do you recall an incident from last year where database matching produced erroneous results and caused the downgrading of thousands of voters to federal only voting status?

A. Off the top of my head, no, I don't remember that.

Q. Could we take a look at -- this is the last document in the potential exhibits folder, Exhibit (F). It's Bates-stamped AZSOS-239070.

A. Got it.

Q. Do you want to take a moment just to review this e-mail, and let me know if you recognize this document?

Reviewing the first page should be sufficient. When you have a chance to get through the first page, just let me know. That's all there is.

So do you recognize this document, Mr. Stevens?
You're on mute.
A. Sorry, I hit that...
Q. Oh, you're on mute again. I don't know what happened.
A. I think I have things on my keyboard. Let me move them.
Q. Now you're good.
A. We're good.
Okay. Well, I'm on the e-mail.
Q. Do you rec -- you're on the e-mail. Do you recognize this e-mail that was sent to you?
A. Off the top of my head, no. I kind of vaguely remember the issue, now that I'm going through the e-mail. This said we had 67 that had an issue.
Q. Okay. Before I ask you questions about this e-mail, can we just confirm this was an e-mail that was sent to you on October 17th, 2022 by the Arizona Secretary of State's Office; is that correct?
A. Yes.
Q. All right. Can we mark this as Exhibit 125?
And do you recall this incident from October of last year?
A. It's starting to come back.
Q. What happened?

A. That some people were put into a fed only system that should not have been there, I guess. We were -- it looks like we were provided a list of names to check.

Q. And how did this happen?

A. My understanding was it was an issue with the AVID system.

Q. Was it an issue of how the AVID system's HAVA checks were interacting with MVD records?

A. I don't know. I didn't design it.

Q. Okay. So you're not sure on a technical level how this happened, but -- correct?

A. For this, correct.

Q. But do you recall how many voters were affected statewide by this incident?

A. No. We would have only been notified for our county.

Q. And how many voters were affected in Cochise County?

A. If I add them up, it's 71.

Q. In light of this, what does this say to you about the reliability of using the MVD databases to assess a person's current U.S. citizenship status?

A. I can't --

MR. LANGHOFER: Form.

THE WITNESS: I can't answer that until I know exactly what caused the problem. The data could have been correct and the software could have been incorrect.

BY MR. SHERMAN:

Q. Do you think it's problematic to be relying on database matching technology like this to assess citizenship status or whether documentary proof of citizenship has been provided?

MR. LANGHOFER: Form.

THE WITNESS: We have to rely on something.

BY MR. SHERMAN:

Q. If 71 voters were accidentally downgraded in your county, would you say that that's an accurate or inaccurate system?

MR. LANGHOFER: Form.

THE WITNESS: Well, out of the amount of data that goes through that system on a daily basis, it's a very small percentage.

Is that me?

BY MR. SHERMAN:

Q. What does your office do in the event that you cannot match a voter registration applicant or registered voter at all to any record in the MVD driver

license or state ID databases?
A. I'm sorry. Say that one more time?
Q. If you can't get a match at all using a HAVA check, what do you do in that circumstance?
A. I would have to consult with staff. They're the ones that actually handle this.
Q. Do you send a notice letter to that voter registration applicant?
A. Typically, that's what they do, is they send a letter. We have a large selection of letters that we can send out.
Q. Got it.
So it would just be a different form of the similar letter?
A. A different form letter, correct.
Q. Got it.
Is it feasible to use the MVD databases to determine a present day lack of U.S. citizenship?
A. I have no knowledge of the MVD system.
Q. Can you rely on HAVA checks to determine a present day lack of U.S. citizenship?
A. I think the HAVA check provides citizenship, not lack of it.
Q. So you can -- is your testimony that you use a HAVA check to confirm U.S. citizenship, but you can't

use it to confirm a lack of U.S. citizenship; is that correct?

A. We use it to confirm citizenship.

Q. Can you use it to confirm a lack of U.S. citizenship, or do you need to take other steps to figure that out?

A. I'm not aware of us ever trying to do that, so I would guess extra steps would be needed.

Q. Okay. Do you agree that the laws that are the subject of this litigation are -- well, strike that question.

H.B. 2492 and H.B. 2243 use the phrase -- the word practicable a number of times. In terms of resources, access, training, is it practicable for your office to use MVD driver license and nonoperating ID databases for citizenship verification?

A. Yes, it is.

MR. CORREA: Form.

BY MR. SHERMAN:

Q. Is it practicable for your office to do monthly MVD checks of all registered voters in Cochise County?

A. I don't know. We've never done that.

Q. If these laws were implemented, you'd be required to under H.B. 2243. Would that be practicable?

A. Probably, since it's IT-based; but it would be

dependent on the time. There are a lot of restrictions around election times for doing this type of work that would prevent us from doing it at that time.

Q. How many registered voters are there in Cochise County, roughly?

A. Active or inactive, or both?

Q. Let's say active.

A. 76,000.

Q. Could your current-size staff, your staff at its current size and level of resources, check about 76,000 people against the MVD database every month; would that be practicable?

A. Well, it wouldn't be one at a time. You would have to develop some system that -- to do that. If we had to do it one at a time, it would not be practicable, no.

Q. Got it.

Does such a system exist currently to automatically compare all of your county's registered voters against the MVD database?

A. Not to my knowledge, no.

Q. Do you know how long it would take to create such a system?

MR. LANGHOFER: Form.

THE WITNESS: I have no idea.

BY MR. SHERMAN:
Q. Have you had any conversations with the Arizona Secretary of State's Office about creating such a system?
A. No.
Q. H.B. 2492 instructs your office to, quote, use all available resources, end quote, to perform these database searches using MVD data.
Is that possible?
MR. LANGHOFER: Form.
THE WITNESS: Were you talking about 43 or 92?
BY MR. SHERMAN:
Q. 2492.
It says you have to use all -- quote, use all available resources, end quote, to perform these MVD database searches.
Is that possible?
MR. CORREA: Form.
THE WITNESS: It depends on the term available, because most of these are not available to us.
BY MR. SHERMAN:
Q. When you say most of these, what are you referring to?

A. Well, like the Social Security Administration.
Q. Okay.
A. We don't have access. But we may, we may have access in the future.
Q. Okay.
A. If we do, then we will use it.
Q. So for HAVA checks, when someone puts down the last four of their social in lieu of Arizona driver license or ID number, you don't do anything to verify the last four of their social?
A. That's part of the verification process to make them either a hard match or a soft match.
Q. But you don't compare the last four of their social against any SSA database?
A. No.
Q. Okay. Has your office ever been given a specific list of means by which a voter registration applicant can be deemed or proven a noncitizen?
A. I don't recall one, no.
Q. Has your office ever been given a specific list of means by which a currently registered Arizona voter can be deemed or proven a noncitizen?
A. I don't recall any, no.
Q. In the USCIS's SAVE system, are you familiar with what the SAVE system is?

A. No, I am not.
Q. Okay. You testified earlier you don't have access to it, and you don't -- correct?
A. I have one staff member with access.
Q. Got it. Sorry.
But you personally don't have access, correct?
A. Correct, I do not.
Q. Okay. And do you -- does your office currently use the SAVE system for purposes of U.S. citizenship verification, or you're not sure?
A. I'm not sure.
Q. Okay.
MR. SHERMAN: Well, I will say the SAVE system is a big part of both of these laws and it is a part of the litigation, and we expected that a representative designee from the Cochise County Recorder's Office would have relevant knowledge of the SAVE system. So I'll note just here for the record that we may have to hold the deposition open to speak with someone else who could testify as to the SAVE system.
BY MR. SHERMAN:
Q. You're not aware, though, yourself, Mr. Stevens, whether you engage in any alternative citizenship verification process or any alternative verification process with USCIS?

A. No, I'm not.
Q. Okay. Have you personally spoken with USCIS ever about citizenship verification for voter registration?
A. I don't recall ever speaking to anybody about it, no.
Q. Okay. Just give me one moment.
Have you talked with anyone whatsoever about the uses of the SAVE system identified in H.B. 2492 and H.B. 2243?
A. Not to my knowledge, no.
Q. Do you know if it's possible to use the SAVE system if you don't have a naturalization certificate number or an alien registration number?
A. No, I don't know.
Q. Okay. And you've testified that you have no knowledge of -- well, excuse me. Let me strike that.
Do you have any experience with accessing or interfacing with Social Security Administration databases?
A. No.
Q. Can we go back just to Exhibit 124? This is your responses to the consolidated plaintiffs' interrogatories. Should have been Exhibit E as it was in the database.

A. E, okay.
Q. Excuse me, in the Dropbox.
A. Okay.
Q. And on Page 5, top of Page 5, your answer to interrogatory number 4 said, "Cochise County Recorder uses --" do you see this, top of Page 5?
A. Yes.
Q. Okay. "Cochise County Recorder uses the statewide voter registration system (AVID) which checks the registrant's information against AZMVD records and if necessary, the Social Security Administration."
In light of your testimony before, could you just explain what you -- what your office meant by this sentence in response to interrogatory number 4?
A. I would have to confer with staff. I don't know.
Q. Okay. So you're unsure sitting here today whether your staff are using Social Security Administration data for any purpose?
A. I am unsure, correct.
Q. Do you have any knowledge of the U.S. citizenship status data in SSA's databases?
A. I don't know that terminology.
Q. Do you know if the Social Security Administration databases have information on U.S.

citizenship status?
A. I don't know.
Q. Okay. And as far as you know, your office is not using SSA databases for purposes of citizenship verification; is that correct?
A. Correct.
Q. Okay. H.B. 2243 would require you to compare all of your county's registered voters to SSA databases on a monthly basis. Is that practicable, given your current access or lack thereof?
A. As of right now, no, it's not.
Q. Okay. Would some kind of system or interface have to be developed for you to automatically compare all 76,000 or so registered voters against SSA databases?
A. My understanding would be yes.
Q. Because, again, just to be -- so the record's clear, it would be infeasible, right, to individually compare every single registered voter in your county to SSA databases on a monthly basis; is that correct?
A. Individually, that is correct.
Q. Have you ever heard of the National Association for Public Health Statistics and Information Systems?
A. No.
Q. Are you familiar with any of NAPHSIS's

databases, such as the Electronic Verification of Vital Events database?

A. Doesn't sound familiar, no.

Q. Okay. And so I take it that you don't currently use any of NAPHSIS's databases for any purpose whatsoever, correct?

A. That would be correct.

Q. Have you been talking to any Arizona Secretary of State staff about potentially using the NAPHSIS databases?

A. No.

Q. Okay. Are you familiar with the Electronic Registration Information Center, or ERIC?

A. Yes.

Q. Do you currently use ERIC for U.S. citizenship verification?

A. I don't recall. We use it for a couple of things. I don't recall if that's one of them.

Q. Do you know if ERIC even contains U.S. citizenship status data?

A. No, I don't know.

Q. Do you have the ability to search or interface with any other government databases with U.S. citizenship database -- with U.S. citizenship data?

A. Not to my knowledge, no.

Q. Are there any other databases whatsoever that your office has access to or is trying to gain access to to perform citizenship checks?

A. Not to my knowledge, no.

Q. Has your office been communicating with any other person or entity regarding the use of any database for citizenship verification?

A. No.

Q. Has your office been instructed as to how to use multiple databases simultaneously for citizenship verification?

A. Other than what we already use? No.

Q. Okay. So no one's given your office instructions on how to, say, reconcile conflicting citizenship status information from different databases?

A. Not to my knowledge, correct.

Q. Okay. And have you been given any instruction or guidance on how to ensure an accurate match is made when using a government database or other database for citizenship verification purposes?

A. Yes. I believe that's all in the EPM.

Q. Okay. So that's baked into current guidance for HAVA checks?

A. My understanding, yes.

Q. Okay. All right, just one other area I wanted

to ask you about.

If a registered voter is removed from the rolls under H.B. 2243 based upon an erroneous determination that they are not a U.S. citizen, can that voter be added back to the rolls if the registration deadline has already passed?

MR. LANGHOFER: Calls for a legal conclusion.

THE WITNESS: Currently, no.

BY MR. SHERMAN:

Q. No, they can't?

A. No.

Q. Okay. Even if it's in -- I just want to be clear for the record.

So even if you later determine that someone was erroneous -- found in error to be a noncitizen, they are, in fact, a citizen, once the registration deadline passes, that person can't be added back to the rolls; is that correct?

A. My understanding is that's correct.

MR. LANGHOFER: Same objection.

MR. SHERMAN: Thank you very much for your time, Mr. Stevens. One of my -- some of my other colleagues on the plaintiffs' side of the v. might have questions for you, but I am done.

THE WITNESS: Okay.

MR. SHERMAN: I don't know if folks want to take a break or if someone else is prepared to jump in.

MR. LANGHOFER: Jon, did you say some other plaintiffs are going to go?

MR. SHERMAN: I'm unclear on whether that's the case, but I see Hayden's come off camera. So I am done now.

MR. JOHNSON: Yeah, Jon, I think just a quick break, if you all don't mind. Can we take like a ten-minute break here?

MR. SHERMAN: That sounds great.

MR. JOHNSON: Thanks.

THE VIDEOGRAPHER: I'm so sorry. I forgot to unmute. That is my fault. We are off the record at 11:13, and this will conclude Media 1.

(A recess was taken.)

THE VIDEOGRAPHER: Okay. We are on the record. Time on the monitor is 11:26 and this begins Media No. 2. You may proceed.

EXAMINATION

BY MR. JOHNSON:

Q. Thank you.

And thank you, Recorder Stevens. I'm Hayden Johnson. I represent the LUCHA plaintiffs in this matter. I just wanted to follow up on a couple of things.

What are you doing differently in terms of processing voter registration applications now that you weren't doing before these laws passed?

A. Well, for the fed onlys they're being held in suspense mode, but everything else is the same. They get a letter asking them to provide more documentation.

Q. So when you say the fed only are held in suspense mode, can you elaborate on that?

A. It's just a status in the database; you know, your active, inactive, merged, canceled, suspended, suspense mode. It's just there so we don't lose you in the paperwork shuffle.

Q. So if someone applies now without giving documentary proof of citizenship, they're put in suspense mode, is that what you're saying, for fed only?

A. Correct. Since the first of the year I've got six that are in suspense and three that are still in the 35-day window after we mailed their letter.

Q. Okay. So make sure I got this right. Six voters have applied since these laws became effective that did not give documentary proof of citizenship; is

that right?
A. Correct.
Q. And those voters are just being held in a suspense field at the moment; is that correct?
A. Right.
Q. And they're not being registered to vote?
A. Right.
Q. And that's for either a full ballot voter or a federal only voter; is that right?
A. These are fed only.
Q. But they're not being registered as a federal only voter?
A. Correct. Suspense mode does not allow them to vote.
Q. Okay. And how long are they held in suspense mode?
A. I'll have to get back to you. We're -- probably till the end of this litigation, because the litigation requires them to be canceled.
Q. Okay. So you haven't rejected the applications, right?
A. Correct.
Q. But they're not registered, right?
A. Correct.
Q. Okay. You mentioned earlier, you know, when we

were -- when I'm talking about DPOR, do you know what I mean by that?

A. Proof of residence?

Q. Right.

A. Yeah.

Q. And that's also a new provision in the new law, right?

A. In 43?

Q. 2492.

A. Yes.

Q. Okay. And of the six applications that you said are in suspense, are all of those voters that lacked DPOC?

A. Yes.

Q. And so are there any voters that are held in suspense that lack providing DPOR?

A. Not to my knowledge, no.

Q. Okay.

MR. JOHNSON: Jody, if we can, and for the witness, if we could look up Petty Exhibit 24.

THE COURT REPORTER: I'm not doing exhibit sharing. I don't know if somebody else is.

THE WITNESS: We've got them here.

BY MR. JOHNSON:

Q. Do you have Petty Exhibit 24? If not, I can do

a screen share for you.

MR. CORREA: We've got it.

THE WITNESS: We have it. We went old school.

BY MR. JOHNSON:

Q. All right. That's quite all right. Sometimes that's better.

So do you see on the first page there it says Exhibit (J) and the second page there's a table; is that correct?

A. I'm not there yet.

Q. Okay.

A. It's a big binder.

Q. Yeah, understandable.

A. Okay, I think I've got it.

"What constitutes Proof of Residency," correct?

Q. Correct.

Have you seen this document before?

A. It looks like it came out of the procedure manual.

Q. Okay. This is a document that's been created during the course of this litigation, and it talks about some of the documentary proof of residency requirements at the top; but you haven't -- you haven't seen this specific document before; is that right?

A. I don't recall it, no.

Q. Okay. I'd like to ask you a couple of questions about what the document contains anyway.

The first is on the left there. So at the top, as you said, it says, "What constitutes Documentary Proof of Residence," is that right?

A. Yes.

Q. And on the left there it says a "Valid/unexpired AZDL/ID number that the county verifies via MVD check."

Do you understand that to mean Arizona driver's license or ID number?

A. Yes.

Q. And MVD check is the Motor Vehicle check, right?

A. Correct.

Q. So if you received a voter registration application that had that information, would you accept that for registration on this basis?

A. For residency, I believe we would.

Q. Okay. And then the next one, "Copy of a valid/unexpired AZDL/ID," which, again, is Arizona driver's license/ID. Do you see that?

A. I do see that.

Q. So if a voter registration application -- if

you received either a state or federal voter registration application that included a copy of a valid/unexpired Arizona driver's license/ID, would you process that application?
A. I believe we would, yes.
Q. Okay. And then same question for "Tribal identification card." If you received Tribal ID, would you use that -- would you process an application for DPOR with that?
A. I believe we would, yes.
Q. And then if you look on the second column, fourth row here, it says, "Pursuant to Gonzalez, Tribal ID does not require an address to be listed."
So if you received a Tribal ID without a residential address, would you still process that voter registration application?
A. I believe we would.
Q. Okay. And then down to the next field, column one, row five, where it says, "Utility bill, bank statement, Arizona insurance card, Arizona vehicle registration, property tax statement, recorder's certification, voter ID card, federal or state issued ID card."
Do you see that?
A. Yes.

Q. If you received a voter application, state or federal form, that included one of those documents, would you count that as satisfying the DPOR requirement?
A. I believe we would.
Q. Okay. And then the same question for the next row down, "Any other document or piece of mail that is issued by a government, educational institution, or place of business that provides the person's name and address."
If the application included that information, would you count the DPOR requirement satisfied?
A. I believe we would.
Q. Okay. And then, last, the voter provides "Written confirmation signed by the registrant that they qualify to register pursuant to 16-166(B) (providing an address at a homeless center; USPS General Delivery; Courthouse)."
If a voter provided that information in their voter registration application, would you count the DPOR requirement satisfied?
A. I believe we would.
Q. Okay. Then I believe you mentioned earlier that you've only received state form applications in the last year; is that -- was that your testimony?
A. Since the first of the year I'm not aware of

any federal forms, correct.
Q. Okay. So would you -- is it fair to say that the substantial majority of forms that your office receives are state form applications?
A. That would be fair to say, yes.
Q. Do you know of any third-party voter registration groups that are active in Cochise County using federal form applications?
A. No. I know there are third-party groups out there, but I don't know them; and I don't know which forms they're using, no.
Q. Okay. But you don't receive federal form applications from third-party groups, to your knowledge; is that right?
A. We receive them from third-party groups. I'm not sure which ones they are, because they tend to come in large bundles.
Q. Okay. So you're not sure whether they're federal forms or state forms?
A. Yeah.
Q. Okay. And are there any -- when I refer to an NVRA designated agency, do you know what I'm talking about there?
A. Yes.
Q. And are there NVRA designated agencies active

in Cochise County?

A. Not to my knowledge.

Q. Okay. When voters apply to vote at a Motor Vehicle Division in Cochise County, do they use a state form?

A. To my knowledge, yes, or they use the form online.

Q. Okay. Your indulgence, one moment.

A. Sure.

Q. If you were to receive a voter registration application that just provided a Tribal ID number, not a copy of a Tribal ID, would you also count that satisfied for DPOR purposes?

A. Yeah, I don't know. I'd have to check.

Q. Okay.

MR. JOHNSON: I think that's it for my questions. Thank you, Recorder Stevens.

THE WITNESS: Oh. Thank you.

MR. JOHNSON: I'll pass the witness. There might be other plaintiff groups on here.

EXAMINATION

BY MS. BRAILEY:

Q. Hi, Mr. Stevens. My name is Emily Brailey. I represent the United States. I only have a few

follow-up questions, just to clarify some answers you gave.

The first is something you just discussed with Mr. Johnson. You said that -- or I think I heard you say that there are six federal only forms that are currently held in suspense. Does this mean that there are six state forms where the applicant did not provide DPOC?

A. They did not provide proof of citizenship, but I can't verify that they're only state forms.

Q. Ah. So some of them could have been done on the -- on the federal form --

A. They could have been. I --

Q. -- and --

A. I was only looking for the fed only, not the type of form they used.

Q. Got it.

And if any of those in suspense were done on the federal only form, will -- is your understanding that the laws at issue in this lawsuit would require your office to reject those forms, or would those voters only vote in certain elections?

A. Say that one more time?

Q. So if any of those forms are federal forms and not state forms, is your understanding that the laws

that are at issue here, specifically 2492, would that require you to reject the form because it does not have DPOC, or would you register the voter and just limit which elections they vote in?

A. My understanding of 2492 is they would be canceled.

Q. Got it.

And how would your -- so, again, at the beginning of the deposition my understanding is that you said your office is implementing the laws as best you can. So what happens if you receive a state form and the person has not put their place of birth; how is that form processed?

A. I don't know, because we don't have place of birth. We have state or county of birth.

Q. Right. So if you have state or -- if you have an area where the person can put their state or county or state or country of birth and they have not -- and they have not filled that area -- they have not put anything in that field, how would you process that form?

A. I don't know. I'll have to ask.

Q. Do you know how your office uses that information generally?

A. I don't know what you mean by use that information. We take everything they put in on the form

and put it in the database.

Q. What kind of -- strike that.

What do you learn about somebody from their place of -- from their state or county or state or country of birth?

A. I'm not sure I understand the question.

Q. Do you use it to confirm their identity?

A. It depends on what else was filled out.

Q. In what situation would you use that information to confirm identity?

A. I don't know.

Q. Okay.

A. I'm not sure I would.

Q. You're not sure you would use it to confirm identity?

A. I'm sorry, what was that?

Q. I'm just clarifying what you just said.

A. Oh. Yeah, I'm not sure how we would use that to identify identity.

Q. Okay.

MS. BRAILEY: Thank you so much for your time. Those are my only questions.

THE WITNESS: Thank you.

MS. BRAILEY: I'll pass the witness.

THE WITNESS: I feel like a potato.

MR. LANGHOFER: Anyone else on the plaintiff side?

All right. Seeing none, I guess it's my turn.

EXAMINATION

BY MR. LANGHOFER:

Q. Recorder Stevens, thanks for your time today. I'm Kory Langhofer, and I represent the RNC, Republican National Committee. We're intervenors in this case.

I don't have a whole lot of questions for you, but I've got just a few of them.

Are you aware of any criminal prosecutions for voting fraud in your county?

A. Yes.

Q. Can you -- how many are you aware of?

A. There potentially were nine. I know one has been processed through the Attorney General's Office, and I do not know the status of the other eight.

Q. Why don't we start with the one that you're familiar with that was processed through the AG's office. What do you remember about that case?

A. What had happened was the individual had passed away a week before early ballots went out, and a ballot was voted, signed and sent back in, and it was

determined it was their daughter who did it. And I don't know the penalty, but there was some -- it went to court, I believe, and there was some resolution to that.

The other case was the same thing, where someone passed away just days before early ballots went out and somebody else signed and mailed it back in, but I do not know the status of that one.

Q. The one that went to court, was that Krista Michelle Connor; does that sound right?

A. That sounds very familiar.

Q. And you said the other one was the same thing. Do you mean all eight of the other ones, or was it one --

A. No. No, those are the two I found through our citizenship verification process. The other seven came from a report from ERIC; that they had voted in Cochise County and in another state.

Q. And what did you do with those cases?

A. We had contact with those states. We contacted primarily the Secretary of State's Office. We exchanged records, their voting records, and then the information was processed up to the Attorney General's Office. I do not know the status now.

Q. Do you recall, of those seven cases, whether they voted in Arizona first or second?

A. I do not know. I do know that they voted here and by mail in the other six states. There was a husband and wife together that voted here and in Illinois.

Q. Okay. When -- let's start with the two where the -- someone voted for the decedent.

Were both of those ballots cast by mail?

A. Yes.

Q. And when you submit a mail in ballot in Arizona, is there some sort of declaration or oath that you have to take on the envelope?

A. I believe so. It's been a while since I've read it.

Q. Do you recall the content of that, generally?

A. They're affirming by signing that they are the proper recipient of that ballot, I believe is the way it's phrased, or something to that effect.

Q. So when those ballots were submitted, was there a false statement made under penalty of perjury?

A. I believe so, by them signing somebody else's name.

Q. And does it also say that they have not voted before; so, basically, would that same principle, someone made a false statement, would that also apply to the other seven cases you had mentioned?

A. I believe so. I don't know what the other -- I don't remember what the other states had, but they -- I believe they knew they were illegally voting.

Q. I'd like to follow up a little bit on the birthplace issue that the Department of Justice was just asking you about.

I think you said, in answering her questions, if someone puts their birthplace on a voter registration form, your staff will put that into the voter file database; did I hear that correctly?

A. Yes. Anything that's on the form gets transposed into the AVID database. We make a scan of the form and attach it to the record also.

Q. And one question that we've been asking of County Recorders whose staff does that is whether the birthplace information going forward would, in some cases, be useful to your office in determining whether a new voter registration form would be duplicative of an already existing voter registration.

So, for example, you've got a person with a common name, say it's John Smith, and a given birth date, say January 1st, 1950. You get a new voter registration form for a person named John Smith born on January 1st, 1950. If you've got a birthplace in the database and you've got a birthplace on the registration

form, would that information on the registration form help you determine whether it's a duplicate voter registration?

A. Well, there would have to be other information that we would use that would supersede that. There's driver's license if they're a valid driver in Arizona, social security number.

But, yeah, something like that would come up as a soft match, but I'm not sure -- I don't recall ever seeing one just with a country of birth and the other information not being there.

Q. So usually in this case when -- the birthplace wouldn't be a country. It would be usually a city. I believe that's the way the statute contemplates it, although don't take my word for it. So country of birth would be very general; but if you were given cities, would that change your answer at all?

A. No. Actually, the form says state or country. So you'll see Illinois or Morocco. I used Morocco because my sister-in-law was born there, but her father was in the Air Force. So those -- and we are a very heavy military community, so the chances of seeing that is greater here, I would think.

Q. So are there circumstances in which the birthplace would be useful to de-duplicate

registrations?

A. To de-duplicate, yes. Any information we can use to separate the concern that two records are actually the same person or different people, yes, I believe so.

Q. Does your office have access to any databases that are more accurate or more reliable for purposes of determining proof of citizenship that you're not currently using?

A. No. My understanding is we have the AVID and then the -- we have access to the SAVE, and that is it.

Q. Do you have access to any other databases that are more accurate than those?

A. Not to my knowledge, no.

Q. Do you have access to any databases that are more up-to-date or current than those databases?

A. Not to my knowledge, no.

Q. When you get a -- when your letter -- excuse me.

When your office sends out notification letters to registrants who don't provide DPOC, do you know what percentage of those you receive back with supporting DPOC?

A. No, I don't have a percentage number, no.

Q. Do you have a rough order of magnitude, idea of

how many that would be?
A. No. No, I don't.
Q. Okay. The October 2022 incident where there was a problem with an AVID database that affected, I want to say it was about 67 folks in your county, does that sound right?
A. Yeah, they listed 67 and 4 others, so 67 or 71.
Q. Did your office follow the instructions you got from the Secretary of State about how to deal with that issue?
A. I'm sure we did.
Q. To your knowledge, was anyone disenfranchised as a result of that issue?
A. To my knowledge, I don't know.
Q. Does your office ever receive voter registration forms with false information?
A. I'm not sure what you mean by false. We generally don't have the ability to determine truth or false. There are a lot of mistakes on there, addressing mistakes. Sometimes they live in areas that don't have an address they can identify to, so they have to draw a little map, and they could be wrong. I don't think it's false. They're just incorrect.
Q. So, for example, have you ever received large batches of voter registration forms from outside groups

where the addresses don't exist or the voters appear to not exist?

A. Not to my knowledge. The worst case is we get multiple copies of the same registration.

Q. For the same person, you mean?

A. For the same person.

Q. When you say the same registration, are they like photocopies of literally the same form or just --

A. They're handwritten, but there are three and four different copies and the same person.

Q. Do those forms indicate whether that person has previously submitted a registration form?

A. Their record in the database will identify everything. Every piece of paper we get in our office we scan and tie it to their record.

Q. So the -- I guess I'm trying to nail down whether we could say like the second, third and fourth form that's handwritten, like you've described, contains any false information. Is there anything on those forms indicating that it's their, you know, initial registration or that they're trying to update an existing registration?

A. I don't recall. If the data's identical, there's no way of knowing, other than the date they put on the bottom, which one came in first; and sometimes

they have the same date, so -- and then we're restricted by when they bring them into the office or when they mail them in.

Q. Have you received, to your knowledge, voter registration forms from convicted felons?

A. To my knowledge, I don't know.

Q. And presumably -- well, let me not presume.

Do you have any knowledge of voter registration forms being submitted by people who have been confirmed to be noncitizens?

A. To my knowledge, no.

MR. LANGHOFER: I really appreciate your time today. That's all the questions I have. I believe the AG's office --

THE WITNESS: Okay.

MR. LANGHOFER: -- and potentially the legislature have questions as well.

EXAMINATION

BY MR. HORLEY:

Q. Yes, Mr. Stevens. My name is Tim Horley. I'm from the State of Arizona, the State AG. I wanted to check, before we dive in, if you needed a break or anything. I don't anticipate too many questions, but could be, you know, 15 minutes, half hour or so. Up to

you.

THE WITNESS: Are you okay?

MR. CORREA: I'm good.

THE WITNESS: I'm good, I'm good.

BY MR. HORLEY:

Q. All right, very good.

Okay. So thank you for your time today. So I wanted to clear up one thing that you mentioned earlier in this deposition. You mentioned that some of the phrases in H.B. 2492 and 2243 are unclear, correct?

A. Yes.

Q. But would guidance from the Secretary of State be useful to clear that up?

A. Yes, any guidance would be useful from the state-level elected officials.

Q. And could that come in the form of an updated EPM?

A. Sure.

Q. And do you generally rely on the EPM to help implement other voting laws?

A. That is a document we do use frequently, yes.

Q. Is it fair to say that other voting laws would also be difficult to implement without further guidance from the Secretary of State?

A. I can't say that without knowing which laws

you're asking about.
Q. But you rely on the EPM to implement other laws, so that guidance helps you implement those laws, right?
A. That's correct, but we don't rely on it for every law.
Q. Okay. But you do rely on it for --
A. Yes.
Q. -- other voting law?
A. Yeah.
Q. Yeah. Okay.
So same thing is true for these laws that is true for other voting laws, you know, you need -- sometimes you need guidance from the Secretary of State to know how to implement them, right?
A. Sometimes, yes. The legislators and the laws can be a little ambiguous.
Q. Yes, okay. Thank you.
And then I also wanted to follow up quickly about the proof of residence requirement. So has anyone been placed in suspense status because of a lack of proof of residence?
A. Not to my knowledge, no.
Q. Okay. And has anybody been not registered to vote because of a lack of proof of residence?

A. Not to my knowledge, no.
Q. Okay. Or received notice because they failed to provide proof of residence?
A. That's probably happened.
Q. Okay.
A. The reason for residency is to know which ballot they're going to get. So it's very critical that we have the correct address and give them the correct ballot when they do go to vote.
Q. Right. So they can be placed in the right precinct, for example?
A. The precinct parts, yes.
Q. Okay. Very good.
All right. Now, I wanted to turn to the topic of checking citizenship. So for federal forms, are you aware there's a citizen checkbox on that form where someone says, yes, I am a citizen; are you aware of that?
A. I believe I am, yes.
Q. Do you think that checkbox provides information about whether a voter is a citizen?
A. Well, I believe -- I don't know what they believe.
Q. So to your -- for your office, if you see that checkbox is checked yes, does that indicate that that

person is a U.S. citizen?
A. That indicates that they checked that box yes. We still have other checks that we have to provide.
Q. Okay. And so for state forms, suppose a registrant were to mark no in the citizen checkbox, but also provided a purported copy of a citizenship document, like a birth certificate. What would your office do in that situation?
A. I would have to check with my chief. I'm sure we would just send a letter.
Q. Yeah. So could that suggest that either the birth certificate is wrong or the checkbox is wrong?
A. Logically, I believe one of them would be, yes.
Q. Yes.
And is it possible for a registered voter to submit a copy of a citizenship document, like, again, birth certificate or passport, that is defective in some way?
A. I don't understand your term defective.
Q. Like, for example, if it was blurry, the photocopy was hard to read?
A. We would send a letter asking for clarity.
Q. Okay. And then in those situations where it was hard to read the proof of citizenship, would it be helpful to know how the voter answered the citizen

checkbox?

A. We view our work based off the data we have.

Q. Okay. I wanted to ask one quick question about the MVD data that you rely on for the HAVA checks. Do you consider that MVD data to be generally reliable?

A. Yes.

Q. Okay. And if a naturalized citizen's status has not yet been updated with the MVD, they can easily reconcile that by providing your office with documentation of their naturalization, correct?

A. That is correct.

Q. Okay. Now, I do want to look at one document that your office produced. I don't believe it's in the Dropbox. So what I would do in this situation, if everybody is okay with it, I will just share it on my screen and we'll just look at it together, if everybody's okay with that.

MR. CORREA: Yeah, we're okay with that.

BY MR. HORLEY:

Q. Okay. And then I will send it over so that we can get it entered when appropriate.

Okay. Can you see this document, Mr. Stevens?

A. Yes.

Q. Yes.

And do you recognize this document?

A. I don't believe it's anything we made, but the data looks familiar. But, no, I don't recognize it.
Q. Okay. So you're not --
A. Is it ours?
Q. You're not aware that your office produced this in response to plaintiffs' requests for production?
A. Could have been. If it came from us, then it is our document. I don't recall seeing it in this format.
Q. Okay. Do you see in this column here under --
A. Cochise.
Q. -- county it says Cochise?
A. Yeah.
Q. Yeah.
A. Yes.
Q. Yeah.
So fair to say this is a Cochise County Recorder document?
A. If you got it from my office, it is.
Q. Okay. I would like to enter this as Exhibit -- I believe we're at number 126.
So have you seen this kind of data before?
A. Not in this format, but I've seen this data, yes.
Q. Not in this format? Okay.

So I'm just going to walk you through this document to the extent you can help explain it to me a little bit.

So on this first column I see a column that's labeled registration date?

A. Yep.

Q. Is that right?

A. Correct.

Q. Yes.

And so that shows the date that someone was registered to vote in Cochise County?

A. Correct.

Q. Okay. And then the second column, it shows the effective date of change; is that right?

A. That's what it says, correct.

Q. So that means that this date is when someone's status was updated?

A. Not necessarily just the status.

Q. Okay. What else might it show?

A. Well, they may have changed their P.O. Box or mailing address. They may change their party.

Q. Understood. Okay.

So that brings me to this next column, which is this status column here. So that shows someone's voter registration status, correct?

A. Yes.
Q. In Cochise County?
A. Yep.
Q. Okay. And so if we just look at row three right here, it shows that this person's status was canceled, correct?
A. Yes.
Q. So that means that voter's registration was canceled?
A. Yes.
Q. Okay. And then in this column it shows status reason, right, this fourth column here?
A. Correct.
Q. So this reason tells us why that their status is canceled, correct?
A. Correct.
Q. Okay. Great.
Now, if you'll bear with me, I'm going to take us very far down this document to row 16510.
Okay. So if you could see where my cursor is here, it's at row 16510; is that right?
A. Correct.
Q. Okay. And so this row shows a voter whose registration was canceled, correct?
A. Yes.

Q. And then it shows the date is March 24th, 2020. Is that when their registration was canceled?
A. Most likely. I'd have to look up their record.
Q. Okay. But most likely. Okay.
And then it shows that the reason for the cancellation is NVRA, correct?
A. Yes.
Q. What does NVRA refer to here?
A. That is the process as defined in the National Voter Registration Act on canceling voter registrations.
Q. Okay. So what does that mean for a voter to have his or her registration canceled for NVRA?
A. They have -- they have not been able -- or they have not responded to our inquiries to update their record. It requires two mailings, unless we get the information from the NCOA, which is National Change of Address. That's considered the first mailing. We mail them a letter to tell them they have 35 days to update their record. If they don't, they'll be inactive.
They'll sit inactive for four federal elections, pending other issues. Maybe they could come back in and cancel the record themselves. But if they go and they don't do anything, primarily vote, for four federal elections, then they're canceled.
Q. Okay. Understood. That's a helpful

explanation.

So you mentioned something in their record might be in need of an update, right?

A. Correct. What happens is we got something back undeliverable, whether it be a ballot, a 90-day notice, an ID card, some of these things. That initiates the first mailing. Then we send a letter stating that your information was undeliverable and you need to update your record and you have 35 days or you'll become inactive.

Q. Okay. So could that indicate that this person is no longer a resident of Cochise County?

A. Sure.

Q. Yeah. Or no longer a resident of Arizona?

A. Correct.

Q. All right. Now I'm going to move us down a bit more to row 23682. Just one moment while I get there.

Okay. So do you see this row on this spreadsheet that I've got my cursor on?

A. I do.

Q. Okay. So this shows that a voter was not eligible as their status; is that correct?

A. Correct.

Q. And then so what's the difference between not eligible and canceled?

A. Well, canceled means they were eligible at one time.

Q. Okay. And so here the reason for not eligible is listed as invalid citizenship proof, correct?

A. Yes.

Q. Okay. And then, you know, if I'm looking over here at this leftmost column, it shows their registration date was in September 2016; is that right?

A. That is correct.

Q. And then this date of change is July 16th, 2022; is that right?

A. Correct.

Q. So does that indicate that this person was registered to vote for a little under six years?

A. No.

Q. Okay. What would --

A. It indicates they were in our system for six years.

Q. Okay. So it's possible that they were never deemed eligible?

A. Correct.

Q. Okay. So it doesn't necessarily show they were registered and now they're not anymore?

A. Correct.

Q. Okay. And so but if someone is not eligible

because of invalid citizenship proof, does that mean that the person did not provide proof of citizenship?

A. Are you talking about this person specifically or in general?

Q. Yeah, just if we see this in this form where it says invalid citizenship proof, does that mean they didn't provide DPOC?

A. That could be one response or what they provided wasn't right.

Q. Okay. Right. So maybe it was somehow defective proof?

A. Correct. I'm not sure --

Q. Now --

A. I'm not sure of your term defective, but it didn't validate through our system.

Q. Yeah. So maybe it was false information?

A. Potentially.

Q. Potentially?

Could it show that that person is not a U.S. citizen?

A. Could it show what?

Q. That someone is -- that person is not a U.S. citizen?

A. Without looking at the record, I don't know.

Q. Don't know? But it's possible that that person

is not a U.S. citizen?

A. With invalid proof, that's -- I -- that's possible.

Q. Okay. Thank you.

And so then just to confirm here, when it says that the voter is not eligible, that means they're not a registered voter at all, correct?

A. Correct, and that is their current status at that time.

Q. Okay. Understood.

But it doesn't mean that they just receive a federal ballot?

A. Well, those statuses are all we can use when we process forms. So it's -- I'd have to look at that one to determine which form they used. This one doesn't state it.

Q. Okay. Understood. Thanks.

I think that's all I've got for that particular document. I do want to look at one other -- or, actually, I've got a couple more for you. So we'll try to get through it quickly, but I appreciate your patience.

A. As long as I don't have to squint anymore.

Q. Sorry. Yes, you might have to squint a little bit more.

A. All right.

Q. This next one is also a pretty big one, but then I think after that it will get a little bit better.

Okay. Do you see this document that I've pulled up?

A. I do.

Q. And do you recognize this one?

A. I do.

Q. Okay. And so this document is called no voter identifying information voting history, correct?

A. Correct.

Q. And your office produced this in response to plaintiffs' requests for production; is that right?

A. Yep.

Q. Okay. So could you just explain sort of in a nutshell what this document shows us?

A. Well, without the -- usually it comes with a voter ID on this or an AVID ID number.

Q. Got it.

A. But it shows an individual that's either active or inactive, valid registration or not, and then their voting history over the last -- I'm not sure how big we made it. The last six years?

No, 2008, '6, '4. I'm not sure what the time frame was on that.

Q. Yeah, and I can scroll to the right here. It goes on a little ways, I believe all the way to --
A. Oh, the general of '22. Okay.
The codes have changed. The formatting has changed over time. We've changed systems. We used to use PowerProfile and now we use AVID. But it shows where and how they voted in a specific election.
Q. Got it. Okay.
MR. LANGHOFER: Tim, can you tell us what the Bates number is for this one?
MR. HORLEY: I'm not sure that there were Bates numbers produced for these spreadsheets. Perhaps Paul Correa could correct me if I'm wrong on that.
MR. CORREA: There are not.
MR. HORLEY: Okay.
MR. CORREA: There are not.
BY MR. HORLEY:
Q. Okay. But I would like to enter this as Exhibit No. 127, please.
Okay. So then -- so kind of similar to the last one, this column on the left here shows the date of registration, correct?
A. Yes.
Q. And then here we have the effective date of change, so that means that's the last time their record

was updated, correct?
A. In most cases, that's correct.
Q. Okay. And then here I have this list of status, and I see that some are active and some are inactive.
A. Correct.
Q. And I think those are the only two options here, correct?
A. Probably because of how the -- how the report was selected, but that's probably the only two.
Q. Yeah. Can you explain why that is?
A. Why there's only two?
Q. Yes.
A. That's probably all we selected to print.
Q. Okay. So what is it that makes someone an inactive voter? How do you become labeled as an inactive voter?
A. That's the NVRA process of you not responding to our letter and updating your record.
Q. Okay.
A. You go inactive for four federal elections, and then after that, if nothing's happened, you get removed.
Q. Okay. So these would be folks who are in that inactive stage, but haven't been canceled yet?
A. Correct.

Q. Okay. Got it.
And so how does a voter become inactive?
A. I just said that. They don't respond to our letters. We get undeliverable mail back to our office. We mail out a letter. They don't respond to that letter, and after 35 days we make them inactive for up to four years, four federal elections, and if they still don't respond, they get canceled.
Q. Okay. Got it. Understood. All right.
So now I would like to draw your attention to row 20 here, and this is someone who was listed as inactive, correct?
A. Yes.
Q. And then the reason given is NVRA inactive address; is that right?
A. Yes.
Q. So, and that, as you just explained, that means something came back. It seems like they're not at that address anymore, and now it seems like they've moved; is that right?
A. Correct. Some mailing, some first-class mailing from our office, or a list from the USPS, the NCOA list, would have initiated that letter from our office to go out back to them, and they still did not respond to it.

Q. Okay. Understood.
All right. I think that's all I have on that document. So I'm going to go ahead and close out of that one.
And then I wanted to ask you just a couple more questions now about some of the challenged laws. So are you aware that in H.B. 2243 it talks about receiving a report from the jury commission?
A. Yes.
Q. So does your office receive reports from the jury commission?
A. Are you talking about -- we get monthly reports of people who did not respond or responded unfavorably to the jury questionnaire.
Q. That's right. So you receive those?
A. We do.
Q. And what is the question on that jury questionnaire?
A. Well, the one in question is are you a U.S. citizen.
Q. Yeah. And so if someone says, no, I'm not, you get a report that says that, right?
A. Correct.
Q. And if you got that kind of report, would that be reason to believe that someone is not a U.S. citizen?

A. That would be a reason to investigate.
Q. Okay. So in that case you would follow the usual process of sending a notice, asking for more information?
A. Well, we'd start by looking at the record and then send a notice of what the discrepancy is. We have a specific jury letter we would send them.
Q. Okay. Okay. Thank you.
All right. Last document, last set of questions. So we're almost there.
A. I'm going to hold you to that.
Q. Yes, you're allowed to. I'm pretty sure, anyway. All right. No, but you can hold me to that. Okay.
Okay. Do you see this document, sir?
A. I do.
Q. All right. And do you recognize this document?
A. I do.
Q. And is it called the cross voter participation report?
A. Yes. This is a report we got from ERIC. I had mentioned the seven people that had voted in multiple states. This looks like that list.
Q. Okay, great. Yeah, that's -- you predicted my question.

So this is a list of people who voted in multiple states, as you just said?
A. Correct.
Q. Okay. I would like to enter this in as Exhibit No. 128.
So I just want to ask you just a couple, couple quick questions here.
So here where it says state code AZ in the first column, then the second column cross state NV, does that mean that this person voted in both Arizona and Nevada?
A. Yes.
Q. Okay. And I see that the election date for all of these is from the 2020 election; is that right?
A. Correct.
Q. And then I see here there's this column for match score, with different numbers. Can you explain what that means?
A. Not without guessing.
Q. Okay.
A. Yeah. There was other documents that came with this spreadsheet that would -- that is their confidence rate that it's actually the right person they think it is of a match.
Q. Okay. Understood.

A. Does that make sense?
Q. Yes. So a higher number would be a higher confidence rate?
A. Yes. That is my recollection of that. This was three years ago.
Q. Understood.
Do you have spreadsheets like this from other elections?
A. I have not seen any, no.
Q. Okay. So are you aware of any cross-state voters in the 2022 election?
A. I'm not aware of any, no.
Q. Okay. Do you think these entries show voter fraud?
A. I think you're asking me to come to a conclusion; but the other states have indicated they voted in those states and we have received a ballot here, so, yes, they voted in two states, and I think that's the definition of voter fraud.
Q. Okay.
MR. HORLEY: Well, thank you very much, Mr. Stevens. That's all I have for you.
THE WITNESS: Excellent. And you did keep it to one question. Good job.
MR. HORLEY: Thank you, thank you. I'm

not sure if anyone else has further questions at this point.

MS. STUART: This is Shayna. I don't have any questions. Thank you.

MS. PORTER: This is Hannah. I do not have any questions. Thank you.

MS. DIBRELL: This is Mollie DiBrell. I do have a couple of follow-up questions.

EXAMINATION

BY MS. DIBRELL:

Q. Mr. Stevens, do you need a quick break? I know, we've been going for a while.

A. No, we're fine. We're fine. We were on a roll. You could have just went.

Q. Might as well continue that roll, so...

Like I said, my name is Mollie DiBrell, and I represent Plaintiffs Mi Familia Vota and Voto Latino. So we'll keep this quick and easy. Earlier you were asked a few questions about how you identified duplicate registration forms, correct?

A. Seems familiar, yes.

Q. And you testified that your office uses an applicant's driver's license number to identify duplicate registrations?

A. That's one of them, yes.
Q. What other items do you use to identify duplicate registrations?
A. Well, address, the last four of the social security number. They're the best indicators of duplication.
Q. So to confirm, driver's license number, address, and you said the last four of the social security number are the best ways to identify duplicate registrations?
A. Yes.
Q. And can you also use an applicant's first and last name?
A. Sure. Without that --
Q. And can you --
A. Yeah, without that you wouldn't know they're duplicates.
Q. And can you use an applicant's birth date to identify a duplicate registration?
A. You can use birth dates too, correct.
Q. Can you also use an applicant's address?
A. Yes.
Q. So just to be clear, your office and you currently use driver's license, social security number -- excuse me, the last four of the social

security number, an applicant's name, birth date, and their address to identify duplicate registrations?

A. Correct.

You're -- by duplicate registration you're talking that they're registered more than once or --

Q. Yes.

A. -- they're multiple people and we're trying to determine which one's which?

Q. Either. Both. So either --

A. Okay.

Q. -- they've already registered and there's a duplicate in the system or you're trying to confirm whether it's two different people.

A. Right. Yeah, we use as much as we can to make a hard match on identifying the duplicated or the updated registration.

MS. DIBRELL: Well, thank you. Those are all the questions I have for you.

THE WITNESS: Okay.

MS. DIBRELL: Quick and easy.

THE WITNESS: It is. Good job.

RE-EXAMINATION

BY MR. JOHNSON:

Q. I've got a handful of follow-up questions as

well. This is, again, Hayden Johnson for the LUCHA plaintiffs.

So in -- if we could pull up again Exhibit 126, and I'll share my screen. That's the one that you were just talking with Mr. Horley about.

Do you see that on your screen?

A. Barely, but yes.

Q. All right. I'll try to zoom in a little bit. This is the spreadsheet that you were looking at where it says effective -- oh, gosh.

A. No, that's good. I can go with it.

Q. All right. It's a big spreadsheet.

A. Yeah.

Q. So you remember this document we were just talking about, Exhibit --

A. Yes.

Q. And does this document include any fields for 2023 status changes?

A. I would have to search the document. Off the top of my head, I don't know.

Q. Okay. Do you know if this document reflects those six voters we were speaking about earlier that are held in suspense for DPOC?

A. I -- I don't know.

Q. Okay.

A. Is it -- yeah, there's no voter -- there's no AVID ID number.
Q. Okay. Understood.
You were also talking to Mr. Horley a second ago about notices that you've sent out to voters that --
A. Uh-huh.
Q. -- for address purposes.
And just to clarify, was that because you couldn't verify the address on the application or because they lacked DPOR?
A. I don't know what your question is. I remember saying that we needed the residency to know which ballot to give them.
Q. Right.
A. Sometimes the information's not complete.
Q. Uh-huh.
A. But the goal is to have as complete data as possible.
Q. Okay. And so you'll send out a notice letter if the address on the face of the form you can't verify; is that right?
A. Yes.
Q. Okay. But not -- you don't send a notice letter currently if the application lacks a separate document providing DPOR; is that right?

A. No, we do. We have -- we have letters for those also.

Q. Okay. So if an applicant currently applies without submitting any documentary proof of residence, what happens?

A. Then we have a problem, because we can't mail a letter.

Q. So I guess what I'm asking is, they've put on the application -- they've written down an address, right, but they didn't separately submit another document that would, you know, purport to further show their address. Have you received applications like that?

A. I'm having a hard time following your hypothetical, so no.

Q. Okay. If an applicant right now applies and just provides their -- just lists their residence on their application, will they be registered to vote if you can confirm that residence?

A. Well, there's other -- there's other things. I have to confirm citizenship too.

Q. All right. And will you consider residence satisfied if they put their -- if they just list their residence on their application right now?

A. My understanding would be, yes, that the

residency would be okay.

Q. Okay. That's fine.

And then you were speaking with Mr. Langhofer earlier about receiving, you know, two or three applications from the same -- handwritten applications from the same applicant, in your view; is that right?

A. Yes.

Q. And in that situation that applicant's only registered one time, right?

A. No, they were multiply filled out.

Q. Right. But on your system that person, regardless of how many applications they submit, they will be registered a single time?

A. A single time, but all of those applications would be tied to their file.

Q. Okay. But it would result in one voter profile in your --

A. Yes. Yes.

Q. And that person would get one ballot, right?

A. Correct.

Q. And are there sufficient safeguards in place in your system that ensure that only one voter is registered, despite submitting multiple applications?

A. Yes.

Q. Okay.

MR. JOHNSON: No other questions for me. Thank you.

MR. LANGHOFER: I have a brief clarification on that.

RE-EXAMINATION

BY MR. LANGHOFER:

Q. You had mentioned that you use -- when we were talking about de-duplicating registrations and I had initially asked you about birthplace being a basis for de-duplicating, and you said you could use address and driver's license number and social security number. I assume you could also use alien number too, correct, or a naturalization number?

A. We can use anything that's on the form, yes.

Q. But the driver's license and social security number and the alien registration number are not mandatory fields, are they?

A. I'm looking at our form. We don't indicate mandatory on there, but without it you're not going to be registered. You'll end up getting a letter from us if we can't --

Q. So if someone doesn't have their driver's license number or they leave it blank and they leave their social security field blank, you will not register

them?

A. We'll put them in the system, but they won't be registered. We'll have to mail them a letter asking for further documentation.

Q. And so some people don't have driver's licenses?

A. Correct.

Q. So what happens with them?

A. Well, it's not a requirement, but we need other fields filled out to fulfill the match criteria to make them a voter.

Q. What -- walk me through that. What's the minimum amount of documentation they could provide that would satisfy your match requirements?

A. Well, they're listed in there. I mean they could come in with a passport. I don't want to go through the whole -- I don't have it memorized in the procedure manual. It's in statute, also, I believe. But the more information we have, the better it is for us to do our job.

Q. So a passport has birthplace on it, correct?

A. Yes.

Q. But if you came in with a passport, but didn't give a driver's license number, an alien registration number, or a social security number, you could register?

A. Have a U.S.-issued passport, I believe we would, yes.

Q. So in that case the only thing you would have to de-duplicate another registration, potentially, from the same person would be a passport number or a birthplace?

A. I believe so.

MR. LANGHOFER: Thank you very much. Nothing else.

THE VIDEOGRAPHER: Is there any other?

MR. SHERMAN: No more -- this is Jon Sherman. No more questions from me.

I just wanted to flag again that we'll follow up. We didn't use the full seven hours here. We may have to hold open this deposition, given the deponent wasn't able to speak to the SAVE system, and this was a 30(b)(6) deposition for the whole County Recorder's Office. I'm just noting that for the record, but we'll follow up separately on that.

Nothing further from me.

THE VIDEOGRAPHER: Okay. If that is the case, then we're going to go off the record. The time on the monitor is 12:30. This ends Volume 1, Media No. 2 of the deposition, 30(b)(6) Defendant County

Recorder David W. Stevens.

(Deposition Exhibits 120 through 128, inclusive, were marked for identification.)

(The videotaped deposition concluded at 12:31 p.m.)

(Signature not requested.)

______________________________

DAVID W. STEVENS

STATE OF ARIZONA )
) ss.
COUNTY OF MARICOPA )

BE IT KNOWN that the foregoing videotaped deposition was taken before me, JODY L. LENSCHOW, RMR, CRR, Certified Reporter No. 50192 for the State of Arizona, and by virtue thereof authorized to administer an oath; that the witness before testifying was duly sworn by me; that the questions propounded by counsel and the answers of the witness thereto were taken down by me in shorthand and thereafter transcribed under my direction; that a review of the transcript by the witness was not requested; that the foregoing pages contain a full, true, and accurate transcript of all proceedings and testimony had, all to the best of my skill and ability.

I FURTHER CERTIFY that I am not related to nor employed by any of the parties hereto and have no interest in the outcome thereof.

DATED at Phoenix, Arizona, this 21st day of August, 2023.

____________________________________

JODY L. LENSCHOW, RMR, CRR
Certified Reporter
Certificate No. 50192

# Exhibit 9

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

Mi Familia Vota, et al., )
)
Plaintiffs, ) Case No.
) 2:22-cv-00509-PHX-SRB
v. ) (Lead)
)
Adrian Fontes, in his ) No. CV-22-00519-PHX-SRB
official capacity as ) No. CV-22-01003-PHX-SRB
Arizona Secretary of State, ) No. CV-22-01124-PHX-SRB
et al., ) No. CV-22-01369-PHX-SRB
) No. CV-22-01381-PHX-SRB
Defendants. ) No. CV-22-01602-PHX-SRB
______________________________) No. CV-22-01901-PHX-SRB
)
AND CONSOLIDATED CASES. )
______________________________)

VIDEO-RECORDED VIDEOCONFERENCE 30(b)(6) DEPOSITION OF COCONINO COUNTY RECORDER, REPRESENTED BY DONNA CASNER

Flagstaff, Arizona

August 23, 2023

Prepared by:
CINDY MAHONEY, RPR, RMR
Certified Court Reporter
Certificate No. 50680

INDEX


| WITNESS | PAGE |
|---|---|
| DONNA CASNER | |
| EXAMINATION BY MR. ATKINS | 8 |
| EXAMINATION BY MR. PATTERSON | 22 |
| EXAMINATION BY MR. HORLEY | 29 |
| EXAMINATION BY MR. LANGHOFER | 43 |
| FURTHER EXAMINATION BY MR. ATKINS | 45 |


EXHIBITS MARKED


| EXHIBITS | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 180 | Spreadsheet - list of registrants in suspense status | 31 |
| Exhibit 181 | Spreadsheet - list of records in canceled status | 37 |


REQUESTS


Page 44 Line 8


PREVIOUSLY MARKED EXHIBITS


Exhibit 178 Page 39

Exhibit 6 Page 45

VIDEO-RECORDED VIDEOCONFERENCE 30(b)(6) DEPOSITION OF COCONINO COUNTY RECORDER, REPRESENTED BY DONNA CASNER, commenced at 2:33 p.m. on August 23, 2023, at Flagstaff, Arizona, before Cindy Mahoney, RPR, RMR (via videoconference), Arizona Certified Court Reporter No. 50680.

* * *

APPEARANCES:

For Poder Latinx, Chicanos Por La Causa, and Chicanos Por La Causa Action Fund (via videoconference):

FAIR ELECTIONS CENTER
By: Beauregard W. Patterson, Esq.
1825 K Street NW
Suite 701
Washington, D.C. 20006
202-331-0114
Bpatterson@fairelectionscenter.org

For Mi Familia Vota and Voto Latino (via videoconference):

ELIAS LAW GROUP LLP
By: Alexander F. Atkins, Esq.
Christopher D. Dodge, Esq.
250 Massachusetts Avenue NW
Suite 400
Washington, D.C. 20001
202-968-4490
Aatkins@elias.law
Cdodge@elias.law

APPEARANCES CONTINUED:

For Promise Arizona and Southwest Voter Registration Education Project (via videoconference):
MEXICAN AMERICAN LEGAL DEFENSE AND EDUCATIONAL FUND
By: Ernest I. Herrera, Esq.
Erika Cervantes, Esq.
634 South Spring Street
11th Floor
Los Angeles, California 90014
213-629-2512
Eherrera@maldef.org
Ecervantes@maldef.org

For Living United for Change in Arizona; League of United Latin American Citizens; Arizona Students' Association; ADRC Action; Inter Tribal Council of Arizona, Inc.; San Carlos Apache Tribe; and Arizona Coalition for Change (via videoconference):
CAMPAIGN LEGAL CENTER
By: Danielle M. Lang, Esq.
1101 14th Street NW
Suite 400
Washington, D.C. 20005
202-736-2200
Dlang@campaignlegalcenter.org

For the Arizona Asian American Native Hawaiian and Pacific Islander for Equity Coalition (via videoconference):
LATHAM & WATKINS, L.L.P.
By: Evan M. Omi, Esq.
505 Montgomery Street
Suite 2000
San Francisco, California 94111
415-391-0600
Evan.omi@lw.com

APPEARANCES CONTINUED:

For Tohono O'odham Nation, Gila River Indian Community, Keanu Stevens, Alanna Siquieros, and LaDonna Jacket (via videoconference):
LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
By: Ryan Snow, Esq.
1500 K Street NW
Suite 900
Washington, D.C. 20005
202-662-8600
Rsnow@lawyerscommittee.org

For the Democratic National Committee and Arizona Democratic Party (via videoconference):
WILMER CUTLER PICKERING HALE AND DORR, LLP
By: Christopher E. Babbitt, Esq.
2100 Pennsylvania Avenue NW
Washington, D.C. 20037
202-663-6000
Christopher.babbitt@wilmerhale.com

For Arizona Attorney General's Office and State of Arizona (via videoconference):
OFFICE OF THE ARIZONA ATTORNEY GENERAL
By: Timothy E. Horley, Esq.
2005 North Central Avenue
Phoenix, Arizona 85004
602-542-7932
Timothy.horley@azag.gov

For Arizona Secretary of State Adrian Fontes (via videoconference):
SHERMAN & HOWARD LLC
By: Craig A. Morgan, Esq.
2555 East Camelback Road
Suite 1050
Phoenix, Arizona 85016
602-240-3000
Cmorgan@shermanhoward.com

APPEARANCES CONTINUED:

For the Coconino County Recorder Patty Hansen:
FLAGSTAFF LAW GROUP
By: Rose M. Winkeler, Esq.
702 North Beaver Street
Flagstaff, Arizona 86001
928-233-6800
Rose@flaglawgroup.com

For Intervenor Republican National Committee
(via videoconference):
STATECRAFT, PLLC
By: Kory A. Langhofer, Esq.
649 North 4th Avenue
Suite B
Phoenix, Arizona 85003
602-571-4275
Kory@statecraftlaw.com

ALSO PRESENT:
Patty Hansen

ALSO PRESENT (all via videoconference)

Jean Roof
Gareth Fowler
Daniel Rohan, Videographer

THE VIDEOGRAPHER: We are on the record. Time on the video monitor is 2:33 p.m. Here begins Volume 1, Media Number 1, in the 30(b)(6) deposition of Coconino County Recorder, by Donna Casner, in the matter of Mi Familia Vota, et al., v. Adrian Fontes, et al., in the United States District Court, District of Arizona, Case Number 2:22-cv-00509-SRB.

Today's date is August 23rd, 2023. Our court reporter is Cindy Mahoney. I am Daniel Rohan, a certified legal videographer. We both represent Coash Court Reporting & Video.

This video deposition is taking place at Coconino County Recorder's Office, 110 East Cherry Avenue, Flagstaff, Arizona 86001.

Council, please identify yourselves and state whom you represent.

MR. ATKINS: Alexander Atkins. I represent Mi Familia Vota and Voto Latino.

MS. WINKELER: Rose Winkeler, Flagstaff Law Group, representing Coconino County Recorder's Office.

MR. BABBITT: Christopher Babbitt --

MR. HORLEY: Tim Horley, representing -- oh, I'm sorry.

MR. BABBITT: Go ahead.

MR. MORGAN: Okay. Thanks. Tim Horley,

representing the State of Arizona and the Arizona attorney general.

MR. BABBITT: Christopher Babbitt for the Democratic National Committee and the Arizona Democratic Party.

MR. MORGAN: Craig Morgan for Sherman & Howard on behalf of the Secretary of State Adrian Fontes.

MR. LANGHOFER: Kory Langhofer for the RNC.

MR. HERRERA: Ernest Herrera for Promise Arizona.

MS. LANG: Danielle Lang for the LUCHA plaintiffs.

MR. PATTERSON: Beauregard Patterson for Poder Latinx, Chicanos Por La Causa, and Chicanos Por La Causa Action Fund.

DONNA CASNER,

the witness herein, being first duly sworn,

was examined and testified as follows:

EXAMINATION

BY MR. ATKINS:

Q. Good afternoon, Ms. Casner. Thank you for your patience.

Just to start, could you state your full name

for the record.

A. Donna Casner.

Q. What's your full title?

A. Coconino County chief deputy recorder.

Q. And how long have you been the chief deputy recorder?

A. Since January 2013.

Q. And have you held any other roles with the Coconino -- Coconino County Recorder's Office?

A. Yes. I've been employed with the recorder's office since June of 2004 in various roles, mostly with voter registration.

Q. And I won't go through all the kind of prefatory questions that you already heard with Ms. Hansen, but just to confirm, you understand that you're testifying under oath?

A. Yes.

Q. And is there anything that would prevent you from giving full, complete, and accurate testimony today?

A. No.

Q. Have you ever been deposed previously regarding voter registration in Coconino County?

A. No.

Q. Can you please describe your responsibilities in your role?

A. Yes. I oversee the voter registration and early voting division, so basically everything to do with any kind of voter registration, list maintenance. We also process petitions related to elections and conduct all aspects of early voting.

Q. So one question that I think we haven't been able to get a complete answer to yet is: Do you -- are you able to give us a sense of the proportion of state form voter registration applicants versus federal form applicants?

A. As far as applicants, not -- no. But I can tell you that -- I can tell you the approximate number of actual federal-only voters versus -- is that what you're looking for?

Q. That would be helpful.

A. So since July of this -- July 1st of 2023, this year, we had 591 active federal-only voters and 1,167 inactive federal-only voters. And I think we have approximately 89,000 total active voters right now. So it's -- it's a small number, but it's still -- it's in the hundreds.

Q. So the vast majority of active registrants in Coconino County are full-ballot voters?

A. Correct.

Q. Ms. Hansen and I spoke briefly about VRAC, and I'm wondering if you have any insights into whether VRAC has

done any work or made any proposals regarding HB 2492 or 2243.
A. I believe that for 2243, there were two VRAC papers proposed, but nothing has been finalized yet on how we would go forward with processing the jury questionnaires, the nonresident and the noncitizen jury questionnaires. So there were two issues: one for nonresident and one for noncitizen.
Q. Understood.
And so jury questionnaire matters are the only issue or only component of the challenged laws that VRAC has taken up at this point?
A. To my knowledge, yes.
Q. And do you know what the basic substance of VRAC's proposal was regarding citizenship vis-a-vis the jury questionnaire?
A. I know that the VRAC papers were based off of if the new laws are followed, so basically the same as what's going to be put in the new EPM if the laws are upheld.
Q. Understood.
Separately, are you aware if either the state or federal registration forms have been revised at all as a result of HB 2492 or 2243?
A. I am not aware. I know that I -- I have the most recent copy of the registration form and it was revised on

the bottom -- it was provided by the secretary of state, revised September of 2022. So that's the most recent form we are using, and I believe that is the most recent form available.

Q. Understood. One moment.

Is it correct that voter registration applicants who complete the federal registration form must affirm their citizenship under the penalty of perjury?

A. Yes.

Q. And under federal law, does that affirmation of citizenship -- is that sufficient to confirm the applicant's citizenship?

MR. LANGHOFER: Calls for a legal conclusion.

THE WITNESS: For the federal form, yes.

BY MR. ATKINS:

Q. So if a federal form applicant completes the citizenship affirmation but does not respond to the citizenship checkbox, does your office register that voter for federal elections?

A. For federal elections, yes. If -- if they did not provide DPOC but they checked "yes" to the citizenship box, they will be a federal-only voter.

Q. And -- and what if they did not provide DPOC and did not check "yes" or "no" but did complete the citizenship affirmation that comes along with them signing

the federal form?

A. So we follow the EPM. So we would put them in suspense -- a suspense status and send them a letter to confirm that they are a U.S. citizen.

Q. Give me just one moment, please.

Some questions about the various databases that have been discussed today thus far.

First, AVID. At a high level, could you just describe how AVID is utilized in the voter registration process?

A. Yes. So AVID is our voter registration database. It holds all of the information about our voters. It also holds all of their voting history and early ballots being issued, things like that. When we enter a registration, it also runs what we call the HAVA checks to check against the -- the other databases that are connected to it for things like citizenship proof and identity.

Q. And when the AVID database runs the HAVA check, is it querying databases other than the MVD ADOT database?

A. Yes. It queries the MVD database and also the Social Security Administration, the -- the state health department for death records, and any -- I'm not sure exactly which courts, but it checks for felony records through the courts as well.

Q. And am I correct that Ms. Hansen testified

earlier -- and maybe you can confirm -- that the HAVA check utilizing the Social Security database is confirming identity as opposed to confirming citizenship; is that right?
A. That's correct.
Q. So is it correct that the MVD data is the only data that HAVA is querying that provides information on citizenship?
A. That is correct.
Q. What is the AVID Enhancement Committee?
A. It is a group of AVID users from the county that are very well versed in AVID and also the secretary of state and the actual AVID, like, software developers. And what we do is we -- we bring ideas for enhancing the system, making it either easier for us to use or if there's a bug or -- or a new law that we have to implement, we would go through that committee to make decisions on what needs to be done.
Q. And to your knowledge, has the AVID Enhancement Committee had any meetings or done any work relating to implementation of HB 2492 or 2243?
A. I know that they have started plans on implementing the jury one, not 2492 -- the other one, the jury questionnaire -- to go along with the VRAC papers that I had mentioned before. So there is some preliminary,

like, just brainstorming on how AVID would have to change with that but nothing has been implemented yet or accepted by the VRAC steering committee, which is -- which has to accept all of our enhancements.

Q. When you use the AVID system to run the HAVA check and -- and it queries MVD's data, what are the different possible results you can get back from that inquiry to -- into MVD data? Like, what are the possible outcomes?

A. There's U.S. citizen and then I believe it's something like resident alien or -- it's whatever we use that we know they're not a citizen. I'd have to look it up for the exact wording. It has something to do with resident: legal resident, something like that. And that's how we know that they were not -- they did not show citizenship proof when they got their driver's license.

Q. Understood.

And am I correct that the inquiry into the MVD data takes place whether the applicant provides a driver's license number or not?

A. Right. We have to run a HAVA check every time we enter a registration or do an update to a registration.

Q. So if they happen to provide a driver's license number, that's an additional piece of data that's used to -- to query the MVD database; but if not, the other information about themselves that they provided is -- is

what's used to get a result from MVD?
A. Right. Even if they don't put a driver's license down on their form, it will still do a query and let us know if something is found in MVD based on the other -- like the date of birth, the name.
Q. Can you describe how your office uses ERIC with regard to voter registration?
A. Yes. So we will receive -- and this comes from -- organized by the Secretary of State's Office. But we receive lists from other states on possible matches. And then we have to compare things like the effective date of change. Did the voter register at the other state later than us and -- to determine if we need to cancel them here.
Q. Is ERIC used at all in determining or verifying whether a voter is a U.S. citizen?
A. Not that I know offhand. We use it for list maintenance in regards to if they move to another state, and we also compare if they voted in more than one state.
Q. Do you know if ERIC even hypothetically could be used with regard to citizenship inquiries?
A. I do not.
Q. Switching over to talk a bit about the SAVE database.
First, do you know how long the Coconino County Recorder's Office has been using SAVE?

A. I would say at least five or six years. It's whenever they had agreement that all the states could use it. Prior to that, I believe it was only Maricopa County that had a separate agreement to use it. So we fell under the blanket of the secretary of state's agreement is my understanding.

Q. And under -- under that agreement, are there certain processes that you're required to follow when using the SAVE database?

A. I mean, it's -- it's fairly straightforward. It does mention in the EPM that we are to use it to verify citizenship if they provided a naturalization number. That's the reason that we would use SAVE -- is to confirm that that natural -- well, to use that naturalization number to confirm that they are a U.S. citizen.

Q. And the same goes for if they provide an alien registration number?

A. Right. I guess, I -- but -- yes.

Q. Do you know if the secretary's existing agreement regarding SAVE would cover the contemplated uses of SAVE under HB 2492 and 2243?

A. I don't know. I don't -- I don't know if I understand the question.

Q. That's fine. We can -- we can move past it.

Is it correct that SAVE can only be utilized

in conjunction with a naturalization number or an A-number?
A. That's my understanding, yes.
Q. And so SAVE can only be utilized to confirm whether someone has become a U.S. citizen as opposed to confirming a natural-born U.S. citizen; right?
A. Correct.
Q. What is your office's policy if the SAVE search returns no match?
A. We follow up with the voter and we ask them for further documentation. A lot of times, they can show us their actual naturalization papers because my understanding is there is a lag time that SAVE will update their information.
Q. And so if you ask an applicant for additional documentation, do you then provide that documentation to USCIS through SAVE so that they can look into it further, or do you look into it further independently?
A. If they show us their naturalization document, we take it at face value.
Q. And what if, for example -- well, strike that.
Are you familiar with USCIS's alternative verification procedures through SAVE?
A. No, I am not.
Q. Are you aware of any circumstances where SAVE did not return a match and you were never ultimately able to

confirm the applicant's citizenship status?
A. I am not aware of that situation.
Q. Is SAVE used by your office only at the point of voter registration, or is it also used for any sort of ongoing maintenance or -- or, I guess, post hoc checks into a person's citizenship status?
A. It's only used at initial registration when we need to check that number to get proof of citizenship.
Q. Other than the MVD database through AVID -- through AVID and the HAVA check process and the SAVE database, are there any other databases that your office uses to inquire into a registrant's citizenship status?
A. No.
Q. Are you aware that HB 2492 would require your office to also utilize, quote, "any other state, city, town, county, or federal database and any other database relating to voter registration"?
A. I did read that, yes.
Q. Do you have any idea what databases that language is referring to?
MR. LANGHOFER: Calls for legal conclusion.
THE WITNESS: No.
BY MR. ATKINS:
Q. Are you aware of any other databases that you're not currently using that would be useful to your office's

voter registration efforts?

A. No.

MR. LANGHOFER: Asked and answered.

Alexander, she isn't a representative for the whole office. So I think we've already asked these questions of someone else from the same office; right? I mean -- I mean, to the extent --

MR. ATKINS: I don't -- you know, she -- she's been designated as the witness that is most knowledgeable on these questions. So to the extent Ms. Hansen spoke to them, I don't think that precludes me from ensuring that we have full and complete answers from the office.

MR. LANGHOFER: Yeah, it's your depo time.

MR. ATKINS: It is.

BY MR. ATKINS:

Q. We talked briefly about how the Social Security Administration data is utilized as part of the HAVA check for confirming an applicant's identity.

Aside from that use, have you ever utilized the Social Security data in any other context in your position?

A. No.

Q. Do you know if Social Security Administration data could be used to verify citizen -- citizenship status?

A. I am not aware of that.
Q. Are you familiar with the National Association for Public Health Statistics and Information Systems, or NAPHSIS?
A. I've never heard of that.
Q. So you're not familiar with any of its databases, then?
A. Correct. I am not.
MR. ATKINS: I don't have any further questions for you, but I'm sure some of my colleagues do. Thank you very much for your time.
THE WITNESS: Thank you.
MS. LANG: Should we take a short break?
MR. ATKINS: Yeah. Can we -- can we take a ten-minute break to see what else we have for Ms. Casner?
MR. MORGAN: Sounds good. Do you think it's possible, at least for the plaintiffs -- we're going to -- I have -- I have obligations to my children at 5:30. I just want to make sure we're on track to be done.
THE COURT REPORTER: Do you want to --
MR. ATKINS: Are we off the record?
MR. MORGAN: Sure.
(An off-the-record discussion ensued.)
THE VIDEOGRAPHER: We're off the record. Time on the video monitor is 3:02 p.m.

(A recess ensued.)

THE VIDEOGRAPHER: We are on the record. Time on the video monitor is 3:12 p.m.

EXAMINATION

BY MR. PATTERSON:

Q. Thank you for your time today again, Ms. Casner. Hopefully we'll be able to wrap this up shortly and have you on your way.

I have a few follow-up questions regarding the MVD database and the USCIS's SAVE system. So I'd like to begin with the MVD databases.

Do you recall an incident from last year that was flagged by the Arizona Secretary of State's Office where database matching produced erroneous results and caused the downgrading of thousands of voters to federal-only voting status?

A. Yes, I do.

Q. What happened?

A. So basically, the secretary of state notified us that the MVD was erroneously not letting us know that the voter was a citizen, so they were being put as fed-only voters for a period of time.

And then we received instructions from the secretary of state on how to rectify them. We got a list

to review and then a letter that we sent out -- a template letter that we sent out to those voters letting them know.

Q. Do you recall what was the cause of the error that downgraded these voters to federal-only status?

A. I do not.

Q. And how many voters were affected in Coconino County?

A. I do have a copy of the email that I sent to the secretary of state with our findings. And I can just read that off if --

Q. Yes.

A. So two records had already been sent a fed-only ballot. We changed them from fed-only to full-ballot status and we reissued a full ballot with a letter. So that was two voters.

Five records were determined to not be a match with the MVD record, the list, so they remained in their original fed-only status.

16 records were changed from fed-only to full-ballot status. And by doing so, they were added to the AEVL and are now being sent a full ballot. They were previously not sent a ballot.

86 records were changed from fed only to full ballot, but they were not on AEVL, so they were not sent a ballot.

Q. In your professional capacity, what does this error say to you about the reliability of database matching to assess a person's current U.S. citizenship status?
A. Databases may sometimes have an error. But in my experience, it's been quickly caught and rectified, as it was with this.
Q. And what does it say to you about the reliability of database matching to assess whether voters have previously satisfied the DPOC requirement?
A. I'm comfortable with the databases performing the function that they need to.
Q. Is it feasible to use MGB -- MVD driver's license and nonoperating ID databases to conclusively determine a lack of U.S. citizenship?
A. I'm confident that if the driver's license is flagged as non-U.S. citizen, then the database will let me know that.
Q. Okay. And is it practicable -- scratch that.
By statute, your office is required to check MVD databases for citizenship verification on a monthly basis. Is this practicable?
MR. LANGHOFER: Calls for a legal conclusion.
THE WITNESS: I don't have an opinion on that. I follow the procedures.
BY MR. PATTERSON:

Q. But in -- with regard to the resources of your office, are you capable of checking against the MVD database for citizenship verification on a monthly basis?

A. It depends on how it's done. If it's an automatic -- which I assume it would be an automatic function of AVID, then yes, it would be capable.

Q. Okay. Thank you.

Moving on to the SAVE system, is it common for people to put down an alien registration number or a naturalization certificate number on their Arizona voter registration form?

A. It's not common. We see very few in the percentage of overall registrations.

Q. Are you able to provide a ballpark percentage?

A. I -- I don't see every form that comes through our office, but I would say, if I had to ballpark, maybe one or two a month.

Q. Okay. Thank you.

If just an alien registration number or a naturalization certificate number is provided, does your office check that using the SAVE system?

A. If there are no other -- if there is no other DPOC provided, then yes. If we are able to -- from, like, a driver's license or something like that, then we don't need to. But if that's the only DPOC, then we run it through.

Q. Can you check both the alien registration number and naturalization certificate number at the same time in the same -- in the SAVE system?
A. My understanding is the SAVE system will take either one.
Q. By "either one," does that mean that you -- in order to check those numbers, you'd have to do either/or, or would you be able to put in both of those numbers simultaneously?
A. Either/or.
Q. Okay. Do you have alien registration numbers or naturalization certificate numbers for all naturalized registered voters in Coconino County?
A. No. Only if they actually provide that on their form.
Q. And what does your office do if the SAVE system search matches to a record reflecting a lack of U.S. citizenship?
A. We will follow up with the voter and ask for proof of citizenship.
Q. And how frequently does this occur?
A. Very seldom. I would have to actually do some research to even find any of those situations.
Q. When you run a SAVE system search and in the case where it indicates a record reflecting a lack of U.S.

citizenship, is that conclusive? Is that the end of the road for that voter registration applicant or registered voter?

A. No. That's when we would follow up with them and ask either to see their naturalization documents or let us know, you know -- give us a different form of citizenship proof.

Q. Do you take -- in addition to that, do you take any other steps to verify that individual citizenship status if initial verification fails to verify U.S. citizenship?

A. Well, we -- we do all of our checks, MVD, you know, everything through AVID. And then if that comes back with nothing and the SAVE program comes back as noncitizen, that's when we would reach out to them and let them know that we need another form of citizenship proof.

Q. Do you have any familiarity with USCIS's additional verification procedures --

A. I do not.

Q. -- following the initial search?

A. No.

Q. Okay. And -- and in the case where you contact individuals following a search which indicates a lack of citizenship, do these individuals typically complete the registration process by providing DPOC after receiving your

notice letter?

A. I -- I couldn't say how many, but I do recall at least a few instances of them saying that they were very recently naturalized. I would have to do some research to actually find those scenarios, though. But it's -- the amount that we have to follow up on is so small that it doesn't happen very often.

Q. Okay. Thank you. I only have two more questions.

Would you agree that SAVE can be used to confirm U.S. citizenship but cannot be used to confirm a lack of U.S. citizenship?

A. Yes. Because if it -- if it is -- if there is a lapse in when they became a citizen and it's still showing that they are not, then -- then I can't 100 percent use that as they are not a citizen.

Q. Thank you.

And has your office been communicating with the USCIS about HB 2492 and HB 2243?

A. Not that I'm aware of.

Q. Okay.

MR. PATTERSON: Thank you very much. That completes my questions.

THE WITNESS: Thank you.

MR. LANGHOFER: Tim, do you have some questions?

MR. HORLEY: Yes, I do have a few questions, hopefully not too many.

EXAMINATION

BY MR. HORLEY:

Q. But I do have a few documents I wanted to look at with you, Ms. Casner, if that's all right.

So yes, Ms. Casner, I'm -- my name is Tim Horley. I'm with the Arizona Attorney General's Office. Thanks for sticking with us through the afternoon today.

So I just have a few questions I wanted to follow up on. If a registrant were to mark "no" in the citizenship checkbox but also provide a purported copy of a citizenship document, like a birth certificate, what would your office do in that situation?

A. According to our current procedures manual, we would take the DPOC as proof of citizenship and register them.

Q. Okay. So even if they say "No, I'm not a citizen" on the form, as long as there's DPOC, you accept DPOC at face value?

A. Right. We will follow up with them as well, but the EPM does specifically say that even if they checked "no," we will still register them as long as DPOC says otherwise.

Q. Okay. And so you say you would follow up with them.
Is that like a set procedure or just something you might --
A. You know, it -- it happens so seldom I can't even think of a time when it has, but I would have to look into it to see. I think we have -- may have a letter that we send them about that.
Q. Okay. And one other thing that Ms. Hansen mentioned you might know more about is whether it's possible for a registrant to submit a purported copy of a citizenship document like a birth certificate or a passport that was somehow defective; for example, it was blurry or difficult to read.
What would you do in that situation?
A. If we couldn't make out enough to match it to the voter's form, the information on their form, then we would ask for a clarifying copy. I cannot recall a time when that has happened.
Q. Okay. What about if it looked like the document maybe belonged to someone else who was registered who had a similar name, like if it was someone named John Smith, for example?
A. We would also match other identifying information like date of birth to make sure.

Q. Okay. And so in those situations, would it be helpful to know how the voter answered the citizenship checkbox?

A. I don't see that as helping.

Q. All right. I now want to ask you about one of the documents that your office produced. It is a spreadsheet. So I'm going to do what I did before and just screen-share, and then I will send it around to everybody in the chat.

Okay. Can you see this document, Ms. Casner?

A. Yes.

Q. And do you recognize this document?

A. I do.

Q. And did your office produce this in response to plaintiffs' request for production?

A. Yes.

Q. Okay.

MR. HORLEY: I would like to mark this as Exhibit -- I believe we're at 180.

THE COURT REPORTER: Yes.

MR. HORLEY: Okay. Thank you.

(The document was marked as Exhibit 180 for identification.)

BY MR. HORLEY:

Q. So could you tell me sort of in a nutshell what does this document show us?

A. This is a list from our AVID database for any registrant in a suspense status, a not-eligible status, or a not-registered status as of the time that it was produced.

Q. Okay. Thank you. And then I'm going to ask you a little bit about just these columns.

So I see this first column says "Status," so that shows someone's voter registration status; is that right?

A. Correct.

Q. And then the "Status Reason," that gives the reason for their current registration status; is that right?

A. Right.

Q. Okay. Great. I'm just going to expand these so they're a little easier to read.

And then this next column shows the date of registration?

A. Correct.

Q. And then this column here, Column E, shows the date that -- of change, so that would show the date that this current status was listed?

A. Usually the -- the effective date of change is the last time something significant happened with the record. So I couldn't say that it's always just when the status was

changed, but when the status changed, it does affect that effective date, if that makes sense.

Q. Okay. Yes, I think so. Just trying to get an idea of what we're looking at here.

So -- okay. And then I want to draw your attention to Row Number 25. And it says this person's status is "Not Registered." And then it says the status reason is "Purged."

Am I reading that right?

A. Yes.

Q. Can you explain what "purged" means in this context?

A. Those are from a very long time ago. We don't use that status anymore, but if -- if I were to say -- I mean, the only time they are purged is if they were in a not-registered status for so long -- or a canceled status, I should say, for so long that they became not registered. I would have to look into it to see exactly what happened with those records.

But one way or another, "purged" means that they were removed, essentially, from the list of -- of voters into a not-registered state because they were either in suspense for so long or in rejected status for so long. That -- that's my best thought. But I would have to look back. That status has not been used for a very long time.

Q. Okay. Understood. Thank you.
Now I want to draw your attention to Row 44 here.
A. Yes.
Q. I'll move it up a little bit.
So here it says that the status is "Not Eligible"; right?
A. Correct.
Q. And then the reason is "Invalid Citizenship Proof"; correct?
A. Yes.
Q. Okay. So what does this status reason mean?
A. This could mean either that they marked "no" on the -- on the box and we did not have DPOC or we received notification from the MVD that they were not a citizen or we received information from the SAVE program that they weren't a citizen and we were not able to receive any DPOC.
Q. Okay. So in this situation, would you follow up with a voter before you determined they were not eligible, or does -- does that process happen without giving notice first?
A. For these specific ones where we are getting that information from the database that they are not a citizen, we change them to not eligible and then follow up.
Q. Okay. And is there a reason why it's listed as

not eligible rather than, for example, suspense?

A. Yes. The suspense are for federal -- federal form voters that did not answer the checkbox -- checkbox question and did not provide DPOC.

Q. Okay. I think you're sort of getting at my next question, which is: Why would someone in this situation not be listed as a fed-only voter? Why would they be considered not eligible?

A. If they used the state form and they said "no" and they didn't have DPOC.

Q. Okay. So is this -- does this suggest that this person may not be a U.S. citizen when they attempted to register to vote?

A. Without any other proof, yes.

Q. Okay. I know Ms. Hansen mentioned there have been some situations like at voter registration drives, for example, when someone may have filled out a form trying to enter someone else's information or otherwise falsely filling out a form.

Could this be that kind of situation?

A. No. No.

THE COURT REPORTER: I'm sorry. Did someone object?

MS. LANG: I did. I had an objection for calls for speculation and lack of foundation.

(An off-the-record discussion ensued.)
BY MR. HORLEY:
Q. Okay. Thank you.
Now I want to look to a row that is much lower down, so just one moment while I get us there.
Okay. Actually, I think I'm done asking questions about this document. I just wanted to ask you about one other thing that Ms. Hansen mentioned.
She said that you have someone who checks the voter list to determine whether people have moved to a different jurisdiction; is that right?
A. Someone who checks?
Q. Yes. Someone in your office whose responsibility is to look at current voter lists and see whether that person has moved out of Arizona or moved to a different county.
A. I -- I don't recall that. I don't -- we don't have anyone who does that.
Q. Oh, okay. Maybe I --
A. It may have been -- you may have misunderstood, maybe.
Q. Okay. It's possible. I thought she mentioned something about that.
Okay. I have another document I would like to look at. This one, it will just be a quick one. Okay.

Can you see this document, Ms. Casner?
A. Yes.
Q. And do you recognize this document?
A. Yes.
Q. And did your office produce this in response to plaintiffs' request for production?
A. Yes.
MR. HORLEY: All right. I'd like to mark this as Exhibit 181.
(The document was marked as Exhibit 181 for identification.)
BY MR. HORLEY:
Q. Okay. Could you please explain in a nutshell what this spreadsheet shows?
A. Yes. This is a voter list out of our AVID database of records in canceled status, anything other than moved out of jurisdiction. I believe I separated those out and there's a different spreadsheet for those.
Q. Got it. All right.
So similar to before, we have this "Status" column and a "Status Reason" column, and same thing applies here, shows their current status and why?
A. Yes.
Q. Okay. Thank you. All right. I'm going to go down -- I'm going to go to this row here, which is

Row 15409.

Do you see that, Ms. Casner?

A. Yes.

Q. And here it says that the person's status is "Canceled"; correct?

A. Correct.

Q. And the reason that their registration was canceled was "Involuntary Cancellation"; is that right?

A. Yes.

Q. Can you explain what that means?

A. Yes. Involuntary cancellation is when they stated on a jury questionnaire that they were -- I believe it is that they were not a citizen. I know it has to do with the jury questionnaire. And I don't know if that status reason is even used anymore or if it's something else in the system now, but that's what we used to use as perjury questionnaires.

Q. Got it. Okay.

Then I see here in Column E it says May 18, 2022; is that right?

A. Yes.

Q. So --

A. So likely, it is still -- yeah, it is still the status that we use, then.

Q. Okay. Understood.

So -- so your testimony, just for -- to be clear, is that if it says "Involuntary Cancellation," that's because it came from a jury report or someone --
A. Yes.
Q. -- reported they were not a citizen?
Okay. Thank you. That is all I have on that one.
Okay. Another quick document that I discussed briefly with Ms. Hansen -- and she mentioned that you might be the person to ask about, so I'm going to pull that up really fast.
Okay. Do you see this document, Ms. Casner?
A. I do.
Q. Okay. And this was previously marked as Exhibit 178.
And so do you recognize this document?
A. I do.
Q. And Ms. Hansen mentioned that your office participated in a SAVE tutorial.
Did you participate in that tutorial?
A. Yes.
Q. Okay. Was this guidance part of that tutorial?
A. I cannot say for certain. What I recall about the tutorial was they went through how to look up a voter's citizenship status. I don't recall them talking about

initiating a case involving a fraudulent document. They provided this information separate from the actual tutorial.

Q. Okay. So does this document address what to do if you receive a document that might be a fraudulent immigration document?

A. Yes, I would say that, just looking at it, that's what it does.

Q. And so is -- have you ever encountered people submitting fraudulent naturalization documents or other immigration-related documents?

A. No.

Q. Okay. And then Ms. Hansen mentioned that -- and I think you mentioned as well that your office takes naturalization documents at face value; is that right?

A. Yes.

Q. And in your view, is that consistent with this guidance?

MS. LANG: Objection. Lack of foundation.

THE WITNESS: I -- I don't have -- I don't know.

BY MR. HORLEY:

Q. Okay. But there is a possibility that someone could submit a fraudulent naturalization document?

MS. LANG: Objection. Lack of foundation.

Calls for speculation.
THE WITNESS: I don't know.
BY MR. HORLEY:
Q. Okay. That is all I have on that one. Just a few more questions for you. Thank you for your patience.
So I just want to ask a few more questions here.
If you received information from MVD that someone was not a U.S. citizen, would you consider that a reason to believe that the person was not a U.S. citizen?
A. It's -- it's a reason to follow up with the voter and make sure we get proof of citizenship.
Q. And same question for SAVE.
If you -- if the SAVE check showed that someone was not a citizen, would that be a reason to believe that someone was not a U.S. citizen?
A. It would be a reason to follow up with the voter and get proof of citizenship.
Q. And you mentioned -- and Ms. Hansen also discussed the jury questionnaire process. And -- that, you know, you received these reports that -- where someone says they were not a U.S. citizen. And Ms. Hansen indicated that you might have more information on what happens next in your office when you get those reports.
Could you just walk me through that process?

A. We have only started receiving those lists recently. And then we -- we used to receive notifications a long time ago and that's where the involuntary cancellations come from. I don't see them every day, but what we do is we send them a letter letting them know that they need to confirm with us whether or not they're a citizen and that's when they go into involuntary cancellation status.

Q. Understood. So if they -- if they get back to you and say, "Yes, I am a U.S. citizen," is them saying that enough or do you require some DPOC or other proof?

A. We -- we will -- I believe we will require DPOC in that situation.

Q. Okay. I think I am at my last question.

So last question is on the topic of birthplace. So Ms. Hansen mentioned you might know a little bit about this.

If someone called into your office and you needed to verify their identity, could you use their birthplace listed on the form as a way to verify that identity?

A. We could use it to verify we're pulling up the correct person, but that's after we ask for their name and their date of birth at least. If it's a common name, we could ask them that, but it's not specifically in any

instructions for our staff to ask for that.

Q. Okay. Could you use it as, like, a sort of security question to make sure that the person on the other end of the line is who they say they are?

A. We could.

Q. Does your office ever do that?

A. No, not that I'm aware of.

Q. Okay.

MR. HORLEY: That is all my questions. Thank you very much.

THE WITNESS: Thank you.

EXAMINATION

BY MR. LANGHOFER:

Q. Hi, Donna. My name is Kory Langhofer, and I'm -- I represent the RNC in this. I think I've only got two questions for you because we got to almost everything else before.

So the first question was: When you all send out the notices to someone who has submitted a state form and doesn't have DPOC saying, "Hey, we still need your DPOC," what percentage of them respond and provide the DPOC?

A. I -- I could not say offhand. I would have to compare the voter list that -- I mean, we have provided the

federal-only voter list. I would have to go through and see, like, a period of time from one period to the next. But I -- I don't even want to speculate on how many without actually looking at our database and giving a concrete answer.

Q. Do you know whether it would be more or less than half?

A. I -- if I had to say, I would say less than half.

Q. Well, if it's not too much trouble, if that's the sort of data that you can pull easily, it would be nice to get that and follow up. I don't think we need to reconvene everyone for that, obviously, though.

The second question -- let me find it in my notes here. I think that Ms. Hansen suggested we ask this of you.

MR. LANGHOFER: In fact, it looks to me like Tim already asked my second question. So you get off easy today. Thanks very much.

Are there any other questions on the defense side?

MR. MORGAN: Nothing from the secretary of state.

MR. LANGHOFER: All right. Any redirect from the plaintiffs?

MR. ATKINS: I have just one follow-up

question.

FURTHER EXAMINATION

BY MR. ATKINS:

Q. Just to clarify, the checkbox requirement on the federal form, isn't it the case that the EPM provides that failure to answer the checkbox or providing a "no" answer does not invalidate the form so long as they swear or affirm their citizenship in Box 9 of the federal form?

A. I would have to look at the actual wording. My understanding, without looking at that, is that it's specifically about the checkbox. If it -- if it was not checked but DPOC was provided, then that's enough to make them a full voter.

Q. Can we please look at Petty Exhibit 6, which is the 2019 EPM.

A. Okay. I am looking at the "Failure to Properly Answer Citizenship Question" section.

Q. If you could just read that -- that first paragraph.

A. "A registrant's failure to answer the citizenship question or 'no' answer to the citizenship question on the State or Federal Form does not invalidate the form so long as there is some other appropriate indicator that the registrant is a U.S. citizen."

Do you want me to go on?

Q. I guess, the part that's of interest to me is down below.

It says, quote, "Other appropriate indicators of U.S. citizenship include providing valid DPOC," which is consistent with your answers, "or a signature swearing/affirming that the registrant is a U.S. citizen (e.g., Box 9 on the Federal Form)."

So I guess that's what I'm referring to where it seems that the EPA is -- or the EPM is instructing your office to not reject a form for failure to complete the checkbox so long as they swear or affirm their citizenship in Box 9.

A. Okay. That makes sense to me now that you said that.

Q. So is it perhaps the case that your office has been placing federal form applicants into suspense for failure to complete the checkbox unnecessarily?

A. That is possible, yes.

Q. But you would agree with me that, pursuant to this paragraph of the EPM, it would appear that so long as they complete the citizenship affirmation in Box 9, their failure to complete the checkbox or to mark "no" is not grounds for invalidation?

A. Yes, that makes sense.

MR. ATKINS: Okay. Thank you. I don't have any other questions.

MR. LANGHOFER: Rose, read and sign?

MS. WINKELER: What's that?

MR. LANGHOFER: Are you guys going --

MS. WINKELER: Oh, read and sign, yes. Sorry.

THE VIDEOGRAPHER: We are off the record. Time on the video monitor is 3:54 p.m. This ends Volume 1, Media Number 1, in the 30(b)(6) deposition of Coconino County Recorder, by Donna Casner.

(The proceedings concluded at 3:54 p.m.)

______________________________

DONNA CASNER

STATE OF ARIZONA )
COUNTY OF MARICOPA )

BE IT KNOWN that the foregoing deposition was taken by me pursuant to stipulation of counsel; that I was then and there a Certified Court Reporter in the State of Arizona, and by virtue hereof authorized to administer an oath; that the witness before testifying was duly sworn by me to testify to the whole truth; pursuant to request, notification was provided that the deposition is available for review and signature; that the questions propounded by counsel and the answers of the witness thereto were taken down by me in shorthand and thereafter transcribed into typewriting under my direction; that the foregoing pages are a full, true and accurate transcript of all the proceedings had upon the taking of deposition, all done to the best of my skill and ability.

I FURTHER CERTIFY that I am in no way related to nor employed by any parties hereto; nor am I in any way interested in the outcome thereof.

Dated at Phoenix, Arizona, this 8th day of September, 2023.

____________________________________

CINDY MAHONEY, RPR, RMR NO. 50680

# Exhibit 10

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

Mi Familia Vota, et al., )
)
Plaintiffs, ) Case No.
) 2:22-cv-00509-PHX-SRB
v. ) (Lead)
)
Adrian Fontes, in his ) No. CV-22-00519-PHX-SRB
official capacity as ) No. CV-22-01003-PHX-SRB
Arizona Secretary of State, ) No. CV-22-01124-PHX-SRB
et al., ) No. CV-22-01369-PHX-SRB
) No. CV-22-01381-PHX-SRB
Defendants. ) No. CV-22-01602-PHX-SRB
________________________________) No. CV-22-01901-PHX-SRB
)
AND CONSOLIDATED CASES. )
________________________________)

VIDEO-RECORDED VIDEOCONFERENCE 30(b)(6) DEPOSITION OF
COCONINO COUNTY RECORDER, REPRESENTED BY PATTY HANSEN

Flagstaff, Arizona

August 23, 2023

Prepared by:
CINDY MAHONEY, RPR, RMR
Certified Court Reporter
Certificate No. 50680

# I N D E X


| WITNESS | PAGE |
|---|---|
| PATTY HANSEN | |
| EXAMINATION BY MR. ATKINS | 11 |
| EXAMINATION BY MR. PATTERSON | 68 |
| EXAMINATION BY MS. LANG | 92 |
| EXAMINATION BY MR. HORLEY | 107 |
| EXAMINATION BY MR. LANGHOFER | 127 |
| FURTHER EXAMINATION BY MS. LANG | 145 |
| FURTHER EXAMINATION BY MR. ATKINS | 147 |


## EXHIBITS MARKED


| EXHIBITS | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 166 | Plaintiffs' Notice of Deposition of Coconino County Recorder's Office Pursuant to Rule 30(b)(6) | 16 |
| Exhibit 167 | Defendant Coconino County Recorder's Responses to Plaintiff Arizona Asian American Native Hawaiian and Pacific Islander for Equity Coalition's First Set of Requests for Production of Documents | 20 |
| Exhibit 168 | Defendant Coconino County Recorder's Answers to Plaintiff's First Set of Interrogatories | 20 |

EXHIBITS MARKED

| EXHIBITS | DESCRIPTION | PAGE |
| --- | --- | --- |
| Exhibit 169 | Defendant Coconino County Recorder's Responses to Consolidated Plaintiffs' First Set of Requests for Production of Documents | 22 |
| Exhibit 170 | Defendant Coconino County Recorder's Answers to Consolidated Plaintiffs' First Set of Interrogatories | 23 |
| Exhibit 171 | March 24, 2022, letter COCONINO-000012 - 000013 | 28 |
| Exhibit 172 | HB 2243 - Voter registration; state residency; cancellation | 34 |
| Exhibit 173 | HB 2617 - Voter registration; cancellations; causes | 35 |
| Exhibit 174 | Teams Chat Pt V 7 18 Discussion with County and State election_CONFIDENTIAL VOTER REGISTRATION INFORMATION | 42 |
| Exhibit 175 | Coconino County Arizona Elections Department "Dear Voter" letter COCONINO-000042 | 50 |
| Exhibit 176 | Documentary Proof of Citizenship Form COCONINO-000041 | 51 |
| Exhibit 177 | Coconino County Arizona Elections Department "Dear Registrant" letter COCONINO-000043 | 100 |
| Exhibit 178 | Document titled How to Initiate a Case Involving a Potentially Fraudulent Document SAVE | 116 |

EXHIBITS MARKED

| EXHIBITS | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 179 | May 24, 2022, email string | 124 |

PREVIOUSLY MARKED EXHIBITS

Exhibit 6 Page 39

Exhibit 24 Page 104

VIDEO-RECORDED VIDEOCONFERENCE 30(b)(6) DEPOSITION OF COCONINO COUNTY RECORDER, REPRESENTED BY PATTY HANSEN, commenced at 9:15 a.m. on August 23, 2023, at Flagstaff, Arizona, before Cindy Mahoney, RPR, RMR (via videoconference), Arizona Certified Court Reporter No. 50680.

APPEARANCES:

For Poder Latinx, Chicanos Por La Causa, and Chicanos Por La Causa Action Fund (via videoconference):

ARNOLD & PORTER KAYE SCHOLER LLP
By: Leah Motzkin, Esq.
601 Massachusetts Avenue NW
Suite 1000
Washington, D.C. 20001
202-942-5000
Leah.motzkin@arnoldporter.com

-and-

FAIR ELECTIONS CENTER
By: Beauregard W. Patterson, Esq.
Jon Sherman, Esq.
1825 K Street NW
Suite 701
Washington, D.C. 20006
202-331-0114
Bpatterson@fairelectionscenter.org
Jsherman@fairelectionscenter.org

For Mi Familia Vota and Voto Latino (via videoconference):

ELIAS LAW GROUP LLP
By: Alexander F. Atkins, Esq.
Christopher D. Dodge, Esq.
250 Massachusetts Avenue NW
Suite 400
Washington, D.C. 20001
202-968-4490
Aatkins@elias.law
Cdodge@elias.law

APPEARANCES CONTINUED:

For Promise Arizona and Southwest Voter Registration Education Project (via videoconference):
MEXICAN AMERICAN LEGAL DEFENSE AND EDUCATIONAL FUND
By: Ernest I. Herrera, Esq.
Erika Cervantes, Esq.
634 South Spring Street
11th Floor
Los Angeles, California 90014
213-629-2512
Eherrera@maldef.org
Ecervantes@maldef.org

For Living United for Change in Arizona; League of United Latin American Citizens; Arizona Students' Association; ADRC Action; Inter Tribal Council of Arizona, Inc.; San Carlos Apache Tribe; and Arizona Coalition for Change (via videoconference):
CAMPAIGN LEGAL CENTER
By: Danielle M. Lang, Esq.
1101 14th Street NW
Suite 400
Washington, D.C. 20005
202-736-2200
Dlang@campaignlegalcenter.org

For the Arizona Asian American Native Hawaiian and Pacific Islander for Equity Coalition (via videoconference):
LATHAM & WATKINS, L.L.P.
By: Evan M. Omi, Esq.
505 Montgomery Street
Suite 2000
San Francisco, California 94111
415-391-0600
Evan.omi@lw.com

APPEARANCES CONTINUED:

For Tohono O'odham Nation, Gila River Indian Community, Keanu Stevens, Alanna Siquieros, and LaDonna Jacket (via videoconference):

LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
By: Ryan Snow, Esq.
1500 K Street NW
Suite 900
Washington, D.C. 20005
202-662-8600
Rsnow@lawyerscommittee.org

-and-

NATIVE AMERICAN RIGHTS FUND
By: Allison Neswood, Esq.
Michael S. Carter, Esq.
950 F Street NW
Suite 1050
Washington, D.C. 20004
202-785-4166
Neswood@narf.org
Carter@narf.org

For the Democratic National Committee and Arizona Democratic Party (via videoconference):

WILMER CUTLER PICKERING HALE AND DORR, LLP
By: Christopher E. Babbitt, Esq.
2100 Pennsylvania Avenue NW
Washington, D.C. 20037
202-663-6000
Christopher.babbitt@wilmerhale.com

For Arizona Attorney General's Office and State of Arizona (via videoconference):

OFFICE OF THE ARIZONA ATTORNEY GENERAL
By: Timothy E. Horley, Esq.
Assistant Attorney General
2005 North Central Avenue
Phoenix, Arizona 85004
602-542-7932
Timothy.horley@azag.gov

APPEARANCES CONTINUED:

For Arizona Secretary of State Adrian Fontes (via videoconference):
SHERMAN & HOWARD LLC
By: Craig A. Morgan, Esq.
2555 East Camelback Road
Suite 1050
Phoenix, Arizona 85016
602-240-3000
Cmorgan@shermanhoward.com

For Yuma County Recorder Richard Colwell (via videoconference):
OFFICE OF THE YUMA COUNTY ATTORNEY
By: William J. Kerekes, Esq.
250 West 2nd Street
Suite G
Yuma, Arizona 85364
928-817-4300
Bill.kerekes@yumacountyaz.gov

For the Coconino County Recorder Patty Hansen:
FLAGSTAFF LAW GROUP
By: Rose M. Winkeler, Esq.
702 North Beaver Street
Flagstaff, Arizona 86001
928-233-6800
Rose@flaglawgroup.com

For Intervenor Republican National Committee (via videoconference):
STATECRAFT, PLLC
By: Kory A. Langhofer, Esq.
Thomas J. Basile
649 North 4th Avenue
Suite B
Phoenix, Arizona 85003
602-571-4275
Kory@statecraftlaw.com
Tom@statecraftlaw.com

ALSO PRESENT:
Donna Casner; Jean Roof; Joann Munoz; Richard Colwell; Colleen Connor; Gareth Fowler; Daniel Rohan, Videographer

TRANSCRIPT OF PROCEEDINGS

THE VIDEOGRAPHER: We are on the record. Time on the video monitor is 9:15 a.m. Here begins Volume 1, Media Number 1, in the 30(b)(6) deposition of Coconino County Recorder, by Patty Hansen and Donna Casner, in the matter of Mi Familia Vota, et al., v. Adrian Fontes, et al., in the United States District Court, District of Arizona, Case Number 2:22-cv-00509-SRB.

Today's date is August 23rd, 2023. Our court reporter is Cindy Mahoney. I am Daniel Rohan, a certified legal videographer. We both represent Coash Court Reporting & Video.

This video deposition is taking place at Coconino County Recorder's Office, 110 East Cherry Avenue, Flagstaff, Arizona 86001.

Counsel, please identify yourselves and state whom you represent.

MR. ATKINS: Good morning. My name is Alexander Atkins. I'm with Elias Law Group, and I represent Mi Familia Vota and Voto Latino, plaintiffs in the case.

MS. WINKELER: Rose Winkeler, Flagstaff Law Group. I represent Coconino County recorder Patty Hansen.

MR. HERRERA: Ernest Herrera, one of the

counsel for plaintiffs -- Promise Arizona plaintiffs.

MR. HORLEY: Tim Horley with the State of Arizona and the Arizona Attorney General's Office.

MR. BABBITT: Christopher Babbitt for the Democratic National Committee and the Arizona Democratic Party.

MS. CERVANTES: Erika Cervantes for Promise Arizona plaintiffs.

MR. PATTERSON: Beauregard Patterson for Poder Latinx, Chicanos Por La Causa, and Chicanos Por La Causa Action Fund.

MR. MORGAN: Craig Morgan for Sherman & Howard, on behalf of the Secretary of State. With me is the state elections director, Colleen Connor.

MR. BASILE: And Thomas Basile for the Intervenor-Defendant Republican National Committee.

THE VIDEOGRAPHER: It looks like everybody.

Can the -- sorry. Was there anyone else?

Will the court reporter please swear in the witness.

///

///

///

///

///

PATTY HANSEN,
the witness herein, being first duly sworn,
was examined and testified as follows:

EXAMINATION

BY MR. ATKINS:
Q. Good morning, Ms. Hansen. As you just heard, my name is Alex Atkins. I represent the plaintiffs, Mi Familia Vota and Voto Latino, in this lawsuit. And thank you for taking the time to speak with us this morning.
A. Good morning.
MR. ATKINS: A few things just to get on the record out of the gate; namely, any objections raised by either side will apply to all parties on that side.
I also want to note that this 30(b)(6) deposition of Coconino County recorder is -- the witness designated is Ms. Hansen, but there is also Donna Casner, who will be offering testimony after Ms. Hansen.
BY MR. ATKINS:
Q. Ms. Hansen, if I ask you a question that is more appropriately answered by Ms. Casner, just please let me know that and -- and we can flag it and ask it later when we switch witnesses.
Does that make sense?
A. Yes.

Q. Okay. So as I'm sure you know, there's various plaintiff groups that have brought legal challenges against HB 2492 and HB 2243, and those cases have all been consolidated together into this lawsuit. So I'm going to be doing the initial questioning today, and then when I'm done, counsel for some of the other plaintiff groups and potentially defendants and intervenors will likely have additional questions for you as well.

A. Okay.

Q. Could you please state your full name for the record.

A. Patty Hansen.

Q. And what is your current title?

A. I'm the Coconino County recorder.

Q. And how long have you been the county recorder in Coconino County?

A. Since January 2013.

Q. Have you held any other roles with the county recorder's office?

A. Yes. In 2003 until I became recorder, I was the election administrator in the recorder's office.

Q. So you have 20 years of election administration experience in Coconino County; is that correct?

A. That is correct.

Q. And could you just describe at a high level what

your responsibilities are as recorder?
A. As recorder, I'm responsible for voter registration, early voting, petition signature verification, also overseeing the official record of property records in the county.
Q. Understood.
And are you represented by an attorney here today?
A. Yes, I am. Rose Winkeler.
Q. And she's in the room with you?
A. Yes.
Q. So before we jump into questions, just a couple of points I want to make sure we're all clear on.
You understand that you're testifying under oath today?
A. Yes, I do.
Q. And do you understand that the court reporter is transcribing this deposition?
A. Yes.
Q. So with that in mind, and especially because we're here on Zoom, please make sure you answer questions audibly and clearly. Please let me know if you don't understand a question or need me to rephrase or repeat any part of it.
A. Okay.
Q. If -- if I ask you a question and you answer it,

I'll assume that you understood it. So if you don't understand, just please let me know.

A. Okay.

Q. And so throughout the deposition, attorneys may make objections to questions that are asked of you. So it will help if you just give a short pause after the question is asked before you answer so that any attorneys have an opportunity to object, but you're still able to answer the question despite the objections unless your attorney instructs you not to answer.

Does that make sense?

A. Yes, it does.

Q. Is there any reason today that you aren't able to give full, complete, and accurate testimony?

A. No.

Q. If at any point during the deposition you need to take a break for any reason, please just let me know. The only thing I ask is that if there's a question pending, we'll finish answering that question and then we can take a break.

A. Okay.

Q. Have you ever been deposed before?

A. Yes.

Q. Approximately how many times?

A. That, I can't remember. I'm sorry.

Q. I take it it's -- it's a significant number, though?

A. Yes. I also worked in another -- in two other states and have been involved in lawsuits there.

Q. So in terms of depositions having to do with the Coconino County Recorder's Office and specifically voter registration or -- or list maintenance activities, have you been deposed in that capacity on those subjects?

A. I believe so. There's been cases like the Gonzalez case and things like that. But I -- I guess I can't say for sure -- remember exactly what the depositions were about.

Q. Sure.

But you were deposed in the Gonzalez case?

A. I believe so.

Q. Okay. And just for the record, where are you physically located today?

A. In the county recorder's office.

Q. And who else is in the room with you?

A. My Chief Deputy, Donna Casner, and my legal counsel, Rose Winkeler.

Q. And did you bring any materials with you to the deposition?

A. Yes.

Q. And what are those materials?

A. Some notes, copies of the interrogatories, my letter to the governor, and then responses that we sent to -- in regards to the court cases, the discovery request, the responses -- not the actual materials for the discovery, but the responses that we sent along with it.

Q. I understand.

So I believe you said you have some notes with you. Are you able to describe what those notes are or where they came from?

A. Yeah. They were notes that Donna and I had made on who would probably have the most knowledge about the questions that you had sent for the deposition.

Q. Okay. All right. Thank you very much.

I'd like to introduce as our first exhibit what is labeled in the folder as Exhibit A.

You can let me know when you have that document in front of you, Ms. Hansen.

A. Yes, I do.

Q. Okay.

MR. ATKINS: And I'd like to mark this as Exhibit 166.

(The document was marked as Exhibit 166 for identification.)

BY MR. ATKINS:

Q. Have you seen this document before today?

A. Yes.
Q. And what do you understand this document to be?
A. Let me see. This is our -- let me see, the notice of deposition for the recorder's office today.
Q. And do you understand that you've been designated as a representative to testify on behalf of the Coconino County Recorder's Office as opposed to in your individual capacity?
A. Yes.
Q. And can we stipulate, therefore, that whenever I say "you" or "your," that that will be the equivalent of saying "your office"?
A. Yes, that's fine.
Q. And can we also stipulate that unless you specify otherwise, if you use the word "I" or "me," that shall refer to the Coconino County Recorder's Office?
A. Okay. Yes.
Q. All right. If you can please turn to page 4 of Exhibit 166, the deposition notice.
A. Okay.
Q. So starting at the bottom of page 4 is a list of 28 topics for today's deposition.
Did you review this list prior to the deposition today?
A. Yes, I did.

Q. Now, I understand that there may be topics that Ms. Casner is prepared to address as opposed to you.
Are -- are you aware of specific topics that you are not prepared to address today?
A. Yes. When it talks about the AVID voter registration system and the specifics for the procedures for the staff in the office, Donna is much more knowledgeable of the forms and she's the one who does the day-to-day supervision of those staff and uses those materials.
Q. Understood.
So with the exception of those topics, are you prepared to address the remaining topics on the deposition notice?
A. Yes, I am.
Q. And did you discuss today's deposition with anyone else outside of your office, besides Ms. Winkeler?
A. No.
Q. And other than the documents that you have with you there, did you review any other documents in preparation for the deposition?
A. Yes. I looked over some emails that I had received and I think were part of the discovery.
Q. Understood.
Okay. I'd like to pull up our next exhibit,

which is marked as Exhibit B in the folder. Please let me know when you have that document in front of you.
A. It's in front of me.
Q. And do you recognize this document?
A. Yes, I do.
Q. And what do you recognize it to be?
A. It's the request for production of documents that we had in our office in relation to the Asian American Native Hawaiian and Pacific Islanders for Equity Coalition's case.
Q. Thank you.
I know that plaintiff, their name is a bit of a mouthful. We tend to -- to refer to them as simply "the Equity Coalition," so feel free to -- if you need to use their name again.
So just to be clear for the record, these are your responses to Equity Coalition's first requests for production, which you submitted on February 10th, 2023; is that correct?
A. That is correct.
Q. And were you involved in preparing these responses?
A. Somewhat. Donna Casner pulled the list and things like that and pulled the materials together.
Q. Did you review this response before today's

deposition?

A. Yes.

Q. Are there any updates to the responses contained in this document that you would like to make at this time?

A. No.

Q. Okay. If we can next pull up what's marked as Exhibit C in the folder.

THE COURT REPORTER: And just for the record, you wanted to mark the previous one as Exhibit 167?

MR. ATKINS: Yes. Apologies.

THE COURT REPORTER: No problem.

MR. ATKINS: Thank you.

(The document was marked as Exhibit 167 for identification.)

THE WITNESS: It's -- I have it in front of me.

MR. ATKINS: Okay. Let's please mark this as Exhibit 168.

(The document was marked as Exhibit 168 for identification.)

BY MR. ATKINS:

Q. And what do you recognize this document to be?

A. This is our response to the first set of interrogatories for the Mi Familia Vota, et al., case.

Q. Understood.

And so for the record, this is Coconino County recorder's answers to Equity Coalition's interrogatories, which you submitted in this case, again, on February 10th, 2023; correct?

A. Yes. Correct.

Q. Did you verify the responses to the interrogatories in this document?

A. Yes, I did.

Q. I just want to note for the record that the -- I noticed last night that the verification page for this document has your name but doesn't actually have your signature.

So I just want to confirm that you did, in fact, verify these responses and intended to sign the verification page?

A. Yes.

Q. And were you involved in preparing these responses?

A. Yes, working with my legal counsel, Rose Winkeler, and with Donna.

Q. And are there any updates or changes that you would like to make to these responses?

A. No.

Q. All right. Let's please pull up what's marked as Exhibit D in the folder.

A. Okay. It's in front of me.

MR. ATKINS: Let's please mark this as Exhibit 169.

(The document was marked as Exhibit 169 for identification.)

BY MR. ATKINS:

Q. And what do you recognize this document to be?

A. This is our response for the request of production of documents that was -- let me see. I don't see a date on here. But I think it was our second request for documents so --

Q. So --

A. June 29th of 2023.

Q. Great.

So this is your office's responses to consolidated plaintiffs' request for production submitted June 29, 2023?

A. That's correct.

Q. And were you involved in preparing these responses?

A. Yes.

Q. And are there any updates that you would like to make to these responses?

A. No.

Q. All right.

A. We did send supplemental because we found Donna was able to find my comments that I had made to the Arizona Association of Counties in their ALTO system. And I'm sorry. I don't remember which discovery request that would go to. But I know that Rose Winkeler sent those to you.
Q. Yes. Confirmed. We received several supplemental documents produced by your office, I believe, on Monday of this week.
A. Okay.
Q. So other than supplementing the production in conjunction with this response, you don't have any updates or changes to make to the responses in this document?
A. No.
Q. All right. Just one more of these. If we can please pull up what's marked as Exhibit E.
A. Okay. And this is response to interrogatories -- the first set of interrogatories that was sent to us.
MR. ATKINS: Let's please mark this as Exhibit 170.
(The document was marked as Exhibit 170 for identification.)
BY MR. ATKINS:
Q. These are your office's responses to consolidated plaintiffs' interrogatories dated June 29, 2023?
A. Yes.

Q. And did you verify these responses?
A. Yes, I did.
Q. Note for the record that the verification is signed on this document by Ms. Hansen.
And you were involved in preparing these responses as well?
A. Yes. Along with Donna Casner and Rose Winkeler.
Q. And do you have any updates or changes to make to these responses?
A. No.
Q. Okay. Thank you.
Switching gears a bit, just want to discuss the responsibilities of your office with respect to voter registration and elections.
A. Okay.
Q. Can you just say again what your responsibilities are with regard to voter registration and elections?
A. Okay. Our office is responsible for processing and maintaining the list of registered voters and also conducting early voting and signature verification for petitions. And that's in regards to elections.
Q. And who in your office specifically is responsible for processing voter registration applications?
A. The person responsible for supervising the staff and overseeing our voter registration division is Donna

Casner.

Q. And who is responsible for maintaining the list of registered voters?

A. Legally responsible is me.

Q. And is there someone else who actually performs that function underneath you?

A. Yes. That would be Donna Casner.

Q. And who is responsible for and who administers the early voting tasks that you described?

A. Donna Casner also does that.

Q. And for early voters in Coconino County, am I correct that they can submit their ballots in person?

A. Yes, they can.

Q. And they can also submit them by mail?

A. Yes.

Q. Is it also possible for them to submit them through dropboxes?

A. Yes. We do have dropboxes in areas of the county.

Q. And is Ms. Casner responsible for processing those early ballots?

A. Yes, she is.

Q. Approximately how many staff members in your office work on voter registration and list maintenance?

A. I think five or six.

Q. And are those individuals supervised by you and

Ms. Casner?
A. Yes. And also, our voter registration manager -- or supervisor, Sedona Stone.
Q. And can you describe that individual's role and how it differs from your own?
A. I think Donna would probably be able to give you more information since she directly supervises Sedona, but they, I know, divide duties and that. And Donna -- or Sedona is more working directly with the -- our administrative specialist I's that are actually doing the data entry. She's checking their work. She oversees the function of our Flagstaff Mall office.
Q. Are you familiar with the Voter Registry Advisory Committee?
A. Voter Registry?
Q. Or VRAC?
A. Oh, VRAC. I am, yes.
Q. And can you just, at a high level, explain what that committee is?
A. That committee discusses procedures and also how AVID, the state voter registration system, should function. VRAC was first created to create uniform procedures across the state when we went on the statewide system back in the early 2000s after the Help America Vote Act went into effect.

Q. And do you have a role on the VRAC committee?
A. I'm a member.
Q. And am I correct that VRAC puts out issue papers?
A. Yes.
Q. And what is the purpose of those issue papers?
A. I think the main purpose is to provide uniformity across the counties; that we're doing things in the same manner.
Q. And -- and who drafts VRAC issue papers?
A. In the past, it was -- the Secretary of State's Office would draft them and then bring them to the committee, and then the committee would vote on them.
It seems to me right now that there's some change that the secretary of state would prefer that the VRAC committee come up with the issue papers that they bring forward. But from my recollection, that has not been finalized if that change is going to come about.
Q. Understood.
So is it fair to say that VRAC works with the secretary's office to try and create uniformity across the county recorders' offices?
A. Yes. And it's in how we process registrations and also in how the AVID system works.
Q. So I'd like to discuss one of the laws being challenged in this litigation, HB 2492.

Are you familiar with that law?
A. Yes.
Q. And am I correct that your office opposed HB 2492 last year?
A. Yes.
Q. If I can ask you to look at what's marked as Exhibit F in the folder.
A. Maybe just a sec. The computer went to sleep.
Q. Take your time.
A. Okay.
Q. So let's mark --
A. It's in front of me.
Q. Great.
And what is this document?
A. This is the letter that I sent to Governor Ducey's office asking him to veto 2492.
MR. ATKINS: So let's mark this as Exhibit 171.
(The document was marked as Exhibit 171 for identification.)
BY MR. ATKINS:
Q. And did you write this letter?
A. Yes, I did.
Q. If I can direct you to the second paragraph of the letter. You wrote, quote, "I am concerned that the

legislation runs afoul of some provisions of the National Voter Registration Act of 1993 (NVRA) and the U.S. Supreme Court decision in the Arizona v. Inter Tribal Council of Arizona . . . Case," with a citation.

Did I read that correctly?

A. Yes, you did.

Q. And does this continue to be your view of 2492 today?

MR. HORLEY: Objection. Calls for a legal conclusion.

MR. BASILE: Objection.

BY MR. ATKINS:

Q. You can answer.

A. Yes.

Q. If I can next direct you to paragraph 4 at the bottom of the page.

You wrote, quote, "The bill also requires proof of residence location. This would be very difficult for Native American voters that reside on the Hopi and Navajo reservations. Many of the citizens that live on the reservation do not have a street address. When they register to vote they put a narrative description of the location of their residence. This allows us to determine their voting precinct, school district and hospital district. They do not have a deed or rental agreement for

their residence. Sadly, some of the Native American citizens do not have access to public utilities so they do not have utility bills that they could use to prove the location of their residence. This requirement would make it extremely difficult for them to register to vote."

Did I read that correctly?

A. Yes, you did.

Q. And does this also continue to be your view today?

MR. HORLEY: Same objection.

MS. WINKELER: You can go ahead and answer.

THE WITNESS: Yes.

BY MR. ATKINS:

Q. And finally, if I can direct you to the fifth paragraph on the next page, you wrote, quote, "I have worked in the field of voter registration and election administration for 35 years, and this bill is trying to address problems that just do not exist. It will create barriers for our citizens to have to overcome to exercise their right to vote," end quote.

Did I read that correctly?

A. Yes.

Q. And does that also continue to be your view today?

MR. HORLEY: Same objection.

THE WITNESS: Yes, it is.

BY MR. ATKINS:

Q. What did you mean when you referred to, quote, "problems that just do not exist"?
A. I just don't see that we are having people register to vote that don't have a residence in our county.
Q. What -- what problems, if any, do you think that HB 2492 is trying to address?
MR. HORLEY: Same objection.
THE WITNESS: That, I don't know for sure. It -- citizenship questions and also residence. But I can't say what the legislators were trying to accomplish with this.
BY MR. ATKINS:
Q. And in the final quote of yours from the letter that I read you, you referred to HB 2492 creating barriers for your citizens that they will have to overcome to exercise the right to vote.
Can you elaborate at all on what barriers you believe HB 2492 creates for your citizens?
A. It's requiring additional activities, producing documents that are not required now, and I don't think really serves a purpose in voter registration.
Q. And how does the requirement that voters produce additional documents create a barrier that they have to overcome?
MR. HORLEY: Same objection.

THE WITNESS: If they don't have an Arizona driver's license or state ID, they're going to have to somehow make copies of the utility bill or a bank statement or certificate of Indian blood or tribal ID, and it's just an additional requirement that is -- they're going to have to meet to be able to register to vote.

BY MR. ATKINS:

Q. If I can finally direct you to the last paragraph of your letter, you wrote, quote, "These are just a few of the concerns that I have with HB2492."

Did I read that correctly?

A. Yes.

Q. Are there additional concerns that you have with 2492 that you did not address in this letter?

A. Yes, in regards to citizenship. And I -- I do apologize. I get 2492 and 2243 mixed up, but --

Q. I'll admit that I do as well sometimes, so no need to apologize.

A. So requiring a box to be met on citizenship, which is -- I believe is in 2492, it -- that we would reject a form because it's not marked is contrary to -- if you provided proof of citizenship, it seems to be that it's just an error in filling out the form. It's not an error -- or it's not proving that you're not a U.S. citizen to vote.

So there's things like that that procedurally -- and having to cancel registrations that -- within a certain time period goes against some of the NVRA requirements. Because the information is secondhand information, they should be made inactive and kept on the rolls for two federal general elections and then canceled.

Q. Understood.

So in addition to the concerns you raised in your letter, you also have concerns about the citizenship checkbox requirement; correct?

A. Yes.

Q. And you also have concerns about the requirement that certain registrations are canceled within a period of time?

A. Yes.

Q. We'll likely discuss both of those issues further a little later in the deposition, but before we move on, are there any additional concerns other than those two and the ones in the letter that you have with either law?

A. Not that I can think of it right now.

Q. Okay. So let's talk a little bit about the other law being challenged, HB 2243. If we can please look at what's marked as Exhibit G.

A. Okay.

Q. And do you recognize this document?

A. Yes, I do.
Q. And can you describe what it is?
A. It's the comments that I put into the AACo ALTO system in regards to what position -- or in regards to the Bill 2243.
MR. ATKINS: So let's please mark this document as Exhibit 172.
(The document was marked as Exhibit 172 for identification.)
BY MR. ATKINS:
Q. And AACo refers to the Arizona Association of Counties; correct?
A. That is correct.
Q. And can you just briefly describe what AACo is?
A. AACo is an organization made up of elected county officials across the state. And they do the majority of our lobbying at the legislature for each of the affiliates. The recorders' association is an affiliate of AACo.
Q. Thank you.
So at the bottom of the page of this document, there's a box that starts on the first page and continues onto the second page. This box contains your analysis and comments on HB 2243; right?
A. That is correct.
Q. So at the top of the second page under "Projected

Impact," your comment reads, quote, "I don't think this accomplishes anything. We follow list maintenance requirements which identify people that have moved out of state. We end up canceling them through the list maintenance procedures. Adding a sentence to the voter registration form isn't going to do anything."

Did I read that correctly?

A. Yes, you did.

Q. And does that continue to be your view today?

MR. HORLEY: Objection to the extent it calls for a legal conclusion.

THE WITNESS: Yes.

BY MR. ATKINS:

Q. All right. If we can now look at what's marked as Exhibit H.

A. It's in front of me.

(The document was marked as Exhibit 173 for identification.)

BY MR. ATKINS:

Q. And am I correct that this is -- also comments that you've provided to AACo, but this time on HB 2617?

A. Yes.

Q. And am I correct that HB 2617 was a predecessor bill to HB 2243?

A. Yes, I believe so.

Q. So again, the box at the bottom of the page contains your comments and analysis on HB 2617; right?

A. Yes, it does.

Q. So under "Projected Impact," your comment reads, quote, "It appears that this legislator thinks we do not verify U.S. citizenship. We already have a process in place that checks a registrant's citizenship. Checking if someone has a driver's license in another state should not trigger a cancellation in our state. This would cause major problems for military voters. This also goes against the NVRA and will result in us being tied up in a court case. This is another example of a solution to a problem that does not exist. It is too bad the legislator doesn't take the time to read the elections procedures manual, state statutes and federal laws to understand what is already required and in place."

Did I read that correctly?

A. Yes, you did.

Q. And does that statement continue to represent your perspective today?

MR. HORLEY: Same objection.

MR. BASILE: Objection.

THE WITNESS: Yes, it does.

BY MR. ATKINS:

Q. Can you briefly explain how your office already

verifies U.S. citizenship?

A. U.S. citizenship is verified through the AVID system, which runs it against the Motor Vehicle Division's database. And we also will verify if they have included documentation, such as a photocopy of their passport, or if they have a state driver's license that has -- indicates that they have proven citizenship in that state and also through the state program.

Q. Understood.

So to summarize, there are a number of different documents or pieces of information that a registrant can provide to your office that you then use to verify their citizenship; is that right?

A. Yes, that is correct. I forgot to mention also birth certificate.

Q. And based on your comments in the document we're looking at, is it your position that those existing methods for verifying citizenship are already sufficient?

A. Yes, it is.

Q. And so is it your position that the additional requirements for citizenship verification proposed in HB 2617 are unnecessary?

A. Yes.

Q. In your statement, you referred to this bill being "another example of a solution to a problem that does not

exist."

Can you explain what you meant by that statement?

A. In my now 36 years of doing voter registration, I have not seen any proof that non-U.S. citizens are registering and voting.

Q. Returning to HB 2492, has your office discussed how to interpret that law with anyone?

A. Just with each other a little bit. Mainly what we're doing is waiting for guidance from the Secretary of State's Office.

Q. So when you discussed it amongst yourselves in the office, what specifically did you discuss?

A. Questions about federal-only voters, as I recall, versus congressional-only voters. Also, we don't -- none of us seem to know the additional database they talk about running the information against. I think it's something with public health.

And that's about it. The main thing is that we find the legislation confusing, and we're waiting for guidance from the Secretary of State's Office.

Q. And is your office currently enforcing any provisions of HB 2492?

A. No.

Q. And is your office handling voter registration

applications differently as a result of HB 2492?
A. No.
Q. Similarly, has your office discussed how to interpret HB 2243?
A. Just like I said with -- previously for 2492.
Q. And is it the case that you are also not currently enforcing any provisions of 2243?
A. That is correct.
Q. To your knowledge, are all the counties in Arizona adhering to the secretary of state's advice on what to implement and what not to implement from those laws at this time?
MR. HORLEY: Objection; foundation.
THE WITNESS: That, I cannot say.
BY MR. ATKINS:
Q. Are you aware of any counties that are currently implementing any provisions of 2492?
MR. HORLEY: Same objection.
THE WITNESS: I have not discussed it with any of the counties.
BY MR. ATKINS:
Q. All right. I'd like to have you look at an existing exhibit from a previous deposition. This is Petty Exhibit 6.
A. Which letter is it?

Q. So --

A. I'm sorry.

Q. So this exhibit is not in the folder that I emailed. It's underneath -- it's within the -- the Dropbox link that was also in my email.

A. Oh.

Q. Are you all able to pull that up, or should we take a short break?

A. I think we should take a short break.

MR. ATKINS: All right. Can we please go off the record.

THE VIDEOGRAPHER: Of course. We are off the record. Time on the video monitor is 10:04 a.m.

(A recess ensued.)

THE VIDEOGRAPHER: We are on the record. Time on the video monitor is 10:12 a.m.

BY MR. ATKINS:

Q. Ms. Hansen, do you now have Petty Exhibit 6 in front of you?

A. Yes.

Q. And can you tell me what this document is?

A. It's the 2019 Elections Procedures Manual.

Q. And is that also referred to as the EPM?

A. Yes, it is.

Q. Is the 2019 EPM still the operative version of the

Elections Procedures Manual?

A. Yes.

Q. Is your office required to follow the EPM?

A. Yes, we are.

Q. Are all parts of the EPM binding on your office?

MR. MORGAN: Objection. Calls for a legal conclusion.

THE WITNESS: Yes.

BY MR. ATKINS:

Q. Can binding guidance be conveyed to your office by the Secretary of State's Office by any other means other than the EPM?

MR. HORLEY: Same objection.

THE WITNESS: Not that I'm aware of. They will share with us best practices and guidances. Like, if there's a court decision, they will also provide an addendum to the EPM if it's needed, but that would be binding.

BY MR. ATKINS:

Q. Has -- has your office seen the draft 2023 EPM?

A. Yes, we have.

Q. And have you provided comments on the 2023 EPM?

A. Yes. The only comment I think we provided was in regards to including forms -- if we were going to include all the forms in the appendix.

Q. Did you provide any comments on the 2023 EPM concerning HB 2492 or HB 2243?
A. No, not that I recall.
Q. If we can please look at what's marked as I in the potential exhibits folder.
A. Okay.
(The document was marked as Exhibit 174 for identification.)
BY MR. ATKINS:
Q. Do you recognize this document?
A. Not as a document.
Q. What do you recognize it as?
A. It says it's part of the Teams chat with the discussion -- I guess, a discussion with Secretary of State's Office. I don't know if it's from the Hobbs administration or the Fontes administration.
Q. Would you like to take a moment to -- to look at the document and see if it's familiar to you?
A. Sure.
Oh, it must be from July 18th of this year. So it's the Fontes.
Q. So am I -- am I correct that this is a chat log from a Microsoft Teams meeting with the secretary's office to discuss the 2023 EPM?
A. I assume so, yes.

Q. Did your office participate in this meeting?
A. Yes, we did.
Q. Did you participate in the meeting?
A. I think so.
Q. Do you have any recollection of what was discussed during this meeting?
A. Not specific to this. We've had several Teams meetings.
Q. If you can turn to the fourth page of the document. At the top of the page, it says, "Pinal agrees!"
A. Okay.
Q. So just underneath that, do you see a message with your name from July 18th at 1:50 p.m.?
A. Yes.
Q. So the message says, quote, "If we have DPOC we should not reject for the box not being checked."
Did I read that correctly?
A. Yes, you did.
Q. And "DPOC" stands for documentary proof of citizenship; right?
A. Yes.
Q. And do you typically refer to it as DPOC?
A. Sometimes. Usually I say "proof of citizenship," but yeah, DPOC is a common use among the counties.
Q. So if I refer to it as DPOC, you'll understand

what I'm referring to?
A. Yes.
Q. Did you write that message that we just read?
A. Yes.
Q. Can you explain what was being discussed and what you meant by your message?
A. I'm assuming that it was in response to talking about if the citizenship box is not checked on the registration form, that we would have to reject the document. But I believe, as I stated earlier, that proof of citizenship should be enough. You shouldn't have to check the box too on the registration form.
Q. And do you see underneath your message it says, quote, "like 4"?
A. Yes.
Q. Do you know what that means?
A. I'm thinking that probably is four people liked my comment.
Q. Do you know who on this meeting liked your comment?
A. No, I don't.
Q. Has the Fontes administration provided your office with any other draft guidance or documents beyond the 2023 EPM that elaborate on interpretation or implementation of HB 2492 or 2243?

A. I don't believe so. I know we had the written document from the Hobbs administration, Kori Lorick, but I don't recall receiving anything else from the Fontes administration so far than what we have in the EPM -- or draft EPM.
Q. And the document that you're referring to from the Hobbs administration, am I correct that that's the December 2022 communication that advised the counties not to implement certain provisions of the laws?
A. Yes.
Q. Have there been any VRAC proposals made regarding HB 2492 or 2243?
A. I'm sorry, I don't remember. Donna may be able to remember that better.
I have had to miss some meetings in the past couple months, so I'm not as up to date on what's been discussed at the meetings.
Q. That's fine.
Is it possible that there will not be agreement on a revised EPM and there, thus, will not be a new operative EPM this year?
MR. MORGAN: Form, foundation.
THE WITNESS: I -- I don't know. It has to have agreement between the governor's office, the Attorney General's Office, and the secretary of state's, from my

understanding, but I don't know what kind of discussions of that are going on. It has happened in the past with not having an approved new EPM, but I'm hopeful that we will have a new one.

BY MR. ATKINS:

Q. If there's not an approved new EPM by this time next year in 2024, will your office nonetheless be obligated to enforce HB 2492 and HB 2243?

MR. HORLEY: Objection. Calls for legal conclusion.

THE WITNESS: I would need to ask my legal counsel on that.

BY MR. ATKINS:

Q. So let's change gears a little bit and talk about the voter registration process.

So in Arizona, voters can register using either the state voter registration form or what's known as the federal form; correct?

A. Yes.

Q. And the state form is prepared by the Secretary of State's Office; right?

A. Yes.

Q. Whereas, the federal form is the registration form that states are required to accept and use to register voters for federal elections; right?

A. Yes.

Q. And that requirement comes from the National Voter Registration Act, or NVRA?

A. Yes.

Q. Am I correct that neither the state form nor the federal form has been updated to reflect any of the new requirements under 2492 or 2243?

A. That, I'm not sure on. There was the additional language that if you register to vote in another state, your registration would be canceled in Arizona, as I recall. And I don't know if that's on the new form or not.

Q. When you're referring to that new language, is there somewhere where you are aware that that new language is present?

A. No. I haven't looked at the registration forms and we have not -- as I recall, we have not ordered new ones yet. Donna Casner would be able to answer that better than me.

Q. Is it the case that Arizona voters are registered as either federal-only voters or full-ballot voters?

A. Yes.

Q. And full-ballot voters can vote in state and local elections in addition to federal elections; correct?

A. That is correct.

Q. Is whether someone is registered as a federal-only

or full-ballot voter dependent on whether the registrant provides DPOC when they register?

A. Yes.

Q. If I use the term "dual-registration system," can we agree that I'm referring to this system that distinguishes between federal-only and full-ballot voters?

A. Yes.

Q. Do you know how long the dual-registration system in Arizona has been in place?

A. No. It came out of the court -- a court case, and I think it was the ITCA case. I can't re- -- I get the cases mixed up, so I'm sorry.

Q. Not a problem.

Is it fair to say that the dual-registration system has been in place for multiple presidential election cycles?

A. I would say at least two, maybe three.

Q. And is it the case that Arizona voters were not always required to provide DPOC when they registered to vote?

A. That is correct.

Q. And so prior to DPOC being required, voters were registered to vote in state, local, and federal elections regardless of whether they provided DPOC; right?

A. That is correct.

Q. The dual-registration system doesn't require those voters who had previously registered without DPOC to come back and provide DPOC in order to maintain their full-ballot status, does it?
A. No, it does not.
Q. But under the dual-registration system, every applicant now has to provide DPOC if they want to vote in state, local elections; right?
A. That is correct.
Q. Today, there are voters who remain registered as full-ballot voters who never provided DPOC; correct?
A. Yes.
Q. Do you know approximately how many of those voters there are in Coconino County?
A. No, I do not.
Q. Do you know approximately how many voters in Coconino County are currently registered as federal-only voters?
A. Donna could tell you that. She runs our statistics.
Q. What does your office currently do if a voter registration applicant fails to provide DPOC when they register?
A. We try to contact them to tell them they need to send us the DPOC to be able to vote for a full ballot, and

that's done with a letter. If it's close to the voter registration deadline, we may try to reach them by phone. And we do that prior to every election that we're going to be conducting so they're aware that if they wanted to vote a full ballot, that they will need to supply that DPOC.

Q. And to be clear, is a voter in that situation registered to vote in federal elections?

A. Yes. Not in the presidential preference election.

Q. But all other federal elections other than the presidential preference?

A. That's correct.

THE WITNESS: Is that correct, Donna? Sorry.

BY MR. ATKINS:

Q. We can -- we can double-check with her when we switch.

A. Yeah, check with her.

Q. If we can please look at the document marked J.

A. Okay.

MR. ATKINS: Let's mark this as Exhibit 175.

(The document was marked as Exhibit 175 for identification.)

BY MR. ATKINS:

Q. Is this the letter that you were just referencing that you send to voters who failed to provide DPOC when they register?

A. Yes.
Q. And this letter has bullet points listing different forms of DPOC that the applicant can provide; right?
A. Yes.
Q. Let's please look at Document K.
A. Okay.
MR. ATKINS: Let's please mark this as Exhibit 176.
(The document was marked as Exhibit 176 for identification.)
BY MR. ATKINS:
Q. What is this document?
A. This, I'll have you refer to Donna. This is part of the letter that she sends out -- or our office sends out, and she's much more familiar with how we deal with that.
Q. Sure.
But can I just ask you: Is this a form that accompanies the letter we were just looking at?
A. Yes.
Q. So I'd like to talk now a bit about your office's current practices for applicants who register using the state form.
A. Okay.

Q. If we could please turn back to Exhibit 169. This is your office's June 29th responses to consolidated plaintiffs' requests for production.

A. Okay.

Q. If I can please have you look at Request for Production Number 1, which is on the second page.

A. Okay.

Q. So RFP 1 asks for "All documents and communications from January 1, 2017, to the present relating to the use of birthplace and Citizenship Checkbox on the State Form, including but not limited to whether Voter Registration Applicants were required to provide birthplace or complete the Citizenship Checkbox to be registered to vote, whether Voter Registration Applicants actually did provide such information, how frequently Voter Registration Applicants actually did provide a correct or incorrect birthplace, fail to provide a birthplace, complete or fail to complete the Citizenship Checkbox, or make errors in completing the Citizenship Checkbox, and whether Voter Registration Applicants were rejected for failing to provide this information."

The request goes on, but we can stop there.

Did I read that correctly?

A. Yes.

Q. And if I can direct you to your response to RFP 1,

it reads, quote, "The Recorder follows the processes and procedures regarding a voter registration applicant's failure to check the citizenship checkbox on a state form set forth in the 2019" EPM "Chapter 1, Section IV(C)(4) and does not use information related to the birthplace of a voter registration applicant to verify such person's eligibility to vote. Further, the Recorder does not maintain a distinct record as to whether Applicants check the Citizenship" checkbox "or provide birthplace information and do not have a way to obtain that information other than reviewing every Application."

And the response goes on.

But did I read that part correctly?

A. Yes, you did.

Q. So currently, if an applicant submits a state registration form and provides adequate DPOC but no birthplace information, your office still registers the applicant to vote; correct?

A. Yes, that is correct.

Q. And is that because birthplace is not currently required to register applicants to vote?

A. It's an optional field.

Q. So if the applicant does include birthplace information, your office doesn't keep track of that information; correct?

A. That's correct.
Q. So now, if we can turn to Exhibit 170, which is your office's June 29th, 2023, responses to consolidated plaintiffs' interrogatories.
A. Okay.
Q. And if we can look at Interrogatory Number 1.
So this interrogatory asks you to "Identify and describe each way that Your office uses or would use information related to the birthplace of a Voter Registration Applicant -- including Applicants for whom you already have DPOC -- to verify such person's eligibility to vote, including but not limited to each way in which a Voter Registration Applicant's failure to provide their birthplace affects or would affect Your ability to confirm the Voter Registration Applicant's identity or determine whether that person is eligible to register and vote in Arizona."
Did I read that part of the interrogatory correctly?
A. Yes, you did.
Q. And your response to Interrogatory 1 reads, quote, "The Coconino County Recorder does not currently and does not anticipate using birthplace information to verify or confirm Voter Registration Applicant's identity or eligibility to register and vote in Arizona. Further, the

Coconino County Recorder believes this requirement to be in violation of the Civil Rights Act of 1964," 52 U.S. Code Section 10101(a)(2)(B), "consistent with guidance provided by the Arizona Secretary of State's Office in December of 2022, and unless and until it receives contradictory guidance from the Secretary of State or a court order saying otherwise, it does not intend to require provision of this information to complete voter registration applications."

Did I read that correctly?

A. Yes, you did.

Q. And is that still your position today?

MR. HORLEY: Objection to the extent it calls for a legal conclusion.

THE WITNESS: Yes, I'll still follow the guidance from Secretary of State's Office.

BY MR. ATKINS:

Q. So you don't use birthplace information to verify or confirm voter identity or eligibility; correct?

A. That's correct.

Q. And you believe that requiring a citizen to provide birthplace information in order for their application to be accepted violates the Civil Rights Act; correct?

A. According --

MR. HORLE7: Same objection.
THE WITNESS: According to what we received from the Secretary of State's Office. I think it was Kori Lorick's memo that she sent out to us.
BY MR. ATKINS:
Q. So you agree with Kori Lorick's memo in that regard?
A. Yes.
Q. Do you understand that under HB 2492, a state form applicant must include their place of birth on the form or it cannot be accepted by your office?
BY MR. HORLEY: Same objection.
THE WITNESS: Yes, I believe that's in there.
BY MR. ATKINS:
Q. Does your office have any means of accurately confirming that a voter's stated place of birth is accurate?
A. No, we do not.
Q. Would your office be able to verify a registrant's citizenship using their place of birth?
A. Not necessarily. I worked in a state where we were -- where people had to supply birthplace not for proof of citizenship, but we had -- we would have people that would be born in Germany, they were children of military personnel. And just because you're born in another

country, it doesn't mean that you are not a U.S. citizen if your parents are U.S. citizens.

Q. So is it fair to say that Coconino County cannot use birthplace information to verify whether an applicant is qualified to vote?

A. That is correct.

Q. And other than the communication from Ms. Lorick in December 2022 and the draft EPM, have you received any guidance from the secretary of state about how to implement the birthplace requirement if the law goes into effect?

A. No.

Q. Are you aware of any other state that requires birthplace information in order to register to vote?

MR. LANGHOFER: Calls for a legal conclusion.

THE WITNESS: When I worked in Nebraska, birthplace was one of the info -- pieces of information that was asked for. So I know Nebraska required it. I don't know that they still do or not.

BY MR. ATKINS:

Q. Do you know if Nebraska would reject voter registration applications that failed to provide birthplace information?

MR. LANGHOFER: Same objection.

THE WITNESS: That, I cannot remember. I do know we had to follow up with the registrants if they would

list another country to find out if their parents were U.S. citizens or if they were naturalized citizens. They did not have to provide proof of that. We would just -- we could verify it either through a letter or over the phone.

BY MR. ATKINS:

Q. Did Nebraska at that time have a DPOC requirement like Arizona does?

MR. LANGHOFER: Same objection.

THE WITNESS: No, it did not.

BY MR. ATKINS:

Q. I'd like to shift gears and speak again about the citizenship checkbox, which appears on both the state form and the federal form; right?

A. Yes.

Q. And I'm correct that the citizenship checkbox on both forms is -- is not new. It's been there for a while; right?

A. Yes, that is correct.

Q. But your office hasn't historically rejected voter application forms simply because a person failed to check the checkbox; correct?

A. That is correct. If they provided DPOC or if it was a federal-only voter and we could confirm identity for being able to vote by mail or in person. You have to mark the box -- if you did not -- on a federal form if you

didn't provide DPOC.

Q. Your office follows the 2019 EPM when it comes to the citizenship checkbox; right?

A. Yes, we do.

Q. And the 2019 EPM provides that failure to answer the checkbox or a "no" answer doesn't invalidate the form if there is some other appropriate indicator of citizenship; is that right?

MR. LANGHOFER: Same objection.

THE WITNESS: If the person marked "no" on the form that they're not a U.S. citizen but they provided proof of -- or provided DPOC, we would go ahead and register them.

Now, if they marked "no" and they did not provide DPOC, then we would not be able to.

BY MR. ATKINS:

Q. And you understand that under HB 2492, an applicant using either the state form or the federal form must affirmatively check the box confirming that they are a citizen or their registration will be rejected; right?

MR. LANGHOFER: Same objection.

MR. HORLEY: Objection.

THE WITNESS: I believe that's how it reads.

BY MR. ATKINS:

Q. And to confirm, your office is not currently

implementing that requirement; right?

A. That is correct.

Q. So right now, if an applicant submits the state form and provides DPOC but does not mark the citizenship checkbox, your office accepts the application; correct?

A. Yes.

Q. So is it fair to say that completing the citizenship checkbox is not necessary to your office confirming that a state form applicant is a citizen?

MR. LANGHOFER: [Indiscernible.]

THE COURT REPORTER: Kory, I couldn't hear you.

MR. LANGHOFER: Same objection.

THE WITNESS: Could you repeat that?

BY MR. ATKINS:

Q. Yeah. Let me -- let me back up a little bit.

It's the case -- right? -- that state form applicants have to provide DPOC with their registration; right?

A. Yes.

Q. So if a state form applicant submits their form with DPOC, their completing the citizenship checkbox is not necessary for your office to confirm that they're a citizen; right?

A. Yes, that is correct.

Q. Now, turning back to federal form applicants, am I correct that the federal form contains an affirmation of citizenship under the penalty of perjury at the bottom of the form?

A. I don't remember. I'm sorry. I believe Donna could answer that better than me.

Q. Let's shift gears away from voter registration. And I just have a few more questions about the challenged laws.

Am I correct that prior to HB 2492 and 2243, it was illegal for a person who was not a U.S. citizen to register to vote in Arizona?

MR. LANGHOFER: Same objection.

THE WITNESS: Yes.

BY MR. ATKINS:

Q. And would you also agree that prior to 2492 and 2243, Arizona had policies, laws, or procedures in place to prevent noncitizens from voting?

A. Yes.

MR. LANGHOFER: Same objection.

BY MR. ATKINS:

Q. In fact, isn't it a felony for a person to register when they know that they're not entitled to register?

MR. LANGHOFER: Same objection.

THE WITNESS: I believe it is a felony, yes.

BY MR. ATKINS:

Q. So if we can continue looking at Exhibit 170, your office's responses to consolidated plaintiffs' interrogatories. If I can have you look at Interrogatory No. 9, which starts on the bottom of page 7.

A. Okay.

Q. So I won't go through reading out the requests and your response with this one, but looking it over, do you see that this interrogatory concerns instances of voter fraud having to do with whether or not the person is a U.S. citizen or a resident of the county?

A. Yes.

Q. And your response on page 8 provides that your office isn't aware of any instances or any records providing evidence of such instances of noncitizens or nonresidents registering or voting; is that right?

A. That is correct.

Q. And is that still the case today, that your office is not aware of any instances of noncitizens registering or voting in the county?

A. Yes.

Q. Almost done. Just want to ask a few questions about voting by mail.

Arizona currently allows all registered

voters to vote by early ballot; correct?
A. Not by mail. Federal-only voters that have not provided an identity have to vote the first time in person.
Q. But other than first-time federal form voters, all other registered voters are entitled to vote early by mail; right?
A. That is correct.
Q. And do you know how long that's --
MR. LANGHOFER: [Indiscernible.]
THE COURT REPORTER: I didn't hear you, Kory.
MR. LANGHOFER: I just said, "Same objection."
BY MR. ATKINS:
Q. And do you know how long it's been the case that -- aside from that one exception, that all Arizona registered voters have been able to vote early by mail?
MR. LANGHOFER: Same objection.
THE WITNESS: I know it's been at least the 20 years I have been here. I don't know when "no-excuse" early voting went into effect.
BY MR. ATKINS:
Q. So during your time as an election administrator, the -- the right to request an early ballot has not depended on which form a voter uses to register, noting the exception that you raised about first-time federal-only

voters?

MR. LANGHOFER: Same objection.

THE WITNESS: That is correct.

BY MR. ATKINS:

Q. So if a voter is on the active early voting list, that means that they're automatically sent a ballot by mail for each election without them having to request it each time; right?

A. Not for unaffiliated voters in the partisan primary election. They need to tell us which party ballot they want -- wish to vote. Otherwise, it won't be mailed to them.

Q. But for affiliated voters and for all voters in general elections, if they're on the active early voting list, they're automatically sent their ballot by mail; correct?

A. Yes, that is correct.

Q. And those voters stay on the active early voting list unless they fail to vote in two subsequent elections; right?

MR. LANGHOFER: Same objection.

THE WITNESS: I believe it's two state elections, like, two election cycles right now.

BY MR. ATKINS:

Q. Understood.

Is it fair to say that voting by early ballot by mail is commonly used in Arizona?
A. Yes, it is.
Q. Most Arizona voters vote by mail; right?
A. A large percentage do.
Q. And is that true in your county?
A. Yes.
Q. Do you happen to know roughly what percentage of Coconino County voters voted by early ballot by mail in the 2022 general election?
A. I can't remember. I'd have to look the information up. I know that it was over 80 percent, as I recall, that voted early, but some of those early voters voted in person early.
Q. Understood.
Based on your significant experience as an election official, are there benefits to voters being able to vote using an early ballot?
A. As an election administrator, you know, it's up to the voter whether they want to or not.
Q. Do you -- do you think that the ability to vote early by mail provides benefits to the voter?
A. I think to some voters, they definitely believe that.
Q. The early ballots that your office sends out have

prepaid return postage; right?
A. That is correct.
Q. So a voter can simply complete their ballot and drop it in the mail; right?
A. That is correct.
Q. And voters who cast early ballots by mail don't need to visit a polling location or arrange time off or transportation to get there; right?
A. That -- that is correct -- majority. You may, if you live in the rural parts of the area, have to -- and you don't have a car, make arrangements to get to the postal areas because they're not delivered to their home. But the majority of the voters, yes.
Q. Do you agree that some voters face obstacles to voting in person on election day?
A. I would say some voters do.
Q. And do you agree that those voters benefit from the flexibility of an early ballot and being able to vote by mail?
A. Yes.
Q. Do you understand that under HB 2492, voters who fail to provide DPOC will not be permitted to vote by mail with an early ballot?
MR. HORLEY: Objection. Calls for a legal conclusion.

THE WITNESS: Yes, that's how I believe it reads.

BY MR. ATKINS:

Q. And so do you agree that those voters would then lose the benefits of early voting by mail that we've discussed?

A. Yes.

Q. All right.

MR. ATKINS: I believe that's all the questions I have for you, Ms. Hansen. So we can switch over to speaking with Ms. Casner.

Would you -- would you or anyone like to take a short break before we switch over?

THE WITNESS: Yes, please.

MR. ATKINS: All right. Does ten minutes work or -- or would longer be helpful?

THE WITNESS: I think ten minutes is fine. Thank you.

MR. MORGAN: Real quick, I don't have any questions for Ms. Hansen. And thank you, by the way, Ms. Hansen, very much. But to the extent others do, does it make sense to let that happen before we switch to the next witness?

MR. LANGHOFER: That's customary.

MR. MORGAN: Yeah, I think that's customary.

Yeah.

MR. ATKINS: Okay. That's -- that's fine with me.

MR. MORGAN: After the break.

MR. ATKINS: Yeah. So why don't we take our ten-minute break and reconvene at ten past the hour again. And, at that time, if other plaintiffs and then other parties have questions, they can address them with Ms. Hansen.

MR. MORGAN: Thank you.

THE VIDEOGRAPHER: We are off the record. Time on the video monitor is 10:59 a.m. This ends Media 1.

(A recess ensued.)

THE VIDEOGRAPHER: We are on the record. Time on the video monitor is 11:13 a.m. This begins Media 2.

EXAMINATION

BY MR. PATTERSON:

Q. Thank you again for your time, Ms. Hansen. I just have some questions for you related to the provisions in HB 2492 and 2243.

Earlier, you stated that your office opposed the enactment of HB 2492; is that correct?

A. Yes.

Q. And what was the basis of that opposition?
A. The main was con- -- conflicting on requirements with the NVRA and also the proof of residency.
Q. And --
(Video disturbance.)
THE COURT REPORTER: I didn't hear the end of answer. "Proof of residency" and -- I'm sorry. I thought you said something.
THE WITNESS: No. The NVRA and proof of residency requirement.
BY MR. PATTERSON:
Q. And can you tell me -- within HB 2492 and 2243, what is information that a person is not a United States citizen?
MR. HORLEY: Objection. Calls for a legal conclusion.
BY MR. PATTERSON:
Q. You can answer the question.
A. Okay. I'm sorry. Would you repeat that?
Q. What would be information that would indicate that a person is not a United States citizen under HB 2492 and HB 2243?
MR. HORLEY: Same objection.
THE WITNESS: Well, if you mark the box "no," that's real clear you're not a U.S. citizen. I guess --

BY MR. PATTERSON:

Q. Has your -- oh, sorry.

A. Yeah, that's -- I don't know -- I don't really understand what you're asking, I guess.

Q. Has your office ever been given a specific list of means or criteria in which a voter registration applicant can be deemed or proven to be a noncitizen?

A. Well, if it comes back through the AVID check with Motor Vehicles and they've been issued a F-license, then that indicates that they're not a U.S. citizen. That would be one way we knew we needed to follow up with the person.

And I think the "F" stands for foreign or -- non-U.S. citizens could get a driver's license, so it indicates to us -- if their records show they're not a U.S. citizen, then it would alert us.

Q. And besides, if someone were to check that they are not a U.S. citizen on -- on the form or the information -- information coming up in the AVID check that would indicate that they're a noncitizen, is there any other types of information that your office would consider or find to be indicative that a person is not a U.S. citizen?

MR. HORLEY: Objection; form. Calls for a legal conclusion.

THE WITNESS: If they mark on their jury

questionnaire that they're not a U.S. citizen, that would alert us. So my experience has been that people that do that mark it because they don't want to serve on the jury, not because they're in the U.S. citizens.

BY MR. PATTERSON:

Q. Thank you.

Is the data in a government database showing noncitizenship 20 years ago information that the person is not a U.S. citizen today?

MR. HORLEY: Same objection.

THE WITNESS: We wouldn't have a database that's 20 years old that I know of.

Are you asking if you registered to vote prior to the proof of U.S. citizenship requirement, would we know if they were a U.S. citizen or not?

BY MR. PATTERSON:

Q. Sorry. Let me restate.

If -- if there was information showing that an individual was a noncitizen, say, many years ago -- so not that the database itself is 20 years old, but that a doc- -- a document within the database was indicative that an individual had not been a citizen 20 years ago -- would that information be valid in demonstrating that a person is not a U.S. citizen today?

MR. HORLEY: Form. Calls for a legal

conclusion.

THE WITNESS: I don't know that we would have a document in our database that would show somebody's not a U.S. citizen because we only -- from 20 years ago, anybody who was not registered is not in our database right now.

BY MR. PATTERSON:

Q. How recent does a document -- scratch that.

Where's the line? When is information too old to be information that is relevant to the consideration of whether someone is not a U.S. citizen in the present day?

MR. HORLEY: Same objection.

THE WITNESS: I don't know.

BY MR. PATTERSON:

Q. Okay. Thank you.

And moving on, what are valid sources of information that someone is not a U.S. citizen?

MR. HORLEY: Same objection.

THE WITNESS: They tell us they're not a U.S. citizen or they mark it on the form. I don't know any other documents out there that would show you're not a U.S. citizen that anybody would present to us or that we would have.

BY MR. PATTERSON:

Q. Would -- would anything beyond a government or

voter registration date -- registration database be able to be a source of information that could indicate that someone is not a U.S. citizen?

MR. HORLEY: Same objection. Also foundation.

THE WITNESS: We check -- I guess it is with governmental databases -- is what we would check against and information the registrant would provide. That's all I --

BY MR. PATTERSON:

Q. Would --

A. I -- I haven't had people come to me and say, you know, that registrants are not a U.S. citizen, you know, and they should not be registered as specific registrant. So yeah, I don't know.

Q. So a phone call from another voter would not be information that would be a valid source for whether or not someone is a U.S. citizen, then?

MR. HORLEY: Same objection. Form.

THE WITNESS: The DPOC, if they've proven citizenship. We're not going to go on secondhand information on somebody's citizenship status.

BY MR. PATTERSON:

Q. And -- and that would include an email or signed letter from another voter; correct?

MR. LANGHOFER: Form.
THE WITNESS: I haven't received those that I know of. We have a gentleman that is checking our databases, but as I recall, most of those are people he thinks has moved or do not live in Arizona.
BY MR. PATTERSON:
Q. What about a phone call from a law enforcement officer in Arizona?
MR. HORLEY: Same objection.
THE WITNESS: I would probably talk to my legal counsel and say, "What's up on this?"
BY MR. PATTERSON:
Q. And what about a phone call from law enforcement in another state?
MR. HORLEY: Same objection.
THE WITNESS: Same thing. I would check with my legal counsel.
BY MR. PATTERSON:
Q. And what about information or lists provided by third-party organizations, like True the Vote or Look Ahead America?
MR. HORLEY: Same objection.
THE WITNESS: Those are not acceptable sources under the NVRA to start list maintenance procedures, so no.

BY MR. PATTERSON:
Q. And what about an anonymous call or email?
MR. HORLEY: Same objection.
THE WITNESS: No. I don't take anonymous requests.
BY MR. PATTERSON:
Q. By what means can you confirm the authenticity of such information that a voter registration applicant is not a United States citizen?
A. If they mark "no" on the registration form or if it comes back through our citizenship checks that indicate that they're not a U.S. citizen and the procedures manual, those checks.
Q. And has the Secretary of State's Office ever given your office a list of information that constitutes as evidence of a lack of U.S. citizenship?
A. No. Not that I'm aware of, no.
Q. What if you identify a registered voter who has already satisfied the DPOC requirement but still holds an F-type license? Is that information that the registered voter is not, in fact, a U.S. citizen?
MR. HORLEY: Same objection.
THE WITNESS: No. In fact, I know of a case where a county employee had become a naturalized citizen and it kept coming back through Motor Vehicles that he was

not a U.S. citizen. And so he provided us copies of our -- or showed us that he was a naturalized citizen.

So there was a lag there, but we follow up with people registering to make sure that they have not -- that they are, indeed, not a U.S. citizen and they have not become a naturalized citizen.

BY MR. PATTERSON:

Q. And what if you identify a registered voter who is exempt from the DPOC requirement and has never shown DPOC because they registered prior to when DPOC went into effect? Is that information showing that they are not a U.S. citizen?

MR. HORLEY: Same objection.

THE WITNESS: No. Because we weren't asking at the time they registered.

BY MR. PATTERSON:

Q. Thank you.

Moving on, what is a database related to voter registration?

A. Our system is AVID. It is our statewide voter registration system.

Q. And for clarification, this comes from A.R.S. 16-121.01(D)(5), "Any other state, city, town, county, or federal database, and any other database relating to voter registration."

Could it be a list of voters you received from another Arizona agency?

MR. HORLEY: Same objection.

THE WITNESS: Not to register to vote. If you're one of the NVRA agencies that have to do registration, like Motor Vehicles or Department of Economic Security programs or programs that assist voters with disabilities, it comes through our AVID system.

BY MR. PATTERSON:

Q. Outside of AVID, are there other databases that relate to voter registration under the statute?

A. We're part of the ERIC, Electronic Registration Information Center, I think. It -- it's a group of states that have gotten together where they compare voter registration databases to see if there has been people who have moved to another state after they were registered in our state so we know to follow up with them to make sure if they have -- if that is indeed them; that we cancel them here in our state.

Is that what you mean by databases? I mean, we check -- there's also -- we can check through the SAVE program U.S. citizenship or, like, Motor Vehicles Department. But we don't deal with any other agencies or that -- well, Social Security, I think the AVID system does run a check against in regards to identity, looking for the

last four digits of the Social Security and the name and birth date.

But they're all governmental except for ERIC, which is quasi-governmental, in that it's -- states are working together to try to keep their list clean. And also --

Q. I'm sorry.

A. They also check to make sure people don't vote in two states in the same election -- ERIC does.

Q. What about a list of registered voters provided by a private group, would that be a database related to voter registration?

A. No, I would not use that.

MR. HORLEY: Form.

BY MR. PATTERSON:

Q. And what about data provided from another state government agency, say, a California county sheriff's office? Would that be a database related to voter registration?

MR. HORLEY: Same objection.

THE WITNESS: No. I don't know why they would contact us.

BY MR. PATTERSON:

Q. Please take a moment -- if we could take a moment to look at -- if we can take a moment to look at 16-165(A).

The statute states, "The county recorder shall cancel registration"; is that correct?

MS. WINKELER: Can you give us a minute to pull up the statute?

MR. PATTERSON: Absolutely.

THE WITNESS: Would you please restate the --

BY MR. PATTERSON:

Q. Yes. It's 61-165 Sub A. It's in HB 2243. Oh, and (A)(10). Sorry. A Sub 10.

A. Okay. So it's in regards to canceling the registration from information from the jury commissioner.

Q. Yes.

A. Yeah.

Q. So at the beginning of 16-165(A), it states, "The county recorder shall cancel a registration"; correct?

A. Yes.

Q. And after that language, HB 2243 lists the number of ways a voter registration can be canceled; true?

A. That's correct.

Q. And now if we can skip to 16-165(A)(10), on page 4.

Read together, this provision reads, the county recorder shall cancel a registration "when the county recorder obtains information pursuant to the section and confirms that the person registered is not a United

States citizen"; is that correct?
A. Yes.
Q. Under this provision, how does one obtain information that a person registered is not a United States citizen?
MR. LANGHOFER: Same objection.
MR. HORLEY: Calls for a legal conclusion.
THE WITNESS: The jury commissioner sends out questionnaires. And one of the questions is: "Are you a U.S. citizen?" And if they marked "no," then we get a report from them. We used to get, as I recall, the actual questionnaire, but now it's a report that lists who's responded. And if they say they're not a U.S. citizen, then we would know that.
Now, our experience has been the majority of those that mark "no," they're not a U.S. citizen are not registered to vote, but we have come across instances when we've followed up with people where they marked "no," they're not a U.S. citizen, and they are registered when we contact them, we find out that they marked "no" to get out of jury duty.
BY MR. PATTERSON:
Q. And outside of the -- besides the jury questionnaire, are there any other ways that your office obtains information that a person is -- that is registered

is not a U.S. citizen?
MR. HORLEY: Same objection.
THE WITNESS: Not that I can think of right now.
BY MR. PATTERSON:
Q. Thank you.
May you please take a moment to review 16-165 Sub G through J. We can take a moment while you review that. Sorry. F through J.
A. Okay.
Q. Are the listed databases outlined in Subsections F through J the means on how one obtains information of noncitizenship?
A. I don't believe J is implemented right now. I think that's listed in 2492 maybe and in 2243, Public Health Statistics and Information System.
Q. If J were implemented, would that be a database in which one would obtain information of noncitizenship?
MR. HORLEY: Objection. Calls for a legal conclusion. Calls for speculation.
THE WITNESS: These databases are set up through the Secretary of State's Office, how they run them through, except for the jury commission. So even that, I believe -- that, I'll have to ask Donna if that does come through the Secretary of State's Office or directly to us

from the jury commissioner.
    But it's set up through the AVID system, the checks. So if it's part of the EPM and that's one of the things that we -- that the secretary of state is required to set up, we would use that.
BY MR. PATTERSON:
    Q. But is it -- are these databases that are outlined in the statute in -- the intended means for how one obtains information of noncitizenship?
    MR. LANGHOFER: Calls for a legal conclusion. Calls for speculation.
    THE WITNESS: It's how our state is set up to check for citizenship.
BY MR. PATTERSON:
    Q. Can the Arizona MVD driver's license and nonoperating ID database be used to obtain information that a registered voter is not a U.S. citizen?
    MR. HORLEY: Same objection.
    THE WITNESS: It's being used now.
BY MR. PATTERSON:
    Q. It's being used to obtain information that a registered voter is not a U.S. citizen? That's what you're saying?
    A. Yes. If it comes back that it indicates a foreign national has the driver's license and the person would be

registered, we would need to follow up with that person to see if the information is current.

You don't have to update your driver's license, I don't believe -- I'm not an expert on driver's licenses -- when you become a U.S. citizen. But you can't register to vote until you become a naturalized citizen. So there is -- could be a discrepancy between the driver's license and registration, which is why we follow up to make sure the information is accurate and up to date.

BY MR. PATTERSON:

Q. Is there anything beyond a database -- can your office obtain information that a person registered is not a United States citizen through any other means?

MR. HORLEY: Same objection.

THE WITNESS: No. I've never seen anything that would be another way of showing a person's not a U.S. citizen. I've never come across that and I don't -- I can't think of anything, but I'm not an expert on citizenship.

BY MR. PATTERSON:

Q. Has your office received any guidance on how one obtains information that a person registered is not a U.S. citizen under 16-165(A)(10)?

A. We do through the EPM.

Q. And has your office received any guidance on how

to order -- checking these databases?
A. Well, we got a tutorial for how to use the SAVE program. That's all I'm aware of.
Q. What happens if there is conflicting data between databases?
A. I have not come across that.
Q. Okay. So now, how would your office confirm that a person registered is not a United States citizen under 16-165(A)(10)?
MR. HORLEY: Calls for a legal conclusion.
THE WITNESS: We confirm citizenship. We don't confirm noncitizenship.
BY MR. PATTERSON:
Q. What would give your office a reason to believe that a person is not a U.S. citizen?
MR. HORLEY: Same objection.
MR. LANGHOFER: Same objection.
THE WITNESS: They mark "no" on the voter registration form, or we would get an indication from Motor Vehicles that they have an F-license, or from the jury commissioner that they marked "no" on the questionnaire.
BY MR. PATTERSON:
Q. And if -- if we could take a moment to look at A.R.S. 16-165 Sub I.
A. Okay.

Q. Based on 16-165 Sub I, is there anything else that would give your office a reason to believe that a person is not a U.S. citizen?

MR. HORLEY: Same objection.

THE WITNESS: I think I stated what we would consider an indication of non-U.S. citizenship.

BY MR. PATTERSON:

Q. Has the Secretary of State's Office provided your office with a list of what would give you or your staff a valid reason to believe someone is not a U.S. citizen?

A. The only guidance we received from the secretary of state's in the EPM.

Q. And in the EPM, has the secretary of state provided any guidance on what your office should consider a valid reason to believe that someone is not a U.S. citizen?

A. Not that I recall. We confirm citizenship. We don't confirm noncitizenship.

Q. Has the Secretary of State's Office provided your office with a list of what will not give you or your staff a valid reason to believe someone is not a U.S. citizen?

A. Not that I'm aware of, except through if it's mentioned in the EPM. And I don't recall anything in the EPM that specifically talks about confirming people being noncitizens, except what I've already mentioned for confirming citizenship.

Q. I'm going to provide you with the same scenario that we went over earlier.

MR. PATTERSON: But before doing so, I would like to stipulate to -- I'm assuming that there's going to be an objection to this as there was before. I'm willing to stipulate to a global objection to these following questions, if that is all right with defense counsel.

MR. LANGHOFER: Sounds good.

MR. MORGAN: That's fine with me.

MR. LANGHOFER: The objections, I suppose, are calls for a legal conclusion and form?

MR. PATTERSON: Yes.

BY MR. PATTERSON:

Q. So would anything beyond a government or voter registration database?

A. Prove noncitizenship? Is that what you're asking?

Q. Is there -- sorry. Is -- let's take a step back.

So is there anything beyond a government or voter registration database that would give your office a reason to believe that a person is not a U.S. citizen?

A. Just if they marked "no" on the registration form.

Q. Can a phone call from a voter -- would a phone call from a voter be a reason to believe a person is not a U.S. citizen?

A. No.

Q. How about an email from the voter?
A. From a -- another voter than the person?
Q. I'm sorry. Yes.
An email from --
A. No.
Q. Sorry. No. The same. From the same voter. My apologies. So an email from the voter saying that they are not a citizen.
A. The voter themselves saying they're not a citizen?
Q. Yes. The voter themselves, yes.
A. Yes.
Q. And --
A. We would want to make sure it is the voter asking questions and stuff.
I've had instances where a spouse tried to kill off another spouse with a registration, and so I do know that you can't go by secondhand information. You need to talk to the actual person.
Q. And for the sake of clarity, I wanted to ask the previous question again, because now that we have -- are of the same understanding.
So if you received a phone call from the voter that they are not a citizen, would that give your office reason to believe that they are not?
A. Yes. We ask them to confirm some information so

we verify that they are the actual registrant. But yes, that would be enough.

Q. And what about a signed letter from the voter?

A. Yes.

Q. How about a phone call from a member of the voter's family?

A. No.

Q. Would a letter from a neighbor provide your office a reason to believe that the voter is a noncitizen?

A. No.

Q. What about a phone call from law enforcement in Arizona?

A. That, I'd have to ask legal counsel. I haven't had that situation come up.

Q. And what about a phone call from a law enforcement in another state?

A. I'd ask legal counsel for guidance.

Q. Would an email or letter from law enforcement in Arizona provide your office reason to believe that a voter is a noncitizen?

A. I would, again, ask legal counsel.

Q. And what about an email or letter from law enforcement in another state?

A. Same thing. I'd ask legal counsel for guidance.

Q. How about an anonymous call?

A. No.
Q. And -- or an anonymous email?
A. No.
Q. What about lists provided by third-party organizations, like True the Vote?
A. No.
Q. Okay. Thank you.
MR. PATTERSON: We will be moving on to other questions, so at this point the global objection can end.
MR. LANGHOFER: Thanks.
BY MR. PATTERSON:
Q. What if the registered voter transposed the first and last name of their registration application form? Would that give your office reason to believe that they were a noncitizen?
MR. HORLEY: Same objection.
THE WITNESS: No.
BY MR. PATTERSON:
Q. What if the registered voter recorded a foreign place of birth on their form?
MR. HORLEY: Same objection.
THE WITNESS: No.
BY MR. PATTERSON:
Q. What if you identify a registered voter who has already satisfied the DPOC requirement but still holds an

F-type license? Is that a reason to believe they are not, in fact, a U.S. citizen?

MR. HORLEY: Same objection. Calls for a legal conclusion.

THE WITNESS: No.

BY MR. PATTERSON:

Q. What about registered voters who are exempt from DPOC under the safe harbor provision because they registered prior to the DPOC requirement going into effect in 2005? Would that failure to show DPOC under this exemption give your office a reason to believe they are not U.S. citizens?

MR. HORLEY: Same objection.

THE WITNESS: No.

BY MR. PATTERSON:

Q. Has your office received any guidance on when your office would have reason to believe that a registered voter is not a U.S. citizen?

A. Only through the EPM.

Q. Thank you.

Moving on, a number of provisions in both laws only obligate your office to the extent they are practical -- practicable. Who makes that call?

MR. HORLEY: Same objection.

THE WITNESS: I would believe that if it's

procedures in regards to voter registration, the Secretary of State's Office.

BY MR. PATTERSON:

Q. And do you meant -- do you understand what is meant by "practicable" within these laws? Is it clear or unclear?

MR. LANGHOFER: Same objection.

MR. HORLEY: Same objection.

THE WITNESS: No, not really. It's a -- a vague term.

BY MR. PATTERSON:

Q. In terms of resources access -- scratch that.

Moving on, if a registered voter is removed from the rolls under HB 2243 based upon an erroneous determination that they are not a U.S. citizen, can that voter be added back to the rolls if the registration deadline has already passed?

A. If it's our mistake, yes.

Q. And what are the mechanics of adding the voter back to the rolls?

A. That, I'd have to ask the legal counsel on the best approach.

MR. PATTERSON: Thank you, Ms. Hansen. That completes my questions for you on behalf of Poder.

THE WITNESS: Okay. Thank you.

MR. PATTERSON: At this point, do we want to take another break or --

MR. LANGHOFER: Do you think there will be more questions from the plaintiffs?

MR. PATTERSON: Yes. I believe there's one other party that has about 10 to 15 minutes of questions, I believe, but I don't want to speak for them.

MS. LANG: That's me. I'm happy -- it is going to be short. And I'm happy to go if Ms. Hansen is ready to go. And I'm also happy for us to take a short break. It's entirely up to you, Ms. Hansen.

THE WITNESS: I'm fine.

MS. LANG: And everybody else okay with that?

THE WITNESS: And I -- I've seen your name many times so . . .

MS. LANG: Likewise, actually. So very good to see you.

Is that okay with everybody else? All right.

EXAMINATION

BY MS. LANG:

Q. Well, with that, thank you so much for your time today, Ms. Hansen. My name is Danielle Lang, and I represent the LUCHA plaintiffs in this matter.

And as was represented earlier, I really have

a very brief set of questions that I want to go through with you, and then we will hopefully wrap -- wrap up your testimony soon.

I want to talk a little bit about kind of state versus federal forms and their usage. And most importantly, I'd like to get to an understanding of kind of the relative breakdown of usage between state and federal forms.

Would you say that the majority of voter registration forms that you receive in your office are the state form rather than the federal form?

A. Yes, I would.

Q. Like by a substantial margin? Is that fair to say?

A. It depends on the election time. I know that there's been organizations that registered voters on the college campus that use the federal form more and some were -- it's -- they're usually out-of-state organizations that come in. And also, if they're going to be registering voters where it may be several counties at the event. But most of the organizations locally use the state form.

Q. Okay. And sometimes your office would provide voter registration forms to groups that are doing voter registration drives; is that right?

A. Yes.

Q. And in that case, does your office provide state forms rather than federal forms?
A. Yes.
Q. Okay. And your office also receives voter registration forms from agencies that are required to conduct voter registration under the NVRA; is that right?
A. Yes.
Q. Not talking about the MVD but the other agencies that are required to do voter registration, do they use the state form in helping individuals register to vote at the agencies?
A. Yes, they do. But as I recall, they need to have the federal form available too. But I --
Q. Okay.
A. What we receive mostly is state forms.
Q. Got it.
And I understand from your testimony earlier that right now, your office kind of processes forms identically, whether they're state form or federal form; is that right?
A. That's correct.
Q. Okay. It's also my understanding that it's -- if the provisions of HB 2492 were to go into effect and be implemented, that it would require you to treat state and federal forms differently.

Is that your understanding?
A. That is my understanding.
Q. Okay. And is that one of the objections you had to this bill when it was pending?
A. Yes, it is.
Q. And based on your experience, is there any kind of reason why you would process a voter registration form differently simply because of whether it's on a federal form or a state form?
A. No. It's -- has the same information. I don't see it -- it being filled out on a different type of paper, why that would matter how you would be treated.
Q. Thank you.
And so from your experience, if you had to treat state forms versus federal forms differently and reject fed- -- state forms in their entirety if they did not include DPOC, would that likely lead to you rejecting more applications?
A. Yes.
Q. And then my next set of questions are briefly about the documentary proof of residence requirements in the law.
And you already testified earlier about your veto letter where you specifically identified your concerns about documentary proof of residence; is that right?

A. Yes.

Q. And can you just elaborate a little bit about what your concern was with respect to that requirement and especially as it applies to native voters?

A. Well, on the reservations, they don't have -- not everybody has street addresses and not everybody has utilities. We have people that live in -- have living situations where they haul their water. They may have solar, if they do have electricity, and they're not going to have utility bills. I don't know if everybody, you know, would have a bank statement. Internet is not available throughout the reservation or even cell phone service.

So I do know several of the people I've talked to on the reservation have TracFones, so that wouldn't have a bill coming to them. So it's difficult for them to get the necessary ID, possibly, to be able to even submit when they register.

And also, you need a photocopier if you're sending copies. And so it would be an additional requirement they would have to do if they didn't have an Arizona driver's license or state ID.

Q. Thank you.

And, you know, one of the concerns you raised, there is, obviously, issues with residential

addressing. But you also mentioned the kind of practical difficulties even for someone who does have a residential address to kind of obtain the documentation of that address.

Is that what I understand your testimony to be about? Is that right?

A. Some people, yeah.

Q. Yeah.

A. I think there's a problem.

Q. And would -- would those concerns potentially extend not only to native voters but also some other rural or low-income voters in your county?

A. Yes, I think so. We have people that we say live off the grid. They may be living in a fifth wheel kind of, you know, RV-type unit in the forest or something. And they're eligible to register to vote if that's where they're residing. But again, they don't have the access to a lot of these IDs that other -- those of us that live in the city or more urban areas would have.

Q. And in your experience, is it possible that students might also have difficulty obtaining this type of documentation and then getting copies of that type of documentation?

A. Yes. If you live in the dormitory, unfortunately, a student ID does not work because it doesn't have your

residence on it. And the -- they don't pay utilities. It's included in the dorms or whatever. That's why I know a lot of the college students end up voting early instead of going to a polling place because it's -- they don't have the necessary ID to show to either vote early in person or to vote at the polling place on election day.

Q. Thank you.

And just talking a little bit about kind of how you process residential addresses, and it -- my understanding is that on a voter registration form, folks have two options as far as providing their residence. They can either provide a traditional street address or they can draw a location or kind of provide other information about their location of residence if they don't have a tradition street address; is that right?

A. That is correct.

Q. Okay. So starting with that first option, if -- if a street address is provided and you input that address into your system, is it sometimes the case that that address is not recognized by your system?

A. Yes. Especially, like, in new housing developments or that, we would have to add the street and the address to the system.

Q. And can you just talk through a little bit how that's done?

A. It's a GIS-type-based system. So we would put a dot to indicate where the residence is at, and then we go in and add it to the system by putting in the address and what districts they were in. Though, since it's GIS-based, a lot of that districting automatically comes in because of the layer with the -- the layers within the GIS system.

Q. And so sometimes if that address comes in as kind of not recognized within your system, does that require additional follow-up to the voter?

A. Sometimes if it's not -- like, if it's a -- not a street address at all, we will try to contact the voter to see if they could give us more information if we cannot determine where on the map they would be located. Because the residence determines what's going to be on your ballot, what districts you live in. And so that's why our nonstandard addressing a lot of times will not be a street address; we give it an artificial address.

So let's say that we could determine that your -- you live in the Leupp precinct and you're in the Flagstaff school district, and then we would give you a 0-Leupp-0, which tells us what ballot style you would get. And we know the general area where you reside. And if -- Leupp is also in the Tuba City school district, so if you're on the other side of the line in the school district, we would give you 0-Leupp-1.

But sometimes if it's on -- really close to the dividing line from their description, we have to call them and try to locate them on exactly where they're at to know which address to give them.

That's probably a -- more detail than you wanted.

Q. No. It was actually perfect.

If we could open up the document in the potential exhibits folder that is labeled L and mark that as the next exhibit.

(The document was marked as Exhibit 177 for identification.)

BY MS. LANG:

Q. When you have it open, just let me know if you recognize the document.

A. Yes.

Q. And can you just identify for me what that document is?

A. This is the letter we send when we have questions in regards to registrations.

Q. And --

A. If it was damaged or the residence is missing or we can't find it.

Q. And so I see here that one of the options is the information regarding your residence is missing or unclear;

is that right?

A. Yes.

Q. And so is this the form you would use if your -- if the address provided is, you know, not coming up in your system or that you otherwise are unable to kind of pinpoint the location of residence for a voter?

A. Yes.

Q. Okay. And what kind of -- kind of response from a voter is sufficient to kind of resolve these types of issues?

A. Usually they would give us a call or -- and help us find where they're located, or they could respond by giving us a -- like, if they're not on the reservation, their parcel number and lot number, longitude or latitude. So a lot of people don't have that. And sometimes, we're now getting some of the Google codes that also help us locate them.

Q. Sounds like there's a lot of different kind of options. Is that fair to say?

A. Yes, there is.

Q. And you don't provide -- and you don't require those voters to provide any documentation, but rather they can provide this information for -- by the phone for example; is that right?

A. Yes. Yeah, they wouldn't have any documentation

really that would show it. I mean, if they were the property owner, maybe they could, you know -- we could check with the assessor's office, but otherwise, no. If you're renting, you're not going to know that information.

Q. And -- and I think you've already testified to this. But is it more likely that native voters living on reservations in your county are more likely to encounter kind of non- -- have nonstandard addresses?

A. Yes, that's correct. It's been left up to each chapter whether they're going to be implementing 911 addresses, and it's been a very slow process. And unfortunately, they just don't have street addresses.

Q. And in your experience, is it common for these kind of nonstandard addressing markers, like a longitude or latitude or Google codes and these other forms of nonstandard addressing, to a full -- to appear on identification documents, like your driver's license or tribal ID?

A. No.

Q. Okay.

A. I know for tribal ID, it would be more their chapter. And we do try to make our precincts follow chapter lines, but they're not necessarily consistent or set in stone. Like, we can't get a map of the exact ones because people can change their chapters and things like

that.

Q. And I notice in your interrogatory responses that you mentioned that sometimes your office might help to assign an address.

By that, did you mean the kind of, like, assignment that you make might make internally just for your own purposes, or does your office actually help folks get a 911 address, for example?

A. No. It's the artifical address that we give internally, which tells us the ballot style. So we know what ballot either to be issued to them at a polling place or what ballot for early voting.

Q. Do you know what office within the county is responsible for helping individuals get a standard address if they want one?

A. If they're not on the reservation, it would be through our GIS department right now, as I recall. And on the reservation, it's like Navajo Nation. From what I understand, it's left up to each of the chapters. And chapters are kind of how they divide the reservation and -- for their governing.

And I'm not sure what the Hopi Tribe -- how they do their addressing, but it would be through the reservation. The county does not assign addresses on reservation land or also in the national parks, so . . .

Q. In Coconino County, do you know, is the voter registration rate among native voters lower than the rate overall of voter registration in the county?

A. I have not checked that against the census numbers. So no, I can't say.

Q. I'd like to look at the exhibit that's been marked Exhibit 24.

MS. LANG: Do you have access to that, Rose?

MS. WINKELER: Yeah, if you could just give me a minute.

MS. LANG: Yes, of course.

THE WITNESS: Okay.

BY MS. LANG:

Q. And if you can look at the second page in this document.

Have you seen this document before?

A. Yes. I think it was included in the information that Kori Lorick sent out.

Q. And do you know when that was?

A. When that was?

Q. Yes.

A. I'm thinking, well, it must have been at the end of 2022 because it was prior to the Fontes administration.

Q. Okay. And is it your understanding that if the DPOR requirement were to be implemented, that this chart

would help you determine what forms of documentation could be accepted under that requirement?
A. Yes. I would assume that it would be included in the EPM.
Q. Okay. So -- but right now, your office has not implemented the DPOR requirement at all; is that correct?
A. That is correct.
Q. Okay. I just wanted to ask briefly about the document listed, kind of -- the very last document on this chart, written confirmation signed by the registrant that they qualify to register. And then in the parenthesis, it explains, like, for -- for folks who are at a homeless center or are using the courthouse as their kind of residence.
Do you know if there is currently a kind of document available that such voters could use as written confirmation of their residence?
A. No, I'm not familiar with any document like that.
Q. Okay. Are you familiar with any kind of document promulgated by the secretary of state or otherwise that would allow voters to kind of affirm their residence as a way to provide documentary proof of residence?
A. Not now, no.
Q. Okay. Outside of this chart, have you received any additional guidance about how you would implement the

DPOR -- how you should implement the DPOR requirements if they are implemented?

A. No.

MS. LANG: I don't have any further questions for you, Ms. Hansen. Thank you so much for your time.

THE WITNESS: Thank you.

BY MR. HORLEY: Hi, Ms. Hansen. I am Tim Horley with the State of Arizona and the Arizona Attorney General's Office. I don't know if any other plaintiffs have any other questions. Also, I'm not sure if folks would like to take a short break. Up to you, Ms. Hansen, on that.

Cindy, I see a hand.

THE COURT REPORTER: Please.

Okay. Is everybody okay with a short break here?

MR. MORGAN: At this hour, I think we ought to have lunch.

MR. HORLEY: I have no problem with a lunch break, but up to you, Ms. Hansen and Rose, what your thoughts are about that.

THE COURT REPORTER: Do you want to go off the record for this?

MR. HORLEY: Sure.

THE VIDEOGRAPHER: We are off the record.

Time on the video monitor is 12:18 p.m.

(A recess ensued.)

THE VIDEOGRAPHER: We are on the record. Time on the video monitor is 1:25 p.m.

EXAMINATION

BY MR. HORLEY:

Q. All right. Hello, Ms. Hansen. Thanks for your time.

As I mentioned before, my name is Tim Horley. I'm with the state attorney general's office.

So I do have a few questions that I wanted to follow up -- follow up on, a few topics. And I may introduce a couple different documents that haven't been introduced yet. And if there are any that you think would be better addressed to Ms. Casner, just let me know and I will plan to ask those questions of her at that time.

A. Okay.

Q. So you mentioned that your office was opposed to the passage of these laws and sent Governor Ducey a letter asking him to veto them; is that correct?

A. I sent a letter to -- asking him to veto 2492.

Q. Okay. Great.

And then -- but I just wanted to confirm that -- will you adhere to whatever a court orders regarding the

implementation of these laws?

A. Oh, Yes.

Q. And you mentioned that some phrases in HB 2492 and 2243 are unclear; correct?

A. Yes.

Q. And guidance from the secretary of state on those unclear provisions would be helpful?

A. That's correct.

Q. And that could come in the form of an updated EPM, for example?

A. Yes.

Q. And the EPM provides guidance on a lot of different voting laws, including laws on topics that aren't relevant to the laws we're talking about here; correct?

A. Yes.

Q. And do you generally rely on the EPM to help implement those other voting laws?

A. Yes, I do.

Q. And would it be easy to implement those other voting laws without the EPM?

A. Not necessarily. I refer to it quite often to make sure that we're doing things correctly.

Q. Okay. So it's fair to say that there are different voting laws that are also difficult to implement without further guidance from the secretary of state; is

that right?

MR. MORGAN: Form.

THE WITNESS: That's correct. Especially in regards to court decisions.

BY MR. HORLEY:

Q. Okay. So same thing is true for these laws that is true for those other laws; correct?

A. That's correct.

Q. Okay. Great.

And then I wanted to look once again at the exhibit that's been marked number 172. I believe it's noted as Exhibit G in the zip file.

A. Okay.

Q. Okay. And then if you look down at the bottom of page 1, top of page 2, there's a part where it says, "Suggested position"; is that right?

A. Yes.

Q. And then there it says, "Take no position"; is that right?

A. Yes.

Q. So does that mean that you wanted the AACo not to take a position on these laws?

A. At -- on this specific bill as it was introduced, yes.

Q. Okay. So that is different than saying you

opposed the law; correct?
A. Yes.
Q. Okay.
A. At that time, I thought it was asking for things that we already -- that were covered with other procedures. But as I recall, another bill was -- amendments incorporated in, but I may be wrong on that because there's so many pieces of legislation.
Q. Okay. Understood.
But just in this document, you did not oppose HB 2243; is that right?
A. That's correct.
Q. Okay. Great. Thank you.
And then I wanted to touch base on the topic of verifying or checking citizenship.
So do the recorders -- does your office do anything to verify DPOC when it is received?
A. No.
Q. Okay. So it's just taken at face value?
A. Yes, it is.
Q. Okay. And is DPC -- DPOC normally provided as a photocopy?
A. For the documents like the -- a birth certificate or pages out of the passport, yes. Or sometimes, they'll take a picture of it on their phone and then send it to us.

Q. Okay. And then you noted in your testimony that the citizenship checkbox is not relevant if the recorder has DPOC from the applicant already; is that right?
A. That's correct.
Q. Okay. What if the recorder does not have DPOC?
A. Then it would not meet the requirements under the current state law.
Q. Okay. Would the citizenship checkbox be relevant in that case?
A. It depends -- there's the affirmation at the bottom of the form where they're saying, you know, that they meet the qualifications.
Prior to Prop 200, which had put in the proof of citizenship, the affirmation was enough. But currently, with us now, we would make them a federal-only voter if they -- well, hold it. No. If they marked the federal -- if they did not mark the box -- I'll have to defer to Donna on that. I'm sorry. I'm getting my stuff confused.
Q. Okay. No worries. I'll just make a note of that to follow up with Ms. Casner.
And so maybe this will be helpful, a more specific question.
If the registrant were to mark "no" in the citizenship checkbox but provided a purported copy of a citizenship document, like a copy of a birth certificate,

for example, what would your office do in that situation?
A. We would follow up with the registrant to see what the issue is.
Q. Okay. And would that issue possibly raise a red flag about either the checkbox being marked wrong or perhaps the proof of citizenship document being faulty?
A. My guess is it's the checkbox would probably be what it is. But I think people can become citizens of other countries and give up their U.S. citizenship. But, you know, since it conflicts, we would want some kind of verification from the registrant on why there's a discrepancy there.
Q. Okay. Understood.
And another question on this. Is it possible for a registered voter to submit a copy of a citizenship document -- again, like a birth certificate or a passport -- that is defective in some way; for example, maybe it's blurry or hard to read?
A. We would ask them to send one that is clear.
Q. Okay. So does that -- in your experience, does that happen frequently that there's something wrong with the -- the document that they submit?
A. I'd have to defer to Donna on that. I don't handle the citizenship paperwork that comes in very often.
Q. Okay. Understood.

But in those situations, if there was an issue with the document, would it be helpful to know how the citizen or the -- excuse me -- how the voter answered the citizenship checkbox?
A. Yes. Because if they mark "no," we'd have to definitely follow up with them.
Q. Okay. Understood.
And then I had some more specific questions on this that refer to some spreadsheets with voter -- registered voter data that your office produced. And my guess is that might be better directed toward Ms. Casner.
Do you think that's right?
A. Yes.
Q. Okay. Okay. Very good. So I'll just skip over those for now.
I did want to ask you a few questions about the databases that your office uses to verify citizenship.
So does your office use the HAVA check system across the AVID database?
A. Yes, we do.
Q. And then that uses the MVD's data; correct?
A. Yes.
Q. Okay. And then you said that your office does use the SAVE system as well?
A. Yes.

Q. And does the recorder's office consider the MVD data to be generally reliable?

A. Yes. Generally. There was a glitch, as I recall, that was found in October maybe of 2022 that the secretary of state notified us about. And we had to go back and double-check on those. And I know Donna can tell you, you know, what we found during that time period where there was some problems with the citizenship match with the MVD.

Q. Okay. Understood.

And in your experience, are those kinds of incidents common?

A. No.

Q. Okay. And if a naturalized citizen status has not yet been updated with the MVD -- like we talked about before, if someone has an F-type license from a long time ago, for example, they can easily reconcile that matter by providing your office with documentation of their naturalization; correct?

A. Yes.

Q. And does the recorder's office generally consider the SAVE data to be reliable?

A. Yes.

Q. Okay. I did want to take a look at one document that hasn't been marked as an exhibit yet. So I think probably the easiest way for me to do this -- but anybody

who disagrees can chime in -- is just to share it on my screen, and then I will send it in the Zoom chat or by email so that we can have it entered in for everybody else.
Does that sound okay to you, Ms. Hansen?
A. Yes, it does.
Q. Okay. Can you see this document that I have shared, Ms. Hansen?
A. Yes.
Q. And you mentioned before that your office was involved in some tutorials on how to use the SAVE system; is that right?
A. Yes.
Q. And did you participate in those tutorials?
A. No, I did not.
Q. Okay. And do you recognize this document?
A. I saw it in the -- what we sent to you. Donna was the one that supplied this. Donna and Sedona were the two that I know that had -- went through the tutorial.
Q. Okay. Very good.
But you recognize this as a document that your office produced in response to the plaintiffs' requests for production?
A. Yes.
Q. Okay. Very good.
MR. HORLEY: Then I would like to mark this

as exhibit -- I believe we're at 178 now. Is that right?

THE COURT REPORTER: Yes.

MR. HORLEY: Okay. I'd like to mark it as that exhibit. I may have more questions on that for Ms. Casner as well.

(The document was marked as Exhibit 178 for identification.)

BY MR. HORLEY:

Q. And just to take a quick look, if you don't mind reviewing it really quickly. I see here at the top, it says, "How to Initiate a Case Involving a Potentially Fraudulent Document"; is that right?

A. Yes, that's what it says.

Q. Do you know if your office has had to use this guidance because they've received potentially fraudulent documents?

A. That, I'll have to ask Donna -- respond. I'm not aware that we have. It wasn't brought to my attention. But Donna is the one that works with it.

Q. Okay. Thank you. I will stop that screen share.

Another question on the topic of databases. You mentioned sometimes using Social Security information or that -- that's part of what the MVD database checks; is that right?

A. Yes. Well, it's -- it's through the HAVA system.

And I -- that's to match for the federal-only voters' proof of identity.

Q. Okay. Understood. So that's HAVA system and it's used to show identity. Okay.

So if a voter does not have a Social Security number when one of the checks is run, could that suggest that that person is not a U.S. citizen?

A. No. It means they didn't fill out the information, didn't have an Arizona driver's license, and they didn't provide any of the DPOC.

Q. Understood.

So they wouldn't have provided their Social Security number when they applied for a driver's license?

A. No. Driver's license would show up if there's a match. But there's some people that are not -- don't have Arizona driver's license. They use the federal-only -- the federal form or national form to register.

And the Social Security number would -- if it had a match in the Social Security system, would prove their identity essentially. The NVRA has it in there about identity on what -- if you -- if we accept it or they've proven identity, they can vote an early ballot, from what I understand, and they don't have to show up in person to vote. But if they have not, they will have to show up in person to vote for the first time. And then after the

first time, it's -- they could vote by mail.

Q. Okay. So I -- just to be clear, if that check was run and there just was no Social Security number, what would happen then?

A. They would be put as a federal-only voter and ID required. I think we call it "fed ID." And they would not be mailed an early ballot if they had requested one.

Q. Okay. Understood.

And then just one point of clarification. If an individual fails to provide DPOC but does check the citizenship box "yes," are they registered as a full-ballot voter?

A. No. They would be a federal-only voter.

Q. Okay. Understood.

I wanted to ask you a little bit more about the jury questionnaire reports that your office receives.

A. Okay.

Q. You mentioned that most people submitted -- you know, said on their questionnaire that they're not a U.S. citizen just to get out of jury duty; is that right?

A. Some -- yeah, some people. That's where I -- it's not a large number of people, but when we've followed up with them, that's what they have been -- they say. So I have verified recently that there is an oath now -- I don't know if it wasn't on in the past -- that they're swearing

or affirming that the information on the jury questionnaire is truthful.

Q. Yes. So if they -- you mentioned that they -- you think that in most cases, they're just, for lack of a better term, lying on the form to try to get out of jury duty. Does your office confirm that? Like, what's the process for making sure that it was just a misrepresentation?

A. We would send a letter or try to call them and see why they marked -- are they indeed not a U.S. citizen. Because some people that are not U.S. citizens have a driver's license and they may be in the jury pool -- to have the jury pool. And so those cases, they can't serve on a jury either.

Q. So there are some cases where that -- that answer they gave on the questionnaire is truthful and they are not U.S. citizens?

A. Not if they're registrants. I'm not aware of -- and that's what -- when we get the list -- Donna is more familiar with this.

From what I understand, when it says "not U.S. citizen" on the jury list, when they check it, they find out they're not registered voters. But Donna is much more familiar with the jury list processing than I am.

Q. Okay. I just had one more question on that.

You mentioned that when you -- when you get this information, you reach out to the -- to the voter and you -- or the person who put this on there, the registrant, and you confirm with them. At that point, do you just take their word for it at face value -- if they say, "Oh, no -- yes, I'm a citizen. I just put that down on the jury form," is that the end of the inquiry, or do you ask for some kind of verification?

A. It would be the end of the inquiry if they had supplied DPOC.

Q. Okay. And if they hadn't supplied DPOC --

A. Then they would have to submit something.

Q. Okay. Thank you.

A. I don't know if we've had that situation ever come up, though.

Q. Understood. Okay.

And now, I wanted to talk a little bit about birthplace.

You mentioned that you used to work as an elections official in the state of Nebraska; is that right?

A. Yes.

Q. And you mentioned that their voters were required to list birthplace on their applications?

A. Yes.

Q. And so if they -- if they didn't -- if they listed

a birthplace that was outside of the United States, your office would have to follow up with them to confirm that they were eligible to vote?
A. Yes.
Q. Okay. Did you find that process to be burdensome on voters?
A. No. Because we would take their word for it if they said they were naturalized.
Now, if they were naturalized citizens, we did ask for the date of their nat- -- naturalization. And if they said that a parent was a U.S. citizen, they didn't have to provide any additional proof or anything.
Q. Okay. And did you -- in your view, was that process discriminatory toward any group of voters?
A. No. Not in Nebraska, no.
Q. Okay. Thank you.
And I just wanted to confirm, your office doesn't track whether voters provide correct or incorrect birthplaces on the form as it exists now; correct?
A. That is correct.
Q. And I understand there's probably no easy way to determine this, but generally, in your experience, do voters commonly list their birthplace even though it's not required?
A. They will put a lot of times -- I'll have to look

at the form, but I think it says "county," and sometimes they'll put country, like USA on it, or instead of a state or, you know, where they were registered -- I mean where they were born.

Q. Okay. So it's fairly common for people to include that on their form?

A. Yeah. The forms I have processed, I see that filled out.

Q. Okay. And then does the county ever use that as a way to help identity a voter over phone? For example, if they call and they say, "I'm so and so," and you can ask, "Are you the so and so who was born in this place?"

A. That, I would have to ask Donna. I don't ask for birthplace when I ask for confirmation, but I'm not positive what our current written procedures are for our staff in the office. Since it's not required, my guess is they don't, but Donna could answer that better.

Q. Okay. Thank you.

And if a court or the secretary of state issued guidance that a county should change how it uses birthplace information, would the recorder follow that instruction?

A. Yes.

Q. And let's -- let's imagine a scenario where a registrant were to write on his or her form that she was

born in one state -- for example, New York -- but then provided a copy of the birth certificate that was from a different state -- let's say Florida -- what would your office do in that situation?

MS. LANG: Form.

THE WITNESS: That, I don't know. I'm not aware we've ever had that situation come up.

BY MR. HORLEY:

Q. Could that situation potentially raise a red flag about that voter's identity?

A. Yeah, I guess. I'd probably want to ask legal counsel on, you know, that because I don't know if it would indicate the type of fraud or what. But, yeah, I'm not aware that the -- a lot of times, they will put Arizona -- they -- like, if they put Arizona as their birthplace for one and then the birth certificate was somewhere else -- people don't fill out forms very well, and they're like, "I'm in Arizona," and they just write the state they're in.

Q. Understood.

A. That would be, I think, more common than if it was like a New York or Florida situation.

Q. Okay. Thank you.

I wanted to quickly go over some documents that haven't been entered yet. These are emails and attachments that you were involved in. So I'm going to do

the same screen sharing thing.
A. Okay.
Q. So just one moment while I pull those up.
Okay. Can you see this document?
A. Yes. But I can't really read it.
There, that's good.
Q. Better. Okay.
And then I am going to -- well, first, let me ask: So -- so you -- do you recognize this -- this document?
A. Yes.
Q. And did your office produce this in response to plaintiffs' request for production?
A. Yes.
Q. Okay.
MR. HORLEY: Okay. I would like to mark this as Exhibit 178.
THE COURT REPORTER: 179.
MR. HORLEY: I'm sorry. 179.
(The document was marked as Exhibit 179 for identification.)
BY MR. HORLEY:
Q. Okay. So I'm going to scroll down here toward the bottom of page 1, top of page 2.
Do you recognize this email from Ian Camacho?

A. Yes.
Q. And I'll give you just a quick second to review the text of that email.
A. Okay.
Q. Okay. And then scrolling up here, I see in your response that you said, "Mr. Camacho, we looked into the list registrants you sent to us and have taken the necessary actions under law to address the issues that we found"; is that right?
A. Yes.
Q. So could you just tell me a little bit more about what happened with this email?
A. We checked what he -- what's -- what he sent and we found that he didn't have all the information, as I recall. Most of the registrants had either moved out of state and had already been canceled or were -- I'll have to ask Donna more. Donna and Sedona are the two that checked that. But I don't take his information for cancellation.
What we would do if we did have a question is we would send probably a voter ID card -- so Donna will confirm this -- to an address where we think somebody may have moved and see if it comes back to us with a different address or undeliverable.
Q. Okay. Understood.
And has your office received a lot of these

kinds of emails and things like this from -- from Mr. Camacho?

A. Yes. He seems to be quite regular at sending it.

Q. And from other voters as well?

A. I can't recall from other voters, no.

Q. Okay. Do you think that having more sort of robust authentication procedures in the registration process might help to cut down on these sorts of inquiries from -- from folks like Mr. Camacho?

A. No. I think he doesn't understand all of the laws. Like, you can stay registered to vote in Arizona, and if you're working, you know, in Washington, D.C. -- people have two residences. So they can kind of decide on their own. And he doesn't have that information.

And he looks at stuff like it's zoned commercial property, and it turns out there is an apartment or a living space at the commercial property. He's kind of a -- I don't know. He wants to -- he wants to do our job, I guess, for us. So that's why I never respond what we find out to him.

Q. Understood. All right. Thank you. That's all I have on that document.

MR. HORLEY: And I believe those are all the questions I have for you. Thank you, Ms. Hansen.

I think maybe some of my colleagues on the

defense side might have further questions.

THE WITNESS: Okay. Thank you.

MR. LANGHOFER: Thanks, Tim. I'm happy to go unless another one of the defense counsel wants to go first.

EXAMINATION

BY MR. LANGHOFER:

Q. All right. Hearing none, Ms. Hansen, I'm Kory Langhofer. I -- I don't know that we've ever talked --

A. Yeah, we've met. I recognize your name too.

Q. Yeah. Yeah, I think we've communicated a lot in writing. Nice -- nice to connect, even if it's virtually here.

A. Nice to see you.

Q. I represent the RNC in this case. And, you know, you've, obviously, endured hours of questions here. I don't have much to add to that, but I have just a couple -- a handful, I should say.

So has your office ever referred anything to law enforcement that arose out of voter registration issues?

A. Yes, we have.

Q. Can you tell me about those?

A. You're asking me to remember details.

It seems to me it was in regards to the town of Tusayan and a person who voted twice -- or attempted to vote twice. Those are the ones that I remember that we would refer to.

Q. Did they have issues with folks in Tusayan registering or attempting to register to vote there even though they didn't live there?

A. Well, Tusayan is an interesting community in that the -- most of the property is owned by businesses and that, and so there's not a lot of private ownership of property. And so the people who work there live in housing provided by their employer or in a campground there. And it's, unfortunately, a community that there has been a lot of disagreement with different groups and there's been a lot of accusations about people not residing there and being ineligible to vote and -- from the two sides up there that are in disagreement.

Q. And have you been able to definitively resolve whether those folks actually reside where they came to reside?

A. Well, it's been my experience people -- if there's a question on residency, we have them -- we read them the statute or have them read the statute and say where you're -- you know, saying is your residence, do you meet it. And we take their word for it.

Q. So --
A. And it's hard in that case because, like I said, it's tied -- some people tie it to their employment. So if they lose their job, they may move into the campground. And it's -- it's a unique community.
Q. Those disputes in Tusayan have been going on for quite a few years; am I right?
A. Yes, they have.
Q. At least -- at least eight years? Am I right about that?
A. At least eight, yeah.
Q. Okay. Does your office have access to any databases that you could use to check citizenship that are more accurate than the MVD database and the SAVE database?
A. Not right now that I'm aware of, no. The one I think is -- I have the most trust in is the SAVE database, but that's not if you're born in the U.S. type things. It's more -- from what I understand, that would be more naturalization or things like that.
I don't know how it works. I know some businesses check for -- if they're documented, I guess. But those kind of databases, it is whether you're -- you've entered the country with the correct documentation or if you have not, so . . .
Q. Do you have -- apart from the MVD database and the

SAVE database, do you have access to anything that is more current and reflects on citizenship status, any more up to date?

A. No.

Q. Okay. When your office gets a state voter registration form and there's no DPOC in the system -- so you send out a notice to the voter saying, "You're missing the DPOC," do you know what percentage of them respond and provide the DPOC?

A. No, I don't. Donna may have a better idea of that since she's the one that sends out the letters --

Q. Yeah.

A. -- or her staff does.

Q. I'll probably ask her about it.

Do you have a rough order of magnitude sense? Are we talking like -- you know, do you have any even "wet finger in the air" idea?

A. No. It depends on how many, like, federal-only register -- or the federal forms we can get in, that's what -- those forms -- we have that missing a lot more, I think, than we do on the state forms.

Q. Yeah. The -- I want to talk about the checkbox, because I think I've got a couple questions about the checkbox briefly.

You had said that there were some problems

with the MVD database. I think in October of 2022 is when they had that glitch, so -- but you'd also said that you think, generally, it's a reliable system. Am I remembering that right?

A. Yes.

Q. So it's reliable but imperfect. And you'd also mentioned something -- I don't think I'd even thought of it before, but the process of renouncing your citizenship.

You could provide DPOC and then the next day or years later renounce your citizenship, theoretically. So if we know that there are sometimes errors in the MVD database or someone could lose their citizenship status, in those sorts of circumstances, wouldn't there be at least some value in having someone check a citizenship box and say, like, "No, whatever your database says, whatever I put in the database years ago through the MVD process, I am currently a citizen"?

A. Well, one of my problems with the citizenship box is it's buried in a small area. My personal opinion, if they would put it really big in a giant box at the top -- "Are you a U.S. citizen, yes or no?" -- you wouldn't have people missing it.

Q. So --

A. So that's -- it's -- the design of the form, I think, leads to people missing things. It's right above,

as I recall, the signature box. It's a little bitty print. And people -- I don't know. Since I've been doing this 36 years now, people used to fill out forms better than they do now.

Q. I guess I'm not surprised to hear that. You know, having employed some people younger than me, I'm not shocked to hear you say that.

Well -- okay. So that's an interesting point. Maybe there's a formatting issue there. What if we could -- what if we could, you know, spend some hours and reformat that document so that it was really prominent and very clear, the citizenship answer is necessary and it was very -- the wording was very simple so people can understand it?

So basically, I'm imagining a world where we could take out your formatting concerns. If we could do that, would you agree that there would be some informational value in having the answer from people, like having them say that they are still citizens?

MS. LANG: Objection. Calls for speculation.

THE WITNESS: If they supply the proof of citizenship, you've met the requirement. The point of both of those -- the box and the DPOC -- is we're trying to find out: Are you a U.S. citizen? Yes or no?

And I think both things -- you know, if we

could take it that the box is checked "yes" and you don't have to supply the DPOC, you know, it would be, we take you at your word in signing the affirmation. If you supply the DPOC, you've supplied proof of citizenship. So why do you have to check a box too, I guess. That's what -- it seems kind of redundant.

BY MR. LANGHOFER:

Q. Let's walk through that.

So if someone provides you a DPOC, let's say they attach a copy of their birth certificate but they don't check the box, it would be possible, wouldn't it, that they have renounced their citizenship since they were born; right? So even if they've got a -- they've got DPOC, they -- in order to really know whether they're a citizen, you need them to currently indicate whether they're a citizen. Do you agree with that?

MS. LANG: Objection. Calls for speculation.

THE WITNESS: I don't know how many people renounce citizenship.

BY MR. LANGHOFER:

Q. Not many.

A. I mean, you know, it's -- I've never seen it happen personally but . . .

Q. Yeah, I think that's a fair point.

A. I mean, I don't like -- I don't think it's good to

have a procedure in place where you may put a block for any what-if scenario, no matter how minute the reason it's there, that may keep eligible people from being able to exercise their right to vote.

Q. Well, so I understand what you're saying. And the -- I think what you're saying is, this is why you would vote against the bill. And I think you've articulated that really well, and I think you -- I think you articulated that to the governor as well as anyone. So I understand why you think it's a bad idea.

I'm asking a little bit different question, though, which is: You know, it is theoretically possible that someone could obtain DPOC at some point? They have a naturalization certificate; they have a birth certificate; a passport. And after getting that, they're either forcibly denaturalized -- there is a process for that -- or they renounced their citizenship.

And so if we're not requiring them to say, "I am currently a U.S. citizen," isn't there some chance you're letting someone register who's, in fact, not a citizen?

MS. LANG: Objection. Calls for speculation. Asked and answered.

THE WITNESS: It could be a possibility but not a probability.

BY MR. LANGHOFER:
Q. So --
A. In my opinion. And this is my opinion.
Q. Yeah, I -- I totally understand that.
So similarly, if the MVD system has had problems -- you know, in October of 2022, there was a problem. I think it lasted only a week or so. But if it has had problems -- and for many of these voters, the DPOC that you're relying on is just in the system, which apparently has some problems. For those folks, isn't it also valuable to have a current avowal from the registrant that they are a U.S. citizen?
MS. LANG: Objection. Lack of foundation. The problem that was identified in the MVD database is not --
MR. LANGHOFER: Speaking objections are not allowed. You don't get to coach the witness. You've made your objection.
THE WITNESS: Well, at the time there was the problem, there were new databases being created. AVID was new or, you know, updated -- well, AVID essentially was new because it was PowerProfile before and that -- that's my problem with databases. Any database is possible to get a glitch in, no matter which ones you look at.
BY MR. LANGHOFER:

Q. Those glitches -- those glitches don't all go one way; they don't all indicate that someone is not a citizen when they actually are; they could also indicate that someone is a citizen when there's not evidence of that; fair?

MS. LANG: Objection. Lack of foundation. Calls for speculation.

THE WITNESS: I guess if there's a glitch.

BY MR. LANGHOFER:

Q. Yeah. And so because you're partially worried about glitches, wouldn't the requirement that a proposed registrant has to say, "I currently am a citizen" add some informational value?

MS. LANG: Objection. Calls for speculation. Asked and answered.

THE WITNESS: Yeah, they provided it if they provided DPOC.

BY MR. LANGHOFER:

Q. But -- but the evidence of DPOC in [indiscernible] database --

THE COURT REPORTER: I'm sorry. You cut out. You cut out. "The evidence of DPOC" --

BY MR. LANGHOFER:

Q. -- is, for some people, just what's in the database, which we're acknowledging here could be

unreliable?

MS. LANG: Objection. Argumentative. Objection. Asked and answered. Calls for speculation.

THE WITNESS: We've had the instance, as I mentioned, the county employee that I know who got naturalized, but the Motor Vehicles still did not have him in as a citizen.

BY MR. LANGHOFER:

Q. So in that case, would there have been some informational value in him saying on the form that he's a citizen?

A. I think he did.

Q. Okay. And there was informational value in that?

A. We couldn't take it as proof of citizenship.

Q. That's not what I asked.

A. Yeah. And our procedures in the EPM was to -- that -- as I recall, is that if it was a -- indicated in an MVD, we could not take that "Yes, I'm a U.S. citizen" as proof of citizenship and we had to follow up with him.

Q. We -- we definitely understand that you oppose these laws. I mean, that's a matter of public record. You've testified to it already. I'm not asking whether you think it's right.

A. Yeah.

Q. What I'm saying is, if you know that these

databases can have errors and the errors could say that someone has provided DPOC when, in fact, they haven't, isn't there informational value in asking them to swear that they are, in fact, citizens?

MS. LANG: Objection. Asked and answered. Argumentative. Speculative.

Mr. Langhofer, you've asked this question at least four times now and you've gotten an answer.

MR. LANGHOFER: Danielle, she's dodged it. No, she -- she has not -- I have not gotten an answer. She's answered a different question, which is basically whether she thinks it's a good policy. And she definitely doesn't think it's a good policy.

But she does have an answer for this question, which I will get before we're done here.

THE WITNESS: Well, you're asking my opinion and I don't -- I don't think --

BY MR. LANGHOFER:

Q. Is it your position that there is no informational value in this checkbox even when you know that for some people, their DPOC indication in the database could be wrong?

MS. LANG: Objection. Lack of foundation. Asked and answered. Argumentative. Calls for speculation.

THE WITNESS: I think it's informational if

they mark "no." For me, that's information that I would find useful.

BY MR. LANGHOFER:

Q. And if someone marks "yes," you don't think that has any informational value?

A. Not if they provided DPOC.

Q. And what if they refused to answer it? Wouldn't that --

A. Then they're a federal-only voter because of the decision in the court case.

Q. If someone refuses to answer a question, couldn't it imply that the answer is not advantageous to them?

MS. LANG: Objection. Calls for speculation. Lack of foundation.

THE WITNESS: Can I ask my legal counsel a question?

BY MR. LANGHOFER:

Q. Yeah, you can. I mean, I think the custom which they --

A. I -- you know, you're asking me if I have an opinion on whether that information would be useful to us to process registrations; right?

Q. No. I'm asking whether there's information value there. Whether -- whether it's useful to you is kind of something that the Court will be looking at eventually.

A. I'm not seeing the difference, I guess, is my problem.

Q. I think the question -- the last question I asked was: Is it your position that there is no informational value when someone says -- refuses to say whether they're a citizen?

MS. LANG: Objection. Lack of foundation. Calls for speculation. Asked and answered. Argumentative.

THE WITNESS: I guess not.

BY MR. LANGHOFER:

Q. I'm sorry.

Are you saying that's not your position or it's not informational value?

A. It's -- information -- you've signed an oath that says an affirmation that the information is -- you meet the qualifications to register to vote, which is listed on the registration form. You've provided DPOC. So I -- yeah.

Q. So --

A. I'm sorry.

Q. I'm sorry. You're getting confused.

You just said -- I was about to take your answer as your final position, but then you said, "You've provided DPOC." And I was trying to limit this to people for whom the database says they provided DPOC, but we have already discussed the database could be wrong.

So you've got the database. Could be right, could be wrong -- probably right -- and they refuse to check the box saying they're a citizen. Are you saying the absence of that information has no informational value?

MS. LANG: Objection. Lack of foundation. Calls for speculation. Asked and answered. Argumentative.

THE WITNESS: Like I said, if you mark "no," we're going to assume you're not. So I -- if you mark "yes," it's the same as providing the DPOC or not providing it. You're a fed-only voter.

BY MR. LANGHOFER:

Q. And if someone refuses to mark the box --

A. You don't know if they're refusing or if they missed it while filling it out. Unless the person is in front of me and I'm asking them, "Are you a U.S. citizen?" The only way I would know they refused is they tell me, "I refuse to answer that."

So I guess that's where I'm coming from.

Q. If I understand it correctly then, you would attribute nonresponsiveness to voter error and overlook it?

A. That's how I would look at it, yes.

Q. What if a voter put their name but nothing else on the form, would you attribute that silence to voter error and register them?

A. No. We --

MS. LANG: Objection. Lack of -- objection; form.

THE WITNESS: In the EPM, it spells out what is needed, and also in the statute, what is required to register. So if you don't have an address, you don't have your birth date, you don't have a signature, we can't register you.

BY MR. LANGHOFER:

Q. Okay. And if the statute says you've got to have a check in that box, you would ignore that part of the statute?

MS. LANG: Objection. Lack of foundation. Misstates testimony.

THE WITNESS: We would follow what the Court rules in this case.

BY MR. LANGHOFER:

Q. Okay. Let's move on, mostly to save Ms. Lang's vocal cords from further objections.

MS. LANG: Thank you.

MR. LANGHOFER: Yeah.

MR. MORGAN: I think we've also learned when Kory says he has a handful of questions, he has huge hands.

BY MR. LANGHOFER:

Q. All right. So I think this is my last question.

So we've heard from some other counties that

sometimes there's these voter registration drives and they'll get a whole bunch of forms in. And then occasionally, on -- they'll have -- it appears to be some bad apples, folks who are filling out voter registration forms with the same information multiple times, maybe handwriting is all the same, kind of suspicious patterns in these voter registration forms.

Have you had anything like that in Coconino County?

MS. LANG: Objection. Lack of foundation.

THE WITNESS: Yeah, we've had registrations where it's obvious that somebody was trying to register someone else; that it was not filled out by the registrants.

BY MR. LANGHOFER:

Q. How is it obvious?

A. Well, a lot of it is the -- if there -- if it's a reregistration, they'll have wrong information, like birth dates. And the best way for us to check these things is when we put it in the system and they run the HAVA check against Motor Vehicles, it comes back and it's -- there's no match or it's, like, somebody else's. Usually it's no match because they don't know what the driver's license number would be and such.

That's -- but Donna is much more familiar

with this since she does the majority -- or oversees the majority of voter registrations processing.

Q. All right.

A. But it's -- we haven't seen a lot of it, but we've seen some. I know some counties have had more problems than we have had here, thank goodness.

Q. Do you have any sense of how many we're talking about in your county?

A. I'd have to ask Donna on that.

MR. LANGHOFER: Thank you, ma'am. That's all the questions I have.

Are we going to ask questions of Donna now?

MR. MORGAN: Yeah, I don't -- I don't pretend that I'm in charge or anything, but, I guess, does anybody else have questions for the recorder?

MS. LANG: I have just a couple follow-up questions for Ms. Hansen, but I don't have big hands like Kory, so I do mean just a couple of questions, if that's all right.

I don't know if any of the other plaintiffs have any follow-up. Alex very well may.

Is it okay with you, Alex, if I just go ahead?

MR. ATKINS: Yeah, that's just fine.

MS. LANG: Great.

FURTHER EXAMINATION

BY MS. LANG:

Q. Thanks, Ms. Hansen.

I just -- you'll have to forgive me. I'm not familiar with the place. But you were talking about a town with Mr. Langhofer -- Tusayan?

A. Tusayan.

Q. Tusayan. Okay.

And I think you testified that there maybe have been one or two referrals there related to double voting; is that right?

A. Yes.

Q. And you had -- you had agreed with Mr. Langhofer that there had been some disagreements about residents there about the residency status of some of those individuals.

Have you actually had any referrals for anyone who was actually found to not reside there that was claiming to reside there?

A. Well, we turned it over to the county attorney's office for investigation, so they would be the ones to check with on it -- or the sheriff. I think the sheriff would be -- do follow-up on that.

Q. Okay. And you mentioned that a number of the people in this town live on campgrounds; is that right?

A. Well, they live in either a campground -- but the campground would be the private area, where they're living actually in something, you know, like a tent or an RV that they own. Or they live in company housing. Like, McDonald's has a -- there has a dormitory, and it's a lot of motels. So the motels would have living situations for their employees.

Q. And many of those folks that reside on campgrounds or in dormitories are legitimate residents that are eligible to vote in the state of Arizona; correct?

A. Yes.

Q. And would those folks, based on your experience, have easy access to any documentation of their residence if they're living on a campground or an RV?

A. Well, they, I would think, would have a more difficult time. So now there would be -- I guess I'm trying to think for utilities and that. I don't -- I'd have to ask Donna if she -- how many she would see that was coming from that area that may not have the proof of citizenship or -- but residency, I think, would be harder.

I do know Tusayan, as I recall, has an awfully high number of people on the active early voting list. And so they don't have to show ID to vote. So if you're voting by mail, we check your signature. So since we don't do the document -- the proof of residency yet, I

don't know.

MS. LANG: Thank you. I don't have any further questions.

MR. ATKINS: I think I have just two.

FURTHER EXAMINATION

BY MR. ATKINS:

Q. Ms. Hansen, how long has it been since you worked in election administration in the state of Nebraska?

A. I worked in the state of Nebraska starting in April 1st, 1987, through 1999.

Q. And are you up to date on Nebraska's requirements for voter registration?

A. No.

MR. ATKINS: I don't have any other questions. Thank you. Thanks so much.

MR. MORGAN: All right. If there are no more questions, I -- unlike Kory's hands, I have a relatively small bladder. Can we take five minutes as we transition to the next witness?

MS. WINKELER: That's good for us.

THE WITNESS: That's good.

MR. MORGAN: Thank you.

THE VIDEOGRAPHER: We are off the record. Time on the video monitor is 2:22 p.m.

(The proceedings concluded at 2:22 p.m.)

________________________________

PATTY HANSEN

STATE OF ARIZONA )
COUNTY OF MARICOPA )

BE IT KNOWN that the foregoing deposition was taken by me pursuant to stipulation of counsel; that I was then and there a Certified Court Reporter in the State of Arizona, and by virtue hereof authorized to administer an oath; that the witness before testifying was duly sworn by me to testify to the whole truth; pursuant to request, notification was provided that the deposition is available for review and signature; that the questions propounded by counsel and the answers of the witness thereto were taken down by me in shorthand and thereafter transcribed into typewriting under my direction; that the foregoing pages are a full, true and accurate transcript of all the proceedings had upon the taking of deposition, all done to the best of my skill and ability.

I FURTHER CERTIFY that I am in no way related to nor employed by any parties hereto; nor am I in any way interested in the outcome thereof.

Dated at Phoenix, Arizona, this 8th day of September, 2023.

__________________________________

CINDY MAHONEY, RPR, RMR NO. 50680

# Exhibit 11

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

Mi Familia Vota, et al., )
)
Plaintiffs, ) Case No.
) 2:22-cv-00509-PHX-SRB
v. ) (Lead)
)
Adrian Fontes, in his ) No. CV-22-00519-PHX-SRB
official capacity as ) No. CV-22-01003-PHX-SRB
Arizona Secretary of State, ) No. CV-22-01124-PHX-SRB
et al., ) No. CV-22-01369-PHX-SRB
) No. CV-22-01381-PHX-SRB
Defendants. ) No. CV-22-01602-PHX-SRB
________________________________) No. CV-22-01901-PHX-SRB
)
AND CONSOLIDATED CASES. )
________________________________)

VIDEO-RECORDED VIDEOCONFERENCE 30(b)(6) DEPOSITION OF GILA COUNTY RECORDER, REPRESENTED BY CHARLOTTE ASRARYNEZAMI

Globe, Arizona

August 16, 2023

Prepared by:
CINDY MAHONEY, RPR, RMR
Certified Court Reporter
Certificate No. 50680

# I N D E X

WITNESS PAGE
CHARLOTTE ASRARYNEZAMI
EXAMINATION BY MR. FERGUSON 10
EXAMINATION BY MR. HIRSCHEL 87
EXAMINATION BY MS. BOUGHTON 100
EXAMINATION BY MR. LANGHOFER 104
EXAMINATION BY MR. MAKKER 106

## EXHIBITS MARKED

EXHIBITS DESCRIPTION PAGE
Exhibit 129 Plaintiff's Notice of Deposition of Gila County Recorder's Office Pursuant to Rule 30(b)(6) 16
Exhibit 130 Consolidated Plaintiffs' First Set of Interrogatories to the Defendant County Recorders, in Their Official Capacities 21
Exhibit 131 The Responses of the Gila County Recorder, Sadie Jo Bingham, in Her Official Capacity, to the First Set of Interrogatories Propounded by Consolidated Plaintiffs 22
Exhibit 132 Email from Kori Lorick sent Aug 23, 2022, attaching 2022 Election Law Updates.pdf 29
Exhibit 133 Email Chain, Oct 17, 18, 19, 2022 attaching Secretary of State Press Release, Oct 18, 2022 SCCR0011465 - 0011466 41

EXHIBITS MARKED

| EXHIBITS | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 134 | Email from Eric Mariscal, Feb 7, 2022, to Charlotte Williams, attaching a spreadsheet Illegal Registrations (25).xlsx; and Severity Levels and Laws.docx | 76 |
| Exhibit 135 | The Responses of the Gila County Recorder, Sadie Jo Bingham, in Her Official Capacity, to the First Set of Requests for Production Propounded by Consolidated Plaintiffs | 80 |
| Exhibit 136 | List of 5 canceled or ineligible voters, dated 6/29/2023 | 82 |

REQUESTS

Page 86 Line 11

PREVIOUSLY MARKED EXHIBITS

Exhibit 6 Page 25
Exhibit 35 Page 26
Exhibit 19 Page 47
Exhibit 24 Page 52
Exhibit 21 Page 57

VIDEO-RECORDED VIDEOCONFERENCE 30(b)(6)
DEPOSITION OF GILA COUNTY RECORDER, REPRESENTED BY CHARLOTTE ASRARYNEZAMI, commenced at 9:03 a.m. on August 16, 2023, at Globe, Arizona, before Cindy Mahoney, RPR, RMR (via videoconference), Arizona Certified Court Reporter No. 50680.

* * *

APPEARANCES (all via videoconference):

For Poder Latinx, Chicanos Por La Causa, and
Chicanos Por La Causa Action Fund:
ARNOLD & PORTER KAYE SCHOLER LLP
By: Andrew Hirschel, Esq.
250 West 55th Street
New York, New York 10019
212-836-8000
Andrew.hirschel@arnoldporter.com

For Mi Familia Vota and Voto Latino:
ELIAS LAW GROUP LLP
By: Daniela Lorenzo, Esq.
250 Massachusetts Avenue NW
Suite 400
Washington, D.C. 20001
202-968-4490
Dlorenzo@elias.law

For Promise Arizona and Southwest Voter Registration
Education Project:
MEXICAN AMERICAN LEGAL DEFENSE AND EDUCATIONAL
FUND
By: Erika Cervantes, Esq.
634 South Spring Street
11th Floor
Los Angeles, California 90014
213-629-2512
Ecervantes@maldef.org

APPEARANCES CONTINUED:

For Living United for Change in Arizona; League of United Latin American Citizens; Arizona Students' Association; ADRC Action; Inter Tribal Council of Arizona, Inc.; San Carlos Apache Tribe; and Arizona Coalition for Change:

CAMPAIGN LEGAL CENTER
By: Robert Brent Ferguson, Esq.
1101 14th Street NW
Suite 400
Washington, D.C. 20005
202-736-2200
Bferguson@campaignlegalcenter.org

For the Arizona Asian American Native Hawaiian and Pacific Islander for Equity Coalition:

LATHAM & WATKINS, L.L.P.
By: Amit Makker, Esq.
505 Montgomery Street
Suite 2000
San Francisco, California 94111
415-391-0600
Amit.makker@lw.com

For Tohono O'odham Nation, Gila River Indian Community, Keanu Stevens, Alanna Siquieros, and LaDonna Jacket:

NATIVE AMERICAN RIGHTS FUND
By: Allison Neswood, Esq.
Michael S. Carter, Esq.
950 F Street NW
Suite 1050
Washington, D.C. 20004
202-785-4166
Neswood@narf.org
Carter@narf.org

APPEARANCES CONTINUED:

For the Democratic National Committee and Arizona Democratic Party:
WILMER CUTLER PICKERING HALE AND DORR, LLP
By: Daniel S. Volchok, Esq.
2100 Pennsylvania Avenue NW
Washington, D.C. 20037
202-663-6000
Daniel.volchok@wilmerhale.com

For Arizona Attorney General's Office and State of Arizona:
OFFICE OF THE ARIZONA ATTORNEY GENERAL
By: Kathryn E. Boughton, Esq.
2005 North Central Avenue
Phoenix, Arizona 85004
602-542-7932
Kathryn.boughton@azag.gov

For Arizona Secretary of State Adrian Fontes:
SHERMAN & HOWARD LLC
By: Craig A. Morgan, Esq.
2555 East Camelback Road
Suite 1050
Phoenix, Arizona 85016
602-240-3000
Cmorgan@shermanhoward.com

For Yuma County Recorder Richard Colwell:
OFFICE OF THE YUMA COUNTY ATTORNEY
By: William J. Kerekes, Esq.
250 West 2nd Street
Suite G
Yuma, Arizona 85364
928-817-4300
Bill.kerekes@yumacountyaz.gov

APPEARANCES CONTINUED:

For Greenlee County Recorder Sharie Milheiro:
GREENLEE COUNTY ATTORNEY'S OFFICE
By: Gary Griffith, Esq.
P.O. Box 1717
Clifton, Arizona 85533
928-865-4108
Ggriffith@greenlee.az.gov

For Gila County Recorder Sadie Jo Bingham:
GILA COUNTY RECORDER'S OFFICE
By: Jefferson R. Dalton, Esq.
1400 East Ash Street
Globe, Arizona 85501
928-402-8638
Jdalton@gilacountyaz.gov

For Intervenor Republican National Committee:
STATECRAFT, PLLC
By: Kory A. Langhofer, Esq.
649 North 4th Avenue
Suite B
Phoenix, Arizona 85003
602-571-4275
Kory@statecraftlaw.com

For Intervenors Ben Toma and Warren Petersen:
GALLAGHER & KENNEDY PA
By: Hannah Hatch Porter, Esq.
2575 East Camelback Road
Suite 1100
Phoenix, Arizona 85016
602-530-8400
Hannah.porter@gknet.com

ALSO PRESENT (all via videoconference):
Daxon Ernyei
Gareth Fowler
Daniel Rohan, Videographer

TRANSCRIPT OF PROCEEDINGS

THE VIDEOGRAPHER: We are on the record. Time on the video monitor is 9:03 a.m. Here begins Volume 1, Media Number 1, in the 30(b)(6) deposition of Gila County Recorder, designeed by Charlotte Asrarynezami, in the United States District Court, District of Arizona, Case Number 2:22-cv-00509-PHX.

Today's date is August 16th, 2023. Our court reporter is Cindy Mahoney. I am Daniel Rohan, a certified legal videographer. We both represent Coash Court Reporting & Video.

This video deposition is taking place at 1400 East Ash Street, Globe, Arizona 85501.

Counsel, please identify yourselves and state whom you represent.

MR. FERGUSON: I'm Brent Ferguson with the Campaign Legal Center, representing the LUCHA plaintiffs.

MR. DALTON: Jeff Dalton representing the Gila County Chief Deputy Recorder Charlotte Asrarynezami

MR. HIRSCHEL: My name is Andrew Hirschel. I'm from Arnold & Porter, representing Poder Latinx.

MS. LORENZO: My name is Daniela Lorenzo. I'm from Elias Law Group, representing MFV plaintiffs.

MS. CERVANTES: My name is Erika Cervantes,

and I am representing Promise Arizona plaintiffs.

MR. MAKKER: Amit Makker from Latham & Watkins, representing the Arizona Asian American Native Hawaiian and Pacific Islander for Equity Coalition plaintiff.

MR. VOLCHOK: Daniel Volchok from Wilmer Cutler Pickering Hale and Dorr for the Democratic National Committee and the Arizona Democratic Party.

MS. BOUGHTON: Kathryn Boughton for the State of Arizona and Arizona Attorney General Kris Mayes.

MR. LANGHOFER: Kory Langhofer --

MR. MORGAN: Craig Morgan. Sorry. Craig Morgan. I represent the secretary of state.

MR. LANGHOFER: In case it wasn't clear, Kory Langhofer for the RNC.

MS. PORTER: Hannah Porter from Gallagher & Kennedy on behalf of intervenor defendants Speaker Toma and President Petersen.

THE VIDEOGRAPHER: Okay. Will the court reporter please swear in the witness.

///

///

///

///

///

CHARLOTTE ASRARYNEZAMI,
the witness herein, being first duly sworn,
was examined and testified as follows:

MR. FERGUSON: Thank you.

EXAMINATION

BY MR. FERGUSON:

Q. Good morning, Ms. Asrarynezami. Please let me know if I'm not getting your name right. Thanks so much for being here today.

We're just going to start off by talking about a few basics about you and the background of this deposition.

So could you start by just stating your name for the record and spelling it.

I know you did that before we were on the record, but if you would just do it one more time, that would be helpful.

A. Charlotte Asrarynezami, A-s-r-a-r-y-n-e-z-a-m-i.

Q. Thanks so much. So a little bit about how the deposition will work, do you understand that you're testifying under oath today?

A. Yes.

Q. Excellent.

And you understand that a court reporter is transcribing the deposition?

A. Yes.

Q. Okay. Great.

So just to make it easier for the court reporter, if every time you answer a question, if you could answer it audibly rather than nodding or shaking your head and say things like "yes" or "no" rather than saying "uh-huh." Does that work?

A. Okay. Yes.

Q. Great.

And if you don't understand a question that I ask, please let me know. And I can repeat it, or I can rephrase it.

So if you do answer the question, I'll assume you did understand it. Do you understand that?

A. Yes.

Q. Okay. Great.

So as I'm asking questions, you might hear your attorney or other attorneys object to a question I ask. So if that happens, then please let them finish the objection. Then after they finish, you can still answer the question.

You should still answer it unless they -- unless your attorney directs you not to answer it. Do you

understand that?

A. Yes.

Q. Okay. Great.

Is there any reason that you can't give full, complete, and truthful testimony today?

A. No.

Q. Great.

Have you taken any medications in the last 24 hours that would affect your ability to testify today?

A. No.

Q. Great. So I'll probably take a couple breaks throughout this deposition. If you would like to take a break, just let me know.

The only thing I would ask is that if I've already asked a question and you want to take a break, please answer that question first before we take the break.

Do you understand that?

A. Yes.

Q. Great.

Have you ever been deposed before?

A. No.

Q. Okay. And once again for the record -- I know you mentioned this -- could you tell us where you're physically located today?

A. I'm at 1400 East Ash Street in Globe, Arizona

85501.

Q. Excellent.

Did you bring any materials with you to the deposition?

A. No. I have -- I have the deposition folder Dropbox.

Q. Excellent. Yeah. The one that I sent?

A. Yes.

Q. Okay. Great.

Do you have any -- so all those documents we'll look at later. Do you have any other documents in front of you right now?

A. No.

Q. Okay. Great.

So now we'll just talk briefly some about your background. And we can start with your educational background.

Can you tell me about any school or degrees you've completed after high school?

A. I have an AA in general science.

Q. Okay. And where is that from?

A. The Gila Pueblo Community College.

Q. Excellent.

And a little bit about your professional background. Can you tell me your current title at the

County Recorder's Office?
    A. I'm a chief deputy recorder.
    Q. And how long have you been in that position?
    A. Since 2016.
    Q. Okay. And did you have any other job within the County Recorder's Office before you were chief deputy?
    A. Yes.
    Q. Okay. What position was that?
    A. As -- I've been a clerk, a recorder clerk senior, the office supervisor, and a voter registration coordinator.
    Q. Okay. A lot of positions.
        So when did you join the County Recorder's Office?
    A. In 2010.
    Q. Okay. So you've been working there about 13 years?
    A. Yes.
    Q. Okay. Excellent.
        And so before 2010, can you tell me what jobs you held?
    A. Oh, gosh, I had a job as a janitor for a really long time. I've worked for the Globe justice court.
    Q. Okay.
    A. Yeah.

Q. And did you have any jobs before you were at the County Recorder's Office that involved any kind of voter registration or voting or anything similar to that?
A. No.
Q. Okay. And have you previously used any names other than your current one?
A. My maiden name, which is Williams.
Q. Okay. And when did you change your name from Williams?
A. 2018.
Q. Okay. So you were known as Charlotte Williams, after you became chief -- chief deputy recorder, for a couple years --
A. Yes.
Q. -- is that correct?
A. Yes.
Q. Okay. Excellent.
Now we're going to move on to just what you've done to prepare for the deposition today. So I'm going to pull up Document A in the Dropbox.
And what I'm going to try to do is share my screen just to make sure we're all looking at the same thing. So I'm going to -- I know you have it too. But I'm going to do that and make sure.
Can you see that?

A. Yes.
Q. Okay. Excellent. Let me pull it up right now.
Okay.
So do you recognize this document?
A. Yes.
Q. Okay. Can you tell me what it is?
A. The notice of -- the plaintiffs' notice of deposition.
THE COURT REPORTER: Do you want to mark this?
MR. FERGUSON: Yes, please. I think we're on 128; is that correct?
THE COURT REPORTER: 129.
MR. FERGUSON: 129. Okay. Can we please mark it as Exhibit 129.
(The document was marked as Exhibit 129 for identification.)
MR. FERGUSON: Thanks very much.
MR. MAKKER: Hey, Brent, just to jump in, I think -- don't we have, like, two going today? I don't know if --
MR. FERGUSON: We do.
MR. MAKKER: Okay. I don't know if you guys coordinated that, so just wanted to make sure.
MR. FERGUSON: Yeah, the other one going on

today is starting in a few hours. And we're --
MR. MAKKER: Okay. Got it.
MR. FERGUSON: -- making an effort --
MR. MAKKER: Got it. Yep.
MR. FERGUSON: Thanks for inquiring on that, though. Appreciate it.
BY MR. FERGUSON:
Q. Let's go down -- I'm going to scroll down on this to the top of page 5.
Do you see where it says "Topics" on the top of page 5 of that document?
A. Yes.
Q. Great.
And have you reviewed the topics that are listed here?
A. Yes.
Q. And are you prepared to discuss all the topics listed here today?
A. Yes.
Q. Excellent. Okay. Thanks very much.
Are there any topics that you don't feel prepared to address?
A. No.
Q. Okay. Excellent.
Do you understand that you have been

designated to be the deponent for -- on behalf of the Gila County Recorder's Office today?
A. Yes.
Q. And so as part of that, I may sometimes use the word "you" or "your." And unless I say otherwise, I'm referring to the County Recorder's Office generally.
Do you understand that?
A. Yes.
Q. Okay. Excellent.
Okay. So let's talk a little bit more about your preparation for the deposition.
First of all, if you discussed anything with your attorney about this deposition, please don't tell me the substance of what you discussed. But it's okay to say that you did meet with your attorney.
So can you tell me if you met with anyone in your office to prepare for the deposition?
A. Does that include my county attorney?
Q. Yes.
You can tell me just that you -- if you had a meeting. But please don't tell me what you discussed.
A. Yes.
Q. Okay. Great.
And how many meetings did you have with the county attorney?

A. We've had maybe two meetings and a couple phone calls.
Q. Okay. Excellent.
And how long were those meetings?
A. Oh, gosh, I couldn't -- I couldn't say.
Q. Yeah, nothing exact. But if you give me, you know, a rough idea --
A. Anywhere from 2 minutes to 40 minutes.
Q. Okay. That was two meetings, you said anywhere between 2 and 40 minutes -- anywhere between 2 and 40 minutes?
A. Yes. Yes.
Q. Okay. And did you meet with anyone else other than your attorney about the deposition?
A. I had met with the recorder.
Q. Okay. And was that just one meeting?
A. Two.
Q. Two meetings.
Can you tell me what you talked about with the county recorder to prepare for the deposition in those meetings?
A. We went over these topics.
Q. The topics listed on the document we're looking at?
A. Yes.

Q. Okay. Excellent.
Is there any particular topic that you recall, from those meetings, discussing?
A. Nothing in particular.
Q. Okay. And did you review any other documents in preparation for the deposition?
A. I have reviewed the Election Procedures Manual and the -- the Election Procedures Manual.
Q. Okay. And is that the 2019 version of the EPM --
A. Yes.
Q. -- that you're referring to?
A. Yes.
Q. Great.
And then do you have an idea of what this lawsuit is about?
A. I have an idea, yes.
Q. Okay. Can -- of course, you don't need to know exactly or talk about specific claims. But can you just give me your general understanding of what it's about?
A. I believe it is about requiring people to put their place of birth as a requirement for the voter registration and kind of what -- that's one part of it -- and what that would look like for voter registration.
Q. Okay. Excellent. So I'm going to pull up a different document now, if you'll bear with me one moment.

Can you see the document that's on the screen now?

A. Yes.

Q. And do you recognize this document?

A. Yes.

Q. Okay. Can you tell me what it is?

A. It's the interrogatories.

Q. Okay. And those are -- and you've seen this document before --

A. Yes.

Q. -- and read those interrogatories; is that correct?

A. Yes.

Q. Okay. Excellent.

Now I'll just quickly go to one more just to make sure you've seen that.

THE COURT REPORTER: Sorry. While you're doing that, do you want to mark that?

MR. FERGUSON: Yes. Thank you for that. We were on 129; is that correct? So this is Exhibit 130.

THE COURT REPORTER: Yes, this is 130.

(The document was marked as Exhibit 130 for identification.)

(An off-the-record discussion ensued.)

MR. FERGUSON: I'm going to pull up right now

Document C. So if we could mark that as 131, that would be great.

(The document was marked as Exhibit 131 for identification.)

BY MR. FERGUSON:

Q. Can you see the document that I just pulled up now?

A. Yes.

Q. Okay. And can you tell me what that document is?

A. Those are our responses to the interrogatories.

Q. And were you involved in preparing those responses?

A. Yes.

Q. Okay. Can you tell me what you did to prepare those responses?

A. I consulted with my legal counsel and the recorder and our Election Procedures Manual.

Q. Okay. And can you tell me about how much time you spent on preparing those responses?

A. Oh, gosh, several days.

Q. Okay. All right. For now, I'm going to pull that down off the screen.

And I just want to move on to just generally a few things about what your office does and responsibilities.

So can you just describe for me generally what the County Recorder's Office does with respect to -- with respect to elections in the county?

A. So we take the voter registration forms that are given to us by voters throughout the county. We enter them into our system. And we process them. We maintain those rolls. And we are responsible for mailing out early ballots and the signature verification of those early ballots.

Q. Okay. And is there anyone else within your office that works on the election side performing those -- those duties that you just described besides you and the county recorder?

A. Yes.

Q. How many people is that?

A. We try to cross-train. So a lot of the employees have a little bit of experience. But I would say maybe one other employee who does the majority of voter registration.

Q. Okay. And what's that person's name?

A. Katie Judd.

Q. Katie Judd.

Okay. You said there are a few other people that might do a little bit. Could you tell me their names too, please?

A. Taylor Holland and Stephanie Johnson.

Q. Okay. And you mentioned Katie Judd. Can we go over her responsibilities a little bit more?
You might have started to mention it, but can you tell me what she does in the office?
A. She processes the daily mail that comes through and the EZ voters. So she does a lot of the day-to-day transactions.
Q. Okay. So is she the main person who is receiving and reviewing voter registration forms that come in?
A. Yes.
Q. And do you do that yourself also?
A. Yes.
Q. Okay. So you share that responsibility. Is that shared about 50-50, or does -- do either one of you do the primary amount of that?
A. Katie does the primary -- the primary amount of it.
Q. Okay. Excellent.
Okay. I'd like to move on now to the Election Procedures Manual that you mentioned a few moments ago. So I will -- I'm going to pull up that document as well. Give me just a moment.
So scrolling to the top, this is Document F, and it's already been marked as -- sorry for that. It's already been marked as Petty Exhibit 6.

Do you recognize this as the 2019 Election Procedures Manual?
A. Yes.
Q. Great. And I'll refer to that as the "EPM."
Can you tell me just how your office uses the EPM?
A. We use it as a reference guide.
Q. Sure. And do you refer to it when you're implementing voter registration rules, things like that?
A. Yes.
Q. And I think we mentioned this before.
Is the 2019 version still the operative version?
A. Yes, I believe.
Q. So that's the one that -- is this the only one you refer to --
A. Yes.
Q. -- in your job today? Okay.
And is -- is the EPM binding on your office, meaning you're required to follow it?
A. I believe so.
MR. FERGUSON: Okay.
MR. LANGHOFER: Form. Calls for a legal conclusion.
BY MR. FERGUSON:

Q. Okay. Now we'll move on to one more document here. So just one moment.

Okay. And this is Document G, which has already been marked Exhibit 35. Do you recognize this document?

A. Yes.

Q. Okay. Can you tell me what it is?

A. It's the draft of the -- of the procedures manual for the -- for June 2023.

Q. Okay. Excellent.

So you've seen this document before; is that correct?

A. Yes.

Q. Okay. And have you provided any comments on this draft or previous drafts to the Secretary of State's Office or anyone else?

A. No.

Q. Okay. Have you attended any meetings or trainings with the secretary of state about this document?

A. Yes.

Q. Okay. Can you tell me about that meeting?

A. We've had a couple of Teams meetings to go over comments and go over their draft of the procedures manual.

Q. Okay. And were those -- can you tell me roughly when those meetings were?

A. Oh, I think -- I think we have one -- I want to say once a month --

Q. Okay.

A. -- if not twice a month.

Q. And so that's been for the last six months or the last year that you've had once-a-month meetings?

A. I don't -- I don't remember. I don't recall.

Q. And you said that your office hasn't provided input on this draft or previous drafts though; is that right?

A. No.

Q. Okay. But have -- in those meetings, have other county recorders or other people in those meetings provided comments? Is that what was happening at those meetings?

A. Other counties have provided comments, yes.

Q. Okay. Great.

And are you -- just to the extent that you know or remember, can you tell me what those comments were about, which subjects of the EPM those were about?

MR. MORGAN: Form.

THE WITNESS: I couldn't tell you. I don't remember. It's a lot of detail.

BY MR. FERGUSON:

Q. Okay. Do you have any recollection of topics that were covered in these meetings or changes to the EPM that

were covered in these meetings?
A. No.
Q. Do you remember discussing, for example, a provision in newly enacted law that requires a registration applicant to list their place of birth on an application?
MR. MORGAN: Form.
THE WITNESS: I don't -- I don't recall specifically.
BY MR. FERGUSON:
Q. Okay. Is there anyone else in your office that's been attending these meetings?
A. Yes.
Q. Okay. Can you tell me who that is?
A. All of the ones I've listed before.
Q. Okay. So the county recorder attends them, and I believe it was -- Ms. Judd attends them as well?
A. Yes.
Q. Okay. Okay. I'd like to just move on to the laws that are being challenged in this lawsuit.
So are you aware of the two laws that are being challenged here: That's HB 2492 and HB 2243?
A. Yes.
Q. Okay. And have you received any guidance from the secretary of state or anyone else within the state about implementation of those laws?

A. No.
Q. Okay. The meetings that you mentioned a moment ago, those have not involved any -- any kind of guidance about implementation?
A. No.
Q. I'm going to pull up one more document right now. And this is Document I in the folder, which I believe we do need to mark as a new exhibit. I think -- is that 131 or 132?
THE COURT REPORTER: 132.
(The document was marked as Exhibit 132 for identification.)
MR. FERGUSON: Okay. Thanks very much.
BY MR. FERGUSON:
Q. Do you recognize this document?
A. Yes.
Q. Okay. Can you tell me what it is?
A. It's an email from Kori.
Q. An email from Kori Lorick?
A. Yes.
Q. And is Kori Lorick from the Secretary of State's Office?
A. Yes.
Q. Did you receive this email, or have you seen it before?

A. Yes.

Q. Okay. Can you tell me what it's referring to or what it's about?

A. I believe it's about a call we had. And we discussed the implementation of the house bills and the effective date of those.

Q. Okay. And so this document refers to a training that was on August 25th, 2022; is that correct?

A. Yes.

Q. And do you remember if you or anyone from your office attended that?

A. I don't remember.

Q. Okay. Do you remember if this training or other ones contained material about implementation of -- of those two laws that we just mentioned: 2492 and 2243?

MR. MORGAN: Form.

THE WITNESS: Can you repeat that?

BY MR. FERGUSON:

Q. Sure.

Do you remember if this training or any others contained material about implementing the challenged laws, which are HB 2243 and 2492?

MR. MORGAN: Form.

THE WITNESS: I -- I don't remember. I don't recall.

BY MR. FERGUSON:
Q. Okay. Has the Secretary of State's Office directed you to implement any parts of HB 2492?
A. No.
Q. Okay. And has the Secretary of State's Office directed you to implement any parts of HB 2243?
A. No.
Q. Okay. Are you implementing any part of HB 2492?
A. I don't believe so.
Q. Okay. Give me just a moment. I'm going to pull up one more document here.
Okay. And we just talked about 2492.
Is your office implementing any portion of HB 2243?
A. No.
Q. Okay. I'm going to pull up what we had before as Document B.
MR. FERGUSON: I think we marked that as Exhibit 130; is that correct?
THE COURT REPORTER: Yes.
BY MR. FERGUSON:
Q. Okay. And this is the set of interrogatories that you saw a few moments ago. I'm going to go to the top of page 10 of this document, which is Interrogatory Number 8.
Okay. So do you see that right there on the

screen --
A. Yes.
Q. -- Interrogatory Number 8?
Okay. I'm going to read for the record just the beginning of that interrogatory.
"Identify and describe each method by which Registered Voters or Voter Registration Applicants can appeal, contest, or cure decisions by Your office based on a finding of non- -- noncitizenship or absence of DPOC or failure to check the Citizenship Checkbox."
Is that what it says right there?
A. Yes.
Q. Okay. And do you remember this interrogatory from -- from answering it?
A. Yes.
Q. Okay. Excellent. Now I'm going to once again share the -- your office's answers to those interrogatories.
So can you see that on the screen now?
A. Yes.
Q. So I'm going to go down to the answer to Interrogatory Number 8. Can you see that there? I'm highlighting it.
A. Yes.
Q. Okay. Could you just read for me the -- what's

highlighted there that's the beginning of the answer to Interrogatory Number 8?

A. I can't see the first part.

Q. I'm sorry about that. Okay. Can you see it now?

A. Yes.

Q. Okay. Sorry. I'll just let you read the first sentence without highlighting it.

A. "They either provide their DPOC or provide a voter registration with a box checked."

Q. Okay. Excellent.

So does this answer indicate that if someone submits a voter registration form without the citizenship box checked, then you will contact them and ask them to resubmit the form with the box checked?

A. If they haven't provided DPOC; if -- if they've answered "no" as well.

Q. If they've -- so that's if they've entered "no" in -- where would they have entered "no"?

A. On the voter registration form.

Q. If they've answered "no" to the question that they are -- asking whether they're a U.S. citizen?

A. Correct.

Q. Okay. Under -- so under your current practice, if they have -- if they've had -- have answered "yes" to that question or if they've signed -- if they've signed the box

saying that they are a U.S. citizen but they have not checked the checkbox that asks whether the person is a U.S. citizen, how does your office handle those applications currently?

A. Can you repeat that?

Q. Sure.

If someone submits a voter registration form and they have answered "yes" that they are a U.S. citizen or they have indicated that they are by signing the form at the bottom under penalty of perjury but separately they have failed to check the box saying "I am a U.S. citizen," how does your office treat those applications?

A. Well, they -- they would have -- they would -- in order for them to indicate they were -- in order to -- that box says that they are a citizen if they check it.

I'm not sure I understand the question.

Q. Okay. Sure. Let me -- let me try that one more time.

If someone submits a voter registration form -- let's use the federal form, for example. Are you familiar with the federal voter registration form?

A. Yes.

Q. Okay. So if someone fills out the federal voter registration form and they've completed the form in its entirety with everything that's required except they have

not checked the box that asks if they are a U.S. citizen, how does your office treat that application?
A. We would enter it. And we would run it through the HAVA checks. And it may provide a proof of citizenship that way. If not, we would send them a letter.
Q. Okay. So you would run a HAVA check. And would you treat that form the same way if it had that -- that checkmark next to the citizenship checkbox -- you would run those same checks that you mentioned?
A. Yes.
Q. Okay. Okay. So do you treat the form any differently if it has the citizenship checkbox checked or if it doesn't have it checked?
A. We send a letter if the box is not checked and we can't provide proof of citizenship through the HAVA checks.
Q. Okay. And do you also send that letter if the box is checked but you can't find proof of citizenship through the HAVA checks that you mentioned?
A. Can you repeat that?
Q. Sure.
If the box is checked and then you can't find proof of citizenship through those HAVA checks that you mentioned, do you also send that letter?
A. Yes.
Q. Okay. So if I'm understanding correctly, you go

through the same process currently regardless of whether that box is checked?

A. Yes.

Q. Okay. Thank you very much. Give me just a moment.

If you do receive an application without the citizenship box checked either on the federal form or the state voter registration form and you find through HAVA checks or elsewhere an indication that the person is a U.S. citizen, do you accept that form or do you reject that form?

A. We accept that.

Q. Okay. Excellent. Okay. I'm going to move on to your office's use of databases in performing your job.

Does your office use the Arizona Motor Vehicles Division, or MVD, database?

A. Yes. I believe it interfaces with our voter registration system.

Q. Okay. And what is that system called?

A. AVID.

Q. Okay. So you use the AVID system which interfaces with the MVD database; is that correct?

A. Correct.

Q. And what do you use that system for?

A. It -- it -- it's the one that checks for

citizenship.

Q. Okay. Can you just walk me through how that process goes in your office using someone's application and running it through that AVID check system?

A. We would enter a voter registration form, enter all the data, and then we would hit the HAVA check button. It runs it through the motor vehicle database. It also runs it through, I believe, the vital statistics database as well.

Q. Okay.

A. And then update it and --

Q. Okay.

A. -- based on those results.

Q. And in talking about those results, can you tell me what are the possible results that your office could get once you run that?

A. You would have a full registered voter who's a citizen, or you could have the fed ID or the fed no ID statuses.

Q. Okay. Is one possibility that it would show that the applicant has an F-type driver's license?

A. Correct.

Q. Okay. And can you tell me what an F-type license is?

A. I can't.

Q. Okay. Is it -- does it refresh your recollection that an F-type license is one that tells you whether the person was a U.S. citizen at the time they received a driver's license?
A. Can you say that again?
Q. Sure. Let's -- let me withdraw that question for now. And I want to pull up the EPM again, so I'm going to share my screen once more.
Okay. Can you see the EPM -- the 2019 EPM up here again?
A. Yes.
Q. It's been marked as Exhibit 6. Okay. I'm going to scroll down to page 3 of the EPM. Bear with me for a moment.
Okay. Could you -- if you can -- can you see the bottom of page 3 there?
A. Yes.
Q. Okay. And I'm highlighting it. Hopefully -- well, it's going to block your view again.
If you could just take a moment to look at that second to last paragraph that begins with "an Arizona driver's license."
Do you see the paragraph I'm talking about?
A. Yes.
Q. I'll just give you a moment to look at that.

Okay. Do you see the part of that paragraph where it refers to -- it says, "The verification must not return a result that indicates noncitizenship" or an "'F-type' license"?
A. Yes.
Q. Okay. Does that help you recall what an F-type license is?
A. Yes.
Q. Okay. Can you tell me your understanding of it now?
A. That they -- yes, that they're not a citizen.
Q. Okay. And to your knowledge, if someone has an F-type license, does that indicate that they were not a U.S. citizen only when they received that driver's license?
A. Can you repeat that?
MS. BOUGHTON: Foundation.
BY MR. FERGUSON:
Q. Sure.
To your knowledge, does the fact that someone has an F-type license indicate that they were not a U.S. citizen when they received that driver's license?
MR. LANGHOFER: Form.
THE WITNESS: Yes.
BY MR. FERGUSON:
Q. And so is it -- when you're processing voter

registration applications and you use the AVID database, have you seen a result come up that someone has an F-type license?

A. I have.

Q. Okay. And do you know whether it happens that someone receives an F-type license and later is naturalized and becomes a U.S. citizen?

A. Can that happen? Is that what --

Q. Yeah, that's the question.

A. Yes --

Q. Okay.

A. -- I would think.

Q. Okay. And if someone is -- when you're running that AVID check through the MVD, do you send a notice letter to people who are deemed ineligible by that check?

A. Yes.

Q. Okay. And do people sometimes provide their proof of citizenship after receiving such a letter?

A. I'm sure they have.

Q. Okay. Is there someone in your office that would handle those situations other than you?

A. The recorder.

Q. Okay. If someone provides proof of citizenship after receiving one of those letters, would it be Ms. Judd who normally would -- would receive and handle those

documents?

A. She could, yes.

MR. FERGUSON: Okay. Okay. So I'd like to move on to one more document right now. And I'll share my screen once more. I'm going to pull up Document L.

This one does need to be marked, I believe. I think that will be Exhibit 133?

THE COURT REPORTER: Yes.

(The document was marked as Exhibit 133 for identification.)

BY MR. FERGUSON:

Q. Can you see the document on the screen there?

A. Yes.

Q. Okay. And do you recognize the document?

A. Yes.

Q. Okay. And starting at that middle of the page where it says "Press Release," could you describe what that press release is?

A. There was a data -- there was an error that affected some of the federal-only voters --

Q. Okay.

A. Or full-ballot voters, I guess it affected them.

Q. Okay. Great. I will read for the record just one part of that press release from the Secretary of State's Office.

"My office found and corrected a database error in concert with the Motor Vehicle Division which led to less than a quarter of 1 percent of voters to be registered as federal-only voters when they should have been registered as full-ballot voters."

Do you remember this incident?

A. I do.

Q. Okay. And can you tell me how it affected voters in Gila County?

A. I don't recall. I don't recall how many we had affected by this --

Q. Okay.

A. -- if any.

Q. You do remember that some voters were affected by it?

A. Correct.

Q. And do you remember the steps your office took to try to correct that error?

A. I -- I -- I don't recall if we had any voters affected by this.

Q. Okay. You don't recall for sure?

A. Yeah.

Q. Do you remember receiving the -- or did -- sorry. Withdrawn.

Did you receive this email that's on top of

the press relief -- release on the first page of this document?

A. I'm sorry. Can you repeat that?

Q. Sure.

I'm just asking if you received this email that's at the top of the document we're looking at, Document L, that I think is marked 133 right now.

A. Yes.

Q. Okay. And did you correspond with the Secretary of State's Office at all in response to this email or about this incident?

A. I -- I don't know.

Q. You don't remember?

A. I don't recall.

Q. Okay. Do you think anyone else in your office would recall?

A. No.

Q. Okay. I'm going to take that document off the screen.

So we talked a little bit about AVID and the MVD database. I want to talk about the Systematic Alien Verification for Entitlements, which I'll call "SAVE."

Are you familiar with the SAVE program?

A. Yes.

Q. And can you tell me what it is?

A. We -- we use it to verify citizenship.
Q. Okay. And can you describe the process of how you use it to verify citizenship?
A. We enter information, and it runs it against -- I'm not really 100 percent sure on the logistics of it. But we enter the, like, alien registration number and the name. And it runs it and tells us if we have results or not.
Q. Okay. And you mentioned the alien registration number. Is it correct that you can only use SAVE if you have an alien registration number or a citizenship certificate number or a naturalization certificate number?
A. I believe so, but I am not sure.
Q. Okay. Have you -- have you personally used the SAVE system?
A. I have, but not a lot.
Q. Sure.
Just to your -- to your memory, does it require putting in one of those numbers that I mentioned?
A. I don't recall if it requires it.
Q. Okay. But you don't know of any other way to use SAVE other than putting in one of those numbers; is that correct?
A. I have put those numbers in before.
Q. Okay. So is the only situation in which your

office uses SAVE a situation in which someone who's applying to register to vote provides one of -- an A-number or one of those numbers that we've been talking about?
A. I believe so.
Q. Okay. You can't think of any other situations in which your office would use the SAVE system; is that correct?
A. No.
Q. Okay. So if you enter someone's A-number into SAVE, what are the potential results you could get back from the SAVE system?
A. It would just verify whether or not they were a citizen or not.
Q. Okay. And let's say you enter that information and you got a result saying that the person is not a U.S. citizen. You know, maybe it identifies them as a legal permanent resident. What do you do with regard to that application?
A. If it comes back as a -- I think it is -- I think it's not eligible, invalid citizenship.
Q. Okay. And so if you do get that -- if you get that answer, that they're not a citizen, do you take any other steps within the SAVE database to determine whether they're a citizen?
A. No.

Q. And do you use any other kind of database to determine whether they're a citizen after you get that -- that result?

A. No.

Q. Okay. Do you send them -- if you get that negative result saying that they're not a U.S. citizen, do you send them a letter?

A. Yes.

Q. And let's say you're using the SAVE system and it returns no match so it can't tell you whether they're -- whether they're a citizen or not. How do you process those applications?

A. We would ask for more information.

Q. Okay. You ask for more information from the voter?

A. Correct.

Q. Okay. If you ask for more information and don't hear back, do you register them as a federal-only voter?

A. I believe so.

Q. Okay. And then I'll ask the same question I asked a moment ago.

If you -- if you get that initial response from -- from SAVE saying that there's no match, are there any other steps that you take within the SAVE database to try to determine if they're a citizen or not?

A. I don't believe so within the SAVE -- SAVE database.

Q. Okay. And -- and then you mentioned sending a letter.

Are there any other databases that you would look at to try to determine if they're a U.S. citizen?

A. You would use AVID as well.

Q. Okay. Okay. Now I'd like to move on to talk a little bit about the two challenged laws we've been talking about already.

The first one we'll talk about is HB 2492. And I will pull that up onto the screen one more time. Okay. And this is Document J, which is marked as Exhibit 19.

Do you recognize that as HB 2492?

A. Yes.

Q. Okay. And I believe you mentioned this before, but are you aware of the provision in 2492 that requires registration applicants to list their place of birth on the application form?

A. Am I aware of it?

Q. Right. Sorry. You don't need to look at it yet for -- for that. I'm just asking generally if you're aware of --

A. Yes.

Q. -- the provision. Okay. Great.
And is your office implementing that requirement right now?
A. No.
Q. Okay. Does your office have access to any kind of database that would confirm a person's identity by using their place of birth?
A. No.
Q. Okay. So separately from the birthplace requirement, are you aware of the provision in 2492 that requires voter registration applicants to provide documentary proof of their residence?
A. Yes.
Q. Okay. And are you implementing that requirement?
A. No.
Q. Okay. So as it is right now before implementing that requirement, is it correct that applicants have to provide on their application either a residential address or some kind of description or drawing of their residence?
A. Yes.
Q. Okay. And if -- so if that happens within your office, if you receive an application that has either a description of someone's residence or a drawing, how do you locate where that residence is?
A. We work with our GSI [sic] department, and then

we -- that typically happens for our reservation addresses so we kind of just have an idea of where those places are.

Q. Okay. Excellent.

And are you normally able to locate the residence using that method?

A. Normally.

Q. Okay. Great.

So you mentioned -- I think you just mentioned this about reservations. But there are some people in Gila County that lack a standard residential street address; is that correct?

A. Correct.

Q. And you said that typically happens on Native American reservations?

A. Yes.

Q. Okay. Which reservations are in the county?

A. We have the White Mountain Apache reservation. We have the Tonto -- Tonto Apache, and we also have the San Carlos Apache reservation.

Q. Okay. And do you ever get -- withdrawn.

So from your experience, applicants from one of those reservations are less likely to have a standard residential street address?

A. Correct.

Q. Okay. And are -- do you ever get applications

from people outside reservations that are -- also lack a residential street address?

A. Not typically.

Q. Okay. Okay. So talking more about that documentary proof of residence requirement -- I'll call that "DPOR." We also spoke a little bit previously about the federal voter registration form. To your -- sorry.

To your knowledge, will that new DPOR requirement apply to the federal registration form?

MS. BOUGHTON: Form. Calls for a legal conclusion.

THE WITNESS: Would it apply to the federal form --

BY MR. FERGUSON:

Q. Right.

A. -- DPOR -- providing DPOR?

Q. Yeah.

A. I would assume.

Q. Okay. And you're aware that on the federal form, each state has an individual set of instructions that helps people complete the federal form?

A. I am not aware.

Q. Okay. Are you aware of any requests that the state has made to -- regarding instructions on the federal form?

MR. MORGAN: Form.
THE WITNESS: I am not aware.
BY MR. FERGUSON:
Q. Okay. If the DPOR requirement is applied to the federal form -- sorry. Strike that, please.
Do you know whether the federal registration form currently requires someone to provide DPOR when they submit it?
A. Do I know if it's required?
Q. Correct.
A. I do not -- I do not believe it is required.
Q. Okay. So if it were required, would that result in the federal form being rejected?
MS. BOUGHTON: Form.
THE WITNESS: I -- I wouldn't know.
BY MR. FERGUSON:
Q. Okay. We talked a moment ago about people who are unable to provide a street address because they lack a standard residential address.
How would someone who lacks a standard residential address be able to provide DPOR?
A. I don't know.
Q. Okay. Is it unclear to you?
A. Yes.
Q. And what -- what types of documents would be

acceptable as DPOR?

MR. LANGHOFER: Form. Calls for a legal conclusion.

THE WITNESS: I wouldn't know.

MR. FERGUSON: Okay. I'm going to pull up one more document here. And this is Document R, which has been marked as Exhibit 24 already.

BY MR. FERGUSON:

Q. Can you see that document on the screen?

A. Yes.

Q. Okay. Great.

Have you seen this document before?

A. Yes.

Q. Can you describe to me what it is?

A. It would be what constitutes the document -- what constitutes the DPOR.

Q. Okay. Great.

Where did you get this document?

A. It was in an email.

Q. Okay. Do you know who the email was from?

A. I don't recall.

Q. Okay. Do you recall if it was from the Secretary of State's Office?

A. I don't recall.

Q. Okay. Do you know if the -- this chart was made

by the Secretary of State's Office?
A. I can't say for certain. I don't recall.
Q. Okay. Do you recall whether you've -- whether you received this document from someone within the County Recorder's Office?
A. I -- I did not receive it from someone within the County Recorder's Office.
Q. Okay. Do you recall if it was from someone -- strike that.
So if you could look at the document. And if you could look at the third box down on the left where it says, "Tribal identification card."
Would you accept a tribal identification card as documentary proof of residence?
A. I would.
Q. Okay. And is the answer the same for a utility bill? You can see that on the fifth box down on the left.
A. I would, yes.
Q. Okay. And then if you look at the last box down on the bottom left that says, "Written confirmation signed by the registrant that they qualify to register," would you accept that as documentary proof of residence?
A. Yes.
Q. Okay. Great.
Are there -- I'll pull that off the screen

for now.

Are there agencies in the county that provide voter registration services pursuant to the National Voter Registration Act that you're aware of?

A. Are there what?

Q. Are there agencies within the county that provide voter registration services other than the County Recorder's Office but -- public assistance agencies, for example?

A. Yes.

Q. And to your knowledge, has there -- has anyone helped educate those agencies on the DPOR requirement that we've been discussing?

A. I have no idea.

Q. Okay. Great.

I'm going to take us back to HB 2492, so I'll pull that document up one more time and share my screen. Okay.

Can you see 2492 up here again?

A. Yes.

Q. Great. And that's Exhibit 19 once more.

Okay. I want to look at a provision on page 5 of this document. I'm going to read this for the record off of page 5.

It says, "If the county recorder or other

officer in charge of elections matches the applicant with information that the applicant is not a United States citizen, the county recorder or other officer in charge of elections shall reject the application."

Do you see that -- that part that I just read?

A. Yes.

Q. Okay. Let's focus on the word "information" in that sentence I read.

Have you received any guidance about what constitutes information that a person is not yet -- sorry -- that the applicant is not a U.S. citizen?

A. Have I received any guidance -- can you repeat that?

Q. Sure.

Have you received any guidance about what qualifies as information that the applicant is not a U.S. citizen?

A. No.

Q. Okay. And is it -- is that clear to you right now what qualifies as information that someone is not a U.S. citizen?

A. No.

Q. Okay. If you were to run an AVID check, that we mentioned, through the MVD database and it shows that the

person was issued an F-type license 20 years ago and therefore were not a citizen 20 years ago, would that constitute information that someone is not a U.S. citizen?

MS. BOUGHTON: Form.

THE COURT REPORTER: What was the answer?

THE WITNESS: Yes.

BY MR. FERGUSON:

Q. It would? Okay.

So using that same example, if -- if someone received that license 20 years ago and they were not a citizen at that time, could that person have naturalized and become a U.S. citizen since they --

MS. BOUGHTON: Form.

BY MR. FERGUSON:

Q. -- received that license 20 years ago?

A. I guess it's possible.

Q. What are some other sources of information that a person is not a U.S. citizen that your office could use in making that determination?

MR. LANGHOFER: Form. Calls for a legal conclusion.

THE WITNESS: We would just -- I think we would just have the MVD database to use.

BY MR. FERGUSON:

Q. Okay. So for example, if your office received a

letter from the neighbor of a voter registration applicant and that letter claimed that the person is not a U.S. citizen, would that qualify as information that a person is not a U.S. citizen?

MR. LANGHOFER: Same objection.

THE WITNESS: No.

BY MR. FERGUSON:

Q. What about if you received an email with a list of people who are allegedly not U.S. citizens and that email was sent to you by an individual or a private organization?

MR. LANGHOFER: Same objection.

THE WITNESS: No.

MR. FERGUSON: Okay. Okay. I'd like to move on now to HB 2243. I'll pull that up on the screen in a moment.

BY MR. FERGUSON:

Q. Okay. Do you see HB 2243 on the screen?

A. Yes.

Q. Okay. And that's been marked as Exhibit 21.

I'd like to go to the top of page 3 here. And I'd like to look at Section 165.

So do you see on line 6, the highlighted portion that says, "The county recorder shall cancel registration"?

A. Yes.

Q. And then there's a list of numbers below that. And I'm going to scroll down to page 4 until we get to Number 10.

Do you see Number 10 there that's highlighted?

A. Yes.

Q. If you can just take a moment to read that. I'll give you a second.

Okay. And I'll -- I'll read the first part of that into the record here.

"When the county recorder obtains information pursuant to this section and confirms that the person registered is not a U.S. citizen" -- so as we did with the last provision, let's focus on the phrase "obtains information."

Do you have a clear idea of what it means to obtain information that someone is not a U.S. citizen?

MR. LANGHOFER: Form. Calls for a legal conclusion.

MR. FERGUSON: Counsel. Sorry. Counsel, if you want to -- I'll be asking a few questions on these topics. If you want to stipulate that same objection for the next few minutes, that's fine.

MR. LANGHOFER: That would be great. Thank you.

MR. MORGAN: Let us know, please, when you're done asking these questions when the stipulation ends.

MR. FERGUSON: Will do.

Sorry about that interruption. I will repeat that question.

BY MR. FERGUSON:

Q. Do you have a clear idea of what it means to obtain information that someone is not a U.S. citizen?

A. I believe so.

Q. Okay. Can you tell me what -- what that is?

A. Well, in this example, it would be information from the jury commissioner.

Q. Okay. And that's the -- the lines of Subsection 10 there that refer to the jury commissioner, is that what you're referring to here?

A. Yes.

Q. Okay. Are there any other methods that you would use to obtain information that someone is not a U.S. citizen?

A. The AVID database and the SAVE database.

Q. Okay. Are those -- are those the only methods that you know of right now?

A. I believe so, yes.

Q. Okay. And has your office received any guidance about what it means to obtain information that someone is

not a U.S. citizen?

A. I don't believe so.

Q. Okay. Now I'd like to just scroll down to the top of page 6 of 2243.

Do you see Subsections G through J highlighted there?

A. Yes.

Q. I'll give you, once again, just a few minutes -- sorry -- a few moments to look. You don't have to read the whole thing in detail but just -- you can take a second to look and get a sense of what it's saying there.

Okay. Is it correct that the Subsections G through J, these describe monthly checks against different databases that the county recorder is required to perform; is that correct?

A. Correct.

Q. And those databases listed here include the Social Security Administration, or SSA, database and the SAVE program that we discussed before; is that correct?

A. Yes.

Q. Okay. So going back to that phrase "obtains information" that we've just been talking about, would these databases listed here, such as the Social Security Administration database, the SAVE program -- would they be methods used to obtain information that someone is not a

U.S. citizen?
A. Yes.
Q. Okay. Once again, if a person's neighbor sent you -- sent your office a letter saying that they were not a U.S. citizen, would that be obtaining information that someone is not a U.S. citizen?
A. No.
Q. Okay. And then the question I asked before about receiving an email from an individual or private organization with a list of people who are allegedly not U.S. citizens, would that be obtaining information?
A. No.
Q. Okay. And if you could look down again at Subsection J that's on the screen. I'll read it for the record.
"To the extent practicable, the county recorder shall review relevant city, town, county, state and federal databases to which the county recorder has access to confirm information obtained . . ."
Are there any other relevant city, town, county, state, or federal databases that you could use to obtain information that someone is not a U.S. citizen?
A. Not that I have access to.
Q. Okay. Can you think of databases that you don't have access to that could be used for that?

A. I -- I can't.

Q. Okay. And then finally on the same section we've been talking about, we talked about the phrase "obtains information." I'm going to read Subsection 10 again, the first sentence.

"When the county recorder obtains information pursuant to this section and confirms that the person registered is not a U.S. citizen" -- do you have a clear idea of how you confirm that the person is not a U.S. citizen?

A. Yes.

Q. Okay. Can you tell me how to do that?

A. Either through the MVD database or the SAVE database.

Q. Okay. And so a few moments ago, we talked about obtaining information. And I think you mentioned those same databases you could use: MVD or SAVE.

And so if you referred to those databases, that would constitute both obtaining information and confirming that the person registered is not a U.S. citizen; is that correct?

A. Yes.

Q. Okay. Now let's go to page 6 once more. Okay. I'd like to look in particular at Subsection H near the top. If you could just take a moment to look at that, and

then I'll read it.

Okay. So I'll read the subsection.

"To the extent practicable, each month the county recorder shall compare persons who are registered to vote in that county and who the county recorder has reason to believe are not United States citizens."

Do you have a clear idea of what it means to have "reason to believe" that someone is not a U.S. citizen?

A. Yes.

Q. Can you describe to me your understanding of that?

A. If the recorder was presented with information to suspect that this person wasn't a citizen, we would research that.

Q. Okay. And can you tell me what kind of information might lead you to do that research?

A. For example, like you were saying, if we got an email, we could research that. But we wouldn't --

Q. Sure.

So under your understanding, if you received the email that I mentioned before from a private organization or individual claiming that a certain person or people were not U.S. citizens, that would give you reason to believe that someone is not a U.S. citizen?

A. We would research it.

Q. Okay. And would that lead you to check the SAVE database to see if that person was a U.S. citizen?
A. We could use that tool, yes.
Q. Okay. If someone is on the list of federal-only voters in Gila County, is that a reason to believe that they're not a U.S. citizen?
A. I'm not sure.
Q. Okay. That's unclear to you?
A. Yes.
Q. Okay. Okay. Let's move on to discuss a couple of these databases in more detail.
And I want to go back to the SSA database that's mentioned in Subsection G here at the top of the screen.
Does your office currently use the SSA database for anything?
A. I believe it's part of the HAVA checks.
MR. FERGUSON: Okay. Just one moment. Sorry.
I think we're at the point where we can stop that stipulation about objections probably. Is that good with everyone?
BY MR. FERGUSON:
Q. Okay. Sorry to interrupt.
You think the SSA database comes up as part

of the HAVA checks? Is that what you said?

A. Yes.

Q. Okay. And does your office use the SSA database directly?

A. If you're asking if we log in to the Social Security database on our own, no, we do not.

Q. Yeah, that is what I was asking. Thank you.

But you believe that the Social Security database is somehow incorporated into the HAVA check system? Is that what you meant by your previous answer?

A. Yes.

Q. Do you know exactly how that works?

A. Not exactly, no.

Q. Okay. And do you have any plans to gain access directly to the SSA database so your office could log in directly and do that?

A. No.

Q. Okay. And are you aware of how the SSA database can be used -- sorry. Strike that.

Are you aware of whether it can be used to verify citizenship?

A. AVID interfaces with it, so it can be used to --

Q. Okay. I'd like to also look at the database mentioned in Subsection I, which is now at the top of the screen in HB 2243 on page 6. I'll give you just a moment

to look at that.
And I'll read into the record part of Subsection I.
"The county recorder shall compare the Electronic Verification of Vital Events system maintained by a National Association for Public Health Statistics and Information Systems."
Are you aware of that database mentioned there, the Electronic Verification of Vital Events database?
A. I believe it also interfaces with AVID.
Q. Okay. But once again, your office doesn't have direct access to the database?
A. No.
Q. And do you know -- and you don't have any plans to gain direct access to it?
A. No.
Q. Okay. And do you know if it can be used to verify citizenship?
A. Yes.
Q. It can be used for that purpose?
A. Yes.
Q. Okay. And is that belief based on your belief that it interfaces with the AVID system?
A. Yes.

Q. Okay. But you don't know directly how that works?

A. Correct.

Q. Okay. Both for this database, the EVVE database, and the SSA database, are you directly aware of instances in which those databases have been used to verify an applicant's citizenship?

A. What was the first one?

Q. The two that we've just been talking about, so the Electronic Verification of Vital Events and the SSA.

A. And I'm sorry. What was the question?

Q. No problem.

Are you aware of any specific instance in which these databases have been used to verify someone's citizenship?

A. Yes.

Q. Okay. Can you tell me about those specific instances?

A. I am not sure.

Q. And when I say "specific instances," I mean an application coming into the office in which one of those databases was used to verify citizenship. Are you recalling a specific one?

A. Well, I recall the motor vehicle one.

Q. Okay. Okay. So you're aware that -- of specific instances in which the MVD database has been used to verify

citizenship; is that correct?
A. Yes.
Q. But you're not aware of how the SSA database would have been used as part of that process?
A. No. I am aware.
Q. Okay. Can you tell me how it was used as part of that process?
A. It will -- it's part of the HAVA checks. It's ran, and it will obtain the -- the last four of the Social Security number or not.
Q. Okay. And let's go back to specific instances.
You're aware of a specific applicant whose citizenship was checked in that manner that you just described?
A. I'm not -- I'm not aware of a specific one, no.
Q. Okay. And then same question with regard to the Electronic Verification of Vital Events system. Are you aware of a specific applicant in which -- for which that's happened?
A. No.
MR. FERGUSON: Okay. I'd like to move on to something called the Electronic Registration Information Center. And that's not mentioned right here on this text, so I'm going to stop sharing the screen.
BY MR. FERGUSON:

Q. Are you aware of the Electronic Registration Information Center that's called ERIC sometimes?
A. Yes.
Q. Okay. And can you describe to me what ERIC is?
A. It is information that we get from other states that we use to -- we use it as a list maintenance tool.
Q. Okay. And does your office in particular use ERIC --
A. Yes.
Q. -- or is it just used statewide? You're -- sorry to cut you off.
Your office in particular uses it?
A. Well, it is statewide.
Q. Right.
But -- but your office accesses ERIC directly?
A. We receive a spreadsheet.
Q. Okay. And who do you receive that spreadsheet from?
A. The secretary of state.
Q. Okay. And you said that that information is used to update the voter rolls?
A. It's -- yes. It can be used to maintain the list, yes.
Q. And what would that spreadsheet indicate on it?

What does it contain?
A. Names and number of -- their voter registration number. It contains a match score. And then depending on what report we request or what it -- it depends on what kind of a process we'll use for it.
Q. Okay. And when you say "match score," can you tell me what you mean by that?
A. So my understanding is that there's a score that is given to the data based on a program that ERIC has so that there's really no personal identifying information that gets released. And so they make matches based on that.
Q. Okay. And is that often related to if someone has registered to vote in a different state?
A. It can be, yes.
Q. Okay. Are there any other things that it contains other than someone who's registered in a different state?
A. There is a deceased record or deceased report that we could receive as well, I believe.
Q. Okay. And does it ever contain information on whether people are U.S. citizens?
A. I don't believe so.
Q. Okay. Do you know of any way to use ERIC to verify whether someone's a U.S. citizen?
A. No, I don't.

Q. Okay. Now I'd like to talk a little bit about the state registration form and the federal form that we've talked about a few times. You're aware of the difference between those two types of forms; is that correct?

A. Yes.

Q. Can you give me the relative breakdown between the number of state form applications your office receives versus federal form applications you receive?

A. I cannot.

Q. Okay. And I'm not asking for exact numbers. But can you tell me, like, whether the -- the majority are state forms?

A. The majority would be state forms, yes.

Q. Okay. Would you say it's substantially more state forms than federal forms?

A. Yes.

Q. Okay. And we -- we talked a little bit ago about those -- those agencies, such as public assistance agencies, that are designated to provide voter registration services.

Are you aware of any of those agencies that use the federal form?

A. I am not aware.

Q. Okay. Do you know whether they use the state form or federal form?

A. I do not.
MR. MORGAN: Foundation.
BY MR. FERGUSON:
Q. Sorry. I didn't get your answer.
A. I do not.
Q. Okay. And your office provides registration forms to -- to third-party voter registration groups; is that correct?
A. Yes.
Q. Okay. And when you provide those forms, do you provide the state form?
A. Yes.
Q. Okay. Do you know whether those groups normally use the state form?
A. I believe that they normally use the state form.
Q. Okay. And are you aware of any -- any such groups that use the federal form?
A. I am not aware.
Q. Okay. Does your office process state form applications any differently from federal form applications?
A. No.
Q. Okay. So you use the same verification procedures for documentary proof of citizenship regardless of whether the applicant uses the state form or federal form?

A. Correct.
Q. Okay. I'd like to talk a little bit about instances of voter fraud in the county or -- and how your office handles it.
Can you just tell me in general what your office does to identify instances of voter fraud?
A. We use the ERIC report.
Q. Okay. Can you describe in a little more detail how that works?
A. There's a report we can request that will give us information on people who may have voted in other states.
Q. Okay. And is that -- I suppose is that the only way that you identify instances of fraud?
A. We -- it's -- I guess if they were brought to our attention, we could research them.
Q. Okay. And so you perform investigations -- if -- if you receive information about potential fraud, you perform an investigation?
A. I believe it has to be a formal challenge. I'm sorry.
Q. No problem.
It needs to be a formal challenge. Can you describe what you mean by "formal challenge"?
A. Like an early ballot challenge. There's a process, I believe, and we would have to start that.

Q. So if someone wants your office to initiate an investigation, they would have to file a formal challenge; is that correct?

A. I believe so, yes.

Q. Okay. And if you were to receive any type of challenge and perform an investigation, who would lead that investigation within your office?

A. Myself or the recorder.

Q. Okay. And has that happened recently?

A. We have had an instance of a double voter -- a potential double voter that we did research, yes.

Q. And can you tell me the outcome of that research?

A. I don't -- I don't know the outcome. I did consult with the other state. So I don't know the outcome, though.

Q. Okay. So this is an instance in which you believed it was possible that someone had voted both in Gila County and in another state in the same election?

A. We had received notification, yes, that that was possible.

Q. And what was the source of that notification that you received?

A. I believe it was the ERIC report.

Q. Okay. And is that the only investigation that you are aware of that you performed since you became deputy

recorder?

A. I'm -- I will -- I guess I should say there are two results. But one indicated that it wasn't an actual -- there was no -- it was a -- someone who was claimed to be deceased when they voted, but that -- that wasn't true.

Q. So this was a separate -- a second investigation?

A. Yes.

Q. And you received information that they were deceased; you investigated and found that it was not correct?

A. Yeah, I believe they had died. They had voted and then passed away. And so, therefore, they were valid.

Q. Okay. So those are the two -- are there any other investigations that you performed into voter fraud or similar incidents like that?

A. No.

Q. Are you aware of instances of noncitizens voting in Gila County?

A. I am not aware --

Q. Okay.

A. -- of any.

Q. And are you aware of instances of noncitizens registering to vote in Gila County?

A. I am not aware of any.

Q. Okay. Give me just a moment. I'm going to pull

up one additional document here. Okay. Can you see that document up here?

A. Yes.

MR. FERGUSON: This is Document N -- the PDF of Document N from the Dropbox. And this one, I believe, does need to be marked as an exhibit. I think we're at 134?

THE COURT REPORTER: Yes.

(The document was marked as Exhibit 134 for identification.)

BY MR. FERGUSON:

Q. Do you recognize this email?

A. Yes.

Q. And this was sent to you; is that correct?

A. Yes.

Q. Okay. And can you describe to me what this email is?

A. It's an email from Ian Camacho, who was letting us know that he'd found several voters that appeared to be illegally registered at addresses.

Q. And did you do any follow-up on this email?

A. We did.

Q. Okay. Can you tell me what follow-up you did?

A. We sent them letters.

Q. Okay.

A. A lot of them were -- a lot of them ended up to be people who were registering at like a PostNets. And so we let them know that they needed to provide a residential address.

Q. Okay. So it appeared that the problem was they -- by "PostNets," do you mean they registered at a post office box?

A. Right. Well --

Q. Sorry. Go ahead.

A. -- it's not really a post office box per se. I guess it's like a place that you could -- I guess -- I guess so, yes.

Q. Okay. Something -- something similar to a P.O. box?

A. Yes.

Q. Okay. And you followed up with them to inform them that they needed to register at -- using their home residential address; is that correct?

A. Correct.

Q. Okay. And did you identify any instances of fraud when you did the follow-up to this email?

A. No.

Q. Okay. Do you think your office's work in preventing voter fraud in Gila County is effective?

A. I believe so.

MR. FERGUSON: Okay. Okay. I'm going to stop sharing that document. I think it's probably a good time for a break. Are you ready for a break?

THE WITNESS: Sure.

MR. FERGUSON: Okay. Does ten minutes work for everyone? And we can restart at 11:00 Arizona time.

MR. LANGHOFER: Sounds good.

MR. FERGUSON: We can go off the record.

THE VIDEOGRAPHER: We are off the record. Time on the video monitor is 10:50 a.m.

(A recess ensued.)

THE VIDEOGRAPHER: We are on the record. Time on the video monitor is 11:01 a.m.

MR. FERGUSON: Okay. Thanks very much.

I'm just going to continue for a little bit more and then pass it off to one of my colleagues.

So I'd like to bring up Document D from the folder. And I'll share my screen so everyone can see that.

BY MR. FERGUSON:

Q. Okay. Can you see that document on the screen?

A. Yes.

Q. And have you seen this one before?

A. Yes.

Q. And can you tell me what that is?

A. Our responses to the request for productions.

Q. Great. And so you did send documents in response to this request for production; is that correct?

A. Yes.

Q. Okay. Can you, I guess, describe to me your process for locating documents that would be responsive to these requests for production?

A. So we did some searching of our emails. We used, I believe, the procedures manual. We did -- we used AVID for some searching results.

Q. Okay. And did you search through your office's computer files?

A. Computer -- what do you mean by "computer files"?

Q. Files that are on your computer or the computer of any other employee in the office.

A. I searched my emails.

Q. Okay. Do you have a shared drive on your -- on the county recorder's computer system --

A. Yes.

Q. -- that all the employees have access to?

Did you perform any search on that drive?

A. I did not.

Q. Okay. And did you perform any search on the files of your -- just your own computer or that of anyone else?

A. The recorder did hers as well.

Q. Okay. And what -- do you know if that was her

emails or just her computer itself?
A. Her emails.
Q. Okay. What search terms did you use when performing those searches?
A. I used birthplace, citizenship checkbox, and the house bill numbers.
Q. Okay. Birthplace, citizenship box, and the house bill numbers?
A. Yes.
Q. Okay. And only those four things?
A. Yes.
MR. FERGUSON: Okay. I'm going to pull up Document C right now.
THE COURT REPORTER: Would you like to mark that one as 135?
MR. FERGUSON: Yep. Sorry about that.
(The document was marked as Exhibit 135 for identification.)
MR. FERGUSON: I apologize. I'm going to pull up Document B first and then C. So give me just one moment. Okay.
BY MR. FERGUSON:
Q. Can you see that Document B once again on the screen?
A. Yes.

Q. And do you see Interrogatory Number 11 there?
A. Yes.
Q. Okay. And I'll read it into the record.
"For every Request for Production served on You in this matter, please describe the methodology for your search for responsive documents and productions, including but not limited to identifying the individuals who assisted in the search, custodians, search terms, date ranges."
Did I read that correctly?
A. Yes.
Q. Okay. Great. Now I'll switch back to Document C. Okay.
Now do you see Document C up here?
A. Yes.
Q. Okay. So do you see Answer to Interrogatory 11?
A. Yes.
Q. Could you read that to me?
A. "The knowledge of the Recorder's chief deputy."
Q. Okay. Is it true that you also performed searches for files in this case?
A. Yes.
Q. Do you still think that that answer is correct?
A. No.
Q. Okay. Do you want to give a new answer to that

interrogatory?
A. Sure. Yeah, we used the search terms that I spoke about before, and we searched the emails --
Q. Okay.
A. -- of both the chief deputy recorder and the recorder.
Q. Okay. Thank you. I'm going to take that document off the screen and introduce one more. I'm going to pull up Document E on the screen.
Did that come up for you?
A. Yes.
Q. Okay. Great.
Do you recognize this document?
A. I -- I don't recognize it.
MR. FERGUSON: Okay. And I do think we need to mark this one as Exhibit -- I think it's 136.
THE COURT REPORTER: Yes.
(The document was marked as Exhibit 136 for identification.)
BY MR. FERGUSON:
Q. You said you don't recognize this document?
A. I -- I do.
Q. You do?
A. Yes.
Q. Okay. Can you tell me what it is?

A. I believe it is the -- it is a response to one of the interrogatories.
Q. Okay. But you're not sure which one?
A. No.
MR. FERGUSON: Okay. Let me -- maybe I'll just pull up that document requesting production one more time to make it more clear.
BY MR. FERGUSON:
Q. Okay. Did that document come up for you?
A. Yes.
Q. Okay. So do you see where it says Answer for -- to Request for Production 3?
A. Yes.
MR. FERGUSON: Great. And for the record, this is Document D, the answers to requests for production.
BY MR. FERGUSON:
Q. Could you just take a moment to read after it says "Request for Production 3."
And so I'll read the first part of that into the record.
"Any and all Documents and Communications relating to -- including but not limited to a complete list of -- Registered Voters whose registrations were canceled, suspended, removed, placed on Congressional-only or federal-only status."

Is that what it says at the beginning of that?
A. Yes.
Q. Okay. And then I believe these are your answers closer to the bottom of page 4 in bold; is that correct?
A. Yes.
Q. Okay. I'll give you a moment to read those.
A. Okay.
Q. Okay. Great.
And so the first answer says, "As to Documents and Communications regarding cancellation, suspension, placement on Congressional-only or federal-only" -- it continues to say -- "see the Google Drive link."
A. Yes.
Q. Did I read that correctly? Okay.
Does that refresh your memory about what that spreadsheet we looked at is?
A. Yes.
Q. Okay. I'll pull that up as we're talking so we can look at it again.
But can you tell me now what that spreadsheet is that's Document E that I think we marked as 136?
A. Anyone who was -- their status changed from -- I believe it was January 2022.

Q. You said anyone who -- sorry. Were you -- were you still talking?
A. No.
Q. Okay. You said anyone whose status changed starting with January 1st, 2022?
A. Whatever the date was provided on the --
Q. Sure. Sure. But it's a listed -- a list of voters whose status changed?
A. Correct.
Q. Okay. And that -- so that's a total of five voters in that time period?
A. Yes.
Q. Okay. And --
A. I think it was -- I think this list is actually only people who were federal-only is who's changed.
Q. Okay. So it's a list of people who were federal-only voters and then their status changed after that?
A. Correct.
Q. Okay. Do you have a list of all federal-only voters in Gila County?
A. Yes.
Q. Okay. Do you know if -- sorry. Go ahead.
A. Sorry. I could have one.
Q. Okay. Do you know if you produced that list in

response to this question that we read?

A. No, I don't think --

Q. Okay.

A. -- provided that separately, no.

Q. Do you know if there would have been a reason not to provide that?

A. No. Other than I guess I didn't understand the question -- the request.

MR. FERGUSON: Sure.

Counsel, if you are able to access that list, we'd appreciate seeing it.

BY MR. FERGUSON:

Q. Do you know about how many people in Gila County are registered as federal-only voters?

A. About -- about -- less than 70, I believe.

Q. Less than 70. Okay.

And do you know how many total are registered, not just federal-only, but everyone?

A. About 36,000.

Q. Okay. So about 70 out of 36,000?

A. Uh-huh.

Q. Okay.

A. Yes.

MR. FERGUSON: I'm going to stop sharing my screen. Okay. That concludes my questions for now.

Thanks very much for your time. I appreciate it.

We're going to move on to some questions by Mr. Hirschel.

EXAMINATION

BY MR. HIRSCHEL:

Q. Hi. Good afternoon.

A. Hello.

Q. I suppose good morning in Arizona. As Mr. Ferguson said, my name is Andrew Hirschel. I'm with Arnold & Porter. I represent Poder Latinx. I'm going to try my best to make this take very little of your time. Just a few questions.

So my first question is about the EPM. Mr. Ferguson asked if the EPM is legally binding, and you said you believe so. Does that apply to the -- to the entire EPM?

MR. LANGHOFER: Form. Calls for a legal conclusion.

THE WITNESS: I would assume so, yes.

BY MR. HIRSCHEL:

Q. Can legally binding guidance be conveyed by the Secretary of State's Office to the County Recorder's Office in any other way besides the EPM?

MR. LANGHOFER: Form; foundation.
MR. MORGAN: Calls for a legal conclusion.
THE WITNESS: I am not aware of that.
BY MR. HIRSCHEL:
Q. You're not aware of any other way that legally binding guidance could be conveyed by the secretary of state?
A. I don't know --
MR. MORGAN: Asked and answered.
THE COURT REPORTER: Can you repeat your answer?
THE WITNESS: I don't know.
BY MR. HIRSCHEL:
Q. Okay. I'm going to move on. I have a couple questions about the MVD.
You can use the MVD to confirm that someone is a citizen; right?
A. Correct.
Q. And I just want to clarify. Can you use the MVD to confirm that someone is not a citizen?
A. Correct.
Q. How would you use the MVD to confirm that someone is not a citizen?
A. The results would come back, and they would say they were an F-type license.

Q. When -- when you discussed F-type licenses with Mr. Ferguson earlier, I believe you discussed how an F-type license reflects a person's citizenship status at a certain point in time but not necessarily their current citizenship status.

Do you recall testifying to that?

A. Yes.

Q. So if you do a check in MVD and it comes back that the person has an F-type license, isn't it possible that a person could have naturalized between the time that they got their F-type license and now?

A. I guess it could be true.

Q. So you can't -- you can't use the MVD to conclusively determine that someone is not a citizen right now; isn't that right?

A. Can you repeat that?

Q. Because of the possibility that someone could naturalize between the time they obtained an F-type license and today, wouldn't it be the case that you cannot use the MVD to conclusively determine that someone is not a citizen today?

MS. PORTER: Form.

THE WITNESS: I think that could be true.

BY MR. HIRSCHEL:

Q. So you cannot use the MVD to confirm that someone

is not a citizen?

MS. BOUGHTON: Form.

THE WITNESS: If -- I guess if they had naturalized between the two times, no.

BY MR. HIRSCHEL:

Q. A number of the provisions in the two laws we've been talking about require the county recorder to do things -- it uses the language "to the extent practicable."

You looked at this, some of these sections, before. And we could pull them up if you want to.

Do you understand what "to the extent practicable" means?

MR. LANGHOFER: Form. Calls for a legal conclusion.

THE WITNESS: I don't.

BY MR. HIRSCHEL:

Q. Do you know who in your office would decide whether something is practicable?

A. I would assume my county attorney would.

Q. In your opinion, is it practicable for the County Recorder's Office to use MVD driver license and nonoperating ID license information -- or nonoperating ID -- excuse me -- information to verify voter citizenship?

MR. MORGAN: Form.

MR. LANGHOFER: Same objection.

THE WITNESS: I don't have an opinion on that.

BY MR. HIRSCHEL:

Q. Okay. I've got a couple questions about the SAVE database.

You talked previously about A-numbers and naturalization certificate numbers. How do you obtain those numbers?

A. They're provided by the voter.

Q. In what form are they provided by the voter?

A. The voter registration form.

Q. If someone provides a naturalization certificate, does that satisfy the DPOC requirement?

MR. LANGHOFER: Same objection.

THE WITNESS: I believe it would.

BY MR. HIRSCHEL:

Q. So if someone provides a naturalization certificate, do you have to check the number in the SAVE system or are they set?

A. We check it.

Q. When you check a naturalization certificate number in the SAVE system, do you also check A-numbers?

A. If it's provided.

Q. Is that to say that sometimes you only check one of those numbers but not both?

A. To be -- to be honest, I don't -- I haven't used the SAVE program that often so I -- I can't -- I can't recall what it actually requires.

Q. Can you use the -- moving on to the Social Security database, can you use that database to confirm that someone is a citizen?

A. We can confirm that they have a Social Security number or not.

Q. And can you use the Social Security database to confirm that someone is not a citizen?

A. We can confirm that they have a Social Security number.

Q. But that's all?

A. Correct.

Q. Do you know if USCIS has an alternative verification citizen -- system -- excuse me -- for citizenship?

A. I have no idea.

Q. So you've never used a USCIS alternative verification system for citizenship?

A. I don't believe -- I don't know what that is, so I don't know.

Q. Okay. In HB 2243, there are a couple places where the county recorder is supposed to compare voter rolls to other databases each month. Are you familiar with that

language?
A. Yes.
Q. Is it practicable to compare the voter rolls to other databases each month?
MR. LANGHOFER: Same objection.
THE WITNESS: I don't know.
BY MR. HIRSCHEL:
Q. Do you think it would be possible to do that?
A. I'm sure it might be possible. I don't know how long it would take.
Q. Thinking about how long it would take, there's a point in HB 2492 where it says that the attorney general should use, quote, "all available resources to verify the citizenship status" of each applicant.
Would it be possible to use all of your office's available resources to -- to perform those checks?
A. I guess it could be possible.
Q. Would there be any downsides that you can think of to doing that?
A. Time.
MR. MORGAN: Form.
BY MR. FERGUSON:
Q. Anything else?
A. Staff.
Q. What do you mean by "staff"?

A. Having enough staff to do that.
Q. Okay. Just a few more questions.
You spoke with Mr. Ferguson previously about what the language in HB 2492 and 2243 -- scratch that. Strike that.
You spoke previously about information that someone is not a U.S. citizen. The -- these laws use the word "information." I want to just identify a few examples. And my question for you is whether this would constitute information that someone is not a U.S. citizen?
So my first example is anything besides a government database, could anything else be information that someone is not a U.S. citizen?
MS. BOUGHTON: Form.
THE WITNESS: I guess it could be. I'm not --
BY MR. HIRSCHEL:
Q. What about if a voter called your office and said they're not a citizen? Would that be information that they're not a citizen?
MR. LANGHOFER: Same objection. Asked and answered.
THE WITNESS: I suppose we could look into that.
///

BY MR. HIRSCHEL:

Q. What if they emailed your office?

MR. LANGHOFER: Same objection. Asked and answered.

THE WITNESS: We could look into that.

BY MR. HIRSCHEL:

Q. What about if a voter's family member called the office and said that someone else is not a citizen? Would that be valid information that they're not a citizen?

MR. LANGHOFER: Same objection.

THE WITNESS: We would look into it. We wouldn't take anything at face value.

MR. HIRSCHEL: Counsel, should we stipulate the objection to -- I'm going to just do a few more of these.

MR. LANGHOFER: Yeah. I think that is good. The objection's form and calls for a legal conclusion.

Go ahead.

MR. MORGAN: Can you just let us know when you're done asking questions subject to the stipulation.

MR. HIRSCHEL: Happy to.

BY MR. HIRSCHEL:

Q. What about a phone call from a law enforcement in Arizona? Would that provide information that someone is not a citizen?

A. Not -- not that we would act on alone, no.
Q. How about a phone call from law enforcement in another state?
A. That would be the same answer.
Q. What about an email or a letter from law enforcement in Arizona?
A. Same answer.
Q. Email or letter from law enforcement in another state?
A. We would definitely -- we would look into things.
Q. What do you mean you would look into things?
A. I guess we would, you know, run their -- run their information through the HAVA check again to see if that's -- if they're a citizen or not, if we got any different results from the first time.
Q. So an email or letter from law enforcement in another state, is your answer that that would constitute information that someone's not a citizen?
A. We would look into it.
Q. So is that -- is that information, then?
A. It could be considered -- if it -- sure.
Q. What if you received an anonymous call, someone said, "I know this other person is not a citizen"? Would that be information that that other person is not a citizen?

A. It could be considered that.

Q. Would your office act on that?

A. We would -- I don't -- we wouldn't act on it. We wouldn't cancel someone based on that.

Q. What about if you received an anonymous email?

A. We wouldn't cancel someone based on that.

Q. Okay. I'm going to ask you many of those same examples now. So the stipulation continues as to the objection.

But this time, instead of information, I want to ask whether it would give you reason to believe that someone is not a citizen since the laws also use that language.

Could anything besides a government or voter registration database give you a reason to believe that someone is not a citizen?

A. We wouldn't cancel based on that.

Q. How about a phone call from a voter? Could that give you reason to believe that someone is not a citizen?

A. No.

Q. What about an email from a voter?

A. We would -- we wouldn't -- we wouldn't cancel based on that.

Q. Could a signed letter from a voter give you reason to believe that someone is not a citizen?

A. No.
Q. What about a phone call from a voter's family member?
A. We -- we would research all of these things.
Q. So is that to say that they would give you a reason to believe that these people are not citizens?
A. No.
Q. What about a phone call from law enforcement in Arizona?
A. No.
Q. Or an email or letter from law enforcement in Arizona?
A. No.
Q. A phone call, email, or letter from law enforcement outside of Arizona?
A. No.
Q. How about an anonymous phone call?
A. No.
Q. Or an anonymous email address?
A. No.
Q. If a voter put their first name in the last name box, put their last name in the first name box on their registration form, would that give you reason to believe that they're not a citizen?
A. No.

Q. What if they put a foreign place of birth on their registration form? Is that a reason to believe they're not a citizen?
A. No.
Q. If you identify a registered voter who has satisfied the DPOC requirement but has an F-type license, is there a reason to believe they're not a U.S. citizen?
A. No.
Q. What about registered voters who are exempt from the DPOC requirement because they registered prior to the DPOC requirement going into effect? Would there be reason to believe that they're not U.S. citizens?
A. No.
Q. Has your office received any guidance from the secretary of state on what would constitute a reason to believe or would give you a reason to believe that a voter is not a citizen?
A. I don't believe so.
MR. HIRSCHEL: Can we go off the record.
THE VIDEOGRAPHER: We are off the record. Time on the video monitor is 11:32 a.m.
(An off-the-record discussion ensued.)
THE VIDEOGRAPHER: We're on the record. Time on the video monitor is 11:33 a.m.
MR. HIRSCHEL: That's all my questions.

Thank you very much for your time.

MR. LANGHOFER: Craig and Kathryn, I'll defer to you guys, being representatives of the government.

MR. MORGAN: Yeah. Craig Morgan for the secretary of state. I don't have any questions.

I just want to say thank you. You were very brave and very honest. We appreciate your time.

THE WITNESS: No problem. Thank you.

EXAMINATION

BY MS. BOUGHTON:

Q. Good afternoon. I do have a few quick questions. And I echo Craig. Thanks for your time today.

Again, my name is Kathryn Boughton. I represent the state and attorney general in this case.

So I wanted to talk to you about the citizenship checkbox. You may recall plaintiffs' counsel -- Mr. Ferguson asked you some questions about what your office does when the box is or isn't checked.

Do you recall that?

A. Yes.

Q. Do you think that the citizenship checkbox provides your office with information about whether the voter is a citizen?

A. That I -- I don't have an opinion on that.

Q. If the citizenship checkbox is not marked, your office runs the HAVA check; correct?

A. We run HAVA checks regardless.

Q. And on the HAVA check, we discussed how the AVID system interfaces with MVD data; correct?

A. Yes.

Q. And is it your opinion, the office's opinion, that that data is generally reliable?

A. Yes.

MR. FERGUSON: Objection. Calls for speculation.

BY MS. BOUGHTON:

Q. Are you aware of any instances in which HAVA returned inaccurate data regarding whether a voter -- or an applicant was a noncitizen?

A. I guess we could say that's -- the email regarding the press release would say that, yes.

Q. And did I -- was I -- do I recall your testimony correctly that you were not sure if Gila County had any voters affected by that?

A. I don't recall if we did.

Q. Okay. But generally is it a common occurrence that the MVD's data -- do you have frequent instances where the data is -- returns inaccurate information to your knowledge?

A. Not to my knowledge.
Q. And similarly, with the SAVE database, do you find that information to be generally reliable?
A. Yes.
Q. The state form has a place for voters -- applicants to put their birthplace; correct?
A. Yes.
Q. Do voters generally submit that information?
A. Generally.
Q. And if a voter submits -- lists their birthplace, is that entered into AVID?
A. Yes.
Q. If at some point there were two applications submitted to your office and they had the same name, the same address, but they listed two different places of birth, how would your office handle that?
MR. MAKKER: Objection. Incomplete hypothetical.
THE WITNESS: We would just enter the information as it came in.
BY MS. BOUGHTON:
Q. Would you do any -- contact the voter who submitted the application?
MR. MAKKER: Same objection.
THE WITNESS: No.

MR. LANGHOFER: This "incomplete hypothetical" objection is not recognized under the Federal Rules of Procedure, so I just want to flag it as potential witness coaching.

MR. MAKKER: Okay.

BY MS. BOUGHTON:

Q. One thing I wanted to loop back on just to clarify -- one of plaintiffs' counsels was asking you some questions about what might give the office a reason to believe that the voter was not a U.S. citizen.

And I think that you testified that if somebody was listed as a federal-only voter, that you weren't sure if that might be a reason to believe they were not a U.S. citizen.

Did I hear that correctly?

A. Can you say it again, please?

Q. Sure. So I guess I'll rephrase my question.

If a voter submits a federal application, voter registration form, they attest that they're a U.S. citizen; correct?

A. Yes.

MS. BOUGHTON: That's all I have for you today. Thank you so much. I really appreciate your time.

THE WITNESS: You're welcome.

EXAMINATION

BY MR. LANGHOFER:

Q. Good morning, ma'am. My name is Kory Langhofer, and I represent the RNC. I have really just a handful of questions that haven't been touched on yet.

When your office receives a state registration form without DPOC and you can't find evidence of citizenship in the MVD system so you send out a notice to the voter saying that you need this DPOC, do you know roughly how many of those -- what percentage of those end up responding with DPOC?

A. I don't know exact numbers, no.

Q. Do you have a rough order of magnitude, you know, like generally what we're talking about?

A. I -- we have very few federal voters, so the majority of them probably.

Q. Okay. So you -- do you mean -- just want to make sure we're clear on this -- a majority of the folks who get the notification letter are able to respond and give you the DPOC?

A. Correct.

Q. Okay. And does your office have access to any databases that are more reliable than the MVD database and SAVE database that you guys use currently?

A. No.

Q. And do you have any access to any databases that for purposes of checking citizenship are more up to date than those two databases?

A. Not that I'm aware of.

Q. If you're required, then, to perform some sort of citizenship check, do you have any better tools than what you're currently using?

A. Not that I'm aware of.

Q. Does your office receive voter registration forms with false information?

MR. MAKKER: Objection. Lacks foundation.

THE WITNESS: I don't know.

BY MR. LANGHOFER:

Q. Why do you say that?

A. For -- I guess, for instance, I can't verify a place of birth. So I wouldn't know if they were -- if that was false information or not.

Q. Have you received voter registration forms from convicted felons, for example?

A. I'm sure we have, but they -- we do get -- there is a felony check that's run as well so . . .

Q. And do you ever identify, as part of that check, people who have already been convicted of felonies?

A. I haven't seen one personally.

Q. Do you know them to have happened inside the

office?

A. I can't -- I couldn't tell you.

Q. Bear with me just one second here. I want to make sure that -- I don't want to ask any questions that have already been done, but I don't want to skip anything either.

The October 2022 incident where the MVD database, the AVID system had a problem with the citizenship checks, are you aware of anyone in your county who was disenfranchised as a result of that?

A. I am not aware.

MR. LANGHOFER: All right. Ma'am, I appreciate your time. Those are all the questions that I have.

THE WITNESS: Thank you.

EXAMINATION

BY MR. MAKKER:

Q. I had one follow-up.

Do you know how many of the letters that you send out when somebody had not provided DPOC are not responded to?

A. I am not aware of that number offhand.

MR. MAKKER: Okay. Thank you.

THE COURT REPORTER: Would you like to go off

the record?

MR. LANGHOFER: I think we're done. Does anyone else have anything further?

MR. MORGAN: I don't think we need to go off the record yet. If there's nobody else, we can just end the deposition.

I assume counsel for the witness is going to read and sign; right?

MR. DALTON: Yes.

THE VIDEOGRAPHER: We're off the record. Time on the video monitor is 11:44 a.m. This ends Volume 1, Media Number 2, of the 30(b)(6) deposition of Gila County Recorder, designeed by Charlotte Asrarynezami.

(The proceedings concluded at 11:44 a.m.)

________________________________

CHARLOTTE ASRARYNEZAMI

STATE OF ARIZONA )
COUNTY OF MARICOPA )

BE IT KNOWN that the foregoing deposition was taken by me pursuant to stipulation of counsel; that I was then and there a Certified Court Reporter in the State of Arizona, and by virtue hereof authorized to administer an oath; that the witness before testifying was duly sworn by me to testify to the whole truth; pursuant to request, notification was provided that the deposition is available for review and signature; that the questions propounded by counsel and the answers of the witness thereto were taken down by me in shorthand and thereafter transcribed into typewriting under my direction; that the foregoing pages are a full, true and accurate transcript of all the proceedings had upon the taking of deposition, all done to the best of my skill and ability.

I FURTHER CERTIFY that I am in no way related to nor employed by any parties hereto; nor am I in any way interested in the outcome thereof.

Dated at Phoenix, Arizona, this 30th day of August, 2023.

________________________________

CINDY MAHONEY, RPR, RMR NO. 50680

# Exhibit 12

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

Mi Familia Vota, et al., )
) Case No:
Plaintiffs, ) 2:22-cv-00509-SRB
) (Lead)
vs. )
) CV-22-00519-PHX-SRB
Adrian Fontes, in his official ) CV-22-01003-PHX-SRB
capacity as Arizona Secretary of ) CV-22-01124-PHX-SRB
State, et al., ) CV-22-01369-PHX-SRB
) CV-22-01381-PHX-SRB
Defendants. ) CV-22-01602-PHX-SRB
______________________________________) CV-22-01901-PHX-SRB
)
AND CONSOLIDATED CASES. )
______________________________________)

DEPOSITION OF GRAHAM COUNTY RECORDER
REPRESENTED BY POLLY MERRIMAN
VIDEOTAPED

Safford, Arizona
September 1, 2023

Prepared by:
Jody L. Lenschow, RMR, CRR
Certified Court Reporter
Certification No. 50192

INDEX TO EXAMINATIONS


| WITNESS | PAGE |
|---|---|
| POLLY MERRIMAN | |
| EXAMINATION BY MR. HEMSTREET | 9 |
| EXAMINATION BY MS. MOTZKIN | 82 |
| EXAMINATION BY MR. ATKINS | 96 |
| EXAMINATION BY MR. HORLEY | 103 |
| EXAMINATION BY MR. LANGHOFER | 131 |
| RE-EXAMINATION BY MR. HEMSTREET | 137 |
| RE-EXAMINATION BY MR. ATKINS | 138 |
| RE-EXAMINATION BY MR. LANGHOFER | 139 |


INDEX TO EXHIBITS PREVIOUSLY MARKED


| NO. | DESCRIPTION | IDENTIFIED |
|---|---|---|
| Exhibit 19 | House Bill 2492 | 46 |
| Exhibit 21 | House Bill 2243 | 58 |


INDEX TO EXHIBITS


| NO. | DESCRIPTION | IDENTIFIED |
|---|---|---|
| Exhibit 249 | Amended Graham County Recorder Deposition Notice | 15 |
| Exhibit 250 | Graham County's Responses to Equity Coalition's First Set of Interrogatories | 17 |
| Exhibit 251 | Graham County's Responses to Consolidated Plaintiffs' First Set of Interrogatories | 17 |

INDEX TO EXHIBITS CONTINUED

| NO. | DESCRIPTION | IDENTIFIED |
|---|---|---|
| Exhibit 252 | Graham County's Supplemental Responses to Equity Coalition's First Set of Interrogatories | 18 |
| Exhibit 253 | Graham County's Responses to Equity Coalition's RFPs | 19 |
| Exhibit 254 | Graham County's Responses to Consolidated Plaintiffs' First Set of RFPs | 20 |
| Exhibit 255 | 12/30/2022 e-mail from Ms. Lorick re implementation of H.B. 2492 and H.B. 2243 AZ-SOS-000001-23 | 27 |
| Exhibit 256 | 10/17/2022 letter from AVID Help to Graham County re MVD HAVA Checks Follow Up AZSOS-0511266-511267 | 50 |
| Exhibit 257 | Sent (Printed) Notices 1/1/22-6/14/23 GRAHAM 1295-1297 | 67 |
| Exhibit 258 | AVID Excel Report GRAHAM000375 | 111 |
| Exhibit 259 | 2019 EPM GRAHAM000751-1294 | 120 |

VIDEOTAPED DEPOSITION OF GRAHAM COUNTY RECORDER
REPRESENTED BY POLLY MERRIMAN
was taken on September 1, 2023, commencing at 9:14 a.m., at the Graham County Attorney's Office, 800 W. Main Street, Safford, Arizona, before Jody L. Lenschow, RMR, CRR, Certified Reporter No. 50192 for the State of Arizona, reported via Zoom Videoconferencing.

* * *

APPEARANCES:

FOR MI FAMILIA VOTA AND VOTO LATINO:
ELIAS LAW GROUP, L.L.P.
By: Mr. Christopher D. Dodge (Via Zoom)
Mr. Alexander F. Atkins (Via Zoom)
250 Massachusetts Avenue NW
Suite 400
Washington, D.C. 20001
202-968-4513
cdodge@elias.law
aatkins@elias.law

For Poder Latinx, Chicanos Por La Causa, and
Chicanos Por La Causa Action Fund:
ARNOLD & PORTER KAYE SCHOLER, L.L.P.
By: Ms. Leah Motzkin (Via Zoom)
601 Massachusetts Avenue NW
Washington, D.C. 20001
202-942-5000
Leah.Motzkin@arnoldporter.com

APPEARANCES CONTINUED:

For the Arizona Asian American Native Hawaiian and Pacific Islander for Equity Coalition:
LATHAM & WATKINS, L.L.P.
By: Ms. Catherine Rizzoni (Via Zoom)
Mr. Robbie Hemstreet (Via Zoom)
505 Montgomery Street
Suite 2000
San Francisco, California 94111-6538
415-391-0600
cat.rizzoni@lw.com
robbie.hemstreet@lw.com

For the Democratic National Committee and Arizona Democratic Party:
WILMER CUTLER PICKERING HALE AND DORR, L.L.P.
By: Ms. Kelsey Quigley (Via Zoom)
2100 Pennsylvania Avenue NW
Washington, D.C. 20037
202-663-6000
kelsey.quigley@wilmerhale.com

For Promise Arizona and Southwest Voter Registration Education Project:
MEXICAN AMERICAN LEGAL DEFENSE AND EDUCATIONAL FUND:
By: Mr. Ernest Herrera (Via Zoom)
634 S. Spring Street
11th Floor
Los Angeles, California 90014
213-629-0266
eherrera@maldef.org

For Tohono O'odham Nation, Gila River Indian Community, Keanu Stevens, Alanna Siquieros, and LaDonna Jacket:
Native AMERICAN RIGHTS FUND
By: Mr. Michael S. Carter (Via Zoom)
1506 Broadway
Boulder, Colorado 80301
303-447-8760
carter@narf.org

APPEARANCES CONTINUED:

For the United States:
U.S. DEPARTMENT OF JUSTICE
CIVIL RIGHTS DIVISION, VOTING SECTION
By: Ms. Heidi Strigenz (Via Zoom)
950 Pennsylvania Avenue, NW
4CON 8th Floor
Washington, D.C. 20530
202-305-1734
heidi.strigenz@usdoj.gov

For Arizona Secretary of State and Adrian Fontes:
SHERMAN & HOWARD
By: Mr. Craig Morgan (Via Zoom)
2555 E. Camelback Road
Suite 1050
Phoenix, Arizona 85016-4234
602-240-3008
cmorgan@shermanhoward.com

For Arizona Attorney General's Office and State of Arizona:
OFFICE OF THE ARIZONA ATTORNEY GENERAL
By: Mr. Timothy Horley (Via Zoom)
2005 N. Central Avenue
Phoenix, Arizona 85004
602-542-5025
timothy.horley@azag.gov

For Republican National Committee:
STATECRAFT, P.L.L.C.
By: Mr. Kory A. Langhofer (Via Zoom)
649 N. Fourth Avenue
Phoenix, Arizona 85003
602-382-4066
kory@statecraftlaw.com

APPEARANCES CONTINUED:

For Graham County Recorder:
GRAHAM COUNTY ATTORNEY'S OFFICE
By: Ms. Jean A. Roof
Chief Civil Deputy County Attorney
800 W. Main Street
Safford, Arizona 85546
928-428-3620
jroof@graham.az.gov

ALSO PRESENT VIA ZOOM:
Mr. Dan Rohan, Videographer

THE VIDEOGRAPHER: We are on the record. Time on the video monitor is 9:14 a.m. Here begins Volume 1, Media No. 1 in the 30(b)(6) deposition of Graham County Recorder by Polly Merriman in the matter of Mi Familia Vota, et al. versus Adrian Fontes, et al., in the United States District Court, District of Arizona, Case No. 2:22-cv-00509-PHX-SRB.

Today's date is September 1st, 2023. Our court reporter is Jody Lenschow. I am Daniel Rohan, a certified legal videographer. We both represent Coash Court Reporting & Video. This video deposition is taking place at the Graham County Attorney's Office, 800 West Main Street, Safford, Arizona, 85546.

Counsel, would you please identify yourselves and state whom you represent.

MR. HEMSTREET: Robbie Hemstreet from Latham & Watkins. I represent Plaintiff Arizona Asian American Native Hawaiian Pacific Islander for Equity Coalition.

MR. ATKINS: Alexander Atkins of Elias Law Group. I represent Plaintiffs Mi Familia Vota and Vota Latino.

MS. MOTZKIN: Hi. I'm Leah Motzkin of Arnold & Porter and I'm representing Poder Latinx, Chicanos Por La Causa, and Chicanos Por La Causa Action

Fund.

MR. HERRERA: Good morning. Ernest Herrera for Promise Arizona Plaintiffs.

MR. HORLEY: Tim Horley for the State of Arizona and the Arizona Attorney General.

MS. ROOF: Jean Roof for the Graham County Recorder.

MR. MORGAN: Craig Morgan for Sherman & Howard on behalf of the Secretary of State.

MR. LANGHOFER: Kory Langhofer for the RNC.

THE VIDEOGRAPHER: If that's everybody, can the court reporter please swear in the witness.

POLLY MERRIMAN,

called as a witness herein, having been first duly sworn by the Certified Court Reporter to speak the truth and nothing but the truth, was examined and testified as follows:

EXAMINATION

BY MR. HEMSTREET:

Q. Good morning, Ms. Merriman. My name is Robbie Hemstreet. I'm an attorney for Latham & Watkins. I represent the Plaintiff Arizona Asian American Native

Hawaiian and Pacific Islander for Equity Coalition in this matter. That's quite a mouthful, so if I refer to it as Equity Collation, will you understand that's who I'm referring to?

A. Okay.

Q. Can you please state and spell your full name for the record?

A. My full legal name is Pauline, P-A-U-L-I-N-E, Merriman, M-E-R-R-I-M-A-N. I hold office as Polly, P-O-L-L-Y, M-E-R-R-I-M-A-N.

Q. And what is your title?

A. I am the Graham County Recorder.

Q. And how long have you been in that role?

A. Since March 27th of 2023.

Q. And prior to March 27th, 2023, Wendy John was the Graham County Recorder, correct?

A. Correct.

Q. Do you know how long she was in that role?

A. 24 years.

Q. Okay. So for today's deposition I want to make the record clear on just a couple of points at the outset. First, you understand that you are testifying under oath today?

A. Yes.

Q. You understand the court reporter is

transcribing this deposition?
A. Correct.
Q. And with that in mind, please answer questions audibly and clearly. You're doing a great job with yes, but no head shakes, nods. Does that make sense?
A. Yeah.
Q. To allow the court reporter to do their job, please let me complete my sentence and question before you respond, and I'll try to do the same and let you finish your answer before asking the next question. Make sense?
A. Oh. Okay.
Q. Will you let me know if you don't understand any part of a question or need me to repeat it?
A. Yes.
Q. And if I ask a question and you answer it, I will assume that you understand the question. Is that fair?
A. Fair.
Q. Is there any reason you can't give full, complete, and accurate testimony today?
A. I'm sorry, I didn't hear what you said. Can I just make one statement?
I'm hard of hearing, and I do have my hearing aids in at full volume, but if you can speak closer to

your microphone, that might help me hear clearer.

Q. Will do. Is that any better?

A. Yeah. Yes.

Q. Is there any reason today that you can't give full, complete, and accurate testimony today?

A. Not that I'm aware of.

Q. All right. You're not on any medications or experiencing any condition that would prevent you from giving full and truthful testimony today?

A. No.

Q. Now, if at any time you need a break, please let me know, or anyone on your end. The only thing I ask is that if I've already asked a question and it's pending, that you finish answering that question before taking a break. Is that fair?

A. Fair.

Q. All right. And since this deposition is being taken remotely, can you please confirm who is in the room with you?

A. It's myself and Jean Roof.

Q. All right. Nobody else?

A. Nobody else is in here.

Q. Okay. And if anyone enters, will you please let me know?

A. I will.

Q. And just one last sort of introductory point, because this is a Zoom deposition, can you please confirm that you will not be receiving any texts, e-mails, or other notes during the deposition from anybody else suggesting how you answer?
A. Yes.
Q. Have you been deposed before?
A. Yes.
Q. How many times?
A. Once.
Q. When was that?
A. 1992.
Q. Do you remember the circumstances?
A. It was a personal matter.
Q. Personal matter. Personal injury or what --
MS. ROOF: I don't -- objection. I don't think that's relevant.
BY MR. HEMSTREET:
Q. Did you bring any materials to the deposition today?
A. I brought the election procedures manual in case I have to refer to it, and I brought notes of like how many voters and things like that, in case you asked for that, and I have the interrogatories printed out, mine and Wendy's, and also our production printed out.

Q. Okay. Those -- are all those documents part of the documents that were sent yesterday?
A. Correct.
Q. Okay.
A. No. I'm sorry.
Q. Do all those documents come from the productions of Graham County?
A. The printouts are from the court case. The paper with the voter totals is something I wrote on a notepad.
Q. Well, can you pull up -- and probably be faster this way if you have, actually, the exhibits in front of you. If you can go to the documents marked A, Document A.
MS. ROOF: She's just showing you her notes.
BY MR. HEMSTREET:
Q. Okay. Great.
A. Oh, I'm sorry. Is that what --
Q. Document A, do you have that in front of you?
MS. ROOF: Yes. We have it on a third screen, so she's going to be turning her head, but it's a larger screen, so it will be more easy for her to see it.
MR. HEMSTREET: Fair.

BY MR. HEMSTREET:

Q. Have you seen this document before?

A. Yes.

Q. All right. Can you tell me what it is?

A. It's the notice of deposition that has the topics.

Q. All right. And so for the record, this is the amended Graham County Recorder deposition notice, dated August 21st, 2023.

MR. HEMSTREET: And, Jody, do you know where the exhibit numbers left off?

THE COURT REPORTER: The next number is 249.

BY MR. HEMSTREET:

Q. All right. We'll mark this as Exhibit 249.

Ms. Merriman, so do you understand you've been designated to testify on behalf of Graham County Recorder's Office on these topics?

A. Yes.

Q. Can we stipulate that whenever I use you, your, or your office in a question, that will be the equivalent of saying the Graham County Recorder's Office?

A. Yes.

Q. All right. And then quickly turning to Page 5

of the Exhibit 249. Do you see where it says "Topics"?
A. Yes.
Q. All right. Are you prepared to address each of these topics today?
A. Yes.
Q. What did you do to prepare for today's deposition?
A. I looked over the topics, and if needed, I looked through my voter AVID system and any e-mails, anything that could pertain to anything that was requested.
Q. Did you meet with anyone?
A. Jean Roof.
Q. Okay. Anybody else?
A. No.
Q. All right. And so you said you reviewed e-mails, the AVID system, some of these documents. Were there any other documents that you reviewed?
A. Not that I recall.
Q. If you could turn to the document marked B. B, as in boy.
MS. ROOF: B? Okay. Sorry.
BY MR. HEMSTREET:
Q. And can you let me know if you recognize this document?

A. Yes.
Q. All right. And what is it?
A. This is Defendant Wendy John's responses.
Q. So can we mark this as Exhibit 250. For the record, this is Graham County responses to the Equity Coalition's interrogatories dated February 13th, 2023.
And we'll just quickly go through several of these. If you could go to Document C.
When you have that up, can you let me know if you recognize this document?
A. This is my responses to the interrogatories.
Q. All right. Thank you. So for the record, this is Graham County responses to the consolidated plaintiffs' interrogatories dated July 10th, 2023; is that right?
A. Yes.
Q. Okay. And we'll mark this as Exhibit 251.
And then could you turn to Document Q.
When you have that up, can you let me know what that document is?
A. That's supplemental responses, my supplemental responses to the interrogatories.
Q. All right. And this is the Graham County supplemental responses to Equity Coalition's interrogatories dated yesterday, August 31st, 2023. And

can we mark that as Exhibit 252.
Now, were you involved in preparing your office's responses to these interrogatories?
A. Yes.
Q. To all three of these interrogatories?
A. I'm sorry, can you repeat?
Q. To all three sets of interrogatories, all three responses?
A. No. I was not involved with Wendy John's responses.
Q. Okay. Was anyone else involved in any of the responses to these interrogatories?
A. No.
Q. So just Wendy John and yourself?
A. Correct. Yes.
Q. What steps did your office take to prepare Graham County's responses to all of these interrogatories?
A. If I knew the answer, I gave the answer. If it was something I needed to look up, I utilized the AVID system to look up any information that was needed.
Q. Okay. So your answer reflects how you prepared for today's deposition?
A. Correct.
Q. Sort of looking at the same sets of documents?

A. I'm sorry, I'm not understanding what you mean.
Q. I just want to establish for the record just all the various steps that you took to answer these interrogatories and try and understand if there's any difference in the documents that you looked at versus preparing for today's deposition, if that's the same thing.
A. No, there were no -- no, there were no differences.
Q. Okay. Do you have any updates to make to the responses to plaintiffs' interrogatories today?
A. No.
Q. If you could go to Document D.
When you have that up, can you tell me what this is?
A. This is Defendant Wendy John's responses to the first request for production of documents.
Q. And then can we mark this as Exhibit 253.
This is the Graham County responses to Equity Coalition's RFPs dated February 13th, 2023.
And then if you could also go to Document E for me.
And when you have that up, can you tell me what this is?
A. Yes. This is my responses to the first set of

requests for production.
Q. And this is the responses to the consolidated plaintiffs' RFPs; is that right?
A. Oh, yes, it is.
Q. Okay. And can we mark this as Exhibit 254.
Were you involved in preparing your office's responses to all these sets of RFPs?
A. All of the sets that were my responses and my interrogatories. I was not involved in Wendy's.
Q. All right. Was anyone else involved in either yours or Wendy's?
A. No.
Q. So it was just -- sorry. For the record, only Wendy John and yourself were involved in responding to these RFPs?
A. Yes.
Q. Did you take any other steps other than what we've previously discussed in preparing Graham County's responses to these RFPs?
A. None that I recall.
Q. Do you have any updates to make to these document requests at this time?
A. None at this time.
Q. We can set those aside for a second.
So are you familiar with the election

procedures manual?
A. I'm sorry, can you repeat?
Q. Are you familiar with the election procedures manual?
A. Yes.
Q. If I shorten that to EPM, you'll understand I'm referring to the elections procedures manual?
A. Yes.
Q. The 2019 version of the EPM is still currently operative; is that right?
A. Yes.
Q. Is your office legally required to follow the EPM?
A. Yes.
MR. HORLEY: Calls for a legal conclusion. This is Tim Horley.
BY MR. HEMSTREET:
Q. So you consider the EPM to be legally binding?
MR. HORLEY: Same objection.
MS. ROOF: You can answer, Polly.
MR. LANGHOFER: Robbie, can we get on the record our stipulation that an objection by one defendant is an objection by all?
MR. HEMSTREET: Yes.
MR. LANGHOFER: Great. Thanks.

MR. MORGAN: Yeah, we join in that. Thanks. Thank you.

Sorry, Mrs. Roof. Sometimes we're going to have objections. So that doesn't mean you shouldn't answer the question, okay?

THE WITNESS: Okay. My answer is yes.

MS. ROOF: I instructed her to answer, so I apologize. I think she was just waiting for everyone to be done.

MR. MORGAN: Oh, no, that's fine. The audio is kind of of wonky today. I can barely hear folks myself, and I'm sure you're having the same issue.

Sorry, Mr. Hemstreet.

MR. HEMSTREET: No worries.

BY MR. HEMSTREET:

Q. I'll repeat.

Do you consider the EPM to be legally binding?

A. I do.

MR. HORLEY: Same.

THE WITNESS: Yes.

BY MR. HEMSTREET:

Q. And does that include Chapter 1 regarding voter registration?

MR. LANGHOFER: Same objection.

THE WITNESS: Yes.

BY MR. HEMSTREET:

Q. So the Secretary of State promulgates the EPM; is that right?

A. Yes.

Q. Can the Secretary of State's Office convey legally binding guidance to your office by means outside of the EPM?

MR. LANGHOFER: Same objection.

MR. HORLEY: Same objection.

THE WITNESS: I am not able to answer that. I'm not sure if they can.

BY MR. HEMSTREET:

Q. So you're not sure one way or the other whether or not the Secretary of State can convey legally binding guidance to your office by different means other than the EPM?

A. Correct.

Q. Are you familiar with the voter registration advisory committee?

A. Yes.

Q. And I'll refer to them as VRAC; is that okay?

A. Yes.

Q. Are VRAC proposals or papers legally binding on your office?

MR. HORLEY: Same objection.

THE WITNESS: I am not sure that they're legally binding.

BY MR. HEMSTREET:

Q. Is your office aware of a draft EPM for 2023?

A. Yes.

Q. Have you provided comments regarding that draft EPM to the Secretary of State?

A. No.

Q. Do you intend to?

A. No.

Q. Does the draft EPM for 2023, to your knowledge, include guidance for how to implement H.B. 2492 and H.B. 2243?

A. Yes.

Q. If there's no approved revised EPM by this time next year, will you nevertheless be obligated to enforce the portions of H.B. 2492 and H.B. 2243 that are directed at the County Recorders?

MR. LANGHOFER: Same objection.

MR. HORLEY: Calls for --

THE WITNESS: I'm uncertain what the question was exactly.

BY MR. HEMSTREET:

Q. I'll rephrase.

I'm trying to understand if -- if there's no

approved new draft, so the 2023 draft EPM is not approved, are you still going to be obligated to enforce H.B. 2492 and H.B. 2243 regardless?

MR. HORLEY: Same objection.

THE WITNESS: It would be pending the outcome of the litigation and any changes to the 2019 EPM that would reflect having to implement those.

BY MR. HEMSTREET:

Q. Other than the draft EPM for 2023, have you received any other guidance from the Secretary of State on how to implement those laws?

A. No.

Q. So has your office been a part of any communications with the Secretary of State's Office regarding the implementation or interpretation of those laws?

A. Nothing outside of the preliminary EPM.

Q. Has your office received guidance from the Secretary of State's Office indicating that portions of H.B. 2492 violate federal law?

A. Yes.

Q. What guidance did you receive?

A. In December of 2022 the Secretary of State Katie Hobbs' staff member had advised that we were not to implement it. There was litigation and we were to

hold off. And she did make a statement that it did contradict federal law.

Q. Do you know which provisions the Secretary of State's Office indicated violated federal law?

A. I do not, no.

Q. And that guidance, that was directed to Ms. John?

A. It was directed to Ms. John.

Q. Does your office today agree that these provisions violate federal law?

MR. HORLEY: Calls for a legal conclusion.

THE WITNESS: Yes.

BY MR. HEMSTREET:

Q. Why?

MR. HORLEY: Same objection.

THE WITNESS: Well, there was a lawsuit, and I believe it was in 2018 or 2019, that was referred to as the LULAC consent agreement or something like that, and it changed the way that we processed voters. And in implementing the new bills, it would override what that lawsuit -- the outcome of that lawsuit, to my knowledge.

BY MR. HEMSTREET:

Q. All right. If you could go to Document F.

Do you recognize this document?

A. We're getting it up right now. Sorry.
This is the e-mail from Kori Lorick.
Q. And this was on December 30th, 2022?
A. Correct.
Oh, sorry.
Q. Who is Ms. Lorick?
A. She worked in the Secretary of State's Office under Katie Hobbs.
Q. In the bcc field, do you see an e-mail with the name Gwyn Villescas, Villescas?
A. Yes.
Q. All right. And who is Gwyn?
A. Gwyn Villescas was Wendy John's chief deputy and is now currently my chief deputy.
MR. HEMSTREET: And could we mark this as Exhibit 250, are we on 5 now?
THE COURT REPORTER: (Nodded.)
BY MR. HEMSTREET:
Q. All right. And the first two paragraphs there reads, "It's been several weeks since we last discussed implementation of H.B. 2492 and H.B. 2243, both of which go into effect January 1st, 2023. If you'll recall, we met several times throughout the year to review implementation and the resulting impacts to the VR system as well as voter registration procedures.

Several questions remained as to whether we could implement requirements that would conflict with the NVRA, federal settlements, and court cases. Having thoroughly analyzed the changes that both bills require, the Secretary of State's Office believes that there is no way to implement certain requirements without conflicting with federal law."

Did I read that correctly?

A. Yes.

Q. All right. Then Ms. Lorick goes on in the next paragraph to note, quote, which provisions we interpret as conflicting with federal law.

Do you see that?

A. Yes.

Q. Are these the provisions that your office agrees violate federal law?

A. Yes.

MR. HORLEY: Calls for a legal conclusion.

BY MR. HEMSTREET:

Q. Are you currently implementing any part of H.B. 2492?

A. No, I am not.

Q. Are you currently implementing any part of H.B. 2243?

A. No, I am not.

Q. Besides the Secretary of State, has your office discussed the implementation of H.B. 2492 and H.B. 2243 with anyone else?
A. No.
Q. Have you discussed the implementation of either law internally?
A. Do you mean with my staff?
Q. Correct.
A. No.
Q. Has your office discussed the implementation of either law with other County Recorders?
A. No.
Q. Could we actually go to Document B, which --
MS. ROOF: B, as in boy?
BY MR. HEMSTREET:
Q. B, as in boy, which should already be marked as Exhibit 251, I think.
And on Page 3, Line 21 through 24, this is in response to Interrogatory 2.
Let me know when you're there.
A. Yes, we're there.
Q. It says, "John has been engaged in discussions with other County Recorders and staff regarding the prospective implementation of H.B. 2243."
Do you see that?

A. Yes.
Q. Do you know with which County Recorders those discussions took place?
A. I am not aware who Wendy John spoke with.
Q. All right. And so you don't know what was discussed?
A. No, I do not.
Q. Or when?
A. I do not, no.
Q. I take it you have not had any discussions with the Arizona Association of Counties regarding the implementation of either law?
A. I have not.
Q. Was your office opposed to passage of H.B. 2492?
A. Yes.
Q. Why?
A. In lay terms, we felt that it was going to be more difficult for the voter and more difficult for us to process a voter.
Q. Was your office opposed to the passage of H.B. 2243?
A. Yes.
Q. And can you tell me why?
A. The same reasons. We felt it would be harder

for some voters and it would be harder for us to process voters.

Q. When you say harder, did you believe that any voters would potentially be disenfranchised by these laws?

MR. LANGHOFER: Calls for speculation.

THE WITNESS: That would be possible.

BY MR. HEMSTREET:

Q. I'm sorry, I think there was some cross-talk. You said you believed it would be possible that --

A. It would be pos -- it would possibly be harder for voters to register, and it would disenfranchise some.

Q. And could you just elaborate a little more on what makes it harder for them to register? We'll start with H.B. 2492, if you --

A. 2492? Can I look at that real quick? I get them confused over which one does which.

Q. We'll actually get into the laws a little later. So perhaps now more generally, what are your office's thoughts on what would make it harder, what about these laws makes it harder for voters to register?

A. So in dealing with the addressing, there are going to be some voters that would have a difficult time providing proof of residency; that if they have to check

the citizenship checkbox in along with providing the DPOC, they may fail to checkmark the box; or answering where their place of birth, if they failed to do that, then we would have to seek out the voter.

It just would create more potential problems and more times that we would have to reach out to the voter for that information if that became mandatory fields.

Q. Are you familiar with H.B. 2617?

A. A little. I'm not real familiar with it. I was under the impression it was vetoed. I didn't research it very much.

Q. Did your office support or oppose H.B. 2617?

A. I believe it was opposed.

Q. If you could open Document J.

A. We have it open.

Q. And can you tell me what this document is?

A. It's an e-mail from Wendy John to multiple entities, looks like some Recorders and AACo, and it's regarding an amendment change to H.B. 2617.

Q. And this was sent on March 14th, 2022?

A. Correct. Yes.

Q. And the subject is "Regarding: H.B. 2617 - Does the Amendment Change Your Position," question mark?

A. Yes.

Q. Do you see on Page 2 where Stallworth Pouquette writes, "Here is the amended bill. Does this change your position?"

A. Yes, I see that.

Q. Okay. And then up on Page 1, in response Wendy John replied "I'm still opposed"?

A. Yes, she did.

Q. And do you know why your office opposed H.B. 2617 as amended?

MR. HORLEY: Foundation, calls for speculation.

THE WITNESS: Wendy John or -- well, I don't know who wrote that. Robyn, I believe, wrote that the bill had some issue -- would cause some issues with databases to which counties do not have access to, and they were opposed because of that.

BY MR. HEMSTREET:

Q. Is that issue with access to databases a concern with either H.B. 2492 or H.B. 2243 for your office?

A. No.

Q. Changing gears slightly, I want to talk about the voter registration process generally. What are the methods that a potential voter can use to register to vote in Graham County?

A. Do you mean the type of ways they can register?
Q. Yes, the various methods and forms.
A. Okay. They can utilize a federal form, a state registration form. They can also register to vote through the Arizona Motor Vehicle Service Arizona currently, and in the future it will be AZ MVD Now.
Q. Are you familiar with NVRA agencies?
A. MVRA? Oh, NVRA, NVRA.
Q. Yes.
A. Yes.
Q. Are there any in Graham County where voters can register?
A. Yes.
Q. What form do those NVRA agencies use?
A. They use the state form.
Q. Besides the federal form, the state form through the MVD and through the NVRA agencies, are there any other ways a potential voter can register to vote in Graham County?
A. Not that I can think of at this time.
Q. How about the federal postcard, the federal postcard application, FPA?
A. Yes, our military and overseas citizens can utilize the FPCA and the FWAB. I apologize. I forgot those. Those are for those individuals.

Q. And are there other ways; are there any other ways that you can think of?

A. Not that I can think of.

Q. So can you take me through how a voter applicant's citizenship is verified today in Graham County?

A. So we enter the voter -- the voter's -- or the applicant's registration information into the AVID system, which is our voter registration system that we utilize. And we enter the voter data and we have a box that's called HAVA, Help America Vote Act, and when we click on that, it checks the voter's information through the database of the Arizona Motor Vehicle, the Social Security, and I think it also runs a check through the Death Index, but I am not positive on that.

Q. Thank you. I want to break that down a little.

So you began with AVID at first; is that correct?

A. Yes.

Q. And then that runs the HAVA check through AVID?

A. Yes, it's through the AVID.

Q. And then that HAVA check accesses the MVD database?

A. Correct.

Q. And then the MVD database contains information

about the applicant's citizenship?
A. Correct.
Q. And you mentioned the Social Security database; is that correct?
A. Yes.
Q. And so HAVA connects to that database?
A. Yes.
Q. Does it connect to any other databases?
A. As I stated, I think that it connects to a Death Index or like a -- you know, the death records; but I am not absolutely certain. I know that that gets checked at some point in the AVID system, the death records, but I'm not sure if it's during voter registration process.
Q. Okay. And then just to make the record clear, beyond the Motor -- the MVD, Social Security, and potentially that death certificate database, there are no other databases you're aware of that HAVA checks?
A. No, not that I'm aware of.
Q. Are HAVA checks run for each voter applicant or just some?
A. All.
Q. If HAVA matches to citizenship information, is the voter registered as a full ballot voter?
A. Yes.

Q. If HAVA does not match to citizenship information, what happens?
A. If it does not match any information or partial? Can you tell me which part you're talking about?
Q. Well, so first -- thank you.
So there's a distinction if it comes back partial information versus no information; is that right?
A. Yes.
Q. So let's walk through if it comes back with no information. What happens?
A. Okay. So if it comes back with no information, the voter is registered as a fed-no ID and they are sent a letter, along with a new voter registration form and a fed-ID only -- or I'm sorry, a federal only ID card. And so they're registered and they can vote, but they will have to provide their proof of citizenship before voting.
Q. So -- and you said they were registered as a federal only voter?
A. If it matches no information, they're what's called a fed-no ID. So they would not be eligible to receive a ballot by mail, and they would have to provide proof of citizenship before they could vote on election

day.

Q. And that would include in federal elections they would need to provide that information to the --

A. Yes.

Q. And if -- let's go through the other scenario, if it comes back with partial information.

A. Partial information would allow the voter to be a fed only voter. So they would be eligible to receive a ballot by mail, and they are also sent a letter along with their federal only ID card and a voter registration.

The letter lists ways that they can provide proof of citizenship that would allow them to become a full voter, but if they do not, a federal only voter is allowed to be on the AEVL and get their ballot by mail because they did provide proof of citizenship. They just didn't match our Motor Vehicle. So they matched the Social Security, but not the Motor Vehicle.

Q. You were anticipating where I was going. Can you perhaps elaborate on the partial information necessary to go from that first scenario we talked about where they come back as a fed-no ID, but what -- what partial information would then allow them to be a federal only, but is short of what's required to become a full ballot voter?

A. Okay. If they include their last four of their social on their voter registration form and the system can match Social Security with that number, then the voter becomes a fed only voter.

Q. And is that the only scenario, if there's the match on the social security number, that they are able to become a fed only?

A. Yes.

Q. So the citizenship data from these HAVA checks, those come from the MVD database, right?

A. The driver's license information comes from the Motor Vehicle -- Arizona Motor Vehicle.

Q. And is that where the citizenship data specifically for the HAVA checks comes from?

A. The driver's license. I believe the Social Security runs through the Social Security Index, but I'm absolutely not certain. That is just how I always perceived it.

Q. And I want to clarify my question. The citizenship data specifically, are you saying that you're not sure if that comes from the Social Security database?

A. If a person puts their social security number on their voter registration form, but they do not include an Arizona driver's license, when I click on

HAVA check, it runs through the Social Security and it will match or it may match, but it will run a check through the Arizona Motor Vehicle. If it finds their driver's license, then they're processed and made a full voter. If it cannot locate the driver's license through the Arizona MVD, then that would be considered a no match to the driver's license, and they would be registered still with the federal only, but just with the Social Security match. And if there was no match, then they would be a fed-ID only. I'm sorry. Yeah, fed-no ID. I apologize.

Q. There are different types of driver's licenses, correct?

A. Correct.

Q. And are you familiar with the F-type license?

A. Yes.

Q. What is that?

A. That is a foreign driver's license. So it would be a driver's license that is a -- that belongs to a non-U.S. citizen.

Q. When you're attempting to match registrants with the MVD database, what happens if the applicant's driver's license is an F-Type?

A. So if it's an F-type license, then the voter would be made fed-no ID, and we would reach out to them

to see if they went through naturalization, and if they have their certificate of citizenship or -- and if they, you know, have that information, they could bring it in and we could make them a full voter.

Q. Okay. So if you identify an applicant who has that F-type license, you send them a notice, and then they're required to present their naturalization certificate or A-Number or some other form of DPOC?

A. Correct.

Q. And then do you check that naturalization number or A-Number against a database?

A. I do not. I have not.

Q. Okay. Are you aware one way or the other if there's a database to check that number against?

A. Yes, there is the SAVE database.

Q. Does your office have access to the SAVE database?

A. We do have access to it.

Q. And the SAVE database, is that run by the United States Citizenship and Immigration Services?

A. I would be speculating, because I have not utilized that system to run a check. So I'm not exactly sure who is in control of that system. I have not used it, so I'm not really aware. I know it's a website.

Q. It's fine if you don't know. So you don't know

one way or the other who runs the SAVE database?
A. I do not.
Q. And your office or you've never used it?
A. I logged on when I very first started in 2016 at the Graham County Recorder's Office to -- I had to get credentials in order to log in, and that is all that I've done on that program.
Q. So we talked through a little bit if someone has an F-type license, they are then required to provide a naturalization number or some other form of documentary proof of citizenship to become registered.
What would be the result, though, if someone had an F-type license that was ten years old? Would that be the same result that we just discussed, where they would need to still provide proof of citizenship?
A. Yes.
Q. Do you treat that dated F-type license, something that's that old, to be conclusive evidence that someone is not a citizen?
A. Yes.
And I'm going to have to retract what I said a minute ago, because I said they would be registered as a fed voter, but they would not be.
An F-Type license, they would actually be in the system as not eligible, invalid citizenship, and we

would send them the information letting them know that if they did go through the naturalization process and have their certificate, they could bring that in and we could get them registered to vote. Because an F-Type license does inform us that the person that is applying to register to vote is a noncitizen.

Q. But would you agree that them having an F-type license doesn't mean that they haven't naturalized since obtaining that license?

A. Yes.

Q. So someone with an F-Type license could be a citizen that's just not in the database; is that right?

A. Yes.

Q. So you'd agree with me that the MVD database is not infallible in terms of its ability to accurately verify a person's citizenship status?

MR. HORLEY: Objection, leading.

MS. ROOF: You can answer, Polly.

THE WITNESS: Okay. I would -- I would agree in the sense that I don't believe that any program is infallible.

BY MR. HEMSTREET:

Q. Has your office ever sent out a notice to a person for lack of citizenship after the applicant failed to match with citizenship information in one of

these databases?
A. I'm sorry, can you repeat that?
Q. Have you ever had to send out one of these notices that we've discussed where someone failed to match with citizenship information?
A. Yes.
Q. How many times has your office sent out a notice that they could not be verified for citizenship?
A. I wouldn't know off the top of my head. Well, I can tell you as of right now today, Graham County has 47 fed voters. So I've sent at least 47 letters.
Q. Has any applicant cured after receiving one of these notices?
A. Not these 47, but in the past I have had a person bring a birth certificate in. I've had them bring in an enhanced out-of-state driver's license and present that to become a full ballot voter.
Q. And so then if the voter fails to cure, what happens then?
A. They remain a fed voter.
Q. So their registration is just federal only?
A. Correct, or fed-no ID.
Q. Or fed-no ID?
A. Correct.
Q. And once a voter is registered, are there any

circumstances where your office will reverify that registered voter's citizenship?

A. Only if they resubmit a new form.

Q. And is the process about the same as the one we discussed?

A. Yes.

Q. And then who at your office is responsible for verifying voter applicants' citizenship status?

A. Myself.

Q. Anybody else?

A. No.

Q. Okay.

A. Not at this time.

MR. HEMSTREET: I'm at a natural stopping point if we would like to take a short break right now.

MR. MORGAN: Fine by me.

MR. LANGHOFER: Same here.

MR. HEMSTREET: Well, if we can go off the record, and let's say about five minutes.

THE VIDEOGRAPHER: We're off the record. Time on the video monitor is 10:03 a.m.

(A recess was taken.)

THE VIDEOGRAPHER: We're on the record. Time on the video monitor is 10:17 a.m.

BY MR. HEMSTREET:

Q. All right. Is anyone else in the room with you besides Jean now?

A. No, just Jean and I.

Q. Great. I'd like to turn to the challenged laws now. If you could open what's been premarked as Petty Exhibit 19.

When you have that up, can you tell me what that document is?

A. That is the House Bill 2492.

Q. Okay. Can you please turn to Page 4 at the bottom, Line 35?

A. Okay.

Q. And there it says, "Within ten days after receiving an application for registration on a form produced by the United States Election Assistance Commission that is not accompanied by satisfactory evidence of citizenship, the County Recorder or other officer in charge of elections shall use all available resources to verify the citizenship status of the applicant and at a minimum compare the information available on the application for registration with the following, provided the county has access."

Did I read that correctly?

A. Yes.

Q. Okay. It then goes on to list a number of databases, and the first is the Department of Transportation databases of Arizona driver's licenses or nonoperating identification licenses.
Are you familiar with the Arizona Department of Transportation databases?
A. Yes.
Q. Is that the same as we've been discussing and calling MVD?
A. Yes.
Q. And you used the information from the ADOT or MVD database to confirm citizenship as we discussed earlier, right?
A. Yes.
Q. Does your county have a memorandum of understanding or agreement with the Arizona Department of Transportation's MVD to govern the sharing of this data?
A. No.
Q. Okay. Do you know if the State or Secretary of State's Office has an agreement?
A. I believe so.
Q. Do you know whether that existing agreement covers the uses outlined in H.B. 2492?
A. I'm not aware.

Q. Do you recall an incident last year where database matching with the MVD database produced erroneous results and caused downgrading of voters to federal only voting status?

A. I did not remember that, but I was reminded in looking over the items that you guys provided, and then I recalled that, yes, there was a time last year that there was a problem.

Q. If we could quickly go to Document M, as in ma'am.

A. Okay.

Q. Is this the document that you were referring to?

A. Yes.

Q. And so this is an e-mail; is that right?

A. Yes.

Q. And it's from AVID Help?

A. Yes.

Q. And it's to Wendy John at Graham; is that right?

A. Yes.

Q. Okay. And the first line of it, "As we discussed on our call today, this information provides -- or this e-mail provides information and action items about the MVD issues that we have been

investigating," and then the last sentence of the first -- the next paragraph, "This meant that some voter records were incorrectly receiving a null value for authorized presence, which resulted in the voter being placed in fed only status when they should have been --"

MS. ROOF: Do you want it opened?

THE WITNESS: Yeah. I'm sorry.

MS. ROOF: That's okay.

THE WITNESS: Let me get to that.

And you're talking about the paragraph "To ensure that no incorrectly-issued federal only ballots," that paragraph?

BY MR. HEMSTREET:

Q. I'm sorry. No, the -- it's the second paragraph of the e-mail that begins with "Following the MVD's investigation."

A. Oh, I see. Okay.

Q. Read that last --

A. Sorry about that.

Q. Can you just confirm that that last sentence says that voters were placed in fed only status when they should have been full ballot voters?

A. Yes.

Q. Okay. And if you see the Bates number in the bottom right-hand corner of that document, starts with

AZ?

A. Yes.

Q. I'll represent this was produced by the Secretary of State in this litigation.

MR. HEMSTREET: Can we mark this first as Exhibit 256, I believe, Jody.

MR. LANGHOFER: Hasn't this one been marked several times already?

MR. HEMSTREET: Okay.

BY MR. HEMSTREET:

Q. So your office is aware that there was a database error that's referred to in this e-mail from October of 2022?

A. Yes.

Q. Did this error affect any voters in Graham County?

A. I do not recall. I know that we reached out to the voters that they notified us that could potentially be affected, and I know that we did send letters to them, and I do believe we ran them back through the database to make sure -- like to check for a rematch.

If it matched it, we notified the voter and told them that they were a full ballot voter and not a fed voter and provided them with a full ballot, a full voter ballot.

Q. Was your office concerned about this error being so close to the November 2022 election?

A. I don't recall if we were concerned pertaining to the election.

Q. In light of this, what does this say to you about the reliability of the data matching to assess a person's citizenship status?

MR. LANGHOFER: Form.

MS. ROOF: You can answer.

THE WITNESS: I can't really say what I felt about it at the time.

BY MR. HEMSTREET:

Q. Going back to 2492 and the databases listed there, it then says the Social Security Administration database; do you see that in --

A. Yes.

Q. -- what's been marked Exhibit 19?

Is this the same database we were discussing earlier?

A. Yes.

Q. And so you have access to that?

A. I'm sorry, can you say that again?

Q. So your office has access to that?

A. Through the HAVA check. We don't have individual access to any of these databases. Just that

when we click on that HAVA check, it checks both the Department of Transportation database and the Social Security.

Q. Do you know if this Social Security Administration database can verify citizenship status at all?

A. I know that it can for Social Security.

Q. Okay. But you don't know one way or the other on citizenship status?

A. I do not know.

Q. The next database on the lists in the law is SAVE. We've already discussed SAVE.

A. Yes.

Q. And is this, again, only used to verify citizenship of naturalized voters?

A. As far as I'm aware of. I don't utilize it for any other -- like for just a -- for any voter registration form, I don't utilize SAVE.

Q. So it's only used if someone presents a naturalization number or A-Number?

A. I believe so.

Q. It also says if practicable, using this database if practicable. Is that language if practicable clear to you?

MR. LANGHOFER: Calls for a legal

conclusion.

MR. HORLEY: Calls for a legal conclusion.

THE WITNESS: I would interpret that to mean if it makes sense to utilize it. I guess I really should not even say, because I don't really know what they're meaning by if practicable.

BY MR. HEMSTREET:

Q. Is there an agreement specifically with your county to use this database?

A. Yes.

Q. And so is that existing agreement with the USCIS, or who is that with?

A. I believe it is. It's -- well, I know it's -- we just refer to it as SAVE. Again, I have not used the database. I am not certain who is in control of it.

Q. Do you know if that agreement covers the uses outlined in H.B. 2492?

A. I do not know.

Q. The next database on here is NAPHSIS, the National Association of Public Health Statistics and Information System. Have you heard of NAPHSIS?

A. That might be what I think -- what I thought was called the Death Index, I think, but I think that's what it checks is the death records.

Q. Could your office, I guess, use -- or are you

familiar with the Electronic Verification of Vital Events database that NAPHSIS operates?

A. I am not familiar with that.

Q. So you don't know if your office could use the EVVE, the Electronic Verification of Vital Events, database for citizenship verification?

A. I do not have access to that, no.

Q. And then Line 5 -- or Page 5, Line 5 states that your office must or shall also utilize any other state, city, town, county, or federal database or any other database relating to voter registration.

Do you see that?

A. I do, yes.

Q. Do you have any idea what other databases that language may refer to?

MR. LANGHOFER: Same objection.

THE WITNESS: No, I do not.

BY MR. HEMSTREET:

Q. Are you aware of any other databases that you're not currently using that could be useful in carrying out your office's voter registration duties?

A. No.

Q. And then earlier you said that you access all these databases through HAVA. Is that true for all the databases we just discussed or just the Social Security

Administration database and the Motor Vehicle Department database?

A. I am only aware of the Social Security, the Motor Vehicle, and possibly the death record.

Q. And my question is a little different. Do you access all those through HAVA or are any of them through a separate means of accessing them?

A. So we access them through the AVID system in doing the voter process. There's just a button. So when we click on that button, it does a background process that I -- so I don't know where it is or what it's accessing. I just know that it comes back with a match or it doesn't. But I'm not -- you know, so it's literally a button. We don't see what it's checking. It's just called HAVA checks.

Q. So you never like open up a different database at any point?

A. No.

Q. And that's true for all of these?

A. True. Yes.

Q. Page 4, Line 38, the law states that your office must use all available resources to verify the citizenship of a federal form applicant who fails to provide DPOC.

Do you see that?

A. Yes.
Q. Do you understand use all available resources; do you understand what that means to you?
MR. LANGHOFER: Same objection.
MR. HORLEY: Calls for a legal conclusion.
THE WITNESS: To me that means the HAVA check that's provided through the AVID voter system.
BY MR. HEMSTREET:
Q. So there are no other resources come to mind that are available to you pursuant to that law?
A. Nothing else --
MR. HORLEY: Same objection.
THE WITNESS: -- other than the SAVE.
BY MR. HEMSTREET:
Q. And then Page 5, Lines 14 through 17 says, "If the County Recorder or other officer in charge of elections matches the applicant with information that the applicant is not a United States citizen, the County Recorder or other officer in charge of elections shall reject the application."
Do you see that?
A. I see that, yes.
Q. What information could be used to determine an applicant is not a citizen?
MR. HORLEY: Same objection.

THE WITNESS: I would say just running the HAVA checks and it coming back with hypothetically an F-type license that would confirm that the person was a noncitizen.

BY MR. HEMSTREET:

Q. And you said would confirm someone is a noncitizen. But earlier we discussed that someone with an F-type license could have naturalized since obtaining that F-type license; is that right?

A. Yes, which would require further information from the voter.

Q. But in that hypothetical, that information that you receive from the HAVA check would be inaccurate as to their actual citizenship status; is that right?

A. It could possibly be.

Q. Has your office ever been given a specific list of means by which a voter applicant can be deemed or proven to be a noncitizen?

A. Not that I'm aware of.

Q. And has the Secretary of State's Office ever given your office a list of the information under this law that constitutes evidence of lack of U.S. citizenship?

A. Not to my knowledge.

Q. And pursuant to this law and information under

it, is there anything beyond a government or voter registration database that you would consider to be information?

MR. HORLEY: Same objection.

THE WITNESS: No.

BY MR. HEMSTREET:

Q. I'd like to have you now open what's been premarked as Petty Exhibit 21.

When you have that up, can you please tell me what that is?

A. That's the House Bill 2243.

Q. Great.

And on Page 4, Line 5, Section 10, it says that the County Recorder shall cancel a registration, quote, When the County Recorder obtains information pursuant to this section and confirms that the person registered is not a United States citizen.

Under this provision, what information could be used to confirm a voter is not a citizen?

MR. LANGHOFER: Same objection.

THE WITNESS: I'm not certain of what that would mean other than, again, running them through the AVID system and doing the HAVA citizenship checking.

BY MR. HEMSTREET:

Q. So all the things that we just discussed would

apply here?

A. Yes.

Q. Going to Page 6, Line 6, Section H.

A. I'm sorry, that was Page 6?

Q. Yes. Line 6.

A. Line 6? Okay.

Okay, I have it.

Q. And here it says, "To the extent practicable, each month the County Recorder shall compare persons who are registered to vote in that county and who the County Recorder has reason to believe are not United States citizens."

What would give your office a reason to believe a person is not a U.S. citizen?

MR. LANGHOFER: Same objection.

MR. HORLEY: Legal conclusion.

THE WITNESS: I would not have a reason to believe a person -- let me rephrase that.

I can't think of anything that would cause me to think somebody wasn't a U.S. citizen if the system had already matched them.

BY MR. HEMSTREET:

Q. If the system had matched them.

Would the return of an F-type license give your office reason to believe they're not a U.S. citizen

under this law?

MR. HORLEY: Same objection.

THE WITNESS: It would create a reason to reach out to the voter to inquire if they have a naturalization certificate.

BY MR. HEMSTREET:

Q. And I believe I asked this, but for the wrong law. So has your office ever been given specific guidance on what would give rise to reason to believe a person is not a U.S. citizen?

A. No.

Q. And how about the converse; has your office ever been provided with specific guidance regarding what is not a valid reason to believe someone is a U.S. citizen?

A. No.

Q. Page 6, Line 20, Section J, it says, "To the extent practicable, the County Recorder shall review relevant city, town, county, state and federal databases that you have access to to confirm information obtained that requires cancellation of registrations pursuant to this section."

Beyond the databases we've already discussed, do you have any idea what databases that language is referring to?

MR. HORLEY: Same objection.

THE WITNESS: I do not. No.

BY MR. HEMSTREET:

Q. If a registered voter is removed from the rolls under H.B. 2243 based on an erroneous determination that they are not a U.S. citizen, can that person be added back to the rolls if the registration deadline has passed?

A. I believe so. I believe that if there was an error and the voter provided proof and it matched in the system, it would retro back to the date that they first registered.

Q. Can you walk through how your county would do that?

A. So in the system we just go in and open up the voter's record, and we would input the new information into their record and run the HAVA check again. And if it matched it, then, you know, you're done.

If, however, it was, say, a birth certificate that they bring in, then we go into the voter's record and we note that the voter has a -- has provided a U.S. birth certificate, and we go in and we change the registrant status to make them a full ballot voter.

Q. Okay. If H.B. 2243 were to take effect, would you still be able to add that erroneously removed voter

back onto the rolls after the registration deadline?

MR. HORLEY: Calls for a legal conclusion, calls for speculation.

THE WITNESS: And I would be speculating, because I am not absolutely familiar with exactly what -- how these processes would take place, because we're not -- we didn't -- we have not ever implemented these, so we have not changed our processes.

BY MR. HEMSTREET:

Q. So you don't know one way or the other whether H.B. 2243 would change your ability to correct that erroneous removal of a voter?

A. I think it --

MR. HORLEY: Same objection.

THE WITNESS: I think if it was erroneous, we would still be able to make the change. If not, we would just create a new record, I would believe, and retro it back to their date of registration.

BY MR. HEMSTREET:

Q. Do you know if this is laid out in the draft 2023 EPM?

A. I do not believe so.

Q. Do you know whether or not this practice could vary from county to county?

MR. HORLEY: Same objection.

THE WITNESS: I do not believe so.
MR. HORLEY: Calls for speculation.
BY MR. HEMSTREET:
Q. I'm sorry, you said you're not clear?
A. I don't think so. In my -- to my knowledge, every county processes the same, and it is based on the EPM 2019 currently.
Q. And apologies to belabor this point, but on Page 4, Line 5 of 2243 where it says "When the County Recorder obtains information pursuant --"
A. Page 4, and that was Line 5?
Q. Yes, Section 10.
A. Okay.
Q. Was it your testimony that you would consider the F-Type license to be information under that law?
MR. HORLEY: Calls for a legal conclusion.
THE WITNESS: Can you repeat that, please?
BY MR. HEMSTREET:
Q. Yeah.
So the law, you know, asks County Recorders, when they obtain information that someone is not a U.S. citizen or has reason to believe that they're not a U.S. citizen, and we've been discussing F-type licenses, and so I just want to understand. Would your office consider an F-type license to be information that gives

your office reason to believe that someone is not a U.S. citizen?

MR. HORLEY: Same objection.

THE WITNESS: Again, initially we would have to process the voter as a non-U.S. citizen because that is how it returns on an F-type license. So we would reach out to the voter and confirm whether they have or have not done their naturalization and then proceed from that.

BY MR. HEMSTREET:

Q. And would you then send them notices?

A. Yes. We would send them a letter informing them that they would need to provide that certificate.

Q. And then if that person doesn't respond in 35 days, under this law, are you required to remove them from the rolls?

MR. HORLEY: Calls for a legal conclusion, calls for speculation.

THE WITNESS: I'm not familiar with what would happen after the 35 days.

BY MR. HEMSTREET:

Q. If you could, sorry, go to Line 11 through 14, also on Page 4 there.

A. Uh-huh.

Q. "The County Recorder shall send the person

notice by forwardable mail that the person's registration will be canceled in 35 days unless the person provides satisfactory evidence of United States citizenship."

Did I read that right?

A. Yes, you did.

Q. So earlier this morning you said that these laws may disenfranchise voters, potentially. Is this an example of how H.B. 2243 could disenfranchise a citizen?

MR. HORLEY: Same objection.

THE WITNESS: This could be.

BY MR. HEMSTREET:

Q. I'm going to change gears slightly. If you could turn back to Document C, which are the Graham County responses to the consolidated plaintiffs' interrogatories.

A. Yes, we have it.

Q. And if you take a look at interrogatory number 9 and your office's response.

Do you see where it says, "Subject to and without waiving these objections, to Merriman's knowledge there has been no case where the county has personally determined that a non-U.S. citizen or non-county resident has registered to vote or voted since she joined the Recorder's Office in February

2016"?

A. Yes.

Q. What do you mean by -- determined?

THE COURT REPORTER: You cut out, Robbie.

BY MR. HEMSTREET:

Q. What does your office mean when it says has not personally determined?

A. I don't personally determine anybody's citizenship.

Q. Is your office aware of any noncitizen registering to vote or voting in Graham County since February 2016?

A. No.

Q. How about at any time?

A. Not that I'm aware of.

Q. And just to be clear for the record, you're not aware of any incidents where a noncitizen registered to vote in Graham County?

A. Right, a noncitizen, I'm not aware of any.

Q. And you're not aware of any incident in which a noncitizen actually voted in Graham County?

A. No, I'm not aware of that.

Q. If we could also briefly turn to the document marked N.

A. Okay, we're there.

Q. Do you recognize this document?
A. It is a Sent (Printed) Notices. It is a report that comes out of the AVID system.
Q. And does this look like reports that come to your office out of the AVID system?
A. Yes, that would be ours.
Q. And it says "Graham" there on the left, above the far left column? Sorry.
A. Yes.
Q. Okay. And then this was produced by your office. There's a Bates number in the far right. Do you see that?
A. Yes.
Q. Okay.
MR. HEMSTREET: And could we mark this as Exhibit 257; is that right, Jody?
THE COURT REPORTER: (Nodded.)
BY MR. HEMSTREET:
Q. Does this reflect all voter register applicants who are placed on federal only status in Graham County from January 1, 2022 to June 14th, 2023?
A. Can you go to the bottom of the page, please?
MS. RUTH: Yes.
THE WITNESS: Can you repeat that question?

BY MR. HEMSTREET:

Q. Yeah.

I'm trying to understand if this reflects all applicants who were placed on fed only status in the dates at the top there?

A. No, it does not reflect all of the voters that are registered as a fed voter. It represents all of the printed notices that were sent from January 1st of 2022 through June 14th of 2023. This is just a sent notice report.

Q. So within those dates this doesn't capture everyone who has attempted to register who's fed only; it just captures those who have been sent notice in that period?

A. Yes.

Q. And then in the Notice Name column, the very first row or actual entry, it has "F Type License" there; do you see that?

A. On Page 1?

Q. On Page 1.

A. Can you scroll up?

Yes, "Registration - F Type License."

Q. So that's an example of someone who registered with an F-type license?

A. Yes.

Q. And so would they be just unable to vote in any election unless they provide DPOC?

A. Yes.

Q. The rest of the registrations on that first page say "Fed ID Only," correct?

A. Yes.

Q. And so for all those individuals, they are able to vote, but only in federal elections; is that right?

A. And the fed ID stands for that they have to provide proof of citizenship in order to vote.

Q. Okay. And then on Page 2 there are a few at the bottom that say "Fed No ID." Can you explain the distinction between "Fed ID Only" and "Fed No ID"?

A. I believe they are the same. It was just a change. So there's two different types of notices in our AVID system, and they are actually the same letter. It was just that when we created the notices, we listed the notice under "Registration - Fed ID Only" and then we changed the notice and changed it to "Registration - Fed No ID."

Q. Okay. You --

A. But it is the same letter.

Q. The same letter. And do they have the same --

A. The same outcome.

I'm sorry?

Q. I'm sorry. I believe you said they have the same outcome, they mean the same thing?

A. Yes. "Fed ID Only" and "Fed No ID" are the same. They provided -- or they did not provide -- they didn't match or something to that effect.

Q. And you said they're unable to vote unless they provide proof of citizenship. Does that apply to federal elections as well?

A. Yes. They present -- they will have to present -- I say citizenship. I guess it would be they would have to present a driver's license, some form of proof of citizenship.

Q. So is there any difference practically between these "Fed ID Only" and the F-type license?

A. So the fed only, they are -- they've proven that they're a citizen and they're allowed to receive a ballot by mail. And so that would be the difference, is that they matched the social, but they may have an out-of-state driver's license, and so they did not match the Arizona MVD system. And so since their social matched, they become a fed only voter with the right to receive a ballot by mail.

Q. So they have the right to receive it, but they can't actually vote unless they provide citizenship information?

A. The fed only can receive the early ballot and vote that early ballot without any other restriction.
Q. But only for federal elections; is that right?
A. Right. They will only -- they will receive a federal only ballot.
Q. Okay.
A. Only, yeah, the federal and congressional races.
Q. Whereas in that first row the person with the F-type license, they would not receive a ballot at all?
A. They would not. And the "Fed ID Only" or "Fed No ID," they are not eligible to receive a ballot by mail.
Q. I'm sorry, I'm confused. I thought you just said that they did receive a ballot by mail, fed only?
A. Okay, so there are -- in this sent notice report there are three types of fed -- actually, four. "F Type License," they're not a citizen. They do not get a ballot and they are not registered until they've proven citizenship.
A "Fed ID Only" and a "Fed No ID" are people that registered to vote, they provided data, but it did not match the system, maybe, or they didn't provide any citizenship data. They were registered in that retrospect and they are eligible to go to a polling

location on election day and vote contingent upon providing proof that they are a citizenship, that they are a citizen.

And then there is the "Fed Only," who provided us Social Security, it matched the system, and so we can confirm that they are a citizen. They just did not provide the second part where a driver's license or a birth certificate, but they are eligible to receive a ballot by mail.

Q. I understand. So the distinction is basically ID, "Fed ID Only" versus "Fed Only"?

A. Correct.

Q. I'd like to shift gears again and discuss H.B. 2492's documentary proof of residence requirements. Can we start with how Graham County currently uses voter -- applicants' residence information?

So in order to register to vote, applicants are currently required to provide an address, or if they don't, a description or drawing of the location of their residence; is that right?

A. Yes.

Q. Can a P.O. Box be used to meet that requirement?

A. It cannot, no.

Q. And why is residence address or location

information important for voter registration?

A. That is how we precinct the voter and how we know what type of ballot and what type of races they get to vote in.

Q. So I want to talk about the two options the voters have in turn. First, the process by which they provide an actual address. If someone provides an address, does the county use -- or how does the county use that address to actually locate the residence?

A. So when we input the data into AVID, AVID has a GIS mapping link to Total Address. So when we put that address in, it will match with that. It's a Shake file that belongs to Graham County that got imported into Total Address. So if it matches, then there's no issue currently.

Q. Okay.

A. If it does not match, then myself, I will utilize the Graham County GIS maps, the Assessor's and Treasurer's either tax or -- either the tax bill information or the property record information, locate the address, and then I can go and pin drop that GIS information into the Total Address system and match the voter. I also utilize that when they do the drawing for the nonstandard address. We can locate that drawing through the GIS map system and we create a pinpoint for

that drawing.

Q. How common is it for someone who provides an address that you're not able to locate?

A. It would be hard to say. We get people that register addresses that are not in our Total Address system because it is a new home build and that information wasn't provided to us to add.

So that's why we utilize as many databases as we can to find the address. But as far as not finding an address at all through all of the databases, I would say probably that's occurred maybe once or -- you know, maybe once a month max, once every six months. It's speculating. I don't have any voters currently that are nonstandard addresses or that I cannot locate an address for.

Q. In those very rare instances, what does your office do to locate them?

A. So we will reach out to the voter and see if they can give us any further information. In the past, when I couldn't locate an address, it actually was not in our county, and so the voter record was transferred to the county it belonged to.

We do have one voter that registered, I believe it was back in 2018, who made up an address just because he was homeless, and so we were not able to match that

address and, therefore, we had to create an address for the homeless.

Q. And was that individual ultimately able to be registered?

A. Yes, he was.

Q. And so you sort of mentioned this, but when your office doesn't locate them, you said you reach out to the voter. Do you send a notice?

A. Yes, if we have a mailing address. We reach out to the voter in any way that they provided contact information. So e-mail, phone, letter, all three, one or all three of them we will reach out to them for the further information.

Q. And you also mentioned the new -- a new home build might present an instance where you're unable to locate them in a database. Are there any other residential addresses where it's like more common than other types of residences where you're not able to locate them in the database?

A. Not that I can recall right now.

Q. Would -- is it any more common to have trouble locating a residence on a Reservation?

A. So that would be probably more common that we wouldn't have the tree west of the store, you know. So they'll give us a description. We're not going to have

that in our system, so we will have to locate that location and pin drop it into our files to create the address so we can precinct them.

One thing that is nice with the Reservations are there's just one precinct in our Peridot residence locations and then one in Bylas. So it's not like it's in -- you know, there's a whole bunch of different choices. So it's not quite difficult, but it is -- it's common.

Q. I think and you said slightly more common at least than other residences to have those issues?

A. Yes.

Q. Beyond the databases you listed, GIS, I believe you said the Assessor's, are there any other methods that you use to locate or any other services you use to locate a residence?

A. Google Maps.

Q. Google Maps?

Would you ever use like the Fire Department or 911 information?

A. That information is in our GIS maps.

Q. Oh, it's in the GIS maps? Okay.

A. Yes.

Q. And then for the second option, where folks draw a description of their residence, how often do you

encounter that?
A. I wouldn't say it's very often, and I really couldn't tell you what the amount is, because we don't really have a way of knowing how many have done that and that we've located the address from a drawing. There's no way for me to find that data without searching through every paper registration that was ever turned in.
Q. In the example we were discussing where the individual was homeless, do you know if they used a drawing or that option?
A. No, they typically will put in an address either at the -- we have two locations. They'll either utilize the Post Office address, like the physical location of the Post Office, or the physical location of our local park.
Q. And would it be any more common for folks living on a Reservation to use that option?
A. To -- oh. They actually do utilize an address for their local Post Office. There are some that have.
Q. There are some that have?
A. Yes.
Q. And my question is, is it any more common or not than folks not on a Reservation to use that option?
A. I wouldn't say it's any -- any more or less

common.

Q. And then speaking of Native American voters in Graham County, does your office do anything specific to try to increase registration with these voters?

A. I'm sorry, to try to what?

Q. Increase registration with such voters.

A. Nothing that I can think of, other than making sure that we, you know, locate where their residence is, what they've drawn on, and, you know, be able to process them and get them registered.

We occasionally will do voter registration drives out on the Reservations. It's not very fruitful, so it sometimes just isn't worth the time and effort. But we do everything that we can to make sure that what they provide on a form is acceptable and that we can register them.

Q. Are those voter registration drives, are there -- does your office take any specific efforts to make sure that they're targeting Native American voters, or are those drives evenly spread out throughout the county?

I'm trying to understand if there are any specific things that your office does to try and increase the registration in that demographic.

A. Okay. So, typically, outside of the

Reservation areas we get a lot of voter registration drives from other entities, political parties, high schools, things like that. So we don't really reach out too much to the city, like inside the city limit type people.

But when we're talking about the Reservation, there's not so many registration drives that are provided out there outside of like candidates, and so in the past there have been voter registration drives in those areas for that reason.

Q. Okay. Do you know if voter registration is any lower in Native communities than the county average?

A. I'm sorry, can you repeat that?

Q. Yeah.

Do you know if the registration in Native communities is any lower than the county average?

A. I don't believe it's any lower, but I'm -- I would be speculating.

Q. If the DPOR, the documentary proof of residence, is implemented by H.B. 2492 and H.B. 2243, what affect do you expect that will have on Native voters attempting to register to vote, if any?

MR. HORLEY: Calls for speculation.

THE WITNESS: I really don't know what the effect would be because I'm not quite sure what I would

be able to do. You know, I don't understand the bill enough to know whether I could still continue to address them the way that I currently do. So I really don't know.

BY MR. HEMSTREET:

Q. If those requirements are implemented, does your office have any plans currently to have any different drives than you currently do to reach out to the Tribes to educate them on the new requirements?

A. I have not looked forward to even assessing that information or -- I have not made any plans.

MR. HEMSTREET: I think this is a good time to take a quick break and go off the record.

MS. RUTH: Out of curiosity, how much longer do you think it's going to be? Because I'm going to need to feed my daughter again in about probably the next 40 minutes or so, within the next 40 minutes.

MR. HEMSTREET: Yeah, so I've --

THE COURT REPORTER: Would you like to go off the record first?

THE VIDEOGRAPHER: We're off the record. Time on the video monitor is 11:06 a.m. This ends Media 1.

(A recess was taken.)

THE VIDEOGRAPHER: We're on the record.

Time on the video monitor is 11:15 a.m. This begins Media 2.

BY MR. HEMSTREET:

Q. I'll thank you again for your time, Ms. Merriman. I just have a few items.

First, at the beginning you had notes that you showed me. What are those notes, again, that you had?

A. So it has the total number of Graham County voters, active and inactive, how many fed voters, which ones are no ID and which ones are fed, how many are active, how many are inactive, how many new voters I've had since January, how many are -- have a residential address that was different than their driver's license, and how many did not report their birthplace. I just was trying to think of things you guys might ask.

Q. How did you prepare those; where did you get that information?

A. This information is in the AVID system.

Q. All of that information was pulled from AVID?

A. Yes.

MR. HEMSTREET: Well, that is all that I actually have. I don't know if any other plaintiffs. Leah, if you're ready to jump in or --

MS. MOTZKIN: Yeah, I am. Thank you.

MR. HEMSTREET: Thank you, Ms. Merriman.

EXAMINATION

BY MS. MOTZKIN:

Q. Hi. Thank you. I'm Leah. I appreciate you answering just a few more questions, and they might feel a little bit out of order, as I'm just jumping in and asking a few questions, so I appreciate you bearing with me.

First, is old government data, such as MVD records from ten years ago, indicative of a lack of current U.S. citizenship?

MR. LANGHOFER: Calls for a legal conclusion.

THE WITNESS: Can you repeat that?

BY MS. MOTZKIN:

Q. Yeah, absolutely.

Is old government data, such as MVD records from ten years ago, is that indicative of a lack of U.S. citizenship today?

A. I'm not sure that I understand your question.

Q. Okay. Is data from the MVD, perhaps that someone has an F-type license, which I know we've talked about in a few contexts, from ten years, is that still indicative of a lack of citizenship currently?

MR. LANGHOFER: Same objection.

THE WITNESS: I'm not really sure how to

answer this, because somebody that registered to vote ten years ago, if they haven't updated their voter registration, we would have no reason to rerun their information through the databases, so it would just remain whatever it was ten years ago.

BY MS. MOTZKIN:

Q. Yeah, I'm sorry. Not voter registration, but MVD records. So is old government data from kind of the MVD records evidence and indicative of a lack of citizenship today?

MR. LANGHOFER: Same objection.

THE WITNESS: I don't know. I don't know how to answer that. I don't understand what you're saying. I'm sorry.

BY MS. MOTZKIN:

Q. Okay. When is information too old to qualify as information that someone is not a U.S. citizen today?

MR. LANGHOFER: Same objection.

THE WITNESS: I'm not aware of a time frame or a time limit.

BY MS. MOTZKIN:

Q. Okay. And we discussed a little bit about this earlier, but we discussed some of the valid sources of information per both rules that someone is not a U.S. citizen. I'm going to go through and run through a few

different hypotheticals to make it a little more concrete.

MS. MOTZKIN: If opposing counsel wants to put in any standing objections, now would be a good time on that.

MR. LANGHOFER: That's great. Yeah, let's just have a standing objection to calling for a legal conclusion. Thanks.

MS. MOTZKIN: Thanks.

BY MS. MOTZKIN:

Q. Okay. So is anything beyond a government or voter registration database a valid source of information that someone is not a U.S. citizen?

A. Outside of Motor Vehicle, Social Security, and the SAVE, I don't have any access to any other database.

Q. What about a phone call from the voter?

A. To declare that they're a noncitizen?

Q. Yeah. Would that be considered a valid source of information that someone is not a U.S. citizen?

A. I would have to -- I've never encountered anybody that called and said, hey, I'm not a U.S. citizen. If they did, I would actually have to confirm that I was speaking to the voter.

THE COURT REPORTER: We've got some background noise.

BY MS. MOTZKIN:

Q. How about an e-mail from the voter?

A. If a voter e-mailed me and said they were not a U.S. citizen --

Q. Uh-huh.

A. -- I would still have to -- I would still have to contact that voter, and especially if they're in my system as a U.S. citizen and their citizenship matched our databases, I would be very, very suspicious of receiving an e-mail or a phone call, and I would not process or make any changes without speaking to that voter.

And, honestly, they would have to come in and sign a form saying they didn't want to be registered, because if they're in my system as a citizen, they would have to come fill out a form requesting to cancel their voter registration.

Q. What about a signed letter from the voter?

A. If it was notarized, maybe, but --

Q. How about a phone -- oh, I'm sorry.

A. Or if it was -- if I was able to verify that signature with the signature that's in their record, which we do that on a canceled request; but, again, that would be very -- that would be very awkward and suspicious.

Q. Uh-huh. How about a phone call from a member of the voter's family?
A. That they were not a U.S. citizen?
Q. Yeah. Would that be considered a valid source of information that someone is not a U.S. citizen?
A. I would not consider that a valid source of information that would create me to change anything without, again, reaching out to that voter and making certain that I'm speaking with that voter. And once again, if the voter registration came back that they were a U.S. citizen, I would not change anything based on what somebody else said.
Q. Can it be a letter from a neighbor?
A. No.
Q. What about a phone call from law enforcement in Arizona, would that be a valid source of information that someone is not a U.S. citizen?
A. I could maybe consider the information; but, again, I would not do any processes without reaching out to the voter.
Q. What about an e-mail or a letter from a law enforcement in -- I'm sorry, a law enforcement officer in another state?
A. I would have the same process. I would still have to reach out with the voter. That law office would

have to -- or law officer would have to provide a lot of proof matching the voter information for me to even reach out to the voter and question any information. Again, if the database came back saying they're a U.S. citizen, I have no reason to believe that's inaccurate.

Q. And I assume that would be the same for a phone call from an officer in another state?

A. Correct. Yes.

Q. And what about an e-mail from an officer in Arizona?

A. The same.

Q. The same? Great.

How about an anonymous call?

A. The same. I would not -- I don't -- I would not make any changes to a voter based on anything like that. If I felt like there was a need to reach out to the voter, I would do so, and I would actually request a meeting with the voter, if possible.

Q. Is it fair to say that's the same for an anonymous e-mail?

A. That would be the same.

Q. Okay. And what about lists provided by third-party organizations like True the Vote?

A. I'm sorry, like who?

Q. True the Vote is one example of a third-party

organization, a list.

A. No. I, again, would not process any changes based on any outside data or person.

Q. Thank you.

Jumping quickly into H.B. 2492, I'm looking at Page 7, Lines 15 through 23, which is also Section 16-143. This provision discusses reporting obligations, the first of which was on or before October 31st, 2022, and that is that the Secretary of State and each County Recorder shall make available to the Attorney General a list of all individuals who are registered to vote and who have not provided satisfactory evidence of citizenship.

So since that deadline has passed, is your office no longer required by this provision to submit to the AG a list of its registered voters who have not shown satisfactory DPOC?

MR. HORLEY: Calls for a legal conclusion.

THE WITNESS: I'm not aware of -- I wouldn't -- I wouldn't know if that is still a requirement. I don't know. I'm going to have to say I have no idea.

BY MS. MOTZKIN:

Q. Thank you.

A. I do know quarterly we report our fed voters

like, but that's with our voter statistics, so, you know, all registered voters and then those that are fed only, and that is also placed on our website. Other than that, I don't know of any list.

Q. Got it.

So jumping in now to 2243, I'm looking at Page 5 and Line 41 and onto Page 6. In ARS 16-165(F) through (J) within H.B. 2243 there are a bunch of enumerated database matching procedures. Do you see those?

A. And that was Line 41?

Q. Yeah, starting at Line 41, which is (F), Section (F).

A. And then what was the question?

Q. Yeah. Do you see those?

A. Yes.

Q. Okay. Are the database matching procedures enumerated here the means by which County Recorders are to obtain information of a lack of U.S. citizenship?

MR. HORLEY: Calls for a legal conclusion. I'm not sure whether our standing objection is still in place. We've jumped around a little bit.

MS. MOTZKIN: Oh, I'm sorry. Let's take them off.

MR. HORLEY: Okay. Thank you.

MS. MOTZKIN: And then I hear your objection.

BY MS. MOTZKIN:

Q. So are these the means by which County Recorders are to obtain information of a lack of U.S. citizenship?

MR. HORLEY: Same objection.

THE WITNESS: I'm reading it again. Just a minute.

BY MS. MOTZKIN:

Q. Please.

A. I'm not aware that that is currently happening, because each county processes their own voters through AVID and we check our own voters through the databases that are listed in the HAVA checks. I've never been notified with a list that is described there in that. So I don't know what that is.

Q. Okay. Are the database matching procedures enumerated in these same 16-165(F) through (J) in H.B. 2243 the means by which County Recorders are to confirm information of a lack of U.S. citizenship?

MR. HORLEY: Same objection.

THE WITNESS: Can you scroll down?

So I currently do not run any kind of -- I don't -- where it says "Each month the County Recorder

shall compare persons who are registered to vote in that county and who the County Recorder has reason to believe are not U.S. citizens," I don't currently practice anything like that. I don't process anything monthly.

I process voters upon registration forms being received, and that is the only time I access their citizenship database. So if that is something -- that must be something new to this bill, because I'm not aware of that, and I don't process -- I don't do that currently.

BY MS. MOTZKIN:

Q. Okay. Is this clear or unclear?

MR. HORLEY: Same objection.

THE WITNESS: To me it's unclear.

BY MS. MOTZKIN:

Q. Thanks.

A. I -- I don't -- yeah, I'm not quite sure what they're referring to.

Q. Okay. And we're going to jump back into some of the hypotheticals we did before, but kind of focused instead on this language in 2243, which is reason to believe. So I'm going to ask you a few questions about whether certain information would constitute or certain things would constitute a reason to believe.

MS. MOTZKIN: Opposing Counsel, do we want

to enter the standing objections?

MR. LANGHOFER: Yeah, for calling for a legal conclusion. Thanks.

MS. MOTZKIN: Thanks.

BY MS. MOTZKIN:

Q. Okay. Would anything beyond a government or voter registration database constitute a reason to believe under 2243?

A. I do not believe so.

Q. Can it be a phone call from the voter?

A. Pertaining to which part?

Q. Would a phone call from the voter, could anything in a phone call give you a reason to believe that a person is not a U.S. citizen?

A. No. My answer's going to be the same. I would not make any process or make any change to a voter with any phone call, any -- any information from outside sources. Like I said, if I had reason, I would reach out to the voter.

Q. Okay. What if a registered voter transposed their first and last name on their registration application form?

A. We actually have had that happen, and we reach out to the voter when a system doesn't match. Sometimes it will come back on a social with a soft match, and the

soft match will show the name being transposed, and we'll reach out to the voter and say, you know, did you inadvertently put your last name first and your first name -- you know, and mix them up. We'll reach out to the voter, again, with all the ways that we have contact information.

Q. And what if a registered voter recorded a foreign place of birth on their form; could that give you a reason to believe that the voter is a noncitizen?

A. No.

Q. What if you identify a registered voter who has already satisfied DPOC requirements, but still holds an F-type license; is that a reason to believe they're not, in fact, a U.S. citizen?

A. Can you -- can you resay that?

Q. Yeah.

If you identify a registered voter who has already satisfied the DPOC requirement, but with an F-type license, is that a reason to believe that they are not a U.S. citizen?

A. Okay, so the F-type license does not satisfy the requirement, and so if the voter provided, like previously spoken about, the naturalization certification, they would then become a full voter. Their proof of citizenship would have been satisfied.

So the F-type license is no longer factored.
Q. What if the registered voter has never provided DPOC because they are exempt from the requirement due to when they registered?
A. I'm not certain what I -- I don't understand what you mean.
Q. Yeah. So if they registered prior to the DPOC requirement going into effect in 2005, would the failure to show DPOC under this exemption give your office a reason to believe that they are not U.S. citizens?
A. I'm sorry, I still don't understand the question.
Q. Thanks. Are there -- is it true that there are certain voters who are exempt from the DPOC requirements under a safe harbor provision because they registered prior to the DPOC requirement going into effect in 2005?
A. I'm not aware of that. If somebody registered back then and they haven't registered currently, the only time, again, that we will run a voter through the system is if they provide a new voter registration. So we would have no reason to look at old records and run them through the system to check if they are or are not a U.S. citizen. If they registered prior and it says that they are, then I mean that stands.
Q. Thanks.

MS. MOTZKIN: And we can take away the standing objection, if that's okay with everyone.

BY MS. MOTZKIN:

Q. I have just a few more questions. Thank you for bearing with me.

A. Okay.

Q. We discussed earlier how H.B. 2492 states that your office must also utilize any other state, city, town, county, or federal database and any other database relating to voter registration, correct, that we already spoke about that?

A. Yes, I remember.

Q. Okay. Could a list of registered voters provided by another Arizona agency constitute a database relating to a voter registration?

MR. HORLEY: Calls for a legal conclusion.

THE WITNESS: No.

BY MS. MOTZKIN:

Q. Could a list of registered voters provided by another state's government agency constitute a database relating to voter registration?

MR. HORLEY: Same objection.

THE WITNESS: No.

BY MS. MOTZKIN:

Q. Okay. And what about from a private group or a

private citizen?

MR. HORLEY: Same objection.

THE WITNESS: No.

MS. MOTZKIN: Thank you so much. I have no further questions.

THE WITNESS: Thank you.

MR. ATKINS: I have maybe five or ten minutes of questions, but I wanted to check with you, Ms. Merriman and Ms. Ruth, if a break is needed at this time.

MS. ROOF: It will probably -- I have told my husband to bring her in about ten minutes, potentially, so I'll touch base with him and let you know, but I anticipate within the next 10 to 20 minutes that a break will be needed.

MR. ATKINS: Okay. If it's all right, I should be able to conclude my questions within that time.

EXAMINATION

BY MR. ATKINS:

Q. So good morning, Ms. Merriman. My name is Alex Atkins. Once again, I represent Plaintiffs Mi Familia Vota and Voto Latino. I appreciate the time you've given all of us this morning.

Just have a few questions about various requirements on voter registration forms. So you've spoken a bit about applicants providing information about their place of birth, and I believe just a moment ago you stated that a foreign place of birth would not present a reason to believe that someone's not a U.S. citizen; is that right?

A. That's right.

Q. Can you explain why that is?

A. We actually have citizens that were born in another country due to their family, their parent or something, being in the military. The voter was born in the other country, but they were born as a U.S. citizen and they have the U.S. citizenship to -- you know, the check for U.S. citizenship comes back as a match.

I'm sure there's other reasons why somebody would have a birth outside of -- you know, outside of the U.S. But, no, that is not a reason for us to automatically assume that they're not a U.S. citizen.

Q. Understood.

And I guess as another potential example, naturalized citizens would theoretically have a foreign place of birth, but would nonetheless be citizens, right?

A. Right.

Q. And your office doesn't reject voter registration forms for failure to include place of birth, right?
A. Right, we do not currently reject.
Q. And is it correct that your office doesn't use birthplace information to verify an applicant's citizenship?
A. Correct. That's true.
Q. And just to be clear then, your office doesn't use birthplace information to determine if an applicant is eligible to vote, right?
A. Yes.
Q. Do you understand that under H.B. 2492 state form voter registration applicants must include their place of birth or the application cannot be processed?
MR. HORLEY: Calls for a legal conclusion.
THE WITNESS: Yes.
BY MR. ATKINS:
Q. Does your office have any means of accurately confirming that a place of birth provided by a voter registration applicant is correct?
A. No.
Q. And does your office have any ability to verify an applicant's citizenship using their place of birth?
A. No.

Q. Have you received any guidance from the Secretary of State about how to implement the birthplace requirement in H.B. 2492?

A. No.

Q. Am I correct that in one of your interrogatory responses you stated that your office may use a voter's birthplace to confirm their identity when speaking to them over the phone?

A. Yes.

Q. Now, we can look at the rog response, if needed, but I believe you also said that you only do that if the voter willingly provides such information. Does that sound right to you?

A. Yes.

Q. Can you explain, is that if the voter willingly provides their birthplace information on their application or over the phone or both?

A. On their application and over the phone. If they provided it on their application, we may say -- you know, we will confirm we're speaking with the voter by requesting their last four of their social, their date of birth, and we'll ask their place of birth if it is listed in the system.

Q. And so it sounds like there's other pieces of information about the voter that you would also use to

confirm identity over the phone?
A. Yes.
Q. And just for the record, what other pieces of information are those?
A. Their full date of birth, the last four of their social. We will even occasionally ask their mother's maiden name or their father's name, because that is an optional information that the voter can provide, and we'll use that sometimes when speaking with the voter. But mainly it will be their full name, full date of birth, the last four of their social, and possibly place of birth.
Q. And does place of birth have any special significance as compared to those other pieces of information when it comes to confirming a voter's identity over the phone?
A. No.
Q. Shifting gears, I'd like to ask a few questions about the citizenship checkbox that appears on both the state and federal registration form.
A. Okay.
Q. So, first of all, the citizenship checkbox has been on both voter registration forms for quite some time, right?
A. As far as I'm aware.

Q. And am I correct that your office does not reject voter registration applicants simply because a person fails to complete the checkbox?

A. Yes.

Q. So speaking about state form registrants in particular, if a state form applicant provides documentary proof of citizenship, but does not complete the citizenship checkbox, your office would still accept that application, correct?

A. Yes.

Q. And am I correct that that applicant would be registered as a full ballot voter?

A. Yes, if they came back with a match.

Q. Now, turning to federal form applicants, am I correct that federal form applicants are able to adequately establish their citizenship by affirming citizenship under the penalty of perjury on the federal form?

A. I'm not certain I understand what you're asking.

Q. Sure.

So I guess I'm alluding to information from the election procedures manual, which I believe says that an appropriate indicator of U.S. citizenship includes swearing or affirming that the applicant is a U.S.

citizen on the federal form. I believe it's Box 9 on the federal form, asks the voter to sign their name after an affirmation of eligibility, including citizenship.

Does that sound familiar?

A. They -- both federal and the state form are processed the same.

Q. So if an applicant submits a federal form and signs that citizenship affirmation, but does not complete the citizenship checkbox, does your office still register that voter?

A. Yes.

MR. ATKINS: That's all the questions I have. Really appreciate it. Thank you.

THE WITNESS: Thank you.

MR. HORLEY: I'm not sure whether any of the other plaintiffs have questions or, Jean, if now is a good time for us to take the break that you discussed.

MS. ROOF: Yeah, let me -- can you give me just a minute. Can you mute us? And I'll let you know, if you just give me a minute.

MR. HEMSTREET: We'll go off the record.

THE VIDEOGRAPHER: We are off the record. Time on the video monitor is 11:45 a.m.

(A recess was taken.)

THE VIDEOGRAPHER: We are on the record. Time on the video monitor is 12:33 p.m.

EXAMINATION

BY MR. HORLEY:

Q. All right. Hello, Ms. Merriman. My name is Tim Horley, and I am representing the State of Arizona and the Arizona Attorney General in this case. Thanks for your time. I may have just said good morning. I think it's now afternoon. So I do have just a set of questions, hopefully won't go too long. We're going to look at a couple documents, but we'll try to have us out of here expeditiously.

So my first set of questions is about sort of implementing laws and how you understand these laws, as plaintiffs asked you a lot about that.

So the first question is, will your office adhere to whatever the court orders regarding the implementation of these laws?

A. Yes.

Q. And you mentioned that some phrases in the challenged laws are unclear; is that right?

A. To me.

Q. Would guidance from the Secretary of State be helpful in resolving that?

A. I would -- yeah, I -- yeah, I think so, and I would also utilize my County Attorney, if needed.

Q. Okay. And could that guidance from the Secretary of State come in the form of an updated EPM?

A. Yes.

Q. And the EPM provides guidance on a lot of voting laws, including laws on topics other than the ones we've been talking about today, correct?

A. Yes.

Q. And you generally rely on the EPM to help implement those other laws?

A. Yes.

Q. And would it be easy to implement all of those laws without the EPM?

A. On my own?

Q. Yeah, if you didn't have the EPM guidance.

A. Well, as far as I know, I don't go outside the EPM. So I rely on that to know how I'm supposed to be processing. So I actually would have a hard time doing it outside of the EPM, to be honest.

Q. Yes. So other voting laws might be difficult to implement without guidance from the Secretary of State, not just these laws, correct?

A. Correct.

Q. So the same thing is true for these laws that

is true for a lot of other voting laws?
A. Yes.
Q. Okay. Now, I want to talk a little bit about verifying citizenship and the citizenship checkbox that we talked about.
Does your office do anything to verify DPOC when it is received?
A. Just the same as I had spoke before. We put them through the AVID voter registration process and click on the HAVA checks.
Q. So if there's a photocopy of a birth certificate or a passport, does your office do anything to verify the authenticity of that document?
A. We require the original document, and we will utilize that too, but that's outside of like -- so we verify that that is the person and we will use those forms as ways to prove citizenship.
Q. Okay. And so I just want to be clear. You require an original, not a photocopy; is that right?
A. I'm actually not certain. I would have to look at the EPM, if it says we could accept a copy of it. Most of the time people bring in their birth certificate and we just make a copy of it from the original, if we need to. So I would have to refer to the EPM if a copy is acceptable.

Q. Okay. Understood. Thanks.
A. Oh --
Q. Yes. Go ahead.
A. I'm sorry. I actually believe that a copy of the birth certificate is acceptable form.
Q. Okay. Understood.
And we talked a little bit or you spoke with Mr. Atkins a little bit about the citizenship checkbox that is on the state and federal forms. Do you think that that information, the checkbox, provides you with information on whether a voter is a citizen?
A. No.
Q. Why not?
A. Because the checkbox is just somebody saying. Like it doesn't provide any way for me to check anything. You know, so it's not providing any information. The person is just checkmarking that box saying that they are a citizen, but it's not verifiable.
Q. Okay. So if the person does not provide DPOC, would it provide any information in that case?
A. No.
Q. What about if you ran a HAVA check and it was unclear based on that whether that person was a citizen; would it be helpful to know the answer to the checkbox in that situation?

A. No.
Q. Okay. If someone were to mark no in the citizenship checkbox, but also provided a copy of a citizenship document, what would you do in that case?
A. I am not -- I've never had that happen. I can't speak from experience. I would have to look at the EPM and see if it has -- I don't know if it even has any instructions on if they checkmark no. I would confirm that they meant to checkmark that no.
Q. So is it fair to say that that would raise sort of a red flag for your office?
A. It would pose a question for sure.
Q. And you would want to follow up with the voter to understand why they marked no, correct?
A. Yes.
Q. Are there situations where someone could renounce their U.S. citizenship?
A. Yes.
Q. So like, for example, maybe a person was born in the United States, then moves to a different country, let's say Canada, and then once they're in Canada they renounce their United States citizenship.
So imagining that scenario, let's suppose that that person comes to Graham County and fills out a voter registration form and then that person provides a birth

certificate as DPOC showing a birthplace in the United States, but also checks no on the citizenship checkbox.
In that case, would the citizenship checkbox be material to determining whether the registrant is eligible to vote?
A. I would probably have to refer to my County Attorney and probably the Secretary of State's Office on how to go forward with that. I've never had that happen. I'm not really certain what the procedure would be in that case.
Q. But would you agree that in that situation, you know, that person does have DPOC, but they are, in fact, not a citizen?
A. Right. So I would reach out to the voter to ask why they answered that question as no.
Q. Right. And so in that case, answering that question no might tell you, oh, this person isn't a U.S. citizen, even though there might be some other data that suggests they are a U.S. citizen?
A. Correct. But I would imagine that they still would not come up in the system, in the HAVA checks.
Q. Yes, and I think that's -- I was also curious to ask you about that. So if they came up in the HAVA system, but they also had -- you know, and in the HAVA check let's suppose that they were once had a driver's

license in Arizona or something when they were a U.S. citizen. In that situation they've now renounced their citizenship. So you run a HAVA check. It says they still have this citizenship, but they've renounced. Would it be helpful in that situation to see, oh, they've marked no in the citizenship checkbox?

A. I would still have to handle it the same way and refer to the County Attorney, contact the voter. I would think if they renounced their citizenship, they would no longer have a driver's license or a social security in the system. Just my thought.

Q. Okay. But do you --

A. But I don't know.

Q. Yes, that's fair.

So do you know whether that kind of thing would be updated in the system when they renounce their citizenship?

A. I don't have knowledge of that.

Q. Okay. Thank you.

Now I want to ask a few questions about a rather large spreadsheet that your office produced. So I'm just going to pull that up. It's not in the folder that was shared with you, but if it's all right with everybody, I will just share the screen and then I can send it around through the chat after, after I'm done

asking questions. Is that all right with you, Ms. Merriman?

THE WITNESS: Is that okay?

MS. ROOF: Yeah, that's fine. I might have -- is it what we produced as 375?

MR. HORLEY: That's right. Yeah.

MS. ROOF: Do you mind, just so she can see it on a bigger screen, can I -- I think I have that, but it will just take me a second to get it pulled up. Is that okay?

MR. HORLEY: Yeah, absolutely. And we could do it -- I could share the screen at the same time, if that's helpful, or I could not, if that makes sense.

MS. ROOF: Let's try just sharing the screen and see if she's able to see it sufficiently, and if she isn't, then I have another alternative to have her see it, though.

MR. HORLEY: Okay. Thanks.

MR. MORGAN: I'd ask that you share the screen anyway just so we can all see it too.

Thanks.

BY MR. HORLEY:

Q. Yeah, so it should be up now. Are you able to see that, Ms. Merriman?

A. Yes.
Q. Okay, great. And do you recognize this document?
A. I did not produce this document, but it looks like it would be a status report out of AVID's system.
Q. Okay. And I'm not sure if you can see it on the screen share, but do you see up here it says GRAHAM000375?
A. Yes.
Q. Okay. Great.
MR. HORLEY: I would like to mark this as Exhibit, I believe we're at number 258; is that right, Jody?
THE COURT REPORTER: It is.
BY MR. HORLEY:
Q. So I see here there's a column for "Status" and then a column for "Status Reason." Am I reading that correctly?
A. Yes.
Q. So that shows what's someone's registration status and the reason why; is that right?
A. Yes.
Q. And then over here there's a column that says "Citizenship Verified," is that right?
A. Yes.

Q. And so if it says "Yes," that means they've been verified as a U.S. citizen; "No," they have not been verified as a U.S. citizen?

A. Yes.

Q. Okay. And then we talked a lot about the different categories of federal voters. So there's "Federal-ID Only" and "Federal-No ID." So these columns tell us whether that person falls into one of those two categories; is that right?

A. Yes.

Q. And then over here I see some dates. So it shows a "Registration Date" in these two columns and then the "Date of Change," is that right?

A. Yes.

Q. And does that "Effective Date of Change" tell us when their status was updated?

A. Not always. There are certain times that a status reason would not change the effective date. Say the voter called or filled out a form to change a phone number. That date might not have gotten changed.

Q. Okay. Understood. Okay.

So I am going to take us down to one of these rows. I'm going to draw your attention to Row 258.

A. Okay.

Q. Do you see this row, Ms. Merriman?

A. Yes, I do.
Q. And it says that the person's status is not eligible, and the reason is invalid citizenship proof; is that right?
A. Yes.
Q. So can you explain what that means?
A. So that means that the person registered to vote and they did not -- either they did not provide proof of citizenship or the system could not match their citizenship.
So back in -- that happened in 2014. That was prior to my time in the Recorder's Office, but I'm aware that in 2014 there were different rules in processing voters that had unmatched citizenship.
Q. Okay. Understood.
And so in that case, was this person's registration rejected?
A. So we don't reject. They're just not eligible until they provide further proof.
Q. Okay. And in these situations, like you said, you would provide notice to the voter and then give them a chance to provide that proof, correct?
A. Yes.
Q. Okay. All right. Now I'm going to take a look at another row. Row 566 here, do you see that,

Ms. Merriman?
A. Five-six -- yes.
Q. Okay. And then this is sort of the same thing here; is that right?
A. Yes, that's going to be the same reason for that.
Q. Okay. And here -- well, I'm sorry. I got a little lost.
So I'm noticing that in this one, in the "Citizenship Verified" column -- sorry, let me get us back there.
In the "Citizenship Verified" column it says the citizenship was verified; is that right?
A. Yeah, it says that in that column.
Q. Can you explain why it would say that if there was invalid citizenship proof?
A. I cannot say why that says "Yes."
Q. So does that seem like there may have been perhaps an error in inputting the data here?
A. Or there was an error in processing this report.
Q. Okay. Understood. All right. So now I've got one more row here. It's way down.
Okay. So this row, it's Row 6272; do you see that?

A. Yes.
Q. Oh, and I see that this person is listed as active and valid registration; is that right?
A. Yes.
Q. And then I see again in the "Citizenship Verified" column it says "No." So could you explain why that is?
A. Again, it could be just something in the way that the report was processed or -- I don't know. I could think of a time like so if the -- if they were not eligible at some point, like the system didn't match them and we sent a letter and the voter provided a certificate of birth, we may have failed to mark that box to "Yes," they were citizenship verified, because you -- I mean you have to checkmark that when you manually process. So that could have been missed.
Q. Okay. Understood.
So could it also have been the case that this person did not provide DPOC or their citizenship otherwise wasn't verified, but they were nonetheless registered as an active voter?
A. That's very unlikely. I'm not saying that we don't make errors, but it's very unlikely that they would be active valid without any kind of citizenship proof.

Q. Okay. And I see here in these -- the columns that deal with whether they're a fed -- a fed only voter it also --

A. Right.

Q. So that would mean that they were registered as a full ballot voter; is that right?

A. Correct.

Q. So this could have been a situation where someone's citizenship was not verified, but they were registered as a full ballot voter?

A. Again, I would say that's not likely. I would believe it was more like they provided a different type form of proof, like a birth certificate or an out-of-state enhanced driver's license, and the user failed to checkmark the citizenship box as verified.

Q. Okay. Understood. Thank you.

And then just for the record, I just want to make clear that it looks like the "Registration Date" was October 8th, 2018, and then the "Date of Change" is also October 8th, 2018; is that right?

A. Yes.

Q. Okay. Great. That's all I have on that document. So I'm going to close out of that.

Okay. And I have a few questions about some of the databases that we've talked about today. Does your

office consider the MVD data that the AVID system uses to be generally reliable?

A. Generally. Yes.

Q. Yes.

And we talked a little bit about a situation where a naturalized citizen's information hasn't been updated in the AVID database yet, so when you check it, it shows that they're not a citizen, even though they are, in fact, a citizen.

In that situation, can that voter easily fix the situation by sending you a copy of the naturalization certificate?

MR. ATKINS: Objection, form.

THE WITNESS: I believe they could provide a copy of the naturalization, but I don't know if -- if it had to be the original, then they would have to bring the original in.

BY MR. HORLEY:

Q. Okay. But either way, in that situation you mentioned that you would send them a notice, so then they could fix that situation by providing you all with the necessary documents?

A. Yes.

Q. Okay. Thank you.

And you mentioned that your office uses SAVE

sometimes, but you don't have a lot of familiarity with using it. Do you consider the SAVE system to be generally reliable?
A. I don't have any experience using it, but I would assume that it would be a reliable source.
Q. Okay. And then you also mentioned -- I just wanted to be clear. We talked a little bit about Social Security and the fact that the HAVA check also checks whether someone has a social security number. So in your view, does someone having a social security number demonstrate that that person is a U.S. citizen?
A. If it comes back with a match, I believe so.
Q. Okay. And if someone did not have a social security number, would that indicate that they are not a U.S. citizen?
A. If they didn't provide it?
Q. Yes, or if there was no match on the social security.
A. Not necessarily. If it doesn't match, we just reach out to the voter.
Q. Okay. And is it possible that someone who is not a U.S. citizen, maybe they're a green card holder, they would still have a social security number?
A. I'm -- I don't have any knowledge of that. I'm not sure whether they get a social security card or not.

Q. Okay. Understood. All right.
Now, I wanted to ask you some questions about birthplace. So if you have a place where voters can fill out the optional birthplace field, your office does not actively track whether someone enters that information, correct?
A. Correct. Yes.
Q. In your experience, though, do voters usually include their birthplace on their form?
A. It's a 50/50.
Q. 50/50? Okay.
And now I want to look at another document that you all produced, and this is the 2019 EPM, and I'm aware that we've already had this as an exhibit, but I think that the version you all produced is a little bit larger, so I think it might just be easier if I enter the version that your office shared. So if it's all right with everybody, I'm just going to screen share this one again as well. Does that work for you, Ms. Merriman?
A. Yes.
Q. Okay.
Okay. Can you see that?
A. Yes.
Q. Okay. And do you recognize this document?

A. Yes.
Q. And so this is the 2019 EPM that your office produced in discovery in this case?
A. Yes.
Q. Okay. I would like to mark this as Exhibit 259.
So I want to draw your attention here to the bottom of Page 4, top of Page 5. So do you see where it says "Birth Certificate" here?
A. Yes.
Q. Okay. And then it says, "A registrant may submit a legible copy of the registrant's birth certificate from any U.S. state or territory as satisfactory DPOC. ARS 16-166(F)(2). For U.S. citizens born abroad, a Certificate of Report of Birth or Consular Report of Birth Abroad issued by a consular officer from the U.S. Department of State will suffice for a birth certificate."
Did I read that correctly?
A. Yes.
Q. And then it goes on. "The registrant must supply supporting legal documentation (such as a marriage certificate or court-documented name change) if the name on the birth certificate or document is not the registrant's current legal name."

Is that right?

A. Right. Yes.

Q. Okay. And then it says, "If the registrant cannot provide supporting legal documentation to account for a different last name, a County Recorder must accept the birth certificate or document if at least the following information matches on both the birth certificate or document and the registration form."

Is that right?

A. Yes.

Q. And then it lists the things to match, and it says "First name; Middle name; Place of birth; Date of birth; and Parents' names."

Did I read that right?

A. Yes.

Q. So in this situation it would be important to know the registrant's place of birth; is that right?

A. Yes.

Q. And so it would be helpful if the person filled in their place of birth information on their voter registration form?

A. Yes.

Q. And that would be material to you being able to tell whether that person was eligible to vote?

MR. ATKINS: Objection, form.

THE WITNESS: It would be helpful in matching the information on the birth certificate if the registrant's last name did not match.

BY MR. HORLEY:

Q. Okay. And, now, next I'm going to look at the same page here where it says "U.S. Passport." Do you see that?

A. Yes.

Q. Okay. And then I'm just going to read this quickly as well. So it says, "A registrant may submit a legible copy of the pertinent pages of the registrant's U.S. passport or passport card, or present the registrant's U.S. passport or passport card to the County Recorder, as DPOC. ARS 16-166(F)(3)."

Is that right?

A. Yes.

Q. And then it says, "The pertinent pages of a U.S. passport are those that contain the photo, passport number, name, nationality, date of birth, gender, place of birth and signature (if applicable)."

Is that right?

A. Yes.

Q. So in that situation, when you're looking at someone's passport as DPOC, is it helpful to know what their place of birth is?

A. We could utilize it to match, yes.
Q. Okay. All right. And now I want to look at another page lower down here.
So here on Page 34 I'm looking at where it says "C. Other Sources of Information on Deceased Registrants." Do you see that?
A. Yes.
Q. Okay. So and then it says, "A County Recorder may also cancel a registrant's record if the County Recorder determines that the registrant is deceased based on other reliable sources, see ARS 16-165(A)(2), including, but not limited to, death notices received by the County Recorder's Office and an affidavit of death from the registrant's next of kin. A County Recorder should match as much information as possible (including first name, last name, maiden name (if applicable), year of birth, place of birth, and city or town of residence) and be reasonably certain that a true match exists before canceling a registrant."
Did I read that correctly?
A. Yes.
Q. And so in that situation, would it be helpful to know what the voter's place of birth is?
A. I'm not certain, because I don't believe that our affidavit that the next of kin fills out has that

information; but if it's there, it would be utilized. It could be utilized.
Q. So in that situation it would be helpful if the person included their place of birth on a voter registration form?
A. It could be.
Q. Would you say it would be important that they did so?
A. I wouldn't say it would be important. I feel like we would verify the other items.
Q. Okay. But you could --
A. That we do currently. Sorry.
Q. No, go ahead.
A. We currently verify the other items.
Q. And you -- do you verify place of birth as well?
A. No.
Q. Okay. All right. One more page on this. Thank you for bearing with me as we go through this.
So on Page 48, I'm looking at where it says, "5. Minimum Requirements for Requesting a Ballot-by-Mail." Do you see that?
A. Yes.
Q. And then it says, "In order for the County Recorder to process a ballot-by-mail request, the

request must contain at least the following information: The voter's name; The voter's residential address; The voter's date of birth; at least one of the following: The voter's state or country of birth; or Another piece of information that, if compared to the voter's record, would confirm the voter's identity, such as the AZDL/ID number or SSN4, father's name, or mother's maiden name."

Is that right?

A. Yes.

Q. So in this situation where you're looking at the requirements for requesting a ballot by mail, would it be helpful if the person had filled in their birthplace on their registration form?

A. Not necessarily, because we process the ballot request separately, and our ballot request might actually -- it is one of the items that we put on there, that the voter could provide their state or country of birth, but they do not have to provide it if they provide the other items. So as far as like we'll compare the place of birth on a ballot request versus the voter's registration record. So it's just not something that we would compare, probably. But if it was there and we could utilize it, we might likely utilize it.

Q. Okay. And that's because the EPM instructs

that that is one of the things that could be used to ensure that they have a valid ballot by mail request; is that right?

A. Right.

Q. Okay. All right. Thank you.

So that is all I have for --

MR. HORLEY: Oh, and I'm not sure if I marked this document. This would be Exhibit 259.

THE COURT REPORTER: We did.

MR. HORLEY: Okay. Thank you.

BY MR. HORLEY:

Q. All right. So if there was a discrepancy between two applications who had the same name, same address, but listed two different places of birth, how would your office address that?

A. In the past, if we've had that, we just put whatever they put on their current form. We don't look into why they put one state over a different state. You know, we don't question why they changed their state of birth.

Q. Okay. So you would treat that as a single registrant, not as multiple people?

A. Right. Right. If all the other information matched, we would just enter the new state of birth on the new registration form in the current record.

Q. Okay. Understood.

And if a court or the Secretary of State issued guidance that the county should change how it uses birthplace information, would you follow that guidance?

A. If he -- if the Secretary of State put it in the EPM?

Q. Yes.

A. Yes.

Q. Or if a court ordered that you change how you use it, you would follow that guidance as well?

A. Yes.

Q. Okay. Almost towards the end. Just a few more questions. Thank you again.

So I wanted to ask a little bit about third-party voter registration drives. Do you ever receive registration forms from third-party voter registration organizations that conduct registration drives?

A. Yes.

Q. I'm sorry, what was -- okay.

And we've heard from some of the other County Recorders that they've received large numbers of voter registration forms from such drives that have false information; for example, totally false names, identities, false driver's license numbers or things

like that.

Has your office experienced that?

A. We did in 2022.

Q. Okay. And could you just describe what happened in 2022 with that?

A. So we received it was about 17 or 18 voter registration forms that were turned in to Maricopa County through a third-party registration drive, and in looking at the voter registration forms, they were either already registered and the data was completely off or it matched some of the data, but not all of the data. The signature would be completely different or like the first name would be the middle name and the middle name would be the first name. So there were like differences.

And so we did reach out to some of the voters and found that they did not fill out that form. So we sent all those forms on to the County Attorney's Office and we set them aside and did not process them.

Q. Okay. Understood.

And I just wanted to double-check. You said at the beginning, I think -- I may have misheard you. You said they turned it in to Maricopa County, but did they turn it in to Graham County?

A. So they turned them -- the third-party

submitter sent all those forms in to Maricopa County. Then Maricopa County took all of the forms that belonged to each of the counties and sent them, you know, forwarded them on to the correct counties. That's why I'm not sure. We had 17 or 18. One of them was not our county, and we had to forward it on to Cochise. So they were turned in to Maricopa, but the forms were all sent to us to be processed.

Q. Okay. Understood.

So you said that you referred that to the County Attorney's Office. Can you explain why you did that?

A. Because we realized that there was -- they were fraudulent, and we weren't certain how to handle it, so Wendy felt like we should advise the County Attorney that it was happening and that we were putting those forms off to the side and we were not processing them.

Q. Okay. And would you consider that, those forms, as being fraudulent attempts to register to vote?

A. I actually think those were forms filled out by people that were paid to turn in voter registration forms. I do not believe that the voter was creating fraud. I believe that there was a third-party person that was committing fraud by filling out those forms.

Q. Okay. Understood.

And do you recall which organization it was that turned in those forms?

A. I do not recall the organization. I don't think it was one single organization, as it was like voter registration drives. I know each one of the forms had some sort of code stamp on them which told who in that -- I guess in Maricopa County the code meant something to them over who that third-party submitter was, but I am not aware of who it was.

Q. Okay. Thanks.

And then I wanted to ask a little bit more about the HAVA checks on AVID. So when you are checking a registrant's identity on AVID, is it possible that there could be a false positive match?

A. I'm not aware of it.

Q. But is it possible that that could happen?

A. In my recollection, no. I don't think that it could falsely match it.

Q. Okay. And then the last set of questions. Your office does not investigate potential cases of voter fraud, correct?

A. We do not, no.

Q. Your office isn't responsible for prosecuting cases of voter fraud?

A. No.

Q. And so you don't keep any records on whether there is or is not voter fraud in Graham County?
A. If -- like pertaining to those 17 or 18 registration forms, we kept them on hand in case anything came out of it statewide, we could provide those forms, if necessary; but that is all that we do.
Q. Okay. And so do you recall any instances of voter fraud of any kind in Graham County since you've been there?
A. No.
Q. Okay. And that could be because that is not something that your office tracks or is responsible for tracking; is that right?
A. Right.
Q. Okay.
MR. HORLEY: All right. Those are all my questions. Thank you very much, Ms. Merriman. Appreciate your time.
THE WITNESS: Thank you.

EXAMINATION
BY MR. LANGHOFER:
Q. Good afternoon, ma'am. My name is Kory Langhofer, and I represent the RNC. I think I have just three questions for you, because, mercifully, most of

the questions I had have been asked by people that came before me.

The first thing I'm going to do is show you a -- the EPM. I think it's already been marked as Exhibit 259.

Here we go. And you can see that okay?

A. Yes.

Q. All right. And I'm on Page 206 of the EPM here, and just for context I'll scroll back up to 205. You can see where in this section it talks about verifying provisional ballot status.

You're familiar with provisional ballots, I take it?

A. Yes.

Q. So I want to look at the last paragraph here. Is that big enough on your screen for you to read it? You don't have to read it out loud. I just want to see if you can read it.

A. I can, except like the right side is blocked from the --

Q. Oh, I'm sorry. Is that any better?

A. -- all the videos.

I don't know how to -- how do I get that off? Do I just minimize?

Q. Is that better?

A. Oh, there. I can read it all there, yeah.
Q. Let me know when you're done.
A. Okay.
Q. All right. And you would agree with me that this paragraph gives you another instance in which it would be appropriate for your office to use birthplace?
A. Yes.
Q. All right. Let me try to take off my screen share, if I can manage that technologically.
So the second question I have for you is, when someone fills out the state form and they don't attach to that DPOC and the HAVA check doesn't return -- doesn't show they've previously proven their citizenship, so you have to send a notification to the voter saying, hey, we don't -- we can't confirm your citizenship and so you need to send it in to us in order to register. In those circumstances, how common is it for the voter to respond and actually provide documentary proof of their citizenship?
A. Uncommon.
Q. Okay. Less than half?
A. It's less than an eighth.
Q. Okay. Do you know why that is?
A. I don't. I have 47 fed voters right now, and every single one of them have received a letter, have

the ability to provide the information. Several of them I know are citizens. They just have out-of-state driver's license because they're -- they don't want to change their driver's license, and for whatever reason they don't bring it in or provide a copy.

Q. Okay. You say you know they're citizens. How do you know that they're citizens?

A. Through church.

Q. Does your church check passports?

A. Well, no. I shouldn't say that I know that they're citi -- I mean I know that they've been in -- I shouldn't say that. I should strike that. I don't know that they're a U.S. citizen. I know that they've been in the U.S. for a very long time.

Q. Last question I've got for you is a hypothetical. So another example about how you might be able to use the birthplace. On the state form the required information includes birth date, but not place of birth or social security, correct?

A. Correct.

Q. So if you received on -- let's just say on a given day. On, you know, Tuesday, since Monday's a holiday, you receive two voter registration forms. Same name, as it happens. The address could be the same or it could be different. Let's go with different, because

Tim's already asked you about the same address. And funny enough, the birth date is the same. But they provided different places of birth.

Would you determine that that's the same person or two different people?

A. I would likely treat them as two different people and send the letter to each person at each individual address.

Q. Based on the different places of birth?

A. Well, based on that I don't have a whole lot other information to go off of that they would be the same person, unless you're saying in this hypothetical question that they have the same social, same date of birth, same name, but a different birthplace. I would treat them as the same person. But if all the data is different, I would treat them as individuals.

Q. Yeah, I'm imagining a situation where someone just leaves their social off, because it's an optional field and they may not want to give it for one reason or another. Does that change your answer?

A. Same name, but different birthplace?

Q. (Nodded.)

A. Same date of birth?

Q. Yes, ma'am.

A. I would likely think they were the same person.

Q. I'm sorry, different -- you might have just said the same place of birth. I'm saying the name's the same, the birth date's the same, but the place of birth is different.
A. I would still have reason to believe that's the same person, and so I would reach out to the most recent voter registration form and send a letter.
Q. And you would think it's the same -- what if it's a common name, like Joe Smith?
A. And you said different addresses?
Q. Correct.
A. Okay. Different addresses, I would treat them as individual voters, and I would send a letter to each person at the address that they listed. If I found that they were one and the same, then I would merge the record.
Q. Okay.
MR. LANGHOFER: That's all the questions I had for you. I really appreciate your time.
Any other questions on the defense side?
Hearing none, Robbie, any more questions on the plaintiff side?
MR. HEMSTREET: I have just one question.

RE-EXAMINATION

BY MR. HEMSTREET:

Q. Regarding, Ms. Merriman, the fed only voters that you know personally through church, do you know if any of those individuals were born in the U.S.?

A. I believe they're born in the U.S. They have church records that date back to -- like they date back a ways. What they said is they just don't want to change their driver's license.

Whether they're going to bring in their stuff prior to the election? They might. Right now nobody's really worried about it because there isn't an election this year.

Q. Fair enough.

And from those church records, though, do you have reason -- do the church records --

A. I'm sorry?

Q. I'm sorry. Do the church records indicate, though, that they were born in the U.S.?

A. I believe they would. I don't know. I just know these -- I know two people that recently voted, and they're fed voters that have been here for a long time, but they've maintained their out-of-state driver's license.

MR. HEMSTREET: And, Alex, I saw you come

on. Do you have any other questions?

MR. ATKINS: Yeah, I just have a few follow-up questions.

RE-EXAMINATION

BY MR. ATKINS:

Q. Ms. Merriman, can you just remind us all how long you've worked in election administration in Graham County?

A. Okay. So I started at the Graham County Recorder's Office in February of 2016.

Q. Okay. And in your time working for the Graham County Recorder's Office, have you ever encountered a voter who renounced their citizenship?

A. No.

Q. Are you able to say approximately how often applicants provide a birth certificate as DPOC?

A. Typically, not often, but we do get high school voter registration forms from junior/senior students, and the teacher will always have the student provide a birth certificate, a copy of the birth certificate to go along with the form, just so that we have that information if it is necessary.

Q. Have you ever encountered the situation that you discussed with Mr. Horley where someone submitted

their birth certificate but had changed their name?
A. I don't recall having anyone with a different name than their birth certificate, no.
Q. So is it fair to say that you've never had to use someone's place of birth to confirm the validity of a birth certificate because of a name change?
A. No, I have not.
Q. Have you ever had to use place of birth to confirm the validity of an applicant's passport?
A. No, I have not.
Q. Have you ever used place of birth to assist you in canceling a registration of a voter being deceased?
A. No, I have not.
MR. ATKINS: Those are all the questions I have. Really appreciate your time today. Thank you.
MR. LANGHOFER: I've got a couple clarification points, unless there's more from the plaintiffs.

RE-EXAMINATION
BY MR. LANGHOFER:
Q. So you said a moment ago you've not seen someone submit a birth certificate as documentary proof of citizenship where the birth certificate name was different from their current name. Most women in Graham

County change their last name when they get married; is that fair?
A. Pretty fair.
Q. And some percentage of women in Graham County use their birth certificate as DPOC, right?
A. We don't typically have a lot of people that provide a birth certificate for their DPOC.
Q. What do they provide?
A. A driver's license.
Q. And the driver's license, though, in getting their driver's license they could have used their birth certificate at the MVD?
A. I'm sorry, I guess I don't understand what you're asking.
Q. So Arizona has for a long time required you to prove citizenship or legal status in order to get a driver's license. So you're saying people show their driver's license to establish citizenship most of the time in Graham County.
A. They will.
Q. But those driver's licenses could themselves have been based on using a birth certificate to prove citizenship?
MR. ATKINS: Objection, calls for speculation.

THE WITNESS: I would imagine they had to provide their birth certificate to get the Arizona driver's license.

BY MR. LANGHOFER:

Q. I think you're -- you have not -- speaking of your church records, you've not actually seen any church records that show that these people that you expect are citizens, you've not seen church records proving they're citizens?

A. No, I have not, but they do have a state-enhanced driver's license.

Q. Okay. From a different state?

A. Right.

Q. Have they -- have you seen their driver's licenses?

A. One of them I've seen.

Q. So --

A. Not in my work capacity, but outside of my work capacity.

Q. I see. So -- and where was that driver's license issued?

MS. ROOF: That's not relevant.

THE WITNESS: Yeah, I mean --

MR. LANGHOFER: Well, I mean I'll explain the relevance. I don't think I'm obligated to, but I

think I will.

MS. ROOF: I just want to be careful here because I know that this transcript itself hasn't been designated confidential, if we need to designate it in this portion, but this is a small county with only 47 people, and I just -- I'm concerned that we're starting to get into information that could disclose the identity of a voter.

MR. LANGHOFER: That's fair. I'm not going to ask any names. I'll explain the relevance. I mean --

MS. ROOF: But I'm saying even without a name, absent a name, if there's enough information disclosed, I feel like we're to the point where we might be able to ascertain specific voters, and that concerns me.

BY MR. LANGHOFER:

Q. Okay. Let me ask the question a different way that I think will avoid the sort of individual identifications issue.

When you say enhanced driver's license, you mean it's from a state that requires proof of citizenship in order to get a driver's license, correct?

A. So an enhanced has the actual stamp that says

"USA," which means that they had to verify citizenship in order to acquire that. It's kind of like our travel ID thing that we have to -- that we can do in Arizona. So an enhanced driver's license is an acceptable form. They can provide a copy of an enhanced driver's license to become a full ballot voter.

Q. Okay. So it seems to you then this person could prove that he or she is a citizen if he or she wanted to?

A. Yes, if they want to.

Q. And your office has given this person the option of getting a full ballot by proving citizenship?

A. Yep. Yes, as we have all of them.

Q. Yeah, of course.

MR. LANGHOFER: That's all I've got. Anything else from anyone?

Thank you, ma'am, for your time. I really appreciate it.

I guess, Dan, do you want to take us off the record.

THE VIDEOGRAPHER: You got it.

We are off the record. Time on the video monitor is 1:26 p.m. This ends Volume 1, Media 2 in the 30(b)(6) deposition of Graham County Recorder by Polly

Merriman.

(Deposition Exhibits 249 through 259, inclusive, were marked for identification.)

(The videotaped deposition concluded at 1:26 p.m.)

______________________________

POLLY MERRIMAN

STATE OF ARIZONA )
) ss.
COUNTY OF MARICOPA )

BE IT KNOWN that the foregoing videotaped deposition was taken before me, JODY L. LENSCHOW, RMR, CRR, Certified Reporter No. 50192 for the State of Arizona, and by virtue thereof authorized to administer an oath; that the witness before testifying was duly sworn by me; that the questions propounded by counsel and the answers of the witness thereto were taken down by me in shorthand and thereafter transcribed under my direction; that a review of the transcript by the witness was requested; that the foregoing pages contain a full, true, and accurate transcript of all proceedings and testimony had, all to the best of my skill and ability.

I FURTHER CERTIFY that I am not related to nor employed by any of the parties hereto and have no interest in the outcome thereof.

DATED at Phoenix, Arizona, this 12th day of September, 2023.

__________________________________

JODY L. LENSCHOW, RMR, CRR
Certified Reporter
Certificate No. 50192