UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

Mi Familia Vota, et al.,         )
                                 )
                 Plaintiffs,     )   No. 2:22-cv-00509-SRB
v.                               )
                                 )   Phoenix, Arizona
Adrian Fontes, et al.,           )   December 19, 2023
                                 )   9:34 a.m.
                 Defendants.     )
_____)


*BEFORE:   THE HONORABLE SUSAN R. BOLTON, JUDGE*

*REPORTER'S TRANSCRIPT OF PROCEEDINGS*


*<u>CLOSING ARGUMENTS</u>*


Official Court Reporter:
Teri Veres, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 38
Phoenix, Arizona 85003-2151
(602) 322-7251


Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription


UNITED STATES DISTRICT COURT

***A P P E A R A N C E S***

For Plaintiff United States of America:

U.S. DEPARTMENT OF JUSTICE - VOTING - M STREET
By:  **Emily Brailey, Esq.**
150 M Street NE
Washington, D.C.  20503

U.S. DEPARTMENT OF JUSTICE CIVIL RIGHT DIVISION VOTING
SECTION - 950
By:  **Richard Dellheim, Esq.**
     **Margaret Turner, Esq.**
950 Pennsylvania Avenue NW
Washington, D.C.  20530

For Plaintiff ADRD Action, Arizona Students' Association,
League of United Latin American Citizens Arizona, Living
United for Change in Arizona:

CAMPAIGN LEGAL CENTER
By:  **Danielle Marie Lang, Esq.**
     **Molly Danahy, Esq.**
1101 14th Street NW, Suite 400
Washington, D.C.  20005

Mayer Brown, LLP
By:  **William Joseph McElhaney, III**
71 S. Wacker Drive
Chicago, Illinois  60606

For Plaintiff Arizona Asian American Native Hawaiian and
Pacific Islander for Equity Coalition:

LATHAM & WATKINS
By:  **Amit Makker, Esq.**
     **Sadik Huseny, Esq.**
505 Montgomery Street, Suite 2000
San Francisco, California  94111

ASIAN AMERICANS ADVANCING JUSTICE
BY:  **Niyati Shah, Esq.**
1620 L Street NW, Suite 1050
Washington, D.C.  20036

*A P P E A R A N C E S   C O N T ' D*

For Plaintiff Arizona Democratic Party, Democratic National Committee:

        WILMER CUTLER PICKERING HALE & DORR, LLP
        By:  **Christopher E. Babbitt, Esq.**
             **Daniel S. Volchok, Esq.**
        2100 Pennsylvania Ave. NW
        Washington, DC 20037


For Plaintiff Chicanos Por La Causa, Chicanos Por La Causa Action Fund, Poder Latinx:

        ARNOLD & PORTER KAYE SCHOLER, LLP
        By:  **John A. Freedman, Esq.**
        601 Massachusetts Avenue NW, Suite 1000
        Washington, D.C.  20001

        FAIR ELECTIONS CENTER
        By:  **Jonathan Sherman, Esq.**
        1825 K St. NW, Ste. 701
        Washington, DC 20006


For Plaintiff Voto Latino, Mi Familia Vota:

        ELIAS LAW GROUP, LLP
        By:  **Christopher Dodge, Esq.**
        250 Massachusetts Avenue NW, Suite 400
        Washington, D.C.  20001


        HERRERA ARELLANO, LLP
        By:  **Austin Tyler Marshall, Esq.**
        1001 N. Central Avenue, Suite 404
        Phoenix, Arizona  85004-1500


For Plaintiff Promise Arizona, Southwest Voter Registration Education Project:

        MALDEF
        By:  **Ernest Israel Herrera, Esq.**
             **Erika Cervantes, Esq.**
        634 Spring Street, 11th Floor
        Los Angeles, California  90014


                    UNITED STATES DISTRICT COURT

4

***A P P E A R A N C E S   C O N T ' D***

For Plaintiff Tohono O'odham Nation:

    OSBORN MALEDON, PA
    By: **Joshua James Messer, Esq.**
    P.O. Box 36379
    Phoenix, Arizona  85067-6379


For Defendant State of Arizona Kris Mayes, Jennifer Toth:

    ARIZONA ATTORNEY GENERAL'S OFFICE - PHOENIX
    By: **Joshua Michael Whitaker, Esq.**
        **Timothy E. Horley, Esq.**
        **Kathryn Boughton, Esq.**
    2005 N. Central Ave.
    Phoenix, AZ 85004


For Defendant Stephen Richer:

    MARICOPA COUNTY ATTORNEY'S OFFICE
    By: **Anna Griffin Critz, Esq.**
    225 W. Madison Street
    Phoenix, Arizona  85003


For the Intervenor-Defendants State of Arizona, Kris Mayes, Ben Toma, Warren Peterson:

    GALLAGHER & KENNEDY, PA
    By: **Hannah Hatch Porter, Esq.**
    2575 E. Camelback Road
    Suite 810
    Phoenix, Arizona  85016-9225


For Counter Plaintiff Republican National Committee:

    STATECRAFT, P.L.L.C.
    By: **Kory A. Langhofer, Esq.**
        **Thomas Basile, Esq.**
    649 North 4th Avenue, Suite B
    Phoenix, Arizona  85003

**P R O C E E D I N G S**

*(Proceedings begin at 9:34 a.m.)*

COURTROOM DEPUTY:  We're on the record in civil docket 22-509, Mi Familia Vota versus Katie Hobbs.

We are set for a bench trial.

THE COURT:  Good morning, Ladies and Gentlemen.

This is the time set for closing arguments.  I have received the parties' Proposed Findings of Fact and Conclusions of Law.  I know there's several pending motions.

The only one that I wanted to specifically ask about was whether or not there is any objection to the plaintiffs' revised request for judicial notices?

MR. WHITAKER:  Your Honor, Josh Whitaker for the State and Attorney General.  I believe that we filed a response to it yesterday, which largely agrees with it.

THE COURT:  So there is a response now filed?

MR. WHITAKER:  Yes.  Is that right?  Yes.

THE COURT:  "Largely agrees with it"?  Does it say "we object to it" or "these things don't matter"?

MR. WHITAKER:  As I recall, there are a couple where we take slight issue with it; but for the vast majority of the statements we agree that the documents are noticeable and that they say what plaintiffs say.

THE COURT:  Okay.  Well, since there's a response on the record, I will take a look at it at some point in time,

but I'm not sure there's any other pending motions that I need to have anyone address this morning.  They can be resolved on the papers, so closing argument.

MR. BABBITT:  Good morning, Your Honor, Christopher Babbitt for the DNC and the ADP.

THE COURT:  Can you give me an idea of what the plan is this morning?

MR. BABBITT:  I'm glad you asked.  So absent further direction from the Court, our proposal would be to spend the morning on this hearing, and our suggestion would be that we split the time evenly among the plaintiffs and the defendants. We'd like to reserve a few minutes for rebuttal, if we could; but if the Court prefers to go longer or shorter, we can accommodate.

THE COURT:  That's fine.  We will take a break in an hour and fifteen minutes.

MR. BABBITT:  Okay.

THE COURT:  Will you be making the entire closing argument?

MR. BABBITT:  Thankfully, no.  What I will do is I will provide a brief overview of what we heard at trial.  I'll address threshold questions of standing to the extent the Court has any questions, the *Anderson-Burdick* framework, and then I'll turn it over to each of my co-counsel who will address specific claims in more detail.

THE COURT:  Okay, please proceed then.

MR. BABBITT:  With that, Your Honor, trial confirmed that the Challenged Laws make it harder to register to vote, harder to stay registered and harder to cast a ballot; and they do so for naturalized citizens, voters of color and those of lower socioeconomic status.

Trial -- the post-trial depositions of the legislators also confirmed that the burdens imposed by these laws are not justified by any sufficiently weighty state interest, and what follows from those points and what we'll present today is that the plaintiffs have carried their respective burdens of proof and that judgement should be entered accordingly.

And before turning to the specific evidence that was adduced at trial, I'd like to remind the Court about where we were before trial began.  So prior to trial, the Secretary of State filed answers admitting core allegations in this case.

In particular, the Secretary admitted that the challenged provisions -- and I'm quoting -- "the challenged provisions do not advance any legitimate regulatory interest in ensuring free, fair, and secure elections, furthering the orderly and efficient administration of elections, or preventing fraud in elections."

That's at our Proposed Findings of Fact 594.

The Secretary also admitted that "there is no

UNITED STATES DISTRICT COURT

rational or strong interest served by the DPOC Requirement, Birthplace Requirement, the Checkmark Requirement, or the mandated use of potentially outdated and incorrect citizen data to purge eligible voters from the rolls."

That's at Paragraph 595.

Not surprisingly, the Secretary offered no defense of these laws at trial.  The Attorney General's Office, for its part, identified in its JPTO an expert, Robert Stein, to defend the laws.  He's a professor at Rice University.  He's supposed to defend the laws and opine that it would be premature to rule on them prior to implementation, but on the last day of trial they pulled Professor Stein.  He never testified.  And one final frame in point, the legislators, as the Court is well aware, fought tooth and nail all the way to the Supreme Court to avoid having their depositions taken in this case.

Well, we've now taken their depositions and the reasons for their resistance are clear.  The legislators had no evidence of voter fraud.  The Legislature didn't bother to evaluate the effect of the laws on those who would be most burdened by them.  It seeded responsibility to drafting and evaluating them to the Free Enterprise Club, an outside organization.  It ignored the warnings of its own legislative counsel.  It brushed aside the concerns of the Association of Counties in Arizona, and it raised 2243 through the

Legislature on the final day of the session without any legislative debate or analysis.

All of that frames what we heard at trial.  The plaintiffs established through two highly-regarded qualified experts in the field of political science, Traci Burch and Michael McDonald, that the Challenged Laws will impose meaningful burdens on the right to vote and that those burdens will fall disproportionately on naturalized citizens, voters of color and voters of lower socioeconomic status who are least able to bear those burdens.

The plaintiffs also established through two highly qualified historians, Vernon Burton and Derek Chang, that the laws follow on a history in Arizona of laws designed to deny immigrants and minorities the right to fully participate in our democracy and in the civic institutions of this state.

Professor Burton also testified to the state's shifting demographics over the past twenty years with a significant increase in the ratio or the proportion of minority and naturalized citizens relative to the white population, again, with a greater proportion of new voters who would be disproportionately affected by these laws coming into the state over the past twenty years.

The plaintiffs established through Lorraine Minnite, one of the world's leading experts in voter fraud, that fraud involving non-citizens is exceedingly rare and that specious

claims of fraud do harm to our democracy.

Her testimony on the absence of fraud was echoed by virtually every other witness, from the County Recorders and the State; and the defendants acknowledge in their own Proposed Findings of Fact that voter fraud in Arizona happens only, quote, "very rarely."

And we heard from the DOJ's expert, Eitan Hersh, from Tufts University, that birthplace is both not used and not useful as a means of establishing eligibility to vote. Again, witnesses from the counties and the Secretary of State's office confirmed that testimony.

Beyond all of that expert and government testimony, we heard -- which is unrefuted on those core points -- we heard from fact witnesses from the plaintiffs on how these laws will harm their organizations and the constituencies they serve.

Their testimony explains the difficulties that they encounter in registering to vote, the distrust of government that exists within -- government intrusion and the fears of government intrusion that exist within certain communities based on their histories in this country and the practical difficulties that those of lower socioeconomic status will have in obtaining DPOC and complying with complicated legal regime.

The defendants' case comes down to three main

points.  First, they argue that the laws haven't been implemented yet so it's premature to evaluate their harm, but they pulled their expert on that point; and the plaintiffs credibly offered evidence at trial on exactly the injuries that they would face if the laws were implemented as written.

Second, the defendants try to justify these laws on the ground that voter fraud is a risk and that the Legislature acted reasonably to restore confidence in our elections after the 2020 election, but the Legislature didn't make any findings to that fact.  They didn't consider any evidence to that effect.  They didn't consider alternative means to addressing those concerns, and it entirely ignored countervailing considerations offered by the Arizona Association of Counties that the laws would chill participation in our democracy and make it more difficult for eligible citizens to vote.

And, in fact, the Attorney General's lead elections investigator, Todd Lawson, admitted at trial that any concerns, any suggestion that the laws would restore confidence in our elections was speculative.

Finally, their expert asserted that the laws will have, quote, "no effect on overall voter turnout."  "Overall voter turnout," that's in their Proposed Findings of Fact 235; but we need to be clear on what that means.

That comes from Mark Hoekstra, the Baylor economist,

who acknowledged in his own prior work that seven percent of US citizens lacked ready access to DPOC.  Professor Hoekstra did not rebut Professor Burch's conclusion that the laws would likely suppress registration and turnout among certain voters.  Rather, he testified only that the laws would have no, quote, "net effect."

That is, in his words, it "is not that there will be no voters who are adversely affected."  It's that "on net, any number of adversely affected voters will be counterbalanced by voters who come into the system."

That's at our Proposed Findings of Fact 495.

And according to Hoekstra, drawing from the academic literature that he reviewed, the most relevant analysis in his opinion predicts that voter ID laws like this have a negative effect of .1 percent up to minus 3 percent.  That comes out to 2200 to 66,000 voters if you look just at the election in 2022, and the figures are roughly twice that when you look at the Arizona electorate as a whole with roughly 5,000,000 citizen voting age people in the state.

Now, Professor Hoekstra says that that amount may be -- is statistically insignificant.  It may be statistically insignificant to an economist, but it's not -- those people are not statistically insignificant in the eyes of the law, and they should not be insignificant in the eyes of the Court.  These laws are harmful.  They're unjustified and they should

be enjoined.

Now, as I said, I'll turn briefly to the question of standing to address two points that the defendants make, and then I'll turn to *Anderson-Burdick*.

So broadly, the defendants challenge the plaintiffs' standing on two grounds. First, they argued that the laws haven't been implemented yet so any injury is speculative; but the test under *Lujan* is whether the injury is actual or imminent. Imminent is, by definition, not yet happened. It will happen, but it hasn't happened yet; and, in fact, the defendants concede in their Conclusions of Law at Paragraph 4 that standing may be based on future harm so long it does not, quote, "rest on a highly attenuated chain of possibilities."

There is no attenuation here. The issue is when these laws are implemented, they will injure the plaintiffs as all of our fact witnesses testified at trial.

Second, the defendants argue that the plaintiffs have not specifically identified any individual member who lacks DPOC or will be otherwise injured by the laws; but the Ninth Circuit has expressly rejected that requirement holding that an organization does not need to name individual members where the injury to the membership is clear and members' specific identities are not relevant to the defendants' ability to understand or respond to the claims.

That case is *National Council of La Raza*, 800 F.3d

1032 at Page 1041.

Finally on *Anderson-Burdick*, the *Anderson-Burdick* as the Court is well aware -- framework, as the Court is well aware, frames the plaintiffs' claims that these laws unduly burden the right to vote in violation of the First and Fourteenth Amendment.

Under that framework the Court must balance, on one hand, the right to vote against the interests and the burdens on the right to vote against the interest that the State asserts to justify them.

The Supreme Court and Ninth Circuit have emphasized that it's a flexible standard and it's subject to a sliding scale of scrutiny based on the character and magnitude of the burden.

Severe burdens are subject to strict scrutiny and may be upheld only where they are narrowly tailored to serve a compelling state interest.

By contrast, lesser burdens are subject to less-exacting scrutiny, but as the Supreme Court explained in *Crawford v. Marion County* -- and this is 553 U.S. 181, 191. This is the lead opinion by Justice Stevens.

However slight the burden, it must be justified by relevant and legitimate state interests that are sufficiently weighty to justify the limitation.

In addition, courts employ heightened standards of

scrutiny in examining laws that impose a burden on an identifiable segment of the population because those laws are more likely to raise constitutional concerns.  That's the Ninth Circuit's decision in the *Arizona Democratic Party v. Hobbs* at Page 1190.

Accordingly, the Ninth Circuit has made clear that "courts," quote, "may consider not only a given law's impact on the electorate in general, but also its impact on subgroups, for whom the burden, when considered in context, may be more severe."  That's Public Integrity Alliance 836 F.3d 1025 Note 2.

So fundamentally, the Court must weigh, quote, "the legitimacy and strength of each of those interests" asserted by the State and "consider the extent to which those interests make it necessary to burden the plaintiff's rights."

That's, again, *Arizona Democratic Party v. Hobbs*.

But honestly, the Challenged Laws here couldn't survive any level of scrutiny.  When you look at the *Anderson-Burdick* cases, this set of laws stands in stark contrast to them.  So they don't contain any of what courts refer to as "the safety valves."  That's a phrase that comes from the Tenth Circuit in the *Fish* case, *Fish v. Schwab*, but it's really drawing from *Crawford*.

In *Crawford* the Supreme Court considered an Indiana voter ID law that provided for free IDs for those who couldn't

afford them and allowed those without ID to vote provisionally and then validate their identity by affidavit.  We don't have any of that here.  There's no safety valves.

The laws are not generally applicable.  They disproportionately burden naturalized citizens, voters of color, those of lower socioeconomic status, and they completely -- they completely leave out everybody who was registered prior to 2004.

The State's asserted interests are speculative. They lack, in the words of the Tenth Circuit in *Fish,* the legitimacy and strength that *Anderson-Burdick* requires, and while it is true, as the Tenth Circuit explained there, that the State has an interest in preventing voter fraud and to restoring confidence or preserving confidence in our elections, those -- those interests may exist and be legitimate in the abstract, but that's not enough because in *Fish* what the Tenth Circuit did is it said that the -- on the record of that case the interests were insufficiently weighty to justify the limitations on the right to vote imposed by the DPOC requirement that Kansas sought to advance.

Your Honor, we submit that the same is true here, and for reasons that Mr. Herrera will explain in greater detail I'll turn the lectern over to him.

THE COURT:  Thank you, Mr. Babbitt.

Mr. Herrera.

MR. HERRERA:  Good morning, Your Honor.  I'm Ernest Herrera and I represent the Promise Arizona plaintiffs.  I will address non-US plaintiffs' Fourteenth Amendment undue burden claim challenging HB2243.

HB2243 requires certain voters to provide documentary proof of citizenship to County Recorders after they have already properly registered to vote and within a 35-day window or else face cancellation of their registration.

This law requires the use of flawed databases and broad County Recorder discretion to target naturalized US citizen voters and voters of color for a redundant showing of eligibility.

Besides the generic invocation of election integrity, State and Intervenor defendants offer no real justification for this law because there is none as evidenced --

THE COURT:  One of the things that really wasn't discussed at trial but was discussed prominently in the defendants' proposed Findings of Fact is the 2019 Election Procedures Manual, and the proposed findings say this aspect of the law, the 35-day notice, really just puts into statute what has been in the Election Procedures Manual for several years, that there was already a procedure where individuals who had not provided documentary proof of citizenship were advised by the various County Recorders that they needed to

provide it and they had 35 days to do so, and I didn't -- I mean, I was not -- if that had been discussed earlier, it had gone past me; but is there any validity to that, that this is just putting into statute what had been binding guidance -- "guidance" is the wrong word, binding procedure from the Election Procedures Manual on all of the County Recorders?

MR. HERRERA:  No, for several reasons, Your Honor. So first of all -- and this -- so I'm not avoiding your question, but the first part is the 2019 Election Procedures Manual, it applies right now, but it's not going to apply for very long.  It is in the process of being revised right now. In part, obviously, we understand based on the proceedings here.

But furthermore, more important, more to your question, that Elections Procedures Manual, that is not some -- HB2243 does not put into place what was in the Elections Procedure Manual.

With regard to the jury questionnaire requirements, that was about -- that was about a certain manner of canceling voters that is not discussed in 2243.  2243 is much broader than just the jury questionnaire and so -- and the other big difference is -- I'll discuss it a little more here, but in 2243 there's no -- as Mr. Babbitt referred to, there are no safety valves, meaning there is no failsafe -- there is no second chance.

Once you're -- once you don't -- once you are caught up in one of these database matches or lists, you are sent a notice; and if you don't respond in 35 days, there's no requirement for the County Recorders to call you, as is advised in the 2019 EPM.

Under 2243 it is just you send the notice, no requirement to call or say, "Hey, maybe you should send something or come in and let's talk about it." It is 35 days and then your registration is cancelled and that's it, and after those 35 days are up and your registration is cancelled, there is no curing mechanism. In other words -- or a provisional voting measure.

So, one, there's no way you can come in and say, "I get a second chance to come in and provide that DPOC." Or two, "If I happen to not be able to provide DPOC within 29 days of an election, will I" -- "will I still get to vote at least provisionally?" No, that does not exist under this law.

Besides the generic invocation of election integrity, defendants did not offer real justification for this law. Additionally, defendants mistakenly dismissed the real burdens presented by this law by imaging or perhaps wishing that the law contains guidance and safeguards sufficient to prevent the wrongful cancellations of voter registration.

I will briefly summarize how plaintiffs have proven

that HB2243 poses an undue burden to voters in violation of the Fourteenth Amendment.

I refer the Court broadly to plaintiffs' Proposed Conclusions of Law regarding undue burden for the entirety of our argument and will focus today on arguments raised by defendants in their Proposed Conclusions of Law.

So under 2243 voters receive a notice requiring them to present documentary proof of citizenship within 35 days or have their registration cancelled.  This provision applies to voters who are already registered to vote and have, therefore, already proven their eligibility.

Because this law could apply to someone who registered years ago, as well as to voters who just registered, voters may have to obtain documentary proof of citizenship, which can be costly and take more than 35 days to obtain.  Could we go to the third slide.  Thanks.

Replacement naturalization certificates, for example, cost $555 and can take six to eight months to obtain. Passport books can cost anywhere from 130 to $260 and can take three to five weeks to receive on an expedited basis.

Also, beginning the process of obtaining DPOC assumes that voters do not miss the notice in the mail.  These literal dollar costs and processing times only represent compliance costs, which is one of the three types of costs about which Professor Burch testified at trial.  The other two

types of cost are learning costs and psychological costs.

As to learning costs, voters must understand that they are being asked to provide DPOC that they may have already provided previously.  Many plaintiffs' representatives testified about how there would have to be additional education done with their constituents and members to get them up to speed on this law.

Additionally, being asked to present proof of citizenship after already having successfully registered entails potential stigma, anxiety, fear or other emotional burdens associated with participation in a government program.

THE COURT:  So let's assume we have -- let's forget about pre-2004 for a minute.  I understand there's, like, 200 some thousand people that may have registered to vote, no DPOC that would be potentially affected by this law if they haven't gone back to Motor Vehicle since 2006; but I want to talk about full ballot voters who provided DPOC and so their record reflects that they provided DPOC.

Isn't it speculative to assume that they'll end up being required to do it again?  I mean, shouldn't I assume that, for example, we have somebody with a foreign -- an authorized presence foreign-type driver's license that has since been naturalized but was not required to notify Motor Vehicles of naturalization.

So when the check is done, it comes back that they

have a foreign-type authorized presence, but wouldn't the County Recorder's records also reflect that they provided satisfactory documented proof of citizenship when they registered to vote either by providing their naturalization certificate or the naturalization -- something that had already been checked?

MR. HERRERA:  Your Honor, not necessarily; and one piece of evidence I can point to there is actually from the effective -- in effect EPM about retention of records.  So those documents may not be held for more than a couple of years by the county.

THE COURT:  I know the county has -- I believe it's two years that they actually keep the documents that were provided, but that doesn't mean the county's records wouldn't reflect that they provided documentary proof of citizenship even though they don't have the copy anymore because it's been destroyed.

That's -- that's what I'm having a hard time with is that why should I assume that the Motor Vehicle check that says foreign-type driver's license is going to trigger the county to decide that the person has not provided documentary proof of citizenship if they already did?

MR. HERRERA:  Well, that -- that -- for one thing, Your Honor, that kind of belies the additional burden of this law and how unnecessary this law is in that it's -- people

have already provided DPOC --

THE COURT:  But you're assuming that the County Recorders are going to require them to do it again.

Why should I assume that?

MR. HERRERA:  Because that's what it says in the law, Your Honor.  It is requiring them.  The language is very forceful, "shall" send a notice, "must" send a notice.

THE COURT:  But that's only if they have reason to believe that the person is not a citizen and they have reason to believe -- you assume that the Motor Vehicle check is going to give the County Recorder reason to believe they're not citizens when they've already provided documentary proof of citizenship and the County Recorder's records so reflect.

MR. HERRERA:  Your Honor, certain county -- different County Recorders were asked about that to some degree, and the reason it's not speculative to assume that they would still send out a notice is that they see this as a new requirement that they have to do and additionally -- and the defendants want to rely on this language that says you have to confirm that that person's not a citizen or maybe not eligible before sending them a notice, but that confirmation language appears in subsection (a)(10) but it also appears in subsection (k) of the statute as amended.

And what it -- so just looking at (k), what it says is to the extent practicable the County Recorder shall review

relevant city, town, county, state and federal databases to which the County Recorder has access to confirm information obtained that requires cancellation of voter -- of registrations pursuant to this section.

When asked about that, two administrators of two of the largest counties of Arizona said they didn't know what information they would find in other databases.  For one, they didn't know what "city, county, state databases" meant; but they also didn't know that those other potential databases would actually provide them that confirmation that the statute's asking them to find.

THE COURT:  Well, clearly the law was not very well thought through with respect to numerous references to "databases" that no one knows what those databases are and databases to which there is not access or even those to which there is limited access, you don't have access for the purposes for which the law requires them to be checked; but, yeah, the County Recorders are without guidance right now because the Secretary of State hasn't given them any in the Election Procedures Manual but -- so they don't really know what to do, but why shouldn't I let the Secretary of State give them guidance on what they should do in the circumstance that I'm talking about?

They had documentary proof of citizenship.  They registered somebody to vote and now they have an MVD record

that says the person has a foreign-type driver's license. That's the common situation that is envisioned by the parties here.

MR. HERRERA:  As far as -- Your Honor, I respectfully disagree that I don't think the plaintiffs think that the Secretary of State's gonna come up with some kind of common-sense guidance that the statute does not provide.

First of all, the statute just doesn't provide this guidance as to what to do, but it's giving very mandatory, very forceful language about sending notices and canceling voter registrations; but, more specifically, the evidence we have here, the factual evidence we have here was from a representative of the Secretary of State's office, Ms. Connor, who said that -- talked about -- so notwithstanding the County Recorder's lack of access to databases with current citizenship data, she expressed concern that the catch-all database provisions in HB2492 and 2243 could require election officials to investigate and potentially refer for prosecution voters on lists of alleged non-citizens submitted by third-party groups.

So I think that uncertainty right now has -- and then there was further uncertainty expressed by Weber and Stevens and Milliaro (sp) about how exactly these provisions in 2243 are going to interact with each other in terms of confirming before actually sending a notice.

So the County Recorders, as I've already said, don't know what they're supposed to do; but someone from the Secretary of State's office also said they're not sure how these provisions are supposed to work, and I think that that's important because -- and one thing I want to emphasize before I relinquish the mic here -- go to the last slide, please -- is what really makes this law stick out is a lack of -- a lack of safety valves.

THE COURT:  Is that what that blue thing is?

MR. HERRERA:  Yeah, I think so.

THE COURT:  That's a safety valve?

MR. HERRERA:  I'm having faith, Your Honor, in Google images that this is a -- one kind of a safety valve.

THE COURT:  I'll take your word for it -- well, it's Google so it must be true.

MR. HERRERA:  Defendants -- as I've discussed, defendants minimize the burden with discussion of confirmation and other databases but, also, County Recorders, what they do now -- or before these laws were passed, County Recorders, as I said, could call people and they testified, you know, if someone doesn't have DPOC and they're put on the federal-only list or a suspense list, they might call someone and ask, "Hey, can you come in and provide information, because we might have you flagged as having an F-type license."

They're not sent a notice and told, "Your

registration is going to be cancelled fully.  You're never going to be able to vote until you re-register."  That's not what happens now -- or before these laws -- this law was passed, and that is an example of how there is not a safety valve here.

In Arizona you have to be registered 29 days before an election.  If your vote is -- if your voter registration is cancelled within that period, there is no provisional voting measure.  There's no other way you could vote within that time and that's what -- as Mr. Babbitt discussed, that is really what distinguishes this case from that -- or this requirement of DPOC from one that was in the *Crawford* case where there was a safety valve and there was a statute of general applicability.

So with that, Your Honor, I think I've taken up more than my fair share of time.  I'm going to pass the baton here.

THE COURT:  Thank you, Mr. Herrera.

MR. MAKKER:  Thank you, your Honor, Amit Makker on behalf of the Arizona Asian American Native Hawaiian Pacific Islander for Equity plaintiff.  I'm going to touch on the procedural due process claims and the intentional discrimination claims.

As Your Honor is aware and you ruled at the Motion to Dismiss phase, *Anderson-Burdick* applies to the procedural due process claims as well.  I want to highlight these ones,

though, just because they fall a little bit differently; and the reason is, as my colleagues have described, how -- you know, how do we balance under *Anderson-Burdick*?  We have to look at the precise injuries, and in the procedural due process claim the precise injuries in 2243 are the insufficient 35-day notice, which we have just heard a little bit about; and in 2492 there's a similar provision in Section 4 which does not provide any period for cure or notice when a non-citizen determination has been found and there's a referral to the AG, and in 2243 there's also a potential for investigation.

And so when we scope down to these particular harms that are being alleged under the procedural due process claims and we think about the sort of generic hand-waving interests that the defendants have put forward, we see there's absolutely no evidence to support these particular procedural burdens.

So if we think about election integrity, we think about voter confidence and think about the 35-day requirement, what about what they have put forward makes it necessary for that period to be 35 days?

In other words, could election integrity and voter confidence, these vague concepts, be served by a period longer than 35 days?  We know the answer is "yes" because the Legislature told us that.  They passed HB2617 that had a

90-day provision for accused non-citizens, and in passing 2243 there is actually a 90-day provision for accused non-residents.

There's no explanation for why 35 days is necessary to support voter confidence and election integrity for non-citizens as opposed to non-residents for 90 days; and speaking of voter confidence, you know, the defendants' position really ignores the evidence we heard from plaintiffs' representatives about the fear and the anger about these Challenged Laws.  That doesn't sound anything like voter confidence to me.

Now, Your Honor touched on with Mr. Herrera the 35 days in the 2019 EPM and so -- it's very different.  I'll explain why.

So in the 2019 EPM the 35 days is tied to the juror questionnaire, as Mr. Herrera pointed out.  Now, that also means that -- that part of it is tied to something that perhaps the voter knows about because they did fill out something.

By contrast, what we have here are database checks that, as defendants argue, because it's not a burden, they say, it's happening without the voters even knowing; and now you're applying 35 days to that as well.  So that's a very different process.

They also point to the NVRA process as somehow

involved here, but the NVRA process in the current EPM is very specific.  There's a lot of other safeguards in place, including the voter not voting in an election.  So that's not a 35-day and cancel like we say -- like we see here in Section 2.

And so because the -- under *Anderson-Burdick*, for the reasons that my colleague, Mr. Babbitt, explained, that scrutiny level is moved up and there's just no evidence here in the record whatsoever for -- how any interest put forward by the defendants makes it necessary to burden voters with this 35-day notice period and subsequent prosecution potential and this absolute no opportunity to contest and cure in HB2492.

I'm going to move to the intentional discrimination claim.  Everyone agrees that the *Arlington Heights* factors control here.  It's important to note when considering these factors and these claims -- the intentional discrimination claim that plaintiffs do not need direct evidence of intent, right.  No smoking gun is required, and plaintiffs do not need to show that the discriminatory intent was the sole driving factor, only that it was a motivating factor.

THE COURT:  So I want to -- I'm glad you're the person.  I had this question from the beginning, but I knew if I asked Mr. Babbitt he would have said somebody else is going to address intentional discrimination.

So we had some very interesting testimony from two expert witnesses about the history of discrimination in Arizona, the history of discriminatory laws related to Asian immigrants, the history of the -- Arizona's relationship to the Confederacy, all of those things, but I don't know how I make a leap from what happened in the 18th or the 19th and 20th -- early 20th Century to draw an inference of intentional discrimination in these laws.

Don't I need something -- I mean, clearly, you don't have to have somebody saying, "We want to pass these laws to prevent naturalized -- to make it more difficult, if not prevent, naturalized citizens from voting," but what did I hear beyond things that happened a hundred years or more ago?

MR. MAKKER:  Yeah, so the --

THE COURT:  And I know the voter -- okay, Arizona was subject to the Voting Rights Act.  They had a history of Native American discrimination that went through much more recent times, the 1960's at least, but -- but those are all these historical things that aren't enough, in my opinion, to infer that there was discriminatory intent in these laws.

MR. MAKKER:  Yeah, so historical background is one of five of the factors, which are not exhaustive factors in *Arlington Heights*.

So the first is the -- you know, how does the law fall on -- on different parts of the subject -- the actual

impact.  We've sort of discussed that impact, and so I think that's one piece of evidence you can draw on is what are the impact of these laws?  How are we going to see that play out?

The historical background is just one of those factors and I think you're right, there's a history.  What does it mean?  It's just informing sort of what is the overall background of what we're looking at.

I think if you consider Dr. Burton's testimony, he went into detail about specifically voting laws, and he noted during that that those kinds of voting practices that we've seen in historical Arizona times were also underpinned by unfounded claims of voter fraud, just like we're seeing now.

And if you look at what Dr. Chang explained about the AANHPI history and how every time we see this perceived or real influx of immigrants, we see a backlash.  We see laws curbing their rights, and he explained, again, that our current moment looks just like that again.

Here in Arizona we've seen a large influx, especially recently, of AANHPI voters coming into the country and we've seen them -- into the country, coming into Arizona as well, and we've seen organizations like my client working to get them on to the voter rolls; and they're now at a point where they're large enough to swing elections, and in our current period we look at the 2020 Election.

That moves us right into the next *Arlington Heights*

33

factor, which are what are the facts that lead up to -- what are the events that led up to this action?  We all know it comes on the heels of the 2020 Election.  All the legislators said that.  That's what was on their minds.  Senator Quezada said that.  There was a very small margin there, smaller than the voting block that is the AANHPI voters that are trying to get onto these rolls.

Without evidence, we hear Donald Trump say 36,000 votes illegally cast by non-citizens.  We hear Rudy Giuliani pushing a narrative of illegal aliens voting in Arizona.  Others, including Arizona legislators, coming into the current moment echo these same narratives without evidence; and as Dr. Burton explains, coming back to the history question, those are our racial code words today, "voter fraud" and "illegals," and that's what we're seeing as the narrative again as we go forward.

So after the Arizona Senate's audit found -- you know, failed to support these claims, the Arizona Republicans then turned to working on the voter rolls themselves, and that takes us to the Challenged Laws.  That's where the Challenged Laws come in and the last two factors under *Arlington Heights,* the legislative history and departures from normal procedures.

And that's really where the stuff we didn't hear at trial becomes a little bit clear through the depositions of Toma and Petersen where we got to see and ask, "Well, what did

you do?  What did you do?" and the resounding answer was "nothing."  They didn't do anything to figure out what these laws did.  They didn't figure out if there going to be any harms.

They ignored everything that everyone said about the harms, that there's no voter fraud, that there's no voter suppression.  They ignored all of that.  Did they figure out if these laws were going to actually improve the two sort of voter integrity -- or election integrity and voter confidence?  Did they determine that the laws were going to do that?  No, there wasn't anything that they told us in deposition that confirmed that that was going to happen either.

And so as we step through this process, you're going to see that all these ex-post justifications, they're -- they're purely pretext and -- and so we start with the Free Enterprise Club, right.  They are the -- go ahead.

THE COURT:  Pretense for intentional discrimination?

MR. MAKKER:  They're pretext for -- the justifications that they have put forward are pretext, yes, for intentional discrimination, that's right.

THE COURT:  Okay.

MR. MAKKER:  And so we start with the Free Enterprise Club.  They're the main proponents and authors. The depositions confirm that both Toma and Peterson believe that "yes" they authored it.  Toma started calling it their --

you know, referring to the Free Enterprise Club, their laws, their bills.  So we know that they used the racial code words of the day.  They used "illegals" in their literature.  They used "voter fraud," and they used that as a rallying cry to get the Arizona republicans behind these Challenged Laws.

Senator Peterson in his deposition tied the racially-charged literature of illegals voting from the Free Enterprise Club to the interest of election integrity in his deposition.  That's at Pages 175 to 176 of the deposition.

And all legislators that testified, Quezada, Peterson and Toma, they all agreed that no one produced any evidence during the legislative process of any non-citizen voting.

THE COURT:  Well, that's because there isn't any.

MR. MAKKER:  Exactly, that's what I mean by pretext.

THE COURT:  The one thing that the defendants agree is that with the exception of two sealed indictments, nobody knows of any non-citizens voting in Arizona.

MR. MAKKER:  That's correct, and that's why -- that's why I said that this is -- this is pretext.  There's going to be some sort of voter confidence change or election integrity change.

There wasn't any findings during the legislative process or anything that any of the deposed legislators could

tell us that they did to confirm that there would be, and so what are we left with as we consider all these factors?

And I want to focus in on the March 10th Senate judiciary hearing on HB2492 and just walk us back through that.

So picture the setting, right.  Packed house, every seat filled, as Quezada explained, a crowd of people of color. The bill sponsor, nowhere to be found, didn't even show up. Speaker after speaker from the public come up to rise against this bill discussed that there is no voter fraud, just as Your Honor mentioned.  There is no vote -- this is a voter suppression bill, that it's unconstitutional, it violates federal law.

Only Greg Blackie from the Free Enterprise Club stands up to try and defend these laws.  Senator Quezada told this Court that often in these meetings Senator Borrelli would make racially-charged comments to him.  The video evidence that we put in corroborates that testimony.  You see Senator Borrelli roll over his chair and mention something to Senator Quezada.  Senator Quezada in that same hearing explains his "no" vote stating that the bill targets people like those in the room.

Senator Peterson, the Chairman of that committee, interrupted him in the middle of his comments, called those comments ridiculous, stopped him from explaining the

37

discriminatory effects and motives behind the bill.  Senator Peterson refused to hear anything that he said would impugn the motives of the bill's sponsors.  The room boiled over as Peterson interrupted Quezada and prevented him from explaining his vote.  Then he recessed that meeting.

During that recess Senator Peterson gets in Senator Quezada's face to the point where they had to be separated by the sergeant at arms.  Peterson never explained himself or his actions in the deposition, and after the recess what happens?  Peterson allows the Free Enterprise Club more time than they allowed any other speaker to continue discussing this bill, and after the committee passes the bill and the audience, that crowd of people of color reacted negatively, Senator Peterson mocked them on the way out.

That takes us to HB2243.  We all know that 2617 was vetoed.  We all know that it was resurrected in 2243 on the last possible day at the last possible time, rammed through the Legislature, circulated minutes before any final vote.

Senator Peterson's explanation, it was inaccurate, it wasn't the same as 2617.  Instead, without any explanation, it reduced the non-citizen time line to a mere 35 days.

THE COURT:  Wasn't it the same with the exception of the 90 and 35?

MR. MAKKER:  I think there's some other things, too. There is changes to whether or not, I think, federal-only were

tied to certain databases.  There were other changes as well, but what I think is important is when that bill comes out from that amendment and he explains that amendment, you've got a mere 35 days for accused non-citizens.  You've still got 90 days for non-residents.  Both are not qualified to vote, but the law treats those two differently.  Why?

There's no explanation.  None of the senators -- none of the legislators gave us any justification for that. Why do we have --

THE COURT:  So neither Peterson nor Toma explained why they put 35 days in there?

MR. MAKKER:  They have no understanding of it whatsoever because they just relied on the Free Enterprise Club to tell them what to do.  That reeks of racial motivation and while Senator Quezada -- well, the defendants are going to explain -- or say late amendments are coming.  Senator Quezada told this Court an amendment that significant, that's not nearly as common.

The legislative process shows numerous other abnormalities.  I think we touched on the fact that both laws, the rules attorneys told them these are going to violate federal law.  No proponent cared about that.  No proponent cared about the public testimony.  No proponent cared about the senators who spoke about these bills; and, as I said, the depositions confirm.  They didn't do anything to even look at

those concerns.  They didn't look at anything to justify anything that they have done.

Speaker Toma wasn't even aware that the 90 days was changed to 35 days until his deposition.  That means he voted on it without caring.  He doesn't even know that it happened.  This is not the serious consideration that a Legislature should do on something this important.

This is abdicating the role of the Legislature to do whatever the Free Enterprise Club wants, and even if there are some individual legislators that don't have a racial animus, the Legislature can still be found to have discriminatory motives based on the animus of the Free Enterprise Club and other proponent constituents under the Ninth Circuit's case of *Avenue 6E*.  That's 817 F.3d 493 at 504 to 05.

So when you take all those factors into account, Your Honor, the evidence does show the laws were motivated by a discriminatory purpose.  The bills intend to strip naturalized voters and voters of color of their right to vote either on the front end with 2492 or on the back end with 2243.

These are the communities that came out to vote in the 2020 Election, and if given the chance could change the political face of Arizona.  Look at the outcome for President.  Look at the outcome for Governor.  Look at the outcome for Attorney General.  Look at the outcome for Secretary of State.

UNITED STATES DISTRICT COURT

What will happen when the minority borders point their attention to the State House?

These laws aim to prevent that.  As plaintiffs' representatives have already testified, the laws already are having an affect by scaring these communities with threats of criminal prosecution just for registering to vote, and that's precisely what the laws are intended to do and they do fall under the *Arlington Heights* factors.

THE COURT:  Thank you.

MR. MAKKER:  Thank you.

MS. BRAILEY:  Good morning, Your Honor, Emily Brailey for the United States.  I'm going to focus on HB2492's birthplace requirement and how we met our burden to show that the birthplace requirement violates the Materiality Provision.

Arizona asked for several pieces of optional information --

THE COURT:  So I have -- I have a question.

One of the things that the defendants said several times in their proposed findings was that, oh, their -- these databases that they don't have access to so it's not practicable so don't pay any attention, but when I read the statutes and I'll take that -- I'm going to talk specifically about that one with the really long name that's the Vital Statistics that Arizona currently doesn't have access to.

But if I read the statute and I were the Secretary

of State or a County Recorder, I would assume that I had some obligation to get access; and unlike the problems with SAVE and the Memorandum of Understanding that limits how often and for what purposes you can look to SAVE and the Social Security Administration records that -- where the State doesn't have access to citizenship information, I don't see any reason why Arizona couldn't get access to these Vital Statistics.

And, as I said, if I were the Secretary of State or County Recorder, I would assume that I should try to get access to these databases because the statute calls it out specifically, and there's no evidence that they couldn't get access to it if they -- I think they -- you just have to, like, sign up for it, and birthplace is a significant item in that database.

Can I put those together and say beyond the -- I mean, we have all this evidence as to why birthplace is not a good security question and how it's not currently used, but it would be used in that database if the State actors had the access to it, which I have no reason to believe they couldn't get if they just subscribed to it.

So should I be looking at birthplace in connection with the assumption that it would be material if they were using that database?

MS. BRAILEY:  No, and for a few reasons.  First is what Your Honor already alluded to, which is that we actually

-- we have no evidence that -- all we know from trial is that counties don't have access to it; but to your hypothetical, if they did, what Dr. Hersh testified to was that birthplace -- even if Arizona had perfect data, even if they had 100 percent participation so that the birthplace field was always filled in and even if they could verify it and they knew that, Dr. Hersh's testimony still showed that birthplace is a weak differentiator and that's because there are millions of voters who vote in Arizona, who were born in Arizona, and at the time that Dr. Hersh looked at the database he found that there were nearly 200,000 people who had just marked United States as their birthplace, which, you know, both of these answers could be verified in the Vital Statistics database; and so birthplace just doesn't provide any kind of conceivably useful way to establish somebody's identity.

THE COURT:  But doesn't this data -- don't we have evidence that this database also includes birth certificate information if you have birthplace?

MS. BRAILEY:  But I -- I think the issue here, again, is under the Materiality Provision you can't deny the right to vote because of an omission that doesn't -- that is not material to determining somebody's qualifications, and so what the evidence at trial shows is that birthplace does not determine those qualifications.

We know from Dr. Hersh's testimony that nearly

anybody -- nearly all registrants can be distinguished based on their name and birth date alone.  We know that Arizona does a good job of collecting identification numbers, and we know that with those sources of information we can distinguish nearly 100 percent of the 5,000,000 people in the database.

We also know that counties have been able to verify identity and verify citizenship and qualifications for decades without relying on birthplace, and so even if Arizona had access -- so, again, with this hypothetical, even if Arizona had access to that information and we had the birthplace information, all it is is a duplicative, redundant piece of data that isn't even actually useful to determining somebody's identity, again, for even just the simply purpose of what Dr. Hersh testified to, which is that millions of people in Arizona who live in Arizona are born in Arizona.

And briefly, I'll speak to citizenship, which we know that birthplace can't determine citizenship as a matter of law.  We also know that merely providing birthplace is not sufficient under Arizona law to establish citizenship because birthplace alone is not documentary proof of citizenship; and as I mentioned, we know that the counties already can verify citizenship when they compare the registration forms to the MVD database through what they call the HAVA check.

We also know it's the case based on the evidence at trial that counties accept anything that's put into the

birthplace field, whether that is a county -- sorry, a country or a state or not a country or a state or it's ambiguous, and so what's important here is there was no piece of evidence deduced at trial that indicates that birthplace could be material to determining whether somebody is qualified to vote.

I'm gonna skip through some things because I think we spoke about verifications enough.  I think it's important that the evidence showed that the counties do not have access to the Vital Statistics database.  What the evidence also showed is there's no plan to standardized the way that birthplace is entered into the State form or into the databases.  There's no plan to backfill the data for the over a million registrants in the system where birthplace doesn't exist, and there's no plan in place to clean up the records that are already in the system and so even if -- back to your hypothetical.

Even if the State had access to the Vital Statistics database, we have no evidence in the record about how that could even be used to fix the problems with the data -- with the birthplace data that already exists.

I'll speak very briefly about the fact that defendants argue that State officials use birthplace information for administrative purposes, like the security checks that Your Honor mentioned, and we aren't disputing their right to ask for birthplace information as one of

several options for administrative reasons; but the State cannot require voters to provide birthplace for administrative purposes that have no relation to voter eligibility when the omission of that information ends up denying people the right to vote.

So if used to establish identity, the evidence shows that birthplace is a duplicative and redundant requirement that isn't even conceivably helpful.  County officials can and do determine voter eligibility based on the information already collected, which includes name and birth date and for almost all of the records an identification number, which means that nearly all of the voters in Arizona are already identified and their eligibility is already determined without birthplace and that's been the case for decades.

And very quickly, on one last point is that the defendants suggest that the State Department uses birthplace as part of the passport process and that this establishes that birthplace is material to establishing an Arizona registrant's qualifications to vote; and that's just not true based on the uncontroverted testimony at trial which shows that birthplace, again, is not used and cannot be used to establish identity.

THE COURT:  I've never quite understood why the fact that it's on your passport means that it's material to voting, but maybe that's a defendant's issue.

MS. BRAILEY:  It's a -- it's a good question and we

don't think that foreign affairs really belongs in the domestic elections context here.

One moment, Your Honor.

One point I'll make for the record, again, about the Vital Statistics database is that it would only help confirm that the person was born in Arizona, let's say, but it's not going to make -- it's not going to change anything that Dr. Hersh testified about the fact that birthplace is just a weak differentiator even if you have the correct information.

So, in short, the evidence here, which was essentially uncontroverted, established that a registrant's birthplace plays no role in determining whether a new registrant is qualified to vote in Arizona and, accordingly, HB2492's birthplace requirement violates the Materiality Provision of the Civil Rights Act, and I'm happy to answer any other questions.

THE COURT:  Thank you.

MR. SHERMAN:  Good morning, Your Honor, we have two additional speakers for the plaintiffs.

Are we going to take a break at the moment or should we forge on?

THE COURT:  Forge on, please.

MR. SHERMAN:  All right.  Thank you, your Honor.

Good morning, Your Honor, my name is Jon Sherman.  I represent the Poder Latinx and CPLC plaintiffs.  We have

focused on the citizenship investigation procedures -- next slide -- and have targeted the arbitrary and non-uniform treatment that will result.

Two key features of these laws:  One, the reliance on stale citizenship data and, two, the reliance on unclear subjective standards, and the results of that are a de facto presumption against naturalized voters' voting eligibility and, also, arbitrary and disparate treatment of applicants and registered voters alike.

Because it is impossible to confirm a lack of US citizenship using databases, these laws shift the burden to naturalized citizens to repeatedly rebut stale citizenship data, and I'm going to walk through the seven areas of the trial record that support these claims.  Next slide.

One is the reliance on stale government data.  This is what we were discussing earlier.  Your Honor has heard a number of witnesses testify, including Dr. McDonald, to the fact that the citizenship data in MVD is stale.  MVD's F-type license data, of course, only reflects the status of --

THE COURT:  Okay, this is an earlier question that I had is that the plaintiffs' proposed findings seem to suggest that as long as MVD data is stale, that that would put naturalized citizens who have not updated their MVD data into this loop and it assumes that the County Recorders aren't going to say, "We already figured this out.  This person's a

naturalized citizen.  It's stale data.  We don't have to do anything."

MR. SHERMAN:  So the answer to Your Honor's question is plaintiffs' PFOF-242.

THE COURT:  I just love -- you know, you just came up with four new letters for me to try to figure out --

MR. SHERMAN:  Oh, I'm sorry, Your Honor.

THE COURT:  -- what they are.

MR. SHERMAN:  Plaintiffs Proposed Findings of Fact, No. 242.  Yolanda Morales, on behalf of the Secretary of State's Office, testified that when a HAVA check is conducted, there is an automatic override of what's in AVID using the authorized presence value in MVD.

So automatically it will populate AVID with that outdated non-citizenship information, and the only way to do something about that is to manually override it in AVID, and there's no process for that, right.

So right now, if HB2243 were to go into effect, every single month the 6,000 plus -- that's what Dr. McDonald's number analysis showed -- 6,000 plus people who have outdated citizen information, F-type licenses, that will override what's in AVID and there's no obligation for someone to update their information with MVD.

So that will continue to happen on a monthly basis forcing this repeated imposition on these voters to repeatedly

rebut that stale citizenship data.

THE COURT:  But that's the leap that I want you to explain to me.  Why can't -- why don't you think the County Recorders aren't going to investigate further -- and, for example, if it's within two years, they've got the documentation.  If they have a naturalization number or an A-number, what makes -- why should I conclude that they're not going to investigate and say, "This person we already verified.  We're not sending them a 35-day notice"?

MR. SHERMAN:  Well, Your Honor, I'd say a couple things.  One, I would refer The Honor -- Your Honor back to Dr. McDonald's testimony on this loop.  I think that's clarifying.

Two, I do think, Your Honor, that the SAVE system, which I'm going to get to, will play a role here because I do think that this data is stale and inconclusive and I do think the next place it will send voters -- it will send County Recorders is to the SAVE system, which is also being used in an arbitrary and inconsistent manner.

The headline here, right, is the reliance on inconclusive non-citizenship data in the absence of any concrete rules is going to result -- is already resulting in arbitrary and inconsistent understandings.

THE COURT:  Well, my understanding about SAVE -- so now we're talking about the post-registration monthly

checks -- that the Secretary of State and the County Recorders can't use SAVE for that purpose.  They're only allowed to use it the first time.

MR. SHERMAN:  Correct.  Currently under the MOA they're prohibited from using it for list maintenance purpose. That could change, though, with the updated --

THE COURT:  No evidence -- no evidence that -- I mean, I remember there being some evidence that this vital statistics thing is not a problem to become a member or subscribe, but there's absolutely no evidence that SAVE is going to allow the Secretary of State to use the system on a monthly basis for these -- these list maintenance checks.

MR. SHERMAN:  Well, Your Honor, I would refer Your Honor to the deposition designations for the USCIS's deposition.  It was inclusive.  I took that deposition, and I think Ms. Slattery testified to the fact that they would consider the proposal, and it is possible that they would ultimately grant such access for HB2243 purposes.

There wasn't a definitive answer one way or the other so it is an open question.

THE COURT:  So let's assume they do, and so on a monthly basis they go to the SAVE system before they send anybody a 35-day letter.  Isn't the evidence that the SAVE system might have some delays, but it's accurate?

MR. SHERMAN:  Well, it has lags; but, no, Your

Honor.  Dr. McDonald -- and this came out of the USCIS deposition as well -- next slide, please.

There were a number of integrity -- data integrity issues, including name discrepancies based on people not changing their maiden name that was on an old record within USCIS's system, entry errors, et cetera.

There's a lot of testimony in that deposition about the number of errors involved in name matching and -- and, also, the reliance on multiple databases, right, the reliance on -- it's not a single database, but it is a wealth of different databases that it's drawing on, and there are inconsistencies between those different data sets.

I would also point Your Honor to the current inconsistent use of USCIS's additional verification procedures.  Ultimately what I'm up here to talk about is the arbitrary and inconsistent treatment that will result and violate both constitutional and statutory requirements.

Stephen, if you could flip to Slide 12.

The evidence in this case has shown inconsistent use of USCIS's additional verification procedures.  This chart reflects what counties do currently with the SAVE system. When there's an initial failure to verify someone's citizenship using the SAVE system, under the MOA they are required to engage in additional -- initiate additional verification and here are the results, though:

Maricopa only initiates additional verification in 12 out of nearly 2,000 cases over the last three years and Pima, by contrast, does it in almost 40 percent of the time. Other counties do it roughly 12.2 percent of the time.

So this data that USCIS produced and it's an admitted Exhibit PX268, we already have arbitrary and inconsistent treatment and arbitrary and inconsistent usage of the SAVE system, right. So this is what defendants want to expand. The past is prologue.

The SAVE system has been used now for years in an inconsistent manner, and it will continue to be used in an inconsistent manner under these new laws. The problem, though, is under 2492 it will result in outright rejection of a form when they use it in an inconsistent manner, and it's going to serve as a gateway or gatekeeper function also on the back end, right. It will result in people being wrongfully removed from the rolls because counties right now are in an inconsistent -- using it in an inconsistent manner to determine whether someone has, in fact, subsequently naturalized; and this is the only effort in the laws to account for subsequent naturalization.

If I could go back, Your Honor, I want to just focus on a few -- quickly the other aspects, areas of law that we think result in arbitrary and inconsistent treatment.

Stephen, if we could go back to Slide 5.

These statutes are riddled with subjective standards. On the "reason to believe" provision in HB2243, Colleen Connor testified at trial that the Secretary of State's office is leaving this to the discretion of fifteen County Recorders, their staff and their counsel.

Even if the EPM came out tomorrow, no help is coming on this provision. They're gonna leave it to the discretion of all those County Recorders and this phrase, this subjective standard, defies common understanding. They will not come to an agreement, and that's demonstrated in the evidence I'll show in a second.

HB2492, I think it's important to note contains the phrase "at a minimum." Database matching is the bare minimum that County Recorders are to engage in to ascertain whether someone is, in fact, a citizen. They can obtain information through seemingly any other manner. This is just -- database matching is just the floor, it's not a ceiling. Next slide.

So effectively -- here was the testimony from the defendants in this case. The Secretary of State said ultimately it would be up to the County Recorders' discretion, and the Attorney General had no had familiarity with the standard. Next slide, please.

So the County Recorders have divergent understandings of HB2243. When we asked questions in the deposition regarding how they would understand this term in

different context, they gave wildly different answers based on whether a voter was contacting the office, law enforcement contacting the office, or whether there was an anonymous phone call or e-mail.

Defendants in their Proposed Findings of Fact invent a new substantially inconsistent standard implicitly conceding that we've shown that there's inconsistent treatment, but they've moved the goal post and want us to -- they believe we've not shown substantially inconsistent treatment.

Third party vigilante groups are watching this, and they will exploit a subjective standard like "reason to believe" and give lists of alleged non-citizens to County Recorders that will then force them to conduct these SAVE checks under 16-165(i).

This was testified to by Dr. McDonald. There was evidence of a nationwide trend of vigilantes --

THE COURT: You just used the "force them," and I think what I saw is that there is different testimony from different County Recorders as to what they think they have to do if they get a third-party group that sends some list without anything other than, "Here's a list."

MR. SHERMAN: Correct, Your Honor. There will be different -- there is a different understanding of what they must do when a third-party group provides those lists, but for the groups that do -- for the County Recorders' offices that

do construe that as a reason to believe, once they have a reason to believe it's mandated that they conduct a SAVE check, right.

So this is why we've alleged under a Civil Rights Act violation because it's an arbitrary standard, it's being interpreted in inconsistent ways and a differential procedure result with that extra SAVE citizenship check when a particular County Recorder's office credits that as a reason to believe a registered voter is not a US citizen.

Next slide, please.

This was some of the differential interpretation of how -- differential understanding of how "reason to believe" would apply across counties.  Next slide.

Your Honor also referred to divergent understandings of how third-party groups -- whether that would be information that these groups would rely on -- County Recorders would rely on.  Next slide.

And as Your Honor saw, there was a wealth of different understandings of how the County Recorders would interpret a list of names or use a list of names provided by a third-party organization like True the Vote.  Next slide.

Lastly, the two other areas of evidence that support our claims of arbitrary and inconsistent treatment.  County Recorders currently have inconsistent enforcement of DPOC. Dr. McDonald testified to this based on DPOC cancellations and

suspensions.  There was also -- this came out of the County Recorders' deposition testimony.  There was inconsistent understanding of whether to reinstate voters after an erroneous removal.

So if the registration deadline had passed, Coconino and Pima County said, "If it was our error, we'll reinstate that voter even if the registration deadline has passed."

Cochise County Recorder said, "No, we cannot do that," hard "no," and Yavapai -- the County Recorder's office said it would be a judgment call and might depend.

Your Honor, my time is dwindling; but quickly, I just want to reference some of the defendants' arguments against our claim.  Next slide.

THE COURT:  Okay, we're going to have to take a break.  We'll reconvene at 11:00 o'clock.

COURTROOM DEPUTY:  All rise.

(Recess taken at 10:50 a.m.)

(Back on the record at 11:01 a.m.)

THE COURT:  Continue, Mr. Sherman.

MR. SHERMAN:  Thank you, your Honor.

One final point on the evidence before I turn briefly just to summarizing our claims.

According to the defendants in this case, the whole reason for the necessity for these laws is that you can't rely on AVID.  That's their position, you can't rely on what's in

AVID.  You need to perform these database matching procedures because the evidence of DPOC in AVID, the notations, et cetera, is flawed.  That's the entire impetus for enacting 2492 and 2243.  That's why they've passed these laws.

So briefly I want to --

THE COURT:  Why do I think that's why they passed the laws?

MR. SHERMAN:  It's in part -- it's in part one of the reasons they passed the laws is you can't rely what's in AVID --

THE COURT:  Who said that?

MR. SHERMAN:  Well, the -- they don't believe that citizenship is sufficiently established and that -- they believe that people are getting on the rolls who are not citizens.

THE COURT:  Whose "they"?

MR. SHERMAN:  The legislators, the legislators and the defendants.

THE COURT:  I thought I just heard one of your other counsel say that the Legislature basically abrogated all responsibility for this law to the Free Enterprise Club and they just -- without any analysis, without any evidence, without anything they just passed it 'cuz the Free Enterprise Club asked them to and they didn't -- I mean, I don't know if you asked them if they even knew what AVID was in their

depositions, but I'm guessing they don't?

MR. SHERMAN:  Your Honor, I misspoke.  I don't mean to speak for the -- what the other plaintiffs' groups have been speaking to with respect to the Legislature.  I meant to say the defendants largely have been arguing that one of the reasons they -- these laws are necessary is -- and the database matching requirements are necessary is because you cannot, in their view, rely on what is in AVID regarding DPOC.  That's -- that was the sole point I was gonna make.

So quickly on the four claims that Poder Latinx and CPLC have brought, I'm not going to rehearse all of the points we've made in the conclusions of law; but on the equal protection claim -- next slide -- I did want to note that defendants in their Proposed Findings of Fact and Conclusions of Law repeatedly say that, quote, "differences are to be expected because the task involves a degree of judgment."

I see this as badly wrong, right.  Voter registration is supposed to be ministerial.  It's not supposed to be left to the judgment calls of individual local registrars.  It's supposed to be rule bound both getting onto the rolls and coming off the rolls.  That's why it's highly regulated both as a matter of state law and under the NVRA under federal law.

And turning to the NVRA, we've also alleged and we think established -- next slide -- that the NVRA has been

violated in four different ways in its uniform and non-discriminatory requirement, right. There's arbitrary and non-uniform treatment of registered voters generally. That's the same evidence as *Bush v. Gore*, the previous claim.

Non-uniform treatment of naturalized voters based on Dr. McDonald's testimony as to disparate impact and, also, the problems that we've been discussing in inconsistent usage of SAVE, that can only impact naturalized voters, not US-born voters because, of course, SAVE-- the SAVE system doesn't have any evidence whatsoever as to US-born voter citizenship.

Third, a discriminatory effect on naturalized voters, which these laws amount to a de facto presumption against naturalized voters' eligibility.

And lastly, because such a high proportion of Latino and AANHPI voters are naturalized there is also a uniform and discriminatory effect on those communities. Defendants in their PFOFs and Conclusions of Law, they've argued that these laws are neutral and uniform, right. The database matching requirements are completely neutral and uniform and apply statewide, but they're not. They rely on databases, and that reliance on stale government data produces a certain result, as we've seen through trial.

It's more like relying on years of college enrollment data to decide whether or not is someone currently a resident of Arizona; and, of course, that would have a

disparate, non-uniform and discriminatory impact on policy --

THE COURT:  I have no idea where that analogy is supposed to be going.

MR. SHERMAN:  My -- my point in making that analogy is saying if you relied on stale college enrollment data from years and years ago as if it were evidence of current -- voters' current residence, that would be creating a disparate impact, a non-uniform and discriminatory impact on college student voters, right.  It would be baked into the DNA of that program --

THE COURT:  Okay, I'm sorry, I'm not following the analogy.

MR. SHERMAN:  Understood.  I'll shift away from the analogy just to say, in closing, on this claim baked into the DNA of these laws, 2292 and 2243, is a presumption against naturalized voters' eligibility and that's because of both the reliance on stale government data and the unclear subjective standards that are already resulting in differing understandings.

I'll conclude with just the last slide, the next slide -- oh, sorry, this was the chart.  I'll skip over this. Next slide.

The 1964 Civil Rights Act, the different standards, practices and procedures provision is also violated here. County Recorders can't perform an extra citizenship check

61

based on any subjective reason to believe, including mere suspicion. *Frazier* and *Shivelhood* are two cases that speak to that.  Even if the reason to believe standard is familiar in other legal areas, here in the voting rights context there is a specific federal civil rights statute that prohibits arbitrarily applying a different standard, practice or procedure for determining a voter's qualifications.

With that I'll rest on our Conclusions of Law with respect to the Fourteenth and Fifteenth Amendment claim.

Thank you, your Honor.

THE COURT:  Thank you, Mr. Sherman.

MS. LANG:  Good morning, Your Honor, Danielle Lang for the LUCHA plaintiffs.  I'll be speaking to the final issues for plaintiffs' case, which are the Section 2 of the Voting Rights Act argument and then a number of legal claims related to the differential treatment between state and federal forms, an issue that, of course, Your Honor did resolve as to DPOC, but that remains a live issue as to documentary proof of residence and birthplace.

To start with the Section 2 argument, I want to take a step back and compare this case to the prototypical kind of Section 2 voting access case and explain why this one is different and easier.

In a prototypical Section 2 voting access case you're going to typically see what is a very facially neutral

law.  Take *Brnovich*, for example, the kind of polling place requirement that you vote at your polling precinct. Undeniably is going to apply to everyone.  Everybody could potentially fall into its traps if you go to the wrong polling place, and you have to kind of excavate the layers of socioeconomic disparities, kind of disparate treatment of different polling place locations in order to understand the disparate impact.

That is not the case here.  In this case what we -- we don't have to kind of unpeel any layers to understand the disparate impact here, and that is because even in defendants' Findings of Fact admit -- and that's because it's just obvious and baked into the record is that naturalized citizens are the folks who are going to fall into the pitfalls of the database matching system.

No one else is going to be subject to those kinds of barriers and pitfalls.  It's well known that this data is stale, that it doesn't reflect current citizenship status. It's well known that's only going to affect one group of people, which is naturalized citizens.  It's just not going to affect US-born citizens.

It's also well known and well established in this record and agreed upon by the defendants that the majority of naturalized citizens are people of color in the State of Arizona.  I was looking at the 2022 records.  It's about 75

percent of naturalized citizens from the year 2022 in Arizona that are either from an Asian country and just a handful of Latin American countries.

So things are completely inverted. This is a group that is not just disproportionately a minority. It is a majority minority community, and so when the Legislature enacts a system that has known drawbacks and failures that only affect one community, that is majority people of color, that has to be what Section 2 is talking about when it talks about a discriminatory result. That has to be something that makes the electoral system not equally open to people of color.

Given this evidence, I was looking at one of defendants' Findings of Fact, which is 662. I find it kind of not -- entirely not credible, which is to say that plaintiffs have provided no evidence that members of minority communities are more likely than others to be identified erroneously as a non-citizen.

That's, of course, wrong. Of course the record establishes that. The defendants acknowledge that the pitfall -- the pitfalls of stale data, that the stale data affects only naturalized citizens and that naturalized citizens are majority minority in the State of Arizona.

And so when a voter registration system and a system of list maintenance is not equally -- it is not equally open

to people of color when the Legislature adopts a system that is known to fail for an overwhelming minority population and not for the majority white population.

I want to point -- return to a couple of the concerns that Your Honor raised about kind of whether or not it's speculative that these database matching procedures are going to have the kind of deep impact on naturalized voters that we allege because I think that's a really fair question, and I think you need to think about it first for purposes of the Section 2 claim in two pieces, which is 2492 and 2243.

So at 2492 there's a requirement to do this database matching. Now, of course, some of that database matching happens under current procedures, but there's a major difference between 2492 and prior procedures, which is a cure period.

So current procedure, as you heard from, you know, Janine Petty and others, are that if somebody comes back as having a foreign-type license they send a letter. They hold that registration in suspense, and people have an opportunity to bring in their documentary proof of citizenship and they often do, right.

Under 2492 there is no suspense period. There's no cure period. There's just a rejection if you have a foreign-type license. So we know what the disparate impact of that is going to be on people of color, absolutely.

And then for 2243, I concur with all of my colleagues' kind of points and responses to your question; but I also would say that we just can't put aside the group of people that you kind of put aside in your hypothetical at the beginning, which is hundreds of thousands of voters who registered before the documentary proof of citizenship requirement that are going to have this disparate impact on them undeniably, right, and that's true for federal-only voters as well who don't have documentary proof of citizenship in their record.

And the third thing I'll say on that is I would direct the quote to the deposition designations of the County Recorders where you'll see that the documentation and practice of this is just not very good, that some counties do a good job of making sure that it's recorded, the documentary proof of citizenship was provided, and other counties not so much and may depend on the administration, depend on how busy folks are, how experienced folks are.  There's been all sorts of issues with inter county when people move from county to county trying to carry that over that demonstrate.

So right now the procedure is supposed to be that if you move from Maricopa County to Pima County, that Pima County can look in AVID and see that you gave your documentary proof of citizenship to Maricopa and register you.  In practice, that often doesn't work because there isn't that good data

management that we're hoping for; and so with that two-year retention period, you don't have the backup document and you don't have very good data management, and so I think that those are some additional reasons beyond what my colleagues have said about our concerns about 2243; but, again, there's hundreds of thousands of voters out there that kind of fall in that caveat that you provided to your question in the first place.

So we have this system that is known to have failures for people of color, basically, only and the Legislature -- whatever you might say about what that -- whether or not you can draw the connection to intent, the Legislature had to have known this.  I mean, other states have tried to do this and have all faced exactly the same problem.

Texas and Florida are two key examples where there have been court battles, and what happened when they tried to use stale Motor Vehicle data?  Naturalized citizens and people of color were targeted and ultimately those systems were given up, but that's not all.

They packaged at least two more layers, I think, of kind of disparate impact on communities of color into these bills.  The first is the birthplace requirement.  As I was reading the defendants' Findings of Fact and Conclusions of Law, I was kind of struck by what seemed to be like a continued waffling about whether or not they're saying

birthplace information is necessary and material because it is relevant to citizenship status.

There's nothing in there -- they said so at first in their Motion to Dismiss papers.  Then they kind of backed off of that.  Then at trial seemed to say that -- they seemed to maybe argue that again.  It's not in the Findings of Fact, but it is in the Conclusions of Law and I think the reason you're seeing that waffling is because it's obvious that that is the reason why the Legislature sought it, but it is also obvious that that is facially discriminatory against naturalized citizens and it is facially saying to naturalized citizens, "If you identify yourself as born outside the United States, we're going to take another look at your application," and so I think that's the struggle the defendants might be having there.

And I think that's because any lay person looking at this law and saying all of a sudden in a law that's all about documentary proof of citizenship, that's all about non-citizens voting, it's all about illegals supposedly flooding the system, you added a mandatory birthplace requirement and you want to tell me that it's not about identifying the people who were born outside the United States?

I don't think that any people in the communities of color of Arizona are fooled by that, and you add to that

mandatory referrals for prosecution that are incredibly rare in the law. You know, normally referrals for prosecution depend on evidence of a crime being committed and, instead, there's this kind of mandatory process for referrals, mandatory process for investigation not based on evidence that actually suggests that any crime occurred; and you put that on a backdrop of a community that has faced really intense racial discrimination in the criminal justice system, something that you did hear evidence about that was not from a hundred years ago, but that is in Arizona's recent history, in this county's recent history, that naturally these folks have fears. Naturally, these communities and families that are mixed status, that include both citizens and non-citizens, have real fears of prosecution.

I'll just kind of run through in addition to that, you know, kind of big picture scenario what are the guideposts that *Brnovich* tell us that tell us to look at the size of the burden.

Well, unlike having to go to a different polling place, if you didn't cure your documentary proof of citizenship issue, you're not going to be able to vote. You're potentially facing prosecution or at least referrals for prosecution.

You've heard about the costs of obtaining documentary proof of citizenship, the lack of a cure period,

and you have to look at all of these things cumulatively and that's -- a good citation for that kind of cumulative look is *North Carolina State Conference of NAACP v. McCrory*, 831 F.3d 204, and defendants harp on saying that we haven't identified any individuals that would have a hard time with this requirement, but I think the evidence is quite to the contrary.

You just need to look at the tens of thousands of folks who are on the federal-only list right now.  Those are folks who are having trouble providing documentary proof of citizenship.  Just look at the thousands more that are in suspense right now or have been rejected because they have F-type licenses.  Defendants admit that non-citizen voting and non-citizen registration is basically non-existent.

So when we know that there's 11,000 people in Maricopa County alone that registered to vote and were denied because they had F-type licenses, this record demonstrates those people are not non-citizens.  Those people are people of color who just didn't manage to respond to this notice and have been locked out of the system.

So there is evidence in this record of tens of thousands of Arizonans who are already struggling with these requirements without the State piling on.

Disparate impact, we've already talked about kind of at length.

70

As to the 1982 benchmark that *Brnovich* applies, this is a novel set of requirements.  No other state in the nation has it now.  They certainly didn't have these types of requirements in 1982, and to suggest the fact that there was a citizenship requirement is enough to meet that 1982 benchmark is kind of absurd.

You know, you could have an 18 year old -- a requirement that you be 18 years old.  That's not a benchmark for a new requirement that you provide your birth certificate to prove your age when it's always been done by affirmation before or provision of date of birth.  It would -- you know, that kind of lax interpretation of the 1982 benchmark would really read it out of existence.

Overall voting opportunities, this is something that just is irrelevant at the registration context because if you can't get over the registration barrier, none of those other voting opportunities matter.

You've heard a great deal already about kind of the tenuousness of the State interests that have been put here, and you've heard about other factors that are relevant to the Voting Rights Act analysis, including history of discrimination, the lasting effects of discrimination and racial appeals in Arizona.

I'll just note on that last one, you know, unfortunately, I think the evidence you heard is much more

recent about the ways in which racial appeals in Arizona are continuing on a legacy of a racially-polarized voting community.

You know, talk about illegals, talk in even less coded terms about minority communities. Defendants say that some of the elected officials have ultimately paid some consequence for some of their racial appeals.

Sometimes that's true, sometimes it's not. You know, Sheriff Arpaio was re-elected over and over again using such appeal for many years before he ultimately was held accountable for his actions. I think a number of the other examples in the record show that these elected officials did not always face consequences for their actions, but the idea that these racial appeals have purchase in our political system and are part of the kind of context in which these bills were passed and which the community sees these bills is important.

And so with that, I would conclude our argument on Section 2. I would say this is a special kind of Section 2 case where everyone knows that this is about targeting largely Latino and Asian Americans in Arizona. I think that's what the lay communities clearly see when they look at these bills, and that's what the impacts will bear out.

And with that I want to turn to the documentary proof of residence issues and the kind of differential

treatment of state and federal forms; and, quite frankly, Your Honor, I think these should be easy issues for Your Honor to resolve.

The first argument that defendants make is that our plaintiffs lack standing.  I think that misstates both the law and the facts in the record.  First as to misstating the law, defendants say, oh, there's nobody who's shown that they cannot and will not be able to provide documentary proof of residence and so there's no standing here.

That really collapses, you know, potentially an argument about the merits and standing in a way that's improper.  In order to establish standing, you just have to prove some sort of injury.  Having to provide documentary proof of residence, even if you've managed to do it, is an injury sufficient to support standing.

And San Carlos Apache Tribe and Arizona Students Association are plainly membership organizations that have not registered members that will have to provide documentary proof of residence.  That's enough for standing.

Now, I think if you look at the record what you'll also see is, actually, really substantial evidence, especially in the student context, that these folks will really struggle to provide this documentation for a million reasons, that their documents are with their parents, that they don't have the kind of traditional residences that have easy

documentation, they don't have printers, that they don't have access to all of the kind of trappings that might make it easy to comply with a documentation requirement.

And as to organizational standing, I mean, it doesn't take -- you heard testimony to it, but it's also kind of intuitive that if you're running a voter registration drive, you have a documentation requirement, that just doubles your work. It makes it so that instead of just collecting one form, you have to find a way to get another form, copy that form, save that form, turn in that additional piece of paperwork.

As to kind of the *Anderson-Burdick* or equal protection argument, I think what you'll find completely lacking in defendants' Findings of Fact or Conclusions of Law is any explanation for why you should treat state and federal forms differently.

The only explanation is because federal law won't let us do it for federal forms, which, I think, gets it backwards. You have to have a real state interest in doing it, and nobody is arguing at this stage in this case that they can't require documentary proof of residence for state elections. So they can do that.

The question is whether or not they can require it for federal elections depending on the header on the piece of paper that a voter turns in, and defendants haven't provided

you one iota of reason for that whatsoever and that just cannot sustain an equal protection or an *Anderson-Burdick* challenge.

So the record is just really lopsided here.  If you look at the record that we put forward, we put forward evidence that there are still gonna be people, especially students, especially non-tribal rural voters that are going to really struggle to meet this requirement regardless of how kind of broadly and generously we've tried to interpret it.

We have evidence from the County Recorders.  They agree that this is going to be really difficult for populations to comply with, and then there's this kind of like the bureaucratic difficulties of kind of turning in additional pieces of paper.  There's the bureaucratic difficulties that election officials are going to face.

So those are all the kind of harms to the election system that are in the record, and defendants' Findings of Fact don't have a single proposed finding of fact about their need or necessity for documentary proof of residence at all and especially not for treating state and federal forms differently, not one.

All of that is in what are very conclusory conclusions of law, but there just aren't any findings of fact one way or another.

THE COURT:  I thought maybe they had abandoned that

position when I didn't see anything about that in the Proposed Findings of Fact, but apparently not.  Well, we'll hear from them in a minute.

MS. LANG:  I also thought maybe that was the case until I got to the conclusions of law section and saw that it had been revived, and I have very similar things to say about the NVRA claims on these issues, which is that you once again -- Section 6 and Section 8, when you read them together, say that the state form can only -- when -- when you're using the state form for federal elections -- so, again, this is not about state form for a state election, but when you're using the state form for federal elections you can only require the minimum information necessary.

There's nothing in the record to support that, that DPOR is the minimum information necessary to assess eligibility.  They could have tried to put on that evidence. They argue that that standard should be maybe more or less lax than a different part of the NVRA, but it has to mean something and it means that the State has to put forward some evidence that this information is necessary and that's been -- in your words I agree, Your Honor, it's been abandoned as a factual matter by the defendants.

And the final issue is this one about Section 7 and public assistance agencies, and this one is a real head scratcher for me; and I've printed out -- and with the Court's

indulgence I would love to pass up to you the statutes that are at issue here, because I think they really elucidate the problem.  Can I pass that up?

So 20506 is the -- part of the NVRA that relates to public assistance agencies, and if you look at the second page of that document it says that they have to either use the federal form or they need to use a form that is equivalent to the form described in 20508(a)(2).

And so if you turn to 20508(a)(2), it describes a form that has to be created by the Election Assistance Commission; and then defendants argue that, in fact, what you should look at is not 20508(a)(2), but instead you should look at 20508(b) and anything that complies with what has to be in the state form should be sufficient as an equivalent to the federal form.

That's just not what the statute says.  The statute says it has to be equivalent to the federal form.  A form that is treated differently simply because it's labeled "state form" instead of "federal form," is not the equivalent of a federal form; and so if you don't provide birthplace or you don't provide your documentary proof of residence and you turn in a state form, you're gonna get rejected.

If that's at a public assistance agency, the public assistance agency is just not complying with 20506 and I don't think that -- you know, defendants don't put forward any other

argument other than that you should kind of skip the statutory citation that's actually in the statute and sub in for it what they would prefer, which is 20508(b).

Of course, that runs them into the same minimum information necessary issue that we talked about before. So I'm not sure how much it helps them, but it's also just wrong as a matter of law.

For those reasons and all of the reasons expressed by my colleagues, I would encourage you to rule in favor of the plaintiffs.

THE COURT: Thank you, Ms. Lang.

MS. LANG: Thank you, your Honor.

THE COURT: I never believed Mr. Babbitt when he said we were going to do it all this morning. So it's 11:30. We're going to let the defendants begin their closing arguments, but clearly you get as much time as plaintiffs have taken; and I'll also give them the final word if you want to take a little bit more time than what they've taken, but we will break for lunch in thirty minutes or so.

MR. WHITAKER: Thank you, your Honor, for that safety valve. Josh Whitaker for the State of Arizona and Attorney General Kris Mayes. I plan to split the defense time with Mr. Langhofer and possibly also Ms. Porter. I don't know yet whether she'll have things to say or not, but I plan to focus on the parts of the Challenged Laws that involve the

database checks as well as issues relating to standing and ripeness.

Mr. Langhofer will tackle the birthplace requirement, the DPOR requirement and issues relating to discriminatory intent in the Voting Rights Act Section 2.

So a lot of claims have been made about the statute, and I'd like to focus on the statutory text.  If we could pull up Exhibit 1, PDF Page 5.  So in HB2492 there was this citizenship verification requirement that was added.  You see there in Part C, this is the part that talks about how County Recorders are supposed to reject state forms that don't have proof of citizenship, and this Court held at summary judgment that provision would violate the LULAC Consent Decree.  That's not currently at issue.

Moving to Part D, this is where the law explains how to handle federal forms that don't have proof of citizenship, and it says County Recorders have to use all available resources to verify citizenship status; and then it lists a bunch of databases that the County Recorders have to check provided they have access, and the first one we've heard a lot about is the Department of Transportation database of driver's licenses and other IDs.

As we explained in our Proposed Findings of Fact, County Recorders have been using this database for this purpose for a very long time.  In the trial in *Gonzalez* there

was testimony explaining that the state registration system would check applicants against the MVD database and flag applications that were -- had an F-type license.

In the LULAC Consent Decree, which this Court ordered Arizona must still follow, that's required under the LULAC Consent Decree.  What happens in the LULAC Consent Decree is if someone -- if either a federal or a state applicant submits an application and if they have proof of citizenship, they're a full ballot voter.  If they don't and MVD does their check and it is flagged as a foreign-type license, then you mark that person not eligible and you notify them that they've been marked that way; and if the applicant doesn't think it's correct, they can submit proof of citizenship.

And also in the LULAC Consent Decree it says that if you don't provide proof of citizenship and the MVD check doesn't have any information about you and you can't otherwise get information, you're a federal-only voter and you're notified; and that same process carries through to the EPM in 2019, and we've cited pages of the EPM explaining that.

So the point is that this process has existed for a very long time --

THE COURT:  So how much time -- how much time do you get to respond to whatever the notice is that the county recorder sends that says, "Oh, you have an F-type license.

You're not eligible to vote, unless you provide me with some information"?

MR. WHITAKER:  Right, right.  So under the current procedures there's no time limit because the status quo was that you weren't registered, right.

So if you go to register and they say, "Oh, sorry," you know, "you didn't provide proof of citizenship.  We checked MVD.  You have a foreign-type license.  We're not going to register you at this time; but if you want to, you know, submit proof of citizenship in the future, you can."

It doesn't -- well, I guess technically -- technically, the time line is -- I believe under the EPM it's under the next -- if you don't do it by the next general election, then you're actually removed from suspense to cancellation, if that makes sense.

THE COURT:  So you're in suspense?

MR. WHITAKER:  You are, that's the word that County Recorders use.

THE COURT:  And all you have to do is provide the proof of citizenship at some point in time?

Can you cast a provisional ballot?

MR. WHITAKER:  I don't know the answer to that, Your Honor.  That might be in the EPM.  I don't know that offhand.

THE COURT:  Okay.  But there's -- there's no time limit except whenever the next general election is?  If you

haven't done something by then, your suspense status is over and you have to re-register?

MR. WHITAKER:  It's -- I believe that's right, Your Honor.  The EPM is the Bible there.  So to the extent the EPM contradicts what I'm saying, you know, the EPM is what the Recorders follow.

Now, I want to sort of compare that with -- could we go to the next page in this statute.

Okay, so (e) talks about after complying with section (d) -- subsection (d) the County Recorder matches the applicant with information that they're a citizen and they're otherwise qualified.  They're registered, great.

If the County Recorder matches the applicant with information that they're not a citizen, the County Recorder must reject the application, notify the applicant that the application was rejected because of the non-citizenship and forward the application to the County Attorney and Attorney General.

Now, plaintiffs have made claims about what this statute means, but it hasn't actually been implemented yet; and I think one thing plaintiffs do is they take an uncharitable reading of statutory language and assume that it will be applied that way so --

THE COURT:  Are you talking about investigation?

MR. WHITAKER:  No, I'm talking about -- well, let's

take it one step at a time.  So the word "reject," when the statute says the County Recorder shall reject the application --

THE COURT:  Right.

MR. WHITAKER:  -- one thing plaintiffs say is that means something harsher than what County Recorders already do. What County Recorders already do is they mark them not eligible, and we don't read the statute as -- requiring the word "reject" as requiring a change to that practice.

The word "reject" there we take the Legislature to mean don't allow them to vote.  So we'll see how it gets implemented, but I think a sensible interpretation of that wording would be, "We got your application.  We're going to reject it in the sense that we're not going to allow you to vote," so for what that's worth.

The statutory language goes on to say notify the applicant that the application was rejected; and plaintiffs say, "Well, there's no cure period in the statute."  Again, it's true that the statute doesn't specify a cure period, Your Honor, but I think it would be sensible for County Recorders to interpret this as not precluding their current process, which is they give notice and the whole point of the notice is so that the applicant can respond if they have proof of citizenship.  I mean --

THE COURT:  Well, did the County Recorders have

anything to say about that?

MR. WHITAKER:  I don't remember exactly, Your Honor.

THE COURT:  Okay.  But then there's also this -- doesn't say if the applicant doesn't cure, if the applicant doesn't do something in a certain amount.  It says tell them it's rejected and forward the application to the chief law enforcement -- I paraphrase -- the chief law enforcement officer of the county and the State of Arizona for investigation.

MR. WHITAKER:  That's true and that part, Your Honor, is new.  That part's not in the EPM.

THE COURT:  There's no waiting around.  There's no "provide us with more information."  It's a mandate that they shall reject and forward.  That's a "shall."

MR. WHITAKER:  That's true, they shall reject, they shall notify and they shall forward.  I guess what I would say there is there's no -- I don't read that as requiring the forwarding to be simultaneous.  In other words, if they give notice --

THE COURT:  How'd you read it?  They can just, like, wait around for a while?  I mean, shall -- doesn't "shall" mean "shall"?

MR. WHITAKER:  "Shall" means "shall."  It's definitely an obligation.  So I guess I would just note --

THE COURT:  Where is the discretion in the County

Recorder to not forward it simultaneous with the rejection and notification?

MR. WHITAKER:  It -- Your Honor, it does have to be forwarded, at least as I read it.  I don't read it as necessarily being simultaneous.

THE COURT:  What causes you to not read it that way?

MR. WHITAKER:  The fact that it hasn't been implemented yet.  So often what happens in implementation of these statutes is that, you know, the Secretary of State, the County Recorders get together and they say, "What would be a sensible way to interpret this language on the ground?"  So --

THE COURT:  What if I've already interpreted that "shall" means "shall" and they have to do all the three things at one time?

MR. WHITAKER:  Well, you are the Judge, Your Honor. You are the Judge, that's fair, but I guess I would just say that there are -- it is not uncommon for election officials in Arizona to get statutory language and think about how to interpret it, how to apply it in a way that makes sense.

THE COURT:  Is there evidence of that?

MR. WHITAKER:  Not at this time, Your Honor.  Not at this time.

THE COURT:  Okay, let's stick to the evidence then.

MR. WHITAKER:  Okay.  So part of the reason it's important to take note of the fact that this process has been

in place for a long time is that plaintiffs in this case haven't identified anyone in particular who has been unable to be registered to vote as a result.

So, for example, we didn't hear testimony from anyone that said, "I'm a citizen, my application was rejected because of one of these MVD checks that has happened for the past fifteen years and I was not able to vote," and I think the reason for that --

THE COURT:  But haven't the -- don't I have evidence from at least one County Recorder that what happens now is they put them in this suspense and they contact the applicant, maybe just call them on the phone, and say, you know, "You have a foreign-type license.  We don't know that you're a citizen.  In fact, that would suggest you're not.  Can you help us out here?"

And the person could respond on the phone with, "Oh, well, I have my naturalization certificate right here.  Let me read the number off to you," and then all is fine.  There's no such -- I mean, that's what the County Recorder said they're currently doing because we know that this is the most common thing that happens to naturalized citizens because driver's licenses in Arizona last for many, many years.

MR. WHITAKER:  Your Honor, again, there, I would just point out that the word "notify" in the statute, I -- I don't think it precludes that same practice.

It doesn't prohibit County Recorders from taking those sorts of steps, and I think that plaintiffs are assuming that it will be interpreted in a cramped way when it's a facial challenge before implementation.

So I think the Court should consider the ways in which the statute could be implemented when evaluating it in this posture, and I would point out, for example, in the *Gonzalez* case, that happened where the proof of citizenship statute -- it said you've got to check the certificate of naturalization number, and it turns out that at that time SAVE -- you needed to have an A-number instead.

So at the beginning of that implementation folks without A numbers weren't run through SAVE and so they couldn't register; and then election officials said, "Wait a second, that doesn't make sense.  Let's interpret the statute even though the statute doesn't specifically call for checking of an A-number to allow that," and that's explained in the *Gonzalez* opinion.

So the point here is simply, Your Honor, that we're at a time when even though the statute was enacted a year and a half ago, it's still pre-implementation because of these lawsuits.  County Recorders haven't proceeded to implement it.

Moving on a little bit on the reliability of the MVD data, plaintiffs point -- plaintiffs' main criticism is, you know, what happens to a person who is not a citizen and they

have this foreign-type license and they naturalize and they don't inform MVD and then they go to register, and it's true those types of situations can happen.

We would just keep three points in mind. One, there's at least a time limit on those kinds of situations because the foreign-type license that you get expires at the same time as your -- expires no later than your underlying documentation of authorized presence.

So it's not like these folks will be naturalized for many, many years and still have the foreign-type unexpired license. That's why plaintiffs refer to this group as "newly naturalized citizens." That's why the *Gonzalez* court in the trial referred to these folks as "recently naturalized citizens." So there is a time limit on the sorts of folks who would fall into that category.

THE COURT:  Do I know what that time limit is?

MR. WHITAKER:  I don't know if in the record anywhere is when each type of document -- type of foreign documentation expires.

THE COURT:  I'm sure that's not in the record, because there's probably a whole bunch of them; but, I don't know, green cards are, like, five years or something.

MR. WHITAKER:  I know, Your Honor -- so, for example, in Exhibit 233 on Page 4 that general principle is laid out by MVD but I don't -- I don't recall whether it -- in

fact, I don't think it does have specific times.

Director Jorgensen may have testified about specific times at trial or his deposition, but for now it's the general principle that -- oh.  Oh, there we go.

Well, this doesn't answer the question of whether there's a specific time, but it's just noting that there is a natural time limit for these sorts of folks.

THE COURT:  But it's potentially years?

MR. WHITAKER:  Yes, I think that's right.

THE COURT:  That's a lot of years of every 30-day database checks.

MR. WHITAKER:  Sure, yes, understood that point as well.

The second point to keep in mind is that County Recorders are aware of this possibility.  So, for example, the State registration form has instruction that says if your license was issued while you weren't a citizen, please give us your immigration number or other form of proof of citizenship, because they know that that can happen.  So that's a known thing.  County Recorders know about it.  They do their best to work with that fact.

And then the third point is that, you know, worst-case scenario if the MVD flags someone as having a foreign-type license, there is a notice requirement, as we've discussed, that County Recorders have already been notifying.

There's now a statutory requirement for them to notify.  I don't think that statutory requirement precludes them from -- precludes County Recorders from doing the sorts of notice that they've already been doing for, you know, a long time.

THE COURT:  So let me go back to something that the plaintiffs said that, I think, was part of the evidence, and it has to do with automatically changing the value when the MVD check is done, because we know that if it's within the first two years of when you registered, if you provided a copy of your naturalization certificate it would be -- I mean, I'm assuming the County Recorder would look -- say, "Oh, look, right here in the record, naturalization certificate.  I'm going to ignore this -- or I'm going to change it back from the 4 to the 1," or whatever the number was.

But every 30 days it would happen again, but then after two years proof of citizenship documentation is destroyed.  The documents go through the MVD -- or the registration goes through the MVD check.  It's automatically changed to 4.

What -- what's the County Recorder going to do?

MR. WHITAKER:  So a couple responses, Your Honor.

One, there was testimony that there is still the transaction history.  So it's not like the changing erases all previous information about the fact that proof of citizenship was already provided.

Two, County Recorders are used to doing this in the context of the juror disclosures already.  So in the 2019 EPM there's a section that explains what to do with these juror reports that you get when someone self reports as a non-citizen, and one thing County Recorders do is they check the registration database and say, "Hey, did this person previously provide proof of citizenship?"

And if they did, they don't send that person a notice, which makes sense.  Back when the proof of citizenship statute was originally enacted, it's true that the underlying documentation of proof of citizenship doesn't need to be kept for two years, but the statute actually requires that the fact that proof of citizenship was given be kept in the permanent voter file.  That's a -- that's a statutory requirement back from 2004.

THE COURT:  So you think that I should assume that County Recorders aren't going to start sending out notices on all the F-type licenses that they get back every 30 days without checking the permanent record?

MR. WHITAKER:  Well, certainly not, Your Honor.  I mean, it's another example of where plaintiffs take this reading of the statute that is not a necessary reading and assume that it will be interpreted that way when, in fact, in Arizona there's a history of election officials taking complex statutes and trying to imply -- apply and interpret them in

reasonable ways.

I wouldn't expect a County Recorder to ignore the fact that proof of citizenship was already given. In fact, in HB2243, which we'll get to in a little bit, the confirmation requirement actually requires them to confirm with any relevant database.

So I think it at least arguably is required that they check their registration database to make sure that these folks who are flagged haven't previously provided proof of citizenship.

The one other minor point I'll say as a technical matter --

THE COURT: Do County Recorders have anything to say about this?

MR. WHITAKER: I don't remember the answer to that, Your Honor. I believe -- broad brush strokes, I believe County Recorders are currently in the position of, "We're not sure what to do here because there's all these lawsuits."

You know, this Court has found part of the statutes already illegal so they're sort of waiting; but at the same time, though, Your Honor, I don't think it's proper for a plaintiff to come in before implementation has happened and assume an implementation that doesn't make a lot of sense and have a court strike it down on that basis. I mean, that's the opposite of how federal courts should be reviewing state laws.

The one minor point there, too, Your Honor, is in HB2243 my understanding is that it's actually a -- it's a monthly file right now that -- well, I'll -- in HB2243 the MVD data part of it is actually -- the Director testified he was giving a big ol' file to the Secretary of State.

THE COURT:  Yeah, that currently has no capacity to do anything with it --

MR. WHITAKER:  Right.

THE COURT:  -- but presumably would have an obligation to figure out a way to --

MR. WHITAKER:  Right.

THE COURT:  -- do that because the statute tells the Secretary of State they have to do some comparison.

MR. WHITAKER:  Right, and my point there is if that were implemented in a way that erased the previous proof of citizenship history, which we don't know yet because the Secretary isn't using it yet, I would assume that someone -- at least I would hope that someone over there would figure out a way to implement it without erasing that -- permanently erasing that sort of indicator.

I mean, that's a -- it's a technical point that is something that can be figured out during implementation.  It's not a reason to strike down the law on its face before it's been implemented.

So moving to the SAVE database, this -- can we go

back to Exhibit 1.

THE COURT:  So you agree, though, that these problems that need to be worked out with F-type licenses only affect naturalized citizens?

MR. WHITAKER:  I think it's true that if there is a citizen who has a foreign-type license, that person is a naturalized citizen.  There may, of course, be non-citizens who have foreign-type licenses.  That's the reason why these checks are being done.

THE COURT:  Was that a "yes"?

MR. WHITAKER:  It's a "yes" in the sense that if there are citizens who are being affected, those would be naturalized citizens.

THE COURT:  Okay, thank you.

MR. WHITAKER:  For the SAVE database, this is now one of the databases that County Recorders are required to check under HB2492.  It's up there at the top.  Again, County Recorders were already using this database for citizenship purposes for a long time.

As the *Gonzalez* court explained in its trial fifteen years ago, "A" numbers were verified using SAVE, and in the 2019 EPM it explains this process.  It's very similar to the MVD data where if SAVE shows you're a citizen, full ballot voter.  If SAVE shows you have a non-citizen status, you -- same thing, you're notified about that.  You're not eligible,

what recorders call "put in suspense."  If you think that's not correct, you can submit proof of citizenship and if there's no information whatsoever --

THE COURT:  Because the EPM says you have to communicate to the registrant that "couldn't verify your citizenship"?

MR. WHITAKER:  Yes, yep.  And so same thing here, this statute now makes it a statutory requirement, where it wasn't before, I don't think, to notify folks who are flagged in the SAVE database as non-citizens; and I do want to briefly clarify one factual thing that plaintiffs' counsel said.

They seem to indicate that SAVE inherently can't verify non-citizenship, and just because there wasn't any USCIS person at trial I want to illustrate -- can we go to Exhibit 275.

THE COURT:  Before you do that, but then what happens?  They're notified that their citizenship could not be verified, and then are they given 35 days to fix it or else?

MR. WHITAKER:  In the 2019 EPM --

THE COURT:  Not the EPM, statute.

MR. WHITAKER:  The statute is silent on that.  The statute just says you notify them.  Now, current practice before the statute was to notify them and, you know, if they responded, then great.  "We've got you in the system now. We're going to put you a full ballot voter."

I don't see a reason why this statute would prohibit that -- those pre-existing procedures.  Presumably that's the point of the notice requirement that's in the statute is to tell someone, "Hey, we ran the SAVE check.  You were flagged as not being a citizen.  So if you want to be a voter, please give us proof of citizenship."  And I fully admit the statute is inartful in several places, but I don't think the statute was intended to preclude that practice that's been longstanding.

So can we turn very briefly to Exhibit 275.  If you go to Page 2.  So that -- that bottom box -- scroll down just a little bit.  So that's an example of, you know, County Recorders getting ready to initiate verification.  They enter the information, and then if you go to the next page, Page 3, up at the top -- up at the top that box that says "SAVE Response," can you zoom in that green box a little bit.

It's an example of something that SAVE would show.  The 2019 EPM walks through this, right.  It says the possible results from SAVE are you're a citizen, you have a specific non-citizen status or there's no match.  So just to, I guess, clarify the record there.

And, once again, you know, even though SAVE has been used for this purpose for a very long time, we didn't hear any testimony about anyone who said, "Hey, I'm a voter.  Because of this SAVE check, I was unable to be registered," because

County Recorders do this sensibly.

They say, you know, "We're going to give a notice and if you -- if we hear something back, we'll work with you. We'll register you." I don't read these statutes as precluding that from happening, and I don't think this Court should either in the posture the case is now when it's a facial challenge pre-implementation.

So very quickly on -- oh, one other point on SAVE. Plaintiffs' counsel talked about there can be a lag time, that's true. County Recorders are aware of it. They even have a provision in the EPM pointing that out. It's not a very long lag time, but it can happen.

THE COURT: Well, the EPM suggests two weeks.

MR. WHITAKER: Yes, I believe the testimony -- so Dr. McDonald, I think, said it would be atypical to be more than two days; but, yes, the point is there can be a lag time because the federal government is a big, multifaceted entity and so when part of the federal government gets information sometimes it -- well, anyway. Yes, there can be a small lag. It's not as -- it's not the same sort of thing as the MVD data.

So plaintiffs' counsel talked a lot about whether County Recorders are following the procedures in the Memorandum of Agreement between the Secretary of State and the USCIS; and, I mean, as an initial matter, that doesn't affect

whether the challenged laws are lawful because HB2492 doesn't instruct County Recorders to use SAVE in a way that violates the Memorandum of Agreement.  In fact, HB2492 says use SAVE if practicable and if you have access so --

THE COURT:  Well, do you agree with me, though, that -- I was talking about the vital statistics website that when all of these websites are specific -- databases, rather, are specifically called out in the statute, that that basically puts an obligation on the Secretary of State and the County Recorders to try to get access?

MR. WHITAKER:  Yeah, I think it depends on the exact statutory language but that database -- let me see, that's -- that's statutory obligation to check if you have access.

THE COURT:  I mean, the vital statistics one, apparently, you can get access if you go through whatever the procedures are or pay the money or whatever it is.  There wasn't any -- any suggestion that Arizona can't get access, just that they don't have it now.

MR. WHITAKER:  I think, yes --

THE COURT:  And wouldn't you also assume that the County Recorders and the Secretary of State, because the statute tells them to do these monthly checks through SAVE, if practicable, that they should try to amend their Memorandum of Understanding to allow for the checks?

That would be trying to follow the statute as best

they could.

MR. WHITAKER:  Your Honor, I think that would be -- if you're trying to follow the legislative intent, I think that you should try to do that.

You know, as to -- I don't want to get County Recorders in trouble, you know, if they haven't done that yet, whether they've violated their statutory obligations.

THE COURT:  I'm not assuming County Recorders are using SAVE contrary to the current authorization, but we all agree, I think, that when specific databases are called out in the statute to check if you can, that Secretary of State and County Recorders should make a good faith effort to get the access.

MR. WHITAKER:  I think -- I think that makes sense, Your Honor.

Very briefly on plaintiffs' counsel's point about County Recorders aren't doing the additional verification procedures that is required under their memorandum of -- under the Secretary of State's Memorandum of Agreement with USCIS.

Again, that's an example of something that I don't think affects the lawfulness of HB2492 or HB2243.  Very -- by way of very brief explanation, the point there is that the Memorandum of Agreement, if there's, say, a no-match situation, there's supposed to do -- they're supposed to tell SAVE -- the folks at SAVE -- it's supposed to go through an

additional verification process with the folks at SAVE.

I will point Your Honor to an exhibit I don't think was talked about at trial, because there was no one from USCIS.  It's Exhibit 274, if we could pull that up.

This is a -- a fact sheet from SAVE, and if you go to Page 2.  That last paragraph on Page 2, I'm not going to spend a lot of time on it, I just would direct the Court there if the Court ends up thinking whether these additional verification procedures were followed is important, which again, we don't think it matters here, but that last sentence explains the following are examples of when a user agency may not need to conduct additional verification after contacting the individual being verified.

And one of the examples there, the second bullet point, when the individual provides proof of citizenship accepted by the user agency without verification by SAVE.

THE COURT:  So you're suggesting that the chart that I was shown by the plaintiffs that showed there were only small numbers in Maricopa County and larger numbers in Pima County of this additional verification through SAVE, that I shouldn't really draw any conclusions from that because the SAVE procedures itself says you can do this without contacting us?

MR. WHITAKER:  That's -- that's how I read it, Your Honor.  Again, I don't think it really ultimately matters, but

I wanted to flag that for the Court's consideration because I don't think it's been proven that County Recorders are violating the Memorandum of Agreement.

THE COURT:  Okay.  We'll break for lunch.  We'll reconvene at 1:30.  Court is in recess.

COURTROOM DEPUTY:  All rise.

(Lunch recess taken at 12:08 p.m.)

(Back on the record at 1:31 p.m.)

THE COURT:  Mr. Whitaker, you may continue with your closing.

MR. WHITAKER:  Thank you, your Honor.

Can we pull up Exhibit 1, PDF Page 5.  Next page, sorry -- oh, no, that's the right page.  You had it right.

Your Honor, so continuing through the laborious task of the statutory language, at the bottom of this page another database to check in the citizenship verification process is the Social Security Administration databases.

The testimony here was pretty clear that County Recorders don't have access to it for citizenship purposes.  I think a claim based on the reliability or unreliability of that type of database would be unripe.  So I'll move on to the next page, PDF Page 6.

Next database here that we haven't discussed yet is the NAPHSIS vital records data.  As we explained earlier, the -- unlike the federal databases, because federal governments

tend to be kind of touchy about who they give access to and why and under what conditions, the testimony here was not very specific but there was testimony that this sort of thing is generally acceptable if you pay for it and agree to the terms from the organization. So that kind of claim is either unripe or there's been no evidence that this database is unreliable.

The next database on the page -- this is the catch-all provision. Any other, et cetera, database, including the Electronic Registration Information Center database, or ERIC, what County Recorders refer to as ERIC, the evidence about ERIC was pretty clear. County Recorders don't get citizenship data from that. So it doesn't seem like the kind of thing that they would have access to for this purpose.

County Recorders didn't identify any other database that could be used for this purpose. One thing plaintiffs' counsel said is that there's a fear that this catch-all database provision could be used by malicious third parties to inundate County Recorders with citizenship -- you know, faulty citizenship information and I think that is speculative and it wouldn't -- it seems not to fit with the word "database" in the statute. I don't think there's been any evidence in the record that that has actually happened.

So stepping back about HB --

THE COURT: What about the third-party concern is related more not to this provision, but to what gives the

County Recorders reason to believe and is a report from a third person or a list from a group, and there is evidence that these things have happened.

MR. WHITAKER:  And I agree with Your Honor that is the primary focus of the concern of third parties in HB2243.

So stepping back about HR2492, again, this is a facial challenge.  The Supreme Court has said you've got to show it's unconstitutional in all of the applications or, as in *Crawford,* a facial challenge must fail when a statute has a plainly legitimate sweep; and the statute does, I think, clearly have a plainly legitimate sweep.

One of the reasons why it's important to wait until some form of implementation or at least not guess that implementation will be bad is that you don't always know how implementation will happen.  That actually happened in this case when the Tohono O'odham plaintiffs challenged DPOR.  They said, "This statute will prohibit us from voting because we don't have standard street addresses," and one of the things we, the State, said when reading the statute, "That's not what that means."

So we worked that out.  The Court issued a declaration on that, but that's an example of why the Court shouldn't rush to a cramped interpretation of a -- of a statute.

In terms of standing and ripeness, our position is

that, at a minimum, claims based on the verification involving Social Security database, ERIC database and this catch-all provision at the end would be unripe.  The vital records data, it's a little bit squishier there because of the testimony there that was County Recorders don't have access to it, but it's a private organization that gives access, but there was no evidence that that kind of database is unreliable for the purposes it's being directed to be used under the statute.

In terms of -- I will quickly say on standing I am not going to try to go through the chart of standing that plaintiffs have helpfully produced, sort of identifies what they think is their testimony on each standing part.

I will just say in terms of general principles, the *Summers* case in the United States Supreme Court does set for the general principle if you are relying on what's called associational standing where you're invoking standing on behalf of one of your member's injury, you generally do have to identify that member; and I think the Ninth Circuit case -- I think it was Mr. Babbitt mentioned -- is an exception to that general principle, but the general principle still remains.

The other thing I will say is that for organizational standing, you generally have to show a frustration of your -- if you're an organization claiming that you have been harmed as an organization, you generally have to

show that your mission has been frustrated by whatever you are challenging and that you have diverted resources in response to that; and although many organizations make a variety of claims about their standing, I think a careful review of the record will show that they are either based on speculation about how they think the laws will affect them or they're diverting resources in a way that isn't actually -- it's actually something that they're already doing.

So like a voter registration, voter outreach organization, if they're claiming that they have to do some voter outreach in response to these laws, well, that's not an injury to them.  That's not a diversion of resources or a frustration of their mission.  That is them continuing to spend money on what they were already doing.

THE COURT:  But didn't we have testimony that they would have to allocate portions of their budget which were not allocated to voter registration to that effort and education about these statutes and efforts to help people cure their registration if they receive 25-day notice that would be diverted from other aspects of their mission?

MR. WHITAKER:  So I would answer by citing to the *Friends of the Earth* opinion in the Ninth Circuit that we cited in our Conclusions of Law, which explains this principle about how if you're gonna be diverting resources -- to get to organizational standing, it has to be something different from

what you're already doing.

And you can see why that is, because otherwise you could just create an organization -- I could create an organization right now that's -- I'm going to educate people about laws, and whenever there's an election law I'll have standing because I'll just spend money to educate people about that new election law.  So there are limits on that kind of standing, and so I'm not going to try to go through each claim; but it does warrant careful review, I think.

So on -- okay, so on undue burden, let's focus on HB2492.  The burden imposed here is not excessive.  Setting aside the parts of the law that this Court has already held to be preempted, there actually isn't much of a newly-imposed burden at all because these MVD and SAVE checks have already been happening and what -- I mean, what could be a burden is that if as a result of these checks an applicant is deemed not to be a citizen and they don't -- you can't otherwise show proof of citizenship to vote -- and that's not a heavy burden. That was the issue confronted in the *Gonzalez* court fifteen years ago and there are two.

There was similar proof by the plaintiffs that, hey, these documents cost money and people -- maybe some people may not have these documents and the Court there found that's not an excessive burden either to naturalized citizens or to the given public in Arizona, and the Court followed the Supreme

Court's guidance in *Crawford* in reaching that conclusion.

Plaintiffs don't really offer a reason to depart from that here.  Again, they don't identify anyone who can't fulfill this requirement of proof of citizenship upon being notified, nor have they provided the number of -- like an estimated number of people who can't do that.

Now, plaintiffs' counsel today said, "Well, we know that the federal-only list is a large list and those sorts of people are the people who are harmed."  That -- that idea was rejected in *Gonzalez* squarely, and I think it's worth reading from the *Gonzalez* opinion here.

The Court found as follows:  Of the approximately 20,000 voters ultimately unable to register to vote due to Proposition 200's proof of citizenship requirement, plaintiffs have not presented any reliable evidence as to the number of these applicants or voting-eligible persons generally who lack proof of identification or unable to attain it, and the Court cites *Crawford*.

The Court goes on to say, indeed, they have only produced one person, Shirley Price, who is unable to register to vote due to Proposition 200's proof of citizenship requirement, nor have they demonstrated that the persons rejected are, in fact, eligible to register to vote.

And, Your Honor, that entire paragraph applies to the evidence here with two exceptions.  One is that plaintiffs

have now had fifteen years of the MVD and SAVE database checks happening, and two is there's no Shirley Price.  There's no person who presented any testimony to this Court that, "Hey, I'm a citizen.  I got falsely flagged in one of these checks and I was unable to register to vote," because the process actually works pretty well.

Generally, the process correctly identifies people and in the instances it don't -- instances they don't, those folks are given notice and an opportunity to respond.

On the possibility of being referred to the County Attorney or Attorney General, there's been no evidence that any particular person would get referred as a result of these new laws.  Even if referred to the County Attorney or Attorney General, there's been --

THE COURT:  Wait.  We had this discussion this morning about this mandatory language.

MR. WHITAKER:  Yes.

THE COURT:  And you're using "if" somebody gets referred.  It's not an "if."  It's a mandate that they be referred.

MR. WHITAKER:  Yes, and this goes to, I think, whether there is notice -- whether there will be an opportunity for them to respond before being referred to investigation or not, I think.

I would -- (a) I would note that there's no

individual who has been identified as they will be referred; but (b), I would also note that we don't even know what the course of an investigation, if any, would be under that referral.

So, for example, if County Recorders interpret the statute to say you have to immediately refer someone who is found to not be a citizen, you give them notice and you immediately refer them to the Attorney General, I think it would be sensible for the Attorney General to say, "Okay, so hang on. You've already sent them a notice, right? Let me know in a month whether they've responded to that notice before I start doing something."

We don't know how that type of investigation, if any, would happen because it just hasn't happened yet. I guess the point I'm trying to make is that there are a lot of unknowns about what that kind of referral process and investigation would look like. So to say that there's a significant burden I think is premature.

On the other side of the coin, the State interests served by citizenship verification are important. There have been two that we've talked about for a long time now. One is reducing the risk of non-citizens voting in Arizona.

THE COURT: Reducing the risk from two to zero?

MR. WHITAKER: Well, two are the number of prosecutions. I think the risk is larger than that but --

THE COURT:  But you think -- but there's no evidence of -- the only evidence of non-citizen voting are those two cases in Arizona.

MR. WHITAKER:  True.

THE COURT:  Every individual who testified said to the extent that they ever knew of someone who voted who wasn't qualified to vote, they voted twice or they had moved and they still voted in Arizona, none of them were non-citizens.

They were all people that were citizens who voted when they weren't qualified to do so, and there's no evidence other than two sealed indictments that any non-citizen has ever voted in Arizona.

MR. WHITAKER:  I -- I generally agree with that, Your Honor.  I would point out two things.

One, a very minor point, but there was some evidence from Janine Petty, the Maricopa County Recorder, who said that she remembered at least one or two occasions where she sent someone a notice after getting a juror disclosure that someone self reported as a non-citizen, and that person affirmatively responded and said, "Yeah, I am not a citizen."  That's not voting.  That's registering, but I would just point that out.

THE COURT:  Yes, there was some -- some evidence that perhaps Motor Vehicles registered people to vote when they shouldn't have.

MR. WHITAKER:  There is also evidence from --

THE COURT:  But no -- no evidence of voting.

MR. WHITAKER:  Yes, your Honor.  So I agree that the evidence of non-citizens voting in Arizona is very rare.  I would point out that there is a group of folks, however, who have registered and who have not proved -- who have not given documentary proof of citizenship.

So as I understand the history here, back in 2004 the Arizona electorate identified what they perceived as a gap in the election system and they said, "Hey, we're allowing people to vote based on their word that they're not a citizen.  Let's start requiring proof of citizenship," and there was a trial about that and, yes, you can do that.  So they've begun to do that.

And over time there have been two what I would call holes in that patch.  The first hole, as perceived by the Legislature, I think, was the intertribal decision which said, actually, for federal-form folks you can't prohibit them from voting in federal elections; and the second, I think as perceived by the Legislature, was the LULAC Consent Decree, which expanded that further.

So I think it's fair to characterize the history as the Arizona electorate was concerned in 2004.  They did what they perceived to be a patch, and now there are perceived holes in the patch.  Now, we don't know.  We don't -- in fact, that's one thing these laws are trying to do is trying to get

to the bottom of these folks who are federal-only voters, who registered to vote and they said they were a citizen but they never provided proof of citizenship and, therefore, are voting in federal elections.

What is their citizenship status?  That's, for example, why there's a provision in the law that says County Recorders give those names to the Attorney General because -- you're right, Your Honor, there isn't evidence either way.

Now, I will say, though, and this is probably the most important thing I'll say today.  The State does not have a burden to demonstrate that.  So in, for example, the *Brnovich* Supreme Court decision recently -- I'll quote from it -- "The State may take action to prevent election fraud without waiting for it to occur and be detected within its own borders."

So although plaintiffs frequently point to the very sparse lack of evidence, they're trying, I think, to implicitly shift the burden a little bit.  The State does not have to demonstrate that there is a large problem to act in response to it.  The State can be pro-active to what it thinks is a risk, and that was in *Gonzalez,* too.

The *Gonzalez* court said, and I quote, "An evidentiary showing of fraud is not required to find a government's interest in preventing voter fraud to be important."

112

So we agree with plaintiffs that the evidence of non-citizens voting in Arizona is extremely rare, but we also don't think that we have the burden to show more than that, and I think the case law backs us up on that.

I also think it's reasonable for the Legislature to conclude that verifying citizenship would address that risk for the basic common sense proposition that if you verify someone's citizenship, you can be more certain that that person is, in fact, eligible.

The second State interest that we've submitted is protecting voter confidence in the outcome of elections. Back in 2004 it appears the Arizona electorate had some concern because they passed Proposition 200, which implemented the proof of citizenship requirement.

Neither side disputes that the general interest of protecting voter confidence is an important government interest, and it's a separate interest from reducing the risk of non-citizens actually voting because how -- how the public perceives election results is critically important to a democracy, to make sure that folks do trust that elections in Arizona are being decided only by those folks who are eligible to vote.

THE COURT:  So I agree with you that that is a legitimate State interest, but is there any evidence or do I need evidence that this law has any affect whatsoever on voter

confidence?

MR. WHITAKER:  So the answer to your second question is "no," Your Honor.  I'll quote from the *Feldman* case we cite in our Proposed Conclusions of Law.

"It is 'practically self-evidently true' that implementing a measure designed to prevent voter fraud would instill public confidence."

It's not something that the State has to prove, nor would it make sense to have the State try to prove that.  The State is not required to take a survey of the populous after passing a law that says, "Hey, you know, before this law how'd you feel about election security?  And now after this law, how do you feel?"

The State is entitled to rely on the judgment of its constituents -- I'm sorry, of its policy makers that are elected by the constituents and are hearing their concerns; and although we didn't have to put on evidence of that, there was evidence of that at least in trial.

We heard from former Senator Quezada who explained that "yes" there were folks coming to the Legislature with these concerns about non-citizens voting.  He didn't think those concerns were accurate, but no one -- no one contested the sincerity of those concerns.

We heard similar testimony from the folks in the Attorney General's Election Integrity Unit that there were

members of the public who expressed concern about this idea that now that there are these federal-only voters, maybe those people are not actually citizens.  There's suspicion.

I will also point out that the *Gonzalez* court in 2008 found the State's interest in protecting voter confidence to be important without citing any evidence.

If you look at the Court's opinion, it just sort of said state asserts this interest and it's important; and I think that makes sense because putting the burden on the State to try to survey the populous beyond trusting the elected policy makers to know what their constituents want is putting too much burden on the State.

I'll briefly talk about plaintiffs' claim of -- they cite *Bush v. Gore*, this idea that there is a free-standing obligation for State election laws not to have arbitrary and disparate treatment, and our papers make an argument as to why *Bush v. Gore* shouldn't be a free-standing legal claim; but even setting that aside, if you look at HB2492, the citizenship verification requirements, they're pretty specific, especially as compared with the issue in *Bush v. Gore*, which was the State Supreme Court ordering a recount of ballots and the order literally said I want you to determine whether these ballots -- well, I won't go into explaining *Bush v. Gore*.

Suffice it to say that if you take a look at *Bush v.*

*Gore,* you will see that the discretion given to election officials was far broader than the discretion given under HB2492.   There isn't a *Bush v. Gore* problem here.

With that, I'll move on to HB2243, which is the post-registration citizenship review statute.

Can we pull up Exhibit 2.   Let's go to PDF Page 5.

Okay.   So the action language in HB2243 starts here in Subsection 10.   It starts with -- and the heading of this was County Recorders are supposed to cancel registrations when -- and then here's 10.   "When the County Recorder obtains information pursuant to this section and confirms that the person registered is not a United States citizen..." and then it goes on, but I'll stop there.

First question is what information pursuant to this section is being talked about?   And I think there are a couple of categories, one of which is the category that immediately follows in the text.   One source of information of non-citizenship is when the County Recorder receives a summary report from the jury commissioner or jury manager indicating the person who's registered to vote has stated that the person is not a United States citizen.

Now, Your Honor had a question about whether HB2243 resembled the 2019 EPM, and for this particular part of the statute it does resemble it.   So if we could pull up -- I won't spend a lot of time on the EPM, but could we pull up

Plaintiffs' Exhibit 6 and go to PDF Page 50.

So -- so backing up, in the EPM, the EPM has a whole chapter devoted to list maintenance procedures and this is in that chapter. There has been a section about what to do when jurors disclose non-citizenship for a while. There is a provision in that in the 20Fourteenth EPM as well.

If you look at Section 1 here, it says you've got to confirm that the registrant does not already have valid proof of citizenship documented in the statewide voter registration database, which makes sense because, you know, we heard testimony that sometimes the juror disclosures aren't reliable. Sometimes people fib about their citizenship to get out of jury duty. There was a little bit of testimony about that in the record. So that's sensible.

And then the next sense is if they don't have DPOC on file, you send them a letter. Give them ten business days, and you tell them -- and then the bullet points say, "Hey, we've got information that says you told the juror folks you're not a citizen and you haven't previously given us proof of citizenship. So please submit proof of citizenship within 35 days to remain eligible and you'll be made a full ballot voter."

And that full ballot voter part is important because if these folks hadn't previously provided proof of citizenship, that means they're not full ballot voters.

They're federal-only voters.  So that is the kind of notice that's sent out.

THE COURT:  Or possibly they're of the 200 and some thousand voters that registered before 2004 and haven't updated their MVD file with a real ID.

MR. WHITAKER:  That's true, Your Honor, and let me briefly -- that's an important point, and I think it's an important point to nail down.

So satisfactory evidence of citizenship in A.R.S. 16-166 -- I forget exactly what it is.  I think it's (g) -- is defined to grandfather those folks in.  So it's -- the statutory provision is written in a way that says, you know, if you have provided -- if you are registered as of the effective date of this proof of citizenship law, then you will be deemed to have provided proof of citizenship; and all of the provisions in HB2492 and 2243 that use this phrase "satisfactory evidence of citizenship" are presumably referring, including that provision, which says, "Hey, if you registered before the effective date of this law, you're deemed to have provided evidence of citizenship."

So, you know, I don't think -- I don't think any of these laws were written with the intent of opening up folks who were expressly grandfathered in when the 2004 proof of citizenship law became law.

THE COURT:  So you think under this provision in the

UNITED STATES DISTRICT COURT

2019 Election Procedures Manual that if a person states on a juror questionnaire that they're not a US citizen and they registered before 2004, that that would mean that there was confirmation that they have valid proof of citizenship documented in the statewide voter registration database even though they don't?  They got grandfathered in, but now there's evidence that they're not a citizen based on their own statement.

I would hope -- I would hope the County Recorder would investigate the discrepancy between a person actually saying, "I'm not a US citizen," and a registration that didn't include, because it wasn't required to include, proof of citizenship.

MR. WHITAKER:  So I don't know the answer to that question under existing practice.  I do think, however, that these statutes, HB2492 and HB2243, whenever they use the phrase "satisfactory evidence of citizenship," they're -- they're referring back to that definition in A.R.S. 16-166, which has that grandfather language.

Now, there is an exception to the grandfather language for folks who moved counties, they register in a different county.  As I recall the language, those folks upon moving to a different county do have to show proof of citizenship but, I mean, I -- my understanding is that that was part of the law back then is that, hey, we're gonna --

this is going to be prospective.  We're going to not require folks who are already registered to submit proof anew.

I would also note that this -- at least this form of citizenship review has been in place for a while, and there was no testimony of someone in this Court saying, you know, "I was a citizen.  I got one of these notices, and it was wrongful and now I can't vote."  At least this process, as narrow as it was, dealing with a juror disclosure issue, there has been no specific evidence that that process has failed.

I think HB2243 can be understood as trying to broaden the types of -- sources of information that lead to a similar process.  So if we go back to Plaintiffs' Exhibit -- I mean, sorry, Trial Exhibit 2.

So we know from Subsection 10 that one source of information pursuant to this section is that jury disclosure stuff.  If we go to the next page, starting at the very bottom, it's "F" in the bill, but the number in the enacted statute is different, but it's "F" in the bill.

This is the part that says each month the Secretary shall compare the statewide registration database with the Department of Transportation's license database, and then the Secretary is supposed to notify the County Recorder if they find the person who is registered in that county and not a citizen, according to the driver's license database.

This is the -- this is the provision that the MVD

Director said, "Okay, we've been giving to the Secretary's office each month this massive file," and the Secretary's representative testified, you know, "We've got it, but we haven't figured out how to use it yet."

I think either evaluating that is premature or the reliability of that kind of data would roughly track what the MVD check front end is doing in HB2492 because it's, as I understand it, functionally the same thing.  It's folks who MVD has flagged as having a license corresponding to non-citizenship, which could include recently naturalized citizens who have not yet notified the MVD.

Now, one difference, though, is that here the data would be a little bit more recent.  So, for example, if someone registered five years ago and they didn't provide any proof of citizenship and MVD had nothing about them and they got a notice and they didn't give proof of citizenship, they would be a federal-only voter.

This kind of check, if that person got a license since then, would show, a-ha, this person has now gotten a foreign-type license or this person has now gotten, you know, a non-foreign license.  So -- so it's -- I understand the data to be basically the same except that it's more recent.

I don't know if Your Honor had a question or not?

THE COURT:  Well, this is the loop that the plaintiffs are referring to.

MR. WHITAKER:  Yes.

THE COURT:  So we already know that foreign-type licenses can last for a number of years.

MR. WHITAKER:  Yes.

THE COURT:  And there is no requirement that if you naturalize you tell the MVD about that.

MR. WHITAKER:  Agreed.

THE COURT:  And so what we have here is a requirement of the statute that on a monthly basis there be a comparison of the statewide voter registration database to the driver's license database which for -- so every 30 days potentially for a series of years someone would come up as a foreign-type license, but they were really a naturalized citizen.

MR. WHITAKER:  Right, so --

THE COURT:  And then we have what the statute requires the Secretary of State to do.

MR. WHITAKER:  Right.  So the Secretary of State is required to do this monthly comparison.  If you go to the next page.

So, I mean, there are a couple of ways this could play out, I think.  We don't know because it's not implemented, but the next -- the last part of this sentence says notify the county if the person's residence address has changed or is not a United States citizen.

UNITED STATES DISTRICT COURT

So it is possible that the Secretary, in doing this comparison, would not include people who already provided proof because they wouldn't interpret that as folks who are not a United States citizen.  It's also --

THE COURT:  How would the Secretary know?

MR. WHITAKER:  Because the Secretary is the -- well, I guess -- the Secretary is the administrator of the statewide voter registration database.  So the Secretary, my understanding is, has -- I believe the Secretary has the information in the statewide voter registration database.  I'm not positive about that.

THE COURT:  I don't -- I'm not either.

MR. WHITAKER:  Okay.

THE COURT:  And then there's Maricopa County and Pima County that are maintaining their own records.

MR. WHITAKER:  That's true.  So I think at a minimum --

THE COURT:  What the statute says is, you know, we do this comparison.  If the comparison -- I'm going to use the term "shows an F-type license," the Secretary of State has to tell the County Recorder, whether it's Pima or Maricopa or one of the other thirteen counties, "These people are not citizens."

MR. WHITAKER:  So if that is how it plays out, then going -- you don't have to move the PDF -- but remembering

back to Subsection 10 the County Recorder doesn't cancel registration unless it obtains information and confirms someone is not a citizen; and if you scroll down on this page a little bit to what's marked "J" here.

So "J" says to the extent practicable, the County Recorder shall review relevant databases to which the County Recorder has access to confirm information obtained that requires cancellation pursuant to this section.

So one sensible way a County Recorder could apply this is to say, "Okay, I've got this information, but I'm also required to review relevant databases to confirm information. So I'm going to review the registration database," which is a database they have access to, "and see whether this person has previously provided proof of citizenship."  And they will be familiar with that because that's already what they do in the context of the juror disclosure context in the EPM.

So the point, though, is the Court shouldn't assume implementation in a way that assumes this loop because I think that loop would be kind of silly, and I don't think the Court should assume recorders will implement these statutes in a way that causes that loop.  It's certainly not on a facial challenge before implementation.

So another source of information in HB2243 is if we go up to the top of this page.  So in "G" here it says to the extent practicable, each month County Recorders are supposed

to compare the voter registration database to the Social Security Administration database.  Again, we've heard that County Recorders don't actually have access to citizenship data through the Social Security Administration database.

THE COURT:  This provision of the statute seems meaningless because this compare -- I don't know that this comparison yields any information whatsoever.

MR. WHITAKER:  I don't disagree with that, Your Honor.  I would note that it says to the extent practicable, and I don't think that it would be practicable for a County Recorder to be checking a database that doesn't give it citizenship information.

THE COURT:  I mean, they might do the comparison, but the answers -- it doesn't give them answers to any questions about eligibility to vote.

MR. WHITAKER:  At a minimum -- well, I guess I -- at a minimum, that's true about citizenship and I don't think there's been testimony about how it would be useful for another purpose. I do think an evaluation of, you know, how that provision would work in practice is premature, however.

So the other source of information, the one that has caused a lot of consternation because it has the "reason to believe" clause is this next one in "H."  To the extent practicable, each month the County Recorder shall compare persons who are registered to vote in the county and who the

County Recorder has reason to believe are not United States citizens; and the second group of people, persons who are registered to vote without satisfactory evidence of citizenship as prescribed by §16-166.  That's -- that refers to the federal-only list with the SAVE program, and here the testimony was pretty clear.

The Secretary of State has long taken the position that under its Memorandum of Agreement with USCIS SAVE is not to be used for list maintenance purposes, and that wasn't just testimony today.  That's actually in the 2019 EPM.

THE COURT:  Well, but we've had this discussion that -- and, apparently, USCIS was asked about this in their deposition, that this statute would seem to suggest that the Secretary of State in order for County Recorders to be able to do what the statute tells them to do should try to renegotiate their Memorandum of Understanding --

MR. WHITAKER:  I agree.

THE COURT:  -- to allow the use of SAVE for list maintenance.

MR. WHITAKER:  I agree it tends to suggest that.  I don't think there is any evidence whatsoever that the federal government will amend its agreement in that way.

As I recall the deposition testimony, the testimony was to the effect of the whole point of SAVE -- it's called the Systematic Alien Verification for Eligibility Entitlement

-- I forget, but it's -- it is referred to, as the USCIS said, a typically front end verification process.

So I don't think that there's any evidence that the federal government would amend its agreement to allow the use contemplated here, and as a result the Secretary of State's representative testified at trial that it wouldn't be practicable to use the statutory word to use SAVE for this purpose.

So what do you do with that?  I think what you do with that is you decide that claims based on the use of SAVE under this provision are not ripe either as a constitutional matter or as a prudential matter because it is not clear whether SAVE will ever be used for this purpose.

The statutory language says use it for that purpose to the extent practicable.  It is not practicable for that purpose now, and there is no evidence that it will be.

THE COURT:  So indulge my hypothetical for a moment. If the Secretary of State renegotiates and they can use SAVE every month for list maintenance purposes, this says that each month the County Recorder shall compare persons who are registered -- I'm skipping the part I don't want to talk about -- shall compare persons who are registered to vote without satisfactory evidence of citizenship as prescribed by Section 16-166 with SAVE.

MR. WHITAKER:  Yes.

THE COURT: That's not modified by reason to believe, is it? Doesn't that say that everybody who's on the federal-only list every month gets run through SAVE?

MR. WHITAKER: That is how I read the statute, Your Honor. There's actually two provisions here. It's folks at the County Recorders have the reason to believe are not citizens.

THE COURT: Right.

MR. WHITAKER: That's one group that's run, and there's folks who are registered without satisfactory evidence of citizenship. That would be the federal-only folks. I think the provision contemplates both.

THE COURT: Doesn't that seem to be targeting naturalized citizens because they're the only ones that are on the federal-only list that could be run through SAVE.

MR. WHITAKER: So as a textual matter it doesn't -- it doesn't distinguish. It says everyone who's on the federal-only voter list, but I believe that SAVE doesn't have information about folks who are citizens by birth. I believe SAVE --

THE COURT: You don't just believe that. You know that?

MR. WHITAKER: I am very -- I'm fairly sure of that, Your Honor. That's what SAVE is designed to do. It's designed to check folks who were previously not citizens and

determine their citizenship status.  That's my understanding.

THE COURT:  Right.  So doesn't that target naturalized citizens?

MR. WHITAKER:  I hesitate to use the word "target," Your Honor, but I agree that --

THE COURT:  The effect of this provision of the statute falls exclusively on naturalized citizens.

MR. WHITAKER:  Okay.  Someone who is a citizen who is -- so to the extent there are lags in SAVE, I think it's true that the lags in SAVE, to the extent those lags result in a false flag of someone who is a citizen, that person would be a naturalized citizen, not a citizen by birth.

THE COURT:  But this is basically, I think you'll agree with me, everyone who's on the federal-only list is supposed to be run through SAVE, but the only people who are in SAVE who would be on the federal-only list who said they were citizens are naturalized citizens.

MR. WHITAKER:  Yes, I believe that's right.

THE COURT:  Is that a problem?

MR. WHITAKER:  Um, well, I think that the Legislature was trying to address a problem from multiple angles.  So the next provision, for example, is about the NAPHSIS vital records -- I guess NAPHSIS vital records.

That section says -- similarly, for the persons who are registered to vote without satisfactory evidence of

citizenship, so federal-only voters, you should compare them with the NAPHSIS vital records if accessible with information on their file, and those have sort of a complementary I guess -- they complement each other in the sense that the NAPHSIS data would verify citizenship of folks who were -- have a record of being born in the United States, and the SAVE data would verify citizenship for folks who were born outside the United States.

So I -- I view the Legislature as trying to think about the problem and come at it from multiple angles rather than having a discriminatory intent because -- because those are the -- those are the two categories of people who --

THE COURT:  You said the Legislature's thinking.

We're talking about 2243 that nobody thought about.

MR. WHITAKER:  Well, I don't think no one thought about it.

THE COURT:  Well, they passed it, you know, in a rather irregular manner on the last day of the session and, apparently, there's now evidence in the record that -- I can't remember if it's Toma or Peterson or both didn't even read it.

MR. WHITAKER:  So I'm gonna have to defer to my colleague, Mr. Langhofer, on that.  I didn't attend the depositions.  I don't feel prepared to speak on that, but I'm sure Mr. Langhofer will be all over that.

THE COURT:  I mean, I don't know that I can assume

that the Legislature thought about what they were doing in 2243 when the evidence about the introduction and passage of 2243 would suggest that nobody had a chance to have a whole lot of thought and intention behind it.

MR. WHITAKER:  I guess what I would say there, Your Honor, and, again, I'm not -- I didn't prepare for this part of the argument, but what I would say is generally the text of the statute is the best indicator of legislative intent; and so the text of this statute does have a provision directed at SAVE, but it also has a provision directed at the NAPHSIS vital records, which suggests to me, not having been at the deposition, that there was a -- there was a thought about both.

So going back to the two pages before PDF Page 5. So moving on with this -- what I will call the place where the action is, Subsection 10, County Recorder obtains information and confirms that the person registered is not a United States citizen.

As we discussed, there's a separate subsection that says to confirm you've got to check relevant databases, and I think the County Recorder could reasonably read that as, "I'm going to check the registration database to make sure this person didn't previously provide proof of citizenship," and then the second sentence is where it has this notice and opportunity to respond language.

The Court may be very familiar with that by now, but this is just what it -- before you cancel, you've got to send the person notice by forwardable mail that the registration will be cancelled in 35 days unless proof of citizenship is provided.  That's very similar to the 2019 EPM language about the juror disclosures section.

The sentence goes on, the notice shall include a list of documents the person may provide in a postage prepaid return envelope; and if the person registered doesn't provide satisfactory evidence within 35 days, the Recorder shall cancel the registration and notify the County Attorney and Attorney General for possible investigation.

THE COURT:  What am I supposed to do with the evidence that if you don't happen to have proof of citizenship handy, that -- for a lot of people you can't get it in 35 days?

MR. WHITAKER:  Right.

THE COURT:  I mean, there's this evidence of if you need a duplicate -- I don't know why it takes eight months to print up a new citizenship certificate, but I have evidence of how long that takes.  I have evidence of how long it takes to get a new passport.  I have evidence of how long it takes to get a certified copy of your birth certificate.

All of them are periods of time that would not allow a citizen to return that information in 35 days if they didn't

132

happen to already have it with them.

MR. WHITAKER:  So I would do four things with that evidence, Your Honor.

First, I would evaluate its strength.  I don't think that there's been any specific individual identified who couldn't do that.  That was a problem that persuaded the *Gonzalez* court to find the burden minimal.

Second, I would evaluate what other opportunities that person may have other than the 35 days, and that's important because the statute actually provides for that. It's a safety valve, to use plaintiffs' counsel's words.

If you go to the next -- Page 7, Subsection K, I think it's "L" in the statute, it says after canceling a registration pursuant to this section, the recorder shall second a notice -- this is the second notice -- by forwardable mail informing the person that the person's registration has been cancelled, the reason for cancellation, the qualifications of electors and instructions on registering to vote if the person is qualified.

So it's not the end of the road for these people. It is true that you have a 35-day period just like in the EPM, but it's also true if you're cancelled after that period you're given another notice that says, "Hey, we cancelled you but, you know, here are the instructions to re-register if you want to."  And, again, that's very similar to the 2019 EPM

language about the juror disclosure issue.

The third thing is --

THE COURT:  What's the rationale -- is there a rationale for giving somebody who changed their residence 90 -- I think it's 90 days and only giving somebody who has to obtain documents that may not be readily available -- like proof of residence is more easily available than maybe documentary proof of citizenship.

They get 90.  Somebody's gonna get their registration cancelled after 35 days because USCIS can't get them a duplicate for eight months or they can't get a birth certificate from the state where they were born within 35 days; but, yet, three whole months to send a copy of your water bill that shows your name and your residence address in?

MR. WHITAKER:  I don't know the answer to that question, Your Honor.  Mr. Langhofer may have an answer there. I would just note that 35 days is what the recorders were already doing in the 2019 EPM in the closest analog that was in the EPM for citizenship.

I haven't looked at the EPM to figure out, you know -- there are other list maintenance provisions.  I haven't looked at that to figure out what those days were, for example.

The two other things I would do with that evidence, Your Honor, is, one, I would keep in mind that Your Honor has

already ruled that the systemic cancellation provisions in this part of the law can't be in effect 90 days leading up to an election.  That was based on another part of the NVRA.  So at least there's some protection for those folks, you know, within the 90 days leading up to the election they'll get the second notice after they're cancelled and have an opportunity to re-register.

And the fourth thing I would do is consider the alternative.  The alternative is there is a person who has been flagged has having information about non-citizenship in a database and that person has not proven citizenship before.  So the alternative is to require the State to allow people like that to vote and the State could decide no -- you know, if we have evidence that someone's not a citizen and they haven't previously provided citizenship, we would rather that person after 35 days not be registered.

Again, it wouldn't take effect within the 90 days leading up to the election because of this Court's previous ruling on that.

Stepping back a little bit about HB2243, again, this is a facial challenge.  So the usual rules about how you've got to show that it's unconstitutional in all of its applications and if it has a a plainly legitimate sweep you don't strike it down, those all apply.

We've talked a little bit about how parts of the

statute, I think, evaluating claims based on that part would be unripe; and I think that does include the SAVE provision and all of the "reason to believe" claims because if it's not practicable to use SAVE for list maintenance, then there is no application of the "reason to believe" clause in the statute. It's only in the SAVE provision.

That doesn't mean that -- you know, a finding of unripeness doesn't mean that later if the Secretary of State does convince the federal government to amend its agreement to allow use of SAVE for list maintenance purposes there could not be a new action at that time, but a finding of unripeness at this time, I think, is appropriate given the record.

On standing, I'm not gonna -- on standing, as distinct from ripeness, similar concerns as to what I previously expressed apply. I'm not going to try to belabor the finer points of organizational standing.

Undue burden analysis here is pretty similar. The burden imposed by citizenship review is not excessive. It's actually even less excessive because folks who -- unlike at the front end registration process, folks who are deemed to not have any match at all in the databases, nothing happens to those folks. They remain where they are in the review process. It's only folks who are flagged as non-citizens and there's no other affirmative indication -- documentation of their citizenship that are flagged for this review process.

So for those individuals, the burden is you've got to give us proof of citizenship within 35 days or we'll cancel you.  That doesn't apply during the 90 days leading up to the election, and even after cancellation they get the second notice that explains, "Here's why we cancelled you."  If you're -- "You know, here are the ways in which you can re-register."

I think the -- the burdensomness, again, of providing proof of citizenship generally was settled in *Gonzalez*.  Plaintiffs have not offered a reason to depart from that ruling here.

Again, *Gonzalez*, the plaintiffs presented evidence of, "Here are the types of citizenship available.  Here's how much they cost," and the Court found that that was not an excessive burden either for naturalized citizens or for the general public.

THE COURT:  But that was to register to vote.

MR. WHITAKER:  That's true.

THE COURT:  Now we're talking about you get flagged for not being -- not having documented proof of citizenship, and you only get a few days to get it together and send it back in.

MR. WHITAKER:  So it's true that they are different stages of the process, but in evaluating what is the burden on -- you know, the undue burden analysis asks what is the

burden that someone must undergo to comply in order to vote?

And in both *Gonzalez* at the front end and in the review process in the back end it's the same.  You got to give proof of citizenship or else you can't vote.  It's true that the time line is more restricted at the back end.

That makes sense, though, because --

THE COURT:  But doesn't it logically make sense that there's more of a burden -- more of an acceptable burden when you're trying to register to vote and show that you're qualified and eligible to vote than to have to keep repeating it?

You've already proved it.  You've already been registered.  You've already shown your eligibility and -- that's a different phase that now after you've already done it every 30 days somebody's potentially contacting you to tell you you need to do it again.

MR. WHITAKER:  So a couple thoughts, Your Honor.

One, I think this falls into the trap of there will be this loop that happens, and I just don't think that will happen and I don't think there's any evidence that will happen other than plaintiffs' expert reading the statute in the way that he did.

So the other point I would make is that if you did provide citizenship at the front end, I don't think you would be flag -- assuming the statute is implemented in a sensible

way, I don't think you would be flagged at the back end because of the requirement that you have to -- in order to confirm that someone's not a citizen you have to check relevant databases or, at a minimum, we don't have -- right.

So if you prove citizenship upon registering, there should, under the statute, be a record in your permanent voter file that you have done so; and at least one sensible implementation of HB2243 is if you're flagged in some database as having indicia of non-citizenship but your registration database shows you previously provided proof, those folks won't get the notice.

At a minimum, I think that is a sensible way to read the statute, and I don't think that the Court should assume that County Recorders will read it otherwise. So I think the level of burden is very similar. In both instances the question is: Can the person get proof of citizenship?

The State interests are also similar. As previously discussed, the State has an important interest in reducing the risk of non-citizens voting. The case law does not require the State to make a showing -- to -- well, the case law does not require the -- let me rephrase.

The Supreme Court has said that the State may take action to prevent election fraud without waiting for it to occur and be detected; and, again, I think that kind of mentality applies just as much to the citizenship review

provisions as it does to the citizenship verification provisions at the front end.

And same thing goes for protecting voter confidence, everyone agrees that protecting voter confidence in elections is an important interest and, again, courts have said that it is quote "practically self-evidently true that implementing a measure designed to prevent voter fraud would instill public confidence," and I think these measures, which are trying to get at identifying folks who are registered, who have some indicia of non-citizenship and then confirming that and sending them notice, I think that is what these provisions are trying to do.

I will speak a little bit about -- you know, plaintiffs' counsel asked County Recorder representatives in depositions a lot of different questions about how -- you know, if such and such situation were to happen, would that be reason to believe?  Or, you know, if such and such were to happen, how would you interpret that?

And I don't think that is persuasive evidence that County Recorders once this actually begins to be implemented will do it differently because the context of a deposition where someone is there, they're being faced with a question or they're being faced with a situation on the fly, they don't know a lot of details, the objections to speculation were all -- there were lots of objections to speculation but,

obviously, the witness has to answer anyway.

I don't think that is persuasive evidence that County Recorders will, in fact, apply these differently; and in the cases that plaintiff site, when that is mentioned, it's mentioned in the context of implementation that's already happened, that there's evidence, hey, there has been implementation of these new laws and it's been inconsistent.

Moreover, I think the fix is to -- well, I don't think there is a fix yet because it's premature to weigh in on that subject.  I think to the extent plaintiffs have identified inconsistencies in current practice -- so, for example, at trial there was evidence that Pima County was doing something different -- I forget exactly what it was.  I think it had to do with how they were coding folks who didn't provide proof of citizenship.

That kind of thing, if that happens, can be fixed with a simple, hey, the EPM has guidance on this -- and it does right now.  The EPM heavily regulates how you handle proof of citizenship.  You know, figure out whether Pima County is complying with the EPM and tell them that.  It's not the sort of thing that suggests striking down a law on its face.

A little bit on the "reason to believe" standard even though, I think, the more appropriate course is to dismiss such claims without prejudice as being unripe --

THE COURT:  I'm going to interrupt you for a moment. I've been trying to keep track of how much time you've used up, and at this point in time you've actually used as much time as the plaintiffs have used in their entirety.  So I didn't know if Mr. Langhofer just had five minutes, but it would be contrary to my experience; and Ms. Porter's, like, totally out of the picture now.

MR. WHITAKER:  Your Honor, thank you.  I'm so excited to talk about these statutory language.  I will -- I'll yield the rest of my time to Mr. Langhofer.

THE COURT:  Okay, and we're going to take a 10-minute break.  We'll reconvene at ten minutes to 3:00.

COURTROOM DEPUTY:  All rise.

(Recess taken at 2:39 p.m.)

(Back on the record at 2:51 p.m.)

THE COURT:  Mr. Langhofer, since Mr. Whitaker spoke for only two minutes less than all of the plaintiffs' lawyers combined, however long you speak minus two minutes is how long they get for their rebuttal argument.  So I just thought I'd start out with that so you had that in mind.

MR. LANGHOFER:  Thank you, your Honor, I understand.

THE COURT:  You may proceed.

MR. LANGHOFER:  Thank you and good afternoon, may it please the Court.  Your Honor, the -- I want to start with what I think is the most important point in my mind and, that

UNITED STATES DISTRICT COURT

is, if -- if an attorney from -- some other attorney from my side of the aisle were to come to court and make a sensational claim that defects in the election had changed the outcome of the election, Your Honor should, and I have no doubt would, hold them to the evidence.  You have to prove claims like that.

It is very important to my client that when people from the other side of the aisle come to court with a sensational allegation the Legislature is racist, these laws were born of racial animus, that you also hold them to the evidence.  If we're going to make allegations like that, they have to be proven or they're not true; and that, I think, is the most important part of the fact finding in this Court.

I'm going to spend -- I'm going to talk about three things.  One is discriminatory intent.  It's probably going to take most of my time.  I'm also going to talk about discriminatory intent and birthplace, but let's start with discriminatory intent.

This section really covers both VRA Section 2 and the *Arlington Heights* factors, but there's so much overlap I think it's most efficient to just discuss it as one.  Let's start with the idea from Ms. Lang, at least in closing, that these laws are facially discriminatory on the basis of naturalization status.

I am somewhat perplexed by this concept because

SAVE -- as Mr. Whitaker pointed out, SAVE and the vital records databases sort of exist together to balance it out to make sure everyone's got somewhere they can be checked.

The thing about SAVE and the vital records database, though, is that they can only help a voter.  So what if vital record wasn't a part of this?  SAVE only has the effect of -- it cannot disqualify someone who is a citizen unless you -- unless you sort of are a denialist and you think it's got all sorts of wrong information or you're naturalized but it doesn't show up.  That's just not consistent with our experience or the testimony about public data being the gold standard for -- for research.

So think about this:  Let's say you -- you naturalize on Monday.  You register to vote on Tuesday.  The Maricopa County or County X runs you through the ADOT system right away and you're not in there.  They notice a little bit of a delay so they check and a few days later, maybe a week later, two weeks later you're still not in there -- in the ADOT system.

What they should do is then check SAVE.  So this is not bad for the voter.  This is good for the voter.  SAVE can only fix the problem of staleness that you have in the ADOT system.  It's not going -- if you've got the proof already in the ADOT system, there's no need to run SAVE because we already know you're a citizen.  Ms. Petty testified that

they'll check the databases.  If you're in one of them as being a citizen, then you're a citizen, right?  They recognize as long as it's somewhere, then it's true.

So even if SAVE existed without the Vital Records database, that's not an undue -- it's a disparate burden.  It's a disparate benefit for people who can't claim citizenship except by naturalization.  So I genuinely don't understand the idea that it's facially discriminatory.

The -- we had some questions during -- I think it was Colleen Connor's testimony about how people acquire citizenship.  Citizenship is for the strong majority of citizens acquired through birth right citizenship.  You're born in the country.  You can be born -- you can get birth right citizenship if you're born overseas to US citizens, of course, but most persons are born in the country.

For those people you have, then, the Vital Records database that will be available once this is implemented; and those two existing in tandem as backstops to any problem you have in the ADOT system ensures that it's -- this is a fair sort of facially neutral system.

There are people who may slip through the cracks there.  You may have the odd case, none identified in this courtroom, of someone who's naturalized but for some reason doesn't show up in SAVE.  In that case, they'll get the letter.  They can respond with their --

THE COURT:  I think one of the examples that was given that could be a problem in SAVE is if someone, for example, their alien registration number was their last name was -- for a woman maiden name and when she naturalized she had changed her name to a married name and there wouldn't be a SAVE match.  I think that was the example that I was given other than SAVE not being updated immediately.

MR. LANGHOFER:  Right, and in that case you would actually have -- you know, foreshadowing an argument I'll make later you have instructed EPM to check the birth certificate and you make sure it's the same person by using the birthplace, right.  So there's a process for how to handle people like that, making sure that the name that's not the same in SAVE is really tracking back to the same person.

Okay.  So that, I think, is facial neutrality.  To the extent naturalized citizens are run through SAVE, you know, disproportionately, it's only helping them.  It's not hurting them.  It's avoiding the burden of them tracking down their naturalization number or certificate, copying it and sending it in.  We're going to solve that problem for you by checking you and say without any labor on the voters' part.  That's good, not bad.

The next part of discriminatory intent is disparate impact.  This is really important.  If there's no disparate impact, disparate burden to be more precise, it's very hard to

say there's discriminatory intent to these laws. The fundamental problem that the plaintiffs had in -- have in proving disparate impact is this -- let's not mention that. I don't need to go on long about that. You understand the issue.

So let's slow down, though, and think about not the suppositions from the lay witnesses, the sort of fears about what could conceivably go wrong, but what is the evidence we have about how this is going to work and whether citizens of color, naturalized citizens perhaps they think are most at risk, whether they will really be disparately burdened by this.

So, first of all, there -- there are no unicorns, right. We've got 50 lawyers on the plaintiffs' side. They've all had more than a year to track down someone who doesn't have one of these documents, and unlike the *Gonzalez* case there are zero people that have been identified, zero.

You will see in the transcripts for the two legislators who were deposed, they, of course, have contacts with the community, the legislators. They were asked the same unicorn question. They don't know of anyone.

As we stand here, we're aware of no one who doesn't have the documents that would enable them, if contacted, to respond and show that they're a citizen, not one; and that's remarkable because we've been using some sort of documentary

proof of citizenship process for about fifteen years, right. If this was going to be truly your problem, you would think it would have popped up by now.

Now, there were -- Mr. Babbitt said that Professor Hoekstra credited a survey that said maybe up to seven percent of Americans couldn't show -- American citizens, I should say just to be clear -- couldn't show their proof of citizenship. I just don't think that's a fair characterization of what was going on with that part of Hoekstra's article.

His article, as you'll recall, was saying that when you implement a strict voter ID requirement it has, you know, no apparent effect -- no statistically significant effect on turnout.

In making that, he observed that there was the study that suggested up to seven percent of people may not be able to do this. He wasn't saying, "This is correct, I've vetted this." He was saying, "There's a study out there, but even so my data shows it doesn't have this effect."

It may be that seven percent of people don't have these documents, but those happen to be people who don't care to register, right. They're seemingly not very participatory in normal society, right. They don't have driver's licenses or birth certificates or, you know, go down the list. So one explanation is they're just not participating, they choose not to register.

The other, I think, more likely explanation is that the way we've defined acceptable documentation in Arizona is probably broader than the survey that Professor Hoekstra cited, right.

A driver's license works in Arizona.  It probably doesn't in most states because in Arizona you've got to prove you're a citizen or at least lawful presence in order to get the driver's license.  So just the driver's license probably cuts out the seven percent number to some smaller number.

You don't have to in Arizona more -- this is also very helpful.  You don't actually have to give the document, right.  You can give the number.  So if you want to establish your citizenship through ADOT, all you have to do is write down your driver's license number.  Same for your naturalization number.  Tribal identity cards, those work, right.

So there are so many ways that you can satisfy this in Arizona.  The definition is so broad.  I don't think it's reasonable to credit the seven percent number that Dr. Hoekstra cited in passing without sort of agreement.

Next point, the -- there was a suggestion here in closing that the laws would have a disproportionate effect on folks who registered pre-Prop 200 because they didn't have to approve their citizenship in order to register.

The language -- subsection (g) in Section 166 has

149

that safe harbor for folks who registered before.  My understanding -- I don't want to turn myself into an expert on this -- but my understanding is that's -- that was very important politically.  People didn't want to vote for a ballot measure if it's going to get them kicked off the voter rolls.

It's an important part of the political compromise that got 200 across the line and, more importantly, it's voter protected, right.  Under the Voter Protection Act -- Your Honor will recall, of course, in Arizona people would pass initiatives and the Legislature would undo them.  People got tired of it so they passed a constitution amendment that says, "When we pass along the ballot, you can't change it," right. "You're stuck with it."

It gives it quasi constitutional status, and so that safe harbor in Prop 200 is very strong; and even in his signing statement for 2492 Governor Ducey went out of his way to say, "This does not disturb the folks in the safe harbor." It's in the signing statement.  He doesn't do those for every bill, but it was important enough for him to say, "We're standing by that commitment we made to the voters when they passed it."  I don't think there's a disparate impact on them. Therefore, they should be unaffected.

Three.  If the DPOC requirement in Arizona has been in effect for fifteen years or so and there are -- there

certainly is some evidence that you have seen that some people have been denied registration for failure to provide DPOC, right.

I think Ms. Petty provided a document to the plaintiff and it was admitted here in court that showed there had been something like 11,000 people who were denied registration due to invalid citizenship proof; but not registered, right. So not voters, but proposed registrants who didn't provide the necessary document.

Ms. Lang said that the evidence showed that there were tens of thousands of people -- I'm paraphrasing. If I get this wrong I apologize -- but roughly there were tens of thousands of people who had been denied access to the voter rolls even though they were qualified.

That's just not the evidence we have. I mean, the evidence we have is that the people who were on the fed-only list, for them there's just an absence of evidence of citizenship. If an F-type license are not supposed to be federal registrants, they're supposed to be not registered, they're put on suspense or they're supposed to be -- Pima County does it a little bit differently, but that's its own problem we can talk about.

For the other folks, you know, if you have an F-type license or you say, you know, "I'm not a citizen on your voter registration form," you wouldn't be registered. You'd be put

on the suspense list and ultimately cancelled when the next election rolls around.

For those people, there is no evidence of citizenship either.  There's actually affirmative evidence of non-citizenship.  I don't think it's fair to say that the evidence shows that qualified electors have been turned away due to these requirements even though we've been doing this for fifteen years or so.

Even Professor McDonald when asked about this -- you may recall during my cross of him I said, you know, "Professor, has this voter turnout data nationwide, going back to 1980" -- at least in Arizona it goes back to 1980, and I pointed out that he had not attempted to show that when Arizona implemented its DPOC requirement turnout went down, right.  It's an important question, of course.

He said "no" if we'd done that study, it would show no effect because there's just not enough people who may be on the margins of these things to any statistically-significant effect, from the plaintiffs' own expert.

Fourth.  Let's think about how DPOC has worked in the Medicaid context.  There's actually a lot of data on this, right, and you've seen the CMS study -- or the GAO study, rather, and Professor Summers' study from Harvard.

Professor Summers relied on objective data, not subjective senses of who was turned away and whether they

might have been citizens, objective data, and it showed that it appropriately targeted non-citizens.  Non-citizen enrollment in Medicaid went down, and there was no statistically-significant effect on citizen enrollment.

There were some states who delayed implementation, right.  Some states gave folks a whole year to provide the data that you may recall from the charts we were going through with Professor Hoekstra.  Where you start to see those two lines diverge was after the first year.

So it's consistent with the idea that after the sort of delayed implementation period rolled off in the states you start to see non-citizens fall away and citizens continue to be registered.

Five.  Lots of testimony about the fact that where voter ID is implemented, turnout doesn't actually go down. This is counterintuitive, I think, because the media always covers it differently, right.  The standard of projection is something different, but that's just not true as it turns out.

Professor Hersh published a study saying that. Professor Minnite published a study saying that.  There's a big one Professor Hoekstra talked about, 1.6 billion observations of voters, massive data site showing how these things happened over time.

No statistical effect on overall turnout.  There was one group that did have a statistical effect.  It was

increased turnout for Latino voters, the only group for which there was statistical effect.  That is not a disparate burden right.  For reasons I'm not sure I can fully explain, it had the opposite effect of what the plaintiffs predict here.

Six.  There are the studies showing what happens to voter behavior -- what happens to voter turnout when they're contacted by officials for list maintenance purposes.  In Florida, you'll recall -- I think this is in 2012 -- they were doing list maintenance with the equivalent of just the ADOT data and not the SAVE backstop.  So they had a staleness problem.

They contacted a bunch of voters and said, "Hey, it looks to us like you might be a citizen."  Some responded, some didn't.  What happened there, turnout increased.  It did not have this --

THE COURT:  Like they sent a subsequent thing saying, "Sorry we sent that to you.  You're reinstated," or "You're still on the voter list," and turnout increased?

MR. LANGHOFER:  Yes, your Honor.  It was essentially a nevermind letter.  Some people had already responded.  Some people hadn't, but in either event turnout increased.

So this idea by asking people to prove this, you will scare them out of participation, particularly for minority groups, that's not true.  The data does not support that conclusion.

Seven.  Similar studies about what happens when you educate the public at large about election integrity measures. I think Professor Hoekstra talked about two studies here where they would send to voters -- they'd randomly select them for different treatments.

Some people would just say, "There's an election on Tuesday.  Vote."  Some people would get a message that said, "There's an election on Tuesday, and we've taken new measures to make sure it's a better election than before," right. "We've tightened up whatever concerns there were."

Here, Professor Hoekstra, I think, was pretty clear. The effect was more muted.  It still had some effect, some increase in voter turnout when people are just aware of improvements in election integrity regimes.  No evidence that that's discouraging minority voter participation.

Eight.  I'm going to show you here Exhibit 973. This is Professor Hoekstra's data on how naturalized citizens compared to citizens by birth on some socioeconomic strata. So employment total income and bachelor's education, naturalized citizens are actually better off than citizens by birth.

Now, this matters because if we were to accept the arguments from Professors Burch and McDonald that low income voters are particularly at risk and, therefore, nationalized citizens are in peril, the data actually undercuts that.  It

looks like non-naturalized citizens would be more at risk than naturalized citizens.  Again, against the argument of disparate impact.

Let's look now at Exhibit 907.  This was prepared by Professor Hoekstra using the ethnicity numbers that Professor McDonald offered, and what we're looking at here is a comparison of fed-only, suspense and cancelled lists by race and the -- if you look at the third column, percent predicted non-Hispanic whites, this actually shows that in the two categories that may still be eligible to vote, fed-only and suspense, non-Hispanic whites are a majority, right.

If -- if we're actually -- if the goal of this was actually to remove non-Hispanic whites from the voter rolls, they're doing a really poor job of it, right.  If there's a disparate impact, it would require a very odd, almost irrational, I think, view of how to be affecting minority turnout.

Next let's look at Exhibit 9.  This is people for whom there is no evidence of DPOC in the system, right?  So we're looking again at the last three years of this are fed-only voters, suspense voters and cancelled voters and what this chart shows is that -- Professor McDonald's argument was if you assume that everyone in these categories is actually a citizen, then you're disenfranchising many sort of minority citizens.

This shows, actually, that the people in these categories, their demographics pretty closely track the demographics of Arizona as a whole, right?  So not just citizens in Arizona, but Arizona citizens as a whole.  Again, if the idea is to have disparate impact, this just seems to cut against that.  It's consistent with the idea for these people who there's no proof of citizenship, well, it also tracks the demographics of the State overall.

The remaining arguments we see from them are that by sending these notices in English and Spanish and some cases tribal languages we're disenfranchising or just unduly burdening people who -- they say specifically the AAPI community who have more limited English proficiency than others.

There is no argument from them, though, that Arizona's not already complying with Section 203 of the Voting Rights Act.  That's the language translation requirements, right.  I'll put in the record the citation for this is 86 FR 6911.  That is where the US Census identifies which counties have to provide translation in which languages in the State.

It's surprisingly diverse.  Some states have, like, multiple language that needs translated to.  No argument or suggestion here that Arizona is not already doing that.  So that what -- what they're left with is this idea of sort of tail end groups who don't even qualify for the 203 protections

are being disenfranchised.

That is not the sort of disparate impact that gives rise to a presumption of racial animus. You can't take tale groups in, you know, small numbers and say, "A-ha, see, look, you're targeting minorities."

The only other evidence that they're offering affirmatively -- affirmative evidence that they're offering as proof of disparate impact is the lay testimony. Lay testimony talking about haters, fear in the community. I don't doubt that they believe what they are saying, but given the objective evidence that we have that it will not have these effects that they're worried about, that is not enough to show disparate impact, right. This sort of speculation of lay witnesses in the face of, you know, contrary evidence from data, at least at this stage, pre-implementation, does not get the job done.

It may happen. If this -- conceivably, if this were implemented and what do you know, everyone who's being -- getting these notifications, letters and being removed from the list, now they're going for a disproportionate number or minority groups, let's come back and talk about it; but at least pre-implementation given the data we have how this will likely happen and how it happened in other contexts, it is not enough to say the lay witnesses' fears overcome that data pre-implementation.

One of the other factors under *Arlington Heights* and Section 2 of the Voting Rights Act is historical background. As Your Honor has pointed out, there needs to be some connection between historical racism and the laws that are being implemented and there's, directly from the US Supreme Court, authority to support your position is the *Abbott* case from the US Supreme Court.  I think it was 2018.

Discrimination that's decades in the past doesn't operate, they say, as an original sin that sort of infects the water and land and everyone that comes after it.  You -- you need to connect the historical discrimination to the laws that are at issue here, and we just don't have that.

No one, I think, would deny -- no one in this courtroom, that I'm aware of, would deny there have been injustices based on race in this State's past.  That's true and that happened, but it appears to me that the legislators have risen above that and passed this without racial motivations.  There's certainly not evidence to the contrary.

Now, their modern evidence, let's deal with that. There was a lot of talk from Professor Burton about dog whistles and code words and, look, some of that's just really inexcusable and uncomfortable to listen to, you know, unpleasant to hear.

The important thing about that is the people that he was talking about weren't, say, Doug Ducey, the signer of this

bill, the one who sent back 2617 and said, "Hey, try it again," right. That is not in his character. There's no evidence that he was involved with that.

He's by and large relying on people who were federal candidates, Trump, Marjorie Taylor Greene. She's not even from this state, Eli Crane, apparently Blake Masters, these candidates either had nothing to do with the Legislature or lost, right. Like, these comments that are inconsistent with our values on race are not rewarded in Arizona. They're punished. It's the opposite.

To the extent people have been engaging in conversations like that, it tends to show that -- I think it tends to show the characteristic being the opposite of the allegation. We reject that. It's not consistent with the way we want policy to be made or even the people we want to be representing to us and -- representing us and speaking to us at the television and so on.

THE COURT: To what extent, if any, should I credit the statements of the Free Enterprise Club who -- which, apparently, according to the things that I've read about the deposition statements of Messrs. Toma and Peterson, authored these bills and wrote them, promoted them and took full credit for having passed them?

MR. LANGHOFER: Well, so --

THE COURT: Because they do have some information on

their website about these bills that would certainly suggest that there was some type of racial animus here.

MR. LANGHOFER:  Well, let us imagine for a moment that the Free Enterprise Club wasn't just a lobbyist.  There are lots of lobbyists, but they were actually a member.  Even if the lobbyist for the Free Enterprise Club was a full member, under *Brnovich v. DNC* you can't use a cat's paw theory and say, "A-ha, look, I found one and all of ya'll are racist now."

That's not the way it works.  The Legislature's not unwitting dupes of each other and they're certainly not unwitting dupes of the Free Enterprise Club.  I think the evidence of the Free Enterprise Club's transgression here is they use the word "illegal" and -- I don't -- I don't -- look, I'm not here to defend the use of that word, but I do think it's more complicated than Mr. Quezada would represent.

The Fifth Circuit has an opinion on this and discusses this about whether the term "illegal immigrants" is, you know, a slur, essentially, or not; and it's the *Texas v. U.S.*  I think I'll get to it in a bit, and they say essentially it's not.  They observe the Supreme Court has used the word -- the phrase "illegal immigrant" at least and I -- look, Free Enterprise Club said what it said.

You will see in the deposition testimony at least Peterson and I think Toma, too, but don't hold me to that

part, probably didn't even read the -- there's an e-mail from the Free Enterprise Club that went to the members saying, "Here's why you should vote for the bill. Illegals" -- their term -- "are voting too much."

They get e-mails like that all the time. I mean, legislators are bombarded. They generally have -- I think the testimony is -- at least Peterson's secretary filters out everything that's not asking him a question. If there's not a question mark, he doesn't see it; and this would have just gone into the bin. It wasn't used on the floor, wasn't used in the committee hearings even by the Free Enterprise Club.

That's just not enough to overcome the presumption of legislative good faith. I mean, I don't want to defend the words again; but that's just not the quantum of evidence you need to show that this bill is borne of racial animus.

I have quite a bit I can say about the historical experts, Your Honor, and if you are inclined to credit their testimony, I could spend, you know, 15 or 20 minutes with more information on that. I don't want to use our time that way, it's scarce, but I'll say just this and then if -- if you're interested, I'll go into much more depth.

I think the views of these experts on race are unorthodox. To say that -- Professor Chang's case -- Cornell has been complicit in countless ways with the perpetuation of white supremacy and that students should be funded based on

the color of their skin, I understand there's some dispute. They think it's fair to say that he believed in a racial quota for students, fair; but he definitely did believe -- or argue for funding students based on the color of their skin.

That is not orthodoxy.  That -- that is legal heresy.  That is unconstitutional, you can't do that, and he feels very free to accuse people of racism, not just Cornell, Arizona in this case, without evidence.  There was the 2376. It was a bill that was passed, I think, the same session. Actually didn't fully pass.  It passed one chamber and didn't all the way get through.  He said it was a modern day alien land law that was limited to certain Asian countries of origin.  You may recall he hadn't even read it, right.

It applied to Venezuela and Cuba and Russia and Saudi Arabia; and there are good policy reasons for that that he just ignores, right.  Like it's a cavalier accusation of a very grave offense without pausing to consider the evidence; and he also said, you know, with commendable candor that he didn't look at the legislative history here because he thought it wouldn't be particularly damming.

That's an admission that he excluded from his view, evidence that didn't support the conclusion he's trying to reach.  That's unorthodoxy.

Professor Burton, I think, he's not an expert in Arizona history.  The man knows a lot about Confederate

history certainly, historical racism; but, you know, when he's making these arguments about Arizona being the 12th star of the Confederacy but leaves out, I think, very compelling evidence, that's just wrong.  That didn't happen.  That is not the type of evidence you need to conclude that this state has a sort of, like, inbred, deeply baked hostility to minorities when it's -- it's wrong.

He also relies on this idea that in 1982 there were, you know, no comparable laws in existence.  It's the same man who cited in his report, you know, a reversed ruling from the Ninth Circuit, but he's holding himself out as someone, "You can trust me, Judge.  There were no laws like this in 1982."

Well, you couldn't -- you couldn't research, you know, case law from 2020.  I don't know if we can trust you on what the case law was on 1982.

There was a Commission on Civil Rights report where he said there's five sort of like voting right sins that you can commit, and Arizona has done all five of them.  It's a very egregious state.

Well, one of them was voter ID.  It was pre-cleared by the Department of Justice.  Another one was proof of citizenship, also pre-cleared by the Department of Justice.  One of them was reducing early voting times, but he said our early voting system was tantamount to a poll tax, but seems to not know that early voting is open after 5:00 o'clock.  You

can vote by mail.  You can go to drop boxes.  You can vote in person.  We've got early voting centers.  If you're in the hospital, they'll come to you and take your vote.

This is why *Brnovich v. DNC* says it's very easy to vote in Arizona, but he says it's tantamount to a poll tax.  He also says -- he compared Justice Taney with Chief Justice Roberts and Alito.  I mean, that's uncalled for.  He accused Chief Justice Rehnquist of perjury for denying that he had targeted minorities for voting rights.

Like, this is not orthodoxy.  These are radical accusations from someone who's just wrong on a number of facts.  Another one he pointed to -- back to the Commission on Civil Rights.  He said that we were canceling voters without giving them notice.  So -- he said he pulled that from Demos report which he just thought was reliable.

Then you show him the EPM and say, "Look, here's where it says we give them notice we're going to cancel and here's the form letter we sent to them that gives them notice, tells them how to respond."  He's got no response to that, but he does really want you to trust him on what the law was in 1982.  It's not just that easy, right.  Like, you cannot prove a scandalous allegation like racial animus with experts like this.

Another *Arlington Heights* factor is the events that preceded passage, and the way I understand this factor is kind

of like broadly speaking what led up to this, right.  The legislative history is a separate factor.  So let's talk like, you know, broad brush what happened here.

Well, look, it seems pretty clear, 2020 was fresh in everyone's minds.  People were really fired up about it and wanting to see if they could plug any holes in the electoral system.  This is very similar to what happened in the *Feldman* case when they passed a ballot harvesting ban there, and that conversation was instigated by -- you'll see in the opinion. I think it was A.J. LaFaro, who was the Maricopa County Republican Party Chair.

If I recall correctly, he had, like, a video of someone jumping off -- dropping off a bunch of ballots and he said it was fraud.  It just turned out not to be true, and the District Court opinion says, look, the incident that started this conversation just was wrong, right.  These are -- these are overwrought allegations, but it sparked a broader conversation; and the Legislature's allowed to think these things through even if the way it comes across their radar is really just sort of, you know, fevered complaints that aren't, in fact, correct.

So even if we accept the idea that the claims during the 2020 Election were unfounded, that does not mean the Legislature can't then take a hard look at those things.  Now, the -- I think there's a lot of evidence that the concerns

about electoral integrity are sincerely held.  Hundreds of thousands of Arizonans by Professor Hoekstra's calculation -- I think he said 700,000 -- think there are real concerns with non-citizens voting.  If that ends up not being true, they still have this concern.

THE COURT:  Well, it's pretty clear it's not true; but I don't doubt that a lot of people think it's true.

MR. LANGHOFER:  That -- and that's the problem.

So when -- you had a really interesting -- Your Honor had a really interesting exchange with Dr. Minnite when she was testifying.  You had said something to the effect of you agree that people have these concerns?  And she said, oh, yeah, people are very concerned about it.  A lot of people are worried about it, and she said, "It's a real problem.  I don't know what to do about it," and it's like "exactly."

This idea that you -- you do not live in a democracy anymore, right?  Like your system doesn't reflect the vote of citizens is a powerful idea, frightingly powerful, and it's durable.  It's been more durable than I ever expected.  What do you do when your citizens say, like, "I don't think democracy works here"?

That's a real problem, and the one thing that they keep coming back like as a lightening rod in Arizona politics is this federal-only voter list.  Like, every time there's a close election people can point to -- I'm going to get to it

in a minute how the federal-only list sort of grew over time.

It used to be a small number not that long ago.  Now it's almost 20,000.  Every time someone loses a close election there's going to be some number of people who say, "We don't know that the people who casted the decisive votes are citizens."  There is just defitionally an absence of evidence on the citizenship.

It is in the interest of this state to get that number down, and I'm not saying to remove them from the voting system.  It is to establish that they're citizens.  In some cases they may not be citizens, but probably, I would suspect, if we actually had evidence, you'd find that many of them are citizens, probably a majority.  That would be really good.

If everyone were proven to be a citizen, they all move on to the full ballot list.  This objection about Arizona elections and whether they can trust them goes away.  That would be great, right.  Just for me, so I get fewer calls about this.  It would -- I mean, the emotion around this particular issue is real, and you can see it in the legislative record.  Like, don't take my word for it.

You look at these hearings and people say, "Look at this fed-only list.  Look at these people who haven't proven their citizenship.  These numbers are scary."

On this, like, little tangent, this number of 36,000 people potentially non-citizens voting has come up a couple of

times.  What you'd see in Warren Peterson's deposition transcript is that he got that number from the Secretary of State's office, and I don't know what that number traces back to.

I don't think it's in the record, but it's probably some combination of the fed-only list, which is -- at the time I want to say it was 16,000.  I think it's in the record somewhere, plus perhaps people who registered on the Prop 200 safe harbor and so they also didn't need to prove citizenship back then, maybe they got to 36,000.  Wherever it comes from, whether the right number was 15,000 or 36,000, doesn't matter, 15,000 being roughly the fed-only list, it's a big enough number to make people concerned.  It would be better if we could get that number down so the concern dissipates.

Next category is procedural departures under *Arlington Heights*.  Your Honor had said that it seemed the law had been adopted with procedural irregularities.  I don't -- I don't think that's a fair characterization of the evidence that we've got in the record at this point.

The first -- the first point here is that there is no allegation that the House and the Senate didn't follow their own rules for how legislation was perceived.  They've got a bunch of rules on this.  Designed primarily, I think it's fair to say, to keep people from delaying the legislative session by introducing things late.  Got to introduce bills on

a certain time line.

If, you know, something's vetoed and you want to re-institute it, you can't just do that any time. You have to find another bill that's germane because there's these complicated rules in the Constitution about how the caption has to describe the contents of the bill. You may be familiar.

So you have to find something that's germane in the caption and then amend on to that. So there are safeguards around how you could introduce something late in the process. There is no argument that those rules weren't followed here. Those rules include notice to the other side.

The *Abbott* case, again from the US Supreme Court, says the fact that a bill is rushed does not show bad faith. That happens, and I don't even think it's fair to say that this was particularly rushed. Sure, the amendment onto 2243 was late but it was -- it was 2617 which had already gone through the normal process, been voted on in both chambers, right. Vetoed with the veto letter, lots of talk about how that was and eventually reintroduced.

The entire Legislature had already had this go through the process once. The amendment on the last day, in addition to, you know, following the rules on advance notice was also timely enough for Senator Quezada to go on the floor after it was amended and say, "Don't vote for this. These

amendments aren't enough.  All the problems we had with 2016 are still here.  I'm against it."

So it is not true to say that people didn't have time to read it and react to it.  They did.  They just didn't have enough folks to stop it on the floor.  It went through.

All right, let's think about -- I think it's helpful to work through the chronology of the 2617 bill in just a little bit more detail so it's clear how this happened.

So first, it's introduced.  The rules are followed. It eventually passes out of the House and the Senate both, and Governor Ducey looked at it and said he didn't think it was sufficiently protective of voters' rights.  He was worried specifically about there being sort of, you know, undue cancellation.  So let's -- let me show his veto letter here.

We're looking on the screen.  On the screen is Exhibit 53.  Here we go.  So in the highlighted paragraph here he says -- he's rejecting it because the implementation is vague and it lacks guidance for how the County Recorder would confirm it and lawfully registered voters deserve to know that their right to vote will not be disturbed without sufficient due process.  He's just worried that this is not well thought out.

Now, this veto letter which is -- you know, the Governor does not have to do it like this.  This veto letter, again, is the opposite of sort of haste finally following the

Arizona Free Enterprise Club's wishes.  This is a Governor doing his job saying, "Hey, I'm glad you all passed this, but I'm not happy," right.  Like, "Maybe come back if you want, but this one's not going to do it for me."  That's good. That's not bad, right.  This is the process working out the kinks.

And so if you look back then at what he's actually worried about -- now we're looking at Exhibit 4.  This is Page 3.  Look at the language here in 2617.  It is pretty cursory. So it says going to be cancelled in 90 days unless the person provides satisfactory evidence that the person is qualified, but doesn't say how they would do that, right.

The notice that goes to them just says a notice.  It doesn't say what kind of notice.  This is not that clear, and if they don't provide the evidence then they're going to be cancelled.  How you notify them, how they respond, it's not made clear in here.  The Governor doesn't like it.

So he sends it back and they fixed it.  So if Your Honor looks at the deposition testimony for President Peterson, there's a series of questions to him about what they did to fix 2617 before amending it into 2243, and it's very clear -- I think there's also a pending exhibit, like an e-mail that explains this.  You haven't ruled on it yet.  We don't need to take our time with that.

But what they did was they worked for the Governor's

office and said, "Okay, we know how to do notices.  That's in the EPM," right.  "We've got a couple of different ways we give notice.  Let's change the notice process so it follows the EPM standard, and let's make sure that it's by forwardable mail and prepaid envelope, you know, so they can send it back.  They don't have to spend their own money on it, and it's really clear with them what's happening and how they can fix their problems."

So sure enough, if we're looking now at Exhibit 2, we're gonna go to Page 5, in the revised version that appears in 2243 -- let me highlight this.  Here we go.

So -- so you're going to send a notice by forwardable mail to each person who's obtained a driver's license in another state, postage prepaid and they have to sign under penalty of perjury.  I think, actually, the part I was looking for --

THE COURT:  This is the one for residents.

MR. LANGHOFER:  Yes, you're right, your Honor.  I pulled up the wrong page here.  Let me -- well, Your Honor's seen it and time is scarce.  So let me not pull that up again.  You know where to find it, and your clerks certainly know where to find it as well.

What I'm going to turn instead to is Exhibit 6, the EPP, Page 36.  This is PDF Page 30 -- 50, rather.  And what we have here is -- if you check the databases, it doesn't say

there is -- there's no evidence of citizenship.  You send them this notice by forwardable, prepaid mail and it says, "You've not previously provided DPOC.  You've got 35 days," and then helpfully this is -- you were asking a question about this earlier so let's look at Page 70 of the EPM.

There are actually templates on -- excuse me, 375 of the EPM -- templates for how they do this, right.  Like, it's very detailed.  All right.  You return this jury questionnaire saying you're not a citizen.  You've got 30 days -- 35 days to respond or you're going to be cancelled.

At the bottom it says what they need to do in order to, you know, respond and it's very clear, right.  Just check the box, write in the numbers if necessary, return this and you'll be fine; and, you know, there's a prepaid response. This is -- this is a good process we've been using for years. At least since 2019.  I actually think it pre-dates that, but it may not be in the record.

And so they worked with the Governor.  He says, "I didn't like the first draft, but these -- these are clear. We've all learned to live with it.  The County Recorders know how to do it.  I'm fine with it if you do it that way."  So they re-introduce it and it passes on the floor in time for Mr. Quezada to say he's still against it, and the testimony from Peterson and Toma is that this is normal.

Some bills get vetoed and then they come back.  You

have amendments on the floor to change bills substantively, particularly on the last day is that people are trying to get their bills through instead of waiting for the next session. That happens, right. Abbott says if it's hurried, that's not bad faith. That's just hurried. I don't think it's particularly hurried, here again, because 2617 had already been the subject of so much debate. That's not procedural irregularity.

Another -- another fact they point to as procedural irregularity is that committee meeting where Martin Quezada was giving his speech and it was at least perceived by the other members on the committee, or by the chair at least, as impugning the motives of his colleagues, which is against the rules. So they say this is inappropriate.

Someone in the audience -- the transcript isn't entirely clear on this, but the transcript definitely does show that someone in the audience was going to be removed, apparently, for being disruptive. I think that was consistent with what Mr. Quezada said on the stand as well, and it was during Mr. Quezada's speech which was, you know, fiery.

Like, the things he was saying were sensational. It fired people up. The testimony, I think, was -- when they went in the hallway the Chairman said to Quezada, "Why are you riling people up like this? It's your fault that we had to adjourn." So, yeah, that -- mercifully, episodes like this

are unusual, but this sort of procedural irregularity was instigated by the opponents.  This isn't the proponents inviting disruptive behavior, let's say.

The final thing on procedural irregularity that the plaintiffs point to is the rules attorney in the House raising questions about the constitutionality of the bill.  It was 22 -- or excuse me, 2492.  They also say in their proposed findings that the Senate rules attorney did the same thing.  I don't think -- I don't think that's true.  I don't think that's what the evidence shows.

They cite for the idea that it happened in the Senate as well a speech from Martin Quezada, again, who said that there had been discussion in the Rules Committee about whether it was constitutional.  He does not say and I don't think the evidence ever shows that the rules attorney had advised them it was unconstitutional.

What the evidence in your record shows is that one attorney -- a staff attorney in the House said, "I've got concerns about this."  So what happened?  Well, he -- I think it was she, actually.  She said -- you know, she's concerned about the intertribal council case and Speaker Bowers -- this is Exhibit 57.  I'm going to pull that up here.

Speaker Bowers, hardly a racist.  Hardly a Trump accolade, right.  This is Speaker Rusty Bowers says, well, is there something we could do -- I'll show it on screen here.

Page 4 of Exhibit 57 he says, is there something we could do, some amendment we could pass that would address these concerns about legality?

And the testimony from now Speaker Toma -- he was Majority Leader at the time was that, yeah, people -- sometimes members will pass something through the Rules Committee even though they've got concerns about legality so that it can be amended and fixed later on; and sure enough, what happened was Exhibit 58 -- there's a transcript from the subsequent floor vote on the bill and, sure enough, they pass amendments to the bill that is at issue here. So members see it fit to pass it through. It's amended on the floor, goes to the Senate, passes, and there you've got 2492.

There is no such objection for 2243 in the record. That appears not to have happened, and I just don't think it's -- it's right to say that if a staff attorney cautions on the legality of a bill pre-amendment in one chamber, that it showed the Legislature is acting racially. That's just not the quantum of evidence you need to prove a claim like that.

All right. Substantive departures, that's the next element here. You know what, Your Honor, time is scarce. I think we've briefed substantive departures enough. Let me rely on the briefing there.

I'll say the next factor is legislative history, and I just want to talk about Borrelli here and the allegations by

Mr. Quezada.  As a matter of law, an offhand comment by one legislator cannot --

THE COURT:  I -- I agree.

MR. LANGHOFER:  Okay.

THE COURT:  I just -- there's a whole lot been made about this one member of the Legislature making remarks to Mr. Quezada.  That just doesn't change what the legislative intent was.  It's what one person may have said privately to one legislator.  Maybe he had reasons that are different, but it just doesn't cause the bill to be intended to discriminate.

MR. LANGHOFER:  I agree, let me move on.

Next factor, this is from -- this is Section 2 under the Voting Rights Act factors.  What was the law in 1982? I've already talked to you about how we regard Professor Burton's evidence on that.  Here's the evidence we offer:

Arizona has always had a citizenship requirement for voting in its constitution.  Its various ways of implementing that over time have changed, of course, but the fundamental idea of "you must be a citizen" has been static.  The -- we also had more strict list maintenance provisions in the '80s. In fact, Professor Burton talked to you about this.

They would de-register you for just not voting. That's -- that's pretty punitive and I -- I'm not even sure there was a notice requirement back in the '80s on that.  So we also had a requirement that you put your birthplace on the

178

registration form.  There is some, I think, disagreement between the parties about whether it was mandatory in 1982.

Our best reading of the law is it was required from approximately statehood to 1993 when it became optional, but our -- as far as we can tell, it was mandatory for a very long period of time.  I suppose because it's not that burdensome, like you'd know where you're born.  All you have to do is write it.  That's the burden.  That's not excessive.

Next factor, overall opportunities in the voting system.  *Brnovich v. DNC* speaks to this well.  I'm not going to spend more time on that.  Let me talk about birthplace.

There are about -- let me jump to the punch line.  I think this is fundamentally about getting the number of people on the fed-only list down for the policy reasons that I've talked about already.  About five percent of the people in the voter system -- voting -- Arizona voter file don't have an ADOT match.  That's from Professors McDonald and Richman and that -- you know, if they don't provide their own birth certificate, for example, they can end up on the fed-only list.

It's bad for the voter because they're only -- they're getting the short, little ballots, as you describe it, but it's also bad for the system because it feeds this concern.

If you ask people for their -- if there's a

birthplace requirement and you join that with the Vital Records database, I hope you can get this number from five percent down, right.  I mean, most people who are citizens were born in the United States.  You should be able to match them, and if you check everyone on the fed-only list every month against that, you should be able to move them onto the full voter list.  If it turns out they're not in there and you've got some evidence that they're not a citizen, you can, of course, follow up with them; but hopefully, without even bothering the voter, you can satisfy yourself they're a real citizen and get those numbers down on the fed-only list.

I think that is the most powerful argument for birthplace.  There are other arguments, of course.  We've talked at length about the five provisions in the EPM that matter.  Ms. Petty said it's helpful to have that information.  There may be some limitations, as Professor Hersh pointed out, but her view, as someone who implements the statute, is that it is helpful.

I think -- before be move on, I think Professor Hersh's criticisms were most effective when he's talking about birthplace as a unique identifier, right.  I take it his point.  Look, I don't -- I don't love it.  It's got some value, but it's not as powerful as a Social Security number, for example, or the last four, which gives you a one in 10,000 chance of getting it right randomly but it -- that's not the

only purpose, right.

If the real purpose of the birthplace requirement, combined with federal records, is to prove citizenship, get these numbers down.  It's not about unique identifier.  It's about confirming citizenship, that, I think, is enough.  He's also very worried about errors in the way the data's been collected historically.  Fair, right?  It's not been standardized historically, but anything outlying to the database, presumably they'll implement that better going forward.

They'll have something like the drop-down menu in Service Arizona or like the coating that the State Department uses for passports.  There is a way of collecting this data that's not messy.  I would assume they'll do something like that going forward.

Documentary proof of residence -- it's painful to cut out all these arguments that I prepared so well last night.

I do want to say something about documentary proof of residence.  Your Honor had observed that we didn't offer Proposed Findings of Fact because I think the power of documentary proof of residence is -- just as a matter of law, you have to be a resident to vote in that jurisdiction.  That's just in the statute.  I think it's 16101, and Judge Silver in the *Gonzalez* case was looking at a related issue,

right.  She was looking at whether NVRA Section 7 and 5 allowed you to do -- to require proof of citizenship.

She's like, well, you've got to be a citizen in order to vote.  So, of course, you know, that's a qualification; and by the exact same logic you have to be a resident in order to vote.  Requiring someone to prove their residence is just as a matter of law relevant if it's one of the five qualifications to register to vote in the state.  It's not a finding fact.  It's just like legally true you have to be a resident in order to vote.

The one -- the one legal point I think is worth clarifying -- most of our arguments are in writing on this. We don't need to repeat them here, but the one is on NVRA Section 6, the accepted use provision, and I think that Ms. Lang has the standard wrong here.  I think that what she's arguing to you, basically, like a least restrictive means test, like the minimum -- you can only ask for the minimum amount of information necessary to register someone.

That's the wrong standard.  That is the standard under Section 5 of the VRA and it applies to motor voter forms.  That is not the claim they raised here.  They raised their claim under Section 6 and if you -- let me zoom out for a moment.

The tribal counsel says of course you have State forms that are different from the Federal form and, you know,

you can -- the NVRA Section 9 says as long as the additional information you're asking for on the State form is helping the elections officials decide whether you'd actually be qualified to vote, that's permissible.

So that seems to fit squarely within the DPOR requirement and perhaps more to the point, as it's been clarified by Your Honor's interpretation at the summary judgment stage, I don't see anyone who can't do that.

Like if you -- if you, in fact, live in a location X, you should be able to either provide a document showing that or fill out the declaration.  I don't see the burden with the requirement as it's been clarified by this Court.

All right, I think I've -- my time is expiring.  There's so much I've skipped.  I'd be happy to answer questions if you'd like, Your Honor, but those are the major points.

THE COURT:  No questions.  Thank you, Mr. Langhofer.

MS. PORTER:  Good afternoon, Your Honor, Hannah Porter on behalf of Speaker Toma and President Peterson.  I will be exceptionally brief.  I just wanted to clarify one really quick point.

I think there was an argument from plaintiffs' counsel that Speaker Toma and President Peterson had not read the bills at issue when they were raised during the session.  That is not true.

Under the deposition testimony, you'll see that they both testified that they did read it before voting on it; and even though plaintiffs' counsel avowed to the Ninth Circuit and I think again to Your Honor that they would not inquire as to personal motives of the Speaker and President, that was a repeated line of questioning in the depositions; and in response to those questions, if Your Honor allows that evidence in, both the President and Speaker Toma -- and I want to note that, also, Speaker Toma is himself a naturalized citizen -- they both said that they viewed these bills as common sense reasonable election integrity measures and that their constituents were very concerned about election integrity and that is part of their modus for passing these bills and that's it.

THE COURT:  Thank you.

MR. BABBITT:  Your Honor --

THE COURT:  Mr. Babbitt.

MR. BABBITT:  Mr. Babbitt back again.  I'll be very brief, and I believe Ms. Lang will also have some additional points that she'll make after me.

So the first point that I want to make is it's really based on the case law, and I want to acknowledge -- first of all, thank you for your patience today and I want to --

THE COURT:  Is it still before lunch?

MR. BABBITT:  It's -- someplace it's before lunch. I couldn't have been more wrong on that.  It was an ambition in good faith.

But anyway, so I want to close by focusing really on the legal standard.  In *Crawford,* the Supreme Court's *Anderson-Burdick* decision from 2008, the Court acknowledges that Courts in your position have to make a hard judgment under *Anderson-Burdick*.  We recognize that here, and the Court has heard a lot; but I also want to address some of the points that I think the defendants are doing to try to make that judgment easier in a way that I think is inappropriate.

So we heard from Mr. Whitaker that the State doesn't have to provide any evidence regarding its motives because, citing *Feldman,* it's practically self-evident the law is designed to address voter fraud, improve voter confidence.

So, first of all, I don't think it is self-evident. We heard from the experts that that's not the case as a matter of social science and we heard from the AG's own lead investigation -- election investigator Todd Lawson in PFOF590 that it's speculative.

So it's not at all self-evident, but more importantly under the Ninth Circuit decision in *Soltysik v. Padilla*.  Courts cannot just excuse the defendant from providing substantiation for the State's interest, and I want to quote *Soltysik* at length, and the site is -- this is

*Soltysik v. Padilla*, 910 F.3d 438.

It's a Ninth Circuit decision from 2018, and I'm quoting from Page 448, and the Ninth Circuit says, "If the *Anderson-Burdick* framework is to remain a sliding-scale, 'means-end-fit analysis,' that from time to time requires an assessment of whether alternative methods would advance the proffered governmental interests, then a state must sometimes be required to offer evidence that its regulation of the political process is a reasonable means of achieving the State's desired ends."

The State does not get a free pass by invoking the abstract interest in election integrity or in preventing voter fraud. If that were the case, the *Anderson-Burdick* claim would become meaningless; and so the State does need to provide that evidence, and I think it's important for the Court to consider the record as a whole.

The other point I would make is from *Crawford* itself, going back to that. So *Crawford* was a split decision among the Supreme Court, and Justice Scalia wrote a concurring opinion. It was not the lead opinion for three justices, and what he criticized there was what he called the "record based resolution" that the majority and the defendant was adopting to *Anderson-Burdick*; but that's the standard that six of the nine Justices on the Supreme Court require. It is a record-based resolution. That's what we're talking about

today, and that's what should form the basis of this Court's decision.

I also want to address a couple of points that Mr. Whitaker addressed in his opening. He acknowledged in his words roughly that the statute was not artfully drafted in many respects, and I think it's important to recognize -- and this was in relation to his position that this challenge is unripe because it's conceivable that the Secretary of State or the County Recorders could construe the language that you focused on earlier in a way that would not be harmful, but we're not talking about economic regulation here.

We're talking about fundamental rights, and when you pass a statute that burdens fundamental rights the State has to get it right. That's what we're talking about. We can't just say, Well, we're gonna introduce a statute that says that, you know, these people shall be investigated and then hope that through some act of administrative grace that won't happen and that the burden will be lifted. The *Anderson-Burdick* says look at it all. Look at the entire set of regulations that are affecting the right to vote.

I also want to address the issue of the safe harbor. This is the 2004 point that both Mr. Langhofer addressed and that you had asked Mr. Whitaker about, and I think as Mr. Langhofer said, look, this was part of Prop 200 because voters didn't want to vote for a bill or pass a bill, a

proposition, that would burden themselves and maybe get themselves kicked off the ballot; but let's be clear about what that safe harbor means.

It's now codified at Arizona Revised Statute 16-666 subsection (g) and what it says is that the people who registered prior to 2004 are, quote, "deemed to have provided statutory proof of citizenship and shall not be required to resubmit evidence of citizenship unless the person is changing voter registration from one county to another."

So when we look at that and we're basically exempting the population from prior to 2044 -- 2004 from these burdens that they didn't want and these risks that are imposed by these new laws and we compare that to the demographic information that was testified to by the experts and basically makes up a lot of this supplemental request for judicial notice in the last docket entry that came in last night that the State agreed to, what we see is the demographics of the State are shifting.

And so when you exempt everybody from prior to 2004 and you subject the more recent population to these burdens, and we know the racial and ethnic composition of them, we know their naturalized citizen status, well, we see these laws are not being evenly applied. This is a disproportionate burden subject to greater scrutiny under *Anderson-Burdick*, and I just think that's a very important dynamic for this Court to

appreciate and I just want the Court to have the benefit of that statutory site.

The other point I would make is, again, just this point that we're talking about fundamental rights here.  The *Anderson-Burdick* framework is flexible.  Courts have adopted it in a number of ways to approve and uphold regulations of the right to vote, ballot access and so forth.  Those are generally the cases that the defendants cite in their Proposed Conclusions of Law.

It is also the case that Courts apply those -- apply the *Anderson-Burdick* to strike down laws that -- where the balance is off, and for that I would commend to the Court if it has -- if Your Honor hasn't read it recently, the Tenth Circuit's decision in *Fish v. Schwab*.  It's 957 F.3d 1105.

I think that is highly relevant and recent.  It's from 2020 and then compare it to the Supreme Court's decision in *Crawford v. Marion County*.  That's the case addressing the Indiana voter ID law where the State had gone out of its way to allow people to validate their identities with an affidavit or provide free identification for those who couldn't afford it.

Those are the safety valves that are present here, and in my view and our view as plaintiffs that's what tilted the balance in *Crawford* and what's missing here.

I will leave it at that.  I will turn it over to

Ms. Lang, who has a number of points to address, and then she'll close out for us.  Thank you.

THE COURT:  Thank you.

MS. BRAILEY:  I'm not Ms. Lang.

THE COURT:  You're not Ms. Lang.  I see Ms. Lang back there.

MS. BRAILEY:  Right, Emily Brailey for the United States.  I'm going to make three very short points and then actually turn it over to the real Ms. Lang.

My points are just a few points on the birthplace requirement in HB2492 and just kind of bring us back to the law and what is at issue in the Materiality Provision, which is that you can't deny somebody the right to vote for an error or omission that is not material to determining whether that person is qualified.

And so although, you know, it could be a laudable goal and a policy to reduce the number of voters on the federal-only list, that -- there's no exception in the materiality provision for a policy exception like lowering the federal numbers -- lowering the numbers of the voters on the federal-only list if it means that you are denying the right to voters.

My second point is -- my next two points are legal points, which is that we've talked about in plenty of the briefing in this Court how birthplace is not determinative of

citizenship; and so we just want to remind the Court on that that even if it could be helpful, helpful is not the standard. Likelihood is not the standard.  It must be material and there's no -- there's no way that birthplace can be material to determining citizenship, and I'll leave it at that and turn it over to Ms. Lang.

MR. MAKKER:  Also not Ms. Lang.  Amit Makker on behalf of the Arizona AANHPI plaintiff.  Just a few brief points, Your Honor, if you'll indulge.

THE COURT:  What happened, Ms. Lang?

MS. LANG:  (Inaudible.)

MS. MAKKER:  She will be next.

THE COURT:  Wait, I don't know, Mr. Herrera is raising his hand, too, and Mr. Sherman's right behind him.

MR. MAKKER:  So just a few points that I wanted to address from Mr. Langhofer's comments.  So he pointed to the federal-only list and the demographics that we see there and how this isn't gonna change sort of who it's going to be applied to, these laws.

Dr. McDonald's testimony showed through his analysis that it does skew toward minorities and younger voters and it's also -- as Your Honor pointed out during these arguments, the provisions are set up to impact naturalized voters and regardless of who's on the federal-only list, it's going to impact the naturalized voters on that list more than others.

Mr. Langhofer suggests that the chilling effect is entirely speculative. I don't think that's a fair characterization. Yes, we heard all sorts of testimony from the different plaintiffs' reps, but we've heard our client has already lost funding based on these laws being passed; and as heard from her community that people are scared of registering, and that is in the record.

Similar in the same vein, kind of the unicorn question that Mr. Langhofer has done throughout trial and asked of the legislators in their deposition as well, he says no one exists but evidence does show -- and this is in our Findings of Fact Paragraph 216 -- that at least students and AANHPI voters there is evidence in the record showing at least some of them do not have access to their documentary proof of citizenship.

Our client testified about their sub grantee island liaison that occupies their office, I believe, one or two times a week helping people who do not have documentary proof of citizenship to obtain that and apply for benefits; and so there is evidence in the record that people do not have access to those documents.

Everyone, obviously, needs to have them to vote, but they don't necessarily have the documentation. This was pointed out to the Legislature during the legislative session by Senator Quezada and by members of the public. The

proponents, as we saw in the deposition testimony, didn't look into that at all.

On 2617 in the rushed amendment, as I said when I first was up here, Mr. Peterson's -- or Senator Peterson's comments were inaccurate when he described what that amendment held.  He admitted that in his deposition, said he could have phrased it better because he recognized he didn't say the right thing.  It wasn't clear to anybody.

You asked me earlier -- and I think I mentioned there were a few -- what the are the significant changes?  Well, there was a number of significant changes and none of those went through Rules Committee, right?  We all know it was an endless session and Mr. Langhofer was saying, "Well, that's normal, that's normal."

As I told you before and I told this Court before and I told everyone that Mr. Quezada explained that kind of amendment, that's not as common.  So we have the 35 days to 90.  That was one.  We also had the change for those that were residents what used to say if you didn't provide residency you were cancelled, that got changed to suspended, all right.

So, again, being lenient toward those that are residents but not toward those that are citizens.  In fact, as we saw, it became much harsher.

There was also a change that the federal-only list would be put through SAVE each month, which you talked about

with Mr. Whitaker.  So those are other significant changes beyond the 35 to 90 that did not go through the normal process, did not get to go through Rules Committee; and I do think that if you look -- it's probably the paragraph right after the one that Mr. Langhofer identified in Governor Ducey's veto letter.

He's not really concerned about what's happening to citizens.  He's talking about residency, and I think that's why you see these lenient changes; but you see a much harsher reaction and much harsher change toward non-citizens -- or to suspected non-citizens I should say.

And then finally, I mean, the idea of can't rely on a cat's paw theory and the dupes that are in the Legislature, I think I mentioned the case from the Ninth Circuit, the *6E Avenue* case, which, you know, when you look at the evidence and you look at what they did, they didn't do anything with these bills.

I don't know what you do when the legislators don't do what their job is to actually weigh the things and figure out what's the right thing to do here, but we don't have evidence of them looking at their harms.  They said that in their deposition, and they also don't have evidence of looking at any supposed benefits.  They just didn't do anything.  They abdicated to the Free Enterprise Club.

There's no evidence in the record of what or any

sort of benefit, as you've already pointed out, to these two interests they've put forward and that's all I have.

Thank you.

THE COURT:  Thank you.

MS. LANG:  I am Ms. Lang for the LUCHA plaintiffs, and I have kind of a mishmash of points that I want to make sure that we clarify for the record, because I do feel like some things got muddled during the defendants' presentation, and then I'll try to close things out briefly.

So at the beginning of Mr. Whitaker's presentation, there was a lot of discussion basically about whether or not "reject" means "reject," and I think Mr. Whitaker said that our reading was uncharitable; but I think it's pretty clear that "reject" does, indeed, mean "reject," and Your Honor asked a question, which I just wanted to make sure you had the answer to, which was:  Is there any evidence in the record about what the Secretary and the County Recorders think about this?  And the answer is absolutely "yes."

Both of them were asked in testimony and deposition designations what they thought about this, and they said this was going to upend their process of suspense and make them instead reject these individuals.  That's very clear from Ms. Petty and Ms. Connor.

So the text is clear, "reject" means "reject," but also the election officials, who Mr. Whitaker says they're

going to do something different, has done quite the opposite. They used to have a suspense system, and now the statute is saying they have to reject.

And the last point I'll make on that is the Legislature knows how to write in a cure period. They wrote in a cure period for 2243. They didn't write one in for 2492. They also knew how to write in a cure period when it comes to incomplete registrations.

So in the Election Procedures Manual there's this allowance up until the election, basically, to cure your registration if it's incomplete in some way. That's not just in the EPM. That's in Arizona statute. They departed from that typical procedure of treating something as incomplete and said that where you have evidence of an F-type license or something like that, you're not to hold it out as incomplete and provide a notice and give them time. Instead, you are to reject them and that is a really material difference, right.

That means that for somebody who turns in their application, as many do, immediately prior to the voter registration deadline, those people aren't voting if they come back as F-type licenses. They're being rejected, and there's no opportunity to cure.

So this is not a question that is unripe. All of the evidence is clear and in one direction, and I think this is just another case of Mr. Whitaker and the defendants trying

to now run away from a statute that they know on its face is unfair to the citizens of Arizona.

There is also a lot of discussion -- let me do a couple smaller items first.

There was some questions about how long the staleness period might be under MVD. The evidence in the record is that typically green cards last ten years. So that means that you --

THE COURT: I couldn't remember if it's five, but it's ten?

MS. LANG: It's ten.

THE COURT: That's a long time.

MS. LANG: It is a long time, Your Honor, and that's why we have the testimony we do from County Recorders, basically everyone saying this is a very common occurrence; and so now we know that it's going to be kind of dramatically changed by this rejection requirement under 2492.

There was -- there's a lot of discussion from Mr. Whitaker, too, about how the County Recorders and election officials are probably gonna kind of play fast and loose with some of these provisions in order to try to give voters more grace; but I think one important piece of testimony that you heard repeatedly from the election officials, from all the County Recorders that you heard in person and from Colleen Connor is how concerned election officials are about the

UNITED STATES DISTRICT COURT

197

felony provisions in these laws.

So I don't see how election officials when implementing these laws are going to play fast and loose and kinda say, "Well, you know, I know the statute says reject, but I'm just going to hold it in suspense," or "I know that the statue says that I shall send a notice, but I don't think I need to here," where they know that the possibilities are that if they mess up, they could be held criminally responsible.

Mr. Whitaker also said that this law was adding a previously not required notification. I think that's just not right. The NVRA and Arizona statutes typically require notification of any denial of a registration or cancellation of a registration generally. So there's no kind of new or, like, added bonus notification for the voters that's being provided by 2492 or 2243.

A couple of clean-up points. Mr. Whitaker suggested that there's no reason to believe that the SAVE MOA, Memorandum of Understanding, would be approved for list maintenance. That's just not what the record reflects.

I do think that the Secretary would feel an obligation to go forward and try to get a modification to the Memorandum of Understanding.

THE COURT: I agree with that. I don't think Mr. Whitaker disagreed with that. He just said that the USCIS

deposition was not definitive about what would happen, that they would discuss it.

MS. LANG:  It was not definitive, but they have approved it for list maintenance purposes for several other states --

THE COURT:  Oh, is that right?

MS. LANG:  -- and that's in the record, Your Honor, including Georgia.  I know offhand from my personal experience that there are a number of other states that have list maintenance systems.

So the record evidence seems to suggest that -- I don't know why they would hold a grudge against Arizona necessarily and not approve it for that reason when they have for other states.

You had some -- you had substantial discussion with Mr. Whitaker about this kind of 35-day rule, and I just wanted to add one more fact for the record in talking about why the 35-day rule doesn't make good sense.

In addition to all the record evidence you already cited about how long it can take to get documentary proof of citizenship and whatnot, to the extent you're going through the SAVE system, the SAVE deposition testimony shows that there is a 40-day backlog for additional verification procedures under the SAVE system.

So if you have a -- you run into some trouble in

verifying someone under SAVE and you were to request additional verification through SAVE, that's at least a 40-day backlog.

THE COURT:  Well, maybe that's why they haven't been doing it.

MS. LANG:  That may be, but I think that that brings me to another point, which is that Mr. Whitaker suggests they didn't need to use the additional verification procedures because they, instead, go directly to the voter and ask for documentary proof of citizenship.

Two points I think are important there.  One is that only works to comply with the Memorandum of Agreement if everybody actually responds with documentary proof of citizenship.

To the extent that they don't, which I think we have a lot of reason to believe many don't, including the 11,000 voters in Maricopa County that are suspended or cancelled because of F-type licenses or because of some other system that was unable to verify their citizenship like SAVE, then you haven't gone through the additional verification procedures that are available for that voter; and I think the existence of these additional verification procedures in the MOA is really important evidence that even USCIS does not think that this should be the end of the line for voters or any other applicants, that they recognize that there are

faults in their system and that's why they have these additional procedures. It's why they require notice.

If they thought that this was some sort of failsafe system, none of that would be necessary. So while defendants try to respond -- rely on SAVE as kind of conclusive evidence, I think SAVE's own kind of documents and procedures show that they do not believe that to be conclusive evidence when it comes to non-citizenship.

The last point I'll make on SAVE is that we know that there's this non-compliance with the additional verification procedures, and I think that should give us great pause about what -- what might happen with respect to the use of SAVE absent an order from this Court going forward.

I think even absent a change to the MOA, the evidence is pretty clear that there's no monitoring of how the County Recorders are actually using SAVE. So it's now putting County Recorders in this rock and hard place where they can get into the SAVE database and use it and check people. Nobody's going to stop them, but it would not be compliant with the MOA, but I don't think that that's a reason to think it's not going to happen.

And the lack of uniformity that we've already seen in how counties approach these questions, what's going on in Cochise County show us that absent some sort of rules and bounds, we have no reason to think that the counties won't go

ahead and use SAVE.

Defendants also say that 2243 was just kind of implementing the procedures in place for notice and cure that were within the Election Procedures Manual, but I think it's important to note that that's certainly not true because at least when it comes to -- the 2019 Manual says that you should allow people to kind of cure issues about documentary proof of citizenship up until the Thursday before election day.

That is not what 2243 does.  That's not what 2492 does.  So there's kind of a picking and choosing of the 2019 Election Procedures Manual that I don't think is proper.

THE COURT:  Well, it appears that they -- they took that little section about if a prospective juror says they're not a citizen, here's what you do and 2243 says that's what you do when a juror says they're not a citizen and, also, when these other things happen that's what you do.

They did copy something out of the EPM, but it was copied something that was very specific to a person saying, "I'm not a citizen."

MS. LANG:  Exactly, Your Honor.  I think that distinction is absolutely right.  You know, for the most part, these jury questionnaires are coming in in a more timely fashion, right.  So you're not going to have the same staleness issues necessarily -- unless you have some big backlog of jury questionnaires, the way this is supposed to

work, at least, like in process, is this is happening regularly.  So the list of jury questionnaires that you're getting is just from the last month, and so you're not going to have nearly the kind of ten years of staleness data for jury questionnaires that you could have with these other databases.

And while we're talking about this staleness point, I want to point something out that I think is really important about kind of lack of a means like ends fit with these statutes.

There is a way to try to get at some of these staleness issues; and so, in fact, I worked on a case about this issue in Texas where Texas tried to use old MVD data, old driver's license data.  It led to a claim that there was a hundred thousand non-citizens on the rolls.  Turns out there were basically no non-citizens on the rolls.  There were about a hundred thousand naturalized citizens on the rolls.  That process was enjoined.

After that there was a settlement agreement, and what the settlement agreement said is you can use the driver's license data if the proof of non-citizenship data that was presented came in after the registration date.  So there's a way to kind of use driver's license data in a more targeted fashion to focus on not stale data, to say we're going to look at our driver's license data and if there's a registered voter

who registered in 2019 and went into the driver's license agency in 2022 and said, "I'm not a citizen," then we can catch that 'cuz that's, you know, much better evidence of non-citizenship than somebody said they were a non-citizen in 2015.

And so I think that kind of failure to consider ways in which you could truly try to find non-citizens rather than reliably target naturalized citizens, that's an option and is an option that the Legislature chose not to take.

On birthplace, I just wanted to revisit this argument that has come up as kind of the primary argument now from the RNC on the Vital Statistics database, and I completely concur with everything Ms. Brailey said. I just want to also add that it's all completely speculative.

There is a materiality standard which says you have to show this is material to a qualification, and what the RNC is now saying is that maybe if we get access to a database, that evidence is no other state has ever used for this purpose of voter registration confirmation anywhere in the union, that maybe if they do that, that's gonna reduce the number of people on the federal-only list because they'll be able to match them to birthplace information that will confirm their citizenship.

They could have put on evidence about that. In fact, they have the whole federal-only list available to them,

and if it's so easy to get access to this Vital Statistics database then I suppose they could have had an expert look at that.  There's just absolutely no evidence that that's the case or that that would work.

There's also no evidence that you wouldn't be able to match people with other unique identifying information without birthplace in order to match people with the Vital Statistics database, and then you'd find out their birthplace through the Vital Statistics; but there's no evidence anywhere in the record to suggest that you actually need birthplace to find somebody and identify somebody in the Vital Statistics database.

To the contrary, Dr. Hersh's testimony is all about how that's kind of one of the worst identifiers possible.  So I want to point out that evidence is entirely speculative and can't possibly support an argument that this is material to defining eligibility qualifications.

Mr. Langhofer said that SAVE can only help a voter, and I guess -- I think we must be talking past each other because I don't see how that's probably true, especially in the 2243 context.  So let's talk about 2243 first.

In the context of HB2243, it can only remove a voter from the rolls.

THE COURT:  Right, I think in the context of 2492 SAVE -- the SAVE check can confirm citizenship.

UNITED STATES DISTRICT COURT

MS. LANG: Yes. So just starting with 2243, I think the only purpose of 2243 is to remove people from the rolls.

THE COURT: Right, that's list maintenance.

MS. LANG: It's list maintenance. So in that context, I'm not sure what Mr. Langhofer is talking about.

In the 2492 context, absolutely, sometimes SAVE can make a voter a full ballot voter; but it's also undisputed that if somebody comes back as showing up as not a citizen, that they won't be able to register to vote and that they will be rejected.

So it's not that it can only help a voter because if it were no match, for example, they would get to be a federal-only voter. So the SAVE database is kind of neutral, I suppose, in that sense. At the 2492 level it could help you become a full ballot voter. It could hurt you by making it so you can't become any kind of voter, and so I think that Mr. Langhofer's argument there is belied by the facts.

Mr. Langhofer made a number of arguments about disparate impact, none of which I think can kind of get away from the clear facts and admissions from the defendants and from Mr. Whitaker that this is a law that the failures solely affect naturalized citizens and naturalized citizens are majority minority in the State of Arizona.

There is a lot of talk about unicorns and I -- I think that Mr. Langhofer's point there is just --

misunderstands these types of cases.  A lot of discussion about why isn't there any individual voter that stood up here and said, "I am the unicorn without documentary proof of citizenship."

There's a whole bunch of reasons.  I can tell you from my experience as a voting rights lawyer, you go find folks who are affected by this, here are two reasons why they don't -- they're not the most effective way to explain the burdens:  One, once you have the assistance of all these lawyers, somebody can get you -- dig out your birth certificate.  Somebody can track it down.  Somebody can call the State of New York.  They can use all the resources of these big law firms to help you get the documentation that you need, and then poof it's gone.

And when you get deposed they say, "Well, why didn't you do this?  Why didn't you do that?" and by the time you get to trial you, in fact, have solved your problem; and, in fact, our clients are just in the business of helping those voters solve their problems and find their documents rather than try to kind of hold off on finding those documents so they can come up here and tell their sad story.

I think a much more effective way of understanding the effect is to know when you don't have a bunch of lawyers kind of helping you along the way, how many voters actually failed to proffer this evidence?  And what we have here is

tens of thousands of voters on the federal-only list or who have been suspended or cancelled because of lack of documentary proof of citizenship.  That's tens of thousands of Arizonans.

We have no reason to believe that those are mostly non-citizens or even really any of them non-citizens, and Mr. Langhofer kept talking about how these are individuals for whom we have no evidence of citizenship.  That is just not true.  We have an affirmation of citizenship for every single one of those individuals, and that is what is considered satisfactory evidence of citizenship in every other state in the nation.

So this idea that these are tens of thousands of individuals for whom we have no evidence of citizenship is just flatly false.

There was a discussion of this kind of Medicaid context and I just want to -- I want to flag one important issue about kind of any comparisons to the Medicaid context. There's a lot of expert testimony about this, and I think you can see for yourself the kind of ways in which this -- the evidence put forward by Dr. Hoekstra just doesn't stand up but it also kind of -- it's important to recognize the ways in which those context don't perfectly line up, which is that voters have a huge financial incentive to provide documentary proof of citizenship in the Medicaid context.

Just like an enormous -- I mean, their healthcare is on the line as opposed to access to voter registration and we just know that the kind of, like, risk reward benefits, the kind of incremental benefit analysis that voters have to do is different if they're talking about their healthcare being on the line or whether or not they're going to be able to vote in the next election, especially for low income folks who are facing so many demands on their time.

With respect to demographics, comparing the demographics of the federal-only list to Arizona's population as a whole just would -- it makes no sense.  As I said, we have no reason to believe that federal-only voters who have affirmed their citizenship are non-citizens; and so the most apt comparisons are to citizen voting age population or to the registered voters list, not to the Arizona population as a whole, which includes a large non-citizen population.  So that's just a distortion of the record.

With respect to racial appeals, there was a discussion of a Fifth Circuit case about the use of terms around people without documentation.  I just want to clarify that that case was about the term "illegal alien," which is you know -- I think that there's evidence in the record that that is often considered a slur in Latino communities and minority communities, but it is not as close a call as the term "illegals," which is the language that I think is at

issue here with Free Enterprise Club and others that have been peddling in lies about non-citizens voting and at the same time using that racially-charged language.

I have one kind of last technical point before I'll kind of close things out, which is about the documentary proof of residence and the NVRA claim.

Mr. Langhofer said I had the standard wrong and that it was -- you know, the standard should just be whether or not this information is relevant to election officials. Your Honor has the statute in front of you. The standard is information necessary to election administration.

So the standard is whether or not the information is necessary. That's just in the statute, and the Court has to interpret that statute and determine whether or not -- whether or not it can be purely a matter of law that a particular type of documentation is necessary to election administration. Especially where it is not necessary in the vast majority of states in the nation and there's been no facts put forward I think is kind of an absurd proposition.

So I want to take us back and kind of zoom out for a moment and talk about two things that I think are really important here. One is the defendants' reliance on *Gonzalez* repeatedly throughout their --

THE COURT: I was wondering if you were ever going to get to that.

MS. LANG:  Here I am.  The reliance on *Gonzalez*, there was a motion in -- or an opposition in response to the judicial notice on this point, and I'll try not to belabor those points too much; but, quite frankly, I don't know what the record evidence was in *Gonzalez* and neither does this Court because we had a trial in this case about the facts in 2023 and defendants had every opportunity to put forward a record and see if you would agree on this record in 2023 on these laws whether or not these laws can pass muster and whether or not you might come to similar decisions to what Judge Silver did in the *Gonzalez* case.

They didn't do that and it's entirely improper.  You can take notice of the fact that Judge Silver's thought based on some record that's not before you, some things about a different law, but you can't rely on any of those kind of factual findings as findings that are relevant to these facts in this case.

And even more importantly, the kind of precedential posture of that case is very, very weak because that case went up on appeal and it went to the Ninth Circuit and then it eventually went to the Supreme Court and that was the intertribal case, and what happened at the Ninth Circuit level is that they didn't address these undue burden claims and whatnot.

They focus on the NVRA claim, and because they found

for plaintiff on the NVRA claim they did not address the appeals on the issues about undue burden and whatnot. So this is a District Court opinion that was appealed, and then that appeal was never resolved because it was mooted. So there's kind of a lack of precedential value even to the conclusions of law there.

I think you'd be much more -- the much more appropriate case to look at is the Tenth Circuit case *Fish v. Schwab* out of the Tenth Circuit which went through a full record, a full review by the Tenth Circuit, and the Tenth Circuit kind of applied the standards of *Crawford* to find a very similar set of documentary proof of citizenship requirements, although less onerous than the ones presented here today, you know, could not be justified by the State interests that were put forward.

And a lot of the things about the record in Fish v. Schwab and this case are pretty similar. There was about 30,000 people, I think, that hadn't been able to get through the system because of documentary proof of citizenship. It's an eerily similar number to the actual number of federal-only voters here.

For what it's worth, I think that that 35,000 number actually does come from a former figure of federal-only voters that was both active and inactive. We've been talking a lot in this case about active voters and active federal-only

voters.  I'm not sure that's always the right number to look at because inactive voters can still vote, and that's kind of a completely different question about kind of NVRA, list maintenance and whatnot that differentiates active and inactive, all of which is to say that we just cannot rely on *Gonzalez* in the ways that defendants are hanging their hat on today.

I'll close with this:  I think the only argument that's had any purchase as to the State interest here is voter confidence, and I think that as election lawyers probably everyone in this room would say that they're concerned with the lack of voter confidence in our system.

What I think that legislators cannot do is stoke -- stoke disbelief in our election integrity and then try to use that as a stalking horse to make it harder to vote.  That is not what it means to serve the interests of promoting election -- promoting voter confidence.

So what we know is that legislators were holding up Arizona Free Enterprise Club as the prime sponsor of this bill, as the author of the bill.  They gave them a huge platform in order to promote the bill in the Legislature, and in doing so what that club did -- what the Free Enterprise Club did was make unfounded, outlandish and racially-charged claims of non-citizen voting.

That is the cause of voter confidence issues.  That

is the evidence that you heard about where the source of voter confidence issues is, and so to the extent that there is kind of a concern about the federal-only list as the kind of bogeyman these days on voter fraud, it's because groups like Arizona Free Enterprise Club and legislators and elected officials and others are promoting the idea that federal-only voters are the equivalent of non-citizens.

They're promoting the idea that we have no idea if these people are not citizens when, in fact, we have their affirmation of citizenship; and so it cannot be the case that we kind of allow legislators to kind of stoke fears about our election process in a racially-charged manner and then tighten the screws on naturalized voters in a way to promote voter confidence.

With that, I would close, Your Honor, and ask that you hold in favor of the plaintiffs. Thank you.

THE COURT: Thank you, Ms. Lang, and thank counsel very much for all of your hard work and your excellent presentations throughout the trial and today. It's ordered taking this matter under advertisement. Court is adjourned.

COURTROOM DEPUTY: All rise.

*(Whereupon the proceedings adjourned at 4:45 p.m.)*

**_REPORTER'S CERTIFICATION_**

I, TERI VERES, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 3rd of February, 2024.

_____s/Teri Veres_____
TERI VERES, RMR, CRR
