1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Mi Familia Vota, et al., | No. CV-22-00509-PHX-SRB |
| Plaintiffs, | **AMENDED ORDER**[*] |
| v. | |
| Adrian Fontes, in his official capacity as Arizona Secretary of State, et al., | |
| Defendants. | |
| **AND CONSOLIDATED CASES** | |

This case arises out of Plaintiffs' challenge to the Arizona Legislature's passage of H.B. 2492 and H.B. 2243 (collectively, the "Voting Laws"). The Court conducted a 10-day bench trial, which concluded on December 19, 2023. Having considered the evidence and the arguments of counsel, the Court makes the following findings of fact and conclusions of law.

## I.    FINDINGS OF FACT[1]

---

[*] The Court's Amended Order amends the Court's conclusion at page 108, lines 27 to 28 that "Arizona may conduct SAVE checks on registered voters who have provided DPOC" to instead read that "Arizona may conduct SAVE checks on registered voters who have **not** provided DPOC."

[1] All docket citations refer to *Mi Familia Vota*, 2:22-cv-00509-SRB, unless otherwise noted. Portions of the Court's findings of fact have been adopted from Plaintiffs' and Defendants' respective Proposed Findings of Fact and Conclusions of Law, without separate citation. (*See* Doc. 673, Pls.' Proposed Findings of Fact; Doc. 674, Pls.' Proposed Conclusions of Law; Doc. 676, Defs.' Proposed Findings of Fact and Conclusions of Law.) Citations to exhibits or documents refer to each exhibit's numbering system unless otherwise indicated. Citations to the trial transcript are denoted by "Tr."

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### A.      Arizona Election Law Background

To be qualified to vote in Arizona, a person must be a United States citizen, a resident of Arizona, and at least eighteen years of age. Ariz. Const. art. VII, § 2.

#### 1.      Voter Demographics

As of the 2020 Census, Arizona had a total population of 7,151,502. (Doc. 672, Plaintiffs' Revised Request for Judicial Notice ("Pls.' Judicial Notice") ¶ 1.)[2] The Census Bureau estimates that as of 2022, Arizona's population was 52.9% non-Hispanic White, 32.5% Hispanic or Latino, 5.5% Black or African American, 5.2% American Indian and Alaska Native, 3.9% Asian, and 0.3% Native Hawaiian and Other Pacific Islander. (*Id.* ¶ 20; Doc. 672-2, Ex. 20, at ECF-218.) The Census Bureau's 2017 to 2021 American Community Survey estimates that Arizona's U.S. citizen voting-age population is 5,000,102. (Pls.' Judicial Notice ¶ 3.) Approximately 436,816 of these individuals are naturalized U.S. citizens. (*Id.* ¶ 5.) There are approximately 1.2 million voting-age Latino (Hispanic) citizens, 17.5% of whom are naturalized citizens. (*Id.* ¶ 31; *see* Doc. 672-4, Ex. 31, at ECF-9, -19.) There are approximately 136,607 voting-age Asian-American, Native Hawaiian, and Pacific Islander ("AANHPI") citizens, 61.5% of whom are naturalized citizens. (*See* Doc. 672-1, Ex. 6, at ECF-37; Doc. 672-1, Ex. 7, at ECF-42.)

As of July 2023, there were 4,198,726 registered voters in Arizona. (Doc. 571-1, Pls.' Stipulated Facts ("Pls.' Stip.") No. 26.) This includes 19,439 active voters who have not provided documentary proof of citizenship ("DPOC") and are registered only for federal elections ("Federal-Only Voters"). (Ex. 336.) The remaining are "Full-Ballot Voters" who may vote in Arizona's State and federal elections. Non-Hispanic White citizens are more likely to be registered to vote than Hispanic citizens or citizens of color.[3] (*See* Doc. 672-1, Ex. 8, at ECF-44.) Arizona's 19,439 Federal-Only Voters represent less

---

[2] The Court takes notice of those facts cited from Plaintiffs' Request for Judicial Notice, as the Court finds that these facts are "not subject to reasonable dispute." Fed. R. Evid. 201(b). This includes data from the U.S. Census and the Census Bureau's American Community Survey ("ACS"). *See Evenwell v. Abbott*, 578 U.S. 54, 63–64 (2016) (referring to ACS data to determine compliance with one-person, one-vote rule).

[3] Specifically, the ACS estimates that 80.1% of non-Hispanic White citizens are registered to vote, as compared to 79.2% of Black citizens, 70.2% of Asian citizens, and 66.8% of Hispanic citizens. (*See* Doc. 672-1, Ex. 8, at ECF-44.)

than half a percent of all the State's registered voters. Dr. Michael McDonald[4] estimated that the racial composition of the Federal-Only Voters is 53.3% non-Hispanic White and 46.7% minority individuals. (Ex. 338; *see* McDonald Tr. 1125:20–1129:22.) According to Dr. McDonald's estimates, approximately one-third of a of non-Hispanic White voters are Federal-Only Voters, while a little more than two-thirds of a percent of minority voters are Federal-Only Voters.[5]

## 2. Proposition 200 and the LULAC Consent Decree

Arizona residents qualified to vote may register for elections using Arizona's state-created registration form ("State Form") or the form created by the United States Election Assistance Commission ("Federal Form"). *See Gonzales v. Arizona*, 677 F.3d 383, 395 (9th Cir. 2012), *aff'd sub nom. Arizona v. Inter Tribal Council of Arizona, Inc.* ("*ITCA*"), 570 U.S. 1 (2013); (*see generally* Ex. 27, ("State Form"); Ex. 28, ("Federal Form").) Public assistance agencies in Arizona typically use the State Form to register individuals to vote. (Petty Tr. 89:9–15.)

In 2004, Arizona voters approved Proposition 200, which required individuals registering to vote to provide one of the following forms of "satisfactory evidence of citizenship," also known as documentary proof of citizenship or "DPOC" ("DPOC Requirement"):

> 1. The number of the applicant's driver license or nonoperating identification license issued after October 1, 1996 by the department of transportation or the equivalent governmental agency of another state within the United States if the agency indicates on the applicant's driver license or nonoperating identification license that the person has provided satisfactory proof of United States citizenship.

---

[4] Plaintiffs offered Dr. McDonald "as an [expert] on political science, voter registration, election registration and quantitative methodologies." (McDonald Tr. 1067:9–12.) The Court found Dr. McDonald credible and affords his analysis considerable weight unless otherwise noted.

[5] Dr. McDonald applied geocoding and surname matching to estimate the percent of voters by ballot-type, race, and ethnicity. (McDonald Tr. 1125:20–1129:22.) Using these estimates, minority voters comprise 28.8% of Arizona's active registered voters, or 1,199,610 voters. (*See* Ex. 338 (minority active registered voter population (0.231 + 0.017 + 0.018 + 0.022) multiplied by 4,165,313 voters).) Minority voters comprise 46.7% of Federal-Only Voters, or 9,078 voters. (*Id.* (minority Federal-Only Voter population (0.378 + 0.052 + 0.012 + 0.025) multiplied by 19,439 voters).) Only 0.76% of all minority voters in Arizona are registered as federal-only (9,078/1,199,610). And 0.35% of White voters are registered as federal-only. (*Id.* ((19,439 x 0.533) / (4,165,313 x 0.712)).)

2. A legible photocopy of the applicant's birth certificate that verifies citizenship to the satisfaction of the county recorder.

3. A legible photocopy of pertinent pages of the applicant's United States passport identifying the applicant and the applicant's passport number or presentation to the county recorder of the applicant's United States passport.

4. A presentation to the county recorder of the applicant's United States naturalization documents or the number of the certificate of naturalization. If only the number of the certificate of naturalization is provided, the applicant shall not be included in the registration rolls until the number of the certificate of naturalization is verified with the United States immigration and naturalization service by the county recorder.

5. Other documents or methods of proof that are established pursuant to the immigration reform and control act of 1986.

6. The applicant's bureau of Indian affairs card number, tribal treaty card number or tribal enrollment number.

Ariz. Rev. Stat. § 16-166(F). County recorders must document that a voter has submitted DPOC in the voter's "permanent voter file" and store the voter's DPOC for at least two years. § 16-166(J). In 2013, the United States Supreme Court held that the National Voter Registration Act ("NVRA") preempted the DPOC Requirement as applied to persons registering to vote with the Federal Form, requiring Arizona to register Federal Form users without DPOC as Federal-Only Voters. *ITCA*, 570 U.S. at 20. The Supreme Court confirmed, however, that Arizona's State Form "may require information the Federal Form does not" and may "be used to register voters in both state and federal elections." *Id.* at 12.

Following *ITCA*, Arizona continued to reject State Forms that were not accompanied by DPOC. In 2018, the Arizona Secretary of State entered into a consent decree that requires Arizona to treat Federal Form and State Form users the same when registering applicants[6] for federal elections ("LULAC Consent Decree"). (Ex. 24, ("LULAC Consent Decree").)[7] Specifically, the LULAC Consent Decree mandates that for *any* applicant who does not provide DPOC, Arizona must review the motor vehicle

---

[6] The Voting Laws at issue in this case refer to individuals registering to vote as "applicants," but the Court will use the term "applicant" and "registrant" interchangeably.
[7] The LULAC Consent Decree was the result of a lawsuit initiated by the League of United Latin American Citizens of Arizona ("LULAC"), alleging that county recorders were not registering State Form applicants who omitted DPOC for any elections. (*See* LULAC Consent Decree at 1–2.)

division ("MVD") database to check for citizenship documentation. (*Id.* at PX 024-8 to -10, -13 to -14.) Arizona must then register an applicant as a Full-Ballot Voter if MVD records show the applicant has provided DPOC, or as a Federal-Only Voter if MVD records show no DPOC or "foreign-type" Arizona credential on file, regardless of whether the applicant used the State Form or Federal Form. (*Id.*)

### 3.    H.B. 2492

Under House Bill 2492 § 4 and § 5, "[a] person is presumed to be properly registered to vote" only if she, among other things, provides documentary "proof of location of residence" ("DPOR Requirement"), lists her "place of birth" ("Birthplace Requirement"), and marks "yes" in the checkbox confirming United States citizenship ("Checkbox Requirement").[8] H.B. 2492 §§ 4–5, 55th Leg., 2d Reg. Sess. (Ariz. 2022); A.R.S. § 16-121.01(A); *see* A.R.S. § 16-123; (*see generally* Ex. 1, ("H.B. 2492 Text").) If an applicant fails to include all the information necessary to be presumed properly registered to vote, "the county recorder shall notify the applicant within ten business days of receipt of the registration form" and inform the applicant that her registration cannot be completed until the applicant supplies the missing information.[9] A.R.S. § 16-134(B), *see* § 16-121.01(A).

A person seeking to register as a Full-Ballot Voter must also satisfy the DPOC Requirement by providing one of the forms of DPOC enumerated in § 16-166(F).[10] § 16-121.01(C); (LULAC Consent Decree at PX 024-8 to -9, -13.) For applicants who use the Federal Form and do not provide DPOC, H.B. 2492 § 4 requires that county recorders "use all available resources to verify the citizenship status of the applicant" before that applicant may be registered to vote ("Citizenship Verification Procedures"). § 16-121.01(D), (E).

---

[8]  The Federal Form does not include a space for applicants to provide birthplace information. (*See generally* Federal Form.)
[9]  The Court previously ruled that section 6 of the NVRA pre-empted H.B. 2492's requirement that Federal Form users provide DPOR to be registered for federal elections. (Doc. 534, 09/14/2023 Order at 9; *see* H.B. 2492 Text.) The Court did not decide Plaintiffs' claims regarding whether Arizona may reject State Forms that lack DPOR.
[10]  The Court previously ruled that Arizona must register any qualified voter who does not complete the Checkbox Requirement but instead satisfies the DPOC Requirement. (09/14/2023 Order at 34.) The Court also found that Arizona must abide by the LULAC Consent Decree and may not reject State Forms not accompanied by DPOC if the registrant is otherwise found qualified to vote. (*Id.*; *see* H.B. 2492 Text at PX 001-4 to -5 (requiring county recorder to reject any State Form not accompanied by DPOC).)

Specifically:

> [A]t a minimum [the county recorder] shall compare the information available on the application for registration with the following, *provided the county has access*:
>
> 1. The department of transportation databases of Arizona driver licenses or nonoperating identification licenses [("MVD database")].
>
> 2. The social security administration [("SSA")] databases.
>
> 3. The United States citizenship and immigration services systematic alien verification for entitlements [("SAVE")] program, if practicable.
>
> 4. A national association for public health statistics and information systems electronic verification of vital events system [("NAPHSIS")].
>
> 5. Any other state, city, town, county or federal database and any other database relating to voter registration to which the county recorder . . . has access, including an electronic registration information center database.

§ 16-121.01(D) (emphasis added).[11]

H.B. 2492 § 4 mandates different outcomes from these database searches. A county recorder "shall" register as Full-Ballot Voters those registrants who the county recorder verifies are United States citizens and qualified to vote. § 16-121.01(E). But if the county recorder "matches the applicant with information that the applicant is not a United States citizen, the county recorder . . . shall reject the application, notify the applicant that the application was rejected because the applicant is not a United States citizen and forward the application to the county attorney and attorney general for investigation."[12] *Id.* H.B. 2492 does not require county recorders to provide an applicant with an opportunity to submit DPOC before rejecting the applicant's registration and forwarding the registration for investigation. *See id.*

H.B. 2492 § 7 directs county recorders to "make available to the attorney general a

---

[11] As further discussed *infra* Section I(B)(1), the MVD database contains information on all Arizonans who possess an Arizona driver's license or identification. The SSA database contains individuals' social security numbers. The SAVE program is a federal system used to retrieve immigration-related information to determine an immigrant's eligibility for state and federal benefits. NAPHSIS is a nonprofit organization that collects vital records, including birth certificates.

[12] H.B. 2492 also requires Federal Form applicants to provide DPOC to vote in presidential elections or by mail if the county recorder was unable to verify the registrant's citizenship status. § 16-121.01(E). The Court ruled that section 6 of the NVRA preempts H.B. 2492's DPOC Requirement for voting in presidential elections or by mail. (09/14/2023 Order at 33; *see also* H.B. 2492 Text at PX 001-6 to -7.)

1   list of all individuals who are registered to vote and who have not provided [DPOC],"[13] as

2   well as the registrations forms of these voters by October 31, 2022. A.R.S. § 16-143(A).

3   The Attorney General must then use "all available resources to verify the citizenship" of

4   these individuals and "at a minimum" consult the same databases listed in § 16-121.01(D)

5   (collectively, "Attorney General Referral Provision"). § 16-143(B). As of trial, neither the

6   Secretary of State nor any county recorders had furnished these lists or registration forms

7   to the Attorney General. (*See* Petty Tr. 113:20–114:1; Knuth Tr. 2122:7–8.) And without

8   these lists or forms, the Attorney General has not investigated the citizenship status of any

9   registered voters pursuant to the Voting Laws. (*See* Knuth Tr. 2124:4–6; Ex. 285.) H.B.

10  2492 § 7 also directs the Attorney General to "prosecute individuals who are found to not

11  be United States citizens pursuant to § 16-182." § 16-143(D); *see also* A.R.S. § 16-182(A)

12  (stating that a person who "knowingly" registers himself or another person "knowing" that

13  the registrant is not eligible to vote is guilty of a class 6 felony).

14              **4.     H.B. 2243**

15          House Bill 2243 expanded upon or superseded H.B. 2492 in certain respects. H.B.

16  2243, 55th Leg., 2d Reg. Sess. (Ariz. 2022); (*see generally* Ex. 2, ("H.B. 2243 Text").)

17  Specifically, election officials must regularly consult state and federal databases to identify

18  potential non-citizens (collectively, "List Maintenance Procedures"). For example, the

19  Secretary of State must compare the Arizona Voter Registration Database to the MVD

20  database each month and notify county recorders of voters who have moved residences or

21  are not citizens. § 16-165(G). County recorders must also, "[t]o the extent practicable,"

22  conduct monthly SAVE checks on registered voters "who the county recorder has reason

23  to believe are not United States citizens" ("Reason to Believe Provision") and on voters

24  "who are registered to vote without [DPOC]." § 16-165(I). County recorders must conduct

25  similar checks with the SSA database and NAPHSIS database. § 16-165(H), (J). Under

26  H.B. 2243 § 2's "Cancellation Provision," a county recorder must then cancel a voter

27  registration:

28  ---

[13] Voters who registered before the effective date of Proposition 200 are "deemed to have
provided" DPOC. *See* § 16-166(G).

1
2
3
4
5
6
7
8

> When the county recorder obtains information pursuant to this section and confirms that the person registered is not a United States citizen, including when the county recorder receives a summary report from the jury commissioner or jury manager pursuant to § 21-314 indicating that a person who is registered to vote has stated that the person is not a United States citizen. Before the county recorder cancels a registration pursuant to this paragraph, the county recorder shall send the person notice by forwardable mail that the person's registration will be canceled in thirty-five days unless the person provides satisfactory evidence of United States citizenship pursuant to § 16-166. The notice shall include a list of documents the person may provide and a postage prepaid preaddressed return envelope. If the person registered does not provide satisfactory evidence within thirty-five days, the county recorder shall cancel the registration and notify the county attorney and attorney general for possible investigation.

9
10
11
12

A.R.S. § 16-165(A)(10). H.B. 2243 § 2 directs county recorders to consult "relevant city, town, county, state and federal databases to which the county recorder has access to confirm information obtained that requires cancellation of registrations pursuant to this section." § 16-165(K).

13

### 5.    Sources of Arizona Election Law Guidance

14
15
16
17
18
19
20
21
22
23
24

The Elections Procedures Manual ("EPM") is a set of election rules prescribed by the Arizona Secretary of State and approved by the Governor and Attorney General every two years. *See* A.R.S. § 16-452. The EPM is binding on county recorders and "ensure[s] election practices are consistent and efficient throughout Arizona." *McKenna v. Soto*, 481 P.3d 695, 699–700 ¶¶ 20–21 (Ariz. 2021). The EPM serves a "gap-filling function" to address election matters not specifically addressed by statute. (Petty Tr. 25:3–5.) The current operative EPM was approved by the Arizona Secretary of State, Governor, and Attorney General on December 30, 2023 ("2023 EPM"). (Doc. 699, ("2023 EPM").) Colleen Connor is Arizona's Elections Director and oversees the elections division of the Secretary of State's office. (Connor Tr. 305:15–19, 307:9–13.) Ms. Connor guides the development of the EPM. (*Id.* 307:14–25.)

25
26
27
28

The Voter Registration Advisory Committee ("VRAC") consists of Arizona's 15 county recorders and the Secretary of State's office. (Petty Tr. 26:8–12.) The VRAC addresses voter registration matters not addressed by statute or the EPM. (*Id.* 26:13–18.) Specifically, the VRAC may unanimously approve "VRAC papers," which act as non-

1  binding guidance to maintain uniform election administration practices. (*Id.* 27:11–28:2.)

2  The VRAC has not yet approved any VRAC papers to guide county recorders on the

3  implementation of the Voting Laws.

4        The Court will consider the Voting Laws in the context of the 2023 EPM. Though

5  the parties' arguments at trial relied on the 2019 version of the EPM, the Court finds it

6  appropriate to consider the Voting Laws based on the current and binding 2023 EPM.

7  (*Compare* 2023 EPM, *with* Ex. 6, ("2019 EPM").)

8        **B.**    **Voter Registration and List Maintenance Procedures**

9        The Arizona Voter Registration Database ("AVID") is Arizona's state-wide voter

10  registration and election management database. (Connor Tr. 333:5–9.) Thirteen counties

11  use AVID directly for voter registration, while Maricopa County and Pima County each

12  operate their own voter registration databases that sync with AVID. (*Id.* 333:15–25.)

13  Maricopa County's system is referred to as "VRAS" and Pima County's system is "Voter."

14  (Petty Tr. 28:7–13; Hiser Tr. 2021:8–14.) The following describes the Voting Laws' impact

15  on Arizona's existing voter registration and list maintenance procedures.

16        **1.**    **Databases Referenced in the Voting Laws**

17        Before the Voting Laws, Arizona retrieved information from MVD and SAVE to

18  verify the citizenship status of voters, in addition to receiving reports of non-citizenship

19  from juror questionnaires. (*See* 2019 EPM at PX 006-20 to -25, -50 to -51; LULAC

20  Consent Decree at PX 024-8 to -10, -13.) H.B. 2492 and H.B. 2243 supplement these

21  databases with SSA and NAPHSIS checks. §§ 16-121.01(D), 16-165(G)–(J). According to

22  Ms. Petty, county recorders currently do not have access to NAPHSIS or the SSA database.

23  (Petty Tr. 38:16–39:1, 68:19–69:16.) Ms. Petty also testified that the Secretary of State has

24  not offered county recorders any guidance on what criteria to use to match voters to the

25  databases required by the Voting Laws, nor how to address situations where multiple

26  databases return conflicting citizenship information. (*Id.* 79:18–80:10.) The Court

27  addresses the utility and reliability of each database in turn.

28

1

### i.   MVD Database

2       MVD issues two types of "credentials": Arizona driver licenses and Arizona

3   identification cards. United States citizens and non-citizens may obtain an MVD credential,

4   so long as an individual can show proof of "authorized presence" in the United States.

5   (Doc. 679-1, Ex. 2, 30(b)(6) Dep. of ADOT ("ADOT Dep.") 27:21–25, 30:18–31:8.) MVD

6   categorizes credentials as either non-foreign or foreign based on an individual's authorized

7   presence status, as stated in the authorized presence documentation. (Pls.' Stip. No. 88; Ex.

8   231, ("MVD Credential Documents List") at PX 231-4 (listing forms of documentation).)

9   MVD issues non-foreign credentials to U.S. citizens, including naturalized citizens, and

10  foreign-type credentials to non-citizens. A naturalized citizen seeking to obtain a non-

11  foreign credential must show an official copy of their naturalization certificate. (MVD

12  Credential Documents List at PX 231-3; ADOT Dep. 72:25–73:10.)

13      An "original credential" is the first issuance of a specific MVD credential, while a

14  "duplicate credential" is a new version of an existing credential. (Pls.' Stip. No. 84;

15  Jorgensen Tr. 555:22–556:4.) Credentials may be REAL ID-compliant or non-REAL ID.

16  (Jorgensen Tr. 543:1–21 (explaining REAL ID), 553:17–22, 554:16–20 (explaining a non-

17  travel ID or "non-TID" is a non-REAL ID); MVD Credential Documents List at PX 231-

18  2 (listing requirements to obtain a travel ID or non-travel ID).) REAL IDs expire after eight

19  years, whereas non-REAL IDs may not expire for more than ten years. (ADOT Dep. 60:21–

20  61:6.) In addition, a foreign-type credential expires based on the individual's provided

21  foreign authorized presence documentation. (*Id.* 62:24–63:3; Ex. 233 at PX 233-1; Ex. 434,

22  at PX 434-3.) For example, if a non-citizen submits a permanent resident card that is valid

23  for five more years to show authorized presence, that individual will receive a foreign-type

24  credential that expires when the permanent resident card expires. (*See, e.g.*, ADOT Dep.

25  63:4–14.)

26      Naturalized citizens are not required to update authorized presence status with MVD

27  when they become a citizen, meaning some citizens may still possess an unexpired foreign-

28  type credential. (Pls.' Stip. No. 93; Jorgensen Tr. 560:2–14.) An individual with a non-

1   REAL ID, foreign-type credential is also not required to provide proof of authorized

2   presence when they renew that credential or obtain a duplicate credential after a change to

3   the individual's address, name change after marriage, or losing the credential. (Jorgensen

4   Tr. 544:2–18, 545:17–546:1, 556:5–24, 558:1–12, 559:17–560:1.) In these circumstances,

5   MVD may possess outdated authorized presence information for naturalized citizens with

6   a foreign-type credential. Dr. McDonald determined that 6,048 Full-Ballot Voters who

7   provided DPOC have a foreign-type credential and would be identified as non-citizens in

8   the MVD database. (McDonald Tr. 1088:16–1089:5.) In addition, Dr. Jesse Richman[14]

9   found that MVD records indicate that 65 Federal-Only Voters possess a foreign-type

10  credential, with 31 of these voters receiving the credential at the same time or after

11  registering to vote. (Richman Tr. 1927:11–15; Ex. 930, ("MVD Non-Citizen Records").)

12  There are also 112 Federal-Only Voters that MVD records indicate are citizens. (Richman

13  Tr. 1915:24–1916:5.)

14      ADOT reports an overall internal record error rate of approximately 10 to 15%.

15  (Jorgensen Tr. 548:12–21; Pls.' Stip. No. 115.) But an MVD representative "would have

16  to make multiple errors" to mistakenly enter a credential applicant's incorrect citizenship

17  status into the MVD database. (Jorgensen Tr. 584:14–585:1.) While AVID has on at least

18  one occasion experienced system error when retrieving citizenship information from

19  MVD, the parties' experts nevertheless agree that Arizona's MVD data is generally

20  reliable. (McDonald Tr. 1189:24–1190:1; Richman Tr. 1907:2–16; see Hiser Tr. 2025:3–

21  2027:13; Exs. 207, 220, 226 (explaining AVID mistakenly identified hundreds of voters as

22  lacking DPOC).) The Court finds that while MVD may possess outdated citizenship

23  information on some Arizonans, MVD typically obtains and maintains accurate

24  information on each Arizona credential-holder.

25              **ii.   SAVE**

26      The U.S. Citizenship and Immigration Services ("USCIS") administers the SAVE

---

27  [14] Dr. Richman is a professor of political science and international studies with a focus on
28  American politics and elections in addition to research methodology, modeling, and
    simulation. (Richman Tr. 1903:1–8.) The Court found Dr. Richman's testimony credible
    and affords his opinions considerable weight.

system, which is used to retrieve immigration and citizenship data from different Department of Homeland Security agencies. (Pls.' Stip. Nos. 116–17; Doc. 679-3, Ex. 19, 30(b)(6) Dep. of USCIS ("USCIS Dep.") 25:1–16, 38:12–13.) Arizona's county recorders and the Secretary of State access SAVE pursuant to a memorandum of agreement between the Secretary of State and USCIS ("SAVE MOA"). (Ex. 266, ("SAVE MOA") at PX 266-2.) The SAVE MOA permits county recorders to verify citizenship information of naturalized and derived U.S. citizens[15] only "when they register to vote." (*Id.*) Arizona currently may not use SAVE for any other purpose. (*Id.* at PX 266-4.) At least one state uses SAVE for "voter list maintenance." (USCIS Dep. 170:15–171:20.) The SAVE system can only verify the citizenship status of naturalized or derived U.S. citizens by searching the individual's immigration number[16] and contains no information on native-born citizens. (*Id.* 27:22, 28:8–11; Pls.' Stip. Nos. 121–122, 131.) Naturalized citizens rarely include their immigration numbers on the State Form, and the Federal Form does not include a space for registrants to provide this information. (Petty Tr. 57:15–58:1; *see generally* Federal Form.)

USCIS considers SAVE to be generally reliable, but recognizes that data integrity issues can arise, including data entry errors. (USCIS Dep. 37:19–25, 112:5–12, 114:5–16, 209:12–23.) While one or two-day delays are possible, SAVE can typically return updated naturalization records within 24 hours of an individual's naturalization. (*Id.* at 37:19–25, 39:20–41:4; *see* 2023 EPM at ECF-25 (cautioning county recorders to be aware of possible delays in SAVE when registering voters close to an election).) USCIS also explained that SAVE may not immediately return updated naturalization records if an individual is naturalized prior to a weekend or a federal holiday. (USCIS Dep. 41:1–19.) Unlike with MVD, which could possess outdated information about naturalized citizens years after naturalization, the Court finds that Plaintiffs have failed to adduce evidence that SAVE is unreliable or contains severely inaccurate or outdated citizenship information. And to the

---

[15] A derived citizen is an individual born abroad who derives U.S. citizenship at birth from a U.S. parent or automatically acquires U.S. citizenship as a minor under specific provisions of U.S. naturalization law. (Ex. 274, at PX 274-1 n.1.)

[16] An immigration number is a numeric identifier from a government-issued immigration document and includes an Alien Number, Certificate of Naturalization Number, or Certificate of Citizenship Number. (Ex. 271, ("SAVE Guide") at PX 271-13.)

1    extent that SAVE does occasionally contain temporarily outdated citizenship information

2    following an individual's naturalization, the 2023 EPM adequately informs county

3    recorders of how to address these circumstances.

### iii.    SSA

5        Arizona's county recorders check SSA records to "confirm[] the registrant's identity

6    and help[] ensure integrity of registration rolls." (2023 EPM at ECF-40; Petty Tr. 37:22–

7    38:15.) County recorders may access the SSA database by conducting a "HAVA Check"[17]

8    through MVD but lack direct access to SSA records. (Petty Tr. 38:16–39:1.) According to

9    reports in the 2000s, the error rate for data in the SSA database is approximately six percent.

10   (McDonald Tr. 1093:6–8.) The SSA database returns "soft" record matches based on the

11   last four digits of a social security number, meaning a SSA check could return multiple

12   matches. (*Id.* 1092:16–1093:5.)

13       Approximately one quarter of SSA records lack citizenship information. (McDonald

14   Tr. 1091:10–13.) An individual who was issued a social security number before obtaining

15   U.S. citizenship has no duty to update her citizenship information with the Social Security

16   Administration. (Pls.' Stip. No. 150.) Setting aside these data issues, the Court finds that it

17   is impracticable for county recorders to obtain citizenship information from the SSA

18   database pursuant to the Voting Laws' Citizenship Verification or List Maintenance

19   Procedures, as the federal government does not allow access to this information. (Petty Tr.

20   66:19–67:5; McDonald Tr. 1090:13–1091:6.) And Plaintiffs offered no evidence

21   suggesting that Arizona could eventually access additional SSA information for these

22   purposes.

### iv.    NAPHSIS

24       NAPHSIS is a national nonprofit organization that compiles vital records, including

25   birth certificates, for individuals born in the United States. (McDonald Tr. 1099:16–25,

26   1100:21–1101:4.) NAPHSIS does not provide information about individuals born outside

---

[17] The Help America Vote Act ("HAVA") requires first-time voters to prove identity before voting in federal elections if the voter registered by mail or through a third-party registration drive. *See* 52 U.S.C. § 21083(b)(1)–(3).

1    of the United States. (Richman Tr. 1941:11–21 (explaining this is a "key limitation[]" to

2    NAPHSIS).) Arizona's county recorders currently do not have access to NAPHSIS, nor

3    are county recorders familiar with the database. (*See, e.g.*, Petty Tr. 68:19–70:16.) But the

4    evidence indicates Arizona could request access to the NAPHSIS database with relative

5    ease. (McDonald Tr. 1101:2–4; Richman Tr. 1934:1–14.) And according to Dr. Richman,

6    the U.S. Election Systems Commission recommends that states use NAPHSIS for election

7    administration. (Richman Tr. 1914:15–1915:2.) Plaintiffs did not adduce evidence

8    establishing that NAPHSIS is unreliable for the purpose of determining the citizenship

9    status of native-born citizens.

10                    **v.      Jury Summary Reports**

11            H.B. 2243 requires Arizona's jury administrators to provide county recorders and

12   the Secretary of State with jury summary reports that contain the prospective jurors who

13   stated that they were not a U.S. citizen or resident of that county. *See* A.R.S. § 16-314(F).

14   Matthew Martin, the Jury Administrator for the Maricopa County Judicial Branch,

15   described Maricopa County's juror selection procedures. (Ex. 970, ("Martin Decl.") ¶ 2.)

16   Specifically, the jury office maintains a master list of potential jurors that includes names

17   from VRAS and MVD records. (*Id.* ¶¶ 6–9.) The jury office receives the full name, address,

18   and birthdate of the individuals on each list but does not obtain citizenship information.

19   (*Id.* ¶¶ 7–8.) Because non-citizens may obtain a foreign-type credential, the master list

20   includes non-citizens from the MVD database. The jury office randomly selects individuals

21   from the master list to issue summonses for jury duty. (*Id.* ¶ 9.) After receiving a jury

22   summons, a prospective juror can inform the jury office that she is a non-citizen by

23   submitting an online pre-screen questionnaire, or by submitting a written statement directly

24   to the jury office. (*Id.* ¶¶ 12–16.)

25            The jury summary reports may contain only as much information as is necessary for

26   county recorders to identify the prospective juror in the voter registration database. A.R.S.

27   § 21-314(F); (*see* 2023 EPM at ECF-57 (requiring county recorders to match the individual

28   to a registered voter to "confirm" non-citizenship).) Plaintiffs presented no evidence

indicating that the jury summary reports would erroneously report jurors' self-attestation of non-citizenship. (*See* Connor Tr. 393:7–394:16.) Moreover, county recorders have historically received reports of non-citizenship from juror questionnaires without issue. (Petty Tr. 104:17–105:11; *see* 2019 EPM at PX 006-50 to -51 (describing past use of jury questionnaires).)

H.B. 2243 also mandates the Secretary of State to inform the Legislature each quarter of the number of individuals who stated on a juror questionnaire that the individual is not a United States citizen. § 16-165(M)(3). In the first half of 2023, 1,324 individuals reported that they were not U.S. citizens. (Ex. 805, at AZSOS-563798; Ex. 806, at AZSOS-563800.) The State does not know how many of these individuals are registered to vote, nor how many misrepresented their citizenship status to avoid jury duty. (*See* Connor Tr. 393:7–22 (recalling 11 prosecutions where persons falsely stated they were non-citizens on a juror questionnaire); Hiser Tr. 2004:4–2005:1 (recalling instances where registered voters declared themselves as non-citizens on juror questionnaires to avoid jury duty).) And in counties like Maricopa that collect prospective juror information from MVD to include lawfully present non-citizens, these quarterly reports do not correlate to the incidence of non-citizens registered to vote.

## 2.     HAVA Checks

Election officials conduct a HAVA Check each time an individual submits a new voter registration or updates an existing voter registration. (*See* Morales Tr. 611:16–19, 614:17–615:14; *see* 2023 EPM at ECF-42.) A HAVA Check compares the applicant's voter registration in AVID to the information available in the MVD database to validate the applicant's identity and check for DPOC. (Morales Tr. 614:17–615:6, 615:11–14; Petty Tr. 33:15–34:4.) When a voter registration is entered into AVID, the database will first compare the registration to existing records to identify duplicate registrations.[18] (2023 EPM

---

[18] When the Maricopa County Recorder's office receives a physical voter registration form, the county recorder manually enters the registrant's information into VRAS, which first checks for existing records in VRAS before automatically comparing the registrant's information to AVID. (Petty Tr. 30:8–15, 31:11–32:9; *see also* Pima Dep. 21:11–17, 63:12–64:14, 66:16–67:6 (describing some of the process of using Voter).)

at ECF-40.) Then, to conduct the HAVA Check, AVID submits a request to ADOT to return any MVD records that match the information provided on the voter registration. (Pls.' Stip. Nos. 100, 102–104.) AVID uses matching criteria to return either a "hard" match, "soft" match, or no match with MVD records. These matching criteria include an applicant's last name, first three characters of first name, last four digits of a social security number ("SSN4"), date of birth, and MVD credential number. (Ex. 935, ("MVD Verification Criteria").)

A HAVA Check returns a "soft" match in four scenarios: when AVID and MVD records match the registrant's (1) last name, first three characters of first name, and SSN4; (2) last name, first three characters of first name, and date of birth; (3) first name, date of birth, and SSN4; or (4) MVD credential number. (*Id.* at AZSOS-564548; *see* McDonald Tr. 1082:9–1083:1.) A soft match may return up to 50 MVD records, after which county recorders exercise "some level of discretion" to determine which MVD record matches the voter registration. (Petty Tr. 36:5–37:11; Morales Tr. 611:1–4, 611:20–612:10; Jorgensen Tr. 563:5–7.) The HAVA Check returns a "hard" match when a combination of at least four of these datapoints return an exact match between AVID and the MVD database. (MVD Verification Criteria at AZSOS-564548.) AVID will "acquire" a missing MVD credential number upon a match with MVD records. (2023 EPM at ECF-40.) The HAVA Check will return no match if the applicant does not possess an unexpired Arizona credential. (Petty Tr. 34:11–35:12.) In that case, the HAVA Check will compare the registrant's information with the SSA database to verify the individual's identity. (*Id.* 37:22–38:5; Ex. 594; 2023 EPM at ECF-40, -42.)

### 3.    Verifying a Voter Registrant's Citizenship Status

County recorders use MVD and SAVE to verify the citizenship of Arizonans who provide an Arizona credential number or immigration number when registering to vote. Applicants who do not provide an Arizona credential number, immigration number, or tribal identification number must provide a physical copy of another form of DPOC to register as a Full-Ballot Voter. *See generally* § 16-166(F). County recorders must retain

1    copies of a voter's DPOC for two years. (2023 EPM at ECF-26; *see* Petty Tr. 56:4–8.)

2             **i.**      **MVD Records**

3          County recorders also use the HAVA Check to verify the citizenship of applicants

4    who provide an Arizona MVD credential number as DPOC. (2023 EPM at ECF-40;

5    Morales Tr. 611:16–19.) AVID contains a "citizenship verified" field, which identifies

6    whether a voter is a U.S. citizen. (*See* Morales Tr. 613:15–24.) If a HAVA Check returns

7    a match from MVD, the county recorder will obtain a voter's citizenship status as it exists

8    in the MVD records at the time of the check. (*Id.* 612:23–613:3; Petty Tr. 36:15–22; Doc.

9    622-1, Ex. A, ("County Recorder Testimony Stip.") No. 5.) An individual's citizenship

10   status is automatically transmitted from MVD and into AVID's "citizenship verified" field.

11   (Morales Tr. 613:15–19; Petty Tr. 39:7–14.) If AVID returns a match with MVD records

12   that indicate U.S. citizenship, AVID will code that voter's citizenship as verified and the

13   county recorder will register the individual as a Full-Ballot Voter. (Morales Tr. 613:20–24,

14   617:2–7; Petty Tr. 41:7–11.)

15         If the HAVA Check matches the applicant with MVD records indicating that the

16   applicant has a foreign-type credential, AVID will automatically mark the "no" box under

17   the "citizenship verified" field. (Morales Tr. 613:25–614:3.) County recorders must then

18   manually override the citizenship field for voters who provide a different form of DPOC.

19   (*Id.* 613:25–614:3, 616:2–14; *see* Hiser Tr. 2019:24–2020:25 (explaining that separate

20   DPOC "is the controlling factor" to determine citizenship when a citizen has a foreign-type

21   credential).) The parties adduced no evidence of the rate at which county recorders

22   erroneously override or fail to override the citizenship field for registrants with a foreign-

23   type credential. For registrants with a foreign-type credential who *do not* provide a different

24   form of DPOC, the 2023 EPM directs county recorders to indicate in the applicant's

25   registration file that the registrant is "not eligible" due to "invalid citizenship proof," and

26   notify the registrant that she must provide DPOC in order to be eligible to vote. (2023 EPM

27   at ECF-22; *see* Petty Tr. 41:16–42:19 (explaining that a registration may be put in

28

1    "suspense" status for lack of DPOC).)[19] Arizona's State Form requests individuals who

2    become a citizen after receiving a foreign-type credential to provide a different form of

3    DPOC, such as the individual's immigration number. (State Form at PX 027-3.) If the

4    HAVA Check returns no match with MVD records and the applicant provides no other

5    DPOC, the county recorder must register the individual as a Federal-Only Voter. (2023

6    EPM at ECF-21; Morales 617:8–13.) County recorders send these voters notice of their

7    federal-only status and explain that the voters must provide DPOC to register for a full

8    ballot. (2023 EPM at ECF-22.)

9                        **ii.    SAVE Verification**

10        The 2023 EPM directs county recorders to use SAVE to verify citizenship

11   information when an applicant provides an immigration number as DPOC, including a

12   citizenship certificate number, naturalization certificate number, or alien registration

13   number. (*Id.* at ECF-23 to -24; *see also* Morales Tr. 616:15–24.) When a county recorder

14   searches the SAVE system, SAVE can return a match with citizenship verified, a match

15   with citizenship not verified, or no match. (Petty Tr. 58:2–8.) SAVE cannot conclusively

16   "confirm" non-citizenship. (USCIS Dep. 152:19–153:6.) A SAVE match with citizenship

17   verified establishes that the applicant is a naturalized or derived U.S. citizen, after which a

18   county recorder will register the applicant as a Full-Ballot Voter. (2023 EPM at ECF-24;

19   Petty Tr. 58:17–59:13.) If SAVE returns a match with citizenship not verified, the applicant

20   must provide DPOC to be registered to vote. (2023 EPM at ECF-24.) If SAVE returns no

21   match, the applicant will be registered as a Federal-Only Voter. (*Id.* at ECF-24 to -25.) In

22   a case of citizenship not verified or no match, the SAVE MOA obligates county recorders

23   to initiate additional verification procedures with SAVE for these individuals unless

24   Arizona "has alternative processes upon which to base its decision." (SAVE MOA at PX

25   266-4; SAVE Guide at PX 271-10.) Arizona's county recorders do not typically initiate the

26   additional verification procedures, but Plaintiffs adduced no evidence that county recorders

27   ---

28   [19] A registration is in "suspense" when a county recorder determines that additional information is necessary to confirm that the applicant is qualified to vote in Arizona, such as by verifying citizenship or residency. (*See, e.g.*, Petty Tr. 42:9–15; McDonald Tr. 1110:11–19.)

do not use "alternative processes" to confirm the eligibility of these registrants. (*See* Ex. 268 (county recorders initiating 154 additional verifications of the 2502 SAVE searches requiring additional verification from 2020 to 2022).)

### iii.    Verifying Citizenship without DPOC

For applicants who do not provide any form of DPOC, county recorders must apply H.B. 2492's Citizenship Verification Procedures by consulting the MVD, SAVE, SSA, and NAPHSIS databases to retrieve citizenship information. § 16-121.01(D). However, because SAVE requires an immigration number, county recorders will be unable to search SAVE to verify the citizenship of registrants who do not have or provide an immigration number as DPOC in the first place. (*See* Petty Tr. 57:15–58:1 (testifying few naturalized citizens provide an immigration number).) Nor can county recorders retrieve citizenship information from the SSA database. In cases where county recorders are unable to conduct the relevant database searches or if a county recorder's investigation does not match an applicant to information establishing citizenship or non-citizenship, the county recorder must register that applicant as a Federal-Only Voter. § 16-121.01(E).

The Voting Laws require county recorders to forward registrations of applicants matched to information of non-citizenship to the Attorney General, but the 2023 EPM has interpreted this provision to first require county recorders to provide applicants with an opportunity to provide DPOC. *See id.*; (2023 EPM at ECF-17.) Specifically, for applicants who do not provide DPOC, "[i]f the database checks affirmatively show the applicant is a non-citizen, the County Recorder must (1) not register the applicant, (2) notify the applicant, and (3) *if the applicant does not timely provide DPOC in response*, forward the application to the County Attorney and Attorney General." (2023 EPM at ECF-27 (emphasis added); *see id.* at ECF-22 (describing similar process when a HAVA Check indicates the applicant possesses a foreign-type credential).) Regardless of whether the county recorder matches the applicant to evidence of non-citizenship in the MVD database or SAVE, an applicant has until "the Thursday before the next regular election" to submit DPOC and be registered to vote in that election. (*Id.* at ECF-22, -24.)

1    Taken together, Arizona's voter registration procedures utilize reliable methods to

2    verify the citizenship status of registrants. For registrants who provide an Arizona

3    credential number or an immigration number, the MVD and SAVE checks will generally

4    return accurate citizenship information. The 2023 EPM also provides registrants who

5    county recorders match to affirmative information indicating non-citizenship with

6    sufficient time to provide DPOC to register to vote and avoid potential investigation by the

7    Attorney General. And registrants will be appropriately registered as Federal-Only Voters

8    when county recorders do not identify affirmative information establishing citizenship or

9    non-citizenship.

10                           **4.        Birthplace Information**

11   Arizona has long collected birthplace information from individuals registering to

12   vote. *See* 1913 A.R.S. § 2885. Since 1979, Arizona has required the State Form to include

13   a field for a registrant to include her "state or country of birth." (*See* State Form at PX 027-

14   1); 1979 Ariz. Laws ch. 209, § 3 (adopting A.R.S. § 16-152 to mandate the inclusion of the

15   birthplace field on the State Form). But prior to the Voting Laws, an individual's birthplace

16   was not *mandatory* for an individual to register to vote. *See, e.g.*, 1993 Ariz. Laws ch. 98,

17   § 10 (adopting § 16-121.01, which specifies the minimum information required to be

18   presumed properly registered to vote).

19   An individual's place of birth is not dispositive of citizenship status, as individuals

20   born outside the U.S. may be derived or naturalized citizens. County recorders do not use

21   birthplace information to determine an applicant's eligibility to vote, nor do county

22   recorders need birthplace to verify an applicant's identity. (Connor Tr. 311:22–312:17;

23   Petty Tr. 100:21–101:9, 102:10–103:1 (explaining use in Maricopa County); Hiser Tr.

24   2055:18–2056:8 (Pima County).) Instead, the HAVA Check matches AVID and MVD

25   records to confirm a person's identity for purposes of voter eligibility. (Petty Tr. 32:19–

26   33:14, 103:2–7; *see* MVD Verification Criteria at AZSOS-564548 (listing first and last

27   name, date of birth, Arizona credential number, and SSN4 as matching criteria for duplicate

28   records).) AVID also does not use birthplace as matching criteria to match duplicate

1    registrations in the MVD database. (*See* MVD Verification Criteria at AZSOS-564547.)

2    However, Ms. Petty and Ms. Hiser testified that a county recorder could use birthplace to

3    identify duplicate registrations in VRAS or Voter if an applicant has the same name and

4    other identifying information as an existing registered voter. (Petty Tr. 132:2–8; Hiser Tr.

5    2000:19–2002:23.)

6          County recorders may collect birthplace in some circumstances related to voter

7    registration.[20] Specifically, if a registrant submits a birth certificate as DPOC that lists a

8    different name than the registrant's current legal name but cannot provide supporting

9    documentation verifying the different last name, the 2023 EPM instructs county recorders

10   to accept the birth certificate as DPOC if the registrant's first and middle names, birthplace,

11   date of birth, and parents' names match that on the voter registration. (2023 EPM at ECF-

12   19.) Maricopa County may also send notices requesting additional information to process

13   applicants' registration forms. These notices request personal identifying information that

14   the county recorder can use to "uniquely identify" the applicant's registration, including

15   the applicant's birthplace, occupation, phone number, and father's name or mother's

16   maiden name, though the county recorder will accept notices returned with incomplete

17   information. (Ex. 85, at PX 85-1; Ex. 773, at MC 002990; Petty Tr. 168:1–12.)

18         County recorders may also use birthplace alongside additional personal identifying

19   information that could be used as a security question to verify a voter's identity over the

20   phone.[21] (Petty Tr. 101:10–14, 102:1–5; Connor Tr. 390:20–391:21; Hiser Tr. 2002:21–

21   2004:3; 2023 EPM at ECF-229 (verifying birthplace when a voter calls to confirm

---

[20] Voters can submit a photocopy of the "pertinent pages" of a U.S. passport as DPOC,
which the 2023 EPM states includes "the photo, passport number, name, nationality, date
of birth, gender, place of birth, and signature" of the applicant. § 16-166(F)(3); (2023 EPM
at ECF-19.) The United States requires birthplace on passport applications because it "is
an integral part of establishing an individual's identity. It distinguishes that individual from
other persons with similar names and/or dates of birth, and helps identify claimants
attempting to use another person's identity." (Ex. 941, at 6.) Defendants ask the Court to
take judicial notice of this provision of the U.S. Department of State's Foreign Affairs
Manual. But the fact that the United States requires birthplace information for an
international travel document is irrelevant to whether birthplace is useful to county
recorders when verifying the identity of prospective voters.

[21] Other personal identifying information could include a voter's date of birth or SSN4.
(Petty Tr. 102:1–20, 166:10–167:3; Hiser 2003:20–2004:3.)

provisional ballot status).) But birthplace alone is generally not sufficient to distinguish between voters for identity verification. (*See* Hiser Tr. 2056:18–2057:10, 2058:17–21.) In addition, ballot-by-mail request forms must contain a field for the voter's "State or country of birth, *or another piece of information* that, if compared to the voter's record, would confirm the voter's identity (such as the AZDL/ID# or SSN4, father's name, or mother's maiden name)." (2023 EPM at ECF-70 to -71 (emphasis added)); *see* A.R.S. § 16-542(A) (requiring a voter to provide her birthplace "or other information" that can be used to confirm her identity). And county recorders may use birthplace when available to match deceased voters with the correct voter record and cancel registrations. (2023 EPM at ECF-52 ("A County Recorder should match as much information as possible (including first name, last name, maiden name (if applicable), year of birth, place of birth, and city or town of residence) . . . .").)

Dr. Eitan Hersh[22] analyzed the efficacy of birthplace information to uniquely identify voters. (Hersh Tr. 647:2–12, 649:23–650:14.) Dr. Hersh noted several data issues with the birthplace information Arizona possesses for currently registered voters. Specifically, approximately one-third of existing voter registrations in Arizona lack birthplace information. (*Id.* 659:13–21.) Another 200,000 registrations list the United States as the voter's country of birth. (*Id.* 677:23–25.) Moreover, county recorders manually enter an applicant's birthplace (when provided) exactly as it appears on the State Form, resulting in non-uniform birthplace information for existing registered voters. (*Id.* 651:25–652:19, 677:20–22, 678:24–679:2; Petty Tr. 99:4–25; Connor Tr. 313:21–314:15.) Some birthplace designations are unclear, such as "CA," which could refer to either California or Canada. (Hersh Tr. 651:25–652:19.) And despite the State Form's request that applicants include "state or country of birth," applicants occasionally write their city or county instead, which in some cases can refer to multiple locations.[23] (*Id.* 652:20–653:4;

---

[22] Dr. Hersh is a Professor Political Science at Tufts University with a background in U.S. elections and election administration. (Hersh Tr. 642:24–643:18.) The Court credits Dr. Hersh's testimony and affords his opinions significant weight.
[23] For example, Dr. Hersh testified that "San Luis" is a city in Arizona and twelve other countries. (Hersh Tr. 652:20–653:1.)

1    Petty Tr. 100:2–15.)

2          To Ms. Connor's knowledge, county recorders are unable to confirm the accuracy

3    of an applicant's birthplace. (Connor Tr. 316:3–6; *see* Petty Tr. 103:21–104:5 (explaining

4    Maricopa County is unable to confirm birthplace).) There is no evidence that Arizona plans

5    to establish parameters to standardize the collection of birthplace information for new

6    voters or to collect missing birthplace information from currently registered voters. (*See*

7    *generally* 2023 EPM (lacking any guidance about how to collect birthplace information on

8    a voter registration).) And despite county recorders' *potential* uses of birthplace,

9    defendants adduced no evidence that county recorders have ever encountered challenges

10   determining the identity or eligibility of the one-third of voters for whom Arizona lacks

11   this information. Dr. Hersh also opined that standardized birthplace information would still

12   not meaningfully help to identify voters. (Hersh Tr. 677:20–679:7.) Specifically, he

13   determined that of the nearly 4.7 million active and inactive voter records in Arizona, only

14   2,734 records cannot be uniquely identified based on the voter's name and date of birth.[24]

15   (*Id.* 658:20–659:11.) Most of these remaining records can be uniquely identified with the

16   individual's SSN4 or Arizona credential number. (*Id.* 659:13–665:12 (explaining that an

17   ID number can confirm whether two records are for the same or two separate individuals

18   in nearly all ambiguous cases); *see* Ex. 972 (illustrating possible identification scenarios).)

19   And for those records that lack an ID number, Dr. Hersh found that birthplace alone would

20   not sufficiently resolve the identity of two voter records. (Hersh Tr. 665:17–668:1.)

21         The Court finds that while county recorders can sometimes use birthplace in

22   Arizona's voter registration process, birthplace is of little utility in nearly all cases.

23

24   ─────────────────
25   [24] Dr. Hersh did not use the matching criteria from the HAVA Check to conduct his
     analysis, but instead treated registration records as identical only if the names matched
26   exactly. (Hersh Tr. 684:12–687:14.) By contrast, Dr. McDonald calculated 12,051
     "instances" of indeterminate record matches from the HAVA Check's soft matching
27   criteria, which Plaintiffs offered as evidence of the unreliability of the MVD database for
     determining citizenship. (McDonald Tr. 1071:14–23, 1084:12–1085:8, 1102:23–1103:1.)
28   The Court finds it unnecessary to ascertain the most likely correct figure, as these analyses
     both indicate that county recorders would seldom have a reason to consult birthplace to
     verify a soft match and identify a voter.

1

#### 5.      Registration List Maintenance

H.B. 2243 § 2's List Maintenance Procedures require county recorders to conduct recurring database checks to verify voters' citizenship status. § 16-165(G)–(J). And pursuant to the Cancellation Provision, county recorder must cancel a voter registration after the county recorder "obtains" and "confirms" information that the voter is a non-citizen, notifies the voter, and that voter fails to provide DPOC within 35 days. § 16-165(A)(10), (K). Except for listing various databases, the Voting Laws do not specifically describe how county recorders are to "obtain" or "confirm" information that a voter is a non-citizen, but the 2023 EPM provides some additional guidance.

#### i.      Obtaining Information of Non-Citizenship

Prior to the Voting Laws, county recorders were required to cancel a voter's registration if that voter had indicated on a juror questionnaire that they were not a U.S. citizen, the county recorder did not find the voter's DPOC on file, and the voter failed to provide DPOC within 35 days. (2019 EPM at PX 006-50 to -51.) The Voting Laws expand on this system by mandating the use of jury summary reports to cancel the registrations of all voters who attest to non-citizenship on a jury questionnaire. §§ 16-165(A)(10), 21-314(F). This is one method for county recorders to "obtain" information of non-citizenship of registered voters. (2023 EPM at ECF-57.)

Since December 2022, ADOT has furnished the Secretary of State a monthly "customer extract" file containing the authorized presence status of all individuals with an MVD credential to comply with H.B. 2243 § 2. (Pls.' Stip. Nos. 101, 105, 107, 108, 112; Ex. 234 at PX 234-1 to -2.) H.B. 2243 § 2 directs the Secretary of State to compare the customer extract file to AVID, identify voters who MVD indicates are not U.S. citizens, and notify county recorders of these individuals.[25] § 16-165(G); (*see also* 2023 EPM at ECF-54 (interpreting § 16-165(G) as requiring the Secretary of State to notify county recorders of individuals who are "not a United States citizen according to the [MVD]

---

[25] Though the Secretary of State has not yet used the customer extract file for any purpose, the court finds it reasonable that the Secretary of State will do so to comply with the Voting Laws. (Jorgensen Tr. 566:24–573:19; Connor Tr. 376:6–15; Morales Tr. 622:5–623:6.)

database").) The customer extract marks a "non-citizen" field with "Y" when an individual's MVD records indicate that the individual possesses a foreign-type credential and leaves the field blank for individuals with a non-foreign-type credential. (Pls.' Stip. No. 106; Ex. 234 at PX 234-1.) Because MVD records reflect only that information provided to MVD when an individual receives a new or duplicate credential, the customer extract file may contain outdated citizenship information for naturalized citizens who still possess an unexpired foreign-type credential or are awaiting SAVE verification to obtain a new credential. (Jorgensen Tr. 571:21–572:15; ADOT Dep. 137:20–138:15.) And because native-born citizens cannot be issued a foreign-type credential, the Secretary of State's use of the customer extract file to conduct monthly MVD checks will only ever misidentify naturalized citizens as non-citizens.

The 2023 EPM states that it is not currently "practicable" for county recorders to obtain information of non-citizenship from SAVE because county recorders lack access to SAVE for list maintenance purposes. (2023 EPM at ECF-24, -57); § 16-165(I). But the evidence suggests that USCIS would consider expanding Arizona's use of SAVE under an amended or new MOA. (USCIS Dep. 59:14–23, 62:20–63:7, 70:8–23, 170:15–171:20 (explaining at least one state is authorized to use SAVE for list maintenance).) Moreover, because the Voting Laws direct county recorders to use SAVE for list maintenance, it is reasonable that Arizona would seek authorization for this purpose.[26] H.B. 2243 § 2 instructs county recorders to consult SAVE each month for voters lacking DPOC and voters who the county recorder has "reason to believe" are non-citizens. § 16-165(I). The Voting Laws do not specify what constitutes a "reason to believe" and Ms. Connor testified that county recorders will likely exercise discretion to make this determination. (Connor Tr. 372:11–23.) Regardless of any county recorder discretion, only naturalized citizens will ever be subject H.B. 2243's SAVE checks under the Reason to Believe Provision because

---

[26] The Voting Laws also require the Secretary of State to provide the Attorney General access to SAVE to investigate voters lacking DPOC, but the SAVE MOA does not authorize this sort of use. A.R.S. § 16-143(C); (USCIS Dep. 58:13–25 (explaining that the Attorney General's office would need its own MOA to use SAVE); *see generally* SAVE MOA.) The Court finds it similarly probable that Arizona would seek authorization from USCIS to use SAVE for investigative purposes.

1    SAVE contains no information on native-born citizens.

2            The Voting Laws and 2023 EPM provide county recorders with well-defined

3    procedures by which county recorders could "obtain" information that a voter is a non-

4    citizen. However, given the limitations of the data accessible from MVD and SAVE, the

5    Court finds that the Voting Laws' List Maintenance Procedures' MVD checks and the

6    Reason to Believe Provision's SAVE checks will cause county recorders to "obtain"

7    information of non-citizenship predominately for naturalized citizens.

8                    ii.    **Confirming Information of Non-Citizenship**

9            If a county recorder obtains information that a voter is a non-citizen, the county

10   recorder must "confirm" this information. § 16-165(A)(10). The county recorder "shall

11   first verify that the person at issue is a true match to a person listed on [AVID]." (2023

12   EPM at ECF-57.) When there is a "true match" and AVID records indicate that the voter

13   has previously provided DPOC, the county recorder "shall not cancel" the voter's

14   registration. (*Id.*) If AVID indicates that the voter has not provided DPOC (i.e., Federal-

15   Only Voters), county recorders must, when practicable, review databases to which the

16   county recorder has access, and may communicate directly with the voter. (*Id.* (citing § 16-

17   165(K).) If a county recorder "confirms" that a voter not a U.S. citizen, the county recorder

18   must notify the individual by forwardable mail that the individual must provide DPOC

19   within 35 days to avoid having her registration canceled.[27] (*Id.*) "The notice shall include

20   a list of documents the person may provide as DPOC and a postage prepaid pre-addressed

21   return envelope." (*Id.* at ECF-58.) County recorders must complete any systematic

22   cancellation of voter registrations based upon the receipt of a jury summary report or MVD

23   records at least 90 days before an election. (*Id.* at ECF-62; *see* 09/14/2023 Order at 34.)

24           Dr. McDonald opined that the 6,084 naturalized voters whose MVD records reflect

25   outdated citizenship information could become stuck in a "loop" where MVD will flag the

26   voter as a non-citizen after each monthly check. (McDonald Tr. 1071:24–1072:5, 1089:23–

---

27   [27] Plaintiffs offered evidence that Arizona counties provide notice letters only in English,
     Spanish, Native languages, and Braille, and that no county issues notice letters in AANHPI
28   languages. (Petty Tr. 162:2–16.) But Plaintiffs do not claim that Arizona is failing to satisfy
     the Voting Rights Act's voting materials language requirements. *See* 52 U.S.C. § 10503.

1090:8.) According to Dr. McDonald, these voters must then repeatedly provide DPOC to county recorders to avoid cancellation and referral to the Attorney General. (*Id.* 1075:3–1077:9.) Dr. McDonald's theory is unpersuasive considering the 2023 EPM's directive that county recorders must first check whether the voter has previously submitted DPOC. (2023 EPM at ECF-57.) Dr. McDonald also opined that the "anomalies" in the distribution of Federal-Only Voters and voter registration cancellations and suspensions among counties "suggest" that county recorders do not uniformly implement DPOC procedures. (McDonald Tr. 1107:12–22, 1113:17–25.) For example, Pima County reported zero canceled or suspended registrations for invalid DPOC despite being the second-largest county. (*See* Ex. 334 ("Registration Cancellation Rates"); Ex. 335 ("Registration Suspension Rates").) But Dr. McDonald adduced no explanation of the cause of this discrepancy except that the Pima County Recorder registers applicants without DPOC as Federal-Only Voters, just as the LULAC Consent Decree requires. (McDonald Tr. 1108:23–1109:6; *see also id.* 1111:19–1112:20 (describing Maricopa County's small number of suspended registrations); Doc. 679-1, Ex. 4, 30(b)(6) Dep. of Pima County Recorder ("Pima Dep.") 143:5–12.) These county registration cancellation, suspension, and Federal-Only Voter rates hold little persuasive value.

### 6.    Investigation by the Attorney General

As outlined above, the Voting Laws require county recorders to refer for investigation the voter registrations of all (1) Federal-Only Voters as part of the Attorney General Referral Provision; (2) applicants who a county recorder "matches" with information indicating non-citizenship and do not submit DPOC; and (3) registered voters who a county recorder "confirms" are non-citizens and do not submit DPOC (collectively, the "Criminal Investigation Procedures"). *See* §§ 16-121.01(E), 16-143(A), 165(A)(10); (2023 EPM at ECF-17, -22.) County recorders refer these registrations to their respective county attorneys in addition to the Arizona Attorney General.

Bill Knuth, a lead special agent with the Attorney General's office, investigates election integrity matters. (Knuth Tr. 2107:25–2108:11.) Mr. Knuth explained that the

Attorney General's office currently handles election-related referrals from county recorders for further investigation on a case-by-case basis. (*Id.* 2124:4–16, 2130:23–2131:4.) Specifically, the Election Integrity Unit assesses referrals and determines whether allegations of non-citizenship warrant a more thorough investigation. (*Id.* 2134:18–2135:5.) H.B. 2492 § 7 mandates that the Attorney General's office "use all available resources to verify the citizenship status" of Federal-Only Voters. § 16-143(B). At minimum, this includes consulting SAVE, the MVD and SSA databases, and any other databases to which the county recorders have access. *Id.*

Mr. Knuth primarily consults the MVD database and various law enforcement databases for his own investigations and testified that he can retrieve limited information from the SSA database. (Knuth Tr. 2114:4–2117:1, 2117:18–2118:10.) He was unfamiliar with SAVE. (*Id.* 2111:6–12.) An MVD search will yield the subject's credential type, but neither the MVD nor SSA database provide the Attorney General's office with direct citizenship information. (*Id.* 2115:12–21.) The Attorney General's office may also speak directly to the subject of an investigation of illegal voting, but Mr. Knuth has never contacted an alleged non-citizen during an investigation. (*Id.* 2131:5–17, 2138:19–2139:14.) Mr. Knuth testified that he would forward a case to prosecutors upon finding probable cause that a non-citizen had registered to vote or voted but he could not recall ever referring such a case for prosecution. (*Id.* 2132:13–2133:2, 2133:17–2134:3.)

**C.     State Interests in Enacting the Voting Laws**

The State offers two purported interests in the Voting Laws: (1) preventing voter fraud and limiting voting to individuals eligible to vote, and (2) improving public confidence in Arizona's elections.

**1.     Preventing Ineligible Individuals from Registering to Vote or Voting in Arizona**

It is a felony to knowingly register oneself or another person to vote, "knowing"

that the registrant is not eligible to vote. § 16-182. Dr. Lorraine Minnite[28] opined that voter fraud is exceedingly rare nationally and in Arizona. (Minnite Tr. 1578:13–1582:7.) Dr. Minnite and Dr. Mark Hoekstra[29] agreed, however, that voter fraud can be difficult to detect. (Minnite Tr. 1565:23–1566:8, 1567:14–22; Hoekstra Tr. 1747:3–1748:2.) As part of her "mixed methods"[30] approach, Dr. Minnite analyzed prosecution data from the U.S. Attorney General's office. Between 2002 and 2005, 200 million votes were cast in federal elections. (Minnite Tr. 1579:4–13.) During this time, the U.S. Attorney General began its "Ballot Access and Voting Integrity Initiative" to identify voter intimidation and voter fraud. (*Id.* 1578:13–25.) The U.S. Attorney General's office indicted 40 individual voters for voter fraud from 2002 to 2005 through the initiative, with only 15 indictments for non-citizen voting. (Minnite Tr. 1578:13–1580:1.) In addition, nearly one billion votes were cast from 2000 to 2017, but U.S. Attorney offices initiated less than 200 election-related cases. (*Id.* 1580:19–1581:21.)

The Arizona Attorney General's office maintains a list of all election-related prosecutions. According to this list, there have been 38 total prosecutions related to illegal voting by the Attorney General since 2008, none of which involved a charge of non-citizen voting. (Ex. 292 at PX 292-1 to -6; Lawson Tr. 1688:3–1690:7.) The Attorney General's office is aware of two current indictments against alleged non-citizen voters, both which involve individuals who engaged in systematic identity theft. (Lawson Tr. 1691:11–15, 1707:8–1708:4.) These cases are sealed and were not known to the Arizona Legislature at

---

[28] Dr. Minnite is an associate professor at Rutgers University and has studied the incidence of voter fraud in U.S. elections for 20 years. (Minnite Tr. 1555:19–1556:9.) Dr. Minnite is the author of a leading book regarding the incidence of voter fraud, which the United States Government Accountability Office has recognized as scientifically reliable. (*Id.* 1557:13–1559:13.) The Court found Dr. Minnite credible and affords substantial weight to her opinions.

[29] Dr. Hoekstra is a professor of economics at Baylor University. (Hoekstra Tr. 1640:20–21.) Dr. Hoekstra has published one paper on the impact of photo identification laws. (*Id.* 1642:20–24.) Defendants offered Dr. Hoekstra's testimony to rebut Dr. Burch's, Dr. McDonald's, and Dr. Minnite's opinions regarding issues of the Voting Laws' correlation to, among other things, disparate registration and voting outcomes. (*Id.* 1654:7–9.) The Court found Dr. Hoekstra credible and affords his opinions only some weight.

[30] The mixed methods approach combines quantitative data and qualitative sources to identify patterns in the research and infer a conclusion from this information. (Minnite Tr. 1564:6–1565:22, 1570:12–1571:4.)

the time it enacted the Voting Laws. (Lawson Tr. 1708:14–23.) The Attorney General's office also receives complaints from the public that non-citizens are voting in Arizona, including allegations regarding specific voters, though these allegations have never led to any prosecutions. (Knuth Tr. 2109:6–2110:2, 2120:11–2121:9; Ex. 286, Ex. 287.) Dr. Minnite identified 13 prosecutions for non-citizen voting in Maricopa County between 2007 and 2008. (Minnite Tr. 1588:3–23.)

Aside from prosecutions, Ms. Petty could recall "one or two instances" in which the Maricopa County Recorder's office confirmed that a registered voter was a non-citizen after receiving notice from the jury office that a potential juror self-reported non-citizenship. (Petty Tr. 105:24–107:24.) Other county recorders reported being unaware of the prevalence of non-citizens registering to vote or voting. (*See* Pima Dep. 241:14–242:11; Doc. 679-3, Ex. 17, 30(b)(6) Dep. of Pinal County Recorder ("Pinal Dep.") 114:19–115:1.) In addition, county recorders often receive faulty voter registration forms from third-party registration drives. For example, both Maricopa County and Pima County reported a marked increase in these forms during the 2022 election cycle. (Petty Tr. 137:21–24; Hiser Tr. 1995:7–1996:19.) But Defendants adduced no evidence indicating that these forms were submitted in an attempt to register non-citizens. (*See, e.g.*, Hiser Tr. 1995:21–1998:15 (Pima County receiving registration forms purported to be for deceased voters); Johnston Tr. 2083:6–2085:5 (Yuma County receiving registration forms containing falsified or incorrect birth date, SSN4, or residence information).) Nor is there evidence that any of Arizona's Federal-Only Voters are non-citizens.

The Court finds that though it may occur, non-citizens voting in Arizona is quite rare, and non-citizen voter fraud in Arizona is rarer still. But while the Voting Laws are not likely to meaningfully reduce possible non-citizen voting in Arizona, they could help to *prevent* non-citizens from registering or voting. (*See* Minnite Tr. 1563:3–14 (opining the Voting Laws will not "reduce" voting fraud "further").)

## 2.    Voter Confidence

Evidence at trial indicates that members of the public have expressed concerns about

1    election integrity in Arizona, specifically as it relates to non-citizens voting in federal
2    elections. (Knuth Tr. 2121:12–23; Lawson Tr. 1696:18–25; Quezada Tr. 877:8–878:17.)
3    For example, when drafting the 2023 EPM, the Secretary of State received public
4    comments for two weeks, approximately one-quarter of which were "form" letters
5    commenting that "voters should be citizens" or should prove their citizenship. (Connor Tr.
6    382:12–383:25.)

7         According to Dr. Hoekstra, the Voting Laws could reduce perceptions of voter fraud
8    by persuading voters that Arizona is taking precautions to make it more difficult for non-
9    citizens to vote. (Hoekstra Tr. 1751:18–1752:9, 1870:2–16; *see also* Richman Tr. 1933:10–
10   18, 1934:16–23, 1935:14–17 (opining that the Voting Laws "should" improve voter
11   confidence).) Dr. Hoekstra cited a study that found "a couple percentage points" increase
12   in voter confidence among individuals who were notified before an election that their state
13   had a voter identification law. (*Id.* 1752:15–1753:16.) However, measuring improved voter
14   confidence typically requires voters to be well-informed about the election law, and
15   Defendants adduced no evidence quantifying the likelihood that Arizonans will become
16   aware of the Voting Laws and their purported impacts on preventing voter fraud in Arizona.
17   (*See id.* 1797:18–1800:16, 1866:4–1867:25.)

18        No party offered direct evidence predicting the expected effects of the Voting Laws
19   on Arizonans' confidence in the State's elections.

20        **D.    Intent and Effects of the Voting Laws**

21             **1.    Evidence of Discrimination**

22                  **i.    History of Discrimination in Arizona**

23        Plaintiffs offered the expert testimony of Dr. Orville Burton and Dr. Derek Chang
24   to illustrate the Voting Laws in the context of Arizona's history of discrimination. Plaintiffs
25   offered Dr. Burton as "an expert in American history, voting behavior, discrimination,
26   socioeconomic status and equality and historical intent."[31] (Burton Tr. 1403:20–22.)

27   _____

28   [31] Overall, the Court affords Dr. Burton's opinions some weight but questions the reliability
     of some of his testimony regarding Arizona history. For example, Dr. Burton testified that

1    Plaintiffs offered Dr. Chang as an expert on historical patterns between the Voting Laws

2    and other discriminatory laws.[32] (Chang Tr. 1335:17–24.)

3        Before statehood, Arizona banned intermarriage between Asians and White people.

4    (Chang Tr. 1346:19–1347:15, *see id.* 1337:24–1338:19 (describing the "Period of

5    Immigration").) Though Arizona historically banned interracial marriage, an Arizona state

6    court ruled this to be unconstitutional before *Loving v. Virginia*, 388 U.S. 1 (1967); (Burton

7    Tr. 1415:1–21, 1504:6–24.) Arizona also passed an "alien land law" in 1921 that barred

8    immigrants who were ineligible to become U.S. citizens—specifically, people of Asian

9    descent—from owning land. (Chang Tr. 1349:16–1350:5.) In 1953, Arizona courts ordered

10   the full desegregation of schools. (Burton Tr. 1421:19–1422:2, 1507:25–1508:17.)

11   Following desegregation, however, Arizona continued to require English-only classroom

12   instruction, thereby producing disparate educational outcomes particularly for Native

13   Americans and Spanish speakers. (*Id.* 1422:3–7, 1423:5–23.) Arizonans also amended the

14   Arizona Constitution in 1988 to mandate that all political subdivisions of Arizona act only

15   in English, but the Arizona Supreme Court ruled this unconstitutional. *See Ruiz v. Hull*,

16   ───────────────

17   Arizona had been deemed the "twelfth star of the Confederacy," but it was unclear whether
     he understood this to refer to the former territory that encompassed both Arizona and New

18   Mexico at the time, or what would become Arizona following statehood. (Burton Tr.
     1491:16–1493:23, *see also id.* 1496:14–24 (failing to consider Arizona's history of
     supporting the Union), 1498:17–1500:23 (Arizona's prohibition of slavery).) Dr. Burton

19   also lacked a strong understanding of existing Arizona election law. (*See, e.g., id.* 1528:8–
     1529:20 (incorrectly believing voters removed for non-citizenship were not notified under

20   previous Arizona law), 1536:4–16 (unaware if polling locations are open past 5:00 PM).)
     And Dr. Burton did not consider it necessary to consult the legislative history of the Voting

21   Laws in forming his opinions. (*Id.* 1542:12–24.)

22   [32] The Court affords Dr. Chang's opinions little weight. Dr. Chang did not review the
     legislative history of the Voting Laws because he did not believe it would have been

23   particularly useful when comparing the Voting Laws to broader historical patterns of
     discrimination. (Chang Tr. 1342:8–12, 1382:8–19.) Dr. Chang informed most of his

24   opinion by considering the history of the Asian American and Pacific Islander ("AAPI")
     community from a national perspective. (*See id.* 1345:20–1346:3 (discussing the federal

25   Page Act), 1348:1–23 (discussing the Federal Chinese Exclusion Act of 1882).) As for
     some of the history of discrimination against the AAPI community in Arizona, Dr. Chang's

26   opinions were incomplete or misleading. For example, he opined that a recent House Bill
     was like Arizona's 1921 "alien land law," but he had not read the bill in its entirety, which

27   prohibits land sales and leases to specific foreign governments or companies. (*Id.* 1375:14–
     1377:14); H.B. 2376, 56th Leg., 1st Sess. (Ariz. 2023). Dr. Chang also asserted that

28   Phoenix experienced a 50% increase in anti-Asian violence from 2019 to 2020, which
     while correct, was an increase from just two reports of violence in 2019 to three in 2020.
     (Chang Tr. 1383:2–1384:24, 1385:3–9.)

957 P.2d 984, 998, 1000 (Ariz. 1998).

Arizona also has a well-documented history of voting discrimination. For example, the territorial government imposed a literacy test as a prerequisite to voting to limit the "ignorant Mexican vote," which Arizona renewed in 1912 after statehood. (Burton Tr. 1429:1–1431:22.) And while Native Americans were granted citizenship in 1924, Arizona courts only recognized their right to vote in 1948. (*Id.* 1432:16–1434:1, 1513:2–8); *see* Indian Citizenship Act of 1924, Pub. L. No. 68-175, 43 Stat. 253 (codified at 8 U.S.C. § 1401(b)). However, Arizona's literacy requirement stood until 1972, meaning many Native Americans were, for all intents and purposes, still unable to vote. (Burton Tr. 1432:16–1434:1); *see Oregon v. Mitchell*, 400 U.S. 112 (1970) (finding amendment to the Voting Rights Act banning literacy tests constitutional). In the 1970s and 1980s, Arizona conducted "total" voter roll purges that required individuals to re-register to vote, but fewer minority voters would re-register compared to White voters. (Burton Tr. 1435:3–10, 1436:3–11.) Dr. Burton also cited at least one example of a Maricopa County election official requesting DPOC around this time even though DPOC was not required by law. (*Id.* 1435:10–20.) And for forty years, Arizona was subject to section 5 of the Voting Rights Act, which required Arizona to seek "preclearance of changes affecting voting."[33] 28 C.F.R. pt. 51, App. (2012).

Plaintiffs offered evidence that disparate socioeconomic outcomes remain pervasive for communities of color. The median household income for Black, Native Indian and Alaska Native, and Latino individuals is approximately $9,000 to $21,000 less than the household average. (Doc. 672-3, Ex. 28, ("ACS Household Income") at ECF-59.) Non-White Arizonans are also more likely than White Arizonans to live in a household with an income falling below the poverty line. (Pls.' Judicial Notice ¶ 27.) For example, 19.2% of Latino Arizonans live in a household below the poverty line, compared to 9.6% of White Arizonans, although naturalized citizens are less likely than native-born citizens to live in

---

[33] In *Shelby County, Alabama v. Holder*, the Supreme Court held that the formula for determining "covered jurisdictions" that were required to seek preclearance was unconstitutional. 570 U.S. 529, 556–57 (2013).

poverty. (Doc. 672-3, Ex. 27, ("ACS Poverty Rates") at ECF-51, -53.) Moreover, approximately 72% of voting-age Latino and 78% of American Indian or Alaska Native Arizonans have earned a high school diploma or equivalent, compared to 95% of White Arizonans. (Doc. 672-3, Ex. 29, ("ACS Educational Attainment") at ECF-71, -74.)

### ii.    The Voting Laws' Legislative History

Arizona's November 2020 presidential election was decided in favor of President Biden by a margin of 10,457 votes. (Pls.' Stip. No. 154.) Former President Trump falsely claimed that non-citizens had illegally cast more than 36,000 ballots in the election. (Minnite Tr. 1597:5–11.) President Trump's attorney Rudolph Giuliani also stated that tens of thousands of "illegal aliens" voted in Arizona, which a New York state appellate court found "false and misleading." *In the Matter of Rudolph W. Guiliani*, 146 N.Y.S. 3d 266, 268, 279–80 (N.Y. App. Div. 2021). Against this backdrop, the Arizona Senate established a committee to audit the 2020 election, which revealed no evidence of voter fraud. (Quezada Tr. 824:15–825:9.)

Prior to passing the Voting Laws, the Arizona Legislature did not establish that any non-citizens were registered to vote in Arizona. (Doc. 679-1, Ex. 6, ("Toma Dep.") 99:20–22, 100:1–5, 102:7–21; Doc. 679-2, Ex. 7, ("Petersen Dep.") 84:15–85:5.) Neither Speaker Toma nor President Petersen could recall the Legislature being presented with or considering evidence of non-citizen voter fraud in Arizona. (Toma Dep. 99:12–18; Petersen Dep. 95:6–8, 95:11–96:10, 184:18–185:4.)

H.B. 2492 was introduced to the Arizona House of Representatives on January 24, 2022. (Pls.' Stip. No. 42.) Representative Jake Hoffman was the prime sponsor of H.B. 2492 and the Arizona Free Enterprise Club[34] helped draft the substance of the bill. (Toma Dep. 139:19–20; Peterson Dep. 158:7–13, 159:19–160:7; *see* Ex. 54, ("H.B. 2492 House Gov. Comm. Tr.") at PX 054-5 to -7.) In support of H.B. 2492's DPOC Requirement, Representative Hoffman explained during a House Government and Elections Committee

---

[34] The Free Enterprise Club is a conservative lobbying group that advocated for the Voting Laws to address "how more illegals started voting in AZ." (Ex. 602 (email from Arizona Free Enterprise Club to Senator Petersen).)

meeting that following the LULAC Consent Decree, more than 11,600 individuals had registered to vote in federal elections without DPOC. (H.B. 2492 House Gov. Comm. Tr. at PX 054-3 to -4.) On February 22, 2022, a majority of the House Rules Committee voted in favor of H.B. 2492 over the concerns of the Committee's counsel that the NVRA likely pre-empted the bill's DPOC Requirement for Federal Form applicants. (*See generally* Ex. 57.) The Arizona House of Representatives passed the bill. (*See generally* Exs. 58, 59.)

The Arizona Senate Judiciary Committee met on March 10, 2022 to discuss the bill. (*See generally* Ex. 61.) In explaining his vote against H.B. 2492 during the committee meeting, then-Senator Martin Quezada indicated that the bill would disproportionately "target[]" people of color, leading Senator Petersen to call a recess after the audience began to audibly react. (*Id.* at PX 061-34 to -36.) The Senate passed H.B. 2492 on March 23, 2022, which then-Governor Doug Ducey signed into law. (Ex. 62, at PX 062-22; Pls.' Stip. No. 43.) H.B. 2492 took effect January 1, 2023. (Pls.' Stip. Nos. 44–45.) The legislative history indicates that the legislators in favor of the bill were concerned specifically with the increase of Federal-Only Voters in Arizona who had not provided DPOC. (*See, e.g.*, H.B. 2492 House Gov. Comm. Tr. at PX 054-3.)

H.B. 2243 was first introduced in the Arizona Legislature in January 2022. (*See generally* Ex. 68.) As originally drafted, H.B. 2243 amended only § 16-152 to require a notice on the State Form informing the voter that her registration would be cancelled if the voter moved permanently to a different state. (*See generally* Exs. 705, 707.) On January 31, 2022, H.B. 2617 was introduced, which would have required county recorders to cancel a voter's registration if the county recorder "confirms" either that the voter is a non-citizen or was issued an out-of-state identification, and the voter failed to furnish "satisfactory evidence that the person is qualified" within 90 days of receiving notice of cancellation.[35]

---

[35] As discussed *supra* Section I(B)(5)(i), county recorders previously provided a voter with 35 days to submit DPOC if that voter had indicated on a juror questionnaire that they were not a U.S. citizen, and voter's registration file lacked DPOC. Also, before the introduction of H.B. 2617, voters were also entitled to a 35-day final notice to update the voter's address and avoid being placed into inactive status if official election mail was returned to county recorders as undeliverable. (2019 EPM at PX 006-52 (describing the process to satisfy the NVRA); *see also id.* at PX 006-52 to -53 (describing similar process when a county recorder receives information from USPS's National Change of Address Service).)

(Ex. 4, ("H.B. 2617 Text") at PX 004-2 to -3; *see generally* Ex. 67, ("H.B. 2617 Bill History").) House Representative Joseph Chaplik was the Primary Sponsor of H.B. 2617, and the Arizona Free Enterprise Club helped draft the bill. (H.B. 2617 Bill History at PX 067-1; Petersen Tr. 238:4–8.) On May 25, 2022, the Arizona Legislature passed H.B. 2617. (*See* H.B. 2617 Bill History at PX 067-3; *see also* Exs. 490, 491, 494, 495, 497, 498.) Governor Ducey vetoed the bill, noting that H.B. 2617 was "vague and lack[ed] any guidance for how a county recorder would" determine whether a person was a "qualified elector." (Ex. 53, ("H.B. 2617 Veto Letter") at PX 053-1; *see* H.B. 2617 Text at PX 004-2 to -3 (requiring county recorder to cancel voter registration when the county recorder confirms that a voter is "not a qualified elector").)

Following Governor Ducey's veto of H.B. 2617, Representative Toma and Representative Chaplik decided to include an amended version of H.B. 2617 into H.B. 2243. (*See* Toma Dep. 235:7–23, 240:2–3, 246:23–247:6, 257:13–17.) Senator Petersen sponsored the amendment in the Senate, and on the last day of the legislative session, proposed a floor amendment[36] in the Committee of the Whole to incorporate H.B. 2617 into H.B. 2243. (Ex. 708; Petersen Dep. 247:10–20, 268:6–22, 269:2–10.) Senators Quezada and Petersen, and Representative Toma all agreed that last-minute amendments commonly occur at the end of the legislative session, though Senator Quezada testified that it was abnormal for "significant" amendments to be introduced so late in the legislative session. (*See* Quezada Tr. 860:9–861:16; Toma Dep. at 237:8–239:3; Petersen Dep. at 319:3–24.)

Senator Petersen characterized the amendments to H.B. 2243 as essentially "identical to" H.B. 2617, except for some "additional notice requirements." (Ex. 499 at PX 499-3.) But H.B. 2243 provides voters with 35 days to furnish DPOC instead of the 90 originally in H.B. 2617. (*Compare* H.B. 2243 Text at PX 002-5 to -6, *with* H.B. 2617 Text at PX 004-3.) H.B. 2243 also differs from H.B. 2617 by requiring county recorders to place

---

[36] A floor amendment allows a legislator to include the substance of a bill that has changed after leaving its assigned committees into a separate "germane" bill within the same section or title of the Arizona Revised Statutes. (Petersen Dep. 270:3–10.)

a voter's registration into inactive status instead of cancelling the registration if the voter fails to attest (instead of providing "satisfactory evidence") that she is an Arizona resident within 90 days. (*Compare* H.B. 2243 Text at PX 002-6, *with* H.B. 2617 Text at PX 004-3.) There is no explanation for these changes in the legislative record except that H.B. 2243 as amended "addresses the [Governor's] veto letter." (Ex. 499 at PX 499-3.) The Committee of the Whole adopted Senator Petersen's floor amendment. (*Id.* at PX 499-6.) The Arizona Legislature then passed H.B. 2243, which Governor Ducey signed into law.[37] (*See* Exs. 68, 500.)

Nothing in the legislative history of H.B. 2492 or H.B. 2243 reflects an intent to suppress voter registrations of members of minority groups or naturalized citizens.[38] (*See generally* H.B. 2492 House Gov. Comm. Tr.; Exs. 57, 58, 61, 490, 491, 494, 495, 497–500.) The evidence indicates that concerns of reinforcing election integrity in response to the increase in Federal-Only Voters drove the Legislature's enactment of the Voting Laws. (*See, e.g.*, H.B. 2492 House Gov. Comm. Tr. at PX 054-3.) Plaintiffs did not adduce evidence challenging the sincerity of some Arizonans' beliefs that non-citizens had voted in the 2020 election. And while there is no evidence that Federal-Only Voters may be non-citizens, the Legislature's decision to scrutinize these voters does not ring of discrimination. In addition, the justification for the Birthplace Requirement came from a representative for the Arizona Free Enterprise Club, who explained that birthplace could help identify voters in the databases enumerated in the Voting Laws, such as NAPHSIS. (Ex. 61 at PX 061-24 to -26.) The legislative record lacks any indicia of a nefarious motive. And despite Dr. Chang and Dr. Burton's account of Arizona's history of discrimination, neither expert articulated a persuasive factual nexus between this history and the Fifty-Fifth Legislature's enactment of the Voting Laws.

---

[37] H.B. 2243 supersedes H.B. 2492 § 8, which would have directed county recorders to cancel the registrations of voters who county recorders "confirm[]" are not U.S. citizens, without first providing notice or an opportunity for voters to furnish DPOC. (*See* H.B. 2492 § 8.)

[38] Plaintiffs make much of ongoing discriminatory comments Senator Borelli purportedly made to Senator Quezada during Senator Quezada's time in the Senate, but regardless of what Senator Borelli may have expressed, Plaintiffs cannot impute his beliefs or motives to the entire Arizona Legislature.

1

### 2.        Effect of the Voting Laws on Voters

Most of H.B. 2243 requires no action on the part of voters. Its List Maintenance Procedures impose obligations on county recorders and the Secretary of State to ensure that all registered voters are U.S. citizens. *See* § 16-165(G)–(J). Only if a county recorder "confirms" a voter is a non-citizen must that voter produce DPOC within 35 days to avoid having her registration cancelled and referred to the attorney general for investigation. *Id.* § 16-165(A)(10). H.B. 2492's Citizenship Verification Procedures and Attorney General Referral Provision similarly require county recorders and the attorney general to investigate the citizenship status of registrants and voters without DPOC. §§ 16-121.01(D), 16-143(B).

Dr. Traci Burch[39] applied the "rational choice" framework to analyze the burdens the Voting Laws would impose on Arizona voters. The rational-choice framework weighs the perceived probable rewards of an action against the probable corresponding costs to predict the likelihood that an individual will perform the action. (Burch Tr. 931:20–932:11.) The three primary costs are: (1) learning costs, such as learning how to register to vote; (2) compliance costs, such as the cost to obtain the information necessary to register to vote; and (3) psychological costs, or the emotional burdens associated with performing the action and the resulting effects of that action. (*Id.* 933:13–17, 934:10–25, 935:15–936:7.) Individuals of higher socioeconomic status are typically better positioned to bear these costs as compared to individuals of lower socioeconomic status. (*Id.* 940:23–941:24, 942:19–944:12.)

Dr. Burch opined that requiring DPOC to register to vote and avoid removal from the voter rolls will increase compliance costs for Arizona voters, particularly those who lack ready access to DPOC. (*Id.* 969:5–9.) Plaintiff representatives testified that some citizens residing in Arizona may lack ready access to the information that constitutes DPOC in Arizona. (*See, e.g.*, Nitschke Tr. 469:8–470:3 (explaining out-of-state students

---

[39] Dr. Burch is an associate professor of political science at Northwestern University and a research professor at the American Bar Foundation. (Burch Tr. 923:23–25.) Dr. Burch testified to the burdens the Voting Laws may impose on individuals in attempting to vote. (*Id.* 927:16–18, 928:16–929:3.) The Court found Dr. Burch credible and affords her opinions considerable weight.

may keep records with parents); Tiwamangkala Tr. 1273:22–1274:3 (explaining that Equity Coalition's partner organization helps AANHPI individuals obtain citizenship documentation to apply for government benefits).) Estimates suggest that around seven percent of all U.S. citizens lack ready access to proof of citizenship. (Hoekstra Tr. 1838:24–1839:10.) But Plaintiffs adduced no evidence estimating the number of Federal-Only Voters who lack all acceptable forms of DPOC. Nor did Plaintiffs show that naturalized citizens or people of color are more likely than their White counterparts to lack DPOC. And assuming *all* of Arizona's Federal-Only Voters did not possess DPOC at the time of registration, this would account for less than half a percent of the State's registered voters. (*See* Ex. 336; Pls.' Stip. No. 26 (19,439/4,198,726=0.4%).)

Aside from Federal-Only Voters, Dr. McDonald testified that county recorders cancelled 1,290 Arizona voter registrations for "Invalid Citizenship Proof," and suspended 5,555 additional voter registrations for this same reason. (McDonald Tr. 1106:25–11, 1111:13–21; *see* Registration Cancellation Rates; Registration Suspension Rates.) Dr. McDonald did not, however, opine on whether these were citizens who did not possess or could not provide DPOC, but instead offered these figures as evidence that county recorders historically have not uniformly implemented Arizona's election laws. (McDonald Tr. 1107:12–22, 1232:2–1234:13.) For example, Cochise County appears to have placed voter registrations in suspense status for lacking DPOC, rather than registering these registrants as Federal-Only Voters. (*See, e.g.*, Ex. 510.) Dr. Richman noted that most of these voters did not match with any MVD file containing citizenship information, in which case county recorders could not have relied on stale MVD data to cancel or suspend these registrations. (Richman Tr. 1954:12–1956:3; MVD Non-Citizen Records (indicating lack of MVD matches for 858 of 1,290 cancelled registrations and 5,010 of 5,555 suspended registrations but listing 77 cancelled registrations for lack of DPOC and 253 suspended registrations for "Invalid Citizenship Proof" in MVD).) Dr. Richman also explained that AVID's coding system to suspend and cancel voter registrations for "Invalid Citizenship Proof" contained "overlapping codes." (*See, e.g.*, Richman Tr. 1917:11–

1919:11 (explaining citizenship cancellation codes include voluntary and involuntary cancellation); *see also* Ex. 796, (listing an "Invalid Citizenship Proof" code for registrants who are "Not Eligible," but lacking any similar code for cancelled or suspended registrants).) The Court finds that Arizona's cancellation and suspension of approximately 7,000 voter registrations for "Invalid Citizenship Proof" is not probative of the number of qualified Arizonans unable to provide DPOC when registering to vote.

Plaintiffs did offer evidence that obtaining DPOC could impose a financial burden on low-income voters. For example, the cost of obtaining a copy of an Arizona birth certificate is 35 dollars.[40] (Doc. 672-7, Ex. 50.) The fee to replace a naturalization certificate is significantly greater, costing $555.[41] (Doc. 672-7, Ex. 53.) However, naturalized citizens are less likely than native-born citizens to live in a household with income below the poverty line, and furthermore, naturalized citizens need only provide an immigration number as DPOC if they do not possess a naturalization certificate. § 16-166(F)(4). Furthermore, while approximately 19% of Latino individuals live in a household below the poverty line, 82% of Arizona's Latino citizens are native-born, meaning most Latinos will not be burdened by the considerably higher costs associated with obtaining new naturalization documents.

Dr. Burch opined that requiring voters to provide DPOC and subjecting voters who cannot provide DPOC to potential investigation could also impose psychological costs. (Burch Tr. 946:12–947:9, 969:5–9, 972:14–23, 993:6–17.) Specifically, Latino and AANHPI voters may fear drawing attention to their families, particularly voters who live with non-citizens in mixed-status households. (*Id.* 993:18–994:7; *see also* Tiwamangkala Tr. 1274:19–1275:3 (chilling effect among AANHPI community); Guzman Tr. 480:9–481:18 (chilling effect among Latino community).) For instance, pursuant to H.B. 2243's

---

[40] Plaintiffs ask the Court to take judicial notice of the cost of obtaining a passport. But a U.S. citizen must provide proof of U.S. citizenship to obtain a passport or pay an additional 150-dollar fee for the United States to conduct a search for a previously issued passport. The Court gives little weight to the burden of obtaining a passport because an individual may obtain a new birth certificate for substantially less and in less time. (*Compare* Doc. 672-7, Ex. 50, *with* Doc. 672-7, Ex. 51, at ECF-13, 16.)

[41] It can take up to eight months to receive a replacement certificate. (Doc. 672-7, Ex. 54.)

1    mandate that the Secretary of State compare AVID to the MVD database each month, the

2    MVD customer extract will flag all individuals with a foreign-type credential as non-

3    citizens, despite that this information will be outdated for the 6,084 naturalized Full-Ballot

4    Voters who still possess an unexpired foreign-type credential. And because MVD does not

5    issue foreign-type credentials to native-born citizens, only naturalized citizens will ever be

6    misidentified as non-citizens. H.B. 2243's Reason to Believe Provision will similarly affect

7    only naturalized citizens because SAVE cannot search for native-born citizens. The Latino

8    and AANHPI communities may associate these procedures with Arizona's history of

9    discriminatory treatment against people of color. (*See supra* Section I(D)(1)(i).)

10        The Court finds that the compliance and psychological costs associated with the

11   Voting Laws' DPOC Requirements[42] and investigative procedures would predominately

12   impact voters of lower socioeconomic status and naturalized citizens. Plaintiffs did not,

13   however, quantify the scope of this impact, given the lack of evidence regarding the

14   distribution of voters who do not possess or would be unable to obtain DPOC. As for the

15   Voting Laws' Birthplace Requirement, Plaintiffs did not adduce any evidence that voters

16   would be unable to include birthplace information. However, the evidence shows that

17   Latino and AANHPI voters could be deterred from registering to vote due to fears of

18   investigation.

19        **E.    Plaintiffs Sue for Relief**

20        Following the passage of the Voting Laws, the United States and a collection of

21   nonpublic entities (collectively, "Plaintiffs") filed several lawsuits seeking injunctive

22   relief. (*See, e.g.*, Doc. 1, 2:22-cv-00519-SRB; Doc. 1, 2:22-cv-01124-SRB.) The Court

23   consolidated the Plaintiffs' eight lawsuits into the instant case. (*See* Docs. 39, 48, 69, 79,

24   91, 164, 193.) Together, Plaintiffs claim the Voting Laws, among other things, (1) violate

25   the Civil Rights Act of 1964, the NVRA, and the Voting Rights Act; (2) place an undue

26   burden on the right to vote; and (3) violate the due process and equal protection guarantees

27   _____

     [42] The Court uses "DPOC Requirements" to refer to H.B. 2492 § 4's mandate that all voter
28   registrations include DPOC to be registered as a Full-Ballot Voter, as well as H.B. 2492
     § 4 and H.B. 2243 § 2's requirement that a registrant or voter provide DPOC if a county
     recorder matches that individual to information of non-citizenship.

1    of the U.S. Constitution. (*See* Doc. 304.) The Republican National Committee ("RNC"),

2    Arizona Senate President Warren Petersen, and Arizona House of Representatives Speaker

3    Ben Toma, intervened as defendants. (Doc. 18, 2:22-cv-01369-SRB; Doc. 363.)

4         The Voting Laws have not yet been enforced, but many non-US Plaintiffs have

5    already shifted their operations to mitigate the anticipated impacts of the laws, while other

6    non-US Plaintiffs anticipate doing so if the Voting Laws take effect. All non-US Plaintiffs

7    assert an interest in maximizing voter turnout among certain communities, including

8    Latinos, Native Americans, AANHPI individuals, Black Americans, students, young

9    people, the elderly, and Democratic voters generally.

10              **1.    Mi Familia Vota**

11        Mi Familia Vota is a national, nonprofit civic engagement organization that seeks

12   to increase civic participation in the Latino community and "ensure that as many people as

13   possible can participate in the democratic process, including members of the Latino

14   community." (Rodriguez-Greer Tr. 780:20–25, 781:22–782:2). At trial, Carolina

15   Rodriguez-Greer, Mi Familia Vota's State Director for Arizona, testified that Mi Familia

16   Vota engages in "year-round" voter engagement efforts and has a reputation as a "trusted

17   community resource" on voting and civic participation. (*Id.* 780:14–17, 782:14–18). Mi

18   Familia Vota's voting-related activities include providing election resources in Spanish,

19   hosting voter education workshops, assisting permanent legal residents with the citizenship

20   application process, and registering voters by tabling at events and with paid canvassers.

21   (*Id.* 781:22–782:24, 785:4–17.) Mi Familia Vota provides in-depth training to its

22   canvassers on the voter registration forms and on how to engage with potential voters in

23   the communities that the organization serves. (*Id.* 783:25–784:7.) Mi Familia Vota has

24   registered over 30,000 voters in Arizona since 2021. (*Id.* 780:18–19, 784:12–14.)

25        Mi Familia Vota claims that the Birthplace Requirement will impact its voter

26   registration efforts because the community members it serves are often hesitant to share

27   personal information with the government, including their place of birth. (*Id.* 786:12–

28   787:3, 787:15–788:8.) Rodriguez-Greer testified that she observed this fear among

naturalized citizens growing up in Tucson, Arizona, which is less than 100 miles from the U.S.-Mexico border. (*Id.* 786:12–787:3.) Mi Familia Vota does not have additional resources to devote to mitigate the anticipated effects of the Voting Laws, so it expects that it will need to "go into crisis mode" and redirect existing funds toward new voter education initiatives. (*Id.* 791:16–792:4, 809:24–810:1.) For example, Mi Familia Vota anticipates redirecting staff members from its ambassadors program, which is designed educate voters about basic election issues, to a new effort that addresses community members' confusion about the Voting Laws and educates them about the changes to the registration and voting process. (*Id.* 791:16–792:23.) Mi Familia Vota also expects to adjust its voter registration program and reallocate its staff's efforts to developing a new training program for canvassers. (*Id.* 792:24–793:12.) Mi Familia Vota spent approximately $1.5 million on its voter engagement efforts in 2023, and it expects that its budget for voter engagement will be "significantly higher" in 2024. (Rodriguez-Greer Tr. 781:13–15, 784:19–22.)

### 2.    Voto Latino

Voto Latino is a 501(c)(4) nonpartisan, nonprofit social welfare organization that aims to "educate and empower a new generation of Latino voters in Arizona." (Patel Tr. 217:4–11.) Voto Latino's voting-related work includes voter registration, increasing voter turnout among low-propensity voters, and advocacy. (*Id.* 216:16–17, 217:12–218:5.) Voto Latino's voter registration efforts include "chase programming," by which Voto Latino follows up with individual voters who did not complete their voter registration or may not have successfully submitted their registration to be placed onto the voter rolls. (*Id.* 221:20–223:14.) Since 2012, Voto Latino has registered over 60,000 voters in Arizona. (*Id.* 220:25–221:6.)

Voto Latino claims that the Birthplace Requirement will disproportionately impact the Latino community, which is more likely to be born outside of the United States. (*Id.* 227:10–25.) Voto Latino's Managing Director Ameer Patel testified that Voto Latino expects to expend additional resources on its chase programming to successfully register the same number of voters as it did in the 2020 election cycle as a result of the Voting

Laws. (*Id.* 229:17–231:8.) Voto Latino claims that this will "take away" resources from the organization's advocacy and turnout efforts. (*Id.* 238:17–23.) Voto Latino also claims that H.B. 2492's Citizenship Verification Procedures and Attorney General Referral Provision will have a chilling effect on prospective Latino voters, which will hinder Voto Latino's voter registration and voter turnout efforts and require the organization to reallocate resources to educate voters about the investigation provisions. (*Id.* 236:9–237:8.) After H.B. 2492 was passed, Voto Latino spent resources and devoted staff time to create new content, including videos, infographics, one-pagers, and a press release to educate voters about the impact of the bill. (*Id.* 237:9–19, 253:22–254:22.)

### 3.    Southwest Voter Registration Education Project

Southwest Voter Registration Education Project ("SVREP") is a 501(c)(3) nonpartisan, nonprofit organization committed to empowering Latino communities through their vote. (Camarillo Tr. 729:10–14, 730:4–13, 732:17–21.) SVREP's voting activities include educating and registering voters, "turning out the vote," and training candidates who run for nonpartisan offices. (*Id.* 727:14–16, 730:7–11.) SVREP has registered 15,000 Latino voters in Arizona since 2022. (*Id.* 736:9–17.) In 2024, SVERP plans to register voters by engaging high schools and community colleges, meeting individuals door-to-door, and conducting voter registration sites. (*Id.* 735:24–736:4.) SVREP is also planning to turn out the vote in 2024 by contacting voters through door-to-door visits, phone banking, and digital messaging, along with continuing its voter education efforts. (*Id.* 737:4–15, 738:5–11.) At trial, SVREP President Lydia Camarillo testified that SVREP anticipates reallocating funding and staff time from its voter registration, voter education, and voter turnout efforts to help voters who receive the 35-day notice letter obtain DPOC and assist voters who are removed from the voter rolls pursuant to H.B. 2243. (*Id.* 740:9–19, 741:6–742:6, 742:21–743:12, 743:21–745:4.)

### 4.    Promise Arizona

Promise Arizona is a community nonprofit organization that seeks to increase the participation of Latino communities from Maricopa County and throughout Arizona in the

electoral process. (Falcon Tr. 1307:3–7, 1307:24–1308:14.) Promise Arizona is a membership organization with 1,043 dues-paying members as of November 2023. (*Id.* 1306:22–23, 1308:15–23.) Promise Arizona's members include voters who are naturalized citizens. (*Id.* 1321:23–1322:3.) The primary services that Promise Arizona's members receive are adult education and assistance with the naturalization application process. (*Id.* 1306:20–23, 1308:24–1309:4.) Promise Arizona's core activities include registering voters, educating voters, and turning out the vote, all of which are carried out by paid staff members and volunteers. (*Id.* 1308:7–14; 1309:5–23, 1313:15–17, 1314:11–1315:1.) Over the past ten years, Promise Arizona has registered around 63,000 voters in Arizona. (*Id.* 1314:7–10.) In 2024, Promise Arizona expects to continue its voter turnout efforts for the primary and general elections. (*Id.* 1316:18–1317:1.)

At trial, Petra Falcon, Promise Arizona's Founding Executive Director, testified that H.B. 2243 will "undo a lot of the work" the organization has done over the past decade. (*Id.* 1321:8–20.) For example, Promise Arizona claims that H.B. 2243's List Maintenance Procedures will cause some of its members to "feel penalized." (*Id.* 1321:8–1322:14) And if one of its members is removed from the voter rolls pursuant to H.B. 2243, Promise Arizona claims that members "would not have trust in the system." (*Id.* 1322:21–1323:10.) Promise Arizona expects to prepare its field organizers and volunteers for the implementation of H.B. 2243, which it anticipates will require new training on the effects of the law. (*Id.* 1320:21–1321:20, 1328:8–1329:20) Promise Arizona also anticipates redirecting the use of its staff members and volunteers to assist registrants who receive a notice to provide DPOC under H.B. 2243. (*Id.* 1318:24–1319:20, 1320:3–1321:20, 1322:20–1323:3.) In addition, Promise Arizona plans to update its literature and its website to reflect the changes to Arizona's voting laws. (*Id.* 1329:8–20.)

### 5. Arizona Asian American Native Hawaiian Pacific Islander for Equity Coalition

Arizona Asian American Native Hawaiian Pacific Islander for Equity Coalition ("Equity Coalition") is a statewide, nonprofit, nonpartisan organization that strives for

equity and justice on behalf of its AANHPI constituents. (Tiwamangkala Tr. 1265:11–23.) Equity Coalition pursues its mission by increasing civic engagement, organizing communities, and developing young leaders. (*Id.* 1265:18–23.) Equity Coalition conducts its voting-related activities—which include voter education, registration, and mobilization—through its Civic Engagement Program. (*Id.* 1265:1–2, 1267:21–1268:1.) Equity Coalition registers voters using digital and print advertisements, phone and text banking, and in person at Asian cultural festivals, Asian businesses, and religious organizations. (*Id.* 1269:10–1270:3.) Equity Coalition also provides voter registration instructions in six AANHPI languages on its website. (*Id.* 1270:4–14.)

At trial, Equity Coalition's Advocacy Director Matine Tiwamangkala testified that after the Voting Laws were passed, Equity Coalition "had to take a pause" on its voter registration efforts to discern how the laws would impact the registration process. (*Id.* 1274:12–18.) Equity Coalition hired a new employee to allow its "Democracy Defender Director" to focus on voting rights. (*Id.* 1281:2–17.) Equity Coalition claims the AANHPI community is fearful of H.B. 2243's List Maintenance Procedures and Cancellation Provision because some may be escaping government persecution. (*Id.* 1274:19–1275:3, 1275:15–21.) Equity Coalition expects to retrain its canvassers, volunteers, subgrantees, and fellows on how to register voters and address these fears of the AANHPI community. (*Id.* 1275:15–1276:1) Equity Coalition also plans to expand the services of one of its subgrantees to assist voters who receive the 35-day notice and need to obtain DPOC. (*Id.* 1275:16–23.) In addition, the organization expects to update the voter registration instructions on its website and translate each set of instructions, which costs 25 cents per word. (*Id.* 1270:18–21, 1275:16–1276:1.) Because Equity Coalition does not currently have the resources to complete these tasks, Equity Coalition plans to "shift [its] priorities" toward assisting the AANHPI community to obtain DPOC and educating its community members and volunteers about the effects of the Voting Laws. (*Id.* 1275:16–1276:19.) Equity Coalition claims that this shift in priorities will impact its other initiatives— including the organization's actual collection of voter registration forms—and will harm

its mission. (*Id.* 1276:4–18.) Equity Coalition decided to reduce its voter registration goals in response to the Voting Laws, which it claims led to a decrease in the organization's funding since its funding is "tied" to its registration goals. (*Id.* 1274:12–18, 1275:4–8, 1278:20–1279:7.)

### 6.  Poder Latinx

Poder Latinx is an organization that aims to "engage the Latinx community to be civil participants through their vote." (Herrera Tr. 1285:5–10.) Poder Latinx serves marginalized communities, primarily "Black, Indigenous, people of color," with a focus on the environment, economic justice, and immigration justice. (*Id.* 1285:11–16, 1285:24–1286:5.) The organization's elections-related work promotes voter engagement, voter participation, and voter protection. (*Id.* 1284:11–13, 1285:5–10.) For example, Poder Latinx engages voters by canvassing in communities, translating election information, and conducting campaigns across multiple content mediums. (*Id.* 1286:6–14, 1286:6–1287:4.) Poder Latinx set a goal of registering 4,600 new voters in 2023 and seeks to register 9,000 new voters in 2024. (*Id.* 1286:19–23.) Poder Latinx plans to meet its registration goals by conducting outreach with on-the-ground canvassers and through social media, television, and radio. (*Id.* 1286:24–1287:4.) Poder Latinx calculates that it costs around $50 to register each individual voter. (*Id.* 1288:6–8.)

Poder Latinx claims that the Citizenship Verification Procedures and List Maintenance Procedures in H.B. 2492 and H.B. 2243 will remove qualified registered voters from the voter rolls and will unlawfully deny new voter applicants. (*Id.* 1290:4–15.) Poder Latinx also claims that naturalized citizens will be fearful of the database checks, which will make them less likely to participate in elections. (*Id.* 1290:16–1291:7.) Nancy Herrera, Poder Latinx's Arizona State Program Director, testified that the Voting Laws' database checks will harm the organization's reputation, as community members who receive support from Poder Latinx and who are later removed from the voting rolls or denied registration will lose trust in the organization. (*Id.* 1300:23–1302:4.) To mitigate these anticipated effects, Poder Latinx claims it will need to "restructure" its "entire

program" and allocate additional time and funding to its voter engagement efforts. (*Id.* 1290:16–1291:12.) The organization plans to add additional canvassers, translate new voting materials, and contact community members who are removed from the voter rolls or those whose applications are denied. (*Id.* 1291:8–25, 1299:10–1300:20.) Poder Latinx also plans to conduct new campaigns utilizing social, digital, television, and print media, accounting for an anticipated increase in spending. (*Id.* 1300:6–22.) Poder Latinx estimates that these strategies will cost an additional $10 to $20 for each voter it registers or re-registers and expects to reallocate funding from its issue-based campaigns. (*Id.* 1299:10–1300:5, 1302:15–23.) It also anticipates that these additional costs will detract from the organization's ability to register new voters. (*Id.* 1291:20–25.)

### 7.    Chicanos Por La Causa

Chicanos Por La Causa, Inc. is a 501(c)(3) community development nonprofit organization with a mission to "empower[] lives" by engaging Latino communities in the political process. (Garcia Tr. 176:16–20, 178:24–179:5; Guzman Tr. 478:2–6, 16–21.) Chicanos Por La Causa Action Fund is a 501(c)(4) nonprofit advocacy organization that aims to support the mission of Chicanos Por La Causa, Inc. (Garcia Tr. 175:19–20, 177:18–22.) The core activities of Chicanos Por La Causa, Inc. and Chicanos Por La Causa Action Fund (collectively, "CPLC") include helping eligible people to register to vote and follow up to make sure they actively vote, in part by targeting "low propensity voters" through its "Latino Loud" initiative. (*Id.* 179:6–22, 180:10–18; Guzman Tr. 478:22–479:17.) Joseph Garcia, vice president of public policy at Chicanos Por La Causa and executive director of Chicanos Por La Causa Action Fund, testified that CPLC has a reputation as "a trusted name within the Latino community." (Garcia Tr. 186:8–19; *see also* Guzman Tr. 485:20–486:3.)

CPLC claims that the Voting Laws' Citizenship Verification Procedures and List Maintenance Procedures regarding voters lacking DPOC will have a chilling effect on voters in the Latino community. (Garcia Tr. 190:19–25, 199:14–200:16; Guzman Tr. 480:9–481:18.) These new procedures would harm CPLC's reputation if members of the

1  Latino community attribute the effects of the Voting Laws to CPLC's inability to
2  effectively register individuals to vote. (Garcia Tr. 191:1–7, 194:7–195:4, 206:24–207:15;
3  Guzman Tr. 486:4–487:2.) During the 2022 midterm election cycle, CPLC registered
4  37,000 new voters and spent $5.7 million on canvassing and registering people to vote.
5  (Garcia Tr. 180:10–18, 203:4–8.) CPLC anticipates reallocating approximately 20 to 30%
6  of its election budget specifically to address the effects of the Voting Laws on its voter
7  programming by increasing its staffing to educate voters about the Voting Laws and
8  assisting those who are removed from the voting rolls. (Garcia Tr. 191:8–194:6, 203:4–23,
9  204:3–22.)

10                    **8.      Arizona Coalition for Change**

11         Arizona Coalition for Change is a 501(c)(3) nonprofit organization based in
12  Arizona, and its mission is to empower individuals in underserved communities to impact
13  their community through civic engagement and collaboration. (Bolding Tr. 258:3–25.)
14  Arizona Coalition for Change operates in Maricopa, Pima, and Pinal Counties and
15  primarily serves Black, Brown, and Indigenous communities, women, and young people.
16  (*Id.* 258:16–25.) Arizona Coalition for Change hosts leadership development programs for
17  youth and college students, leads community organizing efforts, and conducts voter
18  registration and voter education programs as part of its civic engagement activities. (*Id.*
19  259:9–17, 265:8–11.) Arizona Coalition for Change registers voters by tabling at events
20  and at "hot spots," which are high-traffic locations such as grocery stores, libraries, and
21  small businesses. (*Id.* 267:7–268:1, 268:15–25.) The organization staffs its registration
22  drives with paid staff members and volunteers. (*Id.* 261:9–12, 268:2–14.) Arizona
23  Coalition for Change also hosts voter education events to inform individuals about voting,
24  changes to Arizona election law, and the various offices that are up for election. (*Id.* 260:3–
25  261:8, 262:25–263:9.) Organizing, marketing, and hosting each voter education event
26  requires, at a minimum, ten hours of labor. (*Id.* 261:13–25.) Arizona Coalition for Change
27  also pays to advertise its voter education events through social media, digital, and print
28  communications. (*Id.* 262:1–24.)

Arizona Coalition for Change claims that the Voting Laws will pose a "significant challenge" for individuals registering to vote. (*Id.* 265:4–17, 279:11–19.) For example, many individuals will incorrectly believe they are registered to vote when they are not. (*Id.* 272:22–273:3.) Arizona Coalition for Change's President Reginald Bolding testified that Arizona Coalition for Change plans to host new voter education events and create new, paid advertisements about the Voting Laws. (*Id.* 265:4–266:16.) Arizona Coalition for Change also expects to change its voter registration program by hiring additional community organizers, implementing new training for its staff members and volunteers, and hosting "office hours" to assist community members with the registration process. (*Id.* 270:20–273:17, 274:20–275:23.) Arizona Coalition for Change anticipates reallocating time and resources from its civil leadership development program to implement these new voter registration efforts. (*Id.* 273:25–274:18.)

## 9. Arizona Students' Association

Arizona Students' Association ("ASA") is a nonprofit, nonpartisan organization based in Arizona that advocates for affordable and accessible higher education for Arizona university and college students. (Nitschke Tr. 447:18–449:2.) ASA advances its mission by advocating at the state and local level, developing student leaders, and registering students to vote. (*Id.* 445:23–25, 447:18–449:2.) According to ASA, its members include all students at Arizona's public universities, community colleges, and Grand Canyon University, totaling approximately 500,000 students. (*Id.* 446:17–21.) This student population includes Latinos and naturalized citizens. (*Id.* 446:17–447:1.) ASA's primary beneficiaries are its members, and ASA receives input from its members through polling and various on-campus events. (*Id.* 473:15–25.)

ASA conducts its voter registration efforts through online platforms year-round and by tabling at various campus locations during the beginning of every fall semester. (*Id.* 448:14–449:13.) Since the passage of the Voting Laws, ASA has spent time updating its training materials, conducting additional training for its volunteers and paid staff members, and following up with the organization's Federal-Only Voters to ensure they become Full-

1   Ballot Voters. (*Id.* 452:4–23, 453:12–17.) ASA estimates that its regional organizers and

2   executive staff have spent roughly 100 hours conducting the new trainings. (*Id.* 452:14–

3   23, 453:12–17.) ASA also estimates that it has spent between $150 and $210 to provide

4   updated training materials to its staff members and volunteers. (458:17–25, 467:20–467:6.)

5         At trial, Kyle Nitschke, co-Executive Director for ASA, testified that the DPOR

6   Requirement would impact ASA's ability to help Federal-Only Voters on college campuses

7   become Full-Ballot Voters, since many Federal-Only Voters do not have an in-state ID, a

8   utility bill, or another form of DPOR. (*Id.* 453:18–454:8, 462:8–463:2.) ASA further claims

9   that the DPOR requirement would require ASA to spend additional time checking each

10  student's application documents, which would "really slow down the registration process"

11  and may lead to ASA turning away students who do not have readily accessible DPOR.

12  (*Id.* 454:9–24.) ASA expects that it will continue to reallocate resources from its other

13  initiatives, including its youth empowerment summit, to train its staff, pay for upgraded

14  document scanning software to help students upload DPOR and DPOC, and check the voter

15  database to determine the effect the Voting Laws are having on students. (*Id.* 456:8–457:7,

16  458:9–16, 459:1–16., 460:20–461:5.) ASA also claims that students will choose not to

17  register to vote for fear of H.B. 2492's investigation procedures. (*Id.* 461:21–462:7.)

18        **10.**    **Democratic National Committee and Arizona Democratic Party**

19        The Democratic National Committee ("DNC") is the national arm of the Democratic

20  Party. (Reid Tr. 422:10–12.) The DNC coordinates the Democratic Party's operations

21  across all fifty states with the goal of electing Democrats "up and down the ballot,"

22  including federal, state, and local offices in Arizona. (*Id.* 422:13–19, 24–25.) The DNC is

23  comprised of formal voting members along with grassroots Democratic supporters. (*Id.*

24  434:10–435:5.) The Arizona Democratic Party ("ADP") is the operating arm of the

25  Democratic Party in Arizona. (Dick Tr. 508:1–3.) The ADP also works to elect Democrats

26  in federal, state, and local elections in Arizona. (*Id.*) The ADP's membership is comprised

27  of Democratic voters and supporters. (*Id.* 519:12–520:5.) In Arizona, there are

28  approximately 1.26 million registered Democrats. (*Id.* 508:9–10.) The DNC and the ADP

both work to persuade citizens to vote for Democratic candidates and help Democratic supporters register to vote and cast a ballot. (*Id.* 509:13–24; Reid Tr. 423:21–424:10.)

At trial, Ramsey Reid, DNC's Director of States, and Morgan Dick, ADP's Executive Director, both testified that H.B. 2492's Criminal Investigation Procedures would deter Democratic supporters from registering to vote for fear of potentially subjecting themselves or a family member to scrutiny by law enforcement or prosecution. (Reid Tr. 421:8–13, 430:1–23; Dick Tr. 506:25–507:4, 516:22–517:11.) As a result, Reid and Dick testified that these provisions would impact the ability of Democratic candidates to successfully compete in Arizona elections. (Reid Tr. 433:9–23, Dick Tr. 518:18–21.) To address the anticipated impact of H.B. 2492, the DNC is planning to reallocate resources from its work in other states to find new potential registrants and further train its staff and volunteers on how to communicate with potential voters about the Voting Laws. (Reid Tr. 430:24–432:25.) The ADP is also planning reallocating resources from other endeavors to make up the "lost ground" of voters that the ADP could have registered and mobilized to vote. (Dick Tr. 517:12–518:8.)

### 11.    Tribal Plaintiffs

San Carlos Apache Tribe ("Tribe") is a federally recognized Indian Tribe. (Pls.' Stip. No. 1.) The San Carlos Apache Reservation ("Reservation") spans across Gila, Graham, and Pinal Counties in southeastern Arizona and is the tenth largest reservation in the United States. (*Id.* Nos. 2, 4; Rambler Tr. 996:10–17.) Approximately 13,000 to 14,000 of the Tribe's 17,300 members live on the Reservation. (Rambler Tr. 996:18–21.) Roughly half of the Tribe members that live on the Reservation are over sixty years old, and many of them speak Apache and are not fluent in English. (*Id.* 1005:16–23.)

At trial, Tribe Chairman Terry Rambler testified that voting in federal, state, and local elections is very important to the Tribe and its members. (*Id.* 995:14–18, 1003:22–1004:19.) The Tribe claims that the DPOR Requirement would make it more difficult for Tribe members—especially those who are elderly and not fluent in English—to register to vote because the Reservation does not have a uniform mapping system. (*Id.* 999:24–

1000:5, 1005:12–23, 1008:11–21.) For example, residences on the Reservation typically do not have street names or building numbers, and Tribe members receive mail at post office boxes on the Reservation. (*Id.* 996:22–997:4, 997:7–11.) Tribe identification cards list post office box numbers instead of residential addresses. (*Id.* 998:11–16.) In addition, not all Tribe members have an Arizona credential, and those Tribal members with Arizona credentials may list the nearest highway mile marker on their credential, as opposed to a residential address. (*Id.* 997:12–998:1, 999:10–12.) Some Tribe members, including those who are temporarily living with a family member or those who are experiencing homelessness, do not have a permanent residence.[43] (*Id.* 998:17–22.)

Tohono O'odham Nation is a federally recognized Tribe. (Pls.' Stip. No. 5.) According to the 2020 Census, approximately 6,713 voting-age individuals live on Tohono O'odham lands. (*Id.* No. 6.) Gila River Indian Community is a federally recognized Tribe. (*Id.* No. 7.) According to the 2020 Census, approximately 9,628 voting-age individuals live on the Gila River Reservation.[44] (*Id.* No. 8.)

## II.      CONCLUSIONS OF LAW

The Court previously ruled on several of Plaintiffs' claims in its Order addressing the parties' motions for summary judgment. (*See generally* 09/14/2023 Order.) The parties presented evidence on the following remaining issues at trial:

- Whether the non-US Plaintiffs have standing to bring each of their claims.
- Whether H.B. 2492 § 4's Birthplace Requirement for State Form users violates the Civil Rights Act ("CRA"), 52 U.S.C. § 10101, section 2 of the Voting Rights Act ("VRA"), 52 U.S.C. § 10301 et seq., or the Equal Protection Clause, or imposes an undue burden on the right to vote. *See* A.R.S. § 16-121.01(A).

---

[43] The remaining "LUCHA Plaintiffs"—namely, Living United for Change in Arizona, League of United Latin American Citizens, Arizona Democracy Resource Center Action, and Inter Tribal Council of Arizona, Inc.—did not present any evidence at trial regarding their standing to bring this action.
[44] The remaining Tohono O'odham Plaintiffs—namely, Alanna Siquieros, Keanu Stevens, and LaDonna Jacket—did not provide any evidence at trial regarding their standing to bring this action.

- Whether H.B. 2492 § 4's citizenship verification and criminal investigation referral procedures for registrations lacking DPOC violates section 2 of the VRA, procedural due process, or the Equal Protection Clause, or imposes an undue burden on the right to vote. *See* § 16-121.01(D), (E).

- Whether H.B. 2492 § 5's DPOR requirement for State Form users violates the NVRA or the Equal Protection Clause or imposes an undue burden on the right to vote. *See* § 16-123; *see also* § 16-121.01(A).

- Whether H.B. 2492 § 7's referral, citizenship verification, and prosecution procedures for registered voters without DPOC violate the NVRA, section 2 of the VRA, or the Equal Protection Clause, or imposes an undue burden on the right to vote. *See* § 16-143.

- Whether H.B. 2492 § 8's cancellation of a voter registration upon "confirm[ing]" a person's non-citizenship violates the NVRA, section 2 of the VRA, procedural due process, or the Equal Protection Clause, or imposes an undue burden on the right to vote. *See* § 16-165(A)(10), *amended by* H.B. 2243 § 2.

- Whether H.B. 2243 § 2's citizenship verification, registration cancellation, and criminal investigation referral procedures violate the NVRA, section 2 of the VRA, procedural due process, or the Equal Protection Clause, or imposes an undue burden on the right to vote. *See* § 16-165(A)(10), (G)–(K).

- Whether H.B. 2243 § 2's Reason to Believe Provision violates the CRA, the NVRA, section 2 of the VRA, or the Equal Protection Clause *See* § 16-165(I).

- Whether the Voting Laws were enacted with a discriminatory intent.

Under the principles of preemption, "when federal and state law conflict, federal law prevails and state law is preempted." *Knox v. Brnovich*, 907 F.3d 1167, 1173 (9th Cir. 2018) (quoting *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 471 (2018)). Because the Voting Laws have not yet been implemented, Plaintiffs are bringing a facial

challenge to the Voting Laws' legality. To succeed on a facial challenge, Plaintiffs must establish "that 'no set of circumstances exists under which the Act would be valid.'" *Puente Ariz. v. Arpaio*, 821 F.3d 1098, 1104 (quoting *United States v. Salerno*, 481 U.S. 739, 746 (1987)). The Court "must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008).

## A.    Subject Matter Jurisdiction

### 1.    Standing

Defendants argue that all non-U.S. Plaintiffs lack standing because non-U.S. Plaintiffs have not demonstrated that their organizations, or a specific member of their organizations, will suffer an actual or imminent, concrete, and particularized injury due to any challenged provision of the Voting Laws.

Under Article III of the United States Constitution, a plaintiff has standing if it can show (1) an "injury in fact" that is concrete and particularized and actual or imminent, not hypothetical; (2) that the injury is fairly traceable to the challenged action of the defendant; and (3) that it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). In cases for prospective injunctive relief, "past wrongs do not in themselves amount to that real and immediate threat of injury necessary to make out a case or controversy." *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983). Rather, a plaintiff's "standing to seek the injunction requested depend[s] on whether he [is] likely to suffer future injury." *Id.* at 105. When addressing behavior that is alleged to increase the risk of future injury, the future injury must be "certainly impending." *Clapper v. Amnesty Int'l*, 568 U.S. 398, 409 (2013); *see also Protectmarriage.com-Yes on 8 v. Bowen*, 752 F.3d 827, 839 (9th Cir. 2014) ("Whether we view injury in fact as a question of standing or ripeness, 'we consider whether the plaintiff[] face[s] a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement'" (alterations in original) (citation omitted)); *Common Cause Ind. v. Lawson*, 937 F.3d 944, 950 (7th Cir. 2019) ("[O]rganizations may

1    rely on not only actual, but imminent harm for standing, including by challenging laws pre-

2    enforcement if the organization can show a substantial threat of injury.").

3             "Only one plaintiff needs to have standing when only injunctive relief is sought."

4    *DNC v. Reagan*, 329 F. Supp. 3d 824, 841 (D. Ariz. 2018) (citing *Crawford v. Marion*

5    *Cnty. Election Bd.* ("*Crawford I*"), 472 F.3d 949, 951 (7th Cir. 2007)) (finding standing

6    where Arizona Democratic Party and additional private plaintiffs requested injunctive and

7    declaratory relief against Arizona election law), *aff'd sub nom. DNC v. Hobbs*, 9 F.4th

8    1218, 1219 (9th Cir. 2021) (Mem.); *Mecinas v. Hobbs*, 30 F.4th 890, 897 (9th Cir. 2022)

9    ("In a suit with multiple plaintiffs, generally only one plaintiff need have standing for the

10   suit to proceed."). However, at least one plaintiff must establish standing "for each claim

11   for relief." *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct.

12   2367, 2379 n.6 (2020).

13            An organization can have direct standing by "claim[ing] that it suffered an injury in

14   its own right" or representational standing by asserting "standing solely as the

15   representative of its members." *Students for Fair Admissions, Inc. v. President & Fellows*

16   *of Harvard Coll.*, 600 U.S. 181, 199 (2023) (citation omitted). "[A]n organization has direct

17   standing to sue where it establishes that the defendant's behavior has frustrated its mission

18   and caused it to divert resources in response to that frustration of purpose." *E. Bay*

19   *Sanctuary Covenant v. Biden*, 993 F.3d 640, 663 (9th Cir. 2021) (citing *Fair Hous. of*

20   *Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002)). Organizations cannot "manufacture

21   the injury by incurring litigation costs," but they can show standing when they "would have

22   suffered some other injury had they not diverted resources to counteracting the problem."

23   *Id.* (internal quotations omitted). "The fact that the added cost has not been estimated and

24   may be slight does not affect standing, which requires only a *minimal showing of injury*."

25   *Crawford I*, 472 F.3d at 951 (emphasis added), *aff'd*, 553 U.S. 181 (2008); *see also See E.*

26   *Bay Sanctuary Covenant*, 993 F.3d at 664 ("Organizations are not required to demonstrate

27   some threshold magnitude of their injuries . . . .").

28            To invoke representational standing, an organization must show that "(a) its

- 56 -

members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Students for Fair Admissions*, 600 U.S. at 199 (citation omitted). "Implicit in the first prong of this test is the requirement that an organization must generally have 'members' to bring suit on their behalf." *Or. Moms Union v. Brown*, 540 F. Supp. 3d 1008, 1013 (D. Or. May 20, 2021). However, a non-membership organization may also have representational standing if it possesses "indicia of membership" such that it is "sufficiently identified with and subject to the influence of those it seeks to represent as to have a 'personal stake in the outcome of the controversy.'" *Am. Unites for Kids v. Rousseau*, 985 F.3d 1075, 1096 (9th Cir. 2021) (quoting *Or. Advoc. Ctr. v. Mink*, 322 F.3d 1101, 1111 (9th Cir. 2003)). For example, in *Oregon Advocacy Center v. Mink*, the Ninth Circuit held that a non-membership organization had associational standing because it served a "specialized segment" of a community, who were the "primary beneficiaries" of the organization's activities. 322 F.3d at 1111.

### i.    Challenges to the Birthplace Requirement

Mi Familia Vota's testimony demonstrates that the Birthplace Requirement poses a "substantial threat of injury," which frustrates Mi Familia Vota's mission and will require it to divert resources to counteract its effects, constituting an injury-in-fact. *Common Cause*, 937 F.3d at 950; s*ee, e.g.*, *Crawford I*, 472 F.3d at 951 ("[T]he new law injures the Democratic Party by compelling the party to devote resources to getting to the polls those of its supporters who would otherwise be discouraged by the new law from bothering to vote."); *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341 (11th Cir. 2014) ("[O]rganizations can establish standing to challenge election laws by showing that they will have to divert personnel and time to educating potential voters on compliance with the laws and assisting voters who might be left off the registration rolls on Election Day."); *One Wis. Inst., Inc. v. Thomsen*, 198 F. Supp. 3d 896, 909–10 (W.D. Wis. 2016) (finding that nonprofit plaintiffs had suffered an injury-in-fact where plaintiffs presented evidence that they

1    "devoted money, staff time, and other resources away from their other priorities to educate
2    voters about the new laws"), *rev'd in part on other grounds sub nom. Luft v. Evers*, 963
3    F.3d 665 (7th Cir. 2020). This injury is traceable to the Birthplace Requirement and
4    redressable by the injunction sought by Mi Familia Vota. *See Common Cause*, 937 F.3d at
5    950.

6         Defendants argue that Mi Familia Vota has not identified any individual who is
7    likely to be injured by the Birthplace Requirement. But to have standing based on a future
8    injury, a plaintiff need not identify specific individuals who are likely to be harmed by the
9    challenged conduct, so long as the future injury alleged is "certainly impending." *Clapper*,
10   568 U.S. at 409. Defendants further argue that Mi Familia Vota "cannot predict the
11   financial impact" of the Birthplace Requirement and that its anticipated expenses to
12   counteract the provision are speculative. However, a plaintiff need not estimate the cost of
13   their injury to demonstrate standing. *See Crawford I*, 472 F.3d at 951. The Court concludes
14   that Mi Familia Vota has direct standing.

15                    **ii.    Challenges to H.B. 2492's Citizenship Verification**
16                            **Procedures and Criminal Investigation Procedures**

17        The Court concludes that the Democratic National Committee and the Arizona
18   Democratic Party have direct standing. The organizations' testimony demonstrates that
19   H.B. 2492's Criminal Investigation Procedures pose a substantial threat of injury, which
20   frustrates the DNC's and the ADP's missions and will require them to divert resources to
21   respond to its effects. *See Common Cause*, 937 F.3d at 950; *Arcia*, 772 F.3d at 1341. The
22   diversion-of-resources constitutes injuries-in-fact, which is traceable to the H.B. 2492's
23   Criminal Investigation Procedures and redressable by the injunctive relief sought by the
24   DNC and the ADP.

25        The Court also concludes that the Democratic National Committee and the Arizona
26   Democratic Party have representational standing. First, the DNC's and the ADP's members
27   would have standing to sue in their own right. Given the impending enforcement of the
28   Voting Laws, both organizations' members face a "realistic danger of sustaining a direct

injury" due to H.B. 2492's Criminal Investigation Procedures. *Bowen*, 752 F.3d at 839. This constitutes an injury-in-fact, which is traceable to H.B. 2492 and redressable by an injunction preventing their enforcement. Second, the DNC and the ADP seek to protect voting rights of its members, which is germane to the purposes of both organizations. And third, the organizations' claims and requested relief do not require the participation of its members in this litigation. In addition, because it is "relatively clear" that at least one of each organization's members will be impacted by H.B. 2492's Criminal Investigation Procedures, and because defendants need not know the identity of any particular DNC or ADP member to respond to their claims, it is not necessary for the DNC or the ADP to identify any specific member who will be injured by the challenged provisions. *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1041 (9th Cir. 2015).

In addition, Poder Latinx's testimony demonstrates that H.B. 2492's Citizenship Verification Procedures pose a substantial threat of injury, which frustrates Poder Latinx's mission and will require it to divert resources to counteract its effects. *See Common Cause*, 937 F.3d at 950; *Arcia*, 772 F.3d at 1341. This constitutes an injury-in-fact, which is traceable to H.B. 2492's and H.B. 2243's database checks and redressable by the injunctive relief sought by Poder Latinx. Defendants assert that the costs of increasing its community outreach efforts does not amount to injury-in-fact because informing voters about the electoral process is part of the organization's "regular mission." This argument is also misplaced, as an organization can have standing where it "diverts its resources to achieve its typical goal in a different or *amplified manner*." *Fair Fight Action, Inc. v. Raffensperger*, 634 F. Supp. 3d 1128, 1178 (N.D. Ga. 2022) (emphasis added). The Court concludes that Poder Latinx has direct standing.

Lastly, Voto Latino's testimony demonstrates that H.B. 2492's Citizenship Verification Procedures and Criminal Investigation Procedures frustrate Voto Latino's mission. As a result, Voto Latino has diverted and anticipates further diversion of resources to counteract its effects, which constitutes an injury-in-fact. *See Crawford I*, 472 F.3d at 951. This injury is traceable to H.B. 2492's criminal prosecution procedures and

redressable by the injunctive relief sought by Voto Latino. Though Defendants argue that Voto Latino did not adduce evidence that the educational content it has created specifically addresses the bill's prosecution procedures, the standing inquiry does not require such minute specificity. Rather, it is sufficient that Voto Latino presented evidence that it "devoted money, staff time, and other resources away from their other priorities to educate voters about the new laws." *One Wis. Inst., Inc.*, 198 F. Supp. 3d at 909–10. The Court concludes that Voto Latino has direct standing.

### iii.    Challenges to the List Maintenance Procedures and Cancellation Provision

The Court concludes that Promise Arizona has direct standing to challenge H.B. 2243's List Maintenance Procedures and Cancellation Provision. H.B. 2243's database checks and notice and investigation procedures pose a substantial threat of injury, which frustrates Promise Arizona's mission and will require it to divert resources to counteract its effects. *See Common Cause*, 937 F.3d at 950; *Arcia*, 772 F.3d at 1341. This constitutes an injury-in-fact, which is traceable to H.B. 2243's database checks and notice and investigation procedures and redressable by the injunctive relief sought by Promise Arizona.

Promise Arizona also has representational standing. First, Promise Arizona's members would have standing to sue in their own right. Given the impending enforcement of the Voting Laws, and because H.B. 2243's database checks would apply to all registered voters in Arizona, Promise Arizona's members face a "realistic danger of sustaining a direct injury" due to H.B. 2243. *Bowen*, 752 F.3d at 839 (*see* Connor Tr. 371:15–372:2 (testifying the Secretary of State will implement the Voting Laws); Petty Tr. 160:3–15 (testifying Maricopa County Recorder's office will implement the Voting Laws).) This threat of future injury constitutes an injury-in-fact that is traceable to H.B. 2243 and redressable by an injunction preventing its enforcement. Second, Promise Arizona seeks to protect voting rights of its members, which is germane to the organization's purpose. And lastly, Promise Arizona's claim and requested relief do not require the participation of its

members in this litigation.

Defendants argue that Promise Arizona has not identified any specific member who has been or is likely to be injured by H.B. 2243's database checks and notice and investigation procedures. However, to demonstrate representational standing, an organization is not required to identify of any member who is or will be injured "[w]here it is relatively clear, rather than merely speculative, that one or more members have been or will be adversely affected by a defendant's action," and where the defendant does not need to know "the identity of a particular member to understand and respond to an organization's claim of injury." *Nat'l Council of La Raza*, 800 F.3d at 1041; *see also Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1160 (11th Cir. 2008) ("When the alleged harm is prospective, we have not required that the organizational plaintiffs name names because every member faces a probability of harm in the near and definite future.").

The Court also concludes that Equity Coalition, CPLC, and SVREP, and Poder Latinx have direct standing. Tiwamangkala's, Garcia's, Camarillo's, and Herrera's testimony demonstrates that H.B. 2243's List Maintenance Procedures and Cancellation Provision pose a substantial threat of injury, which frustrates the organizations' missions and will require the diversion of resources to respond to its effects. *See Common Cause*, 937 F.3d at 950; *Arcia*, 772 F.3d at 1341. This constitutes an injury-in-fact, which is traceable to H.B. 2243 and is redressable by the injunctive relief.

### iv.    Challenges to the DPOR Requirement

The Court concludes that the San Carlos Apache Tribe has representational standing to challenge the DPOR Requirement. First, the Tribe's members would have standing to sue in their own right. Given the impending enforcement of the Voting Laws, the Tribe's members face a "realistic danger of sustaining a direct injury" due to the DPOR Requirement. *Bowen*, 752 F.3d at 839. This constitutes an injury-in-fact, which is traceable to H.B. 2492 and redressable by an injunction preventing their enforcement. Second, the Tribe seeks to protect voting rights of its members, which is germane to the Tribe's purpose. And third, the Tribe's claim and requested relief do not require the participation

- 61 -

1  of its members in this litigation. In addition, because it is "relatively clear" that at least one

2  of the Tribe's members will be impacted by the DPOR requirement, and because

3  defendants need not know the identity of any particular Tribe member to respond to the

4  Tribe's claims, it is not necessary for the Tribe to identify any specific member who will

5  be injured by the challenged provisions.[45] *Nat'l Council of La Raza*, 800 F.3d at 1041.

6      **2.     Ripeness**

7      Defendants argue that Plaintiffs' claims regarding the Voting Laws are

8  constitutionally and prudentially unripe because Plaintiffs have not shown whether or how

9  these provisions will be implemented, or how they will be affected by their implementation.

10      "[T]he ripeness inquiry contains both a constitutional and a prudential component."

11  *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000) (en

12  banc) (citation omitted). Like the standing analysis, a claim is constitutionally ripe when

13  "plaintiffs face 'a realistic danger of sustaining a direct injury as a result of the statute's

14  operation or enforcement.'" *Id.* at 1139 (quoting *Babbitt v. United Farm Workers Nat.*

15  *Union*, 442 U.S. 289, 298 (1979)); *see Coons v. Lew*, 762 F.3d 891, 897 (9th Cir. 2014)

16  ("When addressing the sufficiency of a showing of injury-in-fact grounded in potential

17  future harms, . . . . the analysis for both standing and ripeness is essentially the same."

18  (citations omitted)), *as amended* (Sept. 2, 2014). Generally, Courts apply three factors to

19  evaluate whether a pre-enforcement challenge is constitutionally ripe: (1) whether

20  "plaintiffs have articulated a concrete plan to violate the law in question," (2) "whether the

21  prosecuting authorities have communicated a specific warning or threat to initiate

22  proceedings," and (3) "the history of past prosecution or enforcement under the challenged

23  statute." *Thomas*, 220 F.3d at 1138 (internal quotations and citation omitted). However,

24  where the plaintiffs "are not the target of enforcement," the Ninth Circuit has determined

25  that "the familiar pre-enforcement analysis articulated in *Thomas* does not apply," and has

26

27

28

---

[45] Because the Court finds that a Plaintiff has standing for each claim for relief, the Court need not determine whether remaining Plaintiffs have standing.

1  limited its ripeness analysis to the prudential component.[46] *San Luis & Delta-Mendota*
2  *Water Auth. v. Salazar*, 638 F.3d 1163, 1173 (9th Cir. 2011). In addition, the Ninth Circuit
3  "appl[ies] the requirements of ripeness and standing less stringently in the context of First
4  Amendment claims." *Twitter, Inc. v. Paxton*, 56 F.4th 1170, 1174 (9th Cir. 2022).

5       The Court concludes that Plaintiffs' claims are constitutionally ripe. The Voting
6  Laws target individual voters, rendering the *Thomas* pre-enforcement factors inapplicable
7  to nearly all Plaintiffs. *See Salazar*, 638 F.3d at 1173. Regardless, the organizational
8  Plaintiffs have shown that Arizona's enforcement of the Voting Laws will imminently
9  harm their missions and/or their members. (*See supra* Section II(A)(1)); *Bowen*, 752 F.3d
10 at 839 (pre-enforcement action is ripe "if the alleged injury is 'reasonable' and 'imminent,'
11 and not merely 'theoretically possible'" (citation omitted)). Defendants emphasize that the
12 Voting Laws are not currently being enforced, it is unclear how the Voting Laws will be
13 enforced, and that Plaintiffs have not proven that any person will be injured by the Voting
14 Laws. But Ms. Connor testified that the Secretary of State will implement the Voting Laws
15 once the Court determines their legality. (Connor Tr. 371:15–372:2.) And the county
16 recorders have indicated their intent to implement the Voting Laws after receiving
17 guidance from the Secretary of State or the Court.[47] (*See, e.g.*, Petty Tr. 160:3–15; Ex. 111,
18 at PX 111-3 to -5; Ex. 118, at PX 118-4 to -5; Ex. 121, at PX 121-2 to -3; *see also* Exs.
19 123, 127, 136, 146, 151, 156, 174, 175.) Plaintiffs' injuries are not just "theoretically
20 possible," but "imminent." *See Bowen*, 752 F.3d at 839.

21       The Court also finds that Plaintiffs' claims are prudentially ripe. A claim is
22 prudentially ripe when "the fitness of the issues for judicial decision and the hardship to
23 the parties of withholding court consideration" both weigh toward hearing the case. *See*
24 *Ass'n of Irritated Residents v. EPA*, 10 F.4th 937, 944 (9th Cir. 2021) (citing *Abbott Labs.*
25 *v. Gardner*, 387 U.S. 136, 149 (1967)). First, the issues are fit for review "because further

26 _____
[46] The third pre-enforcement factor in *Thomas*—the history of past enforcement—is also
27 inapplicable where, as here, the statutes at issue are new. *See Wolfson v. Brammer*, 616
F.3d 1045, 1060 (9th Cir. 2010).
[47] At least one county has already begun implementing certain provisions of the Voting
28 Laws. (Doc. 679-2, Ex. 8, 30(b)(6) Dep. of Cochise County Recorder ("Cochise Dep.") at
26:16–27:10, 28:12–19, 30:8–18, 80:5–81:24; *see also* Exs. 507–510.)

- 63 -

1   factual development would not 'significantly advance [the Court's] ability to deal with the

2   legal issues presented.'" *Salazar*, 638 F.3d at 1173 (quoting *Nat'l Park Hosp. Ass'n v.*

3   *Dep't of Interior*, 538 U.S. 803, 804 (2003)). Second, as the Court previously ruled,

4   "delaying review until after certain Plaintiffs have already been unlawfully removed from

5   Arizona's voting rolls and prevented from voting would make any review 'too late to

6   redress the injuries suffered by [Plaintiffs'] members.'" (Doc. 304, 02/16/2023 Order at 19

7   (quoting *Ass'n of Irritated Residents*, 10 F.4th at 944).)

8       **B.      Civil Rights Act**

9       Plaintiffs claim that the Birthplace Requirement and the Reason to Believe

10  Provision violate the Civil Rights Act.

11      **1.      Private Right Under the CRA**

12      Defendants argue that § 10101 does not confer a private right, and alternatively, that

13  non-U.S. Plaintiffs may not enforce § 10101 under § 1983. Section 10101 provides:

14      (2) No person acting under color of law shall—
15          (A) in determining whether an individual is qualified under State law
        or laws to vote in any election, apply any standard, practice, or procedure
16      different from the standards, practices, or procedures applied under such law
        or laws to other individuals within the same county, parish, or similar
17      political subdivision who have been found by State officials to be qualified
        to vote;
18          (B) deny the right of any individual to vote in any election because of
        an error or omission on any record or paper relating to any application,
19      registration, or other act requisite to voting, if such error or omission is not
        material in determining whether such individual is qualified under State law
20      to vote in such election[.]

21  52 U.S.C. § 10101(a)(2)(A)–(B). The statute does not expressly create a private right of

22  action but empowers the U.S. Attorney General to bring "a civil action or other proper

23  proceeding for preventive relief, including an application for a permanent or temporary

24  injunction, restraining order, or other order." § 10101(c). The Ninth Circuit has not decided

25  whether private citizens may enforce § 10101, though the Fifth and Eleventh Circuits have

26  found in the affirmative. *Vote.Org v. Callanen*, 89 F.4th 459, 473–76 (5th Cir. 2023)

27  (finding federal right under § 10101(a)(1) and (a)(2)(B)); *Schwier v. Cox*, 340 F.3d 1284,

28  1296 (11th Cir. 2003) (finding federal right under § 10101(a)(2)(B)); *see also Davis v.*

1    *Commonwealth Election Comm'n*, No.: 1-14-CV-00002, 2014 WL 2111065, at *9–10 (D.

2    N. Mar. I. May 20, 2014); *but see McKay v. Thompson*, 226 F.3d 752, 756 (6th Cir. 2000)

3    (finding no private right of action).

4         To enforce § 10101 under § 1983, non-U.S. Plaintiffs must show that Congress

5    intended to "'unambiguously confer[]' 'individual rights upon a class of beneficiaries' to

6    which [Plaintiffs] belong[]." *Health and Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S.

7    166, 183 (2023) (quoting *Gonzaga Univ. v. Doe*, 536 U.S. 273, 285–86 (2002)); *see also*

8    *Gonzaga Univ.*, 536 U.S. at 283–84 (applying implied right of action caselaw to analyze

9    whether a statute confers a private federal right enforceable under § 1983). "'[F]all[ing]

10   within the general zone of interest that the statute is intended to protect' is not enough."

11   *All. of Nonprofits for Ins., Risk Retention Grp. v. Kipper*, 712 F.3d 1316, 1326 (9th Cir.

12   2013) (second alteration in original) (quoting *Gonzaga Univ.*, 536 U.S. at 283). If a statute

13   confers a federal right, that right is "presumptively enforceable" under § 1983 because

14   "§ 1983 generally supplies a remedy for the vindication of rights secured by federal

15   statutes." *Gonzaga Univ.*, 536 U.S. at 284; *see* 42 U.S.C. § 1983 (providing remedy for the

16   deprivation of "rights, privileges, or immunities secured by the Constitution and laws" of

17   the United States).

18              **i.      Section 10101 Confers a Federal Private Right**

19        When determining whether a statute creates an enforceable federal right, the Court

20   "considers whether the statute: (1) is intended to benefit a class of individuals of which the

21   Plaintiff is a member; (2) sets forth a standard, clarifying the nature of the right, that makes

22   the right capable of enforcement by the judiciary; and (3) is mandatory, rather than

23   precatory in nature." *Crowley v. Nevada ex rel. Nev. Sec'y of State*, 678 F.3d 730, 735 (9th

24   Cir. 2012) (citing *Blessing v. Freestone*, 520 U.S. 329, 340–41 (1997)).

25        The Court agrees with the courts that have found a federal right under the

26   "Materiality Provision," under which "[n]o person acting under color of law shall . . . deny

27   *the right of any individual* to vote in any election." § 10101(a)(2)(B) (emphasis added);

28   *see, e.g.*, *Schwier*, 340 F.3d at 1296; *Davis*, 2014 WL 2111065, at *10. First, "[t]he subject

of the sentence is the person acting under color of state law, but the focus of the text is nonetheless the protection of each individual's right to vote." *Schwier*, 340 F.3d at 1296; *see also Talevski*, 599 U.S. at 185 ("[I]t would be strange to hold that a statutory provision fails to secure rights simply because it considers, alongside the rights bearers, the actors that might threaten those rights (and we have never so held)."); *Gonzaga Univ.*, 536 U.S. at 284 (explaining statutes "phrased 'with an unmistakable focus on the benefited class'" have been found to create private rights (quoting *Cannon v. Univ. of Chi.*, 441 U.S. 677, 691 (1979)) (emphasis omitted)). For example, *Gonzaga University* cited Title VI of the Civil Rights Act and Title IX of the Education Amendments as examples of clear rights-creating language, which provide that "[n]o person in the United States shall . . . be subjected to discrimination." 536 U.S. at 284 n.3 (quoting 42 U.S.C. § 2000d and 20 U.S.C. § 1681(a)). The Materiality Provision is similar. Second, the Materiality Provision specifically and unambiguously protects an individual's right to vote notwithstanding an immaterial error or omission on her voter registration, which courts are readily capable of enforcing. *See Schwier*, 340 F.3d at 12696–97. And lastly, the Materiality Provision is mandatory, rather than precatory: "[n]o person acting under color of law *shall* . . . *deny* the right of any individual to vote." § 10101(a)(2)(B) (emphasis added).

The Court is unaware of any case analyzing whether § 10101(a)(2)(A) also creates a federal right, under which "[n]o person acting under color of law shall . . . in determining whether any individual is qualified under State law or laws to vote" apply any standard or procedure different than those standards or procedures applied to individuals found qualified to vote ("Different Practices Provision"). Like the Materiality Provision, "[t]he subject of the sentence is the person acting under color of state law," but the Different Practices Provision does not contain similarly clear and "paradigmatic rights-creating language." *Schwier*, 340 F.3d at 1296; *Sanchez v. Johnson*, 416 F.3d 1051, 1058 (9th Cir. 2005) (citing *Gonzaga Univ.*, 536 U.S. at 287). However, the Ninth Circuit has instructed that a court "should not be limited to looking for those precise phrases" and may consider "other indicia so unambiguous that [it is] left without any doubt that Congress intended to

1    create an individual, enforceable right." *Ball v. Rodgers*, 492 F.3d 1094, 1106 (9th Cir.

2    2007) (quoting *Sanchez*, 416 F.3d at 1058).

3           Here, by use of the term "shall," the Different Practices Provision mandates that

4    Arizona officials refrain from applying differential standards or procedures to "any

5    individual." Section 10101(a)(2)(A) does not have an "'aggregate' focus" or "speak only

6    in terms of institutional policy and practice," but unambiguously benefits a specific class

7    of individuals. *See Gonzaga Univ.*, 536 U.S. at 288 (first quoting *Blessing*, 520 U.S. at

8    343). And "no gap exists" between the provision's proscribed conduct "and the persons

9    whose interests are at stake": any individual seeking to vote. *Colon-Marrero v. Valez*, 813

10   F.3d 1, 19 (1st Cir. 2016); *compare id.* (finding enforceable right under HAVA

11   § 303(a)(4)(A), because its "proscription—'no registrant may be removed' [from the voter

12   rolls]—directly and explicitly protects individual voters" (quoting 52 U.S.C.

13   § 21083(a)(4)(A))), *with Gonzaga Univ.*, 536 U.S. at 287–91 (finding no private right in

14   the Family Educations Rights and Privacy Act, because the provision's prohibition on

15   providing funds to any educational institution with a policy of releasing education records

16   without parental consent "is two steps removed from the interests of individual students

17   and parents"). Finally, forbidding state actors from applying any different "standard,

18   practice, or procedure" to determine if an individual is qualified to vote is "not so 'vague

19   and amorphous' that its enforcement would strain judicial competence." *Blessing*, 520 U.S.

20   at 340–41) (citation omitted). The Court finds that § 10101(a)(2)(A) creates a private right.

21          Defendants contend that non-U.S. Plaintiffs may not enforce § 10101 because the

22   statute is not intended to benefit organizations, which are unable to vote. A party generally

23   may assert only "his own legal rights and interests, and cannot rest his claim to relief on

24   the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). But

25   so long as the Court has subject matter jurisdiction, there may be circumstances in which

26   a plaintiff may rest its claim on the legal rights of another. *Id.* at 500–01. The Fifth Circuit

27   recently concluded that an organization with organizational standing could assert

28   individual voters' rights under the Materiality Provision. *Vote.Org*, 89 F.4th at 471–73.

Specifically, the organization Vote.org could assert § 10101 claims of voters because "Vote.org's position as a vendor and voting rights organization is sufficient to confer third-party standing." *Id.* at 472; *see also La Union del Pueblo Entero v. Abbott*, 618 F. Supp. 3d 388, 431–32 (W.D. Tex. 2022) ("*LUPE I*") (finding organizational plaintiffs could enforce § 10101); *Tex. Democratic Party v. Hughs*, 474 F. Supp. 3d 849, 858 (W.D. Tex. 2020) (holding that organizational plaintiffs could sue under § 1983 for violations of § 10101 because "[t]he same facts that establish organizational and associational standing . . . also demonstrate standing to sue for voting rights violations under [§ 10101]"), *rev'd and remanded on other grounds*, 860 F. App'x 874 (5th Cir. 2021). The Court concludes that non-U.S. Plaintiffs may similarly assert the rights of Arizona voters under the CRA.

### ii.    Plaintiffs May Enforce § 10101 Under § 1983

Because § 10101 creates a federal right, Plaintiffs may presumably enforce the provisions of § 10101 under § 1983. *Gonzaga Univ.*, 536 U.S. at 283–84. Defendants may rebut this presumption by showing that "Congress shut the door to private enforcement either expressly, through specific evidence from the statute itself, or impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983." *Id.* at 284 n.4 (citations and internal quotations omitted); *see Talevski*, 599 U.S. at 187. The text of § 10101 does not explicitly preclude a § 1983 remedy, so the question is whether Congress created a comprehensive enforcement mechanism incompatible with enforcement under § 1983. *Migliori v. Cohen*, 36 F.4th 153, 160–61 (3d Cir. 2022), *cert. granted, judgment vacated sub nom. Ritter v. Migliori*, 143 S. Ct. 297 (2022).[48] A remedy under § 1983 is foreclosed "when Congress creates a right by enacting a statute but at the same time limits enforcement of that right through a specific remedial scheme that is narrower than § 1983." *Stilwell v. City of Williams*, 831 F.3d 1234, 1244 (9th Cir. 2016).

---

[48] A vacated decision may still be considered for its persuasive effect. *See Orhorhaghe v. I.N.S.*, 38 F.3d 488, 493 n.4 (9th Cir. 1994) (citing as persuasive authority a decision vacated by the Supreme Court as moot); *In re Taffi*, 68 F.3d 306, 310 (9th Cir. 1995) (citing as persuasive authority a decision vacated by the Supreme Court on other grounds). Though the Supreme Court vacated *Milgori* as moot, this did not disrupt the Third Circuit's underlying analysis of § 10101.

Section 10101 does not include a comprehensive enforcement scheme incompatible with enforcement under § 1983. First, district courts have jurisdiction over "proceedings instituted pursuant to [§ 10101] and shall exercise the same without regard to whether the *party aggrieved* shall have exhausted any administrative or other remedies that may be provided by law." 52 U.S.C. § 10101(d) (emphasis added). *Schwier* explained that because private citizens sued to enforce § 10101 before Congress granted the Attorney General authority to initiate an action in 1957, "this language could not have applied to the Attorney General and thus was meant to remove roadblocks for the previously authorized private rights of action."[49] 340 F.3d at 1295–96 (cleaned up); *see also Migliori*, 36 F.4th at 160 (explaining that § 10101(d) "specifically contemplates an aggrieved party (i.e., private plaintiff) bringing this type of claim in court"); H.R. Rep. No. 85-291 (1957). And when Congress amended § 10101 authorizing the Attorney General to enforce the statute, it did so as a "means of *further securing* and protecting the civil rights of persons within the jurisdiction of the United States." H.R. Rep. No. 85-291, at 1966 (1957) (emphasis added). This "demonstrates an intense focus on protecting the right to vote and does not support the conclusion that Congress meant merely to substitute one form of protection for another."[50] *Schwier*, 340 F.3d at 1295 (citing H.R. Rep. No. 85-291).

In addition, § 10101 lacks the "panoply of enforcement options, including

---

[49] Though several district courts and the Sixth Circuit have found no federal right under § 10101, the *Schwier* Court noted that these decisions rely almost exclusively on *Good v. Roy*, which concluded, without elaboration, that the "unambiguous language" of § 10101 precluded the court from implying a private right of action because "subsection (c) provides for enforcement of the statute by the Attorney General with no mention of enforcement by private persons." *Schwier*, 340 F.3d at 1294 (quoting *Good*, 459 F. Supp. 403, 405–06 (D. Kan. 1978)); *see McKay*, 226 F.3d at 756 (citing *Willing v. Lake Orion Cmty. Schs. Bd. of Trs.*, 924 F. Supp. 815, 820 (E.D. Mich. 1996)); *Willing*, 924 F. Supp at 820 (citing *Good*, 459 F. Supp. at 405). Defendants cite to *Northeast Ohio Coalition for the Homeless v. Husted*, for further support, but there a panel of the Sixth Circuit only noted that *McKay* remained binding in the absence of any Sixth Circuit en banc or Supreme Court decision holding to the contrary. 837 F.3d 612, 630 (6th Cir. 2016).

[50] The Attorney General's potential enforcement of § 10101 in and of itself does not foreclose a private remedy. *See Schwier*, 340 F.3d at 1294–95 (citing *Allen v. State Bd. of Elections*, 393 U.S. 544, 556–57 (1969) (holding enforcement by the Attorney General did not preclude private citizens from enforcing section 12(f) of the VRA and noting that the goals of the VRA "could be severely hampered . . . if each citizen were required to depend solely on litigation instituted at the discretion of the Attorney General")); *Migliori*, 36 F.4th at 162 (noting that § 10101(d) does not *mandate* enforcement by the Attorney General).

noncompliance orders, civil suits, . . . criminal penalties," and "several" private enforcement options that are characteristic of statutory remedies found incompatible with § 1983. *Migliori*, 36 F.4th at 161 (quoting *Blessing*, 520 U.S. at 347). And though "any person of such race or color" may apply for "an order declaring him qualified to vote" if the court finds a "pattern or practice" of § 10101 violations, this entitlement to a judicial determination merely "complement[s], rather than supplant[s], § 1983." § 10101(e); *Isabel v. Reagan*, 394 F. Supp. 3d 966, 977 (D. Ariz. 2019) (quoting *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 122 (2005)) (finding plaintiff must sue directly under the NVRA instead of § 1983 because, among other things, the NVRA creates an express private right of action that requires a plaintiff to first give notice of a violation and explicitly allows only declaratory and injunctive relief, while § 1983 lacks any notice requirement and allows suits for damages). The Court finds that Defendants have failed to rebut the presumption of an enforceable right under § 1983. Non-US Plaintiffs may enforce the rights conferred by § 10101 pursuant to § 1983.

### 2.     H.B. 2492 § 4's Birthplace Requirement

Plaintiffs claim that the Birthplace Requirement violates the Materiality Provision of the Civil Rights Act. *See* § 10101(a)(2)(B). The Materiality Provision prohibits the State from denying an individual her right to vote "because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election." *Id.* The Materiality Provision was "intended to address the practice of requiring unnecessary information for voter registration with the intent that such requirements would increase the number of errors or omissions on the application forms, thus providing an excuse to disqualify potential voters." *Schwier*, 340 F.3d at 1294.

Defendants do not dispute that an applicant's failure to include her birthplace is an "error or omission on any record or paper relating to" a requisite to voting. *See* § 10101(a)(2)(B). And Arizona's refusal to register an individual who omits birthplace is a denial of that individual's right to vote. The question is whether an individual's failure to

provide birthplace is material to determining that individual's eligibility to vote. To vote in Arizona, a person must be a United States citizen, a resident of Arizona, and at least eighteen years of age, who has not been adjudicated incapacitated or convicted of a felony. Ariz. Const. art. VII, § 2; *see also* A.R.S. § 16-121. An individual's birthplace cannot be used to directly verify that individual's citizenship or place of residence. (*See, e.g.*, Connor Tr. 311:22–312:17; County Recorder Testimony Stip. No. 1.) Instead, Defendants claim that the Birthplace Requirement can be used to verify an individual's identity, which is an integral component of determining eligibility.

Materiality "signifies different degrees of importance in different legal contexts." *Fla. State Conf. of N.A.A.C.P.*, 522 F.3d at 1173. The Court previously determined that Congress intended materiality to require "some probability of actually impacting an election official's" determination of a person's eligibility to vote. (09/14/2023 Order at 26.) The erroneous or omitted information need not be essential to determining a person's eligibility to vote, but it must be more than useful or minimally relevant. (*See id.* at 25–26).

The Court concludes that an individual's birthplace is not material to determining her eligibility to vote. First, H.B. 2492 § 4 is not retroactive, meaning approximately one-third of current voter registrations will lack the voter's birthplace until that voter submits a new registration while an additional 200,000 registrations will continue to identify birthplace generally as the United States. That Arizona has determined these voters are qualified to vote notwithstanding the lack of any meaningful birthplace information strongly indicates birthplace is immaterial. Moreover, the Voting Laws do not mandate county recorders to verify an individual's birthplace or reject State Forms with an incorrect birthplace. *See* § 16-121.01(A); (Petty Tr. 103:21–104:5; Connor Tr. 316:3–6, 326:13–16.) "If the substance of the [birthplace field] does not matter, then it is hard to understand how one could claim that this requirement has any use in determining a voter's qualifications." *Migliori*, 36 F.4th at 164 (finding omitting the date on a ballot immaterial in part because "ballots were only to be set aside if the date was *missing*—not incorrect" (emphasis in

original)). And HAVA Checks do not use birthplace as matching criteria for AVID and MVD records to verify an applicant's identity for voter eligibility. (Petty Tr. 32:19–33:14, 103:2–7; *see generally* MVD Verification Criteria.)

Nor does the fact that Arizona can use birthplace for other administrative purposes render birthplace material in determining a voter's eligibility. Specifically, county recorders' use of birthplace as one of several security questions to verify the identity of a *registered voter* does not make birthplace material because that voter has already been identified and found eligible to vote. (*See, e.g.*, 2023 EPM at ECF-70 (including field for birthplace on ballot-by-mail request form,), ECF-229 (using birthplace to verify caller inquiring about status of provisional ballot).) "Once election officials have determined an applicant or voter's identity, additional requirements that confirm identity are not material to determining whether the applicant or voter is qualified to vote or vote by mail and compounds the chance for error and disenfranchisement." *La Union del Pueblo Entero v. Abbott*, 5:21-CV-0844-XR, 2023 WL 8263348, at *18 (W.D. Tex. Nov. 29, 2023) ("*LUPE II*"); *see Martin v. Crittenden*, 347 F. Supp. 3d 1302, 1309 (N.D. Ga. 2018) ("[W]ith respect to the absentee ballots rejected solely on a year of birth error or omission . . . the qualifications of the absentee voters are not at issue because . . . election officials have already confirmed such voters' eligibility through the absentee ballot application process."). And the evidence indicates that county recorders can nevertheless reliably verify the identity of registered voters without birthplace when necessary, especially considering the one-third of all voters who have never provided birthplace information when registering to vote. (*See, e.g.*, Petty Tr. 168:1–12 (explaining Maricopa County accepts registration deficiency notices without birthplace information); Hiser Tr. 2056:18–2057:10 (explaining birthplace alone is insufficient to verify a voter's identity via phone).)

The Court concludes that the Birthplace Requirement violates the Materiality Provision of the Civil Rights Act.

### 3.    H.B. 2243 § 2's Reason to Believe Provision

Plaintiffs claim that H.B. 2243's Reason to Believe Provision will cause county

recorders to apply different standards, practices, and procedures to voters who county recorders suspect lack U.S. citizenship than those standards, practices, and procedures applied to voters not suspected of lacking citizenship. *See* § 10101(a)(2)(A). Specifically, H.B. 2243 requires county recorders to search SAVE only for naturalized voters who county recorders suspect are not U.S. citizens. *See* § 16-165(I).

While the Voting Laws purport to confirm the citizenship status of all voters, because SAVE requires an immigration number, county recorders can only ever conduct SAVE checks on naturalized citizens who county recorders have "reason to believe" are non-citizens. Naturalized citizens will always be at risk of county recorders' subjective decision to further investigate these voters' citizenship status, whereas the Reason to Believe Provision will never apply to native-born citizens. This violates the Different Practices Provision. *C.f. U.S. Student Ass'n Found. v. Land*, 585 F. Supp. 2d 925, 949–50 (E.D. Mich. 2008) ("[The Different Practices Provision] simply requires that if Michigan wishes to impose unique procedural requirements on the basis of a registrant's original voter ID being returned as undeliverable, it must impose those requirements on *everyone* whose original ID is returned as undeliverable." (emphasis in original)); *Frazier v. Callicutt*, 383 F. Supp. 15, 18–19 (N.D. Miss. 1974) (finding violation of § 10101 where registrar summarily referred the registration of every Black student whose registration may have indicated lack of residency to the board of election commissioners for appeal but approved nearly all non-student registrations that similarly indicated lack of residency); *Shivelhood v. Davis*, 336 F. Supp. 1111, 1115 (D. Vmt. 1971) (explaining that "the Board of Civil Authority must use its best efforts to insure that any questionnaire [concerning domicile] is equally relevant to all applicants and not designed only to apply to student applicants" in order to comply with § 10101(a)(2)(A)); *see also Whatley v. Clark*, 482 F.2d 1230, 1232–33 (5th Cir. 1973) (finding equal protection violation where Texas law requiring residency was substantively the same for all voters but applied differently to students by creating a presumption of non-residency for students).

Arizona is entitled to investigate the citizenship status of registered voters to ensure

1   that only qualified individuals are registered to vote. Holding otherwise "would raise

2   serious constitutional doubts if [the Different Practices Provision] precluded a State from

3   obtaining the information necessary to enforce its voter qualifications." *ITCA*, 570 U.S. at

4   17. For example, County recorders must check SAVE and/or NAPHSIS for all voters

5   without DPOC, *i.e.*, Federal-Only Voters. § 16-165(I), (J). But because the application of

6   H.B. 2243's Reason to Believe Provision subjects *only* naturalized citizens to database

7   checks, this provision violates § 10101.

8           **C.    National Voter Registration Act**

9                   **1.    Sections 6 and 7 of the NVRA**

10                          **i.    H.B. 2492 § 5's DPOR Requirement**

11          The Court previously ruled that section 6 of the NVRA preempts H.B. 2492 § 5's

12   requirement that Federal Form users submit DPOR to register for federal elections. (*See*

13   09/14/2023 Order at 9.) Plaintiffs claim that the DPOR Requirement violates section 6 of

14   the NVRA to the extent that Arizona must accept Federal Forms lacking DPOR under the

15   Court's summary judgment ruling but will continue to reject State Forms lacking DPOR

16   and refuse to register otherwise eligible voters for federal elections.

17          Section 6 of the NVRA permits Arizona to register eligible voters for federal

18   elections with a State Form that "meets all of the criteria stated in" section 9 of the NVRA.

19   52 U.S.C. 20505(a)(2). Specifically, as stated in section 9 of the NVRA, the State Form

20   "may require only such identifying information . . . and other information . . . as is

21   necessary to enable the appropriate State election official to assess the eligibility of the

22   applicant and to administer voter registration and other parts of the election process." *Id.*

23   § 20508(b)(1). Though the State Form "may require information the Federal Form does

24   not," Arizona must abide by section 6 and section 9 and show that the information required

25   on the State Form is "necessary" to determine the eligibility of the applicant.[51] *ITCA*, 570

26   ───────────────

27   [51] In *Fish v. Kobach* ("*Fish I*"), the Tenth Circuit analyzed the necessity of information
     under section 5 of the NVRA, which requires states to include a voter registration as part
     of the application process for state driver's licenses and identifications. 840 F.3d 710, 733–
28   39 (10th Cir. 2016). This registration "may require only the *minimum amount of*

1   U.S. at 12, 18; §§ 20505(a)(2), 20508(b).

2        Defendants failed to do so. In fact, the Voting Laws indicate otherwise, as voters

3   who obtain an out-of-state license or identification and receive a notice from the county

4   recorder requesting confirmation of residency must only attest under penalty of perjury that

5   the voter is still a resident of Arizona. § 16-165(E). The Court cannot reconcile why DPOR

6   would be *necessary* for new applicants when an attestation is *sufficient* to determine the

7   eligibility of registered voters who subsequently obtain an out-of-state identification.

8   Section 6 of the NVRA preempts the DPOR Requirement as to State Form users for federal

9   elections.

10       Plaintiffs also claim that Arizona's differential treatment of State Form and Federal

11  Form applications lacking DPOR violates section 7 of the NVRA, which requires public

12  assistance agencies to distribute the Federal Form or an "equivalent" form. 52 U.S.C.

13  § 20506(a)(6) (citing § 20508(a)(2)); *Id.* § 20506(a)(2). The Secretary of State supplies

14  public assistance agencies with the State Form to register individuals. The "plain meaning

15  of a statute controls where that meaning is unambiguous." *Khatib v. County of Orange*,

16  639 F.3d 898, 902 (9th Cir. 2011) (en banc). Section 7 is clear: if the Secretary of State

17  supplies the State Form to public assistance agencies, the State Form must be "equivalent,"

18  or "virtually identical" to the Federal Form. Black's Law Dictionary (11th ed. 2019)

19  (defining equivalent as "equal in value, force, amount, effect, or significance," or "virtually

20  identical").

21       Moreover, the Court does "not look at individual subsections in isolation" but reads

22  "words in their context and with a view to their place in the overall statutory scheme."

23  *Tovar v. Sessions*, 882 F.3d 895, 901 (9th Cir. 2018); *id.* (quoting *King v. Burwell*, 576

24  U.S. 473, 486 (2015)). As discussed above, states may develop "a *mail voter registration*

25  _____

26  information necessary" to determine the applicant's eligibility. 52 U.S.C. § 20504(c)
    (emphasis added). The *Fish I* Court held "that section 5's 'only the minimum amount of

27  information necessary' is a stricter principle than section 9's 'such identifying information
    . . . as is necessary'" and that the information enumerated in section 5 is the "presumptive

28  minimum" a state may require. 840 F.3d at 734. Assuming section 9 is an easier standard
    than section 5, the Court concludes that Defendants must still show the information on the
    State Form is necessary.

1    *form* that meets all of the criteria stated in section [9]" which allows states to include

2    information necessary to determining voter eligibility that may not otherwise be on the

3    Federal Form. §§ 20505(a)(2) (emphasis added), 20508(b)(1). By its terms, section 7 does

4    not afford states this same discretion regarding forms made available at public assistance

5    agencies. § 20506(a)(6). This is buttressed by the fact that Congress required public

6    assistance agencies to provide voter registration services specifically in an effort to target

7    the registration of persons with disabilities and low-income individuals who are more likely

8    to receive public assistance. H.R. Rep. No. 103-66, 19 (1993) (Conf. Rep.). Requiring

9    public assistance agencies to use an "equivalent" to the Federal Form "guarantees that a

10   simple means of registering to vote in federal elections will be available" for these

11   individuals. *ITCA*, 570 U.S. at 12. Because the Voting Laws require a State Form to include

12   DPOR, the State Form is not "equivalent" to the Federal Form. Arizona may not reject

13   State Forms lacking DPOR and must register these applicants as Federal-Only Voters.

14                **ii.    H.B. 2243 § 2's List Maintenance Procedures and**

15                          **Cancellation Provision**

16        Section 6 of the NVRA also mandates that states "accept and use" the Federal Form

17   "for the registration of voters" for federal elections. § 20505(a). The Federal Form requires

18   that applicants attest under penalty of perjury that they are eligible to vote, which includes

19   being a U.S. citizen. (*See* Federal Form.) The Court previously ruled that section 6

20   preempts H.B. 2492 § 5, which requires Federal Form users to provide DPOC to vote in

21   presidential elections and vote by mail. (09/14/2023 Order at 9–14.) Plaintiffs claim that

22   section 6's "accept and use" mandate also preempts H.B. 2243 § 2. Specifically, the

23   Secretary of State and county recorders must conduct monthly database checks to verify

24   the citizenship of voters who do not provide DPOC, namely, Federal-Only Voters. *See*

25   § 16-165(I), (J). If the country recorder "confirms" that the voter is a non-citizen, the voter

26   must then provide DPOC to avoid having her voter registration cancelled. § 16-165(A)(10).

27   Plaintiffs claim that Arizona is not "using" the Federal Form because this regime requires

28   county recorders to investigate and confirm a Federal-Only Voter's citizenship status with

1   information not contained on the Federal Form.

2         H.B. 2243 § 2 does not violate section 6 of the NVRA. *ITCA* held that section 6's

3   "accept and use" mandate preempted Arizona's DPOC requirement for Federal Form users.

4   570 U.S. at 4, 15. The Supreme Court rejected Arizona's argument that section 6 only

5   required Arizona to "receive the [Federal Form] willingly and use it *somehow* in its voter

6   registration process." *Id.* at 9–10 (emphasis in original). "[T]he Federal Form provides a

7   backstop: No matter what procedural hurdles a State's own form imposes, the Federal Form

8   guarantees that a simple means of registering to vote in federal elections will be available."

9   *Id.* at 12. But the Supreme Court noted that "while the NVRA forbids States to demand

10  that *an applicant submit additional information* beyond that required by the Federal Form,

11  it does not preclude States from 'deny[ing] registration based on information in their

12  possession establishing the applicant's ineligibility.'" *Id.* at 15 (emphasis added) (quoting

13  § 20508(b)(1), which allows the Federal Form to include only that information "necessary

14  to . . . assess the eligibility of the applicant").

15        Arizona must accept the Federal Form as prima facie proof of an applicant's

16  eligibility to vote but the NVRA does not preclude Arizona from independently

17  determining that an applicant or voter is ineligible. The monthly database checks require

18  county recorders to consult information available to Arizona; applicants do not submit any

19  "additional information." *Id.*; *see* § 16-165(I), (J). And a county recorder may cancel a

20  registration only if the county recorder "confirms" from that information that the voter is

21  not a citizen. § 16-165(A)(10). This is not "'inconsistent with' the NVRA's mandate that

22  States 'accept and use' the Federal Form." *ITCA*, 570 U.S. at 15 (citation omitted); *see id.*

23  ("The NVRA clearly contemplates that not every submitted Federal Form will result in

24  registration.").

25        Nor do the investigation and additional DPOC requirements "create[] an

26  unacceptable obstacle to the accomplishment and execution of the full purpose and

27  objectives of Congress." *Chamber of Com. v. Bonta*, 62 F.4th 473, 482 (9th Cir. 2023)

28  (citation and internal quotations omitted) (describing conflict preemption). "What is a

1   sufficient obstacle is a matter of judgment, to be informed by examining the federal statute

2   as a whole and identifying its purpose and intended effects. . . ." *Crosby v. Nat'l Foreign*

3   *Trade Council*, 530 U.S. 363, 373 (2000). One of the NVRA's purposes is to "enhance[]

4   the participation of *eligible citizens* as voters in elections for Federal office." 52 U.S.C.

5   § 20501(b)(2) (emphasis added); *see id.* § 20507(a)(1) (states must "ensure that any

6   *eligible* applicant is registered to vote" (emphasis added)). Arizona is entitled to cancel the

7   registrations of ineligible voters "based on information in [its] possession establishing the

8   applicant's ineligibility"; it need not take a voter at her word. *ITCA*, 570 U.S. at 15.

9          Were the Court to embrace Plaintiffs' theory that section 6 prohibited a county

10  recorder from requesting information not contained on the Federal Form after confirming

11  non-citizenship, Arizona seems left with no apparent means to request proof of eligibility

12  before cancelling a registration. The Court is unaware of any caselaw interpreting the

13  NVRA in this manner and, considering *ITCA*, declines to do so here. Section 6 does not

14  preempt H.B. 2243's mandate that a voter submit DPOC to avoid cancellation after the

15  county recorder confirms the voter's non-citizenship.

16                    **2.      Section 8 of the NVRA**

17         Plaintiffs claim that the Voting Laws' post-registration citizenship investigation

18  provisions violate section 8(b) of the NVRA. Specifically, under H.B. 2492 § 7's Attorney

19  General Referral Provision, the Secretary of State and county recorders "shall" provide the

20  Attorney General with the names of registered voters who have not provided DPOC, who

21  must then investigate these registered voters by, "at a minimum," consulting the MVD,

22  SSA, SAVE, and NAPHSIS databases. § 16-143. Similarly, H.B. 2243's List Maintenance

23  Procedures direct county recorders to investigate the citizenship status of registered voters

24  with a foreign-type license, voters lacking DPOC, and voters who county recorders have

25  "reason to believe" are non-citizens. § 16-165(G)–(J). County recorders must then cancel

26  the registrations of confirmed non-citizens. § 16-165(A)(10), (K). Section 8(b) of the

27  NVRA, in relevant part, provides that "[a]ny State program or activity to protect the

28  integrity of the electoral process by ensuring the maintenance of an accurate and current

voter registration roll for elections for Federal office . . . shall be uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965" ("Uniformity Provision"). 52 U.S.C. § 20507(b)(1). Plaintiffs claim that the Voting Laws are non-uniform and discriminatory specifically as applied to naturalized citizens and voters who do not provide DPOC.

### i.    H.B. 2243 § 2's Reason to Believe Provision

For the same reasons that H.B. 2243's Reason to Believe Provision violates the Civil Rights Act, discussed above, the Court concludes that this provision violates section 8(b) of the NVRA. Only naturalized citizens would be subject to scrutiny under the Reason to Believe Provision, who if "confirmed" as non-citizens, would be required to provide DPOC. This would have a non-uniform and discriminatory impact on naturalized citizens. *See United States v. Florida*, 870 F. Supp. 2d 1346, 1350–51 (N.D. Fla. 2012) (finding secretary of state's list maintenance program "probably ran afoul" of section 8 because its "methodology made it likely that the properly registered citizens who would be required to respond and provide documentation would be primarily newly naturalized citizens. The program was likely to have a discriminatory impact on these new citizens.").

### ii.   H.B. 2243 § 2's List Maintenance Procedures and H.B. 2492 § 7's Attorney General Referral Provision

Plaintiffs claim that H.B. 2492 § 7 and H.B. 2243 § 2 violate section 8(b) of the NVRA by requiring county recorders to investigate the citizenship status of select groups of voters, specifically, registered voters without DPOC and naturalized citizens. In *Husted v. A. Philip Randolph Institute*, the Supreme Court reviewed a challenge to Ohio's list maintenance procedures to remove voters who became ineligible due to a change in residence. 584 U.S. 756, 764–66 (2018). Specifically, Ohio would send voters who had not voted for two years a notice requesting verification of the voter's address and remove voters who failed to respond to the notice. *Id.* at 765–66. The plaintiffs claimed that this procedure was unlawful under the NVRA in part because Ohio sent notices "without having any 'reliable indicator' that the addressee ha[d] moved." *Id.* at 776. In rejecting this

argument, the Supreme Court explained in part that "[s]o long as the trigger for sending such notices is 'uniform, nondiscriminatory, and in compliance with the Voting Rights Act,' § 20507(b)(1), States can use whatever plan they think best." *Id.* at 776–77.

Like in *Randolph Institute*,[52] H.B. 2243 § 2 does not violate section 8 of the NVRA because the "trigger" for county recorders to investigate the citizenship status of applicants is uniform and nondiscriminatory: the voter has not submitted DPOC proving her citizenship. The same is true for H.B. 2492 § 7's mandate that county recorders provide the Attorney General with the names of registered voters lacking DPOC. These provisions necessarily require that county recorders first review the registration files of *all* registered voters before further investigating those individuals who have not submitted DPOC.[53] *C.f. Florida*, 870 F. Supp. 2d at 1350–51. Regardless of whether Arizona "overestimated the correlation between" not submitting DPOC and non-citizenship, the NVRA does not prohibit the State from using this methodology to ensure that only eligible individuals are registered to vote. *Randolph Institute*, 584 U.S. at 776; 52 U.S.C. § 20507(a)(1). In addition, no party presented evidence of a comprehensive database of all U.S. citizens, and it is not unreasonable for the Voting Laws to mandate consulting multiple sources that may contain citizenship information. Specifically, voters who have not submitted DPOC will be subject to MVD, NAPHSIS, *and* SAVE checks, if practicable.[54] A.R.S. §§ 16-143,

---

[52] While Plaintiffs in *Randolph Institute* did not assert a claim under § 20507(b)(1), the majority noted that the dissent had not identified any evidence that Ohio's program was tarnished by discriminatory intent. 584 U.S. at 779.

[53] Plaintiffs claim that H.B. 2492 § 7 and H.B. 2243 § 2 confer county recorders with discretion to arbitrarily implement these provisions. But the Voting Laws unequivocally *mandate* that county recorders investigate or refer to the Attorney General for investigation all voters lacking DPOC. Additionally, the Voting Laws prescribe the frequency with which county recorders and the Secretary of State must conduct citizenship checks. A.R.S. 16-165(G) (requiring Secretary of State to conduct monthly MVD database comparisons), (I)–(J) (requiring county recorders to conduct monthly checks); *c.f. Common Cause Ind. v. Lawson*, 327 F. Supp. 3d 1139, 1153 (S.D. Indiana 2018) (concluding that the implementation of a voting law was likely to be non-uniform based on evidence that co-directors of the secretary of state's election division "provid[ed] *differing guidance* to county officials on how to determine whether a particular registered voter is a duplicate registered voter in a different state" (emphasis added)), *aff'd on other grounds*, 937 F.3d 944.

[54] SAVE checks are *not* practicable because SAVE requires an immigration number, meaning neither the Attorney General nor county recorders can conduct these checks on

165(I), (J); *c.f. Project Vote v. Blackwell*, 455 F. Supp. 2d 694, 703 (N.D. Ohio 2006) (concluding Ohio's law that required only compensated voter registration workers to pre-register with the Secretary of State and undergo "online-only" training applied to only "a selected class of persons" because, among other things, "they [did] not apply to everyone involved in the process").

Plaintiffs further claim that H.B. 2492 § 7 and H.B. 2243 § 2 violate section 8 because the additional List Maintenance Procedures and Cancellation Provision will discriminatorily impact naturalized voters due to stale citizenship information in SAVE and the MVD database. *See* A.R.S. §§ 16-143(B)(3), 16-165(I). Assuming it were somehow practicable for county recorders or the Attorney General to conduct SAVE checks on Federal-Only Voters (notwithstanding the current limitations of the SAVE MOA and the lack of immigration numbers for these voters), plaintiffs adduced no evidence that SAVE is so unreliable as to erroneously flag naturalized citizens as non-citizens each month. SAVE typically returns an individual's naturalization status within 24 hours of naturalization, except for the occasional one or two-day delay. (*See* USCIS Dep. 39:20–41:19.) Even if SAVE may periodically return stale citizenship information, Plaintiffs have not shown that naturalized citizens will be disproportionality required to submit additional DPOC compared to other voters. Section 8 of the NVRA does not preempt the Voting Laws' SAVE checks.

Nor does the NVRA preempt the Voting Laws' MVD checks. The Attorney General must review the citizenship information of Federal-Only Voters in the MVD database. § 16-143(B)(1). In addition, the Secretary of State must notify county recorders of all registered voters who are "not a United States citizen according to the [MVD] database." (2023 EPM at ECF-54); § 16-165(G). Under the Voting Laws, the only voters who may be flagged as non-citizens in the MVD database are naturalized citizens who still possess a foreign-type credential after naturalization. (2023 EPM at ECF-54; Jorgensen Tr. 560:2–

---

any Federal-Only Voters who have not provided any form of DPOC. A.R.S. § 16-143(A) (citing § 16-166); (*see* 2023 EPM at 26–27; Petty Tr. 57:15–58:1 (explaining most voters do not provide an immigration number).) For this reason, there will be no non-uniform use of SAVE on naturalized, Federal-Only Voters.

14; *see* Pls.' Stip. No. 93.)

In *United States v. Florida*, the secretary of state compiled a list of voters that included any person who obtained a state license as a non-citizen, became a naturalized citizen, and registered to vote, but had not renewed their driver's license and had not updated motor vehicle records to reflect their new citizenship status. 870 F. Supp. 2d at 1347–48. The district court found that this methodology "probably" violated section 8 because "the Secretary's program identified many properly registered citizens as potential noncitizens" and discriminatorily burdened naturalized citizens with proving citizenship. *Id.* at 1350. Citing *Florida*, the court in *Texas League of United Latin American Citizens v. Whitley* ("*Texas LULAC*"), came to a similar conclusion regarding the Texas Secretary of State's "proactive process using tens of thousands of Department of Public Safety driver license records matched with voter registration records." No. SA-19-CA-074-FB, 2019 WL 7938511, at *1 (W.D. Tex. Feb. 27, 2019). There, the court found that the Secretary's program imposed a burden on "perfectly legal naturalized Americans" while "[n]o native born Americans were subjected to such treatment." *Id.* Unlike in *Florida* and *Texas LULAC*, however, Arizona requires that *all voters* submit DPOC or be subject to additional citizenship investigation procedures. §§ 16-121.01(D)–(E), 16-165(G).

Moreover, for naturalized citizens that provide DPOC when registering to vote (Full-Ballot Voters), MVD's records of non-citizenship will not materially affect these voters' registration status. The 2023 EPM explicitly directs county recorders to "confirm" reports of non-citizenship from the Secretary of State, which includes "deterimin[ing] whether the voter has previously provided DPOC." (2023 EPM at ECF-57; *see id.* at ECF-27 n.10 (warning county recorders that MVD records may return outdated citizenship information for naturalized citizens registering to vote); Morales Tr. 613:25–614:3 (explaining the process of overriding a voter's non-citizenship status in AVID when the voter has provided proof of naturalization as DPOC but MVD indicates non-citizenship).) Aside from Dr. McDonald's "loop" theory, which the Court found unpersuasive, Plaintiffs have not adduced evidence that county recorders would ignore a voter's DPOC on file and

1    burden naturalized citizens with requiring new proof of citizenship. (*See* McDonald Tr.
2    1071:24–1072:5.) And for those who have not provided DPOC (the 65 Federal-Only
3    Voters with a foreign-type credential), the Court concluded *supra* Section II(C)(2) that
4    Arizona may lawfully request proof of citizenship when it obtains and confirms
5    information in its possession that a Federal-Only Voter is a non-citizen. (*See* 2023 EPM at
6    ECF-57 ("If a person has not previously provided DPOC, confirmation also includes
7    reviewing relevant government databases . . . to the extent practicable" and may include
8    "direct communication with the registrant.")); *ITCA*, 570 U.S. at 17 ("[I]t would raise
9    serious constitutional doubts if a federal statute precluded a State from obtaining the
10   information necessary to enforce its voter qualifications.").

11          Except for the Reason to Believe Provision, section 8 of the NVRA does not
12   preempt H.B. 2492 § 7 nor H.B. 2243 § 2.

13          **D.      Section 2 of the Voting Rights Act**

14          Under section 2 of the VRA, States are prohibited from imposing any law, practice,
15   or procedure "which results in a denial or abridgement of the right of any citizen of the
16   United States to vote on account of race or color" or language-minority status. 52 U.S.C.
17   §§ 10301(a), 10303(f)(2). A law violates section 2 if:

18          [B]ased on the totality of circumstances, it is shown that the political
            processes leading to nomination or election in the State or political
19          subdivision are not equally open to participation by members [protected by
            section 2] in that its members have less opportunity than other members of
20          the electorate to participate in the political process and to elect
            representatives of their choice.
21

22   *Id.* § 10301(b). "The essence of a § 2 claim . . . is that a certain electoral law, practice, or
23   structure interacts with social and historical conditions to cause an inequality in the
24   opportunities of minority and non-minority voters to elect their preferred representatives."
25   *Brnovich v. Democratic Nat'l Comm.* ("*DNC*"), 141 S. Ct. 2321, 2333 (2021) (cleaned up);
26   *see also Smith v. Salt River Project Agr. Imp. & Power Dist.*, 109 F.3d 586, 594 (9th Cir.
27   1997) ("Section 2 requires proof only of a discriminatory result, not of discriminatory
28   intent.").

1    The Supreme Court has enumerated a non-exhaustive set of "guideposts" for courts
2    to consider: (1) "the size of the burden imposed by the challenged voting rule"; (2) "the
3    degree to which a voting rule departs from what was standard practice when § 2 was
4    amended in 1982"; (3) "[t]he size of any disparities in a rule's impact on members of
5    different racial or ethnic groups"; (4) "the opportunities provided by a State's entire system
6    of voting"; and (5) "the strength of the state interests served by [the] challenged voting
7    rule." *DNC*, 141 S. Ct. at 2338–39. Courts may also consult the "Senate" factors identified
8    in *Thornburg v. Gingles*, 478 U.S. 30 (1986), though "their relevance is much less direct"
9    when applied outside the vote-dilution context. *DNC*, 141 S. Ct. at 2340.

10   Plaintiffs claim that H.B. 2492 §§ 4 and 7, and H.B. 2243 § 2 violate section 2 of
11   the VRA.

### 1.    Size of the Burden

13   Most of the Voting Laws' challenged provisions impose a de minimis burden on
14   voters. The Citizenship Verification Procedures, Attorney General Referral Provision, and
15   List Maintenance Procedures' database checks impose obligations related to election
16   administration on county recorders and the Attorney General to confirm the eligibility of
17   applicants and registered voters. *See DNC*, 141 S. Ct. at 2338 (focusing on the "effort and
18   compliance" required by voters to determine whether a burden exists); § 16-121.01(D)
19   (verifying citizenship of applicants without DPOC); § 16-143 (investigating citizenship of
20   Federal-Only Voters); § 16-165(G)–(K) (investigating citizenship of registered voters).
21   But assuming that the psychological impacts of being referred to the Attorney General for
22   investigation is a burden on voting, Plaintiffs did introduce evidence that Latino and
23   AANHPI voters, particularly those from mixed-status households, may fear exposing their
24   families to increased government oversight.

25   Only if a county recorder establishes that an applicant or registered voter is a non-
26   citizen must that voter then provide DPOC. §§ 16-121.01(E), 16-165(A)(10); (2023 EPM
27   at ECF-27.) For these voters, the Voting Laws' DPOC Requirements may impose a modest
28   burden on a subset of socioeconomically disadvantaged voters because of the potential

monetary and temporal costs associated with obtaining DPOC. Moreover, the money and time necessary to obtain a birth certificate for native-born citizens pales in comparison to the cost of obtaining a naturalization certificate. *C.f. Crawford v. Marion Cnty. Election Bd.* ("*Crawford II*"), 553 U.S. 181, 198–99 (2008) (plurality opinion) (finding that the evidence "indicate[d] that a somewhat heavier burden may be placed on a limited number of persons . . . who because of economic or other personal limitations may find it difficult either to secure a copy of their birth certificate or to assemble the other required documentation to obtain a state-issued identification"); § 16-165(A)(10) (affording 35 days to provide DPOC before registration is cancelled); (*but see* 2023 EPM at ECF-22, -24 (allowing new registrants until the Thursday before election day to supply DPOC to be registered to vote).)

Arizona's election laws mitigate this burden by allowing voters to provide numerous forms of DPOC, ranging from physical documents to writing an identification number on the registration form, which has worked for 99.5% of Arizona's registered voters. *See* § 16-166. And Plaintiffs were unable to provide evidence quantifying the number of Arizonans qualified to vote that may be unable to provide *any* form of DPOC or that have been or will be deterred from registering to vote because of Arizona's DPOC Requirements. Considering the discrete burden on particularly disadvantaged voters who do not possess DPOC however, the Court finds that this guidepost weighs slightly in favor of finding a section 2 violation.

### 2.      Alternative Means of Registering

"[W]here a State provides multiple ways to vote, any burden imposed on voters who choose one of the available options cannot be evaluated without also taking into account the other available means." *DNC*, 141 S. Ct. at 2339. Practically speaking, the Voting Laws do not afford Arizonans "multiple ways" to register to vote. Individuals must provide DPOC when registering to vote or subject themselves to citizenship verification procedures that may later necessitate proof of citizenship. Specifically, while an applicants can register as Federal-Only Voters without DPOC, the Voting Laws' Citizenship Verification and List

1    Maintenance Procedures may eventually require these voters to submit DPOC to remain

2    registered. This guidepost weighs in favor of finding a section 2 violation. *C.f. DNC*, 141

3    S. Ct. at 2344 (citing the various methods Arizona allows voters to vote as mitigating

4    evidence regarding the State's mandate that voters vote in their assigned precinct on

5    election day).

6                    **3.      Disparate Impact**

7          As discussed *supra* Section I(A)(1), Arizona currently lacks DPOC for less than half

8    a percent of its voters. Approximately one-third of a percent of Arizona's White voters are

9    Federal-Only Voters, and a little more than two-thirds of a percent of minority voters are

10   Federal-Only Voters. (*See* Ex. 338.) In *DNC*, the district court had found that

11   approximately one percent of minority voters had cast ballots in the wrong precinct, while

12   a half a percent of White voters did so. *DNC*, 141 S. Ct. at 2345. The Supreme Court

13   rejected the Ninth Circuit's interpretation of these statistics that "minority voters in Arizona

14   cast [out-of-precinct] ballots at twice the rate of White voters," and instead concluded that

15   "[p]roperly understood, the statistics show only a small disparity that provides little support

16   for" finding a disparate impact. *Id.* (first alteration in original). "A policy that appears to

17   work for 98% or more of voters to whom it applies—minority and non-minority alike—is

18   unlikely to render a system unequally open." *Id.* at 2344–45 (concluding the policy's racial

19   disparity was "small in absolute terms"); *see also Fair Fight Action*, 634 F. Supp. 3d at

20   1244 (finding no disparate impact where citizenship checks affected "less than one percent

21   of any minority group"). As in *DNC*, any disparate impact regarding the Voting Laws'

22   Citizenship Verification Procedures and List Maintenance Procedures is markedly small.[55]

23         More precisely for naturalized citizens,[56] 65 Federal-Only Voters, or *one-third of a*

24   *percent* of the 19,439 Federal-Only Voters, possess a foreign-type credential. (MVD Non-

[55] Relatedly, for voters who are called upon to furnish DPOC pursuant to the Voting Laws,
economically disadvantaged voters might encounter more financial challenges when
obtaining DPOC. But the cost of obtaining DPOC alone is insufficient for the Court to
measure how the Voting Laws' DPOC Requirements will disproportionately impact
minority groups without first assuming that these voters in fact lack all forms of DPOC.
[56] As discussed above, these voters will not be subject to recurring SAVE checks and risk
being erroneously flagged as a non-citizen unless they have previously provided county
recorders with an immigration number.

Citizen Records.) The Voting Laws' MVD checks will flag these voters as non-citizens, thereby triggering additional investigation by county recorders or the Attorney General and possibly requiring DPOC, while all other Federal-Only Voters will not be subject to these procedures.[57] §§ 16-143(B)(1), 16-165(A)(10), (G). But given the very few circumstances that a voter will be called upon to provide DPOC, the Voting Laws' impact on naturalized citizens who may not possess DPOC is negligible and weighs against finding a section 2 violation.

### 3.    Laws and Practices in 1982

United States citizenship has always been a qualification to vote in Arizona. *See* Ariz. Const. art. VII, § 2. While the State Form has included "[a] statement that the registrant is a citizen of the United States" since 1980, no laws analogous to the Voting Laws' DPOC Requirements existed in Arizona in 1982. *See* 1979 Ariz. Sess. Laws ch. 209, § 3 (adopting A.R.S. § 16-152 to require contents of the State Form). Nevertheless, Arizona has already required DPOC for two decades, and the Voting Laws' additional citizenship verification procedures reinforce the State's longstanding limitation of the right to vote to citizens. *See Fair Fight Action*, 634 F. Supp. 3d at 1243 ("The use of a birth certificate as a means of establishing identification—and citizenship—speaks to the State's policy of trying to enforce the citizenship requirement prior to 1982."). This weighs against finding a section 2 violation.

### 4.    State Interests

Arizona has a legitimate interest in preventing voter fraud and ensuring that only eligible Arizonans are registered to vote. *See DNC*, 141 S. Ct. at 2340 ("One strong and entirely legitimate state interest is the prevention of fraud."); *Crawford II*, 553 U.S. at 196 ("There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters."). "Section 2 does not require a State to show that its chosen policy is absolutely necessary or that a less restrictive means would not adequately

---

[57] On the opposite end of the scale, Dr. Richman identified 112 Federal-Only Voters for whom MVD has DPOC on record and would be eligible to vote as a Full-Ballot Voter. It is unclear, however, whether these voters are naturalized or native-born citizens.

serve the State's objectives." *DNC*, 141 S. Ct. at 2345–46. Consulting government databases that may contain information about a voter's citizenship status, and subsequently requiring DPOC when a voter's citizenship is seriously in question, serves this interest. *Fair Fight Action*, 634 F. Supp. 3d at 1245 (finding state's interest in preventing voter fraud served by the state's "citizenship flag" that is triggered "when there is affirmative evidence that someone who registered has a noncitizen driver's license"). And while voter fraud in Arizona is incredibly rare, the State "may take action to prevent election fraud without waiting for it to occur and be detected within its own borders." *DNC*, 141 S. Ct. at 2348 (finding Arizona's justification for third-party ballot-collection restrictions legitimate despite "no evidence that fraud in connection with early ballots had occurred in Arizona"). This weighs against finding a section 2 violation.

### 5.    Senate Factors

The Supreme Court in *DNC* noted that beyond the Senate factors' original purpose in vote-dilution cases, their "only relevance . . . is to show that minority group members suffered discrimination in the past (factor one) and that effects of that discrimination persist (factor five)." 141 S. Ct. at 2340 (citing *Gingles*, 478 U.S. at 36–37).

Plaintiffs' experts established that Arizona has a long history of race-based discrimination against Latino, AANHPI, and Native American individuals. Animus permeated Arizona's legal system, from banning interracial marriage and precluding immigrants from owning land, to mandating that classrooms and political subdivisions act only in English. Specific to voting, Arizona imposed literacy tests for 60 years and conducted regular voter purging practices. And Arizona was subject to the VRA's preclearance requirement until the Supreme Court's ruling in *Shelby County*. The effects of these discriminatory practices continue to linger, particularly as it relates to educational and economic outcomes for people of color. (*See generally* ACS Household Income; ACS Poverty Rates; ACS Educational Attainment.) However, considering the Voting Laws' limited to modest burdens, the small disparate impact on Federal-Only, minority and naturalized voters, and the state's interests, the Court concludes that the Voting Laws'

1   citizenship investigation and additional DPOC Requirements do not "result[] in a denial or

2   abridgment" of citizens' right to vote in Arizona. § 10301(a).

3        **E.**    ***Anderson/Burdick* Claims**

4        Plaintiffs claim that the Voting Laws impose an undue burden on the right to vote

5   in violation of the First and Fourteenth Amendments.[58] Plaintiffs also claim that the Voting

6   Laws burden voters' equal protection and procedural due process rights. The

7   *Anderson/Burdick* framework applies to these claims. *See Ariz. Democratic Party v.*

8   *Hobbs*, 18 F.4th 1179, 1194–95 (9th Cir. 2021) ("*ADP III*") (holding that due process

9   challenges to election laws should be evaluated under the *Anderson/Burdick* framework);

10  *Dudum v. Arntz*, 640 F.3d 1098, 1106 n.15 (9th Cir. 1011) (explaining that the Supreme

11  Court has analyzed due process and equal protection claims under the same framework).

12  Courts evaluate the validity of an election law by balancing the burden the law places on

13  the fundamental right to vote against the state interests served by the law. *See Anderson v.*

14  *Celebrezze*, 460 U.S. 780, 789 (1983). The Court must "consider the character and

15  magnitude of the asserted injury to the rights protected by the First and Fourteenth

16  Amendments that the plaintiff seeks to vindicate"; "identify and evaluate the precise

17  interests put forward by the [s]tate as justifications for the burden imposed by its rule"; 

18  "determine the legitimacy and strength of each of those interests"; and "consider the extent

19  to which those interests make it necessary to burden the plaintiff's rights." *Id.*; *see ADP*

20  *III*, 18 F.4th at 1187.

21       "[T]he severity of the burden the election law imposes on the plaintiff's rights

22  dictates the level of scrutiny applied by the court." *Nader v. Brewer*, 531 F.3d 1028, 1034

23  (9th Cir. 2008) (citing *Burdick v. Takushi*, 504 U.S. 428, 434 (1992)). "Regulations

24  imposing severe burdens on plaintiffs' rights must be narrowly tailored and advance a

25  compelling state interest. Lesser burdens, however, trigger less exacting review, and a

26  State's important regulatory interests will usually be enough to justify reasonable,

27  nondiscriminatory restrictions." *Pierce v. Jacobsen*, 44 F.4th 853, 859–60 (9th Cir. 2022)

28  ---

[58] The Court declines to decide Plaintiffs' constitutional claims for those sections of the Voting Laws that the Court has already ruled unlawful under the CRA, NVRA, or VRA.

(quoting *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997)); *see Dudum*, 640 F.3d at 1114 ("[W]hen a challenged rule imposes only limited burdens on the right to vote, there is no requirement that the rule is the only or the best way to further the proffered interests."). "This is a sliding scale test, where the more severe the burden, the more compelling the state's interest must be." *Soltysik v. Padilla*, 910 F.3d 438, 444 (9th Cir. 2018).

### 1.      Burden on the Right to Vote

A restriction is "not severe" when it is "generally applicable, even-handed, politically neutral, and . . . protect[s] the reliability and integrity of the election process." *Rubin v. City of Santa Monica*, 308 F.3d 1008, 1014 (9th Cir. 2002). This balance means that voting regulations are rarely subjected to strict scrutiny. *See Lemons v. Bradbury*, 538 F.3d 1098, 1104 (9th Cir. 2008). But in the equal protection context, laws that impose "'a particular burden on an identifiable segment' of voters are more likely to raise constitutional concerns" and demand more exacting review. *ADP III*, 18 F.4th at 1190; *Public Integrity All., Inc. v. City of Tucson*, 836 F.3d 1019, 1024 n.2 (9th Cir. 2016) (en banc) ("[C]ourts may consider not only a given law's impact on the electorate in general, but also its impact on subgroups, for whom the burden, when considered in context, may be more severe." (citing *Crawford II*, 553 U.S. at 199–203)). Plaintiffs must present sufficient evidence for the Court to quantify the burden imposed on a specific subgroup of voters. *See Crawford II*, 553 U.S. at 199–203 (weighing the evidence plaintiffs presented to the district court to determine burdens imposed by Indiana's photo ID law).

As discussed regarding Plaintiffs' VRA claim, the Voting Laws' Citizenship Verification Procedures, Attorney General Referral Provision, and List Maintenance Procedures primarily impose burdens on county recorders and the Attorney General, not voters. *See* §§ 16-121.01(D), 16-143, 16-165(G)–(K). The "burden" of an election law is measured by the cost of compliance, not the "consequence of noncompliance." *ADP III*, 18 F.4th at 1188–89 (quoting *Ariz. Democratic Party v. Hobbs* ("*ADP I*"), 485 F. Supp. 3d 1073, 1087 (D. Ariz. 2020), *vacated on other grounds*, *ADP III*, 18 F.4th 1179). In *ADP*

1    *III*, the plaintiffs argued that an election-day deadline to correct a ballot with a missing

2    signature imposed a severe burden on voters who submitted a ballot at the last minute and

3    election officials did not discover the missing signature until after the deadline. *Id.* at 1187–

4    88. In rejecting this argument, the Ninth Circuit explained:

5    > The relevant burden for constitutional purposes is the small burden of signing
     > the affidavit or, if the voter fails to sign, of correcting the missing signature
6    > by election day. To the extent that the election-day deadline results in voters'
     > not casting a vote in an election, that result "was not caused by the election-
7    > day deadline, but by their own failure to take timely steps to effect their vote."

8    *Id.* at 1189 (quoting *Rosario v. Rockefeller*, 410 U.S. 752, 758 (1973)) (cleaned up).

9         *ADP III*'s reasoning applies to this case. The relevant burden is the cost of timely

10   complying with the Voting Laws' DPOC Requirements when registering to vote or after

11   receiving a notice of non-citizenship from the county recorder. §§ 16-121.01(C), (E), 16-

12   165(A)(10); (2023 EPM at ECF-17, -22, -24, -27.) The Voting Laws' ongoing database

13   checks, investigations by the Attorney General, and potential rejection or cancellation of a

14   voter's registration are not burdens, but merely the consequences of not providing DPOC.

15   *ADP III* 18 F.4th at 1188; *see also ADP I*, 485 F. Supp. 3d at 1087–88 (explaining that if

16   burdens were measured by the "consequence of noncompliance" and that consequence is

17   disenfranchisement, that all voting pre-requisites would be subject to strict scrutiny). These

18   provisions remain relevant however, as the frequency at which county recorders might

19   reject or cancel registrations under the Citizenship Verification Procedures and List

20   Maintenance Procedures can serve as an indicator of the severity of the burden DPOC

21   imposes. *See, e.g.*, *Crawford II*, 553 U.S. at 202 (reviewing the frequency of individuals

22   unable to obtain a photo ID in part to identify "how common the problem is"); *Obama for*

23   *America v. Husted*, 697 F.3d 423, 431 (6th Cir. 2012) (affirming district court's ruling that

24   Ohio's changes to early voting imposed a "particularly high" burden because "[p]laintiffs

25   introduced extensive evidence that a significant number of Ohio voters will in fact be

26   precluded from voting" as a result of the changes).

27        The Voting Laws DPOC Requirements place a particular burden on individuals for

28   whom, due to socioeconomic factors, the effort required to obtain and provide county

recorders with the appropriate documentation is cost or time prohibitive. The Court concluded this was limited to modest in analyzing Plaintiffs' VRA claim, but *Anderson/Burdick* demands closer scrutiny of the evidence for the Court to determine a more precise magnitude of this burden.[59] Plaintiffs offered no witness testimony or other "concrete evidence" to corroborate that the Voting Laws' DPOC Requirements will in fact impede any qualified voter from registering to vote or staying on the voter rolls. *Crawford II*, 553 U.S. at 201 (reviewing the "limited evidence" presented to the district court and unable to determine "the magnitude of the impact [a voter ID law] will have on indigent voters").

First, while there are more than 19,000 Federal-Only Voters who have not supplied proof of citizenship, Plaintiffs have not estimated the number of these voters that wholly *lack* DPOC, nor quantified whether naturalized voters or voters of color are more likely to lack DPOC. *Id.* at 202 n.20 (noting that "nothing in the record establishe[d] the distribution of voters who lack photo identification" or "even a rough estimate of how many indigent voters lack copies of their birth certificates [in order to obtain an ID]");[60] *c.f. Ariz. Libertarian Party v. Reagan*, 798 F.3d 723, 731 (9th Cir. 2015) ("Without some assessment of how many voters actually use the Registration Form [as opposed to registering under one of three alternative means], we cannot even begin to gauge the impact it may have had on party registration rolls."). For those voters who possess DPOC but want to avoid the

---

[59] The Supreme Court's "size of the burden" guidepost in *DNC* blurs the distinction between the burden on voting rights central to an *Anderson/Burdick* claim and the disparate impact of voting laws central to a section 2 VRA claim. Despite the analyses' apparent overlap, the foundation of a section 2 claim remains clear: a plaintiff may demonstrate that elections are not "equally open," *due in part* to the burdens imposed on voters. 52 U.S.C. § 10301(b). By contrast, the crux of an *Anderson/Burdick* claim is the "character and magnitude" of the burden itself. *Burdick*, 504 U.S. at 434.

[60] In *Harper v. Virginia Board of Elections*, the Supreme Court held that Virginia violated the Equal Protection Clause by imposing a poll tax on individuals seeking to vote because the ability to pay the tax was not related to voter qualifications. 383 U.S. 663, 668 (1966). The plurality in *Crawford II* noted that even if "most voters already possess a . . . form of acceptable identification" to satisfy Indiana's photo identification law, this "would not save the statute under *Harper*, if the State required voters to pay a tax or a fee to obtain a new photo identification." 553 U.S. at 198. *Crawford* nevertheless concluded that there was insufficient evidence to quantify the magnitude of the burden on individuals who could not afford a birth certificate, which was required to obtain a photo identification. *Id.* at 200–02. *Crawford's* reasoning applies here.

1    "inconvenience" of providing it to county recorders, this "does not qualify as a substantial

2    burden on the right to vote." *Crawford II*, 553 U.S. at 198. Second, even assuming some

3    Federal-Only Voters do not possess DPOC, the evidence does not reliably illustrate the

4    likelihood that voters will encounter obstacles to obtaining this information. The monetary

5    and temporal costs of obtaining DPOC, particularly naturalization documents, can be

6    significant for low-income individuals. But naturalized citizens experience lower levels of

7    poverty than other Arizonans, including native-born citizens, and it bears reiterating that

8    naturalized citizens need only provide an immigration number. And 82% of Arizona's

9    Latino citizens are native-born, meaning most Latino voters may need to only obtain a new

10   birth certificate. Though the costs of obtaining DPOC may have a greater impact on low-

11   income Arizonans, this burden is nevertheless slight in the context of all Arizonan's overall

12   ability to register to vote.

13        Turning to Plaintiffs' related due process claims, the Court's ruling that the Reason

14   to Believe Provision is unlawful under the CRA and the NVRA dispels Plaintiffs'

15   speculation that county recorders will rely on unfounded suspicions of non-citizenship to

16   cancel voter registrations. Pursuant to H.B. 2243's remaining provisions, county recorders

17   may still "obtain" information of non-citizenship from SAVE and NAPHSIS for Federal-

18   Only voters and from the MVD database. A.R.S. § 16-165(G), (I), (J). Regarding the

19   Voting Laws' temporal limitations on the opportunity to cure a voter registration, county

20   recorders must, within ten days of matching an applicant with evidence of non-citizenship,

21   notify the applicant that she has until the Thursday before election day to provide DPOC

22   and be registered to vote.[61] (2023 EPM at ECF-17, -22, -24, -27.) Finding the burden of

23   correcting a missing ballot signature by an election-day deadline to be "limited" in *ADP*

24   *III*, the Ninth Circuit explained that "[t]he deadline does not prohibit voters from voting in

25   any election; they must either sign the affidavit at the outset or correct a missing signature

26   by the deadline of election day." 18 F.4th at 1189. The Court finds the case instructive here,

27

28   _____
[61] For this reason alone, Plaintiffs' argument that H.B. 2492 § 4's Citizenship Verification Procedures violate voter registrants' procedural due process rights because registrants are not allowed *any opportunity* to contest a county recorder's finding of non-citizenship fails.

as the 2023 EPM's Thursday deadline may result in some qualified Arizonans not becoming registered to vote. While *ADP III* implicated only a missing signature, the burden of timely obtaining DPOC similarly increases the closer to an election an individual decides to register to vote without proactively proving citizenship. *See Rosario*, 410 U.S. at 758 (concluding New York's election law "merely imposed a time deadline on [voters'] enrollment" and voters who attained voting age before the deadline "clearly could have registered" in time for the election). And based on the evidence at trial, the Court is left to speculate as to whether the occurrence of Arizonans who may lack DPOC and be meaningfully impacted by processing delays when obtaining new citizenship documentation is sufficiently "frequent as to raise [a] question about the constitutionality" of the Voting Laws. *Crawford II*, 553 U.S. at 197.

Finally, county recorders will in fact "obtain" information of non-citizenship from MVD's monthly customer extracts for at least 65 naturalized citizens registered as Federal-Only Voters who possess a foreign-type license.[62] But the Court will not assume without any persuasive evidence that these 65 of Arizona's 19,439 Federal-Only Voters wholly lack DPOC such that they would be burdened by the List Maintenance Procedures' 35-day deadline.[63] Moreover, voters receive notice by forwardable mail that their registration has been cancelled and instructions regarding how to re-register if the voter is qualified. (2023 EPM at ECF-58.)

Plaintiffs cite *Fish v. Schwab* ("*Fish II*"), which held that Kansas' proof of

---

[62] While the Voting Laws' monthly MVD checks may misidentify naturalized citizens as non-citizens, the evidence indicates that all but 65 naturalized active voters with a foreign-type license have already provided county recorders with DPOC. Because county recorders must confirm evidence of non-citizenship by reviewing an individual's voter file, the Court concludes that naturalized citizens who possess a foreign-type license but have already provided DPOC will not be unduly burdened by the Voting Laws.

[63] Plaintiffs argue that Governor Ducey vetoed H.B. 2617 for lacking "sufficient due process" protections. Plaintiffs point specifically to H.B. 2617's cancellation provision, which would have afforded voters 90 days to provide DPOC and avoid cancellation, instead of the 35 days in H.B. 2243. (*Compare* H.B. 2617 Text, *with* H.B. 2243 Text.) But Governor Ducey found that H.B. 2617's requirement that county recorders cancel registrations after "receiv[ing] information that provides the basis for determining that the person is not a qualified elector" was "vague and lack[ed] any guidance for how a county recorder would confirm such a determination." (H.B. 2617 Veto Letter at PX 053-1.) Governor Ducey did not mention the 90-day cancellation provision.

citizenship requirement imposed an undue burden on the right to vote. 957 F.3d 1105, 1127–32 (10th Cir. 2020). The Tenth Circuit found the proof of citizenship requirement imposed a "significant" burden "primarily" because the Kansas Secretary of State had suspended or cancelled 31,000 registrations for the voters' failure to provide proof of citizenship. *Id.* at 1127–28. Here however, Arizona *may not* deny, suspend, or cancel voter registrations when a voter fails to provide DPOC. These individuals will instead be registered as Federal-Only Voters unless county recorders match the registration to information of non-citizenship. A.R.S. § 16-121.01(E). And county recorders may only cancel a registered voter's registration if the voter is confirmed a non-citizen. § 16-165(A)(10). Without any similar quantifiable evidence regarding how many qualified Arizonans' registrations without DPOC might be rejected or cancelled under the Voting Laws' new DPOC Requirements, it would be mere conjecture to conclude that the DPOC Requirements would impose a burden as significant as that in *Fish II*.

The Voting Laws do not impose an excessive burden on any specific subgroup of voters raising equal protection concerns. Instead, based on the evidence presented, the Court concludes that the Voting Laws impose only a limited burden on all individuals qualified to vote in Arizona.

### 2.    The State's Interests

Because the Voting Laws' DPOC Requirement imposes a limited burden on the right to vote, the Court conducts a "less exacting review" of Arizona's interests. *Pierce*, 44 F.4th at 859–60. The State offers two justifications for the Voting Laws: preventing non-citizens from voting and promoting voter confidence in Arizona's elections.

Arizona has an indisputably legitimate interest "in counting only the votes of eligible voters," and the State is entitled to enact prophylactic legislation to prevent the occurrence of non-citizen voting. *Crawford II*, 553 U.S. at 196; *DNC*, 141 S. Ct. at 2348; *see also League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 925 (11th Cir. 2023) (rejecting plaintiffs' argument that a voting law designed to prevent voter fraud was a "proverbial solution in search of a problem" and a pretext for discrimination because

"[t]he Supreme Court has already held that deterring voter fraud is a legitimate policy on which to enact an election law, even in the absence of any record evidence of voter fraud." (quoting *Greater Birmingham Ministries v. Sec'y of State for State of Ala.*, 992 F.3d 1299, 1334 (11th Cir. 2021))). The State "need not offer 'elaborate, empirical verification'" of non-citizen voting, but it also may not rely on mere "speculative concern[s]" "to justify *any* non-severe voting regulation." *Soltysik*, 910 F.3d at 448–49 (emphasis in original) (quoting *Timmons*, 520 U.S. at 364).

While rare, voter fraud in Arizona does exist. The Arizona Attorney General's Office initiated 38 prosecutions for illegal voting between 2010 and 2023, albeit with most of these cases concerning voting in more than one jurisdiction, or "double voting." (Ex. 292 at PX 292-1 to -6; Lawson Tr. 1688:3–19, 1689:7–24.) In addition, there are currently two sealed indictments related to non-citizen voting. (Lawson Tr. 1691:11–13, 1692:5–1694:15.) At the local level, Maricopa County initiated 13 prosecutions specifically for non-citizen voting between 2007 and 2008. (Minnite Tr. 1588:3–23.) And to be sure, while deliberate non-citizen voting is but one form of voter fraud, the legislative history indicates that the Legislature was concerned with non-citizen voting more generally. (*See, e.g.*, H.B. 2492 House Gov. Comm. Tr. at PX 054-3 to -4; Ex. 61 at PX 061-28 to -30, -39 to -40; Minnite Tr. 1630:13–1632:7.) The State's interests in preventing voter fraud and unintentional non-citizen voting are both legitimate, as both forms of non-citizen voting can undermine the integrity of Arizona's elections.

The State has a related justification for the Voting Laws: "safeguarding public confidence by eliminating [fraud and] even appearances of fraud." *Ohio Democratic Party v. Husted*, 834 F.3d 620, 633 (6th Cir. 2016) (internal quotations omitted). "[P]ublic confidence in the integrity of the electoral process has independent significance, because it encourages citizen participation in the democratic process." *Crawford II*, 553 U.S. at 197. Setting aside the absence of evidence that Arizona's 19,439 Federal-Only Voters are non-citizens, the Court is mindful that the "electoral system cannot inspire public confidence if no safeguards exist to deter or detect fraud or to confirm the identity of

voters." *Id.* Arizona is "permitted to respond to potential deficiencies in the electoral process with foresight rather than reactively." *Munro v. Socialist Workers Party*, 479 U.S. 189, 195–96 (1986); *DNC*, 141 S. Ct. at 2348. While Plaintiffs may disagree with the efficacy of this method, "the propriety of doing so is perfectly clear": it helps ensure that any non-citizens that register to vote, intentionally or mistakenly, do not make it onto or remain on the voter rolls. *Crawford II*, 553 U.S. at 196; *see also Dudum*, 640 F.3d at 1114 ("[W]hen a challenged rule imposes only limited burdens on the right to vote, there is no requirement that the rule is the only or the best way to further the proffered interests.").

Considering the evidence as a whole, the Court concludes that Arizona's interests in preventing non-citizens from voting and promoting public confidence in Arizona's elections outweighs the limited burden voters might encounter when required to provide DPOC.

### F.     Remaining Fourteenth and Fifteenth Amendment Claims

The Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Fifteenth Amendment provides that "[t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." U.S. Const. amend. XV, § 1. There are two aspects to the equal protection doctrine: suspect classifications and fundamental rights. "The first strand bars a state from codifying a preference for one class over another," such as based on race or national origin, while "[t]he second strand bars a state from burdening a fundamental right for some citizens but not for others. Absent some such burden, however, legislative distinctions merit no special scrutiny." *Short v. Brown*, 893 F.3d 671, 678–79 (9th Cir. 2018) (internal citations omitted).

### 1.     *Bush v. Gore* Arbitrary and Disparate Treatment

Non-US Plaintiffs claim that the Voting Laws subject registrants to "arbitrary and disparate treatment," under the equal protection standard articulated in *Bush v. Gore*, 531 U.S. 98, 104–09 (2000) (per curiam). The parties disagree whether *Bush* provides an equal

protection analysis independent of the *Anderson/Burdick* framework.

*Bush* concerned the application of the one-person, one-vote principle in the context of a court-ordered "statewide recount with minimal procedural safeguards." 531 U.S. at 109. Specifically, the Florida Supreme Court directed election officials to discern the intent of voters for whom their "punchcard" ballots were not "perforated with sufficient precision for a machine to register the perforation." *Id.* at 105. But the court did not provide election officials with any standards by which to determine voter "intent," resulting in disparate treatment among similarly situated voters. *Id.* at 105–06. The Supreme Court explained that "[h]aving once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Id.* 104–05 (citation omitted).

The Ninth Circuit has cast doubt on whether *Bush* is "applicable to more than the one election to which the [Supreme] Court appears to have limited it." *Lemons*, 538 F.3d at 1106; *see Paher v. Cegavske*, 457 F. Supp. 3d 919, 927–28 (D. Nev. 2020) (analyzing claim under *Anderson-Burdick* and rejecting plaintiffs' claim that Nevada's all-mail primary would result in "voter disenfranchisement in the form of vote dilution" such that *Bush* should apply). And those cases where the Ninth Circuit has applied *Bush* have similarly focused on the one-person, one-vote principle. *Idaho Coal. United for Bears v. Cenarrusa*, 342 F.3d 1073, 1077–78, 1077 n.7 (9th Cir. 2003) (finding that Idaho's ballot-initiative process violated the one-person, one-vote principle, and citing *Bush*); *Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 882, 894–95 (9th Cir. 2003) (finding that plaintiffs' claim "mirror[ed]" that in *Bush*, "that is, whether unequal methods of counting votes among counties constitutes a violation of the Equal Protection Clause"), *rev'd on other grounds en banc*, 344 F.3d 914 (9th Cir.) (describing *Bush* as "the leading case on disputed elections*" (emphasis added)). *Bush* itself emphasized that its "consideration [was] limited to the present circumstances." 531 U.S. at 109 (noting "the special instance of a statewide recount under the authority of a single state judicial officer").

Assuming *Bush* applied, "[c]ourts have generally found equal protection violations

where a lack of uniform standards and procedures results in arbitrary and disparate treatment of [similarly situated] voters." *Lecky v. Va. State Bd. of Elections*, 285 F. Supp. 3d 908, 920 (E.D. Va. 2018). The Voting Laws are not tainted by "varying" or complete "absence of specific standards" that the Supreme Court found problematic with Florida's recount. *Bush*, 531 U.S. at 106–07. County recorders may reject a voter registration only after matching that registrant to evidence of non-citizenship from the Voting Laws' list of databases. § 16-121.01(D), (E); (2023 EPM at ECF-56.) Whether an applicant's registration information "matches" to information of non-citizenship leaves no guesswork to county recorders. The List Maintenance Procedures and Cancellation Provision likewise mandate county recorders to "obtain" and "confirm" information from these same databases before requesting DPOC from the voter. § 16-165(A)(10). Setting aside the occasional match to outdated MVD citizenship information for naturalized citizens, these databases contain objective and readily verifiable information that in nearly all cases will not require county recorders to request DPOC from a registrant or voter. (*See, e.g.*, 2023 EPM at ECF-57 (requiring county recorders to match a suspected non-citizen to a voter registration, determine whether that voter has already provided DPOC, and review available government databases before requesting DPOC).) Furthermore, Plaintiffs adduced no evidence that county recorders will act arbitrarily when confirming an individual's non-citizenship. This is buttressed by the fact that the Court's ruling prohibits county recorders from investigating the citizenship status of registered voters based on a mere "reason to believe" that a voter is a non-citizen. (*See supra* Sections II(B)(3), (C)(3)(i) (concluding the Reason to Believe Provision is unlawful).)

### 2.  Race & National Origin or Alienage Discrimination

Lastly, Plaintiffs claim that the Voting Laws are facially discriminatory, and in the alternative, were motivated by a discriminatory purpose. Facial unconstitutionality does not require a finding of discriminatory intent. *Mitchell v. Washington*, 818 F.3d 436, 445–46 (9th Cir. 2016) ("When the government expressly classifies persons on the bases of race or national origin . . . its action is 'immediately suspect'. . . . A plaintiff in such a lawsuit

need not make an extrinsic showing of discriminatory animus or a discriminatory effect to trigger strict scrutiny." (citation omitted)). But a plaintiff must prove discriminatory intent if the challenged law does not expressly classify persons on the bases of race or national origin. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977).

The Voting Laws require all voters to provide DPOC or be subject to recurring database checks to validate citizenship. *E.g.*, §§ 16-121.01(D), (E), 16-165(G)–(K). Plaintiffs cite a string of cases to argue that the Voting Laws facially discriminate based on national origin because the databases county recorders must use to verify citizenship can contain outdated citizenship information only for naturalized citizens. But Plaintiffs conflate facial discrimination with discriminatory effects. *Compare Florida*, 870 F. Supp. 2d at 1350 (finding law's use of MVD data "likely" had a "discriminatory impact" on naturalized citizens), *and Texas LULAC*, 2019 WL 7938511, at *1 (citing *Florida* for similar proposition), *with Boustani v. Blackwell*, 460 F. Supp. 2d 822, 824–25 (N.D. Ohio 2006) (concluding election law that allowed election workers to challenge the citizenship status of any voter, question whether the voter was "a native or naturalized citizen," and require naturalized citizens to produce a naturalization certificate, was facially discriminatory). The Voting Laws are facially neutral as to race, ethnicity, and national origin.

Because the Voting Laws are facially neutral, Plaintiffs must show that the Voting Laws were "motivated by" a discriminatory purpose. *Vill. of Arlington Heights* 429 U.S. at 265–66; *see Abbott v. Perez*, 585 U.S. 579, 603 (2018) (explaining burden of proof is on the plaintiff). "The central inquiry in any disparate treatment claim under the Equal Protection Clause is whether 'an invidious discriminatory purpose was a motivating factor' in some government action." *Ballou v. McElvain*, 29 F.4th 413, 424 (9th Cir. 2022) (quoting *Ave. 6E Invs., LLC v. City of Yuma, Ariz.*, 818 F.3d 493, 504 (9th Cir. 2016)); *see Arce*, 793 F.3d at 977 ("A plaintiff does not have to prove that the discriminatory purpose was the sole purpose of the challenged action, but only that it was a 'motivating factor.'" (quoting *Arlington Heights*, 429 U.S. at 265–66)). The Court considers the following, "non-

1    exhaustive factors" to determine whether the Voting Laws were motivated by a
2    discriminatory purpose:

3        (1) the impact of the official action and whether it bears more heavily on one
4        race than another; (2) the historical background of the decision; (3) the
         specific sequence of events leading to the challenged action; (4) the
         defendant's departures from normal procedures or substantive conclusions;
5        and (5) the relevant legislative or administrative history.

6    *Arce*, 793 F.3d at 977 (citing *Arlington Heights*, 429 U.S. at 266–68). Plaintiffs must
7    overcome the "strong 'presumption of good faith'" the Court affords to the Arizona
8    Legislature. *United States v. Carrillo-Lopez*, 68 F.4th 1133, 1139 (9th Cir. 2023) (quoting
9    *Miller v. Johnson*, 515 U.S. 900, 916 (1995)); *see Abbott*, 585 U.S. at 603.

10                               **i.    Historical Background**

11           Beginning with the second *Arlington Heights* factor, Arizona does have a long
12   history of discriminating against people of color. This includes the State's literacy tests that
13   effectively precluded Native American and Latino voters from voting, in addition to voter
14   roll purges that created barriers for people of color to re-register to vote. But "unless
15   historical evidence is reasonably contemporaneous with the challenged decision, it has
16   little probative value." *McCleskey v. Kemp*, 481 U.S. 279, 298 n.20 (1987). Arizona has
17   not employed literacy tests since the 1970s, and Arizona's preclearance requirements under
18   section 5 of the VRA is the most recent evidence of voter discrimination that Plaintiffs'
19   experts cite. Despite these examples of past discrimination, the Court continues to presume
20   good faith on behalf of the 55th Legislature because "[p]ast discrimination cannot, in the
21   manner of original sin, condemn governmental action that is not itself unlawful." *Abbott*,
22   585 U.S. at 603 (citation omitted). More precisely, "[t]he 'historical background' of a
23   *legislative enactment* is 'one evidentiary source' relevant to the question of intent." *Id.* at
24   603–04 (quoting *Arlington Heights*, 429 U.S. at 267) (emphasis added). And neither Dr.
25   Chang nor Dr. Burton identified a persuasive nexus between Arizona's history of animosity
26   toward marginalized communities and the Legislature's enactment of the Voting Laws. *C.f.*
27   *League of Women Voters of Fla.*, 66 F.4th at 923 (disapproving of district court's overt
28   reliance on the state's discriminatory history that was not sufficiently contemporaneous

with the legislation at issue).

ii.     **Events Preceding the Voting Laws and Legislative History**

Regarding precipitating events, the Legislature enacted the Voting Laws on the heels of unsubstantiated voter fraud claims following a victory for President Biden in Arizona by a margin of 10,457 votes during the 2020 presidential election. (*See, e.g.*, Pls.' Stip. No. 154; Minnite Tr. 1597:5–11.) The Arizona Senate's subsequent audit of the election failed to reveal any voter fraud in Arizona, as did the Attorney General's investigation into allegations of voter fraud. (*See, e.g.*, Minnite Tr. 1589:17–1592:14 (recounting the Elections Integrity Unit's efforts to uncover instances of non-citizen voting in the 2020 election); *see* Ex. 401 (letter explaining Elections Integrity Unit's inability to find evidence to substantiate allegations of fraudulent ballots in Pima County).)

Turning to the Voting Laws' legislative history, because legislators rarely publicize their discriminatory motives on the record, the Court considers whether legislators have "'camouflaged' their intent." *Arce*, 793 F.3d at 978 (citation omitted). Nothing in the legislative hearings evince a motive to discriminate against voters based on race or national origin. *See Carrillo-Lopez*, 68 F.4th at 1148 (finding no "racist or derogatory language regarding Mexicans or other Central and South Americans" evincing discriminatory intent in a 925-page Senate Report). Instead, the hearings and the substance of the Voting Laws indicate that the Voting Laws are in many ways the progeny of Arizona's prior effort to require DPOC for all Arizona voters through Proposition 200. The Supreme Court's decision in *ITCA* and the LULAC Consent Decree curtailed the State's power to require DPOC for Federal-Only Voters, regardless of whether voters registered with the State Form or Federal Form. *See ITCA*, 570 U.S. at 12; (LULAC Consent Decree at PX 024-8 to -10, -13 to -14.) During the hearings regarding H.B. 2492, legislators supporting the bills vocalized concerns with the marked increase in Federal-Only Voters following the LULAC Consent Decree. (H.B. 2492 House Gov. Comm. Tr. at PX 054-3 to -4.) The Legislature's passage of the bill attempted to revive the DPOC Requirement for State Form users in light of *ITCA*'s pronouncement that "States retain the flexibility to design and use their own

registration forms" and for Federal Form users by first "establishing the applicant's ineligibility" to side-step the NVRA's "accept and use" requirement. *ITCA*, 570 U.S. at 12, 16; (*see* H.B. 2492 House Gov. Comm. Tr. at PX 054-9 to -10, -17 to -19.)

The Legislature's concern with Federal-Only Voters paralleled some public sentiment that non-citizens were able to vote by falsely attesting to U.S. citizenship. (Connor Tr. 382:12–383:25 (describing public comments regarding 2023 EPM that "voters should be citizens"); Quezada Tr. 877:14–878:17 (explaining the general public's "commentary" was that non-citizens were voting).) The public's concerns regarding non-citizen voting, even if unsubstantiated, does not exhibit "[t]he presence of community animus" for the Court to impute a discriminatory motive to the Legislature. *Ave. 6E Invs.*, 818 F.3d at 504; *c.f. SoCal Recovery, LLC v. City of Costa Mesa*, No. SACV 18-1304-JVS(JDEx), 2023 WL 8263377, at *8 (C.D. Cal. Aug. 17, 2023) (noting evidence of community animus where residents cited "mayhem and violence" and "crime and homelessness" to oppose sober living homes, which the city referenced in permit denials).

Furthermore, the Free Enterprise Club disseminated lobbying materials by email to Arizona legislators that described how the Voting Laws would prevent "illegals" from voting in Arizona elections. (Ex. 602.) "[T]he use of 'code words' may demonstrate discriminatory intent," and the term "illegals" can evince racial animus for members of the Latino community in Arizona. *Ave. 6E Invs.*, 818 F.3d at 505; (*see* Quezada Tr. 867:18–868:9 (explaining the term "illegals" in the voting context is typically used to refer to non-citizens from Latin descent and that the term "undocumented" is less offensive for individuals who are not lawfully present in the United States); Burton Tr. 1453:17–1454:25 (explaining that the term "illegals" in the voting context can refer to non-citizens, or minorities perceived as untrustworthy).) Because Free Enterprise Club helped author the Voting Laws, the Court weighs the organization's coded appeals as some evidence of community animus. *Ave. 6E Invs.*, 818 F.3d at 505. But while community animus "*can* support a finding of discriminatory motives by government officials," Plaintiffs presented no persuasive evidence that the Legislature relied on the Free Enterprise Club's coded

appeals, nor that the Legislature enacted the Voting Laws to prevent anyone other than non-citizens from voting. *Id.* at 504; *c.f. Gonzalez v. Douglas*, 269 F. Supp. 3d 948, 967 (D. Ariz. 2017) (citing officials' use of the terms "'Raza,' 'un-American,' 'radical,' 'communist,' 'Aztlan,' and 'M.E.Ch.a,'" as code words for Mexican Americans and "concepts of foreignness and political radicalism" during public debates of a House bill).

Plaintiffs contend that Senator Borrelli would frequently make derogatory comments about Latino voters to Senator Quezada during Senate Judiciary Committee meetings. Even assuming Senator Borrelli expressed discriminatory remarks, Plaintiffs may not impute his motives to the other individual legislators or the Arizona Legislature as a whole. As the Supreme Court has cautioned:

> Inquiries into congressional motives or purposes are a hazardous matter. When the issue is simply the interpretation of legislation, the Court will look to statements by legislators for guidance as to the purpose of the legislature, because the benefit to sound decision-making in this circumstance is thought sufficient to risk the possibility of misreading Congress' purpose. It is entirely a different matter when we are asked to void a statute that is, under well-settled criteria, constitutional on its face, on the basis of what fewer than a handful of Congressmen said about it. What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork.

*United States v. O'Brien*, 391 U.S. 367, 383–84 (1968); *see also DNC*, 141 S. Ct. at 2349–50 (agreeing with district court's findings that "no evidence [indicated] the legislature as a whole was imbued with racial motives"). And while Senator Quezada testified as to his reasons for voting against the Voting Laws, "the concerns expressed by political opponents during the legislative process are not reliable evidence of legislative intent." *League of Women Voters of Fla.*, 66 F.4th at 940.

### iv.   Impact on Minority and Naturalized Voters

Evidence of a law's disparate impact is generally insufficient alone to evidence a legislature's discriminatory motive. *Carrillo-Lopez*, 68 F.4th at 1141 (explaining that a court may infer a discriminatory motive from disproportionate impacts in the "rare cases" where the effects of the challenged action are unequivocally related to race). As discussed in the Court's section 2 analysis, Plaintiffs have not shown that the Voting Laws will have

any significant discriminatory impact based on naturalization status, race, or ethnicity. First, the difference in registration rates by race and ethnicity, with one-third of a percent of White voters and two-thirds of a percent of minority voters registered as Federal-Only Voters, is "small in absolute terms." *DNC*, 141 S. Ct. at 2345. Second, while it is possible that SAVE and MVD could return outdated citizenship information for a small number of naturalized citizens, these database checks without more do not materially affect Full-Ballot Voters who have already provided DPOC. Of course, 65 naturalized Federal-Only voters will likely be flagged as non-citizens and may be required to produce DPOC, but considering this accounts for just 0.001% of all voters, the impact of these checks is markedly small. (*See* MVD Non-Citizen Records.) Setting aside the racial, ethnic and nationality composition of Federal-Only Voters, Plaintiffs offered testimony to show that minority voters are more likely to lack, and encounter more barriers to furnishing, DPOC than White voters. (*See, e.g.*, Tiwamangkala Tr. 1273:22–1274:4 (AANHPI community); Nitschke Tr. 469:8–470:3 (out-of-state college students)).) But there is no quantifiable evidence regarding the rate at which minority voters both lack *and* are unable to afford DPOC. The same is true for the number of naturalized citizens who lack both their naturalization certificate *and* their immigration number.

In addition, Plaintiffs did not show that the Arizona Legislature enacted the Voting Laws *because of* any impact on minority voters or naturalized citizens. For example, it is common sense that the Voting Laws' MVD checks would be substantially more likely to return information of non-citizenship for naturalized citizens who possess a foreign-type license, as compared to native-born citizens who are ineligible to receive a foreign-type license at all. This result "does not prove that penalizing such individuals was a purpose of this legislation." *Carrillo-Lopez*, 68 F.4th at 1153 (concluding district court erred in relying on evidence of 8 U.S.C. § 1326's disparate impact on Mexicans, which criminalizes the reentry of a removed alien, without more evidence of animus because "the clear geographic reason for disproportionate impact on Mexicans and other Central and South Americans undermines any inference of discriminatory motive").

1    Plaintiffs make much of what the Arizona Legislature did not evaluate when passing
2  the Voting Laws, specifically the impact on voters based on national origin, race, ethnicity,
3  age, or socioeconomic status. Community stakeholders had an opportunity to oppose the
4  Voting Laws on the record, most of whom emphasized the DPOC Requirement's disparate
5  impacts on Federal-Only Voters and the DPOR Requirement's impacts on Native
6  American voters. (*See, e.g.*, Ex. 61 at PX 061-8 to -20.) When explaining his vote against
7  H.B. 2492 during the same hearing, Senator Quezada warned the Senators that the bill
8  would have a discriminatory impact on people of color. (*Id.* at PX 061-33 to -35.) But
9  Plaintiffs must show that the Arizona Legislature enacted the Voting Laws "at least in part
10 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group."
11 *Carrillo-Lopez*, 68 F.4th at 1139 (quoting *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256,
12 279 (1979)). The Legislature's failure to adequately consider the Voting Laws' impact on
13 people of color or naturalized citizens or decision to pass the Voting Laws *notwithstanding*
14 the potential impact on these voters is insufficient to show a discriminatory motive. *Id.*

### v.    Procedural and Substantive Departures

16    Finally, Plaintiffs adduced no persuasive evidence of procedural departures during
17 the Arizona Legislature's enactment of H.B. 2492. Plaintiffs contend that the House Rules
18 Committee knowingly passed the bill after the Committee's attorney opined that the bill
19 was likely unconstitutional and preempted by the NVRA. But the Rules Committee was
20 not bound by this opinion, nor did the Rules Committee attorney indicate that H.B. 2492
21 was unconstitutionally discriminatory as relevant to Plaintiffs' Fourteenth and Fifteenth
22 Amendment claims. (*See, e.g.*, Toma Dep. 174:3–174:10 (explaining the Rules Committee
23 ultimately decides whether a bill "moves forward")); *c.f. Ave. 6E Invs.*, 818 F.3d at 507
24 (finding city's plausible departure from normal procedures by ignoring "the unanimous
25 recommendation" of the city's Planning and Zoning Commission could evince
26 discriminatory intent "particularly when, as here, that recommendation is consonant with
27 the municipality's general zoning requirements and plaintiffs proffer additional evidence
28 of animus" (emphasis added)).

1    Regarding H.B. 2243, Governor Ducey vetoed the bill for lacking "sufficient due
2    process" protections. Legislators collaborated with the Governor's office specifically to
3    address the Governor's due process concerns. (Toma Dep. 232:19–233:18, 234:14–21,
4    235:7–20.) Senator Petersen then introduced the language of H.B. 2617 into H.B. 2243,
5    albeit with several substantive changes, such as reducing the opportunity to provide DPOC
6    from 90 to 35 days. And while the legislators could not name a separate *voting* bill during
7    their depositions that was successfully amended in a similar manner to HB. 2243,
8    amendments to existing bills are common at the close of a legislative session. (Toma Dep.
9    237:8–239:3 (explaining unsuccessful attempt to pass a different vetoed voting bill through
10   a separate germane bill on the last day of the legislative session); Petersen Dep. 319:3–24,
11   333:17–334:2.) The speed with which the Legislature passed H.B. 2243 as amended was
12   not so abrupt as to infer an improper motive, considering the Legislature had previously
13   passed H.B. 2617 through the ordinary legislative process. *Abbott*, 585 U.S. at 610 & n.23
14   ("[W]e do not see how the brevity of the legislative process can give rise to an inference
15   of bad faith—and certainly not an inference that is strong enough to overcome the
16   presumption of legislative good faith.").

17   Substantively, Arizona has required DPOC since 2005, and the Voting Laws
18   supplement this requirement to ensure that non-citizens do not register to vote or remain
19   on the voter rolls. This includes expanding county recorders' existing use of SAVE and the
20   MVD database to also identify existing registered non-citizens. Similarly, H.B. 2243's 35-
21   day notice procedure is not a departure from prior Arizona law, as it adopts the 2019 EPM's
22   35-day period for a voter to prove citizenship after attesting to non-citizenship on a juror
23   questionnaire. (2019 EPM at PX 006-50 to -51.) And while the Court concluded above that
24   the Birthplace Requirement violates the Materiality Provision, the Legislature's decision
25   to mandate birthplace on the State Form is consistent with Arizona's existing practice of
26   collecting this information from voters, even if providing birthplace was historically
27   optional.

28   Having considered the totality of these factors, the Court concludes that Plaintiffs

1    failed to show that the Voting Laws were enacted with a discriminatory purpose.

2    **III.    CONCLUSION**

3          Non-US Plaintiffs may enforce § 10101 of the Civil Rights Act. Requiring

4    individuals who register to vote using the State Form to include the individual's state or

5    country of birth violates the Materiality Provision of the Civil Rights Act. H.B. 2243's

6    Reason to Believe Provision also violates the Civil Rights Act, as well as section 8(b) of

7    the NVRA because the provision will result in the investigation of only naturalized citizens

8    based on county recorders' subjective beliefs that a naturalized individual is a non-citizen.

9    In addition, requiring individuals registering to vote with the State Form to include

10   documentary proof of residence to register for federal elections violates sections 6 and 7 of

11   the NVRA. However, Plaintiffs have not carried their burden to show that the Voting Laws'

12   remaining citizenship investigation procedures, DPOC requirements, and registration

13   cancellation procedures violate the NVRA or the VRA. Nor do these provisions impose an

14   undue burden on the right to vote or violate the equal protection and due process guarantees

15   of the U.S. constitution. Finally, the Court concludes that Plaintiffs failed to show that the

16   Voting Laws were enacted with any discriminatory purpose.

17         **IT IS ORDERED** declaring that A.R.S. § 16-121.01(A) violates § 10101(a)(2)(B)

18   of the Civil Rights Act by denying Arizonans the right to vote based on errors or omissions

19   that are not material to determining Arizonan's eligibility to vote. Arizona may not reject

20   State Form registrations that lack an individual's state or country of birth and must register

21   an individual if that individual is found eligible to vote.

22         **IT IS FURTHER ORDERED** declaring that A.R.S. § 16-165(I) violates

23   § 10101(a)(2)(A) of the Civil Rights Act and section 8(b) of the NVRA by subjecting

24   naturalized citizens whom county recorders have reason to believe are non-citizens to

25   SAVE checks, which is a different standard, practice, or procedure than that applied to

26   native-born citizens. Arizona may not conduct SAVE checks on any registered voter whom

27   county recorders have reason to believe are a non-citizen. But Arizona may conduct SAVE

28   checks on registered voters who have not provided DPOC. *See* A.R.S. § 16-165(I).

1    **IT IS FURTHER ORDERED** declaring that A.R.S. § 16-121.01(A) violates

2 sections 6 and 7 of the NVRA by requiring Arizonans who register with the State Form to

3 provide documentary proof of residence. Arizona may not reject State Form registrations

4 that are not accompanied by documentary proof of residence but must register an individual

5 without proof of residence as a Federal-Only Voter if that individual is otherwise eligible

6 to vote.

7    Dated this 29th day of February, 2024.

8

9

10

11    _____

12    Susan R. Bolton
     United States District Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28