Tyler Green*
Gilbert C. Dickey*
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
tyler@consovoymccarthy.com
gilbert@consovoymccarthy.com

Kory Langhofer, Ariz. Bar No. 024722
Thomas Basile, Ariz. Bar. No. 031150
STATECRAFT PLLC
649 North Fourth Avenue, First Floor
Phoenix, Arizona 85003
(602) 382-4078
kory@statecraftlaw.com
tom@statecraftlaw.com

*Attorneys for Intervenor-Defendant Republican National Committee*

*admitted pro hac vice

**UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA**

| | |
|---|---|
| Mi Familia Vota, et al.,<br>　　　　　Plaintiffs,<br>v.<br><br>Adrian Fontes, et al.,<br>　　　　　Defendants.<br><br>AND CONSOLIDATED CASES | Case No: 2:22-cv-00509-SRB (Lead)<br><br>**INTERVENOR-DEFENDANTS'**<br>**MOTION FOR A PARTIAL**<br>**STAY OF THE INJUNCTION**<br>**PENDING APPEAL**<br><br>(***Expedited Consideration***<br>***Requested***) |

Pursuant to Federal Rule of Civil Procedure Rule 62(d), Intervenor-Defendants Warren Petersen, in his official capacity as the President of the Arizona State Senate; Ben Toma, in his official capacity as the Speaker of the Arizona House of Representatives (together, the "Legislative Intervenors"); and the Republican National Committee ("RNC") respectfully move for a stay pending appeal of this Court's injunction (Doc. 720) against the enforcement of those provisions of 2022 Ariz. Laws ch. 99 (H.B. 2492) that:

1. Prohibit registered voters who have not provided documentary proof of citizenship ("DPOC") from voting for President of the United States;

2. Prohibit registered voters who have not provided DPOC from voting by mail; or

3. Are inconsistent with the consent decree entered in *League of United Latin American Citizens of Arizona v. Reagan*, No. 2:17-cv-04102-DGC (D. Ariz.), Doc. 37 (Jun. 18, 2018) (the "LULAC Consent Decree").

*See* A.R.S. §§ 16-121.01(C), (E), 16-127(A).

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

Determining who may participate in the selection of presidential electors and prescribing procedures governing the issuance, casting, and tabulation of ballots are foundational attributes of state sovereignty. *See* U.S. Const. art. II, § 1, cl. 2 ("Each State shall appoint, in such Manner as the Legislature thereof may direct," its presidential electors); *Chiafalo v. Washington*, 591 U.S. 578, 588-89 (2020) ("Article II, § 1's appointments power gives the States far-reaching authority over presidential electors, absent some other constitutional constraint"); *Clingman v. Beaver*, 544 U.S. 581, 586 (2005) ("The Constitution grants States 'broad power to prescribe the Times, Places and Manner of holding Elections for Senators and Representatives, which power is matched by state control over the election process for state offices.'" (internal citations and quotations omitted)). The Court's conclusions that Congress could and did displace these prerogatives in the National Voter Registration Act of 1993, 52 U.S.C. § 20501, *et seq.* ("NVRA")—and that the Secretary of State could and did permanently abrogate the

Legislature's lawmaking functions by unilaterally signing the LULAC Consent Decree—mutes the results of Arizona's democratic process on the eve of a historic exercise of that very process. To preserve Arizona's ability to protect the integrity of its elections pending the appellate courts' disposition of these consequential questions, the Court should stay its injunction in part.

**ARGUMENT**

When weighing a stay application, the Court must consider "four factors: '(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.'" *Nken v. Holder*, 556 U.S. 418, 434 (2009) (citation omitted); *see also Duncan v. Bonta*, 83 F.4th 803, 805 (9th Cir. 2023). "The first two factors . . . are the most critical." *Nken*, 556 U.S. at 434. Although this rubric resembles that governing the issuance of injunctive relief, "[i]f anything, a flexible approach is even *more* appropriate in the stay context" because "a stay operates only 'upon the judicial proceeding itself . . . either by halting or postponing some portion of the proceeding, or by temporarily divesting an order of enforceability.'" *Leiva-Perez v. Holder*, 640 F.3d 962, 966 (9th Cir. 2011) (quoting *Nken*, 556 U.S. at 428)). While the decision to grant a stay is discretionary, "[s]tay motions and other requests for interlocutory relief are nothing new or particularly remarkable. In truth, they are perhaps 'as old as the judicial system of the [N]ation.'" *Labrador v. Poe by & through Poe*, 144 S. Ct. 921, 922 (2024) (Gorsuch, J., concurring) (citation omitted). All four considerations—individually and collectively—recommend a partial stay.

**I.     The Ninth Circuit Is Likely to Find That Neither the NVRA Nor the LULAC Consent Decree Preempts H.B. 2492**

Few courts think the decision they just issued is likely to be reversed on appeal. *See Cigar Ass'n of Am. v. FDA*, 317 F. Supp. 3d 555, 561 n.4 (D.D.C. 2018). But the Federal Rules contemplate that district courts will stay their own decisions pending appeal, *see*

2

Fed. R. App. P. 8(a), and for good reason. Under the Ninth Circuit's "sliding scale" approach, a stay may be appropriate when the balance of equities decidedly favors the appellant and "offset[s] a weaker showing of" the appellant's likelihood of success on the merits. *Leiva-Perez*, 640 F.3d at 964 (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011)). In other words, the district court can grant the stay (without questioning its own decision) on the ground that the movant has raised "serious legal questions" that are fair grounds for appeal. *Manrique v. Kolc*, 65 F.4th 1037, 1041 (9th Cir. 2023). Movants believe they are likely to prevail on appeal. At a minimum, though, this motion presents several "serious" questions that warrant further review. *Id.*

### A. The NVRA Cannot Preempt State Laws Concerning the Selection of Presidential Electors

The NVRA applies to federal congressional elections, not to presidential elections. The registration rules of the NVRA are classic "Manner" election regulations. U.S. Const. art. I, § 4, cl. 1. But Congress has power to regulate the "Manner" only of congressional elections—the Constitution does not give Congress power to regulate the "Manner" of presidential elections. When it comes to presidential elections, Congress has authority only to "determine the Time of chusing the Electors, and the Day on which they shall give their Votes." U.S. Const. art II, § 1, cl. 4. Neither Congress nor the courts can constitutionally apply the NVRA to presidential elections.

Nevertheless, the Court ruled that Section 6 of the NVRA—which requires that States "accept and use" the Federal Form to register voters in federal elections—also applies to presidential elections. Doc. 534 at 9-12. The Court relied on the text of the NVRA, which it said "reflects an intent to regulate all elections for '[f]ederal office,' including for 'President or Vice President.'" Doc. 534 at 10 (quoting 52 U.S.C. § § 20507(a)). That would have been the correct starting point if the Constitution had nothing to say on the matter. But it does. And because the Constitution is "the supreme Law of the Land," U.S. Const. art. VI, "the preemption analysis" for election laws "must place particular importance on the first step in the determination as to whether Congress lawfully

preempted state law: identifying the enumerated power under which Congress claims to have acted." *Tex. Voters All. v. Dallas Cnty.*, 495 F. Supp. 3d 441, 467 (E.D. Tex. 2020).

          1.        The Constitution does not permit Congress to regulate the "Manner" of presidential elections

"Congress enacted the National Voter Registration Act under the authority granted it in [the Elections Clause]." *Ass'n of Cmty. Orgs. for Reform Now v. Miller*, 129 F.3d 833, 836 (6th Cir. 1997); *see also Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 7-8 (2013). The Elections Clause gives Congress power to regulate "[t]he Times, Places and Manner of holding Elections" for "Senators and Representatives." U.S. Const. art. I, § 4, cl. 1. This power to regulate congressional elections is expansive—it gives Congress authority "to enact the numerous requirements as to procedure and safeguards." *Smiley v. Holm*, 285 U.S. 355, 366 (1932). But the Elections Clause does not extend to presidential elections.

A different clause of the Constitution governs presidential elections. Under the Electors Clause, "Congress may determine the Time of chusing the Electors, and the Day on which they shall give their Votes." U.S. Const. art II, § 1, cl. 4. This power to regulate the presidential elections is far more limited. Congress has power over only the "Time" of choosing presidential electors. Congress's power does not extend to the "Places and Manner" of presidential elections, as it does with congressional elections. "That omission is telling," because when the Constitution "includes particular language in one section … but omits it in another section," courts "generally presume[]" the drafters acted "intentionally and purposely in the disparate inclusion or exclusion." *Collins v. Yellen*, 141 S. Ct. 1761, 1782 (2021); *see Pine Grove Twp. v. Talcott*, 86 U.S. 666, 674-75 (1873) (applying the rule to constitutional interpretation).

The Constitution's text does not give Congress power to regulate the "Places and Manner" of presidential elections. The NVRA facially applies to elections for "Federal office," 52 U.S.C. § 20502(2), which include "the office of President or Vice President," *id.* § 30101(3). But the NVRA, like every other act of Congress, must be squared with the

4

Constitution. And Congress cannot "exceed constitutional limits on the exercise of its authority." *Moore v. Harper*, 600 U.S. 1, 19 (2023). To the extent the NVRA regulates the "Manner" of presidential elections by imposing registration requirements on States for presidential elections, it exceeds Congress's power under the Elections and Electors Clauses.

H.B. 2492's citizenship verification rules do not run afoul of the NVRA. Those rules apply only to state elections and federal *presidential* elections. *See* A.R.S. § 16-121.01. Nothing in H.B. 2492 prevents a federal form applicant from being registered to vote in congressional elections.

> 2. Precedent does not permit Congress to regulate the "Manner" of presidential elections

This Court thought itself bound by precedent, but no court has decided this issue. To start, the Supreme Court has never held that Congress possesses power to regulate the "Places and Manner" of presidential elections. This Court relied in part on *Burroughs v. United States*, 290 U.S. 534 (1934), although it recognized that *Burroughs* only "addressed the constitutionality of a federal statute regulating campaign contributions in presidential elections." Doc. 534 at 10-11. The statute at issue had nothing to do with the appointment of presidential electors. *See Burroughs*, 290 U.S. at 540-43. Indeed, *Burroughs* rested on the premise that if the statute *did* interfere with the "exclusive state power" over presidential elections, it would be unconstitutional. *Id.* at 544-45. That premise applies here: to the extent the NVRA interferes with Arizona's authority to regulate the manner of presidential elections, it is unconstitutional.

This Court next turned to *Buckley v. Valeo*, 424 U.S. 1 (1976). *See* Doc. 534 at 11. But *Buckley* didn't address the Elections Clause or the Electors Clause any more than *Burroughs* did. This Court reasoned that *Buckley* interpreted *Burroughs* "more generally" to recognize "'broad congressional power to legislate in connection with the elections of the President and Vice President.'" Doc. 534 at 11 (quoting *Buckley*, 424 U.S. at 13 n.16). But the Supreme Court upheld the campaign finance laws at issue in *Buckley* under the

1    "General Welfare Clause" and "the Necessary and Proper Clause." *Buckley*, 424 U.S. at
2    90. The Court did not apply the Elections or Electors Clauses, and its passing mention of
3    *Burroughs* says nothing about the scope of Congress's power to regulate presidential
4    elections. Neither *Burroughs* nor *Buckley* addressed preemption of state laws governing
5    the manner of presidential elections.

6          Other Supreme Court cases confirm that Congress does not have power to regulate
7    the "Manner" of presidential elections. Long before *Buckley* and *Burroughs*, the Supreme
8    Court held that the Electors Clause gives "plenary power to the state legislatures in the
9    matter of the appointment of electors." *McPherson v. Blacker*, 146 U.S. 1, 35 (1892). The
10   Court thus upheld Michigan's law dividing the State into separate congressional districts
11   and awarding one of the State's electoral votes to the winner of each district. *Id.* at 35-37.
12   After *Buckley* and *Burroughs*, the Supreme Court reiterated that "the state legislature's
13   power to select the manner for appointing electors is plenary." *Bush v. Gore*, 531 U.S. 98,
14   104 (2000) (per curiam). The Supreme Court did not note any conflict with *Buckley* or
15   *Burroughs*. That's unsurprising because, properly read, "*Burroughs* … reinforce[s] the
16   principle that the manner of appointment is exclusive to the states." *In re Guerra*, 441 P.3d
17   807, 814 (Wash. 2019), *aff'd sub nom. Chiafalo v. Washington*, 140 S. Ct. 2316 (2020).
18   This question "is not one of policy[,] but of power." *McPherson*, 146 U.S. at 35. And
19   unless the Constitution is amended, "the appointment and mode of appointment of electors
20   belong exclusively to the states under the constitution of the United States." *Id.*

21         The Ninth Circuit has not deviated from these binding principles. In *Voting Rights*
22   *Coalition v. Wilson*, the Ninth Circuit considered a challenge to the NVRA based on
23   "[t]hree provisions of the Constitution." 60 F.3d 1411, 1413 (9th Cir. 1995) (citing U.S.
24   Const. article I, § 4; article I, § 2; and the Tenth Amendment). The Electors Clause of
25   Article II was not one of them. The Ninth Circuit cited *Burroughs* in passing for the
26   proposition that the "broad power given to Congress over congressional elections has been
27   extended to presidential elections." *Voting Rts. Coal.*, 60 F.3d at 1414. But that half-
28   sentence misreads *Burroughs*, as explained above. It also conflicts with binding Supreme

Court precedent holding that "the state legislature's power to select the manner for appointing electors is plenary." *Bush*, 531 U.S. at 104. And even if it didn't misread precedent and didn't conflict with the Constitution, "[d]icta that does not analyze the relevant statutory provision cannot be said to have resolved the statute's meaning." *Oklahoma v. Castro-Huerta*, 142 S. Ct. 2486, 2498 (2022). The Ninth Circuit did not and could not hold that Congress had power to regulate the "Manner" of presidential elections.

This Court reasoned that the language in *Voting Rights Coalition* was not dicta because "the NVRA plainly regulates congressional and presidential elections." Doc. 534 at 11. But that reasoning is circular—it doesn't explain the constitutional source of that power. This Court appeared to ground Congress's authority to regulate presidential elections under the Elections Clause. *See* Doc. 534 at 11. But as explained, the Elections Clause applies only to congressional elections.

When interpreting the NVRA, the Supreme Court has been careful about which clause applies (the Elections Clause) and which elections it applies to (congressional elections). *Inter Tribal*, 570 U.S. at 8-9. The "substantive scope" of the Elections Clause "is broad," but it covers only "congressional elections." *Id.* And "[o]ne cannot read the Elections Clause as treating implicitly what these other constitutional provisions regulate explicitly." *Id.* at 16. Under the *Electors* Clause, the "plenary" power to regulate the manner of presidential elections rests with the state legislatures. *Bush*, 531 U.S. at 104.

**B.    The NVRA Does Not Preempt State Laws Concerning Mail-In Voting**

However broadly the NVRA regulates voter registration, the statute says nothing about the procedures States can adopt for mail voting. The NVRA sets rules governing "procedures to register to vote in elections." 52 U.S.C. § 20503(a). One of those rules is that States must "accept and use" the federal registration form "for the registration of voters in elections for Federal office." *Id.* § 20505(a). The NVRA says nothing about the *mechanisms* for mail voting. Nevertheless, this Court held that the "accept and use" requirement for the "registration of voters," *id.*, also preempts Arizona's requirement that

7

residents who wish to vote by mail provide documentary proof of citizenship. Doc. 534 at 12-15. But the NVRA is silent about what information States can require of residents who wish to vote by mail.

Section 20505(c)(1) supports this reading. In that section, Congress explicitly permitted States to "require a person to vote in person if—(A) the person was registered to vote in a jurisdiction by mail; and (B) the person has not previously voted in that jurisdiction." 52 U.S.C. § 20505(c). This Court reasoned "that a state may not limit absentee voting outside of these prescribed circumstances." Doc. 534 at 13. But no court has interpreted the NVRA to "limit the number of circumstances in which a state could prevent an individual from voting by mail." Doc. 534 at 13. For good reason—that novel reading would eviscerate States' longstanding authority to regulate mail voting. *See, e.g.*, Conn. Gen. Stat. § 9-135 (permitting voting by mail only if the voter provides an excuse approved by the Legislature). The better reading of paragraph (c)(1) is a rule of construction—it instructs courts that Congress's provision for *mail-in registration* for first-time voters does not preclude States from requiring *in-person voting* for first-time voters. That general requirement is bolstered by the carve-out for voters who are "entitled to vote otherwise than in person under any … Federal law." 52 U.S.C. § 20505(c)(2). Subsection (c) provides a guarantee for those specific voters to be able to vote in person, notwithstanding any first-time voter laws. Construing that provision to wipe out mail-voting rules by implication finds no support in the text or the caselaw.

Moreover, Congress did not enact the NVRA merely to increase the number of registered voters. *Contra* Doc. 543 at 13-14. It also enacted the NVRA "to protect the integrity of the electoral process." 52 U.S.C. § 20501(b)(3). Arizona's proof-of-citizenship requirements for mail voting do just that. The Supreme Court has recognized that "[f]raud is a real risk that accompanies mail-in voting even if Arizona had the good fortune to avoid it." *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2348 (2021). The legislative history confirms that Congress inserted § 20505(c)(1) to address "concerns regarding fraud," and that the provision "demonstrates the concern of the Committee that each State

8

should develop mechanisms to ensure the integrity of the voting rolls." S. Rep. No. 103-6, at 13 (1993). This Court inferred the opposite, interpreting the provision to restrict what information States can require of absentee voters. But § 20505(c)(1) says nothing—either explicitly or implicitly—about the information States can require of voters before they can vote by mail.

Finally, caselaw confirms that the NVRA did not eliminate state rules governing mail voting. "[V]oting by absentee ballot" is a "privilege" that "make[s] voting easier," not a right secured by the Constitution, the NVRA, or any other federal statute. *Luft v. Evers*, 963 F.3d 665, 672 (7th Cir. 2020); *see also McDonald v. Bd. of Election Comm'rs of Chi.*, 394 U.S. 802, 809 (1969); *Mi Familia Vota v. Hobbs*, 608 F. Supp. 3d 827, 848 (D. Ariz. 2022) (observing that "there is no constitutional right to use [an] alternative voting method," such as voting by mail). And the NVRA sets rules in pursuit of "the right of citizens of the United States to vote." 52 U.S.C. § 20501(a)(1). It says little about the "privilege" of "voting by absentee ballot." *Luft*, 963 F.3d at 672; *cf.* 52 U.S.C. § 20505(c) (permitting States to require first-time voters to vote in person and providing a carve-out for absentee voters under federal law). Arizona thus retains "wide leeway … to enact legislation" governing mail voting. *McDonald*, 394 U.S. at 808. The Court erred in holding otherwise.

### C. The LULAC Consent Decree Cannot Perpetually Constrain the Legislature's Exercise of Its Sovereign Powers

The Ninth Circuit is unlikely to hold that the LULAC Consent Decree permanently precludes the Arizona Legislature from enacting prospective legislation that is inconsistent with its terms. As this Court has recounted, the LULAC Consent Decree requires county recorders "to accept State Form applications submitted without DPOC," if information on file with the Arizona Department of Transportation permits the recorder to identify the putative applicant and verify her citizenship. *See* Doc. 534 at 21, 34; Ex. 24 at 7-10. This directive collides squarely with section 4 of H.B. 2492, which instructs the county

9

recorders to "reject any [State Form] application for registration that is not accompanied by satisfactory evidence of citizenship." A.R.S. § 16-121.01(C).

Subordinating the statute to then-Secretary of State Reagan's bilateral agreement with private litigants inverts Arizona's construct of sovereignty. "The legislature has the exclusive power to declare what the law shall be" in Arizona. *State v. Prentiss*, 786 P.2d 932, 936 (Ariz. 1989). And under the federal Constitution, the "state legislatures" have the "'duty' to prescribe rules governing federal elections." *Moore v. Harper*, 143 S. Ct. 2065, 2074 (2023). Neither the Legislature nor even the State of Arizona was a party to the LULAC Consent Decree. Indeed, the LULAC Consent decree itself specifically denotes the defendant "Parties" as only the Secretary of State and Maricopa County Recorder. *See* Ex. 24 at 1; *see also Roosevelt Irr. Dist. v. Salt River Project Agric. Imp. & Power Dist.*, 39 F. Supp. 3d 1051, 1054-55 (D. Ariz. 2014) (noting that consent decree did not purport to bind all political subdivisions of the state, and emphasizing that "[c]ourts must find the meaning of a consent decree 'within its four corners.'" (citation omitted)); *United States v. State of Oregon*, 913 F.2d 576, 580 (9th Cir. 1990) (a consent decree "is not a decision on the merits or the achievement of the optimal outcome for all parties, but is the product of negotiation and compromise.").

The notion that the Secretary of State—an executive officer whose authority is denoted entirely by statute, *see* Ariz. Const. art. V, § 9—can irrevocably forfeit any portion of the lawmaking power, particularly in the realm of election administration, is dissonant with the U.S. Constitution, the Arizona Constitution, the relevant case law, and separation of powers precepts. *See, e.g.*, *Carson v. Simon*, 978 F.3d 1051, 1060 (8th Cir. 2020) ("Simply put, the Secretary [of State] has no power to override the Minnesota Legislature" by stipulating to the tabulation of absentee ballots received after Election Day). And the LULAC Consent Decree itself manifests no such relinquishment. *See Doe v. Pataki*, 481 F.3d 69, 78 (2d Cir. 2007) (emphasizing that "proper regard for state authority requires a federal court to have a clear indication that a state has intended to surrender its normal authority to amend its statutes"). Regardless, this Court's jurisdiction to enforce the

LULAC Consent Decree expired on December 31, 2020. *See* Ex. 24 at 16. It follows that "the judgment . . . was executed. The case is over." *Taylor v. United States*, 181 F.3d 1017, 1023 (9th Cir. 1999).[1] Even by its own terms, the LULAC Consent Decree exerts no ongoing force.

## II. The Partial Nullification of H.B. 2492 Irreparably Injures the Legislative Intervenors as Representatives of the State and of the Legislative Institution, and Inflicts a Competitive Injury on the RNC

### A. The Suspension of Duly Enacted Laws Inflicts Both Sovereign and Institutional Harms

Enjoining H.B. 2492 exacts two variants of irreparable injury: one to the State itself and one to the legislative institution that the Legislative Intervenors represent. Each is independently sufficient to warrant a partial stay of the Court's injunction pending appeal.

#### 1. Arizona Law Empowers Legislative Intervenors to Assert the State's Interests in the Effectuation of Its Own Duly Enacted Laws

An "injunction[] barring the State from conducting this year's elections pursuant to a statute enacted by the Legislature . . . would seriously and irreparably harm the State," if the statute is ultimately determined to be valid. *Abbott v. Perez*, 585 U.S. 579, 602 (2018); *see also Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." (citation omitted)); *Coal. for Econ. Equity v. Wilson*, 122 F.3d 718, 719 (9th Cir. 1997) ("[I]t is clear that a state suffers irreparable injury whenever an enactment of its people or their representatives is enjoined."); *News v. Shinn*, No. CV-15-02245-PHX-ROS, 2020 WL 409113, at *3 (D. Ariz. Jan. 24, 2020) (agreeing that enjoining "an enactment of Arizona's representatives .

---

[1] Central to the *Taylor* court's apprehension of a potential separation of powers problem in the congressional termination of an existing consent decree was the fact that the judgment at issue "awarded no prospective relief." 181 F.3d at 1025. Here, the RNC and Legislative Intervenors do not wish to "reopen," *id.*, the LULAC Consent Decree or to retroactively nullify voter registrations conducted under its auspices. Rather, they seek only a recognition that it cannot mandate any continuing, judicially enforceable modification of extant Arizona statutes.

. . constitutes a form of irreparable injury"); *cf. Cameron v. EMW Women's Surgical Ctr., P.S.C.*, 595 U.S. 267, 277 (2022) ("[A] State 'clearly has a legitimate interest in the continued enforceability of its own statutes,' and a federal court must 'respect . . . the place of the States on our federal system.'" (citations omitted)).

This axiom of sovereignty—which derives from a confluence of federalism protections and separation of powers principles—is not the province of any single state actor. To the contrary, "a State is free to 'empowe[r] multiple officials to defend its sovereign interests in federal court.'" *Berger v. N.C. State Conference of the NAACP*, 597 U.S. 179, 192 (2022) (citation omitted). While the named defendants who are encumbered by an injunction will almost always have standing to contest it, they are not the only conduits for asserting the State's resultant injury. *See League of Women Voters of Florida Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 945 (11th Cir. 2023) ("The Secretary has standing to appeal the judgment . . . He need not be bound by an injunction nor even bear the primary responsibility for enforcing the solicitation provision to enjoy the requisite interest."). In this vein, "the State's executive branch" does not necessarily "hold[] a constitutional monopoly on representing [Arizona]'s practical interests in court." *Berger*, 597 U.S. at 194. Rather, federal courts must look to state law to discern the dispersion of this authority, and must heed "a State's chosen means of diffusing its sovereign powers among various branches and officials." *Id.* at 191.

Arizona law empowers the Legislative Intervenors to assert and vindicate in the judiciary the State's interest in formulating, enacting, and enforcing its own laws. The Legislature is the locus of sovereignty in Arizona government. *Whitney v. Bolin*, 330 P.2d 1003, 1004 (Ariz. 1958) ("[T]he power of the legislature is plenary and unless that power is limited by express or inferential provisions of the Constitution, the legislature may enact any law which in its discretion it may desire."). While the Attorney General typically represents the State's interests in judicial proceedings, *see* A.R.S. § 41-193(A)(3), the Arizona Legislature "has also reserved to itself some authority to defend state law on behalf of the State." *Berger*, 597 U.S. at 194.

At least two specific provisions of Arizona law undergird the Legislative Intervenors' standing to contest the Court's suspension of the Legislature's enactments. First, A.R.S. § 12-1841—which bears strong parallels to the North Carolina statute that the Supreme Court found "expressly authorized the legislative leaders to defend the State's practical interests in litigation," *Berger*, 597 U.S. at 193 (citing N.C. Gen. Stat. Ann. § 1-72.2 (2021))—reserves for the Speaker of the Arizona House of Representatives and the President of the Arizona Senate an "entitle[ment] to be heard," in any proceeding implicating the constitutionality of a state law, to include "interven[ing] as a party" or "fil[ing] briefs in the matter." A.R.S. § 12-1841(A), (D). As this Court has recognized, the statute embodies Arizona's "policy decision to vest in its legislative leaders an interest in defending the constitutionality of the legislature's enactments" in federal and state courts. *Isaacson v. Mayes*, 2:21-cv-1417, 2023 WL 2403519, at *1 (D. Ariz. Mar. 8, 2023); *see also* Doc. 535 at 6 (affirming that "the Speaker and the President are authorized to defend Arizona's statutes and the Court declines to limit their right to represent the Arizona Legislature's interests"). Because this Court's partial injunction "implicat[es] the constitutionality" of H.B. 2492 in relation to Congress' and the States' respective powers under the Presidential Electors Clause, *see* U.S. Const. art. II, § 1, the Elections Clause, *see id.* art. I, § 4, and the Supremacy Clause, *see id.* art. VI, Arizona law entitles the Legislative Intervenors to protect and pursue the State's sovereign interests in court.

Second, the Arizona Constitution incorporates explicit protections of state sovereignty against unconstitutional federal incursion. *See* Ariz. Const. art. II, § 3. The provision affirms that the State may "pursu[e] any . . . available legal remedy" to counter perceived unconstitutional federal overreach, and contemplates that "the people or their representatives [may] exercise" authority to that end. *Id.* This intended bulwark against unlawful federal encroachment is, by its terms, not the exclusive domain of the Attorney General, but rather is vested collectively in the elected branches of Arizona state government. When, as here, a federal court truncates powers that arguably are entrusted to the State, legislative "representatives" may seek appropriate relief on its behalf.

        2.        **Curtailment of the Legislature's Authority to Select Presidential Electors and to Structure Methods of Registration and Voting in Arizona Elections Irreparably Injures the Institution**

Even if the Legislative Intervenors could not assert and advance the State's sovereign interests in this Court, they certainly may seek redress of injuries to the legislative institution they represent. An extrinsic constraint on a legislative body's lawmaking functions inflicts a cognizable institutional injury. *See Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 800 (2015) (finding that the Arizona Legislature had standing to bring claim that initiative measure "strips the Legislature of its alleged prerogative to initiate redistricting").

The injunction thwarts the State from disallowing individuals who have not proved their U.S. citizenship from participating in Arizona's selection of its presidential electors, or from utilizing Arizona's generous mail-in voting option. It also elevates the Secretary of State's improvident promises in the LULAC Consent decree over the laws of the State. In doing so, the injunction abrogates three constitutional prerogatives that are vested expressly and exclusively in the Arizona Legislature. First, the "Manner" of selecting a State's presidential electors is prescribed solely by "the Legislature thereof." U.S. Const. art. II, § 1; *see also Carson*, 978 F.3d at 1060 (explaining that "when a state legislature enacts statutes governing presidential elections, it operates 'by virtue of a direct grant of authority' under the United States Constitution" (citation omitted)). Second, the Elections Clause imbues "the Legislature" of each State with the responsibility of regulating voting methods and procedures in federal elections, unless until Congress "alter[s]" them. U.S. Const. art. I, § 4; *Ariz. State Legislature*, 576 U.S. at 800 (recognizing Legislature's standing to assert alleged injury to its authority under the Elections Clause). Finally, the Arizona Constitution explicitly charges the Legislature with "enact[ing] registration and other laws to secure the purity of elections and guard against abuses of the elective franchise." Ariz. Const. art. VII, § 12; *see also Priorities USA v. Nessel*, 978 F.3d 976, 981-82 (6th Cir. 2020) (citing parallel provision in Michigan Constitution and explaining

that, when an election law is enjoined, "[t]he legislature has lost the ability to regulate that election in a particular way").

In short, the Arizona Legislature has sustained an irreparable injury because its "specific powers are disrupted" by the injunction. *Id.* at 982. The Legislative Intervenors may seek redress of this harm on the institution's behalf, as both chambers have adopted rules empowering the Legislative Intervenors to "bring or assert in any forum on behalf of the[ir houses] any claim or right arising out of any injury to [their houses'] powers or duties under the Constitution or Laws of this state." State of Arizona, *Senate Rules*, 56th Legislature 2023-2024, Rule 2(N), https://bit.ly/3WXFLDv; State of Arizona, *Rules of the Ariz. House of Representatives*, 56th Legislature 2023-2024, Rule 4(K), https://bit.ly/3HuL9bz. *See also* Doc. 535 at 8 (recognizing the Legislative Intervenors' "right to represent the Arizona Legislature's interests").

### B. Enjoining H.B. 2492's Provisions Governing Voting in Presidential Elections and By Mail Forces Inflicts a Competitive Injury on the RNC

In overriding the Legislature's determination that Federal Only voters—*i.e.*, individuals who have not provided DPOC—may not vote for Arizona's presidential electors or vote by mail, the injunction distorts the competitive environment underpinning the 2024 election in a manner that is unfavorable to the RNC and Republican candidates.[2] "Competitive standing recognizes the injury that results from being forced to participate in an 'illegally structure[d] competitive environment.'" *Mecinas v. Hobbs*, 30 F.4th 890 898 (9th Cir. 2022) (citation omitted); *see also Owen v. Mulligan*, 640 F.2d 1130, 1132 (9th Cir. 1981) (holding that "the potential loss of an election" due to allegedly unlawful attributes of the electoral system is an injury). "Voluminous" authority shows that candidates and parties suffer injury when their "chances of victory would be reduced." *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 587 & n.4 (5th Cir. 2006) (collecting cases).

---

[2] The Legislative Intervenors' demonstration of cognizable irreparable sovereign and institutional injuries, however, obviates the need for an independent showing by the RNC. *See Priorities USA v. Nessel*, 860 Fed. Appx. 419, 421 (6th Cir. 2021).

15

1       According to Non-U.S. Plaintiffs' own expert witness, only 14.3% of Federal Only voters are registered as members of the Republican Party, while Republicans comprise 34.5% of the total active registered voter population in Arizona. *See* Ex. 340. The judicially mandated inclusion of these individuals in the presidential electorate hence necessarily impairs the relative competitive position of the Republican presidential nominee. If, as the RNC and Legislative Intervenors maintain, the Arizona Legislature is entitled to limit participation in presidential elections and use of mail-in voting to only voters who have sufficiently established their U.S. citizenship, the injunction's effective nullification of these public policy determinations alters Arizona's electoral terrain to the RNC's disadvantage. *See Mecinas*, 30 F.4th at 898 (finding that DNC had adequately alleged injury "based on the ongoing, unfair advantage conferred to their rival candidates"); *see also Ariz. State Legislature*, 576 U.S. at 800 (cautioning against a conflation of standing and the merits).

### III. The Balance of Equities and Public Policy Support a Partial Stay

      When, as here, a governmental party seeks a stay, "its interest and harm merge with that of the public." *Veasey v. Abbott*, 870 F.3d 387, 391 (5th Cir. 2017); *see also E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 668 (9th Cir. 2021) (holding in preliminary injunction context that "[w]hen the government is a party, the last two factors (equities and public interest) merge"). The administration of the 2024 election in accordance with safeguards devised by Arizonans' elected representatives to limit the franchise to verified United States citizens is a public interest of the highest order. *See Mi Familia Vota v. Hobbs*, 977 F.3d 948, 954 (9th Cir. 2020) ("States have 'an interest in protecting the integrity, fairness, and efficiency of their ballots and election processes.'" (quoting *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 364 (1997))).

      There is no substantial countervailing harm that an injunction is necessary to remediate. Although the Court found that each of the Plaintiff groups had associational or organizational standing to assert at least one of their respective claims, *see* Doc. 709 at 55-62, it also recognized that "Plaintiffs offered no witness testimony or other 'concrete

evidence' to corroborate that the Voting Laws' DPOC Requirements will in fact impede any qualified elector from registering to vote or staying on the voter rolls," *id.* at 92, and that "[t]he Voting Laws do not impose an excessive burden on any specific subgroup of voters," *id.* at 95. The absence of any articulable harm that the relevant provisions of H.B. 2492 will exact on any identifiable individual underscores the appropriateness of a partial stay. *See Duncan*, 83 F.4th at 806 (stay was warranted where there was no indication that it would "substantially injure" the general public's exercise of Second Amendment rights); *A. Philip Randolph Institute of Ohio v. LaRose*, 831 Fed. App'x 188, 192 (6th Cir. 2020) (concluding that stay of order authorizing counties to deploy ballot drop-boxes "is unlikely to harm anyone" by preventing them from voting).

## CONCLUSION

For the foregoing reasons, the Court should stay pending appeal its injunction to the extent it prohibits the implementation or enforcement of H.B. 2492's provisions that (1) restrict Federal Only voters from voting for president; (2) restrict Federal Only voters from voting by mail, or (3) are inconsistent with the LULAC Consent Decree. To expedite resolution of this motion, Movants waive their right to a reply brief and request that the Court order that any responses to the motion must be filed by May 29, 2024.

RESPECTFULLY SUBMITTED this 17th day of May, 2024.

|  |  |
|---|---|
| Gilbert C. Dickey* <br> CONSOVOY MCCARTHY PLLC <br> 1600 Wilson Blvd., Ste. 700 <br> Arlington, VA 22209 <br> (703) 243-9423 <br> gilbert@consovoymccarthy.com <br><br> Tyler Green* <br> CONSOVOY MCCARTHY PLLC <br> 222 S. Main Street, 5th Floor <br> Salt Lake City, UT 84101 <br> tyler@consovoymccarthy.com <br><br> *admitted pro hac vice | By: */s/ Thomas Basile* <br> Kory Langhofer, Ariz. Bar No. 024722 <br> Thomas Basile, Ariz. Bar. No. 031150 <br> STATECRAFT PLLC <br> 649 North Fourth Avenue, First Floor <br> Phoenix, Arizona 85003 <br> (602) 382-4078 <br> kory@statecraftlaw.com <br> tom@statecraftlaw.com <br><br> *Attorneys for Intervenor-Defendant Republican National Committee* <br><br><br> s/ Hannah H. Porter (with permission) <br> **GALLAGHER & KENNEDY, P.A.** <br> Kevin E. O'Malley (Bar No. 006420) <br> Hannah H. Porter (Bar No. 029842) <br> Ashley E. Fitzgibbons (Bar No. 036295) <br> 2575 East Camelback Road <br> Phoenix, Arizona 85016-9225 <br> Telephone: (602) 530-8000 <br> Facsimile: (602) 530-8500 <br> kevin.omalley@gknet.com <br> hannah.porter@gknet.com <br> ashley.fitzgibbons@gknet.com <br><br> *Attorneys for Intervenor-Defendants Speaker Toma and President Petersen* |

**CERTIFICATE OF SERVICE**

I hereby certify that on this 17th day of May, 2024, I caused the foregoing document to be electronically transmitted to the Clerk's Office using the CM/ECF System for Filing, which will send notice of such filing to all registered CM/ECF users.

/s/ Thomas Basile