Papetti Samuels Weiss McKirgan LLP
Bruce Samuels (State Bar No. 015996)
bsamuels@pswmlaw.com
Jennifer Lee-Cota (State Bar No. 033190)
jleecota@pswmlaw.com
Scottsdale Quarter
16430 North Scottsdale Road
Suite 290
Scottsdale, AZ 85254
+1 480 800 3530

Wilmer Cutler Pickering Hale and Dorr LLP
Seth P. Waxman (*pro hac vice*)
seth.waxman@wilmerhale.com
Daniel S. Volchok (*pro hac vice*)
daniel.volchok@wilmerhale.com
Christopher E. Babbitt (*pro hac vice*)
christopher.babbitt@wilmerhale.com
Britany Riley-Swanbeck *(pro hac vice)*
britany.riley-swanbeck@wilmerhale.com
2100 Pennsylvania Avenue N.W.
Washington, D.C. 20037
+1 202 663 6000 (telephone)
+1 202 663 6363 (facsimile)

*Attorneys for the Democratic National Committee
and Arizona Democratic Party*

## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| Mi Familia Vota, et al., <br><br> Plaintiffs, <br><br> v. <br><br> Adrian Fontes, in his official capacity as Arizona Secretary of State, et al., <br><br> Defendants. <br><br> AND CONSOLIDATED CASES. | Case No. 22-00509-PHX-SRB (Lead) <br><br> **CERTAIN NON-U.S. PLAINTIFFS' OPPOSITION TO INTERVENOR-DEFENDANTS' MOTION TO PARTIALLY STAY THE INJUNCTION PENDING APPEAL** |

**INTRODUCTION**

This Court correctly held that the National Voter Registration Act ("NVRA") and the consent decree entered in *League of United Latin American Citizens of Arizona v. Reagan*, No. 2:17-cv-04102-DGC (D. Ariz.) ( "*LULAC* consent decree"), preclude enforcement of the provisions of Arizona House Bill ("H.B.") 2492 that (1) prohibit people who have not provided documentary proof of citizenship ("DPOC") from voting in presidential elections or in any election by mail, and/or (2) are inconsistent with the *LULAC* consent decree. Intervenors now seek the extraordinary remedy of a stay pending appeal—relief that the state, the attorney general, and the secretary of state all oppose. But intervenors do not satisfy *any* of the factors required to obtain a stay, let alone all four of them.

For example, intervenors cannot demonstrate they are likely to succeed on appeal. Their argument that the NVRA does not apply to presidential elections is foreclosed by precedent that will bind the Ninth Circuit panel (and any en banc court). Their contention that the NVRA does not govern the "mechanisms" and "procedures" of voting is belied by the law's text and purpose. And they also make no attempt to establish that accepting federal-form applications without DPOC but rejecting otherwise identical state-form applications complies with federal law. Finally, their attack on the validity of the *LULAC* consent decree misunderstands controlling precedent and separation-of-powers principles.

Merits aside, a stay at this juncture would be profoundly disruptive and contrary to the public interest. As the secretary of state's opposition explains, a stay would result in "confusion and chaos for voters and election officials alike." ECF 732 at 4; *accord* ECF 733 at 1 (state/attorney general opposition). And that is in addition to the harm to Arizonans' interest in exercising their fundamental right to vote. The injuries asserted by intervenors— who do not speak either for the state, ECF 733 at 3-4, or the public as a whole—come nowhere close to outweighing these important interests.

This Court should promptly deny a stay so that state and county officials—and political parties, candidates, civic organizations, and voters—may continue their preparations for the July 30 primaries and November 5 general election without disruption.

1

**LEGAL STANDARD**

A stay pending appeal is an "'extraordinary remedy'" that will not be granted lightly. *United States v. Mitchell*, 971 F.3d 993, 999 (9th Cir. 2020) (quoting *Nken v. Holder*, 556 U.S. 418, 428 (2009)). "A stay is not a matter of right, even if irreparable injury might otherwise result." *Nken*, 556 U.S. at 433. Whether to grant a stay is a matter of discretion, guided by "(1) whether the stay applicant has made a strong showing that he is entitled to success on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Id.* at 434. "The first two factors … are the most critical." *Id.*

The Ninth Circuit employs a sliding-scale approach to these factors, under which "the required degree of irreparable harm increases as the probability of success decreases." *Manrique v. Kolc*, 65 F.4th 1037, 1041 (9th Cir. 2023). But "[e]ven with a high degree of irreparable injury"—which is not present here—a stay applicant "must show serious legal questions going to the merits." *Id.* (quotation marks omitted).

**ARGUMENT**

**I.     INTERVENORS ARE NOT LIKELY TO SUCCEED ON THE MERITS**

The provisions of H.B. 2492 at issue—excluding anyone who did not provide DPOC when registering to vote with the federal form from voting (1) in presidential elections (by mail or in person) or (2) by mail in any election—conflict with the NVRA's mandate that states "accept and use" the federal form to register voters for federal elections, 52 U.S.C. §20505(a)(1). In this respect, H.B. 2492 is merely a revamped attempt to impose the same restrictions rejected in *Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1 (2013)— and intervenors' efforts to avoid that case lack merit now, as they did earlier. This Court was right to deem the challenged provisions preempted and should likewise hold that intervenors are not likely to succeed on appeal.

H.B. 2492's provision requiring county recorders to reject state-form applications submitted without DPOC also violates the NVRA, which requires states to accept voter

registration forms without DPOC and to accept valid applications submitted at least 30 days prior to an election.  *See* 52 U.S.C. §20507(a)(1).  Nor can that provision stand under the Fourteenth Amendment, because it arbitrarily treats otherwise identical registrants differently based on whether they happen to complete the federal or state form.  Regardless, the *LULAC* consent decree forbids enforcement of that portion of H.B. 2492.

Intervenors' contrary arguments fail.

### A. This Court Correctly Ruled That The NVRA Preempts H.B. 2492's Restriction On Voting In Presidential Elections

1. Intervenors' argument that the NVRA cannot preempt H.B. 2492's bar on voting in presidential elections by those who have not provided DPOC rests on the notion that Congress lacks constitutional authority to regulate the manner of those elections.  But the Supreme Court and the Ninth Circuit have already each rejected that notion.  Intervenors thus have no prospect of prevailing on the merits of their appeal, because whether a party is "likely to succeed on the merits" must be determined "under existing precedent," *Whole Woman's Health v. Jackson*, 141 S.Ct. 2494, 2495 (2021).  Recognizing that, this Court held in a prior case that "a finding that [p]laintiffs were likely to succeed on the merits … was foreclosed by" a binding decision.  *House v. Whiting*, 2011 WL 13119113, at *1 (D. Ariz. May 10, 2011).  The same result is required here.

Contrary to intervenors' claim that no court has decided the issue (Mot.5), the Supreme Court has repeatedly affirmed congressional authority to regulate presidential elections.  For example, in *Burroughs v. United States*, 290 U.S. 534 (1934), the Court held that Congress "undoubtedly" has the power to "pass appropriate legislation to safeguard [presidential] elections," *id*. at 545.  The Court expressly rejected the "narrow view of the powers of Congress" intervenors here espouse, *id*. at 544, calling it "'a proposition so startling as to arrest attention and demand the gravest consideration,'" *id.* at 546 (quoting *Ex parte Yarbrough*, 110 U.S. 651, 657 (1884)).  The Court later reaffirmed that conclusion, citing *Burroughs*'s recognition of "broad congressional power to legislate in connection with the elections of the President."  *Buckley v. Valeo*, 434 U.S. 1, 13 n.16 (1976) (per curiam).

The Ninth Circuit, too, has recognized Congress's constitutional authority to regulate presidential elections.  Citing *Burroughs*, the Ninth Circuit explained in a challenge to the NVRA's constitutionality that "[t]he broad power given to Congress over congressional elections has been extended to presidential elections."  *Voting Rights Coalition v. Wilson*, 60 F.3d 1411, 1414 (9th Cir. 1995).  Other circuits are in accord.  *See ACORN v. Miller*, 129 F.3d 833, 836 n.1 (6th Cir. 1997); *ACORN v. Edgar*, 56 F.3d 791, 793 (7th Cir. 1995).  Intervenors, in contrast, cite no case holding that Congress *cannot* regulate the places and manner of presidential elections.  That alone precludes finding that they are likely to succeed on appeal.

Intervenors also fail to distinguish *Burroughs*, *Wilson*, and the other cases just discussed.  They first assert (Mot.5) that *Burroughs* is irrelevant because it "had nothing to do with the appointment of presidential electors."  In reality, *Burroughs* stated that "the constitutional objection *necessary to be considered* [was] that the power of appointment of presidential electors and the manner of their appointment are expressly committed by section 1, art. 2, of the Constitution to the states, and that [] congressional authority is thereby limited."  290 U.S. at 544 (emphasis added).  Intervenors also wrongly claim (Mot.5) that "*Burroughs* rested on the premise that if the statute [at issue there] *did* interfere with the 'exclusive state power' over presidential elections, it would be unconstitutional."  The Court opined only that the statute at issue "in no sense invade[d] any exclusive state power."  *Burroughs*, 290 U.S. at 545.

Intervenors' attempts to distinguish the other cases foreclosing their argument likewise fail.  For example, they argue (Mot.6) that *Buckley* "says nothing about the scope of Congress's power to regulate presidential elections," ignoring that *Buckley* (twice) explained that "Congress has power to regulate Presidential elections and primaries," 424 U.S. at 91; *see also id.* at 13 n.16.  As for *Wilson*, intervenors contend (Mot.6-7) that the Ninth Circuit's recognition of broad congressional power to regulate presidential elections is dicta—but that recognition plainly was essential to the court's decision to uphold the NVRA, as the NVRA explicitly regulates presidential elections, *see* 52 U.S.C. §20502(2) (citing *id.* §30101(3)).

Intervenors' reliance on other cases (Mot.6) is misplaced.  First, *McPherson v. Blacker*, 146 U.S. 1 (1892), includes no holding about congressional authority to regulate the place and manner of presidential elections.  The case was instead about whether the *Michigan* legislature acted unconstitutionally in enacting a district-based, rather than state-wide, mechanism for choosing presidential electors.  *Id.* at 24-25.  The Court's rejection of the argument that the legislature had acted unconstitutionally did not require it to address the scope of Congress's constitutional power.  And it assuredly cannot be read to have the broad reach intervenors posit, because that reading would conflict with the Court's later rulings in *Burroughs* and *Buckley*.  As for *Bush v. Gore*, 531 U.S. 98 (2000) (per curiam), that case was about constitutional limits on state authority over elections, not the scope of congressional power over elections.  The Court explained there, moreover, that once a "state legislature chooses a statewide election as the means" by which presidential electors are selected, the state may not arbitrarily deny such a right to voters.  *Id.* at 104-105.  That is what H.B. 2492 would do, and what the NVRA prevents.

2.     Intervenors do not address Congress's power to enact the NVRA under the Fourteenth and Fifteenth Amendments—perhaps because intervenor the Republican National Committee ("RNC") has admitted in this litigation (ECF 442 at 5) that "[t]hose amendments could have been a valid source for the NVRA had Congress invoked them."  (As explained in the next paragraph, Congress in fact did so, though it is not required to.)  Intervenors' failure to address the Reconstruction Amendments is by itself sufficient to conclude that they have not shown a likelihood of success on the merits, because plaintiffs argued those amendments to this Court and hence the Ninth Circuit could affirm based on them.  In any event, the amendments independently defeat intervenors' likelihood-of-success argument.

"Congress may use any rational means to effectuate the constitutional prohibition of racial discrimination in voting."  *South Carolina v. Katzenbach*, 383 U.S. 301, 324 (1966).  Congress need not invoke its power under the amendments when legislating; there need only be "some legislative purpose or factual predicate" to support the exercise of that power.  *EEOC v. Wyoming*, 460 U.S. 226, 243 n.18 (1983).  But Congress did invoke that power in

5

the NVRA.  Indeed, both "the legislative history and the text … are clear" that Congress relied on that power to enact the NVRA.  *Condon v. Reno*, 913 F.Supp. 946, 962 (D.S.C. 1995).  Congress's express findings include that "discriminatory and unfair registration laws and procedures … disproportionately harm voter participation by various groups, including racial minorities."  52 U.S.C. §20501(a)(3).  And the Senate report accompanying the law stated that the law sought "to remove the barriers to voter registration and participation under Congress' power to enforce the equal protection guarantees of the 14th Amendment." S.Rep. No. 103-6, at 3 (1993); *see also* H.Rep. No. 103-9, at 3 (1993) (deeming the NVRA necessary to complete the work of the Voting Rights Act ("VRA")).

The RNC's summary-judgment briefing argued (ECF 367 at 7) that the NVRA is not reasonably tailored to preventing race discrimination.  That is wrong.  Mandating a simplified system for registering to vote in federal elections and restricting states' ability to purge voters from the voting rolls are assuredly "rational means," *Katzenbach*, 383 U.S. at 324, of preventing "discriminatory and unfair registration laws and procedures," 52 U.S.C. §20501(a)(3).  The RNC further asserted (ECF 367 at 7) that the proper standard is not rational means but rather "congruence and proportionality," *City of Boerne v. Flores*, 521 U.S. 507, 508 (1997).  That too is wrong; even after *City of Boerne*, the Supreme Court has applied *Katzenbach* when Congress sought to remedy racial discrimination or protect voting rights.  *See Lopez v. Monterey County*, 525 U.S. 266, 283 (1999).  Courts have thus recognized that "*Katzenbach* has yet … to be overruled or otherwise … modified by the Supreme Court," and hence that its "rational means" standard governs in cases involving the Fifteenth Amendment.  *Janis v. Nelson*, 2009 WL 5216902, at *8 (D.S.D. Dec. 30, 2009). Regardless, the NVRA *is* congruent and proportional.  Disputing this, the RNC claimed (ECF 367 at 7) that the NVRA is under-inclusive because it does not address state elections. But Congress need not address every aspect of a problem at once.  *Williamson v. Lee Optical of Oklahoma*, 348 U.S. 483, 489 (1955).  Moreover, at the same time that it faulted Congress for failing to include state elections, the RNC argued that Congress cannot constitutionally regulate state elections.  ECF 367 at 4.  That is wrong (as the VRAs and Civil Rights Act's

coverage of all elections makes plain), but even if it were right it would do nothing to show the absence of congruence and proportionality; such an absence cannot possibly be established simply by showing that Congress did not try to apply the law to matters that are (again, according to the RNC) beyond its constitutional purview.

Lastly, the RNC argued at summary judgment (ECF 367 at 7) that "the NVRA's 'legislative record lacks examples of modern instances' of discrimination on account of proof of citizenship required for registration."  But the case it quotes in making this argument contrasted the record underlying the statute in that case with "the record which confronted Congress … in the voting rights cases."  *City of Boerne*, 521 U.S. at 530.  And in enacting the NVRA, Congress relied on an extensive record of discrimination in voting registration, similar to that underlying the VRA.  *See* S.Rep. No. 103-6, at 3; H.Rep. No. 103-9, at 3-4.  The Ninth Circuit has held that the record supporting the VRA confirms that that law's prophylactic elements are a congruent and proportional means of addressing discrimination in voting.  *See United States v. Blaine County*, 363 F.3d 897, 904-909 (9th Cir. 2004).  The same is thus true of the NVRA.

## B.    The NVRA's Text And Purpose Defeat Intervenors' Mail-Voting Argument

Intervenors argue that the NVRA cannot preempt state laws concerning mail voting because the NVRA concerns only voter registration, not the actual casting of ballots.  That proposed dichotomy is anathema to both the text and purpose of the NVRA.

To start, the NVRA's plain text covers both registration *and* voting.  The law states that the right "to vote" is "fundamental" and that states must "promote the exercise of that right."  52 U.S.C. §20501(a).  Indeed, the law's enumerated purposes include "enhanc[ing] the participation of eligible citizens *as voters*."  *Id.* §20501(b) (emphasis added).

Accordingly, courts recognize that the law's purpose is to ensure that the "right to *exercise the[] franchise* … not be sacrificed."  *Project Vote/Voting for America, Inc. v. Long*, 682 F.3d 331, 335 (4th Cir. 2012) (emphasis added).  That purpose cannot be served by protecting registration alone:  Because "[r]egistration is indivisible from election," states

may not, "by separating registration from voting, … undermine the power that Article I section 4 grants to Congress." *Edgar*, 56 F.3d at 793.  In other words, intervenors' assertion (Mot.7) that registration is distinct from the "procedures" and "mechanisms" of voting is untenable, as that distinction would allow states to formally register voters consistent with the NVRA but then impose all manner of barriers to prevent them from actually voting (such as forcing them to submit hundreds of pages of paperwork in order to vote).  Because H.B. 2492's discriminatory restriction on mail voting would therefore "stand[] as an obstacle to the accomplishment … of the full purposes … of Congress'" in the NVRA, *Puente Arizona v. Arpaio*, 821 F.3d 1098, 1103 (9th Cir. 2016), it is preempted.

Contrary to intervenors' suggestion (Mot.8), the NVRA's treatment of mail voting *defeats* their argument that the NVRA imposes no restrictions on the "procedures" and "mechanisms" of voting.  Section 20505(c)(1) enumerates specific circumstances in which a state may limit mail voting.  As this Court correctly recognized (ECF 534 at 13), per the interpretive canon *expressio unius*, it is a "sensible inference" that Congress "must have … meant" to *prevent* states from limiting mail voting in *other* circumstances, *NLRB v. SW General, Inc.*, 580 U.S. 288, 302 (2017).

Finally, intervenors' attempt to distinguish mail voting as a "privilege" rather than a right (Mot.9) is unavailing.  Nothing in the Constitution suggests that such a distinction is relevant to preemption.  In any event, Arizona has—for decades—guaranteed that "[a]ny qualified elector may vote by early ballot," A.R.S. §16-541, and mail voting has become the means by which the vast majority of Arizonans now vote, ECF 388 ¶60; ECF 732 at 3.

### C.    Intervenors Are Not Likely To Succeed On Their *LULAC* Claim

This Court properly enjoined A.R.S. §16-121.01(C), which required election officials to reject entirely state-form applications submitted without DPOC, even though otherwise-identical registrants who submit federal forms must be registered for federal elections under the NVRA.  *See* ECF 534 at 21-22.  Intervenors cannot make a strong showing that the Ninth Circuit will reverse this Court's judgment, because that issue was correctly decided.

To begin with, while intervenors attack the continued enforceability of the *LULAC*

consent decree (Mot.9-11), they make no attempt to show that A.R.S. §16-121.01(C) complies with federal law apart from the decree.  That is important because of course the Ninth Circuit could affirm this Court's judgment on any appropriate ground.  *See, e.g.*, *Dittman v. California*, 191 F.3d 1020, 1027 n.3 (9th Cir. 1999).  And as this Court recognized in its summary-judgment order, A.R.S. §16-121.01(C) does not comply with federal law.  *See* ECF 534 at 22 n.13.  H.B. 2492's treatment of state-form applicants without DPOC violates the NVRA, which requires that Arizona "ensure that *any* eligible applicant is registered to vote" if their "valid voter registration form" is received at least 30 days before an election.  52 U.S.C. §20507(a)(1) (emphasis added).  And because "the NVRA precludes states from requiring DPOC to register applicants for federal elections," Arizona may not impose such a requirement on applicants with respect to federal elections—regardless of whether they use the federal or state form.  ECF 534 at 22 n.13; *see also* ECF 707 at 74-75 (invalidating DPOC requirement for state form under NVRA).  Intervenors' failure to address this point is fatal to their stay motion.

Similarly, intervenors do not respond to plaintiffs' constitutional challenges to A.R.S. §16-121.01(C).  Those claims include that H.B. 2492's DPOC requirement violates the Equal Protection Clause, by forcing county recorders to reject applications from citizens seeking to register using the state form without DPOC, even though identically situated citizens using the federal form may register for federal elections. *See, e.g.*, ECF 67 ¶¶313, 337; ECF 65 ¶¶86-92.  This is the very same claim plaintiffs made against the same course of conduct in *LULAC v. Reagan*, 2:17-cv-04102-DGC (D. Ariz.), which led the state to enter, and the *LULAC* court to approve, the *LULAC* consent decree.  Intervenors are unlikely to show on appeal that A.R.S. §16-121.01(C) should survive under the Fourteenth Amendment, because they have "not offer[ed] any basis for preventing state form applicants from voting at all without DPOC."  ECF 304 at 23.

Nor can intervenors successfully challenge this Court's holding that the *LULAC* consent decree bars enforcement of A.R.S. §16-121.01(C).  As the Court concluded, *see* ECF 534 at 21-22, a consent decree is a "final judgment" and "is subject to the rules generally

1   applicable to other judgments and decrees." *Rufo v. Inmates of Suffolk County Jail*, 502 U.S.

2   367, 378, 391 (1992).  Thus, the *LULAC* court's order that county recorders must be

3   instructed to "accept State Form applications submitted without DPOC" unquestionably

4   remains the law—it "govern[s] all voter registrations submitted after entry of [the] Consent

5   Decree."  *LULAC* consent decree at 8, 12; *see Taylor v. United States*, 181 F.3d 1017, 1024

6   (9th Cir. 1999) (explaining that "once court decisions achieve finality they may not be

7   lawfully revised, overturned or refused faith and credit by another Department of

8   Government" (quotation marks omitted)).[1]

9          Intervenors invoke *Moore v. Harper*, 600 U.S. 1 (2023), in claiming (Mot.9-10) that

10   enforcing the *LULAC* consent decree would impermissibly transfer the legislature's

11   lawmaking power to the secretary of state.  But this situation is no different from any other

12   court order enjoining a statute: the consent decree does not "preclude[] the Arizona

13   Legislature from enacting prospective legislation," *id.* at 9, it affects whether new legislation

14   may be lawfully enforced by officials such as the secretary of state.  *See, e.g.*, *Hollingsworth

15   v. Perry*, 570 U.S. 693, 705-706 (2013) (differentiating between the interest a law's

16   proponents have in *enacting* a law and those the state has in enforcing the law).

17          Nor was there anything improper about the secretary (then represented by the attorney

18   general) entering into a consent decree that would affect Arizona's ability to enforce its laws.

19   *See* Mot.10.  Under Arizona law, the attorney general had the mandate to litigate the

20   enforceability of Arizona law on behalf of the secretary.  *See* A.R.S. §41-193(A)(3)

21   (requiring department of law to represent state in federal court actions); *id.* §41-192(B)(4)

22   (authorizing attorney general to settle claims against state and its departments with approval

23

24   [1] Intervenors cite *Taylor* (Mot.11) for the proposition that a "case is over" after a consent
    decree is entered and a court's continuing jurisdiction has expired—here, the *LULAC* court
25   retained jurisdiction through December 31, 2020.  But they err by concluding that when a
    "case is over," its final judgment is dissolved.  *Taylor* holds otherwise:  There, like here,
26   Arizona agreed to implement a set of new rules.  *See* 181 F.3d at 1020 (noting the order
    approving new prison rules).  And *Taylor* noted that the lower court did not retain
27   jurisdiction, emphasizing the finality of the lower court's judgment in the course of holding
    that only that court, not Congress, could reopen and modify the judgment.  *Id.* at 1023-1024.
28   The same principle applies here.

1    of department).

2           This arrangement of responsibility is nothing new; state executive officials routinely

3    represent states in litigation.  And in doing so, a state executive has the prerogative to make

4    litigation decisions different from what the state's legislature would have chosen.  The

5    Supreme Court made clear in *Virginia House of Delegates v. Bethune-Hill*, 587 U.S. 658,

6    661 (2019), which held the Virginia House of Delegates lacked standing to defend a

7    redistricting plan after the state's attorney general declined to appeal an order requiring the

8    state to adopt a new plan, that a state executive's litigation decision does not "forfeit … the

9    lawmaking power" of the legislative branch, as intervenors claim here (Mot.10).

10          This Court's reliance on the *LULAC* consent decree is proper and unremarkable.

11   Intervenors' novel contrary proposition—that state legislatures may simply nullify consent

12   decrees at their leisure—would subvert the separation of powers, eviscerating judicial

13   finality and precluding the attorney general from exercising her authority under A.R.S. §§41-

14   193(A)(3) and 41-192(B)(4).  Regardless, the stay motion should be denied because

15   intervenors have failed to make any showing—never mind a strong one—that A.R.S. §16-

16   121.01(C) is not preempted by the NVRA.

17   **II.    INTERVENORS FAIL TO SHOW IRREPARABLE HARM**

18          **A.    Legislative Intervenors**

19          The legislative intervenors assert two irreparable injuries (Mot.11), "one to the State

20   itself" and one to the Arizona legislature.  Neither supports a stay.

21          The legislative intervenors first claim (Mot.11) that a state's sovereign interests are

22   harmed when it cannot enforce the laws it enacts.  But the legislative intervenors must

23   establish that *they* will be irreparably harmed; "[a]fter all, the *Nken* irreparable harm standard

24   is 'whether the *applicant* will be irreparably injured absent a stay,'" *Doe #1 v. Trump*, 957

25   F.3d 1050, 1060 (9th Cir. 2020) (quoting *Nken*, 556 U.S. at 426) (emphasis added).  That

26   dooms the legislative intervenors' argument, because Arizona law (like the law of other

27   jurisdictions) vests responsibility to implement the laws in the executive branch, not the

28   legislature.  *See, e.g.*, A.R.S. §16-1021 (assigning enforcement of election statutes to the

11

attorney general).  Indeed, every irreparable-harm case the legislative intervenors cite (Mot.11-12) involved *executive* officials' claims of irreparable harm.  *See Cameron v. EMW Women's Surgical Center, P.S.C.*, 595 U.S. 267, 277 (2022) (attorney general); *Maryland v. King*, 567 U.S. 1301 (2012) (same); *News v. Shinn*, 2020 WL 409113 (D. Ariz. Jan. 24, 2020) (same); *Abbott v. Perez*, 585 U.S. 579 (2018) (governor); *Coalition for Economic Equity v. Wilson*, 122 F.3d 718, 719 (9th Cir. 1997) (same).  The executive-branch parties here—the attorney general and secretary of state—do not agree that a stay is necessary to prevent irreparable harm.  To the contrary, the secretary explains that a stay would *inflict* harm, by causing "voters to harbor doubts about [Arizona's] election procedures, [] election officials, and [Arizona's] elections themselves."  ECF 732-1 ¶17; *see also* ECF 733 at 2 (state/attorney general opposition).  That harm is exacerbated, moreover by the intervenors' choice to wait two weeks after the entry of final judgment in this accelerated proceeding to request a stay.  (Intervenors certainly had ample time to prepare their stay motion so as to file it sooner, as the rulings they challenge were made over eight months ago.)  Intervenors' delay exacerbates the disruption that a stay would inflict because mail voting, including in the primary election, begins in just weeks.  *See* ECF No. 732 at 2-4.  The delay in filing likewise "weighs against a finding of irreparable harm."  *Plata v. Newsom*, 2021 WL 5410608, at *3 n.3 (N.D. Cal. Nov. 17, 2021).

Despite the foregoing, the legislative intervenors suggest (Mot.12-13) that, under *Berger v. North Carolina State Conference of the NAACP*, 597 U.S. 179 (2022), state legislators sustain harm cognizable for stay purposes when enforcement of a state statute is enjoined.  That is wrong; *Berger* held merely that state legislators had "standing to intervene" in a case challenging a state statute.  *Id*. at 193.  But the Ninth Circuit "has rejected the argument that a determination that a [party] has suffered sufficient injury to support standing logically requires the court to conclude that the [party] necessarily has demonstrated a sufficient fear of immediate and substantial injury to warrant an injunction," *Midgett v. Tri-County Metropolitan Transportation District of Oregon*, 254 F.3d 846, 850

1   (9th Cir. 2001).[2]

2        Likewise infirm is the legislative intervenors' alternative injury argument: that the

3   injunction imposes "an extrinsic constraint" on their "lawmaking functions" and would

4   "disrupt[]" the legislature's "specific powers" (Mot.14-15).  The injunction does no such

5   thing.  What it does—in intervenors' own words—is "thwarts the State from" enforcing the

6   preempted provisions of a law the state legislature passed (Mot.14).  That does not constrain

7   any lawmaking function.  *Cf. supra* p.10.  By contrast, in *Arizona State Legislature v.*

8   *Arizona Independent Redistricting Commission*, 576 U.S. 787 (2015) ("*AIRC*"), on which

9   intervenors rely, the Supreme Court held that a law "strip[ping] the Legislature of its" power

10  to initiate redistricting, *id.* at 800, *would* injure the legislature because the law "would

11  completely nullif[y] any vote by the Legislature, now or in the future."  *Id.* at 804 (alteration

12  in original) (quotation marks omitted).  The Court's injunction does not remotely have that

13  effect.  This case is thus instead like *Bethune-Hill*, 587 U.S. at 659.  The Court there

14  distinguished *AIRC* on the ground that, whereas the law at issue in *AIRC* "permanently

15  deprived the legislative plaintiffs of their role in the redistricting process," the order

16  challenged in *Bethune-Hill* "d[id] not alter the General Assembly's dominant … redistricting

17  role."  *Id.*

18       Moreover, contrary to intervenors' suggestion (Mot.11-14), neither the Supreme

19  Court nor the Ninth Circuit has held that a state suffers irreparable injury any time its laws

20  are enjoined.  In *Bethune-Hill*, in fact, the Supreme Court explained that it "has *never* held

21  that a judicial decision invalidating a state law as unconstitutional inflicts a discrete,

22  cognizable injury on each organ of government that participated in the law's passage."  587

23  U.S. at 666 (emphasis added).  And the Ninth Circuit has observed that although

24  "[i]ndividual justices, in orders issued from chambers, have expressed the view that a state

25  suffers irreparable injury when one of its laws is enjoined," "[n]o opinion for the Court

---

[2] That *Midgett* involved a request for an injunction rather than a stay is irrelevant because "stay requests" are evaluated "under the same standards … [as] motions for … injunctive relief."  *Abbassi v. INS*, 143 F.3d 513, 514 (9th Cir. 1998).

1    adopts this view." *Latta v. Otter*, 771 F.3d 496, 500 n.1 (9th Cir. 2014).

2        **B.     Republican National Committee**

3        The RNC's "competitive injury" argument (Mot.15-16) is meritless.  The RNC relies

4    on cases concerning whether political parties have standing to challenge election laws that

5    would create an "illegally structure[d] competitive environment." *Mecinas v. Hobbs*, 30

6    F.4th 890, 898 (9th Cir. 2022).  Demonstrating that political parties may have a "legally

7    protected interest," *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992), for purposes of

8    standing to challenge election laws is not the same as demonstrating that the RNC is likely to

9    suffer irreparable injury absent a stay here.  *See Midgett*, 254 F.3d at 850.  In other words,

10   the RNC's interest in avoiding an allegedly illegally structured competitive environment

11   could be fully satisfied at the conclusion of the ordinary appellate process; interim relief is

12   not required.

13   **III.   THE EQUITIES DECISIVELY SUPPORT DENYING A STAY**

14       The balance of equities and public interest, which "merge" here, *Nken*, 556 U.S. at

15   435, counsel strongly against a stay because a stay would cause severe harm.

16       To start, a stay would harm the public interest by curtailing thousands of Arizonans'

17   right to vote.  The public has a "strong interest in exercising the 'fundamental political right'

18   to vote." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam).  The "public interest" thus

19   "favors permitting as many qualified voters to vote as possible." *Obama for America v.

20   Husted*, 697 F.3d 423, 437 (6th Cir. 2012).  Indeed, courts frequently "deem restrictions on

21   fundamental voting rights irreparable injury." *League of Women Voters of North Carolina v.

22   North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) (collecting cases).  The secretary of state

23   here estimates that, if this Court's injunction is stayed, *tens of thousands* of Arizonans would

24   lose their ability to vote in presidential elections and by mail.  ECF 732-1 ¶5.  That is

25   undoubtedly against the public interest, especially given that there is basically *no* history of

26   non-citizen voter fraud, *see* ECF 709 at 29-30.

27       Moreover, Arizona's election season is already well underway, ECF 732-1 at 3, and

28   the state's chief elections official warns that altering these election rules at this stage, as a

stay would do, will "drastically impact how affected votes are collected and processed," *id.*

at 4.  Nothing in the record suggests that the state could switch operations this late in the

game:  The presidential primary will occur in less than two months.  ECF 732-1 ¶12.  The

deadline to print ballots for that election is less than a month away, ECF 732-1 ¶8 (citing

A.R.S §16-461), and voting by mail begins on July 3, *id.* ¶9.  Moreover, the EPM—dictating

the procedures for this election—incorporates this Court's summary-judgment rulings.  *See*

ECF 699 at 20, 22, 26 n.9; *see also* ECF 732 ¶17.  Put simply, there is no evidence that state

officials even *could* administer the 2024 primary and general elections under H.B. 2492.

Instead, the record overwhelmingly indicates they could not.  *See, e.g.*, ECF 709 at 8-9

(noting that the secretary of state and county recorders had not issued guidance on

implementation of the challenged provisions).  The "public interest" would not be served by

"sending the State scrambling to implement and to administer new procedure[s]," *Arizona*

*Democratic Party v. Hobbs*, 976 F.3d 1081, 1086 (9th Cir. 2020)—particularly when that

"scrambling" would be all the more acute given intervenors' delay in filing their motion

following the entry of final judgment, *see supra* p.12.

Finally, "preventing a violation of the Supremacy Clause serves the public interest."

*United States v. California*, 921 F.3d 865, 893 (9th Cir. 2019).  That is what this Court's

injunction does.  Any purported harm to *Arizona's* sovereign interest is countervailed by the

*United States's* sovereign interest in the proper administration of federal law.  Indeed, "[t]he

United States suffers injury when its valid laws in a domain of federal authority are

undermined by impermissible state regulations."  *United States v. Alabama*, 691 F.3d 1269,

1301 (11th Cir. 2012).

## CONCLUSION

Intervenors' stay motion should be denied.[3]

---

[3] While intervenors' proposed order seeks a stay with respect to provisions of H.B. 2492 *and*
H.B. 2243, *see* ECF 730-2, intervenors raise no arguments about H.B. 2243.  There is thus
assuredly no basis to stay any part of the Court's injunction addressing H.B. 2243.

1    Respectfully submitted this 31st day of May, 2024.

2                                    PAPETTI SAMUELS WEISS MCKIRGAN LLP

3                                    /s/Bruce Samuels

4                                    Bruce Samuels
                                     Jennifer Lee-Cota

5

6                                    WILMER CUTLER PICKERING HALE AND
                                     DORR LLP

7                                    Seth P. Waxman (*pro hac vice*)

8                                    Daniel S. Volchok (*pro hac vice*)
                                     Christopher E. Babbitt (*pro hac vice*)

9                                    Britany Riley-Swanbeck (*pro hac vice*)

10                                   *Attorneys for the Democratic National*

11                                   *Committee and Arizona Democratic Party*[4]

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27   _____

28   [4] This opposition is joined by all non-U.S. plaintiffs save the Poder Latinx plaintiffs and the Tohono O'odham plaintiffs, who do not have claims or relief that are the subject of the stay motion.

1

**CERTIFICATE OF SERVICE**

2      On the 31st day of May, 2024, I caused the foregoing to be filed and served

3   electronically via the Court's CM/ECF system upon counsel of record.

4

5                                              /s/Bruce Samuels
                                               Bruce Samuels

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28