**FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

FILED

AUG 1 2024

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| MI FAMILIA VOTA; VOTO LATINO; LIVING UNITED FOR CHANGE IN ARIZONA; LEAGUE OF UNITED LATIN AMERICAN CITIZENS ARIZONA; ARIZONA STUDENTS' ASSOCIATION; ADRC ACTION; INTER TRIBAL COUNCIL OF ARIZONA, INC.; SAN CARLOS APACHE TRIBE; ARIZONA COALITION FOR CHANGE; UNITED STATES OF AMERICA; PODER LATINX; CHICANOS POR LA CAUSA; CHICANOS POR LA CAUSA ACTION FUND; DEMOCRATIC NATIONAL COMMITTEE; ARIZONA DEMOCRATIC PARTY; ARIZONA ASIAN AMERICAN NATIVE HAWAIIAN AND PACIFIC ISLANDER FOR EQUITY COALITION; PROMISE ARIZONA; SOUTHWEST VOTER REGISTRATION EDUCATION PROJECT; TOHONO O'ODHAM NATION; GILA RIVER INDIAN COMMUNITY; KEANU STEVENS; ALANNA SIQUIEROS; LADONNA JACKET, | No. 24-3188 <br><br> D.C. No. 2:22-cv-00509-SRB District of Arizona, Phoenix <br><br> ORDER |
| Plaintiffs - Appellees, | |
| v. | |
| ADRIAN FONTES, in his official capacity as Arizona Secretary of State; KRIS | |

MAYES, Arizona Attorney General, in her
official capacity as Arizona Attorney
General; STATE OF ARIZONA; LARRY
NOBLE, Apache County Recorder, in his
official capacity; DAVID W. STEVENS,
Cochise County Recorder, in his official
capacity; PATTY HANSEN, Coconino
County Recorder, in her official
capacity; SADIE JO BINGHAM, Gila
County Recorder, in her official
capacity; SHARIE MILHEIRO, Greenlee
County Recorder, in her official
capacity; RICHARD GARCIA, La Paz
County Recorder, in his official
capacity; STEPHEN RICHER, Maricopa
County Recorder, in his official
capacity; KRISTI BLAIR, Mohave County
Recorder, in her official
capacity; MICHAEL SAMPLE, Navajo
County Recorder, in his official
capacity; GABRIELLA CAZARES-
KELLY, Pima County Recorder, in her
official capacity; SUZANNE SAINZ, Santa
Cruz County Recorder, in her official
capacity; RICHARD COLWELL, Yuma
County Recorder, in official
capacity; DANA LEWIS, Pinal County
Recorder, in official capacity; POLLY
MERRIMAN, Graham County Recorder, in
her official capacity; JENNIFER TOTH, in
her official capacity as Director of the
Arizona Department of
Transportation; MICHELLE BURCHILL,
Yavapai County Recorder, in official
capacity,

        Defendants - Appellees,

WARREN PETERSEN, President of the
Arizona Senate; BEN TOMA, Speaker of

24-3188

the Arizona House of
Representatives; REPUBLICAN
NATIONAL COMMITTEE,

         Intervenor-Defendants -
Appellants,

----------------------------------------

ARIZONA REPUBLICAN PARTY,

        Intervenor - Pending.

| | |
|---|---|
| MI FAMILIA VOTA; VOTO LATINO; LIVING UNITED FOR CHANGE IN ARIZONA; LEAGUE OF UNITED LATIN AMERICAN CITIZENS ARIZONA; ARIZONA STUDENTS' ASSOCIATION; ADRC ACTION; INTER TRIBAL COUNCIL OF ARIZONA, INC.; SAN CARLOS APACHE TRIBE; ARIZONA COALITION FOR CHANGE; UNITED STATES OF AMERICA; PODER LATINX; CHICANOS POR LA CAUSA; CHICANOS POR LA CAUSA ACTION FUND; DEMOCRATIC NATIONAL COMMITTEE; ARIZONA DEMOCRATIC PARTY; ARIZONA ASIAN AMERICAN NATIVE HAWAIIAN AND PACIFIC ISLANDER FOR EQUITY COALITION; PROMISE ARIZONA; SOUTHWEST VOTER REGISTRATION EDUCATION PROJECT; TOHONO O'ODHAM NATION; GILA RIVER INDIAN COMMUNITY; KEANU STEVENS; ALANNA SIQUIEROS; LADONNA JACKET, | No. 24-3559 D.C. No. 2:22-cv-00509-SRB District of Arizona, Phoenix |

Plaintiffs - Appellees,

v.

KRIS MAYES, Arizona Attorney
General; STATE OF ARIZONA,

Defendants - Appellants,

----------------------------------------

ARIZONA REPUBLICAN PARTY,

Intervenor - Pending.

---

PROMISE ARIZONA; SOUTHWEST
VOTER REGISTRATION EDUCATION
PROJECT,

Plaintiffs - Appellants,

and

MI FAMILIA VOTA, VOTO
LATINO, LIVING UNITED FOR
CHANGE IN ARIZONA, LEAGUE OF
UNITED LATIN AMERICAN CITIZENS
ARIZONA, ARIZONA STUDENTS'
ASSOCIATION, ADRC ACTION, INTER
TRIBAL COUNCIL OF ARIZONA,
INC., SAN CARLOS APACHE
TRIBE, ARIZONA COALITION FOR
CHANGE, UNITED STATES OF
AMERICA, PODER
LATINX, CHICANOS POR LA
CAUSA, CHICANOS POR LA CAUSA
ACTION FUND, DEMOCRATIC
NATIONAL COMMITTEE, ARIZONA
DEMOCRATIC PARTY, ARIZONA

No. 24-4029
D.C. No.
2:22-cv-00509-SRB
District of Arizona,
Phoenix

24-3188

ASIAN AMERICAN NATIVE
HAWAIIAN AND PACIFIC ISLANDER
FOR EQUITY COALITION, TOHONO
O'ODHAM NATION, GILA RIVER
INDIAN COMMUNITY, KEANU
STEVENS, ALANNA
SIQUIEROS, LADONNA JACKET,

       Plaintiffs,

 v.

ADRIAN FONTES, LARRY
NOBLE, DAVID W. STEVENS, PATTY
HANSEN, SADIE JO
BINGHAM, SHARIE
MILHEIRO, RICHARD
GARCIA, STEPHEN RICHER, KRISTI
BLAIR, MICHAEL
SAMPLE, GABRIELLA CAZARES-
KELLY, SUZANNE SAINZ, RICHARD
COLWELL, DANA LEWIS, POLLY
MERRIMAN, JENNIFER
TOTH, MICHELLE BURCHILL,

       Defendants,

and

KRIS MAYES, Arizona Attorney
General; STATE OF ARIZONA,

       Defendants - Appellees,

WARREN PETERSEN; BEN
TOMA; REPUBLICAN NATIONAL
COMMITTEE,

       Intervenor-Defendants -
Appellees,

24-3188

```
--------------------------------------

ARIZONA REPUBLICAN PARTY,

            Intervenor - Pending.
```

Appeal from the United States District Court
for the District of Arizona
Susan R. Bolton, District Judge, Presiding

Before: Kim McLane Wardlaw, Ronald M. Gould, and Patrick J. Bumatay, Circuit Judges.
Dissent by Judge Patrick J. Bumatay.

PER CURIAM:

On July 18, 2024, a motions panel of this court granted in part and denied in part Intervenors-Defendants-Appellants' emergency motion to stay the district court's judgment. Dkt. 76. The motions panel issued a stay pending appeal as to "the portion of the [lower court's] injunction barring enforcement of A.R.S. § 16-121.01(C)," *id.*, a provision of law which, prior to the partial stay, had never taken effect in Arizona. The motions panel concluded that Intervenors-Defendants-Appellants "failed to satisfy the standard for a stay pending appeal in all other respects" and declined to stay any other portion of the district court's judgment. *Id.* The motions panel stated that "[t]his order is subject to reconsideration by the panel assigned to decide the merits of the appeal." *Id.*

Certain non-U.S. Plaintiffs-Appellees filed an emergency motion for reconsideration of the partial stay before the panel assigned to decide the merits of

24-3188

this appeal, seeking relief "as soon as possible." Dkt. 97.  The State of Arizona and its Attorney General, who had opposed the issuance of the stay, do not oppose the motion for reconsideration.  Dkt. 99, at 1; Dkt. 62, at 1.  Intervenors-Defendants-Appellants oppose the motion for reconsideration.  Dkt. 100.  Plaintiffs-Appellees' emergency motion for reconsideration of the partial stay pending appeal (Dkt. 97) is **GRANTED**.  We **VACATE** the motions panel's order to the extent it stays the district court's injunction barring enforcement of A.R.S. § 16-121.01(C).  No portion of the district court's judgment shall be stayed pending appeal.

A motion for reconsideration must "state with particularity the points of law or fact which, in the opinion of the movant, the Court has overlooked or misunderstood."  Cir. R. 27-10(a)(3).[1]  We consider four factors with respect to a

---

[1] Intervenors-Defendants-Appellants argue that "[o]nly the en banc Court has authority to review a stay order for error."  Dkt. 100, at 1.  Intervenors-Defendants-Appellants are incorrect.  Federal Rule of Appellate Procedure 35 provides for matters that "may"—not "must"—be reheard en banc.  Fed. R. App. P. 35(a).  The motions panel expressly provided that its order is subject to reconsideration by the merits panel.  Dkt. 76.  And the Intervenors-Defendants-Appellants and the moving non-U.S. Plaintiff-Appellees agree that the motions panel's order is "not binding" on the merits panel.  Dkt. 100, at 3 (quoting *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 660 (9th Cir. 2021) (en banc)); Dkt. 111, at 3.  "[W]hile a merits panel does not lightly overturn a decision made by a motions panel during the course of the same appeal, we do not apply the law of the case doctrine as strictly in that instance."  *United States v. Houser*, 804 F.2d 565, 568 (9th Cir. 1986), *abrogated on other grounds by Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816–17 & n.5 (1988).  If we are persuaded that the decision of the motions panel "is clearly erroneous and its enforcement would work a manifest injustice," *Gonzalez v.*

24-3188

stay pending appeal: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009) (quotation omitted). The burden of demonstrating that these factors weighed in favor of a stay lay with the proponent—in this case, the Intervenors-Defendants-Appellants. *Id*. at 433–34. The likelihood of success and irreparable injury "are the most critical" factors. *Id.* These two factors fall on "a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases." *Humane Soc'y of U.S. v. Gutierrez*, 523 F.3d 990, 991 (9th Cir. 2008). On one end of the continuum, the proponent must show a "strong likelihood of success on the merits" and at least "the possibility of irreparable injury to the [proponent] if preliminary relief is not granted." *Golden Gate Restaurant Ass'n v. City & County of San Francisco*, 512 F.3d 1112, 1116–17 (9th Cir. 2008) (quotation omitted), *application to vacate stay denied*, 2008 WL 11580109 (U.S. Feb. 21, 2008) (Kennedy, J., in chambers). "At the other end of the continuum, the moving party

---

*Arizona*, 677 F.3d 383, 396, 389 n.4 (9th Cir. 2012) (en banc), *aff'd sub nom. Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013), or a "showing" otherwise has been "made which compels us to reconsider [the motions panel's] prior decision," *Houser*, 804 F.3d at 568, we may exercise our discretion to set aside the motions panel's decision.

24-3188

must demonstrate that serious legal questions are raised and that the balance of hardships tips sharply in its favor." *Id.* (quoting *Lopez v. Heckler*, 713 F.2d 1432, 1435 (9th Cir. 1983)); *see Manrique v. Kolc*, 65 F.4th 1037, 1041 (9th Cir. 2023) (explaining that, "[e]ven with a high degree of irreparable injury, the movant must show 'serious legal questions' going to the merits" to warrant a stay) (citing *Lopez*, 713 F.2d at 1435–36).

We exercise our discretion to reconsider and vacate in part the motions panel's July 18 order.  The motions panel's order failed to provide a reasoned analysis of the *Nken* factors with respect to A.R.S. § 16-121.01(C), and we do not see how a balancing of these factors could weigh in favor of a stay.  Moreover, the motions panel overlooked "considerations specific to election cases" and misunderstood the extent of confusion and chaos that would be engendered by a late-stage alteration to the status quo of Arizona's election rules in apparent disregard of the Supreme Court's admonitions in *Purcell v. Gonzalez*, 549 U.S. 1, 7 (2006) (per curiam).[2]

1. Intervenors-Defendants-Appellants have not demonstrated "a strong likelihood of success on the merits."  *Golden Gate Restaurant Ass'n*, 512 F.3d at

---

[2] Not only did the motions panel fail to acknowledge *Purcell*, it failed to follow the Court's instruction to the Ninth Circuit motions panel whose ruling was reversed in *Purcell* that "[i]t was still necessary, as a procedural matter, to give deference to the discretion of the district court."  549 U.S. at 7.

24-3188

1115 (quotation omitted).  The LULAC Consent Decree remains in force and is

binding on the parties.  As the district court held, the Decree requires the Secretary

of State to direct County Recorders to accept state form registration applications

submitted without documentary proof of citizenship ("DPOC") and to register such

applicants consistent with the Decree.  *Mi Familia Vota v. Fontes*, No. CV-22-

00509, 2024 WL 2244338, at *1 (D. Ariz. May 2, 2024), ECF No. 720; *Mi Familia

Vota v. Fontes*, 2024 WL 862406, at *2, *3 n.10 (D. Ariz. Feb. 29, 2024), ECF No.

707.  Because it requires County Recorders to reject such applications (and in fact

criminalizes those who knowingly fail to do so), A.R.S. § 16-121.01(C) directly

contravenes the requirements of the Decree.

Unless the Decree is set aside or modified, Intervenors-Defendants-

Appellants are unlikely to prevail.  A consent decree approved by a court is an

enforceable, final judgment with the force of res judicata.  *S.E.C. v. Randolph*, 736

F.2d 525, 528 (9th Cir. 1984); *see also Rufo v. Inmates of Suffolk Cnty. Jail*, 502

U.S. 367, 391 (1992) ("[A] consent decree is a final judgment that may be

reopened only to the extent that equity requires.").  Thus, "the equitable decree

based on the [parties'] agreement is subject to the rules generally applicable to

other judgments and decrees."  *Gates v. Shinn*, 98 F.3d 463, 468 (9th Cir. 1996).

As a final judgment, a consent decree "may not lawfully be revised, overturned or

refused faith and credit by another Department of Government." *Taylor v. United States*, 181 F.3d 1017, 1024 (9th Cir. 1999) (en banc) (quotation omitted).

Intervenors-Defendants-Appellants offered no authority to the contrary before the motions panel.  They contended only that the executive arms of the State could not, by agreeing to the LULAC Consent Decree, divest the Arizona Legislature of its sovereign power to change voting registration laws prospectively. Dkt. 50, at 12–14; *see also* Dkt. 100, 4–5 (raising similar arguments in opposition to the instant motion).  But as the movants point out, the Consent Decree has no such effect.  It cabins the authority of the parties to the Decree—the Arizona Secretary of State and Maricopa County Recorder—to act contrary to it.  We recognized sitting en banc in *Taylor* that "[t]he Constitution's separation of legislative and judicial powers denies [Congress] the authority" to "enact[] retroactive legislation requiring an Article III court to set aside a final judgment." 181 F.3d at 1026; *see also id.* at 1024 ("Congress may change the law and, in light of changes in the law or facts, a *court* may decide in its discretion to reopen and set aside a consent decree . . . but *Congress* may not *direct* a court to do so with respect to a final judgment (whether or not based on consent) without running afoul of the separation of powers doctrine.").  Intervenors-Defendants-Appellants offer no authority to suggest that a state legislature may nullify a final judgment entered by an Article III court which Intervenors-Defendants-Appellants have not

24-3188

sought to set aside, modify, or otherwise terminate, and we see no reason why the same principle articulated in *Taylor* should not apply with equal force here. *See Cooper v. Aaron*, 358 U.S. 1, 18 (1958) ("Chief Justice Marshall spoke for a unanimous Court in saying that: 'If the legislatures of the several states may, at will, annul the judgments of the courts of the United States, and destroy the rights acquired under those judgments, the constitution itself becomes a solemn mockery.'" (quoting *United States v. Peters*, 9 U.S. (5 Cranch) 115, 136 (1809))). That the court that entered the decree "did not retain jurisdiction, as it could have done," only supports the view that the Decree is a final judgment under *Taylor*. 181 F.3d at 1023; Dkt. 100, at 6.[3]  It does not suggest that the preclusive effect of the final judgment disappeared or "expired" after the docket was closed.[4]

---

[3] Relying on *Martin v. Wilks*, 490 U.S. 755, 762 (1989), Intervenors-Defendants-Appellants argue that they are entitled to "challenge the consent decree in [this] separate action." Dkt. 100, at 6 (quotation omitted). *Martin* held that non-parties may not be bound by a judgment *in personam* in a litigation in which they were not joined. *See* 490 U.S. at 763–64.  As Intervenors-Defendants-Appellants recognize, they are not bound by the final judgment of the LULAC Consent Decree. Dkt. 100, at 7 ("Whatever ongoing obligations the Plaintiffs ascribe to the LULAC Consent Decree do not extend to the Legislature[.]").  No party has sought to bind Intervenors-Defendants-Appellants to that judgment in this action.  The principle articulated in *Martin* thus has no bearing on the issues presented in this appeal.

[4] Because we agree with the movants that Intervenors-Defendants-Appellants have failed to demonstrate a likelihood of success on the merits with respect to the LULAC Consent Decree, we do not reach their alternative arguments under the NVRA and the Equal Protection Clause. *See* Dkt. 97, at 5–15.

24-3188

2.  Even assuming that Intervenors-Defendants-Appellants had raised "serious legal questions going to the merits" with respect to A.R.S. § 16-121.01(C), *Golden Gate Restaurant Ass'n*, 512 F.3d at 1116 (quotation omitted), they did not show "a high degree of irreparable injury," *Manrique*, 65 F.4th at 1041, or that the balance of equities otherwise tips "sharply" in their favor, *Golden Gate Restaurant Ass'n*, 512 F.3d at 1116 (quotation omitted).  Intervenor-Defendant-Appellant Republican National Committee ("RNC") failed to show that the RNC will face irreparable harm absent a stay with respect to A.R.S. § 16-121.01(C).  The RNC alleged that the existence of voters who are registered to vote in federal elections (so called "federal-only voters") inflicts irreparable harm upon it.  Dkt. 100, at 17.  But the RNC has not at any point explained why the use of the State Form to register applicants without accompanying DPOC to vote in federal elections, when identically situated applicants may register for at least federal elections without accompanying DPOC through the Federal Form even with a stay in place, inflicts an irreparable "competitive injury" on the RNC.  Simply put, the RNC has not shown that enforcement of A.R.S. § 16-121.01(C) *specifically* will prevent a likelihood of irreparable harm pending appeal.

Intervenors-Defendants-Appellants the President of the Arizona State Senate Warren Petersen and Speaker of the Arizona House of Representatives Ben Toma (together, "the Legislators"), assert that the district court's judgment inflicts an

irreparable injury to the State's lawmaking interest by enjoining one of its duly

enacted laws.  Dkt. 100, at 13–14.  The Arizona Attorney General, which

represents the State in this action, *see* A.R.S. § 41-193(A)(3), opposed issuance of

a stay on the ground that any harm to the State's lawmaking interest was

outweighed by the State's law-administering interest in avoiding "confusion and

chaos for voters and election officials alike in the upcoming 2024 election cycle."

Dkt. 52, Ex. 1, at 2; Dkt. 62 at 2 (citing Dkt. 52).  The State maintains this position

at the reconsideration stage.  Dkt. 99.

      The movants and the Attorney General dispute Intervenors-Defendants-

Appellants' authority to represent the State's interests in this litigation.  *See* Dkt.

97, at 16; Dkt. 62, at 8.  No party has disputed the Attorney General's authority.

Without reaching the question whether Intervenors-Defendants-Appellants have

authority that overlaps with that of the Attorney General to represent the State's

interests in this case, we find that the Legislators have not shown a "high degree of

irreparable injury" to the State absent a stay.  *Manrique*, 65 F.4th at 1041.

Intervenors-Defendants-Appellants have pointed to no binding authority

suggesting that enjoining enforcement of a duly enacted law by itself inflicts the

"high degree of irreparable injury" on the state required to warrant a stay without a

strong showing of likelihood of success on the merits.  *Id.*  Indeed, the Attorney

General has repeatedly represented in this appeal that both the State's law-making

and law-administering interests would be "better served by denying a stay." Dkt. 62, at 4. Given the conflicting statements of the State's interests and the lack of persuasive authority offered in support of the stay, Intervenors-Defendants-Appellants failed to demonstrate the "high degree of irreparable injury" required for a stay in the absence of a strong likelihood of success on the merits. *Manrique*, 65 F.4th at 1041.

3. The movants contend that the remaining *Nken* factors strongly favor reconsideration and vacatur of the motions panel's order. We agree. A judicial stay is ordinarily a mechanism to preserve, not upset, the status quo pending appeal. *Nken*, 556 U.S. at 429. That principle applies with even greater force in the elections context, where court orders—especially "bare" orders offering "no explanation"—can "result in voter confusion and consequent incentive to remain away from the polls." *Purcell*, 549 U.S. at 4–5. For that reason, the Supreme Court "has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Cmte. v. Democratic Nat'l Cmte.*, 589 U.S. 423, 424 (2020) (per curiam).

The motions panel overlooked this fundamental principle of judicial restraint, resulting in manifest injustice to voters and elections officials alike. Since the LULAC Consent Decree in 2018, elections officials have registered otherwise qualified voters who used the State Form without DPOC as eligible to

vote at least in federal elections.  Those who submitted a State Form without

DPOC yet had DPOC on file with the Motor Vehicles Division were registered for

all elections whether they applied with the Federal or State Form.  The motions

panel's order upset the status quo, altering the voter registration rules just days

before Arizona's July 30 primary and well into the registration timeline for the

November general election.  Parties, including the State of Arizona, its Attorney

General, and its Secretary of State, sounded the alarm that such an intervention

would "only create confusion and chaos for voters and election officials alike."

Dkt. 52, at 4.

Their warnings proved prescient.  The practical effect of the stay has been to

subject elections officials to a class 6 felony offense for knowingly failing to reject

state form registration applications without accompanying DPOC.  *See* A.R.S.

§ 16-121.01(C).  Yet officials are also subject to a class 2 misdemeanor offense for

failing to abide by the provisions of the Election Procedures Manual ("EPM"),

which carries the force of law, *Arizona Public Integrity Alliance v. Fontes*, 475

P.3d 303, 308 (Ariz. 2020), and was adopted in 2023 in compliance with the

LULAC Consent Decree, Dkt. 52, Ex. 1, at 2.  Consistent with the lower court's

judgment in this case and the LULAC Consent Decree, the EPM provides that

elections officials must *accept* the registration applications of otherwise qualifying

applicants who do not provide DPOC for at least federal elections.[5]  *See generally*

Dkt. 97, Ex. 5.  In response to the motions panel's stay order, Arizona's County

Recorders have announced that they will no longer accept any State Forms without

DPOC (in apparent violation of the EPM and the LULAC Consent Decree but

consistent with the motions panel's stay order), while the State Forms themselves

continue to provide that otherwise eligible applicants without DPOC who use the

State Form *will* be eligible to vote in federal elections, consistent with the EPM.

Dkt. 97, Ex. 3, at 3.  Further, applicants whose documentary proof of citizenship is

already on file with the State and is instantly accessible by state elections officials

will see their voter registration applications summarily rejected on the incredible

basis that they have not provided the State with documentary proof of citizenship.

Dkt. 111, at 1; Dkt. 99, at 2.

In *Purcell*, the Court made clear that the uncertainty engendered by judicial

disruptions to the status quo in the midst of elections can and often will cause

eligible voters to remain away from the polls.  549 U.S. at 4–5.  The Court

emphasized that "the possibility that qualified voters might be turned away from

the polls" should "caution any . . . judge to give careful consideration" before

---

[5] Specifically, the EPM provides that an otherwise eligible applicant who does not submit DPOC with their voter registration form but has DPOC on file with the Arizona Motor Vehicles Division will be registered as a full ballot voter whether they apply with the State or Federal Form.  All other otherwise eligible applicants will be registered as federal-only voters.

24-3188

intervening in a state's elections. *Id.* at 4.  The motions panel's failure to adhere to the Supreme Court's warning in *Purcell* has caused a manifest injustice.  Elections officials are now subject to conflicting criminal penalties, orders, and policies.  Identically situated voter registration applicants are treated differently depending on the voter registration application form they pick up.  Applicants whose DPOC is on file with the State and accessible to state officials will see their registrations denied for failure to provide DPOC to the State.  Voters whose registrations were valid prior to the motions panel's stay order but would not be valid if they were submitted after the stay order could be forgiven for wondering whether their registrations remain valid in advance of the upcoming election.  And those who seek to register to vote in Arizona in the lead up to the November election may be unwilling to do so given the confusing and uncertain policies applicable under the eleventh-hour intervention of the motions panel.  All Arizonans must now navigate an arcane web of shifting and confusing rules that will without a doubt dissuade some who are otherwise eligible and willing from exercising the fundamental right to vote.

Under the circumstances, we are compelled to exercise our discretion to reconsider the motions panel's order and reinstate the status quo in Arizona as it has been since 2018 pending this expedited appeal.  Accordingly, we **VACATE**

the portion of the motions panel's order staying in part the judgment of the district

court.

**IT IS SO ORDERED.**

FILED

AUG 1 2024

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

*Mi Familia Vota, et al. v. Petersen, et al.*, No. 24-3188; 24-3559; 24-4029
BUMATAY, J., dissenting

Election-law disputes are critical in a government based on popular sovereignty.  After all, the outcomes of these cases determine how the people will choose who will govern them.  But these cases are also the most perilous for courts.  When any result may affect the election process, courts risk becoming entangled in political concerns.  Thus, we must pay special attention to follow regular order and adjudicate these cases exactly as we would any other—there's no room for judicial innovations, unusual exceptions, or cut corners.

Unfortunately, we abandon regularity here.  Before a motions panel of our court, Intervenor-Appellants moved to stay a lower-court injunction.  The motions panel unanimously granted it in part.  Plaintiffs-Appellees then moved for reconsideration of the motions panel's order.  Motions for reconsideration of a motions panel's order are not meant to be a second bite at the apple.  On the contrary, they are highly irregular and strongly disfavored, primarily appropriate if there have been "[c]hanges in legal or factual circumstances" since the motions panel addressed the issue.  Ninth Cir. R. 27-10(a)(3).  Indeed, our standard for reconsideration is so high that, to grant it, we must declare that our colleagues on the motions panel committed a "manifest injustice."  *Gonzalez v. Arizona*, 677 F.3d 383, 389 n.4 (9th Cir. 2012) (en banc) (simplified).  It's thus no surprise that reconsideration under these circumstances rarely happens.

1

Yet facing *identical* legal and factual circumstances on an even more expedited basis, the majority now grants the motion and lifts the partial stay. What's so pressing that makes Plaintiffs-Appellees entitled to the extraordinary remedy of reconsideration when nothing has changed in the case? Why flirt with the perception that we have adjudicated this dispute on something other than its merits? The answer is unclear to me, as it undoubtably will be to those citizens planning to vote in Arizona's election. All the public can take away from this episode is that four judges of the Ninth Circuit have voted to partially stay the injunction here, while two other judges voted against it. The two judges prevail—not because of any special insight, but because of the luck of an internal Ninth Circuit draw.

Regardless, the motions panel had the answer right the first time. Given the majority's rush to act, I outline only the main arguments against granting reconsideration here. In short, Intervenor-Appellants have carried their burden on all four *Nken* factors: likelihood of success on the merits, irreparable harm, the balance of interests, and the public interest. *Nken v. Holder*, 556 U.S. 418, 434 (2009). Reviewing these factors, we should have denied the motion for reconsideration and declined to revisit the partial stay of the injunction.

For these reasons, I respectfully dissent.

## I. Background

2

In Arizona, eligible residents may register to vote in all elections—federal, state, and local—using either a registration form created by the State ("State Form") or one created by the United States Election Assistance Commission ("Federal Form"). *Mi Familia Vota v. Fontes*, No. CV-22-00509, 2024 WL 862406, at *2 (D. Ariz. Feb. 29, 2024). To vote in state and local elections, Arizona requires eligible voters to provide documentary proof of citizenship ("DPOC"), such as a birth certificate, driver's license, or U.S. passport. *See* Ariz. Rev. Stat. § 16-166(F). The Supreme Court has held that the National Voting Rights Act ("NVRA") prohibits Arizona from requiring DPOC from voters who register with the Federal Form, *see Arizona v. Inter Tribal Council of Ariz. Inc.* ("*ITCA*"), 570 U.S. 1, 20 (2013), and so Arizona requires DPOC only from voters who register with the State Form. Federal Form registrants whose citizenship cannot be verified are given a "Federal-Only" designation that permits them to vote in federal elections, but not state or local ones. *Mi Familia Vota*, 2024 WL 862406, at *1–2. In 2022, the Arizona Legislature enacted Arizona Revised Statutes § 16-121.01(C), which requires state election officials to reject any State Forms which are "not accompanied by satisfactory evidence of citizenship."

Plaintiffs-Appellees challenged this law and others in federal district court. The district court ruled that § 16-121.01(C) is unenforceable for two reasons: First, it is preempted by the NVRA, *Mi Familia Vota*, 2024 WL 862406, at *39–40; and

second, it is barred by a consent decree entered into by the Arizona Secretary of State in 2018.  *See League of United Latin Am. Citizens of Ariz. v. Reagan*, No. 2:17-cv-04102 (D. Ariz.) (June 18, 2018).  This consent decree ("LULAC decree") provides that when a State Form does not come with DPOC, the county recorder must attempt to confirm the applicant's state citizenship by searching the records of the Arizona Department of Transportation.  If the applicant's state citizenship can be confirmed, he is registered to vote in all elections; if it can't, then he is registered as a "Federal-Only" voter.  *Mi Familia Vota*, 2024 WL 862406, at *3–4.  The district court's permanent injunction was entered in May 2024.

Warren Peterson, in his official capacity as President of the Arizona State Senate; Ben Toma, in his official capacity as the Speaker of the Arizona House of Representatives; and the Republican National Committee ("Intervenor-Appellants") moved for a partial stay of the district court's order, which the district court denied. Intervenor-Appellants then moved for a stay of the district court's injunction.  A motions panel of our court partially granted the stay on July 18, 2024, permitting § 16-121.01(C) to go into effect.

A little more than a week later, on July 26, Plaintiffs-Appellees moved for reconsideration on an emergency basis via Ninth Circuit Rule 27-3.  We ordered a greatly expedited response from Intervenor-Appellants due just a few days later, on July 29.

## II.    Motions for reconsideration are strongly disfavored.

To begin, motions for reconsideration are strongly disfavored by our court. *See* Ninth Cir. R. 27-10 Advisory Committee Note (explaining that motions for reconsideration "of orders entered by a motions panel are not favored by the Court"). Beyond general disfavor, our court's rules explain that a motion for reconsideration should be brought only if "in the opinion of the movant, the Court has overlooked or misunderstood" "points of law or fact," or if there have been "[c]hanges in [the] legal or factual circumstances."  Ninth Cir. R. 27-10(a)(3).

Under the rules, our reconsideration's stringent standard hasn't been met. While "a motions panel's legal analysis, performed during the course of deciding an emergency motion for a stay, is not binding on later *merits* panels," we are not adjudicating the merits at this stage.  *See Innovation Law Lab v. Wolf*, 951 F.3d 1073, 1081 (9th Cir. 2020) (simplified) (emphasis added), *vacated and remanded sub nom. Mayorkas v. Innovation L. Lab*, 141 S. Ct. 2842 (2021).  Freeing the merits panel to come to its own determination makes sense.  A court at the merits stage has the benefit of lengthy briefing, oral argument, and (perhaps most importantly) time to thoroughly consider and research each issue.  But a merits panel deciding a motion for reconsideration *before* the merits stage, as we do here, is no better informed or positioned to decide this issue than the motions panel.  We face a similarly abbreviated timeline with similarly limited briefing.  Nor have Plaintiffs-Appellees

cited any specific facts or points of law that the motions panel misunderstood.  And there have been no new developments here since the motions panel issued its order. Indeed, the only thing that has changed is the composition of the panels.  And this change shouldn't compel a different result.

Plaintiffs-Appellees make a conclusory assertion that upholding the motions panel's order "will work a manifest injustice."  Plaintiffs-Appellees speak of the supposed "judicially created confusion" resulting from the motions panel's order. Such speculation isn't enough to meet our high reconsideration standard.  First, none of this is new.  Claims of confusion were brought directly to the motions panel. Second, that the 2023 Elections Procedures Manual ("EPM") and the websites of the Arizona Secretary of State and county recorders have not yet been updated to reflect the motions panel's order (indeed, perhaps because they are awaiting the outcome of this expedited motion for reconsideration) does not indicate that any voters are actually confused.  Third, all this is undercut by the Arizona Secretary of State's own admission that "the EPM may memorialize court rulings as of its adoption date, but to the extent such rulings are reversed or modified on appeal, the statutory requirements as interpreted by the court will control over any contrary provisions in the EPM."

So our high standard for reconsideration is, on its own, enough to warrant denying this motion.  But the motion is also wrong on the facts and the law.  As I

discuss below, the *Nken* factors all support the motions panel stay for § 16-121.01(C).

### III.   The *Nken* factors all favor issuing a partial stay.

We look at four factors when considering an application to stay a district court's injunction: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken*, 556 U.S. at 434 (simplified). "The first two factors . . . are the most critical." *Id.* Additionally, when the Government is a party to a case, as is the case here, "the balance of the equities and public interest factors merge." *Chamber of Com. v. Bonta*, 62 F.4th 473, 481 (9th Cir. 2023).

The motions panel had it right the first time. Intervenor-Appellants satisfied the *Nken* standard for a stay pending appeal with respect to the portion of the injunction barring enforcement of § 16-121.01(C). As a result, we should have denied the motion for reconsideration.

#### a.  Likelihood of Success on the Merits

##### i.  The LULAC decree does not bind the Arizona Legislature.

Plaintiffs-Appellees argue that the district court was right to enjoin the enforcement of § 16-121.01(C) because it conflicts with Arizona's obligations under

the LULAC decree.  Recall that the LULAC decree, entered into by the Arizona Secretary of State, requires Arizona election officials to attempt to determine the state citizenship of State Form registrants who do not provide DPOC, and register them as full-ballot voters if their state citizenship can be validated.  *Mi Familia Vota*, 2024 WL 862406, at *3–4.  Perhaps Plaintiffs-Appellees' contention that these directives conflict with the election officials' obligations under § 16-121.01(C) is correct.  Perhaps not.  But their contention that this somehow binds the Arizona Legislature is clearly incorrect.

The notion that any action by a State executive-branch official may forever curtail a State legislature's lawmaking powers presents significant separation-of-powers concerns—concerns that even the district court realized constituted a "serious legal question."  For example, imagine a State's executive branch opposes a law passed by the Legislature; if a political ally sues challenging that law, the executive branch will be sorely tempted to settle the case by agreeing that the law is unenforceable.  It seems doubtful that the executive branch can circumvent legislative authority in that and similar ways.  And the Supreme Court has echoed this concern specifically with respect to consent decrees, recognizing that if they are not properly limited in scope, they have the potential to "improperly deprive future officials of their designated legislative and executive powers."  *Horne v. Flores*, 557 U.S. 433, 449–50 (2009) (simplified); *see also Roosevelt Irrigation Dist. v. Salt*

*River Project Agric. Improvement and Power Dist.*, 39 F. Supp. 3d 1051, 1055 (D.
Ariz. 2014) (explaining that "political subdivisions" of the State are not bound by
agreements or judgments to which the State is a party, absent specific language to
the contrary).

While these separation-of-powers concerns would apply to any restriction of
the Legislature's lawmaking powers, they're particularly alarming in the election-
law context, where State legislatures have express constitutional authority to act.
The Constitution provides that the "Times, Places, and Manner of holding
Elections . . . shall be prescribed in each State by the Legislature thereof."   U.S.
Const. art. I, § 4.   The Supreme Court has stressed that election regulation is a
legislative concern.  *See Moore v. Harper*, 600 U.S. 1, 10 (2023) (observing that the
"state legislatures" have the "'duty' to prescribe rules governing federal elections"
(simplified)); *see also Carson v. Simon,* 978 F.3d 1051, 1060 (8th Cir. 2020) ("[T]he
Secretary [of State] has no power to override the Minnesota Legislature" by
stipulating to the tabulation of absentee ballots received after Election Day.).

These separation-of-powers concerns are likely what animate the many cases
signifying that legislative acts must predominate over consent decrees, not the other
way around.  After all, consent decrees cannot be used to handcuff governments in
perpetuity.  As a general matter, consent decrees may need to give way to intervening
changes in law, including legislative enactments.  *See, e.g.*, *Rufo v. Inmates of Suffolk*

*Cnty. Jail*, 502 U.S. 367, 388 (1992) ("[A] consent decree must of course be modified
if . . . one or more of the obligations placed upon the parties has become
impermissible under federal law," and that modification may also be warranted
"when the statutory or decisional law has changed to make legal what the decree was
designed to prevent"); *Agostini v. Felton*, 521 U.S. 203, 215 (1997) (noting, in the
context of consent decrees, that "[t]he court cannot be required to disregard
significant changes in law . . . if it is satisfied that what it has been doing has been
turned through changed circumstances into an instrument of wrong" (simplified));
*League of Residential Neighborhood Advocates v. City of Los Angeles*, 498 F.3d
1052, 1055 (9th Cir. 2007) (observing that a consent decree "cannot be a means for
state officials to evade state law"); *Keith v. Volpe*, 118 F.3d 1386, 1393 (9th Cir.
1997) (explaining that parties to a consent decree "c[annot] agree to terms which
would exceed their authority and supplant state law"); *Imprisoned Citizens Union v.
Ridge*, 169 F.3d 178, 189 (3d Cir. 1999) (recognizing that subsequent legislative acts
can terminate consent decrees premised on a prior legislative act or lack of governing
legislative rules).  So when a change in statutory law conflicts with a consent decree,
we should ordinarily expect that the statute ought to be followed.

Especially because this motion is in emergency posture and requires rapid
adjudication, concern for the separation of powers—particularly in the context of
regulating elections—counsels against treating the LULAC decree as binding

against the Arizona Legislature's ability to set election parameters through § 16-121.01(C). This is reason enough to deny the motion, without even considering the many other arguments raised by Intervenor-Appellants for why the LULAC decree doesn't govern this case.

### ii. The NVRA does not preempt Arizona's DPOC requirement.

Because the LULAC decree offers no lawful basis for overriding Arizona's State Form, Plaintiffs-Appellees have to offer some alternative basis to defeat the motions panel's stay. Once again, Plaintiffs-Appellees fail to point to any argument satisfying our stringent standard for reconsideration. Instead, they offer an alternative holding of the district court (taking up less than three pages in a more than 100-page order)—that the NVRA preempts the State's otherwise valid authority in this area. Plaintiffs-Appellees' contention fails on the text of the NVRA and our precedent. In short, the NVRA does not preempt Arizona's DPOC requirement for State Forms.

Start with the NVRA's plain language. To demonstrate preemption a litigant must point to "a constitutional text or a federal statute t[hat] assert[s]" preemptive force. *Puerto Rico Dep't of Consumer Affs. v. Isla Petroleum Corp.*, 485 U.S. 495, 503 (1988); *see also Va. Uranium, Inc. v. Warren*, 587 U.S. 761, 767 (2019) (lead opinion of Gorsuch, J.) ("Invoking some brooding federal interest or appealing to a

11

judicial policy preference should never be enough to win preemption of a state law.").  So Congress's expressions are critical.

Plaintiffs-Appellees point to a few textual components of the NVRA to make their case.

To begin, the NVRA directs that "in the administration of voter registration for elections for Federal office, each State shall—. . . ensure that any eligible applicant is registered to vote in an election—. . . if the valid voter registration form of the applicant is" properly submitted, received, or accepted "not later than the lesser of 30 days, or the period provided by State law, before the date of the election." 52 U.S.C. § 20507(a)(1).  In short, if an eligible applicant timely submits a valid voter registration form for elections for federal office, the State must ensure that the applicant is registered to vote.

So what does a valid form look like?  States must "accept and use" the Federal Form created by the federal government "for the registration of voters in elections for Federal office."  *Id.* § 20505(a)(1).  At the same time, "[i]n addition to accepting and using the [federal] form" a State may also "develop and use" a State Form "that meets all of the criteria stated in section 20508(b) of this title for the registration of voters in elections for Federal office."  *Id.* § 20505(a)(2).

That then brings us to § 20508(b), which sets out the substantive standards for a State Form.  It "may require only such identifying information . . . and other

information . . . as is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process." *Id.* § 20508(b)(1). The State Form also "shall include a statement that—" (A) "specifies each eligibility requirement (including citizenship);" (B) "contains an attestation that the applicant meets each such requirement; and" (C) "requires the signature of the applicant, under penalty of perjury." *Id.* § 20508(b)(2).

So where does this leave us? Rather simply, "state-developed forms may require information the Federal Form does not." *ITCA*, 570 U.S. at 12. "States retain the flexibility to design and use their own registration forms, but the Federal Form provides a backstop: No matter what procedural hurdles a State's own form imposes, the Federal Form guarantees that a simple means of registering to vote in federal elections will be available." *Id.* Moreover, the Court has specifically recognized "Arizona's constitutional authority to establish qualifications (such as citizenship) for voting" and thus to obtain relevant information. *See id.* at 15–16. So "[s]ince the power to establish voting requirements is of little value without the power to enforce those requirements . . . it would raise serious constitutional doubts if a federal statute precluded a State from obtaining the information necessary to enforce its voter qualifications." *Id.* at 17.

Arizona has done exactly what the Court recognized as possible in *ITCA*. It has added a requirement to its own form to ensure its ability to verify citizenship. The district court nonetheless issued an injunction premised on a conflict between the NVRA and Arizona's proof-of-citizenship inquiry. Recall that § 20508(b)(1) requires any additional requirements to be "necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process." 52 U.S.C. § 20508(b)(1). To justify enjoining all applications of the law, the district court determined that Arizona's requirement was not "necessary." *Mi Familia Vota*, 2024 WL 862406, at *39. Why? Because the requirement applies to new applicants, but not to some other applicants. *Id.* ("The Court cannot reconcile why DPOR would be *necessary* for new applicants when an attestation is *sufficient* to determine the eligibility of registered voters who subsequently obtain an out-of-state identification."). That's it. Even though the NVRA itself identifies "citizenship" as an "eligibility requirement," § 20508(b)(2)(A), the district court was satisfied with its pithy rejoinder to Arizona's asserted interest. *Id.* Indeed, the district court provided no further explanation of why it thought information demonstrating citizenship was unnecessary. Given the deference we should give to States in this arena, this isn't sufficient without an affirmative showing that Arizona's law contradicts Congress's mandate.

The failure of the district court to justify its holding, beyond that cursory statement, would itself validate the motions panel's stay. But the motions panel did not need to rely only on the district court's lack of justification. Our Circuit has in fact *already resolved this question* under similar circumstances.

More than fifteen years ago, we considered, in another extraordinary posture, an Arizona requirement for proof of citizenship as part of the registration process. *Gonzalez v. Arizona*, 485 F.3d 1041, 1046 (9th Cir. 2007). And we could not have been clearer. There, plaintiffs again argued that Arizona law was "preempted by the NVRA because, they say, the NVRA prohibits states from requiring that registrants submit proof of citizenship when registering to vote." *Id.* at 1050. But, as we said then, "[t]he language of the statute does not prohibit documentation requirements." *Id.* "Indeed, the statute permits states to 'require such identifying information as is necessary to enable election officials to assess the eligibility of the applicant.'" *Id.* (simplified). We observed that the "NVRA clearly conditions eligibility to vote on United States citizenship" and it "plainly allow[s] states, at least to some extent, to require their citizens to present evidence of citizenship when registering to vote." *Id.* at 1050–51.

The district court's order cannot abrogate the plain import of *ITCA* and the even more specific reasoning in *Gonzalez*. At the very least, we shouldn't reconsider the motions panel's stay against the backdrop of those two precedents and decide

that the district court's injunction should be reinstated in full.  And Plaintiffs-Appellees' arguments otherwise are beside the point.  They rely on two out-of-circuit cases, one involving a different provision of the NVRA with a different standard, *Fish v. Kobach*, 840 F.3d 710 (10th Cir. 2016), and an Administrative Procedure Act case deferentially reviewing an administrative determination of necessity, *Kobach v. EAC*, 772 F.3d 1183 (10th Cir. 2014).  Neither detract from the principles of *ITCA*, our circuit's holding in *Gonzalez*, and the deficit of reasoning from the district court.

In the alternative, the district court noted, and now Plaintiffs-Appellees raise on reconsideration, that the NVRA might preempt the State Form under the limited circumstances when "public assistance agencies" distribute them.  *See Mi Familia Vota*, 2024 WL 862406, at *39 (citing 52 U.S.C. § 20506(a)(6)).  They rely on language stating that public assistance agencies must provide the Federal Form or "the office's own form if it is equivalent to the [federal] form."  *Id.* § 20506(a)(6)(A)(ii).  Taking that text in "context and with a view to [its] place in the overall statutory scheme," *King v. Burwell*, 576 U.S. 473, 486 (2015) (simplified), it is likely that "equivalent" is synonymous with a compliant State Form—one "that meets all of the criteria stated in section 20508(b) of this title for the registration of voters in elections for Federal office."  52 U.S.C. § 20505(a)(2).  Since the district court failed to provide a convincing reason why Arizona's proof-of-citizenship requirement fails the test in § 20508(b), there is little reason to think

it cannot also be distributed by public assistance agencies.  Again, at the very least, the argument is not so irrefutable that reconsideration is warranted.

In short, the deficit of reasoning to enjoin a state law justified the motions panel's stay.  Meanwhile, text and on-point precedent further support the motions panel's order.  To grant reconsideration under these circumstances is extraordinary.

### iii.  The Equal Protection Clause does not prevent Arizona from accepting two different registration forms.

Plaintiffs-Appellees also assert that the partial stay was improper because § 16-121.01(C) violates the Equal Protection Clause of the Fourteenth Amendment. They argue that by rejecting State Forms without DPOC, but accepting Federal Forms without DPOC, Arizona treats similarly situated voters in an "arbitrary and disparate" way.

Plaintiffs-Appellees' invoke *Bush v. Gore*, 531 U.S. 98 (2000), to support their argument.  But that doesn't work.  *Bush v. Gore*, which the Supreme Court recognized was "limited to the present circumstances," gives little guidance here. *Id.* at 109.  And it's easy to see why.  *Bush v. Gore* prohibits courts from imposing different standards for counting ballots across a State.  *Id.*  That has little to do with whether a state election official can accept two kinds of registration forms.

But more generally, accepting the argument would violate our system of federalism in general and the division of authorities between federal and state governments over election matters in particular.  The Constitution itself envisions

different sets of rules for federal and state elections.  Indeed, neither the Elections Clause nor the Electors Clause gives Congress authority to regulate state election procedures.  This reflects the Supreme Court's understanding as well.  The Court has made clear that "States retain the flexibility to design and use their own registration forms" and that "[t]hese state-developed forms may require information the Federal Form does not."  *ITCA*, 570 U.S. at 12.  Nowhere did the Court suggest that the bare existence of differences between the State and Federal Forms' requirements could give rise to an equal protection challenge.  So this argument fails as a basis to reconsider the stay on an expedited basis.

### b.  Irreparable Harm

To start with, the degree of irreparable harm that Intervenor-Appellants Toma and Peterson ("Legislative Leaders") must demonstrate to succeed is lessened because of their high likelihood of success.  When considering whether the party seeking the stay will be irreparably harmed by the injunction, our court takes a sliding-scale approach to the analysis.  *Nat. Res. Def. Council, Inc. v. Winter*, 502 F.3d 859, 862 (9th Cir. 2007) (observing that the likelihood of success and irreparable harm "represent two points on a sliding scale").  "[T]he required degree of irreparable harm increases as the probability of success decreases."  *Manrique v. Kolc*, 65 F.4th 1037, 1041 (9th Cir. 2023).  The inverse is also true.  With high

18

probabilities of success—as is the case here—the degree of irreparable harm that must be shown is lower.

But under any standard, the irreparable harm to the Legislative Leaders is obvious.  By failing to stay the district court's injunction with respect to § 16-121.01(C), the Arizona Legislature, which the Legislative Leaders head, would suffer irreparable harm by the non-enforcement of a constitutional legislative enactment.  Generally speaking, "*any* time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."  *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers) (emphasis added).  When the legislative act in question touches a prerogative that is "primarily the duty and responsibility of the State" (such as regulating the manner of elections), "federal-court review" of such "legislation represents a serious intrusion on the most vital of local functions."  *Abbott v. Perez*, 585 U.S. 579, 603 (2018) (simplified).  So long as the enacted legislation is constitutional and within the authority of the legislature, an "injunction[] barring the State from conducting this year's elections pursuant to a statute enacted by the Legislature . . . would seriously and irreparably harm the State."  *Id*. at 602; *see also Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers).  That is the precise effect of the injunction here—it bars the State

19

from enforcing a statute enacted by the Arizona Legislature, meaning the Legislative Leaders will suffer irreparable harm.

Plaintiffs-Appellees assert that the Legislative Leaders are not the State and thus lack the authority to allege an irreparable harm to the State's sovereign interests. That's not the case.  Begin with state law.  *See Berger v. N.C. State Conf. of the NAACP*, 597 U.S. 179, 191 (2022) (explaining that courts must always respect "a State's chosen means of diffusing its sovereign powers among various branches and officials").  Arizona law grants the Legislative Leaders authority to contest an injunction suspending the Legislature's enactments.  *See* Ariz. Rev. Stat. § 12-1841. Under the law, the Legislative Leaders are "entitled to be heard" in proceedings implicating the constitutionality of a state law and "may intervene as a party" or "file briefs in the matter. *Id.* § 12-1841(A), (D); *see, e.g.*, *Arizonans for Fair Elections v. Hobbs*, 335 F.R.D. 269, 274 (D. Ariz. 2020) ("[T]here is some force to the argument that, at least under Arizona law, the House Speaker and Senate President possess a unique stature that resembles that of the Attorney General[.]"); *see also Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 800 (2015) (observing that the Arizona Legislature had Article III standing to seek redress for injuries); *Forty-Seventh Legislature v. Napolitano*, 143 P.3d 1023, 1028 (Ariz. 2006) (en banc) ("[T]he Legislature has alleged a direct institutional injury and has standing").  Given all this, the Legislative Leaders may assert irreparable harm on

20

behalf of the State.  At the very least, it would be surprising to hold in this truncated proceeding—for the first time—that the Arizona House Speaker and Arizona Senate President lack the ability to assert injury in federal cases on behalf of the State.

### c.  Public Interest/Balance of Equities

Finally, the joint balance-of-interests factor favors the Intervenor-Appellants. It is well-established that "[s]tates have 'an interest in protecting the integrity, fairness, and efficiency of their ballots and election processes.'" *Mi Familia Vota v. Hobbs*, 977 F.3d 948, 954 (9th Cir. 2020) (quoting *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 364 (1997)).  Equally fundamental is "a state's interest in running its elections without judicial interference." *League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 32 F.4th 1363, 1372 (11th Cir. 2022) (citing *Merrill v. Milligan*, 142 S. Ct. 879, 881 (2022) (Kavanaugh, J., concurral)).  This interest is strengthened by the *Purcell* doctrine, which "heightens the showing necessary . . . to overcome the State's extraordinarily strong interest in avoiding late, judicially imposed changes to its election laws and procedures." *Merrill*, 142 S. Ct. at 881 (Kavanaugh, J., concurral).

Plaintiffs-Appellees are quick to point out that *Purcell* cuts against Intervenor-Appellants here because § 16-121.01(C) was not enforced *before* the district court's injunction.  So, they claim, the stay of the injunction is what constitutes "late, judicially imposed changes" to Arizona's election laws and procedures.  But this

argument backs into self-contradiction.  If the status quo was the voluntary non-enforcement of § 16-121.01(C) without any court order, then the partial stay of the injunction doesn't cause them any injury.  It presumably would just return to the status quo before the district court's injunction.

But even so, *Purcell* does not help Plaintiffs-Appellees.  As Justice Kavanaugh observed, "[c]orrecting an erroneous lower court injunction of a state election law does not itself constitute a *Purcell* problem."  *Id.* at 882 n.3.  Indeed, the argument to the contrary "defies common sense and would turn *Purcell* on its head."  *DNC v. Wis. State Legis.*, 141 S. Ct. 28, 31 (2020) (Kavanaugh, J., concurral).  While we give some deference to district courts, in our judicial system, we do not give them the last word.  *Purcell* thus doesn't prevent us from correcting the district court's erroneous injunction.

And Plaintiffs-Appellees do not demonstrate a countervailing interest that could challenge the State's interest to protect the integrity of its elections free from judicial interference.  The district court found no "'concrete evidence' to corroborate that [Arizona's DPOC requirement] will in fact impede any qualified voter from registering to vote or staying on the voter rolls," *Mi Familia Vota*, 2024 WL 862406 at *49 (quoting *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 201 (2008)), nor any evidence that Arizona's election-law statutes "impose an excessive burden on any specific subgroup of voters," *id.* at *51.

The balance of interests favors Intervenor-Appellants.

## IV.     Conclusion

With the political nature of this case, we should be *especially* careful to avoid the use of unconventional or disfavored procedures.  In my mind, that concern alone should have been enough to deny Plaintiffs-Appellees' motion for reconsideration. But even so, the motions panel got the answer right.  Intervenor-Appellants make a compelling showing of all the *Nken* factors, and so that panel's partial stay of the district court's injunction should stand.

For these reasons, I respectfully dissent from the grant of the motion for reconsideration.